SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
D.J. Baker (DB 0085)

KING & SPALDING LLP
191 Peachtree Street
Atlanta, Georgia 30303
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Sarah Robinson Borders

Proposed Attorneys for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11** |
| | : | |
| **WINN-DIXIE STORES, INC., <u>et al.</u>,** | : | **Case No. 05-11063** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------x

## APPLICATION FOR AUTHORITY TO RETAIN
## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AS
## <u>LEAD RESTRUCTURING AND BANKRUPTCY COUNSEL TO THE DEBTORS</u>

Winn-Dixie Stores, Inc. and its debtor affiliates,[1] as debtors and debtors-in-possession

(collectively, the "Debtors"), respectfully represent:

---

[1]     In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

**Background**

1.      The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on February 21, 2005 (the "Petition Date").

2.      The Debtors will continue in possession of their property and will operate and manage their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed in these cases.

4.      This Court has jurisdiction over this Application under 28 U.S.C. § 1334.  Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

**A.      Company Background.**

5.      The Debtors are grocery and drug retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  According to published reports, the Debtors are the eighth-largest food retailer in the United States and one of the largest in the Southeast.  The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion.  The Debtors currently operate more than 900 stores in the United States.  Substantially all of the Debtors' store locations are leased rather than owned.

6.      The Debtors employ nearly 79,000 associates, of whom approximately 33,000 are employed on a full-time basis and 46,000 on a part-time basis.

7.      The Debtors operate in a highly competitive supermarket industry that is generally characterized by intense competition and narrow profit margins.  The Debtors compete

directly with national, regional, and local supermarket chains and independent supermarkets, as well as with Wal-Mart, similar supercenters, and other non-traditional grocery retailers such as dollar discount stores, drug stores, convenience stores, warehouse club stores, and conventional department stores.

**B.      Capital Structure**

8.      The Debtors' primary secured obligations arise under a Second Amended and Restated Credit Agreement dated June 29, 2004, with Wachovia Bank, N.A., as administrative agent; GMAC Commercial Finance LLC, as syndication agent; Wells Fargo Foothill, LLC, General Electric Capital Corporation, and The CIT Group/Business Credit, Inc., as co-documentation agents; Wachovia Bank, N.A., as successor by merger to Congress Financial Corporation (Florida), as collateral monitoring agent; and the several lenders from time to time party thereto (as amended, the "Credit Agreement").

9.      The Debtors' maximum borrowing capacity under the Credit Agreement totals $600 million.  Beginning on September 22, 2004, the Debtors failed to meet a financial test under the Credit Agreement that limited the amount available for borrowings; however, the Debtors obtained a waiver of this financial test on February 9, 2005.  The waiver requires that the Debtors perfect the lenders' security interest in assets with a requisite value on or before March 31, 2005.  The waiver expires on June 29, 2005.

10.      The Credit Agreement provides for revolving loans and the issuance of letters of credit.  It is secured by substantially all of the personal property and owned real property of the Debtors that are parties thereto.  As of the Petition Date, the Debtors were liable for obligations under the Credit Agreement in the aggregate amount of approximately $427 million.  The

Debtors are seeking authority to refinance their obligations under the Credit Agreement pursuant to a debtor-in-possession financing facility provided by Wachovia Bank, N.A. and other lenders.

11.     Certain of the Debtors are parties to an Indenture with Wilmington Trust Company dated December 26, 2000 (as amended and supplemented, the "Indenture"). Pursuant to the Indenture, Debtor Winn-Dixie Stores, Inc. issued $300 million in principal amount of Senior Notes bearing interest at 8.875% per annum, and certain other Debtors guaranteed the Senior Notes. The Senior Notes mature in 2008 and require semi-annual interest-only payments until maturity. The Senior Notes are unsecured obligations that are *pari passu* with most of the Debtors' other unsecured obligations, which generally consist of trade debt, contract and lease obligations (including possible rejection damages), employee obligations, and litigation claims.

12.     Parent company Winn-Dixie Stores, Inc. is publicly owned, and its common stock has been traded on the New York Stock Exchange since 1952 under the ticker symbol WIN. All of the other Debtors are direct and indirect subsidiaries of Winn-Dixie Stores, Inc.

**C.     Events Leading to the Debtors' Chapter 11 Cases.**

13.     In January 2004, the Debtors announced a series of actions designed to improve their competitive position (the "Strategic Plan"). The Strategic Plan included (a) a review of business strategies and marketing programs, (b) an expense reduction plan designed to achieve a $100 million annual expense reduction, (c) a market positioning review through which markets will be identified as either core, and positioned for future investment and growth, or non-core, and evaluated for sale or closure, (d) an image makeover program targeting approximately 700 stores for facilities improvement, and (e) a process re-engineering initiative that is intended to enhance organizational effectiveness and company business initiatives.

14.     As part of the Strategic Plan, the Debtors committed to focus on a core base of stores across 36 designated marketing areas in the United States.  The Debtors decided to exit 156 stores, exit three distribution centers, sell or close four manufacturing plants, and consolidate two dairy operations.  Of these facilities, the Debtors exited 135 stores, three distribution centers, and three manufacturing plants between April 2004 and the Petition Date.

15.     Despite the implementation of the Strategic Plan, during the remainder of 2004, the Debtors continued to experience significant sales declines and market-share losses.  The Debtors' financial performance was affected not only by operating losses but also by ongoing obligations relating to a significant number of store locations where the Debtors no longer operate.  The Debtors are seeking authority to reject a substantial number of the leases relating to these stores, effective immediately.

16.     In part in anticipation of the 2004 holiday season, the Debtors increased their purchasing activities in October and November.  When holiday sales were lower than expected, the Debtors experienced higher-than-anticipated inventory levels and lower-than-anticipated accounts payable, resulting in increased borrowings under the Credit Agreement and reduced liquidity.

17.     On February 10, 2005, the Debtors announced that during their first and second fiscal quarters ending on January 12, 2005, the Debtors incurred losses in the amount of $552.8 million, or $3.93 per share of common stock.  The Debtors also announced that for their second fiscal quarter, identical-store sales declined by 4.9% as compared to the second quarter of the prior year.

18.     The Debtors' financial results and decrease in liquidity, coupled with downgrades by Moody's Investor Services and Standard & Poor's Rating Services, as well as negative press

coverage, led a number of the Debtors' trade creditors to demand shorter payment terms. Since

the announcement of the Debtors' financial results on February 10, 2005, the Debtors have

experienced a reduction in vendor and other credit by more than $130 million. As a result, the

Debtors have been forced to conclude, after consultation with their advisors, that their interests

and the interests of their creditors, employees, and customers will be best served by a

reorganization under Chapter 11 of the Bankruptcy Code.

19.     As part of their restructuring under Chapter 11, the Debtors, led by a chief

executive officer hired in December 2004, intend to implement further asset rationalization and

expense reduction plans and to utilize new sales initiatives to improve the Debtors' brand image

and competitive position, with the goal of improving their operations and financial performance

and strengthening their business for the benefit of creditors, customers, employees, and the

communities in which the Debtors operate.

### Relief Requested

20.     By this Application, the Debtors request entry of an order pursuant to Sections

327(a) and 329 of the Bankruptcy Code, approving the retention of Skadden, Arps, Slate,

Meagher & Flom LLP ("Skadden, Arps") as lead restructuring and bankruptcy counsel to the

Debtors during these cases. The Debtors request that Skadden, Arps be retained to perform the

services described in this Application on the terms set forth herein.

### Basis for Relief

A.      **Selection of Skadden, Arps.**

21.     As noted above, the Debtors have suffered from recent financial difficulties. In

recognition that these difficulties might require the filing of petitions for reorganization relief

under Chapter 11 of the Bankruptcy Code, the Debtors retained Skadden, Arps to provide legal

advice and to serve as lead restructuring and bankruptcy counsel in conjunction with the firm of King & Spalding LLP ("King & Spalding"), the Debtors' proposed bankruptcy co-counsel and general corporate counsel.   Skadden, Arps began providing restructuring and bankruptcy services to the Debtors on February 2, 2005 and the Debtors believe that their continued representation by Skadden, Arps in these cases is critical to the success of the Debtors' reorganization efforts.

22.     The Debtors selected the firm of Skadden, Arps to serve as lead bankruptcy counsel in these cases because of the firm's recognized expertise in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.  The Debtors further desire to employ the firm of Skadden, Arps because of the resources it has available to devote to the extensive legal services that will be required in connection with these cases.

23.     The Debtors have also selected and are, by separate application, seeking to employ King & Spalding to serve as bankruptcy co-counsel during these cases with respect to specific matters as described in such application, as well as to continue to render non-bankruptcy services in the areas of litigation, antitrust matters, environmental matters, general corporate matters, ERISA and other employee benefits matters, securities law and SEC-related matters, and finance and finance-related matters and transactions.  Skadden, Arps will advise and consult with the Debtors through the pendency of these cases as to the division of responsibilities and the coordination of efforts with King & Spalding to accomplish a speedy, successful, and cost-effective reorganization, without unnecessary duplication of legal services.  Each of Skadden, Arps and King & Spalding will have separate areas of responsibility that reflect their respective roles in the Debtors' cases and that recognize, where appropriate, their historical knowledge of

the Debtors' affairs and their respective proximities to the Debtors, the Court, and significant parties in interest in these cases.

**B.    Services to be Rendered.**

24.    The employment of Skadden, Arps under a general retainer is necessary to assist the Debtors in executing faithfully their duties as debtors-in-possession and implementing the reorganization of the Debtors' financial affairs.  Subject to further order of this Court, and subject to an appropriate allocation of responsibilities between Skadden, Arps and King & Spalding, as discussed above and as more particularly detailed in the separate application relating to King & Spalding, Skadden, Arps will be required to render, among others, the following services to the Debtors:

(a)    advise the Debtors with respect to their powers and duties as debtors and debtors-in-possession in the continued management and operation of their businesses and properties;

(b)    attend meetings and negotiate with representatives of creditors and other parties in interest and advise and consult on the conduct of these cases, including all of the legal and administrative requirements of operating in Chapter 11;

(c)    take all necessary actions to protect and preserve the Debtors' estates, including the prosecution of actions on their behalf, the defense of any actions commenced against their estates, negotiations concerning all litigation in which the Debtors may be involved and objections to claims filed against the estates;

(d)    prepare on behalf of the Debtors all motions, applications, answers, orders, reports and papers necessary to the administration of the estates;

(e)    negotiate and prepare on the Debtors' behalf plan(s) of reorganization, disclosure statement(s) and all related agreements and/or documents and take any necessary action on behalf of the Debtors to obtain confirmation of such plan(s);

(f)    advise the Debtors in connection with any sale of assets;

(g)    appear before this Court, any appellate courts, and the United States Trustee, and protect the interests of the Debtors' estates before such courts and the United States Trustee; and

(h)    perform all other necessary legal services and provide all other necessary legal advice to the Debtors in connection with these Chapter 11 cases.

25.    Notwithstanding the generality of the foregoing, Skadden, Arps will not duplicate efforts with respect to the separate matters assigned to King & Spalding, which include, as more particularly detailed in the separate application for King & Spalding, customer issues, trust fund and consignment issues, professional compensation and retention issues, utilities issues, non-bankruptcy litigation issues, insurance and workers compensation issues, governmental tax, fee and fine issues, and environmental issues, unless specifically requested to do so by the Debtors because of a conflict on the part of King & Spalding that necessitates that Skadden, Arps act as conflicts counsel or other exigencies as determined by the Debtors.

26.    It is necessary and essential that the Debtors, as debtors-in-possession, employ attorneys under a general retainer to render the foregoing professional services.

27.    Subject to the Court's approval of this Application, Skadden, Arps has indicated a willingness to serve as the Debtors' counsel and to perform the services described above.

**C.    Disinterestedness of Professionals.**

28.    To the best of the Debtors' knowledge, except as set forth herein and in the Declaration of D. J. Baker and Disclosure of Compensation (the "Baker Declaration") attached hereto as Exhibit A, the members, counsel and associates of the firm of Skadden, Arps (a) do not have any connection with any of the Debtors, their affiliates, their creditors or any other party in interest, or their respective attorneys and accountants, the United States Trustee or any person employed thereby, (b) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code, and (c) do not hold or represent any interest adverse to the estates.

29.    As set forth in the Baker Declaration:

(a)    Neither Skadden, Arps nor any attorney at the firm holds or represents an interest adverse to the Debtors' estates.

(b)      Neither Skadden, Arps nor any attorney at the firm is or was a creditor, an equity security holder or an insider of the Debtors, except as disclosed in the Baker Declaration, and Skadden, Arps previously has rendered legal services to the Debtors for which it has been compensated.

(c)      Neither Skadden, Arps nor any attorney at the firm is or was an investment banker for any outstanding security of the Debtors.

(d)      Neither Skadden, Arps nor any attorney at the firm is or was, within three years before the Petition Date, an investment banker for a security of the Debtors, or an attorney for an investment banker in connection with the offer, sale or issuance of any security of the Debtors, except as disclosed in the Baker Declaration.

(e)      Neither Skadden, Arps nor any attorney at the firm is or was, within two years before the Petition Date, a director, officer or employee of the Debtors or of an investment banker of the Debtors, except as disclosed in the Baker Declaration.

(f)      Skadden, Arps does not have an interest materially adverse to the interest of the estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in the Debtors or an investment banker specified in the foregoing paragraphs, or for any other reason.

30.      Skadden, Arps has informed the Debtors that Adlai S. Hardin III, an associate at the firm, is the son of Judge Adlai Hardin and that, to the best of the firm's knowledge, no other attorney at Skadden, Arps has any connection with (a) any United States District Judge or United States Bankruptcy Judge for the Southern District of New York or (b) the United States Trustee for such district or to any known employee in the office thereof.

**D.      Professional Fees and Expenses.**

31.      The Debtors' retention of Skadden, Arps is evidenced by an engagement agreement dated February 7, 2005 (the "Engagement Agreement"), which provides for the Debtors' representation by Skadden, Arps in connection with the Debtors' efforts to restructure their businesses.  The Engagement Agreement is included as <u>Attachment 1</u> to the Baker Declaration.

32.      Skadden, Arps' fees for professional services are based upon its standard hourly rates, which are periodically adjusted.  Under the Engagement Agreement, Skadden, Arps and

the Debtors have agreed that Skadden, Arps' bundled rate structure will apply to these cases and, therefore, Skadden, Arps will not be seeking to be separately compensated for certain staff, clerical and resource charges.  Presently, the hourly rates under the bundled rate structure range from $540 to $825 for partners, $535 to $640 for counsel, $265 to $495 for associates and $90 to $195 for legal assistants and support staff.   The Debtors are advised that the hourly rates set forth above are subject to periodic increases in the normal course of the firm's business, often due to the increased experience of a particular professional.

33.     Consistent with the firm's policy with respect to its other clients, Skadden, Arps will continue to charge the Debtors for all other services provided and for other charges and disbursements incurred in the rendition of services.  These charges and disbursements include, among other things, costs for telephone charges, photocopying, travel, business meals, computerized research, messengers, couriers, postage, witness fees, and other fees related to trials and hearings.  Charges and disbursements are invoiced pursuant to Skadden, Arps' Policy Statement Concerning Charges and Disbursements, which is included as an attachment to the Baker Declaration, except that copying costs will be charged at $0.10 per page, computerized research and telephone calls will be billed at provider cost without reference to Skadden, Arps' internal capital costs or overhead, and document production (including secretarial and word processing time), facsimile services, proofreading, overtime meals, and overtime travel allowances will not be charged for separately on an incurrence basis but are included within the bundled rate structure.

34.     Pursuant to the retainer provisions of the Engagement Agreement, the Debtors paid an initial retainer amount of $500,000 (the "Retainer") for professional services rendered or to be rendered and expenses incurred or to be incurred by Skadden, Arps on behalf of the

Debtors, with the understanding that any amount remaining after payment of prepetition fees and expenses would be held by Skadden, Arps as a postpetition retainer and applied to the final bill in these cases.

35.     As of the Petition Date, based upon prepetition fees and expenses that have been identified and accounted for or estimated as of the date hereof, and assuming application of all such fees and expenses against the Retainer, Skadden, Arps had approximately $500,000 remaining in the Retainer.  Those remaining retainer funds will be applied by Skadden, Arps to pay prepetition fees and costs that are subsequently identified and accounted for.  Any balance existing after all such applications will be treated as a postpetition retainer and applied to the final bill in these cases as allowed by the Court.  In the event of a deficiency in the Retainer after application to prepetition fees and expenses, Skadden, Arps has agreed to waive any resulting prepetition claim against the Debtors.

36.     Skadden, Arps intends to apply to the Court for allowance of compensation for professional services rendered and reimbursement of expenses incurred in these Chapter 11 cases in accordance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court for the Southern District of New York and the orders of this Court.  Skadden, Arps will seek compensation for the services of each attorney and paraprofessional acting on behalf of the Debtors in these cases at the then-current standard rates charged for such services on non-bankruptcy matters as referenced above.

37.     Skadden, Arps has agreed to accept as compensation such sums as may be allowed by the Court on the basis of the professional time spent, the rates charged for such services, the necessity of such services to the administration of the estates, the reasonableness of

the time within which the services were performed in relation to the results achieved, and the complexity, importance, and nature of the problems, issues or tasks addressed in these cases.

38.     Other than as set forth above and in the Baker Declaration, no arrangement is proposed between the Debtors and Skadden, Arps for compensation to be paid in these cases.

**Notice**

39.     Notice of this Application has been provided to the Office of the United States Trustee, counsel for Wachovia Bank, N.A., as agent for the Debtors' secured lenders, the indenture trustee for the Debtors' noteholders, and the Debtors' fifty (50) largest unsecured creditors.  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

**Waiver of Memorandum of Law**

40.     Pursuant to Local Bankruptcy Rule 9013-1(b) for the Southern District of New York, because there are no novel issues of law presented herein, the Debtors respectfully request that the Court waive the requirement that the Debtors file a memorandum of law in support of this Application.

WHEREFORE the Debtors respectfully request that this Court:

(a)     enter an order pursuant to Section 327(a) and 329 of the Bankruptcy Code
        authorizing the Debtors to employ Skadden, Arps as their lead restructuring and
        bankruptcy counsel during these cases; and

(b)     grant the Debtors such other and further relief as is just and proper.

Dated:  February 21, 2005
        New York, New York

Respectfully submitted,

WINN-DIXIE STORES, INC.
and its debtor affiliates

By: /s/ *Bennett Nussbaum*
     Bennett Nussbaum
     Senior Vice President and
     Chief Financial Officer

**Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
In re                                :
                                     :          Chapter 11
                                     :
WINN-DIXIE STORES, INC., et al.,     :          Case No. 05-11063
                                     :
                Debtors.             :          (Jointly Administered)
                                     :
------------------------------------------------------------x
```

**DECLARATION OF D. J. BAKER**
**AND DISCLOSURE OF COMPENSATION**

I, D. J. Baker, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am a member of the firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps" or the "Firm"), which maintains offices, among others, for the practice of law at Four Times Square, New York, New York 10036-6522.  I submit this declaration and statement pursuant to 11 U.S.C. §§ 327 and 329 and Fed. R. Bankr. P. 2014 and 2016 in support of the Application for Authority to Retain Skadden, Arps, Slate, Meagher & Flom LLP as Lead Restructuring and Bankruptcy Counsel to the Debtors (the "Application"), filed contemporaneously herewith by Winn-Dixie Stores, Inc. and certain of its subsidiaries, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"). Except as otherwise indicated, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.[1]

---

[1]      Certain of the disclosures herein relate to matters within the knowledge of other attorneys at Skadden, Arps and are based on information provided by them.

**Qualification of Professionals**

2.      As of February 2, 2005, I and other attorneys at Skadden, Arps, began performing legal work for the Debtors in connection with their efforts to restructure their financial obligations and businesses.[2]  Such legal work included preparations for, and the filing of, the Debtors' Chapter 11 petitions and various motions for necessary "first-day" operational and administrative relief.

3.      Skadden, Arps believes it has assembled a highly-qualified team of attorneys to service the Debtors during their reorganization efforts.  I am a member of the Firm's corporate restructuring department.  I will coordinate the firm's representation of the Debtors in these cases.  I have over thirty years of experience in complex reorganization cases, including lead debtor representations in the Chapter 11 cases of, among others, Circle K, FiberMark, FoxMeyer, GenTek, Global Marine, MCorp, RCN,  Safety-Kleen and Sterling Chemicals Holdings. Additionally, I have been identified as a leading restructuring attorney in each of "Chambers Global: The World's Leading Lawyers 2004-2005," Euromoney Publication's "Best of the Best 2004," and Legal Media Group's "2004 Guide to the World's Leading Insolvency and Restructuring Lawyers" and have been repeatedly listed in "The Best Lawyers in America" and named by "Turnarounds & Workouts" as one of the outstanding reorganization lawyers in America.

4.      Due to its work during the prepetition period, Skadden, Arps has become familiar with the Debtors' capital structure, financing documents and other material agreements.

---

[2]      Skadden, Arps has, in the past, provided legal services to Winn-Dixie Stores, Inc., one of the Debtors in these cases, in connection with certain matters.

Additionally, Skadden, Arps is familiar with the Debtors' business affairs and many of the potential legal issues that may arise in the context of the Debtors' Chapter 11 cases.  I believe that Skadden, Arps is well positioned to provide the Debtors with the type of legal services they will require as debtors-in-possession.

**Services to be Rendered**

5.        In addition to Skadden, Arps, the Debtors have also selected and are, by separate application, seeking to employ the firm of King & Spalding LLP ("King & Spalding") as their bankruptcy co-counsel during these cases with respect to specific matters as described in such application, as well as to continue to render non-bankruptcy services in the areas of litigation, antitrust matters, environmental matters, general corporate matters, ERISA and other employee benefits matters, securities law and SEC-related matters, and finance and finance-related matters and transactions.  Skadden, Arps will advise and consult with the Debtors through the pendency of these cases as to the division of responsibilities and the coordination of efforts with King & Spalding to accomplish a speedy, successful, and cost-effective reorganization, without unnecessary duplication of legal services.  Each of Skadden, Arps and King & Spalding will have separate areas of responsibility that reflect their respective roles in the Debtors' cases and that recognize, where appropriate, their historical knowledge of the Debtors' affairs and their respective proximities to the Debtors, the Court, and significant parties in interest in these cases.

6.        Subject to an allocation of responsibilities with King & Spalding, the Debtors' proposed bankruptcy co-counsel and general corporate counsel, as discussed above and as more particularly detailed in the separate application relating to King & Spalding, the Debtors have requested that Skadden, Arps render the following services in connection with these cases:

(a)    advise the Debtors with respect to their powers and duties as debtors and debtors-in-possession in the continued management and operation of their businesses and properties;

(b)    attend meetings and negotiate with representatives of creditors and other parties in interest and advise and consult on the conduct of these cases, including all of the legal and administrative requirements of operating in Chapter 11;

(c)    take all necessary actions to protect and preserve the Debtors' estates, including the prosecution of actions on their behalf, the defense of any actions commenced against their estates, negotiations concerning all litigation in which the Debtors may be involved and objections to claims filed against the estates;

(d)    prepare on behalf of the Debtors all motions, applications, answers, orders, reports and papers necessary to the administration of the estates;

(e)    negotiate and prepare on the Debtors' behalf plan(s) of reorganization, disclosure statement(s) and all related agreements and/or documents and take any necessary action on behalf of the Debtors to obtain confirmation of such plan(s);

(f)    advise the Debtors in connection with any sale of assets;

(g)    appear before this Court, any appellate courts, and the United States Trustee, and protect the interests of the Debtors' estates before such courts and the United States Trustee; and

(h)    perform all other necessary legal services and provide all other necessary legal advice to the Debtors in connection with these Chapter 11 cases.

7.    Notwithstanding the generality of the foregoing, Skadden, Arps will not duplicate efforts with respect to the separate matters assigned to King & Spalding, which include, as more particularly detailed in the separate application for King & Spalding, customer issues, trust fund and consignment issues, professional compensation and retention issues, utilities issues, non-bankruptcy litigation issues, insurance and workers compensation issues, governmental tax, fee and fine issues, and environmental issues, unless specifically requested to do by the Debtors because of a conflict on the part of King & Spalding that necessitates that Skadden, Arps act as conflicts counsel or other exigencies as determined by the Debtors.

8.      Subject to this Court's approval of the Application, Skadden, Arps is willing to serve as the Debtors' counsel and to perform the services described above.

### Disinterestedness of Professionals

9.      To the best of my knowledge, and except as otherwise set forth herein, the members, counsel and associates of Skadden, Arps (a) do not have any connection with the Debtors, their affiliates, their creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee or any person employed in the Office of the United States Trustee, (b) are "disinterested persons," as that term is defined in section 101(14) of the Bankruptcy Code, and (c) do not hold or represent any interest adverse to the estates.

10.      Skadden, Arps has represented, currently represents and in the future likely will represent certain creditors of the Debtors and other parties in interest in matters unrelated to the Debtors, their reorganization cases or such parties' claims against or interests in the Debtors. Prior to the commencement of these cases, Skadden, Arps conducted a "conflict check" with respect to the following categories of entities or individuals (the "Identified Parties"), as identified by the Debtors or as ascertained from a review of available documents:[3]

        (a)      the Debtors;

        (b)      the Debtors' non-filing affiliates;

        (c)      the Debtors' directors and officers;

        (d)      professionals representing the Debtors;

        (e)      the Debtors' secured creditors;

        (f)      the indenture trustee, underwriter, and known holders of the Debtors' senior notes;

---

[3]      The identification and classification herein of various entities or individuals as falling within certain categories (e.g., "secured creditor," etc.) is not intended and should not be deemed to be an admission of the legal rights or status of any particular individual or entity.

(g)     the transfer agents for the Debtors and the Debtors' non-filing affiliates;

(h)     the Debtors' top 50 unsecured trade creditors identified as of February 17, 2005;

(i)     the Debtors' known shareholders;

(j)     the Debtors' lessors;

(k)     the Debtors' insurance providers;

(l)     banks at which the Debtors maintain accounts;

(m)     certain parties to litigation involving the Debtors;

(n)     parties that have filed UCC financing statements against the Debtors;

(o)     the Debtors' competitors;

(p)     the Debtors' closed store subtenants;

(q)     the Debtors' software providers;

(r)     certain parties to miscellaneous contracts and/or real and personal property leases with the Debtors;

(s)     certain identified entities possessing other relationships to the Debtors; and

(t)     the United States Trustee, the United States District Court Judges and the United States Bankruptcy Judges for this District.

11.     Skadden, Arps' "conflict check" with respect to the Identified Parties has revealed that it currently represents, or has represented, the following entities or individuals, or entities or individuals that are affiliates of the following entities or individuals, in matters unrelated to the Debtors, their reorganization cases or such entities' claims against or interests in the Debtors:

(a)     <u>Debtors' Professionals</u>: The Blackstone Group, L.P. and KPMG LLP.

(b)     <u>Debtors' Secured Creditors</u>: Amsouth Bank, a lender under the Debtors' prepetition credit agreement; Bank One a lender under the Debtors' prepetition credit agreement; the CIT Group/Business Credit, Inc., a co-documentation agent under the Debtors' prepetition credit agreement; Congress Financial Corporation (Florida), the collateral monitoring agent under the Debtors' prepetition credit agreement; Fleet Retail Group, a

lender under the Debtors' prepetition credit agreement; General Electric Capital Corporation, a co-documentation agent under the Debtors' prepetition credit agreement; GMAC Commercial Finance LLC, the syndication agent under the Debtors' prepetition credit agreement; Lutheran Brotherhood, the holder of a mortgage lien on that property located at 7840 W. Irlo Bronson Highway, Kissimmee, Florida; Merrill Lynch Capital, a lender under the Debtors' prepetition credit agreement; PNC Business Credit, a lender under the Debtors' prepetition credit agreement; Suntrust Bank, a lender under the Debtors' prepetition credit agreement; UBS AG, Stamford Branch, a lender under the Debtors' prepetition credit agreement; Wachovia Bank, National Association, the administrative agent, issuer, and swing line lender under the Debtors' prepetition credit agreement; Wachovia Capital Markets, LLC, the arranger under the Debtors' prepetition credit agreement; and Wells Fargo Foothill, LLC, a co-documentation agent under the Debtors' prepetition credit agreement.

(c)     <u>Known Holders of Debtors' Senior Notes</u>: American Funds; American Memorial Life Insurance Co.; Assurant Inc.; Capital Research and Management Company; Columbia Management Advisors; Credit Suisse Asset Management Ltd.; Credit Suisse FS High Yield Bond; Credit Suisse High Yield Bond Fund; First Fortis Life Insurance Company; Fortis Benefits Insurance Company; Fortis Group; Fortis Insurance Company; IMS Capital Management; IMS Strategic Income Fund; Liberty Funds Distributor, Inc.; Prudential Investments Fund Management LLC; Securities Management and Research, Inc.; and The Vanguard Group.

(d)     <u>Debtors' Transfer Agents</u>: Corporation Service Company

(e)     <u>Debtors' Known Shareholders</u>: Brandes Investment Partners, Inc.; Brandes Investment Partners, L.P.; and Brandes Worldwide Holdings, L.P.

(f)     <u>Debtors' Top 50 Unsecured Trade Creditors Identified as of February 17, 2005</u>: Alberto Culver USA; Bayer Corp.; Campbell Soup Co.; Clorox Sales Co.; Coca-Cola Bottling Co.; Coca-Cola Bottling Works; Del Monte Foods USA; Florida Coca-Cola Bottling; Florida Power & Light Co.; Frito Lay Inc.; General Electric Company; General Mills Inc.; Georgia-Pacific Corporation; Gerber Products Company; Gillette Company; Gulf Coast Coca-Cola Bottling Company; Keebler Company; Kellogg Sales Company; Kimberly Clark; Kraft General Foods Inc.; Kraft Pizza Company; Louisiana Coca-Cola; Nabisco Brands Inc.; Pepperidge Farm Inc.; Pepsico, Inc.; Quaker Oats Company; Ross Laboratories; Sara Lee Foods; Schering-Plough Health Care; Smith Kline Beecham; Unilever Best Foods; Unilever HPC USA; Warner Lambert Consumer Group; and Wyeth Consumer Healthcare.

(g)    <u>Debtors' Lessors</u>: 51st Street & 8th Ave. Corporation; AG Edwards; Aegon USA Realty Advisors Inc.; Bank of New York; Conseco Mortgage Capital Inc.; First Union National Bank; First Union Wholesale Lockbox; General Electric Business Asset; General Electric Capital Business; Indianapolis Life Insurance Co.; JDN Realty Corporation; Kmart Corporation; L.J. Melody & Company; Life Insurance Co. of Georgia; Mellon Trust of California; Metro International Property; Midland Loan Services; Midwest Centers; Orix Capital Markets LLC; Orix Real Estate Capital Markets; PNC Bank Philadelphia; Principal Capital Management LP; Principal Life Insurance Co.; Royal & Son; Southtrust Bank; Swiss Re Investors Inc.; Teachers Retirement System; UrbanAmerica L.P.[4]; U.S. Bank Trust NA; Wachovia Securities; Westland Shopping Center LP; Windsor Place; and Windward Partners IV LP.

(h)    <u>Debtors' Insurance Providers</u>: ACE American Insurance Co.; ACE Bermuda Insurance, Ltd.; ACE (Illinois Union); ACE USA; AIG Aviation, Inc.; American Guarantee Liability Insurance Company (Zurich); Axis Surplus Insurance Co.; Chubb & Son; Commonwealth Insurance Company; Employer's Insurance of Wausau; Federal Insurance Co.; Great American Assurance; Gulf Insurance Company Inc.; The Hartford; Illinois Union Insurance Co.; Lexington Insurance Co.; Liberty Mutual Insurance Company; Liberty Mutual Insurance Europe Ltd.; Marsh Inc.; Marsh USA Inc.; National Union Fire Insurance Co.; RLI Corp.; SR International Business Insurance Co. Ltd.; St. Paul (Bermuda) Ltd.; St. Paul Fire & Marine Insurance Company; St. Paul Mercury; Travelers Indemnity Co. of Illinois; XL Insurance America, Inc.; and Zurich American Insurance Co.

(i)    <u>Banks at which Debtors Maintain Accounts</u>: Bank of Granite; Centura Bank; Citizens Bank; Compass Bank; Fifth Third Bank; Hibernia Bank; The Provident Bank; Union Planters Bank; and U.S. Bank.

(j)    <u>Parties Filing UCC Financing Statements</u>: American Bank Note Company; Bank of America, N.A.; Cargill, Incorporated; Cisco Systems Capital Corporation; Cryovac, Inc.; Fleet Business Credit, LLC; Fleet Capital Leasing - Technology Finance; Fleet Leasing Corporation; IBM Credit Corporation; IBM Credit LLC; National City Bank of Michigan/Illinois; Storagetek Financial Services Corporation; U.S. Bancorp; and Wells Fargo Bank, N.A.

---

[4]    Joseph H. Flom, a member of Skadden, Arps, is a trustee and investor in UrbanAmerica L.P., a lessor with respect to two of the Debtors' stores.  Mr. Flom will not partake in any discussion, access any documents or files, work on any matters related to, or otherwise be involved with the Debtors or these cases.

(k)     <u>Debtors' Competitors</u>: Ahold USA; Albertson's, Inc.; Bruno's Supermarkets, Inc. a/k/a Food World; Great A&P; SuperValu Inc.; and Wal-Mart Stores, Inc.

(l)     <u>Debtors' Closed Store Subtenants</u>: McDonald's Corporation; Nielsen Media Research; Office Depot Inc.; Payless Shoes; Rhodes, Inc.; and TCIM Services, Inc.

(m)     <u>Software Providers</u>: Aprisma Management Technologies; BEA Systems, Inc.; Deloitte & Touche; EMC Corporation; GEAC Enterprise Solutions; Getronics; Hummingbird Ltd.; IBM Corp.; Macro4 Inc.; Manigistics; Mercury Interactive Corporation; Microstrategy; NDC Health; Network Associates; Network General; Oracle Corporation; OutlookSoft Corporation; and Sterling Commerce, Inc.

(n)     <u>Miscellaneous Contract/Lease Parties</u>: Aetna, Inc.; Aetna Life Insurance Company; American Express Travel Related Services Company, Inc.; Canadian Imperial Bank of Commerce[5]; Discover Financial Services, Inc.; First Union Capital Markets; Integrated Payment Systems, Inc.; T. Rowe Price Retirement Services, Inc.; Telecheck Services, Inc.; Unum Life Insurance Company of America; Western Union Financial Services, Inc.; and Western Union North America.

(o)     <u>Certain Other Identified Parties</u>: New York Stock Exchange

12.     If Skadden, Arps should come into possession of information that would suggest the existence of a potential claim that the Debtors have or might have against one or more of Skadden, Arps' clients identified above, Skadden, Arps will advise the Debtors of such information and, to the extent necessary or appropriate, either seek a waiver from such Skadden, Arps' client or have the Debtors retain special counsel to investigate and pursue any such claim.

13.     In addition, and based upon inquiries made in the preparation of this Declaration, one or more partners, counsel, or associates of Skadden, Arps was formerly an employee of the Debtors.

---

[5]     Canadian Imperial Bank of Commerce ("CIBC"), a Skadden, Arps client, was party to a now terminated agreement whereby CIBC banking kiosks were placed in certain of the Debtors' stores.  Skadden, Arps has not provided since the termination of such agreement, and will not

14.     Skadden, Arps has instituted and is carrying on further inquiries of its partners, counsel and associates with respect to the matters contained herein, including the circulation of a special "disinterestedness" questionnaire to each of the approximately 1,700 attorneys in the Firm's domestic and international offices.  Skadden, Arps will file supplemental declarations regarding its retention if any additional relevant information comes to its attention.

15.     I am not related to, and, except as set forth below, to the best of my knowledge, none of the members, counsel, and associates of Skadden, Arps are related to the United States Trustee for this District, any key person employed in the Office of such United States Trustee, any United States District Court Judge for this District or any United States Bankruptcy Court Judge for this District, except that Adlai S. Hardin III, an associate at the Firm, is the son of Judge Adlai S. Hardin.  Skadden, Arps will continue to review its records with respect to such persons, and shall promptly notify the Court by a supplemental affidavit if any such connection is discovered.

16.     Skadden, Arps is one of the largest law firms in the world and has a diverse client base.  For the one-year preceding the Petition Date, no single client of the firm represented more than 3.9036% of Skadden, Arps' total value of time billed to client matters for that period.  Of the entities referenced herein, only 3, or affiliates of only 3, accounted for 1% or more of Skadden, Arps' total value of time billed during that same period: (i) Credit Suisse First Boston LLC; (ii) Deloitte & Touche USA LLP and (iii) Marsh and McLennan Inc.

17.     To the best of my knowledge, neither Skadden, Arps nor any attorney at the firm holds or represents an interest adverse to the Debtors' estates.

---

provide in the future, legal services to CIBC in connection with any matter involving the Debtors.

18.     To the best of my knowledge, Skadden, Arps neither is nor was a creditor, an equity security holder or an insider of the Debtors, except that Skadden, Arps previously rendered legal services to the Debtors for which it was compensated.  One or more partners, counsel, or associates of Skadden, Arps may own or in the past have owned publicly issued equity or debt securities issued by the Debtors.

19.     To the best of my knowledge, neither Skadden, Arps nor any attorney at the firm represented an investment banker in connection with any outstanding security of the Debtors within three years before the Petition Date.

20.     To the best of my knowledge, neither Skadden, Arps nor any attorney at the firm is or was an investment banker for any security of the Debtors in connection with the offer, sale or issuance of any security of the Debtors.

21.     To the best of my knowledge, neither Skadden, Arps nor any attorney at the firm is or was a director, officer or employee of the Debtors or of an investment banker of the Debtors.

22.     To the best of my knowledge, Skadden, Arps does not have an interest materially adverse to the interests of the estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in the Debtors or an investment banker specified in the foregoing paragraphs, or for any other reason.

23.     In view of the foregoing, Skadden, Arps is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code.

## Professional Compensation

24.     Pursuant to an engagement letter dated February 7, 2005 (the "Engagement Letter"), a copy of which is attached hereto as Attachment 1, the Debtors retained Skadden, Arps

-11-

to, among other things, advise them in connection with the exploration of a potential financial restructuring and, in conjunction with King & Spalding, to represent them as debtors in possession if Chapter 11 cases were commenced.  As provided by the terms of the Engagement Letter, and as described below, Skadden, Arps was entitled to be paid for services rendered and expenses incurred.

25.     Skadden, Arps and the Debtors have agreed that Skadden, Arps' bundled rate structure will apply to these cases and, therefore, Skadden, Arps will not be seeking to be separately compensated for certain staff, clerical and resource charges.  For professional services, Skadden, Arps' fees are based on its standard hourly rates, which are periodically adjusted.  Presently, the hourly rates under the bundled rate structure range from $540 to $825 for partners, $535 to $640 for counsel, $265 to $495 for associates and $90 to $195 for legal assistants and support staff.   The Debtors are advised that the hourly rates set forth above are subject to periodic increases in the normal course of the firm's business, often due to the increased experience of a particular professional.

26.     Consistent with the firm's policy with respect to its other clients, Skadden, Arps will continue to charge the Debtors for all other services provided and for other charges and disbursements incurred in the rendition of services.  These charges and disbursements include, among other things, costs for telephone charges, photocopying, travel, business meals, computerized research, messengers, couriers, postage, witness fees and other fees related to trials and hearings.  Charges and disbursements are invoiced pursuant to Skadden, Arps' Policy Statement Concerning Charges and Disbursements, which is included with Attachment 1, except that copying costs will be charged at $0.10 per page, computerized research and telephone calls will be billed at provider cost without reference to Skadden, Arps' internal capital costs or

overhead, and document production (including secretarial and word processing time), facsimile services, proofreading, overtime meals and overtime travel allowances will not be charged for separately on an incurrence basis but are included within the bundled rate structure.

27.      Pursuant to the retainer provisions of the Engagement Agreement, the Debtors paid an initial retainer amount of $500,000 (the "Retainer"), for professional services rendered or to be rendered and expenses incurred or to be incurred by Skadden, Arps on behalf of the Debtors, with the understanding that any amount remaining after payment of prepetition fees and expenses would be held by Skadden, Arps as a postpetition retainer and applied to the final bill in these cases.

28.      As of the Petition Date, based upon prepetition fees and expenses that have been identified and accounted for or estimated as of the date hereof, and assuming application of all such fees and expenses against the Retainer, Skadden, Arps had approximately $500,000 remaining in the Retainer.  Those remaining funds will be applied by Skadden, Arps to pay prepetition fees and costs that are subsequently identified and accounted for.  Any balance existing after all such applications will be treated as a postpetition retainer, and applied to the final bill in these cases as allowed by the Court.  In the event of a deficiency in the Retainer after application to prepetition fees and expenses, Skadden, Arps has agreed to waive any resulting prepetition claim against the Debtors.

29.      Within the one-year period preceding the Petition Date, the total aggregate amount of fees earned and expenses incurred by Skadden, Arps on behalf of the Debtors, as identified and accounted for or estimated as of the date hereof, was approximately $563,757.66. Of that amount, $562,839.25 is attributable to prepetition fees and $918.41 is attributable to prepetition expenses.  During the same period, the Debtors paid Skadden, Arps an aggregate

-13-

amount of $1,063,757.66, including payment of the Retainer.  The balance of $500,000 is the

amount of the remaining, unapplied Retainer funds referred to above. The Debtors understand

that not all of Skadden, Arps prepetition fees and expenses were identified and accounted for as

of the Petition Date or as of the date hereof.  As such amounts are posted, the amount of

prepetition fees and expenses will increase and the amount of the remaining Retainer funds will

decrease.

30.    With respect to the payments described in the preceding paragraph, set forth

below is a summary of (a) invoices sent by Skadden, Arps to the Debtors both for retainers and

for services and expenses and (b) payments made by the Debtors to Skadden, Arps in response to

such invoices:

| | | | |
|---|---|---|---|
| (a) | 2/07/05 | Retainer Request | $500,000.00 |
| | 2/17/05 | Invoice (billed to 2/17/05) | $266,839.25 |
| | 2/17/05 | Invoice (estimated to 2/21/05) | $296,000.00 |
| (b) | 2/09/05 | Retainer Payment | $500,000.00 |
| | 2/18/05 | Invoice Payment | $563,757.66 |

31.    Skadden, Arps intends to apply to the Court for allowance of compensation for

professional services rendered and reimbursement of charges and disbursements incurred in

these Chapter 11 cases in accordance with applicable provisions of the Bankruptcy Code, the

Federal Rules of Bankruptcy Procedure, the Local Rules of the United States Bankruptcy Court

for the Southern District of New York and the orders of this Court.  Skadden, Arps will seek

compensation for the services of each attorney and paraprofessional acting on behalf of the

Debtors in these cases at the then current rate charged for such services on non bankruptcy

matters.

32.    Skadden, Arps has agreed to accept as compensation such sums as may be

allowed by the Court on the basis of the professional time spent, the rates charged for such

services, the necessity of such services to the administration of the estates, the reasonableness of the time within which the services were performed in relation to the results achieved, and the complexity, importance and nature of the problems, issues or tasks addressed in these cases.

33.     Other than as set forth above, no arrangement is proposed between the Debtors and Skadden, Arps for compensation to be paid in these cases.

34.     Except for such sharing arrangements among Skadden, Arps, its affiliated law practice entities and their respective members, Skadden, Arps has no agreement with any other entity to share any compensation received, nor will any be made, except as permitted under section 504(b)(1) of the Bankruptcy Code.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on February 21, 2005.


SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP


/s/  *D. J. Baker*
D. J. Baker

Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000

# ATTACHMENT I

# ENGAGEMENT AGREEMENT

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

DIRECT DIAL
(2 | 2) 735-2150
DIRECT FAX
(9 | 7) 777-2150
EMAIL ADDRESS
DJBAKER@SKADDEN.COM

FOUR TIMES SQUARE

NEW YORK 10036-6522
___

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

February 7, 2005

FIRM/AFFILIATE OFFICES
___
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEWARK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
___
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

Laurence B. Appel, Esq.
Senior Vice President and General Counsel
Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699

RE:    Engagement Agreement with Skadden

Dear Larry:

We are pleased that Winn-Dixie Stores, Inc., for itself and each of its subsidiaries for which there is no disqualifying conflict and which Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden" or the "Firm") has agreed to represent (collectively, the "Company"), has decided to engage Skadden as special counsel in connection with the matters described below in the "Scope of Engagement" section of this Engagement Agreement and such other matters as are assigned to us in the future and that we agree to undertake (the "Engagement"). Accordingly, the Engagement is limited to those specific matters enumerated in and/or contemplated by this Engagement Agreement.

This letter sets forth the terms of our engagement arrangements for all matters (whether pending or prospective), including staffing, fees and waivers, the scope of our engagement, the basis on which the Firm will present its bills for fees, related charges and disbursements, and certain limitations on the Firm's services arising from potential conflicts of interest. Our Engagement is to represent the Company and not its individual directors, officers, employees or shareholders. However, we anticipate that in the course of that Engagement, we may provide information or advice to directors, officers or employees in their corporate capacities.

## Scope of Engagement

We have agreed to represent the Company as special counsel in the Company's efforts to work out its present financial circumstances, which may include restructuring its financial affairs and capital structure, in addition to ongoing and future representation of the Company on matters for which Skadden is or in the future may be engaged by the Company not related to the Company's efforts to work out its present financial circumstances. The services to be provided by Skadden in connection with the Engagement will encompass all services normally and reasonably associated with this type of engagement which the Firm is requested and is able to provide and which are consistent with its ethical obligations. As legal counsel, we are not in a position to, and the

Laurence B. Appel
February 7, 2005
Page 2

Company has not retained us to, provide financial advice. With respect to all matters of our Engagement, we will coordinate closely with the Company as to the nature of the services to be rendered by us and the scope of our engagement.

In addition to certain matters with respect to which we are providing legal services to the Company, in connection with the Company's restructuring activities (whether outside of court or in connection with the preparation for, commencement and prosecution of chapter 11 reorganization cases), the Engagement may involve advice as to corporate transactions and corporate governance, negotiations, out-of-court agreements with creditors, equity holders, prospective acquirers and investors, review of documents, preparation of agreements, review and preparation of pleadings, court appearances and such other actions as both of us deem necessary and desirable. The Engagement also will include advice to, and representation of the Company, as debtors and debtors-in-possession, should the Company seek relief pursuant to the provisions of the Bankruptcy Code subject to the approval of our retention by the Bankruptcy Court.

If the Company determines that reorganization cases under chapter 11 of the Bankruptcy Code are appropriate, we will prepare for the filing of the chapter 11 petitions, including review of documents and preparation of the petitions with supporting schedules and statements, subject to appropriate coordination with King & Spalding LLP, which has commenced such preparations, to avoid duplication of effort and expense. During the cases and subject to our ethical obligations discussed above, we will advise and consult on the conduct of the cases, including all of the legal and administrative requirements of operating in chapter 11; prepare such administrative and procedural applications and motions as may be required for the sound conduct of the cases; prosecute and defend litigation that may arise during the course of the cases; consult with you concerning and participate in the formulation, negotiation, preparation and filing of a plan or plans of reorganization and disclosure statement(s) to accompany the plan(s); review and object to claims; analyze, recommend, prepare, and bring any causes of action created under the Bankruptcy Code; take all steps necessary and appropriate to bring the cases to a conclusion; and perform the full range of services normally associated with matters such as this which the Firm is in a position to provide. With respect to the foregoing, we will allocate appropriate responsibilities to King & Spalding LLP in consultation with the Company, but in all such matters it is our understanding that the Company intends for us to act as the Company's principal bankruptcy counsel.

In the event that chapter 11 cases are commenced and our retention is authorized, our representation will include, as noted above, serving as principal bankruptcy counsel to the debtors-in-possession under a general retainer, subject to court approval. Such representation also will encompass all out-of-court planning and negotiations attendant to these tasks. Although it is hoped that litigation can be avoided, subject to ethical constraints regarding conflicts of interest, we also will be available to serve the Company in any litigation capacities that become necessary to the extent that any required court approval is obtained.

## Case Management and Coordination of Outside Counsel

The Company is presently using more than one law firm for representation of its interests on substantive matters. It is likely that more than one law firm may be needed for such representation, particularly to represent the Company in connection with the numerous labor-intensive day-to-day tasks associated with potential chapter 11 cases. Other than the general

· Laurence B. Appel
February 7, 2005
Page 3

representation of the Company by Skadden as principal restructuring counsel and in the cases (if filed) pursuant to this Engagement Agreement, the Company will continue to have discretion to assign specific tasks to co-counsel, adjunct counsel, or special counsel (collectively, "Other Counsel"), as the case may be. If, as outlined below, we are unable to obtain court approval for all matters in potential chapter 11 cases that you wish us (and we agree) to undertake, our representation would include as many of those matters as are approved. We are committed to working with the Company and in full cooperation with Other Counsel to manage the Engagement on a cost-efficient and productive basis. To the extent possible, given the nature and magnitude of the Engagement, steps have been taken and should continue to be taken by the Company to coordinate tasks and, when practical, to divide these tasks to avoid unnecessary duplication of effort between us and Other Counsel.

## Engagement Personnel

I will coordinate all Engagement matters on behalf of Skadden Arps. Additional lawyers, including those in other practice areas, will be added to the Engagement on an as needed basis.

## Fees, Charges and Disbursements

Our fees will be based primarily on the time involved in the Engagement and our bundled hourly time charges. A list of our current bundled hourly time charges using the Firm's bundled rate structure as of January 1, 2005 is attached as Exhibit A. As part of the Firm's ordinary business practices, hourly time charges are periodically reviewed and revised.

Our final fee statement to the Company normally would reflect a variety of factors. These factors include bundled hourly time charges, the significance of the Firm's role, the importance of the Firm's expertise, the complexity of the matter, the outcome of the matter, the Firm's contribution to the results obtained, the size and significance of the matter, the intensity and duration of the Firm's efforts, the amount of fees we have received in other comparable matters, and the views of our client. As to the latter factor, we consider it very important and would not submit a final statement for services rendered without having discussed our fee in advance with the Company based on the factors mentioned above and obtaining your concurrence.

As to billing, we will submit to the Company for payment a statement with respect to all matters for which we are responsible on not less than a monthly basis. At each matter's conclusion, we will submit a final statement for services rendered that will be based upon our bundled hourly time charges and, if appropriate, the factors outlined above, and that would credit all prior payments. Each statement submitted would be accompanied by a summary of attorney time showing the time worked by each lawyer working on an Engagement matter and the guideline hourly rate for each lawyer. In addition, our billing statements will include charges and disbursements incurred by us in the course of performing legal services in accordance with our standard practice as described in the summary attached as Exhibit B, which may be periodically updated.

Laurence B. Appel
February 7, 2005
Page 4

From time to time, the Company may request a fee range estimate for a particular Engagement matter. Any such estimate would be premised upon certain assumptions, including, but not limited to, completion of the matter by a particular target date, no unusual issues or problems arising, no litigation, counsel for the other parties sufficiently experienced and competent to perform such counsel's normal functions in this type of matter and so forth. In such situations, we will respond promptly to the Company's request in writing although it is agreed that such estimates shall not constitute a fee cap or amendment of this Engagement Agreement and all such discussions and written estimates would be handled through the undersigned in respect of the overall Engagement on behalf of the Firm.

## Fee Structure and Retainers

It is customary in matters of this nature for us to receive a reasonable retainer/on account payment and to be paid promptly for services rendered and charges and disbursements incurred on behalf of the Company, including payment for the services rendered and charges and disbursements incurred prior to the date hereof. Given the size and complexity of the Company's affairs, we have requested a payment in the amount of $500,000.00, representing a retainer/on account payment for professional services rendered and to be rendered and charges and disbursements incurred by us to the Company's account in connection with our representation of the Company including with respect to any consensual non-judicial restructuring as well as any initial preparation that you authorize for cases under chapter 11 of the Bankruptcy Code that may be filed by or against the Company (the "Initial Retainer"). We would appreciate your sending the Initial Retainer by wire transfer to:

CITIBANK, N.A.
460 West 33rd Street
NEW YORK, NEW YORK

ABA #021-000089
FOR CREDIT TO:
ACCOUNT # 3006-0143 of Skadden, Arps, Slate, Meagher & Flom LLP

The Company agrees to supplement the Initial Retainer from time to time during the course of the Engagement in such amounts as we mutually shall agree are reasonably necessary to maintain the Initial Retainer at a level that will be sufficient to fund Engagement fees, charges and disbursements to be incurred for time periods to be covered by the Initial Retainer. Should the Company subsequently decide to seek chapter 11 relief, we may also require an additional retainer/on account payment to supplement the Initial Retainer in order to cover Engagement fees, charges and disbursements to be incurred during the initial phase of the reorganization cases (the "Filing Retainer"). We will determine and discuss the amount of the Filing Retainer with you prior to the initiation of any chapter 11 case or at such earlier time as either we or the Company deems appropriate or desirable. Of course, the reasonableness of the Filing Retainer remains subject to review by the court in any ensuing cases.

In the future, we will send the Company periodic invoices (not less frequently than monthly) for services rendered and charges and disbursements incurred on the basis discussed above. Each invoice constitutes a request for an interim payment against the reasonable fee to be determined

Laurence B. Appel
February 7, 2005
Page 5

at the conclusion of our representation. Upon transmittal of the invoice, the Firm shall draw upon the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) in the amount of the invoice. The Company agrees upon submission of each such invoice, if so requested by the Firm, to wire the invoice amount to us as replenishment of the Initial Retainer (together with any supplemental amount to which the Firm reasonably requests), without prejudice to the Company's right to advise us of any differences it may have with respect to such invoice. We have the right to apply to any outstanding invoice, up to the remaining balance, if any, of the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) at any time subject to (and without prejudice to) the Company's opportunity to review our statements.

In the event that the Company subsequently determines to seek bankruptcy court protection and subject to the terms of any professional compensation order entered in the Company's chapter 11 cases, the issuance of our periodic invoice shall constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of the representation. Although the Company may pay us from time to time for services rendered in our capacity as special counsel for various matters, some fees, charges, and disbursements incurred before the filing of bankruptcy petitions (voluntary or involuntary) may remain unpaid as of the date of the bankruptcy filings. Any portion of the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) not otherwise properly applied will be held by us for the payment of any such unpaid fees, charges and disbursements (whether or not billed).

If the Company determines to commence a chapter 11 case, the unused portion, if any, of the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) will be applied to any unpaid prepetition invoices and unbilled fees, charges and disbursements, although any requisite court permission will be obtained in advance. Postpetition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court, it being agreed and understood that the unused portion, if any, of the Initial Retainer (as may be supplemented from time to time by supplemental retainers or the Filing Retainer) shall be held by us and applied against the final fee application filed and approved by the court. The Company understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Company shall nonetheless remain liable for payment of court approved postpetition fees and expenses. Such items are afforded administrative priority under 11 U.S.C. § 503 (b)(1).

If a dispute develops about our fees, you may be entitled under Part 137 of the Rules of the Chief Administrator of the New York Courts to arbitration of that dispute if it involves more than one thousand and less than fifty thousand dollars.

### Confidentiality and Related Matters

Confidential communications between a client and counsel are ordinarily privileged, but the commencement of a bankruptcy case may severely limit this attorney-client privilege. Specifically, if a trustee is appointed in any case concerning a corporate debtor or partnership, the trustee will be able to obtain from us or other counsel and disclose to others information communicated by the Company to counsel. Some courts also have held that an examiner may invade the attorney-client privilege.

Laurence B. Appel
February 7, 2005
Page 6

Because of the nature of the Firm's practice (involving more than 1,600 lawyers throughout the United States and in various international offices), from time to time we concurrently may represent one client in a particular matter and the adversary of that client in an unrelated matter. Thus, for example, while representing the Company, we may represent a third party who is adverse to the Company in a matter unrelated to the matters covered by this Engagement Agreement. In addition, while representing the Company, we may represent an account debtor of the Company as a debtor in a reorganization case or in connection with out-of-court negotiations with such entity's creditors concerning that entity's ability to pay its debts generally.

Despite any such concurrent representation, we strictly preserve all client confidences and zealously pursue the interests of each of our clients. The mutual understanding reflected in this Engagement Agreement, including the waivers set forth below, are, of course, premised on the Firm's adherence to its professional obligation not to disclose any confidential information or to use it for another party's benefit.

With respect to third parties and based on our initial discussions concerning the Company's capital structure and given the Company's business relationships, we have identified certain entities involved with the Company as our clients, or as affiliates of our clients, on matters unrelated to the Company including, but not limited to, bank group members Amsouth Bank, Bank One, The CIT Group/Business Credit, Inc., Congress Financial Corporation (Florida), Fleet Retail Group, Inc., General Electric Capital Corporation, GMAC Commercial Finance LLC, Merrill Lynch Capital, PNC Business Credit, Suntrust Bank, UBS AG, Wachovia Bank, National Association, Wachovia Capital Markets, LLC, and Wells Fargo Foothill, LLC, as well as other entities that are providing financial accommodations and services to the Company or have other material relationships. (In the event that chapter 11 cases are commenced, we will prepare a disclosure summary that will be publicly disclosed and will be updated periodically thereafter in connection with the filing of interim fee applications and as otherwise required.) Accordingly, while for purposes of this Engagement Agreement, the Company should assume that we represent a substantial number of the Company's creditors and stakeholders on matters unrelated to the Company, we will, at the Company's request, furnish you with a list of relevant clients when we receive updated information from the Company from time to time regarding its creditors and other stakeholders.

We do not provide certain kinds of opinion letters in connection with restructuring and bankruptcy reorganization cases to clients or to others who may wish to rely upon such letters. We do not alter this policy except under very unusual circumstances and then only upon further written agreement, as approved by a special committee of the Firm.

## Waivers and Related Matters

The Firm represents a broad base of clients on a variety of legal matters. Accordingly, absent an effective conflicts waiver, conflicts of interest may arise that could adversely affect your ability and the ability of other clients of the Firm to choose the Firm as its counsel and preclude the Firm from representing you or other clients of our Firm in pending or future matters. Given that possibility, we wish to be fair not only to you, but to our other clients as well. Accordingly, this letter will confirm our mutual agreement that the Firm may represent other present

Laurence B. Appel
February 7, 2005
Page 7

or future parties on matters other than those for which it had been or then is engaged by the Company, whether or not on a basis adverse to the Company or any of its affiliates, including in litigation, legal or other proceedings or matters, which are referred to as "Permitted Other Representation." In furtherance of this mutual agreement, the Company agrees that it will not for itself or any other party assert the Firm's representation of the Company, either previously, in its then existing representation in the Engagement, or in any other matter in which the Company retains the Firm, as a basis for disqualifying the Firm from representing another party in any Permitted Other Representation and agrees that any Permitted Other Representation does not constitute a breach of duty. Permitted Other Representation would include, without limitation, representing a client over which the Company might be seeking to acquire influence or control, or from which the Company may wish to buy assets, or representing a client regarding its interest at the time in acquiring influence or control over an entity in which the Company then has a similar interest. Notwithstanding the foregoing waivers, the Firm agrees that, during the pendency of any chapter 11 reorganization cases involving the Company in which the Firm is acting as bankruptcy and restructuring counsel pursuant to a general retainer pursuant to 11 U.S.C. § 327 (a), the Firm will not represent present or future clients of the Firm on matters adverse to the Company in such chapter 11 reorganization cases.

Our representation of the Company is premised on the Firm's adherence to its professional obligation not to disclose any confidential information or to use it for another party's benefit without the Company's consent. Provided that the Firm acts in the manner set forth in this paragraph, the Company would not for itself or any other party assert that the Firm's possession of such information, even though it may relate to a matter for which the Firm is representing another client or may be known to someone at the Firm working on the matter, (a) is a basis for disqualifying the Firm from representing another of its clients in any matter in which the Company or any other party has an interest; or (b) constitutes a breach of any duty owed by the Firm.

With respect to parties affiliated with the Company generally, including parties owned by the Company and parties that hold direct or indirect interests in the Company, it is our understanding that the Firm is not being asked to provide, and will not be providing, legal advice to, or establishing an attorney-client relationship with, any such affiliated party or person in their individual capacity and will not be expected to do so unless the Firm has been asked and has specifically agreed to do so. Finally, it is our understanding that if the Firm acts as counsel for any other party as to which the Company then owns completely, directly or indirectly, all of the common stock or similar voting interest (other than directors' qualifying shares, if any), the mutual agreement reflected in this letter, including the waivers, would apply to that party as well.

*    *    *

The provisions of this letter will continue in effect, including if the Firm's representation of the Company was ended at your election (which, of course, the Company would be free to do at any time) or by the Firm for Good Cause (which would be subject to ethical requirements). Good Cause includes the Company's breach of this agreement (including any material change in our engagement responsibilities without our consent or the failure to pay any payment when due under this Engagement Agreement), the Company's refusal or failure to cooperate with us or provide us with continuing access to the Board of Directors and senior management officers of the Company as appropriate, any fact or circumstance that would render our continuing representation unlawful or unethical, or, in our reasonable judgment, resignation of the engagement becomes

Laurence B. Appel
February 7, 2005
Page 8

necessary or appropriate. Any unused portion of the retainers we have received will be applied to our outstanding fees, charges and disbursements and the Company will promptly pay to us the remaining balance owed to us, if any. To the extent that the remaining amount of the retainers exceeds the amount of such fees, charges and disbursements, we will pay such amount to the Company. In addition, the provisions of this Engagement Letter will apply to future engagements of the Firm by the Company unless we mutually agree otherwise.

The Company agrees to make appropriate employees available to us to assist in factual inquiries and factual determinations, court hearings and appearances, transactions and dealings in relation to the subject matter with regard to which we have been retained.

This agreement shall be governed by and interpreted in accordance with the laws of the State of New York without regard to its conflicts of laws principles. For purposes of this letter, references to Skadden or the Firm include our affiliated law practice entities. There are no representations or promises other than as expressly set forth herein.

If the foregoing terms of our representation meet with your approval and accurately represent your understanding of the Company's retention agreement with us, we would appreciate your signing one copy of this Engagement Agreement and returning it to us.

Again, we very much appreciate the opportunity to work with Winn-Dixie Stores, Inc. and look forward to doing so.

With best regards,

Yours very truly,

D. J. Baker

Attachments

AGREED AND ACKNOWLEDGED:

Winn-Dixie Stores, Inc., for itself
and its subsidiaries

By: _____
Laurence B. Appel
Senior Vice President and General Counsel

Effective as of February 2, 2005

CONFIDENTIAL

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP & AFFILIATES

### STANDARD BUNDLED HOURLY TIME CHARGE SCHEDULE[*]

#### January 1, 2005

|  | Rate |
|---|---|
| **PARTNERS and OF COUNSEL:** | $540 - $825 |
| **COUNSEL/SPECIAL COUNSEL:** | $535 - $640 |
| **ASSOCIATES:** | |

Level

| | |
|---|---|
| 9 | $495 |
| 8 | 495 |
| 7 | 480 |
| 6 | 460 |
| 5 | 430 |
| 4 | 395 |
| 3 | 375 |
| 2 | 335 |
| 1 | 265[**] |
| **LEGAL ASSISTANTS:** | $90 - $195 |

---

[*]     These are the Firm's standard hourly fee rates for most attorneys and legal assistants in the Firm's "bundled rate" structure for clients who are not billed separately for certain charges (e.g., **secretarial and word processing time preparing legal documents, proofreading, facsimile services, overtime meals and overtime travel allowances). In-house reproduction under the bundled rate structure is charged at $0.10 per page. Please note that in a limited number of cases or for specific types of work (e.g., M&A transactions, certain types of tax matters, etc.), individual rates may be higher or lower than those stated.**

[**]     First year associates will move to $295/hr. at the later of April 1st, 2005 or the date of passing bar exam.

### SKADDEN ARPS, SLATE, MEAGHER& FLOM LLP AND AFFILIATES
#### Policy Statement Concerning Charges and Disbursements
#### Under Standard Bundled Rate Structure
#### Effective 9/1/03

*Skadden Arps bills for reasonable charges and disbursements incurred in connection with an engagement. Clients are billed for external charges at the actual cost billed by the vendor except in a few cases noted below; charges for internal support services are billed at rates derived from internal cost analyses or at rates set at or below comparable outside vendor charges.*

**I. *Research Services.*** *Charges for on-line computerized research (LexisNexis, Westlaw and financial services) and use of outside research services and materials are billed at the actual amounts charged by vendors, which have been reduced by discounts the Firm receives from vendors.*

*SEC filings retrieved using the Disclosure system in our library are charged based on standard vendor rates derived from an internal cost analysis.*

*The State of Delaware Database provides computer access to a corporations database in Dover, Delaware. The charge for this service is $50 per transaction, which is the average amount charged by outside services.*

**II. *Travel-Related Expenses.*** *Out-of-town travel expenses are billed at actual cost and include air or rail travel, lodging, car rental, taxi or car service, tips and other reasonable miscellaneous items associated with travel. Corporate and/or negotiated discounted rates are passed on to the client. Specific Firm policies for expenditures relating to out-of-town travel include:*

- *Air Travel. Coach travel is used for all U.S. domestic flights unless upgrades are available at little additional cost or prior client approval is obtained for a different class. For international flights from the United States, business class is used. Travel by attorneys based outside the United States is consistent with these policies.*

- *Lodging. Overnight accommodations are generally booked with hotels with which the Firm has a corporate rate or, when this is not possible, with hotels suggested by the client.*

*Local travel charges include commercial transportation and, when a private car is used, mileage, tolls and parking. Specific policies govern how and when a client is charged for these expenses; these include:*

- *Fares for commercial transportation (e.g., car service, taxi or rail) are charged at the actual vendor invoice amount. The charge for private car usage is the IRS rate allowance per mile (or the equivalent outside the United States) plus the actual cost of tolls and parking.*

- *Round-trip transportation to the office is not charged separately for attorneys who work weekends or holidays, nor is transportation home on business days when an attorney works past a certain hour (typically 8:30 p.m.);*

- *Local travel for support staff is not charged when a staff member works after 8:00 p.m. specifically for the client.*

**III. *Word Processing and Secretarial and other Special Task-Related Services.*** *Routine secretarial tasks (correspondence, filing, travel and/or meeting arrangements, etc.) are not charged to clients. There is no separate charge for word processing and secretarial services associated with preparing legal documents.*

*Multi-function personnel, such as qualified secretaries and word processors, may also perform other specialized tasks (such as EDGAR filings or legal assistant services). Such work is recorded in the appropriate billing category (for example, legal assistant services are recorded as fee in "Legal Assistant Support" on bills).*

**IV. *Reproduction and Electronic Document Management.*** *Photocopying services (including copying, collating, tabbing and velo binding) performed in-house is charged at 10 cents per page, which represents the average internal cost per page. Color photocopies are charged at 50 cents per page (based on outside vendor rates). Photocopying projects performed by outside vendors are billed at the actual invoice amount. Special arrangements can be made for unusually large projects.*

*Electronic Data Management services (e.g., scanning, OCR processing, printing from scanned files, and conversions) performed by outside vendors are billed at the actual invoice amount and those performed in-house are billed at rates comparable to those charged by outside vendors.*

**V. *Electronic Communications:*** *Clients are charged for communications services as follows:*

- *Telephone Charges. There is no charge for local telephone calls or facsimile services. Long distance telephone calls made from the Firm are charged based on applicable rates in tariff tables and are allocated*

*within a client based on the hours worked by attorneys on various matters for that client. Collect, credit card and third party calls are charged at the vendor rate plus applicable taxes and are assigned to the specific matter for which such charges were incurred.*

- *Facsimile Charges. There is no charge for outgoing or incoming facsimiles.*

*VI. Postage and Courier Services. Outside messenger and express carrier services are charged at the actual vendor invoice amount which frequently involves discounts negotiated by the Firm. Postage is charged at actual mail rates. On certain occasions, internal staff may be required to act as messengers; a standard rate is charged for their time.*

*VII . UCC Filing and Searches. Charges for filings and searches, in most instances, are based on standard amounts determined by the vendor. Unusual filings and searches will be charged based on vendor invoice.*

*VIII. Meals. Business meals with a client are charged at actual cost. Luncheon and dinner meetings with the client at the Firm are charged based on the costs developed by our food service vendor. Breakfast, beverage and snack services at the Firm's offices are not charged, except in unusual circumstances. Overtime meals are not charged separately to clients.*

*IX. Direct Payment by Clients of Other Disbursements. Other major disbursements incurred in connection with an engagement will be paid directly by the client. (Those which are incurred and paid by the Firm will be charged to the client at the actual vendor's invoice amount.) Examples of such major disbursements that clients will pay directly include:*

- *Professional Fees (including disbursements for outside professional services such as local counsel, accountants, witness and other professional fees).*

- *Filing/Court Fees (including disbursements for agency fees for filing documents, standard witness fees, juror fees).*

- *Transcription Fees (including disbursements for outside transcribing agencies and courtroom stenographer transcripts).*

- *Other Disbursements (including any other required out-of-pocket expenses incurred for the successful completion of a matter).*

\* \* \* \* \*

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
In re                                 :

                                     :        **Chapter 11**

                                     :

**WINN-DIXIE STORES, INC., <u>et</u> <u>al.</u>,**    :        **Case No. 05-11063**

                                     :

          **Debtors.**            :        **(Jointly Administered)**

                                     :

-----------------------------------------------------------------x

**INTERIM ORDER AUTHORIZING DEBTORS TO RETAIN**
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AS**
**<u>LEAD RESTRUCTURING AND BANKRUPTCY COUNSEL TO THE DEBTORS</u>**

Upon the Application dated February 21, 2005 (the "Application") of Winn-Dixie Stores, Inc. and its debtor affiliates (collectively, the "Debtors") for an order pursuant to Sections 327(a) and 329 of the Bankruptcy Code approving the retention of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps") as lead restructuring and bankruptcy counsel to the Debtors during these cases, as more fully set forth in the Application; and upon consideration of the Declaration of D. J. Baker and Disclosure of Compensation (the "Baker Declaration"); and upon consideration of the Declaration of Bennett L. Nussbaum Pursuant to Local Bankruptcy Rule 1007-2 (the "Local Rules") in Support of First-Day Motions and Applications sworn to on the 21st day of February, 2005; and the Court having jurisdiction to consider the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.); and consideration of the Application and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application having been provided to (i) the Office of the United States Trustee, (ii) counsel

for Wachovia Bank, N.A., as agent for the Debtors' secured lenders, (iii) the indenture trustee for the Debtors' noteholders, and (iv) the Debtors' fifty (50) largest unsecured creditors, and no other or further notice being required; and the relief requested in the Application being in the best interests of the Debtors, their estates, and creditors; and the Court having reviewed the Application; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Application is granted on an interim basis until such time as the Court conducts a final hearing on this matter (the "Final Hearing Date"); and it is further

ORDERED that the Final Hearing Date shall be _____, 2005 at ____ .m.; and it is further

ORDERED that any objection to the relief requested by the Application on a final basis must be filed with the Court and be served upon (i) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004; (ii) D. J. Baker, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036; and (iii) Sarah Robinson Borders, King & Spalding LLP, 191 Peachtree Street, Atlanta, Georgia 30303, so as to be received by _____, 2005 at 5:00 p.m.; and it is further;

ORDERED that the Debtors are authorized to retain Skadden, Arps as their lead restructuring and bankruptcy counsel, pursuant to Sections 327(a) and 329 of the Bankruptcy Code, as of February 21, 2005 (the "Petition Date") on the terms set forth in the Application and the Baker Declaration; and it is further

ORDERED that no work performed by Skadden, Arps shall be duplicative of work performed by any other counsel retained by the Debtors in these cases; and it is further

ORDERED that if any supplemental declarations are filed and served after the entry of this Order, absent any objections filed within twenty (20) days after the filing and service of such supplemental declarations, Skadden, Arps' employment shall continue as authorized pursuant to this Order; and it is further

ORDERED that Skadden, Arps shall be compensated upon appropriate application in accordance with Sections 330 and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules, and orders of this Court; and it is further

ORDERED that Skadden, Arps is authorized to apply the Retainer received from the Debtors to pay any fees, charges, costs, or expenses relating to services rendered to the Debtors prior to the Petition Date that remain unpaid and to hold any remaining portion of the Retainer for application to allowed amounts owed pursuant to Skadden, Arps' final application in these cases; provided, however, that Skadden, Arps shall hold the Retainer as funds clearly designated for the account of the Debtors; and provided, further, however, that any party in interest may at any time challenge the use and application of the Retainer by Skadden, Arps; and it is further

ORDERED that within five (5) days of the entry of this Order, the Debtors shall serve a copy of this Order on the Office of the United States Trustee, counsel for the Debtors' pre-petition secured lenders, the indenture trustee for the Debtors' senior noteholders, counsel to the Agent for the Debtors' proposed debtor-in-possession lenders, the Debtors' fifty (50) largest unsecured creditors on a consolidated basis, and any counsel or party that has filed a notice of appearance or request for notice within such time; and it is further

-3-

ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order; and it is further

ORDERED that the requirement pursuant to Local Rule 9013-1(b) that the Debtors file a memorandum of law in support of the Application is hereby waived.

Dated: February __, 2005
      New York, New York


              _____
              UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

In re                                          :
                                               :      **Chapter 11**
                                               :
**WINN-DIXIE STORES, INC., et al.,**           :      **Case No. 05-11063**
                                               :
        **Debtors.**                           :      **(Jointly Administered)**
                                               :

----------------------------------------------------------------x

**FINAL ORDER AUTHORIZING DEBTORS TO RETAIN**
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AS**
**LEAD RESTRUCTURING AND BANKRUPTCY COUNSEL TO THE DEBTORS**

Upon the Application dated February 21, 2005 (the "Application") of Winn-Dixie Stores,

Inc. and its debtor affiliates (collectively, the "Debtors") for an order pursuant to Sections 327(a)

and 329 of the Bankruptcy Code approving the retention of Skadden, Arps, Slate, Meagher &

Flom LLP ("Skadden, Arps") as lead restructuring and bankruptcy counsel to the Debtors during

these cases, as more fully set forth in the Application; and upon consideration of the Declaration

of D. J. Baker and Disclosure of Compensation (the "Baker Declaration"); and upon

consideration of the Declaration of Bennett L. Nussbaum Pursuant to Local Bankruptcy Rule

1007-2 (the "Local Rules") in Support of First-Day Motions and Applications sworn to on the

21st day of February, 2005; and the Court having jurisdiction to consider the Application and the

relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of

Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of

New York, dated July 19, 1984 (Ward, Acting C.J.); and consideration of the Application and the

relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Application having been provided to (i) the Office of the United States Trustee, (ii) counsel

for Wachovia Bank, N.A., as agent for the Debtors' secured lenders, (iii) the indenture trustee for the Debtors' noteholders, and (iv) the Debtors' fifty (50) largest unsecured creditors, and no other or further notice being required; and the relief requested in the Application being in the best interests of the Debtors, their estates, and creditors; and the Court having reviewed the Application; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Application is granted; and it is further

ORDERED that the Debtors are authorized to retain Skadden, Arps as their lead restructuring and bankruptcy counsel, pursuant to Sections 327(a) and 329 of the Bankruptcy Code, as of the Petition Date on the terms set forth in the Application and the Baker Declaration; and it is further

ORDERED that no work performed by Skadden, Arps shall be duplicative of work performed by any other counsel retained by the Debtors in these cases; and it is further

ORDERED that if any supplemental declarations are filed and served after the entry of this Order, absent any objections filed within twenty (20) days after the filing and service of such supplemental declarations, Skadden, Arps' employment shall continue as authorized pursuant to this Order; and it is further

ORDERED that Skadden, Arps shall be compensated upon appropriate application in accordance with Sections 330 and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules, and orders of this Court; and it is further

ORDERED that Skadden, Arps is authorized to apply the Retainer received from the Debtors to pay any fees, charges, costs, or expenses relating to services rendered to the

Debtors prior to the Petition Date that remain unpaid and to hold any remaining portion of the

Retainer for application to allowed amounts owed pursuant to Skadden, Arps' final application in

these cases; provided, however, that Skadden, Arps shall hold the Retainer as funds clearly

designated for the account of the Debtors; and provided, further, however, that any party in

interest may at any time challenge the use and application of the Retainer by Skadden, Arps; and

it is further

ORDERED that the Court shall retain jurisdiction to hear and determine all

matters arising from the implementation of this Order; and it is further

ORDERED that the requirement pursuant to Local Rule 9013-1(b) that the

Debtors file a memorandum of law in support of the Application is hereby waived.

Dated: _____ ___, 2005
    New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE