SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
D.J. Baker (DB 0085)

KING & SPALDING LLP
191 Peachtree Street
Atlanta, Georgia 30303
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Sarah Robinson Borders

Proposed Attorneys for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
In re                                                         :
                                                              :   **Chapter 11**
                                                              :
**WINN-DIXIE STORES, INC., et al.,**                          :   Case No. 05-11063
                                                              :
          Debtors.                                            :   (Jointly Administered)
                                                              :
----------------------------------------------------------------x

**MOTION FOR AUTHORITY TO PAY PRE-PETITION TAXES AND OTHER**
**ORDINARY COURSE GOVERNMENTAL OBLIGATIONS**

Winn-Dixie Stores, Inc. and its debtor affiliates,[1] as debtors and debtors-in-possession (collectively, the "Debtors"), respectfully represent:

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., Winn-Dixie Supermarkets, Inc., and Sundown Sales, Inc.

**Background**

**A.    Chapter 11 Filings.**

1. The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on February 21, 2005 (the "Petition Date").

2. The Debtors will continue in possession of their property and will operate and manage their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed in these cases.

4. This Court has jurisdiction over this Motion under 28 U.S.C. § 1334. Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

**B.    Company Background.**

5. The Debtors are grocery and drug retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners. According to published reports, the Debtors are the eighth-largest food retailer in the United States and one of the largest in the Southeast. The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion. The Debtors currently operate more than 900 stores in the United States. Substantially all of the Debtors' store locations are leased rather than owned.

6. The Debtors employ nearly 79,000 associates, of whom approximately 33,000 are employed on a full-time basis and 46,000 on a part-time basis.

7. The Debtors operate in a highly competitive supermarket industry that is generally characterized by intense competition and narrow profit margins. The Debtors compete directly with national, regional, and local supermarket chains and independent supermarkets, as well as with Wal-Mart, similar supercenters, and other non-traditional grocery retailers such as dollar discount stores, drug stores, convenience stores, warehouse club stores, and conventional department stores.

**C.     Capital Structure.**

8. The Debtors' primary secured obligations arise under a Second Amended and Restated Credit Agreement dated June 29, 2004, with Wachovia Bank, N.A., as administrative agent; GMAC Commercial Finance LLC, as syndication agent; Wells Fargo Foothill, LLC, General Electric Capital Corporation, and The CIT Group/Business Credit, Inc., as co-documentation agents; Wachovia Bank, N.A., as successor by merger to Congress Financial Corporation (Florida), as collateral monitoring agent; and the several lenders from time to time party thereto (as amended, the "Credit Agreement").

9. The Debtors' maximum borrowing capacity under the Credit Agreement totals $600 million. Beginning on September 22, 2004, the Debtors failed to meet a financial test under the Credit Agreement that limited the amount available for borrowings; however, the Debtors obtained a waiver of this financial test on February 9, 2005. The waiver requires that the Debtors perfect the lenders' security interest in assets with a requisite value on or before March 31, 2005. The waiver expires on June 29, 2005.

10. The Credit Agreement provides for revolving loans and the issuance of letters of credit. It is secured by substantially all of the personal property and owned real property of the Debtors that are parties thereto. As of the Petition Date, the Debtors were liable for obligations

under the Credit Agreement in the aggregate amount of approximately $427 million. The Debtors are seeking authority to refinance their obligations under the Credit Agreement pursuant to a debtor-in-possession financing facility provided by Wachovia Bank, N.A. and other lenders.

11.     Certain of the Debtors are parties to an Indenture with Wilmington Trust Company dated December 26, 2000 (as amended and supplemented, the "Indenture"). Pursuant to the Indenture, Debtor Winn-Dixie Stores, Inc. issued $300 million in principal amount of Senior Notes bearing interest at 8.875% per annum, and certain other Debtors guaranteed the Senior Notes. The Senior Notes mature in 2008 and require semi-annual interest-only payments until maturity. The Senior Notes are unsecured obligations that are *pari passu* with most of the Debtors' other unsecured obligations, which generally consist of trade debt, contract and lease obligations (including possible rejection damages), employee obligations, and litigation claims.

12.     Parent company Winn-Dixie Stores, Inc. is publicly owned, and its common stock has been traded on the New York Stock Exchange since 1952 under the ticker symbol WIN. All of the other Debtors are direct and indirect subsidiaries of Winn-Dixie Stores, Inc.

**D.    Events Leading to the Debtors' Chapter 11 Cases.**

13.    In January 2004, the Debtors announced a series of actions designed to improve their competitive position (the "Strategic Plan"). The Strategic Plan included (a) a review of business strategies and marketing programs, (b) an expense reduction plan designed to achieve a $100 million annual expense reduction, (c) a market positioning review through which markets will be identified as either core, and positioned for future investment and growth, or non-core, and evaluated for sale or closure, (d) an image makeover program targeting approximately 700 stores for facilities improvement, and (e) a process re-engineering initiative that is intended to enhance organizational effectiveness and company business initiatives.

14.    As part of the Strategic Plan, the Debtors committed to focus on a core base of stores across 36 designated marketing areas in the United States. The Debtors decided to exit 156 stores, exit three distribution centers, sell or close four manufacturing plants, and consolidate two dairy operations. Of these facilities, the Debtors exited 135 stores, three distribution centers, and three manufacturing plants between April 2004 and the Petition Date.

15.    Despite the implementation of the Strategic Plan, during the remainder of 2004, the Debtors continued to experience significant sales declines and market-share losses. The Debtors' financial performance was affected not only by operating losses but also by ongoing obligations relating to a significant number of store locations where the Debtors no longer operate. The Debtors are seeking authority to reject a substantial number of the leases relating to these stores, effective immediately.

16.    In part in anticipation of the 2004 holiday season, the Debtors increased their purchasing activities in October and November. When holiday sales were lower than expected, the Debtors experienced higher-than-anticipated inventory levels and lower-than-anticipated

accounts payable, resulting in increased borrowings under the Credit Agreement and reduced liquidity.

17. On February 10, 2005, the Debtors announced that during their first and second fiscal quarters ending on January 12, 2005, the Debtors incurred losses in the amount of $552.8 million, or $3.93 per share of common stock. The Debtors also announced that for their second fiscal quarter, identical-store sales declined by 4.9% as compared to the second quarter of the prior year.

18. The Debtors' financial results and decrease in liquidity, coupled with downgrades by Moody's Investor Services and Standard & Poor's Rating Services, as well as negative press coverage, led a number of the Debtors' trade creditors to demand shorter payment terms. Since the announcement of the Debtors' financial results on February 10, 2005, the Debtors have experienced a reduction in vendor and other credit by more than $130 million. As a result, the Debtors have been forced to conclude, after consultation with their advisors, that their interests and the interests of their creditors, employees, and customers will be best served by a reorganization under Chapter 11 of the Bankruptcy Code.

19. As part of their restructuring under Chapter 11, the Debtors, led by a chief executive officer hired in December 2004, intend to implement further asset rationalization and expense reduction plans and to utilize new sales initiatives to improve the Debtors' brand image and competitive position, with the goal of improving their operations and financial performance and strengthening their business for the benefit of creditors, customers, employees, and the communities in which the Debtors operate.

**Relief Requested**

20.     By this Motion, the Debtors respectfully request the entry of an order, pursuant to Sections 105(a), 363(b), 507(a)(8), and 541 of the Bankruptcy Code, authorizing them to pay, in their sole discretion, but subject to any cash collateral or post-petition financing documents or orders, and with preference for sales, use, gasoline, gross-receipts, and other trust-fund taxes, any undisputed pre-petition tax, fee, and fine obligations owing to governmental entities (the "Governmental Entities"), in the ordinary course of business, and any undisputed pre-petition taxes that may become due as a result of audits currently underway or audits or assessments that may commence or be received in the ordinary course of business hereafter (collectively, the "Governmental Obligations").  The Debtors estimate that the Governmental Obligations intended to be paid under this Motion do not exceed $43 million in the aggregate.  The Debtors submit that the relief requested herein is necessary and appropriate to carry out the provisions of the Bankruptcy Code.[2]

**The Governmental Obligations**

21.     Prior to the Petition Date, the Debtors incurred obligations to federal, state, and local governments.  Although as of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Governmental Obligations, certain Governmental Obligations attributable to the pre-petition period were not yet due.

---

[2]     The Governmental Obligations proposed to be paid include, without limitation, income or gross-receipts taxes, franchise taxes, real and personal property taxes, sales, use, gasoline and excise taxes, ad-valorem taxes, customs duties, environmental, spill, hazardous waste, and energy taxes and fees, license, privilege, and annual report taxes and fees, regulatory fines, and any other types of taxes, fees, and fines owing to Governmental Entities, including those related to qualification to do business in various jurisdictions.

22.     The continued payment of Governmental Obligations on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful reorganization. If such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Governmental Entity's applicable laws, including (a) whether the obligations are secured, priority, or unsecured in nature, (b) whether they are proratable or fully pre-petition or post-petition, and (c) whether penalties, interest, attorneys' fees, and costs can continue to accrue on a post-petition basis, and if so, whether such penalties, interest, and attorneys' fees and costs are secured, priority, or unsecured in nature.

23.     Non-payment or delayed payment of such obligations may also subject the Debtors to efforts by the Governmental Entities, whether or not permissible under the Bankruptcy Code, to revoke the Debtors' licenses and other privileges on a post-petition or post-confirmation basis. Moreover, certain of the Governmental Obligations are sales, use, gasoline, or gross-receipts taxes, which may be considered to be trust funds that are not included in property of the Debtors' estates, and as to which the Debtors' officers and directors may be held personally liable in the event of non-payment. In such events, collection efforts by the Governmental Entities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring these Chapter 11 cases to an expeditious conclusion.

**Basis for Relief**

24.     To the extent that the Governmental Obligations are priority claims pursuant to Section 507(a)(8) of the Bankruptcy Code, or secured claims pursuant to Section 506(a) of the

Bankruptcy Code, their payment should be authorized on the basis that they are required to be paid in full in any event as a condition to satisfying the plan confirmation requirements contained in Section 1129 of the Bankruptcy Code.

25. If the Governmental Obligations are deemed priority claims, Section 1129(a)(9)(C) of the Bankruptcy Code requires that they be paid no less favorably than in deferred cash payments, over a period not exceeding six years after the date of assessment, of a value as of the effective date of the plan equal to the allowed amount of each such claim. 11 U.S.C. § 1129(a)(9)(C).

26. If the Governmental Obligations are deemed secured claims, Section 1129(b)(2)(A) of the Bankruptcy Code requires that they be satisfied through deferred cash payments totaling at least the allowed amount of each such claim, of a value as of the effective date of the plan equal to the value of the collateral securing the claim, with a continuation of the liens on the collateral; or if the collateral is to be sold, that the lien securing the claim attach to the proceeds of sale; or that the holder realize the indubitable equivalent of the claim. 11 U.S.C. § 1129(b)(2)(A).

27. Alternatively, authorization to pay Governmental Obligations is appropriate under the "doctrine of necessity," which is grounded in Section 105(a) of the Bankruptcy Code, and under Section 363(b) of the Bankruptcy Code. Pursuant to Section 105(a) of the Bankruptcy Code, a court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Debtors submit that the relief requested herein is necessary and appropriate to carry out the provisions of the Bankruptcy Code. Section 105(a) essentially codifies the bankruptcy court's inherent equitable powers. See Management Technology Corp. v. Pardo, 56 B.R. 337, 339 (Bankr. D.N.J. 1985) (court's equitable power

derived from Section 105). Numerous courts have recognized that Section 105(a) allows for the payment of pre-petition obligations where such payment is necessary or essential to the preservation of the debtor in possession's potential for rehabilitation. See, e.g., In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (recognizing that the use of Section 105(a) equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept"); see also In re James A. Phillips, Inc., 29 B.R. 391, 394-95 (S.D.N.Y. 1983).

27.   To the extent that payment of the Governmental Obligations would constitute a use of property outside the ordinary course of business, the payment of these obligations is justified pursuant to Section 363(b) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize use of a debtor's assets, in applying this section, courts have required that it be based upon the sound business judgment of the debtor. See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (same); Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "bankruptcy court can authorize a sale of all of a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action").

28.   Without question, to the extent of available funding, the payment of the Governmental Obligations is necessary here, and the Debtors have articulated a sound business

justification for the payment of these obligations. It is in the best interest of the Debtors' estates that taxes, fees, and fines be paid on time so as to avoid administrative difficulties. Delayed payment of the taxes, fees, and fines may cause Governmental Entities to take precipitous action, including a marked increase in state audits, a flurry of lien filings, and significant administrative maneuvering at the expense of the Debtors' time and resources. Prompt and regular payment of the Governmental Obligations will avoid this unnecessary governmental action.

29.     Additionally, certain of the Governmental Obligations may constitute so-called "trust fund" taxes, which are required to be collected from third parties and held in trust for payment to the governmental entities. These Governmental Obligations are not considered property of the Debtors' estates under Section 541(d) of the Bankruptcy Code. See, e.g., Begier v. Internal Revenue Serv., 496 U.S. 53, 67 (1990); In re Megafoods Stores, Inc., 163 F.3d 1063, 1067-68 (9th Cir. 1998) (holding that sales taxes collected for the benefit of the state of Texas were to be held by the debtors in trust, even if the funds were commingled); In re Shank, 792 F.2d 829, 830 (9th Cir. 1986) (sales taxes required by state law to be collected by sellers from their customers are "trust fund" taxes); DeChiaro v. New York State Tax Comm'n, 760 F.2d 432, 433-34 (2d Cir. 1985) (same); In re Advanced Golf Design, Inc., 272 B.R. 776, 778 (Bankr. M.D. Fla. 2001) (noting general rule); In re Am. Int'l Airways, Inc., 70 B.R. 102, 103 (Bankr. E.D. Pa. 1987) (excise and withholding taxes); In re Sanders, 156 B.R. 854, 858 (Bankr. N.D. Fla. 1993) (referring to federal gasoline taxes as trust fund taxes). The Debtors, therefore, have no equitable interest in these Governmental Obligations, and such funds are not available for the satisfaction of creditors' claims.

30.     Moreover, officers and directors of the collecting entity may be held personally liable for payments owed to Governmental Entities in certain circumstances. See, e.g., Fla. Stat.

Ann. § 213.29 (imposing personal liability for failure to collect and remit taxes); 26 U.S.C. § 4103 (same); <u>Sanders</u>, 156 B.R. at 858 (affirming penalties against debtor-employee of wholly-owned debtor corporation for failure to remit federal gasoline taxes). To the extent that any Governmental Obligations have been collected and unpaid by the Debtors in such jurisdictions, the Debtors' officers and directors may be exposed to lawsuits or criminal prosecution during the pendency of these Chapter 11 cases. Even the threat of such litigation or prosecution would be extremely distracting to the Debtors and their officers and directors, whose full-time attention to the Debtors' reorganization is integral to a successful reorganization. It is in the best interests of the Debtors' estates and consistent with the reorganization policy of the Bankruptcy Code to eliminate the possibility of such time-consuming and potentially damaging distractions.

31. The focus of these cases should be on restructuring the Debtors' operations. The payment of the Governmental Obligations is insignificant by comparison, and will have a negligible effect on the recoveries of the major creditors in these cases, particularly in view of the priority or secured status of a significant portion of the Governmental Obligations. Moreover, the payment amount will likely be offset in no small part by the amount of post-petition resources that will not be required to be expended in disputes with Governmental Entities that are, in the context of these cases, unnecessary and wasteful of the resources of the Debtors and this Court.

32. In numerous Chapter 11 cases, bankruptcy courts have exercised their equitable powers under Section 105 of the Bankruptcy Code to authorize debtors to pay pre-petition tax and related governmental obligations. <u>See</u>, <u>e.g.</u>, <u>In re Git-N-Go, Inc.</u>, Case No. 04-10509 (Bankr. N.D. Okla. Apr. 26, 2004); <u>In re FiberMark, Inc.</u>, Case No. 04-10463 (Bankr. D. Vt. Apr. 1, 2004); <u>In re Penn Traffic Co.</u>, Case No. 03-22945 (Bankr. S.D.N.Y. May 30, 2003); <u>In

re WorldCom, Inc., Case No. 02-13533 (Bankr. S.D.N.Y. July 22, 2002); In re Gentek, Inc., Case No. 02-12986 (Bankr. D. Del. Oct. 17, 2002); In re Enron Corp., Case No. 01-16034 (Bankr. S.D.N.Y. Dec. 3, 2001).  The Debtors submit that the present circumstances warrant similar relief in their Chapter 11 cases.

33. For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of their estates.

## Notice

34. Notice of this Motion has been provided to the Office of the United States Trustee, counsel for Wachovia Bank, N.A., as agent for the Debtors' secured lenders, the indenture trustee for the Debtors' noteholders, and the Debtors' fifty (50) largest unsecured creditors.  In light of the nature of the relief requested, the Debtors submit that no further notice is necessary.

## Waiver of Memorandum of Law

35. Pursuant to Local Bankruptcy Rule 9013-1(b) for the Southern District of New York, because there are no novel issues of law presented herein, the Debtors respectfully request that the Court waive the requirement that the Debtors file a memorandum of law in support of this Motion.

WHEREFORE, the Debtors respectfully request that the Court enter an order:

(a) authorizing payment, in the Debtors' discretion, of the Governmental Obligations owing to the Governmental Entities, with preference for sales, use, gasoline, gross-receipts, and other trust-fund taxes; and

(b) granting the Debtors such other and further relief as may be just.

Dated: February 21, 2005
       New York, New York

                                              /s/      *D. J. Baker*
                                              D. J. Baker (DB 0085)
                                              Sally McDonald Henry (SH 0839)
                                              Rosalie Walker Gray
                                              SKADDEN, ARPS, SLATE, MEAGHER
                                                & FLOM LLP
                                              Four Times Square
                                              New York, New York 10036
                                              Telephone: (212) 735-3000
                                              Facsimile: (917) 777-2150

                                              -and-

                                              Sarah Robinson Borders
                                              Brian C. Walsh
                                              KING & SPALDING LLP
                                              191 Peachtree Street
                                              Atlanta, Georgia 30303
                                              Telephone: (404) 572-4600
                                              Facsimile: (404) 572-5100

                                              PROPOSED ATTORNEYS FOR THE DEBTORS

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re                                                           :
                                                                :    **Chapter 11**
                                                                :
**WINN-DIXIE STORES, INC., <u>et al.</u>,**                     :    **Case No. 05-11063**
                                                                :
            Debtors.                                            :    **(Jointly Administered)**
                                                                :
-----------------------------------------------------------------x

### ORDER AUTHORIZING DEBTORS TO PAY PRE-PETITION TAXES AND OTHER ORDINARY COURSE GOVERNMENTAL OBLIGATIONS

Upon the Motion dated February 21, 2005 (the "Motion") of Winn-Dixie Stores, Inc. and its debtor affiliates (collectively, the "Debtors") for authority to pay pre-petition tax, fee, and fine obligations (collectively, the "Governmental Obligations") owing in the ordinary course to certain federal, state, and local governmental entities, both domestic and foreign (collectively, the "Governmental Entities"), in the Debtors' discretion, with preference for sales, use, gasoline, gross-receipts, and other trust-fund taxes; all as more fully set forth in the Motion; and upon consideration of the Declaration of Bennett L. Nussbaum Pursuant to Local Bankruptcy Rule 1007-2 (the "Local Rules") in Support of First-Day Motions and Applications sworn to on the 21st day of February, 2005; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § § 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. § § 1408 and 1409; and due and proper notice of the Motion having been provided to (i) the Office of the United States Trustee, (ii) counsel for

Wachovia Bank, N.A., as agent for the Debtors' secured lenders, (iii) the indenture trustee for the Debtors' noteholders, and (iv) the Debtors' fifty (50) largest unsecured creditors; and no other or further notice being required; and the relief requested in the Motion being in the best interests of the Debtors, their estates, and creditors; and the Court having reviewed the Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is

        ORDERED that the Motion is granted in its entirety; and it is further

        ORDERED that the Debtors are authorized, but not directed, to pay all Governmental Obligations to Governmental Entities, consistent with the Debtors' policies and practices in effect as of the commencement of the Debtors' Chapter 11 cases, but subject to any limitations that may exist in any cash collateral or post-petition financing documents or orders; and it is further

        ORDERED that entry of this Order is without prejudice to the right of the Debtors to contest the amount or basis of any of the Governmental Obligations, whether or not paid pursuant to this Order, or to seek a refund of the same; and it is further

        ORDERED that notwithstanding the relief granted herein or any actions taken hereunder, nothing contained in this Order shall create any rights in favor of, or enhance the status of any claim held by, the Governmental Entities or any third party; and it is further

        ORDERED that notwithstanding Federal Rule of Bankruptcy Procedure 6004(g), this Order shall be effective immediately upon its entry; and it is further

        ORDERED that the Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order; and it is further

-3-

ORDERED that the requirement pursuant to Local Rule 9013-1(b) that the Debtors file a memorandum of law in support of the Motion is hereby waived.

Dated: February ___, 2005
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE