OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
Counsel for Wachovia Bank, National Association
230 Park Avenue
New York, New York 10169
(212) 661-9100
Jonathan N. Helfat (JH-9484)
Richard G. Haddad (RH-6438)
Daniel F. Fiorillo (DF-7780)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re                                            :
                                                 :          Chapter 11
                                                 :
WINN-DIXIE STORES, INC., et al.,                 :          Case No. 05-11063
                                                 :
                Debtors.                         :          (Jointly Administered)
                                                 :
-----------------------------------------------------------x

## BRIEF OF WACHOVIA BANK, NATIONAL ASSOCIATION, IN SUPPORT OF EMERGENCY MOTION FOR INTERIM AND FINAL FINANCING ORDERS AUTHORIZING, AMONG OTHER THINGS, DEBTORS TO OBTAIN POST-PETITION FINANCING AND UTILIZE CASH COLLATERAL

Wachovia Bank, National Association ("Wachovia Bank"), by its attorneys, Otterbourg,

Steindler, Houston & Rosen, P.C., submits this Brief in support of the Debtors' motion (the "DIP

Motion") seeking, inter alia, authority to pay in full all claims of the Debtors' pre-petition secured

lenders and to obtain post-petition financing from Wachovia Bank, as administrative and

collateral agent (in such capacities, the "DIP Agent") for itself and the other financial institutions

from time to time party to the post petition credit agreement (collectively, the "Post-Petition

Lenders" and together with DIP Agent, the "DIP Lenders").

502759.3                              1

## PRELIMINARY STATEMENT

Prior to February 21, 2005 (the "Petition Date"), the Debtors had access to a $600 million credit facility (the "Pre-Petition Credit Facility"), pursuant to which they obtained loans, advances and other financial accommodations from Wachovia (f/k/a First Union National Bank), as administrative agent (in such capacity, the "Pre-Petition Agent") for itself and the other financial institutions from time to time party to the Pre-Petition Credit agreement (collectively, the "Pre-Petition Revolving Lenders" and together with Pre-Petition Agent, the "Pre-Petition Lenders").[1] As of the Petition Date, the Debtors were indebted to the Pre-Petition Lenders under the Pre-Petition Credit Facility in the aggregate amount of approximately $427,005,000 (the "Pre-Petition Indebtedness").

The Debtors have recently suffered significant sales declines and market-share losses. As a result of their financial difficulties, the Debtors experienced a reduction in vendor and other credit by more than $130 million. Faced with a continuing liquidity crisis, the Debtors filed for protection under Chapter 11 of the United States Bankruptcy Code. As the record will reflect, the Pre-Petition Credit Facility does not provide the Debtors with sufficient liquidity to sustain their operations and run their businesses in Chapter 11 Without post-petition credit being made available to Debtors on better terms and with greater credit availability than what the Pre-Petition Credit Facility currently provides, the Debtors will not have the funds necessary for the continued operation of their businesses. In this regard, the Debtors have negotiated an $800,000,000 post-

---

[1] Specifically, the pre-petition credit facility was provided by Wachovia Bank, N.A., as administrative agent, GMAC Commercial Finance LLC, as syndication agent, Wells Fargo Foothill, LLC, General Electric Capital Corporation and The CIT Group/Business Credit, Inc., as co-documentation agents, Wachovia Bank National Association, as successor by merger to Congress Financial Corporation (Florida), as collateral monitoring agent, Wachovia Capital Markets LLC, as sole arranger and bookrunner and various financial institutions from time to time party thereto as lenders.

502759.3                                         2

petition credit facility with the DIP Lenders (the "DIP Facility"), which will be available, if necessary, to satisfy trade debt, operating expenses and to repay the Pre-Petition Indebtedness owing to the Pre-Petition Lenders.

Other than Wachovia Bank, which is agent to, and a lender of, the Pre-Petition Lenders, none of the current DIP Lenders are members of Pre-Petition Lenders. As the Debtors will demonstrate at the hearing on the DIP Motion, the DIP Facility is truly a *new and improved* credit facility as compared with the Pre-Petition Credit Facility. For example, the interest rate is lower, the maximum credit limit is higher by $200 million, the borrowing base against eligible collateral has been expanded to include additional items such as certain of the Debtors' leasehold properties, and the percentage of eligible collateral against which the Debtors can borrow has increased (for example, the advance rate against eligible inventory has increased from 85% to 90%). All of the foregoing provide the Debtors with the needed liquidity and the ability to implement their business plan and also provide the Debtors with an excellent opportunity to successfully reorganize their businesses for the benefit of all estate creditors.

## POINT I.

### THE DECISION TO IMMEDIATELY REPAY THE PRE-PETITION INDEBTEDNESS IS WITHIN THE DEBTORS' BUSINESS JUDGMENT

There are a sound and practical business reasons why this Court should authorize the Debtors to immediately repay the Pre-Petition Indebtedness. First, the repayment of the Pre-Petition Indebtedness will stop the interest, fees and expenses from continuing to accrue on the Pre-Petition Credit Facility. Since the Pre-Petition Indebtedness accrues interests at a higher interest rate than the DIP Facility obligations, the repayment of the more expensive debt saves the Debtors money. In addition, without access to the full DIP Facility, the Debtors do not have the

improved credit terms or the increased credit availability that they urgently need to smoothly transition into Chapter 11. Lastly, as the Debtors will demonstrate, the businesses simply cannot run on cash collateral alone. The aggregate flow of cash receipts is not sufficient to fund all projected expenditures at various points in the Debtors' business plan, and cash collateral cannot be relied upon to be available when the Debtors need access to funds, as the Chapter 11 will likely dilute receivable collections and other cash receipts.

Bankruptcy Courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. See, e.g., In re Ames Dept. Stores, Inc., 115 B.R. 34 (Bankr. S.D.N.Y. 1990) (recognizing that debtors are entitled to exercise their basic business judgment in context of obtaining financing); In re TM Carlton House Partners, LTD, 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988) (holding that due to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (a debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice).

In fact, this Court has explicitly held that the "business judgment of the Debtor is the standard applied under the law in this district." In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). In this regard, the purpose for which a debtor in possession seeks to obtain financing has been held to be a business decision reserved for the debtor. See In re Simasko

<u>Production Co.</u>, 47 B.R. 444, 449 (Bankr. D. Colo. 1985). In <u>Simasko Production Co.</u>, the debtors sought authority to obtain financing for the purpose of continuing to operate certain drilling operations. Despite conflicting testimony as to the soundness of the decision, the court found that the decision to obtain financing for the purpose of continuing drilling operations was within the debtors' business discretion.

Here, after appropriate investigation and analysis, the Debtors' management has concluded that it would be in the best interest of the Debtors, their estates and their creditors to use a portion of the borrowings under the DIP Facility to repay the Pre-Petition Indebtedness in full. Prior to the Petition Date, the Debtors' poor financial results and decreased cash availability, coupled with downgrades by Moody's Investor Services and Standard & Poor's Rating Services, led several of the Debtors' trade creditors to demand shorter payment terms. Given the reputation associated with financially troubled companies, especially financially troubled companies that file for bankruptcy, the Debtors anticipate that trade creditors will be reluctant to conduct business with the Debtors on reasonable terms and conditions. Accordingly, the Debtors propose to immediately repay the indebtedness owing to the Pre-Petition Lenders. By doing so, the Debtors will realize a significant savings by eliminating the more expensive Pre-Petition Indebtedness with the cheaper DIP Facility loans, will obtain better credit terms with a higher credit limit, and hope to achieve financial stability and improve their reputation and instill a higher level of confidence among their trade support. Clearly, the decision to immediately repay the Pre-Petition Indebtedness using a portion of the DIP Facility cannot be considered anything other than a business decision. As such, the decision to immediately repay the Pre-Petition Indebtedness should be reserved for the Debtors.

## POINT II.

## THE DIP FACILITY IS NOT AN IMPERMISSIBLE "ROLL UP"

While the repayment of the Pre-Petition Indebtedness as requested under the DIP Motion is "technically" a roll up under this Court's Guidelines (defined below), as the Debtors are using the proceeds of the DIP Facility to repay the more expensive Pre-Petition Indebtedness owing under a different credit facility, the present state of the law is such that the "roll up" sought in this case should be allowed -- even on day one -- since the pre-petition debt to be consolidated or "rolled-up" was already fully secured on the Petition Date. In commenting on the permissibility of "roll ups," Collier on Bankruptcy states:

> Roll-overs come in two basic forms. First, a gradual roll-over occurs when a pre-petition lender agrees to advance post-petition funds with the agreement that proceeds of pre-petition accounts receivables will be applied to reduce the pre-petition loan. Alternatively, a post-petition lender can simply lend enough post-petition to payoff the pre-petition loan, immediately converting all of the lender's pre-petition debt to post-petition debt.

> Neither approach should be controversial from the perspective of the priority or satisfaction of liens if the pre-petition lender is fully secured on the petition date, although the post-petition lender often bargains for substantial procedural protections that are not available to protect its pre-petition liens (footnote omitted) 3 Collier on Bankruptcy ¶ 364.04[2][e], p. 364-16 (15th ed. 2002).

The roll up provisions proposed in this instance are anything but controversial. As previously discussed, the Debtors are indebted to the Pre-Petition Lenders in respect of obligations arising under the Pre-Petition Credit Agreement in the aggregate amount of approximately $427,005,000. There is no dispute that the value of the collateral securing the Pre-Petition Indebtedness more than exceeds the aggregate outstanding Pre-Petition Indebtedness.

Accordingly, the Pre-Petition Lenders are fully secured and the proposed "roll up" provisions are therefore not controversial. Similar roll up provisions are routinely granted under the circumstances here presented to this Court. See, e.g., In re Donnkenny Apparel, Inc., No. 05-10712 (RDD) (Bankr. S.D.N.Y. Feb. 9, 2005); In re Twinlab Corporation, Case No. 03-15564 (CB) (Bankr. S.D.N.Y. Sept. 25, 2003) (Docket No. 80) (authorizing the Debtors to "pay the Agent on account of the existing obligations"); In re Ogden New York Services, Inc., No. 02-40826 (CB) (Bankr. S.D.N.Y. May 15, 2002); and In re Cityscape Fin. Corp., Nos. 98-22569 and 98-22570 (ASH) (Bankr. S.D.N.Y. Oct. 27, 1998).

This Court has adopted a General Order identifying certain financing provisions, characterized as "extraordinary" provisions, that must comply with specific requirements before the Court will approve them. See General Order No. M-274 (the "Guidelines"). The only other condition of the DIP Facility, other than the roll up discussed above, that would clearly be deemed an "extraordinary" provision under the Guidelines is the Debtors' waiver of Section 506(c) claims. However, it is entirely common for a fully secured, post-petition lender to request such protection from the outset of the case, and the waiver contained in the DIP Facility expressly provides that it is not binding upon the creditors' committee or any other party in interest.

With respect to the "roll up" provision, an analysis of the factors set forth in the General Order clearly favors approval of the proposed DIP Facility. Specifically, among the factors set forth in the General Order, of particular relevance to this case are (i) the extent and value of the pre-petition liens held by the pre-petition lender (and in particular the amount of any "equity cushion" the pre-petition lender may have) and (ii) whether the repayment can be unwound.

Here, the Pre-Petition Lenders are over secured and the proposed form of order approving the DIP Motion provides ample opportunity to unwind the repayment should grounds to do so be disclosed.    As there is no cross collateralization, unwinding the repayments is easily accomplished.    Furthermore, the proposed form of order (at ¶ 15(e)) provides seventy five (75) days within which certain parties can bring an action seeking to, among other things, disgorge the repayment.    Thus, the "extraordinary" provisions of the DIP Facility (including, without limitation, the "roll up" provisions contained therein) satisfy the requirements set forth by this Court with respect to requests for the approval of "extraordinary" provisions.

In addition, similar post-petition financing facilities containing a "roll up" have been allowed where, as here:

(1)    absent the proposed financing, the debtor's business operations will not survive;

(2)    the debtor is unable to obtain alternative financing on acceptable terms;

(3)    the proposed lender will not accede to less preferential terms; and

(4)    the proposed financing is in the best interests of the general creditor body.

In re Vanguard Diversified, Inc. 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983).    In this regard, absent the proposed financing, the Debtors' suppliers will refuse to sell critical supplies and services to the Debtors.    Clearly this would jeopardize the Debtors' survival.    In addition, none of the alternative potential sources of post-petition financing proposed a facility that, in the Debtors' business judgment, would meet the Debtors' working capital requirements.

The "roll up" is required for other practical reasons as well.    The Debtors' inventory currently includes, and will in the near future include, both pre-petition and post-petition goods.

502759.3

8

The Debtors' programs with customers cover pre-petition and post-petition time periods. It will be virtually impossible to segregate the pre-petition collateral from the post-petition collateral. As a result, the Pre-Petition Indebtedness will be subject to a gradual "roll up" in any event.

The Debtors believe that the DIP Facility will allow the Debtors sufficient liquidity to operate and implement a plan that will inure to the benefit of all constituencies, and is therefore clearly in the best interests of creditors. Without the financing, the Debtors' reorganization prospects are dim. When, as here, an estate is clearly enhanced, "roll up" will be permitted. In re Ames Dept. Stores, Inc., 115 B.R. 34 (Bankr. S.D.N.Y. 1990) (financing approved, including cross-collateralization provisions, where it appeared that the purpose of the loan was to benefit estate rather than party in interest); Ellingsen MacLean, supra, 837 F.2d at 603 (6th Cir. 1987).

## CONCLUSION

The proposed DIP Facility does not provide for an impermissible "roll up", especially given the fact that the Pre-Petition Indebtedness is fully secured. Instead, the "roll up" contemplated by the proposed DIP Facility is similar to "roll ups" approved in other cases. In this regard, any Committee appointed in these cases will have an opportunity to fully investigate and review the Pre-Petition Lenders' liens and, if necessary, commence an adversary proceeding to challenge such liens. Furthermore, the Debtors have exercised sound business judgment in determining that entering into the DIP Facility in order to, among other things, jettison the more expensive Pre-Petition Credit Facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Facility. The terms of the DIP Financing are fair and reasonable and are in the best interests of the Debtors' estates. Accordingly, for all of the foregoing reasons, this Court

should approve the DIP Motion and thereby permit the Debtors to borrow funds under the DIP

Facility on the terms and conditions set forth therein.


Dated  February 22, 2005

        New York, New York



                        OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.


                        By:  /s/ Jonathan N. Helfat
                             Jonathan N. Helfat (JH-9484)
                             230 Park Avenue
                             New York, New York 10169
                             (212) 661-9100

                             Attorneys for Wachovia Bank, National Association

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

In re:                                          :       Chapter 11

OGDEN NEW YORK SERVICES, INC., et al.,          :       Case Nos. 02-40826 (CB)
                                                          through 02-40949 (CB)
                Debtors and Debtors in Possession.   :
                                                        (Jointly Administered)
                                                :

-------------------------------------------------------X

### FINAL ORDER (i) AUTHORIZING POSTPETITION FINANCING PURSUANT TO 11 U.S.C. § 364, (ii) GRANTING SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIM STATUS PURSUANT TO 11 U.S.C. §§ 105, 503(b), 507 AND 364, (iii) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (iv) GRANTING ADEQUATE <u>PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364</u>

Upon the motion of Covanta Energy Corporation and its affiliated debtors and debtors-in-possession (jointly and severally, the "Debtors"),[1] dated April 1, 2002 (the "Motion"), for entry of an order pursuant to sections 105, 361, 363, 364(c) and (d), 503(b) and 507 of Title 11, Chapter 11 of the United States Code (the "Bankruptcy Code"),[2] and Rules 2002, 4001(b), (c) and (d) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking the relief described in paragraphs (i) through (vii) below, as modified on the record of the hearing held before this Court on April 3, 2002  (the "Relief"):

(i)       authorizing the Debtors to obtain and incur on a joint and several basis postpetition financing in the form of loans and other financial accommodations, including the issuance of letters of credit, pursuant to that certain Debtor-In-Possession Credit Agreement, dated as of April 1, 2002, substantially in the form annexed to the

---

[1]    The Debtors are listed on Exhibit A attached hereto.

Motion (as amended, supplemented or otherwise modified, the "DIP Agreement"), by and among the Debtors, as joint and several borrowers, Bank of America, N.A., as Administrative Agent (the "Administrative Agent"), Deutsche Bank AG, New York Branch, as Documentation Agent (the "Documentation Agent", and together with the Administrative Agent, the "DIP Agents"), the lenders from time to time party thereto (collectively, the "DIP Lenders"), in an aggregate principal amount not to exceed $289,062,730.13 (the "DIP Financing") comprised of (a) a $48,200,000 tranche to be utilized for cash borrowings and the issuance of new letters of credit (the "Tranche A Facility"); and (b) a $240,862,730.13 tranche to be used solely to continue, replace, reissue or renew, as necessary, the outstanding letters of credit listed on Exhibit B attached hereto (the "Expiring Letters of Credit") on the date of the Interim Order (as hereinafter defined) (the "Tranche B Facility"); in addition, Section 10.23 of the DIP Agreement provides for a mechanism for the funding of certain prepetition loss-sharing obligations among the Prepetition Lenders (as defined in the Motion), which do not form part of the DIP Financing and are not entitled to any of the postpetition liens and claims granted to the Tranche A Facility and the Tranche B Facility pursuant to this Final Order (the "Tranche C Facility"),[3] provided that all such obligations are Prepetition Secured Obligations owing to the Prepetition Lenders having the same priority as the reimbursement obligation in respect of loss-sharing payments required to be made under

---

[2]    All section and rule references are to the Bankruptcy Code and Bankruptcy Rules, respectively, unless otherwise indicated.

[3]    For the avoidance of doubt, any obligations that arise under the Tranche C Facility shall not be included in the defined term "Obligations" used in this Final Order or the DIP Agreement, provided that all such obligations are and shall be deemed to be Prepetition Secured Obligations owing to the Prepetition Lenders and shall be entitled to all of the rights, privileges and protections provided herein for all other Prepetition Secured Obligations. Capitalized terms used herein and not otherwise defined have the meanings assigned to such terms in the DIP Agreement.

the Intercreditor Agreement as defined in the Credit Agreement (as defined in the Motion).

(ii)    authorizing the Debtors to cause the Subsidiaries listed on Exhibit C attached hereto, each a non-Debtor Subsidiary of the Debtors (collectively, the "DIP Guarantors"), to jointly and severally, unconditionally and irrevocably guarantee the Obligations (as defined in and arising under the DIP Agreement and, for the avoidance of doubt, excluding the Tranche C Facility) pursuant to the Subsidiary Guaranty in the form annexed to the DIP Agreement (the "DIP Guaranty"), and to grant to the DIP Agents, for the benefit of the DIP Lenders with respect to the DIP Financing, pursuant to the terms of the Security Agreement among the Debtors, the DIP Guarantors and the Administrative Agent of even date with the DIP Agreement in the form annexed to the DIP Agreement (the "DIP Security Agreement"), security interests in and liens upon all of the assets of the DIP Guarantors (except to the extent, if any, specifically provided in the DIP Security Agreement) as security therefor, subject only to valid, perfected and non-voidable liens and security interests existing as of the Petition Date (the DIP Agreement, the DIP Guaranty, the DIP Security Agreement, all other Collateral Documents and all other agreements, instruments and documents executed and delivered in connection therewith, collectively, the "DIP Financing Documents");

(iii)    granting to the Administrative Agent for the benefit of the DIP Lenders, subject to the priorities between the Tranche A Facility and the Tranche B Facility more particularly described herein and in the DIP Financing Documents and subject to the Carve-Outs, (A) pursuant to section 364(c)(2), first priority, valid, perfected and non-voidable senior security interests in and liens upon all unencumbered assets of the estates of each of the Debtors, of whatever kind or nature, including (without

3

limitation) all real, personal or mixed property of each of the Debtors (including leasehold interests and capital stock) at any time existing or arising, now or in the future, wherever located, and all proceeds and products thereof (but excluding each estate's interest in the proceeds of any avoidance actions pursuant to sections 544 - 550), (B) pursuant to section 364(d), valid, perfected and non-voidable first priority, senior priming security interests in and liens upon all assets of the estates of each of the Debtors as of the Petition Date that secure obligations owing to the Prepetition Secured Parties (as defined in the Motion), including the Debenture Holders (as defined in the Motion), arising under the Prepetition Loan Documents and the 9.25% debentures (as each is defined in the Motion), wherever located and of whatever kind or nature, and all proceeds and products thereof (the "Prepetition Collateral"),[4] having priority over only the valid, perfected and non-voidable liens and security interests granted to Bank of America, N.A., as Administrative Agent under the Credit Agreement (in such capacity, the "Prepetition Agent"), for the benefit of the Prepetition Secured Parties (as defined in the Motion) pursuant to the Prepetition Loan Documents and the Prepetition Security Agreement (for the avoidance of doubt, including the equal and ratable security interest of the Debenture Holders (the "Prepetition Liens"), and (C) pursuant to section 364(c)(3), valid, perfected and non-voidable security interests in and liens upon all assets of the estates of each of the Debtors at any time existing or arising, now or in the future, wherever located and of whatever kind or nature, and all proceeds and products thereof, subject and junior to any valid, enforceable, perfected and non-voidable liens and security interests that existed on the Petition Date (other than the Prepetition Liens, the "Petition Date Liens") and to the

---

[4]  "Prepetition Collateral" includes, without limitation, all Equipment, Inventory, Accounts, Related Contracts, Deposit Accounts, Securities Collateral, Investment Collateral, Intellectual Property Collateral and Assignee

Project Replacement Liens (as defined in paragraph 5(c) below) (the collateral described in clauses (A), (B) and (C) of this subparagraph (iii) being collectively referred to as the "DIP Collateral"), all of the DIP Collateral to secure the loans, advances and all Obligations at any time owing or to be performed by the Debtors pursuant to the DIP Financing Documents, but in no event shall the DIP Collateral secure the Tranche C Facility, except to the extent DIP Collateral secures Prepetition Secured Obligations pursuant to the adequate protection terms hereof;

        (iv)     pursuant to section 364(c)(1), granting superpriority administrative claim status for such Obligations, subject only to the Carve-Outs to the extent provided herein;

        (v)     pursuant to section 363(c), authorizing the Debtors to use that portion of the Prepetition Collateral that constitutes "cash collateral" within the meaning of section 363 of the Bankruptcy Code (the "Cash Collateral");

        (vi)     pursuant to sections 361, 363(e), 364(c) and 364(d), providing adequate protection to the Prepetition Agents and the Prepetition Secured Parties, subject to the Carve-Outs, with respect to and to the extent of any postpetition diminution in the value of Prepetition Agents' or the Prepetition Secured Parties' interests in the Prepetition Collateral resulting from the (A) priming liens and security interests to be granted herein pursuant to section 364(d) to the Administrative Agent for the benefit of the DIP Lenders to secure the Obligations, (B) Debtors' use of the Prepetition Secured Parties' Cash Collateral, (C) use, sale or lease of the Prepetition Collateral other than the Prepetition

---

Agreements (as such terms are defined and to the extent set forth in the Prepetition Security Agreement) now or hereafter existing of the Debtors party to the Prepetition Loan Documents and all proceeds thereof.

5

Secured Parties' Cash Collateral, and (D) imposition of the automatic stay pursuant to section 362(a); and

(vii)    requesting that this Court schedule a final hearing (the "Final Hearing") to be held within forty-five (45) days of the entry of the Interim Order to consider entry of a final order in form acceptable to the DIP Agents and the required DIP Lenders (the "Final Order") authorizing the above matters in full;

and an emergency hearing on the Motion having been held before the Honorable Stuart Bernstein on April 1, 2002 and an interim hearing on the Motion to consider entry of an interim order (the "Interim Order") pursuant to Rules 4001(b) and (c) having been held before this Court on April 3, 2002 (collectively, the "Initial Hearings")

and the Interim Order having been entered on this Court's docket on April 5, 2002, inter alia, authorizing the Debtors to (i) borrow cash or obtain letters of credit from the DIP Lenders in an aggregate amount not to exceed $20 million under the Tranche A Facility of the DIP Agreement for use by the Debtors until the Final Hearing, and in no event for a period of more than forty-five (45) days, and (ii) continue, replace, reissue or renew under the Tranche B Facility of the DIP Agreement the Expiring Letters of Credit in the maximum aggregate principal amount of $240,862,730.13 prior to this Court's entry of this Final Order, all upon the terms and conditions set forth in the DIP Agreement (collectively, the "Interim Borrowings");

and it further appearing, based upon the record presented to this Court at the Initial Hearings and on May 7, 2001 at the Final Hearing that the ability of the Debtors to continue in business so that they can attempt to confirm a plan of reorganization under the Bankruptcy Code depends upon obtaining the Relief and the Debtors will suffer immediate and irreparable injury if such Relief is not granted;

6

and adequate notice of the Relief, the Interim Order, the Initial Hearings and the Final Hearing having been given to, among others, the (i) United States Trustee, (ii) counsel to the agents of the Debtors' prepetition lenders, (iii) counsel to the agents of the Debtors' proposed DIP Lenders, (iv) counsel to the trustee for the Debenture Holders, (v) counsel to an informal committee of Debenture Holders, (vi) holders of the thirty (30) largest unsecured claims against the Debtors, (vii) project-level indenture trustees or paying agents as identified on Exhibit C to the Affidavit of Jeffrey R. Horowitz, filed concurrently with the Motion (the "Horowitz Affidavit"), (viii) issuers of surety bonds as identified on Exhibit E to the Horowitz Affidavit, (ix) the entities identified on Exhibit D to the Horowitz Affidavit and (x) the official committee of unsecured creditors (the "Committee").    Under the circumstances, such notice of the Initial Hearings, Interim Order, Final Hearing and the Relief constitutes good and sufficient notice and complies with the requirements of sections 102(1), 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001.

**NOW, THEREFORE,** upon all the pleadings filed with this Court, the entire record of the Initial Hearings and the Final Hearing and upon the evidence presented and the arguments of counsel made at the Initial Hearings and the Final Hearing; and the use of the Prepetition Secured Parties' Cash Collateral having been approved on consent at the Initial Hearings; and this Court having concluded that entry of this Final Order is in the best interests of the Debtors, their creditors and estates and having found good and sufficient cause therefor, the Court hereby **OVERRULES** all objections to the Relief and hereby **FINDS** and **CONCLUDES** that:[5]

---

[5]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

A.     On April 1, 2002 (the "Petition Date"), the Debtors filed voluntary chapter 11 petitions under the Bankruptcy Code.  Each chapter 11 petition filed by a Debtor commencing its chapter 11 case was duly authorized by all requisite actions of the board of directors, shareholders, general partners or managing members, as applicable, of such Debtor, in accordance with applicable law and the organizational documents of such Debtor.  No trustee or examiner has been appointed as of the date of this Final Order.  Pursuant to sections 1107(a) and 1108, the Debtors are authorized to operate their business as debtors in possession.

B.     This Court has jurisdiction over these chapter 11 cases and the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2)(D), (G) and (M).

C.     On April 9, 2002, the United States Trustee appointed the Committee.

D.     The Debtors have insufficient funds to meet expenses necessary for the operation of their business and have requested that they be authorized to obtain loans and other financial accommodations pursuant to the terms and conditions set forth herein and in the DIP Agreement.

E.     The Debtors are unable to obtain the financing necessary for the operation of their business either (i) on an unsecured basis pursuant to section 503(b)(1), (ii) pursuant to sections 364(a) or 364(b), (iii) solely on a junior secured basis pursuant to section 364(c)(3), or (iv) on any other terms or conditions more favorable to the Debtors than the terms and conditions set forth herein and in the DIP Financing Documents.

F.     The DIP Lenders (who are certain of the Prepetition Secured Parties) have agreed to provide the DIP Financing on the terms and conditions set forth in the DIP Financing Documents, provided that the Court enters an order satisfactory to the DIP Agents and the required DIP Lenders approving the DIP Financing Documents and granting such rights,

8

privileges, claims and priorities to or for the benefit of the DIP Agents and the DIP Lenders as are set forth herein, in the DIP Financing Documents with respect to all Obligations.

G.    The Debtors and the DIP Guarantors will receive and benefit, and have received and benefited, from the loans and other financial accommodations provided from time to time by the DIP Agents and the DIP Lenders under the DIP Financing Documents. The loans and other financial accommodations provided under the DIP Financing Documents are necessary to fund the business of the Debtors and will contribute to payment of the actual and necessary costs and expenses of preserving their estates.

H.    In addition, it is the prudent business judgment of the Debtors and in the best interests of their estates and creditors that the Debtors use commercially reasonable best efforts to prevent the Expiring Letters of Credit from being drawn solely as a consequence of the commencement of these chapter 11 cases or their maturity occurring during these chapter 11 cases. The Expiring Letters of Credit secure obligations of the Debtors to third parties pursuant to the terms of various agreements. In the conduct of the Debtors' normal business transactions, so long as the maturity of such letters of credit is extended, it appears that such letters of credit would not be drawn by the beneficiaries thereof and the Debtors would not incur the significant liabilities attendant thereto.

I.    The Debtors' current financial condition and capital structure is benefited by maintaining the Expiring Letters of Credit under the Tranche B Facility of the DIP Agreement and keeping the Debtors' reimbursement obligation a contingent one. In the event that such letters of credit had not been maintained and extended under the Tranche B Facility they would likely have been drawn and the Debtors would have incurred actual secured reimbursement obligations to the Prepetition Lenders in the aggregate principal amount of $240,862,730.13 and thereby would have substantially increased the Debtors' prepetition secured liabilities, adversely

9

affecting the Debtors' ability to successfully reorganize. In good faith reliance on the Interim

Order and the rights, remedies and privileges afforded to the DIP Lenders thereunder and under

section 364(e), the DIP Lenders extended certain of the Expiring Letters of Credit prior to the

date hereof in the aggregate face amount of over $230 million.

        J.   Without limiting the Committee's rights under paragraph 20 herein, the

Debtors acknowledge the validity, priority, non-avoidability, perfection and enforceability of the

liens and claims of the Prepetition Secured Parties (including the Debenture Holders) and the

equal and ratable entitlement of each such Prepetition Secured Party with respect to such liens

(such equal and ratable liens being referred to herein as the "Ratable Liens"), and each

Prepetition Secured Party acknowledges the validity, priority, non-avoidability, perfection,

enforceability and equal and ratable entitlement of the Ratable Liens and claims of each other

Prepetition Secured Party. Notwithstanding the preceding sentence, in the event the Ratable

Liens of the Debenture Holders (on the one hand) or the Prepetition Lenders (on the other hand)

are determined judicially or otherwise to be unperfected or avoided for any reason, (i) the

provisions of this Final Order shall be inoperative to the extent such provisions purport to

provide or acknowledge the benefit of the Ratable Liens to the Indenture Trustee (as defined

below) and the Debenture Holders (on the one hand) or the Prepetition Agent and Prepetition

Lenders (on the other hand), and (ii) such judicial or other determination with respect to the party

whose Ratable Liens were determined to be unperfected or otherwise avoided shall not have the

effect of rendering unperfected, avoided or avoidable any portion of any related liens or security

interests granted for the benefit of the other party.

        K.   The Debtors admit that (i) the aggregate outstanding unpaid principal

amount plus letter of credit exposure and reimbursement obligations owed to the Prepetition

Lenders under the Credit Agreement and the other Prepetition Loan Documents, as of the

Petition Date was approximately $477 million (inclusive of all unfunded letters of credit, including the letters of credit that are now Tranche B Facility letters of credit, which are subject to paragraph 2 herein, and approximately $197[6] million with respect to funded letters of credit), plus accrued interest, fees (including, without limitation, amendment, anniversary and exit fees) and other charges thereunder; (ii) the aggregate outstanding unpaid amount owed to the Debenture Holders, as of the Petition Date is approximately $105 million, inclusive of principal and accrued, but unpaid, interest; and (iii) all such obligations and any other obligations owed to the Prepetition Secured Parties hereafter arising or accruing under the Prepetition Loan Documents, the Prepetition Security Agreement and/or the Debenture Holders' indenture (the "Prepetition Secured Obligations") are, without limiting the Committee's rights under paragraph 20 herein, without defense, claims, counterclaim or offset of any kind.

L.    Without limiting the Committee's rights under paragraph 20 herein, the Debtors further admit that the Prepetition Secured Obligations are secured pursuant to the Prepetition Loan Documents and the Prepetition Security Agreement by valid, perfected, enforceable and non-voidable first priority liens and security interests in the Prepetition Collateral subject only to liens permitted therein.

M.    The Prepetition Agent and Prepetition Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral pursuant to sections 361, 363(e) and 364(c) and (d) in order to protect the Prepetition Agent and the Prepetition Secured Parties from any postpetition diminution in the value of their interest in Prepetition Collateral resulting from the (i) Debtors' use of the Prepetition Secured Parties' Cash Collateral, (ii) priming liens and security interests granted to the Administrative Agent for the benefit of the DIP Lenders pursuant to this Final Order and the DIP Financing Documents, (iii) Debtors' use, sale or lease of

---

[6]    This number includes equity bond letters of credit is sued prepetition and funded after the Petition Date.

the Prepetition Collateral other than the Prepetition Secured Parties' Cash Collateral and (iv) imposition of the automatic stay, all subject to the Carve-Outs.

N.    The Debtors have insufficient available sources of working capital from the Prepetition Secured Parties' Cash Collateral or other financing to carry on the operation of their business without the DIP Financing.    The ability of the Debtors to maintain business relationships with their vendors and suppliers, pay necessary employees and otherwise finance their operations is essential to the Debtors' continued viability.    In addition, the Debtors' critical need for financing is immediate.    In the absence of access to the Prepetition Secured Parties' Cash Collateral and the DIP Financing, continued operation of the Debtors' business would be impossible, a precipitate liquidation would ensue, and immediate and irreparable harm to the Debtors' estates would occur.

O.    The Debtors' ability to continue in business so they can attempt to reorganize under the Bankruptcy Code depends upon their obtaining the relief sought in the Motion and the entry of this Final Order is necessary to avoid irreparable harm to, and is in the best interests of the Debtors, their creditors and their estates.

P.    Entry of this Final Order is, therefore, necessary for the Debtors to continue in business and accomplish their goal of reorganizing under the Bankruptcy Code.

Q.    Based on the record before this Court, the financing arrangement contemplated by the DIP Financing Documents is the product of an arm's length negotiation and is entered into by the DIP Agents and the DIP Lenders in good faith, as the term "good faith" is used in sections 364(e) and 363(m).    The transactions contemplated by the DIP Financing Documents are not intended to provide the DIP Agents or DIP Lenders with sufficient control over the Debtors so as to subject the DIP Agents or the DIP Lenders to any liability (including, without limitation, environmental liability as an "owner," "operator" or "responsible person" as

those terms are used in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorizations Act of 1986) in connection with the management of the Debtors' business or any of the Debtors' properties.

R.    The Initial Hearings were held on April 1 and 3, 2002 and the Final Hearing was held on May 7, 2002, each pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), and notice of the Motion, the Initial Hearings, the Interim Order and the Final Hearing were duly and properly given to the appropriate parties pursuant to sections 102(l), 363(c) and 364(c) and (d) and Bankruptcy Rules 2002 and 4001(b), (c) and (d).

Based upon the foregoing findings and conclusions and upon the record made before this Court, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion, as amended on the record at the Initial Hearings, is granted and the DIP Financing Documents as amended as of this date (including, without limitation, the "Second Amendment to Debtor-In-Possession Credit Agreement") are hereby approved in all respects, subject to the terms and conditions set forth below, and any objections to the Relief are overrruled.

2.    The Debtors are authorized to: (a) (i) obtain loans and request the issuance of letters of credit under the Tranche A Facility, as more specifically described in (and subject to the terms and conditions of) the DIP Agreement, in an aggregate amount not to exceed $48,200,000, for the Debtors' working capital needs and capital expenditures, and (ii) use the Prepetition Secured Parties' Cash Collateral in the operation of the Debtors' business, and (b) continue, replace, reissue or renew under the Tranche B Facility of the DIP Agreement the Expiring Letters of Credit in the maximum aggregate principal amount of $240,862,730.13, in

each case (for purposes of clauses (a) and (b)) in accordance with the terms of this Final Order and the DIP Financing Documents and the Monthly Budget, provided however that if (i) an issuing bank receives a draw notice within 60 days of the entry of the Interim Order, with respect to only Expiring Letters of Credit marked with an asterisk on Exhibit B, and (ii) such draw notice is issued on the same grounds on which the beneficiary of such Expiring Letter of Credit could have issued a similar draw notice on the date of entry of the Interim Order (and no additional grounds for a drawing then exist), then a draw based upon such draw notice will not give rise to any postpetition lien or priority status for claims for the reimbursement of such amounts for such Expiring Letters of Credit pursuant to the Tranche B Facility, and all such claims shall be Prepetition Secured Obligations with all of the rights and privileges granted to Prepetition Secured Obligations in the Prepetition Loan Documents, the Prepetition Security Agreement and this Final Order and the Tranche B Commitment (as defined in the DIP Agreement) shall be reduced accordingly.

3.    The Debtors are hereby authorized and directed to (a) execute and deliver the DIP Financing Documents, as amended as of this date, and all other documents necessary or that the DIP Agents may deem desirable to implement the DIP Financing (through one or more officers designated by them) (provided that the Debtors shall give five (5) business days prior notice to counsel to the Committee and counsel to the informal committee of Debenture Holders of any proposed modification or amendment), including, without limitation, modifications and amendments to the DIP Financing Documents and waivers with respect thereto that are not material in the judgment of the Debtors and the required DIP Lenders and as may be agreed upon in writing by the Debtors and the required DIP Lenders, (b) grant the security interests and liens contemplated hereby and thereby, (c) effect all transactions and take any actions provided for in or contemplated by the DIP Financing Documents or deemed necessary or desirable by the DIP

14

Agents or the required DIP Lenders to effectuate the terms and conditions of the DIP Financing Documents and this Final Order, including, without limitation, the payment of any and all fees, including the fees under Section 2.3 of the DIP Agreement and all accrued fees set forth in the fee letters referred to in the DIP Agreement, all costs, charges, commissions and expenses, including reasonable professional fees, payable under the Credit Agreement and the DIP Agreement, including those incurred in negotiating and preparing the DIP Financing Documents (and hereafter the Debtors shall provide the United States Trustee and counsel to the Committee with copies of summary invoices received by the Debtors relating to the fees and expenses of counsel to the DIP Lenders and DIP Agents reimbursed under the terms of the DIP Agreement), and (d) comply with all provisions of the DIP Financing Documents, including without limitation, the payment and satisfaction in full of all Obligations when due in accordance with the terms thereof and the provision of indemnification to the DIP Agents and DIP Lenders and each "indemnified person," as defined in and to the extent and manner provided for in the DIP Financing Documents. Upon execution and delivery thereof, the DIP Financing Documents shall constitute valid and binding obligations of the Debtors, enforceable against each such Debtor in accordance with the terms of each of the DIP Financing Documents.

4.     The Debtors are further authorized and directed to continue, replace, renew or reissue the Expiring Letters of Credit issued under the Credit Agreement as letters of credit under the Tranche B Facility of the DIP Agreement, and the Debtors are authorized to incur the reimbursement obligations as such may come due under the Tranche B Facility, subject to the proviso in paragraph 2 hereof.

5.     The Obligations shall be entitled to, and are hereby irrevocably granted, the following protections, security interests, liens and priorities in favor of the Administrative Agent and the DIP Lenders, subject to the priorities between the Tranche A Facility and the

Tranche B Facility more particularly described herein and in the DIP Financing Documents, to secure full and complete compliance with, and timely payment of, all Obligations at any time owing or to be performed by the Debtors pursuant to the DIP Financing Documents, all subject only to the Carve-Outs:

(a)    pursuant to section 364(c)(2), first priority, valid, perfected and non-voidable senior security interests in and liens upon all unencumbered assets (if any), of the estates of each of the Debtors, of whatever kind and nature including (without limitation) all real, personal or mixed property of each of the Debtors (including leasehold interests and capital stock) at any time existing or arising now or in the future, wherever located, and all proceeds and products thereof (but excluding each estate's interest in the proceeds from any avoidance actions pursuant to sections 544-550);

(b)    pursuant to section 364(d), valid, perfected and non-voidable first priority, senior priming security interests in and liens upon all assets of the estates of each of the Debtors, which, as of the Petition Date, constituted the Prepetition Collateral of the Prepetition Agent and the Prepetition Secured Parties, having priority over and senior to the security interests and liens of the Prepetition Agent and the Prepetition Secured Parties (all security interests and liens granted pursuant to this paragraph 5(b) being subject and junior to the Petition Date Liens and the Project Replacement Liens); and

(c)    pursuant to section 364(c)(3), valid, perfected and non-voidable security interests in and liens upon all assets of the estates of each of the Debtors at any time existing or arising, now or in the future, wherever located and of whatever kind or nature and all proceeds and products thereof, subject only and junior to (x) the Petition Date Liens and (y) the "Replacement Liens" as defined in, and subject to paragraphs 12 and 13 of, that certain Final Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, and (II) Granting

16

Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364, entered by this Court on April 18, 2002 (as in effect on the date hereof and as further modified or amended in a manner reasonably acceptable to the Administrative Agent and the requisite DIP Lenders, the "Final Cash Collateral Order") (such "Replacement Liens", together with replacement liens granted as adequate protection under any other Project Cash Collateral Order (as defined in the DIP Agreement), which term shall include, for the avoidance of doubt, the GECC Cash Collateral Order (as defined herein), being referred to herein as the "Project Replacement Liens") and any other Project Replacement Liens, provided, however, that upon request, and subject in all circumstances to an order of this Court pursuant to section 363(f) and all of the rights afforded to the DIP Lenders under section 363(f) and the DIP Financing Documents, all of which are preserved hereby, the DIP Lenders agree to relinquish their security interests on Project assets upon the exercise of certain "buy out rights" of third parties (to the extent enforceable) in accordance with the provisions of service agreements or similar contracts with any of the Debtors, made pursuant to motions filed with (and approved by) this Court and exercised before confirmation of any plan of reorganization of such Debtor; provided, further that such liens shall attach to the proceeds, if any, from such sale with the same priority as the liens on the assets sold.

6.    All obligations that arise under the Tranche C Facility are Prepetition Secured Obligations owing to the Prepetition Lenders having the same priority as the reimbursement obligation in respect of loss-sharing payments required to be made under the Intercreditor Agreement as defined in the Credit Agreement.

7.    Notwithstanding anything in this Final Order to the contrary, solely as between the Tranche A Facility and the Tranche B Facility, all Obligations relating to the Tranche B Facility shall be junior to and subordinate in seniority and in right of payment to the

prior payment in full of all Obligations relating to the Tranche A Facility pursuant to the terms of, and to the extent provided in, the DIP Agreement.

8.       The liens and security agreements granted pursuant to this Final Order shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates pursuant to section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date (other than the Project Replacement Liens) including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board or court for any liability of the Debtors.

9.       In addition, in order to further assure full and complete compliance with, and timely payment of all Obligations at any time owing or to be performed by the Debtors pursuant to the DIP Financing Documents, the DIP Agents and the DIP Lenders are hereby granted (subject to the Carve-Outs), pursuant to section 364(c)(1), superpriority administrative claim status for such Obligations.  All Obligations owing to the DIP Agents and the DIP Lenders under the DIP Financing Documents (including, but not limited to, the obligation to pay principal, interest, professional fees, costs, charges, commissions and expenses and indemnification obligations) shall be paid from the Debtors' estates and by the DIP Guarantors, as provided in the DIP Financing Documents, when due, without defense, offset, reduction, claim or counterclaim, and shall constitute allowed claims to the full extent thereof against the Debtors arising pursuant to section 364(c)(1), with priority for such claims over any and all administrative expenses (other than the Carve-Outs) of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to paragraph 12 herein), 507(a), 507(b) and 726, other than fees and expenses arising under section 726(b) which are less than $1 million in the aggregate, provided that notwithstanding anything in this Final Order to the contrary, the superpriority administrative

18

claim status of the Obligations, and the liens and security interests securing same, shall exclude each estate's interest in the proceeds from avoidance actions pursuant to sections 544-550 and be subject only to (i) the Petition Date Liens and any Project Replacement Liens to the extent provided for in paragraph 5 herein and in the Project Cash Collateral Orders; (ii) unpaid professional fees and expenses incurred by the Debtors and the Committee (x) prior to the date of the delivery of a notice from the Administrative Agent or required DIP Lenders to the Debtors of the occurrence of an Event of Default and specifying that the limitation on professional fees and expenses referred to in the following clause (iii) is in effect (such notice being the "Carve-Out Notice") or (y) after the earlier of (1)  such time as no Event of Default shall be continuing or (2) such time as such Carve-Out Notice shall be rescinded in writing by the Administrative Agent at the direction of required DIP Lenders in their sole discretion, and which are allowed by the Court in the chapter 11 cases (either on an interim or final basis); (iii) from and after the date of the delivery of a Carve-Out Notice, professional fees and expenses of the Debtors and the Committee allowed by this Court in the chapter 11 cases in an aggregate amount (determined without regard to fees and expenses incurred prior to the date of the delivery of such Carve-Out Notice and which are at any time allowed by the Court either on an interim or final basis) not to exceed $2.5 million (for any period commencing at the time a Carve-Out Notice shall have been so delivered and ending at the earlier of (1) such subsequent time as no Event of Default shall be continuing and (2) such time as such Carve-Out Notice shall be rescinded in writing by the Administrative Agent at the direction of required DIP Lenders in their sole discretion) (lead counsel to the Debtors and counsel to the Committee shall confer with respect to the allocation of the Carve-Out funds, and any dispute with respect to such allocation shall be resolved by this Court); and (iv) fees payable to the Clerk of the Court and to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) (collectively, the "Carve-Outs"), provided further, however, that in no

19

event shall there be paid from proceeds of the DIP Agreement (including, without limitation, from Loans, Letters of Credit, Expiring Letters of Credit or use of proceeds of any DIP Collateral or any Cash Collateral) any fees and expenses incurred in challenging the liens or claims of the DIP Agents, DIP Lenders, Prepetition Agent or the Prepetition Secured Parties, although, subject to the Carve-Outs, the professionals for the Committee may be paid (to the extent allowed by the Court) fees and expenses incurred (no later than the date that is 120 days after (1) the Committee's appointment and (2) in the case of additional collateral granted pursuant to paragraph 22 herein only, the date on which such additional collateral becomes available to be DIP Collateral) in analyzing such prepetition liens or claims, within the scope of paragraph 20 herein, in an aggregate amount not to exceed $125,000. Subject to the Carve-Outs, the Obligations shall at all times be senior to the rights of the Debtors, any trustee or examiner and any unsecured claims of any creditor or other entity in this and any subsequent case under the Bankruptcy Code. With the exception of the Carve-Outs and subject to paragraph 12 herein, no cost or expense of administration or any claims in this Case, including those resulting from or incurred after any conversion of any chapter 11 case pursuant to section 1112 shall rank prior to, or on parity with, the claims of the DIP Agents and DIP Lenders arising hereunder or under the DIP Financing Documents. Nothing contained in this Final Order shall affect or limit the right of DIP Agents and DIP Lenders to object to any requests for fees or fee applications filed with the Court.

10.     Other than the liens and security interests granted pursuant to or referred to or permitted in this Final Order (including the Project Replacement Liens) or under the terms of the DIP Financing Documents, no liens or security interests shall attach to any property of the Debtors' estates in this or any subsequent case under the Bankruptcy Code unless either (a) the DIP Agents, the required DIP Lenders and a majority of the informal committee of Debenture

20

Holders give their express written consent, or (b) the DIP Financing has been terminated and all Obligations have been paid in full in cash, in accordance with the DIP Financing Documents, the Commitments have terminated and all letters of credit issued and outstanding under the DIP Agreement (including, without limitation, under the Tranche B Facility) shall be cash collateralized or otherwise supported or cancelled in a manner satisfactory to the relevant DIP Lenders, as contemplated in the DIP Agreement (the "Discharge of the DIP Financing").

11.     Prior to Discharge of the DIP Financing, the Debtors shall not incur Indebtedness (except as permitted by the DIP Agreement) unless (a) the DIP Agents, the required DIP Lenders and a majority of the informal committee of Debenture Holders consent in writing thereto, or (b) unless the DIP Agreement expressly provides otherwise, the proceeds thereof are used first to satisfy in full all Obligations owing to the DIP Agents or the DIP Lenders under the DIP Agreement in accordance with the terms thereof.

12.     Prior to Discharge of the DIP Financing, no cost or expense, including but not limited to, any cost or expense of administration of the Debtors' chapter 11 cases or any future proceeding that may develop out of such cases, including liquidation in chapter 7 or other case under the Bankruptcy Code, but excluding the Carve-Outs, shall be charged against the DIP Collateral pursuant to section 506(c) or otherwise, without the prior written consent of the DIP Agents and DIP Lenders, and no such consent shall be implied from any action, inaction or acquiescence by the DIP Agents or DIP Lenders. Notwithstanding the preceding sentence or any other provision of this Order or the DIP Agreement, the Debtors or a trustee appointed hereafter are not precluded from, or prejudiced in, seeking recovery of necessary costs and expenses of preserving or disposing of DIP Collateral pursuant to section 506(c) (i) if the DIP Agents (on behalf of the DIP Lenders) have security interests in and liens on such DIP Collateral solely pursuant to section 364(c)(3) and (ii) if each entity with a Petition Date Lien or Project

21

Replacement Lien on such DIP Collateral has consented pursuant to the terms of the Project Cash Collateral Orders to recovery pursuant to section 506(c). Notwithstanding anything herein to the contrary, nothing in this Final Order shall have, or be deemed to have, amended, modified or otherwise superseded any provision of the Final Cash Collateral Order relating to section 506(c).

13.    In respect of the Prepetition Liens only, the Prepetition Agents and the Prepetition Secured Parties are granted adequate protection, for and to the extent of any postpetition diminution in the value of their respective interests in the Prepetition Collateral resulting from the (a) Debtors' granting of priming liens on and security interests in the Prepetition Collateral pursuant to section 364(d) in favor of the DIP Agents and DIP Lenders, (b) Debtors' use of the Prepetition Secured Parties' Cash Collateral, (c) use, sale or lease of the Prepetition Collateral (other than the Prepetition Secured Parties' Cash Collateral) pursuant to section 363 and (d) imposition of the automatic stay pursuant to section 362(a), as follows:

(i)    Without limiting the Committee's rights under paragraph 20 herein, effective upon the date of this Final Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or otherwise, the Prepetition Agents and the Prepetition Secured Parties are, pursuant to sections 361, 363, 364(c) and 364(d) of the Bankruptcy Code, granted valid, perfected and non-voidable replacement security interests in and liens upon (the "Replacement Liens") all property of each of the Debtors including, without limitation, all real, personal and mixed property of the Debtors (including leasehold interests and capital stock) at any time existing or arising, wherever located, and all proceeds and products thereof, subject only to (w) the Carve-Outs, (x) the liens and security interests granted pursuant to this Final Order and the DIP Financing Documents to the DIP Agents (for the benefit of the DIP Lenders) to secure the Obligations, (y) the Petition Date

22

Liens and the Project Replacement Liens and (z) each estate's interest in the proceeds from any avoidance actions pursuant to sections 544 – 550; and

(ii)     Without limiting the Committee's rights under paragraph 20 herein, the Prepetition Agents and Prepetition Secured Parties are granted superpriority claims with priority over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to paragraph 12 herein), 507(a), 507(b) and 726, other than fees and expenses arising under section 726(b) which are less than $1 million in the aggregate, subject only to (w) the superpriority claims granted to DIP Agents and DIP Lenders in respect of the Obligations pursuant to this Final Order (x) each estate's interest in the proceeds from any avoidance actions pursuant to sections 544 - 550 and (y) the Carve-Outs.

(iii)     As further adequate protection for any diminution in the value of the prepetition security interests of the Debenture Holders, the Debtors are directed and authorized to pay in cash on a monthly basis all reasonable accrued fees and all costs, charges and expenses of Akin, Gump, Strauss, Hauer & Feld, L.L.P. and Raymond James & Co., in their respective capacity as advisors to the informal committee of Debenture Holders, and Wells Fargo Bank Minnesota, N.A., in its capacity as indenture trustee for the 9.25% debentures (the "Indenture Trustee") and Dorsey & Whitney, in its capacity as counsel to the Indenture Trustee, in connection with these chapter 11 cases, on the same terms and conditions as applied to the DIP Lenders.

14.     Subject to the terms and conditions of the DIP Agreement, the DIP Financing shall terminate (the "Commitment Termination Date") on the earliest to occur of (a) April 1, 2003 (subject to the extensions permitted under, and in accordance with the terms of the DIP Agreement), (b) the effective date of an order confirming a plan of reorganization in the

chapter 11 cases, (c) the date distributions commence to any class of creditors, equity holders or other claimants under any such plan of reorganization in the chapter 11 cases, (d) the date of termination in whole of the DIP Lenders' commitments pursuant to an acceleration of the DIP Financing, (e) the date that is sixty (60) days after the Petition Date if this Final Order has not been entered by this Court by such date, (f) the date of any sale, transfer or other disposition of all or substantially all of the assets or capital stock of the Debtors, and (g) the date of termination of exclusivity under any of the chapter 11 cases without the prior written approval of the DIP Agents and the required DIP Lenders unless such termination occurs (i) within 180 days of the Petition Date to permit the filing of a competing plan of reorganization by the Committee or (ii) more than 180 days after the Petition Date to permit the Committee to file a plan of reorganization, in each case so long as the DIP Lenders, on the one hand, and Debtors, on the other hand, but no other parties, also have the right to file a plan of reorganization upon and after such termination.

15.    The security interests and liens in the DIP Collateral (i) granted to the Administrative Agent for the benefit of the DIP Lenders herein and (ii) without limiting the Committee's rights under paragraph 20 herein, of the Prepetition Secured Parties pursuant to paragraph 13 hereof are valid, enforceable and fully perfected by entry of this Final Order, and the Administrative Agent, the DIP Lenders and/or the Prepetition Secured Parties shall not be required to file or record financing statements, mortgages, leasehold mortgages, deeds of trust or other documents in any jurisdiction or take any other action (including obtaining possession) in order to validate, perfect or otherwise enforce the security interests and liens in such DIP Collateral. The DIP Agents, the DIP Lenders and/or the Prepetition Secured Parties are hereby authorized to file this Final Order as evidence of their security interests and liens in lieu of a

24

financing statement or other filing or recording, and the appropriate state and local official shall accept the same for filing or recording.

16.    Having been found to be acting in good faith, the DIP Agents and DIP Lenders shall be entitled to the full protection of sections 364(e) and 363(m), respectively, and the claims, liens, security interests and priorities created or authorized in this Final Order and the DIP Financing Documents are so created and authorized pursuant to sections 364(c) and (d) and section 363(c), respectively, and are entitled to the benefits and protections of sections 364(e) and 363(m), respectively. Further, nothing contained herein or resulting from the Debtors' filing of these chapter 11 cases shall preclude the Prepetition Secured Parties and the DIP Lenders, and their respective agents, from assigning all or a portion of their obligations and benefits under their respective loan or governing documents to qualified assignees, as provided in their respective credit agreements or governing documents, so long as they comply with all applicable bankruptcy laws and rules.

17.    The DIP Agents and DIP Lenders are entitled to all of the rights, benefits, privileges and remedies set forth or provided herein and in the DIP Financing Documents, including but not limited to, without further application to or order of this Court, all of the rights, benefits, privileges and remedies available to the DIP Agents or DIP Lenders upon the occurrence and during the continuance of a Default or an Event of Default (including without limitation, any reversal, stay or modification of this Final Order without the consent of the DIP Agents or required DIP Lenders, the appointment or election of an interim or permanent trustee or examiner with expanded powers in this case or the conversion or dismissal of this case), and the automatic stay of section 362 (to the extent applicable) is vacated to permit the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies, including but not limited to (a) the termination by the DIP Agents and the DIP Lenders of all

25

Commitments under the DIP Agreement, (b) the declaration of all Obligations to be immediately due and payable in fill in cash, (c) termination of the Debtors' rights hereunder to use the Prepetition Secured Parties' Cash Collateral, and (d) the exercise of remedies against the DIP Collateral, including, without limitation, foreclosing on such DIP Collateral under applicable state or federal law, provided that the DIP Agents or the DIP Lenders shall give the Debtors, counsel to the informal committee of Debenture Holders, counsel to the Committee and the United States Trustee (and with respect to the exercise of remedies against any DIP Collateral that is subject to Petition Date Liens or Project Replacement Liens, the relevant Secured Parties (as defined in the applicable Project Cash Collateral Orders) and their counsel), at least five (5) Business Days' prior written notice (an "Enforcement Notice") of any exercise of remedies against the DIP Collateral (other than acceleration of the Loans or other Obligations or termination of the Commitment under the DIP Agreement), and shall file a copy of the Enforcement Notice with the Court. Furthermore, five (5) Business Days after the giving of the Enforcement Notice (a) all banks in which any lock-boxes, deposit accounts, concentration accounts, disbursement accounts or other accounts of the Debtors are maintained, and over which there are no liens senior to those of the DIP Lenders, are authorized and directed to comply with any request of the Administrative Agent to turn over all funds of the Debtors (except those funds of the Debtors encumbered by either Petition Date Liens or Project Replacement Liens) to the Administrative Agent without offset or deduction (other than ordinary course of business deductions for returned items and/or postpetition bank account fees), and (b) without limiting any of the Administrative Agent's rights or remedies to collect directly from any account debtor or obligor, all proceeds of the DIP Collateral received by the Debtors or any successors or assigns (including any trustee appointed or elected in these chapter 11 cases or any superseding chapter 7 cases) (except those funds of the Debtors encumbered by either Petition

26

Date Liens or Project Replacement Liens) shall be held in trust for, and immediately turned over to, the Administrative Agent for the benefit of the DIP Lenders until the Discharge of the DIP Financing and thereafter for the benefit of the Prepetition Secured Parties (without limiting the rights of the Committee pursuant to paragraph 20).

18.    The provisions of this Final Order, including the priority and validity of all claims and liens in favor of the DIP Agents or DIP Lenders (including, with respect to the Tranche B Facility), and any actions taken, extension of credit made or use of cash collateral permitted, pursuant hereto or in reliance hereon, shall survive entry of any other order which may be entered in the chapter 11 cases, including any order (a) confirming any plan of reorganization, (b) converting these cases from cases under chapter 11 to cases under chapter 7, (c) appointing a trustee or examiner (including an examiner with expanded powers), or (d) dismissing the chapter 11 cases, and the terms and provisions of this Final Order, as well as the priorities in payment granted pursuant to this Final Order and the DIP Financing Documents shall continue in full force and effect notwithstanding the entry of such other order, until Discharge of the DIP Financing.

19.    If any or all of the provisions of this Final Order are reversed, modified, vacated or stayed by subsequent order of this Court or any other court, such reversal, stay, modification or vacatur shall not affect the validity and enforceability of any Obligation, debt or claim incurred, lien granted or any priority that is or was incurred or granted pursuant to the DIP Financing Documents or this Final Order with respect to the Tranche A Facility, the Tranche B Facility or any of the other Obligations, and notwithstanding any stay, reversal, modification or vacatur of this Final Order (i) any Obligations owing to the DIP Agents or DIP Lenders arising, created or permitted prior to the effective date of such stay, reversal, modification or vacatur shall be governed in all respects by the original provisions of this Final Order and the DIP

27

Financing Documents, as the case may be, prior to the effective date, and (ii) the DIP Agents and DIP Lenders shall be entitled to all of their respective rights, privileges and benefits hereunder and under the DIP Financing Documents, including without limitation, the priorities, rights and remedies granted herein and therein to or for their benefit with respect to the Tranche A Facility, the Tranche B Facility and all other Obligations owing to the DIP Agents and the DIP Lenders prior to the effective date.

      20.    Unless (a) the Committee properly files an adversary proceeding or contested matter challenging the validity, enforceability, nonavoidability, perfection or priority of (x) the Prepetition Secured Obligations, (y) the Prepetition Liens or (z) other prepetition claims of the Prepetition Secured Parties against one or more of the Debtors (collectively with the Prepetition Secured Obligations and the Prepetition Liens, including obligations, liens and claims arising under paragraph 22 herein, the "Claims") no later than the date that is 120 days after (1) the Committee's appointment and (2) in the case of additional collateral granted pursuant to paragraph 22 herein only, the date on which such additional collateral becomes available to be DIP Collateral, and (b) an order of a court of competent jurisdiction that is no longer appealable has been entered in favor of the Committee in any such timely and properly filed adversary proceeding or contested matter (to which the Prepetition Agent and/or the Prepetition Secured Parties may appear and oppose), then (i) the Prepetition Secured Obligations and other Claims shall constitute allowed claims for all purposes in the chapter 11 cases and any subsequent chapter 7 case, and the Prepetition Liens and other Claims shall be deemed legal, valid, binding, enforceable and properly perfected, and not subject to subordination (subject to paragraph 12 with respect to section 506(c) claims only) or avoidance, and (ii) the Prepetition Secured Obligations, Prepetition Liens and other Claims shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of any Debtor's estate

28

(including, without limitation, any successor thereto) or otherwise. Nothing contained herein or in the DIP Financing Documents or by virtue of the Committee's consent to the entry of this Final Order shall preclude or prejudice the Committee's right to contest the Claims to the extent permitted pursuant to this paragraph 20; provided that the Committee's challenge (whether or not successful) of any Claim shall not in any manner limit the rights (including the lien and administrative priorities set forth herein), remedies and privileges of the DIP Lenders set forth in this Final Order and the DIP Financing Documents with respect to any of the Obligations (including, without limitation, the Tranche A Facility and the Tranche B Facility).

21.    Without limiting any provisions of this Final Order or the DIP Financing Documents, no order dismissing any of the chapter 11 cases pursuant to section 1112 of the Bankruptcy Code or otherwise shall be entered unless the Administrative Agent shall have been provided prior written notice and have had an opportunity to be heard. If an order dismissing any of the chapter 11 cases under section 1112 or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349) that (x) the Replacement Liens (as defined in paragraph 13(i) of this Final Order) granted to the Prepetition Secured Parties pursuant to this Final Order and (y) any and all liens and security interests granted to the DIP Agent for the benefit of the DIP Lenders pursuant to the DIP Financing Documents and this Final Order, shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all obligations in respect thereof shall have been paid and satisfied in full (and that such liens and security interests shall, notwithstanding such dismissal, remain binding on all parties in interest) and (z) this Court shall retain jurisdiction, notwithstanding such dismissal, to the extent of its authority to do so, for the purposes of enforcing the liens and security interests referred to in (x) and (y) above. Furthermore, the obligations of the Debtors under the DIP Financing shall not be discharged solely by the entry of an order confirming a plan of

29

reorganization in any of these chapter 11 cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived such discharge.

22. Any Subsidiary of the Debtors that hereafter becomes a debtor in a case under chapter 11 of the Bankruptcy Code in this Court shall immediately upon the filing of a petition for relief for such Subsidiary, be deemed to be one of the "Debtors" hereunder in all respects, and all the terms and provisions of this Final Order, including, without limitation, those provisions granting security interests in, and Liens on, the DIP Collateral, and superpriority claims in each of the Debtors' chapter 11 cases, shall immediately be applicable in all respects to such Subsidiary and its chapter 11 estate; provided, however, that in the event that Covanta Power Pacific, Inc. or any of its direct or indirect Subsidiaries becomes a debtor in a case under chapter 11 of the Bankruptcy Code, the Liens granted to the Administrative Agent for the benefit of the DIP Lenders under the DIP Financing Documents, the Interim Order and this Final Order, as well as the Replacement Liens granted to the Prepetition Agents and the Prepetition Secured Parties as adequate protection under the Interim Order and this Final Order, notwithstanding any language to the contrary in the Interim Order, which is to be deemed superseded hereby with respect to the matters contained in this paragraph, shall under any and all circumstances be (i) limited to the same collateral granted to the agent and the lenders under the senior credit facilities of Covanta Power Pacific, Inc. outstanding on the date hereof, inclusive of any and all Amendment Documents dated on or about April 26, 2002 whether or not the same have yet become effective (entered into with Bayerische Hypo-Und Vereinsbank, AG, New York Branch, as agent and such lenders) (together, the "CPPI Loan Documents"), (ii) junior in all respects to the liens, security interests and rights of setoff granted or contemplated under the CPPI Loan Documents, (iii) subordinate to the debt and all other obligations then or thereafter becoming due to the agent and such lenders under the CPPI Loan Documents, and subject to the prior payment

30

in full of such credit facilities and (iv) the DIP Lenders and the Prepetition Secured Parties may not take any affirmative steps to enforce the liens, other than to assert that such liens exist and to file a proof of claim referencing the same, so long as any such debt and all other obligations then or thereafter becoming due to the agent and such lenders under the CPPI Loan Documents remains outstanding. To the extent that additional collateral becomes available to be pledged as DIP Collateral, such additional collateral shall be pledged and shall constitute DIP Collateral in accordance with the terms of this Final Order, subject to the limitations of this paragraph, for the benefit of all Prepetition Secured Parties as adequate protection and subject to the Committee's rights under paragraph 20 herein, and the DIP Lenders shall not seek or accept any guaranty that could compromise the benefit of such collateral to all Prepetition Secured Parties.

23.    Without limiting the Committee's rights under paragraph 20 herein, the liens and claims of the Prepetition Secured Parties are valid, senior, enforceable, nonvoidable, perfected, equal and ratable and, without limiting the Committee's rights under paragraph 20 herein, each Prepetition Secured Party and Debtor acknowledges the same.

24.    Unless permitted under applicable law or pursuant to an order of this Court (including this Final Order), the Prepetition Secured Parties shall not withhold, recoup or otherwise offset payments owed to the Debtors.

25.    If there is a conflict between the terms of this Final Order and the terms of any of the DIP Financing Documents, including, but not limited to, the DIP Agreement, the terms of this Final Order shall govern.

26.    This Court retains and reserves jurisdiction to enforce all provisions of this Final Order.

27.    The provisions hereof and any priming liens granted herein pursuant to section 364(d) are without prejudice to the rights of the Debenture Holders or any other directly

31

effected parties to present an argument regarding the priority status of liens that may be proposed to be granted in respect of any post-confirmation exit credit facility or whether the obligations to be restructured under a plan of reorganization in these chapter 11 cases should be consistent with the prepetition priority status that is embodied in the Prepetition Security Agreement, and nothing herein shall have any precedential effect with respect to the priority status of liens that may be proposed to be granted in respect of a post-confirmation exit credit facility or the seniority of obligations to be restructured under a plan of reorganization.

28.    For the avoidance of doubt, this Final Order does not create any liens or claims on or over Fleet Account No. 94 175 475 20 ($CDN 1 million) and Canadian Imperial Bank of Commerce Account No. 71-28711 ($CDN 10 million), the funds therein do not constitute Cash Collateral under the terms of this Final Order and the Debtors are not authorized to use the funds in such accounts.

29.    For the avoidance of doubt, (i) this Final Order does not modify, amend or supersede paragraph 4(c) of the Final Cash Collateral Order and shall not prejudice any rights thereunder of the limited partners referred to therein and (ii) all liens (if any) created hereunder with respect to the segregated accounts referred to in paragraph 4(c) of the Final Cash Collateral Order (the "LP Accounts") shall be limited to, and nothing herein shall expand, the Debtors' interests and rights (if any) in and to the LP Accounts and the amounts deposited or otherwise required to be deposited, maintained or credited therein from time to time.  Notwithstanding anything herein to the contrary: (i) the objections of the Huntington and Onondaga limited partners are hereby reserved and shall be subject to a further order of this Court; and (ii) pending further order of the Court, the Interim Order shall remain in effect with respect to the Huntington and Onondaga Debtor entities and their limited partners (to the extent such Interim Order is effective with respect to such parties); provided however, that the Huntington and Onondaga

32

limited partners expressly reserve their rights, if any, to object to the entry of the Interim Order and its effect on the Huntington and Onondaga Debtor entities and their limited partners, and the Debtors, the Prepetition Secured Parties, the Committee and the DIP Lenders expressly reserve all of their rights to contest the Huntington and Onondaga limited partners' objections to the entry and effectiveness of the Interim Order, including their ability to still challenge the Interim Order. In the event that the limited partners cannot agree on the final form of a stipulation with the Debtors and the DIP Agents prior to May 22, 2002, such non-settling limited partners shall pursue their filed objections at a hearing before this Court on May 22, 2002.

30.    In order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, the Prepetition Agent is authorized to file one master proof of claim on behalf of itself and the Prepetition Lenders on account of their claims arising under the Prepetition Loan Documents and hereunder and the Indenture Trustee is authorized to file one master proof of claim on behalf of itself and the holders of the 9.25% debentures on account of it and their claims arising under the 9.25% debentures and hereunder. In addition, the Prepetition Agent and the Indenture Trustee shall not be required to file a verified statement pursuant to Bankruptcy Rule 2019.

31.    Subsequent to any Discharge of the DIP Financing, there shall be a reconciliation among the Debtor borrowers and guarantors with respect to the relative burdens and benefits of the relief granted herein and in the Final Cash Collateral Order.

32.    Nothing contained herein shall be deemed to prejudice or negatively affect the rights of (i) GE Capital Services Structured Finance Group, Inc. ("SFG"), (ii) General Electric Capital Corporation ("GE Capital"), (iii) any of SFG's and/or GE Capital's respective subsidiaries or affiliates or (iv) any special trust or legal entity in which SFG, GE Capital and/or

such subsidiaries or affiliates is a debtor, loan or equity participant or beneficiary (collectively, "GECC") under that certain Agreed Final Order (i) Authorizing Use Of Cash Collateral Of GECC Pursuant To 11 U.S.C. § 363, And (ii) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 363 And 364 (as entered by this Court on May 13, 2002, the "GECC Cash Collateral Order").

33.    Notwithstanding any provision of this Final Order, including, without limitation, paragraphs 20 and 23, as solely between the Prepetition Secured Parties and the Secured Parties (as defined in the Project Cash Collateral Orders) (and without affecting the rights and remedies of any other party, including, without limitation, the Committee) nothing herein shall prejudice the rights of the Prepetition Secured Parties or any Secured Parties (including in each case, their successors, assigns and subrogees) with respect to any rights, remedies, claims or defenses, all of which are reserved ("Reservation of Rights"). However, issues as to the validity, priority, non-avoidability, enforceability and perfection of the Prepetition Secured Obligations and the Prepetition Liens and the equal and ratable entitlement of the Prepetition Secured Parties shall not be subject to this Reservation of Rights.

Dated: New York, New York
     May 15, 2002

                               /s/ Cornelius Blackshear
                               UNITED STATES BANKRUPTCY JUDGE

34

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CITYSCAPE FINANCIAL CORP., | : | Case Nos. 98-B-22569 (ASH) |
| and CITYSCAPE CORP., | : | and 98-B-22570 (ASH) |
| | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |

------------------------------------------------------------x

### FINAL ORDER, PURSUANT TO 11 U.S.C. § 364(c) AND BANKRUPTCY RULE 4001, AUTHORIZING CITYSCAPE CORP. TO OBTAIN AND INCUR POST-PETITION FINANCING AND POST-PETITION INDEBTEDNESS WITH SUPERPRIORITY OVER CERTAIN ADMINISTRATIVE EXPENSES

Cityscape Financial Corp., a debtor and debtor-in-possession herein ("Cityscape") and Cityscape Corp., the other debtor and debtor-in-possession herein ("CSC," and collectively with Cityscape, the "Debtors"), having filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on October 6, 1998 (the "Filing Date"); and the Debtors having filed an application, dated October 6, 1998, pursuant to 11 U.S.C. § 364(c) and Bankruptcy Rule 4001 (the "Application"), for an order, inter alia:

(1)    Authorizing CSC to borrow, or obtain cash advances on a revolving credit basis, from The CIT Group/Equipment Finance, Inc. and/or its affiliates ("CIT"), as lender and agent for a syndicate of lenders including Nomura Asset Capital Corp. (all of these lenders collectively with CIT, the "Lenders"), up to the aggregate principal amount of $50 million for an interim period pending entry of this order (the "Final Order"), and thereafter upon entry of this Final Order, up to the aggregate principal amount of $150 million  (the "Lender Facility"), outstanding at any one

time pursuant to the terms of a Revolving Credit and Security Agreement, dated as of October 12, 1998 (the "Revolving Credit Agreement"), and the other Loan Documents (as defined in the Revolving Credit Agreement) attached thereto (the "Revolving Credit Agreement" and "Loan Documents" collectively are referred to herein as the "DIP Loan Documents");

      (2)     Approving the terms and conditions of the DIP Loan Documents and authorizing the Debtors to execute, deliver and enter into the DIP Loan Documents;

      (3)     Authorizing the Debtors to execute and deliver, from time to time, all such other documents, instruments and agreements and perform such other acts as may be required in connection with the DIP Loan Documents;

      (4)     Authorizing CSC, under 11 U.S.C. § 364(c)(1), (2) and (3), to obtain post-petition financing and incur post-petition indebtedness under the Lender Facility, which indebtedness due and owing by CSC and by Cityscape as the guarantor of such indebtedness to the Lenders shall: (A) pursuant to 11 U.S.C. § 364(c)(1), have priority over any and all expenses and claims of the kind specified in, inter alia, 11 U.S.C. §§ 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 726 and 1114, except as described below and herein; (B) pursuant to 11 U.S.C. § 364(c)(2), be secured by first priority liens on and security interests in all of the CIT Priority Collateral, as defined in that certain Intercreditor Agreement dated as of October 12, 1998 (the "Intercreditor Agreement") (and referred to herein as the "CIT Priority Collateral"), a copy of which is annexed hereto as Exhibit "A"; (C) pursuant to 11 U.S.C. § 364(c)(3), be secured by second priority liens on and security interests in all of the Greenwich Post-Petition Priority Collateral, as defined in the Intercreditor Agreement (and referred to herein as the "Greenwich Post-Petition Priority

Collateral"); and (D) pursuant to 11 U.S.C. § 364(c)(2), be secured by first priority liens on and security interests in (i) the Equal Priority Collateral, as defined in the Intercreditor Agreement (and referred to herein as the "Equal Priority Collateral"), and (ii) the Collateral, as defined in that certain Pledge Agreement, dated as of October 12, 1998 (the "Pledge Agreement") (and referred to herein as the "Pledge Collateral"), a copy of which is annexed hereto as Exhibit "B", with such liens and security interests granted in this subsection (D) being pari passu to the liens and security interests of Greenwich Capital Financial Products, Inc. ("Greenwich"), as more particularly described in the Intercreditor Agreement and Pledge Agreement; and (E) pursuant to 11 U.S.C. § 364(c)(3), be secured by third priority liens on and security interests in all of the Greenwich Pre-Petition Priority Collateral, as defined in the Intercreditor Agreement, (and referred to herein as the "Greenwich Pre-Petition Priority Collateral"); it being understood that all claims and liens arising pursuant to subsections (A) through (E) hereof are subject to the Carveout (as defined in Paragraph 10 below);

        (5)      Authorizing and directing the payment of certain fees and expenses to the Lenders;

        (6)      Requesting that a final hearing (the "Final Hearing") be scheduled for October 27, 1998 at 11:00 a.m. (prevailing eastern time) so that this Court could consider entry of this Final Order authorizing borrowing in accordance with the DIP Loan Documents, up to the aggregate amount described in paragraph (1) above; and

        (7)      Granting to the Debtors such other and further relief as the Court deems necessary, appropriate, equitable and proper.

The Debtors having requested in the Application, pursuant to Bankruptcy Rule 4001, that the Court consider the proposed final financing requested in the Application; and pursuant to Bankruptcy Rule 4001(c)(1), it appearing that any and all necessary notice of the Final Hearing on the Application was duly provided; and upon the record of the Final Hearing on the Application held before this Court on October 27, 1998; and this Court having noted the appearances of all parties in interest in the record of this Court; and all objections to the relief requested in the Application having been withdrawn, resolved or overruled by this Court; and it appearing to this Court that entry of this Final Order, as requested by the Application, is in the best interests of the Debtors and their creditors and is essential for the continued operation of CSC's business; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under 11 U.S.C. § 503(b)(1); and due deliberation having been had; and sufficient cause appearing therefor;

THE COURT HEREBY FINDS as follows:

A.    Capitalized terms used in this Final Order and not otherwise defined herein have the meanings ascribed to such terms in the DIP Loan Documents.

B.    On the Filing Date, the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and are continuing to manage their properties and operate their businesses as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

C.    This Court has jurisdiction over this chapter 11 case, and the parties and property affected hereby, pursuant to 28 U.S.C. § 1334. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(D).

D.    CSC is engaged in the business of originating, purchasing, selling and servicing Mortgage Loans.

E.    Pursuant to 11 U.S.C. §§ 102(1) and 364(c) and Bankruptcy Rules 2002 and 4001(c), the Debtors have provided due and sufficient notice of the Final Hearing, and their request for the relief set forth in the Application and the relief granted in this Order, on (i) the Office of the United States Trustee, (ii) the creditors holding the 20 largest unsecured claims against the Debtors, (iii) counsel to the unofficial subordinated debentureholders' committee, (iv) counsel to the unofficial noteholders' committee, (v) counsel to Greenwich, (vi) counsel to Elliott Associates LP and Westgate International LP, and (vii) all other parties in interest who have filed notices of appearance and requests for documents in these cases, and no further notice of the request for the relief granted in this Order is required. Such notice is appropriate, adequate and proper under the circumstances of this case as set forth herein, in the Application and as presented to the Court.

F.    In order to continue the ordinary course operations of CSC, it is necessary for CSC to borrow money and otherwise obtain credit from (a) the Lenders and (b) from Greenwich under a separate revolving credit facility (the "Greenwich DIP Facility") to provide for, among other things, CSC's working capital needs. Without such funds, CSC's ability to continue operating will be severely jeopardized.

G.    The Debtors are unable to obtain financing allowable under 11 U.S.C. § 503(b)(1), as an administrative expense pursuant to 11 U.S.C. §§ 364(a) or (b), absent the granting of the superpriority claim and of the liens and security interests as set forth herein and in the DIP Loan Documents. After considering all alternatives, and engaging in discussions with other potential lenders, the Debtors have concluded, in the exercise of their best and reasonable business judgment, that the terms and conditions of the Lender Facility and the Greenwich DIP Facility represent the best working capital financing terms available.

H.    Good cause has been shown for the entry of this Final Order. Among other things, CSC has a critical need for the final financing contemplated herein in order to allow for the origination or purchase of Mortgage Loans on a daily basis. The preservation and maintenance of the going-concern value of CSC is of the utmost significance and importance to its successful reorganization, as well as the reorganization of Cityscape, pursuant to the provisions of chapter 11 of the Bankruptcy Code. The terms of the borrowings authorized hereby are fair under the circumstances. Entry of this Final Order is in the best interests of the Debtors, their respective estates and creditors.

I.    Without prejudice to the rights of any party (but subject to the limitations thereon described in paragraphs 10 and 24 herein), the Debtors admit that, in accordance with the terms of the Pre-Petition Credit Agreement, Pre-Petition Collateral Agreements, and other Pre-Petition Loan Documents, immediately prior to and as of the Filing Date, and before giving effect to any repayment thereof from the initial proceeds of the borrowings under the Revolving Credit Agreement, the Debtors were indebted to the Pre-Petition Lenders, without defense,

counterclaim or offset of any kind, in the aggregate principal amount of approximately $14.3 million, plus interest, costs, expenses and other charges thereon, in respect of loans and other extensions of credit made by the Pre-Petition Lenders to CSC in accordance with the Pre-Petition Loan Documents (collectively, the "Pre-Petition Obligations").

J.    Without prejudice to the rights of any other party (but subject to the limitations thereon described in paragraphs 10 and 24 herein), the Debtors further admit that the Pre-Petition Obligations were, immediately prior to and as of the Filing Date, and before giving effect to any repayment thereof from the initial proceeds of the borrowings under the Revolving Credit Agreement, secured by valid, enforceable and perfected first priority liens on, and security interests granted by the Debtors to the Pre-Petition Lenders in, the Pre-Petition Collateral, as more fully described in the Pre-Petition Credit Agreement. The value of the Lenders' interest in the Pre-Petition Collateral substantially exceeds the amount of the Pre-Petition Obligations.

K.    Without prejudice to the rights of any other party (but subject to the limitations thereon described in paragraphs 10 and 24 herein), and without limiting the generality of the foregoing paragraphs, the Debtors further admit that they do not have: (i) any defense to the Pre-Petition Loan Documents, the Pre-Petition Obligations or to the validity, priority or perfection of the Pre-Petition Lenders' liens on the Pre-Petition Collateral; (ii) any claims as debtors and debtors in possession against the Pre-Petition Lenders in respect of the Pre-Petition Loans; and (iii) any basis for the pursuit of a Lender Action (as defined in paragraph 10 herein) or any other basis for the avoidance of any transfer of property from CSC or Cityscape to the Pre-Petition Lenders.

Accordingly, it is hereby FOUND, ORDERED, DETERMINED AND DECREED, as follows:

1.    The Application -- including without limitation the Debtors' request for entry of this Final Order -- shall be, and it hereby is, approved in all respects.

2.    Good and sufficient notice of the Application's request for approval of the Lender Facility and the other relief requested therein has been provided in accordance with, inter alia, 11 U.S.C. §§ 102(1) and 364(c) and Bankruptcy Rules 2002 and 4001(c), and any requirement for other and further notice shall be, and it hereby is, dispensed with and waived.

3.    An ongoing need exists for CSC to have the ability to obtain cash advances from the Lenders in order to continue the ordinary course operation of its business.

4.    CSC is unable to obtain cash advances as unsecured credit allowable under 11 U.S.C. § 503(b)(1).  Without the availability of the Lender Facility, it is extremely unlikely that CSC will be able to finance its working capital needs.  If CSC is unable to finance its working capital needs, CSC's ability to preserve the going-concern value of its respective business will be quickly eroded.  The preservation and maintenance of the going-concern value of CSC is of utmost significance and importance to a successful reorganization of the Debtors pursuant to the provisions of chapter 11 of the Bankruptcy Code.

5.    As set forth in the Application and based upon the record of these proceedings, this Court finds that the terms of the Lender Facility requested in the Application have been negotiated in good faith and at arms' length between the Debtors and the Lenders, and any credit extended by the Lenders pursuant to the terms of the DIP Loan Documents and this

Final Order shall be, and it hereby is, deemed to have been, extended in good faith (as that term is used in 11 U.S.C. § 364(e)).

     6.    CSC will receive post-petition loans and other direct and indirect benefits from the Lender Facility authorized by this Final Order.

     7.    The Debtors are hereby authorized to enter into the Revolving Credit Agreement, substantially in the form annexed hereto, and the other DIP Loan Documents, together with such other documents as the Lenders may request in order to effectuate the terms and conditions thereof.  Cityscape is expressly authorized to guarantee all Obligations.

     8.    CSC is immediately authorized to borrow or obtain cash advances up to the aggregate principal amount of $150 million outstanding at any one time pursuant to the terms of the DIP Loan Documents, as the same may be amended from time to time upon approval of the Bankruptcy Court, which DIP Loan Documents are hereby approved in all respects (including all rights and remedies set forth or referred to in the DIP Loan Documents).  Any payments previously made by the Debtors in accordance with the Interim Order, and in furtherance of the Debtors' obligations under the Interim Order to repay all outstanding Pre-Petition Obligations under the Pre-Petition Agreements with the initial proceeds of the Lender Facility, are hereby deemed indefeasible; provided, however, that nothing contained herein shall limit the Court's ability to fashion an appropriate remedy should the Court determine that the liens and security interests of the Pre-Petition Lenders are invalid in whole or in part.

     9.    The Debtors are authorized to do and perform all acts, to make, execute and deliver all instruments and documents as contemplated by the DIP Loan Documents, all of

which are hereby approved, and to pay all reasonable fees and expenses as provided in the DIP

Loan Documents and other amounts which may be required or necessary for the performance of

the Debtors under the terms of this Final Order, the DIP Loan Documents and the financing

hereby approved, including without limitation the payment to the Lenders of all amounts

necessary to reimburse the fees and expenses incurred by the Lenders or their agent as of the date

hereof, as more fully described in the DIP Loan Documents.

      10.    All of the Debtors' Obligations to the Lenders are hereby authorized and

granted superpriority administrative expense status, in accordance with 11 U.S.C. § 364(c)(1),

over any and all expenses and claims of the Debtors, whether heretofore or hereafter incurred, of

the kind specified in 11 U.S.C. §§ 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 726 or 1114,

pari passu with the postpetition obligations of the Debtors under the Greenwich DIP Facility (the

"Greenwich DIP Obligations"), and subject and subordinate only to:

      (i)    amounts payable to the United States Trustee pursuant to 28 U.S.C.

§ 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; and

      (ii)    the payment of allowed fees and expenses of professionals retained and

authorized by the Court in these chapter 11 cases pursuant to 11 U.S.C. §§ 327, 503(b) and 1103,

by the Debtors, any official committee (or the unofficial committees of noteholders and

subordinated debentureholders up until the time that any official committee or committees are

appointed in these chapter 11 cases replacing -- or consisting of similar members presently

constituting -- such unofficial committees), and the expenses of members of any official

committee appointed in these chapter 11 cases (collectively, the "Professional Expense(s)");

provided, however, that after the occurrence and during the continuance of an Event of Default hereunder or under the DIP Loan Documents, the Professional Expenses subject to priority hereunder shall not exceed $575,000 (inclusive of any holdbacks on interim compensation required by this Court) (the "Professional Expense Cap"), with any Professional Expenses paid after such occurrence or during such continuance (whether incurred before or after such occurrence and continuance) under sections 330 and 331 of the Bankruptcy Code or otherwise reducing the Professional Expense Cap on a dollar-for-dollar basis; and further provided, that no proceeds from this Lender Facility shall be used to pay any fees or expenses incurred at any time in connection with any action or investigation (whether formal or informal, or commenced by contested matter or adversary proceeding) which seeks to invalidate, avoid, subordinate, or otherwise impair any claims of CIT or the other Lenders under the Pre-Petition Agreements or DIP Loan Documents, or any liens created by either facility, or which seeks to recover any transfers made to CIT or the other Lenders or the Pre-Petition Lenders (as defined in the Revolving Credit Agreement) (a "Lender Action").

All of the dollar amounts contemplated by subparagraphs (i) and (ii) are collectively referred to as the "Carveout." Except as otherwise expressly provided in the Revolving Credit Agreement, the Intercreditor Agreement and the Pledge Agreement, no other claim or expense, having a priority senior or pari passu to that granted to the Lenders in this Final Order, shall be granted in this chapter 11 case, or any superseding chapter 7 case, while any portion of the Obligations, the Lender Facility or the commitments thereunder remains outstanding. The Carveout shall apply equally to (i) the liens and security interests granted herein to the Lenders and (ii) the liens and

security interests granted to Greenwich under the separate order of this Court approving the

Greenwich DIP Facility, and the Carveout shall be shared equally by the Lenders and Greenwich;

it being understood that the $575,000 Professional Expense Cap provided hereunder is in addition

to the $575,000 professional expense cap provided under the Greenwich DIP Facility, and that

any Carveout payments made hereunder or under the Greenwich DIP Facility shall be applied

equally (50 cents on the dollar as to the Lenders, 50 cents on the dollar as the Greenwich) on a

"dollar for dollar" basis against the Lenders' and Greenwich's respective collateral; and further

provided, that after (x) payment in full of all obligations outstanding under the Greenwich DIP

Facility, (y) termination of all commitments under the Greenwich DIP Facility, and (z) the release

of all of Greenwich's liens on its collateral, the Professional Expense Cap hereunder shall be

increased by the unused portion of the professional expense cap under the Greenwich DIP

Facility, but in this event, the Professional Expense Cap shall not exceed $1,150,000.

11.     Notwithstanding the foregoing, and subject to the provisions of the DIP

Loan Documents, the Debtors shall be permitted to pay, as the same may become due and payable

(i) administrative expenses of the kind specified in 11 U.S.C. § 503(b) incurred in the ordinary

course of its business and of the Chapter 11 Cases and (ii) subject to the provisions and limitations

of Paragraph 10(ii) hereof, compensation and reimbursement of expenses to professionals allowed

and payable under 11 U.S.C. §§ 330 and 331.  No extraordinary costs or expenses of

administration shall be imposed against the Lenders for the Debtors' Obligations hereunder and

under the DIP Loan Documents, under 11 U.S.C. §§ 105, 506(c) or 552, or otherwise.

12.    Subject to paragraph 13 hereof, as security for the full and timely payment and performance of the Obligations of the Debtors under and pursuant to the DIP Loan Documents and the Lender Facility authorized hereby, the Lenders are hereby granted, pursuant to 11 U.S.C. § 364(c)(1), a superpriority claim for all Obligations having priority over any and all expenses and claims of the kind specified in, inter alia, 11 U.S.C. §§ 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 726 and 1114, except that such claim shall be pari passu with the Greenwich DIP Obligations, as described above.  Such superpriority claim shall: (A) pursuant to 11 U.S.C. § 364(c)(2), be secured by first priority liens on and security interests in all of the CIT Priority Collateral; (B) pursuant to 11 U.S.C. § 364(c)(3), be secured by second priority liens on and security interests in all of the Greenwich Post-Petition Priority Collateral; and (C) pursuant to 11 U.S.C. § 364(c)(2), be secured by first priority liens on and security interests in the Equal Priority Collateral and the Pledge Collateral, with such liens and security interests granted under this subsection (C) being pari passu to the liens and security interests of Greenwich, as more particularly described in the Intercreditor Agreement and Pledge Agreement; and (D) pursuant to 11 U.S.C. § 364(c)(3), be secured by third priority liens on and security interests in the Greenwich Pre-Petition Priority Collateral.

13.    Subject in all cases to the Intercreditor Agreement and Pledge Agreement, other than with respect to Permitted Liens that are entitled to priority over the liens of the Lenders under the Revolving Credit Agreement and the liens of Greenwich under the Greenwich DIP Facility, the liens and security interests granted to the Lenders hereunder and in the DIP Loan

Documents shall not be subordinated to or pari passu with any other lien or security interest, however arising, including but not limited to under 11 U.S.C. § 364(d) or otherwise.

14.    (a)    The liens and security interests in favor of the Lenders described herein and in the DIP Loan Documents shall be deemed valid, binding, enforceable and perfected upon entry of this Final Order, and shall not be subject to any lien or security interest which is avoided and preserved for the benefit of the Debtors under 11 U.S.C. § 551;

(b)    The Lenders shall not be required to file any financing statements, notice of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the liens and security interests granted by or pursuant to this Final Order or pursuant to the DIP Loan Documents;

(c)    Should the Lenders, in their sole discretion, from time to time, choose to file such financing statements, notices of lien or similar instruments, take possession of any collateral securing the indebtedness hereby authorized, or take any other action to validate or perfect any such security interest or lien, the Debtors and their officers are hereby directed to execute any such documents or instruments as the Lenders shall reasonably request and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Final Order; and

(d)    A photocopy of this Final Order may, in the discretion of the Lenders, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, notices of lien or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Final Order for filing and recording.

15.    The provisions of this Final Order shall be binding upon and inure to the

benefit of the Lenders, the Debtors and their respective successors and assigns (including, without

limitation, any chapter 11 or chapter 7 trustee or other fiduciary (including without limitation, any

examiner or responsible person) hereafter appointed for the Debtors or with respect to any of its

properties and any purchaser of an assignment of all or a portion of any Lender's interest in the

Lender Facility).

16.    Except as otherwise provided for in the DIP Loan Documents, and without

limiting the generality of the provisions of Article IX of the Revolving Credit Agreement, no

order shall be entered: (i) dismissing the chapter 11 case of the Debtors under 11 U.S.C.

§§ 105(a), 305 or 1112 or otherwise unless, prior to the entry thereof, all Obligations and

indebtedness owing to the Lenders under the DIP Loan Documents shall have been paid in full in

cash in accordance with the provisions of the DIP Loan Documents, and the Lenders' obligation

and commitment to make loans under the Lender Facility has been terminated; (ii) converting the

Debtors' chapter 11 case under 11 U.S.C. § 1112, or appointing a chapter 11 trustee, examiner

with enlarged powers or other responsible person, unless prior to entry thereof, all Obligations

and indebtedness owing to the Lenders under the DIP Loan Documents shall have been paid in

full in cash in accordance with the provisions of the DIP Loan Documents, and the Lenders'

obligation and commitment to make loans under the Lender Facility has been terminated; (iii)

confirming any plan of reorganization in the Debtors' chapter 11 case unless such order provides

for the payment in full in cash of all Obligations and indebtedness payable or owing to the Lenders

under the DIP Loan Documents in accordance with the provisions of the DIP Loan Documents

on or before the effective date of, or substantial consummation of, the plan of reorganization that is the subject of such order; or (iv) granting relief from the automatic stay to the holder of any security interest in any asset of the Debtors, which relief CIT or the Lenders do not expressly consent to, to the extent the granting of such relief violates the terms of, or causes an event of default under, the Revolving Credit Agreement.

17.    The provisions of this Final Order shall be effective immediately upon entry of this Final Order by the Court and any actions taken pursuant hereto shall survive entry of, and shall govern with respect to any conflict with, any order which may be entered confirming any plan of reorganization, dismissing the Debtors' chapter 11 cases or which may be entered converting the Debtors' chapter 11 cases from chapter 11 to chapter 7. The terms and provisions of this Final Order, as well as the priority of the Lenders' claims, liens and security interests, and all rights of the Lenders and Obligations of the Debtors created or arising pursuant hereto or the DIP Loan Documents, shall constitute a valid and binding obligation of the Debtors, enforceable against the Debtors in accordance with its terms, and shall continue in the Debtors' chapter 11 cases and in any superseding chapter 7 cases under the Bankruptcy Code, and such claims, liens and security interests shall maintain their priority as provided by this Final Order until satisfied and discharged in accordance with the terms of the DIP Loan Documents.

18.    Consistent with 11 U.S.C. § 364(e), if any or all of the provisions of this Final Order are hereafter modified, vacated or stayed:

(a)    such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, liability, security interest or lien granted or incurred by the Debtors to

the Lenders pursuant to this Final Order or the DIP Loan Documents prior to the effective date of such stay, modification or vacation, or the validity and enforceability of any priority or right authorized or created hereby pursuant to the DIP Loan Documents; and

(b) any indebtedness, obligation or liability incurred by the Debtors to the Lenders pursuant to this Final Order or the DIP Loan Documents prior to the effective date of such stay, modification or vacation shall be governed in all respects by the provisions of this Final Order, and the Lenders shall be entitled to all the rights, remedies, privileges and benefits, including the superpriority administrative expenses status, liens and security interests granted herein and pursuant to the DIP Loan Documents, with respect to any such indebtedness, obligation or liability.

19. All advances under the DIP Loan Documents and this Final Order are made in reliance upon this Final Order and, therefore, the indebtedness evidenced by such advances prior to the effective date of any stay, modification or vacation of this Final Order cannot (i) be subordinated (except as otherwise provided in this Final Order as to the Carveout described in Paragraph 10 hereof), (ii) lose its lien status or its superpriority administrative claim status, or (iii) be deprived of the benefit of the superpriority administrative claim status, liens and security interests granted to the Lenders under this Final Order, as a result of any subsequent order in the Debtors' chapter 11 cases, or any superseding chapter 7 cases.

20. Except as otherwise provided in the DIP Loan Documents and this Final Order, so long as the Lenders' commitments or any Obligation, liability or indebtedness under the DIP Loan Documents and this Final Order shall remain outstanding: (i) the Debtors shall not,

directly or indirectly, create, incur, assume or permit to exist any security interest, encumbrance, lien or other security arrangement of any kind, on or with respect to any of its assets, or take or fail to take any action which would grant or create a lien or security interest in favor of any person (other than the Lenders) in such assets, in either case except for Permitted Liens; and (ii) there shall not be entered in the Debtors' chapter 11 cases or any subsequent chapter 7 cases any further order which authorizes under any section of the Bankruptcy Code, including 11 U.S.C. §§ 105, 363 or 364, the procurement of credit or the incurring of indebtedness secured by a lien or which is entitled to superpriority administrative claim status which is equal to or superior to that granted to the Lenders herein, unless in each such instance (x) the Lenders shall have given their prior written consent thereto and no such consent shall ever be implied from any other action, inaction or acquiescence by the Lenders, (y) such other order requires that all Obligations be indefensibly paid in full and in cash to the Lenders and discharged contemporaneously with the entry of such order, or (z) such procurement of credit or indebtedness arises from the Greenwich DIP Facility in a manner consistent with the terms of the Intercreditor Agreement and Pledge Agreement.

21. Subject to the provisions of the DIP Loan Documents, and upon the expiry of three (3) Business Days after the Lenders shall have delivered by hand, telecopier or overnight mail to Cityscape's counsel, counsel for any official creditors' committee appointed in this chapter 11 case (the "Committee"), counsel to Greenwich, counsel to the unofficial subordinated debentureholders' committee, counsel to the unofficial noteholders' committee, and the Court, a written notice identifying any default hereunder or Event of Default under the DIP Loan Documents (provided, however, that if the Lenders have evidence that either Debtor has engaged

in fraudulent conduct, such notice shall not be required), the automatic stay provisions of 11

U.S.C. § 362 are vacated and modified to the extent necessary so as to permit the Lenders to

exercise all rights and remedies provided for in the DIP Loan Documents, without filing further

pleadings or application to or order of this Court.  Upon the occurrence of any Event of Default,

(a) the Lenders shall be relieved of any and all obligations to make additional advances, and (b)

the Lender Facility and the Lenders' commitments thereunder shall be terminated.  Subject only to

the provisions of this paragraph and the DIP Loan Documents, the Lenders shall be and are

hereby authorized, in their discretion, to take any and all actions and remedies which the Lenders

may deem appropriate to exercise rights and remedies in accordance with the DIP Loan

Documents and applicable law.

     22.    Except as provided in Paragraph 10 hereof, no costs or expenses of

administration including, without limitation, professional fees allowed and payable under 11

U.S.C. §§ 330 and 331 that have been or may be incurred in the Debtors' chapter 11 cases, or

after any conversion of such cases under 11 U.S.C. § 1112, or in any other proceeding related

thereto, and no priority claims are, or will be, senior to or on a parity with the superpriority

administrative claims of the Lenders arising hereunder or will be paid from the proceeds of the

collateral granted to the Lenders hereunder and under the DIP Loan Documents.

     23.    To the extent any of the terms and conditions of the DIP Loan Documents

are in conflict with the terms and conditions of this Final Order, the provisions of this Final Order

shall control.

24.     The findings and admissions contained in paragraphs I, J and K hereof shall be binding upon the Debtors immediately upon entry of this Final Order.  The findings and admissions contained in paragraphs I, J and K hereof shall be binding on all other parties in interest, including without limitation the Committee, unless: (a) a party in interest (including without limitation the Committee) has properly filed an adversary proceeding or contested matter (subject to the limitations contained in paragraph 10 hereof) challenging the validity, enforceability or priority of the Pre-Petition Obligations, the Pre-Petition Lenders' liens on the Pre-Petition Collateral, or otherwise asserting any claims or causes of action against the Pre-Petition Lenders in respect of the Pre-Petition Obligations, the Pre-Petition Collateral or the Pre-Petition Agreements no later than thirty (30) days after the Filing Date; and (b) this Court rules in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter; provided, however, that if the date for commencement of the confirmation hearing of the Debtors' pre-packaged chapter 11 plan is adjourned until a date subsequent to November 25, 1998, then the deadline for commencing any Lender Action or any other action contemplated by this paragraph shall be extended to December 4, 1998.  No adversary proceeding or contested matter described in the preceding sentences shall be commenced by any party in interest after the conclusion of such thirty (30) day period (or after the conclusion of the extended deadline, if applicable, and as the case may be).  In the event that no such adversary proceeding or contested matter is properly commenced as of such date, then the Pre-Petition Obligations, Pre-Petition Agreements, and Pre-Petition Loans shall be deemed for all purposes in these Chapter 11 cases and in any subsequently converted Chapter 7 cases to have been legal, valid and

binding, unavoidable, and not subject to subordination; the Pre-Petition Lenders' liens on

Pre-Petition Collateral shall be deemed to have been legal, valid, binding, perfected, not subject to

subordination and otherwise unavoidable; and the Pre-Petition Lenders' liens on Pre-Petition

Collateral shall not be subject to any further or other challenge by any party in interest seeking to

exercise the rights of the Debtors' estates, including without limitation, and any successor thereto.

25.    The record of the hearing on the Application, and the findings of fact and

conclusions of law set forth above, are incorporated herein by this reference.

26.    The Clerk of Court is hereby directed to forthwith enter this Final Order on

the docket of this Court maintained with regard to this case.

Dated: White Plains, New York
       October 27, 1998


/s/ Adlai S. Hardin, Jr.
UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re                  :

                      :    **Chapter 11 Case No.**

                      :

**TWINLAB CORPORATION, et al.,**   :    **03-15564 (cb)**

                      :

       **Debtors.**        :    **(Jointly Administered)**

                      :

-------------------------------------------------------------x

### FINAL ORDER (A) AUTHORIZING POSTPETITION FINANCING AND GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 361, 362, AND 364; (B) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (C) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364

Upon the motion (the "Motion"), dated September 4, 2003 (the "Commencement Date"), of Twinlab Corporation ("Holdings"), Twin Laboratories Inc. ("Laboratories" or the "Borrower") and Twin Laboratories (UK) Ltd. ("Twin UK," and together with Holdings and Laboratories, the "Debtors"), each as debtor and debtor-in-possession in the above-captioned chapter 11 cases (collectively, the "Cases"), pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") and Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other things:

(1) authorization for the Borrower to obtain postpetition financing (the "Postpetition Financing") up to the aggregate amount of $35,000,000 (the actual amount at any time being subject to those conditions set forth in the Loan Documents (as defined herein)), from The CIT Group/Business Credit, Inc. ("CIT"), acting as Agent (in such capacity, the "Agent"), for itself and certain other financial institutions (together with CIT, the "Lenders") to be secured by a senior lien on all assets of the Debtors described herein;

(2) the granting of adequate protection to the Lenders under or in connection with that certain Financing Agreement, dated March 29, 2001, by and among Holdings and

241675-4

certain of its affiliates (collectively, the "Prepetition Borrowers"), the Lenders, and CIT, acting as Agent (as amended and supplemented from time to time, the "Prepetition Loan Agreement"), for any dimunition in the value of the Agent's and each Lender's interest in the collateral, including the Cash Collateral (as defined herein),  securing the Debtors' obligations under the Prepetition Loan Agreement;

(3) pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "Interim Order") (a) authorizing the Borrower, on an interim basis, to forthwith borrow and obtain loans, extensions of credit, and advances from the Agent and the Lenders under the Loan Documents in a principal amount not to exceed $8,800,000, and (b) granting the senior liens and adequate protection described herein; and

(4) that this Court schedule a final hearing (the "Final Hearing") to consider entry of a final order authorizing the balance of the borrowings under the Loan Documents on a final basis, as set forth in the Motion and the Loan Documents (the "Final Order"); and

Whereas, due and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "Notice") having been served by the Debtors on (i) the Agent, (ii) the Lenders, (iii) the Subordinated Debt Holders (as defined herein), (iv) the United States Trustee for the Southern District of New York (the "U.S. Trustee"), (v) the holders of the twenty (20) largest unsecured claims against the Debtors' estates (on a consolidated basis) (the "20 Largest Unsecured Creditors," (vi) certain secured creditors and/or their counsel, (vii) Bank of America, N.A., as a financial institution holding a blocked account of the Borrower (the "Blocked Account Bank"), (viii) the Internal Revenue Service, (ix) all state taxing authorities responsible for collecting sales taxes, (x) all landlords, owners, and/or operators of premises at which any of the Debtors' inventory and/or equipment is located, and (xi) certain other parties identified in the certificate of service filed with the Court (collectively, the "Noticed Parties"); and

Whereas, the Court entered, on the Commencement Date, (i) a First Interim Order (A) Authorizing Postpetition Financing and Granting Security Interests and Superpriority

2

Administrative Expense Status Pursuant to 11 U.S.C. § § 361, 362, and 364; (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Granting Adequate Protection Pursuant to 11 U.S.C. § § 361, 362, 363, and 364; and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "Initial First Interim Order") and (ii) an Amended First Interim Order (A) Authorizing Postpetition Financing and Granting Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. § § 361, 362, and 364; (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Granting Adequate Protection Pursuant to 11 U.S.C. § § 361, 362, 363, and 364; and (D) Scheduling an Interim Hearing Pursuant to Bankruptcy Rule 4001 (the "Amended First Interim Order", and together with the Initial First Interim Order, collectively referred to herein as the "First Interim Order"), which authorized the Debtors, on an interim basis pursuant to the terms and conditions of the First Interim Order, to obtain $750,000 of Postpetition Financing.

Whereas, the Court entered, on September 11, 2003, a Second Interim Order (A) Authorizing Postpetition Financing and Granting Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. § § 361, 362, and 364; (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Granting Adequate Protection Pursuant to 11 U.S.C. § § 361, 362, 363, and 364; and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "Second Interim Order"), which authorized the Debtors, on an interim basis pursuant to the terms and conditions of the Second Interim Order, to obtain $8,800,000 of Postpetition Financing.

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACTS AND CONCLUSIONS OF LAW:

A. Petition. On September 4, 2003  (the "Petition Date"), each of the Debtors filed its voluntary petition (the "Petition(s)") under chapter 11 of the Bankruptcy Code. Pursuant to an order of the Court, the Cases are being jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3

B. <u>Jurisdiction</u>. The Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. The Motion is a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (D), and (M). Venue of the Cases and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. <u>Notice</u>. Under the circumstances, the Notice given by the Debtors of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c).

D. <u>Debtors' Stipulations</u>. The Debtors hereby admit, stipulate, and agree that:

(1) *Prepetition Loan Agreement*. Prior to the commencement of the Cases, the Lenders made loans and advances and provided credit accommodations to the Prepetition Borrowers pursuant to (i) the Prepetition Loan Agreement, and (ii) certain other agreements, documents, and instruments executed and/or delivered with, to, or in favor of the Agent on behalf of itself and Lenders, including without limitation the security agreements, notes, guarantees, mortgages, and Uniform Commercial Code ("UCC") financing statements and all other related agreements, documents, and instruments executed and/or delivered in connection therewith or related thereto, including without limitation that certain Guaranty dated as of March 29, 2001 (the "Guaranty") by Holdings as guarantor ("Guarantor") (collectively, the "Prepetition Loan Documents"). Copies of the Prepetition Loan Agreement and certain of the other Prepetition Loan Documents are annexed as exhibits to the Motion;

(2) *Subordinated Debt Agreement*. Prior to the Petition Date, the Prepetition Borrowers entered into that certain Reimbursement and Security Agreement dated as of April 10, 2001 (the "Subordinated Debt Agreement") with certain parties thereto (collectively, "Subordinated Debt Holders"), which provides for, among other terms, reimbursement and repayment of certain obligations by the Prepetition Borrowers to the Subordinated Debt Holders secured by certain security interests in and liens on assets and properties of the Debtors that are subordinate to the payment of the Prepetition Obligations (as defined herein) owed to the Agent and Lenders and to the priority of the interests and liens in favor of the Agent and Lenders;

4

(3) *Intercreditor Agreement*.    The Agent, each of Lenders, and Subordinated Debt Holders entered into that certain Intercreditor Agreement, dated as of April 10, 2001, as amended and restated by that certain Amended and Restated Intercreditor Agreement, dated as of September 4, 2003 (the "Intercreditor Agreement") which sets forth, inter alia, the respective rights, obligations, and priorities of the claims and interests of the Agent and Lenders, on one hand, and the Subordinated Debt Holders, on the other hand, with respect to the Collateral (as defined herein).    A copy of the Intercreditor Agreement is annexed as an exhibit to the Motion;

(4) *Prepetition Obligations Amount*.    As of the Petition Date, the aggregate sum of obligations owed by the Debtors to the Agent and Lenders under and in connection with the Prepetition Loan Agreement was not less than $27,530,790, plus interest accruing on such amounts including interest since September 1, 2003, and fees, costs, expenses, and other charges accrued, accruing, or chargeable with respect thereto (collectively, the "Prepetition Obligations"), and that the Prepetition Obligations constitute legal, valid, and binding obligations of the Debtors, and are not subject to any offset, defense, counterclaim, avoidance, or subordination pursuant to the Bankruptcy Code or any other applicable law; and

(5) *Prepetition Collateral*.    As of the Petition Date, the Prepetition Obligations were fully secured pursuant to the Prepetition Loan Documents by valid and perfected first priority security interests and liens granted by the Debtors to the Agent for the benefit of itself and Lenders upon all of the Collateral (as defined in the Prepetition Loan Agreement) existing as of the Petition Date and the rents, issues, profits, proceeds, and products thereof, subject only to the Permitted Encumbrances (as defined in the Prepetition Loan Agreement) (collectively, together with any other property of the Debtors' bankruptcy estates (as defined under section 541) (the "Estates") in which a security interest or lien has been granted to

the Agent for the benefit of itself and Lenders prior to the Petition Date, the "Prepetition Collateral").[1]

E.    Findings Regarding the Postpetition Financing.

(1) *Postpetition Financing.*    The Debtors have requested from the Agent and Lenders, and the Agent and Lenders are willing to extend certain loans and to provide other financial and credit accommodations to the Debtors (the "Postpetition Financing"), as more particularly described and on the terms and conditions contained in this Order and the Loan Documents (as defined herein);

(2) *Need for Postpetition Financing.*    The Debtors do not have sufficient available sources of working capital to operate their businesses in the ordinary course of business without the Postpetition Financing.    The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and to otherwise fund their operations, is essential to Debtors' continued viability.    The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money is vital to the preservation and maintenance of the going concern values of the Debtors. Accordingly, the Debtors have an immediate need to obtain the Postpetition Financing in order to permit, among other things, the orderly continuation of the operation of their businesses, to minimize the disruption of their business operations, and to manage and preserve the assets of their estates in order to maximize the recovery to creditors;

(3) *No Credit Available on Other Terms.*    The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code without the grant of liens on assets.    The Debtors have been

---

[1]The assertion by the Agent of the Prepetition Obligations herein shall constitute a proof of claim on behalf of the Agent and Lenders in the Cases.

unable to procure the necessary financing on terms more favorable than the Postpetition Financing; and

(4) *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms of the Postpetition Financing pursuant to the Loan Documents and this Order are fair, just, and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms of the Postpetition Financing as provided in the Loan Documents and this Order have been negotiated in good faith and at arms' length by and between the parties, with all parties represented by counsel. Any credit extended under the terms of this Order shall be deemed to have been extended in good faith by the Agent and Lenders as that term is used in section 364(e) of the Bankruptcy Code.

F.  Adequate Protection. All of the Debtors' cash and proceeds of the Prepetition Collateral are "cash collateral" of the Agent and Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"). Pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Agent and Lenders are entitled to adequate protection of their interests in the Prepetition Collateral in connection with the Debtors' use, sale and lease of the Cash Collateral and the imposition of the automatic stay. The Agent and Lenders reserve all rights with respect to whether the liens and priority granted under this Order provide sufficient adequate protection, within the meaning of section 361 of the Bankruptcy Code, of the interests of the Agent and Lenders in the Collateral.

G.  Continuing Priority; Consent.  Notwithstanding the Debtors' entry into the Loan Agreement and other Loan Documents, the grant of the postpetition lien, interests, and priority in favor of the Agent, for the benefit of the Lenders, as provided herein, or the entry of this Order, the priority of the liens and security interests of the Prepetition Lenders of the liens and security interests over the Subordinated Debt Holders shall remain unchanged. In light of the adequate protection provided herein and the importance of the Postpetition Financing for the preservation of the value of the Debtors' estates, the Prepetition Lenders and the Subordinated

7

Debt Holders have consented to the priming of their liens pursuant to section 364(d) as provided herein.

H. <u>Good Cause</u>.  The Postpetition Financing and relief requested in the Motion is necessary, essential, and appropriate and is in the best interest of and will benefit the Debtors, their creditors, and their Estates as its implementation will, among other things, provide the Debtors with the necessary liquidity (i) to minimize disruption to the Debtors' business and on-going operations, (ii) preserve and maximize the value of the Debtors' Estates' for the benefit of all the Debtors' creditors, and (iii) avoid immediate irreparable harm to the Debtors, their creditors, their business, their employees, and their assets.

I. <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rules 4001(c)(2).  No party appearing in the Cases has filed or made an objection to the relief sought in the Motion and the entry of this Order, or any objections that were made are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

Section 1.  <u>Authorization and Conditions to Financing</u>.

1.1 <u>Motion Granted</u>.  The Motion is granted pursuant to Bankruptcy Rule 4001(c)(2) to the extent provided in this Order.

1.2 <u>Authorization to Borrow</u>.  The Debtors are hereby authorized and empowered to immediately borrow and obtain loans, extensions of credit, and advances from, and to incur indebtedness and obligations to the Agent and Lenders pursuant to the terms and conditions of this Order and the Loan Documents during the period of this Order in an aggregate principal amount not to exceed $35,000,000 (which amount  is inclusive of the $8,800,000 of Postpetition Financing authorized pursuant to the terms and conditions of the Second Interim Order).  The loans, extensions of credit, advances, and all other indebtedness and obligations incurred by the Debtors to the Agent and Lenders after the Petition Date, of every nature and however arising, absolute or contingent, direct or indirect, including without limitation all regular and default

interest, commissions, letter of credit fees, servicing fees, unused line fees, commitment fee, postpetition facility fee, administration fee to the Agent and other fees and expenses, including reasonable attorneys' fees and legal expenses, as more fully set forth in the Loan Documents (collectively, the "Interest and Fees"), and all reimbursement and other obligations in respect of letters of credit issued under the Loan Agreement (as defined herein), shall be collectively referred to as the "Postpetition Obligations," and together with the Prepetition Obligations, the "Obligations."

      1.3 Loan Documents.

          1.3.1   Authorization.  The Debtors are hereby authorized and directed to enter into, execute, deliver, perform, and comply with all of the terms and covenants of that certain Amended and Restated Financing Agreement dated as of September 4, 2003 (as amended and supplemented from time to time, the "Loan Agreement") and all other agreements, documents and instruments executed and/or delivered in connection with or related to the Postposition Financing, including without limitation this Order (collectively, the "Loan Documents"), pursuant to which, inter alia, the Debtors ratify, reaffirm, extend, assume, adopt, amend, and restate the Prepetition Loan Agreement and other Prepetition Loan Documents to which they are a party, including without limitation the Blocked Account Agreement by and among the Agent, Borrowers, and Blocked Account Bank (the "Blocked Account Agreement"). Without limiting the generality of the foregoing, the Guarantor is authorized and directed to enter into, execute, deliver, perform, and comply with all of the terms and covenants of that certain Reaffirmation of the Guaranty, pursuant to which, inter alia, the Guarantor shall ratify, reaffirm, extend, assume, adopt, amend and restate the Guaranty.  Copies of the Loan Agreement and certain of the Loan Documents are attached hereto collectively as Exhibit "A."

          1.3.2   Approval.  The Loan Documents (including the Loan Agreement) and each term therein are approved and shall be deemed to be incorporated into the terms and conditions of this Order.  All of such terms, conditions, and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and among the Debtors, Agent, and Lenders and of the Debtors' assumption and adoption of all of the terms, conditions, and

covenants of the Prepetition Loan Agreement and the other Prepetition Loan Documents for all purposes, including without limitation, to the extent applicable, the payment of all obligations arising thereunder, including principal and Interest and Fees, and the Releases (as defined in the Loan Agreement).

   1.3.3  <u>Amendment</u>.  Subject to the terms and conditions of the Loan Agreement, the Agent, Lender, and Debtors may amend, modify, supplement, or waive any provision of the Loan Documents (an "<u>Amendment</u>") if such Amendment is not material (for purposes hereof, a "material" Amendment shall mean any Amendment that operates to increase the rate of interest other than as currently provided in the Loan Documents, add specific new events of default or enlarge the nature and extent of default remedies available to the Agent and Lenders following an event of default, or otherwise modify any terms and conditions in any Loan Document in a manner materially less favorable to the Debtors in the good faith judgment of the Agent, Lenders, and Debtors) without further approval or order of the Court so long as (i) the Debtors (a) provide prior written notice of the Amendment (the "<u>Amendment Notice</u>") to (x) counsel to the official committee appointed in the Cases under section 1102 of the Bankruptcy Code representing unsecured creditors (the "<u>Committee</u>"), and (y) the U.S. Trustee, and (b) file a notice of the Amendment with the Court (the "<u>Amendment Notice Filing</u>"), and (ii) no objection to the Amendment is filed with the Court within two (2) business days from the date of the later of the date the Amendment Notice is served or the date the Amendment Notice Filing is filed.

   1.4 <u>Payment of Prepetition Debt</u>.  The Debtors are authorized to pay the Agent and Lenders on account of the Prepetition Obligations in accordance with the Loan Documents and sections 1.5 and 1.6 of this Order.

   1.5 <u>Payments and Application of Payments</u>.  The Debtors are authorized to and shall make all payments and transfers of property to the Agent for the benefit of itself and the Lenders as provided, permitted, or required under the Loan Agreement and other Loan Documents which shall not be subject to avoidance under section 549 of the Bankruptcy Code or any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy

Code, other law, or contract.  The Agent shall apply the Collateral, the proceeds of the Collateral, or any other property received by the Agent and Lenders in respect of the Obligations in accordance with the Loan Agreement, whether such Obligations are Prepetition Obligations or Postpetition Obligations.  The Agent shall be entitled to advance or deduct any Interest and Fees to be paid by the Debtors as Obligations. Without limiting the generality of the foregoing, the Debtors are authorized and directed, without further order of this Court, to pay or reimburse the Agent and Lenders for all present and future costs and expenses, including professional fees and legal expenses, paid, or incurred by the Agent and Lenders in connection with the financing transactions as provided in this Order and the Loan Documents, all of which shall be and are included as part of the principal amount of the Obligations, and shall be secured by the Collateral.

       1.6 <u>Continuation of Prepetition Procedures</u>.    All prepetition practices and procedures for the payment and collection of proceeds of the Collateral, the turnover of cash, and delivery of property to the Agent and Lenders, and the funding pursuant to the Loan Documents, including the Block Account Agreement and any other similar lockbox and blocked depository bank accounts arrangements, are hereby approved, shall continue without interruption or break in continuity after the commencement of the Cases, and shall apply to any and all deposit accounts established in accordance with applicable Guidelines of the United States Trustee and other local rules and mandates, and any restriction or prohibition against the continuation of such accounts or procedures after the Petition Date are waived.

Section 2.   <u>Postpetition Lien; Superpriority; Adequate Protection</u>.

       2.1 <u>Postpetition Lien</u>.

          2.1.1   <u>Postpetition Lien Granting</u>.    As security for the Debtors' performance of the Obligations pursuant to sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code and as adequate protection for any diminution in the value of the Agent's and each Lender's interest in the Prepetition Collateral (including Cash Collateral) pursuant to sections 361(a) and 363(e) of the Bankruptcy Code (in addition to the liens and security interests in favor of the Agent for the benefit of itself and each Lender under section 552(b) of the Bankruptcy

Code), the Agent, for itself and the benefit of the Lenders, shall have and is hereby granted a lien and security interest (the "Postpetition Lien," and collectively with the Prepetition Lien, the "Liens") on all of the Debtors' right, title, and interest in presently existing and after acquired tangible and intangible assets and properties of Debtors, whether known or unknown and whether acquired prior to, existing as of, or after the Petition Date, and the rents, issues, profits, products, and proceeds thereof, including without limitation "Collateral" as provided in the Loan Agreement (collectively, the "Postpetition Collateral," and collectively with the Prepetition Collateral, the "Collateral"); provided, however, the Postpetition Collateral shall not include claims, actions, causes of action, and proceeds thereof arising under sections 502(d), 506(i), 542, 544, 547, 548, 549, 550, or 551 of the Bankruptcy Code (the "Avoidance Claims").

2.1.2   Postpetition Lien Priority.   The Postpetition Lien shall be and shall continue to be first and senior in priority to all other interests and liens of every kind and nature, whether created consensually, by an order of the Court, or otherwise, including without limitation liens or interests granted in favor of third parties in conjunction with sections 363, 364, and other sections of the Bankruptcy Code; provided, however, that the Postpetition Lien shall be junior only to (i) the valid, perfected, and unavoidable security interests or liens existing as of the Petition Date that are senior to and that have not been subordinated to the Prepetition Lien, and only so long as and to the extent that such liens are and remain senior and outstanding, and (ii) the Carve Out Expenses (as defined herein) to the extent provided by Section 2.3 of this Order (collectively, the "Permitted Liens and Claims").

2.1.3   Postpetition Lien Perfection.   This Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the Postpetition Lien, effective as of the date and time of entry of this Order, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the Collateral or other act to validate or perfect such security interest or lien including without limitation control agreements with the Blocked Account Bank or other financial institutions holding a Blocked Account or other depository account consisting of Collateral (a "Perfection Act").   Notwithstanding the foregoing, if the Agent and/or any Lender

12

shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, the Agent and/or such Lender is authorized to perform such act and the Debtors are authorized and directed to perform such act to the extent necessary or required by the Agent and/or a Lender, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard to such act in accordance with applicable law.  The Agent and/or any Lender may choose to file, record, or perform a certified copy of this Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Order in accordance with applicable law.  Should the Agent or any Lender so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, or perfection of the Postpetition Lien by virtue of entry of this Order.

2.2 <u>Superpriority   Administrative   Expense</u>.   All   Obligations   shall   have superpriority   in   payment   afforded   by   section 364(c)(1)   of   the   Bankruptcy   Code   (the "<u>Superpriority Claim</u>"), which shall have priority in right of payment over any and all other unsecured obligations, liabilities, indebtedness, and claims of any kind and nature, now in existence   or   hereafter   incurred   by   Debtors,   including   without   limitation   any   and   all administrative expenses of the kinds specified or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), 726, 1114, and other sections of the Bankruptcy Code, including those resulting from the conversion of any one or more of the Cases pursuant to section 1112 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, any successor trustee, or any creditor or other party in interest in the Cases or any subsequent proceedings under the Bankruptcy Code; <u>provided</u>, <u>however</u>, the Superpriority Claim shall be subject to the Permitted Liens and Claims.

13

2.3 <u>Carve Out Expenses</u>.

2.3.1    <u>Carve Out Expenses</u>.    Upon the occurrence of an Event of Default (as defined herein), the Postpetition Lien shall be subject only to the right of payment of the following expenses (the "<u>Carve Out Expenses</u>"):

a.        statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. section 1930(a)(6);

b.        fees payable to the Clerk of the Court; and

c.        subject to the terms and conditions of this Order, the unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date, and approved by a final order of the Court pursuant to section 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "<u>Allowed Professional Fees</u>") by attorneys, accountants, and other professionals retained under section 327 or 1103(a) of the Bankruptcy Code by the Debtors or the Committee (collectively, the "<u>Professionals</u>"), less the amount of any retainers, if any, held by each Professional, in a cumulative, aggregate sum not to exceed $1,000,000 (the "<u>Professional Fee Carve Out</u>").

2.3.2    <u>Excluded Professional Fees</u>.    Notwithstanding anything to the contrary herein, the Professional Fee Carve Out shall not be used to pay any Professional Fees incurred in connection with any of the following:    (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations or the Liens, (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Obligations or the Liens, or (iii) preventing, hindering, or delaying the Agent's and/or any Lender's assertion or enforcement of any Lien or realization upon any Collateral, (b) a request to use the Cash Collateral without the prior written consent of the Agent and Required Lenders (as defined in the Loan Agreement), (c) a request for authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code other than from the Lenders, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action, or

14

defenses against the Agent or any Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, including without limitation any attempt to recover an Avoidance Claim from the Agent or any Lender, or (e) any act which has or could have the effect of materially modifying or compromising the rights and remedies of the Agent or Lenders, or which is contrary to any term or condition set forth in or acknowledged by the Loan Documents or this Order (collectively, "Adverse Actions").

2.3.3   Carve Out Reserve.  At the Agent's sole discretion, the Agent may, at any time and in any increment, establish a Carve Out Reserve (as defined in the Loan Agreement) and may fund such reserve by making one or more advances as an Obligation in order to pay a Professional or, if the Agent so chooses, establish a cash collateral account maintained by the Agent (the "Carve Out Reserve Fund") for the sole purpose of setting aside funds to satisfy the Carve Out Expenses. Subject to the Agent's obligations in respect of the Professional Fee Carve Out, funds in the Carve Out Reserve Fund shall be encumbered by the Postpetition Lien.  The Professional Fee Carve Out, and Agent's and Lenders' liability therefor, shall only be to the extent of the Carve Out Reserve.

2.4 Payment of Carve Out Expenses.  Any payment or reimbursement made either directly by or on behalf of the Agent and Lenders at any time or by or on behalf of the Debtors on or after the occurrence of an Event of Default in respect of any Allowed Professional Fees shall, in either case, permanently reduce the Professional Fee Carve Out on a dollar-for-dollar basis.  The Agent's and Lenders' obligation to fund or otherwise pay the Professional Fee Carve Out shall be added to and made a part of the Obligations, secured by the Collateral, and entitle the Agent and Lenders to all of the rights and protections under this Order, the Loan Documents, the Bankruptcy Code, and applicable law.  Payment of any Carve Out Expenses, whether by or on behalf of the Agent and Lenders, shall not and shall not be deemed to reduce the Obligations and shall not and shall not be deemed to subordinate of the Postpetition Lien or Superpriority Claim to any junior prepetition or postpetition lien, interest, or claim in favor of any other party. Except as otherwise provided herein with respect to the Carve Out Expenses, the Agent and Lenders shall not be responsible for the direct payment or reimbursement of any fees or

disbursements of any Professionals incurred in connection with the Cases under any chapter of the Bankruptcy Code, and nothing in Section 2.3 of this Order shall be construed to obligate the Agent or any Lender in any way, to pay compensation to or to reimburse expenses of any Professional, or to ensure that the Debtors have sufficient funds to pay such compensation or reimbursement.

      2.5 <u>Section 507(b) Priority</u>.  To the extent the Postpetition Lien or any other form of adequate protection of the Agent's and Lenders' interests is found to be insufficient, the Agent and Lenders shall also have the priority in payment afforded by section 507(b) to the extent of any such deficiency.

Section 3.  <u>Default; Rights and Remedies; Relief from Stay</u>.

      3.1 <u>Events of Default</u>.    The occurrence of any of the following events shall constitute an Event of Default under this Order:

      a.  Debtors' failure to perform, in any respect, any of the terms, conditions or covenants or its obligations under this Order; or

      b.  An "<u>Event of Default</u>" under the Loan Agreement or any of the Loan Documents.

      3.2 <u>Rights and Remedies Upon Event of Default</u>. Upon the occurrence of and during the continuance of an Event of Default, the Debtors shall be bound by all restrictions, prohibitions, and other terms as provided in this Order, the Loan Agreement, and the other Loan Documents, and the Agent may elect any and all consequences of such Event of Default and shall be entitled to take any act or exercise any right or remedy as provided in this Order and/or any Loan Document, including without limitation terminating and withholding their consent to Debtors' use of Cash Collateral, declaring all Obligations immediately due and payable, accelerating the Obligations, ceasing to issue letters of credit on behalf of Debtors, setting off any Obligations with Collateral or proceeds in the Agent's possession, and enforcing any and all rights with respect to the Collateral.  The Agent and Lenders shall have no obligation to lend or advance any additional funds to the Debtors, or provide other financial accommodations to the Debtors immediately upon or after the occurrence of an Event of Default or an act, event, or

16

condition that with the giving of notice or the passage of time, or both, would constitute an Event of Default.

      3.3 <u>Expiration of Commitment</u>. Upon the expiration of the Borrower's authority to borrow and obtain other credit accommodations from the Agent and Lenders pursuant to the terms of this Order and the Loan Documents, unless an Event of Default set forth in Section 3.2 above occurs sooner and the automatic stay has been lifted or modified, all of the Obligations shall immediately become due and payable and the Agent and Lenders shall be automatically and completely relieved from the effect of any stay under section 362 of the Bankruptcy Code or any other restriction on the enforcement of its liens upon and security interests in the Collateral or any other rights granted to the Agent and Lenders pursuant to the terms and conditions of the Loan Documents or this Order, and Agent and Lenders shall be and are hereby authorized, in their discretion, to take any and all actions and remedies which the Agent and Lenders may deem appropriate and to proceed against and realize upon the Collateral and any other property of the Debtors' Estates (except if the authority of the Debtors to borrow from the Agent and Lenders shall be extended with the prior written consent of the Agent, which consent shall not be implied from any other action, inaction or acquiescence by the Agent).

      3.4 <u>Relief from Automatic Stay</u>. The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or by law are hereby modified and vacated without further notice, application, or order of the Court to the extent necessary (i) to permit the Agent and/or any Lender to perform any act authorized or permitted under or by virtue of this Order, including without limitation (a) to implement the Postpetition Financing pursuant to the terms of this Order and the Loan Documents, (b) to take any act to create, validate, evidence, attach, or perfect the Postpetition Lien, (c) to assess, charge, collect, advance, deduct, and receive payments with respect to the Obligations including Interest and Fees, and apply such payments to the Obligations pursuant to the Loan Documents and this Order, and (d) upon the occurrence of any Event of Default and after providing three (3) days prior written notice to the Debtors, the Committee, the Office of the United States Trustee and the Court, to take any action and exercise all rights and remedies as provided in this Order and/or

the Loan Documents (consistent with any cure periods provided in the Loan Agreement) and (ii) to allow Debtors to continue to pay the letter of credit fees and ongoing account maintenance and service fees incurred or charged in connection with the Blechmans Letters of Credit (as defined in the Loan Agreement) directly to the bank(s) or financial institution(s) issuing such letters of credit, which fees are estimated to be approximately $8,000 per month.

Section 4. <u>Representations; Covenants; and Waivers.</u>

      4.1 <u>Objections to Prepetition Obligations.</u>    Any action, claim, or defense seeking to object to, challenge, contest, or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, or claim of any kind (a) the existence, validity, or amount of the Prepetition Obligations, or (b) the extent, legality, validity, perfection, or enforceability of the Prepetition Lien (an "<u>Objection</u>") shall be filed with the Court by the Committee, and no other party, within seventy five (75) calendar days from the date of entry of an order approving the retention of counsel by the Committee (the "<u>Objection Period</u>"). If no Objection is timely filed or an Objection is timely filed but denied, (a) the Prepetition Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction, or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and the Prepetition Lien shall be deemed legal, valid, perfected, enforceable, and unavoidable for all purposes and of first and senior priority, subject to only the Permitted Encumbrances, and (b) the Agent and Lenders, their participants, and each of their respective agents, officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Prepetition Loan Documents and shall not be subject to any further objection or challenge by any party at any time.

      4.2 <u>Debtors' Waivers.</u>    At all times during the Cases and whether or not an Event of Default or Termination (as defined herein) has occurred, the Debtors irrevocably waive any rights that they may have to seek authority (i) to use Cash Collateral of the Agent or any Lender under section 363 of the Bankruptcy Code, (ii) to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code other than from the

Lenders, (iii) to challenge the application of any payments authorized by this Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Prepetition Collateral is less than the Prepetition Obligations, (iv) to propose or support a plan of reorganization that does not provide for the indefeasible payment and satisfaction of all Obligations on the effective date of such plan, or (v) to seek relief under the Bankruptcy Code, including without limitation, under section 105, to the extent any such relief would in any way restrict or impair the rights and remedies of the Agent and Lenders as provided in this Order and the Loan Documents or the Agent's or any Lender's exercise of such rights or remedies; provided, however, the Agent and Required Lenders may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by the Agent and Lenders.

    4.3 Section 506(c) Claims. No costs or expenses of administration which have or may be incurred in the Cases at any time prior to a Termination shall be charged against the Agent and/or any Lender, their claims, or the Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the Agent and Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the Agent and Lenders.

    4.4 Collateral Rights. Until all of the Obligations shall have been indefeasibly paid and satisfied in full and without further order of the Court: (a) no other party, including without limitation the Subordinated Debt Holders, shall foreclose or otherwise seek to enforce any junior lien or claim in any Collateral, (b) upon and after the occurrence of an Event of Default, the Agent, in its discretion, in connection with a liquidation of any of the Collateral, may enter upon, occupy, and use any real property, equipment, leasehold interests, warehouse arrangements, trademarks, tradenames, copyrights, licenses, patents, or any other assets of the Debtors, which are owned by or subject to a lien of any party other than the Debtors and which are used by the Debtors in its business, all without interference from the respective lessors, licensors, or owner of such property for the purpose of conducting liquidation sales of the Debtors' assets and properties; provided that, the Lenders will be responsible for the payment of any fees, rentals, royalties, or other amounts due such lessor, licensor, or owner of such property

and any reasonable costs or expenses incurred by such lessor, licensor, or owner for the period of time that the Agent actually occupies or uses the premises, equipment, or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts due for any period prior to or after the date that the Agent actually occupies or uses such assets or properties).

Section 5.  Other Rights and Obligations.

5.1 No Modification or Stay of This Order.  Notwithstanding (i) any stay, modification, amendment, supplement, vacating, revocation, or reversal of this Order, the Loan Documents, or any term hereunder or thereunder, or (ii) the dismissal or conversion of the Cases (a "Subject Event"), (x) the acts taken by the Agent and Lenders in accordance with this Order, and (y) the Postpetition Obligations incurred or arising prior to the Agent's actual receipt of written notice expressly describing the occurrence of such Subject Event shall be governed in all respects by the original provisions of this Order, and the acts taken by the Agent and/or any Lender in accordance with this Order, and the Postpetition Lien, the Postpetition Obligations, and other rights, remedies, privileges, and benefits in favor of the Agent and Lenders pursuant to this Order and the Loan Documents shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.  For purposes of section 364(e) of the Bankruptcy Code, "appeal" shall include any proceeding for reconsideration, amending, rehearing, or re-evaluation of this Order by this Court or any other tribunal.

5.2 Power to Waive Rights; Duties to Third Parties.  The Agent and Lenders shall have the right to waive any of the terms, rights, and remedies provided or acknowledged in this Order (the "Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce any Lender Rights.  Any waiver by the Agent or any Lender of any Lender Rights shall not be or constitute a continuing waiver. A delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, subject the Agent or any Lender to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the Agent and Lenders.

20

5.3 <u>Reservation of Rights</u>.  Except as provided herein, this Order is in addition to and without prejudice to the rights of the Agent and Lenders and any other party in interest to pursue any and all rights and remedies under the Bankruptcy Code, the Loan Documents, or any other applicable agreement or law, including without limitation rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estates.

5.4 <u>Binding Effect</u>.  This Order shall be binding upon Debtors, all parties in interest in the Cases, and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of the Debtors.  This Order shall also inure to the benefit of the Agent, Lenders, Debtors, and their respective successors and assigns.  The provisions of this Order and the Loan Documents, Postpetition Obligations, Superpriority Claim and any and all rights, remedies, privileges, and benefits in favor of the Agent and Lenders provided or acknowledged in this Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including without limitation any order which may be entered confirming any plan of reorganization, converting one or more of the Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases.  Any order dismissing one or more of the Cases under section 1112 or otherwise shall be deemed to provide (in accordance with sections 105 and 349) that (a) the Superpriority Claim and Postpetition Lien shall continue in full force and effect notwithstanding such dismissal until the Obligations are paid and satisfied in full, and (b) this Court shall retain jurisdiction to the extent it has the authority to do so, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and Postpetition Lien.

21

5.5 Term; Termination.   Notwithstanding any term of this Order to the contrary, the term of the Postpetition Financing authorized by this Order may be terminated pursuant to the terms of the Loan Agreement (a "Termination").

5.6 Limited Effect.   In the event of a conflict between the terms and provisions of any Loan Document and this Order, the terms and provisions of this Order shall govern, interpreted as most consistent with the terms and provisions of the Loan Documents.

5.7 Objections Overruled.   All objections to the Motion on an interim basis are hereby overruled.


Dated:  September 25, 2003
        New York, New York

                                     /s/ Cornelius Blackshear
                                     UNITED STATES BANKRUPTCY JUDGE

22

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DONNKENNY APPAREL, INC., et al., | ) | Case No. 05-10712 (RDD) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

### ORDER (A) AUTHORIZING DEBTORS TO OBTAIN INTERIM POST-PETITION FINANCING AND FACTORING AND GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105 AND 364(c); (B) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; (C) AUTHORIZING DEBTORS TO ENTER INTO AGREEMENTS WITH THE CIT GROUP/COMMERCIAL SERVICES, INC., IN ITS CAPACITY AS AGENT FOR ITSELF AND CERTAIN LENDERS, AND IN ITS CAPACITY AS FACTOR; AND (D) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

Upon the motion (the "Motion"), dated February 7, 2005, of Donnkenny Apparel, Inc. ("DKA"), Beldoch Industries Corporation ("BIC"; and together with DKA, each individually a "Borrower", and collectively "Borrowers"), Donnkenny, Inc. ("DKI"), Christiansburg Garment Company Incorporated ("CGCI") and H Squared Dispositions, Inc. ("HSD"; and together with DKI and CGCI, each individually a "Guarantor", and collectively "Guarantors"; and together with the Borrowers, each individually a "Debtor", and collectively "Debtors"), each as Debtor and Debtor-in-Possession in the above-captioned, jointly administered chapter 11 cases (collectively, the "Cases"), pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2) and 364(c)(3) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") and Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other things:

(1)    authorization for Borrowers to obtain post-petition loans, advances and other financial and credit accommodations on an interim basis for a period through and including the date of the Final Hearing (as hereinafter defined) from The CIT Group/Commercial Services, Inc. ("CIT"), in its

capacity as agent (in such capacity, "Agent") for itself and certain other financial institutions from time to time parties to the Credit Agreement (as hereinafter defined) (together with the Agent, each individually a "Lender", and collectively the "Lenders"), inclusive of the amount of all pre-petition indebtedness owed by Debtors to Agent and the Lenders, which loans, advances and other financial and credit accommodations shall be made in Agent's sole discretion by each Lender pursuant to the terms and conditions set forth in the Existing Credit Agreement (as hereinafter defined), as amended and ratified by the Ratification Agreement (as hereinafter defined) and this Order, secured by security interests in and liens upon all of the Collateral (as hereinafter defined) pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code in accordance with the Financing Agreements (as hereinafter defined) and this Order;

(2)     authorization for each of DKA and BIC to sell certain of its pre-petition and post-petition account receivables through and including the date of the Final Hearing to CIT, in its capacity as factor under the Account Factoring Agreements (as hereinafter defined) (in such capacity, "Factor") in accordance with the terms and conditions of the Existing Account Factoring Agreements and the other Existing Factoring Agreements (as each term is hereinafter defined), as amended and ratified by the Ratification Agreement and this Order, and to secure any Factoring Obligations (as hereinafter defined) with security interests in and liens upon all of the Factoring Collateral (as hereinafter defined) pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (as hereinafter defined) in accordance with the Factoring Agreements (as defined in the Ratification Agreement) and this Order;

(3)     authorization for Debtors to enter into the Ratification and Amendment Agreement, dated of even date herewith (the "Ratification Agreement", a copy of which is annexed hereto as Exhibit "A" and is incorporated herein by reference), by and among Debtors, CIT, in its capacities as Agent and Factor, and Lenders, which, among other things, ratifies, extends, adopts and amends each of the Existing Credit Agreement, the Existing Account Factoring Agreements and all other existing loan, financing, factoring and security agreements, documents and instruments executed and/or delivered in connection therewith or related thereto;

(4)     modification of the automatic stay to the extent hereinafter set forth;

2

(5)     granting to each of Factor, Agent and Lenders a super-priority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all Post-Petition Obligations (as defined in the Ratification Agreement), subject to certain claims as expressly provided for in this Order; and

(7)     setting a final hearing on the Motion.

Due and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (as defined below) (the "Notice") having been served by the Debtors on (i) CIT, (ii) Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"); (iii) holders of the twenty (20) largest unsecured claims against the Debtors' estates (on a consolidated basis) (the "20 Largest Unsecured Creditors"); (iv) the Internal Revenue Service ("IRS"); and (v) certain other parties identified in the certificate of service filed with the Court, including, without limitation, all creditors who have filed or recorded pre-petition liens or security interests against any of the Debtors' assets (collectively, the "Noticed Parties");

The initial hearing on the Motion having been held by this Court on February 8, 2005 (the "Interim Hearing"); and

Upon the record made by the Debtors at the Interim Hearing, including the Motion and the filings and pleadings in the Cases, and good and sufficient cause appearing therefor.

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.     Petition.  On February 7, 2005 (the "Petition Date"), each of the Debtors filed voluntary petitions (the "Petitions") under chapter 11 of the Bankruptcy Code.  Pursuant to an order of the Court, the Cases are being jointly administered.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.     Jurisdiction and Venue.  The Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion is a

3

"core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (D), and (M). Venue of the Cases and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    Notice. Under the circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing and the relief granted under this Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c).

D.    Debtors' Acknowledgments and Agreements. The Debtors, for themselves and not for their estates and subject to Section 4 of this Order, admit, stipulate, acknowledge and agree that:

(i)    *Pre-Petition Factoring Arrangements.* Prior to the commencement of the Cases, Factor provided factoring arrangements to each Borrower secured by certain assets and properties of each Borrower as set forth in (a) the Factoring Agreement, dated April 28, 1997 by and between DKA and Factor (the "DKA Factoring Agreement"), and (b) the Factoring Agreement, dated April 28, 1997, by and between BIC and Factor (the "BIC Factoring Agreement"; and together with the DKA Factoring Agreement, as each of the same has heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Existing Account Factoring Agreements", copies of which are annexed to the Exhibit Supplement to the Motion (the "Exhibit Supplement") as part of Exhibit "E" thereto), and (2) all other agreements, documents, and instruments executed and/or delivered with, to, or in favor of Factor, including, without limitation, all other security agreements, notes, guarantees, mortgages, and Uniform Commercial Code ("UCC") financing statements and all other related agreements, documents, and instruments executed and/or delivered in connection therewith or related thereto (as each of the same has heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Existing Factoring Agreements"). Copies of certain other operative Existing Factoring Agreements are contained in the Exhibit Supplement.

(ii)    *Pre-Petition Factoring Obligations.* As of the Petition Date Borrowers are indebted to Factor in respect of all Pre-Petition Factoring Obligations (as defined in the Ratification Agreement), all of which are unconditionally owing by each Borrower to Factor, without offset, defense or counterclaim of any kind, nature and description whatsoever, and that the Pre-Petition

4

Factoring Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess and shall not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Factoring Obligations.

(iii)   *Pre-Petition Factoring Collateral.* As of the Petition Date, the Pre-Petition Factoring Obligations were secured pursuant to the Existing Factoring Agreements by valid, perfected, enforceable and non-avoidable first priority security interests and liens granted by the Debtors to Factor upon all of the Pre-Petition Factoring Collateral (as defined in the Ratification Agreement) existing as of the Petition Date. Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of Factor's liens, claims and/or security interest in the Pre-Petition Factoring Collateral.

(iv) *Pre-Petition Revolving Credit Facility.* Prior to the commencement of these Cases, Agent and the Lenders provided loans, advances and other financial and credit accommodations to Borrowers, secured by liens, mortgages and security interests in all of the Debtors' assets and properties (the "Pre-Petition Collateral", as such term is more fully defined in the Ratification Agreement), in accordance with the terms and conditions of the Credit Agreement, dated as of June 29, 1999, by and among Debtors, Agent and the Lenders, as amended by Waiver and First Amendment to Credit Agreement, dated as of November 12, 1999, the Second Amendment to Credit Agreement, dated as of December ___, 1999, the Third Amendment to Credit Agreement, Waiver and Consent, dated as of February 29, 2000, the Fourth Amendment to Credit Agreement and Waiver, dated as of April 13, 2000, the Fifth Amendment to Credit Agreement, dated as of July 6, 2000, the Sixth Amendment to Credit Agreement and Waiver, dated as of November 13, 2000, the Seventh Amendment to Credit Agreement and Waiver, dated as of March 28, 2001, the Eighth Amendment dated as of March 13, 2002, the Ninth Amendment to Credit Agreement, dated as of March 27, 2003,

the Tenth Amendment to Credit Agreement, dated as of August 11, 2003, the Eleventh Amendment to Credit Agreement and Waiver, dated as of March 26, 2004, and the Twelfth Amendment to Credit Agreement and Waiver, dated as of September 30, 2004 (as all of the same have been amended, modified, supplemented, extended, renewed, restated or replaced at any time prior to the Petition Date, the "Existing Credit Agreement", a copy of which is annexed to the Exhibit Supplement as part of Exhibit "A" thereto), together with all other related agreements, documents, and instruments at any time executed and/or delivered in connection therewith or related thereto, including, without limitation, the Existing Guarantor Documents and the Pre-Petition Security Documents (as each term is defined in the Ratification Agreement) (collectively, as all of the same have been amended, modified, supplemented, extended, renewed, restated or replaced at any time prior to the Petition Date, the "Existing Financing Agreements). Copies of certain other Existing Financing Agreements are contained in the Exhibit Supplement.

(v)     *Pre-Petition Loan Obligations Amount.* As of the Petition Date the Borrowers are indebted to Agent and Lenders, in respect of all Pre-Petition Obligations (as defined in the Ratification Agreement) in the aggregate approximate amount of not less than $49,042,000, together with all interest accrued and accruing thereon, in each case together with all costs, expenses, fees (including attorneys' fees and legal expenses) and other charges now or hereafter owed by Debtors to Agent and Lenders, all of which are unconditionally owing by Debtors to Agent and Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever, and that the Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Obligations.

(vi)     *Pre-Petition Collateral.* As of the Petition Date, the Pre-Petition Obligations were secured pursuant to the Pre-Petition Security Agreements and the other Existing Financing Agreements by valid, perfected, enforceable and non-avoidable first priority security interests

6

and liens granted by the Debtors to Agent, for the ratable benefit of Lenders, upon all of the Pre-Petition Collateral.  Debtors do not possess any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of the Agent's and Lenders' liens, claims and/or security interest in the Pre-Petition Collateral.

     E.    <u>Findings Regarding the Postpetition Financing</u>.

     (i)    *Postpetition Financing*.  The Debtors have requested from Factor, Agent and Lenders, and each of Factor, Agent and Lenders is willing to extend, certain loans, advances and other financial and factoring accommodations, as more particularly described and on the terms and conditions set forth in this Order, the Factoring Agreements and the Financing Agreements (as each term is defined in the Ratification Agreement);

     (ii)    *Need for Post-Petition Financing*.  The Debtors do not have sufficient available sources of working capital to operate their businesses in the ordinary course of their businesses without the financing requested under the Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and to otherwise fund their operations, is essential to Debtors' continued viability.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with Factor, Agent and the Lenders as set forth in this Order, the Factoring Agreements and the Financing Agreements is vital to the preservation and maintenance of the going concern values of the Debtors' assets.  Absent the post-petition financing requested by the Motion, the Debtors would be forced to immediately cease all operations and liquidate.  Accordingly, the Debtors have an immediate need to obtain the post-petition financing and factoring in order to permit, among other things, the orderly continuation of the operation of their businesses, to minimize the disruption of their business operations, and to manage and preserve the assets of their Estates in order to maximize the value of the Estates' assets;

     (iii)    *No Credit Available on More Favorable Terms*.  The Debtors are unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the

7

Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code without the grant of liens on assets. The Debtors have been unable to procure the necessary financing on terms more favorable than the financing and/or factoring offered by Factor, Agent and Lenders pursuant to the Factoring Agreements and the Financing Agreements, respectively;

(iv)     *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms of this Order reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of this Order have been negotiated in good faith and at arms' length by and among the Debtors Factor, Agent and the Lenders, with all parties represented by counsel. Any credit extended under the terms of this Order shall be deemed to have been extended in good faith by Factor, Agent and Lenders as that term is used in section 364(e) of the Bankruptcy Code.

(v)     *Good Cause*. The relief requested in the Motion is necessary, essential, and appropriate and is in the best interest of and will benefit the Debtors and their Estates as its implementation will, among other things, provide the Debtors with the necessary liquidity (i) to minimize disruption to the Debtors' businesses and on-going operations, (ii) preserve and maximize the value of the Debtors' Estates, and (iii) avoid immediate and irreparable harm to the Debtors, their businesses, their employees, and their assets.

(vi)     *Immediate Entry*. Sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rules 4001(c)(2). No party appearing in the Cases has filed or made an objection to the relief sought in the Motion and the entry of this Order, or any objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

Section 1.     Authorization and Conditions to Financing.

1.1    <u>Motion Granted</u>.  The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Order.  This Order may hereinafter be referred to as the "Interim Order."

1.2    <u>Authorization to Borrow, Factor Accounts and Use of Loan Proceeds and Factoring Proceeds</u>.  During the period commencing on the date of this Interim Order through and including the date of the Final Hearing as set forth in section 6 of this Interim Order (the "Interim Financing Period"), Borrowers are hereby authorized and empowered to (i) immediately continue borrowing and obtaining Loans and Letters of Credit (as each term is defined in the Credit Agreement), and other credit and financial accommodations from Agent and Lenders, which Loans and Letters of Credit (as each term is defined in the Credit Agreement), and other credit and financial accommodations shall be made in Agent's sole discretion by each Lender pursuant to the terms and conditions of this Interim Order and the Existing Credit Agreement, as ratified and amended by the Ratification Agreement (as the same has heretofore been or may hereafter be amended, modified, supplemented, restated, extended or replaced, the "Credit Agreement") and the other Financing Agreements, and (ii) continue selling Accounts (as defined in the Account Factoring Agreements) to Factor pursuant to the terms and conditions of this Interim Order, the Existing Account Factoring Agreements, as ratified and amended by the Ratification Agreement (as all of the same have heretofore been or may hereafter be amended, modified, supplemented, restated, extended or replaced, the "Account Factoring Agreements") and the other Factoring Agreements (as defined in the Ratification Agreement).  Subject to the terms and conditions contained in this Interim Order, the Financing Agreements and the Factoring Agreements, Borrowers shall use the proceeds of the Loans, Letters of Credit, advances, factored Accounts (as defined in the Account Factoring Agreements) and any other credit and financial accommodations provided to Borrowers or pursuant to this Interim Order, the Factoring Agreements and/or the Financing Agreements for the payment of employee salaries, payroll, taxes, and other general operating and working capital purposes in the ordinary course of Borrowers' businesses in accordance with the Factoring Agreements and the Financing Agreements, including, without limitation, amounts paid for such purposes which may constitute administrative expense claims allowed under the

9

Bankruptcy Code, expenditures authorized by order of the Court (to the extent such Court-authorized expenditures are in accordance with the Factoring Agreements and the Financing Agreements), professional fees and the fees of the U.S. Trustee and the Clerk of this Court and the funding of the Insurance Escrow (as defined and to the extent set forth in the Ratification Agreement).

    1.3    Factoring Agreements and Financing Agreements.

    1.3.1    Authorization. Subject to the terms hereof, the Debtors are hereby authorized to enter into, execute, deliver, perform, and/or comply with (i) all of the terms, conditions and covenants of the Credit Agreement, the other Existing Financing Agreements (including, without limitation, the Existing Guarantor Documents and the Pre-Petition Security Documents) and all other Financing Agreements (as defined in the Ratification Agreement), and (ii) all of the terms, conditions and covenants of the Account Factoring Agreements and the other Factoring Agreements.

    1.3.2    Approval. All of the terms, conditions, and covenants of the Financing Agreements (including, without limitation, the Credit Agreement) and the Factoring Agreements shall be sufficient and conclusive evidence of the borrowing and factoring arrangements by and among the Debtors, Factor, Agent and the Lenders, and of the Debtors' assumption and adoption of all of the terms, conditions, and covenants of the Financing Agreements and the Factoring Agreements for all purposes, including, without limitation, to the extent applicable and subject to Section 4 herein, the payment of all Obligations (as defined in the Credit Agreement) and all Factoring Obligations (as defined in the Ratification Agreement), including, without limitation, all principal, interest, commissions, Letters of Credit fees, servicing fees, unused line fees, early termination fees, and other fees and expenses, including, without limitation, all attorneys' fees and legal expenses of Factor, Agent and Lenders, as more fully set forth in the Financing Agreements and the Factoring Agreements.

    1.3.3    Amendment. Subject to the terms and conditions of the Financing Agreements and the Factoring Agreements, Debtors, Factor, Agent and the Lenders (as applicable) may amend, modify, supplement, or waive any provision of the Financing Agreements or the Factoring Agreements (an "Amendment") without further approval or order of the Court so long as (i) such Amendment is not material (for purposes hereof, a "material" Amendment shall include any Amendment

10

that operates to increase the rate of interest other than as currently provided in the Financing Agreements, increase the maximum amount of Loans and Letters of Credit permitted outstanding under the Financing Agreements, add specific new events of default or enlarge the nature and extent of default remedies available to either Factor, Agent and the Lenders following an event of default), (ii) the Debtors provide prior written notice of the Amendment (the "Amendment Notice") to counsel to any official committee appointed in the Cases under section 1102 of the Bankruptcy Code (collectively, the "Committee(s)") or in the event no such Committee is appointed at the time of such Amendment, the 20 Largest Unsecured Creditors, and (y) the U.S. Trustee, and file the Amendment Notice with the Court, and (iii) no objection to the Amendment is filed with the Court within two (2) business days from the later of the date the Amendment Notice is served or the date the Amendment Notice is filed with the Court in accordance with this section. Any material Amendment to the Financing Agreements and/or the Factoring Agreements must be approved by the Court to be effective.

  1.4  <u>Payment of Pre-Petition Obligations and Pre-Petition Factoring Obligations</u>. The Debtors are authorized to pay (i) Agent and the Lenders in respect of the Pre-Petition Obligations in accordance with the Financing Agreements and paragraphs 1.5 and 1.6 of this Interim Order, and (ii) Factor in respect of the Pre-Petition Factoring Obligations in accordance with the Factoring Agreements and paragraphs 1.5 and 1.6 of this Interim Order.

  1.5  <u>Payments and Application of Payments</u>. The Debtors are authorized and directed to make all payments and transfers of any property of the Debtors' bankruptcy estates (as defined under section 541 of the Bankruptcy Code) (the "Estates") to Factor, Agent and the Lenders as provided, permitted, and/or required under the Financing Agreements and the Factoring Agreements, which payments and transfers shall not be avoidable or recoverable from Factor, Agent and/or the Lenders under Sections 547, 548, 550, 553 or any other provision of the Bankruptcy Code or any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law, or otherwise, subject, however, to Section 4 of this Interim Order. Subject to Section 4 of this Interim Order, Agent and the Lenders are hereby authorized to apply the proceeds of the Collateral (as defined in the Ratification Agreement) or any other amounts or payments received by Agent and the

11

Lenders to repay all Obligations in accordance with the Financing Agreements, and this Interim Order, including, without limitation, applying all payments, Collateral proceeds and other amounts received by Agent and Lenders first to the Pre-Petition Obligations, until such Pre-Petition Obligations are indefeasibly paid in full and completely satisfied, and then to the Post-Petition Obligations (as defined in the Ratification Agreement). Subject to Section 4 of this Interim Order, Factor is hereby authorized to apply the proceeds of the Factoring Collateral (as defined in the Ratification Agreement) or any other amounts or payments received by Factor to repay all Factoring Obligations in accordance with the Factoring Agreements and this Interim Order, including, without limitation, applying all payments, Factoring Collateral proceeds and other amounts received by Factor first to the Pre-Petition Factoring Obligations, until such Pre-Petition Factoring Obligations are indefeasibly paid in full and completely satisfied, and then to the Post-Petition Factoring Obligations (as defined in the Ratification Agreement). Without limiting the generality of the foregoing, the Debtors are authorized, without further order of this Court, to pay or reimburse Factor, Agent and Lenders for all present and future costs and expenses, including, without limitation, all reasonable and documented professional fees and legal expenses (provided, that, the Debtors shall provide notice of such documented professional and/or legal expenses to the Office of the United States Trustee and counsel for the Committee (if any)), paid, or incurred by any of Factor, Agent and Lenders in connection with the financing transactions as provided in this Interim Order, the Financing Agreements and the Factoring Agreements, all of which, among other things, shall be and are included as part of the principal amount of the Obligations (in the case of the Agent and the Lenders and/or the Factoring Obligations (in the case of Factor).

      1.6    Continuation of Pre-Petition Procedures. Consistent with the terms of this Court's order approving the Debtors' continued use of its cash management procedures and paragraph 1.5 hereof, all pre-petition practices and procedures for the payment and collection of proceeds of the Collateral, the turnover of cash, and delivery of property to Factor, Agent and the Lenders (as applicable), and the funding and factoring arrangements pursuant to the Financing Agreements and the Factoring Agreements, including any other lockbox, blocked accounts or similar concentration accounts and blocked depository bank accounts arrangements established in connection with the Financing

Agreements and/or the Factoring Agreements shall continue without interruption or break in continuity after the commencement of the Cases, and shall apply to any and all deposit accounts established in accordance with applicable Guidelines of the United States Trustee, other local rules and mandates or otherwise.

Section 2.    Postpetition Lien; Superpriority Administrative Claim Status.

　　　2.1    Post-Petition Lien.

　　　　　2.1.1    Lien Granting.

　　　　　　　(a)    To secure the prompt payment and performance of any and all Post-Petition Obligations of Debtors to Agent and the Lenders of whatever kind or nature or description, absolute or contingent, now existing or hereafter arising, Agent, for the ratable benefit of Lenders, shall have and is hereby granted (subject to the Carve-Out Expenses) in accordance with the Financing Agreements, effective as of the Petition Date, valid and perfected first priority security interests and liens, superior to all other liens, claims and/or security interests that any creditor of any Debtor's Estate may have (but subject to certain claims entitled to priority as and to the extent expressly provided in paragraph 2.1.2 below), in and upon all of the Pre-Petition Collateral and the Post-Petition Collateral (as each term is defined in the Ratification Agreement), excluding, however, all causes of action under Chapter 5 of the Bankruptcy Code and the proceeds thereof (the "Avoidance Claims"). The Pre-Petition Collateral and the Post-Petition Collateral are collectively referred to herein as the "Collateral" (as such term is more fully defined in the Ratification Agreement). In accordance with Sections 552(b) and 361 of the Bankruptcy Code, the value, if any, in any of the Collateral, in excess of the amount of the Obligations secured by such Collateral after satisfaction of the Post-Petition Obligations of Debtors to Agent and Lenders, shall constitute additional collateral security replacement liens for the repayment of the Pre-Petition Obligations and adequate protection for the use by Debtors, in each case to the extent of any diminution in the value of the Pre-Petition Collateral existing on and after the Petition Date.

　　　　　　　(b)    To secure the prompt payment and performance of any and all Factoring Obligations of Debtors to Factor of whatever kind or nature or description, absolute or contingent, now existing or hereafter arising, including, without limitation, all Pre-Petition Factoring

Obligations and all Post-Petition Factoring Obligations (as defined in the Ratification Agreement), Factor shall have and is hereby granted (subject to the Carve-Out Expenses), effective as of the Petition Date, valid and perfected first priority security interests and liens, superior to all other liens, claims and/or security interests that any creditor of any Debtor's Estate may have (but subject to certain claims entitled to priority as and to the extent expressly provided in paragraph 2.1.2 below), in and upon all of the Pre-Petition Factoring Collateral and the Post-Petition Factoring Collateral (as each term is defined in the Ratification Agreement), excluding, however, the Avoidance Claims.  The Pre-Petition Factoring Collateral and the Post-Petition Factoring Collateral are collectively referred to herein as the "Factoring Collateral" (as such term is more fully defined in the Ratification Agreement).  In accordance with Sections 552(b) and 361 of the Bankruptcy Code, the value, if any, in any of the Factoring Collateral, in excess of the amount of the Factoring Obligations secured by such Collateral after satisfaction of the Post-Petition Factoring Obligations of Debtors to Factor, shall constitute additional collateral security replacement liens for the repayment of the Pre-Petition Factoring Obligations and adequate protection for the use by Debtors, to the extent of any diminution in the value of the Pre-Petition Factoring Collateral existing on the Petition Date.

2.1.2   Lien Priority.

(a)      The pre-petition and post-petition liens and security interests granted for the benefit of Agent and the Lenders under the Financing Agreements and this Interim Order in the Collateral securing the Obligations (as defined in the Ratification Agreement) shall be and shall continue to be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court, or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364, and/or any other sections of the Bankruptcy Code or other applicable law; provided, however, that Agent's and Lenders' liens and security interests in the Collateral shall be subject only to (i) the liens in the Pre-Petition Collateral expressly permitted under Section 7.01 of the Credit Agreement (to the extent that such liens are valid, perfected, enforceable and unavoidable); and (ii) the Carve Out Expenses (as defined herein) solely to the extent provided for in paragraphs 2.3, 2.4 and 2.5 of this Interim Order

14

(collectively, the foregoing clauses (i) and (ii) are collectively referred to as the "Revolving Loan Permitted Liens and Claims").

(b)      The pre-petition and post-petition liens and security interests of Factor granted under the Factoring Agreements and this Interim Order in the Factoring Collateral securing the Factoring Obligations shall be and shall continue to be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court, or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364, and/or any other sections of the Bankruptcy Code or other applicable law; provided, however, that Factor's liens and security interests in the Factoring Collateral shall be subject only to (i) the liens expressly permitted under the Factoring Agreements (to the extent that such liens are valid, perfected, enforceable and unavoidable); and (ii) the Carve Out Expenses solely to the extent provided for in paragraphs 2.3, 2.4 and 2.5 of this Interim Order (collectively, the foregoing clauses (i) and (ii) are referred to as the "Factoring Permitted Liens and Claims").

2.1.3    Post-Petition Lien Perfection. This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the Collateral, the Factoring Collateral or other act to validate or perfect such security interest or lien including without limitation control agreements with any collection account, lock box or other depository account bank or other financial institutions holding a depository account consisting of Collateral (a "Perfection Act"). Notwithstanding the foregoing, if Factor or Agent shall, in their sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, Factor and/or Agent are authorized to perform such act and the Debtors are authorized and directed to perform such act to the extent necessary or reasonably required by any of Factor or Agent, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, and/or record any document in regard to such act in

15

accordance with applicable law.  Factor or Agent may choose to file, record, or present a certified

copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a

Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or

record such certified copy of this Interim Order in accordance with applicable law.  Should any of

Factor or Agent so choose and attempt to file, record, or perform a Perfection Act, no defect or failure

in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability,

attachment, or perfection of the post-petition liens and security interests granted herein by virtue of entry

of this Interim Order.

    2.2    <u>Superpriority Administrative Expense</u>.

    (a)    For all Post-Petition Obligations now existing or hereafter arising pursuant to

this Interim Order, the Financing Agreements or otherwise, Agent, for the ratable benefit of the Lenders,

is granted an allowed super-priority administrative claim pursuant to section 364(c)(1) of the

Bankruptcy Code having priority in right of payment over any and all other obligations, liabilities and

indebtedness of Debtors, now in existence or hereafter incurred by Debtors and over any and all

administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia,

sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 726 and/or 1114 of the

Bankruptcy Code (the "Revolving Lender Super-Priority Claim") <u>provided</u>, <u>however</u>, that (i) the

Revolving Lender Super-Priority Claim shall be subject only to the Revolving Loan Permitted Liens and

Claims and the Factoring Permitted Liens and Claims, and (ii) the Revolving Lender Super-Priority

Claim shall have the same priority with the Factor Super-Priority Claim (as defined below).

    (b)    For all Post-Petition Factoring Obligations now existing or hereafter arising

pursuant to this Interim Order, the Factoring Agreements or otherwise, Factor is granted an allowed

super-priority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code having priority

in right of payment over any and all other obligations, liabilities and indebtedness of Debtors, now in

existence or hereafter incurred by Debtors and over any and all administrative expenses or priority

claims of the kind specified in, or ordered pursuant to, inter alia, sections 105, 326, 328, 330, 331,

503(b), 506(c), 507(a), 507(b), 364(c)(1), 726 and/or 1114 of the Bankruptcy Code (the "Factor

Super-Priority Claim") provided, however, that (i) the Factor Super-Priority Claim shall be subject only to the Factoring Permitted Liens and Claims and the Revolving Loan Permitted Liens and Claims, and (ii) the Factor Super-Priority Claim shall have the same priority with the Revolving Lender Super-Priority Claim.

      2.3     Carve Out Expenses.

      2.3.1    Carve Out Expenses.  Upon Agent and/or Factor sending notice to Debtors, Debtors' counsel and counsel for the Committee (if any) of the acceleration of all Obligations under the Credit Agreement and all Factoring Obligations under the Account Factoring Agreements or this Interim Order (an "Acceleration Notice"), the liens and security interests of Factor in the Factoring Collateral and the liens and security interest of Agent, for the ratable benefit of the Lenders, in the Collateral, and the Revolving Lender Super-Priority Claim and the Factor Super-Priority Claim shall all be subject only to the right of payment of the following fees and expenses, including, the Professional Fee Carve-Out (collectively, the "Carve Out Expenses"):

      a.     statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. section 1930(a)(6);

      b.     fees payable to the Clerk of this Court; and

      c.     subject to the terms and conditions of this Interim Order, the unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date, and approved by order of the Court (including any interim compensation procedures order of this Court) pursuant to sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees") by attorneys, accountants and other professionals retained by the Debtors and any statutory Committee(s) under section 327 or 1103(a) of the Bankruptcy Code (collectively, the "Professionals") in a cumulative, aggregate sum not to exceed $400,000 (the "Professional Fee Carve Out").

      2.3.2    Excluded Professional Fees.  Notwithstanding anything to the contrary in this Interim Order, the Professional Fee Carve Out shall not be used to pay any Allowed Professional Fees or any other fees and/or expenses incurred by any Professional in connection with any of the following: (a) an assertion or joinder in  (but excluding any investigation into) any claim, counter-claim,

action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations, the Factoring Obligations, Agent's and Lenders' liens on and security interests in the Collateral or Factor's liens on and security interests in the Factoring Collateral, (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, Obligations, the Factoring Obligations, Agent's and Lenders' liens on and security interests in the Collateral or Factor's liens on and security interests in the Factoring Collateral, or (iii) preventing, hindering, or delaying Agent's or Lenders' assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral; (b) a request to use cash collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior written consent of Factor, Agent and the Lenders, (c) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code other than from Factor, Agent and Lenders (unless such financing shall be in an amount sufficient to repay in full all of the Obligations and the Factoring Obligations) without the prior written consent of Factor, Agent and Lenders, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against Factor or Agent and Lenders or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, including, without limitation, any attempt to recover or avoid any claim or interest from any of Factor, Agent and Lenders under Chapter 5 of the Bankruptcy Code, or (e) any act which results in the occurrence of an Event of Default under the Financing Agreements, the Factoring Agreements and/or this Interim Order.

2.4    Carve Out Reserve. At Agent's sole discretion, Agent may, at any time and in any increment in accordance with the Credit Agreement, establish an reserve against the amount of Loans, Letters of Credit and other credit and financial accommodations that would otherwise be made available to Borrowers pursuant to the lending formulae contained in the Credit Agreement in respect of the Professional Fee Carve-Out and the other Carve Out Expenses.

2.5.    Payment of Carve Out Expenses. Any payment or reimbursement made either directly by or on behalf of any of Factor, Agent or Lenders at any time or by or on behalf of the

18

Debtors in respect of any Allowed Professional Fees that are incurred on or after the date on which the Acceleration Notice is made in accordance with paragraph 2.3.1 of this Interim Order shall, in any case, permanently reduce the Professional Fee Carve Out on a dollar-for-dollar basis. The obligation to fund or otherwise pay the Professional Fee Carve Out and the other Carve Out Expenses as set forth in this Interim Order shall be added to and made a part of the Obligations and/or the Factoring Obligations (as applicable), secured by the Collateral or the Factoring Collateral (as applicable), and entitle Factor and/or Agent and Lenders to all of the rights, claims, liens, priorities and protections under this Interim Order, the Financing Agreements, the Factoring Agreements (as applicable) the Bankruptcy Code, and/or applicable law. Payment of any Carve Out Expenses, whether by or on behalf of any of Factor, Agent and/or Lenders, shall not and shall not be deemed to reduce either the Obligations or the Factoring Obligations (as applicable) and shall not and shall not be deemed to subordinate any Factor's, Agent's and Lenders' liens and security interests in the Factoring Collateral, the Collateral, the Factor Super-Priority Claim or the Revolving Lender Super-Priority Claim, respectively, to any junior pre-petition or post-petition lien, interest, or claim in favor of any other party. Except as otherwise provided herein with respect to the Professional Fee Carve Out and the other Carve Out Expenses, Factor, Agent and/or Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Cases under any chapter of the Bankruptcy Code, and nothing in paragraphs 2.3, 2.4 or 2.5 of this Interim Order shall be construed to obligate any of Factor, Agent and/or Lenders in any way, to pay compensation to or to reimburse expenses of any Professional, or to ensure that the Debtors have sufficient funds to pay such compensation or reimbursement.

      2.6.   Section 507(b) Priority.

        (a)   To the extent Agent's and Lenders' liens on and security interests in the Collateral or any other form of adequate protection of the Agent's and/or Lenders' interests is insufficient to pay indefeasibly in full all Post-Petition Obligations and any diminution in the value of the Pre-Petition Collateral after the Petition Date, Agent and Lenders shall also have the priority in payment

afforded by Bankruptcy Code section 507(b), equal in priority to the claim of Factor set forth in paragraph 2.6(b) of this Interim Order, to the extent of any such deficiency.

(b)    To the extent Factor's liens on and security interests in the Factoring Collateral or any other form of adequate protection of the Factor's interests is insufficient to pay indefeasibly in full all Post-Petition Factoring Obligations and any diminution in the value of the Pre-Petition Factoring Collateral after the Petition Date, Factor shall also have the priority in payment afforded by Bankruptcy Code section 507(b), equal in priority to the claim of Agent and Lenders set forth in paragraph 2.6(a) of this Interim Order, to the extent of any such deficiency.

Section 3.    Default; Rights and Remedies; Relief from Stay.

3.1    Events of Default.  The occurrence of any of the following events shall constitute an Event of Default under this Interim Order:

a.    Debtors' failure to perform, in any respect, any of the terms, conditions or covenants or its obligations under this Interim Order; or

b.    An "Event of Default" under either the Financing Agreements and/or the Factoring Agreements, except, that, under no circumstances shall an Event of Default be triggered by the Debtors' filing of the Petitions commencing these Cases.

3.2    Rights and Remedies Upon Event of Default.  Upon the occurrence of and during the continuance of an Event of Default, the Debtors shall be bound by all restrictions, prohibitions, and other terms as provided in this Interim Order, the Financing Agreements and the Factoring Agreements, Agent, Lenders and/or Factor may elect any and all consequences of such Event of Default, and Agent, Lenders and/or Factor shall be entitled to take any act or exercise any right or remedy as provided in this Interim Order, any of the Financing Agreements and/or any of the Factoring Agreements, including, without limitation, declaring all Obligations and/or all Factoring Obligations immediately due and payable, accelerating the Obligations and/or the Factoring Obligations, ceasing to extend Loans and/or make Letters of Credit or other financial or credit accommodations available or factor any of Borrowers' Accounts, setting off any Obligations or Factoring Obligations with Collateral or Factoring Collateral, respectively, and enforcing any and all rights with respect to the Collateral

20

and/or the Factoring Collateral (subject to the provisions contained in paragraph 3.4 of this Interim Order). Factor, Agent and Lenders shall have no obligation to lend or advance any additional funds to or on behalf of Borrowers, or provide any other financial or factoring accommodations to the Debtors immediately upon or after the occurrence and continuance of an Event of Default or an act, event, or condition that with the giving of notice or the passage of time, or both, would constitute an Event of Default.

        3.3    <u>Expiration of Commitment</u>. Upon the expiration of Borrowers' authority to borrow and obtain other credit, financial and factoring accommodations from each of Factor, Agent and Lenders pursuant to the terms of this Interim Order, the Financing Agreements and the Factoring Agreements (except if such authority shall be extended with the prior written consent of Factor or Agent and Lenders, as applicable, which consent shall not be implied or construed from any other action, inaction or acquiescence by Factor or Agent and Lenders), unless an Event of Default set forth in paragraph 3.2 above occurs sooner and the automatic stay has been lifted or modified pursuant to paragraph 3.4 of this Interim Order, all of the Obligations and Factoring Obligations shall immediately become due and payable and Agent, Lenders, and/or Factor shall be automatically and completely relieved from the effect of any stay under section 362 of the Bankruptcy Code or any other restriction on the enforcement of its liens upon and security interests in the Collateral or the Factoring Collateral or any other rights granted to Agent, Lenders and/or Factor pursuant to the terms and conditions of the Financing Agreements, the Factoring Agreements or this Interim Order, and Agent, Lenders and/or Factor, as applicable, shall be and are hereby authorized, in their discretion, to take any and all actions and remedies provided to it in this Interim Order, the Financing Agreements, the Factoring Agreements and/or applicable law which any of such parties may deem appropriate and to proceed against and realize upon the Collateral and/or the Factoring Collateral and any other property of the Debtors' Estates (subject to the provisions contained in paragraph 3.4 of this Interim Order).

        3.4    <u>Relief from Automatic Stay</u>. The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or by law are hereby modified and vacated without further notice, application, or order of the Court to the extent necessary

to permit Agent, Lenders and/or Factor to perform any act authorized or permitted under or by virtue of this Interim Order, the Factoring Agreements or the Financing Agreements, including, without limitation, (a) to implement the post-petition financing and factoring arrangements authorized by this Interim Order and pursuant to the terms of the Financing Agreements and the Factoring Agreements, (b) to take any act to create, validate, evidence, attach, or perfect any lien, security interest, right or claim in the Collateral and the Factoring Collateral, and (c) to assess, charge, collect, advance, deduct, and receive payments with respect to the Obligations and the Factoring Obligations, including, without limitation, all interests, fees, costs, expenses permitted under the Financing Agreements and the Factoring Agreements, and apply such payments to the Obligations and the Factoring Obligations pursuant to the Financing Agreements, the Factoring Agreements and this Interim Order.  In addition, and without limiting the foregoing, upon the occurrence and continuance of an Event of Default, or the expiration of the Commitment described in paragraph 3.3 hereof, and after providing five (5) days prior written notice (the "Enforcement Notice") to counsel for the Debtors, counsel for the Committee (if appointed and, if not appointed, the 20 Largest Unsecured Creditors), the U.S. Trustee and the Court, Agent, Lenders, and/or Factor shall be entitled to take any action and exercise all rights and remedies provided to them by this Interim Order, the Financing Agreements, the Factoring Agreements and/or applicable law as such parties may deem appropriate in their discretion to, among other things, proceed against and realize upon the Collateral, the Factoring Collateral (as applicable) and any other assets and properties of any Debtors' Estates upon which Agent, Lenders and/or Factor has been or may hereafter be granted liens and security interests to obtain the full and indefeasible repayment of all Obligations and Factoring Obligations.

Section 4.        Representations; Covenants; and Waivers.

        4.1        Objections to Pre-Petition Obligations.  Notwithstanding any other provision of this Interim Order, any action, claim, or defense (hereinafter, an "Objection") that seeks to object to, challenge, contest, or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind (a) the existence, validity, or amount of the Pre-Petition

Obligations or the Pre-Petition Factoring Obligations, (b) the extent, legality, validity, perfection, or enforceability of pre-petition liens and security interests granted to the Agent, for the benefit of the Lenders, in the Pre-Petition Collateral or Factor's pre-petition liens and security interests in the Pre-Petition Factoring Collateral, or (c) Agent's and Lenders' right to apply Post-Petition Collateral proceeds against Pre-Petition Obligations, and/or Factor's right to apply Post-Petition Factoring Collateral proceeds against Pre-Petition Factoring Obligations, as provided for in this Interim Order is fully preserved on behalf of the Debtors' Estates; provided, that it shall be filed with the Court (x) by any Committee, and no other party, within seventy-five (75) calendar days from the date of appointment of the Committee by the U.S. Trustee, or (y) in the event no Committee is appointed, within the thirty (30) days following the Petition Date, by any party in interest within ninety (90) calendar days from the date of entry of this Interim Order (the "Objection Period"). If any such Objection is timely filed and successfully pursued, nothing in this Interim Order shall prevent the Court from granting relief in conformity therewith with respect to the Pre-Petition Obligations (including with respect to disgorgement of any amounts previously applied to unsecured Pre-Petition Obligations), the Pre-Petition Factoring Obligations (including with respect to disgorgement of any amounts previously applied to unsecured Pre-Petition Factoring Obligations), Agent's and Lenders' liens on the Collateral and/or Factor's liens on the Factoring Collateral. If no Objection is timely filed or an Objection is timely filed but denied, (i) the Pre-Petition Obligations and the Pre-Petition Factoring Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction, or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and Agent's and Lenders' pre-petition liens on and security interest in the Pre-Petition Collateral and Factor's pre-petition liens on and security interest in the Pre-Petition Factoring Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the Revolving Loan Permitted Liens and Claims and the Factoring Permitted Liens and Claims to the extent set forth in this Interim Order, and (ii) each of Agent, Lenders, and Factor, its participants, and each of their respective agents, officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed released and discharged from any and all claims and causes of action that

23

can be brought by or on behalf of the Debtors or their Estates related to or arising out of the Existing Factoring Agreements and all Existing Revolving Financing Agreements and shall not be subject to any further objection or challenge by any party at any time.  In the event that the value of the liens and security interests in the Pre-Petition Collateral granted to Agent for the ratable benefit of the Lenders, are determined by a final, non-appealable order to be less than the Pre-Petition Obligations existing as of the Petition Date in accordance with clause (c) of this paragraph 4.1, then all fees, interest, costs and expenses that, after the Petition Date, were charged to the Pre-Petition Obligations and paid in accordance with the terms of this Interim Order and the Financing Agreements shall instead be deemed a reduction of the principal amount of the Pre-Petition Obligations outstanding as of the Petition Date in an amount equal to the aggregate amount of all such fees, interests, costs and expenses.

4.2    Debtors' Waivers.  At all times during the Cases and whether or not an Event of Default has occurred and is continuing, the Debtors, for themselves but not their Estates and subject to paragraph 4.1 hereof, irrevocably waive any rights that they may have to seek authority (i) to use cash collateral under section 363 of the Bankruptcy Code that is subject to any of the liens and claims granted to or for the benefit of Agent, Lenders and/or Factor under the Financing Agreements, the Factoring Agreements and/or this Interim Order, (ii) to obtain postpetition loans or other financial or factoring accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code other than from Factor and/or Agent and Lenders, or as may be otherwise expressly permitted pursuant to the Financing Agreements and the Factoring Agreements, (iii) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Pre-Petition Collateral or the Pre-Petition Factoring Collateral is less than the Pre-Petition Obligations or the Pre-Petition Factoring Obligations, respectively, or (iv) to seek relief under the Bankruptcy Code, including without limitation, under section 105, to the extent any such relief would in any way restrict or impair the rights and remedies of Agent, Lenders and/or Factor as provided in this Interim Order, the Financing Agreements and the Factoring Agreements or the exercise of such rights or remedies.

24

4.3     Section 506(c) Claims.  Except for the Carve-Out Expenses as expressly set forth in this Interim Order, no costs or expenses of administration which have or may be incurred in the Cases at any time shall be charged against Agent, Lenders and/or Factor , their respective claims, the Collateral or the Factoring Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of Agent, Lenders and/or Factor, and no such consent shall be implied from any other action, inaction, or acquiescence by Agent, Lenders and/or Factor.

4.4     Intentionally omitted.

4.5     Release.  Notwithstanding any other provision of this Interim Order, the Court does not hereby authorize the Debtors to agree to or be bound by Section 7 of the Ratification Agreement.

Section 5.     Other Rights and Obligations.

5.1     No Modification or Stay of This Interim Order.  Notwithstanding (i) any stay, modification, amendment, supplement, vacating, revocation, or reversal of this Interim Order, the Financing Agreements, the Factoring Agreements or any term hereunder or thereunder, (ii) the failure to obtain a Final Order pursuant to Bankruptcy Rule 4001(c)(2), or (iii) the dismissal or conversion of the Cases (a "Subject Event"), (x) the acts taken by or on behalf of Agent, Lenders and Factor in accordance with this Interim Order, and (y) the Post-Petition Obligations and Post-Petition Factoring Obligations incurred or arising prior to the Agent's, Lenders' and Factor's actual receipt of written notice from Debtors expressly describing the occurrence of such Subject Event shall be governed in all respects by the original provisions of this Interim Order, and the acts taken by or on behalf of Agent, Lenders and Factor in accordance with this Interim Order, and the post-petition liens granted to or for the benefit of Agent and Lenders in the Post-Petition Collateral and to Factor in the Post-Petition Factoring Collateral, and all other rights, remedies, privileges, and benefits granted in favor of Agent, Lenders and Factor pursuant to this Interim Order, the Financing Agreements and the Factoring Agreements shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.  For purposes of this Interim Order, the term "appeal", as used in section 364(e) of the

Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by this Court or any other tribunal.

5.2    Power to Waive Rights; Duties to Third Parties.  Factor, Agent and Lenders shall have the right to waive in writing any of their own rights, and remedies provided or acknowledged in this Interim Order (the "Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce any Lender Rights.  Any waiver of any Lender Rights shall not be or constitute a continuing waiver.  A delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, subject Factor, Agent and/or Lenders to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to any of Factor, Agent and Lenders.

5.3    Disposition of Collateral.  Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral or the Factoring Collateral without the prior written consent of Agent and Lenders (in the case of Collateral) and Factor (in the case of Factoring Collateral) (and no such consent shall be implied, from any other action, inaction or acquiescence by either of Agent, Lenders and/or Factor) and an order of this Court, except for sales of Debtors' Inventory in the ordinary course of its business or as approved by the Bankruptcy Court and consented to by Agent, Lenders and Factor.

5.4    Inventory.  Debtors shall not, without the consent of Agent and an order of the Court, enter into any agreement to return any inventory to any of its creditors for application against any pre-petition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise without the prior written consent of the Agent.

5.5    Reservation of Rights.  Except as may be inconsistent with the provisions of this Interim Order, the terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of Agent and Lenders and/or Factor) to pursue any and all rights and remedies

26

under the Bankruptcy Code, the Financing Agreements, the Factoring Agreements or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the Collateral, the Factoring Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estates.

   5.6  Binding Effect. This Interim Order shall be binding upon Debtors, Agent, the Lenders, the Factor, all parties in interest in the Cases, and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of the Debtors. This Interim Order shall also inure to the benefit of Agent and Lenders, Factor, Debtors, and their respective successors and assigns. The provisions of this Interim Order and the Financing Agreements, the Factoring Agreements, the Obligations, the Factoring Obligations, the Revolving Lender Super-Priority Claim, the Factor Super-Priority Claim and any and all rights, remedies, privileges, and benefits in favor or to the benefit of any of Agent, Lenders and/or Factor provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall, to the extent permitted by applicable law, survive entry of any such other order, including without limitation any order which may be entered confirming any plan of reorganization, converting one or more of the Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases.

   5.7  Intentionally omitted.

   5.8  Limited Effect. Unless the Interim Order specifically provides otherwise, in the event of a conflict between the terms and provisions of any of the Financing Agreements and the Factoring Agreements, on one hand, and this Interim Order, on the other hand, the terms and provisions of this Interim Order shall govern.

   5.9  Intentionally Omitted.

Section 6.    <u>Final Hearing and Response Dates</u>.  The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for February 18, 20055, at *10:00 a.m. before this Court. The Debtors shall promptly mail copies of this Interim Order to the Noticed Parties, and to any other party that has filed a request for notices with this Court and to any Creditors' Committee after same has been appointed, or Creditors' Committee counsel, if same shall have filed a notice.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) counsel for Debtors, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004, Attn: Vivek Melwani; Fax (212) 859-8583, (b) counsel for Agent and Factor, Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169-0075; Attn: Jonathan N. Helfat, Esq.; Fax: (212) 682-6104; (d) counsel to any Committee; and (c) the U.S. Trustee;* and shall be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York (with a copy to Chambers), in each case to allow actual receipt of the foregoing no later than February 16, 2005 at 4:00 p.m., prevailing Eastern time.

Dated: February 9, 2005
     New York, New York

                                      <u>   /s/ Robert D. Drain          </u>
                                        UNITED STATES BANKRUPTCY JUDGE

28