UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

WINN-DIXIE STORES, INC., et al.,

                    Debtors.

Chapter 11

Case No. 05-11063

(Jointly Administered)

## AFFIDAVIT OF SERVICE

I, Kathleen M. Logan, hereby certify under penalty that:

1.      I am of legal age and I am not a party to this action.

2.      I am President of Logan & Company, Inc., located at 546 Valley Road, Upper Montclair, New Jersey.

3.      On or about February 22, 2005, I caused copies of:

●      the Emergency Motion Pursuant to 11 U.S.C. Sections 105, 361, 362, 363 and 364 for Interim and Final Financing Orders (I) Authorizing Debtors to Obtain Post-Petition Financing and Utilize Cash Collateral, (II) Granting Adequate Protection to Pre-Petition Lenders, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) (Docket No. 12)

to be inserted in first class, postage pre-paid and pre-addressed envelopes and delivered to the U.S. Postal Service and/or via facsimile transmission for delivery to those persons on the Service List attached hereto as Exhibit A.  Copy of the served Motion listed above is attached hereto as Exhibit B.

Dated: February 24, 2005

_____
Kathleen M. Logan

Code:  DP

**EXHIBIT A**

Service List
DIP Motion
Overnight

**DEBTOR:    WINN-DIXIE STORES, INC.**                                      **CASE:   05-11063 (SMB)**

CREDITOR ID: 278730-28
AL - DEPT. OF REVENUE
DWIGHT CARLISLE
ALABAMA DEPARTMENT OF REVENUE
GORDON PERSONS BUILDING
50 N. RIPLEY STREET
MONTGOMERY AL 36132

CREDITOR ID: 278734-28
BANK OF AMERICA, N.A.
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL
PO BOX 25086
1111 E. MAIN STREET, 18TH FLOOR
MECHANICSVILLE VA 90017

CREDITOR ID: 278740-28
EMC CORPORATION
TOM CIMENO
6200 COURTNEY CAMPBELL CAUSEWAY
SUITE 900
TAMPA FL 33607

CREDITOR ID: 278746-28
FLEET BUSINESS CREDIT, LLC
TODD A. STUMP
ONE SOUTH WACKER DRIVE
SUITE 3800
CHICAGO IL 60606

CREDITOR ID: 278751-28
GE CAPITAL
PAUL HERINGSLAKE
VICE PRESIDENT & SENIOR ACCOUNT EXECUTIVE
GE COMMERCIAL EQUIPMENT FINANCING
160 INTERNATIONAL PARKWAY, SUITE 120
HEATHROW FL 32746

CREDITOR ID: 278750-28
GE CAPITAL
P O BOX 740441
ATLANTA, GA  30374-0441

CREDITOR ID: 278762-28
NATIONAL CITY BANK OF MI/IL
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL
108 E MICHIGAN AVE
KALAMAZOO MI 49007-3966

CREDITOR ID: 278763-28
NCR CORPORATION
GENERAL COUNCEL NOTICES
1700 SOUTH PATERSON BLVD
DAYTON OH 45479

**Total:   8**

Service List
DIP Motion
Faxed

**DEBTOR:    WINN-DIXIE STORES, INC.**                                                      **CASE:    05-11063 (SMB)**

CREDITOR ID: 278731-28
AL - DEPT. OF REVENUE
TREY GRANGER
GENERAL COUNSEL - SECRETARY OF STATE OF ALABAMA
OFFICE OF THE SECRETARY OF STATE
P.O. BOX 5616
MONTGOMERY AL 36103-5616

CREDITOR ID: 278732-28
AMERICAN BANK NOTE COMPANY
AS AGENT FOR THE UNITED STATES POSTAL SERVICE
BRUCE ACKERMAN
VP BUSINESS DEVELOPMENT

CREDITOR ID: 278733-28
AMSOUTH BANK
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL

CREDITOR ID: 278735-28
BENNETT'S LEASING INCORPORATED
B. MEEHAN
4805 LENNOX AVE.
JACKSONVILLE FL 32205

CREDITOR ID: 278736-28
CARGILL, INCORPORATED
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL
CARGILL, INCORPORATED - CORPORATE HEADQUARTERS
P.O. BOX 9300
MINNEAPOLIS MN 55440-9300

CREDITOR ID: 278737-28
CISCO SYSTEMS CAPITAL CORPORATION
SCOTT ALVAREZ
400 CARILLON PARKWAY
SUITE 220
ST. PETERSBURG FL 33716

CREDITOR ID: 278738-28
COMPUTER LEASING COMPANY OF MICHIGAN, INC.
COLIN ARMSTRONG
5150 PALM VALLEY RD
SUITE 208
PONTA VEDRA BEACH FL 32082

CREDITOR ID: 278739-28
CRYOVAC, INC.
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL

CREDITOR ID: 278742-28
FIDELITY LEASING, INC.
PO BOX 8500-9805
PHILADELPHIA, PA  19178-9805

CREDITOR ID: 278741-28
FIDELITY LEASING, INC.
MIKE O'HARE; GEN SCHEURER
601 RIVERSIDE AVENUE
JACKSONVILLE FL

CREDITOR ID: 278744-28
FIRST UNION NATIONAL BANK
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL

CREDITOR ID: 278743-28
FIRST UNION NATIONAL BANK
AS ADMINISTRATIVE AGENT
NOW KNOWN AS WACHOVIA BANK, NATIONAL ASSOCIATION
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL

CREDITOR ID: 278745-28
FIRST UNION NATIONAL BANK, AS ADMINISTRATIVE AGENT
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL

CREDITOR ID: 278749-28
GATX TECHNOLOGY SERVICES CORPORATION
MICHAEL WILKINSON
1 CIT DRIVE
LIVINGSTON NJ

CREDITOR ID: 278754-28
GENERAL ELECTRIC CAPITAL CORPORATION
WILLIAM S. THEIS, VP - REGION SALES MANAGER
COMMERCIAL EQUIPMENT FINANCING
GENERAL ELECTRIC CAPITAL CORPORATION
2385 EXECUTIVE CENTER DRIVE, SUITE 200
BOCA RATON FL 33431

CREDITOR ID: 278755-28
HEALTHGUARD FINANCE CORPORATION
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL
HEALTHGUARD INTERNATIONAL
255 N WASHINGTON ST # 202
ROCKVILLE MD 20850-1756

CREDITOR ID: 278758-28
IBM CREDIT LLC
LEE LORENZ
315 E. ROBINSON STREET
ORLANDO FL 32801

CREDITOR ID: 278759-28
IKON OFFICE SOLUTIONS INC
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL
CORPORATE HEADQUARTERS
IKON OFFICE SOLUTIONS
70 VALLEY STREAM PARKWAY
MALVERN PA 19355-1407

CREDITOR ID: 278760-28
KONICA PHOTO IMAGING
PAUL GORDON
SVP OF SALES

CREDITOR ID: 278761-28
KONICA USA INC.
PAUL GORDON
SVP OF SALES

CREDITOR ID: 278764-28
NORSE DAIRY SYSTEMS
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL

CREDITOR ID: 278768-28
US BANCORP
OFFICE EQUIPMENT FINANCE
1310 MADRID ST. SUITE 101
MARSHALL MN 56258-4002

CREDITOR ID: 278769-28
WACHOVIA BANK, NATIONAL ASSOCIATION
AS ADMINISTRATIVE AGENT
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL

CREDITOR ID: 278770-28
WELLS FARGO BANK, N.A.
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL

CREDITOR ID: 278771-28
XPEDEX - DIVISION OF INTERNATIONAL PAPER
WINN DIXIE ACCOUNT MANAGER/GENERAL COUNSEL
CORPORATE HEADQUARTERS
6285 TRI-RIDGE BLVD.
LOVELAND OH 45140

     **Total:    25**

**EXHIBIT B**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
D.J. Baker (DB 0085)

KING & SPALDING LLP
191 Peachtree Street
Atlanta, Georgia 30303
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Sarah Robinson Borders

Proposed Attorneys for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————x
**In re**                           :
                                    :      **Chapter 11**
                                    :
**WINN-DIXIE STORES, INC., et al.,**     :      **Case No. 05-11063**
                                    :
               **Debtors.**              :      **(Jointly Administered)**
                                    :
———————————————————————x

## EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 FOR INTERIM AND FINAL FINANCING ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING AND UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION LENDERS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

Winn-Dixie Stores, Inc. and its debtor affiliates,[1] as debtors and debtors-in-possession

(collectively, the "Debtors"), respectfully represent:

---

[1]    In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores,

## Background

`A.   **Chapter 11 Filings.**

1.      The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on February 21, 2005 (the "Petition Date").

2.      The Debtors will continue in possession of their property and will operate and manage their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed in these cases.

4.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

B.   **Company Background.**

5.      The Debtors are grocery and drug retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  According to published reports, the Debtors are the eighth-largest food retailer in the United States and one of the largest in the Southeast.  The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion.  The Debtors currently operate more than 900 stores in the United States.  Substantially all of the Debtors' store locations are leased rather than owned.

---

Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

6.      The Debtors employ nearly 79,000 associates, of whom approximately 33,000 are employed on a full-time basis and 46,000 on a part-time basis.

7.      The Debtors operate in a highly competitive supermarket industry that is generally characterized by intense competition and narrow profit margins. The Debtors compete directly with national, regional, and local supermarket chains and independent supermarkets, as well as with Wal-Mart, similar supercenters, and other non-traditional grocery retailers such as dollar discount stores, drug stores, convenience stores, warehouse club stores, and conventional department stores.

## C.     Capital Structure.

8.      The Debtors' primary secured obligations arise under a Second Amended and Restated Credit Agreement dated June 29, 2004, with Wachovia Bank, N.A., as administrative agent; GMAC Commercial Finance LLC, as syndication agent; Wells Fargo Foothill, LLC, General Electric Capital Corporation, and The CIT Group/Business Credit, Inc., as co-documentation agents; Wachovia Bank, N.A., as successor by merger to Congress Financial Corporation (Florida), as collateral monitoring agent; and the several lenders from time to time party thereto (the "Pre-Petition Credit Agreement").

9.      The Debtors' maximum borrowing capacity under the Pre-Petition Credit Agreement totals $600 million. Beginning on September 22, 2004, the Debtors failed to meet a financial test under the Pre-Petition Credit Agreement that limited the amount available for borrowings; however, the Debtors obtained a waiver of this financial test on February 9, 2005. The waiver requires that the Debtors perfect the lenders' security interest in assets with a requisite value on or before March 31, 2005. The waiver expires on June 29, 2005.

10.     The Pre-Petition Credit Agreement provides for revolving loans and the issuance
of letters of credit. It is secured by substantially all of the personal property and owned real
property of the Debtors that are parties thereto. As of the Petition Date, the Debtors were liable
for obligations under the Pre-Petition Credit Agreement in the aggregate amount of
approximately $427,005,000: The Debtors are seeking authority to refinance their obligations
under the Pre-Petition Credit Agreement pursuant to a debtor-in-possession financing facility
provided by Wachovia Bank, N.A. and other lenders.

11.     Certain of the Debtors are parties to an Indenture with Wilmington Trust
Company dated December 26, 2000 (as amended and supplemented, the "Indenture"). Pursuant
to the Indenture, Debtor Winn-Dixie Stores, Inc. issued $300 million in principal amount of
Senior Notes bearing interest at 8.875% per annum, and certain other Debtors guaranteed the
Senior Notes. The Senior Notes mature in 2008 and require semi-annual interest-only payments
until maturity. The Senior Notes are unsecured obligations that are *pari passu* with most of the
Debtors' other unsecured obligations, which generally consist of trade debt, contract and lease
obligations (including possible rejection damages), employee obligations, and litigation claims.

12.     Parent company Winn-Dixie Stores, Inc. is publicly owned, and its common stock
has been traded on the New York Stock Exchange since 1952 under the ticker symbol WIN. All
of the other Debtors are direct and indirect subsidiaries of Winn-Dixie Stores, Inc.

**D.      Events Leading to the Debtors' Chapter 11 Cases.**

13.     In January 2004, the Debtors announced a series of actions designed to improve
their competitive position (the "Strategic Plan"). The Strategic Plan included (a) a review of
business strategies and marketing programs, (b) an expense reduction plan designed to achieve a

$100 million annual expense reduction, (c) a market positioning review through which markets will be identified as either core, and positioned for future investment and growth, or non-core, and evaluated for sale or closure, (d) an image makeover program targeting approximately 700 stores for facilities improvement, and (e) a process re-engineering initiative that is intended to enhance organizational effectiveness and company business initiatives.

14.     As part of the Strategic Plan, the Debtors committed to focus on a core base of stores across 36 designated marketing areas in the United States. The Debtors decided to exit 156 stores, exit three distribution centers, sell or close four manufacturing plants, and consolidate two dairy operations. Of these facilities, the Debtors exited 135 stores, three distribution centers, and three manufacturing plants between April 2004 and the Petition Date.

15.     Despite the implementation of the Strategic Plan, during the remainder of 2004, the Debtors continued to experience significant sales declines and market-share losses. The Debtors' financial performance was affected not only by operating losses but also by ongoing obligations relating to a significant number of store locations where the Debtors no longer operate. The Debtors are seeking authority to reject a substantial number of the leases relating to these stores, effective immediately.

16.     In part in anticipation of the 2004 holiday season, the Debtors increased their purchasing activities in October and November. When holiday sales were lower than expected, the Debtors experienced higher-than-anticipated inventory levels and lower-than-anticipated accounts payable, resulting in increased borrowings under the Credit Agreement and reduced liquidity.

17.     On February 10, 2005, the Debtors announced that during their first and second fiscal quarters ending on January 12, 2005, the Debtors incurred losses in the amount of $552.8 million, or $3.93 per share of common stock. The Debtors also announced that for their second fiscal quarter, identical-store sales declined by 4.9% as compared to the second quarter of the prior year.

18.     The Debtors' financial results and decrease in liquidity, coupled with downgrades by Moody's Investor Services and Standard & Poor's Rating Services, as well as negative press coverage, led a number of the Debtors' trade creditors to demand shorter payment terms. Since the announcement of the Debtors' financial results on February 10, 2005, the Debtors have experienced a reduction in vendor and other credit by more than $130 million. As a result, the Debtors have been forced to conclude, after consultation with their advisors, that their interests and the interests of their creditors, employees, and customers will be best served by a reorganization under Chapter 11 of the Bankruptcy Code.

19.     As part of their restructuring under Chapter 11, the Debtors, led by a chief executive officer hired in December 2004, intend to implement further asset rationalization and expense reduction plans and to utilize new sales initiatives to improve the Debtors' brand image and competitive position, with the goal of improving their operations and financial performance and strengthening their business for the benefit of creditors, customers, employees, and the communities in which the Debtors operate.

**Relief Requested**

20.     By this Motion, the Debtors respectfully request, pursuant to Sections 105, 361,

362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of

interim and final orders, *inter alia*:[2]

(a) authorizing the Debtors to obtain post-petition secured revolving loans,

advances and other financial accommodations in an aggregate amount of up to $800,000,000

from Wachovia Bank National Association, as Administrative Agent and Collateral Agent

("Agent") for itself and the other financial institutions from time to time parties to the Credit

Agreement (as hereinafter defined) (collectively, "Lenders," and together with Agent,

collectively referred to herein as "Lender"), all in accordance with the terms and conditions set

forth in the Credit Agreement (as the same now exists or may hereafter be amended, modified,

ratified, extended, renewed, restated or replaced, the "Credit Agreement," a copy of which is to

be included in the Exhibit Supplement, filed contemporaneously herewith), by and among the

Debtors and the Lender, and the other Loan Documents, secured by senior (subject to certain

liens and claims set forth below), perfected, valid, enforceable and non-avoidable security

interests in and liens upon all of the Collateral (as defined in the Credit Agreement);

(b) authorizing the Debtors to grant to the Lender priming liens and security

interests in (the "Priming Liens") all assets and properties of the Debtors and their estates which

secure the Pre-Petition Lender Debt, senior and superior in priority in all respects to any and all

liens and security interests of the Pre-Petition Lender (subject to the terms and conditions set

forth in the Interim Order);

---

[2]   Capitalized terms which are not defined herein shall have the meaning ascribed to such
terms in the Credit Agreement.

(c) in connection with the Priming Liens, provide adequate protection to the Pre-Petition Lender, by preserving and continuing in effect, on a junior and subordinated basis, liens on and security interests to secure any Contingent Pre-Petition Lender Debt (as defined in the Interim Order) in accordance with the terms and conditions contained in the Interim Order;

(d) authorizing the Debtors to enter into and comply in all respects with the Credit Agreement and all other Loan Documents, and approval of all of the terms and conditions of the Credit Agreement and all other Loan Documents;

(e) granting the Lender superpriority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of all Obligations, subject to the terms and conditions contained in the Interim Order;

(f) authorizing, upon entry of the Interim Order, the immediate repayment in full of the Pre-Petition Lender Debt owing by certain of the Debtors to Wachovia Bank National Association, in its capacity as Administrative Agent and Collateral Agent for itself ("Pre-Petition Lender Agent") and certain other financial institutions that are parties from time to time to the Pre-Petition Credit Agreement (the "Pre-Petition Lenders," and together with the Pre-Petition Lender Agent, collectively referred to herein as the "Pre-Petition Lender"), and the simultaneous subordination of the Pre-Petition Lender's liens, claims and encumbrances and the termination or assignment of such liens, claims and encumbrances to the Lender on the date that the Final Financing Order becomes final and non-appealable or earlier as the Pre-Petition Lender may agree, all in accordance with the terms and conditions contained in the Interim Order;

(g) authorizing the Debtors to use cash collateral of the Pre-Petition Lender;

- 8 -

(h) scheduling a preliminary hearing on this Motion, to consider entry of an Interim Order authorizing the Borrowers (as hereinafter defined), inter alia, to borrow, on an interim basis, up to an aggregate amount of $600,000,000 (which amount is inclusive of the repayment in full of the Pre-Petition Lender Debt) in Loans and Letters of Credit (as each term is defined in the Credit Agreement) pursuant to the terms and conditions set forth in the Credit Agreement and the Loan Documents during the period commencing upon the entry of this Interim Order and ending upon entry of a Final Financing Order (as hereinafter defined); and

(i) scheduling the Final Hearing and approving notice with respect thereto.

### Pre-Petition Funding of the Debtors' Operations

**A.    The Pre-Petition Credit Agreement.**

21.    Prior to the Petition Date, the working capital needs of the Debtors were met primarily by the Pre-Petition Credit Agreement. The Pre-Petition Credit Agreement and all other agreements, notes, security agreements, instruments, and other documents executed in connection therewith are hereafter collectively referred to as the "Pre-Petition Loan Documents."

22.    The Pre-Petition Loan Documents provide for senior secured credit facilities which consist of a $400 million three-year revolving credit facility and a $200 million three-year standby letter of credit facility, secured by substantially all of the assets of Winn-Dixie Stores, Inc. and its principal domestic affiliates. (The assets of Winn-Dixie Stores, Inc. and its principal domestic affiliates subject to the liens, security interests, and mortgages of the Pre-Petition Lender are hereinafter collectively referred to as the "Pre-Petition Collateral.") The Debtors believe and therefore stipulate that such liens, security interests, and mortgages have been duly perfected against the Pre-Petition Collateral.

**B.     Current Status of Pre-Petition Facility.**

23.     As of the Petition Date, the Debtors were indebted to the Pre-Petition Lender in the aggregate principal amount of approximately $427,005,000 (the "Pre-Petition Lender Debt"), consisting of, among other things, (i) Loans (as defined in the Pre-Petition Credit Agreement) made pursuant to the Pre-Petition Loan Documents in the aggregate principal amount of not less than $265,000,000, plus all interest, fees, costs and expenses and all charges accrued and accruing thereon and/or chargeable with respect thereto, and (ii) Reimbursement Obligations (as defined in the Pre-Petition Credit Agreement) in respect of Letters of Credit in an aggregate amount of not less than $162,005,000, plus all interest, fees, costs, expenses and all charges related thereto.

24.     The Pre-Petition Lender Debt is secured pursuant to the Pre-Petition Loan Documents by perfected, valid, binding and non-avoidable first priority security interests and liens granted by Debtors to or for the benefit of the Pre-Petition Lender upon all of the Pre-Petition Collateral, subject only to certain Permitted Liens (as defined in the Pre-Petition Credit Agreement).[3]

25.     Substantially all cash generated by the Debtors' businesses as of the Petition Date constitutes "cash collateral," as such term is defined in Section 363(a) of the Bankruptcy Code, and is subject to the interest of the Pre-Petition Lenders (the "Cash Collateral").

26.     The Pre-Petition Lender has consented to the Debtors' use of its Cash Collateral and agreed to the priming of its liens in the Pre-Petition Collateral, commencing immediately

---

[3] There may be some de minimis items of Pre-Petition Collateral in which the Pre-Petition Lender's interest is not perfected.

following the entry of the Interim Order through and including the date on which the Final

Financing Order becomes final and non-appealable, subject to the conditions set forth in the

Interim Order.

**The Debtors' Post-Petition Financing Arrangements**

**A.      The Debtors' Efforts to Obtain Financing.**

27.      The Debtors do not have any currently available sources of funds other than the

Cash Collateral and the proposed post-petition financing (the "DIP Financing") to carry on the

operation of their businesses.  The Debtors urgently require working capital to continue their

operations.  The uncertainty concerning the Debtors' financial condition has curtailed the

Debtors' availability of credit and acceptable credit terms.  More specifically, the Debtors'

ability to maintain business relationships with their vendors and suppliers, to purchase new

inventory, and otherwise to finance their operations is dependent on their ability to use cash

collateral and obtain the funds made available under the DIP Financing.

28.      Any potential disruption of the Debtors' operations would be devastating at this

critical juncture.  The inability of the Debtors to obtain sufficient liquidity and to make payments

on certain obligations on a timely basis may result in a permanent and irreplaceable loss of

business, causing a loss of value, to the detriment of the Debtors and all parties in interest.  In

light of the foregoing, the Debtors have determined, in the exercise of their sound business

judgment, that a post-petition credit facility, which permits the Debtors to obtain up to

$800,000,000 in financing, and to use such credit to finance the operation of their businesses, is

critical to their ongoing operations.

- 11 -

29.    Prior to the Petition Date, the Debtors surveyed various sources of post-petition

financing and sought additional financing from both new and existing lenders. The Debtors

concluded that the debtor in possession financing offered by the Agent presented the best option

available and would enable the Debtors to preserve their value as a going concern. The proposal

received from the Lender is competitive and addresses the Debtors' working capital and liquidity

needs.

**B.    The Credit Agreement.**

30.    Prior to the Petition Date, the Debtors engaged in good-faith and extensive,

arm's-length negotiations with the Agent. These negotiations culminated in an agreement by the

Agent to provide post-petition financing on the terms and subject to the conditions set forth in

the Credit Agreement and the Interim Order. A copy of the Credit Agreement is included in the

Exhibit Supplement.

31.    The significant elements of the Loan Documents, and the proposed interim and

final financing orders, are as follows:[4]

(a)    Borrowers. Winn-Dixie Stores, Inc., Dixie Stores, Inc., Winn-Dixie
Supermarkets, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie
Procurement, Inc., and Winn-Dixie Raleigh, Inc. are Borrowers under the
Credit Agreement.

(b)    Guarantors. Astor Products, Inc., Crackin' Good, Inc., Deep South
Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc.,
Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie-
Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc.,

---

[4] This summary is qualified in its entirety by reference to the provisions of the Loan
Documents. This Court's Guidelines for Financial Requests adopted by General Order M-274
dated as of September 9, 2002, requires a debtor to highlight any "Extraordinary Provisions" (as
defined therein). Sections of the Loan Documents that may include Extraordinary Provisions are
included in the summary and are marked with an asterisk*.

- 12 -

Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., and Winn-Dixie Logistics, Inc., are Debtors and Guarantors under the Credit Agreement. Dixon Realty Trust 1999-1, a non-Debtor, is also a Guarantor under the Credit Agreement.

(c)    <u>Commitment and Availability</u>.  The Credit Agreement provides for an available revolving credit facility of $800,000,000 in the aggregate, including any amounts outstanding under the letter of credit facility issued by Wachovia Bank, N.A., which may not exceed $300,000,000.  The Borrowers' obligations under both facilities are to be guaranteed by the Guarantors.

(d)    <u>Borrowing Base</u>.  means, at any time, for the Borrowers collectively, the amount equal to:

the lesser of:

a.  the amount equal to the sum of:

i.  the lesser of (1) seventy percent (70%) of eligible (other than perishable) inventory value or (2) ninety percent (90%) of the net recovery percentage of the eligible (other than perishable) inventory value; <u>plus</u>

ii.  the least of (1) seventy percent (70%) of eligible perishable inventory value or (2) ninety percent (90%) of the net recovery percentage of perishable inventory value or (3) the lesser of (x) $125,000,000 or (y) 17.86% of the maximum non-leasehold availability amount then in effect or (4) the amount equal to (x) the fraction, expressed as a percentage, the numerator of which is the lesser of the amounts set forth in <u>subclauses (1)</u>, <u>(2)</u> or <u>(3)</u> and the denominator of which is the sum of the lesser of the amounts set forth in <u>subclauses (1)</u>, <u>(2)</u> and <u>(3)</u>, plus the lesser of the amounts set forth in <u>subclauses (1)</u> or <u>(2)</u> of <u>clause (a)(i)</u> above, multiplied by (y) perishable inventory value; <u>plus</u>

iii.  the lesser of the pharmacy scripts availability or the pharmacy scripts cap (each as defined in the Credit Agreement); <u>plus</u>

iv.  the lesser of (1) eighty percent (80%) of the net amount of eligible pharmacy receivables or (2) 3.6% of the maximum non-leasehold availability amount then in effect (3) $25,000,000; <u>plus</u>

- 13 -

v. the lesser of (1) fifty-five percent (55%) of the fair market value of eligible real property, as set forth in the most recent appraisal of such real property acceptable to Agent, or (2) the lesser of (x) $30,000,000 or (y) 4.3% of the maximum non-leasehold availability amount then in effect; plus

vi. the leasehold availability, which means (a) $100,000,000 prior to receipt by Agent of initial leasehold appraisals which meet certain criteria, and (b) thereafter the lesser of (i) $100,000,000 or (ii) fifty (50%) percent of the appraised "net orderly liquidation value" of eligible leasehold property; plus

vii. the lesser of (a) twenty-five (25%) percent of the appraised "net orderly liquidation value" of eligible leasehold property or (b) $100,000,000 minus the leasehold availability described in subclause (a)(vi), or (c) $25,000,000; or

b. the total commitment amount of $800,000,000, minus all reserves (as defined in the Credit Agreement).

(e)     Term. The DIP Facility will be available for a term ending on the earliest of (a) twenty-four (24) months after the date of the initial loans made by the Agent and the DIP Lenders under the Credit Agreement pursuant to the Interim Order, (b) the date of effectiveness of any plan of reorganization confirmed in the Debtors' Chapter 11 cases, and (c) the last termination date set forth in the Interim Order or the Final Financing Order, if in effect prior to such date. The Agent may terminate the Credit Agreement earlier upon the occurrence of an Event of Default. The Debtors' failure to obtain entry of a final non-appealable Final Financing Order as to the approval of the Credit Agreement and the other Loan Documents, in form and substance acceptable to Lender, within sixty (60) days after the date of this Motion, is an Event of Default.

(f)     *Purpose. A portion of Debtors' borrowings from Lender under the Credit Agreement, the other Loan Documents and the Interim Order will be used to repay in full the Pre-Petition Lender Debt, subject to the terms and conditions contained in the Interim Order. The remaining borrowings will be used by the Debtors for the payment of (a) employee salaries, payroll, taxes, the purchase of goods, materials and other general corporate and working capital purposes, including amounts paid for such purposes which may constitute administrative expense claims under the Bankruptcy Code attributable to the operation of Debtors' businesses as authorized by order of the Court and in accordance with the Loan Documents, and (b) the fees of the U.S. Trustee, the fees of the Clerk of

this Court, the allowed fees and expenses of attorneys, accountants and other professionals retained under Section 327 or 1103(a) of the Bankruptcy Code by the Debtors and the Committee, and (c) all fees, costs and expenses related to the financing provided by Lender in accordance with the Loan Documents and subject to the terms of the Interim Order.

(g)     Priority and Liens.  Subject to the Carve-Out (as hereinafter defined), the Obligations will at all times be secured by valid, perfected, enforceable and non-avoidable first priority security interests in and liens, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates (subject to the liens and claims set forth in paragraph 8 of the Interim Order), upon substantially all of the assets and properties of the Debtors and their estates (excluding any claims and causes of action brought under Chapter 5 of the Bankruptcy Code and the proceeds thereof) and including, without limitation, the following:  contract rights, general intangibles, accounts, cash or cash equivalents, deposit accounts, letters of credit, letter-of-credit rights, supporting obligations, chattel paper, documents, instruments, investment property, inventory, equipment, fixtures and other goods, real property (owned and leased), and all products and proceeds of any of the foregoing (the "Collateral", as such term is more fully defined in the Security Agreement).  Upon the Final Financing Order becoming final and non-appealable, all liens and security interests of the Pre-Petition Lender in the Pre-Petition Collateral will be terminated or be deemed to be assigned to Lender as additional collateral security for all Obligations.  Assignment of such liens and security interests will be in addition to, and will not limit, prejudice or impair any of the claims or liens and security interests of Lender in the Collateral granted pursuant to the Loan Documents and the Interim Order. In no event will the Lender have any liability in connection with such assignment or the pre-petition liens so assigned (including, without limitation, any liability relating to a Pre-Petition Lien/Claim Challenge (as defined in paragraph 15(e) of the Interim Order) or a Disgorgement Action), and in no event will the Pre-Petition Lender continue to have any rights or benefits in connection with such liens so assigned.

(h)     *Superpriority Claim.  The Debtors have agreed to grant the Lender an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, which claim will have priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtors, now in existence or hereafter incurred by any of the Debtors and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1) and/or 726 of the

- 15 -

Bankruptcy Code (the "Superpriority Claim"), provided, however, that the Superpriority Claim will be subordinate to (i) the Carve-Out and (ii) the Pre-Petition Lender Carve Out, as set forth in the Interim Order. The Lender's superpriority claim will be entitled to payment from the proceeds of causes of action arising under Chapter 5 of the Bankruptcy Code.

(i)     Pre-Petition Lender's Consent to Priming Liens. The Pre-Petition Lender has consented and agreed to the priming of its liens in the Pre-Petition Collateral, commencing immediately following the entry of the Interim Order through and including the date on which the Final Financing Order becomes final and non-appealable, subject to the conditions set forth in the Interim Order.

(j)     Lender Consent to Pre-Petition Lender's Subordinate Lien. The Lender has agreed that the subordinated and junior lien in favor of the Pre-Petition Lenders upon the Pre-Petition Lender Collateral is a Permitted Lien under the Credit Agreement, subject to the terms and conditions of the Interim Order.

(k)     Repayment and Termination of Pre-Petition Lender Debt; Adequate Protection. Subject to the terms and conditions set forth in the Interim Order, the following will be granted to the Pre-Petition Lender as adequate protection in connection with the Priming Liens: (i) the Debtors will use a portion of the proceeds from the Loans and other credit accommodations made under the Credit Agreement to repay the Pre-Petition Lender Debt in full, (ii) the Pre-Petition Lender will continue to hold Pre-Petition Lender Junior Liens (as defined in the Interim Order) on Pre-Petition Collateral, which liens will be junior and subordinate in right of payment to all Obligations; (iii) the Pre-Petition Lender will have a priority claim, senior in priority to the right of payment of Lender in respect of the Obligations, of up to $1,000,000 for any reasonable professional fees and reasonable legal expenses actually incurred by or on behalf of Pre-Petition Lender in connection with any pending or threatened action against Pre-Petition Lender, as more fully described in the Interim Order.

(l)     *Unwinding the Payment of the Pre-Petition Lender Debt. Subject to the terms and conditions of the Interim Order, the repayment of the Pre-Petition Lender Debt is without prejudice to the rights of any committee of unsecured creditors appointed in the Debtors' Chapter 11 cases (the "Committee"), or if no Committee is formed, any party in interest, to seek to (i) disallow the Pre-Petition Lender's claims in respect of the Pre-Petition Lender Debt and (ii) avoid any security interest or liens of the Pre-Petition Collateral. The Committee will have seventy-five (75)

- 16 -

calendar days from the date of appointment of counsel for the Committee (and if no Committee is formed, any party in interest will have seventy-five (75) days from entry of this Interim Order), within which to commence an adversary proceeding with respect to the Pre-Petition Lender's claims in respect of the Pre-Petition Lender Debt or security interest in the Pre-Petition Lender Collateral, or any other claims or causes of action against the Pre-Petition Lender relating to the Pre-Petition Loan Documents.

(m)     Use of Cash Collateral. During the period commencing immediately after the filing of the Debtors' Chapter 11 petitions and through the date on which the Final Financing Order becomes final and non-appealable, the Debtors are authorized to use, subject to the terms contained in the Interim Order, the Cash Collateral. The Pre-Petition Lender retains the right to seek adequate protection against the diminution in the value of the Pre-Petition Lender Junior Liens, as set forth in the Interim Order. The Interim Order provides that Cash Collateral may not be used to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code other than from Lender without the prior written consent of Lender.

(n)     Carve-Out. The liens and superpriority claims granted under the Credit Agreement will be subordinate to the payment of (i) the fees and expenses of the Clerk of this Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (ii) the allowed reasonable fees and expenses of any Chapter 7 Trustee appointed for any Debtor's Chapter 7 case, up to $50,000 in the aggregate for purposes of constituting a part of the Carve Out Expenses, and (iii) on and after the Default Point, the allowed unpaid and outstanding reasonable fees and expenses approved by order of this Court by professionals retained under Sections 327 or 1103(a) of the Bankruptcy Code by the Debtors and the Committee, in an aggregate amount up to $12,000,000.

(o)     Interest. Loans (other than Revolving Loans based on Leasehold Availability and Supplemental Junior Availability) comprising a Borrowing accrue interest at a rate per annum: (i) on that portion maintained from time to time as a Base Rate Loan, equal to the sum of the Alternate Base Rate from time to time in effect plus one-quarter of one percent (¼%) per annum; and (ii) on that portion maintained as a LIBO Rate Loan, during each Interest Period applicable thereto, equal to the sum of the LIBO Rate (Reserve Adjusted) for such Interest Period plus one and three-quarters percent (1¾%) per annum. Loans based on Leasehold Availability comprising a Borrowing accrue interest at a rate per annum: (i) on that portion maintained from time to time as a Base Rate Loan,

- 17 -

equal to the sum of the Alternate Base Rate from time to time in effect plus two and one-quarter percent (2¼%) per annum; and (ii) on that portion maintained as a LIBO Rate Loan, during each Interest Period applicable thereto, equal to the sum of the LIBO Rate (Reserve Adjusted) for such Interest Period plus three and three-quarters percent (3¾%) per annum. Loans based on Supplemental Junior Availability comprising a Borrowing accrue interest at a rate per annum: (i) on that portion maintained from time to time as a Base Rate Loan, equal to the sum of the Alternate Base Rate from time to time in effect plus five and one-half percent (5½%) per annum; and (ii) on that portion maintained as a LIBO Rate Loan, during each Interest Period applicable thereto, equal to the sum of the LIBO Rate (Reserve Adjusted) for such Interest Period plus seven percent (7%) per annum. All LIBO Rate Loans will bear interest from and including the first day of the applicable Interest Period to (but not including) the last day of such Interest Period at the interest rate determined as applicable to such LIBO Rate Loan.

(p)    Default Rates.  Upon the occurrence and during the continuance of an Event of Default, if demanded by the Agent (or automatically in the case of the occurrence of an event described in Section 8.1.10 of the Credit Agreement), the Borrower will pay to the extent permitted by law:  in the case of LIBO Rate Loans only, (i) interest (after as well as before judgment) on the principal amount of all outstanding LIBO Rate Loans at a rate per annum equal to the LIBO Rate (Reserve Adjusted) from time to time in effect, plus, (A) in the case of Loans other than Revolving Loans based on Leasehold Availability, three and three-quarters percent (3¾%) per annum, or (B) in the case of Revolving Loans based on Leasehold Availability, five and three-quarters percent (5¾%) per annum, or (C) in the case of Revolving Loans based on Supplemental Junior Availability, nine percent (9%) per annum, in each case until the expiration of the applicable Interest Period in effect at such time, and (ii) thereafter as set forth in the subsequent paragraph.

In the case of Base Rate Loans, Swing Line Loans and all other amounts payable under the Credit Agreement, interest (after as well as before judgment) on (i) the principal amount of all outstanding Loans, (ii) all unpaid interest and fees payable hereunder and (iii) any other amounts due and payable, in each case at a rate per annum equal to the Alternate Base Rate from time to time in effect, plus (A) in the case of Loans other than Revolving Loans based on Leasehold Availability, two and one-quarter percent (2¼%) per annum, or (B) in the case of Revolving Loans based on Leasehold Availability, four and one-quarter percent (4¼%) per annum or (C) in the case of Revolving Loans based on Supplemental Junior Availability, seven and one-half percent (7½%) per annum.

- 18 -

(q)    *Events of Default. The following are Events of Default under the Credit
Agreement and the Interim Order: (i) the failure of the Debtors to perform
in any material respect any of its obligations pursuant to the Interim
Order; (ii) the occurrence of any Event of Default under the Credit
Agreement or the other Loan Documents, including failure of the Debtors
to satisfy their obligations to pay principal or interest on any Loan, any
breach of warranty made under the Loan Documents, non-performance of
certain covenants and obligations, the occurrence of a Change in Control,
a default on certain Indebtedness, or, under certain circumstances, the
institution of any steps to terminate the Pension Plans; (iii) the termination
or non-renewal of the Loan Documents as provided for in the Credit
Agreement, or if terminated sooner by an order of this Court; (iv)
conversion of any Debtor's Chapter 11 case to a case under Chapter 7 of
the Bankruptcy Code; (v) the appointment of a trustee in the Debtors'
Chapter 11 cases; (vi) the appointment of any examiner with expanded
powers in the Debtors' Chapter 11 cases; (vii) the entry of any order
modifying, reversing, revoking, staying, rescinding, vacating or amending
the Interim Order without the express prior written consent of Lender;
(viii) the failure to obtain entry of a final non-appealable Final Financing
Order and the other Loan Documents, in form and substance acceptable to
Lender, within sixty (60) days after the date hereof; (ix) the failure of
Debtors to remain current in payment of any material amount of post-
petition administrative obligations, except for amounts the validity of
which are being contested in good faith by Debtors; and (x) the filing of a
plan of reorganization by any party which does not provide for the
payment in full in immediately available funds of all Obligations on the
effective date thereof on terms and conditions acceptable to Lender.

(r)    Remedies. Subject to the terms and conditions of the Interim Order, upon
the occurrence of and Event of Default, after giving five (5) business days
notice in writing: (i) all of the Obligations will become immediately due
and payable, (ii) the automatic stay provided for pursuant to Section 362
of the Bankruptcy Code and any other restrictions on the enforcement by
Lender of its liens upon and security interests in the Collateral or any
other rights under the Loan Documents granted to or for the benefit of
Lender or pursuant to the Interim Order will be automatically vacated and
modified without any further action being required, and (iii) Lender,
without further notice, hearing or approval of this Court, will be
authorized to take any and all actions or remedies to proceed against and
realize upon the Collateral and any other assets and properties of Debtors'
estates upon which Lender has been or may hereafter be granted liens and
security interests to obtain the full and indefeasible repayment of the
Obligations.

- 19 -

(s)     Conditions of Initial Extensions of Credit. The conditions precedent to the
        obligations under the Credit Agreement include the following: (i)
        termination of the Pre-Petition Credit Agreement, (ii) Agent's receipt of
        board resolutions as required under the Credit Agreement, (iii) Agent's
        receipt of all fees, costs and expenses due and payable, (iv) Agent's
        receipt of the Blocked Account Agreements required under the Credit
        Agreement, (v) Agent's receipt of certain legal opinions, (vi) the filing of
        all financing statements required under the Loan Documents, (vii) Agent's
        receipt of the Pledge Agreements and Foreign Pledge Agreements, (viii)
        Agent's receipt of certified copies of UCC Requests for Information or
        Copies, or a similar search report certified by a party acceptable to the
        Agent satisfying the conditions set forth in the Credit Agreement, (ix)
        Excess Availability is not less than $300,000,000 after giving effect to the
        initial loans made or to be made and the Letters of Credit issued or to be
        issued on the Closing Date, (x) no material adverse change in the business
        operations or prospects of the Debtors since the date of the most recent
        Form 10-Q filed by Winn-Dixie Stores, Inc., (xi) the lack of an Event of
        Default under any of the Loan Documents, (xii) Agent's receipt of the
        Security Agreement as required under the Credit Agreement, (xiii) the
        commencement of cases under Chapter 11 of the Bankruptcy Code by the
        Borrowers and Guarantors, (xiv) the lack of appointment of a trustee or
        examiner with expanded powers with respect to any of the Debtors or their
        respective business, properties or assets, (xv) the Debtors' compliance
        with the notice and all other requirements as provided for under the
        Interim Financing Order, and (xvi) entry of the Interim Financing Order as
        set forth in the Credit Agreement.

(t)     *Disposition of Collateral. The Debtors may not sell, transfer, lease,
        encumber or otherwise dispose of any portion of the Collateral, or assume,
        reject or assign any Leasehold Property (as defined in the Credit
        Agreement) without the prior written consent of the Agent or the Agent
        and a requisite percentage of the other Lenders, in certain circumstances,
        except as provided in the Interim Order.

(u)     *Waiver of 506(c) Claims Against Lender. No costs or expenses of
        administration which already have been, or may hereafter be, incurred in
        Debtors' Chapter 11 cases or in any subsequently converted case under
        Chapter 7 of the Bankruptcy Code will be charged or asserted by the
        Debtors against the Lender, its claims or the Collateral, pursuant to
        Sections 105 or 506(c) of the Bankruptcy Code or otherwise without the
        prior written consent of Lender (and no such consent will be implied from
        any other action, inaction or acquiescence by Lender). Nothing contained

in the Interim Order waives the rights of the Committee or any other party-in-interest to assert a claim under Section 506(c) of the Bankruptcy Code. However, the Interim Order should not be construed to grant standing to any party to assert a claim under Section 506(c) of the Bankruptcy Code.

(v)     Fees and Expenses.

- Unused Line Fee. 0.375% per annum.

- Costs and Expenses. The Borrowers will pay the Agent's reasonable out-of-pocket expenses and customary administrative charges incurred by the Agent.

- Subfacility Letter of Credit Fee. One percent (1%) per annum on the daily outstanding balance of all Subfacility Letters of Credit for the immediately preceding month (or part thereof), and upon the occurrence and during the continuance of an Event of Default, if demanded by the Agent, at a rate equal to three percent (3%) per annum on the daily outstanding balance of all import Subfacility Letters of Credit for the immediately preceding month (or part thereof).

- Standby Letter of Credit Fee. One and three-quarters percent (1¾%) per annum on the daily outstanding balance of all Standby Letters of Credit for the immediately preceding month (or part thereof), and upon the occurrence and during the continuance of an Event of Default, if demanded by the Agent, at a rate equal to three and three-quarters percent (3¾%) per annum on the daily outstanding balance of all Standby Letters of Credit for the immediately preceding month (or part thereof).

- Closing Fee. The Borrowers will pay to Agent, for the benefit of the DIP Lenders, the amount equal to the sum of (i) 1.00% of Maximum Non-Leasehold Availability plus (ii) 2.50% of the Maximum Leasehold Availability in effect as of the date of the Closing.

- Collateral Monitoring Fee. A monthly fee of $16,500.

**The Proposed DIP Financing Arrangement Should be Authorized**

32.    The Debtors' ability to refinance their Pre-Petition Obligations and full working capital needs can be satisfied only if the Debtors are authorized to borrow up to $800,000,000 under the Credit Agreement and to use such proceeds to fund the operations of the Debtors.

33.    The credit provided under the Credit Agreement will enable the Debtors to refinance the Pre-Petition Obligations (which, among other things, will eliminate substantial costs, fees, and expenses associated with the Pre-Petition Facility), continue financing their operations, pay their employees, vendors, and suppliers, and operate their businesses and in an orderly and reasonable manner to preserve and enhance the value of their assets and enterprise for the benefit of all parties in interest. Moreover, the availability of credit under the Credit Agreement will provide employees, vendors, and suppliers and other parties with confidence in the Debtors that will enable and encourage them to resume ongoing credit relationships with the Debtors. Finally, the implementation of the Credit Agreement will be viewed favorably by the Debtors' employees and outside parties and thereby help promote the Debtors' successful reorganization.

A.    **Use of Cash Collateral.**

34.    The Debtors seek to use Cash Collateral during the period commencing immediately after the filing of the Debtors' Chapter 11 petitions until the date on which the Final Financing Order becomes final and non-appealable. The Cash Collateral will be used by the Debtors to make such essential payments as employee salaries, payroll, taxes, the purchase of goods, materials and other general corporate and working capital purposes in the ordinary course of Debtors' businesses that become due and payable during the period commencing immediately

- 22 -

after the filing of the Debtors' Chapter 11 petitions and through the date on which the Final

Financing Order becomes final and non-appealable.

35.    Pursuant to Section 363(c)(2) of the Bankruptcy Code, a debtor in possession may

use cash collateral with the consent of the secured party or court approval. Section 363(e) of the

Bankruptcy Code provides that upon request of an entity that has an interest in property to be

used by a debtor, the court shall prohibit or condition such use as is necessary to provide

adequate protection of such interest. Based on the foregoing, the Debtors' proposed use of Cash

Collateral is particularly appropriate here, where the Pre-Petition Lender has consented to such

use and the Interim Order provides that the Pre-Petition Lender retains the right to seek adequate

protection against the diminution in the value of its liens.

**B.    Approval Under Section 364(c) of the Bankruptcy Code.**

36.    The Debtors propose to obtain financing under the Credit Agreement by

providing security interests and liens as set forth above pursuant to Sections 364(c) and 364(d) of

the Bankruptcy Code. The statutory requirement for obtaining post-petition credit under Section

364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain

unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]."

37.    Section 364(c) financing is appropriate when the trustee or debtor-in-possession is

unable to obtain unsecured credit allowable as an ordinary administrative claim. See In re Ames

Dept. Stores, Inc., 115 B.R. 34, 37-39 (S.D.N.Y. 1990) (debtor must show that it has made a

reasonable effort to seek other sources of financing under Sections 364(a) and (b)); In re Crouse

Group, Inc., 71 B.R. 544, 549, *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987)

- 23 -

(secured credit under Section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

38.    Courts have articulated a three-part test to determine whether a debtor is entitled to Section 364(c) financing:

(a)    the debtor is unable to obtain unsecured credit under Section 364(b), *i.e.*, by allowing a lender only an administrative claim;

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39. As set forth more fully herein, all of the above conditions have been met.

**C.    The Debtors Do Not Have An Alternative to the DIP Facility.**

39.    As will be shown at the Interim Hearing, a working capital facility of the type and magnitude needed in these cases could not have been obtained on an unsecured basis. As will be shown, potential sources of the proposed DIP Financing for the Debtors, obtainable on an expedited basis and on reasonable terms, were extremely limited. None of the alternative potential sources of post-petition financing proposed a facility that would meet the Debtors' working capital requirements. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986).

40.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Section 364(c) and (d). Id.; see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Where there are few lenders likely to

be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989). Thus, the evidence introduced at the Interim Hearing will satisfy the requirement of Section 364(c) and (d) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

**D.    Request for Adequate Protection.**

41.    Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by senior or "priming" liens, provides that the Court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a
> senior or equal lien on property of the estate that is subject to a lien only
> if–
>
> (A) the trustee is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the
>     lien on the property of the estate on which such senior or equal
>     lien is proposed to be granted.

42.    The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

43.    In accordance with Section 364(d), and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides that adequate

- 25 -

protection will be provided to the Pre-Petition Lender in connection with the Priming Liens, as

follows, (i) the Debtors will use a portion of the proceeds from the Loans and other credit

accommodations made under the Credit Agreement to repay in full the Pre-Petition Lender Debt,

(ii) the Pre-Petition Lender will be granted Pre-Petition Lender Junior Liens (as defined in the

Interim Order); and (iii) subject to the terms and conditions set forth in the Interim Order, the

Pre-Petition Lender will have a priority claim, senior in priority to the right of payment of

Lender in respect of the Obligations, of up to $1,000,000 for (i) any post-petition obligations or

indebtedness reasonably incurred by the Pre-Petition Lender in connection with the repayment of

the Pre-Petition Lender Debt and the termination of the Pre-Petition Lender Junior Liens in

accordance with the terms and conditions contained herein, and (ii) the reasonable professional

fees and reasonable legal expenses actually incurred by or on behalf of Pre-Petition Lender in

connection with any pending or threatened action against Pre-Petition Lender in accordance with

paragraph 15(e) of the Interim Order seeking to avoid, set aside or otherwise challenge all or any

portion of the Pre-Petition Lender Debt or any of Pre-Petition Lender's security interests in or

liens upon the Pre-Petition Lender Collateral, or to pursue any claims against Pre-Petition

Lender in connection with the Pre-Petition Loan Documents.

E.    **Application of the Business Judgment Standard.**

44.    As described above, after appropriate investigation and analysis and given the

exigencies of the circumstances, the Debtors' management has concluded that the DIP Financing

is the only alternative available in the circumstances of these cases. Bankruptcy courts routinely

defer to the debtor's business judgment on most business decisions, including the decision to

borrow money. See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S.

523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business

judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc.

37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the

administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's

provision for private control of administration of the estate, and threaten the court's ability to

control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311

(5th Cir. 1985).

45.     In general, a bankruptcy court should defer to a debtor's business judgment

regarding the need for and the proposed use of funds, unless such decision is arbitrary and

capricious. In re Curlew Valley Assoc., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts

generally will not second-guess a debtor's business decisions when those decisions involve "a

business judgment made in good faith, upon a reasonable basis, and within the scope of [its]

authority under the Code." Id. at 513-14 (footnotes omitted).

46.     The Debtors have exercised sound business judgment in determining that a post-

petition credit facility is appropriate and have satisfied the legal prerequisites to borrow under

the DIP Financing. The terms of the DIP Financing are fair and reasonable and are in the best

interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to enter

into the DIP Financing and borrow funds from the DIP Lenders on the secured, administrative

superpriority basis described above, pursuant to Section 364(c) of the Bankruptcy Code, and take

the other actions contemplated by the Credit Agreement and as requested herein.

47.     Without the liquidity provided by the DIP Financing, the Debtors will be unable

to pay suppliers, employees, and other constituencies that are essential to the orderly operation

of their businesses. The Debtors' managers have exercised their best business judgment in

negotiating the DIP Financing that is presently before the Court.

**F.      The DIP Facility is Necessary to Effectively Preserve
         the Assets of the Debtors' Estates and to Operate Their Businesses.**

48.      No party in interest can seriously contend that the Debtors do not need immediate

access to a working capital facility. As with most other large businesses, the Debtors have

significant cash needs. For example, in the fiscal year ending 2004, the Debtors' cost of sales,

including warehouse and delivery expenses, were approximately $7.8 billion. Accordingly,

access to substantial credit is necessary to meet the day-to-day costs associated with maintaining

business relationships with the Debtors' vendors and suppliers, purchasing new inventory, and

otherwise financing their operations. Access to sufficient cash is therefore critical to the

Debtors. In the absence of immediate access to cash and credit, the Debtors' suppliers will

refuse to sell critical supplies and services to the Debtors, and the Debtors will be unable to

operate their businesses. The inability to meet payments to vendors and satisfy customers'

desires for particular produces would seriously impair the Debtors' prospects for reorganization.

49.      For these reasons, access to credit under the DIP Financing is critical. The

Debtors cannot wait for the beneficial effects of the DIP Financing; any substantial delay could

have the same impact as denial of the Motion. The Debtors' need for access to the DIP

Financing therefore is immediate.

**G.      The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate.**

50.      The Debtors are unable to obtain unsecured credit allowable solely as an

administrative expense. The proposed DIP Financing reflects the exercise of sound and prudent

business judgment. The Debtors would not have been able to obtain financing on an unsecured

basis, or otherwise. In the Debtors' business judgment, the DIP Financing is the best financing

option available in the circumstances in these cases.

51.     The proposed terms of the DIP Financing are fair, reasonable and adequate in that

these terms neither (a) tilt the conduct of these cases and prejudice the powers and rights that the

Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in

interest from being decided on their merits. The purpose of the DIP Financing is to enable the

Debtors to meet ongoing operational expenses.

52.     The proposed DIP Financing provides that the security interests and

administrative expense claims granted to the DIP Lenders are subject to the Carve-Out. In Ames

Dep't Stores, 115 B.R. 346 (Bankr. S.D.N.Y. 1990), this Court found that such "carve-outs" are

not only reasonable, but are necessary to insure that official committees and the debtor's estate

will be assured of the assistance of counsel. Id. at 40.

53.     Likewise, the various fees and charges required by the DIP Lenders under the DIP

Financing are reasonable and appropriate under the circumstances. Indeed, courts routinely

authorize similar lender incentives beyond the explicit liens and other rights specified in Section

364 of the Bankruptcy Code. See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir.

BAP 1992) (authorizing credit arrangement under Section 364, including a lender "enhancement

fee").

54.     The terms and conditions of the DIP Credit Agreement are fair and reasonable,

and were negotiated by the parties in good faith and at an arm's length. Accordingly, the DIP

Lenders under the DIP Credit Agreement should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of such agreement.

55.    The fairness and reasonableness of the terms of the DIP Financing will be further shown at the Interim and Final Hearings.

**H.    Request for Modification of Automatic Stay.**

56.    As set forth more fully in the proposed Interim Order, the proposed DIP Financing Agreement contemplates a modification of the automatic stay established pursuant to Section 362 of the Bankruptcy Code to permit the DIP Lenders, in their sole discretion, to: (a) file financing statements, deeds of trust, mortgages or other similar documents to evidence the DIP Lenders' security interests under the DIP Financing; (b) give the Debtors any notice provided for in the DIP Financing Agreement; (c) execute upon their security interests or exercise other remedies under the DIP Loan Documents upon the occurrence of an Event of Default, after giving five (5) business days notice in writing, served by hand or telefax upon the Court, Debtors' counsel, counsel to the Committee, any trustee of Debtors, if appointed, and the United States Trustee; and (d) take such other actions required or permitted by the DIP Loan Documents. Stay modification provisions of this sort are ordinary and usual features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. The Court accordingly should modify the automatic stay to the extent contemplated by the DIP Financing Agreement and the Interim Order.

- 30 -

I.    **Request for Immediate Interim Relief.**

57.    Pending the Final Hearing, the Debtors require immediate use of Cash Collateral and financing for, among other things, their purchase of inventory, maintenance of their facilities, and other working capital needs. It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, post-petition operating expenses, as well as the pre-petition expenses approved in the first-day orders, to minimize the damage occasioned by their cash flow problems.

58.    Absent immediate use of Cash Collateral and financing, the Debtors will be unable to pay ongoing operational expenses. Consequently, if interim relief is not obtained, the Debtors' assets will be immediately and irreparably jeopardized, to the detriment of their estates, their creditors and other parties in interest.

59.    Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule the Interim Hearing as soon as practicable to consider the Debtors' request for authorization to use cash collateral and obtain interim credit in an amount up to $600,000,000 under the DIP Financing, in accordance with and pursuant to the terms and conditions contained in the Credit Agreement and the Interim Order.

60.    Bankruptcy Rules 4001(b) and 4001(c) permit a court to approve a debtor's request for financing during the 15-day period following the filing of a motion requesting authorization to obtain post-petition financing, "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(c)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., In re Simasko Prod. Co., 47 B.R. at

449; see also In re Ames Dep't Stores, 115 B.R. at 38. After the 15-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business. A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. See, e.g., In re Simasko Prod. Co., 47 B.R. at 449; In re Ames Dep't Stores, 115 B.R. at 36.

### Notice

61.     Pursuant to Sections 102(1), 363(c), and 364(c) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), notice of this Motion has been provided via facsimile, overnight delivery service, electronic transmission, or same-day messenger service to: the Office of the United States Trustee, counsel to the Agent for the Pre-Petition Lenders, the indenture trustee for the Debtors' senior noteholders, counsel to the Agent for the DIP Lenders, known holders of pre-petition liens against the Debtors' property (as listed on Exhibit A, annexed hereto), and the Debtors' fifty largest unsecured creditors on a consolidated basis.

62.     The Debtors will, within three (3) business days of the entry of the Interim Order by the Court, serve by United States mail, first class postage prepaid, copies of this Motion, the Interim Order and a notice of the Final Hearing (the "Final Hearing Notice") to consider entry of the proposed Final Financing Order on: the Office of the United States Trustee, counsel to the Agent for the Pre-Petition Lenders, the indenture trustee for the Debtors' senior noteholders, counsel to the Agent for the DIP Lenders, state and local taxing authorities, known holders of pre-petition liens against the Debtors' property, any party which theretofore has filed in these Chapter 11 cases a request for special notice with this Court and served such upon Debtors'

counsel, the Debtors' fifty largest unsecured creditors on a consolidated basis, and any other parties as directed by the Court.

### Waiver of Memorandum of Law

63.     Pursuant to Local Bankruptcy Rule 9013-1(b) for the Southern District of New York, because there are no novel issues of law presented herein, the Debtors respectfully request that the Court waive the requirement that the Debtors file a memorandum of law in support of this Motion. The Debtors reserve the right to file a memorandum of law prior to the Final Hearing.

WHEREFORE, the Debtors respectfully request that the Court:

(a)     enter the Interim Order;

(b)     enter the Final Financing Order; and

(c)     grant the Debtors such other and further relief as is just and proper.

Dated: February 21, 2005
     New York, New York

                /s/     D.J. Baker
                D. J. Baker (DB 0085)
                Sally McDonald Henry (SH 0839)
                Alexandra Margolis (AM 4163)
                SKADDEN, ARPS, SLATE, MEAGHER
                  & FLOM LLP
                Four Times Square
                New York, New York 10036
                Telephone:  (212) 735-3000
                Facsimile:  (917) 777-2150

                -and-

                Sarah Robinson Borders
                Brian C. Walsh
                KING & SPALDING LLP
                191 Peachtree Street
                Atlanta, Georgia  30303
                Telephone:  (404) 572-4600
                Facsimile:  (404) 572-5100

                PROPOSED ATTORNEYS FOR THE DEBTORS

## EXHIBIT A
## SECURED PARTIES TO BE NOTICED

1. AL - DEPT. OF REVENUE

2. AMERICAN BANK NOTE COMPANY, AS AGENT FOR THE UNITED STATES POSTAL SERVICE

3. AMSOUTH BANK

4. BENNETT'S LEASING INCORPORATED

5. CISCO SYSTEMS CAPITAL CORPORATION

6. COMPUTER LEASING COMPANY OF MICHIGAN, INC.

7. CRYOVAC, INC.

8. EMC CORPORATION

9. FIDELITY LEASING, INC.

10. FIRST UNION NATIONAL BANK

11. FIRST UNION NATIONAL BANK, AS ADMINISTRATIVE AGENT

12. FIRST UNION NATIONAL BANK, AS ADMINISTRATIVE AGENT, NOW KNOWN AS WACHOVIA BANK, NATIONAL ASSOCIATION

13. FLEET BUSINESS CREDIT, LLC

14. FLEET CAPITAL LEASING - TECHNOLOGY FINANCE

15. FLEET LEASING CORPORATION

16. GATX TECHNOLOGY SERVICES CORPORATION

17. GE CAPITAL

18. GENERAL ELECTRIC CAPITAL

19. GENERAL ELECTRIC CAPITAL CORPORATION

20. HEALTHGUARD FINANCE CORPORATION

21. HEALTHGUARD
    INTERNATIONAL, INC.

22. IBM CREDIT CORPORATION
    (LESSOR)

23. IBM CREDIT LLC

24. KONICA PHOTO IMAGING

25. KONICA USA INC.

26. NATIONAL CITY BANK OF MI/IL

27. NORSE DAIRY SYSTEMS

28. STATE OF ALABAMA, DEPT. OF
    REVENUE

29. STORAGETEK FINANCIAL
    SERVICES CORPORATION

30. US BANCORP

31. WACHOVIA BANK, NATIONAL
    ASSOCIATION, AS
    ADMINISTRATIVE AGENT

32. WELLS FARGO BANK, N.A.

33. WELLS FARGO BANK, N.A.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

In re                     :      Chapter 11

                         :

WINN-DIXIE STORES, INC., et al.,     :      Case No. 05-11063

                         :

         Debtors.           :      (Jointly Administered)

                         :

------------------------------------------------x

**INTERIM ORDER PURSUANT TO SECTIONS 105, 361, 362, 363, 364(c) AND 364(d) OF THE BANKRUPTCY CODE AND RULES 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING DEBTORS TO OBTAIN SECURED POST-PETITION FINANCING ON A SUPERPRIORITY PRIMING LIEN BASIS AND MODIFYING THE AUTOMATIC STAY, (II) AUTHORIZING DEBTORS TO USE PRE-PETITION SECURED LENDERS' CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION, (III) AUTHORIZING DEBTORS TO PAY IN FULL ALL CLAIMS OF DEBTORS' PRE-PETITION SECURED LENDERS, AND (IV) PRESCRIBING FORM AND MANNER OF NOTICE AND TIME FOR FINAL HEARING**

THIS MATTER came before this Court on February __, 2005, upon the Motion

("Motion") of Winn-Dixie Stores, Inc., Debtor and Debtor-in-Possession ("Winn-Dixie"), Winn-

Dixie Supermarkets, Inc., Debtor and Debtor-in-Possession ("Supermarkets"), Winn-Dixie

Montgomery, Inc., Debtor and Debtor-in-Possession ("Montgomery"), Winn-Dixie Procurement,

Inc., Debtor and Debtor-in-Possession ("Procurement"), Winn-Dixie Raleigh, Inc., Debtor and

Debtor-in-Possession ("Raleigh") and Dixie Stores, Inc., Debtor and Debtor-in-Possession

("Dixie", and together with Winn-Dixie, Supermarkets, Montgomery, Procurement and Raleigh,

each individually a "Borrower", and collectively "Borrowers"), Astor Products, Inc., Debtor and

Debtor-in-Possession ("Astor"), Crackin' Good, Inc., Debtor and Debtor-in-Possession

("Crackin'"), Deep South Products, Inc., Debtor and Debtor-in-Possession ("Deep South

Products"), Dixie Packers, Inc., Debtor and Debtor-in-Possession ("Dixie Packers"), Economy

1

Wholesale Distributors, Inc., Debtor and Debtor-in-Possession ("Economy"), Winn-Dixie

Logistics, Inc., Debtor and Debtor-in-Possession ("Logistics"), Deep South Distributors, Inc.,

Debtor and Debtor-in-Possession ("Distributors"), Dixie Darling Bakers, Inc., Debtor and

Debtor-in-Possession ("Bakers"), Dixie-Home Stores, Inc., Debtor and Debtor-in-Possession

("Home"), Dixie Spirits, Inc., Debtor and Debtor-in-Possession ("Spirits"), Foodway Stores,

Inc., Debtor and Debtor-in-Possession ("Foodway"), Kwik Chek Supermarkets, Inc., Debtor and

Debtor-in-Possession ("Kwik"), Sunbelt Products, Inc., Debtor and Debtor-in-Possession

("Sunbelt"), Sundown Sales, Inc., Debtor and Debtor-in-Possession ("Sundown"), Superior Food

Company, Debtor and Debtor-in-Possession ("Superior"), Table Supply Food Stores Co., Inc.,

Debtor and Debtor-in-Possession ("Table Supply"), WD Brand Prestige Steaks, Inc., Debtor and

Debtor-in-Possession ("WD Steaks"), Winn-Dixie Handyman, Inc., Debtor and Debtor-in-

Possession ("Handyman", and together with Borrowers, Astor, Crackin', Deep South Products,

Dixie Packers, Economy, Logistics, Distributors, Bakers, Home, Spirits, Foodway, Kwik,

Sunbelt, Sundown, Superior, Table Supply, and WD Steaks, each individually a "Debtor" and

collectively, the "Debtors"), filed on February __, 2005, seeking, inter alia:

      a.   authority, pursuant to Sections 105, 364(c)(1), 364(c)(2), 364(c)(3) and

364(d) of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. ("Bankruptcy Code")

and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"),

for Debtors to obtain post-petition secured loans, advances and other financial accommodations

from Wachovia Bank National Association, as Administrative Agent and Collateral Agent for

itself ("Agent") and the other financial institutions from time to time parties to the Credit

Agreement (as hereinafter defined) (collectively, "Lenders"; and together with Agent,

collectively referred to herein as "Lender"), all in accordance with the terms and conditions set

2

forth in the Credit Agreement, dated as of the date hereof (as the same now exists or may

hereafter be amended, modified, ratified, extended, renewed, restated or replaced, the "Credit

Agreement", a copy of which is included in the Exhibit Supplement to the Motion (the "Exhibit

Supplement") and is incorporated herein by reference), by and among Debtors and Lender, and

the other Loan Documents (as defined in the Credit Agreement)[1], secured by senior (subject to

certain liens and claims set forth below), perfected, valid, enforceable and non-avoidable security

interests in and liens upon all of the Collateral (as hereinafter defined);

      b.   authority, pursuant to Sections 105, 364(d)(1) and 364(d)(2) of the

Bankruptcy Code and Bankruptcy Rules 4001 and 9014, for Debtors to grant to Lender, pending

the release and termination and/or assignment of the Pre-Petition Lender Junior Liens pursuant to

a final, non-appealable Final Financing Order (as hereinafter defined), priming liens on and

security interests in (subject to certain liens and claims as set forth in paragraph 8 of this Interim

Order) all Pre-Petition Lender Collateral (as hereinafter defined) and in any other assets or

properties of the Debtors and their estates, senior and superior in priority in all respects to any

and all liens and security interests of the Pre-Petition Lender (as hereinafter defined) in the Pre-

Petition Lender Collateral and such other assets and properties (the "Priming Liens"), and in

connection with such Priming Liens, provide adequate protection to Pre-Petition Lender by

preserving and continuing, on a junior and subordinate basis, its liens on and security interests in

the Collateral to secure any Contingent Pre-Petition Lender Debt (as hereinafter defined) in

accordance with the terms and conditions contained in this Interim Order (as hereinafter

defined);

---

[1]    Defined terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms
in the Credit Agreement.

3

c.   authority for Debtors to enter into and comply in all respects with the Credit Agreement and all other Loan Documents, and approval of all of the terms and conditions of the Credit Agreement and all other Loan Documents;

d.   the granting to Lender superpriority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of all Obligations (as defined in the Credit Agreement);

e.   authority, pursuant to Sections 361 and 363 of the Bankruptcy Code, for the Debtors to use cash collateral of the Pre-Petition Lender pursuant to the terms and conditions set forth herein;

f.   authority, upon the entry of the Interim Order (as hereinafter defined), to immediately repay in full the Pre-Petition Lender Debt (as hereinafter defined) owing by Debtors to Wachovia Bank National Association, in its capacity as Administrative Agent and Collateral Agent for itself ("Pre-Petition Lender Agent") and certain other financial institutions that are parties from time to time to the Pre-Petition Credit Agreement (as hereinafter defined) (the "Pre-Petition Lenders", and together with the Pre-Petition Lender Agent, collectively referred to herein as the "Pre-Petition Lender"), and the simultaneous subordination of the Pre-Petition Lender's liens, claims and encumbrances and the agreement of Pre-Petition Lender to release and terminate, subject to paragraph 6 of this Interim Order, such liens, claims and encumbrances on the date that the Final Financing Order becomes final and non-appealable or earlier as Pre-Petition Lender may agree, all in accordance with the terms and conditions contained in this Interim Order;

4

g.  a preliminary hearing on the Motion to consider entry of an order pursuant to Bankruptcy Rule 4001 (this "Interim Order") authorizing the Borrowers, inter alia, to borrow up to an aggregate amount of $600,000,000 (which amount is inclusive of the repayment in full of the Pre-Petition Lender Debt) in Loans and Letters of Credit (as each term is defined in the Credit Agreement) pursuant to the terms and conditions set forth in the Credit Agreement and the Loan Documents during the period commencing upon the entry of this Interim Order and ending upon the entry of a Final Financing Order (as hereinafter defined); and

h.  the setting of the date of Final Hearing on the Motion.

Due and appropriate notice of the Motion, the relief requested therein, the material terms of this Interim Order and the Interim Hearing (as defined below) has been served by the Debtors, whether by telecopy, e-mail, overnight courier or hand delivery, on the following parties:  (1) the Office of the United States Trustee; (2) Agent, (3) Pre-Petition Lender Agent; (4) the Internal Revenue Service ("IRS"); (5) Wilmington Trust Company, in its capacity as Trustee for Winn-Dixie's 8⅞% Senior Unsecured Notes due 2008 issued for gross cash proceeds of $300,000,000 on March 29, 2001; (6) Debtors' 50 largest unsecured creditors on a consolidated basis; (7) those other creditors known to the Debtors who may have liens against or interests in any of the Debtors' assets and properties, which are more particularly described on Exhibit "A" attached to the Motion (all parties referred to in the foregoing clauses (1) through (7) are collectively referred to as the "Interim Noticed Parties").

The interim hearing on the Motion was held by this Court on February __, 2005 (the "Interim Hearing").

5

Upon the record made by the Debtors at the Interim Hearing, including the Motion and the filings and pleadings in the Debtors' Chapter 11 cases, and good and sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    Petition.    On February 21, 2005 (the "Petition Date"), each of the Debtors filed voluntary petitions under Chapter 11, Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Each Debtor is continuing in the management and possession of its business and properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Code.

B.    Jurisdiction and Venue.    Consideration of this Motion constitutes a "core proceeding" as defined in 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K), (M) and (O). This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.

C.    Notice.    Sufficient and adequate notice of this Interim Order has been provided based upon the notice sent to the Interim Noticed Parties, the consent to the Motion as approved by this Interim Order by Lender and the Pre-Petition Lender, and no other party herein has filed an objection to the Motion, pursuant to Bankruptcy Rules 4001(c) and (d) and 9014 and Section 102(1) of the Bankruptcy Code as required by Sections 364(c) and 364(d) of the Bankruptcy Code, and no further notice of, or hearing on, the Motion or this Interim Order is necessary or required.

6

      D.     Debtors' and Pre-Petition Lender's Acknowledgements and Agreements. Without prejudice to the rights of any other party-in-interest in the Debtors' Chapter 11 cases (but subject to the limitations with respect to such rights contained in paragraph 15(e) of this Interim Order), the Debtors and the Pre-Petition Lender admit, stipulate, acknowledge and agree that:

      (i) *Pre-Petition Financing Arrangements.* Prior to the commencement of the Debtors' Chapter 11 cases, Pre-Petition Lender made loans and advances and agreed to provide other credit accommodations to the Debtors pursuant to the terms and conditions set forth in various agreements, documents and instruments, including, without limitation, the Second Amended and Restated Credit Agreement, dated as of June 29, 2004, by and among Borrowers and the Pre-Petition Lender (as the same has been amended, modified, restated, renewed, replaced and/or supplemented from time to time through to the Petition Date, the "Pre-Petition Credit Agreement"), which is incorporated herein by reference; other credit, guarantee and security agreements executed and/or delivered by Debtors in favor of Pre-Petition Lender (copies of which are annexed to the Exhibit Supplement and incorporated herein by reference); Uniform Commercial Code ("UCC") filings; and all other agreements, documents and instruments at any time executed and/or delivered in connection with or related to the Pre-Petition Credit Agreement (as all of the same have been amended, modified, restated, renewed, replaced and/or supplemented from time to time through to the Petition Date, the "Pre-Petition Loan Documents").

      (ii)     *Pre-Petition Lender Debt.* The Debtors are indebted to the Pre-Petition Lender in respect of all outstanding Obligations (as defined in the Pre-Petition Credit Agreement) as of February 18, 2005 in the aggregate principal amount of not less than

7

$427,005,000 (the "Pre-Petition Lender Debt"), consisting of, among other things, (i) Loans (as defined in the Pre-Petition Credit Agreement) made pursuant to the Pre-Petition Loan Documents in the aggregate principal amount of not less than $265,000,000, plus all interest, fees, costs and expenses (including, without limitation, all attorneys' fees and legal expenses of Pre-Petition Lender) and all charges accrued and accruing thereon and/or chargeable with respect thereto, and (ii) Reimbursement Obligations (as defined in the Pre-Petition Credit Agreement) in respect of Letters of Credit in an aggregate amount of not less than $162,005,000, plus all interest, fees, costs, expenses (including, without limitation, all attorneys' fees and legal expenses of Pre-Petition Lender) and all charges accrued and accruing thereon or chargeable with respect thereto. The Pre-Petition Lender Debt is unconditionally owing by Debtors to Pre-Petition Lender, without offset, defense or counterclaim of any kind, nature and description whatsoever.

(iii)    *Pre-Petition Lender Collateral.* As of the Petition Date, the Pre-Petition Lender Debt is fully secured pursuant to the Pre-Petition Loan Documents by perfected, valid, binding and non-avoidable first priority security interests and liens granted by Debtors to or for the benefit of the Pre-Petition Lender upon all of the Collateral (as defined in the Pre-Petition Credit Agreement) existing as of the time immediately prior to the filing of the petitions for relief herein, and the post-petition proceeds and products thereof (collectively, together with any other property of, among other things, each Debtors' estate in which a security interest or lien has been granted to or for the benefit of Pre-Petition Lender immediately prior to the filing of the petitions for relief herein, the "Pre-Petition Lender Collateral").

(iv)    *Repayment of Pre-Petition Lender Debt.* A portion of Debtors' borrowings from Lender under the Credit Agreement, the other Loan Documents and this Interim

8

Order will be used to repay the Pre-Petition Lender Debt owing to Pre-Petition Lender in accordance with the terms and conditions set forth in this Interim Order.

        (v)    *Pre-Petition Lender's Consent to Priming Liens.* Pre-Petition Lender has consented and agreed that, subject to the terms and conditions contained herein, any and all pre-petition or post-petition liens and security interests (including, without limitation, any adequate protection replacement liens at any time granted to Pre-Petition Lender by this Court) that the Pre-Petition Lender has or may have in the Pre-Petition Lender Collateral or any other assets and properties of the Debtors and their estates shall (a) only secure any Pre-Petition Lender Debt that is (1) at any time repaid with the proceeds of the loans and advances made by the Lender (including, without limitation, at closing of the post-petition credit facility in accordance with this Interim Order) prior to the Final Financing Order becoming final and non-appealable and (2) subsequently reinstated after the full payment thereof because such payment (or any portion thereof) is required to be returned or repaid to Debtors or Lender, other than as a result of a Disgorgement Action (as defined in paragraph 15(e) of this Interim Order); and (b) shall be junior and subordinate in all respects to Lender's liens on and security interests in the Collateral (including, without limitation, Lender's Priming Liens) granted under this Interim Order and the Loan Documents (such junior liens and security interests of the Pre-Petition Lender are hereinafter referred to as the "Pre-Petition Lender Junior Liens"). Such reinstated Pre-Petition Lender Debt described in clauses (a)(1) and (2) above in this paragraph is hereinafter referred to as the "Contingent Pre-Petition Lender Debt" and shall be junior and subordinate in all respects to the Obligations (as defined in the Credit Agreement). Pre-Petition Lender has further agreed that, (a) until such time as all of the Obligations are indefeasibly paid in full in cash in accordance with the Loan Documents and this Interim Order, Pre-Petition

9

Lender shall have no right to seek or exercise any enforcement rights or remedies in connection

with the Contingent Pre-Petition Lender Debt or the Pre-Petition Lender Junior Liens, including,

without limitation, in respect of the occurrence or continuance of any Event of Default (as

hereinafter defined); (b) the Pre-Petition Lender shall be deemed to have consented to any sale or

disposition of all or any portion of the Collateral approved by, arranged for or by Agent and shall

terminate and release upon any such sale or disposition all of its Pre-Petition Lender Junior Liens

on and security interests in such Collateral; (c) Pre-Petition Lender shall deliver or cause to be

delivered, at Debtors' costs and expense (for which Pre-Petition Lender shall be reimbursed upon

submission to Debtors of invoices or billing statements), any termination statements, releases

and/or assignments (to the extent provided for in paragraph 6 herein) in favor of Lender or other

documents necessary to effectuate and/or evidence the release, termination and/or assignment of

the Pre-Petition Lender Junior Liens on any portion of the Collateral subject to any sale or

disposition approved or arranged for by Agent; and (d) upon the Final Financing Order (as

defined in the Credit Agreement) becoming a final and non-appealable order (and subject to the

right of Pre-Petition Agent to consent to any material modifications contained in the Final

Financing Order that, after giving effect to any such modification, adversely affect the Pre-

Petition Lender's rights contained in paragraphs 9(a), 9(b), 10 and 15(e) of this Interim Order) all

Pre-Petition Lender Junior Liens in the Collateral shall, subject to paragraph 6 of this Interim

Order, terminate and be released (automatically and without further action of the parties), and

Pre-Petition Lender shall execute and deliver such agreements to evidence and effectuate such

termination, release or assignments as Agent may request and Agent shall be authorized to file

on behalf of Pre-Petition Lender such UCC termination statements or such other filings as may

be applicable to the extent required such authorization is required under the Uniform Commercial Code of the applicable jurisdiction.

E.    Findings Regarding Post-Petition Financing

(i)    *Need for Post-Petition Financing.*  The Debtors represent that without the financing proposed by the Motion, the Debtors will not have the funds necessary to pay post-petition payroll, payroll taxes, trade vendors, suppliers, overhead and other expenses necessary for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and properties. The Debtors have requested that, pursuant to the Credit Agreement, the other Loan Documents and this Interim Order, Lender make loans and advances and provide other financial accommodations to the Debtors to be used by the Debtors to: (A) repay the Pre-Petition Lender Debt, and (B) fund the Debtors' general operating, working capital and other administrative costs of their Chapter 11 cases. The ability of the Debtors to continue their businesses and remain viable entities and thereafter reorganize under Chapter 11 of the Bankruptcy Code depends upon the Debtors obtaining such financing from Lender. Lender is willing to make such loans and advances and provide such other financial accommodations on a secured basis as more particularly described herein pursuant to the terms and conditions of the Credit Agreement, all other Loan Documents, including, without limitation, the Security Agreement, dated as of the date hereof, by and among the Debtors and Agent ("Security Agreement", a copy of which is included in the Exhibit Supplement and is incorporated herein by reference) and in accordance with this Interim Order. Accordingly, the relief requested in the Motion is necessary, essential, and appropriate for the continued operation of the Debtors' businesses, the management and preservation of their assets and properties and is in the best interests of the Debtors, their estates and creditors.

11

(ii) *No Credit Available on More Favorable Terms.* The Debtors represent that they are unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code or pursuant to Sections 364(a), (b) or (c)(1) of the Bankruptcy Code or secured credit pursuant to Sections 364(c)(2) and (3) only. Additionally, the Debtors were unable to procure the necessary financing on more favorable terms than those offered by Lender pursuant to the Credit Agreement, the other Loan Documents and this Interim Order.

(iii) *Business Judgment and Good Faith Pursuant to Section 364(e).* The Debtors represent that the terms of the Credit Agreement and the other Loan Documents among the Debtors and Lender, pursuant to which the post-petition loans, advances, letters of credit and other credit and financial accommodations will be made or provided to Borrowers by Lender have been negotiated at arms' length and in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors, their estates and creditors. The Debtors further represent that Lender is extending financing to the Borrowers in good faith and Lender is entitled to the benefits of the provisions of Section 364(e) of the Bankruptcy Code.

(iv) *Good Cause, Immediate Entry.* The Debtors represent that the relief requested by the Motion pursuant to the terms of the Credit Agreement, the other Loan Documents and this Interim Order is necessary to avoid immediate and irreparable harm to Debtors' estates. Good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of this Interim Order. No party appearing in the Debtors' Chapter 11 cases has filed or made an objection to the relief sought in the Motion and the entry of this Interim Order, and to the extent any objections were made (and not withdrawn prior to the entry of this Interim Order) such objections are hereby overruled.

12

F.    Committee.  As of the date hereof, the Office of the United States Trustee has not appointed an official committee of unsecured creditors (the "Committee") in accordance with section 1102 of the Bankruptcy Code.

Based upon the foregoing, and after due consideration and good cause appearing therefor:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

1.    Motion Granted.  The Motion is granted and approved to the extent provided below.

2.    Authorization to Borrow on an Interim Basis.  Borrowers are hereby authorized and empowered to immediately borrow and obtain Loans, Letters of Credit (as each term is defined in the Credit Agreement) and other financial and credit accommodations from Lender pursuant to the terms and conditions of the Credit Agreement, the other Loan Documents and this Interim Order, in such amount or amounts as may be made available to Borrowers by Lender, in accordance with the terms and conditions set forth in the Credit Agreement, the other Loan Documents and this Interim Order; provided, however, the aggregate amount of all such Loans, Letters of Credit and other financial and credit accommodations provided to Borrowers by Lender in accordance with the Loan Documents and this Interim Order during the period commencing on the date hereof and ending upon entry of the Final Financing Order shall not exceed the aggregate principal amount of $600,000,000 outstanding at any one time, which amount is inclusive of the funds necessary to repay the Pre-Petition Lender Debt in accordance with this Interim Order.

13

3.    Use of Loan and Letter of Credit Proceeds. Borrowers shall use the

proceeds of the Loans and Letters of Credit made or arranged for by Lender to Borrowers

pursuant to the Credit Agreement, the other Loan Documents and this Interim Order, for (a) the

repayment of the Pre-Petition Lender Debt owed to the Pre-Petition Lender as of the date hereof,

subject to the terms and conditions contained in this Interim Order; (b) the payment of employee

salaries, payroll, taxes, the purchase of goods, materials and other general corporate and working

capital purposes in accordance with the Loan Documents and this Interim Order, including

amounts paid for such purposes which may constitute administrative expense claims under the

Bankruptcy Code attributable to the operation of Debtors' businesses as authorized by order of

the Court and in accordance with the Loan Documents; (c) the fees of the U.S. Trustee, the fees

of the Clerk of this Court, the allowed fees and expenses of attorneys, accountants and other

professionals retained under Section 327 or 1103(a) of the Bankruptcy Code by the Debtors and

the Committee; and (d) all present and future costs and expenses, including all reasonable

attorneys' fees and legal expenses (provided, that, the Debtors shall provide notice of such

attorneys' fees and legal expenses to the Office of the United States Trustee and counsel for the

Committee (if any)), paid or incurred by Lender at any time in connection with the financing

transactions as authorized and provided for in this Interim Order and the Loan Documents, all of

which unpaid fees, commissions, costs and expenses shall be added to, and are included as part

of, the principal amount of the Obligations, secured by the Collateral and afforded all of the

rights, priorities and protections afforded to Lender in respect of the Obligations under this

Interim Order and the Loan Documents.

4.    Authorization to Enter Into and Comply with Loan Documents. Debtors

are authorized and directed to execute, deliver, perform and comply with all of the terms and

14

covenants of the Credit Agreement and the other Loan Documents, each of which constitute valid, binding, enforceable and non-avoidable obligations of the Debtors for all purposes during the Debtors' Chapter 11 cases, any subsequently converted case(s) of any Debtor under Chapter 7 of the Bankruptcy Code or after the dismissal or reorganization of any of the Debtors' bankruptcy case(s). Debtors are hereby authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements in addition to the above Loan Documents, as Lender may reasonably require as evidence of and for the protection of the Obligations and the Collateral or which may be otherwise deemed necessary by Lender to effectuate the terms and conditions of this Interim Order and the Loan Documents, each of such additional documents, instruments, and agreements being included in the definition of "Loan Documents" contained herein.

5.     Approval of Loan Documents. The terms, conditions and covenants of the Credit Agreement and the other Loan Documents are hereby approved in all respects and shall be deemed to be incorporated into the terms and conditions of this Interim Order. Such terms, conditions and covenants shall be sufficient and conclusive evidence of the borrowing and financing arrangements among Debtors and Lender for all purposes, including, without limitation, the payment of all principal, interest, fees (including, without limitation, unused line fees, servicing fees, letter of credit fees, closing fees, syndication fees, early termination fees, appraisal fees), Lender's legal expenses, and other fees and expenses, as more fully set forth in the Credit Agreement and the other Loan Documents.

6.     Lien Grant. To secure the prompt payment and performance of any and all Obligations under the Credit Agreement, the other Loan Documents and/or this Interim Order, Lender shall have, and is hereby granted in accordance with the terms and conditions of

15

the Loan Documents, effective on and after the Petition Date, valid, perfected, enforceable and non-avoidable first priority security interests in and liens, senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates, including, without limitation, the Priming Liens (but subject to the liens and claims set forth in paragraph 8 of this Interim Order), upon all assets and properties of the Debtors and their estates (excluding any claims and causes of action brought under Chapter 5 of the Bankruptcy Code and the proceeds thereof) and including, without limitation, the following (the "Collateral", as such term is more fully defined in the Security Agreement[2]): contract rights, general intangibles (including, without limitation, all trademarks, patents and other intellectual property, tax refunds, choses in action, franchises, licenses and other rights and agreements), accounts, cash or cash equivalents, deposit accounts, letters of credit, letter-of-credit rights, supporting obligations, chattel paper, documents, instruments (including any notes receivable and stock in subsidiaries and affiliates and all interests in any limited liability company or other entity, except as to the stock of controlled foreign corporations as determined under the Internal Revenue Code for the stock of such corporations in excess of sixty-five percent (65%) thereof to the extent that it would result in any material additional US tax liability), investment property, inventory, equipment, fixtures and other goods, real property (owned and leased) and all products and proceeds of any of the foregoing. In no event shall (i) any lien or security interest granted to Lender pursuant to the Loan Documents or this Interim Order be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) any person or entity who pays (or through the extension of credit to any Debtor, causes to be

---

[2]    Capitalized terms used in paragraph 7 of this Interim Order, unless otherwise defined in this Interim Order, shall have the meanings ascribed to such terms in the Security Agreement. To the extent that there are any inconsistencies or conflicts between the description of Collateral contained in this Interim Order and the description of Collateral contained in the Security Agreement, the description of Collateral as set forth in the Security Agreement shall control and govern in all respects.

16

paid) any of the Obligations be subrogated, in whole or in part, to any rights, remedies, claims,

privileges, liens or security interests granted in favor of, or conferred upon, Lender by the terms

of the Loan Documents or this Interim Order, until such time as all of the Obligations are

indefeasibly paid in full in cash in accordance with the Loan Documents and this Interim Order;

and (iii) Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with

respect to the Collateral.  Upon the Final Financing Order becoming final and non-appealable, all

pre-petition liens and security interests of the Pre-Petition Lender in the Pre-Petition Collateral

shall be deemed to be assigned (and not terminated and released to the extent so assigned) to

Lender as additional collateral security for all Obligations, and such assignment shall be in

addition to, and shall not limit, prejudice or impair in any way any of the claims or liens and

security interests of Lender in the Collateral granted pursuant to the Loan Documents and this

Interim Order.  In no event shall Lender have any liability in connection with such assignment or

the pre-petition liens so assigned (including, without limitation, any liability relating to a Pre-

Petition Lien/Claim Challenge (as defined in paragraph 15(e) herein) or a Disgorgement Action),

and in no event shall the Pre-Petition Lender continue to have any rights or benefits in

connection with such liens so assigned.

    7. <u>Lien Perfection</u>.  This Interim Order shall be sufficient and conclusive

evidence of the priority, perfection and validity of all of the liens and security interests in and

upon the property of each Debtor's estate granted to Lender, as set forth herein and in the Loan

Documents, without the necessity of filing, recording or serving any financing statements,

mortgages, deeds of trust or other agreements, documents or instruments which may otherwise

be required under federal or state law in any jurisdiction (collectively, "Lien Recording

Documents") or the taking of any other action to validate or perfect the security interests and

17

liens granted to Lender in this Interim Order and the Loan Documents.  Such security interests and liens granted to Lender shall be prior and senior to all security interests, liens, claims, and encumbrances of all other creditors in and to such property, subject to paragraph 8 of this Interim Order.  If Lender shall, in its discretion, elect for any reason to file any such Lien Recording Documents with respect to such security interests and liens, Debtors are authorized and directed to execute, or cause to be executed, all such Lien Recording Documents upon Lender's request and the filing, recording or service thereof (as the case may be) of such Lien Recording Documents shall be deemed to have been made at the time of and on the Petition Date.  Lender may, in its discretion, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which Debtors have an interest in real or personal property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of this Interim Order.  To the extent that any applicable non-bankruptcy law would otherwise restrict the grant, scope, enforceability, attachment or perfection of the security interests and liens authorized or created hereby, or otherwise would impose filing or registration requirements with respect thereto, such law is hereby pre-empted to the maximum extent permitted by the United States Constitution, the Bankruptcy Code, applicable federal law, and the judicial power of the United States Bankruptcy Court (provided that Lender may still take such steps as it wishes to perfect its security interests and liens under otherwise applicable state law without waiving the benefits of this provision of this Interim Order).  In the event that any Lien Recording Document, which Lender elects to file in accordance with this paragraph, contains any limitations, defects, deficiencies or other information which might otherwise limit or adversely affect Lender's liens upon and security interests in the Collateral or any of Lender's claims, rights, priorities and/or protections afforded under this Interim Order and the Loan

18

Documents, such limitations, defects, deficiencies or other information shall not impair, limit, restrict or adversely affect in any way any of Lender's liens and security interests in the Collateral or its claims, rights, priorities and/or protections granted under this Interim Order and/or the Loan Documents. Agent shall, in addition to the rights granted to it under the Loan Documents, be deemed the successor-in-interest to the Pre-Petition Agent with respect to all Pre-Petition Collateral access agreements and other agreements with third parties granting rights in, or waiving claims against, any Pre-Petition Collateral, including, without limitation, each collateral access agreement duly executed and delivered by any landlord of the Borrowers or any of their Subsidiaries (as defined in the Credit Agreement).

8.   Permitted Liens and Claims. Except as otherwise provided pursuant to the provisions of this Interim Order, the security interests and liens of Lender in and upon the Collateral shall not have priority over (i) the liens upon Debtors' property that are permitted in Section 7.2.3 of the Credit Agreement to the extent that such liens are expressly entitled to priority over Lender's liens in the Collateral as provided for in such Section 7.2.3, (ii) security interests and liens that are (A) valid, perfected, non-avoidable and in existence immediately prior to the Petition Date (other than Pre-Petition Lender's liens in the Pre-Petition Lender Collateral securing the Pre-Petition Lender Debt and/or the Pre-Petition Lender Junior Liens securing the Contingent Pre-Petition Lender Debt) to the that extent such liens and security interest have priority over Lender's liens under applicable law, and (B) valid, non-avoidable and in existence immediately prior to the Petition Date but are perfected subsequent to the Petition Date pursuant to Bankruptcy Code Section 546(b) to the extent that such liens and security interest have priority over Lender's liens under applicable law; (iii) the Pre-Petition Lender Carve-Out to the extent set forth in paragraph 9 of this Interim Order; and (iv) the Carve Out Expenses, including,

19

without limitation, the Professional Fee Carve-Out as and to the extent set forth in this Interim Order. The foregoing is without prejudice to the rights of Debtors, the Committee (if any), or any other party in interest, including Lender, to object to the validity, extent, priority, enforceability or allowance of any such liens and security interests referenced in clauses (i) and (ii) above in this paragraph.

        9.      Repayment and Termination of Pre-Petition Lender Debt; Adequate Protection.

        (a)      Immediately following the entry of this Interim Order, as adequate protection for the Priming Liens granted to Lender in accordance with the terms and conditions contained in this Interim Order, (i) Debtor shall use a portion of the proceeds from the Loans and other credit accommodations made by Lender to Borrowers in accordance with the Loan Documents and this Interim Order to repay in full the Pre-Petition Lender Debt, and (ii) Pre-Petition Lender shall have, subject to the terms and conditions set forth below, Pre-Petition Lender Junior Liens to secure any Contingent Pre-Petition Lender Debt. The adequate protection granted to Pre-Petition Lender under this paragraph 9 is expressly conditioned upon the following: (i) the Contingent Pre-Petition Lender Debt shall be junior and subordinate in right of payment to all Obligations; (ii) the Pre-Petition Lender Junior Liens shall be junior and subordinate in all respects to Lender's liens and security interests (including, without limitation, Lender's Priming Liens) upon and in the Collateral; (iii) until such time as all of the Obligations are indefeasibly paid in full in cash in accordance with the Loan Documents and this Interim Order, Pre-Petition Lender shall have no right to seek or exercise any enforcement rights or remedies in connection with the Contingent Pre-Petition Lender Debt or the Pre-Petition Lender Junior Liens, including, without limitation, in respect of the occurrence or continuance of any

20

Event of Default (as hereinafter defined); (iv) the Pre-Petition Lender shall be deemed to have consented to any sale or disposition of Collateral approved, arranged for or by Agent, and shall terminate and release upon any such sale or disposition all of its liens on and security interests in such Collateral; (v) Pre-Petition Lender shall deliver or cause to be delivered, at Debtors' costs and expense (for which Pre-Petition Lender shall be reimbursed upon submission to Debtors of invoices or billing statements), any termination statements, releases or other documents necessary to effectuate and/or evidence the release and termination of Pre-Petition Lender's liens on or security interests in any portion of the Collateral subject to any sale or disposition approved or arranged for by Agent; and (vi) upon the Final Financing Order becoming a final and non-appealable order all Pre-Petition Lender Junior Liens in the Collateral shall, subject to paragraph 6 of this Interim Order, terminate and be released (automatically and without further action of the parties), and Pre-Petition Lender shall execute and deliver such agreements to evidence and effectuate such termination and release as Agent may request and Agent shall be authorized to file on behalf of Pre-Petition Lender such UCC termination statements or other such other filings as may be applicable to the extent required such authorization is required under the Uniform Commercial Code of the applicable jurisdiction. Nothing contained in this paragraph 9(a) shall impair the rights of Pre-Petition Lender granted under this Interim Order.

(b)    In addition to the repayment of the Pre-Petition Lender Debt and the grant to Pre-Petition Lender of the Pre-Petition Lender Junior Liens, subject to the terms and conditions set forth herein, Pre-Petition Lender shall have a priority claim, senior in priority to the right of payment of Lender in respect of the Obligations, of up to $1,000,000 for (i) any post-petition obligations or indebtedness reasonably incurred by the Pre-Petition Lender in connection with the repayment of the Pre-Petition Lender Debt and the termination of the Pre-Petition

21

Lender Junior Liens in accordance with the terms and conditions contained herein, and (ii) the reasonable professional fees and reasonable legal expenses actually incurred by or on behalf of Pre-Petition Lender in connection with any pending or threatened action against Pre-Petition Lender in accordance with paragraph 15(e) of this Interim Order seeking to avoid, set aside or otherwise challenge all or any portion of the Pre-Petition Lender Debt or any of Pre-Petition Lender's security interests in or liens upon the Pre-Petition Lender Collateral, or to pursue any claims against Pre-Petition Lender in connection with the Pre-Petition Loan Documents (the "Pre-Petition Lender Carve Out"); provided, that, the Pre-Petition Lender Carve Out shall terminate and be of no further force and effect if (1) an adversary proceeding has not been commenced against Pre-Petition Lender in accordance with paragraph 15(e) of the Interim Financing Order, or (2) Debtors, Pre-Petition Lender and Lender otherwise agree in writing to terminate the Pre-Petition Lender Carve Out.

10.     Use of Pre-Petition Lender's Cash Collateral.  During the period commencing immediately after the filing of the Debtors' Chapter 11 petitions and terminating upon the date at which the Final Financing Order becomes final and non-appealable (the "Cash Collateral Use Period"), the Debtors shall be authorized to use, subject to the terms contained in this paragraph, the Pre-Petition Lender's cash collateral (as defined in Section 363(a) of the Bankruptcy Code).  Pre-Petition Lender hereby reserves the right to seek, as adequate protection against the diminution in the value of the Pre-Petition Lender Junior Liens occasioned by the imposition of the automatic stay and the Debtors' use of Pre-Petition Lender's cash collateral in accordance with sections 361, 362 and 363 of the Bankruptcy Code, a Section 507(b) claim in an amount equal to any diminution in the value of the Pre-Petition Lender Junior Liens; provided, however, any Section 507(b) claim granted to Pre-Petition Lender pursuant to this paragraph or

22

otherwise (i) shall terminate and be released upon the Final Financing Order becoming a final and non-appealable order; and (ii) shall be junior and subordinate in right of payment to all Obligations.

11.    <u>Nullifying Pre-Petition Restrictions to Post-Petition Financing</u>. Notwithstanding anything to the contrary contained in any pre-petition agreement, contract, lease, document, note or instrument to which any Debtor is a party or under which any Debtor is obligated, except as otherwise permitted under the Loan Documents, any provision that restricts, limits or impairs in any way any Debtor from granting Lender security interests in or liens upon any of its assets or properties (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) or otherwise entering into and complying with all of the terms, conditions and provisions of the Credit Agreement, the other Loan Documents and/or this Interim Order shall not be effective and shall be unenforceable against any such Debtor(s) and Lender, and, therefore, shall not adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to Lender pursuant to this Interim Order, the Credit Agreement and/or the other Loan Documents or any of the rights of Lender hereunder or thereunder.

12.    <u>Cash Management Authorization</u>.  In accordance with the provisions of the Credit Agreement and this Interim Order, Debtors are authorized and directed either to deposit or cause to be deposited into the Majority Accounts (as defined in the Credit Agreement), or to remit, in kind, immediately to Lender, all monies, checks, drafts and any other payments received from its account debtors and other parties, now or hereafter obligated to pay Debtors for services provided by Debtors or for inventory or other property of Debtors' estates.  Lender is

23

authorized to apply such payments and proceeds received by Debtors to the Obligations in accordance with the Credit Agreement, the other Loan Documents and this Interim Order.

13.    <u>Modification of Automatic Stay</u>. Except as otherwise specifically provided with respect to Lender's rights and remedies after the occurrence of an Event of Default under the terms of the Loan Documents and subject to the provisions of paragraph 18 below, the automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit Lender to implement the provisions of the Loan Documents and this Interim Order.

14.    <u>Superpriority Claim</u>. For all Obligations now existing or hereafter arising pursuant to the Credit Agreement, the other Loan Documents and/or this Interim Order, Lender is hereby granted an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, which claim shall have priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtors, now in existence or hereafter incurred by any of the Debtors and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1) and/or 726 of the Bankruptcy Code (the "Superpriority Claim"), provided, however, that the Superpriority Claim shall be subordinate to (i) the Carve-Out Expenses as and to the extent set forth in this Interim Order, and (ii) the Pre-Petition Lender Carve Out as and to the extent set forth in this Interim Order.

15.    (a)    <u>Professional Fee Carve-Out and Other Carve-Out</u>. Subject to the terms and conditions contained in this paragraph 15, Lender's Superpriority Claim and security

24

interests in and liens upon the Collateral shall be subordinate only to (collectively, the "Carve-Out Expenses"):

> (i)  the fees and expenses of the Clerk of this Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a);

> (ii)  the allowed reasonable fees and expenses of any Chapter 7 Trustee appointed for any Debtor's Chapter 7 case; provided, that such allowed fees and expenses shall not exceed $50,000 in the aggregate for purposes of constituting a part of the Carve Out Expenses; and

> (iii)  on and after the Default Point (as defined below), the allowed unpaid and outstanding reasonable fees and expenses approved by order of the Court pursuant to sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees") by attorneys, accountants and other professionals retained under section 327 or 1103(a) of the Bankruptcy Code by the Debtors and the Committee (collectively, the "Professionals") in an aggregate amount not to exceed $12,000,000 (the "Professional Fee Carve-Out").  As used herein, "Default Point" means the date when both (x) an Event of Default (as defined in the Credit Agreement or this Interim Order) shall have occurred, and (y) the Lender has ceased making to Borrowers advances or other extensions of credit in accordance with the terms of the Credit Agreement and the other Loan Documents.

25

(b)    Payment of Professional Fee Carve-Out.  Any payment or

reimbursement made either directly by or on behalf of Lender or by or on behalf of the Debtors

on or after the Default Point in respect of any Allowed Professional Fees shall, in either case,

permanently reduce the Professional Fee Carve-Out on a dollar-for-dollar basis.  Any payments

made to Professionals in respect of Allowed Professional Fees at any time prior to the Default

Point shall not reduce the Professional Fee Carve-Out.  Any payments made at any time in

respect of any Carve Out Expenses other than Allowed Professional Fees subject to the

Professional Fee Carve-Out shall not reduce the Professional Fee Carve-Out.  Lender's

obligation to fund or otherwise pay Carve Out Expenses, including Allowed Professional Fees

subject to the Professional Fee Carve-Out, shall be added to and made a part of the Obligations,

secured by the Collateral, and Lender shall be entitled to all of the rights, claims, liens, priorities

and protections under this Interim Order, the Loan Documents, the Bankruptcy Code, and/or

applicable law in connection therewith.  Payment of any obligations relating to the Professional

Fee Carve-Out or other Carve Out Expenses, whether by or on behalf of Lender, shall not and

shall not be deemed to reduce the Obligations and shall not and shall not be deemed to

subordinate any of Lender's liens and security interests in the Collateral or its Superpriority

Claim to any junior pre-petition or post-petition lien, interest, or claim in favor of any other

party.  Except as otherwise provided herein with respect to the Professional Fee Carve-Out and

the other Carve Out Expenses, Lender shall not be responsible for the direct payment or

reimbursement of any fees or disbursements of any Professionals incurred in connection with the

Debtors' cases under any chapter of the Bankruptcy Code, and nothing in this Interim Order or

otherwise shall be construed to obligate Lender in any way, to pay compensation to or to

26

reimburse expenses of any Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(c)     Professional Fee Carve-Out Reserve.  Without limiting any of Lender's rights under the Loan Documents or this Interim Order, Lender shall implement a Reserve (as defined in the Credit Agreement) in respect of the Professional Fee Carve-Out and the other Carve-Out Expenses in accordance with the terms and conditions of the Credit Agreement.  Such Reserve shall reduce the amount of Loans and Letters of Credit otherwise available to Borrowers under the Credit Agreement.

(d)     Excluded Professional Fees.  Notwithstanding anything to the contrary in this Interim Order, the Professional Fee Carve-Out shall not be used to pay any Allowed Professional Fees or any other claims incurred in connection with any of the following: (i) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief: (A) challenging the legality, validity, priority, perfection, or enforceability of the Obligations or Lender's liens on and security interests in the Collateral, (B) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Obligations or Lender's liens on and security interests in the Collateral, or (C) preventing, hindering, or delaying Lender's assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral, (ii) a request to use the Cash Collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior written consent of Lender, (iii) a request for authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code other than from Lender without the prior written consent of Lender, (iv) the commencement or prosecution of any action or proceeding of any claims, causes of action, or

27

defenses against Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, or (v) any act which has or could have the effect of materially and adversely modifying or compromising the rights and remedies of Lender, or which is contrary, in a manner that is material and adverse to Lender to any term or condition set forth in or acknowledged by the Loan Documents or this Interim Order. Nothing contained herein shall limit or prevent the Professional Fee Carve-Out to be used to investigate and/or bring claims against the Pre-Petition Lender with respect to the Pre-Petition Lender Debt or Pre-Petition Lender's liens and security interests in the Pre-Petition Lender Collateral in accordance with paragraph 15(e) of this Interim Order.

(e)    Subject to the terms of this paragraph, the repayment of the Pre-Petition Lender Debt as set forth in paragraph 9 of this Interim Order shall be without prejudice to the rights of the Committee, or if no Committee is formed, any party in interest, to seek to disallow the Pre-Petition Lender's claims in respect of the Pre-Petition Lender Debt, pursue any claims against Pre-Petition Lender in connection with the Pre-Petition Loan Documents or avoid any security interest or liens in the Pre-Petition Lender Collateral or in any other asset or property of the Debtors in which the Pre-Petition Lender claims an interest, including, without limitation, any claim, action or proceeding brought against Pre-Petition Lender in accordance with this paragraph 15(e) that requires the Pre-Petition Lender to disgorge the repaid Pre-Petition Lender Debt (or any portion thereof) as a result of any of Pre-Petition Lender's claims against the Debtors or liens upon and security interests in any of the assets and properties of Debtors (including the Pre-Petition Lender Collateral) and their estates being invalidated, avoided, subordinated, impaired or compromised in any way, either by an order of this Court (or other court of competent jurisdiction) or by settlement (collectively, a "Disgorgement Action"). The

28

Committee shall have seventy-five (75) calendar days from the date of appointment of counsel for the Committee (and if no Committee is formed, any party in interest shall have seventy-five (75) days from entry of this Interim Order), within which to commence an adversary proceeding (collectively, a "Pre-Petition Lien/Claim Challenge") with respect to the Pre-Petition Lender's claims in respect of the Pre-Petition Lender Debt or security interest in the Pre-Petition Lender Collateral, or any other claims or causes of action against the Pre-Petition Lender relating to the Pre-Petition Loan Documents. If such a Pre-Petition Lien/Claim Challenge is not timely commenced within such applicable period set forth above, (a) the Pre-Petition Lender Debt and Pre-Petition Lender's security interests in and liens upon the Pre-Petition Lender Collateral shall be recognized and allowable as valid, binding, in full force and effect, not subject to any claims, counterclaims, setoff or defenses and perfected, and (b) Pre-Petition Lender and its respective agents, officers, directors and employees shall be deemed released and discharged from all claims and causes of action of any kind, nature or description arising at any time immediately prior to the Petition Date in accordance with the Pre-Petition Loan Documents entered into with Debtors, and all of the Debtors' acknowledgements, releases and waivers of claims granted to or in favor of Pre-Petition Lender relating to the Pre-Petition Loan Documents in accordance with this Interim Order shall be binding upon all parties in interest in the Debtors' Chapter 11 cases and/or in any subsequently converted case(s) under Chapter 7 of the Bankruptcy Code.

16.    Disposition of Collateral. Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral, or assume, reject or assign any Leasehold Property (as defined in the Credit Agreement) without the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Lender or an order of this Court), except for sales of Debtors' Inventory in the ordinary course of its

29

businesses or except as otherwise provided for in the Credit Agreement, the other Loan Documents and this Interim Order.

17.     Waiver of 506(c) Claims Against Lender.  No costs or expenses of administration which already have been, or may hereafter be, incurred in Debtors' Chapter 11 cases or in any subsequently converted case under Chapter 7 of the Bankruptcy Code shall be charged or asserted by the Debtors against Lender, its claims or the Collateral, pursuant to Sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior written consent of Lender (and no such consent shall be implied from any other action, inaction or acquiescence by Lender).  Nothing contained in this paragraph shall waive the rights of the Committee or any other party-in-interest to assert a claim under Section 506(c) of the Bankruptcy Code; provided, that, the foregoing does not and shall not be construed to grant standing to any such party to assert a claim under Section 506(c) of the Bankruptcy Code.

18.     Remedies upon Occurrence of Event of Default.  In the event of the occurrence of any of the following: (a) the failure of Debtors to perform in any material respect any of its obligations pursuant to this Interim Order, (b) the occurrence of any Event of Default under the Credit Agreement or the other Loan Documents, (c) the termination or non-renewal of the Loan Documents as provided for in the Credit Agreement, or if terminated sooner by an order of this Court, (d) conversion of any Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code, (e) the appointment of a trustee pursuant to Section 1104(a) of the Bankruptcy Code in Debtors' Chapter 11 cases, (f) the appointment of any examiner with expanded powers pursuant to Section 1106(b) of the Bankruptcy Code in Debtors' Chapter 11 cases, (g) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending this Interim Order without the express prior written consent of Lender (and no such

consent shall be implied from any other action, inaction or acquiescence by Lender), (h) the

failure to obtain entry of a final non-appealable Final Financing Order as to the approval of the

Credit Agreement and the other Loan Documents, in form and substance acceptable to Lender,

granting the Motion within sixty (60) days after the date of the Motion, (i) the failure of Debtors

to remain current in payment of any material amount of post-petition administrative obligations,

except for amounts the validity of which are being contested in good faith by Debtors, or (j) the

filing of a plan of reorganization by any party which does not provide for the payment in full in

immediately available funds of all Obligations on the effective date thereof on terms and

conditions acceptable to Lender (each of the foregoing being referred to in this Interim Order,

individually, as an "Event of Default" and collectively, as "Events of Default"); then (unless

such Event of Default is specifically waived in writing by Lender, which waiver shall not be

implied from any other action, inaction or acquiescence by Lender) and upon or after the

occurrence of any of the foregoing, and at all times thereafter, after giving five (5) business days

notice in writing, served by hand or telefax upon the Court, Debtors' counsel, counsel to the

Committee, any trustee of Debtors, if appointed, and the United States Trustee: (i) all of the

Obligations shall become immediately due and payable, (ii) the automatic stay provided for

pursuant to Section 362 of the Bankruptcy Code and any other restrictions on the enforcement by

Lender of its liens upon and security interests in the Collateral or any other rights under the Loan

Documents granted to or for the benefit of Lender or pursuant to this Interim Order shall be

automatically vacated and modified without any further action being required, and (iii) Lender,

without further notice, hearing or approval of this Court, shall be, and are hereby authorized, in

the discretion of the Lender, to take any and all actions or remedies which Lender may deem

appropriate to proceed against and realize upon the Collateral and any other assets and properties

31

of Debtors' estates upon which Lender has been or may hereafter be granted liens and security interests to obtain the full and indefeasible repayment of the Obligations. Nothing contained in this Interim Order or otherwise shall be construed to obligate Lender in any way to lend or advance any additional funds to Debtors, or provide other financial accommodations to Debtors upon or after the occurrence of an Event of Default.

19.    Collateral Rights. Until all of the Obligations shall have been indefeasibly paid and satisfied in full and without further order of the Court: (a) no other party shall foreclose or otherwise seek to enforce any junior lien (including contractually junior liens) or other right such other party may have in and to any property of the estate of Debtors upon which Lender holds or asserts a lien or security interest, and (b) upon and after the occurrence of an Event of Default, and subject to Lender obtaining relief from the automatic stay as provided for herein, Lender, in its discretion, in connection with a liquidation of any of the Collateral may, without cost or expense to Lender: (i) enter upon, occupy and use any real property, fixtures and equipment owned or leased by Debtors and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses. Lender will be responsible for the payment of any fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property and any reasonable costs or expenses incurred by such lessor, licensor or owner for the period of time that Lender actually occupies or uses the premises, equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that Lender actually occupies or uses such assets or properties).

32

20.    Amendment to Loan Documents. Agent, with the consent of Debtors, is hereby authorized to amend and/or modify the Loan Documents without further order of the Court for purposes of, among other things, implementing the syndication of the financing provided for in the Credit Agreement and the other Loan Documents (which syndication may result in increased costs charged to the Borrowers under the Credit Agreement and the other Loan Documents) and modifying or waiving compliance with financial covenants contained in the Credit Agreement or increasing the amount of loans available to Borrowers or changes related to any of the foregoing; provided, that, any such amendments and modifications must be in writing and served upon counsel for the Committee and the U.S. Trustee.

21.    Reservation of Lender's Rights. Entry of this Interim Order shall not be deemed to prejudice any and all rights, remedies, claims and causes of action Lender may have against third parties, and shall not prejudice the rights of Lender from and after the entry of this Interim Order to seek any other relief in the Debtors' Chapter 11 cases. Entry of this Interim Order shall not in any way constitute:  (a) a preclusion or a waiver of any right of Lender to file, or to prosecute if already filed, a motion for relief from stay, a motion or request for relief, including but not limited to any adversary proceeding; (b) agreement, consent, or acquiescence to the terms of any plan of reorganization by virtue of any term or provision of this Interim Order; (c) a preclusion or waiver to assert any other rights, remedies or defenses available to Lender, or to respond to any motion, application, proposal, or other action, all such rights, remedies, defenses and opportunities to respond being specifically reserved by Lender; or (d) a preclusion, waiver or modification of any rights or remedies that Lender has against any other person or entity.

33

22.    Release Upon Repayment of Obligations  Upon the payment in full of all
Obligations owed to Lender and termination of the Credit Agreement and the other Loan
Documents, Lender shall be released from any and all obligations, liabilities or responsibilities
arising in connection with or related to this Interim Order, the Credit Agreement and the other
Loan Documents in accordance with the terms and conditions contained in the Loan Documents.

23.    Restrictions on Use of Cash Collateral, Additional Financing.  All post-
petition advances and other financial accommodations under the Credit Agreement and the other
Loan Documents are made in reliance on this Interim Order and there shall not at any time be
entered in Debtors' Chapter 11 cases or in any subsequently converted case under Chapter 7 of
the Bankruptcy Code any order (other than the Final Financing Order) which (a) authorizes the
use of cash collateral of Debtors in which Lender has an interest or the sale, lease, or other
disposition of property of Debtors' estates in which Lender has a lien or security interest, except
as expressly permitted hereunder or in the Loan Documents, or (b) authorizes under Section 364
of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien
or security interest which is equal or senior to a lien or security interest in property in which
Lender holds a lien or security interest, or which is entitled to priority administrative claim status
which is equal or superior to that granted to Lender herein; unless, in each instance (i) Lender
shall have given its express prior written consent thereto, no such consent being implied from
any other action, inaction or acquiescence by Lender, or (ii) such other order requires that the
Obligations shall first be indefeasibly paid in full, including, without limitation, all debts and
obligations of Debtors to Lender which arise or result from the obligations, loans, security
interests and liens authorized herein, on terms and conditions acceptable to Lender.  The security
interests and liens granted to or for the benefit of Lender hereunder and the rights of Lender

34

pursuant to this Interim Order and the Loan Documents with respect to the Obligations and the Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of Debtors and, if Lender shall expressly consent in writing that the Obligations shall not be repaid in full upon confirmation thereof, shall continue after confirmation and consummation of any such plan.

24.    Binding Effect of Interim Order and Loan Documents.

(a)    The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered converting Debtors' Chapter 11 cases to a Chapter 7 case, dismissing any of Debtors' bankruptcy cases or any order which may be entered confirming or consummating any plan of reorganization of Debtors, and the terms and provisions of this Interim Order as well as the priorities in payment, liens, and security interests granted pursuant to this Interim Order and the Loan Documents shall continue in this or any superseding case under the Bankruptcy Code, and such priorities in payment, liens and security interests shall maintain their priority as provided by this Interim Order until all Obligations are indefeasibly paid and satisfied; provided, that, all obligations and duties of Lender hereunder, under the Loan Documents or otherwise with respect to any future loans and advances or otherwise shall terminate immediately upon the earlier of the date of any Event of Default or the date that a plan of reorganization of the Debtors becomes effective unless Lender has given its express prior written consent thereto, no such consent being implied from any other action, inaction or acquiescence by Lender.

(b)    The provisions of this Interim Order and the Loan Documents shall inure to the benefit of Debtors, Lender and the Pre-Petition Lender and shall be binding upon

35

Debtors, Lender, and the Pre-Petition Lender and their respective successors and assigns, including any Chapter 11 or Chapter 7 Trustee or other fiduciary hereafter appointed as a legal representative of Debtors or with respect to property of the estate of Debtors, whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case, and shall also be binding upon all creditors of Debtors and other parties in interest.

        25.    <u>No Modification or Stay of This Interim Order</u>. If any or all of the provisions of this Interim Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by Debtors to Lender or the Pre-Petition Lender prior to the effective date of such modification, vacation or stay, (b) the validity or enforceability of any security interest, lien, or priority authorized or created hereunder or pursuant to the Loan Documents, as applicable, or (c) the indefeasible repayment by Debtors of the Pre-Petition Lender Debt. Notwithstanding any such modification, vacation or stay, any indebtedness, obligations or liabilities incurred by Debtors to Lender or the Pre-Petition Lender prior to the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and Lender and the Pre-Petition Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein with respect to all such indebtedness, obligations and/or liabilities. The obligations and indebtedness of Debtors to Lender under this Interim Order and/or the Loan Documents shall not be discharged by the entry of an order confirming a plan of reorganization in Debtors' bankruptcy cases pursuant to Section 1141(d)(4) of the Bankruptcy Code or otherwise, unless and until all Obligations of Debtors to Lender are indefeasibly paid in full in accordance with the terms and conditions of the Loan Documents prior to or concurrently with the entry of such order.

36

26.    No Waivers or Modification of Interim Order.  Debtors irrevocably waive any right to seek any modifications or extensions of this Interim Order without the prior written consent of Lender and no such consent shall be implied by any other action, inaction or acquiescence by Lender.  Notwithstanding anything to the contrary contained herein, no provision of this Interim Order concerning the repayment of the Pre-Petition Lender Debt pursuant to the provisions of this Interim Order shall be modified, vacated, stayed or altered in any manner or respect.

27.    Conflicting Provisions.  Unless otherwise provided in this Interim Order, to the extent the terms and conditions of the Loan Documents are in conflict with the terms and conditions of this Interim Order, the terms and conditions of this Interim Order shall control.

28.    Good Faith.  The terms of the financing arrangements among Debtors and Lender have been negotiated in good faith and at arms' length among Debtors and Lender and any loans, advances or other financial accommodations which are made or caused to be made to Debtors by Lender pursuant to the Loan Documents are deemed to have been made and provided in good faith, as the term "good faith" is used in Section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  Consistent with Section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter modified, vacated or stayed:

> i.  such stay, modification or vacation shall not affect the validity of any obligation, indebtedness, liability or lien granted or incurred by an Debtor to Lender prior to the effective date of such stay, modification or vacation,

37

or the validity, enforceability or priority of any lien, priority or right authorized or created under the original provisions of this Interim Order or pursuant to the Loan Documents; and

ii. any indebtedness, obligation or liability incurred by any Debtor to Lender under the Loan Documents prior to the effective date of such stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and Lender shall be entitled to all the rights, remedies, privileges and benefits, including the liens, security interests and priorities granted herein and pursuant to the Loan Documents, with respect to any such indebtedness, obligation or liability; and

iii. since the loans made pursuant to the Loan Documents are made in reliance on this Interim Order, the Obligations owed Lender prior to the effective date of any stay, modification or vacation of this Interim Order cannot, as a result of any subsequent order in these chapter 11 cases, or in any superseding case, be subordinated, lose its lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to Lender under this Interim Order and/or the Loan Documents.

29. <u>Interim Financing Term</u>. The authorization of Debtors to obtain Loans and Letter of Credit Accommodations from Lender in accordance with the Loan Documents and this Interim Order shall expire sixty (60) days from the date of entry of this Interim Order, unless

38

a Final Financing Order (as defined in the Credit Agreement) in form and substance satisfactory to Lender is entered on or before such date.

30.    <u>Final Hearing</u>.  This matter is set for a final hearing at __:__ a.m. on _____ __, 2005 ("Final Hearing"), in the United States Bankruptcy Court for the Southern District of New York, at which time any party-in-interest may appear and state its objections, if any, to the provisions of the post-petition financing arrangements among Debtors and Lender. The following parties shall immediately, and in no event later than _____ __, 2005, be mailed copies of this Interim Order or such written summary of this Interim Order as the Court may approve:  (a) the Interim Noticed Parties, (b) all creditors known to the Debtors who may have liens against or interests in any of the Debtors' assets and properties, including, without limitation, all landlords, operators, mortgagors and/or mortgagees of the premises at which any of the Debtors' Inventory or other items of Collateral are located; and (c) all parties who have filed a Notice of Appearance in these Chapter 11 cases.  Objections shall be in writing and shall be filed with the Clerk of this Court, on or before _____ __, 2005 at __:__ __.m., with a copy served upon Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attention: D. J. Baker, Esq. and Alexandra Margolis, Esq.; King & Spalding LLP, 191 Peachtree Street, Atlanta, Georgia 30303, Attention: Sarah Borders, Esq.; Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169, Attention: Jonathan N. Helfat, Esq.; and Shearman & Sterling LLP, 599 Lexington Avenue, New York, New York 10022-6069, Attention: Andrew Tenzer, Esq. so that such objections are received on or before __.m., _____ __, 2005.  Any objections by creditors or any other party-in-interest to any of the provisions of the post-petition financing arrangements among Debtors and Lender shall be deemed waived unless filed and received in accordance with the foregoing on or before

39

the close of business on such date.  Except as otherwise provided in this paragraph, the terms of

this Interim Order shall be valid and binding upon Debtors, all creditors of Debtors (including,

without limitation, the Pre-Petition Secured Lender), and all other parties-in-interest from and

after the date of this Interim Order by this Court.  In the event this Court modifies any of the

provisions of this Interim Order and the Loan Documents following such further hearing, such

modifications shall not affect the rights and priorities of Lender pursuant to this Interim Order

with respect to the Collateral and any portion of the Obligations which arises, or is incurred or is

advanced prior to such modifications (or otherwise arising prior to such modifications), and this

Interim Order shall remain in full force and effect except as specifically amended or modified at

such final hearing.

Dated: New York, New York
      February ___, 2005

 

_____
United States Bankruptcy Judge

40