**Hearing Date: March 9, 2005 at 10:00 a.m.**
**Objection Deadline: March 4, 2005 at 4:00 p.m.**

Reginald A. Greene (RG 3566)
BellSouth
675 West Peachtree Street NE
Suite 4300
Atlanta, Georgia 30375
Telephone:  (404) 335-0761
Facsimile:  (404) 614-4054

Attorney for BellSouth Telecommunications, Inc.;
BellSouth Business Systems, Inc.; and BellSouth
Long Distance, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------x
| | | |
|---|---|---|
| **In re** | **:** | **Chapter 11** |
| | **:** | |
| **WINN-DIXIE STORES, INC., et al.,** | **:** | **Case No. 05-11063 (RDD)** |
| | **:** | **(Jointly Administered)** |
| **Debtors.** | **:** | |

-----------------------------------------------------x

**OBJECTION OF BELLSOUTH TELECOMMUNICATIONS, INC.;**
**BELLSOUTH BUSINESS SYSTEMS, INC.; AND BELLSOUTH**
**LONG DISTANCE, INC. TO DEBTORS' MOTION FOR ORDER**
**(A) DEEMING UTILITIES ADEQUATELY ASSURED OF PAYMENT,**
**(B) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR**
**DISCONTINUING SERVICES, AND (C) ESTABLISHING PROCEDURES**
**FOR RESOLVING RQUESTS FOR ADDITIONAL ADEUATE ASSURANCE**

        BellSouth Telecommunications, Inc.; BellSouth Business Systems, Inc.; and BellSouth

Long Distance, Inc. (collectively, "BellSouth"), by and through undersigned counsel,

respectfully object to the Motion For Order (A) Deeming Utilities Adequately Assured of

Payment, (B) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services, and

(C) Establishing Procedures for Resolving Requests for Additional Assurance (the "Motion")

filed by Winn-Dixie, Stores, Inc. and its debtor affiliates, as debtors and debtors-in-possession

(collectively, the "Debtors").  In support of this objection, BellSouth represents and states as follows.

### Preliminary Statement

BellSouth objects to the relief sought in the Motion on the basis that it would impermissibly limit and circumvent BellSouth's rights under section 366 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code").[1]  In support of their Motion, the Debtors rely primarily on their payment history with respect to BellSouth's prepetition invoices and the administrative priority provided to the BellSouth as a utility under sections 503(b) and 507(a)(1) of the Bankruptcy Code.  BellSouth submits, and case law confirms, that past payment history coupled with the granting of an administrative priority claim do not constitute adequate assurance in all cases.  In fact, courts in this jurisdiction and elsewhere have recognized that the facts and circumstances of each case are determinative as to what constitutes adequate assurance under section 366 of the Bankruptcy Code.

In this case, BellSouth submits that the adequate assurance proposed by the Debtors is inadequate.  Moreover, BellSouth proposes a carefully crafted set of provisions that will provide BellSouth with adequate assurance until such time as the facts and circumstances of these cases change.  In that regard, BellSouth submits that the Debtors should be required to provide BellSouth with adequate assurance that will include: (a) a deposit covering two month's estimated billing for certain accounts; (b) prepayment of certain other accounts; (c) weekly flash reports showing the Debtors' available, restricted and unrestricted cash, as the case may be; (d) requiring the Debtors to pay invoices prior to raising disputes; (e) accelerated 14 day payment terms for the Debtors and expedited payment default rights for BellSouth; (f) wire transfer of

---

[1]    BellSouth asserts that it is a utility for purposes of section 366, but reserves all of its rights and arguments with respect to the issue.

payments to BellSouth for postpetition services; and (g) upon a change in circumstances, granting such additional deposits or prepayments as circumstances may require.

## Background

1.     As of February 21, 2005 (the "Petition Date"), BellSouth provided approximately $420,000[2] in telecommunication services to the Debtors each month (the "Monthly Run Rate"). Moreover, based on new, pending and proposed orders and other transactions between the Debtors and BellSouth, BellSouth projects the Monthly Run Rate to increase significantly.

2.     The telecommunication services that BellSouth provides to the Debtors include, among other things, (a) wholesale ("CABS") and retail ("CRIS") data and voice services (approximately $340,000 per month), (b) long distance telephone service (approximately $76,000 per month),  and (c) internet access (approximately $4,000 per month).

3.     As of the Petition Date, the Debtors owed BellSouth approximately $465,000 for telecommunication services, which includes many accounts that were up to 90 days past due, and BellSouth did not have any deposits or bonds to secure the Debtors' accounts with BellSouth.

## Argument

### The Caldor Case Is Controlling Law In This Court

4.     There is no dispute that the controlling case on point for section 366 adequate assurance issues in this Court is Caldor.  See In re Caldor, Inc., 199 B.R. 1 (S.D.N.Y. 1996), aff'd, 117 F.3d 646 (2d Cir. 1997).  In sum, Caldor held "[t]hat 'adequate assurance of payment' might in

---

[2]     BellSouth is still in the process of determining the extent of its claims against the Debtors and reserves the right to supplement or modify any or all of the estimated and approximate amounts contained in this objection as appropriate to calculate the full amount of its claims in these cases.

certain, exceptional cases require nothing more than what the Code already requires, does not render unnecessary or superfluous § 366's provision that there be 'adequate assurance' in all cases – a provision that may indeed require something more in other (if not most) circumstances." <u>Caldor</u>, 117 F.3d at 652.

5.        In essence, <u>Caldor</u> held that in certain <u>exceptional</u> cases, adequate assurance could be satisfied with the enforcement of the existing provisions of the Bankruptcy Code, and that other form of adequate assurance, such as pre-payments, deposits, accelerated payments, enhanced financial reporting, etc. are not required.  <u>Id</u>.  The <u>Caldor</u> court made clear that <u>in most circumstances</u>, something more than what the Bankruptcy Code already provides is required to satisfy the adequate assurance requirements of section 366.  <u>Id</u>.

6.        The Debtors rely on <u>Caldor</u> for the proposition that "[i]t is impracticable and entirely unnecessary here to require the Debtors to provide new security deposits to the Utility Companies in light of the administrative priority provided to the Utilities under Sections 503(b) and 507(a)(1) of the Bankruptcy Code and the circumstances of these cases."  Motion at ¶ 28.  This Debtors' contention overstates the holding in <u>Caldor</u>.

7.        The <u>Caldor</u> court did not unequivocally hold that an administrative expense priority claim is equal to adequate assurance, and did not hold that a timely prepetition payment history was sufficient as the only factor to warrant adequate assurance in the form of an administrative expense claim.  Rather, the <u>Caldor</u> court arrived at its conclusion after analyzing the specific facts in the case.  Only after conducting an evidentiary hearing and finding that the Caldor debtors exhibited various qualities, did the <u>Caldor</u> court arrive at its conclusion.

8.        BellSouth believes that although the <u>Caldor</u> factors are instructive and provide a starting point in making an adequate assurance determination, they are not the sole determinative

factors in making an adequate assurance ruling in these cases.  Rather, an analysis must be made of the driving factors in the present cases.

9.       In <u>Caldor</u>, the court found that the existence of the following six factors established that the adequate assurance provided by the Caldor debtors satisfied the requirements of section 366: "(1) [T]he Debtors have significant cash on hand and access to over $500 million in financing; (2) the Debtors pose significantly less risk than other customers of the Utilities; (3) the Utilities have a greater ability to monitor the financial strength of the Debtors; (4) the Debtors are solvent and are operating out of the proceeds of their operations; (5) the Debtors have a solid prepetition payment history; and (6) the Utilities generally had not required deposits from the Debtors in the past." <u>Caldor</u>, 199 B.R. at 2.

10.      The six <u>Caldor</u> factors have not been met in this case for the following reasons. First, the Caldor Debtors had "significant cash on hand and access to over $500 million in financing." <u>Id</u>., 199 B.R. at 2.  Here, the Debtors have not yet provided evidence of the current amount of available cash on hand and the availability under their proposed DIP financing remains unknown to BellSouth.

11.      The Debtors are seeking approval of a proposed debtor-in-possession loan (the "Proposed DIP Loan") of up to $800 million, the approval of which is "critical to their ongoing operations." Dip Motion at ¶ 28.  The Proposed DIP Loan would, however, provide only $600 million on an interim basis and $427 million of that amount is earmarked to repay borrowings under the Debtors' prepetition financing.  While it is clear that the Debtors are relying upon their Proposed DIP Loan to pay BellSouth for post-petition services, it is not clear how much availability the Debtors will have under the Proposed DIP Loan and how fast the Debtors will burn through their cash.  Thus, the Proposed DIP Loan should not be weighted heavily as a supporting factor in

determining adequate assurance for BellSouth, particularly considering the multitude of potential

defaults thereunder.   Should the Debtors default under the Proposed DIP Loan, BellSouth is at risk

of not being paid for postpetition services provided to the Debtors.

12.     Moreover, the Proposed DIP Loan includes a waiver by the Debtors of the

provisions of section 506(c) of the Bankruptcy Code.  In the event there is a liquidation of the

Debtors, and the liquidation value is less than the amount of the outstanding debt owed to the

DIP lenders, BellSouth may have provided services to the estate for the sole benefit of the DIP

lenders, but the Debtors will be prohibited from seeking to surcharge the value of the collateral

to pay BellSouth for the services it provided for the sole benefit of the DIP lenders, and the

Debtors will lack the resources to pay BellSouth for such services.  Such a precarious and

uncertain situation cannot be the basis of an adequate assurance proposal to BellSouth.

13.     Second, the Caldor court found that the Caldor debtors presented "significantly less

risk than other customers of the Utilities."  This is not the case with the Debtors.  In fact, the

Debtors present significantly more risk to BellSouth than other customers of BellSouth.  Prior to the

Petition Date, the Debtors were up to 90 days past due on many of their accounts with BellSouth.

14.     Third, the Caldor debtors provided their utilities with a greater ability to monitor

their debtors' financial strength.  In this case, the Debtors do not propose any type of enhanced

financial reporting to BellSouth for adequate assurance purposes.

15.     Fourth, in Caldor, the bankruptcy court specifically determined that the Caldor

debtors were solvent and were "operating out of the proceeds of their operations."  Here, the

Debtors will not be "operating out of the proceeds of their operations" as they are dependent upon

their Proposed DIP Loan.  In fact, the Debtors have admitted that "[p]rior to the Petition Date, the

working capital needs of the Debtors were met primarily by the Pre-Petition Credit Agreement."

DIP Motion ¶ 21.  There is no indication that the Debtors will not continue to meet their operating needs in the same manner postpetition.

16.     Fifth, the Caldor debtors had a "solid prepetition payment history" with their utilities.  In this case, while the Debtors contend that "[t]o the best of the Debtors' knowledge, there are no defaults or arrearages with respect to undisputed utility service invoices," the Debtors had many accounts with BellSouth that were up to 90 days past due prepetition.

17.     Sixth, and finally, in Caldor, the bankruptcy court found that the utilities generally had not required deposits from the Caldor debtors in the past.  While it is true that BellSouth had not required deposits from the Debtors prepetition, BellSouth was in the process of conducting a periodic credit review of the Debtors and was planning to require a deposit from the Debtors.  Notwithstanding that fact, absence of a prepetition deposit is only one of many facts that were considered in Caldor and, standing alone, that factor is not determinative.

18.     Based upon the foregoing, the Debtors cannot support a Caldor style adequate assurance approach, which is essentially what the Debtors are proposing.  Under Section 366(b), as interpreted by the Caldor decisions, Congress intended that utility companies be afforded additional protections in the bankruptcy context, but for those few exceptional cases, as compared to what was afforded by the debtor to the utility under their pre-petition practices.  See In re Security Investment Properties, Inc., 559 F.2d 1321, 1326 (5th Cir. 1997) ("While a public utility has a duty to serve, neither its history of past service nor its franchise to serve in the future may fix upon it a duty to provide unsecured future service to a Chapter XI debtor.").

**In These Cases, Section 366 Requires More**
**Than What The Debtors Have Proposed**

19.      Adequate assurance is not satisfied in these cases through the Debtors' mere promise

to pay coupled with an administrative expense claim, which is essentially what they are offering.

Since BellSouth is being treated like any other potential administrative claimant, and the Debtors

are proposing nothing to differentiate any other administrative claimant from BellSouth, the Debtors

are arguing that there is essentially no risk of non-payment for any administrative claimant in these

cases.  Although most chapter 11 cases are commenced with the best of intentions, it is too early in

these cases to know whether these cases will be administratively solvent, or whether the Debtors

will emerge from chapter 11 as a going concern.

20.      The Debtors specifically reference various bankruptcy cases in which the adequate

assurance proposals sought in these cases were granted in other cases.  Noticeably absent from the

Debtors' citations, however, are key decisions decided in this Court since Caldor, which granted

adequate assurance protections consistent with those BellSouth is seeking.  These protections

include: (i) weekly flash reports of available cash and loan availability; (ii) negotiation of global

offset rights; (iii) expedited fax notice and order to show cause procedures for payment defaults;

(iv) accelerated 14 day payment terms; (v) expedited dispute resolution by motion;

(vi) reconsideration of adequate assurance in the event of a material adverse change; and

(vii) expedited procedures for payment defaults.[3]

---

[3]      See In re Adelphia Business Solutions, Inc., 280 B.R. 63 (Bankr. S.D.N.Y. 2002)
(Gerber, J); see also In re Global Crossing, Case No. 02-40188 (Bankr. S.D.N.Y), Order
dated March 15, 2002 and transcript of hearing held February 21, 2002.  Pursuant to the
Global Crossing Court's direction, 14-day payment terms were awarded to BellSouth
upon agreement with Global Crossing pursuant to Stipulation dated May 31, 2002, In re
Global Crossing, Case No. 02-40188 (Bankr. S.D.N.Y).

21.    The Debtors' proposed adequate assurance fails to include the most important adequate assurance protections awarded in cases in this Court since <u>Caldor</u>.  Absent these protections, the Debtors' proposed adequate assurance is inadequate.

**BellSouth's Adequate Assurance Proposal**

22.    BellSouth proposes the following as adequate protection for its estimated monthly billing to the Debtors of approximately $420,000:

    (a)    <u>**Deposit**</u>:  Debtor to pay or post a deposit of $160,000, which equals two month's estimated charges for telecommunication services billed to the Debtors by BellSouth, excluding amounts billed to the Debtors though BellSouth's "CABS" and "CRIS" billing system;

    (b)    <u>**Prepayment**</u>: Debtors to make approximately $340,000 in monthly prepayments for "CABS" and "CRIS" billing, subject to periodic true-ups.

    (c)    <u>**Weekly Flash Reports**</u>: Debtors to provide BellSouth with weekly reports showing the Debtors' available, restricted and unrestricted cash, as the case may be.

    (d)    <u>**Pay Then Dispute:**</u>  Debtors to pay invoices prior to submitting disputes.

    (e)    <u>**Accelerated Payment and Default Terms**</u>:   14 day payment terms for the Debtors invoices and expedited payment default rights for BellSouth.

    (f)    <u>**Wire Transfers:**</u>  Debtors to make all payments to BellSouth by wire transfer.

    (g)    <u>**Additional Assurance**</u>:  Upon a change in circumstances, BellSouth reserves the right to seek such additional deposits or prepayments as circumstances may require

WHEREFORE, BellSouth respectfully requests that the Court: (i) overrule the Motion as to BellSouth; (ii) enter an order providing BellSouth with adequate assurance as set forth herein; and (iii) grant such other and further relief as is just.

Dated: March 3, 2005

Respectfully submitted,


/s/ Reginald A. Greene
Reginald A. Greene (RG 3566)
BellSouth
675 West Peachtree Street NE
Suite 4300
Atlanta, Georgia 30375
Telephone:  (404) 335-0761
Facsimile:  (404) 614-4054
Email:  Reginald.greene@bellsouth.com

Attorney for BellSouth Telecommunications, Inc.;
BellSouth Business Systems, Inc.; and BellSouth
Long Distance, Inc.