**Hearing Date and Time: March 9, 2005 at 10:00 a.m.**

Thomas R. Slome (TS-0957)
Jil-Mazer Marino (JM-6470)
SCARCELLA ROSEN & SLOME LLP
333 Earle Ovington Boulevard
Ninth Floor
Uniondale, New York 11553-3622
(516) 227-1600

    and

Russell R. Johnson III
3734 Byfield Place
Richmond, Virginia 23233
(804) 747-7208

Co-Counsel for American Electric Power; Duke Energy
Corporation, d/b/a Duke Power Company; Virginia
Electric and Power Company, d/b/a Dominion Virginia
Power and Dominion North Carolina Power; Florida
Power Corporation, d/b/a Progress Energy Florida;
Carolina Power & Light, d/b/a Progress Energy Carolinas;
Orlando Utilities Commission; and Tampa Electric Company

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— )
                             )
**In re:**                        ) **Chapter 11**
                             )
**WINN-DIXIE STORES, INC., <u>et al.</u>,** ) **Case No. 05-11063 (RDD)**
                             )
                **Debtors.** ) **(Jointly Administered)**
                             )
———————————————————————— )

**(I) OBJECTION OF CERTAIN UTILITY COMPANIES TO MOTION OF
DEBTORS FOR ORDER (A) DEEMING UTILITIES ADEQUATELY ASSURED OF
PAYMENT, (B) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR
DISCONTINUING SERVICES, AND (C) ESTABLISHING PROCEDURES FOR
RESOLVING REQUESTS FOR ADDITIONAL ASSURANCE, AND (II) MOTION OF
<u>UTILITY COMPANIES TO DETERMINE ADEQUATE ASSURANCE OF PAYMENT</u>**

1

American Electric Power ("AEP"); Duke Energy Corporation, d/b/a Duke Power Company ("Duke"); Virginia Electric and Power Company, d/b/a Dominion Virginia Power and Dominion North Carolina Power; Florida Power Corporation, d/b/a Progress Energy Florida ("Progress Energy Florida"); Carolina Power & Light, d/b/a Progress Energy Carolinas ("Progress Energy Carolinas"); Orlando Utilities Commission )("OUC"); and Tampa Electric Company ("Tampa") (collectively, the "Utilities"), by counsel, hereby (I) object to the Motion of Debtors for Order (A) Deeming Utilities Adequately Assured of Payment, (B) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services, and (II) move the Court to determine adequate assurance of payment to the Utilities pursuant to 11 U.S.C. Section 366(b). In support of this Objection and Motion, the Utilities set forth the following:

### Procedural Facts

1.      On February 21, 2005 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with this Court.  The Debtors continue to manage their properties and operate their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.  These cases are being jointly administered.

2.      Also on February 21, 2005, the Debtors filed a *Motion for Authorization Order (A) Deeming Utilities Adequately Assured of Payment, (B) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services, and (C) Establishing Procedures for Resolving Requests for Additional Assurance* (the "Utility Motion").  There was no objection deadline or hearing date set forth in the Utility Motion.

3.      The Utility Motion seeks entry of a proposed Interim Order and a proposed Final

2

Order (together, the "Proposed Orders") providing that the granting of administrative expense priority status, under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, of post-petition undisputed charges for utility service, without more, shall constitute adequate assurance of payment for post-petition utility services under section 366 of the Bankruptcy Code. Proposed Interim Order at 2-3; proposed Final Order at 2. The Proposed Orders also provide, in relevant part, as follows:

> ORDERED that this Order is without prejudice to the rights of any Utility Company to make a written (a "Request") to Debtors' counsel, King & Spalding LLP, 191 Peachtree Street, Atlanta, Georgia 30303, <u>Attn</u>: Brian C. Walsh for additional adequate assurance in the form of a deposit or other security from the Debtors, within thirty (30) days of the date hereof (the "Request Deadline"), provided that any Request must set forth the location(s) for which utility services are provided, the account number(s) for such location(s), the outstanding balance for each account, and a summary of the Debtors' payment history on each account; and it is further

> ORDERED that any Utility Company that fails to submit a timely Request in compliance with the preceding paragraph shall be deemed adequately assured of payment for post-petition services under Section 366 of the Bankruptcy code without the provision of a deposit or other security from the Debtors; and it is further

> *                          *                          *

> ORDERED that if a Utility Company makes a timely Request that the Debtors believe is unreasonable, and no consensual resolution of the Request is reached within sixty (60) days after the Debtors receive such Request, the Debtors shall file a motion for determination of adequate assurance of payment ("Motion for Determination") with respect to such Request. The Debtors shall seek a hearing on a Motion for Determination on the next available hearing date on or after twenty (20) days after the filing of the Motion for Determination, unless another hearing date is agreed to by the parties or ordered by the Court (the "Determination Hearing"); and it is further

3

ORDERED that if a Determination Hearing is scheduled in accordance with the preceding paragraph, the Utility Company involved shall be deemed to be adequately assured of payment under Section 366 of the Bankruptcy Code until and unless this Court orders otherwise in connection with such Determination Hearing…. (collectively, the "Determination Procedures")

Proposed Interim Order at pp. 3-4; proposed Final Order at 3-4.

4.      On February 22, 2005, the Debtors filed a *Notice Of Further Hearing On Certain First Day Applications And Motions* (the "First Notice").  In the First Notice, it provided that there would be a hearing on the Utility Motion on March 4, 2005 and that objections were due on March 3, 2005.  Presumably, the foregoing hearing was to concern the entry of the Interim Order. The Utilities did not receive the First Notice.

5.      On March 3, 2005, the Debtors filed a *Notice Of Continued Hearing On Certain First Day Applications And Motions* (the "Second Notice").  The Second Notice provides that the hearing on the Utility Motion has been rescheduled to March 9, 2005 at 10:00 a.m. and that the objection deadline remains unchanged.  It, however, is not clear if the Debtors are seeking the entry of the proposed Interim Order or the proposed Final Order attached to the Utility Motion.  The Utilities did not receive the Second Notice.

6.      The Utilities only recently learned of the Utility Motion, the First and the Second Notice from counsel who obtained them from PACER.  Accordingly, the Utilities are filing this Objection to the Utility Motion to oppose the entry of either the proposed Interim or Final Orders.

**<u>Facts Regarding The Debtors</u>**

7.      The Debtors are grocery and drug retailers operating in the southeastern United

4

States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  According to

published reports, the Debtors are the eighth-largest food retailer in the United States and one of

the largest in the Southeast.  Utility Motion at ¶ 5.

8.      The Debtors operate in a highly competitive supermarket industry that is

generally characterized by intense competition and narrow profit margins.  The Debtors compete

directly with national, regional, and local supermarket chains and independent supermarkets, as

well as with Wal-Mart, similar super centers, and other non-traditional grocery retailers such as

dollar discount stores, drug stores, convenience stores, warehouse club stores, and conventional

department stores.  Utility Motion at ¶ 7.

9.      As of the Petition Date, the Debtors owed approximately $427 million to its

prepetition secured lenders under a Second Amended and Restated Credit Agreement, dated June

19, 2004, with Wachovia Bank, N.A., as administrative agent (the "Prepetition Credit

Agreement").  Utility Motion at ¶ 10.

10.     The Debtors' average and peak borrowings under the Prepetition Credit

Agreement during the 16 weeks ended January 12, 2005 were $71.1 million and $179.0 million,

respectively.  As of January 12, 2005, the Debtors had letters of credit totaling $141.0 million

issued under the Prepetition Credit Agreement.  Form 10-Q for the quarterly period ended

January 12, 2005, at 10-11.

11.     Certain of the Debtors are parties to an Indenture with Wilmington Trust

Company, dated December 26, 2000 (as amended and supplemented, the "Indenture"), pursuant

to which the parent company, Winn-Dixie Stores, Inc. issued $300 million in principal amount of

Senior Notes bearing interest at 8.875% per annum, and certain other Debtors guaranteed the

Senior Notes.  The Senior Notes mature in 2008 and require semi-annual interest-only payments until maturity.  The Senior Notes are unsecured obligations that are *pari passu* with most of the Debtors' other unsecured obligations.  Utility Motion at ¶ 11.

12.     During the first two quarters of fiscal year 2005, the Debtors experienced a significant decline in liquidity.  The decline in liquidity was attributable primarily to the following two factors:  (1) beginning on September 22, 2004, the Debtors failed to meet an earnings before interest, taxes, depreciation and amortization ("EBITDA") test under the Prepetition Credit Agreement that reduced available borrowings under the Prepetition Credit Facility by $100 million; and (2) the Debtors had higher than desired inventory levels at the end of the second quarter and an $82.2 million decrease in accounts payable during the second quarter.  *Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 for Interim and Final Financing Orders (I) Authorizing Debtors to Obtain Post-Petition Financing and Utilize Cash Collateral, (II) Granting Adequate Protection to Pre-Petition Lenders, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "DIP Financing Motion"), at ¶ 9; Form 10-Q for quarterly period ended January 12, 2005, at 5.

13.     In January 2004, the Debtors announced a series of actions designed to improve their competitive position (the "Strategic Plan"), which included (a) a review of business strategies and marketing programs, (b) an expense reduction plan designed to achieve a $100 million annual expense reduction, (c) a market positioning review through which markets will be identified as either core, and positioned for future investments and growth, or non-core, and evaluated for sale or closure, (d) an image makeover program targeting approximately 700 stores

for facilities improvement, and (e) a process re-engineering initiative that is intended to enhance organizational effectiveness and company business initiatives.  As part of the Strategic Plan, the Debtors committed to focus on a core base of stores across 36 designated marketing areas in the United States.  The Debtors decided to exit 156 stores, exit three distribution centers, sell or close four manufacturing plants, and consolidate two dairy operations.  Of these facilities, the Debtors exited 135 stores, three distribution centers, and three manufacturing plants between April 2004 and the Petition Date.  Despite the implementation of the Strategic Plan, during the remainder or 2004, the Debtors continued to experience significant sales declines and market-share losses.  Utility Motion at ¶¶ 13-15.

14.    The Debtors sales for the 2004 holiday season were lower than expected (i.e., approximately 8% lower than the corresponding period in the prior year), leading to higher-than-anticipated inventory levels and lower-than-anticipated accounts payable, resulting in increased borrowings under the Prepetition Credit Agreement and reduced liquidity.  Utility Motion at ¶ 16; Form 10-Q for the quarterly period ending January 12, 2005, at 27.

15.    The Debtors' liquidity is dependent upon the continuation of existing bank and vendor financing.  A substantial restriction in or tightening of vendor credit terms or the continuation of the level of operating losses experienced in the second quarter of fiscal year 2005 could leave the Debtors with insufficient liquidity to operate its business.  Form 10-Q for the quarterly period ended January 12, 2005, at 6.

16.    During their first and second fiscal quarters ending on January 12, 2005, the Debtors incurred losses in the amount of $552.8 million, or $3.93 per share or common stock.

For their second fiscal quarter, identical-store sales declined by 4.9% as compared to the second quarter of the prior year.  Utility Motion at ¶ 17.  The decline was due primarily to a decline in customer count (measured by the number of in-store sales transactions), which in turn attributable primarily to competitive factors that have impacted the Debtors' sales over the last several quarters, most notably competitor store openings in the Debtors' operating areas (which in the second quarter increased from levels in recent prior quarters), conditions in the Debtors' stores and competitor pricing and promotional activity.  Form 10-Q for the quarterly period ending January 12, 2005, at 27.

17.     For the quarterly period ended September 22, 2004, the Debtors reported a net loss of $153.1 million, or $1.09 per share of common stock.  During the quarterly period ended a year earlier on September 17, 2003, the Debtors reported net earnings of $1.2 million, or $.01 per share of common stock.  Condensed Consolidated Statements of Operations (Unaudited) set forth in the Debtors Form 10-Q/A Amendment No. 1 for the quarterly period ended September 22, 2004.

18.     According to the Debtors, based on their knowledge of competitor activity in the Debtors' trade areas, the Debtors anticipate that identical store sales will continue to be negatively impacted by competitor store openings.  In addition, the Debtors' total sales growth will continue to be negatively impacted by the Debtors' lack of projected company store openings and remodelings.  Form 10-Q for the quarterly period ending January 12, 2005, at 29.

19.     The Debtors' financial results and decrease in liquidity, coupled with downgrades by Moody's Investor Services and Standard & Poor's Rating Services, as well as negative press

coverage, led a number of the Debtors' trade creditors to demand shorter payment terms.  Since

the announcement of the Debtors' financial results on February 10, 2005, the Debtors have

experienced a reduction in vendor and other credit by more than $130 million.  Utility Motion at

¶ 18.

20.    For the thirty-day period following the Petition Date, the Debtors project a net

cash loss of approximately $20 million.  Schedule 11 to *Declaration of Bennett L. Nussbaum*

*Pursuant to Local Bankruptcy Rule 1007-2 in Support of First-Day Motions and Applications*

(the "Declaration").

21.    The Debtors do not have any currently available sources of funds other than the

Cash Collateral (defined below) and the proposed post-petition financing (the "DIP Financing")

to carry on the operation of their business.  The Debtors' ability to maintain business

relationships with their vendors and suppliers, to purchase new inventory, and otherwise to

finance their operations is dependent on their ability to use cash collateral and obtain the funds

made available under the DIP Financing.  Any potential disruption of the Debtors' operations

would be devastating at this critical juncture.  The Debtors have determined, in the exercise of

their business judgment, that a post-petition credit facility which permits the Debtors to obtain

up to $800 million in financing, and to use such credit to finance the operation of their

businesses, is critical to their ongoing operations.  DIP Financing Motion, at ¶¶ 27 and 28.

### Debtor-In-Possession Financing

22.    According to the Debtors, "[t]he Debtors' ability to refinance their Pre-Petition

Obligations and full working capital needs can be satisfied only if the Debtors are authorized to

borrow up to $800 million under the [DIP Credit Facility] and to use such proceeds to fund the

operations of the Debtors."  DIP Financing Motion, at ¶ 32.

23.     The Debtors filed their DIP Financing Motion, seeking approval of a debtor-in-possession credit facility in the aggregate principal amount of up to $800 million (subject to a borrowing base and certain reserves) from Wachovia Bank National Association, as Administrative Agent (the "DIP Credit Facility").   On February 22, 2005, the Court entered an *Emergency Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Granting Adequate Protection Pursuant to 11 U.S.C. § 361 and 363* (the "Emergency Cash Collateral Order"), which authorized the Debtors' use of cash collateral securing the prepetition lenders' secured debt ("Cash Collateral") on an emergency basis for the period from the Petition Date through 5:00 p.m. e.s.t. on February 23, 2005, in an aggregate amount not to exceed $100 million.  Then, on February 23, 2005, the Court entered an interim order approving the DIP Credit Facility (the "Interim DIP Financing Order").  A final hearing on the DIP Financing Motion is scheduled for March 15, 2005.

24.     The DIP Credit Facility provides the Debtors with revolving credit of up to $800 million in the aggregate, including any amounts outstanding under the letter of credit facility issued by Wachovia Bank, N.A., which may not exceed $300 million, from a group of lenders led by Wachovia Bank, N.A., as Administrative Agent and Collateral Agent (collectively, the "DIP Lenders").  DIP Financing Motion, at ¶ 31(c).  Pursuant to the terms of the DIP Credit Facility, a portion of the proceeds of the loans made under the DIP Credit Facility are to be used to repay the Debtors' prepetition secured indebtedness in full.  DIP Financing Motion at ¶ 31(f).

25.     Availability of credit under the DIP Credit Facility is further limited by (1) a borrowing base formula, which is based in part on the Debtors' economic performance, and (2)

certain availability reserves, including a $12 million reserve for the Professional Fee Carve-Out and reserves for certain other Carve-Outs.  DIP Financing Motion, at ¶ 31(d); Interim DIP Financing Order at ¶ 9(a), 15(c).

26.     The DIP Credit Facility provides for a carve-out from superpriority claim status and liens granted under the DIP Credit Facility in the aggregate amount of $12 million for payment of (i) fees and expenses of the Clerk of this Court and the Office of the United States Trustee, (ii) allowed reasonable fees and expenses of any Chapter 7 Trustee appointed for any Debtor's Chapter 7 case, up to $50,000 in the aggregate for purposes of constituting a part of the Carve Out Expenses, and (iii) on and after the Default Point, the allowed unpaid and outstanding reasonable fees and expenses approved by order of this Court by professionals retained under Sections 327 or 1103(a) of the Bankruptcy code by the Debtors and the Committee.  DIP Financing Motion, at ¶ 31(n).

27.     The DIP Credit Facility also provides for a carve-out from superpriority claim status of up to $1 million for professional fees and expenses incurred by or on behalf of the Debtors' prepetition lender in connection with any pending or threatened action against the prepetition lender.  DIP Financing Motion, at ¶ 31(k).

28.     In addition, the DIP Lenders may from time to time establish additional reserves that would further reduce available borrowings under the DIP Credit Facility to reflect, among other things, events, conditions, contingencies or risks which the agent in good faith determines may adversely affect (i) the eligible Borrowing Base Assets or any other property which is security for the Obligations or its value, (ii) the assets, business, financial condition or prospects of any Borrower or Obligor, or (iii) the security interests and other rights of the Agent or any

11

Lender in the Eligible Borrowing Base Assets or any other property which is security for the

Obligations.  DIP Credit Agreement, § 1.1 ("Reserves"), at 31-32.

29.     Events of Default under the DIP Credit Facility include the following:

(1) the failure of the Debtors to perform in any material respect any of its obligations pursuant to the Interim Order;

(2) the occurrence of any Event of Default under the [DIP] Credit Agreement or the other Loan Documents, including failure of the Debtors to satisfy their obligations to pay principal or interest on any Loan, any breach of warranty made under the Loan Documents, non-performance of certain covenants and obligations, the occurrence of a Change in Control, a default on certain other Indebtedness…;

(3) conversion of any of the Debtors' Chapter 11 case to a case under chapter 7 of the Bankruptcy Code;

(4) the appointment of a trustee in the Debtors' Chapter 11 cases;

(5) the appointment of any examiner with expanded powers in the Debtors' Chapter 11 cases; and

(6) the failure of Debtors to remain current in payment of any material amount of post-petition administrative obligations, except for amounts the validity of which are being contested in good faith by Debtors;

(7) any Material Adverse Effect shall occur as determined by the Agent and the Required Lenders in good faith.

DIP Financing Motion, at ¶ 31(q); DIP Credit Agreement, §8.1.12, at 100.

30.     Under the terms of the DIP Credit Facility and the Interim DIP Financing Order,

upon the occurrence of any Event of Default, the DIP Lenders are entitled to automatic relief

from the automatic stay, upon as early as five business days' written notice to the Court, counsel

to the Debtors, counsel to the Official Committee of Unsecured Creditors, any trustee of the

Debtors, and the United States Trustee, to exercise all remedies permitted under the DIP Credit

Facility loan documents and applicable law.  In addition, upon the occurrence of any Event of

12

Default, the Lenders shall have no further commitment to extend credit under the DIP Credit

Facility.  DIP Financing Motion, at ¶ 31(q); Interim DIP Financing Order, at ¶ 18.

## Facts Regarding the Utilities

31.    Each of the Utilities provided the Debtors with prepetition utility service and

currently provides the Debtors with post-petition utility service.

32.    The billing cycle for each of the Utilities is governed by applicable state laws and

regulations and/or the Utilities' applicable tariffs.  In general, with respect to each of the

Utilities, a customer receives approximately one month of utility service before a bill is issued.

The customer then has between 15 and 30 days from the bill date to pay each bill.  If the bill is

not paid within that time frame, a late fee may be assessed on the customer's account at the next

month's billing and a late notice is issued giving the customer a certain amount of time to cure

the default before service may be terminated.  If payment is still not made within the applicable

cure period, the Utility may terminate the customer's service.  Thus, under the billing cycle for

each Utility, a customer may receive two to three months of unpaid utility service before service

may be terminated for non-payment.

### AEP

33.    AEP maintained eleven (11) prepetition accounts with the Debtors.

34.    As of the Petition Date, the Debtors were indebted to AEP in the sum of

approximately $28,539.51 for utility service provided to the Debtors' eleven accounts.

35.    AEP requests adequate assurance in the form of a two-month deposit in the total

sum of $66,186.00, as set forth in more detail in the chart attached hereto as Exhibit A.

### Duke

13

36.     The Debtors maintained eighty-nine (89) prepetition accounts with the Debtors.

37.     Duke requests adequate assurance in the form of a two-month deposit in the total sum of $1,362,925.00, as set forth in more detail in the chart attached hereto as Exhibit B.

**Dominion Virginia Power**

38.     Dominion Virginia Power maintained twenty-two (22) prepetition accounts with the Debtors.

39.     As of the Petition Date, the Debtors were indebted to Dominion Virginia Power in the sum of approximately $115,470.00 (before recoupment of its prepetition deposit) for utility service provided to the Debtors' twenty-two accounts.

40.     Dominion Virginia Power maintained a deposit on the Debtors' prepetition accounts in the aggregate amount of $326,447.00.

41.     Dominion Virginia Power requests adequate assurance in the form of a two-month deposit in the total sum of $328,291.00, which deposit could be partially satisfied by permitting Dominion Virginia Power to transfer the credit (currently estimated to be $210,977.00) resulting after recoupment of its prepetition deposit against the outstanding prepetition debt.  A chart showing the prepetition debt amount, prepetition deposit held, and post-petition deposit request, on an account-by-account basis, is attached hereto as Exhibit C.

**Dominion North Carolina Power**

42.     Dominion North Carolina Power maintained three (3) prepetition accounts with the Debtors.

43.     As of the Petition Date, the Debtors were indebted to Dominion North Carolina Power in the sum of approximately $18,172.00 (before recoupment of its prepetition deposit) for

14

utility service provided to the Debtors' three accounts.

44.     Dominion North Carolina Power maintained a deposit on the Debtors' prepetition accounts in the aggregate amount of $45,207.00.

45.     Dominion North Carolina Power requests adequate assurance in the form of a two-month deposit in the total sum of $44,876.00, which deposit could be partially satisfied by permitting Dominion North Carolina Power to transfer the credit (currently estimated to be $27,035.00) resulting after recoupment of its prepetition deposit against the outstanding prepetition debt.  A chart showing the prepetition debt amount, prepetition deposit held, and post-petition deposit request, on an account-by-account basis, is attached hereto as Exhibit C.

### Progress Energy Carolinas

46.     Progress Energy Carolinas maintained 28 prepetition accounts with the Debtors. As a result of the recent lease rejections, Progress Energy Carolinas only maintains 26 post-petition accounts with the Debtors.

47.     After recouping the $496,012 in prepetition deposits that Progress Energy Carolina maintained on the prepetition accounts against the prepetition amounts owed by the Debtors on those accounts, Progress Energy Carolinas has a credit remaining on the prepetition accounts in the amount of $244,115.04.

48.     Progress Energy Carolinas requests adequate assurance in the form of a two-month deposit in the total sum of $548,069, which deposit could be partially satisfied by permitting Progress Energy Carolinas to transfer the credit (currently estimated to be $244,115.04) resulting after recoupment of its prepetition deposit against the outstanding prepetition debt.

**Progress Energy Florida**

49.     Progress Energy Florida maintained 104 prepetition accounts with the Debtors.

50.     Progress Energy Florida is currently determining the amount of its prepetition debt for utility service provided to the Debtors' 104 accounts.  Progress Energy Florida maintained a $2,912,585.00 deposit on the foregoing prepetition accounts.

51.     Progress Energy Florida requests adequate assurance in the form of a two-month deposit, which Progress Energy Florida is still in the process of calculating.

## OUC

52.     OUC maintained sixteen (16) prepetition accounts with the Debtors.

53.     As of the Petition Date, the Debtors were indebted to OUC in the sum of approximately $350,000.00 for utility service provided to the Debtors' sixteen accounts.

54.     OUC maintained a $5,000 surety bond on one account and a $32,500 letter of credit on two other stores.

55.     OUC requests adequate assurance in the form of a two-month deposit in the total sum of $400,000.00.

## TAMPA

56.     Tampa maintained thirty (30) prepetition accounts with the Debtors.

57.     Tampa has not obtained a final figure for the amount of the prepetition amounts owed by the Debtors to Tampa.  Tampa, however, believes that the prepetition debt will be less than the $1,033,000 surety bond that Tampa maintained on the prepetition accounts.

58.     Tampa requests adequate assurance in the form of a two-month deposit in the total sum of $1,102,000.00.

16

**Discussion**

I.    **THE COURT SHOULD DETERMINE ADEQUATE ASSURANCE OF PAYMENT AS TO THE UTILITIES AND ANY OTHER OBJECTING UTILITIES AT THE MARCH 9, 2005 HEARING OR AT SOME DATE SHORTLY THEREAFTER INSTEAD OF DELAYING AN ACTUAL DETERMINATION OF ADEQUATE ASSURANCE AND REQUIRING THE UTILITIES TO GO THROUGH THE DEBTORS' PROPOSED PROCEDURES.**

Bankruptcy Code Section 366(b) provides as follows:

> (b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.  On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

11 U.S.C. § 366(b) (emphasis added).  Thus, the statute expressly provides that the Debtors have 20 days from the order for relief to provide the Utilities with adequate assurance of payment.  In this case, the Debtors proposed "offer" of adequate assurance is not acceptable to the Utilities.  Although the Utilities have not had time to discuss their requests for adequate assurance of payment with the Debtors, they presume that the Debtors would object to their requests based on the relief sought in the Utility Motion.  Accordingly, since the parties cannot agree on the form of adequate assurance of payment, the Court should make the initial determination of what the Debtors should provide the Utilities to serve as adequate assurance of payment instead of implementing procedures that would delay an actual determination for several months.

II.    **THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE UTILITIES WITH ADEQUATE ASSURANCE OF PAYMENT IN THE FORM OF POST-PETITION DEPOSITS OR ADVANCE PAYMENTS.**

Section 366(b) of the Bankruptcy Code provides:

Such utility may alter, refuse, or discontinue service if neither the trustee nor the

17

debtor, within 20 days after the date of the order for relief, furnishes adequate
assurance of payment, in the form of a deposit or other security, for service after
such date.  On request of a party in interest and after notice and a hearing, the
court may order reasonable modification of the amount of the deposit or other
security necessary to provide adequate assurance of payment.

A determination of adequate assurance is within the court's discretion, and is made on a

case-by-case basis. In re Utica Floor Maintenance, Inc., 25 B.R. 1010, 1016 (Bankr. N.D.N.Y.

1982); In re Cunha, 1 B.R. 330, 332-33 (Bankr. E.D. Va. 1979).  The Utilities acknowledge that

the Second Circuit Court of Appeals' decision in Virginia Electric And Power Company v.

Caldor, Inc., 117 F.3d 646 (2d Cir. 1997) is controlling authority in this Circuit.  The Court in

Caldor, however, merely held that a court is afforded reasonable discretion in determining what

constitutes adequate assurance of payment in each case and that, in certain exceptional cases,

adequate assurance of payment may not require anything more than the protections already

afforded the utilities under the Bankruptcy Code.  This case, however, does not present the

"exceptional" set of circumstances that was presented at the early stages of the Caldor

bankruptcy case.  To the contrary, under the totality of circumstances test that Caldor establishes,

the Utilities should be provided with post-petition deposits or some form of advance payments to

protect the Utilities from an unreasonable risk of nonpayment of post-petition invoices.

In this case, the factors that weigh in favor of requiring the Debtors to provide the

Utilities with post-petition deposits or advance payments are:

1.      The Debtors prepetition attempts to improve their liquidity were unsuccessful;

2.      The Debtors continued to lose customers and money despite their previous

attempts to reorganize;

3.      The Debtors are in a competitive industry that includes competitors, such as Wal

18

Mart, which reduces their chances of significantly improving their liquidity position.  In fact, the Debtors acknowledge in their pleadings with this Court that they expect their sales to continue to decrease because of competition;

4.    The Debtors acknowledge that their liquidity, in part, is dependent upon vendor financing and extended credit terms from the vendors.  There is no evidence that the Debtors have or will receive vendor financing or more favorable credit terms from their vendors;

5.    The Debtors have incurred substantial losses and project that they will continue to lose money post-petition; and

6.    There is no guarantee that the Debtors will receive the post-petition financing they are seeking.  Moreover, even if the Debtors obtain the post-petition financing they are seeking, it is substantially limited through the repayment of the prepetition secured debt, various carve outs and further reductions that the lender can impose based on the Debtors' post-petition performance.   Furthermore, there are a substantial number of default provisions that could result in the Debtors losing the financing that they claim to need to continue their operations.

In addition, there is a substantial carve-out in the DIP Financing Order to ensure payment of the post-petition bills of Debtors' counsel and other professionals retained by the Debtors.  If Debtors' counsel, who has access to inside information of the Debtors, believes it is necessary to secure their post-petition fees and those of other professionals, then it is clear that the Utilities, which do not possess such information, should be entitled to security for providing the Debtors with essential post-petition services.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to

ensure for itself and its rate payers that it receives payment for providing these essential services. See In re Hanratty, 907 F.2d 1418, 1424 (3d Cir. 1990). The balance is struck, with respect to a debtor, by not allowing the utility to require the debtor to pay prepetition invoices or exorbitant deposits[1] in exchange for providing a debtor with an essential service. In consideration for negating the utility's bargaining power, Section 366 provides that utilities are to receive "adequate assurance of payment, in the form of a deposit or other security" from the debtor for having to assume the risk of providing the debtor with post-petition service.

The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." In re Coastal Dry Dock & Repair Corp., 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." In re Begley, 760 F.2d 46, 49 (3d Cir. 1985). Based on the Debtors' anticipated utility consumption in this case, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of bills is 2 to 3 months. Accordingly, the two-month security deposits requested by the Utilities are reasonable. Stagecoach, 1 B.R. at 735-36 (two-month deposit is appropriate where the debtor could receive 60 days of service before termination of services because of the utilities' billing cycle); see also In the Matter of Robmac, Inc., 8 B.R. 1, 3-4 (Bankr. N.D. Ga. 1979).

Finally, several of the Utilities maintained prepetition security on the Debtors' utility accounts. Thus, it is only fair that, having acted to protect their rights prepetition, those Utilities

---

[1]The Utilities are state-regulated entities that can only request a deposit or other security that is permitted by applicable tariffs. Accordingly, the deposits or other security requests made by the Utilities cannot and do not exceed the amount of security they are permitted to request under their tariffs.

be permitted to maintain the status quo by obtaining similar security on the Debtors' post-

petition accounts.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

(I)      Awarding the Utilities the post-petition security they have requested from the

Debtors herein; and

(II)     awarding such other and further relief as the Court deems just and appropriate.

Dated:  Uniondale, New York
        March 4, 2005

SCARCELLA ROSEN & SLOME LLP

By: /s/ Thomas R. Slome
        Thomas R. Slome (TS-0957)
        Jil-Mazer Marino (JM-6470)

333 Earle Ovington Boulevard
Ninth Floor
Uniondale, New York 11553-3622
(516) 227-1600

        and

Russell R. Johnson III
3734 Byfield Place
Richmond, Virginia 23233
(804) 747-7208

Co-Counsel for American Electric Power; Duke
Energy Corporation, d/b/a Duke Power Company;
Virginia Electric and Power Company, d/b/a
Dominion Virginia Power and Dominion North
Carolina Power; Florida Power Corporation, d/b/a
Progress Energy Florida; Carolina Power & Light,
d/b/a Progress Energy Carolinas; Orlando Utilities
Commission; and Tampa Electric Company