**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Hearing Date:  March 18, 2005
Hearing Time:  10:00 a.m.

-----------------------------------------------------------x

In re                                                    :

                                                         :     Chapter 11

                                                         :

WINN-DIXIE STORES, INC., et al.,                         :     Case No. 05-11063 (RDD)

                                                         :

          Debtors.                                       :     (Jointly Administered)

                                                         :

-----------------------------------------------------------x


# REPLY MEMORANDUM OF LAW
## OF WACHOVIA BANK, NATIONAL ASSOCIATION
## IN FURTHER SUPPORT OF DEBTORS' MOTION
## TO OBTAIN POST-PETITION FINANCING


Of Counsel:

    Jonathan N. Helfat
    Richard G. Haddad
    Daniel F. Fiorillo


OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
Attorneys for Wachovia Bank, National Association
230 Park Avenue
New York, New York 10169
(212) 661-9100

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................................1

POINT I        THE LANDLORD OBJECTIONS SHOULD BE OVERRULED
               BECAUSE (A) SECURITY INTERESTS IN LEASEHOLDS
               ARE PERMISSIBLE, (B) A LIEN DOES NOT DEPRIVE
               THE LANDLORDS OF THEIR RIGHTS UNDER
               SECTION 365, AND (C) THE DIP LENDERS WILL PAY
               FOR ANY ACTUAL USE OF THE PREMISES BY THE
               DIP LENDERS POST-DEFAULT ................................................................5

        A.     Section 365(d) of the Bankruptcy Code Permits the Granting of
               Security Interests in the Debtors' Leases Notwithstanding
               That a Lease Purports to Prohibit the Grant of
               Security Interests Therein .........................................................................5

        B.     A Lien on the Leases Would Not Eliminate the Protections
               Given to Landlords Under the Bankruptcy Code or
               Otherwise ...................................................................................................8

        C.     The Relief Requested in the DIP Motion Would Not
               Otherwise Violate Section 365 of the Bankruptcy Code .........................9

POINT II       THE RECLAMATION OBJECTIONS ARE WITHOUT MERIT
               BECAUSE, AS A MATTER OF LAW, SUCH CLAIMS ARE
               VALUELESS AND NOT ENTITLED TO ANY SPECIAL
               PROTECTION ..........................................................................................10

POINT III      THE PACA OBJECTIONS SHOULD BE OVERRULED ...................17

CONCLUSION .........................................................................................................................20

## TABLE OF AUTHORITIES

Page

<u>Cases</u>

<u>In re Ames Department Stores, Inc.</u>, Case No. 01-42217...................................................7

<u>In re Arlco, Inc.</u>, 239 B.R. 261 (Bankr. S.D.N.Y. 1999) ...............................................14

<u>In re Bradlees Stores, Inc.</u>, 2001 U.S. Dist LEXIS 14755
    (S.D.N.Y. 2001) ............................................................................................................9

<u>In re Dairy Mart</u>, 302 B.R. 128 (Bankr. S.D.N.Y. 2003)..................3, 4, 11, 12, 13, 14, 15, 16

<u>In re I&M Acquisition Corp.</u>, 1995 U.S. Dist. LEXIS 15089
    (S.D.N.Y. 1995) ......................................................................................................3, 5, 6

<u>In re Jamesway</u>, 201 B.R. 73 (Bankr. S.D.N.Y. 1996) .............................................5, 7

<u>JSG Trading Corp. v. Tray-Wrap, Inc.</u>, 917 F.2d 75 (2d Cir. 1990) ......................18, 19

<u>In re Kaiser Aluminum Chemical Corp.</u>, Case No. 02-10429
    (Bankr. Del. Feb 10, 2005)..........................................................................................7

<u>In re Pester Refining Co.</u>, 964 F.2d 842 (8th Cir. 1992)....................................13, 14

<u>In re Phar-Mor, Inc.</u>, 301 B.R. 482 (Bankr. N.D. Ohio 2003)................................16, 17

<u>In re Pittsburgh-Canfield Corp.</u>, 309 B.R. 277 (6th Cir. B.A.P. 2004) ..................17, 18

<u>In re Rickel Home Centers, Inc.</u>, 240 B.R. 826 (D. Del. 1998),
    aff'd, 209 F.3d 291 (3d Cir. 2000).............................................................................7

<u>In re Solutia Inc.</u>, Case No. 03-17949 ............................................................................7

<u>In re U.L. Radio Corp.</u>, 19 B.R. 537 (Bankr. S.D.N.Y. 1982)..................................7, 8

<u>In re Victory Markets Inc.</u>, 212 B.R. 738 (Bankr. N.D.N.Y. 1997) ........................13, 14

<u>Statues and Codes</u>

7 U.S.C. § 499 (PACA) .......................................................................................4, 18, 19

11 U.S.C. § 363...............................................................................................................10

11 U.S.C. § 365.....................................................................................................2, 6, 7, 9

11 U.S.C. § 546....................................................................................................12, 13, 14

NY U.C.C. § 2-702 ................................................................................................13, 14, 15, 16

<u>Other Authority</u>

H.R. Rep. No. 543, 98th Cong., Sess., <u>reprinted in</u> 1984 U.S. Code Cong.
  & Admin. News 405, Legislative History of <u>JSG Trading Corp. v.
  Tray-Wrap, Inc.</u>, 917 F.2d 75 (2d Cir. 1990) ............................................................18

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re                                              :

                                                   :        Chapter 11

                                                   :

WINN-DIXIE STORES, INC., et al.,                   :        Case No. 05-11063 (RDD)

                                                   :

          Debtors.                                 :        (Jointly Administered)

                                                   :

-------------------------------------------------------------x

## REPLY MEMORANDUM OF LAW
## OF WACHOVIA BANK, NATIONAL ASSOCIATION
## IN FURTHER SUPPORT OF DEBTORS' MOTION
## TO OBTAIN POST-PETITION FINANCING

Wachovia Bank, National Association ("Wachovia"), by its attorneys, Otterbourg, Steindler, Houston & Rosen, P.C., respectfully submits this Reply Memorandum of Law to the various objections filed in response to the Debtors' Emergency Motion for Interim and Final Financing Orders Authorizing, Among Other Things, Debtors to Obtain Post-Petition Financing and Utilize Cash Collateral (the "DIP Motion"), which seeks, inter alia, authority to obtain post-petition financing from Wachovia Bank, National Association, as administrative and collateral agent (in such capacities, the "Post-Petition Agent") for itself and the other financial institutions from time to time party to the post petition credit agreement (collectively, the "Post-Petition Lenders" and together with Post-Petition Agent, the "DIP Lenders").

## PRELIMINARY STATEMENT

On February 23, 2005, the Court granted the DIP Motion on an interim basis, authorizing the Debtors, among other things, to repay the outstanding balance of their $600 million pre-petition credit facility and to obtain financing on more favorable terms from the DIP

Lenders' $800 million credit facility. On Friday afternoon, March 11, 2005, sixteen objections[1] were filed to the entry of an order approving the DIP Motion on a final basis. The objectors can be grouped into three groups: (1) landlords; (2) putative reclamation claimants; and (3) PACA claimants.

Certain of the Debtors' landlords (the "Landlords") object to final approval of the DIP Motion primarily because they assert (i) the DIP Motion seeks to grant security interests in certain leases notwithstanding that these leases purportedly prohibit the grant of security interests therein; (ii) a direct lien on the leases would eliminate the protections given to shopping center landlords under Section 365(b)(3) of the Bankruptcy Code, and would otherwise violate the requirements of Section 365 because the lien grant is a *de facto* assignment of the underlying lease; and (iii) the lender occupancy and liquidation rights contemplated in the DIP Motion and proposed form of final financing order are somehow impermissible under Section 365 of the Bankruptcy Code. For the reasons set forth below, each of the Landlord's objections should be overruled.

Notably, $100 million of the $800 million line of credit is exclusively based on obtaining control of the Debtors' real property leasehold interests. As a condition to obtaining this much-needed increase to its credit facility, the Debtors are required to grant to the DIP Lenders liens and security interest in, among other things, all of their real property leasehold interests and all of their rights relating thereto, and to also provide the DIP Lenders with the right to consent to (pre-default) or to direct (post-default) the Debtors' assumption, assignment or rejection of their real property leases. Any objection based upon a claim that any of the Debtors' real property leases restrict the granting of liens in favor of the DIP Lenders should be rejected

---

[1]      Joinders to certain of these objections were filed after Friday, March 11, 2005 (the objection deadline to the DIP Motion).

because any such restriction is contrary to the provisions of the Bankruptcy Code and inconsistent with case law in this District. Moreover, in In re I&M Acquisition Corp., 1995 U.S. Dist. LEXIS 15089 (S.D.N.Y. 1995), the Court held that granting the DIP Lenders a lien in the Debtors' leasehold interests does not constitute a *de facto* assignment of the underlying leases in violation of the landlord's rights.

Contrary to the assertions of certain objecting Landlords, the DIP Lenders are not seeking, through the lien grant in the Debtors' real property leasehold interests, any rights greater than the Debtors' rights in such leases. The DIP Lenders are merely seeking to have a lien and enforcement rights in all of the same rights and interests that the Debtors have in respect of such leases. By granting the DIP Lenders liens and enforcement rights, the Landlords are not being stripped of their rights under their leases, except to the extent the Bankruptcy Code and applicable law limit such rights. In addition, the collateral access rights granted to the DIP Lenders do not prejudice the rights of the Landlord because the proposed financing order expressly provides that the DIP Lenders shall pay the costs or expenses provided for in the leases for the period of time that the DIP Lenders actually occupy or use the premises.

The reclamation claimants make various objections to the relief requested in the DIP Motion including: (i) a request for adequate protection of reclamation claimants' interests in property of the Debtors; (ii) a request for a "carve-out" for reclamation claims; and (iii) a request for segregation of the proceeds of sold goods subject to reclamation claims. Most of the objecting reclamation claimants, however, share a common, overriding theme in their opposition to the DIP Motion: namely, that the pre-petition lenders' floating lien and the DIP Lenders' post-petition floating liens on all of the Debtors' inventory subject to the reclamation demands do not render the reclamation creditors' claims "valueless." However, just as in In re Dairy Mart, 302 B.R. 128 (Bankr. S.D.N.Y. 2003), the reclamation claims here are, in fact, valueless and should

be relegated to general unsecured claim status. However, in any event, there is no valid basis raised by the reclamation objections to deny approval of the DIP Motion.

Dairy Mart holds that a reclamation claim is not enhanced upon the filing of a bankruptcy, and such claims are not entitled to an administrative claim or lien when the reclamation claim is subject to the rights of a secured creditor with a floating lien, as in this case. The reclamation creditors' attempt to enhance the status of their valueless reclamation claims is in direct contravention of the Dairy Mart holding and other persuasive authority set forth below at Point II.

Even if this Court were persuaded to find that the reclamation claims have value, notwithstanding that applicable law mandates otherwise, any remedy that this Court would ultimately grant any such reclamation creditors would be junior and subordinate in all respects to the senior secured, super-priority administrative expense claims of the DIP Lenders because no provision of the Bankruptcy Code, applicable case law or state law affords any reclamation creditor with a super-priority administrative expense claim or senior lien.

The PACA claimants contend that the proposed DIP order fails to provide adequate protection for their unpaid pre-petition interests that are allegedly protected under the Perishable Agricultural Commodities Act, as amended, 7 U.S.C. §499a et seq. ("PACA"). As a result, the PACA claimants object to the proposed DIP order to the extent that it does not grant the PACA claimants senior replacement liens or establish a trust fund equal to $30,000,000 (the total amount of the alleged pre-petition trust claims under PACA). As discussed in more detail below, the relief requested by the PACA claimants is premature at best and is not supported by any facts before this Court. As the law in this Circuit provides, cause for the segregation of PACA trust assets is established only upon a showing of dissipation of assets. While there is no

- 4 -

question that valid PACA claims have superior rights, the PACA claimants have not met their burden of proof of dissipation, so their request that this Court burden the Debtors' estate with an unnecessary and costly protection in favor of this exclusive group of creditors should be denied.

## POINT I

### THE LANDLORD OBJECTIONS SHOULD BE OVERRULED BECAUSE (A) SECURITY INTERESTS IN LEASEHOLDS ARE PERMISSIBLE, (B) A LIEN DOES NOT DEPRIVE THE LANDLORDS OF THEIR RIGHTS UNDER SECTION 365, AND (C) THE DIP LENDERS WILL PAY FOR ANY ACTUAL USE OF THE PREMISES BY THE DIP LENDERS POST-DEFAULT

A.  Section 365(d) of the Bankruptcy Code Permits the Granting of Security Interests in the Debtors' Leases Notwithstanding That a Lease Purports to Prohibit the Grant of Security Interests Therein

Contrary to the Landlords' unsupported arguments, the grant of a security interest in the Debtors' leases is permissible and entirely consistent with the law in this District even if the underlying leases contain anti-lien granting provisions. The United States District Court for the Southern District of New York has explicitly held that a lease provision granting a landlord the right to withhold consent to encumbrance is unenforceable under Sections 365(f)(1) and (3) of the Bankruptcy Code. In re I&M Acquisition Corp., 1995 U.S. Dist. LEXIS 15089 (S.D.N.Y. 1995). See also In re Jamesway, 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996) (11 U.S.C. § 365(f)(1) "permits assignment of an unexpired lease despite a clause in the lease prohibiting, conditioning, or restricting the assignment").

In I&M Acquisition Corp, the landlord owned property leased to the debtor's parent company pursuant to a written lease agreement. The debtor operated one of several restaurants on the property, and, during its bankruptcy, the debtor's parent company renegotiated and assumed the lease, pursuant to which, among other things, the landlord agreed to reduce the rent. Thereafter, the debtor pledged all of its interests in the leases as security for a note tendered

under its plan of reorganization.  Notwithstanding the Bankruptcy Court order granting the debtor's secured lender liens on the leases, the landlord contended that the collateral assignment violated the terms of the lease, giving the landlord the right to declare the lease in default unless the debtor agreed to pay increased rent in accordance with the lease terms.  The landlord sued the debtor in state court to enforce the default.  The debtor commenced an adversary proceeding in the Bankruptcy Court and moved to enjoin the landlord from enforcing the default in state court and to ascertain the rights and duties of the parties under the lease. The Bankruptcy Court granted the debtor's motion for summary judgment and the District Court affirmed.

In its decision, the District Court first determined that the Bankruptcy Court was correct in finding that the provisions in the lease giving the landlord the right to withhold consent to the debtor/lessee's grant of a lien on its leasehold interest was "unenforceable under Sections 365(f)(1) and (3) of the Bankruptcy Code".  I&M Acquisition at *10.  This determination is entirely consistent with the relief requested here by the Debtors in the DIP Motion, and the District Court opinion in I&M Acquisition validates this Court's authority to permit the Debtors to grant liens on their leases notwithstanding any restrictive or prohibitive provisions allegedly contained in the leases.

The Court in I&M Acquisition also found that the debtor's grant of a lien in its leasehold interest did not constitute an improper assignment of the lease to the secured creditor. The Court rejected the landlord's argument in I&M Acquisition that the pledge of the lease constituted a voluntary assignment of the lease and thereby triggered the automatic increase in rent. Id. at *10.  In distinguishing a pledge from an assignment, the Court correctly noted that "a pledge is distinguishable from an assignment in that title to the pledged property remains with the pledgor". Id. at *15.  Thus, the suggestion here by some Landlords that the security interest violates some anti-assignment clause is without merit.

Certain Landlords also imply that no court has ever entered a financing order that authorized the grant of a security interest in a lease where the lease purported to prohibit such a grant. The Landlords, however, are misguided. See, e.g., In re Kaiser Aluminum Chemical Corp., Case No. 02-10429 (Bankr. Del. Feb 10, 2005) (JFK) (copy attached). In fact, Bankruptcy Courts in this District have authorized the grant of post-petition liens in leasehold interests notwithstanding restrictive language contained in the lease agreements. See, e.g., In re Solutia Inc., Case No. 03-17949 (PCB) (copy attached); In re Ames Department Stores, Inc., Case No. 01-42217 (REG) (copy attached). Specifically, the final financing order in Solutia provides that "any provision of any lease ... that requires [] the consent or approval of one or more landlords ... in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest ... is hereby deemed inconsistent with the applicable provisions of the Bankruptcy Code." Solutia at ¶ 11. Authorizing the Debtors to grant security interests in their leases notwithstanding the restrictive language in the lease agreements is a usual occurrence and is entirely consistent with applicable law.

It is fundamental that a debtor may assign its leases notwithstanding contractual anti-assignment provisions. See 11 U.S.C. § 365(f)(3). This rule derives from the strong policy favoring assignment so as to maximize the value of the estate. See In re Jamesway, supra, 201 B.R. at 78 (referencing "Congressional policy favoring a debtor's ability to maximize the value of its leasehold assets"). As one court has noted, "in interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease prohibitions that are so restrictive that they constitute de facto anti-assignment provisions." See In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D. Del. 1998), aff'd, 209 F.3d 291 (3d Cir. 2000); In re U.L. Radio Corp., 19 B.R. 537,

- 7 -

543 (Bankr. S.D.N.Y. 1982) ("'[a]ny lease provision, not merely one entitled "anti-assignment clause", would be subject to the court's scrutiny regarding its anti-assignment effect'").

Like anti-assignment clauses, the provisions in the Debtors' leases that purport to prohibit the Debtors from utilizing the leases as collateral security do not maximize the value of the estate. We are assuming for sake of argument that at least one objecting Landlord has such a clause in its lease. Not every Landlord has supported its objection with testimonial or documentary evidence to substantiate many of the Landlords' "boilerplate" objections. The DIP Lenders have agreed to provide the Debtors with an $800 million dollar credit facility -- $100 million of this amount is being made available based exclusively on the agreed upon values of the Debtors' leases as collateral security. If the Debtors are prohibited from granting security interests in the leases, the Debtors will lose access to $100 million of credit from the facility. The Debtors have already testified that their business requires the complete facility, so denying the required liens would frustrate the Debtors' business objectives. Allowing the Debtors to grant security interests in the leases notwithstanding the restrictive covenants contained therein enables the Debtors to maximize the value of estate property and thereby promotes the underlying policy of the Bankruptcy Code.

B.  A Lien on the Leases Would Not Eliminate the Protections
    Given to Landlords Under the Bankruptcy Code or Otherwise

By granting a lien in the Debtors' rights under their leases, the DIP Lenders are not requiring that the Debtors grant them any more rights vis-á-vis the Landlords than what is otherwise available to the Debtors under the leases, applicable law and the Bankruptcy Code. For example, in the event that the DIP Lenders were to enforce their rights and liens with respect to the leases following the Debtors' default under the DIP credit facility, the DIP Lenders bargained for and expect to have the same rights and interests as the Debtors in such leases.

Accordingly, if the DIP Lenders sought to sell and assign any lease through the Bankruptcy Court in connection with exercising their rights under the financing order and the DIP credit facility, the Landlords would have an opportunity to be heard at such time to assert their rights under their respective leases, Section 365 of the Bankruptcy Code and applicable law.

The exercise by a third party of the Debtors' lease designation rights is not uncommon when value has been provided to the estate for such rights. See, e.g., In re Bradlees Stores, Inc., 2001 U.S. Dist LEXIS 14755 (S.D.N.Y. 2001).  In this regard, the DIP Lenders, who have agreed to advance up to $100 million against the value of certain leases, would essentially step into the shoes of the Debtors in connection with realizing on the leases and the Debtors' rights with respect thereto.  Similarly, in the unlikely event that the DIP Lenders opted to lift the automatic stay and foreclose on their lien in the leases in state court, the Landlords would be entitled to all of the rights and protections afforded to them under applicable state law foreclosure proceedings.  In short, the grant of a security interest in the leases and Debtors' designation rights with respect thereto does not reduce any of the Landlords' rights, whether such rights arise under the leases, Bankruptcy Code, applicable law or otherwise.

Certain Landlords also claim that they are entitled to the protections given to "shopping center landlords" under Section 365(b)(3) of the Bankruptcy Code.  For the reasons discussed above, a lien on the leases would not eliminate the protections currently afforded to the Landlords.

C.  The Relief Requested in the DIP Motion Would Not
    Otherwise Violate Section 365 of the Bankruptcy Code

As collateral security for providing an $800 million dollar credit facility, the Debtors are granting the DIP Lenders security interests in substantially all of their assets, including leasehold interests. Just like any other asset based lender, the DIP Lenders are entitled

- 9 -

to take measures to protect their collateral.  To the extent the DIP Lenders are forced to enter onto any leased premises in order to liquidate the collateral located there, the proposed order would require the DIP Lenders to pay the Landlord rent in connection with the DIP Lenders actual use of the leased premises, including rental charges.  Accordingly, there is no prejudice to the Landlords during the time in which the DIP Lenders would access the leased premises to retrieve or recover their collateral.   In the unlikely event that the DIP Lenders opted to run "going out of business" sales at various leased locations of the Debtors stores, it is understood that the DIP Lenders would obtain a sale order under Section 363 of the Bankruptcy Code to conduct such sales, at which time the Landlords would receive notice of the proceedings and would have an opportunity to raise any concerns they may have to the sale process at such time. Therefore, any objection based upon prejudice to the Landlords should be overruled.

## POINT II

### THE RECLAMATION OBJECTIONS ARE WITHOUT MERIT BECAUSE, AS A MATTER OF LAW, SUCH CLAIMS ARE VALUELESS AND NOT ENTITLED TO ANY SPECIAL PROTECTION

Various creditors purportedly holding reclamation claims (collectively, the "Reclamation Objectors") have filed a litany of objections to the entry of the proposed order approving the DIP Motion on a final basis.  These objections boil down to the following: (1) that granting of post-petition liens to the DIP Lenders without providing adequate protection somehow deprives the Reclamation Objectors of a property interest; (2) that a "carve-out" for reclamation claims should be established for the payment of reclamation claims on the same footing as the estate professionals in the Debtors' cases; (3) that the proceeds of sold goods subject to reclamation should be segregated; (4) that reclamation claims cannot be rendered valueless because the Debtors' pre-petition lenders were fully secured when the reclamation

demands were made; and (5) that the assignment of the pre-petition liens and security interests of the pre-petition lenders to the DIP Lenders was not valid because the debt held by the pre-petition lenders was fully satisfied after the entry of the interim financing order approving the DIP Motion. The Reclamation Objectors are wrong on each point, and provide no valid basis to reject the proposed DIP order.

Certain of the Reclamation Objectors have also filed objections to the Debtors' Reclamation Motion [Docket No. 21] and have requested in their objection to the Reclamation Motion that the Court make a threshold determination as to whether their reclamation claims are "valueless" because they are subject to the DIP Lenders' floating liens.

The well-reasoned decision in <u>Dairy Mart</u>, <u>supra</u>, 302 B.R. 128, dispenses with all of the objections of the Reclamation Objectors. In <u>Dairy Mart</u>, the Chapter 11 debtors moved to reclassify as general unsecured claims, alleged priority reclamation claims asserted by pre-petition merchandise suppliers. The Bankruptcy Court held that the putative reclamation claims were rendered valueless, and thus were properly reclassified as general unsecured claims. This Court should undertake the same analysis as in <u>Dairy Mart</u> and likewise find that the Reclamation Objectors and other parties who have asserted reclamation claims against the Debtors do not have any entitlement to administrative priority or secured claim status in respect of such reclamation claims.

As in the case at bar, prior to Dairy Mart's bankruptcy filing, Dairy Mart's pre-petition secured revolving credit lenders, whose agent was Citizens Bank ("Citizens"), were granted a floating lien on, among other things, all of Dairy Mart's inventory. Just as in this case, after the commencement of Dairy Mart's Chapter 11 case, Dairy Mart and Citizens entered into a stipulation for the use of cash collateral. Citizens was granted replacement liens on all of the

pre-petition collateral and the proceeds thereof, and all of the types of property that constituted pre-petition collateral coming into existence post-petition. Id. at 130-31.

Dairy Mart also filed a "first day" motion seeking entry of an order approving a post-petition secured facility to be provided by Foothill Capital Corporation ("Foothill"). The Foothill DIP credit facility was secured by a first priority lien on and a security interest in all property of Dairy Mart subject and subordinate to, among other things, valid and perfected liens and security interests of Citizens in its pre-petition collateral. The Court approved the Foothill credit facility on both an interim and a final basis. The final order approving the Foothill DIP facility approved the use of a portion of the Foothill loan proceeds to repay in full all pre-petition debt owing to Citizens (except for letters of credit outstanding which were transferred to and deemed issued under the Foothill DIP facility), and that contemporaneous with such repayment of all amounts outstanding under the pre-petition credit facility, Dairy Mart would obtain an immediate and complete release from Citizens of all of its pre-petition liens and security interests. Id. at 131.

In response to various reclamation claims, Dairy Mart maintained that, because such claims were subject to the interest of a holder of a prior perfected "floating lien" on the Debtors' inventory, when that lienholders' interest was paid, the interests of the respective reclamation claimants were rendered valueless. As such, Dairy Mart contended that the reclamation claimants were not entitled to an administrative expense priority. Id. at 132.

The Court explained that the purpose of Section 546(c) of the Bankruptcy Code is to recognize any legitimate right to reclamation that a seller may have under applicable non-bankruptcy law. Id. What Section 546(c) does not do, however, is to create a new, independent right to reclamation. Id. Pursuant to Section 546(c), a seller may reclaim goods it has sold to an

insolvent debtor only if it establishes each of the following: (1) that is has a statutory or common law right to reclaim the goods; (2) that the goods were sold in the ordinary course of the seller's business; (3) that the debtor was insolvent at the time the goods were received; and (4) that it made a written demand for reclamation within the statutory time limit after the debtor received the goods.  Id. at 133 (citing In re Victory Markets Inc., 212 B.R. 738, 741 (Bankr. N.D.N.Y. 1997) (denying reclamation claimant's request for an administrative expense claim where the reclamation claim did not have value beyond the secured lender's lien)).  The reclaiming seller has the burden of establishing each element of Section 546(c) by a preponderance of the evidence.  Dairy Mart, 302 B.R. at 133.

Uniform Commercial Code Section 2-702 forms the statutory right upon which sellers base their reclamation demand.  U.C.C. Section 2-702 provides in relevant part:

> (2) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after receipt.

> (3) The seller's right to reclaim under subsection (2) is subject to the rights of a buyer in ordinary course or other good faith purchaser under this Article (Section 2-403).

Only after the right to reclamation is established, does Section 546(c) afford a bankruptcy court discretion to protect the right to reclaim.  302 B.R. at 133 (citing In re Pester Refining Co., 964 F.2d 842, 845 (8th Cir. 1992)).  This discretion gives the court needed flexibility and permits it to recognize the reclaiming creditor's rights while allowing the debtor the opportunity to retain the goods in order to reorganize.  302 B.R. at 133.  This flexibility, however, does not enable the Court to alter the value of the claim.  Id.  In other words, the Court can provide some protection to a valid reclamation claim; however, if under applicable non-

- 13 -

bankruptcy law, the value of the reclamation claim is zero, Section 546(c) does not permit the Court to enhance a reclamation claimant's position.  Id.

UCC Section 2-702(3) makes a seller's right to reclamation expressly "subject to" the rights of a good faith purchaser.  Id. at 133 (citing, UCC 2-702 and In re Arlco, Inc., 239 B.R. 261, 267 (Bankr. S.D.N.Y. 1999)).  A holder of a prior perfected floating lien on inventory is treated as a good faith purchaser with rights superior to those of a reclaiming seller.  Dairy Mart, 302 B.R. at 133.  In Dairy Mart, because Citizens held such a lien, it qualified as a good faith purchaser for value.  Id.  However, while a reclaiming seller's claim is not automatically extinguished, the reclaiming seller also is not automatically granted an administrative claim or lien in the full amount sought when it is subject to the rights of a good faith purchaser.  Id. at 135, citing, Victory Markets, 212 B.R. at 743.  The reclaiming seller's right to reclaim depends on the value of the excess goods remaining once the secured creditor's claim is paid or released. However, when goods subject to a reclamation demand are liquidated and the proceeds used to pay the secured creditor's claim, the reclaiming seller's subordinated right is rendered valueless. Dairy Mart, 302 B.R. at 134 (citing Arlco at 273).  Once the secured creditor is paid in full, the reclaiming seller is only entitled to reclamation when the surplus collateral remaining consists of the very goods sold by the reclaiming seller or the traceable proceeds from those goods. 302 B.R. at 134.

The Court in Dairy Mart concluded that by the time Citizens was paid in full from the Foothill DIP facility, the reclamation claims in Dairy Mart were rendered valueless.  Id. at 135.  The Court recognized that the only way Dairy Mart could have gotten a post-petition loan was if the debtor afforded a prospective post-petition lender a lien on all of its collateral. Therefore, the Court  in interpreting the release of Citizens' lien and the simultaneous grant of the lien to Foothill properly recognized the commercial reality of an "integrated transaction."  Id.

- 14 -

at 135-36.  There was a direct nexus between the release of Citizens' liens on the pre-petition

collateral and the payment on the pre-petition secured loan.  Id.  As a condition to its making of

the post-petition loan to Dairy Mart, Foothill required that a lien be placed on the very same

inventory and proceeds that had secured Citizens' loan, as well as any additional post-petition

inventory.

      Based on the foregoing, it is clear that Dairy Mart provides a road-map for this

Court to squarely address and overrule the objections of the Reclamation Objectors.  Similar to

Dairy Mart, the Debtors first obtained authority to use up to $100 million of cash collateral of the

Debtors' pre-petition lenders, Wachovia (f/k/a First Union National Bank), as administrative

agent for itself and the other financial institutions (collectively, the "Pre-Petition Lenders")

pending the entry of the order approving the DIP Motion.  On the second day of the Debtors'

Chapter 11 cases, the Debtors obtained authority to repay in full $427 million of outstanding pre-

petition indebtedness owing to the Pre-Petition Lenders, and the Pre-Petition Lenders were

granted junior liens and other protections to secure certain contingent obligations relating to their

pre-petition claims against the Debtors.  The Pre-Petition Lenders had liens on substantially all

of the Debtors' assets, including the goods which are the subject of the Reclamation Objectors'

demands.  The DIP Lenders obtained post-petition first priority liens on the same collateral

granted to the Pre-Petition Lenders, including the goods which are the subject of the Reclamation

Objectors' demands.

      As provided for under U.C.C. 2-702(3) and Dairy Mart, a reclamation claimant's

right to reclaim goods is subject to the rights of a buyer in the ordinary course or other good faith

purchaser.  The Pre-Petition Lenders, who held prior perfected floating liens on the goods

seeking to be reclaimed were good faith purchasers with rights superior to those of the

Reclamation Objectors.  Accordingly, like Dairy Mart, once the Debtors repaid the Pre-Petition

Lenders' debt with proceeds of the DIP Lenders' loans secured by the same collateral, the Reclamation Objectors reclamation claims were rendered "valueless". Moreover, as in the case of <u>Dairy Mart</u>, among the conditions to the post-petition financing arrangements between the Debtors and the DIP Lenders was that the DIP Lenders be granted first priority floating liens in, among other things, all of the Debtors' inventory, including the inventory that was the subject of the Pre-Petition Lenders' liens and the demands of the Reclamation Objectors. These steps must be viewed as an "integrated transaction" under <u>Dairy Mart</u>. To hold otherwise would result in the Debtors having less credit availability under the terms of the DIP Lenders' financing arrangements, because the inventory collateral subject to the Reclamation Objectors' claims would be rendered ineligible for borrowing purposes. For all of the foregoing reasons, the objections of the Reclamation Objectors should be overruled.

Certain of the Reclamation Objectors have also objected to the Pre-Petition Lenders' assignment of their pre-petition liens and security interests to the DIP Lenders as an invalid assignment meant to frustrate the rights of the Reclamation Objectors. This objection is a proverbial "red herring" in an effort to shift this Court's attention from conducting the appropriate analysis in determining that the reclamation claims of the Reclamation Objectors have no value and should be relegated to general unsecured claim status. Indeed, by now it is settled that full repayment of the pre-petition lender's debt and the assignment of their pre-petition liens to the DIP lenders negates any reclamation claim. In re Pittsburgh-Canfield Corp., 309 B.R. 277, 282 (6th Cir. B.A.P. 2004). In <u>Pittsburgh-Canfield</u>, the Sixth Circuit Bankruptcy Appellate Panel noted that, "[o]f significant importance in this case is the fact that on the Petition Date, the Debtor and its affiliates moved for approval of a debtor-in-possession credit facility. Pursuant to the final order approving the Pittsburgh-Canfield DIP facility, all of the prepetition lenders were paid in full and the liens or security interests of the oversecured prepetition lenders

- 16 -

were assigned and transferred to the lenders under the DIP facility.  Id.  The Bankruptcy

Appellate Panel affirmed the Bankruptcy Court order, noting that while the "result may be

harsh," the reclaiming creditors lost their rights when they voluntarily shipped without obtaining

a purchase money security interest.  Id. at 288.

Given the unequivocal holding of the Sixth Circuit Bankruptcy Appellate Panel in

Pittsburgh-Canfield, any argument based upon the earlier holding of the Ohio Bankruptcy Court

in In re Phar-Mor, Inc., 301 B.R. 482 (Bankr. N.D. Ohio 2003) is no longer valid.  Equally

without merit is the claim that the pre-petition lenders should have marshaled their assets in

satisfaction of the pre-petition debt.  It is well settled that unsecured creditors may not assert the

equitable doctrine of marshaling.  Pittsburgh-Canfield, 309 B.R. at 291-92.

Finally, to the extent that this Court is persuaded that the Reclamation Objectors

and the other reclamation creditors are ultimately entitled to some form of reclamation claim

treatment under the Bankruptcy Code (even though the weight of the applicable legal authority is

against such a result), no administrative expense claim or replacement lien that can be granted to

any reclamation creditor can prime or subordinate the liens and super-priority claims of the DIP

Lenders.  This point is made in this Response because some of the Reclamation Objectors have

suggested, albeit without citing any authority, that their reclamation claim rights are somehow

senior to the liens and claims of the DIP Lenders.  We are aware of no legal support for that

proposition.

## POINT III

## THE PACA OBJECTIONS SHOULD BE OVERRULED

A group of "PACA Objectors" allege that the proposed DIP order should be

denied because it fails to provide adequate protection for their unpaid pre-petition interests and,

in turn, they seek either the granting of replacement liens or a set aside of assets equal to $30,000,000, the total amount of the Debtors' alleged pre-petition PACA trust claims. While valid PACA claims are superior to the DIP liens, the objections raised by the PACA Objectors' to the DIP Motion are, at best, premature, costly and unnecessary, and in any case without merit and should be denied with prejudice.

PACA provides a statutory trust to enforce the payment obligations of commission merchants, dealers and brokers pursuant to 7 U.S.C. §499(e)(c)(2). Neither the language of 7 U.S.C. §499(e)(c)(2) nor its legislative history suggests that PACA trust assets need to be segregated from a buyer's other assets. JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 78 (2d Cir. 1990). "Instead, the statute clearly provides that a trust is created in the '[p]erishable agricultural commodities[,] ... and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products.'" Id. Moreover, a review of the PACA legislative history reveals that the segregation of trust fund assets was not one of Congress' purposes:

> The trust impressed by section 5(c)(2) is a nonsegregated "floating trust" made up of all a firm's commodity related liquid assets, under which there may be a commingling of trust asset. Under this provision there is no necessity to specifically identify all of the trust assets through each step of the assets accrual and disposal process. Since commingling is contemplated, all trust assets would be subject to the claims of unpaid seller-suppliers and agents to the extent of the amount owed them.

JSG Trading, 917 F.2d at 79, citing, H.R. Rep. No. 543, 98th Cong., Sess., reprinted in 1984 U.S. Code Cong. & Admin. News 405, 406-07.

In JSG Trading, JSG Trading Corp. ("JSG"), a tomato seller, sued Tray-Wrap, Inc. ("Tray-Wrap"), a tomato purchaser, for a $24,000 breach of contract action. JSP moved for a preliminary injunction to require Tray-Wrap to preserve trust assets allegedly due JSG in an

account segregated from the purchaser's other produce-derived proceeds.  In a reversal of the District Court, the Court of Appeals held that PACA did not require Tray-Wrap to maintain a segregated account.

The Second Circuit held that while it was Congress' aim to protect sellers by requiring all proceeds from unpaid perishable commodities to be held in trust, a seller is not automatically entitled to a remedy that would require a buyer to segregate and hold trust assets separate from other assets of the buyer's business.  JSG Trading, 917 F.2d at 78.  In order for JSG to prevail, it had to show that that the PACA trust assets were "dissipating" in that JSG was suffering an irreparable harm.  Id.  Because the Second Circuit saw no evidence of dissipation of PACA trust assets by Tray-Wrap, it denied JSG's request for segregation.  Id.

Similar to JSG Trading, here, the PACA Objectors have not set forth any facts sufficient for the Court to conclude that the PACA trust assets in the Debtors' case have been dissipated.  Instead, the PACA Objectors allege that the existing PACA trust will be shared amongst pre- and post-petition PACA claimants.  In addition, the PACA Objectors allege, without providing any evidence, that the Debtors' use of cash collateral is dissipating the PACA trust assets.  Based on the language of 7 U.S.C. §499(e)(c)(2), legislative history, and binding Second Circuit precedent, the PACA Objectors' mere allegations are insufficient to compel the Debtors to segregate PACA trust assets.  In addition, what the PACA Objectors conveniently forget is that the Debtors have been granted access to an $800 million post-petition credit facility.  Moreover, while it is clear that the PACA Objectors have not met their burden, requiring the Debtors to segregate $30 million in alleged PACA trust assets will harm the Debtors' liquidity, which liquidity is essential for the Debtors' successful reorganization.

## **CONCLUSION**

For all of the foregoing reasons, this Court should overrule the objections of each of the

Reclamation Objectors, the Landlord Objectors and the PACA Objectors, and enter the proposed

order approving the DIP Motion on a final basis on the terms and conditions set forth therein.

Dated: March 17, 2005
      New York, New York

               OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.

               By: /s/ Jonathan N. Helfat
                   Jonathan N. Helfat (JH-9484)
                   230 Park Avenue
                   New York, New York 10169
                   (212) 661-9100

                   Attorneys for Wachovia Bank, National Association

Of Counsel:
      Jonathan N. Helfat
      Richard G. Haddad
      Daniel F. Fiorillo

511826.2