UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| KAISER ALUMINUM & | ) Case No. 02-10429 (JKF) |
| CHEMICAL CORPORATION, *et al.*, | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Hearing Date: 02/08/05 |
| | ) Re: Docket No. 5950; Agenda Item 1 |

### ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(e), AND (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS

Upon the motion (the "**Motion**"), dated January 14, 2005, of Kaiser Aluminum &

Chemical Corporation, a Delaware corporation ("**KACC**"), Kaiser Aluminum

Corporation, a Delaware Corporation ("**KAC**"), and their affiliated debtors, all of which

are debtors and debtors in possession (collectively, the "**Debtors**") in the above-

captioned cases (the "**Cases**"), pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2),

364(c)(3), 364(e), 503(b) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101,

et seq. (the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking, among other things:

      (1) authorization for KACC, KAC and certain of the other Debtors

      (collectively, with KACC and KAC, the "**Borrowers**"), excluding Alpart

      Jamaica Inc., Kaiser Jamaica Corporation, Kaiser Alumina Australia

      Corporation, Kaiser Bauxite Company and Kaiser Finance Corporation

(the "**Excluded Debtors**"), to obtain post-petition financing (the "**Financing**") up to the aggregate principal amount of $200,000,000.00 (the actual available principal amount at any time being subject to those conditions set forth in the DIP Documents (as defined below)) from The CIT Group/Business Credit, Inc. ("**CIT**") and JPMorgan Chase Bank, National Association ("**JPMCBB**"), acting as administrative agent (in such capacity, the "**Agent**"), for itself and a syndicate of financial institutions (together with CIT and JPMCBB and including the fronting and issuing banks for letters of credit, the "**DIP Lenders**"), to be arranged by J.P. Morgan Securities Inc., as lead arranger ("**JPMorgan**"), and CIT, as co-arranger; and for all of the Debtors that are not Borrowers other than the Excluded Debtors (collectively, the "**Guarantors**")[1] to guaranty the Borrowers' obligations in connection with the Financing;

(2)  authorization for the Debtors to execute and enter into the DIP Documents and to perform such other and further acts as may be required in connection with the DIP Documents;

(3)  the granting of mortgages, security interests, liens and superpriority claims to the Agent on behalf of and for the benefit of the DIP Lenders (including superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and

---

[1]     The Borrowers and the Guarantors, collectively, shall be referred to herein as the "Debtor Obligors."

2

364(c)(3) of the Bankruptcy Code) subject to the Carve-Out (as defined below);

(4) the waiver of the Debtors' right to surcharge against collateral securing the Financing pursuant to section 506(c) of the Bankruptcy Code; and

(5) the granting of certain related relief.

Due and appropriate notice of the Motion, the relief requested therein and the Hearing (as defined below) having been served by the Debtors on (i) the United States trustee for the District of Delaware (the "U.S. Trustee"), (ii) counsel for the official committee of unsecured creditors (the "Creditors' Committee"); (iii) counsel to the statutory committee of asbestos claimants (the "Asbestos Committee"); (iv) counsel for the administrative agent under the Old DIP Credit Facility (as defined below); (v) counsel to MAXXAM Inc., the Debtors' principal equity holder; (vi) counsel to the legal representative for future asbestos claimants (the "Asbestos Representative"); (vii) counsel to the legal representative for future silica and coal tar pitch volatile claimants (the "Silica Representative"); (viii) counsel to the official committee of retired employees (the "Retirees' Committee"); and (ix) parties that have requested notice in the Cases.

The hearing to consider approval of the Financing having been held by this Court and concluded on February 8, 2005 (the "Hearing").

Upon the record made by the Debtors at the Hearing and after due deliberation and consideration and sufficient cause appearing therefore;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1. *Jurisdiction.* This Court has core jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. *Notice.* Due and sufficient notice of the Motion and the Hearing has been given, in compliance with Bankruptcy Rules 2002 and 4001(c).

3. *Objections.* All objections to the entry of this Order, if any, are resolved hereby or, to the extent not resolved, are overruled.

4. *Findings Regarding the Financing.*

    (a)    Good cause has been shown for the entry of this Order.

    (b)    The Debtors have an immediate need to obtain the Financing in order to, among other things, (i) refinance the Debtors' current debtor-in-possession financing facility (the "**Old DIP Credit Facility**"),[2] which matures on February 13, 2005 and, as most recently amended, was approved by the Court pursuant to the Third Amended and Restated Order Authorizing Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C. §§ 363, 364, and 507(b) and Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362 (Docket No. 5280) (the "**Old DIP Credit Facility Order**"); (ii) fund working capital, letters of credit and capital expenditures; (iii) use for other general corporate purposes of the Debtors; (iv) pay

---

[2] Certain letters of credit issued under the pre-petition credit facility to which certain of the lenders under the Old DIP Credit Facility were parties (the "Pre-Petition Credit Facility") were deemed issued under the Old DIP Credit Facility.

related transaction costs, fees and expenses; and (v) fund the costs of administration of the Cases.

(c)    The Debtors are unable to obtain financing from sources other than the DIP Lenders on more favorable terms than the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or adequate unsecured credit solely with the enhanced priority afforded by section 364(c)(1) of the Bankruptcy Code. The Debtors are also unable to obtain adequate credit without granting the Agent and the DIP Lenders, subject to the Carve-Out as provided for herein, the DIP Liens (as defined below) pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, under the terms and conditions set forth in this Order and in the DIP Documents.

(d)    The terms of the Financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)    The Financing has been negotiated in good faith and at arm's length between the Debtors, the Agent and the DIP Lenders, and all of the Debtor Obligors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, (i) all loans made to, and all letters of credit issued for the account of, the Debtors pursuant to a Secured Superpriority Debtor In Possession Revolving Credit and Guaranty Agreement (as hereafter finalized and executed, the "DIP Credit Agreement"), a copy of a draft of

which has been filed with the Court,[3] and (ii) any "Obligations" (as defined in the DIP

Credit Agreement), including credit extended in respect of overdrafts and related

liabilities and other depository, treasury, and cash management services and other

clearing services provided by JPMCBB or its affiliates (all of the foregoing in clauses (i)

and (ii) collectively, the "DIP Obligations"), shall be deemed to have been extended by

the Agent and the DIP Lenders and their affiliates in good faith, as that term is used in

section 364(e) of the Bankruptcy Code and in express reliance upon the protections

offered by section 364(e) of the Bankruptcy Code, and the Agent, the DIP Lenders and

their affiliates shall be entitled to the full protection of section 364(e) of the Bankruptcy

Code if this Order or any provision hereof is vacated, reversed or modified, on appeal or

otherwise.

      (f)     The access of the Debtors to sufficient working capital and

liquidity through the incurrence of new indebtedness for borrowed money and other

financial accommodations is vital to the preservation and maintenance of the going

concern values of the Debtors and to a successful reorganization of the Debtors.

Furthermore, the DIP Credit Facility approved hereby will serve as a bridge to an exit

financing facility to be provided to the Debtor Obligors on and after the effective date of

a confirmed plan or plans of reorganization in the Debtor Obligors' chapter 11 cases as

described more fully in that certain commitment letter, dated as of January 14, 2005 (the

"Commitment Letter"), among JPMorgan, CIT, JPMCBB, KACC and KAC, a copy of

which was attached to the Motion as Exhibit A. Consummation of the Financing in

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Credit Agreement.

accordance with this Order and the DIP Documents is therefore in the best interest of the Debtors' estates.

5. *Authorization of the Financing and the DIP Documents.*

(a)     The Debtor Obligors are hereby authorized to enter into the DIP Documents. The Borrowers are, subject to having filed a fully executed copy of the DIP Credit Agreement with the Court, hereby authorized to borrow money, obtain letters of credit and to enter into swap agreements pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guaranty such borrowings and the Borrowers' obligations with respect to such letters of credit and swap agreements, up to an aggregate principal or face amount of $200,000,000.00 (plus interest, fees and other expenses provided for in the DIP Documents), with a sub-limit not in excess of $60,000,000.00 available for the issuance of letters of credit by JPMCBB and a second sub-limit not in excess of $17,500,000.00 available for swing line loans from JPMCBB, in accordance with the terms of this Order and the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Debtor Obligors and to pay interest, fees and expenses in accordance with this Order and the DIP Documents. In addition to obtaining such loans and incurring such obligations, the Debtor Obligors are authorized to incur, and the Guarantors are hereby authorized to guaranty the Debtor Obligors' obligations with respect to, overdrafts and related liabilities arising from treasury, depository and cash management services including any automated clearing house fund transfers provided to or for the benefit of the Debtor Obligors by JPMCBB or any of its affiliates; *provided, however,* that nothing

7

herein shall require JPMCBB or any other party to incur overdrafts or to provide any such services or functions to the Debtors.

(b)     In furtherance of the foregoing and without further approval of this Court, the Debtor Obligors are authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees that may be reasonably required or necessary for the Debtor Obligors' performance of their obligations under the Financing, including, without limitation:

(i)     the execution, delivery and performance of the Loan Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without limitation, the DIP Credit Agreement, the Security and Pledge Agreement (as defined in the DIP Credit Agreement) and the mortgages contemplated thereby (collectively, and together with the letter agreements referred to in clause (iii) below, the "DIP Documents"),

(ii)     the execution, delivery and performance of one or more amendments to the DIP Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the Agent and the DIP Lenders may agree (it being understood that no further approval of the Court shall be required for amendments to the DIP Credit Agreement that do not shorten the maturity of the extensions of credit thereunder or increase the commitments, the rate of interest or the letter of credit fees payable thereunder),

8

(iii)    the non-refundable payment to the Agent or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement (and in the separate letter agreements between them in connection with the Financing, including, without limitation, the Commitment Letter and a certain fee letter, dated as of January 14, 2005, among JPMorgan, JPMCBB, KACC and KAC) and reasonable costs and expenses as may be due from time to time, including, without limitation, (A) agent fees, (B) commitment fees, (C) closing fees, (D) letter of credit fees, (E) facility fees, (F) termination fees and (G) reasonable attorneys', financial advisors' and accountants' fees and disbursements as provided for in the DIP Documents (collectively, the "Advisor Fees and Expenses"), and

(iv)    the performance of all other acts required under or in connection with the DIP Documents.

(c)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtor Obligors, enforceable against each Debtor Obligor in accordance with the terms of the DIP Documents. No obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code, under section 548 of the Bankruptcy Code or under any applicable State Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

9

(d)    The obligations of the Debtor Obligors hereunder and under the DIP Documents shall be joint and several.

6. *Superpriority Claims.*

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtor Obligors with priority over any and all administrative expenses, diminution claims and all other claims against the Debtor Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to the Collateral and all proceeds thereof as provided in the DIP Credit Agreement, subject and subordinate to the payment of the Carve-Out to the extent specifically provided for herein. Except for the Carve-Out, no costs or administrative expenses that have been or may be incurred in the Cases, in any conversion of the Cases pursuant to section 1112 of the Bankruptcy Code, or in any other proceeding related thereto, and no priority claims, including, without limitation, any other superpriority claims, are or will be prior to or on a parity with the (i) claims of the Agent, the DIP Lenders or the other Secured Parties (as defined below) against the Debtor Obligors arising out of the DIP Obligations or any provision of this Order or (ii) the DIP Liens (as

10

defined below) granted herein and in the other DIP Documents in and to the Collateral (as defined below).

(b)    For purposes hereof, the "**Carve-Out**" means (i) the payment of allowed and unpaid professional fees and disbursements incurred by the Borrowers, any statutory committees appointed in these chapter 11 cases and any legal representatives for future claimants appointed in these chapter 11 cases in an aggregate amount not in excess of $4,000,000.00 and (ii) the payment of fees pursuant to 28 U.S.C. § 1930. The portion of the Carve-Out provided in (i) above may not be asserted by any party other than in the event of the occurrence and during the continuance of an Event of Default, or an event that would constitute an Event of Default with the giving of notice or lapse of time or both. Following the Revolving Credit Termination Date (as defined in the DIP Credit Agreement), amounts in a Letter of Credit Account (as defined in the DIP Credit Agreement) shall not be subject to the Carve-Out. Notwithstanding the foregoing, so long as an Event of Default or an event which with the giving of notice or lapse of time or both would constitute an Event of Default shall not have occurred and be continuing, the Borrowers shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and any compensation and expenses accrued prior to the occurrence of such Event of Default or other event, as described above, shall not reduce the Carve-Out.

7.  *DIP Liens.* As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution, recordation of filings by the Debtor Obligors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents,[4] the following security interests and liens are hereby granted to the Agent for its own benefit and the benefit of the DIP Lenders and any other parties as provided for under any of the DIP Documents (such parties, together with the Agent and the DIP Lenders, the "Secured Parties") (all property identified in clauses (a) and (b) below being collectively referred to as the "Collateral"), subject and subordinate, only in the event of the occurrence and during the continuance of an Event of Default, to the payment of the Carve-Out (all such liens and security interests granted to the Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Order and the DIP Documents, the "DIP Liens"):

(a)    First Lien on Cash Balances and Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first-priority senior security interest in and lien on all pre- and post-petition property of the Debtor Obligors, whether existing on the dates that any of the Debtor Obligors filed petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Petition Dates") or thereafter acquired, that, on or as of the Petition Dates was not subject to valid, perfected and non-avoidable liens (collectively, "Unencumbered Property"), including without limitation, all cash and cash collateral of

_____

[4] This paragraph 7 shall only apply to the liens granted under the DIP Credit Agreement. Any liens granted pursuant to any exit financing shall be properly recorded and perfected and nothing in this Order shall eliminate the necessity for such recordation and perfection.

12

the Debtor Obligors (whether maintained with the Agent or otherwise) and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Dates, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing. Unencumbered Property shall exclude the Debtor Obligors' claims and causes of action, and the proceeds therefrom, under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.

(b)    Lien Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien on all pre- and post-petition property of the Debtor Obligors (other than the property described in clause (a) of this paragraph 7, as to which the lien and security interest in favor of the Agent will be as described in such clause), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Dates or to valid and unavoidable liens in existence immediately prior to the Petition Dates that are perfected subsequent to the Petition Dates as permitted by section 546(b) of the Bankruptcy Code, which security interest and lien in favor of the Agent is junior to such valid, perfected and unavoidable liens.

(c)    Lien Senior to Certain Other Liens.  The DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for

13

the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) except as otherwise provided herein or in the DIP Documents, any liens arising after the Petition Dates including, without limitation, any lien or security interest granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, or (ii) except as otherwise provided herein or in the DIP Documents, subordinate to or made *pari passu* with any other lien or security interest under section 364 of the Bankruptcy Code or otherwise.

8.    *Satisfaction of the Old DIP Credit Facility Obligations.*  Following entry of this Order and prior to the closing of the transactions contemplated hereby, the Debtor Obligors, Bank of America, N.A., the agent under the Old DIP Credit Facility (the "**Old DIP Agent**"), for the benefit of itself and the other lenders under the Old DIP Credit Facility (the "**Old DIP Lenders**") and JPMCBB for the benefit of itself and the DIP Lenders shall enter into a pay-off letter substantially in the form attached hereto as Exhibit A (the "**Pay-Off Letter**"). Upon the payment of the Pay-Off Amount (as defined in the Pay-Off Letter), including the Expense Reserve (as defined in the Pay-Off Letter), the deposit of L/C Cash Collateral (as defined in the Pay-Off Letter) equal to 105% of the face amount of the Continuing L/Cs (as defined in the Pay-Off Letter) in the L/C Cash Collateral Account (as defined in the Pay-Off Letter), and satisfaction of the other conditions set forth in the Pay-Off Letter, all of the liens and security interests of the Old DIP Lenders and the Old DIP Agent in the assets of the Debtors shall be released (provided, however, that notwithstanding anything in this Order to the contrary, (a) the Old DIP Agent shall retain a first priority security interest and super priority claim (no

14

longer subject and subordinate to the Carve-Out (as defined in the Old DIP Credit Facility)) on the L/C Cash Collateral and the Reserve Collateral (as defined in the Pay-Off Letter), (b) the L/C Cash Collateral and the Reserve Collateral shall not constitute Collateral under the DIP Credit Agreement or this Order until it is released by the Old DIP Agent pursuant to the terms and conditions of the Pay-Off Letter and (c) the Debtors shall not be entitled to seek to use or to use the L/C Cash Collateral or Reserve Collateral until it is released by the Old DIP Agent pursuant to the terms and conditions of the Pay-Off Letter). Notwithstanding anything in this Order to the contrary, any Continuing Obligations (as defined in the Pay-Off Letter) shall be subordinated to the Superpriority Claims of the DIP Lenders hereunder as set forth in the Pay-Off Letter. The satisfaction of obligations under the Pre-Petition Credit Facility by the Old DIP Credit Facility (including without limitation the roll-up of letter of credit obligations into the Old DIP Credit Facility) shall be, and hereby is, determined to be final and unchallengeable by any party, and, accordingly, no obligations under the Pre-Petition Credit Facility shall be reinstated or deemed to exist, in whole or in part, under any circumstances.

9. *Protection of DIP Lenders' Rights.*

(a)    Subject to the limitations set forth in the DIP Credit Agreement, the Agent is authorized in accordance with the terms of the DIP Documents, from time to time and after the occurrence and during the continuance of an Event of Default in the Agent's sole discretion, to make Loans (as defined in the DIP Credit Agreement) to the Borrowers, on behalf of all DIP Lenders, which the Agent, in its Permitted Discretion (as defined in the DIP Credit Agreement), deems necessary or desirable (i) to preserve or

15

protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other DIP Obligations, or (iii) to pay any other amount chargeable to or required to be paid by the Borrowers pursuant to the terms of the DIP Credit Agreement, including payments of principal, interest, Letter of Credit Disbursements (as defined in the DIP Credit Agreement), fees, premiums, reimbursable expenses and other sums payable under the DIP Documents (any of such Loans, the "**Protective Advances**"). The Protective Advances shall be secured by the DIP Liens in favor of the Agent in and to the Collateral and shall constitute DIP Obligations.

(b)     The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Agent, the DIP Lenders and the other Secured Parties to exercise, (i) immediately upon the occurrence of an Event of Default, all rights and remedies under the DIP Documents other than those rights and remedies against the Collateral as provided in clause (ii) below and (ii) upon the occurrence and during the continuance of an Event of Default and after the giving of five business days prior written notice(the "**Notice Period**") to the Debtors; counsel to the Creditors' Committee; counsel to the Asbestos Committee; counsel to the Asbestos Representative; counsel to the Silica Representative; and the US Trustee, all rights and remedies against the Collateral provided for in the DIP Documents (including, without limitation, the right to setoff monies of the Debtor Obligors in accounts maintained with the Agent or any DIP Lender or Secured Party). During the Notice Period, the Debtors shall be entitled to an emergency hearing with the Court to challenge whether an Event of

Default has, in fact, occurred, upon two days' advance written notice to the Agent and the DIP Lenders. In any hearing regarding any exercise of rights or remedies the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors hereby waive their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Agent or the DIP Lenders set forth in this Order or the DIP Documents. In no event shall the Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral. The Agent's or any DIP Lender's failure to seek relief or otherwise exercise its rights and remedies under the DIP Documents or this Order shall not constitute a waiver of the Agent's or any DIP Lender's rights hereunder, thereunder or otherwise.

10. *Limitation on Charging Expenses Against Collateral.* Except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Agent and no such consent shall be implied from any other action, inaction, or acquiescence by the Agent or the DIP Lenders.

11. *Payments Free and Clear.* Any and all payments or proceeds remitted to the Agent pursuant to the provisions of this Order shall be received by the Agent for the benefit of the relevant DIP Lenders free and clear of any claim, charge, assessment or

other liability including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.

12. *Interest on DIP Obligations.* Interest on the DIP Obligations shall accrue at the rates (including any default rates, but only after an Event of Default under the DIP Documents) and shall be paid at the times as provided in the DIP Documents.

13. *Perfection of DIP Liens.* With respect to the DIP Liens securing the Financing (and excluding any security interest and lien securing the exit financing facility to be provided to the Debtor Obligors on and after the effective date of a confirmed plan or plans of reorganization in the Debtor Obligors' chapter 11 cases as described more fully in the Commitment Letter):

(a)    the Agent and the DIP Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of liens or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the Agent on behalf of the DIP Lenders shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of liens or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Order;

18

(b)      a certified copy of this Order may, in the discretion of the Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of liens or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording without the imposition of any stamp, intangibles, recording or similar tax in accordance with the provisions of section 1146 of the Bankruptcy Code;

(c)      the Debtor Obligors shall execute and deliver to the Agent and the DIP Lenders all such agreements, financing statements, instruments and other documents as the Agent or any of the DIP Lenders may reasonably request to evidence, confirm, validate or perfect the DIP Liens granted pursuant hereto; and

(d)      any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor Obligor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the transactions granting post-petition liens, in such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor Obligor, in favor of the DIP Lenders in accordance with the terms of the DIP Credit Agreement or this Order.

19

14. *Preservation of Rights Granted Under the Order.*

(a)    Unless all DIP Obligations shall have been paid in full (and, with respect to outstanding letters of credit issued pursuant to the DIP Credit Agreement, cash collateralized or otherwise provided for in accordance with the provisions of the DIP Credit Agreement), the Debtors shall not seek, and it shall constitute an Event of Default if any of the Debtors seek, or if there is entered, (i) any modification, termination or extension of this Order without the prior written consent of the Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the Agent, or (ii) an order dismissing any of the Cases.  If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims and DIP Liens granted to the Agent pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP Obligations shall have been paid and satisfied in full in cash (and that such Superpriority Claims and DIP Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (i) in this sentence.

(b)    If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations incurred prior to the actual receipt of written notice by the Agent of the effective date of such reversal, stay, modification or vacation

20

or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement or the DIP Documents with respect to any DIP Obligations. Notwithstanding any such reversal, stay, modification or vacation, any DIP Obligations incurred by the Debtor Obligors to the Agent or the DIP Lenders prior to the actual receipt of written notice by the Agent of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the Agent and DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Documents with respect to all DIP Obligations.

       (c)     Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the Superpriority Claims and all other rights and remedies of the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor Obligors will be deemed to have waived any discharge as to any remaining DIP Obligations. Under no circumstances shall any plan of reorganization of a Debtor Obligor be confirmed or become effective unless such plan provides that the DIP Obligations are paid in full in cash on or before the effective date of such plan or as may otherwise be agreed by the DIP Lenders in the manner provided in the DIP Documents. The terms and

provisions of this Order and the DIP Documents shall continue in the Debtor Obligors'

Cases, in any successor cases if such Cases cease to be jointly administered, or in any

superceding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the

Superpriority Claims and all other rights and remedies of the Agent and the DIP Lenders

granted by the provisions of this Order and the DIP Documents shall continue in full

force and effect until the DIP Obligations are indefeasibly paid in full.

15. *Limitation on Use of Financing Proceeds and Collateral.* The Debtor

Obligors shall use the proceeds of the Financing solely as provided in this Order and in

the DIP Documents. Notwithstanding anything herein or in any other order by this Court

to the contrary, no borrowings, letters of credit, Collateral or the Carve-Out may be used

to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or

enforceability of any amount due under the DIP Documents or the liens or claims granted

under this Order or the DIP Documents, (b) assert any claims or defenses or causes of

action related in any way to the Financing or related documents against the Agent or the

DIP Lenders or their respective agents, affiliates, representatives, attorneys or advisors,

(c) prevent, hinder or otherwise delay the Agent's assertion, enforcement or realization

on the Collateral in accordance with the DIP Documents or this Order, (d) seek to modify

any of the rights granted to the Agent or the DIP Lenders hereunder or under the DIP

Documents, in each of the foregoing cases without such parties' prior written consent or

(e) pay any amount on account of any claims arising prior to the Petition Dates unless

such payments are approved or authorized by an order of this Court or approved by the

Agent in its sole discretion.

16. *Insurance.* Pursuant to this Order, the Agent and the DIP Lenders shall be and shall be deemed to be, in the manner and to the extent provided in the DIP Credit Agreement, without any further action or notice, named (a) as additional insured on all liability insurance maintained by the Debtor Obligors with respect to occurrences arising out of or relating to the Collateral and occurring on or after the date the Financing is consummated and (b) as sole loss payee on all property insurance covering Collateral maintained by the Debtor Obligors for losses occurring on or after the date the Financing is consummated.

17. *Waiver of Claims and Causes of Action.* Without prejudice to the rights of any other party, including the statutory committees and legal representatives for future claimants appointed in the Cases, the Debtor Obligors have waived any and all claims and causes of action against the Agent and the DIP Lenders, and their respective affiliates, directly related to the Financing or the negotiation of the terms thereof.

18. *Order Governs.* In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.

19. *Binding Effect; Successors and Assigns.* The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in the Debtor Obligors' Cases, including, without limitation, the Agent, the DIP Lenders, the statutory committees and the legal representatives for future claimants appointed in the Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the

23

Bankruptcy Code, or any other fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) and shall inure to the benefit of the Agent, the DIP Lenders and the Debtors and their respective successors and assigns; *provided, however,* that the Agent and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

20. *Limitation of Liability.*  In determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the Agent and the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing in this Order or in any of the DIP Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the Agent or the DIP Lenders of any liability for any claims arising from the pre-petition or post-petition activities by the Debtors or debtors-in-possession and their affiliates (as defined in section 101(2) of the Bankruptcy Code) in the operation of their businesses, or in connection with their restructuring efforts.

21. *Right of Access and Information.*

    (a)    The Debtor Obligors shall cooperate with the Agent and the DIP Lenders to permit them to exercise their rights of access and to information as set forth in the DIP Documents, including, but not limited to, section 5.06 of the DIP Credit Agreement.

    (b)    Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the Agent and the DIP Lenders contained in this Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Credit Agreement or the DIP Documents, upon three (3) days' advance written notice to the landlord of any leased premises that a default has occurred and is continuing under the DIP Documents, the Agent may, subject to any separate agreement by and between such landlord and the Agent, enter upon any leased premises of the Debtor Obligors for the purpose of exercising any remedy with respect to Collateral located thereon and shall be entitled to all of the applicable Debtor Obligor's rights and privileges as lessee under such lease without interference from the landlords thereunder, provided that the Agent shall only pay rent and additional rent obligations of the applicable Debtor Obligor that first arise after the Agent's written notice referenced above and that are payable during the period of such occupancy by the Agent, calculated on a per diem basis. Other than the payment obligation contained in this paragraph, the Agent shall not be required to perform any of the Debtors' obligations under any lease as a condition to the rights afforded to the Agent in this paragraph.

22. *Effectiveness.* This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

23. *Advisor Fees and Expenses.* Invoices for any Advisor Fees and Expenses shall be submitted to counsel for the Debtors, counsel for the Creditors' Committee, counsel for the Asbestos Committee, counsel for the Asbestos Representative and counsel for the Silica Representative. The Debtors, Creditors' Committee, Asbestos Committee, Asbestos Representative and Silica Representative shall have ten (10) days from receipt of such invoices to file an objection with the Court. If no objection is timely filed, JPMCBB shall file a certification of counsel, with a copy of the invoice or summary of the invoice, informing the Court that no objections to the proposed Advisor Fees and Expenses have been filed. Upon the filing of this certification of counsel by JPMCBB, the Debtors shall be authorized to pay the proposed Advisor Fees and Expenses. If an objection is filed, such objection shall be heard at the next scheduled omnibus hearing in these Cases that is at least ten (10) days after the filing of such objection. Other than as provided in this paragraph of the Order, there shall be no other requirements for the payment of Advisor Fees and Expenses, notwithstanding any other order entered in the Cases with respect to payment of professional fees and expenses.

Dated:     February 10, 2005
           Wilmington, Delaware

_Judith K. Fitzgerald_
                              mab
UNITED STATES BANKRUPTCY JUDGE

494789-Chicago Server 2A - MSW