SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
D. J. Baker (DB 0085)

Attorneys for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
**In re**                                                    :
                                                             :        **Chapter 11**
                                                             :
**WINN-DIXIE STORES, INC., et al.,**                         :        **Case No. 05-11063 (RDD)**
                                                             :
              **Debtors.[1]**                                :        **(Jointly Administered)**
                                                             :
-------------------------------------------------------------x

**BRIEF IN SUPPORT OF EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§**
**105, 361, 362, 363 AND 364 FOR INTERIM AND FINAL FINANCING ORDERS**
**AUTHORIZING, INTER ALIA, DEBTORS TO OBTAIN SECURED**
**POST-PETITION FINANCING AND UTILIZE CASH COLLATERAL**

          Winn-Dixie Stores, Inc. and certain of its subsidiaries and affiliates, as debtors

and debtors-in-possession (collectively, the "Debtors"), hereby submit this memorandum

of law in support of the Debtors' motion pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and

364 for interim and final financing orders seeking, inter alia, authority to obtain post-

petition financing and utilize cash collateral, filed on February 22, 2005 (the "Motion"),

and in response to various objections to the Motion.

---

[1]       In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases:
          Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products,
          Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc.,
          Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek
          Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table
          Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc.,
          Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-
          Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

## PRELIMINARY STATEMENT

Prior to February 21, 2005 (the "Petition Date"), the Debtors had access to a $600 million credit facility, pursuant to a Second Amended and Restated Credit Agreement dated June 29, 2004 (the "Pre-Petition Credit Facility"), with Wachovia Bank, N.A., as administrative agent, and a syndicate of lenders (collectively, the "Pre-Petition Lenders"). As of the Petition Date, the Debtors were indebted to the Pre-Petition Lenders under the Pre-Petition Credit Facility in the aggregate amount of approximately $427,005,000 (the "Pre-Petition Obligations").[2]

During the months preceding the Petition Date, the Debtors suffered significant sales declines and market-share losses. As a result, the Debtors undertook a series of actions to improve their financial situation and competitive position. Despite implementing these actions, the Debtors continued to experience financial difficulties and on February 10, 2005, the Debtors announced that during their first and second fiscal quarters ending on January 12, 2005, they incurred substantial losses in the amount of $552.8 million. Following the Debtors' announcement of their financial results, the Debtors experienced a reduction in vendor related and other credit by more than $130 million. As a result, the Debtors were forced to file voluntary petitions for reorganization relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 as amended (the "Bankruptcy Code").

The Debtors have determined, in the exercise of their sound business judgment, that the Pre-Petition Credit Facility does not provide them with sufficient liquidity to sustain their operations during the Chapter 11 process. The Debtors urgently

---

[2]    Capitalized terms used and not defined herein shall have the meaning ascribed to them in the Motion.

need a significant increase in  credit in order to continue their business operations at or near customary levels.  Without the immediate availability of working capital and other financial accommodations, the Debtors will be unable to pay their employees, subcontractors and suppliers or otherwise conduct their business operations in an uninterrupted fashion.  The proposed post-petition financing facility is essential to enable the Debtors to regain the confidence of their trade vendors, and to ensure the continued supply of goods in the quantities needed to sustain their operations and maintain a competitive position in the marketplace.  The failure to obtain final court approval of post-petition financing providing additional credit will cause severe liquidity problems for the Debtors that will irreparably harm their businesses and likely cause their reorganization efforts to fail.

In this regard, the Debtors have negotiated a post-petition credit facility with Wachovia Bank, National Association, as Administrative Agent and Collateral Agent for itself and a syndicate of lenders (collectively, the "Lenders") that will provide financing in an aggregate amount of $800,000,000 (the "DIP Financing Facility").  The proposed credit accommodations are the best financing alternative available to the Debtors and will provide the Debtors with the necessary liquidity to operate their businesses.  The DIP Financing Facility is far superior to the limited working capital that otherwise would be available to the Debtors under the Pre-Petition Credit Facility or from the use of cash collateral generated in the course of their post-petition activities.  The DIP Financing Facility is inherently fair to the Debtors' estates and their creditors.  Its terms and provisions were negotiated at arm's length and in good faith by the Debtors and the

Lenders, and are the most favorable terms upon which the Debtors can obtain the needed debtor-in-possession financing.

On February 23, 2005, this Court granted the Motion on an interim basis and authorized the Debtors to, among other things, repay the Pre-Petition Obligations and borrow under the DIP Financing Facility in an amount up to $600 million.  The Debtors now seek entry of a proposed final order (the "Final Order") approving the DIP Financing Facility and the refinancing and repayment of the Pre-Petition Obligations with a portion of the proceeds borrowed under the DIP Financing Facility.  The Debtors also seek final approval of the use of the Cash Collateral of the Pre-Petition Lenders.  The Pre-Petition Lenders have consented to the Debtors' use of the Cash Collateral and the priming of their liens in the Pre-Petition Collateral through the date on which the Final Order becomes final and non-appealable, at which time the liens securing the Pre-Petition Obligations will be released, terminated, and/or assigned to the Lenders.

Various parties have filed objections to the entry of the Final Order.  The objecting parties can be categorized into three groups: (i) landlords, (ii) reclamation claimants, and (iii) PACA claimants.  According to the objecting landlords ("Landlords"), the request for entry of the Final Order should be denied because, among other reasons, (i) the Final Order grants security interests to the Lenders in leasehold interests in violation of restrictions on assignment in the leases, (ii) the Lenders' right to use and occupy the leased premises to exercise remedies with respect to the Collateral is impermissible under section 365 of the Bankruptcy Code, and (iii) a direct lien on the leases would eliminate the protections afforded shopping center landlords under section 365(b)(3) of the Bankruptcy Code and would constitute a de facto assignment of the lease

in violation of section 365.  For the reasons set forth in detail herein, each of these objections of the Landlords should be overruled.

The Lenders will provide a $100 million line of credit to the Debtors based exclusively on the appraised values of the Debtors' real property leasehold interests.  As a condition to obtaining this significant increase in their credit availability, the Debtors have agreed to grant to the Lenders liens and security interests in all of their real property leases and all rights related thereto, as well as provide the Lenders with the rights to consent to (before default), or direct (post-default), the Debtors' assumption, assignment or rejection of their real property leases.  Although the Landlords assert that their leases with the Debtors prohibit the granting of liens to the Lenders, the vast majority of these leases contain no contractual restrictions whatsoever on the Debtors' ability to pledge the leases to the Lenders.  Further, for the limited number of leases that do contain such restrictions, the case law in this District has made clear that lease restrictions on encumbrances are unenforceable under section 365(f) of the Bankruptcy Code.

Contrary to the assertions of certain Landlords, the Lenders are not seeking, through the lien grant in the leases, a de facto assignment of the leases or any rights greater than the Debtors' rights in the leases.  The Lenders are merely seeking to obtain enforcement rights with respect to their liens in all of the same rights and interests in the leases that the Debtors currently possess.  By the Debtors' grant of liens and enforcement rights in the leases to the Lenders, the Landlords are not being deprived of any of their rights under their respective leases, subject to applicable provisions of the Bankruptcy Code that limit the enforcement of certain of those rights in a bankruptcy case.

The reclamation claimants assert various objections to the relief requested in the Motion, but the aspect of the financing that the reclamation objectors most vigorously oppose is the payment of the Pre-Petition Obligations and the assignment to the Lenders of prepetition floating liens in the Debtors' inventory which render the reclamation objectors' claims "valueless."  Under recent case law in this District, the repayment of the Pre-Petition Obligations and release of the Pre-Petition Lenders' liens on the Debtors' inventory, together with the contemporaneous grant of liens on the inventory to the Lenders are one integrated transaction that renders the reclamation claims valueless.  See In re Dairy Mart Convenience Stores, Inc., 302 B.R. 128 (Bankr. S.D.N.Y. 2003).  The refinancing of the Debtors' prepetition debt by the $800 million DIP Financing Facility, however, is crucial to the Debtors' ability to survive as a going concern and maximize the value of their assets for the benefit of the estates.  The additional liquidity provided by the postpetition facility was not available without the repayment in full of the Pre-Petition Obligations.  If the consequence of that refinancing is the extinguishment of certain claims of reclamation claimants -- who have no legal entitlement under the Bankruptcy Code or nonbankruptcy law to prevent the postpetition financing from eliminating their ability to elevate their claims -- that result is necessary to preserve the value of the Debtors' assets for the benefit of all creditors.

Under Dairy Mart, a reclamation claimant's claim is not enhanced upon the filing of a bankruptcy case, and such claims are not entitled to administrative expense priority or a lien when the reclamation claim is subject to the rights of a secured creditor with a floating lien on all goods subject to the reclamation demand, as exists here.  As explained further below, by objecting to the Motion, the reclamation objectors are

6

seeking to elevate the status of their claims, in direct contravention of the <u>Dairy Mart</u> case. This is neither justified, nor grounds to deny final approval of the DIP Financing Facility, which is essential to the Debtors' survival and ability to pay its creditors.

The PACA claimants allege that the Final Order fails to provide for a segregated fund or provide replacement liens as adequate protection for their claims. As set forth herein, neither the PACA statute, legislative history, nor controlling Second Circuit precedent supports these unwarranted demands. The additional liquidity that will be provided by the $800 million DIP Financing Facility provides an adequate source of payment for all valid PACA claims, and nothing more is required.

## I

### THE PROPOSED DIP FINANCING FACILITY SHOULD BE AUTHORIZED BECAUSE THE DEBTORS HAVE SATISFIED THE APPLICABLE STANDARDS UNDER SECTION 364(c) OF THE BANKRUPTCY CODE

The Debtors propose to obtain financing under the DIP Financing Facility by providing security interests and superpriority claims to the Lenders pursuant to section 364(c) of the Bankruptcy Code. Before authorizing the section 364(c) financing proposed in the Motion, this Court must find, after notice and a hearing, that the Debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."[3] To satisfy this requirement, the Debtors must show that they have

---

[3]      Section 364(c) of the Bankruptcy Code provides:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —

    (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

made reasonable efforts to obtain alternative financing.  They need not, however, seek

credit from every possible lender before concluding that the proposed financing is the

best alternative available.  See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40

(Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek

other sources of financing under sections 364(a) and 364(b)); In re Crouse Group, Inc.,

71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) is

authorized, after notice and hearing, upon showing that unsecured credit cannot be

obtained).

        In determining whether a debtor is entitled to section 364(c) financing,

some courts have articulated an eight-factor test to determine whether to approve the

proposed debtor-in-possession financing.  Under this test, the debtor must show that:  (1)

the proposed financing is an exercise of sound and reasonable business judgment; (2) no

alternative financing is available on any other basis; (3) the financing is in the best

interests of the estate and its creditors; (4) as a corollary to the first three points, no better

offers, bids, or timely proposals are before the court; (5) the credit transaction is

necessary to preserve assets of the estate; (6) the terms of the transaction are fair,

reasonable, and adequate, given the circumstances of the debtor and the proposed lender;

(7) the financing is necessary, essential, and appropriate for the continued operation of

the debtor's business and the preservation of its estate; and (8) the financing agreement

---

    (2)       secured by a lien on property of the estate
                  that is not otherwise subject to a lien; or

    (3)       secured by a junior lien on property of the
                  estate that is subject to a lien.

11 U.S.C. § 364(c).

was negotiated in good faith and at arm's length between the debtor and the lender.  See, e.g., In re Farmland Indus., Inc., 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003).  See also In re WorldCom, Inc., No. 02-13533, 2002 WL 1732646, at *2-3 (S.D.N.Y. July 22, 2002); In re Ames Dep't Stores, 115 B.R. at 37-39.

The Debtors have satisfied this test and shown that the circumstances of these cases require the Debtors to obtain financing under sections 364(c)(1), (2) and (3). The Debtors are unable to obtain the required funds in the form of unsecured credit with an administrative priority because substantially all the Debtors' assets are encumbered. Having determined that financing was available only under section 364(c) of the Bankruptcy Code, the Debtors negotiated the DIP Financing Facility at arm's length and pursuant to their business judgment.  The proposed credit facility is the only financing alternative available to the Debtors that will provide the Debtors with the liquidity they need to operate their businesses.  In addition, its terms are the most favorable terms upon which the Debtors can obtain the needed debtor-in-possession financing.

Pursuant to the authority granted in the Interim Order, the Debtors used the proceeds of the DIP Financing Facility to repay the Pre-Petition Obligations in full on February 23, 2005.  Although the Pre-Petition Obligations have been repaid, the Pre-Petition Lenders are retaining their liens and security interests, on a junior basis to the liens securing the DIP Financing Facility, until such time as the Final Order becomes final and non-appealable.  At that time, the junior liens of the Pre-Petition Lenders will be released, terminated and/or assigned to the Lenders.  Other than the consensual priming of the Pre-Petition Liens, the DIP Financing Facility will not prime any other valid, perfected and nonavoidable liens.

A.      **The Debtors' Determination to Seek Approval of the DIP Financing Facility Reflects the Exercise of Sound Business Judgment**

After appropriate investigation and analysis and given the exigencies of the circumstances, the Debtors' management has concluded that the DIP Financing Facility is the only alternative available in the circumstances of these cases.  The Debtors' decision in this regard is entitled to judicial deference.  See Group of Institutional Investors v. Chicago, M., St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court.").  In general, courts do not second guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code. " In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (footnote omitted); Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) (bankruptcy courts generally should respect a debtor-in-possession's business judgment).

The Debtors have exercised sound business judgment in determining that the proposed post-petition credit facility is appropriate.  Without the liquidity provided by the DIP Financing Facility, the Debtors will be unable to pay suppliers, employees, and other constituencies that are essential to the orderly operation of their businesses.  The Debtors' exercise of their business judgment in negotiating the DIP Financing Facility is consistent with the policies and provisions of the Bankruptcy Code and, accordingly, is entitled to judicial deference.  See, e.g., Bray v. Shenandoah Fed.  Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-in-possession financing necessary to sustain seasonal business); In re Ames Dep't Stores, 115 B.R. at 40

("the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers").

**B.      The Debtors Have No Alternative to the DIP Financing Facility**

As shown at the interim hearing on the Motion held on February 23, 2005 (the "Interim Hearing"), a working capital facility of the type and magnitude needed in these cases was not available from any other funding source.  Potential sources of post-petition financing for the Debtors, obtainable on an expedited basis and on reasonable terms, were extremely limited.  As Paul Huffard, a Senior Managing Director of The Blackstone Group, L.P., the Debtors' investment bankers and financial advisors, testified at the Interim Hearing, neither of the two alternative sources of post-petition financing proposed a facility that met the Debtors' working capital requirements.  See Transcript of Interim Hearing (hereinafter "Tr.") at 9.  In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  In re Snowshoe Co., 789 F.2d at 1088.

A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c).  Id.; see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992) (same with respect to section 364(d)).  Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct … an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117 (N.D. Ga. 1989).  Under these circumstances, where the

Debtors' need for financing of the magnitude required here was immediate, the Debtors

have shown that alternative credit that meets the Debtors' liquidity needs is unavailable.

In re Snowshoe Co., 789 F.2d at 1088 (court should give significant weight to particular

facts and circumstances surrounding debtor's credit needs, particularly factor that "time is

of the essence" in debtor's reorganization efforts); In re Reading Tube Indus., 72 B.R.

329, 332 (Bankr. E.D. Pa. 1987) (same).

C.     **The DIP Financing Facility is in the Best Interest of the Debtors' Estates and their Creditors**

The DIP Financing Facility will provide the Debtors with substantial

liquidity to enable them to regain the confidence of their trade vendors, and ensure the

continued supply of goods in the quantities needed to sustain their operations and

maintain a competitive position in the marketplace.  The interest rate on the nonleasehold

portion of the DIP Financing Facility is lower than the interest rate on the Pre-Petition

Credit Facility, and an additional $175 million in borrowing base availability will be

provided.  Tr. at 10.  The $800 million DIP Financing Facility will provide adequate

liquidity for the Debtors to operate their businesses.  Tr. at 12.  Through the improved

terms and borrowing availability, the DIP Financing Facility will maintain the value of

the Debtors' estates pending their emergence from Chapter 11.  See In re Sky Valley,

Inc., 100 B.R. at 115 (the purpose of a debtor-in-possession financing is to maintain the

value of the debtor's estate pending its emergence from Chapter 11).  Thus, the DIP

Financing Facility is in the best interest of the Debtors' estates and their creditors.

**D.      The DIP Facility is Necessary for the Debtors to Effectively Preserve the Assets of their Estates and to Operate Their Businesses**

No party-in-interest can credibly contend that the Debtors do not need immediate access to a working capital facility.  As with most other large businesses, the Debtors have significant cash needs.  For example, in fiscal year 2004, the Debtors' cost of sales, including warehouse and delivery expenses, was approximately $7.8 billion. Accordingly, access to substantial credit is necessary to meet the day-to-day costs associated with maintaining business relationships with the Debtors' vendors and suppliers, purchasing new inventory, and otherwise financing their operations.

As Mr. Huffard testified at the Interim Hearing, the Pre-Petition Credit Facility does not provide the Debtors with sufficient liquidity to sustain their operations and run their businesses in Chapter 11.  Tr. at 14.  If the DIP Financing Facility is not approved today, "that will cause severe liquidity issues for the company in the very near term those liquidity issues will irreparably harm the business."  Id.  The nature of the Debtors' business is such that it is highly dependent on immediately available financing to meet its inventory turnover requirements extremely quickly and ensure that the shelves in its stores are at all times adequately stocked.  Tr. at 14-15.  For these reasons, access to credit under the DIP Financing Facility is immediate and critical.

**E.      The Terms of the DIP Financing Facility Are Fair, Reasonable and Adequate**

The terms of the DIP Financing Facility are fair, reasonable and adequate. These terms provide a substantial improvement over the terms of the Pre-Petition Facility.  Id.  The DIP Financing Facility provides a $200 million increase in overall credit from the Pre-Petition Facility.  Id.  An additional $175 million in borrowing base availability will be provided.  Id.  The interest rate on the nonleasehold portion of the DIP

13

Financing Facility is lower by 25 basis points.  Id.  Overall, the structure of the DIP

Financing Facility has been streamlined to provide significant operational benefits to the

Debtors.  Tr. at 10-11.  Accordingly, the Debtors concluded that the terms of the

postpetition financing are fair, reasonable and adequate, and in the best interests of the

Debtors, their estates and their creditors. Tr. at 17.

F.    **The Financing Agreement Was Negotiated In Good Faith And At Arm's Length Between The Debtors And The Lender**

The Debtors and the Lenders engaged in extensive negotiations regarding

the terms of the DIP Financing Facility.  Tr. at 11.  These negotiations resulted in a

significant number of improvements to the terms of the facility during the course of the

negotiations.  Id.  All of these negotiations were conducted at arm's length and in good

faith.  Id.  As a result of these good faith negotiations, the terms of the DIP Financing

Facility are fair and reasonable.  Id.  Accordingly, the Lenders are entitled to the benefits

of section 364(e) of the Bankruptcy Code.

## II

## FINAL APPROVAL OF THE REPAYMENT OF THE PRE-PETITION OBLIGATIONS SHOULD BE GRANTED

The Debtors' decision to immediately repay their pre-petition bank debt is

a sound exercise of the Debtors' business judgment for several reasons.  First, the

repayment of the Pre-Petition Obligations stops the accrual of interest, fees and expenses.

Since the Pre-Petition Obligations accrue interest at higher interest rates than the DIP

Financing Facility obligations, the repayment of the pre-petition debt provides substantial

saving to the Debtors and their estates.  In addition, as described above, without access to

the $800 million in credit available under the DIP Financing Facility, the Debtors will not

14

have the liquidity that they urgently need to meet their working capital requirements and

reorganize successfully in Chapter 11.  The Pre-Petition Lenders would not agree to

permit the Pre-Petition Obligations to remain outstanding and have their liens primed by

the DIP Financing Facility.  Tr. at 13.  Lastly, as Mr. Huffard testified at the Interim

Hearing, the cash collateral generated by the Debtors' cash receipts is insufficient to allow

the Debtors to stabilize their operations and regain the confidence of their trade vendors.

Tr. at 14.

Therefore, after appropriate investigation and analysis, the Debtors'

management concluded that it would be in the best interest of the Debtors, their estates

and their creditors to use a portion of the borrowings under the DIP Financing Facility to

repay the Pre-Petition Obligations in full.  Pursuant to the authorization granted in the

Interim Order, the Debtors used a portion of the borrowings from the DIP Financing

Facility to repay approximately $268 million in outstanding indebtedness and replace

approximately $162 million in letter of credit obligations under the Pre-Petition Credit

Facility on February 23, 2005.  By doing so, the Debtors will realize a substantial savings

by eliminating the more expensive pre-petition indebtedness with the more favorable

terms of the DIP Financing Facility, will enjoy better credit terms with a higher credit

limit, and obtain better prospects for achieving financial stability.

Under the circumstances of this case, the repayment of the pre-petition

indebtedness is not controversial because the pre-petition obligations were fully secured

by valid perfected and non-avoidable liens and security interests.  As of the Petition Date,

the value of the collateral securing the Pre-Petition Obligations exceeded the amount of

such obligations.  Tr. at 6.  Further, the proposed final order, at paragraph 15(e), provides

15

ample opportunity for the Creditors' Committee to seek to unwind the repayment should grounds to do so arise.  Moreover, the Pre-Petition Lenders have consented to the Debtors' use of their Cash Collateral and the priming of their liens in the Pre-Petition Collateral through the date on which the Final Order becomes final and non-appealable, at which time the liens securing the Pre-Petition Obligations will be released, terminated and/or assigned to the Lenders.

Accordingly, the decision to immediately repay the Pre-Petition Obligations with a portion of the funding provided by the DIP Financing Facility is a well-reasoned exercise of the Debtors' sound business judgment, and should be approved on a final basis by this Court.  See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1992) (financing approved, including cross-collateralization provisions, where it appeared that the purpose of the loan was to benefit estate rather than party in interest); In re Simasko Prod. Co., 47 B.R. 444, 450 (Bankr. D. Colo. 1985) (court would not second-guess debtor's business judgment, based on distinct awareness of its financial needs, to put aside cash to effectuate a refinancing of its debts); In re Donnkenny Apparel, Inc., No. 05-10712 (RDD) (Bankr. S.D.N.Y. Feb. 9, 2005) (approving roll up of pre-petition debt); In re Twinlab Corp., Case No. 03-15564 (CB) (Bankr. S.D.N.Y. Sept. 25, 2003) (Docket No. 80) (authorizing Debtors to repay existing prepetition bank debt).

**III**

**THE LANDLORDS' OBJECTIONS SHOULD BE OVERRULED**

Certain Landlords have filed objections[4] to entry of the Final Order on the basis that provisions of the order allegedly contravene express provisions of their leases with the Debtors and the Landlords' rights under section 365 of the Bankruptcy Code. These Landlords are parties to 95 leases with the Debtors, representing less than 15% of the Debtors' total leases.  According to the Landlords, the relief sought in the Motion should be denied because, among other reasons, (i) the Final Order grants security interests to the Lenders in the leases in violation of anti-assignment restrictions in the leases, (ii) the Lenders' right to use and occupy the leased premises to exercise remedies with respect to the Collateral is impermissible under section 365 of the Bankruptcy Code, and (iii) a direct lien on the leases would eliminate the protections afforded to shopping center landlords under section 365(b)(3) of the Bankruptcy Code.

As discussed in detail below, these contentions are not supported by the provisions of either the Bankruptcy Code or the leases themselves.

**A**.    **The Bankruptcy Code Permits the Grant of Liens in the Debtors' Leases Notwithstanding Any Restriction in the Leases on Encumbrances**

Preliminarily, despite the Landlords' assertions that anti-assignment or anti-pledge clauses in their leases with the Debtors prevent the Lenders  from obtaining liens on these leases, *the majority of the Landlords' leases with the Debtors contain no such clauses.*  Indeed, 73 of the 95 leases of the Landlords do not prohibit the Debtors

---

[4]    Objections were filed on March 11, 2005 by Prudential Insurance Company of America, Victory Real Estate Investments and Edens & Avant, Developers Diversified Realty Corporation, Weingarten Realty Investors, WRI/TEXLA, Krusch Properties, Palm Springs Mile Associates, Villa Rica Realty Properties, and ALG Limited Partnership.  Objections were filed on March 14, 2005, after the objection deadline, by Inland Southeast, Ernst Properties and Chester Dix.

from assigning or encumbering the leases.  While some of the Landlords' leases contain

restrictions on the Debtors' absolute assignment of the leases, only 16 of the Landlords'

95 leases contain restrictions on the Debtors' ability to pledge or grant liens on the leases.

As the United States District Court for the Southern District of New York

has made clear, any restrictions on assignment of the leases are irrelevant here.   This is

because a pledge of a lease is merely a collateral assignment that is not subject to any

lease provision purportedly restricting absolute assignments.  See Reorganized

Gilbert/Robinson, Inc. v. Wagner (In re I&M Acquisition Corp.) No. 95 Civ. 2114, 1995

WL 606353, at *4-6 (S.D.N.Y. 1995)  ("A pledge is distinguishable from an assignment

in that title to the pledged property remains with the pledgor.").  Thus, only 16 of the

Landlords' leases with the Debtors contain any contractual restriction allegedly

contravened by the relief sought to be granted in the Final Order.

In the I&M decision, the district court affirmed the Bankruptcy Court's

conclusion that any lease provision granting the landlord the right to withhold consent to

a pledge of the lease for collateral is unenforceable under section 365(f)(1) and (3) of the

Bankruptcy Code.  Id., at *4.  This holding reflects the important Bankruptcy Code policy

that contractual restrictions that impair the debtor's ability to maximize the value of its

assets for the benefit of the estate should not be strictly enforced.  To further this policy,

courts have consistently interpreted section 365(f) broadly to nullify any lease provision

that is so restrictive as to be the equivalent of an anti-assignment provision.  As one court

has noted, "[i]n interpreting Section 365(f), courts and commentators alike have

construed the terms to not only render unenforceable lease provisions which prohibit

assignment outright, but also lease prohibitions that are so restrictive that they constitute

de facto anti-assignment provisions." Rickel Home Ctrs., Inc., 240 B.R. 826, 831 (D. Del. 1998). Thus, section 365(f) confers significant authority on the bankruptcy court to nullify lease restrictions which, if they were enforced, would preclude the debtor from realizing value on its leases for the benefit of its estate.

In addition to the authority conferred by section 365(f), section 363(b) also authorizes this Court to permit the Debtors, notwithstanding contractual restrictions, to maximize the value of their assets by pledging their leases to secure the credit facility. In considering whether to approve going out of business sales governed by section 363(b), bankruptcy courts have consistently refused to strictly enforce contractual restrictions in leases that purportedly would prevent the debtor from conducting such sales or liquidating inventory. See, e.g., In re Ames Dep't Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (enforcement of contractual restriction against going out of business sales would contravene overriding federal policy requiring debtors to maximize asset); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (Bankruptcy Code permits the compromise or adjustment of private rights and should permit a going out of business sale absent proof of specific injury or damage when the lease restrictions conflict with debtor's reorganization). In the Ames case, the court concluded that going out of business requests were governed by section 363 not section 365 and that lease restrictions may be abrogated subject to regulation by the court as provided in section 363(b). In re Ames, 136 B.R. at 359.

If enforced, the restrictions on encumbrances in the Debtors' leases would prevent the Debtors from using the leases to obtain the liquidity provided by the $100 million leasehold portion of the Lenders' $800 million credit facility, which is essential to

the Debtors' business operations.  Clearly, authorizing the Debtors to grant liens on the leases notwithstanding any restrictions on encumbrances in the leases enables the Debtors to maximize the value of estate property for the benefit of all creditors.  Further, any exercise of remedies by the Lenders which causes the assumption, assignment or rejection of any lease by the Debtors will be subject to the rights of the Landlords under section 365, to the extent applicable.  Therefore, the Landlords are adequately protected for the encumbrance of their leases by the protections afforded in the Final Order.

Further, although certain Landlords allege that postpetition lenders typically obtain only a lien on lease proceeds because anti-assignment and anti-pledge clauses prevent the granting of liens directly on the leases, this is not true.  In fact, this Court and courts in numerous other cases have approved the grant of postpetition liens in leases notwithstanding restrictive clauses in the leases.  See, e.g., In re Solutia Inc., Case No. 03-17959 (PCB); In re Kaiser Aluminum & Chem. Corp., Case No. 02-10429 (JKF) (Bankr. D. Del); In re Interstate Bakeries Corp., Case No. 04-45814 (JWV) (Bankr. W.D. Mo.) (copies annexed as Exhibit A hereto).  Thus, approving the Debtors' grant of liens in the leases, notwithstanding restrictions therein, is not unusual and is entirely consistent with postpetition financing orders approved in this and other jurisdictions.

**B.    The Lender's Right to Exercise Remedies With Respect to the Collateral Would Not Violate Section 365 of the Bankruptcy Code**

As collateral security for providing an $800 million credit facility, the Debtors will grant the Lenders' security interests in substantially all assets, including leases, inventory and equipment.  Upon occurrence of an event of default under the Loan Documents, the Lenders will be entitled to exercise remedies with respect to their collateral in accordance with the provisions of the Loan Documents and the Final Order.

20

Contrary to the Landlords' assertions, the Lenders' right to enter upon leased premises and exercise remedies against their collateral granted in the Final Order is not equivalent to the assignment to the Lenders of the underlying lease under section 365.  See I&M, 1995 WL 606353, at *5-6 (pledge of lease does not involve transfer of lessee's rights of possession or control of leased premise and does not constitute an assignment).

If the Lenders are forced to enter upon any lease premises in order to take measures to liquidate the collateral located on those premises, the Final Order requires the Lenders to give five business days prior written notice to the applicable Landlord, and to reimburse the Landlord for any reasonable costs or expenses, including rent changes, incurred by the Landlord in connection with the Lenders' actual use of the leased premises.  The Lenders' use of the premises will be in accordance with the provisions of the lease, to the extent enforceable under section 365 and other applicable provisions of the Bankruptcy Code.  In addition, if the Lenders elect to conduct going out of business sales at various leased locations of the Debtors' stores, the Lenders would obtain a sale order under section 363 of the Bankruptcy Code, and the Landlords would have an opportunity at that time to raise any concerns they may have related to the sale process. Accordingly, there is no prejudice to the Landlords from the provisions of the Final Order granting the Lenders access to the leased premises to liquidate collateral.

**C**.      **A Direct Lien on the Leases Does Not Impair the Landlords' Rights Under the Bankruptcy Code**

The lien grant to the Lenders is not a de facto assignment of the leases themselves.  In the event that the Lenders were to exercise their remedies with respect to the leases following an event of default under the Loan Documents, the Lenders would have no greater rights in the leases than those currently possessed by the Debtors, which

21

rights are subject to the provisions of section 365 of the Bankruptcy Code.  Accordingly,
if the Lenders sought to require the Debtors to assume and assign any lease connection
with an exercise of their remedies in the event of a default, the Landlords would receive
notice and have an opportunity to assert their rights under their respective leases and
section 365 of the Bankruptcy Code.  The Lenders, who have agreed to advance up to
$100 million based on the value of the Debtors' leases, cannot succeed to any greater
rights than the Debtors have in their leases.  The exercise by a third party of a debtor's
lease designation rights is not unusual when value has been provided to the estate for
such rights.  See, In re Ames Dep't Stores, Inc., 287 B.R. 112, 117 (Bankr. S.D.N.Y. 2002)
("the sale of designation rights is hardly novel; it has been repeatedly approved"); In re
Bradlee's Stores, Inc., No. 00-16033, 2001 WL 1112308, at *4 (S.D.N.Y. Sept. 20, 2001).
Similarly, in the unlikely event that the Lenders elected to foreclose on the liens in the
leases in state court, the Landlords would be entitled to assert all rights afforded to them
under the leases and applicable state law foreclosure proceedings.  Therefore, the grant of
liens in the leases and the Debtors' designation rights does not impair any of the
Landlords' rights under the leases, the Bankruptcy Code or other applicable law.

              Further, although the Landlords claim they are entitled to the protections
afforded by section 365(b)(3) applicable to shopping center landlords, they have not
shown that their leases are shopping center leases entitled to such protections.  To the
extent that the Landlords' leases qualify as shopping center leases, the Landlords may
assert their rights under section 365(b)(3) at such time as the Debtors seek to assume
and/or assign such leases.  The arguments of the Landlords based on shopping center
treatment of their leases -- which may or may not be applicable -- are at best premature.

Nothing in the Final Order eliminates the protections provided to the Landlords by section 365(b)(3), to the extent applicable, regarding the assumption and/or assignment of any purported shopping center leases.

## IV

## THE RECLAMATION OBJECTIONS SHOULD BE OVERRULED

Certain vendors asserting rights to reclamation have filed objections to the proposed Final Order on the following bases:  (i) reclamation claims should not be rendered valueless by the Final Order because the Pre-Petition Lenders were fully secured when the reclamation demands were made, (ii) the assignment of the prepetition liens and security interests of the Pre-Petition Lenders to the Lenders will not be valid because the debt held by the Pre-Petition Lenders was fully satisfied after entry of the interim financing order, (iii) the proceeds of the sold goods subject to reclamation should be segregated, (iv) the reclamation claimants must receive adequate protection of their rights in connection with the granting of postpetition liens to the Lenders, and (v) a carveout should be established to pay reclamation claims with the same priority as the professionals' carveout.  The aspect of the financing that the reclamation objectors most vehemently oppose, however, is the payment of the Pre-Petition Lenders' debt and assignment to the Lenders of the prepetition liens which renders the reclamation creditors' claims "valueless."  Based on the recent Dairy Mart decision in this District directly on point, however, the reclamation claims asserted by the reclamation creditors are, in fact, rendered valueless and are entitled to only general unsecured claim status. See In re Dairy Mart Convenience Stores, Inc., 302 B.R. 128 (Bankr. S.D.N.Y. 2003).

The Debtors do not seek at this time any judicial ruling or determination as to application of the "valueless" defense or the principles of the Dairy Mart case to the

reclamation claims asserted by the vendors in question.  Such issues may well be subject to a consensual resolution that would encompass a number of related issues.  Whether any such consensual resolution does or does not occur, the Debtors believe that it would be inequitable to allow reclamation creditors to improve their legal position as a result of approval of the DIP Financing Facility.

Set forth below are the arguments that the Debtors believe would be appropriate to make in the event that the issues relating to the "valueless" defense are litigated.  Although there are contrary views and opinions on the issue, the Debtors believe that the arguments presented herein would prevail.  The Debtors expressly do not request a ruling at this time as to the effect of entry of the Final Order on reclamation claims.

In Dairy Mart, the Bankruptcy Court held that a reclamation claimant's claim is not enhanced upon the filing of a bankruptcy, and such claims are not entitled to an administrative claim or lien in the amount sought when the reclamation claim is subject to the rights of a secured creditor with a floating lien on all goods subject to the reclamation demand.  Prior to Dairy Mart's bankruptcy filing, Dairy Mart's prepetition lenders held a floating lien on all of Dairy Mart's inventory.  After the Chapter 11 case was commenced, the prepetition lender and Dairy Mart entered into a cash collateral stipulation, pursuant to which the prepetition lender was granted replacement liens on all prepetition collateral and proceeds thereof, and all types of property that constituted prepetition collateral coming into existence postpetition.  Id. at 130-31.

Dairy Mart also filed a motion for approval of a postpetition credit facility to be provided by Foothill Capital Corporation ("Foothill"), secured by a first priority lien

on all of Dairy Mart's assets, subject and subordinate to the liens of the prepetition lender in its prepetition collateral.  The court granted the motion, and the final order approved the use of a portion of the Foothill loan proceeds to repay in full all prepetition debt owing to the prepetition lenders (except for letters of credit outstanding which were transferred to and deemed issued under the Foothill facility) and the contemporaneous release by the prepetition lenders of their prepetition liens and security interests.  Id. at 131.

In response to various reclamation claims filed by its vendors, Dairy Mart asserted that because such reclamation claims were subject to the rights of a holder of a prior perfected floating lien on the debtors' inventory when that holder's debt was paid, the interests of the reclamation claimants were rendered valueless.  Thus, Dairy Mart contended that the reclamation claimants were not entitled to administrative claims.  Id. at 132.

Based on its analysis of the reclamation claimants' rights under state law and section 546(c) of the Bankruptcy Code, the Dairy Mart court concluded that by the time the prepetition lender was paid in full from the Foothill facility, the reclamation claims were rendered valueless.  Id. at 132.  The court noted that section 546(c) of the Bankruptcy Code recognizes the rights of reclamation claimants under nonbankruptcy law but does not expand those rights.  Id. at 134.  Pursuant to section 546(c), a seller may reclaim goods sold to an insolvent debtor if it shows:  (i) a statutory or common law right to reclaim the goods, (ii) the goods were sold in the ordinary course of the seller's business, (iii) the debtor was insolvent when the goods were received, and (iv) it made written demand for reclamation within the statutory time period required.  Id. at 133

(citing In re Victory Mkts., Inc., 212 B.R. 738, 741 (Bankr. N.D.N.Y. 1997)).  The

reclaiming seller has the burden of establishing each element of section 546(c) by a

preponderance of the evidence.  Id.

Section 2-702 of the Uniform Commercial Code provides the statutory

right upon which sellers base their reclamation demands.  That provision grants a seller

the right to reclaim goods that a buyer has received on credit while insolvent upon

demand made within ten days after receipt, subject to the rights of a buyer in the ordinary

course of business or other good faith purchaser.  See UCC § 2-702.  Once the right to

reclamation is established, section 546(c) affords the bankruptcy court discretion to

substitute an administrative claim or lien in place of the right to reclaim.  Dairy Mart, 302

B.R. at 133 (citing In re Pester Ref. Co., 964 F.2d 842, 845 (8th Cir. 1992)).  While this

discretion affords the court the flexibility to decide between permitting a reclamation

claimant an administrative claim or a lien to preserve the value of the reclamation claim,

it does not permit the court to enhance the claimant's position if under applicable

nonbankruptcy law the value of the reclamation claim is zero.  Id. at 134.

A seller's right to reclamation is subject to the rights of a good faith

purchaser, including a holder of a prior perfected floating lien on inventory.  Id.  While a

reclaiming seller's claim is not automatically extinguished, the reclaiming seller also is

not automatically granted an administrative claim or lien in the full amount sought when

it is subject to the rights of a good faith purchaser.  Id. (citing Victory Mkts., 212 B.R. at

743).  The reclaiming seller's right to reclaim depends on the value of the excess goods

remaining once the secured creditor's claim is paid or released.  When the goods subject

to a reclamation demand are liquidated and the proceeds used to pay the secured

creditor's claim, the reclaiming seller's subordinated right is rendered valueless.  Id. at

134 (citing In re Arlco, Inc., 239 B.R. 261, 273 (Bankr. S.D.N.Y. 1999)).  Once the

secured creditor is paid in full, the reclaiming seller is only entitled to reclamation when

the surplus collateral remaining consists of the very goods sold by the reclaiming seller or

the traceable proceeds from those goods.  Id.

   Thus, when the prepetition lender was paid in full from the postpetition

facility, the reclamation claims in Dairy Mart were rendered valueless.  Id.  The court

recognized that the only way Dairy Mart could obtain a postpetition loan was by

providing the DIP lender with a lien on all of the prepetition lenders' collateral.  As a

condition to making the postpetition loan to Dairy Mart, Foothill required that a lien be

placed on the same inventory and proceeds that had secured the prepetition loans, as well

as any additional postpetition inventory.  Therefore, the release of the prepetition lenders'

liens and simultaneous grant of liens to Foothill was an "integrated transaction."  Id. at

135.

   The refinancing of the prepetition debt in this case affects the claims of

reclamation claimants in the same manner as in the Dairy Mart case.  Similarly to Dairy

Mart, the Debtors first obtained authority to use up to $100 million of cash collateral of

the Debtors' prepetition lenders.  The following day, the Debtors obtained authority to

repay in full $427,005,000 of the outstanding debt to the Pre-Petition Lenders, and the

Pre-Petition Lenders were granted junior liens to secure certain contingent obligations

relating to the Pre-Petition Obligations.  The Pre-Petition Lenders had liens on

substantially all of the Debtors' assets, including the goods subject to reclamation

demands.  The Lenders obtained postpetition first priority liens on the same collateral

granted to the Pre-Petition Lenders, including the goods that are the subject of reclamation demands.

As in Dairy Mart, as a condition to providing the DIP Financing Facility, the Lenders required the grant of first priority floating liens in all of the Debtors' inventory on which the Pre-Petition Lenders had liens. As provided for in UCC § 2-702, a reclamation claimant's right to reclaim goods is subject to the rights of the debtor's prepetition lenders as good faith purchasers. Accordingly, as in Dairy Mart, when the Debtors repaid the Pre-Petition Lenders' debt with proceeds of the Lenders' loans secured by the same collateral, the reclamation claims were rendered "valueless." As in Dairy Mart, these steps must be viewed as an "integrated transaction." If, under the Bankruptcy Code, applicable precedent and applicable nonbankruptcy law, the refinancing of the Pre-Petition Obligations by the more favorable DIP Financing Facility causes reclamation claims to be extinguished, that is a necessary consequence to enable the Debtors to survive and reorganize as a going concern. The desire of the reclamation claimants to elevate their position -- without any vested legal right to do so -- is not a legitimate reason to deny approval of the DIP Financing Facility to the detriment of the Debtors' other creditors and parties in interest.

Certain of the reclamation objectors also have objected to the assignment of the Pre-Petition Lenders' liens to the Lenders as an invalid assignment meant to frustrate the rights of reclamation objectors. There is established precedent, however, for the full repayment of prepetition debt and the assignment of the prepetition lender's liens to postpetition lenders. See In re Pittsburgh-Canfield Corp., 309 B.R. 277, 282 (9th Cir. 2004).

28

Certain reclamation objectors further request that their claims be granted superpriority status.  This request is unfounded.  By the express language of section 546(c), there is no right to superpriority administrative status for reclamation claimants.  See In re Flagstaff Foodservice Corp., 14 B.R. 462, 467 (Bankr. S.D.N.Y. 1981) (nothing in § 546(c) indicates that reclamation claimants have greater rights than other holders of § 503(b) administrative expenses).  Accordingly, these claimants are not entitled to treatment beyond that provided in section 546(c), which does not entitle them to superpriority claims.

Similarly, reclamation claimants are not entitled to adequate protection for the grant to the Lenders of liens and superpriority claims.  Section 546(c) does not enlarge a reclamation seller's substantive rights.  Under UCC § 2-702, a reclamation creditor does not have a security interest in the goods subject to reclamation.  See, e.g., Johnston & Murphy Shoes, Inc. v. Meinhard Commercial Corp. (In re Mel Golde Shoes, Inc.), 403 F.2d 658, 659-60 (6th Cir. 1968) (under the UCC a reclamation right is not a security interest);  In re Pittsburgh-Canfield, 309 B.R. at 291 (reclamation sellers have no lien under the UCC); In re Arlco, Inc., 239 B.R. at 274 (a reclamation seller "does not have a secured claim").  A reclamation claimant obtains a lien only if granted one by the Bankruptcy Court, which has not occurred in these cases.  Since the reclamation objectors have no liens to protect, they are not entitled to adequate protection.

## V

## THE PACA OBJECTIONS SHOULD BE OVERRULED

Certain PACA claimants have objected to the proposed Final Order because it fails to provide adequate protection for their unpaid prepetition claims that are

allegedly protected under the Perishable Agricultural Commodities Act, as amended, 7 U.S.C. § 499a-499s ("PACA").  As a result, the PACA claimants assert an entitlement to a set-aside of $30 million, the total amount of the Debtors' alleged prepetition PACA claims, or adequate protection in the form of replacement liens.  These allegations are premature and completely lacking in merit.

The statute, case law, and legislative history make clear that buyers of PACA goods are not required to segregate trust assets as a means to enforce a seller's right to payment, absent compelling reasons.  On the contrary, the regulations promulgated under PACA clearly state that trust assets are "nonsegregated" and "floating" and that "[c]ommingling of trust assets is contemplated."  7 C.F.R. § 46.46(b) (2005).  As recently set forth by the Second Circuit Court of Appeals: "To satisfy its obligations under PACA, a produce buyer must simply 'maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities.'"  C.H. Robinson Co. v. Alanco Corp., 239 F.3d 483, 488 (2d Cir. 2001) (quoting 7 C.F.R. § 46.46(d)(1)); see id. at 487-88 (dicta); see also JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 78 (2d Cir. 1990) ("[N]either the language of [PACA] nor its legislative history suggests that trust assets actually need to be segregated from a buyer's other assets.").

Cause for the segregation of PACA assets is established in this Circuit only upon a showing of dissipation of such trust assets, which has not been shown here. Indeed, case law demonstrates that segregation is an extraordinary remedy to be granted only upon a showing that the debtor's use of funds in its ongoing business operations would so deplete the trust that the unpaid supplier would have an inadequate remedy at

law.  See JSG Trading, 917 F.2d at 80 (denying segregation because PACA creditor
failed to demonstrate trustee's inability to pay trust claims);  DeBruyn Produce Co. v.
Victor Foods, Inc., 674 F. Supp. 1405, 1407-09 (E.D. Mo. 1987) (no showing that debtor
was dissipating trust assets to warrant segregation).

Here, the PACA objectors have failed to present any evidence of
dissipation or that the Debtors have insufficient assets to pay their prepetition PACA
obligations.  The PACA objectors merely argue that the Debtors are using trust assets to
pay other creditors.  This fact by itself, however, is insufficient to warrant segregation.
Case law in this Circuit and elsewhere shows that a debtor may use trust assets as long as
there are sufficient assets to pay the PACA claims in full.  See C.H. Robinson Co., 239
F.3d at 488 ("A PACA trustee may use trust assets to pay ordinary business expenses as
long as it does not do so at the expense of its PACA beneficiaries, or in any way impair
the ability of the beneficiaries to collect money owed in connection with produce sales.").
The $800 million DIP Financing Facility will provide the Debtors with sufficient
liquidity to pay valid PACA claims in full.  Thus, use of trust assets, in and of itself, is
not sufficient dissipation to support a segregation argument.

Finally, the PACA objectors allege -- without any evidence -- that the
Debtors' use of cash collateral is dissipating the PACA trust assets.  The PACA objectors
therefore assert an entitlement to replacement liens as adequate protection.  The Final
Order, however, expressly acknowledges the seniority of valid PACA trust claims:
"neither this Final Order nor the liens and claims granted hereby are intended to, or shall,
prime or in any way affect  . . . valid  trust claims of creditors under the [PACA]."  Final
Order ¶ 6.  Nothing further is required.

## <u>CONCLUSION</u>

As explained by the Debtors' witnesses at the Interim Hearing, the proposed DIP Financing Facility clearly is the best available credit source for the Debtors to fund their operations in Chapter 11.  The DIP Financing Facility will enable the Debtors to refinance the more expensive Pre-Petition Obligations, continue their operations, pay their employees, and operate their businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their assets and enterprise for the benefit of all parties-in-interest.  The availability of credit under the DIP Financing Facility will provide outside parties with confidence in the Debtors that will enable and encourage them to resume ongoing credit relationships with the Debtors and thereby promote the Debtors' successful reorganization.

For all of the reasons set forth herein, this Court should overrule the objections of each of the Landlords, the reclamation objectors, and the PACA objectors. The DIP Financing Facility reflects the exercise of the Debtors' sound business judgment, and the Debtors have satisfied the legal prerequisites to borrow under the DIP Financing Facility.  Accordingly, this Court should grant the Motion and authorize the Debtors to borrow funds under the DIP Financing Facility on a secured superpriority basis pursuant to section 364(c) of the Bankruptcy Code.

Dated: March 17, 2005
     New York, New York

/s/ D.J. Baker
D. J. Baker (DB 0085)
Sally McDonald Henry (SH 0839)
Alexandra Margolis (AM 4163)
Venera Taouchanova (VT 6136)
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000

Eric M. Davis
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
One Rodney Square
Wilmington, Delaware 19801
Telephone:  (302) 651-3000
Facsimile:  (302) 651-3001

Attorneys for Debtors
