**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------- x
                           :
In re                           :    Chapter 11
                           :
    **SOLUTIA INC.,** *et al.,*          :    Case No. 03-17949(PCB)
                           :
              Debtors.     :    Jointly Administered
                           :
---------------------------------------------------------------------- x

### FINAL ORDER (I) APPROVING USE OF CASH COLLATERAL, (II) AUTHORIZING DEBTORS TO INCUR POST-PETITION SECURED INDEBTEDNESS, AND (III) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS PURSUANT TO SECTIONS 105(a), 361, 363, 364(c), 364(d) AND 364(e) OF THE <u>BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014</u>

        Solutia Inc. ("Solutia") and Solutia Business Enterprises, Inc. ("Solutia Business,"

and together with Solutia, the "Borrowers"), Solutia Systems, Inc. ("Solutia Systems"), Solutia

Overseas, Inc. ("Solutia Overseas"), CPFilms Inc. ("CPFilms"), Solutia Management Company,

Inc. ("Solutia Management"), Monchem International, Inc. ("Monchem International"), Axio

Research Corporation ("Axio"), Solutia Investments, LLC ("Solutia Investments"), Beamer Road

Management Company ("Beamer"), Monchem, Inc. ("Monchem"), Solutia Inter-America, Inc.

("Solutia Inter-America"), Solutia International Holding, LLC ("Solutia International"), Solutia

Taiwan, Inc. ("Solutia Taiwan"), Solutia Greater China, Inc. ("Solutia China") (each a

"Guarantor" and, collectively, the "Guarantors"), as debtors and debtors-in-possession herein

(each of the Borrowers and Guarantors a "Debtor" and collectively, the "Debtors" or the "Loan

Parties"), having moved on December 17, 2003 (the "Motion") for an order authorizing the use

of certain Collateral (as defined in the Existing Credit Agreement, "Pre-Petition Collateral"),[1]

including certain collateral securing the 2009 Notes pursuant to the 2009 Note Indenture between

Solutia and the 2009 Note Trustee (each of the 2009 Notes, the 2009 Note Indenture and the

2009 Note Trustee as defined in the DIP Loan Agreement), and including cash (together with

any cash as to which liens are granted pursuant to this Final Order, the "Cash Collateral"), in

which certain pre-petition secured parties may have an interest, to incur post-petition secured

indebtedness, to grant security interests and superiority claims pursuant to sections 105(a) and

364(c) and (d) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended (the

"Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and having requested that:

       (a)    the Court authorize the Debtors to use the Cash Collateral on the terms set forth herein;

       (b)    the Court authorize the Debtors, pursuant to sections 105(a) and 364(c)

and (d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014, to obtain from

Citicorp USA, Inc. ("Citicorp") as Administrative, Collateral and Documentation Agents and

Citibank, N.A. as Issuer ("Citibank," and together with Citicorp, each an "Agent" and,

collectively, the "Agents"), acting for themselves, as lenders, and as agents for other lenders that

may from time to time become lenders (Citicorp and Citibank, in their capacities as lenders,

together with such other lenders and the Agents, collectively, the "Lenders"), cash advances and

other extensions of credit in an aggregate principal amount of up to $525,000,000 (the

---

[1] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in that certain Financing Agreement by and among the Debtors and Lenders, dated as of January 16, 2004 (as may have been, or may in the future be, amended from time to time, the "DIP Loan Agreement").

"Maximum Final Borrowing") consisting of term loans, revolving loans and letters of credit (including certain letters of credit issued by Citibank prior to the Filing Date which, pursuant to the DIP Loan Agreement, will be deemed to have been issued under the DIP Loan Agreement, which in turn will allow the cash collateral securing the reimbursement obligation under such letters of credit to be released to the Debtors) (collectively, the "DIP Loans"), pursuant to the DIP Loan Agreement to: (i) fund ongoing working capital and general corporate needs of the Debtors during the above-captioned chapter 11 cases (the "Chapter 11 Cases"); (ii) pay the fees, costs, expenses, and disbursements of professionals retained by the Debtors and/or any statutory committees appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "Committees"); (iii) pay the costs and expenses of members of the Committees as approved by the Court, and other bankruptcy-related charges as allowed by the Court, including the UST/Clerk Fees (as defined herein); (iv) pay the fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the Lenders under the DIP Loan Agreement and the other agreements, instruments and other documents executed in connection therewith (collectively, with the DIP Loan Agreement, the "DIP Loan Documents"); and (v) upon entry of this Final Order, repay all obligations owing as of the Filing Date under the Existing Credit Agreement (plus all accrued and accruing interest, fees, costs, expenses, charges, reimbursements and other obligations, the "Pre-Petition Obligations"), which repayment requirement constitutes an "Extraordinary Provision" pursuant to this Court's Guidelines for Financing Requests, adopted by General Order No. M-274, dated as of September 9, 2002 (the "Guidelines"), and subject to, among other things, certain provisions in the DIP Loan Agreement which provide that Events of Default thereunder include: (x) the entry of an order granting relief from the automatic stay with respect to a claim in excess of $5,000,000, (y) the making of a

motion by a party in interest seeking the relief set forth in subsection (x) hereof, provided the

Debtors do not contest such motion or obtain a stay pending appeal of such motion, if granted

and (z) the making of certain management changes; and (vi) upon entry of this Final Order,

repay all obligations owing as of the Closing under the DIP Loan Agreement under the debtor-

in-possession financing facility between the Debtors and Ableco Finance LLC ("Ableco") as

collateral agent, Congress Financial Corporation (Central) ("Congress"), as documentation agent,

and Wells Fargo Foothill, Inc. ("Foothill") as administrative agent and the lenders thereunder

that was approved by the Court on an interim basis on December 19, 2003 (the "Prior DIP

Facility");

        (c)     the Court order, on a final basis as set forth in the Motion, pursuant to

sections 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code, that the Obligations of the

Debtors under the DIP Loan Agreement and the other DIP Loan Documents (collectively, the

"DIP Obligations") (i) be granted superpriority administrative expense status, having priority

over any and all administrative expenses of the kinds specified in, arising or ordered under,

sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), and to the extent permitted by

law, 726, 1113 and 1114 of the Bankruptcy Code, except the administrative expenses and claims

relating to the UST/Clerk Fees and the fees and expenses defined as "Carve-Out Expenses" in the

DIP Loan Agreement up to $15,000,000 (the "Carve-Out Expenses") and (ii) be secured  by first

priority, perfected security interests in and liens on all of the property, assets, or interests in

property or assets of each Debtor, of any kind or nature whatsoever, real or personal, now

existing or hereafter acquired or created, including, without limitation, all property of such

Debtors' "estates" (within the meaning of the Bankruptcy Code), and all accounts, inventory,

goods, contract rights, instruments, documents, chattel paper, general intangibles, payment

intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and

equipment, real property (including all of the Principal Properties), fixtures, leases, all of the

Capital Stock (whether such stock is voting or non-voting stock) in any of its direct Domestic

Subsidiaries, all of the non-voting Capital Stock in any of its direct Foreign Subsidiaries, Solutia

UK Holdings Ltd. and Solutia UK Investments Ltd., 65% of all of the voting Capital Stock in

any of its direct Foreign Subsidiaries, Solutia UK Holdings Ltd. and Solutia UK Investments

Ltd., all of its Capital Stock or other equity interests in Astaris LLC, Flexsys International L.P.,

Quimica "M" S.A. de C.V. and in all other joint venture, partnership or limited liability company

interests or other similar interests of such Debtor in Persons that are not its Subsidiaries directly

owned by such Debtor, 65% of the promissory note made by Solutia UK Investments Ltd. in

favor of Solutia UK Holdings Ltd., money, investment property, deposit accounts, all

commercial tort claims  and all cash and non-cash proceeds, rents, products and profits of any of

the foregoing  (all of the foregoing, collectively, the "Post-Petition Collateral"), senior and prior

to any and all other liens and security interests in the Post-Petition Collateral, except for

Permitted Priority Liens, as provided by section 364(d) of the Bankruptcy Code;

        (d)      the Court grant, as adequate protection for the granting of such senior

security interests and the use of such Cash Collateral, (i) to the 2009 Note Holders and 2009

Note Trustee, superpriority administrative expense claims and junior replacement liens on all

Post-Petition Collateral  (the "2009 Post-Petition Collateral"), as adequate protection against the

diminution of the value of the Pre-Petition Collateral securing the 2009 Notes as of the Filing

Date, which junior replacement liens, together with the 2009 Note Holders' pre-petition liens on

the collateral securing the 2009 Notes as of the Filing Date (the "2009 Pre-Petition Liens"), shall

be subordinated in right and time of payment to the Post-Petition Liens (as defined herein);

(e)        the Court find, pursuant to Bankruptcy Rule 4001(c)(1), that notice of the final hearing to consider the relief requested in the Motion (the "Final Hearing") given to (i) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), (ii) the Debtors' 50 largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions, (iii) counsel to the Existing Lenders, Existing Agent and the Lenders, (iv) counsel to the Agents under the Prior DIP Facility, (v) the indenture trustees for each of the Debtors' public debt securities, (vi) Pharmacia Corporation, (vii) Monsanto Company, (viii) Akin Gump Strauss Hauer & Feld LLP as proposed counsel for Official Committee of Unsecured Creditors (the "Creditors' Committee"), (ix) Weil, Gotshal & Manges LLP as counsel for the *ad hoc* committee (the "2009 Committee") of 2009 Note Holders, and (x) all parties having filed a notice of appearance pursuant to Bankruptcy Rule 2002 on or before the date notice of the final hearing was required to be given pursuant to the Interim Order (as defined below) (collectively, the "Notice Parties") was good and sufficient under the particular circumstances and no other or further notice is or shall be required; and

it appearing that all the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors, and such relief is essential for the continued operations of the Debtors' businesses; and it further appearing that the Debtors are unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code or other secured financing on equal or more favorable terms than those set forth in the DIP Loan Documents; and upon the record herein; and after due deliberation thereon; and sufficient cause appearing therefor;

9564528.8

6

**IT IS HEREBY FOUND, DETERMINED, ORDERED, ADJUDGED, AND DECREED THAT:**[2]

      1.    <u>Disposition</u>. The Motion is hereby granted on a final basis on the terms set forth in this Order. Any objections to the relief sought in the Motion that have not previously been resolved or withdrawn are hereby overruled on their merits. This Final Order shall be valid, binding on all parties-in-interest and fully effective immediately upon entry. The term of this Final Order and the DIP Loan Documents, and use of the Cash Collateral authorized hereunder shall expire, and the DIP Loans made pursuant to this Final Order, the DIP Loan Agreement, and the DIP Loan Documents will mature and, together with all interest thereon and any other DIP Obligations accruing under the DIP Loan Agreement, will become due and payable (unless such DIP Loans and other DIP Obligations become due and payable earlier pursuant to the terms of the DIP Loan Documents and this Final Order by way of acceleration or otherwise) upon the Final Maturity Date (as defined in the DIP Loan Agreement).

      2.    <u>Jurisdiction; Venue</u>. The Court has jurisdiction over the Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D). Venue of the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.

      3.    <u>Purpose and Necessity of Financing</u>. The Debtors require the financing described in the Motion to fund, among other things, the Debtors' cash requirements for working capital and general corporate needs during the Chapter 11 Cases. The Debtors are unable to obtain adequate unsecured credit, allowable under section 503 of the Bankruptcy Code as an administrative expense, or other, secured financing, under sections 364(c) or (d) of the

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Loan

Agreement and the other DIP Loan Documents.

4.      Availability of the Financing.  The Lenders are willing to make a loan

facility, in the amount and in the manner provided by the DIP Loan Agreement and the other DIP

Loan Documents, available to the Debtors only upon the conditions that (a) all Pre-Petition

Obligations and obligations under the Prior DIP Facility are Paid in Full (as defined in the

Existing Credit Agreement) out of the proceeds of the DIP Loans and all liens on and security

interests in the Pre-Petition Collateral granted pursuant to the Existing Credit Agreement, and

Post-Petition Collateral granted pursuant to the Prior DIP Facility, are released upon such

payment, and (b) the Lenders and Agents are granted, pursuant to sections 364(c)(1), (2), (3) and

364(d) of the Bankruptcy Code: (i) superpriority administrative expense claims with respect to

all DIP Loans and other DIP Obligations having priority over any and all administrative

expenses of the kinds specified in, or arising or ordered under, sections 105(a), 326, 328, 330,

331, 503(b), 506(c)507, 546(c), and to the extent permitted by law, 726, 1113 and 1114 of the

Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment

lien or other non-consensual lien, levy or attachment (except as otherwise expressly provided for

herein with respect to the UST/Clerk Fees and the Carve-Out Expenses); and (ii) as security for

all DIP Obligations, a first priority, perfected senior security interest in and lien on, all Post-

Petition Collateral, subject and subordinate only to Permitted Priority Liens, Mechanics Liens (as

defined herein), the UST/Clerk Fees, and the Carve-Out Expenses.  Accordingly, after

considering all alternatives, the Debtors have concluded in the exercise of their prudent business

judgment that the loan facility provided under the DIP Loan Documents represents the best

working capital financing available to them.

5.     Good Cause.  The Debtors' ability to obtain sufficient working capital and liquidity under the DIP Loan Documents is vital to the Debtors' estates and their creditors, so that the Debtors can continue to operate their businesses in the ordinary course.  The preservation of the going concern value of the Debtors' businesses is the linchpin to any successful reorganization.  Good cause has been shown for the relief sought in the Motion.

6.     Good Faith.  The terms of the DIP Loan Documents, including the interest rates and fees applicable thereto and the intangible factors inherent therein, are at least as, or more, favorable to the Debtors as those available from alternative sources.  The DIP Loan Documents have been negotiated in good faith and at arm's-length between the Debtors and the Lenders.  Any DIP Loans and other financial accommodations made to the Debtors by the Lenders pursuant to this Final Order and the DIP Loan Agreement or other DIP Loan Documents shall be deemed to have been extended by the Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the Lenders shall be entitled to all protections afforded thereby.  The terms of the loan facility provided under the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  The DIP Loans are hereby deemed to be extended in exchange for reasonably equivalent value and fair consideration.

7.     Authorization to Use Cash Collateral.  Subject to the terms of this Final Order, the Debtors are authorized to use Cash Collateral in which any party including the Lenders may have an interest, in accordance with the terms, conditions, and limitations set forth in the budget annexed hereto as Exhibit "A" (the "Budget") and otherwise pursuant to the terms of the DIP Loan Agreement and this Final Order.  The Debtors shall provide copies of Cash Flow Schedules (which shall include accrued but unpaid expenses), as and when required by, and

otherwise in accordance with, section 8.01(a)(xix) of DIP Loan Agreement to the Agents,

counsel to the Creditors' Committee and counsel to the 2009 Committee.  Such Cash Flow

Schedules shall replace the Budget annexed hereto as the Budget defined in this paragraph, and

the Debtors shall be entitled to use Cash Collateral in accordance therewith without further

approval by the Court.  Any dispute in connection with the Budget or the Cash Flow Schedules

shall be heard by the Court.  To the extent that any such party (other than the 2009 Note Trustee)

does not consent to the use of Cash Collateral, the interests of such party are hereby deemed

adequately protected.

    8. <u>Borrowing</u>.  The Debtors are immediately authorized to obtain DIP Loans

pursuant to the terms of the DIP Loan Documents and this Final Order in the aggregate principal

amount of up to the Maximum Final Borrowing.  Available financing and advances under the

DIP Loan Agreement will be made only (a) to pay the full outstanding amount of all Pre-Petition

Obligations, (b) to pay the full outstanding amount of all obligations under the Prior DIP Facility

and (c) to fund the Debtors' ordinary working capital needs, general corporate needs, (including

professional fees as and when approved by the Bankruptcy Court) and other amounts required or

allowed to be paid in accordance with this Final Order and the DIP Loan Documents, including

any and all costs of obtaining the DIP Loans.

    9. <u>Repayment of the Pre-Petition Obligations And Obligations Under The</u>

<u>Prior DIP Facility</u>.

    (a) The Debtors are hereby authorized and directed to use the proceeds of the

DIP Loans to, immediately upon entry of this Final Order, indefeasibly pay in full all Pre-

Petition Obligations that remain outstanding as of the Final Facility Effective Date, subject only

to the rights of certain parties granted pursuant to paragraph 19 hereof and (ii) all obligations

under the Prior DIP Facility that remain outstanding as of the date of Closing;

(b)     Upon payment in full of all outstanding Pre-Petition Obligations and all

obligations under the Prior DIP Facility from the proceeds of the DIP Loans, all valid,

enforceable and perfected first priority and senior liens on and security interests in all of (i)]the

Pre-Petition Collateral pursuant to the Existing Credit Agreement and the other Loan Documents

(as defined in the Existing Credit Agreement), as in effect on the Filing Date (the "Pre-Petition

Liens"),and (ii) the Post-Petition Collateral pursuant to the Prior DIP Facility (the "Prior Post-

Petition Liens"), shall be released, extinguished, discharged, fully satisfied and of no further

force and effect.  The Debtors are hereby authorized and directed, once the Pre-Petition

Obligations and the obligations under the Prior DIP Facility have been indefeasibly Paid in Full

(as defined in the Existing Credit Agreement), to file any and all termination statements or other

similar instruments evidencing the termination of the Pre-Petition Liens and the Post-Petition

Liens.

10.    Superpriority Claim and Lien Priority.

(a)     The Lenders are hereby granted an allowed superpriority administrative

expense claim (the "Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code

in the amount of all obligations under the DIP Facility having priority over any and all

administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326,

328, 330, 331, 503(b), 506(c), 507, 546(c), and to the extent permitted by law, sections 726,

1113 and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become

secured by a judgment lien or other non-consensual lien, levy or attachment, subject and

subordinate only to the UST/Clerk Fees and the Carve-Out Expenses.

9564528.8

(b)        As security for the DIP Obligations, in accordance with the terms of the DIP Loan Documents and this Final Order, effectively immediately, the Lenders are hereby granted, pursuant to sections 364(c) and (d) of the Bankruptcy Code, first priority liens on and security interests in all of the Post-Petition Collateral (the "Post-Petition Liens"), senior in all respects to any and all present and future liens, claims, interests or encumbrances, if any, including, without limitation, any and all liens and security interests held by the 2009 Note Trustee, for the benefit of the 2009 Note Holders, subject and subordinate only to the Permitted Priority Liens, the Carve-Out Expenses, the UST/Clerk Fees and any valid mechanics' lien (i) perfected, or deemed to have been perfected,  prior to, or relating back to a date prior to, the date on which the Pre-Petition Liens in favor of the Existing Lenders are determined to have been initially perfected in the assets securing the respective mechanics' liens, or (ii) which, under applicable law, are deemed to have priority over the Existing Lenders' Pre-Petition Liens (collectively, the "Mechanics' Liens").

(c)        No lien or security interest granted to the Lenders under this Final Order or the DIP Loan Documents, shall (i) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) hereafter be subordinated to or made *pari passu* with any other lien or security interest pursuant to sections 364(c) or (d) of the Bankruptcy Code or otherwise.

11.        Perfection of Post-Petition Liens.  The post-petition liens granted hereunder shall be and hereby are fully perfected security interests.  No additional steps need be taken by the holders of the post-petition liens to perfect such liens.  Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental

9564528.8

12

entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other Post-Petition Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the transactions granting post-petition liens, in such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the Lenders or 2009 Note Trustee in accordance with the terms of the DIP Loan Agreement or this Final Order.

12. <u>Acknowledgements</u>. In seeking post-petition financing under the DIP Loan Agreement, the Debtors (but not any other party in interest) have acknowledged, represented, stipulated and agreed, for purposes of this Final Order, that:

(a) the Debtors have obtained all authorizations, consents and approvals required to be obtained from, and have made all filings with and given all notices required to be made or given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, performance, validity and enforceability of the DIP Loan Documents to which any Debtor is a party;

(b) in entering into the DIP Loan Documents, and as consideration therefor, the Debtors hereby agree that until such time as all DIP Obligations are Paid in Full in cash and the Total Commitment is terminated in accordance with the DIP Loan Agreement, the Debtors shall not in any way prime, or seek to prime, the liens provided to the Lenders under this Final Order or the DIP Loan Documents by offering a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise;

9564528.8

13

(c)    in entering into the DIP Loan Documents, and as consideration therefor, the Debtors hereby agree that until such time as all DIP Obligations are indefeasibly Paid in Full in cash and the Total Commitment is terminated in accordance with the DIP Loan Agreement, the Debtors shall not in any way or at any time permit to exist an administrative expense claim against any of the Debtors or their subsidiaries that are Loan Parties (now existing or hereafter arising), of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c) 726, 1113 and 1114 of the Bankruptcy Code having priority equal or superior to the priority of the Superpriority Claims or the Adequate Protection Claims (as defined below) of the 2009 Note Trustee provided herein, except for the Carve-Out Expenses and the UST/Clerk Fees;

(d)    the Debtors are indebted to the Existing Agent and the Existing Lenders, as of January 16, 2003, (a) in the aggregate principal amount of not less than $285, 677,102.42 in respect of Pre-Petition Obligations constituting Loans under the Existing Credit Agreement and (b) in the aggregate undrawn amount of not less than $51,328,435.00 in respect of Pre-Petition Obligations related to the Pre-Petition Letters of Credit, in each case, together with interest and fees (including attorneys' fees), accrued and accruing thereon in respect of such loans and letters of credit, costs, expenses, indemnities, reimbursement obligations and other charges now or hereafter owed by the Debtors to the Existing Agents and the Existing Lenders, all of which are unconditionally owing by the Debtors without offset, defense or counterclaim of any kind, nature and description whatsoever;

(e)    except as otherwise provided herein with respect to the Post-Petition Liens, the Existing Agents and the Existing Lenders prior to the Filing Date had, have and,

9564528.8

14

unless and until all Pre-Petition Obligations are indefeasibly Paid in Full (as defined in the

Existing Credit Agreement) from the proceeds of the DIP Loans, shall continue to have valid and

enforceable (i) Pre-Petition Liens on and security interests in all of the Pre-Petition Collateral

pursuant to the Existing Credit Agreement and the other Loan Documents (as defined in the

Existing Credit Agreement), as in effect on the Filing Date, to secure all of the Pre-Petition

Obligations and (ii) Existing Lender Replacement Liens (as defined in the Interim Order) as

adequate protection against any diminution in the value of the Pre-Petition Collateral;

(f)     the 2009 Pre-Petition Liens held by the 2009 Note Trustee for the benefit

of the 2009 Note Holders are and shall continue to be valid, enforceable and perfected second

priority liens on and security interests in that portion of the Pre-Petition Collateral that secures

the 2009 Notes as in effect as of the Filing Date, which 2009 Pre-Petition Liens shall be subject

to the Post-Petition Liens granted to the Lenders hereunder; and

(g)     as of the date of the entry of this Final Order, there are no other liens on or

security interests in the Pre-Petition Collateral except for the Permitted Liens and liens held by

the Existing Lenders and Existing Agents and the 2009 Note Trustee.

13.     <u>Adequate Protection</u>.

(a)     (i) As adequate protection for use of the Pre-Petition Collateral securing

the 2009 Notes (including Cash Collateral) by the Debtors, and in accordance with sections 361,

363(e), and 364(d) of the Bankruptcy Code, the 2009 Note Trustee, for the benefit of the 2009

Note Holders, is hereby granted valid, perfected, second priority post-petition security interests

in and liens (the "2009 Replacement Liens") on the 2009 Post-Petition Collateral, including,

without limitation, the Cash Collateral, and all cash and non-cash proceeds, rents, products and

profits of such 2009 Post-Petition Collateral, and all of the Principal Properties, to secure an

amount equal to the diminution in the value of the Cash Collateral and that certain Pre-Petition

Collateral that secures the 2009 Note Indenture as in effect as of the Filing Date (the "2009

Diminution Amount"), provided, however, that, notwithstanding anything to the contrary, the

2009 Replacement Liens shall be subordinated to the (i) Post-Petition Liens, (ii) the Permitted

Priority Liens, (iii) the Mechanics Liens, (iv) the Designated Mechanics' Liens (as hereinafter

defined) (but only to the extent the Designated Mechanics' Liens encumber property that is not

subject to a Pre-Petition Lien in favor of the 2009 Note Trustee), (v) the Carve-Out Expenses,

and (vi) the UST/Clerk Fees.

       (ii)     As adequate protection for mechanics' liens that were perfected, or are

deemed to have been perfected under applicable law, prior to the Filing Date but are not

Mechanics' Liens within the definition herein ("Designated Mechanics' Liens"), and in

accordance with sections 361, 363(e), and 364(d) of the Bankruptcy Code, each holder of a

Designated Mechanics' Lien is hereby granted valid, perfected, junior post-petition security

interests in and liens on the 2009 Post-Petition Collateral (the "Designated Mechanics' Liens

Replacement Liens") to secure an amount equal to the diminution in the value of the property

securing the relevant Designated Mechanics' Lien as in effect or deemed to have been in effect as

of the Filing Date (each a "Designated Mechanics' Lien Diminution Amount"), provided,

however, that, notwithstanding anything to the contrary, the Designated Mechanics' Lien

Replacement Liens shall be subordinated to (i) the Post-Petition Liens, (ii) the 2009 Replacement

Liens (except to the extent that the Designated Mechanics' Lien Replacement Lien in question

was perfected or deemed to be perfected prior to the Filing Date in property of the Debtors in

which the 2009 Note Trustee did not have a perfected Pre-Petition Lien), (ii) the Permitted

Priority Liens, (iii) the Mechanics Liens, (iv) the Carve-Out Expenses, and (v) the UST/Clerk Fees.

(b)      To the extent that the 2009 Replacement Liens and the Designated Mechanics' Liens Replacement Liens prove insufficient to provide the 2009 Note Holders and 2009 Note Trustee and the holders of Designated Mechanics' Liens, as the case may be, with adequate protection as required by the Bankruptcy Code, the 2009 Note Holders and 2009 Note Trustee and the holders of Designated Mechanics' Liens shall be granted junior superpriority administrative claims (the "Adequate Protection Claims") in the full amount of the 2009 Diminution Amount or the Designated Mechanics' Lien Diminution Amount, as the case may be, as contemplated by section 507(b) of the Bankruptcy Code, having priority over any other claims including claims made pursuant to section 507(b) of the Bankruptcy Code, and junior only to the claims under section 364(c)(1) of the Bankruptcy Code held by the Lenders and subject only to payment of DIP Obligations, the 2009 Diminution Amount, the Carve-Out Expenses, and the UST/Clerk Fees.

(c)      Subject only to the rights of the parties in interest reserved under Paragraph 19 below, and effective upon entry of this Final Order, each Debtor shall be deemed to have agreed not to pursue any and all claims and causes of action it has or may have against the Existing Lenders, Existing Agents, 2009 Note Holders and 2009 Note Trustee or the Pre-Petition Collateral.

(d)      Current Payment of Interest and Certain Fees, Costs and Other Charges in Respect of the 2009 Notes.

(i)      The 2009 Notes shall be paid all interest as and when payable under the 2009 Note Indenture (the "2009 Interest Payments").  Any unpaid interest that came due prior to

the Filing Date or prior to entry of this Order (i.e., the interest payment which was payable on January 15, 2004) shall be paid within five days after entry of this Order. All payments of the 2009 Interest Payments shall be calculated at the contract non-default rate provided under the 2009 Note Indenture.

(ii)     The 2009 Note Trustee shall be paid all of its incurred fees, costs and other charges and expenses upon monthly submission of invoices to the Debtors.  Any such fees, costs and other charges and expenses of the 2009 Note Trustee that came due prior to the Filing Date or prior to the entry of this Final Order shall be paid within five days after the entry of this Final Order.

(iii)     The Debtors shall pay (a) upon submission of invoices and related documentation, the reasonable fees and expenses of Weil, Gotshal & Manges LLP ("WGM"), as counsel to the 2009 Committee, including in each instance any such reasonable fees, charges, expenses and other amounts which were incurred or accrued but unpaid prior to the Filing Date or prior to entry of this Final Order, and (b) upon submission of invoices and related documentation, the reasonable out-of-pocket expenses of the members of the 2009 Committee, including those expenses which were incurred or accrued but unpaid prior to the Filing Date or prior to entry of this Final Order; in both cases, up to an aggregate amount of $475,000.00 (inclusive of any retainer previously paid to WGM).

(iv)     The Creditors' Committee shall receive copies of the invoices submitted by WGM (redacted for attorney-client privilege) and the 2009 Note Trustee no later than five business days prior to payment of such fees by the Debtors.  To the extent that the Creditors' Committee objects to the payment of any such invoice, it shall be required to give written notice of such objection to WGM or the 2009 Note Trustee, as applicable, and the Debtors.  To the

9564528.8

extent that any such objection is not timely made with respect to any particular fee invoice, the Creditors' Committee shall be deemed to have waived any objection to such invoice.    Any disputes with respect to such invoices shall be resolved by the Bankruptcy Court.

(v)    The Creditors' Committee shall have the right at any time (and the Debtors shall have the right at any time after the payment of the 2009 Interest Payments due July, 2005) to file a motion or commence a proceeding for entry of an order determining:    (a) pursuant to Section 506(b) of the Bankruptcy Code, that the value of that portion of the Pre-Petition Collateral that secures the 2009 Notes does not exceed the amount of the 2009 Notes, (b) that all (I) payments of the 2009 Interest Payments paid to the 2009 Note Holders since the Filing Date and (II) payments of fees and expenses to WGM and the 2009 Note Trustee since the Filing Date should be applied solely in reduction of the secured principal amount of the 2009 Notes (and to any interest arising thereunder but only to the extent accrued and unpaid through the Filing Date) and (c) that all future payments of the 2009 Interest Payments and fees and expenses of WGM and the 2009 Trustee should terminate.    Pending a determination by the Bankruptcy Court with respect to any such motion or proceeding, the obligations of the Debtors to make all such payments, and comply with all other terms and conditions required by this Final Order shall remain.    Notwithstanding anything to the contrary, in the event the Creditors' Committee commences any such motion or proceeding, there shall not be any limitation on the Debtors' ability to participate and advocate positions with respect to such motion or proceeding consistent with their fiduciary duties.

(vi)    Nothing contained in this Final Order shall preclude the 2009 Note Holders, the 2009 Committee, and the  2009 Note Trustee, from seeking a further order of the Bankruptcy Court to obtain other or additional adequate protection, which may include, inter

alia, the payment or reimbursement by the Debtors of an investment banker retained by the 2009 Committee, additional cash payments and the payment of additional fees.  Similarly, nothing contained in this Final Order shall preclude the Debtors (except as set forth in clause (v) above) or the Committee from seeking a further order of the Bankruptcy Court to reduce the adequate protection provisions for the 2009 Note Holders and 2009 Note Trustee.

14.    Fees.  All fees payable and costs and/or expenses reimbursable under the DIP Loan Agreement and other DIP Loan Documents by the Debtors to the Lenders are hereby approved and shall be promptly paid by the Debtors in accordance with the DIP Loan Documents.  The Debtors are hereby authorized to pay all such fees without the necessity of the Debtors, the Lenders or the Agents filing any further application with the Court for approval or payment of such fees or expenses.  All fees and costs and/or expenses payable by the Debtors in connection with the recording, filing and insuring of financing statements, mortgages and financing statements to confirm (pursuant to paragraphs 15 and 21 of this Final Order) the perfection of the security interests granted or authorized by this Final Order are hereby approved and shall be promptly paid in full by the Debtors without the necessity of the Debtors, the Lenders or the Agents filing any further application with the Court for approval or payment of such fees, costs and/or expenses.  Further, the Creditors' Committee shall receive statements for attorneys' fees (redacted for attorney-client privilege) reimbursable to the Lenders pursuant to the DIP Loan Agreement and this Paragraph 14 no less than 5 days prior to payment of such fees by the Debtor.  Any challenge to such fees not brought within such 5 days shall be forever waived by the Creditors' Committee and hereby barred.  Any disputes with respect to such fees, costs and/or expenses shall be resolved by the Bankruptcy Court.

9564528.8

15.    <u>Authority to Execute and Deliver Necessary Documents</u>.  Each of the Debtors is hereby authorized and empowered to enter into and deliver the DIP Loan Agreement in the form annexed hereto, and the other DIP Loan Documents (to the extent not previously executed and delivered), in each case including (subject to any requisite Court approval and the requirements of paragraph 16 hereof) any amendments thereto, and including UCC financing statements and mortgages or deeds of trust encumbering all of the Post-Petition Collateral (including, without limitation, each of the Principal Properties) and securing all of the Debtors' obligations under the DIP Loan Agreement, including repayment of all DIP Obligations.  Each of the Debtors is hereby further authorized, empowered and directed (a) to perform all of its obligations under the DIP Loan Documents and such other agreements as may be required by the DIP Loan Documents to give effect to the terms of the financing provided for in the DIP Loan Documents; (b) to perform all acts required under the DIP Loan Documents and this Final Order, including, without limitation, the payment of all principal, interest, charges, fees, and the reimbursement of present and future reasonable costs and expenses (including without limitation, reasonable attorneys' fees and legal expenses) paid or incurred by the Lenders, or the Agents, as provided for in the DIP Loan Documents; and (c) to do and perform all other acts, to make, execute and deliver all other instruments, agreements and documents, which may be required or necessary for the Debtors to perform all of their obligations under this Final Order and the DIP Loan Documents, without further order of the Bankruptcy Court.  All unpaid principal, interest, charges, fees, reasonable attorneys' fees and the reimbursement of present and future reasonable costs and expenses payable in accordance with this Final Order or the DIP Loan Documents shall (i) be included and constitute part of the principal amount of the DIP Obligations, (ii) be deemed a superpriority administrative claim having the same priority as all other DIP Obligations

9564528.8

hereunder, and (iii) and be secured by a first priority lien on and security interest in all of the

Post-Petition Collateral as and to the extent provided for in the DIP Loan Agreement and the

other DIP Loan Documents, provided, however, that any such claim or lien shall remain subject

and subordinate in priority of payment only to the UST/Clerk Fees and the Carve-Out Expenses

and any such lien shall remain subject and subordinate in priority of payment to the Permitted

Priority Liens and the Mechanics Liens. The DIP Obligations shall constitute valid and binding

obligations of each of the Debtors enforceable against each of them, and each of their successors

and assigns, in accordance with the terms of the DIP Loan Documents and the terms of this Final

Order.

        16.   Amendments. The Debtors, only with the express prior written consent of

the Lenders in accordance with the DIP Loan Documents, may enter into any amendments or

modifications to the DIP Loan Agreement and the other DIP Loan Documents without the need

of further notice and hearing or order of this Court, provided that (i) such modifications or

amendments do not materially and adversely affect, in the reasonable view of the Debtors, after

consultation with the Committee, the rights of any creditor or other party-in-interest, (ii) notice

of any such amendment or modification is filed with the Court and (iii) notice of any such

amendment or modification (other than those which in the reasonable view of the Debtors are

ministerial, technical or do not adversely affect the Debtors), if any, are provided in advance to

the counsel to the Creditors' Committee, counsel to the 2009 Committee, all parties having filed

a notice of appearance pursuant to Fed. R. Bankr. P. 2004 that was entered on the docket prior to

the date of the filing of such amendment or modification with the Bankruptcy Court and the U.S.

Trustee.

9564528.8

22

17.    UST/Clerk Fees.  The Superpriority Claim, Post-Petition Liens, Adequate Protection Claims, Mechanics Liens, Designated Mechanics' Liens and 2009 Replacement Liens shall be subject and subordinate in payment only to the Carve-Out Expenses as defined below and amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Court (collectively, the "UST/Clerk Fees").

18.    Carve-Out Expenses.

(a)    Carve-Out Expenses, to the extent that the amount entitled to administrative priority under the DIP Loan Agreement (collectively, the "Priority Professional Expenses") (inclusive of (a) any holdbacks required by the Bankruptcy Court, (b) actual, documented and reasonable fees and expenses of a trustee payable under Section 726(b) of the Bankruptcy Code, as required by the Guidelines, and (c) actual, documented and reasonable expenses of the members of the Creditors' Committee) shall be paid by the Debtors  pursuant to the terms of the DIP Loan Agreement.

(b)    Carve-Out Expenses also shall include any payments authorized to be made pursuant to any Bankruptcy Court-approved procedure for monthly or other payment of compensation or reimbursement of expenses; provided, however, that nothing contained herein shall be construed (i) to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any such Bankruptcy Court-approved procedure from the applicable provisions of bankruptcy law, including the requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications, and, if applicable, any subsequent order of this Court requiring that such payments be disgorged, and/or (ii) as consent to the allowance of any fees and expenses referred to above, and shall not affect any right of the Lenders to object to the reasonableness of such

9564528.8

amounts; provided, further, that Carve-Out Expenses shall not include, and Cash Collateral or proceeds of any of the DIP Loans shall not be used for, the payment or reimbursement of any fees or disbursements of the Debtors, any Committees or any trustee appointed in these Chapter 11 Cases incurred in connection with the assertion and prosecution of, or joinder in, any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (A) commencing or prosecuting any action asserting claims pursuant to sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code or other cause of action (whether arising under state law, the Bankruptcy Code or other federal law) against the [Lenders], with respect to the validity and extent of the DIP Obligations or the validity, extent and priority of liens and security interests securing the DIP Obligations,; (B) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Lenders' liens on and security interests in the Post-Petition Collateral, ; or (C) preventing, hindering or delaying (whether directly or indirectly) the Lenders, in respect of their liens and security interests in the Post-Petition Collateral  (except that nothing herein shall limit the Debtors' ability to seek relief from the Bankruptcy Court of the kind described in paragraph 27(b) hereof).  No liens or priority status, other than UST/Clerk Fees and the Carve-Out Expenses, having a lien or administrative priority superior to or *pari passu* with those granted by this Final Order to the Lenders, shall be granted while any portion of the DIP Obligations remains outstanding without the written consent of the Lenders in accordance with the DIP Loan Documents.  Effective upon entry of this Final Order, in exchange for the Carve-Out provisions of the DIP Loan Documents, the parties entitled to be paid therefrom shall not be entitled, directly or indirectly, to charge the  Post-Petition Collateral, whether by operation of Sections 105, 506(c) or 552(b) or otherwise.

9564528.8

19.    <u>Committee Investigation Period</u>.  Notwithstanding anything herein or in the DIP Loan Agreement to the contrary, until seventy-five (75) days after the entry of an order authorizing the retention of counsel for the Creditors' Committee (the "Investigation Termination Date"), the Creditors' Committee  and the 2009 Committee shall be entitled to investigate the validity, perfection, enforceability and extent of the Existing Lenders' and Existing Agents' existing liens relating to the Pre-Petition Obligations, as the case may be, and any other claims or causes of action against the Existing Lenders and Existing Agents.  If such party in interest determines that there may be a challenge to the existing liens of the Existing Lenders and Existing Agents, the Pre-Petition Obligations or the propriety of the repayment of the Pre-Petition Obligations by the Investigation Termination Date, such party shall file a motion seeking authority from the Court to commence such cause of action.  If no such motion is filed on or before the Investigation Termination Date (or such other later date as extended by the written consent of the Existing Lenders and Existing Agents or by an order of the Bankruptcy Court, for cause shown), the acknowledgements contained in paragraphs 12(d) and 12(e) of this Final Order shall be irrevocably binding on all parties in interest without further action by any party or this Court and all parties shall be forever barred from bringing or taking any such action.

20.    <u>Limitation On Additional Surcharges</u>.  The Post-Petition Collateral, Lenders, and Agentsshall not be subject to surcharge for any amounts arising or accruing from the Filing Date through and including the Final Facility Termination Date (with the exception of amounts owing for UST/Clerk Fees and the Carve-Out Expenses), pursuant to sections 506(c), 552(b) or 105(a) of the Bankruptcy Code, or otherwise, by (a) any of the Debtors or (b) any other party in interest.  Notwithstanding the foregoing, no action, inaction, or acquiescence by the Lenders, Agents, Existing Lenders, Existing Agents, 2009 Note Holders or 2009 Note Trustee in

9564528.8

these cases, including the Lenders' funding of the Debtors' ongoing operations under this Final

Order, or the DIP Loan Documents, shall be deemed to be or shall be considered as evidence of

any alleged consent by the Lenders, Agents, Existing Lenders, Existing Agents, 2009 Note

Holders or 2009 Note Trustee, to a charge against the Post-Petition Collateral, Pre-Petition

Collateral, Lenders, Agents, Existing Lenders, Existing Agents, 2009 Note Holders or 2009 Note

Trustee pursuant to sections 506(c), 552(b) or 105(a) of the Bankruptcy Code.  The Lenders shall

not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar

doctrine with respect to the Post-Petition Collateral.

21.    <u>Additional Perfection Measures</u>.

(a)    The liens, security interests, and priorities granted to the Lenders pursuant

to this Final Order and the DIP Loan Documents with respect to property of the Debtors' estates

shall be perfected by operation of law immediately upon entry of this Final Order by the Court.

Neither the Debtors nor the Lenders shall be required to enter into or to obtain landlord waivers,

mortgagee waivers, bailee waivers or warehouseman waivers or to file or record financing

statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments

in any jurisdiction (including, trademark, copyright, tradename or patent assignment filings with

the United States Patent and Trademark Office, Copyright Office, or any similar agency with

respect to intellectual property), or obtain consents from any licensor or similarly situated party-

in-interest, or take any other action in order to validate and to perfect the security interests and

Post-Petition Liens or 2009 Replacement Liens granted pursuant to this Final Order.

(b)    If the Lenders, in their sole discretion, choose to obtain consents from any

licensor or similarly situated party-in-interest, to file financing statements, notices of lien or

similar instruments, to record financing statements, mortgages or deeds of trust, or to otherwise

confirm perfection of such security interests and liens: (i) the Lenders are authorized and empowered to file or record financing statements, mortgages, deeds of trust or similar instruments which secure the DIP Obligations; (ii) all such documents shall be deemed to have been recorded and filed as of the time and on the date of entry of this Final Order; and (iii) no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(c)     In lieu of obtaining such consents or filing such financing statements, notices of lien or similar instruments, the Lenders may, at their sole discretion, choose to file a true and complete copy of this Final Order in any place at which any such instruments would or could be filed, together with a description of Post-Petition Collateral located within the geographic area covered by such place of filing, and such filing by the Lenders shall have the same effect as if such financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Final Order.

22.     <u>Application of Collateral Proceeds</u>.  Except as otherwise permitted under the DIP Loan Documents and this Final Order, including, without limitation, Paragraph 7 hereof, or the Budget with respect to the use of Cash Collateral, the Debtors are hereby authorized and directed (whether or not an Event of Default or a Default by the Debtors of any of their obligations under the DIP Loan Documents has occurred) to remit to the Lenders all collections on, and proceeds of, the Post-Petition Collateral, including all accounts receivable collections, proceeds of sales of inventory, fixed assets and any other assets, including sales in and outside the ordinary course of business, and all other cash or cash equivalents, which shall at any time on or after the Filing Date come into the possession or control of the Debtors, or to which the Debtors shall become entitled at any time.  The automatic stay provisions of section 362 of the

Bankruptcy Code are hereby modified to permit the Lenders to collect, retain and apply all existing Cash Collateral and collections, remittances and proceeds of Post-Petition Collateral to the DIP Obligations, in accordance with this Final Order and the DIP Loan Documents.

23.     Payment of Administrative Expenses.  Notwithstanding the foregoing, the Debtors shall be permitted to pay, as the same may become due and payable, but solely to the extent permitted by the DIP Loan Documents or the Budget, (i) administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code incurred in the ordinary course of their businesses, (ii) payments pursuant to "first day" orders entered by this Court, (iii) compensation and reimbursement of expenses to professionals allowed and payable under section 331 of the Bankruptcy Code and (iv) subject to the requirements of the Bankruptcy Code, any other administrative expenses and payments permitted under the DIP Loan Agreement.

24.     Access to Information.  Without limiting the rights of access and information afforded the Lenders under the DIP Loan Agreement and other DIP Loan Documents, the Debtors shall permit representatives, agents and/or employees of the Lenders to have reasonable access to their premises and their records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

25.     Access to Collateral.  Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the Lenders, contained in this Final Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Agreement, upon three (3) business days' written notice to the landlord of any leased premises upon which any Post-Petition Collateral is located (a "Landlord"), that an

9564528.8

Event of Default or a Default by the Debtors of any of their obligations under the DIP Loan Documents or this Final Order has occurred and is continuing, the Lenders may, subject to any separate agreement by and between such Landlord and the Lenders, enter upon any leased premises of any of the Debtors for the purpose of exercising any remedy with respect to Post-Petition Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the Landlords thereunder; provided, however, that the Lenders shall only be obligated to pay base rent, as defined in the lease with any such Landlord (or other agreement between Lender and the Landlord), and charges for utilities (unless otherwise agreed between the Landlord and Lenders) that first arise after the Lenders' written notice referenced above, and that are payable during the period of such occupancy by the Lenders, calculated on a per diem basis. Nothing herein shall require the Debtors to assume and assign to the Lenders any lease under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the Lenders in this paragraph.

26.    Cash Management Systems. The Debtors are authorized and directed to maintain their cash management system in a manner consistent with the DIP Loan Documents and the Cash Management Order.

27.    Automatic Stay Modified. The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified to the extent necessary so as to permit the Lenders:

(a)    upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents or a violation of the terms of this Final Order, and after five (5) business days' prior written notice to the counsel for Debtors, counsel for the Creditors' Committee, counsel for the 2009 Committee and the U.S. Trustee, to declare all or any portion of

the DIP Loans then outstanding to be due and payable and exercise all other enforcement rights and remedies provided for in the DIP Loan Agreement, the other DIP Loan Documents, this Final Order, or under other applicable bankruptcy and nonbankruptcy law (including the right to setoff funds in accounts maintained by the Debtors with any Lenders to repay the DIP Obligations, as to which such prior written notice shall not be required) without requiring prior authorization of this Court in order to exercise such rights and remedies.

(b)     The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Creditors' Committee, the 2009 Committee and/or the U.S. Trustee have not obtained an order from this Court to the contrary within five (5) business days after receiving such notice from the Lenders pursuant to this Final Order.

(c)     The Debtors, the Creditors' Committee, the 2009 Committee and/or the U.S. Trustee shall have the burden of proof at any hearing on any request by them to re-impose or continue the automatic stay of section 362(a) of the Bankruptcy Code or to obtain any other injunctive relief, and the only issue that may be raised at any such hearing shall be whether, in fact, an Event of Default or Default has occurred and is continuing;

(d)     this Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Final Order and relating to the application, re-imposition or continuance of the automatic stay of section 362(a) of the Bankruptcy Code or other injunctive relief requested;

(e)     upon the occurrence and during the continuance of a Default or an Event of Default by the Debtors of any of their obligations under the DIP Loan Documents, the

9564528.8

30

Lenders and/or Agents, as applicable, may, without providing any prior notice thereof, immediately charge interest at the Post-Default Rate set forth in the DIP Loan Agreement;

(f)     upon the occurrence and during the continuance of a Default or an Event of Default by the Debtors of any of their obligations under the DIP Loan Documents or a violation of the terms of this Final Order, the Lenders may at all times continue to collect and sweep cash as provided in paragraphs [22] and [26] hereof; and

(g)     upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents or a violation of the terms of this Final Order, the Lenders shall have no further obligation to provide financing under the DIP Loan Documents or DIP Loan Agreement.

28.     <u>Termination of Authorization to Use Cash Collateral</u>.

(a)     Upon the occurrence and during the continuance of an Event of Default under the DIP Loan Documents or a violation of the terms of this Final Order, and after three (3) business days' notice from the Lenders, Agents or, subject to subparagraph (c) hereof, the 2009 Committee, to counsel for the Debtors, counsel for the Committee, counsel for the 2009 Committee and the U.S. Trustee, the authorization to use Cash Collateral under the terms of this Final Order shall automatically terminate, <u>provided</u>, that after such notice, any use of Cash Collateral shall be limited to operating costs as set forth in the Budget or Cash Flow Schedules. If the Debtors' right to use Cash Collateral has been terminated pursuant to the provisions of this Final Order, such right may be extended only upon (i) consent of the Lenders, (ii) the DIP Obligations having been Paid in Full, or (iii) further Order of this Court entered upon and after appropriate notice and opportunity for a hearing being provided to the Lenders, 2009 Committee and 2009 Note Trustee, <u>provided</u>, that the Lenders shall have absolutely no obligation to agree to

9564528.8

such an extension under any circumstances and may elect or not elect to agree to such an extension as they determine in their sole and absolute discretion.  Notwithstanding the foregoing, if the Debtors' right to use cash collateral has been terminated pursuant to the provisions of this Final Order providing adequate protection to the 2009 Note Trustee contained in paragraph 13 hereof, such right may be extended only upon (i) consent of the 2009 Committee or (ii) further order of the Court entered upon and after appropriate notice and opportunity for a hearing being provided to the 2009 Committee and 2009 Note Trustee.

(b)      Any further Order authorizing the use of Cash Collateral shall be prohibited or conditioned as is necessary to provide adequate protection to the Lenders, the 2009 Note Trustee, and the Designated Mechanics" Lienholders as required by the Bankruptcy Code. At any hearing on any request to authorize the continued use of Cash Collateral, the moving party shall have the burden of proof.

(c)      The right of the 2009 Committee to give the notice and consent referred to in this paragraph 28 shall only apply (i) so long as the then members of the 2009 Committee own at least a majority of the aggregate principal amount of the 2009 Notes and (ii) upon (x) termination of the DIP Loan Agreement or acceleration of the obligations thereunder, (y) the failure to timely pay interest on the 2009 Notes in accordance with this Final Order, or (z) any violation of the terms of this Final Order which materially adversely affects the adequate protection granted to the 2009 Note Holders hereunder.

29.      No Responsible Person.  In making the decision to make DIP Loans, administering the DIP Loans, and extending other financial accommodations to the Debtors under the DIP Loan Agreement or collecting the indebtedness and obligations of the Debtors, the Lenders shall not be considered to be exercising control over any operations of the Debtors or

9564528.8

acting in any way as a responsible person, an owner or an operator under any applicable law,

excluding applicable tax laws, but otherwise including, without limitation, applicable

environmental laws (including but not limited to the Comprehensive Environmental Response,

Compensation and Liability Act, 42 U.S.C. 9601, *et seq.*, the Resource Conservation and

Recovery Act, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to time, or any

similar federal or state statute), provided, however, that the foregoing shall only apply to the

Lenders for so long as the Lenders do not (a) "participate in management" of the Debtors, as that

term is used and defined in 42 U.S.C. § § 9601(20)(E) through (G), or (b) otherwise control the

Debtors or be deemed a responsible person, owner or operator, or the equivalent under applicable

law.

   30.  Successors and Assigns.  The DIP Loan Documents and the provisions of

this Final Order shall be binding upon the Lenders, the Debtors and their respective successors

and assigns, and shall inure to the benefit of the Lenders and the Debtors and their respective

successors and assigns including, without limitation, any trustee, responsible officer, examiner

with expanded powers, estate administrator or representative, or similar person appointed in a

case for the Debtors under any chapter of the Bankruptcy Code.

   31.  No Third Party Beneficiary.  Except with respect to any of the Lenders,

Agents, Existing Lenders, Existing Agents, the 2009 Note Holders, the 2009 Note Trustee, their

delegates, successors and assigns, no rights are created hereunder for the benefit of any third

party, any creditor or any direct, indirect or incidental beneficiary.

   32.  Binding Nature of Agreement.  Each of the DIP Loan Documents to which

the Debtors are and will become a party shall constitute legal, valid and binding obligations of

the Debtors, enforceable against the Debtors in accordance with their terms.  The DIP Loan

9564528.8

Documents have been or will be properly executed and delivered to the Lenders by the Debtors. The rights, remedies, powers, privileges, liens and priorities of the Lenders provided for in this Final Order and in any other DIP Loan Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order) or by any plan of reorganization or liquidation in these cases or in any subsequent case under the Bankruptcy Code, unless and until the DIP Obligations have first been indefeasibly Paid in Full in cash and completely satisfied and the Total Commitment is terminated in accordance with the DIP Loan Agreement.

33.     <u>Subsequent Reversal or Modification</u>.  This Final Order is entered pursuant to section 364 of the Bankruptcy Code, granting the Lenders all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, that action will not affect (a) the validity of any obligation, indebtedness or liability incurred hereunder by any of the Debtors to the Lenders prior to the date of receipt by the Lenders of written notice of the effective date of such action or (b) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents.  Notwithstanding any such reversal, stay, modification or vacatur, any post-petition indebtedness, obligation or liability incurred by any of the Debtors to the Lenders prior to written notice to the Lenders of the effective date of such action shall be governed in all respects by the original provisions of this Final Order, and Lenders shall be entitled to all the rights, remedies, privileges and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligation or liability.  Notwithstanding the foregoing, nothing herein shall be deemed to limit, affect or modify the ability of this Court to

order appropriate relief in the event of a successful challenge to the validity, perfection, or priority of the Existing Lenders' Pre-Petition Liens.

        34.   <u>No Waiver</u>.  This Final Order shall not be construed in any way as a waiver or relinquishment of any rights that the Lenders may have to bring or be heard on any matter brought before this Court.

        35.   <u>Sale/Conversion/Dismissal</u>.  (a)  No order providing for either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code shall be entered by the Court unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to indefeasibly pay all DIP Obligations, and such DIP Obligations shall be indefeasibly Paid in Full in cash and completely satisfied and the Total Commitment is terminated in accordance with the DIP Loan Agreement as part of such action, or the Lenders expressly consent in writing to any such transaction or the entry of such an order by the Court or such transaction is expressly permitted in the DIP Loan Documents.  Without limiting the generality of the foregoing, the Debtors shall not sell either the Capital Stock of any of the Debtors or substantially all of the assets including, without limitation,  the Capital Stock of any of the Subsidiaries of any of the Debtors under section 363 of the Bankruptcy Code unless, in any such event, the Lenders expressly consent in writing to any such transaction, such transaction is expressly permitted in the DIP Loan Documents, or the terms of the sale expressly provide that the sale shall not be consummated unless the proceeds of the sale (other than proceeds of the assets of Solutia Europe SA/NV and its subsidiaries) are sufficient to indefeasibly pay all DIP Obligations and such DIP Obligations shall be, upon the closing of such sale, indefeasibly Paid

in Full in cash and completely satisfied and the Total Commitment is terminated in accordance with the DIP Loan Agreement.

(b)    If an order dismissing any of these cases under sections 305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide that (x) the liens, security interests, and Superpriority Claims granted to the Lenders hereunder and in the DIP Loan Documents, as the case may be, shall continue in full force and effect, shall remain binding on all parties-in-interest and shall maintain their priorities as provided in this Final Order until all DIP Obligations shall have been indefeasibly Paid in Full in cash and the Total Commitment shall have been terminated in accordance with the DIP Loan Agreement, and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the liens, security interests and Superpriority Claims of the Lenders, as the case may be.

36.    <u>Injunction</u>.  Except as provided in the DIP Loan Agreement and/or this Final Order, the Debtors shall be enjoined and prohibited from, at any time during the Chapter 11 Cases, (a) granting liens in the Pre-Petition Collateral, the Post-Petition Collateral or any portion thereof to any other parties, pursuant to Section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to, *pari passu* with or junior to the liens of the Lenders or Existing Lenders, Existing Agents and/or (b) (i) using the Cash Collateral, (ii) using the Post-Petition Collateral, and (iii) applying to the Bankruptcy Court for an order authorizing the use of the Cash Collateral or the Post-Petition Collateral, except in accordance with the DIP Loan Agreement and this Final Order.

37.    <u>Survival</u>.  Unless and until the DIP Obligations have been indefeasibly Paid In Full and the 2009 Notes have been or deemed to have been satisfied in accordance with the provisions of the Bankruptcy Code, (a) the protections afforded to the Lenders under this

9564528.8

Final Order, and any actions taken pursuant thereto shall survive the entry of an order (i) confirming a plan of reorganization; (ii) dismissing any of these cases or (iii) converting any of these cases into a case pursuant to chapter 7 of the Bankruptcy Code, (b) the Post-Petition Liens, and the Superpriority Claim and Adequate Protection Claims of the Lenders shall continue in these proceedings, in any such successor case or after any such dismissal.  The Post-Petition Liens, the Adequate Protection Claims and the Superpriority Claim shall maintain their validity and priority as provided by this Final Order and shall not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of Indebtedness, conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of these Chapter 11 Cases, or by any other act or omission until the DIP Obligations have been indefeasibly Paid In Full.

38.    <u>Citibank Accounts</u>.  For the avoidance of doubt, nothing contained in this Final Order shall be construed to give any entity a lien or similar right which is senior or equal to, or otherwise to limit or impair, any lien, right of setoff, ownership interest, or other right that Citibank, N.A. (in any capacity) may have with respect to any accounts maintained at Citibank, N.A.

39.    <u>Setoff and Recoupment</u>.  Notwithstanding anything to the contrary contained herein, neither the terms of this Order nor the Interim Order shall limit or impair the nature, extent, validity and/or priority of the rights, if any, of any party-in-interest in the Debtors' Chapter 11 cases under sections 546(c), 545, and 553 and/or the equitable doctrine of recoupment.

40.    <u>Claims Among Borrowers</u>.  As adequate protection for each Debtor for the continued use of the centralized cash management system to the extent that any Debtor transfers

9564528.8

property (including cash) following the Petition Date (the "Adequately Protected Debtor") to or for the benefit of any other Debtor (the "Beneficiary Debtor"), with an aggregate fair value in excess of the aggregate fair value of property (including cash) or benefit received by the Adequately Protected Debtor from the Beneficiary Debtor following the Petition Date, then the following shall apply:

(a)  the Adequately Protected Debtor shall have (x) an allowed claim against the Beneficiary Debtor equal to the amount by which the fair value of property (including cash) or benefit transferred (net of any reasonable expenses for overhead or other services reasonably allocated or reasonably charged to the Adequately Protected Debtor) exceeds the aggregate for value of property (including cash) or benefit received, under sections 364(c)(1) and 507(b) of the Bankruptcy Code, having priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, which claim shall bear a market rate of interest for the period accruing from and after the date such claim arises until repayment thereof (collectively, the "Junior Reimbursement Claim") and (y) a lien on all property of the Beneficiary Debtor's estate under section 364(c)(3) of the Bankruptcy Code securing such Junior Reimbursement Claim ("Junior Lien");

(b)  (i)  all Junior Reimbursement Claims and Junior Liens shall be junior, subject and subordinate only to the Carve-Out and to the Super-Priority Claim and Liens granted to the Lenders and the 2009 Note Trustee, and to any claims against such Beneficiary Debtor that are expressly senior to, or carved out from, such claims of the Lenders and the 2009 Note Trustee; (ii) the Adequately Protected Debtor shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to a Junior Lien or Junior Reimbursement Claim including, without limitation, seeking relief from the automatic stay, or seeking any sale, foreclosure,

realization upon or repossession or liquidation of any property of another Debtor, or taking any position with respect to any disposition of the property, the business operations, or the reorganization of another Debtor; and (iii) the Lender shall have the exclusive right to manage, perform and enforce all such rights and remedies described in the preceding clause (ii) and under the DIP Agreement, and the Adequately Protected Debtor shall immediately, upon the request of the Lenders, release or otherwise terminate its Junior Lien, to the extent that the property subject to such Junior Lien is sold or otherwise disposed of by the Lenders or the other Debtors, in the case of each of clauses (i), (ii) and (iii) above or the DIP Agreement; and with respect to the effect of Junior Liens on any sale of property by the Debtors, (i) the Debtors may sell property, in accordance with section 363 of the Bankruptcy Code, free and clear of any Junior Lien with such lien attaching to the proceeds of sale in the same priority as existed in respect of the property sold, *and* (ii) the provisions of section 363(k) of the Bankruptcy Code shall not apply.

41.    Priority of Terms.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Final Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Loan Agreement or the DIP Loan Documents, the terms and provisions of this Final Order shall govern.

42.    Adequate Notice.  The notice given by the Debtors of the Final Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the local rules of this Court.  Under the circumstances, no other or further notice of the request for the relief granted at the Final Hearing is required.

9564528.8

43.    Entry of Order; Effect.  This Order shall take effect immediately upon execution hereof, notwithstanding the possible application of Fed. R. Bankr. P. 6004(g), 7062, 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Final Order on the Court's docket in these Chapter 11 Cases.

44.    JP Morgan Chase Bank, As Indenture Trustee.  Notwihtstanding any other provision of this Order, the Interim Order, the Existing Loan Agreement, or the Financing Agreement dated December 16, 2003, or any related loan documents (collectively, the "Prepetition Ableco Financing Agreement"), any and all claims of the debenture holders and the indenture trustee under the Indenture dated as of October 1, 1997 with respect to the Pre-Petition Ableco Financing Agreements, the Prior DIP Facility or any related transactions, against the Debtors, their officers and directors, or any third parties, are hereby preserved.  No provision in this Order or the Prior DIP Facility shall have any effect on such claims.

Dated:  New York, New York
        January 16, 2004

                              /s/ Prudence Carter Beatty
                              UNITED STATES BANKRUPTCY JUDGE

9564528.8

Solutia Inc.
13 Week Forecast - US
Week Ending  1/9/04
(in millions)

| | Fcst 1/9/04 | Fcst 1/16/04 | Fcst 1/23/04 | Fcst 1/30/04 | Fcst 2/6/04 | Fcst 2/13/04 | Fcst 2/20/04 | Fcst 2/27/04 | Fcst 3/5/04 | Fcst 3/12/04 | Fcst 3/19/04 | Fcst 3/26/04 | Fcst 4/2/04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts/(Disbursements)** | | | | | | | | | | | | | |
| Trade Receivables | $ 36.0 | $ 28.4 | $ 25.1 | $ 21.8 | $ 41.8 | $ 27.5 | $ 28.5 | $ 27.8 | $ 43.2 | $ 28.4 | $ 28.3 | $ 27.3 | $ 27.3 |
| Operating Agreements | - | - | 9.5 | 10.1 | - | - | 5.6 | 15.4 | - | 1.5 | 2.5 | 7.9 | 8.0 |
| Other Receipts | 0.5 | 8.3 | 0.5 | 13.0 | 0.5 | 0.5 | 0.5 | 15.5 | 0.5 | 0.5 | 0.5 | 0.5 | 15.5 |
| **Total Receipts** | 36.5 | 36.7 | 35.1 | 44.9 | 42.3 | 28.0 | 34.6 | 58.7 | 43.7 | 30.4 | 31.3 | 35.7 | 50.8 |
| | | | | | | | | | | | | | |
| Trade Payables | (19.4) | (26.4) | (31.0) | (37.7) | (32.1) | (30.0) | (30.0) | (40.5) | (33.5) | (30.0) | (31.0) | (37.3) | (31.3) |
| Payroll | (7.4) | (15.3) | (3.7) | (14.3) | (4.7) | (14.0) | (5.1) | (14.3) | (4.7) | (14.0) | (5.1) | (11.0) | (7.5) |
| Interest Payments | - | (3.1) | (12.5) | - | (4.1) | - | - | - | (4.1) | - | - | - | (4.1) |
| Professional Fees | - | (2.4) | - | - | (2.4) | - | - | - | (2.4) | - | - | - | (2.4) |
| Other Disbursements | (0.4) | (0.1) | (0.3) | (6.5) | (0.4) | (0.7) | (0.7) | (0.7) | (0.3) | (0.3) | (0.6) | (0.3) | (0.4) |
| **Total Disbursements** | (27.2) | (47.3) | (47.5) | (58.5) | (43.7) | (44.7) | (35.8) | (55.5) | (45.0) | (44.3) | (36.7) | (48.6) | (45.7) |
| | | | | | | | | | | | | | |
| **Net Cash Receipts/(Disbursements)** | $ 9.3 | $ (10.6) | $ (12.4) | $ (13.6) | $ (1.4) | $ (16.7) | $ (1.2) | $ 3.2 | $ (1.3) | $ (13.9) | $ (5.4) | $ (12.9) | $ 5.1 |
| | | | | | | | | | | | | | |
| **Liquidity** | | | | | | | | | | | | | |
| *Revolver* | | | | | | | | | | | | | |
| Borrowing Base | $ 138.6 | $ 138.6 | $ 138.6 | $ 150.0 | $ 150.0 | $ 150.0 | $ 150.0 | $ 150.0 | $ 150.0 | $ 150.0 | $ 150.0 | $ 150.0 | $ 150.0 |
| L/C's | 51.2 | 51.2 | 51.2 | 51.2 | 51.2 | 51.2 | 51.2 | 51.2 | 51.2 | 51.2 | 51.2 | 51.2 | 51.2 |
| Revolver Advance | 87.4 | 87.4 | 87.4 | 87.4 | 87.4 | 87.4 | 87.4 | 87.4 | 87.4 | 87.4 | 87.4 | 87.4 | 87.4 |
| **Total Revolver Availability** | $ - | $ - | $ - | $ 11.4 | $ 11.4 | $ 11.4 | $ 11.4 | $ 11.4 | $ 11.4 | $ 11.4 | $ 11.4 | $ 11.4 | $ 11.4 |
| | | | | | | | | | | | | | |
| *Cash* | | | | | | | | | | | | | |
| Beginning Cash Balance | $ 124.3 | $ 133.6 | $ 123.0 | $ 185.6 | $ 172.0 | $ 170.6 | $ 153.9 | $ 152.7 | $ 155.9 | $ 154.6 | $ 140.7 | $ 135.3 | $ 122.4 |
| Final DIP Funding | - | $ - | $ 75.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Net Receipts/(Disbursements) | 9.3 | (10.6) | (12.4) | (13.6) | (1.4) | (16.7) | (1.2) | 3.2 | (1.3) | (13.9) | (5.4) | (12.9) | 5.1 |
| **Ending Cash Balance** | $ 133.6 | $ 123.0 | $ 185.6 | $ 172.0 | $ 170.6 | $ 153.9 | $ 152.7 | $ 155.9 | $ 154.6 | $ 140.7 | $ 135.3 | $ 122.4 | $ 127.5 |
| | | | | | | | | | | | | | |
| **Total Liquidity** | $ 133.6 | $ 123.0 | $ 185.6 | $ 183.4 | $ 182.0 | $ 165.3 | $ 164.1 | $ 167.3 | $ 166.0 | $ 152.1 | $ 146.7 | $ 133.8 | $ 138.9 |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>KAISER ALUMINUM &<br>CHEMICAL CORPORATION, *et al.*,<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 02-10429 (JKF)<br>)<br>) Jointly Administered<br>)<br>) Hearing Date: 02/08/05<br>) **Re: Docket No. 5950; Agenda Item 1** |

## ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(e), AND (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS

Upon the motion (the "**Motion**"), dated January 14, 2005, of Kaiser Aluminum &

Chemical Corporation, a Delaware corporation ("**KACC**"), Kaiser Aluminum

Corporation, a Delaware Corporation ("**KAC**"), and their affiliated debtors, all of which

are debtors and debtors in possession (collectively, the "**Debtors**") in the above-

captioned cases (the "**Cases**"), pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2),

364(c)(3), 364(e), 503(b) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101,

et seq. (the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking, among other things:

(1) authorization for KACC, KAC and certain of the other Debtors

(collectively, with KACC and KAC, the "**Borrowers**"), excluding Alpart

Jamaica Inc., Kaiser Jamaica Corporation, Kaiser Alumina Australia

Corporation, Kaiser Bauxite Company and Kaiser Finance Corporation

(the "**Excluded Debtors**"), to obtain post-petition financing (the

"**Financing**") up to the aggregate principal amount of $200,000,000.00

(the actual available principal amount at any time being subject to those

conditions set forth in the DIP Documents (as defined below)) from The

CIT Group/Business Credit, Inc. ("**CIT**") and JPMorgan Chase Bank,

National Association ("**JPMCBB**"), acting as administrative agent (in

such capacity, the "**Agent**"), for itself and a syndicate of financial

institutions (together with CIT and JPMCBB and including the fronting

and issuing banks for letters of credit, the "**DIP Lenders**"), to be arranged

by J.P. Morgan Securities Inc., as lead arranger ("**JPMorgan**"), and CIT,

as co-arranger; and for all of the Debtors that are not Borrowers other than

the Excluded Debtors (collectively, the "**Guarantors**")[1] to guaranty the

Borrowers' obligations in connection with the Financing;

(2)  authorization for the Debtors to execute and enter into the DIP

Documents and to perform such other and further acts as may be required

in connection with the DIP Documents;

(3)  the granting of mortgages, security interests, liens and

superpriority claims to the Agent on behalf of and for the benefit of the

DIP Lenders (including superpriority claims pursuant to section 364(c)(1)

of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and

---

[1]    The Borrowers and the Guarantors, collectively, shall be referred to herein as the "**Debtor Obligors**."

2

364(c)(3) of the Bankruptcy Code) subject to the Carve-Out (as defined below);

(4) the waiver of the Debtors' right to surcharge against collateral securing the Financing pursuant to section 506(c) of the Bankruptcy Code; and

(5) the granting of certain related relief.

Due and appropriate notice of the Motion, the relief requested therein and the Hearing (as defined below) having been served by the Debtors on (i) the United States trustee for the District of Delaware (the "**U.S. Trustee**"), (ii) counsel for the official committee of unsecured creditors (the "**Creditors' Committee**"); (iii) counsel to the statutory committee of asbestos claimants (the "**Asbestos Committee**"); (iv) counsel for the administrative agent under the Old DIP Credit Facility (as defined below); (v) counsel to MAXXAM Inc., the Debtors' principal equity holder; (vi) counsel to the legal representative for future asbestos claimants (the "**Asbestos Representative**"); (vii) counsel to the legal representative for future silica and coal tar pitch volatile claimants (the "**Silica Representative**"); (viii) counsel to the official committee of retired employees (the "**Retirees' Committee**"); and (ix) parties that have requested notice in the Cases.

The hearing to consider approval of the Financing having been held by this Court and concluded on February 8, 2005 (the "**Hearing**").

Upon the record made by the Debtors at the Hearing and after due deliberation and consideration and sufficient cause appearing therefore;

3

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.   *Jurisdiction.*  This Court has core jurisdiction over the Cases, the Motion, and

the parties and property affected hereby pursuant to 28 U.S.C. §§157(b) and 1334.

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.   *Notice.*  Due and sufficient notice of the Motion and the Hearing has been

given, in compliance with Bankruptcy Rules 2002 and 4001(c).

3.   *Objections.*  All objections to the entry of this Order, if any, are resolved

hereby or, to the extent not resolved, are overruled.

4.   *Findings Regarding the Financing.*

(a)      Good cause has been shown for the entry of this Order.

(b)      The Debtors have an immediate need to obtain the Financing in

order to, among other things, (i) refinance the Debtors' current debtor-in-possession

financing facility (the **"Old DIP Credit Facility"**),[2] which matures on February 13, 2005

and, as most recently amended, was approved by the Court pursuant to the Third

Amended and Restated Order Authorizing Secured Post-Petition Financing on a Super

Priority Basis Pursuant to 11 U.S.C. §§ 363, 364, and 507(b) and Granting Relief from

the Automatic Stay Pursuant to 11 U.S.C. § 362 (Docket No. 5280) (the **"Old DIP**

**Credit Facility Order"**); (ii) fund working capital, letters of credit and capital

expenditures; (iii) use for other general corporate purposes of the Debtors; (iv) pay

---

[2] Certain letters of credit issued under the pre-petition credit facility to which certain of the lenders under the Old DIP Credit Facility were parties (the "**Pre-Petition Credit Facility**") were deemed issued under the Old DIP Credit Facility.

4

related transaction costs, fees and expenses; and (v) fund the costs of administration of the Cases.

(c)    The Debtors are unable to obtain financing from sources other than the DIP Lenders on more favorable terms than the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or adequate unsecured credit solely with the enhanced priority afforded by section 364(c)(1) of the Bankruptcy Code. The Debtors are also unable to obtain adequate credit without granting the Agent and the DIP Lenders, subject to the Carve-Out as provided for herein, the DIP Liens (as defined below) pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, under the terms and conditions set forth in this Order and in the DIP Documents.

(d)    The terms of the Financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)    The Financing has been negotiated in good faith and at arm's length between the Debtors, the Agent and the DIP Lenders, and all of the Debtor Obligors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, (i) all loans made to, and all letters of credit issued for the account of, the Debtors pursuant to a Secured Superpriority Debtor In Possession Revolving Credit and Guaranty Agreement (as hereafter finalized and executed, the "**DIP Credit Agreement**"), a copy of a draft of

which has been filed with the Court,[3] and (ii) any "**Obligations**" (as defined in the DIP

Credit Agreement), including credit extended in respect of overdrafts and related

liabilities and other depository, treasury, and cash management services and other

clearing services provided by JPMCBB or its affiliates (all of the foregoing in clauses (i)

and (ii) collectively, the "**DIP Obligations**"), shall be deemed to have been extended by

the Agent and the DIP Lenders and their affiliates in good faith, as that term is used in

section 364(e) of the Bankruptcy Code and in express reliance upon the protections

offered by section 364(e) of the Bankruptcy Code, and the Agent, the DIP Lenders and

their affiliates shall be entitled to the full protection of section 364(e) of the Bankruptcy

Code if this Order or any provision hereof is vacated, reversed or modified, on appeal or

otherwise.

   (f) The access of the Debtors to sufficient working capital and

liquidity through the incurrence of new indebtedness for borrowed money and other

financial accommodations is vital to the preservation and maintenance of the going

concern values of the Debtors and to a successful reorganization of the Debtors.

Furthermore, the DIP Credit Facility approved hereby will serve as a bridge to an exit

financing facility to be provided to the Debtor Obligors on and after the effective date of

a confirmed plan or plans of reorganization in the Debtor Obligors' chapter 11 cases as

described more fully in that certain commitment letter, dated as of January 14, 2005 (the

"**Commitment Letter**"), among JPMorgan, CIT, JPMCBB, KACC and KAC, a copy of

which was attached to the Motion as Exhibit A. Consummation of the Financing in

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Credit Agreement.

accordance with this Order and the DIP Documents is therefore in the best interest of the Debtors' estates.

     5.  *Authorization of the Financing and the DIP Documents.*

     (a)    The Debtor Obligors are hereby authorized to enter into the DIP Documents. The Borrowers are, subject to having filed a fully executed copy of the DIP Credit Agreement with the Court, hereby authorized to borrow money, obtain letters of credit and to enter into swap agreements pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guaranty such borrowings and the Borrowers' obligations with respect to such letters of credit and swap agreements, up to an aggregate principal or face amount of $200,000,000.00 (plus interest, fees and other expenses provided for in the DIP Documents), with a sub-limit not in excess of $60,000,000.00 available for the issuance of letters of credit by JPMCBB and a second sub-limit not in excess of $17,500,000.00 available for swing line loans from JPMCBB, in accordance with the terms of this Order and the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Debtor Obligors and to pay interest, fees and expenses in accordance with this Order and the DIP Documents. In addition to obtaining such loans and incurring such obligations, the Debtor Obligors are authorized to incur, and the Guarantors are hereby authorized to guaranty the Debtor Obligors' obligations with respect to, overdrafts and related liabilities arising from treasury, depository and cash management services including any automated clearing house fund transfers provided to or for the benefit of the Debtor Obligors by JPMCBB or any of its affiliates; *provided, however*, that nothing

7

herein shall require JPMCBB or any other party to incur overdrafts or to provide any such services or functions to the Debtors.

(b)    In furtherance of the foregoing and without further approval of this Court, the Debtor Obligors are authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees that may be reasonably required or necessary for the Debtor Obligors' performance of their obligations under the Financing, including, without limitation:

(i)    the execution, delivery and performance of the Loan Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without limitation, the DIP Credit Agreement, the Security and Pledge Agreement (as defined in the DIP Credit Agreement) and the mortgages contemplated thereby (collectively, and together with the letter agreements referred to in clause (iii) below, the "**DIP Documents**"),

(ii)    the execution, delivery and performance of one or more amendments to the DIP Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the Agent and the DIP Lenders may agree (it being understood that no further approval of the Court shall be required for amendments to the DIP Credit Agreement that do not shorten the maturity of the extensions of credit thereunder or increase the commitments, the rate of interest or the letter of credit fees payable thereunder),

8

(iii)    the non-refundable payment to the Agent or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement (and in the separate letter agreements between them in connection with the Financing, including, without limitation, the Commitment Letter and a certain fee letter, dated as of January 14, 2005, among JPMorgan, JPMCBB, KACC and KAC) and reasonable costs and expenses as may be due from time to time, including, without limitation, (A) agent fees, (B) commitment fees, (C) closing fees, (D) letter of credit fees, (E) facility fees, (F) termination fees and (G) reasonable attorneys', financial advisors' and accountants' fees and disbursements as provided for in the DIP Documents (collectively, the "Advisor Fees and Expenses"), and

(iv)    the performance of all other acts required under or in connection with the DIP Documents.

(c)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtor Obligors, enforceable against each Debtor Obligor in accordance with the terms of the DIP Documents. No obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code, under section 548 of the Bankruptcy Code or under any applicable State Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

9

(d)     The obligations of the Debtor Obligors hereunder and under the DIP Documents shall be joint and several.

6. *Superpriority Claims.*

(a)     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtor Obligors with priority over any and all administrative expenses, diminution claims and all other claims against the Debtor Obligors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "**Superpriority Claims**"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to the Collateral and all proceeds thereof as provided in the DIP Credit Agreement, subject and subordinate to the payment of the Carve-Out to the extent specifically provided for herein. Except for the Carve-Out, no costs or administrative expenses that have been or may be incurred in the Cases, in any conversion of the Cases pursuant to section 1112 of the Bankruptcy Code, or in any other proceeding related thereto, and no priority claims, including, without limitation, any other superpriority claims, are or will be prior to or on a parity with the (i) claims of the Agent, the DIP Lenders or the other Secured Parties (as defined below) against the Debtor Obligors arising out of the DIP Obligations or any provision of this Order or (ii) the DIP Liens (as

10

defined below) granted herein and in the other DIP Documents in and to the Collateral
(as defined below).

(b)    For purposes hereof, the **"Carve-Out"** means (i) the payment of
allowed and unpaid professional fees and disbursements incurred by the Borrowers, any
statutory committees appointed in these chapter 11 cases and any legal representatives for
future claimants appointed in these chapter 11 cases in an aggregate amount not in excess
of $4,000,000.00 and (ii) the payment of fees pursuant to 28 U.S.C. § 1930. The portion
of the Carve-Out provided in (i) above may not be asserted by any party other than in the
event of the occurrence and during the continuance of an Event of Default, or an event
that would constitute an Event of Default with the giving of notice or lapse of time or
both. Following the Revolving Credit Termination Date (as defined in the DIP Credit
Agreement), amounts in a Letter of Credit Account (as defined in the DIP Credit
Agreement) shall not be subject to the Carve-Out. Notwithstanding the foregoing, so
long as an Event of Default or an event which with the giving of notice or lapse of time
or both would constitute an Event of Default shall not have occurred and be continuing,
the Borrowers shall be permitted to pay compensation and reimbursement of expenses
allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same
may be due and payable, and any compensation and expenses accrued prior to the
occurrence of such Event of Default or other event, as described above, shall not reduce
the Carve-Out.

11

7. *DIP Liens.* As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution, recordation of filings by the Debtor Obligors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents,[4] the following security interests and liens are hereby granted to the Agent for its own benefit and the benefit of the DIP Lenders and any other parties as provided for under any of the DIP Documents (such parties, together with the Agent and the DIP Lenders, the **"Secured Parties"**) (all property identified in clauses (a) and (b) below being collectively referred to as the **"Collateral"**), subject and subordinate, only in the event of the occurrence and during the continuance of an Event of Default, to the payment of the Carve-Out (all such liens and security interests granted to the Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Order and the DIP Documents, the **"DIP Liens"**):

(a)    First Lien on Cash Balances and Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first-priority senior security interest in and lien on all pre- and post-petition property of the Debtor Obligors, whether existing on the dates that any of the Debtor Obligors filed petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Petition Dates") or thereafter acquired, that, on or as of the Petition Dates was not subject to valid, perfected and non-avoidable liens (collectively, **"Unencumbered Property"**), including without limitation, all cash and cash collateral of

---

[4] This paragraph 7 shall only apply to the liens granted under the DIP Credit Agreement. Any liens granted pursuant to any exit financing shall be properly recorded and perfected and nothing in this Order shall eliminate the necessity for such recordation and perfection.

the Debtor Obligors (whether maintained with the Agent or otherwise) and any

investment of such cash and cash collateral, inventory, accounts receivable, other rights

to payment whether arising before or after the Petition Dates, contracts, properties, plants,

equipment, general intangibles, documents, instruments, interests in leaseholds, real

properties, patents, copyrights, trademarks, trade names, other intellectual property,

capital stock of subsidiaries, and the proceeds of all the foregoing.  Unencumbered

Property shall exclude the Debtor Obligors' claims and causes of action, and the proceeds

therefrom, under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy

Code, or any other avoidance actions under the Bankruptcy Code.

        (b)    <u>Lien Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3)

of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected

security interest in and lien on all pre- and post-petition property of the Debtor Obligors

(other than the property described in clause (a) of this paragraph 7, as to which the lien

and security interest in favor of the Agent will be as described in such clause), whether

now existing or hereafter acquired, that is subject to valid, perfected and unavoidable

liens in existence immediately prior to the Petition Dates or to valid and unavoidable

liens in existence immediately prior to the Petition Dates that are perfected subsequent to

the Petition Dates as permitted by section 546(b) of the Bankruptcy Code, which security

interest and lien in favor of the Agent is junior to such valid, perfected and unavoidable

liens.

        (c)    <u>Lien Senior to Certain Other Liens</u>.  The DIP Liens shall not be (i)

subject or subordinate to (A) any lien or security interest that is avoided and preserved for

13

the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or

(B) except as otherwise provided herein or in the DIP Documents, any liens arising after

the Petition Dates including, without limitation, any lien or security interest granted in

favor of any federal, state, municipal or other governmental unit, commission, board or

court for any liability of the Debtors, or (ii) except as otherwise provided herein or in the

DIP Documents, subordinate to or made *pari passu* with any other lien or security

interest under section 364 of the Bankruptcy Code or otherwise.

       8.  *Satisfaction of the Old DIP Credit Facility Obligations.* Following entry of

this Order and prior to the closing of the transactions contemplated hereby, the Debtor

Obligors, Bank of America, N.A., the agent under the Old DIP Credit Facility (the "**Old**

**DIP Agent**"), for the benefit of itself and the other lenders under the Old DIP Credit

Facility (the "**Old DIP Lenders**") and JPMCBB for the benefit of itself and the DIP

Lenders shall enter into a pay-off letter substantially in the form attached hereto as

Exhibit A (the "**Pay-Off Letter**"). Upon the payment of the Pay-Off Amount (as defined

in the Pay-Off Letter), including the Expense Reserve (as defined in the Pay-Off Letter),

the deposit of L/C Cash Collateral (as defined in the Pay-Off Letter) equal to 105% of the

face amount of the Continuing L/Cs (as defined in the Pay-Off Letter) in the L/C Cash

Collateral Account (as defined in the Pay-Off Letter), and satisfaction of the other

conditions set forth in the Pay-Off Letter, all of the liens and security interests of the Old

DIP Lenders and the Old DIP Agent in the assets of the Debtors shall be released

(provided, however, that notwithstanding anything in this Order to the contrary, (a) the

Old DIP Agent shall retain a first priority security interest and super priority claim (no

14

longer subject and subordinate to the Carve-Out (as defined in the Old DIP Credit

Facility)) on the L/C Cash Collateral and the Reserve Collateral (as defined in the Pay-

Off Letter), (b) the L/C Cash Collateral and the Reserve Collateral shall not constitute

Collateral under the DIP Credit Agreement or this Order until it is released by the Old

DIP Agent pursuant to the terms and conditions of the Pay-Off Letter and (c) the Debtors

shall not be entitled to seek to use or to use the L/C Cash Collateral or Reserve Collateral

until it is released by the Old DIP Agent pursuant to the terms and conditions of the Pay-

Off Letter). Notwithstanding anything in this Order to the contrary, any Continuing

Obligations (as defined in the Pay-Off Letter) shall be subordinated to the Superpriority

Claims of the DIP Lenders hereunder as set forth in the Pay-Off Letter. The satisfaction

of obligations under the Pre-Petition Credit Facility by the Old DIP Credit Facility

(including without limitation the roll-up of letter of credit obligations into the Old DIP

Credit Facility) shall be, and hereby is, determined to be final and unchallengeable by any

party, and, accordingly, no obligations under the Pre-Petition Credit Facility shall be

reinstated or deemed to exist, in whole or in part, under any circumstances.

9. *Protection of DIP Lenders' Rights.*

(a)     Subject to the limitations set forth in the DIP Credit Agreement,

the Agent is authorized in accordance with the terms of the DIP Documents, from time to

time and after the occurrence and during the continuance of an Event of Default in the

Agent's sole discretion, to make Loans (as defined in the DIP Credit Agreement) to the

Borrowers, on behalf of all DIP Lenders, which the Agent, in its Permitted Discretion (as

defined in the DIP Credit Agreement), deems necessary or desirable (i) to preserve or

15

protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or

maximize the amount of, repayment of the Loans and other DIP Obligations, or (iii) to

pay any other amount chargeable to or required to be paid by the Borrowers pursuant to

the terms of the DIP Credit Agreement, including payments of principal, interest, Letter

of Credit Disbursements (as defined in the DIP Credit Agreement), fees, premiums,

reimbursable expenses and other sums payable under the DIP Documents (any of such

Loans, the "**Protective Advances**"). The Protective Advances shall be secured by the

DIP Liens in favor of the Agent in and to the Collateral and shall constitute DIP

Obligations.

        (b)     The automatic stay provisions of section 362 of the Bankruptcy

Code are vacated and modified to the extent necessary to permit the Agent, the DIP

Lenders and the other Secured Parties to exercise, (i) immediately upon the occurrence of

an Event of Default, all rights and remedies under the DIP Documents other than those

rights and remedies against the Collateral as provided in clause (ii) below and (ii) upon

the occurrence and during the continuance of an Event of Default and after the giving of

five business days prior written notice(the "**Notice Period**") to the Debtors; counsel to

the Creditors' Committee; counsel to the Asbestos Committee; counsel to the Asbestos

Representative; counsel to the Silica Representative; and the US Trustee, all rights and

remedies against the Collateral provided for in the DIP Documents (including, without

limitation, the right to setoff monies of the Debtor Obligors in accounts maintained with

the Agent or any DIP Lender or Secured Party). During the Notice Period, the Debtors

shall be entitled to an emergency hearing with the Court to challenge whether an Event of

Default has, in fact, occurred, upon two days' advance written notice to the Agent and the DIP Lenders. In any hearing regarding any exercise of rights or remedies the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors hereby waive their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Agent or the DIP Lenders set forth in this Order or the DIP Documents. In no event shall the Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral. The Agent's or any DIP Lender's failure to seek relief or otherwise exercise its rights and remedies under the DIP Documents or this Order shall not constitute a waiver of the Agent's or any DIP Lender's rights hereunder, thereunder or otherwise.

10. *Limitation on Charging Expenses Against Collateral.* Except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Agent and no such consent shall be implied from any other action, inaction, or acquiescence by the Agent or the DIP Lenders.

11. *Payments Free and Clear.* Any and all payments or proceeds remitted to the Agent pursuant to the provisions of this Order shall be received by the Agent for the benefit of the relevant DIP Lenders free and clear of any claim, charge, assessment or

17

other liability including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.

12. *Interest on DIP Obligations.* Interest on the DIP Obligations shall accrue at the rates (including any default rates, but only after an Event of Default under the DIP Documents) and shall be paid at the times as provided in the DIP Documents.

13. *Perfection of DIP Liens.* With respect to the DIP Liens securing the Financing (and excluding any security interest and lien securing the exit financing facility to be provided to the Debtor Obligors on and after the effective date of a confirmed plan or plans of reorganization in the Debtor Obligors' chapter 11 cases as described more fully in the Commitment Letter):

(a)     the Agent and the DIP Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of liens or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the Agent on behalf of the DIP Lenders shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of liens or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Order;

18

(b)      a certified copy of this Order may, in the discretion of the Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of liens or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording without the imposition of any stamp, intangibles, recording or similar tax in accordance with the provisions of section 1146 of the Bankruptcy Code;

(c)      the Debtor Obligors shall execute and deliver to the Agent and the DIP Lenders all such agreements, financing statements, instruments and other documents as the Agent or any of the DIP Lenders may reasonably request to evidence, confirm, validate or perfect the DIP Liens granted pursuant hereto; and

(d)      any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor Obligor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the transactions granting post-petition liens, in such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor Obligor, in favor of the DIP Lenders in accordance with the terms of the DIP Credit Agreement or this Order.

19

14. *Preservation of Rights Granted Under the Order.*

      (a)     Unless all DIP Obligations shall have been paid in full (and, with respect to outstanding letters of credit issued pursuant to the DIP Credit Agreement, cash collateralized or otherwise provided for in accordance with the provisions of the DIP Credit Agreement), the Debtors shall not seek, and it shall constitute an Event of Default if any of the Debtors seek, or if there is entered, (i) any modification, termination or extension of this Order without the prior written consent of the Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the Agent, or (ii) an order dismissing any of the Cases. If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims and DIP Liens granted to the Agent pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP Obligations shall have been paid and satisfied in full in cash (and that such Superpriority Claims and DIP Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (i) in this sentence.

      (b)     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations incurred prior to the actual receipt of written notice by the Agent of the effective date of such reversal, stay, modification or vacation

20

or (ii) the validity or enforceability of any lien or priority authorized or created hereby or

pursuant to the DIP Credit Agreement or the DIP Documents with respect to any DIP

Obligations.  Notwithstanding any such reversal, stay, modification or vacation, any DIP

Obligations incurred by the Debtor Obligors to the Agent or the DIP Lenders prior to the

actual receipt of written notice by the Agent of the effective date of such reversal, stay,

modification or vacation shall be governed in all respects by the original provisions of

this Order, and the Agent and DIP Lenders shall be entitled to all the rights, remedies,

privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order and

pursuant to the DIP Documents with respect to all DIP Obligations.

       (c)     Except as expressly provided in this Order or in the DIP

Documents, the DIP Liens, the Superpriority Claims and all other rights and remedies of

the Agent and the DIP Lenders granted by the provisions of this Order and the DIP

Documents shall survive, and shall not be modified, impaired or discharged by (i) the

entry of an order converting any of the Cases to a case under chapter 7, dismissing any of

the Cases, terminating the joint administration of these Cases or by any other act or

omission, or (ii) the entry of an order confirming a plan of reorganization in any of the

Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor Obligors

will be deemed to have waived any discharge as to any remaining DIP Obligations.

Under no circumstances shall any plan of reorganization of a Debtor Obligor be

confirmed or become effective unless such plan provides that the DIP Obligations are

paid in full in cash on or before the effective date of such plan or as may otherwise be

agreed by the DIP Lenders in the manner provided in the DIP Documents.  The terms and

provisions of this Order and the DIP Documents shall continue in the Debtor Obligors' Cases, in any successor cases if such Cases cease to be jointly administered, or in any superceding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims and all other rights and remedies of the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full.

15. *Limitation on Use of Financing Proceeds and Collateral.* The Debtor Obligors shall use the proceeds of the Financing solely as provided in this Order and in the DIP Documents. Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, letters of credit, Collateral or the Carve-Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents or the liens or claims granted under this Order or the DIP Documents, (b) assert any claims or defenses or causes of action related in any way to the Financing or related documents against the Agent or the DIP Lenders or their respective agents, affiliates, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the Agent's assertion, enforcement or realization on the Collateral in accordance with the DIP Documents or this Order, (d) seek to modify any of the rights granted to the Agent or the DIP Lenders hereunder or under the DIP Documents, in each of the foregoing cases without such parties' prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Dates unless such payments are approved or authorized by an order of this Court or approved by the Agent in its sole discretion.

22

16. *Insurance.* Pursuant to this Order, the Agent and the DIP Lenders shall be and shall be deemed to be, in the manner and to the extent provided in the DIP Credit Agreement, without any further action or notice, named (a) as additional insured on all liability insurance maintained by the Debtor Obligors with respect to occurrences arising out of or relating to the Collateral and occurring on or after the date the Financing is consummated and (b) as sole loss payee on all property insurance covering Collateral maintained by the Debtor Obligors for losses occurring on or after the date the Financing is consummated.

17. *Waiver of Claims and Causes of Action.* Without prejudice to the rights of any other party, including the statutory committees and legal representatives for future claimants appointed in the Cases, the Debtor Obligors have waived any and all claims and causes of action against the Agent and the DIP Lenders, and their respective affiliates, directly related to the Financing or the negotiation of the terms thereof.

18. *Order Governs.* In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.

19. *Binding Effect; Successors and Assigns.* The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties in interest in the Debtor Obligors' Cases, including, without limitation, the Agent, the DIP Lenders, the statutory committees and the legal representatives for future claimants appointed in the Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the

23

Bankruptcy Code, or any other fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) and shall inure to the benefit of the Agent, the DIP Lenders and the Debtors and their respective successors and assigns; *provided, however*, that the Agent and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

20. *Limitation of Liability*. In determining to make any loan under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the Agent and the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Order or in any of the DIP Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the Agent or the DIP Lenders of any liability for any claims arising from the pre-petition or post-petition activities by the Debtors or debtors-in-possession and their affiliates (as defined in section 101(2) of the Bankruptcy Code) in the operation of their businesses, or in connection with their restructuring efforts.

24

21. *Right of Access and Information.*

(a)     The Debtor Obligors shall cooperate with the Agent and the DIP Lenders to permit them to exercise their rights of access and to information as set forth in the DIP Documents, including, but not limited to, section 5.06 of the DIP Credit Agreement.

(b)     Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the Agent and the DIP Lenders contained in this Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Credit Agreement or the DIP Documents, upon three (3) days' advance written notice to the landlord of any leased premises that a default has occurred and is continuing under the DIP Documents, the Agent may, subject to any separate agreement by and between such landlord and the Agent, enter upon any leased premises of the Debtor Obligors for the purpose of exercising any remedy with respect to Collateral located thereon and shall be entitled to all of the applicable Debtor Obligor's rights and privileges as lessee under such lease without interference from the landlords thereunder, provided that the Agent shall only pay rent and additional rent obligations of the applicable Debtor Obligor that first arise after the Agent's written notice referenced above and that are payable during the period of such occupancy by the Agent, calculated on a per diem basis. Other than the payment obligation contained in this paragraph, the Agent shall not be required to perform any of the Debtors' obligations under any lease as a condition to the rights afforded to the Agent in this paragraph.

25

22. *Effectiveness.* This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

23. *Advisor Fees and Expenses.* Invoices for any Advisor Fees and Expenses shall be submitted to counsel for the Debtors, counsel for the Creditors' Committee, counsel for the Asbestos Committee, counsel for the Asbestos Representative and counsel for the Silica Representative. The Debtors, Creditors' Committee, Asbestos Committee, Asbestos Representative and Silica Representative shall have ten (10) days from receipt of such invoices to file an objection with the Court. If no objection is timely filed, JPMCBB shall file a certification of counsel, with a copy of the invoice or summary of the invoice, informing the Court that no objections to the proposed Advisor Fees and Expenses have been filed. Upon the filing of this certification of counsel by JPMCBB, the Debtors shall be authorized to pay the proposed Advisor Fees and Expenses. If an objection is filed, such objection shall be heard at the next scheduled omnibus hearing in these Cases that is at least ten (10) days after the filing of such objection. Other than as provided in this paragraph of the Order, there shall be no other requirements for the payment of Advisor Fees and Expenses, notwithstanding any other order entered in the Cases with respect to payment of professional fees and expenses.

Dated:      February 10, 2005
            Wilmington, Delaware

                                    *Judith K. Fitzgerald*
                                                        rmab
                            UNITED STATES BANKRUPTCY JUDGE

26

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION

| | | |
|---|---|---|
| In Re: | ) | In Proceedings Under Chapter 11 |
| | ) | |
| | ) | Case No.    04-45814 (JWV) |
| INTERSTATE BAKERIES | ) | |
| CORPORATION, <u>et</u> <u>al</u>., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |

**FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. §363, AND (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364**

Upon the motion (the "**Motion**"), dated September 22, 2004, of Interstate Bakeries Corporation and its affiliated debtors (jointly and severally, the "**Borrowers**"), each as debtor and debtor-in-possession (collectively, the "**Debtors**"), in the above-captioned cases (the "**Cases**") pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§101, et seq. (the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking, among other things:

(1)  authorization for the Borrowers to obtain post petition financing (the "**Financing**"), in an aggregate principal amount of $200,000,000 (the actual available principal amount at any time being subject to those conditions set forth in the DIP Documents (as defined below)), from JPMorgan Chase Bank ("**JPMCB**"), acting as Administrative Agent and Collateral Agent (in such capacities, the "**Agent**"), for itself and a syndicate of financial institutions

(together with JPMCB and including the fronting banks for the letters of credit, the "**DIP Lenders**") to be arranged by J.P. Morgan Securities Inc.;

(2)  authorization for the Debtors to execute and enter into the DIP Documents  and to perform such other and further acts as may be required in connection with the DIP Documents;

(3)  the granting of adequate protection to the lenders (the "**Pre-Petition Secured Lenders**") under or in connection with that certain Amended and Restated Credit Agreement, dated as of April 25, 2002 (as heretofore amended, supplemented or otherwise modified, the "**Pre-Petition Credit Agreement**"), among Interstate Bakeries Corporation, Interstate Brands Corporation, the lenders and agents listed therein, the letter of credit issuing bank(s) named therein, and JPMCB, as administrative agent for the Pre-Petition Secured Lenders (the "**Pre-Petition Agent**"), and that certain Guarantee and Collateral Agreement, dated as of July 19, 2001, between Borrowers and the Pre-Petition Agent (as heretofore amended, supplemented or otherwise modified, the "**Security Agreement**" and, collectively with the Pre-Petition Credit Agreement, the Loan Documents (as defined in the Pre-Petition Credit Agreement) and the mortgages and all other documentation executed in connection therewith, the "**Existing Agreements**"), whose liens and security interests are being primed by the Financing;

(4)  authorization for the Debtors to use cash collateral (as such term is defined in the Bankruptcy Code) in which the Pre-Petition Secured Lenders have an interest, and the granting of adequate protection to the Pre-Petition Secured

Lenders with respect to, *inter alia*, such use of their cash collateral and all use and diminution in the value of the Pre-Petition Collateral (as defined below); and

(5) the granting of certain superpriority claims to the DIP Lenders payable from, and having recourse to, all pre-petition and post-petition property of the Debtors' estates and all proceeds thereof, subject to the Carve Out (as defined below);

due and appropriate notice of the Motion and the relief requested therein having been served by the Debtors on all appropriate parties in accordance with Bankruptcy Rule 4001(c); an interim hearing (the "**Interim Hearing**") on the Motion having been held by this Court on September 23, 2004; the Financing having been approved on an interim basis by this Court's Interim Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) (the "**Interim Order**"), entered September 23, 2004; upon all of the pleadings filed with this Court; upon the record made at the Interim Hearing and the final hearing (the "**Final Hearing**") on the Motion; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Jurisdiction*.  This Court has core jurisdiction over the Cases, the Motion, and the parties and property affected under this Order pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 11 U.S.C. §§ 1408 and 1409.

2.    *Notice*.   Under the circumstances, the notice given by the Debtors of the Motion and the Final Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

3.    *Pre-Petition Debt*.  The Pre-Petition Agent and the Pre-Petition Secured Lenders assert that:

(a) as of the filing of the Debtors' Chapter 11 petitions (the "**Petition Date**"), the Borrowers were indebted and liable to the Pre-Petition Secured Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $649,000,000 in respect of Loans (as defined in the Existing Agreements) made, and in the aggregate principal amount of approximately $174,000,000 in respect of letters of credit issued, in each case, by the Pre-Petition Secured Lenders pursuant to, and in accordance with the terms of, the Existing Agreements, plus, in each case, interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Existing Agreements), charges and other obligations incurred in connection therewith as provided in the Existing Agreements and that are reimbursable thereunder (collectively, the "**Pre-Petition Debt**"), the Pre-Petition Debt constitutes legal, valid and binding obligations of the Debtors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no portion of the Pre-Petition Debt is subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and the Debtors do not have any claims, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or otherwise, against the Pre-Petition Secured Lenders, the Pre-Petition Agent and their respective affiliates, agents, officers, directors, employees and attorneys; and

(b) the liens and security interests granted to the Pre-Petition Agent pursuant to and in connection with the Existing Agreements (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Pre-Petition Agent, for its benefit and for the benefit of the Pre-Petition Secured Lenders), are (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the personal and real property described in the Existing Agreements (including the setoff rights described in the Existing Agreements and arising by operation of law, collectively, the "**Pre-Petition Collateral**"), (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve Out (as defined below) to which the DIP Liens are subject and (C) valid, perfected and unavoidable liens to the extent such liens are senior to or pari passu with the liens of the Pre-Petition Agent on the Pre-Petition Collateral.

4.      *Findings Regarding the Financing.*

(a)     Good cause has been shown for the entry of this order (the "**Order**").

(b)     The Debtors have an immediate need to obtain the Financing and use Cash Collateral (as defined below) in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital needs.  The ability of the Debtors to obtain sufficient working capital and liquidity through the use of Cash Collateral (as defined below), incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)     The Debtors are unable to obtain financing from sources other than the DIP Lenders on more favorable terms than under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the Agent and the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens and the Superpriority Claims (as defined below) under the terms and conditions set forth in this Order and in the DIP Documents.

(d)     The terms of the Financing and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

(e)     The Financing has been negotiated in good faith and at arm's length between the Debtors, the Agent and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, (i) all loans made to, and all letters of credit issued for the account of, the Debtors pursuant to the Revolving Credit Agreement substantially in the form previously filed with the Court (the "**DIP Credit Agreement**"), and (ii) any "**Obligations**" (as defined in the DIP Credit Agreement), including credit extended in respect of overdrafts and related liabilities and other depository, treasury and cash management services and other clearing services provided by the Agent or its affiliates (all of the foregoing in clauses (i) and (ii) collectively,  the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy

Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     The Debtors have requested entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the Financing and the use of Cash Collateral in accordance with this Order and the DIP Documents is therefore in the best interest of the Debtors' estates.

5.     *Authorization of the Financing and the DIP Documents.*

(a)     The Debtors are hereby authorized to enter into the DIP Documents.  The Borrowers are hereby authorized to borrow monies and obtain letters of credit pursuant to the DIP Credit Agreement, up to an aggregate principal or face amount of $200,000,000 (plus interest, fees and other expenses provided for in the DIP Documents), in accordance with the terms of this Order and the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Debtors and to pay interest, fees and expenses in accordance with this Order and the DIP Documents.  In addition to such amounts and obligations, the Debtors are authorized to incur overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house fund transfers provided to or for the benefit of the Debtors by JPMCB or any of its affiliates; *provided, however*, that nothing herein shall require JPMCB or any other party to incur overdrafts or to provide any such services or functions to the Debtors.

(b)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of the Financing, including, without limitation:

(i)    the execution, delivery and performance of the Loan Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without limitation, the DIP Credit Agreement, the Security and Pledge Agreement (as defined in the DIP Credit Agreement), Letters of Credit (as defined in the DIP Credit Agreement), and the mortgages contemplated thereby (collectively, and together with the letter agreements referred to in clause (iii) below, the "**DIP Documents**"),

(ii)    the execution, delivery and performance of one or more amendments to the DIP Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the Agent and the DIP Lenders may agree (it being understood that no further approval of the Court shall be required for amendments to the DIP Credit Agreement that do not shorten the maturity of the extensions of credit thereunder or increase the commitments, the rate of interest or the letter of credit fees payable thereunder),

(iii)    the non refundable payment to the Agent or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement (and in the separate letter agreements between them in connection with the Financing) and reasonable costs and expenses

as may be due from time to time, including, without limitation, reimbursable fees and expenses of the professionals retained as provided for in the DIP Documents, and

(iv)    the performance of all other acts required or advisable under or in connection with the DIP Documents.

(c)    The DIP Documents constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Documents.  No obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff or counterclaim.

6.    *Superpriority Claims*.

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims (including all Adequate Protection Obligations (as defined below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "**Superpriority Claims**"), which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve Out to the extent specifically provided for herein.

(b)    For purposes hereof, the "**Carve Out**" means, collectively, (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (ii) an aggregate amount not exceeding $200,000 of the unpaid fees and expenses of any Chapter 7 trustee in these proceedings; and (iii) an aggregate amount not exceeding $3,000,000 (plus the amount set forth in the most recent Borrowing Base Certificate delivered by the Debtors to the Administrative Agent of then unpaid professional fees and expenses incurred prior to the occurrence of a Default or Event of Default (as defined in the DIP Credit Agreement) to the extent that such unpaid fees and expenses are subsequently allowed by the Bankruptcy Court), which amount may be used after the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement) subject to the terms of this Order, including, without limitation, paragraph 13 hereof, to pay any fees or expenses incurred by the Debtors and any statutory committees appointed in the Cases (each, a "**Committee**") that remain unpaid subsequent to the payment, pro rata with other nonpriority administrative creditors, of such fees and expenses from available funds remaining in the Debtors' estates for such creditors, in respect of (A) allowances of compensation for services rendered or reimbursement of expenses awarded by the Bankruptcy Court to the Debtors' or any Committee's professionals and (B) the reimbursement of expenses allowed by the Bankruptcy Court incurred by Committee members in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members); *provided*, *however*, that the dollar limitation in this clause 6(b)(ii) on fees and disbursements shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses paid prior to the occurrence of an Event of Default in respect of which the Carve Out is invoked or by any fees, expenses, indemnities or other amounts paid to any Agent, Lender or

their respective attorneys and agents under the DIP Credit Agreement or otherwise, and

*provided, further*, that nothing herein shall be construed to impair the ability of any party to

object to any of the fees, expenses, reimbursement or compensation described in clauses (A) and

(B) above, and *provided, further*, that cash or other amounts on deposit in the Letter of Credit

Account (as defined in the DIP Credit Agreement), shall not be subject to the Carve Out.

7.      *DIP Liens*.  As security for the DIP Obligations (including with respect to the

obligations related to any incidental overadvances, as set forth in Section 6.3(v) of the Credit

Agreement and incorporated into Section 2 of the Security Agreement, as to Bank of America,

N.A. and UMB Bank, N.A.), effective and perfected upon the Petition Date and without the

necessity of the execution, recordation of filings by the Debtors of mortgages, security

agreements, control agreements, pledge agreements, financing statements or other similar

documents, the following security interests and liens are hereby granted to the Agent for its own

benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b) and (c)

below, being collectively referred to as the "**Collateral**"), subject to the payment of the Carve

Out (all such liens and security interests granted to the Agent, for its benefit and for the benefit

of the DIP Lenders, pursuant to this Order and the DIP Documents, the "**DIP Liens**"):

(a)      First Lien on Cash Balances and Unencumbered Property.  Pursuant to

section 364(c)(2) of the Bankruptcy Code, the Agent is hereby granted (for the benefit of itself

and the DIP Lenders) a valid, binding, continuing, enforceable, fully-perfected first priority

senior security interest in and lien upon all pre- and post-petition property of the Debtors,

whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is

not subject to valid, perfected and non-avoidable liens (collectively, "**Unencumbered**

**Property**"), including without limitation, all cash and cash collateral of the Debtors (whether

maintained with the Agent or otherwise) and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing. Unencumbered Property shall exclude the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553(b) of the Bankruptcy Code, and/or any other avoidance claims and/or actions under the Bankruptcy Code (collectively, "**Avoidance Actions**"), but shall include any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions.

(b)    <u>Liens Priming Pre-Petition Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, the Agent (for the benefit of itself and the DIP Lenders) is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre- and post-petition property of the Debtors (including, without limitation, cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing), whether now existing or hereafter acquired, that is subject to existing liens which secure (i) the Pre-Petition Debt (including in respect of issued but undrawn letters of credit), and (ii) other obligations or indebtedness of the Borrowers pursuant to other

agreements in an aggregate amount in excess of $2,500,000 (collectively, the "**Primed Liens**").[1]

Such security interests and liens shall be senior in all respects to the Primed Liens and any other

interests in such property of the Pre-Petition Secured Lenders arising from current and future

liens of the Pre-Petition Secured Lenders (including, without limitation, adequate protection liens

granted hereunder), but shall not be senior to any valid, perfected and unavoidable interests of

other parties arising out of liens, if any, on such property existing immediately prior to the

Petition Date, or to any valid, perfected and unavoidable interests in such property arising out of

liens to which the liens of the Pre-Petition Secured Lenders become subject subsequent to the

Petition Date as permitted by section 546(b) of the Bankruptcy Code, in an aggregate amount

less than or equal to $2,500,000.

(c)    Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the

Bankruptcy Code, the Agent (for the benefit of itself and the DIP Lenders) is hereby granted

valid, binding, continuing, enforceable, fully-perfected security interests in and liens upon all

pre-  and post-petition property of the Debtors (other than the property described in clauses (a) or

(b) of this paragraph 7, as to which the liens and security interests in favor of the Agent will be

as described in such clauses), whether now existing or hereafter acquired, that is subject to valid,

perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid

and unavoidable liens in existence immediately prior to the Petition Date that are perfected

subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which

security interests and liens in favor of the Agents are junior to such valid, perfected and

unavoidable liens.

---

[1]    Any requests for adequate protection with respect to the Primed Liens, including any Primed Liens held by governmental entities, must be filed in accordance with, inter alia, Sections 363 and 364 of the Bankruptcy Code.

(d)    <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens and the Adequate

Protection Liens (as defined below) shall not be subject or subordinate to (i) any lien or security

interest that is avoided and preserved for the benefit of the Debtors and their estates under

section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date including,

without limitation, any liens or security interests granted in favor of any federal, state, municipal

or other governmental unit, commission, board or court for any liability of the Debtors.

8.    *Protection of DIP Lenders' Rights*.

(a)    So long as there are any borrowings or letters of credit or other amounts

(other than contingent indemnity obligations as to which no claim has been asserted when all

other amounts have been paid and no letters of credit are outstanding) outstanding, or the DIP

Lenders have any Commitment (as defined in the DIP Credit Agreement) under the DIP Credit

Agreement, the Pre-Petition Agent and Pre-Petition Secured Lenders shall (a) take no action to

foreclose upon or recover in connection with the liens granted thereto pursuant to the Existing

Agreements or this Order, or otherwise exercise remedies against any Collateral, except to the

extent authorized by an order of this Court and (b) be deemed to have consented to any release of

Collateral authorized under the DIP Documents and (c) not file any further financing statements,

trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or

otherwise take any action to perfect their security interests in the Collateral.

(b)    The automatic stay provisions of section 362 of the Bankruptcy Code are

vacated and modified (i) to permit the Agent and the DIP Lenders to exercise, upon the

occurrence of an Event of Default, all rights and remedies under the DIP Documents other than

those rights and remedies against the Collateral and (ii) to the extent necessary to permit the

Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of an

Event of Default and the giving of five business days prior written notice to the extent provided for in the DIP Credit Agreement, all rights and remedies against the Collateral provided for in the DIP Documents (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the Agent or any DIP Lender).  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors and the Pre-Petition Secured Lenders hereby waive their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Agent or the DIP Lenders set forth in this Order or the DIP Documents.  In no event shall the Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

9.      *Limitation on Charging Expenses Against Collateral*.  To the extent permitted by law and except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Agent or the Pre-Petition Agent, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured Lenders.

10.      *The Cash Collateral*.  To the extent any funds were on deposit with the Pre-Petition Secured Lenders as of the Petition Date, including, without limitation, all funds deposited in, or credited to, an account of any Debtor with any Pre-Petition Secured Lender

immediately prior to the filing of the Debtors' bankruptcy petitions (the "**Petition Time**")

(regardless of whether, as of the Petition Time, such funds had been collected or made available

for withdrawal by any such Debtor), such funds (the "**Deposited Funds**") are subject to rights of

setoff. By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of such

Pre-Petition Secured Lenders pursuant to sections 506(a) and 553 of the Bankruptcy Code. Any

proceeds of the Pre-Petition Collateral (including the Deposited Funds but not including any

Deposited Funds and/or proceeds attributable to any Pre-Petition Collateral, if any, as to which

pre-petition liens are later avoided) are cash collateral of the Pre-Petition Secured Lenders within

the meaning of section 363(a) of the Bankruptcy Code. Such Deposited Funds and all such

proceeds of Pre-Petition Collateral are referred to herein as "**Cash Collateral**."

      11.    *Use of Cash Collateral*. Upon the depletion of all cash that is not Cash Collateral,

if any, the Debtors are hereby authorized to use all Cash Collateral of the Pre-Petition Secured

Lenders, and Pre-Petition Secured Lenders are directed promptly to turn over to the Debtors all

Cash Collateral received or held by them, *provided* that the Pre-Petition Secured Lenders are

granted adequate protection as hereinafter set forth. The Debtors' right to use Cash Collateral

shall terminate automatically on the Termination Date (as defined in the DIP Credit Agreement).

In addition, if the Borrowers voluntarily terminate the Commitment prior to the Maturity Date

(as each such term is defined in the DIP Credit Agreement), the Debtors shall, for the benefit of

the Pre-Petition Secured Lenders, continue to comply with the requirements of Sections 5 and 6

of the DIP Credit Agreement and, upon any failure by the Debtors to observe any such

requirement or upon the occurrence of any event that would have constituted an Event of Default

under the DIP Credit Agreement prior to the termination of the Commitment, the Pre-Petition

Agent on behalf of the Pre-Petition Secured Lenders shall have the immediate right unilaterally to terminate the Debtors' right to use Cash Collateral.

12.     *Adequate Protection.*  The Pre-Petition Secured Lenders are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the Pre-Petition Collateral, including the Cash Collateral, for and equal in amount to the aggregate diminution in value of the Pre-Petition Secured Lenders' interests in the Debtors' interests in the Pre-Petition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Pre-Petition Collateral, the priming of the Pre-Petition Agent's security interests and liens in the Pre-Petition Collateral by the Agent and the DIP Lenders pursuant to the DIP Documents and this Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, but excluding diminution in value, if any, arising from the avoidance of any Liens on the Pre-Petition Collateral (collectively, the "**Adequate Protection Obligations**"). For purposes of determining the diminution in value of the Pre-Petition Collateral, including the Cash Collateral (which shall be determined by this Court on motion of any party in interest), and for purposes of determining the Adequate Protection Obligations, any of the Pre-Petition Collateral, including the Cash Collateral, of the Pre-Petition Secured Lenders as to which their security interests or liens are later avoided shall not be included.  As adequate protection, the Pre-Petition Agent and the Pre-Petition Secured Lenders are hereby granted the following:

(a)     <u>Adequate Protection Liens</u>.  As security for the payment of the Adequate Protection Obligations, the Pre-Petition Agent (for itself and for the benefit of the Pre-Petition Secured Lenders) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge

agreements, financing statements or other agreements) a replacement security interest in and lien upon all the Collateral, subject and subordinate only to (i) the security interests and liens granted to the Agent for the benefit of the DIP Lenders in this Order and pursuant to the DIP Documents and any liens on the Collateral to which such liens so granted to the Agent are junior and (ii) the Carve Out (the "**Adequate Protection Liens**"); *provided that* the Adequate Protection Liens shall not extend to any proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions;

(b)     Section 507(b) Claim. The Pre-Petition Agent and the Pre-Petition Secured Lenders are hereby granted, subject to the payment of the Carve Out, a superpriority claim in the amount of the Adequate Protection Obligations as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the Agent and the DIP Lenders *provided*, *however*, that the Pre-Petition Agent and the Pre-Petition Secured Lenders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder or under the Existing Agreements unless and until the DIP Obligations have indefeasibly been paid in cash in full, and *provided further*, that superpriority claims arising under Section 507(b) of the Bankruptcy Code shall have the same priority, and shall share ratably with, administrative expenses under Section 503(b) of the Bankruptcy Code with regard to the proceeds of Avoidance Actions;

(c)     Interest, Fees and Expenses. The Pre-Petition Agent shall receive from the Debtors (i) following the closing of the Financing, immediate cash payment of all accrued and unpaid interest on the Pre-Petition Debt and letter of credit fees at the rates as of the Petition Date as provided for in the Existing Agreements, and all other accrued and unpaid fees and

disbursements (including, but not limited to, fees owed to the Pre-Petition Agent and the reasonable out-of-pocket expenses of members of the steering committee of Pre-Petition Secured Lenders, in their capacity as such) owing under the Existing Agreements at the non-default contract rate and incurred prior to the Petition Date, (ii) current cash payments of all fees and expenses payable to the Pre-Petition Agent under the Existing Agreements, including, but not limited to, the reasonable fees and disbursements of counsel, financial and other consultants for the Pre-Petition Agent, and current cash payment of all reasonable out-of-pocket expenses of the steering committee of Pre-Petition Secured Lenders, in their capacity as such, provided that none of the fees, costs and expenses of the Pre-Petition Agent's advisors or members of the steering committee payable pursuant to this clause (ii) shall be subject to the approval of this Court (unless an objection is lodged as set forth below), and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided further that payment of such fees, costs and expenses shall be made promptly following, but no earlier than, ten days after delivery to Debtors and counsel to the Creditors' Committee and counsel to the Ad Hoc Equity Security Holders Committee (or any other statutory committee) of a statement setting forth in reasonable detail such fees, costs and expenses and the Debtors shall withhold payment of the fees that are specified as unreasonable in a written objection from either the Debtors or the Creditors' Committee delivered to the relevant party prior to the expiration of the ten day period until the earlier of the resolution of such objection (x) on such terms as the parties may agree or (y) as this Court may determine; and (iii) on the first business day of each month, all accrued but unpaid interest on the Pre-Petition Debt, and letter of credit and other fees at the non-default contract rate applicable on the Petition Date (including LIBOR pricing options) under the Existing Agreements, *provided* that, without prejudice to the rights of any

other party to contest such assertion, the Pre-Petition Secured Lenders reserve their rights to assert claims for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for in the Existing Agreements, *provided further* that, payments under (i), (ii) and (iii) above shall be without prejudice to the rights of any party in interest to later contend that such payments should be applied to the principal amount of the Pre-Petition Debt;

(d)     Monitoring of Collateral.  The Pre-Petition Secured Lenders shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors, which consultants and advisors, and the professionals retained by any Committee, shall be given reasonable access for purposes of monitoring the Collateral; and

(e)     Determination of Adequate Protection Obligations.  As of any date of determination, the amount of Adequate Protection Obligations then outstanding shall be determined by the difference, if any, between (x) the value of Pre-Petition Secured Lenders' interest in the Debtors' interest in the Pre-Petition Collateral as of the Petition Date and (y) the sum of the (i) the value of Pre-Petition Secured Lenders' interest in the Debtors' interest in the remaining Pre-Petition Collateral as of such date of determination plus (ii) the value of Pre-Petition Secured Lenders' interest in the Debtors' interest in any property that constitutes Pre-Petition Collateral under the Existing Agreements after giving effect to Section 552(b) of the Bankruptcy Code as of such date of determination and (iii) without duplication, all proceeds of the foregoing as of such date of determination. The determination of the  amount of Adequate Protection Obligations herein shall be calculated exclusive of the value of any Pre-Petition Collateral  as to which the security interests or liens of Pre-Petition Secured Lenders are avoided. Nothing in this paragraph shall be deemed to limit the scope of the Adequate Protection Liens

granted to secure any outstanding Adequate Protection Obligations or to create any obligation on the part of the Pre-Petition Agent or Pre-Petition Secured Lenders to marshal as to certain types of Collateral or otherwise limit the exercise of its remedies in respect of outstanding Adequate Protection Obligations.

13.    *Reservation of Rights*.  Under the circumstances and given that the above described adequate protection is consistent with the Bankruptcy Code, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Pre-Petition Secured Lenders.  However, the Pre-Petition Agent and the Pre-Petition Secured Lenders may request further or different adequate protection, and, following a change of circumstances, the Debtors may, subject to the provisions of paragraph 15(b), request a modification of the adequate protection payments contemplated by clause (iv) of paragraph 12(c) hereof.  Any party in interest may contest or object to any such request.  Moreover, nothing contained in this Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify the right of the Pre-Petition Agent, any Pre-Petition Secured Lender or DIP Lender (i) to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans of reorganization or (ii) that is a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of the Debtors to contest such assertions).

14.    *Perfection of DIP Liens and Adequate Protection Liens*.

(a)    The Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Secured Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any

jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the Agent on behalf of the DIP Lenders or the Pre-Petition Agent on behalf of the Pre-Petition Secured Lenders shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of this Order.  Upon the request of the Agent, each of the Debtors, Pre-Petition Agent and Pre-Petition Secured Lenders, without any further consent of any party, is authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind) to enable the Agent to further validate, perfect, preserve and enforce DIP Liens.

(b)     A certified copy of this Order may, in the discretion of the Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

15.     *Preservation of Rights Granted Under the Order*.

(a)     No claim or lien having a priority superior to or *pari passu* with those granted by this Order to the Agent and the DIP Lenders or to the Pre-Petition Agent and the Pre-Petition Secured Lenders, respectively, shall be granted or allowed while any portion of the Financing (or any refinancing thereof) or the Commitments thereunder or the DIP Obligations or the Adequate Protection Obligations remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided

and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

       (b)    Unless all DIP Obligations shall have been paid in full (and, with respect to outstanding letters of credit issued pursuant to the DIP Credit Agreement, cash collateralized in accordance with the provisions of the DIP Credit Agreement) and the Adequate Protection Obligations shall have been paid in full, the Debtors shall not seek, and it shall constitute an Event of Default and a termination of the right to use Cash Collateral if any of the Debtors seek, or if there is entered, (i) any modification or extension of this Order without the prior written consent of the Agent and the Pre-Petition Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the Agent or the Pre-Petition Agent, or (ii) an order dismissing any of the Cases.  If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, priming liens, security interests and replacement security interests granted to the Agent and, as applicable,  the Pre-Petition Agent pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP Obligations and Adequate Protection Obligations shall have been paid and satisfied in full (and that such Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

(c)    If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Agent or Pre-Petition Agent, as applicable, of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations or Adequate Protection Obligations.  Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtors to the Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured Lenders prior to the actual receipt of written notice by the Agent and Pre-Petition Agent of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the Agent, DIP Lenders, Pre-Petition Agent and Pre-Petition Secured Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)    Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the Superpriority Claims and all other rights and remedies of the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under Chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code,

the Debtors have waived any discharge as to any remaining DIP Obligations and such waiver is hereby approved. The terms and provisions of this Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superceding Chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims and all other rights and remedies of the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full.

16.     *Effect of Stipulations on Third Parties.* The stipulations, admissions, agreements and assertions contained in this Order, including, without limitation, the assertions contained in paragraph 3 of this Order, shall be binding upon the Debtors and all other parties in interest, including, without limitation, any Committee, unless (a) a party in interest, including without limitation the Debtors, has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in paragraph 17) by no later than March 2, 2005 (or such later date (x) as has been agreed to, in writing, by the Pre-Petition Agent in its sole discretion or (y) ordered by the Court for cause shown by the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") or other objecting party in interest, including without limitation the Debtors), (i) for claims challenging the extent, validity, enforceability, perfection or priority of the Pre-Petition Debt or the Pre-Petition Agent's or the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral or (ii) otherwise asserting or prosecuting any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action , objections, contests or defenses against the Pre-Petition Agent or any of the Pre-Petition Secured Lenders or their affiliates, representatives, attorneys or advisors in connection with matters related to the Existing Agreements, the Pre-Petition Debt,

the Pre-Petition Collateral, and (b) there is a final order in favor of the plaintiff sustaining any

such challenge or claim in any such timely filed adversary proceeding or contested matter.

Nothing contained herein is intended to assign any claim of the Debtors to any third party and/or

to bestow any standing with respect thereto.  If no such adversary proceeding or contested matter

is timely filed, (x) the Pre-Petition Debt and all related obligations of the Debtors (the "**Pre-**

**Petition Obligations**") shall constitute allowed claims, not subject to counterclaim, setoff,

subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any

subsequent Chapter 7 cases, (y) the Pre-Petition Agent's and the Pre-Petition Secured Lenders'

liens on the Pre-Petition Collateral shall be deemed to have been, as of the Petition Date, legal,

valid, binding and perfected, not subject to recharacterization, subordination or avoidance and (z)

the Pre-Petition Obligations, the Pre-Petition Agent's and the Pre-Petition Secured Lenders' liens

on the Pre-Petition Collateral and the Pre-Petition Agent and the Pre-Petition Secured Lenders

shall not be subject to any other or further challenge by any party in interest, including without

limitation the Debtors, seeking to exercise the rights of the Debtors' estates, including, without

limitation, any successor thereto (including, without limitation, any Chapter 7 or 11 trustee

appointed or elected for any of the Debtors).  If any such adversary proceeding or contested

matter is timely filed, the assertions contained in paragraph 3 of this Order shall nonetheless

remain binding and preclusive (as provided in the second sentence of this paragraph) on any

Committee (including the Creditors' Committee) and on any other person or entity, except to the

extent that such assertions were expressly challenged in such adversary proceeding or contested

matter.  Nothing contained in either the stipulations, admissions, agreements and assertions

contained in this Order or the effect thereof as contemplated by this paragraph shall act to release

or otherwise affect any separate and non-derivative claims or causes of action, if any, arising

under non-bankruptcy law and capable of being asserted by third parties against the Pre-Petition

Secured Lenders.

17.     *Limitation on Use of Financing Proceeds and Collateral*.  Notwithstanding

anything herein or in any other order by this Court to the contrary, no borrowings, letters of

credit, Cash Collateral, Collateral or the Carve Out may be used to (a) object, contest or raise any

defense to, the validity, perfection, priority, extent or enforceability of any amount due under the

DIP Documents or the Existing Agreements, or the liens or claims granted under this Order, the

DIP Documents or the Existing Agreements, (b) assert any Claims or Defenses or causes of

action against the Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured

Lenders or their respective agents, affiliates, representatives, attorneys or advisors, (c) prevent,

hinder or otherwise delay the Agent's or the Pre-Petition Agent's assertion, enforcement or

realization on the Cash Collateral or the Collateral in accordance with the DIP Documents, the

Existing Agreements or this Order, (d) seek to modify any of the rights granted to the Agent, the

DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured Lenders hereunder or under the

DIP Documents or the Existing Agreements, in each of the foregoing cases without such parties'

prior written consent, or (e) pay any amount on account of any claims arising prior to the Petition

Date unless such payments are (i) approved by an Order of this Court and (ii) in accordance with

the Budget (as defined in the DIP Credit Agreement) as approved by the Agent in its discretion;

*provided*, *however*, that notwithstanding anything to the contrary herein, the Creditors'

Committee appointed in these cases shall be permitted up to $250,000 to perform the

investigations contemplated hereby.

18.     *JPMCB as Collateral Agent*.  To the extent JPMCB, in its role as Collateral Agent

under the Existing Agreements, is the secured party under any Control Agreements (as defined in

the Existing Agreements), listed as loss payee under the Debtors' insurance policies as required

under the Security Agreement or is the secured party under any other Existing Agreement,

JPMCB, in its role as Collateral Agent under the DIP Credit Agreement, is also deemed to be the

secured party under such Control Agreements, loss payee under the Debtors' insurance policies

and the secured party under any other Existing Agreement and shall act in that capacity and

distribute any proceeds recovered or received first, for the benefit of the DIP Lenders in

accordance with the DIP Credit Agreement and second, subsequent to indefeasible payment in

full of all DIP Obligations, for the benefit of the Pre-Petition Secured Lenders under the Existing

Agreements.

19.    *Limits on DIP Lenders' Liability*.  Nothing in this Order or in any of the DIP

Documents or any other documents related to this transaction shall in any way be construed or

interpreted to impose or allow the imposition upon the Agent or the DIP Lenders any liability for

any claims arising from the pre-petition or post-petition activities by the Debtors or Debtors-in-

Possession and their Affiliates in the operation of their businesses, or in connection with their

restructuring efforts.

20.    *Master Proof of Claim.*  (a) In order to facilitate the processing of claims, to ease

the burden upon the Court and to reduce any unnecessary expense to the Debtors' estates, the

Pre-Petition Agent is authorized to file a master proof of claim on behalf of itself and the Pre-

Petition Secured Lenders on account of their claims arising under the Existing Agreements and

hereunder against all of the Debtors (the "**Master Proof of Claim**"), and the Pre-Petition Agent

shall not be required to file a verified statement pursuant to Rule 2019 of the Bankruptcy Rules.

(b) Upon the filing of the Master Proof of Claim against the Debtors, the Pre-

Petition Agent and each Pre-petition Secured Lender, and each of their respective successors and

assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name

therein in respect of its claims against each Debtor arising under the Loan Documents, and the

claim of the Pre-Petition Agent and each Pre-Petition Secured Lender (and each of their

respective successors and assigns), named in the Master Proof of Claim shall be allowed or

disallowed as if such entity had filed a separate proof of claim in the Chapter 11 case in the

amount set forth opposite each name in the master Proof of Claim; *provided that* the Pre-Petition

Agent may, but shall not be required to, amend the Master Proof of Claim from time to time to,

among other things, reflect a change in the holders of claims set forth therein or a reallocation

among such holders of the claims asserted therein resulting from any transfer of any such claims,

but shall provide such information to the Debtors upon their request.

       (c) The provisions set forth in this paragraph and the Master Proof of Claim are

intended solely for the purpose of administrative convenience and, except to the extent set forth

herein or therein, neither the provisions of this paragraph nor the Master Proof of Claim shall

affect the substantive rights of the Debtors, any statutory committee appointed in these Chapter

11 cases, the Pre-Petition Agent or the Pre-Petition Secured Lenders or any other party in interest

or their respective successors in interest including, without limitation, the right of each Pre-

Petition Secured Lender (or their successors in interest) to vote separately on any plan of

reorganization proposed in the Debtors' Chapter 11 cases.

     21.    *Order Governs.*  In the event of any inconsistency between the provisions of this

Order and the DIP Documents, the provisions of this Order shall govern.

     22.    *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions

of this Order, including all findings herein, shall be binding upon all parties in interest in these

Cases, including, without limitation, the Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-

Petition Secured Lenders, any Committee appointed in these Cases, and the Debtors and their

respective successors and assigns (including any Chapter 7 or Chapter 11 trustee hereinafter

appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the

Agent, the DIP Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders and the

Debtors and their respective successors and assigns, *provided*, *however*, that the Agent and the

DIP Lenders shall have no obligation to extend any financing to any Chapter 7 trustee or similar

responsible person appointed for the estates of the Debtors.  In determining to make any loan

under the DIP Credit Agreement or in exercising any rights or remedies as and when permitted

pursuant to this Order or the DIP Documents, the Agent and the DIP Lenders shall not be

deemed to be in control of the operations of the Debtors or to be acting as a "responsible person"

or "owner or operator" with respect to the operation or management of the Debtors (as such

terms, or any similar terms, are used in the United States Comprehensive Environmental

Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar

federal or state statute).

    23.    *Service of Order*.  The Debtors shall promptly mail or otherwise provide copies of

this Order to the parties having been given notice of the Final Hearing, to any other party that has

filed a request for notices with this Court and to the Creditors' Committee and its counsel.

    24.    *Certain Covenants in the DIP Credit Agreement.*  The Debtors agree that they will

meet and confer in good faith and at reasonable times with representatives of the Creditors'

Committee and the Ad Hoc Equity Security Holders Committee (subject to the execution of

appropriate confidentiality agreements by members of the respective committees with the

Debtors) with respect to any covenant contained in the DIP Credit Agreement for which no set

amount, minimum or limit has been yet established, including, but not limited to, such covenants

in Sections 6.4 and 6.5 of the DIP Credit Agreement.  The Debtors further agree that they will provide reasonable prior notice to the Creditors' Committee of any proposed material changes to the DIP Credit Agreement.  The failure of the Debtors to comply with this paragraph will not affect the rights and/or interests of the DIP Lenders under this Order, the DIP Credit Agreement or otherwise.

      25.    *Settlement of Certain Issues with Hewlett-Packard Financial Services Company.* In compromise and settlement of the particular issues between Hewlett Packard Financial Services Company ("HPFS") and Debtor Interstate Brands Corp. with respect to the Financing, and notwithstanding anything to the contrary in this Order, (i) the DIP Lenders shall not have any liens arising under Section 364(d) of the Bankruptcy Code with respect to HPFS on equipment subject to the Master Lease and Financing Schedules (the "Master Lease Schedules") to the Master Lease and Financing Agreement dated February 26, 2004 between Debtor Interstate Brands Corp. and HPFS; (ii) any valid, perfected and unavoidable liens of HPFS in equipment subject to the Master Lease Schedules shall not be considered "Primed Liens" for purposes of paragraph 7(b) or any other provision of this Order; and (iii) those liens of HPFS will not be counted for purposes of the $2.5 million total set forth in paragraph 7(b) of this Order.

Dated: October 22, 2004

                             /s/ Jerry W. Venters
                             UNITED STATES BANKRUPTCY JUDGE

ORDER SUBMITTED BY:

Gregory D. Willard, Esq.     MO#30192
Laurence M. Frazen, Esq.    MO #31309
Cullen K. Kuhn, Esq.        MO#53151
BRYAN CAVE LLP
1200 Main Street, Suite 3500
Kansas City, MO  64105
(816) 374-3200
Attorney for Movant to Serve