SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
D. J. Baker (DB 0085)

Attorneys for the Debtors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

| | | |
|---|---|---|
| **In re:** | : | |
| | : | **Chapter 11** |
| | : | |
| **WINN-DIXIE STORES, INC., et al.,**[1] | : | **Case No. 05-11063 (RDD)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------x

**EXPEDITED EMERGENCY MOTION FOR ENTRY OF AN ORDER UNDER 11
U.S.C. §§ 105(a) AND 363 AND FED. R. BANKR. P. 6004 (I) AUTHORIZING AND
APPROVING THE SALE OF A 2002 GULFSTREAM G-200 AIRCRAFT
AND RELATED EQUIPMENT TO MOLINARO KOGER, INC. FREE AND
CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES,
(II) AUTHORIZING PAYMENT OF A BROKERAGE FEE TO BLOOMER
deVERE GROUP AVIA, INC. IN CONNECTION WITH SALE AND
(III) GRANTING RELATED RELIEF**

Winn-Dixie Stores, Inc. and its debtor affiliates, as debtors and debtors-in-

possession (collectively, the "Debtors"), move (the "Motion"), pursuant to sections 105(a)

---

[1]      In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases:  Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc.,

and 363 of title 11 of the United States Code (as amended, the "Bankruptcy Code") and

Fed. R. Bankr. P. 6004 for an entry of an order (i) authorizing and approving the sale of a

2002 Gulfstream G-200 aircraft and related equipment to Molinaro Koger, Inc. (the

"Purchaser") free and clear of liens, claims, interests and encumbrances, (ii) authorizing

payment of a brokerage fee to Bloomer deVere Group Avia, Inc. ("deVere") in

connection with the sale and (iii) granting related relief.

In support of the Motion, the Debtors state as follows:

### BACKGROUND

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed

voluntary petitions for reorganization relief under chapter 11 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1330 as amended (the "Bankruptcy Code"). Their cases

are being jointly administered by order of this Court.

2.      The Debtors are operating their businesses and managing their

properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and

1108. No request has been made for the appointment of a trustee or examiner. On

March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an

official committee of unsecured creditors (the "Creditors Committee") to serve in these

cases pursuant to Bankruptcy Code sections 1102 and 1103.

3.      The Debtors are grocery and drug retailers operating in the

southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie

_____

Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc.,

Marketplace" banners. According to published reports, the Debtors are the eighth-largest food retailer in the United States and one of the largest in the Southeast. The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion. The Debtors currently operate more than 900 stores in the United States with nearly 79,000 employees. Substantially all of the Debtors' store locations are leased rather than owned.

4.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334. Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a) and 363, and such relief is subject to Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### RELIEF REQUESTED

6.      By this Motion, the Debtors request that the Court enter an order (i) authorizing and approving the Debtors to sell a 2002 Gulfstream G-200 aircraft and related equipment to Purchaser, or to a party submitting a higher and better offer, (ii) authorizing the Debtors to pay a brokerage fee to deVere in connection with the sale and (iii) granting related relief.

---

and Winn-Dixie Supermarkets, Inc.

## BASIS FOR RELIEF

7.     The Debtors have implemented, and shall continue to implement, an asset rationalization and expense reduction plan with the goal of improving their operations and financial performance and strengthening their businesses for the benefit of creditors, customers, employees, and the communities in which the Debtors operate.

8.     In furtherance of these plans, the Debtors determined that it was in their best interests to expeditiously close or sell unprofitable stores and divest themselves of unnecessary, underperforming or non-core assets. The Debtors' ability to reduce their expenses and, thereby, increase liquidity is critical for the success of their chapter 11 cases.

9.     The Motion is the Debtors' second motion seeking to sell certain assets on an expedited basis. The Debtors' first expedited motion to sell assets was filed on March 3, 2005 and sought approval to sell certain pharmaceutical prescriptions and related inventory. (Dkt. No. 231). This Court entered an order granting that motion on March 8, 2005. (Dkt. No. 315).

10.     Here, the Debtors are seeking to sell a 2002 Gulfstream G-200 aircraft (the "Airplane") and two (2) Pratt & Whitney Engines (the "Engines") as well as appliances, parts, accessories and other equipment or property related to the Airplane or Engines including all books, manuals and other data (the "Related Equipment" and together with the Airplane and the Engines, the "Assets"). The Debtors understand that expedited relief to sell assets is typically only granted in exigent circumstances. The

-4-

Debtors respectfully submit that expedited relief to approve the sale of the Assets is warranted under the circumstances present here.[2]

11.    The Debtors are seeking to sell the Assets to Purchaser pursuant to a certain Aircraft Purchase and Sale Agreement attached hereto as <u>Exhibit A</u> (the "Purchase Agreement"), or to a party submitting a higher and otherwise better offer. Under the terms of the Purchase Agreement, if the sale is not approved by March 30, 2005 and there is not a final, non-appealable order by April 10, 2005, Purchaser has the right to terminate the transaction. If Purchaser does not go through with the sale, the Debtors' estates and creditors will be harmed. The Debtors have engaged in extensive marketing efforts for the sale of the Assets and believe that Purchaser's price for the Assets is the highest and otherwise best offer for the Assets. The Debtors firmly believe that they will not be able to locate another purchaser willing and able to purchase the Assets on similar terms. Thus, the Debtors respectfully submit that the expedited relief requested herein is warranted.

12.    The material terms of the sale[3] with Purchaser, subject to this Court's approval, are detailed in the Purchase Agreement, but include the following:

(a)    <u>Purchase Price</u>: On the terms and subject to the conditions set forth in the Purchase Agreement, the aggregate purchase

---

[2]    Support for the requested expedited relief is buttressed by the fact that the Debtors have already provided and are continuing to provide information regarding the sale of the Assets to counsel for the Creditors Committee. The Debtors are hopeful that they can come to the Court with the support of the Creditors' Committee on this Motion.

[3]    This summary of the Purchase Agreement is provided as a convenience only. To the extent that the summary differs in any way from the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.

price for the Assets shall be $15,180,000 (the "Purchase Price").  Additionally, a deposit of $200,000 is required to be paid by Purchaser prior to execution of the Purchase Agreement.  The remainder of the Purchase Price is to be paid on or before the Delivery Date to the Escrow Agent, as detailed in the Purchase Agreement.

(b)     Escrow.  The Purchase Agreement provides for the creation of a mutually acceptable Escrow Agreement between the Debtors and Purchaser, with Insured Aircraft Title Services, Inc. as the Escrow Agent.

(c)     Sale Free and Clear.  The Purchase Agreement provides that the Assets are to be transferred free and clear of any lien, claim, lease or encumbrance of any nature except any claim arising through Purchaser or any of its agents or contractors.

(d)     Court Order.  The sale of the Assets to Purchaser shall have been approved by a final, non-appealable order that authorizes the sale pursuant to the terms of the Purchase Agreement.

(e)     Delivery Conditions.  Sale is subject to a satisfactory pre-purchase inspection paid for by Purchaser.  All maintenance records and log books are to be made available for inspection.  The Airplane is to be as represented and have no damage history.  The Airplane is to have a U.S. Certificate of Airworthiness and any corrective action needed to be taken for the Airplane to receive the Certificate of Airworthiness is at the Debtors' cost.

13.     Additionally, the Debtors' ability to close on the sale and receive

the Purchase Price is conditioned upon their ability to execute and file certain customary

and reasonable sale documents.  The Debtors believe that the foregoing conditions as well

as all conditions for closing on the sale with Purchaser in accordance with the Purchase

Agreement will be timely satisfied.  Moreover, the Debtors have been informed that

Purchaser is ready, willing and able to promptly consummate the sale upon the

satisfaction of same. Therefore, the sale with Purchaser is likely to close and, thus, bring substantial money into the estates.

14.    The Debtors believe that the sale of the Assets is in their best interests and in the best interests of their estates and their creditors. Beginning in October 2004, the Debtors determined that the Assets were not necessary for their business needs and sought to sell them.

15.    The Debtors concluded that the best means to maximize the value of the Assets was to extensively market them. To assist with their efforts to market and sell the Assets, as well as market and sell a second airplane, the Debtors employed deVere on or about October 8, 2004.

16.    deVere is considered one of the preeminent brokers in the airplane industry.

17.    Since hiring deVere in October 2004, the Debtors and deVere engaged in significant and targeted marketing efforts designed to obtain the most attractive price (and other terms) attainable. Specifically, the Debtors and deVere identified and contacted parties that they believed would be interested in purchasing the Assets and the Debtors' second airplane.

18.    Further, the Debtors and deVere engaged in other marketing measures designed to generate the greatest interests in the Assets. These measures included placing several advertisements monthly in certain magazines and newspapers, including in Business Air Today, World Aircraft Sales, and the Executive Controller.

19.     deVere also advertised the Assets via the internet.  Since October 2004, the Assets have been advertised continuously on at least two websites that specialize in the marketing and sale of airplanes:  Brokernet.com and Aircraft.com. Moreover, advertisements for the Assets, together with other marketing materials for the Assets, have been available on deVere's website since October 2004.

20.     Additionally, marketing materials for the Assets were sent by deVere to over 3,000 brokers and dealers around the world.

21.     deVere also attended the National Business Aircraft Association convention (NBAA) in Las Vegas, Nevada on October 11, 2004, which is the largest business aviation show in North America.  The convention was attended by over 30,000 people.  There, deVere spoke with approximately fifty brokers/dealers about the Assets.

22.     The above efforts by deVere to sell the Assets are in addition to the many hours deVere spent fielding inquiries regarding the Assets from people that reviewed the Assets through one or more of the marketing strategies employed by deVere. The extensive marketing and sale efforts of the Assets culminated in nine offers for the Assets, including Purchaser's offer.

23.     After reviewing all offers, including all terms of all offers, it was determined by the Debtors that Purchaser's offer was the highest and otherwise best offer for the Assets.

24.     The Debtors now move quickly for authority to consummate the sale of the Assets with Purchaser.  The Debtors are confident that they have marketed the Assets sufficiently such that another purchaser is unlikely to agree to terms similar to

those under the Purchase Agreement. Further, the Assets are, by their very nature, depreciable assets and so a delay in the sale of the Assets may significantly harm the Debtors' ability to realize the Purchase Price, or a price close thereto, for the Assets.

25.     The Debtors believe that the terms of the Purchase Agreement are fair, reasonable and favorable. The Debtors believe further that the sale of the Assets to Purchaser offers the best opportunity for the Debtors to maximize the value of the Assets as the Debtors do not believe that a higher or otherwise better offer can be received for the Assets. Thus, the Debtors believe that the sale is in the best interests of their estates and their creditors and is also necessary for the successful reorganization of these cases.

26.     In addition to seeking authority to sell the Assets to Purchaser, the Debtors seek authority to pay a brokerage fee to deVere that is in accordance with their agreement with deVere to market and sell the Assets (the "Brokerage Agreement"). Under the Brokerage Agreement, upon a sale of the Assets, deVere is entitled to .75% of the purchase price up to $15 million. Further, deVere is entitled to 5% of any amounts realized over $15 million. The Purchase Price is $15,180,000 and, thus, the Debtors seek authority to pay deVere $121,500 (the "Brokerage Fee").

27.     The Debtors submit that payment of the Brokerage Fee to deVere is in accordance with industry standards and fair and reasonable, under the circumstances present here.

28.     Accordingly, by this Motion, the Debtors request that the Court enter an order granting the following relief:

(a)     Authorizing and approving the sale of the Assets to Purchaser or to a party that submits a higher or otherwise better offer for the Assets;

(b)     Authorizing the sale of the Assets and making the following determinations, among others, with respect to the sale:

(i)      that such sale has been agreed upon, and will be made and completed, in good faith, for purposes of Bankruptcy Code section 363(m);

(ii)     that such sale shall be made, and the Assets shall be delivered to Purchaser or to the party submitting the highest or otherwise best offer for the Assets, free and clear of any and all liens, claims, encumbrances and interests, except any claim arising through Purchaser or any of its agents or contractors;

(iii)    that Purchaser or the party submitting the highest or otherwise best offer for the Assets shall receive good, valid and marketable title to the Assets;

(iv)     that the ten (10) day stay period provided for in Rule 6004(g) of the Federal Rules of Bankruptcy Procedure shall not be in effect with respect to the sale order and the sale order shall be effective and enforceable immediately upon its entry; and

(c)     Authorizing the payment of the Brokerage Fee to deVere.

## APPLICABLE AUTHORITY

### A.      Section 363(b) Authorizes the Proposed Sale.

29.     Bankruptcy Code section 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 1107 (a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under section 363(b)(1).

30.     Although Bankruptcy Code section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, in applying this section, courts have required that it be based upon the sound business judgment of the debtor.  See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application);  Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "bankruptcy court can authorize a sale of all of a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); In re Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991).  To determine whether a sound business justification exists, courts look for four factors:  (a)  sound business reason; (b) fair and reasonable consideration; (c) good faith in the transaction; and (d) adequate and reasonable notice.  Here, each element is met.

31.     **Sound Business Purpose**.  The Debtors submit that a sound business purpose exists for the sale of the Assets to Purchaser.  As noted above, the Assets are unnecessary assets for the Debtors.  A key component to the success of the Debtors' chapter 11 cases is for the Debtors to divest themselves of unnecessary and unproductive assets and increase liquidity.  Thus, a sound business purpose exists for the sale of the Assets because the sale will further these goals.  Further, since the Assets depreciate in value over time, any delay of the sale may create a significant risk to the Debtors' ability to realize a purchase price similar to that offered by Purchaser.

32.    **Fair and Reasonable Consideration**. The Debtors submit that the proposed sale of the Assets will provide fair and reasonable consideration to the Debtors' estates. Prior to entering into the Purchase Agreement with Purchaser, the Debtors, together with deVere, extensively marketed the Assets. The Debtors submit that their marketing process was sufficient to serve as a market check that the proposed sale is for fair and reasonable consideration. This is because after months of marketing the Assets, Purchaser's offer was determined to be the highest and otherwise best offer for the sale of the Assets. Given the time and resources that have been devoted to marketing the Assets, the Debtors believe that it is extremely unlikely that additional marketing would result in an offer that would realize more value to the Debtors, their estates and their creditors.

33.    **Good Faith.** The proposed sale is the product of arm's length negotiations between the Debtors and Purchaser and, therefore, was made in good faith. Purchaser has no affiliation with the Debtors, and the marketing process that occurred ensured a fair and reasonable environment for interested parties to submit an offer to purchase the Assets. If required, the Debtors are prepared to present further evidence of good faith during the course of the hearing on the Motion that Debtors believe will satisfy this Court and the mandates of Bankruptcy Code section 363(m).

34.    **Notice.** The Debtors respectfully submit that notice and timing of the Sale Hearing (defined below) is adequate and fair and reasonably calculated to elicit any further interest in acquiring the Assets. The Debtors strongly believe that their marketing efforts garnered the highest and best possible value for the Assets. As in the

case of <u>Delaware & Hudson Ry. Co.</u>, the Debtors' efforts in soliciting and marketing the Assets support the proposed process and the reasonableness of any offer ultimately presented through that process.  124 B.R. 169, 177-80 (D. Del. 1991) (finding reasonable purchase price where extensive soliciting occurred in addition to negotiations with prospective purchasers).

35.     The Debtors intend to give notice of the hearing to consider approval of this Motion and the proposed sale by the Debtors of the Assets, (the "Sale Hearing") by mailing a copy of the Motion and a notice of the Sale Hearing to (i) the Internal Revenue Service, the state and local taxing authorities; (ii) all parties who previously have expressed serious interest in acquiring the Assets; (iii) counsel for the Debtors' postpetition secured lenders; (iv) the indenture trustee for the Debtors' noteholders; (v) counsel for the Creditors' Committee; (vi) all entities having requested notices pursuant to Bankruptcy Rule 2002; (vii) the Office of United States Trustee; and (viii) any other parties not otherwise named herein but included in the Order (A) Establishing Notice Procedures on a Final Basis and (B) Continuing Hearing with Respect to Scheduling Omnibus Hearings (Dkt. No. 254) (the persons listed in clauses (i) through (viii) are referred to collectively as the "Notice Parties").  The Debtors submit that the foregoing is sufficient notice of the Sale Hearing and the proposed sale of the Assets.

36.     By this Motion, the Debtors intend to sell the Assets in order to monetize them for distributions to their creditors, and to enhance their ability to successfully reorganize.  The Debtors strongly believe that, in furtherance of these goals,

-13-

they have done all that is reasonably possible to secure the highest or best possible offer for the Assets. For all of the foregoing reasons, the proposed sale of the Assets to Purchaser, or to a party submitting a higher or better offer, is warranted and appropriate under Bankruptcy Code section 363(b), and the relief requested in this Motion is a product of sound business judgment and is in the best interests of the Debtors, their creditors and their estates.

37.    Thus, this Court should approve the sale of the Assets to Purchaser or to a party submitting a higher or otherwise better offer.

**B.      Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

38.    The Debtors request that the sale and transfer of the Assets pursuant to the Purchase Agreement be approved free and clear of all liens, claims, interests and encumbrances of any nature except as to claims arising through Purchaser or any of its agents or contractors and other interests. Such relief is consistent with the provisions of Bankruptcy Code section 363(f) in these cases.

39.    Bankruptcy Code section 363(f) provides that a debtor-in-possession may sell property free and clear of any lien, claim or interest of another entity in such property if any of the following circumstances apply:

    (1)  applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    (2)  such entity consents;

    (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

40.     As indicated by the use of the disjunctive term "or," satisfaction of any one of the five requirements listed in Bankruptcy Code section 363(f) is sufficient to permit the sale of assets free and clear of liens, claims, encumbrances, pledges, mortgages, security interests, charges, options and other interests (collectively, the "Interests").  See In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, *12 (Bankr. S.D.N.Y. 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

41.     The Debtors do not believe that the Assets are subject to any liens or other Interests.  However, to the extent that any Interests exist the Debtors will satisfy this subsection by obtaining any necessary consent of such parties prior to or at the Sale Hearing.  Moreover, any holder of any Interests will be adequately protected because any Interests will attach to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto.  Accordingly, the requirements of Bankruptcy Code section 363(f) can be satisfied, and the sale of the Assets free and clear of any lien, claim, lease or encumbrance of any nature is appropriate.

**C.     Purchaser Should Be Afforded All Protections Under Bankruptcy Code Section 363(m) as a Good Faith Purchaser.**

42.     Bankruptcy Code section 363(m) provides that

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity

> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). The Bankruptcy Code does not define the term "good faith."

Courts, however, indicate that a party would have to show fraud or collusion between the

purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of good

faith.

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings. Typically,
> the misconduct that would destroy a purchaser's good faith status at a
> judicial sale involves fraud, collusion between the purchaser and other
> bidders or the trustee, or an attempt to take grossly unfair advantage of
> other bidders.

In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986) (citations

omitted) (omission in original); see also In re Colony Hill Associates, 111 F.3d 269, 276

(2d Cir. 1997) (same). No such facts exist here.

43.     The Debtors submit that: (i) the proposed sale is the subject of

arm's length negotiations with Purchaser; (ii) Purchaser has no affiliation with the

Debtors; (iii) the Assets were marketed extensively by deVere; (iv) to the best of the

Debtors' knowledge, Purchaser has taken no action to chill or otherwise collude with any

other party to restrict bidding on the Assets; and (v) the marketing process that occurred

and notice of the Sale Hearing ensures that Purchaser has not exerted undue influence

over the Debtors. The Debtors, thus, request that the Court make a finding that

Purchaser, or the party submitting a higher or better offer, acted in good faith within the

meaning of Bankruptcy Code section 363(m).

-16-

### D.      Payment of the Brokerage Fee is Warranted

44.      It is normal and customary in transactions of this nature for the selling party to pay a brokerage fee or commission.  The ability of a debtor to offer such a fee allows a debtor to sell its property for the benefit of the estate and its creditors.

45.      The Debtors seek authority to pay deVere the Brokerage Fee in the amount of $121,500.  As stated previously, deVere greatly assisted in the marketing efforts for the Assets.  Without deVere's efforts, the proposed sale would not have been possible.  The Debtors, therefore, believe that payment of the Brokerage Fee is reasonable and warranted.

46.      The Brokerage Fee is in accordance with deVere's contract with the Debtors that is customary and usual in the airplane brokerage industry.  A copy of the Brokerage Agreement is attached hereto as Exhibit B.

47.      Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay the Brokerage Fee to deVere at closing, from the proceeds of the sale of the Assets.

### NOTICE

48.      Notice of this Motion has been provided or will be provided to the Notice Parties.

49.      The Debtors submit that no other or further notice need be given.

### WAIVER OF MEMORANDUM OF LAW

50.      Pursuant to Local Bankruptcy Rule 9013-1(b) for the Southern District of New York, because there are no novel issues of law presented herein, the

Debtors respectfully request that the Court waive the requirement that the Debtors file a

memorandum of law in support of this Motion.

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court

(a)  enter an order (a) substantially in the form attached hereto as <u>Exhibit C</u> that grants the motion and authorizes and approves the sale of the Assets to Purchaser in accordance with the Purchase Agreement, or to a party submitting a higher and otherwise better offer for the Assets, and (b) authorizes payment of the Brokerage Fee to deVere;

(b)  authorize the Debtors to take all actions reasonably necessary to effectuate the sale of the Assets in accordance with the Purchase Agreement; and

(c)  grant such other and further relief as the Court deems just and proper.

Dated: March 18, 2005
   New York, New York

/s/      *D. J. Baker*
D. J. Baker (DB 0085)
Sally McDonald Henry (SH 0839)
Rosalie Walker Gray
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York   10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000

-and-

Eric M. Davis
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
One Rodney Square
P. O. Box 636
Wilmington, Delaware   19899
Telephone:  (302) 651-3000
Facsimile:  (302) 651-3001

Attorneys for the Debtors

**EXHIBIT A**

## AIRCRAFT PURCHASE AND SALE AGREEMENT

This Aircraft Purchase and Sale Agreement (this "Agreement") is made as of March ___, 2005, by and between Winn-Dixie Stores, Inc., with an address at 5050 Englewood Court, Jacksonville, Florida 32254 ("Seller), and Molinaro Koger, Inc., with an address at 1676 International Drive, Suite 575, McLean, Virginia 22102, or its assigns ("Purchaser").

### RECITALS

A.    Seller owns that certain 2002 Gulfstream Aerospace G-200 aircraft, bearing the manufacturer's serial number 074 and the U.S. civil aviation mark N80R (the "Airframe"), together with two (2) Pratt & Whitney Canada PW306A engines bearing manufacturer's serial numbers PCE-CC0149 and PCE-CC0150 (the "Engines"), the appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment or property installed on or attached to the Airframe and Engines, listed in Exhibit I attached hereto and incorporated herein by this reference (the "Aircraft Specification"), and all books, manuals, logbooks, maintenance records and other data related to the operation and maintenance of the Aircraft the Airframe and Engines currently in Seller's possession (the "Aircraft Documents") (the Airframe, the Engines and the other foregoing described equipment and property, collectively, the "Aircraft").

B.    Subject to the terms and conditions set forth in this Agreement, Seller desires to sell and deliver the Aircraft to Purchaser and Purchaser desires to accept and purchase the Aircraft from Seller.

C.    Seller, Purchaser and Insured Aircraft Title Services, Inc., a corporation organized under the laws of the state of Oklahoma ("Escrow Agent") will enter into a mutually acceptable escrow agreement ("Escrow Agreement") with respect to the transactions contemplated hereunder, in the form attached hereto as Exhibit V and incorporated herein by this reference.

D.    Purchaser has conducted a visual inspection of the Aircraft and now desires to enter into this Agreement.

E.    Seller commenced Case No. 05-11063-rdd (the "Case") under Chapter 11, 11 U.S.C. sections 101 et seq. (the "Bankruptcy Code"), on February 21, 2005 by filing a voluntary petition with the United States Bankruptcy Court for the Southern District of New York (the "Court").

IN CONSIDERATION of the mutual covenants contained herein, the parties hereto agree as follows:

ARTICLE 1.    SALE OF AIRCRAFT.

   1.1    Subject to the terms and conditions set forth herein, Seller hereby agrees to sell and deliver, and Purchaser hereby agrees to buy and accept the Aircraft.

1

## ARTICLE 2.  BANKRUPTCY COURT APPROVAL

2.1     Seller's and Purchaser's obligations under this Agreement are subject to and conditioned upon the entry of the Order (as defined herein) of the Court approving the sale of the Aircraft to Purchaser, pursuant to the terms and conditions of this Agreement, becoming a Final Order (as defined herein). The Final Order must be acceptable to Purchaser and must provide for a sale of the Aircraft to Purchaser, free and clear of all liens, encumbrances and claims. "Final Order" shall mean an action, ruling, or other order approving the sale of the Aircraft pursuant to the terms and conditions of this Agreement ("Order") (i) that shall have become final as to an action or order of the Court, (ii) that has not been reversed, vacated or stayed, is no longer subject to appeal, certiorari proceeding or other proceeding for review, reconsideration, re-argument or rehearing, and (iii) that no appeal, certiorari proceeding or other proceeding for review, reconsideration, re-argument or rehearing has been requested or is then pending, and the time to file any such appeal, certiorari proceeding or other proceeding for review, reconsideration, re-argument or rehearing has expired.

2.2     Motion to Approve Sale to Purchaser.

2.2.1.  No later than five (5) days from the date hereof, Seller shall file Seller's motion to sell the Aircraft (the "Motion"), which Motion shall contain all of the provisions required for authority to sell the Aircraft to Purchaser, as provided in this Agreement. Seller shall diligently pursue the issuance of the Order and use its best efforts to obtain the Order and to ensure that the Order becomes a Final Order as soon as practicable.

2.2.2.  Seller's effort to obtain Court approval of the sale of the Aircraft shall include, but not be limited to, initiation of any contested matter or, as necessary, adversary proceeding or other exercise of jurisdiction by the Bankruptcy Court that may be required pursuant to Section 363 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or otherwise, to the extent necessary. Seller shall oppose any challenges to any such approval or exercise of jurisdiction by the Court, including an appeal. Seller shall provide not less than 20 days notice, pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure, to all required creditors and parties in interest, and the United States Trustee of the Motion of the hearing before the Court to approve the Motion, or such lesser time as the Court may allow on a motion to shorten time.

## ARTICLE 3.  DELIVERY CONDITION, INSPECTION AND ACCEPTANCE.

3.1     The Aircraft shall be delivered to Purchaser on the Delivery Date (as defined in Section 3.11 herein) in the following condition:

120566.0001/1175176.12

3.1.1   equipped as specified in the Aircraft Specification and in the same condition as during the Inspection;

3.1.2   with a current and valid United States Standard Airworthiness Certificate;

3.1.3   in an airworthy condition (as "airworthy" has the meaning set out in Chapter 1, Paragraph 9 of FAA Order 8130.21) suitable for operations under Part 91 of the FAR, with all systems and installed equipment and engines in normal working order and operating to manufacturers' specifications, and with each engine able to produce its rated takeoff power in a ground power run;

3.1.4   up to date on all manufacturers' recommended maintenance and inspection schedules (including all calendar and hourly inspections), and in compliance with all applicable FAA airworthiness directives and manufacturers' service bulletins (or equivalents) that have been issued with respect to the Aircraft on or before the Delivery Date;

3.1.5   with all applicable airframe, engine, and avionics maintenance programs and contracts, if any, paid to the date and time of the Delivery Date and transferable to Purchaser;

3.1.6   with no corrosion or damage and no history of corrosion or damage;

3.1.7   with no parts, systems or components installed in the Aircraft on a temporary loan or exchange basis; and

3.1.8   with all Aircraft Documents original and complete, continuous and up-to-date, printed or published in English, and maintained in accordance with industry standards and the applicable Federal Aviation Regulations ("FAR").

3.2    Upon the Order becoming a Final Order, pursuant to this Agreement, Seller shall remove the Aircraft from the used aircraft market and at Purchaser's expense (limited to expense for fuel and landing fees), Seller shall ferry the Aircraft from its then present location to the Gulfstream Service Center in Savannah, Georgia ("Inspection Facility") where the Aircraft shall undergo a pre-purchase inspection in accordance with a G-200 Phase "A" inspection ("Inspection") and the additional items set out in Exhibit II attached hereto and incorporated herein by this reference. The Inspection will commence upon the arrival of the Aircraft at the Inspection Facility, and after the Order becomes a Final Order, and will not exceed ten (10) days after the arrival of the Aircraft at the Inspection Facility, except for delays caused by the condition of the Aircraft or the Inspection Facility's schedule.  Purchaser shall have three (3) business days from the conclusion of the Inspection to conditionally accept or to reject the Aircraft pursuant to Section 3.4 below.

3

3.3    Upon the Order becoming a Final Order, Seller shall make the Aircraft available for the Inspection. Purchaser shall open a work order with the Inspection Facility for Purchaser's account to pay all costs of the Inspection. Seller shall open an account with the Inspection Facility for the correction of any "Airworthiness Discrepancies" (as defined below) found during the Inspection. The work order of Purchaser shall be acknowledged by Seller, but Seller shall have no liability thereon. The work order of Seller shall be acknowledged by Purchaser, but Purchaser shall have no liability thereon. Flight costs for a test flight of the Aircraft that will not exceed two (2) hours shall be at Purchaser's cost for fuel and landing fees. Purchaser shall have the right to have an agent on board the Aircraft during any test flight. All flights of the Aircraft under this Agreement shall be under the operational control of Seller.

3.4    Purchaser shall cause the Inspection Facility to conduct the Inspection to identify in reasonable detail those discrepancies that cause the Aircraft to not be in compliance with the delivery conditions in Section 3.1 herein ("Airworthiness Discrepancies"), and Seller shall bear the cost of correcting each and every Airworthiness Discrepancy. The parties hereto agree that cosmetic items noted by the Inspection Facility during the Inspection shall not be an obligation of Seller to correct. At the conclusion of the Inspection, Purchaser may, in its sole discretion, reject the Aircraft by notifying Seller and Escrow Agent in writing of such rejection as provided in Section 3.7. If Purchaser does not reject the Aircraft, Seller and Purchaser shall each execute a Technical Acceptance Certificate (the "Acceptance"), the form of which is attached hereto as Exhibit III and is incorporated herein by this reference ("Certificate") setting forth on an attachment thereto a list of all Airworthiness Discrepancies. If Purchaser fails to execute the Certificate within three (3) days of delivery by the Inspection Facility of a list of Airworthiness Discrepancies found as a result of the Inspection, then Purchaser shall be deemed to have rejected the Aircraft. Upon the mutual execution by Seller and Purchaser of the Certificate, subject to Section 3.5, Seller shall be obligated to correct and pay for the correction of all Airworthiness Discrepancies attached to the Certificate. Seller and Purchaser each shall have paid their respective amounts owed the Inspection Facility prior to the Aircraft's departure from the Inspection Facility. Except as otherwise provided herein, Purchaser, upon executing the Certificate shall be irrevocably obligated to accept delivery of the Aircraft after Seller has performed Seller's obligations under the Certificate and Seller has met its other obligations under this Agreement. Upon Purchaser's Acceptance of the Aircraft by Purchaser's execution of the Certificate, the Deposit (as defined in Section 4.1 herein) shall become non-refundable to Purchaser except as specifically provided herein, or except in the case of Seller's default under this Agreement.

3.5    It shall be a pre-condition to Purchaser's obligation to accept delivery of the Aircraft at Delivery (as defined in Section 3.10 herein) that the Aircraft shall be in the condition set forth in Section 3.1 herein.

3.6    It shall be a pre-condition to Purchaser's obligation to accept delivery of the Aircraft at Delivery (as defined in Section 3.10 herein) that Gulfstream Aerospace shall have agreed in writing to the transfer to Purchaser of the EGM Program, as modified, conditioned, or expanded by any e-mails, letters, side-letters, or other understandings between Gulfstream Aerospace and Seller.

4

3.7     Should Purchaser, in its sole discretion, reject the Aircraft or be deemed to have rejected the Aircraft prior to Purchaser's execution of the Certificate, as set out in Sections 3.2 and 3.4 herein, Purchaser, at Purchaser's sole cost, shall be responsible to return the Aircraft to its physical condition prior to the Inspection and Purchaser shall indemnify Seller for any physical damage to the Aircraft incurred in connection with the Inspection, unless such damage was caused by an act or omission of Seller or if such damage is covered and paid by insurance carried by the Inspection Facility. Payment of the Deposit, as defined in Section 5.1(a), by Escrow Agent to Purchaser, shall be preconditioned upon Purchaser having paid the Inspection Facility for all costs of Purchaser due the Inspection Facility. Upon Purchaser's notice to Escrow Agent that Purchaser has rejected the Aircraft, and preconditioned upon written confirmation by Inspection Facility and Seller that Purchaser has paid all amounts set out above in this Section 3.7, Escrow Agent shall pay the Deposit to Purchaser on the next business day after receiving notice from Purchaser, Seller and Inspection Facility that Purchaser has performed all preconditions required herein for the return of the Deposit. Purchaser may give Seller notice of Purchaser's rejection prior to acceptance by writing "REJECTS" across the face of the Certificate, initialing "REJECTS" and delivering the Certificate to Seller, notifying Seller of Purchaser's rejection of the Aircraft. Notwithstanding anything herein to the contrary, Purchaser shall not be responsible for the costs set out in this Section 3.7 unless the Court's Order approving the sale of the Aircraft becomes the Final Order.

3.8     Unless at such time Seller shall be in breach or default under this Agreement or as otherwise provided herein, should Purchaser fail to purchase the Aircraft after Purchaser has executed the Certificate and Seller has corrected and paid for all of the Airworthiness Discrepancies attached to the Certificate, Purchaser shall pay for the Inspection and Seller's out-of-pocket expenses related to the flight to the Inspection Facility and any test flights and shall pay Seller for all expenses incurred by Seller in connection with Seller's attempt to sell the Aircraft to Purchaser hereunder, including without limitation, Seller's legal and professional fees and those costs over and above fuel and landing fees for each flight of the Aircraft performed by Seller hereunder. The Deposit shall be paid to Seller as Seller's exclusive remedy and as sole compensation for the removal of the Aircraft from the used aircraft market and the loss of use of the Aircraft during the period of the Inspection. Upon Seller's receipt of the Deposit and the other payments referred to in this Section 3.8, this Agreement shall become null and void and neither Seller or Purchaser shall be further obligated to each other under this Agreement. Notwithstanding anything herein to the contrary, Purchaser shall not be responsible for the costs set out in this Section 3.8 unless the Court's Order approving the sale of the Aircraft becomes the Final Order.

3.9     Should Seller fail to correct all the Airworthiness Discrepancies designated to be corrected and paid for by Seller attached to the Certificate, then Purchaser may terminate this Agreement provided Purchaser has paid the Inspection Facility for all the costs and charges related to any work orders opened by Purchaser at the Inspection Facility.   Upon such termination by Purchaser, the Escrow Agent shall pay the Deposit to Purchaser and Seller shall pay to Purchaser, upon Purchaser's demand, for all expenses incurred by Purchaser in connection with Purchaser's attempt to purchase the Aircraft including, without limitation, Purchaser's legal and professional fees and the cost of the Inspection and any payments made to Seller for ferry or test flights.   Upon receipt by Purchaser of the Deposit and other amounts set forth in the

5

preceding sentence, this Agreement shall be null and void and neither party hereto shall have any further obligation to the other.

3.10    Upon completion of the correction of all Airworthiness Discrepancies and the placement of the "approved for return to service" entry by the Inspection Facility in the Aircraft's logbook, Purchaser and Seller shall, within three (3) business days, proceed to closing and delivery at the Inspection Facility or at another mutually agreeable location within the continental United States (closing and delivery "Delivery"). In the event Delivery shall not take place at the Inspection Facility, Purchaser shall pay the cost of fuel and landing fees for the ferry flight from the Inspection Facility to such other Delivery location.

3.11    If the Aircraft is damaged or destroyed after Purchaser has accepted the Aircraft as set out in Section 3.4 herein, but before Delivery, Seller shall notify Purchaser of such damage within twelve (12) hours of the incident and Purchaser, in Purchaser's sole discretion, shall give notice to Seller within two (2) business days after Purchaser receives such information whether Purchaser will accept the Aircraft after the Aircraft has been repaired from an incident resulting in anything less than a total loss. Should Purchaser notify Seller that Purchaser rejects the Aircraft due to such incident, Escrow Agent shall, upon confirmation that Purchaser has paid the Inspection Facility for all costs due the Inspection Facility from Purchaser, during the next day when Escrow Agent's bank is open, pay the Deposit back to Purchaser.

3.12    Prior to the day of Delivery ("Delivery Date"), Seller shall have, pursuant to this Section 3.12, delivered to Purchaser the Final Order and delivered to Escrow Agent a fully executed but undated Warranty Bill of Sale conveying legal title to the Aircraft to Purchaser free and clear of any lien, claim, lease or encumbrance of any nature whatsoever except any claim arising through Purchaser or any of its agents or contractors. Such Warranty Bill of Sale shall be in the form as set out as Exhibit IV attached hereto and incorporated herein by this reference ("Bill of Sale"). Prior to the day of Delivery, Seller shall have also executed and delivered to Escrow Agent an undated FAA Bill of Sale (AC Form 8050-2) for filing and recording at the FAA Registry in Oklahoma City, Oklahoma (the "FAA Bill of Sale") (collectively the Bill of Sale and the FAA Bill of Sale, the "Bills of Sale"). In addition, prior to the day of Delivery, Purchaser shall have executed and delivered to Escrow Agent an undated FAA Application for Registration (AC Form 8050-1) for filing and recording at the FAA Registry in Oklahoma City, Oklahoma (the "FAA Registration Application") and a duly executed but undated Delivery Receipt (as defined in Section 2.12 herein). Subject to and in accordance with the terms and conditions set forth in the Escrow Agreement, on the Delivery Date (a) Seller shall instruct Escrow Agent to date and file the FAA Bill of Sale with the FAA Registry and to date and deliver the Bill of Sale to Purchaser after Purchaser has paid the Purchase Price to Seller as defined in Section 4.1 herein and (b) Purchaser shall instruct Escrow Agent to date and file the FAA Registration Application with the FAA Registry and to date and deliver the Delivery Receipt to Seller as further set out in Section 2.12 herein upon notice from Escrow Agent that the FAA Bill of Sale and FAA Registration Application have been duly filed at the FAA Registry in Oklahoma City, Oklahoma.

3.13    On the Delivery Date, subject to and in accordance with the terms and conditions set forth in the Escrow Agreement, Purchaser shall pay the balance of the Purchase Price (as

6

defined in Section 5.1 herein) and cause the delivery to Seller of a duly executed Delivery Receipt acknowledging delivery of the Aircraft. Such Delivery Receipt shall be in the form set forth in Exhibit V, which is attached hereto and incorporated herein by this reference ("Delivery Receipt"), and shall be effective when executed by an authorized agent of Purchaser and delivered to Seller. Upon execution and delivery by Purchaser of the Delivery Receipt, (a) it shall be conclusively presumed that Purchaser has approved and accepted the physical condition of the Aircraft "as is, where is, with all faults" in its then-current physical condition and state of repair, and (b) Purchaser shall unconditionally waive and release any claim against Seller for any breach of any representation or warranty regarding the Aircraft, whether express or implied, other than the warranties of title and the absence of liens or encumbrances set forth in Section 9.1.3 herein or in the Bill of Sale or otherwise contained in this Agreement. Payment of the Purchase Price by Purchaser shall be a precondition to Delivery and Seller's delivery of the Bills of Sale, as set out in Section 3.12 herein, to Purchaser. The Delivery of the Aircraft, the delivery of the Final Order, delivery of the executed Bill of Sale by Seller to Purchaser, the filing of the FAA Bill of Sale at the FAA Registry, the truth and accuracy of Seller's representations and warranties and the performance of Seller's covenants and agreements under this Agreement shall be preconditions to Purchaser delivering an executed Delivery Receipt to Seller.

3.14   Seller agrees, at the sole cost and expense of Purchaser, promptly after Delivery, to assist in the transfer of all maintenance service plans, including the ESP Gold Lite Plan carried on the Engines, the Airframe or any part or engine thereof to Purchaser to the extent transferable. Purchaser understands that there may be certain enrollment or transfer fees required for transfer of some extended coverage maintenance programs, and Purchaser will apply for and pay for the transfer of coverage for those programs.

ARTICLE 4.   TITLE AND RISK OF LOSS.

4.1   Title to and risk of loss of the Aircraft shall pass from Seller to Purchaser when Purchaser has executed and delivered to Seller or its representative (or authorized the Escrow Agent to deliver) the Delivery Receipt and Seller has executed and delivered (or authorized the Escrow Agent to deliver) to Purchaser or its representative the Bills of Sale, and not prior thereto.

ARTICLE 5.   PURCHASE PRICE AND PAYMENT SCHEDULE.

5.1   The purchase price of the Aircraft is FIFTEEN MILLION ONE HUNDRED AND EIGHTY THOUSAND DOLLARS AND NO/100 (US$15,180,000.00) ("Purchase Price") and shall be paid in immediately available funds to Seller in the following manner:

(a)   Purchaser has deposited TWO HUNDRED THOUSAND DOLLARS AND NO/100 (US$200,000.00) in an escrow account with Escrow Agent ("Deposit"); and

7

(b)    Purchaser's transfer of the balance of the Purchase Price, FOURTEEN MILLION NINE HUNDRED AND EIGHTY THOUSAND DOLLARS AND NO/100 (US$14,980,000.00), on or before the Delivery Date to Escrow Agent.

ARTICLE 6.   COMMISSIONS.

6.1    Seller represents to Purchaser that Seller has hired, at Seller's sole cost, Bloomer deVere as its broker for the transaction anticipated by this Agreement and Purchaser represents to Seller that it has hired J. Mesinger Corporate Jet Sales, Inc. to represent Purchaser for the transaction anticipated by this Agreement.

6.2    Both parties hereto agree to indemnify and hold the other harmless from and against any and all claims, suits, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees) asserted by any agent, broker or other third party for any commission or compensation of any nature whatsoever based upon the transactions contemplated by this Agreement.

ARTICLE 7.   DISCLAIMER BY SELLER OF WARRANTIES.

THE AIRCRAFT AND ANY AND ALL OTHER ITEMS SUBJECT TO THIS AGREEMENT ARE SOLD ON AN "AS-IS, WHERE-IS, WITH-ALL-FAULTS" BASIS AND WITH ALL FAULTS. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 9.1.3 HEREIN OR IN THE BILL OF SALE, SELLER DOES NOT MAKE, AND SELLER HEREBY DISCLAIMS, ANY AND ALL EXPRESS, IMPLIED OR STATUTORY WARRANTIES OR REPRESENTATIONS OF ANY NATURE WHATSOEVER WITH RESPECT TO THE AIRCRAFT AND ANY AND ALL OTHER ITEMS SUBJECT TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, AS TO THE DESIGN OR CONDITION OF THE AIRCRAFT, ITS MERCHANTABILITY, DURABILITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE AIRCRAFT, OR THE CONFORMITY OF THE AIRCRAFT TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER OR ORDERS RELATING THERETO, AS TO THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT, OR ANY OTHER MATTER CONCERNING THE AIRCRAFT (WHICH DISCLAIMER PURCHASER HEREBY SPECIFICALLY ACKNOWLEDGES PURSUANT TO ITS ACCEPTANCE OF THE BILL OF SALE).   EXCEPT WITH RESPECT TO THE EXPRESS WARRANTIES AND/OR REPRESENTATIONS OF SELLER IN SECTION 9.1.3 HEREIN AND IN THE BILL OF SALE, PURCHASER HEREBY WAIVES ANY CLAIM (INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR INCIDENTAL OR CONSEQUENTIAL DAMAGE) OR EXPENSE CAUSED BY THE AIRCRAFT OR BY PURCHASER'S LOSS OF USE THEREOF FOR ANY REASON WHATSOEVER.   WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER SHALL NOT BE LIABLE OR RESPONSIBLE FOR ANY DEFECTS, EITHER PATENT OR LATENT (WHETHER OR NOT DISCOVERABLE BY PURCHASER) IN THE AIRCRAFT, OR FOR ANY DIRECT OR INDIRECT DAMAGE TO PERSONS OR PROPERTY RESULTING THEREFROM, OR FOR

8

PURCHASER'S LOSS OF USE OF THE AIRCRAFT OR FOR ANY INTERRUPTION IN PURCHASER'S BUSINESS CAUSED BY PURCHASER'S INABILITY TO USE THE AIRCRAFT FOR ANY REASON WHATSOEVER.

ARTICLE 8.   TAXES.

8.1   Purchaser shall be responsible for paying (a) any and all sales, use, value added, stamp, excise, transfer or similar taxes, and any interest or penalties on such taxes, imposed on the purchase and sale of the Aircraft pursuant to this Agreement and (b) any and all landing fees, property taxes, excise taxes, fuel taxes, excise or similar taxes, and any interest or penalties on such taxes, that may be assessed against the Aircraft attributable to Purchaser's ownership and operation of the Aircraft on and after the Delivery Date (collectively, "Purchaser Taxes"). In the event that Purchaser fails to pay any Purchaser Taxes and such Purchaser Taxes are levied upon, assessed against, collected from, or otherwise imposed on Seller, then Purchaser shall indemnify, protect, defend and hold Seller harmless from and against all such Purchaser Taxes, together with any interest, penalties or other additions thereto, and any legal or other expenses incurred to defend or protect against any such Purchaser Taxes. In the event Seller receives notice or otherwise becomes aware of any audit, claim, assessment or proposed assessment of any tax for which Purchaser may be responsible under this Section, Seller shall immediately notify Purchaser thereof, and Purchaser shall have the right to control, manage or defend any such audit, claim, assessment or proposed assessment.   Seller's failure to provide Purchaser such notice in a timely manner shall relieve Purchaser of its obligation to pay any such tax, or any associated interest or penalties, to the extent Purchaser's rights have been impaired by Seller's failure.

8.2   Seller shall be responsible for paying (a) any and all taxes on, or measured by, the income, gross revenue, capital gain or any other characterization of the gain of Seller in connection with the sale of the Aircraft pursuant to this Agreement and (b) any and all landing fees, property taxes, excise taxes, fuel taxes, excise or similar taxes, and any interest or penalties on such taxes, that may be assessed against the Aircraft attributable to Seller's ownership and operation of the Aircraft prior to the Delivery Date (collectively, "Seller Taxes"). In the event that Seller fails to pay any Seller Taxes and such Seller Taxes are levied upon, assessed against, collected from, or otherwise imposed on Purchaser, then Seller shall indemnify, protect, defend and hold Purchaser harmless from and against all such Seller Taxes, together with any interest, penalties or other additions thereto, and any legal or other expenses incurred to defend or protect against any such Seller Taxes.

8.3   It shall be a condition to Seller's obligation to sell the Aircraft to Purchaser hereunder that Seller, in good faith, shall have received evidence satisfactory to Seller that Purchaser is exempt from or has paid or has made arrangements satisfactory to Seller for the payment of any sales or use taxes imposed on the purchase and sale of the Aircraft.

ARTICLE 9.   REPRESENTATIONS OF SELLER.

9.1   Seller's Representations and Warranties.   Seller represents and warrants to Purchaser that:

9.1.1   Seller is a corporation duly organized and validly existing in good standing under the laws of the state of its incorporation.

9.1.2   Subject to approval of the Court, Seller has had at all relevant times the power and authority to execute and deliver the Aircraft and to perform its obligations under this Agreement.

9.1.3   At Delivery, except for any liens, claims or encumbrances of Purchaser, Seller shall have good and marketable title to the Aircraft free and clear of all liens, claims and encumbrances.

9.1.4   Subject to approval of the Court, the execution, delivery and performance of this Agreement by Seller will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien upon Seller under any indenture, mortgage or other agreement or instrument to which it is a party or by which it or any of its property is bound, or any existing applicable law, rule, regulation, judgment, order or decree of any government, governmental instrumentality or court having jurisdiction over it or any of its properties.

9.1.5   Except for approval of the Court, neither the execution and delivery by Seller of this Agreement nor the consummation of any of the transactions contemplated hereby requires the consent or approval of, the giving of notice to, or, subject to Section 9.1.3, the taking of any other action in respect of, any trustee or holder of any indebtedness or obligation of Seller or any governmental authority or agency, other than the filing and recording of the FAA Bill of Sale and the FAA Registration Application at the FAA Registry in Oklahoma City, Oklahoma, and except such other consents, approvals, notices and actions as have been obtained, given, or taken, as the case may be.

9.1.6   No law or governmental rule or regulation makes invalid or not binding on Seller, this Agreement by reason of its participation in the transactions contemplated hereby.

9.1.7   This Agreement has been duly authorized, executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller enforceable in accordance with the terms hereof.

9.1.8   Seller is the sole and exclusive legal and beneficial owner of the Aircraft and has good and marketable title to it, free and clear of all debts, liens, security interests, pledges and collateral assignments.

10

ARTICLE 10.  REPRESENTATIONS OF PURCHASER.

10.1    Purchaser's Representations and Warranties.  Purchaser represents and warrants to Seller that:

10.1.1  Purchaser is a corporation duly organized and validly existing in good standing under the laws of its state of incorporation.

10.1.2  Purchaser has had at all relevant times the power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.

10.1.3  The execution, delivery and performance of this Agreement by Purchaser has been duly authorized by all necessary company action. Compliance with the terms and provisions hereof do not and will not result in a conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien under any indenture, mortgage or other agreement or instrument to which it is a party or by which it or any of its property is bound, or any existing applicable law, rule, regulation, judgment, order or decree of any government, governmental instrumentality or court having jurisdiction over it or any of its properties.

10.1.4  Neither the execution and delivery by Purchaser of this Agreement nor the consummation of any of the transactions contemplated hereby requires the consent or approval of, the giving of notice to, or the taking of any other action in respect of, any trustee or holder of any indebtedness or obligation of Purchaser or any governmental authority or agency, except such as have been obtained, given, or taken, as the case may be.

10.1.5  No law or governmental rule or regulation makes invalid or not binding on Purchaser, this Agreement by reason of its participation in the transactions contemplated hereby.

10.1.6  This Agreement has been duly authorized, executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser enforceable in accordance with the terms hereof.

ARTICLE 11.  FORCE MAJEURE.

11.1    Each party shall be excused from, and shall not be liable in any manner for, any delay or failure in its performance under this Agreement if occasioned by a cause or causes beyond its control including, but not necessarily limited to, acts of God, wars, insurrections, riots, hostilities, acts of government, fire, strikes, other material labor disputes, explosions, major accidents, or floods. Notwithstanding the foregoing, the failure of Seller to obtain the Order or a Final Order as provided herein shall not be deemed to be an event of force majeure. Should

11

Seller be prevented from delivering the Aircraft due to force majeure, Seller shall have thirty (30) days after the scheduled Delivery Date to tender the Aircraft for Delivery, or Purchaser may, at its sole option, give written notice to Seller of its decision to terminate this Agreement. Both parties hereto agree that if Seller acknowledges that Seller cannot deliver this Aircraft within the thirty (30) day period after the event of force majeure, Purchaser may terminate this Agreement immediately. If Seller cannot deliver the Aircraft, Purchaser will continue to have the obligation to pay the Inspection Facility any costs incurred by Purchaser. If Purchaser terminates this Agreement pursuant to this Article 11, Seller through Escrow Agent shall refund the Deposit to Purchaser, this Agreement shall become null and void and neither party shall be obligated to the other under this Agreement.

ARTICLE 12. TERMINATION.

12.1    Either party hereto may terminate this Agreement in the event the other party materially breaches any of the terms and conditions contained herein, or otherwise defaults in the performance of its contractual obligations. Such termination shall be effective upon five (5) days written notice to the defaulting party and shall in no way affect the rights or liabilities of the parties hereto which shall have accrued as of the date of such termination.

12.2    Purchaser may terminate this Agreement by written notice to Seller, if the Order has not become a Final Order on or before April 10, 2005 (the "Termination Date"), in which event Seller shall have no further obligation under this Agreement and the Escrow Agent shall deliver to Purchaser the Deposit without deduction for any inspection expenses, all of which shall be the sole liability of Seller. Purchaser, in its sole discretion, may extend the Termination Date.

12.3    Except as provided in Article 11, if Purchaser fails to perform its obligations hereunder after delivery of the Aircraft is tendered by Seller in accordance with this Agreement, Seller in addition to the following set out in this Section 12.3, may cancel this Agreement. In addition, Seller shall be paid the Deposit as liquidated damages and not as a penalty. Seller shall have the right to proceed to otherwise sell or dispose of the Aircraft with no further liability to the Purchaser. Notwithstanding the foregoing, Purchaser shall in such event cause any liens or encumbrances on the Aircraft arising through Purchaser in connection with the Inspection and test flights to be released and removed.

12.4    Except as provided in Article 11, if Seller fails to obtain the Final Order by April 10, 2005 (unless extended by Purchaser), and deliver the Aircraft or perform its obligations in accordance with this Agreement, Purchaser shall have the option of terminating this Agreement and receiving a return of the Deposit in full in which event Seller shall pay or reimburse Purchaser for all costs incurred by Purchaser in connection with the Purchaser's attempt to purchase the Aircraft including, without limitation, Purchaser's legal and professional fees, the cost of the Inspection, and any payments made to Seller for ferry or test flights.

12

ARTICLE 13. NOTICES.

13.1     All notices or other communications shall be in writing and shall be sent by (a) personal delivery, (b) telephone facsimile transmission, (c) express courier or delivery service, addressed as follows:

| SELLER | PURCHASER |
|---|---|
| Winn-Dixie Stores, Inc.<br>5050 Englewood Court<br>Jacksonville, FL 32254 | Molinaro Koger, Inc.<br>1676 International Drive, Suite 575<br>McLean, Virginia 22102 |
| Tel:    904-370-7172<br>Fax:    904-783-5646<br>Attn:   Mike Chlebovec | Tel:    703-760-5203<br>Fax:    775-860-2547<br>Attn:   Jonathan Propp |
| With a copy to: | With a copy to: |
| Lane Powell PC<br>1420 Fifth Avenue, Suite 4100<br>Seattle, WA 98101<br>Tel:    206-223-7431<br>Fax:    206-223-7107<br>Attn:   Kit Narodick | Galland, Kharasch, Greenberg, Fellman<br>  & Swirsky, PC<br>1054 31st Street, NW, Suite 200<br>Washington, DC 20007<br>Tel:  202-342-5251<br>Fax:  202-965-5725<br>Attn:  Keith Swirsky |

13.2     All notices shall be deemed given as of the date of receipt.


ARTICLE 14. MANUFACTURER WARRANTIES.

14.1     Manufacturer Warranties

14.1.1 At Delivery or promptly thereafter, Seller agrees, at its sole cost and expense, to cause to be transferred to Purchaser all manufacturer's and peripheral vendors' warranties including, without limitation, the EGM Program, as modified, conditioned, or expanded by any e-mails, letters, side-letters, or other understandings between Gulfstream Aerospace and Seller.

14.1.2 To the extent that the same may not be assigned or otherwise made available to Purchaser, Seller agrees, at the sole cost and expense of Purchaser, to exert its best reasonable efforts to enforce such rights as Seller may have with respect thereto for the benefit of Purchaser.

13

ARTICLE 15. MODIFICATION.

15.1    No modification, amendment or termination of this Agreement shall be effective unless it is in writing and signed by each party hereto or their duly authorized representative.

ARTICLE 16. LITIGATION COSTS.

16.1    In the event of any litigation or arbitration between Seller, on the one hand, and Purchaser, on the other, respecting or arising out of this Agreement, the prevailing party, whether or not such litigation proceeds to final judgment or determination, shall be entitled to recover from the non-prevailing party or parties all of the attorney's fees incurred with respect to such legal efforts, in each such action, suit or other proceeding, including any and all appeals or petitions therefrom.

ARTICLE 17. WAIVER.

17.1    All rights of hereunder of Seller, on the one hand, and Purchaser, on the other, are separate and cumulative.

17.2    No waiver by either party of any default hereunder shall be deemed a waiver of any subsequent default.

ARTICLE 18. SUCCESSORS AND ASSIGNS.

18.1    Except where expressly provided to the contrary, this Agreement, and all provisions hereof, shall inure to the benefit of and be binding upon the parties hereto, their successors in interest, assigns, administrators, executors, heirs and devisees.

18.2    No party may assign or transfer its rights or obligations under this Agreement without the prior written consent of the other party.

ARTICLE 19. INDEMNIFICATION.

19.1    In the event of any breach of any covenant, warranty or representation herein, the breaching party shall indemnify, defend and hold the non-breaching party harmless from any and all claims, debts, liabilities, costs, damages, obligations and actions of every kind or nature whatsoever arising out of or in any way relating to such breach, including, but not limited to, indemnifying the non-breaching party for all attorneys' fees and costs incurred in connection with any defense.

14

ARTICLE 20.  COUNTERPARTS.

20.1    This Agreement may be signed in several counterparts, each of which shall be an original, but all of which together shall constitute the same instrument.  Delivery of a signed counterpart by telephone facsimile transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

ARTICLE 21.  MISCELLANEOUS.

21.1    This Agreement sets forth the entire contract between the parties hereto and supersedes all previous communications, representations or agreements, whether oral or written, between the parties with respect to the sale and purchase of the Aircraft.

21.2    Should any provisions of this Agreement be void or unenforceable, such provisions shall be deemed omitted, and this Agreement, with such provision omitted, shall remain in full force and effect.  Such invalid or unenforceable provision will be replaced, if possible, through interpretation or through good faith negotiations between the parties hereto so as to maintain the purposes and intentions of this Agreement and the provisions in question.

21.3    Any Exhibits, Attachments, Appendices and/or Schedules annexed to this Agreement are hereby incorporated herein by reference and are an integral part of this Agreement, and where there is any reference to this Agreement, it shall be deemed to include any and all Exhibits, Attachments, Appendices and/or Schedules.

21.4    This Agreement has been negotiated and delivered in the Commonwealth of Virginia and shall in all respects be governed by, and construed in accordance with, the laws of the Commonwealth of Virginia, including all matters of construction, validity and performance, without giving effect to its conflict of laws provisions.

21.5    During the pendency of the Case, exclusive jurisdiction and venue over any and all disputes between the parties arising under this Agreement shall be in, and for such purpose each party hereby submits to the jurisdiction of, the Court.  Thereafter, exclusive jurisdiction and venue over any and all disputes between the parties arising under this Agreement shall be in, and for such purpose each party hereby submits to the jurisdiction of, the federal and state courts in the Commonwealth of Virginia.

120566.0001/1175176.12

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized agents as of the date first above written.

WINN-DIXIE STORES, INC.                    MOLINARO KOGER. INC.
Seller                                     Purchaser


By:_____                 By:_____


Title:_____                 Title:_____


Date:_____                  Date:_____

16

## EXHIBIT I

### 2002 Gulfstream 200
### s/n 0747N80R

**AIRFRAME:**

**ENGINES:** One ESP Gold Lite Plan

| | | | Eng 1 | Eng 2 |
|---|---|---|---|---|
| **Total Time:** | [511] | **Total Time:** | [511] | [511] |
| **Landings:** | [477] | | | |
| | | **Cycles:** | [477] | [477] |

**APU:** Garrett GTCP 36-150

| | | | |
|---|---|---|---|
| **AVIONICS:** | Collins Pro-Line 4 | | |
| **EFIS** | Collins 5 Tube EFIS | **EGPWS:** | Honeywell Mark V Enhanced |
| **AP:** | Collins FCC 4000 | **HFComm** | Dual Honeywell KHF 950 |
| **COMMS:** | Dual Collins VHP 422D vfe/8.33 Spac. | **FMS:** | Dual Collins FMC 61 10 w/Printer |
| **NAVS:** | Dual Collins VIR 432 w/FM IMM | **COMPASS:** | Dual Collins AHS-3000 AHS |
| **DME:** | Dual Collins DME 442 | **PHONED** | MagnaStar Radio w/ 3 handsets |
| **ADF:** | Dual Collins ADF 462 | **AFIS:** | Honeywell |
| **TPDR:** | Dual Collins TDK 94D Mode S | **FDR:** | FDR w/57 Parameters |
| **Radar** | Collins Color TWR 850 | **CVR:** | Universal CVR-120 |
| **RAD ALT:** | Collins ALT 4000 | **TCAS:** | Collins TCAS |
| **LRN:** | Dual Collins FMC-6100 w/ Dual GPS-4000A | | |

**INTERIOR:**
Gulfstream lightweight completion. Nine Passenger configuration featuring 4 place berthable club forward, Aft two place berthable club and a single 3-place divan. Jump Seat. Cabin amenities include 2 dataports, AirShow 400 and 7 electrical outlets. Forward Galley and Aft Lav. Galley includes ice drawer, coffee maker, wine storage, cold food storage & microwave. Entertainment center features DVD, 5-disc CD player, VHS, and two 14 inch LCD monitor. Fireblocked.

**MISC. INFORMATION:**
Life Rafts & Life Jackets
China Service/ Glassware/ Cutlery
Labor Warranty is 5 Yrs. or 3,000 hrs (exp. 3/28/08)
Primary Structural Warranty 10 Years or 10,000 Hours (exp. 3/28/13)
Pratt Whitney Engine Warranty handled directly with Pratt Whitney and is 5 Years from Operational Delivery or 3,000 engine hours (3/28/08)
EGM Program (3/28/08)

IAI proprietary Parts Warranty (exp. 3/28/08)
Paint & Interior Warranty 2 Yrs. (exp 3/28/05)
Rockwell Collins 5 Yrs. or 3,000 hrs. (exp. 3/28/08)

*Specifications/descriptions are provided as introductory information and do not constitute representation or warranties of Bloomer deVere or Bloomer deVere client(s). Accordingly, you should rely on your own inspection of the aircraft. Any proposed transaction is subject to final execution of a contract acceptable in form and substance to Bloomer de Vere, its client(s), and their counsel.*

### SPECIFICATIONS SUBJECT TO VERIFICATION
### UPON INSPECTION BY PURCHASER

120566.0001/1175176.12

## **EXHIBIT II**

### **SCOPE OF PRE-PURCHASE INSPECTION**

2       Phase "A" Inspection
3       Full Avionics ramp test
4       Full Engine boroscope
5       Engine "Minor" Inspection
6       Cabin Windows thickness check
7       Generator Brush Inspection
8       APU boroscope and filter check

18

**EXHIBIT III**

**TECHNICAL ACCEPTANCE CERTIFICATE**

The undersigned representative of MOLINARO KOGER, INC. or its successors or assigns ("Purchaser") hereby certifies that Purchaser has, pursuant to the Aircraft Purchase and Sale Agreement, dated as of March __, 2005 (the "Agreement"), between WINN-DIXIE STORES, INC. ("Seller") and Purchaser, inspected the 2002 Gulfstream Aerospace Model G-200 aircraft, bearing the manufacturer's serial number 074 and the U.S. civil aviation mark N80R (the "Airframe"), with the two (2) attached Pratt & Whitney Canada PW306A engines bearing manufacturer's serial numbers PCE-CC0149 and PCE-CC0150 (the "Engines") and inspected the appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment or property installed on or attached to the Airframe and Engines, the tools, spares, all other equipment for the Airframe and Engines listed in Exhibit I attached to the Agreement (the Airframe, the Engines and the other foregoing described equipment and property, collectively, the "Aircraft") and hereby conditionally accepts the Aircraft in accordance with the conditions set out in Section 3.4 of the Agreement.   Capitalized terms used but not defined in this Certificate have the meanings given them in the Agreement.

The undersigned representative of Seller hereby represents to Purchaser that Seller, at Seller's cost, will correct all the Airworthiness Discrepancies (as determined under the terms of Section 3.4 of the Agreement) attached to this Certificate prior to Delivery of the Aircraft to Purchaser. Purchaser represents to Seller that Purchaser shall as long as all other conditions set forth in the Agreement are met, then, after all Airworthiness Discrepancies are corrected by Seller, will irrevocably accept the Aircraft "AS IS – WHERE IS, WITH ALL FAULTS" at the Delivery location on the Delivery Date.

DATED: _____, 2005    MOLINARO KOGER, INC.
    Purchaser


By:_____

Title:_____


WINN-DIXIE STORES, INC.
Seller


By:_____

Title:_____

19

## EXHIBIT IV

## WARRANTY BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS:

THAT WINN-DIXIE STORES, INC., with an address at 5050 Englewood Court, Jacksonville, FL 32254 ("Seller"), is the owner of the full legal and beneficial title to that certain 2002 Gulfstream Aerospace Model G-200 aircraft, bearing manufacturer's serial number 074 and the U.S. civil aviation mark N80R (the "Airframe"), together with two (2) Pratt & Whitney Canada PW306A engines bearing manufacturer's serial numbers PCE-CC0149 and PCE-CC0150 (the "Engines"), the appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment or property installed on or attached to the Airframe and Engines and all books, manuals, logbooks, maintenance records and other data related to the operation and maintenance of the Aircraft the Airframe and Engines currently in Seller's possession (the Airframe, the Engines and the other foregoing described equipment and property, collectively, the "Aircraft").

THAT for good and valuable consideration, receipt of which is hereby acknowledged, Seller, does this _____ day of April 2005, grant, convey, transfer, deliver and set over, at the _____ Airport, all right, title and interest in and to the Aircraft unto MOLINARO KOGER, INC. ("Purchaser"), and unto its successors and assigns forever.

THAT Seller hereby warrants to Purchaser, its successors and assigns, that there is hereby conveyed to Purchaser on the date hereof, good and marketable title to the Aircraft, free and clear of all liens, encumbrances and rights of others, and that it will warrant and defend such title forever against all claims and demands whatsoever.

THIS Bill of Sale is delivered by Seller to Purchaser, at the _____ Airport, and is governed by the laws of the Commonwealth of Virginia, exclusive of its conflicts of law provisions.

IN WITNESS WHEREOF, SELLER has caused this instrument to be executed by its duly authorized officer this _____ day of April 2005.

WINN-DIXIE STORES, INC.


By: _____

Title: _____

20

## EXHIBIT V

### DELIVERY RECEIPT

The undersigned, on behalf of, and as the duly authorized agent of MOLINARO KOGER, INC. ("Purchaser"), hereby acknowledges receipt from WINN-DIXIE STORES, INC. ("Seller") of the delivery to Purchaser at the _____ Airport, on this ___ day of April 2005, of the following described aircraft:

One (1) 2002 Gulfstream Aerospace Model G-200 aircraft, bearing manufacturer's serial number 074 and the U.S. civil aviation mark N80R (the "Airframe"), together with two (2) Pratt & Whitney Canada PW306A engines bearing manufacturer's serial numbers PCE-CC0149 and PCE-CC0150 (the "Engines") (the "Engines"), the appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment or property installed on or attached to the Airframe and Engines and all books, manuals, logbooks, maintenance records and other data related to the operation and maintenance of the Airframe and Engines.

in accordance with the terms of the Aircraft Purchase and Sale Agreement dated as of March ___, 2005, between Purchaser and Seller pertaining to this transaction.

MOLINARO KOGER, INC.

By: _____

Name: _____

120566.0001/1175176.12

**EXHIBIT VI**

**ESCROW AGREEMENT**

This Escrow Agreement (this "Escrow Agreement") is made and entered into as of March ___, 2005, by and among MOLINARO KOGER, INC. ("Purchaser"), WINN-DIXIE STORES, INC. ("Seller"), and INSURED AIRCRAFT TITLE SERVICES, INC. ("Escrow Agent").

This Escrow Agreement is being entered into in connection with the execution of a certain Aircraft Purchase and Sale Agreement (the "Agreement") between Purchaser and Seller pertaining to one (1) Gulfstream Aerospace G-200 aircraft, bearing manufacturer's serial number 074 and the U.S. civil aviation mark N80R (the "Airframe"), together with two (2) Pratt & Whitney Canada PW306A engines bearing manufacturer's serial numbers PCE-CC0149 and PCE-CC0150 (the "Engines" and collectively with the Airframe, the "Aircraft"). Capitalized terms used herein and not defined herein shall have the meaning assigned to such terms in the Aircraft Purchase and Sale Agreement.

In consideration of the payments herein provided for and the agreements and promises of the parties herein contained, the parties hereto agree as follows:

(A)    Escrow Agent has established an escrow account in its own name (the "Escrow Account"). Any deposit in the Escrow Account shall be made by wire transfer of immediately available funds according to the wire instructions set forth in Attachment 1, which is attached hereto and made a part hereof. All funds deposited therein shall be held without interest.

(B)    Purchaser has deposited in the Escrow Account a deposit in the amount of Two Hundred Thousand Dollars (US$200,000) (the "Deposit") to be held subject to this Escrow Agreement pursuant to the Aircraft Purchase and Sale Agreement, which shall remain refundable until Escrow Agent receives the mutually executed Technical Acceptance Certificate, at which point the Deposit shall, except as otherwise provided in the Agreement, become nonrefundable to Purchaser.

(C)    Prior to the Delivery Date: (1) Seller shall place in escrow with Escrow Agent a duly executed but undated FAA Bill of Sale (AC Form 8050-2) and a duly executed but undated Warranty Bill of Sale (the FAA Bill of Sale and Warranty Bill of Sale collectively referred to herein as the "Bills of Sale"); and (2) Purchaser shall place in escrow with Escrow Agent a duly executed but undated FAA Registration Application (AC Form 8050-1) and Delivery Receipt; and (3) place in the Escrow Account Purchaser's share of the escrow fees of the Escrow Agent; and (4) the remainder of the Purchase Price.

(D)    On the Delivery Date, the parties, and their respective counsel if requested by the relevant party, shall participate in a telephone conference call to effect the closing:

(1)    Escrow Agent shall confirm to all parties on the call that it is holding funds in the amount of the Purchase Price (as defined in the Agreement) and one or more manually executed original counterparts of each of the FAA Registration Application and the

22

FAA Bill of Sale (collectively, the "FAA Documents"), the Bill of Sale and each other document and writing as any party may have elected to deposit with Escrow Agent (together with the FAA Documents and the Warranty Bill of Sale, collectively, the "Documents");

(2)    Escrow Agent shall confirm to all parties on the call that the FAA Documents are in proper form for filing with the Federal Aviation Administration ("FAA");

(3)    Escrow Agent shall further confirm to all parties on the call that it has checked the ticker tape on such date and that the Aircraft and its engines remain free and clear of any liens;

(4)    each Party on the conference call shall confirm to Escrow Agent that Escrow Agent is authorized to release such party's signed Documents, to fill in the date of the closing in appropriate spaces in the Documents, and to proceed with the filing of the FAA Documents with the FAA upon the concurrent authorization to such effect from each other Party on the conference call and the confirmation of the Federal Funds Reference number for the wire transfer referred to in clause (5) below;

(5)    upon verbal authorization by each party to Escrow Agent as provided in clause (4) above, Purchaser shall instruct Escrow Agent to wire transfer the Purchase Price minus Seller's share of the escrow fees to Seller or as Seller may direct. Escrow Agent shall notify the parties on the conference call of the Federal Funds Reference Number for that wire transfer as soon as it is available; and

(6)    immediately upon notice to the parties of that Federal Funds Reference Number, Escrow Agent shall file the FAA Documents with the FAA, and Escrow Agent shall confirm the time of filing of each of the FAA Documents to the parties on the conference call.

(7)    promptly thereafter, Escrow Agent shall send to Purchaser by overnight courier originally executed counterparts of the warranty Bill of Sale and shall send to Seller by overnight courier originally executed counterparts of the Delivery Receipt.

(E)    The authorized persons to give the Escrow Agent instructions are:

(1)    for Seller,
Winn Dixie Stores, Inc.
5050 Englewood Court
Jacksonville, FL  322544
Phone:    904-370-7172
Fax:       904-783-5646
Attn: Mike Chlebovec

(2)    For Purchaser,
Molinaro Koger, Inc.
1676 International Drive, Suite 575
McLean, VA 22102
Tel:   703-760-5203
Fax:   703-860-2547
Attn:  Jonathan Propp

(F)    Should Purchaser or Seller breach the Agreement, Escrow Agent shall pay the funds held on deposit to the appropriate party upon written instructions from both Purchaser and Seller. Notwithstanding the prior sentence, the Deposit shall be controlled under the provisions set out in the Agreement to which this Escrow Agreement is an exhibit.

(G)    Subject to Section D above, any instructions, directions or notices required to be delivered hereunder to Escrow Agent (a) shall be in writing, (b) may be delivered by hand delivery, internationally recognized overnight courier, or facsimile, and (c) may be executed in one (1) or more counterparts, each of which shall constitute an original and all of which, taken together, shall constitute the same instrument. All notices to Escrow Agent shall be addressed as follows:

Name:          Insured Aircraft Title Services, Inc.
Address:      4848 S.W. 36th Street
City/State:    Oklahoma City, OK  73179
Attention:    Kirk Woford
Phone:       (800) 654-4882
Fax:         (405) 681-5356

(H)    Escrow Agent shall perform its customary FAA filing service. Escrow Agent shall act as stakeholder and shall not be responsible for validity, sufficiency or collectibility of funds deposited hereunder, and shall not be required to determine existence of any fact or decide any questions of law. Escrow Agent shall not be liable in any respect on the account of identity, authority or rights of the persons executing or delivering or purporting to execute or deliver any such document, paper or funds, its duties hereunder being limited to the safekeeping of funds deposited hereunder, and for the delivery of the same in accordance with this Escrow Agreement.

(I)    In accepting funds deposited hereunder, it is agreed and understood among the parties hereto that Escrow Agent will not be called upon to construe this Escrow Agreement or any document hereunder.

(J)    Escrow Agent, as part of the consideration for the acceptance of this Escrow Agreement, will not be liable for any acts or omissions done in good faith, nor for any claims, demands or losses, nor for any damages made or suffered by any party to this Escrow Agreement, except such as may arise through or be caused by its bad faith or gross negligence.

120566.0001/1175176.12

(K)    The Escrow Agent's fee and expenses shall be shared equally by Seller and Purchaser and paid to Escrow Agent by Seller and Purchaser at the closing from funds deposited in the Escrow Account or as otherwise agreed by the parties hereto.

(L)    The term of this Escrow Agreement may be amended at any time by the mutual written consent of the parties hereto.

(M)    The Agreement and this Escrow Agreement supersedes any other contract or agreement with reference to the funds deposited hereunder, in so far as Escrow Agent is concerned, and Escrow Agent may rely absolutely thereon to the exclusion of any and all other agreements among the parties hereto, except any duly executed subsequent amendments to the Agreement or this Escrow Agreement.

(N)    This Escrow Agreement shall be governed by the laws of the State of Oklahoma, except for its conflicts of laws provisions.

(O)    This Escrow Agreement may be executed in multiple counterparts, originally signed or a facsimile thereof, each of which shall constitute an original, all of which, taken together, shall constitute the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the date first above written.

MOLINARO KOGER, INC.                    WINN-DIXIE STORES, INC.
as Purchaser                            as Seller


By:_____            By:_____

Title:_____            Title:_____

Date:_____            Date:_____


INSURED AIRCRAFT TITLE SERVICES,
INC.
as Escrow Agent


By:_____

Title:_____

Date:_____

25

**Insured Aircraft Title Service, Inc.**
P.O. Box 19527
Oklahoma City, Oklahoma 73144
(405) 681-6663   (800) 654-4882
FAX #405-681-9229

## WIRE TRANSFER INSTRUCTIONS

FUNDS BEING WIRED TO INSURED ESCROW SERVICE SHOULD BE WIRED
PURSUANT TO THE FOLLOWING INSTRUCTIONS:

*INTERNATIONAL BANK OF COMMERCE*

*1200 SAN BERNARDO*

*LAREDO, TEXAS  78040*

**ABA:  114 902 528**
**SWIFT CODE:  IBCLUS44**

**CREDIT:  INSURED AIRCRAFT TITLE SERVICE, INC.**
**ACCOUNT NUMBER:  0717213717**

**REFERENCE:  GULFSTREAM G-200, SERIAL NUMBER 074**

**ATTENTION:  KIRK WOFORD**

FOR OVERNIGHT DELIVERIES PLEASE USE THE FOLLOWING ADDRESS

*4848 SOUTHWEST 36th STREET*

*OKLAHOMA CITY, OK  73179*

TEL:  405-681-6663

Escrow deposits received are considered <u>refundable</u> to the depositor until we are notified
otherwise by the depositor or until we are in receipt of a fully executed purchase agreement
outlining the terms and conditions of funds held in escrow.

This escrow account is  non-interest bearing.  Fees must be paid at the time of closing.

26

**EXHIBIT B**



### BLOOMER de VERE
#### GROUP AVIA, INC.

LOS ANGELES • WEST PALM BEACH • PHILADELPHIA • NEWPORT BEACH • NEW YORK • MONACO

## AIRCRAFT CONSULTING AGREEMENT

### *CORPORATE AIRCRAFT MARKETING AND SALE*

Winn-Dixie Stores, Inc., ("Client") intends to sell two aircraft described as Gulfstream 200, S/N 072 & 074 (the "Aircraft"), equipped as per attachment A. Client desires to employ Bloomer deVere Group Avia, Inc. ("Bloomer deVere") as agent and Bloomer deVere desires to act as agent for the sale of the Aircraft, pursuant to the terms set forth herein.

### 1.    CONSULTING AGENT.

Client hereby appoints Bloomer deVere as its representative and agent to consummate a sale of the Aircraft. Bloomer deVere hereby accepts its appointment as agent, and agrees to be bound by the terms of this Agreement. The firm will provide to the client marketing intelligence, proven sales procedures, contracts and negotiating expertise. All parties will work toward the common strategic and financial goals established by the Client.

### 2.    ADVERTISING.

Bloomer deVere shall prepare all advertising and promotional programs in connection with the sale of the Aircraft. Client shall be responsible for one half of the costs related to advertising and shall have the right to approve copy and art work which will be used in sales and promotional literature and shall approve any advertising or other sales related expense before such expense is incurred. Bloomer deVere may, from time to time, solicit the participation of certain other aircraft brokerage firms, with the express written consent of Client, to assist in the sale of the Aircraft. These firms are selected on the basis of their location, sales records and integrity. Nevertheless, Client will deal directly with Bloomer deVere at all times and it shall be Bloomer deVere's sole responsibility to deal with other firms.

1

CORPORATE OFFICE • LOS ANGELES

Phone: (805) 484-6605 • Fax: (805) 484-6656 • www.bloomerdevere.com
855 Aviation Drive • Suite 205 • Camarillo, CA 93010

### 3.    CONDITION OF AIRCRAFT.

The Aircraft will be offered for sale by Client as a "used" aircraft in an "as-is" condition. No warranties whatsoever, either expressed, implied or statutory, shall be represented by Bloomer deVere to any prospective purchaser , except those that may be transferred by the aircraft's manufacturer.

### 4.    TERM.

The initial term of this Agreement shall commence upon acceptance of this Agreement by Client and shall continue for 180 days from the date hereof. At Client's option, this Agreement may be renewed for additional term of 90 days. Client retains the right to terminate this Agreement at any time upon 30 day written notice prior to termination. In the event of termination of this Agreement, Bloomer deVere shall deliver to Client a list of all potential purchasers with whom Bloomer deVere has had contact in its specific sales efforts. The Client should have a list every 30 days for the previous 30 days. If any purchaser on said list reaches an agreement in principle for the sale of the Aircraft within 90 days of the last day of the term, and Purchases the Aircraft then Client agrees to pay the full commission set forth in Section 7 hereof.

### 5.    PROSPECTS.

Client hereby agrees that all inquiries, contacts and communications received by Client from prospective purchasers and other aircraft firms shall be referred to Bloomer deVere and that all such parties shall be advised of Bloomer deVere's sales representation capacity. Bloomer deVere shall diligently pursue each prospect referred to it by Client.

### 6.    LISTING PRICE.

The quoted sales price of the Aircraft shall be: "Make Offer", which shall not be varied, modified or changed without Client's prior approval. Client shall be notified of all reasonable written offers received by Bloomer deVere, and Client shall have the right to accept or reject such offers, subject to the provisions set forth in Section 7(b) hereof.  Notwithstanding the above of this Section 6, Bloomer deVere shall advise Client of the sale price Client should expect from a sale of the Aircraft.

### 7.    COMPENSATION.

    (a)    For the sales representation services to be rendered by Bloomer deVere on behalf of Client pursuant to this Agreement, Client shall pay Bloomer deVere a sales commission in accordance with the following:

    Bloomer deVere will be entitled to a flat fee commission ("Fee") to be paid by Client to Bloomer deVere at the closing of each Aircraft. The Fee for each Aircraft will be 0.75% of the Aircraft's purchase price up to $15

2

Million. Thereafter, Bloomer deVere will earn an incentive fee of 5.0% of any amounts realized by Client over $15 Million for each Aircraft.

The date of sale shall be the date Client receives payment of the purchase price and delivers title and possession of the Aircraft to buyer.

(b)     Bloomer deVere shall be entitled to the commission set forth in this

7(a)    Section 7 upon Client's acceptance of any purchaser's offer during the term of this Agreement, subsequent transfer of title or delivery of possession to purchaser and payment of the purchase price, whether or not Bloomer deVere is the procuring cause of the purchase. The commission shall be paid in cash on the date of transfer of title or delivery of possession to purchaser and payment of the purchase price. Notwithstanding the foregoing of this Section 7, this commission amount set out in Section 7 (a) shall be the total extent of Client's payment obligation to Bloomer deVere. Client shall not be responsible for any payments to other aircraft brokers that Bloomer deVere may use to sell the Aircraft.

## 8.    EXPENSES.

Client shall reimburse Bloomer deVere for all pre-approved travel, advertising, promotional and other routine costs associated with the market and sale of the Aircraft. Bloomer deVere shall invoice Client on or about the first day of each calendar month for the pre-approved reimbursable expenses incurred, which shall be invoiced at their actual cost and have the prior approval of Client. Bloomer deVere shall send all said invoices to the attention:

Paul Novak
Chief Development Officer
Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, FL 32254-3699
Phone: (904) 370-7772
Fax:     (904) 370-7773
E-Mail: paulnovak@winn-dixie.com

## 9.    STATUS REPORTS.

Bloomer deVere shall provide Client on a monthly basis with progress reports on its sales efforts which shall include, among other things, offers received to date, the names of prospective purchasers and a general estimate of the existing market for the Aircraft.

3

10.   **DOCUMENTS.**

Bloomer deVere shall prepare the forms and documents required to evidence the purchase and transfer of title, but it shall be the Client's and purchaser's respective obligations to file such documents with the Federal Aviation Administration and other appropriate government agencies.

11.   **NOTICES.**

All notices or other communications required or permitted to be given hereunder shall be (as elected by the party giving such notice) (a) personally delivered, (b) transmitted by first-class mail -- airmail if international, (c) transmitted by telex or telecopier, or (d) telephonic with written confirmation to the parties, as follows:

| If to Bloomer deVere: | If to Client: |
|---|---|
| BLOOMER deVERE GROUP AVIA<br>855 Aviation Dr., Suite # 205<br>Camarillo, CA 93010 | WINN-DIXIE STORES, INC.<br>5050 Edgewood Court<br>Jacksonville, FL 32254-3699 |
| Attn:  Mr. Mark Bloomer | Attn:  Paul Novak, SVP |
| Phone: 805-484-6605<br>Fax: 805-484-6656<br>E-Mail:  bloomerdv@aol.com | Phone: (904) 370-7772<br>Fax:   (904) 370-7773<br>E-Mail: paulnovak@winn-dixie.com |

12.   **CONFIDENTIALITY OF MATERIAL.**

Bloomer deVere may, during the course of its services hereunder, have access to, and acquire knowledge from, material, data, systems and other information of or with respect to Client which may not be accessible or known to the general public. Any knowledge acquired by Bloomer deVere from such material, data, systems or information or otherwise through its engagement hereunder shall not be used, published or divulged by Bloomer deVere in connection with any services rendered by Bloomer deVere to any other person, firm or corporation, in any advertising or promotion regarding Bloomer deVere or its services, or in any other manner or connection whatsoever without first having obtained the written permission of Client, which permission Client may withhold in its sole discretion.

4

13.    **MISCELLANEOUS.**

This Agreement shall be governed by and construed according to the laws and by the courts of the State of California. In the event judicial action is instituted by either party against the other to enforce its rights hereunder, then each party shall be responsible for payment of its own attorneys' fees and costs incurred pursuant to the judicial action. This Agreement contains the entire understanding and agreement of Client and Bloomer deVere concerning the sale of the Aircraft. The terms and conditions of this Agreement supersede any prior or contemporaneous oral or written agreements concerning the subject matter hereof. This Agreement may only be altered or modified in a writing that is executed by the duly authorized representatives of the parties hereto.

BLOOMER deVERE GROUP AVIA           WINN-DIXIE STORES, INC.
a California corporation                          A Florida corporation

By: _____       By: _____

Date: _____       Date: _____

# **EXHIBIT C**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------x
In re:                                              :
                                                    :        **Chapter 11**
                                                    :
**WINN-DIXIE STORES, INC., et al.,**                :        **Case No. 05-11063 (RDD)**
                                                    :
                     **Debtors.**                   :        **(Jointly Administered)**
                                                    :
------------------------------------------------------x

**ORDER UNDER 11 U.S.C. §§ 105(a) AND 363 AND FED. R. BANKR. P. 6004
(I) AUTHORIZING AND APPROVING THE SALE OF A 2002 GULFSTREAM
G-200 AIRCRAFT AND RELATED EQUIPMENT TO MOLINARO KOGER,
INC. FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND
ENCUMBRANCES, (II) AUTHORIZING PAYMENT OF A BROKERAGE FEE
TO BLOOMER deVERE GROUP AVIA, INC. IN CONNECTION WITH SALE
AND (III) GRANTING RELATED RELIEF**

Upon the expedited motion (the "Motion")[1] of Winn-Dixie Stores, Inc. and its

debtor affiliates (collectively, the "Debtors") for an order (i) authorizing and approving

the sale of a 2002 Gulfstream G-200 aircraft and related equipment (the "Assets") to

Molinaro Koger, Inc. (the "Purchaser") free and clear of liens, claims, interests and

encumbrances, (ii) authorizing payment of a brokerage fee to Bloomer deVere Group

Avia, Inc. ("deVere") in connection with the sale and (iii) granting related relief; and a

hearing regarding the Motion having been held (the "Sale Hearing"); and it appearing,

under the circumstances, that due notice of the Motion and the Sale Hearing have been

given and due and proper notice of the Motion having been provided to (i) the Internal

Revenue Service, the state and local taxing authorities; (ii) all parties who previously

---

[1]      All capitalized terms not otherwise defined herein shall have the meaning
ascribed to them in the Motion.

have expressed serious interest in acquiring the Assets; (iii) counsel for the Debtors'

postpetition secured lenders; (iv) the indenture trustee for the Debtors' noteholders; (v)

counsel for the Creditors' Committee; (vi) all entities having requested notices pursuant

to Fed. R. Bankr. P. 2002; (vii) the Office of United States Trustee; and (viii) any other

parties not otherwise named herein but included in the Order (A) Establishing Notice

Procedures on a Final Basis and (B) Continuing Hearing with Respect to Scheduling

Omnibus Hearings (Dkt. No. 254), and no other or further notice need be given; and the

relief requested in the Motion being in the best interests of the Debtors, their estates, and

their creditors; and the Court having reviewed the Motion; and the Court having

determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and upon all of the proceedings had before the Court; and after

due deliberation and good and sufficient cause appearing therefor:

THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:

A.      The Court has jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these Chapter 11 cases and the

Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Motion are 11 U.S.C.

§§ 105(a), 363(b), (f), (m), and (n) and Fed. R. Bankr. P. 6004.

C.      As evidenced by the certificate of service filed on the Motion, the Debtors

served the Motion and notice of the Sale Hearing as contemplated by paragraph 35 of the

Motion.  The foregoing notice constitutes proper, timely and sufficient notice of the

Motion, the Sale Hearing, and the sale of the Assets; such notice has been provided in accordance with the Motion, 11 U.S.C. § 102(1) and Fed. R. Bankr. P. 2002, and such notice was adequate and appropriate notice under the particular circumstances, and no other or further notice is required.

D.     A reasonable opportunity to object or be heard with respect to the Motion and the sale of the Assets has been afforded to all parties in interest (including all third parties asserting Interests or Claims (as such terms are defined below) in, to or against the Assets, if any).

E.     The Debtors' marketing efforts with respect to the Assets were reasonable, adequate, and designed to obtain the highest price possible for the Assets.

F.     The Purchase Agreement has been duly and validly authorized by all necessary corporate action of the Debtors.  Upon entry of this Order, the Debtors shall have all the corporate power and authority necessary to consummate the sale of the Assets in accordance with the terms and conditions of the Purchase Agreement.

G.     No consents or approvals are required for the Debtors to consummate a sale of the Assets with Purchaser.

H.     The Purchase Agreement reflects the exercise of the Debtors' sound business judgment.

I.     Approval at this time of the sale of the Assets to the Purchaser is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

J.     The Debtors have demonstrated a good, sufficient, and sound business purpose and justification for the sale of the Assets, including, without limitation, that:  (i)

absent an immediate sale of the Assets to the Purchaser, the Debtors would potentially lose the value of the Assets to the detriment of their estates and their creditors; and (ii) the marketing of the Assets has garnered the highest and best possible value for the Assets under the circumstances.

K.      The Purchase Agreement was negotiated, proposed, and agreed to by the Debtors and the Purchaser without collusion, in good faith, and from arm's length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

L.      The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to all of the protections afforded thereby.  The Purchaser has acted and will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in consummating a sale of the Assets at all times after the entry of this Order.

M.      The Purchase Agreement must be approved and consummated promptly in order to preserve the value of the Assets.

N.      The Purchaser's offer for the Assets embodies a fair and reasonable offer to acquire the Assets and was the highest and otherwise best offer available for the Assets.

O.      The transfer of the Assets to the Purchaser will be a legal, valid and effective transfer of the Assets and will vest Purchaser with good and valid title in and to the Assets, free and clear of any lien, lease, or encumbrance of any nature (collectively, the "Interests") and claims (as such term is defined in 11 U.S.C. § 101(5)) ("Claims")

because either no Interests or Claims exist against the Assets or because one or more of

the standards set forth in 11 U.S.C. §§ 363(f)(1)-(5) have been satisfied. Any party

holding or asserting Interests or Claims in or to the Assets who did not object to the

Motion or to the sale of the Assets, or who withdrew their objections to the Motion or to

the sale of the Assets, are deemed to have consented to the consummation of the Purchase

Agreement pursuant to 11 U.S.C. § 363(f)(2). Any party holding or asserting Interests or

Claims in or to the Assets that did object to the Motion or the sale of the Assets falls

within one or more of the other subsections of 11 U.S.C. § 363(f) and is adequately

protected by having its Interests or Claims attach to the proceeds of the sale of the Assets

with the same validity, enforceability, priority, force, and effect that they now have as

against the Assets, subject to the rights, claims, defenses, and objections, if any, of the

Debtors and all interested parties with respect to such Interests and Claims.

    P.    Payment of the Brokerage Fee to deVere in connection with the sale of the

Assets is reasonable, customary and not detrimental to the Debtors' estates.

    NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND

DECREED AS FOLLOWS:

    1.    The findings of fact and conclusions of law set forth above be, and the

same hereby are, ratified and adopted as findings of this Court.

    2.    The Motion is GRANTED.

    3.    All objections, if any, to the Motion or to the relief requested therein that

have not been withdrawn, waived, or settled, and all reservation of rights included

therein, are hereby overruled on the merits.

4.     The terms and conditions of the Purchase Agreement are hereby approved in all respects pursuant to 11 U.S.C. §§ 105(a) and 363.

5.     Pursuant to 11 U.S.C. §§ 105(a) and 363(f), as provided for in the Purchase Agreement, the Assets shall be transferred to Purchaser free and clear of all Interests and Claims with all such Interests and Claims, if any, to attach to the proceeds of the sale of the Assets, with the same validity, enforceability, priority, force, and effect that they now have as against the Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all interested parties with respect to such Interests and Claims.

6.     Each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions (provided that the taking of such actions shall not require such creditor to incur any material costs) as may be reasonably necessary to release its Interests or Claims, if any, against the Assets, as such Interests or Claims may have been recorded or may otherwise exist.

7.     This Order (i) is and shall be effective as a determination that any and all Interests existing as to the Assets have been unconditionally released, discharged, and terminated, and that the conveyance of the Assets described herein has been effected, and (ii) is and shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their

- 6 -

office, or contract, to accept, file, register, or otherwise record or release any documents

or instruments, or who may be required to report or insure any title or state of title in or to

the Assets.

8.      Each and every federal, state, and local governmental agency or

department is directed to accept any and all documents and instruments necessary or

appropriate to consummate the Purchase Agreement.

9.      If any person or entity that has filed financing statements, mechanic's

liens, lis pendens, or other documents or agreements evidencing Interests on or Claims in

the Assets shall not have delivered to the Debtors, in proper form for filing and executed

by the appropriate parties, termination statements, instruments of satisfaction, or releases

of all Interests or other Claims that the person or entity has with respect to the Assets or

otherwise, then (i) the Debtors are authorized to execute and file such statements,

instruments, releases, and other documents on behalf of the person or entity with respect

to the Assets, and (ii) the Purchaser is authorized to file, register, or otherwise record a

certified copy of this Order which, once filed, registered, or otherwise recorded, shall

constitute conclusive evidence of the release of all Interests and other Claims of any kind

or nature whatsoever in the Assets.

10.     All entities that are presently in possession of any portion of the Assets are

directed to surrender possession of the Assets to Purchaser.

11.     The consideration provided by the Purchaser for the Assets shall be

deemed to constitute reasonably equivalent value and fair consideration under the

Bankruptcy Code and applicable non-bankruptcy law, and may not be avoided under 11 U.S.C. § 363(n).

12.   The transactions contemplated by the Purchase Agreement are undertaken by the Purchasers in good faith, as that term is used in 11 U.S.C. § 363(m). Accordingly, the reversal or modification on appeal of the authorization to consummate the sale of the Assets shall not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending appeal. The Purchaser is a purchaser in good faith of the Assets and is entitled to all of the protections afforded by 11 U.S.C. § 363(m).

13.   During the pendency of the Debtors' jointly administered case, this Court shall retain exclusive jurisdiction (i) to enforce and implement the Purchase Agreement and any agreements and instruments executed in connection with the Purchase Agreement, (ii) to compel delivery of possession of the Assets to Purchaser, (iii) to resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement, and (iv) to interpret, implement, and enforce the provisions of this Order.

14.   Nothing contained in any plan of reorganization or liquidation confirmed in these Chapter 11 cases, or any order of this Court confirming such a plan, or any other order entered in these Chapter 11 cases or in any subsequent Chapter 7 cases shall conflict with or derogate from the terms of this Order.

15.   In the absence of a stay pending appeal, in the event that the Purchaser and the Debtors elect to consummate the Purchase Agreement at any time after entry of this Order, then, the Purchaser, as a purchaser in good faith within the meaning of 11 U.S.C.

§ 363(m), shall be entitled to the protections of 11 U.S.C. § 363(m) if this Order or any authorization contained herein is reversed or modified on appeal.

16.    The terms and provisions of this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and their creditors, the Purchaser, their affiliates, and their respective successors and assigns, and this Order shall be binding in all respects upon all persons, if any, asserting Interests against or Claims in the Debtors' estates or the Assets.  The Purchase Agreement shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any Chapter 7 or Chapter 11 trustee of the Debtors and their estates.

17.    The failure specifically to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

18.    Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided, however, that, in connection therewith, the parties shall obtain the prior written consent of the Creditors' Committee, which consent shall not be unreasonably withheld; and provided further, that any such modification, amendment or supplement shall neither be materially adverse nor materially adversely change the economic substance of the transactions contemplated hereby.

19.     To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in the Purchase Agreement shall govern.

20.     Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized and empowered to fully consummate and implement the Purchase Agreement, together with all additional instruments and documents that may be necessary, desirable, or appropriate to implement the Purchase Agreement, and the Debtors are authorized to take all further actions as may reasonably be required by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to Purchaser their Assets, or as may be necessary, desirable or appropriate to the performance of the Debtors' obligations under the Purchase Agreement.

21.     The Debtors are authorized to pay to deVere the Brokerage Fee, $121,500, from the proceeds of the sale of the Assets to the Purchaser.

22.     Any findings or conclusions read into the record by the Court at the Sale Hearing that are not expressly set forth in this Order are hereby fully incorporated as if the same were set forth herein.

23.     Notwithstanding Fed. R. Bankr. P. 6004(g), this Order shall take effect immediately upon entry.

Dated: _____, 2005
          New York, New York

                                        _____
                                        Honorable Robert D. Drain
                                        United States Bankruptcy Judge

- 10 -