Dennis F. Dunne (DD 7543)
Matthew S. Barr (MB 9170)
Michael E. Comerford (MC 7049)
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

Counsel for Official Committee
of Unsecured Creditors of
Winn-Dixie Stores, Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------x
In re:                              : Chapter 11
                                    :
**WINN-DIXIE STORES, INC., et al.,** : Case No. 05-11063 (RDD)
                                    :
                        Debtors.  : (Jointly Administered)
------------------------------------x

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
WINN-DIXIE STORES, INC., *ET AL.,* TO MOTION OF BUFFALO
ROCK COMPANY SEEKING ENTRY OF AN ORDER, UNDER
28 U.S.C. § 1412, TRANSFERRING VENUE OF DEBTORS' CASES**

**TO THE HONORABLE ROBERT D. DRAIN,**
**UNITED STATES BANKRUPTCY JUDGE:**

The official committee of unsecured creditors (the

"Committee") of Winn-Dixie Stores, Inc. and its affiliated

debtors and debtors-in-possession in the above-captioned cases

(collectively, "Winn-Dixie" or the "Debtors") hereby objects to

the motion, dated March 14, 2005 (the "Motion"), of Buffalo Rock

Company seeking entry of an order under 28 U.S.C. § 1412

transferring venue of the Debtors' cases,[1] and respectfully

states as follows:

**PRELIMINARY STATEMENT**

1.    The Committee believes that the Motion should be

denied because (i) most creditors prefer New York over Florida

(or Louisiana, as requested by Ernst Properties), (ii) New York

is more convenient for the parties, (iii) this Court has had

substantial involvement and made significant rulings in these

cases to date, and (iv) the cost of administering the cases may

be significantly lower if the cases remain in New York.

2.    The Committee did not exist when the Debtors

decided to file these cases in New York.  It played no part in

the Debtors' bankruptcy planning or its venue decisions.

Nevertheless, after reviewing all of the relevant legal and

factual criteria, the Committee believes that, on balance, venue

should remain in New York and not be transferred.

3.    Although the Committee does not dispute that the

Florida (or Louisiana) Bankruptcy Court would competently and

judiciously handle these cases, the Committee believes, as shown

---

[1]    The following parties filed a joinder to the Motion: Riverdale Farms,
Inc., Richard J. Ehster and Bradley T. Keller ("Ehster and Keller") and
Ernst Properties, Inc. ("Ernst Properties").  Although Ernst Properties
joined in the relief requested in the Motion, it requested that the
cases be transferred to the Eastern District of Louisiana, not Florida.

2

below, that New York is more convenient for the parties than Florida (or Louisiana, as requested by Ernst Properties) and that retention of the cases in New York will minimize the cost of administering these estates. Moreover, since the Debtors announced that they were consenting to a venue transfer, the Committee has been approached by many creditors urging the Committee to oppose the Motion on such grounds.

4.    The Debtors' Response is also telling. While the Debtors purport to consent to the transfer of venue, they contend that (i) the cases were properly filed in New York and (ii) New York is more convenient for creditors than Florida. These beliefs existed when the cases were filed and still exist today. The only thing that has changed is the filing of the Motion. But the pendency of the Motion is neither indicative of creditor preferences nor a justification for disregarding the Debtors' initial preference for New York, which preference is best evidenced by their decision to file these cases here and avail themselves of the New York court. For these reasons (and others described below), the Committee opposes the Motion and requests that the Court deny it in its entirety.

## BACKGROUND

5.    <u>Chapter 11 Filing</u>.  On February 21, 2005 (the "<u>Petition Date</u>"), the Debtors, including Dixie Stores, Inc. ("<u>DSI</u>"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1330 (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>New York Bankruptcy Court</u>").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  "According to published reports, Winn-Dixie is the eighth largest food retailer in the United States."  <u>See</u> Declaration of Bennett L. Nussbaum Pursuant to Local Bankruptcy Rule 1007-2 in Support of First-Day Motions and Applications, p. 2 (the "<u>Declaration</u>").  No trustee or examiner has been appointed in these cases.

6.    <u>Creditors' Committee</u>.  On March 1, 2005, the United States Trustee duly appointed the Committee.

7.    <u>Debtors' Response To Motion</u>.  On March 14, 2005, Buffalo Rock Company ("<u>Buffalo Rock</u>") filed the Motion seeking to transfer these cases to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "<u>Florida Bankruptcy Court</u>") or such other district where venue would be appropriate.  On March 30, 2005, the Debtors filed a

4

response to the Motion (the "Response") requesting that this case be transferred to the Florida Bankruptcy Court.[2]  Tellingly, the Debtors' Response **does not** disavow any of the actual or implied representations the Debtors made when they filed these bankruptcy cases in this Court.  In fact, the Debtors assert that all of the bases for finding venue proper in this Court still exist.  See Debtors' Response, ¶¶ 1 – 3.

8.    Instead, the Debtors use the existence of the venue dispute itself as the sole basis for acquiescing to Buffalo Rock's request to transfer.  Id., ¶ 4.  This is a clear

---

[2]    By filing these cases in New York and participating before this Court, the Debtors have waived their right to request a change of venue.  The filing of a bankruptcy case "in a certain venue and subsequent participation in the case constitute both consent to that venue and conduct waiving objections to that venue."  Block v. Citizens Bank (In re Moss), 249 B.R. 200, 203 (Bankr. W.D. Mo. 2000).  As the Moss court noted, "[t]he only circumstances in which a court has allowed a debtor to seek a change of venue post-petition is when the debtor has moved and a change of venue would be convenient to the creditors and would promote the interests of justice."  Id.  "Of paramount importance in our decision is the fact that the Debtor voluntarily chose this venue."  Id. (denying debtor's motion to change venue).  See also In re Fishman, 205 B.R. 147, 149 (Bankr. E.D. Ark. 1997) ("It is nothing less than bizarre that the debtor now 'objects' to his own choice of venue.").  The Debtors may respond that these cases are inapposite because the Debtors do not repudiate and, in fact, reaffirm the bases of their original venue choice.  The Debtors appear to suggest that changed circumstances, in the form of this venue dispute, warrant a different venue now than the one that was just and proper when the cases were filed.  The Debtors cite no authority for the proposition that a postpetition dispute of any kind in and of itself can ever warrant a change in venue and the Committee believes no such authority exists.  Even if postpetition litigation could warrant a change in venue, it does not do so here.  This dispute must have been foreseen and considered by the Debtors and their counsel before they filed the petitions and, accordingly, cannot constitute a true change of circumstances invalidating the Debtors' original choice of venue on a post hoc basis.

case of the tail wagging the dog:  the venue dispute will be
resolved by this Court shortly, probably after a single hearing.
It is simply incorrect to argue -- as the Debtors do -- that
this one issue will so dominate the attention of the parties and
the Court for such a length of time that it will interfere with
the Debtors' attempt to reorganize.

     9.    As the Debtors correctly noted when filing the
Response, only one -- now a few -- of the thousands of creditors
in these cases have supported Buffalo Rock, the DIP Lender has
not joined in the Motion, and neither has anyone else.  See
Debtors' Response, ¶ 2.  This is further evidence that Peter
Lynch, President and Chief Executive Officer of Winn-Dixie, is
correct when he states that Winn-Dixie's "decision to file in
New York . . . was with the understanding that creditors
preferred that location because of its convenience.  In fact . .
. [Winn-Dixie's] research showed that most of . . . [its] major
creditors either have offices or legal representation in New
York."  Winn-Dixie Requests that Bankruptcy Court Transfer
Chapter 11 Case to Jacksonville, Florida, March 30, 2005, at
http://www.winndixie.com/company/reorganization/release/033005.a
sp.

**ARGUMENT**

I.    **Venue Is Proper In Southern District Of New York**

10.    In chapter 11 cases, venue is governed by section 1408 of title 28 of the United States Code ("section 1408").  In relevant part, section 1408 provides:

> [A] case under title 11 may be commenced in the district court for the district --
>
> (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case[.]

28 U.S.C. § 1408(1).  Moreover, section 1408(2) provides that "[a] case under title 11 may be commenced in the district court for the district in which there is a pending case under title 11 concerning such person's affiliate."  28 U.S.C. § 1408(2).

11.    The United States Supreme Court has consistently stated that statutory analysis must begin with the language of the applicable statute.  See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000) ("Congress 'says in a statute what it means and means in a statute what it says there'") (citation omitted).  Congress' intentions are reflected very clearly in section 1408.  First, Congress differentiates among an entity's place of business, its state of incorporation

(i.e., a corporation's domicile),[3] and the location of its
principal assets.  Next, Congress provided that any of the three
are appropriate venue bases.  If, as Buffalo Rock urges,
Congress intended that venue should be proper only in the
district in which a debtor's officers, employees, and books and
records are located, Congress would **not** have expressly declared
venue to be proper in either the state of incorporation or the
state in which a debtor's principal assets are located.  Indeed,
several times in the past couple of years, most recently as
February 2005, Congress considered an amendment to the
bankruptcy venue statute that would have restricted venue of
corporate bankruptcy cases to the district in which a debtor's
principal place of business is located.  Each time this
amendment was proposed, however, it was **not** adopted and has
never become law.  See Fairness in Bankruptcy Litigation Act of
2005, S. 314, 109th Cong. (Feb. 8, 2005).

   12.  The applicable statute -- section 1408 -- on its
face provides that the Debtors' cases are appropriately before
this Court.  The first two companies to be filed in these cases

---

[3]    See Enron Corp. v. Arora (In re Enron Corp.), 316 B.R. 434, 447 (Bankr.
S.D.N.Y. 2004) ("[V]enue under section 1408(1) could be based upon a
number of factors, including a 'corporation's domicile [which] is
generally held to be its state of incorporation.'"); In re Bullmore,
300 B.R. 719, 730 (Bankr. D. Neb. 2003) ("In bankruptcy cases, 'a
corporation's domicile is the state of incorporation.'").

both had their domicile and/or their principal assets in New York. It cannot be disputed that DSI's place of incorporation (i.e., its domicile) and both DSI's and Table Supply Food Stores Co., Inc.'s ("Table Supply") principal assets are located in New York.[4] Thus, both of these cases were appropriately filed in New York under the plain language of section 1408. Furthermore, it cannot be disputed that each of DSI and Table Supply, both wholly-owned subsidiaries of Winn-Dixie Stores, Inc., is an "affiliate" (as defined in section 101(2) of the Bankruptcy Code) of the other Debtors in these jointly administered cases.

13. Buffalo Rock argues that the Debtors created DSI for the purposes of establishing venue in the New York Bankruptcy Court. Assuming, for argument's sake, that this is correct, it is irrelevant for at least three reasons. First, the Committee and the individual creditors had nothing to do with the process resulting in the filing of these cases in the New York Bankruptcy Court. Accordingly, their good faith support for continued venue in this District cannot be undermined by the unilateral actions of the Debtors. Second,

---

[4] As stated in the Motion, DSI's principal assets on the Petition Date were located in New York (in addition to New York being its place of domicile). Furthermore, the principal assets of the second Debtor entity that filed a chapter 11 petition, Table Supply (Case no. 05-11062), were also located in New York on the Petition Date.

the system Congress crafted already has a safety valve: the transfer authority granted the courts under section 1412. Section 1412 occupies the universe of corrective remedies for facially properly-filed cases.  If the criteria for transferring cases under section 1412 are met, then these cases should be moved to Florida (or Louisiana, as requested by Ernst Properties).  If not, they should remain in New York.  Third, to transfer the cases to Florida (or Louisiana, as requested by Ernst Properties), even though the criteria for such transfer have not been met, would amount to a *de facto* rewriting of the relevant statutes.  As already noted, Congress has repeatedly considered revising the venue statutes to address issues such as those raised by Buffalo Rock -- and has consistently refused to do so.  Buffalo Rock is, in essence, asking the Court not to apply the statutes, but to rewrite them -- an invitation that this Court should decline.  As the Bankruptcy Appellate Panel for the Second Circuit observed,

> [a]ppellee's practical arguments based upon the burgeoning caseload, etc. seek relief from the wrong branch of government.  The statute as enacted by Congress requires notice and a hearing.  Neither the Chapter 7 Trustee, nor the UST, nor the Clerk of the Court, nor even the Court can ignore the statute to lighten the burden on Chapter 7 trustees.

Dinova v. Harris (In re Dinova), 212 B.R. 437, 445-46 (B.A.P. 2d Cir. 1997).  Furthermore, if Congress has refused to act, courts cannot legislate in its place.  United States Lines, Inc. v.

United States (In re McLean Indus.), 196 B.R. 670, 677 (S.D.N.Y. 1996) ("Congress having spoken by its silence, this Court is not empowered to rewrite the statute").  The Dinova and McLean Indus. courts were merely stating principles that have been accepted by federal courts at every level.[5]  Congress has provided Buffalo Rock with a remedy -- 28 U.S.C. § 1412. Accordingly, as set forth herein (and as the Debtors strenuously assert in the Response), under the applicable statute, venue for DSI, Table Supply, and each of their affiliated Debtors is proper in this District.[6]

---

[5]    See Louisiana Pub. Serv. Comm'n v. F.C.C., 476 U.S. 355, 374-76 (1986) ("[a federal] agency may not confer power upon itself. To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress.  This we are both unwilling and unable to do. . . . [section] 152(b) precludes both the FCC and this Court from providing the relief sought.  As we so often admonish, only Congress can rewrite this statute"); Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.), 920 F.2d 183, 187 (2d Cir. 1990) ("improving legislation by amending it is not [this court's] function; only Congress can rewrite the statute") (citing Louisiana Pub. Serv.); In re Pan Am Corp., 125 B.R. 372, 374 (S.D.N.Y. 1991) ("a court may not use its review of the legislative history to rewrite a statute merely because the court disagrees with the manner Congress chose to further its policy") (also citing Louisiana Pub. Serv.), aff'd, 929 F.2d 109 (2d Cir. 1991), cert. denied, 500 U.S. 946 (1991) and Daluz v. Automatic Plating of Bridgeport, Inc. (In re Automatic Plating of Bridgeport, Inc.), 202 B.R. 540, 542 (Bankr. D. Conn. 1996) ("courts may construe statutes, they may not reconstruct them").

[6]    In addition to venue being proper in this District, the Committee fails to understand how Buffalo Rock's bad faith arguments are related to its request to transfer venue.  For example, In re Laguna Assocs. Ltd. P'ship, 30 F.3d 734 (6th Cir. 1994), addresses whether an attempt by a debtor to delay a creditor's exercise of state court remedies constitutes bad faith.  Buffalo Rock cites Laguna (Motion, p. 9) as support for an alleged bad faith filing by the Debtors.  The facts and

## II.   Parties Have Failed To Meet Their Burden Of Demonstrating That Transfer Of These Cases Is Warranted

14.   A motion to transfer the venue of bankruptcy cases is governed by section 1412 of title 28 of the United States Code ("section 1412") and Rule 1014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  Section 1412 provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."  Similarly, Bankruptcy Rule 1014(a) states:

> [i]f a petition is filed in a proper district, on timely motion of a party in interest, and after hearing on notice to the petitioners, the United States Trustee, and other entities as directed by the court, the case may be transferred to any other district if the court determines that the transfer is in the interest of justice[7] or for the convenience of the parties.

A motion under section 1412 to transfer a case is "within the discretionary authority of the district courts, according to 'an individualized, case-by-case consideration of convenience and fairness.'"  Official Committee of Asbestos Claimants of G-I

---

holding in Laguna, however, are completely unrelated to the relief sought in the Motion.

[7]   "The interest of justice component of [section] 1412 is a broad and flexible standard which must be applied on a case-by-case basis.  It contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness . . . ."  Gulf States Exploration

Holding, Inc. v. Heyman, 306 B.R. 746, 749 (S.D.N.Y. 2004)
(quoting Gulf States Exploration Co. v. Manville Forest Prods.
Corp. (In re Manville Forest Prods. Corp.), 896 F.2d 1384, 1391
(2d Cir. 1990)). "The party moving for change of venue bears
the burden of proof and that burden must be carried by a
preponderance of the evidence." In re Manville Forest Prods.
Corp., 896 F.2d at 1390.

   15. It may appear that the Debtors' Response changes
the way the Court should evaluate the Motion. It does not. As
previously noted, the burden is on Buffalo Rock and the parties
who joined in the Motion to establish that these cases should be
transferred, and there is a strong presumption that the Debtors'
choice of venue should be upheld. Indeed, the burden, and that
presumption, would not be changed even if the Debtors themselves
had filed a motion to transfer venue. See Moss, 249 B.R. at
200. In the Moss case, the debtor filed her chapter 7 petition
in Missouri and then filed a motion to change venue to Arizona.
The court rejected the attempt, stating that "[b]y filing her
bankruptcy petition in this Court, the Debtor triggered the
presumption that venue was proper here. The burden of
establishing that a case should be transferred is on the moving

---

Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods.
Corp.), 896 F.2d 1384, 1391 (2d Cir. 1990).

party and must be shown by a preponderance of the evidence."
Id. at 205.

16.  Under the reasoning of Moss, the mere fact that
the Debtors now choose to support a change of venue does not
modify the presumption favoring retention of the bankruptcy
cases by this Court or the fact that the burden is on Buffalo
Rock and parties joining in the Motion to establish that venue
should be changed.  Accord In re Weatherly Frozen Food Group,
133 B.R. 862, 867 (Bankr. N.D. Ohio 1991) (debtor against whom
an involuntary petition had been filed and who subsequently
sought to transfer venue to New York "must carry its burden to
change venue by a preponderance of the evidence") (citing
Manville Forest Prods., 896 F.2d at 1390).  Despite the filing
of the Response, Buffalo Rock still bears its burden, a burden
that, for the reasons set forth below, it has not met.

17.  The factors the Court should consider in deciding
the Motion include:

- the proximity of creditors of every kind to the
  court;

- the proximity of the debtor to the court and the
  proximity of witnesses necessary to the
  administration of the estate;

- the location of the assets;

- the economic administration of the estate;[8] and

- the necessity for ancillary administration if liquidation should result.[9]

In re Suzanne de Lyon, Inc., 125 B.R. 863, 868 (Bankr. S.D.N.Y. 1991) (citing Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co., Inc. (In re Commonwealth Oil Refining Co., Inc.), 596 F.2d 1239, 1247 (5th Cir. 1979). Applying these factors to these cases makes it clear that they should remain in the New York Bankruptcy Court.

### 1.    Estates Can Be Administered Most Economically In New York Bankruptcy Court

18.    Of the factors the Court should consider in determining whether to transfer venue "the most important . . . is where the economic administration of the chapter 11 case can best be accomplished."  In re Suzanne de Lyon, Inc., 125 B.R. at 869.  For instance, if these cases are transferred to Florida (or Louisiana), each of the parties will need local counsel and spend substantial amounts of time traveling to and attending

---

[8]    In In re Enron Corp., 274 B.R. 327, 349 (Bankr. S.D.N.Y. 2002) (overruled on other grounds in Enron Corp. v. Arora (In re Enron Corp.), 317 B.R. 629, 638 n.8 (Bankr. S.D.N.Y. 2004)), the court found that although the "interest of justice" prong under section 1412 is a broad and flexible standard applied based on the facts and circumstances of a particular case "considerations involved with the interest of justice are intertwined with the economic and efficient administration of the estate."  Id.

hearings.  These items will increase the costs of the chapter 11 cases.  It seems beyond doubt that the costs of these cases will be lower if they stay in the New York Bankruptcy Court.

19.  **New York Is A Convenient Forum.**  Winn-Dixie selected this forum, and its choice is entitled to considerable deference.  In re Manville Forest Prods. Corp., 896 F.2d at 1391 (stating that district in which case is pending presumed to be correct district for bankruptcy case).  Despite Buffalo Rock's argument that nearly all witnesses are located in Florida, it has not identified any witnesses in Florida that will be necessary *for the administration of the Debtors' chapter 11 case* -- which is the relevant focus of this inquiry in the venue transfer context.  Indeed, experience dictates that only a few of the Debtors' employees would necessarily travel to attend court or testify in these cases.  As stated in In re Pic 'N Pay Stores Inc., Case No. 96-182 (PJW), Bench decision (Bankr. D. Del. Mar. 8, 1996) (a copy of which is attached hereto as Exhibit A): "[m]y experience suggests that rank and file employees do not participate in a bankruptcy proceeding . . . I do not see the rank and file employees as having a role in the administration

---

[9]    Since the Debtors' cases are at such an early stage it is not necessary for this Court to "contemplate the failure of . . . [Winn-Dixie's] cases] at this early stage."  In re Enron Corp., 274 B.R. at 349.

of this case." Bench decision at 16; see also In re American Film Techs., Case No. 93-1207 (PJW), Bench decision at 75 (Bankr. D. Del. Nov. 23, 1993) ("I don't think [operating personnel are] going to be significantly involved in the working of this chapter 11 case.") (a copy of which is attached hereto as Exhibit B); In re Commonwealth Oil Ref. Co., 596 F.2d at 1248 ("The concern is with the corporation's employees who must appear in court, not with the employees who are on the production line."). Furthermore, telephonic appearances, if authorized, can alleviate any inconvenience. See, e.g., In re Enron Corp., 274 B.R. 327, 347 (Bankr. S.D.N.Y. 2002) (overruled on other grounds in Enron Corp. v. Arora (In re Enron Corp.), 317 B.R. 629, 638 n.8 (Bankr. S.D.N.Y. 2004))("Subject to approval, appearances required by officers (or other management) can be addressed by telephonic and video conferencing capabilities."). Accordingly, any assertion by Buffalo Rock that the cost to transport potential witnesses from Florida to New York will be prohibitive and expensive is misleading and inaccurate.

20. Furthermore, the attendance of certain of the Debtors' officers at meetings with the Committee and its professionals, the DIP Lender and the Debtors' professionals in New York will occur irrespective of the venue of these chapter 11 cases. Accordingly, retention of venue in New York will

17

reduce the costs associated with these meetings as fewer parties will have to travel to New York to attend, and the Debtors can attempt to further reduce costs by scheduling meetings in close proximity to court hearings requiring the attendance of these officers.

21.  Most of the professionals working on these cases are based in New York.  The specific professionals representing the major parties in interest in the chapter 11 cases include:

- The reorganization attorneys for the Debtors, Skadden, Arps, Slate Meagher & Flom, are located in New York City;

- Conflicts counsel for the Debtors, Togut, Segal & Segal LLP, is located in New York City;

- The Blackstone Group L.P., the Debtors' financial advisor, is located in New York City;

- XRoads Solutions Group, the Debtors' financial and operations restructuring consultant, is operating from offices in New York City, California and Missouri;

- The attorneys for the Committee, Milbank, Tweed, Hadley & McCloy LLP, are located in New York City;

- Houlihan Lokey Howard & Zukin Capital, the Committee's financial advisor, is located in New York City;

- Alvarez & Marsal, LLC, operations and real estate advisor to the Committee, is located in New York City;

- The attorneys representing Wilmington Trust Company, the indenture trustee for Winn-Dixie's $300 million Senior Notes due 2008, Curtis, Mallet-Prevost, Colt & Mosle LLP, are located in New York City;

- The attorneys representing the DIP Lender, Otterbourg, Steindler, Houston & Rosen, P.C., are located in New York City; and

- Many of the law firms representing many of landlords, trade creditors, and reclamation creditors who have appeared in Court with respect to the DIP financing, reclamation motion, PACA motion, and other relief, are located in New York or in nearby Wilmington, Delaware or Philadelphia, Pennsylvania.

The foregoing professionals, as well as the Committee (which has two members and counsel for a third member located in New York City), will all play instrumental roles and provide vital input into the development of the Debtors' reorganization plan. Indeed, the ultimate success of the Debtors' chapter 11 effort will depend largely on that input. Meetings between the Debtors and the Committee and the Debtors and their landlords, PACA and reclamation creditors have, to date, occurred in New York. In sum, given the location of these individuals, New York has been and will likely continue to be the geographic center of the Debtors' reorganization efforts.

22. **Substantial Learning Curve**. This Court has already presided over many hearings involving dozens of motions and applications, seeking various forms of relief. This Court has heard testimony in connection with numerous motions

regarding the operation of the Debtors' businesses with respect

to relief sought to minimize the transition into chapter 11.

For instance, the Court has considered testimony and argument in

connection with the Debtors' post-petition financing, which

order incorporates this Court's oral rulings on important issues

regarding the potential priority and status of certain claims in

these cases.   The Committee believes that this Court is uniquely

suited to interpret its own oral rulings and the scope of

certain reservation of rights crafted by it.   See In re Manville

Forest Prods. Corp., 896 F.2d at 1391 (stating that district

court correctly found that "bankruptcy court had developed a

substantial 'learning curve' and that transferring venue would

have delayed the final resolution of the bankruptcy case").

     23.   When the incumbent court has had significant

involvement with a debtor's chapter 11 case, retention of venue

is particularly appropriate.   Thus, in In re Vienna Park Props.,

128 B.R. 373 (Bankr. S.D.N.Y. 1991), the court denied the

request to transfer venue made within the first six weeks of the

debtor's chapter 11 case due to its significant early

involvement in the case, despite the fact that (unlike these

cases) almost all factors weighed in favor of transfer.   "[T]his

Court has gained such a familiarity with, and insight into, this

case, that a transfer of venue would only thwart the efficient

administration of the case and work an injustice in the case and to all parties." Id. at 377.

### 2. To Extent That Creditors Have A Geographic Focus, It Is Not Florida Or Louisiana

24.   New York is also the most convenient forum for the creditors considered as a whole (and, at worst, is no more inconvenient to the creditors than is Jacksonville, Florida or New Orleans, Louisiana).  As further described below, the geographic focus of the Committee members is not in Florida or Louisiana.  Additionally, a review of the schedules attached to the Declaration indicates that Florida and Louisiana are not more convenient venues for the Debtors' forty largest trade creditors and ten largest institutional creditors than is New York:

- Only two out of the twenty largest unsecured creditors of the Debtors, on a consolidated basis (excluding insiders), are located in Florida (and none are located in Louisiana);

- The Debtors' three largest secured creditors as of the Petition Date were located in Charlotte, North Carolina; Nashville, Tennessee and Minneapolis, Minnesota;

- The Debtors' other creditors are located throughout the United States and, of their 50 largest unsecured creditors (excluding insiders), only five are located in Florida (and only one is located in Louisiana).

25.   Indeed, only five out of the combined fifty trade creditors and institutional creditors are located in Florida (and only one of such creditors is located in Louisiana).  In

other words, 90% of the Debtors' largest unsecured creditors (45 out of 50) are **not** based in Florida (and 98% (49 out of 50) are **not** based in Louisiana).  The Debtors' creditors are found in a number of states and Canada, so there is no greater connection to Florida or Louisiana than there is to New York.  Cf. In re Enron Corp., 274 B.R. at 346.  Indeed, although Ernst Properties joined in the relief requested in the Motion, it does not believe that Florida is the most convenient forum.  Ernst Properties requests that this Court transfer the cases to the Eastern District of Louisiana.  Accordingly, even creditors supporting a transfer don't agree that Florida is the most convenient forum.

26.  Buffalo Rock also fails to consider its relatively limited role in these cases as opposed to the role of the Committee.  Unlike Buffalo Rock, who has filed the Motion in an effort to advance its individual self interests, the Committee is charged with statutory and fiduciary responsibility for the collective body of unsecured creditors.  In re Victory Mkts., Inc., 195 B.R. 9, 16 (N.D.N.Y. 1996).  It is clear that New York will be the center of the Committee's efforts to fulfill its mandate.  The members of the Committee operate from the following locations:

| | |
|---|---|
| Capital Research & Management Company | Los Angeles, California |
| Deutsche Bank Trust Company Americas | New York, New York |
| Kraft Foods Global, Inc. | Northfield, Illinois |
| New Plan Excel Realty Trust, Inc. | New York, New York |
| OCM Opportunities Fund V, L.P. | Los Angeles, California (retained New York counsel) |
| Pepsico | Plano, Texas |
| $R^2$ Investments, LDC c/o Amalgamated Gadget, LP | Forth Worth, Texas |

Additionally, as previously stated, the Committee selected

counsel from New York and individual Committee members are

represented by counsel from New York and Philadelphia.   The

proposed financial advisor and operations and real estate

advisor to the Committee are both located in New York.   No

member of the Committee, Committee counsel, individual counsel

to members of the Committee or the Committee's other advisors is

23

located in Florida or Louisiana.  As for most parties in interest, New York is far more convenient than Jacksonville, Florida or New Orleans, Louisiana.  Travel to New York for hearings and meetings in these cases is certainly more convenient than travel to Jacksonville, Florida or New Orleans, Louisiana.  Creditors throughout the country are considerably more likely to find frequent and direct flights to New York.

27.  Although the Florida Bankruptcy Court may be preferable to Buffalo Rock for a variety of reasons, "where a transfer would merely shift the inconvenience from one party to the other[,] the plaintiff's choice of forum should not be disturbed."  Rosa v. C.P.P. Corp. (In re Legend Indus.), 49 B.R. 935, 938 (Bankr. E.D.N.Y. 1985) (citations omitted); see also Redmond v. Alexander, No. 88-2516, 1992 WL 224051 at *2 (D. Kan. Aug. 5, 1992) ("Change of venue should not be granted where the evidence indicates that transfer would merely shift the inconvenience from one party to another.") (citation omitted). Rather then disrupting the ongoing reorganization effort for the purported convenience of a single creditor (or a handful of creditors), the Committee believes that the Court should act in the best interests of the entire creditor community and retain the Debtors' bankruptcy cases.  Further, the joinder by Ester and Keller attempts to grossly overstate the potential involvement of employees they claim reside in Florida.  Ester

24

and Keller fail to recognize that this Court previously entered
an order in connection with "first day" motions authorizing
payment of employee obligations and retiree benefits that will
likely significantly reduce employee involvement in hearings in
these cases, and, as stated above, the long history of cases
finding that rank and file or operating employees do not
generally have significant roles in chapter 11 cases.

### 3.    **Location Of Debtors' Assets**

28.    Buffalo Rock's argument that the majority of the
Debtors' assets are located in Florida is of little weight.
First of all, the assets are not clustered around Jacksonville,
but are scattered throughout the Southeast and elsewhere.
Second, this case is a reorganization and thus this factor is of
minimal importance.  In Commonwealth Oil, for instance, the
Fifth Circuit found that the location of a debtor's assets "is
of little importance in a. . . [reorganization] proceeding where
the goal is financial rehabilitation, not liquidation."  596
F.2d at 1248.  "Furthermore, while a debtor's location and the
location of its assets are often important considerations in
single asset real estate cases, these factors take on less
importance in a case where a debtor has assets in various
locations."  In re Enron Corp., 274 B.R. at 348.

29.    The Debtors' objective is to achieve a
reorganization and not a liquidation.  Accordingly, the location

of the Debtors' assets is not of great significance in deciding where proper venue lies.  Moreover, given the reorganization effort that lies ahead, the cases must remain here where the Debtors and the Committee will easily be able to meet and consult with their respective professionals.

### WAIVER OF MEMORANDUM OF LAW

30.  Pursuant to Local Bankruptcy Rule 9013-1(b) for the Southern District of New York, because there are no novel issues of law presented herein, the Committee respectfully requests that the Court waive the requirement for a memorandum of law in support of this Objection.[10]

---

[10]   The Committee is hopeful that it will not need the Court's intervention in connection with necessary discovery.  The Committee, however, reserves the right to seek appropriate relief from this Court should the need arise.

26

## CONCLUSION

31. For the reasons set forth above, the Court should enter an order denying the Motion to transfer venue of these chapter 11 cases in its entirety.

Dated: April 5, 2005

MILBANK, TWEED, HADLEY & McCLOY LLP

By: /s/ Dennis F. Dunne
  Dennis F. Dunne (DD 7543)
  Matthew S. Barr (MB 9170)
  Michael E. Comerford (MC 7049)
  1 Chase Manhattan Plaza
  New York, New York 10005
  (212) 530-5000

  Counsel for the Official
  Committee of Unsecured Creditors
  of Winn-Dixie Stores, Inc., et al.

EXHIBIT A

1              IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE DISTRICT OF DELAWARE

3

4   In Re:                        )
                                  )
5   PIC 'N PAY STORES, INC.,      ) Case No. 96-182 (PJW)
                                  )
6                                 )
            Debtor.               )
7

8

9                          —

10                   United States Bankruptcy Court
                     824 Market Street - Sixth Floor
11                   Wilmington, Delaware

12

13                   Friday, March 8, 1996
                     1:30 p.m.

14

15

16

17   BEFORE: HONORABLE PETER J. WALSH,
             United States Bankruptcy Judge

18

19

20

21

22

23                   WILCOX & FETZER
24         1330 King Street - Wilmington Delaware  19801
                     (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

1          THE COURT:  Please be seated.  This is

2    the matter of Pic 'N Pay Stores.  I apologize for

3    the continuance from yesterday, but I had

4    administrative problems that made it impossible for

5    me to try to put something on paper that I could

6    hopefully present in a more organized fashion, and I

7    have been able to do that.

8          And in making the ruling, from time to

9    time I may ad lib in addition to what I have been

10   able to put on paper.  Unfortunately given the

11   additional day, I did what lawyers do and made it

12   longer than it should be.

13         The matter before me is the motion

14   filed by NationsBank, N.A. pursuant to 28 USC,

15   Section 1412 to transfer venue of this case to the

16   Western District of North Carolina located in

17   Charlotte, North Carolina.  The motion was, of

18   course, heard on March 6, 1996.

19         Having considered the evidence

20   presented by the affidavits and live testimony and

21   other matters of record in this case, and having

22   heard extensive argument by parties in favor and

23   those opposed, I find that while this is a close

24   question, as I view Section 1412 and the relevant

1   cases, the relevant factors favor the Debtor and I

2   will therefore deny the motion.

3              I will briefly discuss a number of,

4   but not all of, the factors I have considered in

5   coming to this conclusion.

6              Pic 'N Pay Stores, Inc. is a Delaware

7   corporation and there is no disputing the fact that

8   pursuant to 28 USC, Section 14081, it is entitled to

9   file a Chapter 11 case in this district.

10             The question is whether a transfer of

11  venue to the Western District of North Carolina

12  would, pursuant to Section 1412, be in the interest of

13  justice or for the convenience of the parties.  The

14  focus of the debate here is the convenience of the

15  parties.

16             A transfer of venue motion pursuant to

17  Section 1412 lies within the sound discretion of the

18  Court and the party moving for change of venue bears

19  the burden of proof which must be carried by a

20  preponderance of the evidence.

21             The case law has established a number

22  of factors which the Court should consider.  And the

23  parties are agreed that those factors are as

24  follows:  One, the proximity of creditors of every

4

1    kind to the Court.

2                Two, the proximity of the Debtor to

3    the Court.

4                Three, the proximity of witnesses

5    necessary to the administration of the estate.

6                Four, the location of the Debtor's

7    principal assets.

8                And five, the economic administration

9    of the estate.

10               The parties are in disagreement

11   regarding the application of the facts to these

12   factors.  In applying these factors, it's

13   appropriate to first point out what this case does

14   not involve.

15               Unlike the number of reported

16   decisions in this district and elsewhere and

17   unreported decisions in this district which resulted

18   in a transfer of venue, this case does not involve a

19   debtor whose principal asset is commercial real

20   estate located in a district other than this one.

21               Furthermore, this case does not

22   involve disputes between the Debtor and secured

23   creditors, or between competing secured creditors

24   having substantial claims.

1          There are no significant creditors

2     with secured claims and consequently it is

3     anticipated that there will not be significant

4     disputes involving state law issues regarding

5     priorities, collateral value, and the like.

6          NationsBank is by far the largest

7     creditor in this case.  Indeed its $41 million claim

8     dwarfs the other claims in this case.  NationsBank,

9     of course, is headquartered in Charlotte, North

10    Carolina and it is entirely understandable that it

11    would prefer to have this case proceed in the

12    bankruptcy court in Charlotte.

13         There is no doubt that the Debtor's

14    contacts within North Carolina in terms of assets

15    and creditors are much more significant than those

16    types of contacts within the State of Delaware.

17         The Debtor's administrative offices

18    and its distribution center are located in a large

19    facility in Charlotte.

20         Furthermore, out of a total of

21    approximately 800 stores, 109 of them are located in

22    North Carolina.

23         The Debtor has only four stores in

24    Delaware.  However, the Debtor has many more

6

1    contacts outside of North Carolina than in North

2    Carolina.

3               The Debtor has close to 800 stores and

4    most of those stores are not located in North

5    Carolina.  For example, it has more stores in

6    Georgia than in North Carolina, and almost as many

7    stores in Florida as in North Carolina.

8               Its stores are located for the most

9    part in the southeast region of the country,

10   including 27 stores in Texas.

11              Furthermore, the Debtor has many

12   contacts with closer proximity to Delaware than to

13   North Carolina.

14              In its opposition to the motion, the

15   Debtor sets forth a number of facts which it asserts

16   supports its position when applying the five factors

17   recited above.  While some of those facts may be

18   subject to limited dispute, for the most part I find

19   them to support the conclusion that this forum is

20   either more convenient or equally convenient versus

21   Charlotte for the administration of this case.

22              In brief, these factors include the

23   following:  One, according to the Debtor's

24   twenty largest



1  creditors list, some of which listings may be in

2  dispute, fifty percent of the unsecured creditors

3  with claims in excess of $11 million are located in

4  the northeast part of this country, particularly in

5  Maryland, Massachusetts, New Jersey, New York, and

6  Pennsylvania.

7           Two, 880 venders and landlords are

8  scattered throughout thirty-six states in the United

9  States and three foreign countries.

10           Three, sixty percent of the inventory

11  is imported from foreign venders.

12           Four, the heaviest concentration of

13  domestic venders is New York with twenty-nine

14  venders, and New Jersey with seventeen venders.

15           Five, fifty-two percent of domestic

16  venders are located in the northeast while only ten

17  percent of them are located in North Carolina.

18           Six, eighty-six percent of the

19  landlords are located in states other than North

20  Carolina, although it must be pointed out that most

21  of the landlords are, in fact, located in states

22  contiguous to North Carolina.

23           Seven, the Debtor has approximately

24  800 retail stores located in nineteen states.

1          Parenthetically I would add that

2  prepetition, at least according to my information,

3  the Debtor closed a large number of stores in Texas

4  and it is my understanding that it is likely to

5  close more stores in Texas.  And in terms of

6  landlord/debtor disputes, at least at this early

7  stage it would appear that much of the action will

8  arise out of Texas leases.

9          I will return and comment later

10 on this point of landlord/debtor disputes because as

11 I observed at the hearing, I didn't view this as a

12 terribly important issue in terms of venue change.

13         Based on this itemization which is

14 obviously a summary, and on some of these points I

15 will discuss them in more detail, it seems clear to

16 me that most of the Debtor's assets and most of its

17 creditor contacts are well outside the state of

18 North Carolina.

19         The Debtor's two senior executives,

20 Messrs. William Taggart and Sanford Nacht both

21 reside in and have their offices in New Jersey.

22         Mr. Nacht is senior vice-president in

23 charge of reorganization.  Mr. Nacht recently came

24 on board with the Debtor and he is the principal

1  officer in charge of the Debtor's reorganization

2  affairs including, but not limited to, DIP financing,

3  downsizing, lease rejections, and going out of

4  business programs.  He has and will have a pivotal

5  role in this reorganization proceeding, and is

6  expected to be the Debtor's primary witness in court

7  proceedings relating to these matters.

8            While Mr. Nacht is presently spending

9  three to four days a week in Charlotte, that is

10  intended to be a temporary arrangement lasting six

11  to seven weeks.  And once the process is in place, as

12  he testified, he does not expect to spend much time

13  there.

14            He lives in Princeton, New Jersey and

15  will be operating out of his office in Edison, New

16  Jersey.

17            Of course the day-to-day operating

18  officer of the Debtor does operate out of Charlotte,

19  but according to Mr. Nacht he is relocatable.

20            One hundred percent of the stock of

21  the Debtor is owned by Sussex Holdings, Inc., a

22  Delaware corporation which is owned and controlled

23  by Mr. Taggart.  Sussex acquired its sharehold

24  interest in early February, 1996, just prior to the

1   filing of the petition.  Prior to that time the

2   Debtor was owned by a Canadian corporation and prior

3   to the early February transaction, NationsBank was

4   involved in discussions and negotiations with the

5   Canadian parent with a view to a reorganization,

6   including a Chapter 11 filing in Charlotte.

7                Before these negotiations could be

8   completed and a plan put in place, the Canadian

9   parent sold its interest to Sussex and then Sussex

10  caused the Debtor to file its Chapter 11 petition in

11  this Court.

12                It appears that this turn of events

13  came as a surprise and a disappointment to

14  NationsBank and under the circumstances its fervor

15  in pressing for a transfer of this case to Charlotte

16  is entirely understandable.

17                I find the situation with respect to

18  the Debtor's administrative offices and distribution

19  center in Charlotte to be of considerable

20  significance here.  Note I say the "situation" with

21  respect to that.

22                According to Mr. Nacht's testimony,

23  the Debtor's facility in Charlotte is a 50,000

24  square foot administrative office with a 200,000

1  square foot distribution center located on forty

2  acres.

3          This facility has much more capacity

4  than is needed by the Debtor, and indeed the

5  facility was put up for sale some time before Sussex

6  acquired the Debtor.  The proposed sale will be

7  either a straight sale or a sale lease back

8  arrangement.

9          According to Mr. Nacht, a sale lease

10  back arrangement is problematic because the facility

11  is much too big for the Debtor, and a sale lease

12  back arrangement would need to involve one or more

13  other parties to share the space, and presumably

14  would require some reconfiguration of the facility.

15          This raises the distinct possibility,

16  if not probability, that the Debtor's administrative

17  offices and/or distribution center will be

18  relocated.  Mr. Nacht indicated that a possible new

19  location would be Charleston, South Carolina.  The

20  reason for that being that with most of its

21  inventory coming from foreign countries, it would

22  make more sense to have the distribution center

23  located at the point where the goods are imported.

24          Thus, I find the present fact of the

1    existence of the administrative office and the

2    distribution center in Charlotte to be of limited

3    significance in terms of this Chapter 11 case that is

4    likely to be pending for a significant period of

5    time.

6         I suggest a significant period of time

7    because it is quite clear that if this Debtor is to

8    successfully reorganize, it will have to undertake

9    major restructuring which in today's distressed

10   retail environment will likely require considerable

11   time and effort.

12         Furthermore, given the fact that

13   Mr. Taggart is the chairman of the board of the

14   Debtor and has given Mr. Nacht complete

15   reorganization responsibilities, it cannot be

16   concluded with certainty that the North Carolina

17   facility is the "principal" office of the Debtor.

18         In terms of decision making, at least

19   as it relates to dealing with creditors and this

20   reorganization case, the focus is in New Jersey, not

21   North Carolina.

22         As I previously noted, given the size

23   of NationsBank's claim, it is a major player in this

24   case and its convenience has to be considered.

1  However, it is a matter of public record and indeed

2  the testimony of NationsBank's witness,

3  Mr. King, shows that NationsBank is not a local

4  bank, not even a regional bank, but a nationwide

5  bank.

6            According to Mr. King who is in the

7  corporate workout department of the bank, the bank

8  has $180 billion of assets.  Its lending activities

9  to large and small corporations is nationwide and

10 like any large lending institution, I assume it

11 finds itself in bankruptcy courts throughout the

12 country.

13            In this regard it is important to note

14 that NationsBank is not a secured lender and it does

15 not have an ongoing lending relationship with the

16 Debtor.

17            Consequently, to the extent that the

18 loan is administered in the bank's Charlotte office,

19 there is little left to administer.  At this point

20 the loan is in the corporate workout department of

21 the bank and I assume that that department is

22 nationwide in its activities.

23            This Chapter 11 case was commenced on

24 February 15, 1996.  The transfer of venue motion was

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1    filed on February 22.  The Creditors' Committee was

2    formed on March 1, and shortly thereafter it held

3    its first meeting, retained counsel, and then took

4    under consideration, among other things, the transfer

5    motion.

6         Shortly prior to the March 6th

7    hearing, I was advised that the committee voted to

8    support the motion.  At the outset of the hearing on

9    March 6th, I observed that I found this fact to be

10   of considerable significance in favor of a

11   transfer.

12        However, during the course of the

13   hearing, it was revealed that the Committee's vote

14   in favor of the motion was sharply divided and

15   subject to debate as to its implication.

16        There are seven committee members.  At

17   a meeting at which all seven members were in

18   attendance, three voted for, two voted against, and

19   two abstained.

20        According to the bylaws which counsel

21   for the committee proposes that the committee adopt,

22   a quorum will consist of five members.  And with

23   respect to this particular vote, the two abstentions

24   would be viewed as not in attendance, so that

1  according to committee counsel's interpretation, a

2  quorum of five voted and three out of the five voted

3  in favor of supporting the motion and therefore the

4  motion carried.

5          Assuming that bylaw is applicable and

6  the method of counting votes is appropriate, as I

7  view the matter, four of the seven members found

8  that they could not support the motion. This hardly

9  constitutes an enthusiastic support of the motion by

10 the committee.

11          What I find equally perplexing is why

12 the committee members, given their locations, would

13 support the motion. According to the US Trustee's

14 March 4, 1996 notification of appointment, of the

15 seven members, only one is located in Charlotte,

16 North Carolina, namely NationsBank whose

17 representative is the chairman of the committee.

18          According to the US Trustee's report,

19 the other six members are located in San Francisco,

20 California, Newton, Massachusetts, St. Louis,

21 Missouri, New York City, Bedford New Hampshire, and

22 Hong Kong.

23          Although I cannot tell these six

24 members what is more convenient to their location,

1   Delaware or North Carolina, my understanding of

2   geography and airline travel would not lead me to

3   conclude that, with the possible exception of the St.

4   Louis member, for these six members a venue in

5   Charlotte, North Carolina is more convenient than a

6   venue in Delaware.

7            NationsBank makes much of the fact

8   that the Debtor has 250 employees in Charlotte

9   representing more employees than located in any

10  other state.  As I observed at the hearing, I do not

11  attach much significance to this fact simply because

12  my experience suggest that rank and file employees

13  do not participate in a bankruptcy proceeding.

14           Certainly in terms of court

15  appearances and being involved in negotiating

16  reorganization matters including the plan, while

17  their stake in the Debtor's affairs is certainly

18  important, I do not see the rank and file employees

19  as having a role in the administration of this

20  case.  Certainly none of those employees or their

21  representatives are on the committee.

22           Wachovia Bank, N.A., not a member of

23  the committee, has spoken in support of the motion.

24  It is my understanding that Wachovia is also located

1    in Charlotte. Wachovia is a credit card processor

2    which does the credit card processing for the

3    Debtor. It is my understanding that approximately

4    twenty percent of the Debtor's sales are processed

5    through credit cards through Wachovia. Obviously

6    this is an important aspect of the Debtor's

7    business.

8         However, Wachovia is not a significant

9    creditor of the Debtor and the credit card

10   processing work which it does for the Debtor is a

11   very mechanical process, not really involving a

12   conventional lender/debtor banking relationship.

13        Indeed it is my understanding that if

14   Wachovia wished to terminates its relationship with

15   the Debtor, it could elect to do so, and likewise

16   the Debtor could elect to terminate the

17   arrangement.

18        On a non-emergency basis, a substitute

19   credit card processor could easily be obtained by

20   the Debtor.

21        Furthermore, pursuant to a recently

22   concluded stipulation and order, Wachovia's

23   prepetition claim has been paid and I therefore

24   conclude it does not have a significant role in this

1   case and I would see no reason for it to participate

2   in these proceedings.

3           In support of the Debtor's position,

4   Congress Financial has filed a written submission

5   and argued in favor of the Debtor's case at the

6   hearing.   Congress is the DIP lender having both a

7   security interest and an administrative priority

8   claim.

9           One of the first-day orders was to

10   approve an interim loan by Congress to the Debtor

11   pursuant to a credit facility which permits the

12   Debtor to borrow up to $25 million.

13           This credit facility is essential to

14   the Debtor's ongoing operations.  As a result of two

15   additional interim orders, the Debtor has now drawn

16   down 16-and-a-half million dollars on the credit

17   line from Congress.

18           The interim orders were entered with

19   the consent of NationsBank.  Indeed NationsBank is a

20   significant beneficiary of this credit facility

21   because approximately $6 million of the line of

22   credit is being used to collateralize letters of

23   credit issued by NationsBank pursuant to its

24   prepetition agreement with the Debtor.

1       While Congress also lends on a
2   national basis, the facts show that this particular
3   loan is being handled through its New York office
4   and in that regard it is represented by New York
5   counsel.

6       That New York counsel has taken an
7   active role in this case in negotiating the terms of
8   the credit facility and the terms of the interim
9   orders, and has appeared at several hearings thus
10  far conducted in this case.

11      As the DIP lender playing a critical
12  role in this case, and presently having an exposure
13  of 16-and-a-half million dollars and a potential
14  exposure of $25 million, I find that Congress is
15  indeed a major player in this case and I find that
16  it is a "party", as that term is used in Section
17  1412, and it is undisputably clear that its
18  convenience is better served by a Delaware venue.

19      The Debtor has filed an application
20  seeking to retain the firm of DeLoitte & Touche as
21  accountants and business consultants.  The retention
22  application indicates that the DeLoitte & Touche has
23  extensive experience in the retail industry in their
24  business consulting department.

1          While it appears that DeLoitte &

2   Touche maintains an office in Charlotte, there is no

3   evidence that any of its retail business consultants

4   are located there.

5          In any event, the retention

6   application makes it clear that the consulting work

7   will be headed up by a principal of the firm who

8   operates out of DeLoitte & Touche's New York City

9   office.

10         The committee has not yet retained an

11  investment banker and/or an accountant or business

12  consultant.

13

14  While the balance sheet filed with

15  the Debtor's schedules, suggests that there

16  is substantial equity, NationsBank argues that

17  given the very substantial downsizing being

18  undertaken by the Debtor, it is unlikely that that

19  equity will survive.  The

20  suggestion being that the magnitude

21  of the downsizing is and will be such that the

22  equity will be wiped out.

23         Consequently, NationsBank suggest that

24  Sussex will have no continuing economic interest in

1    this case and its involvement therefore should have

2    no weight in the venue decision.

3              I believe it is premature to reach

4    that conclusion.  The record shows that Mr. Taggart

5    is an active player in turning around distressed

6    companies either in bankruptcy or outside of

7    bankruptcy.

8              At the first day hearing in this case

9    in connection with the retention application of the

10   Crummy Del Deo firm, Mr. DeFillipo stated on the

11   record that his firm represented Mr. Taggart in two

12   other bankruptcy cases, not in this district, in

13   which Mr. Taggart through single purpose

14   corporations acquired the stock of a financially

15   distressed debtor and put the debtor through a

16   Chapter 11 reorganization process and emerged with

17   confirmed plans.  In other words, a pattern the same

18   as that being pursued here.

19             While this does not demonstrate that

20   Mr. Taggart will have the same success here, it does

21   demonstrate that Sussex has a real economic interest

22   here as a party.  Apparently Mr. Taggart has

23   substantial resources so that if an equity infusion

24   is called for, he will be in a position to make it.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1          In any event, it would make absolutely
2    no sense for Mr. Taggart to acquire the equity
3    interest and embark on a major restructuring through
4    a Chapter 11 reorganization if he did not have a
5    continuing economic interest in the Debtor.
6          Whether that economic interest
7    eventually converts into equity value remains to be
8    seen, but it would be inappropriate to speculate at
9    this early stage that Sussex's interest should not
10   be considered in a venue decision.
11          The fact of the matter is that Sussex
12   at this point controls the Debtor and unless someone
13   comes forward with a sound basis for appointing a
14   trustee, Sussex's interest must be considered in the
15   venue equation.
16          With respect to the proximity of the
17   Court to potential witnesses, NationsBank argues
18   that (a) the lessor whose leases will be rejected and
19   who will have substantial claims are closer to North
20   Carolina than Delaware; and (b), a valuation of the
21   Debtor's Charlotte facility will necessitate the
22   retention of a real estate appraisal expert in that
23   locale and his or her testimony will be required in
24   this case.   I am not persuaded by these points.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1          First with respect to lease

2   rejections, in the last year we have seen this occur

3   on a massive scale in the retail industry.  In my

4   experience, given the cap put on lease rejection

5   claims by Section 502(b) of the Code, an evidentiary

6   hearing to determine damages is unusual.

7          Consequently, I don't anticipate

8   seeing many lessors appear in this case for an

9   evidentiary hearing even in light of the rather

10  substantial large number of leases which are in the

11  process of being rejected.

12          With respect to the valuation of the

13  Debtor's administrative office and distribution

14  facility in Charlotte, I do not understand that any

15  such valuation would be called for.  It is my

16  understanding that no creditor has a security

17  interest in that property.  Thus, there is no need to

18  make a Section 506(a) determination.

19          The property is for sale.  It is my

20  understanding that it has been in the hands of a

21  real estate broker for some time and the marketplace

22  will determine the disposition of that property.

23          Furthermore, it seems clear that if

24  any valuation is to be done in this case, it is

1  likely to be a going concern value which is not

2  likely to bring into play a "local" appraiser.

3          The Debtors argue that a transfer of

4  this case would cause serious disruption to the

5  reorganization effort and possibly jeopardize a

6  successful reorganization.

7          As a general proposition I do not

8  attach much weight to this factor because every

9  transfer involves disruption.  If that factor were

10 to be given the kind of weight the Debtor argues

11 for, it would create a very practical roadblock to a

12 party's entitlement to relief under Section 1412.

13          However, there is no denying the fact

14 that some disruption would occur simply because of

15 the logistics and the bureaucratic paperwork in

16 effecting a transfer to another court.

17          The Debtor is entering into a critical

18 selling period, the Easter season, and it is

19 certainly important that disruptions be held to a

20 minimum.

21          Furthermore, the Debtor has filed a

22 motion seeking authority to conduct going out of

23 business sales at approximately 140 additional

24 stores which will be closed and leases rejected.

1           Given the administrative expense claims

2    resulting from post petition rent obligations, it is

3    important that lease rejection matters be pursued on

4    an expedited basis.  Any paperwork delay could be

5    detrimental to the Debtor.

6           In summary, while I do not attach much

7    significance to the disruption argument, I cannot

8    entirely ignore with respect to this Debtor in a

9    sick retail environment the problems that it is

10   going through, and the need for expeditious

11   resolutions.

12           While not presented as a principal

13   issue, NationsBank in its moving papers and in its

14   oral argument briefly alluded to its concern that the

15   Debtor may have filed this case here rather than in

16   Charlotte because it perceived this Court as having

17   a more favorable disposition to debtors.

18           Based on the facts of record, I view

19   this issue as a red herring.  At the conclusion of

20   the argument on the motion on March 6th,

21   Mr. DeFillipo of the Crummy Del Deo firm stated, and

22   I quote from the record, "I'm the person that

23   recommended this case be filed in Delaware, and the

24   reason that was because it's a proper venue and it's

1    the most convenient venue to the people I thought

2    were going to have the most to do with this case."

3              It is appropriate to put this

4    representation in context of what went on the record

5    in the first day of this case.  On the first day

6    hearing, counsel for the US Trustee's office

7    objected to the retention application of the Crummy-

8    Del Deo firm.

9              In the course of that discussion, the

10   US Trustee stated that because of that firm's prior

11   and apparently extensive relationship with

12   Mr. Taggart, it was objecting to its retention as

13   bankruptcy counsel for the Debtor.

14             In response to the US Trustee's

15   objection, Mr. DeFillipo stated on the record that

16   indeed his firm did have a relationship with

17   Mr. Taggart extending back some period of time.  He

18   specifically pointed out that his firm represented

19   Mr. Taggart on two prior occasions involving Chapter

20   11 cases similar to this one.  That is, he advised

21   that his firm represented Mr. Taggart in two prior

22   situations where Mr. Taggart formed a single purpose

23   corporation, acquired the stock of a distressed

24   company, and put that company into a Chapter 11

1  reorganization.

2              One of those companies was Herman's

3  Sporting Goods, and the other was NOV Stores.  The

4  Herman's Sporting Goods case was a bankruptcy case

5  in New Jersey.  I do not know where the NOV Stores

6  case was, but it was not in this district.

7              In both those cases the Crummy Del Deo

8  firm represented the Debtor, and as I understand it

9  both of those cases resulted in a confirmed plan of

10  reorganization.

11              Of course the Crummy Del Deo firm is

12  located in Newark, New Jersey and a Delaware forum

13  is obviously more convenient than a Charlotte, North

14  Carolina forum.

15              Given the facts that we have here, if

16  I were the bankruptcy partner in the Crummy Del Deo

17  firm, I certainly would file here rather than in

18  Charlotte, North Carolina.

19              And let me add that in the oral

20  argument as well as in the moving papers,

21  NationsBank continued to observe that the case law

22  was that the location of Debtor's law firm is

23  irrelevant citing In Re Seton, S-e-t-o-n, Chase

24  Associates, Inc., 141 BR-2, that's the Bankruptcy

1   Court for the Eastern District of New York, 1992.  I

2   don't think that case stands for that proposition,

3   what that case said was on the facts before it, it

4   found that the location of the law firm was not a

5   significant factor to consider.  It didn't say it

6   was irrelevant, it just said it was not a

7   significant factor.

8           And it cited its own prior decision of

9   some years prior to that where it made a similar

10  finding and the issue was is the New York City's

11  location relevant to a case in the Eastern District

12  of New York versus a case in Newark, New Jersey.

13  And those locations are so close that I could easily

14  see where that issue would not have significance.

15          In any event, I think the law is not

16  that the location of the firm is irrelevant, but it

17  may or may not have significance.  And the

18  significance here is not the fact of its location,

19  but the fact that because of its location, that is

20  what initiated the filing here.

21          So for that reason, i.e., to explain

22  why the Debtor landed here rather than in Charlotte,

23  I do find it significant.

24          Let me adjust one footnote.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    NationsBank is obviously going to be a major player

2    in this case and it will no doubt be inconvenienced

3    by this ruling.  Somebody has to be inconvenienced

4    by the ruling.  I have previously noted that as a

5    major nationwide lending institution appearing in

6    bankruptcy courts outside of North Carolina should

7    not be an unusual experience for NationsBank.

8              With no offense intended to the fine

9    people who live in Altoona, Pennsylvania, for

10   example, Wilmington, Delaware is not Altoona

11   Pennsylvania.  The travel time and arrangements

12   between Charlotte, North Carolina and Wilmington,

13   Delaware are quite accommodating.

14             Although it was not made a matter of

15   record, I am informed by reliable sources that the

16   flight time from Charlotte to Philadelphia direct is

17   one-and-a-half hours and that USAir has six direct

18.  flights daily from Charlotte to Philadelphia and

19   nine direct flights daily from Philadelphia to

20   Charlotte.  The Philadelphia airport is a half hour

21   from this Court.

22             Under the circumstances, I do not view

23   NationsBank's inconvenience as being burdensome.

24             I apologize for my verbosity.

1            I have one other observation that I

2 prefer to make off the record and for that reason I

3 would appreciate it if counsel could join me in

4 chambers for just five minutes.

5            (Discussion off the record.)

6            (Court adjourned at 2:45 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
1
2   State of Delaware )
                      )
3   New Castle County )
4
5
6
7               CERTIFICATE OF REPORTER
8
9           I, Dale C. Hawkins, Registered
10  Professional Reporter and Notary Public, do hereby
11  certify that the foregoing record is a true and
12  accurate transcript of my stenographic notes taken
13  on March 8, 1996, in the above-captioned matter.
14
15          IN WITNESS WHEREOF, I have hereunto
16  set my hand and seal this 17th day of March, 1996,
17  at Wilmington.
18
19
20
21                      Dale C. Hawkins, RPR
22
23
24
```



# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

RECEIVED DEC 0 9 1993

IN THE MATTER OF )
)
AMERICAN FILM TECHNOLOGIES, ) Case No.
) 93-1207
Debtor. )

Courtroom No. 3
J. Caleb Boggs Building
844 King Street
Wilmington, Delaware

November 23, 1993
9:30 a.m.

- - - -

TRANSCRIPT OF HEARING

- - - -

BEFORE:   HONORABLE PETER J. WALSH, JUDGE.

- - - -

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477

Wilcox & Fetzer
Registered Professional Reporters

COPY

1    elegant, but you'll get it this afternoon.  I've got

2    hearings at 2:00 o'clock.  If convenient to counsel,

3    I'd like to reconvene at 1:30.  And it may just take me

4    15 or 20 minutes to read something onto the record.  Is

5    that okay?

6            MR. PATTON:  That's fine, Your Honor.

7            THE COURT:  So we'll see you back here at

8    1:30.

9            (Proceedings adjourned 11:05 a.m. and

10   reconvened at 1:30 p.m.)

11            -  -  -  -

12            THE COURT:  I have had an opportunity to

13   consider this matter, and I'm going to try to plow

14   through some notess and jottings that I have made and

15   hopefully put this matter on the record in a reasonably

16   organized fashion.

17            Before the Court is the motion by Comerica

18   Bank - California.  -- I'll refer to them as the

19   bank. --  to move the venue of this case from Delaware

20   to the Central District of California.  The petition

21   was filed on October 15 and the motion was timely filed

22   on November 2.

23            As counsel is aware, the burden of proving

24   that a transfer of venue is appropriate under Section

*Wilcox & Fetzer*
Registered Professional Reporters

1    1412 of Title 28 is on the party making the motion and

2    that movant has the burden of proving by a

3    preponderance of the evidence a mere shift of

4    inconvenience from one party to another will not

5    suffice to cause a transfer under Section 1412.

6          These matters are very fact intensive.  And

7    reported decisions only give a rough guide to where we

8    should be going.  For the reasons which I will now set

9    forth in some detail I find that the bank has not met

10   its burden and therefore that the motion should be

11   denied.

12         Most of the cases recite four factors, and

13   these factors have been addressed in the pleadings of

14   both parties.  Number one is the proximity of the court

15   to the interested parties.  Two, the proximity of the

16   court to the debtor's assets.  Three, the economics of

17   administering the estate.  And, fourth, the relative

18   economic harm to the debtor and the other interested

19   parties.  I'll take these up in that order.

20         With respect to the proximity of the court

21   to the interested parties, we're aware that the debtor

22   provided a North Hollywood, California, mailing address

23   in its petition.  And the movant demonstrated by SEC

24   filings that that address was also used recently for

1  those filings.  On the other hand, and the movant

2  alleges that the debtor's chief executive offices and

3  financial records are located there.  The debtor

4  asserts that this office is no longer its principal

5  place of business or at least no longer the place where

6  its chief executive officer resides.  And I think

7  that's pretty clearly demonstrated on the record.

8  The pleadings indicated that the debtor was going to

9  close that office.  And a post-confirmation primary

10  place of business is somewhat up in the air.

11          The debtor also has asserted -- and I think

12  fairly demonstrated -- that its marketing efforts are

13  now directed from a location other than California  and

14  that it intends to conduct its post-petition sales and

15  marketing efforts in a location other than the

16  California one.  The debtor's operations are primarily

17  conducted at its production facilities in San Diego and

18  Tijuana, Mexico.

19          Admittedly, most of its employees are in the

20  San Diego facility, but the testimony is clear, I

21  believe, that those people are mostly technical and

22  administrative staff, not management personnel.

23  The debtors also engaged or did recently engage in

24  activity in London, England and, of course, maintains

1   an office in Wayne, Pennsylvania.

2          The CEO of the company and Mr. Wetzler lives

3   and maintains an office in New York City.  Mr. Hartel,

4   the president, lives in Wayne, Pennsylvania and

5   conducts his business from Wayne, Pennsylvania.  I note

6   that Mr. Hartel has attended all of the court hearings

7   to date.

8          The debtor has employed bankruptcy counsel

9   in Philadelphia and locally and also has employed the

10  firm of Wolfe Block Schorr & Solis-Cohen for corporate

11  matters.  As the record shows, Wolfe Block is located

12  in Philadelphia.  Mr. Hartel testified that he has been

13  the president since November of '92 and that he's been

14  employed by the debtor since 1988.  He is currently

15  assisting the CEO.  Mr. Wetzler, of course, is in New

16  York.  Mr. Hartel is in Wayne, Pennsylvania.  And

17  obviously that produces a situs on the east coast, not

18  in California.

19         We have testimony to the effect that

20  starting in September immediately before the petition

21  Mr. Wetzler made an equity commitment investment with

22  the company and has been since that time working with

23  Mr. Hartel.  My recollection of the testimony is that

24  only one member of the board of directors is located in

1   California and that the board of directors meetings

2   have been held by conference call and sometimes in

3   Pennsylvania.  The record also shows that the

4   shareholder meetings were held in Pennsylvania.  In

5   addition to Mr. Hartel being in Wayne, Pennsylvania,

6   Mr. Wetzler in New York, the testimony is also to the

7   effect that Mr. Glaser, the marketing officer, is also

8   in New York.  We have one officer in San Diego,

9   Mr. Weisel, but I note that he is a plant manager.  And

10  the testimony is to the effect that he would not be

11  significantly involved in the reorganization efforts.

12          I previously noted that Wolfe Block has been

13  retained as special counsel, and it is my understanding

14  and the testimony, I believe, that Ernst & Young is

15  going to be retained as accountants for the debtor.

16  And I note that pre-petition both of those

17  professionals were retained by the debtor or did work

18  for the debtor.

19          I note that Mr. Hartel's testimony is that

20  he is the person primarily responsible for this case

21  and he is running the company.  And in light of his

22  location here in Wayne, Pennsylvania, I think it may be

23  fairly concluded that the proximity of the parties at

24  least in terms of the proximity of those

1   representatives of the parties who are in responsible

2   charge suggest a proximity to Delaware rather than to

3   California.

4          Let me now address the second test or the

5   second consideration.  That is the proximity of the

6   debtor's assets relative to California versus

7   Delaware.  Mr. Hartel testified -- and his testimony is

8   uncontroverted. -- that in fact starting in 1985 the

9   company, its principal office was in Pennsylvania --

10  that is, its executive office was in Pennsylvania --

11  and remained there until April of '92.  It moved to

12  North Hollywood at that point and then moved back to

13  Pennsylvania in November of '92.  Its location in North

14  Hollywood was principally a result of the president

15  being Mr. Taritero.  The executive office, of course,

16  now is, I think essentially where Mr. Hartel is.

17         Regarding the assets of the debtor,

18  Mr. Hartel testified that the company is basically in

19  mothballs.  And I think it may be fairly concluded that

20  the location of its assets is in a state of transition,

21  and, therefore, it's really very difficult to conclude

22  that there is a significant proximity to California.

23         Mr. Hartel indicated that the company is

24  attempting to sell its film library, has negotiated

70

1    with a potential buyer in Toronto.  That library is a

2    box full of articles, the location of which, even

3    though it is in San Diego, is of little import in terms

4    of looking at the proximity of the debtor's assets to a

5    particular venue.

6             Mr. Hartel indicated that the other assets,

7    software, patents and technology, for the most part

8    have no fixed situs and will really travel with

9    wherever the executive office may be.

10             In addition to those assets, there are

11   tangible assets.  But the testimony in that regard

12   likewise suggests no significant proximity to

13   California, albeit there is about $700,000 of hard

14   assets in California.  Equally, there is another

15   $700,000 in Mexico and another $300,000 in London.  All

16   of this based upon the unrefuted testimony of

17   Mr. Hartel.

18             Equally important in this regard is the fact

19   that the company's operating funds are coming from

20   investment infusions by Mr. Wetzler, and, of course, he

21   is located in New York.  With respect to bank accounts,

22   apparently we have one account in New York and the

23   other account on the other side of the country in

24   San Diego.

1    It seems pretty clear that with respect to

2    the proximity of the debtor's assets to a court we can

3    certainly conclude that it cannot be said that there is

4    more of a proximity of the debtor's assets in

5    California than there is in Delaware.

6    Thirdly, with respect to the economics of

7    the administration of the estate -- and I think the

8    case law suggests that this is really the most

9    important factor to be considered and it complicates

10    aspects of the other two factors.  -- as already

11    indicated, the debtor asserts that it conducts its

12    business from New York and Wayne, Pennsylvania.  Its

13    officers and professionals are in New York City and

14    Philadelphia.  And it's more likely, it seems to me,

15    that these individuals will be attending court hearings

16    than it is that unsecured creditors, even if scattered

17    throughout the country will be doing so.

18    I also note that that at this point there is

19    no unsecured creditors committee so it's difficult to

20    assess what impact that would have on the consideration

21    before the Court.  And it seems to me that it's not

22    worth speculating where the convenience of the

23    committee would be when in fact we don't have one yet

24    and may not have one in this case.

72

1    Mr. Hartel testified that one of the reasons

2  the case was brought here in addition to the

3  incorporation of the debtor in Delaware is that he and

4  Mr. Wetzler are convenienced by being here.  He's

5  running the business.  Wetzler is financing it.  And

6  since the property has little or no significant situs,

7  it seems to me that it's appropriate to say the

8  debtor's assets are here and it's appropriate to say

9  that the administration of the case is convenienced by

10  being here.

11    Mr. Hartel indicated that he was of the view

12  that moving the case would be chaotic.  He talked about

13  the cost of air transportation.  Obviously, there was

14  some debate about whether that cost could be minimized

15  by advanced planning.  But in any event, he is the

16  manager of the business.  I believe he is going to see

17  this thing through if it is to be seen through as a

18  successful Chapter 11 case.  And his choice is

19  Delaware, not California.

20    In this connection, the administration of

21  the estate, I am very concerned about a possible

22  serious disruption which could be caused to the case if

23  it were transferred to California.  It would require

24  the debtor to deal with new and different

73

1   professionals, and there would certainly be a

2   duplication of cost in retaining new and different

3   professionals.  And I acknowledge that one

4   professional, of course, has a situs for its office

5   both in New York and California.  But it does seem to

6   me that there would be significant cost and

7   inconvenience to Mr. Hartel in addition to the

8   professionals to Mr. Hartel in operating the business

9   long distance.

10          I should note also that it seems to me that

11  there could be logistical and court docketing problems

12  in transferring a case.  Having had some experience

13  with cases being transferred from one busy bankruptcy

14  court to another, it's not unusual to just lose track

15  of the paperwork for 30 or 60 days.  And I think that

16  kind of disruption given the context of this debtor's

17  operations, i.e., being disrupted by sources outside

18  the revenue stream, I think that kind of disruption

19  would be unfortunate.  Indeed it seems to me that with

20  a serious disruption in the administration of the case

21  Mr. Wetzler's inclination to fund the operations

22  pending the turn around might be jeopardized.

23          Under the circumstances, I find that,

24  looking at the third factor, that the conclusion is

74

1  reached that the administration of the estate favors

2  retaining the case here.

3          Finally, we look at the relative harm to the

4  debtor and the other interested parties.  And I

5  conclude that the potential harm to the debtor in

6  transferring it outweighs the harm to the movant in

7  having to litigate in Delaware.  The movant expects

8  that its officers and witnesses may be coming here to

9  litigate cash collateral or post-petition financing

10  matters or possibly avoidance actions.  There is in the

11  debtor's opposition papers some saber rattles about

12  avoidance actions, but we don't have any yet.  And I

13  think to speculate that there will be such actions and

14  therefore will require a significant commitment by the

15  movant in this venue it is inappropriate.  I think

16  that's speculation at this point, and it may well turn

17  out that the bank's claim is not going to be seriously

18  disputed, in which case the bank may not be a

19  significant player in this case.  And on the basis of

20  the record today, I don't think we can conclude that it

21  is going to be a significant player.  And, of course,

22  in any event, I'm not prepared to say that if the bank

23  is to be a significant player that its convenience is

24  to be preferred over that of the debtor given the

75

1    factors that I have discussed.

2         I note at this point that Mr. Taritero has

3    joined the bank in moving for a change of venue and

4    Mr. Taritero has suggested that he's the largest

5    creditor. Whether he will have an allowed claim

6    remains to be seen. And this ruling does not implicate

7    the venue question for the determination of

8    Mr. Taritero's claim. I want to emphasize that point.

9         Under the circumstances in balancing the

10   equity, because there is no concrete suggestion that

11   the bank is going to be a major player in the case and

12   even if it is, given the other factors I've cited, I

13   think the balancing of the equity favors the debtor in

14   keeping the venue here.

15        I should observe that the bank has made some

16   good points in its argument for changing venue. The

17   bank points out that there are 20 active employees, and

18   they're all in California. But I observe that these

19   are really, at least the testimony indicates, are

20   operating personnel. And I don't think they're going

21   to be significantly involved in the working of this

22   chapter case.

23        The bank also points out that there is a

24   history of a California base of operation, as reflected

76

1    in the SEC filings.  I observed during argument that

2    the question remained as to whether that was a matter

3    of history or whether it had any real significance at

4    this time.  It is my view that the current state of

5    affairs is more relevant, and the current state affairs

6    suggests to me there is not significant  California

7    activity at least in terms of a chapter proceeding.

8          The bank has pointed out that it is the

9    largest secured creditor, in fact maybe the only

10    secured creditor.  But I've already observed that that

11    fact alone is not enough.  We don't know at this stage

12    whether the bank is going to be a significant player.

13    And even if it is, I don't think the balance of the

14    case either in terms of creditors or assets is dwarfed

15    by the size of the bank's claim, which I think is

16    something in the neighborhood of 600 and some thousand

17    dollars.

18          So all of those factors considered, I

19    conclude that the convenience of the parties and the

20    interest of justice is served by denying the motion.

21    And I will enter a judgment order pursuant to

22    Bankruptcy Rule 9021, which essentially will be a

23    judgment order saying for the reasons stated on the

24    record the motion is denied.  Does counsel have

77

1  anything else?

2          MR. PATTON:  That's it, Your Honor.  Thank

3  you.

4          THE COURT:  I think we have a stipulation to

5  another matter?

6          MR. SHANNON:  There is the pending

7  stipulation between Mr. Taritero and ourselves.

8          THE COURT:  I have that and I have reviewed

9  it, and I will sign it and it will be docketed today.

10         MR. SHANNON:  Thank you, Your Honor

11         THE COURT:  Unless there is something else,

12  I think that does it for this case.

13         MR. PATTON:  That's all we have, Your

14  Honor.  Thank you.

15         (Hearing concluded at 1:55 p.m.)

16         -  -  -  -

17

18

19

20

21

22

23

24