# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |

## MOTION FOR AN ORDER UNDER 11 U.S.C. §§ 105(a), 363, 365, AND 1146(c) AND FED. R. BANKR. P. 6004 AND 6006 (A) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT WITH FOOD LION, LLC FOR THE SALE OF CERTAIN LEASEHOLD INTERESTS, EQUIPMENT AND INVENTORY RELATING TO THREE STORES, (B) AUTHORIZING SUCH SALE FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (C) DETERMINING THAT SUCH SALE IS EXEMPT FROM ANY STAMP, TRANSFER, RECORDING OR SIMILAR TAX, (D) AUTHORIZING DEBTORS TO ASSUME AND ASSIGN LEASES IN CONNECTION WITH THE SALE, (E) FIXING CURE AMOUNTS AND (F) GRANTING RELATED RELIEF

Winn-Dixie Stores, Inc. and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), move for an order pursuant to sections 105(a), 363, 365, and 1146(c) of Title 11 of the United States Code (as amended, the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure 6004 and 6006 (a) authorizing and approving the asset purchase agreement with Food Lion, LLC for the sale of certain leasehold interests, equipment and inventory relating to three

---

[1]    In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc.,

(Continued...)

stores, (b) authorizing such sale free and clear of liens, claims, interests and encumbrances, (c) determining that such sale is exempt from any stamp, transfer, recording or similar tax, (d) authorizing the Debtors to assume and assign three leases in connection with the sale, (e) fixing cure amounts and (f) granting related relief (the "Sale Motion"). In support of the Sale Motion, the Debtors respectfully represent as follows:

**BACKGROUND**

1.    On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "New York Court"). By order dated April 13, 2005, the New York Court transferred venue of these cases to this Court. The Debtors' cases are being jointly administered for procedural purposes only.

2.    The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No request has been made for the appointment of a trustee or examiner. On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases pursuant to Bankruptcy Code sections 1102 and 1103.

3.    The Debtors are grocery and drug retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie

---

(...continued)
    Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

Marketplace" banners.  According to published reports, the Debtors are the eighth-largest food retailer in the United States and one of the largest in the Southeast.  The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion.  The Debtors currently operate more than 900 stores in the United States with nearly 79,000 employees.  Substantially all of the Debtors' store locations are leased rather than owned.

4.      This Court has jurisdiction over this Sale Motion under 28 U.S.C. § 1334.  Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested by this Sale Motion are Bankruptcy Code sections 105(a), 363, 365 and 1146(c) and such relief is subject to Fed. R. Bankr. P. 6004 and 6006.

**RELIEF REQUESTED**

6.      By this Sale Motion, the Debtors request that the Court enter an order (a) authorizing and approving the asset purchase agreement with Food Lion, LLC for the sale of certain leasehold interests, equipment and inventory relating to three stores as set forth in such asset purchase agreement, (b) authorizing such sale free and clear of liens, claims, interests, and encumbrances, (c) determining that such sale is exempt from any stamp, transfer, recording or similar tax, (d) authorizing the Debtors to assume and assign leases in connection with the sale, (e) fixing cure amounts and (f) granting related relief.

**BASIS FOR RELIEF**

7.    Prior to the filing of these chapter 11 cases, the Debtors undertook a comprehensive analysis of their businesses to determine how best to maximize their value and compete in the marketplace and announced a series of actions designed to improve their competitive position (the "Strategic Plan"). The Strategic Plan includes an expense reduction plan designed to achieve a $100 million annual expense reduction and a market positioning review through which markets will be identified as either core, and positioned for future investment and growth, or non-core, and evaluated for sale or closure. Core markets are identified as markets where the Debtors maintain a first, second or third market share position, or where management believes there may be future strategic opportunities to become a market leader. Non-core markets represent areas where the opportunities are limited for the Debtors to gain market share and are unprofitable in the aggregate.

8.    As part of the Strategic Plan, the Debtors identified approximately 156 stores that they believed should be sold, or if they could not be sold, then closed (the "Asset Rationalization Plan"). Out of the 156 stores, the Debtors sought to sell 45 unprofitable stores across 36 core designated market areas ("DMAs"). The Debtors also targeted 111 stores for sale or closure in 16 non-core DMAs.

9.    The Debtors extensively marketed those 156 stores. Since June 2004 and prior to the filing of these chapter 11 cases, the Debtors sold approximately 69 stores. The Stores (defined below) that are the subject of this Sale Motion are the last stores to be sold as part of the initial Asset Rationalization Plan. The remainder of the

4

stores that were part of the initial Asset Rationalization Plan have already been, or are likely to be, closed.

10.    The Debtors' continued identification and sale of unnecessary and unprofitable stores in accordance with the Asset Rationalization Plan and other expense reduction plans is critical to the success of these chapter 11 cases and in the best interests of their estates and creditors. It will enable the Debtors to bring substantial money into the estates and/or reduce expenses while at the same time allow the Debtors to focus on growing their more profitable businesses.

11.    The stores that are the subject of this Sale Motion are three supermarket stores operated by the Debtors that, as noted above, were slated for sale and/or closure under the Asset Rationalization Plan. These stores are (a) Store #954 in Midlothian Virginia, (b) Store #956 in Highland Springs, Virginia and (3) Store #967 in Quinton, Virginia (collectively the "Stores"). The Stores are in a non-core DMA where the Debtors are fifth in market share.

12.    The Debtors lease the Stores. For Store #954, the Debtors are a tenant pursuant to a certain original deed of lease between The Village at Waterford, as landlord, and Winn-Dixie Raleigh, Inc., as tenant, dated August 6, 1990, and as modified by subsequent agreements and amendments. For Store #956 the Debtors are a tenant pursuant to a certain original deed of lease between Springer Associates, as landlord, and Winn-Dixie Raleigh, Inc., as tenant, dated April 28, 1983, and as modified by subsequent agreements and amendments. For Store #967 the Debtors are a tenant pursuant to a certain original deed of lease between The Peebles Company, as landlord, and Winn-

Dixie Raleigh, Inc., as tenant, dated April 15, 1994, and as modified by subsequent agreements and amendments (collectively, the Leases). A description of the Leases is located at Exhibit A-2 of the Purchase Agreement.

13.    The Debtors seek Court approval, pursuant to the terms and conditions of an asset purchase agreement (the "Purchase Agreement") with Food Lion, LLC (the "Purchaser") to sell their interests in the Leases (including their interests in the premises upon which the leases are located) (the "Property Interests"). The Debtors also seek to sell certain equipment (the "Equipment") and inventory (the "Inventory") relating to the Stores as defined and specified in the Purchase Agreement (collectively, the Property Interests, the Equipment and the Inventory are referred herein as the "Assets"). A copy of the Purchase Agreement is attached as Exhibit A to the Sale Motion. The Purchase Agreement is dated December 15, 2004, as amended by First Amendment to Asset Purchase Agreement dated February 15, 2005 and by the terms and conditions of a certain letter agreement entered into by the Debtors and the Purchaser on March 15, 2005 that, among other things, extends the outside date for the sale transaction with Purchaser to May 27, 2005. The Debtors request that the sale of the Assets to the Purchaser pursuant to the Purchase Agreement be free and clear of liens, claims, encumbrances and other interests (other than the Permitted Encumbrances and the Assumed Liabilities, as defined in the Purchase Agreement). The Debtors also request authority to assume and assign the Leases to the Purchaser and fix cure amounts on the Leases.

14.    The material terms of the transaction with the Purchaser, subject to this Court's approval, are detailed in the Purchase Agreement (the "Sale"), but include the following:[2]

(a)    <u>Purchase Price</u>.  On the terms and subject to the conditions set forth in the Purchase Agreement, the aggregate purchase price for the Property Interests and the Equipment is $1,000,000 (the "Base Purchase Price").  The Base Purchase Price will be delivered to an escrow account on the day the inventory is to be counted and then will be paid upon closing. The purchase price for the Inventory is the total inventory price (based on a percentage of the retail shelf price) for each item of inventory and is to be paid at closing after an inventory count.  The Purchaser has made a deposit of 10% of the Base Purchase Price that will be credited against the Base Purchase Price at closing.

(b)    <u>Assets</u>.  The assets to be sold and transferred to the Purchaser include:

(i)    the rights of the Debtors in the Leases and in any Improvements thereon, as defined in the Purchase Agreement;

(ii)    the Debtors' interest in all fixtures and all equipment located in buildings existing on the Debtors' leased premises (the "Buildings") and the Debtors' interest in the Buildings including but not limited to any Improvements, as defined in the Purchase Agreement, and any trade fixtures and equipment;

(iii)    the grocery and general inventory at Store #954 and Store #956 and the pharmacy inventory at Store #954;[3]

(iv)    the Pharmacy Scripts (as defined in the Purchase Agreement) and control of the Pharmacy Phone Line (as defined in the Purchase Agreement), if transferable.

---

[2]    This summary of the Purchase Agreement is provided as a convenience only.  To the extent that this summary differs in any way from the terms of the Purchase Agreement, the terms of the Purchase Agreement will control.

[3]    Store 967 is closed.  Only equipment remains in that store.

(c)     <u>Sale Free and Clear</u>. The Purchase Agreement provides that the Assets are to be transferred free and clear of any liens, claims and encumbrances other than the Permitted Encumbrances and Assumed Liabilities, as those terms are defined in the Purchase Agreement.

(d)     <u>Assumed Liabilities</u>.  The Assumed Liabilities include (i) all liabilities of the Debtors under the Leases arising after the closing and (ii) all liabilities of the Debtors relating to the Assets arising after the closing.

(e)     <u>Excluded Liabilities</u>.  The Assumed Liabilities do not include (i) any liability to pay any taxes; (ii) any liability for the Debtors to perform under the Purchase Agreement; (iii) any liability of the Debtors with respect to Environmental, Health and Safety Requirements, as defined in the Purchase Agreement, relating to the Stores to the extent that such liability is related to pre-closing facts or circumstances; (iv) any liability under any assigned Lease assumed by the Purchaser that arises out of or relates to any breach or facts and circumstances that occurred or were in existence prior to closing; (v) any liability of the Debtors arising out of any Proceeding, as defined in the Purchase Agreement; (vi) all liability relating to the indebtedness of the Debtors; (vii) any liability of the Debtors related to any employee benefits with respect to persons employed at the Stores prior to the closing; and (viii) any other liability of the Debtors that is not an Assumed Liability.

(f)     <u>Assumption and Assignment of the Leases; Cure Costs</u>.  On the closing date, the Debtors shall assume and assign to the Purchaser the Leases.  In connection with the assumption and assignment of the Leases, the Debtors shall be responsible for the payment of any Cure Amounts (defined below) that are to be paid in cash prior to or upon closing.

(g)     <u>Court Order.</u> The sale of the Assets to the Purchaser shall have been approved by a final, non-appealable order that authorizes the sale pursuant to the terms of the Purchase Agreement provided, however, that under certain circumstances the Purchaser may waive the condition that such order be final and non-appealable.

15.     Additionally, the Debtors' ability to close on the Sale is contingent on the Debtors' ability to fulfill certain other conditions as more fully described in the Purchase Agreement. The Debtors believe that all conditions for closing on the Sale will

8

be timely satisfied.  Moreover, the Debtors have been informed that the Purchaser is ready, willing and able to promptly consummate the Sale.  Accordingly, the Sale is likely to close and, thus, bring substantial money into the estates.

16.      The Debtors believe that the Sale is in their best interests and in the best interests of their estates, their creditors and other parties in interest in these chapter 11 cases.  As stated above, the Debtors determined that the Assets were not profitable for them and should be sold.

17.      The Debtors concluded that the best means to maximize the value of the Assets was to extensively market them.  To assist with their efforts to market and sell the Assets, the Debtors employed The Food Partners, LLC, The Blackstone Group, L.P. and Excess Space Retail Services, Inc.

18.      The marketing efforts were extensive.[4]  The Stores were marketed through worldwide press releases.  Also, two advertisements for the sale of the Stores ran in the Wall Street Journal.  Further, approximately 225 prospective purchasers were contacted regarding the sale of the Stores as well as for other stores under the Asset Rationalization Plan.  From the approximate 225 prospective purchasers contacted, 120 of these requested further information, including several requests for more information on the Stores.

---

[4]       The Debtors understand that several parties will be seeking compensation for their efforts in marketing and selling the Stores in accordance with certain prepetition agreements, or other arrangements, with the Debtors.  The Debtors reserve their rights to apply to this Court, within a reasonable time after entry of an order on the Sale Motion, for authorization to pay broker fees or other reasonable fees sought in connection with the Sale to parties that are owed money by the Debtors.  Notwithstanding the foregoing, in no event shall any liability for such compensation attach to the Assets or become the liability of the Purchaser, its successors, assigns or affiliates.

19.    On or about June 17, 2004, information packages on the Stores were sent out to those that expressed interest in the Stores.  Offers were due on or about July 13, 2004, but the Stores continued to be marketed after that date and, thus, offers were accepted beyond July 13, 2004.

20.    In addition to marketing efforts directed towards grocers, the Stores were also extensively marketed for non-grocery uses by Excess Space Retail Services, Inc.

21.    The marketing and sale efforts for the Assets culminated in several offers relating to the Stores.  After reviewing all offers for the Stores, individually and in the aggregate, the Debtors determined that the Purchaser's offer for the Stores was the highest and otherwise best offer.  The Purchaser's offer is further attractive to the Debtors because the Purchaser is a competitor to the Debtors and occupies the number one market share position in the area.  The Debtors believe that these facts demonstrate the Purchaser's strong interest in purchasing the Assets on favorable terms.

22.    The Debtors now move for authority to consummate the Sale with the Purchaser.  The Debtors are confident that they have marketed the Assets aggressively and that another purchaser is unlikely to agree to terms better than those presented by the Purchaser under the Purchase Agreement.

23.    The Debtors believe that the terms of the Purchase Agreement are fair, reasonable and favorable to them.  The Debtors believe further that the Sale offers the best opportunity for the Debtors to maximize the value of the Assets as the Debtors do not believe that a higher or otherwise better offer can be received for the Assets.  Thus,

the Debtors submit that the Sale is in the best interests of their estates, their creditors, and other parties in interest in these chapter 11 cases and is also necessary for the successful reorganization of these cases. If the Sale is not consummated, it is likely that the Stores will just be closed in accordance with the Asset Rationalization Plan.

24.    In addition to seeking authority to sell the Assets to the Purchaser, the Debtors seek authority under Bankruptcy Code sections 105(a) and 365 to (a) assume and assign the Leases to the Purchaser (or to a party submitting a higher or otherwise better offer) and (b) execute and deliver to the Purchaser (or a party submitting a higher or otherwise better offer) such documents or other instruments as may be necessary to assign and transfer the Leases to the Purchaser (or a party submitting a higher or otherwise better offer). The Leases to be assumed and assigned by the Debtors to Purchaser are listed and described on Exhibit A-2 to the Purchase Agreement and are described generally above in paragraph 12. Pursuant to the Purchase Agreement, the date that the Leases are to be assumed and assigned is the date of closing of the Sale (the "Closing").

25.    On or before the Closing, the Debtors will pay any and all undisputed amounts owing to the landlords under the Purchase Agreement (the "Cure Amounts"). To expedite this process, the Debtors have calculated the Cure Amounts for the Leases. The Cure Amounts are set forth in Exhibit B to the Sale Motion (the "Cure Amount Notice"). If no amount is listed for the respective Lease on the Cure Amount Notice, then the Debtors believe that no Cure Amount is owing for that Lease.

26.     Unless a party to the Leases files an objection (the "Cure Objection") to the Cure Amount listed on Exhibit B to the Sale Motion and serves a copy of the Cure Objection by May 4, 2005 at 4:00 p.m. (prevailing Eastern time) on the parties listed in the notice of the Sale Motion (the "Notice"), such party shall be (a) deemed to have waived and released any right to assert an objection to the proposed assignment of the Leases or to the Cure Amount, and to have otherwise consented to the assumption and assignment of the Leases and (b) forever barred, permanently enjoined and estopped from asserting or claiming any other or further claims against the Debtors, the Purchaser (or the party submitting a higher or otherwise better offer), their respective successors and assigns, the Assets, or the property or assets of any or all such parties, relating to or arising under the Leases, including but not limited to any claims that any additional amounts are due or defaults exist under the Leases, or that conditions to assignment must be satisfied under such assumed Lease, except with respect to defaults occurring wholly after closing of the Sale.  Upon entry of an order approving the Cure Amounts, the Debtor shall pay the Cure Amounts, in accordance with the Purchase Agreement, to the non-debtor party to the respective Lease prior to or upon Closing, as provided in the Purchase Agreement.

27.     In the event that a Cure Objection is timely filed by a party to the Leases, the Cure Objection must (a) set forth the nature and basis for the Cure Objection, (b) state the amount the party to such Lease asserts as the proper Cure Amount, and (c) attach any and all documentation upon which the party will rely at any hearing on the Cure Objection.  If a Cure Objection is properly filed and received in accordance with the

above procedures, the Debtors request that the Court determine the appropriate Cure

Amount during the hearing on the Sale (the "Sale Hearing"). Further, the Debtors request

that the Court order that a properly filed Cure Objection reserves such objecting party's

rights against the Debtors (but not against the Purchaser) with respect to the relevant Cure

Amount obligation, but that such objection does not constitute an objection to the sale of

the Assets to the Purchaser or to any other relief requested in this Sale Motion.

    28.    Accordingly, by this Sale Motion, the Debtors request that the

Court enter an order granting the following relief:

    (a)    Authorizing and approving the Sale on the terms and conditions of the Purchase Agreement to the Purchaser or to a party that submits a higher or otherwise better offer for the Assets;

    (b)    Authorizing the sale of the Assets and making the following determinations, among others, with respect to the sale:

        (i)    that such sale has been agreed upon, and will be made and completed, in good faith, for purposes of Bankruptcy Code section 363(m);

        (ii)    that such sale shall be made, and the Assets shall be delivered to the Purchaser or to the party submitting the highest or best offer for the Assets, free and clear of any and all liens, claims, encumbrances and interests, except for the Permitted Encumbrances and the Assumed Liabilities, as those terms are defined in the Purchase Agreement;

        (iii)    that the Purchaser or the party submitting the highest or best offer for the Assets shall receive good, valid and marketable title to the Assets;

        (iv)    that the Sale is exempt under Bankruptcy Code section 1146(c) from any stamp, transfer, sales, recording or similar taxes;

        (iv)    that the ten (10) day stay period provided for in Fed. R. Bankr. P. 6004(g) and 6006 shall not be in effect with

respect to the sale order and the sale order shall be effective and enforceable immediately upon its entry;

(c)     Authorizing the assumption and assignment of the Leases to the Purchaser; and

(d)     Approving and fixing the Cure Amounts on the Leases.

## APPLICABLE AUTHORITY

### A.     Bankruptcy Code Section 363(b) Authorizes the Sale.

29.     Bankruptcy Code section 363(b)(1) provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 1107 (a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under section 363(b)(1). See 11 U.S.C. § 1107(a).

30.     Although Bankruptcy Code section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, in applying this section, courts have required that it be based upon the sound business purpose of the debtor. See In re B.D.K. Health Mgmt., Inc. ("B.D.K. Health Mgmt."), Case Nos. 98-00609-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515

14

(7th Cir. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991).  To determine whether a sound business purpose exists, courts typically evaluate four factors: (a) sound business reason; (b) fair and reasonable consideration; (c) good faith in the transaction; and (d) adequate and reasonable notice.  Here, the Debtors have established each of these elements.

31.    Sound Business Reason.  The Debtors submit that there is strong business justification for the Sale.  As set forth above, the sale of the Stores was part of the Debtors' prepetition efforts to restructure their businesses in order to compete in the marketplace and reduce expenses.  The Debtors and their consultants thoroughly analyzed the market where the Stores are located and the prospects of the Debtors' future success (or lack thereof) in that market.  Based upon the results of this exhaustive analysis, the Debtors' management and financial advisors concluded that a sale of the Stores was necessary.  The Debtors' management and their advisors determined that the Stores are unprofitable for the Debtors and located in a market area that is not likely to grow or produce future profits for them.

32.    The Sale is essential for the Debtors to continue their business plan to identify and divest themselves of unprofitable assets and this plan will remain critical to the Debtors' survival in these chapter 11 cases.  Thus, a sound business reason exists for the Sale.

33.    Further, the Sale is supported by a sound business reason because if the Stores are not sold, then the Debtors will close them and reap no financial benefit whatsoever. This, in turn, will result in harm to the Debtors' estates and their creditors because, among other things, the Debtors may be subject to substantial rejection damages.

34.    <u>Fair and Reasonable Consideration</u>. The Debtors submit that the Sale will provide fair and reasonable consideration to the Debtors' estates. Prior to entering into the Purchase Agreement with the Purchaser, the Debtors, together with The Food Partners, LLC, The Blackstone Group, L.P. and Excess Space Retail Services, Inc. extensively marketed the Assets. The Debtors submit that their marketing process was sufficient to serve as a market check that the Sale is for fair and reasonable consideration. After months of marketing the Assets, the Purchaser's offer was determined to be the highest and otherwise best offer for the sale of the Assets. Given the time and resources that have been devoted to marketing the Assets, the Debtors believe that it is extremely unlikely that additional marketing would result in an offer that would realize more value to the Debtors, their estates and their creditors.

35.    <u>Good Faith</u>. The Sale is the product of arm's length negotiations between the Debtors and the Purchaser and, therefore, was made in good faith. The Purchaser has no affiliation with the Debtors, and the extensive and highly publicized marketing process ensured a fair and reasonable environment for interested parties to submit an offer to purchase the Assets. If required, the Debtors are prepared to present further evidence of good faith during the course of the hearing on the Sale Motion that

Debtors believe will satisfy this Court and the mandates of Bankruptcy Code section 363(m).

      36.    <u>Adequate and Reasonable Notice</u>.  The Debtors respectfully submit that notice and timing of the Sale Hearing is adequate and fair and reasonably calculated to elicit any further interest in acquiring the Assets.  The Debtors strongly believe that their marketing efforts garnered the highest and best possible value for the Assets.  As in the case of <u>In re Delaware & Hudson Railway Co.</u>, 124 B.R. 169 (D. Del. 1991), the Debtors' efforts in soliciting and marketing the Assets support the proposed process and the reasonableness of any offer ultimately presented through that process.  <u>See id.</u> at 179 (finding reasonable purchase price where extensive soliciting occurred in addition to negotiations with prospective purchasers).

      37.    The Debtors intend to give notice of the Sale Hearing to consider approval of this Sale Motion and the Debtors' proposed sale of the Assets by serving a copy of the Sale Motion and a notice of the Sale Hearing to (a) the Internal Revenue Service, the state and local taxing authorities; (b) the Purchaser; (c) all parties that expressed serious interest in purchasing the Assets; (d) counsel for the Debtors' postpetition secured lenders (the "DIP Lenders"); (e) the indenture trustee for the Debtors' noteholders; (f) counsel for the Creditors' Committee; (g) all known holders of Interests and Claims (as those terms are defined below) in the Assets; (h) all entities having requested notices pursuant to Fed. R. Bankr. P. 2002; (i) the Office of United States Trustee; and (j) any other parties not otherwise named but included in the Order (A) Establishing Notice Procedures on a Final Basis and (B) Continuing Hearing with

Respect to Scheduling Omnibus Hearings (the persons listed in clauses (a) through (i) are referred to collectively as the "Notice Parties"). The Debtors submit that the foregoing is sufficient notice of the Sale Hearing and the Sale.

38.    By this Sale Motion, the Debtors intend to sell the Assets in order to monetize them for distributions to their creditors, and to enhance their ability to successfully reorganize. The Debtors strongly believe that, in furtherance of these goals, they have done all that is reasonably possible to secure the highest or best possible offer for the Assets. For all reasons above, the Debtors submit that the proposed sale of the Assets to the Purchaser, or to a party submitting a higher or otherwise better offer, is warranted and appropriate under Bankruptcy Code section 363(b), and the relief requested in this Sale Motion is the product of sound business judgment and is in the best interests of the Debtors, their creditors and their estates.

39.    Thus, this Court should approve the sale of the Assets to the Purchaser or to a party submitting a higher or otherwise better offer.

**B.    Bankruptcy Code Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

40.    The Debtors request that the Sale and transfer of the Assets pursuant to the Purchase Agreement be approved free and clear of any lien, claim, interest and encumbrance of any nature except for the Permitted Encumbrances and Assumed Liabilities, as defined in the Purchase Agreement. Such relief is consistent with the provisions of Bankruptcy Code section 363(f) in these cases.

41.     Bankruptcy Code section 363(f) provides that a debtor-in-possession may sell property free and clear of any lien, claim or interest of another entity in such property if any of the following circumstances apply:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

42.     As indicated by the use of the disjunctive term "or," satisfaction of any one of the five requirements listed in Bankruptcy Code section 363(f) is sufficient to permit the sale of assets free and clear of any lien, interest or encumbrance of any nature (collectively, the "Interests") and claims (as such term is defined in 11 U.S.C. § 101(5)) ("Claims").  See In re Gulf States Steel, Inc. of Ala., 285 B.R. 497, 506 (Bankr. N.D. Ala. 2002) ("[s]ince the five conditions listed in 11 U.S.C. § 363(f) are phrased in the disjunctive, property may be sold free and clear of interests if any one of the five conditions is satisfied."); See In re Dundee Equity Corp., Case No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.").

43.     The Debtors believe that there are no Interests in or Claims against the Assets, other than Interests in or Claims against the Assets by the DIP Lenders and landlords to the Leases.  The Debtors submit that, as further described below, any such Interests or Claims will be satisfied upon Closing, in accordance with the terms and conditions of the Purchase Agreement.

44.     To the extent that any other Interests in or Claims against the Assets exist, the Debtors will satisfy Bankruptcy Code section 363(f) by obtaining any necessary consent of such parties prior to or at the Sale Hearing.  Moreover, any holder of any Interests or Claims will be adequately protected because Interests and Claims, if any, will attach to the proceeds of the Sale, with the same validity, enforceability, priority, force and effect they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors and all interested parties with respect to such Interests and Claims.  Accordingly, the requirements of Bankruptcy Code section 363(f) can be satisfied, and the sale of the Assets free and clear of any lien, claim, lease or encumbrance of any nature, except for the Permitted Encumbrances and Assumed Liabilities, is appropriate.

**C.      The Purchaser Should Be Afforded All Protections Under Bankruptcy Code Section 363(m) as a Good Faith Purchaser.**

45.     Bankruptcy Code section 363(m) provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). The Bankruptcy Code does not define the term "good faith."

Courts, however, indicate that a party would have to show fraud or collusion between the

purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of good

faith.

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings. Typically,
> the misconduct that would destroy a purchaser's good faith status at a
> judicial sale involves fraud, collusion between the purchaser and other
> bidders or the trustee, or an attempt to take grossly unfair advantage of
> other bidders.

In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986) (ellipsis in original;

citations omitted); accord Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re

Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997). No such facts exist here.

46.    The Debtors submit that: (a) the proposed Sale is the subject of

arm's length negotiations with the Purchaser and is made in good faith; (b) the Purchaser

has no affiliation with the Debtors; (c) the Assets were marketed extensively and that the

purchase price is fair and reasonable; (d) to the best of the Debtors' knowledge, the

Purchaser has taken no action to chill or otherwise collude with any other party to restrict

bidding on the Assets; and (e) the marketing process that occurred and notice of the Sale

Hearing ensure that the Purchaser has not exerted undue influence over the Debtors.

Accordingly, the Debtors request that the Court find that the Purchaser, or the party

submitting a higher or otherwise better offer, acted in good faith within the meaning of

Bankruptcy Code section 363(m). See B.D.K. Health Mgmt., 1998 WL, at *4 (finding

that the purchaser is entitled to the protections of Bankruptcy Code section 363(m)

because the sale was negotiated at arms-length, proposed in good faith and the consideration for the assets was fair and reasonable.).

**D.      The Debtors' Request for Relief from Transfer Taxes Under Bankruptcy Code Section 1146(c) Should Be Granted.**

47.     Bankruptcy Code section 1146(c) provides that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax."  11 U.S.C. § 1146(c).  This language has been construed to include transfers pursuant to a sale outside of, but in furtherance of effectuating, a reorganization plan.  See Webster Classic Auctions, Inc. ("Webster"), 318 B.R. 216, 218 (Bankr. M.D. Fla. 2004) (adopting rationale that purpose of Bankruptcy Code section 1146(c) is to facilitate reorganizations and that transfers need not be postconfirmation); B.D.K. Health Mgmt., 1998 WL, at *8 (granting Bankruptcy Code section 1146(c) relief outside of confirmed plan); see also In re T.H. Orlando Ltd., 391 F.3d 1287, 1291 (11th Circuit 2004) (exemption applies where transfer is necessary to the consummation of a plan.); City of New York v. Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.), 758 F.2d 840, 841-42 (2d Cir. 1985) (holding that where a transfer is necessary to the consummation of a plan, the transfer is "under a plan" within meaning of Bankruptcy Code section 1146(c)); In re United Press Int'l, Inc., Case No. 91 B 13955 (FGC), 1992 Bankr. LEXIS 842, at *4, *6-7 (Bankr. S.D.N.Y. May 18, 1992) (holding that Bankruptcy Code section 1146(c) exemption applied to section 363 sale where it found "the value of the Debtor's assets is likely to deteriorate [during the] time necessary to . . . confirm a plan"); In re Permar Provisions, Inc., 79 B.R. 530, 533-34 (Bankr.

E.D.N.Y. 1987) (stating that determination of applicability of Bankruptcy Code section 1146(c) exemption is same for pre- and post-confirmation dispositions of property, namely "whether the sale of 'property is essential to confirmation of the plan'") (citation omitted); City of New York v. Smoss Enters. Corp. (In re Smoss Enters. Corp.), 54 B.R. 950, 951 (E.D.N.Y. 1985) (stating that section 1146(c) was designed to reach transfers on which "the plan hinged and which the court had to approve prior to the confirmation"), aff'd mem., No. 85-5106, 1986 U.S. App. LEXIS 28677 (2d Cir. Mar. 31, 1986).

48.     The Sale directly furthers the Debtors' restructuring plan that began prepetition. The continuance of this restructuring plan is integral and essential to the Debtors' survival in these chapter 11 cases and successful reorganization.

49.     While the Debtors have not yet filed their chapter 11 plan of reorganization, an integral part of the plan will be the Debtors' continued ability to identify and divest themselves of unprofitable or otherwise unnecessary assets. The Sale furthers this plan. In light of the foregoing, the Debtors respectfully submit that the Sale is an integral part of, and necessary step toward, their chapter 11 reorganization plan. Accordingly, the Sale should be exempt under Bankruptcy Code section 1146(c) from any stamp, transfer, sales, recording or similar taxes.[5]

---

[5]      In Webster, Judge Baynes denied granting Bankruptcy Code section 1146(c) relief. 318 B.R. 216. However, in that case, the requested relief was not mentioned in the sale motion and there was not proper notice of the motion. Here, the Debtors are requesting 1146(c) relief in their sale motion and have served or are in the process of serving all applicable taxing authorities and interested parties. Further, the Sale directly facilitates and furthers the Debtors' reorganization plan. The Debtors operate hundreds of grocery stores and their ability to identify unprofitable stores and sell such stores in bankruptcy is absolutely critical to the success of these cases and the ultimate confirmation of their reorganization plan. Thus, the Debtors submit that Webster is distinguishable. Further, notwithstanding that the Debtors do not have their reorganization plan on file, the Debtors submit that the purposes of Bankruptcy Code section 1146(c) are present and that such relief should be afforded to the Sale.

**E.    The Assumption and Assignment of the Leases Should Be Authorized.**

50.    Bankruptcy Code section 365(f)(2) provides:

The trustee may assign an executory contract or unexpired lease of the debtor only if:

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Bankruptcy Code section 365(b)(1) codifies the requirements for

assuming an unexpired lease or executory contract of a debtor:

If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:

(A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

51.    The meaning of "adequate assurance" depends on the facts and

circumstances of each case, but should "'be given a practical pragmatic construction.'"

EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide

Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citation omitted), aff'd, 993 F.2d 300 (2d Cir.

1993).  The assurance that rent will be paid is a chief determinant.  See id.

52.    Adequate assurance of future performance of a lease of real property in a shopping center, such as in this case, includes adequate assurance:

(A)    of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B)    that any percentage rent due under such lease will not decline substantially;

(C)    that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D)    that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3).  Thus, adequate assurance includes demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance was present when prospective assignee of lease from debtor had the financial resources, and an expressed willingness, to devote sufficient funding to business in order to give it strong likelihood of succeeding).

53.    Here, the Debtors will pay the Cure Amounts prior to or upon Closing, as provided for in the Purchase Agreement.  To the extent that any defaults exist under any of the Leases to be assumed, the Debtors will cure any such defaults prior to the assumption and assignment of the Leases in accordance with the terms contained in

this Sale Motion and the Purchase Agreement. Thus, any and all defaults under the Leases will be cured.

54.    There is also adequate assurance of future performance by Purchaser under the Leases. The Purchaser is a nationally recognized competitor of the Debtors. The Debtors will adduce facts at the Sale Hearing to show the Purchaser's financial credibility, experience in the industry, and willingness and ability to perform under the Leases. The Leases will be assumed and performed under their terms post-assignment as if the Debtors were still operating under them. The Court and interested parties will have the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser, or a party submitting a higher or otherwise better offer, to provide adequate assurance of future performance under the Leases to be assumed. Thus, adequate assurance of future performance exists.

55.    For the above reasons, the Debtors submit that Bankruptcy Code sections 365(b)(1), (3) and (f)(2) are met and, accordingly, request authority to assume

56.    and assign the Leases to the Purchaser in accordance with the terms and conditions of the Purchase Agreement.

**NOTICE**

57.    Notice of this Sale Motion has been provided or will be provided to the parties listed above in paragraph 37.

58.    The Debtors submit that no other or further notice need be given.

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court: (a) enter an order substantially in the form attached as Exhibit C that

grants the Sale Motion and authorizes and approves the relief requested by the Sale

Motion; (b) authorize the Debtors to take all actions reasonably necessary to effectuate

the sale of the Assets in accordance with the Purchase Agreement; and (c) grant such

other and further relief as the Court deems just and proper.


Dated: _____, 2005

SKADDEN, ARPS, SLATE, MEAGHER          SMITH HULSEY & BUSEY
& FROM, LLP


By____s/ D. J. Baker_____          By____s/ Stephen D. Busey_____
      D. J. Baker                                    Stephen D. Busey
      Sally McDonald Henry                           James H. Post
      Rosalie Walker Gray                            Cynthia C. Jackson

Four Times Square                         Florida Bar Number 117790
New York, New York 10036                  225 Water Street, Suite 1800
(212) 735-3000                            Jacksonville, Florida 32202
(212) 735-2000 (facsimile)                (904) 359-7700
  - and –                              (904) 359-7708 (facsimile)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Eric M. Davis
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
(302) 651-3001 (facsimile)


Attorneys for the Debtors