FOOD LION – 3 STORES — FINAL

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made effective as of December 15, 2004 (the "Effective Date"), by and among

**WINN-DIXIE RALEIGH, INC.**, a Florida corporation ("Seller"),

**WINN-DIXIE STORES, INC.**, a Florida corporation ("Winn-Dixie", and together with Seller, the "Seller Parties", and each of them singly, a "Seller Party"), and

**FOOD LION LLC**, a North Carolina limited liability company, or its permitted assignee pursuant to Paragraph 15.6 of this Agreement ("Buyer").

## RECITALS:

A.     Seller is the tenant of each of 3 supermarket stores (the "Stores"), each of which is listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under the respective leases (including all modifications, amendments, side letters, exhibits, and currently effective subordination agreements and estoppel certificates pertaining thereto, the "Leases") described on Exhibit A-2 to this Agreement.  The Stores occupy the respective leased premises as described in each Lease (the "Leased Premises"), within the respective parcels of real property described on Exhibit A-2 to this Agreement associated with each Lease. Seller's leasehold interest in each Leased Premises pursuant to each Lease, together with those additional items described in Paragraph 2.0 of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "Assets."  Certain of the Stores are part of a shopping center (the "Shopping Centers") as described on Exhibit A-3 to this Agreement.

B.     Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0     **Defined Terms.**  Capitalized terms as used in this Agreement will have the following meanings when used herein.

1.1     "Affiliate" will mean any Person directly or indirectly controlling or controlled by or under direct or indirect control with any other specified Person.

1.2     "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date, including all Exhibits hereto.

1.3     "Assets" will have the meaning assigned in Paragraph A of the Recitals to this Agreement.

1.4     "Assumed Liabilities" will mean: (a) all liabilities of Seller under the Leases arising after the Closing; and (b) all liabilities of Seller relating to the Assets (other than liabilities relating to the Leases, for which Paragraph 1.4(a) shall apply) arising after the Closing Date, other than to the extent such liabilities are attributable to facts or circumstances occurring or in existence prior to or on the Closing Date; provided, however, that, notwithstanding the provisions of Paragraphs 1.4(a) and (b), the Assumed Liabilities will not include (i) any liability to pay any federal or state income taxes or sales and use taxes of either Seller Party or any of such Person's Affiliates, regardless of whether arising in connection with the consummation of transactions contemplated by this Agreement or otherwise; (ii) any liability of either Seller Party or any of such Person's Affiliates for performance under this Agreement or the agreements to be delivered by either Seller Party or their Affiliates at the Closing; (iii) any liability of either Seller Party or any of such Person's Affiliates with respect to Environmental, Health and Safety Requirements relating to the Stores to the extent such liabilities are attributable to facts or circumstances occurring or in existence prior to the Closing Date or otherwise arising out of the operation of the Stores prior to the Closing Date; (iv) any liability under any assigned Lease assumed by Buyer pursuant to Paragraph 1.4(a) that arises out of or relates to any breach or facts and circumstances that occurred or were in existence prior to the Closing Date; (v) any liability of a Seller Party or any of its Affiliates arising out of any Proceeding concluded prior to or pending at the Closing, to which either Seller Party or any of such Person's Affiliates is a party; (vi) all liability relating to Indebtedness of either Seller Party or any of such Person's Affiliates; (vii) any liability of either Seller Party or any of such Person's Affiliates related to any employee benefits or any employee benefit plan with respect to persons employed at the Stores prior to the Closing Date; and (viii) any other liability of either Seller Party or any of such Person's Affiliates that is not an Assumed Liability.

1.5     "Base Purchase Price" will mean the amount set forth in Paragraph 3.1 of this Agreement.

1.6     "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at each Closing the Inventory, as applicable, the Equipment and all other tangible and intangible personal property constituting a portion of the Assets relating to the one or more Stores being transferred at such Closing.

1.7 "Buildings" will have the meaning assigned in Paragraph 2.1.2 of this Agreement.

1.8 "Business Day" will mean any day, other than Saturday, Sunday, or federal holidays recognized by businesses generally in both Jacksonville, Florida, and Salisbury, North Carolina.

1.9 "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

1.10 "Buyer Indemnified Parties" will have the meaning assigned in Paragraph 16.1 of this Agreement.

1.11 "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policies (and the cost of any simultaneous issue mortgagee title insurance policies and any loan-related title insurance endorsements thereon); (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instruments; (e) cost of the Surveys; (f) one-half the cost of the Phase I Assessments; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment and Inventory; (i) one-half of the fees and costs of the Closing Escrow Agent; and (j) one-half of the fees and costs of the Inventory Service.

1.12 "Buyer's Escrowed Items" will have the meaning assigned in Paragraph 14.3 of this Agreement.

1.13 "Closing" with respect to one or more Stores will mean the consummation of the sale and purchase of the Assets, and assignment and assumption of the Assumed Liabilities, relating to such Store or Stores pursuant to this Agreement as indicated by delivery of the Conveyance Instruments and other documents contemplated by Paragraph 14 of this Agreement and the Purchase Price as contemplated in this Agreement with respect to such Store or Stores, which will be deemed to occur at 12:01 a.m. on the Closing Date with respect to such Store or Stores.

1.14 "Closing Date" will mean the date as to a particular Store or Stores that is 14 days following the applicable Real Property Escrow Date for such Store or Stores. In addition, notwithstanding the foregoing, the Closing Date

shall not occur for any Stores unless and until the Closing Date for all of the Key Stores has occurred or is simultaneously occurring.

1.15    "Closing Remittance" will have the meaning assigned in Paragraph 3.4.1 of this Agreement.

1.16    "Closing Statement" will mean a statement in the form of Exhibit C to this Agreement reflecting the net amount due Seller (other than in respect of the Inventory Price and the Supply Price) at each Closing, after making the adjustments described in Paragraph 3.4.3 and in other provisions of this Agreement.

1.17    "COBRA" will mean the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

1.18    "Code" will mean the Internal Revenue Code of 1986, as amended.

1.19    "Confidentiality Agreement" will mean the existing letter agreement, dated May 7, 2004, between Winn-Dixie and Buyer, regarding confidentiality relating to the subject matter of this Agreement.

1.20    "Conveyance Instrument" will have the meaning assigned in Paragraph 14.2 of this Agreement.

1.21    "Credit Agreement Liens" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Second Amended and Restated Credit Agreement, dated as of June 29, 2004, between Winn-Dixie Stores, Inc. and certain banks and financial institutions and (ii) documents executed by Winn-Dixie or Seller in connection with such Second Amended and Restated Credit Agreement.

1.22    "Damages" will have the meaning assigned in Paragraph 16.1 of this Agreement.

1.23    "Delivery Deadline" will mean 5:00 p.m., Eastern Time on the date that is thirty (30) days after the Effective Date, constituting the deadline for Seller's delivery, in accordance with the provisions of Paragraphs 4.3, 4.4 and 4.5 of this Agreement, of the Title Commitments, Surveys and Phase I Assessments, or such earlier date (on or after the Effective Date) as of which all of the following: a Title Commitment, Survey and Phase I Assessment have been delivered to Buyer for a particular Store (it being understood that such delivery shall be deemed to have occurred notwithstanding that Buyer may assert, as contemplated by Paragraphs 4.3, 4.4 and 4.5 of this Agreement, that one or more of such Title Commitments, Surveys and Phase I Assessments do not conform to the

requirements with respect thereto specified in <u>Paragraphs 4.3, 4.4 and 4.5</u> of this Agreement).

1.24 "<u>Deposit</u>" will have the meaning assigned in <u>Paragraph 3.2</u> of this Agreement.

1.25 "<u>Designated Stores</u>" will mean the following Stores: (i) Store #954, Midlothian, VA; and (ii) Store #956, Highland Springs, VA.

1.26 "<u>Effective Date</u>" will have the meaning assigned in the initial paragraph of this Agreement.

1.27 "<u>Employees</u>" will have the meaning assigned in <u>Paragraph 6.6</u> of this Agreement.

1.28 "<u>Environmental, Health, and Safety Requirements</u>" means all Orders and Laws concerning or relating to public health and safety, the practice of pharmacy, worker/occupational health and safety, and pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, threatened release, control, or other action or failure to act involving cleanup of any Hazardous Materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise, or radiation, each as amended and as now in effect and in effect at Closing.

1.29 "<u>Equipment</u>" will have the meaning assigned in <u>Paragraph 2.1.2</u> of this Agreement.

1.30 "<u>Escrow Agent</u>" will mean Title Insurer, acting as escrow and closing agent.

1.31 "<u>Estoppel Certificate</u>" will have the meaning assigned in <u>Paragraph 8.3</u> of this Agreement.

1.32 "<u>Excluded Personal Property</u>" will mean: (i) all inventories not included in the term "Inventory"; (ii) all packaging materials and supplies; (iii) all leased point-of-sale equipment and leased photo lab equipment; (iv) all other leased equipment (all of which other leased equipment is described on <u>Exhibit D</u> to this Agreement with respect to each Store); (v) all owned computer and related equipment that contains software subject to a license that restricts its transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed; (vi) all equipment and

5

other personal property that is neither owned nor leased by Seller or Winn-Dixie, including by way of example but not as a limitation, third-party owned equipment such as payphones, vending machines, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners and equipment owned by product vendors; (vii) all over-the-road motor vehicles; (viii) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (ix) all data files other than Pharmacy Scrips; (x) all lottery equipment and tickets; (xi) all accounts receivable, cash and cash equivalents; (xii) all trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates; (xiii) all building signs and panels in all pole and pylon signs that advertise Seller's business in the Stores; (xiv) all intellectual property and rights (other than Pharmacy Scrips) relating to any of the foregoing; (xv) all branded (with a Winn-Dixie name or logo) shopping carts other than any such carts from which the brand is removable and which brands are removed by Buyer on the Closing Date; and (xvi) all service agreements, contracts and warranties relating to Seller's possession and operation of the Stores, except that warranties pertaining to the construction of the Stores and/or Improvements, or pertaining to any equipment or fixtures that are part of the Assets, if any, shall be included in the Assets to the extent assignable but only if such warranties do not relate to any other assets or stores of the Seller Parties or any of their Affiliates.

1.33 "General Assignment" will mean an assignment in the form of Exhibit E to this Agreement assigning any assignable Permits owned by Seller, warranties and other intangible property relating to any of the Assets or the operation of the Stores but only if such Permits, warranties and other intangible property do not relate to any other assets or stores of the Seller Parties or any of their Affiliates.

1.34 "Governmental Authority" will mean any legislature, agency, bureau, branch, department, division, commission, court, tribunal, magistrate, justice, or other similar recognized organization or body of any federal, state, county, municipal, or local government or other similar recognized organization or body exercising similar powers or authority.

1.35 "Hazardous Material" will mean any hazardous or toxic substance, material or waste which is regulated by any Governmental Authority, including, but not limited to, any hazardous material, substance or waste which is defined as (i) a "Hazardous Material" or an "Extremely Hazardous Material" under any applicable federal or state Laws; (ii) a hazardous substance under Section 311 of the Federal Water Pollution Control Act (33 U.S.C. Section 1317); (iii) a hazardous waste under Section 1004 of the Federal Resource Conservation and Recovery Act (42 U.S.C. Section

6901 et. seq.); (iv) a hazardous waste substance under Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, (42 U.S.C. Section 9601 et. seq.); or (iv) a hazardous or toxic waste, substance or material in any Law enacted by the applicable state and/or the federal government.

1.36    "Improvements" will have the meaning assigned in Paragraph 2.1.2 of this Agreement.

1.37    "Indebtedness" will mean: (a) all indebtedness for borrowed money or for the deferred purchase price of property or services; (b) any other indebtedness that is evidenced by a note, bond, debenture or similar instrument; (c) all obligations under financing leases other than any of the Leases; (d) all obligations in respect of acceptances issued or created, and (e) all guarantee obligations.

1.38    "Inventory" will mean all inventories of goods and merchandise within the Designated Stores, and owned by Seller on the Inventory Count Date and held for resale in the ordinary course of business of Seller conducted at the Designated Stores to retail customers, but excluding: (i) pharmaceutical inventory at each Store other than Store #954, Midlothian, VA; (ii) any private label goods and merchandise; (iii) any goods and merchandise that are damaged, spoiled or distressed; (iv) any items (other than Perishables) that as of the Inventory Count Date are within fourteen days prior to the earlier of Seller's "pull date", the manufacturer's expiration date or the manufacture's "best before" date; and (v) any dairy and frozen food Perishables that as of the Inventory Count Date are within ten days prior to the earlier of Seller's "pull date", the manufacture's expiration date or the manufacture's "best before" date.

1.39    "Inventory Count" will have the meaning assigned in Paragraph 3.3 of this Agreement.

1.40    "Inventory Count Date" will have the meaning assigned in Paragraph 3.3 of this Agreement.

1.41    "Inventory Price" will mean the purchase price payable by Buyer for the Inventory, based on the Inventory Count, which (i) with respect to Pharmaceutical Inventory will be Seller's actual cost as reflected on its records kept in the ordinary and customary course of business, and (ii) with respect to all other Inventory will be determined by taking Seller's standard retail shelf price (without regard to any temporary or special price reductions or discounts, coupon discounts or customer loyalty card discounts) for the applicable item and deducting the percentage for each merchandise category indicated in the table below:

| | | |
|---|---|---|
| 1. | Grocery (food and non-food) | 20% |
| 2. | Meat | 24% |
| 3. | Produce | 36% |
| 4. | Bakery | 30% |
| 5. | Deli | 30% |
| 6. | Dairy | 20% |
| 7. | Frozen Food | 25% |
| 8. | General Merchandise | 38% |
| 9. | Tobacco | 20% |
| 10. | Alcohol | 15% |
| 11. | Packaged Lunch Meats | 25% |

1.42  "Inventory Service" will mean Accurate Inventory & Calculating Service, Inc.

1.43  "Investigation Objection Notice" will have the meaning assigned in Paragraph 4.1.3 of this Agreement.

1.44  "Investigation Objection Response" will have the meaning assigned in Paragraph 4.1.3 of this Agreement.

1.45  "Investigation Period" will mean the period commencing on the Effective Date and ending at 5:00 p.m., Eastern Time on that date that is 10 Business Days after the Effective Date.

1.46  "Key Stores" will mean the following Stores: (i) Store #954, Midlothian, VA; and (ii) Store #956, Highland Springs, VA.

1.47  "Knowledge" will mean the actual knowledge of, with respect to Seller and Winn-Dixie, the corporate officers of Seller and Winn-Dixie and Winn-Dixie's Corporate Environmental and Safety Manager and its Director of Maintenance; and, with respect to Buyer, the corporate officers of Buyer, without any requirement of investigation or inquiry.

1.48  "Landlords" will mean the lessors under the Leases.

1.49  "Law" will mean any law (statutory, common, or otherwise), constitution, ordinance, code, rule, regulation, executive order, or other similar authority enacted, adopted, promulgated, or applied by any Governmental Authority, each as amended and now in effect.

1.50  "Leased Premises" will have the meaning assigned in Paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in Paragraph 2.1.1 of this Agreement.

1.51  "<u>Lease Objection Notice</u>" will have the meaning assigned in <u>Paragraph 4.6</u> of this Agreement.

1.52  "<u>Lease Objection Response</u>" will have the meaning assigned in <u>Paragraph 4.6</u> of this Agreement.

1.53  "<u>Leases</u>" will have the meaning assigned in <u>Paragraph A</u> of the Recitals to this Agreement.

1.54  "<u>Legal Descriptions</u>" will have the meaning assigned in <u>Paragraph 4.4</u> of this Agreement.

1.55  "Letter Agreement" will have the meaning assigned in <u>Paragraph 3.2</u> of this Agreement.

1.56  "<u>Monetary Objections</u>" will mean (i) mortgages on any of Seller's leasehold interests; (ii) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such assessments can be cured by the payment of money; (iii) mechanics', materialmen's or construction liens that have attached to and become a lien against Seller's interest under any of the Leases; (iv) judgments that have attached to and become a lien against Seller's interest under any of the Leases or other Assets; and (v) any other lien against Seller's interest under any of the Leases or other Assets that can be satisfied with the payment of money.

1.57  "<u>New Buyer Employee</u>" will have the meaning assigned in <u>Paragraph 9.5</u> of this Agreement.

1.58  "<u>Order</u>" means any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Authority or arbitrator.

1.59  "<u>PBGC</u>" means the Pension Benefit Guaranty Corporation.

1.60  "<u>Perishables</u>" will mean meat, poultry and seafood, fresh milk and dairy foods, vegetables (fresh or frozen), fruit, bread or other types of frozen foods.

1.61  "<u>Permitted Encumbrances</u>" will have the meaning assigned in <u>Paragraph 4.2</u> of this Agreement.

1.62  "<u>Permits</u>" will mean any permit, license, certificate, approval, consent, notice, waiver, franchise, registration, declaration, filing, accreditation, or

other similar authorization required by any Law, Governmental Authority, or contract.

1.63   "<u>Person</u>" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or Governmental Authority.

1.64   "<u>Pharmaceutical Inventory</u>" will mean prescription medicines or products owned by Seller that relate to the pharmacy operated in Store #954, Midlothian, VA.

1.65   "Pharmacy Phone Line" will mean the pharmacy phone line in which Seller has an interest that relates to the pharmacy operated in Store #954, Midlothian, VA.

1.66   "<u>Pharmacy Scrips</u>" will mean all customer lists, prescription files, prescription registers, and operating and maintenance logs owned by Seller that relate to the pharmacy operated in Store #954, Midlothian, VA.

1.67   "<u>Phase I Assessment</u>" will have the meaning assigned in <u>Paragraph 4.5</u> of this Agreement.

1.68   "<u>Phase I Objection Notice</u>" will have the meaning assigned in <u>Paragraph 4.5</u> of this Agreement.

1.69   "<u>Phase I Objection Response</u>" will have the meaning assigned in <u>Paragraph 4.5</u> of this Agreement.

1.70   "<u>Proceeding</u>" means any action, arbitration, audit, case, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

1.71   "<u>Purchase Price</u>" will mean the Base Purchase Price and the Inventory Price, collectively.

1.72   "<u>Purchase Price Allocation</u>" will mean the allocation of the Base Purchase Price among the Stores as provided on <u>Exhibit F</u> to this Agreement.

1.73   "<u>Real Property</u>" will mean the Leased Premises and the Improvements together.

1.74   "<u>Real Property Escrow Date</u>" with respect to one or more Stores will mean the date that is 5 Business Days following the satisfaction or waiver of all of the conditions set forth in <u>Paragraphs 10 and 11</u> of this Agreement (other than any such conditions required under this Agreement to be satisfied as of the Closing Date or at the Closing, including the

performance of covenants contained in the last sentence of <u>Paragraph 3.4.1</u> of this Agreement and in <u>Paragraphs 3.4.2, 8.5, 8.7, 9.3, 14.4, 14.5 and 14.6</u> of this Agreement) with respect to such Store or Stores or such earlier date after the satisfaction of such conditions as Buyer and Seller may mutually designate.

1.75    "<u>Required Consent</u>" will mean any consent that is required, in the reasonable opinion of Buyer, from a lessor pursuant to any Lease in order for Seller to assign the Lease to Buyer.

1.76    "<u>Review Deadline</u>" with respect to a particular Store will mean 5:00 p.m., Eastern Time, on the day that is 10 Business Days after the Delivery Deadline for that particular Store.

1.77    "<u>Seller</u>" will have the meaning assigned in the initial paragraph of this Agreement.

1.78    "<u>Seller Indemnified Parties</u>" will have the meaning assigned in <u>Paragraph 16.2</u> of this Agreement.

1.79    "<u>Seller Parties</u>" will have the meaning assigned in the initial paragraph of this Agreement.

1.80    "<u>Seller's Brokers</u>" will mean The Blackstone Group, The Food Partners and Excess Space Retail Services, Inc.

1.81    "<u>Seller's Closing Costs</u>" will mean: (a) recording fees payable in connection with recording the Conveyance Instruments in the appropriate public records; (b) fees and costs of Seller's counsel relating to the subject transaction; (c) commissions payable to Seller's Brokers as provided in <u>Paragraph 15.4</u> of this Agreement; (d) one-half the cost of the Phase I Assessments; (e) one-half of the fees and costs of the Closing Escrow Agent; and (f) one-half of the fees and costs of the Inventory Service.

1.82    "<u>Seller's Escrowed Items</u>" will have the meaning assigned in <u>Paragraph 14.2</u> of this Agreement.

1.83    "<u>Seller Response Deadline</u>" with respect to a particular Store will mean 5:00 p.m., Eastern Time, on the later to occur of the respective dates required for delivery of (a) the Title Objection Response, (b) the Survey Objection Response, (c) the Phase I Objection Response, and the Lease Objection Response pursuant to <u>Paragraphs 4.3, 4.4, 4.5 and 4.6</u> of this Agreement.

1.84    "<u>Shopping Centers</u>" will have the meaning assigned in <u>Paragraph A</u> of the Recitals to this Agreement.

1.85    "Stores" will have the meaning assigned in Paragraph A of the Recitals to this Agreement and, when followed by "#" and a number will refer to the particular Store or associated gas station with the indicated number listed on Exhibit A-1 to this Agreement.

1.86    "Subleases" will mean the sublease and license agreements, if any, described on Exhibit G to this Agreement with respect to the Stores, including any modifications, amendments, side letters, exhibits and currently effective subordination agreements and estoppel certificates pertaining thereto.

1.87    "Surveys" will have the meaning assigned in Paragraph 4.4 of this Agreement.

1.88    "Survey Objection Notice" will have the meaning assigned in Paragraph 4.4 of this Agreement.

1.89    "Survey Objection Response" will have the meaning assigned in Paragraph 4.4 of this Agreement.

1.90    "Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs, ad valorem, duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

1.91    "Title Commitments" will have the meaning assigned in Paragraph 4.3 of this Agreement.

1.92    "Title Insurer" will mean First American Title Insurance Company, through its National Accounts Division, Atlanta, Georgia.

1.93    "Title Objection Notice" will have the meaning assigned in Paragraph 4.3 of this Agreement.

1.94    "Title Objection Response" will have the meaning assigned in Paragraph 4.3 of this Agreement.

1.95    "Title Policies" will have the meaning assigned in Paragraph 4.2 of this Agreement.

1.96    "WARN Act" will mean the Worker Adjustment and Retraining Notification Act, as amended.

1.97    "Winn-Dixie" will have the meaning assigned in the initial paragraph of this Agreement.

## 2.0    Purchase and Sale of Assets.

2.1    **Property Included in Sale.**  Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to purchase from Seller, the Assets, which—excluding Excluded Personal Property—are comprised of the following:

2.1.1    All rights of Seller under the Leases and Seller's interest in any Improvements and Real Property;

2.1.2    Seller's interest in all fixtures and all equipment located in the store buildings now existing on the Leased Premises (the "Buildings"), and Seller's interest in the Buildings, including but not limited to (i) heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "Improvements"), and (ii) Seller's trade fixtures and equipment located in the Buildings and, if applicable, all fuel pumps and equipment located on the Leased Premises and used by Seller in the operation of any motor vehicle fuel operations (the "Equipment");

2.1.3    The Inventory at the Designated Stores;

2.1.4    The Pharmacy Scrips and, to the extent transferable, ownership and control of the Pharmacy Phone Line; and

2.1.5    Any assignable Permits relating to the Assets or the operation of the Stores.

2.2    **Assumed Liabilities.**  Buyer agrees to assume and become responsible for all of the Assumed Liabilities with respect to a Store at the Closing for such Store.  Buyer will not assume or have any responsibility, however, with respect to any other obligation or liability of the Seller Parties not included within the definition of Assumed Liabilities.

## 3.0    Purchase Price.

3.1    Amount.  The purchase price to be paid by Buyer to Seller for the Assets (other than the Inventory) is $1,000,000 in the aggregate, which will be

allocated to each Store as set forth on the Purchase Price Allocation (the "Base Purchase Price"). The purchase price to be paid by Buyer to Seller for the Inventory in respect of each Designated Store is the total of the Inventory Price for each item of Inventory. If this Agreement is terminated in accordance with its terms as to some, but not all, of the Stores, then (i) the aggregate Base Purchase Price will be adjusted based on the Purchase Price Allocation as to the Stores that remain subject to the continuing force and effect of this Agreement; and (ii) the term "Inventory" will be deemed to exclude all Inventory of the Stores with respect to which this Agreement is terminated.

3.2     Contract Consideration.  As a partial advance payment by Buyer of the Base Purchase Price for the Assets, Buyer, by executing and delivering this Agreement, hereby instructs and directs Escrow Agent to continue to hold the "Good Faith Deposit" (as defined in the Letter Agreement) made under the letter agreement, dated October 28, 2004, between Winn-Dixie and Buyer (the "Letter Agreement"), as an earnest money deposit in the amount specified with respect to each Store on Exhibit F to this Agreement equal to 10% of the Base Purchase Price (the "Deposit"), such Deposit to be held and distributed in accordance with the terms of this Paragraph and Paragraphs 3.4.1, 4.1.3, 4.3, 4.4, 4.5, 4.6, 4.7, 12 and 15.1(c) of this Agreement. In the event of a failure without waiver of any of the conditions to Buyer's obligations as set forth in Paragraph 10 that results in termination of this Agreement by Buyer pursuant to Paragraph 15.1(a)(ii) of this Agreement with respect to all or any of the Stores, Buyer shall be entitled to a prompt return of the relevant portion of the Deposit and Seller shall direct Escrow Agent to return such portion of the Deposit to Buyer. The applicable portion of the Deposit will be credited against the Base Purchase Price at the relevant Closing, and will be held in an interest bearing escrow account maintained by Escrow Agent. Whenever used herein, the term Deposit also will be deemed to include all interest accrued thereon; however, for state and federal income tax purposes, interest accrued on the Deposit will be deemed earned by Buyer. Buyer's federal taxpayer identification number (FEIN) is 56-2173154.

3.3     Inventory Count.  Beginning immediately following the close of business of one or more of the Designated Stores on the day immediately preceding the Closing Date with respect to such Designated Store or Designated Stores (the "Inventory Count Date"), the parties will conduct a physical count of the Inventory at each of such Designated Stores (the "Inventory Count") with the assistance of the Inventory Service.  Prior to each Inventory Count, Buyer and Seller, acting in good faith, will identify all items of inventory that are Excluded Personal Property and Seller will remove such items prior to the Closing.  Buyer and Seller each will have representatives present at each Designated Store during the Inventory Count who will acknowledge in writing all computations before leaving the

Designated Store. Pharmaceutical Inventory will be inventoried by item as follows and the inventory forms for such Inventory will be signed by registered pharmacists representing Seller and Buyer:

> (a) Schedule II drugs will be inventoried as exact counts and transferred on DEA 222 form supplied to Seller by Buyer; and

> (b) Will-call prescriptions filled but not purchased by customers at the time of the Inventory Count will be credit returned and included in the Inventory Count.

The parties agree to be cooperative and reasonable in connection with each Inventory Count and will attempt, in good faith, to resolve any disputes respecting the quantity that may arise during the Inventory Count. On Seller's request, Buyer agrees to provide Seller with a certificate stating that Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Seller or any Governmental Authority to document that sale of the Inventory is exempt from sales tax. Sellers may remove its merchandise shelf tags at any time before or during the Inventory Count with respect to merchandise that is Excluded Personal Property and with respect to other merchandise as and after the Inventory Count is completed with respect to the related merchandise. Seller will engage the Inventory Service but the fees of the Inventory Service will be billed one-half to Seller, and one-half to Buyer. Each of Buyer and the Seller Parties agrees to pay one-half of such fees at Closing or earlier if then due and before delinquent.

3.4   Payment. The Purchase Price will be paid in the following manner:

3.4.1   *Base Purchase Price*. On the Inventory Count Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (with any adjustments with respect to the Base Purchase Price contemplated by the relevant Closing Statement, including subtraction of the relevant Deposit amount) with respect to such Store or Stores. On the Closing Date for such Store or Stores, Buyer will, subject to the conditions set forth in Paragraph 10 of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted) with respect to such Store or Stores to Seller (by wire transfer to an account designated in writing by Seller). On the Closing Date for such Store or Stores, to the extent the applicable Deposit for such Store or Stores exceeds the Base Purchase Price (as adjusted pursuant to the Closing Statement) with respect to such Store or Stores (such excess Deposit, a "Closing Remittance"), Seller will instruct Escrow Agent to transfer and deliver the Closing Remittance with respect to

such Store or Stores to Buyer (by wire transfer to an account designated in writing by Buyer).

3.4.2    *Inventory Price.*    At each Closing for one or more Designated Stores, Buyer will pay (by wire transfer to an account designated in writing by Seller) the Inventory Price for all items of Inventory, with respect to such Designated Store or Designated Stores, to be determined in good faith by the parties (based on the Inventory Count and, with respect to determining Seller's standard retail shelf price, Seller's books and records) as of the day prior to the relevant Closing Date. If any dispute should arise as to the Inventory Price with respect to any item or items of Inventory, Seller and Buyer will, through good faith negotiations, attempt to resolve the dispute and adjust the relevant Inventory Price.

3.4.3    *Certain Transaction Costs.* All relevant rent, taxes (including real and personal property taxes), utilities (including the Pharmacy Phone Line, where applicable) and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding each Closing Date and will be a credit or debit, as the case may be, against the Inventory Price payable at such Closing, as applicable, to the extent thereof and then against the Base Purchase Price. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. Each Seller Party agrees to timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or make a report with respect to, such taxes.

4.0    **Buyer's Due Diligence.**

4.1    Investigation Period.

4.1.1    During the Investigation Period, (a) Buyer will be entitled to investigate and inspect the Assets with respect to each Store and all matters reasonably relating thereto, to determine whether or not the same are satisfactory to Buyer and to conduct a physical inventory of the Equipment located at each Store; and (b) the Seller Parties shall provide information (without representation or warranty as to its accuracy or completeness) reasonably requested by Buyer that is (i) reasonably related to the physical condition of the Assets and Stores, or (ii) a document reasonably related to or affecting the Leases or the Assumed Liabilities; provided, however, in connection therewith neither Seller nor Winn-Dixie shall be required to provide any written or electronic information or materials relating to the Assets other than those expressly required or contemplated pursuant to the foregoing provisions in this Paragraph 4.1.1 or any other terms of this Agreement, including without limitation any books and records, sales records, trade secrets, and other proprietary information or materials that are proprietary in nature.

4.1.2    Buyer will, at all reasonable times during the Investigation Period, and after giving Seller advance written or telephonic notice, have the privilege of going upon any of the Real Property with its agents and engineers as needed, to inspect any of the Assets; **SUCH PRIVILEGE SHALL IN NO WAY ABROGATE BUYER'S OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT OR UNDER PARAGRAPH 15.10 OF THIS AGREEMENT.** Buyer hereby indemnifies and agrees to hold harmless Seller and Winn-Dixie from and against any and all damage to the Real Property (including the cost of restoring the Real Property to its pre-entry condition) and injury to any persons caused by Buyer or its agents in the course of exercising Buyer's due diligence rights under this Agreement. Notwithstanding the preceding sentence, Buyer will have no obligation to indemnify or hold Seller harmless from those claims, demands, liabilities, costs, expenses, penalties, damages and losses arising out of or relating to: (a) the negligence or willful misconduct of Seller or Winn-Dixie or any of their Affiliates, subtenants, licensees, employees, agents, officers, or directors, (b) a pre-existing condition of any of the Assets; or (c) the existence of information obtained by Buyer as a result of its investigation. Such indemnification will survive the expiration or termination of this Agreement and/or the consummation of the transactions contemplated by this Agreement.

4.1.3  If Buyer determines that the Assets or any Store or Stores are not in acceptable physical condition because of the inadequacy of the Equipment located at the Store, because of a material defect in any of the Buildings, because any material Asset or Assets is or are not usable, because it is not reasonably satisfied that it has obtained sufficient, reliable information regarding the physical condition of the Assets or because of the failure of the Buildings or Leased Premises to comply with applicable Law for use as a retail grocery store by Buyer without material modification or expenditure with respect to such affected Buildings or Leased Premises, Buyer will notify Seller in writing on or before the expiration of the Investigation Period as to those matters to which Buyer objects (each such notice, an "Investigation Objection Notice").  Any objection Buyer may have to any matters relating to the Equipment or the physical condition of any Assets or Store will be deemed waived to the extent Buyer does not timely provide an Investigation Objection Notice to Seller with respect to such objection.  If Buyer timely delivers an Investigation Objection Notice to Seller, then Seller will have 5 Business Days after the date of receipt of such Investigation Objection Notice to notify Buyer in writing whether Seller is willing to cure all or any one or more of the stated objections prior to the relevant Real Property Escrow Date (the "Investigation Objection Response"); provided, however, that Seller shall be entitled within such 5 Business Day period to specify in writing to Buyer, either in an Investigation Objection Response or in a separate notice, one or more of the stated objections that Seller is diligently and in good faith investigating the feasibility of curing and with respect to such objections Seller will have an additional 10 Business Days after the 5 Business Day period to provide the Investigation Objection Response with respect to such objections. If Seller states in the Investigation Objection Response that it is unwilling to cure all or any one or more of such objections before the relevant Real Property Escrow Date, or Seller fails to timely provide an Investigation Objection Response with respect to all or any one or more of such objections, then Buyer will have 5 days after receipt of the Investigation Objection Response or the deadline for giving same to elect by written notice to Seller whether to (i) waive the unresolved objections with respect to any Store or Stores affected, or (ii) terminate this Agreement with respect to any Store or Stores affected.   If Seller states in the Investigation Objection Notice that Seller is willing to cure all or any one or more of the objections stated in the Investigation Objection Notice, then Seller will use reasonable, diligent and good faith efforts to cure such objections before the relevant Real Property Escrow Date.  If Seller is unable to cure all or any one or more of such objections before the relevant Real Property Escrow Date despite reasonable,

diligent and good faith efforts to do so, then Buyer may, at its sole option, either (i) waive such unresolved objections as to any Store or Stores affected, or (ii) terminate this Agreement as to any Store or Stores affected.

4.1.4   If Buyer discovers any condition that affects any of the Assets that is of a nature that requires reporting to applicable Governmental Authorities, then Buyer or its consultants will promptly notify Seller in writing of such condition and, unless required by applicable Law in the reasonable determination of Buyer, will not contact or report to such agencies with respect to such condition without Seller's prior written consent. Following Buyer's written notification to Seller of such condition, Seller agrees to report the same to the applicable Governmental Authorities to the extent required by Law and to provide a copy of said notification(s) to Buyer.

4.2    Title.    At Closing, Seller will assign to Buyer, and Buyer will assume, Seller's right, title and interest, as tenant, under the Leases and Seller's interest in the Real Property to the extent provided in the relevant Conveyance Instrument, in each case subject only to any items with respect to any particular Store approved by Buyer pursuant to Paragraph 4.3 (collectively, the "Permitted Encumbrances"). Evidence of the delivery of marketable and insurable title will be pursuant to Title Insurer's issuance of a leasehold policy of title insurance for each Real Property associated with a Store (in the form of a marked Title Commitment delivered at Closing evidencing the Title Insurer's binding obligation to issue its policy), insuring (to the extent contemplated by the relevant Conveyance Instrument) the leasehold interest in the Real Property associated with such Store in favor of Buyer, with the survey exception deleted (and substituted for a survey reading reflecting matters disclosed on the applicable Survey as approved by Buyer) using the promulgated form and typical endorsements or such other or similar form as is available in the State in which the Real Property is located, in the amount of the Purchase Price Allocation associated with such Store (the "Title Policies").

4.3    Title Insurance Commitments.    Seller will order from Title Insurer title insurance commitments (the "Title Commitments") naming Buyer as the proposed insured for each Store, committing to insure Buyer's leasehold interest in the Real Property (to the extent contemplated by the relevant Conveyance Instrument) relating to such Store in the amount of the Purchase Price Allocation associated with such Store, and stating all exceptions and conditions to such title, including, without limitation, all easements, restrictions, covenants, reservations and other encumbrances affecting the title. Seller will cause the Title Commitments and legible copies of the matters affecting the title to be delivered to Buyer not later than the Delivery Deadline. Buyer will have until the Review Deadline to

examine each Title Commitment and the related instruments. It is a condition of Buyer's obligation to close as to any Store, and pay to Seller the Purchase Price applicable to such Store, that title to the Real Property relating to such Store is good and marketable at Closing, and insurable subject only to the Permitted Encumbrances. Based on the foregoing, if any title is found to be objectionable to Buyer, Buyer will notify Seller in writing on or before the Review Deadline as to those matters to which Buyer objects (each such notice, a "Title Objection Notice"). Any objection Buyer may have to any matters covered by the Title Commitments (other than the Credit Agreement Liens and other Monetary Objections) will be deemed waived to the extent Buyer does not timely provide a Title Objection Notice to Seller with respect to such objection. If Buyer timely delivers a Title Objection Notice to Seller, then Seller will have 5 Business Days following receipt of such Title Objection Notice to notify Buyer in writing whether Seller is willing to cure all or any one or more of the stated objections before the relevant Real Property Escrow Date (the "Title Objection Response"); provided, however, that Seller shall be entitled within such 5 Business Day period to specify in writing to Buyer, either in a Title Objection Response or in a separate notice, one or more of the stated objections that Seller is diligently and in good faith investigating the feasibility of curing and with respect to such objections Seller will have an additional 10 Business Days after the 5 Business Day period to provide the Title Objection Response with respect to such objections. Seller shall be obligated to cure the Credit Agreement Liens and other Monetary Objections on or before the relevant Closing Date whether or not such objections are referenced in a Title Objection Notice or Title Objection Response. If Seller states in the Title Objection Response that it is unwilling to cure all or any one or more of such objections (other than the Credit Agreement Liens and other Monetary Objections) before the relevant Real Property Escrow Date, or Seller fails to timely provide a Title Objection Response with respect to all or any one or more of such objections, then Buyer will have 5 Business Days after receipt of the Title Objection Response or the deadline for giving same to elect by written notice to Seller whether to (i) waive the unresolved objections with respect to any Store or Stores affected, or (ii) terminate this Agreement as to any Store or Stores affected. The term "Permitted Encumbrances" shall mean such encumbrances as shall be accepted or deemed accepted by Buyer pursuant to the foregoing review process. In no event shall the Credit Agreement Liens or any Monetary Objections be considered Permitted Encumbrances. If Seller states in the Title Objection Response that Seller is willing to cure all or any one or more of the objections stated in the Title Objection Notice, then Seller will use reasonable, diligent and good faith efforts to cure such objections on or before the relevant Real Property Escrow Date. If Seller is unable to cure all or any one or more of such objections (other than the Credit Agreement Liens and other Monetary Objections) before the relevant Real Property Escrow Date despite

reasonable, diligent and good faith efforts to do so, then Buyer may, at its sole option, either (i) waive such unresolved objections as to any Store or Stores affected, or (ii) terminate this Agreement as to any Store or Stores affected. Seller's inability to cure the Credit Agreement Liens or other Monetary Objections shall be a default of Seller's obligations hereunder.

4.4    Surveys.    Not later than the Delivery Deadline, Seller will cause to be delivered to Buyer and Title Insurer two prints of a current boundary survey of the Real Property relating to each Store (the "Surveys") (i) prepared by U.S. Surveyor, Inc. in accordance with ALTA-ACSM - 1999 minimum standard detail requirements, (ii) showing how the matters identified in the Title Commitments affect the relevant Real Property (including but not limited to the plotting of all easements that are not blanket in nature), (iii) showing the location of any Improvements located thereon and applicable "set-back" lines, (iv) showing a metes and bounds legal description for the relevant parcels of real property described on attached Exhibit A-2 to this Agreement associated with each Lease and any easements benefiting the land (the "Legal Descriptions"), and (v) certified to Buyer, Seller and Title Insurer. Buyer will have until the Review Deadline to review each Survey and to deliver written objections to the accuracy, completeness or consistency of the legal descriptions set forth in such Survey and the related Title Commitment and to any material items noted on the Survey (each such notice, a "Survey Objection Notice"). Any objection Buyer may have to any matters covered by the Surveys will be deemed waived to the extent Buyer does not timely provide a Survey Objection Notice to Seller with respect to such objection and will be considered part of the Permitted Encumbrances. If Buyer timely delivers a Survey Objection Notice to Seller, then Seller will have 5 Business Days after receipt of such Survey Objection Notice to notify Buyer in writing whether Seller is willing to cure all or any one or more of the stated objections before the relevant Real Property Escrow Date (the "Survey Objection Response"); provided, however, that Seller shall be entitled within such 5 Business Day period to specify in writing to Buyer, either in a Survey Objection Response or in a separate notice, one or more of the stated objections that Seller is diligently and in good faith investigating the feasibility of curing and with respect to such objections Seller will have an additional 10 Business Days after the 5 Business Day period to provide the Survey Objection Response with respect to such objections. If Seller states in the Survey Objection Response that it is unwilling to cure all or any one or more of such objections before the relevant Real Property Escrow Date, or Seller fails to timely provide a Survey Objection Response with respect to all or any one or more of such objections, then Buyer will have 5 Business Days after receipt of the Survey Objection Response or the deadline for giving same to elect by written notice to Seller whether to (i) waive the unsatisfied objections with respect to any Store or Stores affected (in which case such objections

shall become Permitted Encumbrances), or (ii) terminate this Agreement as to any Store or Stores affected. If Seller states in the Survey Objection Response that Seller is willing to cure all or any one or more of the objections stated in the Survey Objection Notice, then Seller will use its reasonable, diligent and good faith efforts to cure such objections on or before the relevant Real Property Escrow Date. If Seller is unable to cure all or any one or more of such objections despite reasonable, diligent and good faith efforts to do so, then Buyer may, at its sole option, either (i) waive such unresolved objections, as to any Store or Stores affected, or (ii) terminate this Agreement as to any Store or Stores affected.

4.5    Environmental Site Assessments. Not later than the Delivery Deadline, Seller will cause to be delivered to Buyer a separate Phase I environmental site assessment covering the Real Property relating to each Store, prepared by Golder and Associates, Inc. and certified to Buyer (the "Phase I Assessments"). The Phase I Assessments will investigate, analyze and report with respect to those matters that current ASTM guidelines recommend should be included. Buyer will have until the Review Deadline to review the Phase I Assessments and to deliver written objections to any of the material items disclosed in such Phase I Assessment (each such notice, a "Phase I Objection Notice"). Any objection Buyer may have to any matters covered by the Phase I Assessments will be deemed waived to the extent Buyer does not timely provide a Phase I Objection Notice to Seller with respect to such objection. If Buyer timely sends a Phase I Objection Notice to Seller, then Seller will have 5 Business Days after receipt of the Phase I Objection Notice to notify Buyer in writing whether Seller is willing to cure all or any one or more of the stated objections before the relevant Real Property Escrow Date (the "Phase I Objection Response"); provided, however, that Seller shall be entitled within such 5 Business Day period to specify in writing to Buyer, either in a Phase I Objection Response or in a separate notice, one or more of the stated objections that Seller is diligently and in good faith investigating the feasibility of curing and with respect to such objections Seller will have an additional 10 Business Days after the 5 Business Day period to provide the Phase I Objection Response with respect to such objections. If Seller states in the Phase I Objection Response that it is unwilling to cure all or any one or more of such objections before the relevant Real Property Escrow Date, or Seller fails to timely provide a Phase I Objection Response with respect to all or any one or more of such objections, then Buyer will have 5 Business Days after receipt of the Phase I Objection Response or the deadline for giving same to elect by written notice to Seller whether to (i) waive the unsatisfied objections with respect to any Store or Stores affected, or (ii) terminate this Agreement as to any Store or Stores affected. If Seller states in the Phase I Objection Response that Seller is willing to cure all or any one or more of the objections stated in the Phase I Objection Notice, then Seller

will use its reasonable, diligent and good faith efforts to cure such objections on or before the relevant Real Property Escrow Date. If Seller is unable to cure such objections despite reasonable, diligent and good faith efforts to do so, then Buyer may, at its sole option, either (i) waive such unresolved objections as to any Store or Stores affected, or (ii) terminate this Agreement as to any Store or Stores affected.

4.6   **Lease Review.**  Buyer will have until the 10th day following the Effective Date to review the Leases and to deliver written objections to any of the material terms (each such notice, a "Lease Objection Notice"), which may include a requirement for consent of Landlord to the proposed transaction hereunder with respect to a particular Store.  Any objection Buyer may have to the provisions of the Leases will be deemed waived to the extent Buyer does not timely provide a Lease Objection Notice to Seller with respect to such objection.  If Buyer timely sends a Lease Objection Notice to Seller, then Seller will have 5 Business Days after receipt of the Lease Objection Notice to notify Buyer in writing whether Seller is willing to cure all or any one or more of the stated objections before the relevant Real Property Escrow Date (the "Lease Objection Response"); provided, however, that Seller shall be entitled within such 5 Business Day period to specify in writing to Buyer, either in a Lease Objection Response or in a separate notice, one or more of the stated objections that Seller is diligently and in good faith investigating the feasibility of curing and with respect to such objections Seller will have an additional 10 Business Days after the 5 Business Day period to provide the Lease Objection Response with respect to such objections.  If Seller states in the Lease Objection Response that it is unwilling to cure all or any one or more of such objections before the relevant Real Property Escrow Date, or Seller fails to timely provide a Lease Objection Response with respect to all or any one or more of such objections, then Buyer will have 5 Business Days after receipt of the Lease Objection Response or the deadline for giving same to elect by written notice to Seller whether to (i) waive the unsatisfied objections with respect to any Store or Stores affected, or (ii) terminate this Agreement as to any Store or Stores affected.  If Seller states in the Lease Objection Response that Seller is willing to cure all or any one or more of the objections stated in the Lease Objection Notice, then Seller will use its reasonable, diligent and good faith efforts to cure such objections on or before the relevant Real Property Escrow Date. If Seller is unable to cure such objections despite reasonable, diligent and good faith efforts to do so, then Buyer may, at its sole option, either (i) waive such unresolved objections as to any Store or Stores affected, or (ii) terminate this Agreement as to any Store or Stores affected.

4.7   In the event of any termination of this Agreement under Paragraphs 4.1.3, 4.3, 4.4, 4.5 or 4.6 of this Agreement, none of the parties thereafter will have any further rights or obligations hereunder as to the terminated Store

or Stores except with respect to the indemnifications given by Buyer in Paragraph 4.1.2 of this Agreement and except that Buyer will be entitled to the prompt return from the Escrow Agent of the Deposit attributable to such Store or Stores; provided, however, that this Agreement will be a continuing obligation of the parties as to the Stores not affected by such termination.

4.8    The rights of Buyer set forth in Paragraphs 4.1.3, 4.3, 4.4, 4.5 and 4.6 of this Agreement will constitute Buyer's sole remedy in the event that an objectionable condition is identified as a result of Buyer's due diligence investigation, the Title Commitments, Surveys, Leases or Phase I Assessments if the objection is waived by Buyer or the Agreement is terminated by Buyer as to the affected Store, notwithstanding Seller's representations in Paragraph 5 of this Agreement.

5.0    **Representations and Warranties of Seller and Winn-Dixie Relating to the Assets.**  To induce Buyer to purchase the Assets as provided above, Seller and Winn-Dixie jointly and severally represent and warrant to Buyer that, except as disclosed on Exhibit H to this Agreement:

5.1    Real Property.

5.1.1    Each of the Leases is valid and in full force and effect. There are no subleases, licenses, occupancy agreements or assignment agreements in effect with respect to any of the Leased Premises or Real Property. On or prior to the Effective Date, Seller has delivered to Buyer true, correct and complete copies of each of the Leases (including all amendments, side letters, and currently effective estoppel certificates and subordination and non-disturbance agreements with respect thereto) as in effect on the Effective Date.

5.1.2    The Seller Parties are not in default of any of the Leases. To the Knowledge of the Seller Parties (a) no condition or occurrence exists, which, with the passage of time and/or the giving of notice, would constitute a default by the Seller Parties under any of the Leases; and (b) no Landlord or subtenant under the Leases, respectively, is in default and no condition or occurrence exists which, with the passage of time and/or the giving of notice, would constitute a default by any Landlord under the Leases.

5.1.3    On or prior to the Effective Date, Seller has delivered to Buyer the following materials, to the extent such items currently exist and are in the possession or control of Seller or any of its Affiliates:

(a)    copies of the as-built plans for the Buildings;

(b)     copies of all fixture plans; and

(c)     a list, attached hereto as Section 5.1(c) of <u>Exhibit H</u> to this Agreement, of owned equipment with respect to each Store as reflected in Seller's current records;

it being understood that the materials described in this clause 5.1.3 have been provided for information purposes only with no representations or warranties by Buyer or Winn-Dixie as to accuracy, completeness or otherwise.

5.2     <u>Compliance with Land Use Regulation</u>.  Neither Seller nor Winn-Dixie has Knowledge that any of the Real Property or the Shopping Centers (including but not limited to the use and operation of the Real Property or the Shopping Centers) are not, in all material respects, in compliance with applicable building codes and zoning and land use Laws.  Neither of the Seller Parties has received any notice of any special assessments (whether by a Governmental Authority, a Landlord or otherwise) with respect to any of the Real Property or Shopping Centers.

5.3     <u>Land Use Regulation Proceedings</u>.  Neither Seller nor Winn-Dixie has Knowledge of any condemnation, environmental, zoning or other land use regulation Proceedings, either instituted or threatened pertaining to any of the Real Property or the Shopping Centers.  Neither Seller Party has made and will not make any commitments or representations to any Governmental Authority, any adjoining tenants, any Landlord, any shopping center association, or any other Person that would in any manner be binding upon Buyer or the Real Property, whether for or in connection with proffers, public improvement agreements, Shopping Center improvements, or otherwise, except those contained in currently effective estoppel certificates and subordination and non-disturbance agreements delivered to Buyer as contemplated by <u>Paragraph 5.1</u> of this Agreement or similar certificates or agreements delivered between the Effective Date and the Closing Date pursuant to obligations of either Seller Party contained in agreements existing on the Effective Date or imposed by Law.

5.4     <u>Litigation and Defaults</u>.   There is no Proceeding pending or, to the Knowledge of either Seller Party, threatened between Seller and any Landlord or any other Person with respect to any Assets, the Real Property or the Shopping Centers.  In addition, neither Seller nor Winn-Dixie has Knowledge of any default on the part of any party to the Leases, or any recorded reciprocal easement agreements or restrictive covenants affecting the Real Property or the Shopping Centers, or of any event that with notice or lapse of time would constitute such a default.  Each Seller Party and its respective predecessors (by merger, consolidation or

liquidation) and Affiliates have complied with all applicable Laws and recorded covenants, easements and restrictions with respect to the Stores, the Real Property and the Shopping Centers.

5.5    Environmental Matters.  To Seller's Knowledge, except as disclosed in the Phase I Assessments, Seller has materially complied with all Environmental, Health and Safety Requirements relating to the Shopping Centers and the Real Property, and all Laws of all Governmental Authorities having jurisdiction over any of the Shopping Centers and the Real Property, or the use thereof, relating, in any way, to any Hazardous Material.  To Seller's Knowledge, except as disclosed in the Phase I Assessments, none of the following exists at any of the Leased Premises or Real Property:  (i) under or above ground storage tanks, (ii) asbestos containing material in any form or condition, (iii) materials or equipment containing polychlorinated biphenyls, or (iv) landfills, surface impoundments, or disposal areas.  The transactions contemplated by this Agreement will not result in any liabilities to Buyer for site investigation or cleanup, or require the consent of any Person, pursuant to any Environmental, Health, and Safety Requirements, including any so-called "transaction-triggered" or "responsible property transfer" requirements. Neither of the Seller Parties has Knowledge of any violation of any Environmental, Health and Safety Requirements by any Landlords or other parties with respect to any of the Leased Premises, the Real Property or the Shopping Centers.

5.6    Condition of and Title to Assets.  The Equipment, in its existing condition, together with any equipment that is part of the Excluded Personal Property, is generally sufficient to operate the Stores in substantially the same manner as operated by Seller.  Seller has good and marketable title to the Equipment, the Inventory and all other Assets (excluding the Leased Premises, the Building and the Improvements, which are discussed in the next clause) and possesses a valid leasehold interest in the Leased Premises, the Building and the Improvements, all free and clear of all liens and encumbrances other than the Credit Agreement Liens and Monetary Objections (which will be removed at or prior to Closing) and Permitted Encumbrances.

5.7    Utilities.  All water, sewer, gas, electric, telephone, and drainage facilities and all other utilities required by Law or for the normal use and operation of the Real Property are (i) installed to the property lines of the relevant Leased Premises, (ii) connected pursuant to valid Permits, and (iii) adequate to service the Real Property for its current use.

5.8    Taxes.  Seller and Winn-Dixie have duly filed when due all Tax reports and returns in connection with and in respect of the Stores, the Assets and employees related thereto, and has timely withheld and paid and

discharged all amounts required to be withheld and paid. Seller has not received any notice of any Tax deficiency outstanding, proposed or assessed against or allocable to it, and has not executed any waiver of any statute of limitations on the assessment or collection of any Tax or executed or filed with any Governmental Authority any contract now in effect extending the period for assessment or collection of any Taxes against it. Except for current real estate taxes and collected sales and use taxes not yet due and payable as of the Closing, there are no encumbrances for Taxes upon, or pending or threatened against, any Store or Asset. Seller is not subject to any Tax allocation or sharing contract other than as provided in the Leases and other than with Affiliates.

5.9     Insurance.  Section 5.9 of Exhibit H to this Agreement contains a list, derived from Winn-Dixie's records kept in the ordinary course of business, of all insurance loss runs or workers' compensation claims received for the past three policy years with respect to the Stores. Seller Parties carry, and will continue to carry between the Effective Date and the Closing Date, all of the insurance that Seller Parties are required to carry pursuant to the Leases and Law with respect to the Stores.

5.10    Permits.  The Seller Parties possess all Permits required to be obtained for operation of the Stores by Seller. Section 5.10 of Exhibit H to this Agreement sets forth a list of Permits derived solely from Winn-Dixie's records kept at its headquarters and not by researching individual Store records and neither Seller nor Winn-Dixie makes any representation or warranty as to the accuracy or completeness of the records from which this information is derived.

6.0   **General Representations and Warranties of Seller and Winn-Dixie.**  In order to induce Buyer to purchase the Assets as provided above, Seller and Winn-Dixie jointly and severally represent and warrant to Buyer that, except as disclosed on Exhibit H to this Agreement:

6.1     Entity Status; Power and Authority.  Seller and Winn-Dixie each is a corporation duly organized, validly existing and in good standing under the Laws of the State of Florida, and has the power and authority to consummate the transactions contemplated hereunder. This Agreement and each of the closing documents to which Seller or Winn-Dixie is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required corporate action on behalf of Seller and Winn-Dixie.

6.2     Required Permits.  No Permit is or will be required in connection with the execution, delivery or performance by Seller or Winn-Dixie of this Agreement or any closing document to which Seller or Winn-Dixie is or is

to become a party or the transactions herein or therein contemplated other than those that have been obtained and are in full force and effect.

6.3    Enforceability.  This Agreement and each of the closing documents to which Seller or Winn-Dixie is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller or Winn-Dixie, enforceable against Seller or Winn-Dixie in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a Proceeding in equity or at law).

6.4    Litigation.  There is no Proceeding pending against or affecting or, to the Knowledge of either Seller Party, threatened against Seller or Winn Dixie before or by any Governmental Authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller or Winn-Dixie is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller or Winn-Dixie) have a material adverse effect on the ability of Seller or Winn-Dixie to perform its obligations under this Agreement or the closing documents to which Seller or Winn-Dixie is or is to become a party.

6.5    No Violation.  Entry into this Agreement or any of the closing documents to which Seller or Winn-Dixie is or is to become a party by Seller or Winn-Dixie will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Seller or Winn-Dixie under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement or document to which Seller or Winn-Dixie is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Seller or Winn-Dixie to perform their respective obligations under this Agreement or any of the closing documents to which Seller or Winn-Dixie is or is to become a party.

6.6    Employees.  Seller is not a party to any collective bargaining agreement with respect to the employees of the Stores and none of the employees employed by Seller in the Stores is covered by a union contract, collective bargaining agreement or other labor agreement.  No employees of the Stores are on strike or, to the Knowledge of the Seller Parties, threatening any strike or work stoppage, and there is no pending union representation election or negotiation of a collective bargaining agreement with respect to the employees of the Stores.  No Seller Party has violated the WARN Act or any similar state or local Law with respect to the Stores. There is no Proceeding pending or, to the Knowledge of either Seller Party, threatened between either Seller Party and any employee currently or

heretofore employed by Seller at any Store (including, without limitation, individuals employed on a full time, part time, or temporary basis, and individuals on loan or contracted from third parties) (the "Employees").

6.7    Employee Benefits.  With respect to any kind of employee benefit plan maintained by either Seller or Winn-Dixie for employees at the Stores, such plan has been funded and maintained in compliance with all Laws applicable thereto and the requirements of such plan's governing documents such that none of the Assets is encumbered in connection with any such employee benefit plan.

6.8    Brokers.  Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

6.9    Solvency.  None of the Seller Parties is now insolvent, nor will any Seller Party be rendered insolvent by any of the transactions contemplated by this Agreement.  As used herein, "insolvent" means that the sum of the liabilities of the applicable Seller Party exceeds the fair present value of such Seller Party's assets.  Immediately after giving effect to the consummation of the transactions contemplated by this Agreement: (a) each Seller Party will be able to pay its liabilities as they become due in the ordinary course of business of such Seller Party; (b) each Seller Party will not have unreasonably small capital with which to conduct its present or proposed business; and (c) each Seller Party will have assets (calculated at fair market value) that exceed its liabilities.

6.10    Accuracy of Information Furnished.  No representation, statement, or information contained in this Agreement (including the Exhibits) contains or will contain any untrue statement of a material fact or omits or will omit any material fact necessary to make the information contained therein not misleading.  Seller has provided Buyer with correct and complete copies of all documents listed or described in Exhibit H to this Agreement.

7.0    **Buyer's Representations and Warranties**.  Buyer represents and warrants to Seller and Winn-Dixie as follows:

7.1    Entity Status; Power and Authority.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of North Carolina, and has the power and authority to consummate the transaction contemplated hereunder.  This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required limited liability company action on behalf of Buyer.

7.2   <u>Required Permits</u>.  No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated, except for such Permits that would not, individually or in the aggregate, have a material adverse effect on Buyer's ability to perform its obligations hereunder.

7.3   <u>Enforceability</u>.  This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a Proceeding in equity or at law).

7.4   <u>Litigation</u>.  There is no Proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any Governmental Authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

7.5   <u>No Violation</u>.  Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

8.0   <u>**Covenants of Seller and Winn-Dixie**</u>.  Seller and Winn-Dixie each for itself hereby covenants for the benefit of Buyer as follows:

8.1   Seller and Winn-Dixie will (i) maintain the Assets until the relevant Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and, except with respect to any particular Stores in which Store operations were suspended prior to the Effective Date, will continue operation of the Stores in the ordinary course of business and will perform their obligations under the

Leases, (ii) will not sell, dispose of, abandon or remove from any Store any of the Assets or agree to do so except in the ordinary course of business; provided, however, it is expressly acknowledged and understood that, following the Real Property Escrow Date, Seller will take certain actions to wind up its operations at the relevant Store or Stores and eliminate or remove the Excluded Personal Property in preparation for the relevant Inventory Counts, Closings and the turnover of possession to Buyer; (iii) will not modify, amend or terminate any of the Leases, or any recorded easements, restrictions or covenants affecting any of the Real Property or Shopping Centers, without the express written consent of Buyer; (iv) will not enter into any subleases, licenses, occupancy agreements or assignment agreements with respect to any of the Leases or Leased Premises nor any easements, covenants, conditions or restrictions with respect to any Real Property or Shopping Centers; (v) will not cause any material changes to the Buildings or Improvements for any of the Stores other than repairs in the ordinary course of business; and (vi) will promptly give Buyer copies of any notices given by any of the Landlords after the Effective Date.

8.2     Seller and Winn-Dixie will use reasonable commercial efforts to obtain all required Permits and the Required Consents as required to perform the obligations of Seller and Winn-Dixie under this Agreement and each of the closing documents to which either is or is to become a party and to attain the fulfillment of the conditions set forth in Paragraphs 10 and 11 of this Agreement.

8.3     Seller and Winn-Dixie will use reasonable commercial efforts to obtain from each of the Landlords an estoppel certificate substantially in the form of Exhibit I-1 to this Agreement or in such substantively similar form as may be provided for under the particular Lease (the "Estoppel Certificate"). Seller and Winn Dixie agree that "reasonable commercial efforts" shall include, without limitation, sending out a written request for an Estoppel Certificate within seven (7) Business Days of the Effective Date, and following up by telephone or e-mail with each of the Landlords at least once every two weeks.

8.4     Seller and Winn-Dixie will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with each Closing and the issuance of the Title Policies.

8.5     Seller will remove all Excluded Personal Property on or before the relevant Closing Date, except that Seller may remove its signs and panels that are part of the Excluded Personal Property within 48 hours after the relevant Closing Date and may do so in coordination with the installation by Buyer's sign contractor of Buyer's own signs and panels.

8.6     On and after the Real Property Escrow Date, Seller will release to Buyer a schedule of Seller's current employees at the relevant Store or Stores, and will permit Buyer, at reasonable times during normal business hours and with minimum impact on Seller's business, to arrange for personal interviews with Store managers and other Store employees, at times and places mutually agreeable to both Seller and Buyer, and to arrange for those relevant employees of Seller, who are interested, to interview with Buyer.

8.7     Seller will (except to the extent otherwise required by the Family Medical Leave Act) transfer or terminate all its employees at each Store on the relevant Closing Date.   For purposes of clarity, Seller shall remain responsible for payment of, and shall pay, all amounts payable by Seller Parties or any of their Affiliates to or for terminated Employees of Seller prior to Closing including, without limitation, amounts due in respect of wages and salary, vacation pay, severance pay, COBRA benefits, and other employee benefits.   Seller shall retain the responsibility for all workers' compensation claims of Store employees arising from events occurring prior to Closing.

8.9     Seller and Winn-Dixie will (i) furnish to Buyer such necessary information and reasonable assistance as Buyer may request in connection with its preparation of any filing, registration or declaration that is necessary under any Law for the consummation of the transactions contemplated hereby, (ii) keep Buyer apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Authority, and will comply promptly with any such inquiry or request, (iii) use their reasonable commercial efforts to obtain any consent, approval, order or authorization of any Governmental Authority necessary in connection with the transactions contemplated hereby or to resolve any objections that may be asserted by any Governmental Authority with respect to such transactions, and (iv) in the event any Proceeding by any Person is commenced that questions the validity or legality of any of the transactions contemplated hereby or seeks damages in connection therewith, cooperate with Buyer and use all reasonable efforts to defend against such Proceeding and, if an injunction or other order is issued in any such Proceeding, use all reasonable efforts to have such injunction or other order lifted.

8.10    Seller and Winn-Dixie will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Buyer in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

9.0 **Covenants of Buyer.** Buyer for itself hereby covenants for the benefit of Seller and Winn-Dixie, as follows:

9.1 Buyer will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with each Closing and the issuance of the Title Policies.

9.2 Buyer will use reasonable commercial efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in Paragraph 11 of this Agreement. Buyer agrees that "reasonable commercial efforts" shall include, without limitation, submitting applications for all required Permits (including Permits for the sale of beer and wine) within seven (7) Business Days of the Effective Date, and following up by telephone or e-mail with each of the applicable Governmental Authorities at least once every two weeks.

9.3 Buyer will coordinate the installation of its signs and panels with the removal by Seller of its signs and panels within 48 hours after each Closing Date.

9.4 Buyer will (i) furnish to Seller and Winn-Dixie such necessary information and reasonable assistance as Seller or Winn-Dixie may request in connection with its preparation of any filing, registration or declaration that is necessary under any Law for the consummation of the transactions contemplated hereby, (ii) keep Seller and Winn-Dixie apprised of the status of any communications with, and any inquiries or requests for additional information from, any Governmental Authority, and will comply promptly with any such inquiry or request, (iii) use its reasonable commercial efforts to obtain any consent, approval, order or authorization of any Governmental Authority necessary in connection with the transactions contemplated hereby or to resolve any objections that may be asserted by any Governmental Authority with respect to such transactions, and (iv) in the event any Proceeding by any Person is commenced that questions the validity or legality of any of the transactions contemplated hereby or seeks damages in connection therewith, cooperate with Seller and Winn-Dixie and use all reasonable efforts to defend against such Proceeding and, if an injunction or other order is issued in any such Proceeding, use all reasonable efforts to have such injunction or other order lifted.

9.5 Provided that an Employee of a Store files an application for employment with Buyer and such Employee otherwise satisfies Buyer's employment requirements and needs, Buyer will consider hiring such Employee and assign such Employee to a location in the trade area as Buyer's employment needs dictate, but Buyer shall have no obligation to hire any

such Employees or to pay any Employees wages or salaries, or provide benefit plans, comparable to those paid or offered by Seller. Any such Employee whose employment is terminated by Seller and who is subsequently hired by Buyer is herein referred to as a "New Buyer Employee" and collectively, as the "New Buyer Employees." Buyer shall be entitled to encourage any Employee to accept any employment offered by Buyer. Nothing herein shall require Buyer to continue the employment of any New Buyer Employee for any period of time following the Closing. If Buyer hires any Employee whose employment is terminated by Seller and who is subsequently hired by Buyer, Buyer shall not be required to give any such employee or New Buyer Employee any credit for service as Employees of Seller prior to Closing for purposes of eligibility, vesting, eligibility for retirement and benefit accrual and participation in any retirement, pension or 401(k) plans, or for any deductibles, co-payments or applicable waiting periods under any benefit plans.

9.6     Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller and Winn-Dixie in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

10.0    **Conditions Precedent to Buyer's Obligations.**  The obligations of Buyer under this Agreement as to each Store are subject to the satisfaction on or before the relevant Closing Date, or such earlier date as herein provided, of all conditions contained in this Agreement relating to such Store, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

10.1    Seller and Winn-Dixie will have performed all of their covenants contained in this Agreement, and all of Seller's and Winn-Dixie's representations and warranties contained in this Agreement, with respect to such Store will be true and accurate in all material respects (disregarding any materiality qualifiers contained in any such representations and warranties) on the Effective Date and as of such Closing Date.

10.2    The relevant Delivery Deadline, Review Deadline and Seller Response Deadline, if applicable, will have occurred and all applicable notice time limits under Paragraphs 4.1.3, 4.3, 4.4, 4.5 and 4.6 of this Agreement shall have expired.

10.3    No material adverse change in the facts on which Buyer's approval of the relevant Title Commitment, Survey, Phase I Assessments and Leases in accordance with Paragraphs 4.3, 4.4, 4.5 and 4.6 of this Agreement is based will have occurred prior to the Closing.

10.4    Seller shall have delivered to Buyer Estoppel Certificates (either made by Landlords or by Seller) and such Estoppels Certificates shall not have revealed any material adverse facts about any of the Assets that had not been delivered or revealed pursuant to the due diligence process set forth in Article 4 of this Agreement or pursuant to the representations set forth in Articles 5 and 6 of this Agreement.

10.5    No material adverse change in the facts on which Buyer's approval of the relevant Leases prior to the Effective Date of this Agreement will have occurred prior to the Closing. Buyer and Seller stipulate that a "material adverse change" shall include, but not be limited to, (a) a notice of default given by any Landlord (unless such default has been cured prior to the Closing Date); and (b) a claim asserted by a Landlord (whether or not Buyer or Seller agree with such claim) that such Landlord's consent is required to assign such Lease (unless such consent has been obtained prior to the Closing Date or such Landlord has agreed that no consent is required).

10.6    The Required Consents listed on Exhibit J and any other Required Consents that Buyer specifies in a Lease Objection Notice pursuant to Paragraph 4.6 of this Agreement shall have been obtained without conditions or limitations and otherwise in form and substance reasonably acceptable to Buyer.

10.7    There will not have occurred any material adverse change to the relevant Assets (including without limitation, any uncured notices of defaults under the Leases), or any part thereof, ordinary wear and tear, condemnation and insured casualty excepted.

10.8    The Title Insurer will have issued the relevant Title Policy or will be irrevocably and unconditionally committed to issue the relevant Title Policy effective as of such Closing Date.

10.9    All material Permits (including, where applicable, consent of the relevant Landlord) required to be obtained prior to such Closing Date in connection with the consummation of the transactions contemplated hereby with respect to such Store will have been obtained (without any materially adverse terms, limitations or conditions), and such Permits will be in full force and effect.

10.10   Seller will have delivered to Escrow Agent on or before the relevant Real Property Escrow Date each item listed in Paragraph 14.2 of this Agreement.

10.11   No order, injunction or decree issued by any applicable Governmental Authority or other legal restraint or prohibition preventing the

consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

10.12 This Agreement shall not have been terminated for any reason whatsoever with respect to any of the Key Stores; it being understood that Buyer may, at its option, terminate this Agreement with respect to all Stores in the event this Agreement is terminated with respect to any of the Key Stores.

11.0 **Conditions Precedent to Seller's Obligations.** The obligations of Seller and Winn-Dixie under this Agreement as to each Store are subject to the satisfaction on or before the relevant Closing Date, or such earlier date as herein provided, of all conditions contained in this Agreement relating to such Store, including each of the following (any of which may be waived by Seller and Winn-Dixie in their sole discretion, unless otherwise stated herein):

11.1 Buyer will have performed all of its covenants contained in this Agreement, and all of Buyer's representations and warranties contained in this Agreement, with respect to such Store will be true and accurate in all material respects (disregarding any materiality qualifiers contained in any such representations and warranties) on the Effective Date and as of such Closing Date.

11.2 All material Permits (including, where applicable, consent of the relevant Landlord but excluding any material Permits required by Buyer for or relating to the operation of the Stores by Buyer) required to be obtained prior to such Closing Date in connection with the consummation of the transactions contemplated hereby with respect to such Store will have been obtained (without any materially adverse terms, limitations or conditions), and such Permits will be in full force and effect.

11.3 No order, injunction or decree issued by any applicable Governmental Authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

11.4 This Agreement shall not have been terminated for any reason whatsoever with respect to Store #967, Quinton, VA; it being understood that Seller may, at its option, terminate this Agreement with respect to all Stores in the event this Agreement is terminated with respect to Store #967, Quinton, VA.

12.0 **Loss by Fire or Other Casualty; Condemnation.** In the event that, prior to a Closing, the relevant Assets, or any material part thereof, are destroyed or materially damaged, or if condemnation Proceedings are commenced against any part of the relevant Real Property, either party will have the right, exercisable

by giving notice of such decision to the other within 5 Business Days after receiving written notice of such damage, destruction or condemnation Proceedings, to terminate this Agreement as to the Assets affected by such loss, and thereafter none of the parties will have any further rights or obligations hereunder as to such Assets; provided, however, that this Agreement will be a continuing obligation of the parties as to the Stores not affected by such termination and provided further, however, that Buyer will be entitled to the return from the Escrow Agent of the Deposit attributable to such Store or Stores. If neither party exercises its right of termination with respect to the Assets affected by such casualty or Proceeding and the Assets are sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

13.0   **Possession**.  Seller will turn over exclusive physical possession of each Store and the Assets associated therewith, including all keys, combinations to safes, security codes and passwords, to Buyer at the conclusion of the Inventory Count for such Store provided that the Inventory Count for such Store commences no earlier than the close of business on the day immediately preceding the Closing Date for such Store; otherwise at the commencement of such Closing Date. After conclusion of the Inventory Count for each Store, or upon Closing for such Store, whichever is earlier, Buyer may commence preparation for opening of such Store as a Buyer's store including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and commencing electrical and wiring work required in order to install Buyer's POS and other equipment, signage, etc.

14.0   **Closing.**

14.1   The Closing for each Store (which may occur on the same date as Closings for other Stores) hereunder will occur on the Closing Date for such Store or such other date agreed to by Seller, Winn-Dixie and Buyer. The Closings will be conducted by use of escrows administered by Escrow Agent pursuant to the terms and conditions of this Agreement, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller and Winn-Dixie based on satisfaction of the terms and conditions of this Agreement.

14.2   On or before the Real Property Escrow Date for each Store, Seller will, subject to the conditions contained in Paragraph 11 of this Agreement, deliver the following ("Seller's Escrowed Items") to Escrow Agent:

(i)    The Lease Assignment substantially in the form of Exhibit K to this Agreement ( the "Conveyance Instrument");

(ii)     A certificate executed by the appropriate officers of each of Seller and Winn-Dixie as to their compliance with the conditions set forth in <u>Paragraph 10.1</u> of this Agreement;

(iii)    The relevant Bill of Sale, executed by Seller;

(iv)    The relevant General Assignments, executed by Seller;

(v)     an Estoppel Certificate executed by the relevant Landlord or a certificate executed by Seller substantially in the form of <u>Exhibit I-2</u> to this Agreement with respect to each Lease;

(vi)    The relevant Closing Statement, executed by Seller;

(vii)   Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof, including without limitation, evidence of the corporate authority of the person executing the closing documents on behalf of the Seller Parties;

(viii)  A DEA Power of Attorney in the form attached as <u>Exhibit L</u> to this Agreement, executed by Seller, if as of the Closing Date Buyer has not received a DEA Registration;

(ix)    An Operating Agreement in the form attached as <u>Exhibit M</u> to this Agreement, executed by Seller, for each Designated Store where Buyer, as of the relevant Closing Date, has not received an alcoholic beverage permit or approval of the transfer of the Designated Store's existing alcoholic beverage Permit from the applicable Governmental Authority;

(x)     Any other documents, instruments or agreements called for hereunder for delivery by Seller or Winn-Dixie with respect to such Store that have not previously been delivered; and

(xi)    Any other documentation with respect to such Store required of Seller or Winn-Dixie under local Law.

Buyer may waive compliance by Seller or Winn-Dixie as to any of the foregoing items in a manner permitted by <u>Paragraph 15.7</u> of this Agreement. Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent will be deemed to be an acknowledgement by Seller that the conditions of <u>Paragraph 11</u> of this Agreement have been fulfilled or waived as of the relevant Real Property Escrow Date, excluding such conditions required under this Agreement to be satisfied as of the Closing Date or at the Closing and subject to any

circumstances that may affect such conditions between the Real Property Escrow Date and the related Closing Date.

14.3    On or before the Real Property Escrow Date for each Store or Stores, Buyer will, subject to the conditions contained in <u>Paragraph 10</u> of this Agreement, deliver the following ("<u>Buyer's Escrowed Items</u>") to Escrow Agent:

(i)     The relevant Conveyance Instrument, executed by Buyer;

(ii)    A certificate executed by the appropriate officers of Buyer as to its compliance with the conditions set forth in <u>Paragraph 11.1</u>;

(iii)   The relevant Closing Statement, executed by Buyer;

(iv)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof;

(v)     An Operating Agreement in the form attached as <u>Exhibit M</u> to this Agreement, executed by Buyer, for each Designated Store where Buyer, as of the relevant Closing Date, has not received an alcoholic beverage permit or approval of the transfer of the Designated Store's existing alcoholic beverage Permit from the applicable Governmental Authority;

(vi)    Any other document, instruments or agreements called for hereunder for delivery by Buyer that have not previously been delivered; and

(vii)   Any other documentation required of Buyer under local Law.

Seller and Winn-Dixie may waive compliance by Buyer as to any of the foregoing items in a manner permitted by <u>Paragraph 15.7</u> of this Agreement. Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will be deemed to be an acknowledgement by Buyer that the conditions of <u>Paragraph 10</u> of this Agreement have been fulfilled as of the Real Property Escrow Date, excluding such conditions required under this Agreement to be satisfied as of the Closing Date or at the Closing and subject to any circumstances that may affect such conditions between the Real Property Escrow Date and the related Closing Date.

14.4    At the Closing for each Store or Stores:

14.4.1 Seller will, subject to the conditions contained in <u>Paragraph 11</u> of this Agreement (a) direct Escrow Agent to deliver Seller's Escrowed Items

to Buyer and (b) deliver any other items to Buyer that Seller is required to deliver to Buyer hereunder at the Closing; and

14.4.2 Buyer will, subject to the conditions contained in Paragraph 10 of this Agreement (a) direct Escrow Agent to deliver Buyer's Escrowed Items to Seller and (b) deliver any other items to Seller that Buyer is required to deliver to Seller hereunder at the Closing.

14.5    With respect to the Leases, all items customarily prorated in transactions similar to the transactions contemplated under this Agreement shall be prorated at Closing including, without limitation, rental or other payments under the Leases; all common area maintenance charges and assessments under the Leases; real estate taxes; utilities including, without limitation, water, sewer, gas and electricity, if the responsibility for such utilities cannot be transferred to Buyer as of the Closing Date. If, at any time after the Closing Date, the amount of any Closing cost or pro-rated charge or adjustment shall prove to be incorrect (whether as a result of an omission, an error in calculation or a lack of complete or current information as of the Closing or otherwise), the party in whose favor the error was made shall pay to the other party the sum necessary to correct such error within thirty (30) days after receipt of reasonable evidence of such error, provided that such evidence must be delivered within one (1) year after Closing. The provisions of the foregoing sentence shall survive Closing.

14.6    On each Closing Date, Winn-Dixie, Seller and Buyer will each deposit such other instruments with the Title Insurer as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the relevant Assets in accordance with the terms hereof.

14.7    Winn-Dixie or Seller will pay Seller's Closing Costs, if any, relating to each Store, and Buyer will pay Buyer's Closing Costs, if any, relating to each Store.

15.0    **Miscellaneous**.

15.1    Termination.

(a)    This Agreement may be terminated, and the transactions contemplated hereby abandoned, as to any or all Stores not the subject of a completed Closing, only as follows:

(i)    by written consent of Winn-Dixie, Seller and Buyer;

(ii)    at the election of either Buyer or Winn-Dixie and Seller, if the relevant Closing will not have occurred on or before February 15,

2005, provided that no party will be entitled to terminate this Agreement pursuant to this clause (ii) if such party's failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the relevant Closing to occur on or before such date;

(iii)   at the election of Buyer as provided in <u>Paragraphs 4.1.3, 4.3, 4.4, 4.5, 4.6, 10.12 and 12</u> of this Agreement or if the condition set forth in <u>Paragraph 10.9</u> of this Agreement shall have become incapable of fulfillment and shall not have been waived by Buyer; or

(iv)   at the election of Seller and Winn-Dixie as provided in <u>Paragraphs 11.4 and 12</u> of this Agreement or if the condition set forth in <u>Paragraph 11.3</u> of this Agreement shall have become incapable of fulfillment and shall not have been waived by Seller and Winn-Dixie.

(b)   If this Agreement is terminated with respect to any Store or Stores for any reason, then, as to the Store or Stores affected by such termination, all materials provided by Seller to Buyer and all materials relating to the relevant Assets obtained by Buyer and all copies of any such materials will be delivered to Seller within 5 Business Days following termination. In the event this Agreement is terminated pursuant to <u>Paragraph 15.1(a)(iii)</u> of this Agreement with respect to the condition set forth in <u>Paragraph 10.9</u> of this Agreement, or pursuant to <u>Paragraph 15.1(a)(iv)</u> of this Agreement with respect to the condition set forth in <u>Paragraph 11.3</u> of this Agreement, Buyer shall be entitled to the prompt return of the relevant portion of the Deposit, and Seller shall direct Escrow Agent to return such portion of the Deposit to Buyer.

(c)   Upon any termination of this Agreement with respect to any Store or Stores pursuant to <u>Paragraph 15.1(a)(ii)</u> of this Agreement each party will retain any rights it may have against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement; <u>provided, however,</u> in the event this Agreement is terminated by Seller or Winn-Dixie pursuant to <u>Paragraph 15.1(a)(ii)</u> of this Agreement and Buyer's failure to satisfy the condition to Closing set forth in <u>Paragraph 11.1</u> of this Agreement was the cause of or resulted in the failure of the relevant closing to occur on or before December 15, 2004, Buyer shall forfeit and promptly direct the Escrow Agent to release to Seller the relevant portion of the Deposit (such amount to be deemed a non-refundable deposit by Buyer to Seller in consideration of Seller's execution and delivery of this Agreement and to constitute liquidated damages for any breach by Buyer on or prior to the relevant Real Property Escrow Date of the terms and conditions of this Agreement, it being understood that with respect to a breach by Buyer

41

following the Real Property Escrow Date, Seller Parties will be entitled to receive the relevant portion of the Deposit and any other rights they may have) and; provided, further, however, in the event this Agreement is terminated pursuant to Paragraph 15.1(a)(ii) of this Agreement other than as contemplated by the preceding *proviso*, Buyer shall be entitled to the prompt return of the relevant portion of the Deposit and Seller shall direct Escrow Agent to return such portion of the Deposit to Buyer. The parties waive their rights to seek or receive recovery of consequential or speculative damages.

15.2    Notices. All notices, requests, demands, offers, communications and document deliveries required or permitted to be given pursuant to this Agreement will conform to the requirements of this Paragraph 15.2 and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller, Buyer or Winn-Dixie at their respective addresses stated below:

If to Seller or Winn-Dixie:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Senior Vice President
Telefax No. 904 370 5551
e-mail: *bennettnussbaum@winn-dixie.com*

With a copy to:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Office of General Counsel
Telefax No. 904 783 5651
e-mail: larryappel@winn-dixie.com

and

Kirschner & Legler, P.A.
300A Wharfside Way
Jacksonville, Florida 32207
Attn: Kenneth M. Kirschner
Telefax No.  904 346 3299
e-mail: kmkirschner@leglerlaw.com

If to Buyer:

Food Lion, LLC
P.O. Box 1330
2110 Executive Drive
Salisbury, NC  28145-1330
Attn:  Real Estate Department
Telefax No.  704-636-4940
e-mail:  realestate@foodlion.com

With a separate copy to the same address set forth above, to the attention of the Legal Department, fax:  704-639-1353; e-mail: agoodrich@foodlion.com (both copies shall be required in order to constitute notice hereunder).

With a copy to:

Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Ave., NW
Washington, D.C. 20036
Attn:  Franz R. Rassman
Telefax No. 202-887-4288
e-mail: frassman@akingump.com

or such other address as any party may from time to time specify by notice to the other.

15.3    Notice of Certain Inquiries.  If any party is contacted, whether before or after any Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state Governmental Authority, with respect to any transactions contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

15.4    Brokers and Finders.  The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Agreement other than that due by Seller to Seller's Brokers.  Seller agrees to pay all fees and commissions claimed by Seller's Brokers as a result of the transaction contemplated by this Agreement, which fees and commissions will be considered payable by Seller with respect to a Store only if, as and when the relevant Closing contemplated by this Agreement occurs.  Except for Seller's Brokers, neither Seller nor Buyer has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement.  Seller and Buyer hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts, said indemnifications by Seller and Buyer to survive the Closings or earlier termination of this Agreement.

15.5    Successors and Assigns.  This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

15.6    Assignment.  Neither Seller and Winn-Dixie, on the one part, nor Buyer, on the other, may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the reasonable discretion of the party whose consent is so required. Notwithstanding the foregoing, Buyer may assign or delegate all or any portion of its rights and obligations under this Agreement to an Affiliate of Buyer, without the consent of the Seller Parties so long as Buyer remains primarily liable for Buyer's obligations hereunder.

15.7    Amendments.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller, Winn-Dixie and Buyer (and delivered physically or by facsimile transmission or by e-mail from any party or its counsel to the other party or its counsel provided such e-mail expressly states it is sent pursuant to the provisions of this paragraph and provided the other party or its counsel

indicates its agreement thereto by written instrument or e-mail in accordance with the provisions of this paragraph).

15.8    <u>Governing Law</u>.  The application and effect of this Agreement as to any particular Store or Stores will be governed by and construed in accordance with the Laws of the State in which such Store or Stores is located; the application and effect of this Agreement as to any matter of the rights and obligations of the parties generally will be governed by and construed in accordance with the Laws of the Commonwealth of Virginia.

15.9    <u>Merger of Prior Agreements</u>.  This Agreement supersedes all prior agreements and understandings between the parties hereto, other than the Confidentiality Agreement, and (except for the Confidentiality Agreement) constitutes the entire agreement of the parties with respect to the matters contained herein.    **BUYER AND SELLER EACH ACKNOWLEDGES ITS OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT CONTINUE AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT.**

15.10    <u>Publicity</u>.  Prior to the relevant Real Property Escrow Date, neither party will, without the consent of the other party, issue any press release or make any public statement, internal announcement or media response regarding the transactions contemplated hereby with respect to the Store or Stores relating to such Real Property Escrow Date (including any statement or other oral or written communication to employees of any such Store or Stores other than statements to specific employees reasonably necessary in connection with the transactions contemplated hereby), except where such release or statement is required by applicable Law or pursuant to any listing agreement with, or the rules or regulations of, any securities exchange or any other regulatory requirement, in which case the disclosing party will endeavor to provide the other party with as much prior notice of the content of such release or statement as is reasonably practicable under the circumstances.    On and after the relevant Real Property Escrow Date, (i) Buyer may communicate directly with a Store's employees prior to the Closing relating to such Store only to the extent provided in <u>Paragraph 8.6</u> of this Agreement; and (ii) prior to issuing any press release or making any public statement other than direct communications with Store employees, each party will notify the other party and will cooperate with the other as to the timing, and provide the other party an opportunity to comment on the content, of the proposed release or statement.  Notwithstanding, and as an optional alternative to, the provisions of <u>Paragraph 15.2</u> of this Agreement, notices and other communications with respect to matters covered by clause (ii) of the preceding sentence may, to the extent reasonably practicable, be made as follows:

If to Seller or Winn-Dixie:

Kathy Lussier
Office Telephone: (904) 370-6025
Cell Telephone (904) 327-1445
e-mail: kathylussier@winn-dixie.com

If to Buyer:

Jeff Lowrance
Office Telephone: (704) 633-8250, x-3888
Corporate Communications Department
e-mail: jclowrance@foodlion.com

or such other or additional contact person or address as either party may from time to time specify by notice to the other.

15.11 <u>Time is of the Essence</u>.  Time is of the essence of this Agreement.

15.12 <u>No Recordation</u>.  This Agreement will not be recorded in any public office or court, except that upon default it may be presented to a court of competent jurisdiction.

15.13 <u>Headings</u>.  The paragraph headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

15.14 <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

15.15 <u>Compliance with Bulk Sales Laws</u>.  Buyer acknowledges that the Seller Parties may not comply with provisions of any bulk transfer Laws of any jurisdiction in connection with the transactions contemplated by this Agreement.  Seller and Winn-Dixie will jointly and severally indemnify Buyer for any claims, liabilities, losses, damages, costs and expenses, including without limitation the fees and disbursements of counsel suffered or incurred by Buyer resulting from any encumbrance attaching to the Assets as a result of such non-compliance.

15.16 <u>Dates</u>.  If any date upon which action is required under this Agreement, including without limitation the Real Property Escrow Date and the Closing Date, shall not be a Business Day, the date for such action shall be extended to the first Business Day after such date.

15.17 <u>Survival</u>.  The Seller Parties' and Buyer's respective obligations and liabilities under this Agreement shall survive Closing (except for any obligations and liabilities that have been waived or that are deemed waived pursuant to the terms of this Agreement) and shall not be merged with Seller's delivery of the Conveyance Instruments; provided, however, any party's liability for breach of any representation or warranty made by such party in this Agreement shall terminate twelve (12) months after Closing, except to the extent the other party has commenced, on or before such date, a Proceeding based on the breach thereof.

15.18 <u>Specific Performance</u>.  Each Seller Party acknowledges and agrees that Buyer would be damaged irreparably if any provision of this Agreement to be performed by a Seller Party is not performed by such Seller Party in accordance with its specific terms or is otherwise breached by such Seller Party.  Accordingly, each Seller Party agrees that Buyer will be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement by such Seller Party and to enforce specifically this Agreement and its terms and provisions in any Proceeding instituted in any court of the United States or any state thereof having jurisdiction over the parties and the matter, subject to <u>Paragraph 15.8</u>, in addition to any other remedy to which they may be entitled, at law or in equity.

16.0 **<u>Indemnification</u>.**

16.1 <u>Indemnification by Seller Parties</u>.  Winn-Dixie and Seller shall jointly and severally indemnify, defend and hold harmless Buyer and its members, directors, officers, employees, affiliates, attorneys and representatives ("<u>Buyer Indemnified Parties</u>") from and against any and all liabilities, claims, damages (other than consequential or speculative damages), costs, expenses (including reasonable attorneys' fees), judgments, Proceedings, causes of action, and losses (collectively, "<u>Damages</u>") arising out of or in any way connected with (i) Seller's ownership and operation of the Assets or Seller's lease or ownership of any of the Assets or any portion thereof, prior to Closing; (ii) acts or omissions of either Seller Party or any of their Affiliates occurring at or in connection with any Asset prior to Closing; (iii) any Taxes (whether assessed or unassessed) that relate to any of the Assets, or the ownership or operation thereof, for any period prior to Closing including, without limitation, any Taxes arising by reason of the transactions contemplated herein; (iv) the breach of any covenant, agreement, or (subject to <u>Paragraph 15.17</u> of this Agreement) warranty or representation of Seller or Winn-Dixie contained in this Agreement or any agreement or certificate contemplated hereby; (v) either Seller Party's or any of such Person's Affiliates' former or current employment of any officers, directors, employees, consultants or independent contractors at or in connection with any of the Assets and/or

47

the termination of such employment including, without limitation, in connection with any employee benefit plans or collective bargaining, labor or employment agreements or any similar arrangement or obligation in respect of retiree health benefits, statutory or contractual severance, vacation, benefits and/or accrued wages and in connection with any actual or alleged unfair labor practice, discrimination, wrongful discharge, WARN Act, COBRA, Employee Retirement Income Security Act of 1974, as amended, workers' compensation, breach of contract or related claims; (vi) any real and/or personal property, rights and/or interests of Seller that are not being assigned or conveyed to Buyer pursuant to this Agreement; (vii) any contract or agreement (whether written, oral or otherwise) to which either Seller Party or any of its Affiliates is a party and that was entered in connection with or otherwise affecting any Asset, other than Buyer's obligations in respect of the Assumed Liabilities and Buyer's obligations under this Agreement, the Confidentiality Agreement, the Conveyance Instrument and any other agreement to which Buyer is a party that is with or for the benefit of any Seller Party entered into pursuant to or in connection with this Agreement; or (viii) any violation or alleged violation of any Law not disclosed in the Phase I Assessments arising from any act, omission or condition occurring or existing at or in connection with any Asset prior to Closing including, without limitation, any violation of the Americans with Disabilities Act or any Environmental, Health and Safety Requirements with respect to any Asset, except to the extent that any such Damages arise as a direct result of any activities, acts, omissions or negligence of any of the Buyer Indemnified Parties.

16.2    Buyer's Indemnification.    Buyer agrees to indemnify, defend and hold harmless each Seller Party and its shareholders, members, directors, officers, employees, affiliates, attorneys and representatives (the "Indemnified Seller Parties") from and against any and all Damages arising out of or in any way connected with (i) the Assumed Liabilities, (ii) any Taxes (whether assessed or unassessed) that relate to Buyer's ownership or operation of the Assets for any period following Closing, (iii) the breach of any covenant, agreement, or (subject to Paragraph 15.17 of this Agreement) warranty or representation of Buyer contained in this Agreement or any agreement or certificate contemplated hereby, (iv) Buyer's employment of any person at any Asset after the Closing, or (v) any violation or alleged violation by Buyer of any Environmental, Health and Safety Requirement with respect to any Asset that is based on any facts, circumstances, actions or omissions that first occur or commence or relate to a period subsequent to Closing, except to the extent that any such Damages arise as a direct result of any activities, acts, omissions or negligence of any of the Seller Indemnified Parties.

## 17.0  **Escrow Agent.**

17.1  Duties.  By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon its receipt of funds and documents from Buyer, Escrow Agent will receive and hold such funds, and interest accrued thereon, and documents in trust to be disposed of in accordance with the provisions of this Agreement at the instruction of Buyer.  Upon its receipt of documents from the Seller Parties, Escrow Agent will receive and hold such documents in trust to be disposed of in accordance with the provisions of this Agreement at the instruction of Seller.

17.2  Indemnity.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent. If the escrowed funds or interest accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all loss, cost, damage, liability or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct.   If the indemnity amounts payable hereunder result from the fault of Buyer or Seller and Winn-Dixie (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts.  Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.

17.3  Dispute.  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest accrued thereon until the matter is resolved either by joint written direction from the parties or by the court having jurisdiction of the dispute or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor.   In any Proceeding regarding the escrowed funds or interest accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Buyer is not the prevailing party in such Proceeding.  If there is no prevailing party, Seller and Buyer each shall be responsible for one-half of such costs and fees.

18.0  **Waiver of Jury Trial**.  Buyer, Seller and Winn-Dixie each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transactions contemplated herein undesirable.  Accordingly, Buyer, Seller and Winn-Dixie each knowingly, voluntarily and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Agreement or the transactions contemplated herein.

[Signature page follows]

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the Effective Date.

Witnesses:

**SELLER:**

**WINN-DIXIE  RALEIGH,  INC.,** a  Florida corporation

By:_____
    Name: _Bennett L. Nussbaum_
    Title: Vice President

**WINN-DIXIE:**

**WINN-DIXIE  STORES,  INC.,** a  Florida corporation

By:_____
    Name: _Bennett L. Nussbaum_
    Title: Senior Vice President

**BUYER:**

**FOOD LION, LLC,** a North Carolina limited liability company

By:_____
    Name: R. Glenn Dixon, Jr.
    Title: Senior Vice President

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the Effective Date.

Witnesses:

**SELLER:**

**WINN-DIXIE RALEIGH, INC.,** a Florida corporation

By:_____
   Name: _____
   Title: Vice President

**WINN-DIXIE:**

**WINN-DIXIE STORES, INC.,** a Florida corporation

By:_____
   Name: _____
   Title: Senior Vice President

**BUYER:**

**FOOD LION, LLC,** a North Carolina limited liability company

By:_____
   Name: R. Glenn Dixon, Jr.
   Title: Senior Vice President

Acknowledged this 15 day of December, 2004:

**ESCROW AGENT:**

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _____
Name: ___Leonard R. Gray, Jr.___
Title: ___Counsel, National Commercial Services___
        ___First American Title Insurance Company___