1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    05-11063-rdd
     ---------------------------------x
5
     IN RE:
6
           WINN-DIXIE STORES, INC.
7
     ---------------------------------x
8                    United States Custom House
                     One Bowling Green
9                    New York, New York

10                   April 12, 2005
                     12:50 p.m.
11

12

13

14   B e f o r e:

15     ROBERT D. DRAIN,

16        United States Bankruptcy Judge

17

18
     Motion to Transfer Venue of the Debtors'
19   Bankruptcy Cases to the United States
     Bankruptcy Court for the Middle District
20   of Florida, Jacksonville Division or Such
     Other District Where Venue Would Be
21   Appropriate filed by Buffalo Rock Company

22
     Application of Official Committee of
23   Unsecured Creditors Of Winn-Dixie Stores,
     Inc., et al., For Order Authorizing
24   Retention and Employment of Milbank,
     Tweed, Hadley & McCloy LLP as Counsel

25

2

1

2    RE: Doc #561; Motion of Riverdale Farms,
Inc. to Join Motion of Buffalo Rock

3    Company to Transfer Venue of the Debtors'
Bankruptcy Cases to the United States

4    Bankruptcy Court for the District of
Florida

5

6    RE: Doc # 569; Debtors' Response to Motion
of Buffalo Rock Company to Transfer Venue

7

8    RE: Doc # 612; Motion for Relief from Stay
Motion for Relief from Stay Joint Motion

9    of Debtors and Commonwealth of Kentucky
for Relief from Stay to Allow for

10   Continuation of Condemnation Proceedings

11

Motion to Join in the Motion of Buffalo

12   Rock Company to Transfer Venue (related to
document(s)407) filed by Bradley T.

13   Keller, Richard S. Ehster

14

RE: Doc #624; Motion to Join the Motion of

15   Buffalo Rock Company to Transfer Venue
(related document(s){407}) filed by Ernst

16   Properties, Inc.

17

RE: Doc #640 Response of Clorox Sales Co.

18   to Motion to Join the Motion of Buffalo
Rock Company to Transfer Venue

19

20   Objection of Official Committee of
Unsecured Creditors of Winn-Dixie Stores,

21   Inc., et al., to Motion of Buffalo Rock
Company, Transferring Venue of Debtors'

22   Cases

23

24

25

3

1

2   RE: Doc #644; Objection of Edens & Avant,
    Weingarten Realty Investors, Palm Springs
3   Mile Associates, Ltd., Villa Rica Retail
    Properties, L.L.C., ALG Limited
4   Partnership and Curry Ford, LP to the
    Objection of The Official Committee of
5   Unsecured Credtors

6
    RE: Doc #647; Opposition by Buffalo Rock
7   Company Seeking Entry of an Order
    Transferring Venue of Debtors' Cases
8   (related document(s)[407])

9
    Objection of Wilmington Trust Company, as
10  Indenture Trustee, and Joinder in
    Objection of Official Committee of
11  Unsecured Creditors of Winn-Dixie Stores,
    Inc., et al., to Motion of Buffalo Rock
12  Company Seeking Entry of an Order
    Transferring Venue of Debtor
13

14  Joinder of Certain Utility Companies in
    Support of Motion of Buffalo Rock Company
15  to Transfer Venue

16
    Motion to Join in Support of Motion of
17  Buffalo Rock Company to Transfer Venue
    filed by Dairy Farmers of America, Inc.
18

19  Motion to Join Motion of Buffalo Rock
    Company to Transfer Venue filed by Ja-Ru,
20  Inc., Beaver Street Fisheries, Inc.

21
    Motion to Join Motion to Transfer Venue
22  (related document(s) 407) filed by Florida
    Power & Light Company
23

24

25

4

1

2    RE: Doc #690; Omnibus Response to
     Objections to Motion of Buffalo Rock
3    Company to Transfer Venue of the Debtors'
     Bankruptcy Cases to the United States
4    Bankruptcy Court for the Middle District
     of Florida, Jacksonville Division (related
5    document(s)[643])

6
     RE: Doc #696; Notice of Hearing on April
7    12, 2005 (related document(s) [411], [23],
     [562], [536], [296], [24], [489], [564],
8    [13], [472], [407], [612], [495], [510],
     [487], [488])
9

10

11

12

13   Reported by:
        Todd DeSimone, RPR
14

15

16

17

18

19

20

21

22

23

24

25

5

```
 1

 2   A P P E A R A N C E S :

 3
     BURR & FORMAN LLP
 4   3100 Southtrust Tower
     420 North 20th Street
 5   Birmingham, Alabama 35203
             Attorneys for Buffalo Rock Company,
 6           Inc.
     BY:    ROBERT B. RUBIN, ESQ.
 7           DEREK F. MEEK, ESQ.
             MARC P. SOLOMON, ESQ.
 8

 9
     DECHERT LLP
10   30 Rockefeller Plaza
     New York, New York 10112
11           Attorneys for Buffalo Rock Company,
             Inc.
12   BY:    ELISE SCHERR FREJKA, ESQ.
             JOEL LEVITIN, ESQ.
13

14
     SKADDEN ARPS SLATE MEAGHER & FLOM LLP
15   Four Times Square
     New York, New York 10036
16           Attorneys for Debtors
     BY:    GEORGE A. ZIMMERMAN, ESQ.
17           D.J. BAKER, ESQ.
             STEVEN EICHEL, ESQ.
18

19

20   MILBANK, TWEED, HADLEY & McCLOY LLP
     One Chase Manhattan Plaza
21   New York, New York 10005-1413
             Attorneys for The Official
22           Committee of Unsecured Creditors
     BY:    LUC A. DESPINS, ESQ.
23           MATTHEW S. BARR, ESQ.
             DENNIS F. DUNNE, ESQ.
24

25
```

6

1

2    A P P E A R A N C E S: (Continued)

3

     DLA PIPER RUDNICK GRAY CARY US LLP
4    1200 Nineteenth Street, NW
     Washington, DC  20036-2412
5            Attorneys for Kraft Foods, et al.
     BY:    DANIEL J. CARRIGAN, ESQ.
6            JOSEPH I. MARCHESE, ESQ.

7

8    GREENBERG TRAURIG, LLP
     Met Life Building
9    200 Park Avenue
     New York, New York 10166
10           Attorneys for Equity One
     BY:    RICHARD S. MILLER, ESQ.
11           MARK D. BLOOM, ESQ.

12

13   WHITEMAN, BANKES & CHEBOT, LLC
     Suite 1300
14   Constitution Place
     325 Chestnut Street
15   Philadelphia, Pennsylvania 19106
             Attorneys for Sunkist Growers,
16           et al.
     BY:    JEFFREY M. CHEBOT, ESQ.
17

18
     BALLARD SPAHR ANDREWS & iNGERSOLL, LLP
19   1735 Market Street
     51st Floor
20   Philadelphia, Pennsylvania 19103
             Attorneys for New Plan Excel Realty
21           Trust, Inc, et al.
     BY:    DAVID I. POLLACK, ESQ.
22

23

24

25

7

```
 1

 2    A P P E A R A N C E S: (Continued)

 3
      KOZYAK, TROPIN & THROCKMORTON, P.A.
 4    2525 Ponce de Leon
      Coral Gables, Florida 33134
 5          Attorneys for Lennar Partners
      BY:    JOHN W. KOZYAK, ESQ.
 6

 7
      WOLF, HILL, McFARLIN & HERRON, P.A.
 8    1851 West Colonial Drive
      Orlando, Florida 32804
 9          Attorneys for Richard Ehsten
      BY:    FRANK M. WOLFF, ESQ.
10          DAVID R. McFARLIN, ESQ.

11

12    PORZIO BROMBERG & NEWMAN P.C.
      100 Southgate Parkway
13    Post Office Box 1997
      Morristown, New Jersey 07962-1997
14          Attorneys for Riverdale Farms
      BY:    WARREN J. MARTIN, JR., ESQ.
15

16
      TOGUT SEGAL & SEGAL LLP
17    One Penn Plaza
      New York, New York 10119
18          Conflicts Counsel for Debtors
      BY:    ALBERT TOGUT, ESQ.
19

20
      U.S. DEPARTMENT OF JUSTICE
21    OFFICE OF THE UNITED STATES TRUSTEE
      33 Whitehall Street
22    21st Floor
      New York, New York 10004
23    BY:    RICHARD C. MORRISSEY, ESQ.
             DEIRDRE MARTINI, ESQ.
24

25
```

8

```
 1

 2   A P P E A R A N C E S: (Continued)

 3   HELD & ISRAEL, ESQS.
     Suite 1916 Riverplace Tower
 4   1301 Riverplace Boulevard
     Jacksonville, Florida 32207
 5           Attorneys for Beaver Street
             Fisheries, et al.
 6   BY:     EDWIN W. HELD, JR., ESQ.

 7

 8   OTTERBOURG STEINDLER HOUSTON & ROSEN P.C.
     230 Park Avenue
 9   New York, New York 10169
             Attorneys for Wachovia Bank
10   BY:     JONATHAN N. HELFAT, ESQ.

11

12   ELK BANKIER CHRISTU & BAKST LLP
     Esperante
13   Suite 1330
     222 Lakeview Avenue
14   West Palm Beach, Florida 33401
             Attorneys for Garden Park Plaza
15   BY:     MICHAEL R. BAKST, ESQ.

16

17   SCARCELLA ROSEN & SLOME LLP
     333 Earle Ovington Boulevard
18   Ninth Floor
     Uniondale, New York 11553
19           Attorneys for Florida Power & Light
     BY:     JIL MAZER-MARINO, ESQ.
20

21
     HERRICK FEINSTEIN LLP
22   2 Penn Plaza
     Newark, New Jersey 07105
23           Attorneys for Ernst Properties
     BY:     JOHN AUGUST, ESQ.
24

25
```

9

1

2    A P P E A R A N C E S: (Continued)

3    KELLEY DRYE & WARREN LLP
     101 Park Avenue
4    New York, New York 10178
          Attorneys for various landlords
5    BY:    ROBERT LEHANE, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

10

```
 1
 2                    THE COURT:  Let's go on the
 3      record on Winn-Dixie.
 4                    MR. RUBIN:  Your Honor, I'm
 5      counsel for the movant.  Your Honor, if I
 6      may, we have handed up to your clerk some
 7      agreed stipulation of facts --
 8                    MR. BAKER:  Excuse me, we had a
 9      couple of noncontested matters.  I wonder
10      if we could do those first in case anybody
11      is here for those.
12                    THE COURT:  Sure.
13                    MR. BAKER:  At the request of
14      the U.S. Trustee, your Honor, most of the
15      matters that were originally set today
16      were delayed or adjourned pending a
17      determination by your Honor of the venue
18      motion.  There were I think three matters
19      that the parties conclude it probably made
20      sense to go ahead and present an order on.
21                    The first of those related to
22      the Debtors' request for an order under
23      Section 365(d)(4) extending the time to
24      assume or reject nonresidential real
25      estate leases.  There were I think five
```

11

1
2    objections.  What we agreed to with all of
3    the objecting parties was to seek a bridge
4    order that would simply continue the time
5    period for making that determination or
6    requesting a further extension to the next
7    scheduled hearing in this case.  I think
8    all of the objecting parties were fine
9    with that.
10           THE COURT:  All right.  I've
11    reviewed that order, and that is fine.
12    That will be entered today.
13           MR. BAKER:  The next matter,
14    your Honor, the Commonwealth of Kentucky
15    had started a condemnation action with
16    respect to two properties, or the frontage
17    along two store properties.  We've talked
18    to the Commonwealth's Legal Office.  They
19    convinced the Debtors that it made sense
20    to let that go forward.  It will generate
21    a modest cash inflow to the Debtor, and
22    actually they think that benefits store
23    traffic.  So they were willing to do that.
24    As far as we know, there are no objections
25    to that.

12

```
 1
 2              THE COURT:  Does anyone want to
 3   be heard on that motion?
 4              Hearing no one, I will grant
 5   that based on the moving papers.  It is
 6   clearly in the interest of the Debtor.
 7              MR. BAKER:  The final matter,
 8   your Honor, was to authorize the retention
 9   of Milbank Tweed as Committee counsel.
10   Insofar as we are aware, no objections
11   were filed to that.
12              THE COURT:  I haven't seen any
13   either.
14              Does anyone want to address
15   this motion?
16              Again, based on there being no
17   objections, as well as my review of the
18   moving papers and the affidavit, I will
19   approve the retention.
20              MR. BAKER:  Thank you, your
21   Honor.
22              Now we are ready to go into the
23   venue matter, which Mr. Zimmerman will be
24   primarily handling for the Debtors.
25              MR. ZIMMERMAN:  Your Honor, the
```

13

1
2    Debtors have only one witness we would
3    like to call at this time, Mr. Larry
4    Appel.
5              MR. RUBIN:  Excuse me, your
6    Honor, before we commence this proceeding,
7    we have a stipulation of facts that have
8    been entered into between the Debtors and
9    the movant.  Pursuant to our telephonic
10   hearing on Friday, we were able to take
11   Mr. Appel's deposition yesterday.
12   Mr. Zimmerman and I have signed the
13   stipulation.  We would like to submit it
14   to the Court.  Then, of course, if he
15   wants to proceed with his testimony.
16              THE COURT:  I'm assuming your
17   examination is premised on the facts being
18   agreed to, correct?
19              MR. ZIMMERMAN:  Yes, but we
20   will not be repeating any of those facts
21   in the direct testimony.
22              MR. DESPINS:  Luke Despins with
23   Milbank Tweed on behalf of the Committee.
24              The stipulation is between the
25   Debtors and the movant.  The Committee

14

```
 1              APPEL - DIRECT
 2   will cross the witness on the stipulation
 3   when the witness is put up.
 4             THE COURT:  Okay.
 5             MR. RUBIN:  May we approach
 6   with the stipulation?
 7             THE COURT:  Yes.
 8      *   *   *
 9   L A R R Y  B.  A P P E L:
10   called as a witness, having been first
11   duly sworn, was examined and testified
12   as follows:
13   DIRECT EXAMINATION
14   BY MR. ZIMMERMAN:
15      Q.      Would you state your full name
16   for the record, please?
17      A.      Larry Bruce Appel.
18      Q.      By whom are you employed?
19      A.      Winn-Dixie Stores.
20      Q.      What is your current position
21   with Winn-Dixie?
22      A.      Senior vice president, general
23   counsel, and corporate secretary.
24      Q.      How long have you had that
25   position?
```

15

```
 1                 APPEL - DIRECT

 2       A.        Approximately two and a half

 3  years.

 4       Q.        Could you briefly summarize

 5  your responsibilities as senior VP and

 6  general counsel?

 7       A.        Sure.  I supervise the Legal

 8  Department.  I oversee the operation of

 9  our compliance program.  As corporate

10  secretary, I'm responsible for

11  communications and operations between

12  management and the board of directors, and

13  I also oversee our Loss Prevention and our

14  Security departments as well.

15       Q.        Just for convenience, I'm going

16  to refer to the Debtors as Winn-Dixie

17  unless I specify otherwise.

18       A.        I understand.

19       Q.        Mr. Appel, were you involved

20  personally in the deliberations by

21  Winn-Dixie leading to the filing of the

22  Chapter 11?

23       A.        Yes, I was.

24       Q.        Were you involved in the

25  deliberations leading to the selection of
```

16

```
 1                APPEL - DIRECT
 2  New York as the original venue?
 3      A.      Yes, I was.
 4      Q.      What other members of
 5  Winn-Dixie management were involved in
 6  those processes?
 7      A.      Winn-Dixie management would
 8  have included Bennett Nussbaum, our chief
 9  financial officer, Peter Lynch, our CEO,
10  and Jay Skelton, our chairman of the
11  board, as well as myself.
12      Q.      In connection with the decision
13  to both file for Chapter 11 and the
14  initial selection of New York as a venue,
15  did you have any advisors participating in
16  those deliberations?
17      A.      Yes, we did.
18      Q.      Could you identify them?
19      A.      We have legal advisors, King &
20  Spalding and Skadden Arps, and we have
21  restructuring advisors, Crossroads Group
22  and our investment bankers, Blackstone.
23      Q.      Before deciding on New York as
24  the initial venue, did management consider
25  the possibility of commencing Chapter 11
```

17

```
 1              APPEL - DIRECT
 2   in Jacksonville, Florida?
 3      A.      Yes, we did.
 4      Q.      Were you personally involved in
 5   those deliberations?
 6      A.      Yes, I was.
 7      Q.      Did those deliberations include
 8   an analysis of the potential benefits and
 9   any downsides of Jacksonville versus New
10   York?
11      A.      Yes.
12      Q.      Can you tell us what you
13   remember being discussed about potential
14   benefits of a filing in Jacksonville?
15      A.      The potential benefits of being
16   in Jacksonville, Florida, well, we
17   discussed the fact that company management
18   is located in Jacksonville and it would be
19   a little bit more convenient for us for
20   court hearings if we didn't travel back
21   and forth.
22              We also discussed the fact that
23   we are a Jacksonville-based company.  We
24   are 75 years old.  The founding family is
25   in Jacksonville.  The company and the
```

18

2    founding family, the Davis family, have

3    substantial roots in Jacksonville, invest

4    in the communities civically and

5    charitably, and Jacksonville would be a

6    community that we had some goodwill and

7    would want Winn-Dixie to restructure

8    successfully.

9         Q.      Were there any potential

10   downsides in the management discussions

11   about the possibility of Jacksonville as

12   the venue?

13        A.      I wouldn't necessarily call it

14   a downside, but we did talk about the fact

15   that we were a very large, if not the

16   largest, company in Jacksonville, and that

17   if the proceedings were in Jacksonville,

18   there would be a lot of press coverage on

19   those proceedings.

20               And not that we were worried

21   one way or the other about it being good

22   or bad, but we definitely had a belief

23   that one of the keys to restructuring

24   successfully was sort of segmenting to a

25   small group the case management, to the

19

```
 1              APPEL - DIRECT
 2   lawyers and some of the financial people,
 3   and really keeping the large bulk of our
 4   employees not distracted by restructuring
 5   cases, but focused on what was important
 6   to the operational turnaround, which is
 7   taking care of our customers in the
 8   stores.
 9              And more coverage, whether bad
10   or good, might make it a little more
11   difficult, just the more people read.
12        Q.      In the deliberations about
13   where to file venue, I take it there were
14   deliberations and discussions about New
15   York as a possible venue?
16        A.      Yes.
17        Q.      Did you participate in those
18   discussions?
19        A.      Yes, I did.
20        Q.      Could you tell me, was there an
21   analysis of the relative benefits and
22   downsides of filing in New York as well?
23        A.      Yes.
24        Q.      What do you remember about the
25   potential benefits being discussed about
```

20

```
 1                APPEL - DIRECT
 2   New York as a venue?
 3       A.       The most significant benefit of
 4   New York was our belief that our creditors
 5   would find it a convenient forum for us to
 6   be in.  We had talked to our advisors.  We
 7   had talked to our outside restructuring
 8   advisors, folks who have a lot of
 9   experience in restructuring such as ours,
10   who have experience in retail
11   restructurings.
12                Based on their experience,
13   based on their understanding of our
14   specific facts, and I believe based on
15   their reaching out to, directly or
16   indirectly, to some of the significant
17   creditors that would be involved in our
18   case, they talked to us about the fact
19   that New York would be a good place to
20   establish a strong relationship with our
21   important creditors, and that having
22   strong relationships with the creditors
23   would be an important part of the
24   successful turnaround.
25                That was, to some extent,
```

```
 1                APPEL - DIRECT
 2   consistent with our own data.  We looked
 3   at our list of our top 100 creditors and
 4   we saw 30 of them had offices in New York
 5   and 9 of them had offices in Florida.
 6   With travel schedules and everything we
 7   looked at, it made sense to us.  So that
 8   was a major consideration.
 9        Q.      Do you know what specific
10   creditors your financial advisors may have
11   reached out to in advising you?
12        A.      I believe that we had some
13   level of direct or indirect input from
14   some of our bondholders or their
15   representatives and from our lending
16   group.
17        Q.      Who was the lender?
18        A.      Wachovia is the primary agent.
19        Q.      Do you directly have interface
20   with Wachovia?
21        A.      Yes.
22        Q.      Is there a specific branch that
23   is handling this?
24        A.      Yes, the New York office.
25        Q.      Was there any discussion of any
```

22

```
 1              APPEL - DIRECT
 2    potential negatives with respect to New
 3    York?
 4        A.      Other than I would have to take
 5    a -- some people like me would have to
 6    take a few more plane trips, no.
 7        Q.      Are you familiar with the
 8    motion papers filed by Buffalo Rock?
 9        A.      Yes, I am.
10        Q.      There was a suggestion that New
11    York was selected in an effort by the
12    Debtors to somehow escape or run away or
13    evade Jacksonville.  Is that true?
14        A.      That is patently untrue.
15        Q.      Based on your personal
16    involvement in the deliberative process,
17    was there any discussion about escaping or
18    running away or in any way trying to avoid
19    Jacksonville?
20        A.      I believe I was involved in
21    every discussion on this issue, and there
22    was none at any time.  It was absolutely
23    to the contrary.  We were trying to do
24    something that would make us most
25    accessible to the creditor community, not
```

23

```
 1              APPEL - DIRECT
 2   inaccessible.
 3      Q.      In coming to New York, did the
 4   management make a conclusion as to bottom
 5   line whether New York would be an
 6   appropriate place for this restructuring
 7   to take place?
 8              MR. RUBIN:  Objection to the
 9   form of the question, your Honor.
10              THE COURT:  On what basis?
11              MR. RUBIN:  Calls for a mental
12   conclusion on the part of the witness.
13              MR. ZIMMERMAN:  I think a
14   witness is, first of all, permitted to
15   testify about his own mental conclusions,
16   because I don't know who else could.
17              THE COURT:  Why don't you
18   phrase the question just in his role as
19   general counsel.
20      Q.      Based on your understanding,
21   based on your role as general counsel and
22   your involvement in the process, can you
23   tell me what the bottom-line conclusion
24   was of the company with respect to the
25   appropriateness of New York as a venue for
```

24

```
 1              APPEL - DIRECT
 2    this filing?
 3        A.      Sure.  That New York was an
 4    appropriate venue for us.
 5        Q.      Based on the developments that
 6    have occurred subsequent to the filing,
 7    including the Buffalo Rock motion, do you
 8    know whether management's assessment and
 9    conclusions that you've just testified to
10    changed in any way?
11        A.      No, they haven't changed at
12    all.
13        Q.      You still believe New York is
14    an appropriate forum?
15        A.      Absolutely.  To the extent that
16    one of the main considerations was
17    convenience to creditors, the fact that
18    the Creditor Committee and several of our
19    trade vendors and landlords and others
20    have submitted motions to that effect
21    suggest that we were right.
22        Q.      Did management at one point
23    become aware of the fact that Buffalo Rock
24    had filed a motion to transfer venue?
25        A.      Yes.
```

25

APPEL - DIRECT

2   Q.      Do you know how they became

3   aware of that?

4   A.      I believe that either Jan Baker

5   or somebody else at the Skadden firm

6   provided me a copy of the filing, and we

7   made management aware of it.

8   Q.      Did you review the motion to

9   transfer?

10   A.      Yes, I did.

11   Q.      The fact that the motion to

12   transfer had been made, did that receive

13   press in Florida?

14   A.      Yes, it did.  It received a

15   great deal of press.

16   Q.      Were there any press reports

17   purporting to summarize or quote from some

18   of Buffalo Rock's moving papers?

19   A.      There were many.

20   Q.      Buffalo Rock, in its motion,

21   suggests that the Debtors selected New

22   York to somehow reduce or eliminate

23   creditor involvement in the proceedings.

24   Are you aware of that?  Are you familiar

25   with those charges?

26

```
 1                APPEL - DIRECT

 2       A.      I know what it says.

 3       Q.      I know you testified to it

 4  before, but was that the intent of

 5  Winn-Dixie in selecting New York?

 6       A.      Absolutely not.  Nothing could

 7  be farther from the truth.

 8       Q.      Was it ever discussed to file

 9  in New York to reduce or eliminate

10  creditor involvement?

11       A.      The opposite was discussed.

12       Q.      Did management discuss and

13  consider an appropriate response to the

14  motion that was made by Buffalo Rock?

15       A.      Yes, we did.

16       Q.      Did you personally participate

17  in those discussions?

18       A.      Yes.

19       Q.      Did the company ultimately

20  reach a decision as to how to best respond

21  to the motion?

22       A.      We ultimately decided to file

23  the response which we did requesting a

24  transfer of venue to Florida.

25       Q.      Who else other than yourself
```

```
 1                APPEL - DIRECT
 2  was involved in that deliberative process?
 3      A.      The same individuals from
 4  management that I mentioned before.  That
 5  would be myself, Peter Lynch, Bennett
 6  Nussbaum, Jay Skelton, and the same
 7  advisor group, being Blackstone,
 8  Crossroads, Skadden Arps.  At that point I
 9  don't think King & Spalding would have
10  been involved.
11      Q.      Does the Debtor still believe
12  that New York is an appropriate venue?
13      A.      Yes.
14      Q.      Why has the Debtor decided to
15  now ask this court to transfer these
16  proceedings to Jacksonville?
17      A.      Basically all of the facts that
18  caused us to make the initial decision,
19  none of them had changed.  But there was
20  one new intervening subsequent event or
21  fact, if you will, which was the filing of
22  the motion.
23              It was a motion that I think
24  purposely contained some very harsh
25  language and was picked up that way in the
```

28

```
 1              APPEL - DIRECT
 2   press.  It said things like "fabricating
 3   venue."  It talked about management making
 4   decisions to hide from creditors.  It
 5   talked about bad faith, references like
 6   Enron, comparisons like Enron.  The press
 7   asked questions like did we pick New York
 8   because it was debtor-friendly, because we
 9   would get larger retention programs,
10   because our advisors would make more
11   money.
12              All of those things were
13   inaccurate.  None of those things were
14   things that we discussed, considered.
15   They were just absent.  As a result, A, I
16   don't want to use the word offensive, but
17   it was offensive to the management team.
18   Nobody likes to be painted with that kind
19   of brush.
20              More importantly, you could use
21   the word distracting, but damaging, the
22   distraction was damaging to the company.
23   I had business leaders who travel
24   regularly, our CEO saying he gets asked on
25   every trip why are we in New York and are
```

29

```
 1                  APPEL - DIRECT
 2   we hiding from something not being in
 3   Florida.  Our HR Group was telling me
 4   there was a huge awareness within just
 5   sort of general associates of this issue
 6   and are we doing something shady.
 7   Frankly, that was damaging to us.
 8                As I said before, one of the
 9   things we thought was important was to
10   segregate case management and allow the
11   large majority of our associates to focus
12   on the business.  We were being damaged by
13   all of the inaccurate statements that came
14   out as a result of that motion.  We had
15   said all along we would be happy in
16   Florida and we weren't hiding from
17   anything.
18                And, frankly, we needed to stop
19   that damage, and actions speak louder than
20   words, so the best thing we need to do is
21   file the response we did and say we always
22   would have been happy in Florida, let's
23   move it to Florida.
24        Q.     Do you believe that moving to
25   Florida, to Jacksonville, Florida, will
```

30

```
 1                APPEL - DIRECT
 2    undo all of the harm that has been caused
 3    by these charges that were publicized
 4    against you?
 5        A.        No, we don't.  I think once you
 6    cast those aspersions out in the air,
 7    there is no way to undo all of it.
 8        Q.        Then tell us why you believe
 9    that since those charges have now been
10    cast, why moving to Jacksonville is better
11    for the company in the company's view than
12    staying.
13        A.        All of this is a balance.  On
14    the one hand, we can stay in New York and
15    people can read about a legal decision
16    that was entered, or we can come back to
17    Jacksonville and physically show people
18    that we are there and we have nothing to
19    hide.  On balance, the latter of those two
20    may be more powerful and more effective.
21                I think the most important
22    thing that can come out of today is for
23    our communities and our associates and our
24    constituencies to understand after this
25    process that we, as a company, did nothing
```

31

```
 1              APPEL - DIRECT
 2  inappropriate, illegal, unethical, or in
 3  bad faith.  Those kinds of innuendo are
 4  damaging to our state.
 5              MR. ZIMMERMAN:  No further
 6  questions, your Honor.
 7              THE COURT:  Okay.  Does anyone
 8  wish to cross-examine Mr. Appel?
 9              MR. DESPINS:  Your Honor, just
10  a question.  I'm not sure where we are
11  procedurally in the sense that it is the
12  movant's motion, they tendered stipulated
13  facts, but then the Debtor presented a
14  witness.
15              So are the movants -- is their
16  case closed?  Where are we in the process?
17  I don't want to cross-examine until I know
18  where the movants are.  First they have to
19  put their case on.
20              THE COURT:  But you don't wait
21  for their case to close to cross-examine.
22  Are you asking whether the movants want to
23  examine on direct?
24              MR. DESPINS:  That is the first
25  question.  It is their case to put on
```

32

```
 1              APPEL - DIRECT
 2   first.  Is their case closed?
 3              THE COURT:  Do you want any
 4   additional direct examination of
 5   Mr. Appel?
 6              MR. RUBIN:  We would like to
 7   ask a couple of questions.
 8              THE COURT:  Okay.  Why don't
 9   you go ahead and then we will have
10   cross-examination.
11   DIRECT EXAMINATION
12   BY MR. RUBIN:
13     Q.     Mr. Appel, in your testimony
14   today you indicated that financial
15   advisors on behalf of the company talked
16   to bondholders and lenders prior to the
17   filing of the bankruptcy case in respect
18   to the choice of New York as the venue for
19   this case; is that not correct?
20     A.     I said that I believe they did
21   speak either directly or indirectly to
22   those constituencies or their advisors.
23     Q.     Did you not in your deposition
24   yesterday testify that none of your
25   advisors spoke with any of the trade
```

33

```
 1                APPEL - DIRECT
 2   creditors who are also creditors in this
 3   case, that the discussion of venue was
 4   limited to bondholders and lenders?
 5        A.      No, I think what I said
 6   yesterday is I was unaware whether they
 7   had spoken to any trade creditors, but
 8   they very well may have.  I don't know of
 9   that.
10        Q.      You are not aware of any trade
11   creditors that your advisors spoke to in
12   respect to the issue of venue prior to the
13   filing of the petition, are you?
14        A.      That's correct.
15        Q.      I will ask you, sir, have you
16   seen the stipulation of facts that has
17   been filed this morning?
18        A.      Yes, I have.
19        Q.      And you've authorized your
20   counsel to execute that stipulation on
21   behalf of the company; is that not
22   correct?
23        A.      Yes, I have.
24        Q.      The facts as stated in the
25   stipulation are true and correct to the
```

34

```
 1                    APPEL - DIRECT
 2   best of your knowledge, information, and
 3   belief; are they not?
 4        A.       To the best of my knowledge,
 5   information, and belief, yes, they are.
 6                    MR. RUBIN:  Now, in addition to
 7   the stipulation, there were certain
 8   exhibits introduced into evidence
 9   yesterday in respect to the deposition,
10   Judge, which we would like to make part of
11   the record in respect to the stipulation.
12                    All of the exhibits which we
13   wish to introduce, starting with Exhibit 3
14   and ending with Exhibit 11, are pleadings
15   that have been filed in this case and the
16   Court could take judicial knowledge of.
17                    THE COURT:  You don't need to
18   introduce those.  I will take judicial
19   knowledge of them.  You can identify them
20   for the record.
21        Q.       First of all, Mr. Appel, you
22   did identify for us --
23                    MR. RUBIN:  And if I may
24   approach the witness, your Honor?
25                    THE COURT:  Sure.
```

35

```
 1              APPEL - DIRECT
 2     Q.      Mr. Appel, for the record, you
 3  did identify as an exhibit the articles of
 4  incorporation of Dixie Stores, Inc.?
 5     A.      I did, yes.
 6             MR. RUBIN:  We offer that.
 7     Q.      You also identified as an
 8  exhibit to your deposition the petition
 9  that was filed by Dixie Stores, Inc.; is
10  that not correct?
11     A.      I did.
12     Q.      You then also identified an
13  engagement letter dated February the 7th
14  by and between Skadden Arps and Winn-Dixie
15  Stores, Inc. in respect to the engagement
16  of Skadden; did you not?
17     A.      Yes, sir.
18     Q.      You did also identify the
19  bankruptcy petition of Table Supply Food
20  Stores Co., Inc.; is that not correct?
21     A.      Yes, that's correct.
22     Q.      You did identify the
23  declaration of Bennett L. Nussbaum
24  pursuant to Local Bankruptcy Rule 1007-2
25  in support of first-day motions and
```

36

```
 1              APPEL - DIRECT
 2   applications; did you not?
 3       A.      Yes, sir.
 4       Q.      You identified also as an
 5   exhibit to your deposition the summary of
 6   the schedules of Winn-Dixie Stores, Inc.;
 7   is that not correct?
 8       A.      Yes.
 9       Q.      You identified, did you not,
10   sir, as part of your deposition testimony
11   the motion of Richard J. Ehster and
12   Bradley T. Keller to join in the motion of
13   Buffalo Rock; is that not correct, sir?
14       A.      Yes, it is.
15       Q.      You also identified as an
16   exhibit to your deposition a part of the
17   schedules of Winn-Dixie Stores, Inc.,
18   paragraph 18 of the schedule statement of
19   affairs, including the nature, location,
20   and name of each business of each Debtor;
21   is that not correct?
22       A.      Schedule 18 of the statement of
23   financial affairs, yes.
24       Q.      You also did identify for the
25   purposes of your deposition the Debtors'
```

```
 1                APPEL - DIRECT
 2  response to the motion of Winn-Dixie
 3  Stores, Inc.?
 4       A.       I believe I did.
 5                MR. RUBIN:  Judge, we offer all
 6  those.  I ask the Court to take judicial
 7  knowledge of those.
 8                THE COURT:  I will take
 9  judicial knowledge.
10                MR. RUBIN:  Thank you, sir.
11       Q.       You are aware of the fact, are
12  you not, sir, that there were also not
13  only joinders filed in respect to the
14  Buffalo Rock motion, but also joinders
15  filed by others in support of Buffalo Rock
16  as well as joinders in opposition to the
17  motion filed with the Committee?  There
18  were joinders on both sides?
19       A.       Yes.  I specifically mentioned
20  the Creditor Committee because our
21  understanding is they act as fiduciaries
22  for all creditors.
23                MR. RUBIN:  Those are all the
24  questions.  We would like the opportunity
25  to argue the stipulation to the Court at
```

38

```
 1                 APPEL - DIRECT
 2   the appropriate time, go through the
 3   stipulation, and give the Court our
 4   version of what we think the law is.
 5                 THE COURT:  Okay, very well.
 6                 MR. McFARLIN:  Your Honor, may
 7   I ask a couple of questions on direct
 8   examination before we get to that?
 9                 My name is David McFarlin.  We
10   are representing a couple of the employee
11   creditors and retirees of Winn-Dixie.
12                 THE COURT:  Okay.
13                 MR. McFARLIN:  Just a couple of
14   questions, Mr. Appel.
15   DIRECT EXAMINATION
16   BY MR. McFARLIN:
17       Q.      You had indicated that employee
18   distraction or avoiding employee
19   distraction was one of your considerations
20   in selecting venue; is that correct?
21       A.      It was a small factor, but
22   sure.  We wanted to have our associates
23   focused on the task at hand, taking care
24   of customers.
25       Q.      And associates are employees?
```

```
 1                APPEL - DIRECT
 2       A.       Yes.  We use the term
 3  associates to refer to employees.
 4       Q.       Are you familiar with the
 5  Winn-Dixie nonqualified deferred
 6  compensation plans, in particular a
 7  management security plan and a
 8  supplemental retirement plan?
 9       A.       Yes, I am.
10       Q.       What are those?
11       A.       They are deferred compensation
12  retirement plans.
13       Q.       Who gets to participate in
14  those?
15       A.       Well, the plans set forth the
16  criteria, but, broadly speaking,
17  management employees.
18       Q.       Would you be able to
19  participate?
20       A.       I would.
21       Q.       Could you tell me approximately
22  how many participants are involved in
23  those plans?
24       A.       I'm sorry, I don't know the
25  answer to that.
```

40

```
 1              APPEL - DIRECT
 2      Q.      Can you tell me, give or take
 3  $50 million, the total amount of the
 4  obligations of Winn-Dixie under those
 5  plans?
 6      A.      I apologize, but no, I can't.
 7  I don't know the number.
 8      Q.      Even give or take $50 million?
 9      A.      I really don't.  If I had an
10  opportunity to look at financial
11  statements, I'm sure I could derive it,
12  but I don't know it sitting here right
13  now.
14              MR. McFARLIN:  Thank you, I
15  appreciate it.
16              THE COURT:  Before we get to
17  cross, does anyone else want to ask direct
18  questions?
19              MR. RUBIN:  I have one more
20  question, your Honor.  May I ask it?
21              THE COURT:  Yes.
22  DIRECT EXAMINATION
23  BY MR. RUBIN:
24      Q.      Mr. Appel, in the stipulation
25  your counsel signed, in paragraph 12 it
```

41

```
 1              APPEL - DIRECT
 2   states "All of the Debtors' employees are
 3   employed in the southeastern United
 4   States."  You agreed with that statement.
 5              But the one thing that is
 6   missing, how many employees are there of
 7   the company?
 8   A.      I think what I had asked it to
 9   say is "substantially all."  But it is
10   substantially all.  It may be all.  I'm
11   not sure.  It is roughly 79,000.
12   Q.      79,000 employees?
13   A.      I think that is the right
14   number.
15   Q.      Substantially all of those are
16   in the southeastern United States?
17   A.      I believe that's correct.
18              MR. RUBIN:  Thank you, Judge.
19   That is it.
20              MR. MARTIN:  Your Honor, Warren
21   Martin for Riverdale Farms.  I joined in
22   the motion.  A couple of questions.
23   DIRECT EXAMINATION
24   BY MR. MARTIN:
25   Q.      Mr. Appel, you testified quite
```

42

```
 1              APPEL - DIRECT
 2  clearly that it was not Debtors' intention
 3  to limit creditor involvement in choosing
 4  New York as a venue?
 5       A.      Absolutely not, that's correct.
 6       Q.      Does it have that effect,
 7  though, in any event?
 8       A.      I don't think so.
 9       Q.      How about employees?
10       A.      Involvement?
11       Q.      Yes.  Let's say you were to
12  file a motion affecting employees.  Do you
13  think employees would show up here in New
14  York?
15       A.      It is undeniable the large
16  majority of our associates are in the
17  southeast and it would be easier for them
18  to be in Jacksonville, marginally easier
19  for them to be in Jacksonville than New
20  York.  That is true.  But it would never
21  have been our intent to choose New York to
22  limit their ability to attend here.
23       Q.      Would the same go for your
24  run-of-the-mill trade creditors such as my
25  client, Riverdale Farms, which is located
```

43

```
 1                APPEL - DIRECT
 2   in Florida?
 3      A.      If your client is located in
 4   Florida, that would be true.  I don't know
 5   what "run-of-the-mill trade creditors"
 6   means.  So no, I don't think it would
 7   generally be true of run-of-the-mill trade
 8   creditors.  When we looked at our top 100,
 9   30 of them had offices in New York and 9
10   had offices in Florida.
11              MR. MARTIN:  No further
12   questions.
13              MR. HELD:  Your Honor, I have a
14   couple of questions.  I'm Edwin Held on
15   behalf of Beaver Street Fisheries.
16   DIRECT EXAMINATION
17   BY MR. HELD:
18      Q.      Mr. Appel, are you aware of any
19   objections by the members of the Committee
20   individually in their capacity as
21   creditors to Buffalo Rock's motion for
22   change of venue?
23      A.      I don't think so, no.  Are
24   there?  I don't think so.
25      Q.      I'm not aware of any.
```

44

```
 1              APPEL - DIRECT
 2              Are you aware of any members of
 3    the Committee in their individual capacity
 4    joining in with the Committee --
 5         A.      Wait, did New Plan file?  I
 6    can't remember.  I thought New Plan had
 7    filed a motion, but I may be wrong.
 8              MR. DUNNE:  Your Honor, I will
 9    help him out.  The clients are listed in
10    the relevant pleadings.
11         A.      I just don't remember, I'm
12    sorry.
13         Q.      With respect to employees,
14    isn't it true that more employees are
15    located in Jacksonville than in any other
16    area of the country?
17         A.      That may be true.  We have a
18    substantial store base there and we have
19    our corporate office there.  But we have
20    more stores in Miami.  There are a large
21    number of employees in Jacksonville.  I
22    don't know if there are more there than
23    anywhere else.
24         Q.      Do you know approximately how
25    many employees are employed in the
```

45

```
 1                  APPEL - CROSS
 2    administrative offices?
 3         A.       A couple of thousand maybe.
 4         Q.       Do you know approximately how
 5    many employees are employed in the general
 6    distribution center?
 7         A.       I'm sorry, I don't know.
 8         Q.       Would it be in the hundreds or
 9    thousands?
10         A.       My guess is it would be in the
11    hundreds, but I really don't know.
12                  MR. HELD:  No further
13    questions, your Honor.
14                  THE COURT:  Mr. Despins?
15    CROSS-EXAMINATION
16    BY MR. DESPINS:
17         Q.       Good afternoon, Mr. Appel.
18         A.       Good afternoon.
19                  MR. DESPINS:  May I approach
20    the witness with the stipulated facts?
21                  THE COURT:  Yes.
22         Q.       Just a few questions regarding
23    the agreed facts, Mr. Appel.
24                  The first one, let me direct
25    your attention to paragraph 2, which says
```

46

```
 1              APPEL - CROSS
 2    "Dixie Stores was the first filed
 3    bankruptcy case, and the Debtors selected
 4    venue for the bankruptcy cases in New York
 5    Bankruptcy Court by virtue of their status
 6    as affiliates of Dixie Stores."
 7              Two questions regarding this.
 8    First, there is another debtor called I
 9    believe Table Supply?
10    A.        Yes.
11    Q.        Is it the company's belief that
12    that debtor could file on its own in New
13    York without relying on the affiliate
14    provision of 1408?
15    A.        Yes.
16    Q.        So, therefore, when you use the
17    word "Debtors" there, it probably should
18    read "the Debtors other than Table
19    Supply"?
20    A.        I guess that is technically
21    correct, yes.
22    Q.        The second point is, it says
23    "The Debtors selected venue for their main
24    bankruptcy cases based on the affiliate
25    provision."
```

47

```
 1              APPEL - CROSS
 2              It could be semantics, but do
 3    you mean to say there that the Debtors
 4    relied on that section of 28 USC rather
 5    than that was the reason why you came to
 6    New York?
 7              MR. RUBIN:  Objection.  The
 8    document speaks for itself.  It has been
 9    submitted by his counsel.
10              MR. DESPINS:  I can
11    cross-examine him on the intent.
12        A.      When I read this, and if I read
13    this wrong, I'm sorry, "selected" meant
14    that was the provision we relied on.
15    Absolutely, the reason we, quote, selected
16    New York were all of the reasons that I
17    talked about before, not a provision in a
18    bankruptcy statute.
19        Q.      I will direct you to paragraph
20    5 and 9 of the stipulated facts.  Those
21    paragraphs are essentially the same,
22    except one relates to Dixie Stores, the
23    other relates to Table Supply.  Both of
24    them say that these entities have no
25    business operations, no physical presence
```

48

```
 1              APPEL - CROSS
 2   in New York, no employees, and no
 3   prepetition liabilities.
 4              I would like you to focus on
 5   the words "prepetition liabilities" which
 6   are repeated in paragraph 5 and paragraph
 7   9.
 8              First, a preliminary question,
 9   are you familiar with the concept of
10   control group liability?  Do you know what
11   that term means?
12       A.     Yes.
13       Q.     Can you describe --
14       A.     In certain circumstances,
15   whether with respect to employee benefit
16   plans, tax, liability, or otherwise,
17   subsidiaries and parent that are part of a
18   control group can be jointly liable for
19   certain things, certain obligations.
20       Q.     Do you believe that Dixie
21   Stores and Table Supply would both be part
22   of the Winn-Dixie control group?
23       A.     We did not focus on control
24   group liabilities when we drafted this.
25   But if your question is could there be
```

49

```
 1                    APPEL - CROSS
 2   control group liabilities that Dixie
 3   Stores, prepetition, could have been
 4   liable for, I think the answer is probably
 5   yes.
 6        Q.        Just to be clear, Dixie Stores
 7   and Table Supply are both 100 percent
 8   controlled by Winn-Dixie?
 9        A.        Absolutely, they both are.
10        Q.        Let me direct your attention to
11   paragraph 14.  It says "All of the
12   Debtors' officers and directors and
13   management are located in the southeastern
14   United States."
15             "Located" can have many
16   meanings.  What did you intend to convey
17   by "located"?
18        A.        I believe all of our officers,
19   their primary company office, if you will,
20   is in the southeast.  For our directors,
21   they all either own a home in the
22   southeast or have an office in the
23   southeast.
24        Q.        But these directors might very
25   well have other homes elsewhere?
```

50

```
 1                APPEL - CROSS
 2      A.      Sure, absolutely.
 3      Q.      For example, isn't it a fact
 4  that the chief financial officer of the
 5  company has his primary residence or one
 6  of his residences in California?
 7      A.      I believe his primary
 8  residence, his wife and young child live
 9  in California, and he commutes from time
10  to time back and forth.  He also has a
11  home in Miami.
12      Q.      Paragraph 16 says "A
13  substantial number of the Debtors'
14  creditors have offices in the southeastern
15  United States."
16              Couldn't the same be true of
17  the New York area?
18      A.      Yes.  As I said, 30 of our
19  largest 100 have offices in the New York
20  area.
21      Q.      Turning to paragraph 18, it
22  says that "The Debtors believe that they
23  can achieve a successful reorganization in
24  the Florida Bankruptcy Court."
25              Same question, couldn't the
```

51

```
 1                  APPEL - CROSS
 2    same be true of the Southern District of
 3    New York Bankruptcy Court?
 4         A.       Yes, absolutely.
 5         Q.       The last paragraph is paragraph
 6    19, and it says "The Debtors believe that
 7    it may be less expensive to administer
 8    these bankruptcy cases in the Florida
 9    Bankruptcy Court than in the New York
10    Bankruptcy Court."
11                  First question is, is that
12    really a statement of intent or goal, or
13    do you think it is a fact that it will be
14    cheaper if the case is in Florida?
15         A.       I believe both are true.  It is
16    a statement of intent and goal, and I do
17    believe it is a fact that they may be less
18    expensive in Florida than in New York.
19         Q.       You used the words "may be."
20    Actually, the stipulation uses the words
21    "may be."  So it may not be as well?
22         A.       Yes.  I mean, I don't have a
23    crystal ball.  There are a lot of things
24    that will change.  We are going to have
25    certain New York advisors who end up
```

52

```
 1              APPEL - CROSS
 2   having to take trips to Jacksonville that
 3   they otherwise wouldn't have had to take.
 4   We will have certain local counsel for the
 5   company or some of the other
 6   constituencies that the estate ends up
 7   paying for.  They will add local counsel
 8   in Florida.
 9              When I looked at it from the
10   company's perspective, I tried to decide,
11   whether through thoughtful delegation of
12   assignment and Skadden rates and local
13   Florida counsel rates, I reached the
14   conclusion I very well might be able to
15   manage the case in such a way that the
16   overall expense would be lower in Florida
17   than in New York.
18       Q.      What kind of analysis have you
19   done to reach that conclusion?
20       A.      Back of the napkin.  You know,
21   I've looked -- I know what it costs to fly
22   here.  I know what my New York lawyer,
23   sort of what the range and average rates
24   are.  I know what quality local counsel in
25   Florida, what the range and average rates
```

53

```
 1                APPEL - CROSS
 2     are.  I took a look at some of the
 3     activities and tried to decide what I
 4     might be comfortable letting Florida
 5     counsel run lead in.  I tried to think
 6     about what percent of the case that might
 7     be, what average case fees are.
 8                Like I said, I don't have a
 9     crystal ball, but I did the best that I
10     could to try to think about how I would
11     manage fees appropriately for the benefit
12     of the estate.
13         Q.     But your back of the napkin
14     analysis, did it focus on the Debtors'
15     side of professionals?
16         A.     Yes, that is the only thing
17     that I'm really aware of, is the Debtors'
18     side.
19         Q.     But you are aware that the
20     Committee has its own set of
21     professionals, correct?
22         A.     Absolutely.  And I'm assuming
23     that the Committee would equally try to
24     manage expense and utilize lower-cost
25     providers for servicers that are
```

54

```
 1                APPEL - CROSS
 2    appropriate.
 3       Q.      But you have no control over
 4    that part, as the company?
 5       A.      I don't know what control I
 6    have over -- I don't know what I get to
 7    say about fee applications that the estate
 8    pays for from non-company advisors.
 9       Q.      What about the banks, the banks
10    have counsel?
11       A.      Yes.
12       Q.      And the company reimburses the
13    banks for their cost of counsel, correct?
14       A.      It is absolutely fair to say
15    that my back of the napkin analysis was
16    based on company cost, and I am aware that
17    there are other parties that would have
18    other costs.  That is why, at the end of
19    the day, it says "may."
20              As you said, that would be my
21    intent to try to accomplish that.  We will
22    never know, because we will be in one
23    place or the other.  We won't be in both.
24    We will never get to look back, I think,
25    unless you have something in mind that I
```

55

```
 1              APPEL - CROSS
 2   can't conceive of right now.  I'm not
 3   trying to be difficult.
 4      Q.      Let's talk about the employees
 5   for a second.
 6              If the employees were able to
 7   participate in court hearings by
 8   conference call, by phone, do you think
 9   that that would minimize this issue of
10   convenience to the employees?
11      A.      Surely if you can participate
12   by conference call, then that is helpful,
13   sure.
14      Q.      Are you aware that is what is
15   done in the Southern District of New York
16   for the other large cases?
17      A.      Specifically with respect to
18   employees, I wasn't aware of that.  I'm
19   aware of the fact that we have
20   participated in a number of meetings with
21   various creditors, and here I assume we
22   are talking about employees that are
23   creditors, which is by no means all of our
24   employees, the large majority of whom,
25   under our first-day motions, we were able
```

56

```
 1              APPEL - CROSS
 2   to pay their prepetition claims.  And the
 3   large majority of our associates -- that
 4   is just the term we use, I apologize, it
 5   is a habit -- won't be creditors.
 6              But I have participated in
 7   meetings here in New York with creditors
 8   and had various creditors and their
 9   representatives participate
10   telephonically.
11      Q.      Have you ever had any contacts
12   with representatives from the movant,
13   Buffalo Rock?
14      A.      Yes, I have.
15      Q.      Can you describe in what
16   context?
17      A.      Sure.  I had a telephone
18   conversation with the general counsel of
19   Buffalo Rock shortly after their motion
20   was filed.
21      Q.      How did that come about?  Was
22   it telephonic?
23      A.      It was a telephone call.  I
24   actually was here in New York at the time.
25   I took it from Skadden Arps' office.
```

57

```
 1              APPEL - CROSS
 2     Q.        Who was the representative from
 3  Buffalo Rock that you talked to?
 4     A.        The general counsel of the
 5  company.
 6     Q.        Do you recall the general
 7  counsel's name?
 8     A.        I apologize, I should, but I
 9  don't have it at the tip of my tongue.
10     Q.        Who initiated the call?
11     A.        I called him.
12     Q.        After pleasantries were
13  exchanged, I assume, what did you tell
14  him?
15     A.        Essentially I said a
16  two-sentence summary of a lot of what I
17  said today.  I said "We chose New York
18  because we thought it would be more
19  convenient for the creditors, not because
20  we were trying to hide from any creditors.
21  We were taken aback by the severity of the
22  language that you used, and we would like
23  to understand why you did what you did and
24  where we are going to go from here."
25     Q.        What was the response from the
```

58

```
 1                    APPEL - CROSS
 2    general counsel of the movant?
 3         A.      We talked back and forth for a
 4    little while, and ultimately he indicated
 5    that they had, I don't know whether he had
 6    come or his outside advisors, but Buffalo
 7    Rock had been represented at the Creditor
 8    Committee formation meeting, I think that
 9    is the appropriate term for it, here in
10    New York, and that they did not feel that
11    they had been treated appropriately.
12              They were disappointed that
13    they were not on the Creditor Committee.
14    They were concerned about their ability to
15    have access to the matter in New York.
16         Q.      Was the statement made, and I'm
17    going to read from your deposition
18    yesterday, by the general counsel of
19    Buffalo Rock, something to the effect of
20    "We can be in Jacksonville, we can be in
21    New York, we just want to be on the
22    Creditors Committee"?
23         A.      Yes.  When he said "We can be
24    in Jacksonville or we can be in New York,"
25    or whenever he said "Jacksonville is okay,
```

59

```
 1              APPEL - CROSS
 2   New York is even better," and he said "We
 3   just want to be on the Creditor
 4   Committee," I remember it distinctly,
 5   because, A, it was the last sentence of
 6   the call.  It was sort of the summary of
 7   the call, if you will.
 8              B, because, frankly, it was a
 9   little bit difficult to hear.  We had been
10   dealing for several days with the rhetoric
11   of that motion, with the publicity
12   fallout, with feeling like we were being
13   painted by doing something in bad faith.
14   And, you know, I will admit to not being
15   pleased to hear that at the end of the day
16   they didn't appear to care about the
17   underlying issue very much.
18   Q.      In fact, didn't that general
19   counsel for Buffalo Rock state something
20   to the effect that if they can be on the
21   Creditors Committee, this motion would go
22   away?
23              MR. RUBIN:  Your Honor, I
24   object on the basis of Rule 408 of the
25   Federal Rules of Evidence.  That would be
```

60

1                    APPEL - CROSS

2    settlement negotiations between the

3    parties and inadmissible into evidence as

4    to what would cause the motion to be

5    withdrawn, if it was withdrawn.

6                    MR. DESPINS:  Your Honor, if I

7    may be heard on this issue.

8                    408 says that you cannot put on

9    evidence to prove liability or the

10   weakness of the claim.  The claim at issue

11   here is whether venue should be changed.

12   So if the general counsel of Buffalo Rock

13   told Mr. Appel "We think our basis to

14   change venue is weak, we don't have a good

15   case," that couldn't come in as part of

16   the settlement discussion.  That is not

17   the case here.  We are trying to put this

18   in to show intent.  Our view, frankly, is

19   it is incredibly improper to use a motion

20   to change venue to essentially circumvent

21   the U.S. Trustee's decision to appoint or

22   not to appoint somebody to the Committee.

23                    In fact, Judge Gonzalez, in the

24   WorldCom decision, reached a similar

25   conclusion of 408 on different facts.  But

61

```
 1                  APPEL - CROSS
 2    in that case the taxing authorities moved
 3    to disqualify the debtors' accountants.
 4    That threat came in the context of
 5    settlement discussion about the merits of
 6    the taxing authorities' claims.  When the
 7    debtor tried to put on evidence of that
 8    threat, the taxing authorities said "Oh,
 9    408, settlement privilege, we can't use
10    that."  Judge Gonzalez said "No, this has
11    nothing to do with the merit of the
12    claims.  It has to do with why this motion
13    to disqualify the accountants was brought
14    by the taxing authorities."
15              It is exactly the same issue
16    here.  That is why we should be hearing
17    from the witness what the answer was.
18              THE COURT:  I agree with that.
19    The objection is overruled.  I think that,
20    again, Buffalo Rock, I fully believe that
21    the objection is meritorious, but I don't
22    believe the question goes to that issue.
23    Q.    Let me restate the question.
24              Was there a statement from the
25    representative of Buffalo Rock in that
```

62

```
 1               APPEL - CROSS
 2   conversation, to the effect, not
 3   literally, but if they were placed on the
 4   Creditors Committee, this motion to change
 5   venue would go away?
 6       A.      First of all, for whatever it
 7   is worth, I didn't think of the
 8   conversation I had as settlement
 9   discussions.  I always prefaced that in
10   the discussions.
11               The answer to your question is
12   yes.  Because they had indicated that they
13   were frustrated and didn't think they
14   would get transparency in the matter in
15   New York, I said to them there were
16   certain things that were under our
17   control.  "If we agree to have regular
18   conversations, whether it is general
19   counsel to general counsel, CFO to CFO,
20   would that help you?"
21               Over the course of the
22   conversation, that evolved into
23   essentially a three-tier discussion.  "If
24   we are on the Creditor Committee and have
25   a vote, we are done.  If we are on the
```

63

```
 1              APPEL - CROSS
 2   Creditor Committee and we don't have a
 3   vote, I can't tell you we are done, but I
 4   think I can sell that.  And informal
 5   discussions aren't going to cut it."
 6      Q.      Let's focus for a minute on the
 7   company's decision to not object to a
 8   change of venue to Florida, which was
 9   already explored on direct, but I will
10   spend a minute on it.
11              Would it be fair to say that if
12   the negative PR aspects, public relation
13   aspects, of this whole motion to change
14   venue could be removed, that the company
15   would be satisfied with staying in New
16   York?
17      A.      If they could be removed?
18      Q.      Yes, if they could be undone
19   somehow.  I'm not saying that they can.
20      A.      You asked me before whether I
21   thought, if the statement in the
22   stipulation said New York instead of
23   Florida, could we successfully reorganize
24   here, and I said yes.
25              So I think the answer to that
```

64

```
 1                 APPEL - CROSS
 2   is definitely yes, unless I'm
 3   misunderstanding the question.
 4        Q.      The next question is, to a
 5   certain extent the negative PR, the
 6   negative public relations, is something
 7   that cannot be undone, you've already
 8   received that?
 9        A.      Correct, it can't be fully
10   undone.
11        Q.      Presumably there are two things
12   the Court can do with this current motion,
13   either grant it, meaning transfer the case
14   to Florida, and would that undo all the
15   negative PR that you've suffered?
16        A.      All, no.
17        Q.      And the Court could also decide
18   to retain the case, saying that the case
19   is properly venued here?
20        A.      Yes.
21        Q.      If the Court did find the case
22   was properly venued here, would that go a
23   long way to defuse all this negative
24   publicity?
25        A.      Sure.  I assume the finding
```

```
 1              APPEL - REDIRECT
 2    that it was properly venued here, that
 3    would mean we as a company complied with
 4    the law in choosing venue and never acted
 5    in bad faith, that would go a long way
 6    towards helping us, undoing the damage
 7    that has been done.
 8        Q.      We hear that loud and clear.
 9        A.      That is very important to us.
10              MR. DESPINS:  Your Honor, if I
11    can just talk to my clients for one
12    minute.
13              THE COURT:  Okay.
14              (Pause.)
15              MR. DESPINS:  That is all we
16    have, your Honor.
17              THE COURT:  Any redirect?
18              MR. RUBIN:  Just a couple of
19    questions, if I may, your Honor.
20    REDIRECT EXAMINATION
21    BY MR. RUBIN:
22        Q.      Mr. Appel, how many stores of
23    Winn-Dixie Stores, Inc. are located in the
24    State of Florida?
25        A.      Somewhere in the low 400's.  I
```

66

2    don't have the exact number.

3        Q.        How many stores are operating

4    today all throughout the southeastern

5    United States?

6        A.        Around 920.  So call it 45

7    percent, 40, 45 percent, something like

8    that, are in Florida.

9        Q.        Do you have an estimate as to

10   how many employees are also in the State

11   of Florida?

12       A.        Round numbers, I would say

13   maybe slightly more than the percentage of

14   stores.  So call it 50.

15       Q.        Approximately 50,000?

16       A.        50 percent of the 80,000.  If

17   40 or 45 percent of the stores and then

18   our corporate offices -- I would assume it

19   is slightly more -- a slightly larger

20   percent of our associates are in our

21   stores.  So call it half.

22       Q.        Would it be fair to say there

23   are approximately 40,000 employees located

24   in the State of Florida in all different

25   capacities?

```
 1              APPEL - REDIRECT
 2      A.      Back of the napkin math, yes, I
 3 think that is probably pretty close.
 4      Q.      All right.  One other question,
 5 then.
 6              Based on the questions that
 7 Mr. Held asked you in respect to employee
 8 participation in the case, the employees
 9 by and large are nonunion; is that not
10 correct?
11      A.      All of our U.S. employees are
12 nonunion.
13      Q.      So they are not organized with
14 union representation in that fashion?
15      A.      You are correct.
16      Q.      One last question.
17              You have made an investigation
18 as to the hourly rates for your counsel in
19 Florida, and you testified yesterday that
20 in some instances the hourly rates of
21 Florida counsel would be half of those of
22 Skadden; is that correct?
23      A.      It is close to half, yes.
24              MR. RUBIN:  That is all, Judge.
25 Thank you.
```

68

```
 1                  APPEL - REDIRECT

 2                  MR. MARTIN:  Your Honor, Warren

 3     Martin, attorney for Riverdale Farms.

 4     REDIRECT EXAMINATION

 5     BY MR. MARTIN:

 6          Q.       Mr. Appel, you attended the

 7     organizational meeting up here in New York

 8     for creditors, to form the Creditors

 9     Committee?

10          A.       Yes, I did.

11          Q.       The next day, Winn-Dixie held a

12     meeting in Jacksonville for creditors; is

13     that correct?  On or about the next day,

14     the next couple of days?

15          A.       The day after the meeting for

16     the formation of the Creditors Committee,

17     we held a meeting for creditors in

18     Jacksonville?

19          Q.       Yes.  Are you aware of that?

20          A.       I don't think so.  Shortly

21     after -- either shortly before or shortly

22     after the formation meeting, there was a

23     meeting in Orlando that was prescheduled

24     and we do sort of every quarter or every

25     six months at the request of a vendor
```

69

```
 1                APPEL - REDIRECT
 2    trade group.  I think it is mostly health
 3    and beauty, but whoever they are, that
 4    many of our major vendors are in that
 5    trade group.  We meet with them on a
 6    regular basis.
 7                We did have a meeting with them
 8    at that time, but it wasn't timed to be
 9    coincident with that Creditors Committee
10    meeting.  In fact, it had been scheduled
11    for earlier and we delayed it for a week
12    and a half if I remember correctly.
13        Q.      And you were at that meeting in
14    Orlando?
15        A.      No, I was not.
16        Q.      Are you aware as to how many
17    creditors attended that meeting?
18        A.      I had heard that it was a
19    relatively small number from what the
20    normal attendance was, but I'm not
21    certain.
22        Q.      If I said 100, would that sound
23    about right?
24        A.      No.  I thought it was a much,
25    much smaller number.  But I really don't
```

70

```
 1              APPEL - REDIRECT
 2   know.  I wasn't there.  I thought it was
 3   less than 20.
 4              The recollection I got from our
 5   CFO who went was it was much smaller than
 6   previous times.  I had been there once
 7   before and there were about two dozen
 8   people in the room.  But I don't know how
 9   many people were there.
10       Q.      One other question.
11              Did I or any representative of
12   Riverdale Farms tell you that if we were
13   on the Creditors Committee we would
14   withdraw our joinder in the motion?
15       A.      Absolutely not.
16              MR. MARTIN:  Thank you.  No
17   further questions.
18              MR. McFARLIN:  I have a couple
19   of questions.
20   REDIRECT EXAMINATION
21   BY MR. McFARLIN:
22       Q.      Mr. Appel, are you familiar
23   with avoidance actions in Chapter 11's or
24   bankruptcy in general?
25       A.      I'm sorry, I'm not.
```

71

1              APPEL - REDIRECT

2      Q.      Are you familiar with

3   preference actions?

4      A.      Generally I'm aware of the

5   preference concept.

6      Q.      Correct me if I am wrong, it

7   was hard to hear, I believe your testimony

8   was you did participate in the preparation

9   of the Debtors' schedules and statement of

10  affairs?

11     A.      Yes, that's correct.

12     Q.      With respect to payments to

13  creditors that is referred to in paragraph

14  3 of the statement of affairs, are you

15  familiar with the number of payments that

16  were actually made and the number of pages

17  as referred to in the statement of

18  affairs?

19     A.      I don't have that in front of

20  me.  I don't have it memorized.

21     Q.      The statement of affairs sets

22  forth the list of payments as voluminous

23  in nature, consisting of approximately

24  76,000 entries on 2,000 pages.  It would

25  be too burdensome to attach everything,

```
 1              APPEL - REDIRECT
 2  etc.
 3      A.      That is in a three-month period
 4  prior to filing?
 5      Q.      Yes.
 6      A.      I'm generally aware of that.
 7      Q.      With respect to these payments
 8  and with respect to preferences, wouldn't
 9  it also be true that the payments within
10  90 days may trigger certain preference
11  litigation?
12      A.      We believe we were solvent in
13  that time period.
14      Q.      You acknowledge solvency during
15  that time period?
16      A.      I'm sorry?
17              MR. DUNNE:  Your Honor, I
18  object to trying to get any testimony out
19  as to solvency within the 90 days prior.
20              MR. McFARLIN:  I haven't asked
21  for solvency.
22              THE COURT:  Do you want to
23  reask your question?
24              MR. McFARLIN:  I will rephrase
25  it.
```

```
1                 APPEL - REDIRECT
2        Q.        With respect to a situation
3   where the Debtors are insolvent and there
4   are approximately 76,000 payments made,
5   wouldn't you agree that the number of
6   preference-type actions either in the way
7   of demands or actual adversary proceedings
8   or lawsuits would be numerous?
9                 MR. ZIMMERMAN:  Objection.  A,
10  this calls for a legal conclusion.  B, we
11  don't know the facts or nature of these
12  cases.  C, you don't need testimony about
13  preference.  I don't see what the
14  relevance of any of this is.
15                THE COURT:  Are you just really
16  pointing out that there are listed
17  potentially 76,000 claims?
18                MR. McFARLIN:  I was leading up
19  to that the witness' books and records --
20                THE COURT:  I will take
21  judicial notice of that.
22                MR. McFARLIN:  I have no
23  further questions.
24                MR. DESPINS:  Just a very quick
25  question.
```

74

```
 1              APPEL - RECROSS

 2    RECROSS-EXAMINATION

 3    BY MR. DESPINS:

 4        Q.      You've done no solvency or

 5    insolvency analysis on this company, have

 6    you?

 7        A.      No, I haven't.

 8        Q.      Sort of back of the napkin

 9    analysis, do you know what the full fare

10    coach airfare is from New York to

11    Jacksonville?

12        A.      It depends on when you book it,

13    but it is anywhere --

14        Q.      I'm talking full fare, no

15    restrictions.

16        A.      It is slightly more than

17    $1,000, I believe.

18        Q.      What about a hotel in

19    Jacksonville, ballpark?

20        A.      They are a lot less expensive

21    than here.  It is less than $100.

22        Q.      Let me make it easier for you.

23    The hotel where Skadden is staying.

24        A.      The nicest hotel -- no, I won't

25    make a joke at Skadden's expense.  It is
```

75

1
2    probably $100, in all seriousness.
3              MR. DESPINS:  Thank you.
4              THE COURT:  You could step
5    down.
6              Are there other witnesses that
7    are anticipated to be called?
8              MR. ZIMMERMAN:  None for the
9    Debtor.
10             MR. RUBIN:  None, your Honor.
11             THE COURT:  It is 10 to 2.  I
12   think we could use a lunch break, at least
13   I could.  Why don't we return about 20 of
14   3.
15             (Luncheon recess from 1:50 p.m.
16   through 2:43 p.m.)
17             THE COURT:  We are back on the
18   record in Winn-Dixie.  We will proceed
19   with oral argument.
20             MR. ZIMMERMAN:  I'm the culprit
21   for the scheduling conflict, so Mr. Rubin
22   has been kind enough to let me go first.
23   To make something clear, there was some
24   cross-examination before about Debtor no
25   longer opposing Buffalo Rock's motion.

76

1
2    That is true, but it is beyond that.  The
3    Debtors are affirmatively seeking a
4    transfer to Jacksonville.
5                If I may, I would like to
6    briefly address two topics.  First, the
7    propriety of New York ab initio, and,
8    second, what led the Debtors to now seek
9    to go to Jacksonville.  The fact record
10    now is closed.  The evidence is undisputed
11    that there wasn't a scintilla of bad faith
12    here.  There was never an intention to
13    somehow evade or run away from
14    Jacksonville.  In fact, it is directly to
15    the contrary.  This is a well-reputed
16    company.  Terrific goodwill, philanthropic
17    founders.  The last thing they would need
18    to do is escape Jacksonville.
19                Nor is there evidence that
20    there was an effort to pick a forum that
21    would inconvenience creditors.  The
22    unrebutted evidence is directly to the
23    contrary.  There was a careful business
24    judgment analysis by management weighing
25    the same types of factors the Court does.

77

1
2    On balance, there is one thing that is
3    indisputable, there is not a forum in the
4    country that every creditor group and
5    every constituency is going to agree to.
6    That is off the table.  The issue is which
7    forum can maximize the conveniences of as
8    many critical players as you can and
9    facilitate the successful reorganization
10   of the company.  The record is what it is.
11   There are creditors in the southeast.
12   There are substantial participants in this
13   process in New York and the tristate area.
14           Based on their own judgment,
15   their analysis of the issues, the advice
16   of their expert advisors, based on actual
17   experience and contacts with prospective
18   creditors and prospective participants,
19   the conclusion was reached New York was
20   the appropriate forum.  Did they solicit
21   trade creditors' views?  Of course not.  A
22   debtor is not going to go to their trade
23   creditors and say "We are going to file
24   for bankruptcy, where would you like us to
25   file?"  Some things are best left to

78

1
2    managerial discretion.
3            The only thing that is left on
4    the argument by Buffalo Rock that this was
5    improperly selected for a bad purpose is
6    rhetoric.  There is no evidence.  They had
7    ample opportunity yesterday to
8    cross-examine and they established nothing
9    in that.  They had ample opportunity to
10   today.  There is not a shred of evidence
11   supporting that allegation.  Nor do they
12   dispute nor can they dispute that venue
13   was absolutely appropriate under the four
14   corners of this statute.  That is not an
15   issue.  The only way they get out of that
16   is to ask this court, somehow using its
17   equitable powers under Section 105, to
18   find not only that despite the fact that
19   venue is undeniably within the four
20   corners of this statute and despite the
21   fact that the evidence is uncontroverted
22   that it was a good-faith decision, you
23   should bend over backwards to transfer it
24   and find bad faith on those grounds.  That
25   makes absolutely no sense.  It would be a

1

2   perversion of Section 105.  105 leads

3   inescapably to a different conclusion.

4   This was a good-faith finding.

5        The one case I would cite on

6   this proposition, Judge, because it is a

7   Second Circuit Court of Appeals case, is

8   Capitol Motor against LeBlanc, 201 F.2d

9   356, where a company transferred its stock

10   to another company for the sole purpose of

11   becoming a subsidiary so it can then latch

12   on to the other company's bankruptcy

13   filing.  That was done on the eve of

14   filing, and then both companies, within

15   minutes of each other, filed for

16   bankruptcy.

17        The Second Circuit rejected a

18   bad-faith argument because they said it

19   fit within the technical requirements of

20   the statute.  The subsidiary can file

21   where its parent does.  There was a

22   legitimate potential reorganization.

23   There was no effort to frustrate

24   creditors.  That was the bad faith, if

25   there was going to be one, frustrating

80

1
2    creditors.  On those grounds, they found
3    no bad faith.  In fact, the stock transfer
4    in that case was unlawful because it
5    violated a stock transfer restriction,
6    and, nevertheless, the Second Circuit said
7    it is not bad faith.
8            Here it is the opposite, there
9    is no unlawful activity whatsoever.  Under
10   the Second Circuit law, clearly this is an
11   appropriate venue, no bad faith.  So why
12   are we joining, then, in the motion?  And
13   this was clearly a long, careful decision,
14   and with all due respect, you can take
15   judicial notice of the fact that after
16   everything that has gone on to date, the
17   last thing the Debtors wanted to do is
18   join in a motion with Buffalo Rock.
19            But here are the facts.
20   Buffalo Rock filed its papers.  The
21   bad-faith allegation, the escaping
22   Jacksonville, frustrating creditors, was
23   all over the papers.  As undoubtedly could
24   not have been a surprise to them, it was
25   picked up by the press.  The creditors, I

81

1
2    believe the Committee, in their
3    opposition, says that since the Debtors
4    selected New York and since the Debtors
5    now want to move, we have the burden of
6    showing some change that occurred
7    post-filing.  Without debating whether
8    that is the right standard or not, let's
9    apply that standard.  The testimony is
10   clear, there was a substantial and
11   dramatic change.  That was Buffalo Rock's
12   filing.  For better or worse, because you
13   don't have to plead evidence, you can
14   basically say whatever you want, and that
15   is apparently what they did.  Without any
16   evidence, it is all over the press.
17            The fact is the testimony is,
18   again, undisputed, that caused real
19   serious, tangible harm to this company.
20   People in the field are getting constant
21   feedback from associates, employees.  They
22   are being deluged with these problems.
23   And people are wondering just what the
24   heck went on here, why did this company do
25   this, are these charges true?  And can the

82

1
2    Debtors engage in a press campaign?  Sure.
3    Can they benefit from a finding by this
4    court that they acted totally appropriate
5    at all times?  Absolutely.  I think the
6    testimony was clear, that would go, quote,
7    a long way.  But the problem is that
8    doesn't take us where they need to go.
9            I think Mr. Appel made it
10   clear, his words were eloquent, actions
11   speak louder than words.  Do the Debtors
12   believe they can have a successful
13   reorganization in New York?  Absolutely.
14   They filed here.  Do they believe they can
15   have a successful reorganization in
16   Florida?  Absolutely.  The problem is once
17   the courtroom process is over and there is
18   hopefully a successful reorganization,
19   life goes on.  That is the period of time,
20   that is the event that we have to plan for
21   now.  And the Debtors, who know their
22   constituencies and know their community
23   better than anybody else in this
24   courtroom, in their business judgment have
25   made a conclusion they need not only to

83

1
2    take the stand here and swear under oath
3    to disavow those baseless charges of bad
4    faith, they need to do everything they can
5    proactively to show that they are
6    perfectly happy to go to Jacksonville.
7    They were happy to commence in
8    Jacksonville, but on balance determined it
9    would be better for all involved to go to
10   New York.
11          But they need to show their
12   constituencies that not only can they
13   swear to the truth, but they can act on
14   it, and they affirmatively are joining and
15   requesting that this court, for all the
16   reasons that I discussed and for the
17   testimony, the unrebutted sworn testimony,
18   that the best interests of this estate
19   would be to move this case to
20   Jacksonville.
21          Thank you.
22          MR. RUBIN:  Would you like for
23   us to go next, your Honor?
24          THE COURT:  Yes.
25          MR. RUBIN:  Your Honor, we

84

1
2    appreciate the opportunity to be heard
3    this afternoon and a bit of this morning.
4              We stand by the motion which we
5    filed, the cases which we've cited and the
6    facts which we have articulated in that
7    motion, and the response which we filed.
8    But, more importantly, we stand by the
9    stipulation of facts which we filed
10   earlier today with the Court.  And
11   although we appreciate the fact that the
12   Debtor consents and we think that is
13   extremely important that the Debtors'
14   wishes be adhered to in respect to moving
15   the case to Jacksonville, we also believe
16   that the facts as alleged in the
17   stipulation point out the motion papers
18   that we filed were absolutely correct, as
19   well as the response, that venue was
20   manufactured here in the Southern District
21   of New York by the actions taken by the
22   Debtor in respect to the filing of these
23   cases.  However you want to characterize
24   them, that is up to the Court to
25   characterize it.  The facts are pretty

85

1
2      clear, they are pretty salient.
3                    First of all, on February the
4      21st these cases were filed.  There are 24
5      cases in all.  19 of those cases are
6      Florida corporations.  What was the nexus
7      between New York and these debtors?  That
8      nexus was created on February the 9th,
9      2005, some 12 days before the filing of
10     the petition, by the incorporation of a
11     company known as Dixie Stores, Inc., a New
12     York corporation which came into existence
13     on the 9th and did not exist prior to that
14     date.  It is clear also from the
15     stipulation that Dixie Stores has no
16     prepetition creditors.  Dixie Stores has
17     no assets except for a $100,000 bank
18     account which is at the Wachovia Bank here
19     in New York.  How did that bank account
20     come into existence?  That money was
21     either wire-transferred or deposited by
22     Winn-Dixie Stores itself to that bank
23     account.  That happened on or about
24     February 12th.  So there was absolutely no
25     nexus between these debtors and the State

86

1
2    of New York.
3              There is no physical presence
4    of Dixie Stores in the State of New York
5    other than the bank account.  Paragraph 6
6    of the stipulation is clear.  The Debtor
7    and the movant stipulate that DSI, Dixie
8    Stores, Inc., was formed solely to
9    establish venue in the New York Bankruptcy
10   Court.  The testimony was clear, and
11   substantially clear from the witness this
12   morning, that there are approximately
13   80,000 employees, over 40,000 of them are
14   located in the State of Florida, that 40
15   percent of the stores of the Debtor are
16   located in the State of Florida, that all
17   of the management of the Debtor is located
18   in the State of Florida, that all of the
19   substantial assets of the Debtor are
20   located in the southeastern United States,
21   Alabama, Mississippi, Georgia, Florida,
22   North and South Carolina, etc., Louisiana.
23              The second hook for venue, on
24   or about February 12th, 2005, Table
25   Supply, a Florida corporation, not

87

1

2     qualified to do business in the State of

3     New York, established a bank account at

4     Wachovia Bank here in New York City.

5     Where did that money come from?  That

6     money came from Winn-Dixie Stores, Inc.

7                     So what is the nexus, then,

8     after the establishment of that bank

9     account, between New York and this debtor?

10    The nexus is approximately $200,000 in

11    assets as opposed to the total amount of

12    assets of the Debtor in accordance with

13    its summary of schedules of an amount of

14    $1,724,693,681.28.  My math has always

15    been paltry and poor, but we have tried to

16    calculate that, and we believe that the

17    $200,000 worth of deposits in the State of

18    New York represent 1/100 of 1 percent of

19    the total assets of this debtor.

20                    It is telling in paragraph 10

21    of the stipulation that the Table Supply

22    bank account was created solely to sustain

23    venue in the New York Bankruptcy Court.

24    Substantially all of the Debtors' assets

25    other than the DSI bank account and this

88

```
 1
 2    Table Supply bank account are located in
 3    the southeastern United States.  That is
 4    paragraph 11.
 5                Paragraph 12, all of the
 6    Debtors' employees are employed in the
 7    southeastern United States.  The Debtors'
 8    books and records, including those of
 9    Table Supply and Dixie Stores, are located
10    in Jacksonville, Florida, paragraph 13 of
11    the stipulation.  All of the Debtors'
12    officers and directors and management are
13    located in the southeastern United States,
14    paragraph 14.  15, all of the Debtors'
15    corporate decision-making occurs in
16    Jacksonville, Florida.  The Debtors
17    consent in paragraph 17.  In paragraph 18,
18    the Debtors believe they could achieve a
19    successful reorganization in the Florida
20    Bankruptcy Court.  In paragraph 19, the
21    Debtors believe it may be less expensive
22    to administer the case.
23                Your Honor, this is clearly a
24    case that is governed by 28 USC Section
25    1408, subparagraph 1.  Venue was
```

1

2    manufactured.  This is blatant forum

3    shopping by this debtor in the filing of

4    these cases in the Southern District of

5    New York.  We believe that if you take

6    those facts as you see them, then both the

7    Table Supply and the Dixie Stores cases

8    are subject to dismissal.  There is no

9    possibility of a reorganization of Dixie

10    Stores.  It has no business.  There is no

11    possibility of a reorganization of Table

12    Supply.  It hasn't operated, in accordance

13    with the papers here, at least since 2002.

14             We believe that the Court

15    should transfer these cases to the

16    Bankruptcy Court for the Middle District

17    of Florida located in the Jacksonville

18    Division because they should have never

19    been filed here in the first place.  They

20    are not properly filed here.  They are

21    subject to 1408, subparagraph 1.  This was

22    a bad-faith filing and it should be moved.

23             Thank you.

24             THE COURT:  When you say 1408,

25    subparagraph 1, what, in effect, are you

1
2    referring to that fits into that section?
3                THE MR. RUBIN:  That the assets
4    were not here in a greater portion of the
5    last 180 days prior to the filing of the
6    bankruptcy.  There is no connection
7    whatsoever --
8                THE COURT:  Doesn't the statute
9    actually say "or such lesser amount"?
10               MR. RUBIN:  Yes.  These were
11   fabricated situations where these cases
12   should be transferred, your Honor.  This
13   was manufactured venue.
14               THE COURT:  I'm just trying to
15   focus on the statute.
16               MR. RUBIN:  And the second
17   basis for transfer of course is 1412,
18   convenience of the parties, and justice
19   requires that the cases be transferred.
20   We have gone through the litany of those
21   items with employees, creditors, etc.  I
22   think in either basis the Court can
23   transfer this case.
24               THE COURT:  Do any of the other
25   people who joined in the motion want to

1

2    speak?

3              MR. McFARLIN:  Yes, your Honor.

4    Your Honor, I'm David McFarlin.

5              I think everyone agrees that we

6    have a perception problem here with the

7    filing of this case.  I guess what

8    happened here is we disagree on who

9    created the problem.  The Committee would

10   argue that Buffalo Rock has created this

11   perception problem by objecting and

12   seeking to transfer venue, and we would

13   join with Buffalo Rock in suggesting that

14   the problem was created by the Debtor in

15   filing this bankruptcy case in a distant

16   forum with no meaningful connection to its

17   base of operation.

18             My clients are represented by

19   the key managers, executives, and retirees

20   of Winn-Dixie that participated in these

21   nonqualified deferred compensation plans.

22   With all due respect to the very talented

23   professionals in this room today, I think

24   that those managers and executives are

25   going to be the people that are most

1
2    important in deciding whether or not
3    Winn-Dixie reorganizes.  I think herein
4    lies the rub.  Although these managers and
5    executives that participate in these plans
6    in the aggregate have very large claims,
7    individually they don't have enough that
8    would permit them to participate in this
9    case in a distant forum.  The economics
10   simply won't justify that.
11            THE COURT:  Since the major
12   reason, if not the only reason, that the
13   Debtor has changed its position on venue
14   is to deal with perception, and since
15   obviously perception is important here, I
16   will ask you some questions about that.
17            What do you mean by your
18   clients participating?
19            MR. McFARLIN:  These employees,
20   these executives and retirees, want to be
21   able to participate in this bankruptcy
22   case in the sense of coming to a hearing.
23            THE COURT:  Do you practice
24   bankruptcy law, sir?
25            MR. McFARLIN:  Yes, sir.

93

1
2              THE COURT:  How often in your
3    experience have you seen employees come
4    and actively speak and participate in
5    hearings?
6              MR. McFARLIN:  The point is
7    well-taken.  I think I probably overstated
8    the case.  What I meant to say, your
9    Honor, is that I think we have gotten to a
10   point now where a working stiff with a
11   million-dollar claim can no longer
12   economically afford to retain a New York
13   lawyer to represent them in a Chapter 11
14   case in bankruptcy.  Were this case in
15   Jacksonville, I think that these employees
16   could participate through legal counsel in
17   the bankruptcy case in a meaningful way.
18             But your point is well-taken.
19   I don't expect that these employees are
20   going to show up at hearings and give the
21   court recommendations or advice or
22   argument about the way the case ought to
23   move.
24             THE COURT:  Do you think 1114
25   is applicable here for your clients?

94

1
2              MR. McFARLIN:  I can talk
3    around that a little bit.  I think
4    arguably that our clients could separately
5    be represented through a committee.  For
6    example, I think that their interests are
7    somewhat different from the current
8    Creditors Committee.  And that may solve
9    some of their problems, because under the
10   current setup here, they are not on the
11   Committee.  Their interests are certainly
12   divergent from what the current Committee
13   representatives would have the Court do.
14              And I guess the third point is,
15   and it goes back to the perception, I
16   think it is one thing to be permitted to
17   participate through a committee, but I
18   think it is another matter to be forced to
19   participate through a committee simply
20   because the Debtor elected to file its
21   case in a distant forum.
22              I think that perception is
23   going to be very important because I
24   happen to think that these managers and
25   executives are important to what happens

95

1

2    in this reorganization.  If they feel that

3    they have been disenfranchised, then I

4    don't think that they are going to be

5    putting in the blood, sweat, and tears

6    that is necessary for a reorganization,

7    and I don't think that bodes well for

8    reorganization.

9            THE COURT:  They are very

10   important obviously.  I just wonder

11   whether -- well, frankly, I wonder if they

12   are being misinformed about what the

13   process is like.  Did you represent all

14   the people that sent the letters to court?

15           MR. McFARLIN:  No, sir.  I

16   would not encourage them to send letters

17   to court.  But we have spoken to a

18   significant number of the participants in

19   this plan.  I subsequently became aware

20   that they had sent letters, and it is

21   certainly not a recommendation that we

22   made.

23           THE COURT:  I'm perfectly happy

24   to get letters.  That is not the issue.  I

25   just worry about people being given the

96

1
2    wrong impression about what it takes to be
3    active in a bankruptcy case and what their
4    rights are, which are substantial and real
5    in any bankruptcy case.  Seeing your
6    retirement nest egg in jeopardy is
7    frightening enough as it is.
8                    I would hope that in any future
9    issue about venue people not be stirred up
10   needlessly about what normally happens in
11   a bankruptcy case and what people's rights
12   are.  If it is a difference between a $400
13   lawyer and a $200 lawyer, I can understand
14   that for some people.  But if people are
15   being told that you actually have to come
16   in person and attend every bankruptcy
17   hearing, then they are just being lied to,
18   and that is not right.
19                    MR. McFARLIN:  Agreed.  Thank
20   you, Judge.
21                    THE COURT:  Congress
22   specifically set up a section because they
23   were concerned about retirees that gave
24   them rights that are unique.  The right to
25   a committee under the proper circumstances

```
 1
 2    paid for by the estate, no one else has
 3    that.
 4              MR. McFARLIN:  Yes, sir.
 5              MR. MARTIN:  Good afternoon,
 6    your Honor, Warren Martin, Porzio,
 7    Bromberg & Newman, attorneys for Riverdale
 8    Farms.
 9              Your Honor, before I begin, I
10    intend to say I have one war story to
11    answer the question that you asked the
12    gentleman before me.  I had a bankruptcy
13    case where I represented the committee and
14    it was a hospital that was the debtor.
15    The committee was going forward and
16    objecting to a WARN Act severance claim
17    that would affect employees.  The hospital
18    was in the district where the case was
19    pending, which happened to be Newark, New
20    Jersey.  Much to my frustration, about 150
21    employees showed up at that hearing, and I
22    was the bad guy trying to sever their
23    claims, but, nonetheless, because of the
24    location of the case, they had the
25    opportunity to do that.  We can't foresee
```

98

1
2    every possible motion or issue that might
3    come up, but those types of things I think
4    are the reasons why Congress enacted the
5    venue provision that it did enact in 1408.
6            Your Honor, I think it is hard
7    for all of us to say bye to a nice case,
8    both the Court and counsel, including
9    myself.  I'm up here to work myself out of
10   a job.
11           THE COURT:  Well, I don't get
12   paid by the case.
13           MR. MARTIN:  But none of us
14   ever think we are going to get another
15   case, but somehow we do.
16           The problem that I have with
17   this, and my analysis, Judge, kind of
18   started and ended with 1408.  That is what
19   I'm here to talk about.  1408 gives three
20   options, principal place of business,
21   principal assets, domicile, which
22   essentially is state of incorporation for
23   a corporation.  It doesn't also say "or
24   any one of the other 50 states where you
25   form a company 12 days before the filing."

99

1
2              Dixie Stores clearly, as is in
3    the stipulation, paragraph 6, had no
4    purpose for filing a bankruptcy and no
5    purpose for its formation, in fact, other
6    than to establish venue.  In my view,
7    because of that, it is not a proper
8    debtor.  Dixie Stores is the only entity,
9    I submit, that technically meets 1408.
10              With respect to Table Supply,
11   Inc., I do not believe that that meets
12   1408's requirements because its principal
13   assets were not in this district for the
14   greater portion of the 180 days prior to
15   the petition.  Now, its principal assets
16   might have been its name and an empty bank
17   account for 178 days, but those were its
18   principal assets, and its asset of
19   $100,000 cash was only there for 12 days.
20   So I believe that Table Supply does not at
21   all comply with 1408.  The only company
22   that can comply with 1408 is Dixie Stores.
23   Again, we have the admission that that was
24   formed solely to establish venue.
25              Frankly, I thought about

100

1
2    whether or not I would do this as a
3    bankruptcy attorney to get venue, would I
4    set up a corporation like that.  I would
5    ask the Court to reflect upon that as
6    well, whether this would be an
7    inappropriate use of the bankruptcy code.
8    Good lawyering is great, and we all try to
9    be creative and do the best thing for our
10   client, but some lawyering, I think, is so
11   clever that we do an injustice to the
12   language and the intent of the statute.
13           I think the venue statute in
14   1408 was intended by Congress that there
15   be some meaningful nexus to a debtor.
16   What we have here, from what I heard from
17   the testimony, was a large bank creditor
18   and some bondholder creditors who felt it
19   would be better to be in New York and some
20   herculean efforts by the Debtor to make
21   that happen.  I submit, like was stated in
22   the Committee's brief, that Congress means
23   what it says and says what it means.
24   Unless we want to entirely gut 1408, this
25   case must move to Florida.

1
2                    Thank you, your Honor.
3                    MR. AUGUST:  Good afternoon,
4     your Honor, John August of Herrick
5     Feinstein on behalf of Ernst Properties.
6     I will be very brief.
7                    We had filed a joinder in which
8     we joined in all of Mr. Rubin's arguments
9     for a transfer and suggested that if your
10    Honor is going to transfer, that the more
11    convenient and the most central location
12    would be the Eastern District of
13    Louisiana.  I just wanted to basically
14    summarize that the Debtors are present in
15    Louisiana.  They have significant
16    operations there and in states to the
17    west.  The Eastern District of Louisiana
18    is centrally located and we think provides
19    the most convenient location for all the
20    employees and all the local creditors.
21                   Also, there was a case, Jitney
22    Jungle, that was still pending in the
23    Eastern District of Louisiana, and the
24    court there presided over a significant
25    sale of assets to the debtors in that

102

1

2    case.  So we think that court already has

3    some familiarity with the issues that

4    would arise in this case, your Honor.

5              THE COURT:  Anyone else who

6    joined?

7              MS. MARTINI:  Good afternoon,

8    your Honor.  For the record, Deidre

9    Martini, United States Trustee for Region

10   2.

11             Your Honor, my remarks this

12   afternoon are postured more in the nature

13   of a venue statement than they are a venue

14   position, because I believe that my role

15   in this dispute, after all, I was one of

16   the first on the scene, if you will, is to

17   assist the Court in applying the

18   appropriate standard to determine the

19   merits of this motion.

20             As a party in interest, but not

21   a true stakeholder in this case, it is

22   inappropriate for me to opine on the

23   ultimate resolution of this issue, but

24   rather give the Court some background on

25   the U.S. Trustee's views on venue.  To do

103

1

2      that I would like to take a minute to tell

3      you factually how we got involved in the

4      case originally.

5              As the Court is aware, and most

6      of the parties are, in the prefiling stage

7      we are given an enormous amount of

8      information to review to get the debtor

9      prepared to enter into bankruptcy and to

10     seek protection under Title 11.  As part

11     of that review, we inquire of every debtor

12     to explain to us their connections to New

13     York and to give us nexus to venue in the

14     Southern District of New York.  That

15     information was communicated to us.  And

16     when I say "us," I was involved in almost

17     every conversation, conference call, and

18     negotiation in the prefiling stage, as was

19     Richard Morrissey, who is present here in

20     court.

21             The Debtor answered our

22     questions as to venue, and the information

23     that was communicated prior to the filing

24     was sufficient then and now factually to

25     support venue in the Southern District of

104

1
2    New York.  I was unaware that there was an

3    affiliate that was created 12 days before

4    the filing.  However, I have to state that

5    in all of the communications and

6    conferences that were held, that question

7    was not directed at the Debtor, any of its

8    representatives, or counsel.

9                 Your Honor, it is

10   understandable that the creation of DSI

11   could be perceived as enhancing or

12   bolstering the Debtors' connections to New

13   York.  But there are two debtors here with

14   assets in New York, and in our view, at

15   the time of the filing there was nothing

16   present that violated Title 28.

17                 As the U.S. Trustee, I have an

18   obligation to this court to alert the

19   Court of any violations of bankruptcy

20   code, and federal law for that matter,

21   chime in on issues of appearance, and

22   probably most importantly issues relating

23   to integrity of the system.  It is not my

24   intention to alter any of the current

25   procedures that we now employ within the

105

1
2     U.S. Trustee's Office.  However, upon
3     reflection, I may in the future probe a
4     little deeper so that these types of facts
5     come to light a lot sooner in the case
6     than later.
7                    I would like to note, on
8     timing, this is -- a venue challenge to me
9     is a challenge that should be viewed
10    almost as a first-day type of issue.  The
11    motion should be made immediately upon
12    discovery of the facts which would form
13    the basis for the request to transfer
14    venue.  The motion should be brought prior
15    to major milestones in the case.  In this
16    case, we have approval of DIP financing.
17    There is certain procedures, reclamation
18    procedures, that have been employed, a
19    huge number of interim and final orders.
20    I haven't checked PACER, but there must be
21    50 or 60 orders that have been entered in
22    this case.  When there is a venue
23    challenge well into the case, such as this
24    one, I think the Court should look at the
25    timing of the motion to evaluate whether

106

1
2    or not there is more strategic-like
3    factors that are present and why other
4    creditors, notably the Committee, have a
5    vastly different view of venue.
6              In turning to the venue issue,
7    absent evidence that the filing was in bad
8    faith, which I don't think, as I listened
9    to the testimony today, that there was any
10   evidence whatsoever proffered in that
11   regard, coupled with compliance with
12   Section 1408, I think the Court has to
13   look at the interests of justice and the
14   convenience of the parties.
15             The U.S. Trustee and the Office
16   of the U.S. Trustee is in a very, very
17   unique position because we are not
18   creditors, we are not stakeholders in the
19   outcome.  We are truly unique in that we
20   are disinterested.  We are a national
21   program, and this case will be
22   administered and monitored by me if it
23   stays in New York, or by Felicia Turner if
24   it is transferred to Florida.  So we truly
25   don't have an interest at all in where the

1

2    case is ultimately postured.

3              My position today is that the

4    Court should undertake a convenience

5    analysis and hear from the parties that

6    are most affected even when there is the

7    Debtors' acquiescence to this transfer.

8    This acquiescence, as stated by the Court,

9    is due to its perception that there is

10   negative ramifications and that the

11   disruption that this venue dispute has

12   created will derail the reorganization

13   process.  Movants have the burden of proof

14   on this issue.  The Debtors' support of

15   the transfer may not be dispositive since

16   the Committee and what I have calculated

17   to be almost $600 million of debt have

18   objected to the transfer.

19             So the U.S. Trustee encourages

20   the Court to apply the standard under 1412

21   to allow the true stakeholders in this

22   case to be heard.

23             THE COURT:  Thank you.

24             MS. MARTINI:  Your Honor, I

25   have a flight to Washington D.C. that I'm

108

1

2    trying to get on.

3                    THE COURT:  So you can be

4    excused.

5                    MS. MARTINI:  Richard Morrissey

6    is also here in court.

7                    THE COURT:  Okay, thank you.

8                    MR. DUNNE:  Your Honor, Dennis

9    Dunne of Milbank, Tweed, Hadley & McCloy

10   on behalf of the Official Committee of

11   Unsecured Creditors in these cases.

12                   At the outset, I want to make

13   clear that the Creditors Committee is

14   merely dealing with the cards that they

15   were dealt, and given those cards,

16   weighing all the options and trying to do

17   what is consistent with their fiduciary

18   duties to maximize recovery to the

19   unsecured creditors.  The Creditors

20   Committee obviously did not exist and had

21   no input on any of the pre-bankruptcy

22   planning.

23                   We would also like to contrast

24   that with Buffalo Rock, who we submit has

25   unclean hands.  The testimony was

1
2    unrebutted that the primary reason for
3    their filing of the motion when they did
4    was that they were upset they weren't
5    appointed to the Official Creditors
6    Committee.  They knew that they couldn't
7    make a motion to compel the Court or to
8    have the Court compel the U.S. Trustee to
9    appoint them, so they tried to make an end
10   run around that process and use the venue
11   motion as the lever for trying to extract
12   appointment to the Creditors Committee.
13            What is amazing about that,
14   your Honor, is that it seems to have been
15   successful to one degree, which is that
16   the Debtors' position changed as a result
17   of the consequences of that motion.  The
18   Debtors are saying "Look, there was no bad
19   faith, we acted in good faith, the venue
20   is appropriate under 1408 here."  And,
21   indeed, under a 1412 analysis, that may
22   lead to staying in New York, but because
23   of the PR, the press, which is already --
24   you know, the genie is out of the bottle,
25   your Honor, on the articles that have been

110

1
2   written in the Florida newspapers.  But
3   because of the press that they have
4   received, they changed their position, and
5   I submit, your Honor, that one factor that
6   is not present in any case law under 1412
7   is the opinion of journalists in other
8   forums.
9              The reasons that the Committee
10  is opposing the motion can be distilled to
11  two, which is that we believe it is more
12  convenient for most creditors, and, this
13  may be more important, more convenient for
14  those creditors who are likely to have
15  meaningful disputes with the estate, who
16  have appeared to date on disputes that
17  aren't resolved yet, and I will come back
18  to that in a few minutes.
19              The Committee is also convinced
20  that Florida will be more expensive than
21  New York.  I know we heard Mr. Appel's
22  testimony where he went out of his way to
23  say it may be that Florida could be
24  cheaper, but that is back of the envelope,
25  it is really just a Debtors' side analysis

111

1
2      if they could shift a sufficient amount of
3      the work from Skadden to local counsel.
4              I could tell you the Committee
5      members have been in a number of cases,
6      some with local counsel, some without, and
7      they understand -- they believe that that
8      leads to incremental costs in terms of
9      travel of New York counsel to another
10     jurisdiction, having local counsel at all
11     the hearings, and having them on the
12     conference calls.  It also doesn't
13     address, and I think Mr. Appel admitted as
14     much, that there will be incremental costs
15     for the Piper Rudnick firm and the trade
16     creditors they represent will have to go
17     out and get Florida counsel, and Kelley
18     Drye and the landlords they represent will
19     have to go out and get local counsel.  As
20     fiduciaries who are charged with
21     minimizing liabilities, maximizing returns
22     to unsecureds, the Committee has come out
23     on balance as believing that Florida will
24     be more expensive.
25              Before I turn to the statute,

112

1
2    your Honor, I did want to address the
3    burden, which is we cited cases, and I
4    don't believe anybody has cited contrary
5    authority, that the burden remains with
6    the movant.  The Debtors' change of
7    position does not change that burden.  I
8    heard the phrase "business judgment"
9    several times.  The analysis under 1412 or
10   1408 does not revolve around a business
11   judgment test.  In fact, the cases we cite
12   are undisputed that the best evidence,
13   even when the Debtors have changed their
14   mind on their preference, the best
15   evidence of the Debtors' preference is
16   what did they actually do under the
17   petition date.  In this case, they filed
18   in New York.  Once we are at Section 1412,
19   that creates a presumption that it stays
20   here, unless rebutted.
21            The last point is that
22   Mr. Zimmerman talked about there being a
23   change since the petition date.  Again,
24   the change is the number of journalists
25   who have written articles that have picked

113

1
2    up on some of the adjectives used by
3    Buffalo Rock in their pleadings.  I submit
4    anybody to read those cases.  Those aren't
5    the changes they are talking about.  They
6    are talking about the changes related to
7    venue, i.e., did your headquarters move
8    across the country, did you move your
9    assets from Oregon to Wisconsin, things
10   that would directly justify a change of
11   position with respect to venue.  Your
12   Honor, nothing of that sort has occurred
13   here.
14              That being said, as kind of a
15   preface, your Honor, let's start with
16   1408, because I don't think anybody has
17   really parsed through this.  I think the
18   Supreme Court, under Ron Pair and the
19   litany of those cases, has made it clear
20   the analysis should begin and end with a
21   literal reading.  What I think the other
22   parties have missed is that 1408 only
23   deals with Dixie Stores and Table Supply.
24   The balance of the Winn-Dixie entities are
25   not here under 1408-1.  They are here

114

1
2    under 1408-2, which is a completely

3    different analysis.  Let me come back to

4    that in a moment.

5              If Dixie Stores were the only

6    entity to file, do they really argue that

7    it is improper in New York when they were

8    clearly domiciled in New York by state of

9    incorporation?  There is nothing in 1408-1

10   that says one individual corporation that

11   has only existed for 12 days cannot file a

12   Chapter 11 case.  In fact, they couldn't

13   file anywhere else.  It had to file in New

14   York given the evidence that we've heard.

15             Then we get to important

16   qualifiers that Congress clearly thought

17   about, crafted, and put in, which was

18   okay, but it had to have been the domicile

19   for 180 days prior to the petition date.

20   That doesn't apply to Dixie Stores because

21   they didn't exist for 180 days.  We are in

22   the second prong, which says okay, if they

23   haven't existed for 180 days, you could

24   still file.  That is important.  They

25   could have said that you can't file if you

115

1
2    only existed for 60 days.  What they have
3    said is that no other district can claim
4    that they housed your domiciled residence,
5    principal assets, or place of business for
6    a longer period than the place where you
7    filed.  That is also true of Dixie Stores.
8    No district has a greater claim that they
9    were in their district for longer than the
10   12 days that they were in New York.
11                So under 1408-1, in the
12   literal, plain meaning of it, Dixie Stores
13   was a proper debtor venued here in New
14   York.
15                THE COURT:  What they are
16   saying is there is no reason for Dixie
17   Stores to be in bankruptcy.
18                MR. DUNNE:  What I understand
19   that to mean is they would like to dismiss
20   it as a bad-faith filing because there is
21   no basis for a reorganization proceeding.
22   That, I submit, is not 1408-1 analysis.
23   That would be to dismiss Dixie Stores as a
24   debtor.  That is not their request.  We
25   can deal with that.

116

 1
 2                    What they are getting to is
 3  whether a dismissed case can be the
 4  predicate hook under 1408-2.  They are not
 5  a creditor of Dixie Stores.  They don't
 6  have standing if only Dixie Stores was
 7  here.  What they are saying is, by using
 8  Dixie Stores under 1408-2, we can't bring
 9  everyone else in.  I believe there are
10  cases out there talking about your
11  creditor hook being dismissed, and at the
12  time of analysis for 1408-2 is the
13  petition date.  Simply, was there an
14  affiliate in that location, yes or no?
15                    Congress has considered on many
16  occasions putting some heft on this.  This
17  is why the 180-day qualifiers that are in
18  1408-1 are so important.  They didn't put
19  them in 1408-2.  They could have said the
20  first to file that you are using as the
21  predicate for all your affiliates, they
22  had to have been in that district for 180
23  days or they had to have been in existence
24  for 180 days.  They know how to draft
25  this.  They just drafted it in 1408-1.  If

117

1
2    you go back through the legislation that
3    has been considered by Congress over the
4    past several sessions, they talked about
5    amending this section to do exactly that,
6    put some qualifications on it.  They have
7    not done it.
8              What does the Supreme Court say
9    about that?  We have to take the statute
10   as it is.  If your Honor feels like it
11   would be wise or preferable to put those
12   qualifiers in there, that is the province
13   of Congress, not the Court.  So I don't
14   believe that we are in 1408 at all.  Just
15   for the record, there was no dispute that
16   if Dixie Stores was proper here under
17   1408-1, that they were affiliated with the
18   rest of the Winn-Dixie entities for 1408-2
19   purposes.
20             Moving to 1412, your Honor,
21   which is important, because that is where
22   I think the analysis should be done, is
23   that Congress didn't leave the Court or
24   the parties without a remedy for those
25   situations which scream out for a transfer

118

1
2    because all the parties would be more
3    convenienced by moving it or in the
4    interests of justice it would favor it.
5    We suggest that both of those strongly
6    militate in favor of retaining the cases
7    in New York.
8              Let's talk about the interests
9    of justice prong first, which principally
10   refers to judicial economy, costs of
11   administration, and related issues.  While
12   we believe that the Florida bench clearly
13   could handle the cases as competently as
14   this court, there is no doubt that this
15   court has more knowledge about these cases
16   and about its own rulings.  This court has
17   overseen numerous hearings and ruled on
18   many motions since the petition date.  As
19   a result, it has listened to testimony and
20   become familiar with the company's
21   financial condition, its structure, and
22   the legal issues facing it.
23             I want to give a couple of
24   examples of that.  On some of the
25   first-day orders, your Honor directed the

119

 1
 2    Committee to work with the Debtors on the
 3    consignment order to make sure it is not a
 4    disguised critical vendor payment.  To the
 5    extent we have disputes on that, it is
 6    helpful to come back to the court that had
 7    those oral overlays on written orders.
 8               Perhaps a better example of it
 9    is the DIP hearing.  Your Honor heard
10    hours of testimony and oral argument.  A
11    lot of it telescoped around the issue of
12    what is the effect of the assignment of
13    the prepetition secured lenders to the DIP
14    lenders on the allowability of reclamation
15    claims.  Your Honor crafted again an oral
16    reservation of rights dealing with the
17    need to, perhaps if we don't settle it, to
18    talk about the scope, the extent of that
19    assignment.
20               What your Honor had in mind by
21    those words may very well be at issue in
22    this case, and I believe --
23               THE COURT:  I'm sorry, isn't
24    that a reservation of rights in the order
25    now?

120

1
2                  MR. DUNNE:  I think it
3    references the oral argument in the
4    transcript, your Honor.  You are right, we
5    added language expressly reserving the
6    rights, but on the terms set forth on the
7    record.
8                  I think the point is made, your
9    Honor, that both parties -- I think it is
10   important to note that the reclamation
11   creditors themselves are here supporting
12   retention in New York.  Both parties would
13   prefer to have the judge who actually
14   heard the testimony and the arguments and
15   made that reservation of rights statement
16   interpret it, if need be.
17                 The other point is the location
18   of the assets.  We cite cases that I think
19   make it clear that the location of a
20   debtor's assets, while it is a factor, has
21   negligible weight unless you are in a
22   liquidation or you think a liquidation is
23   a likely prospect.  You can understand why
24   it is necessary in a liquidation process
25   to be near the assets.  Even then I would

121

1
2    submit we have all been in liquidating
3    Chapter 11's and selling assets under
4    Section 363 all over the country without
5    the need to be near them.  But in any
6    event, the cases are clear that is a very
7    minor factor.
8              The Committee believes that the
9    cost of the cases increases.  I keep
10   coming back to that because that is the
11   touchstone.  If you look at all the
12   parties here, clearly New York would be
13   more convenient.  That is not just
14   convenience for the professionals.  That
15   convenience translates into less travel
16   time, less airfare, less time spent in
17   transit.  That is dollars that will be
18   borne by the estate.  We believe we are
19   the residual economic stakeholders here
20   and every incremental dollar comes out of
21   the unsecureds' pockets.
22              What is in the interests of
23   justice in this case?  I think we have
24   shown that judicial economy militates in
25   favor of keeping it here.  We believe that

122

1
2    the cost of administration does as well.
3    Virtually every professional on an
4    estate-retained party is in New York or
5    has offices.  Skadden, New York;
6    Crossroads, New York; Blackstone, New
7    York; Houlihan, New York; Alvarez &
8    Marsal, New York.  Milbank as well.
9              Lastly, there will be
10    inevitably a learning curve for the new
11    judge in Jacksonville.  There will be
12    incremental time explaining what has
13    transpired to date, what has gone on in
14    each of these rulings, and generally
15    duplicating what we have done in a
16    truncated fashion, but duplicating what
17    has gone on to date here.
18              Your Honor, on the convenience
19    of the parties, I think I've spoken about
20    where some of the key professionals are.
21    But let's talk about the other side of the
22    aisle.  The principal movant here is
23    Buffalo Rock.  They have a $2 million or
24    so claim.  They do not have a contract
25    with the company.  There are no assumption

123

1
2    or rejection issues on the horizon.  We
3    don't know whether or not they would be
4    involved in a material dispute with the
5    company.  But as evidenced by today, I
6    think that we can clearly conclude that
7    they can represent themselves effectively
8    in New York, and, again, I don't think it
9    was about venue with them, it was about a
10   vendetta for being upset by not being
11   appointed to the Creditors Committee.
12              The employees, your Honor, I'm
13   just going to make a few points.  First of
14   all, the Creditors Committee is solicitous
15   of employees.  We want them to be happy,
16   well-paid, and working hard.  We will take
17   steps to ensure their participation,
18   whether that is by conference call or
19   otherwise.  But I just want to point out
20   there has been an employee order entered.
21   All their prepetition wage claims and
22   benefit claims will be paid in the
23   ordinary course.  Their vacation time,
24   etc., will be dealt with in the ordinary
25   course.  To the extent there is an issue

124

1
2  with a retirement plan under 1114, we all
3  know how many times that arises in a
4  bankruptcy case, they are likely to have a
5  representative or we will all go out of
6  our way to craft a procedure so they can
7  participate meaningfully.
8          Some Florida utilities have
9  also joined in in the venue transfer
10  motion.  It is not surprising that they
11  do.  No doubt being in Jacksonville would
12  cut down their travel time.  The utility
13  disputes, there is a pending order that
14  deals with them.  Most of them had
15  deposits for their prepetition claims.
16  Cases aren't reorganized on the backs,
17  maybe except for telecom companies, with
18  utilities.
19          At the end of the analysis,
20  your Honor, Buffalo Rock is arguing that
21  the mere creation of Dixie Stores and the
22  transfer of assets to Table Supply
23  constitutes such bad faith and
24  manipulation of the system that this court
25  per se has no choice but to move it to

125

```
 1
 2    Jacksonville.  I think a closer look at
 3    the facts, the unrebutted testimony, and
 4    the law shows that they are wrong.  I
 5    didn't hear any evidence that went to the
 6    bad faith of the Debtors.  I don't think
 7    Buffalo Rock really argued that point.
 8              On the law, look at the cases
 9    they cite where there is a gloss in some
10    of these cases about bad faith and abuse
11    of the bankruptcy process.  In those
12    cases, the debtors were filing in a remote
13    jurisdiction to gain a distinct legal
14    advantage over the creditors.  That is not
15    the case here.  In those cases, it is the
16    creditors committee and large creditors
17    who are seeking to get it back to another
18    jurisdiction to avoid the debtors getting
19    the advantage of some unique law in the
20    Second or Ninth District that favors them
21    in a two-party dispute with a landlord.
22    We don't have any of those facts here.
23              So what we are saying on
24    balance is that this court should not
25    expand that minimal gloss on the statute.
```

126

1

2    Justice Scalia and the balance of the

3    Supreme Court have made it clear you

4    interpret the statute as it is written,

5    and there is a very small exception for

6    egregious bad faith of the debtors, which

7    is not present here, and there is no

8    evidence of it, and the Court should not

9    expand that exception.

10           THE COURT:  The phrase

11    "interests of justice" is a pretty broad

12    phrase.  I can certainly understand the

13    point that it is not just that in a

14    federal system a company be permitted to

15    so clearly create a basis for venue.  What

16    is your response to that argument?  I

17    mean, I've never seen this done before

18    where it has been brought to light, I've

19    never seen it before when it wasn't

20    brought to light.

21           If I rule as you want, what is

22    to keep any debtor in the future from

23    doing this and basically loading down one

24    or two corporations with every case?

25           MR. DUNNE:  It comes back to

127

1
2    the balancing of the factors, the
3    interests of justice and the convenience
4    of the parties.  Are they doing it for an
5    improper purpose or bad faith?  Let's
6    assume every creditor, and here we have
7    some small creditors, in terms of number
8    of dollars, arguing otherwise, but the
9    vast majority of the creditors argue that
10   yes, this will result in a more efficient
11   administration of justice so that more
12   funds are available for distribution to
13   the unsecured creditors.  It depends
14   whether your Honor is going to make a per
15   se ruling that if you do this, you are
16   gone, because of macro concerns about the
17   bankruptcy system.
18              I submit, and particularly as
19   fiduciaries for unsecureds, we have to do
20   what is right and best for all the
21   constituents in this case.  If there was
22   evidence of bad faith or trying to get a
23   leg up in a particular dispute, then we
24   start segueing and sliding towards those
25   cases.  But clearly they are asking your

128

```
 1
 2    Honor to expand those cases.  As I said,
 3    Congress could have addressed this in the
 4    affiliate hook or elsewhere in 1408, and
 5    they didn't.
 6              One last point, because this
 7    came up in some of the cross I think of
 8    Mr. Appel, the trade members of the
 9    Committee did not support the opposition
10    of the Committee to the venue motion.  I
11    would like to point out that Piper
12    represents a majority of the large
13    creditors.  I will read them off for a
14    second.  It includes members of the
15    Committee.  It is Clorox, Conagra,
16    Conopco, Frito-Lay, which is on the
17    Committee, General Mills, Kraft Foods,
18    which is on the Committee, Masterfoods,
19    Mars, Nestle, Pepsi, Procter & Gamble,
20    Quaker Foods, Sara Lee, and SC Johnson.
21              In sum, your Honor, there is no
22    dispute that DSI can file here properly
23    under a strict reading of 1408-1.  There
24    is no dispute that the languages of the
25    relevant statutes authorize the filing in
```

129

1
2    New York.  There is similarly no dispute
3    that Congress has been considering
4    legislation and hasn't adopted it to
5    address these issues.  We have to deal,
6    again, with the statute and the plain
7    meaning, and the Court should narrowly
8    construe any exceptions to it.  The
9    Debtors have tried to stake out a path to
10   a cost-effective and convenient case.
11   Virtually all of the large creditors
12   agree, the Committee agrees, the Court
13   should retain the case in New York.
14            THE COURT:  Anyone else?
15            MS. MAZER-MARINO:  Jil
16   Mazer-Marino, Scarcella Rosen & Slome, for
17   Florida Power & Light, Progress Energy
18   Florida, Progress Energy Carolina.  Just a
19   few words to address what the Creditors
20   Committee has said.
21            I think, although you shouldn't
22   address macro concerns in this case with
23   respect to the Bankruptcy Code, this is
24   one instance where the concerns of policy
25   in general and the interests of this case

130

```
 1
 2    walk hand in hand.  If you ignore the
 3    policy, then you are inviting every
 4    case -- there is going to be an issue,
 5    people are deciding what is in the best
 6    interests of the Debtor, whether it should
 7    be venued where somebody has a sub or a
 8    venue with a real nexus to a jurisdiction.
 9    To try to predict what issues are going to
10    come up and what creditors will be
11    interested in attending the hearings, we
12    certainly, although I should have
13    cross-examined the Debtors' witness, but
14    we didn't ask any questions of the
15    Creditors Committee.  It is too early to
16    say what creditors will want to be part of
17    the issues.
18              As far as bad faith, I don't
19    think you have to deny Buffalo Rock's
20    motion because of bad faith.  I think that
21    whatever their issues are, there are
22    plenty of creditors interested in seeing
23    this case in Florida who don't have those
24    issues.  I think we should focus on what
25    the parties have said before, that you
```

131

1

2    have a debtor who wants to move, the

3    majority of creditors who want to move,

4    and a Creditors Committee, who although

5    they didn't put on evidence, are saying it

6    is going to be cheaper down there.

7              THE COURT:  You said the

8    majority of the creditors.  Where is that

9    on the record?

10             MS. MAZER-MARINO:  I'm sorry, I

11   didn't mean to say that.  We don't know

12   what creditors will be involved.  We don't

13   know what the costs are going to be.  So

14   to take those kind of issues into account

15   now just seems inappropriate.  Thank you.

16             MR. CHEBOT:  Good afternoon,

17   your Honor.  My name is Jeffrey Chebot of

18   Whiteman, Bankes & Chebot, representing

19   Sunkist Growers, Inc. as well as some PACA

20   customers, approximately $7 million worth

21   of PACA trust creditors.  We did not

22   submit a filing here today, but we have

23   entered our appearance in the case.

24             What prompted our position here

25   today was the most recent filing by

```
 1
 2   Buffalo Rock, and I respectfully request
 3   permission to briefly address it.
 4              THE COURT:  Okay.
 5              MR. CHEBOT:  Your Honor, we are
 6   here today to join with Wachovia, the
 7   debtor-in-possession lending agent, and
 8   also with the Creditors Committee in
 9   opposing the motion of Buffalo Rock.
10              THE COURT:  I don't think
11   Wachovia has said anything on this.  Their
12   counsel is here, though.
13              MR. CHEBOT:  They have taken a
14   position in the papers, your Honor, I
15   believe, and certainly the Creditors
16   Committee has, and we join in and we
17   support the reasoning in the papers that
18   were filed by the Creditors Committee.
19              From the standpoint of PACA, in
20   addition, there is also the concern of the
21   promise of PACA, which is full payment
22   promptly to the unpaid produce suppliers
23   of the Debtor, Winn-Dixie.  That is
24   contained in 7 USC Section 499(B)(4),
25   prompt payment.  And, also, in the context
```

133

1
2    of certain of today's PACA trust
3    enforcement cases, any delays attendant
4    upon a change of venue to any jurisdiction
5    other than New York will thwart a
6    Congressional premise of prompt payment to
7    the unpaid PACA trust creditors.
8             We have no doubt that the court
9    in the Middle District of Florida,
10   probably even in the Eastern District of
11   Louisiana, could render a competent
12   decision regarding issues regarding PACA.
13   But the fact is this particular court
14   already has been exposed to the PACA issue
15   through the objections that were filed to
16   the initial motions for approval of both
17   the cash collateral order and also the
18   interim PACA trust claims procedure order.
19   Through these oppositions, the Court has
20   already gained an appreciation of the
21   primacy and immediacy of the issues
22   regarding PACA trust claims.
23             During the two and a half weeks
24   after the initial motions were filed
25   regarding PACA trust claims, PACA trust

1
2    counsel, representing approximately $27

3    million worth of claims, engaged in

4    substantial negotiations with Wachovia,

5    the Creditors Committee, and with the

6    Debtor to craft an order that was

7    satisfactory to the PACA trust creditors

8    both with respect to the PACA trust claims

9    procedure and also with respect to the

10   financing order.

11          By retaining venue in this

12   jurisdiction, your Honor, with the same

13   set of players, that would best protect

14   the PACA trust creditors, because an order

15   such as the PACA trust claims procedure

16   order which could potentially be viewed as

17   interlocutory and possibly subject to

18   attack if, as we heard some of the

19   testimony today, the Debtor engages new

20   professionals in Florida, that would

21   certainly be harmful to the interests of

22   the PACA trust creditors.

23          So, therefore, we respectfully

24   ask both from the standpoint of economies

25   and the familiarity of the Court, and also

135

1

2   with respect to the question of potential

3   additional costs involved and delays in

4   payment to the PACA trust creditors, that

5   venue be retained in this jurisdiction,

6   and we respectfully join in the opposition

7   of the Creditors Committee to change venue

8   by Buffalo Rock.

9           Thank you, your Honor.

10          THE COURT:  The 546 order and

11  the DIP order and cash collateral order

12  are all final orders.

13          MR. CHEBOT:  That's correct.

14  But it could be ordered that the PACA

15  trust claim procedure -- we don't believe

16  it is.  We believe the PACA trust claims

17  procedure is a final order.  It states

18  final order, but it could possibly be open

19  to an attack in another forum.  We want to

20  avoid any possibility of collateral

21  attack.

22          THE COURT:  Thank you.

23          MR. LEHANE:  Good afternoon,

24  your Honor.  Robert Lehane from Kelley

25  Drye & Warren on behalf of six landlords

136

1
2    holding 25 leases.
3            We represent Edens & Avent,
4    Weingarten Realty Investors, Palm Springs
5    Mile Associates, Villa Rica Retail
6    Properties, ALG Limited Partnership, and
7    Curry Ford LP, and we also join in the
8    Committee's objection to Buffalo Rock's
9    motion to transfer venue.
10           We are here primarily in
11   support of the convenience analysis and
12   would like to point out that 11 of our 25
13   leases are in fact located in Florida.
14   The remainder are in Alabama, Mississippi,
15   Georgia, North Carolina, South Carolina,
16   and Louisiana.  Those leases are not in
17   New York.  Also, our landlords' primary
18   principal places of residence are in
19   Florida, Georgia, South Carolina, and
20   Texas, not New York.  Nevertheless, our
21   landlords believe that venue is
22   appropriate in New York and request that
23   the court deny Buffalo Rock's motion to
24   transfer venue.
25           This court has already invested

137

```
 1
 2    substantial time and energy in this case,
 3    and the landlords with these 25 leases
 4    hold some unsecured claims at this point
 5    for rejection damages, but may perhaps
 6    amount to millions of dollars in unsecured
 7    claims, but will also have continued
 8    involvement in this case with respect to
 9    motions to extend the time to assume or
10    reject potential disposition of the leases
11    and/or other asset sales and the plan
12    disclosure statement.
13            The landlords' ongoing
14    involvement in this case we believe is a
15    matter that should be taken into
16    consideration when the Court considers the
17    convenience analysis.  Leases are a
18    significant asset of this estate.  We
19    recognize with 25 leases we are only a
20    small voice in the total of 920 leases,
21    but nevertheless we think it is important
22    to point out that our clients do believe
23    that this court, with significant retail
24    experience, the case is properly venued in
25    this court.
```

138

```
 1
 2                   Thank you very much, your
 3   Honor.
 4                   MR. CARRIGAN:  Good afternoon,
 5   your Honor.  Daniel Carrigan, DLA Piper
 6   Rudnick Gray Cary US LLP.
 7                   My motion to appear pro hac
 8   vice is before the Court.  I don't know if
 9   it has been approved or not at this stage.
10   I thought I would disclose that.
11                   THE COURT:  It probably has
12   been approved.  Anyway, you can speak.
13                   MR. CARRIGAN:  Thank you, your
14   Honor.
15                   Mr. Dunne has stolen most of
16   our story.  However, we do represent 14 of
17   the larger vendors in the case.  According
18   to the Debtors' schedules, in the list of
19   the top 50 unsecured creditors, we
20   represent more than $50 million of claims,
21   approximately half of which we think are
22   entitled to some claim of reclamation.
23                   We are pleased to see in one of
24   the exhibits today that one of the
25   first-day affidavits by Mr. Nussbaum
```

139

1
2    suggests that they may be valid.  We were
3    also pleased to hear that someone at the
4    Debtor thinks they are solvent 90 days
5    before the bankruptcy case.
6              THE COURT:  I think later he
7    said he didn't know what he was talking
8    about.
9              MR. CARRIGAN:  Your Honor, two
10   things, two observations perhaps that
11   haven't really been addressed yet.
12             One is there has been a lot of
13   discussion about the negative impact of
14   the motion and the attendant publicity and
15   what the effect of a court's ruling would
16   be that the case either should or should
17   not stay here.  One thing that hasn't been
18   discussed is that if the Court were to
19   rule that the case should not stay here,
20   is that publicity going to be any better
21   than the publicity they already have?  It
22   will merely confirm, perhaps, the notion
23   that it was filed in bad faith or in some
24   inappropriate manner.  That is somewhat
25   jesuitical in analysis, but it is

140

1
2    nonetheless talking about practical

3    effects and perceptions.

4              The other observation is if the

5    change of venue is to be some sort of

6    prophylactic against the encouragement of

7    others to structure transactions to create

8    venue, your Honor, the interests of

9    justice is a pretty broad standard and it

10    brings in a number of different factors

11    that can be brought to the analysis and

12    brought to the reasoning to conclude that

13    notwithstanding what the circumstances

14    might be, it yet may be in the interests

15    of justice because of the interests of

16    creditors and the interests of other

17    parties to the case that it is better for

18    it to be in one location versus another

19    regardless of how it got there, as long as

20    we are not talking about, for example, the

21    bad-faith filing, which goes more to the

22    jurisdictional aspects of the case than to

23    the venue.

24              For those reasons, your Honor,

25    we struggled with this as to whether to

141

1

2    support the motion or to take our own

3    position on it, and it occurred to us --

4    and I understood the allusion that we may

5    be one of the parties with whom there is a

6    substantial dispute with the company down

7    the road here, and it may be that in light

8    of some of the case law that is present

9    here in this jurisdiction that there was a

10   reaction by reclamation creditors that

11   ought to be anticipated anywhere but here

12   and Ohio.  In our view, if we are going to

13   have that litigation about a substantial

14   amount of money in a protracted state, it

15   would be more conducive to having it

16   fought out on a level playing field than

17   perhaps anywhere else that we have a

18   choice.

19              For those reasons, your Honor,

20   we would ask the Court to take our

21   interests into consideration and to find

22   that the case should stay here.  Thank

23   you, your Honor.

24              MR. RUBIN:  Judge, could we

25   just respond?

142

1

2              THE COURT:  I think there may

3    be one or two more people to speak.  Are

4    we done with all of the people who have

5    said their first piece and hopefully don't

6    want to say a second piece?

7              MR. RUBIN:  May I respond now?

8              THE COURT:  That is fine.

9              MR. RUBIN:  Just a couple of

10   quick points.

11             First of all, the venue motion

12   was filed on March 14th, which was within

13   three weeks of the filing of the case.  It

14   was not a late filing.  It wasn't filed

15   deep into the case.  It was filed early in

16   the case.

17             Second of all, it was mentioned

18   that what we were doing was attempting to

19   derail the organization process.  That is

20   totally untrue.  The Debtor itself

21   testified today through its witness as

22   well as through its stipulation that the

23   reorganization process can be successful

24   in Florida as well.  We are not trying to

25   extract an appointment to the Committee.

143

1

2    The Court is aware of the fact under 1102

3    and 1103 of the Code that in 1994 Congress

4    took away from the court the ability to

5    basically add members to the committee.

6    That is up to the U.S. Trustee.  We are

7    here to see to it that these cases are in

8    the appropriate and proper venue.

9              Next, the courts universally

10    have held that an entrenchment of counsel

11    is not a reason to keep a case in the New

12    York venue.  Of course there are New York

13    lawyers involved.  The case was filed in

14    New York.

15              We take the position, Judge,

16    that the interests of justice require that

17    the Court not reward such an effort to

18    manufacture venue which has been done in

19    this case.  That is what has happened

20    here.  That is an opinion of the United

21    States Bankruptcy Court for the Southern

22    District of New York, cited as 255 BR 121,

23    which is the Eclair Bakery case.

24              THE COURT:  You read that case,

25    I assume.  That involves a gentleman who

144

1
2    filed about 14 times in the Eastern
3    District of New York and thought he would
4    get a better break if he came over across
5    the river.
6              MR. RUBIN:  It is clear both in
7    the Second Circuit and in the Eleventh
8    Circuit that the Dixie Stores case,
9    wherein there is no business, no
10   creditors, no assets, would have been a
11   case which would have been considered to
12   have been filed in bad faith under the
13   Albany Partners case in the Eleventh
14   Circuit as well as the Second Circuit
15   case, CFTC.
16             And there is no prospect of any
17   reorganization of Dixie Stores, and the
18   same holds true for the second company,
19   which was dormant as well and had no
20   business, the second to file.
21             THE COURT:  What about
22   Mr. Dunne's point?  Frankly, I'm not sure
23   of the answer, but he contends that once
24   venue is established, the predicate for
25   venues having its case dismissed doesn't

145

1
2    matter, venue is established at that
3    point.
4              MR. RUBIN:  Venue cannot be
5    established through fraud or bad faith or
6    bad conduct.
7              THE COURT:  Let's assume for
8    the moment that that is not on the record.
9              MR. RUBIN:  Well, I don't know
10   that I know the answer to that either,
11   Judge, other than the fact that I did read
12   from the same opinion that you did in
13   respect to the interests of justice, and
14   it seems to me that for the Court to
15   condone venue in the Southern District of
16   New York based on a filing of a
17   corporation 12 days before the filing of
18   the case is not in the interests of
19   justice, and these cases should be moved.
20             THE COURT:  Do you have any
21   comment on the Capitol Motors versus
22   LeBlanc case that the Debtor cited, the
23   Second Circuit case?
24             MR. RUBIN:  No, sir.
25             MR. MARTIN:  Thank you, your

146

1

2    Honor.  Just briefly, Warren Martin again,

3    attorney for Riverdale Farms.

4              I think a lot of the arguments

5    before your Honor invoke an improper

6    statutory analysis.  A lot of what we have

7    heard is essentially a 1412 analysis, that

8    convenience of the parties, interests of

9    justice, where is it better, let's count

10   heads, these five creditors would like it

11   here and these ten creditors would like it

12   there.  Frankly, we don't have enough

13   fingers and toes to count all the heads.

14   There has been no systematic polling of

15   creditors.  I'm not even suggesting that

16   there should be.

17             What appears to me happened

18   here, from the testimony of Mr. Appel, as

19   best I heard it, was that the Debtor had

20   essentially decided to file in Florida and

21   it heard through its advisors and whatnot

22   that there were certain creditor

23   constituencies that would have preferred

24   the case in New York.  That was

25   essentially a 1412 type of analysis done

147

1

2    prepetition.  But the problem with that is

3    you've got to have 1408 first.  You've got

4    to have jurisdiction and you've got to

5    have venue before you can consider a

6    motion as to whether or not you are in the

7    right place.

8              Essentially what happened is

9    that jurisdiction and venue was

10   manufactured through the device that has

11   been described in order to get the case

12   here.  We've talked about interests of

13   justice, bad faith, but there is no

14   evidence whatsoever of any evil intent by

15   the Debtor.  But I suggest that your Honor

16   can find that bad faith in the fact of

17   creating a corporation solely to establish

18   jurisdiction and venue, contrary to the

19   terms of the statute.  The statute is

20   1408.

21             One other point, your Honor.

22   The Committee argued that the Committee

23   didn't exist on the petition date, the

24   Committee wasn't involved, we just took

25   this case as we found it.  Prior to the

148

1
2    petition date, there was an informal
3    committee of bondholders represented by
4    Milbank.  From what I understand of
5    Mr. Appel's testimony, the bondholders
6    were among the group that supported the
7    New York venue.  The bondholders are 4/7
8    of the Committee membership, so they
9    dominate the Committee, and the Committee
10   is represented by Milbank.  I also heard
11   the Committee's counsel say that on
12   balance the Committee supports transfer of
13   venue to Florida.  On balance, that sounds
14   to me significantly short of unanimity.
15            If your Honor rules that
16   1408 --
17            THE COURT:  Maybe I misheard
18   him, but I thought Mr. Dunne referred to
19   Committee trade members who separately
20   joined in the motion.
21            MR. MARTIN:  There are some, I
22   guess two Committee trade members, one or
23   two that joined in the motion.  Maybe it
24   is one, Pepsi.
25            MR. DUNNE:  Are we testifying

149

1

2    now, your Honor?  I think virtually

3    everything he said is inaccurate.  I don't

4    know if this is relevant or not.  I can

5    get into it if the Court wants to.

6              I just referenced the fact that

7    the two trade members had retained Piper

8    Rudnick, which filed the pleading, which

9    represents itself.

10             MR. CARRIGAN:  Yes, your Honor,

11   we represent Kraft and Frito-Lay, which

12   are on the Committee.

13             MR. DUNNE:  Suffice to say,

14   most of what he said is inaccurate.

15             MR. MARTIN:  Finally, your

16   Honor, I hear there is a great bankruptcy

17   judge in Juneau, and if your Honor rules

18   this way, I'm going to consider filing my

19   next case up there.  Thank you.

20             THE COURT:  I'm going to take

21   about a ten-minute break.

22             (Recess taken.)

23             THE COURT:  We are back on the

24   record in Winn-Dixie.

25             I have before me a motion by

150

1

2    Buffalo Rock Company, a creditor of most,

3    if not all of the Debtors, to transfer

4    venue of these Chapter 11 cases to the

5    Middle District of Florida, which has been

6    joined in by several other creditors or

7    groups of creditors, including a number of

8    former employees and certain other

9    creditors holding claims that are for them

10    significant, although not necessarily

11    among the largest claims in the case.

12        Importantly, the Debtors, who

13    originally chose this forum, have, because

14    of the effect of the filing of the venue

15    transfer motion and in particular its

16    characterization in the press and among

17    its employees and various suppliers, have

18    concluded that they at this point favor

19    transfer of venue and affirmatively seek

20    transfer of venue also to the Middle

21    District of Florida.  One creditor seeks

22    transfer of venue to Louisiana, but I

23    gather would equally be happy to have a

24    transfer to Florida.

25        The motion is opposed by the

151

1

2    Official Committee of Unsecured Creditors,

3    a group of trade creditors holding

4    substantial claims, a group of landlords

5    holding substantial claims.  And what I

6    took away from the U.S. Trustee's remarks

7    is that, generally speaking, although the

8    U.S. Trustee was making more of a policy

9    statement, the U.S. Trustee also would

10   oppose transfer of venue at this stage of

11   the case.

12         We held a hearing and took the

13   testimony of the Debtors' general counsel,

14   Mr. Appel, on the issue of why the Debtors

15   chose venue in New York.  That testimony,

16   as well as the agreed facts as agreed to

17   between the Debtors and Buffalo Rock, made

18   it clear that but for actions taken by the

19   Debtors shortly before the Chapter 11

20   filings, there would not be a basis for

21   venue in New York, but that, as set forth

22   in the agreed stipulation of facts, Dixie

23   Stores, Inc., DSI, was formed solely to

24   establish venue in this bank, and a bank

25   account was established for an essentially

152

1

2    defunct corporation, Table Supply Company,

3    also to sustain venue in New York.

4                    I approach this issue first and

5    foremost by examining the relevant

6    statutes, as the Supreme Court has

7    instructed us to do.  The relevant statute

8    here is 28 USC Section 1408(A), which

9    provides for the venue of a bankruptcy

10   case where a corporation is domiciled or

11   residenced, or, in this case,

12   incorporated, in DSI's case, or for other

13   reasons not relevant here, and where its

14   assets existed for, and this is important,

15   for 180 days or for a longer portion of

16   such 180-day period than the domicile

17   residence or principal place of business

18   in the United States or principal assets

19   in the United States of such person were

20   located in any other district.  That is,

21   Section 1408(A)(1) does not require that a

22   corporation be domiciled for at least 180

23   days in the district to qualify for proper

24   venue, but, rather, that it be domiciled

25   here for a longer period during that

153

1
2    180-day period than anywhere else.
3            That interpretation was adopted
4    as to the predecessor statute by the
5    Second Circuit Court of Appeals in Capitol
6    Motor versus Leblanc Corp., 201 F.2d 536,
7    Second Circuit Court of Appeals, 1953,
8    cert. denied 345 U.S. 957, also 1953.
9            Therefore, I conclude that on
10   the face of the statute and pursuant to
11   its plain meaning, venue was technically
12   proper for DSI.
13           Venue for the other debtors is
14   obtained through 28 USC Section
15   1408(A)(2), the so-called affiliate rule,
16   that DSI is wholly controlled by the
17   parent debtor and an affiliate of all the
18   other debtors.
19           As the Supreme Court in the
20   Lamie case that came down towards the end
21   of last year noted, and I guess repeatedly
22   noted I guess since Ron Pair, if the
23   statute is not ambiguous, it must be
24   applied according to its plain terms
25   unless an absurd result would apply, an

154

1
2    illogical result would apply by doing so.
3    Based on my reading of the Lamie case,
4    which is at 540 U.S. 526, 2004, and the
5    Court's analysis of the absurd result
6    exception, that exception would not apply
7    here on the theory that Congress says what
8    it means and means what it says.
9            Consequently, we are not left
10   with considering whether 28 USC Section
11   1412 is applicable where venue is
12   improper.  Contrast In Re Sorrels, 218 BR
13   580, Tenth Circuit, 1998, with In Re
14   Lazaro, 128 BR 168, Bankruptcy, Western
15   District of Texas, 1991.  But, rather,
16   turn immediately to the applicability of
17   28 USC Section 1412 where venue will be
18   transferred if the movant sustains its
19   burden, which is established by a
20   preponderance of the evidence, that such
21   transfer is in the interests of justice or
22   for the convenience of the parties.
23            The standard applying Section
24   1412 is generally well-understood.  The
25   court shall weigh a number of factors in

155

```
 1
 2    the exercise of its reasonable discretion
 3    and in particular in determining whether
 4    the transfer is established by a
 5    preponderance of the evidence, and should
 6    consider the following:  These are in no
 7    particular order of priority, but simply
 8    factors that the court should consider.
 9              First, proximity of the court
10    to the assets, the creditors, the debtor,
11    its principals, evidence that may be
12    adduced.  Second, the parties' own
13    preferences.  Third, the economical and
14    efficient administration of the estate.
15    Fourth, in some instances, the necessity
16    for ancillary administration if
17    liquidation should result, although
18    numerous courts state that that factor
19    should be given little weight unless it
20    appears likely or reasonable to assume
21    that liquidation should result, which none
22    of the evidence suggests.  Fifth, a local
23    interest in having localized controversies
24    decided at home and the applicability of
25    state law to the case, and in particular
```

156

1
2    adversary proceedings.  Sixth, the ease of
3    compelling unwilling witnesses to appear.
4    Seventh, the Debtors' original choice of
5    forum, which some courts, including Judge
6    Gonzalez in his first venue ruling in the
7    Enron case, accords significant weight to.
8    I do to some extent as well.
9              Those factors are set forth in
10   a number of cases, including In Re Bent,
11   93 BR 329-331, Bankruptcy Court, District
12   of Vermont, 1988, by Judge Conrad, as well
13   as by Judge Gonzalez in In Re Enron
14   Corporation, including to the Debtors'
15   initial choice of forum, at 284 BR
16   376-386, Bankruptcy, SDNY, 2002.
17             Of course, here the Debtor has
18   changed its mind and there is an issue as
19   to whether the Court should continue to
20   place emphasis on the Debtors' choice of
21   venue when it has changed its mind.  Here
22   the parties disagree to some extent.  The
23   objectants point out that once the Debtor
24   has chosen venue, it has effectively
25   waived the right to make another decision

157

1
2     on the topic, citing In Re Fishman, 205 BR
3     147-149, Bankruptcy, ED Arkansas, 1997.
4     And ironically the movants have also
5     stated that the Debtors' decision is not
6     as important if there is a significant
7     opposition to the venue change.
8                   I believe that the Debtors'
9     views here are important, and in
10    particular are important with respect to
11    the important factor of the economic and
12    efficient administration of the estate,
13    because essentially they have said that
14    they are making a business decision that
15    the adverse impact of the venue transfer
16    motion on their business requires them to
17    take a tangible step through their
18    observable conduct to move the venue to
19    try to correct some, if not all, of the
20    adverse effects of the venue motion.  I
21    will consider the Debtors' views in that
22    context.
23                   In weighing the following
24    factors, I find this to be a fairly close
25    question, at least the factors as to the

158

1
2    convenience of the parties.  In terms of
3    dollar amount, it appears clear to me that
4    the dollar amount of creditors involved in
5    the case prefer to have the case stay
6    here.  On the other hand, it is perfectly
7    obvious that the business and the assets
8    and the personnel have very little
9    connection to New York other than through
10   the working out of the bankruptcy case
11   itself.  Operationally, the company is
12   clearly centered in Florida and the rest
13   of the southeast.
14            Because, however, I believe the
15   primary focus of the restructuring is
16   centered in New York where the larger
17   creditors are, the issue of convenience to
18   the parties is a fairly close question
19   with regard to travel cost and the like.
20   I note that at this point, however, this
21   court, and I assume also the court in
22   Jacksonville, is fairly adept at handling
23   telephonic hearings and facilitating
24   electronic filing.  Of course, that
25   technology was in operation outside of the

159

1
2      court in the business environment long
3      before that.
4                   There is, however, somewhat of
5      a disadvantage, in some cases perhaps a
6      significant one, for smaller creditors who
7      are not as actively involved in the case
8      as those larger ones who have already
9      appeared in the case and oppose the
10     transfer of venue.  I believe that in
11     particular those parties will be
12     disadvantaged in the context of lease
13     rejections, claim objections, and any sort
14     of preference avoidance actions.  Without
15     characterizing whether there are
16     preference claims or not, the petitions or
17     schedules indicate there are potentially a
18     great number of preference avoidance
19     claims.
20                  The harm, at least in terms of
21     adversary proceedings and any actual
22     contested matters, to creditors in those
23     contexts could be ameliorated by venue
24     transfer with regard to those types of
25     proceedings in contested matters.

160

1
2  Although, frankly, the law in that area is
3  somewhat against transfer, it would seem
4  to me in a case like this it would be more
5  called for.
6              In a couple of the cases cited
7  by the Committee, the Pick 'N Pay and
8  American Film Technologies cases attached
9  to its pleading, or the transcripts by the
10 Delaware courts were attached to the
11 pleadings, there was a reference of the
12 difficulty of switching the venue.
13 Mechanically, I believe that no longer
14 exists.  I believe with the implementation
15 of the electronic filing system, the
16 mechanical switch of these cases would be
17 a matter of a day or two at most.  So that
18 is not a factor that I think calls for
19 keeping venue here.
20             It has been argued with more
21 force, however, that retaining venue here
22 is appropriate because of this court's
23 familiarity with the case, and in
24 particular with regard to at least a
25 couple of the issues that have already

161

1
2  come up in a meaningful way regarding
3  reclamation claims and PACA claims, and to
4  some extent with regard to the DIP order.
5              I would accord some weight to
6  that point.  But note, on the other hand,
7  that I view there having been really only
8  one meaningful hearing in this case at
9  this time.  It was a lengthy hearing and a
10 lot was accomplished at it.  But I have no
11 doubt that a court sitting in
12 Jacksonville, or, frankly, anywhere else
13 in the country, would be able to come up
14 to speed very quickly on that issue and
15 certainly on any other issue in this case.
16 On that issue in particular, I believe the
17 orders were reasonably clear.  Hopefully
18 the transcript is clear as well.  So I,
19 again, do not believe that that is a
20 significant reason for either transferring
21 the case or keeping it here.
22             It is noted that many, if not
23 most of the professionals, if not all of
24 the professionals in the case, are based
25 in New York.  That will obviously increase

162

1
2  the cost of the case if the case is
3  transferred.  However, it is quite
4  possible that with the transfer, the
5  Debtor will be able to, for itself, use
6  local counsel efficiently and may be able
7  to persuade other constituents to use
8  local counsel efficiently to somewhat
9  offset the travel cost for the New York
10  professionals.
11            In addition to that, while I
12  believe that a debtor and a committee and
13  other parties in interest are allowed
14  leeway in choosing the professionals that
15  they do, it is not a significant reason to
16  keep venue in a particular venue that
17  those professionals come from one location
18  or another.  I should say from my own
19  personal experience before I went on the
20  bench, I spent so much time on a couple of
21  cases in the Middle District of Florida
22  that my partners accused me of having a
23  second family down there.  So I'm
24  convinced that the case could be conducted
25  efficiently in Florida.

163

1
2                    That leaves the point of local
3    interest, which I do not want to give
4    short shrift at all.  However, it appears
5    to me that the record is clear that local
6    interest was a factor that the Debtor
7    originally considered in favor of the case
8    being in Jacksonville, given the long
9    history of the Debtors there and the long
10   history of good corporate citizenship
11   there.  On the other hand, there is no
12   evidence whatsoever of any attempt to
13   avoid any responsibilities or any
14   unfavorable law by the Debtors' initial
15   choice to have venue be here.
16                    One could ask, in any event, if
17   a debtor believed that a particular
18   venue's substantive law is more likely to
19   enhance its reorganization prospects,
20   whether in that case it should file in
21   that venue.  But that issue is not really
22   germane here based on the record in any
23   event.
24                    On that point, I should say as
25   clearly as I can that the evidentiary

164

1

2    record and the record of this hearing

3    shows that the Debtors made their choice

4    of venue entirely in good faith, not to

5    hide anything or to obtain any sort of

6    improper advantage or edge on any

7    particular creditor.  Specifically there

8    is no evidence whatsoever that the Debtors

9    filed in New York to obtain a

10   debtor-friendly or a management-friendly

11   forum.  In fact, the evidence is to the

12   contrary, that they filed in New York in

13   the belief that that is where the center

14   of their reorganization, their financial

15   reorganization, would be.

16          It is unfortunate that remarks

17   to the contrary that were not proven and

18   not even alleged in the hearing today,

19   with one exception, and I will get to

20   that, or in the papers, has made its way

21   into the press and into the public

22   knowledge to the detriment of the Debtors.

23   It is an unfortunate aspect of the venue

24   debate or venue context that all of the

25   courts operate under.  Frankly, I believe

165

1
2    these types of allegations not only by the
3    movants, but by purportedly learned
4    professors and members of Congress, do no
5    good to the bankruptcy system and impugn
6    and malign the courts.
7              Given the foregoing, as I said
8    earlier, and weighing all of the foregoing
9    considerations, I would normally say that
10   this was a close question whether to keep
11   the case here or not, particularly with
12   appropriate safeguards, including not only
13   telephonic access to the court, but, more
14   importantly, greater willingness to
15   transfer venue in contested matters
16   involving creditors in the southeast,
17   particularly smaller creditors.  Based on
18   my weighing of all of the factors, I would
19   probably keep the cases.
20             However, there is one factor
21   that I have not discussed because I do not
22   view it as falling within the convenience
23   of the parties element of Section 1412.
24   It is clear that that statute is phrased
25   in the disjunctive and that the interests

166

1
2    of justice prong of it will not always

3    serve the convenience of the parties, as

4    so found or so stated by Judge Geotz in

5    Port Jeff Corporation, 118 BR 184 at 192,

6    Bankruptcy, EDNY, 1990.  Frankly, the

7    interpretation of the phrase "in the

8    interests of justice" as applied by the

9    courts is not particularly helpful here

10   except that it is applied very broadly as

11   the Second Circuit said in Exploration

12   Company versus Manville Forest Products

13   Corp., 894 F.2d 1384-1391, Second Circuit,

14   1990.  The interests of justice component

15   is a broad and flexible standard that must

16   be applied on a case-by-case basis and

17   contemplates, among other things,

18   considerations of fairness.

19            Given the circumstances here,

20   first and foremost, and really solely the

21   following factor, that DSI was formed

22   solely to establish venue in New York, I

23   conclude that the transfer of venue here

24   would be in the interests of justice under

25   Section 1412 and therefore will order the

167

1

2      transfer of the cases to the Middle

3      District of Florida.

4               Although the case law itself is

5      not particularly on point when it

6      interprets the interests of justice, I

7      need to say why I believe that is the case

8      here.  I do not believe it is an

9      unacceptable judicial intrusion on the

10     statute, on Section 1408, to find that the

11     interests of justice require transfer here

12     and to close a loophole in the statute

13     that would otherwise, according to the

14     statute's plain terms, permit venue to be

15     properly established here on the eve of

16     filing.

17               I do this, again, not because

18     venue was established here in bad faith or

19     wrongfully, but simply because I don't

20     believe it is just to exploit the loophole

21     of the statute to obtain venue here.  I do

22     that mindful of the Second Circuit's

23     ruling in Capitol Motors versus LeBlanc,

24     which I cited earlier, where the Second

25     Circuit did not seem to have any problem

168

1
2  in finding a proper basis for jurisdiction
3  at, least, in the Second Circuit, although
4  the corporation that served as the basis
5  for jurisdiction was incorporated just a
6  matter of weeks before the filing.
7          I distinguish that case because
8  it appears to me, based on reading the
9  case, that that corporation, although
10  recently formed, had a separate and valid
11  reason for existing.  That is, real
12  buyers, different owners, if you will,
13  purchased the debtor shortly before the
14  filing.  They were located in New York and
15  they created the corporation in New York
16  because that is where they were.  So I
17  view that as distinguishable.
18          I note that Judge Feinberg in
19  the district court similarly distinguished
20  that case in In Re Popell Company, Inc.,
21  221 F Supp. 534, SDNY, 1963, which was
22  later affirmed by the Second Circuit, when
23  he transferred venue of a case where all
24  of the actions seemed to be outside of New
25  York.

169

1
2          Of course, this raises the
3    issue how close to a Chapter 11 filing is
4    too close for establishing a basis for
5    venue.  I will not answer that question
6    except to say under these facts where
7    there appears to be no economic substance
8    to DSI, we are too close.
9          I should note, since there has
10   been a lot of loose talk here as well as
11   in the press about forum shopping, that my
12   decision makes a critical distinction
13   between creating the facts to fit the
14   statute, which I believe is undeniable
15   here, as opposed to applying the statute
16   to fit the facts.  Again, in the context
17   of forum shopping, this is a very big
18   distinction.
19          The forum shopping that is
20   properly decried in cases like Eclair
21   Bakery and Abacus Broadcasting
22   Corporation, 154 BR 682, Bankruptcy,
23   Western District of Texas, 1993, and In Re
24   Maruki USA, Inc., 97 BR 166, Bankruptcy,
25   Southern District of New York, 1988, all

170

1
2   involve efforts by debtors who were
3   already in trouble in one forum trying to
4   evade that forum to get a better result
5   somewhere else.  In my mind, that is
6   improper forum shopping.  I do not believe
7   it is otherwise improper to file within a
8   district that Congress has expressly
9   created for one.  In fact, it may well be
10  a duty to do so based on one's analysis of
11  all the facts at hand.
12          On the other hand, I think that
13  the interests of justice require transfer
14  of venue where, again, the facts were
15  created to fit the statute.  In that
16  sense, you are building the shop that you
17  choose to act in as opposed to going to
18  it.
19          On that sole basis, and none
20  other, I will grant the motion.
21          Let me just say again, in
22  closing, if it isn't clear already, I
23  believe that it is plain and simple, the
24  case here, that there is no evidence of
25  bad faith and no evidence of the type of

171

1
2    forum shopping that the cases properly
3    punish, and that this is not a punishment
4    of the Debtor.  There is no evidence and I
5    believe there could be no evidence that
6    the Debtor is trying to obtain any sort of
7    leg up on any creditor by filing here, and
8    that any suggestions to the contrary,
9    whether made in the papers or in the
10   press, are unfounded.  If offered up in a
11   law school course, they would get an F,
12   and if generally offered up in a
13   courtroom, they would be subject to Rule
14   11.
15           On that score, I note that in
16   its response Buffalo Rock attached remarks
17   made by the junior senator from Texas
18   about various bankruptcy cases and what he
19   viewed as incidents of improper forum
20   shopping.  I will only comment on the two
21   that I personally know the facts of, in
22   which the senator implied that in Enron
23   and WorldCom managers received lenient
24   treatment and trustees were not appointed
25   notwithstanding the obvious evidence of

172

1
2    fraud.
3              Plain and simple, that is a
4    lie.  Anyone who know those cases would
5    understand management did not evade any
6    exposure.  Management was replaced in the
7    Enron case by Stephen Cooper (let alone to
8    examiners) and in the WorldCom case not
9    only by Michael Capellas, but also by a
10   court-appointed monitor, former chairman
11   of the SEC, Richard Breeden, who proposed
12   what has been described as a gold standard
13   of corporate governance and which WorldCom
14   subsequently adopted.
15             Consequently, those remarks are
16   either woefully misguided or slander on
17   the court, and, more importantly, mislead
18   the public, including employees, who I've
19   already stated should have a right to the
20   best information in these cases, not
21   information that plays upon their worst
22   fears.
23             Mr. Rubin, you can submit an
24   order directing transfer of venue to the
25   Middle District of Florida.

173

```
 1
 2        C E R T I F I C A T I O N
 3
 4
 5
 6     I, TODD DeSIMONE, a Registered
 7  Professional Reporter and a Notary Public,
 8  do hereby certify that the foregoing is a
 9  true and accurate transcription of my
10  stenographic notes.
11       I further certify that I am not
12  employed by nor related to any party to
13  this action.
14
15
16
17
18            TODD DeSIMONE, RPR
19
20
21
22
23
24
25
```