Hearing Date: May 19, 2005, 1:00 p.m.
Objection Deadline: May 12, 2005, 4:00 p.m.

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors.[1] | ) | Jointly Administered |

## MOTION FOR AN ORDER UNDER 11 U.S.C. §§ 105(a) AND 363 AND FED. R. BANKR. P. 6004 (A) AUTHORIZING AND APPROVING THE SALE OF A 2002 GULFSTREAM G-200 AIRCRAFT AND RELATED EQUIPMENT FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) AUTHORIZING THE PAYMENT OF A BROKERAGE FEE IN CONNECTION WITH THE SALE TO BLOOMER DEVERE GROUP AVIA, INC. AND (C) GRANTING RELATED RELIEF

Winn-Dixie Stores, Inc. and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), move the Court for an order pursuant to sections 105(a) and 363 of Title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a) authorizing and approving the sale of a 2002 Gulfstream G-200 aircraft and related equipment to Studio City Aviation 04, LLC (the "Purchaser"), an entity with no affiliation with or connection to any of the Debtors, or to the party

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

submitting a higher or otherwise better offer, if any, free and clear of liens, claims, interests and encumbrances, (b) authorizing the payment of a brokerage fee to Bloomer deVere Group Avia, Inc. ("deVere") in connection with the sale and (c) granting related relief (the "Motion").  In support of the Motion, the Debtors respectfully state as follows:

## BACKGROUND

1.    On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "New York Court").  By order dated April 13, 2005, the New York Court transferred venue of these cases to this Court.  The Debtors' cases are being jointly administered for procedural purposes only.

2.    The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request has been made for the appointment of a trustee or examiner.  On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases pursuant to Bankruptcy Code sections 1102 and 1103.

3.    The Debtors are grocery and drug retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  According to published reports, the Debtors are the eighth-largest food retailer in the United States and one of the largest in the Southeast.  The Debtors' business was founded in 1925 with a single grocery store and has grown through

acquisitions and internal expansion.  The Debtors currently operate more than 900 stores

in the United States with nearly 79,000 employees.  Substantially all of the Debtors' store

locations are leased rather than owned.

4.      This Court has jurisdiction over the Motion under 28 U.S.C.

§ 1334.  Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested in the Motion are

Bankruptcy Code sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule

6004.

## RELIEF REQUESTED

6.      By this Motion, the Debtors request that the Court enter an order

(a) authorizing and approving the sale of a 2002 Gulfstream G-200 aircraft and related

equipment to the Purchaser, or the successful bidder, if any, free and clear of liens,

claims, interests and encumbrances, (b) authorizing the payment of a brokerage fee to

deVere in connection with the sale and (c) granting related relief.

## BASIS FOR RELIEF

7.      Prior to the filing of these chapter 11 cases, the Debtors undertook

a comprehensive analysis of their businesses to determine how best to maximize their

value and compete in the marketplace and announced a series of actions designed to

improve their competitive position (the "Strategic Plan").  The Strategic Plan includes an

asset rationalization and expense reduction plan designed to achieve a $100 million

annual expense reduction and a market positioning review with the goal of improving

their operations and financial performance and strengthening their businesses for the

benefit of creditors, customers, employees, and the communities in which the Debtors

operate.

8.      In furtherance of the Strategic Plan, and other expense reduction

plans, the Debtors determined that it was in their best interests to expeditiously close or

sell unprofitable stores and divest themselves of unnecessary, underperforming or non-

core assets.  The Debtors' continued ability to reduce their expenses and, thereby,

increase liquidity is critical for the success of their chapter 11 cases.  The Debtors have

determined that the Assets (defined below) are not necessary for the Debtors'

reorganization and, therefore, seek to maximize their value and sell them by way of this

Motion.

**The Assets**

9.      The Debtors own a 2002 Gulfstream G-200 aircraft, serial number

072 (the "Airplane").  The Airplane is presently situated in Jacksonville, Florida at the

Jacksonville International Airport.  The Airplane is equipped with two Pratt & Whitney

Engines (the "Engines").  The Debtors are seeking to sell the Airplane and the Engines as

well as the appliances, parts, instruments, appurtenances, accessories, furnishings and

other equipment or property installed on or attached to the Airplane and Engines,

including all books, manuals, logbooks, maintenance records and other data (the "Related

Equipment" and together with the Airplane and the Engines, the "Assets").

**The Purchase Agreement**

10.     On April 29, 2005 the Debtors and the Purchaser entered into an Aircraft Purchase and Sale Agreement attached to this Motion as <u>Exhibit A</u> (as the same may be modified prior to the hearing on this Motion, the "Purchase Agreement").

11.     The Debtors will, pursuant to the terms of the Purchase Agreement, convey the Assets to the Purchaser or to the party submitting a higher or otherwise better offer for the Assets. A summary of the material terms of the transaction with the Purchaser, subject to this Court's approval, are as follows:[2]

> (a)     <u>Assets</u>:  The assets to be sold and transferred to the Purchaser include:
>
> > (i)     a 2002 Gulfstream G-200 aircraft, serial number 072;
> >
> > (ii)     two Pratt & Whitney Engines; and
> >
> > (iii)     certain appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment or property installed on or attached to the Airplane and Engines, including all books, manuals, logbooks, maintenance records and other data.
>
> (b)     <u>Purchase Price</u>:  On the terms and subject to the conditions set forth in the Purchase Agreement, the aggregate purchase price for the Assets shall be $15,350,000 (the "Purchase Price"). Additionally, a deposit of $500,000 is required to be paid by the Purchaser prior to execution of the Purchase Agreement.  The remainder of the Purchase Price is to be paid on or before the Delivery Date.
>
> (c)     <u>Sale Free and Clear</u>:  The Assets are to be transferred free and clear of liens, claims and encumbrances.

---

[2]     This summary of the Purchase Agreement is provided as a convenience only.  To the extent that the summary differs in any way from the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.

(d)    <u>Court Order</u>:  The sale of the Assets to the Purchaser shall have been approved by entry of an order by May 19, 2005 that authorizes the sale pursuant to the terms and conditions of the Purchase Agreement.

(e)    <u>Delivery Conditions</u>:  The sale is subject to a satisfactory pre-purchase inspection paid for by the Purchaser.  All maintenance records and log books are to be made available for inspection.  The Airplane is to be as represented and have no damage history.  The Airplane is to have a U.S. Standard Airworthiness Certificate and any action needed to be taken to correct any Airworthiness Discrepancies, as defined in the Purchase Agreement, is at the Debtors' cost.

12.    Additionally, closing on the sale with the Purchaser is contingent on the fulfillment of certain other conditions, including but not limited to executing and filing certain customary and reasonable sale documents, as more fully described in the Purchase Agreement.  The Debtors believe that any and all conditions for closing on the sale with the Purchaser in accordance with the Purchase Agreement have been or will be timely satisfied.

**Prepetition Marketing**

13.    In early October 2004, the Debtors determined that the Assets were not necessary for their business needs and sought to sell them.

14.    The Debtors concluded that the best means to maximize the value of the Assets was to extensively market them.  To assist with their efforts to market and sell the Assets, as well as market and sell another airplane (the sale of which was approved by the New York Court on March 31, 2005), the Debtors employed deVere.  deVere is considered one of the pre-eminent brokers in the airplane industry.

15.    The marketing efforts for the Assets by the Debtors and deVere were extensive.  Since hiring deVere on October 8, 2004, the Debtors and deVere engaged in significant and targeted marketing efforts designed to obtain the most attractive price (and other terms) attainable for the Assets.  Specifically, the Debtors and deVere identified and contacted parties that they believed would be interested in purchasing the Assets and the Debtors' other airplane.

16.    Further, the Debtors and deVere engaged in other marketing measures designed to generate the greatest interest in the Assets.  These measures included placing several advertisements monthly in certain magazines and newspapers, including in Business Air Today, World Aircraft Sales and the Executive Controller.

17.    deVere also advertised the Assets via the Internet.  Since October 2004, the Assets have been advertised continuously on at least two websites that specialize in the marketing and sale of airplanes:  Brokernet.com and Aircraft.com. Moreover, advertisements for the Assets, together with other marketing materials for the Assets, have been available on deVere's website since October 2004.

18.    Additionally, marketing materials for the Assets were sent by deVere to over 3,000 brokers and dealers around the world.

19.    deVere also attended the National Business Aircraft Association convention (NBAA) in Las Vegas, Nevada on October 11, 2004, which is the largest business aviation show in North America.  The convention was attended by over 30,000 people.  There, deVere spoke with approximately fifty brokers/dealers about the Assets.

20.    The efforts described above by deVere to sell the Assets are in addition to the many hours deVere spent fielding inquiries regarding the Assets from people that reviewed the Assets through one or more of the marketing strategies employed by deVere.

21.    The extensive marketing and sale efforts of the Assets culminated in seven offers for the Assets, including the Purchaser's offer.  After reviewing all offers for the Assets, including all terms of all offers, the Debtors determined that the Purchaser's offer was the highest and best offer for the Assets.  The Debtors also believe that the terms of the Purchase Agreement are fair, reasonable and favorable to them.

22.    The Debtors now move for authority to consummate the sale with the Purchaser, or, alternatively, to the party submitting a higher or otherwise better offer pursuant to the procedures below.

### Solicitation of Higher and Better Offers

23.    Notwithstanding that the Assets have been sufficiently marketed, the Debtors are soliciting higher and better bids for the Assets.  Any person or entity interested in submitting a higher or otherwise better bid for the Assets must submit such bid so that it is received by the undersigned counsel for the Debtors no later than May 15, at 4:00 pm (prevailing Eastern Time).

24.    If the Debtors receive a higher or better offer for the Assets, they will conduct an auction (the "Auction") for the Assets at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York two days prior to

the hearing on the Motion (the "Sale Hearing"), or May 17, 2005.[3]  The Auction shall be conducted in consultation with the Creditors' Committee and on terms the Debtors determine, in their discretion and in consultation with the Creditors' Committee, to be in the best interests of the Debtors and their estates.

### Use of the Proceeds

25.     The proceeds from the sale of the Assets will be applied in accordance with the terms of the credit agreement governing the Debtors' debtor-in-possession financing facility, as amended.

### Broker Fee

26.     In addition to seeking authority to sell the Assets to the Purchaser, the Debtors seek authority to pay a brokerage fee to deVere that is in accordance with their agreement with deVere to market and sell the Assets (the "Brokerage Agreement"). Under the Brokerage Agreement, upon a sale of the Assets, deVere is entitled to 0.75% of the purchase price up to $15 million.  Further, deVere is entitled to 5% of any amounts realized over $15 million.  The Purchase Price is $15,350,000 and, thus, the Debtors seek authority to pay deVere $130,000 (the "Brokerage Fee").

27.     The Debtors submit that payment of the Brokerage Fee to deVere is in accordance with industry standards and fair and reasonable, under the circumstances present here.

28.     Accordingly, by this Motion, the Debtors request that the Court enter an order granting the following relief:

---

[3]     The Debtors reserve the right to conduct the Auction telephonically, if reasonable and appropriate.

(a)    authorizing and approving the proposed sale of the Assets to the Purchaser on the terms and conditions of the Purchase Agreement or to the party that submits a higher or otherwise better offer for the Assets;

(b)    authorizing the proposed sale of the Assets and making the following determinations, among others, with respect to the sale:

   (i)    that such sale has been agreed upon, and will be made and completed, in good faith, for purposes of Bankruptcy Code section 363(m);

   (ii)   that such sale shall be made, and the Assets shall be delivered to the Purchaser or to the party submitting the highest or otherwise best offer for the Assets, free and clear of any and all liens, claims, encumbrances and interests;

   (iii)  that the Purchaser or the party submitting the highest or otherwise best offer for the Assets shall receive good, valid and marketable title to the Assets;

   (iv)   that the ten (10) day stay period provided for in Rule 6004(g) of the Federal Rules of Bankruptcy Procedure shall not be in effect with respect to the sale order and the sale order shall be effective and enforceable immediately upon its entry; and

(c)    authorizing the payment of the Brokerage Fee to deVere.

## APPLICABLE AUTHORITY

**A.    Bankruptcy Code Section 363(b) Authorizes the Proposed Sale.**

29.    Bankruptcy Code section 363(b)(1) provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy Code section 1107 (a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under section 363(b)(1).  See 11 U.S.C. § 1107(a).

30.    Although Bankruptcy Code section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or

-10-

disposition of a debtor's assets, in applying this section, courts have required that it be based upon the sound business purpose of the debtor.  See In re B.D.K. Health Mgmt., Inc. ("B.D.K. Health Mgmt."), Case Nos. 98-00609-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991).  To determine whether a sound business purpose exists, courts look for four factors: (a) sound business reason; (b) fair and reasonable consideration; (c) good faith in the transaction; and (d) adequate and reasonable notice.  Here, the Debtors have established each of these elements.

        31.    Sound Business Reason.  The Debtors submit that there is strong business justification for the sale to the Purchaser.  As noted above, the sale of the Assets is part of the Debtors' Strategic Plan to reduce unnecessary assets and expenses.  The sale is essential for the Debtors to continue their business plan to identify and divest themselves of unnecessary and unproductive assets and increase liquidity.  This plan will

remain critical to the Debtors' survival in these chapter 11 cases. Thus, a sound business reason exists for the sale, because the sale will further these goals.

32.     The Debtors believe that an expeditious sale is necessary to assure the greatest possible price for the Assets. The Purchaser has offered substantial value for the Assets and the Debtors believe that any delay of the sale may create a significant risk to their ability to realize such value. Further, since the Assets depreciate in value over time, any delay of the sale may create a significant risk to the Debtors' ability to realize a purchase price similar to that offered by the Purchaser. Accordingly, the Debtors believe that a sound business reason exists for the sale of the Assets because a sale will maximize the value of the Assets for the benefit of the Debtors' estates and their creditors.

33.     <u>Fair and Reasonable Consideration</u>. The Debtors submit that the proposed sale will provide fair and reasonable consideration to the Debtors' estates. Prior to entering into the Purchase Agreement with the Purchaser, the Debtors, together with deVere, extensively marketed the Assets. The Debtor's believe that the Purchaser's offer is the highest and best offer and that it is unlikely that additional marketing would realize more value to the Debtors, their estates and their creditors. Thus, the Debtors believe the proposed sale of the Assets to the Purchaser will result in the Debtors receiving fair and reasonable consideration or the Assets.

34.     Further, the sale of the Assets is subject to competing bids, ensuring that the Debtors will receive the highest or otherwise best offer for the Assets. Thus, the fairness and reasonableness of the consideration to be received for the Assets

ultimately will be demonstrated by a "market check" and auction process – the best means for establishing whether a fair and reasonable price is being paid.

35.    <u>Good Faith</u>.  The proposed sale is the product of arm's length negotiations between the Debtors and the Purchaser and was made in good faith.  The Purchaser has no affiliation with the Debtors, and the ability of third parties to make higher or better offers ensures that the Purchaser has not exerted any undue influence over the Debtors.

36.    If required, the Debtors are prepared to present further evidence of good faith during the course of the Sale Hearing that the Debtors believe will satisfy this Court and the mandates of Bankruptcy Code section 363(m).

37.    <u>Adequate and Reasonable Notice</u>.  In view of the Debtors' previous marketing efforts for the Assets, and in accordance with Local Rule 2002-1, the Debtors will serve notice of this Motion on the following parties: (a) each taxing authority known to the Debtors to have a potential interest in the Assets, (b) all parties that expressed serious interest in purchasing the Assets; (c) the Purchaser; (d) deVere; (e) counsel for the Debtors' postpetition secured lenders (the "DIP Lenders"); (f) the indenture trustee for the Debtors' noteholders; (g) counsel for the Creditors' Committee; (h) all known holders of Interests and Claims (as defined below) in the Assets; (i) all entities having requested notices pursuant to Fed. R. Bankr. P. 2002; (j) the Office of United States Trustee; and (k) any other parties not otherwise named in this Paragraph but included in the Order (A) Establishing Notice Procedures on a Final Basis and (B) Continuing Hearing with Respect to Scheduling Omnibus Hearings.

38.     The foregoing notice is good and sufficient under the particular circumstances and reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those persons most interested in these cases and those persons potentially interested in bidding on the Assets.   The Debtors, thus, submit that the proposed notice is sufficient for entry of an order granting the relief requested in the Motion.

39.     By the Motion, the Debtors intend to sell the Assets in order to monetize them for distributions to their creditors, and to enhance their ability to successfully reorganize.  The Debtors strongly believe that, in furtherance of these goals, they have done all that is reasonably possible to secure the highest or best possible offer for the Assets.  For the reasons above, the proposed sale of the Assets to the Purchaser, or to the party submitting a higher or otherwise better offer, is warranted and appropriate under Bankruptcy Code section 363(b), and the relief requested in this Motion is a product of sound business judgment and is in the best interests of the Debtors, their creditors and their estates.  Thus, this Court should approve the sale of the Assets to the Purchaser or to the party submitting a higher or otherwise better offer.

**B.     Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

40.     The Debtors seek to sell the Assets free and clear of all liens, claims, interests and encumbrances of any nature.

41.     Bankruptcy Code section 363(f) provides that a debtor-in-possession may sell property free and clear of liens, claims or interests and encumbrances of another entity in such property if any of the following circumstances apply:

-14-

      (1)  applicable non-bankruptcy law permits sale of such property free and clear of such interest;

      (2)  such entity consents;

      (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

      (4)  such interest is in bona fide dispute; or

      (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

      42.     As indicated by the use of the disjunctive term "or," satisfaction of any one of the five requirements listed in Bankruptcy Code section 363(f) is sufficient to permit the sale of assets free and clear of liens, claims, encumbrances, pledges, mortgages, security interests, charges, options and other interests (collectively, the "Interests") and claims (as such term is defined in 11 U.S.C. § 101(5)) ("Claims").  See In re Gulf States Steel, Inc. of Ala., 285 B.R. 497, 506 (Bankr. N.D. Ala. 2002) ("[s]ince the five conditions listed in 11 U.S.C. § 363(f) are phrased in the disjunctive, property may be sold free and clear of interests if any one of the five conditions is satisfied."); In re Dundee Equity Corp., Case No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.").

      43.     The Debtors do not believe that the Assets are subject to any Interests or Claims other than Interests and Claims held by the DIP Lenders.  The Debtors believe that they have the consent of the DIP Lenders for the proposed sale of

the Assets or will obtain such consent at or prior to the Sale Hearing.  However, to the

extent that the Debtors are unable to obtain such consent or if other Interests or Claims

exist the Debtors submit that one of the subsections of Bankruptcy Code section 363(f)

applies. Accordingly, the sale should be approved under Bankruptcy Code section 363(f).

**C.     The Purchaser Should Be Afforded All Protections Under Bankruptcy Code
        Section 363(m) as a Good Faith Purchaser.**

       44.     Bankruptcy Code section 363(m) provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  The Bankruptcy Code does not define the term "good faith."

Courts, however, indicate that a party would have to show fraud or collusion between the

purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of good

faith.

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.  Typically,
> the misconduct that would destroy a purchaser's good faith status at a
> judicial sale involves fraud, collusion between the purchaser and other
> bidders or the trustee, or an attempt to take grossly unfair advantage of
> other bidders.

In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986) (ellipsis in original;

citations omitted); accord Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re

Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997).  No such facts exist here.

45.    The Debtors submit that: (a) the proposed sale is the subject of arm's length negotiations with the Purchaser and is made in good faith; (b) the Purchaser has no affiliation with the Debtors; (c) the Assets were marketed extensively by deVere and the purchase price is fair and reasonable; (d) to the best of the Debtors' knowledge, the Purchaser has taken no action to chill or otherwise collude with any other party to restrict bidding on the Assets; and (e) the marketing process that occurred and notice of the Sale Hearing ensure that the Purchaser has not exerted undue influence over the Debtors.  Accordingly, the Debtors request that the Court find that the Purchaser, or the party submitting a higher or otherwise better offer, acted in good faith within the meaning of Bankruptcy Code section 363(m).  See B.D.K. Health Mgmt., 1998 WL, at *4 (finding that the purchaser is entitled to the protections of Bankruptcy Code section 363(m) because the sale was negotiated at arms-length, proposed in good faith and the consideration for the assets was fair and reasonable.).

**D.    Payment of the Brokerage Fee is Warranted**

46.    It is normal and customary in transactions of this nature for the selling party to pay a brokerage fee or commission.  The ability of a debtor to offer such a fee allows a debtor to sell its property for the benefit of the estate and its creditors.

47.    The Debtors seek authority to pay deVere the Brokerage Fee in the amount of $127,505.  As stated previously, deVere greatly assisted in the marketing efforts for the Assets.  Without deVere's efforts, the proposed sale would not have been possible.  The Debtors, therefore, believe that payment of the Brokerage Fee is reasonable and warranted.

48.     The Brokerage Fee is in accordance with deVere's contract with the Debtors that is customary and usual in the airplane brokerage industry.  A copy of the Brokerage Agreement is attached to this Motion as <u>Exhibit B</u>.

49.     Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay the Brokerage Fee to deVere at closing, from the proceeds of the sale of the Assets.

### NOTICE

50.     Notice of the Motion has been provided or will be provided to the Notice Parties listed above in paragraph 37.  The Debtors submit that such notice is sufficient and that no other or further notice need be given.

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court:

(a)     enter an order substantially in the form attached to this Motion as <u>Exhibit C</u> that (i) grants the Motion and authorizes and approves the sale of the Assets to the Purchaser in accordance with the Purchase Agreement, or to the party submitting a higher or otherwise better offer for the Assets and (ii) authorizes payment of the Brokerage Fee to deVere;

(b)     authorize the Debtors to take all actions reasonably necessary to effectuate the sale of the Assets in accordance with the Purchase Agreement; and

(c)     grant such other and further relief as the Court deems just and proper.

Dated: April 29, 2005

SMITH HULSEY & BUSEY

By   _/s/ Cynthia C. Jackson_____
        Stephen D. Busey
        James H. Post
        Cynthia C. Jackson
Florida Bar Number 498882
225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)

– and –

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
D. J. Baker (DB 0085)
Sally McDonald Henry (SH 0839)
Rosalie Walker Gray
Four Times Square
New York, New York 10036
(212) 735-3000
(917) 777-2150 (facsimile)

– and –

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Eric M. Davis
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
(302) 651-3001 (facsimile)

Attorneys for the Debtors

**EXHIBIT A**

## AIRCRAFT PURCHASE AND SALE AGREEMENT

This Aircraft Purchase and Sale Agreement (this "Agreement") is made as of April 29, 2005, by and between Winn-Dixie Stores, Inc. with an address at 5050 Englewood Court, Jacksonville, Florida 32254 ("Seller), and Studio City Aviation 04, LLC, with an address c/o ACF Property Management, Inc., 12411 Ventura Blvd., Studio City, CA 91604 ("Purchaser").

### RECITALS

A.    Seller owns that certain 2002 Gulfstream Aerospace G-200 aircraft, bearing the manufacturer's serial number 072 and the U.S. civil aviation mark N65R (the "Airframe"), together with two (2) Pratt & Whitney Canada PW306A engines bearing manufacturer's serial numbers PCE-CC0146 and PCE-CC0148 (the "Engines"), the appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment or property installed on or attached to the Airframe and Engines, listed in Exhibit I attached hereto and incorporated herein by this reference (the "Aircraft Specification"), and all books, manuals, logbooks, maintenance records and other data related to the operation and maintenance of the Aircraft the Airframe and Engines currently in Seller's possession (the "Aircraft Documents") (the Airframe, the Engines and the other foregoing described equipment and property, collectively, the "Aircraft").

B.    Subject to the terms and conditions set forth in this Agreement, Seller desires to sell and deliver the Aircraft to Purchaser and Purchaser desires to accept and purchase the Aircraft from Seller.

C.    Seller, Purchaser and Insured Aircraft Title Services, Inc., a corporation organized under the laws of the state of Oklahoma ("Escrow Agent") will enter into a mutually acceptable escrow agreement ("Escrow Agreement") with respect to the transactions contemplated hereunder, in the form attached hereto as Exhibit V and incorporated herein by this reference.

D.    Purchaser shall conduct a visual inspection of the Aircraft and desires to enter into this Agreement.

E.    Seller commenced Case No. 05-11063-rdd under Chapter 11, 11 U.S.C. sections 101 et seq. (the "Bankruptcy Code"), on February 21, 2005 by filing a voluntary petition with the United States Bankruptcy Court for the Southern District of New York.  By order dated April 13, 2005, venue of the Case was transferred by such Court to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Court") and is currently pending there under Case No. 3:05-bk-03817-JAF (the "Case").

120556.0001/1195890.2

IN CONSIDERATION of the mutual covenants contained herein, the parties hereto agree as follows:

ARTICLE 1.   SALE OF AIRCRAFT.

1.1     Subject to the terms and conditions set forth herein, Seller hereby agrees to sell and deliver, and Purchaser hereby agrees to buy and accept the Aircraft.

ARTICLE 2.   BANKRUPTCY COURT APPROVAL

2.1     Seller's obligations under this Agreement are subject to higher or otherwise better offers for the Aircraft and conditioned upon the entry of the Order (as defined herein) of the Court approving the sale of the Aircraft to Purchaser, pursuant to the terms and conditions of this Agreement.  The Order must be reasonably acceptable to Purchaser and must provide for a sale of the Aircraft to Purchaser, free and clear of all liens, encumbrances and claims to the extent allowed by Section 363(f) of the Bankruptcy Code.

2.2     Motion to Approve Sale to Purchaser.

2.2.1   On the date hereof, and time permitting, Seller shall file Seller's motion to sell the Aircraft (the "Motion"), which Motion shall contain all of the provisions required for authority to sell the Aircraft to Purchaser, as provided in this Agreement.  Seller shall use commercially reasonable efforts to obtain the Order.

2.2.2   Seller shall provide not less than 20 days notice, pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure, to all required creditors and parties in interest, and the United States Trustee of the Motion of the hearing before the Court to approve the Motion, or such lesser time as the Court may allow on a motion to shorten time.

2.2.3   The Motion shall be served upon all parties who previously have expressed serious interest in acquiring the Aircraft.

ARTICLE 3.   DELIVERY CONDITION, INSPECTION AND ACCEPTANCE.

3.1     The Aircraft shall be delivered to Purchaser on the Delivery Date (as defined in Section 3.11 herein) in the following condition:

3.1.1   equipped as specified in the Aircraft Specification and in the same condition as during the Inspection;

3.1.2   with a current and valid United States Standard Airworthiness Certificate;

3.1.3   in an airworthy condition (as "airworthy" has the meaning set out in Chapter 1, Paragraph 9 of FAA Order 8130.21) suitable for operations

2

under Part 91 of the FAR, with all systems and installed equipment and engines in normal working order and operating to manufacturers' specifications, and with each engine able to produce its rated takeoff power in a ground power run;

3.1.4    up to date on all manufacturers' recommended maintenance and inspection schedules (including all calendar and hourly inspections), and in compliance with all applicable FAA airworthiness directives and manufacturers' service bulletins (or equivalents) that have been issued with respect to the Aircraft on or before the Delivery Date;

3.1.5    with all applicable airframe, engine, and avionics maintenance programs and contracts, if any, paid to the date and time of the Delivery Date and transferable to Purchaser;

3.1.6    with no corrosion or damage and no history of corrosion or damage;

3.1.7    with no parts, systems or components installed in the Aircraft on a temporary loan or exchange basis; and

3.1.8    with all Aircraft Documents original and complete, continuous and up-to-date, printed or published in English, and maintained in accordance with industry standards and the applicable Federal Aviation Regulations ("FAR").

3.2    Upon entry of the Order and pursuant to this Agreement, Seller shall remove the Aircraft from the used aircraft market and at Purchaser's sole expense, (including but not limited to fuel, MSP charges, travel expenses for the crew and landing fees). Seller shall ferry the Aircraft from its then present location to the Gulfstream Service Center in Savannah, Georgia ("Inspection Facility") where the Aircraft shall undergo a pre-purchase inspection in accordance with the items set out in Exhibit III attached hereto and incorporated herein by this reference ("Inspection"). The Inspection will commence upon the arrival of the Aircraft at the Inspection Facility, and will not exceed three (3) days after the arrival of the Aircraft at the Inspection Facility, except for delays caused by the condition of the Aircraft or the Inspection Facility's schedule. Purchaser shall have twenty-four (24) hours from the conclusion of the Inspection to conditionally accept or to reject the Aircraft pursuant to Section 3.4 below.

3.3    Prior to the issuance of the Order, Purchaser may, at Purchaser's option, conduct a visual inspection of the Aircraft and as a result of such visual inspection, Purchaser shall, on or before May 16, 2005, accept or reject the Aircraft and shall deliver to Seller a duly executed "Visual Inspection" form as set out in Exhibit II attached hereto. If Purchaser accepts the Aircraft as a result of the visual inspection, then the parties hereto shall proceed as set out in Section 3.7 hereunder. If Purchaser rejects the Aircraft as a result of the visual inspection, then the Deposit shall be returned promptly to Purchaser, this Agreement shall immediately terminate and neither party hereto shall be obligated to the other in regard to this Agreement. Upon entry of the Order, Seller shall make the Aircraft available for the Inspection. Purchaser shall open a

3

work order with the Inspection Facility for Purchaser's account to pay all costs of the Inspection. Seller shall open an account with the Inspection Facility for the correction of any "Airworthiness Discrepancies" (as defined below) found during the Inspection. The work order of Purchaser shall be acknowledged by Seller, but Seller shall have no liability thereon. The work order of Seller shall be acknowledged by Purchaser, but Purchaser shall have no liability thereon. Flight costs for a test flight of the Aircraft that will not exceed two (2) hours shall be at Purchaser's cost for fuel and landing fees. Purchaser shall have the right to have an agent on board the Aircraft during any test flight. All flights of the Aircraft under this Agreement shall be under the operational control of Seller.

3.4     Purchaser shall cause the Inspection Facility to conduct the Inspection to identify in reasonable detail those airworthiness discrepancies ("Airworthiness Discrepancies") that cause the Aircraft not be in compliance with the delivery conditions in Section 3.1 herein. The Airworthiness Discrepancies, which in the reasonable judgment of the Inspection Facility, as a result of the Inspection, shall be corrected by seller to cause the Aircraft to be airworthy as set forth in Chapter 1, Paragraph 9 of FAA Order 8130.2E. Seller shall bear the cost of correcting each and every Airworthiness Discrepancy. The Inspection shall not exceed three (3) business days. The parties hereto agree that cosmetic items noted by the Inspection Facility during the Inspection shall not be an obligation of Seller to correct. At the conclusion of the Inspection, Purchaser may, in its sole discretion, reject the Aircraft by notifying Seller and Escrow Agent in writing of such rejection as provided in Section 3.7. If Purchaser does not reject the Aircraft, Seller and Purchaser shall each execute a Technical Acceptance Certificate (the "Acceptance"), the form of which is attached hereto as Exhibit IV and is incorporated herein by this reference ("Certificate") setting forth on an attachment thereto a list of all Airworthiness Discrepancies. If Purchaser fails to execute the Certificate within two (2) days of delivery by the Inspection Facility of a list of Airworthiness Discrepancies found as a result of the Inspection, then Purchaser shall be deemed to have accepted the Aircraft. Upon the mutual execution by Seller and Purchaser of the Certificate, subject to Section 3.5, Seller shall be obligated to correct and pay for the correction of all Airworthiness Discrepancies attached to the Certificate. Seller and Purchaser each shall have paid their respective amounts owed the Inspection Facility prior to the Aircraft's departure from the Inspection Facility. Except as otherwise provided herein, Purchaser, upon executing the Certificate shall be irrevocably obligated to accept delivery of the Aircraft after Seller has performed Seller's obligations under the Certificate and Seller has met its other obligations under this Agreement. Upon Purchaser's Acceptance of the Aircraft by Purchaser's execution of the Certificate, the Deposit (as defined in Section 4.1 herein) shall become non-refundable to Purchaser except as specifically provided herein.

3.5     It shall be a pre-condition to Purchaser's obligation to accept delivery of the Aircraft at Delivery (as defined in Section 3.10 herein) that the Aircraft shall be in the condition set forth in Section 3.1 herein.

3.6     Should Purchaser, in its sole discretion, reject the Aircraft or be deemed to have rejected the Aircraft prior to Purchaser's execution of the Certificate, as set out in Sections 3.2 and 3.4 herein, Purchaser, at Purchaser's sole cost, shall be responsible to return the Aircraft to its physical condition prior to the Inspection. Purchaser shall indemnify Seller for any physical damage and any resulting loss of value to the Aircraft incurred during the Inspection or any

4

claim arising out of the Inspection process (including the ferrying of the Aircraft), unless such damage was caused by an act or omission of Seller or if such damage is covered and paid by insurance carried by the Inspection Facility.  Purchaser's indemnity set out in the preceding sentence shall not be pre-conditioned on Purchaser's purchasing the Aircraft.  Payment of the Deposit, as defined in Section 5.1(a), minus $100,000.00 holdback to cover Purchaser's payment obligations set forth in this Section 3.6 except for the indemnity provision set forth herein, by Escrow Agent to Purchaser, shall be preconditioned upon Purchaser having paid the Inspection Facility for all costs of Purchaser due the Inspection Facility.  Upon Purchaser's notice to Escrow Agent that Purchaser has rejected the Aircraft, and preconditioned upon written confirmation by Inspection Facility and Seller that Purchaser has paid all amounts set out above in this Section 3.6, Escrow Agent shall pay the Deposit to Purchaser on the next business day after receiving notice from Purchaser, Seller and Inspection Facility that Purchaser has performed all preconditions required herein for the return of the Deposit.  Purchaser may give Seller notice of Purchaser's rejection prior to acceptance by writing "REJECTS" across the face of the Certificate, initialing "REJECTS" and delivering the Certificate to Seller, notifying Seller of Purchaser's rejection of the Aircraft.

3.7     Unless at such time Seller shall be in breach or default under this Agreement or as otherwise provided herein, should Purchaser fail to purchase the Aircraft after Purchaser has executed the Certificate and Seller has corrected and paid for all of the Airworthiness Discrepancies attached to the Certificate, Purchaser shall pay for the Inspection.  The Deposit shall be paid to Seller as compensation for Seller's removal of the Aircraft from the used aircraft market and Seller's loss of use of the Aircraft during the period of the Inspection and shall be Seller's exclusive remedy for Purchaser's breach under this Section 3.7.  Upon Seller's receipt of the Deposit, this Agreement shall become null and void and neither Seller or Purchaser shall be further obligated to each other under this Agreement.

3.8     Should Seller fail to correct all the Airworthiness Discrepancies designated to be corrected and paid for by Seller attached to the Certificate, then Purchaser may terminate this Agreement provided Purchaser has paid the Inspection Facility for all the costs and charges related to any work orders opened by Purchaser at the Inspection Facility.  Upon such termination by Purchaser, the Escrow Agent shall pay the Deposit minus a $100,000.00 holdback for any of Purchaser's payment obligations hereunder to Purchaser as the exclusive remedy to Purchaser.  Upon receipt by Purchaser of the Deposit and other amounts set forth in the preceding sentence, this Agreement shall be null and void and neither party hereto shall have any further obligation to the other.

3.9     Upon completion of the correction of all Airworthiness Discrepancies and the placement of the "approved for return to service" entry by the Inspection Facility in the Aircraft's logbook, Purchaser and Seller shall, within three (3) business days, proceed to closing and delivery at the Inspection Facility or at another mutually agreeable location within the continental United States (closing and delivery "Delivery").  In the event Delivery shall not take place at the Inspection Facility, Purchaser shall pay Seller all costs for the ferry flight from the Inspection Facility to such other Delivery location.  If closing does not occur within the three (3) day period set out in this Section 3.9 after all Airworthiness Discrepancies have been corrected due to a delay caused by Purchaser, then Purchaser shall be deemed to be in default of

5

this Agreement and Seller, at Seller's sole discretion, may pursue its remedies as set out in Section 3.7 herein.

3.10    If the Aircraft is damaged or destroyed after Purchaser has accepted the Aircraft as set out in Section 3.4 herein, but before Delivery, Seller shall notify Purchaser of such damage within twelve (12) hours of the incident and Purchaser, in Purchaser's sole discretion, shall give notice to Seller within two (2) business days after Purchaser receives such information whether Purchaser will accept the Aircraft after the Aircraft has been repaired from an incident resulting in anything less than a total loss.    Should Purchaser notify Seller that Purchaser rejects the Aircraft due to such incident, Escrow Agent shall, upon confirmation that Purchaser has paid the Inspection Facility for all costs due the Inspection Facility from Purchaser, during the next day when Escrow Agent's bank is open, pay the Deposit back to Purchaser.

3.11    Prior to the day of Delivery ("Delivery Date"), Seller shall have, pursuant to this Section 3.11, delivered to Purchaser and Escrow Agent a detailed invoice with reasonable supporting receipts, all costs due Seller by Purchaser for ferry and test flights conducted by Seller ("Invoice").    Seller shall also, prior to the Delivery Date, have delivered to Escrow Agent a fully executed but undated Bill of Sale to Purchaser.    Such Bill of Sale shall be in the form as set out as Exhibit V attached hereto and incorporated herein by this reference ("Bill of Sale"). Prior to the day of Delivery, Seller shall have also executed and delivered to Escrow Agent an undated FAA Bill of Sale (AC Form 8050-2) for filing and recording at the FAA Registry in Oklahoma City, Oklahoma (the "FAA Bill of Sale") (collectively the Bill of Sale and the FAA Bill of Sale, the "Bills of Sale").    In addition, prior to the day of Delivery, Purchaser shall have executed and delivered to Escrow Agent an undated FAA Application for Registration (AC Form 8050-1) for filing and recording at the FAA Registry in Oklahoma City, Oklahoma (the "FAA Registration Application") and a duly executed but undated Delivery Receipt (as defined in Section 2.12 herein).    Subject to and in accordance with the terms and conditions set forth in the Escrow Agreement, on the Delivery Date (a) Seller shall instruct Escrow Agent to date and file the FAA Bill of Sale with the FAA Registry and to date and deliver the Bill of Sale to Purchaser after Purchaser has paid the Purchase Price to Seller as defined in Section 4.1 herein and (b) Purchaser shall instruct Escrow Agent to date and file the FAA Registration Application with the FAA Registry and to date and deliver the Delivery Receipt to Seller as further set out in Section 2.12 herein upon notice from Escrow Agent that the FAA Bill of Sale and FAA Registration Application have been duly filed at the FAA Registry in Oklahoma City, Oklahoma.

3.12    On the Delivery Date, subject to and in accordance with the terms and conditions set forth in the Escrow Agreement, Purchaser shall pay the balance of the Purchase Price (as defined in Section 5.1 herein) and cause the delivery to Seller of a duly executed Delivery Receipt acknowledging delivery of the Aircraft.    Such Delivery Receipt shall be in the form set forth in Exhibit VI, which is attached hereto and incorporated herein by this reference ("Delivery Receipt"), and will be effective when executed by an authorized agent of Purchaser and delivered to Seller.    Upon execution and delivery by Purchaser of the Delivery Receipt, (a) it shall be conclusively presumed that Purchaser has approved and accepted the physical condition of the Aircraft "as is, where is, with all faults" in its then-current physical condition and state of repair, and (b) Purchaser shall unconditionally waive and release any claim against Seller for any breach of any representation or warranty regarding the Aircraft or set forth in this Agreement,

6

whether express or implied. At Delivery, Seller will deliver to Purchaser all maintenance records and log book, in original form, from the date of delivery by the Aircraft's manufacturer and in the English language, including wiring diagrams. All airworthiness directives and mandatory service bulletins and mandatory inspections shall have been accomplished. Payment of the Purchase Price by Purchaser shall be a precondition to Delivery and Seller's delivery of the Bills of Sale, as set out in Section 3.11 herein, to Purchaser. The Delivery of the Aircraft, delivery of the executed Bill of Sale by Seller to Purchaser, the filing of the FAA Bill of Sale at the FAA Registry shall be preconditions to Purchaser delivering an executed Delivery Receipt to Seller.

     3.13    Seller agrees, at the sole cost and expense of Purchaser, promptly after Delivery, to assist in the transfer of all maintenance service plans, including the ESP Gold Lite Plan carried on the Engines, the Airframe or any part or engine thereof to Purchaser to the extent transferable. Purchaser understands that there may be certain enrollment or transfer fees required for transfer of some extended coverage maintenance programs, and Purchaser will apply for and pay for the transfer of coverage for those programs.

## ARTICLE 4.    TITLE AND RISK OF LOSS.

     4.1    Title to and risk of loss of the Aircraft shall pass from Seller to Purchaser when Purchaser has executed and delivered to Seller or its representative (or authorized the Escrow Agent to deliver) the Delivery Receipt and Seller has executed and delivered (or authorized the Escrow Agent to deliver) to Purchaser or its representative the Bills of Sale, and not prior thereto.

## ARTICLE 5.    PURCHASE PRICE AND PAYMENT SCHEDULE.

     5.1    The purchase price of the Aircraft is Fifteen Million, Three Hundred Fifty Thousand Dollars (US$15,350,000.00) ("Purchase Price") and shall be paid in immediately available funds to Seller in the following manner:

        (a)    Purchaser shall have deposited Five Hundred Thousand Dollars (US$500,000.00) in an escrow account with Escrow Agent ("Deposit"); and

        (b)    Purchaser's transfer of the balance of the Purchase Price, Fourteen Million, Eight Hundred Fifty Thousand Dollars (US$14,850,000.00), and any other payments due Seller by Purchaser (as set out in but not limited to the Invoice) on or before the Delivery Date to Escrow Agent.

## ARTICLE 6.    COMMISSIONS AND RESERVATION OF REGISTRATION NUMBER.

     6.1    Seller represents to Purchaser that Seller has hired, at Seller's sole cost, Bloomer deVere as its broker for the transaction anticipated by this Agreement and Purchaser shall pay Bloomer deVere's brokerage fee. Purchaser represents to Seller that it has hired Lee Krelstein as

its broker to represent Purchaser for the transaction anticipated by this Agreement and Purchaser shall pay Lee Krelstein his fee.

6.2    Both parties hereto agree to indemnify and hold the other harmless from and against any and all claims, suits, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees) asserted by any agent, broker or other third party for any commission or compensation of any nature whatsoever based upon the transactions contemplated by this Agreement.

ARTICLE 7.    <u>DISCLAIMER BY SELLER OF WARRANTIES</u>.

THE AIRCRAFT AND ANY AND ALL OTHER ITEMS SUBJECT TO THIS AGREEMENT ARE SOLD ON AN "AS-IS, WHERE-IS, WITH-ALL-FAULTS" BASIS AND WITH ALL FAULTS.    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 9.1.3 HEREIN, SELLER DOES NOT MAKE, AND SELLER HEREBY DISCLAIMS, ANY AND ALL EXPRESS, IMPLIED OR STATUTORY WARRANTIES OR REPRESENTATIONS OF ANY NATURE WHATSOEVER WITH RESPECT TO THE AIRCRAFT AND ANY AND ALL OTHER ITEMS SUBJECT TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, AS TO THE DESIGN OR CONDITION OF THE AIRCRAFT, ITS MERCHANTABILITY, DURABILITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE AIRCRAFT, OR THE CONFORMITY OF THE AIRCRAFT TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER OR ORDERS RELATING THERETO, AS TO THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT, OR ANY OTHER MATTER CONCERNING THE AIRCRAFT (WHICH DISCLAIMER PURCHASER HEREBY SPECIFICALLY ACKNOWLEDGES PURSUANT TO ITS ACCEPTANCE OF THE BILL OF SALE). PURCHASER HEREBY WAIVES ANY CLAIM (INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR INCIDENTAL OR CONSEQUENTIAL DAMAGE) OR EXPENSE CAUSED BY THE AIRCRAFT OR BY PURCHASER'S LOSS OF USE THEREOF FOR ANY REASON WHATSOEVER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER SHALL NOT BE LIABLE OR RESPONSIBLE FOR ANY DEFECTS, EITHER PATENT OR LATENT (WHETHER OR NOT DISCOVERABLE BY PURCHASER) IN THE AIRCRAFT, OR FOR ANY DIRECT OR INDIRECT DAMAGE TO PERSONS OR PROPERTY RESULTING THEREFROM, OR FOR PURCHASER'S LOSS OF USE OF THE AIRCRAFT OR FOR ANY INTERRUPTION IN PURCHASER'S BUSINESS CAUSED BY PURCHASER'S INABILITY TO USE THE AIRCRAFT FOR ANY REASON WHATSOEVER.

120556.0001/1195890.2

ARTICLE 8.  <u>TAXES</u>.

8.1    Purchaser shall be responsible for paying (a) any and all sales, use, value added, stamp, excise, transfer or similar taxes, and any interest or penalties on such taxes, imposed on the purchase and sale of the Aircraft pursuant to this Agreement and (b) any and all landing fees, property taxes, excise taxes, fuel taxes, excise or similar taxes, and any interest or penalties on such taxes, that may be assessed against the Aircraft attributable to Purchaser's ownership and operation of the Aircraft on and after the Delivery Date (collectively, "Purchaser Taxes").  In the event that Purchaser fails to pay any Purchaser Taxes and such Purchaser Taxes are levied upon, assessed against, collected from, or otherwise imposed on Seller, then Purchaser shall indemnify, protect, defend and hold Seller harmless from and against all such Purchaser Taxes, together with any interest, penalties or other additions thereto, and any legal or other expenses incurred to defend or protect against any such Purchaser Taxes.

8.2    Seller shall be responsible for paying (a) any and all taxes on, or measured by, the income, gross revenue, capital gain or any other characterization of the gain of Seller in connection with the sale of the Aircraft pursuant to this Agreement and (b) any and all landing fees, property taxes, excise taxes, fuel taxes, excise or similar taxes, and any interest or penalties on such taxes, that may be assessed against the Aircraft attributable to Seller's ownership and operation of the Aircraft prior to the Delivery Date (collectively, "Seller Taxes").  In the event that Seller fails to pay any Seller Taxes and such Seller Taxes are levied upon, assessed against, collected from, or otherwise imposed on Purchaser, then Seller shall indemnify, protect, defend and hold Purchaser harmless from and against all such Seller Taxes, together with any interest, penalties or other additions thereto, and any legal or other expenses incurred to defend or protect against any such Seller Taxes.  In the event Seller receives notice or otherwise becomes aware of any audit, claim, assessment or proposed assessment of any tax for which Purchaser may be responsible under this Section, Seller shall immediately notify Purchaser thereof, and Purchaser shall have the right to control, manage or defend any such audit, claim, assessment or proposed assessment.  Seller's failure to provide Purchaser such notice in a timely manner shall relieve Purchaser of its obligation to pay any such tax, or any associated interest or penalties, to the extent Purchaser's rights have been impaired by Seller's failure.

8.3    It shall be a condition to Seller's obligation to sell the Aircraft to Purchaser hereunder that Seller, in good faith, shall have received evidence satisfactory to Seller that Purchaser is exempt from or has paid or has made arrangements satisfactory to Seller for the payment of any sales or use taxes imposed on the purchase and sale of the Aircraft.

ARTICLE 9.  <u>REPRESENTATIONS OF SELLER</u>.

9.1    <u>Seller's Representations and Warranties</u>.    Seller represents and warrants to Purchaser that:

      9.1.1    Seller is a corporation duly organized and validly existing in good standing under the laws of the state of its incorporation.

9.1.2   Subject to approval of the Court, Seller has had at all relevant times the power and authority to execute and deliver the Aircraft and to perform its obligations under this Agreement.

9.1.3   At closing, Seller shall have good and marketable title to the Aircraft. Subject to approval of the Court, to Seller's knowledge the execution, delivery and performance of this Agreement by Seller will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien upon Seller under any indenture, mortgage or other agreement or instrument to which it is a party or by which it or any of its property is bound, or any existing applicable law, rule, regulation, judgment, order or decree of any government, governmental instrumentality or court having jurisdiction over it or any of its properties.

9.1.4   Except for approval of the Court, neither the execution and delivery by Seller of this Agreement nor the consummation of any of the transactions contemplated hereby requires the consent or approval of, the giving of notice to, or, subject to Section 9.1.3, the taking of any other action in respect of, any trustee or holder of any indebtedness or obligation of Seller or any governmental authority or agency, other than the filing and recording of the FAA Bill of Sale and the FAA Registration Application at the FAA Registry in Oklahoma City, Oklahoma, and except such other consents, approvals, notices and actions as have been obtained, given, or taken, as the case may be.

9.1.5   No law or governmental rule or regulation makes invalid or not binding on Seller, this Agreement by reason of its participation in the transactions contemplated hereby.

9.1.6   This Agreement has been duly authorized, executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller enforceable in accordance with the terms hereof.

ARTICLE 10. REPRESENTATIONS OF PURCHASER.

10.1   Purchaser's Representations and Warranties.  Purchaser represents and warrants to Seller that:

10.1.1 Purchaser is a limited liability company duly organized and validly existing in good standing under the laws of its state of organization.

10.1.2 Purchaser has had at all relevant times the power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.

10

10.1.3 The execution, delivery and performance of this Agreement by Purchaser has been duly authorized by all necessary company action. Compliance with the terms and provisions hereof do not and will not result in a conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien under any indenture, mortgage or other agreement or instrument to which it is a party or by which it or any of its property is bound, or any existing applicable law, rule, regulation, judgment, order or decree of any government, governmental instrumentality or court having jurisdiction over it or any of its properties.

10.1.4 Neither the execution and delivery by Purchaser of this Agreement nor the consummation of any of the transactions contemplated hereby requires the consent or approval of, the giving of notice to, or the taking of any other action in respect of, any trustee or holder of any indebtedness or obligation of Purchaser or any governmental authority or agency, except such as have been obtained, given, or taken, as the case may be.

10.1.5 No law or governmental rule or regulation makes invalid or not binding on Purchaser, this Agreement by reason of its participation in the transactions contemplated hereby.

10.1.6 This Agreement has been duly authorized, executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser enforceable in accordance with the terms hereof.

## ARTICLE 11. <u>FORCE MAJEURE</u>.

11.1    Each party shall be excused from, and shall not be liable in any manner for, any delay or failure in its performance under this Agreement if occasioned by a cause or causes beyond its control including, but not necessarily limited to, acts of God, wars, insurrections, riots, hostilities, acts of government, fire, strikes, other material labor disputes, explosions, major accidents, or floods. Notwithstanding the foregoing, the failure of Seller to obtain the Order as provided herein shall not be deemed to be an event of force majeure. Should Seller be prevented from delivering the Aircraft due to force majeure, Seller shall have thirty (30) days after the scheduled Delivery Date to tender the Aircraft for Delivery, or Purchaser may, thirty (30) days after the event constituting force majeure at its sole option, give written notice to Seller of its decision to terminate this Agreement. Both parties hereto agree that if Seller acknowledges that Seller cannot deliver this Aircraft within the thirty (30) day period after the event of force majeure, Purchaser may terminate this Agreement immediately. If Seller cannot deliver the Aircraft, Purchaser will continue to have the obligation to pay the Inspection Facility any costs incurred by Purchaser. If Purchaser terminates this Agreement pursuant to this Article 11, Seller through Escrow Agent shall refund the Deposit to Purchaser, this Agreement shall become null and void and neither party shall be obligated to the other under this Agreement.

11

ARTICLE 12. TERMINATION.

12.1    Either party hereto may terminate this Agreement in the event the other party materially breaches any of the terms and conditions contained herein, or otherwise defaults in the performance of its contractual obligations.  Such termination shall be effective upon five (5) days written notice to the defaulting party and shall in no way affect the rights or liabilities of the parties hereto which shall have accrued as of the date of such termination.  Upon Seller's breach and Purchaser's termination based upon such breach of this Agreement, the Deposit shall be promptly returned to Purchaser.

12.2    Purchaser may terminate this Agreement by written notice to Seller, if the Order has not been entered on or before May 19, 2005 (the "Termination Date"), in which event Seller shall have no further obligation under this Agreement and the Escrow Agent shall deliver to Purchaser the Deposit without deduction for any inspection expenses, all of which shall be the sole liability of Seller.  Purchaser, in its sole discretion may extend the Termination Date.

ARTICLE 13. NOTICES.

13.1    All notices or other communications shall be in writing and shall be sent by (a) personal delivery, (b) telephone facsimile transmission, (c) express courier or delivery service, addressed as follows:

| SELLER | PURCHASER |
|---|---|
| Winn-Dixie Stores, Inc. | Studio City Aviation 04, LLC |
| 5050 Englewood Court | c/o ACF Property Management, Inc. |
| Jacksonville, FL  32254 | 12411 Ventura Blvd. |
| Tel:    904-370-7172 | Studio City, CA 91604 |
| Fax:    904-783-5646 | Tel:    818-505-6777 |
| Attn:   Mike Chlebovec | Fax:    818-505-6778 |
| | Attn:   Alan Fox, Manager |

With a copy to:

| | |
|---|---|
| Lane Powell PC | Brownstein Hyatt Farber, P.C. |
| 1420 Fifth Avenue, Suite 4100 | 410 Seventeenth Street |
| Seattle, WA 98101 | Twenty-second Floor |
| Tel:    206-223-7431 | Denver, CO 80202 |
| Fax:    206-223-7107 | Tel:    303-223-1132 |
| Attn:   Kit Narodick | Fax:    303-223-0932 |
| | Email: mdiamant@bhf_law.com |
| | Attn:   Marc C. Diamant |

120556.0001/1195890.2

13.2   All notices shall be deemed given as of the date of receipt.

ARTICLE 14.   <u>MANUFACTURER WARRANTIES</u>.

    14.1   <u>Manufacturer Warranties</u>

        14.1.1 At Delivery or promptly thereafter, Seller agrees, at Purchaser's sole cost and expense, to cause to be transferred to Purchaser all manufacturer's and peripheral vendors' warranties.

        14.1.2 To the extent that the same may not be assigned or otherwise made available to Purchaser, Seller agrees, at the sole cost and expense of Purchaser, to exert its best reasonable efforts to enforce such rights as Seller may have with respect thereto for the benefit of Purchaser.

ARTICLE 15.   <u>MODIFICATION</u>.

    15.1   No modification, amendment or termination of this Agreement shall be effective unless it is in writing and signed by each party hereto or their duly authorized representative.

ARTICLE 16.   <u>WAIVER</u>.

    16.1   All rights of hereunder of Seller, on the one hand, and Purchaser, on the other, are separate and cumulative.

    16.2   No waiver by either party of any default hereunder shall be deemed a waiver of any subsequent default.

ARTICLE 17.   <u>SUCCESSORS AND ASSIGNS</u>.

    17.1   Except where expressly provided to the contrary, this Agreement, and all provisions hereof, shall inure to the benefit of and be binding upon the parties hereto, their successors in interest, assigns, administrators, executors, heirs and devisees.

    17.2   No party may assign or transfer its rights or obligations under this Agreement without the prior written consent of the other party.

ARTICLE 18.   <u>COUNTERPARTS</u>.

    18.1   This Agreement may be signed in several counterparts, each of which shall be an original, but all of which together shall constitute the same instrument.  Delivery of a signed

counterpart by telephone facsimile transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

ARTICLE 19.  MISCELLANEOUS.

19.1  ALL OF SELLER'S REPRESENTATIONS, WARRANTIES AND PRE-CLOSING OBLIGATIONS SET FORTH HEREIN SHALL TERMINATE UPON THE FILING OF THE FAA BILL OF SALE AT THE FAA REGISTRY.

19.2  Purchaser, at Purchaser's cost, shall remove the current registration mark within sixth (60) days after Delivery and reserve the current registration mark "N65R" in the name of Seller at the FAA Registry in Oklahoma City, Oklahoma.

19.3  This Agreement sets forth the entire contract between the parties hereto and supersedes all previous communications, representations or agreements, whether oral or written, between the parties with respect to the sale and purchase of the Aircraft.

19.4  Should any provisions of this Agreement be void or unenforceable, such provisions shall be deemed omitted, and this Agreement, with such provision omitted, shall remain in full force and effect.  Such invalid or unenforceable provision will be replaced, if possible, through interpretation or through good faith negotiations between the parties hereto so as to maintain the purposes and intentions of this Agreement and the provisions in question.

19.5  Any Exhibits, Attachments, Appendices and/or Schedules annexed to this Agreement are hereby incorporated herein by reference and are an integral part of this Agreement, and where there is any reference to this Agreement, it shall be deemed to include any and all Exhibits, Attachments, Appendices and/or Schedules.

19.6  This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Florida, including all matters of construction, validity and performance, without giving effect to its conflict of laws provisions.

19.7  During the pendency of the Case, exclusive jurisdiction and venue over any and all disputes between the parties arising under this Agreement shall be in, and for such purpose each party hereby submits to the jurisdiction of the Court.  Thereafter, exclusive jurisdiction and venue over any and all disputes between the parties arising under this Agreement shall be in, and for such purpose each party hereby submits to the Florida jurisdiction of, the federal and state courts in the State of Florida.

14

120556.0001/1195890.2

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized agents as of the date first above written.

WINN-DIXIE STORES, INC.
Seller

By: _____

Title: _____

Date: _____

STUDIO CITY AVIATION 04, LLC
Purchaser

By: _____

Title: _____

Date: _____

## EXHIBIT I

### 2002 Gulfstream G200
### MSN 072, N65R

**AIRFRAME:**

| | |
|---|---|
| Total Time: | 591 |
| Landings: | 480 |

**APU:** Garrett GTCP 36-150

**ENGINES:** On ESP Gold Lite Plan

| | Eng 1 | Eng 2 |
|---|---|---|
| Total Time: | 591 | 591 |
| Cycles: | 480 | 480 |

| **AVIONICS:** | Collins Pro-Line 4 | | |
|---|---|---|---|
| EFIS | Collins 5 Tube EFIS | **EGPWS:** | Honeywell Mark V Enhanced |
| AP: | Collins FCC 4000 | **HFComm** | Dual Honeywell KHF 950 |
| COMMS: | Dual Collins VHP 422D vfe/8.33 Spac. | **FMS:** | Dual Collins FMC 6110 w/Printer |
| NAVS: | Dual Collins VIR 432 w/FM IMM | **COMPASS:** | Dual Collins AHS-3000 AHS |
| DME: | Dual Collins DME 442 | **PHONE:** | MagnaStar Radio w/ 3 handsets |
| ADF: | Dual Collins ADF 462 | **AFIS:** | Honeywell |
| TPDR: | Dual Collins TDR 94D Mode S | **FDR:** | Provisions only w/57 Parameters |
| Radar | Collins Color TWR 850 | **CVR:** | Universal CVR-120 |
| RAD ALT: | Collins ALT 4000 | **TCAS:** | Collins TCAS |
| LRN: | Dual Collins FMC-6100 w/ Dual GPS-4000A | | |

**INTERIOR:**
Gulfstream lightweight completion. Nine Passenger configuration featuring 4 place berthable club forward, Aft two place berthable club and a single 3-place divan. Cabin amenities include 2 dataports, AirShow 400 and 7 electrical outlets. Forward Galley and Aft Lav. Galley includes ice drawer, dual Prepco hot liquid containers, wine storage, cold food storage. Entertainment center features DVD, 5-disc CD player, VHS, five 5.6 inch LCD monitor and one 14 inch LCD monitor. Fireblocked.

**MISC. INFORMATION:**
Life Rafts & Life Jackets
Labor Warranty is 5 Yrs. or 3,000 hrs (exp. 3/28/08)
Primary Structural Warranty 10 Years or 10,000 Hours (exp. 3/28/13)
IAI proprietary Parts Warranty (exp. 3/28/08)
Paint & Interior Warranty 2 Yrs. (exp 3/28/05)
Rockwell Collins 5 Yrs. or 3,000 hrs. (exp. 3/28/08)
Pratt Whitney Engine Warranty handled with Pratt Whitney and is 5 Years from Operational Delivery or 3,000 engine hours (3/28/08)

*Specifications/descriptions are provided as introductory information and do not constitute representation or warranties of Bloomer deVere or Bloomer deVere client(s). Accordingly, you should rely on your own inspection of the aircraft. Any proposed transaction is subject to final execution of a contract acceptable in form and substance to Bloomer de Vere, its client(s), and their counsel.*

### SPECIFICATIONS SUBJECT TO VERIFICATION
### UPON INSPECTION BY PURCHASER

120556.0001/1195890.2

## **EXHIBIT II**

### VISUAL INSPECTION ACCEPTANCE CERTIFICATE

The undersigned representative of STUDIO CITY AVIATION O4, LLC ("Purchaser") hereby certifies that Purchaser has, pursuant to the Aircraft Purchase and Sale Agreement, dated as of April ___, 2005 (the "Agreement"), between Winn-Dixie Stores, Inc. ("Seller") and Purchaser, visually inspected the 2002 Gulfstream Aerospace Model G-200 aircraft, bearing the manufacturer's serial number 072 and the U.S. civil aviation mark N68R (the "Airframe"), with the two (2) attached Pratt & Whitney Canada PW306A engines bearing manufacturer's serial numbers PCE-CC0146 and PCE-CC0148 (the "Engines"). Capitalized terms used but not defined in this Certificate have the meanings given them in the Agreement.

Purchaser: (*check one*)
☐ Accepts
☐ Rejects
the Aircraft as a result of the visual inspection.

DATED: April ___, 2005.          STUDIO CITY AVIATION 04, LLC
                                 Purchaser


                                 By: _____

                                 Title: _____

17

# EXHIBIT III

## SCOPE OF PRE-PURCHASE INSPECTION

Full Engine Test Flight boroscope
Inspection of Aircraft's books and records

120556.0001/1195890.2

## EXHIBIT IV

## TECHNICAL ACCEPTANCE CERTIFICATE

The undersigned representative of STUDIO CITY AVIATION 04, LLC ("Purchaser") hereby certifies that Purchaser has, pursuant to the Aircraft Purchase and Sale Agreement, dated as of April ___, 2005 (the "Agreement"), between Winn-Dixie Stores, Inc. ("Seller") and Purchaser, inspected the 2002 Gulfstream Aerospace Model G-200 aircraft, bearing the manufacture's serial number 072 and the U.S. civil aviation mark N68R (the "Airframe"), with the two (2) attached Pratt & Whitney Canada PW306A engines bearing manufacturer's serial numbers PCE-CC0146 and PCE-CC0148 (the "Engines") and inspected the appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment or property installed on or attached to the Airframe and Engines, the tools, spares, all other equipment for the Airframe and Engines listed in Exhibit I attached to the Agreement (the Airframe, the Engines and the other foregoing described equipment and property, collective, the "Aircraft") and hereby conditionally accepts the Aircraft in accordance with the conditions set out in Section 3.4 of the Agreement. Capitalized terms used but not defined in this Certificate have the meanings given them in the Agreement.

The undersigned representative of Seller hereby represents to Purchaser that Seller, at Seller's cost, will correct all the Airworthiness Discrepancies (as determined under the terms of Section 3.4 of the Agreement) attached to this Certificate prior to Delivery of the Aircraft to Purchaser. Purchaser represents to Seller that as long as all other conditions set forth in the Agreement are met, and after all Airworthiness Discrepancies are corrected by Seller, Purchase will irrevocably accept the Aircraft "AS IS – WHEREIS, WITH ALL FAULTS" at the Delivery location of the Delivery Date.

DATED: April ___, 2005.          STUDIO CITY AVIATION 04, LLC
                                 Purchaser


                                 By: _____

                                 Title: _____

                                 WINN-DIXIE STORES, INC.
                                 Seller


                                 By: _____

                                 Title: _____

120556.0001/1195890.2

## EXHIBIT V

### BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS:

THAT Winn-Dixie Stores, Inc., with an address at 5050 Englewood Court, Jacksonville, FL 32254 ("Seller"), is the owner of the full legal and beneficial title to that certain 2002 Gulfstream Aerospace Model G-200 aircraft, bearing manufacturer's serial number 072 and the U.S. civil aviation mark N80R (the "Airframe"), together with two (2) Pratt & Whitney Canada PW306A engines bearing manufacturer's serial numbers PCE-CC0149 and PCE-CC0150 (the "Engines"), the appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment or property installed on or attached to the Airframe and Engines and all books, manuals, logbooks, maintenance records and other data related to the operation and maintenance of the Aircraft the Airframe and Engines currently in Seller's possession (the Airframe, the Engines and the other foregoing described equipment and property, collectively, the "Aircraft").

THAT for good and valuable consideration, receipt of which is hereby acknowledged, Seller, does this _____ day of May 2005, grant, convey, transfer, deliver and set over, at the _____ Airport, all right, title and interest in and to the Aircraft unto Studio City Aviation 04, LLC ("Purchaser"), and unto its successors and assigns forever.

THIS Bill of Sale is delivered by Seller to Purchaser, at the _____ Airport, and is governed by the laws of the State of Florida, exclusive of its conflicts of law provisions.

IN WITNESS WHEREOF, SELLER has caused this instrument to be executed by its duly authorized officer this _____ day of May 2005.

WINN-DIXIE STORES, INC.

By: _____

Title: _____

20

**EXHIBIT VI**

**DELIVERY RECEIPT**

      The undersigned, on behalf of, and as the duly authorized agent of Studio City Aviation 04, LLC ("Purchaser"), hereby acknowledges receipt from Winn-Dixie Stores, Inc. ("Seller") of the delivery to Purchaser at the _____ Airport, on this ___ day of May 2005, of the following described aircraft:

      One (1) 2002 Gulfstream Aerospace Model G-200 aircraft, bearing manufacturer's serial number 072 and the U.S. civil aviation mark N68R (the "Airframe"), together with two (2) Pratt & Whitney Canada PW306A engines bearing manufacturer's serial numbers PCE-CC0146 and PCE-CC0148 (the "Engines"), the appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment or property installed on or attached to the Airframe and Engines and all books, manuals, logbooks, maintenance records and other data related to the operation and maintenance of the Airframe and Engines.

in accordance with the terms of the Aircraft Purchase and Sale Agreement dated as of May ___, 2005, between Purchaser and Seller pertaining to this transaction.

                  STUDIO CITY AVIATION 04, LLC

                  By: _____

                  Name: _____

21

**EXHIBIT VII**

**ESCROW AGREEMENT**

This Escrow Agreement (this "Escrow Agreement") is made and entered into as of April ___, 2005, by and among Studio City Aviation 04, LLC, or its assigns ("Purchaser"), Winn-Dixie Stores, Inc. ("Seller"), and Insured Aircraft Title Services, Inc. ("Escrow Agent").

This Escrow Agreement is being entered into in connection with the execution of a certain Aircraft Purchase and Sale Agreement (the "Agreement") between Purchaser and Seller pertaining to one (1) Gulfstream Aerospace G-200 aircraft, bearing manufacturer's serial number 072 and the U.S. civil aviation mark N68R (the "Airframe"), together with two (2) Pratt & Whitney Canada PW306A engines bearing manufacturer's serial numbers PCE-CC0146 and PCE-CC0148 (the "Engines" and collectively with the Airframe, the "Aircraft"). Capitalized terms used herein and not defined herein shall have the meaning assigned to such terms in the Aircraft Purchase and Sale Agreement.

In consideration of the payments herein provided for and the agreements and promises of the parties herein contained, the parties hereto agree as follows:

(A)     Escrow Agent has established an escrow account in its own name (the "Escrow Account").  Any deposit in the Escrow Account shall be made by wire transfer of immediately available funds according to the wire instructions set forth in Attachment 1, which is attached hereto and made a part hereof.  All funds deposited therein shall be held without interest.

(B)     Purchaser has deposited in the Escrow Account a deposit in the amount of Five Hundred Thousand Dollars (US$500,000.00) (the "Deposit") to be held subject to this Escrow Agreement pursuant to the Aircraft Purchase and Sale Agreement, which shall remain refundable until Escrow Agent receives the mutually executed Technical Acceptance Certificate, at which point the Deposit shall, except as otherwise provided in the Agreement, become nonrefundable to Purchaser.

(C)     Prior to the Delivery Date:  (1) Seller shall place in escrow with Escrow Agent a duly executed but undated FAA Bill of Sale (AC Form 8050-2) and a duly executed but undated Warranty Bill of Sale (the FAA Bill of Sale and Warranty Bill of Sale collectively referred to herein as the "Bills of Sale"); and (2) Purchaser shall place in escrow with Escrow Agent a duly executed but undated FAA Registration Application (AC Form 8050-1) and Delivery Receipt; and (3) place in the Escrow Account Purchaser's share of the escrow fees of the Escrow Agent; and (4) the remainder of the Purchase Price.

(D)     On the Delivery Date, the parties, and their respective counsel if requested by the relevant party, shall participate in a telephone conference call to effect the closing:

(1)     Escrow Agent shall confirm to all parties on the call that it is holding funds in the amount of the Purchase Price (as defined in the Agreement) and one or more manually executed original counterparts of each of the FAA Registration Application and the

FAA Bill of Sale (collectively, the "FAA Documents"), the Bill of Sale and each other document and writing as any party may have elected to deposit with Escrow Agent (together with the FAA Documents and the Warranty Bill of Sale, collectively, the "Documents");

(2)    Escrow Agent shall confirm to all parties on the call that the FAA Documents are in proper form for filing with the Federal Aviation Administration ("FAA");

(3)    Escrow Agent shall further confirm to all parties on the call that it has checked the ticker tape on such date and that the Aircraft and its engines remain free and clear of any liens;

(4)    each Party on the conference call shall confirm to Escrow Agent that Escrow Agent is authorized to release such party's signed Documents, to fill in the date of the closing in appropriate spaces in the Documents, and to proceed with the filing of the FAA Documents with the FAA upon the concurrent authorization to such effect from each other Party on the conference call and the confirmation of the Federal Funds Reference number for the wire transfer referred to in clause (5) below;

(5)    upon verbal authorization by each party to Escrow Agent as provided in clause (4) above, Purchaser shall instruct Escrow Agent to wire transfer the Purchase Price minus Seller's share of the escrow fees to Seller or as Seller may direct.  Escrow Agent shall notify the parties on the conference call of the Federal Funds Reference Number for that wire transfer as soon as it is available; and

(6)    immediately upon notice to the parties of that Federal Funds Reference Number, Escrow Agent shall file the FAA Documents with the FAA, and Escrow Agent shall confirm the time of filing of each of the FAA Documents to the parties on the conference call.

(7)    promptly thereafter, Escrow Agent shall send to Purchaser by overnight courier originally executed counterparts of the warranty Bill of Sale and shall send to Seller by overnight courier originally executed counterparts of the Delivery Receipt.

(E)    The authorized persons to give the Escrow Agent instructions are:

(1)    for Seller

Winn Dixie Stores, Inc.
5050 Englewood Court
Jacksonville, FL  322544
Phone:  904-370-7172
Fax:      904-783-5646
Attn: Mike Chlebovec

120556.0001/1195890.2

(2)    For Purchaser,

> Studio City Aviation 04, LLC
> c/o ACF Property Management, Inc.
> 12411 Ventura Blvd.
> Studio City, CA 91604
> Tel:    818-505-6777
> Fax:    818-505-6778
> Attn:   Alan Fox, Manager

(F)    Should Purchaser or Seller breach the Agreement, Escrow Agent shall pay the funds held on deposit to the appropriate party upon written instructions from both Purchaser and Seller.  Notwithstanding the prior sentence, the Deposit shall be controlled under the provisions set out in the Agreement to which this Escrow Agreement is an exhibit.

(G)    Subject to Section D above, any instructions, directions or notices required to be delivered hereunder to Escrow Agent (a) shall be in writing, (b) may be delivered by hand delivery, internationally recognized overnight courier, or facsimile, and (c) may be executed in one (1) or more counterparts, each of which shall constitute an original and all of which, taken together, shall constitute the same instrument.  All notices to Escrow Agent shall be addressed as follows:

> Name:           Insured Aircraft Title Services, Inc.
> Address:        4848 S.W. 36th Street
> City/State:     Oklahoma City, OK  73179
> Attention:      Joan Roberts
> Phone:          (800) 654-4882
> Fax:            (405) 681-5356

(H)    Escrow Agent shall perform its customary FAA filing service.  Escrow Agent shall act as stakeholder and shall not be responsible for validity, sufficiency or collectibility of funds deposited hereunder, and shall not be required to determine existence of any fact or decide any questions of law.  Escrow Agent shall not be liable in any respect on the account of identity, authority or rights of the persons executing or delivering or purporting to execute or deliver any such document, paper or funds, its duties hereunder being limited to the safekeeping of funds deposited hereunder, and for the delivery of the same in accordance with this Escrow Agreement.

(I)    In accepting funds deposited hereunder, it is agreed and understood among the parties hereto that Escrow Agent will not be called upon to construe this Escrow Agreement or any document hereunder.

(J)    Escrow Agent, as part of the consideration for the acceptance of this Escrow Agreement, will not be liable for any acts or omissions done in good faith, nor for any claims, demands or losses, nor for any damages made or suffered by any party to this Escrow Agreement, except such as may arise through or be caused by its bad faith or gross negligence.

24

120556.0001/1195890.2

(K)    The Escrow Agent's fee and expenses shall be shared equally by Seller and Purchaser and paid to Escrow Agent by Seller and Purchaser at the closing from funds deposited in the Escrow Account or as otherwise agreed by the parties hereto.

(L)    The term of this Escrow Agreement may be amended at any time by the mutual written consent of the parties hereto.

(M)    The Agreement and this Escrow Agreement supersedes any other contract or agreement with reference to the funds deposited hereunder, in so far as Escrow Agent is concerned, and Escrow Agent may rely absolutely thereon to the exclusion of any and all other agreements among the parties hereto, except any duly executed subsequent amendments to the Agreement or this Escrow Agreement.

(N)    This Escrow Agreement shall be governed by the laws of the State of Oklahoma, except for its conflicts of laws provisions.

(O)    This Escrow Agreement may be executed in multiple counterparts, originally signed or a facsimile thereof, each of which shall constitute an original, all of which, taken together, shall constitute the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the date first above written.

**STUDIO CITY AVIATION 04, LLC**
as Purchaser

By: _____

Title: _____

Date: _____

**INSURED AIRCRAFT TITLE SERVICES, INC.**
as Escrow Agent

By: _____

Title: _____

Date: _____

**WINN-DIXIE STORES, INC.**
as Seller

By: _____

Title: _____

Date: _____

120556.0001/1195890.2

**Insured Aircraft Title Service, Inc.**
P.O. Box 19527
Oklahoma City, Oklahoma 73144
(405) 681-6663   (800) 654-4882
FAX #405-681-9229

## WIRE TRANSFER INSTRUCTIONS

FUNDS BEING WIRED TO INSURED ESCROW SERVICE SHOULD BE WIRED
PURSUANT TO THE FOLLOWING INSTRUCTIONS:

*INTERNATIONAL BANK OF COMMERCE*

*1200 SAN BERNARDO*

*LAREDO, TEXAS  78040*

**ABA:  114 902 528**
**SWIFT CODE:  IBCLUS44**

**CREDIT:  INSURED AIRCRAFT TITLE SERVICE, INC.**
**ACCOUNT NUMBER:  0717213717**

**REFERENCE:  GULFSTREAM G-200, SERIAL NUMBER 072**

**ATTENTION:  JOAN ROBERTS**

FOR OVERNIGHT DELIVERIES PLEASE USE THE FOLLOWING ADDRESS

*4848 SOUTHWEST 36TH STREET*

*OKLAHOMA CITY, OK  73179*

TEL:  405-681-6663

Escrow deposits received are considered underline(refundable) to the depositor until we are notified
otherwise by the depositor or until we are in receipt of a fully executed purchase agreement
outlining the terms and conditions of funds held in escrow.

This escrow account is  non-interest bearing.  Fees must be paid at the time of closing.

120556.0001/1195890.2

**EXHIBIT B**



**BLOOMER de VERE**
GROUP AVIA, INC.

LOS ANGELES  •  WEST PALM BEACH  •  PHILADELPHIA  •  NEWPORT BEACH  •  NEW YORK  •  MONACO

## AIRCRAFT CONSULTING AGREEMENT

*CORPORATE AIRCRAFT MARKETING AND SALE*

Winn-Dixie Stores, Inc., ("Client") intends to sell two aircraft described as Gulfstream 200, S/N 072 & 074 (the "Aircraft"), equipped as per attachment A. Client desires to employ Bloomer deVere Group Avia, Inc. ("Bloomer deVere") as agent and Bloomer deVere desires to act as agent for the sale of the Aircraft, pursuant to the terms set forth herein.

**1.    CONSULTING AGENT.**

Client hereby appoints Bloomer deVere as its representative and agent to consummate a sale of the Aircraft. Bloomer deVere hereby accepts its appointment as agent, and agrees to be bound by the terms of this Agreement. The firm will provide to the client marketing intelligence, proven sales procedures, contracts and negotiating expertise. All parties will work toward the common strategic and financial goals established by the Client.

**2.    ADVERTISING.**

Bloomer deVere shall prepare all advertising and promotional programs in connection with the sale of the Aircraft. Client shall be responsible for one half of the costs related to advertising and shall have the right to approve copy and art work which will be used in sales and promotional literature and shall approve any advertising or other sales related expense before such expense is incurred. Bloomer deVere may, from time to time, solicit the participation of certain other aircraft brokerage firms, with the express written consent of Client, to assist in the sale of the Aircraft. These firms are selected on the basis of their location, sales records and integrity. Nevertheless, Client will deal directly with Bloomer deVere at all times and it shall be Bloomer deVere's sole responsibility to deal with other firms.

1

3.    **CONDITION OF AIRCRAFT.**

The Aircraft will be offered for sale by Client as a "used" aircraft in an "as-is" condition. No warranties whatsoever, either expressed, implied or statutory, shall be represented by Bloomer deVere to any prospective purchaser , except those that may be transferred by the aircraft's manufacturer.

4.    **TERM.**

The initial term of this Agreement shall commence upon acceptance of this Agreement by Client and shall continue for 180 days from the date hereof. At Client's option, this Agreement may be renewed for additional term of 90 days. Client retains the right to terminate this Agreement at any time upon 30 day written notice prior to termination. In the event of termination of this Agreement, Bloomer deVere shall deliver to Client a list of all potential purchasers with whom Bloomer deVere has had contact in its specific sales efforts. The Client should have a list every 30 days for the previous 30 days. If any purchaser on said list reaches an agreement in principle for the sale of the Aircraft within 90 days of the last day of the term, and Purchases the Aircraft then Client agrees to pay the full commission set forth in Section 7 hereof.

5.    **PROSPECTS.**

Client hereby agrees that all inquiries, contacts and communications received by Client from prospective purchasers and other aircraft firms shall be referred to Bloomer deVere and that all such parties shall be advised of Bloomer deVere's sales representation capacity. Bloomer deVere shall diligently pursue each prospect referred to it by Client.

6.    **LISTING PRICE.**

The quoted sales price of the Aircraft shall be: "Make Offer", which shall not be varied, modified or changed without Client's prior approval. Client shall be notified of all reasonable written offers received by Bloomer deVere, and Client shall have the right to accept or reject such offers, subject to the provisions set forth in Section 7(b) hereof.  Notwithstanding the above of this Section 6, Bloomer deVere shall advise Client of the sale price Client should expect from a sale of the Aircraft.

7.    **COMPENSATION.**

(a)    For the sales representation services to be rendered by Bloomer deVere on behalf of Client pursuant to this Agreement, Client shall pay Bloomer deVere a sales commission in accordance with the following:

Bloomer deVere will be entitled to a flat fee commission ("Fee") to be paid by Client to Bloomer deVere at the closing of each Aircraft. The Fee for each Aircraft will be 0.75% of the Aircraft's purchase price up to $15

2

Million. Thereafter, Bloomer deVere will earn an incentive fee of 5.0% of any amounts realized by Client over $15 Million for each Aircraft.

The date of sale shall be the date Client receives payment of the purchase price and delivers title and possession of the Aircraft to buyer.

(b)    Bloomer deVere shall be entitled to the commission set forth in this

7(a)    Section 7 upon Client's acceptance of any purchaser's offer during the term of this Agreement, subsequent transfer of title or delivery of possession to purchaser and payment of the purchase price, whether or not Bloomer deVere is the procuring cause of the purchase. The commission shall be paid in cash on the date of transfer of title or delivery of possession to purchaser and payment of the purchase price. Notwithstanding the foregoing of this Section 7, this commission amount set out in Section 7 (a) shall be the total extent of Client's payment obligation to Bloomer deVere. Client shall not be responsible for any payments to other aircraft brokers that Bloomer deVere may use to sell the Aircraft.

8.    **EXPENSES.**

Client shall reimburse Bloomer deVere for all pre-approved travel, advertising, promotional and other routine costs associated with the market and sale of the Aircraft. Bloomer deVere shall invoice Client on or about the first day of each calendar month for the pre-approved reimbursable expenses incurred, which shall be invoiced at their actual cost and have the prior approval of Client. Bloomer deVere shall send all said invoices to the attention:

Paul Novak
Chief Development Officer
Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, FL 32254-3699
Phone: (904) 370-7772
Fax:    (904) 370-7773
E-Mail: paulnovak@winn-dixie.com

9.    **STATUS REPORTS.**

Bloomer deVere shall provide Client on a monthly basis with progress reports on its sales efforts which shall include, among other things, offers received to date, the names of prospective purchasers and a general estimate of the existing market for the Aircraft.

3

**10.   DOCUMENTS.**

Bloomer deVere shall prepare the forms and documents required to evidence the purchase and transfer of title, but it shall be the Client's and purchaser's respective obligations to file such documents with the Federal Aviation Administration and other appropriate government agencies.

**11.   NOTICES.**

All notices or other communications required or permitted to be given hereunder shall be (as elected by the party giving such notice) (a) personally delivered, (b) transmitted by first-class mail -- airmail if international, (c) transmitted by telex or telecopier, or (d) telephonic with written confirmation to the parties, as follows:

| If to Bloomer deVere: | If to Client: |
|---|---|
| BLOOMER deVERE GROUP AVIA<br>855 Aviation Dr., Suite # 205<br>Camarillo, CA 93010 | WINN-DIXIE STORES, INC.<br>5050 Edgewood Court<br>Jacksonville, FL  32254-3699 |
| Attn:  Mr. Mark Bloomer | Attn:   Paul Novak, SVP |
| Phone: 805-484-6605<br>Fax: 805-484-6656<br>E-Mail:  bloomerdv@aol.com | Phone: (904) 370-7772<br>Fax:   (904) 370-7773<br>E-Mail: paulnovak@winn-dixie.com |

**12.   CONFIDENTIALITY OF MATERIAL.**

Bloomer deVere may, during the course of its services hereunder, have access to, and acquire knowledge from, material, data, systems and other information of or with respect to Client which may not be accessible or known to the general public. Any knowledge acquired by Bloomer deVere from such material, data, systems or information or otherwise through its engagement hereunder shall not be used, published or divulged by Bloomer deVere in connection with any services rendered by Bloomer deVere to any other person, firm or corporation, in any advertising or promotion regarding Bloomer deVere or its services, or in any other manner or connection whatsoever without first having obtained the written permission of Client, which permission Client may withhold in its sole discretion.

4

## 13.    MISCELLANEOUS.

This Agreement shall be governed by and construed according to the laws and by the courts of the State of California. In the event judicial action is instituted by either party against the other to enforce its rights hereunder, then each party shall be responsible for payment of its own attorneys' fees and costs incurred pursuant to the judicial action. This Agreement contains the entire understanding and agreement of Client and Bloomer deVere concerning the sale of the Aircraft. The terms and conditions of this Agreement supersede any prior or contemporaneous oral or written agreements concerning the subject matter hereof. This Agreement may only be altered or modified in a writing that is executed by the duly authorized representatives of the parties hereto.


BLOOMER deVERE GROUP AVIA              WINN-DIXIE STORES, INC.
a California corporation                A Florida corporation

By: _____          By: _____

Date: _____          Date: _____


Intiving the

**<u>EXHIBIT C</u>**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

**ORDER UNDER 11 U.S.C. §§ 105(a) AND 363 AND FED. R. BANKR. P. 6004 (A) AUTHORIZING AND APPROVING THE SALE OF A 2002 GULFSTREAM G-200 AIRCRAFT AND RELATED EQUIPMENT FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) AUTHORIZING THE PAYMENT OF A BROKERAGE FEE IN CONNECTION WITH THE SALE TO BLOOMER DEVERE GROUP AVIA, INC. AND <u>(C) GRANTING RELATED RELIEF</u>**

These cases came before the Court for hearing on May 19, 2005 (the "Sale Hearing") [1], upon the motion of Winn-Dixie Stores, Inc. and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order under 11 U.S.C. §§ 105(a) and 363 and Federal Rule of Bankruptcy Procedure 6004 (a) authorizing and approving the sale of a 2002 Gulfstream G-200 aircraft and related equipment (the "Assets") to Studio City Aviation 04, LLC (the "Purchaser") or to the party submitting a higher or otherwise better offer, if any, free and clear of liens, claims, interests and encumbrances, (b) authorizing the payment of a brokerage fee to Bloomer deVere Group Avia, Inc. ("deVere") in connection with the sale and (c) granting related relief (the "Motion"). The Court has reviewed the Motion, considered the evidence and heard the argument of counsel.  After due deliberation and

---

[1]     All capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the Motion.

finding proper notice of the Motion and the Sale Hearing has been provided to (a) each taxing authority known to the Debtors to have a potential interest in the Assets; (b) all parties who previously have expressed serious interest in acquiring the Assets; (c) the Purchaser; (d) deVere; (e) counsel for the Debtors' postpetition secured lenders (the "DIP Lenders"); (f) the indenture trustee for the Debtors' noteholders; (g) counsel for the Creditors' Committee; (h) all known holders of Interests and Claims (as those terms are defined below) in the Assets; (i) all entities having requested notices pursuant to Bankruptcy Rule 2002; (j) the Office of the United States Trustee; and (k) any other parties not otherwise named in this Motion but included in the Order (A) Establishing Notice Procedures on a Final Basis and (B) Continuing Hearing with Respect to Scheduling Omnibus Hearings, the Court determines that good cause exists to grant the relief and that granting the relief is in the best interest of these estates and creditors. Accordingly, the Court

FINDS AND CONCLUDES AS FOLLOWS:

A.      The Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue of these cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief requested in the Motion are sections 105(a) and 363 of the Bankruptcy Code, and such relief is subject to Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.      Notice of the Motion, the Auction and the Sale Hearing was good and sufficient under the particular circumstances and no other or further notice is or shall be required.

D.      A reasonable opportunity to object or be heard with respect to the Motion and the sale of the Assets has been afforded to all parties in interest (including all third parties asserting Interests or Claims (as such terms are defined below) in, to or against the Assets, if any).

E.      The Debtors' marketing efforts with respect to the Assets were reasonable, adequate, and designed to obtain the highest price possible for the Assets.  Through the Debtors' marketing efforts and an auction process, the Debtors afforded interested potential purchasers a full, fair and reasonable opportunity to make higher or better offers to purchase the Assets.

F.      The Debtors demonstrated good, sufficient, and sound business purpose and justification for the sale of the Assets.

G.      The Purchaser is not an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

H.      The Purchase Agreement, a copy of which is attached as Exhibit A to this Order, was proposed, negotiated and entered into by the Debtors and the Purchaser without collusion, in good faith and at arms-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

I.      The Purchaser is a good faith purchaser within the meaning of 11 U.S.C.

§ 363(m).  The Purchaser will be acting in good faith within the meaning of 11 U.S.C.

§ 363(m) in closing the transactions contemplated by the Purchase Agreement and at all

times after the entry of this Order.

J.      The consideration provided by the Purchaser pursuant to the Purchase

Agreement to acquire the Assets (i) is fair and reasonable; (ii) is the highest and

otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value and

fair consideration for the Assets.

K.      The transfer of the Assets to the Purchaser pursuant to the Purchase

Agreement will be a legal, valid and effective transfer of the Assets, and will vest the

Purchaser with good and valid title in and to the Assets free and clear of any liens,

claims, encumbrances, pledges, mortgages, security interests, charges, options and other

interests of any kind or nature (collectively, the "Interests") and claims (as such term is

defined in 11 U.S.C. § 101(5)) ("Claims").

L.      The Debtors may sell and transfer the Assets free and clear of all Interests

and Claims, because any entity with Interests or Claims, if any, in the Assets to be

transferred (i) has consented to the sale; (ii) could be compelled in a legal or equitable

proceeding to accept money satisfaction of such interest; or (iii) otherwise falls within the

provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards

set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Interests and Claims,

if any, who did not object, or who withdrew their objections, to the Motion are deemed to

have consented pursuant to 11 U.S.C. § 363(f)(2).

M.    The Debtors shall cause the proceeds from the sale to be paid in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Prepetition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order"), and the Loan Documents (as defined in the Final Financing Order).

N.    The payment of the Brokerage Fee to deVere in connection with the sale of the Assets is reasonable, customary and not detrimental to the Debtors' estates.

O.    The approval of the sale of the Assets to the Purchaser, or to the party submitting a higher or otherwise better offer is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

ACCORDINGLY, IT IS ORDERED AND ADJUDGED:

1.    The findings of fact and conclusions of law set forth above are ratified and adopted as findings of this Court.  To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent that any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

2.    The Motion is GRANTED.

3.      Any objections to the Motion or the relief request in the Motion that have not been withdrawn, waived, or settled, and all reservation of rights included in any objection, are overruled on the merits.

4.      The terms and conditions of the Purchase Agreement are approved in all respects.  Pursuant to 11 U.S.C. §§ 105 and 363, the Debtors are authorized (subject to applicable closing conditions set forth in the Purchase Agreement) to consummate the sale including transferring and conveying the Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

5.      The Debtors are authorized and empowered to consummate and implement fully the Purchase Agreement, together with all additional instruments and documents that may be necessary or appropriate to implement the Purchase Agreement, and the Debtors are authorized to take all further actions as may reasonably be necessary or appropriate for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to the Purchaser the Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations under the Purchase Agreement.

6.      Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties to the Purchase Agreement in accordance with the terms of the Purchase Agreement without further order of the Court; provided, however, that, in connection with any modification, amendment or supplement, the parties shall obtain the prior written consent of the Creditors' Committee, which consent shall not be unreasonably withheld; and

- 6 -

provided further, that any such modification, amendment or supplement shall neither be materially adverse to the Debtors nor materially adversely change, with respect to the Debtors, the economic substance of the transactions contemplated by this Order.

7.    Except as expressly permitted or otherwise specifically provided for in the Purchase Agreement or this Order, pursuant to 11 U.S.C. § 105(a) and 363(f), the Assets shall be transferred to the Purchaser free and clear of all Interests and Claims, with all such Interests and Claims, if any, to attach to the proceeds of the sale of the Assets, with the same validity, enforceability, priority, force and effect they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors and all interested parties with respect to such Interests and Claims.

8.    The transfer of the Assets shall be a legal, valid, and effective transfer of the Assets and shall vest the Purchaser with all right, title and interest of the Debtors in and to the Assets, free and clear of all Interests and Claims.

9.    The Debtors shall cause the proceeds from the sale to be paid in accordance the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

10.    The consideration provided by the Purchaser for the Assets constitutes reasonably equivalent value and fair and reasonable consideration under the Bankruptcy Code and applicable non-bankruptcy law, and may not be avoided under 11 U.S.C. § 363(n).

11.    The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in 11 U.S.C. § 363(m).  Accordingly,

the reversal or modification on appeal of the authorization to consummate the sale of the Assets shall not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal. The Purchaser is a purchaser in good faith of the Assets and is entitled to all of the protections afforded by 11 U.S.C. § 363(m) of the Bankruptcy Code.

12.    All entities who are presently in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors. Each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary or appropriate to release its Interests in and Claims against the Assets  (provided that the taking of such actions shall not require such creditor to incur any material costs) as such Interests or Claims may have been recorded or may otherwise exist.

13.    This Order is and shall be effective as a determination that any and all Interests or Claims, if any, shall be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

14.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens or other documents or agreements evidencing Interests and Claims with respect to the Debtors and/or the Assets, shall not have delivered to the Debtors and the Purchaser, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests and Claims which the person or entity has with respect to the Debtors and/or the Assets or otherwise, then (a) the Debtors are authorized to execute and file such statements,

instruments, releases and other documents on behalf of the person or entity with respect to such assets and contracts and (b) the Purchaser is authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests and Claims in the Assets, of any kind or nature whatsoever.

15.     This Order shall constitute a full and complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to the Purchaser.  Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

16.     This Order shall be binding in all respects upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

17.     This Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and creditors, the Purchaser and its respective affiliates, successors and assigns, and this Order shall be binding in all respects upon all

persons asserting an Interest in or Claim against the Debtors' estates or the Assets. The

sale shall be enforceable against and binding upon, and not subject to rejection or

avoidance by, the Debtors or any chapter 7 or chapter 11 trustee of the Debtors and their

estates.

18.     During the pendency of the Debtors' jointly administered cases, this Court

shall retain exclusive jurisdiction (a) to enforce and implement the Purchase Agreement

and any agreements and instruments executed in connection with the Purchase

Agreement, (b) to compel delivery of possession of the Assets to the Purchaser, (c) to

resolve any disputes, controversies or claims arising out of or relating to the Purchase

Agreement and (d) to interpret, implement, and enforce the provisions of this Order.

19.     All persons and entities that hold Interests in or Claims against the Debtors

are forever barred, estopped and permanently enjoined from asserting or prosecuting any

claims or causes of action against the Purchaser, its affiliates, successors or assigns or any

of their respective officers, directors, employees, attorneys or advisors, arising out of or

in connection with the sale of the Assets.

20.     Nothing contained in any plan of reorganization or liquidation confirmed

in these chapter 11 cases, or any order of this Court confirming such a plan, or any other

order entered in these chapter 11 cases or in any subsequent chapter 7 cases shall conflict

with or derogate from the terms of this Order.

21.     The failure specifically to include any particular provision of the Purchase

Agreement in this Order shall not diminish or impair the effectiveness of such provision,

it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

22.      To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in the Purchase Agreement shall govern.

23.      The Debtors are authorized to pay to deVere the Brokerage Fee, $130,000, from the proceeds of the sale of the Assets to the Purchaser.

24.      Any findings or conclusions read into the record by the Court at the Sale Hearing that are not expressly set forth in this Order are fully incorporated as if the same were set forth in this Order.

25.      Notwithstanding Fed. R. Bankr. P. 6004(g), this Order shall take effect immediately upon entry.

Dated May _____ 2005 in Jacksonville, Florida

_____
Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve
a copy of this Order on all parties who
received copies of the Motion.