01/23/95

## SUPPLEMENTAL LEASE AGREEMENT

**THIS SUPPLEMENTAL LEASE AGREEMENT,** made this _16th_ day of _February_, 1995, between **NORTH MADISON ASSOCIATES, LTD.,** an Alabama limited partnership, (hereinafter called "Landlord"), and **WINN-DIXIE ATLANTA, INC.,** a Florida corporation duly qualified to transact business in the State of Alabama, (hereinafter called "Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H :

**WHEREAS,** by Lease dated October 14, 1993, Landlord did lease and demise unto Tenant those certain premises located at the northeastern corner of the intersection of U S. Highway 72 East and Wal-Triana Highway in the City of Madison, County of Madison, State of Alabama, reference being made to said Lease for a more detailed description of the demised premises, for an initial term of twenty (20) years commencing upon a date dependent upon the completion of certain construction, and upon such other terms and conditions as are set forth therein; and

**WHEREAS,** a Short Form of said Lease is recorded in the State of Alabama, Madison County Probate Office, Book 0827, Page 0538; and

**WHEREAS,** said Lease has been amended by First Amendment to Lease dated October 14, 1993; and

**WHEREAS,** Tenant has now opened for business in the demised premises and the parties desire to fix the commencement date of said Lease as hereinafter set forth;

**NOW THEREFORE,** in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable considerations paid by Tenant to Landlord, the receipt and sufficiency whereof are hereby acknowledged, it is mutually agreed:

1.    The commencement date of the above-described Lease is fixed at January 19, 1995 and the expiration of the initial term of twenty (20) years demised therein shall be at midnight on January 18, 2015.

This instrument was prepared by Charles P. Milford Jr.. Attorney-at-Law whose address is P. O.

2. All covenants, terms and conditions of the above-described Lease not modified or amended by this Supplemental Lease Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Supplemental Lease Agreement the day and year first above written.

Signed, sealed and delivered
in the presence of:

NORTH MADISON ASSOCIATES, LTD.,
an Alabama limited partnership

By: VALLEYDALE, INC., an Alabama
corporation

By _____
Its _____ President Chairman

Attest _____
Its _____ Secretary

(CORPORATE SEAL)

LANDLORD

_____
Witness

_____
As to Landlord

WINN-DIXIE ATLANTA, INC.

By _____
Its _____ Vice President

Attest _____
Its _____ Assistant Secretary

(CORPORATE SEAL)

TENANT

_____
Witness

_____
As to Tenant

2

STATE OF _Alabama_ )
                    )
COUNTY OF _Jefferson_ )

I, _James W. Poole_ , a Notary Public in and for said County and in said State, hereby certify that _William O'Neir_ , whose name as _Chairman_ President of VALLEYDALE, INC., is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, s/he, as such _Chairman_ President and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this _16th_ day of _____, 1995.

_James W. Poole_
Notary Public
My commission expires: _4-77-96_

(NOTARIAL SEAL)


STATE OF FLORIDA )
                 )
COUNTY OF DUVAL )

I, _Jane Elizabeth DeWitte_ , a Notary Public in and for said County and in said State, hereby certify that _James Kufeldt_ , whose name as _Vice_ President of WINN-DIXIE ATLANTA, INC is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, s/he, as such _Vice_ President and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this _27th_ day of _February_ , 1995.

_Jane Elizabeth DeWitte_
Notary Public
My commission expires:

(NOTARIAL SEAL)

JANE ELIZABETH DeWITTE
My Comm. Exp. May 16, 1996
Comm. No. CC 20950

08/26/93

# LEASE

THIS LEASE, made this 14TH day of October, 19 93,

between NORTH MADISON ASSOCIATES, LTD., an Alabama limited partnership,

_____ ("Landlord")

and WINN-DIXIE ATLANTA, INC., a Florida corporation duly qualified to

transact business in the state of Alabama

_____ ("Tenant");

which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires,

singular or plural, and the heirs, legal representatives, successors and assigns of the

respective parties;

## WITNESSETH:

That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and

demise unto Tenant and the Tenant hereby agrees to take and lease from the Landlord, for the term

hereinafter specified, the following described premises:

## PREMISES

That certain store building, approximately 220 feet in width by 200 feet

in depth, for a total of 44,000 square feet, together with a front vestibule,

a rear receiving room, and concrete pads at rear of building for installation

of Tenant's exterior coolers and/or freezers,

and the land on which the same shall stand (hereinafter collectively called "demised

premises"), which store building and related improvements are to be constructed by the

Landlord according to plans and specifications to be approved by the parties as hereinafter

provided, and shall be in the location and the dimensions as outlined in red on the Plot

Plan entitled "a Proposed Shopping Centre, Madison, Alabama", prepared by Bailey-Corley

and Associates, Inc., Birmingham, Alabama, last revised May 18, 1993,

attached hereto market Exhibit "A" and by reference made a part hereof.

The demised premises are located in a shopping center development (shown in detail on

Exhibit "A"), known as North Madison Corners

("shopping center"), located at the northeasterly corner at the intersection of

U. S. Highway 72, East and Wal-Triana Highway,

in the City of Madison , County of Madison ,

State of Alabama , the legal description of the shopping center being set

forth on Exhibit "B" attached hereto and by this reference made a part hereof.

APPROVED
AS TO FORM

Division Mgr.
Legal Dept.
Winn-Dixie Stores,
Inc.

by
Charles P. _____ Attorney-
at-Law whose address is P. O.

**TERM**

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens the demised premises for the transaction of its business for an initial term of __Twenty__ (20) years from the commencement date. The parties agree to execute a supplemental agreement documenting the commencement date.

This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

**RENTAL**

1.

The Tenant agrees to pay to the Landlord as minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of __Two Hundred Eight-Six Thousand and No/100__ Dollars ($ 286,000.00 ) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of __Twenty-Three Thousand Eight Hundred Thirty-Three and 33/100__ Dollars ($ 23,833.33 ) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

In addition, the Tenant agrees to pay to the Landlord a percentage rental equal to one percent (1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant ending approximately June 30 during the term of this lease and any extensions thereof in excess of the sum of __Twenty-Eight Million Six Hundred Thousand and No/100__ ($28,600,000.00).

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of the percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculation the percentage rental due hereunder, the Tenant's fiscal year shall be approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINITION OF "GROSS SALES"**

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold in or from the demised premises, both for cash and on credit. Such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

**RECORD OF SALES**

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

USE

2. The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail or service business (including discount businesses).

Tenant reserves the right to operate a banking facility, a pharmacy and automatic fund transfer machines in its demised premises at any time. Tenant agrees that the demised premises will not be used or assigned or subleased under the terms of Article 26 herein for any use which would violate the provisions of Article 7 hereof.

Tenant agrees that the demised premises shall be initially opened and used for a retail food store, commonly referred to as a "supermarket". However, it is expressly agreed by the parties hereto that after opening for business as a supermarket, Tenant shall not be required to remain in operation thereafter.

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of the premises, as such shall relate to the cleanliness and use of the premises and the character and manner of operation of the business conducted in or at the premises.

CONSTRUCTION
OF SHOPPING
CENTER

3. The Landlord, at its sole cost and expense, shall construct the shopping center, substantially as shown on Exhibit "A", consisting of all the buildings shown thereon, together with all ramps, sidewalks, streets, entranceways, malls, parking areas, service areas, landscape areas, driveways, utility lines, water detention and retention facilities and related improvements, such improvements (excluding buildings) being sometimes hereinafter referred to as "common areas". The Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the shopping center and the tenants and their employees during the term of this lease and any extensions thereof. The arrangement and location of all store buildings and common areas (including parking area) within the shopping center shall at all times during the term of this lease, or any extensions thereof, be maintained substantially as shown on Exhibit "A" and shall not be changed without the written consent of the Tenant. The exterior of the shopping center (including store buildings and the demised premises) shall not be materially modified without Tenant's prior written consent. If not shown on Exhibit "A", Tenant expressly reserves the right to approve the finish grade elevations of all store buildings and common areas (including parking and service areas) within the shopping center which are to be constructed concurrently with Tenant's store building.

Notwithstanding the foregoing, it is understood that Landlord intends to construct initially only Tenant's store building, the further store buildings required by Article 5 herein, and all the common areas in the shopping center. Landlord reserves the right, but shall not be required, to construct additional buildings in the shopping center, provided, however, such additional buildings shall be of like structural and architectural quality as the building for Tenant and must be only in the locations and of the dimensions shown on Exhibit "A". Landlord agrees that Tenant shall have uninterrupted use and enjoyment of the demised premises and the shopping center common areas during any such additional construction without unreasonable interference therewith by reason of such construction work. Notwithstanding the foregoing, Landlord shall be allowed to expand small local tenant space stores in the shopping center to a depth of 100 feet.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to construct the store building for occupancy by Tenant in accordance with the plans and specifications to be approved by both Landlord and Tenant. Plans and specifications shall be approved when initialed by both parties, and when initialed shall constitute a part of this lease. The plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job".

4. Landlord ~~covenants~~ January 31,1994 and agrees that the construction of the shopping center shall begin not later than ~~December 1, 1993~~ and shall be completed not later than October 31, 1994; and if the same shall not be begun or completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this lease and constitute additional time for the beginning or completion of construction; provided, however, that if after the beginning of construction the Landlord's failure to complete the improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than November 30, 1994 (the "outside completion date"), this option to terminate shall not arise. "Construction of the shopping center" shall be deemed to have begun when the first concrete footings have been poured. If pursuant to this paragraph Tenant shall cancel or terminate this lease or if Landlord fails to commence or complete construction of the shopping center by the above dates, Landlord agrees for a period of three (3) years after such failure or cancellation or termination not to permit or consent to the use as a supermarket of the demised premises or any portion of the shopping center, or any enlargement thereof, except by Tenant; provided, however, if Landlord has commenced construction of the shopping center and acted in good faith and with due diligence in attempting to complete the shopping center within the completion date specified herein, this restriction shall be waived by Tenant if it exercises its option to cancel the Lease.

5. The Tenant shall open its store for business within ninety (90) days following performance of the following:

(a) Tenant's store building and other improvements constructed on the premises shall have been delivered to Tenant substantially completed in accordance with the plans and specifications and Landlord shall have delivered to Tenant, at Landlord's expense, a Certificate of Occupancy or equivalent document for the demised store building; notwithstanding the foregoing, no opening for business nor payment of rentals shall constitute a waiver by Tenant of its right to have its store building fully completed in accordance with the plans and specifications therefore;

(b) Construction of all of the common areas shall have been completed substantially as shown on Exhibit "A";

(c) All drives, entrances, median cuts, acceleration and deceleraton lanes and traffic control devices shown on Exhibit "A" in or connecting the common areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(d) Construction of at least 230 lineal feet of store frontage and 22,720 sq. ft. of total building area (excluding Tenant's store building) shall have been substantially completed as shown on Exhibit "A", with fronts and doors and under roof, but the interior partitions and interior finishes thereof need not be completed until any specific space is occupied, none of such space being required to be leased to tenants or opened for business.

(e) A Declaration of Restrictions and Grants of Easements covering the Phase I area and the future Phase II area as illustrated on Exhibit A mutually satisfactory to the parties shall have been entered into and recorded priming all leases and mortgages.

In the event that all the above requirements shall not have been met on or prior to the outside completion date, the Tenant at its sole option may cancel and terminate this lease.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of sixty (60) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised

COMPLETION DATE

COMMENCE-MENT DATE

413

premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

Notwithstanding the other provisions of Articles 4 and 5 hereof, Landlord agrees that if for any reason the requirements of Article 5 are met by Landlord on or after December 1 of any year and on or before January 31 of the succeeding year, Tenant shall not be required to open its store for business and rent shall not begin to accrue until the later of February 1 of the succeeding year, or 30 days after the requirements of Article 5 are met, unless Tenant actually opens its store for business sooner.

**HAZARDOUS SUB-STANCES**

6.   Tenant shall indemnify and hold Landlord harmless from any and all claims, actions, judgments, criminal penalties and rulings of regulatory agencies in anywise resulting out of Tenant's having stored, used or sold hazardous substances (as the same are defined by federal and state statutes and regulation of governmental agencies having jurisdiction over the same) in the demised premises.

Similarly, Landlord shall indemnify and hold Tenant harmless from any and all claims, actions, judgments, criminal penalties and rulings of regulatory agencies in anywise resulting out of the fact that the shopping center and/or the demised premises were erected on ground that was or is polluted with hazardous substances as the same are defined by federal and state statutes and regulation of governmental agencies having jurisdiction over the same.

**RETAIL AND SERVICE STORES ONLY**

7.   Without the prior written consent of Tenant herein only retail and/or service stores shall be allowed to operate in the shopping center, it being the intent of the parties hereto that no spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theatre (either motion or legitimate), not in excess of a total of 10,000 square feet of business or professional offices, sales of automobiles, or health, recreational or entertainment-type activities, non-retail, or non-service type activities, shall be permitted.

**PARKING AND COMMON AREAS**

8.   Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks. Tenant may use the sidewalks adjacent to the demised premises or exterior surfaces of its building for the display and sale of seasonal merchandise and services.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a)   a minimum ratio of at least 5.5     automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in the shopping center, and

(b)   facilities for convenient parking of at least 401 automobiles (minimum); provided, however, that no additional parking spaces or change in minimum ratio parking spaces need be provided by reason of the enlargement of Tenant's store building as contemplated in Article 38 hereof;

and in the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including

parking area) shall be adequately lighted by Landlord at its expense during Tenant's food store shopping hours. In the event Tenant desires to keep its store building open on a twenty-four (24) hour basis, Tenant agrees to reimburse Landlord for the cost of lighting of such portion of the shopping center common areas as are requested by Tenant to be lighted on a twenty-four (24) hour basis. Landlord must maintain at all times a minimum of 2.5 footcandle power lighting systems in the shopping center common areas. Landlord further agrees that no signboards or other construction shall be erected in any of the said common areas shown on Exhibit "A" or so as to obstruct the view of the demised premises from the adjoining public streets. Without the prior written consent of Tenant herein, no carnivals, fairs or shows nor sales by merchants utilizing vehicles or booths in the common areas shall be allowed in the shopping center.

**SERVICE AREA**

9.  Landlord agrees to provide for the exclusive use of the Tenant at its service entrances parking spaces for two large trailer trucks for continuous use. Landlord further agrees that Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for its store into and from trucks and trailers at such service entrances.

**UTILITIES**

10.  The Tenant agrees to pay all charges for telephone, electricity, water, gas and other utilities and services used by Tenant at the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities. Tenant shall not be responsible for any charges for the fire alarm system, static or flowing water to supply the fire sprinkler system, or any "hook up" fees or other charges incident to providing access to any utility.

**TENANT'S REPAIRS**

11.  Upon completion of construction by Landlord and acceptance of the demised premises by Tenant, Tenant agrees to keep the interior of the demised premises in good condition and repair, excepting structural repairs and all repairs which are the responsibility of the Landlord or which are made necessary by reason of fire or the elements or other casualty covered by Landlord's fire and extended coverage insurance, and excepting reasonable wear and tear. Within the repair and maintenance responsibilities of Tenant shall be included: automatic doors, interior exposed plumbing and wiring, interior lighting, the heating and air-conditioning systems and equipment, floor surfacing, windows and plate glass (except such damage as is caused by faulty construction or settling of the building or such as is covered by Landlord's fire and extended coverage insurance, all of which will be Landlord's responsibility). Landlord agrees to accord to Tenant the benefit of any and all warranties extended by the manufacturers or installers of such items of equipment for which Tenant has maintenance and repair responsibility.

**LANDLORD'S REPAIRS**

12.  The Landlord shall, at its cost and expense, keep and maintain, in good condition and repair, the common areas, the exterior of Tenant's store building, including the roof, gutter, downspouts, exterior painting, masonry walls, foundation and structural members, the automatic sprinkler system (including central alarm system therefor, if required by governmental authority), the exterior and interior concealed plumbing (including septic tank, if any), and exterior and interior concealed wiring of the store building in good condition and repair, and shall make any and all structural repairs to both the exterior and interior of said premises. If any portion of the common areas (as defined in Article 3 hereof) or any portion of the store building, which is the responsibility of the Landlord, shall at any time be in need of repair, Landlord will repair same immediately upon receipt of written notice from Tenant to do so, except that the Landlord shall not be obligated to make or pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of the Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements, or other casualty covered by Landlord's fire and extended coverage insurance.

If in order to protect persons or property it shall be necessary to make emergency repairs which are the responsibility of the Landlord, or if the Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas, as defined in Article 3 hereof, which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs. Landlord further covenants that the store building will be so constructed and maintained at all times so as to structurally to comply with and conform to the requirements

prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that the premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated.

13.   Tenant may place, erect and maintain any signs on the walls, and any other places on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs. Landlord agrees to erect a pylon sign in the shopping center in the location labeled "Winn-Dixie Pylon Sign" on Exhibit "A", being adjacent to U. S. Highway 72-East. Simultaneously with construction of the addition, Landlord shall lay and install suitable electrical conduit and wiring extending from the pylon sign to a junction box at Tenant's demised store building premises. Tenant, at its own cost, shall be permitted to affix its own electrically eluminated sign panel to such pylon sign. Landlord shall be responsible for the repair and maintenance of the pylon sign with the exception of Tenant's sign panel affixed thereto.

FIXTURES AND INTERIOR ALTERATIONS

14.   The Tenant, at its own expense, shall have the right from time to time during the term of this lease to make any interior or exterior alterations, additions and improvements, including doors and partitions, in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. This right of Tenant shall include the erection of interior partitions and the installation of additional front and rear doors. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

Tenant may construct and build or install in the premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from said premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to the premises resulting from the installation or removal of such items.

15.   Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by * reason of an accident or damage to any person or property happening in the demised premises. Likewise, Landlord shall indemnify and save harmless the Tenant from any claim or loss (including costs of investigation, court costs and reasonable attorney's fees) by reason of an accident or damage to any person or property happening on or about all common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, comprehensive general liability insurance coverage with Tenant named as an additional insured on all common areas (as defined in Article 3 hereof) of the shopping center, in a company qualified to transact business in the state where the premises are located, stipulating limits of liability of not less than $2,000,000.00. Certificate of such coverage from the insurer providing 30 days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant.

*(including cost of investigation, court costs, and reasonable attorney's fees)

INDEMNIFICA-
TION

During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of the premiums for Landlord's liability insurance above described. Tenant shall be responsible for its pro-rata share of such premiums. Tenant's pro-rata share to be an apportionment made in the ratio which the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floor of all buildings from time to time existing in the shopping center. The amount of premiums for which Tenant is to reimburse Landlord shall be less any available abatements, discounts or refunds thereon. Landlord shall at all times use its best and earnest efforts to obtain such coverage at the most reasonable rates available. Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums. Notwithstanding the above, it is agreed that Tenant's obligations to

make the payments herein described is expressly conditioned upon receipt from Landlord of the written invoice for such insurance premiums no later than six (6) months after the due date thereof. Further, Tenant shall not be required to make the payments herein described unless and until Tenant is furnished with photocopies of the applicable insurance policy to include the declaration page.

CLEANLINESS

16.   Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the delivery areas of the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the demised premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

FIRE

17.   In the event that Tenant's demised premises shall be totally destroyed or damaged to the extent of 75% or more of the value thereof by fire or other casualty, then Tenant may elect within thirty (30) days after such damage, to terminate this lease by giving to the Landlord a written notice of termination, and thereupon both parties shall stand released of and from all further liability under this lease. If Tenant's demised premises shall thereby suffer damage to any extent less than 75% of the value thereof, or if Tenant does not elect to terminate as aforesaid, then the Landlord agrees to proceed promptly and without expense to the Tenant to repair the damage or restore the improvements, remitting a fair and just portion of the rent, according to the unusable space, until said premises are completely reinstated or restored. If at any time during the term of this lease or any extension thereof any of the buildings in the shopping center, exclusive of Tenant's demised premises, are damaged by fire or by the elements or otherwise, Landlord shall immediately commence and diligently prosecute to completion repair of all such damage and shall restore said improvements to their condition prior to such damage.

~~Landlord shall carry fire and extended insurance on Tenant's demised premises and any additions, alterations and improvements made thereto by Landlord or Tenant and on all other buildings within the shopping center in the amount of full insurable value thereof, above~~ foundation walls, and hereby expressly waives any and all claims against the Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the Tenant, its agents, servants or employees.

During the term of this lease and any extensions thereof, Tenant ~~agrees to pay to Landlord as additional rental the amount of the premiums for Landlord's fire and extended coverage insurance allocable to the demised premises.~~ If such premiums shall not be billed separately upon Tenant's demised store premises the same shall be fairly apportioned to determine Tenant's share thereof. Such apportionment shall be made in the ratio which the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floor of all buildings from time to time existing in the shopping center. The amount of premiums for which Tenant is to reimburse Landlord shall be less any available abatements, discounts or refunds thereon. Landlord shall at all times use its earnest and best efforts to obtain such fire and extended coverage insurance at the most reasonable rates available. Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums. Notwithstanding the above, it is agreed that Tenant's obligations to make the payments herein described is expressly conditioned upon receipt from Landlord of the written invoice for such insurance premiums no later than six (6) months after the due date thereof. Further, Tenant shall not be required to make the payments herein described unless and until Tenant is furnished with photocopies of the applicable insurance policy to include the declaration page.

QUIET ENJOYMENT

18.    The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a mercantile, retail or service business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a mercantile, retail or service business or using the common areas (as defined in Article 3 hereof) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

TAXES AND LIENS

19.    All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord prior to delinquency. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the demised premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the demised premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law.

CONDEMNATION

20.    If any part of the demised premises or more than twenty percent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of this lease improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances. The right of Tenant to a division of condemnation proceeds shall extend only to such portion of the award as may be attributable by the Court to Tenant's trade fixtures, equipment, the unamortized portion of Tenant's leasehold improvements and moving expenses, and Tenant shall not thereby be entitled to any portion of the award attributable to the land and buildings, or to the value of the unexpired portion of Tenant's lease term.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of Fifteen percent (15%) or reduce the number of cars which may be conveniently parked to less than 341, the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking. Tenant's option to terminate this lease under this article shall not arise if within three (3) months after such taking, Landlord shall provide or commence to provide and diligently pursue to completion the construction of equivalent, substitute parking spaces reasonably satisfactory to Tenant and located either on property contiguous to or within the original shopping center area, and situated in reasonably comparable proximity to Tenant's building, thereby fulfilling and maintaining the minimum parking requirements hereunder.

**DEFAULT**

21.  In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than Twenty (20) days after Landlord has given Tenant written notice of such default demanding payment of such installment of rent, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete that performance required to cure such default.

**BANKRUPTCY**

22.  The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

**CONSTRUCTION RISKS**

23.  Nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing said improvements, and that the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated and to request change orders to be paid by Tenant.  The tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing the improvements pursuant to the terms of this lease.  Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing the improvements or from any faulty construction thereof.

**NOTICES**

24.  All notices required to be given to Landlord hereunder shall be sent by registered or certified mail or delivery service with receipt to, and all rent payments shall be made to Landlord at __2117 SECOND AVENUE NORTH, P. O. BOX 12767__
__BIRMINGHAM,  ALABAMA 35202-2767__
or such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail or delivery service with receipt.

All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at ___P. O. BOX 4809___

___ATLANTA, GEORGIA 30302-4809___

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail or delivery service with receipt.

**END OF TENANCY**

25.   The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state. Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

**ASSIGNMENT AND SUBLEASING**

26.   Except for use as a "super drug store" ~~in excess of 30,000 square feet~~, the Tenant may without the consent of the Landlord assign this lease, or sublease or vacate the demised premises in whole or in part, provided the Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this lease.

In the event of any assignment or sublease or vacating of the entire demised premises, the annual rental thereafter shall be the sum of: (a) the average percentage rental, if any, paid by Tenant for the two full fiscal years of Tenant immediately preceding such assignment, vacating or subletting, and (b) the minimum guaranteed rental provided herein; provided, however, this provision shall not apply in the event such assignment or sublease shall be to any corporation or entity which is the parent of, subsidiary to or affiliated with Tenant or to any corporation or entity with which Tenant merges or consolidates or to which it sells all or substantially all of its business in the state where the demised premises are situated. The provisions of this paragraph shall not be construed to limit or restrict the right of Tenant to sublease a portion or department of the demised premises without consent of Landlord to any concessionaire or licensee or otherwise in connection with the operation of Tenant's business in the demised premises, provided the sales of such concessionaire or licensee shall be included within the gross sales of Tenant, as defined hereinabove in Article 1a.

In the event Tenant shall vacate the entire demised premises or cease selling merchandise therein for in excess of a period of six (6) months, while the demised premises are usable for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant), Landlord shall have the continuing option thereafter for a period of sixty (60) days (unless Tenant shall have reoccupied the premises) to terminate and cancel this lease upon fifteen (15) days' written notice to Tenant of its election so to do, unless within such fifteen (15) day period Tenant shall advise Landlord that Tenant had prior to receipt of such notice in good faith committed to assign this lease or sublease the demised premises to a third party for occupancy within two (2) months.

**EXTENSIONS**

27.   It is further agreed that Tenant, at its option, shall be entitled to the privilege of __Four  (4)__ successive extensions of this lease, each extension to be for a period of __Five  (5)__ years and at the same rentals and upon the same terms and conditions as required herein for the initial term.

Such option privilege may be exercised by Tenant giving to the Landlord a notice in writing at least Six (6) Months before the expiration of the initial term, and if extended, at least Six (6) Months before the expiration of such extended term, stating the intention of the Tenant to exercise such option and the period for which such option is exercised and thereupon this lease shall be so extended without the execution of any other or further document.

Landlord shall send to Tenant a written reminder notice concerning the expiration of the initial term or of an option term, the reminder to be sent not less than eight (8) months prior to expiration. If Landlord fails to render such notice, the sole effect shall be that Tenant shall have a continuing right to renew this Lease as hereinabove provided at any time up to ninety (90) days prior to the expiration date.

EXCLUSIVE
SUPERMARKET

28.    Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in on or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant; except the sale of such items in not to exceed the lesser of 1,000 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, for consumption either on or off the premises, shall not be deemed a violation hereof.  With the exception of package stores and Big B Drug Store or its successors and assigns, only Tenant may sell beer and wine in the shopping center for off-premises consumption.  Only Tenant may operate a bakery, delicatessen or similar department in the shopping center.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any of provisions herein to the contrary, the Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights or recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation.  If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument.

SUBORDINATE

29.    The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be

delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant performs all of its obligations hereunder.

30.    Tenant agrees that it will give notice to any holder of a first mortgage (which term shall include all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, the Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 12 of this lease.

31.    Landlord agrees to operate and maintain in good condition and repair all the common areas, as defined in Article 3 hereof, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping at least three (3) times weekly, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and watering and maintenance of landscaped areas. If the Landlord, after fifteen (15) days following receipt of services described in this Article, the Tenant shall have the right to make such repairs or perform the services to be performed in its behalf and to deduct from the rental installment then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred therein.

For such services, Tenant shall pay to Landlord at the end of each month during the term of this Lease, as additional rental hereunder and as reimbursement for the annual cost thereof, the amount of Tenant's pro-rata share thereof, computed in the proportion which the square footage of Tenant's store building bears to the total square footage of all buildings (including additional floor levels) existing in the shopping center from time to time. Such amounts shall be payable on a monthly basis for the expenses for the previous month and within thirty (30) days following the furnishing by Landlord to Tenant of a detailed statement of such cost, together with copies of paid receipts therefor, for common area maintenance expenses incurred during the previous month. Tenant shall have the right to audit at its own expense any such costs and expenses within six (6) months following submission of such statement. Tenant shall not reimburse Landlord for any expense not reasonably connected with the necessary maintenance and repair of the shopping center common areas. Examples of expenses for which Tenant shall not make reimbursement are rental insurance premiums and shopping center management fees and administrative costs. Notwithstanding the above, it is agreed that Tenant's obligation to make the payments herein described is expressly conditioned upon receipt from Landlord of such detailed statement of costs no later than six (6) months following the end of the calendar year for which such payments were due. Tenant shall not be required to make any such payments when the detailed statement of such costs is delivered to Tenant later than December 31 of the calendar year following the year for which the payments were due. Notwithstanding Tenant's obligation to pay a portion of Landlord's common area maintenance expenses as required by this Lease, Tenant shall in no way be responsible for the cost of testing, removing, abating, or

otherwise dealing with hazardous substances or other violations of environmental laws, ordinances, rules, regulations or written policies now or hereafter existing, including, but not limited to, the Toxic Substances Control Act, Comprehensive Environmental Response, Compensation and Liability Act of 1980, Clean Water Act, Rivers and Harbors Acts of 1899 and 1910, Clean Air Act or the like, as amended, and is now existing or hereinafter adopted or amended, except for those which are caused by the intentional or negligent activities of Tenant, its employees, officers and agents.

**BENEFIT**

32. This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

**TRANSFER BY LANDLORD**

33. In the event Landlord transfers Landlord's interest in this lease, Landlord agrees to promptly provide Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's interest in this lease.

**SHORT FORM LEASE**

34. The Landlord agrees that any time on request of the Tenant it will execute a short form of this lease in form permitting its recording.

**MARGINAL TITLES**

35. The marginal titles appearing in this lease are for reference only and shall not be considered a part of this lease or in any way to modify, amend or affect the provisions thereof.

**COMPLETE ASSIGNMENT**

36. This written lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**TAXES**

37. During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of ad valorem real estate taxes levied against the demised premises. Tenant shall be responsible only for its pro-rata share of such taxes for fractional years occurring at the commencement and expiration of the term of this lease and any extensions thereof.

If such taxes shall not be assessed separately, but shall be included within an assessment of the demised premises and others, said assessments shall be fairly apportioned to determine Tenant's share thereof. Such apportionment shall be made in the ratio which the square footage of Tenant's store building bears to the total square footage of all store buildings (including additional floor levels) from time to time existing in the shopping center. The amount of taxes attributable to the shopping center, and for which Tenant is to reimburse Landlord in part, shall be less any available abatements, discounts or refunds thereon, whether or not taken by Landlord. Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements as evidence of the basis upon which any increase in taxes is chargeable to Tenant and an 'as built' survey of the shopping center, and such additional rental shall be payable by Tenant on demand after payment by Landlord. All taxes, other than ad valorem real estate

taxes, including special assessments, improvement liens and the like shall remain the sole responsibility of the Landlord. However, Tenant shall remain responsible for sales taxes on rentals levied by law on lessees.

Tenant shall have the right from time to time to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned, and to institute such proceedings in the name of the Landlord as the Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to the Landlord.

Notwithstanding the above, it is agreed that Tenant's obligation to make the payments herein described is expressly conditioned upon receipt from Landlord of a written statement for such ad valorem real estate tax increase contributions (as well as the other documents described herein if requested by Tenant) no later than December 31 of the calendar year following the year in which the taxes were due.

38. Tenant is hereby granted the option and privilege at any time during the term of this lease, or any extensions thereof, of enlarging its store building by incorporating therein the area to the westerly side thereof, such addition not to exceed 60 feet in width by 200 feet in depth. This option may be exercised only at five (5) year intervals, it being contemplated that Landlord shall not lease such area to other tenants for in excess of five (5) years, and that Tenant shall have the expansion privilege herein described no later than five (5) years from the commencement date hereof and at five (5) year intervals thereafter. Landlord shall give notice to Tenant of any such expiration date and, during the period between six (6) months and three (3) months prior to such expiration date, afford to Tenant the opportunity to exercise this option, and upon Tenant giving to Landlord a notice in writing of its exercise thereof, Landlord agrees to construct such addition, or prepare such enlargement area for occupancy by Tenant, in accordance with plans and specifications to be approved by the parties hereto, with the construction to be completed with all due diligence following the vacation of the necessary area by any other tenant, and the enlarged portion of the building to be of a like quality of construction as the original building for Tenant. In order to facilitate the expansion of Tenant's demised store building as herein contemplated, Landlord agrees that any adjacent building or buildings within the expansion area shall be of like structural quality and in architectural harmony with Tenant's store building, shall front on a line which is the interior sidewalk line of Tenant's demised store building extended and shall have a finish floor level, roof and ceiling heights which shall be at the same elevations as the finish floor level and roof height of Tenant's demised store building. Further, Landlord agrees that the wall of Tenant's demised store building adjoining the expansion area shall be constructed with steel column supports therein equivalently spaced to the nearest row of steel column supports within the open area of Tenant's demised store building and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original and of the expanded building width. Upon completion of such building addition, or tender of such additional space to Tenant, if there shall not at such date remain at least ten (10) years of the then term of this lease, such term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date. Thereafter, during such extended term, the annual minimum guaranteed rental (and the base for computation of percentage rental hereunder) shall be increased by the greater of: an amount equal to twelve percent (12%) of the cost of such addition, or an amount equal to $6.50 per square foot of the enlargement area, or an amount equal to a computed percentage times the cost of such addition, such computed percentage consisting of twelve percent (12%) plus the current prime interest rate charged by New York City banks at the time of the exercise of the option. At Tenant's request, construction cost shall be established by bids obtained by Landlord

from at least three (3) reputable contractors acceptable to Tenant, with the final cost of the addition upon completion to be certified to by the general contractor performing the work. During such extended term the provisions of this lease shall remain in effect and the option periods herein provided, if any shall remain, shall be construed to follow upon the end of the extended term and the rentals to remain as adjusted in consequence of the addition. Upon completion of the addition, it shall be and become a portion of the demised premises and this lease thereby be taken and construed as so amended.

Nothing herein contained shall constitute any express or implied obligation on the part of the holder of a first mortgage encumbering the fee simple title to the demised premises or of any purchaser at a sale under foreclosure of such mortgage, to comply with the terms and provisions of this Article, it being the understanding of the parties that the obligation to cause such expansion is the sole obligation of the Landlord, its heirs, legal representatives, successors and assigns, but this paragraph shall not limit Tenant's right to construct the expansion at its own cost as provided herein.

In the event Landlord shall for any reason fail or refuse to construct the building addition contemplated hereunder after Tenant has properly exercised its option herein, the Tenant, as its sole remedy against Landlord and at its option, shall have the right at its own expense to construct the building addition of the size and quality set forth above. If Tenant constructs the enlargement, Tenant agrees to cause any mechanics' liens incurred by and in connection with such expansion to be promptly discharged and agrees to indemnify and hold harmless the Landlord from any expense occasioned thereby. Upon completion of such building addition and occupancy thereof by Tenant, if there shall not at such date remain at least ten (10) years of the then term of this lease, the lease term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date. Upon completion of the building addition and occupancy thereof by Tenant, during the remaining lease term and any extensions thereof, there shall be no additional minimum guaranteed annual rental payable by Tenant in respect of such addition.

Notwithstanding any contrary provisions in this Article 38, if either Landlord or Tenant constructs the enlargement of Tenant's store building, then, commencing with the date Tenant exercises its expansion option and during the remaining Lease term and any extensions thereof, the minimum guaranteed annual rental hereunder and the base for percentage rentals payable by Tenant shall increase by an amount equal to the annual guaranteed rentals paid by the last tenant(s) occupying any rental space lying within the expansion area under bonafide written lease with a term of not less than three (3) years ('annual replacement rentals'), adjusted for any common area maintenance, insurance, tax or other payments to be made by Tenant under the last paragraph of this Article 38 but not under the replaced leases. If rental space lying within the expansion area prior to the addition has not been leased (so that annual lost rentals cannot be calculated) and the parties cannot agree to a replacement rental, Landlord and Tenant shall each select one MAI appraiser, and the two selected shall choose a third appraiser to determine the reasonable annual rental value, and such reasonable annual rental value shall constitute annual replacement rentals for purposes of this paragraph. Regardless of which party constructs Tenant's addition, the size of the premises as expanded shall be used to calculate Tenant's pro-rata share of real estate taxes, insurance premiums, liability insurance premiums and common area maintenance charges.

39. Notwithstanding anything to the contrary provided in this lease, if Landlord or any successor in interest of Landlord shall be an individual, joint venture, tenancy in common, firm or partnership, general or limited, it is specifically understood and agreed that there shall be absolutely no personal liability on the part of such individual or on the part of the members of such firm, partnership or joint venture with respect to any of the terms, covenants and conditions of this lease, and that Tenant shall look solely to the

equity of Landlord or such successor in interest in the shopping center for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this lease to be performed by Landlord, such exculpation of personal liability to be absolute and without any exception whatsoever.

If Landlord shall default in the performance or observance of any agreement or condition in this lease contained on its part to be performed or observed, and if Landlord shall not cure such default within thirty (30) days after notice from Tenant specifying the default (or shall not within said period commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Tenant may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter cure such default for the account of the Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord and the Landlord agrees to reimburse Tenant therefor or save Tenant harmless therefrom; provided that Tenant may cure any such default as aforesaid prior to the expiration of said waiting period, but after said notice to Landlord, if the curing of such default prior to the expiration of said waiting period is reasonably necessary to protect the real estate or Tenant's interest therein or to prevent injury or damage to persons or property. If Landlord shall fail to reimburse Tenant upon demand for any amount paid for the account of Landlord hereunder, said amount may be deducted by Tenant from the next or any succeeding payments of rent or any other payments due hereunder.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this agreement the day and year this instrument the day and year first above written.

Signed, sealed and delivered
in the presence of:

NORTH MADISON ASSOCIATES, LTD.,
an Alabama limited
partnership

By: VALLEYDALE, INC., an
Alabama corporation

By: _E. Paul Sherger_
Its President

Attest _____
Its Secretary Chairman

(CORPORATE SEAL)

LANDLORD.

WINN-DIXIE ATLANTA, INC.

By: _____
Its Vice President

Attest _____
Its Secretary

(CORPORATE SEAL)

TENANT

_John Smith_
_Judith Randolph_
As to Landlord

_Soap Boone_
Witness

_Mac Elizabeth Smith_
As to Tenant

## GUARANTY

In consideration of the sum of Ten Dollars ($10.00) paid by NORTH MADISON ASSOCIATES, LTD., an Alabama limited partnership, hereinafter called "Landlord", to WINN-DIXIE STORES, INC., a Florida corporation with its principal office at 5050 Edgewood Court, Jacksonville, Florida 32205, hereinafter called "Guarantor", the receipt and sufficiency whereof are hereby acknowledged, Guarantor does hereby guarantee unto Landlord, its heirs, legal representatives, successors and assigns, the due performance and observance by WINN DIXIE ATLANTA, INC., a Florida corporation duly qualified to transact business in the State of Alabama, hereinafter called "Tenant", of all the terms, covenants and conditions on the part of Tenant to be performed and observed including, without limitation, payment of rentals under the attached and foregoing lease agreement. covering certain premises located in a shopping center development situated at the northeasterly corner of the intersection of U. S. Highway 72 East and Wal-Triana Highway in the City of Madison, County of Madison, State of Alabama.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed in its corporate name and its corporate seal to be hereunto affixed and attested by its officers thereunto duly authorized this 22nd day of _____, 1993.

Signed, sealed and delivered
in the presence of:

Witness _____

_____
As to Guarantor

WINN-DIXIE STORES, INC.

By _____
    Its President

Attest _____
        Its Secretary

GUARANTOR

STATE OF ALABAMA

COUNTY OF Jefferson

I, _____, a Notary Public in and for said County and in said State, hereby certify that E. Paul Strempel Jr., whose name as _____ President of VALLEYDALE, INC., an Alabama corporation, is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, s/he, as such _____ President and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this 14th day of October, 19 93.

_____
Notary Public
My commission expires:

MY COMMISSION EXPIRES APRIL 27, 1996

(NOTARIAL SEAL)

STATE OF FLORIDA

COUNTY OF DUVAL

I, JANE ELIZABETH DeWITTE, a Notary Public in and for said County and in said State, hereby certify that James Kufeldt, whose name as Vice President of WINN-DIXIE ATLANTA, INC is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, s/he, as such Vice President and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this 22nd day of October, 19 93.

_____
Notary Public
My commission expires:

(NOTARIAL SEAL)

JANE ELIZABETH DeWITTE
My Comm. Exp. May 18, 1996
Comm. No. CC 201960

STATE OF FLORIDA

COUNTY OF DUVAL

I, _____ JANE ELIZABETH DeWITTE _____, a Notary Public in

and for said County and in said State, hereby certify that

_____ James Kufeldt _____, whose name as _____ President

of WINN-DIXIE STORES, INC is signed to the foregoing conveyance,

and who is known to me, acknowledged before me on this day that,

being informed of the contents of the conveyance, s/he, as such

_____ President and with full authority, executed the same

voluntarily for and as the act of said corporation.

Given under my hand and official seal this _____ day of

_____, 19___.

_____
Notary Public
My commission expires:

(NOTARIAL SEAL)

JANE ELIZABETH DeWITTE
My Comm. Exp. May 18, 1996
Comm. No. CC 201962



## PROJECT DATA

### PHASE I
- FOOD STORE                              47,718 S.F.
- DRUG STORE                               8,470 S.F.
- LEASE SPACE                             13,800 S.F.
- TOTAL BUILDING AREA                     69,988 S.F.

- PARKING REQUIRED (5.5/1000 S.F.)           385 SPACES
- PARKING PROVIDED                           407 SPACES (22 ADDITIONAL)

- WINN-DIXIE (FOOD STORE) EXPANSION        4,720 S.F. (3,600 S.F. EXISTING SHOPS)
- ADDITIONAL PARKING REQUIRED                 34 SPACES (5.5/1000 S.F.)
- ADDITIONAL PARKING PROVIDED                 22 SPACES (PROVIDED INITIALLY)
                                             -12 SPACES (DUE TO EXPANSION)
                                             +24 SPACES (ADDED)
- TOTAL ADDITIONAL PARKING PROVIDED           34 SPACES

- PHASE I SHOPPING CENTER AREA           414,612 S.F. (9.516+ ACRES)
- TOTAL OUTPARCEL AREA, PHASE I          120,000 S.F. (2.750+ ACRES)
- TOTAL PHASE I DEVELOPMENT AREA         534,612 S.F. (12.273+ ACRES)

- OPEN (GREEN) SPACE REQUIRED (10%)       62,282 S.F. (1.43 ACRES)

### TYPICAL PARKING STALLS

# LEGAL DESCRIPTION

## Shopping Center Parcel

ALL THAT PART OF THE NORTHWEST QUARTER OF SECTION 28, TOWNSHIP 3 SOUTH, RANGE 2 WEST OF THE HUNTSVILLE MERIDIAN, MADISON COUNTY, ALABAMA.

PARTICULARLY DESCRIBED AS BEGINNING AT AN IRON STAKE ON THE EASTERLY MARGIN OF WALL-TRIANA HIGHWAY, SAID POINT OF TRUE BEGINNING IS FURTHER DESCRIBED AS BEING SOUTH 02 DEGREES 35 MINUTES 23 SECONDS WEST, 1801.23 FEET, AND SOUTH 87 DEGREES 24 MINUTES 37 SECONDS EAST, 40.00 FEET FROM THE NORTHWEST CORNER OF SECTION 28, TOWNSHIP 3 SOUTH, RANGE 2 WEST.

THENCE FROM THE POINT OF TRUE BEGINNING,ALONG THE EASTERLY MARGIN OF WALL-TRIANA HIGHWAY, NORTH 02 DEGREES 35 MINUTES 23 SECONDS EAST, 193.91 FEET TO A POINT ON A CURVE AT THE SOUTHWESTERLY CORNER OF OUT PARCEL "A"!

THENCE AROUND SAID CURVE TO THE LEFT, WITH A RADIUS OF 27.00 FEET AND A CHORD BEARING AND DISTANCE OF SOUTH 76 DEGREES 39 MINUTES 05 SECONDS EAST, 22.65 FEET TO A POINT AT THE P.T. OF THE CURVE!

THENCE NORTH 78 DEGREES 33 MINUTES 09 SECONDS EAST, 66.40 FEET TO A POINT!

THENCE NORTH 65 DEGREES 35 MINUTES 29 SECONDS EAST, 75.90 FEET TO A POINT!

THENCE NORTH 11 DEGREES 29 MINUTES 57 SECONDS WEST, 74.62 FEET TO A POINT!

THENCE NORTH 24 DEGREES 19 MINUTES 43 SECONDS EAST, 70.24 FEET TO A POINT!

THENCE NORTH 11 DEGREES 29 MINUTES 57 SECONDS WEST, 106.59 FEET TO A POINT ON A CURVE!

THENCE AROUND SAID CURVE TO THE LEFT, WITH A RADIUS OF 57.65 FEET AND A CHORD BEARING AND DISTANCE OF NORTH 80 DEGREES 56 MINUTES 57 SECONDS WEST, 40.47 FEET TO A POINT AT THE P.T. OF THE CURVE!

THENCE SOUTH 78 DEGREES 30 MINUTES 03 SECONDS WEST, 62.62 FEET TO A POINT AT THE P.C. OF A CURVE TO THE LEFT!
THENCE AROUND SAID CURVE TO THE LEFT, WITH A RADIUS OF 63.50 FEET, AND A CHORD BEARING AND DISTANCE OF SOUTH 59 DEGREES 03 MINUTES 19 SECONDS WEST, 42.28 FEET TO A POINT ON THE EASTERLY MARGIN OF WALL-TRIANA HIGHWAY AND THE NORTHWESTERLY CORNER OF OUT PARCEL "A"!

THENCE ALONG THE EASTERLY MARGIN OF SAID HIGHWAY, NORTH 02 DEGREES 35 MINUTES 23 SECONDS EAST, 74.31 FEET TO AN IRON STAKE!

THENCE NORTH 78 DEGREES 30 MINUTES 03 SECONDS EAST, 733.04 FEET TO A POINT!

THENCE SOUTH 11 DEGREES 29 MINUTES 57 SECONDS EAST, 467.44 FEET TO A POINT AT THE NORTHEASTERLY CORNER OF OUT PARCEL "C"!

THENCE SOUTH 78 DEGREES 30 MINUTES 03 SECONDS WEST, 172.00 FEET TO A POINT!

THENCE SOUTH 11 DEGREES 29 MINUTES 57 SECONDS EAST, 232.56 FEET TO A POINT ON THE NORTHERLY MARGIN OF U.S. HIGHWAY NUMBER 72 (WEST) AND THE SOUTHWESTERLY CORNER OF OUT PARCEL "C"!

THENCE ALONG THE NORTHERLY MARGIN OF SAID HIGHWAY NUMBER 72, SOUTH 78 DEGREES 30 MINUTES 03 SECONDS WEST, 331.50 FEET TO A POINT AT THE SOUTHEASTERLY CORNER OF OUT PARCEL "B"!

THENCE NORTH 11 DEGREES 29 MINUTES 57 SECONDS WEST, 236.18 FEET TO A POINT AT THE NORTHEASTERLY CORNER OF OUT PARCEL "B"!

THENCE SOUTH 78 DEGREES 30 MINUTES 03 SECONDS WEST, 139.72 FEET TO A POINT AT THE NORTHWESTERLY CORNER OF OUT PARCEL "B"!

THENCE SOUTH 02 DEGREES 35 MINUTES 23 SECONDS WEST, 43.51 FEET TO AN IRON STAKE AT THE NORTHEASTERLY CORNER OF THE SHELL FOOD MART SERVICE STATION PROPERTY!

THENCE SOUTH 78 DEGREES 33 MINUTES 09 SECONDS WEST, 206.18 FEET TO THE POINT OF TRUE BEGINNING AND CONTAINING 9.5177 ACRES MORE OR LESS.