## SUB-LEASE AGREEMENT

THIS SUB-LEASE AGREEMENT, Dated as of May 8, 1990 between Selma Highway 80 Venture II Joint Venture, an Alabama General Partnership, having an address at 2117 Second Avenue North, Birmingham, Alabama 35203, (hereinafter referred to as "Sublessor"), and WINN-DIXIE MONTGOMERY, INC., a Kentucky Corporation, having an address at Post Office Box 2029, Montgomery, Alabama 36197, (hereinafter referred to as "Sublessee"), which terms "Sublessor" shall include its successors and assigns and the term "Sublessee" shall include its successors, assigns and sub-sub-lessees.

### WITNESSETH:

Whereas, sublessor as "Lessee" has entered into a Ground Lease dated March 21, 1990 covering a certain parcel of land located in the City of Selma, Dallas County, Alabama which land area is described in Exhibit "B" and identified as such and outlined in green on Exhibit "A" (the site plan) attached hereto and by this reference made a part hereof;

Now, therefore, sublessor and sublessee agree as follows:

1. Demise of Premises. In consideration of the rents to be paid and the agreements to be performed pursuant to this sublease, and upon the terms and conditions herein specified, sublessor hereby subleases to sublessee the parcel of land (the "WDX Tract") described in Exhibit "C" and identified as such and outlined in red on the Site Plan, together with all easements, rights and appurtenances thereto (herein after referred to as the "Premises"). The Premises are located in a shopping center development (shown in detail on Exhibit "A"), known as Selma Marketplace (hereinafter called the "shopping center"), the legal description of the shopping center being set forth on Exhibit "B".

2. Title, Condition and Quiet Enjoyment. Sublessor covenants, warrants and represents that: (a) it is a partnership validly constituted and currently existing under the laws of the State of Alabama; (b) it will put the Sublessee into complete and exclusive possession of the Premises; (c) it has the power to sublease the Premises; (d) it has the full authority and legal right to execute and deliver this sublease and such other instruments, documents and agreements as may be necessary to effect or confirm the subleasing of the Premises and the transactions contemplated thereby; (e) neither the zoning nor any other restrictions prevent or restrict the use of the Premises for the conduct of a general mercantile business including but not limited to use as a supermarket or use of the common area for parking purposes; and (f) the Sublessee on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of the sublease and any extension thereof. Sublessor further covenants that pursuant to paragraph 24(d) of the Ground Lease dated March 21, 1990, the Lessor under such Ground Lease expressly agrees that in the event of any default by Sublessor, any sublease made by Sublessor prior to termination of the Ground Lease or repossession of the demised premises thereunder on account of any such event of default, shall survive such termination and shall continue in full force and effect and after such termination, the Lessor shall be substituted for Sublessee as sublessor in such sublease and shall be entitled to exercise all of the rights of Sublessor in and under said sublease. Lessor further agrees under said Ground Lease to execute an agreement upon request of any subtenant confirming the foregoing provisions.

-2-

3. Term.

(a) Sublessee shall have and hold the Premises, subject to the provisions hereof, for an Interim Term commencing upon the date hereof or upon the date all conditions precedent contained in Paragraph 22(a) are satisfied, whichever occurs last, and ending upon its completion of construction of its proposed improvements its opening for business therein, and the placement of financing on its leasehold improvements, but in no event more that fourteen (14) months from the commencement date of the pouring of the footings and foundation for Sublessor's building.

(b) Sublessee shall have and hold the Premises, subject to the provisions hereof, for a Basic Term of twenty (20) years (the Basic Term) beginning on the date the Interim Term ends and ending at midnight twenty (20) years thereafter. The parties shall execute a supplemental document setting forth the Basic Term commencement date.

(c) Sublessee shall have the right to extend this Sublease beyond the Basic Term for eight (8) successive terms of five (5) years each (the Extended Terms). Sublessee shall exercise its right to extend this Sublease for an Extended Term by giving notice of such extension to Sublessor not less than one hundred eighty (180) days prior to the expiration of the then existing Term. However, this Sublease must be in full force and effect without any event of default by Sublessee, of which Sublessee has received written notice from Sublessor, then existing in order for Sublessee to exercise its right to extend this Sublease for an Extended Term. If at the time of the attempted exercise of an extension, the Sublessee is in a cure period under Paragraph 16, the Sublessee may extend only if it then provides adequate assurances and security for curing, and then failing eventually to cure in accordance with Paragraph 16, Sublessee shall be deemed to have committed an event

-3-

of default during the Term in which the cure period expires. Each Extended Term shall commence on the day next succeeding the expiration date of the Basic Term or the immediately proceeding Extended Term, as the case may be.

4. Rent and Interest.

Sublessee agrees to pay to the Sublessor, as a minimum guaranteed rental for the Premises, the following amount:

(a) For the Interim Term as provided under Paragraph 3, no rental shall be payable except in the event one of the following events occurs during the Interim Term:

(i) Sublessee's opening for business;

(ii) The expiration of sixty (60) days from the date all conditions precedent contained in Paragraph 22(b) are satisfied; or

(iii) The expiration of twelve (12) months from the commencement date of the pouring of the footings and foundation for Sublessee's building;

then rent shall be paid for each month of the Interim Term which extends beyond the occurrence of such event, at the rate of Nine Thousand Sixty-Seven and 92/100 Dollars ($9,067.92) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the Interim Term;

(b) For the basic Term of twenty (20) years the sum of One Hundred Eight Thousand Eight Hundred Fifteen and No/100 Dollars ($108,815) per annum payable in monthly installments at the rate of Nine Thousand Sixty-Seven and 92/100 Dollars ($9,067.92) per month which installments shall be due and payable 'in advance on the first day of each and every calendar month of the basic sublease term.

-4-

(c) The annual minimum guaranteed rental for each Extended Term, as exercised, shall be as hereinafter provided:

For years 21 through 25 the sum of $119,696.50 payable in monthly installments at the rate of $9,974.71 per month.

For years 26 through 30 the sum of $131,666.15 payable in monthly installments at the rate of $10,972.18 per month.

For years 31 through 35 the sum of $144,832.77 payable in monthly installments at the rate of $12,069.40 per month.

For years 36 through 40 the sum of $159,316.05 payable in monthly installments at the rate of $13,276.34 per month.

For years 41 through 45 the sum of $175,247.66 payable in monthly installments at the rate of $14,603.97 per month.

For the years 46 through 50 the greater of a ten percent (10%) increase in the Annual Rent of the previous Extended Term or the Consumer Price Index increase, payable in equal monthly installments.

For the years 51 through 55 the greater of a ten percent (10%) increase in the Annual Rent of the previous Extended Term or the Consumer Price Index increase, payable in equal monthly installments.

For the years 56 through 60 the greater of a ten percent (10%) increase in the Annual Rent of the previous Extended Term or the Consumer Price Index increase, payable in equal monthly installments.

-5-

Notwithstanding the foregoing provisions of this Paragraph 4, herein set forth, the annual guaranteed minimum rental shall be increased by ten percent (10%) on the expiration of twenty (20) years from the earliest of the first to occur of the following dates:

(i) The first day of the first month after ten (10) months from the commencement date of the pouring of the footings and foundation of a building to be occupied by a major subtenant of the Premises; or

(ii) The first day of the first month after the completion and formal opening of a store of a major subtenant on the Premises

and said increased rental payment shall continue for the balance of the Basic term and throughout the first five year option if extended.

(d) In addition to the payment of Basic Rent as hereinabove provided, Sublessee shall pay to Sublessor for each Fiscal Year ending approximately June 30th during the Basic Term of this Sublease, and any extensions thereof, percentage rent in an amount equal to 0.25% of the Gross Sales, as hereinafter defined, over and above $21,000,000, made on or from the Premises during such Fiscal Year. For the Fiscal Year ending during the first Lease Year of the Basic Term, the $21,000,000 figure shall be reduced ratably for purposes of determining the additional percentage rent due. The $21,000,000 figure shall be reduced ratably also for determining the annual percentage rent due for the Fiscal Year ending during the last lease year of the Sublease. The percentage rent shall be payable as hereinafter provided at the same address as that given for payment of monthly rental installments or such other place as Sublessor may designate, without any prior demand therefor. Percentage rent shall become due and payable 60 days after the last day of each Fiscal

-6-

Year for which percentage rent is due. The term "Fiscal Year" as used herein shall mean the 12 month accounting period of Sublessee ending on or about June 30. The term "Gross Sales" as used herein shall mean the aggregate gross sales price of all merchandise sold, and gross charges for all services rendered in or from the Premises, both for cash and on credit; provided, however, such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Sublessee may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Sublessee from the demised premises to any other stores or warehouses of Sublessee or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange or merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Sublessee makes no representation or warranty as to the amount of sales it expects to make on the demised premises.

5. Record of Sales.

(a) The Sublessee shall keep complete and accurate books and records of its Gross Sales made from the Premises, which books and records shall be kept by the Sublessee at the office address hereinafter designated for notices. At the end of each fiscal year, or at the end of the leasehold, if sooner occurs, and

-7-

at such time as the percentage rental shall be payable by Sublessee as hereinabove provided, the Sublessee shall submit to the Sublessor a written statement of the Gross Sales made by Sublessee from the Premises during the preceding Fiscal Year. Such statement of Gross Sales shall be treated as confidential by the Sublessor and shall be conclusive unless the Sublessor, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Sublessee's business by a certified public accountant employed and paid by the Sublessor. If such audit should disclose that the percentage rent was underpaid by Sublessee by five percent (5%) or more, Sublessee shall promptly pay Sublessor for the costs of said audit in addition to the deficiency, which deficiency shall be payable in any event.

(b) If Sublessee shall fail to make payment when due of any sum payable by it under this Sublease Agreement, such sum(s) shall bear interest at the prime rate, as the same may change from time to time, charged by New York City banks plus four percent (4%) per annum, beginning on the earlier of ten (10) days after said sum(s) become due and payable or upon Sublessor's notice to Sublessee that said sum(s) are past due.

6. Use of Premises.

(a) The Premises will be developed by Sublessee, in accordance with the site plan, for use as a supermarket, dealing primarily in, but not limited to foods and food products or for the conduct of any general mercantile business, retail or service business not restricted under the "ECR" Agreement as provided in Paragraph 22 hereof; provided, however, except as a supermarket, the Premises shall not be used, nor assigned, or subleased under the terms of Paragraph 11 herein, for any primary use or business which shall be in direct competition with the primary use or

-8-

business engaged in by any other than tenant in the shopping center to whom Sublessor has granted a right of exclusive use to which Sublessee has given consent herein or in writing, or a replacement or successor tenant for such exclusive use. Sublessee has the non-exclusive right to operate a prescription pharmacy, in the Premises.

Notwithstanding the foregoing, the Premises shall be initially developed, and opened for business and operated by Sublessee as a retail food store, commonly referred to as a "supermarket", and shall continue to be so operated for such purposes for a period of not less than six (6) months provided, however, Sublessee shall not thereafter be required to continue to remain open for business in the Premises, even for the operation of a food supermarket or otherwise.

(b) So long as the Premises are owned by the United Methodist Children's Home, or any corporation or trust associated with any religious organization whose precepts and teachings preach the abstinence of alcohol, no wine, distilled spirits, beer, ale or other malt alcoholic beverages may be served on the Premises, or any part thereof, and Sublessee may not operate a business on the Premises which specializes in the sale of alcoholic beverages of any kind; provided, however, this restriction shall not prohibit or restrict the sale of beer, ale, malt alcoholic beverages or wines from the Premises for off-premises consumption where such sale is incidental only to the business of the Sublessee and no more than 5% of the gross leasable floor area of Sublessee is used for the merchandising of distilled spirits and nothing contained herein shall be construed to prohibit the use of wine or distilled spirits where prescribed for medicinal purposes or where the same constitutes a part of any patent medicine. So long as the Premises are owned by the United Methodist Children's

-9-

Home, Sublessee may not operate a business on the Premises which sells pornographic books, magazines, pictures, records, tapes or video tapes or shows pornographic movies, and Sublessee may not operate a business which engage in any form of gambling, bookmaking or the sale of lottery tickets.

(c) Sublessee at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of said Premises, as such shall relate to the cleanliness and use of said Premises and the character and manner of operation of the business conducted or at said Premises.

7. Charges.

(a) For the Basic Term and any extension thereof, Sublessee covenants to pay all costs, expenses and obligations for which Sublessee shall be liable by reason of its estate in the Premises or its interest under this Sublease, or which arise out of the possession, maintenance, repair, rebuilding, use or occupancy of the Premises, including charges for utility and communications services. Sublessee shall pay all ad valorem real estate taxes, assessments, fees, water and sewer charges, and other governmental charges, which are levied upon or assessed against the Premises or which arise in respect to the occupancy or use thereof. Sublessee shall be responsible only for its pro rata share of such charges for fractional years occurring at the beginning and expiration of the term of this Sublease, and any extension thereof.

(b) Sublessee shall, at its cost and expense, comply with all agreements and legal requirements affecting the Premises or the use thereof.

-10-

8.  Improvements.

    (a)  Sublessor hereby grants authority to Sublessee to construct a store building of approximately 46,153 square feet and related common areas substantially as shown on the site plan (Exhibit "A") hereto.  Sublessor agrees to join in the application for any permits required for any construction of buildings or other improvements on the Premises.

    (b)  Any buildings or other improvements constructed on the Premises shall attach to and become a part of the real estate and will become the property of Sublessor upon termination of this Sublease, but shall belong to and be the property of Sublessee during the term of this Sublease, including all extensions thereof.

    (c)  Sublessee shall be solely responsible for all costs and expenses of constructing said store building, including, but not limited to, all legal, architectural and engineering, survey, soil tests, permitting fees, utility connection charges, utility impact fees, building materials and supplies, labor, equipment and similar charges.

    (d)  The Sublessee, at its own expense, may from time to time during the term of this Lease make any interior alterations, additions and improvements in and to the Premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities.  All permanent structural improvements shall belong to the Sublessor and become a part of the Premises upon termination or expiration of this Lease.

-11-

    (e)  The Sublessee, at its own expense, may during the term of this Lease, make exterior alterations, additions and improvements to the Premises; provided, however, Sublessee must obtain the prior written consent of the Sublessor before making any such alterations, additions and improvements, which consent shall not be unreasonably withheld.  All permanent exterior improvements shall belong to the Sublessor and become a part of the Premises upon termination or expiration of this Lease.

    (f)  Sublessee may construct and build or install in said Premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Sublessee's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Sublessee, and Sublessee shall have the right to remove all or any part of the same from said Premises at any time, provided, Sublessee shall repair or reimburse Sublessor for the cost of repairing any damage to said Premises resulting from the installation or removal of such items.

    9.  Liens.  Sublessee will promptly remove and discharge at its cost and expense, all liens, encumbrances and charges upon the Premises or Sublessee's interest therein which arise out of the use or occupancy of the Premises or by reason of the furnishing of labor or materials with respect to the Premises which have been requested by Sublessee; but excluding all liens, encumbrances and charges created or caused by Sublessor (except as specifically provided in Paragraph 12 below), the Mortgagee (as defined in Paragraph 20 herein) and any assignment or assignments of the Sublease made to secure indebtedness of Sublessee or to finance.

-12-

10. Condemnation.

(a) If (i) the entire Premises or (ii) any substantial portion of the Premises, which portion Sublessee determines in its reasonable judgment to be sufficient to render the remaining portion thereof uneconomic for the use of Sublessee, shall be condemned or otherwise taken in the exercise of the power of eminent domain by a duly constituted governmental authority or agency having jurisdiction, then Sublessee shall, not later than sixty (60) days after Sublessor gives Sublessee notice that Sublessor has received a notice of a taking or Sublessee receives notice of a taking, give notice to Sublessor of its intention to terminate this Sublease on any date where payment of rent is due, which date (the "Termination Date") shall be the later of the first date rent is due after the actual date of the taking or the effective date of the taking under the laws of the State of Alabama. On the Termination Date, this Sublease shall be automatically terminated and of no further force and effect.

(b) In the event this Sublease is terminated under the provisions of paragraph (a) above and separate condemnation awards are made for the land and the improvements thereon, then Sublessor shall be entitled to so much of the entire award as is equal to the award for the land, and the parties agree that the condemnation award for the improvements shall be allocated so that, after payment therefrom of any sums due any leasehold mortgagee, the remainder as it relates to the value of the building or buildings thereon shall be allocated between the Sublessor and Sublessee in such proportions as the parties shall agree, after giving due consideration to the number of years remaining in the term of this Lease and the condition of the buildings at the time of the Condemnation. In the event of any disagreement between the parties, the matter shall be submitted to arbitration in the manner hereafter described. In the event that separate awards are not

-13-

made, the allocation of the award between the land and building shall be made by three MAI appraisers, one of whom shall be chosen by Sublessor, one by Sublessee, and the third by the first two chosen, and the allocation made by all or a majority of said persons shall be binding on Sublessor and Sublessee. Sublessor shall be entitled to an amount allocated to the land so determined and the amount allocated to the building shall be divided between Sublessor and Sublessee in the manner provided for in this Paragraph 10(b). If within ten (10) days after written notice by either party entitled to appoint an appraiser to the other party entitled to appoint an appraiser, such other party does not choose an appraiser, the party giving the notice shall forthwith name the three appraisers, who shall act with like effect as if they had been mutually chosen. Should the Sublessor and the Sublessee each select an appraiser as hereinabove provided and the two appraisers so named fail within twenty (20) days after their selection to name the third appraiser, then the Senior Judge of the United States Federal District Court sitting in Montgomery, Alabama, shall name the third appraiser, and the one so named by him shall act hereunder. If vacancies occur in the board of appraisers appointed and named hereunder, such vacancies shall be filled in the same way as the appraiser who ceased to serve was originally appointed. If the board of appraisers fail, within a period of sixty (60) days, to return their findings, a new board of appraisers, composed of entirely different individuals from the first, shall be named and chosen in the same manner as the original board of appraisers. The fees of such appraisers shall be borne proportionately by Sublessor and Sublessee in the ratio in which they receive the condemnation award.

(c) If the Premises are partially condemned by any governmental authority or other entity in the exercise of eminent domain and should the remaining portion of the Premises remain, in

-14-

the sole reasonable opinion of Sublessee, be fit or suitable for the operation of a supermarket, then this Sublease shall continue in full force and effect. The entire amount of any condemnation award allocated to the land shall be paid to and retained by the Sublessor. Subject to any prior obligations of Sublessee or Sublessor to pay any condemnation award to any mortgagee of the Premises, the entire amount of any condemnation award allocated to the building improvements shall be immediately made available to Sublessee for the purpose of restoring the Premises to its value, condition and character immediately prior to such condemnation. If the award allocated to the building improvements exceeds the cost of such restoration, the remainder shall be divided between Sublessor and Sublessee so that Sublessor receives such portion of the award for the improvements not used in restoring the improvements as the number of months as have elapsed since the beginning of the Basic Term bears to the total months constituting the Basic Term and all Extended Terms which have been exercised as of the date of the payment of such award. In the event that separate awards are not made for the land and improvements, the allocation of the award between the land and building shall be made by three MAI appraisors, one of whom shall be chosen by Sublessor, one by Sublessee, and the third by the first two chosen, and the allocation made by all or a majority of said persons shall be binding on Sublessor and Sublessee.

(d) Upon the payment of such condemnation award, the annual basic rental payable immediately prior to such award shall be reduced by being multiplied by a fraction, the numerator of which fraction shall be the number of square feet taken in such taking and the denominator of which shall be the number of acres constituting the Premises prior to such taking. For example, if 5,000 square feet are taken by condemnation and there are 50,000

square feet constituting the Premises, the annual basic rental would be reduced by one-tenth (1/10).

(e) In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasipublic use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Sublessee's business in the Premises, or so as to reduce the required parking area by an amount in excess of twelve percent (12%) and reduce the number of cars which may be conveniently parked to less than eighty-eight percent (88%) of the total parking spaces as shown on the site plan under the "Tabulation" table for three (3) different building area criteria, the Sublessee may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking. Sublessee's option to terminate this Sublease under this paragraph shall not arise, if, within ninety (90) days after such taking, Sublessor shall provide equivalent substitute parking spaces reasonably satisfactory to Sublessee and located on property contiguous or located within the original shopping center area, and situated in comparable proximity to Sublessee's building, thereby fulfilling the minimum parking requirements hereunder.

11. Assignment and Subletting; Non-Recourse.

(a) Subject to the provisions of Paragraph 6(a) hereof, Sublessee at any time may vacate, sublet the Premises, or assign, transfer, sell, mortgage or pledge its interest under this Sublease and its interest in and to any Sub-Sublease or the rentals payable thereunder. No mortgage, pledge or assignment of this Sublease absolutely or as security shall impair or diminish any obligations of Sublessee hereunder or impose any direct obligations on the mortgagee, pledgee or assignee thereof. Any inter-

est so assigned may be assigned and reassigned in like manner by an assignee thereof.

(b) Should Sublessee sublet, assign, transfer, sell, mortgage or pledge its interest under this Sublease pursuant to the provisions of Paragraph 11(a) to any other person or entity ("Transferee"), Sublessee shall be and remain primarily liable for the performance of all covenants and obligations under this Sublease notwithstanding any transfer of the interest of Sublessee hereunder. In the event that any Transferee later sublets, assigns, transfers, sells, mortgages or pledges its interest under this Sublease pursuant to the provisions of Paragraph 11(a), such Transferee shall be relieved of all covenants and obligations under this Sublease hereunder arising thereafter, and any party by accepting such transfer shall be deemed to have assumed all covenants and obligations of Sublessee and Transferee hereunder.

(c) Anything contained in this Sublease to the contrary notwithstanding, if any Transferee shall be an individual or partnership, general or limited, it is specifically understood and agreed that there shall be no personal liability against such individual, partnership, or the members of such partnership with respect to any of the covenants or obligations of this Sublease, and, as to such Transferee, Sublessor shall look solely to the interest of such Transferee in the Premises for the satisfaction of the remedies of Sublessor in the event of a breach by Sublessee or Transferee of any of the covenants or obligations of this Sublease, and no property or assets of such individual, individuals, or partnership other than the Premises shall be subject to levy, execution or other enforcement procedures for the satisfaction of Sublessor's remedies.

-17-

12. Maintenance; Inspection by Sublessor. Sublessee shall at all times maintain the Premises in good repair and appearance except for ordinary wear and tear, and shall promptly make all alterations (substantially equivalent in quality and workmanship to the original work) of every kind and nature, whether foreseen or unforeseen, which may be required to be made upon or in connection with the Premises in order to keep and maintain the land and improvements in as good repair and appearance as they were originally, except for ordinary wear and tear. In the event Sublessee fails to maintain the Premises in good repair and appearance, Sublessor retains the right subject to the notice and cure provisions of Paragraphs 16 and 17 below, to enter upon the Premises and make such repairs and shall be reimbursed by Sublessee for all costs incurred and interest thereon. The making of such repairs by Sublessor shall not constitute a waiver of any then existing breach of this Sublease by Sublessee. Sublessor shall have the right to enter upon the Premises at any and all times as may be reasonable for the purpose of inspecting the same.

13. Insurance.

(a) Sublessee shall maintain at its sole cost and expense the following insurance on the Premises:

(i) Insurance against loss or damage to all improvements on the Premises by fire and other risks from time to time included under standard, extended and additional coverage policies, vandalism and malicious mischief, sprinkler, plate glass and flood, if applicable, in amounts not less than the actual replacement value of such improvements excluding footings and foundations and other parts of such improvements which are not insurable. Such policies shall contain replacement cost endorsements. In the event that Sublessee's building shall be totally destroyed or damaged to any extent by fire or other casualty

-18-

Sublessee agrees to proceed promptly and without expense to Sublessor to repair the damage or restore the improvements.

    (ii) Workmen's compensation insurance covering all persons employed in connection with any work done on or about the Premises for which claims for death or bodily injury could be asserted against Sublessor, Sublessee or any of the Premises, or in lieu of such workmen's compensation insurance, a program of self-insurance complying with the rules, regulations and requirements of the appropriate agency of the State of Alabama.

    (iii) Such other insurance, including flood, if applicable, rent or business interruption to the extent of rents required under this Sublease Agreement, war-risk if available, on the Premises as Sublessor and any Mortgagee may require, which at the time is commonly obtainable in connection with properties similar to the Premises.

    (b) The insurance required by this Paragraph 13 shall be written by companies of recognized financial standing which are approved by Sublessor and are authorized to do an insurance business in the State of Alabama. Notwithstanding the above, it is understood the Sublessee is a self-insurer, as a wholly-owned subsidiary of Winn-Dixie Stores, Inc., the Guarantor of this Lease; the parties agree that so long as the Sublessee is not in default hereunder and its or its Guarantor's net worth as shown by audited financial statements made available to Sublessor, is in excess of $100,000,000, Sublessor or its Guarantor may self-insure for each of the coverages described in Paragraph 13(a), except for rent or business interruption insurance, if such self-insurance does not violate any legal requirements to which Sublessee is bound, and such self insurance is acceptable to the Sublessor's mortgage lender. The insurance policies (i) shall be for a term

of not less than one year, (ii) shall be in amounts sufficient at all times to satisfy any coinsurance requirements thereof, and (iii) shall (except for the workmen's compensation insurance referred to in Clause (iii) hereof) name Sublessor, Sublessee and any Mortgagee as insured parties, as their respective interests may appear. If said insurance or any part thereof shall expire, be withdrawn, become void by breach of any condition thereof by Sublessee or become void or unsafe by reason of the failure or impairment of the capital of any insurer, or if for any other reason whatsoever said insurance shall become unsatisfactory to Sublessor, Sublessee shall immediately obtain new or additional insurance satisfactory to Sublessor.

    (c) Each insurance policy referred to in clauses (i) and (iii) of Paragraph 13(a) above shall contain standard non-contributory mortgagee clauses in favor of and acceptable to any Mortgagee. Each policy shall provide that it may not be cancelled except for thirty (30) days prior written notice as herein provided to Sublessor and any Mortgagee. Each such policy shall also provide that any loss otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Sublessor or Sublessee which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, (ii) the occupation or use of any of the Premises for purposes more hazardous than permitted by the provisions of such policy, (iii) any foreclosure or other action or proceeding taken by any Mortgagee pursuant to any provision of a mortgage upon the happening of an event of default therein, or (iv) any change in title or ownership of any of the Premises.

    (d) Sublessee shall pay as they become due all premiums for the insurance required by this Paragraph 13, shall renew or replace each policy, shall deliver to Sublessor evidence of the

payment of the full premium therefor at least twenty (20) days prior to the expiration date of each policy, and shall deliver to Sublessor all original policies; and in the event of Sublessee's failure to comply with any of the foregoing requirements, Sublessor shall be entitled to procure such insurance.

(e) Anything in this Paragraph 13 to the contrary notwithstanding, any insurance which Sublessee is required to obtain pursuant to Paragraph 13(a) may be carried under a "blanket" policy or policies covering other properties or liabilities of Sublessee, provided that such "blanket" policy or policies otherwise comply with the provisions of this Paragraph 13. The amount of the total insurance allocated to the Premises, which amount shall be not less than the amounts required pursuant to this Paragraph 13, shall be specified either (i) in each such "blanket" policy, or (ii) in a written statement, which Sublessee shall deliver to Sublessor, from the insurer thereunder.

(f) If requested by Sublessor (but not more often than once every three years), Sublessee shall have the then replacement and insurable values of any improvements located on the Premises determined by the underwriter of fire insurance on the Premises or, if such underwriter will not act, by a "qualified appraiser satisfactory to Sublessor, and shall deliver such determination to Sublessor.

(g) Sublessee shall promptly comply with and conform to (i) all provisions of each insurance policy and (ii) all requirements of the insurers thereunder, applicable to Sublessor, Sublessee or any of the Premises or to the use, manner of use, occupancy, possession, operation, maintenance, alteration or repair of any of the premises, even if such compliance necessitates structural changes or improvements or results in interference with

-21-

the use or enjoyment of any of the Premises. Sublessee shall not use any of the Premises in any manner which would permit the insurer to cancel any insurance policy.

(h) In the event of any casualty loss, Sublessee shall give Sublessor immediate notice thereof. Sublessee is hereby authorized to adjust, collect and compromise, in its discretion, all claims under any of the insurance policies required by this Paragraph 13 (except the workmen's compensation insurance). However, any adjustment, settlement or compromise of any such claim shall be subject to the prior written approval of Sublessor and any Mortgagee and Sublessor and any Mortgagee shall have the right to prosecute or contest, or to require Sublessee to prosecute or contest, any such claim, adjustment, settlement or compromise. All proceeds of any insurance required under clauses (ii), (ii), (iii) of Paragraph 13 shall be payable to a trustee selected by Sublessor and Sublessee and reasonably satisfactory to Mortgagee. Each insurer is hereby authorized and directed to, make payment under said policies, including return of unearned premiums, directly to such trustee instead of to Sublessor and Sublessee jointly; and Sublessee hereby appoints Sublessor as Sublessee's attorney-in-fact to endorse any drafts therefore.

14. Indemnification. Sublessee will protect, indemnify and save harmless Sublessor from and against all liabilities, damages, claims, causes of action, fines, suits, charges and expenses, including attorney's fees, which may be imposed upon or incurred by or asserted against Sublessor by reason of any loss, damage or claim for loss of life or injuries to personal property occurring on the Premises. In case any action or proceeding is brought against Sublessor by reason of any such occurrence, Sublessee, upon written notice from Sublessor, will, without cost and expense to Sublessor, resist and defend such action or proceeding. Sublessee, however, shall not be liable for nor required to hold

-22-

Sublessor harmless for any claim, damage, loss, liability or obligation arising out of, related to or resulting from any negligent or willful act or omission by Sublessor, its agents, employees or contractors.

Sublessor is a self-insurer, as a wholly-owned subsidiary of Winn-Dixie Stores, Inc., the Guarantor of this Sublease. The excess liability coverage and self-insurance limits may change from time to time as presently in effect, but so long as Sublessee's or Guarantor's net worth, as shown by audited financial statements made available to Sublessor, is in excess of $100,000,000.00, Sublessee may carry such self-insurance; otherwise Sublessee must furnish to Sublessor insurance with such limits, by such companies and with such provisions as required by Sublessor in Paragraph 13 hereof. Sublessee agrees to furnish from time to time upon Sublessor's request evidence as to the required net worth or insurance.

15. Performance by Sublessor; Contents.

(a) If Sublessee shall fail to make or perform any payment or act on its part to be made or performed under this Sublease, then, subject to the provisions of Paragraph 15(b), Sublessor may (but need not) upon ten (10) days' notice to Sublessee and without waiving any default or releasing Sublessee from any obligation, make such payment or perform such act for the account of Sublessee, and the cost thereof, with interest at the prime rate, as the same may change from time to time, charged by New York City banks, plus four (4%) percent per annum, shall be payable by Sublessee upon demand.

(b) Sublessee shall not be required, nor shall Sublessor have the right, to pay, discharge or remove, any tax, levy, assessment, lien, encumbrance or charge against the Premises, so long as Sublessee shall, at its cost and expense, contest the

-23-

amount or validity thereof by appropriate proceedings which shall operate to prevent the collection of, or other realization upon, such tax, levy, assessment, lien, encumbrance or charge, and the sale or forfeiture of the Premises or any part thereof, to satisfy the same.

(c) In the event of the termination of this Sublease as herein provided, the obligations of Sublessee, actual or contingent, under this Sublease which arose prior to such termination and which remained unperformed by Sublessee at the time of such termination shall survive such termination.

16. Default. The following occurrences or acts shall constitute events of default under this Sublease:

(a) If Sublessee shall fail to make payment when due of any sum payable by it hereunder and such failure shall continue for twenty (20) days after Sublessor shall have given Sublessee written notice specifying such default and demanding that the same be cured.

(b) If Sublessee shall fail to observe or perform any other provision of this Sublease to be observed or performed by Sublessee and if such default shall continue for thirty (30) days after Sublessor shall have given Sublessee notice specifying such default and demanding that the same be cured or, if by reason of the nature thereof such default cannot with due diligence be wholly cured within such 30-day period, if Sublessee shall fail to proceed promptly to cure the same and thereafter prosecute the curing of such default with all due diligence, it being intended in connection with a default not susceptible of being wholly cured with due diligence within such period that the time within which to cure the same shall be extended for such period as may be necessary to complete the curing or the same with due diligence.

-24-

17. Sublessor's Remedies upon Default. Sublessor shall have the right, at its election, subject to Paragraphs 16 and 19, while any event of default shall continue, to give Sublessee notice of Sublessor's intention to exercise, at its option, the following remedies on a date specified in such notice not earlier than thirty (30) days after the giving of such notice, and if such notice shall be given and such event of default shall not have been cured on or prior to the date so specified, the Sublessor shall have the right, subject to Paragraphs 16 and 19, at its option:

(i) To terminate this Sublease on such dates and upon such termination, Sublessor shall have the immediate right of re-entry and possession of the Premises and the right to remove all persons and property therefrom, and Sublessee will quit and surrender the Premises to Sublessor, and Sublessor may without further notice enter upon, re-enter and repossess the Premises by summary proceedings, judgment or otherwise;

(ii) To require Sublessee, by appropriate legal proceedings, to specifically perform all of the duties, covenants and obligations imposed upon Sublessee under this Sublease; or

(iii) To re-enter and re-let the Premises from time to time as agent of Sublessee, which action shall not discharge Sublessee from any liability or obligation hereunder, except that the gross rent actually paid by any new Sublessee, less the reasonable expenses of collection and less reasonable rental agent's commissions collected as a result of such re-letting, shall be credited on Sublessee's liability for rent under the terms of this Sublease.

Subject to the provisions of Paragraphs 16 and 19, the remedies herein provided for shall be cumulative and the exercise of any of the remedies provided for above shall not be a bar to the exercise of any other remedy.

18. Attorney's Fees.

(a) In the event of any default by Sublessee trigger-ing the exercise, at the option of Sublessor, of the remedies provided for in Paragraph 17 above, and the subsequent employment by Sublessor of an attorney for the collection of any amount due under this Sublease or for the institution of any suit filed for the purpose of enforcing the correction of any default hereunder or seeking possession of the Premises or for advice with refer-ence to the remedy to be sought or enforced by reason of any such default, Sublessee agrees to pay and shall be taxed with a rea-sonable attorney's fee for the services of such attorney.

(b) In the event of any default by Sublessor hereunder and the subsequent employment by Sublessee of an attorney for the institution of any suit filed for the purpose of enforcing the correction of any default hereunder or for advice with reference to the remedy to be sought or enforced by reason of any such default, Sublessor agrees to pay and shall be taxed with a rea-sonable attorney's fee for the services of such attorney.

19. Sub-sublease. Sublessee intends to sub-sublease the Premises or assign this Sublease from time to time hereafter. During any period of time when such a sub-sublease or assignment (the Sub-sublease) is in effect, performance by any sub-sublessee or assignee (the Sub-sublessee) of the provisions of the Sublease shall be accepted by Sublessor as performance by Sublessee hereunder.

20. **Leasehold Mortgages.** Sublessee and every successor and assign of Sublessee (including, but not limited to, any sub-sublessee) is hereby given the right (exercisable at any time and from time to time) by Sublessor in addition to any other rights herein granted, without Sublessor's prior written consent, to mortgage its interests in this Sublease or any part or parts thereof, under one or more leasehold mortgage(s), and to assign this Sublease, as collateral security for such mortgage(s), provided however, in no event shall this Sublease be subordinated to any such leasehold mortgage and, provided further, that at no time shall there be more than two (2) leasehold mortgages covering the Premises. Any holder of a first or second leasehold mortgage on the Premises is hereinafter sometimes called a "Leasehold Mortgagee". Sublessee covenants and agrees that any lien or mortgage placed on the Premises must provide level monthly amortization and the maturity date shall not extend beyond the termination date of the Basic Term plus any extended terms thereof which has already been exercised and the aggregate amount of such mortgage or mortgages shall not exceed 80% of the fair market value of the improvements or proposed improvements to the Premises. The fair market value shall be mutually agreed upon by the Sublessor and Sublessee but, in the event they are not able to so agree, each party shall select a licensed real estate appraiser who holds the M.A.I. certification who shall, by mutual agreement, determine the fair market value. In the event the two selected appraisers cannot agree upon the fair market value by mutual agreement, they shall select a third real estate appraiser who hold the M.A.I. certification and the three real estate appraisers shall each appraise the improvements or proposed improvements and the fair market value shall be deemed the average of the three appraised values.

Sublessor may, during the term of this Sublease, without Sublessor's prior written consent, mortgage its leasehold

interest in the Premises or place or allow to be placed any lien upon the Premises provided (a) Sublessor provides Sublessee with at least sixty (60) days written notice of Sublessor's intention to do so and (b) Sublessor, Sublessee and Lendor enter into a Non-Disturbance Agreement protecting Sublessee's leasehold interest and Sublessee's Lendor's interest. Sublessor further covenants and agrees that any lien or mortgage placed upon the Premises shall not be senior to this Sublease and that the enforcement by any lien holder or mortgagee of any right or remedy based upon the lien or mortgage shall in no way affect or disturb Sublessee's leasehold interest in the Premises.

If Sublessee and/or Sublessee's successors and assigns (including, but not limited to, any Sub-sublessee) shall mortgage this leasehold, or any part or parts thereof, and if Sublessee or the Leasehold Mortgagee(s) shall send to Sublessor written notice as herein provided specifying the name and address of the Leasehold Mortgagee and either the date or the pertinent recording data with respect to such mortgage(s), Sublessor agrees that the following provisions shall apply to the leasehold mortgages with respect to which such conditions are met, so long as such mortgages shall remain unsatisfied of record or until written notice of satisfaction is given by Leasehold Mortgagee to Sublessor:

(a) There shall be no cancellation without default, surrender or modification of this Sublease with respect to the Premises encumbered by the mortgage by joint action of Sublessor and Sublessee without the prior consent in writing of the Leasehold Mortgagee(s), and no merger shall result from the acquisition by or devolution upon, any one entity of the fee and leasehold estates in the Premises.

(b) Sublessor shall, upon serving Sublessee with any notice of default or other notice provided for in this Sublease, simultaneously serve a copy of such notice upon the Leasehold Mortgagee(s) and any Sub-sublessees whose Sub-subleases encumber the Premises (hereinafter sometimes called "Sub-sublessee(s)"), and which Sub-sublessee(s) have also notified Sublessor as herein provided of their respective interests and no such notice to Sublessee shall be effective unless a copy of such notice is so served on such Leasehold Mortgagee(s) and Sub-sublessee(s). Such Sub-sublessees and Leasehold Mortgagee(s) shall thereupon have the same period, after service of such notice upon it or them, to remedy or cause to be remedied the defaults complained of, and Sublessor shall accept such performance by or at the instigation of such Leasehold Mortgagee(s) or Sub-sublessees as if the same had been done by Sublessee.

(c) Anything herein contained notwithstanding, if any default shall occur which, pursuant to any provision of this Sublease, entitles Sublessor to terminate this Sublease and Sublessor desires to terminate this Sublease, Sublessor must provide notice of termination to the Leasehold Mortgagee(s) as herein provided, and if, before the expiration of thirty (30) days from the date of service of notice of termination upon such Leasehold Mortgagee(s), any of such Leasehold Mortgagee(s) shall have notified Sublessor of its desire to nullify such notice and shall have paid to Sublessor all rent and additional rent and other payments herein provided for and then in default, and shall have complied or shall commence the work of complying with all of the other requirements of this Sublease then in default and shall prosecute the same to completion with reasonable diligence, then in such event Sublessor shall not be entitled to terminate this Sublease and any notice of termination theretofore given shall be void and of no effect; and, if there is more than one Leasehold Mortgagee of any estate, the

holder of the mortgage which is prior in lien shall have the prior right so to act.

(d) The Leasehold Mortgagee(s) shall be given notice by Sublessor of any arbitration or judicial proceedings entered into by Sublessor and Sublessee, and shall have the right to intervene therein and be made a party to such proceedings, and the parties hereto do hereby consent to such intervention. In the event that the Leasehold Mortgagee(s) shall not elect to intervene or become a party to such proceedings, the Leasehold Mortgagee(s) shall receive from Sublessor notice of, and a copy of any award or decision made in said arbitration or judicial proceedings.

(e) Sublessor shall, upon request, execute, acknowledge and deliver to each Leasehold Mortgagee(s) an agreement prepared at the sole cost and expense of Sublessee, in form satisfactory to such Leasehold Mortgagee(s), between Sublessor, Sublessees and Leasehold Mortgagee(s), agreeing to all of the provisions of this Paragraph. The term "mortgage", whenever used herein, shall include whatever security instruments are used in the locality of the Premises, such as, without limitation, mortgages, deeds of trust, security deeds and conditional deeds, as well as financing statements, security agreements and other documentation required pursuant to the Uniform Commercial Code or successor or similar legislation.

(f) If Sublessee shall fail timely to exercise any option provided to Sublessee under this Sublease, each Leasehold Mortgagee shall nevertheless have the right to exercise such option provided that it so exercises not later than thirty (30) days after Sublessor has given it written notice that Sublessee has failed to timely exercise such option.

21. Surrender of Premises. Sublessee will peaceably surrender and deliver up the Premises at the end of the term provided in Paragraph 3 above or earlier termination, in good order and condition, reasonable wear and tear excepted, and shall have no right to remove from the Premises any improvements that may have been erected thereon and have become part of the real estate as are not usually classed as furniture and trade fixtures.

22. Conditions Precedent. Anything contained in this Sublease to the contrary notwithstanding, this Sublease shall be null and void and of no effect unless all of the following requirements have been completed.

(a) Requirements to be completed within 120 days after all parties have executed this sublease.

1. Sublessor has given approval of a title report covering the premises issued by a title insurance company satisfactory to Sublessee; such approval shall be deemed given upon Sublessee's failure to specify in writing within fifteen (15) days of Sublessee's receipt of said report reasonable reason why such approval cannot be provided.

2. Sublessee has given approval of a current perimeter survey of both the premises and the shopping center; such approval shall be deemed given upon Sublessee's failure to specify in writing within fifteen (15) days of Sublessee's receipt of the survey reasonable reason why such approval cannot be provided;

3. The shopping center parcel and the WDM tract shall have been provided with an Easement With Covenants And Restrictions affecting land ("ECR"), recorded prior to any mortgage or other encumbrances which could foreclose upon the same,

-31-

providing for reciprocal ingress, egress and parking rights between the shopping center parcel and the WDM tract and with such other provisions as approved by Sublessee including but not limited to Common Facility maintenance, Common Facility being defined herein.

4. Sublessor and Sublessee shall have entered into a mutually acceptable Development Agreement covering the construction of Sublessee's building.

(b) Requirements to be completed sixty (60) days prior to Sublessee opening its store for business:

1. Sublessee's store building and other improvements constructed on Sublessee premises shall have been delivered to Sublessee completed in accordance with the Development Agreement.

2. Construction of all the Common Facilities (including, but not limited to, such driveways, entranceways, parking areas, as specifically required herein, service areas, sidewalks, outdoor lighting facilities that are not part of any building, future buildings or additions, landscaped areas, utility lines, and related facilities being herein sometimes referred to as the common area shall have been substantially completed as shown on Exhibit "A".

3. Construction of at least 75 lineal feet of store frontage and 10,125 sq. ft. of building area (excluding Sublessee's store building) shall have been substantially completed simultaneously with Sublessee's store business as shown on Exhibit "A" (drug store space) and said area leased to other sublessees.

-32-

4. Construction of at least 160 lineal feet of store frontage and 9,600 sq. ft. of miscellaneous small shop building area shall have been completed as shown on Exhibit "A" hereto with store fronts and floors, and under roof, but the interior partitions and interior finishes thereof need not be completed until any specific space is occupied, none of such space shall be required to be leased to other Subtenants or opened for business; the service drives and all curb cuts and drives as shown on Exhibit "A" hereto shall have been completed and opened for use;

5. The acceleration and deceleration lanes along the south margin of the U.S. Highway 80 at the entrance to the shopping center and the left turn lane with median crossing for west bound traffic along U.S. Highway 80 as shown on Exhibit "A" hereto shall have been completed and opened for use.

23. Option for Expansion.

Sublessee is hereby granted the option and privilege at any time during the term of this Sublease or any extensions thereof, of enlarging its store building by incorporating therein the area to the westerly side thereof, such addition not to exceed sixty (60) feet in width by two hundred (200) feet in depth. This option may be exercised by Sublessee only at such times as the adjoining storerooms may be vacant and not subject to a continuing sublease, or after ten (10) years from the date of this sublease and thereafter in five (5) year intervals, it being contemplated that Sublessor shall not lease such area to other Subtenants for in excess of ten (10) years, and that Sublessee shall have the expansion privilege herein described no later than ten (10) years from the commencement date hereof and at five (5) year intervals thereafter. Sublessee shall exercise this option by giving Sublessor written notice not less than six (6) months prior to the expiration date of the interval date mentioned above.

-33-

Sublessee agrees to construct such addition, or prepare such enlargement area for occupancy by Sublessee at its sole cost and expense, in accordance with plans and specifications to be approved by the parties hereto, with the construction to be completed with all due diligence following the vacation of the necessary area by any other Subtenant, and the enlarged portion of the building to be of a like quality of construction as the original building for Sublessee. In order to facilitate the expansion of Sublessee's demised store building as herein contemplated, Sublessor agrees that any adjacent building or buildings within the expansion shall be of like structural quality and in architectural harmony with Sublessee's store building; shall front on a line which is the interior sidewalk line of Sublessee's demised store building extended and shall have a finish floor level and roof which shall be at the same elevations as the finish floor level and roof of Sublessee's demised store building. Further, Sublessee agrees that the wall of Sublessee's demised store building adjoining the expansion area shall be constructed with steel column supports thereon equivalently spaced to the nearest row of steel column supports within the open area of Sublessee's demised store building and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original end of the expanded building width.

Upon Sublessor's delivery of the expansion area to Sublessee, the annual minimum guaranteed rental shall be increased by the amount (less payments required for common area maintenance, ad valorem taxes and insurance to be paid by Sublessee as set forth below) of the rental Sublessor has received for the formerly occupied expansion area as provided in bona fide Sublease Agreements with a term of not less than two (2) years for such space under the most recent Sublease Agreements therefor, or if there are no such Sublease Agreements, the product resulting from multiplying the total square footage of the occupied expansion area by the product of nine and 25/100ths dollars ($9.25)

-34-

multiplied by the Consumer Price Index (CPI) for all urban consumers or equivalent inflation adjustment index, if the CPI is discontinued. The base CPI factor shall be the factor derived for the year in which the Winn-Dixie store first opens for business; provided, however, in no event shall the rental be less than the product resulting from the multiplication of the total square footage of the occupied expansion area multiplied by nine and 25/100 dollars ($9.25). Upon Sublessor's delivery of the expansion area to the Sublessee, it shall be and become a portion of Sublessee's premises and this Sublease thereby be taken and construed as so amended, and the other provisions of this Sublease shall apply to the building as so expanded, and the expanded size shall be used in calculating Sublessee's pro rata share of common area maintenance, real estate taxes and other expenses as provided in the "ECR" Agreement provided for in Paragraph 22 hereof. Additionally, Sublessee shall pay the amount of increased taxes which, if any, are assessed as a result of the expansion and related improvements, paying that amount the first year assessed and each year thereafter in addition to its prorate share of the other ad valorem taxes.

Sublessee agrees to cause any mechanics' liens incurred by and in connection with such expansion to be promptly discharged and agrees to indemnify and hold harmless the Sublessor from any expense occasioned thereby. Sublessee further agrees to protect, indemnify and save harmless Sublessor from and against all costs and expenses of construction, liabilities, damages, claims causes of action, fines, suits, charges and expenses, including attor-ney's fees incurred by reason of the construction of the expansion of the building addition.

24. Sublessor's Liability. Notwithstanding anything to the contrary provided in this Sublease, it is specifically understood and agreed that there shall be absolutely no personal liability on

the part of Sublessor or any partner or joint venture of Sublessor with respect to any of the terms, covenants and conditions of this Sublease, and that Sublessee shall look solely to the equity of Sublessor or such successor in interest in the Shopping Center for the satisfaction of each and every remedy of Sublessee in the event of any breach of Sublessor of any of the terms, covenants and conditions of this Sublease to be performed by Sublessor, such exculpation of personal liability to be absolute and without any exception whatsoever.

25. Self-Help. If Sublessor shall default in the perfor-mance or observance of any agreement or condition in this Sub-lease or observance of any agreement or condition in this Sub-lease to be performed or observed, and if Sublessor shall not cure such default within thirty (30) days after notice from Sublessee specifying the default (or shall not within said period commence to cure such default and thereafter prosecute the curing of such default to completion with due dili-gence), Sublessee may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter cure such default for the account of the Sublessor, and any reasonable amount paid or any reasonable contractual liability incurred by Sublessee in so doing shall be deemed paid or incurred for the account of Sublessor and the Sublessor agrees to reimburse Sub-lessee therefor or save Sublessee harmless therefrom; provided that Sublessee may cure any such default as aforesaid prior to the expiration of said waiting period, but after said notice Subles-sor, if the curing of such default prior to the expiration of said waiting period is reasonably necessary to protect the real estate or Sublessee's interest therein or to prevent injury or damage to persons or property. If Sublessor shall fail to reimburse Sub-lessee upon demand for any amount paid for the account of Subles-sor hereunder, said amount may be deducted by Sublessee from the next or any succeeding payments of rent due hereunder.

26. _Notices_. All notices, instruments and communications permitted or required to be delivered pursuant to this Sublease shall be in writing and shall be validly given when mailed by prepaid United States registered or certified mail, return receipt requested, addressed to the person entitled to receive the same. Sublessor, Sublessee and Leasehold Mortgagee and any other person to whom any such notice, instrument or communication may be given, shall each have the right to specify, form time to time, as its address for purposes of this Sublease, any address in the United States upon giving fifteen (15) days' notice thereof to each other person then entitled to receive notices, instruments or communications hereunder. The addresses of Sublessor and Sublessee for purposes of this Sublease, until notice to the contrary has been given as above provided, shall be their respective addresses set forth above.

27. _Estoppel Certificate_. Sublessor will, from time to time upon ten (10) days' request by Sublessee, or the Leasehold Mortgagee(s), execute, acknowledge and deliver a statement, dated currently, certifying that this Sublease is unmodified and in full effect (or, if there have been modifications, that this Sublease is in full effect as modified, and identifying such modifications) and the dates to which Basic Rent and other amounts payable hereunder have been paid, and that no default or event of default of which the signer may have knowledge, it being intended that any such statement may be relied upon by the Leasehold Mortgagee(s) or by any prospective purchaser of the interest of Sublessee in the Premises or any assignee of Sublessee of the Leasehold Mortgagee. So long as no default has occurred and is continuing under this Sublease, Sublessor will from time to time, upon ten (10) days' request by the Leasehold Mortgagee, execute and deliver an instrument in recordable form ratifying and confirming the provisions of this Sublease and recognizing a Leasehold Mortgagee or Sublessee as mortgagee or sublessee of the interest of Sublessee in the

-37-

Property. Similarly, Sublessee shall furnish such certificates to Sublessor at their request.

28. _No Merger_. There shall be no merger of this Sublease or of the leasehold estate hereby created by any other estate or interest in the Premises or any portion thereof by reason of the fact that the same person may acquire or hold, directly or indirectly, (a) this Sublease or the leasehold estate hereby created or any interest in this Sublease or such leasehold estate, and (b) any such other estate or interest in the Premises or any portion thereof, and this Sublease shall not be terminated for any cause except as expressly provided herein.

29. _Payments_. Payments hereunder shall initially be sent payable to Sublessor, 2117 Second Avenue North, Post Office Box 12767, Birmingham, Alabama 35202-2767. Sublessee shall have no responsibility to make rental payments except as directed by Sublessor.

30. _Miscellaneous_. Each covenant and agreement contained in this Sublease shall for all purposes be construed to be a separate and independent covenant and agreement. If any provision of this Sublease of any application thereof shall to any extent be invalid and unenforceable, the remainder of this Sublease and any other application of such provision shall not be affected thereby. All provisions of this Sublease shall be binding upon and inure to the benefit of the respective successors and assigns of Sublessor and Sublessee. This Sublease may not be amended, modified, or discharged except by a writing signed by Sublessor and Sublessee. This Sublease shall be governed by and construed and enforced in accordance with the laws of the State of Alabama.

-38-

31. **Counterparts.** This Sublease may be executed in any number of counterparts, each of which will be considered an original.

32. **Short Form Lease.** The Sublessor agrees that at any time on request of the Sublessee it will execute a short form of this Sublease in form permitting its recording.

IN WITNESS WHEREOF, Sublessor and Sublessee have caused this Sublease to be duly executed as of the day and year first above written.

Signed, sealed and delivered in the presence of:

SUBLESSOR:

SELMA HIGHWAY 80 VENTURE II JOINT VENTURE

By: Arlington Properties, Inc., an Alabama Corporation, General Partner

By: _____ Its: President

By: Baker Properties, an Alabama Partnership, General Partner

By: Baker Investments, Inc., an Alabama Corporation and General Partner of Baker Properties

By: _____ Chester M. Baker, President

-39-

SUBLESSEE:

Signed, sealed and delivered    WINN-DIXIE MONTGOMERY, INC.

By: _____ Its Vice President
Attest: _____ Its Secretary

(CORPORATE SEAL)

THE STATE OF ALABAMA }
_____ COUNTY }

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Frank A. Nix, whose name as _____ of Arlington Properties, Inc., an Alabama corporation, a general partner of Selma Highway 80 Venture I, Joint Venture, an Alabama general partnership, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such _____ of Arlington Properties, Inc. and with full authority executed the same voluntarily for and as the act of said Selma Highway 80 Venture I, Joint Venture, a joint venture.

Given under my hand and official seal, this the 23rd day of April, 1990.

_____
NOTARY PUBLIC
My Commission Expires: 4/2/93

THE STATE OF ALABAMA }
_____ COUNTY }

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Chester M. Baker, whose name as President of Baker Investments, Inc., an Alabama corporation and general partner of Baker Properties, a general partner of Selma Highway 80 Venture I, Joint Venture, an Alabama general partnership, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such general partner and with full authority, executed the same voluntarily for and as the act of Baker Properties, an Alabama general partnership, as general partner of Selma Highway 80 Venture II, Joint Venture, a joint venture.

Given under my hand and official seal, this the 23rd day of _____, 1990.

_____
NOTARY PUBLIC
My Commission Expires: _____

-40-

## GUARANTY

In consideration of the sum of Ten Dollars ($10.00) paid by Selma Highway 80 Venture II Joint Venture, an Alabama general partnership, hereinafter called "Sublessor", to WINN-DIXIE STORES, INC., a Florida corporation with its principal offices at 5050 Edgewood Court, Jacksonville, Florida 32205, hereinafter called "Guarantor", the receipt and sufficiency whereof are hereby acknowledged, Guarantor does hereby guarantee unto Sublessor, its legal representatives, successors and assigns, the due performance and observance by WINN-DIXIE MONTGOMERY, INC., a Kentucky corporation hereinafter called "Sublessee", of all the terms, covenants and conditions on the part of Sublessee to be performed and observed including, without limitation, payments of rentals under the attached and foregoing Sublease Agreement dated _May 8, 1990_ covering certain premises located at the southwest corner of the intersection of U. S. Highway 80 By-Pass and Range Street in the City of Selma, Dallas County, State of Alabama.

Guarantor hereby waives notice of any amendments or changes or modification which may be made to the Sublease Agreement and this Guaranty Agreement shall extend fully to the Sublease Agreement as so amended, changed or modified.

This Guaranty Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Alabama.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed in its corporate name and its corporate seal to be hereunto affixed and attested by its officers thereunder duly authorized this _8th_ day of _May_, 1990.

Signed, sealed and delivered
in the presence of:

WINN-DIXIE STORES, INC.

By _____
        Its President

Attest _____
        Its Secretary

(CORPORATE SEAL)
GUARANTOR

THE STATE OF _Florida_ }
_Duval_ COUNTY }

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that _James Kufeldt_, whose name as _Vice President_ of WINN-DIXIE Montgomery, Inc., a corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal, this the _8th_ day of _May_, 1990.

_____
NOTARY PUBLIC

My Commission Expires: 4/2/90

\COR\04SUBL

-41-

STATE OF Florida )
COUNTY OF Duval )

I, Rebecca L. Sawyer, a Notary Public in and for said County, in said State, hereby certify that James Kuhlitt, whose name as Vice President of WINN-DIXIE MONTGOMERY, INC., a Kentucky corporation, is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such Vice President and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this 8th day of _____, 19__.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

6/7/90

(NOTARIAL SEAL)

EXHIBIT "B"

STATE OF ALABAMA
DALLAS COUNTY

PARCEL "C" BOUNDARY

COMMENCE AT THE NEW EAST MARGIN OF FRANKLIN STREET AT THE POINT WHERE THE SOUTH LINE OF SECTION 24, TOWNSHIP 17 NORTH, RANGE 10 EAST, INTERSECTS AND BEING SITUATED IN THE CITY OF SELMA, ALABAMA), THENCE SOUTH 89 DEGREES 56' 48" EAST A DISTANCE OF 390.61 FEET TO A FOUND IRON PIN; THENCE SOUTH 89 DEGREES 49' 21" EAST A DISTANCE OF 619.89 FEET TO A FOUND IRON PIN AND THE POINT-OF-BEGINNING.

THENCE CONTINUE SOUTH 89 DEGREES 49' 21" EAST A DISTANCE OF 280.00 FEET TO A POINT LYING ON THE WEST RIGHT-OF-WAY LINE OF RANGE STREET; THENCE NORTH 00 DEGREES 44' 44" EAST ALONG SAID RIGHT-OF-WAY LINE A DISTANCE OF 485.99 FEET; THENCE ALONG SAID RIGHT-OF-WAY LINE NORTH 44 DEGREES 51' 31" WEST A DISTANCE OF 136.57 FEET TO A FOUND CONCRETE MONUMENT LYING ON THE SOUTH RIGHT-OF-WAY LINE OF US HIGHWAY 80 (ALABAMA HIGHWAY 114); THENCE ALONG SAID RIGHT-OF-WAY NORTH 89 DEGREES 51' 31" WEST A DISTANCE OF 495.22 FEET TO A FOUND IRON PIN; THENCE LEAVING SAID RIGHT-OF-WAY SOUTH 00 DEGREES 10 (0.33') WEST A DISTANCE OF 582.16 FEET TO THE POINT-OF-BEGINNING, SAID BOUNDARY LYING IN THE SOUTH 1/2 OF THE SOUTHEAST 1/4 OF SECTION 24, TOWNSHIP 17 NORTH, RANGE 10 EAST, DALLAS COUNTY, ALABAMA AND CONTAINING 7.78 ACRES, MORE OR LESS.

LESS AND ACCEPT THE FOLLOWING PARCEL:

STATE OF ALABAMA
DALLAS COUNTY

WINN-DIXIE DEMISED AREA (PREMISES)

COMMENCE AT THE NEW EAST MARGIN OF FRANKLIN STREET AT THE POINT WHERE THE SOUTH LINE OF SECTION 24, TOWNSHIP 17 NORTH, RANGE 10 EAST, INTERSECTS AND BEING SITUATED IN THE CITY OF SELMA, ALABAMA), THENCE SOUTH 89 DEGREES 56' 48" EAST A DISTANCE OF 390.61 FEET TO A FOUND IRON PIN; THENCE SOUTH 89 DEGREES 49' 21" EAST A DISTANCE OF 840.89 FEET TO A POINT, SAID POINT BEING THE POINT-OF-BEGINNING.

THENCE NORTH 00 DEGREES 10' 39" EAST A DISTANCE OF 296.00 FEET; THENCE SOUTH 89 DEGREES 49' 21" EAST A DISTANCE OF 220.00 FEET; THENCE SOUTH 00 DEGREES 10' 39" WEST A DISTANCE OF 296.00 FEET; THENCE NORTH 89 DEGREES 49' 21" WEST A DISTANCE OF 220.00 FEET; TO THE POINT OF BEGINNING.

SAID WINN-DIXIE DEMISED AREA LYING IN THE SOUTH 1/2 OF THE SOUTHEAST 1/4 OF SECTION 24, TOWNSHIP 17 NORTH, RANGE 10 EAST, DALLAS COUNTY, ALABAMA, (BEING SITUATED WITHIN PARCEL "C") AND CONTAINING 1.49 ACRES, MORE OR LESS.

THE WINN-DIXIE PARCEL, AND THE SHOPPING CENTER PARCEL, ARE SUBJECT TO THE EASEMENT WITH COVENANTS AND RESTRICTIONS DATED _____, AND RECORDED IN THE JUDGE OF PROBATE OFFICE OF DALLAS COUNTY, ALABAMA IN REAL BOOK ____, PAGE ____.

---

STATE OF ALABAMA
DALLAS COUNTY

WINN-DIXIE DEMISED AREA (PREMISES)

COMMENCE AT THE NEW EAST MARGIN OF FRANKLIN STREET AT THE POINT WHERE THE SOUTH LINE OF SECTION 24, TOWNSHIP 17 NORTH, RANGE 10 EAST, INTERSECTS AND BEING SITUATED IN THE CITY OF SELMA, ALABAMA), THENCE SOUTH 89 DEGREES 56' 48" EAST A DISTANCE OF 390.61 FEET TO A FOUND IRON PIN; THENCE SOUTH 89 DEGREES 49' 21" EAST A DISTANCE OF 840.89 FEET TO A POINT, SAID POINT BEING THE POINT-OF-BEGINNING.

THENCE NORTH 00 DEGREES 10' 39" EAST A DISTANCE OF 296.00 FEET; THENCE SOUTH 89 DEGREES 49' 21" EAST A DISTANCE OF 220.00 FEET; THENCE SOUTH 00 DEGREES 10' 39" WEST A DISTANCE OF 296.00 FEET; THENCE NORTH 89 DEGREES 49' 21" WEST A DISTANCE OF 220.00 FEET; TO THE POINT OF BEGINNING.

SAID WINN-DIXIE DEMISED AREA LYING IN THE SOUTH 1/2 OF THE SOUTHEAST 1/4 OF SECTION 24, TOWNSHIP 17 NORTH, RANGE 10 EAST, DALLAS COUNTY, ALABAMA, (BEING SITUATED WITHIN PARCEL "C") AND CONTAINING 1.49 ACRES, MORE OR LESS.

EXHIBIT "C"