# LEASE

THIS LEASE, made this 13th day of January, 1995, between VALLEYDALE ASSOCIATES, LTD., an Alabama limited partnership

("Landlord") and

WINN-DIXIE MONTGOMERY, INC., a Kentucky corporation, authorized to do business in the State of Alabama

("Tenant"); which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

## WITNESSETH:

**PREMISES**

That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and demise unto Tenant and the Tenant hereby agrees to take and lease from the Landlord, for the term hereinafter specified, the following described premises:

That certain store building, approximately 220 feet in width by 200 feet in depth, together with a vestibule entry approximately 82 feet in width by 12 feet in depth, together with concrete pads, at the rear for coolers and freezers and compactor or baler and rear addition approximately 40 feet in width by 35 feet in depth,

and the land on which the same shall stand (hereinafter collectively called "demised premises"), which store building and related improvements are to be constructed by the Landlord according to plans and specifications to be approved by the parties as herein provided, and shall be in the location and of the dimensions as outlined in red on the Plot Plan labeled "A" proposed Shopping Center, Valleydale Road, Birmingham, Alabama" prepared by Holmes, Wilkins, Architects, dated October 7, 1991, last revised June 24, 1993,

attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in detail on Exhibit "A"), known as Valleydale Marketplace

("shopping center"), located at the southerly corner of Valleydale Road and Caldwell Mill Road

in the City of xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx, County of Shelby,

State of Alabama, the legal description of the shopping center being set forth on Exhibit "B" attached hereto and by this reference made a part hereof.

This instrument was prepared by P. Christopher Woom, Attorney at Law, whose address is 5050 Edgewood Court, Jacksonville, Florida 32205.

**REPLACEMENT LEASE**

THIS LEASE REPLACES AND SUPERCEDES THAT CERTAIN LEASE DATED MAY 20, 1992, BETWEEN VALLEYDALE ASSOCIATES, LTD., WHICH LEASE WAS AMENDED BY THAT CERTAIN FIRST AMENDMENT TO LEASE AGREEMENT DATED JUNE 24, 1993, BETWEEN THE AFOREDESCRIBED PARTIES.

**TERM**

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens the demised premises for the transaction of its business for an initial term of twenty (20) years from May 27, 1993.

This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations.

**RENTAL**

1. The Tenant agrees to pay to the Landlord as minimum guaranteed rental for the demised premises during the term of this lease, and any extension thereof, the sum of THREE HUNDRED TWENTY-THREE THOUSAND FOUR HUNDRED and No/100 ------ Dollars ($ 323,400.00 ------) per annum, The minimum guaranteed rental shall be payable in equal monthly installments of TWENTY-SIX THOUSAND NINE HUNDRED FIFTY and (12) No/100 ------ Dollars ($26,950.00 ------) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

In addition, the Tenant agrees to pay the Landlord a percentage rental equal to the amount, if any, by which one per cent (1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant during the term of this lease, and any extensions thereof, exceeds the minimum guaranteed annual rental.

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the fact extension thereof, any excess rent which may be due by reason of the percentage of sales provision shall be payable by tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculation of the percentage rental due hereunder, the Tenant's fiscal year shall be approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINITION OF "GROSS SALES"**

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold in or from the demised premises, both for cash and on credit. Such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds or servings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

-1-

**RECORD OF SALES**

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it is sooner occurs, and at such time as the percentage rental shall be payable, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the landlord and shall be conclusive unless the landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the landlord.

**USE**

2. The demised premises may be used for retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to, foods and food products, or for the conduct of any general mercantile business, retail or service business (including discount businesses) not restricted under Article 7 hereof; provided, however, except as a supermarket, the demised premises shall not be used or assigned, or subleased under the terms of Article 26 herein, for any primary use or business which is in direct competition with the primary use or business engaged in by any other then tenant in the shopping center to whom landlord has granted a right of exclusive use to which Tenant has given consent herein or in writing, or a replacement or successor tenant for such exclusive use. Tenant has the non-exclusive right to operate a pharmacy or drugstore in the demised premises.

Notwithstanding the foregoing, the demised premises shall be initially opened and used for a retail food store, commonly referred to as "supermarket", and shall continue to be so operated for such purpose only for a period of six (6) months provided, however, Tenant shall not thereafter be required to continue to remain open for business in the shopping center, even for the operation of a food supermarket or otherwise.

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of the premises, as such shall relate to the cleanliness and use of the premises and the character and manner of operation of the business conducted in or at the premises.

**CONSTRUCTION OF SHOPPING CENTER**

3. The Landlord, at its sole cost and expense, shall construct the shopping center, substantially as shown on Exhibit "A", consisting of all the buildings shown thereon, together with all ramps, sidewalks, streets, entranceways, malls, parking areas, service areas, driveways, utility lines, water detention and retention facilities and related improvements, such improvements (excluding buildings) being sometimes hereinafter referred to as "common areas". The Landlord, at its sole cost and expense, shall provide sometimes with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the shopping center and the tenants and their employees during the term of this lease, or any extensions thereof. The arrangement and location of all store buildings and common areas (including parking area) within the shopping center shall at all times during the term of this lease, be maintained as shown on Exhibit "A". Tenant expressly reserves the right to approve center (including any store buildings and the demised premises) shall not be materially modified without Tenant's prior written consent. If not shown on Exhibit "A", Tenant expressly reserves the right to approve the finish grade elevations of all store buildings and common areas (including parking and service areas) within the shopping center which are to be constructed concurrently with Tenant's store building.

substantially

Landlord reserves the right, but shall not be required to construct, an additional building not to exceed sixty (60) feet in width by one hundred (100) feet in depth, within the area described as "Winn-Dixie Expansion Area or Retail Shop Expansion" on Exhibit "A", provided, however, such additional building shall be of like structural and architectural quality as the building for Tenant's store building and shall meet all requirements imposed on adjacent buildings lying within Tenant's expansion area by Article 38 of this lease. Pending construction thereon, the area so described shall be maintained as a paved parking area as shown on Exhibit "A". Landlord agrees that Tenant shall have uninterrupted use and enjoyment of the demised premises and the common areas during any such additional construction work. Notwithstanding Landlord's right to construct said building, Landlord agrees to give Tenant written notice of its intent to construct the said building prior to construction of such building, and Tenant shall have 120 days from receipt of such written notice in which to exercise its option to expand its store building as set forth in Article 30. If Tenant declines to exercise its option to expand or fails to respond to Landlord's notice within such 120 day period, Tenant shall be deemed to have acquiesced to Landlord's construction, and Landlord may thereafter construct its building and lease the same. However, landlord shall not lease any portion of such building to a tenant other than Tenant for any term which would expire subsequent to any "option date," as such term is defined in Article 38 of the lease.

Buildings constructed on Pad "A" and Outparcel "A" as shown on Exhibit "A" shall not exceed one story in height, or exceed twenty (20) feet in height, except for cupolas, weather vanes and similar architectural adornments.

**COMPLETION DATE**

4. INTENTIONALLY DELETED.

Concurrently with the above construction, landlord agrees at its sole cost and expense, to construct the store building for occupancy by Tenant in accordance with the plans and specifications to be approved by both landlord and Tenant. Plans and specifications shall be approved when initialed by both parties, and when initialed shall constitute a part of this lease. The plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job".

-3-

SC-6

| | | |
|---|---|---|
| COMMENCEMENT DATE | 5. | INTENTIONALLY DELETED. |
| OTHER TENANTS | 6. | INTENTIONALLY DELETED. |

RETAIL AND SERVICE STORES ONLY

7. Without the prior written consent of Tenant herein only retail and/or service stores shall be allowed to operate in the shopping center, or any enlargement thereof, it being the intent of the parties hereto that no spa, lounge, bar, "teen lounge", bowling alley, skating rink, bingo or electronic or other game parlor, theatre (either motion picture or legitimate), business or professional offices, sales of automobiles, or health, recreational or entertainment-type activities, non-retail or non-service type activities, shall be permitted.

Notwithstanding the foregoing, small service-type businesses, such as a finance company, insurance agency, or real estate company (so long as such real estate company does not conduct on its premises real estate courses or other educational courses) shall be permitted to operate in the shopping center so long as no single business employs more than seven (7) persons. A physician's office or a dentist's office may operate in the shopping center so long as it is located in the most easterly 6,000 square feet of retail shop space or on Outparcel "A," as both are shown on the attached "Exhibit "A.".

PARKING AND COMMON AREAS

8. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks. Tenant may use the sidewalks adjacent to the demised premises or exterior surfaces of its building for the display and sale of merchandise and services.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a) a minimum ratio of at least  5.5   *   automobile parking spaces for each 1,000 sq. ft. of gross building area (including additional floor levels) in the shopping center, and

(b) facilities for convenient parking of at least  384  **   automobiles (minimum);

\*  Decreasing to 4.21 after Tenant's expansion or after the construction of a building on the land designated "Winn-Dixie Expansion Area or Retail Shop Expansion" on Exhibit "A" in accordance with Article 3 of this Lease.

\*\*  Decreasing to 342' after Tenant's expansion or after the construction of a building on the land designated "Winn-Dixie Expansion Area or Retail Shop Expansion" on Exhibit "A" in accordance with Article 3 of this Lease.

, and one hour later, but in any event not later than 10:00 p.m., provided that such area will be lighted upon Tenant's request, but at its expense prorated on a square footage basis with other tenants, if any, open for business during such extended hours. The expense shall be based upon actual billings, if available, or upon the kilowatt usage of the fixtures times the hours of use times the applicable utility rate.

and in the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord at its expense during Tenant's food store shopping hours, and Landlord further agrees that no signboards or other construction shall be erected in any of the said common areas shown on Exhibit "A", or so as to obstruct the view of the demised premises from the adjoining public streets. Without prior written consent of Tenant herein, no carnivals, fairs or shows nor sales by merchants utilizing vehicles or booths in the common areas shall be allowed in the shopping center, or any enlargement thereof.

**SERVICE AREA**

9. Landlord agrees to provide for the exclusive use of the Tenant at its service entrances parking spaces for two large trailer trucks for continuous use. Landlord further agrees that Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for its store into and from trucks and trailers at such service entrance.

**UTILITIES**

10. The Tenant agrees to pay all charges for telephone, electricity, water, gas and other utilities and service used by Tenant at the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities. Tenant shall not be responsible for any charges for the fire alarm system, static or providing water to any utility, or any "hook up" fees or other charges incident to providing access to any utility.

**TENANT'S REPAIRS**

11. Upon completion of construction and acceptance of the demised premises by Tenant, Tenant agrees during the initial term hereby granted and extension or renewal thereof, to perform all maintenance necessary to keep and maintain the interior and exterior of the demised premises in good condition and repair (including the roof, structural or exterior parts of the demised premises), and to repair at or before the end of the initial term or any extension or renewal thereof, all injury done by the installation or removal of fixtures or property of Tenant. Tenant shall have the benefit of all manufacturer's installer's or other warranties in connection with the items to be maintained by it. The repair responsibilities under Article 11 and 12 of this Lease shall apply to Tenant's demised premises as they may be expanded under Article 38 hereof or otherwise.

**LANDLORD'S REPAIRS**

12. It is understood that this is intended to be a "net" lease as far as maintenance and repair of Tenant's store building, but that Landlord shall remain responsible for, and keep and maintain in good condition and repair, the common areas, including the electrical system, plumbing and other utilities outside Tenant's store building. If any portion of the common areas or any such utilities outside of the store building shall at any time be in need of repair, Landlord will repair the same immediately upon receipt of written notice from Tenant to do so, except that the Landlord shall not be obligated to make or pay for any such repairs rendered necessary by fault, act or negligence of the Tenant, or any of its servants, agents or employees, (except in the case of damage by fire or the elements or other casualty covered by Landlord's fire and extended coverage insurance). Landlord further covenants that Tenant's store building and common areas will be constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises and common areas which may become necessary in order that said premises and common areas may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated. If Landlord, after receipt of notice, fails or neglects to make, with all due diligence, such repairs to the common areas or utilities outside of the store building or structural changes which are its responsibility under this Lease, Tenant shall have the right to do so and to deduct from the rentals then due or to become due such sums as necessary to reimburse it for the money expended or expense incurred by it in doing so.

(And see Article 31 dealing with common area maintenance)

-7-

If in order to protect persons or property it shall be necessary to make emergency repairs which are the responsibility of the Landlord, or if the Landlord either receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas, as defined in Article 3 hereof, which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs. Landlord further covenants that the store building will be so constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that the premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated.

**SIGNS**

13. Tenant may place, erect and maintain any signs on the roof, walls, and any other places on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs.

Notwithstanding the foregoing, Landlord's approval of signs located in the interior of the demised premises shall not be required, and Landlord's approval of the standard signs used by a chain tenant, if required permitting has been obtained, shall not be required.

Tenant shall be permitted to affix on the pylon sign shown on attached Exhibit "A" and located in the entranceway island in the most western corner of the shopping center an electrically illuminated sign panel advertising its business. Landlord shall bear the expense of the provision of electrical power to the pylon area including wiring and controls to serve the main pylon, but the installation of the sign panels advertising Tenant's business shall be at Tenant's expense provided that Landlord can separately meter to its sign panels. Landlord shall be responsible for the maintenance and operation of the pylon with the exception of Tenant's sign panels affixed thereto.

**FIXTURES AND ALTERATIONS**

14. The Tenant, at its own expense, shall have the right from time to time during the term of this lease to make any interior or exterior alterations, additions and improvements, including doors and partitions, in and to the demised premises which it may deem necessary or desirable in the Tenant's business, provided the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. This right of Tenant shall include the erection of interior partitions and the installation of additional front and rear doors. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

Tenant may construct and build or install in the premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from the premises at any time provided, and Tenant shall repair or reimburse Landlord for the cost of repairing any damage of any kind to the premises resulting from the installation or removal of such items.

-8-

**INDEMNIFI-**
**CATION**

15. Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises. Likewise, Landlord shall indemnify and save harmless the Tenant from any claim or loss (including costs of investigation, court costs and reasonable attorneys' fees) by reason of an accident or damage to any person or property happening on or about the common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, comprehensive general liability insurance coverage with Tenant named as an additional insured on all common areas (as defined in Article 3 hereof) of the shopping center, in a company qualified to transact business in the state where the premises are located, stipulating limits of liability of not less than $2,000,000.00. Certificate of such coverage from the insurer providing 30 days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant.

\* , including reasonable attorney's fees, court costs and the reasonable
cost of investigation.

\*reasonable

**FIRE**

During the term of this Lease and any extensions, Tenant agrees to pay to Landlord as additional rental the amount of the premium for Landlord's fire and extended coverage insurance above described. Tenant shall be responsible for its prorata share of such premiums. Tenant's prorata share of the premium shall be equal to the sum which the same ratio to the total premium for such insurance as the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floors of all buildings from time to time existing in the shopping center. Tenant's prorata share shall be reduced by any abatements, discounts or refunds actually received by Landlord. Landlord shall use its best efforts to obtain liability coverage at competitive rates. Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums. Notwithstanding the foregoing provisions, Tenant's obligation to pay its prorata share is expressly conditioned upon receipt from Landlord of the written invoice for such insurance premium no later than six (6) months after its due date. Further, Tenant shall not be required to pay its prorata share unless and until Tenant is furnished with photocopies of the applicable insurance policy, including the declaration page of such information as Tenant may reasonably request.

Notwithstanding the foregoing, so long as Tenant's guarantor, Winn-Dixie Stores, Inc. maintains a net worth in excess of $100,000,000.00, Tenant shall be permitted to self-insure against the risks insured against by such comprehensive general liability insurance covering claims or losses occurring within the demised premises.

**CLEANLINESS** 16. Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the delivery areas at the rear of the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the demised premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

17. In the event that Tenant's demised premises shall be totally destroyed or damaged to the extent of 75% or more of the value thereof by fire or other casualty, then Tenant may elect within thirty (30) days after such damage, to terminate this lease by giving to the Landlord a written notice of termination, and thereupon both parties shall stand released of and from all further liability under this lease. If Tenant's demised premises shall hereby suffer damage to any extent less than 75% of the value thereof, or if Tenant does not elect to terminate as aforesaid, then the Landlord agrees to proceed promptly and without expense to the Tenant to repair the damage or restore the improvements, remitting a fair and just portion of the rent, according to the unusable space, until said premises are completely reinstated or restored. If at any time during the term of this lease or any extensions thereof any of the buildings in the shopping center, exclusive of Tenant's demised premises, are damaged by fire or by the elements or otherwise, Landlord shall immediately commence and diligently prosecute to completion repair of all such damage and shall restore said improvements to their condition prior to such damage.

-9-

Landlord shall carry fire and extended coverage insurance on Tenant's demised premises and any additions, alterations and improvements made thereto by Landlord or Tenant and on all other buildings within the shopping center in the amount of full insurable value thereof, above foundation walls, and hereby expressly waives any and all claims against the Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the Tenant, its agents, servants or employees.

During the term of this Lease and any extensions, Tenant agrees to pay to Landlord as additional rental the amount of the premium for Landlord's fire and extended coverage insurance above described. Tenant shall be responsible for its prorata share of such premiums. Tenant's prorata share of the premium shall be equal to the sum which the same ratio to the total premium for such insurance as the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floors of all buildings from time to time existing in the shopping center. Tenant's prorata share shall be reduced by any abatements, discounts or refunds actually received by Landlord. Landlord shall use its best efforts to obtain liability coverage at competitive rates. Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums. Notwithstanding the foregoing provisions, Tenant's obligation to pay its prorata share is expressly conditioned upon receipt from Landlord of the written invoice for such insurance premium no later than six (6) months after it is due. Further, Tenant shall not be required to pay its prorata share unless and until Tenant is furnished with photocopies of the applicable insurance policy, including the declaration page of such information as Tenant may reasonably request.

Notwithstanding the foregoing, so long as Tenant's guarantor, Winn-Dixie Stores, Inc. maintains a net worth in excess of $100,000,000.00, Tenant shall be permitted to self-insure against the risks insured against by such fire and extended coverage insurance on its demised premises.

If, and only if, Tenant elects to self-insure, as permitted by this paragraph, its obligation to pay to Landlord as additional rental the amount of the premium for Landlord's fire and extended coverage insurance shall cease.

**QUIET**
**ENJOYMENT:** 18. The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging to or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a mercantile, retail or service business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a mercantile, retail or service business or using the common areas (as defined in Article 3 hereof) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

-10-

**TAXES AND LIENS**

19. All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord prior to delinquency. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement, or obligation of the Landlord which may threaten its enjoyment of the demised premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord and the Landlord shall be reimbursed by the Tenant for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law.

**CONDEMNATION**

20. If any part of the demised premises or more than twenty per cent (20%) of the buildings, exclusive of Tenant's building, within the shopping center shall be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

Notwithstanding the foregoing, Tenant shall not be entitled to any award for loss of or loss in value of its leasehold, but only to separate awards for loss or damage to its trade fixtures and for the unamortized cost of any improvements made by Tenant and moving, business interruptions or similar expenses, if allowable.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of ____fifteen____ 326 per cent (—15—%) or reduce the number of cars which may be conveniently parked to less than 346, the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking.

In the event that, as a result of such statute, right of eminent domain, or private purchase in lieu thereof, the required parking area is reduced by an amount in excess of ten percent (10%) or the number of cars which may be conveniently parked is reduced to less than 346, Landlord agrees to use its best efforts to locate and provide such additional parking in the shopping center as may be required to restore the number of parking spaces to at least 346.

**DEFAULT**

21. In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ~~ten (10) days after the same becomes due and payable,~~ or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address designated, from the Landlord ~~at such occurrence~~ to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commence performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.

twenty (20) days after landlord has given Tenant written notice of such default demanding payment of such installment of rent.

-11-

**BANKRUPTCY**

22. The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

**CONSTRUCTION RISKS**

23. Nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing the improvements, and the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated and to request change orders to be paid by Tenant. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord, or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing the improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing the improvements or from any faulty construction thereof.

**NOTICES**

24. All notices required to be given to Landlord hereunder shall be sent by registered or certified mail or delivery service with receipt to, and all rent payments shall be made to Landlord at

2117 Second Avenue North
Post Office Box 12767
Birmingham, Alabama  35202-2767

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail or delivery service with receipt.

All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at

1550 Jackson Ferry Road
Post Office Box 2029
Montgomery, Alabama  36104-2029
Attention:  Steve Lincoln

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail or delivery service with receipt.

**END OF TENANCY**

25. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state. Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

-12-

SC-12

**ASSIGNMENT**
**AND**
**SUBLEASING**

26. The Tenant may without the consent of the Landlord assign this lease, or sublease or vacate the demised premises in whole or in part, provided the Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this lease.

to a supermarket or food store

In the event Tenant desires to assign its lease or to sublease its premises for the conduct of some business other than a supermarket or food store (except for an assignment or sublease to any corporation or entity which is the parent of, subsidiary to, or affiliated with Tenant or to any entity with which Tenant merges or consolidates or to which it sells all or substantially all of its business in the county in which the demised premises are situated), Tenant shall give written notice to Landlord of its desire to assign or sublease, and disclose the identity of the intended assignee or sublessee, and the terms of the intended assignment or sublease. Within two (2) months after the delivery of such notice, Landlord may either approve or disapprove the intended assignment or sublease. If Landlord approves the intended assignment or sublease, Tenant shall proceed to effect it. If Landlord disapproves the intended assignment or sublease, Landlord agrees to accept assignment of or sublease of the demised premises on the same terms and those offered by Tenant's intended assignee or sublessee. If Landlord fails to approve or disapprove the intended assignment or sublease within two (2) months of delivery of Tenant's notice, the intended assignment or sublease shall be deemed approved.

In the event the entire demised premises are vacated or merchandise or services are not sold therein for a period in excess of six (6) months, while the demised premises may be used for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant), Landlord shall have the option thereafter for a period of sixty (60) days (unless the premises shall have been reoccupied by Tenant for use as a supermarket) to terminate and cancel this lease upon not less than thirty (30) nor more than ninety (90) days' written notice to Tenant of its election so to do, unless within fifteen (15) days of receipt of such notice, Tenant advises Landlord that Tenant, prior to receipt of such notice, had in good faith committed to assign this lease or sublease the demised premises to a third party for occupancy within two (2) months from such notice.

**EXTENSIONS**

27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of _five_ ( _5_ ) successive extensions of this lease, each extension to be for a period of _five_ ( _5_ ) years and at the same rentals and upon the same terms and conditions as required herein for the initial term.

Such option privilege may be exercised by Tenant giving to the landlord a notice in writing at least _six (6) months_ before the expiration of the initial term, and if extended, at least _six (6) months_ before the expiration of such extended term, staling the intention of the Tenant to exercise such option and thereupon this lease shall be so extended without the execution of any other or further document.

-13-

**EXCLUSIVE**
**SUPERMARKET**

28. Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant; except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the 1,000 square foot area of any storeroom within the shopping center, or on incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, for consumption only on or off the premises, shall not be deemed a violation hereof. With the exception of package stores, only Tenant may sell beer and wine in the shopping center for off-premises consumption. Only Tenant may operate a bakery, delicatessen or similar department in the shopping center.

* and Harco Drugs or its successor drug store,

Notwithstanding the foregoing, the 1,000 square feet of food sales area allowed above shall be increased to 1,200 square feet for Harco Drugs or its successor drug store.

+ Only Tenant may operate a seafood market or seafood department in the shopping center.

**SUBORDINATE**

29. The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

as owner/landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument.

-14-

**NOTICE TO LENDER**

30. Tenant agrees that it will give notice to any holder of a first mortgage (which term shall include all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, the Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 12 of this lease.

**COMMON AREA MAINTENANCE**

31. Landlord agrees to operate and maintain in good condition and repair all the common areas, as defined in Article 3 hereof, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping of all paved surfaces, repainting of parking area stripping, and watering and maintenance of all landscaped areas, general repair and maintenance of landscaped areas. If the Landlord, after fifteen (15) days following receipt of written notice from Tenant to do so, shall fail to make such repairs or cause such services to be performed in this Article, the Tenant shall have the right to make such repairs or perform the services described and in its behalf and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred therein.

Landlord's obligation to provide safe-guarding shall not be construed to impose an affirmative duty to provide security protection in the shopping center unless Landlord determines such security protection to be necessary. Nothing in this Article 31 shall relieve Landlord of its obligation to indemnify Tenant for claims or loss by reason of its accident or damage on or about all common areas, as set forth in Article 15 of this Lease.

For such services, Tenant shall pay to the Landlord at the end of each calendar year, as additional rental hereunder and as reimbursement for the annual cost thereof, the amount of Tenant's prorata share thereof, computed in the proportion which the square footage of Tenant's store building bears to the total square footage of all buildings (including additional floor levels) existing in the shopping center from time to time. Such amount shall be payable within thirty (30) days following the furnishing (not more than monthly, but no less than twice annually) by Landlord and Tenant of a detailed statement of such costs and of the basis for proration (including an as-built survey if requested). Tenant shall have the right to audit at its own expense any such costs and expenses within six (6) months following submission of such statement.

Such payments shall be prorated for fractional years and months occurring at the commencement and end of the term of the Lease. Tenant shall not reimburse Landlord for any expense not reasonably required for the necessary maintenance and repair of the shopping center common areas, such as rental insurance premiums, shopping center management fees and administrative costs. In the event that Landlord wishes to make capital acquisitions of goods to provide such services, such as lawn mowers or the like, the equipment shall be used only for a shopping center under this Lease or proper records showing the amount of use of such equipment chargeable to the shopping center under this Lease shall be maintained, and only that prorata share charged against common area maintenance of the shopping center. The charge therefor shall also be less any depreciation or similar tax benefits to Landlord, and shall include a credit for any recovery of the cost thereof upon disposition of the equipment.

Notwithstanding Tenant's obligation to pay a portion of Landlord's common area maintenance expenses hereunder, Tenant shall in no way be responsible for cost of testing, removing, abating, or otherwise dealing with hazardous substances or other violations of environmental laws, ordinances, rules, regulations or written policies now or hereafter existing, including, but not limited to, the Toxic Substances Control Act, Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Clean Water Act, Rivers and Harbors Acts of 1899 and 1910, Clean Air Act or the like, as amended and as now existing or hereinafter adopted or amended, except for those caused by the intentional or negligent activities of Tenant, its employees, officers and agents.

**BENEFIT**

32. This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

**TRANSFER BY LANDLORD**

33. In the event Landlord transfers Landlord's interest in this lease, Landlord agrees to promptly provide Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's interest in this lease.

**SHORT FORM LEASE**

34. The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease in form permitting its recording.

**MARGINAL TITLES**

35. The marginal titles appearing in this lease are for reference only and shall not be considered as part of this lease or in any way to modify, amend or affect the provisions thereof.

**COMPLETE AGREEMENT**

36. This written lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**REAL ESTATE TAXES**

37. During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of ad valorem real estate taxes levied against the demised premises. Tenant shall be responsible only for its prorata share of such taxes for fractional years occurring at the commencement and expiration of the term of this Lease and any extensions thereof.

-16-

If such taxes are not assessed separately, but shall be included within the assessment of the demised premises and others, the assessment shall be fairly apportioned to determine Tenant's prorata share. Such apportionment shall be made in the ratio which the square footage of Tenant's store building bears to the total square footage of all store buildings (including additional floor levels) from time to time existing in the shopping center. The amount of taxes attributable to the shopping center, and for which Tenant is to reimburse Landlord in part, shall be less any abatements, discounts (whether or not taken) or refunds thereon. Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements as evidence of the basis upon which any increase in taxes is chargeable to Tenant and an "as built" survey of the shopping center, and such additional rental shall be payable by Tenant on demand after payment by Landlord. All taxes, other than ad valorem real estate taxes, including special assessments, improvement liens and the like shall remain the sole responsibility of the Landlord. However, Tenant shall remain responsible for sales taxes on rentals levied by law on leases.

Tenant shall have the right from time to time to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned, and to institute such proceedings in the name of the Landlord as the Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to the Landlord.

Notwithstanding the above, it is agreed that Tenant's obligation to make the payments herein described is expressly conditioned upon receipt from Landlord of a written statement for such ad valorem real estate tax contributions (as well as the other documents described herein if requested by Tenant) no later than June 1 of the calendar year following the year in which the taxes were due.

**OPTION OR EXPANSION**

38. Tenant is hereby granted the option and privilege at any time during the term of this Lease or any extensions thereof, of enlarging its store building by incorporating the area on its westerly side with an addition not exceeding sixty (60) feet in width by two hundred (200) feet in depth. This option may be exercised only at such times as the adjoining retail shop space in the enlargement area is unimproved or vacant, or on the eighth (8th) anniversary of the commencement date, and at five (5) year intervals thereafter (the "option date"). Landlord shall not lease such retail shop space to other tenants for any term which would expire subsequent to any option date. Tenant shall be entitled to exercise this option by giving notice in writing during the period between six (6) months and three (3) months prior to any option date. Thereafter, Landlord agrees to construct such addition for occupancy by Tenant, in accordance with plans and specifications to be approved by the parties, with all due diligence following the vacation of the necessary area by other tenant. The addition shall be of like quality of construction as Tenant's original building. In order to facilitate the expansion of Tenant's store building, Landlord agrees that any adjacent building or buildings within the expansion area shall be of like structural quality and architectural harmony with Tenant's store building, shall front on the line which is the interior sidewalk line of Tenant's store building, and shall have a finish floor level, and roof and ceiling heights which shall be at the same elevations as the finish floor level, roof and ceiling heights of Tenant's store building. Further, Landlord agrees that the wall of Tenant's store building adjoining the expansion areas shall be constructed with steel column equivalently spaced to the nearest row of steel column supports within the open area of Tenant's demised store

-17-

building, and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original and of the expanded building width.

If, at the date of completion of any such building addition, fewer than ten (10) years of the term of this Lease remain, the term of this Lease shall be extended for the period of time necessary to provide a full ten (10) years from that date. Thereafter, for the balance of the term, including extensions, the annual minimum guaranteed rental (and the base for computation of percentage rental) shall be increased by the greater of: an amount equal to twelve percent (12%) of the cost of the addition, or an amount equal to a computed percentage multiplied by the cost of such addition, such percentage being equal to four percent (4%) plus the current prime interest rate (as published by the Federal Reserve or in the Wall Street Journal or similar public source) at the time of the exercise of the option. At Tenant's request, the construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant. The final cost of the addition upon completion shall be certified by the general contractor performing the work. If the term of this Lease is extended to provide a full ten (10) year term, the provisions of the Lease shall remain in effect, and the option periods, if any, shall follow upon the end of the extended term. Rentals, as adjusted by reason of the addition, shall continue. Upon completion, the addition shall be a part of the demised premises, and all references to the demised premises contained in this Lease shall be construed to include both Tenant's store building and the addition.

Causing any addition to be constructed is the sole obligation of the Landlord, its heirs, legal representatives, successors and assigns. However, nothing contained in this Lease shall constitute any express or implied obligation on the part of the holder of a first mortgage encumbering the fee simple title to the demised premises, or on the part of any purchaser at a sale under foreclosure of that mortgage, to comply with the terms and provisions of this Article 38. Additionally, Landlord's obligation shall not limit Tenant's right to undertake and complete the addition at its own cost, as described later in this Article 38.

If Landlord, for any reason, fails or refuses to construct the building addition contemplated after Tenant has properly exercised its option, Tenant, as its sole remedy against Landlord and at its option, and at its own expense, shall have the right to construct the building addition of the size and quality set forth above. If Tenant constructs the addition, Tenant agrees to cause any mechanics' liens incurred by it in connection with such addition to be promptly discharged, Tenant further agrees to indemnify and hold Landlord harmless from any expense occasioned by mechanics' liens. If, upon completion and occupancy of a building addition by Tenant, fewer than ten (10) years of the term of this Lease remain, the lease term shall be extended for a period of time necessary to provide a full ten (10) year term. For ten (10) years following the date of completion of the addition, the base for calculation of percentage rental, if any, shall be increased by an amount equal to the greatest of the three (3) factors set forth in the second paragraph of this Article 38 (in addition to the adjustment for the annual replacement rentals as defined hereinafter). Upon expiration of ten (10) years following the date of completion of the addition, the base for calculation of percentage rental shall revert to the minimum annual guaranteed rental established in Article 1 of this lease as adjusted for annual replacement rentals.

Notwithstanding any contrary provisions in this Article 38, if, and only if, (1) prior to construction of the enlargement, subject to the requirements of Article 3, Landlord has constructed a building in the area designated "Winn-Dixie

-18-

Expansion Area or Retail Shop Expansion" on Exhibit "A," and (2) either Landlord or Tenant constructs the enlargement to Tenant's store building, then, during the remaining lease term and any extensions, minimum guaranteed annual rental and the base for percentage rentals payable by Tenant shall increase by an amount equal to the annual guaranteed rentals paid by the last tenant(s) occupying any rental space lying within the expansion area under a bona fide written lease with a term not less than three (3) years ("annual replacement rentals"), adjusted for any common area maintenance, insurance, tax or other payments to be made by Tenant under the last paragraph of this Article 38 but not under the replaced leases. If rental space lying within the expansion area prior to the addition has not been leased (so that annual lost rentals cannot be calculated) and the parties cannot agree on a replacement rental, Landlord and Tenant shall each select one MAI appraiser, and the two selected shall choose a third appraiser to determine the reasonable annual rental value, and such reasonable annual rental value shall constitute annual replacement rentals for purposes of this paragraph.

Regardless of which party constructs Tenant's addition, the size of the premises as expanded shall be used to calculate Tenant's prorata share of real estate taxes, insurance premiums and common area maintenance charges.

MITIGATION   39. Notwithstanding anything to the contrary provided in this
LIABILITY   lease, if Landlord or any successor in interest of Landlord is an individual, joint venture, tenancy in common, firm or partnership, general or limited, there shall be absolutely no personal liability on the part of such individual or on the part of the members of such firm, partnership or joint venture with respect to any of the terms, covenants and conditions of this lease. Tenant shall look solely to the equity of Landlord or such successor in interest in the shopping center for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Lease. This exculpation of personal liability is absolute and without any exception whatsoever.

SLF-HELP   40. If Landlord defaults in the performance or observance of any agreement or condition in this Lease contained on its part to be performed or observed, and if Landlord fails to cure such default within thirty (30) days after receipt of written notice from Tenant specifying the default (or fails within said period to commence to cure such default and thereafter to prosecute the curing of such default to completion with due diligence), Tenant may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter, cure such default for the account of the Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord. Landlord agrees to reimburse Tenant therefor or save Tenant harmless from such liability. Tenant may cure any default as aforesaid prior to the expiration of said thirty (30) days, but after said notice to Landlord, if the curing of such default prior to the expiration of said thirty (30) days is reasonably necessary to protect the real estate or Tenant's interest therein or to prevent injury or damage to persons or property. If Landlord fails to reimburse Tenant upon demand for any amount paid for the account of Landlord hereunder, said amount may be deducted by

-19-

Tenant from the next or any succeeding payments of rent due hereunder.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this agreement the day and year first above written.

Signed, sealed and delivered
in the presence of:

                                    VALLEYDALE ASSOCIATES, LTD., an
                                    Alabama Limited Partnership

                                    By: VALLEYDALE, INC., an
                                        Alabama corporation

                                    By: /s/ [signature]
                                    Its  Chairman

As to Landlord                      By: /s/ [signature]
                                    Its  President

                                    (CORPORATE SEAL)

                                    LANDLORD


                                    WINN-DIXIE MONTGOMERY, INC.

                                    By: /s/ [signature]
                                    Its  Vice President

As to Tenant                        By: /s/ Ronald D. [signature]
                                    Its  Assistant Secretary

                                    (CORPORATE SEAL)

                                    TENANT

STATE OF Alabama
COUNTY OF Jefferson

I, _____, a Notary Public in and for said County, in said State, hereby certify that _____ _____ of Valleydale, Inc., an Alabama corporation, as authorized general partner of VALLEYDALE ASSOCIATES, Ltd., an Alabama limited partnership whose name is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such General Partner and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this 19th day of January, 1995.

_____
Notary Public, State and County aforesaid.

My Commission Expires 4-27-96

(NOTARIAL SEAL)

STATE OF FLORIDA
COUNTY OF DUVAL

I, Sally Reece, a Notary Public in and for said County, in said State, hereby certify that James Kufeldt, whose name as Vice President of WINN-DIXIE MONTGOMERY, INC. a Kentucky corporation, whose name is signed to the foregoing conveyance, and who is known to me, acknowledge before me on this day that, being informed of the contents of the conveyance, he, as such Vice President and with full authority, executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this 5th day of April, 1995.

Sally Reece
Notary Public, State and County aforesaid.

My Commission Expires _____

(NOTARIAL SEAL)

---

GUARANTY

In consideration of the sum of Ten Dollars ($10.00) paid by VALLEYDALE ASSOCIATES, LTD., an Alabama limited partnership

hereinafter called "Landlord", to WINN-DIXIE STORES, INC., a Florida corporation with its principal office at 5050 Edgewood Court, Jacksonville, Florida 32205, hereinafter called "Guarantor", the receipt and sufficiency whereof, are hereby acknowledged, Guarantor does hereby guarantee unto Landlord, its heirs, legal representatives, successors and assigns, the due performance and observance by WINN-DIXIE MONTGOMERY, INC.

hereinafter called "Tenant", of all the terms, covenants and conditions on the part of Tenant to be performed and observed including, without limitation, payment of rentals under the attached and foregoing lease agreement dated _____, covering certain premises located _____ at the southerly corner of Valleydale Road and Caldwell Mill Road in the County of Shelby, State of Alabama

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed in its corporate name and its corporate seal to be hereunto affixed and attested by its officers thereunto duly authorized this 5th day of April, 19 95.

Signed, sealed and delivered in the presence of:

_____

_____

WINN-DIXIE STORES, INC.
By: _____
Its President
Attest: _____
Its Asst. Secretary
(CORPORATE SEAL)

GUARANTOR

STATE OF FLORIDA)
COUNTY OF DUVAL)

The foregoing instrument was acknowledged before me this 8th day of _____, 1995, by James Kufeldt and Ronald D. Peterson, President and Assistant Secretary, respectively, of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation, who are personally known to me.

(NOTARIAL SEAL)

[Notary stamp: SALLY REECE, MY COMMISSION #CC382555, EXPIRES July 19, 1997]

Printed Name: Sally Reece

Notary Public, State and County aforesaid
My Commission Expires: _____
Notary ID Number: _____

EXHIBIT "B"

OVERALL DESCRIPTION

A parcel of land situated in the southeast one-quarter of the northwest one-quarter and the southwest one-quarter of the northwest one-quarter of Section 15, Township 19 South, Range 2 West, more particularly described as follows:

Commence at the southwest corner of the north one-half of the southeast one-quarter of the northwest one-quarter of said Section and run south 89 degrees 10 minutes 56 seconds east along the north line of the north one-half of southeast one-quarter of the northwest one-quarter of said section for a distance of 345.00 feet to the point of beginning of herein described property; thence run south 8 degrees 37 minutes 32 seconds west for a distance of 100.93 feet; thence run north 89 degrees 10 minutes 55 seconds west for a distance of 91.29 feet; thence run south 85 degrees 22 minutes 23 seconds west for a distance of 105.48 feet; thence run south 86 degrees 46 minutes 24 seconds west for a distance of 99.25 feet; thence run north 85 degrees 51 minutes 01 seconds west for a distance of 34.57 feet; thence run north 0 degrees 04 minutes 46 seconds east for a distance of 15.00 feet; thence run north 89 degrees 10 minutes 56 seconds west for a distance of 120.11 feet; thence run north 44 degrees 19 minutes 31 seconds west for a distance of 74.56 feet to the point of commencement of a curve to the left, said curve having a central angle of 22 degrees 43 minutes 08 seconds and a chord bearing of north 12 degrees 10 minutes 38 seconds east and a radius of 231.50 feet; thence travel in a northerly direction along the arc of said curve for a distance of 91.79 feet; thence run north 0 degrees 49 minutes 04 seconds east for a distance of 40.00 feet to the point of commencement of a curve to the left, said curve having a central angle of 41 degrees 40 minutes 00 seconds, and a chord bearing of north 20 degrees 00 minutes 56 seconds west and a radius of 254.91 feet; thence run in a northwesterly direction along the arc of said curve for a distance of 185.38 feet; thence run north 40 degrees 50 minutes 56 seconds west for a distance of 113.48 feet to a point on the southerly right-of-way line of Valleydale Road, said point also being the point of commencement of a curve to the left having a central angle of 3 degrees 19 minutes 18 seconds, and a chord bearing of north 52 degrees 29 minutes 59 seconds east and a radius of 2913.72 feet; thence run in a northeasterly direction along the arc of said curve for a distance of 168.92 feet; thence run north 50 degrees 50 minutes 23 seconds east for a distance of 92.74 feet; thence run south 0 degrees 00 minutes 32 seconds east for a distance of 199.55 feet; thence run north 53 degrees 20 minutes 43 seconds east for a distance of 130.22 feet to a point on the southwest right-of-way line of Caldwell Mill Road; thence run south 36 degrees 39 minutes 17 seconds east for a distance of 672.21 feet; thence run north 89 degrees 10 minutes 56 seconds west for a distance of 359.63 feet to the point of beginning.

Said parcel contains 9.1584 acres.