**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ORDER (A) APPROVING THE SALE OF A 2002 GULFSTREAM  G-200
AIRCRAFT AND RELATED EQUIPMENT FREE AND CLEAR OF LIENS,
CLAIMS, INTERESTS AND ENCUMBRANCES
AND (B) GRANTING RELATED RELIEF**

These cases came before the Court upon the motion of Winn-Dixie Stores, Inc.

and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession

(collectively, the "Debtors" [1]) for entry of an order under 11 U.S.C. §§ 105(a) and 363

and Federal Rule of Bankruptcy Procedure 6004 (a) approving the sale of an Israel

Aircraft Industries Gulfstream 200 aircraft bearing FAA registration number N65R and

manufacturer's serial number 072 and related equipment and all books, manuals,

logbooks, maintenance records and other related data (the "Assets") to Studio City

Aviation 04, LLC ("Studio City") or to the party submitting a higher or otherwise better

offer, if any, free and clear of liens, claims, interests and encumbrances, (b) authorizing

the payment of a brokerage fee to Bloomer deVere Group Avia, Inc. ("deVere") in

connection with the sale and (c) granting related relief (the "Motion"). The Debtors

subsequently agreed to seek consideration of the payment of the brokerage fee to deVere

---

[1] All capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them
in the Motion or the Purchase Agreement.

by separate Motion and, thus, such issue was not considered by the Court. A hearing on the Motion was held on May 19, 2005 (the "Sale Hearing"). The Court has read the Motion and considered the representations of counsel. Upon the representations of counsel and without objection from the United States Trustee or any interested party, the Court makes the following findings of fact:

A.    The Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

B.    The Motion solicited higher or better bids for the Assets and contemplated that if a higher or better offer for the Assets was received, the Debtors would conduct an auction for the Assets (the "Auction"). Leading Edge Aviation Solutions, LLC ("Leading Edge" or the "Purchaser") submitted a competing bid for the Assets and an Auction was held at the offices of Skadden, Arps, Slate, Meagher & Flom LLP on May 17, 2005. Bidding ensued and Leading Edge's final bid of $16,435,000 represented the highest and best offer received for the Assets.

C.    Upon the Purchaser's submission at the Auction of a bid in the amount of $16,435,000, Studio City declined to bid further, and the Debtors properly declared the Auction closed.

D.    The Debtors have provided interested parties with proper notice of the Motion, the Sale Hearing and the Auction in accordance with 11 U.S.C. §§ 102(1), 105(a), and 363 and Fed. R. Bankr. P. 2002 and 6004, Local Rule 2002-1 and the Notice Procedures Order.

E.     A reasonable opportunity to object or be heard with respect to the Motion and the sale of the Assets has been afforded to all parties in interest (including all third parties asserting Interests or Claims (as such terms are defined below) in, to or against the Assets, if any).

F.     The Debtors' marketing efforts with respect to the Assets were reasonable, adequate, and designed to obtain the highest price possible for the Assets.  Through the Debtors' marketing efforts and Auction process, the Debtors afforded interested potential purchasers a full, fair and reasonable opportunity to make higher or better offers to purchase the Assets.

G.     The Debtors demonstrated good business reason to sell the Assets pursuant to 11 U.S.C. § 363(b), prior to a plan of reorganization.

H.     The Purchaser is not an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

I.     The Purchase Agreement, a copy of which is attached as Exhibit A to this Order, was proposed, negotiated and entered into by the Debtors and the Purchaser without collusion, in good faith and at arms-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

J.     The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m).

K.     The consideration provided by the Purchaser pursuant to the Purchase Agreement to acquire the Assets (i) is fair and reasonable; (ii) is the highest and

otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value and fair consideration for the Assets.

L.      The transfer of the Assets to the Purchaser pursuant to the Purchase Agreement will be a legal, valid and effective transfer of the Assets, and will vest the Purchaser with good, marketable and valid title in and to the Assets free and clear of any liens, claims, encumbrances, pledges, mortgages, security interests, charges, options and other interests of any kind or nature (collectively, the "Interests") and claims (as such term is defined in 11 U.S.C. § 101(5)) ("Claims").

M.      The Debtors may sell and transfer the Assets free and clear of all Interests and Claims, because any entity with Interests or Claims, if any, in the Assets to be transferred (i) has consented to the sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Interests and Claims, if any, who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2).

N.      The Debtors shall cause the proceeds from the sale to be paid in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Prepetition Secured Lenders' Cash Collateral and Granting

- 4 -

Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order"), and the Loan Documents (as defined in the Final Financing Order).

O.      The approval of the sale of the Assets to the Purchaser is in the best interests of the Debtors, their estates, their creditors and other parties in interest. Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is GRANTED.

2.      Any objections to the entry of this Order or to the relief granted and requested in the Motion that have not been withdrawn, waived, or settled are overruled on the merits.

3.      The terms and conditions of the Purchase Agreement are approved in all respects.  Pursuant to 11 U.S.C. §§ 105 and 363, the Debtors are authorized to consummate the sale (subject to applicable closing conditions set forth in the Purchase Agreement).  The Debtors are authorized to transfer the Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

4.      The Debtors are authorized and empowered to consummate and implement fully the Purchase Agreement, to execute, deliver and consummate all additional instruments and documents that may be necessary or appropriate to implement the Purchase Agreement, and the Debtors are authorized to take all further actions as may reasonably be necessary or appropriate for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to the Purchaser the

Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations under the Purchase Agreement.

5.      Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties to the Purchase Agreement in accordance with the terms of the Purchase Agreement without further order of the Court; provided, however, that, the Debtors shall first obtain the prior written consent of the Creditors' Committee, which consent shall not be unreasonably withheld; and provided further, that any such modification, amendment or supplement shall neither be materially adverse to the Debtors nor materially adversely change, with respect to the Debtors, the economic substance of the transactions contemplated by this Order.

6.      Pursuant to 11 U.S.C. § 105(a) and 363(f), the Assets shall be transferred to the Purchaser free and clear of all Interests and Claims, with all such Interests and Claims, if any, to attach to the  proceeds of the sale of the Assets, with the same validity, enforceability, priority, force and effect they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors and all interested parties with respect to such Interests and Claims.

7.      The transfer of the Assets shall be a legal, valid, and effective transfer of the Assets and shall vest the Purchaser with all right, title and interest of the Debtors in and to the Assets, free and clear of all Interests and Claims.

12.    This Order is and shall be effective as a determination that any and all Interests or Claims, if any, shall be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

13.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens or other documents or agreements evidencing Interests and Claims with respect to the Debtors and/or the Assets, shall not have delivered to the Debtors and the Purchaser, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests and Claims which the person or entity has with respect to the Debtors and/or the Assets or otherwise, then (a) the Debtors are authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such assets and contracts and (b) the Purchaser is authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests and Claims in the Assets, of any kind or nature whatsoever.

14.    This Order shall constitute a full and complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good, marketable and valid title in the Assets to the Purchaser.  Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

8.     The Debtors shall cause the proceeds from the sale to be paid in accordance the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

9.     The consideration provided by the Purchaser for the Assets constitutes reasonably equivalent value and fair and reasonable consideration under the Bankruptcy Code and applicable non-bankruptcy law, and may not be avoided under 11 U.S.C. § 363(n).

10.     The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in 11 U.S.C. § 363(m). Accordingly, the reversal or modification on appeal of the authorization to consummate the sale of the Assets shall not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal. The Purchaser is a purchaser in good faith of the Assets and is entitled to all of the protections afforded by 11 U.S.C. § 363(m) of the Bankruptcy Code.

11.     All entities who are presently in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors. Each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary or appropriate to release its Interests in and Claims against the Assets (provided that the taking of such actions shall not require such creditor to incur any material costs) as such Interests or Claims may have been recorded or may otherwise exist.

15.    This Order shall be binding in all respects upon and shall govern the acts of all entities, including, without limitation, the Federal Aviation Administration, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

16.    This Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and creditors, the Purchaser and its respective affiliates, successors and assigns, and this Order shall be binding in all respects upon all persons asserting an Interest in or Claim against the Debtors' estates or the Assets.  The sale shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee of the Debtors and their estates.

17.    During the pendency of the Debtors' jointly administered cases, this Court shall retain exclusive jurisdiction (a) to enforce and implement the Purchase Agreement and any agreements and instruments executed in connection with the Purchase Agreement, (b) to compel delivery of possession of the Assets to the Purchaser, (c) to resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement and (d) to interpret, implement, and enforce the provisions of this Order.

18.    All persons and entities that hold Interests in or Claims against the Debtors are forever barred, estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the sale of the Assets.

19.    Nothing contained in any plan of reorganization or liquidation confirmed in these chapter 11 cases, or any order of this Court confirming such a plan, or any other order entered in these chapter 11 cases or in any subsequent chapter 7 cases shall conflict with or derogate from the terms of this Order or from the provisions of the Purchase Agreement that, under the terms of the Purchase Agreement, survive closing.

20.    The failure specifically to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

21.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in the Purchase Agreement shall govern.

22.     Notwithstanding Fed. R. Bankr. P. 6004(g), this Order shall take effect immediately upon entry.

Dated this ___20___ day of May, 2005 in Jacksonville, Florida

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve
a copy of this Order on all parties who
received copies of the Motion.

**EXHIBIT A**

412436.12-Wilmington Server 1A - MSW

## AIRCRAFT PURCHASE AND SALE AGREEMENT

This Aircraft Purchase and Sale Agreement (this "Agreement") is made as of May 17, 2005, by and between Winn-Dixie Stores, Inc., with an address at 5050 Edgewood Court, Jacksonville, Florida 32254 ("Seller"), and Leading Edge Aviation Solutions, LLC, with an address at 777 Franklin Ave., Franklin Lakes, New Jersey 07417, or its assigns ("Purchaser").

RECITALS

A.    Seller owns that certain 2002 Gulfstream Aerospace G-200 aircraft, bearing the manufacturer's serial number 072 and the U.S. civil aviation mark N65R (the "Airframe"), together with two (2) Pratt & Whitney Canada PW306A engines bearing manufacturer's serial numbers PCE-CC0146 and PCE-CC0148 (the "Engines"), the appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment or property installed on or attached to the Airframe and Engines, listed in Exhibit I attached hereto and incorporated herein by this reference (the "Aircraft Specification"), and all books, manuals, logbooks, maintenance records and other data related to the operation and maintenance of the Aircraft the Airframe and Engines currently in Seller's possession or under its control (the "Aircraft Documents") (the Airframe, the Engines and the other foregoing described equipment and property, collectively, the "Aircraft").

B.    Subject to the terms and conditions set forth in this Agreement, Seller desires to sell and deliver the Aircraft to Purchaser and Purchaser desires to accept and purchase the Aircraft from Seller.

C.    Seller, Purchaser and Insured Aircraft Title Services, Inc., a corporation organized under the laws of the state of Oklahoma ("Escrow Agent") will enter into a mutually acceptable escrow agreement ("Escrow Agreement") with respect to the transactions contemplated hereunder, in the form attached hereto as Exhibit IV and incorporated herein by this reference.

D.    Purchaser has conducted a visual inspection of the Aircraft and now desires to enter into this Agreement.

E.    Seller commenced Case No. 05-11063-rdd under Chapter 11, 11 U.S.C. sections 101 et seq. (the "Bankruptcy Code"), on February 21, 2005 by filing a voluntary petition with the United States Bankruptcy Court for the Southern District of New York. By order dated April 13, 2005, venue of the Case was transferred by such Court to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Court") and is currently pending there under Case No. 3:05-bk-03817-JAF (the "Case").

IN CONSIDERATION of the mutual covenants contained herein, the parties hereto agree as follows:

## ARTICLE 1.    SALE OF AIRCRAFT.

1.1    Subject to the terms and conditions set forth herein, Seller hereby agrees to sell and deliver, and Purchaser hereby agrees to buy and accept the Aircraft.

## ARTICLE 2.    BANKRUPTCY COURT APPROVAL

2.1    Seller's obligations under this Agreement are conditioned upon the entry of the Order (as defined herein) of the Court approving the sale of the Aircraft to Purchaser, pursuant to the terms and conditions of this Agreement. The Order must be reasonably acceptable to Purchaser, shall be in form and substance substantially similar to the form of order filed with the Court contemporaneously with the debtor's motion seeking leave to sell the Aircraft (the "Motion") and must provide for a transfer of good and marketable title of the Aircraft to Purchaser, free and clear of all liens, encumbrances and claims.

2.2    The Seller has filed the Motion, and a hearing regarding approval of a sale of the Aircraft (the "Hearing ") has been scheduled on May 19, 2005. Seller shall use commercially reasonable efforts to obtain entry of the Order at the Hearing.

## ARTICLE 3.    DELIVERY CONDITION, INSPECTION AND ACCEPTANCE.

3.1    The Aircraft shall be delivered to Purchaser on the Delivery Date (as defined in Section 3.11 herein) in the following condition:

3.1.1    equipped as specified in the Aircraft Specification and in the same condition as during the Inspection;

3.1.2    with a current and valid United States Standard Airworthiness Certificate;

3.1.3    in an airworthy condition (as "airworthy" has the meaning set out in Chapter 1, Paragraph 9 of FAA Order 8130.21) suitable for operations under Part 91 of the FAR, with all systems and installed equipment and engines in normal working order and operating to manufacturers' specifications, and with each engine able to produce its rated takeoff power in a ground power run;

3.1.4    up to date on all manufacturers' recommended maintenance and inspection schedules (including all calendar and hourly inspections), and in compliance with all applicable FAA airworthiness directives and manufacturers' service bulletins (or equivalents) that have been issued with respect to the Aircraft on or before the Delivery Date;

3.1.5    with all applicable airframe, engine, and avionics maintenance programs and contracts, if any, paid to the date and time of the Delivery Date and transferable to Purchaser;

2

    3.1.6   with no corrosion or damage and no history of corrosion or damage;

    3.1.7   with no parts, systems or components installed in the Aircraft on a temporary loan or exchange basis; and

    3.1.8   with all Aircraft Documents original and complete, continuous and up-to-date, printed or published in English, and maintained in accordance with industry standards and the applicable Federal Aviation Regulations ("FAR").

3.2    Upon entry of the Order and pursuant to this Agreement, Seller shall remove the Aircraft from the used aircraft market and at Purchaser's sole expense, (including but not limited to fuel, MSP charges, travel expenses for the crew and landing fees). Seller shall ferry the Aircraft from its then present location to the Gulfstream Service Center in Savannah, Georgia ("Inspection Facility") where the Aircraft shall undergo a pre-purchase inspection in accordance with the items set out in Exhibit II attached hereto and incorporated herein by this reference ("Inspection"). The Inspection will commence upon the arrival of the Aircraft at the Inspection Facility, and will not exceed three (3) days after the arrival of the Aircraft at the Inspection Facility, except for delays caused by the condition of the Aircraft or the Inspection Facility's schedule. Purchaser shall have twenty-four (24) hours from the conclusion of the Inspection to conditionally accept or to reject the Aircraft pursuant to Section 3.4 below.

3.3    Upon entry of the Order, Seller shall make the Aircraft available for the Inspection. Purchaser shall open a work order with the Inspection Facility for Purchaser's account to pay all costs of the Inspection. Seller shall open an account with the Inspection Facility for the correction of any "Airworthiness Discrepancies" (as defined below) found during the Inspection. The work order of Purchaser shall be acknowledged by Seller, but Seller shall have no liability thereon. The work order of Seller shall be acknowledged by Purchaser, but Purchaser shall have no liability thereon. Flight costs for a test flight of the Aircraft that will not exceed two (2) hours shall be at Purchaser's cost for fuel and landing fees. Purchaser shall have the right to have an agent on board the Aircraft during any test flight. All flights of the Aircraft under this Agreement shall be under the operational control of Seller.

3.4    Purchaser shall cause the Inspection Facility to conduct the Inspection to identify in reasonable detail those airworthiness discrepancies ("Airworthiness Discrepancies") that cause the Aircraft to not be in compliance with the delivery conditions in Section 3.1 herein. The Airworthiness Discrepancies, which in the reasonable judgment of the Inspection Facility, as a result of the Inspection, shall be corrected by Seller to cause the Aircraft to be airworthy as set forth in Chapter 1, Paragraph 9 of FAA Order 8130.2E. Seller shall bear the cost of correcting each and every Airworthiness Discrepancy. The Inspection shall not exceed three (3) business days. The parties hereto agree that cosmetic items noted by the Inspection Facility during the Inspection shall not be an obligation of Seller to correct. At the conclusion of the Inspection, Purchaser may, in its sole discretion, reject the Aircraft by notifying Seller and Escrow Agent in writing of such rejection as provided in Section 3.7. If Purchaser does not reject the Aircraft, Seller and Purchaser shall each execute a Technical Acceptance Certificate (the "Acceptance"), the form of which is attached hereto as Exhibit III and is incorporated herein by this reference ("Certificate") setting forth on an attachment thereto a list of all Airworthiness Discrepancies. If

Purchaser fails to execute the Certificate within two (2) days of delivery by the Inspection Facility of a list of Airworthiness Discrepancies found as a result of the Inspection, then Purchaser shall be deemed to have accepted the Aircraft. Upon the mutual execution by Seller and Purchaser of the Certificate, subject to Section 3.5, Seller shall be obligated to correct and pay for the correction of all Airworthiness Discrepancies attached to the Certificate. Seller and Purchaser each shall have paid their respective amounts owed the Inspection Facility prior to the Aircraft's departure from the Inspection Facility. Except as otherwise provided herein, Purchaser, upon executing the Certificate shall be irrevocably obligated to accept delivery of the Aircraft after Seller has performed Seller's obligations under the Certificate and Seller has met its other obligations under this Agreement. Upon Purchaser's Acceptance of the Aircraft by Purchaser's execution of the Certificate, the Deposit (as defined in Section 4.1 herein) shall become non-refundable to Purchaser except as specifically provided herein.

3.5    It shall be a pre-condition to Purchaser's obligation to accept delivery of the Aircraft at Delivery (as defined in Section 3.10 herein) that the Aircraft shall be in the condition set forth in Section 3.1 herein.

3.6    Should Purchaser, in its sole discretion, reject the Aircraft or be deemed to have rejected the Aircraft prior to Purchaser's execution of the Certificate, as set out in Sections 3.2 and 3.4 herein, Purchaser, at Purchaser's sole cost, shall be responsible to return the Aircraft to its physical condition prior to the Inspection but shall not be required to correct Airworthiness Discrepancies or cause the Aircraft to be returned to service. Purchaser shall indemnify Seller for any physical damage and any resulting loss of value to the Aircraft incurred during the Inspection or any claim arising out of the Inspection process, to the extent such damage was caused by an act or negligent omission of Purchaser unless such damage is covered and paid by insurance carried by the Inspection Facility or Seller. Purchaser's indemnity set out in the preceding sentence shall not be pre-conditioned on Purchaser's purchasing the Aircraft. Payment of the Deposit, as defined in Section 5.1(a), less any amounts due and payable from Purchaser to Seller hereunder, by Escrow Agent to Purchaser, shall be preconditioned upon Purchaser having paid the Inspection Facility for all costs of Purchaser due the Inspection Facility. Upon Purchaser's notice to Escrow Agent that Purchaser has rejected the Aircraft, and preconditioned upon written confirmation by Inspection Facility and Seller that Purchaser has paid all amounts set out above in this Section 3.6, Escrow Agent shall pay the Deposit to Purchaser on the next business day after receiving notice from Purchaser, Seller and Inspection Facility that Purchaser has performed all preconditions required herein for the return of the Deposit. Purchaser may give Seller notice of Purchaser's rejection prior to acceptance by writing "REJECTS" across the face of the Certificate, initialing "REJECTS" and delivering the Certificate to Seller, notifying Seller of Purchaser's rejection of the Aircraft.

3.7    Unless at such time Seller shall be in breach or default under this Agreement or as otherwise provided herein, should Purchaser fail to purchase the Aircraft after Purchaser has executed the Certificate and Seller has corrected and paid for all of the Airworthiness Discrepancies attached to the Certificate, Purchaser shall pay for the Inspection. The Deposit shall be paid to Seller as compensation for Seller's removal of the Aircraft from the used aircraft market and Seller's loss of use of the Aircraft during the period of the Inspection and shall be Seller's exclusive remedy for Purchaser's breach under this Section 3.7. Upon Seller's receipt of

the Deposit, this Agreement shall become null and void and neither Seller or Purchaser shall be further obligated to each other under this Agreement.

3.8     Should Seller fail to correct all the Airworthiness Discrepancies designated to be corrected and paid for by Seller attached to the Certificate, then Purchaser may terminate this Agreement provided Purchaser has paid the Inspection Facility for all the costs and charges related to any work orders opened by Purchaser at the Inspection Facility. Upon such termination by Purchaser, the Escrow Agent shall pay to Purchaser the Deposit less any amounts due and payable from Purchaser to Seller hereunder as the exclusive remedy to Purchaser. Upon receipt by Purchaser of the Deposit and other amounts set forth in the preceding sentence, this Agreement shall be null and void and neither party hereto shall have any further obligation to the other.

3.9     Upon completion of the correction of all Airworthiness Discrepancies and the placement of the "approved for return to service" entry by the Inspection Facility in the Aircraft's logbook, Purchaser and Seller shall, within three (3) business days, proceed to closing and delivery at the Inspection Facility or at another mutually agreeable location within the continental United States (closing and delivery "Delivery"). In the event Delivery shall not take place at the Inspection Facility, Purchaser shall pay Seller all costs for the ferry flight from the Inspection Facility to such other Delivery location. If closing does not occur within the three (3) day period set out in this Section 3.9 after all Airworthiness Discrepancies have been corrected due to a delay caused by Purchaser, then Purchaser shall be deemed to be in default of this Agreement and Seller, at Seller's sole discretion, may pursue its remedies as set out in Section 3.7 herein.

3.10     If the Aircraft is damaged or destroyed after Purchaser has accepted the Aircraft as set out in Section 3.4 herein, but before Delivery, Seller shall notify Purchaser of such damage within twelve (12) hours of the incident and Purchaser, in Purchaser's sole discretion, shall give notice to Seller within two (2) business days after Purchaser receives such information whether Purchaser will accept the Aircraft after the Aircraft has been repaired from an incident resulting in anything less than a total loss. Should Purchaser notify Seller that Purchaser rejects the Aircraft due to such incident, Escrow Agent shall, upon confirmation that Purchaser has paid the Inspection Facility for all costs due the Inspection Facility from Purchaser, during the next day when Escrow Agent's bank is open, pay the Deposit back to Purchaser.

3.11     Prior to the day of Delivery ("Delivery Date"), Seller shall have, pursuant to this Section 3.11, delivered to Purchaser and Escrow Agent a detailed invoice with reasonable supporting receipts, all costs due Seller by Purchaser for ferry and test flights conducted by Seller ("Invoice"). Seller shall also, prior to the Delivery Date, have delivered to Escrow Agent a fully executed but undated Bill of Sale to Purchaser. Such Bill of Sale shall be in the form as set out as Exhibit IV attached hereto and incorporated herein by this reference ("Bill of Sale"). Prior to the day of Delivery, Seller shall have also executed and delivered to Escrow Agent an undated FAA Bill of Sale (AC Form 8050-2) for filing and recording at the FAA Registry in Oklahoma City, Oklahoma (the "FAA Bill of Sale") (collectively the Bill of Sale and the FAA Bill of Sale, the "Bills of Sale"). In addition, prior to the day of Delivery, Purchaser shall have executed and delivered to Escrow Agent an undated FAA Application for Registration (AC Form 8050-1) for filing and recording at the FAA Registry in Oklahoma City, Oklahoma (the "FAA Registration

Application"). Subject to and in accordance with the terms and conditions set forth in the Escrow Agreement, on the Delivery Date (a) Seller shall instruct Escrow Agent to date and file the FAA Bill of Sale with the FAA Registry and to date and deliver the Bill of Sale to Purchaser after Purchaser has paid the Purchase Price to Seller as defined in Section 4.1 herein and (b) Purchaser shall instruct Escrow Agent to date and file the FAA Registration Application with the FAA Registry and to date and deliver the Delivery Receipt to Seller as further set out in Section 3.12 herein upon notice from Escrow Agent that the FAA Bill of Sale and FAA Registration Application have been duly filed at the FAA Registry in Oklahoma City, Oklahoma.

3.12    On the Delivery Date, subject to and in accordance with the terms and conditions set forth in the Escrow Agreement, Purchaser shall pay the balance of the Purchase Price (as defined in Section 5.1 herein) and cause the delivery to Seller of a duly executed Delivery Receipt acknowledging delivery of the Aircraft. Such Delivery Receipt shall be in the form set forth in Exhibit V, which is attached hereto and incorporated herein by this reference ("Delivery Receipt"), and will be effective when executed by an authorized agent of Purchaser at the delivery location and delivered to Seller. Upon execution and delivery by Purchaser of the Delivery Receipt, (a) it shall be conclusively presumed that Purchaser has approved and accepted the physical condition of the Aircraft "as is, where is, with all faults" in its then-current physical condition and state of repair, and (b) Purchaser shall unconditionally waive and release any claim against Seller for any breach of any representation or warranty regarding the Aircraft or set forth in this Agreement, whether express or implied, except as set forth in Section 20.1 herein. At Delivery, Seller will deliver to Purchaser all maintenance records and log book, in original form, from the date of delivery by the Aircraft's manufacturer and in the English language, including wiring diagrams. All airworthiness directives and mandatory service bulletins and mandatory inspections shall have been accomplished. Payment of the Purchase Price by Purchaser shall be a precondition to Delivery and Seller's delivery of the Bills of Sale, as set out in Section 3.11 herein, to Purchaser. The Delivery of the Aircraft, delivery of the executed Bill of Sale by Seller to Purchaser, the filing of the FAA Bill of Sale at the FAA Registry shall be preconditions to Purchaser delivering an executed Delivery Receipt to Seller.

3.13    Seller agrees, at the sole cost and expense of Purchaser, promptly after Delivery, to assist in the transfer of all maintenance service plans, including the ESP Gold Lite Plan carried on the Engines, the Airframe or any part or engine thereof to Purchaser to the extent transferable. Purchaser understands that there may be certain enrollment or transfer fees required for transfer of some extended coverage maintenance programs, and if it elects to continue such programs, Purchaser will apply for and pay for the transfer of coverage for those programs.

ARTICLE 4.    TITLE AND RISK OF LOSS.

4.1    Title to and risk of loss of the Aircraft shall pass from Seller to Purchaser when Purchaser has executed and delivered to Seller or its representative (or authorized the Escrow Agent to deliver) the Delivery Receipt and Seller has executed and delivered (or authorized the Escrow Agent to deliver) to Purchaser or its representative the Bills of Sale, and not prior thereto.

*$16,435,000.00 [handwritten]*        *Sixteen [handwritten]*

ARTICLE 5.    PURCHASE PRICE AND PAYMENT SCHEDULE.              *Thirty Five cc [handwritten]*

5.1    The purchase price of the Aircraft is ~~Fifteen~~ Million, Four Hundred Thousand Dollars (US$~~15,400,000.00~~) ("Purchase Price") and shall be paid in immediately available funds to Seller in the following manner:

(a)    Purchaser shall have deposited Five Hundred Thousand Dollars (US$500,000.00) in an escrow account with Escrow Agent ("Deposit"); and          *cc [handwritten]*

(b)    Purchaser's transfer of the balance of the Purchase Price, ~~Fourteen~~ Million, *Fifteen [handwritten]* Nine Hundred Thousand Dollars (US$~~14,900,000.00~~) and any other payments due Seller by Purchaser (as set out in but not limited to the Invoice) on or before the Delivery Date to Escrow Agent.          *Thirty Five cc [handwritten]*

ARTICLE 6.    COMMISSIONS.          *$15,935,000.00  cc [handwritten]*

6.1    Seller represents to Purchaser that Seller has hired, at Seller's sole cost, Bloomer deVere as its broker for the transaction anticipated by this Agreement and Seller shall pay Bloomer de Vere's brokerage fee. Purchaser represents to Seller that it has not hired any broker to represent it for the transaction anticipated by this Agreement.

6.2    Both parties hereto agree to indemnify and hold the other harmless from and against any and all claims, suits, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees) asserted by any agent, broker or other third party for any commission or compensation of any nature whatsoever based upon the transactions contemplated by this Agreement.

ARTICLE 7.    DISCLAIMER BY SELLER OF WARRANTIES.

THE AIRCRAFT AND ANY AND ALL OTHER ITEMS SUBJECT TO THIS AGREEMENT ARE SOLD ON AN "AS-IS, WHERE-IS, WITH-ALL-FAULTS" BASIS AND WITH ALL FAULTS. SELLER DOES NOT MAKE, AND SELLER HEREBY DISCLAIMS, ANY AND ALL EXPRESS, IMPLIED OR STATUTORY WARRANTIES OR REPRESENTATIONS OF ANY NATURE WHATSOEVER WITH RESPECT TO THE AIRCRAFT AND ANY AND ALL OTHER ITEMS SUBJECT TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, AS TO THE DESIGN OR CONDITION OF THE AIRCRAFT, ITS MERCHANTABILITY, DURABILITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE AIRCRAFT, OR THE CONFORMITY OF THE AIRCRAFT TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER OR ORDERS RELATING THERETO, AS TO THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK OR COPYRIGHT, OR ANY OTHER MATTER CONCERNING THE AIRCRAFT (WHICH DISCLAIMER PURCHASER HEREBY SPECIFICALLY ACKNOWLEDGES PURSUANT TO ITS ACCEPTANCE OF THE BILL OF SALE). PURCHASER HEREBY WAIVES ANY CLAIM (INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR INCIDENTAL OR CONSEQUENTIAL DAMAGE) OR EXPENSE CAUSED BY THE AIRCRAFT OR BY PURCHASER'S LOSS OF USE THEREOF FOR ANY REASON WHATSOEVER. WITHOUT LIMITING THE GENERALITY OF THE

FOREGOING,  SELLER SHALL NOT BE LIABLE OR RESPONSIBLE FOR ANY
DEFECTS, EITHER PATENT OR LATENT (WHETHER OR NOT DISCOVERABLE BY
PURCHASER) IN THE AIRCRAFT, OR FOR ANY DIRECT OR INDIRECT DAMAGE TO
PERSONS OR PROPERTY RESULTING THEREFROM, OR FOR PURCHASER'S LOSS OF
USE OF THE AIRCRAFT OR FOR ANY INTERRUPTION IN PURCHASER'S BUSINESS
CAUSED BY PURCHASER'S INABILITY TO USE THE AIRCRAFT FOR ANY REASON
WHATSOEVER.

ARTICLE 8.  TAXES.

     8.1    Purchaser shall be responsible for paying (a) any and all sales, use, value added,
stamp, excise, transfer or similar taxes, and any interest or penalties on such taxes, imposed on
the purchase and sale of the Aircraft pursuant to this Agreement and (b) any and all landing fees,
property taxes, excise taxes, fuel taxes, excise or similar taxes, and any interest or penalties on
such taxes, that may be assessed against the Aircraft attributable to Purchaser's ownership and
operation of the Aircraft on and after the Delivery Date (collectively, "Purchaser Taxes").  In the
event that Purchaser fails to pay any Purchaser Taxes and such Purchaser Taxes are levied upon,
assessed against, collected from, or otherwise imposed on Seller, then Purchaser shall indemnify,
protect, defend and hold Seller harmless from and against all such Purchaser Taxes, together
with any interest, penalties or other additions thereto, and any legal or other expenses incurred to
defend or protect against any such Purchaser Taxes.

     8.2    Seller shall be responsible for paying (a) any and all taxes on, or measured by, the
income, gross revenue, capital gain or any other characterization of the gain of Seller in
connection with the sale of the Aircraft pursuant to this Agreement and (b) any and all landing
fees, property taxes, excise taxes, fuel taxes, excise or similar taxes, and any interest or penalties
on such taxes, that may be assessed against the Aircraft attributable to Seller's ownership and
operation of the Aircraft prior to the Delivery Date (collectively, "Seller Taxes").  In the event
that Seller fails to pay any Seller Taxes and such Seller Taxes are levied upon, assessed against,
collected from, or otherwise imposed on Purchaser, then Seller shall indemnify, protect, defend
and hold Purchaser harmless from and against all such Seller Taxes, together with any interest,
penalties or other additions thereto, and any legal or other expenses incurred to defend or protect
against any such Seller Taxes.  In the event Seller receives notice or otherwise becomes aware of
any audit, claim, assessment or proposed assessment of any tax for which Purchaser may be
responsible under this Section, Seller shall immediately notify Purchaser thereof, and Purchaser
shall have the right to control, manage or defend any such audit, claim, assessment or proposed
assessment.  Seller's failure to provide Purchaser such notice in a timely manner shall relieve
Purchaser of its obligation to pay any such tax, or any associated interest or penalties, to the
extent Purchaser's rights have been impaired by Seller's failure.

     8.3    It shall be a condition to Seller's obligation to sell the Aircraft to Purchaser
hereunder that Seller, in good faith, shall have received evidence satisfactory to Seller that
Purchaser is exempt from or has paid or has made arrangements satisfactory to Seller for the
payment of any sales or use taxes imposed on the purchase and sale of the Aircraft.

## ARTICLE 9.  REPRESENTATIONS OF SELLER.

9.1    Seller's Representations and Warranties.  Seller represents and warrants to Purchaser that:

9.1.1    Seller is a corporation duly organized and validly existing in good standing under the laws of the state of its incorporation.

9.1.2    Subject to approval of the Court, Seller has had at all relevant times the power and authority to execute and deliver the Aircraft and to perform its obligations under this Agreement.

9.1.3    At closing, Seller shall have good and marketable title to the Aircraft. Subject to approval of the Court, to Seller's knowledge the execution, delivery and performance of this Agreement by Seller will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien upon Seller under any indenture, mortgage or other agreement or instrument to which it is a party or by which it or any of its property is bound, or any existing applicable law, rule, regulation, judgment, order or decree of any government, governmental instrumentality or court having jurisdiction over it or any of its properties.

9.1.4    Except for approval of the Court, neither the execution and delivery by Seller of this Agreement nor the consummation of any of the transactions contemplated hereby requires the consent or approval of, the giving of notice to, or, subject to Section 9.1.3, the taking of any other action in respect of, any trustee or holder of any indebtedness or obligation of Seller or any governmental authority or agency, other than the filing and recording of the FAA Bill of Sale and the FAA Registration Application at the FAA Registry in Oklahoma City, Oklahoma, and except such other consents, approvals, notices and actions as have been obtained, given, or taken, as the case may be.

9.1.5    No law or governmental rule or regulation makes invalid or not binding on Seller, this Agreement by reason of its participation in the transactions contemplated hereby.

9.1.6    This Agreement has been duly authorized, executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller enforceable in accordance with the terms hereof.

9.1.7    Seller has provided not less than 20 days notice, pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure, to all required creditors and parties in interest and the United States Trustee of the Motion and the Hearing, or such lesser time as the Court allowed on a motion to shorten time.

9.1.8 Seller served the Motion upon all parties who, prior to the Motion's filing with the Court, had expressed serious interest in acquiring the Aircraft.

9.1.9 Except for flights of the Aircraft to the Bahamas, at no time since the purchase of the Aircraft by Seller has the Aircraft been operated outside the continental United States.

## ARTICLE 10. REPRESENTATIONS OF PURCHASER.

10.1 <u>Purchaser's Representations and Warranties</u>. Purchaser represents and warrants to Seller that:

10.1.1 Purchaser is a limited liability company duly organized and validly existing in good standing under the laws of its state of organization.

10.1.2 Purchaser has had at all relevant times the power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.

10.1.3 The execution, delivery and performance of this Agreement by Purchaser has been duly authorized by all necessary company action. Compliance with the terms and provisions hereof do not and will not result in a conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien under any indenture, mortgage or other agreement or instrument to which it is a party or by which it or any of its property is bound, or any existing applicable law, rule, regulation, judgment, order or decree of any government, governmental instrumentality or court having jurisdiction over it or any of its properties.

10.1.4 Neither the execution and delivery by Purchaser of this Agreement nor the consummation of any of the transactions contemplated hereby requires the consent or approval of, the giving of notice to, or the taking of any other action in respect of, any trustee or holder of any indebtedness or obligation of Purchaser or any governmental authority or agency, except such as have been obtained, given, or taken, as the case may be.

10.1.5 No law or governmental rule or regulation makes invalid or not binding on Purchaser, this Agreement by reason of its participation in the transactions contemplated hereby.

10.1.6 This Agreement has been duly authorized, executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser enforceable in accordance with the terms hereof.

ARTICLE 11. FORCE MAJEURE.

11.1    Each party shall be excused from, and shall not be liable in any manner for, any delay or failure in its performance under this Agreement if occasioned by a cause or causes beyond its control including, but not necessarily limited to, acts of God, wars, insurrections, riots, hostilities, acts of government, fire, strikes, other material labor disputes, explosions, major accidents, or floods. Notwithstanding the foregoing, the failure of Seller to obtain the Order as provided herein shall not be deemed to be an event of force majeure. Should Seller be prevented from delivering the Aircraft due to force majeure, Seller shall have thirty (30) days after the scheduled Delivery Date to tender the Aircraft for Delivery, or Purchaser may, thirty (30) days after the event constituting force majeure at its sole option, give written notice to Seller of its decision to terminate this Agreement. Both parties hereto agree that if Seller acknowledges that Seller cannot deliver this Aircraft within the thirty (30) day period after the event of force majeure, Purchaser may terminate this Agreement immediately. If Seller cannot deliver the Aircraft, Purchaser will continue to have the obligation to pay the Inspection Facility any costs incurred by Purchaser. If Purchaser terminates this Agreement pursuant to this Article 11, Seller through Escrow Agent shall refund the Deposit to Purchaser, this Agreement shall become null and void and neither party shall be obligated to the other under this Agreement.

ARTICLE 12. TERMINATION.

12.1    Either party hereto may terminate this Agreement in the event the other party materially breaches any of the terms and conditions contained herein, or otherwise defaults in the performance of its contractual obligations. Such termination shall be effective upon five (5) days written notice to the defaulting party and shall in no way affect the rights or liabilities of the parties hereto which shall have accrued as of the date of such termination. Upon Seller's breach and Purchaser's termination based upon such breach of this Agreement, the Deposit shall be promptly returned to Purchaser.

12.2    Purchaser may terminate this Agreement by written notice to Seller, if the Order has not been entered on or before May 19, 2005 (the "Termination Date"), in which event Seller shall have no further obligation under this Agreement and the Escrow Agent shall deliver to Purchaser the Deposit without deduction for any inspection expenses, all of which shall be the sole liability of Seller. Purchaser, in its sole discretion, may extend the Termination Date.

ARTICLE 13. NOTICES.

13.1    All notices or other communications shall be in writing and shall be sent by (a) personal delivery, (b) telephone facsimile transmission, (c) express courier or delivery service, addressed as follows:

| SELLER | PURCHASER |
|---|---|
| Winn-Dixie Stores, Inc. | Leading Edge Aviation Solutions, LLC |
| 5050 Edgewood Court | 777 Franklin Avenue |
| Jacksonville, FL 32254 | Franklin Lakes, NJ 07417 |
| Tel:    904-370-7172 | Tel:    201-891-0881 |
| Fax:    904-783-5646 | Fax:    201-891-3556 |
| Attn:   Mike Chlebovec | Attn:   Craig Carfagna |
| With a copy to: | With a copy to: |
| Lane Powell PC | Crowell & Moring LLP |
| 1420 Fifth Avenue, Suite 4100 | 1001 Pennsylvania Avenue, N.W. |
| Seattle, WA 98101 | Washington, DC 20004 |
| Tel:    206-223-7431 | Tel:    202-624-2840 |
| Fax:    206-223-7107 | Fax:    202-628-5116 |
| Attn:   Kit Narodick | Attn:   Eileen M. Gleimer |

13.2    All notices shall be deemed given as of the date of receipt.

## ARTICLE 14. MANUFACTURER WARRANTIES.

14.1    Manufacturer Warranties

14.1.1 At Delivery or promptly thereafter, Seller agrees, at its sole cost and expense, to cause to be transferred to Purchaser all manufacturer's and peripheral vendors' warranties.

14.1.2 To the extent that the same may not be assigned or otherwise made available to Purchaser, Seller agrees, at the sole cost and expense of Purchaser, to exert its best reasonable efforts to enforce such rights as Seller may have with respect thereto for the benefit of Purchaser.

## ARTICLE 15. MODIFICATION.

15.1    No modification, amendment or termination of this Agreement shall be effective unless it is in writing and signed by each party hereto or their duly authorized representative.

## ARTICLE 16. WAIVER.

16.1    All rights of hereunder of Seller, on the one hand, and Purchaser, on the other, are separate and cumulative.

16.2    No waiver by either party of any default hereunder shall be deemed a waiver of any subsequent default.

ARTICLE 17. SUCCESSORS AND ASSIGNS.

17.1    Except where expressly provided to the contrary, this Agreement, and all provisions hereof, shall inure to the benefit of and be binding upon the parties hereto, their successors in interest, assigns, administrators, executors, heirs and devisees.

17.2    No party may assign or transfer its rights or obligations under this Agreement without the prior written consent of the other party, provided, however, that in the case of an assignment by the Purchaser, the Purchaser shall remain responsbile for all obligations arising hereunder.

ARTICLE 18. COUNTERPARTS.

18.1    This Agreement may be signed in several counterparts, each of which shall be an original, but all of which together shall constitute the same instrument.  Delivery of a signed counterpart by telephone facsimile transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

ARTICLE 19. LIKE-KIND EXCHANGE.

Purchaser is structuring the transaction herein contemplated as the receipt of replacement property pursuant to a like-kind exchange under the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended and the Treasury Regulations issued pursuant thereto, and as a trade-in under Georgia sales and use law. Seller and Purchaser agree to fully cooperate with one another to structure the transaction in such manner, including, without limitation, the execution of any documents, including an amendment to this Agreement or an assignment of this Agreement to a qualified intermediary or exchange accommodation titleholder.

ARTICLE 20. MISCELLANEOUS.

20.1    EXCEPT FOR THE REPRESENTATION CONTAINED IN SECTION 9.1.9 ALL OF SELLER'S REPRESENTATIONS, WARRANTIES AND PRE-CLOSING OBLIGATIONS SET FORTH HEREIN AND IN THE BILL OF SALE AND IN ANY OF THE EXHIBITS ATTCHED HERETO SHALL TERMINATE UPON THE FILING OF THE FAA BILL OF SALE AT THE FAA REGISTRY.

20.2    Purchaser, at Purchaser's cost, shall file such documents with the FAA at the time of closing as are necessary to request the assignment of a new registration number to the Aircraft as part of the process and reserve the current registration mark "N65R" in the name of Seller at the FAA Registry in Oklahoma City, Oklahoma.  ~~Such documents shall be filed by Purchaser at Closing.~~  CC

20.3    This Agreement sets forth the entire contract between the parties hereto and supersedes all previous communications, representations or agreements, whether oral or written, between the parties with respect to the sale and purchase of the Aircraft.

20.4    Should any provisions of this Agreement be void or unenforceable, such provisions shall be deemed omitted, and this Agreement, with such provision omitted, shall

remain in full force and effect. Such invalid or unenforceable provision will be replaced, if possible, through interpretation or through good faith negotiations between the parties hereto so as to maintain the purposes and intentions of this Agreement and the provisions in question.

20.5    Any Exhibits, Attachments, Appendices and/or Schedules annexed to this Agreement are hereby incorporated herein by reference and are an integral part of this Agreement, and where there is any reference to this Agreement, it shall be deemed to include any and all Exhibits, Attachments, Appendices and/or Schedules.

20.6    This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of Florida, including all matters of construction, validity and performance, without giving effect to its conflict of laws provisions.

20.7    During the pendency of the Case, exclusive jurisdiction and venue over any and all disputes between the parties arising under this Agreement shall be in, and for such purpose each party hereby submits to the jurisdiction of the Court. Thereafter, exclusive jurisdiction and venue over any and all disputes between the parties arising under this Agreement shall be in, and for such purpose each party hereby submits to the Florida jurisdiction of, the federal and state courts in the State of Florida.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their duly authorized agents as of the date first above written.

WINN-DIXIE STORES, INC.                    LEADING EDGE AVIATION SOLUTIONS, LLC
Seller                                     Purchaser

By: _____            By: _____
     Bennett Nussbaum
Title: Sr. Vice President & CFO            Title: Vice President Aircraft Transactions

Date: ___May 19, 2005___                   Date: ___5/17/05___

120655.1200933.2                    15

**BAE SYSTEMS**

**Enterprise Systems Incorporated**
**11487 Sunset Hills Road**
**Reston, Virginia 20190-5234**

# CERTIFICATE OF SERVICE

```
District/off: 113A-3        User: cartes           Page 1 of 1            Date Rcvd: May 20, 2005
Case: 05-03817              Form ID: pdfdoc         Total Served: 1
```

```
The following entities were served by first class mail on May 22, 2005.
aty      +Cynthia C. Jackson,   Smith Hulsey & Busey,   225 Water Street, Suite 1800,
          Jacksonville, FL 32202-4494
```

```
The following entities were served by electronic transmission.
NONE.                                                                    TOTAL: 0

          ***** BYPASSED RECIPIENTS *****
NONE.                                                                    TOTAL: 0
```

```
Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.
```

I, Joseph Speetjens, declare under the penalty of perjury that I have served the attached document on the above listed entities in the manner shown, and prepared the Certificate of Service and that it is true and correct to the best of my information and belief.

First Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed.  This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.

Date: May 22, 2005                    Signature:    *Joseph Speetjens*