Hearing Date: June 16, 2005, 1:00 p.m.
Objection Deadline: June 9, 2005, 4:00 p.m.

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |

### APPLICATION FOR AUTHORITY TO RETAIN DELOITTE CONSULTING LLP TO PROVIDE IN-STORE OPERATIONAL CONSULTING SERVICES TO THE DEBTORS

Winn-Dixie Stores, Inc. and its subsidiaries and affiliates in the above-captioned

jointly-administered cases, as debtors and debtors-in-possession (collectively, the "Debtors"),

move the Court for entry of an order approving the retention of Deloitte Consulting LLP

("Deloitte Consulting"), nunc pro tunc to May 16, 2005, under 11 U.S.C. § 327(a) to provide in-

store operational consulting services to the Debtors during these cases (the "Application"). In

support of the Application, the Debtors state as follows:

### Background

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary

petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11

U.S.C. §§ 101-1330 as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court

for the Southern District of New York (the "New York Court"). By order dated April 13, 2005,

the New York Court transferred venue of these cases to this Court. Any orders entered by the

---

[1]      In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie

New York Court remain in full force and effect before this Court, unless otherwise ordered by this Court.  These cases are jointly administered for procedural purposes only.

2.      The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request has been made for the appointment of a trustee or examiner.  On March 1, 2005, an official committee of unsecured creditors (the "Creditors Committee") was appointed to serve in these cases pursuant to Bankruptcy Code section 1103.

3.      The Debtors are grocery and drug retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  According to published reports, the Debtors are the eighth-largest food retailer in the United States and one of the largest in the Southeast.  The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion.  The Debtors currently operate more than 900 stores in the United States with nearly 79,000 employees. Substantially all of the Debtors' store locations are leased rather than owned.

4.      This Court has jurisdiction over the Application under 28 U.S.C. § 1334. Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested by this Application is Bankruptcy Code section 327(a) and such relief is subject to Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

**Relief Requested**

6.      By this Application, the Debtors request entry of an order pursuant to

section 327(a) of the Bankruptcy Code, approving the retention of Deloitte Consulting, <u>nunc</u> <u>pro</u>

<u>tunc</u> to May 16, 2005, to provide in-store operational consulting services to the Debtors during

these cases.  The Debtors request that Deloitte Consulting be retained to provide such services on

the terms provided in this Application and in the letter agreement between the Debtors and

Deloitte Consulting dated May 10, 2005 (the "Engagement Letter").  A copy of the Engagement

Letter is attached as Exhibit A to this Application.

**Basis for Relief**

7.      Improving in-store operations is a vital component of the Debtors'

ongoing efforts to enhance their business performance.  In furtherance of these efforts, the

Debtors intend to pursue operational initiatives related to direct to store delivery and store

ordering practices (the "DSD Initiatives").  The DSD Initiatives are intended to increase sales

through better in-stock conditions, reduce labor costs through higher stocking productivity, and

reduce non-productive backroom inventory.  The Debtors also intend to pursue operational

initiatives related to improving in-store cash office and other front end practices (the "Front End

Initiatives") (the DSD Initiatives and the Front End Initiatives collectively, the "Initiatives").

The Front End Initiatives are intended to increase the profitability of the Debtors' stores through

improved utilization, higher service expectations, improved management processes, and

increased productivity.  The Debtors believe that, if properly developed and successfully

implemented, the Initiatives will significantly enhance their in-store performance and, by

extension, their overall business.

8.     The Debtors wish to retain Deloitte Consulting to provide in-store operational consulting services to assist the Debtors in developing and implementing the Initiatives.  Specifically, subject to further order of this Court and as more fully described in the Engagement Letter, the services for which the Debtors propose to retain Deloitte Consulting include the following:

(a)     DSD Initiatives:

(i)     Assist in the development of an improved backroom/stocking package (confirm key operational initiatives with the Debtors' senior operations personnel, develop and validate performance management program, develop and validate store certification and compliance program, develop supporting functional schedules and staffing guidelines);

(ii)     Jointly develop the backroom/stocking package implementation plan (review plan with Debtors' retail operations management and obtain approval, review plan with stores and Debtors' corporate leadership);

(iii)     Assist with development of related training package content (leverage Debtors' training department resources, develop and validate training approach and content, develop a training plan, identify and train project-specific Winn-Dixie district training coordinator);

(iv)     Assist with selection of stores for the initial pilot and subsequent roll-out waves (gather appropriate information on selected stores, provide advance communication and preparation requirements to stores, finalize supporting equipment needs by store);

(v)     Assist with store employee and Winn-Dixie district training coordinators training (confirm training methodology and logistics, conduct store employee training kickoff meetings, conduct "train the trainer" sessions with Winn-Dixie district training coordinators during the pilot district and initial rollout wave activities);

(vi)     Assist with implementation of new direct store delivery and ordering processes in stores (work with store management in developing and implementing new process, coach store/department managers and set performance goals);

(vii)    Assist with design of performance management reporting and follow-up processes (establish hierarchy and follow-up guidelines, work with store and area management teams on remedial activities for variance stores);

(viii)    Assist with design and implementation of shrink reduction activities (develop in store shrink reduction goals and action plans, design and implement more effective production planning and ordering techniques, design and implement "known loss" programs);

(ix)    Assist with development of store compliance certification process (develop and test compliance and certification strategy, train management and trainers on compliance and follow-up processes, report compliance and certification results for management action);

(x)    Assist with assessment and refinement of program initiatives based on district pilot (review results of pilot district stores implementations and lessons learned, update and refine initiatives and related activities for lessons learned, revise training documentation as required); and

(xi)    Assist with chain-wide implementation of DSD Initiatives (incorporate results of (x) into roll-out plan for all stores, provide training and program management support during roll-out).

(b)    Front End Initiatives:

(i)    Assist with development of expected service behaviors and process changes (identify and document 3 to 6 critical and observable cashiering behaviors, identify process and procedure change opportunities to speed cashiering process, empower and train Front End managers to implement the desired behavior changes);

(ii)    Assist with the development of refinements to front end resource scheduling (interject the new standards in the cashier scheduling software application, review/revise bagger standards and schedules, match cashiering standards with cashier thru-put goals);

(iii)    Assist with redesign of cash office procedures (focus cash activities on those deemed the "critical few": eliminate/defer all others, use industry established practices to simplify cash settlement and balancing activities, establish cash office measurement and exception management processes);

(iv)    Assist with development of revisions to the cashier counseling process (focus on critical few measures with minimum acceptance levels, establish a progressive counseling process to enhance performance and reduce exceptions);

(v)     Assist with development and conduct of training (assist in creating cash office training document, "train the trainers," follow up with under-represented or high concern stores);

(vi)    Assist with implementation of process changes in stores (assist front end managers and store management in implementing new processes, coach store managers and set performance goals);

(vii)   Assist with design of exception reporting and follow up activities (establish hierarchy and follow up guidelines, work with store and area management on remedial activities for variance stores); and

(viii)  Assist with design of program refinements and enhancements (review results and modify for lessons learned, update training package as appropriate).

Subject to the Court's approval of this Application, Deloitte Consulting has indicated its willingness to provide the in-store operational consulting services required by the Debtors to assist them in the development and implementation of the Initiatives.

9.      The proposed retention of Deloitte Consulting as contemplated by this Application is critical to the successful development and implementation of the Initiatives. The operational improvement opportunities that the Initiatives are intended to exploit were identified by Deloitte Consulting during a separate engagement by the Debtors in November of 2004 and, as such, Deloitte Consulting is uniquely positioned to develop and assist in implementing the Initiatives. Moreover, Deloitte Consulting has the necessary expertise to assist the Debtors in developing and implementing the Initiatives. Deloitte Consulting has a strong record of helping the Debtors improve their in-store operations during past engagements and has, during the course of these engagements, become familiar with such operations. Additionally, Deloitte's professionals have experience assisting over thirty other grocery chains with respect to direct store delivery and front end operations. Accordingly, the Debtors' retention of Deloitte

6

Consulting on the terms set forth in this Application and in the Engagement Letter is in the best interests of the Debtors, their estates, and other parties in interest.

10.    To the best of the Debtors' knowledge, except as set forth in this Application and in the affidavit of Anthony D. Forcum, attached as Exhibit B to this Application (the "Forcum Affidavit"): (a) Deloitte Consulting neither holds nor represents any interest adverse to the Debtors' estates; (b) Deloitte Consulting has had no affiliation with the Debtors, their creditors or any party in interest, or to the Debtors' attorneys that are known to Deloitte Consulting to be assisting the Debtors in these cases, and the personnel expected to provide services to the Debtors on behalf of Deloitte Consulting pursuant to the Engagement Letter are not related to the United States Trustee assigned to these cases, any person employed in the office of such United States Trustee, or the Bankruptcy Judge presiding over these cases; and (c) Deloitte Consulting is a "disinterested person" within the meaning of Sections 101(14) and 327(a) of the Bankruptcy Code.

11.    Consistent with the Engagement Letter and as described in the Forcum Affidavit, the Debtors have agreed to pay Deloitte Consulting reasonable sums in accordance with hourly rates that are consistent with the rates charged by Deloitte Consulting for similar services and to compensate Deloitte Consulting for reasonable and necessary expenses incurred, which expenses may include travel, telephone costs, meals, and other necessary costs in providing services to the Debtors in accordance with Deloitte Consulting's customary reimbursement policies.  Deloitte Consulting will be compensated at hourly rates of $475-$530 for principals and directors; $400-$425 for senior managers; $360-$380 for managers; $280-$295 for senior consultants; and $175-$210 for staff consultants.  The Debtors are advised that Deloitte Consulting revises its rates in the normal course of its business and that, subject to future

agreement between the Debtors and Deloitte Consulting, the rates applied to services provided

with respect to this engagement may differ from those listed above.  Deloitte Consulting has

indicated that its estimated professional fees for this engagement will be approximately $3.0

million (on a time and materials basis) based upon the work-plan that has been agreed upon by

the Debtors and Deloitte.

12.     Deloitte Consulting will file fee applications with the Court in accordance

with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure,

the Local Bankruptcy Rules, and orders of this Court.

13.     The Engagement Letter also provides for (a) a limitation on any damages

that may be recoverable by the Debtors against Deloitte, except to the extent any such damages

result from gross negligence, willful misconduct, bad faith, or self-dealing by Deloitte, and (b) an

indemnification from the Debtors in favor of Deloitte Consulting against claims of third parties,

except to the extent any such claims result from gross negligence, willful misconduct, bad faith,

or self-dealing by Deloitte Consulting.

14.     As of the Petition Date, Deloitte Consulting was owed $209,411 for

services provided to the Debtors and expenses incurred.  Subsequent to the Petition Date, but

prior to May 16, 2005, Deloitte Consulting provided services to the Debtors totaling $95,842 and

incurred $18,003 in expenses, each in support of certain initiatives relating to the Debtors'

perishable trading network.  Deloitte Consulting has indicated that it will not seek any recovery

with respect to such amounts.

**Notice**

15.     Notice of this Application has been provided to (a) counsel to the United

States Trustee, (b) counsel for the Debtors' postpetition secured lenders, (c) counsel for the

Creditors Committee, (d) the other parties in interest named on the Master Service List

maintained in these cases, and (e) Deloitte Consulting. No other or further notice need be given.

WHEREFORE, based upon the foregoing, the Debtors respectfully request that

the Court (i) enter an order substantially in the form of Exhibit C, approving the retention of

Deloitte Consulting to provide in-store operational consulting services to the Debtors and (ii)

grant such other and further relief as the Court deems just and proper.

Dated: May 27, 2005

| | |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | SMITH HULSEY & BUSEY |
| By _____ s/ D. J. Baker _____ | By _____ s/ Cynthia C. Jackson _____ |
| D. J. Baker | Stephen D. Busey |
| Sally McDonald Henry | James H. Post |
| Rosalie Walker Gray | Cynthia C. Jackson, |
| David M. Turetsky | Florida Bar Number 498882 |
| Four Times Square | 225 Water Street, Suite 1800 |
| New York, New York 10036 | Jacksonville, Florida 32202 |
| (212) 735-3000 | (904) 359-7700 |
| (212) 735-2000 (facsimile) | (904) 359-7708 (facsimile) |
| | |
| Co-Attorneys for Debtors | Co-Attorneys for Debtors |

**Exhibit A**

# Deloitte.

**Deloitte Consulting LLP**
6363 N. State Highway 161
Suite 800
Irving, TX 75038-2279
USA

Tel: +1 469 417-3000
Fax: +1 469 417-3250
www.deloitte.com

May 10, 2005

Mr. Peter Lynch
Chief Executive Officer
And
Mr. Bennett Nussbaum
Chief Financial Officer
Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, FL 32254

Dear Sirs:

It has been a pleasure to work with Winn-Dixie Stores, Inc. ("Winn-Dixie"). Our team has gained an understanding of your store operations opportunities and can work collaboratively with you toward achieving tangible results in the short-term. This Engagement Letter details the Deloitte Consulting LLP ("Deloitte Consulting") services to assist Winn-Dixie with business performance improvement initiatives for its stores.

In early November 2004, we worked with members of your management team to identify opportunities to improve the ordering and Direct Store Delivery (DSD) functions in three stores in the Jacksonville area. In less than three months, these three stores demonstrated consistent, measurable operations improvement by enhancing in-stock position (over 8% out of stocks to less than 3%), generating increased sales, completing stocking with less labor, and reducing non-productive backroom inventory. Both management and customers saw a noticeable improvement in store appearance and conditions.

During this time we also identified and discussed significant operational improvement opportunities in the Front End operations of the same three stores. Based on the successful experience our team has with over 30 other grocery chains in these opportunity areas, we believe that improved processes related to ordering, DSD, and Front End activities can yield benefits across the chain. Deloitte Consulting's assistance with these initiatives are further described in this Engagement Letter and are supported by your store operations management team.

These opportunities have significant business improvement value, and the Winn-Dixie management team is targeting benefits in excess of 30 million dollars for the planned number of stores. We are confident that we bring unique and distinctive strengths to this work and are enthusiastic about the opportunity to assist you and your management team with these projects. We look forward to working with Winn-Dixie on this important engagement.

Sincerely,

Anthony D. Forcum
Principal
Deloitte Consulting LLP

Member of
**Deloitte Touche Tohmatsu**

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 2

Table of Contents

## Section                                          *Page Number*

- DSD and Store Ordering/Inventory Reduction

  - Objective and Scope                              3

  - Deliverables                                     3

  - Approach                                         4 - 5

  - Targeted Benefits                                5

- Front End and Cash Office Process Improvements

  - Objective and Scope                              6

  - Deliverables                                     6

  - Approach                                         6 - 7

  - Targeted Benefits                                7

- Project Organization and Timeline                 8

- Winn-Dixie Client Requirements                    8

- Professional Fees and Expenses                    9 - 10

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 3

# DSD and Store Ordering/Inventory Reduction

## *Objective and Scope*

The key objectives of the DSD and Store Ordering/Inventory Reduction ("Back End") operational initiatives are to (a) increase the sales in center store through better in-stock conditions; (b) reduce labor costs through higher stocking productivity; and (c) reduce non-productive backroom inventory.  Winn-Dixie has requested Deloitte Consulting to assist with achieving the following objectives:

- Reduce stocking labor by setting goals, scheduling resources to the workload, and training to improved practices and methods
- Reduce backroom inventory by implementing better DSD controls, organizing the backroom inventory, and working back stock more effectively
- Reduce inventory on the sales floor through improved ordering guidelines and capacity controls
- Improve store in-stock position by improving the ordering process and the supporting processes in stocking and DSD
- Reduce shrink in the store departments using a program of department manager accountability and by targeting shrink reduction opportunities through a "known loss program" and more effective production planning and ordering

Deloitte Consulting will work with Winn-Dixie store operations management to initially establish, monitor, and maintain the new processes.  The Back End operational improvements and related implementation methodology will be validated in a district pilot implementation and then rolled out to the entire chain in a series of seven waves.  The roll out will be supported directly by Deloitte Consulting in the first three waves and continued by trained Winn-Dixie resources in the remaining four waves (with a corresponding reduced amount of Deloitte Consulting resources).  The Back End operational initiatives will be rolled out simultaneously with the Front End operational initiatives described below.

## *Deliverables*

Deliverables for this initiative will be:

- A model for store stocking practices, staffing guidelines, and performance management
- A model for revised backroom layout and organization
- Revised ordering procedures with systems requirements
- Revised DSD practices and  procedures
- Proposed DSD vendor scorecard
- A model for a shrink accountability program, known loss program, and production planning methods in the perishable departments

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 4

## Approach

We will use the following approach to complete these deliverables and to assist you in achieving your objectives in an initial pilot district of 8 stores and then in a series of roll-out waves. This approach will rely on close collaboration with Winn-Dixie Store Operations management as well as store directors and key store staff.

- Step 1: Assist in the Development of an improved backroom/stocking package
  - Confirm key operational initiatives with Winn-Dixie senior operations personnel
  - Develop and validate performance management program
  - Develop and validate store certification and compliance program
  - Develop supporting functional schedules and staffing guidelines

- Step 2: Jointly develop the backroom/stocking package implementation plan
  - Review plan with retail operations management and obtain approval
  - Review plan with stores and corporate leadership

- Step 3: Assist with development of related training package content
  - Leverage Winn Dixie training department resources
  - Develop and validate training approach and content
  - Develop a training plan
  - Identify and train project-specific Winn-Dixie District Training Coordinator

- Step 4: Assist with selection of stores for the initial pilot and subsequent roll-out waves
  - Gather appropriate information on selected stores
  - Provide advance communication and preparation requirements to stores
  - Finalize supporting equipment needs by store

- Step 5: Assist with store employee and Winn-Dixie District Training Coordinators training
  - Confirm training methodology and logistics
  - Conduct store employee training kickoff meetings
  - Conduct "train the trainer" sessions with Winn-Dixie District Training Coordinators during the pilot district and initial rollout wave activities

- Step 6: Assist with implementation of new DSD and Ordering processes in stores
  - Work with store management in developing and implementing new process
  - Coach store/department managers and set performance goals

- Step 7: Assist with design of performance management reporting and follow-up processes
  - Establish hierarchy and follow-up guidelines
  - Work with store and area management teams on remedial activities for variance stores

- Step 8: Assist with design and implementation of shrink reduction activities
  - Develop in store shrink reduction goals and action plans
  - Design and implement more effective production planning and ordering techniques
  - Design and implement "known loss" programs

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 5

- Step 9:  Assist with development of store compliance certification process
  - Develop and test compliance and certification strategy
  - Train management and trainers on compliance and follow-up processes
  - Report compliance and certification results for management action

- Step 10:  Assist with assessment and refinement of program initiatives based on district pilot
  - Review results of pilot district stores implementations and lessons learned
  - Update and refine initiatives and related activities for lessons learned
  - Revise training documentation as required

- Step 11: Assist with chain-wide implementation
  - Incorporate results of Step 9 into roll-out plan for all stores
  - Provide training and program management support during roll-out

## *Targeted Benefits*

Winn-Dixie is targeting benefits for this initiative to be derived from four primary sources.  First, through better ordering and DSD practices, store in-stock performance may improve significantly as seen in the initial three stores (more than 8% out of stocks to less than 3%).  Both industry studies and the three store results suggest that this improved in-stock position may generate a marginal sales increase of approximately 1.5% to 2% net of other sales trends.   Second, by organizing the backrooms and more clearly directing the stocking teams, productivity of that team may improve up to 20% as indicated in the initial three stores.  Third, through improved DSD controls, an ordering pick list enhancement, and enhanced store ordering guidelines, backroom and sales floor inventory could potentially be reduced by 5% to 7% in target areas.  Lastly, through improved accountability, measurement, and production planning, shrink may be reduced in the perimeter departments by 15% or more.

Using an estimated new sales base for the center store departments, Winn-Dixie store operations management is targeting the following benefits when these benefits are rolled out across the chain:
- $17.5 million in sales increases
- $4.375 million in gross margin dollar improvements on incremental sales (at a 25% gross margin for incremental sales)
- $8 million dollar savings in stocking team labor
- $10 million reduction in inventory levels
- $5.25 million reduction in shrink

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 6

# Front End and Cash Office Improvements

## *Objective and Scope*

The key objective of the Front End and Cash Office Improvements ("Front End") operational initiatives is to increase the profitability of the stores through improved utilization, higher service expectations, improved management processes, and increased productivity. In conjunction with this effort, Winn-Dixie wishes to:

- Raise customer service expectations and performance at the Front End through the training and reinforcement of simple, proven customer service behaviors
- Improve the quality and convenience of customer service through better cashiering methods
- Improve utilization of cashier, bagger, and supervisory resources, and provide higher service levels
- Increase accuracy and reduce shortage through training and exception management techniques

Deloitte Consulting will work with Winn-Dixie Stores Operations management to initially establish, monitor, and maintain the new processes. The Front End operational improvements and implementation methodology will be validated in a District Pilot implementation and then rolled out to the entire chain in a series of seven waves. The roll out will be supported directly by Deloitte Consulting in the first three waves and continued by trained Winn-Dixie resources in the remaining four waves (with a corresponding reduced number of Deloitte Consulting resources). The Front End operational initiatives will be rolled out simultaneously with the Back End initiatives described above.

## *Deliverables*

Deliverables for this initiative will be:

- Suggestions to improve utilization of Front End service resources including cashiers, baggers, and supervisors
- Proposed revisions to customer service guidelines
- Suggestions for modifications to Front End scheduling processes through the Tomax system
- Recommendations for simplified cash office processes and procedures
- Proposed improvements for cashiering productivity and service measurement
- Proposed revisions to performance and exception management processes using ShrinkTrax

## *Approach*

We will use the following approach to complete these deliverables and to assist in achieving your objectives. This approach will rely on close collaboration with Winn-Dixie store operations management, as well as store directors and key store staff.

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 7

- Step 1: Assist with development of expected service behaviors and process changes
  - Identify and document 3 to 6 critical and observable cashiering behaviors
  - Identify process and procedure change opportunities to speed cashiering process
  - Empower and train Front End managers to implement the desired behavior changes

- Step 2: Assist with the development of refinements to Front End resource scheduling
  - Interject the new standards in the cashier scheduling software application
  - Review/revise bagger standards and schedules
  - Match cashiering standards with cashier thru-put goals

- Step 3: Assist with redesign of cash office procedures
  - Focus cash activities on those deemed the "critical few": eliminate/defer all others
  - Use industry established practices to simplify cash settlement and balancing activities
  - Establish cash office measurement and exception management processes

- Step 4: Assist with development of revisions to the cashier counseling process
  - Focus on critical few measures with minimum acceptance levels
  - Establish a progressive counseling process to enhance performance and reduce exceptions

- Step 5: Assist with development and conduct of training
  - Assist in creating cash office training document
  - "Train the trainers"
  - Follow up with under-represented or high concern stores

- Step 6: Assist with implementation of process changes in stores
  - Assist Front End managers and store management in implementing new processes
  - Coach store managers and set performance goals

- Step 7: Assist with design of exception reporting and follow up activities
  - Establish hierarchy and follow up guidelines
  - Work with store and area management on remedial activities for variance stores

- Step 8: Assist with design of program refinements and enhancements
  - Review results and modify for lessons learned
  - Update training package as appropriate

## *Targeted Benefits*

Winn-Dixie is targeting benefits from this initiative to be derived from three primary sources. First, though improved cashiering behaviors, Winn-Dixie customers may have a better store experience and an additional reason to shop Winn-Dixie (the project team has not attempted to estimate the potential sales improvement that might result). Second, by focusing on transaction productivity, improved practices, and Front End scheduling productivity, an estimated 5% to 7% Front End labor savings could occur along with improved customer service. Lastly, through improved use of the Front End Manager and updated ShrinkTrax processes, Front End shrink may be reduced.

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 8

In summary, Winn-Dixie is targeting the benefits of enhanced Front End and cashiering processes that could be as follows when rolled out across the entire chain:

- $6.156 million savings in Front End labor
- $5.25 million savings in Front End shrink

## *Project Organization and Timeline*

### Project Organization

To support this portion of the store initiatives, initially Deloitte Consulting will provide a team of 9 dedicated personnel during the district pilot and up to 16 dedicated personnel during the first three roll-out waves of the project. Each resource will be active in the stores assisting Winn-Dixie management with hands-on training, implementation, and monitoring. Each Deloitte Consulting team member will be a competent industry professional with an understanding of each operational improvement initiative. Scott Bearse and Vic Gallese, two of Deloitte Consulting's leaders from our retail operations practice, will provide overall engagement leadership and management throughout the project.

A Deloitte Consulting Project Director and a Winn Dixie Project Manager will establish and manage a project management office to coordinate the implementation activities of Deloitte Consulting's consultants and Winn-Dixie's District training coordinators through a pilot and seven waves of implementation. Winn-Dixie will provide additional operations management resources and a dedicated training department resource to assist and support the overall effort.

### Timeline

The timeline for completing the project is as follows currently:

- Step 1: Finalize approach, create packages, deploy backroom guidance – 4 weeks
- Step 2: Conduct district pilot implementation in 8 stores – 4 weeks
- Step 3: Conduct training, implement and follow up in first three waves of stores – 12 weeks
- Step 4: Winn-Dixie will complete the final 4 waves of stores, and Deloitte Consulting will provide a reduced team at the conclusion of wave 3 to provide program management and oversight – 16 weeks

This timeline is an estimate only and may need to be adjusted during the course of the engagement.

## *Winn-Dixie Requirements*

Winn-Dixie executive and store operations leadership will play a critical role in ensuring that the combined Deloitte Consulting and Winn-Dixie project team gets the required level of organizational support. Winn-Dixie will also provide the appropriate and agreed upon number of full-time personnel for development of training documentation and the rollout of the agreed upon process and procedural changes across the chain. In addition, as required, Winn-Dixie management will make and/or approve implementation decisions on a timely basis in order to expedite the completion of each project step. Furthermore, Winn-Dixie will provide or facilitate access to data, people, and information as needed to facilitate the completion of the project.

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 9

Winn-Dixie will also provide the bulk of the resources needed to conduct training in its stores. We currently estimate this to be 62 resources based on the agreed work plan between Winn-Dixie and Deloitte Consulting. Winn-Dixie also agrees to provide two dedicated lead coordinators to focus on program content and expertise on the Front End and Back End initiatives. Winn-Dixie has agreed to provide the support of four resources from store operations management during the district pilot phase and then to provide troubleshooting support during the remainder of the chain roll-out.

Winn-Dixie will need to provide some limited capital investment in equipment to support process changes in the stores. Every effort has been made to minimize this requirement given the current circumstances.

## *Professional Fees and Expenses*

Based on the agreed-upon work plan, professional fees are estimated to be approximately $3.0 million (on a time and materials basis) based on hourly rates for our professionals as follows:

| Staff Classification | Hourly Billing Rate |
|---|---|
| Principals and Directors | $475-530 |
| Senior Managers | $400-425 |
| Managers | $360-380 |
| Senior Consultants | $280-295 |
| Staff Consultants | $175-210 |

In addition, we estimate that expenses (e.g., travel, telephone, meals, etc.) will approximate 15% to 18% of professional fees and will be billed at cost.

Deloitte Consulting will invoice professional fees and expenses in accordance with guidelines that may be established for professionals by the Bankruptcy Court. We will invoice our fees on a time and materials basis including actual, expenses as incurred and reported starting at the commencement of the engagement on May 16, 2005.

Our General Business Terms are attached and incorporated by reference.

Winn-Dixie agrees that it will promptly seek Bankruptcy Court approval of this engagement. The application, proposed order and other supporting documents (collectively, the "Application") submitted to the Bankruptcy Court seeking its approval of this engagement must be satisfactory to Deloitte Consulting in all respects. In addition to Deloitte Consulting's other rights or remedies hereunder, Deloitte Consulting may, in its sole discretion and without any liability arising therefrom, terminate this engagement in the event that (a) a third party objects or threatens to object, or Deloitte Consulting reasonably believes that a third party may object, in the form of an objection or otherwise, to Deloitte Consulting's retention by Winn-Dixie in the case on the terms and conditions set forth in this letter, (b) a final order authorizing the employment of Deloitte Consulting as consultants for the Company is not issued by the Bankruptcy Court on or before sixty (60) days from the date of the filing of the Application on the terms and conditions set forth herein or on such other terms and conditions as are satisfactory to Deloitte Consulting, or (c) the Application is denied by the Bankruptcy Court. In such event, Winn-Dixie hereby agrees to withdraw or amend, promptly upon Deloitte Consulting's request, any Application filed

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 10

or to be filed with the Bankruptcy Court to retain Deloitte Consulting's services in the bankruptcy proceeding. The "Bankruptcy Court" shall mean the United States Bankruptcy Court having jurisdiction over the chapter 11 cases of Winn-Dixie and its affiliates.

We look forward to assisting Winn-Dixie with this effort to enhance the operating performance and effectiveness in the stores. We look forward to helping you meet your current challenges and achieve your goals.

DELOITTE CONSULTING LLP

Anthony D. Forcum
Principal
Signature: _____
Title:      _____Principal_____
Date:       ____May 27, 2005_____

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 11


WINN-DIXIE STORES, INC.

Bennett Nussbaum
Chief Financial Officer
Signature:
Title:  Senior Vice President
Date:  May 26, 2005

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 12

# Deloitte.

## GENERAL BUSINESS TERMS

**1.    Services.**

a)    It is understood and agreed that Deloitte Consulting's services (the "Services")  under the engagement letter to which these terms are attached (the "Engagement Letter") may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, the Client.

b)    For purposes of these terms and the Engagement Letter, the "Client" shall mean the entity to which the Engagement Letter is addressed and its subsidiaries.  The Client represents and warrants that it has the power and authority to execute this agreement on behalf of, and to bind, itself and its subsidiaries.

c)    The Services may be performed away from the Client's site by Deloitte Consulting personnel under Deloitte Consulting's "Office Fridays Policy" (or similar policies as may be adopted and amended by Deloitte Consulting from time to time) whereby such personnel spend four (4) days of each workweek (and no more than three (3) nights) at the Client's site(s) and the fifth day at the personnel's resident city.

**2.    Payment of Invoices.**  Subject of any applicable requirements of the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or orders of the Bankruptcy Court, Deloitte Consulting's invoices are due upon presentation.  Invoices upon which payment is not received within thirty (30) days of the invoice date shall accrue a late charge of the lesser of (i) 1½% per month or (ii) the highest rate allowable by law, in each case compounded monthly to the extent allowable by law.  Without limiting its rights or remedies, Deloitte Consulting shall have the right to halt or terminate the Services entirely if payment is not received within thirty (30) days of the invoice date. The Client shall be responsible for all taxes imposed on the Services or on the transaction, other than income taxes imposed on a net basis or by withholding, and other than taxes imposed on Deloitte Consulting's property.

**3.    Term.**  Unless terminated sooner in accordance with its terms, this engagement shall terminate on the completion of the Services.  This engagement may be terminated by either party at any time, with or without cause, by giving written notice to the other party not less than thirty (30) days before the effective date of termination; provided that, in the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period.   Upon termination of the engagement, the Client will compensate Deloitte Consulting under the terms of the Engagement Letter for the Services performed and expenses incurred through the effective date of termination.

**4.    Deliverables.**  Upon full and final payment to Deloitte Consulting hereunder, and subject to all other terms and conditions herein, Deloitte Consulting hereby grants the Client a royalty-free, fully paid-up, non-exclusive license to use, for Client's internal business purposes, the works of authorship, materials, information and other intellectual property delivered to the Client pursuant to the Engagement Letter (the "Deliverables").  To the extent a Deliverable being licensed to the Client hereunder is a product (to the extent it constitutes merchandise within the meaning of section 471 of the Internal Revenue Code), such license is provided by Deloitte Consulting as agent for Deloitte Consulting Product Services LLC on the terms and conditions herein.  The

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 13

license grant in this Paragraph 4 does not apply to any software, documentation or products that are subject to a separate license agreement between the Client and a third party, including, without limitation, Deloitte Consulting Products Services LLC.

5.    **Limitation on Warranties. THIS IS A SERVICES ENGAGEMENT. DELOITTE CONSULTING WARRANTS THAT IT SHALL PERFORM THE SERVICES IN GOOD FAITH AND IN A PROFESSIONAL MANNER. DELOITTE CONSULTING DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE CLIENT'S EXCLUSIVE REMEDY FOR ANY BREACH OF THIS WARRANTY SHALL BE FOR DELOITTE CONSULTING, UPON RECEIPT OF WRITTEN NOTICE, TO USE DILIGENT EFFORTS TO CURE SUCH BREACH, OR, FAILING ANY SUCH CURE IN A REASONABLE PERIOD OF TIME, THE RETURN OF PROFESSIONAL FEES PAID TO DELOITTE CONSULTING HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH.**

6.    **Limitation on Damages and Indemnification**.

a)    The Client agrees that Deloitte Consulting, its subcontractors and their respective personnel shall not be liable to the Client for any claims, liabilities, or expenses relating to this engagement ("Claims") for an aggregate amount in excess of the fees paid by the Client to Deloitte Consulting pursuant to this engagement, except to the extent finally judicially determined to have resulted primarily from the gross negligence, bad faith, willful misconduct or self-dealing of Deloitte Consulting or its subcontractors. In no event shall Deloitte Consulting, its subcontractors or their respective personnel be liable for consequential, special, indirect, incidental, punitive or exemplary loss, damage, or expense (including, without limitation, lost profits and opportunity costs), relating to this engagement. In circumstances where all or any portion of the provisions of this Paragraph 6 or Paragraph 11(b) are finally judicially determined to be unavailable, the aggregate liability of Deloitte Consulting, its subcontractors and their respective personnel for any Claim shall not exceed an amount which is proportional to the relative fault that their conduct bears to all other conduct giving rise to such Claim.

b)    Deloitte Consulting shall indemnify, defend and hold harmless the Client and its personnel from and against any and all Claims attributable to claims of third parties solely for bodily injury, death or damage to real or tangible personal property, to the extent directly and proximately caused by the negligence or intentional misconduct of Deloitte Consulting while engaged in the performance of the Services.

c)    The Client shall indemnify and hold harmless Deloitte Consulting, its subcontractors and their respective personnel from all Claims attributable to claims of third parties, except to the extent finally judicially determined to have resulted primarily from the gross negligence, bad faith, willful misconduct or self-dealing of Deloitte Consulting or its subcontractors.

d)    With respect to indemnification Claims arising during the Client's chapter 11 cases, but prior to the effective date of a confirmed plan of reorganization in such cases, all requests for indemnity under the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Bankruptcy Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought; provided, however, that in no event shall Deloitte Consulting be indemnified in the case of its own gross negligence, bad faith, willful misconduct or self-dealing.

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 14

7.  **Client Responsibilities**.  The Client shall cooperate with Deloitte Consulting hereunder, including, without limitation, providing Deloitte Consulting with reasonable facilities and timely access to data, information and personnel of the Client.  The Client shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of data and information provided to Deloitte Consulting for purposes of the performance of the Services.  The Client acknowledges and agrees that Deloitte Consulting's performance is dependent upon the timely and effective satisfaction of the Client's responsibilities hereunder and timely decisions and approvals of the Client in connection with the Services.  Deloitte Consulting shall be entitled to rely on all decisions and approvals of the Client.  The Client shall be solely responsible for, among other things: (i) making all management decisions and performing all management functions; (ii) designating a competent management member to oversee the Services; (iii) evaluating the adequacy and results of the Services; and (iv) establishing and maintaining internal controls, including, without limitation, monitoring ongoing activities.

8.  **Force Majeure**.  Except for the payment of money, neither party shall be liable for any delays or non-performance resulting from circumstances or causes beyond its reasonable control, including, without limitation, acts or omissions or the failure to cooperate by the other party (including, without limitation, entities or individuals under the other party's control, or any of their respective officers, directors, employees, other personnel and agents), acts or omissions or the failure to cooperate by any third party, fire or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

9.  **Limitation on Actions**.  No action, regardless of form, relating to this engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for non-payment may be brought not later than one year following the date of the last payment due to the party bringing such action.

10.  **Independent Contractor**.  It is understood and agreed that each party is an independent contractor and that neither party is, nor shall be considered to be, the other's agent, distributor, partner, fiduciary, joint venturer, co-owner or representative.  Neither party shall act or represent itself, directly or by implication, in any such capacity or in any manner assume or create any obligation on behalf of, or in the name of, each other.

11.  **Confidentiality and Use.**

a)  To the extent that, in connection with this engagement, either party (each, the "receiving party") comes into possession of any trade secrets or other proprietary or confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the disclosing party's consent.  The disclosing party hereby consents to the receiving party disclosing such information (i) to subcontractors, whether located within or outside of the United States, that are providing services in connection with this engagement and that have agreed to be bound by confidentiality obligations similar to those in this Paragraph 11(a), (ii) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards or rules, or in connection with litigation pertaining hereto, or (iii) to the extent such information (A) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency and available to the public) other than as the result of a disclosure in breach hereof, (B)  becomes available to the receiving party on a nonconfidential basis from a source other than the disclosing party which the receiving party believes is not prohibited from disclosing such information  by obligation to the disclosing party, (C) is known by the receiving party prior to its receipt from the disclosing party without any obligation of confidentiality with respect thereto, or (D) is developed by the receiving party independently of any disclosures made by the disclosing party to the receiving party of such information.  In satisfying its

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 15

obligations under this Paragraph 11(a), each party shall maintain the other's trade secrets and proprietary or confidential information in confidence using at least the same degree of care as it employs in maintaining in confidence its own trade secrets and proprietary or confidential information, but in no event less than a reasonable degree of care. Nothing in this Paragraph 11(a) shall alter the Client's obligations under Paragraph 11(b). Notwithstanding anything to the contrary herein, the Client acknowledges that Deloitte Consulting, in connection with performing the Services, may develop or acquire experience, skills, knowledge and ideas that are retained in the unaided memory of its personnel. The Client acknowledges and agrees that Deloitte Consulting may use and disclose such experience, skills, knowledge and ideas.

b)   The Client agrees that neither the Services nor any Deliverables are intended for the express or implied benefit of any person or entity other than the Client. Except as otherwise provided in the Engagement Letter, the Client further agrees that the Services and Deliverables shall not be disclosed, in whole or in part, to any person or entity other than the Client and other contractors of the Client, to whom the Client may disclose the Deliverables solely for the purpose of providing services to the Client. The Client shall indemnify and hold harmless Deloitte Consulting, its subcontractors and their respective personnel from all Claims arising from the Client's disclosure of the Deliverables to any third party.

12.   **Survival and Interpretation.** All Paragraphs herein relating to payment of invoices, deliverables, limitation on warranties, limitation on damages and indemnification, limitation on actions, confidentiality and use, survival and interpretation, assignment, non-exclusivity, non-solicitation, waiver of jury trial, and governing law shall survive the expiration or termination of this engagement. In the event of any conflict, ambiguity, or inconsistency between these terms and the Engagement Letter, these terms shall govern and control. For purposes of Paragraph 6 of these terms only, "Deloitte Consulting" shall mean Deloitte Consulting LLP and Deloitte Consulting Product Services LLC, one of its subsidiaries. The Client acknowledges and agrees that no affiliated or related entity of Deloitte Consulting, whether or not acting as a subcontractor, shall have any liability hereunder to the Client or any other person and the Client will not bring any action against any such affiliated or related entity in connection with this engagement. Without limiting the foregoing, affiliated and related entities of Deloitte Consulting are intended third party beneficiaries of these terms, including, without limitation, the limitation on liability and indemnification provisions of Paragraph 6, and the agreements and undertakings of the Client contained in the Engagement Letter. Any affiliated or related entity of Deloitte Consulting may in its own right enforce such terms, agreements and undertakings. **The provisions of Paragraphs 6, 9, 11(b), 12, 16 and 18 hereof shall apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise.**

13.   **Assignment.** Except as provided below, neither party may assign, transfer or delegate any of its rights or obligations hereunder (including, without limitation, interests or Claims) without the prior written consent of the other party. Client hereby consents to Deloitte Consulting assigning or subcontracting any of Deloitte Consulting's rights or obligations hereunder to (i) any affiliate or related entity or (ii) any entity that acquires all or a substantial part of the assets or business of Deloitte Consulting.

14.   **Non-exclusivity.** The parties acknowledge that Deloitte Consulting shall have the right to (i) provide consulting or other services of any kind or nature whatsoever to any person or entity as Deloitte Consulting in its sole discretion deems appropriate, or (ii) use any works of authorship or other intellectual property that may be included in the Deliverables, to develop for itself, or for others, materials or processes that may be similar to those produced as a result of the Services.

15.   **Non-solicitation.** During the term of this engagement and for a period of one (1) year thereafter, each party agrees that its personnel (in their capacity as such) who had direct and substantive contact in the course of this engagement with personnel of the other party shall not, without the

Mr. Peter Lynch
Mr. Bennett Nussbaum
May 10, 2005
Page 16

other party's consent, directly or indirectly employ, solicit, engage or retain the services of such personnel of the other party. In the event a party breaches this provision, the breaching party shall be liable to the aggrieved party for an amount equal to thirty percent (30%) of the annual base compensation of the relevant personnel in his/her new position. Although such payment shall be the aggrieved party's exclusive means of monetary recovery from the breaching party for breach of this provision, the aggrieved party shall be entitled to seek injunctive or other equitable relief. This provision shall not restrict the right of either party to solicit or recruit generally in the media.

16. **Waiver of Jury Trial. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM RELATING TO THIS ENGAGEMENT.**

17. **Entire Agreement, Amendment and Notices.** These terms, and the Engagement Letter, including exhibits, constitute the entire agreement between the parties with respect to this engagement, supersede all other oral and written representations, understandings or agreements relating to this engagement, and may not be amended except by written agreement signed by the parties. All notices hereunder shall be (i) in writing, (ii) delivered to the representatives of the parties at the addresses set forth in the Engagement Letter, unless changed by either party by notice to the other party, and (iii) effective upon receipt.

18. **Governing Law and Severability.** These terms, the Engagement Letter, including exhibits, and all matters relating to this engagement, shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof). If any provision of these terms or the Engagement Letter is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

19. **Disclosure Notice for Referral Fees.** In connection with the Services, Deloitte Consulting may, at the Client's request or otherwise, to the extent permitted by applicable laws, regulations or professional standards, refer certain third party products or services to the Client, and Deloitte Consulting or its affiliates may receive a fee from such third parties in connection with such referral.

**<u>Exhibit B</u>**

.

UNITED STATES BANKRUPTCY COURT

Middle District of Florida (Jacksonville)

| | |
|---|---|
| In re: | Chapter 11 |
| Winn-Dixie Stores, Inc., | Case No. 05-03817-3F1 |
| et al., | Jointly Administered |
| Debtors. | |

**AFFIDAVIT OF ANTHONY D. FORCUM
IN SUPPORT OF APPLICATION FOR AUTHORITY TO RETAIN DELOITTE
CONSULTING LLP TO PROVIDE IN-STORE OPERATIONAL CONSULTING
SERVICES TO THE DEBTORS NUNC PRO TUNC TO MAY 16, 2005**

**Anthony D. Forcum, being duly sworn, deposes and says:**

1.      I am a principal of the firm of Deloitte Consulting LLP ("Deloitte

Consulting"), which has an office located at 6363 N. State Highway 161, Suite 800,

Irving, TX.  I make this affidavit based upon inquiries made by myself or on my behalf in

support of the application (the "Retention Application") for an order  pursuant to section

327(a) of the Bankruptcy Code (as defined in the Retention Application) authorizing the

retention of Deloitte Consulting to provide in-store operational consulting services for the

above-captioned debtors and debtors-in-possession (the "Debtors") nunc pro tunc to May

16, 2005.

2.      To the best of my knowledge information and belief formed after a

reasonable inquiry, (1) Deloitte Consulting, Anthony D. Forcum and Scott Bearse, who

are the Principal and Director, respectively, of Deloitte Consulting (the "Deloitte

1

Consulting Principals/Directors") that are anticipated to provide services as part of the engagement team on the engagement for which Deloitte Consulting is to be retained in these Chapter 11 cases (the "Winn-Dixie Engagement Team"), and the employees of Deloitte Consulting who are anticipated to provide the services as part of the Winn-Dixie Engagement Team, do not hold or represent any interest adverse to any of the Debtors with respect to the matters on which Deloitte Consulting is to be retained in these Chapter 11 cases, and (2) as set forth below and, to the best of my knowledge, information and belief, Deloitte Consulting and the Deloitte Consulting Principals/Directors have no relationship to any of the Debtors, any of the Debtors' significant creditors, other known parties-in-interest in these Chapter 11 cases (as identified by the Debtors), or to the Debtors' attorneys that are known to be assisting the Debtors in these Chapter 11 cases, except as described herein or as set forth on Attachment 1, attached hereto, and (3) Deloitte Consulting and the Deloitte Consulting Engagement Principals/Directors are "disinterested persons" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

3.      From time to time, Deloitte Consulting or its affiliates have provided, currently provide or may currently provide services and likely will continue to provide services, to certain creditors of the Debtors and various other parties potentially adverse to the Debtors in matters unrelated to these Chapter 11 cases.

4.      As described below, Deloitte Consulting has undertaken an internal search to determine whether it or its affiliates are or have been employed by or had other relationships with any entities that were listed on a schedule provided to Deloitte Consulting by the Debtors in connection with these Chapter 11 cases.  As noted herein,

certain of these creditors, other parties-in-interest, attorneys, or accountants have or may have provided goods or services to, currently provide or may currently provide goods or services to, and may in the future provide goods or services to Deloitte Consulting and its affiliates and the Deloitte Consulting Principals/Directors in matters unrelated to these Chapter 11 cases.

5.      To check upon and disclose possible relationships with parties-in-interest in these Chapter 11 cases, Deloitte Consulting researched its client databases and performed reasonable due diligence to determine whether it or its affiliates had any relationships with the entities that were listed on a schedule provided to Deloitte Consulting by the Debtors in connection with these chapter 11 cases, which included the following:

- the Debtors and their affiliates;

- the Debtors' key personnel, including its current and former directors and officers;

- the Debtors' pre-petition senior secured lenders;

- the Debtors' top 50 unsecured trade creditors;

- the Indenture Trustee for the senior unsecured noteholders, the senior unsecured noteholders, and related funds and administrators;

- the publicly identified shareholders of the Debtors;

- parties with filed UCC financing statements;

- the Debtors' mortgage holder;

- the Debtors' material lessors of real property;

- the attorneys and other professionals that the Debtors have sought authority to employ in these chapter 11 cases;

- the members of the Official Creditors' Committee and its attorneys; and

3

■ other potential parties-in-interest as identified by the Debtors.

6.     Despite the efforts described above to identify and disclose Deloitte

Consulting's and its affiliates' connections with the parties-in-interest in these Chapter 11

cases, because Deloitte Consulting is a large firm with many personnel, and because the

Debtors are a large enterprise, Deloitte Consulting is unable to state with certainty that

every client relationship or other connection with it or its affiliates has been disclosed.  In

this regard, if Deloitte Consulting discovers additional material information that it

determines requires disclosure, it will file a supplemental disclosure promptly with the

Court.

7.     From this internal search, Deloitte Consulting has determined that certain

relationships should be disclosed as follows.

(a)     Deloitte Consulting and/or its affiliates provides services in matters
        unrelated to these Chapter 11 cases to certain of the Debtors' parties in
        interest or certain affiliated entities listed on Attachment 1.  Deloitte
        Consulting will not provide services to these entities in connection with
        these Chapter 11 cases.

(b)     JPMorgan Chase (f/k/a BankOne), Sun Trust, Bank of America (f/k/a
        Fleet Retail Finance), Wachovia, Wells Fargo, and Credit Suisse First
        Boston have been identified by the Debtors as pre-petition bondholders or
        lenders to the Debtors.   These institutions and/or their affiliates are all
        lenders to Deloitte Consulting or its affiliates or to their respective
        members.

(e)     Deloitte Consulting has provided, may currently provide and may in the
        future provide services to Skadden, Arps, Slate, Meagher & Flom LLP,
        and King & Spalding LLP, counsel to the Debtor, in matters unrelated to
        these chapter 11 cases. Each of the law firms (including Skadden, Arps,
        Slate, Meagher & Flom LLP, and King & Spalding LLP) listed on
        Attachment 1 hereto may have provided, may currently provide or may in
        the future provide legal services to Deloitte Consulting or its affiliates in
        matters unrelated to these Chapter 11 cases

(f)     In the ordinary course of its business, Deloitte Consulting and/or its
        affiliates has business relationships in unrelated matters with its principal
        competitors, the other "Big Four" accounting firms, including KPMG and

PriceWaterhouseCoopers, which together with their affiliates, has been identified by the Debtors as potential parties-in-interest in these Chapter 11 cases.  For example, from time to time, Deloitte Consulting and/or its affiliates and one or more of such entities may work jointly on assignments for the same client or may otherwise engage each other for various purposes.

(g)     Certain parties in interest identified on Attachment 1 may be adverse to and/or involved in litigation matters with Deloitte Consulting or its affiliates in connection with matters unrelated to these Chapter 11 cases.

8.     Except as may be disclosed herein, to the best of my knowledge, Deloitte Consulting and the Deloitte Consulting Principals/Directors do not hold or represent any interest adverse to the Debtors, and I believe that Deloitte Consulting and the Deloitte Consulting Principals/Directors are "disinterested persons" as that term is defined in Section 101(14) of the Bankruptcy Code, as modified by Section 1107(b) of the Bankruptcy Code.  Moreover, the personnel anticipated to provide services to the Debtors under the Engagement Letter are not related to the United States Trustee, the employees thereof assigned to this case or the bankruptcy judge presiding in this case.

9.     As set forth in the Engagement Letter (as defined in the Application), the nature and extent of the services that Deloitte Consulting proposes to render, as may be requested by the Debtors and as may be agreed to by Deloitte Consulting, are focused on business performance improvement initiatives in its stores.  The specific objectives of the services to be provided include assisting the Debtors in their efforts to improve store inventory ordering practices, enhance Direct Store Delivery ("DSD") merchandising and inventory controls,  increase sales and gross margin of "center store" items, reduce shelf stocking labor hours and related costs, reduce store-level inventories while increasing "in-stock" position on key items,  reduce "shrink" at store level, and align in-store cash office and other "front end" work practices and labor costs with customer service

objectives.

As further detailed in the attached Engagement Letter, a summary of specific

project activities include assisting the Debtors with the following:

- Implementing improved in-store shelf stocking practices, modified related staffing guidelines, and performance management techniques
- Revising backroom layout, organization and "pick list" priorities
- Implementing revised store inventory ordering practices and procedures
- Revising DSD receiving practices and procedures
- Developing and implementing a DSD Vendor Scorecard
- Designing and implementing a Shrink Accountability Program, Known Loss Program and enhanced Production Planning Methods in certain perishable departments
- Implementing practices to improve utilization of Front End service resources including cashiers, baggers, and in-store supervisors/managers
- Designing and implementing enhancements to selected customer service guidelines
- Developing and implementing modifications to the front-end scheduling processes leveraging the Tomax system
- Designing and implementing simplified cash office procedures
- Improved cashiering productivity and service measurement
- Revising performance and exception management processes using ShrinkTrax
- Performing overall project planning and program management activities

10.        Deloitte Consulting has significant qualifications and experience in

performing the scope of work described above that is the subject of Deloitte Consulting's

retention to provide post-petition services to the Debtors.  Subject to the Court's approval

of Deloitte Consulting's retention hereunder, the scope of post-petition services Deloitte

Consulting anticipates providing to the Debtors is limited to those services described in

the Engagement Letter.

11.    Some services incidental to the tasks to be performed by Deloitte Consulting

in these Chapter 11 cases may be performed by personnel employed by or associated with

affiliates of Deloitte Consulting, including Deloitte & Touche LLP.  The fees and

expenses with respect to such services, if any, will be included in the fee applications of Deloitte Consulting.

12.    Deloitte Consulting intends to apply to the Court for allowance of compensation and reimbursement of expenses consistent with the terms of the Engagement Letter, the Retention Application and this Affidavit, the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court of the Middle District of Florida (Jacksonville), the United States Trustee's Guidelines and the Orders of this Court.

13.    Deloitte Consulting will charge the hourly rates as specified in the Engagement Letter in performing the aforementioned services which are consistent with the rates charged for similar services.  For all services, the range of rates is as follows:

| *Staff Classification* | *Hourly Billing Rate* |
| --- | --- |
| Principals/Directors | $ 475-530 per hour |
| Senior Managers | $ 400-425 per hour |
| Managers | $ 360-380 per hour |
| Senior Consultants | $ 280-295 per hour |
| Staff | $ 175-210 per hour |

14.    The billing rates reflect, among other things, differences in experience levels within classifications, geographic differentials and differences between types of services being provided.  In the normal course of business, Deloitte Consulting revises its regular hourly rates to reflect changes in responsibilities, increased experience, and increased costs of doing business.  Accordingly, Deloitte Consulting requests that the aforementioned rates be revised to the hourly rates that will be in effect from time to time

subject to agreement between the Debtors and Deloitte Consulting.  Changes in regular hourly rates will be noted on the invoices for the first time period in which the revised rates became effective.

15.    The professional fees charged for Deloitte Consulting's services are calculated from the actual hours expended in providing the services multiplied by the hourly billing rates for the specific personnel involved.  In addition, reasonable expenses, including, without limitation, travel and delivery services will be included in the total amount billed.

16.    Deloitte Consulting requests that it be permitted to submit monthly invoices for fees and expenses. Such invoices will be submitted in accordance with the procedures outlined by, and will contain reasonable detail consistent with, any rules, guidelines, and/or administrative orders promulgated by the Court that apply to these Chapter 11 cases.  Deloitte Consulting requests that the invoices, after appropriate review, be paid in a manner consistent with the payment of other retained professionals in these cases, consistent with any administrative orders, if any, that would apply to interim payments.

17.    Deloitte Consulting and/or certain of its affiliates did provide services to the Debtors prior to the inception of these Chapter 11 cases.   Such services included:

(a)    Assistance with implementation of Winn-Dixie's Procurement Process Redesign project.  Activities included guidance and assistance related to the following:

(i)    organizational change management associated with the transition of 400+ associates into a new Central Procurement

8

organization structure,

(ii)    process redesign with respect to financial analysis capabilities

within the Central Procurement function,

(iii)   process improvements and work-flow redesign related to

advertising and promotions processes,

(iv)    identification of tools, processes, and technologies to improve

item/store level forecasting,

(v)     enhanced processes related to assortment planning and

category analysis,

(vi)    development of a pricing strategy function,

(vii)   design and implementation of vendor management processes

and tools,

(viii)  evaluation of trading network  alternatives for perishables, and

(ix)    development of scorecards to track performance of individual

components of Winn-Dixie's Merchandising and Supply Chain

function;

(b)     Assistance with identification of opportunities to improve store

inventory ordering processes, Direct Store Delivery (DSD) functions

and "Front End operations" inside each of Winn-Dixie's stores;

(c)     Assistance to Winn-Dixie's Internal Audit Department related to scope

and approach to internal audits of purchasing and procurement

functions and fraud risk assessments (performed by Deloitte & Touche

LLP ("Deloitte & Touche"), an affiliate of Deloitte Consulting);

(d)        In addition, by an agreement effective on May 24, 2004, Deloitte &

Touche Tax Technologies LLC ("D&T Tax Technologies"), an

affiliate of Deloitte Consulting, licensed corporate sales tax software

for a term of one year to Winn-Dixie Stores, Inc. ("WDS"), a Debtor.

As of the Petition Date, no amounts were due under this license

agreement.  WDS may seek to extend the term of the license pursuant

to and, in accordance with, the terms of the license agreement in which

case further license payments would become due.  Subsequent to the

execution of the license agreement, D&T Tax Technologies and

Deloitte & Touche entered into an engagement letter to provide certain

services to WDS associated with the implementation of the licensed

software.  D&T Tax Technologies and Deloitte & Touche LLP were

paid for these services.


Deloitte Consulting and its affiliates received $2,286,200 (Deloitte Consulting

received $2,268,100 and D&T Tax Technologies received $18,100) from the Debtors

within 90 days prior to the inception of these Chapter 11 cases for the services described

above.  Deloitte Consulting was owed $209,411 by the Debtors as of the Petition Date.

Deloitte Consulting will not seek any recovery with respect to such amounts.  Subsequent

to the Petition Date, but prior to May 16, 2005, Deloitte Consulting provided services to

the Debtor totaling $95, 842 and incurred $18,003 of expenses in support of the Debtors'

initiatives related to implementation of the selected perishable trading network and

pricing strategy capability described above.  Deloitte Consulting will also not seek any

10

recovery with respect to such amounts.

18.     Deloitte Consulting has received no promises regarding compensation in these Chapter 11 cases other than in accordance with the Bankruptcy Code and as set forth in this Affidavit.  Deloitte Consulting has no agreement to share its revenues from the services for which it is seeking to be retained hereunder with any nonaffiliated entity.

Anthony D. Forcum
Principal

Sworn to and subscribed before me,
this _19_ th day of May, 2005.

PAT MYERS
MY COMMISSION EXPIRES
April 22, 2008

**<u>Exhibit C</u>**

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### ORDER AUTHORIZING DEBTORS TO RETAIN DELOITTE CONSULTING LLP TO PROVIDE IN-STORE OPERATIONAL CONSULTING SERVICES TO THE DEBTORS

These cases came before the Court for hearing on June 16, 2005, upon the application of Winn-Dixie Stores, Inc. and its subsidiaries and affiliates in the above-captioned jointly-administered cases, as debtors and debtors-in-possession (collectively, the "Debtors"), for entry of an order authorizing the Debtors to retain Deloitte Consulting LLP ("Deloitte Consulting") to provide in-store operational consulting services to the Debtors during these cases (the "Application").[1]    The Court has reviewed the Application and the supporting affidavit of Anthony D. Forcum (the "Forcum Affidavit") and has considered the evidence and heard the argument of counsel.  After due deliberation and finding proper notice has been given, the Court determines that good cause exists to grant the relief requested in the Application and that granting such relief is in the best interest of these estates and creditors.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.    The Application is granted.

---

[1]    All capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the Application.

2.      The Debtors are authorized to retain Deloitte Consulting, <u>nunc</u> <u>pro</u> <u>tunc</u> to May 16, 2005, pursuant to section 327(a) of the Bankruptcy Code, to provide in-store operational consulting services on the terms set forth in the Application, the Forcum Affidavit, and the letter agreement between the Debtors and Deloitte Consulting dated May 10, 2005 and attached to the Application as Exhibit A (the "Engagement Letter").

3.      If any supplemental affidavits are filed and served after the entry of this Order, absent any objections filed within twenty (20) days after the filing and service of such supplemental affidavits, Deloitte Consulting's employment shall continue as authorized pursuant to this Order.

4.      Deloitte Consulting shall be compensated upon appropriate application in accordance with Sections 330 and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules, and orders of this Court.

5.      With respect to indemnification claims arising during the Debtors' chapter 11 cases but prior to the effective date of a confirmed plan of reorganization in such cases, all requests for indemnity under the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought; <u>provided</u>, <u>however</u>, that in no event shall Deloitte Consulting be indemnified in the case of its own gross negligence, bad faith, willful misconduct, or self-dealing.

6.      The Court shall retain jurisdiction to hear and determine all matters arising from

the implementation of this Order.

Dated June ___, 2005 in Jacksonville, Florida.


_____
Jerry A. Funk
United States Bankruptcy Judge


Cynthia C. Jackson is directed to serve
a copy of this Order on all parties included
on the Master Service List.

3