Hearing Date: June 16, 2005, 1:00 p.m.
Objection Deadline: June 9, 2005, 4:00 p.m.

### UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

|  |  |
|---|---|
| In re: | ) Case No: 05-03817-3F1 |
|  | ) |
| WINN-DIXIE STORES, INC., et al., | ) *Chapter 11* |
|  | ) |
| Debtors.[1] | ) Jointly Administered |

### DEBTORS' MOTION FOR ORDER AUTHORIZING IMPLEMENTATION OF EMPLOYEE RETENTION AND SEVERANCE PLANS

Winn-Dixie Stores, Inc. and its subsidiaries and affiliates in the above captioned cases, as debtors and debtors-in-possession (collectively, the "Debtors"), move the Court for entry of an order under 11 U.S.C. §§ 105(a) and 363(b)(1) authorizing the Debtors to implement (a) an expanded retention plan for key employees and (b) a comprehensive severance program covering all employees (the "Motion"). In support of the Motion, the Debtors state as follows:

### Background

1.  On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "New York Court"). By order dated April 13, 2005, the New York Court transferred venue of these cases to this Court. Any orders entered by the New York Court remain in full force and effect before this Court, unless otherwise ordered by this Court. These cases are jointly administered for procedural purposes only.

---

[1]     In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie

2.     The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No request has been made for the appointment of a trustee or examiner. On March 1, 2005, an official committee of unsecured creditors (the "Creditors Committee") was appointed to serve in these cases pursuant to Bankruptcy Code section 1103.

3.     The Debtors are grocery and drug retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners. According to published reports, the Debtors are the eighth-largest food retailer in the United States and one of the largest in the Southeast. The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion. The Debtors currently operate more than 900 stores in the United States with nearly 79,000 employees. Substantially all of the Debtors' store locations are leased rather than owned.

4.     This Court has jurisdiction over the Motion under 28 U.S.C. § 1334. Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.     The statutory predicates for the relief requested by this Motion are Bankruptcy Code sections 105 and 363(b)(1).

## Relief Requested

6.     By this Motion, the Debtors seek authority to implement and make payments under the following programs:

(a)     An expanded key employee retention plan tailored to the Debtors' retention needs during the course of these chapter 11 cases (the "Chapter 11 Retention Plan"), which will replace the Debtors' existing retention plan (the "Prepetition Retention Plan") and will provide for periodic

---

Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

retention payments to certain key employees during the pendency of these cases; and

(b)     A severance program covering all employees, which will formalize the Debtors' severance practices under a comprehensive program while eliminating any enhanced severance benefits upon a change in control or other severance entitlements pursuant to any preexisting arrangement (the "Corporate Benefits Severance Program") (the Chapter 11 Retention Plan and the Corporate Benefits Severance Program collectively, the "Employee Programs").

### Description of Programs

A.     Chapter 11 Retention Plan

7.     As more fully discussed below, the Chapter 11 Retention Plan is designed to address the Debtors' retention needs during the course of these chapter 11 cases and will replace the Debtors' Prepetition Retention Plan.

8.     Under the Debtors' Chapter 11 Retention Plan, approximately 290 of the Debtors' key employees, excluding the Debtors' chief executive officer, will receive non-discretionary retention incentive payments (the aggregate of such payments to a participating employee being that employee's "Retention Incentive"), ranging from 25% to 150% of their respective annual salaries in consideration for remaining in the Debtors' employ during the pendency of, and through confirmation of a plan of reorganization in, these cases.

9.     Participants in the Chapter 11 Retention Plan will be paid Retention Incentives according to the following schedule of payments (each such payment being a "Retention Payment"): (a) one third of the total Retention Incentive will be paid on or as soon as is practicable following the date upon which the Chapter 11 Retention Plan is approved by this Court; (b) one third of the Retention Incentive will be paid on October 15, 2005; and (c) one third of the Retention Incentive will be paid on the date upon which a plan of reorganization is confirmed in the Debtors' chapter 11 cases.

3

10.     Participants who have terminated their employment voluntarily (except as described below) or who are terminated by the Debtors for cause will forfeit their right to any unpaid Retention Incentives and will not receive any Retention Payment following such termination.  However, participants whose employment is terminated by reason of a qualified reduction in the Debtors' workforce, retirement, disability, or death will be entitled to receive a pro-rata Retention Payment based upon (a) the number of days worked from April 15, 2005 through October 15, 2005 for participants whose employment is terminated prior to October 16, 2005[2] or (b) the number of days worked from October 16, 2005 through the date upon which a plan of reorganization is confirmed in the Debtors' chapter 11 cases.[3]

11.     Additionally, each new employee hired by the Debtors will, at the discretion of the Debtors' chief executive officer, be eligible to receive a Retention Incentive commensurate with those of his or her peers or equal to the amount forfeited by the person he or she replaced.

12.     Total payments made under the Chapter 11 Retention Plan will not exceed $13,977,093.

B.      Corporate Benefits Severance Program

13.     The Corporate Benefits Severance Program formalizes the Debtors' prior layoff severance practice and provides for severance benefits (the "Severance Benefits") for each of the Debtors' executives and employees during these chapter 11 cases.  The Corporate Benefit Severance Program will remain in place through the second anniversary of the Debtors' emergence from chapter 11.

---

[2]      Such pro-rata Retention Payment will be made as soon as is practicable following the participant's termination.

[3]      Such pro-rata Retention Payment will be made as soon as is practicable following the date upon which a plan of reorganization is confirmed in the Debtors' chapter 11 cases.

4

14.    Under the Corporate Benefits Severance Program, an executive or employee who has been employed by the Debtors for a minimum of sixty days and is terminated without cause by the Debtors will be entitled to receive a Severance Benefit in accordance with the levels described in the following table:

| Tier | Illustrative Title | Estimated Number of Employees | Severance Benefits Payable |
|------|--------------------|-------------------------------|----------------------------|
| 1 | Chief Executive Officer | 1 | 3 x (base salary + target bonus) |
| 2 | Senior Vice Presidents | 8 | 2 x (base salary + target bonus) |
| 3 | Vice Presidents, General Vice Presidents, Regional Vice President | 25 | 1 x (base salary + target bonus) |
| 4 | Senior Directors | 15 | 6 months' salary |
| 5 | Directors/Managers | 53 | 1 week's salary per year of service (maximum of 26 weeks' salary) |
| 6 | Plant Managers | 7 | 20 weeks' salary |
| 7 | Other (Exempt) Full Time Employees | 4,591 | 1 week's salary per year of service (maximum of 12 weeks' salary) |
| 8 | Other (Exempt) Part Time Employees | 1 | $100 for part time employees with less than one year of service and $200 for part time employees with one year of service or longer. |
| 9 | Other (Non-Exempt) Full Time Employees | 28,000 | 1 week's salary per year of service (maximum of 6 weeks' salary) |
| 10 | Other (Non-Exempt) Part Time Employees | 45,022 | $100 for part time employees with less than one year of service and $200 for part time employees with one year of service or longer. |
| 11 | PT Pharmacist | 277 | $1,000 flat amount |

15.    Executives and employees who voluntarily terminate their employment with the Debtors, whose employment is terminated by the Debtors for cause, or whose employment is terminated prior to the sixty day minimum employment period will not be entitled to receive Severance Benefits.

16.     Payment of Severance Benefits under the Corporate Benefits Severance Program will take the form of (a) a lump sum cash payment for those employees listed in tiers 1 through 6 in the table above and (b) salary continuation for those employees listed in tiers 7 through 11 above, and are in lieu of any other severance benefits to which the participant might otherwise be entitled. To be eligible to receive any of the Severance Benefits, participants in the Corporate Benefits Severance Program are required to enter into a non-solicitation, non-compete,[4] non-disclosure, and non-disparagement agreement with the Debtors and, to the extent applicable, a waiver of any enhanced change in control or other severance benefits.

17.     In order to take advantage of an exemption from payment of FICA, FUTA and federal income tax on severance payments, the Debtors intend to pay severance to employees listed in tiers 7 through 11 by virtue of a supplemental unemployment benefits plan (a "SUB Plan"). In order to qualify for the exemption, the Internal Revenue Service requires that payment of severance through a SUB Plan must be linked to the employee's receipt of state unemployment compensation. Therefore, severance must be paid over time rather than in a lump sum. In addition, the employee must otherwise remain entitled to receive state unemployment benefits while he or she is receiving periodic severance payments from the Debtors.

18.     The ultimate cost of the Corporate Benefits Severance Program will be a function of the number of executives and employees whose employment is severed. Assuming a worst case scenario, in which all stores are closed and all executives and employees are terminated, the estimated maximum cost of the Corporate Severance Benefits Program will be $119,624,611.80 consisting of: (a) $89,305,617.38 in payments to approximately 71,000 retail employees; (b) $11,111,927.32 in payments to approximately 4,000 logistics employees; (c) $917,774.38 in payments to approximately 300 store maintenance employees; (d) $2,109,662.95

---

[4]     As applicable, depending upon the participant's level of employment.

6

in payments to approximately 700 manufacturing employees; and (e) $16,179,629.77 in payments to approximately 2,000 corporate office employees. The Debtors do not contemplate that such a worst case scenario will arise.

## Basis for Relief

A.    Chapter 11 Retention Plan

19.    The Debtors' ability to maintain their business operations and maximize value for all parties in interest depends, in large measure, on the continued employment, active participation, and dedication of certain key employees who possess knowledge, experience, and skills that are required to support the Debtors' business operations and support the demands of the chapter 11 process (the "Key Employees").

20.    Unfortunately, the Debtors' ability to rely on the future services of the Key Employees has been thrown into some doubt by the commencement of these chapter 11 cases. Because of the uncertainty surrounding their reorganization efforts, including rumors of store closings and accompanying layoffs, the Debtors expect that employee morale will decline substantially. Increased employee responsibilities and other burdens, as well as understandable concerns over limited compensation opportunities and employment security, occasioned by the Debtors' financial difficulties, status as debtors in possession, and publicly disclosed intention to restructure their operations, combined with a robust Jacksonville job market, may lead many of the Key Employees to pursue alternative employment opportunities.

21.    The Debtors believe that any substantial level of attrition among their Key Employees will have an adverse effect on their ability to reorganize. Many of the Key Employees possess unique knowledge, experience, and skills necessary to support the Debtors' business operations and/or are crucial to a successful reorganization. Moreover, the process of replacing departing Key Employees would be extremely difficult. In many cases, it will be

7

impossible for the Debtors to recruit and train qualified replacements for their departing Key Employees without considerable delay, expense, and disruption to the Debtors' business operations and reorganization efforts.

22.    With respect to the Debtors' senior managers, the consequences of attrition would be particularly drastic. In addition to the dislocations and loss of morale that often result during a transition of senior management, the departure of any high-ranking employee generally leads to additional employee turnover, as employees follow the example of their resigning colleagues. As senior managers and other Key Employees depart, the remaining employees become even more concerned over additional workload and job responsibilities further contributing to a decline in morale.

23.    In addition, the process of replacing such managers will be particularly difficult. Highly-qualified job candidates often find the prospect of working for a chapter 11 company unattractive. Even if suitable candidates could be found to replace departing senior managers, the recruitment of such candidates would involve considerable expense. Because of the lack of comparably-sized businesses in the Jacksonville area, the Debtors would likely be required to retain costly executive search firms to conduct a lengthy nationwide search to find replacements. The Debtors also anticipate that they would be required to pay signing bonuses, reimbursement for relocation expenses, and above-market salaries to induce qualified candidates to accept employment with a chapter 11 debtor, particularly in light of the fact that the Debtors may be unable for the foreseeable future to offer such candidates compensation in the form of stock options or other equity-based awards.

24.    Moreover, the Debtors do not believe that their existing retention plan is sufficient to address the risk of Key Employee departures during the pendency of these cases. Prior to the Petition Date, the Debtors established the Prepetition Retention Plan which provided

for payment of retention incentives to forty-six of the Debtors' Key Employees ranging from 35% to 150% of their respective annual salaries. A first group of 7 Key Employees became participants in the Prepetition Retention Plan in July of 2004 while a second group of 39 Key Employees became participants in October of 2004. One third of the contemplated retention incentives was paid to the first group of Key Employees prior to the Petition Date and payment of the remaining two thirds was suspended as a result of the filing of these cases. The second group of 39 Key Employees have not been paid any portion of their respective retention incentives. While the Prepetition Plan may have been sufficient to address their retention needs outside of chapter 11, the Debtors believe, in the exercise of their business judgment, that addressing the increased challenges and uncertainty caused by the filing of these cases as well as the anxieties occasioned by the Debtors' publicly-announced intention to downsize their businesses, requires replacing the Prepetition Retention Plan with a Chapter 11 Retention Plan covering an expanded number of Key Employees and providing for payment dates tailored to the chapter 11 context.

25.    The Debtors obtained assistance in formulating the Chapter 11 Plan from the firm of Watson Wyatt Worldwide ("Watson Wyatt"). Watson Wyatt performed an extensive review of similar retention plans adopted by other chapter 11 debtors and compared the annualized cost of the Debtors' proposed Chapter 11 Retention Plan as a percentage of both revenue and assets to the annualized cost of other chapter 11 retention plans. Based upon such analysis, the Debtors believe, in the exercise of their business judgment, that the Retention Incentives to be paid under the Chapter 11 Retention Plan as proposed herein are reasonable, well within the range of competitive practice, and narrowly tailored to reduce the risk that Key Employees will depart from the Debtors during the critical period of their chapter 11

9

restructuring. It is also the Debtors' business judgment that the expected benefits of the Chapter 11 Retention Plan outweigh the costs associated with adopting and implementing the plan.

B    Corporate Benefits Severance Program

26.    In addition to the Key Employees described above, the success of the Debtors' reorganization efforts will depend upon the efforts of the Debtors' wider workforce. In this vein, it is essential that the Debtors have a workforce that is focused upon the needs of the Debtors' businesses and undistracted by fears of potential job loss occasioned by the Debtors' restructuring efforts. To achieve the necessary focus of its workforce, it is essential that the Debtors provide clear assurance that employees who are involuntarily terminated for reasons other than cause will receive some compensation in the form of severance benefits.

27.    Prior to the Petition Date, the Debtors had no formal severance plan but contracted to provide special severance protections to their chief executive officer and certain of their senior executives. In addition, the Debtors have a past practice of paying severance in the event of a layoff and store disposition. Nevertheless, to counter the heightened uncertainties and related workforce concerns arising as a result of the Debtors' chapter 11 cases, it is necessary for the Debtors to formalize their informal severance practices by implementing the Corporate Benefits Severance Program. By taking such action, a clear message will be sent that employees who continue to work for the Debtors will receive compensation in the event that they are involuntarily terminated without cause, thereby allowing the Debtors' workforce to focus on the demands of the Debtors' businesses.

28.    In developing the Corporate Benefits Severance Program, the Debtors were once again assisted by Watson Wyatt, which compared the benefits proposed to be offered under the Corporate Benefits Severance Program to benefits offered under key employee severance plans adopted by other chapter 11 debtors and under severance programs adopted by

10

non-chapter 11 companies. Based upon such analysis, the Debtors' believe, in the exercise of their business judgment, that the Severance Benefits to be paid under the Corporate Benefits Severance Program as proposed herein are reasonable, well within the range of competitive practice, and narrowly tailored to reduce the risk that employees will be distracted by fears of potential job loss in the performance of the work. It is also the Debtors' business judgment that the expected benefits of the Corporate Benefits Severance Program outweigh the costs associated with adopting and implementing the program.

### Applicable Authority

29.     Section 363(b) of the Bankruptcy Code permits the Debtors to use property of the estate "other than in the ordinary course of business," after notice and a hearing. 11 U.S.C. § 363(b)(1). The standard applicable to a motion under section 363(b) of the Bankruptcy Code is whether a debtor has exercised sound business judgment. See In re BDK Health Mgmt., 1998 WL 34188241, at *4-5 (Bankr. M.D. Fla. Nov. 16, 1998) (approving a sale of the debtor's assets under § 363(b) of the Bankruptcy Code where sale was found to serve a sound business purpose); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him a good business reason to grant the application."); In re First Merchants Acceptance Corp., Nos. 97-1500 & 97-1892 (JJF), 1997 Bankr. LEXIS 1492, at *10 (D. Del. Sept. 11, 1997) (applying sound business judgment standard to section 363(b) sale of assets).

30.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

11

31.    The business judgment rule has vitality in chapter 11 cases and shields a
debtor's management from judicial second-guessing. Id.; see also In re Johns-Manville Corp.,
60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a
business by a debtor and a presumption of reasonableness attaches to a debtor's management
decisions.").

32.    There is a strong business justification for adopting and implementing the
Employee Programs. Left unchecked, the uncertainty surrounding the Debtors' chapter 11 cases
threatens to distract the Debtors' workforce from the demands of the Debtors' businesses and
may lead to significant employee attrition. The Employee Programs are designed to counter
workforce anxieties caused by the filing of these chapter 11 cases and to ensure that employees
work effectively toward the Debtors' reorganization. Given the importance of the Debtors'
employees to their continued operations, this Court should authorize the relief requested herein.

33.    Recognizing the needs of chapter 11 debtors to retain their employees in
order to assure continued business functions in chapter 11, courts have approved retention and
severance programs under section 363(b) of the Bankruptcy Code similar to the proposed
Employee Programs (each program, of course, being tailored to the needs of particular debtors).
See, e.g., In re FiberMark, Inc., Case No. 04-10463 (CAB) (Bankr. D. Vt. Aug. 6, 2004)
(approving key employee retention and severance plans); In re Twinlab Corp., Case No. 03-
15564 (CB) (Bankr. S.D.N.Y. Oct. 29, 2003) (approving amended key employee retention and
severance plan); In re Penn Traffic Co., Case No. 03-22945 (ASH) (Bankr. S.D.N.Y. Oct. 23,
2003) (approving key employee retention, incentive, and severance plans); In re Kmart Corp.,
Case No. 02-B02474 (Bankr. E.D. Ill. Mar. 6, 2002, Mar. 20, 2002, Apr. 23, 2002); In re Eagle
Food Centers, Inc., Case No. 03-15299 (PSH) (Bankr. N.D. Ill. Jun 27, 2003) (approving
employee retention and severance program); In re Genuity Inc., Case No. 02-43558 (PCB)

12

(Bankr. S.D.N.Y. Dec. 30, 2002) (approving the continuation of an existing employee retention program and the implementation of a severance benefits program); In re Aerovox, Inc., 269 B.R. 74 (Bankr. D. Mass. 2001) (approving key employee retention and severance program as a proper exercise of the debtor's business judgment); In re Exodus Communications, Inc., Case No. 01-10539 (SLR) (D. Del. Nov. 15, 2001) (approving $17.4 million retention/emergence bonus program and approving continuation of existing severance program); In re Owens Corning, Case No. 00-03837 (MFW/JKF) (Bankr. D. Del. Jan. 17 & Mar. 26, 2001 (approving $69 million retention and emergence bonus program and severance program of up to one year severance pay for over 5,600 employees); In re Montgomery Ward Holding Corp., 242 B.R. 147 (D. Del. 1999) (affirming the bankruptcy court's decision that the implementation of key employee retention and severance plans was a proper exercise of the debtor's business judgment); In re Long John Silver's Restaurants, Inc., No. 98-1164 (PJW) (Bankr. D. Del. Aug. 21, 1998) (approving almost a $13 million employee retention program; approving lump sum severance pay of 100-200% of annual base salaries for top 26 management personnel); In re America West Airlines, Inc., 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (holding that proposal to pay bonuses on confirmation of reorganization plan was exercise of debtor's sound business judgment); In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991) (concluding that implementation of a critical employee retention plan was a proper exercise of debtor's business judgment).

       34.    For the reasons stated above, the Debtors believe that the costs associated with the authorization and adoption of the proposed Employee Programs are more than justified by the benefits that are expected to be realized by encouraging all employees to work together to bring these cases to a successful conclusion and discouraging employee resignations.

### Notice

35.    Notice of this Motion has been provided to (a) counsel to the United States Trustee, (b) counsel for the Debtors' postpetition secured lenders, (c) counsel for the Creditors Committee, and (d) the other parties in interest named on the Master Service List maintained in these cases. No other or further notice need be given.

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court (i) enter an order substantially in the form of Exhibit A, authorizing the Debtors to establish and implement the Chapter 11 Retention Plan and the Corporate Benefits Severance Program and (ii) grant the Debtors such other and further relief as the Court deems just and proper.

Dated:  May 27, 2005.

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By ___s/ D. J. Baker___
        D. J. Baker
        Sally McDonald Henry
        Rosalie Walker Gray
        David M. Turetsky
Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)

Co-Attorneys for Debtors

SMITH HULSEY & BUSEY

By ___s/ Cynthia C. Jackson___
        Stephen D. Busey
        James H. Post
        Cynthia C. Jackson,
        Florida Bar Number 498882
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)

Co-Attorneys for Debtors

14

## Exhibit A

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ORDER AUTHORIZING DEBTORS TO IMPLEMENT EMPLOYEE RETENTION AND SEVERANCE PLANS

These cases came before the Court for hearing on June 16, 2005, upon the motion of Winn-Dixie Stores, Inc. and its subsidiaries and affiliates in the above-captioned jointly-administered cases, as debtors and debtors-in-possession (collectively, the "Debtors"), for entry of an order authorizing the Debtors to implement an expanded retention plan for key employees (the "Chapter 11 Retention Plan") and a severance program covering all employees (the "Corporate Benefits Severance Program") (the "Motion").[1] The Court has reviewed the Motion and has considered the evidence and heard the argument of counsel. After due deliberation and finding proper notice has been given and that a sound business reason exists for entering into the Chapter 11 Retention Plan and the Corporate Benefits Severance Program, each as described in the Motion, the Court determines that good cause exists to grant the relief requested in the Motion and that granting such relief is in the best interest of these estates and creditors. Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.    The Motion is granted.

---

[1]    All capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the Application.

2.    The Debtors are authorized to implement, and to make payments provided for under, the Chapter 11 Retention Plan as described in the Motion.

3.    The Debtors are authorized to implement, and to make payments provided for under, the Corporate Benefits Severance Program as described in the Motion.

4.    The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated June ____, 2005 in Jacksonville, Florida.


_____
Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve
a copy of this Order on all parties included
on the Master Service List.

1002753-New York Server 7A - MSW