

# MASTER LOCATION AGREEMENT

**PARTIES.** TRM CORPORATION, an Oregon Corporation ("TRM"), and WINN-DIXIE MONTGOMERY, INC. (the "Business").



Division Headquarters:    Winn-Dixie Montgomery, Inc.
1550 Jackson Ferry Road
Montgomery, Alabama 36104-1718

Date:   December 11, 2001

TRM and the Business desire to allow TRM to locate TRM-owned copy machines and related products (the "Equipment") and TRM-owned signs (the "Signs") at jointly agreed upon retail locations owned and operated by the Business. The Equipment will be available for use by the Business and its customers.

TRM and the Business agree as follows:

1. **Obligations of TRM.** During the term of this Agreement, TRM will:

    (a)   deliver and install the Equipment and Signs at the Business locations set forth on Attachment A (the "Locations"). The Equipment shall be new or like-new Konica NEXTGEN copiers with change making vend tower attached. The Signs shall be limited to those specifically identified on Attachment D;

    (b)   sell to the Locations all paper, toner and supplies necessary for the operation of the Equipment when the Equipment is delivered, and within 48 hours of any service call made by the Business to TRM;

    (c)   provide repair and maintenance services for the Equipment in accordance with the standards set forth herein;

    (d)   commence repair services on any malfunctioning Equipment at its Location within 48 hours of any service call made by the Business to TRM. TRM will use it's best efforts to ensure that Equipment is repaired and operating within 96 hours of a service call. Response times shall exclude weekends and holidays;

    (e)   provide complete preventative maintenance service for Equipment on an "as needed" basis during the normal business hours of each Location. Such maintenance shall be at or above industry standard and shall be consistent with professional workmanlike care of this type of equipment. All services shall be performed by trained, certified technicians.

2. **Obligations of the Business.** During the term of this Agreement, the Business will:

    (a)   provide adequate space for Signs provided by TRM and approved by the Business;

    (b)   situate the Equipment in a clean and safe location which facilitates access to and use by customers of the Business;

    (c)   collect all sums paid for copies made on the Equipment, account to TRM for all moneys received and remit the portion due TRM as provided in

Attachment B and according to the payment terms set forth in Section 4 herein; and

(d) maintain the Equipment in a clean and orderly manner on an "as needed" basis.

**3. Ownership of Equipment.** The Business acknowledges that the Equipment and Signs are owned by TRM and that the Business will not obtain any rights or interests in the Equipment or Signs under this Agreement.

**4. Price.** In consideration for TRM carrying out its obligations herein, the Business will pay TRM for each copy made on the Equipment, less the appropriate discount (Business' Profit), as set forth in Attachment B. The price includes all paper, toner and supplies necessary for the operation of the Equipment. The amount payable to TRM shall be computed and paid as follows: For each Location, TRM will calculate and submit a monthly invoice to the Business for the amount due for copies made during the previous month, based upon the difference between the meter reading taken the previous month and the reading for the current month, less the Business' Profit. TRM's invoice shall be paid within thirty (30) days from the invoice date. A late payment charge of 1.5 percent per month shall be added to any unpaid balance. In the event that the Business fails to make such timely payment, TRM shall have the right to terminate the Agreement and remove the Equipment and Signs if the account is not paid within ten (10) days after receipt of written notice of such delinquency from TRM.

**5. Master Location Agreement.** Locations mutually agreed to by the Business and TRM, as set forth on Attachment A, which may be amended by mutual, written agreement of the parties from time to time, shall be bound by the terms of this Master Agreement. The Business shall also be entitled, in its sole discretion, to delete a Location from Attachment A without further obligation hereunder if it determines that such Location will be closed or sold.

**6. Up-Time Performance.** TRM and the Business agree that a reasonable level of in-service customer availability for the Equipment at each Location ("Uptime") shall be 96% of the time during which the Location is open for business Monday through Friday (major holidays excluded) and that this constitutes a reasonable monthly performance standard for the Equipment "Uptime" goal. Therefore, TRM agrees to operate the Equipment in an efficient and diligent manner intended to meet the "Uptime" goal. The calculation of "Uptime" shall be on a quarterly basis and in accordance with the industry's normal and then current methods, but shall not include downtime due to (i) circumstances beyond TRM's control, or (ii) electrical or other utility service failures. Should the Equipment fail to meet the "Uptime" goal during any one quarter for any Location, the Business may request that TRM either replace or remove the Equipment from the Location. It is the decision of the Business as to which of these two options are selected. If requested in writing by the Business, TRM will remove the Equipment within 15 days of the written request and this Agreement will be terminated without penalty or further liability with respect to that Location.

**7. Satisfaction Guarantee.** If the Business is dissatisfied with any Equipment due to frequent service needs related to the operation of any one (1) unit of Equipment (three or more service calls within a 30 day period to remedy a malfunction of the Equipment shall be deemed to trigger this guarantee), TRM will, at the request of the Business, replace the Equipment without charge to the Business with an identical model or, at the option of TRM, with Equipment of comparable features and capabilities.

**8. Taxes, Liens, and Encumbrances.** The Business shall not knowingly create, permit, or suffer any assessments, liens, or other encumbrances on the Equipment. The Business shall be responsible for the collection, reporting and remittance of all sales, use, and business occupation taxes arising out of the sale of copies made on or the use of the Equipment (other

than taxes on the income of TRM). The Business will provide TRM with its resale identification number by completing Attachment C.

**9. Use of the Equipment.** The Business shall at all times exercise reasonable care in using and supervising the use of the Equipment and the Signs, and shall not remove the Equipment or the Signs from a Location without written approval of TRM, except if such removal is due to the closure or sale of such Location, or to protect the Equipment from damage.

**10. Independent Contractor.** The parties acknowledge that TRM is an independent contractor and that this Agreement will not create the relationship of agent, employee, or servant between TRM and the Business for any purpose whatsoever.

**11. Term and Termination.**

(a) All Equipment currently installed, or installed prior to the effective date of this Agreement, is subject to a minimum placement term of 36 months commencing on the date of this Agreement. Equipment installed on or after the date of this Agreement is subject to a minimum placement term of 36 months commencing upon the date of installation for each Location. At the conclusion of the 36-month contractual period for each Location set forth above, and unless terminated in accordance with the terms herein, this Agreement shall continue on a month-to-month basis.

(b) Either party may terminate this Agreement (i) after the initial 36-month term by providing thirty (30) days written notice to the other party; (ii) at any time upon breach of the Agreement by the other party that remains uncured thirty (30) days following notice of such breach; or (iii) if the other party applies for or consents to the appointment of a receiver, trustee or liquidator of all or a substantial part of its assets, files a petition in bankruptcy or admits in writing its inability to pay its debts as they become due, makes a general assignment for the benefit of its creditors, files a petition or an answer seeking reorganization or arrangement with creditors, or takes advantage of any insolvency law, or if an order, judgment or decree is entered by a court of competent jurisdiction on the application of a creditor, adjudicating the party a bankrupt or insolvent corporation or approving a petition seeking reorganization of the party or appointment of a receiver, trustee or liquidator of all or substantially all of its assets.

(c) TRM shall have an immediate right to terminate the Agreement, without notification, if execution or other writ of process shall be issued in any action or proceeding against the Business where the Equipment faces the risk of being seized, taken or detained. For the purposes of termination pursuant to this section c, TRM may enter upon the Business location to remove the Equipment and/or Signs during normal business hours after reasonable prior notification to the Business and the manager of the particular Location affected.

(d) Upon termination pursuant to section a or b above, the Business shall make the Equipment and Signs available for pick up by TRM at reasonably agreeable days and times for a period of sixty (60) days following termination. Thereafter, the Business may dispose of the remaining Equipment and Signs as it so determines.

(e) The termination of this Agreement and the removal of the Equipment shall not prejudice any rights or claims which either party may have against the other for damage to the Equipment or otherwise under this Agreement.

**12. Exclusivity.** The Business agrees that during the term of this Agreement, public copying services at each Location governed by this Agreement, will be available solely on TRM Equipment.

**13. Severability.** If any provision of this Agreement is deemed illegal or otherwise void, invalid, or unenforceable, such provision shall be disregarded and the remainder of this Agreement without such provision shall not be affected and shall remain in full force and effect.

**14. Indemnification.** Concurrently herewith, TRM shall execute the Indemnity Agreement attached hereto as Attachment E.

**15. Payments Marked "Payment in Full".** TRM may accept late payments or partial payment, even though marked "Payment in Full," without affecting any of its rights under this Agreement.

**16. Entire Agreement.** This Agreement, including the Attachments incorporated herein, contains the entire and only agreement between the parties, and any and all statements and representations, written and oral, including previous correspondence and agreements between the parties hereto, are merged herein. The parties acknowledge that all representations and statements upon which each relied in executing this Agreement are contained herein.

**17. Litigation Expense.** In the event that any litigation arises to enforce or declare any term of this Agreement, the prevailing party shall recover and the losing party shall pay the reasonable attorney fees and other litigation expenses incurred by the prevailing party at trial and upon any appeals therefrom, as determined by the respective courts.

**18. Governing Law and Venue.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of Florida.

**19. Agreements Executed by Facsimile.** The parties agree that the Master Location Agreement executed by facsimile shall be deemed valid and enforceable for all purposes.

**20. Notices.** All notices required to be given pursuant to this Agreement shall be in writing and deemed given (i) when actually delivered, if delivered in person; (ii) at the time of transmission if sent by facsimile transmission to the number listed below; or (iii) at the time of receipt if deposited in the United States mails, certified, return receipt requested, postage prepaid and addressed to the receiving party as follows:

TO WINN-DIXIE:

Curt M. Gore
Division President
Winn-Dixie Montgomery, Inc.
1550 Jackson Ferry Road
Montgomery, Alabama 36104-1718

Fax: (334) 240-6200

With copies to:

| General Counsel | Talmage B. Booth, III |
| Winn-Dixie Stores, Inc. | Winn-Dixie Stores, Inc. |
| 5050 Edgewood Court | 5050 Edgewood Court |
| Jacksonville, FL 32254-3699 | Jacksonville, FL 32254-3699 |
| Fax: (904) 783-5651 | Phone: (904) 783-5184 |

TO TRM:

Danial Tierney
Sr. VP No. America
5208 N.E. 122nd. Avenue
Portland, OR 97230-1074

21. **Assignment and Modification.** This Agreement may be modified only in writing signed by both parties. This Agreement shall be binding upon the parties, their respective subsidiaries, successors, and assigns; provided, however, that this Agreement may not be assigned without the prior written consent of the parties, which shall not unreasonably be withheld. Any attempted assignment without prior written approval shall be void.

| | |
|---|---|
| Authorized Signature | *HSWadford* |
| Print Full Name | STANLEY WADFORD |
| Title | DIVISION SUPPORT MANAGER |
| Company Name | WINN-DIXIE MONTGOMERY, INC. |
| TRM Representative | *Daniel J. Tierney* |
| Title | SR VP NORTH AMERICAN Business |



## ATTACHMENT A

**Winn-Dixie Montgomery, Inc.**          Store List or Delivery Requests

Please indicate all stores for install and list complete information for each
or attach a signed store list to be incorporated as Attachment A.

| Account Number | Store Name | Store # | Address | City | ST | ZIP | County | Phone Number |
|---|---|---|---|---|---|---|---|---|
|   |   |   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |   |   |
|   |   |   |   |   |   |   |   |   |

Signature of Acceptance_____   Date_____



## ATTACHMENT B
10¢ Suggested Retail Price

**Profit Schedule**

The Business will pay TRM for all copies made on the Equipment at all Locations, an amount equal to the currently suggested retail price (or retail price if greater than the currently suggested retail price) less the discount (profit) outlined below. The above per copy cost to the Business includes all paper, toner and supplies necessary for the operation of the equipment.

Tiered Discount All Locations - Discount tied to the monthly average (retail) copy volume of all 10¢ Locations:

| Average Monthly Copies For All Locations | Discount |
|---|---|
| 0 – 1,500 | 15% |
| 1,501 – 4,000 | 20% |
| 4,001 – 6,000 | 30% |
| 6,001 + | 40% |

Note: All copies made using the "by-pass" key will be at a cost to the Business of 3.5¢, plus sales tax as appropriate.

**Copy Volume Standards**

The net revenue to TRM must average $110.00 per Location per month, based on an aggregate average of the total of all Locations at which TRM Equipment is installed. In the event that the aggregate, average net monthly revenue due TRM is less than $110.00 a month after three months of placement or thereafter, the Business shall, in its sole determination, either (a) subsidize the difference between the actual net revenue of all Locations in the aggregate, and the aggregate average of $110.00 per Location; or (b) allow TRM to remove its Equipment from the lowest copy volume Locations until the aggregate average of all Locations is at $110.00 per month net revenue. Prior to Equipment removal, every effort will be made by both TRM and the Business to achieve acceptable copy volumes. These efforts may include, but are not limited to, merchandising improvement, Equipment relocation within the Location, operator re-training and repricing.

**Paper Price**

TRM reserves the right to terminate this Agreement upon sixty (60) days prior written notice to the Business in the event paper prices increase more than 25% from the price as of the date of this Agreement.

Signature of Acceptance: _HJWadford_ (signature)
Date: 5/16/02



# ATTACHMENT C
# CERTIFICATE OF RESALE

This is to certify that all services, material, merchandise or goods purchased by the undersigned from:

TRM CORPORATION

after _____, are purchased for resale in its present form or as converted
(date)
into or as a component part of tangible personal property in the regular course of business.

This certificate shall be considered a part of each order which we shall give. This certificate is to continue in force until revoked in writing. It is our belief that TRM Corporation is not required to collect the sales or use tax on the transaction or transactions covered by this certificate. In addition, I understand that we will be liable for the tax due, plus penalties and interest, for any misuse of this certificate.

Business Name: __Winn-Dixie Montgomery, Inc.__

Address: __1550 Jackson Ferry Road__

__Montgomery, Alabama 36104-1718__

Initials of Authorized
Signer's Acceptance: _____

Print Your Full Name: _____

Your Title: _____

Date: _____

State Resale Tax Number            State

_____            _____

_____            _____

_____            _____

_____            _____



## ATTACHMENT D
### Merchandising Agreement

No advertisements of any third-party service or business, or any other TRM service or business besides the signage specifically described below, is permitted. The Business agrees to allow TRM to place and maintain the following signage at each of its Locations unless prohibited by city ordinance.

*Please indicate quantity and placement*

Banner — NO
Window Sign — NO
Door/Window Decal — NO
Machine Decal — YES
Wall Sign with Pole & Landscape Brackets — NO
Riverside Sign — YES
Wobbler — NO
Clip — NO
Mobile — NO

# ATTACHMENT E

## Indemnity Agreement

THIS AGREEMENT, made this 11th. day of December, 2001, by the undersigned ("Indemnitor") in favor of Winn-Dixie Stores, Inc., its affiliates, subsidiaries and lenders and landlords, ("Indemnitee").

In consideration of Indemnitee's permitting the Indemnitor or its agents, employees and representatives (including subcontractors) to enter upon or to place, construct or service equipment or material upon premises owned or controlled by Indemnitee, and/or to use any equipment owned or controlled by Indemnitee, Indemnitor agrees as follows:

(1)     Indemnity. Indemnitor will indemnify and hold Indemnitee, its successors and assigns, harmless from all loss, liability and expense, and all claims therefor, including reasonable attorneys' fees, by reason of bodily injury, including death, and property damage sustained by any person or entity whatsoever arising out of or in connection with the presence or activity of Indemnitor, its employees, agents and representatives (including sub-contractors) on Indemnitee's premises, including the installation of the Equipment in, or the use of the Equipment by Indemnitor or any third party on Indemnitee's premises, whether belonging to Indemnitor, Indemnitee, or otherwise, and whether such injury, death, loss or damage is caused, occasioned or contributed to by Indemnitor's negligence or the negligence, sole or concurrent, of Indemnitee, its successors and assigns. In no event will Indemnitor's liability under the Agreement exceed the recovery under the commercial insurance policies maintained by Indemnitor in accordance with this Agreement.

(2)     Insurance. Indemnitor agrees to maintain general liability coverage with no less than an A-rated carrier with minimum limits of liability of $2,000,000.00. Coverage's required are: Premises/Operations, underground, explosion and collapse, Products/Completed Operations, Contractual, Independent Contractors, broad Form Property Damage, Personal Injury, Auto Liability, and Statutory Workers Compensation Insurance. Indemnitee shall be an additional named insured on all coverages before Indemnitor uses or installs any equipment or commences any work on Indemnitee's premises. Indemnitee shall be furnished with a Certificate of Insurance providing for 30 days notice to Indemnitee prior to policy cancellation. Such certificate shall be furnished to Indemnitee and updated as required by policy changes.

(3)     Compliance with Laws. Indemnitor, in performing any labor or using any equipment on Indemnitee's premises, as contemplated in this Agreement, will fully comply and ensure that its agents, employees, representatives and subcontractors conduct their activities on Indemnitee's premises in a manner which will fully comply with all applicable safety and health standards established by any applicable federal, state or municipal statute, regulation or ordinance, including, without limitation, the federal occupational Safety and Health Act., as amended.

(4)     Costs. Should it become necessary for Indemnitee to incur any costs or expenses, whether direct or indirect, including, but not limited to, attorney's fees, investigator's fees, collection costs, or court costs, in connection with any claim or demand for which indemnification is provided by this Agreement, or in connection with any attempt to recover losses incurred on such claims or demands, or in connection with the enforcement of this Agreement, Indemnitor agrees to fully reimburse Indemnitee for such costs and expenses provided, however, that Indemnitee must prevail in any claim or demand against Indemnitor.

(5)     Severability. Any provision, covenant or agreement contained in this Agreement which is found to be prohibited by law or void or unenforceable shall not invalidate the remainder of this Agreement.

(6)     Termination. This Agreement shall remain in full force and effect during the term of the Master Location Agreement. After termination, this Agreement shall remain effective as to losses, liabilities and expenses, including claims therefor, arising prior to the date of termination.

IN WITNESS WHEREOF, the Indemnitor has executed this Agreement on the day first above written.

INDEMNITOR