UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, DIVISION


In re:

    WINN-DIXIE STORES, INC.,

       Debtor.               CASE NO. 05-03817-3F1

_____/


TRANSCRIPT OF PROCEEDINGS


    Status Conference before the Honorable Jerry A. Funk,

United States Bankruptcy Judge, Courtroom 4D, 300 North

Hogan Street, Jacksonville, Florida, Thursday, April 25,

2005, to commence at 10:00 a.m., as reported by Loretta D.

McDonald, a Notary Public in and for the State of Florida

at Large.


- - -

2

```
 1                    A P P E A R A N C E S

 2

 3          STEPHEN D. BUSEY, Esquire
            CYNTHIA D. JACKSON, Attorney at Law
 4          JAMES H. POST, Esquire
                 Attorneys for the Debtor.
 5
            D.J. BAKER, Esquire
 6               Attorney for the Debtor.

 7          Sally MacDonald Henry, Attorney at Law
                 Attorney for the Debtor.
 8
            JEFFREY C. REGAN, Esquire
 9               Attorney for Liberty
                 Mutual Insurance Company
10
            KEN MEEKER, U.S. Trustee
11
            ELENA ESCAMILLA, U.S. Trustee
12
            SCOTT SHUKER, Esquire
13               Attorney for Gustafsons
                 Southeast Milk, Buffalo
14               Rock, Citrus World, Inland Realty.

15          JOHN MACDONALD, Esquire
            JACOB BROWN, Esquire
16               Attorneys for unsecured creditors
                 committee (local counsel.)
17
            JON HELFAT, Esquire
18          BETSY COX, Attorney at Law
            BOB HYDE, Esquire
19               Attorneys for Wachovia Bank

20          JOHN KOZYAK, Esquire
                 Attorney for Lennar Partners.
21
            NINA. M. LAFLEUR, Attorney at Law
22               Attorney for JEA.

23          BRADLEY R. MARKEY, Esquire
                 Attorney for Moulton Properties, Inc.
24
            KEN JACOBS, Esquire
25               Attorney for Cardinal Health.
```

3

```
 1              SCOTT A. ZUBER, Esquire
                    Attorney for Cardinal Health.
 2
                ROBERT B. RUBIN, Esquire
 3                  Attorney for Buffalo Rock.

 4              DEREK F. MEEK, Esquire
                    Attorney for Buffalo Rock.
 5
                STEPHEN R. TAKEUCHI, IRS
 6
                CHIP HERRON, Esquire
 7                  Attorney for Richard Easter
                    and Bradley Keller.
 8
                DENNIC DUNNE, Esquire
 9                  Attorney for Official
                    Creditors Committee.
10
                MATT BARR, Esquire
11                  Attorney for Official
                    Creditors Committee.
12
                ROBERT PERRY, Esquire
13                  Attorney for Beaver Street
                    Fisheries, Ja-Ru, Inc., et. al.
14
                EDDIE HELD, Esquire
15                  Attorney for Beaver Street
                    Fisheries, Ja-Ru, Inc., et. al
16

17
            A P P E A R I N G   T E L E P H O N I C A L L Y
18

19
                MICHELLE "SHELLEY" BISHOP, Attorney at Law
20
                RACHEL BUDKE, Attorney at Law
21
                STEWARD CUPPS, Esquire
22
                TIMOTHY CURTIN, Esquire
23
                JANICE DUBAN, Attorney at Law
24
                MARY DURDEN, Attorney at Law
25
                STACY EISELSTEIN, Attorney at Law
```

4

1
                    CRAIG ELLER, Esquire
2
                    MARK ELMORE, Esquire
3
                    EARLE I. ERMAN, Esquire
4
                    HEATHER FOLEY, Attorney at Law
5
                    J. DAVID FORSYTH, Esquire
6
                    JOE FRANKS, Esquire
7
                    MARK FRIEDMAN, Esquire
8
                    MARY E. GARDNER, Attorney at Law
9
                    GILDA GUENECHEA, Attorney at Law
10
                    KURT GWYNNE, Esquire
11
                    RUSSELL R. JOHNSON, III, Esquire
12
                    JOSHUA KLEIN, Esquire
13
                    ROY KOBERT, Esquire
14
                    JEFFREY KURTZMAN, Esquire
15
                    ROBERT L. LEHANE, Esquire
16
                    RICHARD S. MILLER, Esquire
17
                    MIKE NIXON, Esquire
18
                    DAVID L. POLLACK, Esquire
19
                    GERALDINE E. PONTO, Attorney at Law
20
                    CHRISTOPHER A. PROVOST, Esquire
21
                    ERIC T. RAY, Esquire
22
                    ALLISON RICHARDS, Attorney at Law
23
                    CASEY ROY, Attorney at Law
24
                    SHELLEY RUCKER, Attorney at Law
25
                    JAMES SMITH, Esquire

1
       JENNIFER STEVENSON, Attorney at Law
2
       GENE B. TARR, Esquire
3
       ANDREW THAU, Esquire
4
       MICHAEL WARNER, Esquire
5
       DAVE WHEELER, Esquire
6
       WILLIAM DOUGLAS WHITE, Esquire
7

8
                     - - -
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                    P R O C E E D I N G S

2    April 25, 2005                                    10:00 a.m.

3                              - - -

4            THE COURT:  Good morning.  We're here on the case

5        of the Winn Dixie Stores, Inc., for a case management

6        and status conference.

7            I hope that beep is not going to continue.

8            There are a couple of things I want to say

9        before we get started, go over a few things.

10           We're not taking oral appearances at these

11       hearings.  There will be a sign-in sheet or there is

12       one going around, and that sign-in sheet will be made

13       part of the record.  It will be recorded with the

14       promemo on the docket.  So anybody that wants to appear

15       needs to fill out that sign-in sheet.

16           We have a list of the individuals who are here

17       telephonically, and that also will be recorded in the

18       docket.

19           This is a relatively new courthouse and built with

20       all the state-of-the-art things, and the thing about it

21       in this courtroom is acoustics are very good.  If two of

22       you are talking to each other out there, I can hear you

23       like you're sitting right here.  But if you want to talk

24       to me and you don't go to a microphone, for some reason

25       the sound doesn't travel.  So anybody that needs to

1    speak needs to come to one of the microphones.  There's

2    two on the table and one at each lectern and speak into

3    the microphone so that I and Ms. Lori, the court

4    reporter, can hear you and take down what you say.

5         Also, Ms. Lori has said that she would like for

6    everybody to identify themselves if they speak, so that

7    she'll know who is talking.  And even if you have

8    identified yourself once, you need to do it each time

9    you speak, the same thing with the people that are

10   appearing telephonically.

11        I just want to introduce some of the people to my

12   staff.  I have my law clerk Jodie Spencer and my other

13   law clerk Melissa Cole is somewhere in the courtroom.

14   Diane Jackson is the courtroom administrator.  We also

15   have several members of the clerk's staff here:  Michael

16   Shadburn, the deputy in charge; Susan Carter who is the

17   case manager for the Winn Dixie case; Gull Weaver, our

18   automation specialist and Mavis Flight who supervises

19   all of my cases.  And they will be here and they will be

20   here after the hearing if any of you need to talk with

21   them specifically about certain things.

22        Some of you have realized that you can't bring cell

23   phones into the courthouse.  In addition, you can't

24   bring laptop computers unless I approve it.  And I

25   generally do.  Anybody that is interested in bringing

1          their laptop needs to write me a letter, tell me why

2          they need it and so forth.  And we have a standing

3          order, and I update it every two or three weeks listing

4          the people that can bring in their laptops, which they

5          can bring just to this courtroom, I think to the

6          lawyer's lounge and the 341 meeting room.

7               We do not have any Internet connections in the

8          courtroom.  So it's strictly for you to recall your own

9          information.

10              A couple of other things, when we get to the

11         point in the case where people want to get paid, I need

12         your fee applications to be in a project billing format.

13         I think the U.S. trustee likes that, and it's a lot

14         easier for us to look at if there's some contest.

15              Our Local Rule 2090 is applicable to all

16         out-of-town attorneys who are not admitted to practice

17         in the Middle District of Florida.  And our courtroom is

18         available or set up to handle telephonic and video

19         conference hearings.  However, my experience has been

20         they do not work in contested matters.  So if you have a

21         contested hearing, the attorneys that are participating

22         have to be here.  The attorneys that want to appear

23         by teleconference can do so, but basically it's just to

24         listen as to what goes on.

25              I'll now call on I think, Mr. Busey, are you going

1   to be doing the talking for the debtor today?  Oh, yeah,

2   you can sit.  I see you're crippled.

3        MR. BUSEY:  And I will be pleased to stand.  Thank

4   you, Your Honor.

5        THE COURT:  I may have some questions as you go

6   through it, but I'll let you take it from there as to

7   the status and any case management matters that you

8   want us to bring up.

9        MR. BUSEY:  We have a number of case management

10   procedural matters we would like to address, Your Honor.

11   But I think before we do that, I'd like to introduce Jan

12   Baker, my cocounsel from Skadden Baker -- Scadden Arps

13   who's going to give an overview of the status of the

14   case to date and some expectancy of where we're going to

15   go with it.

16        THE COURT:  Thank you very much.

17        MR. BAKER:  Good morning, Your Honor.  I would say,

18   as a threshold matter, I've known Mr. Busey for going on

19   20 years.  And it's nice, after all that time, to

20   finally be on the same side with him as opposed to the

21   opposite side.  So that's a pleasant experience.

22        Mr. Busey asked me to give a brief overview to the

23   Court of where we are at this point in the Chapter 11.

24   And I thought it might be helpful to first talk about

25   the events leading up to the 11 and then the first month

1          or six weeks or so of the 11.

2              The question always is when a large, seemingly

3          successful company suddenly goes into a Chapter 11, what

4          happened, what caused it?  And without trying to get

5          into probably more background or detail than the Court

6          wants at least this morning, although we may well get

7          into it at other times in the case, I think it's fair to

8          say that Winn Dixie made a decision over the last 12 to

9          18 months that it needed to execute a strategic

10         turnaround to meet the increasingly tough competition

11         that it was facing in essentially all of its markets.

12             It announced the closure of about 150 stores, you

13         know, elected a -- late last year a new chairman of the

14         Board, Jay Skelton.  Mr. Skelton and the Board decided

15         to bring in a very experienced highly regarded CEO,

16         Peter Lynch, which was done at year end.  And I think

17         what -- what immediately got us here was the fact that

18         on February 10th the company issued a quarterly earnings

19         report that basically said it had had a very tough

20         quarter.

21             Now, the trade creditors with whom the company

22         deals and from whom it buys literally billions of

23         dollars of merchandise every year, watch those quarterly

24         reports and any other filing that the company makes very

25         closely, particularly, when a company is perceived to be

1          in any sort of difficulty.  Because their concern,

2           obviously, is they don't want to have a large

3           significant trade receivable in the event the company

4           should file a Chapter 11.

5              This quarterly report caused a number of our major

6          trade vendors to begin either reducing the trade credit

7          that the company had or, in some cases, eliminating it

8          entirely and putting on the -- putting the company on a

9          C.O.D. prepaid basis.  And what the company's management

10         concluded within a week or so of the release of the

11         earnings report, was that this process did not look like

12         it was going to stop or no one knew where it was going

13         to stop.  And the company was in the process of losing

14         tens of millions of dollars of trade credit daily.

15             Somewhat, ironically, you know, the more vigilant a

16         trade creditor is in terms of contracting the trade

17         credit and the more of them that do it, in order to

18         protect themselves against the possible filing, the

19         greater the likelihood that there will be a filing.  It

20         almost becomes a self-fulfilling prophecy.  And that's

21         exactly what happened here.

22             The company ultimately decided that, as a result

23         of the significant erosion of trade credit, it couldn't

24         avoid a Chapter 11; and as a result, commenced these

25         cases on February 21st.  Once that happened the company

1    filed a number of first day motions, all of which I

2    would say were designed to do three things:

3        Keep merchandise in the stores.  Because if they

4    didn't have merchandise when the shoppers came in, this

5    wasn't going to be a very successful or a happy 11.

6        Second, keep the employees focused on doing their

7    jobs and continuing to execute the overall turnaround

8    that Mr. Lynch and the management team had in progress.

9        And third, getting enough liquidity in order to be

10    able to run the business.

11        These orders were I think almost all heard and

12    entered on an interim basis only, pending appointment of

13    a creditors committee.  A committee was appointed

14    fairly quickly.  After a lot of thought and

15    consideration by the U.S. trustee, they selected three

16    bondholders, two large trade creditors and two large

17    landlords.  The committee then retained counsel and

18    financial advisor.

19        And the debtor started a very intensive process of

20    basically providing them with information so they could

21    look at the proposed first day orders and react to them.

22    We took a number of comments and changes from the

23    committee's counsel that got added to the final orders.

24    And, ultimately, we were successful in getting all of --

25    all of the final orders entered.

1          I guess I would say probably the most noteworthy

2     single order that was entered was our DIP order.  The

3     company's lender, prepetition, was Wachovia.  And

4     Wachovia and its predecessors had a very, very

5     longstanding and good relationship with Winn Dixie.

6     That proved to be very important, because what we

7     ultimately negotiated with Wachovia was an $800 million

8     DIP facility that frankly gave the company more

9     liquidity and worked better for the company than our

10    prepetition facility did.

11         Wachovia was enormously supportive in terms of

12    helping to stabilize the company and cooperating with

13    it.  And so that has been an extremely important factor

14    to date in the case.

15         Going forward, Judge, I think the major event, at

16    least that we're aware of, has to do with developing a

17    business plan and trying to figure out what this company

18    should look like when it gets reorganized.

19         Most retail cases that have a lot of locations like

20    Winn Dixie that I've seen, have ended up concluding that

21    some of those locations were probably not essential for

22    the long-term reorganization of the company.  And, in

23    deed, the company might be better off without them.

24         What Winn Dixie's management team has been in the

25    process of doing very intensively since the case was

1       filed and actually before that, was looking literally at

2       every store operated by Winn Dixie, every geographic

3       market served by Winn Dixie with a view toward trying to

4       determine when this company comes out of Chapter 11, how

5       can it best be positioned in order to maximize value for

6       the benefit of all of the constituencies who are looking

7       to see what happens:  creditors, vendors, landlords,

8       shareholders?  That has been an extremely, extremely

9       arduous process.

10          We have now, within the last week, started a

11      discussion with the creditors committee to communicate

12      to them the preliminary views of the debtors as to what

13      a business plan for the reorganized company ought to

14      look like; which stores should be either sold or have

15      their leases rejected; which store location should have

16      their leases assumed and what, looking at the entire

17      business operation, how it ought to be organized coming

18      out of Chapter 11.

19          This is going to be a very fact-intensive process.

20      We're making available to the creditors committee and

21      its advisors all of the data and information that

22      basically that the company has that they want to see

23      with a view toward hopefully coming to a consensus

24      between the company and the creditors committee as to

25      what the best business plan, what the best store

1       configuration for the company going forward will be.

2            That in turn will lead to what I expect will be the

3       major case activity certainly this summer and then

4       perhaps thereafter.  And that is to look at stores, see

5       which stores can be sold to third parties; and in the

6       event it's not possible to in fact assume and assign a

7       lease, then which stores ought to have their leases

8       rejected and the stores closed and Winn Dixie exit that

9       location.

10           That is, as I said, a process that is very

11      detailed.  I'm very impressed with the job the business

12      people have done.  They've gone about it I would say

13      better than any company I've ever seen confronting these

14      kinds of issues.  And I frankly believe that at the end

15      of the day, there will be a consensus between the

16      company and the committee in terms of how the

17      reorganized stores ought to look.

18           Having said all that, Judge, just to make the

19      point, at the end of the day, the lawyers, the financial

20      advisors, the investment bankers can only do so much.

21      And I think there is a very, very high degree of

22      consciousness of the company that the business people

23      charged with running the stores have to be and are

24      totally focused on the fundamental job of getting

25      customers back into the stores and increasing sales for

1    each and every store.

2         There has been a lot done so far.  There's been a

3    major produce initiative that the new management team

4    launched that was very successful.  There are a variety

5    of other business improvement, customer satisfaction

6    initiatives that are currently either under way or in

7    the planning stage.

8         And Mr. Lynch is out actively recruiting for a

9    senior executive whose sole focus will be customer

10   satisfaction.  Because I think we all recognize that at

11   the end of the day, if you don't make the customers

12   want to come shop at Winn Dixie, there's a limit to what

13   can be accomplished.

14        In terms of process, we have a I think very good

15   open dialogue with the creditors committee.  We have set

16   up a schedule to basically meet with the full committee

17   and its advisors once a month.  We'll be having the next

18   meeting two days from now to basically present the

19   senior management team to the members of the committee,

20   let them make a presentation to the committee about what

21   they're doing, what's going on, how sales are going,

22   what initiatives they have in mind.

23        And in between those meetings, the professionals

24   for the company and for the committee have a very active

25   essentially daily dialogue providing the committee with

1      information on whatever -- whatever particular subject

2      it has questions about.

3           So that is I think in a snapshot what we expect

4      going forward.  I don't want to minimize the nonbusiness

5      plan issues.  There's certainly a -- in a company this

6      big with this many different facets to its operations,

7      there are any number of issues, some of them very

8      significant, that will come before the Court and be

9      presented hopefully for approval of an agreed order; but

10     failing that, determination by the Court if the parties

11     can't agree.

12          Probably the largest single issue that we're aware

13     of on the horizon other than the business plan, relates

14     to reclamation.  We had about 400 vendors file claims

15     totaling a little over 100 million dollars.  There have

16     been ongoing preliminary discussions back and forth over

17     how to deal with those claims, how they should be

18     treated.  But to date, we don't have any resolution.

19          One factor, just to make the Court aware of,

20     there had been in some other food service cases,

21     litigation that occurred with respect to the underlying

22     issue of whether the reclamation claims were valid at

23     all.  That issue is sometimes I'm told called the

24     valueless defense.

25          The reclamation creditors at the beginning of this

1       case, I think said perfectly reasonably that if we

2       didn't get these issues settled fairly quickly and if

3       there were going to be litigation over the extent and

4       validity of their reclamation claims, they wanted that

5       teed up basically by the end of May.  So I'm hopeful

6       that we will get things resolved and not have to do

7       that.

8           But just to flag the issue should that not be the

9       case, then we may well be looking at litigation over

10      that issue.

11          With that, Your Honor, I think that completes my

12      report as to the current status of the case.

13          THE COURT:  Thank you very much.

14          MR. BUSEY:  Your Honor, I think that you can see

15      from Mr. Baker's report that, although this proceeding

16      is new to the Middle District, that a lot has happened

17      since the February 21 filing and the company is well on

18      its way to try and to build a consensus for this

19      constituency to bring a successful reorganization.

20          One of the things that we need to talk about now,

21      procedurally, is there had been an order entered by the

22      Southern District providing for a schedule of what it

23      referred to as omnibus hearings, regularly scheduled

24      hearings at which the debtor could and other parties

25      could set matters for hearing.  You have already

1        provided us a hearing date of May 6th, and the debtors

2        have noticed a number of pending motions for a hearing

3        on that date, May 6th.  And then this morning

4        Ms. Jackson has provided us a schedule of additional

5        subsequent dates of which the Court has very graciously

6        made available to the case for -- so that we can

7        continue the tradition of Judge Drain of setting omnibus

8        hearings.

9              And for the benefit of the parties in the

10       courtroom, I remind that one of Judge Drains orders, a

11       procedural order which was Docket Number 254 which was

12       continued by your first order in this case, provided

13       for a procedure for an aspirational 20-days' notice for

14       each of those hearings.  Matters to be noticed on those

15       hearing days are, in any event, at least by ten days.

16       And then if a 20-day notice was obtained, an

17       objection date seven days before the hearing date, and

18       if only ten-days' notice were given, an objection date

19       of three days before the hearing date and then a

20       directive to the debtors to provide to the Court the day

21       before the hearing an agenda which would inform the

22       Court of the matters which are scheduled for a hearing

23       which are going forward, which are going to be

24       adjourned, which are contested and which are not

25       contested.

1           And we intend to continue that tradition based upon

2       the dates that you have given us that's provided by that

3       order.  Again, the docket number for that order is 254

4       for everybody's benefit.

5           THE COURT:  I just want to say one thing.  Unless

6       something is almost an emergency, I would hope that it

7       would be under the 20-day time period and so forth.

8       And, of course, we would like the agenda, a final

9       agenda, the day before the hearing.  But I assume we'll

10      be getting an agenda once you're inside the scope of

11      hearing.  I mean, we know that's all that's going to be

12      set that date.

13          MR. BUSEY:  We should be able to do that after the

14      objection date, Your Honor.

15          THE COURT:  Right.

16          MR. BUSEY:  We'll do that.  And the debtors will

17      publish to the parties the schedule of dates that you've

18      given us this morning so that everybody can have that --

19      you've given us dates through September, and we'll

20      publish that to all of the parties on the master service

21      list.

22          The other thing, you've addressed a number of

23      procedural issues this morning, Your Honor, for which

24      we're grateful.  The other thing that probably would be

25      of interest to the parties is the subject of electronic

1          filing.  I know that Mr. Shadburn is in the courtroom,

2          and it may be useful if he would speak to what he

3          intends to do in terms of permitting lawyers from other

4          than the Middle District of Florida, do electronic

5          filing in the Middle District.

6               THE COURT:  We'd be happy to.

7               Mr. Shadburn, if you'll come forward and explain

8          our procedures on electronic filing.

9               MR. SHADBURN:  Your Honor, on June 23rd of 2004,

10         the Court entered an order making electronic case filing

11         mandatory in the Middle District of Florida,

12         Jacksonville Division.  And it requires all attorneys to

13         file all documents and pleadings electronically using

14         the electronic case system no later than October 1st.

15         So that order is in effect at this time.

16              In order to file electronically in our division,

17         you first have to obtain a log-in and password.  If you

18         have a log-in and password from another district court

19         in the United States, we would reciprocate and issue a

20         log-in and a password.  If you are not an electronic

21         filer either in our court or another court in the United

22         States, you would have to go through training, which

23         would be arranged through our court or the training team

24         of another district court.

25              THE COURT:  Any questions, Mr. Busey, or anybody

1      else of Mr. Shadburn?

2          (No response.)

3          MR. SHADBURN:  We do have information on our

4      web site, which is www.flmb.uscourts.gov concerning

5      electronic filing in registering for training and

6      obtaining a log-in and password if you have that from

7      another court.

8          THE COURT:  Thank you very much.

9          MR. BUSEY:  Mr. Shadburn and the clerk's office

10     have been very helpful, Your Honor, in providing that

11     reciprocity.  And we really appreciate it.  I think it's

12     really going to help with all the lawyers in the case

13     from outside the Middle District of Florida.

14         And to reiterate and Mr. Baker just asked me, how

15     do we get the registration and the log-in and the

16     password?  If you go to the middle district's web site

17     in the clerk's office, the instructions and the

18     registration form are available on the web site.

19         Your Honor, from the debtor's perspective, that

20     concludes what we have to offer to the Court today.  We

21     would be pleased to answer any questions.

22         I did want to introduce, if I may, Your Honor, I

23     know you're not taking appearances, but Larry Appel, who

24     is the general counsel of Winn Dixie, is with us at

25     counsel table this morning.

1             THE COURT:  Nice to see you.

2             MR. BUSEY:  And that concludes our presentation,

3       Your Honor.

4             THE COURT:  You have a couple of items relating to

5       the hearing proceeding that I had notes on.  And I

6       assume this will be coming from debtor's counsel.  Hard

7       copies of pleadings and objections should be delivered

8       to my office at least three days prior to a hearing, at

9       least the contested ones.

10            MR. BUSEY:  Yes, sir.

11            THE COURT:  Well, I would like the moving papers,

12      in any event.  And, of course, notify us of settled

13      matters immediately.  We will update the J-cal -- that's

14      our calendar from the agenda -- so that that information

15      would be available on PACER.  We'll also attempt to -- I

16      need to call the parties at least three days prior to

17      the hearing to just make sure everything is on schedule.

18             I'm not sure, but motions for relief from stay will

19      not be put on the omnibus calendar.  Motions for relief

20      from stay will be scheduled on Mondays with my other

21      stays.  I do them every Monday.  And if it is not

22      settled, it will be a preliminary hearing.  And I'll

23      probably continue it to a day certain for a final

24      hearing if it's going to take an evidentiary hearing.

25             Obviously, if it's settled and we gang schedule

1          these, you'll come in and advise the courtroom

2          administrator that it's been settled and you do not have

3          to stay; or if you've already filed your notice, the

4          4000 notice, then, you know, just let us know that and

5          nobody is going to default you.

6               Generally, if nobody appears and I haven't heard

7          anything, then I just deny the motion unless some kind

8          of consent papers come in within seven days.  That's how

9          that's going to work.

10              And is there anybody else here that has any

11         questions?  Mr. Meeker, assistant U.S. trustee for this

12         district, is there anything you need to say at this

13         point?

14              MR. MEEKER:  Thank you, Your Honor.  Not really,

15         other than to mention that -- and we will finalize it

16         later this morning -- I believe the first meeting will

17         be held on May 25th.

18              THE COURT:  May 25th?

19              MR MEEKER:  (Nods head.)

20              THE COURT:  That being done, no further questions,

21         I guess I'll see some of you on May the 6th.  Is that

22         the first date?

23              MR. BUSEY:  That's the first hearing, Your Honor.

24              MR. WHITE:  Your Honor?

25              THE COURT:  Yes, sir.

1          MR. WHITE:  This is Bill White, on behalf of

2     Florida Power and Line Company.  With respect, I have

3     not received any notice of the utility motions that were

4     the adequate assurance motion that was filed and the

5     response was filed by the various utilities.  I believe

6     a number of them are on the phone.  Has a date been set

7     for that?  We were understanding that it would be set

8     at the earliest possible time.

9          MR. BUSEY:  Your Honor, I'm informed that has been

10     set by the debtors for the 6th.

11          THE COURT:  May 6.

12          MR. WHITE:  At 10:00 a.m., Your Honor?

13          MR. BUSEY:  Yes.

14          THE COURT:  I believe so.

15          MR. WHITE:  Thank you very much.

16          MR. FORSYTH:  Your Honor, this is David Forsyth in

17     New Orleans for one of the landlords Westland Plaza

18     Associates.  I have two questions.  One, is the hearing

19     on the motion to extend the time to assume or reject

20     going to be on May the 6th?

21          THE COURT:  I'm getting nods from people in the

22     audience --

23          MS. JACKSON:  Yes, Your Honor --

24          THE COURT:  So I guess --

25          MS. JACKSON:  -- it is May 6th.

1          THE COURT:  I haven't received an agenda for May 6

2     yet, so I don't know.

3          MR. FORSYTH:  Is a nod yes, Your Honor, or no?

4          THE COURT:  Yes nods.

5          MR. FORSYTH:  The other question, Your Honor, is

6     this, in reading your Rule 2090, many of us I know were

7     admitted in the New York case.  And I see that on the

8     consent to act by someone else, some of us have very

9     limited roles.  And I see the Court can waive the

10    designation of local counsel for cause shown.  And

11    I was wondering if, in this kind of case where so many

12    people that have probably very narrow roles in the case,

13    whether the Court would consider allowing that,

14    particularly since the notice issues are, for the most

15    part, pretty easily handled because of the electronic

16    filing.  And many of us have already been involved in

17    the case in New York from other states without any

18    local counsel there.  I don't know how Your Honor,

19    would feel about that.

20         THE COURT:  Well, I think the first paragraph of

21    that rule says you do not need a local counsel, if

22    you're just going to appear and be noticed and receive

23    notices.

24         MR. FORSYTH:  Yes.

25         THE COURT:  The second paragraph says if you're

1        going to be involved in contested matters, then, of

2        course, you need to have local counsel.  I'm not sure

3        where you fit, halfway in between?

4            MR. FORSYTH:  Well, I see that it says that the

5        Court can waive the designation.  That's the question

6        of --

7            THE COURT:  Well, I would take that on a

8        case-by-case basis.

9            MR. FORSYTH:  Okay.  Okay.

10           MR. POLLACK:  Good morning, Your Honor, David

11       Pollack, on behalf certain landlords.  Your Honor

12       addressed the issue of cell phones and laptops.  Where

13       do Blackberries sit in in between those two?

14           THE COURT:  Wait a minute.  I don't even know what

15       a Blackberry is.

16           MR. POLLACK:  Well, probably half the courtroom can

17       show you theirs.

18           MR. BUSEY:  That's the same thing as a cell phone.

19           THE COURT:  We don't allow Blackberries?

20           MR. SHADBURN:  Your Honor, that would be the same

21       type of cell phone.  It will be the same as the laptops

22       or cell phone.

23           THE COURT:  The only thing I allow is laptops, and

24       you have to write me a letter, and that's something you

25       use here.  Other than that, the marshals will take any

1          other electronic equipment from you -- not from you,

2          they won't let you in the building.  And they don't hold

3          it.  So don't even come to the building with it.

4                  Anything else?

5                  MR. WHITE:  Your Honor, Bill White again for

6          Florida Power and Light.  With respect to the waiver of

7          designation raised earlier, how would the Court want

8          that presented in terms of the request for waiver on a

9          case by case?  Would you like a motion?

10                 THE COURT:  I think I like everything by motion.

11         Other than requesting to bring a laptop, you can write

12         me a letter about that.  But anything else needs to be

13         done in a motion.  Otherwise, we get carried away in

14         these letters sometimes.

15                 MR. WHITE:  Thank you, Your Honor.

16                 THE COURT:  Anybody else have any questions?  May

17         be the last time you get a chance to ask me one of these

18         questions.

19                 MR. FORSYTH:  Oh, Your Honor, one other question.

20         This is David Forsyth again.  On the motion on the

21         designation of local counsel, do those have to be

22         actually noticed to the hearing or can that be

23         considered by the Court ex parte as long as notice is

24         sent out?

25                 THE COURT:  I think as long as you get -- you just

1       designate that we have who your counsel is and he's

2       accepted that role, I don't think we need a motion or an

3       order.  Just file the notice that he's your, you know,

4       his local counsel.

5            MR. FORSYTH:  Well, no.  What I was talking about,

6       Your Honor, is the rule says that you can waive that

7       requirement of even designating if Your Honor --

8            THE COURT:  That has to be by motion.

9            MR. FORSYTH:  Yeah, but can the motion be done

10      ex parte or would that have to be noticed for a hearing?

11           THE COURT:  No.  It can be done ex parte.

12           MR. FORSYTH:  Thank you, Your Honor.

13           THE COURT:  No further questions?  The meeting is

14      adjourned.

15           (Whereupon, at 10:37 a.m., on Monday, April 25,

16      2005, the hearing in the above-entitled matter was

17      concluded.)

18                                    - - -

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3     STATE OF FLORIDA )

4     COUNTY OF DUVAL   )

5         I, Loretta D. McDonald, Professional Court Reporter, do

6     hereby certify that the attached material represents the

7     original records of proceedings before the United States

8     Bankruptcy Court, Middle District of Florida, Jacksonville

9     Division, before the Honorable Jerry A. Funk, United States

10    Bankruptcy Judge, in the matter of WINN DIXIE STORES, INC.;

11    such Record is an accurate and complete recordation of the

12    proceedings which took place.  A transcript of this Record

13    has been produced on May 4, 2005, the original of which was

14    delivered to the Transcript Copy Custodian, Jacksonville,

15    Florida.

16

17                                    STATEWIDE REPORTING SERVICE

18

19                        _____

                                    LORETTA D. MCDONALD
20

21

22

23

24

25