F I L E D
JACKSONVILLE, FLORIDA

JUN 1 4 2005

CLERK, U. S BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:

WINN-DIXIE STORES, INC., et al.,                Case No.: 03:05-bk-03817-JAF

Debtors.                                          Chapter 11
_____/                  Jointly Administered


MOTION BY EMPLOYEE, CHRISTOPHER SIMMLER, TO EFFECT TIMELY, TRUTHFUL, PLAIN, AND NON-DECEPTIVE COMMUNICATION OF THE DEBTORS' INTENDED SEVERANCE PACKAGE PLAN FOR THOSE EMPLOYEES IDENTIFIED IN TIERS 7 THROUGH 11 OF THE DEBTOR'S MOTION, DOC 1492, TO BE HEARD JUNE 16, 2005.

### FACTUAL BACKGROUND:

1.      Christopher Simmler was retained by the Debtor, Winn-Dixie Stores, Inc. for his professional pharmacy services in North Carolina in April of 2002. Within 3 months, Simmler identified, articulated, and submitted an estimated annual $30,000,000 cost savings plan for pharmacy operations (Exhibit A). Simmler continued to identify areas where pharmacy operation capital was unnecessarily spent on pharmacy supplier, Cardinal Health, through January of 2003 (Exhibit B).

2.      Notably, early in February of 2003 Simmler was directed to take Cardinal financial issues to a corporate manager (Exhibit C). The manager sent the issue back to Simmler, claiming that Simmler was unwilling to provide specific details to support allegations of $5,000,000 annual losses associated with Cardinal dealings (Exhibit D). Simmler responded, identifying and *resubmitting* some 10 documents that clearly identified financial loss, referenced in Exhibit E.

3.      Since exhibit A, and coincidentally 1 year subsequent, Simmler was the first person to document his belief on June 13, 2003 that Winn-Dixie's CEO may not be accurately stating Winn-Dixie's financial position, as

noted by Simmler's understanding of Winn-Dixie's efforts to improve cash flow by withholding employee evaluations and raises (Exhibit F).

4.      When Al Rowland, former Winn-Dixie CEO, stepped down approximately 1 month later, with a several million dollar severance, Frank Lazaran filled the position.

5.      Early in January of 2004 Lazaran announced a $0.05/share dividend to investors, some $13,000,000, for Winn-Dixie's second fiscal quarter while he knew the soon to be announced desperate financial condition of the Company (public information documented by most any reputable financial reporter and WD's web page).  Remarkably, on March 26, 2004, <u>over 1 year following Exhibit E</u> **_and 2 months after_**, Lazaran announced the Debtor's dire financial condition to the public on January 30, 2004, a new policy was effected regarding one of the issues Simmler identified in line item 10 of Exhibit E.  The amount of annual loss before the end of the 3rd fiscal quarter pertaining to Simmler's previously ignored observation exceeded $1,200,000 (Exhibit G).

6.      Lazaran implemented a proposed $100,000,000 annual operations curtailment that included closing of "non-core" stores, manufacturing plants, and distribution centers, while generously, and arguably rightfully, supplying "lump sum" severance packages to the displaced employees.  Additionally, and according to document 1621, Lazaran received over $8 million in compensation, despite his failed efforts to achieve the estimated operational cost savings.

7.      As Lazaran's efforts proved futile, stepped in Mr. Peter Lynch as CEO.  During Lynch's administration, February of 2005, Winn-Dixie filed for Debtor's protection through the court under 11 U.S.C.

8.      While Lynch's plans are yet to be fully realized, or materialized, it is strongly implied that the size of the company will be materially reduced according to a yet to be disclosed "footprint" (Exhibit H).

9.      Acknowledging, *inter alia*, that the Debtors' success on emerging from Chapter 11 relies on the continued employment of its employees, some employees will be displaced, and in "worst case scenario" all will be displaced, a motion for Employee Retention and Severance Plan, document 1492, has been filed by the Debtors on 05/27/05.

10.     Specifically, the Debtor has argued "to achieve the necessary focus of its workforce, it is essential that the Debtors provide **clear**[1] assurance that employees who are involuntarily terminated for reasons other than cause will receive **some**[2] compensation in the form of severance benefits... thereby allowing the Debtor's workforce to focus on the demands of the Debtor's business."  The plan also clearly articulates that it is the employer's intent to administer "to the extent applicable, a waiver of any enhanced change in control or other severance benefits."

11.     Contained in the motion for retention and severance is a specific 11-tier blueprint identifying all the various types of employees "covered" by the severance plan and the requested remuneration for each type. Furthermore, the Debtors have divided the 11-tier blueprint into those who will receive lump sums, tiers 1 through 6, and those who will not receive "lump sum" payment, but rather weekly installments governed and limited[3] by State Unemployment Regulations, tiers 7 through 11.

12.     The Debtor's argument is flawed in the event that any employee contained in tiers 7 through 11 is purchased by another corporate entity, he will not receive any benefits according to the plan, and will wrongfully lose healthcare, among other, benefits.

13.     The employees that have less than 5 years employ who participate in 401(K) investing and lose the Debtor's employ also lose a significant portion of federally regulated vested retirement benefits, as well as valuable time that could be used in achieving fully vested 401(K) rights with another company.

14.     Regardless, the company, and/or its representatives or management, permit a newly appointed "pharmacist scheduler" the opportunity to spread propaganda.  Specifically, he makes assurances of job placement for "many" while promising a "severance package worth waiting for" in the event of displacement (Exhibit I, 1).

15.     Simmler responded to the scheduler's assurances in the like form, email, to the perceived propaganda with his understanding of the severance package submitted to the Court.  Specifically Simmler understood that a majority of full time pharmacists were encompassed in the tier 7 description, "other (exempt) full time employees" and part time pharmacists were included in tier 11, and recited the respective severance packages outlined in the Debtor's Motion (Exhibit I, 2).

---

[1] Emphasis added.
[2] Emphasis added.
[3] Emphasis added.

16.     The Debtors, and/or upper management, have discredited Simmler's clarification, and reprimanded him "for stirring up a hornet's nest."

17.     Bob Boyer, 1 of 4 Winn-Dixie Regional Pharmacy Directors, has responded to Simmler's information as being "incorrect" (Exhibit J).

18.     Additionally, other management personnel are rumoring and reminding employees of the previous "lump sum" severance packages that were administered under Lazaran's control, while making qualified suggestions that pharmacists are needed and _may_ be treated better than what is blueprinted in the Debtor's Motion (Exhibit K, affidavit).

19.     This employee believes that willful misrepresentation, whether by ignorance or design, used to deceive any of the 78,000 employees contained in tiers 7 thru 11 into believing "there is a pot of gold at the end of this rainbow" or any information that is hopeful beyond written agenda filed with the court, deceitful, inaccurate, or otherwise tainted for the benefit of the Debtors and is communicated by management, is a malicious and inappropriate method of employee retention effort by the Debtors.

### RELIEF SOUGHT

20.     This employee, and on behalf of all other lower tiered employees, requests that the court order Winn-Dixie Stores, Inc., and all of its employing affiliates, to post a copy of the blueprint related to the lower tiered employees, 7 through 11, part of public record, in a conspicuous place in each place of employ.

21.     Additionally information to the post should include, a clear, articulate, in layman's language, complete explanation of the terms of the proposed severance packages, including that employees assumed by purchase of property will not be eligible for _any_ severance package, and will incur a total loss of other severance benefits.  And that in the event of displacement all packages will be paid weekly, and likely only in entirety as long as the employee remains unemployed, according to Unemployment Regulations of each perspective state.

22.     Finally, the above relief must be executed within 7 days of the June 16, 2005 hearing on the matter.

### ARGUMENT TO SUPPORT MOTION

4

23.      All 78,000 employees contained in Debtors' tiers 7 through 11 have timely decisions to make regarding the well being of their persons, families, children, communities, affairs, and goals.  It is fair and equitable that the 78,000 potentially affected employees have a timely, truthful, complete, and non-deceptive representation the Debtor's *intent* and terms by which to remunerate each lower tier employee for his or her extraordinary effort and years of dedication.

24.      Mr. Lynch's offer to share the complete and factual information contained in the Debtor's motion only after the Court has decided (Exhibit H) is an unnecessary stall that achieves the Debtor's agenda to maintain necessary staffing, at the sacrifice of its employee's factually informed well-being.

25.      Indeed, the Court's approval of the Debtor's Motion for Retention and Severance is distinguishable from the Debtor's intent.  Regardless of the Court's decision, the Debtor's timely conveyance of its intent is material to every employee's well-being.

26.      Although Mr. Lynch states that uncontrollable forces, "the perfect storm," have effected the Chapter 11 proceedings, the situation is possibly precipitated by upper tier negligence and deception, as illustrated by the Factual Background supported in this motion.  For the court to allow the continuation of the Debtor's deceptive practices would be remiss to not only creditors, but employees who choose to remain in the employ of the Debtor through false pretense.

27.      The aforementioned is presented as sworn truthful information by the undersigned and he acknowledges that any willful dishonesty or deceit is punishable by law.


Respectfully submitted by,

Christopher Simmler, R.Ph., June 13, 2005
3566 C Highway 96
Oxford, NC 27565
919.939.9090
Similar@gloryroad.net

# **CERTIFICATE OF SERVICE**

I, Christopher Simmler, hereby affirm that, on June 13, 2005, I served a copy of

Motion to Effect Non-Deceptive Communication with relevant exhibits, by U.S. express

mail to the Jacksonville Court and to Cynthia C. Jackson, Esq., Smith, Hulsey, and

Busey, 225 Water Street, Suite 1800, Jacksonville, FL 32201.


Christopher Simmler, R.Ph.
June 13, 2005

*Motion to Effect Non-Deceptive Communications*

*Winn-Dixie Stores. Inc. et al.*

## Similar

*Debtors*

**From:**     Similar <Similar@gloryroad.net>
**To:**       Bob Boyer <BobBoyer@winn-dixie.com>
**Sent:**     Monday, June 10, 2002 7:13 AM
**Attach:**   wd memo_.doc
**Subject:**  observations

Bob,

Attached you will find a report of observations after 2 months on the job.  Hopefully you will find the information useful.


Christopher Simmler

*EXHIBIT*

*A*

3/2/03

## MEMO

**To:** Bob Boyer
**From:** Christopher Simmler
**Subject:** WINN-DIXIE PHARMACY 0811: OBSERVATION OF OPERATIONS
**Date:** June 10, 2002

## Introduction

This memo is intended to highlight areas that may present opportunities for increased profitability, employee morale, and customer service and patient care. The following are derived from observations of pharmacy operations in store #0811 after 2 months on the job. Most address productivity and margin due to absence of customary corporate practices and operating problems.

## Corporate Practices Not in Evidence

1. **Orientation** – No organized orientation session to reveal corporate culture, policies, organizational relationships, problem resolution process, explanation of fringe benefits, salary review and bonus policy, etc. Affects: problems and delays due to uncertainty, problem resolution time, shared services, esprit de corps, corporate image, employee morale etc.

2. **Job Descriptions** – None: pharmacy staff has no documented list of tasks, priorities, responsibilities, reporting relationships, expectations, performance measurements, etc. Affects: productivity and efficiency, communications among staff and corporate management, standardized patient care, employee morale, etc.

3. **Training** – Except for computer OJT, there is no structured training or suitable training material addressing periodic duties and reports, corporate issues, review of job description and organizational structure, functional training/operations. Affects: productivity and efficiency, patient care, customer service, reporting accuracy, margin, understanding of delegation of authority, etc.

4. **Policy manual** – No written recitation of corporate mission, rules, ethics, must-do's and don'ts, delegation of authority, pricing, promotionals, employee benefits, travel, reimbursements, seniority, other pharmacy-specific issues, etc. Affects: productivity and efficiency, system wide uniformity, replicable processes, cost of remediation, communication, etc.

## Operating Problems

1. **Pricing Discrepancies** between invoiced prices and those listed in Cardinal Item book often significant in Cardinal's favor. Comments: No procedure addresses the role of the pharmacy staff with respect to the Cardinal Item book. How are COGS

1

verified as contractually agreed?  What is the role of the pharmacy staff in identifying discrepancies?  Is there a standard cost system with Cardinal Item book as the Standard cost?  How often do the Standards change? Does the cost accounting system track purchase price variances?  Are purchase price variances credited to appropriate store? Are contracted costs and prices charged for each item checked for agreement? (How) does accounts payable verify quantities invoiced agree with quantity received in store?  (How) does accounting verify that prices charged to patients and third party payors is in accordance with approved retail prices and contracted schedules, respectively?  Estimated annual loss: $9,000,000.00

2. **Third Party Adjudication**: Activity report indicates that third party(s) owe monies to store.  According to the third party and PDX Transaction Log, no monies are owed. Are transaction reversals tracked timely? Estimated annual paper loss:  $400,000.

3. **Signature on File**: NC Medicaid requires signature be on file prior to processing claims by outside contractors.  Is there a procedure for timely refiling with required documentation to ensure payment of rejected claims?  Is there an accounting of the magnitude of the losses incurred for this class of rejection?

4. **Substitutions for Products Ordered**

    a. <u>Contracted Items</u>: ~~Store is subject to loss when drug are sold priced in larger quantity than has been... sources monitored... and consumed timely in... when case expiration date is reached or the MAC price is reduced.~~  Estimated annual corporate loss: $23,000.00
    b. <u>Generic for Brand</u>: Loss in time and effort, and delay in filling prescription occurs when a generic drug is substituted in filling an order for a brand drug.
    c. <u>Automatic Reorder of Generic Drug by Same Manufacturer</u>: Same-manufacturer drug is automatically reordered when reorder point is triggered.  ~~Automatic resupply with lowest priced generic will insure maximum gross profit.~~  Estimated annual corporate loss: $100,000.00

5. **Miscellaneous Inefficiencies**

    a. <u>Computer PDX System</u>: Systems used at Eckerd and CVS (sources unknown by writer) require approximately one-third less time to effect transactions than the PDX system.  This inefficiency consumes about 25% of pharmacists' time. Key areas (encompassing about 80% of time wasted) include ordering, excessive and irrelevant key strokes, limited information retention, time to retrieve prescriptions lost in program loops, non traditional Backspace and Enter functions, information retrieval. Estimated annual corporate loss: $20,000,000.00
    b. Lack of uniformity and standards with respect to supplies.  Estimated annual corporate loss: $250,000.00
    c. Pharmacy layout cumbersome and impedes flow.
    d. No evidence of Total Quality Management.

**pharm1-0915**



| | |
|---|---|
| **From:** | Bob Boyer |
| **Sent:** | Wednesday, January 29, 2003 5:19 PM |
| **To:** | pharm1-0915 |
| **Subject:** | RE: Inventory Targets |

Christopher--- You may have a point but most people just transmit the return on the telxon and don't speak to anyone. 950 kept the stickers from the bottles which had date and price so we knew it was in the 30 day limit, then compared the prices on the bottle to the credit issued. She then called them and had the restocking fee returned to us. ~~As you have said in the past they are doing it to us.~~

Thanks
Bob

-----Original Message-----
| | |
|---|---|
| **From:** | pharm1-0915 |
| **Sent:** | Wednesday, January 29, 2003 5:07 PM |
| **To:** | Bob Boyer |
| **Subject:** | RE: Inventory Targets |

Bob,

I was thinking about the ~~overstock fees~~ that have been accruing.  When I make returns, the Cardinal reps ask if the reason for the return is "~~overstock~~".  I have to tell them that is was ordered wrong or something else.  Maybe people are saying yes to this question and that is part of the reason for the fees that are being charged.

Just a thought.

Christopher

-----Original Message-----
| | |
|---|---|
| **From:** | Bob Boyer |
| **Sent:** | Wednesday, January 29, 2003 3:33 PM |
| **To:** | pharm1-0803; pharm1-0804; pharm1-0809; pharm1-0811; pharm1-0903; pharm1-0910; pharm1-0915; pharm1-0940; pharm1-0945; pharm1-0950; pharm1-0954; pharm1-0961; pharm1-0962; pharm1-0965; pharm1-0967; pharm1-0969; pharm1-0977; pharm1-0979; pharm1-0983; pharm1-2022; pharm1-2025; pharm1-2039; pharm1-2061; pharm1-2062; pharm1-2066; pharm1-2073; pharm1-2091 |
| **Subject:** | Inventory Targets |

All Pharmacies--- Probably on next weeks A23BY report, if not then the week after, you will see the new inventory targets that have been established based on sales results. With the exception of 903, 2022 and 2039 these are realistic adjustments with good adjustments upward for increased sales and decreases for negative sales trends.

This inventory target is a very hot button right now and these budgets are realistic so get to them immediately. If a dead inventory return with a restocking fee is needed, talk to me first.

THANKS
Bob

EXHIBIT

B

**pharm1-0915**

| | |
|---|---|
| **From:** | Bob Boyer |
| **Sent:** | Tuesday, February 11, 2003 11:36 AM |
| **To:** | pharm1-0915 |
| **Subject:** | FW: opportunity |

Christopher----- Charlie Van Pelt would be interested in your thoughts but there is no money available for work at home at this time.
Thanks
Bob

-----Original Message-----
| | |
|---|---|
| **From:** | Mike LeBlanc |
| **Sent:** | Tuesday, February 11, 2003 6:58 AM |
| **To:** | Bob Boyer |
| **Subject:** | RE: opportunity |

Bob,

This is Charlie's focus, If Chris has some valid points about the Cardinal programs please have him pass these to Charlie.

On the restocking fee, these are worked on a Calendar month not a Winn-Dixie Period. The timing on the information is the reason for the delay.

Mike

-----Original Message-----
| | |
|---|---|
| **From:** | Bob Boyer |
| **Sent:** | Monday, February 10, 2003 4:43 PM |
| **To:** | Mike LeBlanc |
| **Cc:** | pharm1-0915 |
| **Subject:** | FW: opportunity |

Mike---- for your consideration.
Thanks
Bob    Chris

-----Original Message-----
| | |
|---|---|
| **From:** | **pharm1-0915** |
| **Sent:** | Friday, February 07, 2003 5:10 PM |

**To:** Bob Boyer
**Cc:** pharm1-0915
**Subject:**    opportunity

Bob,

I may have cracked the code on why we can never seem to locate restocking fees. I believe, thanks to somewhat diligent research that there is a 60 day lag between the stocking fees and the time that the number reaches the operating report.

You know, I have a proposition for you and yours. I would be willing to work one day per week from home, in addition to my 30 hours weekly, reviewing the cardinal contract, and calling them to the carpet on the estimated 5 million dollars a year we lose through their antics. Please advise of this consideration.

Christopher

1 904 783-5000
1 904 370-6840

EXHIBIT



C

**pharm1-0915**

| | |
|---|---|
| **From:** | Charlie Van Pelt |
| **Sent:** | Friday, February 28, 2003 3:52 PM |
| **To:** | pharm1-0915; Bob Boyer |
| **Subject:** | CARDINAL ISSUES |

Christopher:

Concerning the issues you have raised regarding Cardinal - I can assure you that we are always most concerned with any potential or actual problem relating to any of our suppliers that cost Winn-Dixie expense or lost sales. As I explained to you, the procedure we would like you to follow is to make Cardinal aware of any such issue relating to your store and attempt to resolve it at store level. If, after two such attempts, Cardinal is not responsive, you should escalate the issue, along with all pertinent details, to your Pharmacy District Manager for his review. Bob Boyer will then direct you as to the appropriate action to take from that point.

As far as you having identified issues with Cardinal that are costing our company $5,000,000 per year in losses of any kind, I certainly take any allegation of that type very seriously. As a Winn-Dixie associate, it would be your responsibility to immediately bring any such situations to the attention of your supervisor, with all pertinent details, so the information can be examined and forwarded to company management responsible for that area. I understand from discussion with Bob that you have had a similar conversation with him previously, but have been unwilling to provide specific details that could be investigated. I would encourage you to make any information you possess relating to real or potential losses to the company available to Bob so he can review at the earliest possible date. I can assure you that a full investigation will be made if it appears your evidence has merit.

I'm asking Bob to contact you directly to review this with you, and advise me of any information you are able to provide. Please feel free to copy me on any information you provide to Bob. Hard copies may be directed to my attention in the store mail at HDQ Winn-Dixie Central Procurement - Deerwood. Thanks again for your concern and interest in controlling our costs and protecting our assets.

**Charlie Van Pelt**
**Business Development Manager**
**Pharmacy Health Care**
**Central Procurement**
**Winn-Dixie Stores**
VM: 904-783-5207
E-mail: charlievanpelt@winn-dixie.com
Confidential & Private Communication

EXHIBIT

D

**MEMO**

**To:** Charlie Van Pelt
**From:** Christopher Simmler
**Date:** March 6, 2003
**Subject:** Cardinal Issues
**Reference:** your email February 28, 2003

Per your email Feb. 28th, I am forwarding hard copies of information provided since May 2002, possibly they will be of some use.

These memos contain:

- Specific details related to Cardinal costs and other charges
- Other issues related to cost and profit

Note that, except for the February 28th request for verification of restocking fees, there has been no feedback in closing the loop on these initiatives.

So there is no misunderstanding, I like working for Winn-Dixie, and do not want to jeopardize my position or possible advancement within the company. Any suggestions you may have as to how I may be better utilized in improving W-D's operations and profit would be most welcome.

Enclosures:

1.  May 9, 2002 – discounting/profit
2.  June 10 – Cardinal pricing discrepancies (part of operational observations)
3.  July 5 – cost/profit issues (part of job description)
4.  July 15 – Cardinal issues/cost (part of meeting agenda)
5.  August 8 – operational/cost issues
6.  January 29, 2003 – Cardinal overstock fees
7.  January 29 – overstock fees
8.  February 7 – overstock fee-reporting time lag
9.  February 11 – restocking fees
10. February 28 – restocking fee verification list (page 1 of 6)

EXHIBIT
E

## pharm1-0915

| | |
|---|---|
| **From:** | pharm1-0915 |
| **Sent:** | Friday, June 13, 2003 1:27 PM |
| **To:** | Bob Boyer |
| **Subject:** | RE: Updates |

Bob,

Waited or weighted?  Bob, Cash flow obviously isn't as good as Mr. Rolland assures us.  What else is missing from the picture.  Is the company for sale?  Please don't BS me.  I think the 8 of 16 suggestions that you and yours have taken on my advice in operations warrants a little bit of consideration, since nothing else seems forth coming for the extra efforts.  Honesty, to say the least, is warranted as by policy.  If you are merely passing on the sales pitch, woe to those above you and the example they set.

Your email is over 2 months past my evaluation time.  Surely you aren't going to rest on a past the fact action as justification for the obvious slights, lack of execution of your duties, and deny the preservation of the $1.5 million in cash flow with the offered facade.

On a different note, should I reasonably expect a raise that will "catch me up" to people that were hired after me and who are currently paid 5 percent more?  Please advise, with objective measures, on how, and if you plan, rectify this.

Christopher

-----Original Message-----
| | |
|---|---|
| **From:** | Bob Boyer |
| **Sent:** | Friday, June 13, 2003 12:48 PM |
| **To:** | pharm1-0915 |
| **Subject:** | RE: Updates |

Christopher--- regretfully yes but increases will be waited due to this delay.

thanks
Bob

-----Original Message-----
| | |
|---|---|
| **From:** | pharm1-0915 |
| **Sent:** | Friday, June 13, 2003 11:21 AM |
| **To:** | Bob Boyer |
| **Subject:** | RE: Updates |

Bob,

my anniversary date was 4/08/03.  I was eligible for evaluation then however received none.  am I now to wait til October?

Christopher

-----Original Message-----
| | |
|---|---|
| **From:** | Bob Boyer |
| **Sent:** | Monday, June 09, 2003 5:23 PM |
| **To:** | pharm1 2022; pharm1 2025; pharm1 2039; pharm1 2061; pharm1 2062; pharm1 2066; pharm1 2073; pharm1 2091; pharm1 803; pharm1 804; pharm1 809; pharm1 811; pharm1 903; pharm1 910; pharm1 915; pharm1 940; pharm1 945; pharm1 950; pharm1 954; pharm1 961; pharm1 962; pharm1 965; pharm1 967; pharm1 969; pharm1 977; pharm1 979; pharm1 983; Rita Ryman |
| **Subject:** | Updates |

All Pharmacies---

1---- Winn Dixie has changed the method that raises will be given. The raises will be based on operating results against budget. Some of the criteria will be Sales, Gross Margin, Payroll control, Supplies, and Inventory turns. We have established bud          ̶  ̶   ̶   ̶   ̶  ̶et us started. The results from 2003 will play a part in the upcoming raises but they won't be                    ̶  ̶ ̶ecause the emphasis was not there this past year as it will be in the future.

*Exhibit*

*E*

**pharm1-0915**

| | |
|---|---|
| **From:** | Bob Boyer |
| **Sent:** | Friday, March 26, 2004 5:44 PM |
| **To:** | pharm1-0805; pharm1-0803; pharm1-0804; pharm1-0809; pharm1-0811; pharm1-0903; pharm1-0910; pharm1-0915; pharm1-0940; pharm1-0945; pharm1-0950; pharm1-0954; pharm1-0961; pharm1-0962; pharm1-0965; pharm1-0967; pharm1-0969; pharm1-0977; pharm1-0979; pharm1-0983; pharm1-2022; pharm1-2025; pharm1-2039; pharm1-2061; pharm1-2062; pharm1-2066; pharm1-2073; pharm1-2091 |
| **Subject:** | CARDINAL RETURNS – NEW POLICY |

All Pharmacies----This new return policy was prompted by a corporate expense of $1.2 million in restocking fees so far this fiscal year. Can you imagine $1.2 mil!!!. You must watch your daily orders carefully and return the problems immediately. You must also take full advantage of the free return every six months. Thanks

CARDINAL
URNS - NO FEES PE

Bob

EXHIBIT

G

**pharm1-0915**

| | |
|---|---|
| **From:** | Kathy Lussier on behalf of Peter Lynch |
| **Sent:** | Wednesday, May 25, 2005 4:30 PM |
| **To:** | ALL |
| **Subject:** | Section 341 Mtg Today |

*Please post for those without access to e-mail.*

Dear Associates:

This morning, the Section 341 meeting was held at the Prime Osborn Convention Center in Jacksonville. This meeting was hosted by the U.S. Trustee's Office and is part of our Chapter 11 proceedings. Everyone to whom Winn-Dixie owes money because of our bankruptcy was invited to hear from and ask questions of Winn-Dixie, represented by Larry Appel, our General Counsel, Bennett Nussbaum, our Chief Financial Officer, and me.

After some brief introductory remarks by the U.S. Trustee, we gave our presentation-much of which you heard at the Town Hall Meetings or have read in the Chapter 11 updates we've been sending out frequently. I told the audience what I told you on February 21-poor earnings, high inventories, tight credit lines and other factors came together in what I call "the perfect storm," leading us to our decision to file for Chapter 11. I outlined important "First Day Motions," such as ensuring our Associates receive pay and benefits as usual, continuing the retiree health insurance benefits, and asking the court to allow us to pay at least a portion of death benefits under our retirement plan.

I emphasized how very proud I am of our Associates who, upon hearing the news of our filing, did not shrink away from the challenge but stood tall and immediately committed themselves to doing everything possible to turn around this Company. I outlined efforts to drive profitable sales, such as our produce campaign, Valentine's Day sales contest in Floral, and our meat campaign that just kicked off today. I know I have said before that I sincerely appreciate that support and positive attitude, but it's important you know that and it's important to me that our creditors and the U.S. Trustee know it as well.

A good amount of time was spent explaining the need to create a smaller footprint; how we must have the right stores in the right markets to succeed. A smaller footprint, I told them, allows us to focus our efforts on operating stores that will give us the best possible opportunity for maximum sales at good margins. I repeated the message I gave to you that we expect to make a public announcement about our footprint in mid- to late-June.

I also explained to the crowd, as I have told you previously, that with a smaller footprint, combined with the need to cut costs overall, we will need to make significant reductions in our support structure. We have six office buildings here in Jacksonville with many people who are doing a great job, but it makes sense that with a reduced number of stores, we simply must reduce our administrative staff. There is a team of people from Human Resources, Accounting, Finance, Legal and other areas who are working very hard to determine the right size staff that's needed to support the stores and facilities in our new footprint.

We expect be able to announce to you our plans for the new administrative structure by the end of July. I can't give exact dates for those announcements at this time because there is a process we must follow and milestones along the way that must be reached, but I CAN tell you I intend to give you the details first. You will continue to see speculation in the media and from others about what our new footprint will look like; please know that we

1

EXHIBIT H

have not made any official announcement and do not intend to do so until the plans are finalized and until I am able to tell you about it personally.

Following our presentation, the creditors in the audience had the chance to ask questions. Many of the questions came from our retirees wanting clarification about how their benefits would be affected by the bankruptcy and we did our best to address their concerns. We clarified a misunderstanding that Winn-Dixie discontinued or changed death benefits under the retirement plan, when we did not. In fact, Winn-Dixie pleaded the court to allow us to at least pay a portion of the death benefits while in bankruptcy, rather than the normal course of not being able to pay anything at all during this time. Our retirees are an important part of the Winn-Dixie family and we plan to communicate more frequently with them.

We have some important decisions ahead that will impact our creditors, associates, customers and vendors. They are difficult decisions to make, and I take them seriously. Many people are working on our plans and I'm proud of what they've done so far, but the details are not done today.

I appreciate your patience with this process. This is a large company with extremely complex issues. This company didn't get broken overnight, and it will take a while to fix it, but I'm confident with your continued commitment and hard work, we'll get there.

Keep up the great work you are doing for your Company.

See you in the stores!

Peter Lynch

# pharm1-0915

| | |
|---|---|
| **From:** | pharm1-0915 |
| **Sent:** | Friday, June 10, 2005 12:19 PM |
| **To:** | pharm1-0915 |
| **Subject:** | FW: Scheduler Info |

-----Original Message-----

| | |
|---|---|
| **From:** | pharm1-0915 |
| **Sent:** | Friday, June 10, 2005 11:28 AM |
| **To:** | pharm1-2061; Lisa Matras; pharm1-0803; pharm1-0804; pharm1-0805; pharm1-0809; pharm1-0811; pharm1-0882; pharm1-0884; pharm1-0903; pharm1-0911; pharm1-0912; pharm1-0923; pharm1-2022; pharm1-2025; pharm1-2039; pharm1-2062; pharm1-2066; pharm1-2073 |
| **Subject:** | RE: Scheduler Info |

FYI,

according to the motion filed with the court, suggested severance packages for full time pharmacists is 1 week for every year of service for a maximum of 12 weeks, part time a flat fee of $1000.

Christopher

-----Original Message-----

| | |
|---|---|
| **From:** | pharm1-2061 |
| **Sent:** | Thursday, June 09, 2005 4:36 PM |
| **To:** | Lisa Matras; pharm1-0803; pharm1-0804; pharm1-0805; pharm1-0809; pharm1-0811; pharm1-0882; pharm1-0884; pharm1-0903; pharm1-0911; pharm1-0912; pharm1-0915; pharm1-0923; pharm1-2022; pharm1-2025; pharm1-2039; pharm1-2061; pharm1-2062; pharm1-2066; pharm1-2073 |
| **Subject:** | Scheduler Info |

Hi Pharmacists,

   My name is Tom Colonel and I'm the pharmacist at #2061 in Burlington. In these trying times of reorganization, I urge you to hold on. We will know our future soon and there will be positions for many of us. And if not a position, a severance package worth waiting for. Please bear with me. I am new at this new position, so you may receive many calls from me. Here is my info:

Tom Colonel RPh
Winn Dixie Pharmacy #2061
(336) 584-5168
Fax (336) 584-4801
Home Phone (336) 446-4242
Cell Phone (336) 254-3543
Alternate Phone (My wife's store) (336) 222-8052
regular internet e-mail  tmcolonel@yahoo.com
Winn Dixie e-mail  pharm1-2061  or  new address to follow

Please, if you have names and phone numbers of part time pharmacists that have worked at your store, please forward them. We have virtually no relief pharmacists. If you are booked with an overlap of hours at your store, I will be asking for help covering other stores until the summer crisis is finished. When planning time off, please work with you partner to cover Mondays, Fridays and Saturdays as much as possible. We all like our weekends off so there is much competition for Saturdays. However it is easier for me to find coverage in the middle of the week.

Tom Colonel RPh
pharm1-2061

EXHIBIT
I

1

## pharm1-0915

| | |
|---|---|
| **From:** | pharm1-0903 |
| **Sent:** | Friday, June 10, 2005 5:31 PM |
| **To:** | pharm1-0915 |
| **Subject:** | FW: pharmacist severance packages |

-----Original Message-----

| | |
|---|---|
| **From:** | Bob Boyer |
| **Sent:** | Friday, June 10, 2005 4:56 PM |
| **To:** | pharm1-0903 |
| **Subject:** | RE: pharmacist severance packages |

Anita--- It is also incorrect. When did Christopher become an authority on our motions?

Thanks
Bob

-----Original Message-----

| | |
|---|---|
| **From:** | pharm1-0903 |
| **Sent:** | Friday, June 10, 2005 12:01 PM |
| **To:** | Bob Boyer |
| **Subject:** | FW: pharmacist severance packages |
| **Importance:** | High |

Bob, this stinks
Anita Logan 0903

-----Original Message-----

| | |
|---|---|
| **From:** | pharm1-0915 |
| **Sent:** | Friday, June 10, 2005 11:28 AM |

FYI,
according to the motion filed with the court, suggested severance packages for full time pharmacists is 1 week for every year of service for a maximum of 12 weeks, part time a flat fee of $1000.

Christopher

EXHIBIT
J

## AFFIDAVIT OF CHRISTOPHER SIMMLER

1. My name is Christopher Simmler. I am currently employed by Winn-Dixie Stores, Inc. in Store 0915 located in Durham, NC. I make this affidavit in support of the Motion to Effect Non-Deceptive Communication by the Debtors, Winn-Dixie Stores, Inc., et. al. I am over the age of 18 and competent to make this affidavit. I have personal knowledge of the statements contained in this affidavit, and all the statements are true and correct to the best of my knowledge and belief.

2. I have worked for Winn-Dixie Stores, Inc. in NC full time since my hiring in April of 2002. As a pharmacist with extensive experience in retail pharmacy, over the past 3 years I have submitted significant suggestions on improving operations, cash flow, and capital retention to my immediate supervisor Bob Boyer. Examples and copies of those ideas are enclosed in this Motion and identified as Exhibits A, B, C, E, and F, as presented to Mr. Boyer and others.

3. Several of my ideas, though never acknowledged, have been implemented over time with little follow through, monitoring of progress, or gauges for success.

4. During my tenure, I have come across several situations wherein I believed that my employer was being deceptive in its practices. One situation pertained to my submitting a proposal that I believed that one of our wholesalers was gouging us on certain practices to the estimated amount of $5 million annually. When I took this matter to upper management as directed by my supervisor, upper management responded by way of exhibit D. I have always given specific example of where we were losing money, and the corporate manager's response was off base; accusing me of an unwillingness to share information. As time eventually showed, after Winn-Dixie's public announcement of its critical financial situation, my advice from over 1 year prior finally was enforced, after we lost over $1.2 million dollars, unnecessarily.

5. Now my employer is the named Debtor in a Chapter 11 proceeding. Although there is a new CEO, many of the old upper management still turn the same cranks. Although Mr. Lynch appears to speaking honestly and caringly for the some 78,000 employees, I am noticing a pattern of what I perceive to be willful deceit.

6. Specifically, although the Debtor's have filed motion for a Retention and Severance Plan, Mr. Lynch has chosen not to inform his employees as to the details of that plan, while assuring us on May 25, 2005 "The proposed severance program provides protection for all Winn-Dixie Associates. Knowing that a fair and appropriate severance program is in place in the event restructuring displaces an associate should provide all of us with the peace of mind to focus on our jobs and what we can do to help Winn-Dixie succeed." Exhibit L. I have to take exception to his leading over 75,000 people with comments like "fair and appropriate," while refusing to share the specifics. "More information about the severance program will be made available once it's approved by the Court." I take exception that the Debtor's are willfully withholding information on its intent on an arbitrary action of the court. I perceive such actions as a deliberate means to retain necessary employees with subjective assurances.

7. Additionally, and in support of my perception, through email on June 9, 2005, a "new scheduler" has propagated unsubstantiated assurances of retention and severance as written in Exhibit I. Within minutes of my responding to that email, my now supervisor, Robert Muse, called to reprimand me for my informing my colleagues of what the

*EXHIBIT*

*K*

Debtor's motion intended as far as severance for us pharmacists. He immediately accused me of inappropriately using corporate email. I explained to him that I was not using the email for personal use, but was rather responding to a collective email that pertains to all of my colleagues.

8. Mr. Muse continued that I had no right to go "stirring up a hornet's nest." And that he had already answered several phone calls in response to my email and would likely spend the rest of the afternoon fielding such calls. I told him he could just put his response in writing to all the associates, as I did, but he refused.

9. Mr. Muse informed me that 12 weeks will likely be the severance offered to pharmacists, as "pharmacists are especially needed employees, and will likely be treated differently" When I challenged him that such an idea is in contrast to the written agenda filed with the court, he said that we'll just apply that standard to you." I told him that there was no need to discriminate against me, that I was just tired of hearing rumors and documents about inflated severance packages, when I was reasonably knowledgeable of the meaning of the motion filed with the court and that Winn Dixie would have to act in accordance with it filed Chapter 11 motions.

10. Mr. Muse continued to explain that the "non-core" stores received 12 weeks' severance, and likely we would, too. He left the conversation expressing that he was going to check with legal.

11. Later that day, one of my colleagues addressed in my email forwarded my email to my former supervisor, Bob Boyer, who is now of 1 of 4 regional pharmacy directors. Bob informed my colleague that my information was incorrect, as written in exhibit J

12. Mr. Muse called me this morning to apologize. He said that went to the Logan Web page and agrees that the information I put forward was accurate.

13. I believe that the Debtors have an obligation to be truthful and non-deceptive in its communication with its employees. I further believe that any information from upper management such as Bob Boyer should be correct or unspoken.


I the undersigned, Christopher Simmler attest that the foregoing affidavit is truthful. I am aware that any false information or statements willfully made by me are punishable by law.


Christopher Simmler, 6/13/2005

**pharm1-0915**

| | |
|---|---|
| **From:** | Kathy Lussier on behalf of Peter Lynch |
| **Sent:** | Friday, May 27, 2005 4:56 PM |
| **To:** | ALL |
| **Subject:** | Company News and Chapter 11 Update |

*Please post for Associates without e-mail.*

Dear Associates:

It has been a busy past two weeks, with our Town Hall Meetings and several important developments in our Chapter 11 process. I'd like to take a little extra time this afternoon to share updates on many fronts. So let's get started.

**Town Hall Meetings**

We held our quarterly Town Hall Meetings last week, traveling to each region to speak directly with our store directors and regional management teams. Our Meat Department Managers were our special guests. They were treated to a sneak preview of the advertising, marketing and merchandising strategies designed to help spread the word about our meat campaign, which launched Wednesday. A special edition of *WINNing Spirit* is headed to each Associate with details on this exciting campaign, but we're hopeful that after just one visit to your local Winn-Dixie, you'll see for yourself what our campaign is all about: quality products from knowledgeable and friendly Associates. We're enhancing our offerings by adding free marinades and recipes, Angus Beef and oven-ready foods. As our advertising asks, "Isn't that what you'd expect from The Beef People?" I encourage everyone to stop by our meat departments over the holiday weekend to check it out and offer a word of support. This campaign has the potential to really turn up the heat on sales and win over customers.

I also encourage you to check out the new TV spots, a fun video about our Operation Fresh Start efforts, and other videos. Just go to the Company Info site at <http://info> and click on Associates' Corner, then on WD Fresh Start Videos.

The highlight for me at our Town Hall Meetings is the "Question and Answer" period. I could spend all day just hearing your questions. It helps me gain insight into what's happening around our Company and lets me know what issues are most important to you.

I don't have enough space to list all the questions that were asked, but here are a few requests that we're already working on:

Associate Discounts: We are preparing to roll out a pilot program in late summer that will allow us to offer an Associate Rewards Program. The program would take our coupon books a step further, offering

*EXHIBIT 2*

Associate discounts, contests to win a free week of vacation, and more through our Customer Reward Card. Stay tuned for more information as the pilot approaches. In the meantime, keep an eye out for your Associate Appreciation Coupons starting Wednesday, June 1. This flyer features six coupons-four are for FREE products, and two are for $5 off your $50 purchase! If you don't receive one by the end of the week, please talk to your supervisor. These coupons are for all Associates, both retail and non-retail.

Support of Local Youth and Sports Teams: We heard from a lot of you that it's important that Winn-Dixie support local youth teams and organizations, like the neighborhood Little League team or Girl Scout troop. You'll be pleased to hear that we're expanding our contributions to include an allocation for these groups so your store will be able to get more involved with your neighborhood.

Suggestion Box: Thanks to your suggestion at the Town Hall Meetings, a suggestion box is on its way. Watch for news soon on how you can submit your idea for improving our company.

There were many more great ideas and suggestions and I assure you, a list was kept from each meeting and our senior management is at work to look into every issue. I want you to know that when you make a request at these Town Hall Meetings, you have my personal commitment that your question or suggestion gets immediate attention. This is YOUR Company, and your thoughts are important to me.

**Restructuring**

Today we filed a motion with the Court seeking approval of severance and retention plans related to the restructuring and our new footprint. Both plans were prepared after much research and advice from experts in retention and severance programs, as well as input from our own Human Resources, Benefits and Legal teams. These plans are quite common in Chapter 11 cases and we believe they are needed to better ensure a stable and focused workforce during our reorganization.

The proposed severance program provides protection for all Winn-Dixie Associates. Knowing that a fair and appropriate severance program is in place in the event the restructuring displaces an Associate should provide all of us with the peace of mind to focus on our jobs and what we can do to help Winn-Dixie succeed. More information about the severance program will be made available once it's approved by the Court.

Our retention plan is designed to ensure that Winn-Dixie retains those Associates who have the specialized knowledge, experience and skills needed to support our business operations and meet the additional demands of the Chapter 11 process. The Associates covered in this plan are not limited to executives and top management as is the case with most retention plans. We included Associates at several levels who will be relied on heavily as we develop and implement changes in our Company's structure. The Associates who will be covered under the retention plan will be notified directly after the

bankruptcy court approves the plan. The Court is expected to review both plans at a hearing June 16.

We also today filed a motion seeking court authorization to extend the deadline by which the Company has the exclusive right to file a Plan of Reorganization (or "POR"). A POR is a roadmap for how a company will emerge from the Chapter 11 process. It sets out what recoveries, if any, a company's various creditors will receive on their claims.

When the time is right, we expect to have thorough discussions with the Creditors' Committee and other interested parties about our POR. But that time is not now. At the moment, we still need to focus on stabilizing the business. As you know, we are putting the final touches on our Footprint plan and later this summer we will take steps to ensure our administrative and support functions are appropriately sized.

It is customary in the early days of a large, complex Chapter 11 case like ours for a company to request one or more extensions of the period in which it has the exclusive right to file a POR with the Court. This period had been scheduled to end on June 21. We are requesting a 120-day extension - through October 19. This does not mean we will or will not be ready to file our POR by then; it simply moves the due date forward to give us some flexibility. The Court will consider our request at the June 16 hearing.

Another motion filed today seeks Court approval of procedures that we can use in the future to sell assets that we determine the company no longer needs to own.

Yesterday, the Company, the U.S. Trustee, and the Creditors' Committee each filed objections to a motion submitted by a number of retired Associates who want the Court to order the formation of a second Creditors' Committee in our Chapter 11 case. As you know, there is already a Creditors' Committee set up to represent all unsecured creditors. The sole purpose of the proposed second committee would be to represent the interests of participants in the Supplemental Retirement Plan (SRP) and Management Security Plan (MSP).

The U.S. Trustee, which is responsible for forming creditor committees in Chapter 11 cases, had previously rejected the retirees' request for a second committee but said it would consider adding a representative of the SRP and MSP participants to the existing Creditors' Committee.

We said in our filing that we would not object to the addition of an MSP/SRP participant to the existing committee. We think it's fine for the participants to have a seat on the Creditors' Committee, but we agree with the U.S. Trustee that a second committee is not needed. A second creditors' committee would create a large, new expense for the Company and would add administrative complexity to the case.

We certainly understand the concerns of the approximately 1,000 SRP and MSP participants who want to ensure that their retirement benefits are protected. In fact, one of the first things we did when the Company filed for Chapter 11 was to obtain special Court authorization to continue making payments to SRP and MSP participants who are currently eligible to receive payments under the plan. We will work hard to do what we can to protect these plans. The Court is expected to rule on the request for a second committee on June 2.

In closing, I want to remind you that many of our Associates will be working this holiday weekend to help make your celebration special, ensuring you have everything you need for your gatherings. I would appreciate it if every Associate would visit one of our stores and show support for our retail team. I also want to thank our Associates "behind the scenes" who also will be working to ensure our stores have everything they need. Making sure the products show up on our store shelves takes a real team effort. I sincerely appreciate everyone's contributions.

Finally, let me extend to you and your families my wishes for a safe and relaxing Memorial Day Weekend. This is a time when our country pauses to remember U.S. service men and women who died while protecting our freedom. As the saying goes, freedom isn't free. Our lives are richer because of those who made the ultimate sacrifice.

Whether you're staying close by or hitting the road, travel safe.

Peter

Kathy Lussier, APR
Senior Director of Communications
Winn-Dixie Stores, Inc.
7596 Centurion Parkway
Jacksonville, FL 32256
ph: 904-370-6025