May 19 hrg transcript re JEA


UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, DIVISION


In re:

    WINN-DIXIE STORES, INC., et al.,

       Debtors.            CASE NO. O5-3817-3F1

_____/


TRANSCRIPT OF PROCEEDINGS


    Motion for Order (A) Deeming Utilities Adequately

Assured of Payment (B) Prohibiting Utilities from Altering,

Refusing or Discontinuing Services and (C) Establishing

Procedures for Resolving Requests for Additional Assurances

before the Honorable Jerry A. Funk, United States Bankruptcy

Judge, Courtroom 4D, 300 North Hogan Street, Jacksonville,

Florida, Thursday, May 19, 2005, to commence at 1:00 p.m., as

reported by Loretta D. McDonald, a Notary Public in and for

the State of Florida at Large.


                     - - -


                                 2

1              A P P E A R A N C E S

2

3

4

5          RICHARD THAMES, Esquire,

May 19 hrg transcript re JEA

6          Stutsman & Thames, P.A.
            121 West Forsyth Street
7          Jacksonville, Florida  32202

8          Attorney for JEA.

9

10

           STEPHEN BUSEY, Esquire,
11      CYNTHIA JACKSON, Attorney at Law,

12          Smith Hulsey & Busey
            225 West Water Street
13          Jacksonville, Florida  32202

14          Attorney for the Debtors.

15

16
                              - - -
17

18

19

20

21

22

23

24

25

3

1                     I N D E X

2

3    Witness                          Page

4    JOSEPH AKINS

5       Direct Examination by
           Mr. Thames                  7
6
        Cross-Examination by
7          Mr. Busey                  16

8
     MICHAEL BYRUM
9
        Direct Examination by
                    Page 2

May 19 hrg transcript re JEA

10          Mr. Busey                          19

11      Cross-Examination by
            Mr. Thames                         24
12
        Redirect Examination by
13          Mr. Busey                          32

14      Recross Examination by
            Mr. Thames                         32
15

16

17                          - - -

18

19                    E X H I B I T S

20
    JEA Exhibit Numbers 1 through 13           6
21

22                          - - -

23

24

25

                                              4

1                 P R O C E E D I N G S

2    May 19, 2005                        1:00 p.m.

3                          - - -

4        THE COURT:  All right.  We're back on the objection

5        to the utilities ordered by the JEA.

6            Mr. Thames, I'll allow you to proceed first on your

7        objection.

8            MR. THAMES:  Thank you, Your Honor.  Before we

9        begin with evidentiary presentation, I just wanted to

10       correct something that was stated earlier.  JEA is not

11       the only party that has objected to the Debtor's motion.

12       We also have objections still pending from American

13       Electric Power, Duke Power Company, Florida Power

14       Company, Carolina Power and Light, Orlando Utilities

May 19 hrg transcript re JEA

15      Commission and the Tampa Electric Company.

16           And we are one of the utilities that did not have a

17      preexisting security deposit or a letter of credit in

18      place that was covered by the earlier motion that was

19      handled.  And despite their efforts to resolve, we

20      haven't been able to.  So we're here today to ask for a

21      two-months' security deposit.  And I think after you

22      review the -- weigh the evidence, the risk of the

23      parties and do your balancing, you'll find that to be

24      appropriate.

25           Having said that at this point, by agreement of


                                                          5

1      parties, I would like to introduce into evidence certain

2      exhibits.  Number one is a copy of the Debtor's

3      emergency motion for postpetition financing.

4           Number 2 is the utility motion, which you are

5      presently hearing.

6           Exhibit Number 3 is the objection and request for

7      deposit, filed by the JEA.

8           Number 4 is the order preliminary entered on this

9      matter deeming the utility is adequately assured a

10      payment.

11           Exhibit Number 5 is the order granting the Debtor's

12      emergency motion for postpetition financing.

13           Exhibit Number 6 is the Debtor's monthly operating

14      reports for February 22, 2005 to March 9, 2005.

15           Exhibit Number 7 is the Debtor's monthly operating

16      report for March 10, 2005 to April 6, 2005.

17           Number 8 and Number 9 are two contracts which the

18      JEA has with Winn-Dixie, other volume discount

                         May 19 hrg transcript re JEA
19      contracts.

20              Exhibit Number 10 is the -- and 11 are the two

21      invoices for the prepetition services reflecting an

22      amount due of over $600,000.

23              Exhibit Number 12 is a summary of the prior 12

24      months of billing history for Winn-Dixie.

25              Exhibit 13 is the SEC Form 10Q for the period


                                                            6

1       ending April 6th, 2005.

2               I would move those into evidence as JEA's Exhibits

3       1 through 13.

4               THE COURT:   Any objection?

5               MR. BUSEY:   No, Your Honor.

6               THE COURT:   Admitted as previously numbered.

7                               (Whereupon, the documents

8                               previously marked as JEA's

9                               Exhibit Nos. 1 through 13

10                              were received into evidence.)

11              MR. THAMES:   Thank you, Your Honor.   I would now

12      like to call to the witness stand Mr. Joseph Akins.

13              COURTROOM ADMINISTRATOR:   Mr. Akins, would you be

14      seated in the witness stand, please.   Please be seated.

15              Raise your right hand.

16      WHEREUPON,

17                              JOSEPH AKINS

18      was called as a witness herein and, after having first been

19      duly sworn by the courtroom administrator, was examined and

20      testified as follows:

21              COURTROOM ADMINISTRATOR:   Will you state your name

22      and current home or business address and include the

23      city and state.
                              Page 5

May 19 hrg transcript re JEA

24          THE WITNESS:  My name is Joe Akins.  My address is
25     1357 Arrow Lakes Drive East, Jacksonville, Florida.


                                                        7
1           THE COURT:  You may inquire.
2           MR. THAMES:  Thank you, Your Honor.
3                    DIRECT EXAMINATION
4      BY MR. THAMES:
5           Q     Mr. Akins, what's your position with JEA?
6           A     I'm currently the revenue risk manager.
7           Q     And what is the nature of JEA's business?
8           A     Utility service.
9           Q     And what is JEA's service area?
10          A     Duval County, primarily with the St. Johns County
11     and some in Nassau County.
12          Q     As the manager of revenue risk for JEA, are you
13     familiar with the company's billing practices and procedures?
14          A     That's correct.
15          Q     And does your knowledge include the billing
16     practices and procedures used for JEA's commercial accounts?
17          A     That's correct.
18          Q     Is Winn-Dixie a customer of JEA?
19          A     That's correct.
20          Q     In terms of consumption, how large a customer of
21     JEA is Winn-Dixie?
22          A     Overall, Winn-Dixie is the sixth largest user of
23     consumption with JEA; and, privately, it's the second.
24          Q     Are you one of the custodians of records pertaining
25     to JEA's business transactions with Winn-Dixie?

                                                        8

May 19 hrg transcript re JEA

1    A    That's correct.

2    Q    What specific type of utility services does JEA

3    provide to Winn-Dixie?

4    A    Electric service, water and sewer.

5    Q    And approximately how many locations does

6    Winn-Dixie have in your service area?

7    A    Approximately 40.

8    Q    How is Winn-Dixie billed for the utility services

9    which JEA provides to it?

10    A    They bill once a month in arrears.

11    Q    How long after Winn-Dixie's meters are read, does

12    it typically take for the invoices to be generated and then

13    sent out the door?

14    A    From one to four days.

15    Q    And after those invoices are generated, how long is

16    it before they become due?

17    A    Invoice date, the invoice date would be 22 days.

18    Q    Are invoices numbered generated for each billing

19    which you send to Winn-Dixie?

20    A    Yes, sir.

21    Q    And from those invoice numbers, are you able then

22    to track when payment is received from Winn-Dixie on any

23    particular invoice?

24    A    That's correct.

25    Q    And from a review of those records, have you been

9

1    able to determine the average payment time for the last year

2    on the invoices of which JEA has issued to Winn-Dixie?

3    A    That's correct, yes.

4    Q    Is it about 16 days?

5    A    Yes, 16, 17 days.

May 19 hrg transcript re JEA

6      Q      So how long a period of time would it be -- would

7   Winn-Dixie typically be utilizing JEA's utility services

8   before it would receive payment?

9      A      Approximately about 45 days, 45 or 47 days,

10   something like that.

11      Q      In the typical commercial setting, when does JEA

12   consider a customer to be in default?

13      A      The time we had attached a late fee, the 27 days

14   after the billing invoice date.

15      Q      Is that the point and time where you would first

16   become aware that a customer is delinquent in payment?

17      A      That's correct.

18      Q      And then how long after -- what happens after the

19   27th day with respect to a large -- a default in a large

20   commercial account?

21      A      Well, due to the size of Winn-Dixie, we would make

22   contact through one of our internal sources, our key account

23   rep that normally is in contact with them on a regular basis

24   and find out what's going on; and then depending on that

25   communication, determine exactly what next steps are


                                                                    10

1   necessary.

2      Q      So is there typically a resolution period within

3   which you are trying to secure or obtain payment?

4      A      Correct.   Yes.

5      Q      And how long is that period typically?

6      A      Well, we're looking at, you know, the history of

7   the account due to the size of the account.   But when the

8   late charges are assessed, that's when we start looking

9   specifically to determine if we're going to receive a payment

Page 8

May 19 hrg transcript re JEA

10    or when we're going to receive a payment.  In other words, we

11    make contact with Winn-Dixie.  So the period of time would be

12    up to possibly 30 days, possibly a little bit longer than

13    that.

14        Q    And at some point typically at that point, is when

15    you would decide to terminate services, correct?

16        A    Well, we'd be in that mode at that point and time.

17        Q    Is there anything inherent in the nature of

18    Winn-Dixie's business which would cause additional delays

19    beyond the norm in your decision to terminate services?

20        A    Well, we have to understand at JEA that we have --

21    we're dealing with a customer that requires these types of

22    services because of perishable items and the volume of those

23    perishable items.  You're talking about quite a large amount

24    of inventory.

25        Q    And does that typically extend the time period with

11

1    which you would have -- before you would terminate services?

2        A    It very well could extend that period of time due

3    to those issues.

4        Q    How long, logistically, would it take to you to

5    physically terminate services to Winn-Dixie stores and the

6    facilities in your service area if you decided -- once you

7    decide to make --

8        A    Once we decide to cut service, the strategy would

9    go into place to terminate all services.  It could take up

10    to, you know, 14 days, you know, a week to 14 days to

11    discontinue services, which could go on out to approximately

12    75 days of outstanding service.

13        Q    All right.  So would that -- that was my next

14    question.  How long, based on what you just testified to,

May 19 hrg transcript re JEA

15    about how long a period of time would you consider JEA to be

16    at risk for nonpayment for the postpetition services as it's

17    providing to Winn-Dixie?

18         A    It could be as much as 75 days to over 75 days,

19    maybe up to, you know, 85, 90 days.

20         Q    Have you been able to determine, from review of

21    your records, what the average monthly billings to JEA are?

22         A    Yes.

23         Q    If you would, please, let's look at Exhibit

24    Number 12 that's in the notebook before you.  Is Exhibit

25    Number 12 a summary which JEA has prepared to reflect the

12

1     average monthly billings for the 12 months preceding the

2     petition date?

3          A    That's correct.

4          Q    And are the actual invoices used to prepare the

5     summary here in the court today?

6          A    Yes, they are.

7          Q    And what does your analysis or summary show is the

8     average monthly billings from JEA to Winn-Dixie for the year

9     preceding the bankruptcy case?

10         A    It's approximately $572,000 monthly.

11         Q    And is that inclusive of all the utility services

12    which you provide to Winn-Dixie?

13         A    That is correct.

14         Q    How much is JEA owed for prepetition services

15    provided to Winn-Dixie?

16         A    Approximately $606,500.

17         Q    Let's try to put that in perspective in terms of

18    current delinquent receivables.  How large is this receivable

May 19 hrg transcript re JEA

19    compared to all the others which JEA has?

20        A    It's better one month average.

21        Q    Excuse me?

22        A    It's better than one month's average debt.

23        Q    Is this your largest delinquent receivable?

24        A    To my accounts, yes.

25        Q    To your knowledge, has JEA ever suffered a loss or


                                                              13

1     a default in payment of this magnitude?

2         A    Not that I'm aware of.

3         Q    Is it possible that this loss could affect JEA's

4     bond ratings?

5         A    I would agree with that statement.

6         Q    Does JEA have an established policy of requiring

7     security deposits from new nonresidential customers?

8         A    Yes.

9         Q    And what is the required security deposit for new

10    nonresidential customers?

11        A    It's two times the average month bill consumption.

12        Q    And are debtors in possession treated as new

13    customers under JEA's billing procedures?

14        A    Yes, sir, that's correct.

15        Q    Did Winn-Dixie have a prepetition security deposit

16    posted with JEA?

17        A    No.

18        Q    Why not?

19        A    Due to the grandfather clause back in '81 in the

20    history that JEA -- I mean, that Winn-Dixie had paid JEA, JEA

21    used that to excuse the debt, I mean, excuse the requirement.

22        Q    Does JEA's current policy, credit policies, permit

23    it to waive deposit requirements to commercial customers in

May 19 hrg transcript re JEA

24    some instances?

25         A    Not that I'm aware of.


                                                              14

 1         Q    Is Winn-Dixie eligible for a deposit waiver for

 2    postpetition services?

 3         A    Not that I'm aware of.  I mean, we're asking for a

 4    deposit.

 5         Q    Is strict compliance with your credit policies

 6    including those relative to security deposits necessary to

 7    preserve your bond ratings on your borrowings?

 8         A    Yes, that's correct.

 9         Q    Has Winn-Dixie offered you a postpetition security

10    deposit?

11         A    Not that I'm aware of.

12         Q    Does JEA consider itself to be at risk of

13    nonpayment for the postpetition services which it provides to

14    Winn-Dixie?

15         A    Yes.

16         Q    Is Winn-Dixie current on it's postpetition -- well,

17    excuse me.  Does Winn-Dixie currently owe JEA any sums for

18    postpetition services?

19         A    Before I came to the -- here, I looked at the

20    account, it was outstanding.  April 26 invoice was -- still

21    hadn't been paid.  It was due on the 18th.

22         Q    And how much is that invoice for?

23         A    My recollection it was around 630,000 -- hold on,

24    $629,741.13.

25         Q    Now, with respect to this bill, it is not JEA's


                                                              15

May 19 hrg transcript re JEA

1  contention that the debtor is delinquent on that bill at the

2  moment, correct?

3      A    No, sir.

4      Q    Is that because the bill went out a little bit

5  late?

6      A    It's a possibility it could have went out a little

7  late.

8      Q    How large a security deposit does JEA contend is

9  necessary to protect it from any further loss in connection

10 with the utility services which it provides to Winn-Dixie?

11     A    We look at the history of the account and determine

12 what the invoices were and average those and then multiply by

13 two.  And if I look at the history here, it would be in

14 excess of a million dollars, about like a million -- close to

15 a million two.

16     Q    Two times average monthly consumption reflected in

17 Exhibit Number 12?

18     A    Correct.

19     Q    Is JEA obligated by contract or law to continue

20 providing utility services to Winn-Dixie?

21     A    Yes, in some terms.

22     Q    And does -- incidentally, does Winn-Dixie receive a

23 discount on the utility services JEA provides?

24     A    Yes, we've provided a discount, we've negotiated a

25 discount with Winn-Dixie.


                                                         16

1      Q    Is that because it is a high-volume user?

2      A    That's correct.

3      Q    There are contracts reflecting that discount

4  arrangement?

5      A    Yes.

May 19 hrg transcript re JEA

6      Q    And approximately how much per month does

7  Winn-Dixie save as the result of this discount based on this

8  average consumption?

9      A    How much are saved?  Approximately $40- to $50,000

10  monthly.

11      Q    Under the terms of the rate discount contract that

12  are in evidence, is Winn-Dixie eligible to continue receiving

13  discounted utility services?

14      A    No.

15      Q    Is that because they have not posted a security

16  deposit?

17      A    That's correct.

18      Q    Is it also because there is a prepetition sum due?

19      A    That's correct.

20          MR. THAMES:  Thank you, Your Honor.  I'll tender

21      the witness.

22          THE COURT:  Mr. Busey?

23                      CROSS-EXAMINATION

24  BY MR. BUSEY:

25      Q    Mr. Akins, are you aware that the April 26 invoice,


                                                        17

1  which was due May 18th, was revised by JEA?

2      A    I understood it was held up.  I didn't understand

3  it was revised.

4      Q    Did you know that it was revised because it

5  included prepetition services?

6      A    No, sir.

7      Q    Did you know that the revised bill was delivered to

8  Winn-Dixie by JEA just three days ago?

9      A    No, sir, I'm not aware of that.

                          Page 14

May 19 hrg transcript re JEA

10          MR. BUSEY:  I have no further questions, Your

11     Honor.

12          THE COURT:  Mr. Akins, do you bill Winn-Dixie, do

13     you read all the meters at all the stores within a few

14     days and send one bill?  They're not billed to each

15     store individually during the month; is that right?

16          THE WITNESS:  That's correct.  We read meters to

17     try -- in a particular window and upload all those reads

18     to attach to the specific service points or those

19     specific security agreements that entail, create it

20     into one bill.

21          THE COURT:  And other than this last month, I

22     believe you said that they've been paying usually within

23     16 days of receiving their bill?

24          THE WITNESS:  Average around 16 to 17 days.

25          THE COURT:  Redirect, Mr. Thames?


                                                        18

1          MR. THAMES:  None, Your Honor.

2          THE COURT:  Thank you very much, sir.  You may step

3     down.

4          THE WITNESS:  Thank you.

5                              (Witness excused.)

6          THE COURT:  Additional evidence?

7          MR. THAMES:  Not on our case, Your Honor.

8          THE COURT:  Mr. Busey, do you wish to present any

9     evidence?

10          MR. BUSEY:  Yes, Your Honor.  We'd like to call to

11     the stand Mike Byrum.

12          COURTROOM ADMINISTRATOR:  If you'd be seated in the

13     witness stand, please.

14               Raise your right hand.

May 19 hrg transcript re JEA

15    WHEREUPON,

16                         MICHAEL BYRUM

17    was called as a witness herein and, after having first been

18    duly sworn by the courtroom administrator, was examined and

19    testified as follows:

20                 COURTROOM ADMINISTRATOR:   Will you state your name

21         and current home or business address and include the

22         city and state.

23                 THE WITNESS:   Michael Byrum, it's 5050 Edgewood

24         Court, Jacksonville, Florida.

25                 THE COURT:   You may inquire.


                                                              19

1                  MR. BUSEY:   Thank you, Your Honor.

2                            DIRECT EXAMINATION

3     BY MR. BUSEY:

4          Q     Mr. Byrum, you're employed by the Debtor,

5     Winn-Dixie Stores, Inc.?

6          A     Yes.

7          Q     And what is your position?

8          A     Corporate controller and chief accounting officer.

9          Q     Chief accounting officer?

10         A     Yes.

11         Q     How long have you worked for Winn-Dixie?

12         A     Just over 32 years.

13         Q     What are your responsibilities?

14         A     The general accounting function, including

15    reporting, accounts receivable, accounts payable.

16         Q     Including paying the company's vendors?

17         A     That's correct.

18         Q     Including utilities?

May 19 hrg transcript re JEA

19      A    Yes.

20      Q    How many utility companies do the Debtors have

21  accounts with?

22      A    Approximately 800.

23      Q    Eight hundred different utilities?

24      A    Yes.

25      Q    And what's the total number of accounts the Debtors

20

1  have for all of these utilities?

2       A    There's approximately 3,500 separate accounts.

3       Q    On the average, what's the combined total of all

4  the monthly bills of those utilities to Winn-Dixie?

5       A    It's a little over $16 million per month.

6       Q    Per month.  Prior to the petition date, had the

7  Debtors paid all of their undisputed utility bills on a

8  timely basis?

9       A    Yes.

10      Q    At the time the petition was filed, were the

11  Debtors current in their payments to all of their utilities?

12      A    Yes.  All undisputed amounts, to my knowledge, were

13  current.

14      Q    Are the debtors continuing to timely and currently

15  pay all postpetition utility bills?

16      A    Yes.

17      Q    How long has Winn-Dixie had a working relationship

18  with JEA?

19      A    To my knowledge, since I've been in Jacksonville,

20  they've had a relationship which is --

21      Q    Thirty-something years?

22      A    Over 30 years, yes.

23      Q    To your knowledge, have the Debtors ever had a

May 19 hrg transcript re JEA

24    dispute with JEA or a default in their billing?

25         A    I'm not aware of any unresolved disputes.


                                                              21

1         Q    And what is your understanding of the average

2    monthly bill that Winn-Dixie pays on a timely basis to JEA?

3         A    According to our records, it is approximately

4    570,000 per month.

5         Q    If the Debtors were required to place a security

6    deposit with all the existing utilities that it has and the

7    terms of two months of payments, how much total would that

8    be?

9         A    That would be approximately $32 million.

10        Q    In your capacity as the chief accounting officer,

11   you're responsible for overseeing the Debtors' books and

12   records?

13        A    That's correct.

14        Q    And for preparing the Debtors' monthly operating

15   reports?

16        A    Yes.

17        Q    Including its Form 8Ks and 10Ks following the

18   Security and Exchange Commission?

19        A    Yes.

20        Q    What is the status currently of the Debtors'

21   ability to pay their debts as they come due, its liquidity?

22        A    The current status of our borrowing availability is

23   the last publicly filed document, 10Q, showing in excess

24   availability of $424 million under the credit facility.

25        Q    Are the Debtors at a better credit risk now than


                                                              22

May 19 hrg transcript re JEA
1   they were prepetition?

2       A    Yes, we have more borrowing capacity now than we

3   did then.

4       Q    Based upon the circumstances of your current -- of

5   the Debtors' current 12-week forecast, do the Debtors have

6   sufficient liquidity or maintain normal operations during the

7   bankruptcy proceedings?

8       A    Yes, our borrowing availability is essentially

9   unchanged during our current 12-week forecast, which ends in

10  July.  Assuming that the -- that the conditions are

11  essentially unchanged, then that would be correct.

12      Q    Can you tell us what -- tell the Court, please,

13  what the Debtors' net worth is according to its most recently

14  filed public report?

15      A    As of April 6th, that would be $344 million.

16      Q    Under the approximately 799 utilities, how many

17  utilities objected to the relief requested by this motion?

18      A    I believe that was 12.

19      Q    And how many of those approximately 800 utilities

20  had -- prepetition had bonds or deposits?

21      A    I believe we had approximately 63 separate

22  utilities with assurety bonds and approximately 175 with cash

23  deposits.

24      Q    And break down that 175 for us, if you would.

25      A    A hundred and seventy of those totaled $300,000.


                                                        23

1       Q    For all 170?

2       A    Yes.  The remaining five was approximately $13.8 of

3   the 14 total deposits.

4       Q    If the debtors had to post a two-months' security

5   deposit with each of its utilities to the tune of $32 or $33

May 19 hrg transcript re JEA

6    million, what effect would that have on the Debtors' ability

7    to reorganize?

8        A    That would impair our ability.

9        Q    If the utility's motion that we're before the Court

10    today were granted over the JEA's objection, would the JEA

11    still be able to come to court and request a deposit if the

12    Debtors' circumstances changed?

13        A    Yes.

14        Q    If the Debtors' circumstances did change, how would

15    a utility company be able to determine that?

16        A    We file a monthly operating report with the U.S.

17    Trustee's Office.  And in that report, we disclose the excess

18    availability under the DIP credit facility, as well as an

19    income statement, balance sheet and cash flow statement.

20        Q    And how is that information accessible by anybody

21    who wants to see it?

22        A    It is posted to the Logan web site, and it is also

23    posted on the sec.gov web site as we filed as an 8K item.

24            MR. BUSEY:  No further questions, Your Honor.

25            THE COURT:  Cross-examination, Mr. Thames?


                                                        24

1            MR. THAMES:  Yes, sir.

2                        CROSS-EXAMINATION

3    BY MR. THAMES:

4        Q.    Mr. Byrum, you say that Winn-Dixie was current with

5    its utility company's prepetition.  You're not contesting the

6    fact, are you, that Winn-Dixie owes JEA approximately

7    $500,000 for prepetition services, are you?

8        A    I'm not contesting the fact that there's a

9    prepetition amount owing, yes.

May 19 hrg transcript re JEA

10      Q       Has Winn-Dixie agreed to post a postpetition

11   security deposit with any utilities?

12      A       Not that I'm aware.

13      Q       Have you offered to post a postpetition security

14   deposit within the utility?

15      A       Not that I'm aware.

16      Q       You stated that if you were forced to post a

17   two-month security deposit for all your utility accounts,

18   that that would total somewhere around $30 million; is that

19   correct?

20      A       Yes.

21      Q       Did you disclose that potential liability in your

22   quarterly reports filed with the Security and Exchange

23   Commission?

24      A       No, that would not raise itself to the level of a

25   disclosure item.


25

1       Q       You have filed, have you not, a motion to allow you

2    to compromise security deposit claims without, you know,

3    without coming to the Court for authority in advance,

4    correct?

5       A       I don't understand the question.

6       Q       Are you familiar with the motion which was heard

7    earlier today which would allow you to comprise security

8    deposit claims with certain utilities?

9       A       No.

10      Q       Let's talk for a moment about your postpetition

11   financing arrangement.  How much is Winn-Dixie permitted to

12   borrow under that arrangement?

13      A       As of the latest filed document in the 10Q, our

14   excess availability was 424 million.  We must maintain a

May 19 hrg transcript re JEA

15    minimum of $100 million availability.  So it's -- we're able

16    to borrow 324 million.

17         Q    So then how large in total is the credit facility?

18         A    It's a $800 million facility.

19         Q    And I presume that loan is secured, correct?

20         A    Yes.

21         Q    And does the security interest extend to deposits

22    held with utility companies?

23         A    I don't believe so.

24         Q    Do you anticipate having to borrow the full $800

25    million under your credit facility?


                                                                   26

1          A    I can't answer that.

2          Q    Did you have, prior to entering into the financing

3     arrangement, did you have discussions with your lender about

4     the possibility that you might have to post security deposits

5     with your utility suppliers?

6          A    I was not involved in any discussions like that.

7          Q    Over the last year, has Winn-Dixie closed some of

8     its unprofitable stores?

9          A    Yes.

10         Q    Approximately how many stores have you shut down?

11         A    Last year we announced plans to close 156

12    unprofitable stores.  Our stores outside areas we were to be

13    in, we closed all but I believe two of those.

14         Q    And what were Winn-Dixie's profits or losses for

15    2004?

16         A    I don't have that information with me.

17         Q    If you would, let's please turn to Exhibit 13,

18    which is the quarterly Form 10Q filed with the Security and

May 19 hrg transcript re JEA
19    Exchange Commission.  If you would, please turn to Page 7 of

20    that document.

21            MS. JACKSON:  Your Honor, can I hand this to the

22        witness?

23            THE COURT:  He doesn't have one up there?

24            MR. THAMES:  He does.

25    BY MR. THAMES:


                                                            27

1        Q    It's Exhibit 13.  If you would, reflect to us

2    the -- tell the Court that the cash flow from operating

3    activities was for the 40-week period ending April 6, 2005.

4        A    The cash used in operating activities was $94

5    million.

6        Q    If you would, go to the top of the page and tell us

7    what your net loss from cash flow from operating expenses was

8    for the period ending -- 40-week period ending April 6th,

9    2005.

10       A    Five hundred and sixty-six million.

11       Q    Loss, correct?

12       A    Yes.

13       Q    If you would now, turn to Exhibit 6, which is

14    your -- the initial monthly report filed in this case.  And

15    I'm going to ask you to turn to the -- yes, it is the fourth

16    page in.  And if you would, tell the Court what was

17    Winn-Dixie's loss from continuing operations before income

18    tax and reorganization items for the 16-day period ending

19    March 9, 2005.

20       A    Loss of continuing operations for income tax and

21    reorganization items for 16 days, 70.6 million.

22       Q    And if you would flip back one-page, what were

23    your -- the accounts payable at the end of the 16-day period

May 19 hrg transcript re JEA

24    ending March 9, 2005?

25         A     Sixty-eight million.


28

1         Q     And what were your total current liabilities for

2    the 16-day period ending March 9, 2005?

3         A     As of March 9th it was $1.1 million -- billion

4    dollars, rather.

5         Q     But that's on that total current liabilities.

6         A     Excuse me.  Total current liabilities as of

7    March 9th, $333 million.

8         Q     And what was the total shareholders' equity at the

9    end of March 9, 2005?

10         A     Total shareholders' equity as of March 9th, was

11    $427 million.

12         Q     All right.  Let's now go to the next monthly report

13    which is under Tab 7.  And if you would, turn four pages into

14    that document and tell us what your operating income or loss

15    was before reorganization items and income taxes for the

16    four-week period ending April 6th, 2005.

17         A     The loss before reorganization items and income

18    taxes for the four-week period was $81 million.

19         Q     Now, if you will flip back one page, please, to the

20    balance sheet.  What was your accounts payable at the end of

21    the period dated -- four-week period, dated April 6, 2005?

22         A     One hundred thirteen million.

23         Q     And what were your total current liabilities for

24    the four-week period ending April 6, 2005?

25         A     Three hundred ninety-two million.


29

May 19 hrg transcript re JEA

1     Q    If you'll drop down, please, what was your total

2   shareholders' equity at the end of the four-week period,

3   ending April 6, 2005?

4     A    Three hundred forty-three million.

5     Q    So when at this four-week period then,

6   shareholders' equity declined by over $85 million, correct?

7     A    Yes.

8     Q    Now, is there -- if you would, turn to -- there are

9   page numbers at the bottom of the report.  If you would,

10   please, turn to Page Seven of Exhibit Number 7.  Does this

11   reflect the amount of available credit under your DIP

12   financing arrangement?

13     A    The 424 million, it is subject to a $100 million

14   minimum.  So it's 324 million that would be available to

15   borrow.

16     Q    So then Winn-Dixie would have the ability then to

17   borrow the money to post a security deposit with JEA,

18   correct?

19     A    The amount available would exceed the total amount,

20   yes, the amount of the deposit.

21     Q    You have $424 million as available credit,

22   correct -- well, $324 million as available credit, correct?

23     A    Yes.

24     Q    And you could borrow against that --

25     A    Yes.

30

1     Q    -- to post a two-months' security deposit with JEA,

2   correct?

3     A    Yes.

4     Q    Incidentally, does the credit facility contemplate

5   or include a super priority lien in favor of Wachovia for any

May 19 hrg transcript re JEA

6      unreimbursed postpetition advances?

7           A    I don't recall.

8           Q    Does the credit facility contain a carve out which

9      would allow for the payment of professional fees in

10     connection with this Chapter 11 case?

11          A    I believe so, yes.

12          Q    If you believe that Winn-Dixie is able to pay its

13     debts such as its utility bills in the ordinary course of

14     business, why was a carve out for professional fees to

15     professionals armed with insider knowledge necessary?

16          A    I wasn't involved in those negotiations.

17          Q    Based on the losses which JEA -- excuse me, which

18     Winn-Dixie is continuing to suffer, can it survive as a going

19     concern without borrowing under that DIP credit facility?

20          A    Well, the losses are substantially noncash and

21     would not have an impact on the ability to pay its bills.

22          Q    But do you need the credit facility to remain in

23     business?

24          A    Yes.

25          Q    And does Wachovia hold a blanket lien on all of

31

1      Winn-Dixie's assets?

2           A    Yes.

3           Q    And does Winn-Dixie have other sources of funds

4      outside of Wachovia's collateral base to pay its postpetition

5      bills?

6           A    Not other than operating funds, operating

7      activities.

8           Q    And the cash and receivables generated from

9      operating activities are subject to Wachovia's lien, correct?

May 19 hrg transcript re JEA
```
10      A    I believe so.
11      Q    And if Wachovia were to declare a default under its
12  credit facility, how then would you pay JEA?
13      A    Could you repeat the question?  I'm not sure I
14  understand.
15      Q    If Wachovia were to declare a default under the
16  credit facility and terminate your ability to utilize the
17  cash collateral to pay bills in the ordinary course of
18  business, how would Winn-Dixie pay JEA?
19      A    To the extent that the loans and unless the credit
20  outstanding are satisfied then, they would be paid from the
21  operating funds.
22      Q    After the liquidation of your assets?
23      A    Yes.
24           MR. THAMES:  No further questions, Your Honor.
25           THE COURT:  Redirect?
```

32
```
                    REDIRECT EXAMINATION
1
2   BY MR. BUSEY:
3       Q    Mr. Byrum, Winn-Dixie has a current 12-week
4   forecast?
5       A    That's correct.
6       Q    And what's that period?
7       A    It's done every four weeks, the last one completed
8   covers the May, June and July.
9       Q    What does that forecast for that period show in
10  terms of operations?
11      A    It shows that our borrowing availability at the
12  beginning of that period is essentially the same as it is at
13  the end.
14      Q    Essentially break even?
```
Page 27

May 19 hrg transcript re JEA

15     A     Yes.

16           MR. BUSEY:  No further questions, Your Honor.

17           THE COURT:  Thank you very much, sir.  You may step

18     down.

19           MR. THAMES:  Your Honor, I have a question based on

20     that testimony.

21                         RECROSS-EXAMINATION

22     BY MR. THAMES:

23     Q     Mr. Byrum, did Winn-Dixie meet its expectations for

24     its business plan for 2004 or the loss is greater than

25     anticipated?

33

1      A     Losses are greater than anticipated.

2            MR. THAMES:  Thank you.  No further questions.

3            THE COURT:  Thank you very much, sir.

4                            (Witness excused.)

5            THE COURT:  Additional evidence, Mr. Busey?

6            MR. BUSEY:  No, Your Honor.

7            THE COURT:  Rebuttal evidence, Mr. Thames?

8            MR. THAMES:  None, Your Honor.

9            MR. BUSEY:  Your Honor, you look like you're

10     thinking.  And if you are, I'd like to address the Court

11     in terms of argument.

12           THE COURT:  Well, I'm thinking about whether I

13     should have you submit it in writing or listen to you

14     articulate your arguments.  But I'll let you articulate.

15     I think Mr. Thames should go first and you respond to

16     him.

17           MR. BUSEY:  That will be fine, Your Honor.  I

18     think you ought to limit us to about ten minutes per

                    May 19 hrg transcript re JEA
19      side.
20          THE COURT:   That's pretty generous.   Do you think
21      you need that much time?
22          MR. THAMES:   I don't need that.   Mr. Busey might.
23          Your Honor, JEA is at risk no matter how you look
24      at it.   But from the time we render services to when
25      there is an indication of default, 57 days have expired.


                                                            34
1       You then go another ten days or so in what we call the
2       resolution period.   You then, if there is no resolution
3       and you begin the process of terminating services,
4       it takes another ten days, two weeks of time to
5       logistically accomplish that.
6           So we are now at 57 days.   You have the normal
7       ten-day resolution process.   You're now at 67 days and
8       you have another ten days for logistical issues.   You're
9       at the 75-day at-risk time period.   And that's -- it's
10      assuming JEA -- I mean, Winn-Dixie was a normal
11      customer.
12          It is unique.   It is a -- because it has a lot of
13      perishable commodities, that 10-day resolution period is
14      probably going to be extended.   In all practicalities,
15      you're looking at 90 days of exposure before we can pull
16      the plug.   This is -- Winn-Dixie is the JEA's second
17      largest customer.   The potential loss is huge.   It can't
18      be understated.   I know you think JEA is a huge
19      conglomerate, but it has its expenses too.   It has bond
20      ratings and bond expenses that are tied to its credit
21      policies.
22          THE COURT:   You're getting away from the evidence.
23      Just argue the facts that I've listened to in the
                        Page 29

May 19 hrg transcript re JEA

24          hearing.
25               MR. THAMES:   Okay.  Well, I think what we've

                                                         35

1          established is that we're at risk for a 90-day time
2          period.  If you look at the DIP credit facility, it
3          covers everything.   There's not really a cash
4          alternative to pay us, no other form of security.
5               The debtor has suffered $566 million in losses for
6          40 weeks last year.  It has suffered $85 million decline
7          in shareholder value in just 27 days.  At the rate it's
8          going, it will be upside down in no time, five months.
9               Section 366 of the Code says that Court is to
10         fix a deposit requirement or some other security.
11         The code does not say that, you know, an administrative
12         expense is sufficient.  It wouldn't be sufficient in
13         this instance.  We need a postpetition deposit.  Forget
14         all the prior history.  Winn-Dixie is a different animal
15         now.
16              It's losing a lot of money.  It's a debtor in
17         possession.   The financing arrangement has changed.
18         There's a carve out for professionals contained in the
19         document.   It shows that even those professionals
20         felt themselves at risk and had to protect themselves.
21         Those people are armed with insider knowledge.
22              I think -- and you can't make -- you shouldn't
23         rely -- make your decision based on what other
24         utilities may or may not have done.  That's just rank
25         speculation whether they objected to this motion or not.

                                                         36

May 19 hrg transcript re JEA

1     You've had the evidence before you is that JEA is at

2     serious risk.   The 75-day deposit, based on the evidence

3     presented today, would be justified.   We're asking for

4     something less than that.

5          This is a big hit for the JEA to absorb.   The

6     debtor has the availability under its credit facility.

7     You know that that's part of their -- they know going

8     into this Chapter 11, that they have to meet the

9     requirements of 366(b) and that they're at risk for

10    having to post these type deposits.

11         The Code says deposit or other security.   We have

12    none.   The appropriate amount you've heard -- Judge

13    Proctor has an old decision, Stage Coach Enterprises,

14    says two-month security in a deposit is appropriate.   I

15    think just to state that as a blanket.   The statement

16    is probably not appropriate.   You need to weigh the

17    evidence.   But I think under these cases, under the

18    evidence that's before you today, the two-month security

19    deposit is appropriate.   And we'd ask that you do that

20    to protect the JEA.   We are an involuntary lender to the

21    debtor at the tune of $570,000 per month.

22         Thank you.

23         THE COURT:   Mr. Busey?

24         MR. BUSEY:   Thank you, Your Honor.   There are some

25    4- or 500 utilities out there who do not have

37

1     prepetition bonds or deposits who have not objected to

2     this motion.   What the motion does -- and I wanted to

3     state the terms of the motion -- is it establishes a

4     procedure.   It asks for the Court to enter an order

5     that says that continues the protection of Section 363

May 19 hrg transcript re JEA

6       of the Bankruptcy Code, that a utility company has to

7       continue to provide services because it's a monopoly

8       postpetition for at least 20 days.  And then after that

9       time, the utility can request adequate assurance in the

10      form of a bond or other deposit, it can request

11      adequate assurance in the form of a bond or other

12      deposit.

13          And what the motion does, it says it's going to --

14      and Judge Drain entered the order, on an interim basis,

15      the consent as to JEA, which was the objecting utility.

16      And I think I said earlier there are 12 objecting

17      utilities.  We've reached agreement with five of them.

18      We're talking to seven of them.  This is the one utility

19      that doesn't want to talk anymore.

20          And what order does -- and what the motion does --

21      or what the order does, it says that this 366 protection

22      is continued, that procedures established where any

23      utility which deems itself insecure or wants adequate

24      protection, can request adequate protection of the

25      debtors.  And once the request is made by the utility

38

1       for adequate protection, adequate assurances, the

2       Debtors can talk to the utility.  And if the Debtors

3       cannot reach an agreement with the utility within 60

4       days, then the Debtors have to bring the request to the

5       Court for resolution.  That's the procedure that's

6       established and was satisfactory to 4- or 500 utilities

7       who do not have deposits or bonds.

8           What this objection does is short circuits that

9       motion and presents to the Court today the request to

May 19 hrg transcript re JEA
10        the JEA for a two-month deposit for a million dollars is

11        what they're looking for.

12             I think it's -- I'm going to look for a minute at

13        the law under 366(b) the -- past the 20-day period of

14        time:   A utility can refuse to provide protection that

15        needs adequate assurances and is not provided to it in

16        the form of a deposit or other security.   There's case

17        law out that discusses that.   What does that mean,

18        deposit or other security?

19             And you'll find lower court cases on both sides of

20        that issue as to whether or not it is to be taken

21        literally in terms of a deposit or a security if

22        necessary after 20 days or whether a Bankruptcy Court

23        may in its discretion determine, based on the evidence,

24        that a utility is adequately assured by reason of the

25        circumstance of the prepetition history and postpetition

                                                          39

1        history and the liquidity of the debtor.

2             The Seminole case on this issue -- and there are

3        only circuit court authority we have that's directly on

4        point that addresses the issue -- is the Caldor

5        decision of a Second Circuit Court of Appeal in

6        New York in 1997, which squarely addressed this issue.

7        Caldor was a retail chain, and Caldor had a presence,

8        according to the second circuit across the entire

9        eastern coast, they had some -- I don't know how many

10        stores, but they had relations with 400 utilities.   And

11        Caldor asked that the 20-day stay period for adequate

12        assurance postpetition be continued until the plan of

13        reorganization is continued without posting any deposit

14        or bond with any of the utility companies.   And there's

May 19 hrg transcript re JEA

15          a handful of its 400 utilities which objected.

16              And the Bankruptcy Court determined in its ruling

17          that because of the showing by Caldor that it had

18          timely paid all its utility bills postpetition and was

19          timely paying all of its utility bills -- excuse me --

20          that it timely paid all its utility bills prepetition

21          and was timely paying all its utilities postpetition and

22          because it had a $250 million postpetition financing

23          DIP loan, that the utilities were deemed adequately

24          assured that they'll be paid on those facts and on the

25          fact that if there were any change of circumstances,

                                                        40

1           the utilities could promptly under the Court and

2           renew a request for adequate assurance.

3               That decision, by the Bankruptcy Court in the

4           Southern District, went to the district court.  The

5           district court had a little different bent on it.  They

6           said:  Well, the security -- the deposit or the security

7           is to be taken literally.  But the second sentence of

8           366(b) which says upon the request of any part and

9           interest, the Court can reconsider that requirement and

10          reduce it.

11              And so based upon that reasoning, the United States

12          District Court for the Southern District said on that:

13          We don't think any deposit is required based upon

14          the evidentiary record that Caldor was current

15          prepetition, current postpetition and had plenty of

16          liquidity that's affected by a $250 million postpetition

17          line of credit.

18              That decision went to the Circuit Court of Appeal.

May 19 hrg transcript re JEA

19     And the circuit court said they didn't need to give off

20     on whether or not the adequate assurance record there

21     satisfied the requirement of other security.  The fact

22     is that they -- that the utility would have a 507

23     priority lien under Section 507, that they weren't going

24     to decide whether that literally satisfied the

25     requirements of Section 366(b) but that they would rely

41

1      on the language, the second sentence of 366(b), which

2      says:  Upon request of any party and interest the Court

3      could revisit it.  And based upon that, the Court didn't

4      think was any error by either the Bankruptcy Court

5      or the district court in not requiring any deposit or a

6      security for the objection utilities.

7          And I want to read a little bit of the language out

8      of that decision just because I think it's persuasive

9      to the Court.  This is out of the Caldor decision.

10     It's reported at 117 F.3d at 646.  And I'm reading

11     from Page 650:

12         (Reads as follows:  Even assuming that other

13     security should be interpreted narrowly, we agree with

14     the appellees -- that's Caldor -- that a Bankruptcy

15     Court's authority to modify the level of deposit or

16     other security, provided under the 366(b), includes the

17     power to require no deposit or other security.  And none

18     is necessary to provide a utility supplier with adequate

19     assurance of payment.)

20         And the Court went on to say:  The Bankruptcy

21     Courts are properly afforded significant discretion in

22     the exercise of their duties.  We have observed that in

23     bankruptcy proceedings, substance should not give way to

May 19 hrg transcript re JEA

24          form, and a bankruptcy judge must not be shackled with
25          unnecessary rigid rules when exercising the undoubtedly

42

1          broad administrative power granted him under the
2          Bankruptcy Code.
3               In deciding what constitutes adequate assurance in
4          a given case, a Bankruptcy Court must focus on the need
5          of the utility for assurance and to require more -- and
6          to acquire that the debtor supply no more than that,
7          since the debtor almost perforce has conflicting need to
8          conserve scarce financial resources.   Accordingly,
9          Bankruptcy Courts must be afforded reasonable discretion
10         in determining what constitutes adequate assurance of
11         payment for continuing utility services.
12              On the record before you, Your Honor, it's the same
13         or better than in that decision in Caldor.   We have
14         800 utilities.   All of whom could, under the utility
15         order, come in because of the -- if this request were
16         granted and asked the Court to revisit granting them
17         security deposits and the consequence of that if carried
18         to its fullest extreme, the evidence shows it would be
19         $32 million out of the liquidity of this debtor.
20              Given the prepetition payment on a timely basis,
21         even when the operations were losing more money and the
22         numbers that Mr. Thames were giving you were prepetition
23         numbers, what's the current operations of the Debtor,
24         which you heard from the witness, is that for a 12-week
25         period, that is for three months now, their projections

43

May 19 hrg transcript re JEA

1    are they'll break even.  That is that their borrowing

2    capacity at the end of the three months will be the same

3    as it was at the beginning of the three months.

4        Obviously, the situation is stabilized because the

5    company has filed bankruptcy.  As Mr. Byrum says, the

6    company is now at better credit risk than it was

7    prepetition.  And by the granting of this motion and

8    under the operation of the Bankruptcy Code, JEA will

9    have administrative priority expense for the

10   postpetition services that it provides.

11       Because the evidence is that the current operations

12   are okay and because there's plenty of liquidity and

13   because the company is timely paying all of its bills

14   within 16 or 17 days or less, we ask this Court to

15   determine that the JEA is presently, on this evidence,

16   adequately secured.  And under the terms of the order

17   that we had asked the Court to enter, if that

18   circumstance were to changed and since they're currently

19   breaking even for three months, it would take a long

20   time to go through $300 million.  If that circumstance

21   was changed, then JEA has the ability to promptly come

22   into this Court under the terms of the order and revisit

23   the issue.

24       But as we stand now, based on the evidence,

25   utilities adequately assured and on the authority of

44

1    Caldor, a Circuit Court of Appeal decision, we ask the

2    Court to overrule the this objection.

3        THE COURT:  Mr. Thames?

4        MR. THAMES:  Thank you.  You'll have to forgive

5    Mr. Busey.  He may not be familiar with the fact that

May 19 hrg transcript re JEA

6       we have -- I personally have written at least three
7       letters to the New York counsel in attempts to resolve
8       this.  When he says that we don't want to talk, that was
9       not correct.

10          The Caldor decision was not faced with the losses
11      that we are faced here today.  You saw the monthly
12      operating reports reflect the performance of the Debtor
13      postpetition.  During the first 16 days of the case
14      there was a $7.6 million loss.  During the next 27 days,
15      there was an $81 million loss.  The Debtors' forecasting
16      suspect, you heard the witness testify they didn't
17      meet their projections before.

18          There's no circuit authority within the Eleventh
19      Circuit.  But if you look at all the cases that have
20      addressed this, they generally fall at the two-months'
21      security deposit requirement.  They've considered the
22      arguments that Mr. Busey has advanced.  But they
23      recognize it's not -- it is money set on deposit.  It is
24      money that they are current.  It protects JEA.  It
25      protects them but, you know, at some point in the

45

1       future, as Mr. Busey correctly articulated, if they can
2       establish an adequate payment history, then they could
3       come and request a reduction of that deposit.  And we'll
4       see about how they're doing at that point.

5          Right now the evidence is we are exposed for the
6       greater portion of 75 days.  We have no postpetition
7       payment history within which to judge whether or not
8       just letting it go forward, you know, without a security
9       deposit would be appropriate.  I don't think Section 366

May 19 hrg transcript re JEA

10      permits you to just to not require the posting of the
11      security -- some sort of security that has value or some
12      sort of security deposit.
13          This administrative lien, given the postpetition
14      financing arrangement is -- you know how those
15      workout -- there's no value that has been shown by the
16      debtor of giving just simply allowing us an
17      administrative expense claim.  We already have that.  We
18      need something within the contemplation of Section
19      366(b), which is a deposit or some other form of
20      tangible security, not just what we already have or
21      congress would not have even needed to put that
22      provision in the code if we were just to get an
23      administrative expense; because, obviously, utility
24      service is an actual necessary cost of doing business in
25      a Chapter 11 case.

46

1          So, again, the evidence, documentary evidence of
2       the losses, postpetition losses, prepetition losses,
3       failure to meet the business forecast of last year as
4       reflected in the quarterly reports.  They still
5       recognize the competitive influences that are driving
6       some of these losses are still present.  There's been no
7       testimony that those have changed.
8          What the debtor is proposing is adequate assurance
9       of future performance is not adequate.  Two-months'
10      security deposit please.  Thank you.
11          THE COURT:  You're welcome.
12          Anything further, Mr. Busey or do you think you
13      said it all?
14          MR. BUSEY:  I said enough, Your Honor.

May 19 hrg transcript re JEA

15          THE COURT:   The Court finds that Winn-Dixie has not
16     posted any kind of security deposit or bond as provided
17     by the Bankruptcy Code.   The Court further finds that
18     Winn-Dixie has paid its bills current or on a current
19     basis historically through the date of the petition and
20     subsequently thereto.   Apparently, there was an in
21     between time, so there is a prepetition debt but it
22     wasn't overdue.
23          The most time that they're out is about 45 to 47
24     days.   JEA is a monopoly.   JEA, given the three or four
25     years that we've known Winn-Dixie has been having

                                                        47

1     trouble, had to call them and say put up a deposit or
2     we're going to shut off your power, they never did.   I
3     don't see where putting up a deposit at this point is
4     going to provide any -- well obviously provides
5     security, but I think it's not in the best interest of
6     the estate to do it at this point as long as the bills
7     are being paid within the time periods prior to any late
8     charges being paid.
9          Fortunately, you guys have brought this case down
10     here in Jacksonville where you have the JEA people and
11     the Winn-Dixie people.   And I can be here at 8:00 one
12     morning on a short notice if there's a problem and you
13     need to get a quick order to turn off all the power.
14          I can't imagine, as a practical matter, the secured
15     creditor allowing that happen, because a good deal of
16     its collateral would be -- would perish if the power was
17     turned off.   So in my personal experience as a trustee,
18     I've had security -- I mean mortgage companies come in
                         Page 40

May 19 hrg transcript re JEA

19    and provide for guard service and pay the electric bill

20    so I could liquidate.  So I don't anticipate that really

21    being a problem.

22        That being said, the Court respectfully overrules

23    the objection without prejudice to raise or file

24    whatever motions you deem are appropriate.  I would ask

25    that Mr. Busey prepare the appropriate order.

48

1        MR. BUSEY:  We have, Your Honor.

2        THE COURT:  Including -- well, does that include

3    findings in case Mr. Thames wants to take this up or are

4    you just going to allow findings I just stated on the

5    record?

6        MR. BUSEY:  The order we prepared does not include

7    findings.  It's simply -- it was an overrule of

8    objection.  We will submit it -- we have a copy for

9    Mr. Thames.

10       THE COURT:  I think that will be fine.

11       Thank you very much.  I think the hearings are

12    concluded.

13       MR. BUSEY:  Thank you, Your Honor.

14       (Whereupon, at 3:19 p.m., on Thursday, May 19,

15    2005, the hearing in the above-entitled matter was

16    concluded.)

17                  - - -

18

19

20

21

22

23

May 19 hrg transcript re JEA

24

25

49

1                    C E R T I F I C A T E

2

3    STATE OF FLORIDA )

4    COUNTY OF DUVAL  )

5        I, Loretta D. McDonald, Professional Court Reporter, do

6    hereby certify that the attached material represents the

7    original records of proceedings before the United States

8    Bankruptcy Court, Middle District of Florida, Jacksonville

9    Division, before the Honorable Jerry A. Funk, United States

10   Bankruptcy Judge, in the matter of WINN-DIXIE STORES, INC.,

11   ET AL.; such Record is an accurate and complete recordation

12   of the proceedings which took place.  A transcript of this

13   Record has been produced on May 26, 2005, the original of

14   which was delivered to the Transcript Copy Custodian,

15   Jacksonville, Florida.

16

17                          STATEWIDE REPORTING SERVICE

18

19                          _____

20                              LORETTA D. MCDONALD

21

22

23

24

25