1

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION


IN RE:

WINN-DIXIE STORES, INC.,          CASE NO.: 05-03817-3F1

　　　　　　Debtor.
_____/



## TRANSCRIPT OF PROCEEDINGS



　　　　Hearing re: Motion for Order Deeming Utilities Adequately Assured, before the Honorable Jerry A. Funk, U. S. Bankruptcy Judge, commencing at approximately 2:10 p.m., on Thursday, June 2, 2005, at the United States Courthouse, Room 4-D, 300 North Hogan Street, Jacksonville, Florida, as reported by Cindy Danese, Notary Public in and for the State of Florida at Large.


- - -

**STATEWIDE REPORTING SERVICE**
606 BLACKSTONE BUILDING
JACKSONVILLE, FLORIDA 32202
(904) 353-7706                249-9952
EXPERTS IN MEDICAL, TECHNICAL & EXPEDITED TRANSCRIPTS


RED STAMP INDICATES
CERTIFIED
COPY

A P P E A R A N C E S


STEPHEN D. BUSEY, ESQUIRE

     Attorneys for Debtors.



RUSSELL JOHNSON, ESQUIRE

     Attorney for American Electric Power, Duke
     Power and Orlando Utilities Commission.


                    -   -   -

3

# T A B L E   O F   C O N T E N T S

PAGE

**LESTER THERRELL**

      Direct Examination
          by Mr. Johnson          10

      Cross-Examination
          by Mr. Busey          19

**SHARON BERRY**

      Direct Examination
          by Mr. Johnson          20

**JASON ROY**

      Direct Examination
          by Mr. Busey          26

      Cross-Examination
          by Mr. Johnson          28

**HOLLY FELDER ETLIN**

      Direct Examination
          by Mr. Busey          31

      Cross-Examination
          by Mr. Johnson          47

      Redirect Examination
          by Mr. Busey          60

- -

# E X H I B I T S

Utilities' Exhibit 1          16

Utilities' Exhibit 2          24

4

1                P R O C E E D I N G S

2    June 2, 2005                        2:10 p.m.

3                        - - -

4         THE COURT:  We'll take the motion for order

5    deeming utilities adequately assured.

6         MR. BUSEY:  Your Honor, by this motion which

7    has been granted as to nonobjecting utilities,

8    you recall that we did this two weeks ago, and

9    it's been granted as to all nonobjecting

10   utilities.  There were approximately 12 utilities

11   that objected to the order.  We've reached

12   resolutions with a number of those.

13        We heard the objection two weeks ago of the

14   Jacksonville Electric Authority.  The objections

15   that are being heard today are the objections of

16   American Electric Power, Duke Power and the

17   Orlando Utilities Commission.

18        As we did with the Jacksonville Electric

19   Authority, I think it would be appropriate to let

20   the objectors proceed first.

21        THE COURT:  Very well.

22        You're going to be representing the

23   objectors?

24        MR. JOHNSON:  Yes, Your Honor.

25        Your Honor, Russell Johnson here on behalf

1    of the three objecting utilities.

2    Initially the objection was filed by six

3    utilities and was joined by the City of Ocala,

4    Florida.  As debtors' counsel correctly noted,

5    Virginia Electric Power doing business as

6    Dominion Virginia Power and Dominion North

7    Carolina Power, Progress Energy Carolinas,

8    Progress Energy Florida, Tampa Electric Company

9    and the City of Ocala, Florida have all reached

10   settlements with the debtors under which they're

11   going to get a one-month deposit and satisfaction

12   of their prepetition debt.  So those utilities

13   are not here before the Court today, Your Honor,

14   just American Electric Power, Duke Power and

15   Orlando Utilities Commission.

16   Your Honor, the three utilities before the

17   Court had modified their request to the debtors'

18   counsel from the objection because of closed

19   stores, and also had reduced the request to a

20   one-month deposit to the debtors' counsel.

21   Those amounts would be:  For American

22   Electric Power, $14,207; Duke Power, $658,505,

23   which interestingly is less than their

24   prepetition loss of $712,000.  As far as the

25   Orlando Utilities Commission, their one-month

1    deposit would be $230,000, which is also less

2    than their prepetition loss of $362,000.

3         Your Honor, the grand total of that one-

4    month deposit amount, the modified request, is

5    $902,712, a fairly insignificant sum in this case

6    particularly considering the massive amounts of

7    money that the debtors are proposing to pay under

8    their key employee retention plan and their

9    severance plan that they recently filed this

10   week.

11        Your Honor, I was not here for the May 19th

12   hearing because of surgery to my leg, but I do

13   have a transcript for the hearing and I'd like to

14   make sure that I accurately understand the

15   Court's ruling from that hearing from the

16   transcript.

17        As I understood the Court's ruling from that

18   hearing, the Court found that, based on testimony

19   from the debtors, that the debtors have not

20   posted any kind of security deposit or bond

21   postpetition, which, as we just mentioned, is not

22   correct, at least as to my four clients, my four

23   clients that have settled.

24        And I don't believe that's the case with

25   respect to Alabama Power Company or Florida Power

1    & Light Company, also objecting utilities that,

2    it's my understanding from the agenda, have

3    settled as well.

4        The Court found that the debtors paid their

5    bills to JEA on time.  That won't be the

6    testimony from my two witnesses from Duke Power

7    and Orlando Utilities Commission, so we'll deal

8    with that during testimony.

9        JEA, knowing the debtors' financial

10   situation over the past several years, did not

11   require the debtors to post security.  There will

12   be testimony from Duke Power about a different

13   fact situation to that that we'd like to

14   address.

15       Your Honor also noted that posting a

16   deposit, in its decision, that was not in the

17   best interest of the estate at this time.

18       It was unclear from the transcript as to

19   what that was based upon.  The best that I could

20   recollect was there was a statement by the

21   debtors' witness that, if it had to pay deposits

22   to all 800 of the utilities, it would be $32

23   million.  Well, I'll get to that in a second,

24   because I think that's a somewhat inaccurate

25   statement.

1    The JEA, being based in Jacksonville, would

2    be available for prompt hearings if they needed

3    to get some, get immediate relief.

4    And, lastly, the Court stated that it was

5    unlikely that the secured creditor would allow

6    the lights to go out at these stores because of

7    the perishable nature of the inventory.

8    Your Honor, with respect to the $32-million

9    argument that if they had to pay all 800

10   utilities adequate assurance, I think the

11   pleadings in the record show that they have

12   already settled with utilities that had requested

13   $14 million worth of deposits.  So I don't think

14   it's true to say that they'd have to pay 32

15   because they've already settled with utilities,

16   according to the objections filed in this case,

17   that would have requested $14 million worth of

18   deposits.

19   No other utilities other than the three here

20   today, and BellSouth who apparently has continued

21   their objection, have brought pleadings before

22   this Court seeking adequate assurance.

23   So, once again, I don't think that slippery

24   slope, if you ordered deposits for these

25   utilities you're going to have to order for

1    everybody else, really applies.

2         With respect to the fact that the secured

3    creditor would step up to pay the bills, Your

4    Honor, that was a statement Your Honor made at

5    the end of the hearing.  There was no evidentiary

6    support for it, and I would state for the record

7    that really the record reflects quite a different

8    situation; that the lender has built in

9    significant protections in their DIP financing

10   for events default that occur to pull the

11   financing if they have to.

12        They have provided for one constituency, the

13   professional fees.  They've given them a $12

14   million carve out.  But there is no carve out for

15   utility expenses, no 506(c) lien.  And with the

16   utilities' billing cycle, even if the lender

17   would agree to pay for a certain period of time,

18   there's an certain billing lag that would expose

19   these utilities.

20        So, Your Honor, I don't think that just on

21   the basis of the initial May 19th ruling that a

22   lot of those bases for those decisions were

23   accurate.

24        As far as the facts specifically as to JEA,

25   I do have two witnesses here, one Lester Therrell

10

1      from Duke Power and a Sharon Berry from Orlando

2      Utilities Commission, to testify.

3             THE COURT:  You ready?

4             MR. JOHNSON:  I am, Your Honor.

5             THE COURT:  Call your first witness.

6             MR. JOHNSON:  Lester Therrell from Duke

7      Power.

8             COURTROOM ADMINISTRATOR:  Please have a seat

9      at the witness stand.

10     WHEREUPON,

11                       **LESTER THERRELL**

12     was called as a witness herein, and having been first

13     duly sworn by the Courtroom Administrator, was

14     examined and testfied as follows:

15            COURTROOM ADMINISTRATOR:  Please state your

16     name --

17            THE WITNESS:  Lester Therrell.

18            COURTROOM ADMINISTRATOR:  State your name

19     and current home or business address, including

20     city and state.

21            THE WITNESS:  Lester Therrell, Charlotte,

22     North Carolina.  Work for Duke Power Company.

23            THE COURT:  You may inquire.

24                      **DIRECT EXAMINATION**

25     BY MR. JOHNSON:

1    Q    Mr. Therrell, who are you employed by?

2    A    Duke Power.

3    Q    And how long have you been employed by Duke

4    Power?

5    A    Twenty-six years.

6    Q    What is your position with Duke Power?

7    A    I'm a supervisor of receivables manager.

8    Q    How long have you been in that position?

9    A    About eight years.

10   Q    In that position, what are your job

11   responsibilities with Duke?

12   A    To work with our nonresidential customers

13   and our bankruptcy customers.

14   Q    In what capacity?

15   A    Basically to review those accounts, look at

16   those accounts, and see if there's any possibility

17   that they may be in arrears or leave us with a debt.

18   Q    In your position, do you have any

19   responsibility for securing customer accounts?

20   A    Yes, I do.

21   Q    Are you familiar with the debtors' accounts

22   with Duke Power?

23   A    Yes, I am.

24   Q    How are you familiar?

25   A    Well, in actuality I've worked with them

1    over the last maybe five to ten years.  I worked with

2    them in a previous position, billing program.  So I

3    know the accounts really well, know the customer

4    really well.

5        Q    And with respect to Duke's relationship with

6    the debtors, is it governed by a contract or --

7        A    Actually, two utilities commission, one in

8    North Carolina and one in South Carolina, actually

9    govern our activities.

10       Q    In what way?

11       A    Basically, they give us -- they tell us how

12   we can go about billing customers, how we can collect

13   arrears and how we can go about disconnecting service

14   if needed.

15       Q    You mentioned that those regulations from

16   those commissions address the billing cycle.  What is

17   the billing cycle that Duke Power has with the

18   debtors?

19       A    Basically, we render a bill every 30 days.

20   The bill rendered is past due -- is due upon receipt

21   if the customer is due upon receipt to pay the bill.

22   It's past due in 15 days.  On the 27th day they're

23   accrued a late charge.

24            At the next billing, if the bill is still

25   not paid, we give a reminder notice.  And on the 45

1    day -- on the 45th day, the account is out for

2    disconnection.

3        Q    So you say 45th day, that's 45 days from the

4    bill date?

5        A    Forty-five days from the date of the bill,

6    correct.

7        Q    So that's a bill for 30 days worth of

8    service 45 days later.

9        A    Correct.

10       Q    Did Duke Power have security on the debtors'

11   prepetition accounts?

12       A    No, we did not.

13       Q    Did Duke request the debtors to post a

14   security before the filing of the petition?

15       A    No.  We actually had a conversation with a

16   -- I believe his name was Derrick Strong with

17   Winn-Dixie on December 8, 2004.  We discussed their

18   financial health and well being at that point in

19   time.  We decided not to go forward with the deposit

20   request at that time.

21       Q    So that was a December 8, 2004 meeting?

22       A    That is correct.

23       Q    And you were involved with that meeting?

24       A    Yes, I was.  Myself, Lori Maltsby and Hal

25   Owen were involved from Duke Power.  Derrick Strong

1    was involved from Winn-Dixie.

2        Q    Anybody else from Winn-Dixie?

3        A    There was, but I don't recall their name.

4        Q    And after that December 4th (sic) meeting,

5    did Duke request the debtors to post security?

6        A    We did not at that time.  However, in mid

7    February we felt like, looking at financials and

8    looking at what had come out recently according to

9    news about Winn-Dixie, we felt like it was in order to

10   go ahead and request security.

11       Q    And when was that?

12       A    That was February 14th.

13       Q    And was that letter sent out?

14       A    The letter was not sent out.  They filed

15   before we could actually get the letter out.

16       Q    Is there an exhibit book over there?  I'd

17   like to show you a document that's at Tab 10.

18            MR. JOHNSON:  Your Honor, do you have an

19       exhibit book as well?

20            THE COURT:  No, but that's all right.  It

21       hasn't been admitted into evidence yet.

22            MR. JOHNSON:  I know, I just --

23            THE COURT:  I may, I don't know.  Did you

24       supply one?

25            MR. JOHNSON:  I believe so.  Debtors'

1        counsel has one as well.

2             THE COURT:  Do you have one?

3             COURTROOM ADMINISTRATOR:  Yes.

4             THE COURT:  We got it.  I'm not going to

5        look at it until it's admitted.

6             MR. JOHNSON:  Understood, Your Honor.

7             THE COURT:  That wouldn't be appropriate.

8   BY MR. JOHNSON:

9        Q    Mr. Therrell, the document at Tab 10, are

10  you familiar with this document?

11       A    Yes, I am.

12       Q    What is it?

13       A    It's a listing of Winn-Dixie accounts, their

14  service address, their prepetition debt they had with

15  us, and the postpetition deposit that we were

16  requesting.

17       Q    Who prepared this chart?

18       A    Gwendolyn Morrison.

19       Q    And who is she?

20       A    She's an employee at Duke Power that works

21  for me.

22       Q    With respect to this chart, what does it

23  provide with respect to the prepetition debt?

24       A    Basically, the prepetition debt is actually

25  what we billed out through the petition date.  We've

1   asked for a one-month security postpetition.

2       Q    What is the total prepetition debt on this

3   document?

4       A    I believe it was $713,000 -- $712,000.

5            MR. JOHNSON:  Your Honor, I'd like to move

6       this as Duke Exhibit 1 or Utilities Exhibit 1.

7            THE COURT:  Any objection?

8            MR. BUSEY:  No, Your Honor.

9            THE COURT:  It's admitted as previously

10       numbered.

11                         (Whereupon, the document

12                         previously marked as Utilities'

13                         Exhibit 1 for identification was

14                         received in evidence.)

15  BY MR. JOHNSON:

16       Q    With respect to the postpetition deposit

17  request, what is the amount of that?

18       A    $658,000.

19       Q    Are you familiar with the debtors'

20  postpetition payment history with Duke Power?

21       A    Yes, I am.

22       Q    How has that been?

23       A    We've had -- we've had some difficulty with

24  a couple of accounts being paid.  I think one is a

25  warehouse in Greenville, South Carolina.  They went

1    past due, I think, about 45 days.

2         Q    Have you found out why from the debtors?

3         A    We have not.  The only -- we've been in

4    touch with contacts at Winn-Dixie and trying the

5    figure out -- we think it's a bookkeeping error, we're

6    not real sure.  But we've provided this list to them

7    so they can bring their payable system up to date with

8    the new account numbers.

9         Q    Did the debtors pay their prepetition bills

10   on time, by the due date?

11        A    Yes, they did.

12        Q    They paid their prepetition bills --

13        A    Not by the due date.  They paid by the

14   late-pay date.

15        Q    Can you explain what that means?

16        A    The bills are due upon receipt.  They're

17   past due on the 15th day.  We don't penalize the

18   customer until the 27th day with a late-pay charge.

19        Q    So payments would come in after the 15th but

20   before the 27th?

21        A    That's correct.

22        Q    In this case, the deposit that you just

23   testified to from Duke Exhibit 1, which is marked as

24   Tab 10, is that the security Duke is seeking from the

25   debtors, the $658,505?

1      A      In actuality, we could ask for a two-month

2   -- our commissions allow us for a two-month deposit,

3   which would be in excess, I think it's $1.3 million,

4   but we would just be satisfied with the one-month

5   deposit.

6      Q      Why is Duke seeking this one-month deposit

7   from the debtors?

8      A      Well, we feel like Winn-Dixie, at this point

9   in time, is not giving a clear plan to how they're

10  going to continue in business.

11     Q      Any other reasons?

12     A      I feel like their cash burn at this point in

13  time is a little bit unreasonable.

14     Q      At this point the debtors have not offered

15  anything other than administrative expense priority to

16  Duke.  Is that an acceptable form of adequate

17  assurance for Duke Power?

18     A      No.

19     Q      Why not?

20     A      We again feel that Winn-Dixie is burning

21  through cash too quickly to kind of rely on that in

22  the future.

23     Q      Has Duke Power ever experienced a loss from

24  a debtor, postpetition debtor?

25     A      Yes, we have.

1      Q     In those cases, were you granted

2  administrative expense priority?

3      A     No.

4            MR. JOHNSON:  No further questions, Your

5        Honor.

6            THE COURT:  Cross-examination?

7                    **CROSS-EXAMINATION**

8  BY MR. BUSEY:

9      Q     How many accounts does Duke have with

10 Winn-Dixie?

11     A     I think it's approximately about 60 to 65.

12     Q     And you said that your problem postpetition

13 was with a couple of accounts; is that what you said?

14     A     That is correct.

15     Q     Two?

16     A     That is correct.

17     Q     And you think those may be a bookkeeping

18 error?

19     A     We believe that, yes.

20     Q     And other than that, the postpetition

21 payments are as timely as the prepetition payments?

22     A     Yes.

23            MR. BUSEY:  No further questions, Your

24        Honor.

25            MR. JOHNSON:  Nothing further for this

20

1       witness, Your Honor.

2            THE COURT:  Thank you very much, sir.  You

3       may step down.

4                      (Witness excused.)

5            MR. JOHNSON:  Your Honor, at this time I'd

6       like to call Sharon Berry from the Orlando

7       Utilities Commission.

8            THE COURT:  You may.

9   WHEREUPON,

10                      **SHARON BERRY**

11  was called as a witness herein, and having been first

12  duly sworn by the Courtroom Administrator, was

13  examined and testfied as follows:

14           COURTROOM ADMINISTRATOR:  Please state your

15      name and current home or business address,

16      including city and state.

17           THE WITNESS:  Sharon Berry, 500 South Orange

18      Avenue, Orlando, Florida.

19           THE COURT:  You may inquire.

20           MR. JOHNSON:  Thank you, Your Honor.

21                   **DIRECT EXAMINATION**

22  BY MR. JOHNSON:

23      Q    Ms. Berry, who are you currently employed

24  by?

25      A    Orlando Utilities.

1       Q    And what is your position?

2       A    Coordinator of billing.

3       Q    And how long have you been coordinator of

4 billing?

5       A    About a year.

6       Q    And how long have you been with Orlando

7 Utilities Commission?

8       A    Twenty years.

9       Q    Before you were coordinator of billing, what

10 was your prior position?

11      A    Manager of billing.

12      Q    And how were you in that position?

13      A    Six years.

14      Q    In your current position as coordinator of

15 billing, what are your job responsibilities?

16      A    To assure accuracy of the billing for

17 residential and commercial accounts.

18      Q    Are you involved with dealing with bankrupt

19 customers?

20      A    Limited, just based on my knowledge of

21 billing.

22      Q    Are you familiar with Orlando's accounts

23 with the debtors, with Winn Dixie?

24      A    Yes.

25      Q    And how are you familiar with the debtors'

1   accounts?

2        A    With the billing aspect of it, and then also

3   some of the collection that has gone on.  Collections

4   and billing are the same -- under the same

5   vice-president at OUC.

6        Q    So how are you familiar with your

7   relationship with Winn-Dixie?  Through the billing?

8        A    Yes.

9        Q    With respect to your billing, how do you

10  bill?  What are your procedures with respect to

11  billing the debtors?

12       A    We bill them three to five days from the

13  time that we take the reading.  Those bills are then

14  due 17 days from the day they're printed, which is the

15  day after billing.  And they're past due 17 days, and

16  we assess late fees on the 26th day.

17       Q    And those bills represent about 30 days

18  worth of service?

19       A    Yes.

20       Q    What if they don't pay a bill after it's

21  due?

22       A    We -- in some instances, they are

23  disconnected.  If we see a pattern, a consistent

24  pattern, many times they are not disconnected.  We

25  just notify them that we've not received payment.

1       Q     Are you familiar with the debtors'

2    prepetition payment history --

3       A     Yes.

4       Q     -- with Orlando?

5             Did the debtors pay their prepetition bills

6    by the due date?

7       A     No.

8       Q     How did they pay their prepetition invoices?

9       A     Consistently three to five days after the

10   past due date, which is four to five days prior to

11   penalty being assessed.

12      Q     So after due date but before penalty.

13      A     Yes.

14      Q     I show you a document at Tab 11 in the book

15   that's in front of you.  What is this document?

16      A     It is the accounts that we have with

17   Winn-Dixie, the location, service address, prepetition

18   debt and postpetition deposit requirement.

19      Q     Are you familiar with this chart?

20      A     Yes.

21      Q     Who prepared it?

22      A     Pam Reneke.

23      Q     Who is Pam Reneke?

24      A     An employee for OUC that handles

25   bankruptcies.

1    MR. JOHNSON:  I'd like to offer this as, I

2  guess, Utilities' Exhibit 2.

3    THE COURT:  Any objection?

4    MR. BUSEY:  No, Your Honor.

5    THE COURT:  Admitted as previously

6  numbered.

7        (Whereupon, the document

8        previously marked as Utilities'

9        Exhibit 2 for identification was

10       received in evidence.)

11 BY MR. JOHNSON:

12  Q With respect to this exhibit that's at Tab

13 11 here at the exhibit book, what is the amount of the

14 prepetition debt that the debtors owe to Orlando

15 Utilities Commission as of the filing date?

16  A $362,957.10.

17  Q And what is the amount of the postpetition

18 deposit request set forth?

19  A $460,000.

20  Q Are you aware of whether Orlando has made a

21 modified request to the debtors for postpetition

22 security?

23  A Yes, for one month instead of the two

24 months, which is $230,000.

25  Q Are you familiar with the debtors'

1    postpetition payment history with Orlando?

2        A    Yes.

3        Q    And have the debtors timely paid their

4    postpetition bills?

5        A    No.

6        Q    How are they paying their postpetition

7    bills?

8        A    There are four accounts that have had a

9    second bill billed with the previous bill still

10   unpaid.  The other bills remain the same, the three to

11   five days after due date.

12       Q    With respect to the four accounts you just

13   mentioned, would late fees be assessed on those

14   accounts?

15       A    Yes.

16       Q    Why is Orlando Utilities Commission seeking

17   security from the debtors in this case?

18       A    Partly because of the payment history

19   postpetition, as well as any time we change a name on

20   an account we require a deposit.

21       Q    Any other reasons that you're aware of?

22       A    No.

23            MR. JOHNSON:  That's all for this witness,

24       Your Honor.

25            THE COURT:  Mr. Busey?

26

1          MR. BUSEY:  No questions, Your Honor.

2          THE COURT:  Thank you very much.  You may

3      step down.

4                         (Witness excused.)

5          MR. JOHNSON:  I have no further witnesses,

6      Your Honor.

7          THE COURT:  Does the debtor wish to offer

8      any witnesses?

9          MR. BUSEY:  Yes, Your Honor.  We call Jason

10     Roy.

11         COURTROOM ADMINISTRATOR:  Please have a seat

12     in the witness stand.

13  WHEREUPON,

14                       **JASON ROY**

15  was called as a witness herein, and having been first

16  duly sworn by the Courtroom Administrator, was

17  examined and testfied as follows:

18         COURTROOM ADMINISTRATOR:  Please state your

19     name and current business or home address,

20     including city and state.

21         THE WITNESS:  Jason Roy, 5050 Edgewood

22     Court, Jacksonville, Florida.

23         THE COURT:  You may inquire.

24                  **DIRECT EXAMINATION**

25  BY MR. BUSEY:

1     Q     Mr. Roy, by whom are you employed?

2     A     Winn-Dixie Stores, Incorporated.

3     Q     What's your position?

4     A     Senior director of accounting.

5     Q     How long have you worked for Winn-Dixie?

6     A     A little over 20 years.

7     Q     What are your responsibilities as a senior

8  director of accounting?

9     A     Basically over the accounting operation.

10    Q     Are you responsible for paying the company's

11 vendors?

12    A     Yes, I am.

13    Q     Including utilities?

14    A     Yes, I am.

15    Q     Approximately how many utility companies do

16 the debtors work with in connection with their stores?

17    A     Approximately 800.

18    Q     Prior to the petition date, have the debtors

19 paid all undisputed utility bills on a timely basis?

20    A     To my knowledge, we have.

21    Q     And at the time the petition was filed, were

22 the debtors behind in any payments to any of these

23 utility companies?

24    A     Not to my knowledge.

25    Q     Subject to issues associated with the

1    filing, have the debtors continued to timely pay all

2    postpetition utility bills?

3        A    Yes, to my knowledge, we have.

4             MR. BUSEY:  No further questions, Your

5        Honor.

6             THE COURT:  Cross-examination?

7                   **CROSS-EXAMINATION**

8    BY MR. JOHNSON:

9        Q    Mr. Roy, you qualified both your answers

10   about paying prepetition bills and postpetition to the

11   best of your knowledge.  Why did you make that

12   qualification?

13       A    Basically, to the best of my knowledge,

14   we've paid on time.

15       Q    Have you reviewed all the payments to all

16   800 of the utilities prepetition and postpetition,

17   every single bill?

18       A    No, I haven't.

19       Q    So on what basis do you say that all the

20   utility bills have been paid on time prepetition and

21   postpetition?

22       A    What I was qualifying was the two or three

23   utilities we are talking about currently.

24       Q    So you're saying, as far as American

25   Electric Power, you've reviewed all their prepetition

1   bills and all their postpetition bills, and you've

2   come to the conclusion that they were all paid on

3   time?

4        A    I've not reviewed all prepetition, no, just

5   approximately the last year.

6        Q    For all the American Electric Power

7   accounts?

8        A    I have not reviewed all of the bills, you

9   know, per se.  I've looked at an average on a yearly

10  basis.

11       Q    When you say "an average," how was that

12  prepared?  Was it prepared from invoices and payment

13  records that you have?  Or what is this average?  Is

14  it a document that you have?

15       A    No.  I have a -- basically, I have an

16  analysis of the last 12 months of payments that I

17  have.

18       Q    For every account.  Let's start with first

19  American Electric Power.

20            So you've reviewed every account American

21  Electric Power had prepetition, and your testimony is

22  that they paid every bill on time?

23       A    Not every bill on time, but on average we're

24  paying timely.

25       Q    What do you mean by "timely"?  By the due

30

1   date?

2        A    Basically what the last witness said, within

3   the time frame of the 15 to 18 days.

4        Q    So after due date but before finance charges

5   are imposed?

6        A    That's correct.

7        Q    Would your testimony be the same for Duke

8   Power and for Orlando Utilities Commission?

9        A    Yes.

10       Q    Are you familiar with the December 2004

11   meeting between Duke Power and the debtors regarding

12   the request for security?

13       A    No, I'm not.

14            MR. JOHNSON:  That's all, Your Honor.

15            THE COURT:  Anything further of this

16       witness?

17            MR. BUSEY:  No, Your Honor.

18            THE COURT:  Thank you very much.  You may

19       step down.

20                           (Witness excused.)

21            THE COURT:  Additional evidence, Mr. Busey?

22            MR. BUSEY:  I beg your pardon?

23            THE COURT:  Any additional evidence?

24            MR. BUSEY:  Yes, Your Honor.  We'd like to

25       call to the stand Holly Etlin.

```
 1            COURTROOM ADMINISTRATOR:  Would you please
 2        have a seat at the witness stand.
 3    WHEREUPON,
 4                    HOLLY FELDER ETLIN
 5    was called as a witness herein, and having been first
 6    duly sworn by the Courtroom Administrator, was
 7    examined and testfied as follows:
 8            COURTROOM ADMINISTRATOR:  Please state your
 9        name and current home or business address,
10        including city and state.
11            THE WITNESS:  Holly Felder Etlin, XRoads
12        Solutions Group, 400 Madison Avenue, New York,
13        New York.
14            THE COURT:  You may inquire.
15            MR. BUSEY:  Thank you, Your Honor.
16                    DIRECT EXAMINATION
17    BY MR. BUSEY:
18        Q    Ms. Etlin, what is XRoads Solutions Group
19    and what is your position with them?
20        A    I am a principal with XRoads.  XRoads is a
21    national turnaround and crisis management firm with
22    offices in Los Angeles, Dallas, Kansas City, New York
23    and Miami.  We have approximately a hundred
24    professionals and we specialize in working with
25    companies in severe financial distress.
```

1      Q    Can you give us an example of some of the
2  major companies that you've worked with at financial
3  restructuring?
4      A    Certainly.  I have been in the business
5  personally in excess of 25 years, and prior to joining
6  XRoads in June 2002, I spent in excess of 23 years
7  with Deloitte & Touche where I was the national leader
8  of their restructuring practice for the last five
9  years.
10          And I've worked in a variety of cases,
11  primarily in the retail and consumer products field,
12  going all the way back, as you said, with Charter, I
13  go back into the 1980s, well into the '80s as well,
14  Mr. Busey.
15      Q    You still look better than I do.
16      A    Some people like to say I started when I was
17  12.
18          I've worked in the Macy's case, I've worked
19  in Aimes, Bradley's, Caldor.  I've been the CRO of a
20  variety of both midsize and larger retailers, as well
21  as a variety of companies outside of the retail
22  business.
23      Q    What has XRoads been engaged to do by
24  Winn-Dixie?
25      A    Well, we're officially named the debtors'

1    restructuring and financial consultants.  The industry

2    slang term for us is we're the turnaround and crisis

3    managers.

4            We're full time on-site at the company.  I

5    am the principal in charge of the work that we're

6    doing for the company.

7            And we're involved in a broad variety of

8    aspects related to the turnaround of the business,

9    including we assist the company in preparing its 12-

10   week cash forecasts and actually presenting those

11   forecasts to both the committee and to the banks.  We

12   assist the company in its forecast and business

13   planning efforts.  We work with the company on all

14   sorts of vendor issues.

15           As a matter of fact, I was personally

16   involved with the negotiation with the company's major

17   vendors in the three days leading up to the petition

18   to make sure that the company got adequate product

19   flow through that holiday weekend leading up to the

20   filing, and were involved in a very extensive way in

21   an ongoing basis in working with those vendor

22   creditors to make sure that we had continued supply of

23   product under the terms and conditions that the

24   company had prepetition.

25           We're also working with the company on its

1   major restructuring initiatives, which is something

2   that I personally specialize in when it comes to

3   retailers.

4            As Peter Lynch, the company's CEO, has

5   stated in the public on several occasions now, the

6   company has a large number of under-performing stores

7   and the company intends to use the Chapter 11 process

8   to dispose of those stores and shed itself of the

9   liabilities associated with those stores.

10            That has involved a very intensive planning

11   process that has been underway now since the petition

12   date and, again, as Mr. Lynch indicated publicly, we

13   intend to announce the results of that effort and

14   actually start the formal disposition process in late

15   June.

16            Commensurate with that, the company

17   obviously needs to take a very serious look at its

18   overhead structure.  And so, again, for the past eight

19   weeks, my team and the company's senior management

20   have been involved in a very, very exhaustive process

21   to start with a blank piece of paper and say, based

22   upon what the new chain, the new footprint for the

23   company might look like:  What should the GNA

24   structure for this company be?  What should the

25   organization look like?  How many people do we need in

1  what functions?

2              It's very involved.  There are thousands of

3  people affected by this process.  And we have been

4  spending countless hours putting the plan together for

5  that.

6              Again, as Mr. Lynch has indicated, the

7  company would anticipate making that announcement and

8  starting that process to downsize its corporate GNA

9  structure later this summer.

10       Q    As a part of the restructuring process that

11  you've described, which involves closing unprofitable

12  stores, or selling them and disposing of closed stores

13  and reducing GNA, is there going to be a change in the

14  cash consumption of the company?

15       A    There's going to be a dramatic change.  I

16  don't think it's a secret to anyone that the company

17  has lost money, both on an income statement basis,

18  which includes noncash items, as well as on a cash

19  basis.

20              I think the company's monthly operating

21  reports would show that the company is currently

22  losing, on a cash basis, approximately $25 million a

23  month.  Clearly that cannot continue.

24              And the restructuring efforts are aimed at

25  making sure that the reconfigured chain and the

1    reconfigured overhead structure restore the company to

2    profitability.

3        Q    Just for example, do you know how much the

4    company was spending annually on stores that have been

5    closed, that are dark?

6        A    Yes.  I actually believe that's come -- the

7    original motions came before the New York Court, but

8    they're in the record.

9            The company had in excess of 200 stores that

10   it had previously closed in various markets over the

11   years -- and it is years, it's multiple years -- that

12   it had exited, that it was still paying on those

13   leases.  And the approximate lease cost per year for

14   those dark stores was $80 million a year.

15           To date, the company has been able to reject

16   leases associated with those closed locations that

17   total an ongoing expense of approximately $60-plus

18   million a year and is working on getting to resolution

19   with the balance of those locations.

20           Many of the remaining locations that have

21   yet to be rejected actually have subleases in them,

22   but the sublessee doesn't fully cover the lease cost

23   that the company is obligated for.

24           So, again, the payment is net negative on a

25   monthly basis, and we're certainly working to get

1   through that process and get those renegotiated so the

2   company can get out from under those obligations as

3   well.

4       Q    This restructuring process you've described

5   of closing stores and reducing GNA and returning to

6   profitability, give us just some idea of the process

7   and the timing.

8       A    Certainly.  As I've indicated, normally a

9   company, a retailer this size, could take anywhere

10  from six to nine months to really do the planning for

11  this and actually execute it, and generally a

12  substantial amount of that occurs after the company

13  has been inside bankruptcy.

14          The company, before we arrived -- and I only

15  arrived on February 16th, five days before we had to

16  actually file the company -- had actually already

17  started a process of really vetting through its store

18  base and looking very carefully at its competitive

19  market position in each geographic area in which it

20  operates, and where it really made sense to invest its

21  future capital and its future efforts.

22          That process was well underway when we

23  walked in the door and, as a result, we've been able

24  then, through that and through sheer effort on our

25  part and with the help of the committee professionals,

1    really truncate the process for decision-making around

2    this in an attempt to stem those ongoing losses.

3           And so, as I indicated previously, we're now

4    at the point at which we will be filing with this

5    Court in late June motions to sell certain stores that

6    the company wishes to exit from, as well as a motion

7    to commence liquidations in stores in which the

8    company has been unsuccessful in marketing.

9           And the process, of course, commensurate

10   with the GNA, started about eight weeks ago, and we

11   would expect to have that process again complete later

12   in the summer, make the announcements and then start

13   the process for transitioning employees who are going

14   to transition to new jobs within the company, doing

15   that, as well as transitioning employees who will no

16   longer be with the company out of the company.

17          It's a very intense and very compact process

18   specifically designed to maximize the proceeds coming

19   into the company and minimize the costs going out of

20   going through this kind of restructuring.

21          Along with that, I don't want anyone to

22   think that the company is not engaged in other

23   issues.

24          As Mr. Lynch has announced publicly, the

25   company is in the process of a variety of significant

1   operating turn-around initiatives relating to changing

2   how it does business at the store level, being more

3   focused on customers, redoing its merchandising, et

4   cetera, and we've been assisting the company in all of

5   those efforts as well.

6        Q    Are you familiar with the company's

7   postpetition borrowing facility with Wachovia, the

8   $800-million DIP facility?

9        A    Yes.  The negotiating effort was led by

10  Blackstone, but we did participate in the process of

11  negotiating that agreement as well, and we are the

12  party primarily charged with responsibility for

13  interfacing with the DIP lender on an ongoing basis.

14            As a matter of fact, the DIP lender -- the

15  senior lenders from the DIP lender are at the company

16  today meeting with members of my team and management

17  going over the forecasts that we recently submitted to

18  them, which was required under the DIP facility.  We

19  had to submit a business plan through the end of this

20  calendar year to them under the requirements of the

21  DIP, and that was due on May 31st, which was this

22  week.

23        Q    Amazing how you anticipate my question.  I

24  wanted to ask you about that business plan.

25            Did the business plan include a cash

1    forecast for the balance of this calendar year?

2        A    Yes, it did.  The business plan includes a

3    forcasted P&L balance sheet, the borrowing base

4    assumptions and what the borrowings under the DIP

5    facility will be, an EBITDA calculation,

6    calculations as to inventory levels and other uses of

7    cash.

8        Q    What does the business plan the company

9    submitted to Wachovia show in terms of the cash

10   forecast of this liquidity, this cash availability

11   under the DIP financing agreement, for the balance of

12   this calendar year?

13       A    The DIP facility has a calculation in it,

14   just like many asset-based borrowing agreements, that

15   comes from what's available under the line, calculates

16   based upon inventory and receivables what's actually

17   available, deducts an amount for LCs outstanding which

18   are taken out of the line, and then also has $100-

19   million net availability block that they just deduct

20   off the top.

21           Taking all that into account, the company

22   has availability today, and through the end of the

23   year, forecast in excess of $200 million of undrawn

24   availability under the line.

25       Q    As of when?

41

1        A      As of today and through the balance end of

2   this year.

3        Q      $200-million availability?

4        A      That's right, in excess of $200 million

5   available.   And that's after paying all the bills,

6   taking into account everything that has to go on,

7   including fluctuations in inventory for the holiday

8   period, for example, when you would build up inventory

9   and need to borrow a little bit more money in order to

10  do that.

11       Q      So essentially it shows the same

12  availability at the end of this calendar year as

13  roughly as it does now.

14       A      Roughly, yes.

15       Q      See that exhibit book in front of you?  Open

16  that up, please, to Tab 8, which is the monthly

17  operating report for Winn-Dixie which was filed last

18  week for the period April 7, 2005 to May 4, 2005.

19  And, if you would, turn to Page 2, Page Number 2.

20       A      That would be the Condensed Consolidated

21  Statement of Operations?

22       Q      Yes.   What does it show in terms of

23  operating losses for that 28-day period ending May 4?

24       A      It shows a net loss, at the bottom of the

25  page, of just over $45 million.

1     Q     And then turn the page.  What's the next
2  page?
3     A     The next page is the Condensed Consolidated
4  Statement of Cash Flows.
5     Q     And what does it show in terms of cash usage
6  by the company for the 28 days ending May 4th, 2005?
7     A     The company used -- net cash used in
8  operating activities was approximately $82 million.
9     Q     How do you reconcile that consumption of
10  cash in that period of time with your cash forecast
11  you just told us about that's a part of the business
12  plan that you gave to the bank?
13     A     As you might imagine, that's fairly easy.
14     Q     Took me a while to understand.
15     A     A couple of things.  First of all, you have
16  to remember that the company purchases on a monthly
17  basis approximately $500 million worth of inventory,
18  and it actually maintains an inventory balance in its
19  distribution centers and stores at any given time of
20  approximately a billion dollars.
21          Now, clearly the company works very
22  carefully to manage its inventory levels to make sure
23  that it's not purchasing too much or too little.  Too
24  little, it won't have goods in the stores, the
25  customers will be disappointed, they go away.  Too

1    much, you've obviously tied up money in inventory more

2    than you should.

3              In this monthly period, the company

4    experienced an increase in its merchandise inventories

5    of $33 million.  Because of the company's credit

6    position right now with its vendors and many of its

7    vendors, it has very short terms available to it.

8              Short terms are also very common in the

9    grocery industry.  Typically, average credit terms to

10   a grocery store not in a Chapter 11 proceeding are

11   about 20 to 25 days.  It's less than 30 days' credit

12   that you operate under with your vendors, and that's

13   because you turn the inventory so quickly.

14             In this case, the company had what is, as a

15   percentage basis on a billion dollars in inventory, a

16   fairly small up tic in inventory, but it results in a

17   use of cash of approximately $33 million, and that's

18   part of this $82-million usage.

19             In addition, in the month of April, which

20   ended on May 4th, the company's fiscal month, they

21   paid out approximately $26 million in PACA claims.

22        Q    Can you explain what PACA claims are?

23        A    So a PACA motion, pursuant to the Court's

24   approval, requires that valid claimants that have PACA

25   claims, which are generally produce vendors, which are

1    afforded special protection under the law, were

2    required to be paid in the amount that was due them on

3    a prepetition basis.   I'm not a lawyer, but I think

4    they have some sort of a lien that attaches to their

5    inventory and the proceeds from the sale of their

6    inventory that puts them ahead of other unsecured

7    creditors.

8            So the company, on a one-time basis -- this

9    is almost the entire amount of the PACA claims.   I

10   think the total PACA claim report showed approximately

11   $29 million as needing to be paid, and twenty-six of

12   those were paid in this time frame.

13           Obvious that's not going to recur because

14   once you pay the claim, you've paid the claim.

15           Those two things alone comprise almost $60

16   million of the $82 million in cash usage.

17           The other is the net true cash usage that I

18   referred to previously, which is, while the company

19   shows a $45-million loss, that includes a lot of

20   noncash accounting items: depreciation, amortization,

21   things like that, that really don't reflect cash.

22           The actual cash loss that the company

23   incurred in this period is approximately $27 million,

24   and that's consistent with the run rate that we're

25   trying to turn the company around from.   The company

1    has been losing approximately that amount in cash at

2    this time.

3        Q    So do you see the monthly operating

4    statement for the period ending May 4, 2005 as

5    recurring or not recurring?

6        A    No, we don't see it as recurring.  First of

7    all, the inventory items, any working capital item,

8    inventory is going to fluctuate up and down.

9            We could just as easily in the next

10   four-week period see that inventory has gone back down

11   or could even go lower than the normal target levels

12   as the company tries very aggressively to manage its

13   inventory levels, and that would actually then be a

14   source of cash in the next month, driving the

15   inventory levels down and not having as much tied up.

16           So you could see this $33-million number in

17   the month of May be a positive $33-million number, or

18   it could just be -- or it could be even more than 33

19   if they go below their target levels.

20           And currently the company isn't happy with

21   the fact that it's got this extra inventory and is

22   actively working to work those inventory levels down.

23           Obviously the PACA payment doesn't recur.

24   We'll see the balance of those PACA claims be paid

25   out.  I believe they're substantially all settled at

1    this time, so we'll see those going through the

2    monthly operating report that gets filed for the month

3    of May, which will be due here fairly shortly.

4           As to the operating losses, I think I've

5    already indicated that the company doesn't intend to

6    continue to lose ad infinitum $20 million to $25

7    million a month.  That's the purpose of being in this

8    process, is to utilize the process to reorganize

9    itself and make itself a more profitable business.

10       Q    So the facts and circumstances that are

11   evident in the last monthly operating report and its

12   preceding monthly operating report, you were aware of

13   when you did the cash forecast included in the

14   business plan that was delivered to Wachovia?

15       A    Absolutely.

16       Q    You took all that into consideration?

17       A    Yes, we did.

18       Q    Based on your familiarity with the company's

19   finances as you've just evidenced, in your judgment

20   are Winn-Dixie's utilities adequately assured of being

21   paid by Winn-Dixie for the services they deliver to

22   the company postpetition?

23       A    Absolutely.

24           MR. BUSEY:  No further questions, Your

25       Honor.

1      THE COURT:  Cross-examination, Mr. Johnson.

2                  **CROSS-EXAMINATION**

3  BY MR. JOHNSON:

4      Q    Good afternoon.  I'd like to turn your

5  attention to the exhibit in the exhibit book there

6  that's at Tab 6.  It's a monthly operating statement

7  for the period from February 22nd to March 9th, 2005.

8      A    Yes, I have it in front of me.

9      Q    Page 6.  If you could turn to Page 6 of that

10  document, please.  It's Number 6 at the bottom of the

11  page.  I don't think it's actually the sixth page in.

12  It's actually the one numbered Number 6.

13          At the top of it, it has "Winn-Dixie Stores

14  Inc., Case Number 05-11063, Jointly Administered."

15  It's Page 6 at the bottom.

16      A    Yes, I see it.

17      Q    In the middle of that page there, it talks

18  about excess availability as of March 9, 2005 of

19  $414,355,000.  Is that the correct amount of the

20  availability at that point?

21      A    Yes, it is.

22      Q    Is that over and above the $100-million

23  limit, or does that not include the $100-million limit

24  that you testified to?

25      A    I believe that's over and above the $100-

1    million limit.

2         Q    So it would be $514 million availability

3    minus $100 million?

4         A    Yes.

5         Q    Let's turn then to Exhibit Number 7, Page 7

6    on this document.   Availability as of April 6,

7    according to this document, was $424,513,000?

8         A    Yes, that's what it says on Page 7.

9         Q    All right.   And then let's turn to Exhibit 9

10    -- I'm sorry -- Exhibit 8, Page 7.   Availability as of

11    May 4th was $359,895,000?

12         A    Yes, that's what it shows here.

13         Q    So as of April 6, there was $424 million.

14    As of May 4th, a month later, $359 million in excess

15    availability, a $64-million drop in availability?

16         A    Yes, that's correct, and it's consistent

17    with the use of cash that's reflected in the debtors'

18    MOR of approximately $82 million.

19         Q    And your testimony was that the current

20    excess availability is over $200 million?

21         A    That is correct.

22         Q    And that's as of, what, May 31st, June 1st?

23         A    Approximately this week, yes.

24         Q    What explains the difference from May 4th to

25    today where we had $359 million on May 4th, and now

1   your testimony is, as of today or yesterday, it's a

2   little over $200 million?  What would explain that

3   drop in availability?

4       A    There are a variety of things.  First of

5   all, as I indicated, the company is currently, prior

6   to the commencement of this restructuring process

7   which will start later this month, losing on a cash

8   basis from operations approximately $25 million a

9   month.

10          In addition, in the month of June, the

11  company did have an additional growth in inventory of

12  -- I think it's approximately $40 million, which is a

13  direct use of cash as well.  Again, the company is

14  working now to pull those inventory levels down.

15          So we had an increase in inventory in the

16  month of May -- excuse me -- in the month of April

17  which I referred to of thirty-three.  We've had

18  another $40-plus million on top of that.

19          So that would account for most of the

20  difference.  I know we've made payments out under the

21  balance of the PACA claims.

22          I honestly can't think of specifically what

23  there might be in addition to that, but it's probably

24  normal working capital fluctuations.

25      Q    So what would be the exact figure, though,

1    for availability at this point?  You testified a

2    little over $200 million.  Do you know the exact

3    figure of excess availability at this time?

4         A    I don't specifically recall.  I think it's

5    in the $225- to $250-million range.

6         Q    And that amount is above the $100-million

7    cap that the DIP facility has, correct?

8         A    That is correct.

9         Q    In your testimony you mentioned that the

10   PACA claims were nonrecurring, $26 million, and this

11   inventory was a $33 million possibly one-time thing.

12            So, according to your testimony, there's no

13   other nonreoccurring charges that's going to occur to

14   this debtor before the end of this year?

15        A    I don't believe that's my testimony.

16        Q    In explaining the $81 million loss that was

17   in the May operating report that you testified to, it

18   was my understanding that your testimony was this was

19   a one-time thing.  There was a $26-million PACA

20   charge, a $33-million increase in inventory, and then

21   an actual $27-million actual loss.  Did I

22   misunderstand your testimony?

23        A    That is my testimony as it pertains to

24   that.  I think where we differ is your projection that

25   I testified that there might be -- that might be

1    indicative of a lack of nonrecurring charges or normal

2    working capital fluctuations for the balance of the

3    year.  I did not testify to that.

4        Q    So there may be more what you would call

5    nonreoccurring charges that would occur throughout the

6    rest of 2005?

7        A    There certainly will be.  And there

8    certainly will be other working capital fluctuations.

9    They'll go both directions.

10       Q    And would the debtors' motion for

11   authorization to implement an employee retention

12   severance plan, would that affect the cash?

13       A    To the extent that the company does

14   determine that it will terminate certain quantities of

15   employees, yes, it will.  And it has been -- the

16   actual potential amounts for that have been factored

17   into the plan that was presented to the bank group.

18       Q    As I understand it, there's two components

19   to this employee retention.  There's a retention plan

20   for executives which they state will not exceed $14

21   million in payments, and then there's the corporate

22   benefit severance program.

23            Are you familiar with this employee

24   retention motion?

25       A    Yes, I am.

1          Q     In the motion itself, it states that the

2     maximum cost of the corporate severance benefits will

3     -- the maximum cost will be $119 million.   Is that

4     your understanding of the maximum potential cost?

5          A     Yes.   And that would be if every last one of

6     the company's 79,000 employees were to lose their

7     jobs.   That is the cost of the severance associated

8     with that.   Obviously, we don't anticipate that that's

9     going to be the result.

10          Q     Has there been any anticipation of numbers?

11     Has there been any projections about the number of

12     employees that would be covered by this proposed plan?

13          A     Yes, there have.

14          Q     What are those numbers?

15          A     I'm not prepared to disclose that to you.

16     The company is not prepared to make that announcement

17     with regard to its employees other than to say what

18     Mr. Lynch has already stated in the public record,

19     which is that there will be a substantial downsizing

20     of the corporate headquarters here in Jacksonville and

21     the disposition of a number of stores.

22              It would be unfair to the company's

23     associates to have this come out in open court before

24     the company has had a chance to communicate to them

25     directly.

1       Q    So my clients are supposed to take your word

2   that the availability will remain the same under the

3   DIP facility, and yet we're not given information as

4   to how much in charges that this potential plan is

5   going to cost the company?

6           MR. BUSEY:   Your Honor, I think I should

7       object at this point for the reason that that

8       question is argumentative, and permit me to make

9       the objection that Ms. Etlin just made.  She just

10      forgot her place.

11          The real objection to the prior question in

12      terms of the number of employees is that's not

13      really relevant to what's going on here.

14          The question is:  Has there been a

15      projection made, and was it included or not

16      included in the projection that given to the

17      bank.  That would be a fair and reasonable

18      cross-examination question.

19          But the precise number of employees isn't

20      going to be probative one way or the other on the

21      issue that's before you, and it would be very

22      prejudicial to the company at this point.

23          THE COURT:  Objection sustained.

24          MR. JOHNSON:  Well, Your Honor, I'd just

25      like to say, we're not given a cost.  We're told

1        everything is supposed to be going forward.

2        We're supposed to rely on their projections which

3        we have no back-up information for.  We don't

4        have this plan that they propose to lenders.

5              It's all nice for them to tell us that

6        they're going to have $200 million of

7        availability through the end of the year, but we

8        have no idea.  I mean, we're left in the dark on

9        this.

10             So I understand that they can't go into

11       specifics, but it is a significant item.  We're

12       talking $119 million worst case scenario.  What

13       is the projected scenario?

14             THE COURT:  Go ahead.

15   BY MR. JOHNSON:

16       Q    Would another example of a nonrecurring

17   charge be substantive contracts that would occur

18   through motions to assume contracts?

19       A    Yes.  Should the debtor determine to do so,

20   that is correct.  If there is a balance due under the

21   contract, the debtor was substantially not in arrears

22   on any form of payment, be they leases or other forms

23   of contracts, at the time that it filed.

24             And so generally the kinds of cure costs

25   that you might be referring to don't exist as they

1  pertain to the company's assumption of any form of

2  contract.

3     Q    But the substantive contracts, was that

4  included in your budget plan for the DIP lender?   Were

5  the executory contract assumption costs included in

6  that forecast?

7     A    To the extent the debtor has made a

8  determination that those are part of its ongoing

9  business and that those are costs associated with

10 them, yes, it has been included.

11    Q    But those decisions aren't final at this

12 point?

13    A    The company is still in the process of

14 finalizing its restructuring plans.  However, we know

15 enough about the reconfigured business to make some

16 reasonable business judgments about what those

17 potential costs would be and we've drafted the plan

18 from a conservative basis.

19    Q    You earlier testified that you arrived at

20 Winn-Dixie on February 16th of this year; is that

21 correct?

22    A    That is correct.

23    Q    Were you at that time or since that time

24 have you become familiar with their past attempts to

25 restructure or turn around their operations?

1          A      Yes.

2          Q      And what in the new business plan are they

3    proposing that is different than the past methods that

4    haven't worked?

5          A      Well, first of all, the company has a new

6    senior manager in Mr. Lynch, someone who is

7    specifically focused on fixing things at actual store

8    level and restoring sales to the proper levels in the

9    stores through improved customer service and

10   merchandising, which, in my opinion as a retail

11   expert, is the proper way to go about turning around

12   this business.

13          In addition, the company has sought the

14   protection of the bankruptcy process and is going to

15   be smart about the way in which it disposes of stores

16   and assets going forward such that the interest and

17   rights of all the creditors of the company are

18   protected in this process.

19          In the past, they didn't have that

20   opportunity and therefore continued to pay on dark-

21   store leases.  We're not in a position to negotiate

22   the kinds of exits from other kinds of contracts, et

23   cetera, that they now have the opportunity to do in

24   this process.

25          Q      Is there anything in this new business plan

1   that's going to deal with the competitive problems

2   that the debtors mention in various pleadings in this

3   case?

4        A    Yes.   The sales projections take into

5   account -- one of the things I testified to was that

6   the company had engaged in a fairly exhaustive look at

7   its markets and its competitors prior to us even

8   walking through the door, and that work was led by

9   Bain.

10            And the company had done a very, very

11  extensive study of both the effects of competitive

12  openings on its store base historically, and then had

13  looked out for the next 18 to 24 months at the

14  competitive openings in each one of its markets now

15  for the go-forward footprint, and we've taken the

16  impact of those competitive openings into account in

17  preparing the sales projections for the stores in that

18  business plan.

19        Q    You testified that the utilities would be

20  paid.   Would a deposit payment in the total amount of

21  $902,000 affect the debtors' cash flow, significantly

22  affect the debtors' cash flow?

23        A    It would be a negative cash flow item.

24        Q    But we're talking $902,000.   I mean, in the

25  grand scheme of things, is that going to significantly

1    impair the debtors' ability to reorganize?

2        A     As a single isolated incident, no.  But, as

3    you well know, $900,000 times a variety of various

4    motions and circumstances that could come up

5    ultimately adds up to a lot of money.

6        Q     I think the testimony from the debtors'

7    first witness at the May 19th hearing was that would

8    be $32 million, and as I stated earlier, based on the

9    objections filed, $14 million of that has already been

10   resolved, so that you're talking about $18 million.

11            Is that a significant number, if all 800

12   utilities came in and got a two-month deposit?

13       A     First of all, the $14 million in settlements

14   that have occurred to date were for utilities that had

15   prepetition deposit arrangements with the debtor, and

16   in each case each one of those settlements has been

17   for an amount equal to or less than the prepetition

18   deposit amount that each of those utilities actually

19   already had an arrangement with the debtor.

20       Q     The debtors had to pay cash to those

21   utilities as part of the settlements, correct?

22       A     In some cases, yes.

23       Q     More than $902,000, correct?

24       A     Yes, consistent with the deposit

25   arrangements that each of those utilities had.   The

1    three utilities here had no deposits with the debtor

2    prepetition.

3         Q    Right.   They provided normal credit terms to

4    the debtors prepetition, correct?

5         A    That is correct.

6         Q    So, unlike most of the other vendors that

7    changed their credit terms and shortened the debtors'

8    credit terms, these utilities did not.

9         A    I think that's a mischaracterization.   It's

10   my understanding that the deposits that existed with

11   the utilities prepetition for the debtor in many cases

12   have been outstanding for multiple years, and were

13   part of their normal business relationship given the

14   relative size of the businesses' operations to those

15   individual utilities' operations.

16        Q    When you say number of years, you mean two,

17   three years those deposits were on hand?

18        A    I believe so.

19        Q    Do you know when Progress Energy Carolina

20   and Progress Energy Florida received its deposits,

21   prepetition deposits?

22        A    I'm not going to have a specific

23   recollection of any individual utility.

24             MR. JOHNSON:   That's all, Your Honor.

25             THE COURT:   Redirect?

1              MR. BUSEY:  Yes, Your Honor.

2                    **REDIRECT EXAMINATION**

3    BY MR. BUSEY:

4        Q    Ms. Etlin, if you would open that book up

5    again to Tab 8, Page 7, which is the monthly operating

6    report for the period ending May 4, 2005.  On Page 7

7    it has availability under the line.

8              I want to reconcile that $359,000 number

9    with your testimony of the current availability being

10   approximately $225- to $250 million in response to Mr.

11   Johnson's questions.

12             Isn't that $359,000 that's shown on Page 7

13   of Tab 8 really before the $100 million that Wachovia

14   requires to stay on the line, so the real availability

15   -- we're comparing apples and apples -- as of May 4th

16   was approximately $259 million?

17       A    It may be the case.  What I'm looking at

18   here, Mr. Busey, is the fact that there are net

19   reserves reflected parenthetically in the first line

20   of $235,000 against the availability, and I had

21   assumed that the hundred million was part of that

22   235.

23             There's also a small PACA reserve left, and

24   then of course there's a reclamation reserve that the

25   bank has booked, and I assumed the 235 included the

1    $100 million.  I may be mistaken.

2         Q    But the real availability, as you testified

3    now, is roughly $225- to $250 million?

4         A    That is correct.

5              MR. BUSEY:  No further questions.

6              THE COURT:  Thank you very much.  You may

7         step down.

8                             (Witness excused.)

9              THE COURT:  Additional evidence, Mr. Busey?

10             MR. BUSEY:  No, Your Honor.

11             THE COURT:  Rebuttal evidence, Mr. Johnson?

12             MR. JOHNSON:  No, Your Honor.

13             THE COURT:  You want to say anything?

14             MR. JOHNSON:  Thank you, Your Honor.

15             What we have here, Your Honor, are three

16        utilities: American Electric Power, Duke Power

17        and Orlando Utilities Commission, who continue to

18        provide service to the debtors prepetition

19        according to normal business terms, which is

20        essentially 60 days or more, as you heard from

21        their testimony.

22             That's even better than the debtors'

23        vendors.  As the testimony was presented here,

24        their normal trade with other vendors is 30

25        days.  They get 60 days from the utilities, and

1   they got that prepetition.

2          The debtors have settled with various

3   utilities that had obtained security, which is

4   fine.  I mean, there's perfectly logical reasons

5   for doing that.

6          But it seems rather odd for a debtor that

7   claims one of the main reasons it filed was the

8   constriction of trade credit, and three of those

9   utilities here that continue to provide credit at

10  normal terms did not constrict it.  In fact, the

11  testimony is the debtors knew when to make the

12  payments.  They knew to pay it after the bill

13  date and before the late fee gets charged to get

14  that extra flow.

15         And so these utilities have as a reward,

16  they get huge prepetition losses.  What's the

17  reward postpetition?  Told no security.  Not even

18  a one-month deposit which wouldn't even cover

19  their billing cycle but, based on current facts,

20  they're willing to take that at this point in the

21  case.

22         It just seems very ironic that that's how a

23  debtor with trade credit problems is treating

24  those type of creditors.

25         We're told today that we should be happy

1    that they have this $259-million availability

2    that's been projected to the end of the year, and

3    that will stay regardless of what other things

4    come up, like a KERP motion and all these other

5    pleadings where there's a potential significant

6    cash drain on the company, and yet we're not

7    given any specifics.  And for good reason.

8        I don't quibble with the debtors' counsel

9    objecting to that.  I understand there's business

10   reasons for not disclosing that, but, on the

11   other hand, my clients are sitting here with very

12   limited information and told once again to trust

13   that the debtors will pay their bills, when all

14   they can see from the monthly operating reports

15   each month since the filing is loss, loss, loss.

16       Testimony is not disputed on that, it's just

17   somehow they're, through this new miraculous

18   plan, which apparently will be different than

19   their past plans, will stem the flow of those

20   losses and everything will be bright and rosy.

21       Well, we certainly hope that that's the

22   case, but the monthly operating reports, the

23   current losses and the uncertainty as to what

24   these financial dealings are paint certainly a

25   different picture for my clients who provide

1    service on an arrearage basis.

2        And even if the secured lender were to say:

3    This inventory is out there, we don't want

4    service to be turned off, we'll pay for service

5    up to a certain date, that just isn't going to

6    work for the utilities either, Your Honor,

7    because they bill in arrears.  And if the lenders

8    say:  We'll pay to the end of June, the June bill

9    won't even go out until July and won't be due

10   until late July or August.

11       There is a serious risk based on their

12   billing exposure.  If the debtors want to pay in

13   advance as opposed to paying a deposit, if that

14   would help their cash flow, we certainly would

15   entertain that as well.

16       But these are utilities that suffered a

17   loss.  All three of them suffered large

18   prepetition losses.  Continue to trust in the

19   debtor.

20       Duke met with the debtor, decided to give

21   them another shot, didn't require the security,

22   took a $700,000 loss.

23       So, Your Honor, I think the facts are pretty

24   clear.  And we're talking a $902,000 total one-

25   month deposit for these three utilities, a rather

1    insignificant sum.

2         I think the slippery slope argument is

3    nonexistent in that there's only one other

4    objecting utility out there, BellSouth, I believe

5    it is, for a $120,000 deposit.  No other

6    utilities have filed anything.

7         Even if they did, the large utilities that

8    got most of this $32-million amount, which seems

9    to pale in comparison to the current motion,

10   they've already settled, 14 million of the 32,

11   worst-case scenario.

12        So for that reason, Your Honor, we request

13   that the debtors provide these three utilities a

14   one-month deposit.

15        THE COURT:  Mr. Busey.

16        MR. BUSEY:  You heard Mr. Johnson, Your

17   Honor, say that he'd had knee surgery and that's

18   why he wasn't here last time, and saw that he has

19   a leg brace on.  That's why I put my boot back on

20   today.  I just wanted to make sure we'd be evenly

21   matched.

22        (General laughter.)

23        MR. BUSEY:  Mr. Johnson speaks of Duke's

24   $700,000 loss.  Well, I know that they haven't

25   been paid that $700,000 yet because the law says

1     we can't pay it, but it is yet to be determined

2     whether they're going to have a $700,000 loss.

3          If we do what the debtors want to do in this

4     case and what Ms. Etlin suggested the debtors are

5     working hard at in this case, there won't be that

6     $700,000 loss, and we'll be able to recover a

7     value for the successful organization of this

8     very thriving enterprise by the benefit of the

9     Chapter 11 process.

10          The narrow issue before the Court today is

11     whether or not there is adequate assurance under

12     Section 633 of the Bankruptcy Code of whether

13     they're going to get paid.

14          The slippery slope aspect of this is that,

15     under the terms of the orders that have been

16     entered so far and under the terms of the

17     Bankruptcy Code, at any time any of these 800

18     utilities can come back into this Court, if they

19     see the circumstances warrant, and request a

20     deposit.

21          That's the terms of the order that has been

22     entered on this motion by the debtors, is that at

23     any time any of these utilities can come back in

24     here and ask for a security or the deposit if

25     circumstances warrant.

1    And I guarantee you, as soon as you grant

2    the motion to give a security deposit to these

3    three utilities, some of the other 800 utilities

4    are going to think that was a real good idea and

5    they're going to want to avail themselves of the

6    same remedy.

7    As you know, and I won't belabor it, I cited

8    to the Court the decision of in re Caldor, which

9    was a 2nd Circuit Court of Appeals decision in

10   1997 on this issue.

11   And the question is, under 366 of the

12   Bankruptcy Code, upon a showing that the debtors

13   have timely paid their prepetition bills and are

14   timely paying their postpetition bills, and in

15   that case there was a $250-million postpetition

16   financing facility providing adequate liquidity

17   for the debtor, the Court of Appeals said that

18   the Court has discretion in not requiring the

19   posting of a bond or other security.

20   And I want to read again this section of the

21   Court's decision which I think is persuasive.

22   "Bankruptcy courts are properly afforded

23   significant discretion in the exercise of their

24   duties.  We have observed in bankruptcy

25   proceedings substance should not give way to form

1    and a bankruptcy judge should not be shackled

2    with ununnecessary rigid rules when exercising

3    the undoubted broad administrative power granted

4    him under the Code.

5         "In deciding what constitutes adequate

6    assurance in a given case, a bankruptcy court

7    must focus upon the need of the utility for

8    assurance and to require that the debtor supply

9    no more than that, since the debtor almost per

10   force has a conflicting need to conserve scarce

11   financial resources.

12        "Accordingly, bankruptcy courts must be

13   afford reasonable discretion in determining what

14   constitutes adequate assurance of payment for

15   continuing utility services," and held that the

16   507 administrative lien under the Bankruptcy Code

17   in this case, on those facts, which are very

18   similar to the record in this case, provided

19   adequate assurance.

20        I think that the testimony has shown that

21   the concern of Duke Power which you heard from

22   the stand about the cash strain was a concern

23   obviously of this company, too, but it was a

24   concern that bore circumstances prepetition, and

25   that now the company has the opportunity to and

1   is addressing it postpetition.  And the

2   circumstances that caused that cash drain

3   hopefully will be shortly changed.

4        We are filing monthly operating reports.

5   The utilities can see them on line.  If the

6   circumstances warrant and they're concerned about

7   it, they can come back in at any time, or, as you

8   said last time, at 8:00 o'clock on any morning

9   and you will hear them, and we can revisit

10  whether or not those circumstances determine

11  that.

12       But based on the record today, there's

13  plenty of liquidity in these debtors, and they

14  have taken the actions necessary to stop the

15  bleeding, and these utilities are adequately

16  assured of payment.

17       We ask the Court to overrule their

18  objection.

19       THE COURT:  Any last comments?

20       MR. JOHNSON:  Real brief, Your Honor.  Two

21  things.

22       With respect to the slippery slope, I think

23  if the utilities this far into the case haven't

24  filed something with this Court, I think it's

25  unlikely you're going to get this slippery

1    slope.  You might get a few, I don't think I

2    could contest that, but I think they're making a

3    bigger issue out of that.

4         With respect to Caldor, the facts of this

5    case at this point are not the same as Caldor,

6    and I certainly hope they don't ever become the

7    same as Caldor ended up.

8         First, the Caldor decision, Your Honor, the

9    debtors had a $250-million facility -- it's

10   actually $500 million.  The Court of Appeals got

11   that wrong in their findings of fact.  But, in

12   any event, the key issue was it had not been

13   tapped into.  The debtor was still operating off

14   of cash flow, not borrowing money as of that

15   hearing, which was held actually very close to

16   the filing date, the petition date.  It was very

17   shortly thereafter.

18        So this is not the same case there at that

19   point, which is a debtor operating on cash flow,

20   not even touching into its borrowings at that

21   time.

22        Conversely, the problem with Caldor is that

23   it became administratively insolvent, so the

24   judge in that case who said you won't find a

25   better credit risk than this debtor was

1    absolutely dead wrong, and maybe one of the

2    reasons that judges make legal decisions and

3    credit managers make credit decisions.

4        So, Your Honor, I think factually the Caldor

5    decision is different.  As far as its test and

6    standard, it's a decision that I'm not familiar

7    with being followed by anybody else other than

8    the Southern District of New York and 2nd

9    Circuit.  It's certainly not followed in Delaware

10   and many other jurisdictions where I've

11   practiced, mainly because the decision is not in

12   accord with the language of the statute, which is

13   probably one of the reasons it was recently

14   amended to overrule the Caldor decision.

15       Thank you, Your Honor.

16       THE COURT:  Considering the evidence

17   presented today and argument of counsel, the

18   Court does not find any substantial difference

19   from the last hearing.

20       I'm certainly not going to say that this is

21   a guaranteed deal for the power company.  I won't

22   go far as that other judge and say this is a

23   great credit risk.

24       But I think, under the circumstances, the

25   fact that the payments have been made timely

1    prepetition, with the exception of the payment

2    due at the time of filing, that payments have

3    been made in the ordinary course of business

4    postpetition.

5         The way the account is set up, every payment

6    is late because it's due on receipt, so it's all

7    going to be paid before the late charge.  Down

8    South, if you pay something before a late charge,

9    you're paying on time, whenever that is.

10        However, the Court is overruling the

11   objection on that basis, but it's without

12   prejudice.  If they ever feel insecure,

13   substantially insecure, there's been a change of

14   circumstances from today, the Court will make

15   court time available on short notice.  You're not

16   going to get two or three hours, but you can get

17   a good hour at 8:00 o'clock about any morning and

18   we can deal with this if that case arises.

19        Mr. Busey, I'd ask you to prepare the

20   appropriate order.

21        MR. BUSEY:  We have an order, Your Honor.

22   This is in the same form as the JEA.

23        THE COURT:  Well, except you got the wrong

24   creditor in here.

25        MR. BUSEY:  Does it say JEA?

1    THE COURT:  It says JEA.  I think you'll --

2    MR. BUSEY:  Your Honor, like we just said,

3    we'd like to submit an order to the Court.

4    (General laughter.)

5    THE COURT:  Thank you very much.

6    Does that dispose -- no, we have one more

7    matter to deal with.

8    Court takes the motion for order extending

9    time with which to assume or reject leases.  Has

10   that been continued?  That was continued.

11   MR. JOHNSON:  Your Honor, may I be excused?

12   THE COURT:  Yes, you may.

13   MR. BUSEY:  Your Honor, we are going to

14   continue that.  By agreement between the

15   objecting party and the debtor, we've moved it to

16   June 16.

17   THE COURT:  All right.  I believe that

18   covers everything on the agenda.

19   MR. BUSEY:  Yes, Your Honor.

20   THE COURT:  Anything further?  Nice to have

21   seen everybody.  These hearings are all

22   concluded.

23   (Thereupon, at 3:50 p.m., the hearing was

24   concluded.)

25                    -  -  -

74

1                    C E R T I F I C A T E

2    STATE OF FLORIDA )

3    COUNTY OF DUVAL  )

4              I, Cindy Danese, Notary Public, State of

5    Florida at Large, do hereby certify that the attached

6    excerpt represents the proceedings before the United

7    States Bankruptcy Court, Middle District of Florida,

8    Jacksonville Division, before the Honorable Jerry A.

9    Funk, Bankruptcy Judge, in the matter of In Re:

10   Winn-Dixie Stores, Inc.; such transcript is an

11   accurate recordation of the proceedings which took

12   place.  A transcript of this proceeding has been

13   produced on June 16, 2005.

14

15

16

17                              STATEWIDE REPORTING SERVICE

18

19

20   _____

21            CINDY DANESE

22                         

23

24

25