## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |

### DEBTORS' MOTION FOR ORDER (A) AUTHORIZING
### THE SALE OF ASSETS FREE AND CLEAR OF LIENS,
### CLAIMS AND INTERESTS AND EXEMPT FROM TAXES,
### (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
### LEASES AND CONTRACTS AND (C) GRANTING RELATED RELIEF

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates (collectively, the "Debtors"), move the Court for entry of one or more orders pursuant to 11 U.S.C. §§ 363, 365 and 1146 and Rules 6004 and 6006, Federal Rules of Bankruptcy Procedure: (i) authorizing the sale of inventory, equipment, supplies and other assets in connection with leased stores, free and clear of claims, liens and interests, (ii) authorizing the assumption and assignment of leases in connection with the sales, (iii) determining that all such sales are exempt from any stamp, transfer, recording or similar tax, (iv) determining any requisite cure, and (v) granting related relief (the "Motion"). In support of the Motion, the Debtors respectfully represent:

### Background

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the Bankruptcy Code (as amended, the

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

"Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "New York Court").  By order dated April 13, 2005, the New York Court transferred venue of these cases to this Court.  The Debtors' cases are being jointly administered for procedural purposes only.

2.      The Debtors operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request has been made for the appointment of a trustee or examiner.  On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") to serve in these cases pursuant to Bankruptcy Code sections 1102 and 1103.

3.      The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  According to published reports, the Debtors are the eighth-largest food retailer in the United States and one of the largest in the Southeast.  The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion.  The Debtors currently operate more than 900 stores in the United States with nearly 79,000 employees.  Substantially all of the Debtors' store locations are leased rather than owned.

**Strategic Plan**

4.      Prior to the Petition Date, the Debtors and their financial advisors began a comprehensive analysis of the Debtors' businesses to determine how best to maximize their value.  In connection with this analysis, the Debtors announced a series of actions to improve their competitive position, which the Debtors refer to as their Strategic Plan.  The Strategic Plan includes an effort to reduce the Debtors' annual expenses by over $100 million.

00497657.DOC.9

5.      In connection with the Strategic Plan, the Debtors and their financial advisors analyzed the Debtors' market areas and determined that some of these markets are noncore, with limited opportunities for the Debtors and unprofitable operations in the aggregate.  Prepetition, the Debtors sold or closed 111 stores in these noncore areas and another 45 unprofitable stores located in core market areas.  Postpetition, the Debtors have determined that all stores in the noncore areas should be sold or closed.

6.      Since the Petition Date, the Debtors and their financial advisors have continued to analyze all of Debtors' stores, including each store's market share, cash flow, profitability, real estate quality and financial outlook.  Based upon this analysis, the Debtors have identified additional stores which are located in core market areas but remain unprofitable and should be sold or closed.  Attached as Exhibit A is a schedule identifying each of the stores the Debtors seek to sell or close, together with a summary description of the relevant lease, the lease term, and the identity of the landlord (collectively, the "Targeted Stores").[2]  Attached as Exhibit B is a schedule reflecting the inventory available for purchase at each of the Targeted Stores.

7.      When these Targeted Stores are sold or closed, the Debtors will operate a total of 589 stores in Florida, Alabama, Louisiana, Mississippi and Georgia.  This strategic restructuring will best position the Debtors for long term financial health.

8.      Since the Petition Date, the Debtors have extensively marketed the Targeted Stores with the purpose of selling rather than closing the stores.  The Debtors have retained three brokerage companies to assist in these marketing efforts, each of which has its own area of marketing expertise.  The Blackstone Group has and will continue to market the Targeted Stores to other national grocery chains.  The Food Partners has and will continue to market the Targeted Stores to smaller grocers**.**  DJM Asset Management has and will continue to market the Targeted

---

[2] Exhibit A does not include company-owned stores the Debtors intend to sell by separate motion.

3

Stores to nongrocers. Since being retained, these brokers have directly contacted over 500 potential purchasers.

9.      On April 26, 2005, the Debtors established an internet website as a part of their efforts to market the Targeted Stores (the "Merrill Site"). Potential purchasers may access the Merrill Site after signing a confidentiality agreement. The Merrill Site contains information on each of the Targeted Stores, including financial performance information, copies of the applicable leases and amendments, a site and fixture plan for each store, a summarized environmental assessment, a form asset purchase agreement and a proposed sale order, and, when available, real property title information.

10.     As of June 30, 2005, the Debtors have received bids from national grocery chains and smaller grocers (collectively, "Enterprise Purchasers"), regarding seventy-nine of the Targeted Stores. Many of the Enterprise Purchasers bid on groups of stores and many of these groups overlap. The Debtors and their financial advisors have analyzed the bids, consulted with the legal and financial advisors to the Creditors' Committee (the "Committee's Professionals") and Wachovia Bank, National Association, in its capacity as administrative agent (the "DIP Lender," and collectively, with its professionals, the "DIP Lender Agent Representatives") and selected twenty of these bidders as stalking horse Enterprise bidders (the "Stalking Horse Enterprise Bids"). Attached as Exhibit C is a schedule identifying each Stalking Horse Enterprise Bid, together with a summary of their bid terms. The Debtors will provide each landlord who has a lease with a Stalking Horse Enterprise Bid with a copy of the bid by electronic or overnight delivery. In connection with any such bid, the landlord will receive the proposed purchase agreement and a declaration regarding financial performance. A copy of the proposed purchase agreement for each Stalking Horse Enterprise Bid will also be available to the public at

www.loganandco.com[3].  Any interested party may also obtain a copy of the proposed purchase

agreement for any of the Stalking Horse Enterprise Bids by contacting Missy Heinz at [(404) 572-

2424].

### Relief Requested

11.     By this Motion, the Debtors request authority to sell any or all of the Targeted

Stores to an Enterprise Purchaser for the highest or best offer.  For each of the Targeted Stores

with a Stalking Horse Enterprise Bid[4], the Debtors seek authority to sell the Targeted Store and

assume and assign the relevant lease to the identified Stalking Horse Enterprise Bidder, subject to

a higher or better offer.  For each of the Targeted Stores with no such Stalking Horse Enterprise

Bid, the Debtors request authority to sell the Targeted Store and assume and assign the applicable

lease for the highest or best offer which the Debtors receive from Enterprise Purchasers at or

before the Auction (as defined below).  If no bid is received from an Enterprise Purchaser for any

one or more Targeted Store, the Debtors will withdraw the motion as to such Targeted Stores and

may continue to market the store.

12.     In the marketing process and Auction, the Debtors will comply with the bidding

procedures approved by the Court by Order dated June 21, 2005 (Docket No. 1801) (the "Bidding

Procedures").  A copy of the Bidding Procedures is attached as Exhibit D.  Any bidder who

desires to submit a competing bid (or, if no bid has been made as to a particular asset, an initial bid

on any Targeted Store) must do so by 5:00 p.m. E.T. on July 14, 2005.  A qualified bidder must

execute an asset purchase agreement (i) substantially in the form attached as Exhibit E[5] (to the

---

[3] At the request of the Bidders, the Debtors have agreed not to attach some of the Exhibits to the purchase agreements posted on the website or otherwise provided to the public.
[4] In the event a Stalking Horse Enterprise Bid is withdrawn, the Debtors reserve the right to accept additional Stalking Horse Enterprise Bids for the affected stores prior to the Auction.
[5] Exhibit E is the form of Purchase Agreement for a single store purchase.  The Debtors' also have a form for bidders on multiple stores, which is also posted on the Merrill Site.

extent there is no Stalking Horse Bid), or (ii) to the extent a Stalking Horse Bid exists, substantially in the form of the purchase agreement proposed by such Stalking Horse (in either event, the "Purchase Agreement"), marked to show any changes sought by the bidder.  The Debtors' proposed form of Purchase Agreement contains customary terms, conditions and defaults for sales of this type and has been posted on the Merrill Site since May 2, 2005.

13.   The material terms of the form of Purchase Agreement are as follows: [6]

(a)   <u>Purchase Price</u>.  The purchase price will be the sum of the inventory price, the supplies price and a fixed dollar amount agreed on or to be agreed to by the parties.  The purchase price for the Inventory is the total inventory price (based on a percentage of the retail shelf price) for each item of inventory and is to be paid at closing after an inventory count.  The supplies price is a fixed dollar amount per store agreed on or to be agreed on by the parties.

(b)   <u>Assets</u>.  The assets to be sold and transferred to the Purchaser include:

(i)   the Debtors' rights in the applicable lease and in any leasehold improvements;

(ii)   the Debtors' interest in all fixtures and equipment located in buildings existing on the Debtors' leased premises, other than Excluded Personal Property, and the Debtors' interest in the buildings including but not limited to any Improvements, as defined in the Purchase Agreement, and any trade fixtures and equipment;

(iii)   the grocery, general and pharmacy related over the counter inventory, other than excluded inventory, at the relevant store and the pharmacy inventory, if any;

(iv)   if the relevant store has a pharmacy and the Enterprise Bidder has offered to purchase, the Pharmacy Scrips, prescription drug inventory and control of the pharmacy phone line, if transferable; and

(v)   the Supplies ((i) – (vi) collectively, the "Assets").

---

[6] This summary of the form of Purchase Agreement is provided as a convenience only.  The form is subject to negotiation by bidders.  To the extent that this summary differs in any way from the terms of the Purchase Agreement, the terms of the Purchase Agreement and related documents control.  Capitalized terms are defined in the form of Purchase Agreement.  No party should rely on this summary in submitting a bid on a Targeted Store.  If a party wants to submit a competing bid the party should review the form of Purchase Agreement submitted by the initial bidder.

(c)     <u>Sale Free and Clear</u>.  The Purchase Agreement provides that the Assets are to be transferred free and clear of any liens, claims, interests and encumbrances (other than any Permitted Encumbrances) pursuant to 11 U.S.C. §363.

(d)     <u>Assumption and Assignment of the Leases; Cure Costs</u>.  On the closing date, the Debtors will assume and assign the relevant lease to the Purchaser. In connection with the assumption and assignment of the lease, the Debtors are responsible for any cure required pursuant to 11 U.S.C. §365(b).

(e)     <u>Court Order</u>.  The sale of the Assets to the Purchaser is subject to entry of an order of the Bankruptcy Court authorizing the sale pursuant to the terms of the Purchase Agreement.

(f)     <u>Allocation</u>.  To the extent the bidder is purchasing more than one of the Targeted Stores, the Agreement will include an allocation of the purchase price on a store by store basis.

14.     The Purchase Agreement provides for the assumption and assignment of the relevant lease to the Purchaser.  The Debtors will pay any undisputed cure amount due at closing (provided however, that the Debtors have a right to terminate any Purchase Agreement to the extent the cure amount is excessive).  Attached as Exhibit F is a schedule reflecting any cure amounts the Debtors believe are owed as to each landlord of a Targeted Store and any other cure required.  All landlords of the Targeted Stores will be served with a copy of this Motion. Landlords who dispute the cure amount or other proposed cure for their lease or contract must file with the Court and serve on the Debtors an objection to this Motion on or before July 14, 2005.  Any objection to a proposed cure will be adjudicated by the Court at a hearing to be scheduled and separately noticed by the Debtors (the "Cure Hearing").  If a landlord fails to timely file and serve an objection to this Motion contesting its scheduled cure, the landlord will be deemed to have consented to the cure for its respective lease as scheduled on Exhibit F and will be barred from asserting a larger claim for such cure.

16.     To the best of the Debtors' knowledge (i) Florida Fine Wine and Spirits' intended use of store number 739 under its trade name complies with the use provisions of the leases

described in the attached Exhibit H for the store and (ii) the exclusive use clauses granted to Ross Department Stores and Service Merchandise are completely and accurately described in the Exhibit H.

17.     In accordance with the Bidding Procedures, the Debtors will hold an Auction on July 18 and 19 at 10:00 a.m. E.T. at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036.

18.     At the conclusion of the Auction, the Debtors will determine, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, which, if any, is the highest or best offer by an Enterprise Purchaser for any particular store or group of stores (a "Successful Enterprise Bid").  The Debtors will file the proposed purchase agreement for each Successful Enterprise Bid and serve within 24 hours of the conclusion of the Auction, by overnight or hand delivery, a copy of the proposed purchase agreement and a declaration regarding adequate assurance of future performance on (i) the landlord for the relevant store (ii) the Committee's Professionals, (iii) the U.S. Trustee, and (iv) the DIP Lender Agent Representatives.  A hearing to approve the Successful Enterprise Bid(s) will be held on July 27, 28 or 29, 2005 (or such other later date as the Debtors designate) (the "Sale Hearings").

19.     At the Sale Hearings, the Debtors will request entry of one or more orders substantially in the form attached as Exhibit G (i) authorizing the Debtors to sell the Targeted Stores free and clear of liens, claims and interests to the Successful Enterprise Bidder, (ii) approving the assumption and assignment of the relevant lease, and (iii) finding that the Purchaser is a good faith purchaser under Bankruptcy Code Section 363(m) and has demonstrated adequate assurance of future performance under Bankruptcy Code Section 365(f).  The Debtors may continue (in their sole discretion) to market all unsold Targeted Stores.

## Notice

20.     The Debtors will serve this Motion, together with a notice of hearing upon (i) all entities known to have expressed an interest in any of the Targeted Stores in the last twelve months, (ii) all nondebtor parties to the leases and subleases of the Targeted Stores, (iii) all entities known to assert any lien, claim, or interest in any of the Assets, (iv) all federal, state and local regulatory or taxing authorities relating to these leased locations, and (v) all parties on the Master Service List.  In addition, to the extent the Debtors have a Stalking Horse Bid in excess of $5 million for any Assets, the Debtors will publish a notice of sale of the Assets in accordance with the Bidding Procedures.  At the conclusion of the Auction, the Debtors will serve a notice to all parties served with the Motion, summarizing the sale results and specifying the exact date of the Sale Hearings (July 27, 28 or 29) for each Successful Enterprise Bid.  **Objection Deadline:** Except for landlords of affected leases, only objections filed and served on D. J. Baker at djbaker@skadden.com, Skadden, Arps, Slate, Meagher, & Flom, LLP, Four Times Square, New York, New York 10036 and on Cynthia C. Jackson at cjackson@smithhulsey.com, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 so as to be received by **July 20, 2005** will be considered by the Bankruptcy Court at the Sale Hearing.  .

## Applicable Authority

A.     **Authority to Enter into the Purchase Agreement and Sell the Assets**

21.     Bankruptcy Code Section 363(b)(1) provides:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy Code Section 1107(a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under Section 363(b)(1).

22.     A debtor's sale under Section 363(b)(1) should be approved when supported by a sound business reason.  *See In re BDK Health Mgmt., Inc.,* Case Nos. 98-00609-6B1, 1998 WL

00497657.DOC.9

34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a Section 363(b) application must find from the evidence presented before him a good business reason to grant such application); *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (holding that a debtor in possession may sell assets of his estate outside the ordinary course of business if he has an articulated business justification); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that the business judgment test is the proper standard to apply when considering a debtor's motion to sell assets outside the ordinary course of business); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that a trustee must show that "there is a sound business purpose for conducting the sale prior to confirmation of a plan"); *In re Gulf States Steel, Inc. of Alabama,* 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002) ("[T]he Trustee has the burden to establish sound business reasons for the terms of the proposed sale").

23.     Once a court is satisfied that a sound business reason for the sale exists, the court must also consider whether (a) the sale price is fair and reasonable, (b) the purchaser is proceeding in good faith, and (c) the debtor has provided interested parties with adequate and reasonable notice. *Delaware & Hudson*, 124 B.R. at 175-76.

24.     The Debtors have a sound business reason for pursuing this sales process in the manner set forth in the Motion. To the extent the Debtors receive an Enterprise Bid for any of the

Targeted Stores, the Debtors need to consummate the sale as quickly as possible to capture the store's going concern value and thereby maximize the value to be received by the Debtors' estates and creditors. Delay in the sale will, based on the Debtors' prepetition experience, result in a significant loss of value for the stores. Accordingly, there is a sound business purpose for the requested relief.

**B.      The Sale Free and Clear of All Liens and Encumbrances**

25.     The Debtors request that the sale of any of the Targeted Stores and the transfer of any Assets pursuant to such sale be approved free and clear of any lien, claim, or interest. This relief is consistent with the provisions of Bankruptcy Code Section 363(f) in these cases.

26.     Pursuant to Section 363(f) of the Bankruptcy Code, a debtor may sell property of the estate free and clear of all liens and encumbrances, after notice and a hearing. *See In re Parrish*, 171 B.R. 138, 140 (Bankr. M.D. Fla. 1994) (noting that compliance with the requirements of Section 363(f) is a prerequisite to a sale free and clear of liens).

27.     The Debtors believe that there are no interests in or claims against the Assets, other than those of Wachovia Bank, National Association, as Administrative Agent and Collateral Agent (collectively, the "DIP Lender"), and the nondebtor parties to the leases and subleases. Any undisputed claims of the landlord will be paid by the Debtors upon closing, in accordance with the terms and conditions of the Purchase Agreement and 11 U.S.C. §365. Any disputed cure will be satisfied upon adjudication by the Bankruptcy Court at the Cure Hearing or by resolution of the Debtors and the affected landlord. The interests of the DIP Lender will be satisfied because the Debtors will cause the proceeds from any of these sales to be paid in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and

11

Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders'

Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of

All Claims of Debtors' Pre-Petition Secured Lenders dated March 23, 2005 (Docket No. 501) (the

"Final Financing Order") and the Loan Documents (as defined in the Final Financing Order).

28.     To the extent that any other interests in or claims against the Assets exist, the

Debtors will satisfy Bankruptcy Code Section 363(f).  Moreover, any holder of any interests or

claims will be adequately protected because interests and claims, if any, will attach to the proceeds

of the Sale, with the same validity, enforceability, priority, force and effect they now have as

against the Assets, subject to any rights, claims, defenses and objections of the Debtors and all

interested parties.  Accordingly, the requirements of Bankruptcy Code Section 363(f) will be

satisfied, and the sale of the Assets free and clear of any lien, claim, or interest is appropriate.

Thus, the proposed sale process satisfies section 363(f) of the Bankruptcy Code.

**C.     Good Faith Purchaser**

29.     Bankruptcy Code Section 363(m) provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

30.     The Bankruptcy Code does not define the term "good faith".  Courts, however,

have held that a party would have to show fraud or collusion between the purchaser and other

bidders or the Debtors to demonstrate a lack of good faith.

00497657.DOC.9

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchasers' good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

> *In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988).

*Accord Kabro Assoc. of W. Islip, LLC v. Colony Hill Assoc. (In re Colony Hill Assoc.)*, 111 F.3d 269, 276 (2d Cir. 1997).

31.    The Debtors submit that: (a) the Targeted Stores were marketed extensively; and (b) the marketing process that occurred and the notice of the Sale Hearings ensure that the Enterprise Purchaser has not exerted undue influence over the Debtors.  If a landlord objects to any proposed sale, the Debtors will also offer additional evidence of the purchaser's good faith. Accordingly, at the Sale Hearings the Debtors will request that the Court find that the respective Enterprise Purchaser acted in good faith within the meaning of Bankruptcy Code Section 363(m). *See BDK Health Mgmt.*, 1998 WL 34188241 at *4 (finding that the Purchaser is entitled to the protections of Bankruptcy Code Section 363(m) because the sale was negotiated at arms-length, proposed in good faith and the consideration for the assets was fair and reasonable.).

**D.    Authority to Assume and Assign the Leases**

32.    Section 365(a) of the Bankruptcy Code authorizes a debtor to assume an unexpired lease subject to the Court's approval.

33.    The standard that is applied in determining whether an unexpired lease should be assumed is the debtors' "business judgment" that the assumption is in the Debtors' economic best interest. *Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984).  The Debtors' assumption and

13

assignment of any lease connected to a Targeted Store is an integral part of the proposed sale and,

therefore, within the Debtors' sound business judgment.

      34.     Bankruptcy Code Section 365(b)(1) codifies the requirements for assuming an

unexpired lease of a debtor:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:

> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default;

> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

      35.     By the Purchase Agreement, the Debtors have agreed to comply with Bankruptcy

Code Section 365(b)(1)(A) and (B) by curing any defaults under the respective lease.

      36.     At the Sale Hearings, the Debtors will also satisfy Bankruptcy Code Section

365(b)(1)(C), by demonstrating adequate assurance of future performance by the Enterprise

Purchaser.  Bankruptcy Code Section 365(f)(2) provides:

> The trustee may assign an executory contract or unexpired lease of the debtor only if:

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

14

11 U.S.C. § 365(f)(2).

37.     The meaning of "adequate assurance" depends on the facts and circumstances of each case, but should "be given a practical pragmatic construction".  *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citation omitted), *aff'd*, 993 F.2d 300 (2d Cir. 1993).  The assurance that rent will be paid is a chief determinant in assessing adequate assurance of future performance.  *Id*.

38.     Adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance:

(A)     of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B)     that any percentage rent due under such lease will not decline substantially;

(C)     that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D)     that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3).

Thus, adequate assurance includes demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance was present when prospective assignee of lease from debtor had the financial resources, and an expressed willingness, to devote sufficient funding to business in order to give it strong likelihood of succeeding).

15

00497657.DOC.9

39.     If a landlord of any affected lease or sublease objects to any proposed sale, the Debtors will offer evidence at the Sale Hearings to demonstrate the financial wherewithal of any Enterprise Purchaser including, its experience in the industry and its willingness and ability to perform.   At the Sale Hearings, the Court and interested parties will have the opportunity to evaluate and, if necessary, challenge the ability of the Enterprise Purchaser to provide adequate assurance of future performance under the particular lease to be assumed.   The Court will therefore have sufficient bases to find that adequate assurance of future performance exists.

**E.     The Sale Should be Exempt from Taxes**

40.     Bankruptcy Code Section 1146(c) provides that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax."   11 U.S.C. § 1146(c).   This language has been construed to include transfers pursuant to a sale outside of, but in furtherance of effectuating, a reorganization plan.   *Webster Classic Auctions, Inc*., 318 B.R. 216, 218 (Bankr. M.D. Fla. 2004) (adopting rationale that purpose of Bankruptcy Code Section 1146(c) is to facilitate reorganizations and that transfers need not be postconfirmation); *BDK Health Mgmt.*, 1998 WL 34188241, at *8 (granting Bankruptcy Code Section 1146(c) relief outside of confirmed plan); *see also In re T.H. Orlando Ltd.*, 391 F.3d 1287, 1291 (11th Cir. 2004) (exemption applies where transfer is necessary to the consummation of a plan.); *City of New York v. Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.)*, 758 F.2d 840, 841-42 (2d Cir. 1985) (holding that where a transfer is necessary to the consummation of a plan, the transfer is "under a plan" within meaning of Bankruptcy Code section 1146(c)); *City of New York v. Smoss Enters. Corp. (In re Smoss Enters. Corp.)*, 54 B.R. 950, 951 (E.D.N.Y. 1985) (stating that Section 1146(c) was designed to reach transfers on which "the plan hinged and which the court had to approve prior to the confirmation"), *aff'd mem.*, No. 85-5106, 1986 U.S. App. LEXIS

16

28677 (2d Cir. Mar. 31, 1986); *In re United Press Int'l, Inc.*, Case No. 91 B 13955 (FGC), 1992

Bankr. LEXIS 842, at *4, *6-7 (Bankr. S.D.N.Y. May 18, 1992) (holding that Bankruptcy Code

Section 1146(c) exemption applied to Section 363 sale where it found "the value of the Debtor's

assets is likely to deteriorate [during the] time necessary to . . . confirm a plan"); *In re Permar*

*Provisions, Inc.*, 79 B.R. 530, 533-34 (Bankr. E.D.N.Y. 1987) (stating that determination of

applicability of Bankruptcy Code Section 1146(c) exemption is same for pre- and post-

confirmation dispositions of property, namely "whether the sale of 'property is essential to

confirmation of the plan'") (citation omitted).

41.     Although the Debtors have not yet filed a Chapter 11 plan of reorganization, an

integral part of any plan will be the Debtors' ability to divest themselves of the Targeted Stores.

In light of the foregoing, the Debtors respectfully submit that the sale of the Targeted Stores is an

integral part of, and a necessary predicate toward, the Debtors' Chapter 11 reorganization plan.

Accordingly, the sales should be exempt under Bankruptcy Code Section 1146(c) from any stamp,

transfer, sales, recording or similar taxes.

**F.      Elimination of 10-Day Stay Under Rules 6004(g) and 6006(d)**

42.     Pursuant to Rule 6004(g), F.R. Bankr. P., unless the Court orders otherwise, all

orders authorizing the sale of property outside of the ordinary course of business pursuant to

Section 363 of the Bankruptcy Code are automatically stayed for ten days after entry of the order.

Rule 6006(d), F.R. Bankr. P. provides a similar ten-day automatic stay period with respect to the

assumption and assignment of executory contracts.  Given the requirements of the Purchase

Agreement and the need to close the sale and assume and assign the leases as promptly as

possible, the Debtors request that the Court order and direct a waiver of the 10-day stay period.

17

**<u>Conclusion</u>**

For the foregoing reasons, the Debtors respectfully request that (i) at the applicable Cure Hearing, the Court enter an order establishing any cure due under the leases described in Exhibit F, and (ii) at the Sale Hearings, the Court enter one or more orders substantially in the form attached as Exhibit G (a) authorizing the Debtors to sell any particular Targeted Store free and clear of all liens, claims and encumbrances and exempt from taxes, (b) authorizing the Debtors to assume and assign the relevant leases and subleases to the relevant Enterprise Purchaser; and (c) granting such other and further relief as the Court deems just and proper.

Dated: July 1, 2005

| | |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | SMITH HULSEY & BUSEY |
| | |
| By   */s/ D. J. Baker* | By   */s/ Cynthia C. Jackson* |
|       D. J. Baker |       Stephen D. Busey |
|       Sally McDonald Henry |       James H. Post |
|       Rosalie W. Gray |       Cynthia C. Jackson  (F.B.N. 498882) |
|       Eric M. Davis |       Eric N. McKay |
| | |
| Four Times Square | 225 Water Street, Suite 1800 |
| New York, New York 10036 | Jacksonville, Florida  32202 |
| (212) 735-3000 | (904) 359-7700 |
| (212) 735-2000 (facsimile) | (904) 359-7708 (facsimile) |
| djbaker@skadden.com | cjackson@smithhulsey.com |
| | |
| Co-Attorneys for Debtors | Co-Attorneys for Debtors |

00497657.DOC.9