## COMPOSITE EXHIBIT E

**For Discussion Purposes Only**
[FORM -SINGLE STORE - Last Revised 5/31/05]
3772317 v.2

### ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made effective as of _____, 2005 (the "Effective Date"), by and among

**WINN-DIXIE _____, INC.,** a Florida corporation ("Seller"), and

_____, a _____, or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

### R E C I T A L S :

A.   Seller is the tenant of the supermarket store (the "Store"), listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under the lease, including amendments thereto (the "Lease") described on Exhibit A-2 to this Agreement. The Store occupies the leased premises as described in the Lease (the "Leased Premises"), within the parcel or parcels of real property described on Exhibit A-2 to this Agreement associated with the Lease. Seller's leasehold interest in the Leased Premises pursuant to the Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to the Leased Premises, hereinafter collectively are referred to as the "Assets."

B.   Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.   Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no. 05-03817-3F1 (the "Bankruptcy Case").

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0   **Defined Terms.**  Capitalized terms as used in this Agreement will have the following meanings when used herein.

1.1  "Adequate Assurance Information" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that Landlord and Subtenant are adequately assured of Buyer's future performance under the Lease, as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's obligations under the Lease and (where applicable) the Sublease by an Affiliate of Buyer with sufficient assets to provide adequate assurance of future performance.

1.2  "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3  "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4  "Approval Hearing" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.5  "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.6  "Bankruptcy Code" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.7  "Bankruptcy Court" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.8  "Bankruptcy Court Approval" will mean the entry of a Sale Order with respect to the Store by the Bankruptcy Court.

1.9  "Bankruptcy Case" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.10 "Base Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.11 "Base Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.12 "Bidding Procedures" will mean the procedures approved by the Bankruptcy Court that will govern the selection by Seller of the Successful Bid for the Store.

1.13 "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at the Closing the Inventory, the Supplies, the Equipment and other tangible

and intangible personal property constituting a portion of the Assets relating to the Store.

1.14 "Building" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.15 "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.16 "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

1.17 "Buyer Inventory Representative" will mean _____ or another person designated in writing by such person or by Buyer to act in such capacity.

1.18 "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to this transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policy (and the cost of any simultaneous issue mortgagee title insurance policy and any loan-related title insurance endorsements thereon); (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instrument; (e) recording fees payable in connection with recording the Conveyance Instrument in the appropriate public records; (f) cost of the Environmental Report, including any supplements or updates; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the note and mortgage; (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment, Supplies and Inventory; (i) the fees and costs of the Closing Escrow Agent; and (j) the fees and costs of the Inventory Service.

1.19 "Buyer's Escrowed Items" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.20 "Closing" will mean the consummation of the assignment, assumption, sale and purchase of the Assets pursuant to this Agreement as indicated by delivery of the Conveyance Instrument and other documents contemplated by paragraph 14 of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.21   "Closing Date" will mean the date designated by Seller in writing, and reasonably acceptable to Buyer, that is between one day and 30 days following the Bankruptcy Court Approval.

1.22   "Closing Statement" will mean a statement in the form of Exhibit C-1 to this Agreement (or in such other form as is prepared by Seller and reasonable acceptable to Buyer) reflecting the net amount due Seller at the Closing (other than in respect of the Inventory Price), after making the adjustments described in paragraph 3.3.3 of this Agreement and in other provisions of this Agreement.

1.23   "Confidentiality Agreement" will mean the existing letter agreement between Winn-Dixie and Buyer, regarding, among other things, confidentiality relating to the subject matter of this Agreement.   Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.[1]

1.24   "Conveyance Instrument" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.25   "Credit Agreement Liens" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.26   "Cure Costs" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Lease and the Sublease.

1.27   "Damages" will have the meaning assigned in paragraph 16.5 of this Agreement.

1.28   "Deposit" will have the meaning assigned in paragraph 3.3 of this Agreement.

1.29   "Due Diligence Materials" will mean, collectively, (i) the Lease, the Sublease (if any), the Title Reports and the Environmental Report, (ii) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, at the Store, on the Merrill Website, or

---

[1] Revise in cases where Winn-Dixie Stores, Inc. is the Seller.

otherwise and (iii) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.30 "Effective Date" will have the meaning assigned in the initial paragraph of this Agreement.

1.31 "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.32 "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.33 "Escrow Agent" will mean Title Insurer, acting as escrow and closing agent.

1.34 "Excluded Inventory" will mean (i) any private label goods and merchandise; (ii) any goods and merchandise that are damaged, spoiled or distressed; (iii) any items that as of the Inventory Count Date are past Seller's "pull date", if any, or, with respect to dairy items, within five days of Seller's "pull date" or, with respect to frozen foods, within 10 days of Seller's "pull date", or with respect to pharmaceutical inventory (including diabetic supplies), within 30 days of the manufacturer's expiration date, if any; and (iv) if applicable, any inventory deemed to be Excluded Inventory under paragraph 3.5 of this Agreement.

1.35 "Excluded Personal Property" will mean: (i) all Excluded Inventory; (ii) all packaging materials and supplies not included in the term "Supplies"; (iii) all leased point-of-sale equipment and leased photo lab equipment; (iv) all other leased equipment (including all other leased equipment described on Exhibit D to this Agreement with respect to the Store); (v) all owned computer and related equipment that contains software subject to a license that restricts its transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed; (vi) all equipment and other personal property that is neither owned nor leased by Seller, including by way of example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners and equipment owned by product vendors; (vii) all branded shopping carts; (viii) all over-the-road motor vehicles; (ix) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (x) all data files other than Pharmacy Scrips; (xi) all lottery equipment and tickets; (xii) all accounts receivable, bank accounts, cash and cash equivalents; (xiii) all trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates; (xiv) all building signs and panels in all pole and pylon signs that advertise Seller's

business in the Store; (xv) all intellectual property and rights (other than Pharmacy Scrips) relating to any of the foregoing; and (xvi) all service agreements, leases of personal property, contracts and warranties relating to Seller's possession and operation of the Store.

1.36    "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.37    "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.38    "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.39    "Initial Title Reports" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Store that Seller has made available to Buyer for review on the Merrill Website or otherwise as of the Effective Date. [²]  Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.40    "Inventory" will mean all inventories of goods and merchandise within the Store and owned by Seller on the Inventory Count Date and held for resale in the ordinary course of business of Seller conducted at the Store to retail customers, but excluding the Excluded Inventory.

1.41    "Inventory Certificate" will mean a certificate executed by Buyer and Seller in connection with the Closing as contemplated by paragraph 3.4.4 of this Agreement, in the form attached hereto as Exhibit H to this Agreement.

1.42    "Inventory Closing Statement" will mean a statement in the form of Exhibit C-2 to this Agreement reflecting the net amount due Seller at the Closing in respect of the Inventory Price, after making the adjustments described in Exhibit C-2 and in other provisions of this Agreement.

1.43    "Inventory Count" will have the meaning assigned in paragraph 3.4.1 of this Agreement.

---

[²] [Note:  Seller has posted on the Merrill Website certain existing title insurance policies with respect to the Store.  Seller has ordered current title insurance commitments and intends to make such commitments available to prospective bidders on the Merrill Website or otherwise as soon as practical and possibly before execution of the Asset Purchase Agreement. ]

1.44 "Inventory Count Date" will mean the day immediately preceding the Closing Date.

1.45 "Inventory Deposit" will have the meaning assigned in paragraph 3.3 of this Agreement.

1.46 "Inventory Price" will mean the purchase price for the Inventory determined pursuant to paragraph 3.4 of this Agreement.

1.47 "Inventory Service" will mean MSI Inventory Service Corporation or Accurate Inventory & Calculating Service, Inc., as designated by Seller, or such other inventory service as is selected by Seller and reasonably acceptable to Buyer.

1.48 "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of _____, without any requirement of investigation or inquiry.[3]

1.49 "Landlord" will mean the lessor under the Lease.

1.50 "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.1 of this Agreement.

1.51 "Lease" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.52 "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Store for its current use, taken as a whole, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the

---

[3] The person or persons identified as "Knowledge" party for Buyer should include all senior officers of Buyer and its Affiliates having responsibility for legal affairs.

conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.53    "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Jaguar" with respect to the disposition of the Store and other properties.

1.54    "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on any of Seller's leasehold interests or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under the Lease or on any other Assets; and (D) judgments that have attached to and become a lien against Seller's interest under the Lease or on any other Assets.

1.55    "ordinary course of business" means the ordinary course of business of Seller after the Filing Date.

1.56    "Outside Date" means September 2, 2005, as such date may be extended by the written agreement of Seller and Buyer.

1.57    "Permits" will have the meaning assigned in paragraph 6.2 of this Agreement.

1.58    "Permitted Encumbrances" will mean (i) all matters listed on Exhibit F to this Agreement, (ii) all other matters set forth as exceptions in the Initial Title Reports, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in any additional Title Reports, other than Monetary Liens.

1.59    "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.60    "Pharmacy Scrips" will mean all customer lists, prescription files, prescription registers, and operating and maintenance logs owned by Seller that relate to the pharmacy operated in the Store.

1.61    "Purchase Price" will mean the Base Purchase Price, the Inventory Price and the Supplies Price collectively.

1.62 "Real Property" will mean the Leased Premises and the Improvements together.

1.63 "Real Property Escrow Date" will mean the date that is two Business Days prior to the Closing Date or such earlier date after the Bankruptcy Court Approval as Buyer and Seller may mutually designate.

1.64 "Sale Order" will mean an order or orders of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby.

1.65 "Seller" will have the meaning assigned in the initial paragraph of this Agreement.

1.66 "Seller Delivery Confirmation" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.67 "Seller Inventory Representative" will mean Michael Chlebovec or another person designated in writing by Michael Chlebovec or by Seller to act in such capacity.

1.68 "Seller's Brokers" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.69 "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; and (c) the Cure Costs.

1.70 "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.71 "Store" will have the meaning assigned in paragraph A of the Recitals to this Agreement, including if applicable any associated gas station, liquor store, pharmacy or other specialty area operated by Seller at the Leased Premises.

1.72 "Sublease" will mean, collectively whether there is one or more, the sublease(s) of a portion of the Leased Premises listed on Exhibit A-2 to this Agreement (if any), including amendments. If no sublease is listed on Exhibit A-2 to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Sublease will be disregarded.

1.73 "Subtenant" will mean, collectively whether there is one or more, the subtenant or sublessee under each Sublease. If no sublease is listed on

Exhibit A-2 to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Subtenant will be disregarded.

1.74    "Successful Bid" will mean the highest or otherwise best offer to purchase the Assets, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.75    "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the preparation or merchandising of Inventory, located within the Store and owned by Seller on the Inventory Count Date, excluding, however, any such packaging materials and supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of their Affiliates.

1.76    "Supplies Price" will mean the purchase price payable by Buyer for the Supplies, which will be $2,500.00.

1.77    "Title Reports" will mean, collectively, (i) the Initial Title Reports and (ii) any additional title reports and/or title insurance commitments with respect to the Store that Seller has made available to Buyer for review on the Merrill Website or otherwise.

1.78    "Title Insurer" will mean First American Title Insurance Company or Near North National Title LLC, as agent for Lawyers Title Insurance Corporation, or any other nationally recognized title insurance company, as designated by Seller.

1.79    "Title Policy" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.80    "Winn-Dixie" will mean Winn-Dixie Stores, Inc.

2.0    **Property Included in Sale.** Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets, which—excluding Excluded Personal Property—are comprised of the following:

2.1    Seller's interest, as tenant, under the Lease and Seller's interest in any leasehold improvements;

2.2    Seller's interest in all fixtures and all equipment located in the store building or buildings now existing on the Leased Premises (the "Building"), including but not limited to Seller's interest in (i) heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Building, elevators, docks, lifts, doors, storefronts,

ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "Improvements"), and (ii) Seller's trade fixtures and equipment located in the Building (the "Equipment");

2.3    The Inventory;

2.4    The Supplies;

2.5    If the Store includes a pharmacy, the Pharmacy Scrips (provided Buyer has obtained all Permits necessary for Seller to lawfully convey the Pharmacy Scrips to Buyer at Closing) and, to the extent transferable, ownership and control of pharmacy phone lines;

2.6    Seller's interest in the Sublease (if any).

Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are subject to higher or otherwise better offers for the Assets and conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

3.0    **Purchase Price.**

3.1    Amount.  The purchase price to be paid by Buyer to Seller for the Assets (other than the Inventory and Supplies) is $_____ (the "Base Purchase Price").  The purchase price to be paid by Buyer to Seller for the Inventory is the total of the Inventory Price for each item of Inventory, and the purchase price to be paid by Buyer to Seller for the Supplies is the Supplies Price.

3.2    Contract Consideration and Base Deposit.  As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer shall deliver to Escrow Agent, no later than two Business Days after Seller's execution and acceptance of this Agreement, a base earnest money deposit of $_____ (the "Base Deposit").[4]    Buyer shall make the Base Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Base Deposit will be subject to refund to Buyer to the extent and in the circumstances described in paragraphs 12, 15 and 16.  The Base Deposit will be credited against the Base Purchase Price at the Closing and will be held in an escrow account maintained by Escrow Agent prior to the Closing.  Whenever used herein, the term Base Deposit also will be deemed to include all interest accrued thereon if the escrow account maintained by Escrow Agent is an interest bearing account; however, for state and federal income tax purposes, interest, if any,

---

[4] The Base Deposit should be no less than the greater of (i) 10% of the Base Purchase Price, or (ii) $10,000.00.

accrued on the Base Deposit will be deemed earned by Buyer.  Buyer's federal taxpayer identification number (FEIN) is _____.

3.3    Payment.  The Purchase Price will be paid in the following manner:

3.3.1  *Base Purchase Price and Supplies Price*.  On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Base Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the Closing Statement), and the Supplies Price.  On the Closing Date, Buyer will, subject to the conditions set forth in paragraph 10 of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted) and the Supplies Price to Seller (by wire transfer to an account designated in writing by Seller).

3.3.2  *Inventory Deposit and Inventory Price*.   On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) an inventory deposit of $_____ (the "Inventory Deposit").[5] The Inventory Price shall be determined in the manner set forth in paragraph 3.4 of this Agreement.  At the Closing, (a) Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the amount by which the Inventory Price exceeds the Inventory Deposit, and (b) Buyer will instruct Escrow Agent to transfer and deliver the Inventory Price to Seller, by wire transfer to an account designated in writing by Seller.  If the Inventory Deposit exceeds the Inventory Price, then Seller and Buyer shall provide written instructions to Escrow Agent to deliver the excess to Buyer promptly following Closing.   The Base Deposit and, once deposited, the Inventory Deposit will individually and collectively sometimes be referred to in this Agreement as the "Deposit".

3.3.3  *Certain Transaction Costs*.  All relevant rent, taxes (including real and personal property taxes), utilities (including the pharmacy phone line, where applicable) and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Base Price and Supplies Price to the extent thereof and then against the Inventory Price.   Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be

---

[5]   The Inventory Deposit should be no less than 110% of the estimated Inventory Price.

responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.3.3 which apply to the period after the Closing shall survive the Closing.

3.3.4  *Sales Tax*.  Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. On Seller's request, Buyer agrees to provide Seller with a certificate stating that Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Seller or any governmental authority to document that sale of the Inventory is exempt from sales tax. This paragraph 3.3.4 shall survive the Closing.

3.4  Inventory.

3.4.1  *Count of Store Inventory.*  Seller shall close the Store at a time designated by Seller between 5:00 p.m. and 11:00 p.m. on the Inventory Count Date, unless otherwise agreed to by Seller and Buyer. As soon as possible after the closing of the Store, the parties will conduct a physical count (or measurement with respect to gasoline and other vehicle fuels) of the Inventory at the Store (the "Inventory Count") with the assistance of the Inventory Service. Buyer and Seller will each have representatives present at the Store during the Inventory Count who will acknowledge in writing all computations before leaving the Store. Upon completion of such Inventory Count, except for mathematical errors, other agreed upon changes and disputes regarding Excluded Inventory, the count of the Inventory Service shall be final and binding on the parties for all purposes of this Agreement.

3.4.2  *Pharmacy Inventory.*  If the Store includes a pharmacy, pharmaceutical Inventory will be inventoried by item as follows and the inventory forms for such Inventory will be signed by registered pharmacists representing Seller and Buyer:

(a)    Schedule II drugs will be inventoried as exact counts and transferred on DEA 222 form supplied to Buyer by Seller and approved by Buyer; and

(b)    Will-call prescriptions filled but not purchased by customers at the time of the Inventory Count will be returned for credit and included in the Inventory Count.

3.4.3  *Valuation of Inventory.* The Inventory will be valued by applying the following methods to the count reported by the Inventory Service:

(a)    with respect to pharmaceutical Inventory and gasoline the value used will be Seller's actual cost as reflected on its records kept in the ordinary course of business (for gasoline, cost shall be last acquisition cost), and

(b)    with respect to all other Inventory the value used will be determined by taking Seller's standard retail shelf price (after adjusting to remove temporary or special price reductions, promotions or discounts, coupon discounts or customer loyalty card discounts) for the applicable item and multiplying such price by the valuation percentage for each merchandise category indicated in the table below:

| Category | Valuation Percentage |
|----------|----------------------|
| 1.  Grocery (food and non-food) | 77% |
| 2.  Dairy | 86% |
| 3.  Frozen Food | 65% |
| 4.  General Merchandise | 76% |
| 5.  Tobacco | 82% |
| 6.  Alcohol | 85% |
| 7.  Packaged Lunch Meats | 68% |

3.4.4  *Inventory Certificates; Inventory Closing Statement.* Upon completion of the valuation of the Inventory, which shall be completed prior to the completion of Closing, the Buyer and Seller shall execute an Inventory Certificate, which shall contain the Inventory Price for the Inventory, and shall have incorporated therein a complete listing of the Inventory. Following execution of the Inventory Certificate, if requested by Buyer, Seller or Escrow Agent, Buyer and Seller shall execute an Inventory Closing Statement, which shall contain the Inventory Price for the Inventory and shall otherwise be consistent with the Inventory Certificate, and shall have incorporated therein appropriate disbursement instructions to Escrow Agent.

3.4.5 *Cooperation and Resolution of Disputes.* The parties agree to be cooperative and reasonable in connection with the Inventory Count and will attempt, in good faith, to resolve any disputes respecting the quantity of Inventory, Excluded Inventory and Excluded Personal Property that may arise during the Inventory Count. Any disputes that have not been resolved by the completion of Closing shall be separately listed and settled by Buyer Inventory Representative and Seller Inventory Representative as expeditiously as practicable thereafter or, if the parties cannot agree, by the Bankruptcy Court. Any such determination of any dispute shall be final and binding on the parties.

3.4.6 *Inventory Services and Fees.* Seller will engage the Inventory Service, but the fees of the Inventory Service will be billed to and paid by Buyer. Buyer agrees to pay such fees at Closing or earlier if then due and in any event before delinquent.

3.5 Inventory Relating to Permits. If by Closing Buyer shall not have obtained any required Permit contemplated by paragraph 9.2 of this Agreement, notwithstanding its best efforts to do so, any tobacco, liquor, beer, wine, pharmaceuticals or other Inventory that under applicable law may not be transferred without such Permit will not be sold and transferred at Closing but will be segregated at the Store, unless the parties agree otherwise at or before Closing, (a) the relevant items of Inventory will be deemed to constitute Excluded Inventory, (b) the Bill of Sale to be delivered to Buyer at Closing will specifically exclude such Inventory, (c) the Inventory Price will be reduced by the Inventory Price allocable to such Inventory, and (d) Seller will remove such Inventory from the Store in the same manner as other Excluded Property and with reasonable promptness after Closing. Notwithstanding the foregoing clause (d), if applicable law or regulation restricts Seller from removing from the Store (or transporting from the Store to a convenient location in which Seller will have continuing operations) any tobacco, liquor, beer, wine, pharmaceuticals or other Inventory that constitutes Excluded Property, then (i) Seller will have the right to segregate such Inventory at a secured location in the Store selected by Seller and reasonably acceptable to Buyer, and to maintain and protect such Inventory at such secured location for so long as Seller reasonably requires in order to obtain all Permits necessary to remove or transport such Inventory (or to sell or convey such Inventory to a third party entitled to do so), (ii) Seller will have reasonable access to such secured location to maintain and protect such Inventory and when appropriate remove such Inventory from the Store, and (iii) Seller will have the right but not the obligation to require Buyer to purchase such Inventory, at the Inventory Price allocable to such

Inventory, at such time as Buyer has obtained such Permits as are required for Seller to do so.

3.6     <u>Allocation of Base Purchase Price Among Assets</u>.  Seller shall have the right to allocate the Base Purchase Price, for tax purposes and all other purposes, among the Assets other than Inventory and Supplies (as such Assets are described in <u>paragraph 2.0</u> of this Agreement); <u>provided, however</u>, that such allocation shall not be binding upon Seller or determinative with respect to any allocation made by Seller of the Base Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case.  The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets on the Closing Statement.

## 4.0     **Buyer's Due Diligence.**

4.1     <u>Acknowledgment</u>.  In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence regarding the Store and the Assets and it has had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement.  Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Store and the Assets and to acquire such additional information about the Store and the Assets as Buyer has reasonably requested.  Buyer agrees that any physical access to or investigation of the Store by Buyer or its representatives shall be limited by and shall comply in all respects with the written instructions and requirements of Seller.

4.2     <u>Title</u>.  Buyer confirms and acknowledges that Seller has made the Initial Title Reports available to Buyer, and intends to make additional Title Reports available to Buyer, and Buyer may negotiate with the Title Insurer to obtain a title insurance policy with respect to the Store (the "<u>Title Policy</u>") at Closing.  If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present use or occupancy of the Store, Buyer may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to Catherinelbold@winn-dixie.com within three business days of the date such additional Title Report is either delivered to Buyer or posted on the Merrill Website.  To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #____" with the appropriate Store number set forth).  If Buyer timely notifies Seller of any valid objection to any such matter set forth in any additional Title

Report , and if Seller declines or is unable to cure any such objection, then Seller will have the right to terminate this Agreement at any time thereafter, with no liability to Buyer, unless Buyer waives such objection by written notice received by Seller no later than the earlier of (x) one Business Day following Buyer's receipt of notice from Seller that it will not cure such objection or (y) the Closing Date. If Buyer closes the purchase of the Assets, then Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter and such matter shall constitute a Permitted Encumbrance.

4.3    Environmental Reports. Buyer confirms and acknowledges that Seller has made available to Buyer for review on the Merrill Website an environmental report (the "Environmental Report"), covering the Real Property relating to the Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where the Store is located.

5.0    **Representations and Warranties of Seller Relating to the Assets.** To induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

5.1    On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website: (i) a copy of the Lease (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a)    a copy of the site plan for the Store;

(b)    a copy of the fixture plans for the Store; and

(c)    a list of Equipment (other than Excluded Personal Property) at the Store as reflected in Seller's current records; [6]

it being understood that the materials described in this paragraph 5.1 have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

5.2    At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Monetary Liens other than the Permitted Encumbrances to the extent provided under Section 363 of the Bankruptcy Code.

---

[6] Note: This list is in process and has not yet been posted to Merrill Website.

6.0   **General Representations and Warranties of Seller.**  In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

6.1   Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

6.2   No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, (iii) those contemplated by or required under paragraph 3.5 of this Agreement and (iv) Bankruptcy Court Approval.

6.3   Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.4   To Seller's Knowledge, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

6.5   None of the employees employed by Seller in the Store is covered by a union contract, collective bargaining agreement or other labor agreement.

6.6     Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

7.0     **Buyer's Representations and Warranties.**  Buyer represents and warrants to Seller as follows:

7.1     Buyer is a _____ duly organized, validly existing and in good standing under the laws of the State of _____, and has the power and authority to consummate the transaction contemplated hereunder.  This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required **[corporate/partnership/limited liability company]** action on behalf of Buyer.

7.2     No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated.

7.3     This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4     There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

7.5     Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect

on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

7.6     As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

8.0     **Covenants of Seller.**   Seller hereby covenants for the benefit of Buyer as follows:

8.1     Seller will (i) use commercially reasonable efforts to maintain the Assets until the Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and, except where Store operations were suspended prior to the Effective Date, will continue operation of the Store, and (ii) will not sell, dispose of, abandon or remove from the Store any of the Assets or agree to do so except in the ordinary course of business; provided, however, it is expressly acknowledged and understood that, following the Effective Date, Seller will take certain actions to wind up its operations (including related marketing, promotions and advertising) at the Store and eliminate or remove the Excluded Personal Property in preparation for the Inventory Count, Closing and the turnover of possession to Buyer.

8.2     Seller will use commercially reasonable efforts to remove all Excluded Personal Property from the Store on or before the Closing Date, except that Buyer shall remove and dispose of Seller's signs and panels and branded shopping carts that are part of the Excluded Personal Property as more fully provided in paragraph 9.3 of this Agreement.

8.3     On or after the entry of the Sale Order, Seller will release to Buyer a schedule of Seller's current employees at the Store, and will permit Buyer, at reasonable times during normal business hours and with minimum impact on Seller's business, to arrange for personal interviews with Store managers and other Store employees, at times and places mutually agreeable to both Seller and Buyer, and to arrange for those relevant employees of Seller, who are interested, to interview with Buyer.

8.4     Seller will (except to the extent otherwise required by the Family Medical Leave Act) transfer or terminate all its employees working at the Store on the Closing Date.

8.5     If this Agreement is determined to be the Successful Bid, Seller will use commercially reasonable efforts to obtain the entry of a Sale Order.

8.6     Prior to the Closing, Seller will not cause or permit to be granted any material increase in the salaries, wages, benefits or other compensation

payable or to become payable to employees working at the Store, except for (i) merit and cost-of-living increases in the ordinary course of business and (ii) incentive bonuses or compensation granted by Seller in connection with Seller's winding up of its operations at the Store.

8.7    Seller will cooperate reasonably with Buyer, upon written request, with respect to Buyer's performance of its covenants under paragraph 9.2 of this Agreement.

9.0    **Covenants of Buyer.**  Buyer for itself hereby covenants for the benefit of Seller as follows:

9.1    Buyer will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with the Closing and the issuance of the Title Policy.

9.2    Buyer will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11 of this Agreement, including without limitation all Permits necessary for Seller to sell and Buyer to buy the Inventory and the Pharmacy Scrips.

9.3    Within forty-eight (48) hours after the Closing Date, Buyer shall, at Buyer's sole cost and expense, (i) remove from the Store, destroy and lawfully dispose of all signs and panels that are part of the Excluded Personal Property, and (ii) either (A) remove from the Store and lawfully dispose of all branded shopping carts or (B) remove all trademarks, trade names, logos and designs of Seller, Winn-Dixie or their Affiliates from all shopping carts and destroy and lawfully dispose of all such trademarks, trade names, logos and designs.  Without limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 16.5 of this Agreement shall encompass any breach by Buyer of this paragraph 9.3.

9.4    Buyer will hire a sufficient number of such employees at the Store to the extent necessary to avoid the notice requirements of the Worker Adjustment and Retaining Notification Act with respect to the Store and will not terminate such employees' employment following the Closing except in circumstances that will not create liability under such Act.  From and after entry of the Sale Order, this paragraph 9.4 shall supersede any provision of the Confidentiality Agreement limiting the ability of Buyer to employ or solicit for employment the employees at the Store.  In addition, at Closing Buyer will hire at least 85% of the full-time employees of the Store and at least 95% of the part-time employees of the Store, and will continue to employ such employees for a period of not less than **[six months]** following Closing, other than as a result of (i) dismissals of employees for cause in accordance with Buyer's standard employment

policies for ongoing operations and (ii) voluntary termination by any employee of such employment. For a period of **[six months]** following Closing, Buyer agrees to deliver to Seller, within ten days following Seller's request, a list identifying all then-current employees of Buyer at the Store.

9.5   Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

9.6   If this Agreement is determined to be the Successful Bid, then Buyer will use commercially reasonable efforts to obtain the entry of a Sale Order, including by providing Adequate Assurance Information to Seller, the Bankruptcy Court, Landlord and Subtenant (if any) as may be reasonably requested.

9.7   For a period of 180 days following the Closing Date Buyer will not sell or otherwise transfer the Pharmacy Scrips to any Person other than an Affiliate of Buyer.

10.0   **Conditions Precedent to Buyer's Obligations.** The obligations of Buyer under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

10.1   Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of paragraph 5.1 of this Agreement), all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Seller's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the

Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

10.2 No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

10.3 The Sale Order shall have been entered by the Bankruptcy Court in substantially the form posted on the Merrill Website and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Buyer, which shall not be unreasonably withheld.

10.4 The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(iv) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1 (a)(iv).

11.0 **Conditions Precedent to Seller's Obligations.** The obligations of Seller under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

11.1 Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. All of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Buyer's representations and warranties

contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2 No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

11.3 The Sale Order shall have been entered by the Bankruptcy Court in substantially the form posted on the Merrill Website and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Seller, which shall not be unreasonably withheld.

11.4 The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(v) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1(a)(v).

12.0 **Loss by Fire or Other Casualty; Condemnation**. In the event that, prior to a Closing, the Store or any material part thereof is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with the Store, either party will have the right, exercisable by giving notice of such decision to the other within 5 Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, and thereafter none of the parties will have any further rights or obligations hereunder; provided, however, that, if Buyer is not in breach of this Agreement, Buyer will be entitled to the return from the Escrow Agent of the Deposit. If neither party exercises its right of termination described in the immediately preceding sentence and the Store is sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

13.0 **Possession**. Seller will turn over to Buyer exclusive physical possession of the Store and the Assets (including, to the extent in Seller's possession, control or

custody) all keys, combinations to safes, security codes and passwords, on the Closing Date upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Buyer to transfer to Seller, the entire Base Purchase Price, Inventory Price and the Supplies Price. After conclusion of the Inventory Count and upon Seller's receipt of such written confirmation from Escrow Agent, Buyer may commence preparation for opening the Store as a Buyer's store including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and commencing electrical and wiring work required in order to install Buyer's point of sale and other equipment, signage, and similar items.

14.0   **Closing.**

14.1   The Closing will occur on the Closing Date.  The Closing will be conducted by use of an escrow administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

14.2   On or before the Real Property Escrow Date, Seller will, subject to the conditions contained in <u>paragraph 11</u> of this Agreement, deliver the following ("<u>Seller's Escrowed Items</u>") to Escrow Agent:

   (i)     Two counterparts of the Lease Assignment, substantially in the form of <u>Exhibit G</u> to this Agreement (the "<u>Conveyance Instrument</u>"), executed by Seller;

   (ii)    The Bill of Sale, executed by Seller;

   (iii)   Two counterparts of the Closing Statement, executed by Seller;

   (iv)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

   (v)     Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered.

   Buyer may waive compliance by Seller as to any of the foregoing items in a manner permitted by <u>paragraph 17.6</u> of this Agreement.  Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent,

will not be deemed to be an acknowledgement by Seller that the conditions of paragraph 11 of this Agreement have been fulfilled or waived until Seller Delivery Confirmation. The "Seller Delivery Confirmation" will mean the later of (A) the Real Property Escrow Date and (B) Seller's delivery to Escrow Agent, by original counterpart or telecopy, of Seller's written confirmation that that the conditions of paragraph 11 of this Agreement have been fulfilled or waived. In any event such delivery and notice shall be subject to any circumstances that may affect such conditions between Seller Delivery Confirmation and the Closing Date.

14.3 On or before the Real Property Escrow Date, Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, deliver the following ("Buyer's Escrowed Items") to Escrow Agent:

(i) Two counterparts of the Conveyance Instrument, executed by Buyer;

(ii) Two counterparts of the Closing Statement, executed by Buyer;

(iii) Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; and

(iv) Any other document, instrument or agreement called for hereunder for delivery by Buyer that has not previously been delivered.

(v) All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to paragraph 3 of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement. Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will be deemed to be an acknowledgement by Buyer that the conditions of paragraph 10 of this Agreement have been fulfilled as of the Real Property Escrow Date, subject to any circumstances that may affect such conditions between the Real Property Escrow Date and the related Closing Date.

14.4 At the Closing, Seller will, subject to the conditions contained in paragraph 11 of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items and the Purchase Price to Seller.

14.5 On the Closing Date, Seller and Buyer will each deposit such other instruments with the Title Insurer as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the Assets in accordance with the terms hereof; provided, however, that in no event

shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

14.6    Except as provided in <u>paragraph 16</u> of this Agreement, at or before Closing, or if Closing does not occur due to earlier termination of this Agreement in accordance with its terms, (i) Seller will pay Seller's Closing Costs; and (ii) Buyer will pay Buyer's Closing Costs.

15.0    **<u>Termination</u>**.

15.1    <u>Termination</u>.

(a)    This Agreement may be terminated, and the transactions contemplated hereby abandoned only as follows:

(i)    by written consent of Seller and Buyer, in which case the Deposit shall be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the Deposit, then Escrow Agent shall pay over the Deposit to Seller as consideration for Seller's agreement to terminate this Agreement);

(ii)    at the election of Seller if and to the extent permitted under <u>paragraph 16.1</u> of this Agreement, in which case the Deposit shall be disbursed as provided in such <u>paragraph 16.1</u>;

(iii)    at the election of Buyer if and to the extent permitted under <u>paragraph 16.2</u> of this Agreement, in which case the Deposit shall be disbursed as provided in such <u>paragraph 16.2</u>;

(iv)    at the election of Buyer if any of the conditions set forth in <u>paragraph 10</u> of this Agreement has not been satisfied or waived by Buyer on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>paragraph 16</u> of this Agreement rather than pursuant to this <u>paragraph 15.1(a)(iv)</u>;

(v)    at the election of Seller if any of the conditions set forth in <u>paragraph 11</u> of this Agreement has not been satisfied or waived by Seller on or before the Outside Date, in which

-27-

case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(v);

(vi)    at the election of Buyer or Seller as provided in paragraph 12 of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this Agreement rather than pursuant to this paragraph 15.1(a)(vi);

(vii)   at the election of Seller (A) if this Agreement is not the Successful Bid or (B) if the Bankruptcy Court denies Bankruptcy Court Approval, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this Agreement rather than pursuant to this paragraph 15.1(a)(vii);

(viii)  at the election of Seller if the Cure Costs with respect to the Lease exceed 15% of the Base Purchase Price, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this Agreement rather than pursuant to this paragraph 15.1(a)(viii); or

(ix)    at the election of Buyer or Seller if the Closing will not have occurred on or before the Outside Date for any reason other than as contemplated in paragraphs 15.1(a)(i) through 15.1(a)(viii) of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided that neither Buyer nor Seller, as the case may be, will be

entitled to terminate this Agreement pursuant to this paragraph 15.1(a)(ix) if such party's breach of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(ix).

(b)     If this Agreement is terminated for any reason, then all materials provided by Seller to Buyer and all materials relating to the Assets obtained by Buyer and all copies of any such materials will be delivered to Seller within 5 Business Days following termination. This paragraph shall not in any way limit Buyer's duties to Seller or Winn-Dixie under the Confidentiality Agreement.

(c)     Upon any termination of this Agreement pursuant to paragraphs 15.1(a)(iii) through (ix) of this Agreement, each party will retain those rights (if any) it may have under paragraph 16 of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

## 16.0   Default and Remedies.

16.1   Buyer's Default. If the Closing as contemplated under this Agreement is not consummated due to Buyer's breach of this Agreement, or if this Agreement is terminated due to Buyer's breach of this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such breach, (A) to terminate this Agreement, and (B) to receive the Base Deposit as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Base Deposit is a reasonable estimate thereof. Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity. Seller's right to receive the Base Deposit is intended not as a penalty, but as full-liquidated damages. The right to receive the Base Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by Buyer, and Seller hereby waives and releases any right to (and Seller hereby covenants that it shall not) sue Buyer with respect to the Store or the Assets: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Base Deposit. Buyer hereby waives and releases any right to (and hereby covenants that it

shall not) Seller to seek or claim a refund of the Base Deposit (or any part thereof) on the grounds that the Base Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages.  This paragraph 16.1 is subject to paragraph 16.4 of this Agreement.

16.2    Default by Seller.  If the sale as contemplated under this Agreement is not consummated due to Seller's breach of this Agreement, or if this Agreement is terminated due to Seller's breach of this Agreement, then Buyer shall be entitled, as its sole and exclusive remedy for such breach, to receive the return of the Base Deposit, which return shall operate to terminate this Agreement and release Seller from any and all liability under this Agreement.  Buyer expressly waives and releases (i) any right to seek specific performance of Seller's obligations under this Agreement and (ii) any right to seek or collect any damages, including any actual, consequential, speculative, remote or punitive damages.  This paragraph 16.2 is subject to paragraph 16.4 of this Agreement.

16.3    Notice of Default; Opportunity to Cure.  Neither Seller nor Buyer shall be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within 5 Business Days after receipt of such notice; provided, however, that this paragraph 16.3 (i) shall not be applicable to Buyer's failure to deliver any Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Real Property Escrow Date or the Closing Date and, accordingly, (ii) shall not have the effect of extending the Closing Date or the due date of any Deposit.

16.4    Recoverable Damages.  In no event shall the provisions of paragraphs 16.1 and 16.2 of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to, a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreement and paragraphs 16.5 and 17.3 of this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees or expenses under the Confidentiality Agreement and paragraphs 3.3.3 and 3.4.3 of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs.  In addition, if this Agreement is terminated for any reason, and Buyer or any Affiliate of Buyer asserts any claim or right to any Asset that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to any Asset, then Seller shall have all rights and remedies available at law or in equity with respect to such assertion by Buyer and any loss, damage or other consequence suffered by Seller as a result of such assertion.

16.5 <u>Buyer Indemnification of Seller</u>. Buyer shall indemnify and save and hold harmless Seller and its Affiliates and representatives, from and against any and all costs, losses liabilities, damages, lawsuits, deficiencies, claims and expenses (whether or not arising out of third-party claims) including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (herein, the "<u>Damages</u>") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by Buyer (including any payment obligation), or the inaccuracy of any representation made by Buyer in or pursuant to this Agreement or other transaction documents, (b) any liability, obligation or commitment of any nature (absolute, accrued, contingent or otherwise) of Buyer that is due to or arises in connection with Buyer's acts or omissions prior to, on or after the Closing Date, including any claim, liability, or obligation that is assumed by Buyer pursuant to this Agreement or in any transaction documents signed by Buyer. Notwithstanding the foregoing, Buyer shall not be liable for any matter (i) with respect to which Seller has not given Buyer written notice within a reasonable period of time following Seller's receiving written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a material adverse effect on Buyer), or (ii) that is due Seller's acts or omissions. The provisions of this <u>paragraph 16.5</u> shall cover all obligations and liabilities of whatsoever kind, nature or description relating, directly or indirectly, to product liability, third party litigation or third party claims against Buyer or Seller in connection with, arising out of, or relating to the Assets. This <u>paragraph 16.5</u> shall survive the Closing or earlier termination of this Agreement.

17.0 **Miscellaneous.**

17.1 <u>Notices</u>. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this <u>paragraph 17.1</u> and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail,

three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Winn-Dixie _____, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Chief Financial Officer
Telefax No. 904 783 5646
e-mail: *bennettnussbaum@winn-dixie.com*

With a copy to:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Office of General Counsel
Telefax No. 904 783 5651
e-mail: *larryappel@winn-dixie.com*

and

King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia  30303
Attn:  Timothy N. Tucker
Telefax No. 404-572-5148
e-mail: *ttucker@kslaw.com*

If to Buyer:

    _____
    _____
    _____
    _____

or such other address as any party may from time to time specify by notice to the other.

17.2    <u>Notice of Certain Inquiries</u>.  If any party is contacted, whether before or after the Closing and whether orally or in writing, by the United States

Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to any transactions contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

17.3   Brokers and Finders.   The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Agreement other than that due by Seller to Seller's Brokers.  Seller agrees to pay all fees and commissions claimed by Seller's Brokers as a result of the transaction contemplated by this Agreement, which fees and commissions will be considered payable only if, as and when the Closing contemplated by this Agreement occurs.   Except for Seller's Brokers, neither Seller nor Buyer has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement.    Seller and Buyer hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts, said indemnifications by Seller and Buyer to survive the Closing or earlier termination of this Agreement.

17.4   Successors and Assigns.  This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

17.5   Assignment.  Neither Seller nor Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole discretion of the party whose consent is so required.  No assignment by Buyer shall release or relieve Buyer of its liabilities and obligations hereunder, which shall remain in full force and effect notwithstanding any such assignment.

17.6   Amendments.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller and Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to Bankruptcy Court Approval, if applicable.

17.7   Governing Law.  The application and effect of this will be governed by and construed in accordance with the laws of the State in which the Store is located; the application and effect of this Agreement as to any matter of the rights and obligations of the parties generally will be governed by and construed in accordance with the laws of the State of Florida.

17.8    <u>Merger of Prior Agreements</u>.    This Agreement supersedes all prior agreements and understandings between the parties hereto, other than the Confidentiality Agreement, and (except for the Confidentiality Agreement) constitutes the entire agreement of the parties with respect to the matters contained herein.    **BUYER ACKNOWLEDGES ITS OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT CONTINUE AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT.**

17.9    <u>Survival</u>.    Acceptance by Buyer of the Conveyance Instrument shall constitute an acknowledgement by Buyer that all of Seller's representations, covenants and obligations under this Agreement and all conditions to Buyer's obligations to close under this Agreement have been performed, satisfied and/or waived.    Seller's representations, warranties, covenants and obligations under this Agreement shall not survive the Closing but shall merge into the Conveyance Instrument, and shall have no further force or effect after the Closing, except that those covenants of Seller under <u>paragraphs 3.3.3, 3.3.4 and 17.3</u> of this Agreement that are expressly provided to be performed after the Closing shall survive.    All representations, warranties, covenants of obligations of Buyer under this Agreement shall survive the Closing.    In addition, all representations, covenants and obligations of Buyer under the Confidentiality Agreement shall survive the termination or consummation of this Agreement.

17.10    <u>Time is of the Essence</u>.    Time is of the essence of this Agreement.

17.11    <u>No Recordation</u>.    This Agreement will not be recorded in any public office or court other than as part of the Bankruptcy Court Approval process except that upon default it may be presented to a court of competent jurisdiction.

17.12    <u>State Specific Provisions</u>:

    17.12.1    ***With respect to a Store in Florida***: <u>Radon Gas</u>. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county health department.

    17.12.2    **[Other state-specific provisions to come as applicable]**

18.0 **Escrow Agent**.

18.1 Duties. By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon its receipt of funds from Buyer, Escrow Agent will receive and hold such funds, and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.

18.2 Indemnity. Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent. If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all loss, cost, damage, liability or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct. If the indemnity amounts payable hereunder result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts. Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.

18.3 Dispute. If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor. In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Buyer is not the prevailing party in such action or proceeding. If there is no prevailing party, Seller and Buyer each shall be responsible for one-half of such costs and fees.

18.4 Execution by Escrow Agent. Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this paragraph 18. Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this paragraph 18 shall not be required.

19.0 **Waiver of Jury Trial**. Buyer and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transactions contemplated herein undesirable. Accordingly, Buyer and Seller each knowingly, voluntarily and intentionally waive

any right to a trial by jury that any of them may have in any court with respect to any action relating to this Agreement or the transactions contemplated herein.

20.0 **Consent to Jurisdiction.** THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Buyer and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in paragraph 17.1 of this Agreement shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum. If a court finds that subject-matter jurisdiction is not available in the Bankruptcy Court, Buyer and Seller hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of the U.S. District Court for the Middle District of Florida, Jacksonville Division, or if such court shall not have jurisdiction, then to the appropriate courts of the State of Florida sitting in Duval County, Florida.

21.0 **HSR Filings.** The parties anticipate that the transactions contemplated hereby are exempt from review and filing under the HSR Act. However, if such is not the case, Seller and Buyer shall each seek regulatory approval or HSR clearance and prepare and submit, in a timely manner, all necessary filings for Seller and Buyer in connection with this Agreement under the HSR Act and the rules and regulations thereunder. Seller and Buyer shall request expedited treatment of such HSR Filing by the Federal Trade Commission, shall make promptly any appropriate or necessary subsequent or supplemental filings, and shall furnish to each other copies of all HSR Filings at the same time as they are filed with the appropriate governmental authority except to the extent such party is legally restricted from providing or believes, based where appropriate on the advice of counsel, that it should not provide such copies. [7]

22.0 **Disclaimers and Waivers.**

22.1 **NO RELIANCE ON DOCUMENTS. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN PARAGRAPHS 5 AND 6 HEREOF (THE "CONTRACT WARRANTIES"),**

---

[7] Note: If a given transaction exceeds HSR thresholds, Seller will require a more expansive provision.

SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY OR ON BEHALF OF SELLER TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY.   BUYER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE) ARE PROVIDED TO BUYER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY BUYER SHALL BE AT THE SOLE RISK OF BUYER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER ACKNOWLEDGES AND AGREES THAT (A) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (B) BUYER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED BY SELLER OR ANY AFFILIATE TO BUYER, BUT RATHER WILL RELY ON ITS OWN INVESTIGATIONS AND ANY REPORTS COMMISSIONED BY BUYER WITH RESPECT THERETO, AND (C) NEITHER SELLER, ANY AFFILIATE OF SELLER NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL HAVE ANY LIABILITY TO BUYER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

22.2   Disclaimers.   EXCEPT FOR THE CONTRACT WARRANTIES, BUYER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS OR

OTHER INFORMATION PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS.  BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "AS IS, WHERE IS, WITH ALL FAULTS".  BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND NEITHER SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER OR ANY AFFILIATE, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE, OTHER THAN THE CONTRACT WARRANTIES.

BUYER ACKNOWLEDGES THAT BUYER'S ACCESS AND INSPECTION RIGHTS HAVE BEEN LIMITED AS SET FORTH IN THIS AGREEMENT AND THAT BUYER UNDERSTANDS THE RISKS ASSOCIATED WITH PURCHASING THE ASSETS ON THE BASIS OF SUCH LIMITED INVESTIGATIONS.  BUYER REPRESENTS TO SELLER THAT NOTWITHSTANDING SUCH LIMITATIONS BUYER HAS CONDUCTED SUCH INVESTIGATIONS AS BUYER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE ASSETS AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE ASSETS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION), AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AFFILIATES, AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN THE CONTRACT WARRANTIES. UPON CLOSING, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS, AND BUYER, UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER AND SELLER'S AFFILIATES (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT OR UNDER ANY ENVIRONMENTAL LAW), LOSSES, DAMAGES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED

AGAINST SELLER AND SELLER'S AFFILIATE'S (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE ASSETS.

BUYER AGREES THAT SHOULD ANY INVESTIGATION, CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION) ON OR RELATED TO THE ASSETS BE REQUIRED AFTER THE DATE OF CLOSING, NEITHER SELLER NOR ANY AFFILIATE SHALL HAVE ANY LIABILITY TO BUYER TO PERFORM OR PAY FOR SUCH INVESTIGATION, CLEAN-UP, REMOVAL OR REMEDIATION, AND BUYER EXPRESSLY WAIVES AND RELEASES ANY CLAIM TO THE CONTRARY.

BUYER FURTHER ACKNOWLEDGES THAT (1) THE CONTRACT WARRANTIES SHALL NOT SURVIVE THE CLOSING BUT SHALL MERGE INTO THE CONVEYANCE INSTRUMENT, AND SHALL HAVE NO FURTHER FORCE OR EFFECT AFTER THE CLOSING AND (2) THE LIABILITY OF SELLER UNDER OR WITH RESPECT TO THE CONTRACT WARRANTIES SHALL BE LIMITED TO THE EXPRESS REMEDIES OF BUYER SET FORTH IN THIS AGREEMENT.

BUYER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY BUYER, AND BUYER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OF BUYER'S CHOICE WITH REGARD TO THE TERMS OF SUCH DISCLAIMERS, WAIVERS AND RELEASES.  BUYER ACKNOWLEDGES AND WARRANTS THAT BUYER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS AND RELEASES IS FREE AND VOLUNTARY.

22.3   <u>Effect and Survival of Disclaimers</u>.  Seller and Buyer acknowledge that the provisions of this <u>paragraph 22</u> are an integral part of the transactions contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller would not enter into this Agreement but for the provisions of this <u>paragraph 22</u>.  Seller and Buyer agree that the provisions of this <u>paragraph 22</u> shall survive Closing or any termination of this Agreement.

[Signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

**SELLER:**

**WINN-DIXIE** _____, **INC.,** a Florida corporation

By:_____
   Name:_____
   Title: Vice President

**BUYER:**

_____
_____

By:_____
   Name:_____
   Title: _____

**[Note: Witnesses and other formalities of execution
to be conformed to applicable state requirements, if any]**

Acknowledged and agreed this ___ day of _____, 2005 for the limited purposes set forth in paragraph 18 of this Agreement:

**ESCROW AGENT:**

_____

By: _____
Name: _____
Title: _____

## LIST OF EXHIBITS

| | | |
|---|---|---|
| Exhibit A | - | Description of Store |
| Exhibit A-1 | | Description of Leases and Leased Premises |
| Exhibit B | - | Form of Bill of Sale |
| Exhibit C-1 | - | Form of Closing Statement |
| Exhibit C-2 | - | Form of Inventory Closing Statement |
| Exhibit D | - | Schedule of Certain Excluded Personal Property |
| Exhibit E | - | [Intentionally Omitted] |
| Exhibit F | - | Permitted Encumbrances |
| Exhibit G | - | Form of Conveyance Instrument |
| Exhibit H | - | Form of Inventory Certificate |

For Discussion Purposes Only
3772506v2
[Winn-Dixie [Form] Exhibits Package - Single Store - Last revised 5/31/05]

Store Number # _____

## LIST OF EXHIBITS

| | | |
|---|---|---|
| Exhibit A-1 | - | Description of Store |
| Exhibit A-2 | - | Description of Lease and Leased Premises |
| Exhibit B | - | Form of Bill of Sale |
| Exhibit C-1 | - | Form of Closing Statement |
| Exhibit C-2 | - | Form of Inventory Closing Statement |
| Exhibit D | - | Schedule of Certain Excluded Personal Property |
| Exhibit E | - | Base Purchase Price Allocation; Deposits |
| Exhibit F | - | Permitted Encumbrances |
| Exhibit G | - | Form of Conveyance Instrument |
| Exhibit H | - | Form of Inventory Certificate |

EXHIBIT A-1
To Asset Purchase Agreement

Description of Store

| Store No. | Street Address | City | County | State |
|-----------|----------------|------|--------|-------|

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASE AND RELATED LAND

WINN-DIXIE STORE # _____
  (city)   ,   (state)   


Lease:      _____ dated _____ between _____, as Landlord, and _____, as Tenant;

As evidenced by _____ dated _____, recorded in Book \_\_\_\_, Page \_\_\_\_, of the public records of _____ County, _____.

Amendments:




Premises:    That certain store building and related improvements located at _____, _____, _____ County, _____.

Legal Description:    The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

Sublease(s):




Amendments to Sublease(s):

EXHIBIT B
To Asset Purchase Agreement

Form of

**BILL OF SALE**

**WINN-DIXIE _____, INC.**, a Florida corporation ("Seller"), in consideration of the mutual covenants set forth in that certain Asset Purchase Agreement dated effective _____, 200___, among _____, a _____, ("Buyer") and Seller (the "Agreement"), does hereby grant, bargain, transfer, sell, assign and convey unto Buyer all of Seller's right, title and interest in the Assets described in the Agreement (other than the Lease and any sublease(s) or permit(s), which are subject to separate instruments of conveyance and assignment), relating to Seller's store locations as more particularly described on attached Schedule A.

This Bill of Sale is delivered by Seller to Buyer as required under the Agreement, and is made subject to the terms and conditions of the Agreement. All capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Agreement.

[SIGNATURES ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed by the undersigned as of this _____ day of _____, 200___.

"SELLER"

**WINN-DIXIE _____, INC.**, a Florida corporation

By: _____
Name: _____
Title: _____

## EXHIBIT C-1
### To
### Asset Purchase Agreement

## INDIVIDUAL STORE CLOSING STATEMENT

**BUYER:** _____, a _____

**SELLER:** Winn-Dixie _____, Inc., a Florida corporation

**ESCROW AGENT and
SETTLEMENT AGENT:** _____

**Property:** Store No. _____

**CLOSING DATE:** _____, 2005

## SELLER'S STATEMENT

**BASE PURCHASE PRICE:**

Leasehold: $_____

FF&E: $_____

BASE PURCHASE PRICE: $_____

**SUPPLIES PRICE:** $_____

**TOTAL  BASE PURCHASE PRICE AND
SUPPLIES PRICE:** $_____

**Less Adjustments (Debit):**

Seller's Prorated Share of Taxes and
Other Charges Payable Under Lease (1)    $_____

Buyer's Prorated Share of Rents Paid in
Advance **[Under Sublease (2)]**    $_____

**Total Debit Adjustments:**    $_____

**Plus Adjustments (Credit):**    $_____

Seller's Prorated Share of Rents and
Other Charges Paid in Advance Under
Lease (3)                                                        $_____

Environmental Assessment Costs Paid by
Seller                                                           $_____

[Other]                                                         $_____

   **Total Credit Adjustments:**                                $_____

**NET DEBIT/CREDIT TO SELLER**

**Less Closing Costs Payable by Seller:**

Seller's Attorneys' Fees & Costs                $_____

Seller's Brokerage Fees                         $_____

Cure Costs                                      $_____

**Total Seller's Closing Costs:**

**AMOUNT DUE TO SELLER**                                        $_____


## BUYER'S STATEMENT

**ALLOCATED BASE PURCHASE
PRICE:**                                        $_____

**SUPPLIES PRICE:**                             $_____

**TOTAL BASE PURCHASE PRICE AND
SUPPLIES PRICE:**
                                                                $_____

**Less Adjustments (Credit):**

Allocated Amount of Base Deposit                                $_____

Seller's Prorated Share of Rents and
Other Charges Paid in Advance Under
Lease (1)                                                       $_____

[Other]                                                         $_____

**Total Debit Adjustments:**

**Plus Adjustments (Debit):**                              $_____

Seller's Prorated Share of Rents and          $_____
Other Charges Paid in Advance Under
Lease (3)

Environmental Assessment Costs Paid by        $_____
Seller

[Other]                                       $_____

  **Total Credit Adjustments:**                            $_____

**NET DEBIT/CREDIT TO BUYER**

**Less Closing Costs Payable by Buyer:**

Buyer's Attorneys' Fees & Costs               $_____

Title Insurance Premiums(4)                   $_____

Title Examination Fees                        $_____

Transfer/Documentary Taxes                    $_____

Buyer's Brokerage Fees                        $_____

Closing Escrow Fees                           $_____

Inventory Service Fees(8)                      $_____

**Total Buyer's Closing Costs:**               $_____

**AMOUNT DUE FROM BUYER**                                  $_____

**ALLOCATED AMOUNT OF BASE**                               $_____
**DEPOSIT**

**TOTAL AMOUNT DUE AT CLOSING**                            $_____

## SCHEDULE OF DISBURSEMENTS

1.   Allocated Amount of Base Deposit from Escrow Agent    $_____
                                                           $_____
2.   Amount Due From Buyer

**TOTAL RECEIPTS:**                                        $_____

1.   The Blackstone Group L.P.                             ($_____)
     (Seller's Brokers Fees)
2.   The Food Partners, LLC                                ($_____)

|  |  |  |
|---|---|---|
|  | (Seller's Brokers Fees) |  |
| 3. | DJM Asset Management, LLC | ($_____) |
|  | (Seller's Brokers Fees) |  |
| 4. | _____ Title Insurance Company | ($_____) |
|  | Title Premiums, Title Examination Fees and related Costs, Recording and Escrow Fees |  |
| 5. | _____ |  |
|  | Transfer/Documentary Taxes |  |
| 6. | **[Name of Inventory Service]** | ($_____) |
|  | (Inventory Service Fees) |  |
| 7. | _____ | ($_____) |
|  | (Lease Cure Costs, if any) |  |
| 8. | _____ | ($_____) |
|  | (Sublease Cure Costs, if any) |  |
| 9. | Seller | ($_____) |
|  | (Seller's Proceeds) |  |
| [10.] | [Other] | ($_____) |

**TOTAL DISBURSEMENTS:**

**Notes:**

(1) <u>2005 Prorations - Amounts Not Yet Paid and Payable</u>.  Prorations are based on (i) estimate of 2005 real estate taxes derived from actual 2004 amounts paid by Seller in arrears in accordance with Lease; and (ii) estimate of 2005 insurance charges derived from actual 2004 amounts paid by Seller in arrears in accordance with Lease.  Buyer will be responsible for the payment of such charges for 2005 and subsequent years.

**Real Estate Taxes**

Store # _____

| | | |
|---|---|---|
| - 2005 Real Estate Taxes | $ | |
| - Per Diem Tax Amount | $ | |
| - Seller's Share of 2005 Taxes (1/1/05 - __/__/05) (_____ days) | $_____ | _____ |

**Total Real Estate Taxes:**

**Personal Property Taxes**

Store # _____

| | | |
|---|---|---|
| - 2005 Personal Property Taxes | $ | |
| - Per Diem Tax Amount | $ | |
| - Seller's Share of 2005 Taxes (1/1/05 - __/__/05) (_____ days) | $_____ | _____ |

**Total Personal Property Taxes:**

**CAM Charges**

Store # _____

- 2005 CAM Charges                                  $
- Per Diem Amount                                    $
- Seller's Share of 2005 CAM Charges
  ( __/__/__ - __/__/05) ( _____ days)    $ _____          _____

**Total CAM Charges:**

**Insurance**

Store # _____

- 2005 Insurance                                     $
- Per Diem Amount                                    $
- Seller's Share of 2005 Insurance
  ( __/__/__ - __/__/05) ( _____ days)    $ _____

**Total Insurance:**
**Total Amount of Seller's Prorated
Share of 2005 Prorations:**                                           _____

(2)      _____, 2005 Sublease Prorations - Amounts Previously Received by
         Seller. Prorations are based on _____, 2005 rents previously paid to
         Seller in accordance with Sublease.  Buyer will be responsible for the
         collection of such charges that become due and payable for _____, 2005
         and thereafter.  Prorations are as follows:

Store # _____

- Total _____, 2005 rent paid:       $
- Per diem rent:                             $
- Buyer's prorated share
  ( __/__/__ - __/__/05) ( _____ days)      $ _____

**Total Amount of Seller's Prorated Share of _____ Prorations:**

(3)      _____, 2005 Prorations - Amounts Previously Paid by Seller.  Prorations
         are based on _____, 2005 rents, common area maintenance
         assessments and other charges previously paid by Seller in accordance with
         applicable Lease.  Buyer will be responsible for the payment of such charges
         that become due and payable for _____, 2005 and thereafter.
         Prorations are as follows:

**Rent**

Store # _____

- Total _____, 2005 rent paid:       $
- Per diem rent:                             $
- Buyer's prorated share
  ( __/__/__ - __/__/05) ( _____ days)      $ _____

- Per diem rent:                                          $
- Buyer's prorated share
  (__/__/__ - __/__/05) (_____ days)                     $ _____  _____

**Total Amount of Buyer's Prorated Share of _____ Prorations:**

(4)     Title Premiums and Expenses.  Title insurance fees and costs, including title examination fees and title insurance premiums, are as follows:

Store # _____
- Title Search Fees and Costs               $                    -
- Title Premium                             $ _____    -

**Total Amount of Title Fees and Expenses:**

(5)     Utility Deposits and Charges.  All utility deposits will be returned to Seller directly by the respective utility companies.  Seller will be responsible for payment of any portion of any utility charges attributable to utility service (including telephone service) provided through and including the date hereof. Buyer will be responsible for payment of any new utility deposits which may be assessed by the respective utility companies and for payment of any portion of such utility charges attributable to utility service provided subsequent to the date hereof.  The party responsible for each share of such utility charges will pay such charges promptly and without demand therefor.  Each party agrees to indemnify and hold harmless the other party from and against liability for payment of the first party's share of such utility charges.

(6)     Adjustments.  Seller and Buyer acknowledge and agree that any amounts not determinable as of the Closing Date or reflected on this Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination. Buyer agrees that it will timely make all required notifications to appropriate taxing authorities to effect the change in party responsible for taxes.

(7)     Inventory Purchase Price and Adjustments.   To the extent Inventory has acquired inventory pursuant to the Purchase Agreement, the Inventory Price has been determined in good faith by the parties in accordance with the provisions set forth in the Purchase Agreement and is set forth in a separate Inventory Closing Statement  between Seller and Buyer dated as of even date herewith.  Seller and Buyer acknowledge and agree that if any dispute should arise as to the Inventory Price with respect to any item or items of Inventory, Seller and Buyer will resolve the dispute in accordance with the terms and provisions of the Purchase Agreement.

(8)     <u>Inventory Service Fees</u>. Seller and Buyer acknowledge and agree that Buyer will be responsible for payment of the fees and costs of the inventory services that conducts the Inventory Count, as such term is defined in the Purchase Agreement, upon receipt of the final invoices. Seller may pay the inventory service fee outside of closing, and Buyer will reimburse Seller for such costs. In the event the final invoices for such inventory charges is not available at the time of closing, the inventory service fee will be estimated at $800 per store. Upon receipt of final invoices for such services, if the inventory service cost differs by more than 10% from the estimated amount, then Buyer and Seller will reconcile such difference by payment to, or reimbursement from, Seller to account for the difference.

(9)     <u>Capitalized Terms</u>. Capitalized terms used herein will have the meanings ascribed to them in the Purchase Agreement.

## STIPULATIONS

1.  <u>Purchase Agreement</u>. This transaction has been closed pursuant to the provisions set forth in that certain Asset Purchase Agreement between Seller and Buyer, dated effective as of _____, 2005 (the "Purchase Agreement").

2.  <u>Authorization to Disburse</u>. By their signatures below, Seller and Buyer hereby (a) authorize and direct the closing agent to (i) make the disbursements included in this Closing Statement and (ii) to wire the AMOUNT DUE SELLER to the following account:

_____
_____
_____
_____

3.  <u>Counterparts</u>. This Closing Statement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement and the signatures of any party to any counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart. To facilitate execution and delivery of this Closing Statement, the parties may execute and exchange counterparts of the signature pages hereof by telecopier or electronic mail, immediately followed by delivery of originals by overnight delivery services.

4.  <u>Adjustments</u>. Seller and Buyer acknowledge and agree that any amounts not determinable as of the Closing Date or reflected on this Closing Statement (including on the individual closing statements attached hereto) will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination. Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination.

The undersigned parties acknowledge and agree to the this Closing Statement as of this _____ day of _____, 2005, and hereby authorize _____ Title Insurance Company, as closing agent, to disburse the sums set forth herein in accordance herewith.

**SELLER:**                                **BUYER:**

**WINN-DIXIE** _____,            _____,
a Florida corporation                      a _____

By: _____           By: _____

Name: _____           Name: _____

Title: Vice President _____          Title: _____

Exhibit C-2

To Asset Purchase Agreement

Form of Inventory Closing Statement

### INVENTORY CLOSING STATEMENT

**SELLER**                          Winn-Dixie _____, Inc., a Florida corporation

**BUYER:**                          _____ a _____

**TRANSACTION:**                    Acquisition of Leasehold Interest in Store _____

**BASE PURCHASE PRICE:**            Under Separate Closing Statement

**INVENTORY PRICE (2):**

$_____

_____

**CLOSING DATE:** _____ , 2005 _____

### SELLER'S STATEMENT

**Inventory Price**                                                       $

**Less Adjustments:**

   1.      Ten Percent of Inventory Price

           Retained by Escrow Agent        $_____

           **Total Adjustments:**            $              $   (            )

**TOTAL AMOUNT DUE TO SELLER:**                                           $

### BUYER'S STATEMENT

**Inventory Price**                                                       $

**Plus Closing Costs to be Paid by Buyer:**

   1.      Inventory Service Fees (3)        _____   $

(Direct Payment or Reimbursement
to Seller)
**Total Buyer's Inventory Closing
Costs:**                                                    $                              $ _____

**AMOUNT DUE FROM BUYER:**                                                    $ _____

The undersigned parties acknowledge and agree to the foregoing Inventory Closing Statement as of this
day of July, 2004, and hereby authorize **[Title Insurer]**, as closing agent, to disburse the sums set forth
herein in accordance herewith.

**SELLER:**

                                                            **BUYER:**


**WINN-DIXIE**        , INC., a Florida                     _____ ., a _____
corporation

By:_____
Name:_____                               By:_____
Title: _____ President                            Name:_____
                                                           Title: _____


**Notes:**

(1)     Adjustments.  Seller and Buyer acknowledge and agree that any amounts not
        determinable as of the Closing Date or reflected on this Inventory Closing Statement
        will be taken into account at the Closing based on good faith estimates with the
        actual amount to be calculated by Seller and Buyer as soon as practicable after the
        actual amounts are determinable with an appropriate adjustment to be paid by the
        appropriate party promptly after determination.  Seller and Buyer also acknowledge
        and agree to execute any documents necessary to correct any errors or omissions in
        this Inventory Closing Statement with an appropriate adjustment to be paid by the
        appropriate party promptly after determination.  Buyer agrees that it will timely make
        all required notifications to appropriate taxing authorities to effect the change in party
        responsible for taxes.

(2)     Inventory Price Adjustments.  The Inventory Price has been determined in good faith
        by the parties in accordance with the provisions set forth in that certain Asset
        Purchase Agreement among Seller and Buyer, dated effective as of _____,
        2005 (the "Purchase Agreement"), and shall be payable in accordance with the
        Purchase Agreement.  Seller and Buyer agree that any disputes shall be reconciled
        as set forth in the Purchase Agreement.  The balance of the Inventory Price, if any,
        shall be paid by Escrow Agent to Seller within five (5) Business Days after Buyer
        and Seller receive the final recapitulation sheet for the Inventory, and any excess
        payment held by Escrow Agent shall be refunded to Buyer within such five (5)
        Business Day period.  To the extent that the Inventory Price is in excess of the
        amount stated herein, Buyer shall pay over to Seller the amount of such excess
        within such five (5) Business Day period.

(3)  Inventory Service Fees.  The recipient of any invoices for such charges agrees that it will promptly provide the other party with a copy of such invoices upon receipt of same.  Buyer will pay such invoices upon receipt, subject to adjustments as set forth in Note 1 above in the event of any discrepancy between the amount of the invoices and the amount for such services set forth in this Inventory Closing Statement.

(4)  Capitalized Terms.  Capitalized terms used herein shall have the meanings ascribed to them in the Purchase Agreement.

## DISBURSEMENT SCHEDULE

RECEIPTS:

1.  Total Amount Due From Buyer    $ _____

TOTAL CASH RECEIVED:    $                    $ _____

DISBURSEMENTS:

1.  Winn-Dixie _____, Inc.    $ _____
    (Seller's Proceeds and Reimbursement of Inventory Service
    Fee)

TOTAL DISBURSEMENTS:    $ _____

BALANCE OF INVENTORY PRICE HELD IN ESCROW BY TITLE AGENT
PURSUANT TO PURCHASE AGREEMENT:    $

EXHIBIT D
To Asset Purchase Agreement

<u>Schedule of Certain Excluded Personal Property</u>

[see attached schedules]

## EXHIBIT E

[intentionally omitted]

EXHIBIT F
To Asset Purchase Agreement

Permitted Encumbrances

1.    Taxes and assessments of any taxing authority that levies taxes or assessments on real property for the year 2005 and subsequent years.

2.    All applicable laws, ordinances, and regulations imposed by any applicable governmental authority, including, but not limited to, all applicable building, zoning, land use and environmental ordinances and regulations.

3.    Rights or claims of parties in possession, boundary line disputes, overlaps, encroachments, and any other matters which would be disclosed by an accurate survey and inspection of the Leased Premises, including but not limited to all matters shown or set forth on any survey, site plan or Environmental Report.

4.    Rights of Landlord under the Lease, including the rights of any Landlord's mortgagee.

5.    Rights of Subtenant under the Sublease.

6.    All matters set forth as exceptions in the Initial Title Reports or the site plans, other than Monetary Liens.

7.    All other matters set forth as exceptions in those Title Reports other than the Initial Title Reports, other than Monetary Liens.  **[Note to Buyer:  See paragraph 4.2 of the Asset Purchase Agreement for the limited right of Buyer to object to such matters.]**

8.    All other restrictions, reservations, covenants, agreements, easements, limitations and other matters appearing of record as of the date of this Agreement, other than Monetary Liens, and which do not, individually or in the aggregate, interfere in a material and adverse way with the present use of or occupancy of the affected Store.

EXHIBIT G
To Asset Purchase Agreement

Form of
Lease Assignment

## ASSIGNMENT AND ASSUMPTION OF LEASE

[Store #_____, _____, _____]

**THIS ASSIGNMENT AND ASSUMPTION OF LEASE** (this "Assignment") is made as of _____, 200___ (the "Effective Date"), by and between **WINN-DIXIE** _____, **INC.** a Florida corporation (hereinafter referred to as "Assignor"), and _____, a _____ (hereinafter referred to as "Assignee");

### R E C I T A L S :

A.    Assignor has agreed to convey to Assignee certain assets in connection with Assignor's retail supermarket store location described on attached Exhibit A (the "Premises") as more particularly described in the Asset Purchase Agreement dated effective _____, 2005 by and among Assignor, as seller, Assignee, as buyer, as amended from time to time (the "Agreement").

B.    As part of the purchase and sale of Assignor's assets referenced above, Assignor has agreed to assign to Assignee (i) all of Assignor's right, title and interest, as tenant or lessee, in and to the lease, together with any and all amendments thereto, as described on the attached Exhibit A (the "Lease"), and all of Assignor's right, title and interest, as landlord or lessor, in and to the subleases, together with all amendments thereto, described on Exhibit A (collectively, whether one or more, the "Sublease"); and Assignee has agreed to assume and perform Assignor's liabilities and obligations arising under the Lease and the Sublease after the Effective Date, all subject to and in accordance with the terms of the Lease, the Sublease, the Agreement and this Assignment;

**NOW, THEREFORE**, in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.    **EFFECTIVE DATE.**  This Assignment shall be effective as of the Effective Date.

2.    **ASSIGNMENT.**

(a)    Assignor hereby assigns, transfers, and conveys unto Assignee all of Assignor's right, title, interest and obligation as tenant or lessee in and to the Lease and all of the rights, benefits and privileges of the tenant or lessee thereunder.

(b)     Assignor hereby assigns, transfers and conveys unto Assignee all of Assignor's right, title, interest and obligation as landlord or lessor in and to the Sublease and all the rights, benefits and privileges of the landlord or lessor thereunder.

3.    **ASSUMPTION; ACCEPTANCE OF PREMISES**.

(a)     Assignee hereby accepts the aforesaid assignment of the Lease and assumes and agrees to pay and perform all liabilities and obligations of the tenant or lessee that accrue under the Lease from and after the Effective Date, and Assignee hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignor from and against all liabilities and obligations of the tenant or lessee that accrue under the Lease on or after the Effective Date.

(b)     Assignee hereby accepts the aforesaid assignment of the Sublease and assumes and agrees to pay and perform all liabilities and obligations of the landlord or lessor that accrue under the Sublease from and after the Effective Date, and Assignee hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignor from and against all liabilities and obligations of the landlord or lessor that accrue under the Sublease on or after the Effective Date.

(c)     Assignee acknowledges that it has had opportunity to make such environmental, physical, zoning, topographical, land use, survey, title and other examinations, inspections and investigations of the Premises as Assignee has determined, in its sole discretion, to be necessary and appropriate. Assignee acknowledges that the Premises is being assigned to Assignee in its "AS-IS" condition, and that possession and use of the Premises is subject to the terms of the Lease and to applicable legal requirements, title matters and rules and regulations.    Taking the foregoing into consideration, Assignee has determined that the Premises is satisfactory to Assignee in all respects, and has agreed to accept the Premises in accordance with the terms and conditions of this Assignment. In making such determination, Assignee has and will rely solely on Assignee's own independent examinations, inspections and investigations of the Premises and has not relied and will not rely on any representations of Assignor. Assignee acknowledges and agrees that neither Assignor nor any of Assignor's agents, representatives or employees have made any representations to Assignee with regard to the Premises or the improvements located thereon, including, but not limited to, representations concerning the condition of the Premises or their fitness for Assignee's intended use, except as otherwise set forth in this Assignment.

4.    **NOTICES**. All notices, requests, demands, and other communications required

or permitted to be given under this Assignment will be in writing and sent to the address(es) set forth below. Each communication will be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested; (3) if given by nationally recognized or reputable overnight delivery service, on the next business day after receipted deposit with same; or (4) if given by telefax, when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient.

|  |  |
|---|---|
| If to Assignor: | Winn-Dixie _____, Inc.; Re: Store #_____<br>5050 Edgewood Court<br>Jacksonville, FL 32254-3699<br>Attn: Chief Financial Officer<br>Telefax No.: 904/783-5646 |
| With a copy to: | Winn-Dixie Stores, Inc.<br>5050 Edgewood Court<br>Jacksonville, FL 32254-3699<br>Attn: Office of General Counsel<br>Telefax No.: 904/783-5641 |

or to such other address or telefax number as Assignor may direct from time to time.

If to Assignee:    _____
                   _____
                   _____
                   _____
                   Telefax No.: _____

or to such other address or Telefax number as Assignee may direct from time to time.

5.  **NOTICE OF ASSIGNMENT**. On the Effective Date, Assignor and Assignee shall execute and deliver a Notice of Assignment of Lease and record the same in the recording office of the county in which the Premises is located, for the purpose of placing third parties on notice of Assignor's assignment to Assignee of Assignor's right, title and interest as tenant or lessee in and to the Lease, and of the existence of certain limitations on Assignee's rights under the Lease as set forth in this Assignment.

6.    **BINDING EFFECT**.  This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns.

7.    **FURTHER ASSURANCES**.  Assignor and Assignee each covenant and agree to execute or procure any additional documents as may be reasonably necessary to establish the rights of the other hereunder, provided however that under no circumstances shall Assignor be required to undertake any liability not expressly provided in this Agreement.

8.    **NO BROKERS**.  The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Assignment other than that due by Assignor to Assignor's Brokers, if any, as defined on the attached Exhibit B, and that due by Assignee to Assignee's Brokers, if any, as described on the attached Exhibit B.  Assignor agrees to pay all fees and commissions claimed by Assignor's Brokers arising out of this Assignment, and Assignee agrees to pay all fees and commissions, if any, claimed by Assignee's Brokers arising out of this Assignment.        Except for Assignor's Brokers and Assignee's Brokers, respectively, neither Assignor nor Assignee has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with this Assignment, the Lease or the Premises.  Assignor and Assignee hereby indemnify and agree to hold harmless each other from and against any claims by any other person or entity for brokerage fees, commissions or other similar costs related to this Assignment, the Lease or the Premises by reason of Assignor's or Assignee's own acts, said indemnifications by Assignor and Assignee to survive expiration or earlier termination of this Assignment.

9.    **ATTORNEYS' FEES**.  If Assignor becomes a party to any suit or proceeding affecting the Premises or involving this Assignment or Assignee's interest under this Assignment, other than a suit between Assignor and Assignee, or if Assignor engages counsel to collect any of the amounts owed under this Assignment, or to enforce performance of any of the agreements, conditions, covenants, provisions, or stipulations of this Assignment, without commencing litigation, then Assignor's costs, expenses, and reasonable attorneys' fees and disbursements incurred with respect thereto will be paid to Assignor by Assignee, on demand. All references in this Assignment to attorneys' fees will be deemed to include all legal assistants' and paralegals' fees and will include all fees incurred through all post-judgment and appellate levels and in connection with bankruptcy proceedings.

10.   **WAIVER OF JURY TRIAL**.  Assignor and Assignee each acknowledge and agree that the nature of this Assignment, the Premises, the Lease and the Sublease makes a jury determination of any dispute arising out of this Assignment, the Premises, the Lease or the Sublease undesirable. Accordingly, Assignor and Assignee each knowingly, voluntarily and intentionally waive any

right to a trial by jury that any of them may have in any court with respect to any action relating to this Assignment, the Premises, the Lease or the Sublease.

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment as of the Effective Date.

**ASSIGNOR:**

Signed, sealed and delivered
in the presence of:

**WINN-DIXIE** _____, **INC.,** a
Florida corporation

_____
Name:_____

By:_____
Name: _____
Title: Vice President

_____
Name:_____

[CORPORATE SEAL]

[ADD ACKNOWLEDGMENT PER STATE-SPECIFIC REQUIREMENTS]

[SIGNATURES CONTINUED ON FOLLOWING PAGE]

Signed, sealed and delivered
in the presence of:

**ASSIGNEE:**

_____, a

_____

By:_____

_____    Name:_____

Name:_____    Title:_____

_____    [SEAL]

Name:_____

[ADD ACKNOWLEDGMENT PER STATE-SPECIFIC REQUIREMENTS]

Exhibit A

Description of Premises and Lease

STORE #:

STREET ADDRESS:

SHOPPING CENTER:

LEASE:

AMENDMENTS TO LEASE:

SUBLEASE(S):

AMENDMENTS TO SUBLEASE(S):

Exhibit B

Schedule of Brokers

## EXHIBIT B-1

## ASSIGNOR'S BROKERS:[1]

> The Blackstone Group L.P.
> 345 Park Avenue
> New York, New York  10154

> The Food Partners, LLC
> 1250 Eye Street, N.W.
> Suite 850
> Washington, D.C.  20005

> DJM Asset Management, LLC
> 445 Broad Hollow Road
> Suite 417
> Melville, New York  11747

## EXHIBIT B-2

## ASSIGNEE'S BROKERS:

---

[1] Modify for particular transaction to reflect the area more listed brokers which is acting as Seller's Broker for the transaction.

# EXHIBIT H
## to Asset Purchase Agreement

### Form of Inventory Certificate

**INVENTORY CERTIFICATE**

| | | | |
|---|---|---|---|
| Store #: _____ | | Date: _____/_____/ | |
| Store Address: | | Time: _____ : _____ AM  PM | |

| | Inventory Taken @ Retail | Valuation Percentage | Inventory @ Cost |
|---|---|---|---|
| Dry Grocery Taken @ Retail | $ | x  77.00% | $ |
| Frozen Grocery Taken @ Retail | $ | x  65.00% | $ |
| Dairy Taken @ Retail | $ | x  86.00% | $ |
| Tobacco Taken @ Retail | $ | x  82.00% | $ |
| Alcohol Taken @ Retail | $ | x  85.00% | $ |
| Packaged Lunch Meats Taken @ Retail | $ | x  68.00% | $ |
| Pharmaceutical Taken @ Cost | | | $ |
| Gasoline Taken @ Cost | | | $ |
| | $ | x _____% | $ |
| | $ | x _____% | $ |
| | $ | x _____% | $ |
| Total Inventory | | | $ |

_____   ___/___/___
Seller's Authorized Agent         Date

_____   ___/___/___
Buyer's Authorized Agent          Date