EXHIBIT "A"

Opened for business on 6-25-80

# Lease

THIS LEASE, made this 15th day of May 1979, between NORTH HILLS, INC., a North Carolina corporation, (hereinafter called "Landlord") and WINN-DIXIE RALEIGH, INC., a Florida corporation qualified to do business in North Carolina, (hereinafter called "Tenant"); which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

WITNESSETH:

PREMISES

That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and demise unto said Tenant and the Tenant hereby agrees to take and lease from the Landlord, for the term hereinafter specified, the following described premises:

That certain store building, approximately 160 feet in width by 160 feet in depth, together with concrete pads at rear of store building for installation of Tenant's exterior coolers and/or freezers and the land on which the same shall stand (hereinafter collectively called "demised premises"), which store building and related improvements are to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided, and shall be in the location and of the dimensions as outlined in red on the Plot Plan entitled "North Ridge Shopping Center", Falls of Neuse Road, Raleigh, N. C.", dated April 3, 1978, last revised April 19, 1979 by McGee, Scovil & Rairden, Architects, Raleigh, North Carolina attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in detail on Exhibit "A"), known as North Ridge Shopping Center (hereinafter called "shopping center"), located at the southeast corner of the intersection of Falls of Neuse Road and Spring Forest Rd. in the City of Raleigh, County of Wake, State of North Carolina, the legal description of the shopping center being as follows:

(Said North Ridge Shopping Center is described in Exhibit "B" attached hereto and by this reference made a part hereof).

APPROVED
Division Manager
Legal Dept.
Winn-Dixie Stores, Inc.

This instrument was prepared by Charles P. Milford, Jr., Attorney at Law whose address is P. O. Box B, Jacksonville, Florida 32203

SC.3M

TERM

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens said premises for the transaction of its business as hereinafter provided for an initial term of twenty (20) years from said commencement date. The parties agree to execute a supplemental agreement fixing the commencement date when the same shall have been determined as herein provided.

This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

RENTAL

1. The Tenant agrees to pay to the Landlord as a minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of Ninety-Four Thousand Seven Hundred Twenty and No/100------------------------- Dollars ($94,720.00) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of Seven Thousand Eight Hundred Ninety-Three and 33/100---------------------------------------------- Dollars ($ 7,893.33) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

In addition, the Tenant agrees to pay to the Landlord a percentage rental equal to amount if any, by which one and one-eighth per cent (1 1/8 %) of Tenant's gross sales made from the demised premises in each fiscal year ending June 30th during the term of the lease, and any extensions thereof, exceeds Ninety-Four Thousand Seven Hundred Twenty and No/100 - - - - - - - - Dollars ($94,720.00).

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of said percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculating the percentage rental due hereunder, the Tenant's fiscal year shall be from July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINITION OF "GROSS SALES"**

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold, and gross charges for all services rendered in or from the demised premises, both for cash and on credit; provided, however, such term shall not include (1) any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) accommodation sales, such as sales of postage stamps, government bonds or savings stamps or similar items; (5) returns of merchandise to suppliers or manufacturers; (6) net amount of discounts allowed to any customer, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (7) merchandise or other things of value issued in redemption of trading stamps or as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

**RECORD OF SALES**

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address hereinafter designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable by Tenant as hereinabove provided, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

**USE**

2. The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, [redacted]; provided, however, except as a supermarket, the demised premises shall not be used, nor assigned, or subleased under the terms of Article 26 herein, for any use or business which shall be in direct competition with the primary use or business engaged in by any other than tenant in the shopping center to whom Landlord has granted a right of exclusive use, of which Tenant has been given notice as herein provided.

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of said premises, as such shall relate to the cleanliness and use of said premises and the character and manner of operation of the business conducted in or at said premises.

ramps,

CONSTRUCTION OF SHOPPING CENTER

3. The Landlord, at its sole cost and expense, shall construct the shopping center, substantially as shown on Exhibit "A" consisting of all the buildings shown thereon, together with all sidewalks, streets, entranceways, malls, parking areas, service drives, driveways and related improvements, said improvements (excluding buildings) being sometimes hereinafter referred to as "common areas." The Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the shopping center and the tenants and their employees during the term of this lease and any extensions thereof. The arrangement and location of all store buildings and common areas (including parking area) within the shopping center shall at all times during the term of this lease or any extensions thereof, be maintained as shown on Exhibit "A" and shall not be changed without the written consent of the Tenant. If not shown on Exhibit "A", Tenant expressly reserves the right to approve the finish grades of all store buildings and common areas (including parking and service areas) within the shopping center which are to be constructed concurrently with Tenant's store building.

Notwithstanding the foregoing, it is agreed that Landlord shall be obligated to construct only Tenant's store building and the further store buildings required under Articles 5 and 6 hereto, together with all the common areas in the shopping center, including, without limitation, all the sidewalks, drives, entranceways, service areas and parking areas as shown on Exhibit "A". Landlord reserves the right, but shall not be required, to construct additional buildings in the locations and of the dimensions reserved therefor on Exhibit "A", provided, however, such additional buildings shall be of a like structural quality and in architectural harmony with the other buildings in the shopping center. Landlord covenants and agrees that the development of the overall shopping center shall at all times be substantially in accordance with Exhibit "A", and that the additional buildings, if any, shall be provided with adequate setbacks, entranceways and service areas as shown on Exhibit "A". Despite such additional buildings, Landlord agrees to maintain within the shopping center at least the ratio of automobile parking spaces to building area (including additional floor levels) as hereinafter provided. Throughout this Lease, the use and meaning of the term "shopping center" shall be appropriately modified to apply only to the common area improvements together with the buildings actually completed. Landlord agrees that Tenant shall have uninterrupted use and enjoyment of the demised premises and the common areas during any additional construction without unreasonable interference therewith by reason of or on account of such construction work.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to construct the store building for occupancy by Tenant in accordance with the plans and specifications to be approved by both Landlord and Tenant. Plans and specifications shall be approved when initialed by both parties, and when initialed shall constitute a part of this lease. Said plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job," and shall include, but without limitation the following:

air conditioning and heating equipment, including insulated duct work, registers and grilles and roof or ceiling structural system adequately designed to support said air conditioning and heating equipment, plumbing and plumbing fixtures, drains, interior walls and partitions, electrical wiring, lighting fixtures to Tenant's requirements, floor surfacing of vinyl asbestos floor tile (color at Tenant's option), [redacted] sprinkler system (including ADT Alarm System therefor, if such alarm system is now or hereafter required by applicable building codes), [redacted] connections to all utilities, [redacted] and concrete pads for Tenant's compactor and exterior mounted coolers and/or freezers. Tenant shall furnish its own trade fixtures. Any and all of such equipment and fixtures to be furnished by Tenant shall remain its property and may be removed by Tenant from the demised premises at any time.

COMPLETION DATE

4. Landlord covenants and agrees that the construction of the shopping center shall begin not later than July 1, 1979 and shall be completed not later than March 30, 1980, and if the same shall not be begun or completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this lease or may extend the Landlord additional time for the beginning or completion of construction; provided, however, that if after the beginning of construction the Landlord's failure to complete said improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than August 31, 1980, said option to terminate shall not arise. If pursuant to this paragraph Tenant shall cancel or terminate this lease, Landlord agrees that for a period of three (3) years after such cancellation or termination, Tenant herein shall have "first refusal" of the right to operate any food supermarket Landlord may desire to permit in the shopping center, including any enlargement thereof, provided that Tenant exercise such right of first refusal on the terms and conditions of this Lease during the first year of said 3-year period.

For the purposes hereof, construction shall not be deemed to have begun until the concrete footings for the store building demised to Tenant under this Lease are poured in the ground at the site.

COMMENCEMENT DATE

5. The Tenant shall open its store for business within thirty (30) days following performance of the following:

(a) Tenant's store building and other improvements constructed on the demised premises shall have been delivered to Tenant completed in accordance with the plans and specifications;

(b) Construction of all of the common areas (including parking area hereinafter specifically required) shall have been completed substantially as shown on Exhibit "A";

(c) Construction of at least 19,000 square feet of total building area (excluding Tenant's store building) shall have been completed and said area leased to other tenants and opened for business simultaneously with Tenant; and

(d) The stores to be operated by each of the following tenants shall have been completed and opened for business or been readied for opening for business simultaneously with Tenant.

Drug Store
Other retail stores as specified in Article 6 hereof.

In the event that all the above requirements shall not have been met on or prior to August 31, 1980, the Tenant at its sole option may cancel and terminate this lease.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of thirty (30) days following the performance of all the above requirements whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

RETAIL AND SERVICE STORES ONLY

5A. It is agreed that without the prior written consent of Tenant herein only retail and/or service stores shall be allowed to operate in the shopping center including any enlargement thereof, it being the intent of the parties hereto that no [redacted] bowling alley, skating rink, bingo parlor, [redacted] or health, recreational or entertainment-type activities, or non-retail or non-service type activities, shall be permitted.

Notwithstanding the foregoing, it is agreed that Landlord may locate one (1) spa in the Phase I portion of the center provided that the same is on the "lower level" as indicated on Exhibit "A". Further notwithstanding the foregoing, it is agreed that Landlord may locate one (1) motion picture

theater in Phase II of the shopping center as shown on Exhibit "A" and may also locate office buildings in Phase II of the shopping center as shown on Exhibit "A". Otherwise, Landlord agrees not to locate any spac, theaters and/or office buildings in the shopping center.

OTHER TENANTS

6. As a condition and inducement to Tenant's entering into this lease, Landlord represents and warrants that it has entered into firm commitments for leases with the tenants listed below for the terms and for the amount of floor space indicated.

| Name | Term Years | Floor Area (sq. ft.) |
|---|---|---|
| Drug Store | 15 | 9,000 |
| Other retail shops | variable | 10,000 minimum |

Landlord further warrants and represents that such tenants shall occupy the space in the shopping center in the locations indicated on Exhibit "A" and in the minimum amounts set opposite their respective names above, and Landlord agrees, on demand, to furnish evidence satisfactory to Tenant, prior to and as a further condition to the establishment of the commencement date of this lease, that Landlord has entered into non-cancellable leases, except for default, with such tenants.

PARKING AND COMMON AREAS

7. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, including parking area, as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a) a minimum ratio of at least 5.0 automobile parking spaces per each 1,000 square feet of gross building area (including additional floor levels) in the shopping center, including any enlargement thereof; and

(b) facilities for convenient parking of at least 444 automobiles in Phase I (and the location of 2 bascart corrals as shown on Exhibit "A"), and the minimum number of automobile parking spaces required by the above parking ratio as future phases, if any, of the shopping center are added;

and in event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord at its expense during customary food store shopping hours (but in no event later than 11:00 o'clock P.M.). In the event Tenant desires to keep its store building open after 11:00 o'clock P.M., it agrees to reimburse Landlord for the cost of lighting of such portions of the common areas (including parking area) as are requested by Tenant to be lighted after said hour of 11:00 o'clock P.M. Landlord further agrees that no signboards or other construction shall be erected in any of the common areas (including the parking area) shown on Exhibit "A" or so as to obstruct the view of the demised premises from the adjoining public streets.

Tenant agrees that its employees shall park their automobiles in an area of the shopping center designated by Landlord for such parking, provided however, that the employees of all tenants in the center shall be similarly restricted, and provided further, that such employees' parking area shall be located in an area which is reasonably accessible to the demised premises.

Landlord agrees that until the construction of future store buildings as shown on Exhibit "A", if any, beyond those required under Articles 5 and 6 herein, the remaining portion of the shopping center site as described on Exhibit "B" (except the required common areas) will remain as paved, grassed or landscaped area and be kept free of weeds and debris.

Landlord further agrees that without the prior written consent of Tenant herein, no traveling carnivals, fairs or shows nor sales by transient merchants utilizing vehicles or booths shall be allowed in the shopping center, or any enlargement thereof.

SERVICE AREA

8. Landlord further agrees to provide for the exclusive use of the Tenant at its grocery service entrances parking spaces for two large trailer trucks for continuous use and further agrees that Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for loading and unloading merchandise for its store into and from trucks and trailers at such service entrances.

UTILITIES

9. The Tenant agrees to pay all charges for telephone, electricity, water, gas, necessary pest control and other utilities used by Tenant on the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities.

TENANT'S REPAIRS

10. Upon completion of construction by Landlord and acceptance of the demised premises by Tenant, Tenant agrees to keep the interior of the demised premises in good condition and repair, excepting structural repairs and all repairs which are the responsibility of the Landlord or which are made necessary by reason of fire and other unavoidable casualties covered by Landlord's fire and extended coverage insurance, and excepting reasonable wear and tear.

Within the repair responsibilities of Tenant shall be included: routine maintenance of the air conditioning and heating equipment except insulated duct work, registers and grilles which shall be the responsibility of Landlord; interior exposed plumbing except sprinkler system; interior exposed wiring; floor surfacing; and windows and plate glass (except such damage as is caused by faulty construction or settling of the building or is covered by Landlord's fire and extended coverage insurance, which should be Landlord's responsibility. Landlord shall afford Tenant the benefit of any warranties extended by the manufacturers or the installers of the equipment herein before described for which Tenant has repair responsibilities. Tenant agrees that without the prior consent of Landlord, Tenant will cause no holes to be cut in the roof of the demised premises.

LANDLORD'S REPAIRS

11. The Landlord shall, at its cost and expense, keep and maintain the common areas (including parking area, sidewalks, ramps and service areas) in good condition and repair, and shall maintain the exterior of Tenant's store building, including the roof, gutter, downspouts, exterior painting, masonry walls, foundation and structural members, [redacted] concealed plumbing (including septic tank, if any) and concealed wiring

[redacted] of the store building in good condition and repair, and shall make any and all structural repairs to both the exterior and interior of said premises. If any portion of the common areas (including parking area, sidewalks, ramps and service areas) or any portion of the store building which is the responsibility of the Landlord shall at any time be in need of repair, Landlord will repair same immediately upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of the Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements, or other casualty covered by Landlord's fire and extended coverage insurance.

Within the repair responsibilities of Landlord shall be included: insulated duct work, registers and grilles, repairs and replacement of air conditioning and heating equipment except as stipulated in Article 10 above, and the entire sprinkler system, including sprinkle heads and ADT Alarm System therefor, if now or hereafter required by applicable building codes.

, sidewalks, ramps and service areas

If in order to protect the Tenant's property in the store building it shall be necessary to make emergency repairs to any portion thereof which is the responsibility of the Landlord to repair, or if the Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas (including parking area) which are the responsibility of the Landlord the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs. Landlord further covenants that the store building will be so constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that said premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated.

SIGNS

12. Tenant may place, erect and maintain any signs on the roof, walls, and any other place on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs. The design of such signs of Tenant to be affixed to the exterior of the demised premises shall be subject to the prior approval of Landlord, such approval not to be unreasonably withheld, it being contemplated that such approval shall be accorded to sign designs usual to Tenant's business and in reasonable architectural harmony with the design of Tenant's store building and the other store buildings in the shopping center.

SCRIPT

Tenant shall make no permanent structural improvement to the demised premises without Landlord's prior written consent.

FIXTURES AND INTERIOR ALTERATIONS

13. The Tenant, at its own expense, may from time to time during the term of this lease make any interior alterations, additions and improvements in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

Tenant may construct and build or install in said premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from said premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to said premises resulting from the installation or removal of such items. Tenant agrees not to suffer any mechanic's lien to be filed against the demised premises or any other portion of the shopping center by reason of any work, labor, services or materials performed at or furnished to the demised premises for Tenant, or for anyone holding the demised premises through or under Tenant. If any such mechanic's lien shall at any time be filed, Tenant shall forthwith cause the same to be discharged of record by payment, bond, order of a court of competent jurisdiction, or otherwise, but Tenant shall have the right to contest any and all such liens provided security satisfactory to Landlord is deposited with it. Nothing in this lease contained shall be construed as a consent on the part of Landlord to subject Landlord's estate in the demised premises to any lien or liability under the mechanic's lien law of the state of North Carolina.

INDEMNIFICATION 14. Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises. Likewise, Landlord shall indemnify and save harmless the Tenant from any claim or loss by reason of an accident or damage to any person or property happening on or about all common areas (including without limitation, parking area, sidewalks, ramps and service areas) of the shopping center, and Landlord further agrees to carry, at its expense, public liability insurance coverage on all common areas (including without limitation, parking area, sidewalks, ramps and service areas) of the shopping center, with a contractual liability endorsement on the policy, in a company qualified to transact business in North Carolina, stipulating limits of liability of not less than $200,000.00 for an accident affecting any one person; and not less than $500,000.00 for an accident affecting more than one person; and $50,000.00 property damage. Certificate of such coverage from the insurer providing 30 days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant.

CLEANLINESS 15. Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the entryways and delivery areas adjoining the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for making repairs and for examining or showing the same to prospective purchasers. Tenant shall not sell merchandise from the sidewalks without the prior consent of Landlord, such consent not to be unreasonably withheld.

FIRE 16. In the event that Tenant's building shall be totally destroyed or damaged to the extent of 75% or more of the value thereof by fire or other casualty, then Tenant may elect within thirty (30) days after such damage, to terminate this lease by giving to the Landlord a written notice of termination, and thereupon both parties shall stand released of and from all further liability under this lease. If Tenant's building shall thereby suffer damage to any extent less than 75% of the value thereof, or if Tenant does not elect to terminate as aforesaid, then the Landlord agrees to proceed promptly and without expense to the Tenant to repair the damage or restore the improvements, remitting a fair and just portion of the rent according to the unusable space, until said premises are completely reinstated or restored, provided, however, if Tenant's building shall be damaged to the extent of 75% or more of the value thereof by fire or other casualty during the last five (5) years of the lease term (including time during any renewal or extended term), then in such event Landlord shall not be obligated

to repair the damage or restore the improvements unless and until Tenant agrees to extend the lease term or renewal or extended term so as to run for a period of five (5) years from the date of completion of such repair or restoration, such extension to be on the same conditions and for the same rentals and to be in addition to and not in lieu of any extension or renewal options then remaining available to Tenant under the provisions of this Lease. If at any time during the term of this Lease or any extensions thereof any of the buildings in the shopping center, exclusive of Tenant's store building, are damaged by fire or by the elements or otherwise, Landlord shall immediately commence and diligently prosecute to completion repair of all such damage and shall restore said improvements to their condition prior to such damage, provided, however, that such obligation to restore said other buildings shall be conditioned upon the provisions of the leases covering such buildings.

It is further agreed that if after said destruction or damage by fire or other casualty the demised premises are not restored by Landlord and this Lease is terminated as above provided, then in such event Tenant shall be entitled to such division of insurance proceeds as shall be just and equitable by reason of any leasehold improvements Tenant may have made to the demised premises.

Landlord agrees to carry fire and extended coverage insurance on Tenant's building and any additions, alterations and improvements made thereto by Landlord or Tenant and on all other buildings within the shopping center in the amount of full insurable value thereof, above foundation walls, and hereby expressly waives any and all claims against the Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the Tenant, its agents, servants or employees; and Tenant hereby expressly waives any and all claims against the Landlord for loss or damage to Tenant's merchandise, fixtures and equipment due to fire, explosion, windstorm or other casualty covered by standard fire and extended coverage insurance policies, regardless of the cause of such damage, including, without limitation, damage resulting from the negligence of the Landlord, its agents, servants or employees.

If the demised premises are used for any principal business other than the operation of a food supermarket and as if as a result of such other use the premiums for fire and extended coverage insurance on the demised premises increase, then in such events, Tenant agrees to reimburse Landlord for such increase in the cost of such premiums.

QUIET ENJOYMENT

17. The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created, that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein, and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a general mercantile business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease preventing or restricting Tenant from conducting a general mercantile business or using the common areas (including parking area) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

TAXES AND LIENS

18. All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord when due. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at six per cent (6%) per annum.

(And see Article 34 hereof).

CONDEMNATION

19. If any part of the demised premises or more than twenty per cent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease as aforesaid, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

Tenant shall not be entitled to share in any condemnation awards for any taking other than for its leasehold improvements. It is understood, however, that Tenant shall also be entitled to such awards as are accorded it under law, including, but not limited to, moving expenses, business interruption allowances and awards for Tenant's trade fixtures and other personalty.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of ten per cent ( 10 %) or reduce the number of cars which may be conveniently parked to less than 399, the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time it ceased business operations in the demised premises as the result of such taking.

DEFAULT

20. In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.

BANKRUPTCY 21. The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

CONSTRUCTION RISKS 22. It is understood and agreed that nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing said improvements, and that the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub contractors, employees, agents or servants by reason of Landlord's constructing said improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing said improvements or from any faulty construction thereof.

NOTICES 23. All notices required to be given to Landlord hereunder shall be sent by registered or certified mail to, and all rent payments shall be made to Landlord at __________.

P. O. Box 17004

Raleigh, North Carolina 27609

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail.

All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at P. O. Box 25511

Raleigh, North Carolina 27611

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail.

END OF TENANCY 24. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct.

**ARBITRATION** 25. In the event there should arise any misunderstanding between the parties hereto as to the compliance with the terms and conditions of this lease upon the part of either of the parties hereto, or as to whether the Tenant's store building tendered by the Landlord has been improved in substantial conformity with the plans and specifications approved by the parties, or whether the common areas, including parking area, comply with the agreement of the parties hereto, or as to whether either party has ground hereunder entitling it to terminate this lease, it is mutually agreed that such differences, if they cannot be satisfactorily adjusted between the parties hereto within thirty (30) days, shall be submitted to a single arbitrator, if the parties hereto agree upon one; otherwise, to a board of three arbitrators, of whom one shall be selected by each party within ten (10) days after such 30-day period, and a third person shall be selected by these two, and the decision and award of such single arbitrator, if only one is used, or any two of such board, if three are used, as the case may be, shall be final and binding upon the said parties and their successors and assigns respectively, and shall have the same force and effect as though such decision had been handed down by a court of final jurisdiction. Each of the parties hereto covenants to abide by any such arbitration decision.

**ASSIGNMENT AND SUBLEASING** 26. The Tenant may without the consent of Landlord assign or sublease to any corporation or entity which is the parent of, subsidiary to or affiliated with Tenant or to any corporation or entity with which Tenant merges or consolidates or to which it sells all or substantially all of its business in the state where the demised premises are situated or sublease a portion or department of the demised premises without consent to any concessionnaire or licensee or otherwise in connection with the operation of Tenant's business in the demised premises, provided the sales of such concessionnaire or licensee shall be included within the gross sales of Tenant, as defined hereinabove in Article 1a.

Except as provided above, Tenant may assign the Lease or sublease the demised premises only if Landlord approves the proposed sub-tenant or assignee selected by Tenant. If Tenant desires to assign or sublease, it shall give written notice to Landlord of its intention to do so and shall reveal the identity of the intended sub-lessee or assignee, in which case Landlord shall within thirty (30) days of the delivery of such notice advise Tenant in writing of its approval or disapproval of such intended subleasing or assignment. If Tenant receives notice of Landlord's approval within such period, Tenant may proceed in due course. If Landlord shall fail to give Tenant notice of its approval or disapproval within such thirty (30) day period, then approval will be presumed and Tenant may proceed in due course. If Landlord shall give Tenant written notice of its disapproval of the proposed sub-lease or assignment within such thirty (30) day period, then the parties shall, for a period of up to twelve (12) months from the date of notice of disapproval, negotiate in good faith to locate a proposed sub-tenant or assignee acceptable to Landlord and Tenant. If, at the expiration of such twelve (12) month period, the parties are unable, in good faith, to successfully negotiate an agreement as to a mutually acceptable sub-tenant or assignee, then Landlord shall have the option to terminate and cancel this Lease without the execution of any other or further document, and both parties hereto shall be released of and from any further liability hereunder. Should Landlord not elect to exercise its option to terminate and cancel this lease in such event, Tenant shall remain liable on this lease for the duration of the then current lease term. Landlord agrees that its approval of Tenant's assignee or sub-tenant shall not be unreasonably withheld.

Tenant shall have the right, without the consent of Landlord, to vacate the entire demised premises or cease selling merchandise therein after giving Landlord ninety (90) days' advance notice of its intent to do so, which notice shall be required only if the demised premises are usable for the operation of a general mercantile business and excluding temporary cessation of business caused by happenings beyond the control of Tenant. In the event Tenant shall vacate or cease selling merchandise hereunder for a period of more than ninety (90) days, Landlord shall have the continuing option thereafter (unless Tenant shall have reoccupied the premises) to terminate and cancel this Lease upon fifteen (15) days' written notice to Tenant of its election so to do, unless within such 15-day period Tenant shall advise Landlord that Tenant had prior to receipt of such notice in good faith committed to assign this Lease or sublease the demised premises to a corporation or entity which is the parent of, subsidiary to or affiliated with Tenant or any corporation or entity with which Tenant has merged or consolidated or to which it has sold all or substantially all of its business in the state where the demised premises are situated or to another party acceptable in good faith to Landlord, for occupancy within two (2) months.

**EXTENSIONS** 27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of four (4) successive extensions of this lease, each extension to be for a period of five (5) years and on the same terms and conditions provided herein except that the annual minimum guaranteed rental during each such extension shall be a sum equal to $3.70 per sq. ft. of Tenant's demised store building plus an amount equal to 80% of the average of the last five (5) years' percentage rental defined in Article 1 hereof. In addition, the Tenant agrees during each of such extension periods, if exercised, to pay to the Landlord a percentage rental equal to the amount, if any, by which one and one-eighth per cent (1 1/8%) of Tenant's gross sales made during such extended term from the demised premises in each fiscal year ending June 30th exceed such adjusted minimum guaranteed annual rental. During each of such extensions of the lease term, if any, Tenant agrees to pay to Landlord as additional rental the amount of any increase in ad valorem real estate taxes levied against the demised premises in excess of the amount of such taxes levied thereon for the twentieth year of the initial term of the Lease in accordance with the provisions of Article 34 hereof. [redacted] During each of said extensions of the lease term, if any, Tenant shall also pay to Landlord as additional rental hereunder and as reimbursement of common area maintenance expenses its prorata share of such expenses, with any additional rental payable thereunder being credited on a non-cumulative basis against any and all percentage rental, if any, which may become due under the Lease to the extent that Tenant's prorata share of such expenses exceeds a sum equal to 25¢ per square foot of Tenant's demised store building ($6,400.00 for the initial size of the store building).

EXCLUSIVE SUPERMARKET

28. Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off premises consumption any staple or fancy groceries, meats, fish, dairy items, vegetables, fruits, bakery goods or frozen foods without written permission of the Tenant, except the sale of such items in stores in the shopping center which do not exceed 3,600 square feet in gross floor area, and except the sale by a restaurant operation of prepared, ready-to-eat food items, either for consumption on or off the premises, shall not be deemed a violation hereof.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any provisions herein to the contrary, the Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation. If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage.

SUBORDINATE

29. The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees upon demand, without cost, to execute any instrument as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

BENEFIT

30. This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

SHORT FORM LEASE 31. The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease in form permitting its recording.

MARGINAL TITLES 32. The marginal titles appearing in this lease are for reference only and shall not be considered a part of this lease or in any way to modify, amend or affect the provisions thereof.

COMPLETE AGREEMENT 33. This written lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

APPLICABLE LAW 33A. The laws of the state of North Carolina shall govern the validity, performance and enforcement of this Lease. The invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provision.

TAXES 34. During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the fifty per cent (50%) of amount of any increase in ad valorem real estate taxes levied against the demised premises in excess of the amount of such taxes levied thereon for the first (1st) full calendar year of the lease term in which both the value of the land and the buildings thereon shall be assessed for tax purposes; provided, however, any additional rental payable hereunder by the Tenant may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due hereunder, it being intended that such credit shall be made annually in respect of the tax payments for the previous tax year at the time percentage rentals are payable, but if there shall not be any percentage rentals due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning of the period in which Tenant is responsible for such tax payments, or at the end of the lease term or any extensions thereof, shall be prorated on the basis of the annual credit. Tenant shall be responsible only for its pro-rata share of such taxes for fractional years occurring at the beginning and expiration of the term of this Lease, and any extensions thereof.

If such taxes shall not be assessed separately, but shall be included within an assessment of the demised premises and others, said assessment shall be fairly apportioned to determine Tenant's share thereof. Such apportionment shall be made in the ratio which the square footage of Tenant's store building bears to the total square footage of all store buildings (including additional floor levels) from time to time existing in the shopping center. The amount of taxes attributable to the shopping center, and for which Tenant is to reimburse Landlord in part, shall be less any abatements, discounts or refunds thereon. Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements as evidence of the basis upon which any increase in taxes is chargeable to Tenant and an "as built" survey of the shopping center, and such additional rental shall be payable by Tenant on demand after payment by Landlord. All taxes, other than ad valorem real estate taxes, including special assessments, improvement liens, and the like, shall remain the sole responsibility of the Landlord. However, Tenant shall remain responsible for sales taxes on rentals levied by law on lessees.

Tenant shall have the right from time to time to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned, and to institute such proceedings in the name of the Landlord as the Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to the Landlord,

It is understood that the shopping center is to be constructed in two or more phases and that Tenant's demised store building will be located in the initial phase. The parties hereto agree to amend this article so as to provide new base years for computing Tenant's contribution to ad valorem tax increases as above set forth at such time or times as construction of the second or other subsequent phases of the center have been completed, with the result that following completion of each subsequent phase, Tenant's pro-rata share of the increases in ad valorem real estate taxes levied against the entire shopping center shall be based upon the amount of taxes in excess of the taxes levied thereon for the first full calendar year of the lease term in which the value of the land and of the buildings in the combined phases of the shopping center shall be assessed for tax purposes. Until such times, Tenant shall continue to make contribution toward increases in ad valorem taxes as above set forth or as adjusted hereunder for addition of previous phases. It is further understood that this paragraph shall not be applicable in the event Tenant's demised store building is assessed separately from the shopping center.

EXPANSION OF DEMISED PREMISES

35. Landlord agrees, upon request of Tenant, to negotiate in good faith with Tenant for the construction of an enlargement to Tenant demised store building.

COMMON AREA MAINTENANCE

36. Landlord agrees to operate and maintain all the common areas, as herein defined, and provide therefor all such services as are reasonably required, including, but without limitation, cleaning and sweeping, snow and ice removal, lighting, policing, if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping and watering and maintenance of landscaped areas. For such services, Tenant shall pay to Landlord, as additional rental hereunder and as reimbursement for the annual cost thereof, its pro-rata share of such expenses. Such apportionment shall be made at a ratio which the square footage of Tenant's store building bears to the total square footage of all store buildings (including additional floor levels) from time to time existing in the shopping center, the expenses for which Tenant is to reimburse Landlord shall be less any abatements, discounts or refunds thereon. Tenant shall make its estimated payments for such common area maintenance contribution to Landlord on a monthly basis in the sum of $213.33 per month in advance on the first day on each and every calendar month of the lease term and any extensions thereof. Within thirty (30) days following the end of the lease year, Landlord shall submit to Tenant a detailed statement of all common area maintenance charges (together with the calculation of Tenant's pro-rata share thereof) for such previous lease year, and within thirty days of receiving such statement, Tenant shall pay Landlord any overage due from Tenant should its total monthly contributions not equal its pro-rata share of such common area maintenance charges. On the other hand, should such statement reveal an overpayment by Tenant during the lease year, Landlord agrees, within thirty days after submission of such statement to Tenant, to refund to Tenant the amount of such overpayment. Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid statements as evidence of the basis upon which any payment hereunder is to be made, and such additional rental shall be payable by Tenant on demand after payment by Landlord not more often than monthly

Any additional rental payable hereunder by the Tenant may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due hereunder to the extent that such expenses exceed a sum equal to 15¢ per square foot of Tenant's store building ($3,840.00 for the initial building size). It is intended that such credit shall be made annually in respect of the common area payments for the previous lease year at the time percentage rentals, if any, are payable, but if there shall not be any percentage rentals due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning and end of the lease term or any extensions thereof shall be prorated on the basis of the annual credit. If the Landlord, after receipt of written notice from Tenant to do so, shall fail to make the repairs or perform the services described in this Article, the Tenant shall have the right to make such repairs or cause such services to be performed in its behalf and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred therein.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this agreement the day and year first above written.

Signed, sealed and delivered in the presence of:

NORTH HILLS, INC.

By: ______ Its ______ President

Attest: ______ Its ______ Secretary

As to North Hills, Inc.

(CORPORATE SEAL)

LANDLORD

WINN-DIXIE RALEIGH, INC.

By: ______ Its Vice President

Attest: ______ Its Secretary

As to Winn-Dixie Raleigh, Inc.

(CORPORATE SEAL)

TENANT

North Carolina – doubl. rporate

STATE OF North Carolina )
COUNTY OF Wake )

I, Betty A. Howard, a Notary Public, do hereby certify that Russell W. Whitted personally came before me this day and acknowledged that he is ______ Secretary of ______ NORTH HILLS, INC., a North Carolina corporation ______, and that, by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its ______ President, sealed with its corporate seal, and attested by himself as its ______ ______ Secretary.

Witness my hand and official seal, this the 15th day of May, 1979.

My commission expires: My Commission Expires February 24, 1982

Betty A. Howard
Notary Public
State and County aforesaid
(NOTARIAL SEAL)

STATE OF FLORIDA )
COUNTY OF DUVAL )

I, Brenda B. Thomas, a Notary Public, do hereby certify that J. S. Byers, Jr. personally came before me this day and acknowledged that he is ______ ______ Secretary of ______ ______ WINN DIXIE RALEIGH, INC., a Florida corporation ______, and that, by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its ______ Vice President, sealed with its corporate seal, and attested by himself as its ______ ______ Secretary.

Witness my hand and official seal, this the 22nd day of May, 1979.

My commission expires: NOTARY PUBLIC STATE OF FLORIDA AT LARGE MY COMMISSION EXPIRES NOV. 24, 1979

Brenda B. Thomas
Notary Public
State and County aforesaid

(NOTARIAL SEAL)