UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE:                                              :        Chapter 11
                                                    :        Case No. 05-03817-3F1
WINN-DIXIE STORES, INC., *et al.,*                  :
                                                    :        Jointly Administered
        Debtors.                                    :
                                                    :        **Re:  D.I. No. 1962**
_____:

## OBJECTION OF TOWER CENTER ASSOCIATES, LTD. TO PROPOSED CURE AMOUNT AS STATED IN DEBTORS' MOTION FOR ORDER (A) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS AND EXEMPT FROM TAXES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF LEASES AND CONTRACTS AND (C) GRANTING RELATED RELIEF [D.I. 1962]

Tower Center Associates, Ltd. ("TCA" or, the "Landlord"), by and through its undersigned counsel, hereby objects (the "Objection") to the proposed cure amount as stated in the Motion of the above-captioned debtors and debtors-in-possession (the "Debtors") For Order (A) Authorizing The Sale Of Assets Free And Clear Of Liens, Claims And Interests And Exempt From Taxes, (B) Authorizing The Assumption And Assignment Of Leases And Contracts And (C) Granting Related Relief (D.I. 1962) (the "Motion"), and in support of its Objection, TCA respectfully states as follows:

### Background

1.      On February 21, 2005 (the "Petition Date") the Debtors each filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York. By order dated April 13, 2005, venue of the Debtors' bankruptcy cases was transferred to this Court.

2.    The Debtors' cases are being jointly administered.  To date, no trustee or examiner has been appointed.

3.    The Debtors are operating their properties and managing their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

4.    Prior to the Petition Date, on or about August 19, 1988, Landlord and Debtor Winn-Dixie Stores, Inc. (the "Debtor Tenant") entered into a Lease (the "Lease"),[1] by which Landlord leased to Debtor Tenant certain commercial real property located on the east side of Tower Road, South of Newberry Road (S.R. 26), in Gainesville, Florida (the "Property"). On March 22, 1990, Landlord and Debtor Tenant entered into the Supplemental Lease Agreement (the "Lease Supplement"),[2] which amended and supplemented certain of the terms of the Lease.

5.    Among other obligations, the Lease requires Debtor Tenant to pay Debtor Tenant's pro rata share of the expense of maintaining the common areas (collectively, the "CAM Obligations") in connection with the Property. (Lease, ¶ 31). Debtor Tenant's CAM Obligations include the obligation to reimburse Landlord for Debtor Tenant's portion of utilities, including, without limitation expenses related to water, sewer, power, and paving services in the common areas.

6.    Both prior to and after the Petition Date, Debtor Tenant incurred certain CAM Obligations for the first quarter of 2005 (i.e., that period from January 1, 2005 through March 31, 2005. On May 3, 2005, Landlord invoiced Debtor Tenant for its first quarter CAM

---

[1]    A copy of the Lease is appended hereto as Exhibit "A".

[2]    A copy of the Lease Supplement is appended hereto as Exhibit "B".

Obligations, which totaled $9,505.35.[3]  On May 19, 2005, the Debtors paid only a portion of this

amount, or $4,013.37.   As such, to date, $5,491,98 of Debtor Tenant's first quarter CAM

Obligations remain unpaid.

       7.     On July 1, 2005, the Debtors filed the Motion.  Pursuant to the Motion, the

Debtors request, among other things, authorization to assume and assign certain unexpired leases

and executory contracts of the Debtors.  The Motion includes the Lease as a potential lease that

Debtors may seek to assume and assign to a potential purchaser.  (Motion, Exhibit "A").

However, the Motion also asserts that Landlord must be paid only $58,615.81 (the "Proposed

Cure Amount") in order to satisfy real estate taxes and cure any defaults under the Lease.

(Motion, Exhibit "F").

       8.     Landlord hereby objects to the Proposed Cure Amount as asserted in the

Motion, because it does not reflect the amounts owed to Landlord by Debtor Tenant in

connection with Debtor Tenant's CAM Obligations.

## Objection

       9.     Bankruptcy Code section 365, as a prerequisite to the assumption or

assumption and assignment of an unexpired lease, such as the Lease, obligates Debtors to cure

defaults under such lease.  Specifically, Bankruptcy Code section 365(b)(1) provides:

> If there has been a default in an executory contract or unexpired lease of
> the debtor, the trustee may not assume such contract or lease unless, at the
> time of assumption of such contract or lease, the trustee – (A) cures, or
> provides adequate assurance that the trustee will promptly cure, such
> default . . .

11 U.S.C. § 365(b)(1)(A).  It is well-settled that Bankruptcy Code section 365(b)(1) requires the

Debtor to cure defaults under an unexpired lease as a prerequisite to assumption of such lease.

---

[3]     A copy of this Invoice is appended hereto as Exhibit "C".

See In re Lykes Bros. S.S. Co., Inc., 221 B.R. 881 (Bankr. M.D. Fla. 1997) (holding that before debtor may assume executory contract, debtor must promptly cure or assure prompt cure of any defaults under contract sought to be assumed); In re Stoltz, 315 F.3d 80 (2d Cir. 2002) (same); In re Liljeberg E'prises., Inc., 304 F.3d 410 (5th Cir. 2002); In re Overland Park Financial Corp., 236 F.3d 1246 (10th Cir. 2001) (same); In re Emberg 86th St., 184 B.R. 892 (Bankr. S.D.N.Y. 1995) (same).

10.     Thus, in order for Debtors to assume the Lease, Debtors' unpaid CAM Obligations, as well as all other amounts owed to Landlord, must be satisfied. Landlord objects to the Proposed Cure Amount because it understates Debtors' cure obligations as owed to Landlord. That is, the Proposed Cure Amount does not reflect the $4,013.37 that Debtors failed to pay in connection with Debtor Tenant's first quarter CAM Obligations. As such, the amount needed to cure Debtor Tenant's defaults under the Lease is no less than $62,629.18.

11.     The Lease and Lease Supplement, and other documents related thereto, impose other obligations upon Debtor Tenant in addition to the obligations to pay rent and satisfy CAM Obligations. For instance, the Lease requires that Debtor Tenant pay: (i) a percentage of gross sales each fiscal year (Lease, ¶ 1); (ii) utilities on the Property (Lease, ¶ 10); and (iii) damages related to accidents occurring on the Property (Lease, ¶ 15). Also, the Lease imposes certain other monetary and non-monetary obligations (such as to keep the premises in good repair) upon Debtor Tenant.

12.     It is possible that the Debtor Tenant is in default with respect to one or more of these additional monetary and/or non-monetary obligations, but that Landlord is not yet aware, and could not be expected to be aware, of such defaults. Furthermore, certain additional defaults under the Lease may occur between the time this Objection is filed and such time as the

Lease is actually assumed.  Landlord hereby reserves any and all rights to supplement this Objection to assert additional and/or supplemental cure amounts required to be paid in connection with any assumption or assumption and assignment of the Lease.  Landlord further reserves any and all rights, claims and defenses Landlord has with respect to the Debtors and or their bankruptcy estates, as well as with respect to any other party.

WHEREFORE, Landlord hereby objects to assumption or assumption and assignment of the Lease absent payment to Landlord of a cure amount of no less than $62,629.18, and hereby requests such other and further relief in favor of Landlord as the Court deems just and proper.

Dated: July 13, 2005

/s/ Gardner F. Davis
_____

FOLEY & LARDNER LLP
Gardner F. Davis (No. 0471712)
One Independent Drive, Suite 1300
Jacksonville, FL  32202
(904) 359-2000

and

PEPPER HAMILTON LLP
James C. Carignan (Del. Bar No. 4230)
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE   19899-1709
(302) 777-6500

and

PEPPER HAMILTON LLP
Alan K. Sable, Esq.
50th Floor
500 Grant Street
Pittsburgh, PA  15219-2502
(412) 454-5854

Counsel to Tower Center Associates, Ltd.

WL: #172190 v1 (3_V201!.DOC)

## CERTIFICATE OF SERVICE

I, James C. Carignan, hereby certify that on July 14, 2005, I caused to be served the Objection Of Tower Center Associates, Ltd. To Proposed Cure Amount As Stated In Debtors' Motion For Order (a) Authorizing The Sale Of Assets Free And Clear Of Liens, Claims And Interests And Exempt From Taxes, (b) Authorizing The Assumption And Assignment Of Leases And Contracts And (c) Granting Related Relief, upon the following entities via regular, first-class mail.

D.J. Baker, Esq.
Skadden, Arps, Slate, Meagher, & Flom, LLP
Four Times Square
New York, NY 10036

Cynthia C. Jackson, Esq.
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, FL 32202

Elena L. Escamilla, Esq.
Office of the United States Trustee
135 W. Central Blvd., Suite 620
Orlando, FL 32806

Dennis F. Dunne, Esq.
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005

Dated: July 14, 2005
Wilmington, DE

_____
James C. Carignan (Del. Bar ID No. 4230)

**Exhibit "A'**

# LEASE

THIS LEASE, made this _19th_ day of _August_ , 19 _88_

between _TOWER CENTER ASSOCIATES, LTD., a Florida limited partnership_

_____

_____ (hereinafter called "Landlord")

and _WINN-DIXIE STORES, INC., a Florida corporation_

_____

_____(hereinafter called "Tenant");

which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singu-

lar or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### WITNESSETH:

That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and

demise unto said Tenant and the Tenant hereby agrees to take and lease from the Landlord, for

the term hereinafter specified, the following described premises:

That certain store building, approximately _220_ feet in width by _200_

feet in depth, _together with vestibule approximately 83.67 feet in width_

_by 11.75 feet in depth, together with pads for Tenant's exterior coolers_
_and freezers_
and the land on which the same shall stand (hereinafter collectively called "demised pre-

mises"), which store building and related improvements are to be constructed by Land-

lord according to plans and specifications to be approved by the parties as herein pro-

vided, and shall be in the location and of the dimensions as outlined in red on the

Plot Plan _entitled "Leasing Plan for Tower Center" prepared by Fugleberg_

_Koch Architects, Orlando, Florida, dated August 10, 1988_

_____

attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in de-

tail on Exhibit "A"), known as _Tower Center_

(hereinafter called "shopping center"), located _on the east side of Tower Road,_

_South of Newberry Road (S. R. 26)_

in the City of _Gainesville_ , County of _Alachua_ ,

State of _Florida_ , the legal description of the shopping center being

set forth on Exhibit "B" attached hereto and by this reference made a part hereof.

APPROVED
TO FORM
_lew_
vi.w., Mgr.
w Dept.
Store, Stores,
Inc.

This instrument was prepared by
Wayne E. Ripley, Jr., Attorney-
at-Law, whose address is 5050
Edgewood Court, Jacksonville,
Florida 32205.

36 Rev. 4/79

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens said premises for the transaction of its business as hereinafter provided for an initial term of _____ twenty (20)_____ years from said commencement date. The parties agree to execute a supplemental agreement fixing the commencement date when the same shall have been determined as herein provided.

This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

1. The Tenant agrees to pay to the Landlord as a minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of _____

Two Hundred Ninety Eight Thousand Eight Hundred Fifteen and 60/100

Dollars ($298,815.60_____) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of_____

Twenty Four Thousand Nine Hundred One and 30/100_____ Dollars ($24,901.30_____) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof. Tenant shall additionally pay all sales tax on rents directly to the State of Florida as permissible, or to Landlord.

In addition, the Tenant agrees to pay to the Landlord a percentage rental equal to the amount, if any, by which_____one_____ per cent ( --------1 %) of Tenant's gross sales made from the demised premises in each fiscal year ending approximately June 30th during the term of this lease, and any extensions thereof, exceeds the minimum guaranteed annual rental.

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of said percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculating the percentage rental due hereunder, the Tenant's fiscal year shall be from approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

ION
OSS

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold, and gross charges for all services rendered in or from the demised premises, both for cash and on credit; provided, however, such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

lottery sales

)
ES

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address hereinafter designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable by Tenant as hereinabove provided, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

2. The demised premises may be used for retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any general mercantile business, retail or service business not restricted under Article 7 hereof; provided, however, except as a supermarket, the demised premises shall not be used, nor assigned, or subleased under the terms of Article 26 herein, for any primary use or business which shall be in direct competition with the primary use or business engaged in by any other then tenant in the shopping center to whom Landlord has granted a right of exclusive use to which Tenant has given consent herein or in writing, or a replacement or successor tenant for such exclusive use.

Additionally, Tenant agrees that its premises shall not be used as a department store or junior department store so long as one is in operation in the shopping center as hereinafter provided.

Tenant further agrees that its premises shall not be used in violation of Section 3.01(e), (f), (g) and (h) of that certain Reciprocal Easement Agreement between National Development Communities, Inc., and The Home Depot, Inc., as previously approved in writing by Tenant, which shall not be amended or changed without prior written consent of Tenant.

        all times shall fully and promptly comply with all laws, ordinances
        s of every lawful authority having jurisdiction of said premises,
        relate to the cleanliness and use of said premises and the
        manner of operation of the business conducted in or at said premises.

UCTION
PPING

3. The Landlord, at its sole cost and expense, shall construct the shopping center, substantially as shown on Exhibit "A", consisting of all the buildings shown thereon, together with all ramps, sidewalks, streets, entranceways, malls, parking areas, service areas, driveways and related improvements, said improvements (excluding buildings) being sometimes hereinafter referred to as "common areas". The Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the shopping center and the tenants and their employees during the term of this lease and any extensions thereof. The arrangement and location of all store buildings and common areas (including parking area) within the shopping center shall at all times during the term of this lease, or any extensions thereof, be maintained as shown on Exhibit "A" and shall not be changed without the written consent of the Tenant. If not shown on Exhibit "A", Tenant expressly reserves the right to approve the finish grade elevations of all store buildings and common areas (including parking and service areas) within the shopping center which are to be constructed concurrently with Tenant's store building.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to construct the store building for occupancy by Tenant in accordance with the plans and specifications to be approved by both Landlord and Tenant. Plans and specifications shall be approved when initialed by both parties, and when initialed shall constitute a part of this lease. Said plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job", and shall include, but without limitation the following:

environmental control panel, heat reclaim coil, automatic doors, interior partitions, all the plumbing and plumbing fixtures, drains, electrical wiring, lighting fixtures to Tenant's requirements, connection of trade fixtures to plumbing and electrical outlets, automatic sprinkler system (including A.D.T. alarm system therefor if such systems and equipment is now or hereafter required by applicable building codes), air conditioning and heating systems and equipment (including insulated duct work, registers and grilles), music and P.A. systems (except microphones and amplifiers to be furnished by Tenant), Manager's office, courtesy counter, delicatessen , vinyl asbestos floor tile, ceramic tile and quarry tile floor coverings as specified (color at Tenant's option), computer housing and connection to all utilities, including all "hook up" environmental impact, system impact, initial connection and similar charges incident providing access to any utility system. Tenant at its own expense, shall furnish and install its own trade fixtures, and its compactor (or baler) on concrete pads therefor to be erected by Landlord. All equipment and fixtures provided by Tenant shall remain the property of Tenant and may be removed by Tenant from the demised premises at any time.  Landlord will also install the emergency generator to be furnished by Tenant.

TION

4. Landlord covenants and agrees that the construction of the shopping center shall begin not later than___November 1, 1988_____and shall be completed not later than_____ August 1, 1989____; and if the same shall not be begun or completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this lease or may extend the Landlord additional time for the beginning or completion of construction; provided, however, that if after the beginning of construction the Landlord's failure to complete said improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than____December 1, 1989_____, said option to terminate shall not arise. "Construction of the shopping center" shall be deemed to have begun when the first concrete footings have been poured.  If pursuant to this Article Tenant shall cancel or terminate this Lease, then Landlord agrees to give Tenant the first right of refusal, on the same terms and conditions as Landlord is willing to grant to a bonafide third party, to be exercised within sixty (60) days after receipt of written notice of the terms and conditions thereof from Landlord, to occupy any premises within the shopping center which Landlord may offer for use as a food supermarket. The first right of refusal shall be operative and effective for a period of three (3) years from the date of such cancellation.  However, if offered to Tenant within six (6) months after cancellation of this Lease, the lease term provisions shall be the same as this Lease.

NCE-
ATE

5. The Tenant shall open its store for business within sixty (60) days following performance of the following:

(a) Tenant's store building and other improvements constructed on the demised premises shall have been delivered to Tenant completed in accordance with the plans and specifications and Landlord shall have delivered to Tenant, at Landlord's expense, a Certificate of Occupancy or equivalent document for the demised store building;

(b) Construction of all of the common areas (including parking area hereinafter specifically required) shall have been completed substantially as shown on Exhibit "A";

(c) Additionally, approximately 31,000 square feet of local tenant space indicated as "'B' Shops" on Exhibit "A" hereto shall have been constructed for occupancy by retail and service shops with fronts and floors (unless otherwise agreed in writing by the parties) and under roof, and the interior partitions and finishes thereof need not be completed until any specific space is occupied, and none of such space shall be required to be leased or opened for business.

(d) Landlord shall have caused to be recorded a Declaration of Restrictions and Grant of Easements in form and substance satisfactory to Tenant providing reciprocal ingress, egress and parking rights with Outparcel "2" as shown on Exhibit "A" hereto, restricting the uses of the three outparcels as shown on Exhibit "A" hereto in accordance with the restrictions of Articles 7 and 28 hereof except as may be provided therein, and restricting any additional lands owned by Landlord adjacent to the shopping center in accordance with Article 28 hereof.

ome Depot
[

(e) All entrance drives and access roads to Tower Road and the one from University Avenue shall have been installed and opened for use.

(f) Landlord has paid $300,000 to Alachua County to widen Tower Road to 5 lanes and have installed the traffic signal as shown on Exhibit "A" in the right-of-way of Tower Road and shall continue to seek such road improvements with due diligence.

In the event that all the above requirements shall not have been met on or prior to _____ December 1, 1989 _____, the Tenant at its sole option may cancel and terminate this lease.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of sixty (60) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

Notwithstanding the other provisions of Articles 4 and 5 hereof, Landlord agrees that if for any reason the requirements of Article 5 are met by Landlord on or after December 1, of any year and on or before January 31 of the succeeding year, Tenant shall not be required to open its store for business and rent shall not begin to accrue until said opening, which shall be the later of February 1 of the succeeding year, or 30 days after the requirements of Article 5 are met, unless Tenant actually opens its store for business sooner.

ARTICLE 6 INTENTIONALLY DELETED

7. Without the prior written consent of Tenant herein only retail and/or service stores shall be allowed to operate in the shopping center, or any enlargement thereof, it being the intent of the parties hereto that no spa, bowling alley, skating rink, bingo parlor, theatre (either motion picture or legitimate), business or professional offices, sales of automobiles, or health, recreational or entertainment-type activities, or non-retail or non-service type activities, shall be permitted. Notwithstanding the foregoing, Landlord may use "'B' Shop" spaces 1 thru 7 as shown on Exhibit "A" hereto as bank, savings and loan or similar financial institution uses or business or professional offices of a type typically found in retail shopping centers.

8. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof, and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(prior to Tenant expansion)

(a) a minimum ratio of at least __5.5__ automobile parking spaces for each 1,000 sq. ft. of gross building area (including additional floor levels) in the shopping center, and

(b) facilities for convenient parking of at least____500____ automobiles (minimum);

Landlord shall at all times maintain sufficient parking within the shopping center parcel to accommodate Tenant's expansion ara under applicable statutes, codes or regulations at the time of execution of this Lease, subject to the provisions of Article 20 hereof.

and in the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord at its expense during Tenant's food store shopping hours, and Landlord further agrees that no signboards or other construction shall be erected in any of the said common areas shown on Exhibit "A" or so as to obstruct the view of the demised premises from the adjoining public streets. Without the prior written consent of Tenant herein, no carnivals, fairs or shows nor sales by merchants utilizing vehicles or booths in the common areas shall be allowed in the shopping center, or any enlargement thereof.

up until 10:00 p.m. (after which Landlord will have such area lighted at the expense of Tenant, such charges prorated with others open for business or requesting lighting for all or part of such extended hours, based upon the actual or calculated charges for such lighting and prorated based upon square footage of buildings).

9. Landlord further agrees to provide for the exclusive use of the Tenant at its grocery service entrances parking spaces for two large trailer trucks for continuous use and further agrees that Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for loading and unloading merchandise for its store into and from trucks and trailers at such service entrances.

S    10. The Tenant agrees to pay all charges for telephone, electricity, water; gas and other utilities used by Tenant on the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities.

'S    11. Upon completion of construction by Landlord and acceptance of the demised premises by Tenant, Tenant agrees to keep the interior of the demised premises in good condition and repair, excepting structural repairs and all repairs which are the responsibility of the Landlord or which are made necessary by reason of fire and other unavoidable casualties covered by Landlord's fire and extended coverage insurance, and excepting reasonable wear and tear.

Included within Tenant's maintenance responsibility shall be the air conditioning and heating systems (except duct work, registers and grilles), floor surfacing and plate glass (except damage to plate glass caused by improper installation, settling or as covered under Landlord's insurance as provided hereinafter) , electrical bulbs and ballasts, exposed plumbing fixtures, automatic doors, sprinkler system heads and electrical switches and outlets extending from but excluding the main panels to the store.

Except as provided in Article 11,

ORD'S    12. The Landlord shall, at its cost and expense, keep and maintain, in good condition and repair, S    the common areas, the exterior of Tenant's store building, including the windows and plate glass, automatic doors, roof, gutter, downspouts, exterior painting, masonry walls, foundation and structural members, the automatic sprinkler system (including central alarm system therefor, if required by governmental authority), the plumbing (including septic tank, if any), wiring, air conditioning and heating systems and floor surfacing of the store building in good condition and repair, and shall make any and all structural repairs to both the exterior and interior of said premises. If any portion of the common areas (as defined in Article 3 hereof) or any portion of the store building, which is the responsibility of the Landlord, shall at any time be in need of repair, Landlord will repair same immediately upon receipt of written notice from Tenant to do so, except that the Landlord shall not be obligated to make or pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of the Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements, or other casualty covered by Landlord's fire and extended coverage insurance.

If in order to protect the Tenant's property in the store building it shall be necessary to make emergency repairs to any portion thereof which is the responsibility of the Landlord to repair, or if the Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas, as defined in Article 3 hereof, which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs. Landlord further covenants that the store building will be so constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that said premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated, if and to the extent they validly and enforcedly require such charges and alterations to be made during the term of this Lease.

-7-

13. Tenant may place, erect and maintain any signs on the roof, walls, and any other place on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs.

Landlord shall construct a shopping center pylon sign adjacent to Tower Road as shown on Exhibit "A" hereto, and Tenant shall be permitted to affix thereon its electrically illuminated sign panels advertising its business to be installed by Landlord and furnished by Tenant, and to be connected to power outlets to be installed by Landlord, with suitable underground conduit and wiring extending to the pylon sign from Tenant's demised store building.  Landlord shall maintain, including painting, the pylon, and Tenant shall maintain its own sign panels located thereon.

The initial sign as shown in the approved plans and specifications, and all signage shall be subject to any applicable statutes, ordinances or rules.

**ES** 
**)R** 
**TIONS** 
14. The Tenant, at its own expense, may from time to time during the term of this lease make any interior alterations, additions and improvements in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

Tenant may construct and build or install in said premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from said premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to said premises resulting from the installation or removal of such items.

**IIFI-** 
15. Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises. Likewise, Landlord shall indemnify and save harmless the Tenant from any claim or loss by reason of an accident or damage to any person or property happening on or about all common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, public liability insurance coverage on all common areas (as defined in Article 3 hereof) of the shopping center, with a contractual liability endorsement on the policy, in a company qualified to transact business in the state where the premises are located, stipulating limits of liability of not less than $500,000.00 for an accident affecting any one person; and not less than $1,000,000.00 for an accident affecting more than one person; and $100,000.00 property damage. Certificate of such coverage from the insurer providing 30 days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant.

**INESS** 
16. Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the entryways and delivery areas adjoining the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

17.  In the event that Tenant's building shall be totally destroyed or damaged to any extent by fire or other casualty Landlord agrees to proceed promptly and without expense to Tenant to repair the damage or restore the improvements, remitting a fair and just portion of the rent, according to the unusable space, until said premises are completely reinstated or restored, provided, however, if such damage to Tenant's building to the extent of fifty percent (50%) or more occurs within the last three (3) years of the lease term hereof (whether the original lease term or an extension thereof, if then or theretofore this lease has been extended pursuant to the term hereof), then in such event Landlord shall have no obligation to restore Tenant's building unless Tenant agrees to extend the lease term hereof on the same conditions and for the same rentals so as to expire five (5) years from date of completion of such restoration by Landlord, such extension to be in addition to and not in lieu of any renewal privileges then remaining available to Tenant, which renewal options shall not thereby be exercised.  Failing such notice to extend, Landlord at its option shall have the right to terminate this Lease or to restore the premises and the lease shall continue for the remainder of the then unexpired term.

In the event that Landlord shall fail within a reasonable time, not to exceed thirty (30) days following such damage (except as in this paragraph provided), to proceed with and within a reasonable time commensurate with the amount of damage, not to exceed six (6) months following such damage, to complete any repairs and restoration of the demised premises as herein required Tenant may, at its option, in either of such events, terminate this Lease by giving to Landlord written notice thereof.  If Landlord's failure to commence or complete said repairs within the stipulated times shall be due to strikes, war, material shortages, weather conditions or similar happenings beyond its control, and provided further the repairs are completed with all due diligence commensurate with such delay, such option to terminate shall not arise.  If the lease shall terminate as aforesaid and any rent shall have been paid by Tenant in advance, Landlord agrees to refund to Tenant all rent so paid applicable to the period subsequent to such damage or destruction.

If at any time during the term of this lease or any extensions thereof any of the buildings in the shopping center, exclusive of Tenant's store building, are damaged by fire or by the elements or otherwise, Landlord shall immediately commence and diligently prosecute to completion repair of all such damage and shall restore said improvements to their condition prior to such damage, or so much of such damaged buildings as necessary to meet the greater of the following requirements: (1) all those buildings required to be restored under the lease agreements Landlord may have with the particular tenants affected (provided such tenants shall not have cancelled their leases), and (2) at least seventy-five per cent (75%) of the buildings then in the shopping center, exclusive of Tenant's store building.

Landlord agrees to carry fire and extended coverage insurance on Tenant's building and any additions, alterations and improvements made thereto by Landlord or Tenant and on all other buildings within the shopping center in the amount of full insurable value thereof, above foundation walls, and hereby expressly waives any and all claims against the Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the Tenant, its agents, servants or employees.

18. The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a general mercantile business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a general mercantile business or using the common areas (as defined in Article 3 hereof) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

19. All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord prior to delinquency. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law.

EM- 20. If any part of the demised premises or more than twenty per cent (20%) of the buildings,
·N   exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease as aforesaid, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

by written notice within 60 days from such taking

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of____ten____ per cent (-----10 %) or reduce the number of cars which may be conveniently parked to less than____450____, the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking.

JLT 21. In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default. Any rents or additional rents unpaid after five (5) days' written notice shall bear interest at 15% per annum.

TCY 22. The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

ICTION 23. It is understood and agreed that nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing said improvements, and that the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing said improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing said improvements or from any faulty construction thereof.

S 24. All notices required to be given to Landlord hereunder shall be sent by registered or certified mail to, and all rent payments shall be made to Landlord at _____

<u>2180 West State Road 434, Suite 1114</u>

<u>Longwood, Florida 32779</u>
or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail.

All notices required to be given to Tenant shall be sent by registered or certified mail to
Tenant at _____ <u>Post Office Box B</u> _____

<u>Jacksonville, Florida</u>
or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail.

F
ICY 25. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state. Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

T· 26. The Tenant may without the consent of the Landlord assign this lease, or sublease or vacate the demised premises in whole or in part, provided the Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this lease.

In the event Tenant shall vacate the entire demised premises or cease selling merchandise therein for in excess of a period of six (6) months, while the demised premises are usable for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant), Landlord shall have the option for a period of thirty(30) days (unless Tenant shall have reoccupied the premises) to terminate and cancel this lease upon thirty (30) days' written notice to Tenant of its election so to do, unless within such fifteen (15) day period Tenant shall advise Landlord that Tenant had prior to receipt of such notice in good faith committed to assign this lease or sublease the demised premises to a third party for occupancy within two (2) months.
If Tenant desires to sublease or assign the premises for any use restricted under Article 7 hereof, Tenant shall identify the proposed use to Landlord in writing and Landlord shall have thirty (30) days from receipt of such notice to approve or disapprove such use.  If Landlord does not reply within such time limit, approval shall be presumed.  If Landlord denies approval for such use within the time limit, Tenant shall have fifteen (15) days from receipt fo such disapproval to cancel this Lease by written notice to Landlord.

s  27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of _____ ____four____ ( 4 ) successive extensions of this lease, each extension to be for a period of_____five_____( 5 ) years and at the same rentals and upon the same terms and conditions as required herein for the initial term.

Such option privilege may be exercised by the Tenant giving to the Landlord a notice in writing at least_____six (6) months_____ before the expiration of the initial term, and if extended, at least_____six (6) months_____ before the expiration of such extended term, stating the intention of the Tenant to exercise such option and the period for which such option is exercised and thereupon this lease shall be so extended without the execution of any other or further document.

28. Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a (ET supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant; except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, either for consumption on or off the premises, shall not be deemed a violation hereof. With the exception of bars and package stores, only Tenant herein may sell beer and wine in the shopping center for off-premises consumption.

It is further agreed that only Tenant herein shall have the privilege of operating a pharmacy or other business dispensing drugs required to be dispensed by a licensed pharmacist, or a bakery and/or delicatessen or seafood market or any department or concession which would constitute the equivalent thereof in the shopping center, including any enlargement thereof.
Tenant shall have the non-exclusive rights to operate manned banking facilities, automatic teller machines and electronic fund transfer machines.

Notwithstanding the foregoing, Landlord may have no more than four (4) specialty food tenants, each not exceeding 2,000 square feet, selling products of a type or quality not then carried by Tenant, such as specialty, imported, gourmet or premium cheeses, meats, wines, ice cream products and condiments for consumption on or off the premises.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any provisions herein to the contrary, the Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation. If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument.

29. The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

30. Tenant agrees that it will give notice to any holder of a first mortgage (which term shall include all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, the Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 12 of this lease.

AREA  31. Landlord agrees to operate and maintain in good condition and repair all the common areas,
&CE  as herein defined, and provide therefor all such services as are reasonably required, including, but
without limitation, safe-guarding, cleaning and sweeping, lighting, snow and ice removal if neces-
sary, general repair and maintenance of all paved surfaces, repainting of parking area striping,
and watering and maintenance of landscaped areas. If the Landlord, after fifteen (15) days follow-
ing receipt of written notice from Tenant to do so, shall fail to make the repairs or perform the
services described in this Article, the Tenant shall have the right to make such repairs or cause such
services to be performed in its behalf and to deduct from the rental installments then due or there-
after to become due such sums as may be necessary to reimburse the Tenant for the money ex-
pended or expense incurred therein.

For such services, Tenant shall pay to Landlord with the
next installment of rent payable at least fifteen (15) working
days after receipt of the billing, the amount of Tenant´s prorata
share of the cost of operating maintaining such common areas,
computed in a proportion which the square footage for Tenant´s
store building bears to the total square footage for all build-
ings from time to time existing in the shopping center. All such
billings shall provide reasonable supporting information, and
Landlord shall promptly furnish to Tenant such additional infor-
mation as Tenant may reasonably require prior to payment. Land-
lord shall retain all invoices and other records in connection
therewith, and Tenant shall have the right to audit at its own
expense any such cost and expenses within one year following
submission of each billing, which shall not include administra-
tive overhead of Landlord, or ad valorem, real estate or similar
taxes, including special assessments, improvement liens and the
like. Any additional rental payable hereunder by the Tenant may
be credited on a non-cumulative basis against any and all per-
centage rental, if any, which may become due hereunder, it being
intended that such credit shall be made annually in respect of
the common area payments of the previous lease year at the time
percentage rentals are payable, but if there shall not be any
percentage rentals due or the amount thereof shall be insuffi-
cient to allow the full credit, Tenant shall receive no credit,
or only a partial credit, as the case may be; and the credit for
fractional years and fractional months occurring at the beginning
and end of the lease term or any extensions thereof shall be
prorated on the basis of the annual credit.

Tenant´s share of such expenses shall be only of the bona
fide, reasonable expenses of such common area maintenance and
replacement (not insurance), less any rebates or adjustments
therein, and Landlord shall use its good faith efforts to mini-
mize the cost thereof. In the event that Landlord wishes to make
capital acquisitions of goods to provide such services, such as
lawn mowers or the like, the equipment shall be used only at the
shopping center under this Lease or proper records showing the
amount of use of such equipment chargeable to the shopping center
under this Lease shall be maintained, sand only that prorata
share charged against common area maintenance of the shopping
center. The charge therefor shall also be less any depreciation
or similar tax benefits to Landlord, and shall include a credit       ? RE
for any recovery of the cost thereof upon disposition of the          covers .
equipment. The common area maintenance cost hereunder shall also      ins
exclude any service, administrative or overhead charges of Land-
lord, except those actually incurred up to 5% of the total other
charges.

32. This lease and all of the covenants and provisions thereof shall inure to the benefit of and be
binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each
provision hereof shall be deemed both a covenant and a condition and shall run with the land.

BY  33. In the event Landlord transfers Landlord's interest in this lease, Landlord agrees to promptly
provide Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's
interest in this lease.

34. The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease in form permitting its recording.

35. The marginal titles appearing in this lease are for reference only and shall not be considered a part of this lease or in any way to modify, amend or affect the provisions thereof.

36. This written lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

37. Tenant is hereby granted the option and privilege at any time during the term of this lease, or any extensions thereof, of enlarging its store building by incorporating therein the area to the west side thereof, such addition not to exceed sixty (60) feet in width by two hundred (200) feet in depth. This option may be exercised only at such times as the adjoining storerooms may be vacant, or at five (5) year intervals, it being contemplated that Landlord shall not lease such area to other tenants for in excess of five (5) years, and that Tenant shall have the expansion privilege herein described no later than ten (10) years from the commencement date hereof and at five (5) year intervals thereafter. Landlord shall give notice to Tenant of any such expiration date and, during the period between six (6) months and three (3) months prior to such expiration date, afford to Tenant the opportunity to exercise this option, and upon Tenant giving to Landlord a notice in writing of its exercise thereof, Landlord agrees to construct such addition, or prepare such enlargement area for occupancy by Tenant, at its sole cost and expense, in accordance with plans and specifications to be approved by the parties hereto, with the construction to be completed with all due diligence following the vacation of the necessary area by any other tenant, and the enlarged portion of the building to be of a like quality of construction as the original building for Tenant. In order to facilitate the expansion of Tenant's demised store building as herein contemplated, Landlord agrees that any adjacent building or buildings within the expansion area shall be of like structural quality and in architectural harmony with Tenant's store building, shall front on a line which is the interior sidewalk line of Tenant's demised store building extended and shall have a finish floor level, roof and ceiling heights which shall be at the same elevations as the finish floor level, roof and ceiling heights of Tenant's demised store building. Further, Landlord agrees that the wall of Tenant's demised store building adjoining the expansion area shall be constructed with steel column supports therein equivalently spaced to the nearest row of steel column supports within the open area of Tenant's demised store building and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original and of the expanded building width.

Upon completion of such building addition, if there shall not at such date remain at least ten (10) years of the then term of this lease, such term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date. Thereafter, during such extended term, the annual minimum guaranteed rental (and the base for computation of percentage rental hereunder) shall be increased by the greater of: an amount equal to twelve per cent (12%) of the cost of such addition, or an amount equal to $6.45 per square foot of the enlargement area, or an amount equal to a computed percentage times the cost of such addition, such percentage consisting of four per cent ( 4 %) plus the current prime interest rate charged by New York City banks at the time of the exercise of the option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least

-15-

three (3) reputable contractors acceptable to Tenant, with the final cost of
the addition upon completion to be certified to by the general contractor per-
forming the work. During such extended term the provisions of this lease shall
remain in effect and the option periods herein provided (if any shall then
remain) shall be construed to follow upon the end of the extended term and
the rentals to remain as adjusted in consequence of the addition. Upon comple-
tion of the addition, it shall be and become a portion of the demised premises
and this lease thereby be taken and construed as so amended.

Nothing herein contained shall constitute any express or implied obligation
on the part of the holder of a first mortgage encumbering the fee simple title
to the demised premises, or of any purchaser at a sale under foreclosure of
such mortgage, to comply with the terms and provisions of this Article, it
being the understanding of the parties that the obligation to cause such
expansion is the sole obligation of the Landlord, its heirs, legal representa-
tives, successors and assigns.

In the event Landlord shall for any reason fail or refuse to construct the
building addition contemplated hereunder after Tenant has properly exercised
its option hereunder, the Tenant shall have no right to cancel or terminate this
lease or to withhold rental payments on account of such breach and the Tenant's
sole remedy shall be to construct the contemplated building addition at its
own expense, with the then term of the Lease to be extended for a ten (10) year
period as above contemplated and Tenant shall be entitled to occupy the
enlarged building during construction and for a ten (10) year period thereafter
without obligation to pay any minimum guaranteed rental in respect of such
enlargement area; also, for the duration of such ten (10) year extended term
hereunder and for the remainder of the lease term and any extensions thereof,
there shall be an adjustment in the percentage rentals which would otherwise
be payable under the provisions of Article 1 hereof whereby Tenant shall pay to
Landlord a percentage rental equal to the amount, if any, by which one percent
(1%) of Tenant's gross sales made from the demised premises in each fiscal year
ending approximately June 30 exceeds the annual minimum guaranteed rental (not
adjusted) plus the greater of: an amount equal to <u>twelve</u> percent (12%) of the
cost of such addition, or an amount equal to $ <u>6.45</u> per square foot of the
enlargement area, or an amount equal to a computed percentage times the cost
of such addition, such percentage consisting of <u>four</u> percent ( 4 %) plus
the current prime interest rate charged by New York City banks at the time
of the exercise of the option. Such percentage rentals, if any, occurring
at the beginning and end of such extended ten (10) year term shall be prorated
between the rentals payable before and those payable after the rental adjustments
provided herein. During any balance of the term or any option extensions
following after such ten (10) year term, the basis for calculation of percentage
rental shall revert to the annual minimum guaranteed rental.

Landlord shall assist Tenant in obtaining and providing addition-
al parking, utilities and zoning to accommodate the expansion
herewith. As used herein, the "current prime interest rate
charged by New York City banks" shall be that as published in the
<u>Wall Street Journal</u> from time to time (or in an equivalent busi-
ness publication of general circulation if not available).

38. During the term of this lease and any extensions thereof, Tenant agrees to
pay to Landlord as additional rental the amount of ad valorem real estate taxes
levied against the demised premises. Tenant shall be responsible only for its
pro-rata share of such taxes for fractional years occurring at the expiration
of the term of this lease and any extensions thereof.

If such taxes shall not be assessed separately, but shall be included within an
assessment of the demised premises and others, said assessment shall be fairly
apportioned to determine Tenant's share thereof. Such apportionment shall be
made in the ratio which the square footage of Tenant's store building bears to
the total square footage of all store buildings (including additional floor levels)
from time to time existing in the shopping center. The amount of taxes attribu-
table to the shopping center, and for which Tenant is to reimburse Landlord in
part, shall be less any abatements, discounts or refunds thereon. Upon request
of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements as evi-

dence of the basis upon which any taxes is chargeable to Tenant and an "as built' survey of the shopping center, and such additional rental shall be payable by Tenant on demand after payment by Landlord.  All taxes, other than ad valorem real estate taxes, including special assessments, improvement liens, and the like, shall remain the sole responsibility of the Landlord.  However, Tenant shall remain responsible for sales taxes on rentals levied by law on lessees.

Tenant shall have the right from time to time to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned, and to institute such proceedings in the name of the Landlord as the Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to the Landlord.

Notwithstanding the above, it is agreed that Tenant's obligation to make the payments herein described is expressly conditioned upon receipt from Landlord of a written statement for such ad valorem real estate tax contributions (as well as the other documents described herein if requested by Tenant) no later than June   31 of the calendar year following the year in which the taxes were due.

Any additional rental payable hereunder by the Tenant may be credited on a non-cumulative basis against any and all percentage rentals, if any, which may become due under this Lease, it being intended that such credit shall be made annually in respect of the tax payments for the previous tax year at the time percentage rentals are payable, but if there shall be no percentage rentals due or if the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be.  The credit for such fractional years and fractional months occurring at the beginning of the period in which Tenant is responsible for such tax payments or at the end of the lease term or any extensions thereof, shall be prorated on the basis of the annual credit.  Tenant shall be responsible only for its prorata share of such taxes for fractional years occurring at the beginning and expiration of the term of this Lease, and any extensions thereof.

39.   Tenant agrees to pay to the Landlord, as additional rental hereunder and as reimbursement for the cost thereof, its prorata share of the premiums for the insurance required to be carried by Landlord on Tenant's building under Article 17 hereof, with the proration being in the ratio which the square footage of Tenant's store building bears to the total square footage of all store buildings from time to time existing in the shopping center.  Tenant shall have the option of furnishing the fire and extended coverage insurance required of Landlord under Article 17 hereof as to the demised premises at its cost and expense in lieu of contributing to the cost thereof.

Any additional rental payable hereunder by the Tenant may be credited on a non-cumulative basis against any and all percentage rentals, if any, which may become due under this Lease, it being intended that such credit shall be made annually in respect of the insurance payments for the previous insurance year at the time percentage rentals are payable, but if there shall be no percentage rentals due or if the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be.  The credit for such fractional years and fractional months occurring at the beginning of the period in which Tenant is responsible for such insurance payments or at the end of the lease term or any extensions thereof, shall be prorated on the basis of the annual credit.  Tenant shall be responsible only for its prorata share of such insurance for fractional years occurring at the beginning and expiration of the term of this Lease, and any extensions thereof.

IN WITNESS WHEREOF, the undersigned have caused this instrument

o be executed the day and year first above written.

igned, sealed and delivered
n the presence of:

TOWER CENTER ASSOCIATES, LTD.,
a Florida limited partnership,

BY:  National Development
Properties of Florida, Inc.,
a Florida corporation, its
authorized general partner

By _Winston D. Schwartz_
Its _EXEC. VICE_ President

Attest _Claire E. Randle_
Its _____ Secretary

s to Landlord

LANDLORD

WINN-DIXIE STORES, INC.

By _____
Its _____ President

Attest _____
Its _____ Secretary

As to Tenant

(CORPORATE SEAL)

TENANT

STATE OF *Florida*    )

COUNTY OF *Seminole*    )


The foregoing instrument was acknowledged before me this *August* *31* , 198 *8* , by *Winton D. Schwartz* the *Executive Vice* President of NATIONAL DEVELOPMENT PROPERTIES OF FLORIDA, INC. _____ , a _____ Florida _____ corporation, as authorized general partner of ___ TOWER CENTER ASSOCIATES, LTD. ___ _____ , a(n)  Florida        limited

partnership.


                    *Claire L. Winingder*
                    Notary Public, State and County
                    aforesaid.

                    My commission expires:
                    Notary Public
                    My Commission Expires Sept. 13, 1989
                    Bonded Thru Troy Fain - Insurance Inc.

(NOTARIAL SEAL)


‹ OF    FLORIDA    }

‹Y OF   DUVAL     )


    The foregoing instrument was acknowledged before me this *ust* *22* , 19 *88* , by *James Kufeldt* *JS Bryan, Jr* , _____ President and _____ etary, respectively, of ___ WINN-DIXIE STORES, INC. ___ _____ , a _____ Florida _____

oration, on behalf of the corporation.

                    *Michael C. Thomas*
                    Notary Public, State and County aforesaid

                    My commission expires:
                    *6/23/90*

EXHIBIT "B"
TOWER CENTER

Gainesville, Florida

OVERALL LEGAL DESCRIPTION

A TRACT OF LAND SITUATED IN THE NORTHWEST 1/4 OF SECTION 4, T10S, R19E, ALACHUA COUNTY, FLORIDA, SAID TRACT OF LAND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCE AT THE NORTHWEST CORNER OF SECTION 4, T10S, R19E, AND RUN S.00°50'48"E., ALONG THE WEST LINE OF SAID SECTION 4, A DISTANCE OF 801.31 FEET; THENCE RUN N.89°26'12"E., 39.53 FEET TO THE EAST RIGHT OF WAY LINE OF COUNTY ROAD NO. S.W. 29 (N.W. 75th STREET) AND THE POINT OF BEGINNING; THENCE RUN S.00°50'48"E., ALONG THE EAST RIGHT-OF-WAY LINE OF SAID COUNTY ROAD S.W. 29 (N.W. 75th STREET), 868.40 FEET; THENCE RUN S.89°57'23"E., 204.22 FEET; THENCE RUN S.00°02'37"W., 300.00 FEET; THENCE RUN S.89°57'23"E., 1230.02 FEET; THENCE RUN S.00°02'37"W., 300.00 FEET TO THE NORTH RIGHT-OF-WAY LINE OF WEST UNIVERSITY AVENUE EXTENSION; THENCE RUN S.89°57'23"E., ALONG THE NORTH RIGHT-OF-WAY LINE OF SAID WEST UNIVERSITY AVENUE EXTENSION, 80.00 FEET; THENCE RUN N.00°02'37"E., 300.00 FEET; THENCE RUN S.89°57'23"E., 739.10 FEET TO THE SOUTHWESTERLY RIGHT-OF-WAY LINE OF A CITY OF GAINESVILLE RIGHT-OF-WAY LINE WITH THE FOLLOWING COURSES AND DISTANCES; THENCE RUN N.37°37'23"W., 1018.75 FEET; THENCE RUN N.55°24'06"W., 470.44 FEET; THENCE RUN S.89°51'13"W., 475.41 FEET; THENCE RUN N.00°33'48"W., 104.89 FEET; THENCE RUN S.89°26'12"W., 780.36 FEET TO THE EAST RIGHT OF WAY LINE OF SAID COUNTY ROAD NO. S.W. 29 AND THE POINT OF BEGINNING, SAID TRACT OF LAND CONTAINING 45.7753 ACRES MORE OR LESS.

ALSO

COMMENCE AT THE NORTHWEST CORNER OF SECTION 4, TOWNSHIP 10 SOUTH, RANGE 19 EAST; AND RUN SOUTH 0 DEGREES 50 MINUTES 48 SECONDS EAST ALONG THE WEST LINE OF SAID SECTION, 100 FEET; THENCE RUN NORTH 89 DEGREES 26 MINUTES 12 SECONDS EAST, 40 FEET TO THE INTERSECTION OF THE SOUTH RIGHT OF WAY LINE OF STATE ROAD 26 AND THE EAST RIGHT OF WAY LINE OF COUNTY ROAD NO. SW-29; THENCE RUN SOUTH 0 DEGREES 50 MINUTES 48 SECONDS EAST ALONG THE SAID EAST RIGHT OF WAY LINE, 651.31 FEET TO THE POINT OF BEGINNING; THENCE RUN NORTH 89 DEGREES 26 MINUTES 12 SECONDS EAST, 908.2 FEET TO A POINT ON THE SOUTHWESTERLY RIGHT OF WAY OF INTERSTATE HIGHWAY NO. 75, SAID POINT BEING ON A CURVE HAVING A RADIUS OF 385 FEET, A TOTAL CENTRAL ANGLE OF 65 DEGREES AND, BEING CONCAVE TO THE NORTHEAST; THENCE RUN IN A SOUTHEASTERLY DIRECTION ALONG SAID CURVE AN ARC DISTANCE OF 160.79 FEET TO THE P.T. OF SAID CURVE; THENCE RUN SOUTH 78 DEGREES 37 MINUTES 23 SECONDS EAST, ALONG THE SAID SOUTHWESTERLY RIGHT OF WAY LINE OF I-75, 290.79 FEET; THENCE RUN SOUTH 55 DEGREES 24 MINUTES 06 SECONDS EAST ALONG SAID RIGHT OF WAY 434.05 FEET; THENCE RUN SOUTH 37 DEGREES 37 MINUTES 23 SECONDS EAST ALONG SAID RIGHT OF WAY, 1,537.58 FEET; THENCE RUN SOUTH 1 DEGREE 00 MINUTES 00 SECONDS EAST, 125.72 FEET; THENCE RUN NORTH 37 DEGREES 37 MINUTES 23 SECONDS WEST, 1,626.87 FEET; THENCE RUN NORTH 55 DEGREES 24 MINUTES 06 SECONDS WEST, 470.44 FEET; THENCE RUN SOUTH 89 DEGREES 51 MINUTES 13 SECONDS WEST, 475.43 FEET; THENCE RUN NORTH 0 DEGREES 33 MINUTES 48 SECONDS WEST, 104.89 FEET; THENCE RUN SOUTH 89 DEGREES 26 MINUTES 12 SECONDS WEST, 780.36 FEET TO THE EAST RIGHT OF WAY LINE OF COUNTY ROAD NO. SW-29; THENCE RUN NORTH 0 DEGREES 50 MINUTES 48 SECONDS WEST ALONG SAID RIGHT OF WAY 50 FEET TO THE POINT OF BEGINNING. ALL BEING AND LYING IN SECTION 4, TOWNSHIP 10 SOUTH, RANGE 19 EAST, ALACHUA COUNTY, FLORIDA AND CONTAINING 5.628 ACRES, MORE OR LESS.

LESS AND EXCEPT THE FOLLOWING FOUR PARCELS:

OUT PARCEL 1

COMMENCE AT THE NORTHWEST CORNER OF SECTION 4, TOWNSHIP 10
SOUTH, RANGE 19 EAST, THENCE GO SOUTH 00 DEGREES 50 MINUTES 48
SECONDS EAST ALONG THE WEST LINE OF SAID SECTION 4, A DISTANCE
OF 801.31 FEET; THENCE GO NORTH 89 DEGREES 26 MINUTES 12 SECONDS
EAST A DISTANCE OF 39.53 FEET TO THE EAST RIGHT-OF-WAY LINE OF
COUNTY ROAD NO. S.W. 29 (N.W. 75th STREET) AND THE POINT OF
BEGINNING; THENCE GO SOUTH 00 DEGREES 50 MINUTES 48 SECONDS
EAST, ALONG SAID EAST RIGHT-OF-WAY LINE, A DISTANCE OF 399.65
FEET TO THE POINT OF CURVATURE (P.C.) OF A CURVE CONCAVE
NORTHEASTERLY HAVING A RADIUS OF 36.00 FEET, A CENTRAL ANGLE OF
89 DEGREES 06 MINUTES 35 SECONDS, AND A CHORD BEARING AND
DISTANCE OF SOUTH 45 DEGREES 24 MINUTES 05 SECONDS EAST, 50.52
FEET; THENCE DEPARTING SAID EAST RIGHT-OF-WAY LINE, GO
SOUTHEASTERLY ALONG SAID CURVE A DISTANCE OF 55.99 FEET TO THE
POINT OF TANGENCY (P.T.); THENCE GO SOUTH 89 DEGREES 57 MINUTES
23 SECONDS EAST A DISTANCE OF 223.51 FEET; THENCE GO NORTH 00
DEGREES 02 MINUTES 37 SECONDS EAST A DISTANCE OF 105.00 FEET;
THENCE GO NORTH 13 DEGREES 47 MINUTES 38 SECONDS EAST A
DISTANCE OF 170.00 FEET; THENCE GO NORTH 33 DEGREES 23 MINUTES 34
SECONDS EAST A DISTANCE OF 263.00 FEET; THENCE GO SOUTH 89
DEGREES 26 MINUTES 12 SECONDS WEST A DISTANCE OF 451.50 FEET TO
THE AFOREMENTIONED EAST RIGHT OF WAY LINE OF COUNTY ROAD NO.
S.W. 29; THENCE GO SOUTH 00 DEGREES 50 MINUTES 48 SECONDS EAST,
ALONG SAID EAST RIGHT-OF-WAY LINE, A DISTANCE OF 50.00 FEET TO
THE POINT OF BEGINNING. SAID PARCEL CONTAINING 3.569 ACRES MORE
OR LESS.


OUT PARCEL 2

COMMENCE AT THE NORTHWEST CORNER OF SECTION 4,
TOWNSHIP 10 SOUTH, RANGE 19 EAST; THENCE GO SOUTH 00
DEGREES 50 MINUTES 48 SECONDS EAST ALONG THE WEST LINE
OF SAID SECTION 4, A DISTANCE OF 801.81 FEET; THENCE GO
NORTH 89 DEGREES 26 MINUTES 12 SECONDS EAST A DISTANCE
OF 39.53 FEET; TO THE EAST RIGHT-OF-WAY LINE OF COUNTY
ROAD NO. S.W. 29 (N.W. 75th STREET); THENCE GO SOUTH 00
DEGREES 50 MINUTES 48 SECONDS EAST ALONG SAID EAST
RIGHT-OF-WAY LINE A DISTANCE OF 556.67 FEET TO THE POINT
OF BEGINNING; THENCE CONTINUE ALONG SAID EAST
RIGHT-OF-WAY LINE SOUTH 00 DEGREES 50 MINUTES 48
SECONDS EAST A DISTANCE OF 213.98 FEET TO THE POINT OF
CURVATURE (P.C.) OF A CURVE CONCAVE NORTHEASTERLY,
HAVING A RADIUS OF 36.00 FEET, A CENTRAL ANGLE OF 89
DEGREES 06 MINUTES 35 SECONDS, AND A CHORD BEARING AND
DISTANCE OF SOUTH 45 DEGREES 24 MINUTES 05 SECONDS
EAST, 50.51 FEET; THENCE GO SOUTHEASTERLY ALONG SAID
CURVE A DISTANCE OF 55.99 FEET TO THE POINT OF
TANGENCY (P.T.); THENCE GO SOUTH 89 DEGREES 57 MINUTES
23 SECONDS EAST A DISTANCE OF 148.74 FEET TO THE P.C. OF
A CURVE CONCAVE NORTHWESTERLY, HAVING A RADIUS OF
21.00 FEET, A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00
SECONDS, AND A CHORD BEARING AND DISTANCE OF NORTH 45
DEGREES 02 MINUTES 37 SECONDS EAST, 29.70 FEET; THENCE
GO NORTHEASTERLY ALONG SAID CURVE A DISTANCE OF 32.99
FEET TO THE P.T.; THENCE GO NORTH 00 DEGREES 02 MINUTES
37 SECONDS EAST A DISTANCE OF 243.96 FEET TO THE P.C. OF
A CURVE CONCAVE SOUTHWESTERLY HAVING A RADIUS OF
21.00 FEET, A CENTRAL ANGLE OF 90 DEGREES 00 MINUTES 00
SECONDS, AND A CHORD BEARING AND DISTANCE OF NORTH 44
DEGREES 57 MINUTES 23 SECONDS WEST, 29.70 FEET; THENCE
GO NORTHWESTERLY ALONG SAID CURVE A DISTANCE OF 32.99
FEET TO THE P.T.; THENCE GO NORTH 89 DEGREES 57 MINUTES 23
SECONDS WEST A DISTANCE OF 152.07 FEET TO THE P.C. OF A
CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 36
FEET, A CENTRAL ANGLE OF 90 DEGREES 53 MINUTES 25
SECONDS, AND A CHORD BEARING AND DISTANCE OF SOUTH 44
DEGREES 35 MINUTES 54 SECONDS WEST, 51.31 FEET; THENCE
GO SOUTHWESTERLY ALONG SAID CURVE A DISTANCE OF 57.11
FEET TO THE P.T. AND THE POINT OF BEGINNING. SAID
PARCEL CONTAINING 1.34 ACRES, MORE OR LESS.

OUT PARCEL 3

COMMENCE AT THE NORTHWEST CORNER OF SECTION 4, TOWNSHIP 10 SOUTH, RANGE 19 EAST; THENCE GO SOUTH 00 DEGREES 50 MINUTES 48 SECONDS EAST ALONG THE WEST LINE OF SAID SECTION 4, A DISTANCE OF 801.31 FEET; THENCE GO NORTH 89 DEGREES 26 MINUTES 12 SECONDS EAST A DISTANCE OF 39.53 FEET TO THE EAST RIGHT OF WAY LINE OF COUNTY ROAD NO. S.W. 29 (N.W. 75th STREET); THENCE GO SOUTH 00 DEGREES 50 MINUTES 48 SECONDS EAST ALONG SAID RIGHT OF WAY LINE A DISTANCE OF 868.40 FEET; THENCE, DEPARTING SAID RIGHT OF WAY LINE, GO SOUTH 89 DEGREES 57 MINUTES 23 SECONDS EAST A DISTANCE OF 204.22 FEET; THENCE GO SOUTH 00 DEGREES 02 MINUTES 37 SECONDS WEST A DISTANCE OF 300.00 FEET; THENCE GO SOUTH 89 DEGREES 57 MINUTES 23 SECONDS EAST A DISTANCE OF 1230.02 FEET; THENCE GO SOUTH 00 DEGREES 02 MINUTES 37 SECONDS WEST A DISTANCE OF 300.00 FEET; THENCE GO SOUTH 89 DEGREES 57 MINUTES 23 SECONDS A DISTANCE OF 80.00 FEET; THENCE GO NORTH 00 DEGREES 02 MINUTES 37 SECONDS EAST A DISTANCE OF 300.00 FEET TO THE POINT OF BEGINNING; THENCE GO NORTH 89 DEGREES 57 MINUTES 23 SECONDS WEST A DISTANCE OF 16.00 FEET; THENCE GO NORTH 00 DEGREES 02 MINUTES 37 SECONDS EAST A DISTANCE OF 706.25 FEET; THENCE GO SOUTH 89 DEGREES 57 MINUTES 23 SECONDS EAST A DISTANCE OF 54.65 FEET TO THE POINT OF CURVATURE (P.C.) OF A CURVE CONCAVE SOUTHWESTERLY, HAVING A RADIUS OF 508.81 FEET, A CENTRAL ANGLE OF 57 DEGREES 20 MINUTES 00 SECONDS, AND A CHORD BEARING AND DISTANCE OF SOUTH 61 DEGREES 47 MINUTES 23 SECONDS EAST, 488.75 FEET; THENCE GO SOUTHEASTERLY ALONG SAID CURVE A DISTANCE OF 464.74 FEET TO THE POINT OF TANGENCY (P.T.); THENCE GO SOUTH 37 DEGREES 37 MINUTES 23 SECONDS EAST A DISTANCE OF 1091.53 FEET; THENCE GO SOUTH 01 DEGREES 00 MINUTES 00 SECONDS EAST A DISTANCE OF 125.72 FEET; THENCE GO NORTH 37 DEGREES 37 MINUTES 23 SECONDS WEST A DISTANCE OF 608.12 FEET; THENCE GO NORTH 89 DEGREES 57 MINUTES 23 SECONDS WEST A DISTANCE OF 739.10 FEET TO THE POINT OF BEGINNING, SAID PARCEL CONTAINING 10.063 ACRES, MORE OR LESS.

HOME DEPOT PARCEL

A TRACT OF LAND SITUATED IN THE NORTHWEST 1/4 OF SECTION 4, T10S, R19E, ALACHUA COUNTY, FLORIDA, SAID TRACT OF LAND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:
COMMENCE AT THE NORTHWEST CORNER OF SECTION 4, T10S, R19E, AND RUN S.00°50'48"E., ALONG THE WEST LINE OF SAID SECTION 4, A DISTANCE OF 801.31 FEET; THENCE RUN N.89°26'12"E., 39.53 FEET TO THE EAST RIGHT-OF-WAY LINE OF COUNTY ROAD NO. S.W. 29 (N.W. 75th STREET); THENCE RUN S.00°50'48"E., ALONG THE EAST RIGHT-OF-WAY LINE OF SAID COUNTY ROAD S.W. 29 (N.W. 75th STREET), 868.40 FEET; THENCE RUN S.89°57'23"E., 204.22 FEET; THENCE RUN S.00°02'37"W., 300.00 FEET; THENCE RUN S.89°57'23"E., 790.02 FEET TO THE POINT OF BEGINNING; THENCE RUN S.89°57'23"E., 456.00 FEET; THENCE RUN N.00°02'37"E., 809.51 FEET; THENCE RUN N.89°57'23"W., 426.00 FEET; THENCE RUN S.00°02'37"W., 687.51 FEET; THENCE RUN N.89°57'23"W., 30.00 FEET; THENCE RUN S.00°02'37"W., 122.00 FEET TO THE POINT OF BEGINNING, SAID TRACT OF LAND CONTAINING 8.001 ACRES MORE OR LESS.

## Exhibit "B'

## LEASE AMENDMENT

THIS LEASE AMENDMENT is made this _29th_ day of _August_ _2000_ by and between Winn-Dixie Stores, Inc., a Florida corporation ("Tenant") and Tower Center Associates, Ltd., a Florida limited partnership ("Landlord').

## STATEMENT OF FACTS

A.    Landlord and Tenant did heretofore execute and deliver a lease (the "Winn Dixie Lease") covering premises as therein described in shopping center known as "Tower Center" in Gainesville, Florida.

B.    The Term of the Winn Dixie Lease commenced on January 17, 1990.

C.    Section 37 of the Winn Dixie Lease provided in part as follows:

> "Tenant is hereby granted the option and privilege at any time during the term of this lease, or any extensions thereof, of enlarging its store building by incorporating therein the area to the west side thereof, such addition not to exceed sixty (60) feet in width by two hundred (200) feet in depth. This option may be exercised only at such times as the adjoining storerooms may be vacant, or at five (5) year intervals, it being contemplated that Landlord shall not lease such area to other tenants for in excess of five (5) years, and that Tenant shall have the expansion privilege herein described no later than ten (10) years from the commencement date hereof and at five (5) year intervals thereafter. Landlord shall give notice to Tenant of any such expiration date and, during the period between six (6) months and three (3) months prior to such expiration date, afford to Tenant the opportunity to exercise this option, and upon Tenant giving to Landlord a notice in writing of its exercise thereof, Landlord agrees to construct such addition, or prepare such enlargement area for occupancy by Tenant, at its sole cost and expense, in accordance with plans and specifications to be approved by the parties hereto, with the construction to be completed with all due diligence following the vacation of the necessary area by any other tenant, and the enlarged portion of the building to be of a like quality of construction as the original building for Tenant."

D.    Landlord has requested that Section 37 of the Winn Dixie Lease be amended as hereafter provided, and Tenant is willing to agree to such Amendment.

NOW THEREFORE, in consideration of the premises, the sum of $10.00, and other good and valuable consideration in hand paid by each party hereto to the other, the receipt whereof is hereby acknowledged, it is hereby agreed as follows:

00-0443.39.a

1.   <u>Incorporation of Statement of Facts</u>.  The Statement of Facts is incorporated herein and by this reference made a part hereof.

2.   <u>Amendment to Expansion Privilege and Notice Thereof</u>.  Section 37 of the Winn Dixie Lease is amended so as to provide that:

A.   Instead of the next expansion privilege being at January 17, 2005 and at 5-year intervals thereafter, that the next expansion period shall be at November 30, 2003 and at 5-year intervals thereafter, and

B.   Instead of the stipulated time for the giving of notice by Landlord to Tenant of the expansion privilege at November 30, 2003, and the time for Tenant to exercise its option between 6 months and 3 months prior thereto, the same is hereby changed so that the time for Winn Dixie to exercise its option shall be between 10 months and 7 months prior to such November 30, 2003 date.  Such acceleration of notice to Tenant and time to exercise such option by Tenant will only apply to the November 30, 2003 date and not to any subsequent 5-year interval thereafter.

3.   <u>No Further Amendment</u>.  Except as herein specifically provided, the Winn Dixie Lease is not otherwise modified.

4.   <u>Counterpart Execution</u>.  This Lease Amendment may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

5.   <u>Facsimiles</u>.  A facsimile copy of this instrument and any signatures thereon shall be considered for all purposes as an original hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Lease Amendment as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

Rebecca L. Sawyer

TANYA BEARD
As to Tenant

Winn-Dixie Stores, Inc.

By: _____

Its:  Senior Vice President

"TENANT"

2

Tower Center Associates, Ltd., a
Florida Limited Partnership

By:    NDC Real Estate Management,
       Inc.

       By:    _____
              Charles N. Kasza
              Its Senior Vice President

As to Landlord          Its Agent

                        "LANDLORD"

**Exhibit "C'**



4415 Fifth Avenue
Pittsburgh, Pennsylvania 15213
(412) 647-7400
Fax: (412) 578-7889
TT: 1-800-654-5984
www.ndcrealestate.com

# NDC Real Estate
# Management, Inc.

May 3, 2005

Ms. Jane DeWitte
Area Property Manager
Winn-Dixie
5050 Edgewood Ct.
Jacksonville, FL  32254

Re:    Winn-Dixie Store #170
       1st Quarter CAM Billing – 2005

Dear Jane,

Enclosed is the above-mentioned billing along with copies of the invoices supporting the calculation.  The first quarter billing results in a current amount due of $9,505.35.

Should you have any questions on the above, please contact me at (412) 578-7891.

Sincerely,

Diane G. Connor
Vice President

DGC/dlt
Enclosures
CC:    Ann Cannizzaro
       ✓ Marty Mason
       Mark Foster – Florida
       Mary Fitzwater
       Files





TOWER CENTER ASSOCIATES
WINN-DIXIE COMMON AREA MAINTENANCE CHARGES
JANUARY 1, 2005 THRU MARCH 31, 2005

| VENDOR | DESCRIPTION | AMOUNT | |
|---|---|---|---|
| GAINSVILLE REGIONAL UTILITIES | SERVICE THRU 01/14/05 | 2,299.92 | |
| | SERVICE THRU 01/14/05 | 182.59 | |
| | SERVICE THRU 01/14/05 | 222.81 | |
| (ELECTRIC SERVICE) | SERVICE THRU 02/14/05 | 2,298.12 | |
| | SERVICE THRU 02/14/05 | 155.93 | |
| | SERVICE THRU 02/14/05 | 230.74 | |
| | SERVICE THRU 12/14/04 | 2,291.96 | |
| | SERVICE THRU 12/14/04 | 138.42 | |
| | SERVICE THRU 12/14/04 | 218.42 | |
| | SUBTOTAL | | 8,038.91 |
| | | | |
| GAINSVILLE REGIONAL UTILITIES | SERVICE THRU 01/14/05 | 165.00 | |
| | SERVICE THRU 01/14/05 | 63.53 | |
| | SERVICE THRU 02/14/05 | 202.21 | |
| | SERVICE THRU 02/14/05 | 63.53 | |
| (WATER SERVICE) | SERVICE THRU 03/15/05 | 236.04 | |
| | SERVICE THRU 03/15/05 | 61.83 | |
| | SUBTOTAL | | 792.14 |
| | | | |
| GAINSVILLE REGIONAL UTILITIES | SERVICE THRU 01/14/05 | 313.22 | |
| | SERVICE THRU 01/14/05 | 117.29 | |
| | SERVICE THRU 02/14/05 | 385.06 | |
| | SERVICE THRU 02/14/05 | 117.29 | |
| (SEWER SERVICE) | SERVICE THRU 03/15/05 | 450.38 | |
| | SERVICE THRU 03/15/05 | 114.02 | |
| | SUBTOTAL | | 1,497.26 |
| | | | |
| SNG PAVEMENT MARKING | LAWN MAINT AND POWER SWEEP- JAN | 4,879.52 | |
| | LAWN MAINT AND POWER SWEEP-FEB | 4,879.52 | |
| | LAWN MAINT AND POWER SWEEP-MARCH | 4,879.52 | |
| | ASPHALT REPAIRS, SEALCOAT PARKING LOT | 17,583.00 | |
| | REPAIR BROKEN SIGN POST | 250.00 | |
| | | | 32,471.56 |
| AQUA PLANT | DOWN PYMT AND MARCH PYMT | 1,340.63 | |
| | | | 1,340.63 |
| ADMINISTRATVE FEE 5% | | | 2,207.03 |
| TOTAL COMMON AREA MAINTENANCE COSTS | | | 46,347.53 |
| PRORATION BASED UPON TOTAL SQUARE FOOTAGE | | 166,400.00 | |
| WINN DIXIE SQUARE FOOTAGE | | 44,000.00 | |
| TOTAL-COMMON AREA MAINTENANCE CHARGE | | | 12,255.36 |
| EXPENSES SPECIFIC TO WINN-DIXIE(including 5% administrative fee) | | | 0.00 |
| PAYMENTS MADE TO DATE | | | -2,750.01 |
| CURRENT AMOUNT DUE | | | 9,505.35 |

Check Date: 19.May.2005

Check No. 0080042506

| Division | Invoice Number | Invoice Date | Voucher ID | Gross Amount | Discount Available | Paid Amount |
|---|---|---|---|---|---|---|
| WDHDQ | 170CAM1Q05 | 19.May.2005 | 00592598 | 4,013.37 | 0.00 | 4,013.37 |

Jane DeWitte
904-763-5265
— Bankruptcy

| Vendor Number | Name | | |
|---|---|---|---|
| 0000140890 | NDC ASSET MANAGEMENT | | |
| Check Number | Date | Total Amount | Total Paid Amount |
| 0080042506 | 19.May.2005 | $4,013.37 | $4,013.37 |

| Total Discounts | | |
|---|---|---|
| | $0.00 | |
| | Discounts Taken | |
| | $0.00 | |