EXHIBIT "B"

'That certain piece, parcel or tract of land situate, lying and being in the City of Daytona Beach, Volusia County, Florida, more particularly described as follows:

SHOPPING CENTER

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the Easterly R/W of State Road No. S-5A (Nova Road) and Northerly of State road No. 400 (Beville Road), Bethune Grant being recorded in Map Book 1, page 56 (also Map Book 12, page 41) Public Records of Volusia County, Florida and being more particularly described as follows: As a point of reference commence at the Northwest corner of Fairway Unit No. 6 as recorded in Map Book 35, page 93 of the Public Records of Volusia County, Florida; thence S 25° 32' 25" E along the Westerly line of said Fairway Unit No. 6, a distance of 950.00 feet for the Point of Beginning; thence continue S 25° 32' 25" E, a distance of 471.01 feet; thence S 64° 27' 35" W, a distance of 300.00 feet; thence S 25° 32' 25" E a distance of 651.06 feet to the Northerly R/W of State Road No. 400; thence S 64° 29' 43" W along the Northerly R/W of State Road No. 400, a distance of 406.19 feet to the PC of a curve to the right; thence Westerly along said curve having a radius of 5679.65 feet, an arc distance of 200.46 feet, said arc being subtended by a chord bearing of S 65° 30' 23" W and a chord distance of 200.45 feet; thence S 66° 31' 03" W along said Northerly R/W a distance of 135.55 feet to the PC of a curve to the left; thence Westerly along said curve having a radius of 5779.65 feet, an arc distance of 26.53 feet, said arc being subtended by a chord bearing of S 66° 23' 07" W and a chord distance of 26.53 feet to a point on the Easterly R/W of State Road No. S-5A; thence Northerly along said Easterly R/W and along a curve to the right, said curve having a radius of 2704.79 feet, an arc distance of 63.95 feet, said arc being subtended by a chord bearing of N 07° 26' 04" W and a chord distance of 63.95 feet to the PC of a curve to the right; thence Northerly along said Easterly R/W and curve to the right, said curve having a radius of 2704.93 feet, an arc distance of 188.84 feet, said arc being subtended by a chord bearing of N 07° 41' 27" W and a chord distance of 188.80 feet to the PT of said curve; thence N 05° 41' 27" W along said Easterly R/W, a distance of 20.45 feet; thence N 11° 24', 05" W along said Easterly R/W, a distance of 50.25 feet; thence N 05° 42' 39" W along said Easterly R/W, a distance of 422.13 feet to the PC of a curve to the left; thence Northerly along said Easterly R/W and said curve having a radius of 11614.20 feet, an arc distance of 429.79 feet, said arc being subtended by a chord bearing of N 06° 44' 14" W and a chord distance of 429.27 feet; thence N 64° 27' 35" E, a distance of 689.89 feet to the Point of beginning. Containing 18.22 acres more or less.

All of the above described premises being shown on plat of survey dated December 22, 1986, prepared by Daniel W. Cory Surveyor, Inc., New Smyrna Beach, Florida, Daniel W. Cory, Reg. Surveyor No. 2027, incorporated herein by this reference.

LESS AND EXCEPT:

OUTPARCEL "J"

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the Easterly Right-of-Way Line of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant being recorded in Map Book 1, Page 56 (also Map Book 12, Page 41) Public Records of Volusia County, Florida and being more particularly described as follows: As a point of reference commence at the North West Corner of Fairway Unit No. 6 as recorded in Map Book 35, Page 93 of the Public Records of Volusia County, Florida; Thence South 25°32'25" East along the Westerly Line of said Fairway Unit No. 6, a distance of 950.00 feet; Thence South 64°27'35" West a distance of 689.89 feet, to the Easterly Right-of-Way Line of State Road No. S-5A, as now occupied and established; Thence South Easterly along a curve concave to the right, said curve having a central angle of 02°07'13" and a radius of 11614.20 feet, an arc distance of 429.79 feet, to the Point of Tangency of said curve; Thence South 06°44'14" East continuing along the aforesaid Easterly Right-of-Way Line a distance of 80.00 feet to the Point of Beginning; Thence North 64°27'35" East a distance of 170.00 feet; Thence South 25°32'25" East a distance of 140.00 feet; Thence South 64°27'35" West a distance of 220.51 feet, to the aforesaid Easterly Right-of-Way Line; Thence North 05°42'39" West, along the aforesaid Easterly Right-of-Way Line a distance of 148.83 feet, to the Point of Beginning , containing 0.63 Acres, more or less.

OUTPARCEL "K"

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4, and 5, Block 22, lying Easterly of the Easterly Right-of-Way Line of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant being recorded in Map Book 1, Page 56 (also Map Book 12, Page 41) Public Records of Volusia County, Florida, and being more particularly described as follows: As a point of reference commence at the North West Corner of Fairway Unit No. 6 as recorded in Map Book 35, Page 93 of the Public Records of Volusia County, Florida; Thence South 25°32'25" East along the Westerly Line of said Fairway Unit No. 6, a distance of 950.00 feet; Thence South 64°27'35" West a distance of 689.89 feet, to the Easterly Right-of-Way Line of State Road No. S-5A, as now occupied and established; Thence Southeasterly along a curve concave to the right, said curve having a central angle of 02°07'13" and a radius of 11614.20 feet, an arc distance of 429.79 feet, to the Point of Tangency of said curve; Thence South 06°44'14" East continuing along the aforesaid Easterly Right-of-Way Line a distance of 228.83 feet, to the Point of Beginning; Thence North 64°27'35" East a distance of 140.00 feet; Thence South 25°32'25" East a distance of 150.00 feet; Thence South 64°27'35" West a distance of 194.12 feet, to the aforesaid Easterly Right-of-Way Line; Thence North 05°42'39" West, along the aforesaid Easterly Right-of-Way Line a distance of 159.47 feet, to the Point of Beginning, containing 0.58 Acres, more or less.

OUTPARCEL "L"

A portion of Lots 3 and 4, Block 21, and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the Easterly Right-of-Way of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant, as recorded in Map Book 1, Page 56 (also Map Book 12, Page 41), Public Records of Volusia County, Florida, being more particularly described as follows:

From a Point of Reference, said point being the North West Corner of Fairway Unit No. 6, as recorded in Map Book 35, Page 93 of aforesaid Public Records; Run thence South 25°32'25" East along the Westerly line of said Fairway Unit No. 6, a distance of 1421.01 feet; Thence South 64°27'35" West a distance of 300.00 feet; Thence South 25°32'25" East a distance of 651.06 feet, to the Northerly Right-of-Way Line of aforesaid State Road No. 400 as now occupied and established; Thence South 64°29'43" West along the Northerly line of aforesaid State Road No. 400, a distance of 406.19 feet, to a Point of Curvature; Thence Westerly along the Northerly Line of aforesaid State Road No. 400 and along a curve concave to the right, said curve having a central angle of 00°37'46", a radius of 5679.65 feet, a chord bearing of South 64°48'36" West, and a chord distance of 62.39 feet, an arc distance of 62.40 feet, to the Point of Beginning; Thence continue along the Northerly Line of State Road No. 400, along a curve

concave to the right, said curve having a central angle of 01°23'34", a radius of 5679.65 feet, a chord bearing of South 65°49'16" West, and a chord distance of 138.07 feet, an arc distance of 138.07 feet, to a Point of Tangency; Thence South 66°31'03" West, continuing along the Northerly Line of aforesaid State Road No. 400, a distance of 135.55 feet, to a Point of Curvature; Thence continuing along the Northerly line of aforesaid State Road No. 400, along a curve concave to the left, said curve having a central angle of 00°15'47", a radius of 5779.65 feet, a chord bearing os South 66°23'07" West, and a chord distance of 26.53 feet, an arc distance of 26.54 feet, to the Easterly Line of aforesaid State Road S5-A; Thence Northerly along the Easterly Line of aforesaid Nova Road and along a curve concave to the right, said curve having a central angle of 01°21'17", a radius of 2704.79 feet, a chord bearing of North 07°26'04" West, and a chord distance of 63.95 feet, an arc distance of 63.95 feet to a Point of Curvature; Thence Northerly continuing along the Easterly Line of aforesaid State Road S5-A, along a curve concave to the right, said curve having a central angle of 03°46'14", a eadius of 2704.93 feet, a chord bearing of North 07°48'19" West and a chord distance of 177.98 feet, an arc distance of 178.01 feet; Thence North 64°27'35" East, a distance of 225.92 feet; Thence South 25°32'25" East, a distance of 239.34 feet, to the Point of Beginning.

All of the above described premises being shown on plat of survey dated May 15, 1987 and last revised May 28, 1987, Reg. Land Surveyor No. 3473, Carrol E. Godwin, II, Godwin & Associates, Inc., DeLand, Florida, and supplemented by Survey dated July 6, 1987, incorporated herein by this reference.

By _K.J. Gleason_
Its _____ Vice President

The foregoing Agreement is accepted and approved as of
OCT. 5 1987 _____ , 1987.

SHOPPES OF TOWNE SOUTH, INC.

By _____ pres
Authorized Representative

OPERATORS OF SUPERMARKETS ACROSS THE SUNBELT
LANDLORD

# LEASE

THIS LEASE, made this _n4th_ day of _July_, 19 _87_

between ___SHOPPES OF TOWNE SOUTH, INC, a Florida corporation___

_____ (hereinafter called "Landlord")

and___WINN-DIXIE STORES, INC., a Florida corporation___

_____(hereinafter called "Tenant");

which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

## WITNESSETH:

**PREMISES**

That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and demise unto said Tenant and the Tenant hereby agrees to take and lease from the Landlord, for the term hereinafter specified, the following described premises:

That certain store building, approximately _220_ feet in width by _200_ feet in depth, plus vestibule at front approx. 88' by 12' together with concrete pads for coolers and freezers at rear and the land on which the same shall stand (hereinafter collectively called "demised premises"), which store building and related improvements are to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided, and shall be in the location and of the dimensions as outlined in red on the Plot Plan _entitled "The Shoppes of Towne South" prepared by Pate-Martin Architects, AIA, PA, Ft. Lauderdale, Florida, dated March 13, 1987 (and stamped (in red) printed "Jul 9, 1987" for identification purposes._ attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in detail on Exhibit "A"), known as _The Shoppes of Towne South_ (hereinafter called "shopping center"), located _at the northeast corner of Nova and Beville Roads_ in the City of _Daytona Beach_, County of _Volusia_, State of _Florida_, the legal description of the shopping center being set forth on Exhibit "B" attached hereto and by this reference made a part hereof.

APPROVED
AS TO FORM

DIVISION MGR.

LEGAL DEPT.
WINN-DIXIE STORES, INC.

WD 33-36 Rev. 4/79 .

This instrument was prepared by
Ronald O. Peterson, Attorney-at-Law
whose address is 5050 Edgewood
Court, Jacksonville, Florida 32205

M        FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens said premises
for the transaction of its business as hereinafter provided for an initial term of_____
____twenty (20)_____years from said commencement date. The parties agree to execute a
supplemental agreement fixing the commencement date when the same shall have been determined
as herein provided.

        This lease is granted and accepted upon the foregoing and upon the following terms, cove-
nants, conditions and stipulations:

ITAL    1. The Tenant agrees to pay to the Landlord as a minimum guaranteed rental for the demised
premises during the term of this lease, and any extensions thereof, the sum of _____

        Two Hundred Seventy Thousand Six Hundred and 00/100_____
Dollars ($_270,600.00____) per annum. The minimum guaranteed rental shall be paid in twelve
(12) equal monthly installments of_____

        Twenty-Two Thousand Five Hundred Fifty and 00/100_____Dollars
($_22,550.00____) per month, which installments shall be due and payable in advance on the
first day of each and every calendar month of the lease term, and any extensions thereof. Tenant
shall be responsible for, and pay, Florida State Sales Tax imposed
upon rentals due and paid to Landlord under terms of this Lease.

        In addition, the Tenant agrees to pay to the Landlord a percentage rental equal to the
amount, if any, by which_____one_____ per cent ( ---1----%) of Tenant's
gross sales made from the demised premises in each fiscal year ending approximately June 30th
during the term of this lease, and any extensions thereof, exceeds the minimum guaranteed annual
rental.

        Any excess rent which may become due by reason of the percentage of sales provision shall
be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However,
upon final termination of the lease, if not extended, or upon termination of the last extension
thereof, any excess rent which may be due by reason of said percentage of sales provision shall be
payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The
percentage rent for each fiscal year shall be calculated separately and without reference to the
volume of sales of any other year. For purposes of calculating the percentage rental due hereun-
der, the Tenant's fiscal year shall be from approximately July 1st to June 30th of each year. The
first monthly installment of rental shall be due on the first day of the next succeeding complete
calendar month after the date the lease commences as hereinafter provided, and shall include any
rent due for the preceding fractional month. Both guaranteed rental and percentage rental for
fractional years and fractional months occurring at the beginning and end of the term, or any
extension thereof, shall be pro-rated on the basis of the annual rental.

-2-

**INITION**
**"GROSS**
**ES"**

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold, and gross charges for all services rendered in or from the demised premises, both for cash and on credit; provided, however, such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

**:ORD**
**SALES**

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address hereinafter designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable by Tenant as hereinabove provided, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

**E**

2.   The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any general mercantile or retail (including discount operations) or service business.  If permitted by local, state and federal laws Tenant or its licensee shall be permitted to sell beer and wine for off-premises consumption from the demised premises.  Tenant shall be permitted at all times to install in its demised store premises an automatic bank teller machine (ATM) or equivalent electronic fund transfer unit or a manned banking facility. Tenant shall be permitted to sell prescription drugs and operate a pharmacy or drug department or concession in the demised store premises.  The term "discount operations" shall, for the purpose of this paragraph, mean sales to the public generally at less than retail prices including reduced service and quantity packaging minimum purchases and including so-called "wholesale" pricing.

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of said premises, as such shall relate to the cleanliness and use of said premises and the character and manner of operation of the business conducted in or at said premises.

STRUCTION 3. The Landlord, at its sole cost and expense, shall construct the shopping center, substantially as
HOPPING shown on Exhibit "A", consisting of all the buildings shown thereon, together with all ramps,
ER sidewalks, streets, entranceways, malls, parking areas, service areas, driveways and related im-
provements, said improvements (excluding buildings) being sometimes hereinafter referred to as
"common areas". The Landlord, at its sole cost and expense, shall grade and surface with top
quality materials all paved portions of the common areas (including parking area), and shall pro-
vide proper and adequate water drainage and lighting system and operations therefor and shall
operate and maintain the same in good repair and usable condition for use by the patrons of the
shopping center and the tenants and their employees during the term of this lease and any exten-
sions thereof. The arrangement and location of all store buildings and common areas (including
parking area) within the shopping center shall at all times during the term of this lease, or any
extensions thereof, be maintained as shown on Exhibit "A" and shall not be changed without the
written consent of the Tenant. If not shown on Exhibit "A", Tenant expressly reserves the right to
approve the finish grade elevations of all store buildings and common areas (including parking and
service areas) within the shopping center which are to be constructed concurrently with Tenant's
store building.

Notwithstanding the foregoing, it is understood that Landlord
intends initially to construct only Tenant's building and the
store buildings required under Articles 5 and 6 herein, together
with all the common areas of the shopping center, including
without limitation, all the sidewalks, drives, entranceways,
service areas and parking areas to the limits of the initial
paving within Phase I as shown on Exhibit "A", including all
customer and service drives connecting to Nova Road and Beville
Road. Landlord reserves the right, but shall not be required, to
construct additional buildings within the building areas reserved
therefor indicated on Exhibit "A", with the depth and interior
dimensioning of same to be at Landlord's discretion, provided,
however, such additional buildings shall be of like structural
and architectural quality as the building for Tenant, and all
such buildings shall be set back from the streets adjoining the
shopping center or the property lines thereof distant at least
within the sidewalk lines or building outlines as shown on
Exhibit "A". In the event Landlord shall expand the shopping
center into the Phase II property owned by it adjoining on the
south and west the initial development as shown on Exhibit "A"
hereto, Landlord reserves the right, but shall not be required,
to construct additional buildings and common areas upon such
property, with the location and placement of future buildings and
common areas thereon to be in Landlord's discretion, but upon the
condition that any such future buildings shall not exceed the
indicated sizes and shall be set back from the streets adjoining
the enlarged shopping center or the property lines thereof dis-
tant at least within the sidewalk lines, building outlines or
building setback lines as shown on Exhibit "A". Such future
buildings in such an expansion of the shopping center may be
joined to the buildings in Phase I of the shopping center on the
condition that at all times there shall be maintained a paved
through service drive a minimum of 30 feet in width permitting a
circular traffic pattern around all buildings from time to time
constructed in the shopping center, or any enlargement thereof.
Throughout the shopping center, or any enlargement thereof, in
connection with the construction of any additional buildings, at
least the ratio of automobile parking area to gross building area
as hereinafter required shall be maintained at all times; and
Landlord shall grade and pave such additional parking area as is
necessary for such purpose and shall also provide such additional
buildings with adequate service areas and drives. Landlord
agrees that Tenant shall have uninterrupted use and enjoyment of
the demised premises and the common areas during any such
additional construction without unreasonable interference there-
with by reason of such construction work.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to
construct the store building for occupancy by Tenant in accordance with the plans and specifica-
tions to be approved by both Landlord and Tenant. Plans and specifications shall be approved
when initialed by both parties, and when initialed shall constitute a part of this lease. Said plans
and specifications shall provide for a completed store building, commonly referred to as a "lock
and key job", and shall include, but without limitation the following:

environmental control panel, heat reclaim coil, automatic sliding doors, interior partitions, all plumbing and plumbing fixtures, drains, electrical wiring, lighting fixtures to Tenant's requirements, connection of Tenant's trade fixtures to plumbing and electrical outlets, air conditioning and heating systems and equipment (including insulated ducts, registers and grilles), furnished by Tenant), manager's office, delicatessen department, vinyl composite, quarry and ceramic tile floor coverings as specified (color at Tenant's option), automatic sprinkler system (including A.D.T. or other approved alarm system therefor if required by applicable building codes) concrete pad and connections for Tenant's baler/compactor; concrete truck unloading pads at rear of building and connection to all utilities. Tenant shall furnish and erect its own baler at the job site on the concrete pad therefor to be erected by Landlord, with all other installation and connection to electrical, water, plumbing and plumbing fuel systems, ready for use, to be performed by Landlord. Tenant shall also furnish its own trade fixtures. Any and all such equipment and fixtures furnished by Tenant shall remain its property and may be removed from the demised premises by Tenant at any time.

**MPLETION**
**E**

4. Landlord covenants and agrees that the construction of the shopping center shall begin not later than___September 1, 1987_____and shall be completed not later than_____ ___March 3, 1988_; and if the same shall not be begun or completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this lease or may extend the Landlord additional time for the beginning or completion of construction; provided, however, that if after the beginning of construction the Landlord's failure to complete said improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than____April 28, 1988_____, said option to terminate shall not arise. "Construction of the shopping center" shall be deemed to have begun when the first concrete footings have been poured. If pursuant to this paragraph Tenant shall cancel or terminate this lease or if Landlord fails to commence or complete construction of the shopping center by the above dates, Landlord agrees to give the Tenant the first right of refusal, on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to be exercised within sixty (60) days after receipt of notice of the terms and conditions from the Landlord, to occupy any premises within the shopping center which Landlord may offer for use as a food supermarket. The first right of refusal shall be operative and effective for a period of three years from the date of such cancellation. However, if offered to Tenant within six (6) months after cancellation of this Lease, the Lease terms and provisions and rentals shall be the same as this Lease.

**OMMENCE-**
**NENT DATE**

5. The Tenant shall open its store for business within sixty (60) days following performance of the following:

substantially

(a) Tenant's store building and other improvements constructed on the demised premises shall have been delivered to Tenant completed in accordance with the plans and specifications and Landlord shall have delivered to Tenant, at Landlord's expense, a Certificate of Occupancy or equivalent document for the demised store building;

(b) Construction of all of the common areas (including parking area hereinafter specifically required) shall have been completed substantially as shown on Exhibit "A";

(c) Construction of at least __1,333__ lineal feet of store frontage and __133,500__ sq. ft. of total building area (excluding Tenant's store building) shall have been completed as shown on Exhibit "A" and said area leased to other tenants and opened for business or readied for opening for business simultaneously with Tenant; and

(d) The stores to be operated by each of the following tenants shall have been completed and opened for business or been readied for opening for business simultaneously with Tenant:

> 1st Phase
> Ben Franklin
> 34,000 s.f. of local, retail and
> service store tenants (to be shelled
> and roofed but not necessarily leased)

(e) Landlord shall have installed and open to vehicular traffic, all drives, entrances, median cuts, acceleration and deceleration lanes and traffic control devices located in or from Nova Road and Beville Road and connecting the shopping center with said roadways substantially as shown on Exhibit "A" hereto and specifically as shown on the plans and specifications to be approved by the parties.

(f) Landlord shall have recorded upon the public records of Volusia County, Florida, and delivered to Tenant in form satisfactory to Tenant, a Declaration of Restrictions encumbering outparcels "J", "K" and "L" as shown on Exhibit "A" hereto prohibiting such parcels from being used in violation of the provisions in Articles 7 and 28 of this Lease and prohibiting any buildings constructed thereon from exceeding 20 feet maximum vertical height measuring from ground level prior to site preparations or exceeding 25% of the gross land area square footage in building size. Landlord agrees that the building areas and common and parking areas of such parcels shall be constructed in accord with the layout of such parcels shown on Exhibit "A" unless deviation is approved in writing by Tenant.

(g) Landlord shall have complied with local, state and county ordinances, rules, laws or regulations regarding construction of water runoff retention pond(s) for the shopping center and shall cause any retention pond(s) to be fenced around its entire perimeter if required by applicable ordinances, laws or regulations. Any easements or other agreements providing for ground water, street flow or drainage of water from the shopping center to other property shall be demonstrated to be effective and not subject to cancellation prior to the expiration of Tenant's initial Lease term plus option extension periods granted to Tenant.

(h) Landlord shall provide written proof of allocation of sewerage and water connections and use in sufficient quantity and capacity to allow future construction of the addition to Tenant's demised store premises contemplated by Article 38 of this Lease. Such allocations shall be in form and substance subject to approval by Tenant and shall not be subject to cancellation or termination by the issuing entities.

In the event that all the above requirements shall not have been met on or prior to _____ __April 28, 1988__, the Tenant at its sole option may cancel and terminate this lease.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of sixty (60) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

ITS

6. As a condition and inducement to Tenant's entering into this lease, Landlord represents and warrants that it has entered into firm commitments for leases with the tenants listed below for the terms and for the amount of floor space indicated:

| | Name | Minimum Term Years | Minimum Floor Area (sq. ft.) |
|---|---|---|---|
| 1st Phase | Ben Franklin Retail & Service Store to be shelled and roofed but not necessarily leased | 10+10 variable | 15,000 34,000 |
| 2nd Phase | Two Tenants consisting of not less than Major Drug Retail & Service Stores to be shelled and roofed but not necessarily leased | 20 variable | 25,000 10,350 18,000 |

Landlord further warrants and represents that such tenants shall occupy the space in the shopping center in the locations indicated on Exhibit "A" and in the minimum amounts set opposite their respective names above; and Landlord agrees, on demand, to furnish evidence satisfactory to Tenant, prior to and as a further condition to the establishment of the commencement date of this lease, that Landlord has entered into non-cancellable leases, except for default, with such tenants.

GENERAL MERCANTILE STORES ONLY

7. Without the prior written consent of Tenant herein only general mercantile stores or service businesses, or retail stores (including discount operations) shall be allowed to operate in the shopping center, or any enlargement thereof, it being the intent of the parties hereto that no spa, bowling alley, skating rink, bingo parlor, theatre (either motion picture or legitimate), business or professional offices, sales of automobiles, or health, recreational amusement and entertainment-type activities (including without limitation, bars, lounges, "teen lounges" and package stores), or non-retail or non-mercantile type activities, shall be permitted.   Provided, however, Landlord shall be permitted to lease not more than a total of 5,000 square feet of rental space for office or professional office use in the shopping center or any enlargement thereof.

PARKING AND COMMON AREAS

8. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof, and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a) a minimum ratio of at least ___5.0___ automobile parking spaces for each 1,000 sq. ft. of gross building area (including additional floor levels) in the shopping center, and

(b) facilities for convenient parking of at least___894___ automobiles (minimum);

and in the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord at its expense during Tenant's food store shopping hours, and Landlord further agrees that no signboards or other construction shall be erected in any of the said common areas shown on Exhibit "A" or so as to obstruct the view of the demised premises from the adjoining public streets. Without the prior written consent of Tenant herein, no carnivals, fairs or shows nor sales by merchants utilizing vehicles or booths in the common areas shall be allowed in the shopping center, or any enlargement thereof.

Landlord agrees with respect to the areas labeled outparcels "J", "K" and "L" respectively, as shown on Exhibit "A" as follows: No building to be located on any of the outparcels shall exceed 3,000 square feet;*no structures or buildings on any outparcel shall be allowed to exceed 1 story or 20 feet in height and parking ratios required by all governmental authorities shall be met by the owner of each respective outparcel. No buildings on any of the outparcels may be used for any business or activity which would violate the exclusive rights of Tenant as set forth in Article 28 of this Lease or the provisions of Article 7 of this Lease with the exception of use of the buildings for general office or professional office usage. Further, Landlord agrees that pending such uses, the parcels shall be maintained as paved, or as grassed or landscaped areas and shall be maintained in sightly condition and kept free of weeds and debris.

*except for outparcel "L" which have no building which shall exceed 25% of the total square footage of the parcel.

RVICE
REA

9. Landlord further agrees to provide for the exclusive use of the Tenant at its grocery service entrances parking spaces for two large trailer trucks for continuous use and further agrees that Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for loading and unloading merchandise for its store into and from trucks and trailers at such service entrances.

TILITIES

10. The Tenant agrees to pay all charges measured by consumption or use for telephone, garbage collection, electricity, water, gas and other utilities and services furnished to or used by Tenant on the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities. Provided, Tenant shall not be required to pay any charges for static or flowing water in pipes to supply the fire sprinkler system, nor any "hook up" fees, environmental impact charges, system impact charges or initial connection charges incident to providing access to any utility system.

ENANT'S
EPAIRS

11. Upon completion of construction by Landlord and acceptance of the demised premises by Tenant, Tenant agrees to keep the interior of the demised premises in good condition and repair, excepting structural repairs and all repairs which are the responsibility of the Landlord or which are made necessary by reason of fire and other unavoidable casualties covered by Landlord's fire and extended coverage insurance, and excepting reasonable wear and tear. Tenant shall also be responsible for repair of its trade fixtures and equipment, including the baler/compactor.

-8-

LORD'S
RS

**12.** The Landlord shall, at its cost and expense, keep and maintain, in good condition and repair, the common areas, the exterior of Tenant's store building, including the windows and plate glass, automatic doors, roof, gutter, downspouts, exterior painting, masonry walls, foundation and structural members, the automatic sprinkler system (including central alarm system therefor, if required by governmental authority), the plumbing (including septic tank, if any), wiring, air conditioning

uding  and heating systems, and floor surfacing of the store building in good condition and repair, and
work  shall make any and all structural repairs to both the exterior and interior of said premises. If any
rilles) portion of the common areas (as defined in Article 3 hereof) or any portion of the store building, which is the responsibility of the Landlord, shall at any time be in need of repair, Landlord will repair same immediately upon receipt of written notice from Tenant to do so, except that the Landlord shall not be obligated to make or pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of the Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements, or other casualty covered by Landlord's fire and extended coverage insurance. Landlord shall also be responsible for the extermination of termites.

If in order to protect the Tenant's property in the store building it shall be necessary to make emergency repairs to any portion thereof which is the responsibility of the Landlord to repair, or if the Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas, as defined in Article 3 hereof, which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs. Landlord further covenants that the store building will be so constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that said premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated.

3NS

**13.** Tenant may place, erect and maintain any signs on the roof, walls, and any other place on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs.

Landlord agrees to construct and maintain, including painting, one (1) shopping center pylon in the shopping center located adjacent to the main entrance to the shopping center from Nova Road and Beville Road       as shown on Exhibit "A" hereto and Tenant shall be permitted to affix thereon electrically illuminated sign panels advertising its business, to be installed by Landlord. Landlord at its expense shall lay and install suitable underground conduit and wiring extending to the pylon site  from Tenant's demised store building. Tenant shall maintain its own sign panels located on the pylon , and sign panels of other tenants may be located on said pylon  below those of Tenant provided the other tenants' signs are connected to separate electrical supply lines.

XTURES
ID IN-
:RIOR
.TERATIONS

**14.** The Tenant, at its own expense, may from time to time during the term of this Lease make any interior non-structural alterations, additions and improvements in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this Lease. Tenant agrees to cause any mechanics' or materialmen's liens incurred as a result of construction work instigated by Tenant to be promptly discharged and agrees to indemnify and hold harmless Landlord from any expense occasioned thereby.

Tenant may construct and build or install in said premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from said premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to said premises resulting from the installation or removal of such items.

I—
ON

15. Unless caused by the sole negligence of the Landlord, its servants, agents, or employees, Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises and also any claim or loss by reason of an accident or damage to any person or property occasioned beyond the demised premises, but only if such damage or loss is caused by the sole negligent acts or omissions of Tenant, its agents, servants or employees.

Likewise, unless caused by the sole negligence of the Tenant, its servants, agents or employees, Landlord shall indemnify and save harmless the Tenant from any claim or loss by reason of an accident or damage to any person or property happening on or about all common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, public liability insurance coverage on all common areas (as defined in Article 3 hereof) of the shopping center, with the contractual liability endorsement on the policy, in a company qualified to transact business in Florida, stipulating limits of liability of not less than $500,000.00 for an accident affecting any one person; and not less than $1,000,000.00 for an accident affecting more than one person; and $100,000.00 property damage. Certificate of such coverage from the insurer providing thirty (30) days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant.

:ANLINESS

16. Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the entryways and delivery areas adjoining the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

RE

17. In the event that Tenant's building shall be totally destroyed or damaged to any extent by fire or other casualty Landlord agrees to proceed promptly and without expense to Tenant to repair the damage or restore the improvements, remitting a fair and just portion of the rent, according to the unusable space, until said premises are completely reinstated or restored, provided however, if such damage to Tenant's building to the extent of fifty per cent (50%) or more occurs within the last three (3) years of the lease term hereof (whether the original lease term or an extension thereof), then in such event Landlord shall have no obligation to restore Tenant's building unless Tenant agrees to extend the lease term hereof on the same conditions and for the same rentals so as to expire ten (10) years from the date of completion of such restoration by Landlord, such extension to be in addition to and not in lieu of any renewal privileges then remaining available to Tenant, which renewal options shall not thereby be exercised. Failing such notice to extend, Landlord at its option shall have the right to terminate this lease or to restore the premises and the lease shall continue for the remainder of the then unexpired term.

In the event that Landlord shall fail within a reasonable time, not to exceed ninety (90) days following such damage (except as in this paragraph provided), to proceed with and within a reasonable time commensurate with the amount of damage, not to exceed six (6) months following such damage, to complete any repairs and restoration of the demised premises as herein required Tenant may, at its option, in either of such events, terminate this Lease by giving to Landlord written notice thereof. If Landlord's failure to commence or complete said repairs within the stipulated times shall be due to strikes, war, material shortages, weather conditions, or similar happenings beyond its control, and provided further the repairs are completed with all due diligence commensurate with such delay, such option to terminate shall not arise. If the Lease shall terminate as aforesaid and any rent shall have been paid by Tenant in advance, Landlord agrees to refund to Tenant all rent so paid applicable to the period subsequent to such damage or destruction.

If at any time during the term of this lease or any extensions thereof any of the buildings in the shopping center, exclusive of Tenant's store building, are damaged by fire or by the elements or otherwise, Landlord shall immediately commence and diligently prosecute to completion repair of all such damage and shall restore said improvements to their condition prior to such damage, or so much of such damaged buildings as necessary to meet the greater of the following requirements: (1) all those buildings required to be restored under the Lease agreements Landlord may have with the particular tenants affected (provided such tenants shall not have cancelled their leases), and (2) at least fifty per cent (50%) of the buildings then in the shopping center, exclusive of Tenant's store building. All buildings not required to be restored hereunder shall be razed, and the area therefor shall be used as paved parking area, grassed or landscaped area, free of weeds, trash and debris.

**QUIET**
**ENJOYMENT**

18. The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a general mercantile business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a general mercantile business or using the common areas (as defined in Article 3 hereof) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

19. All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord prior to delinquency. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law.

**EM-**
**IN**

20. If any part of the demised premises or more than twenty per cent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease as aforesaid, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

The right of Tenant to a division of condemnation proceeds shall extend only to such portion of the award as may be attributable by the Court to disturbance of Tenant's established business and to Tenant's trade fixtures, equipment, leasehold improvements and moving expenses; and Tenant shall not thereby be entitled to any portion of the award attributable to the land or building or to the value of the unexpired portion of the lease term.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of ——— ten ——— per cent ( ———10 %) or reduce the number of cars which may be conveniently parked to less than____804____, the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking.

**FAULT**

21. In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default. Enumeration of remedies in this paragraph shall not in any way restrict the right of Landlord to pursue any other remedies permitted under the laws of the State of Florida.

-12-

**UPTCY** 22. The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

**RUCTION** 23. It is understood and agreed that nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing said improvements, and that the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing said improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing said improvements or from any faulty construction thereof.

**ICES** 24. All notices required to be given to Landlord hereunder shall be sent by registered or certified mail to, and all rent payments shall be made to Landlord at _____

437 East Atlantic Boulevard, Suite 1

Pompano Beach, Florida 33060

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail.

All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at _____ P. O. Box 15200

Orlando, Florida 32808

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail.

**ID OF NANCY** 25. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state. Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

MENT
ID
SING

26. The Tenant may without the consent of the Landlord assign this lease, or sublease or vacate the demised premises in whole or in part, provided the Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this lease.



SIONS

27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of _____ _____five_____( 5 ) successive extensions of this lease, each extension to be for a period of_____five_____( 5 ) years and at the same rentals and upon the same terms and conditions as required herein for the initial term.

Such option privilege may be exercised by the Tenant giving to the Landlord a notice in writing at least____six (6) months_____ before the expiration of the initial term, and if extended, at least_____six (6) months_____ before the expiration of such extended term, stating the intention of the Tenant to exercise such option and the period for which such option is exercised and thereupon this lease shall be so extended without the execution of any other or further document.

LUSIVE
ERMARKET

28. Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant; except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, either for consumption on or off the premises, shall not be deemed a violation hereof. With the exception of bars and package stores, only Tenant and the National Drug may sell beer and wine in the shopping center for off-premises consumption. Tenant shall have the exclusive right in the shopping center to operate a bakery/delicatessen or any department or concession equivalent to the same. Provided, however, despite the above provisions in this Article, Landlord shall be permitted to lease up to 2,400 square feet to a package liquor store not located within 250 lineal feet from the exterior walls of Tenant's store building, which may sell beer and wine for off-premises consumption. Despite any other provisions of this Lease, Landlord may lease up to 1,600 square feet of store space not located within 250 lineal feet of Tenant's store building for use as an ice cream shop.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any provisions herein to the contrary, the Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation. If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument.

**RDINATE** 29. The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

Tenant agrees to attorn to the holder of any first mortgage encumbering the demised premises or any other purchaser who shall succeed to the interest of the Landlord under this Lease by reason of foreclosure or sale under such mortgage or by deed in lieu of foreclosure, provided Tenant is furnished with proper evidence of such foreclosure or purchase; and upon such attornment, the holder of the mortgage or other purchaser shall be bound to Tenant under all the terms, conditions and covenants of this Lease, to the extent of the then remaining balance of the term and any extensions or renewals thereof.

**ITICE TO
NDER** 30. Tenant agrees that it will give notice to any holder of a first mortgage (which term shall include all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, the Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 12 of this lease.

(at least twice weekly)

**31.** Landlord agrees to operate and maintain in good condition and repair all the common areas, as herein defined, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and watering and maintenance of landscaped areas. If the Landlord, after fifteen (15) days following receipt of written notice from Tenant to do so, shall fail to make the repairs or perform the services described in this Article, the Tenant shall have the right to make such repairs or cause such services to be performed in its behalf and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred therein.

For such services, Tenant shall pay the Landlord, as additional rental hereunder and as reimbursement for the cost thereof, the sum of $4,400.00 per year, payable in twelve (12) equal monthly installments of $366.67 per month in advance on the first day of each and every calendar month of the Lease term, and any extensions thereof. Any additional rental paid by the Tenant may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due under terms of this Lease, it being intended that such credit shall be made annually in respect of the common area payments for the previous lease year at the time percentage rentals are payable, but if there shall not be any percentage rentals due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning and end of the Lease term or any extensions thereof shall be pro-rated on the basis of annual credit.

**32.** This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

**33.** In the event Landlord transfers Landlord's interest in this lease, Landlord agrees to promptly provide Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's interest in this lease.

**34.** The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease in form permitting its recording.

**35.** The marginal titles appearing in this lease are for reference only and shall not be considered a part of this lease or in any way to modify, amend or affect the provisions thereof.

-16-

ETE
MENT

36. This written lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

37. During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of ad valorem real estate taxes levied against the demised premises for the first full calendar year of the lease term in which both the value of the land and the buildings thereon shall be assessed for tax purposes and the amount of ad valorem real estate taxes levied against the demised premises in each year thereafter during the term of this Lease, and during any exercised option extensions thereof; provided, however, any additional rental payable hereunder by the Tenant may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due hereunder; it being intended that such credit shall be made annually in respect of the tax payments for the previous tax year at the time percentage rentals are payable, but if there shall not be any percentage rentals due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning of the period in which Tenant is responsible for such tax payments, or at the end of the Lease term or any extensions thereof, shall be prorated on the basis of the annual credit. Tenant shall be responsible only for its pro-rata share of such taxes for fractional years occurring at the beginning and expiration of the term of this Lease, and any extensions thereof.

If such taxes shall not be assessed separately, but shall be included within an assessment of the demised premises and others, said assessment shall be fairly apportioned to determine Tenant's share thereof. Such apportionment shall be made in the ratio which the square footage of Tenant's store building bears to the total square footage of all store buildings (including additional floor levels) from time to time existing in the shopping center. The amount of taxes attributable to the shopping center, and for which Tenant is to reimburse Landlord in part, shall be less any abatements, discounts or refunds thereon. Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements as evidence of the basis upon which any increase in taxes is chargeable to Tenant and an "as built" survey of the shopping center, and such additional rental shall be payable by Tenant on demand after payment by Landlord. All taxes, other than ad valorem real estate taxes, including special assessments, improvement liens, and the like, shall remain the sole responsibility of the Landlord. However, Tenant shall remain responsible for sales taxes on rentals levied by law on lessees.

Tenant shall have the right from time to time to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned, and to institute such proceedings in the name of the Landlord as the Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to the Landlord.

PTION FOR
XPANSION

38. Tenant is hereby granted the option and privilege at any time during the term of this lease, or during any extensions thereof, of requiring the enlargement of its demised store premises by incorporating therein as an addition the area immediately adjacent on the southerly side of the existing demised store premises sixty (60) feet in width by two hundred (200) feet in depth. Landlord agrees that such area shall not be leased or otherwise encumbered in any manner which may prevent Tenant from exercising the option to expand. This option may be exercised at any time. Upon Tenant giving to Landlord a notice in writing of its exercise of this option, Landlord agrees to construct such

-17-

addition, or prepare such enlargement area for occupancy by Tenant, in accordance with plans and specifications to be approved in writing by the parties hereto, with the construction to be completed with all due diligence following the vacation of the necessary area by any other tenant, and the enlarged portion of the building to be of a like quality of construction as the original building for Tenant.

In order to facilitate the expansion of Tenant's demised store building as herein contemplated, Landlord agrees that any adjacent building or buildings within the expansion area shall be of like structural quality and in architectural harmony with Tenant's store building, shall front on a line which is an extension of the interior sidewalk line of Tenant's demised store building and shall have a finish floor level, roof and ceiling heights of Tenant's demised store building adjoining the expansion area shall be constructed with steel column supports therein equivalently spaced to the nearest row of steel column supports therein the open front sales area of Tenant's demised store building and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original and of the expanded building width.

Upon completion of such building addition, or tender of such additional space to Tenant, if there shall not, at such date remain at least ten (10) years of the then term of this Lease, such term shall be extended for a period of time as shall be necessary to provide a full ten (10) years from such date. Thereafter, during such extended term, the annual minimum guaranteed rental (and the base for computation of percentage rental hereunder) shall be increased by the greater of: an amount equal to twelve (12%) percent of the enlargement area, or an amount equal to $6.15 per square foot of the enlargement area, or any amount equal to a computed percentage times the cost of such addition, such percentage consisting of four percent (4%) plus the current prime interest rate charged by New York City banks at the time of the exercise of the option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant with the final cost of the addition upon completion to be certified to by the general contractor performing the work. During the remaining term of during such extended term, the provisions of this Lease shall remain in effect and the option periods herein provided, if any shall remain, shall be construed to follow upon the end of the extended term and the rentals to remain as adjusted in consequence of the addition. Upon completion of the addition, it shall be and become a portion of the demised store premises and this Lease be construed as so amended.

Nothing herein contained shall constitute any express or implied obligation on the part of the holder of a first mortgage encumbering the fee simple title to the demised premises or of any purchaser at a sale under foreclosure of such mortgage, to comply with the terms and provisions of this Article, it being the understanding of the parties that the obligation to cause such expansion is the sole obligation of the Landlord, its heirs, legal representatives, successors and assigns.

In the event Landlord shall for any reason fail or refuse to construct the building addition contemplated hereunder after Tenant has properly exercised its option herein, the Tenant, at its option, shall have the right at its own expense to construct the building addition of the size and quality set forth above. If Tenant constructs the enlargement, Tenant agrees to cause any mechanic's lien incurred by and in connection with such expansion

to be promptly discharged and agrees to indemnify and hold harmless the Landlord from any expense occasioned thereby. Upon completion of such building addition and occupancy thereof by Tenant, if there shall not at such date remain at least ten (10) years of the then term of this Lease, the lease term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date. Thereafter, during the remaining lease term and any extensions thereof, there shall be no additional minimum guaranteed annual rental payable by Tenant in respect of such addition.

Landlord specifically agrees that it shall obtain and pay all costs, fees and expenses incident to obtaining all utility permits or allocations of consumption or use of such utilities, specifically including, but not limited to, (a) sewerage and water permits, (b) allocations of sewerage and water or (c) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the addition contemplated by this Option for Expansion. In the event Landlord does not pay such costs, fees or expenses or obtain such permit(s) and waiver(s), Tenant may pay same, obtain any reasonably necessary waiver and deduct the amounts paid or costs incurred from all rentals payable under this Lease. Landlord shall be responsible for such items described above in this paragraph irrespective of whether Landlord or Tenant constructs such addition and improvements to the demised store premises.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this agreement the day and year first above written.

Signed, sealed and delivered in the presence of:

SHOPPES OF TOWNE SOUTH, INC.

By _____
Its              President

Attest _____
Its              Secretary

As to Ralph Obernin Company, Inc.

(CORPORATE SEAL)

LANDLORD

WINN-DIXIE STORES, INC.

By _____
Its              President

Attest _F. P. Hamilton_____
Its        Ass't Secretary

As to Winn-Dixie Stores, Inc.

(CORPORATE SEAL)

TENANT

STATE OF FLORIDA )

COUNTY OF BROWARD )

The foregoing instrument was acknowledged before me this
24 day of JULY , 1987, by RALPH CHECNIN and
ALAN CHECNIN , the _____ President and _____
Secretary of SHOPPES OF TOWNE SOUTH, INC. a Florida corporation,
on behalf of the corporation.

_____
NOTARY PUBLIC, State and County
aforesaid

(NOTARIAL SEAL)

My Commission Expires:

NOTARY PUBLIC, STATE OF FLORIDA
MY COMMISSION EXPIRES MAR. 21. 1991
BONDED THRU NOTARY PUBLIC UNDERWRITERS


STATE OF FLORIDA )

COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this
14th day of Aug. , 1987, by A. Dano Davis and
O. P. Hamilton , _____ President and asst.
Secretary, respectively, of WINN-DIXIE STORES, INC., a Florida
corporation, on behalf of the corporation.

Teresa J. Dentry
NOTARY PUBLIC, State and County
aforesaid

(NOTARIAL SEAL)

My Commission Expires:

EXHIBIT "B"

That certain piece, parcel or tract of land situate, lying and
being in the City of Daytona Beach, Volusia County, Florida,
more particularly described as follows:

SHOPPING CENTER

portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the
sterly R/W of State road No. S-5A (Nova Road) and Northerly of State road No. 400 (Beville Road),
thune Grant being recorded in Map Book 1, page 56 (also Map Book 12, page 41) Public Records of
lusia County, Florida and being more particularly described as follows: As a point of reference
mmence at the Northwest corner of Fairway Unit No. 6 as recorded in Map Book 35, page 93 of the
blic Records of Volusia County, Florida; thence S 25° 32' 25" E along the Westerly line of said
airway Unit No. 6, a distance of 950.00 feet for the Point of Beginning; thence continue S 25°
2' 25" E, a distance of 471.01 feet; thence S 64° 27' 35" W, a distance of 300.00 feet; thence
25° 32' 25" E a distance of 651.06 feet to the Northerly R/W of State Road No. 400; thence S 64°
9' 43" W along the Northerly R/W of State Road No. 400, a distance of 406.19 feet to the PC of
curve to the right; thence Westerly along said curve having a radius of 5679.65 feet, an arc distance
f 200.46 feet, said arc being subtended by a chord bearing of S 65° 30' 23" W and a chord distance
f 200.45 feet; thence S 66° 31' 03" W along said Northerly R/W a distance of 135.55 feet to the
C of a curve to the left; thence Westerly along said curve having a radius of 5779.65 feet, an
rc distance of 26.53 feet, said arc being subtended by a chord bearing of S 66° 23' 07" W and a
hord distance of 26.53 feet to a point on the Easterly R/W of State Road No. S-5A; thence Northerly
long said Easterly R/W and along a curve to the right, said curve having a radius of 2704.79 feet,
n arc distance of 63.95 feet, said arc being subtended by a chord bearing of N 07° 26' 04" W and
chord distance of 63.95 feet to the PC of a curve to the right; thence Northerly along said Easterly
/W and curve to the right, said curve having a radius of 2704.93 feet, an arc distance of 188.84
feet, said arc being subtended by a chord bearing of N 07° 41' 27" W and a chord distance of 188.80
feet to the PT of said curve; thence N 05° 41' 27" W along said Easterly R/W, a distance of 20.45
feet; thence N 11° 24' 06" W along said Easterly R/W, a distance of 50.25 feet; thence N 05° 42'
39" W along said Easterly R/W, a distance of 422.13 feet to the PC of a curve to the left; thence
ortherly along said Easterly R/W and said curve having a radius of 11614.20 feet, an arc distance
f 429.79 feet, said arc being subtended by a chord bearing of N 06° 44' 14" W and a chord distance
f 429.77 feet; thence N 64° 27' 35" E, a distance of 689.89 feet to the Point of beginning.
ontaining 18.22 acres more or less.

All of the above described premises being shown on plat of survey
dated December 22, 1986, prepared by Daniel W. Cory Surveyor, Inc.,
New Smyrna Beach, Florida, Daniel W. Cory, Reg. Surveyor No. 2027,
incorporated herein by this reference.

LESS AND EXCEPT:

OUTPARCEL "J"

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4 and 5,
Block 22, lying Easterly of the Easterly Right-of-Way Line of State Road
No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road),
Bethune Grant being recorded in Map Book 1, Page 56 (also Map Book 12,
Page 41) Public Records of Volusia County, Florida and being more
particularly described as follows: As a point of reference commence at
the North West Corner of Fairway Unit No. 6 as recorded in Map Book 35,
Page 93 of the Public Records of Volusia County, Florida; Thence
South 25°32'25" East along the Westerly Line of said Fairway Unit No.
6, a distance of 950.00 feet; Thence South 64°27'35" West a distance
of 689.89 feet, to the Easterly Right-of-Way Line of State Road No.
S-5A, as now occupied and established; Thence South Easterly along a
curve concave to the right, said curve having a central angle of
02°07'13" and a radius of 11614.20 feet, an arc distance of 429.79
feet, to the Point of Tangency of aforesaid curve; Thence South 05°44'14"
East continuing along the aforesaid Easterly Right-of-Way Line a
distance of 80.00 feet to the Point of Beginning; Thence North 64°27'35"
East a distance of 170.00 feet; Thence South 25°32'25" East a distance
of 140.00 feet; Thence South 64°27'35" West a distance of 220.51 feet,
to the aforesaid Easterly Right-of-Way Line; Thence North 05°42'39"
West, along the aforesaid Easterly Right-of-Way Line a distance of
148.83 feet, to the Point of Beginning , containing 0.63 Acres, more or
less.

OUTPARCEL "K"

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4, and 5, Block 22, lying Easterly of the Easterly Right-of-Way Line of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant being recorded in Map Book 1, Page 56 (also Map Book 12, Page 41) Public Records of Volusia County, Florida, and being more particularly described as follows: As a point of reference commence at the North West Corner of Fairway Unit No. 6 as recorded in Map Book 35, Page 93 of the Public Records of Volusia County, Florida; Thence South 25°32'25" East along the Westerly Line of said Fairway Unit No. 6, a distance of 950.00 feet; Thence South 64°27'35" West a distance of 689.89 feet, to the Easterly Right-of-Way Line of State Road No. S-5A, as now occupied and established; Thence Southeasterly along a curve concave to the right, said curve having a central angle of 02°07'13" and a radius of 11614.20 feet, an arc distance of 429.79 feet, to the Point of Tangency of said curve; Thence South 06°44'14" East continuing along the aforesaid Easterly Right-of-Way Line a distance of 228.83 feet, to the Point of Beginning; Thence North 64°27'35" East a distance of 140.00 feet; Thence South 25°32'25" East a distance of 150.00 feet; Thence South 64°27'35" West a distance of 194.12 feet, to the aforesaid Easterly Right-of-Way Line; Thence North 05°42'39" West, along the aforesaid Easterly Right-of-Way Line a distance of 159.47 feet, to the Point of Beginning, containing 0.58 Acres, more or less.

OUTPARCEL "L"

A portion of Lots 3 and 4, Block 21, and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the Easterly Right-of-Way of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant, as recorded in Map Book 1, Page 56 (also Map Book 12, Page 41), Public Records of Volusia County, Florida, being more particularly described as follows:

From a Point of Reference, said point being the North West Corner of Fairway Unit No. 6, as recorded in Map Book 35, Page 93 of aforesaid Public Records; Run thence South 25°32'25" East along the Westerly line of said Fairway Unit No. 6, a distance of 1421.01 feet; Thence South 64°27'35" West a distance of 300.00 feet; Thence South 25°32'25" East a distance of 651.06 feet, to the Northerly Right-of-Way Line of aforesaid State Road No. 400 as now occupied and established; Thence South 64°29'43" West along the Northerly line of aforesaid State Road No. 400, a distance of 406.19 feet, to a Point of Curvature; Thence Westerly along the Northerly Line of aforesaid State Road No. 400 and along a curve concave to the right, said curve having a central angle of 00°37'46", a radius of 5679.65 feet, a chord bearing of South 64°48'36" West, and a chord distance of 62.39 feet, an arc distance of 62.40 feet, to the Point of Beginning; Thence continue along the Northerly Line of State Road No. 400, along a curve

concave to the right, said curve having a central angle of 01°23'34", a radius of 5679.65 feet, a chord bearing of South 65°49'16" West, and a chord distance of 138.07 feet, an arc distance of 138.07 feet, to a Point of Tangency; Thence South 66°31'03" West, continuing along the Northerly Line of afore-said State Road No. 400, a distance of 135.55 feet, to a Point of Curvature; Thence continuing along the Northerly line of aforesaid State Road No. 400, along a curve concave to the left, said curve having a central angle of 00°15'47", a radius of 5779.65 feet, a chord bearing os South 66°23'07" West, and a chord distance of 26.53 feet, an arc distance of 26.54 feet, to the Easterly Line of aforesaid State Road S5-A; Thence Northerly along the Easterly Line of aforesaid Nova Road and along a curve concave to the right, said curve having a central angle of 01°21'17", a radius of 2704.79 feet, a chord bearing of North 07°26'04" West, and a chord distance of 63.95 feet, an arc distance of 63.95 feet to a Point of Curvature; Thence Northerly continuing along the Easterly Line of aforesaid State Road S5-A, along a curve concave to the right, said curve having a central angle of 03°46'14", a radius of 2704.93 feet, a chord bearing of North 07°48'19" West and a chord distance of 177.98 feet, an arc distance of 178.01 feet; Thence North 64°27'35" East, a distance of 225.92 feet; Thence South 25°32'25" East, a distance of 239.34 feet, to the Point of Beginning.

All of the above described premises being shown on plat of survey dated May 15, 1987 and last revised May 28, 1987, Reg. Land Surveyor No. 3473, Carrol E. Godwin, II, Godwin & Associates, Inc., DeLand, Florida, and supplemented by Survey dated July 6, 1987, incorporated herein by this reference.

SUPPLEMENTAL LEASE AGREEMENT

THIS AGREEMENT, made this _11th_ day of _APRIL_, 1989, between SHOPPES OF TOWNE SOUTH, INC., a Florida corporation, (hereinafter called "Landlord") and WINN-DIXIE STORES, INC., a Florida corporation, (hereinafter called "Tenant"); which terms "Landlord" and "Tenant" shall include the heirs, legal representative, successors and assigns of the respective parties;

WITNESSETH:

WHEREAS, by Lease dated July 24, 1987, Landlord did lease and demise unto Tenant those certain premises, therein more particularly described, located in a shopping center development known as The Shoppes of Towne South, located at the northeast corner of Nova and Beville Roads, in the City of Daytona Beach, County of Volusia and State of Florida, for an initial term of twenty (20) years commencing upon a date dependent upon the completion of certain construction, and for such rentals and upon such terms and conditions as more particularly set forth therein, a short form of said Lease being recorded in Official Record Book 3056, pages 0319 through 0325 of the Public Records of Volusia County, Florida; and

WHEREAS, the Lease has been amended to date by letter agreements dated September 23, 1987 and June 20, 1988, and by Addendum to Lease and Second Addendum to Lease each respectively dated December 22, 1988; and

WHEREAS, the said construction has been completed and the Tenant has now opened for business in the demised premises and the parties hereto desire to fix the commencement date of said Lease, as hereinafter set forth.

NOW THEREFORE, in consideration of the premises and the sum of Ten Dollars ($10.00) and other good and valuable considerations, in hand paid by the Tenant to the Landlord,

APPROVED
AS TO FORM

Division Mgr.

Legal Dept.
Winn-Dixie Stores,
Inc.

This instrument was prepared by
Ronald D. Peterson, Attorney-at-Law
whose address is 5050 Edgewood
Court, Jacksonville, Florida 32205

the receipt and sufficiency of which is hereby acknowledged, it is mutually agreed as follows:

1. The commencement date of the above described Lease dated July 24, 1987 is fixed at March 30, 1989, and the expiration of the initial term of twenty (20) years demised therein shall be March 29, 2009 at twelve o'clock midnight.

2. It is mutually understood and agreed that the Lease dated July 24, 1987, as amended, shall be and remain in full force and effect and unmodified, except as the same is specifically modified and amended hereby. All covenants, terms, obligations and conditions of the Lease, as previously amended, not modified or amended by this Supplemental Lease Agreement, are hereby ratified and confirmed.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this instrument the day and year first above written.

Signed, sealed and delivered
in the presence of:

SHOPPES OF TOWNE SOUTH, INC.

By _____
Its                    President

Attest: _____
Its                    Secretary

As to Landlord

(CORPORATE SEAL)

LANDLORD

WINN-DIXIE STORES, INC.

By _____
Its                    President

Attest: _____
Its                    Secretary

As to Tenant

(CORPORATE SEAL)

TENANT

STATE OF  *Florida*  )
                     )
COUNTY OF  *Broward*  )

The foregoing instrument was acknowledged before me this

*11* day of *April*, 1989, by *Ralph Chernin*

and *Alan Chernin*, *The* President and *The*

Secretary, respectively, of SHOPPES OF TOWNE SOUTH, INC., a

Florida corporation, on behalf of the corporation.

(NOTARIAL SEAL)                     _____
                                    NOTARY PUBLIC, State and County
                                    aforesaid

                                    My Commission Expires:
                                    *4-30-90*


STATE OF   FLORIDA    )
                      )
COUNTY OF  _____    )

The foregoing instrument was acknowledged before me this

_____ day of _____, 1989, by _____

and _____, _____ President and _____

Secretary, respectively, of WINN-DIXIE STORES, INC., a Florida

corporation, on behalf of the corporation.


(NOTARIAL SEAL)                     _____
                                    NOTARY PUBLIC, State and County
                                    aforesaid

                                    My Commission Expires:

## DECLARATION OF RESTRICTIONS
## AND GRANT OF EASEMENTS

Shoppes of Towne South, Inc, a Florida corporation qualified to transact business in Florida, (hereinafter called "Declarant") is the owner of four (4) adjoining and contiguous parcels of land situated at the northeast corner of Nova Road and Beville Road, near or in the City of Daytona Beach, Volusia County, Florida, each parcel being more particularly described on Exhibit "A" attached to this Declaration and by this reference included herein as if set forth in full in this Declaration.

Declarant plans in the future to construct or to be permitted to be constructed on the parcels various commercial store buildings and improvements, which together in the future will constitute a shopping center.

Declarant desires to declare, establish, grant and provide for the benefit of: (1) Declarant and any present or subsequent owners of all or any portion of the parcels and the respective heirs, legal representatives, successors and assigns of all of them and any successors entitled to all or any portions of the parcels (collectively called "Owners"); and also for the benefit of: (2) Winn-Dixie Stores, Inc., a Florida corporation duly qualified to transact business in the State of Florida, and the holder or holders of any first mortgage now or in the future constituting a lien against all or any portion of the parcels; and (3) the tenants and occupants from time to time of any of the commercial buildings constructed within the building areas on any of the parcels, their employees, successors and assigns, customers and invitees, which are collectively called "Beneficiaries"; certain restrictions, rights, obligations, easements and licenses to run with the title to the parcels to create a mutually beneficial building plans automobile parking plan and a compatible plan for the arrangement and design of the improvements their

APPROVED
AS TO FORM

D.V.SION MGR.

LEGAL DEPT.
WINN-DIXIE STORES,
INC.

This instrument was prepared by
Ronald D. Peterson, Attorney-at-Law
whose address is 5050 Edgewood
Court, Jacksonville, Florida 32205

permitted uses in the shopping center comprised of the composite parcels above described.

Declarant has entered into a Lease with Winn-Dixie Stores, Inc., ("Winn-Dixie") which demises to Winn-Dixie, as Tenant, certain premises located in the parcel labeled "shopping center" described on Exhibit "A" attached to this Declaration for an initial term of twenty (20) years commencing upon the completion of certain construction as set forth in the Lease. The initial Lease term is subject to five (5) successive option extensions each for a period of five (5) years. A short form of the Lease will be recorded in the public records of Volusia County, Florida.

The establishment of the restrictions, rights, privileges and easements created in this Declaration of Restrictions and Grant of Easements is one of the principal inducements to Winn-Dixie to omit outparcels "J", "K" and "L" described on Exhibit "A" attached to this Declaration from the legal description of the shopping center attached to the Winn-Dixie Lease.

In consideration of the premises and the mutual benefits to the Declarant and to the Beneficiaries, the Declarant, for itself, its heirs, personal representatives, successors, grantees and assigns, grants, declares and provides as follows:

1. No above-ground buildings or structures of any kind shall be erected on outparcels "J", "K" and "L" except in such locations and of such dimensions as shall be approved in writing by Winn-Dixie prior to construction. The remainder of the land in outparcels "J", "K" and "L" not used for building construction shall be reserved for use as common facilities' and no buildings or structures of any kind shall be constructed within the areas reserved for the common facilities, which may be used only as vehicular parking areas, roadways, service areas, drives, entranceways, exits and sidewalks and landscaped areas but per-

mitting those necessary appurtenances for such use including, without limitation, paving, light standards, curbings, directional signs, drainage facilities and underground facilities and pylon signs advertising the shopping center and the business or businesses conducted by the occupants of commercial buildings on the respective outparcels "J", "K" and "L". All buildings on outparcels "J", "K" and "L" shall be restricted to one story and twenty (20) feet in height.

2. Declarant establishes and creates for Declarant, Owners and Winn-Dixie and gives, grants and conveys to each and every one of the Declarant, Owners and Winn-Dixie, and to their respective employees, servants, agents, suppliers, customers and invitees, a mutual, reciprocal and non-exclusive easement, rights license and privilege of passage and use, both pedestrian and vehicular, over, across and upon any and all portions of the common facilities for the purpose of ingress, egress and parking, and all common facilities from time to time existing upon the above described parcels are expressly reserved and set apart for such purpose or purposes, respectively. Nothing is intended to be construed to create any rights for the benefit of the general public in either of the parcels or improvements constructed thereon.

3. Declarant establishes and creates for the benefit of the building areas and for the benefit of Declarant, Owners and Winn-Dixie and gives, grants and conveys to each and every Declarant, Owner and Winn-Dixie a mutual reciprocal and non-exclusive right and easement in, under, over, across, upon and through any and all portions of the common facilities for the installation, use, maintenance, repair and replacement of all utility lines, wires, pipes, conduits, sewers, drainage lines and other utilities necessary to serve the building areas; provided, however, that no pipes, conduits, sewers, drainage lines or other

utility apparatus shall be placed above the surface of the common facilities without the prior consent of Declarant, Owners and Winn-Dixie, which said consent shall not be unreasonably withheld; and provided further, that any and all damage to the common facilities or building areas occasioned by such work shall be promptly repaired and restored at the sole cost and expense of the party causing such work to be performed.

4.  Declarant agrees to indemnify and save harmless Winn-Dixie from any claim or loss by reason of any accident or damage to any person or property happening on or about the common facilities as described in this document and Declarant also agrees to carry at its expense, public liability insurance coverage on all such common facilities on outparcels "J", "K" and "L" with a contractual liability on the policy and issued by a company qualified to transact business in Florida stipulating limits of not less than $1,000,000.00 for an accident affecting any one person, or not less than $1,000,000.00 for an accident affecting more than one person, and $50,000.00 property damage. In the event of any sale or transfer of title of all or any portion or portions of the above described parcels any purchaser or transferee shall expressly assume the obligations imposed by this article as to the property so sold or transferred.

5.  For and during the term of the Lease to Winn-Dixie Stores, Inc., and any extensions or renewals thereof, it shall have the exclusive right to operate a supermarket on all of said parcels, and no other portion or portions either parcel shall be permitted to be occupied or be leased or rented, directly or indirectly, for occupancy as a supermarket, grocery store, dairy store, meat, fish, fruit or vegetable market, nor shall any owner, tenant or occupant of any portion of either parcel be permitted to lease or sublet in any manner, directly or indirectly, all or any part of any parcel to any person, firm or

corporation engaged in such business without the prior written consent of Winn-Dixie.

Also, except as otherwise provided in the Winn-Dixie Lease, only retail and service shops and business and professional offices shall be allowed to operate on the outparcels, it being intended that no spa, bowling alley, skating rink, bingo parlor, or health or recreational and entertainment type activity shall be permitted thereon.

6. The terms, covenants, conditions and provisions of these restrictions may be extended, abrogated, modified, rescinded or amended in whole or in part only with the consent of Declarant, Owner(s) and Winn-Dixie Stores, Inc. and the holder or holders of any first mortgage now or in the future constituting a lien against either parcel; but subject to such consent, Declarant, or its successor or successors in title, expressly reserves the right to extend, abrogate, modify, rescind or amend the covenants and restrictions herein by an instrument in writing duly executed by the appropriate parties in interest and duly recorded in the public records of Volusia County, Florida.

7. These restrictions shall become effective on the date of this document and shall be binding upon all parties or persons claiming under them and shall run with the land for a period of forty-five (45) years from such date, or until such date as Winn-Dixie Stores, Inc., or its successors and assigns cease possession of the premises demised to it, whichever shall earlier occur (which fact shall be exclusively established by the true affidavit of Declarant or its successors and assigns). The easements, rights, privileges, restrictions and benefits created or granted under these restrictions and each provision hereof shall be enforceable by Declarant, Owner(s) and Beneficiaries by injunction or by specific performance and shall be deemed covenants running with the title to the parcels so long as these

restrictions (as the same may be amended from time to time) shall
be in effect, as above provided.  This instrument shall be bind-
ing upon and inure to the benefit of the respective heirs, legal
representatives, successors and assigns of Declarant, Owner(s)
and Winn-Dixie as above provided.

Declarant has executed this Declaration of Restrictions and
Grant of Easements as of ___7/14/87___, 1987.

Signed, sealed and delivered
in the presence of:                       SHOPPES OF TOWNE SOUTH, INC.


By _____
                              Its _____ President

                              Attest _____
As to Declarant                   Its _____ Secretary

                              (CORPORATE SEAL)

                              DECLARANT

STATE OF FLORIDA )

COUNTY OF BROWARD )

The foregoing instrument was acknowledged before me this
24 day of JULY , 1987, by RALPH CHECNIN and
ALAN CHECNIN , President and
Secretary, respectively, of SHOPPES OF TOWNE SOUTH, INC. a
Florida corporation, on behalf of the corporation.

_____
NOTARY PUBLIC, State and County
aforesaid

(NOTARIAL SEAL)

My Commission Expires:

NOTARY PUBLIC, STATE OF FLORIDA
MY COMMISSION EXPIRES MAR. 21, 1991.
BONDED THRU NOTARY PUBLIC UNDERWRITERS.

EXHIBIT "A"

That certain piece, parcel or tract of land situate, lying and being in the City of Daytona Beach, Volusia County, Florida, more particularly described as follows:

## SHOPPING CENTER

portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the asterly R/W of State Road No. S-5A (Nova Road) and Northerly of State road NO. 400 (Beville Road), ethune Grant being recorded in Map Book 1, page 56 (also Map Book 12, page 41) Public Records of olusia County, Florida and being more particularly described as follows: As a point of reference ommence at the Northwest corner of Fairway Unit No. 6 as recorded in Map Book 35, page 93 of the ublic Records of Volusia County, Florida; thence S 25° 32' 25" E along the Westerly line of said airway Unit No. 6, a distance of 950.00 feet for the Point of Beginning; thence continue S 25° 2' 25" E, a distance of 471.01 feet; thence S 64° 27' 35" W, a distance of 300.00 feet; thence S 64° 25' 32' 25" E a distance of 651.06 feet to the Northerly R/W of State Road No. 400; thence S 64° 9' 43" W along the Northerly R/W of State Road No. 400, a distance of 406.19 feet to the PC of curve to the right; thence Westerly along said curve having a radius of 5679.65 feet, an arc distance f 200.46 feet, said arc being subtended by a chord bearing of S 66° 30' 23" W and a chord distance f 200.45 feet; thence S 66° 31' 03" W along said Northerly R/W a distance of 135.55 feet to the C of a curve to the left; thence Westerly along said curve having a radius of 5779.65 feet, an rc distance of 26.53 feet, said arc being subtended by a chord bearing of S 66° 23' 07" W and a hord distance of 26.53 feet to a point on the Easterly R/W of State Road No. S-5A; thence Northerly long said Easterly R/W and along a curve to the right, said curve having a radius of 2704.79 feet, n arc distance of 63.95 feet, said arc being subtended by a chord bearing of N 07° 26' 04" W and chord distance of 63.95 feet to the PC of a curve to the right; thence Northerly along said Easterly R/W and curve to the right, said curve having a radius of 2704.93 feet, an arc distance of 188.84 feet, said arc being subtended by a chord bearing of N 07° 41' 27" W and a chord distance of 188.80 feet to the PT of said curve; thence N 05° 41' 27" W along said Easterly R/W, a distance of 20.45 feet; thence N 11° 24' 06" W along said Easterly R/W, a distance of 50.25 feet; thence N 05° 42' 39" W along said Easterly R/W, a distance of 422.13 feet to the PC of a curve to the left; thence ortherly along said Easterly R/W and said curve having a radius of 11614.20 feet, an arc distance f 429.79 feet, said arc being subtended by a chord bearing of N 06° 44' 14" W and a chord distance f 429.79 feet; thence N 64° 27' 35" E, a distance of 689.89 feet to the Point of beginning. ontaining 18.22 acres more or less.

All of the above described premises being shown on plat of survey dated December 22, 1986, prepared by Daniel W. Cory Surveyor, Inc., New Smyrna Beach, Florida, Daniel W. Cory, Reg. Surveyor No. 2027, incorporated herein by this reference.

## OUTPARCEL "J"

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the Easterly Right-of-Way Line of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant being recorded in Map Book 1, Page 56 (also Map Book 12, Page 41) Public Records of Volusia County, Florida and being more particularly described as follows: As a point of reference commence at the North West Corner of Fairway Unit No. 6 as recorded in Map Book 35, Page 93 of the Public Records of Volusia County, Florida; Thence South 25°32'25" East along the Westerly Line of said Fairway Unit No. 6, a distance of 950.00 feet; Thence South 64°27'35" West a distance of 689.89 feet, to the Easterly Right-of-Way Line of State Road No. S-5A, as now occupied and established; Thence South Easterly along a curve concave to the right, said curve having a central angle of 02°07'13" and a radius of 11614.20 feet, an arc distance of 429.79 feet, to the Point of Tangency of said curve; Thence South 06°44'14" East continuing along the aforesaid Easterly Right-of-Way Line a distance of 80.00 feet to the Point of Beginning; Thence North 64°27'35" East a distance of 170.00 feet; Thence South 25°32'25" East a distance of 140.00 feet; Thence South 64°27'35" West a distance of 220.51 feet, to the aforesaid Easterly Right-of-Way Line; Thence North 05°42'39" West, along the aforesaid Easterly Right-of-Way Line a distance of 148.83 feet, to the Point of Beginning, containing 0.63 Acres, more or less.

OUTPARCEL "K"

A portion of Lots 3 and 4, Block 21 and a portion of Lots 3, 4, and 5, Block 22, lying Easterly of the Easterly Right-of-Way Line of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant being recorded in Map Book 1, Page 56 (also Map Book 12, Page 41) Public Records of Volusia County, Florida, and being more particularly described as follows: As a point of reference commence at the North West Corner of Fairway Unit No. 6 as recorded in Map Book 35, Page 93 of the Public Records of Volusia County, Florida;  Thence South 25°32'25" East along the Westerly Line of said Fairway Unit No. 6, a distance of 950.00 feet;  Thence South 64°27'35" West a distance of 689.89 feet, to the Easterly Right-of-Way Line of State Road No. S-5A, as now occupied and established;  Thence Southeasterly along a curve concave to the right, said curve having a central angle of 02°07'13" and a radius of 11614.20 feet, an arc distance of 429.79 feet, to the Point of Tangency of said curve;  Thence South C6°44'14" East continuing along the aforesaid Easterly Right-of-Way Line a distance of 228.83 feet, to the Point of Beginning;  Thence North 64°27'35" East a distance of 140.00 feet; Thence South 25°32'25" East a distance of 150.00 feet;  Thence South 64°27'35" West a distance of 194.12 feet, to the aforesaid Easterly Right-of-Way Line;  Thence North 05°42'39" West, along the aforesaid Easterly Right-of-Way Line a distance of 159.47 feet, to the Point of Beginning, containing 0.58 Acres, more or less.

OUTPARCEL "L"

A portion of Lots 3 and 4, Block 21, and a portion of Lots 3, 4 and 5, Block 22, lying Easterly of the Easterly Right-of-Way of State Road No. S-5A (Nova Road) and Northerly of State Road No. 400 (Beville Road), Bethune Grant, as recorded in Map Book 1, Page 56 (also Map Book 12, Page 41), Public Records of Volusia County, Florida, being more particularly described as follows:

From a Point of Reference, said point being the North West Corner of Fairway Unit No. 6, as recorded in Map Book 35, Page 93 of aforesaid Public Records; Run thence South 25°32'25" East along the Westerly line of said Fairway Unit No. 6, a distance of 1421.01 feet;  Thence South 64°27'35" West a distance of 300.00 feet;  Thence South 25°32'25" East a distance of 651.06 feet, to the Northerly Right-of-Way Line of aforesaid State Road No. 400 as now occupied and established;  Thence South 64°29'43" West along the Northerly line of aforesaid State Road No. 400, a distance of 406.19 feet, to a Point of Curvature;  Thence Westerly along the Northerly Line of aforesaid State Road No. 400 and along a curve concave to the right, said curve having a central angle of 00°37'46", a radius of 5679.65 feet, a chord bearing of South 64°48'36" West, and a chord distance of 62.39 feet, an arc distance of 62.40 feet, to the Point of Beginning;  Thence continue along the Northerly Line of State Road No. 400, along a curve

concave to the right, said curve having a central angle of 01°23'34", a radius of 5679.65 feet, a chord bearing of South 65°49'16" West, and a chord distance of 138.07 feet, an arc distance of 138.07 feet, to a Point of Tangency;  Thence South 66°31'03" West, continuing along the Northerly Line of aforesaid State Road No. 400,  a distance of 135.55 feet, to a Point of Curvature;  Thence continuing along the Northerly line of aforesaid State Road No. 400, along a curve concave to the left, said curve having a central angle of 00°15'47", a radius of 5779.65 feet, a chord bearing os South 66°23'07" West, and a chord distance of 26.53 feet, an arc distance of 26.54 feet, to the Easterly Line of aforesaid State Road S5-A; Thence Northerly along the Easterly Line of aforesaid Nova Road and along a curve concave to the right, said curve having a central angle of 01°21'17", a radius of 2704.79 feet, a chord bearing of North 07°26'04" West, and a chord distance of 63.95 feet, an arc distance of 63.95 feet to a Point of Curvature;  Thence Northerly continuing along the Easterly Line of aforesaid State Road S5-A, along a curve concave to the right, said curve having a central angle of 03°46'14", a radius of 2704.93 feet, a chord bearing of North 07°48'19" West and a chord distance of 177.98 feet, an arc distance of 178.01 feet;  Thence North 64°27'35" East, a distance of 225.92 feet;  Thence South 25°32'25" East, a distance of 239.34 feet, to the Point of Beginning.


All of the above described premises being shown on plat of survey dated May 15, 1987 and last revised May 28, 1987, Reg. Land Surveyor No. 3473, Carrol E. Godwin, II, Godwin & Associates, Inc., DeLand, Florida, and supplemented by Survey dated July 6, 1987, incorporated herein by this reference.