|  | |
|---|---|
| **Hearing Date:** | **August 4, 2005** |
| **Hearing Time:** | **1:00 PM (EST)** |

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

```
-------------------------------------------------------------x
                                                             :        Fees Sought:        $105,606.50
                                                             :        Expenses Sought:        $756.84
In re:                                                       :        Aggregate Sought:   $106,363.34
                                                             :
WINN-DIXIE STORES, INC., et al.,                             :        Case No. 05-03817-3F1
                                                             :        Chapter 11
                  Debtors.                                   :        Jointly Administered
                                                             :
-------------------------------------------------------------x
```

TO THE HONORABLE JERRY A. FUNK,
UNITED STATES BANKRUPTCY JUDGE:

### Schedule of Fees for the Period February 28, 2005 through April 13, 2005; and June 21, 2005 through July 11, 2005[2]

| Name of Professional(s) | Year Admitted | Year Fee Incurred | Hourly Rate | Hours Engaged | Total Value(s) |
|---|---|---|---|---|---|
| **PARTNERS** | | | | | |
| ALBERT TOGUT | 1975 | 2005 | $765 | 74.7 | $57,145.50 |
| FRANK A. OSWALD | 1986 | 2005 | $640 | .4 | 256.00 |
| NEIL BERGER | 1987 | 2005 | $630 | 25.9 | 16,446.50 |
| **OF COUNSEL** | | | | | |
| HOWARD P. MAGALIFF | 1985 | 2005 | $545 | 3.9 | 2,125.50 |
| **ASSOCIATES** | | | | | |
| JAYME GOLDSTEIN | 2003 | 2005 | $255 | 54.7 | 13,948.50 |
| JONATHAN HOOK | 2004 | 2005 | $210 | 41.5 | 8,715.00 |
| RENEE RANDAZZO | 2004 | 2005 | $190 | 23.9 | 4,541.00 |
| **LAW CLERK** | | | | | |
| SCOTT PASSET | N/A | 2005 | $125 | 5.2 | 650.00 |
| **PARALEGALS** | | | | | |
| DAWN PERSON | N/A | 2005 | $190 | 3.9 | 741.00 |
| BRENNA MCDONOUGH | N/A | 2005 | $135 | 7.5 | 1,012.50 |
| DENISE CAHIR | N/A | 2005 | $125 | .2 | 25.00 |
| **TOTALS:** | | | | **241.8** | **$105,606.50** |

---

1  The rates charged herein are the same rates charged in all other cases on which this firm is engaged.

2  Includes request for Fee Application preparation pursuant to May 19, 2005 Order.

Hearing Date:        **August 4, 2005**
Hearing Time:        **1:00 PM (EST)**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

```
-------------------------------------------------------------x
                                          :
In re:                                    :        Case No. 05-03817-3F1
                                          :
WINN-DIXIE STORES, INC., et al.,          :        Chapter 11
                                          :
                      Debtors.            :        Jointly Administered
                                          :
-------------------------------------------------------------x
```

TO THE HONORABLE JERRY A. FUNK,
UNITED STATES BANKRUPTCY JUDGE:

### FIRST INTERIM APPLICATION OF TOGUT, SEGAL & SEGAL LLP PURSUANT TO ORDER DATED MAY 19, 2005 FOR SERVICES RENDERED AS CONFLICTS COUNSEL TO THE DEBTORS AND FOR REIMBURSEMENT OF EXPENSES

Togut, Segal & Segal LLP ("TS&S"), as conflicts counsel for Winn-Dixie

Stores, Inc. and the other above-captioned debtors and debtors in possession (collec-

tively, "Winn-Dixie" or the "Debtors"), respectfully submits this application (the "Ap-

plication") pursuant to the May 19, 2005 Order (the "May 19 Order") authorizing the

Debtors' retention of TS&S on a final basis, and for reimbursement of expenses incurred

in connection with such services.  In support of this Application, TS&S states:

I.        **FEES AND EXPENSES FOR WHICH ALLOWANCE IS SOUGHT**

1.        This Application is made pursuant to sections 330 and 331 of title

11 of the United States Code (the "Bankruptcy Code"), Rule 2016(a) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules") and the May 19 Order for allowance

of compensation for services rendered to the Debtors in the amount of $105,606.50, and

for reimbursement of expenses in the amount of $756.84.  A copy of the May 19 Order is attached hereto as Exhibit "1".

2.      TS&S seeks compensation and reimbursement of expenses for the period of February 28, 2005 through April 13, 2005, and fees and expenses incurred in connection with the preparation of this Application (the "Fee Period").

3.      TS&S attorneys and paraprofessionals expended a total of 241.8 hours in rendering services for which the firm requests compensation.  A schedule setting forth the number of hours expended by the firm's partners, counsel, associates and paraprofessionals during the Fee Period, their respective hourly rates, and the year in which each attorney was admitted to practice is attached as Exhibit "2."  A schedule specifying the type of expenses for which TS&S is seeking reimbursement during the Fee Period and the total amount of each category is attached as Exhibit "3."  To the extent that time or disbursement charges for services rendered or disbursements incurred relate to the Fee Period, but are not processed until after the date of this Application, TS&S reserves the right to request additional compensation and reimbursement in a future application.

4.      TS&S maintains computerized records of the daily time slips completed by all attorneys and paraprofessionals.  Preceding the time entries is a chart listing the names, billing rates and time spent by each of the attorneys and paraprofessionals rendering services on behalf of the Debtors.  In support of this Application, copies of these computerized records, together with a computer-generated detailed itemization of the expenses incurred, have been filed electronically with the Court as a supplement to this Application and furnished to the Debtors, the Court, the United States Trustee, the Debtors' secured lenders, and counsel for the official statutory committee of unsecured creditors appointed in these cases (the "Committee").

2

5.    TS&S has neither sought nor received any compensation or reim-bursement of expenses from the Debtors in connection with the services that it has pro-vided.  TS&S did not receive a retainer.

6.    As confirmed by the Certification of Neil Berger, a member of TS&S, attached as Exhibit "4," all of the services rendered by TS&S during the case for which compensation is sought were rendered for and on behalf of the Debtors and in connection with their chapter 11 cases.

## II.    **BACKGROUND**

7.    The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  According to published reports, as of the Petition Date the Debtors are the eighth-largest food retailer in the United States and one of the largest in the Southeast.  The Debtors' business was founded in 1925 with a single grocery store and grew through acquisitions and internal expansion.  As of the Petition Date, the Debtors operated more than 900 stores in the United States with nearly 79,000 employ-ees.  Substantially all of the Debtors' store locations are leased rather than owned.

8.    On February 21, 2005 (the "Petition Date"), the Debtors each filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the Bank-ruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court").

9.    On March 2, 2005, the Committee was appointed to serve in these cases pursuant to section 1103 of the Bankruptcy Code.  The Committee retained Mil-bank, Tweed, Hadley & McCloy LLP as its counsel.

10.     On March 3, 2005, the New York Bankruptcy Court entered an Order authorizing the Debtors' retention of TS&S on an interim basis, *nunc pro tunc* to February 28, 2005, to perform services for the Debtors on the matters for which Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") could not represent the Debtors' due to conflicts, and to perform other discrete duties as would be assigned to TS&S by Skadden (the "TS&S Interim Order").

11.     The Debtors' cases are being jointly administered for procedural purposes only.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No request has been made for the appointment of a trustee or examiner.

12.     By an Order of the New York Bankruptcy Court entered on April 13, 2005, as amended on April 14, 2005, (the "Venue Transfer Date") the Debtors' cases were transferred to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014(a)(1).

13.     This Court has jurisdiction over this Application under 28 U.S.C. § 1334.  Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## III.     RETENTION OF TS&S

14.     The TS&S Interim Order was entered by the New York Bankruptcy Court on March 30, 2005.  Pursuant to the May 19 Order, this Court authorized the Debtors to retain TS&S on a final basis for the period February 28, 2005 through April 13, 2005, subject to any further Order of the Court authorizing any further retention of TS&S.  Pursuant to the May 19 Order, TS&S is "entitled to seek compensation for services provided between February 28, 2005 and April 13, 2005, and reimbursement for as-

4

sociated expenses, together with any fees and expenses incurred in connection with seeking such compensation and reimbursement." Copies of the Interim and May 19 Orders are jointly attached hereto as Exhibit "1".

15.    During the Fee Period, the work performed by TS&S and Skadden was complementary; the two firms coordinated tasks to not duplicate each other's efforts on any matters.

16.    TS&S is a highly specialized "boutique". For more than 25 years, the firm's practice has been limited, almost exclusively, to insolvency and bankruptcy matters. TS&S has considerable experience in representing high profile chapter 11 debtors, and has acted in a professional capacity in hundreds of cases representing the interests of debtors, creditors' committees, secured creditors and trustees.

17.    Some of the chapter 11 debtors TS&S has represented include: (i) Enron Corp. and certain of its affiliates, which are primarily engaged in energy trading and operating gas transmission systems and which filed the second largest chapter 11 cases in U.S. history (TS&S is bankruptcy co-counsel for the Enron debtors); (ii) Allegiance Telecom, Inc. and its related debtor entities, which was a facilities-based national local exchange carrier that provided integrated telecommunications products and services; (iii) Ames Department Stores, Inc., the largest regional discount retailer in the United States (where TS&S is co-counsel); (iv) the operating subsidiaries of Loews Cineplex Entertainment Corporation, which involved the restructuring of the second largest movie theatre exhibitors in the U.S. with over $1.5 billion of debt (where TS&S is co-counsel); (v) Daewoo International (America) Corp., an international trading company; (vi) ContiMortgage Corporation and certain of its affiliates, which were engaged in the consumer finance business and which filed chapter 11 cases to restructure more than $1 billion of debt; (vii) OnSite Access, Inc. and certain of its subsidiaries, which

provided voice and data communication services to tenants in commercial buildings located throughout the United States and which filed chapter 11 cases to restructure more than $100 million in debt;  (viii) Rockefeller Center, which involved the restructuring of more than $1.3 billion of debt and 12 historic landmarked buildings in the heart of Manhattan;  (ix) the Olympia & York Tower B Company's World Financial Center, which concerned the restructuring of more than $1 billion of debt;  (x) Guilford Mills, Inc. and its subsidiaries, one of the largest automotive textile producers in the country, which restructured over $300 million of secured debt and paid all creditors in full under a confirmed plan;  and (xi) Clift Holdings LLC, which restructured nearly $100 million of debt and recently confirmed a plan which will pay all creditors in full, plus interest.

18.     The work encompassed by this Application for which TS&S seeks compensation was performed efficiently and at the lowest cost to the Debtors' estates.

19.     All of the work summarized in this Application was performed in a manner to ensure minimal duplication of services in an effort to keep the administration expenses to a minimum.

## IV.    SERVICES RENDERED BY TS&S DURING THE FEE PERIOD

20.     The following is a summary description of the significant services performed by TS&S during the Fee Period.  All of the professional services provided by TS&S are set forth in TS&S' computerized time records, and this Court is respectfully referred to those records for the details of all of the work performed.

21.     It was determined during the beginning of the Debtors' Chapter 11 case that a division of litigation-related duties initially assigned to Skadden made sense because of the:  (i) emergent number of matters that the Debtors thought needed to be immediately addressed;  (ii) potential conflicts that Skadden could have faced if it had

6

been responsible for the resolution of such matters;  (iii) increasing number of plaintiffs that were contacting the Debtors on a daily basis for information regarding their lawsuits;  and (iv) need for the Debtors to develop and provide a consistent and coordinated response to all issues and inquiries regarding the commencement and/or continuation of pre-chapter 11 litigation.

22.    The Debtors therefore decided to utilize TS&S to assist Skadden in handling these litigation issues, including prosecuting as well as developing a quick and uniform response to such issues.  Specifically, Skadden and the Debtors requested that TS&S take primary responsibility in the following matters:  (i) all motions brought against the Debtors to lift the automatic stay to proceed in miscellaneous actions (i.e. personal injury claims) pending throughout the United States;  (ii) the administration and coordination of all pending litigation where the Debtors' ordinary course professionals were defending the Debtors;  (iii) the filing and defending of any civil actions that needed to be removed to the Bankruptcy Court pursuant to 28 U.S.C. § 1452(a) and Bankruptcy Rule 9027;  (iv) the resolution of any pending indemnification issues or lawsuits involving the insurance coverage of the Debtors;  (v) the prosecution of all actions brought pursuant to sections 547, 548 and 550 of the Bankruptcy Code for the potential avoidance and recovery of preferential and/or fraudulent transfers made by the Debtors;  and (vi) any miscellaneous adversary proceedings that would need to be filed and prosecuted on behalf of the Debtors, including, but not limited to, actions for unauthorized post-petition transfers and turnover pursuant to section 542 of the Bankruptcy Code.  These duties assigned to TS&S were similar to those that TS&S has handled in other chapter 11 mega-cases.  TS&S is accustomed to working with main counsel on such matters and had a team ready to do so when it was contacted by the Debtors.

23.    The two matters that TS&S needed to spend immediate time and effort on (due to their magnitude and urgency) involved the Debtors' rights under the Bankruptcy Code section 362 automatic stay and, potentially, the extension of the stay pursuant to section 105 of the Bankruptcy Code to: 1) the massive number of pending tort litigations that had been brought against the Debtors (e.g., the Co-Defendant Actions); and 2) the Debtors' appellate bond and letter of credit securing same.

A.    **The Co-Defendant Actions**

24.    Prior to the Petition Date, the Debtors, and in many instances, officers, directors and employees ("Employees") of the Debtors were named as co-defendants in approximately 2,600 (mostly slip and fall) actions throughout the United States (the "Co-Defendant Actions"); beyond that, there were 39,000 "de minimus" actions brought against the Debtors. The plaintiffs in the Co-Defendant Actions (the "Plaintiffs") sought to recover damages that they claimed to have suffered as a result of alleged wrongdoing or negligence by the Debtors and/or Employees.

25.    The Co-Defendant Actions were distracting the attention of the Debtors' management and threatened to divert significant resources (both human and financial) that the Debtors required to stabilize their businesses shortly after the Petition Date, when all of their attention was required to begin formulating and implementing a strategy for restructuring. In many instances, key executives were named as co-defendants—key executives that were completely occupied with other matters relating to the Debtors' chapter 11 filings. The likelihood of these key executives' time and involvement in the numerous Co-Defendant Actions threatened to impair their ability, and the ability of the Debtors' general counsel, to continue to stabilize and operate the

Debtors' businesses (i.e. the continued supply of merchandise) at such an early and crucial stage of the reorganization.  This was a primary concern of management.

26.    The continuation of the Co-Defendant Actions also threatened to: (i) increase litigation costs;  (ii) trigger indemnity obligations of the Debtor to Employees;  (iii) lead to judgments that could have exceeded available insurance available for the claims asserted in the Co-Defendant Actions;  and (iv) impair employee loyalty and commitment (which are essential to the Debtors' value as a business enterprise).

27.    If a stay against all the actions—protecting not only the Debtors but all of its key executives that had never been named as defendants in the Co-Defendant Actions—could be obtained, not only would the time of the Debtors' management and key executives be freed up to do more important things but the Plaintiffs' inability to prosecute the Co-Defendant Actions would encourage the Plaintiffs to settle because they would be left to only recover "bankruptcy dollars" on any judgment they could obtain far into the future.

28.    TS&S conferred with the Debtors to identify all of the Co-Defendant Actions, the Employees named as defendants in those lawsuits, the availability of insurance to respond to those claims, and the negative effect upon the Debtors' operations as a result of the continuation of the Co-Defendant Actions.  In connection with those activities, TS&S reviewed and analyzed numerous pleadings in Co-Defendant Actions as well as information concerning insurance and co-insurance policies of the Debtors.

29.    In response to the Debtors' requests, TS&S also conducted extensive legal research to determine, among other things, the ability of the Debtors to enforce the automatic stay in certain Co-Defendant Actions, and to obtain injunctive relief pursuant to Bankruptcy Code sections 105 and 362 to the extent that claims were being

9

asserted in the Co-Defendant Actions against Employees who themselves were not Debtors. TS&S needed to confer with the Debtors during numerous conferences prior to the Venue Transfer Date regarding issues relating to this research.

30.     Given the substantial number of lawsuits and parties affected as well as the importance of the delay of these actions to the Debtors' reorganization efforts, it was essential for TS&S to focus almost exclusively on this matter. The work performed by TS&S on these matters during the Fee Period assisted the Debtors in focusing on its chapter 11 case rather than dealing with the myriad of issues involved in the assorted litigation matters.

**B.     Appellate Bond**

31.     During the Fee Period, the Debtors also asked TS&S to provide advice regarding the Debtors' ability to stay the execution against a multi-million dollar letter of credit that the Debtors obtained prior to the Petition Date to secure an appellate bond.

32.     In response to the Debtors' requests, TS&S preformed legal and factual research to determine the extent of the Debtors' rights and the ability of the New York Bankruptcy Court to enjoin execution against the bond. TS&S also reviewed pleadings, orders and correspondence in connection with the litigation that was subject to that appeal, and participated in numerous conferences with the Debtors regarding this issue. Throughout this inquiry, TS&S conferred with the Debtors and provided guidance based upon available facts.

## V.   INTERRUPTION OF SERVICES

33.   When TS&S began working on the matters assigned to it, there was no way for it to know that the chapter 11 cases would be transferred to a different venue.  After the motion requesting a change in venue was filed, the Debtors and Skadden determined that TS&S should suspend its activities until the venue dispute regarding was resolved.  Once the New York Bankruptcy Court entered the Order on the Venue Transfer Date, TS&S ceased all work on the Debtors' behalf.

## VI.   THE COMPENSATION REQUESTED

34.   There are numerous factors to be considered by the Court in determining allowances of compensation.  *See, e.g.*, *In re Red Carpet Corp. of Panama City Beach*, 902 F.2d 883 (11th Cir. 1990);  *In re Beverly Mfg. Corp.*, 841 F.2d 365 (11th Cir. 1988);  *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.), *cert. denied*, 431 U.S. 904 (1977);  *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991).

35.   The perspective from which an application for an allowance of compensation should be viewed in a reorganization case was aptly stated by Congressman Edwards on the floor of the House of Representatives on September 28, 1978, when he made the following statement in relation to section 330 of the Bankruptcy Code:

> [B]ankruptcy legal services are entitled to command the same competency of counsel as other cases.  In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11.  Contrary language in the Senate report accompanying S.2266 is rejected, and *Massachusetts Mutual Life Insurance Company v. Brock*, 405 F.2d 429, 432 (5th Cir. 1968) is

> overruled.  Notions of economy of the estate in fixing fees
> are outdated and have no place in a bankruptcy code.

124 Cong. Rec. H11,092 (daily ed. Sept. 28, 1978) (emphasis added).  *See also In re*

*McCombs*, 751 F.2d 286 (8th Cir. 1984);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R.

13 (Bankr. S.D.N.Y. 1991);  *In re Carter*, 101 B.R. 170 (Bankr. D.S.D. 1989);  *In re Public*

*Service Co. of New Hampshire*, 93 B.R. 823, 830 (Bankr. D.N.H. 1988);  *In re White Motor*

*Credit Corp.*, 50 B.R. 885 (Bankr. N.D. Ohio 1985).

     36.    In awarding compensation pursuant to section 330 of the Bank-

ruptcy Code to professional persons employed under section 327, the Court must take

into account, among other factors, the cost of comparable non-bankruptcy services.  Sec-

tion 330 of the Bankruptcy Code provides, in pertinent part, for payment of:

> •   reasonable compensation for actual, necessary services
> rendered by the trustee, examiner, professional person,
> or attorney and by any paraprofessional persons em-
> ployed by such person;  and
>
> •   reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

     37.    As the court in *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13

(Bankr. S.D.N.Y. 1991), stated:

> With due recognition of the historical position of Bankruptcy
> Courts in compensation matters, we recognize that creditors
> have agreed to pay rates for retained counsel of their choice
> because of the needs of the particular case.  One could posit
> other situations or cases where a presumption of prior in-
> formed judgment might not be as strong.  Here, however,
> we have a multi-debtor, multi-committee case involving so-
> phisticated creditors who have determined that the rates
> charged and tasks undertaken by attorneys are appropriate.
> We should not, and will not, second guess the determination
> of those parties, who are directed by Congress, under the
> Bankruptcy Code, to shape and resolve the case, and who
> are in fact bearing the cost.  To do so, of course, would be to
> continue what Congress specifically intended to stop in
> 1978: Courts, instead of markets, setting rates, with the inevi-

> table consequence that all the legal specialists required by
> the debtor or official committees would demur to partici-
> pate.

*Drexel*, 133 B.R. at 20-21.

38.     The professional services rendered by TS&S have required expendi-
ture of substantial time and effort, at many times to the exclusion of other matters.
During the case, TS&S' professionals and paraprofessionals recorded 241.8 hours in
providing the required professional services for which TS&S seeks compensation.

39.     Time and labor devoted, however, is only one of the many factors
to be considered in awarding attorney compensation.  The number of hours expended
must be considered in light of:  (i) the amount involved and the results achieved to date;
(ii) the novelty and difficulty of the questions presented;  (iii) the skill requisite to per-
form properly the legal services;  (iv) the preclusion of other employment on behalf of
other clients;  (v) the customary fee charged to a private client for the services rendered;
(vi) awards in similar cases;  (vii) time constraints required by the exigencies of the case,
including the frequency and amount of time required to be devoted other than during
regular business hours;  (viii) the experience, reputation and ability of the attorneys
rendering services;  and (ix) the nature and length of the professional relationship with
the client (the "Johnson Factors").  *See Johnson v. Georgia Highway Express*, 488 F.2d at
717-19 (enumerating factors to be considered in awarding attorneys' fees in equal em-
ployment opportunities cases under Title VII);  *In re First Colonial Corp. of America*, 544
F.2d 1294 (applying the Johnson Factors in bankruptcy cases).

40.     The majority of the Johnson Factors are codified in section 330(a) of
the Bankruptcy Code, and have been applied by various courts in making determina-
tions that requested attorneys' fees constitute reasonable compensation.  It is well set-

tled that the "lodestar method,"[1] as opposed to an application solely of the Johnson Factors, is the best means of determining attorney fees in bankruptcy cases.[2]  The Supreme Court, however, has clearly articulated that the "lodestar method" is presumed to subsume the Johnson Factors, as does § 330(a) of the Bankruptcy Code. *See Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 546, 563 (1986).

41.    Additionally, the Application requests that TS&S be paid according to the prevailing market rates in New York, New York for services that were provided to the Debtors prior to the Venue Transfer Date.  Bankruptcy Code section 330 dictates whether professional fees are unreasonable, and requires a market analysis of those fees in determining their reasonableness.  Such a market analysis and an analysis confirms that the rates charged by TS&S are neither excessive nor unreasonable.

42.    *In re Farley*, 156 B.R. 203, 204 (Bankr. N.D.Ill. 1993), is instructive: there the Pension Benefit Guaranty Corporation ("PBGC") objected to the hourly rates charged by the Debtor's attorneys, Kaye, Scholer, Fierman, Hays & Handler ("Kaye Scholer"), a New York law firm, because the bankruptcy case was not filed in New York. *Id.* at 209.  PBGC objected because Kaye Scholer's rates were higher than the average hourly rates charged by non-New York firms involved in the case. *Id.* at 206.  Re-

---

[1]    Application of the "lodestar method" involves multiplying the number of hours reasonably expended on the case by the reasonable hourly rate of compensation for each attorney. *Norman v. Hous. Auth. of the City of Montgomery*, 836 F.2d 1292 (11th Cir. 1988).  This method of calculating attorney fees is appropriate in light of section 330(a) of the Bankruptcy Code, which serves as a starting point, permitting bankruptcy courts, in their own discretion, to consider other factors, such as the novelty and difficulty of the issues, the special skills of counsel, and their results obtained. *In re Copeland*, 154 B.R. 693, 698 (Bankr. W.D. Mich. 1993).

[2]    *See e.g., Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 546 (1986); *Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 483 U.S. 711, on remand, 826 F.2d 238 (3rd Cir. 1987); *Lindy Bros. Builders Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973), *vacated on other grounds*, 540 F.2d 102 (3rd Cir. 1976); *In re U-Can-Rent, Inc.*, 262 B.R. 147 (Bankr. M.D. Ga. 2001); *In re Howell*, 226 B.R. 279 (Bankr. M.D. Fla. 1998);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13, 21 (Bankr. S.D.N.Y. 1991).

jecting that objection, Judge Schmetterer held that attorneys could charge the rates pre-

vailing in the areas where their offices were located, and that those rates would not be

dictated by the venue.  *Id.* at 213.  TS&S's office is located in Manhattan.  As a result, it is

appropriate for TS&S to charge prevailing New York City rates.

43.    In addition, the *Farley* Court utilized a market analysis in evaluat-

ing Kaye Scholer's fees.  The Court held that a "reasonable rate" in the market was one

that an attorney "could have been collecting directly from paying clients for comparable

work."  *Id.* at 211.  The Court determined that Kaye Scholer charged, and collected, its

fees from paying clients on similar engagements, therefore rendering the fees reason-

able.  *Id.* at 212.  Additionally, the Court determined that the debtors had their choice of

attorneys and bargained at arms length with Kaye Scholer for its services, once again

indicating that a market existed for services at Kaye Scholer's prevailing rates.  *Id.*  The

compensation that TS&S seeks herein is measured upon the rates that it changes all of

its other clients.  See Neil Berger Certification attached as Exhibit "4,".  After careful

consideration, TS&S was chosen as conflicts counsel by the Debtors.

44.    TS&S respectfully submits that application of the foregoing criteria

more than justifies the compensation requested in this Application.  The professional

services rendered in these chapter 11 cases have been performed by attorneys with

broad expertise and high levels of skill in their practice areas or specialty.  All of the

work performed by TS&S occurred while these cases were in the New York Bankruptcy

Court—at TS&S' customary rate (which is routinely allowed).

45.    TS&S has not sought to burden this Court by setting forth all of the

services rendered to the Debtors and for the benefit of creditors.  TS&S has reviewed all

of its office files which indicate numerous legal situations and problems resolved over

and above those detailed in this Application, and which are more fully summarized in

the time sheet entries annexed hereto and made a part hereof which were contemporaneously prepared when the services were rendered.

46.     TS&S has devoted 241.8 hours of actual recorded time during the Fee Period resulting in time charges of $105,606.50.  Throughout the Fee Period, TS&S sought to assign projects in this case to associates, law clerks, and paraprofessionals who could most efficiently and expeditiously handle them.  TS&S respectfully submits that the legal services reflected in the annexed time slip entries are fair and reasonable and are commensurate with the quality of services provided herein.

47.     In addition to the fees sought for legal services, TS&S has incurred $756.84 in out-of-pocket expenses during the Fee Period directly attributable to the representation of the Debtors.

48.     No part of the compensation to be received pursuant to this Application will be shared with any other person or firm, and no other agreements, either express or implied, to share any compensation received as attorneys for the Debtors has been, or will be, made by TS&S.

49.     Copies of this Application have been given to:  (i) the Debtors; (ii) co-counsel for the Debtors;  (iii) counsel for the Committee;  (iv) the United States Trustee;  and (v) counsel for the Debtors' secured lenders.

[continued on following page]

**WHEREFORE**, TS&S respectfully requests that this Application be granted and that it be awarded an allowance of $105,606.50 for legal services rendered to the Debtors during the Fee Period, and $756.84 for reimbursement of expenses, and that the Debtors be directed to pay such amounts to the extent not previously paid, together with such other and further relief be granted as may be just and proper.

Dated:     New York, New York
           July 12, 2005

                                     WINN-DIXIE, *et al.*
                                     Debtors and Debtors in Possession,
                                     By their Conflicts Counsel,
                                     TOGUT, SEGAL & SEGAL LLP
                                     By:


                                     /s/ Neil Berger
                                     ALBERT TOGUT (AT-9759)
                                     NEIL BERGER (NB-3599)
                                     Members of the Firm
                                     One Penn Plaza, Suite 3335
                                     New York, New York  10119
                                     (212) 594-5000

17