### UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | CASE NO.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et. al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

### SUMMARY OF FIRST INTERIM FEE APPLICATION FOR ALLOWANCE AND PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES OF XROADS SOLUTIONS GROUP, LLC, AS FINANCIAL AND OPERATIONS RESTRUCTURING CONSULTANTS FOR THE PERIOD FEBRUARY 21, 2005 TO MAY 28, 2005

1.  Name of Applicant:  XRoads Solutions Group, LLC

2.  Role of Applicant:   Financial Advisors and Operations Restructuring Consultants for the Debtors

3.  Name of Certifying Professional:   Holly Felder Etlin

4.  Date Case Filed:   February 21, 2005

5.  Date of Application for Employment:   February 21, 2005

6.  Date of Order Approving Employment:   June 2, 2005 (final Order)

7.  If Debtor's counsel, date of disclosure of Compensation form:  N/A

8.  Date of this Application:   July 15, 2005

9.  Dates of Services Covered:  February 21, 2005 through May 28, 2005[1]


**FEES:**

10.  Amount of 100% compensation sought
     as actual, reasonable and necessary:                           $ 4,534,122.50

**EXPENSES:**

11.  Amount of 100% expense reimbursement sought
     as actual, reasonable and necessary:                           $    326,995.50

**TOTALS:**

12.  Total Amount Requested for 1st Interim:                        **$ 4,861,118.00**

13.  Total of Fees and Expenses paid to date:                       ($3,954,293.50)

14.  **Total Balance Due for 1st Interim Period:**                  **$   906,824.50**

---

[1] Time and Expenses covered in the monthly fee application of May, 2005 is for the dates of  May 1, 2005 through May 28, 2005, due to XRoads' month end reporting cycle.  XRoads reserves the right to request compensation for the dates of  May 29 – 31, 2005 in a future fee application.

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **CASE NO.  05-03817-3F1** |
| | ) | |
| **WINN-DIXIE STORES, INC., et. al.,** | ) | **Chapter 11** |
| | ) | |
| **Debtors.** | ) | **Jointly Administered** |

**FIRST INTERIM FEE APPLICATION FOR ALLOWANCE AND PAYMENT OF
COMPENSATION AND REIMBURSEMENT OF EXPENSES OF XROADS SOLUTIONS GROUP,
LLC, AS FINANCIAL AND OPERATIONS RESTRUCTURING CONSULTANTS
<u>FOR THE PERIOD FEBRUARY 21, 2005 TO MAY 28, 2005</u>**

XRoads Solutions Group, LLC ("XRoads" or "Applicant") financial advisors and operations
restructuring consultants to the debtors and debtors-in-possession in the above-captioned cases (Winn-Dixie
Stores, Inc. is hereinafter sometimes referred to as the "Company", and the debtors-in-possession are
collectively referred to as the "Debtors"), hereby makes its First Interim Application for Allowance of
Compensation and Reimbursement of Expenses for services rendered and costs incurred in this Chapter 11
proceeding from February 21, 2005 through May 28, 2005 (the "Application") [2].  This Application is filed
pursuant to 11 U.S.C § 330 and Federal rule of Bankruptcy Procedure 2016, as well as the Court's Order
Establishing Procedures to Permit Monthly Payment of Interim Fee Applications of Chapter 11 professionals
entered on March 15, 2005.  This is the first Interim Application filed by the XRoads, financial and operations
restructuring consultants for the Debtors and is not an amendment or supplement to a previous Fee Application.

The Exhibits attached to this Application, pursuant to the Guidelines are:

> **Exhibit "1"** – Retention Order
>
> **Exhibit "2"** – Application to Employ XRoads
>
> **Exhibit "3"** – Summary of Professionals' Time
>
> **Exhibit "4"** – Summary of Requested Reimbursement of Expenses
>
> **Exhibit "5"** – XRoads' complete time records, in chronological order, by activity code for the time
> period covered in this Application.  The requested fees are itemized to the tenth of an
> hour.
>
> **Exhibit "6"** – XRoads' complete expense records, in chronological order, by activity code for the
> time period covered in this Application.

---

[2] Time and Expenses covered in the monthly fee application of May, 2005 is for the dates of  May 1, 2005 through May 28, 2005, due
to XRoads' month end reporting cycle.  XRoads reserves the right to request compensation for the dates of May 29 – 31, 2005 in a
future fee application.

In support of this Application, XRoads respectfully represents as follows:

## GENERAL BACKROUND

1.      The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on February 21, 2005 (the "Petition Date").

2.      The Debtors will continue in possession of their property and will operate and manage their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors are grocery and drug retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  The Debtor's business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion.  The Debtors currently operate more than 900 stores in the United States.  Substantially all of the Debtors' store locations are leased rather than owned.

4.      The Debtors operate in a highly competitive supermarket industry that is generally characterized by intense competition and narrow profit margins.  The Debtors compete directly with national, regional, and local supermarket chains and independent supermarkets, as well as with Wal-Mart, similar super centers, and other non-traditional grocery retailers such as dollar discount stores, drug stores, convenience stores, warehouse club stores, and conventional department stores.

## RETENTION OF XROADS

5.      By Final Order dated June 6, 2005 under section 327(a) of the Bankruptcy Code (the "Retention Order"), XRoads was authorized to be employed by the Debtors as Financial and Operations Restructuring Consultant in connection with the Chapter 11 cases.  A true and correct copy of the Retention Order is attached hereto as Exhibit "1." and true and correct copy of the Application by Debtors to Employ XRoads Solutions Group, LLC as Financial and Operations Restructuring Consultants is attached hereto as Exhibit "2." Pursuant to the Engagement Letter dated March 4, 2004, which was attached to the Application by Debtors to Employ XRoads Solutions Group, LLC as Financial and Operations Restructuring Consultants, the computation for XRoads' fees earned during this Application Period includes a base monthly rate of $200,000 for the first 400 hours plus $400 per hour for all hours over the 400 hour threshold.

6.       XRoads incurred a gross amount of 12,857.40 hours of professional services during this Application Period.  XRoads charged the Debtors a net amount of 10,446.40 hours.  The first 1,298 hours

(400 x 3 months, one week) is capped at $650,000.  The remaining 9,148.40 hours were billed at $400 per hour (or $3,659,360.00).

7.      In addition, non-professional services have been charged at rates of $85 to $160 per hour in accordance with our engagement agreement, and clerical and secretarial services have been provided free of charge.  Costs incurred by the "on-client site" clerical and secretarial support while at the Debtors' location have not been charged to the Estate.  XRoads incurred a gross amount of 2,740.50 hours for non-professional services of which 1,951.30 were billed (or $224,762.50).

8.      Combined, fees for professional and non-professional services for this Application Period total $4,534,122.50.  The overall hourly rate charged to the Debtors for this Application Period averages $365.72 based on net billable hours (or an average hourly rate of $290.69 based on total gross hours incurred).

## OVERVIEW OF XROADS' KEY ACCOMPLISHMENTS

9.      XRoads has been engaged by Winn-Dixie Stores, Inc. to provide it and its affiliates and subsidiaries with financial and operations restructuring advice.  XRoads' goal is to help the Debtors maximize its enterprise value for the benefit of all of its constituents: creditors, employees and shareholders.  There are five major initiatives in which XRoads has been heavily involved which will have a significant impact on the efficiency, asset utilization and profitability of the business.  These initiatives include:  (1) footprint downsizing, (2) headquarters and divisional realignment, (3) non-merchandise cost reductions and outsourcing, (4) real estate and occupancy cost reductions, and (5) PACA and reclamation claims settlement negotiations.  In addition to these five on-going initiatives, during the initial phase of the case, XRoads was instrumental in streamlining the process and flow of information and eliminating duplicative efforts to produce the information required for the petitions, first day motions and completion of the Statement of Financial Affairs and Schedules for the 24 individual Debtors.

10.     XRoads has established cross-functional teams to oversee and manage the initiatives outlined above.  XRoads' teams include: (1) real estate planning and management, (2) treasury and finance, which covers vendor management, cash management and financial reporting and lender communications, (3) strategic advisory, (4) procurement/strategic sourcing and (5) case management services.  In working with the Debtors to bring both sustainability and self sufficiency to the restructuring process, XRoads has undertaken two significant projects that cut across functional areas defined above: contract management and information technology.  These cross-functional teams and initiatives are discussed in more detail below.

11.    **Real Estate Management:**  XRoads is tasked with reducing occupancy costs and cash outflows and maximizing asset recoveries from stores, warehouses, distribution centers, aircraft and manufacturing facilities throughout the organization.  By resolving issues preventing rejection of multiple closed stores, XRoads has executed the rejection of 181 leases (with creditor committee and court approval).  This has resulted in the reduction of the Debtors' burn rate by approximately $5 million per month and reduction of total lease liabilities by $451.6 million.  In addition, XRoads is managing the lease disposition process, including negotiations by real estate firms and Blackstone with landlords, equipment sales, the orderly closure of stores and the GOB process.  To date this has resulted in stalking horse bids totaling $38.7 million for leasehold interests and approximately $40 million for related inventories. In this connection, XRoads has:

    a.    Managed the negotiations by real estate firms and Blackstone.

    b.    Developed and implemented a work-plan and timeline for store dispositions including coordination between functional areas of Debtors to ensure that disposition proceeds are maximized and that other goals of the Debtors are met.

    c.    Developed and delivered over 900 "tear sheets" containing key financial and lease information related to operating stores and to be used by potential purchasers.

    d.    Established due diligence data site containing 30,000 documents to be used by potential purchasers of leases.

    e.    Improved quality and accuracy of the real property database in order to produce a comprehensive and timely reporting tool for internal and external constituencies.

    f.    Refined reporting system to enable senior management to make more informed decisions on issues such as lease renewal, rejection and renegotiation.

Additionally, XRoads initiated and is managing lease re-negotiations that to date have resulted in savings over the life of the leases totaling $11.3 million ($1.8 million on an annualized basis).  XRoads also managed the sale and disposition of two aircraft for combined proceeds of approximately $33 million.  XRoads' real estate group has also provided analysis in support of the Debtors' decisions to assume or reject selected contracts, analysis in support of the correct downsized footprint development and providing data for the development of 12-week cash flow projections, integrated financial model and business plan.  In addition XRoads has developed better data and reporting systems for the operation of the Debtors' Real Estate Department and for the benefit of Debtors' senior management.

12.    **Treasury and Finance:**  This XRoads team is responsible for cash management, borrowing base computations, covenant reporting and forecasting.  In addition to the credit facility reporting

requirements, the financial reporting is a key piece of the Debtors' external communications to creditors and lenders.  Working with Winn-Dixie, XRoads developed the 12-week rolling cash flow model which allows the Debtors to forecast and monitor weekly revenue and disbursements by category and track overall cash burn rate.  The model also allows XRoads to have a base line experience on operating performance in order to eventually analyze the impact of alternative strategies and make recommendations to executive management and the Board of Directors to improve the Debtors' cash position.  This group has also been instrumental in analyzing issues that impact future liquidity (e.g. store level inventory in support of negotiations with potential liquidators), analyzing the impact of the keep/close decisions on manufacturing facilities and related strategic options relating to manufacturing operations.  XRoads is in the process of turning over the going forward maintenance and updating of the cash flow forecast to the Company's finance department, however, it is anticipated that XRoads will continue to review the forecasts to identify potential controversial topics, bankruptcy related matters and issues affecting various constituencies.  In addition to the work outlined above, during this reporting period, XRoads:

     a.    Prepared and updated the 4-week variance reports for the banks, required by Wachovia/Congress.

     b.    Refined the 12-week cash flow forecast.

     c.    Provided an analysis of the Company's accounts payable float.

     d.    Prepared several presentations for the Unsecured Creditors' Committee and other constituents.

     e.    Developed a "dash board" performance report to monitor liquidity.

     f.    Finalized the analysis and development of a liquidation forecast and impact on borrowing base for the closing of additional stores and warehouses.

     g.    Prepared for and met with the Bank Group regarding the initial cash forecast and liquidation analysis.

     h.    Assisted in the G&A budget process and restructuring efforts.

     i.    Prepared balance sheet asset recovery analysis for new Footprint.

     j.    Analyzed and developed plan to resolve post-petition vendor Accounts Receivable build up.

     13.    **Strategy and Advisory:**  This XRoads team pulls together the information provided by other XRoads groups and the Company to develop strategic alternatives and recommendations.  Specifically,  this team manages the coordination, communication and analysis in support of the strategic and tactical advice

given to the Company as it relates to store closing decisions, development of financial projections,

management of the interface between the Unsecured Creditors' Committee and the Debtors as well as various

other bankruptcy and restructuring related matters as more fully described below.

      a.     Advising the Company and assisting in the preparation of financial projections/business plan for the year ended June 2006 which was required to be delivered to the DIP Lender on May 31, 2005 under the terms of the DIP agreement.

      b.     Advising the Company, along with the real estate team, with respect to its recommended store closing program that was announced in June 2005. The program was designed to focus the Debtors' resources in better performing stores and significantly improve cash flow from operations. XRoads work in this area primary related to the overall store closing strategy as well as communication with the Unsecured Creditors Committee and the DIP Lenders as to the Company's decisions and implementation thereof. The execution of that program is anticipated to be completed and benefits realized in September 2005.

      c.     Managing the interface between the Debtor and the Unsecured Creditors Committee's dual financial advisors who submitted multiple and voluminous information and due diligence requests throughout the period covered by this Application. In order to ensure effective communication, XRoads developed a weekly and monthly standard reporting package to provide the Committee with critical monitoring information. In doing so, XRoads was able to incorporate reports already prepared by the Debtors' finance department thereby minimizing costs to the estate. XRoads involvement in this process allowed Company personnel to focus on running the business and execution of approved initiatives. Additionally, the Committee has been kept fully informed of all major decisions and timelines, resulting in a more efficient and less costly process.

      d.     Advised the Company with respect to other issues including, but not limited to the negotiation of the cash management order, supporting analysis related to financial projection/business plan development including analysis of sensitivities and alternatives, analysis of various insurance issues and coordination and development of detailed workplans and case execution timelines.

      14.   **Procurement/Strategic Sourcing:**  At the request of the Debtor, XRoads has assumed the role

as Interim Director of Winn-Dixie's Corporate Sourcing and Procurement department. XRoads is guiding

and managing the company's efforts to reduce G&A and overall corporate spending and allocate internal

resources more effectively. XRoads developed a strategy to centralize corporate sourcing and procurement

from nine separate departments into one within the Company, and upgrade purchasing software. XRoads'

strategy also includes benchmarking non-merchandise procurement against best practices and best in class

data and developing work plans to implement such best in class methodologies and processes. During this

reporting period, XRoads:

a.  Performed an analysis of the Company's G&A organizational structure and annual spending to determine the best opportunities for cost reductions, researched the market and best practices, consolidated the vendor base to reduce redundancy and standardize purchase specifications.

b.  Began analysis of "ground up" needs of the new company after the implementation of the Footprint Plan.

c.  Identified non-recurring transactions to determine "normalizing adjustments."

XRoads' work in this area includes procurement analysis of the Company's cost structures for supplies, services, equipment, fixtures and technology.  XRoads is assisting the Debtors in identifying and prioritizing areas of cost reduction, to take advantage of buying power and focus on competitive bids and explore alternative sources.  XRoads also lead and assisted the Company in its review of executory contracts, created the strategy for analyzing the effects of the footprint reduction on information technology contracts, and advised the Company's Information Technology department with their equipment budget.

15.  **Case Management:**  During this initial reporting period, XRoads' case management team was instrumental in coordinating information flow throughout the organization in order to obtain the data necessary to produce:  the first day motions, the initial reporting package for the Office of the US Trustee, the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs.  XRoads managed the flow of information from the Debtors' accounting and finance departments to the various constituencies including counsel, the claims and noticing agent, the Office of the United States Trustee and others thereby eliminating duplicative efforts and multiple information requests for the same information.  The case management team has also taken the lead on the contract management database described below and continues to gather information to build out the database to create a useful tool for Winn-Dixie long after the restructuring process is completed.  This team has also been responsible for managing the analysis, reconciliation and negotiation of all PACA Claims and Reclamation Claims.  During this initial reporting period, XRoads:

a.  Completed the PACA report, which was filed with the Court on May 6, 2005.  This involved the analysis, reconciliation and negotiation of 127 claims totaling approximately $34 million.  Through analysis and negotiation with vendors and vendors' counsel, XRoads, with the assistance of the Company's accounting personnel and Debtors' counsel, Skadden Arps, eventually settled the disputed claims saving the estate roughly $4.0 million (or 18%).

b.  Reconciled over 480 Reclamation Claims totaling more than $129 million to the Debtors' books and records enabling the Debtors and Debtors' counsel to file the Reclamation Report with the Court on June 30, 2005.  Through this process, XRoads was able to identify merchandise delivered outside of the reclamation window which has produced a

reduction of approximately 21% (or $27 million). This process also included researching inventory turn rates to develop a strategy for negotiating the consumption offset, analyzing payments made to the reclamation creditors as well as accounts receivable due from the reclamation creditors to the Company producing additional offsets to the Reclamation Claims.

c.    Meetings with the sub-committee for the reclamation claimants to negotiate the computation and treatment of reclamation claims.

16.    **Contract Management:**  The case management team has also been involved in the analysis of contracts and lease agreements as part of the database management project described above.  This process started with work related to Schedule G.  It quickly became clear that the Debtors had no centralized location and or tracking methods for its contracts.  The few contracts databases that existed in some departments were not complete and had not been maintained or updated regularly.  The Company had no central repository for contracts.  This is not an uncommon practice, especially for a company that has been doing business for over 75 years and has expanded its business in more than 20 states. By working with the Debtors and the XRoads real estate team, we are working to deliver the Company with a useful, complete and comprehensive contract database which will be instrumental throughout the implementation of the Footprint Plan and after.

a.    XRoads began by contacting all directors, department heads and regional managers to obtain copies of all equipment leases, service agreements, real estate leases, employment agreements, etc.  XRoads eventually identified over 2,900 contracts which XRoads has abstracted and entered into a database.

b.    The second phase of this project was to tie all of the contracts to a store or warehouse location, so that all contracts associated with stores that have been closed or sold can be rejected, or otherwise managed to maximize the results related thereto.  The database is set up to track each contract by:  the contracting parties' contact information; a description of the services covered; the debtor entity and stores to which the contract pertains; the effective and expiration dates; renewal terms; payment terms and amounts; the Company contact person; default provisions and ramifications; assumption or rejection plans; and potential cure amounts.

c.    XRoads is also in the process of formulating the database to cross reference any pre-petition claims that may affect cure or rejection amounts.

d.    XRoads' database will be vital during the claims reconciliation process in that cure payment arrangements can be cross-referenced to ensure that creditors are not inadvertently double-paid (through cure and Proof of Claim distribution).

XRoads has gathered and analyzed essential contract-related information required for the life of the bankruptcy case in a single review, rather than an expensive, piecemeal approach.  XRoads created (through imaging and tracking numbers) a permanent repository of contracts that can be immediately accessed,

reducing unnecessary time spent looking for documents, as well as administrative costs of assembling files and documents. The database is designed to assist and support the contract rejection/assumption process as well as provide additional information to the Company's real estate group with respect to the impact of store closings/sales.

17.     **Information Technology:**  The Company's IT systems have not kept pace with its growth or needs. This impacts all areas of the organization including merchandising, procurement, accounting and finance and information flow. XRoads has been developing a holistic approach to cost reductions within the Information Technology area. The reductions must be made in the context of the complexity of existing systems, and the desired technology enhancements to support the Company's sales and margin growth plans. In addition XRoads is working within the IT organization to analyze technology system related contract obligations. The analysis seeks to identify opportunities to reduce short and long term fixed costs while mitigating system and business disruption risks. A comprehensive document detailing a thoughtful and organized cost reduction plan is being prepared and will be presented to the Company's management during the week of June 13. The plan includes organizational span of control and headcount reductions, non-headcount related expense reductions, and a plan to reduce system complexity while delivering mission critical system improvements and other legislatively mandated improvements.

## THE INTERIM APPLICATION

18.     For the first interim fee application period beginning February 21, 2005 and ending May 28, 2005, XRoads incurred professional and non-professional fees of $4,534,122.50 and expenses of $326,995.50 for a total of $4,861,118.00. XRoads has received payment in the amount of $3,627,298.00 (approximately 80% fees) for professional fees and $326,995.50 (100% expenses) in expenses for a total of $3,954,293.50 for the period of February 21, 2005 through May 28, 2005. Accordingly, XRoads requests an interim allowance of compensation for professional services XRoads rendered from the period February 21, 2005 to May 28, 2005 for the Debtors in the amount of $4,861,118.00 and payment for the balance of the 20% holdback for February 21, 2005 through May 28, 2005 totaling $906,824.50.

19.     XRoads seeks approval of the fees and expenses incurred during the Application Period in the amounts as summarized in the following table:

| Monthly Statements | Capped Fees to 400 hours | Fees over 400 Hours @ $400 per hr | Admin Fees | Total Fees | Expenses | Total Fees & Expenses | Payments 80% Fees – 100% Exp |
|---|---|---|---|---|---|---|---|
| February 21-28, 2005 (prorated) | $50,000.00 | $ 163,600.00 | $ 0.00 | $213,600.00 | $ 0.00 | $213,600.00 | $ 170,880.00 |
| March, 2005 | $200,000.00 | $1,125,120.00 | $80,800.00 | $1,405,920.00 | $122,229.46 | $1,528,149.46 | $ 1,246,965.46 |
| April, 2005 | $200,000.00 | $1,138,360.00 | $63,404.00 | $1,401,764.00 | $108,764.37 | $1,510,528.37 | $ 1,230,175.57 |
| May, 2005 | $200,000.00 | $1,232,280.00 | $80,558.50 | $1,512,838.50 | $ 96,001.67 | $1,608,840.17 | $1,306,272.47 |
| Totals | $650,000.00 | $3,659,360.00 | $224,762.50 | $4,534,122.50 | $326,995.50 | $4,861,118.00 | $3,954,293.50 |
| Amount Due for 1st Interim Period | | | | | | | **$906,824.50** |

20.     The professional services and related expenses for which XRoads requests an interim allowance of compensation and reimbursement of expenses were rendered and incurred in connection with this case in the discharge of XRoads' professional responsibilities as financial and operations restructuring consultants for the Debtors in these Chapter 11 cases.  XRoads' services have been substantial, necessary and beneficial to the Debtors and their estates, creditors and other parties-in-interest.  The variety and complexity of issues involved in this case and the need to act or respond on an expedited basis to those issues have required substantial time on a daily basis.

21.     XRoads has maintained written records of the time expended by its professionals and staff in this case as required in the Middle District of Florida.  Time records are maintained contemporaneously with the rendering of services by each of XRoads' professionals and staff in the ordinary course of business.  Such records set forth in detail the services rendered on behalf of the Debtors, the dates upon which services were rendered, the nature of the services, the time spent and the identity of the professional or staff who performed such services during the First Interim Application Period, and are annexed hereto as Exhibits 3 to 5.  A schedule setting forth the number of hours expended by the individual professional and staff personnel during the First Interim Application Period are annexed hereto as Exhibit 3.

### SUMMARY OF SERVICES RENDERED

22.     During the First Interim Application Period, XRoads provided extensive services to the Debtors in furtherance of XRoads' professional responsibilities as financial and operations restructuring consultants.  Moreover, the number of hours expended by XRoads' professionals and staff were actual,

necessary and beneficial to the Debtors. XRoads encountered numerous complex financial advisory, restructuring and case management issues during the First Interim Application Period. XRoads was called upon to respond, often upon very short notice, to a host of issues and demands. XRoads professionals have rendered advice in all of these areas with skill and great dispatch. The single most important factor this Court should consider when determining Applicant's allowance in these proceedings is the value of XRoads' services as measured by the results obtained. Applicant would show that the work it is performing in these bankruptcy cases is beneficial to the Debtors. The full breadth of XRoads services are reflected in the attached XRoads time records, and annexed hereto as Exhibit "5".

23.    The following summary of services rendered during the Application Period is not intended to be a detailed description of the work performed, as those day-to-day services and the time expended in performing such services are more fully available by requesting Exhibit "5". Rather, it is merely an attempt to highlight certain of those areas in which services were rendered to the Debtors, as well as to identify some of the issues that XRoads was required to address.

     **A.**    <u>**ACCOUNTING  (37.20 hours)**</u>**:** This billing category includes accounting work done by the Xroads' treasury and finance team in their work on cash management, borrowing base computations, covenant reporting and forecasting.

     **B.**    <u>**APPLICATION TO EMPLOY (15.40 hours)**</u>**:** This billing category includes the work done by Xroads' principals and general counsel in connection with the initial application to employ and is limited to 15.4 hours.

     **D.**    <u>**ASSET ANALYSIS (62.20 hours)**</u>**:** This billing category includes analysis done by the Xroads real estate group to evaluate asset recoveries from stores, warehouses, distribution centers, aircraft and manufacturing facilities throughout the organization and make recommendations to our client and the Court in order to maximize value to the estate.

     **E.**    <u>**ASSET SALE (26.60 hours):**</u> This billing category includes a portion of the time spent on the GOB sale process and well as the sale of some on-going store operations.

     **F.**    <u>**BUSINESS ANALYSIS (6,163.20 hours):**</u> This is the largest billing category and includes work done by all of the cross-functional teams described above including: modeling and cash flow analyses done by the treasury and finance team, analysis of real property leases done by the real estate group, preparation of the business plan and

analysis of alternative scenarios done by the strategic planning team and analysis of other contracts and vendor agreements done by the procurement group.

G.    **BUSINESS OPERATIONS (2,586.90 hours):**  This billing category includes Xroads involvement in the management of on-going day-to-day operations of the business.  A large portion of the time in this category has been incurred by the real estate team, because they have essentially been running the Debtors' real estate department after the departure of several senior level real estate professionals.  This also includes work being done by the treasury group in the collection of accounts receivable and in the strategic planning group in areas such as merchandising, KERP negotiations and vendor communications.

H.    **CASE ADMINISTRATION (263.50 hours):**  This billing category includes time spent by our paralegals and other administrative personnel in connection with the coordination between the Debtors and the claims agent in the preparation of the SOFAs and Schedules. It also includes communications between the cross-functional teams to ensure that critical tasks are identified and coordinated as the reorganization initiatives are implemented.

I.    **CLAIMS (1,034.40 hours):**  This billing category includes all of the work described above on the PACA Claims reconciliation and preparation of the PACA report as well as the Reclamation Claims analysis, reconciliation and negotiation.  As outlined above, the work done by Xroads on the PACA claims saved the estate approximately $4 million, and the work done on the reclamation claims may produce a reclassification of close to $30 million from an administrative claim to a general unsecured claim, which will have a significant impact on the Debtors' cash flow and its ability to emerge from the chapter 11.

J.    **CORPORATE FINANCE (37.00 hours):**  This billing category includes executive level meetings to discuss the analysis of various restructuring options and their impact on the exit strategy.

K.    **CREDITOR MEETING (169.50 hours):**  This billing category not only includes the time spent at meetings with creditors, but the preparation for those meetings including the

presentations for the Unsecured Creditor's Committee and the Bank Group.  It also includes meetings with the ad hoc committee representing the Reclamation Claimants.

**L.**    **FEE APPLICATION (22.20 hours):**  This billing category includes the preparation of the narrative sections of the monthly fee statements as well as a portion of the accounting work done by the billing department to prepare and file the monthly fee statements.

**M.**    **REPORTING (28.30 hours):**  This billing category includes the work done by the treasury group in preparing the borrowing base report, the forecast to actual report and other ad hoc reports requested by various creditor constituencies.

## SUMMARY OF EXPENSES REQUESTED

24.    Applicant seeks reimbursement for actual, necessary expenses (the "Expenses") incurred in rendering services during the First Fee Application Period.  The total amount of the Expenses is $326,995.50.

25.    Section 330 of the Bankruptcy Code authorizes "reimbursement for actual, necessary expenses incurred by a professional person employed by the Debtors.  Attached hereto as Exhibit "6" is XRoads' complete expense records, in chronological order, by activity code for the time period covered in this Application.

26.    The following is a brief cost summary as to the different types of expenses the Applicant is seeking reimbursement for:

A.    Airfare:  All of XRoads professionals flew coach fare and booked flights in advance, whenever necessary and possible, to reduce costs for the Debtors. In this case, XRoads incurred airfare charges of $159,565.42 on behalf of the Debtors.

B.    Ground:  XRoads incurred the sum of $36,892.58 in ground transportation charges including car rentals, gas, taxi, mileage, parking and tolls.  XRoads' policy for car rentals is that whenever possible, XRoads' professionals share rental cars to lower the cost of car per person.  For the period February 21, 2005, through May 28, 2005, the total cost for rental cars was $26,249.52.  XRoads voluntarily discounted the cost for the rental car expense in the amount of $9,396.27 to lower the car usage per professional to a ratio of 1:3.  In addition, XRoads' voluntarily discounted transportation to/from residence to the airport (capped at $35.00) and

travel from the hotel to the Client location (capped at $40.00) in the amount of $6,263.90 for a total discount of $15,660.17 for ground transportation costs.

C.      Lodging:  In the months of April and May, XRoads entered into several short term apartment lease agreements to offset the cost of hotel charges to the Estate. XRoads conducted an analysis of the cost of hotel rates versus the cost of apartments.  The study indicated the estate would benefit if XRoads professionals reduced hotel stays and took apartments.  The actual effect is a savings realized in the months of April and May of $32,573.00 to the Estate. XRoads incurred total apartment costs in the amount of $41,355.00 for the months of April and May, 2005. This amount is for 530 night stays or a daily average lodging cost of $78.03.

Numerous XRoads professionals "doubled up" to reduce lodging costs to the Estate.  In the event that XRoads professionals are not assigned to an apartment or one was not available, whenever possible, XRoads negotiates corporate rates to reduce the cost of lodging, however, hotel rates do fluctuate based on availability at the time of reservation. XRoads incurred total hotel expenses in the amount of $70,523.55 for the period February 21, 2005 through May 28, 2005.  This amount is for 557 night stays or a daily average lodging cost of $126.61.  In addition,   XRoads discounted its lodging charges for "on-client site" clerical and secretarial  support for the time spent at the Debtors' location in the amount of $5,056.19.  The total amount of lodging expenses incurred for the period February 21, 2005 through May 28, 2005 is $111,878.55.

D.      Meals:  XRoads incurred the sum of $43,688.94 in meal charges while traveling to and from and working at company offices, however, these meal charges were not billed to the Debtors.  Pursuant to the Bankruptcy Guidelines, XRoads did not charge the Debtors for breakfast, lunch or dinner unless XRoads was participating, during the meal, in a necessary meeting respecting the case.  XRoads has only billed the sum of $446.71 in accordance with the Bankruptcy Guidelines.

E.      Telephone:  XRoads incurred the sum of $4,566.54 in telephone charges related to this case.

F.    <u>Federal Express</u>:  XRoads incurred the sum of $1,163.08 in Federal Express charges directly related to this case and required by the circumstances.

G.    <u>Facsimile Charges</u>:  XRoads incurred the sum of $31.69 in facsimile charges directly related to this case.

H.    <u>Research Charges</u>:  XRoads incurred the sum of $39.96 in research charges directly related to this case.

I.    <u>Supply Charges</u>:  XRoads incurred the sum of $114.28 in supply charges directly related to this case

27.    Applicant maintains the following policies with respect to Expenses:

a.    No amortization of the cost of any investment, equipment, or capital outlay is included in the Expenses.

b.    Applicant uses FedEx or similar express mail delivery only for emergency or exigent circumstances (<u>i.e.</u>, when next-day response from the recipient was necessary) and when less costly than other available alternatives in light of the time constraints involved.

c.    In-house photocopying by Applicant is charged at $.15 per page.  To the extent practicable, Applicant generally uses and will continue to use less expensive, outside copying services.

d.    All expenses for which Applicant seeks reimbursement are of the kind, and at the least expensive rate, Applicant customarily charges nonbankruptcy/insolvency clients.

e.    All amounts paid to third party providers of goods and services are billed by Applicant at actual cost, without enhancements for handling or other administrative charges.

f.    No portion of the expenses represent secretarial time, secretarial overtime, word processing time, charges for after-hour and/or weekend air conditioning and other utilities, cost of meals or transportation provided to professionals and staff who work late or on weekends or other office overhead.

g.    Any and all automotive travel expenses are billed in accordance with the amount allowed by the Internal Revenue Service pursuant to IRC §274(d) and the current applicable I.R.B. Announcement.

### **LEGAL ARGUMENT**

28.    XRoads believes that the requested fee amount of $4,534,122.50 for 10,446.40 hours worked, is reasonable considering the twelve factors enumerated in *Johnson v. Georgia Highway*

*Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), made applicable to bankruptcy proceedings by In re *First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), as follows:

## TIME AND LABOR REQUIRED

29.    Applicant's personnel rendered a total of 10,446.40 hours of services on behalf of the Debtors during the Applicable Period.  The time expended and expenses incurred were necessary, reasonable and appropriate under the circumstances of these cases based on the complex and time sensitive matters addressed.

## THE NOVELTY AND DIFFICULTY OF THE SERVICE

30.    Applicant represents and would demonstrate to this Court that its role as financial and operations restructuring consultants to the Debtor in these cases has involved significant sophistication and expertise.

## THE SKILL REQUISITE TO PERFORM THE SERVICES PROPERLY

31.    Due to the nature of the financial and operating issues presented in these cases, a relatively high degree of skill is required by Applicant in its representation of the Debtors.  Applicant's experience and expertise is facilitating and expediting the results being achieved in these cases, without incurring the extra time and expense had less experienced financial advisors handled these matters.

32.    Admittedly, the criterion of "the skill requisite to perform the services properly" is a subjective standard.  XRoads submits that the paramount factor that the Court should consider in applying this standard, however, is whether the results being achieved by Applicant are beneficial to the Estates.  Applicant believes that the answer to such a query justifies allowance of the fees and costs requested in this Application.

## THE PRECLUSION OF OTHER EMPLOYMENT BY THE PROFESSIONAL
## DUE TO THE ACCEPTANCE OF THE CASE

33.    Due to the expedited manner in which these cases are being handled, work on other clients and matters were often deferred or delayed as a result.

## THE CUSTOMARY FEE

34.    Applicant represents and would demonstrate that the rates charged by Applicant for the services performed herein are competitive and customary for the degree of skill and expertise required in the

performance of similar services rendered by other experienced financial advisors in bankruptcy matters and in the Middle District of Florida.

<b>WHETHER THE FEE IS FIXED OR CONTINGENT</b>

35.    Applicant's fee is neither fixed nor contingent (other than the contingency of court-allowance and available assets to pay professionals).  It is based primarily upon the actual total number of hours worked, plus the actual costs incurred.

<b>TIME LIMITATIONS IMPOSED BY THE CLIENT<br>OR OTHER CIRCUMSTANCES</b>

36.    Throughout these bankruptcy cases and XRoads' involvement herein, there were many expedited hearings.  Because of the size and complexity of this case, in many instances, XRoads has assisted the Debtors' and Debtors' counsel in preparing for multiple hearings covering a wide range of issues impacting many constituencies heard on the same day resulting in increased time constraints placed upon Applicant to effectively represent the Debtors' interests herein.

<b>EXPERIENCE, REPUTATION AND ABILITY OF APPLICANT</b>

37.    The professionals who provided services on behalf of Applicant in this case are thoroughly experienced in all matters of bankruptcy, insolvency, and reorganization.  The ability of XRoads' professionals who have assisted the Debtors should be considered by this Court in measuring the results obtained.

<b>THE UNDESIRABILITY OF THE CASE</b>

38.    The uncertainty of success or payment for services rendered, or for reimbursement of out-of-pocket expenses incurred in this case, could cause this case to be considered undesirable.  Notwithstanding the difficulties imposed by the uncertainty of payment, Applicant was nevertheless willing to undertake these risks.

<b>THE NATURE AND LENGTH OF THE PROFESSIONAL<br>RELATIONSHIP WITH THE CLIENT</b>

39.    Applicant has been employed by the Debtors since the Court's entry of its Employment Order, effective February 21, 2005.  None of the members of the Debtors are members of Applicant, and Applicant

has not agreed to share any fees received in the Bankruptcy Case with anyone other than members of Applicant.

## AWARDS IN SIMILAR CASES

40.    Applicant represents and would demonstrate that the compensation sought in connection with the services rendered and expenses incurred in these cases is not excessive and is commensurate with the compensation sought or awarded in similar cases under the Bankruptcy Code.  The amounts sought in this Fee Application are based in part on the usual and customary hourly rates which Applicant charges other clients in similar matters.  Applicant routinely scrutinizes its bills to ensure that its fees are in compliance with the customary rates in this District and voluntarily writes off certain fees and all overhead expenses, including its use of counsel, secretarial overtime, after-hour utilities, tabs and binders, etc.  Moreover, Applicant believes its billing rates are equivalent to or may even be less than those charged by other nationally recognized financial advisors in the bankruptcy community.  Therefore, taking into consideration the time and labor spent, the nature and extent of the representation and the nature of this proceeding, Applicant believes the allowance prayed for herein is reasonable and just.

## REASONABLENESS OF XROADS' FEES

41.    The general areas of focus in this stage of the case as described earlier in this Application are certainly not exhaustive of the variety or number of issues and problems encountered in connection with its role as financial and operations restructuring consultants herein.  XRoads has been asked to assist, and represent the Debtors throughout these cases on time-consuming and difficult tasks.  Many of the issues have arisen under exigent circumstances and have required XRoads to dedicate significant resources exclusively to these cases within a very compressed period of time.

42.    XRoads represents and would demonstrate that the fees and expenses requested herein are not excessive and are, in its opinion, fair and reasonable in connection with the services provided by XRoads on behalf of the Debtors.  The rates charged by XRoads are competitive and customary for the degree of skill and expertise necessary for cases of this type and are consistent with, or below, rates charged by other nationally recognized financial advisors with similar experience in the Middle District of Florida.

43.    XRoads would show that the work it has performed during the Applicable Period has been beneficial to the Debtors and its constituency as set forth above and in the Fee Statements attached hereto.

Taking into consideration the time and labor spent, the nature and extent of the representation and the nature of these proceedings, XRoads believes the allowance prayed for herein is reasonable and just.

## **<u>CONCLUSION</u>**

44.     For the foregoing reasons, XRoads requests approval and allowance of the interim compensation requested herein in connection with its representation of the Debtors during the Applicable Period, representing all fees in the amount of $4,534,122.50 (100%) and actual and necessary out-of-pocket expenses in the amount of $326,995.50 (100%), for a total of $4,861,118.00 incurred during the time period beginning February 21, 2005 through May 28, 2005.

WHEREFORE, PREMISES CONSIDERED, XRoads respectfully requests that, after appropriate notice and a hearing, this Court approve and allow the interim compensation and reimbursement of expenses incurred on behalf of the Debtors during the Applicable Period, as more particularly set forth above, authorize and direct the Debtors to remit payment of such allowed fees and reimbursement of costs to XRoads as approved by the Court, and grant such other and further relief to which it may show itself to be justly entitled.

Dated: July __, 2005                                 Respectfully submitted:

By:_____

Holly Felder Etlin
XRoads Solutions Group, LLC
9 Executive Circle, Suite 190
Irvine, CA   92614

FINANCIAL ADVISORS AND
OPERATIONS RESTRUCTURING
CONSULTANTS FOR THE DEBTORS

## CERTIFICATION

1.      I have been designated by Xroads Solutions Group, LLC (the "Applicant") as the professional with responsibility in this case for compliance with the "Guidelines for Fee Applications for Professionals in the Middle District of Florida in Bankruptcy Cases" (the Guidelines").

2.      I have read the Applicant's Application  for Compensation and Reimbursement of Expenses (the "Application").  The Application complies with the Guidelines, and the fees and expenses sought fall within the guidelines, except as specifically noted in this Certification and described in the Application.

3.      The fees and expenses sought are billed at rates and in accordance with practices customarily employed by the Applicant and generally accepted by the Applicant's clients.

4.      In seeking reimbursement for the expenditures described on Exhibit "2", the Applicant is seeking reimbursement only for the actual expenditure and has not marked-up the actual cost to provide a profit or to recover the amortized cost of invstment in staff time or equiptment or capital outlay (except to the extent that the Applicant has elected to charge for in-house photocopies and outgoing facsimily transmissions at the maximum rates permitted by the Guidelines).

5.      In seeking reimbursement for any service provided by a third party, the Applicant is seeking reimbursement only for the amount actually paid by the Application to third party.

6.      The following are the variances with the provisions of the Guidelines, the date of each Court Order approving the variance, and the justification for the variance: <u>NONE</u>

Xroads Solutions Group, LLC
9 Executive Circle, Suite 190
Irvine, California  92614

_____
Holly Felder Etlin
XRoads Solutions Group, LLC
9 Exuctive Circle, Suite 190
Irvine, CA   92614

FINANCIAL ADVISORS AND OPERATIONS
RESTRUCTURING CONSULTANTS FOR THE
DEBTORS