## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made effective as of July 18, 2005 (the "Effective Date"), by and between

**WINN-DIXIE RALEIGH, INC.,** a Florida corporation ("Seller"), and **ALEX LEE, INC.**, a North Carolina corporation, or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

### R E C I T A L S :

A.    Seller is the tenant of a supermarket store (the "Store"), listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under a lease, including amendments thereto (the "Lease") described on Exhibit A-2 to this Agreement. The Store occupies the leased premises as described in the Lease (the "Leased Premises"), within the parcel of real property described on Exhibit A-2 to this Agreement associated with the Lease.  Seller's leasehold interest in the Leased Premises pursuant to the Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "Assets."  The Store is part of a shopping center (the "Shopping Center") as described on Exhibit A-3 to this Agreement.

B.    Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.    Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date.  By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no.  05-03817-3F1 (the "Bankruptcy Case").

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0    **Defined Terms.**  Capitalized terms as used in this Agreement will have the following meanings when used herein.

    1.1    "Adequate Assurance Information" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that the Landlord and Subtenants are adequately assured of Buyer's future performance under the Lease, as required by

Section 365(f) of the Bankruptcy Code, including, if appropriate, a guaranty of Buyer's permitted assignee's obligations under the Lease and (where applicable) the Subleases by Buyer.

1.2    "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3    "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4    Intentionally omitted.

1.5    "Approval Hearing" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.6    "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.7    "Bankruptcy Code" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.8    "Bankruptcy Court" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.9    "Bankruptcy Court Approval" will mean the entry of one or more Sale Orders with respect to the Store by the Bankruptcy Court.

1.10   "Bankruptcy Case" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.11   "Base Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.12   "Base Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.13   "Bidding Procedures" will mean the procedures approved by the Bankruptcy Court that governed the selection by Seller of the Successful Bid relating to the Store.

1.14   "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at the Closing the Inventory, the Supplies, the Equipment and other tangible and intangible personal property constituting a the Assets.

1.15    "Buildings" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.16    "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.17    "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

1.18    "Buyer Inventory Representative" will mean such person or persons designated in writing by Buyer to act in such capacity.

1.19    "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policies (and the cost of any simultaneous issue mortgagee title insurance policies and any loan-related title insurance endorsements thereon); (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instruments; (e) recording fees payable in connection with recording the Conveyance Instruments in the appropriate public records; (f) cost of the Environmental Reports, including any supplements or updates, up to (but not exceeding) $3,000; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment, Supplies and Inventory; (i) the fees and costs of the Closing Escrow Agent; and (j) the fees and costs of the Inventory Service.

1.20    "Buyer's Escrowed Items" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.21    "Closing" with respect to the Store will mean the consummation of the assignment, assumption, sale and purchase of the Assets relating to the Store pursuant to this Agreement as indicated by delivery of the Conveyance Instrument and other documents contemplated by paragraph 14 of this Agreement and the Purchase Price as contemplated in this Agreement with respect to such Store, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.22    "Closing Date" will mean the date designated by Seller in writing, and reasonably acceptable to Buyer, that is between one day and 30 days following the satisfaction or waiver of all conditions to Closing with respect to the Store.

1.23    "<u>Closing Statement</u>" will mean a statement in the form of <u>Exhibit C-1</u> to this Agreement (or in such other form as is prepared by Seller and reasonable acceptable to Buyer) reflecting the net amount due Seller at each Closing (other than in respect of the Inventory Price), after making the adjustments described in <u>paragraph 3.3.3</u> of this Agreement and in other provisions of this Agreement.

1.24    "<u>Confidentiality Agreement</u>" will mean the existing letter agreement dated June 16, 2004 between Winn-Dixie and Buyer and that certain Addendum dated May 16, 2005 among Winn-Dixie, Buyer and Associated Wholesale Grocers, Inc. regarding, among other things, confidentiality relating to the subject matter of this Agreement.  Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.

1.25    "<u>Contract Warranties</u>" will have the meaning assigned in <u>paragraph 22.1</u> of this Agreement.

1.26    "<u>Conveyance Instrument</u>" will have the meaning assigned in <u>paragraph 14.2</u> of this Agreement.

1.27    "<u>Credit Agreement Liens</u>" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.28    "<u>Cure Costs</u>" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Lease and the Subleases.

1.29    "<u>Damages</u>" will have the meaning assigned in <u>paragraph 16.5</u> of this Agreement.

1.30    "<u>Deposit</u>" will have the meaning assigned in <u>paragraph 3.3.2</u> of this Agreement.

1.31    "<u>Due Diligence Materials</u>" will mean the items identified on <u>Schedule 1</u> to this Agreement.

1.32    "<u>Effective Date</u>" will have the meaning assigned in the initial paragraph of this Agreement.

1.33    "Environmental, Health and Safety Requirements" will mean all orders and applicable laws concerning or relating to public health and safety, the practice of pharmacy, worker/occupational health and safety, and pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, threatened release, control, or other action or failure to act involving cleanup of any Hazardous Materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise, or radiation, each as amended and as now in effect and in effect at Closing.

1.34    "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.35    "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.36    "Escrow Agent" will mean Near North National Title LLC, acting as escrow and closing agent.

1.37    "Excluded Fuel Operations" will mean all fuel Inventory, fuel pumps and related equipment relating to the Store.

1.38    "Excluded Inventory" will mean (i) any private label goods and merchandise; (ii) any goods and merchandise that are damaged, spoiled or distressed; (iii) any items that as of the Inventory Count Date are past Seller's "pull date", if any, or, with respect to dairy items, within five days of Seller's "pull date," if any, or, with respect to frozen foods, within 10 days of Seller's "pull date," if any; (iv) all perishables, including, but not limited to, produce, deli items, meat items (other than packaged lunch meats), floral items, seafood items and bakery items; (v) all pharmaceutical inventory; (vi) all fuel inventory; (vii) all video inventory; and (viii) if applicable, any inventory deemed to be Excluded Inventory under paragraph 3.5 of this Agreement.

1.39    "Excluded Personal Property" will mean: (i) all Excluded Inventory; (ii) all packaging materials and supplies not included in the term "Supplies"; (iii) all leased point-of-sale equipment and leased photo lab equipment; (iv) all other leased equipment as described on Exhibit D to this Agreement with respect to the Store; (v) all owned computer and related equipment that contains software subject to a license that restricts its transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed; (vi) all equipment and other personal property that is neither owned nor leased by Seller or Winn-Dixie, including by way of

example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners and equipment owned by product vendors; (vii) all branded (with a Winn-Dixie name or logo) shopping carts, other than any such carts from which the brand is removable and which brands are removed in accordance with paragraphs 8.2 and 9.3 of this Agreement; (viii) all over-the-road motor vehicles; (ix) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (x) all data files other than the Files and Records; (xi) all lottery equipment and tickets; (xii) all accounts receivable, bank accounts, cash and cash equivalents; (xiii) all trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates; (xiv) all building signs and panels in all pole and pylon signs that advertise Seller's business in the Store; (xv) all personal property associated with the Excluded Pharmacy Operations; (xvi) all personal property associated with the Excluded Fuel Operations; (xvii) all Video Equipment; (xviii) all intellectual property and rights relating to any of the foregoing; and (xix) all service agreements, leases of personal property, contracts and warranties relating to Seller's possession and operation of the Store except that Warranties and Guaranties pertaining to the construction of the Store and/or Improvements, or pertaining to any equipment or fixtures that are part of the Assets, if any, shall be included in the Assets to the extent assignable.

1.40   "Excluded Pharmacy Operations" will mean pharmacy Inventory and Pharmacy Scrips relating to the Store.

1.41   "Files and Records" will mean, to the extent in Seller's possession (or otherwise within or under its control) and currently existing, (a) all real estate files, documents, instruments, papers, books and records of Seller or Winn-Dixie relating to the Store, and (b) electronic files for the Store showing for each item of Inventory the item description, and UPC code and such other information as Buyer may reasonably request relating to such item of Inventory.  Files and Records shall not include any materials that are (x) not related to the Store or Assets, (y) related to Excluded Personal Property, or (z) protected by privilege, the work-product doctrine, or any other relevant immunity or protection.

1.42   "Hazardous Material" will mean any hazardous or toxic substance, material or waste which is regulated by any governmental authority, including, but not limited to, any hazardous material, substance or waste which is defined as (i) a "Hazardous Material" or an "Extremely Hazardous Material" under any applicable federal or state laws; (ii) a hazardous substance under Section 311 of the Federal Water Pollution Control Act

(33 U.S.C. Section 1317); (iii) a hazardous waste under Section 1004 of the Federal Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et. seq.); (iv) a hazardous waste substance under Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, (42 U.S.C. Section 9601 et. seq.); or (v) a hazardous or toxic waste, substance or material in any applicable law enacted by the applicable state and/or the federal government.  To the extent not otherwise included, phenolic foam shall be considered a Hazardous Material.

1.43    "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.44    "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.45    "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.46    "Initial Title Reports" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Store that Seller has made available to Buyer for review on the Merrill Website or otherwise as of the Effective Date.  Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.47    "Inventory" will mean all inventories of goods and merchandise within the Store and owned by Seller on the Inventory Count Date and held for resale in the ordinary course of business of Seller conducted at the Store to retail customers, but excluding the Excluded Inventory.

1.48    "Inventory Certificate" will mean with respect to the Store a certificate executed by Buyer and Seller in connection with the Closing as contemplated by paragraph 3.4.4 of this Agreement, in the form attached hereto as Exhibit H to this Agreement.

1.49    "Inventory Closing Statement" will mean a statement in the form of Exhibit C-2 to this Agreement reflecting the net amount due Seller at the Closing in respect of the Inventory Price, after making the adjustments described in Exhibit C-2 and in other provisions of this Agreement.

1.50    "Inventory Count" will have the meaning assigned in paragraph 3.4.1 of this Agreement.

\\COR\433614.5

1.51 "<u>Inventory Count Date</u>" will mean, with respect to the Store, the day immediately preceding the Closing Date for the Store.

1.52 "<u>Inventory Deposit</u>" will have the meaning assigned in <u>paragraph 3.3.2</u> of this Agreement.

1.53 "<u>Inventory Price</u>" will mean the purchase price for the Inventory determined pursuant to <u>paragraph 3.4</u> of this Agreement.

1.54 "<u>Inventory Service</u>" will mean MSI Inventory Service Corporation or Accurate Inventory & Calculating Service, Inc., as designated by Seller, or such other inventory service as is selected by Seller and reasonably acceptable to Buyer.

1.55 "<u>Knowledge</u>" will mean (i) in the case of Seller, the actual knowledge of each of Winn-Dixie's Corporate Environmental and Safety Manager and its Director of Maintenance and the lawyers in the real estate section of its legal department, together with Larry Appel, Senior Vice President and General Counsel, in each case, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of John Orgain, Vice President and General Counsel, without any requirement of investigation or inquiry.

1.56 "<u>Landlord</u>" will mean the lessor under the Lease.

1.57 "<u>Leased Premises</u>" will have the meaning assigned in <u>paragraph A</u> of the Recitals to this Agreement, and will include the elements thereof as described in <u>paragraph 2.0</u> of this Agreement.

1.58 "<u>Lease</u>" will have the meaning assigned in <u>paragraph A</u> of the Recitals to this Agreement.

1.59 "<u>Liquidated Deposit</u>" will have the meaning assigned in <u>paragraph 16.1</u> of this Agreement.

1.60 "<u>Material Adverse Effect</u>" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Store for its current use, taken as a whole, except to the extent that fact, circumstance, change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions

\\COR\433614.5

contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.61    "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Jaguar" with respect to the disposition of the Store and other properties.

1.62    "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on any of Seller's leasehold interests or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction, mechanics' or materialmen's liens that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets; and (D) judgments that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets.

1.63     "New Buyer Employee" will have the meaning assigned in Paragraph 9.4 of this Agreement.

1.64    "ordinary course of business" means the ordinary course of business of Seller after the Filing Date.

1.65    "Outside Date" means September 2, 2005, as such date may be extended by the written agreement of Seller and Buyer.

1.66    "Permits" will have the meaning assigned in paragraph 6.2 of this Agreement.

1.67    "Permitted Encumbrances" will mean (i) all matters listed on Exhibit F to this Agreement, (ii) all other matters set forth as exceptions in the Initial Title Reports, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in any additional Title Reports, other than Monetary Liens.

1.68    "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

\\COR\433614.5

1.69 "Pharmacy Scrips" will mean all customer lists, prescription files, prescription registers, and operating and maintenance logs owned by Seller that relate to the pharmacy operated by the Store.

1.70 "Purchase Price" will mean the Base Purchase Price, the Inventory Price and the Supplies Price collectively.

1.71 "Real Property" will mean the Leased Premises and the Improvements together.

1.72 "Real Property Escrow Date" will mean the date that is two (2) Business Days prior to the Closing Date or such earlier date after the Bankruptcy Court Approval as Buyer and Seller may mutually designate.

1.73 "Sale Order" will mean an order or orders of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby.

1.74 "Seller" will have the meaning assigned in the initial paragraph of this Agreement.

1.75 "Seller Inventory Representative" will mean Michael Chlebovec or another person designated in writing by Michael Chlebovec or by Seller to act in such capacity.

1.76 "Seller's Brokers" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.77 "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; (c) the Cure Costs; and (d) the cost of the Environmental Reports to the extent in excess of $3,000.

1.78 "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.79 "Shopping Center" will have the meaning assigned in Paragraph A of the Recitals to this Agreement.

1.80 "Special Permits" will mean all permits and licenses, including, without limitation, liquor, beer, and similar licenses, required with respect to the use, ownership, operation (including the sale at retail of liquor, beer and other items where a permit or license is required) or maintenance of any of the Store or other Assets. The term Special Permits will not include any

permits or licenses associated with the Excluded Pharmacy Operations or the Excluded Fuel Operations.

1.81    "Store Employees" will have the meaning assigned in paragraph 8.9 of this Agreement.

1.82    "Store" will have the meaning assigned in paragraph A of the Recitals to this Agreement and, when followed by "#" and a number will refer to the Store with the indicated number listed on Exhibit A-1 to this Agreement, including if applicable any associated gas station, liquor store, pharmacy or other specialty area operated by Seller at the Leased Premises.

1.83    "Sublease" will mean each sublease of a portion of the Leased Premises listed on Exhibit A-2 to this Agreement (if any), including amendments.  If no Sublease is listed on Exhibit A-2 to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Sublease will be disregarded.

1.84    "Subtenant" will mean the subtenant or sublessee under each Sublease. If no Sublease is listed on Exhibit A-2 to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Subtenant will be disregarded.

1.85    "Successful Bid" will mean the highest or otherwise best offer to purchase the Assets relating to the Store, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.  The parties acknowledge that this Agreement has been determined to be the Successful Bid for the Store.

1.86    "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the preparation or merchandising of Inventory, located within the Store and owned by Seller on the Inventory Count Date, excluding, however, any such packaging materials and supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of their Affiliates.

1.87    "Supplies Price" will mean the purchase price payable by Buyer for the Supplies, which will be $2,500.00.

1.88    Intentionally omitted.

1.89    "Title Reports" will mean, collectively, (i) the Initial Title Reports and (ii) any additional  title reports and/or title insurance commitments with respect to the Store that Seller has made available to Buyer for review on the Merrill Website or otherwise.

\\COR\433614.5

1.90 "<u>Title Insurer</u>" will mean First American Title Insurance Company or any other nationally recognized title insurance company, as designated by Seller.

1.91 "<u>Title Policies</u>" will have the meaning assigned in <u>paragraph 4.2</u> of this Agreement.

1.92 "<u>Video Equipment</u>" will mean, collectively, all display racks and equipment utilized in connection with video sales and rentals in the Store, including computers, software, computer peripherals and data bases, but excluding sales counters and other fixtures attached to the permanent improvements.

1.93 "<u>Warranties and Guaranties</u>" will mean all assignable third party warranties, guaranties or similar rights owned by Seller or Winn-Dixie or inuring to Seller's or Winn-Dixie's benefit in connection with, and only to the extent of, the Assets.

1.94 "<u>Winn-Dixie</u>" will mean Winn-Dixie Stores, Inc.

2.0 **Property Included in Sale.** Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets, which - excluding Excluded Personal Property - are comprised of the following:

2.1 Seller's interest, as tenant, under the Lease and Seller's interest in any leasehold improvements;

2.2 Seller's interest in all fixtures and all equipment located in the store buildings now existing on the Leased Premises (the "<u>Buildings</u>"), including but not limited to Seller's interest in (i) heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "<u>Improvements</u>"), and (ii) Seller's trade fixtures and equipment located in the Buildings (the "<u>Equipment</u>");

2.3 The Inventory;

2.4 The Supplies;

2.5 Seller's interest in the Subleases (if any);

2.6 Any assignable Special Permits;

2.7 The Warranties and Guaranties; and

2.8    The Files and Records.

Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are subject to higher or otherwise better offers for the Assets and conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

3.0    **Purchase Price.**

3.1    <u>Amount</u>.  The purchase price to be paid by Buyer to Seller for the Assets (other than the Inventory and Supplies) is $2,000,000.00 in the aggregate (the "<u>Base Purchase Price</u>").  The purchase price to be paid by Buyer to Seller for the Inventory is the total of the Inventory Price for each item of Inventory, and the purchase price to be paid by Buyer to Seller for the Supplies is the Supplies Price.

3.2    <u>Contract Consideration and Base Deposit</u>.  Seller and Buyer acknowledge that as specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer has delivered to Escrow Agent, by wire transfer to an account designated in writing by Seller, a base earnest money deposit in the amount of $200,000 (the "<u>Base Deposit</u>").  The Base Deposit will be subject to refund to Buyer to the extent and in the circumstances described in <u>paragraphs 4.2, 12, 15 and 16</u>.  The Base Deposit will be credited against the Base Purchase Price at the relevant Closing and will be held in an interest bearing escrow account maintained by Escrow Agent prior to the relevant Closing.  Whenever used herein, the term Base Deposit also will be deemed to include all interest accrued thereon; however, for state and federal income tax purposes, interest, if any, accrued on the Base Deposit will be deemed earned by Buyer.  Buyer's federal taxpayer identification number (FEIN) is 56-1780605.

3.3    <u>Payment</u>.  The Purchase Price will be paid in the following manner:

3.3.1    *Base Purchase Price and Supplies Price*.  On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Base Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the relevant Closing Statement), and the Supplies Price.  On the Closing Date, Buyer will, subject to the conditions set forth in <u>paragraph 10</u> of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted) and the Supplies Price to Seller (by wire transfer to an account designated in writing by Seller).

3.3.2    *Inventory Deposit and Inventory Price*.  On the Real Property

Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) an inventory deposit in the amount of $660,000 (the "Inventory Deposit"). The Inventory Price shall be determined in the manner set forth in paragraph 3.4 of this Agreement. At the Closing, (a) Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the amount by which the Inventory Price exceeds the Inventory Deposit, and (b) Buyer will instruct Escrow Agent to transfer and deliver the Inventory Price to Seller, by wire transfer to an account designated in writing by Seller. If the Inventory Deposit exceeds the Inventory Price, then Seller and Buyer shall provide written instructions to Escrow Agent to deliver the excess to Buyer promptly following Closing. The Base Deposit and, once deposited, the Inventory Deposit will individually and collectively sometimes be referred to in this Agreement as the "Deposit". The provisions of this paragraph 3.3.2 which apply to the period after the Closing shall survive the Closing.

3.3.3   *Certain Transaction Costs*. All relevant rent, taxes (including real and personal property taxes), utilities (including the pharmacy phone line, where applicable) and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Base Purchase Price and Supplies Price payable at such Closing to the extent thereof and then against the Inventory Price. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.3.3 which apply to the period after the Closing shall survive the Closing.

3.3.4   *Sales Tax*. Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. On Seller's request, Buyer agrees to

-14-

provide Seller with a certificate stating that Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Seller or any governmental authority to document that sale of the Inventory is exempt from sales tax.  This paragraph 3.3.4 shall survive the Closing.

3.4    Inventory.

3.4.1    *Count of Store Inventory.*  Seller shall close the Store at a time designated by Seller between 5:00 p.m. and 11:00 p.m. on the Inventory Count Date, unless otherwise agreed to by Seller and Buyer.  As soon as possible after the closing of the Store, the parties will conduct a physical count (or measurement with respect to gasoline and other vehicle fuels) of the Inventory at the Store (the "Inventory Count") with the assistance of the Inventory Service. Buyer and Seller will each have representatives present at the Store during the Inventory Count who will acknowledge in writing all computations before leaving the Store.  Upon completion of such Inventory Count, except for mathematical errors, other agreed upon changes and disputes regarding Inventory and Excluded Inventory, the count of the Inventory Service shall be final and binding on the parties for all purposes of this Agreement.

3.4.2    Intentionally omitted.

3.4.3    *Valuation of Inventory.*  The Inventory will be valued by applying the following methods to the count reported by the Inventory Service:

the value used will be determined by taking Seller's standard retail shelf price (after adjusting to remove temporary or special price reductions, promotions or discounts, coupon discounts or customer loyalty card discounts) for the applicable item and multiplying such price by the valuation percentage for each merchandise category indicated in the table below:

| | Category | Valuation Percentage |
|---|---|---|
| 1. | Grocery (food and non-food) | 77% |
| 2. | Dairy | 80% |
| 3. | Frozen Food | 65% |
| 4. | General Merchandise | 65% |
| 5. | Tobacco | 82% |
| 6. | Alcohol | 85% |
| 7. | Packaged Lunch Meats | 68% |

-15-

3.4.4 *Inventory Certificates; Inventory Closing Statement*.    Upon completion of the valuation of the Inventory for the Store, which shall be completed prior to the completion of Closing, the Buyer and Seller shall execute an Inventory Certificate, which shall contain the Inventory Price for the Inventory at the Store, and shall have incorporated therein a complete listing of the Inventory for the Store.  Following execution of the Inventory Certificate, if requested by Buyer, Seller or Escrow Agent, Buyer and Seller shall execute an Inventory Closing Statement, which shall contain the Inventory Price for the Inventory at the Store and shall otherwise be consistent with the Inventory Certificate, and shall have incorporated therein appropriate disbursement instructions to Escrow Agent.

3.4.5 *Cooperation and Resolution of Disputes.*  The parties agree to be cooperative and reasonable in connection with each Inventory Count and will attempt, in good faith, to resolve any disputes respecting the quantity of Inventory, Excluded Inventory and Excluded Personal Property that may arise during the Inventory Count.  Any disputes that have not been resolved by the completion of Closing shall be separately listed and settled by Buyer Inventory Representative and Seller Inventory Representative with respect to the relevant Store as expeditiously as practicable thereafter or, if the parties cannot agree, by the Bankruptcy Court.  Any such determination of any dispute shall be final and binding on the parties.

3.4.6 *Inventory Services and Fees*.  Seller and Buyer will jointly select and  engage the Inventory Service, but the fees of the Inventory Service will be billed to and paid by Buyer.  Buyer agrees to pay such fees at Closing or earlier if then due and in any event before delinquent.

3.5    Inventory Relating to Special Permits.  If by Closing Buyer shall not have obtained any required Special Permit contemplated by paragraph 9.2 of this Agreement, notwithstanding its best efforts to do so, any tobacco, liquor, beer, wine, or other Inventory that under applicable law may not be transferred without such Special Permit will not be sold and transferred at Closing but will be segregated at the Store, in which case, unless the parties agree otherwise at or before Closing, (a) the relevant items of Inventory will be deemed to constitute Excluded Inventory, (b) the Bill of Sale to be delivered to Buyer at Closing will specifically exclude such Inventory, (c) the Inventory Price will be reduced by the Inventory Price allocable to such Inventory, and (d) Seller will remove such Inventory from the Store in the same manner as other Excluded Property and with reasonable promptness after Closing.  Notwithstanding the foregoing

clause (d), if applicable law or regulation restricts Seller from removing from the Store (or transporting from the Store to a convenient location in which Seller will have continuing operations) any tobacco, liquor, beer, wine, pharmaceuticals or other Inventory that constitutes Excluded Property, then (i) Seller will have the right to segregate such Inventory at a secured location in the Store selected by Seller and reasonably acceptable to Buyer, and to maintain and protect such Inventory at such secured location for so long as Seller reasonably requires in order to obtain all Special Permits necessary to remove or transport such Inventory (or to sell or convey such Inventory to a third party entitled to do so), (ii) Seller will have reasonable access to such secured location during normal business hours to maintain and protect such Inventory and when appropriate remove such Inventory from the Store, and (iii) Seller will have the right but not the obligation to require Buyer to purchase such Inventory, at the Inventory Price allocable to such Inventory, at such time as Buyer has obtained such Special Permits as are required for Seller to do so provided that such Inventory does not meet the definition of "Excluded Inventory" under paragraph 1.41(ii), (iii) or (iv) at such time as Buyer has obtained such Special Permits.

3.6    Allocation of Base Purchase Price Among Assets at the Store.    Seller shall have the right to allocate the Base Purchase Price for the Store, for tax purposes and all other purposes, among the Assets at the Store other than Inventory and Supplies (as such Assets are described in paragraph 2.0 of this Agreement) in accordance with the Internal Revenue Code of 1986, as amended, including Section 1060 thereof; provided, however, that such allocation shall not be binding upon Buyer or determinative with respect to any allocation made by Seller of the Base Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case.  The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets at the Store on the Closing Statement.

4.0    **Buyer's Due Diligence.**

4.1    Acknowledgment by Buyer.  In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct certain due diligence regarding the Store and the Assets and that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to acquire certain additional information about the Store and the Assets.  Notwithstanding the foregoing, Buyer and Seller acknowledge that Buyer desires to conduct additional due diligence regarding the Store and the Assets in order to satisfy itself that the conditions to Closing are being met.  Buyer agrees that any physical access to or investigation of the Store by Buyer or its representatives shall be limited by and shall comply in all respects with this Agreement and the written instructions of Seller.

4.1.1   From the Effective Date until Closing, (a) Buyer shall have the privilege at all reasonable times, and after giving Seller advance written or telephonic notice, of going upon any of the Real Property with its agents and engineers as needed to (i) investigate and inspect the Assets with respect to the Store, which investigation and inspection shall include, but not be limited to, taking photographs of, and collecting data on, the Real Property, the Assets and the Store, and contacting and having confidential discussions with any officers, directors or employees of Seller or Winn-Dixie regarding the business or operation of the Store, and (ii) conduct a Phase I environmental assessment with respect thereto to the extent that a recent assessment has not been posted to the Merrill Website and (iii) conduct a physical inventory of the Equipment located at the Store; provided, however, that such Phase I environmental assessments and physical inventories shall not be physically intrusive on the Store unless Seller permits otherwise in a prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed; and (b) Seller shall use commercially reasonable efforts to provide information (without representation or warranty as to its accuracy or completeness) reasonably requested by Buyer that is reasonably related to the physical condition of the Assets and Store; provided, however, that, in connection therewith, Seller shall not be required to provide any written or electronic information or materials relating to the Assets other than those expressly required or contemplated pursuant to the foregoing provisions in this paragraph 4.1.1 or any other terms of this Agreement (and in no event shall Seller be required to provide any books and records, sales records, trade secrets, and other proprietary information or materials that are proprietary in nature or any information or materials that are protected by any privilege, immunity, work-product doctrine or other such protection).

4.1.2   The rights provided to Buyer in paragraph 4.1.1 **SHALL IN NO WAY ABROGATE BUYER'S OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT; provided, however, that, so long as Buyer does not violate any other provisions of the Confidentiality Agreement, Buyer's exercise of its rights in paragraph 4.1.1(a) shall be deemed to not violate the provisions of subparagraph (b) of the fourth paragraph of the Confidentiality Agreement and the entire sixth paragraph of the Confidentiality Agreement**.   Buyer hereby indemnifies and agrees to hold harmless Seller from and against any and all damage to the Real Property (including the cost of restoring the Real Property to its pre-entry condition) and injury to any persons caused by Buyer or its agents in the course of exercising Buyer's

due diligence rights under this Agreement. Notwithstanding the preceding sentence, Buyer will have no obligation to indemnify or hold Seller harmless from those claims, demands, liabilities, costs, expenses, penalties, damages and losses arising out of or relating to: (a) the negligence or willful misconduct of Seller or any of its Affiliates, subtenants, licensees, employees, agents, officers, or directors, or (b) the existence of information obtained by Buyer as a result of its investigation or (c) a pre-existing condition of any of the Assets. Such indemnification will survive the expiration or termination of this Agreement and/or the consummation of the transactions contemplated by this Agreement. Notwithstanding anything in this Agreement to the contrary, Buyer shall not conduct (or cause to be conducted) any physically intrusive investigation, examination or study of the Real Property without obtaining the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed.

4.1.3 **Intentionally Omitted**.

4.2 Title. Buyer confirms and acknowledges that Seller has made the Initial Title Reports available to Buyer, and intends to make additional Title Reports available to Buyer, and Buyer may negotiate with the Title Insurer to obtain title insurance policies with respect to the Store (the "Title Policies") at Closing. If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present use or occupancy of the Store, Buyer may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to CatherineIbold@winn-dixie.com within two (2) Business Days of the date such additional Title Report is either delivered to Buyer or posted on the Merrill Website. To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #805". If Buyer timely notifies Seller of any valid objection to any such matter set forth in any additional Title Report with respect to the Store, and if Seller declines or is unable to cure any such objection, then Buyer will have the right to terminate this Agreement on the earlier of (x) two (2) Business Days following Buyer's receipt of notice from Seller that it will not cure such objection or (y) the Closing Date. If Buyer fails to so terminate this Agreement, then Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter and such matter shall constitute a Permitted Encumbrance.

4.3 Environmental Reports. Seller represents that it has made, or will make, available to Buyer for review on the Merrill Website an environmental report (each, an "Environmental Report"), covering the Real Property

relating to the Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where such Store is located.

5.0    **Representations and Warranties of Seller Relating to the Assets.**  In addition to any representations and warranties contained elsewhere in this Agreement, Seller hereby makes the following representations and warranties (subject, however, to any exceptions noted on <u>Exhibit I</u> attached hereto and incorporated herein by this reference, which Exhibit will specifically refer to the applicable representation for each item listed) to and for the benefit of Buyer and its successors and permitted assigns, in connection with the Assets, each of which warranties and representations (a) is being relied upon by Buyer and (b) is true in all respects as of the date hereof (or such other date as may be indicated).

5.1    On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website: (i) copies of the Lease (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a)    copies of the site plan for the Store;

(b)    copies of the as-built plan for the Buildings;

(c)    copies of the fixture plan for the Store; and

(d)    a list of Equipment (other than Excluded Personal Property) with respect to the Store as reflected in Seller's current records; and

(e)    copies of all surveys in the possession of (or within or under the control of Seller or any Affiliate thereof relating to the Store (the "Surveys");

it being understood that the materials described in subparagraphs (a) through (e) of this <u>paragraph 5.1</u> have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

5.2    At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Monetary Liens other than the Permitted Encumbrances to the extent provided under Section 363 of the Bankruptcy Code.

5.3    To Seller's Knowledge, the Lease is in full force and effect.  To Seller's Knowledge, except with respect to the Subleases (if any) identified on

Exhibit A-2, there are no subleases, licenses, occupancy agreements or assignment agreements in effect with respect to the Leased Premises or Real Property.  To Seller's Knowledge, the copy of the Lease on the Merrill Website or otherwise provided to Buyer is a true, correct and complete copy of the Lease (including all amendments with respect thereto) in effect on the Effective Date.

5.4     Except to the extent the filing of the Bankruptcy Case constitutes a default under the Lease, to Seller's knowledge no condition or occurrence exists which, with the passage of time and/or the giving of notice, would constitute a material default by Seller under the Lease.

5.5     Seller has not received any written notice from any governmental authority that any of the Real Property is in material violation of applicable building codes or zoning and land use laws.

5.6     To Seller's Knowledge, except as disclosed, or as to be disclosed, in the Environmental Reports, Seller has not received any written notice from any governmental authority that there exist any material violations of any Environmental, Health and Safety Requirements relating to the Leased Premises or the Real Property or any applicable laws of governmental authorities having jurisdiction over the Leased Premises or Real Property relating to any Hazardous Material, which material violations, individually or in the aggregate with other material violations, could (i) interfere in a material and adverse way with the present use or occupancy of the Store, (ii) expose Buyer or its customers, employees or suppliers to a risk of physical harm, or (iii) expose Buyer to significant regulatory or financial risk.

5.7     <u>Warranties and Guaranties</u>.  To Seller's Knowledge, <u>Exhibit J</u> attached hereto and incorporated herein by this reference includes a true and correct summary of all Warranties and Guaranties concerning roofs of the Real Property.

5.8     <u>Insurance</u>.  To Seller's Knowledge, the Assets are insured by Seller or for Seller's benefit, in amounts and against risks deemed adequate by Seller, subject to any deductibles and/or levels of self-insurance consistent with the ordinary course of business of Seller and neither Winn-Dixie nor Seller has received any notice or request from any insurance company or Board of Fire Underwriters or governmental agency, department, bureau or other entity requiring or demanding the performance of any work or alteration with respect to the Assets.

6.0     **General Representations and Warranties of Seller.**  In addition to any representations and warranties contained elsewhere in this Agreement, Seller hereby makes the following representations and warranties (subject, however, to

\\COR\433614.5

any exceptions noted on <u>Exhibit I</u> attached hereto and incorporated herein by this reference, which Exhibit will specifically refer to the applicable representation for each item listed) to and for the benefit of Buyer and its successors and permitted assigns, in connection with the Assets, each of which warranties and representations (a) is being relied upon by Buyer and (b) is true in all respects as of the date hereof (or such other date as may be indicated).

6.1    Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

6.2    No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("<u>Permit</u>") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, (iii) those contemplated by or required under <u>paragraph 3.5</u> of this Agreement and (iv) Bankruptcy Court Approval.

6.3    Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.4    Other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

\\COR\433614.5

6.5     None of the employees employed by Seller in the Store is covered by a union contract, collective bargaining agreement or other labor agreement.

6.6     Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

7.0     **Buyer's Representations and Warranties.**  Buyer represents and warrants to Seller as follows:

7.1     Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of North Carolina, and has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required corporate action on behalf of Buyer.

7.2     No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated other than those contemplated or required under paragraph 3.5 of this Agreement.

7.3     This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4     There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

7.5     Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease,

\\COR\433614.5

order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

7.6    As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

8.0    **Covenants of Seller.**    Seller hereby covenants for the benefit of Buyer as follows:

8.1    Seller (i) will use commercially reasonable efforts to maintain the Assets until the Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and will continue operation of the Store in the ordinary course of business, (ii) will not sell, dispose of, abandon or remove from the Store any of the Assets or agree to do so except in the ordinary course of business; provided, however, it is expressly acknowledged and understood that, no sooner than one week prior to the anticipated Closing Date, Seller will take certain actions to wind up its operations (including related marketing, promotions and advertising) at the Store and eliminate or remove the Excluded Personal Property in preparation for the Inventory Count, Closing and the turnover of possession to Buyer; (iii) will not modify, amend or terminate the Lease, or any recorded easements, restrictions or covenants affecting the Real Property or Shopping Center, without the express written consent of Buyer; (iv) will not enter into any subleases, licenses, occupancy agreements or assignment agreements with respect to the Lease or Leased Premises nor any easements, covenants, conditions or restrictions with respect to the Real Property or Shopping Center, without the express written consent of Buyer; (v) will not cause any material alterations to the Buildings or Improvements for the Store other than repairs in the ordinary course of business; and (vi) will use its best efforts to promptly give Buyer copies of any notices given by any of the Landlord after the Effective Date; provided, however, that Seller will be required, without qualification, to promptly give Buyer copies of any notices of default given by the Landlord after the Effective Date.

8.2    Seller will use commercially reasonable efforts to remove all Excluded Personal Property from the Store on or before the relevant Closing Date, except that Buyer shall (i) remove and dispose of Seller's signs and panels, and (ii) remove and dispose of, or change the signs and panels of, Seller's branded shopping carts that are part of the Excluded Personal Property, as more fully provided in paragraph 9.3 of this Agreement.

\\COR\433614.5

8.3    Seller will (except to the extent otherwise required by the Family Medical Leave Act) transfer or terminate all its employees working at the Store on the relevant Closing Date.

8.4    The parties acknowledge that this Agreement has been determined to be the Successful Bid.  Seller will use commercially reasonable efforts to obtain the entry of a Sale Order.

8.5    Prior to the Closing, Seller will not cause or permit to be granted any material increase in the salaries, wages, benefits or other compensation payable or to become payable to employees working at the Store, except for (i) merit and cost-of-living increases in the ordinary course of business and (ii) incentive bonuses or compensation granted by Seller in connection with Seller's winding up of its operations at the Store.

8.6    Unless required by applicable laws, Seller will not make any commitments or representations to any governmental authority, any adjoining tenants, the Landlord, any shopping center association, or any other Person that would in any manner be binding upon Buyer or the Real Property, whether for or in connection with proffers, public improvement agreements, Shopping Center improvements, or otherwise, without the prior written consent of Buyer.

8.7    Seller will cooperate reasonably with Buyer, upon written request, with respect to Buyer's performance of its covenants under paragraph 9.2 of this Agreement and will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with the issuance of the Title Policies; provided, however, that in no event shall Seller be required to indemnify Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion.

8.8    Seller will cooperate reasonably with Buyer in obtaining from the Landlord an estoppel certificate substantially in the form of Exhibit K attached hereto for the purpose of confirming that each Lease as posted on the Merrill Website is a true and complete copy of the same ("Estoppel Certificate").

8.9    Employee Information; Interviews.  At Buyer's request, following the Effective Date Seller and Winn-Dixie will release to Buyer a list of each of Seller's employees employed at the Store, indicating rate of pay, number of employees enrolled in Seller's health and welfare benefit plan, position title and hire or re-hire date as shown in Seller's books and records (provided no representation is made as to the accuracy or completeness of such information), and will permit Buyer, at reasonable times during

normal business hours and with minimum impact on Seller's business, to arrange for personal interviews with the Store manager and other Store employees ("Store Employees"), at times and places mutually agreeable to Seller and Buyer, and to arrange for those relevant employees of Seller, who are interested, to interview with Buyer.

9.0    **Covenants of Buyer.**    Buyer for itself hereby covenants for the benefit of Seller as follows:

9.1    Buyer will execute and deliver such documents as may be reasonably required by the Escrow Agent and the Title Insurer, as applicable, in connection with the Closing and the issuance of the Title Policies.

9.2    Buyer will use commercially reasonable efforts to obtain all Special Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11 of this Agreement, including without limitation all Special Permits necessary for Seller to sell and Buyer to buy the Inventory.

9.3    As soon as reasonably practicable after the Closing Date,  Buyer shall, at Buyer's sole cost and expense, (i) remove from the Store, destroy and lawfully dispose of all signs and panels that are part of the Excluded Personal Property, and (ii)  either (A) remove from the Store and lawfully dispose of all branded shopping carts  or (B) remove all trademarks, trade names, logos and designs of Seller, Winn-Dixie or their Affiliates from all shopping carts and destroy and lawfully dispose of all such trademarks, trade names, logos and designs.  Without limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 16.5 of this Agreement shall encompass any breach by Buyer of this paragraph 9.3.

9.4    Provided that such employees file an application for employment with Buyer and otherwise satisfy Buyer's employment requirements, Buyer shall, as soon as practicable, and in any event within seven (7) days after the Closing Date, offer employment to and, if such offer is accepted, hire no less than 70% of the full-time employees that are employed by Seller at the Store on the Closing Date, and assign such employees to a location in the trade area as Buyer's employment needs dictate; provided, however, that any full-time employees hired by Seller at the Store, or transferred to the Store, after the Effective Date shall not be included in the final number of full-time employees on which the 70% calculation is based.  Buyer shall compensate and provide benefits to such employees at levels comparable to similarly situated employees of Buyer, but Buyer shall have no obligation to pay such employees wages or salaries at the levels existing prior to the Closing Date, or provide benefit plans comparable to those paid or offered by Seller.  Any employee whose employment is terminated by Seller, Winn-Dixie or any direct or indirect subsidiary of Winn-Dixie and

-26-

who is subsequently hired by Buyer is herein referred to as a "<u>New Buyer Employee</u>" and collectively, as the "<u>New Buyer Employees</u>." Buyer shall be entitled to interview and directly solicit for employment any employee of Seller, Winn-Dixie or any direct or indirect subsidiary of Winn-Dixie in any manner Buyer deems reasonable, and to encourage any such employee to accept any employment offered by Buyer; <u>provided</u>, <u>however</u>, that, with respect to such employees whom Buyer has not already contacted, or been contacted by, prior to the Effective Date as permitted by the Confidentiality Agreement, and with respect to such employees whom Buyer has not been, and shall not have been, in contact with through generalized searches and solicitations or job fairs as described in the following sentence (either before or after the Effective Date), Buyer shall not interview or directly solicit for employment such employees until the date that is seven (7) days after the Effective Date.  Nothing herein shall restrict or preclude Buyer in any way from making generalized searches and solicitations for employees by use of advertisements or postings in any medium or the holding of job fairs, or to hire any individual responding to such advertisements or postings or attending such job fairs.  Nothing herein shall require Buyer to continue the employment of any New Buyer Employee for any period of time following his or her hiring.  If Buyer hires any New Buyer Employee, Buyer shall not be required to give any such New Buyer Employee any credit for service as an employee of Seller, Winn-Dixie or any direct or indirect subsidiary of Winn-Dixie, as the case may be, prior to Closing for purposes of eligibility, vesting, eligibility for retirement and benefit accrual and participation in any retirement, pension or 401(k) plans, or for any deductibles, co-payments or applicable waiting periods under any benefit plans.  So long as Buyer does not violate any other provisions of the Confidentiality Agreement, Buyer's exercise of its rights in this <u>paragraph 9.4</u> shall be deemed to not violate any provisions of the Confidentiality Agreement limiting the ability of Buyer to contact, employ or solicit for employment any employee of Seller, Winn-Dixie or any direct or indirect subsidiary of Winn-Dixie.  No later than two (2) Business Days prior to the Closing Date, Buyer will deliver to Seller, in writing, a list identifying all employees of Seller, Winn-Dixie or any direct or indirect subsidiary of Winn-Dixie who have been hired by Buyer, or to whom offers of employment have been made by Buyer.  Any other provision in this <u>paragraph 9.4</u> to the contrary notwithstanding, Buyer shall not actually employ any employees of Seller, Winn-Dixie or any direct or indirect subsidiary of Winn-Dixie prior to the Closing Date.

9.5   At any time prior to entry of the Sale Order, if Buyer intends to conduct employment interviews with any employees of Winn-Dixie as provided herein, Buyer shall, via e-mail, provide to Dedra Dogan at dedradogan@winn-dixie.com, at least twenty-four (24) hours notice of the day, starting time and location of such interviews so that Ms. Dogan or other human resources personnel of Winn-Dixie may be on premises

\\COR\433614.5

during or after such interviews to answer questions or otherwise communicate with any such Winn-Dixie employees about the employee transition process; _provided_, _however_, that neither Ms. Dogan nor any other human resources personnel of Winn-Dixie shall have the right to participate in or attend any such interviews or consent to the hire or refusal to hire of such Winn-Dixie employees; _provided_, _further_, that such notice need not specify which Winn-Dixie employees Buyer intends to interview.   Failure of Seller or its representatives to be present as provided above shall not prohibit Buyer in any manner from proceeding with any such scheduled interviews, as Seller acknowledges that it in no manner desires to impede or slow the solicitation and hiring process in any respect.

9.6     Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

9.7     The parties acknowledge that this Agreement has been determined to be the Successful Bid.  Buyer will use commercially reasonable efforts to obtain the entry of a Sale Order, including by providing Adequate Assurance Information to Seller, the Bankruptcy Court, the Landlord and Subtenants as may be reasonably requested.

10.0   **Conditions Precedent to Buyer's Obligations.**  The obligations of Buyer under this Agreement are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

10.1    Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of paragraph 5.1 of this Agreement), all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Seller's representations and warranties contained in this

\\COR\433614.5

Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

10.2    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

10.3    The Sale Order shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to Seller and Buyer and their respective counsel and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Buyer, which shall not be unreasonably withheld.

10.4    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(iv) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1 (a)(iv).

11.0    **Conditions Precedent to Seller's Obligations.**  The obligations of Seller under this Agreement are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

11.1    Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  Subject to any limitations expressly set forth in this Agreement, all of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of

-29-

the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

11.3    The Sale Order shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to Seller and Buyer and their respective counsel and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Seller, which shall not be unreasonably withheld.

11.4    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(v) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1(a)(v).

12.0    **Loss by Fire or Other Casualty; Condemnation**.  In the event that, prior to a Closing, the Store, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with the Store, either party will have the right, exercisable by giving notice of such decision to the other within five (5) Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, and thereafter none of the parties will have any further rights or obligations hereunder; provided, however, that if Buyer is not in breach of this Agreement,  Buyer will be entitled to the return from the Escrow Agent of the Deposit.  If neither party exercises its right of termination and the Store is sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.  In the event that prior to Closing,

a material part of the Equipment is destroyed or materially damaged, but the Store is not destroyed or materially damaged, neither party shall have the right solely under this <u>paragraph 12.0</u> to terminate this Agreement; provided, however, that in such circumstances, if the Closing occurs, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds in respect of such Equipment and will promptly pay over and deliver to Buyer any such proceeds received by it.

13.0    **Possession**.  Seller will turn over to Buyer exclusive physical possession of the Store and the Assets associated therewith (including, to the extent in Seller's possession, control or custody) all keys, combinations to safes, security codes and passwords, on the Closing Date upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Buyer to transfer to Seller, the entire Base Purchase Price, Inventory Price and the Supplies Price.  After conclusion of the Inventory Count and upon Seller's receipt of such written confirmation from Escrow Agent, Buyer may commence preparation for opening of the Store as a Buyer's store including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and commencing electrical and wiring work required in order to install Buyer's point of sale and other equipment, signage, and similar items.

14.0    **Closing.**

14.1    The Closing will occur on the Closing Date.  The Closing will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

14.2    On or before the Real Property Escrow Date, Seller will, subject to the conditions contained in <u>paragraph 11</u> of this Agreement, deliver the following ("<u>Seller's Escrowed Items</u>") to Escrow Agent:

(i)    Two counterparts of the Lease Assignment, substantially in the form of <u>Exhibit G</u> to this Agreement (the "<u>Conveyance Instrument</u>"), executed by Seller;

(ii)    The Bill of Sale, executed by Seller;

(iii)    Two counterparts of the Closing Statement, executed by Seller;

(iv)    Such other instruments as are reasonably required by the Escrow Agent and the Title Insurer, as applicable, in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Escrow Agent, the Title Insurer, Buyer, or

any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion;

(v)     An assignment and assumption of Warranties and Guaranties executed by Seller and Winn-Dixie to Buyer, in the form set forth in <u>Exhibit L</u> attached hereto and incorporated herein by this reference (the "<u>Warranties and Guaranties Assignment</u>"); and

(vi)    Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered.

Buyer may waive compliance by Seller as to any of the foregoing items in a manner permitted by <u>paragraph 17.6</u> of this Agreement. Except to the extent that Seller provides Buyer with prior or contemporaneous express written notice to the contrary, Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent, will be deemed to be an acknowledgement by Seller that the conditions of <u>paragraph 11</u> of this Agreement have been fulfilled, or waived until Seller Delivery Confirmation. The "<u>Seller Delivery Confirmation</u>" will mean the later of (A) the Real Property Escrow Date and (B) Seller's delivery to Escrow Agent, by original counterpart or telecopy, of Seller's written confirmation that that the conditions of <u>paragraph 11</u> of this Agreement have been fulfilled or waived. In any event such delivery and notice shall be subject to any circumstances that may affect such conditions between Seller Delivery Confirmation and the Closing Date.

14.3   On or before the Real Property Escrow Date, Buyer will, subject to the conditions contained in <u>paragraph 10</u> of this Agreement, deliver the following ("<u>Buyer's Escrowed Items</u>") to Escrow Agent:

(i)     Two counterparts of the Conveyance Instrument, executed by Buyer;

(ii)    Two counterparts of the Closing Statement, executed by Buyer;

(iii)   Such other instruments as are reasonably required by the Escrow Agent or the Title Insurer in accordance with the terms hereof;

(iv)    The Warranties and Guaranties Assignment, executed by Buyer;

(v)     Any other document, instrument or agreement called for hereunder for delivery by Buyer that has not previously been delivered; and

(vi)    All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to <u>paragraph 3</u> of this Agreement.

\\COR\433614.5

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by <u>paragraph 17.6</u> of this Agreement. Except to the extent that Buyer provides Seller with prior or contemporaneous express written notice to the contrary, Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will be deemed to be an acknowledgement by Buyer that the conditions of <u>paragraph 10</u> of this Agreement have been fulfilled, subject to any circumstances that may affect such conditions between the Real Property Escrow Date and the related Closing Date.

14.4    At the Closing, Seller will, subject to the conditions contained in <u>paragraph 11</u> of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in <u>paragraph 10</u> of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items and the Purchase Price to Seller.

14.5    On the Closing Date, Seller and Buyer will each deposit such other instruments with the Title Insurer and the Escrow Agent, as applicable, as are reasonably required by the Title Insurer for the issuance of the Title Policies or otherwise required by the Escrow Agent to consummate the purchase of the relevant Assets in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, the Escrow Agent, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion.

14.6    Except as provided in <u>paragraph 16</u> of this Agreement, at or before Closing, or if Closing does not occur due to earlier termination of this Agreement in accordance with its terms, (i) Seller will pay Seller's Closing Costs; and (ii) Buyer will pay Buyer's Closing Costs.

15.0    **<u>Termination</u>**.

15.1    <u>Termination</u>.

(a)    This Agreement may be terminated, and the transactions contemplated hereby abandoned, only as follows:

(i)    by written consent of Seller and Buyer, in which case the Deposit shall be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the Deposit, then Escrow Agent shall pay over the Deposit to Seller as consideration for Seller's agreement to terminate this Agreement);

-33-

(ii)    at the election of Seller if and to the extent permitted under
paragraph 16.1 of this Agreement, in which case the Deposit
shall be disbursed as provided in such paragraph 16.1;

(iii)   at the election of Buyer if and to the extent permitted under
paragraph 16.2 of this Agreement, in which case the Deposit
shall be disbursed as provided in such paragraph 16.2;

(iv)    at the election of Buyer if any of the conditions set forth in
paragraph 10 of this Agreement has not been satisfied or
waived by Buyer on or before the Outside Date, in which
case Seller shall direct Escrow Agent to return the Deposit to
Buyer; provided, however, that if any of such conditions has
not been satisfied due to a breach of this Agreement by
Buyer or Seller, then Buyer's and Seller's respective rights,
remedies and obligations, including any right of termination,
shall be determined in accordance with paragraph 16 of this
Agreement rather than pursuant to this paragraph
15.1(a)(iv);

(v)     at the election of Seller if any of the conditions set forth in
paragraph 11 of this Agreement has not been satisfied or
waived by Seller on or before the Outside Date, in which
case Seller shall direct Escrow Agent to return the Deposit to
Buyer; provided, however, that if any of such conditions has
not been satisfied due to a breach of this Agreement by
Buyer or Seller, then Buyer's and Seller's respective rights,
remedies and obligations, including any right of termination,
shall be determined in accordance with paragraph 16 of this
Agreement rather than pursuant to this paragraph 15.1(a)(v);

(vi)    at the election of Buyer or Seller as provided in paragraph 12
of this Agreement, in which case Seller shall direct Escrow
Agent to return the Deposit to Buyer; provided, however, that
if at the time such election is made, Buyer is in breach in
respect of this Agreement, then Buyer's and Seller's
respective rights, remedies and obligations (including any
right of termination) shall be determined in accordance with
paragraph 16.1 of this Agreement rather than pursuant to
this paragraph 15.1(a)(vi);

(vii)   **Intentionally omitted.**

(viii)  at the election of Seller if the Bankruptcy Court denies
Bankruptcy Court Approval with respect to the Store, in
which case Seller shall direct Escrow Agent to return the
Deposit to Buyer; provided, however, that if at the time such

-34-

election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.1(a)(viii);

(ix)    at the election of Seller if the Cure Costs with respect to the Lease exceed 50% of the Base Purchase Price, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.1(a)(ix);

(x)    at the election of Buyer or Seller if the Closing will not have occurred on or before the Outside Date for any reason other than as contemplated in paragraphs 15.1(a)(i) through 15.1(a)(ix) of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided that neither Buyer nor Seller, as the case may be, will be entitled to terminate this Agreement pursuant to this paragraph 15.1(a)(x) if such party's breach of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(x); or

(xi)    at the election of Buyer as provided in paragraph 4.2 of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.1(a)(xi).

(b)    If this Agreement is terminated for any reason, then all materials provided by Seller to Buyer and all materials relating to the Assets obtained by Buyer and all copies of any such materials will be delivered to Seller within five (5) Business Days following

termination.    This paragraph shall not in any way limit Buyer's duties to Seller or Winn-Dixie under the Confidentiality Agreement.

(c)    Upon any termination of this Agreement pursuant to <u>paragraphs 15.1(a)(ii) through (xi)</u> of this Agreement, each party will retain those rights (if any) it may have under <u>paragraph 16</u> of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

16.0    **Default and Remedies**.

16.1    <u>Buyer's Default</u>.  If the Closing as contemplated under this Agreement is not consummated due to Buyer's breach of this Agreement, or if this Agreement is terminated due to Buyer's breach of this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such breach, (A) to terminate this Agreement and (B) to receive the Base Deposit (collectively, the "<u>Liquidated Deposit</u>") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof.  Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity.  Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages.  The right to receive the Liquidated Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by Buyer, and Seller hereby waives and releases any right to (and Seller hereby covenants that it shall not) sue Buyer: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit.  Buyer hereby waives and releases any right to (and hereby covenants that it shall not) Seller or seek or claim a refund of the Liquidated Deposit (or any part thereof) on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages.  This <u>paragraph 16.1</u> is subject to <u>paragraph 16.4</u> of this Agreement.

16.2    <u>Default by Seller</u>.  If the sale of the Store as contemplated under this Agreement is not consummated due to Seller's breach of this Agreement, or if this Agreement is terminated due to Seller's breach of this Agreement, then Buyer shall be entitled, as its sole and exclusive remedy for such breach, to receive the return of the Deposit, which return shall operate to terminate this Agreement and release Seller from any and all liability under this Agreement. Buyer expressly waives and releases (i) any right to seek specific performance of Seller's obligations under this Agreement and (ii) any right to seek or collect any damages, including any

\\COR\433614.5

actual, consequential, speculative, remote or punitive damages.   This paragraph 16.2 is subject to paragraph 16.4 of this Agreement.

16.3   Notice of Default; Opportunity to Cure.   Neither Seller nor Buyer shall be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within five (5) Business Days after receipt of such notice; provided, however, that this paragraph 16.3   (i) shall not be applicable to Buyer's failure to deliver any Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Real Property Escrow Date or the Closing Date and, accordingly, (ii) shall not have the effect of extending the Closing Date or the due date of any Deposit.

16.4   Recoverable Damages.   In no event shall the provisions of paragraphs 16.1 and 16.2 of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying  party due to, a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreement and paragraphs 16.5 and 17.3 of this Agreement, or (ii)  either Buyer's or Seller's obligation to pay costs, fees or expenses under the Confidentiality Agreement and paragraphs 3.3.3, 3.3.4 and 18 of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs.   In addition, if this Agreement is terminated for any reason, and Buyer or any Affiliate of Buyer asserts any claim or right to any Asset that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to any Asset, then Seller shall have all rights and remedies available at law or in equity with respect to such assertion by Buyer and any loss, damage or other consequence suffered by Seller as a result of such assertion.

16.5   Buyer Indemnification of Seller. Buyer shall indemnify and save and hold harmless Seller and its Affiliates and representatives, from and against any and all costs, losses, liabilities, damages, lawsuits, deficiencies, claims and expenses arising solely out of third-party claims, including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (herein, the "Damages") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by Buyer (including any payment obligation), or the inaccuracy of any representation made by Buyer in or pursuant to this Agreement or other transaction documents, or (b) any liability, obligation or commitment of any nature (absolute, accrued, contingent or otherwise) of Buyer, including any liability, obligation or commitment assumed by Buyer pursuant to this Agreement, that is due to or arises in connection with Buyer's acts or

omissions prior to, on or after the Closing Date pursuant to this Agreement or any transaction documents signed by Buyer pursuant to this Agreement.  Notwithstanding the foregoing, Buyer shall not be liable for any matter (i) with respect to which Seller has not given Buyer written notice within a reasonable period of time following Seller's receiving written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a material adverse effect on Buyer's ability to operate the Store), or (ii) to the extent that such liability arises from Seller's acts or omissions.    The provisions of this <u>paragraph 16.5</u> shall cover all obligations and liabilities of whatsoever kind, nature or description relating, directly or indirectly, to third party product liability, third party litigation or third party claims against Buyer in connection with, arising out of, or relating to this Agreement or any transaction documents signed by Buyer pursuant to this Agreement.  This <u>paragraph 16.5</u> shall survive the Closing or earlier termination of this Agreement.

17.0  **<u>Miscellaneous</u>.**

17.1  <u>Notices</u>. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this <u>paragraph 17.1</u> and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

-38-

If to Seller:

Winn-Dixie Raleigh, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Chief Financial Officer
Telefax No. 904 783 5646
e-mail: *bennettnussbaum@winn-dixie.com*

With a copy to:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Office of General Counsel
Telefax No. 904-783-5651
e-mail: *larryappel@winn-dixie.com*

and

King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia  30303
Attn:  Timothy N. Tucker
Telefax No. 404-572-5148
e-mail:  *ttucker@kslaw.com*

If to Buyer:

Alex Lee, Inc.
P.O. Box 800
120 Fourth Street SW
Hickory, North Carolina  28602
Attention:  General Counsel
Telefax No. 828-725-4435
e-mail:  *jorgain@alexlee.com*

With a copy to:

McGuireWoods LLP
Bank of America Corporate Center
100 North Tryon Street, Suite 2900
Charlotte, NC 28202-4011
Attn:  Jane Whitt Sellers
Telefax No. 804-698-2170
e-mail:  *jsellers@mcguirewoods.com*

-39-

or such other address as any party may from time to time specify by notice to the other.

17.2    <u>Notice of Certain Inquiries</u>.  If any party is contacted, whether before or after any Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to any transactions contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

17.3    <u>Brokers and Finders</u>.  The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Agreement other than that due by Seller to Seller's Brokers.  Seller agrees to pay all fees and commissions claimed of either party by Seller's Brokers as a result of the transaction contemplated by this Agreement, which fees and commissions will be considered payable only if, as and when the Closing contemplated by this Agreement occurs.  Except for Seller's Brokers, neither Seller nor Buyer has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement.  Seller and Buyer hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts, said indemnifications by Seller and Buyer to survive the Closings or earlier termination of this Agreement.

17.4    <u>Successors and Assigns</u>.  This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

17.5    <u>Assignment</u>.  Neither Seller nor Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole discretion of the party whose consent is so required. The foregoing notwithstanding, Buyer may, without consent, assign its rights and obligations under this Agreement to any of its wholly-owned subsidiaries provided that such subsidiary assumes in writing all of the duties and obligations of Buyer with respect to the Store.  No assignment by Buyer shall release or relieve Buyer of its liabilities and obligations hereunder, which shall remain in full force and effect notwithstanding any such assignment.

17.6    <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by

\\COR\433614.5

Seller and Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to Bankruptcy Court Approval, if applicable.

17.7 <u>Governing Law</u>.  The application and effect of this Agreement will be governed by and construed in accordance with the laws of the State of North Carolina.

17.8 <u>Merger of Prior Agreements</u>.  This Agreement supersedes all prior agreements and understandings between the parties hereto, other than the Confidentiality Agreement, and (except for the Confidentiality Agreement) constitutes the entire agreement of the parties with respect to the matters contained herein.  **BUYER ACKNOWLEDGES ITS OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT CONTINUE AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT**.

17.9 <u>Survival</u>.  Acceptance by Buyer of the Conveyance Instrument shall constitute an acknowledgement by Buyer that all of Seller's representations, covenants and obligations under this Agreement and all conditions to Buyer's obligations to close under this Agreement have been performed, satisfied and/or waived. Seller's representations, warranties, covenants and obligations under this Agreement shall not survive the Closing but shall merge into the Conveyance Instrument, and shall have no further force or effect after the Closing, except that those covenants of Seller under <u>paragraphs 3.3.2, 3.3.3, 3.3.4 and 17.3</u> of this Agreement that are expressly provided to be performed after the Closing shall survive. All representations, warranties, covenants of obligations of Buyer under this Agreement shall survive the Closing.  In addition, all representations, covenants and obligations of Buyer under the Confidentiality Agreement and the obligations of both parties under <u>paragraph 18</u> of this Agreement shall survive the termination or consummation of this Agreement.

17.10 <u>Time is of the Essence</u>.  Time is of the essence of this Agreement.

17.11 <u>No Recordation</u>.  This Agreement will not be recorded in any public office or court other than as part of the Bankruptcy Court Approval process except that upon default it may be presented to a court of competent jurisdiction.

18.0 **Escrow Agent**.

18.1 <u>Duties</u>.  By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon its receipt of funds from Buyer, Escrow Agent will receive and hold

such funds, and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.

18.2    <u>Indemnity</u>.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent. If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all loss, cost, damage, liability or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct.  If the indemnity amounts payable hereunder result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts.  Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.

18.3    <u>Dispute</u>.  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor.  In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Buyer is not the prevailing party in such action or proceeding.  If there is no prevailing party, Seller and Buyer each shall be responsible for one-half of such costs and fees.

18.4    <u>Execution by Escrow Agent</u>.  Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this <u>paragraph 18.</u>  Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this <u>paragraph 18</u> shall not be required.

19.0    **Waiver of Jury Trial**.  Buyer and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transactions contemplated herein undesirable. Accordingly, Buyer and Seller each knowingly, voluntarily and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Agreement or the transactions contemplated herein.

20.0    **Consent to Jurisdiction.** **THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS**

\\COR\433614.5

**AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.**

Buyer and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in paragraph 17.1 of this Agreement shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum. If a court finds that subject-matter jurisdiction is not available in the Bankruptcy Court, Buyer and Seller hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of the U.S. District Court for the Middle District of Florida, Jacksonville Division, or if such court shall not have jurisdiction, then to the appropriate courts of the State of Florida sitting in Duval County, Florida.

21.0 **HSR Filings.** The parties anticipate that the transactions contemplated hereby are exempt from review and filing under the HSR Act. However, if such is not the case, Seller and Buyer shall each seek regulatory approval or HSR clearance and prepare and submit, in a timely manner, all necessary filings for Seller and Buyer in connection with this Agreement under the HSR Act and the rules and regulations thereunder. Seller and Buyer shall request expedited treatment of such HSR Filing by the Federal Trade Commission, shall make promptly any appropriate or necessary subsequent or supplemental filings, and shall furnish to each other copies of all HSR Filings at the same time as they are filed with the appropriate governmental authority except to the extent such party is legally restricted from providing or believes, based where appropriate on the advice of counsel, that it should not provide such copies.

22.0 **Disclaimers and Waivers.**

22.1 **NO RELIANCE ON DOCUMENTS. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN PARAGRAPHS 5 AND 6 HEREOF (THE "CONTRACT WARRANTIES"), (A) SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY OR ON BEHALF OF SELLER TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY AND (B) BUYER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER IN CONNECTION WITH THE TRANSACTION**

-43-

CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE) ARE PROVIDED TO BUYER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY BUYER SHALL BE AT THE SOLE RISK OF BUYER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER ACKNOWLEDGES AND AGREES THAT (A) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (B) BUYER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED BY SELLER OR ANY AFFILIATE TO BUYER, BUT RATHER WILL RELY ON ITS OWN INVESTIGATIONS AND ANY REPORTS COMMISSIONED BY BUYER WITH RESPECT THERETO, AND (C) NEITHER SELLER, NOR ANY AFFILIATE OF SELLER SHALL HAVE ANY LIABILITY TO BUYER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

22.2   **Disclaimers**.  EXCEPT FOR THE CONTRACT WARRANTIES, BUYER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS.  BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "<u>AS IS, WHERE IS, WITH ALL FAULTS</u>".  BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND NEITHER SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE

ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER OR ANY AFFILIATE, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE, OTHER THAN THE CONTRACT WARRANTIES.

BUYER ACKNOWLEDGES THAT BUYER'S ACCESS AND INSPECTION RIGHTS HAVE BEEN LIMITED AS SET FORTH IN THIS AGREEMENT AND THAT BUYER UNDERSTANDS THE RISKS ASSOCIATED WITH PURCHASING THE ASSETS ON THE BASIS OF SUCH LIMITED INVESTIGATIONS. BUYER REPRESENTS TO SELLER THAT NOTWITHSTANDING SUCH LIMITATIONS BUYER WILL HAVE CONDUCTED SUCH INVESTIGATIONS AS BUYER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE ASSETS AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE ASSETS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION), AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AFFILIATES, AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN THE CONTRACT WARRANTIES. UPON CLOSING, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS, AND BUYER, UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER AND SELLER'S AFFILIATES (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT OR UNDER ANY ENVIRONMENTAL LAW), LOSSES, DAMAGES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AND SELLER'S AFFILIATE'S (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) REGARDING THE ASSETS AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE ASSETS.

\\COR\433614.5

**BUYER AGREES THAT SHOULD ANY INVESTIGATION, CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION) ON OR RELATED TO THE ASSETS BE REQUIRED AFTER THE DATE OF CLOSING, NEITHER SELLER NOR ANY AFFILIATE SHALL HAVE ANY LIABILITY TO BUYER TO PERFORM OR PAY FOR SUCH INVESTIGATION, CLEAN-UP, REMOVAL OR REMEDIATION, AND BUYER EXPRESSLY WAIVES AND RELEASES ANY CLAIM TO THE CONTRARY.**

**BUYER FURTHER ACKNOWLEDGES THAT (1) THE CONTRACT WARRANTIES SHALL NOT SURVIVE THE CLOSING BUT SHALL MERGE INTO THE CONVEYANCE INSTRUMENT, AND SHALL HAVE NO FURTHER FORCE OR EFFECT AFTER THE CLOSING AND (2) THE LIABILITY OF SELLER UNDER OR WITH RESPECT TO THE CONTRACT WARRANTIES SHALL BE LIMITED TO THE EXPRESS REMEDIES OF BUYER SET FORTH IN THIS AGREEMENT.**

**BUYER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY BUYER, AND BUYER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OF BUYER'S CHOICE WITH REGARD TO THE TERMS OF SUCH DISCLAIMERS, WAIVERS AND RELEASES.  BUYER ACKNOWLEDGES AND WARRANTS THAT BUYER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS AND RELEASES IS FREE AND VOLUNTARY.**

22.3    <u>Effect and Survival of Disclaimers</u>.  Seller and Buyer acknowledge that the provisions of this <u>paragraph 22</u> are an integral part of the transactions contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller would not enter into this Agreement but for the provisions of this <u>paragraph 22</u>.  Seller and Buyer agree that the provisions of this <u>paragraph 22</u> shall survive Closing or any termination of this Agreement.

[Signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

**SELLER:**

**WINN-DIXIE RALEIGH, INC.**,
a Florida corporation


By: _____
Name: _____
Title: _____


**BUYER:**

**ALEX LEE, INC.**,
a North Carolina corporation


By: _____
Name: _____
Title: _____

\\COR\433614.5

Acknowledged and agreed this ___ day of _____, 2005 for the limited purposes set forth in <u>paragraph 18</u> of this Agreement:

**ESCROW AGENT:**

**NEAR NORTH NATIONAL TITLE LLC**

By: _____

Name: _____

Title: _____

\\COR\433614.5