## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made effective as of June 30, 2005 (the "Effective Date"), by and among

**WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation and **WINN-DIXIE RALEIGH, INC.,** a Florida corporation (collectively, the "Seller"), and

**THE BUYERS,** as listed on Schedule 1 attached hereto and incorporated herein , or their permitted assignees pursuant to paragraph 17.5 of this Agreement (each, a "Buyer"; collectively, the "Buyers").

### R E C I T A L S :

A.     Seller is the tenant of each of 37 supermarket stores and an adjacent fuel center (the "Stores"), each of which is listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under the respective leases, including amendments thereto (the "Leases") described on Exhibit A-2 to this Agreement.  The Stores occupy the respective leased premises as described in each Lease (the "Leased Premises"), within the respective parcels of real property described on Exhibit A-2 to this Agreement associated with each Lease.  Seller's leasehold interest in each Leased Premises pursuant to each Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "Assets."

B.     Seller desires to transfer and sell and Buyers have agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.     Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date.  By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no.  05-03817-3F1 (the "Bankruptcy Case").

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0     **Defined Terms.**  Capitalized terms as used in this Agreement will have the following meanings when used herein.

1.1     "Adequate Assurance Information" will mean, with respect to each Buyer, financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that Landlords and Subtenants are adequately assured of such Buyer's future performance under the Leases, as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of such Buyer's obligations under the Leases and (where applicable) the Subleases by an Affiliate of such Buyer with sufficient assets to provide adequate assurance of future performance.

1.2     "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3     "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4     "Allocation Schedule" will mean the allocation of the Base Purchase Price, Base Deposit and Inventory Deposit to each of the Stores as provided on Exhibit E to this Agreement.

1.5     "Approval Hearing" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.6     "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.7     "Bankruptcy Code" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.8     "Bankruptcy Court" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.9     "Bankruptcy Court Approval" will mean the entry of one or more Sale Orders with respect to the Stores by the Bankruptcy Court.

1.10    "Bankruptcy Case" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.11    "Base Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.12    "Base Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.13    "Bidding Procedures" will mean the procedures approved by the Bankruptcy Court that will govern the selection by Seller of the Successful Bid relating to a particular Store.

1.14  "<u>Bill of Sale</u>" will mean a bill of sale substantially in the form of <u>Exhibit B</u> to this Agreement, pursuant to which Seller will sell and convey to the applicable Buyer at each Closing the Inventory, the Supplies, the Equipment and other tangible and intangible personal property constituting a portion of the Assets relating to the one or more Stores being transferred at such Closing.

1.15  "<u>Buildings</u>" will have the meaning assigned in <u>paragraph 2.2</u> of this Agreement.

1.16  "<u>Business Day</u>" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.17  "<u>Buyer</u>" and "<u>Buyers</u>" will have the meanings assigned in the initial paragraph of this Agreement.  As used herein, the term "Buyer" means, with respect to any particular Store or Stores (and related Assets), the Buyer that is purchasing such Store as provided in the Allocation Schedule.

1.18  "<u>Buyer Delivery Confirmation</u>" will have the meaning assigned in <u>paragraph 14.3</u> of this Agreement.

1.19  "<u>Buyer Inventory Representative</u>" will mean a person designated in writing by each Buyer to act in such capacity.

1.20  "<u>Buyer's Closing Costs</u>" will mean, with respect to each Buyer: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policies (and the cost of any simultaneous issue mortgagee title insurance policies and any loan-related title insurance endorsements thereon); (d) intentionally omitted; (e) recording fees payable in connection with recording the Conveyance Instruments in the appropriate public records; (f) cost of the Environmental Reports, including any supplements or updates; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment, Supplies and Inventory; (i) one half of the fees and costs of the Closing Escrow Agent; and (j) one half of the fees and costs of the Inventory Service.

1.21  "<u>Buyer's Escrowed Items</u>" will have the meaning assigned in <u>paragraph 14.3</u> of this Agreement.

1.22    "<u>Closing</u>" with respect to each Buyer and with respect to one or more Stores will mean the consummation of the assignment, assumption, sale and purchase of the Assets relating to such Store or Stores pursuant to this Agreement as indicated by delivery of the Conveyance Instruments and other documents contemplated by <u>paragraph 14</u> of this Agreement and the Purchase Price as contemplated in this Agreement with respect to such Store or Stores, which will be deemed to occur at 12:01 a.m. on the Closing Date with respect to such Store or Stores.

1.23    "<u>Closing Date</u>" will mean the date as to a particular Store or Stores designated by Seller in writing, and reasonably acceptable to the applicable Buyer, that is between one day and 30 days following the Bankruptcy Court Approval with respect to such Store or Stores.

1.24    "<u>Closing Statement</u>" will mean a statement in the form of <u>Exhibit C-1</u> to this Agreement (or in such other form as is prepared by Seller and reasonably acceptable to the applicable Buyer) reflecting the net amount due Seller at each Closing (other than in respect of the Inventory Price), after making the adjustments described in <u>paragraph 3.3.3</u> of this Agreement and in other provisions of this Agreement.

1.25    "<u>Confidentiality Agreements</u>" will mean the existing letter agreements between (i) Winn-Dixie and SUPERVALU INC. and (ii) Winn-Dixie and each respective Buyer, regarding, among other things, confidentiality relating to the subject matter of this Agreement.  Each Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreements and is entitled to enforce all obligations of the respective Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.

1.26    "<u>Conveyance Instrument</u>" will have the meaning assigned in <u>paragraph 14.2</u> of this Agreement.

1.27    "<u>Credit Agreement Liens</u>" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.28    "<u>Cure Costs</u>" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Leases and the Subleases.

1.29    "<u>Damages</u>" will have the meaning assigned in <u>paragraph 16.5</u> of this Agreement.

1.30 "Deposit" will have the meaning assigned in paragraph 3.3.2 of this Agreement.

1.31 "Due Diligence Materials" will mean, collectively, (i) the Leases, the Subleases (if any), the Title Reports and the Environmental Reports, (ii) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreements or otherwise) in hard copy, in electronic format, at the Stores, on the Merrill Website, or otherwise and (iii) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.32 "Effective Date" will have the meaning assigned in the initial paragraph of this Agreement, and shall also be the date that Seller accepts this Agreement.

1.33 "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.34 "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.35 "Escrow Agent" will mean Title Insurer, acting as escrow and closing agent.

1.36 "Excluded Inventory" will mean (i) any private label goods and merchandise; (ii) any goods and merchandise that are damaged, spoiled or distressed; (iii) any items that as of the Inventory Count Date are past Seller's "pull date", if any, or, with respect to dairy items, within five days of Seller's "pull date" or, with respect to frozen foods, within 10 days of Seller's "pull date", or with respect to pharmaceutical inventory (including diabetic supplies), within 30 days of the manufacturer's expiration date, if any; (iv) all goods and merchandise other than saleable, nonperishable, national-brand merchandise inventory in the categories commonly known as Grocery, Dairy, Frozen Food and GM/HBC (General Merchandise / Health, Beauty and Cosmetic); and (v) if applicable, any inventory deemed to be Excluded Inventory under paragraph 3.5 of this Agreement. Specifically, Excluded Inventory shall include without limitation tobacco, alcohol and perishable department product including bakery, deli, floral, produce and meat.

1.37 "Excluded Personal Property" will mean: (i) all Excluded Inventory; (ii) all packaging materials and supplies not included in the term "Supplies"; (iii) all leased point-of-sale equipment and leased photo lab equipment; (iv) all other leased equipment (including all other leased equipment described on Exhibit D to this Agreement with respect to each Store); (v) all owned computer and related equipment that contains software subject to a

license that restricts its transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed; (vi) all equipment and other personal property that is neither owned nor leased by Seller, including by way of example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners and equipment owned by product vendors; (vii) all over-the-road motor vehicles; (viii) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (ix) all data files other than Pharmacy Scrips; (x) all lottery equipment and tickets; (xi) all accounts receivable, bank accounts, cash and cash equivalents; (xii) all trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates; (xiii) all building signs and panels in all pole and pylon signs that advertise Seller's business in the Stores; (xiv) all intellectual property and rights (other than Pharmacy Scrips) relating to any of the foregoing; and (xv) all service agreements, leases of personal property, contracts and warranties relating to Seller's possession and operation of the Stores.

1.38    "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.39    "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.40    "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.41    "Initial Title Reports" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Stores that Seller has made available to Buyer for review on the Merrill Website or otherwise as of the Effective Date.  Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.42    "Inventory" will mean all inventories of goods and merchandise within the Stores and owned by Seller on the Inventory Count Date and held for resale in the ordinary course of business of Seller conducted at the Stores to retail customers, but excluding the Excluded Inventory.

1.43    "Inventory Certificate" will mean with respect to each Store a certificate executed by Buyer and Seller in connection with the Closing as

contemplated by paragraph 3.4.4 of this Agreement, in the form attached hereto as Exhibit H to this Agreement.

1.44 "Inventory Closing Statement" will mean a statement in the form of Exhibit C-2 to this Agreement reflecting the net amount due Seller at each Closing in respect of the Inventory Price, after making the adjustments described in Exhibit C-2 and in other provisions of this Agreement.

1.45 "Inventory Count" will have the meaning assigned in paragraph 3.4.1 of this Agreement.

1.46 "Inventory Count Date" will mean, with respect to each Store, the day immediately preceding the Closing Date for such Store.

1.47 "Inventory Deposit" will have the meaning assigned in paragraph 3.3 or this Agreement.

1.48 "Inventory Price" will mean the purchase price for the Inventory determined pursuant to paragraph 3.4 of this Agreement.

1.49 "Inventory Service" will mean MSI Inventory Service Corporation or Accurate Inventory & Calculating Service, Inc., as designated by Seller, or such other inventory service as is selected by Seller and reasonably acceptable to Buyer.

1.50 "Investigation Period" will mean the period commencing on the Effective Date and ending at 5:00 p.m. Eastern Time five (5) Business Days after the Effective Date.

1.51 "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, and (ii) in the case of each Buyer, the actual knowledge of the senior officer or officers of such Buyer having responsibility for legal affairs, without any requirement of investigation or inquiry.

1.52 "Landlords" will mean the lessors under the Leases.

1.53 "Lease Concessions" will have the meaning assigned in paragraph 4.4 of this Agreement.

1.54 "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.1 of this Agreement.

1.55  "Leases" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.56  "Liquidated Deposit" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.57  "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or any particular Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Store or Stores for their current use, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.58  "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Jaguar" with respect to the disposition of the Stores and other properties.

1.59  "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on any of Seller's leasehold interests or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets; and (D) judgments that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets.

1.60  "Negotiation Period" will mean the period commencing on the Effective Date and ending at 12:00 Noon Eastern Time on July 11, 2005.

1.61  "ordinary course of business" means the ordinary course of business of Seller after the Filing Date.

1.62  "Outside Date" means September 2, 2005, as such date may be extended by the written agreement of Seller and Buyer.

1.63  "Permits" will have the meaning assigned in paragraph 6.2 of this Agreement.

1.64  "Permitted Encumbrances" will mean (i) all matters listed on Exhibit F to this Agreement, (ii) all other matters set forth as exceptions in the Initial Title Reports, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in any additional Title Reports, other than Monetary Liens.

1.65  "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.66  "Pharmacy Scrips" will mean all customer lists, prescription files, prescription registers, and operating and maintenance logs owned by Seller that relate to the pharmacy operated in any of the stores.

1.67  "Purchase Price" will mean the Base Purchase Price, the Inventory Price and the Supplies Price collectively.

1.68  "Real Property" will mean the Leased Premises and the Improvements together.

1.69  "Real Property Escrow Date" with respect to one or more Stores will mean the date that is two Business Days prior to the Closing Date for such Store or Stores or such earlier date after the Bankruptcy Court Approval as Buyer and Seller may mutually designate.

1.70  "Sale Order" will mean an order or orders of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, in each case with respect to one or more of the Stores.

1.71  "Seller" will have the meaning assigned in the initial paragraph of this Agreement.  As used herein, the term "Seller" means, with respect to each Store and its related Assets located in Georgia, Winn-Dixie Raleigh, Inc., and with respect to each Store and its related Assets located in Alabama and Mississippi, Winn-Dixie Montgomery, Inc.

1.72  "Seller Delivery Confirmation" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.73    "Seller Inventory Representative" will mean Michael Chlebovec or another person designated in writing by Michael Chlebovec or by Seller to act in such capacity.

1.74    "Seller's Brokers" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.75    "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; (c) the Cure Costs; (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instruments; (e) one half of the fees and costs of the Closing Escrow Agent; and (f) one half of the fees and costs of the Inventory Service.

1.76    "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.77    "Stores" will have the meaning assigned in paragraph A of the Recitals to this Agreement and, when followed by "#" and a number will refer to the particular Store with the indicated number listed on Exhibit A-1 to this Agreement, including if applicable any associated gas station, liquor store, pharmacy or other specialty area operated by Seller at the Leased Premises.

1.78    "Sublease" will mean, with respect to each Store, each sublease of a portion of the Leased Premises listed on Exhibit A-2 to this Agreement (if any), including amendments.  If no sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Sublease at such Store will be disregarded.

1.79    "Subtenant" will mean, with respect to each Store, the subtenant or sublessee under each Sublease.  If no sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Subtenant at such Store will be disregarded.

1.80    "Successful Bid" will mean, with respect to a particular Store, the highest or otherwise best offer to purchase the Assets relating to such Store, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.81    "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the

preparation or merchandising of Inventory, located within the Stores and owned by Seller on the Inventory Count Date, excluding, however, any such packaging materials and supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of their Affiliates.

1.82    "Supplies Price" will mean the purchase price payable by Buyer for the Supplies, which will be $2,500.00 per Store.

1.83    "Terminated Stores" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.84    "Title Reports" will mean, collectively, (i) the Initial Title Reports and (ii) any additional title reports and/or title insurance commitments with respect to the Stores that Seller has made available to Buyer for review on the Merrill Website or otherwise.

1.85    "Title Insurer" will mean First American Title Insurance Company or Near North National Title LLC, as agent for Lawyers Title Insurance Corporation, or any other nationally recognized title insurance company, as designated by Seller.

1.86    "Title Policies" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.87    "Winn-Dixie" will mean Winn-Dixie Stores, Inc.

2.0    **Property Included in Sale.**  Seller agrees to assign, transfer, sell and convey to the applicable Buyer, and each Buyer, with respect to the Stores it is purchasing, agrees to assume and purchase from Seller, the Assets, which-excluding Excluded Personal Property-are comprised of the following:

2.1    Seller's interest, as tenant, under the Leases and Seller's interest in any leasehold improvements;

2.2    Seller's interest in all fixtures and all equipment located in the store buildings now existing on the Leased Premises (the "Buildings"), including but not limited to Seller's interest in (i) heating and air conditioning systems (including all refrigerants and gases), facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "Improvements"), and (ii) Seller's trade fixtures and equipment located in the Buildings (the "Equipment");

2.3    The Inventory;

2.4    The Supplies;

2.5    With respect to each Store that includes a pharmacy, the Pharmacy Scrips (provided Buyer has obtained all Permits necessary for Seller to lawfully convey the Pharmacy Scrips to Buyer at Closing) and, to the extent transferable, ownership and control of pharmacy phone lines;

2.6    Seller's interest in the Subleases (if any).

2.7    Each Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are (a) subject to higher or otherwise better offers for the Assets, and (b) conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement. Each Seller agrees and acknowledges that (i) this Agreement is a block bid by the Buyers for the Assets related to the Stores, and is to be considered as a whole, and (ii) Seller shall not be permitted to terminate this Agreement with respect to any particular Store or Stores, or with respect to any particular Buyer, except as specifically permitted in paragraphs 15.1(a)(i), 15.1(a)(ii), 15.1(a)(v), 15.1(a)(vi), 15.1(a)(viii) and 15.1(a)(ix) herein.  If Seller selects this Agreement as the "Initial Bid" as defined in the Bidding Procedures, Seller may consider competing bids in accordance with the Bidding Procedures; provided, however, any such competing bid must exceed the Base Purchase Price for all Stores as set forth in this Agreement by at least five percent (5%).  Notwithstanding the foregoing, however, after Seller has selected this Agreement as the Initial Bid, if this Agreement is terminated with respect to the Stores because this Agreement is not the Successful Bid with respect to the Stores, each Buyer shall be entitled to a termination fee of 3% of the cash portion of the Base Purchase Price allocated for the respective Buyer's Store or Stores as set forth in this Agreement, which fee shall be payable from the proceeds Seller receives after the closing of the sale of the Stores pursuant to a Successful Bid or Bids to any Person that is not SUPERVALU INC., a Buyer, or an Affiliate of SUPERVALU INC. or a Buyer; provided, however, that Buyer shall not be entitled to receive any termination fee if Buyer is in default of this Agreement at the time of termination of this Agreement.

3.0    **Purchase Price.**

3.1    Amount.  The purchase price to be paid by Buyers to Seller for the Assets (other than the Inventory and Supplies) is Nine Million Five Hundred Thousand and no/100 Dollars ($9,500,000.00) in the aggregate (the "Base Purchase Price"), which will be allocated to each Store as set forth on the Allocation Schedule,.  The purchase price to be paid by the applicable Buyer to Seller for the Inventory in respect of each Store is the total of the Inventory Price for each item of Inventory, and the purchase price to be paid by the applicable Buyer to Seller for the Supplies in respect of each Store is the Supplies Price.  If this Agreement is terminated in accordance with its terms as to one or more, but not all, of the Stores, then (i) the

aggregate Base Purchase Price will be reduced based on the Allocation Schedule for each Store as to which this Agreement is so terminated and such reduced Base Purchase Price shall apply to the Stores that remain subject to the continuing force and effect of this Agreement; and (ii) the terms "Inventory", "Supplies" and "Subleases" will be deemed to exclude, respectively, all Inventory, Supplies and Subleases of the Stores with respect to which this Agreement is terminated.

3.2     <u>Contract Consideration and Base Deposit</u>.  As specific consideration for Seller's agreement to sell the Assets to Buyers in accordance with the terms and conditions of this Agreement, Buyers shall deliver to Escrow Agent, no later than two Business Days after Seller's execution and acceptance of this Agreement, provided Seller has delivered to each Buyer the Landlord contact information as required by <u>paragraph 4.4</u> of this Agreement, a base earnest money deposit with respect to the Stores in an aggregate amount equal to the amount set forth in the Allocation Schedule (the "<u>Base Deposit</u>"), which will be allocated to each Store pursuant to the Allocation Schedule.  Buyers shall make the Base Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Base Deposit will be subject to refund to Buyers to the extent and in the circumstances described in <u>paragraphs 12, 15 and 16</u>.  The applicable portion of the Base Deposit will be credited against the Base Purchase Price at the relevant Closing and will be held in an escrow account maintained by Escrow Agent prior to the relevant Closing.  Whenever used herein, the term Base Deposit also will be deemed to include all interest accrued thereon if the escrow account maintained by Escrow Agent is an interest bearing account; however, for state and federal income tax purposes, interest, if any, accrued on the Base Deposit will be deemed earned by Buyers.  Each of the Buyers' federal taxpayer identification numbers (FEIN) are identified on <u>Schedule 1</u>.

3.3     <u>Payment</u>.  The Purchase Price will be paid in the following manner:

3.3.1   <u>*Base Purchase Price and Supplies Price*</u>.  On the Real Property Escrow Date, each Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Base Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the relevant Closing Statement), and the Supplies Price with respect to such Store or Stores.  On the Closing Date for such Store or Stores, each Buyer will, subject to the conditions set forth in <u>paragraph 10</u> of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted) and the Supplies Price with respect to such Store or Stores to Seller (by wire transfer to an account designated in writing by Seller).

3.3.2    *Inventory Deposit and Inventory Price*.    On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) an inventory deposit with respect to the applicable Store or Stores in the amount set forth in the Allocation Schedule (the "<u>Inventory Deposit</u>") with respect to such Store or Stores.    The Inventory Price for each Store shall be determined in the manner set forth in <u>paragraph 3.4</u> of this Agreement.    At each Closing for one or more Stores, (a) Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the amount by which the Inventory Price for such Store or Stores exceeds the Inventory Deposit for such Store or Stores, and (b) Buyer will instruct Escrow Agent to transfer and deliver the Inventory Price with respect to such Store or Stores to Seller, by wire transfer to an account designated in writing by Seller.    If the Inventory Deposit for any Store or Stores being purchased by any one Buyer on any Closing Date exceeds the aggregate Inventory Price for such Stores, then Seller and Buyer shall provide written instructions to Escrow Agent to deliver the excess to the applicable Buyer promptly following the Closing for such Store or Stores.    The Base Deposit and, once deposited, the Inventory Deposit with respect to each Store will individually and collectively sometimes be referred to in this Agreement as the "<u>Deposit</u>".

3.3.3    *Certain Transaction Costs*.    All relevant rent, taxes (including real and personal property taxes), utilities (including the pharmacy phone line, where applicable) and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding each Closing Date and will be a credit or debit, as the case may be, against the Base Purchase Price and Supplies Price payable at such Closing to the extent thereof and then against the Inventory Price.    Following any proration of annual real and personal property taxes resulting in a credit to a Buyer, such Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate.    Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Each Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes.    The provisions of this <u>paragraph 3.3.3</u> which apply to the period after the Closing for any Store shall survive the Closing for such store.

3.3.4 *Sales Tax*.  Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyers, unless such transfer is subject to an available exemption therefrom.  On Seller's request, each Buyer agrees to provide Seller with a certificate stating that such Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Seller or any governmental authority to document that sale of the Inventory is exempt from sales tax.  This paragraph 3.3.4 shall survive the Closing for each store.

3.4 Inventory.

3.4.1 *Count of Store Inventory.*  Seller shall close each Store at a time designated by Seller between 5:00 p.m. and 11:00 p.m. on the Inventory Count Date, unless otherwise agreed to by Seller and Buyer.  As soon as possible after the closing of each such Store, the parties will conduct a physical count (or measurement with respect to gasoline and other vehicle fuels) of the Inventory at each of such Stores (the "Inventory Count") with the assistance of the Inventory Service.  Buyer and Seller will each have representatives present at each Store during the Inventory Count who will acknowledge in writing all computations before leaving the Store.  Upon completion of such Inventory Count, except for mathematical errors, other agreed upon changes and disputes regarding Excluded Inventory, the count of the Inventory Service shall be final and binding on the parties for all purposes of this Agreement.

3.4.2 *Pharmacy Inventory.*  With respect to each Store that includes a pharmacy, pharmaceutical Inventory will be inventoried by item as follows and the inventory forms for such Inventory will be signed by registered pharmacists representing Seller and Buyer:

(a) Schedule II drugs will be inventoried as exact counts and transferred on DEA 222 form supplied to Buyer by Seller and approved by Buyer; and

(b) Will-call prescriptions filled but not purchased by customers at the time of the Inventory Count will be returned for credit and included in the Inventory Count.

3.4.3 *Valuation of Inventory.*  The Inventory will be valued by applying the following methods to the count reported by the Inventory Service:

(a) with respect to pharmaceutical Inventory and gasoline the value used will be Seller's actual cost as reflected on its

records kept in the ordinary course of business (for gasoline, cost shall be last acquisition cost), and

(b)     with respect to all other Inventory the value used will be determined by taking Seller's standard retail shelf price (after adjusting to remove temporary or special price reductions, promotions or discounts, coupon discounts or customer loyalty card discounts) for the applicable item and multiplying such price by the valuation percentage for each merchandise category indicated in the table below:

| Category | Valuation Percentage |
|---|---|
| 1.    Grocery (food and non-food) | 60% |
| 2.    Dairy | 60% |
| 3.    Frozen Food | 60% |
| 4.    General Merchandise/Health, Beauty, and Cosmetic | 50% |

3.4.4   *Inventory Certificates; Inventory Closing Statement*.   Upon completion of the valuation of the Inventory for each Store, which shall be completed prior to the completion of Closing, the applicable Buyer and Seller shall execute an Inventory Certificate, which shall contain the Inventory Price for the Inventory at such Store, and shall have incorporated therein a complete listing of the Inventory for such Store.  Following execution of the Inventory Certificates, if requested by Buyer, Seller or Escrow Agent, Buyer and Seller shall execute an Inventory Closing Statement, which shall contain the Inventory Price for the Inventory at such Store and shall otherwise be consistent with the Inventory Certificate, and shall have incorporated therein appropriate disbursement instructions to Escrow Agent.

3.4.5   *Cooperation and Resolution of Disputes.*   The parties agree to be cooperative and reasonable in connection with each Inventory Count and will attempt, in good faith, to resolve any disputes respecting the quantity of Inventory, Excluded Inventory and Excluded Personal Property that may arise during the Inventory Count.  Any disputes that have not been resolved by the completion of Closing shall be separately listed and settled by Buyer Inventory Representative and Seller Inventory Representative with respect to the relevant Store as expeditiously as practicable thereafter or, if the parties cannot agree, by the Bankruptcy Court.  Any such determination of any dispute shall be final and binding on the parties.

3.4.6 *Inventory Services and Fees*.   Seller will engage the Inventory Service, but the fees of the Inventory Service will be paid equally by Buyers and Seller.  Buyers and Seller agree to pay such fees at Closing or earlier if then due and in any event before delinquent.

3.5   Inventory Relating to Permits.  If by Closing any particular Buyer shall not have obtained any required Permit contemplated by paragraph 9.2 of this Agreement, notwithstanding its commercially reasonable efforts to do so, any pharmaceuticals or other Inventory that under applicable law may not be transferred without such Permit will not be sold and transferred at Closing but will be segregated at the applicable Store, in which case, unless the parties agree otherwise at or before Closing, (a) the relevant items of Inventory will be deemed to constitute Excluded Inventory, (b) the Bill of Sale to be delivered to such Buyer at Closing will specifically exclude such Inventory, (c) the Inventory Price for that Store will be reduced by the Inventory Price allocable to such Inventory, and (d) Seller will remove such Inventory from the applicable Store in the same manner as other Excluded Property and with reasonable promptness after Closing. Notwithstanding the foregoing clause (d), if applicable law or regulation restricts Seller from removing from the applicable Store (or transporting from such Store to a convenient location in which Seller will have continuing operations) any pharmaceuticals or other Inventory that constitutes Excluded Property, then (i) Seller will have the right to segregate such Inventory at a secured location in the Store selected by Seller and reasonably acceptable to Buyer, and to maintain and protect such Inventory at such secured location for so long as Seller reasonably requires in order to obtain all Permits necessary to remove or transport such Inventory (or to sell or convey such Inventory to a third party entitled to do so), (ii) Seller will have reasonable access to such secured location to maintain and protect such Inventory and when appropriate remove such Inventory from the Store, and (iii) Seller will have the right but not the obligation to require the applicable Buyer to purchase such Inventory, at the Inventory Price allocable to such Inventory, at such time as such Buyer has obtained such Permits as are required for Seller to do so.

3.6   Allocation of Base Purchase Price Among Assets at each Store.  Seller shall have the right to allocate the Base Purchase Price for each Store, for tax purposes and all other purposes, among the Assets at such Store other than Inventory and Supplies (as such Assets are described in paragraph 2.0 of this Agreement); provided, however, that such allocation shall not be binding upon the applicable Buyer or Seller or determinative with respect to any allocation made by Seller of the Base Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case.  The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets at each Store on the applicable Closing Statement.

4.0  **Buyers' Due Diligence.**

4.1    Acknowledgment.   In deciding to acquire the Assets pursuant to this Agreement, Buyers acknowledge that they have had the opportunity to conduct some due diligence regarding the Stores and the Assets and they have had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement. Buyers confirm and acknowledge that Seller has given Buyers and their representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Stores and the Assets and to acquire such additional information about the Stores and the Assets as Buyers have reasonably requested.

4.1.1  Investigation Period.   During the Investigation Period, (a) each Buyer shall have the privilege at all reasonable times, and after giving Seller advance written or telephonic notice, of going upon any of the Real Property with its agents and engineers as needed to investigate and inspect the Assets with respect to each Store to determine whether or not the same are in acceptable physical condition (in the applicable Buyer's reasonable determination) as further specified in paragraph 4.1.3 below and to conduct a physical inventory of the Equipment located at each Store; provided, however, that any investigations or inspections shall not be physically intrusive on the Real Property unless Seller permits otherwise in a prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed; and (b) Seller shall use commercially reasonable efforts to provide information (without representation or warranty as to its accuracy or completeness) requested by the Buyer that is (i) related to the physical condition of the Assets and Stores, or (ii) related to or affecting the Leases; provided, however, in connection therewith Seller shall not be required to provide any written or electronic information or materials relating to the Stores or the Assets other than those expressly required or contemplated pursuant to the foregoing provisions in this paragraph 4.1.1 or any other terms of this Agreement (and no event shall Seller be required to provide any books and records, sales records, trade secrets, and other proprietary information or materials that are proprietary in nature or any information or materials that are protected by any privilege, immunity, work-product doctrine or other such protection).

4.1.2  Inspection.   The rights provided to each Buyer in paragraph 4.1.1 SHALL IN NO WAY ABROGATE SUCH BUYER'S OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENTS.  Each Buyer hereby indemnifies and agrees to hold harmless Seller from and against any and all damage to the Real Property and all other Assets (including the cost of restoring the Real Property to its pre-entry condition) and injury to any

persons caused by such Buyer or its agents in the course of exercising such Buyer's due diligence rights under this Agreement.  Notwithstanding the preceding sentence, each Buyer will have no obligation to indemnify or hold Seller harmless from those claims, demands, liabilities, costs, expenses, penalties, damages and losses arising out of or relating to: (a) the negligence or willful misconduct of Seller or any of its Affiliates, subtenants, licensees, employees, agents, officers, or directors, (b) a pre-existing condition of any of the Assets; or (c) the existence of information obtained by a Buyer as a result of its investigation.  Such indemnification will survive the expiration or termination of this Agreement and/or the consummation of the transactions contemplated by this Agreement. Notwithstanding anything in this Agreement to the contrary, each Buyer shall not conduct (or cause to be conducted) any physically intrusive investigation, examination or study of the Real Property without obtaining the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed.

4.1.3  Termination.  If a Buyer determines that physical condition of the relevant Assets or any Store or Stores are subject to (a) a material defect in any of the Equipment, Buildings or Improvements that could reasonably be expected to, individually or in the aggregate, have a material adverse effect on such Buyer's ability to operate such Store or Stores, or (b) the failure of the Buildings, Improvements or Leased Premises to comply with applicable law for use by such Buyer as a retail grocery store without significant material expenditures by such Buyer to modify such affected Buildings, Improvements or Leased Premises such that the operation of such affected Store by such Buyer would be economically unfeasible in such Buyer's opinion (any item specified in (a) or (b) above being a "Material Physical Defect"), then such Buyer may terminate this Agreement as to any such affected Store or Stores by notice to Seller (given by facsimile to Timothy N. Tucker at 404-572-5100 and by given by email to TTucker@kslaw.com with copy to CatherineIbold@winn-dixie.com) before the end of the Investigation Period, which notice, to be effective, shall specify the affected Store or Stores and specify with particularity the Material Physical Defect.  Any right of each Buyer to terminate this Agreement pursuant to this paragraph 4.1.3 as to any Store or Store on account of any Material Physical Defect shall be deemed waived if any such Buyer does not so terminate this Agreement as provided above before the end of the Investigation Period.  If this Agreement is terminated in accordance with this paragraph 4.1.3 as to one or more, but not all, of the Stores, then (i) the aggregate Base Purchase Price shall be reduced based on the Allocation Schedule for each Store as to which this Agreement is so terminated and such reduced Base Purchase Price shall apply to the Stores that remain subject to the continuing force and effect of this Agreement; and (ii) the terms "Inventory", "Supplies" and "Subleases" will be deemed to exclude,

respectively, all Inventory, Supplies and Subleases of the Stores with respect to which this Agreement is terminated.  Except as specifically stated in the foregoing sentence, such termination shall not modify or affect this Agreement in any way as to the Stores where notice of termination has not been timely given in accordance with this paragraph 4.1.3.  Upon termination of this Agreement with respect to any Store or Stores pursuant to this paragraph 4.1.3, Seller shall immediately instruct the Escrow Agent to return the applicable Base Deposit to the applicable Buyer within two (2) Business Days after expiration of the Investigation Period.

4.2    Title.  Buyers confirm and acknowledge that Seller has made the Initial Title Reports available to Buyers, and intends to make additional Title Reports available to Buyers, and Buyers may negotiate with the Title Insurer to obtain title insurance policies with respect to the Stores (the "Title Policies") at Closing.  If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present use or occupancy of the affected Store, a Buyer may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to CatherineIbold@winn-dixie.com within three business days of the date such additional Title Report is either delivered to Buyer or posted on the Merrill Website.  To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #____" with the appropriate Store number set forth).  If a Buyer timely notifies Seller of any valid objection to any such matter set forth in any additional Title Report with respect to any Store, and if Seller declines or is unable to cure any such objection, then Seller will have the right to terminate this Agreement with respect to such Store at any time thereafter, with no liability to the Buyer, unless the Buyer waives such objection by written notice received by Seller no later than the earlier of (x) one Business Day following Buyer's receipt of  notice from Seller that it will not cure such objection or (y) the Closing Date.  If a Buyer closes the purchase of the Assets with respect to any Store, then the Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter and such matter shall constitute a Permitted Encumbrance.

4.3    Environmental Reports.  Buyers confirm and acknowledge that, with respect to some Stores, Seller has made available to Buyers for review on the Merrill Website a separate environmental report (each, an "Environmental Report"), covering the Real Property relating to each Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where such Store is located.

4.4   <u>Lease Negotiations</u>.   Within 24 hours after full execution of this Agreement, Seller shall provide Buyers with the current listing of contact information for the Landlords (and leasing agents, if applicable) in Seller's possession.  During the Negotiation Period, representatives of each Buyer shall be allowed to contact and have discussions with the Landlord(s) for the Store or Stores such Buyer intends to purchase hereunder to attempt to obtain from such Landlord(s) lease concessions as required by such Buyer in the categories set forth on <u>Exhibit A-3</u> (the "Lease Concessions"). The parties agree that <u>Exhibit A-3</u> has been appended to the executed copy of this Agreement but shall not be filed with the Court.  Each Buyer shall make reasonable efforts to contact the applicable Landlord(s) and, if such Landlord(s) engage in discussions with such Buyer, each Buyer shall make reasonable efforts to negotiate with the Landlord(s) in good faith and shall use commercially reasonable diligent efforts to obtain the Lease Concessions.  Each Buyer shall give Seller reasonable notice of any discussions with any Landlord and shall provide Seller with copies of all correspondence between such Buyer and each Landlord and all such discussions shall be subject to the terms of the Confidentiality Agreements.  If at the end of the Negotiation Period, a Buyer has not received from a Landlord assurance satisfactory to such Buyer that such Landlord will grant to such Buyer the Lease Concessions upon Closing, then such Buyer may terminate this Agreement as to any Store with respect to which the Lease Concessions were not granted by providing notice to Seller (given by facsimile to Timothy N. Tucker at 404-572-5100 and by email to TTucker@kslaw.com with copy to CatherineIbold@winn-dixie.com) before the end of the Negotiation Period, which notice, to be effective, shall specify the category(ies) of Lease Concessions that were not granted.  Failure or delay on the part of any Landlord(s) to timely or satisfactorily respond to a Buyer's efforts to contact or negotiate with such Landlord(s) shall not impact such Buyer's right to terminate this Agreement as to the applicable Store pursuant to this <u>paragraph 4.4</u>.  Any right of a Buyer to terminate this Agreement pursuant to this <u>paragraph 4.4</u> shall be deemed waived if such Buyer does not timely terminate this Agreement as provided above before the end of the Negotiation Period.  If this Agreement is terminated in accordance with this <u>paragraph 4.4</u> as to one or more, but not all, of the Stores, then (i) the aggregate Base Purchase Price will be reduced based on the Allocation Schedule for each Store as to which this Agreement is so terminated and such reduced Base Purchase Price shall apply to the Stores that remain subject to the continuing force and effect of this Agreement; and (ii) the terms "Inventory", "Supplies" and "Subleases" will be deemed to exclude, respectively, all Inventory, Supplies and Subleases of the Stores with respect to which this Agreement is terminated.  Except as specifically set forth in the foregoing sentence, such termination shall not modify or affect this Agreement in any way as to the Stores where notice of termination has not been timely given in accordance with this <u>paragraph 4.4</u>.  Upon

termination of this Agreement with respect to any Store or Stores pursuant to this paragraph 4.4, Seller shall immediately instruct the Escrow Agent to return the applicable Base Deposit to the applicable Buyer within two (2) Business Days after expiration of the Negotiation Period.

5.0 **Representations and Warranties of Seller Relating to the Assets.**  To induce Buyers to purchase the Assets as provided above, each Seller, with respect to itself only, represents and warrants to the applicable Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials.

5.1 On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website: (i) copies of each of the Leases (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a) copies of the site plans for the Stores;

(b) copies of the fixture plans for the Stores; and

(c) a list of Equipment (other than Excluded Personal Property) with respect to each Store as reflected in Seller's current records;

it being understood that the materials described in this paragraph 5.1 have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

5.2 At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Monetary Liens other than the Permitted Encumbrances as provided in the Sale Order.

6.0 **General Representations and Warranties of Seller.**  In order to induce the Buyers to purchase the Assets as provided above, each Seller, with respect to itself only, represents and warrants to the applicable Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

6.1 Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transaction contemplated hereunder.  This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

6.2 No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("<u>Permit</u>") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, (iii) those contemplated by or required under <u>paragraph 3.5</u> of this Agreement and (iv) Bankruptcy Court Approval. To Seller's Knowledge, as of the Effective Date, Seller has all Permits required for Seller to occupy and operate the Stores, except to the extent that Seller's failure to have any such Permits would not have a Material Adverse Effect on Seller's occupancy or operation of the Stores.

6.3 Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.4 To Seller's Knowledge, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a Material Adverse Effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

6.5 None of the employees employed by Seller in the Stores is covered by a union contract, collective bargaining agreement or other labor agreement. To Seller's Knowledge, as of the Effective Date, with respect to the Stores, Seller is not a party to, or bound by, any collective bargaining or other labor or union agreement, and Seller is not involved in a labor dispute (relating to organized labor or collective bargaining, but not individual employment dispute), process or organization or collective bargaining with, or relating to, any of its employees.

6.6 Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

6.7    To Seller's Knowledge, as of the Effective Date, Seller has not received any notice (a) indicating that the Stores are not in compliance in any material respect with applicable laws of federal, state, local or other governments having jurisdiction (and all agencies thereof), including without limitation environmental laws, or (b) of any pending or threatened condemnation, zoning, eminent domain or similar proceeding affecting the Stores, except in the case of either (a) or (b), as otherwise would not have a Material Adverse Effect on the ability to operate the Stores as a supermarket.

7.0    **Buyers' Representations and Warranties.**  Each Buyer, with respect to itself only, represents and warrants to the applicable Seller as follows:

7.1    Each Buyer is an entity duly organized, validly existing and in good standing under the laws of the State, as indicated in Schedule 1 of this Agreement, and has the power and authority to consummate the transaction contemplated hereunder.  This Agreement and each of the closing documents to which each Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required action on behalf of each Buyer.

7.2    No Permit is or will be required in connection with the execution, delivery or performance by each Buyer of this Agreement or any closing document to which each Buyer is or is to become a party or the transactions herein or therein contemplated, except for pharmacy licenses and permits for the sale of beer, wine or other alcoholic beverages, which each Buyer agrees to use commercially reasonable efforts to obtain (provided that no Closing under this Agreement will be conditioned upon Buyer's receipt of such license or permit; provided, further, that the applicable Seller shall cooperate with each Buyer in obtaining such licenses and permits).  If as of Closing a Buyer, despite its reasonable efforts, is unable to obtain any such pharmacy license or permit for the sale of beer, wine or other alcoholic beverages, then (to the extent allowed by and in the manner permitted under applicable law and regulation) at such Buyer's request, the applicable Seller will enter into a customary management agreement or similar arrangement, reasonably acceptable to such Seller, that provides the applicable Buyer with the right to operate under the Seller's license or permit on a short-term basis while such Buyer continues to use commercially reasonable efforts to obtain such license or permit, which agreement shall include, among other matters,    (i) appropriate indemnification by the Buyer in favor of such Seller, (ii) reasonable compensation to the Seller based on a percentage of sales under such license or permit, (iii) requirements that the Buyer comply with all applicable laws and regulations, and (iv) other provisions customarily contained in such agreements.

7.3 This Agreement and each of the closing documents to which each Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of each Buyer, enforceable against each Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4 There is no action, suit or proceeding pending or, to the Knowledge of each Buyer, threatened against or affecting each Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which each Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against each Buyer) have a Material Adverse Effect on the ability of each Buyer to perform its obligations under this Agreement or the closing documents to which each Buyer is or is to become a party.

7.5 Entry into this Agreement or any of the closing documents to which each Buyer is or is to become a party by each Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by each Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which each Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a Material Adverse Effect on the ability of each Buyer to perform its obligations under this Agreement or any of the closing documents to which each Buyer is or is to become a party.

7.6 As of the Effective Date and at all times through and including the Closing Date, each Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

8.0 **Covenants of Seller.**  Each Seller for itself hereby covenants for the benefit of the applicable Buyer as follows:

8.1 Seller will (i) use commercially reasonable efforts to maintain the Assets until the relevant Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and, except with respect to any particular Stores in which Store operations were suspended prior to the Effective Date, will make commercially reasonable efforts to continue operation of the Stores in the

ordinary course of business, including without limitation employment of Store level employees and management, to the extent within Seller's reasonable ability to control, and (ii) will not sell, dispose of, abandon or remove from any Store any of the Assets or agree to do so except in the ordinary course of business; provided, however, it is expressly acknowledged and understood that, following the Effective Date, Seller will take certain actions to wind up its operations (including related marketing, promotions and advertising) at the relevant Store or Stores and eliminate or remove the Excluded Personal Property in preparation for the relevant Inventory Counts, Closings and the turnover of possession to Buyer.

8.2     Seller will use commercially reasonable efforts to remove all Excluded Personal Property from the Stores on or before the relevant Closing Date, except that Buyer shall remove and dispose of Seller's signs and panels that are part of the Excluded Personal Property as more fully provided in paragraph 9.3 of this Agreement.

8.3     After this Agreement is selected as the Successful Bid, Seller will release to each Buyer a schedule of Seller's current employees at the relevant Store or Stores, and will permit Buyer, at reasonable times during normal business hours and with minimum impact on Seller's business, to arrange for personal interviews with Store managers and other Store employees, at times and places mutually agreeable to both Seller and Buyer, and to arrange for those relevant employees of Seller, who are interested, to interview with Buyer.

8.4     Seller will (except to the extent otherwise required by the Family Medical Leave Act) transfer or terminate all its employees working at each Store on the relevant Closing Date.  Seller will have the sole and absolute responsibility for any financial or other commitments to its employees including, without limitation, any and all claims or obligations for severance pay and any and all claims and obligations arising under any collective bargaining agreement, employee benefit plan (including, without limitation, any withdrawal liability) or any local, state or federal law, rule or regulation (including, without limitation, the Worker Adjustment and Retaining Notification Act).

8.5     If this Agreement is determined to be the Successful Bid as to the Stores, Seller will use commercially reasonable efforts to obtain the entry of a Sale Order as to the Stores.  Seller shall file the motion for approval of the Sale Order within ten (10) Business Days after Seller selects this Agreement as the Initial Bid with respect to the Stores.  The Sale Order shall be in the form mutually agreed upon by Seller and Buyers.  Seller shall seek to have an 1146(c) finding in the Sale Order, but it shall not be a basis for termination of this Agreement if such a finding is not included in the Sale Order.

8.6    Prior to the Closing, Seller will not cause or permit to be granted any material increase in the salaries, wages, benefits or other compensation payable or to become payable to employees working at the Stores, except for (i) merit and cost-of-living increases in the ordinary course of business and (ii) incentive bonuses or compensation granted by Seller in connection with Seller's winding up of its operations at the Stores.

8.7    Seller will cooperate reasonably with Buyer, upon written request, with respect to Buyer's performance of its covenants under paragraph 9.2 of this Agreement.

8.8    Promptly following the Effective Date, Seller will provide Buyers with contact information for the providers of the POS equipment located in the Stores, so that Buyers may negotiate with such providers regarding retention of such POS equipment.  Whether or not Buyers are able to reach resolution with such providers regarding retention of the POS equipment is not a contingency to Buyer's obligations under this Agreement.

9.0    **Covenants of Buyers.**  Each Buyer for itself hereby covenants for the benefit of the applicable Seller as follows:

9.1    Buyer will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with each Closing and the issuance of the Title Policies.

9.2    Buyer will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11 of this Agreement, including without limitation all Permits necessary for Seller to sell and Buyer to buy the Inventory and the Pharmacy Scrips.

9.3    Buyer shall, at Buyer's sole cost and expense, (i) within five (5) days after the relevant Closing Date, cover all signs and panels that are part of the Excluded Personal Property, and as soon as reasonably possible after the relevant Closing Date, remove from the Stores, destroy and lawfully dispose of such signs and panels, and (ii) within five (5) days after the relevant Closing Date, either (A) remove from the Stores and lawfully dispose of all branded shopping carts or (B) cover so as to fully hide all trademarks, trade names, logos and designs of Seller, Winn-Dixie or their Affiliates from all shopping carts and as soon as reasonably possible after the relevant Closing Date, destroy and lawfully dispose of all such trademarks, trade names, logos and designs.  Without limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 16.5 of this Agreement shall encompass any breach by Buyer of this paragraph 9.3.

9.4     Each Buyer will assess the employee base at each of the Stores it intends to acquire hereunder with a view toward hiring a sufficient number of such employees to avoid the notice requirements of the Worker Adjustment and Retaining Notification Act with respect to such Stores.  From and after entry of the Sale Order, this paragraph 9.4 shall supersede any provision of the Confidentiality Agreements limiting the ability of Buyer to employ or solicit for employment the employees at such Stores.  In addition, at Closing, each Buyer will hire (or offer to hire) those employees such Buyer deems qualified in its discretion based on such Buyer's standard employment criteria and planned operations for such Store.  No later than two Business Days prior to Closing, Buyer will deliver to Seller, in writing, a list identifying all employees of Seller who have been hired by Buyer, or to whom offers of employment have been made by Buyer.  Other than the specific obligations of each Buyer set forth in this paragraph 9.4 no Buyer shall have any contractual or other obligation with respect to assessing, hiring, offering to hire or employing any of Sellers' employees.  In no event shall Buyer be obligated to commit to any particular usage of employees or to any particular benefits or wage rates.

9.5     Buyer will use commercially reasonable efforts to take or cause to be taken actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, those things necessary or appropriate to consummate and make effective, in as expeditious a manner as practicable, the transactions contemplated by this Agreement.

9.6     If this Agreement is determined to be the Successful Bid as to the Stores, provided the applicable Buyer has not terminated this Agreement pursuant to paragraph 4.1.3 or paragraph 4.4 above, then Buyer will use commercially reasonable efforts to assist Seller to obtain the entry of a Sale Order as to such Stores, including by providing Adequate Assurance Information to Seller, the Bankruptcy Court, Landlords and Subtenants as may be reasonably requested.

9.7     Intentionally Omitted.

10.0    **Conditions Precedent to Buyers' Obligations.**  The obligations of each of the Buyers under this Agreement as to their relevant Store or Stores are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement relating to such Store or Stores, including, without limitation, each of the following (any of which may be waived by a Buyer in such Buyer's sole discretion, unless otherwise stated herein):

10.1    The applicable Seller will have performed in all material respects all of its covenants contained in this Agreement with respect to the Store or Stores

being purchased by such Buyer which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and the applicable Seller will have performed in all respects all of its covenants contained in this Agreement with respect to such Store or Stores which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of <u>paragraph 5.1</u> of this Agreement), all of the applicable Seller's representations and warranties contained in this Agreement with respect to such Store or Stores which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of the applicable Seller's representations and warranties contained in this Agreement with respect to such Store or Stores which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

10.2    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

10.3    The Sale Order with respect to such Store shall have been entered by the Bankruptcy Court in a form reasonably agreed upon by Seller and Buyer and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Buyer, which shall not be unreasonably withheld.

10.4    With respect to such Store, the stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

10.5    The applicable Buyer shall not have exercised its termination rights pursuant to <u>paragraph 4.1.3</u> or <u>paragraph 4.4</u> above.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then the applicable Buyer shall have the right to terminate this Agreement pursuant to <u>paragraph 15.1(a)(iv)</u> of this Agreement with respect to the Store or Stores such Buyer is purchasing; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by the applicable Buyer or Seller, then the applicable Buyer's and Seller's respective rights, remedies and obligations, including any right of termination,

shall be determined in accordance with <u>paragraph 16</u> of this Agreement rather than pursuant to <u>paragraph 15.1 (a)(iv).</u>

11.0 **Conditions Precedent to Seller's Obligations.**   The obligations of the applicable Seller under this Agreement as to each Store are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement relating to such Store, including each of the following (any of which may be waived by such Seller in its sole discretion, unless otherwise stated herein):

11.1 The applicable Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and the applicable Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  All of the applicable Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of the applicable Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2 No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

11.3 The Sale Order with respect to such Store shall have been entered by the Bankruptcy Court in a form reasonably agreed upon by Seller and Buyer, provided, however, failure of the Sale Order to contain an 1146(c) finding shall not be a condition to Seller's obligations hereunder, and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Seller, which shall not be unreasonably withheld.

11.4 The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then the applicable Seller shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(v) of this Agreement with respect to such Store or Stores; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by the applicable Buyer or Seller, then the applicable Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1(a)(v).

12.0  **Loss by Fire or Other Casualty; Condemnation**.  In the event that, prior to a Closing, any Store, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with any Store, either the applicable Seller or the applicable Buyer will have the right, exercisable by giving notice of such decision to the other within 5 Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement as to the Store affected by such loss, and thereafter none of these parties will have any further rights or obligations hereunder as to such Store; provided, however, that this Agreement will be a continuing obligation of the parties as to the Stores not affected by such termination and provided further, however, that, if the applicable Buyer is not in breach of this Agreement, such Buyer will be entitled to the return from the Escrow Agent of the Deposit attributable to such Store or Stores pursuant to the Allocation Schedule.  If neither party exercises its right of termination with respect to any Store affected by such casualty or proceeding and the Store is sold to the applicable Buyer pursuant to the terms of this Agreement, as the applicable Buyer's sole remedies, the applicable Seller will assign to such Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to such Buyer any such proceeds or compensation received by it.

13.0  **Possession**.  The applicable Seller will turn over to the applicable Buyer exclusive physical possession of each Store and the Assets associated therewith (including, to the extent in Seller's possession, control or custody) all keys, combinations to safes, security codes and passwords, on the Closing Date upon written confirmation to such Seller by Escrow Agent that Escrow Agent has received, and has been authorized by such Seller and such Buyer to transfer to Seller, the entire Base Purchase Price, Inventory Price and the Supplies Price with respect to such Store.  After conclusion of the Inventory Count for each Store and upon Seller's receipt of such written confirmation from Escrow Agent for such Store, the applicable Buyer may commence preparation for opening of such Store as a Buyer's store including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and commencing electrical and wiring work required in order to install Buyer's point of sale and other equipment, signage, and similar items.

14.0  **Closing.**

14.1  The Closing for each Store (which may occur on the same date as Closings for other Stores) will occur on the Closing Date for such Store. The Closings will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by the applicable Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

14.2  On or before the Real Property Escrow Date for each Store, the applicable Seller will, subject to the conditions contained in <u>paragraph 11</u> of this Agreement, deliver the following ("<u>Seller's Escrowed Items</u>") to Escrow Agent:

(i)  Two counterparts of the relevant Lease Assignment, substantially in the form of <u>Exhibit G</u> to this Agreement (the "<u>Conveyance Instrument</u>"), executed by such Seller;

(ii)  The relevant Bill of Sale, executed by such Seller;

(iii)  Two counterparts of the relevant Closing Statement, executed by such Seller;

(iv)  Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; provided, however, that in no event shall such Seller be required to indemnify the Title Insurer, any Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

(v)  Any other documents, instruments or agreements called for hereunder for delivery by such Seller with respect to such Store that have not previously been delivered.

A Buyer may waive compliance by such Seller as to any of the foregoing items in a manner permitted by <u>paragraph 17.6</u> of this Agreement. The applicable Seller's delivery of all of the relevant Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent will not be deemed to be an acknowledgement by such Seller that the conditions of <u>paragraph 11</u> of this Agreement have been fulfilled or waived until Seller Delivery Confirmation. The "<u>Seller Delivery Confirmation</u>" will mean the later of (A) the relevant Real Property Escrow Date and (B) Seller's delivery to Escrow Agent, by original counterpart or telecopy, of Seller's written confirmation that that the conditions of <u>paragraph 11</u> of this Agreement have been fulfilled or waived. In any event such

delivery and notice shall be subject to any circumstances that may affect such conditions between Seller Delivery Confirmation and the related Closing Date.

14.3    On or before the Real Property Escrow Date for each Store or Stores, the applicable Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, deliver the following ("Buyer's Escrowed Items") to Escrow Agent:

(i)    Two counterparts of the relevant Conveyance Instrument, executed by the applicable Buyer;

(ii)    Two counterparts of the relevant Closing Statement, executed by the applicable Buyer;

(iii)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; and

(iv)    Any other document, instrument or agreement called for hereunder for delivery by the applicable Buyer that has not previously been delivered.

(v)    All funds required to be transferred and delivered by the applicable Buyer to Escrow Agent pursuant to paragraph 3 of this Agreement.

The applicable Seller may waive compliance by the applicable Buyer as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement.  The applicable Buyer's delivery of all of the relevant Buyer's Escrowed Items (other than those waived by the applicable Seller) to Escrow Agent will not be deemed to be an acknowledgement by the applicable Buyer that the conditions of paragraph 10 of this Agreement have been fulfilled or waived until Buyer Delivery Confirmation.  The "Buyer Delivery Confirmation" will mean the later of (A) the relevant Real Property Escrow Date, and (B) the applicable Buyer's delivery to Escrow Agent, by original counterpart or telecopy, of such the applicable Buyer's written confirmation that the conditions of paragraph 10 of this Agreement have been fulfilled or waived.  In any event, such delivery and notice shall be subject to any circumstances that may affect such conditions between the Buyer Delivery Date and the related Closing Date.

14.4    At the Closing for each Store or Stores, Seller will, subject to the conditions contained in paragraph 11 of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items and the Purchase Price to Seller.

14.5  On each Closing Date, Seller and Buyer will each deposit such other instruments with the Title Insurer as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the relevant Assets in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

14.6  Except as provided in <u>paragraph 16</u> of this Agreement, at or before Closing for each Store or Stores, or if Closing does not occur due to earlier termination of this Agreement in accordance with its terms with respect to any Store or Stores, (i) Seller will pay Seller's Closing Costs relating to such Store or Stores; and (ii) the Buyer will pay Buyer's Closing Costs relating to such Store or Stores.

15.0  **<u>Termination</u>**.

15.1  <u>Termination</u>.

(a)  Agreement may be terminated, and the transactions contemplated hereby abandoned, as to any or all Stores not the subject of a completed Closing, only as follows:

(i)  by written consent of the applicable Seller and the applicable Buyer, in which case the applicable Deposit shall be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the applicable Deposit, then Escrow Agent shall pay over the applicable Deposit to Seller as consideration for Seller's agreement to terminate this Agreement with respect to such Store or Stores);

(ii)  at the election of the applicable Seller if and to the extent permitted under <u>paragraph 16.1</u> of this Agreement, in which case the applicable Deposit shall be disbursed as provided in such <u>paragraph 16.1</u>;

(iii)  at the election of the applicable Buyer with respect to any Store such Buyer is purchasing if and to the extent permitted under <u>paragraph 16.2</u> of this Agreement, in which case the applicable Deposit shall be disbursed as provided in such <u>paragraph 16.2</u>;

(iv)  at the election of the applicable Buyer with respect to any Store such Buyer is purchasing if any of the conditions set forth in <u>paragraph 10</u> of this Agreement has not been

satisfied or waived by such Buyer on or before the Outside Date with respect to such Store or Stores, in which case Seller shall direct Escrow Agent to return the applicable Deposit to the Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(iv);

(v)     at the election of Seller with respect to a Store if any of the conditions set forth in paragraph 11 of this Agreement has not been satisfied or waived by Seller on or before the Outside Date with respect to such Store, in which case Seller shall direct Escrow Agent to return the Deposit to the applicable Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(v);

(vi)    at the election of the applicable Buyer or Seller as provided in paragraph 12 of this Agreement, in which case Seller shall direct Escrow Agent to return the applicable Deposit to such Buyer; provided, however, that if at the time any such election is made, the applicable Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this Agreement rather than pursuant to this paragraph 15.1(a)(vi);

(vii)   at the election of Seller (A) if this Agreement is not the Successful Bid with respect to the Stores or (B) if the Bankruptcy Court denies Bankruptcy Court Approval with respect to the Stores or (C) if this Agreement is terminated by Seller to the for any reason other than as provided in paragraph 15.1(a)(viii) below, in which case Seller shall direct Escrow Agent to return the Deposit to Buyers; provided, however, that if at the time any such election is made, Buyers are in breach in respect of this Agreement, then Buyers' and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this

Agreement rather than pursuant to this paragraph 15.1(a)(vii);

(viii)    at the election of Seller with respect to any Store, if the Cure Costs with respect to the Lease at such Store exceed 15% of the Base Purchase Price for the Stores, provided that in such case Seller shall direct Escrow Agent to return the Deposit allocated to such Store to the applicable Buyer; provided, however, that if at the time any such election is made, Buyers are in breach in respect of this Agreement, then Buyers' and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this Agreement rather than pursuant to this paragraph 15.1(a)(viii); or

(ix)    at the election of the applicable Buyer or Seller with respect to any Store or Stores if the relevant Closing will not have occurred on or before the Outside Date for any reason other than as contemplated in paragraphs 15.1(a)(i) through 15.1(a)(viii) of this Agreement, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided that neither Buyer nor Seller, as the case may be, will be entitled to terminate this Agreement pursuant to this paragraph 15.1(a)(ix) if such party's breach of this Agreement has been the cause of, or resulted in, the failure of the relevant Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(ix).

(x)    at the election of any Buyer with respect to a Store such Buyer is purchasing, to the extent permitted pursuant to paragraph 4.1.3 and/or paragraph 4.4 of this Agreement, in which case Seller shall direct Escrow Agent to return the applicable Deposit to the Buyer.

(xi)    at the election of Buyers upon occurrence of any of the following: (a) Seller's failure to timely file the motion for entry of the Sale Order as set forth in paragraph 8.5 of this Agreement; (b) Seller's failure to obtain entry of the Sale Order within sixty (60) days after entry of the motion therefore unless a Buyer's failure to assist Seller pursuant to paragraph 9.6 materially contributes to such failure; or (c) entry of a Sale Order approving a sale of the Assets to any

Person that is not SUPERVALU INC., a Buyer, or an Affiliate of SUPERVALU INC. or a Buyer, in which, in the case of (a), (b), and (c), Seller shall direct Escrow Agent to return the Deposit attributable to each Store on the Allocation Schedule to the applicable Buyer and, in the case of (c), shall pay to each Buyer from the proceeds received from such sale a termination fee contemplated by Section 2.7 of this Agreement; provided, however, that if Buyers are in breach in respect of this Agreement, then Buyers' and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.1(a)(xi).

(b)     If this Agreement is terminated for any reason, then all materials provided by Seller to Buyers and all materials relating to the relevant Assets obtained by Buyers and all copies of any such materials will be delivered to Seller within 5 Business Days following termination.  This paragraph shall not in any way limit each Buyer's duties to Seller or Winn-Dixie under their respective Confidentiality Agreements.

(c)     Upon any termination of this Agreement with respect to any Store or Stores pursuant to paragraphs 15.1(a)(iii) through (x) of this Agreement, each party will retain those rights (if any) it may have under paragraph 16 of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

(d)     Notwithstanding anything to the contrary contained in this Agreement, each Seller agrees and acknowledges that (i) this Agreement is a block bid by the Buyers for the Assets related to the Stores, and is to be considered as a whole, and (ii) Seller shall not be permitted to terminate this Agreement with respect to any particular Store or Stores, or with respect to any particular Buyer, except as specifically permitted in paragraphs 15.1(a)(i), 15.1(a)(ii), 15.1(a)(v), 15.1(a)(vi), 15.1(a)(viii) and 15.1(a)(ix) herein.

16.0   **Default and Remedies**.

16.1   Buyer's Default.   If the Closing for any one or more Stores as contemplated under this Agreement is not consummated due to the applicable Buyer's breach of this Agreement, or if this Agreement is terminated as to any one or more Stores due to the applicable Buyer's breach of this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such breach,  (A) (i) to terminate this Agreement with respect to such Store or Stores only or  (ii) to terminate this Agreement

with respect to all of the Stores to be purchased by such defaulting Buyer which, on the date of such election, are still owned by Seller (the Store or Stores as to which this Agreement is terminated under clause (i) or (ii) being the "Terminated Stores"), and (B) to receive the Base Deposits for all Terminated Stores (collectively, the "Liquidated Deposit") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof. Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity. Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages. The right to receive the Liquidated Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by a Buyer with respect to the Terminated Stores, and Seller hereby waives and releases any right to (and Seller hereby covenants that it shall not) sue such Buyer with respect to the Terminated Stores: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit. Buyers hereby waive and release any right to (and hereby covenants that it shall not) sue Seller or seek or claim a refund of the Liquidated Deposit (or any part thereof) on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages. This paragraph 16.1 is subject to paragraph 16.4 of this Agreement.

16.2    Default by Seller. If the sale of any one or more Stores as contemplated under this Agreement is not consummated due to Seller's breach of this Agreement, or if this Agreement is terminated as to any one or more Stores due to Seller's breach of this Agreement, then the applicable Buyer shall be entitled, as its sole and exclusive remedy for such breach, to receive the return of the Base Deposit with respect to such Store or Stores, which return shall operate to terminate this Agreement with respect to such Store or Stores and release Seller from any and all liability under this Agreement with respect to such Store or Stores. Buyers expressly waives and releases (i) any right to seek specific performance of Seller's obligations under this Agreement and (ii) any right to seek or collect any damages, including any actual, consequential, speculative, remote or punitive damages. This paragraph 16.2 is subject to paragraph 16.4 of this Agreement.

16.3    Notice of Default; Opportunity to Cure. Neither Seller nor any Buyer shall be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within 5 Business Days after receipt of such notice; provided, however, that this paragraph 16.3 (i) shall not be

applicable to Buyer's failure to deliver any Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Real Property Escrow Date or the Closing Date for any Store or Stores and, accordingly, (ii) shall not have the effect of extending the Closing Date or the due date of any Deposit.

16.4    Recoverable Damages.   In no event shall the provisions of paragraphs 16.1 and 16.2 of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to, a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreements and paragraphs 4.1.2, 16.5 and 17.3 of this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees or expenses under the Confidentiality Agreements and paragraphs 3.3.3 and 3.4.3 of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs, or (iii) if applicable, payment of the termination fee as set forth in paragraph 2 of this Agreement.  In addition, if this Agreement is terminated for any reason with respect to any one or more Stores or in its entirety, and the applicable Buyer or any Affiliate of such Buyer asserts any claim or right to any Asset that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to any Asset, then Seller shall have all rights and remedies available at law or in equity with respect to such assertion by such Buyer and any loss, damage or other consequence suffered by Seller as a result of such assertion.

16.5    Buyer Indemnification of Seller.  Each Buyer shall indemnify and save and hold harmless Seller and its Affiliates and representatives, from and against any and all costs, losses liabilities, damages, lawsuits, deficiencies, claims and expenses (whether or not arising out of third-party claims) including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (herein, the "Damages") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by such Buyer (including any payment obligation), or the inaccuracy of any representation made by such Buyer in or pursuant to this Agreement or other transaction documents, (b) any liability, obligation or commitment of any nature (absolute, accrued, contingent or otherwise) of such Buyer that is due to or arises in connection with such Buyer's acts or omissions prior to, on or after the Closing Date, including any claim, liability, or obligation that is assumed by such Buyer pursuant to this Agreement or in any transaction documents signed by such Buyer. Notwithstanding the foregoing, such Buyer shall not be liable for any matter (i) with respect to which Seller has not given such Buyer written notice within a reasonable period of time following Seller's receiving

written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a material adverse effect on Buyer), or (ii) that is due Seller's acts or omissions.  The provisions of this paragraph 16.5 shall cover all obligations and liabilities of whatsoever kind, nature or description relating, directly or indirectly, to product liability, third party litigation or third party claims against the applicable Buyer or Seller in connection with, arising out of, or relating to the Assets.   This paragraph 16.5 shall survive the Closings or earlier termination of this Agreement.

17.0   **Miscellaneous.**

17.1   Notices. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this paragraph 17.1 and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Winn-Dixie Montgomery, Inc.
Winn-Dixie Raleigh, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Chief Financial Officer
Telefax No. 904 783 5646
e-mail: *bennettnussbaum@winn-dixie.com*

With a copy to:

Winn-Dixie Stores, Inc.

5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Office of General Counsel
Telefax No. 904 783 5651
e-mail: *larryappel@winn-dixie.com*

and

King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia 30303
Attn:  Timothy N. Tucker
Telefax No. 404-572-5148
e-mail:  *ttucker@kslaw.com*

If to any Buyer:

SUPERVALU INC.
11840 Valley View Road
Eden Prairie, MN 55344
Attn:  Tony Pellegrin
Vice President, Corporate Development
Telefax No. (952) 828-8900
e-mail:  *Tony.J.Pellegrin@SUPERVALU.com*

or such other address as any party may from time to time specify by notice
to the other.

17.2   <u>Notice of Certain Inquiries</u>.  If any party is contacted, whether before or
after any Closing and whether orally or in writing, by the United States
Department of Justice or the Federal Trade Commission, or any similar
state governmental authority, with respect to any transactions
contemplated by this Agreement, such party will promptly notify the other
party of such contact and describe the facts and circumstances thereof.

17.3   <u>Brokers and Finders</u>.  The parties agree that there is no brokerage
commission due in connection with the transactions contemplated by this
Agreement other than that due by Seller to Seller's Brokers.  Seller agrees
to pay all fees and commissions claimed by Seller's Brokers as a result of
the transaction contemplated by this Agreement, which fees and
commissions will be considered payable with respect to a Store only if, as
and when the relevant Closing contemplated by this Agreement occurs.
Except for Seller's Brokers, neither Seller nor Buyers have dealt with any
investment adviser, real estate broker, real estate consultant or finder, or
incurred any liability for any commission or fee to any investment adviser,
real estate broker, real estate consultant, or finder in connection with the

sale of the Assets or this Agreement.  Seller and Buyers hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts, said indemnifications by Seller and Buyers to survive the Closings or earlier termination of this Agreement.

17.4    Successors and Assigns.  This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

17.5    Assignment.  Neither Seller nor any Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole discretion of the party whose consent is so required.  No assignment by any Buyer shall release or relieve such Buyer of its liabilities and obligations hereunder, which shall remain in full force and effect notwithstanding any such assignment.

17.6    Amendments.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller and any affected Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to Bankruptcy Court Approval, if applicable.

17.7    Governing Law; Conflicts.  The application and effect of this Agreement as to any particular Store or Stores will be governed by and construed in accordance with the laws of the State in which such Store or Stores is located; the application and effect of this Agreement as to any matter of the rights and obligations of the parties generally will be governed by and construed in accordance with the laws of the State of Florida.  In the event of a conflict between the terms of this Agreement and the Bidding Procedures, the terms and conditions of the Bidding Procedures shall control.

17.8    Merger of Prior Agreements.   This Agreement supersedes all prior agreements and understandings between the parties hereto, other than the Confidentiality Agreements, and (except for the Confidentiality Agreements) constitutes the entire agreement of the parties with respect to the matters contained herein.  **EACH BUYER ACKNOWLEDGES ITS OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENTS CONTINUE AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT**.

17.9    Survival.  Acceptance by each Buyer of the Conveyance Instrument with respect to any Store shall constitute an acknowledgement by such Buyer

that all of Seller's representations, covenants and obligations under this Agreement with respect to such Store and all conditions to such Buyer's obligations to close under this Agreement with respect to such Store have been performed, satisfied and/or waived. Seller's representations, warranties, covenants and obligations under this Agreement with respect to any Store shall not survive the Closing for such Store but shall merge into the Conveyance Instrument for such Store, and shall have no further force or effect after the Closing for such Store, except that those covenants of Seller under paragraphs 3.3.3, 3.3.4, and 17.3 of this Agreement with respect to any Store that are expressly provided to be performed after the Closing for such Store shall survive.   All representations, warranties, covenants of obligations of Buyer under this Agreement with respect to any Store shall survive the Closing for such Store.  In addition, all representations, covenants and obligations of each Buyer under the Confidentiality Agreements shall survive the termination or consummation of this Agreement.

17.10  Time is of the Essence.  Time is of the essence of this Agreement.

17.11  No Recordation.  This Agreement will not be recorded in any public office or court other than as part of the Bankruptcy Court Approval process except that upon default it may be presented to a court of competent jurisdiction.

17.12  Independent Obligations.  Each Buyer is independently responsible for its own obligations under this Agreement, and neither SUPERVALU INC. nor any Buyer is guarantying or otherwise assuming any liability for the obligations to be performed by any other Buyer.   Each Seller is independently responsible for its own obligations under this Agreement, and neither Winn-Dixie nor any Seller is guarantying or otherwise assuming any liability for the obligations to be performed by any other Seller.

18.0  **Escrow Agent**.

18.1  Duties.  By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon its receipt of funds from Buyer, Escrow Agent will receive and hold such funds, and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.

18.2  Indemnity.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent. If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any

and all loss, cost, damage, liability or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct. If the indemnity amounts payable hereunder result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts. Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.

18.3    <u>Dispute</u>. If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor. In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Buyer is not the prevailing party in such action or proceeding. If there is no prevailing party, Seller and Buyer each shall be responsible for one-half of such costs and fees.

18.4    <u>Execution by Escrow Agent</u>. Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this <u>paragraph 18.</u> Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this <u>paragraph 18</u> shall not be required.

19.0    **Waiver of Jury Trial**. Buyers and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transactions contemplated herein undesirable. Accordingly, Buyers and Seller each knowingly, voluntarily and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Agreement or the transactions contemplated herein.

20.0    **Consent to Jurisdiction.** **THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.**

Buyers and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth

in paragraph 17.1 of this Agreement shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyers and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.  If a court finds that subject-matter jurisdiction is not available in the Bankruptcy Court, Buyers and Seller hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of the U.S. District Court for the Middle District of Florida, Jacksonville Division, or if such court shall not have jurisdiction, then to the appropriate courts of the State of Florida sitting in Duval County, Florida.

21.0   **HSR Filings.**  The parties anticipate that the transactions contemplated hereby are exempt from review and filing under the HSR Act.  However, if such is not the case, Seller and the applicable Buyer shall each seek regulatory approval or HSR clearance and prepare and submit, in a timely manner, all necessary filings for Seller and such Buyer in connection with this Agreement under the HSR Act and the rules and regulations thereunder.  Seller and the applicable Buyer shall request expedited treatment of such HSR Filing by the Federal Trade Commission, shall make promptly any appropriate or necessary subsequent or supplemental filings, and shall furnish to each other copies of all HSR Filings at the same time as they are filed with the appropriate governmental authority except to the extent such party is legally restricted from providing or believes, based where appropriate on the advice of counsel, that it should not provide such copies.

22.0   **Disclaimers and Waivers.**

22.1   **NO RELIANCE ON DOCUMENTS.  EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN PARAGRAPHS 5 AND 6 HEREOF (THE "CONTRACT WARRANTIES"), SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY OR ON BEHALF OF SELLER TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY.  EACH BUYER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE) ARE PROVIDED TO BUYER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY BUYER SHALL BE AT THE SOLE RISK OF BUYER. WITHOUT LIMITING THE**

GENERALITY OF THE FOREGOING, EACH BUYER ACKNOWLEDGES AND AGREES THAT (A) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (B) BUYER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED BY SELLER OR ANY AFFILIATE TO BUYER, BUT RATHER WILL RELY ON ITS OWN INVESTIGATIONS AND ANY REPORTS COMMISSIONED BY BUYER WITH RESPECT THERETO, AND (C) NEITHER SELLER, ANY AFFILIATE OF SELLER NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL HAVE ANY LIABILITY TO BUYER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

22.2    **Disclaimers**.  EXCEPT FOR THE CONTRACT WARRANTIES, EACH BUYER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS.  EACH BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "<u>AS IS, WHERE IS, WITH ALL FAULTS</u>". EACH BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND NEITHER SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER OR ANY AFFILIATE, TO

WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE, OTHER THAN THE CONTRACT WARRANTIES.

EACH BUYER ACKNOWLEDGES THAT BUYER'S ACCESS AND INSPECTION RIGHTS HAVE BEEN LIMITED AS SET FORTH IN THIS AGREEMENT AND THAT BUYER UNDERSTANDS THE RISKS ASSOCIATED WITH PURCHASING THE ASSETS ON THE BASIS OF SUCH LIMITED INVESTIGATIONS.  EACH BUYER REPRESENTS TO SELLER THAT NOTWITHSTANDING SUCH LIMITATIONS BUYER HAS CONDUCTED SUCH INVESTIGATIONS AS BUYER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE ASSETS AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE ASSETS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION), AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AFFILIATES, AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN THE CONTRACT WARRANTIES. UPON CLOSING, EACH BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS, AND EACH BUYER, UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER AND SELLER'S AFFILIATES (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT OR UNDER ANY ENVIRONMENTAL LAW), LOSSES, DAMAGES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AND SELLER'S AFFILIATE'S (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE ASSETS.

**EACH BUYER AGREES THAT SHOULD ANY INVESTIGATION, CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION) ON OR RELATED TO THE ASSETS BE REQUIRED AFTER THE DATE OF CLOSING, NEITHER SELLER NOR ANY AFFILIATE SHALL HAVE ANY LIABILITY TO BUYER TO PERFORM OR PAY FOR SUCH INVESTIGATION, CLEAN-UP, REMOVAL OR REMEDIATION, AND BUYER EXPRESSLY WAIVES AND RELEASES ANY CLAIM TO THE CONTRARY.**

**EACH BUYER FURTHER ACKNOWLEDGES THAT (1) THE CONTRACT WARRANTIES AS TO ANY STORE SHALL NOT SURVIVE THE CLOSING FOR SUCH STORE BUT SHALL MERGE INTO THE CONVEYANCE INSTRUMENT FOR SUCH STORE, AND SHALL HAVE NO FURTHER FORCE OR EFFECT AFTER THE CLOSING FOR SUCH STORE AND (2) THE LIABILITY OF SELLER UNDER OR WITH RESPECT TO THE CONTRACT WARRANTIES SHALL BE LIMITED TO THE EXPRESS REMEDIES OF BUYER SET FORTH IN THIS AGREEMENT.**

**EACH BUYER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY BUYER, AND BUYER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OF BUYER'S CHOICE WITH REGARD TO THE TERMS OF SUCH DISCLAIMERS, WAIVERS AND RELEASES. BUYER ACKNOWLEDGES AND WARRANTS THAT BUYER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS AND RELEASES IS FREE AND VOLUNTARY.**

22.3    <u>Effect and Survival of Disclaimers</u>.  Seller and Buyers acknowledge that the provisions of this <u>paragraph 22</u> are an integral part of the transactions contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller would not enter into this Agreement but for the provisions of this <u>paragraph 22</u>.  Seller and Buyers agree that the provisions of this <u>paragraph 22</u> shall survive Closing or any termination of this Agreement.

[Signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

**SELLER:**

**WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation

By:_____
     Name:_____
     Title: Vice President

**SELLER:**

**WINN-DIXIE    RALEIGH,    INC.,** a Florida corporation

By:_____
     Name:_____
     Title: Vice President

**BUYERS:**

**All American Quality Foods, Inc.**

By:_____

    Name:_____

    Title: _____

**Chandler's JKE, Inc.**

By:_____

    Name:_____

    Title: _____

**Chandler's of Weir, Inc.**

By:_____
   Name:_____
   Title: _____

**Kaye Food Companies, LLC**

By:_____
   Name:_____
   Title: _____

**Premier Foods, Inc.**

By:_____
   Name:_____
   Title: _____

**Ramey Enterprises, Inc.**

By:_____
    Name:_____
    Title: _____

**Southeast Foods, Inc.**

By:_____

    Name:_____

    Title: _____

**Wayfield Foods, Inc.**


By:_____
   Name:_____
   Title: _____

**Triple V, Inc.**


By:_____
    Name:_____
    Title: _____

Acknowledged and agreed this ___ day of _____, 2005 for the limited purposes set forth in <u>paragraph 18</u> of this Agreement:

**ESCROW AGENT:**

**NEAR NORTH NATIONAL TITLE LLC**

By: _____

Name: _____

Title: _____

<u>LIST OF EXHIBITS</u>

Schedule 1   -      Preliminary List of Buyers, FEINs, Stores and total Base Purchase
Price
Exhibit A-1   -      List of Stores
Exhibit A-2   -      Description of Leases and Leased Premises
Exhibit A-3   -      Categories for Landlord Negotiations
Exhibit B     -      Form of Bill of Sale
Exhibit C-1   -      Form of Closing Statement
Exhibit C-2   -      Form of Inventory Closing Statement
Exhibit D     -      Schedule of Certain Excluded Personal Property
Exhibit E     -      Allocation Schedule
Exhibit F     -      Permitted Encumbrances
Exhibit G     -      Form of Conveyance Instrument
Exhibit H     -      Form of Inventory Certificate