# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ORDER APPROVING DEBTORS' (A) SALE OF ASSETS FREE AND CLEAR OF LIENS, (B) ASSUMPTION AND ASSIGNMENT OF LEASES AND (C) RELATED RELIEF

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and

twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively,

the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr.

P. 6004 and 6006 (a) authorizing the Debtors to sell leasehold interests, equipment, inventory

and if the respective store contains a pharmacy, the pharmacy scrips, including the assets

described in the Asset Purchase Agreement as modified by Amendment No. 1 to the Asset

Purchase Agreement (the "Purchase Agreement") attached as Exhibit A for Store Numbers 851,

2014, 2022, 2039, 2061 and 2104 (collectively, the "Assets"), free and clear of liens, claims,

interests and encumbrances to Harris Teeter, Inc. (the "Purchaser"), (b) determining that the sale

is exempt from any stamp, transfer, recording or similar tax, (c) authorizing the Debtors to

assume and assign all unexpired leases identified in the Purchase Agreement in connection with

the sale (collectively, the "Leases"), (d) fixing cure amounts for the Leases, and (e) granting

related relief (the "Motion"). By the Motion, the Debtors assert that there are no cure amounts

due for Store Numbers 851, 2014, 2022 and 2039 and $5,948.35 due under Store Number 2061

and $41,071.67 for Store Number 2104 (the "Cure Amounts"). By the Motion, the affected

Landlords had until July 14, 2005 to object to the Cure Amounts. Only the landlords for Store

00503145.2

Numbers 2039 and 2061 filed an objection. The Court held a hearing on the Motion on July 27, 2005 to approve the sale (the "Sale Hearing"). The Court has reviewed the Motion and heard the representations of counsel. Upon the representations of counsel and without objection by the United States Trustee or any other interested party, the Court makes the following findings of fact:

    A.    This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U S C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

    B.    The Debtors solicited highest or otherwise best offer for the Assets in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 16, 2005 (the "Bidding Procedures"). A competing bid was received for the Assets and the Debtors conducted an auction for the Assets on July 18, 2005 (the "Auction"). At the Auction, the Purchaser submitted the final bid of $15,890,000, plus supplies (at $2,500 per store) and inventory at a percentage of retail, representing the highest or otherwise best offer received for the Assets.

    C.    The Debtors have provided interested parties (including all parties asserting claims or interests in the Assets, if any) with proper notice of the Motion, the Sale Hearing,[1] the Auction, the assumption and assignment of the Leases, and the fixing of any cure amounts, in accordance with 11 U.S.C. §§ 102(l), 105(a), 363 and 365, Fed. R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order and the Bidding, Procedures Order.

    D.    The Debtors marketed the Assets and conducted the sale process in compliance with the Bidding Procedures Order, the Bidding Procedures, the Bankruptcy Code

---

[1] All capitalized terns not otherwise defined in this Order have the same meaning provided to them in the Motion.

and all other orders entered in these cases.  Bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner.  The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets.  In their sound business judgment, the Debtors determined that: the bid submitted by the Purchaser at the Auction represented the highest or otherwise best offer for the Assets.

E.    The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A, the Assumption and Assignment Agreement attached to the Purchase Agreement, and all related documents, and the sale of the Assets and assumption and assignment of the Leases has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

F.    The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

G.    Neither the Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

H.    The Leases and all modifications, amendments or supplements thereto are fully described in the Purchase Agreement.

I.    The Debtors and the Purchaser proposed, negotiated and entered into the Purchase Agreement, without collusion, in good faith and at arms'-length bargaining positions. Neither the Debtors nor the Purchaser have engaged any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

J.    The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

00503145                                        3

K.    The consideration the Purchaser gave the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value.

L.    The Debtors' sale of the Assets and the assumption and assignment of the Leases will facilitate the formulation and confirmation of a plan of reorganization.  For this reason, the sale of the Assets and the assumption and assignment of the Leases constitute transfers to which 11 U.S.C. § 1146(c) applies.

M.    The Debtors' transfer of the Assets to the Purchaser pursuant to the Purchase Agreement and the Assumption and Assignment Agreement will be a legal, valid, and effective transfer of the Assets.  The Debtors' transfer of the Assets to the Purchaser vests the Purchaser with good and valid title in and to the Assets free and clear of any liens, claims, encumbrances, pledges, mortgages, security interests, charges, options or other interests of any kind or nature (collectively, the "Claims and/or Interests"), with the exception of the Permitted Encumbrances and the Assumed Liabilities, if any, as defined in the Purchase Agreement.  Any non-assumed Claim and/or Interest will attach to the proceeds of the sale with the same validity, enforceability and priority they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors and all interested parties with respect to such Claims and/or Interests.

N.    The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the Purchase Agreement free and clear of all Claims and/or Interests (except the Permitted Encumbrances and the Assumed Liabilities) because any entity with any Claims and/or Interests in the Assets to be transferred (i) has consented to the Sale (including the assumption and assignment of the Leases) or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claims

and/or Interests; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. Holders of Claims and/or Interests, if any, who did not object, or who withdrew their objections to the Sale Motion are deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2).

O.    The Debtors will cause the proceeds from the Sale to be paid in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

P.    The Debtors' assumption and assignment of the Leases in connection with the Sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

Q.    The Debtors have provided the landlords of the Leases with adequate assurance that they will promptly cure any defaults under the Leases pursuant to 11 U.S.C. §§ 365(b)(1).

R.    Pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006, no Cure Amount is due for Store Numbers 851, 2014 or 2022. The Court will hold a hearing to determine the appropriate Cure Amount for Store Numbers 2039 and 2061. Once the Debtors pay any Cure Amount due under the Leases for Store Numbers 2039 and 2061, if any, no other amounts are due and owing by the Debtors under the Leases. The Debtors will pay the Cure Amount, if any,

for Store Numbers 2039 and 2061 upon agreement by the parties or adjudication by the Bankruptcy Court. Upon payment of the Cure Amount, all defaults, if any, under the Leases will be deemed cured.

        S.    The Purchaser has provided the landlord for the Leases with adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B).

        T.    No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under the Leases.

        U.    Except as expressly set forth in the Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser will have no responsibility for any liability, claim or other obligation of or against the Debtors related to the Assets or the Leases by virtue of the transfer of the Assets and the assumption and assignment of the Leases to the Purchaser. The Purchaser will not be deemed as a result of any action taken in connection with the purchase of the Assets or assumption and assignment of the Leases to (i) be a successor to the Debtors (other than with respect to the Assumed Liabilities and any obligations arising under the assigned Leases from and after the closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors. The Purchaser is not acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the Purchase Agreement or in any assigned Leases.

        V.    The Court's approval of the Purchase Agreement and the Assumption and Assignment Agreement is in the best interests of the Debtors, their estates and their creditors. Accordingly, it is

### ORDERED AND ADJUDGED THAT

        1.    The Motion is granted.

2.    All objections to the entry of this order or to the relief granted and requested in the Motion, including any objection that has not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

3.    The Purchase Agreement and the Assignment and Assumption Agreement are each approved in all respects. Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized (subject to applicable Closing conditions set forth in the Purchase Agreement), to consummate the Sale including transferring and conveying the Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

4.    Upon Closing, the Debtors are authorized, in accordance with 11 U.S.C. §§ 105(a), 363 and 365 to assume and assign the Leases to Purchaser.

5.    The Debtors have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2).

6.    The Leases will be assumed and assigned to the Purchaser, in accordance with their respective terms. The assigned Leases will remain in full force and effect notwithstanding any provision in the Leases to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1)) which prohibit, restrict or condition such assignment or transfer). The DIP Lender and all non-debtor parties to the Leases are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the Purchase Agreement.

7.    Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized and empowered to consummate and implement fully the Purchase Agreement and the Assignment and Assumption Agreement, together with all additional instruments and documents that may be necessary to implement the Purchase Agreement. The Debtors are

authorized to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Assets and the Leases to Purchaser.

8.     Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended or supplemented by the parties in accordance with the terms of the Purchase Agreement without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.     The Debtors will transfer the Assets to the Purchaser upon closing free and clear of all Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances and Assumed Liabilities). All non-assumed Claims and/or Interests, if any, will attach to the proceeds of the Sale, with the same validity, enforceability, priority, force and effect they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors and all interested parties with respect to such Claims and Interests.

10.     The Debtors will cause the proceeds from the Sale to be paid in accordance with the terms of the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

11.     The Debtors' transfer of the Assets pursuant to the terms of the Purchase Agreement is a transfer pursuant to 11 U.S.C. § 1146(c). Accordingly, the making, delivery, filing or recording of any deeds, assignments or other transfer documents in connection with the sale (the "Transfer Instruments"), will not be taxed under any law imposing a recording tax, stamp tax, transfer tax or similar tax (including

without limitation, any transfer or recordation tax applicable to deeds and/or security interests). All filing and recording officers are directed to accept for filing or recording, and to file or record the Transfer Instruments immediately upon presentation without payment of any such taxes.

12. The Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and applicable non-bankruptcy law. For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

13. All defaults, claims or other obligations of the Debtors arising or accruing under each of the Leases, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be cured by the Debtors by paying the Cure Amount, if any. No other or further monetary amounts or obligations are due or existing under the Leases by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise; provided, however, in accordance with the Purchase Agreement, estimated 2005 taxes, common area maintenance charges, insurance and other similar charges will be prorated at Closing and Purchaser will be responsible for the payment to the applicable landlord or taxing authorities, as appropriate, of such charges for 2005 and subsequent years.

14. Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Leases to the Purchaser, (a) the Debtors and their estates are relieved from any and all liability for any breach of the Leases occurring after assignment to the Purchaser, and (b) the Purchaser is responsible for any and all claims and obligations under the Leases occurring or arising after the assignment.

15.    Subject to the terms of this Order, the Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser assumes all rights and obligations of the Debtors under the Leases.

16.    All non-Debtor parties to the Leases are forever enjoined and estopped from contesting the Cure Amount (other than with respect to Store Numbers 2039 and 2061) and from asserting any default against the Purchaser which existed as of the date of the Sale Hearing.

17.    Upon entry of this Order and the assignment and assumption of the Leases, all non-Debtor parties to the Leases are forever enjoined and estopped from contesting that the Leases and the modifications, amendments and supplements thereto, as described in the Purchase Agreement, constitute the full and complete Leases being assigned to the Purchaser.

18.    Upon the Debtors assignment of the Leases to the Purchaser, no default will exist under the Leases. Upon entry of this Order and the assumption and assignment of the Leases, the Purchaser is deemed to be in compliance with all terms and provisions of the Leases.

19.    All entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors. Prior to or upon the closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims and/or Interests in the Assets (except for the Permitted Encumbrances and Assumed Liabilities), if any. In the event any Creditor fails to release its Claims and/or Interests in the Assets, the Debtors are authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other

documents on such creditor's behalf. The Purchaser is also authorized to file, register or otherwise record a certified copy of this Order. Once this Order is so filed, registered or otherwise recorded, the Order constitutes conclusive evidence of the release of all Claims and/or Interests against the Assets as of the Closing (except for the Permitted Encumbrances and Assumed Liabilities).

20.    The Purchaser acted in good faith in purchasing the Assets and Leases under the Purchase Agreement as that term is used in 11 U.S.C. § 363(m). For that reason, any reversal or modification of the Order on appeal will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

21.    The Debtors' transfer of the Assets to Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances or Assumed Liabilities) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

22.    The Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets, including, the Leases (other than the Permitted Encumbrances and the Assumed Liabilities as set forth in the Purchase Agreement). The Debtors' transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

23.    Upon closing, this Order constitutes a complete general assignment, conveyance and transfer of the Assets and the Leases and a bill of sale transferring good and marketable title in the Assets to Purchaser. Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

24.    This Order is effective as a determination that any and all Claims and/or Interests (except for the Permitted Encumbrances and Assumed Liabilities), if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

25.    This Order is binding upon all entities who may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Assets.

26.    This Court retains exclusive jurisdiction to (a) enforce and implement the Purchase Agreement, the Assumption and Assignment Agreement, and any other agreements and instruments executed in connection with the Purchase Agreement, (b) compel delivery of possession of the Assets to Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement, and (d) interpret, implement and enforce the provisions of this Order.

27.    The terms and provisions of this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the

Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

28.    All persons who hold Claims and/or Interests against the Debtors are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

29.    Subject to terms of this Order, after the Closing no person or entity, including, without limitation, any federal, state local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Purchase Agreement. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

30.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in the Purchase Agreement will control.

00503145                                    13

31.     Notwithstanding Fed. R. Bankr. P. 6004(g) and 6006(d), this Order
will take effect immediately upon entry.

Dated this ___ day of July, 2005 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve a
copy of this Order on all parties who
received copies of the Motion.

# **EXHIBIT A**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made effective as of _____, 2005 (the "Effective Date"), by and between

**WINN-DIXIE RALEIGH, INC.,** a Florida corporation ("Seller"), and **HARRIS TEETER, INC.,** a North Carolina corporation, or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

## R E C I T A L S :

A.      Seller is the tenant of each of nine (9) supermarket stores (the "Stores"), each of which is listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under the respective leases, including amendments thereto (the "Leases") described on Exhibit A-2 to this Agreement.  The Stores occupy the respective leased premises as described in each Lease (the "Leased Premises"), within the respective parcels of real property described on Exhibit A-2 to this Agreement associated with each Lease.   Seller's leasehold interest in each Leased Premises pursuant to each Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "Assets."  Certain of the Stores are part of a shopping center (the "Shopping Centers") as described on Exhibit A-3 to this Agreement.

B.      Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.      Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date.  By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no.  05-03817-3F1 (the "Bankruptcy Case").

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0      **Defined Terms.**  Capitalized terms as used in this Agreement will have the following meanings when used herein.

1.1 "Adequate Assurance Information" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that Landlords and Subtenants are adequately assured of Buyer's future performance under the Leases, as required by Section 365(f) of the Bankruptcy Code.

1.2 "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3 "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4 "Allocation Schedule" will mean the allocation of the Base Purchase Price, Base Deposit and Inventory Deposit among the Stores as provided on Exhibit E to this Agreement.

1.5 "Approval Hearing" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.6 "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.7 "Bankruptcy Code" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.8 "Bankruptcy Court" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.9 "Bankruptcy Court Approval" will mean the entry of one or more Sale Orders with respect to the Stores by the Bankruptcy Court.

1.10 "Bankruptcy Case" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.11 "Base Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.12 "Base Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.13 "Bidding Procedures" will mean the procedures approved by the Bankruptcy Court that will govern the selection by Seller of the Successful Bid relating to a particular Store.

1.14 "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at each Closing the Inventory, the Supplies, the Equipment and other

-2-

tangible and intangible personal property constituting a portion of the Assets relating to the one or more Stores being transferred at such Closing.

1.15 "Buildings" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.16 "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.17 "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

1.18 "Buyer Inventory Representative" will mean Jeff D. Sherman or another person designated in writing by such person or by Buyer to act in such capacity.

1.19 "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policies (and the cost of any simultaneous issue mortgagee title insurance policies and any loan-related title insurance endorsements thereon); (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instruments; (e) recording fees payable in connection with recording the Conveyance Instruments in the appropriate public records; (f) cost of the Environmental Reports, including any supplements or updates, up to (but not exceeding) $3,000 per Store; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment, Supplies and Inventory; (i) the fees and costs of the Closing Escrow Agent; and (j) the fees and costs of the Inventory Service.

1.20 "Buyer's Escrowed Items" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.21 "Closing" with respect to one or more Stores will mean the consummation of the assignment, assumption, sale and purchase of the Assets relating to such Store or Stores pursuant to this Agreement as indicated by delivery of the Conveyance Instruments and other documents contemplated by paragraph 14 of this Agreement and the Purchase Price as contemplated in this Agreement with respect to such Store or Stores,

which will be deemed to occur at 12:01 a.m. on the Closing Date with respect to such Store or Stores.

1.22    "Closing Date" will mean the date as to a particular Store or Stores designated by Seller in writing, and reasonably acceptable to Buyer, that is between one day and 30 days following the Bankruptcy Court Approval with respect to such Store or Stores.

1.23    "Closing Statement" will mean a statement in the form of Exhibit C-1 to this Agreement (or in such other form as is prepared by Seller and reasonable acceptable to Buyer) reflecting the net amount due Seller at each Closing (other than in respect of the Inventory Price), after making the adjustments described in paragraph 3.3.3 of this Agreement and in other provisions of this Agreement.

1.24    "Confidentiality Agreement" will mean the existing letter agreement between Winn-Dixie and Buyer, regarding, among other things, confidentiality relating to the subject matter of this Agreement.    Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.

1.25    "Conveyance Instrument" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.26    "Credit Agreement Liens" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.27    "Cure Costs" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Leases and the Subleases.

1.28    "Damages" will have the meaning assigned in paragraph 16.5 of this Agreement.

1.29    "Deposit" will have the meaning assigned in paragraph 3.3 of this Agreement.

1.30    "Due Diligence Materials" will mean, collectively, (i) the Leases, the Subleases (if any), the Title Reports and the Environmental Reports, (ii) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard

-4-

copy, in electronic format, at the Stores, on the Merrill Website, or otherwise and (iii) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.31   "Effective Date" will have the meaning assigned in the initial paragraph of this Agreement.

1.32   "Environmental, Health and Safety Requirements" will mean all orders and applicable laws concerning or relating to public health and safety, the practice of pharmacy, worker/occupational health and safety, and pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, threatened release, control, or other action or failure to act involving cleanup of any Hazardous Materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise, or radiation, each as amended and as now in effect and in effect at Closing.

1.33   "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.34   "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.35   "Escrow Agent" will mean Title Insurer, acting as escrow and closing agent.

1.36   "Excluded Inventory" will mean (i) any private label goods and merchandise; (ii) any goods and merchandise that are damaged, spoiled or distressed; (iii) any items that as of the Inventory Count Date are past Seller's "pull date", if any, or, with respect to dairy items, within five days of Seller's "pull date" or, with respect to frozen foods, within 10 days of Seller's "pull date", or with respect to pharmaceutical inventory (including diabetic supplies), within 30 days of the manufacturer's expiration date, if any; (iv) all perishables, including, but not limited to, produce, deli items, meat items (other than packaged lunch meats), floral items, seafood items and bakery items; and (v) if applicable, any inventory deemed to be Excluded Inventory under paragraph 3.5 of this Agreement.

1.37   "Excluded Personal Property" will mean: (i) all Excluded Inventory; (ii) all packaging materials and supplies not included in the term "Supplies"; (iii) all leased point-of-sale equipment and leased photo lab equipment; (iv) all other leased equipment as described on Exhibit D to this Agreement with respect to each Store; (v) all owned computer and related equipment that

C725380.14

contains software subject to a license that restricts its transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed; (vi) all equipment and other personal property that is neither owned nor leased by Seller or Winn-Dixie, including by way of example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners and equipment owned by product vendors; (vii) all branded (with a Winn-Dixie name or logo) shopping carts, other than any such carts from which the brand is removable and which brands are removed in accordance with paragraphs 8.2 and 9.3 of this Agreement; (viii) all over-the-road motor vehicles; (ix) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (x) all data files other than Pharmacy Scrips; (xi) all lottery equipment and tickets; (xii) all accounts receivable, bank accounts, cash and cash equivalents; (xiii) all trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates; (xiv) all building signs and panels in all pole and pylon signs that advertise Seller's business in the Stores; (xv) all intellectual property and rights (other than Pharmacy Scrips) relating to any of the foregoing; and (xvi) all service agreements, leases of personal property, contracts and warranties relating to Seller's possession and operation of the Stores except that warranties pertaining to the construction of the Stores and/or Improvements, or pertaining to any equipment or fixtures that are part of the Assets, if any, shall be included in the Assets to the extent assignable.

1.38    "Hazardous Material" will mean any hazardous or toxic substance, material or waste which is regulated by any governmental authority, including, but not limited to, any hazardous material, substance or waste which is defined as (i) a "Hazardous Material" or an "Extremely Hazardous Material" under any applicable federal or state laws; (ii) a hazardous substance under Section 311 of the Federal Water Pollution Control Act (33 U.S.C. Section 1317); (iii) a hazardous waste under Section 1004 of the Federal Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et. seq.); (iv) a hazardous waste substance under Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, (42 U.S.C. Section 9601 et. seq.); or (iv) a hazardous or toxic waste, substance or material in any applicable law enacted by the applicable state and/or the federal government.

1.39    "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.40    "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

-6-

C725380.14

1.41    "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.42    "Initial Title Reports" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Stores that Seller has made available to Buyer for review on the Merrill Website or otherwise as of the Effective Date.  Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.43    "Inventory" will mean all inventories of goods and merchandise within the Stores and owned by Seller on the Inventory Count Date and held for resale in the ordinary course of business of Seller conducted at the Stores to retail customers, but excluding the Excluded Inventory.

1.44    "Inventory Certificate" will mean with respect to each Store a certificate executed by Buyer and Seller in connection with the Closing as contemplated by paragraph 3.4.4 of this Agreement, in the form attached hereto as Exhibit H to this Agreement.

1.45    "Inventory Closing Statement" will mean a statement in the form of Exhibit C-2 to this Agreement reflecting the net amount due Seller at each Closing in respect of the Inventory Price, after making the adjustments described in Exhibit C-2 and in other provisions of this Agreement.

1.46    "Inventory Count" will have the meaning assigned in paragraph 3.4.1 of this Agreement.

1.47    "Inventory Count Date" will mean, with respect to each Store, the day immediately preceding the Closing Date for such Store.

1.48    "Inventory Deposit" will have the meaning assigned in paragraph 3.3 of this Agreement.

1.49    "Inventory Price" will mean the purchase price for the Inventory determined pursuant to paragraph 3.4 of this Agreement.

1.50    "Inventory Service" will mean MSI Inventory Service Corporation or Accurate Inventory & Calculating Service, Inc., as designated by Seller, or such other inventory service as is selected by Seller and reasonably acceptable to Buyer.

-7-

1.51  "<u>Investigation Period</u>" will mean the period commencing on the Effective Date and ending at 5:00 p.m., Eastern Time on the seventh day after the Effective Date.

1.52  "<u>Knowledge</u>" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of Jeff D. Sherman, without any requirement of investigation or inquiry.

1.53  "<u>Landlords</u>" will mean the lessors under the Leases.

1.54  "<u>Leased Premises</u>" will have the meaning assigned in <u>paragraph A</u> of the Recitals to this Agreement, and will include the elements thereof as described in <u>paragraph 2.1</u> of this Agreement.

1.55  "<u>Leases</u>" will have the meaning assigned in <u>paragraph A</u> of the Recitals to this Agreement.

1.56  "<u>Liquidated Deposit</u>" will have the meaning assigned in <u>paragraph 16.1</u> of this Agreement.

1.57  "<u>Material Adverse Effect</u>" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Stores for their current use, taken as a whole, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.58  "<u>Material Physical Defect</u>" will have the meaning assigned in <u>Paragraph 4.1.3</u> of this Agreement.

1.59  "<u>Merrill Website</u>" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the

name "Project Jaguar" with respect to the disposition of the Stores and other properties.

1.60    "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on any of Seller's leasehold interests or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction, mechanics' or materialmen's liens that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets; and (D) judgments that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets.

1.61    "New Buyer Employee" will have the meaning assigned in Paragraph 9.4 of this Agreement.

1.62    "ordinary course of business" means the ordinary course of business of Seller after the Filing Date.

1.63    "Outside Date" means September 2, 2005, as such date may be extended by the written agreement of Seller and Buyer.

1.64    "Permits" will have the meaning assigned in paragraph 6.2 of this Agreement.

1.65    "Permitted Encumbrances" will mean (i) all matters listed on Exhibit F to this Agreement, (ii) all other matters set forth as exceptions in the Initial Title Reports, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in any additional Title Reports, other than Monetary Liens.

1.66    "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.67    "Pharmacy Scrips" will mean all customer lists, prescription files, prescription registers, and operating and maintenance logs owned by Seller that relate to the pharmacy operated in any of the Stores.

1.68    "Purchase Price" will mean the Base Purchase Price, the Inventory Price and the Supplies Price collectively.

1.69    "Real Property" will mean the Leased Premises and the Improvements together.

1.70  "Real Property Escrow Date" with respect to one or more Stores will mean the date that is two Business Days prior to the Closing Date for such Store or Stores or such earlier date after the Bankruptcy Court Approval as Buyer and Seller may mutually designate.

1.71  "Sale Order" will mean an order or orders of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, in each case with respect to one or more of the Stores.

1.72  "Seller" will have the meaning assigned in the initial paragraph of this Agreement.

1.73  "Seller Inventory Representative" will mean Michael Chlebovec or another person designated in writing by Michael Chlebovec or by Seller to act in such capacity.

1.74  "Seller's Brokers" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.75  "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; (c) the Cure Costs; and (d) the cost of the Environmental Reports to the extent in excess of $2,500 per Store.

1.76  "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.77  "Shopping Centers" will have the meaning assigned in Paragraph A of the Recitals to this Agreement.

1.78  "Stores" will have the meaning assigned in paragraph A of the Recitals to this Agreement and, when followed by "#" and a number will refer to the particular Store with the indicated number listed on Exhibit A-1 to this Agreement, including if applicable any associated gas station, liquor store, pharmacy or other specialty area operated by Seller at the Leased Premises.

1.79  "Sublease" will mean, with respect to each Store, each sublease of a portion of the Leased Premises listed on Exhibit A-2 to this Agreement (if any), including amendments. If no Sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Sublease at such Store will be disregarded.

-10-

1.80 "Subtenant" will mean, with respect to each Store, the subtenant or sublessee under each Sublease. If no Sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Subtenant at such Store will be disregarded.

1.81 "Successful Bid" will mean, with respect to a particular Store, the highest or otherwise best offer to purchase the Assets relating to such Store, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.82 "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the preparation or merchandising of Inventory, located within the Stores and owned by Seller on the Inventory Count Date, excluding, however, any such packaging materials and supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of their Affiliates.

1.83 "Supplies Price" will mean the purchase price payable by Buyer for the Supplies, which will be $2,500.00 per Store.

1.84 "Terminated Stores" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.85 "Title Reports" will mean, collectively, (i) the Initial Title Reports and (ii) any additional title reports and/or title insurance commitments with respect to the Stores that Seller has made available to Buyer for review on the Merrill Website or otherwise.

1.86 "Title Insurer" will mean First American Title Insurance Company or any other nationally recognized title insurance company, as designated by Seller.

1.87 "Title Policies" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.88 "Winn-Dixie" will mean Winn-Dixie Stores, Inc.

2.0 **Property Included in Sale.** Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets, which - excluding Excluded Personal Property - are comprised of the following:

2.1 Seller's interest, as tenant, under the Leases and Seller's interest in any leasehold improvements;

-11-

2.2 Seller's interest in all fixtures and all equipment located in the store buildings now existing on the Leased Premises (the "<u>Buildings</u>"), including but not limited to Seller's interest in (i) heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "<u>Improvements</u>"), and (ii) Seller's trade fixtures and equipment located in the Buildings (the "<u>Equipment</u>");

2.3 The Inventory;

2.4 The Supplies;

2.5 With respect to each Store that includes a pharmacy, the Pharmacy Scrips (provided Buyer has obtained all Permits necessary for Seller to lawfully convey the Pharmacy Scrips to Buyer at Closing) and, to the extent transferable, ownership and control of pharmacy phone lines;

2.6 Seller's interest in the Subleases (if any).

Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are subject to higher or otherwise better offers for the Assets and conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

3.0   **Purchase Price.**

3.1 <u>Amount</u>.  The purchase price to be paid by Buyer to Seller for the Assets (other than the Inventory and Supplies) is $16,750,000.00 in the aggregate (the "<u>Base Purchase Price</u>"), which will be allocated to each Store as set forth on the Allocation Schedule.  The purchase price to be paid by Buyer to Seller for the Inventory in respect of each Store is the total of the Inventory Price for each item of Inventory, and the purchase price to be paid by Buyer to Seller for the Supplies in respect of each Store is the Supplies Price.  If this Agreement is terminated in accordance with its terms as to one or more, but not all, of the Stores, then (i) the aggregate Base Purchase Price will be adjusted based on the Allocation Schedule as to the Stores that remain subject to the continuing force and effect of this Agreement; and (ii) the terms "Inventory", "Supplies" and "Subleases" will be deemed to exclude, respectively, all Inventory, Supplies and Subleases of the Stores with respect to which this Agreement is terminated.

3.2 <u>Contract Consideration and Base Deposit</u>.  As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer shall deliver to Escrow

C725380.14

Agent, no later than two Business Days after Seller's execution and acceptance of this Agreement, a base earnest money deposit with respect to each Store in the amount set forth in the Allocation Schedule (the "Base Deposit").    Buyer shall make the Base Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Base Deposit will be subject to refund to Buyer to the extent and in the circumstances described in paragraphs 12, 15 and 16.  The applicable portion of the Base Deposit will be credited against the Base Purchase Price at the relevant Closing and will be held in an interest bearing escrow account maintained by Escrow Agent prior to the relevant Closing.  Whenever used herein, the term Base Deposit also will be deemed to include all interest accrued thereon; however, for state and federal income tax purposes, interest, if any, accrued on the Base Deposit will be deemed earned by Buyer.  Buyer's federal taxpayer identification number (FEIN) is 56-1390087.

3.3 Payment.  The Purchase Price will be paid in the following manner:

    3.3.1  *Base Purchase Price and Supplies Price*.  On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Base Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the relevant Closing Statement), and the Supplies Price with respect to such Store or Stores.  On the Closing Date for such Store or Stores, Buyer will, subject to the conditions set forth in paragraph 10 of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted) and the Supplies Price with respect to such Store or Stores to Seller (by wire transfer to an account designated in writing by Seller).

    3.3.2  *Inventory Deposit and Inventory Price*.  On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) an inventory deposit with respect to the applicable Store or Stores in the amount set forth in the Allocation Schedule (the "Inventory Deposit") with respect to such Store or Stores. The Inventory Price for each Store shall be determined in the manner set forth in paragraph 3.4 of this Agreement.  At each Closing for one or more Stores, (a) Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the amount by which the Inventory Price for such Store or Stores exceeds the Inventory Deposit for such Store or Stores, and (b) Buyer will instruct Escrow Agent to transfer and deliver the Inventory Price with respect to such Store or Stores to Seller, by wire transfer to an account designated in writing by Seller.  If the

-13-

aggregate Inventory Deposit for all Stores having the same Closing Date exceeds the aggregate Inventory Price for such Stores, then Seller and Buyer shall provide written instructions to Escrow Agent to deliver the excess to Buyer promptly following Closing. The Base Deposit and, once deposited, the Inventory Deposit with respect to each Store will individually and collectively sometimes be referred to in this Agreement as the "Deposit". The provisions of this paragraph 3.3.2 which apply to the period after the Closing for any Store shall survive the Closing for such Store.

3.3.3   *Certain Transaction Costs*.   All relevant rent, taxes (including real and personal property taxes), utilities (including the pharmacy phone line, where applicable) and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding each Closing Date and will be a credit or debit, as the case may be, against the Base Price and Supplies Price payable at such Closing to the extent thereof and then against the Inventory Price. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.3.3 which apply to the period after the Closing for any Store shall survive the Closing for such Store.

3.3.4   *Sales Tax*.   Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. On Seller's request, Buyer agrees to provide Seller with a certificate stating that Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Seller or any governmental authority to document that sale of the Inventory is exempt from sales tax. This paragraph 3.3.4 shall survive the Closing for each store.

-14-

3.4    Inventory.

   3.4.1    *Count of Store Inventory.*   Seller shall close each Store at a time designated by Seller between 5:00 p.m. and 11:00 p.m. on the Inventory Count Date, unless otherwise agreed to by Seller and Buyer.   As soon as possible after the closing of each such Store, the parties will conduct a physical count (or measurement with respect to gasoline and other vehicle fuels) of the Inventory at each of such Stores (the "Inventory Count") with the assistance of the Inventory Service.   Buyer and Seller will each have representatives present at each Store during the Inventory Count who will acknowledge in writing all computations before leaving the Store.   Upon completion of such Inventory Count, except for mathematical errors, other agreed upon changes and disputes regarding Inventory and Excluded Inventory, the count of the Inventory Service shall be final and binding on the parties for all purposes of this Agreement.

   3.4.2    *Pharmacy Inventory.*   With respect to each Store that includes a pharmacy, pharmaceutical Inventory will be inventoried by item as follows and the inventory forms for such Inventory will be signed by registered pharmacists representing Seller and Buyer:

      (a)    Schedule II drugs will be inventoried as exact counts and transferred on DEA 222 form supplied to Buyer by Seller and approved by Buyer; and

      (b)    Will-call prescriptions filled but not purchased by customers at the time of the Inventory Count will be returned for credit and included in the Inventory Count.

   3.4.3    *Valuation of Inventory.*   The Inventory will be valued by applying the following methods to the count reported by the Inventory Service:

      (a)    with respect to pharmaceutical Inventory and gasoline the value used will be Seller's actual cost as reflected on its records kept in the ordinary course of business (for gasoline, cost shall be last acquisition cost), and

      (b)    with respect to all other Inventory the value used will be determined by taking Seller's standard retail shelf price (after adjusting to remove temporary or special price reductions, promotions or discounts, coupon discounts or customer loyalty card discounts) for the applicable item and multiplying such price by the valuation percentage for each merchandise category indicated in the table below:

-15-

| Category | Valuation Percentage |
|----------|---------------------|
| 1. Grocery (food and non-food) | 77% |
| 2. Dairy | 80% |
| 3. Frozen Food | 65% |
| 4. General Merchandise | 65% |
| 5. Tobacco | 82% |
| 6. Alcohol | 85% |
| 7. Packaged Lunch Meats | 68% |

3.4.4 *Inventory Certificates; Inventory Closing Statement*.   Upon completion of the valuation of the Inventory for each Store, which shall be completed prior to the completion of Closing, the Buyer and Seller shall execute an Inventory Certificate, which shall contain the Inventory Price for the Inventory at such Store, and shall have incorporated therein a complete listing of the Inventory for such Store.  Following execution of the Inventory Certificates, if requested by Buyer, Seller or Escrow Agent, Buyer and Seller shall execute an Inventory Closing Statement, which shall contain the Inventory Price for the Inventory at such Store and shall otherwise be consistent with the Inventory Certificate, and shall have incorporated therein appropriate disbursement instructions to Escrow Agent.

3.4.5 *Cooperation and Resolution of Disputes.*  The parties agree to be cooperative and reasonable in connection with each Inventory Count and will attempt, in good faith, to resolve any disputes respecting the quantity of Inventory, Excluded Inventory and Excluded Personal Property that may arise during the Inventory Count.  Any disputes that have not been resolved by the completion of Closing shall be separately listed and settled by Buyer Inventory Representative and Seller Inventory Representative with respect to the relevant Store as expeditiously as practicable thereafter or, if the parties cannot agree, by the Bankruptcy Court.  Any such determination of any dispute shall be final and binding on the parties.

3.4.6 *Inventory Services and Fees*.  Seller and Buyer will jointly select and  engage the Inventory Service, but the fees of the Inventory Service will be billed to and paid by Buyer.  Buyer agrees to pay such fees at Closing or earlier if then due and in any event before delinquent.

3.5 Inventory Relating to Permits.  If by Closing Buyer shall not have obtained any required Permit contemplated by paragraph 9.2 of this Agreement,

-16-

notwithstanding its best efforts to do so, any tobacco, liquor, beer, wine, pharmaceuticals or other Inventory that under applicable law may not be transferred without such Permit will not be sold and transferred at Closing but will be segregated at the Store, in which case, unless the parties agree otherwise at or before Closing, (a) the relevant items of Inventory will be deemed to constitute Excluded Inventory, (b) the Bill of Sale to be delivered to Buyer at Closing will specifically exclude such Inventory, (c) the Inventory Price will be reduced by the Inventory Price allocable to such Inventory, and (d) Seller will remove such Inventory from the applicable Store in the same manner as other Excluded Property and with reasonable promptness after Closing.    Notwithstanding the foregoing clause (d), if applicable law or regulation restricts Seller from removing from the Store (or transporting from the Store to a convenient location in which Seller will have continuing operations) any tobacco, liquor, beer, wine, pharmaceuticals or other Inventory that constitutes Excluded Property, then (i) Seller will have the right to segregate such Inventory at a secured location in the Store selected by Seller and reasonably acceptable to Buyer, and to maintain and protect such Inventory at such secured location for so long as Seller reasonably requires in order to obtain all Permits necessary to remove or transport such Inventory (or to sell or convey such Inventory to a third party entitled to do so), (ii) Seller will have reasonable access to such secured location during normal business hours to maintain and protect such Inventory and when appropriate remove such Inventory from the Store, and (iii) Seller will have the right but not the obligation to require Buyer to purchase such Inventory, at the Inventory Price allocable to such Inventory, at such time as Buyer has obtained such Permits as are required for Seller to do so provided that such Inventory does not meet the definition of "Excluded Inventory" under paragraph 1.36(ii), (iii) or (iv) at such time as Buyer has obtained such Permits.

3.6 Allocation of Base Purchase Price Among Assets at each Store.    Seller shall have the right to allocate the Base Purchase Price for each Store, for tax purposes and all other purposes, among the Assets at such Store other than Inventory and Supplies (as such Assets are described in paragraph 2.0 of this Agreement) in accordance with the Internal Revenue Code of 1986, as amended, including Section 1060 thereof; provided, however, that such allocation shall not be binding upon Seller or determinative with respect to any allocation made by Seller of the Base Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case.    The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets at each Store on the applicable Closing Statement.

4.0    **Buyer's Due Diligence.**

C725380.14