adjustments described in <u>paragraph 3.3.3</u> of this Agreement and in other provisions of this Agreement.

1.23 "<u>Confidentiality Agreement</u>" will mean the existing letter agreement between Winn-Dixie and Buyer, regarding, among other things, confidentiality relating to the subject matter of this Agreement.    Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.

1.24 "<u>Conveyance Instrument</u>" will have the meaning assigned in <u>paragraph 14.2</u> of this Agreement.

1.25 "<u>Credit Agreement Liens</u>" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.26 "<u>Cure Costs</u>" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Lease and the Sublease.

1.27 "<u>Damages</u>" will have the meaning assigned in <u>paragraph 16.5</u> of this Agreement.

1.28 "<u>Deposit</u>" will have the meaning assigned in <u>paragraph 3.3</u> of this Agreement.

1.29 "<u>Due Diligence Materials</u>" will mean, collectively, (i) the Lease, the Sublease (if any), the Title Reports and the Environmental Report, (ii) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, at the Store, on the Merrill Website, or otherwise and (iii) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.30 "<u>Effective Date</u>" will have the meaning assigned in the initial paragraph of this Agreement.

1.31 "<u>Environmental Report</u>" will have the meaning assigned in <u>paragraph 4.3</u> of this Agreement.

1.32 "<u>Equipment</u>" will have the meaning assigned in <u>paragraph 2.2</u> of this Agreement.

1.33  "Escrow Agent" will mean Title Insurer, acting as escrow and closing agent.

1.34  "Excluded Inventory" will mean (i) any private label goods and merchandise; (ii) any goods and merchandise that are damaged, spoiled or distressed; (iii) any items that as of the Inventory Count Date are past Seller's "pull date", if any, or, with respect to dairy items, within five days of Seller's "pull date" or, with respect to frozen foods, within 10 days of Seller's "pull date", or with respect to pharmaceutical inventory (including diabetic supplies), within 30 days of the manufacturer's expiration date, if any; (iv) any non-consumable or non-food items; and (v) if applicable, any inventory deemed to be Excluded Inventory under paragraph 3.5 of this Agreement.

1.35  "Excluded Personal Property" will mean: (i) all Excluded Inventory; (ii) all packaging materials and supplies; (iii) all leased point-of-sale equipment and leased photo lab equipment; (iv) all other leased equipment (including all other leased equipment described on Exhibit D to this Agreement with respect to the Store); (v) all owned computer and related equipment that contains software subject to a license that restricts its transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed; (vi) all equipment and other personal property that is neither owned nor leased by Seller, including by way of example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners and equipment owned by product vendors; (vii) all branded shopping carts; (viii) all over-the-road motor vehicles; (ix) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (x) all data files other than Pharmacy Scrips; (xi) all lottery equipment and tickets; (xii) all accounts receivable, bank accounts, cash and cash equivalents; (xiii) all trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates; (xiv) all building signs and panels in all pole and pylon signs that advertise Seller's business in the Store; (xv) all intellectual property and rights (other than Pharmacy Scrips) relating to any of the foregoing; and (xvi) all service agreements, leases of personal property, contracts and warranties relating to Seller's possession and operation of the Store.

1.36  "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.37  "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.38    "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.39    "Initial Title Reports" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Store that Seller has made available to Buyer for review on the Merrill Website or otherwise as of the Effective Date. Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.40    "Inventory" will mean all inventories of goods and merchandise within the Store and owned by Seller on the Inventory Count Date and held for resale in the ordinary course of business of Seller conducted at the Store to retail customers, but excluding the Excluded Inventory.

1.41    "Inventory Certificate" will mean a certificate executed by Buyer and Seller in connection with the Closing as contemplated by paragraph 3.4.4 of this Agreement, in the form attached hereto as Exhibit H to this Agreement.

1.42    "Inventory Closing Statement" will mean a statement in the form of Exhibit C-2 to this Agreement reflecting the net amount due Seller at the Closing in respect of the Inventory Price, after making the adjustments described in Exhibit C-2 and in other provisions of this Agreement.

1.43    "Inventory Count" will have the meaning assigned in paragraph 3.4.1 of this Agreement.

1.44    "Inventory Count Date" will mean the day immediately preceding the Closing Date.

1.45    "Inventory Deposit" will have the meaning assigned in paragraph 3.3 of this Agreement.

1.46    "Inventory Price" will mean the purchase price for the Inventory determined pursuant to paragraph 3.4 of this Agreement.

1.47    "Inventory Service" will mean MSI Inventory Service Corporation or Accurate Inventory & Calculating Service, Inc., as designated by Seller, or such other inventory service as is selected by Seller and reasonably acceptable to Buyer.

1.48    "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any

requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of Tommy Snipes, without any requirement of investigation or inquiry.

1.49    "Landlord" will mean the lessor under the Lease.

1.50    "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.1 of this Agreement.

1.51    "Lease" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.52    "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Store for its current use, taken as a whole, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.53    "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Jaguar" with respect to the disposition of the Store and other properties.

1.54    "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on any of Seller's leasehold interests or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under the Lease or on any other Assets; and (D) judgments that

1.67    "Seller Inventory Representative" will mean Michael Chlebovec or another person designated in writing by Michael Chlebovec or by Seller to act in such capacity.

1.68    "Seller's Brokers" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.69    "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; and (c) the Cure Costs.

1.70    "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.71    "Store" will have the meaning assigned in paragraph A of the Recitals to this Agreement, including if applicable any associated gas station, liquor store, pharmacy or other specialty area operated by Seller at the Leased Premises.

1.72    "Sublease" will mean, collectively whether there is one or more, the sublease(s) of a portion of the Leased Premises listed on Exhibit A-2 to this Agreement (if any), including amendments. If no sublease is listed on Exhibit A-2 to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Sublease will be disregarded.

1.73    "Subtenant" will mean, collectively whether there is one or more, the subtenant or sublessee under each Sublease. If no sublease is listed on Exhibit A-2 to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Subtenant will be disregarded.

1.74    "Successful Bid" will mean the highest or otherwise best offer to purchase the Assets, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.75    Intentionally deleted.

1.76    Intentionally deleted.

1.77    "Title Reports" will mean, collectively, (i) the Initial Title Reports and (ii) any additional title reports and/or title insurance commitments with respect to the Store that Seller has made available to Buyer for review on the Merrill Website or otherwise.

1.78 "<u>Title Insurer</u>" will mean First American Title Insurance Company or Near North National Title LLC, as agent for Lawyers Title Insurance Corporation, or any other nationally recognized title insurance company, as designated by Seller.

1.79 "<u>Title Policy</u>" will have the meaning assigned in <u>paragraph 4.2</u> of this Agreement.

1.80 "<u>Winn-Dixie</u>" will mean Winn-Dixie Stores, Inc.

2.0 **<u>Property Included in Sale</u>.** Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets, which—excluding Excluded Personal Property—are comprised of the following:

2.1 Seller's interest, as tenant, under the Lease and Seller's interest in any leasehold improvements;

2.2 Seller's interest in all fixtures and all equipment located in the store building or buildings now existing on the Leased Premises (the "<u>Building</u>"), including but not limited to Seller's interest in (i) heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Building, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "<u>Improvements</u>"), and (ii) Seller's trade fixtures and equipment located in the Building (the "<u>Equipment</u>");

2.3 The Inventory;

2.4 Intentionally deleted;

2.5 If the Store includes a pharmacy, the Pharmacy Scrips (provided Buyer has obtained all Permits necessary for Seller to lawfully convey the Pharmacy Scrips to Buyer at Closing) and, to the extent transferable, ownership and control of pharmacy phone lines;

2.6 Seller's interest in the Sublease (if any).

Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are subject to higher or otherwise better offers for the Assets and conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

3.0 **<u>Purchase Price</u>.**

3.1 <u>Amount</u>. The purchase price to be paid by Buyer to Seller for the Assets (other than the Inventory) is $25,000 (the "<u>Base Purchase Price</u>"). The

purchase price to be paid by Buyer to Seller for the Inventory is the total of the Inventory Price for each item of Inventory.

3.2     <u>Contract Consideration and Base Deposit</u>.  As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer shall deliver to Escrow Agent, no later than two Business Days after Seller's execution and acceptance of this Agreement, a base earnest money deposit of $2,500 (the "<u>Base Deposit</u>").  Buyer shall make the Base Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Base Deposit will be subject to refund to Buyer to the extent and in the circumstances described in <u>paragraphs 12, 15 and 16</u>.  The Base Deposit will be credited against the Base Purchase Price at the Closing and will be held in an escrow account maintained by Escrow Agent prior to the Closing. Whenever used herein, the term Base Deposit also will be deemed to include all interest accrued thereon if the escrow account maintained by Escrow Agent is an interest bearing account; however, for state and federal income tax purposes, interest, if any, accrued on the Base Deposit will be deemed earned by Buyer.  Buyer's federal taxpayer identification number (FEIN) is 200296226.

3.3     <u>Payment</u>.  The Purchase Price will be paid in the following manner:

3.3.1   <u>*Base Purchase Price*</u>.  On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Base Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the Closing Statement).  On the Closing Date, Buyer will, subject to the conditions set forth in <u>paragraph 10</u> of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted) to Seller (by wire transfer to an account designated in writing by Seller).

3.3.2   <u>*Inventory Deposit and Inventory Price*</u>.  On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) an inventory deposit  of $10,000 (the "<u>Inventory Deposit</u>").  The Inventory Price shall be determined in the manner set forth in <u>paragraph 3.4</u> of this Agreement.  At the Closing, (a) Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the amount by which the Inventory Price exceeds the Inventory Deposit, and (b) Buyer will instruct Escrow Agent to transfer and deliver the Inventory Price to Seller, by wire transfer to an account designated in writing by Seller.  If the Inventory Deposit exceeds the Inventory Price, then Seller and Buyer shall provide written instructions to Escrow Agent

-11-

to deliver the excess to Buyer promptly following Closing. The Base Deposit and, once deposited, the Inventory Deposit will individually and collectively sometimes be referred to in this Agreement as the "<u>Deposit</u>".

3.3.3 *Certain Transaction Costs*. All relevant rent, taxes (including real and personal property taxes), utilities (including the pharmacy phone line, where applicable) and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Base Price to the extent thereof and then against the Inventory Price. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this <u>paragraph 3.3.3</u> which apply to the period after the Closing shall survive the Closing.

3.3.4 *Sales Tax*. Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. On Seller's request, Buyer agrees to provide Seller with a certificate stating that Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Seller or any governmental authority to document that sale of the Inventory is exempt from sales tax. This <u>paragraph 3.3.4</u> shall survive the Closing.

3.4 <u>Inventory</u>.

3.4.1 *Count of Store Inventory.* Seller shall close the Store at a time designated by Seller between 5:00 p.m. and 11:00 p.m. on the Inventory Count Date, unless otherwise agreed to by Seller and Buyer. As soon as possible after the closing of the Store, the parties will conduct a physical count (or measurement with respect to gasoline and other vehicle fuels) of the Inventory at the Store (the "<u>Inventory Count</u>") with the assistance of the Inventory Service.

Buyer and Seller will each have representatives present at the Store during the Inventory Count who will acknowledge in writing all computations before leaving the Store. Upon completion of such Inventory Count, except for mathematical errors, other agreed upon changes and disputes regarding Excluded Inventory, the count of the Inventory Service shall be final and binding on the parties for all purposes of this Agreement.

3.4.2 *Pharmacy Inventory.* If the Store includes a pharmacy, pharmaceutical Inventory will be inventoried by item as follows and the inventory forms for such Inventory will be signed by registered pharmacists representing Seller and Buyer:

(a) Schedule II drugs will be inventoried as exact counts and transferred on DEA 222 form supplied to Buyer by Seller and approved by Buyer; and

(b) Will-call prescriptions filled but not purchased by customers at the time of the Inventory Count will be returned for credit and included in the Inventory Count.

3.4.3 *Valuation of Inventory.* The Inventory will be valued by applying the following methods to the count reported by the Inventory Service:

(a) with respect to pharmaceutical Inventory and gasoline the value used will be Seller's actual cost as reflected on its records kept in the ordinary course of business (for gasoline, cost shall be last acquisition cost), and

(b) with respect to all other Inventory the value used will be determined by taking Seller's standard retail shelf price (after adjusting to remove temporary or special price reductions, promotions or discounts, coupon discounts or customer loyalty card discounts) for the applicable item and multiplying such price by the valuation percentage for each merchandise category indicated in the table below:

| Category | Valuation Percentage |
|---|---|
| 1. Grocery (food only) | 70% |
| 2. Dairy | 75% |
| 3. Frozen Food | 65% |
| 4. Packaged Lunch Meats | 68% |

3.4.4 *Inventory Certificates; Inventory Closing Statement.* Upon completion of the valuation of the Inventory, which shall be

-13-

completed prior to the completion of Closing, the Buyer and Seller shall execute an Inventory Certificate, which shall contain the Inventory Price for the Inventory, and shall have incorporated therein a complete listing of the Inventory. Following execution of the Inventory Certificate, if requested by Buyer, Seller or Escrow Agent, Buyer and Seller shall execute an Inventory Closing Statement, which shall contain the Inventory Price for the Inventory and shall otherwise be consistent with the Inventory Certificate, and shall have incorporated therein appropriate disbursement instructions to Escrow Agent.

3.4.5  *Cooperation and Resolution of Disputes.*  The parties agree to be cooperative and reasonable in connection with the Inventory Count and will attempt, in good faith, to resolve any disputes respecting the quantity of Inventory, Excluded Inventory and Excluded Personal Property that may arise during the Inventory Count. Any disputes that have not been resolved by the completion of Closing shall be separately listed and settled by Buyer Inventory Representative and Seller Inventory Representative as expeditiously as practicable thereafter or, if the parties cannot agree, by the Bankruptcy Court. Any such determination of any dispute shall be final and binding on the parties.

3.4.6  *Inventory Services and Fees*.  Seller will engage the Inventory Service, but the fees of the Inventory Service will be billed to and paid by Buyer. Buyer agrees to pay such fees at Closing or earlier if then due and in any event before delinquent.

3.5  Inventory Relating to Permits.  If by Closing Buyer shall not have obtained any required Permit contemplated by paragraph 9.2 of this Agreement, notwithstanding its best efforts to do so, any tobacco, liquor, beer, wine, pharmaceuticals or other Inventory that under applicable law may not be transferred without such Permit will not be sold and transferred at Closing but will be segregated at the Store, in which case, unless the parties agree otherwise at or before Closing, (a) the relevant items of Inventory will be deemed to constitute Excluded Inventory, (b) the Bill of Sale to be delivered to Buyer at Closing will specifically exclude such Inventory, (c) the Inventory Price will be reduced by the Inventory Price allocable to such Inventory, and (d) Seller will remove such Inventory from the Store in the same manner as other Excluded Property and with reasonable promptness after Closing. Notwithstanding the foregoing clause (d), if applicable law or regulation restricts Seller from removing from the Store (or transporting from the Store to a convenient location in which Seller will have continuing operations) any tobacco, liquor, beer, wine, pharmaceuticals or other Inventory that constitutes Excluded Property, then (i) Seller will have the right to segregate such Inventory at a secured

-14-

location in the Store selected by Seller and reasonably acceptable to Buyer, and to maintain and protect such Inventory at such secured location for so long as Seller reasonably requires in order to obtain all Permits necessary to remove or transport such Inventory (or to sell or convey such Inventory to a third party entitled to do so), (ii) Seller will have reasonable access to such secured location to maintain and protect such Inventory and when appropriate remove such Inventory from the Store, and (iii) Seller will have the right but not the obligation to require Buyer to purchase such Inventory, at the Inventory Price allocable to such Inventory, at such time as Buyer has obtained such Permits as are required for Seller to do so.

3.6   <u>Allocation of Base Purchase Price Among Assets</u>.  Seller shall have the right to allocate the Base Purchase Price, for tax purposes and all other purposes, among the Assets other than Inventory (as such Assets are described in paragraph 2.0 of this Agreement); provided, however, that such allocation shall not be binding upon Seller or determinative with respect to any allocation made by Seller of the Base Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case.  The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets on the Closing Statement.

## 4.0   <u>Buyer's Due Diligence</u>.

4.1   <u>Acknowledgment</u>.  In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence regarding the Store and the Assets and it has had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement.  Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Store and the Assets and to acquire such additional information about the Store and the Assets as Buyer has reasonably requested.  Buyer agrees that any physical access to or investigation of the Store by Buyer or its representatives shall be limited by and shall comply in all respects with the written instructions and requirements of Seller.

4.2   <u>Title</u>.  Buyer confirms and acknowledges that Seller has made the Initial Title Reports available to Buyer, and intends to make additional Title Reports available to Buyer, and Buyer may negotiate with the Title Insurer to obtain a title insurance policy with respect to the Store (the "<u>Title Policy</u>") at Closing.  If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present use or occupancy of the Store, Buyer

may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to Catherinelbold@winn-dixie.com within three business days of the date such additional Title Report is either delivered to Buyer or posted on the Merrill Website. To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #____" with the appropriate Store number set forth). If Buyer timely notifies Seller of any valid objection to any such matter set forth in any additional Title Report , and if Seller declines or is unable to cure any such objection, then Seller will have the right to terminate this Agreement at any time thereafter, with no liability to Buyer, unless Buyer waives such objection by written notice received by Seller no later than the earlier of (x) one Business Day following Buyer's receipt of notice from Seller that it will not cure such objection or (y) the Closing Date. If Buyer closes the purchase of the Assets, then Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter and such matter shall constitute a Permitted Encumbrance.

4.3 Environmental Reports. Buyer confirms and acknowledges that Seller has made available to Buyer for review on the Merrill Website an environmental report (the "Environmental Report"), covering the Real Property relating to the Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where the Store is located.

4.4 Negotiation Period. During the Negotiation Period, representatives of Buyer shall be allowed to contact and have discussions with the Landlord(s) to attempt to obtain lease concessions from the Landlord(s) no less favorable than those set forth on Exhibit A-3, which Exhibit has been appended to the executed copy of this Agreement but shall not be filed with the Court. Buyer shall negotiate with the Landlord(s) in good faith and shall use its diligent efforts to obtain the concessions listed on Exhibit A-3. Buyer shall give Seller at least 24 hours notice of any discussions with any Landlord and shall provide Seller with copies of all correspondence between Buyer and each Landlord; no such contact or discussions shall occur outside the presence (either in person or by telephone) of a representative of Seller and all such discussions shall be subject to the terms of the Confidentiality Agreement. If at the end of the Negotiation Period, Buyer has not received reasonable assurance from a Landlord (which may be oral) to grant to Buyer the requested lease concessions from such Landlord upon Closing, then, if the failure to receive such concessions, individually or in the aggregate, materially increases the financial costs or expenditures that will be borne by the Buyer, Buyer may terminate this Agreement as to any Store with respect to which the concessions were not granted by providing notice to Seller

-16-

(given by facsimile to Timothy N. Tucker at 404-572-5100 and by email to TTucker@kslaw.com with copy to Catherinelbold@winn-dixie.com) before the end of the Negotiation Period, which notice, to be effective, shall specify the concessions that were not granted.   Any right of Buyer to terminate this Agreement pursuant to this paragraph 4.4 shall be deemed waived if Buyer does not timely terminate this Agreement as provided above before the end of the Negotiation Period.   Such termination shall not modify or affect this Agreement in any way as to the Stores where notice of termination has not been timely given in accordance with this paragraph 4.4.   "Negotiation Period" will mean the period commencing on the Effective Date and ending at 5:00 p.m. Eastern Time five (5) days after the Effective Date.

5.0   **Representations and Warranties of Seller Relating to the Assets.**  To induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

5.1   On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website: (i) a copy of the Lease (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a)   a copy of the site plan for the Store;

(b)   a copy of the fixture plans for the Store; and

(c)   a list of Equipment (other than Excluded Personal Property) at the Store as reflected in Seller's current records;

it being understood that the materials described in this paragraph 5.1 have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

5.2   At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Monetary Liens other than the Permitted Encumbrances to the extent provided under Section 363 of the Bankruptcy Code.

6.0   **General Representations and Warranties of Seller.**  In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

-17-

6.1     Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

6.2     No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, (iii) those contemplated by or required under paragraph 3.5 of this Agreement and (iv) Bankruptcy Court Approval.

6.3     Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.4     To Seller's Knowledge, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

6.5     None of the employees employed by Seller in the Store is covered by a union contract, collective bargaining agreement or other labor agreement.

6.6     Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

7.0     **Buyer's Representations and Warranties.**  Buyer represents and warrants to Seller as follows:

-18-

7.1    Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Georgia, and has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required corporate action on behalf of Buyer.

7.2    No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated.

7.3    This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4    There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

7.5    Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

7.6    As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or

other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

8.0 **Covenants of Seller.** Seller hereby covenants for the benefit of Buyer as follows:

8.1 Seller will (i) use commercially reasonable efforts to maintain the Assets until the Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and, except where Store operations were suspended prior to the Effective Date, will continue operation of the Store, and (ii) will not sell, dispose of, abandon or remove from the Store any of the Assets or agree to do so except in the ordinary course of business; provided, however, it is expressly acknowledged and understood that, following the Effective Date, Seller will take certain actions to wind up its operations (including related marketing, promotions and advertising) at the Store and eliminate or remove the Excluded Personal Property in preparation for the Inventory Count, Closing and the turnover of possession to Buyer.

8.2 Seller will use commercially reasonable efforts to remove all Excluded Personal Property from the Store on or before the Closing Date, except that Buyer shall remove and dispose of Seller's signs and panels and branded shopping carts that are part of the Excluded Personal Property as more fully provided in paragraph 9.3 of this Agreement.

8.3 On or after the entry of the Sale Order, Seller will release to Buyer a schedule of Seller's current employees at the Store, and will permit Buyer, at reasonable times during normal business hours and with minimum impact on Seller's business, to arrange for personal interviews with Store managers and other Store employees, at times and places mutually agreeable to both Seller and Buyer, and to arrange for those relevant employees of Seller, who are interested, to interview with Buyer.

8.4 Seller will (except to the extent otherwise required by the Family Medical Leave Act) transfer or terminate all its employees working at the Store on the Closing Date.

8.5 If this Agreement is determined to be the Successful Bid, Seller will use commercially reasonable efforts to obtain the entry of a Sale Order.

8.6 Prior to the Closing, Seller will not cause or permit to be granted any material increase in the salaries, wages, benefits or other compensation payable or to become payable to employees working at the Store, except for (i) merit and cost-of-living increases in the ordinary course of business and (ii) incentive bonuses or compensation granted by Seller in connection with Seller's winding up of its operations at the Store.

-20-

8.7    Seller will cooperate reasonably with Buyer, upon written request, with respect to Buyer's performance of its covenants under paragraph 9.2 of this Agreement.

9.0    **Covenants of Buyer.**  Buyer for itself hereby covenants for the benefit of Seller as follows:

9.1    Buyer will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with the Closing and the issuance of the Title Policy.

9.2    Buyer will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11 of this Agreement, including without limitation all Permits necessary for Seller to sell and Buyer to buy the Inventory and the Pharmacy Scrips.

9.3    Within forty-eight (48) hours after the Closing Date, Buyer shall, at Buyer's sole cost and expense, (i) remove from the Store, destroy and lawfully dispose of all signs and panels that are part of the Excluded Personal Property, and (ii)  either (A) remove from the Store and lawfully dispose of all branded shopping carts or (B) remove all trademarks, trade names, logos and designs of Seller, Winn-Dixie or their Affiliates from all shopping carts and destroy and lawfully dispose of all such trademarks, trade names, logos and designs.  Without limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 16.5 of this Agreement shall encompass any breach by Buyer of this paragraph 9.3.

9.4    Buyer will hire a sufficient number of such employees at the Store to the extent necessary to avoid the notice requirements of the Worker Adjustment and Retaining Notification Act with respect to the Store and will not terminate such employees' employment following the Closing except in circumstances that will not create liability under such Act.  From and after entry of the Sale Order, this paragraph 9.4 shall supersede any provision of the Confidentiality Agreement limiting the ability of Buyer to employ or solicit for employment the employees at the Store.  In addition, at Closing Buyer will hire at least 50% of the full-time employees of the Store and at least 50% of the part-time employees of the Store, and will continue to employ such employees for a period of not less than six months following Closing, other than as a result of (i) dismissals of employees for cause in accordance with Buyer's standard employment policies for ongoing operations and (ii) voluntary termination by any employee of such employment.  No later than two (2) Business Days prior to Closing Buyer will deliver to Seller, in writing, a list identifying all employees of Seller who have been hired by Buyer, or to whom offers of employment have been made by Buyer.

-21-

9.5    Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

9.6    If this Agreement is determined to be the Successful Bid, then Buyer will use commercially reasonable efforts to obtain the entry of a Sale Order, including by providing Adequate Assurance Information to Seller, the Bankruptcy Court, Landlord and Subtenant (if any) as may be reasonably requested.

9.7    For a period of 180 days following the Closing Date Buyer will not sell or otherwise transfer the Pharmacy Scrips to any Person other than an Affiliate of Buyer.

10.0   **Conditions Precedent to Buyer's Obligations.**  The obligations of Buyer under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

10.1   Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of paragraph 5.1 of this Agreement), all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Seller's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

10.2   No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the

-22-

consummation of the transactions contemplated by this Agreement will be in effect.

10.3    The Sale Order shall have been entered by the Bankruptcy Court in substantially the form posted on the Merrill Website and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Buyer, which shall not be unreasonably withheld.

10.4    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(iv) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1 (a)(iv).

11.0    **Conditions Precedent to Seller's Obligations.**  The obligations of Seller under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

11.1    Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  All of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2   No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

11.3   The Sale Order shall have been entered by the Bankruptcy Court in substantially the form posted on the Merrill Website and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Seller, which shall not be unreasonably withheld.

11.4   The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(v) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1(a)(v).

12.0   **Loss by Fire or Other Casualty; Condemnation**.  In the event that, prior to a Closing, the Store or any material part thereof is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with the Store, either party will have the right, exercisable by giving notice of such decision to the other within 5 Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, and thereafter none of the parties will have any further rights or obligations hereunder; provided, however, that, if Buyer is not in breach of this Agreement, Buyer will be entitled to the return from the Escrow Agent of the Deposit.  If neither party exercises its right of termination described in the immediately preceding sentence and the Store is sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

13.0   **Possession**.  Seller will turn over to Buyer exclusive physical possession of the Store and the Assets (including, to the extent in Seller's possession, control or custody) all keys, combinations to safes, security codes and passwords, on the Closing Date upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Buyer to transfer to Seller, the entire Base Purchase Price, Inventory Price.  After conclusion of the Inventory Count and upon Seller's receipt of such written confirmation from

-24-