# **EXHIBIT A**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made effective as of July 18, 2005 (the "Effective Date"), by and among

**WINN-DIXIE STORES, INC.,** a Florida corporation and **WINN-DIXIE RALEIGH, INC.,** a Florida corporation (collectively, "Seller"), and

**PUBLIX SUPER MARKETS, INC.,** a Florida corporation, or its permitted assignee pursuant to paragraph 18.5 of this Agreement ("Buyer").

## R E C I T A L S :

A.   Seller is the tenant of each of three (3) supermarket stores (the "Stores"), each of which is listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under the respective leases, including amendments thereto (the "Leases") described on Exhibit A-2 to this Agreement. The Stores occupy the respective leased premises as described in each Lease (the "Leased Premises"), within the respective parcels of real property described on Exhibit A-2 to this Agreement associated with each Lease. Seller's leasehold interest in each Leased Premises pursuant to each Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "Assets."

B.   Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.   Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no. 05-03817-3F1 (the "Bankruptcy Case").

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0   **Defined Terms.** Capitalized terms as used in this Agreement will have the following meanings when used herein.

   1.1   "Adequate Assurance Information" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that Landlords and Subtenants are adequately assured

of Buyer's future performance under the Leases, as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's obligations under the Leases and (where applicable) the Subleases by an Affiliate of Buyer with sufficient assets to provide adequate assurance of future performance.

1.2    "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3    "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4    "Allocation Schedule" will mean the allocation of the Base Purchase Price and Base Deposit among the Stores as provided on Exhibit E to this Agreement.

1.5    "Approval Hearing" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.6    "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.7    "Bankruptcy Code" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.8    "Bankruptcy Court" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.9    "Bankruptcy Court Approval" will mean the entry of one or more Sale Orders with respect to the Stores by the Bankruptcy Court.

1.10    "Bankruptcy Case" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.11    "Base Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.12    "Base Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.13    "Bidding Procedures" will mean the order of the Bankruptcy Court entered on June 21, 2005, that will govern the selection by Seller of the Successful Bid relating to a particular Store.

1.14    "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at each Closing, as applicable, the Equipment and other tangible and

intangible personal property constituting a portion of the Assets relating to the one or more Stores being transferred at such Closing.

1.15 "Buildings" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.16 "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.17 "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

1.18 Intentionally Omitted.

1.19 "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policies (and the cost of any simultaneous issue mortgagee title insurance policies and any loan-related title insurance endorsements thereon); (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instruments; (e) recording fees payable in connection with recording the Conveyance Instruments in the appropriate public records; (f) cost of the Environmental Reports, including any supplements or updates; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment; and (i) the fees and costs of the Closing Escrow Agent.

1.20 "Buyer's Escrowed Items" will have the meaning assigned in paragraph 15.3 of this Agreement.

1.21 "Closing" with respect to one or more Stores will mean the consummation of the assignment, assumption, sale and purchase of the Assets relating to such Store or Stores pursuant to this Agreement as indicated by delivery of the Conveyance Instruments and other documents contemplated by paragraph 15 of this Agreement and the Purchase Price as contemplated in this Agreement with respect to such Store or Stores, which will be deemed to occur at 12:01 a.m. on the Closing Date with respect to such Store or Stores.

1.22 "Closing Date" will mean the date as to a particular Store or Stores designated by Seller in writing, and reasonably acceptable to Buyer, that is between one day and 65 days following the Bankruptcy Court Approval with respect to such Store or Stores.

1.23 "Closing Statement" will mean a statement in the form of Exhibit C-1 to this Agreement (or in such other form as is prepared by Seller and reasonable acceptable to Buyer) reflecting the net amount due Seller at each Closing, after making the adjustments described in paragraph 3.3.3 of this Agreement and in other provisions of this Agreement.

1.24 "Confidentiality Agreement" will mean the existing letter agreement between Winn-Dixie and Buyer, regarding, among other things, confidentiality relating to the subject matter of this Agreement.  Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.

1.25 "Conveyance Instrument" will have the meaning assigned in paragraph 15.2 of this Agreement.

1.26 "Credit Agreement Liens" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.27 "Cure Costs" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Leases.

1.28 "Damages" will have the meaning assigned in paragraph 17.5 of this Agreement.

1.29 "Deposit" will have the meaning assigned in paragraph 3.3 of this Agreement.

1.30 "Due Diligence Materials" will mean, collectively, (i) the Leases, the Title Reports and the Environmental Reports, (ii) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format on the Merrill Website.

1.31 "Effective Date" will have the meaning assigned in the initial paragraph of this Agreement.

1.32 "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.33 "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.34  "Escrow Agent" will mean Title Insurer, acting as escrow and closing agent.

1.35  Intentionally Omitted.

1.36  "Excluded Personal Property" will mean: (i) all Inventory; (ii) all packaging materials and supplies ; (iii) all leased point-of-sale equipment and leased photo lab equipment; (iv) all other leased equipment (including all other leased equipment described on Exhibit D to this Agreement with respect to each Store); (v) all owned computer and related equipment that contains software subject to a license that restricts its transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed; (vi) all equipment and other personal property that is neither owned nor leased by Seller, including by way of example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners and equipment owned by product vendors; (vii) all branded shopping carts; (viii) all over-the-road motor vehicles; (ix) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (x) all data files other than Pharmacy Scrips; (xi) all lottery equipment and tickets; (xii) all accounts receivable, bank accounts, cash and cash equivalents; (xiii) all trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates; (xiv) all building signs and panels in all pole and pylon signs that advertise Seller's business in the Stores; (xv) all intellectual property and rights (other than Pharmacy Scrips) relating to any of the foregoing; and (xvi) all service agreements, leases of personal property, contracts and warranties relating to Seller's possession and operation of the Stores.

1.37  "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.38  "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.39  "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.40  "Initial Title Reports" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Stores that Seller has made available to Buyer for review on the Merrill Website, or otherwise, with an effective date of July 12, 2005 or earlier. Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering

property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.41    "Inventory" will mean all inventories of goods and merchandise within the Stores and owned by Seller on the Inventory Count Date and held for resale in the ordinary course of business of Seller conducted at the Stores to retail customers.

1.42    Intentionally Omitted.

1.43    Intentionally Omitted.

1.44    Intentionally Omitted.

1.45    Intentionally Omitted.

1.46    Intentionally Omitted.

1.47    Intentionally Omitted.

1.48    Intentionally Omitted.

1.49    "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of John Frazier, Vice President Real Estate, without any requirement of investigation or inquiry.

1.50    "Landlords" will mean the lessors under the Leases.

1.51    "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.1 of this Agreement.

1.52    "Leases" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.53    "Liens" will mean any and all mortgages, pledges, hypothecations, security interests, encumbrances, claims (including as defined in Section 101(5) of the Bankruptcy Code), rights of first refusal, options, liens or charges of any kind, rights of setoff, or any other monetary encumbrance or other restriction on the use or exercise of any attribute of ownership or other interests however evidenced or created (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the lien notice records or other similar legislation of any jurisdiction), including all Monetary Liens;

provided, however, such term shall not include any such restrictions on the use or exercise of any attribute of ownership or other interest evidenced or created by any Lease.

1.54    "Liquidated Deposit" will have the meaning assigned in paragraph 17.1 of this Agreement.

1.55    "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Stores for their current use, taken as a whole, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.56    "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Jaguar" with respect to the disposition of the Stores and other properties.

1.57    "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on any of Seller's leasehold interests or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets; and (D) judgments that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets.

1.58    "ordinary course of business" means the ordinary course of business of Seller after the Filing Date.

1.59    "Outside Date" means September 30, 2005, as such date may be extended by the written agreement of Seller and Buyer.

1.60 "Permits" will have the meaning assigned in paragraph 7.2 of this Agreement.

1.61 "Permitted Encumbrances" will mean (i) all matters listed on Exhibit F to this Agreement, and (ii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in the Initial Title Reports, other than Monetary Liens and matters listed as "requirements".

1.62 "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.63 "Pharmacy Scrips" will mean all customer lists, prescription files, prescription registers, and operating and maintenance logs owned by Seller that relate to the pharmacy operated in any of the stores.

1.64 "Purchase Price" will mean the Base Purchase Price.

1.65 "Real Property" will mean the Leased Premises and the Improvements together.

1.66 "Real Property Escrow Date" with respect to one or more Stores will mean the date that is two Business Days prior to the Closing Date for such Store or Stores or such earlier date after the Bankruptcy Court Approval as Buyer and Seller may mutually designate.

1.67 "Sale Order" will mean an order or orders of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, in each case with respect to one or more of the Stores.

1.68 "Seller" will have the meaning assigned in the initial paragraph of this Agreement.

1.69 "Seller Delivery Confirmation" will have the meaning assigned in paragraph 15.2 of this Agreement.

1.70 Intentionally Omitted.

1.71 "Seller's Brokers" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.72 "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 18.3 of this Agreement; and (c) the Cure Costs.

1.73 "Seller's Escrowed Items" will have the meaning assigned in paragraph 15.2 of this Agreement.

1.74 "Stores" will have the meaning assigned in paragraph A of the Recitals to this Agreement and, when followed by "#" and a number will refer to the particular Store with the indicated number listed on Exhibit A-1 to this Agreement, including if applicable any associated gas station, liquor store, pharmacy or other specialty area operated by Seller at the Leased Premises.

1.75 "Sublease" will mean, with respect to each Store, each sublease of a portion of the Leased Premises listed on Exhibit A-2 to this Agreement (if any), including amendments. If no sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Sublease at such Store will be disregarded.

1.76 "Subtenant" will mean, with respect to each Store, the subtenant or sublessee under each Sublease. If no sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Subtenant at such Store will be disregarded.

1.77 "Successful Bid" will mean, with respect to a particular Store, the highest or otherwise best offer to purchase the Assets relating to such Store, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.78 Intentionally Omitted.

1.79 Intentionally Omitted.

1.80 "Terminated Stores" will have the meaning assigned in paragraph 17.1 of this Agreement.

1.81 "Title Reports" will mean, collectively, (i) the Initial Title Reports and (ii) any additional title reports and/or title insurance commitments with respect to the Stores that Seller has made available to Buyer for review on the Merrill Website or otherwise.

1.82 "Title Insurer" will mean First American Title Insurance Company or Near North National Title LLC, as agent for Lawyers Title Insurance Corporation, or any other nationally recognized title insurance company, as designated by Seller.

1.83 "Title Policies" will have the meaning assigned in paragraph 5.2 of this Agreement.

1.84   "Winn-Dixie" will mean Winn-Dixie Stores, Inc.

2.0   **Property Included in Sale.**  Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets, free and clear of all Liens, encumbrances and interests, subject only to the Permitted Exceptions, which—excluding Excluded Personal Property—such Assets are comprised of the following:

2.1   Seller's interest, as tenant, under the Leases, any Subordination, Non-Disturbance and Attornment Agreements related thereto, and Seller's interest in any leasehold improvements;

2.2   Seller's interest in all fixtures and all equipment located in the store buildings now existing on the Leased Premises (the "Buildings"), including but not limited to Seller's interest in (i) heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "Improvements"), and (ii) Seller's trade fixtures and equipment located in the Buildings (the "Equipment");

2.3   Intentionally Omitted;

2.4   Intentionally Omitted;

2.5   With respect to each Store that includes a pharmacy, the Pharmacy Scrips (provided Buyer has obtained all Permits necessary for Seller to lawfully convey the Pharmacy Scrips to Buyer at Closing) and, to the extent transferable, ownership and control of pharmacy phone lines;

2.6   Seller's interest in the Subleases (if any).

2.7   All of Seller's right, title and interest in and to any warranties applicable to the Equipment, and to all claims under such warranties;

2.8   Any manuals, blueprints, drawings, literature, technical information, designs, specifications or other intangible property related to the Assets, if in the possession of Seller.

Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are subject to higher or otherwise better offers for the Assets and conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

3.0   **Purchase Price.**

3.1   Amount.  The purchase price to be paid by Buyer to Seller for the Assets is $300,000 in the aggregate (the "Base Purchase Price"), which will be allocated to each Store as set forth on the Allocation Schedule.  If this

Agreement is terminated in accordance with its terms as to one or more, but not all, of the Stores, then (i) the aggregate Base Purchase Price will be adjusted based on the Allocation Schedule as to the Stores that remain subject to the continuing force and effect of this Agreement; and (ii) the term "Subleases" will be deemed to exclude, respectively, all Subleases of the Stores with respect to which this Agreement is terminated.

3.2   <u>Contract Consideration and Base Deposit</u>.   As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer shall deliver to Escrow Agent, no later than two Business Days after Seller's execution and acceptance of this Agreement, a base earnest money deposit with respect to each Store in the amount set forth in the Allocation Schedule (the "<u>Base Deposit</u>").   Buyer shall make the Base Deposit by wire transfer to an account designated in writing by Escrow Agent. The Base Deposit will be subject to refund to Buyer to the extent and in the circumstances described in <u>paragraphs 13, 16 and 17</u>.   The applicable portion of the Base Deposit will be credited against the Base Purchase Price at the relevant Closing and will be held in an escrow account maintained by Escrow Agent prior to the relevant Closing. Whenever used herein, the term Base Deposit also will be deemed to include all interest accrued thereon if the escrow account maintained by Escrow Agent is an interest bearing account; however, for state and federal income tax purposes, interest, if any, accrued on the Base Deposit will be deemed earned by Buyer.   Buyer's federal taxpayer identification number (FEIN) is 59-0324412.

3.3   <u>Payment</u>.  The Purchase Price will be paid in the following manner:

   3.3.1   <u>*Base Purchase Price*</u>.   On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Base Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the relevant Closing Statement) with respect to such Store or Stores.   On the Closing Date for such Store or Stores, Buyer will, subject to the conditions set forth in <u>paragraph 11</u> of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted) with respect to such Store or Stores to Seller (by wire transfer to an account designated in writing by Seller).

   3.3.2   <u>Intentionally Omitted</u>.

   3.3.3   <u>*Certain Transaction Costs*</u>.   All relevant rent, taxes (including real and personal property taxes), utilities (including the pharmacy phone line, where applicable) and other payments regarding the Assets will be prorated (based on actual days within the relevant

-11-

annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding each Closing Date and will be a credit or debit, as the case may be, against the Base Price payable at such Closing to the extent thereof. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.3.3 which apply to the period after the Closing for any Store shall survive the Closing for such store.

    3.3.4  *Sales Tax*.  Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom.  This paragraph 3.3.4 shall survive the Closing for each store.

3.4    Intentionally Omitted.

3.5    Intentionally Omitted.

3.6    Allocation of Base Purchase Price Among Assets at each Store.  Seller shall have the right to allocate the Base Purchase Price for each Store, for tax purposes and all other purposes, among the Assets at such Store (as such Assets are described in paragraph 2.0 of this Agreement); in accordance with the Internal Revenue Code of 1986, as amended, including Section 1060 thereof, provided, however, that such allocation shall not be binding upon Seller or determinative with respect to any allocation made by Seller of the Base Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case.  The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets at each Store on the applicable Closing Statement.

4.0    Bankruptcy Court Approval.

4.1    Condition Precedent. It shall be a condition precedent to the obligations of each of the parties to this Agreement to consummate the transactions contemplated hereby that the Bankruptcy Court shall have entered after

notice and a hearing (as defined in Section 102 of the Bankruptcy Code) a sale approval order, approving the terms and conditions of this Agreement and authorizing Seller to perform all acts necessary to consummate the transactions contemplated hereby, and to transfer title to the Assets free and clear of all Liens, encumbrances and interests, subject only to the Permitted Exceptions.

4.2     Approval of Sale. Unless such a motion has previously been filed, then within ten (10) Business Days of the date of execution of this Agreement, Seller shall file a sale motion with the Bankruptcy Court seeking entry of the sale approval order.

4.3     Bankruptcy Court Approval. Provided that Buyer is determined to have submitted the Successful Bid, Seller will use its reasonable efforts to obtain entry of the Sale Approval Order by July 29, 2005 (the "Outside Sale Approval Order Date"); provided, that Buyer shall be obligated to cooperate in all reasonable respects with such efforts by Seller and, if and to the extent that the Bankruptcy Court requires the same, shall provide to the Bankruptcy Court with Adequate Assurance Information to the Bankruptcy Court's satisfaction.

4.4     Notices. The Sale Motion, the notice of the hearing on the Sale Motion and the objection deadline shall, at a minimum, be served by Seller in accordance with Bankruptcy Rules 2002, 6004, 6006, 9014 (or as otherwise provided by the Bankruptcy Court) on all persons required to receive notice under the Bankruptcy Code (as modified by any Orders entered in the Bankruptcy Case), including all persons who have asserted Liens on all or any portion of the Assets, all non-debtor parties to the Leases and Subleases, to the extent that Winn-Dixie has the information in its possession and control, all mortgage lenders on any Real Property, all official committees, and the United States Trustee, including but not limited to: (a) all local, state and federal taxing authorities, and all state and federal environmental authorities, having jurisdiction over any of the Assets; and (b) all creditors who have otherwise filed notices of appearance in the Bankruptcy Case. Furthermore, notice of the Sale Motion, the hearing on the Sale Motion and the objection deadline shall be given by Seller by publication of a notice as contemplated by the Bidding Procedures Order.

4.5     Overbids. The Seller shall not accept one or more bids for any or all of the Assets that in the aggregate is not higher or better than the last bid submitted by Buyer for the Assets. Subject to the terms of the Bidding Procedures Order, Buyer shall have the right to overbid any offer or offers determined by Seller to be, in the aggregate, higher or better than the last offer submitted by the Buyer.

5.0 **Buyer's Due Diligence.**

5.1 <u>Acknowledgment</u>. In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence regarding the Stores and the Assets and it has had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement. Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Stores and the Assets and to acquire such additional information about the Stores and the Assets as Buyer has reasonably requested. Buyer agrees that any physical access to or investigation of the Stores by Buyer or its representatives shall be limited by and shall comply in all respects with the written instructions and requirements of Seller.

5.2 <u>Title</u>. Buyer confirms and acknowledges that Seller has made the Initial Title Reports available to Buyer, and intends to make additional Title Reports available to Buyer, and Buyer may negotiate with the Title Insurer to obtain title insurance policies with respect to the Stores (the "<u>Title Policies</u>") at Closing. If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present use or occupancy of the affected Store, Buyer may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to Catherinelbold@winn-dixie.com within three business days of the date such additional Title Report is either delivered to Buyer or posted on the Merrill Website. To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #____" with the appropriate Store number set forth). If Buyer timely notifies Seller of any valid objection to any such matter set forth in any additional Title Report with respect to any Store, and if Seller declines or is unable to cure any such objection, then Buyer will have the right to terminate this Agreement with respect to such Store at any time thereafter, with no liability to Buyer, unless Buyer waives such objection by written notice received by Seller no later than the earlier of (x) five (5) Business Days following Buyer's receipt of notice from Seller that it will not cure such objection or (y) the Closing Date. If Buyer closes the purchase of the Assets with respect to any Store, then Buyer will be deemed to have waived any objection made under this <u>paragraph 5.2</u> to any matter and such matter shall constitute a Permitted Encumbrance.

5.3 <u>Environmental Reports</u>. Buyer confirms and acknowledges that Seller has made available to Buyer for review on the Merrill Website a separate environmental report (each, an "<u>Environmental Report</u>"), covering the Real

Property relating to each Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where such Store is located. If any matter set forth in the Environmental Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present or continued use, value or occupancy of the affected Store as a supermarket, Buyer may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to Catherinelbold@winn-dixie.com within five (5) Business Days of the later of (i) the date such Environmental Report is either delivered to Buyer or posted on the Merrill Website, or (ii) the Effective Date. To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER ENVIRONMENTAL OBJECTION NOTICE - WINN-DIXIE STORE #_____" with the appropriate Store number set forth). If Buyer timely notifies Seller of any objectionable environmental condition set forth in any Environmental Report with respect to the Store, and if Seller declines or is unable to remedy any such condition, then Buyer will have the right to terminate this Agreement at any time thereafter. The Escrow Agent shall immediately return the Deposit to Buyer, which return shall operate to terminate this Agreement. If Buyer closes the purchase of the Assets with respect to the Store, then Buyer will be deemed to have waived any objection made under this paragraph 5.3 to any matter set forth in the Environmental Report.

**6.0**   **Representations and Warranties of Seller Relating to the Assets.**  To induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials.

6.1   On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website: (i) copies of each of the Leases (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a)   copies of the site plans for the Stores;

(b)   a copy of the as-built plans for the Store;

(c)   copies of the fixture plans for the Stores; and

(d)   a list of Equipment (other than Excluded Personal Property) with respect to each Store as reflected in Seller's current records;

it being understood that the materials described in subparagraphs (a) through (d), inclusive, of this paragraph 6.1 have been provided for

-15-

information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

6.2    At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Monetary Liens other than the Permitted Encumbrances to the extent provided under Section 363 of the Bankruptcy Code.

6.3    To Seller's Knowledge, the Assets are in material compliance with applicable zoning laws as well as any applicable deed restrictions, covenants, conditions, restrictions, easement agreements and any other applicable private land use restrictions, and Seller has not received any written notice of material violation of any of the foregoing that has not been remedied or cured.

6.4    To Seller's Knowledge, except for any Permitted Encumbrances, there are no condemnation, environmental, zoning or other land use regulation proceedings, either instituted or threatened, in writing, that would have a Material Adverse Effect on the use and operation of any Store as a supermarket.

7.0   **General Representations and Warranties of Seller.**  In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

7.1    Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

7.2    No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, (iii) those contemplated by or required under paragraph 3.5 of this Agreement and (iv) Bankruptcy Court Approval.

7.3     Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4     To Seller's Knowledge, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

7.5     None of the employees employed by Seller in the Stores is covered by a union contract, collective bargaining agreement or other labor agreement.

7.6     Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

7.7     To Seller's Knowledge, entry into this Agreement or any of the closing documents to which Seller is or is to become a party by Seller will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Seller under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Seller is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a Material Adverse Effect.

8.0     **Buyer's Representations and Warranties.**   Buyer represents and warrants to Seller as follows:

8.1     Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida, and has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required corporate action on behalf of Buyer.

8.2     No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to

-17-

which Buyer is or is to become a party or the transactions herein or therein contemplated.

8.3     This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

8.4     There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

8.5     Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

8.6     As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

9.0     **Covenants of Seller.**   Seller hereby covenants for the benefit of Buyer as follows:

9.1     Seller will (i) use commercially reasonable efforts to maintain the Assets until the relevant Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and, except with respect to any particular Stores in which Store operations were suspended prior to the Effective Date, will continue operation of the Stores, and (ii) will not sell, dispose of, abandon or remove from any Store any of the Assets or agree to do so except in the

ordinary course of business; provided, however, it is expressly acknowledged and understood that, following the Effective Date, Seller will take certain actions to wind up its operations (including related marketing, promotions and advertising) at the relevant Store or Stores and eliminate or remove the Excluded Personal Property in preparation for the relevant Closings and the turnover of possession to Buyer.

9.2    Seller will use commercially reasonable efforts to remove all Excluded Personal Property from the Stores on or before the relevant Closing Date, except that Buyer shall remove and dispose of Seller's signs and panels and branded shopping carts that are part of the Excluded Personal Property as more fully provided in paragraph 10.3 of this Agreement.

9.3    Seller shall terminate, transfer or relocate, as of or at any time before the Closing, the employment of all employees working at the Store, and all vendor, distribution and supply agreements relating to the operation of the Store.  Seller shall remain responsible for payment of, and shall pay, all amounts accruing to or for employees of the Store prior to the effective time of Closing, including expenses for accrued wages and salary, vacation pay, severance pay, and other employee benefits.  Seller warrants that it will provide such employees with all pre-termination notices required by applicable law, including any applicable notices for plant closings or mass layoffs under the WARN Act.  Seller or Seller's employee benefit plans shall be exclusively liable for payment of any such severance pay and employee benefits.  Seller acknowledges Buyer is not assuming any employee benefit plans, employee contracts, or any collective bargaining agreements between Seller and any labor organizations.  Further, Buyer is not assuming any debts, obligations, responsibilities, liabilities, claims, damages, judgments or settlements arising from any such employee benefit plans, contracts or agreements, or arising out of or relating to Sellers' business operations at the Stores.  Any such debts, obligations, responsibilities, liabilities, claims, damages, judgment or settlements contemplated hereunder, pending, contingent or otherwise, shall be the sole and exclusive responsibility of Seller, and Seller agrees to indemnify and hold harmless Buyer therefrom.  Seller acknowledges and agrees that it is not authorized to make, and that it will not make, any representations on behalf of Buyer to any persons or legal entities regarding matters related to employment or employee benefit plans.

9.4    Seller will (except to the extent otherwise required by the Family Medical Leave Act) transfer or terminate all its employees working at each Store on the relevant Closing Date.

9.5    If this Agreement is determined to be the Successful Bid as to one or more Stores, Seller will use commercially reasonable efforts to obtain the entry of a Sale Order as to such Stores.

9.6    Prior to the Closing, Seller will not cause or permit to be granted any material increase in the salaries, wages, benefits or other compensation payable or to become payable to employees working at the Stores, except for (i) merit and cost-of-living increases in the ordinary course of business and (ii) incentive bonuses or compensation granted by Seller in connection with Seller's winding up of its operations at the Stores.

9.7    Seller will cooperate reasonably with Buyer, upon written request, with respect to Buyer's performance of its covenants under paragraph 10.2 of this Agreement.

9.8    From the Effective Date through and including the Closing Date, Seller will comply at all times in all material respects with its post petition obligations under the Lease and Sublease.

9.9    Seller will not place any Liens on the Assets that would survive the Closing or take any action that would cause Seller to be unable to perform its obligations under this Agreement (other than in connection with the discharge of its fiduciary duties, including considering higher or better bids for the Assets).

9.10   Seller will maintain insurance coverage (including fire and general liability insurance) for the Store on substantially the same terms and conditions as all other similarly situated supermarkets maintained by Seller.

9.11   Seller will pay all post petition real estate and ad valorem property taxes when due and owing with respect to the ownership and operation of each of the Stores.

9.12   Except as contemplated by this Agreement to the contrary, Seller will operate the business conducted at the Store generally consistent with past practice since the Filing Date and substantially in compliance with all applicable laws.

9.13   Seller shall use commercially reasonable efforts to obtain a Landlord Estoppel Certificate stating that the Lease is in full force and effect, there are no known defaults or conditions that with the passage of time will become defaults, and that the assignment of the Lease in accordance with the terms of this Agreement shall not constitute a default thereunder (without any adverse terms, limitations or conditions).

9.14   Seller shall use commercially reasonable efforts to obtain an SNDA in favor of the Buyer providing that as long as Buyer is not in default under the Lease beyond any applicable cure period Buyer's rights under the Lease and occupancy and use of the Leased Premises shall not be disturbed or diminished in the event of a foreclosure, deed in lieu of foreclosure or other transfer of the Landlord's interest in the Leased Premises as a result of a default of Landlord under the terms of any mortgage, deed to secure debt of similar instrument encumbering any

assigned Real Property (without any adverse terms, limitations or conditions).

9.15 Seller shall use commercially reasonable efforts to have Title Insurer unconditionally commit to issue to Buyer, upon payment of the regular premiums therefor, ALTA leasehold title insurance policies ensuring Buyer has fee simple leasehold title to the Real Property pursuant to the Lease, free and clear of all Liens other than the Permitted Encumbrances.

10.0 **Covenants of Buyer.** Buyer for itself hereby covenants for the benefit of Seller as follows:

10.1 Buyer will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with each Closing and the issuance of the Title Policies.

10.2 Buyer will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 12 of this Agreement, including without limitation all Permits necessary for Seller to sell and Buyer to buy the Pharmacy Scrips.

10.3 Promptly after the relevant Closing Date, Buyer shall, at Buyer's sole cost and expense, (i) remove from the Stores, destroy and lawfully dispose of all signs and panels that are part of the Excluded Personal Property, and (ii) either (A) remove from the Stores and lawfully dispose of all branded shopping carts  or (B) remove all trademarks, trade names, logos and designs of Seller, Winn-Dixie or their Affiliates from all shopping carts and destroy and lawfully dispose of all such trademarks, trade names, logos and designs.   Without limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 17.5 of this Agreement shall encompass any breach by Buyer of this paragraph 10.3.

10.4 Intentionally Omitted.

10.5 Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

10.6 If this Agreement is determined to be the Successful Bid as to one or more Stores, then Buyer will use commercially reasonable efforts to obtain the entry of a Sale Order as to such Stores, including by providing Adequate Assurance Information to Seller, the Bankruptcy Court, Landlords and Subtenants as may be reasonably requested.

10.7    Intentionally Omitted.

11.0    **<u>Conditions Precedent to Buyer's Obligations</u>**.  The obligations of Buyer under this Agreement as to each Store are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement relating to such Store, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

11.1    Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of <u>paragraph 6.1</u> of this Agreement), all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Seller's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

11.3    The Sale Order with respect to such Store shall have been entered by the Bankruptcy Court in substantially the form posted on the Merrill Website and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Buyer, which shall not be unreasonably withheld.

11.4    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

11.5    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

11.6    Seller shall have made available to Buyer for review on the Merrill Website any Title Report for the Store not posted to the Merrill Website as of the date hereof.

11.7    Seller shall have made available to Buyer for review on the Merrill Website any Environmental Report for the Store not posted to the Merrill Website as of the date hereof.

11.8    Seller shall have closed the Store and ceased operations therein.

11.9    Seller shall have provided all pre-termination notices required by applicable laws, and complied with all applicable laws regarding termination, and pre-termination notices, for its employees, including any applicable notices for plant closings or mass layoffs under the WARN Act.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer shall have the right to terminate this Agreement pursuant to paragraph 16.1(a)(iv) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 17 of this Agreement rather than pursuant to paragraph 16.1 (a)(iv).

12.0   **Conditions Precedent to Seller's Obligations.**  The obligations of Seller under this Agreement as to each Store are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement relating to such Store, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

12.1    Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  All of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the

-23-

Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

12.2    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

12.3    The Sale Order with respect to such Store shall have been entered by the Bankruptcy Court in substantially the form posted on the Merrill Website and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Seller, which shall not be unreasonably withheld.

12.4    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller shall have the right to terminate this Agreement pursuant to paragraph 16.1(a)(v) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 17 of this Agreement rather than pursuant to paragraph 16.1(a)(v).

13.0    **Loss by Fire or Other Casualty; Condemnation**.  In the event that, prior to a Closing, any Store, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with any Store, either party will have the right, exercisable by giving notice of such decision to the other within 5 Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement as to the Store affected by such loss, and thereafter none of the parties will have any further rights or obligations hereunder as to such Store; provided, however, that this Agreement will be a continuing obligation of the parties as to the Stores not affected by such termination and provided further, however, that, if Buyer is not in breach of this Agreement beyond any applicable cure period, Buyer will be entitled to the return from the Escrow Agent of the Deposit attributable to such Store or Stores.  If neither party exercises its right of termination with respect to any Store affected by such casualty or proceeding and the Store is sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

14.0    **Possession**.  Seller will turn over to Buyer exclusive physical possession of each Store and the Assets associated therewith (including, to the extent in Seller's possession, control or custody) all keys, combinations to safes, security codes and passwords, on the Closing Date upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Buyer to transfer to Seller, the entire Base Purchase Price with respect to such Store.  Upon Seller's receipt of such written confirmation from Escrow Agent for such Store, Buyer may commence preparation for opening of such Store as a Buyer's store including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and commencing electrical and wiring work required in order to install Buyer's point of sale and other equipment, signage, and similar items.

15.0    **Closing.**

15.1    The Closing for each Store (which may occur on the same date as Closings for other Stores) will occur on the Closing Date for such Store. The Closings will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

15.2    On or before the Real Property Escrow Date for each Store, Seller will, subject to the conditions contained in underline paragraph 12 of this Agreement, deliver the following ("Seller's Escrowed Items") to Escrow Agent:

(i)    Two counterparts of the relevant Lease Assignment, substantially in the form of Exhibit G to this Agreement (the "Conveyance Instrument"), executed by Seller;

(ii)    The relevant Bill of Sale, executed by Seller;

(iii)    Two counterparts of the relevant Closing Statement, executed by Seller;

(iv)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion;

(v)    An executed certificate of an officer of Seller issued to Buyer in satisfaction of the requirements under paragraph 11.1;

(vi)    If received by Seller, a Landlord Estoppel Certificate;

-25-

(vii)    If received by Seller, an SNDA; and

(viii)    Any other documents, instruments or agreements called for hereunder for delivery by Seller with respect to such Store that have not previously been delivered.

Buyer may waive compliance by Seller as to any of the foregoing items in a manner permitted by paragraph 18.6 of this Agreement. Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent, will not be deemed to be an acknowledgement by Seller that the conditions of paragraph 12 of this Agreement have been fulfilled or waived until Seller Delivery Confirmation. The "Seller Delivery Confirmation" will mean the later of (A) the relevant Real Property Escrow Date and (B) Seller's delivery to Escrow Agent, by original counterpart or telecopy, of Seller's written confirmation that that the conditions of paragraph 12 of this Agreement have been fulfilled or waived. In any event such delivery and notice shall be subject to any circumstances that may affect such conditions between Seller Delivery Confirmation and the related Closing Date.

15.3    On or before the Real Property Escrow Date for each Store or Stores, Buyer will, subject to the conditions contained in paragraph 11 of this Agreement, deliver the following ("Buyer's Escrowed Items") to Escrow Agent:

(i)    Two counterparts of the relevant Conveyance Instrument, executed by Buyer;

(ii)    Two counterparts of the relevant Closing Statement, executed by Buyer;

(iii)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; and

(iv)    Any other document, instrument or agreement called for hereunder for delivery by Buyer that has not previously been delivered.

(v)    All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to paragraph 3 of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by paragraph 18.6 of this Agreement. Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will be deemed to be an acknowledgement by Buyer that the conditions of paragraph 11 of this Agreement have been fulfilled as of the Real Property Escrow Date, subject to any circumstances that may affect such conditions between the Real Property Escrow Date and the related Closing Date.

15.4 At the Closing for each Store or Stores, Seller will, subject to the conditions contained in paragraph 12 of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in paragraph 11 of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items and the Purchase Price to Seller.

15.5 On each Closing Date, Seller and Buyer will each deposit such other instruments with the Title Insurer as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the relevant Assets in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

15.6 Except as provided in paragraph 17 of this Agreement, at or before Closing for each Store or Stores, or if Closing does not occur due to earlier termination of this Agreement in accordance with its terms with respect to any Store or Stores, (i) Seller will pay Seller's Closing Costs relating to such Store or Stores; and (ii) Buyer will pay Buyer's Closing Costs relating to such Store or Stores.

## 16.0 **Termination**.

### 16.1 Termination.

(a) Agreement may be terminated, and the transactions contemplated hereby abandoned, as to any or all Stores not the subject of a completed Closing, only as follows:

(i) by written consent of Seller and Buyer, in which case the applicable Deposit shall be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the applicable Deposit, then Escrow Agent shall pay over the applicable Deposit to Seller as consideration for Seller's agreement to terminate this Agreement with respect to such Store or Stores);

(ii) at the election of Seller upon a default by Buyer if and to the extent permitted under paragraph 1671 of this Agreement, in which case the applicable Deposit shall be disbursed as provided in such paragraph 17.1;

(iii) at the election of Buyer upon a default by Seller if and to the extent permitted under paragraph 17.2 of this Agreement, in which case the applicable Deposit shall be disbursed as provided in such paragraph 17.2;

(iv)    at the election of Buyer if any condition set forth in <u>paragraph 11</u> of this Agreement has not been satisfied or waived by Buyer on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a default of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>paragraph 17</u> of this Agreement rather than pursuant to this <u>paragraph 16.1(a)(iv)</u>;

(v)     at the election of Seller if any condition set forth in <u>paragraph 12</u> of this Agreement has not been satisfied or waived by Seller on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>paragraph 17</u> of this Agreement rather than pursuant to this <u>paragraph 16.1(a)(v)</u>;

(vi)    at the election of Buyer or Seller as provided in <u>paragraph 13</u> of this Agreement, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in default in respect of this Agreement beyond any applicable cure period, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with <u>paragraph 17.2</u> of this Agreement rather than pursuant to this <u>paragraph 16.1(a)(vi)</u>;

(vii)   at the election of Seller, with respect to any one or more of the Stores remaining under this Agreement, if this Agreement is terminated by Buyer with respect to any Store or Stores for any reason (including, without limitation, because of Seller's breach of this Agreement), in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer or Seller is in default in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with <u>paragraph 17</u> of this Agreement rather than pursuant to this <u>paragraph 16.1(a)(vii)</u>;

(viii)   at the election of Seller with respect to any particular Store or Stores (A) if this Agreement is not the Successful Bid with respect to such Store or Stores or (B) if the Bankruptcy Court denies Bankruptcy Court Approval with respect to such Store or Stores or (C) if this Agreement is terminated by Seller with respect to any other Store or Stores for any reason other than as provided in paragraph 16.1(a)(ix) below, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer or Seller is in default in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 17 of this Agreement rather than pursuant to this paragraph 16.1(a)(viii);

(ix)   at the election of Seller if the Cure Costs with respect to any Lease exceed 15% of the Base Purchase Price for the relevant Store, as shown on the Allocation Schedule, provided that in such case Seller may terminate this Agreement under this clause (ix) only with respect to such Store, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer or Seller is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 17 of this Agreement rather than pursuant to this paragraph 16.1(a)(ix); or

(x)   at the election of Buyer if the relevant Closing will not have occurred on or before the Outside Date for any reason other than as contemplated in paragraphs 16.1(a)(i) through 16.1(a)(ix) of this Agreement, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided that Buyer will not be entitled to terminate this Agreement pursuant to this paragraph 16.1(a)(x) if Buyer's default of this Agreement has been the cause of, or resulted in, the failure of the relevant Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 17.2 of this Agreement rather than pursuant to this paragraph 16.1(a)(x).

(b)   If this Agreement is terminated with respect to any Store or Stores for any reason, then, as to the Store or Stores affected by such termination, all materials provided by Seller to Buyer and all

-29-

materials relating to the relevant Assets obtained by Buyer and all copies of any such materials will be delivered to Seller or destroyed within 5 Business Days following termination. This paragraph shall not in any way limit Buyer's duties to Seller or Winn-Dixie under the Confidentiality Agreement.

(c) Upon any termination of this Agreement with respect to any Store or Stores pursuant to paragraphs 16.1(a)(iii) through (x) of this Agreement, each party will retain those rights (if any) it may have under paragraph 17 of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

**17.0 Default and Remedies.**

17.1 Buyer's Default. If the Closing for any one or more Stores as contemplated under this Agreement is not consummated due to Buyer's breach of this Agreement, or if this Agreement is terminated as to any one or more Stores due to Buyer's breach of this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such breach, (A) (i) to terminate this Agreement with respect to such Store or Stores only or (ii) to terminate this Agreement with respect to all of the Stores which, on the date of such election, are still owned by Seller (the Store or Stores as to which this Agreement is terminated under clause (i) or (ii) being the "Terminated Stores"), and (B) to receive the Base Deposits for all Terminated Stores (collectively, the "Liquidated Deposit") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof. Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity. Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages. The right to receive the Liquidated Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by Buyer with respect to the Terminated Stores, and Seller hereby waives and releases any right to (and Seller hereby covenants that it shall not) sue Buyer with respect to the Terminated Stores: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit. Buyer hereby waives and releases any right to (and hereby covenants that it shall not) Seller or seek or claim a refund of the Liquidated Deposit (or any part thereof) on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages. This paragraph 17.1 is subject to paragraph 17.4 of this Agreement.

17.2    <u>Default by Seller</u>.  If the sale of any one or more Stores as contemplated under this Agreement is not consummated due to Seller's breach of this Agreement, or if this Agreement is terminated as to any one or more Stores due to Seller's breach of this Agreement, then Buyer shall be entitled, as its sole and exclusive remedy for such breach, to receive the return of the Base Deposit with respect to such Store or Stores, which return shall operate to terminate this Agreement with respect to such Store or Stores and release Seller from any and all liability under this Agreement with respect to such Store or Stores. Buyer expressly waives and releases (i) any right to seek specific performance of Seller's obligations under this Agreement and (ii) any right to seek or collect any damages, including any actual, consequential, speculative, remote or punitive damages.  This <u>paragraph 17.2</u> is subject to <u>paragraph 17.4</u> of this Agreement.

17.3    <u>Notice of Default; Opportunity to Cure</u>.  Neither Seller nor Buyer shall be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within 5 Business Days after receipt of such notice; <u>provided, however</u>, that this <u>paragraph 17.3</u> (i) shall not be applicable to Buyer's failure to deliver any Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Real Property Escrow Date or the Closing Date for any Store or Stores and, accordingly, (ii) shall not have the effect of extending the Closing Date or the due date of any Deposit.

17.4    <u>Recoverable Damages</u>.  In no event shall the provisions of <u>paragraphs 17.1 and 17.2</u> of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to, a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreement and <u>paragraphs 17.5 and 18.3</u> of this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees or expenses under the Confidentiality Agreement and <u>paragraphs 3.3.3 and 3.4.3</u> of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs.  In addition, if this Agreement is terminated for any reason with respect to any one or more Stores or in its entirety, and Buyer or any Affiliate of Buyer asserts any claim or right to any Asset that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to any Asset, then Seller shall have all rights and remedies available at law or in equity with respect to such assertion by Buyer and any loss, damage or other consequence suffered by Seller as a result of such assertion.

17.5    <u>Buyer Indemnification of Seller</u>. Buyer shall indemnify and save and hold harmless Seller and its Affiliates and representatives, from and against any and all costs, losses liabilities, damages, lawsuits, deficiencies, claims

-31-

and expenses (whether or not arising out of third-party claims) including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (herein, the "Damages") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by Buyer (including any payment obligation), or the inaccuracy of any representation made by Buyer in or pursuant to this Agreement or other transaction documents, (b) any liability, obligation or commitment of any nature (absolute, accrued, contingent or otherwise) of Buyer that is due to or arises in connection with Buyer's negligent acts or omissions prior to, on or after the Closing Date, including any claim, liability, or obligation that is assumed by Buyer pursuant to this Agreement or in any transaction documents signed by Buyer.  Notwithstanding the foregoing, Buyer shall not be liable for any matter (i) with respect to which Seller has not given Buyer written notice within a reasonable period of time following Seller's receiving written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a material adverse effect on Buyer), or (ii) that is due to Seller's acts or omissions.  The provisions of this paragraph 17.5 shall cover all obligations and liabilities of whatsoever kind, nature or description relating, directly or indirectly, to product liability, third party litigation or third party claims against Buyer or Seller in connection with, arising out of, or relating to the Assets.   This paragraph 17.5 shall survive the Closings or earlier termination of this Agreement.

## 18.0   **Miscellaneous.**

18.1   Notices. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this paragraph 18.1 and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Winn-Dixie Raleigh, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Chief Financial Officer
Telefax No. 904 783 5646
e-mail: *bennettnussbaum@winn-dixie.com*

With a copy to:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Office of General Counsel
Telefax No. 904 783 5651
e-mail: *larryappel@winn-dixie.com*

and

King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia  30303
Attn:  Timothy N. Tucker
Telefax No. 404-572-5148
e-mail:  *ttucker@kslaw.com*

If to Buyer:

Publix Super Markets, Inc.
3300 Publix Corporate Parkway
Lakeland, Florida 33811
Attn:   John Frazier
        Vice President Real Estate
Telefax No. (863) 499-5465
Email: John.Frazier@Publix.com

With copies to:

Publix Super Markets, Inc.
3300 Publix Corporate Parkway
Lakeland, Florida 33811
Attn:   John A. Attaway, Jr.
        Senior Vice President and General Counsel
Telefax No. (863) 413-5702
Email: John.Attaway@Publix.com

or such other address as any party may from time to time specify by notice to the other.

18.2 <u>Notice of Certain Inquiries</u>.  If any party is contacted, whether before or after any Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to any transactions contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

18.3 <u>Brokers and Finders</u>.  The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Agreement other than that due by Seller to Seller's Brokers.  Seller agrees to pay all fees and commissions claimed by Seller's Brokers as a result of the transaction contemplated by this Agreement, which fees and commissions will be considered payable with respect to a Store only if, as and when the relevant Closing contemplated by this Agreement occurs.  Except for Seller's Brokers, neither Seller nor Buyer has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement.  Seller and Buyer hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts, said indemnifications by Seller and Buyer to survive the Closings or earlier termination of this Agreement.

18.4 <u>Successors and Assigns</u>.  This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

18.5 <u>Assignment</u>.  Neither Seller nor Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole discretion of the party whose consent is so required. No assignment by Buyer shall release or relieve Buyer of its liabilities and obligations hereunder, which shall remain in full force and effect notwithstanding any such assignment.

18.6 <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller and Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to Bankruptcy Court Approval, if applicable.

18.7 <u>Governing Law</u>.  The application and effect of this Agreement as to any particular Store or Stores will be governed by and construed in

accordance with the laws of the State in which such Store or Stores is located; the application and effect of this Agreement as to any matter of the rights and obligations of the parties generally will be governed by and construed in accordance with the laws of the State of Florida.

18.8    <u>Merger of Prior Agreements</u>.    This Agreement supersedes all prior agreements and understandings between the parties hereto, other than the Confidentiality Agreement, and (except for the Confidentiality Agreement) constitutes the entire agreement of the parties with respect to the matters contained herein.    **BUYER ACKNOWLEDGES ITS OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT CONTINUE AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT.**

18.9    <u>Survival</u>.    Acceptance by Buyer of the Conveyance Instrument with respect to any Store shall constitute an acknowledgement by Buyer that all of Seller's representations, covenants and obligations under this Agreement with respect to such Store and all conditions to Buyer's obligations to close under this Agreement with respect to such Store have been performed, satisfied and/or waived. Seller's representations, warranties, covenants and obligations under this Agreement with respect to any Store shall not survive the Closing for such Store but shall merge into the Conveyance Instrument for such Store, and shall have no further force or effect after the Closing for such Store, except that those covenants of Seller under <u>paragraphs 3.32, 3.3.3, 3.3.4 and 18.3</u> of this Agreement and those conditions and covenants with respect to any Store that are expressly provided to be performed after the Closing for such Store shall survive.    All representations, warranties, covenants of obligations of Buyer under this Agreement with respect to any Store shall survive the Closing for such Store.    In addition, all representations, covenants and obligations of Buyer under the Confidentiality Agreement shall survive the termination or consummation of this Agreement.

18.10    <u>Time is of the Essence</u>.  Time is of the essence of this Agreement.

18.11    <u>No Recordation</u>.  This Agreement will not be recorded in any public office or court other than as part of the Bankruptcy Court Approval process except that upon default it may be presented to a court of competent jurisdiction.

18.12    <u>State Specific Provisions</u>:

18.12.1    ***With respect to any Store in Florida***: <u>Radon Gas</u>. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state

guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county health department.

19.0  **Escrow Agent.**

19.1  <u>Duties</u>.  By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon its receipt of funds from Buyer, Escrow Agent will receive and hold such funds, and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.

19.2  <u>Indemnity</u>.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent. If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all loss, cost, damage, liability or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct. If the indemnity amounts payable hereunder result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts.  Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.

19.3  <u>Dispute</u>.  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor.  In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Buyer is not the prevailing party in such action or proceeding.  If there is no prevailing party, Seller and Buyer each shall be responsible for one-half of such costs and fees.

19.4  <u>Execution by Escrow Agent</u>.  Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this <u>paragraph 19.</u>  Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this <u>paragraph 19</u> shall not be required.

20.0  **Waiver of Jury Trial**.  Buyer and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transactions contemplated herein undesirable. Accordingly, Buyer and Seller each knowingly, voluntarily and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Agreement or the transactions contemplated herein.

21.0  **Consent to Jurisdiction. THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.**

Buyer and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in paragraph 18.1 of this Agreement shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum. If a court finds that subject-matter jurisdiction is not available in the Bankruptcy Court, Buyer and Seller hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of the U.S. District Court for the Middle District of Florida, Jacksonville Division, or if such court shall not have jurisdiction, then to the appropriate courts of the State of Florida sitting in Duval County, Florida.

22.0  **HSR Filings.**  The parties anticipate that the transactions contemplated hereby are exempt from review and filing under the HSR Act.  However, if such is not the case, Seller and Buyer shall each seek regulatory approval or HSR clearance and prepare and submit, in a timely manner, all necessary filings for Seller and Buyer in connection with this Agreement under the HSR Act and the rules and regulations thereunder.  Seller and Buyer shall request expedited treatment of such HSR Filing by the Federal Trade Commission, shall make promptly any appropriate or necessary subsequent or supplemental filings, and shall furnish to each other copies of all HSR Filings at the same time as they are filed with the appropriate governmental authority except to the extent such party is legally restricted from providing or believes, based where appropriate on the advice of counsel, that it should not provide such copies.

23.0  **Disclaimers and Waivers**.

23.1  **NO RELIANCE ON DOCUMENTS**.  EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN **PARAGRAPHS 6 AND 7** HEREOF (THE "**CONTRACT WARRANTIES**"), SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY OR ON BEHALF OF SELLER TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY.  BUYER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE) ARE PROVIDED TO BUYER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY BUYER SHALL BE AT THE SOLE RISK OF BUYER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER ACKNOWLEDGES AND AGREES THAT (A) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (B) BUYER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED BY SELLER OR ANY AFFILIATE TO BUYER, BUT RATHER WILL RELY ON ITS OWN INVESTIGATIONS AND ANY REPORTS COMMISSIONED BY BUYER WITH RESPECT THERETO, AND (C) NEITHER SELLER, ANY AFFILIATE OF SELLER NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL HAVE ANY LIABILITY TO BUYER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

23.2  **Disclaimers**. EXCEPT FOR THE CONTRACT WARRANTIES, BUYER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS

MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS.  BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "<u>AS IS, WHERE IS, WITH ALL FAULTS</u>".  BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND NEITHER SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER OR ANY AFFILIATE, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE, OTHER THAN THE CONTRACT WARRANTIES.

BUYER ACKNOWLEDGES THAT BUYER'S ACCESS AND INSPECTION RIGHTS HAVE BEEN LIMITED AS SET FORTH IN THIS AGREEMENT AND THAT BUYER UNDERSTANDS THE RISKS ASSOCIATED WITH PURCHASING THE ASSETS ON THE BASIS OF SUCH LIMITED INVESTIGATIONS.  UPON CLOSING, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS.

BUYER FURTHER ACKNOWLEDGES THAT (1) THE CONTRACT WARRANTIES AS TO ANY STORE SHALL NOT SURVIVE THE CLOSING FOR SUCH STORE BUT SHALL MERGE INTO THE CONVEYANCE INSTRUMENT FOR SUCH STORE, AND SHALL HAVE NO FURTHER FORCE OR EFFECT AFTER THE CLOSING FOR SUCH STORE AND (2) THE LIABILITY OF SELLER UNDER OR WITH RESPECT TO THE CONTRACT WARRANTIES SHALL BE LIMITED TO THE EXPRESS REMEDIES OF BUYER SET FORTH IN THIS AGREEMENT.

BUYER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY BUYER, AND BUYER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OF BUYER'S CHOICE WITH REGARD TO THE TERMS OF SUCH

**DISCLAIMERS, WAIVERS AND RELEASES.   BUYER ACKNOWLEDGES AND WARRANTS THAT BUYER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS AND RELEASES IS FREE AND VOLUNTARY.**

23.3    <u>Effect and Survival of Disclaimers</u>.  Seller and Buyer acknowledge that the provisions of this <u>paragraph 23</u> are an integral part of the transactions contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller would not enter into this Agreement but for the provisions of this <u>paragraph 23</u>.  Seller and Buyer agree that the provisions of this <u>paragraph 23</u> shall survive Closing or any termination of this Agreement.

[Signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

<u>**SELLER**</u>:

**WINN-DIXIE   STORES,   INC.,**   a   Florida corporation

By: _____

    Name: _____

    Title: _____

**WINN-DIXIE   RALEIGH,   INC.,**   a   Florida corporation

By: _____

    Name: _____

    Title: _____

<u>**BUYER**</u>:

**PUBLIX SUPER MARKETS, INC.,** a Florida corporation

By: _____

    Name: _____

    Title: _____

-41-

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

<u>**SELLER:**</u>

**WINN-DIXIE STORES, INC.,** a Florida corporation

By:_____
    Name:_____
    Title: _____


**WINN-DIXIE RALEIGH, INC.,** a Florida corporation

By: _____
    Name: _____
    Title: _____


<u>**BUYER:**</u>

**PUBLIX SUPER MARKETS, INC.,** a Florida corporation

By:_____
    Name:_____
    Title:_____

Acknowledged and agreed this ___ day of July, 2005 for the limited purposes set forth in paragraph 19 of this Agreement:

**ESCROW AGENT:**

**NEAR NORTH NATIONAL TITLE LLC**

By: _____

Name: _____

Title: _____