## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
|  | ) |  |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

## ORDER APPROVING DEBTORS' (A) SALE OF
## PHARMACEUTICAL ASSETS FREE AND CLEAR
## OF LIENS AND CLAIMS, AND (B) GRANTING RELATED RELIEF

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a) and 363, and Fed. R. Bankr. P. 6004(a), authorizing the Debtors to sell pharmaceutical assets, including the assets described in the asset purchase agreement attached as Exhibit A (the "Purchase Agreement), free and clear of liens, claims, interests and encumbrances to CVS Corporation (by or through existing or newly formed wholly owed subsidiary corporations or limited liability companies) (collectively the "Purchaser"), and (b) granting related relief (the "Motion"). Pursuant to the Motion, and by Notice of Filing and Hearing dated July 21, 2005 (the "Notice"), the Debtors provided notice of their intent to enter into the Purchase and Sale Agreement (the "Purchase Agreement") with the Purchaser, a copy of which is attached hereto as Exhibit "A." The Court held a hearing on the Motion and Notice on July 29, 2005 to approve the sale (the "Sale Hearing"). The Court has reviewed the Motion and Notice, considered the evidence and heard argument of counsel.  After due deliberation and good and sufficient cause existing, the Court makes the following findings of fact:

A.    This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

B.    The Debtors solicited the highest or otherwise best offer for the assets described in the Purchase Agreement (the "Pharmaceutical Assets"), in accordance with bidding procedures approved by the Court by order (Docket No. 1825) dated June 21, 2005 (the "Bidding Procedures").    Competing bids were received for the Pharmaceutical Assets and the Debtors conducted an auction for the Pharmaceutical Assets on July 19, 2005 (the "Auction").    At the Auction, the Purchaser submitted final bids aggregating $6,411,000, representing the highest or otherwise best offer received for the Pharmaceutical Assets.

C.    The Debtors have provided interested parties (including all parties asserting claims or interests in the Pharmaceutical Assets, if any) with proper notice of the Motion, the Purchase Agreement, the Sale Hearing,[1] and the Auction, in accordance with 11 U.S.C. §§ 102(1), 105(a) and 363, Fed. R. Bankr. P. 2002(a) and 6004(a) and Local Rule 2002-1, the Notice Procedures Order and the Bidding Procedures Order.

D.    The Debtors marketed the Pharmaceutical Assets and conducted the sale process in compliance with the Order approving the Bidding Procedures, the Bidding Procedures, the Bankruptcy Code and all other Orders entered in these cases. The bidding on the Pharmaceutical Assets and the Auction was conducted in a non-collusive, fair and good faith manner.    The Debtors have given all interested parties a reasonable opportunity to make the highest or otherwise best offer for the Pharmaceutical

---

[1]    All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Motion.

Assets. In their sound business judgment, the Debtors determined that the purchase price provided in the Purchase Agreement attached to the Notice was the highest or otherwise best offer for the Pharmaceutical Assets.

     E.    The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A, and all related documents, and the sale of the Pharmaceutical Assets has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

     F.    The Debtors have good business reasons to sell the Pharmaceutical Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

     G.    Neither the Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

     H.    The Debtors and the Purchaser proposed, negotiated and entered into the Purchase Agreement, without collusion, in good faith and at arms'-length bargaining positions. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

     I.    The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

3

J.    The consideration the Purchaser is providing to the Debtors for the Pharmaceutical Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Pharmaceutical Assets; and (iii) constitutes reasonably equivalent value.

K.    The Debtors will provide any notice of this transfer of the Pharmaceutical Assets, as required by applicable state and federal law.

L.    The Debtors' transfer of the Pharmaceutical Assets to the Purchaser pursuant to the Purchase Agreement will be a legal, valid, and effective transfer of the Pharmaceutical Assets.  The Debtors' transfer of the Pharmaceutical Assets to the Purchaser vests the Purchaser with good and valid title in and to the Pharmaceutical Assets, free and clear of any liens, claims, encumbrances, pledges, mortgages, security interests, charges, options or other interests of any kind or nature. The only claim or interest in the Pharmaceutical Assets (other than the Debtors) is that of Wachovia Bank, National Association, as Administrative Agent and Collateral Agent for itself ("Agent") and the other financial institutions from time to time parties to the Credit Agreement dated as of February 23, 2005, as may be amended or modified (collectively, "Lenders" and together with Agent, collectively, the "DIP Lender") and all other interested parties with respect to such Claims and/or Interests.

N.    The DIP Lender is adequately protected because the Debtors will cause the proceeds from the Sale to be paid in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use

4

Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

   O.  Purchaser does not constitute a successor to the Debtors or their estates. The transaction contemplated by the Purchase Agreement does not amount to a consolidation, merger or *de factor* merger of Purchaser and the Debtors and their estates. Purchaser is not merely a continuation of the Debtors or their estates, there is not substantial continuity between Purchaser and the Debtors, and there is no continuity of enterprise between the Debtors and Purchaser.

   P.  The Court's approval of the Purchase Agreement is in the best interests of the Debtors, their estates and their creditors. Accordingly, it is

ORDERED AND ADJUDGED THAT:

   1.  The Motion is granted.

   2.  The Debtors provided adequate notice of the Motion, the Notice, the Purchase Agreement and the Sale Hearing and complied with any applicable state and federal law regarding notice of their transfer of the Pharmaceutical Assets.

   3.  All objections to the entry of this order or to the relief granted and requested in the Motion, that have not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

   4.  The Purchase Agreement is approved in all respects. Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized (subject to applicable closing conditions set forth in the Purchase Agreement), to consummate the Sale

5

including transferring and conveying the Pharmaceutical Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

5.      Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized and empowered to consummate and implement fully the Purchase Agreement, together with all additional instruments and documents that may be necessary to implement the Purchase Agreement. The Debtors are authorized to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Pharmaceutical Assets to Purchaser.

6.      Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties in accordance with the terms of the Purchase Agreement without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of (a) the DIP Lender and (b) the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

7.      The Debtors will transfer the Pharmaceutical Assets to the Purchaser upon closing free and clear of all known or unknown Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f). The only known Claims and/or Interests are those of the senior liens and superpriority administrative claims of the DIP Lender. The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds of the Sale

in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

8.        The Debtors will cause the proceeds from the Sale to be paid in accordance with the terms of the Final Financing Order and the Loan Documents.

9.        The Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the Pharmaceutical Assets under the Bankruptcy Code and applicable non-bankruptcy law.   For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

10.       Upon Closing of the Sale of Pharmaceutical Assets in accordance with the Purchase Agreement and this Order, the Purchaser will be deemed to have acted in good faith in purchasing the Pharmaceutical Assets under the Purchase Agreement as that term is used in 11 U.S.C § 363(m).   For that reason, any reversal or modification of the Order on appeal will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

11.       The Debtors' transfer of the Pharmaceutical Assets to the Purchaser will not result in (a) the Purchaser having any liability for any known or unknown Claim and/or Interest against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

12.       Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Pharmaceutical Assets and a

7

bill of sale transferring good and marketable title in the Pharmaceutical Assets to Purchaser. Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

13.     This Order is effective as a determination that upon Closing any and all known or unknown Claims and/or Interests, if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Pharmaceutical Assets.

14.     This Order is binding upon all entities who may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Pharmaceutical Assets.

15.     This Court retains exclusive jurisdiction to (a) enforce and implement the Purchase Agreement and any other agreements and instruments executed in connection with the Purchase Agreement, (b) resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement, and (d) interpret, implement and enforce the provisions of this Order.

16.     The terms and provisions of the Purchase Agreement and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent

8

appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

17.     Except as may otherwise be provided for in the Purchase Agreement and/or all related documents, including, without limitation, claims arising from the Purchaser's performance and obligations under the Purchase Agreement, all related documents and this Order, upon Closing, all persons who hold Claims and/or Interests against the Debtors are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

18.     To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in this Order will control.

19.     The transactions provided for in the Purchase Agreement and approved by this Order shall be deemed transfers under a plan of reorganization to be confirmed under Section 1129 of the Bankruptcy Code and, in accordance with Section 1146(c) of the Bankruptcy Code, shall not be subject to taxation under any state or local law imposing a stamp, transfer or similar tax or to the "bulk-sale" laws of any jurisdiction.

20.      Within ten days after closing, the Debtors will file a statement with the Bankruptcy Court as required by and in accordance with Rule 6004(f), Federal Rules of Bankruptcy Procedure.

21.      Notwithstanding Fed. R. Bankr. P. 6004(g) and 6006(d), this Order will take effect immediately upon entry.

Dated this $\underline{28}$ day of July, 2005 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to
serve a copy of this Order on all
parties who received copies of the
Motion.

WILM-524357-v2-CVS   WINN-DIXIE   SCRIPT SALE1.DOC2
524357.2 7/28/05

# **EXHIBIT A**

# PURCHASE AND SALE AGREEMENT

This **PURCHASE AND SALE AGREEMENT** ("Agreement") is made and entered into as of the 19th day of July, 2005, by and between **WINN-DIXIE STORES, INC.**, a Florida corporation, with its principal place of business at 5050 Edgewood Court, Jacksonville, FL 32254 (hereinafter "Seller"), and **CVS CORPORATION**, a Delaware corporation, with its principal place of business at One CVS Drive, Woonsocket, RI 02895 (by or through existing or newly formed wholly owned subsidiary corporations or limited liability companies (collectively, "Buyer")).

## R E C I T A L S :

A.     Seller owns and operates a pharmacy business located within Seller's supermarkets in the locations set forth in Schedule 1 to this Agreement (the "Pharmacies").

B.     Buyer desires to purchase from Seller the prescription files and records and certain Pharmacy inventory located at the Pharmacies (the "Assets").

C.     Seller desires to sell said Assets upon the terms, covenants and agreements hereinafter provided.

D.     Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under Case No. 05-03817-3F1 (the "Bankruptcy Case"). In consideration of the covenants and agreements hereinafter contained and of the mutual undertakings of the parties hereto and subject to Bankruptcy Court approval, it is hereby mutually agreed by and between Seller and Buyer as follows:

1.     <u>Description of Transaction</u>.  Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, the following described personal property:

a.     all prescription files and prescription records, patient refill history for the prior twelve (12) months (to the extent available), including patient profiles on hard copy and electronic record, if requested by Buyer, in the general format requested by Buyer, daily dispensing records, and purchase history documents customer lists and patient profiles relating to the Pharmacies, (collectively referred to as the " Records") currently located at the Pharmacies or any Records at the Pharmacies added between the date of this Agreement and the Closing Date as defined in paragraph 6 below.

b.     the entire inventory of non-damaged, in-date legend drug products located in the Pharmacy at the conclusion of the Physical Inventory described in paragraph 5 below, including full and partial containers and controlled substances, as well as insulin, syringes, and certain specified over-the-counter items identified in Exhibit A hereto, but no other over-the-counter items (collectively referred to as the "Pharmacy Products.") A product will be considered out-of-date if the product has less than 60 days remaining to its expiration date on the date the Physical Inventory is taken.

2.    <u>Bankruptcy Court Approval</u>.  The parties acknowledge that this Agreement is subject to approval by the Bankruptcy Court, and that the Bankruptcy Court must issue an order (or orders) in the Bankruptcy Case approving this Agreement and all of the terms and conditions hereof, and further authorizing Seller to consummate the transactions contemplated herein ("Bankruptcy Court Approval").  Buyer agrees to use its best efforts to assist Seller in seeking Bankruptcy Court Approval of this Agreement.

3.    <u>Consideration</u>.  On or before that date which is two (2) business days prior to the Closings provided for in paragraph 6 below or such earlier date after Bankruptcy Court approval of this Agreement as Buyer and Seller may mutually designate, Buyer will transfer and deliver to the Escrow Agent identified herein (by wire transfer to an account designated in writing by Escrow Agent) SIX MILLION FOUR HUNDRED SIXTY ONE THOUSAND and no/100 Dollars ($6,461,000.00) for the Records.

Buyer shall also deliver to Escrow Agent as soon as practicable, but prior to the Closing Date, two counterparts of the relevant Closing Statement as described in paragraph 5(c) below, executed by Buyer.  (Buyer's executed Closing Statement is hereinafter referred to as "Buyer's Escrowed Items").  The final price to be paid by Buyer for the Pharmacy Products and the Physical Inventory shall be determined in the manner set forth in paragraph 5 below, and together with the amount set above, shall comprise the "Purchase Price."  Within twenty-four (24) hours after the Pharmacy Products at the applicable Pharmacy is made available by Seller to Buyer for pick-up as provided in paragraph 6 below, the Buyer will transfer and deliver to the Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the amount by which the Purchase Price exceeds the amounts delivered and deposited pursuant this paragraph 3.

4.    <u>Seller's Escrowed Items</u>.  On or before that date which is two (2) business days prior to the Closing Date (as that term is defined in paragraph 6 below) or such earlier date after Bankruptcy Court approval of this Agreement as Buyer and Seller may mutually designate, Seller will deliver to Escrow Agent an executed Bill of Sale conveying to Buyer complete and unencumbered title to the Records and to the Pharmacy Products to be sold pursuant to this Agreement.  A sample of the Bill of Sale is attached hereto as Exhibit B.  Seller shall also deliver to Escrow Agent as soon as practicable, but prior to the Closing Date, two counterparts of the relevant Closing Statement as described in paragraph 5(c) below, executed by Seller.  (The executed Bill of Sale and Seller's executed Closing Statement are hereinafter referred to as "Seller's Escrowed Items.").  Buyer may waive compliance by Seller as to any of the foregoing items.

5.    <u>Physical Inventory</u>.

        a.    On or before that date which is one (1) business day prior to the Closing Date (as that term is defined in paragraph 6 below), a physical inventory of all Pharmacy Products at the Pharmacy (the "Physical Inventory") shall be conducted by RGIS Inventory Specialists or such other nationally-recognized inventory service selected by Seller in its sole discretion.  Seller and Buyer each will have registered pharmacists as their respective representatives present at each individual Pharmacy during the Physical Inventory who will acknowledge in writing all computations before leaving the Pharmacy.

        b.    Each of the Pharmacy Products shall be inventoried by item as follows:

            i.    Schedule II drug products shall be inventoried as exact counts and transferred on DEA Form 222 supplied to Seller and Buyer.

ii.     Legend drug products shall be inventoried at Seller's acquisition cost reflected on the sticker cost affixed to the item itself.

iii.     Over-the-counter items set forth on Exhibit A will be inventoried at the Seller's current acquisition cost.

iv.     "Will call" prescriptions filled by Seller but not purchased by customers at the time of the Physical Inventory shall be credit returned and included in the inventory count.

Pharmacy Products in opened containers shall be inventoried at one-half of the full container cost. Unopened containers shall be inventoried at the full cost of the container.

c.     Upon completion of the Physical Inventory, except for mathematical errors, other agreed upon changes or disputes noted in writing, the count of the inventory service shall be final and binding on the parties for all purposes of this Agreement and shall be used to determine the value of the Pharmacy Products. Upon completion of the valuation of the Pharmacy Products, which shall be completed prior to the Closing Date, the Buyer and Seller shall execute a closing statement, which shall contain the final purchase price for the Pharmacy Products at the Pharmacy and shall otherwise be consistent with the count of the inventory service, and shall have incorporated therein appropriate disbursement instructions to Escrow Agent.

d.     The parties agree to cooperate in connection with the Physical Inventory and will attempt, in good faith, to resolve any disputes respecting the quantity or quality of Pharmacy Products that may arise during the Physical Inventory. Any disputes that have not been resolved by the Closing Date shall be separately listed and settled by the Buyer and Seller as expeditiously as practicable thereafter or, if the parties cannot agree, by the Bankruptcy Court. Any such determination of any dispute shall be final and binding on the parties.

e.     The cost of the Physical Inventory will be shared and paid equally by the parties. Seller will engage the inventory service, but the fees of the inventory service will be billed to and paid by Buyer with appropriate credits given to Buyer at closing. Buyer agrees to pay such fees at closing.

6.     <u>Delivery, Closing, and Risk of Loss</u>. The closing of the transactions contemplated herein will take place on that date designated by Buyer in writing, and reasonably acceptable to Seller, that is between three (3) days and thirty (30) days following Bankruptcy Court Approval of this Agreement (the "Closing Date"). At the closing of these transactions, Seller will, subject to the terms and conditions herein, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer, and Buyer will, subject to the terms and conditions herein, direct Escrow Agent to deliver Buyer's Escrowed Items and that portion of the Purchase Price for the Pharmacy Records to Seller. Immediately after the closing of these transactions, Seller shall surrender to Buyer possession of the Records and the Pharmacy Products. Buyer shall make appropriate arrangements to move the Records and the Pharmacy Products from the Pharmacy to Buyer's facilities. Buyer shall be responsible for any charges or losses resulting from the movement of the Records or the Pharmacy Products provided such Pharmacy Products and Records are made available for pick-up on the Closing Date. The balance of the Purchase Price shall be wired directly to Seller within twenty-four (24) hours of the receipt of the Pharmacy Products.

SGRJAX\71428.2

7.    Indemnification.  The Parties agree to indemnify and hold harmless each other against, and in respect of, all liabilities, losses, claims, costs or damages, including reasonable legal fees (the "Claims") resulting from or arising out of:

a.    any breach of any representation or warranty made by them herein,

b.    any failure to perform any of their obligations, covenants or agreements hereunder,

c.    with respect to indemnification by Seller, any Claims made against or incurred by Buyer that relate to the Records or the Pharmacy Products or the operation of the Pharmacy during the period up to and including the Closing Date, and,

d.    with respect to indemnification by Buyer, any Claims made against or incurred by the Seller that relate to the Records or the Pharmacy Products during the period from and after the Closing Date.

8.    Notice of Transfer.

a.    Seller agrees to post appropriate signs in the Pharmacies to refer customers to Buyer's pharmacies as identified by Buyer.  Such signs will be posted for the period of time Seller's retail store remains open for business and Seller's landlord permits.

b.    Seller agrees to allow Buyer to arrange for appropriate telephone referrals to Buyer's pharmacies, or to the extent required by the applicable telephone companies, Seller will arrange for and/or consent to such referrals, either through call forwarding, assignment of telephone numbers or such other means to which the parties agree, all subject to approval and acceptance by the appropriate telephone company. Such referrals may remain in place for up to sixty (60) days following Seller's delivery of the Assets to Buyer and shall be made at Buyer's sole expense.

c.    Buyer will submit any advertising copy regarding its purchase and sale of the Assets to Seller for prior approval, which approval shall not be unreasonably withheld.  If Seller does not contact Buyer within twenty-four (24) hours after receipt of said copy, Seller shall be deemed to have approved it.  Any advertising by Buyer with respect to the closing of a Pharmacy or a Seller supermarket shall be factual, professional, and limited to the locations named in Schedule 1.

d.    Buyer shall notify the appropriate governmental agencies, including the State Board of Pharmacy and the regional DEA office, of the transfer of prescription records and controlled substances described herein on a timely basis and provide evidence thereof to Seller.

9.    Ongoing Cooperation by Seller.  Seller agrees to comply with all applicable laws and regulations that may relate to its transfer of the Records or the Pharmacy Products.  If Seller requests information or assistance necessary to its fulfillment of its obligations under this provision, Buyer agrees that it will cooperate and use commercially reasonable efforts to render such assistance.

10.    Ongoing Cooperation by Buyer.  After the date of the Physical Inventory, Buyer shall use commercially reasonable efforts to make Seller's RX Data and prescription files and records available for access to patients and disclosure to other authorized third (3rd) parties in accordance with the Health Insurance Portability and Accountability Act privacy standards

4

SGRJAX\71428.2

(hereinafter "HIPAA Privacy Standards") and other applicable laws. Seller acknowledges and agrees that notwithstanding the foregoing, Buyer shall not assume any legal obligations of Seller under the HIPAA Privacy Standards relating to uses and disclosures of protected health information made prior to the date of Physical Inventory. All inquiries relating to patient rights under HIPAA Privacy Standards relating to uses or disclosures of health information made prior to the Closing Date shall be forwarded to Seller or its designated agent for handling.

11.    Seller Representations and Warranties.

a.    Seller represents and warrants to Buyer that it is a corporation duly organized and in good standing under the laws of the State of Florida, that subject to Bankruptcy Court approval Seller has full power and authority to enter into and perform this Agreement, and that Seller has taken all appropriate action to enable it to perform this Agreement.

b.    From the date of execution hereof, Seller agrees to cause the Pharmacy Products and Records to be maintained and kept in good condition, and agrees not to remove any of the same from the Stores other than in the ordinary course of business. In addition, Seller agrees to carry on its business in the Stores in its usual and customary manner up to the applicable Inventory dates.

12.    Buyer Representations and Warranties.  Buyer represents and warrants to Seller that it is a corporation duly organized and in good standing under the laws of the State of Delaware, that Buyer has full power and authority to enter into and perform this Agreement and that the execution, delivery and performance of this Agreement has been duly authorized by all requisite corporate action on behalf of Buyer.

13.    Notices.  All notices hereunder shall be in writing and sent by United States certified or registered mail, postage prepaid, addressed, if to Buyer, to:

> CVS CORPORATION
> 1 CVS Drive
> Woonsocket, RI 02895
> Attn: Ashlee Allard

and if to Seller,

to:

> WINN-DIXIE STORES, INC.                WINN-DIXIE STORES, INC.
> 5050 Edgewood Court                    5050 Edgewood Court
> Jacksonville, FL 32254                 Jacksonville, FL 32254
> Attn:  Mike LeBlanc,                   Attn: Office of General Counsel
> Business Development Manager, Pharmacy

Provided, however, that each party by like notice may designate any further or different addresses to which subsequent notices shall be sent.

14.    Successors and Assigns.  This Agreement shall bind and benefit the successors and assigns of the respective parties hereto.

SGRJAX\71428.2

15.    <u>Bankruptcy Court</u>.  The Bankruptcy Court shall have exclusive jurisdiction over all matters, including any legal action, suit or proceeding arising out of or relating to this Agreement, any related agreements, or the contemplated transactions and the interpretation, implementation and enforcement of this Agreement, and the parties hereto irrevocably submit and consent to such jurisdiction.  Buyer and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in paragraph 13 of this Agreement shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above.  Each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

16.    <u>Attorney Fees</u>. In the event of litigation between the parties arising out of or relating to this Agreement, any related agreements, or the contemplated transactions and the interpretation, implementation and enforcement of this Agreement, the party prevailing in such litigation shall be entitled to recover from the non-prevailing party its reasonable attorneys' fees and court costs, including any fees and costs incurred during pre-suit investigation, mediation or other alternative dispute resolution process, or on appeal(s).

17.    <u>Conditions to Closing</u>.  Buyer shall not assume any liability of any nature not expressly provided herein as a result of the transactions contemplated hereunder. Anything in this Agreement to the contrary notwithstanding, this Agreement is subject to:

a.    The entry of an order of the Bankruptcy Court approving the sale of Assets in a form acceptable to Buyer which provides, among other protections, (a) that Buyer is a good faith purchaser within the meaning of 11 U.S.C. . Section 363(m) and, as such, is entitled to the protections afforded by that section, (b) that the consideration provided for the Assets (i) is fair and reasonable, (ii) is the highest and best offer for the assets and (iii) constitutes reasonably equivalent value, (c) that the sale will be free and clear of any liens, claims, encumbrances, pledges, mortgages, security interests, charges, options or other interests of any kind or nature and (d) that the sale constitutes a transfer to which 11 U.S.C. Section 1146(c) applies and, therefore, is not subject to taxation under any state or local law imposing a stamp, transfer, sales or similar tax;

b.    Receipt by Buyer of electronic data and hard copy of the Records of Seller for the applicable stores in a format that can be converted to Buyer protocols (Seller to provide sample "dummy data" to facilitate Buyer conversion); and right to use the pharmacy computer and printer from each of the subject stores for a period not to exceed 180 days from the date of Closing;

c.    Cooperation and assistance by Seller to transfer to Buyer, at Buyer's expense, all pharmacy related telephone numbers;

d.    Receipt by Buyer of a list of pharmacy employees in each of the Stores listed on Schedule 1 with right but not obligation to interview and hire;

e.    Fulfillment of Seller commitment to use reasonable commercial efforts to ensure that through the Closing Date, Seller shall operate for Seller's account, each pharmacy located at the specified locations in a manner which is considered ordinary course in the pharmacy industry, with operations and maintenance procedures consistent with those customarily applicable in the pharmacy industry;

f.      An audit to be conducted by Buyer in the applicable Stores at any mutually convenient time during business hours within two (2) weeks prior to each scheduled date for the Physical Inventory (hereinafter "Audit"). The result of such Audit must disclose that Seller has filled an average of at least the numbers of prescriptions per week from and in the applicable Stores as listed on Schedule 1for the last four (4) weeks prior to said Audit; and

g.      Receipt by Seller and Buyer prior to the Closing of such approvals, and other consents, governmental or otherwise, deemed necessary or appropriate by them to permit the consummation of the transactions contemplated herein.

18.     <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, including all matters of construction, validity, performance and enforcement.

19.     <u>Escrow Agent</u>.

a.      By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent.  Upon its receipt of funds from Buyer, Escrow Agent will receive and hold such funds, and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent.  If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all loss, cost, damage, liability or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct.  If the indemnity amounts payable hereunder result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts.  Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.

b.      If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and thereafter be relieved of any and all liability.  In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees from whichever of Seller or Buyer is not the prevailing party in such action or proceeding.  If there is no prevailing party, Seller and Buyer each shall be responsible for one-half of such costs and fees.

c.      Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this paragraph 18.  Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this paragraph 18 shall not be required.

20.     <u>Integration</u>.  This Agreement constitutes the entire agreement between the parties and supersedes all prior offers, negotiations, and understandings, whether oral or written, between the parties hereto and may only be modified by a writing executed by both parties.

**IN WITNESS WHEREOF**, this Agreement has been executed and delivered by Seller and Buyer as of the day and year first above written.

**SELLER:**

**WINN-DIXIE STORES, INC.**, a Florida corporation

By: _____

Name: Tom Robbins

Title: Senior Vice President

**BUYER:**

**CVS CORPORATION**, a Delaware corporation

By: _____

Name: _____

Title: _____

Acknowledged and agreed this 21st day of July, 2005 for the limited purposes set forth in paragraph 19 of this Agreement:

**ESCROW AGENT:**

**SMITH, GAMBRELL & RUSSELL, LLP**
**Jacksonville, Florida Office**

By: _____

Name: Douglas G. Stanford

Title: Partner

8

**IN WITNESS WHEREOF**, this Agreement has been executed and delivered by Seller and Buyer as of the day and year first above written.

SELLER:

**WINN-DIXIE STORES, INC.,** a Florida corporation

By: _____
Name: Tom Robbins
Title: Senior Vice President

BUYER:

**CVS CORPORATION**, a Delaware corporation

By: _____
Name: _Dino M. DeThomas_
Title: _SVP Real Estate_

Acknowledged and agreed this 21st day of July, 2005 for the limited purposes set forth in paragraph 19 of this Agreement:

ESCROW AGENT:

**SMITH, GAMBRELL & RUSSELL, LLP
Jacksonville, Florida Office**

By: _____
Name:  Douglas G. Stanford
Title: Partner

8

## SCHEDULE 1

| Store | ADDRESS | CITY | ZIP | ST | Closing Inventory 7-13-05 | RX Weekly Avg (6 weeks ending 7-13-05) |
|---|---|---|---|---|---|---|
| 55 | 312 EAST FIRST STREET | VIDALIA | 30474 | GA | $99,004 | 191 |
| 57 | 2550 PINETREE BLVD | THOMASVILLE | 31792 | GA | $140,752 | 509 |
| 414 | 9120 PARKWAY EAST | BIRMINGHAM | 35206 | AL | $121,276 | 374 |
| 423 | 1225 HWY 231 SOUTH | TROY | 36081 | AL | $100,906 | 448 |
| 432 | 126 South Highway 231 | OZARK | 36360 | AL | $180,904 | 994 |
| 519 | 145 INTERSTATE DRIVE | GREENVILLE | 36037 | AL | $263,257 | 1197 |
| 529 | 128 MARKET CENTER DRIVE | ALABASTER | 35007 | AL | $213,432 | 939 |
| 532 | 1300 MONTGOMERY HWY | VESTAVIA | 35216 | AL | $202,890 | 891 |
| 573 | 3501 DENNY AVENUE | PASCAGOULA | 39581 | MS | $133,829 | 373 |
| 575 | 2200 VILLAGE DRIVE | MOODY | 35094 | AL | $196,528 | 1188 |
| 597 | 275 COLUMBIANA SQUARE | COLUMBIANA | 35051 | AL | $144,634 | 696 |
| 620 | 850 3RD AVE SOUTH | ST.PETERSBURG | 33701 | FL | $49,630 | 452 |
| 636 | 8702 HUNTER'S LAKE DRIVE | TAMPA | 33647 | FL | $65,792 | 135 |
| 739 | 5010 AIRPORT ROAD, N. | NAPLES | 34105 | FL | $50,637 | 77 |
| 803 | 1393 KILDAIRE FARM ROAD | CARY | 27511 | NC | $104,143 | 340 |
| 804 | 1520 DABNEY DRIVE | HENDERSON | 27536 | NC | $172,718 | 836 |
| 884 | 600 CEDAR CREEK ROAD | FAYETTEVILLE | 28301 | NC | $197,265 | 505 |
| 903 | 1514 GARNER STATION ROAD | RALEIGH | 27603 | NC | $93,310 | 399 |
| 923 | 11407 US 70 WEST | CLAYTON | 27520 | NC | $101,955 | 461 |
| 1005 | 135 MARKET PLAZA DR. | N. AUGUSTA | 29841 | SC | $144,015 | 757 |
| 1008 | 1048 YORK STREET NORTH | AIKEN | 29801 | SC | $77,609 | 327 |
| 1015 | 1475 PEARMAN DAIRY RD. | ANDERSON | 29624 | SC | $135,933 | 416 |
| 1016 | 605 S. MAIN STREET | BELTON | 29627 | SC | $88,726 | 359 |
| 1023 | 1000 E. FRANKLIN STREET | HARTWELL | 30643 | GA | $148,727 | 378 |
| 1084 | 951 GROVE RD | GREENVILLE | 29609 | SC | $141,427 | 526 |
| 1098 | 134 FOOTHILL DRIVE | WEST UNION | 29678 | SC | $103,699 | 257 |
| 1225 | 700 EAST MAIN STREET | DUNCAN | 29334 | SC | $114,649 | 243 |
| 1243 | 1014 AUGUSTA ROAD, SE | THOMSON | 30824 | GA | $110,319 | 463 |
| 1244 | 529 HAMPTON AVENUE | PICKENS | 29671 | SC | $155,850 | 1070 |
| 1256 | 895 SPRINGFIELD RD. | SPARTANBURG | 29303 | SC | $138,127 | 463 |
| 1259 | 2551 HWY 25 SOUTH | GREENWOOD | 29646 | SC | $179,233 | 914 |
| 1297 | 642 SULFUR SPRINGS ROAD | GREENVILLE | 29611 | SC | $134,529 | 319 |
| 1337 | 1209 DELAWARE AVE | McCOMB | 39648 | MS | $97,827 | 354 |
| 1469 | 1815 PROSPECT AVENUE | HOUMA | 70360 | LA | $148,803 | 644 |
| 1541 | 241 TUNICA VILLAGE, SC | MARKSVILLE | 71351 | LA | $113,075 | 586 |
| 1585 | 5355 GOVERNMENT STREET | BATON ROUGE | 70809 | LA | $140,268 | 680 |
| 1589 | 402 SOUTH RANGE AVENUE | DENHAM SPRINGS | 70726 | LA | $116,412 | 618 |
| 1807 | 1750 VERNON ST., SUITE K | LAGRANGE | 30240 | GA | $82,252 | 263 |

| Store | ADDRESS | CITY | ZIP | ST | Closing Inventory 7-15-05 | RX Weekly Avg (6 weeks ending 7-15-05) |
|---|---|---|---|---|---|---|
| 1826 | 1850 N. COLUMBIA ST | MILLEDGEVILLE | 31061 | GA | $95,301 | 202 |
| 1860 | 2518 CLEVELAND HWY | DALTON | 30721 | GA | $89,583 | 190 |
| 1904 | 200G OAKWOOD AVENUE | HUNTSVILLE | 35811 | AL | $107,559 | 193 |
| 1912 | 1338 WINCHESTER RD. | HUNTSVILLE | 35811 | AL | $109,692 | 495 |
| 1933 | 11150 DAYTON PIKE | SODDY DAISY | 37379 | TN | $143,103 | 780 |
| 2008 | 818 EAST ARROWOOD RD | CHARLOTTE | 28217 | NC | $108,695 | 164 |
| 2024 | 10215 UNIVERSITY CITY BLVD | CHARLOTTE | 28213 | NC | $75,623 | 193 |
| 2025 | 189 HICKORY TREE RD | WINSTON SALEM | 27107 | NC | $117,736 | 452 |
| 2036 | 908 N. SALISBURY GQ AVENUE | SALISBURY | 28146 | NC | $217,751 | 482 |
| 2062 | 1020 MEBANE OAKS RD | MEBANE | 27302 | NC | $125,155 | 669 |
| 2066 | 1003 W. MAIN STREET | HAW RIVER | 27258 | NC | $98,058 | 374 |
| 2070 | 2449 N. CENTER STREET | HICKORY | 28601 | NC | $103,435 | 296 |
| 2079 | 425 WEST A STREET | NEWTON | 28658 | NC | $113,249 | 367 |
| 2157 | 933 HECKLE BLVD | ROCK HILL | 29730 | SC | $101,362 | 401 |
| 2196 | US 421-A | N. WILKESBORO | 28659 | NC | $122,102 | 676 |
| 2629 | 5320 I-55 NORTH | JACKSON | 39211 | MS | $83,934 | 190 |
| 2701 | 3701 WALT STEPHENS RD. | STOCKBRIDGE | 30281 | GA | $90,762 | 173 |
| 2703 | 3050C MARTIN LUTHER KING JR. DR. | ATLANTA | 30331 | GA | $88,543 | 416 |
| 2704 | 4489 HWY 20 SOUTH | CONYERS | 30094 | GA | $88,395 | 253 |
| 2705 | 8777 TARA BLVD | JONESBORO | 30236 | GA | $87,809 | 183 |
| 2711 | 6335 HWY 85 | RIVERDALE | 30274 | GA | $81,624 | 198 |
| 2713 | 4801 LAWRENCEVILLE HWY | LILBURN | 30047 | GA | $59,232 | 149 |
| 2715 | 1404 LAWRENCEVILLE SUWANEE | LAWRENCEVILLE | 30043 | GA | $66,895 | 115 |
| 2722 | 1200 BARRETT PARKWAY | KENNESAW | 30101 | GA | $86,415 | 189 |

## EXHIBIT A

## LIST OF OVER THE COUNTER DRUGS TO BE INCLUDED AS PHARMACY PRODUCTS

| CIN | Item Description | NDC | Vendor Name |
|---|---|---|---|
| 1714872 | INS HUMULIN 70/30 10ML | 2871501 | LILLY ELI & CO |
| 2990174 | ONE TCH ULTRA 100 | 53885024510 | LIFESCAN INC |
| 1325398 | INS HUMULIN N 100U/ML 10ML | 2831501 | LILLY ELI & CO |
| 2778207 | ACCU-CHEK CCRV 100 | 50924038110 | ROCHE DIAGNOSTICS |
| 1171008 | INS NOVOLIN 70/30 10ML | 169183711 | NOVO NORDISK PHARMACEUTICAL INC |
| 3437829 | ACCU-CHEK COMPACT 102 | 50924088401 | ROCHE DIAGNOSTICS |
| 1391051 | INS NOVOLIN N 100U/ML 10ML | 169183411 | NOVO NORDISK PHARMACEUTICAL INC |
| 2487239 | BD UFII 31X5/16 100X0.5 328468 | 8290328468 | BECTON DICKINSON CONS |
| 1325240 | INS HUMULIN R 100U/ML 10ML | 2821501 | LILLY ELI & CO |
| 2990166 | ONE TCH ULTRA 50 | 53885024450 | LIFESCAN INC |
| 2245389 | ONE TCH BAS PROF II TEST 100 | 53885037410 | LIFESCAN INC |
| 2778199 | ACCU-CHEK CCRV 50 | 50924037350 | ROCHE DIAGNOSTICS |
| 3270238 | ACCU-CHEK COMPACT 51 | 50924098850 | ROCHE DIAGNOSTICS |
| 3235421 | ACCU-CHEK ACTIVE 50 | 50924047550 | ROCHE DIAGNOSTICS |
| 3383866 | FREESTYLE TEST STRIPS 100 | 99073012101 | THERASENSE |
| 2812451 | ASCENSIA ELITE 100 | 193394221 | BAYER DIAGNOSTICS |
| 1860956 | BD UF 30GX0.5N 0.5ML100 328466 | 8290328466 | BECTON DICKINSON CONS |
| 3398864 | MUCINEX 600MG 40 | 63824000840 | ADAMS LABORATORIES |
| 2355337 | ACCU-CHEK ADVNT 100 | 50924096610 | ROCHE DIAGNOSTICS |
| 1860949 | BD UF 30GX0.5IN 1ML 100 328411 | 8290328411 | BECTON DICKINSON CONS |
| 2772184 | ONE TCH SRST 100 | 53885005210 | LIFESCAN INC |
| 3270022 | ACCU-CHEK COMPACT KIT | 50924001901 | ROCHE DIAGNOSTICS |
| 3376118 | INS NOVOLIN 70/30 INNOLET 5X3 | 169231721 | NOVO NORDISK PHARMACEUTICAL INC |
| 2561066 | BD UFII 30GX5/16 100X1ML328418 | 8290328418 | BECTON DICKINSON CONS |
| 2721306 | INS NOVOLIN 70/30 5X3ML | 169347718 | NOVO NORDISK PHARMACEUTICAL INC |
| 1710631 | ASCENSIA ELITE 50 | 193391850 | BAYER DIAGNOSTICS |
| 2824514 | INS HUMULIN 70/30 5X3ML PFS | 2877059 | LILLY ELI & CO |
| 1231539 | INS NOVOLIN R 100U/ML 10ML | 169183311 | NOVO NORDISK PHARMACEUTICAL INC |
| 2487247 | BD UFII 31X5/16 100X0.3 328438 | 8290328438 | BECTON DICKINSON CONS |
| 2990182 | ONE TCH ULTRA SYS METR | 53885024701 | LIFESCAN INC |
| 2848208 | ASCENSIA  AUTODISC 100 | 193362721 | BAYER DIAGNOSTICS |
| 1147099 | INS HUMULIN L 100U/ML 10ML | 2841501 | LILLY ELI & CO |
| 2710945 | ASCENSIA  AUTODISC 5 | 193361050 | BAYER DIAGNOSTICS |
| 2399715 | SOFTCLIX 100 | 50924097110 | ROCHE DIAGNOSTICS |
| 3453677 | BD TEST STRIPS 50 322053 | 8290322053 | BECTON DICKINSON CONS |

| CIN | Item Description | NDC | Vendor Name |
|---|---|---|---|
| 2420289 | ONE TCH SRST 50 | 53885035950 | LIFESCAN INC |
| 2073112 | ACCU-CHEK ADVNT CARE KIT | 50924086001 | ROCHE DIAGNOSTICS |
| 2196061 | NOVOFINE 30 ND 30GX8MM 100 | 169185250 | NOVO NORDISK PHARMACEUTICAL INC |
| 2975647 | FREESTYLE TEST STRIPS 50 | 99073012050 | THERASENSE |
| 1561349 | ONE TCH BAS PROF II TEST 50 | 53885019850 | LIFESCAN INC |
| 3292034 | PRECISION XTRA 100 | 57599987705 | MEDISENSE INC |
| 3536844 | ASCENSIA MICROFILL 100TESTSTRP | 193709021 | BAYER DIAGNOSTICS |
| 3447117 | LORATADINE 10MG 100 | 781507701 | SANDOZ - CS (GENEVA) |
| 1152388 | BD MF 28GX0.5N0.5ML 100 328465 | 8290328465 | BECTON DICKINSON CON |
| 3459377 | MUCINEX 600MG 20 | 63824000820 | ADAMS LABORATORIES |
| 2325447 | PRECISION QID 100 | 57599740105 | MEDISENSE INC |
| 2073104 | ACCU-CHEK ADVNT 50 | 50924055350 | ROCHE DIAGNOSTICS |
| 1625615 | INS HUMULIN 50/50 10ML | 2951501 | LILLY ELI & CO |
| 1860964 | BD UF 30GX0.5N 0.3ML100 328431 | 8290328431 | BECTON DICKINSON CONS |
| 2760312 | BD UF3 PEN 31GX8MM 100 320109 | 8290320109 | BECTON DICKINSON CONS |
| 3376134 | INS NOVOLIN N INNOLET 5X3ML | 169231421 | NOVO NORDISK PHARMACEUTICAL INC |
| 2824522 | INS HUMULIN N 100U/ML 5X3MLPFS | 2873059 | LILLY ELI & CO |
| 2444065 | INS HUMULIN U 100U/ML 10ML | 2861501 | LILLY ELI & CO |
| 1152669 | BD MF 28GX0.5IN 1ML 100 328410 | 8290328410 | BECTON DICKINSON CONS |
| 2744480 | ONE TCH FASTTAKE 50 | 53885044450 | LIFESCAN INC |
| 2721280 | INS NOVOLIN N 100UML 5X3ML PEN | 169347418 | NOVO NORDISK PHARMACEUTICAL INC |
| 3007788 | ONE TCH ULTRASOFT 100 | 53885039310 | LIFESCAN INC |
| 3307337 | NOVOFINE 31 ND 31GX6MM 100 | 169185255 | NOVO NORDISK PHARMACEUTICAL INC |
| 1237551 | BD ALCOHOL SWAB 100 326895 REG | 8290326895 | BECTON DICKINSON CONS |
| 2539716 | MAG-OX 400 120 | 165002212 | BLAINE COMPANY |
| 2487213 | BD UF PEN 29GX0.5N 100 328203 | 8290328203 | BECTON DICKINSON CONS |
| 2325439 | PRECISION QID 50 | 57599740004 | MEDISENSE INC |
| 2772168 | ONE TCH FASTTAKE 100 | 53885004810 | LIFESCAN INC |
| 2254589 | VIVONEX PEDIATRIC 36X1.7OZ | 212713176 | NOVARTIS NUTRITION |
| 3126786 | FERREX 150 100UD | 51991020311 | BRECKENRIDGE PHARM INC – CS |
| 1370626 | MURO-128 5% 15ML OPTH | 24208027715 | BAUSCH & LOMB (BRAND) |
| 2533628 | SOFTCLIX 200 | 50924098820 | ROCHE DIAGNOSTICS |
| 3536810 | ASCENSIA MICROFILL 50 TESTSTRP | 193708050 | BAYER DIAGNOSTICS |
| 2245397 | ONE TCH BAS PROF II TEST 25 | 53885019725 | LIFESCAN INC |

| CIN | Item Description | NDC | Vendor Name |
|---|---|---|---|
| 3335395 | BD UF3 MINI PEN 31GX5MM 100 | 8290320119 | BECTON DICKINSON CONS |
| 1370600 | MURO-128 5% 3.5GM OPTH OINT | 24208038555 | BAUSCH & LOMB (BRAND) |
| 2420297 | ONE TCH SRST METER SYSTEM | 53885034101 | LIFESCAN INC |

**EXHIBIT B**

**SAMPLE BILL OF SALE**

KNOW ALL MEN BY THESE PRESENTS:   That WINN-DIXIE STORES, INC., a Florida corporation, as debtor and debtor-in-possession, with a place of business at _____ ("Winn-Dixie"), for valuable consideration paid by _____, a _____ corporation, having its principal place of business at _____ ("Buyer"), does hereby sell, transfer and convey to Buyer certain Pharmacy Products and Pharmacy Records, as defined in that certain Purchase and Sale Agreement between Winn-Dixie and Buyer, dated _____, 2005 (the "Agreement") owned by Winn-Dixie located in and used in the operation of its stores located at the foregoing address.

This Bill of Sale is given pursuant to the provisions of the Agreement.

Winn-Dixie hereby warrants that it has good and merchantable title thereto and the capacity to transfer and convey the same to Buyer, and Winn-Dixie further warrants that the same are free of all liens and encumbrances of any nature whatsoever.

IN WITNESS WHEREOF, the undersigned has executed this Bill of Sale as of the _____ day of _____, 2005.

ATTEST:

_____        By: _____

**BAE SYSTEMS**

**Enterprise Systems Incorporated**
**11487 Sunset Hills Road**
**Reston, Virginia 20190-5234**

# CERTIFICATE OF SERVICE

```
District/off: 113A-3        User: cartes          Page 1 of 1              Date Rcvd: Jul 29, 2005
Case: 05-03817             Form ID: pdfdoc        Total Served: 1
```

The following entities were served by first class mail on Jul 30, 2005.
aty      +Cynthia C. Jackson,   Smith Hulsey & Busey,   225 Water Street, Suite 1800,
           Jacksonville, FL 32202-4494

The following entities were served by electronic transmission.
NONE.                                                                      TOTAL: 0

        ***** BYPASSED RECIPIENTS *****
NONE.                                                                      TOTAL: 0

Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.

**I, Joseph Speetjens, declare under the penalty of perjury that I have served the attached document on the above listed entities in the manner shown, and prepared the Certificate of Service and that it is true and correct to the best of my information and belief.**

**First Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed.  This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

**Date: Jul 30, 2005**                    **Signature:**