# EXHIBIT A

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made effective as of June 30, 2005 (the "Effective Date"), by and among:

**WINN-DIXIE STORES, INC.,** a Florida corporation, on behalf of itself and each of its Affiliates that is a tenant of a Store, it being expressly understood and agreed by Buyer as evidenced by its signature hereto that only the actual tenant of a Store shall be deemed the "Seller" in respect of such Store and that WINN-DIXIE STORES, INC. is entering into this Agreement solely as to those Stores with respect to which it is the Tenant and for purposes of obligating the actual tenants of the remaining Stores to sell, convey and transfer such Stores in accordance with the terms and conditions of this Agreement ("Seller"), and

**BI-LO, LLC,** a Delaware limited liability company ("BI-LO"), and **SOUTHERN FAMILY MARKETS ACQUISITION LLC,** a Delaware limited liability company ("SFM"), jointly and severally, or permitted assigns pursuant to paragraph 18.6 of this Agreement (BI-LO and SFM are collectively referred to herein as "Buyer").

### RECITALS:

A.    Seller is the tenant of each of twenty (20) supermarket stores (the "Stores"), each of which is listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under the respective leases, including amendments thereto (the "Leases") described on Exhibit A-2 to this Agreement. The Stores occupy the respective leased premises as described in each Lease (the "Leased Premises"), within the respective parcels of real property described on Exhibit A-2 to this Agreement associated with each Lease. Seller's leasehold interest in each Leased Premises pursuant to each Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "Assets."

B.    Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets in multiple transactions, subject to the terms and conditions contained in this Agreement.

C.    Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no. 05-03817-3F1 (the "Bankruptcy Case").

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0   **Defined Terms.**   Capitalized terms as used in this Agreement will have the following meanings when used herein.

1.1   "Adequate Assurance Information" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that Landlords and Subtenants are adequately assured of Buyer's future performance under the Leases, as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's obligations under the Leases and (where applicable) the Subleases by an Affiliate of Buyer with sufficient assets to provide adequate assurance of future performance.

1.2   "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3   "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4   "Approval Hearing" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.5   "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.6   "Bankruptcy Code" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.7   "Bankruptcy Court" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.8   "Bankruptcy Court Approval" will mean the entry of one or more Sale Approval Orders with respect to the Stores by the Bankruptcy Court.

1.9   "Bankruptcy Case" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.10   "Base Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.11   "Base Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.12   "Bidding Procedures Order" will mean the order of the Bankruptcy Court entered on June 20, 2005, authorizing the Debtors to offer to potential asset purchasers certain types of "bidding protection".

1.13   "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at each Closing, as applicable, the Inventory, the Supplies, the Equipment and other tangible and intangible personal property constituting a portion of the Assets relating to the one or more Stores being transferred at such Closing.

1.14   "Break-up Fee" will have the meaning assigned in paragraph 16.3 of this Agreement.

1.15   "Buildings" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.16   "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.17   "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

1.18   "Buyer Inventory Representative" will mean (i) in the case of BI-LO, such Person as may be designated by BI-LO in writing to Seller no less than two (2) days in advance of a Closing Date and (ii) in the case of SFM, such Person as may be designated by SFM in writing to Seller no less than two (2) days in advance of a Closing Date, or another Person designated in writing by such Buyer to act in such capacity.

1.19   "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policies (and the cost of any simultaneous issue mortgagee title insurance policies and any loan-related title insurance endorsements thereon); (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instruments; (e) recording fees payable in connection with recording the Conveyance Instruments in the appropriate public records; (f) cost of the Environmental Reports, including any supplements or updates; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment, Supplies and Inventory; (i) the fees and costs of the Closing Escrow Agent; and (j) one-half of the fees and costs of the Inventory Service.

1.20   "Buyer's Escrowed Items" will have the meaning assigned in paragraph 15.3 of this Agreement.

1.21   "Closed Stores" will mean the Stores listed on Exhibit A-3 to this Agreement.

1.22  "Closing" with respect to one or more Stores will mean the consummation of the assignment, assumption, sale and purchase of the Assets relating to such Store or Stores pursuant to this Agreement as indicated by delivery of the Conveyance Instruments and other documents contemplated by paragraph 15 of this Agreement and the Inventory Price and Supplies Price as contemplated in this Agreement with respect to such Store or Stores, which will be deemed to occur at 12:01 a.m. on the Closing Date with respect to such Store or Stores.

1.23  "Closing Date" will mean the date of Closing as to a particular Store or Stores mutually agreed on by Seller and Buyer in writing (a "Closing Notice") that is between ten (10) days and the Final Closing Date (as defined in paragraph 15.1).

1.24  "Closing Notice" will have the meaning assigned in paragraph 1.23 of this Agreement.

1.25  "Closing Statement" will mean a statement in the form of Exhibit C-1 to this Agreement (or in such other form as is prepared by Seller and reasonably acceptable to Buyer) reflecting the net amount due Seller at each Closing (other than in respect of the Inventory Price), after making the adjustments described in paragraph 3.3.4 of this Agreement and in other provisions of this Agreement.

1.26  "Confidentiality Agreement" will mean the existing letter agreement between Winn-Dixie and Buyer, regarding, among other things, confidentiality relating to the subject matter of this Agreement.  Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.

1.27  "Conveyance Instrument" will have the meaning assigned in paragraph 15.2 of this Agreement.

1.28  "Credit Agreement Liens" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.29  "Cure Costs" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Leases and the Subleases.

1.30  "Current Title Reports" will have the meaning assigned in paragraph 5.2 of this Agreement.

1.31  "Damages" will have the meaning assigned in paragraph 17.5 of this Agreement.

1.32 "Deposit" will have the meaning assigned in paragraph 3.3.3 of this Agreement.

1.33 "Due Diligence Materials" will mean, collectively, (i) the Leases, the Subleases (if any), the Title Reports and the Environmental Reports, and (ii) all other documents and written materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, at the Stores, or on the Merrill Website.

1.34 "Effective Date" will have the meaning assigned in the initial paragraph of this Agreement.

1.35 "Environmental Report" will have the meaning assigned in paragraph 5.3 of this Agreement.

1.36 "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.37 "Escrow Agent" will mean Title Insurer, acting as escrow and closing agent.

1.38 "Excluded Inventory" will mean (i) any private label goods and merchandise; (ii) any goods and merchandise that are non-saleable, damaged, spoiled or distressed or with damaged packaging; (iii) any items that as of the applicable Closing Date will be past Seller's "pull date", if any, or, with respect to frozen foods, within 20 days of Seller's "pull date"; (iv) with respect to pharmaceutical inventory (including diabetic supplies), any items that as of the applicable Closing Date will be within 45 days of the manufacturer's expiration date, if any, any products not in original containers, and any damaged products; (v) if applicable, any inventory deemed to be Excluded Inventory under paragraph 3.7 of this Agreement; (vi) any out of season seasonal products, except for back-to-school; (vii) consignment inventory; (viii) any open containers of fresh deli and seafood, any store packaged fresh meat and seafood, any partial cases or loose product of fresh counter produce, any fresh deli or bakery product within 7 days of Seller's "pull date", any dairy product within 14 days of Seller's "pull date", any fresh cut flowers and potted plants, any open packages of ingredients in the deli, bakery, meat or seafood departments; (ix) items of inventory shipped or redirected after the date of this Agreement from other Winn-Dixie stores to any of the Stores; (x) greeting cards and cosmetics; and (xi) any Inventory at a Closed Store.

1.39 "Excluded Personal Property" will mean: (i) all Excluded Inventory; (ii) all packaging materials and supplies not included in the term "Supplies"; (iii) all leased point-of-sale equipment and owned or leased photo lab equipment; (iv) all other leased equipment (including all other leased equipment described on Exhibit D to this Agreement with respect to each Store); (v) all owned computer and related equipment that contains software subject to a license that restricts its

transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed; (vi) all equipment and other personal property that is neither owned nor leased by Seller, including by way of example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATMs, rug cleaners and equipment owned by product vendors; (vii) all branded shopping carts; (viii) all over-the-road motor vehicles; (ix) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (x) all data files (other than Pharmacy Scrips), data files and records related to employees who are not offered employment by Buyer, and customer loyalty cards and related files and records; (xi) all lottery equipment and tickets; (xii) all accounts receivable, bank accounts and, except for up to $15,000 of Til Cash at any Store that is not a Closed Store, cash and cash equivalents; (xiii) all trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates; (xiv) all building signs and panels in all pole and pylon signs that advertise Seller's business in the Stores; (xv) all intellectual property and rights (other than Pharmacy Scrips) relating to any of the foregoing; (xvi) all service agreements, leases of personal property, contracts and warranties relating to Seller's possession and operation of the Stores; and (xvii) all Supplies at Closed Stores.

1.40    "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.41    "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.42    "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.43    "Initial Title Reports" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Stores that Seller has made available to Buyer for review on the Merrill Website or otherwise with an effective date earlier than May 1, 2005. Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.44    "Inventory" will mean all reasonable and customary inventories of goods and merchandise within the Stores after the Filing Date and owned by Seller on the Inventory Count Date and held for resale in the ordinary course of business of Seller conducted at the Stores to retail customers, but excluding the Excluded Inventory.

1.45    "Inventory Certificate" will mean with respect to each Store a certificate executed by Buyer and Seller in connection with the Closing as contemplated by paragraph 3.4.4 of this Agreement, in the form attached hereto as Exhibit H to this Agreement.

1.46    "Inventory Closing Statement" will mean a statement in the form of Exhibit C-2 to this Agreement reflecting the net amount due Seller at each Closing in respect of the Inventory Price, after making the adjustments described in Exhibit C-2 and in other provisions of this Agreement.

1.47    "Inventory Count" will have the meaning assigned in paragraph 3.4.1 of this Agreement.

1.48    "Inventory Count Date" will mean, with respect to each Store, the day immediately preceding the Closing Date for such Store.

1.49    "Inventory Deposit" will have the meaning assigned in paragraph 3.3.3 of this Agreement.

1.50    "Inventory Price" will mean the purchase price for the Inventory determined pursuant to paragraph 3.4 of this Agreement.

1.51    "Inventory Service" will mean MSI Inventory Service Corporation or Accurate Inventory & Calculating Service, Inc., as designated by Seller, or such other inventory service as is selected by Seller and reasonably acceptable to Buyer.

1.52    "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, (ii) in the case of BI-LO, the actual knowledge of Kevin McDougall, Vice President and General Counsel, without any requirement of investigation or inquiry; and (iii) in the case of SFM, the actual knowledge of Carl Wistreich, Senior Vice President, Legal and Human Resources, without any requirement of investigation or inquiry.

1.53    "Landlords" will mean the lessors under the Leases.

1.54    "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.1 of this Agreement.

1.55    "Leases" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.56    "Liens" will mean any and all mortgages, pledges, hypothecations, security interests, encumbrances, claims (including as defined in Section 101(5) of the Bankruptcy Code), rights of first refusal, options, liens or charges of any kind, rights of setoff, or any other monetary encumbrance or other restriction on the

use or exercise of any attribute of ownership or other interests however evidenced or created (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the lien notice records or other similar legislation of any jurisdiction), including all Monetary Liens; provided, however, such term shall not include any such restrictions on the use or exercise of any attribute of ownership or other interest evidenced or created by any Lease.

1.57    "Liquidated Deposit" will have the meaning assigned in paragraph 17.1 of this Agreement.

1.58    "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Stores for their current use, taken as a whole, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of Seller's Bankruptcy Case or the bankruptcy case of any of Seller's Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of Seller or of any of its Affiliates.

1.59    "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Jaguar" with respect to the disposition of the Stores and other properties.

1.60    "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller or are owed by Seller: (A) mortgages on any of Seller's leasehold interests or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction or materialmen's liens or rights against Seller's interest under any of the Leases or on any other Assets; and (D) judgments that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets.

1.61    "ordinary course of business" means the ordinary course of business of Seller after the Filing Date.

1.62   "Outside Date" means September 2, 2005, as such date may be extended by the written agreement of Seller and Buyer.

1.63   "Outside Sale Approval Order Date" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.64   "Payment Dates" will have the meaning assigned in paragraph 3.3.1 of this Agreement.

1.65   "Permits" will have the meaning assigned in paragraph 7.2 of this Agreement.

1.66   "Permitted Encumbrances" will mean (i) all matters listed on Exhibit F to this Agreement, and (ii) subject to the provisions of paragraph 5.2 of this Agreement, all other matters set forth as "exceptions" in any Current Title Report, other than Monetary Liens and matters listed as "requirements" or "for informational purposes only" in such Current Title Report.

1.67   "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.68   "Pharmacy Scrips" will mean all customer lists, prescription files, prescription registers, and operating and maintenance logs and data bases owned or maintained by or on behalf of Seller that relate to the pharmacy operated in any of the Stores.

1.69   "Purchase Price" will mean the Base Purchase Price, the Inventory Price and the Supplies Price collectively.

1.70   "Real Property" will mean the Leased Premises and the Improvements together.

1.71   "Real Property Escrow Date" with respect to one or more Stores will mean the date that is one (1) Business Day prior to the Closing Date for such Store or Stores or such earlier date after the Bankruptcy Court Approval as Buyer and Seller may mutually designate.

1.72   "Sale Motion" will mean a motion in form and substance reasonably satisfactory to Buyer and Seller to be filed with the Bankruptcy Court by Seller that satisfies the requirements set forth in paragraph 4.2 of this Agreement.

1.73   "Sale Approval Order" will mean an order or orders of the Bankruptcy Court approving this Agreement and authorizing the sale of the Assets that satisfies paragraph 4.2 of this Agreement.

1.74   "Seller" will have the meaning assigned in the initial paragraph of this Agreement.

1.75   "Seller Delivery Confirmation" will have the meaning assigned in paragraph 15.2 of this Agreement.

1.76   "Seller Inventory Representative" will mean Michael Chlebovec or another Person designated in writing by Michael Chlebovec or by Seller to act in such capacity.

1.77   "Seller's Brokers" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.78   "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 18.4 of this Agreement; (c) the Cure Costs; and (d) one-half of the fees and costs of the Inventory Service.

1.79   "Seller's Escrowed Items" will have the meaning assigned in paragraph 15.2 of this Agreement.

1.80   "SNDA" will have the meaning assigned in paragraph 2.1 of this Agreement.

1.81   "Stores" will have the meaning assigned in paragraph A of the Recitals to this Agreement and, when followed by "#" and a number will refer to the particular Store with the indicated number listed on Exhibit A-1 to this Agreement, including if applicable any associated gas station, liquor store, pharmacy or other specialty area operated by Seller at the Leased Premises.

1.82   "Sublease" will mean, with respect to each Store, each sublease of a portion of the Leased Premises listed on Exhibit A-2 to this Agreement (if any), including amendments.  If no sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Sublease at such Store will be disregarded.

1.83   "Subtenant" will mean, with respect to each Store, the subtenant or sublessee under each Sublease.  If no sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Subtenant at such Store will be disregarded.

1.84   "Successful Bid" will mean the highest or otherwise best offer to purchase the Assets, as determined by Seller in its sole discretion, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.85   "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the

preparation or merchandising of Inventory, located within the Stores and owned by Seller on the Inventory Count Date, excluding, however, any such packaging materials and supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of their Affiliates, any Supplies at a Closed Store and any photo lab Supplies.

1.86    "Supplies Price" will mean the purchase price payable by Buyer for the Supplies, which will be $2,500.00 per Store that is not a Closed Store.

1.87    "Take Down Allocation" will mean the allocation of the Base Purchase Price among the Stores as provided on Exhibit E to this Agreement. The Take Down Allocation as used in this Agreement is for the purpose of management of multiple Store Closings on multiple dates as contemplated by this Agreement and to address situations where this Agreement is terminated with respect to some, but not all, of the Stores.

1.88    "Terminated Stores" will have the meaning assigned in paragraph 17.1 of this Agreement.

1.89    "Til Cash" means all monetary funds located at a Store and shall include cash in til, cash kept in registers and safes, postage stamps and phone calling cards, but shall not include cash physically in transit to or from the Store or cash in bank accounts of Seller.

1.90    "Til Cash Determination Certificate" will mean with respect to each Store a certificate executed by Buyer and Seller in connection with the Closing as contemplated by paragraph 3.5 of this Agreement, setting forth their respective agreement with respect to the amount of Til Cash at such Store.

1.91    "Title Reports" will mean, collectively, (i) the Initial Title Reports and (ii) the Current Title Reports.

1.92    "Title Insurer" will mean First American Title Insurance Company or Near North National Title LLC, as agent for Lawyers Title Insurance Corporation, or any other nationally recognized title insurance company, as designated by Seller.

1.93    "Title Policies" will have the meaning assigned in paragraph 5.2 of this Agreement.

1.94    "Upset Purchase Agreement" will have the meaning assigned in paragraph 16.3 of this Agreement.

1.95    "Upset Purchaser" will have the meaning assigned in paragraph 16.3 of this Agreement.

1.96    "Winn-Dixie" will mean Winn-Dixie Stores, Inc.

2.0 **Property Included in Sale.** The parties have agreed that the Assets will be transferred in several stages. At each Closing, Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets related to the Store or Stores identified in the Closing Notice applicable to such Closing, which—excluding Excluded Personal Property and Excluded Inventory—are comprised of the following with respect to each such Store or Stores:

2.1 Seller's interest, as tenant, under the Leases, any Subordination, Non-Disturbance and Attornment Agreement (an "SNDA") related thereto, and Seller's interest in any leasehold improvements;

2.2 Seller's interest in all fixtures and all equipment located in the store buildings now existing on the Leased Premises (the "Buildings") and any substitutions or replacements thereof made between the Effective Date and the relevant Closing Date in accordance with this Agreement, including but not limited to Seller's interest in (i) heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, checkstands and flooring (collectively, the "Improvements"), and (ii) Seller's trade fixtures and equipment located in the Buildings (the "Equipment");

2.3 The Inventory;

2.4 The Supplies;

2.5 With respect to each Store that includes a pharmacy, the Pharmacy Scrips (provided Buyer has obtained all Permits necessary for Seller to lawfully convey the Pharmacy Scrips to Buyer at Closing) and, to the extent transferable, ownership and control of pharmacy phone lines;

2.6 Seller's interest in the Subleases (if any);

2.7 To the extent transferable, Seller's right, title and interest in and to all manufacturer's warranties to the extent related to the Equipment and all future claims under such warranties;

2.8 All goodwill in or arising from the Assets;

2.9 To the extent Seller has in its possession and is solely and directly related to the Assets, all blueprints, drawings, literature, user manuals, technical information, designs and other intangible property related to the Assets;

2.10 Except at Closed Stores, up to $15,000.00 of Till Cash; and

2.11 The employment records and data files of each employee of a Store who is offered and has accepted employment by Buyer.

Subject to paragraph 4.5, Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are subject to higher or otherwise better offers for the Assets and conditioned upon the entry of a Sale Approval Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

3.0 **Purchase Price.**

3.1 <u>Amount</u>. The purchase price to be paid by Buyer to Seller for the Assets (other than the Inventory and Supplies) is $9,000,000 in the aggregate (the "<u>Base Purchase Price</u>"). The Base Purchase Price shall be attributable to the Stores as set forth on the Take Down Allocation. The purchase price to be paid by Buyer to Seller for the Inventory in respect of each Store is the total of the Inventory Price for each item of Inventory, and the purchase price to be paid by Buyer to Seller for the Supplies in respect of each Store is the Supplies Price. If this Agreement is terminated in accordance with its terms as to one or more, but not all, of the Stores, then (i) the aggregate Base Purchase Price will be adjusted based on the Take Down Allocation as to the Stores that remain subject to the continuing force and, effect of this Agreement; and (ii) the terms "Inventory", "Supplies" and "Subleases" will be deemed to exclude, respectively, all Inventory, Supplies and Subleases of the Stores with respect to which this Agreement is terminated.

3.2 <u>Contract Consideration; Base Deposit</u>. As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer shall deliver to Escrow Agent, no later than two Business Days after the date of this Agreement, an earnest money deposit in respect of each Store in the aggregate amount of $900,000 as attributable to each Store as set forth on the Take Down Allocation (the "<u>Base Deposit</u>"). Buyer shall make the Base Deposit by wire transfer to an account designated in writing by Escrow Agent. The Base Deposit will be payable to Buyer to the extent and in the circumstances described in <u>paragraphs 5, 13, 16 and 17</u>. The Base Deposit will be credited against the Base Purchase Price for the Stores purchased at the Closing for the last Store and will be held in an escrow account maintained by Escrow Agent. Whenever used herein, the term Base Deposit also will be deemed to include all interest accrued thereon if the escrow account maintained by Escrow Agent is an interest bearing account; however, for state and federal income tax purposes, interest, if any, accrued on the Deposit will be deemed earned 14/20ths by BI-LO and 6/20ths by SFM. BI-LO's federal taxpayer identification number (FEIN) is 52-2260130. SFM's federal taxpayer identification number (FEIN) is 20-2871771.

3.3 <u>Payment</u>. The Purchase Price will be paid in the following manner:

3.3.1 *Base Purchase Price*. The Base Purchase Price shall be paid in three (3) equal installments of $3,000,000.00 on the following payment dates (the "<u>Payment Dates</u>"):

      (a)    the date of the Closing of the first Store,

      (b)    the date of the Closing of the tenth Store, and

      (c)    the date of the Closing for the final Store, it being understood and agreed that the Base Deposit shall be credited against the last installment due on the date of the Closing of the last Store.

3.3.2   *Base Purchase Price and Supplies Price*.  On each Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price and the Supplies Price with respect to such Store or Stores that are being closed on the relevant Closing Date (subject to any adjustments with respect to the Base Purchase Price and the Supplies Price contemplated by the relevant Closing Statement).  On the Closing Date for such Store or Stores, Buyer will instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price and Supplies Price with respect to such Store or Stores to Seller by wire transfer to an account designated in writing by Seller.

3.3.3   *Inventory Deposit and Inventory Price*.  On each Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) an inventory deposit with respect to the applicable Store or Stores being closed in the relevant Closing Date in an amount equal to 100% of the estimated Inventory value (the "Inventory Deposit") with respect to such Store or Stores as determined by the Seller in good faith based upon Seller's books and records.  The Inventory Price for each Store shall be determined in the manner set forth in paragraph 3.4 of this Agreement.  On the Closing Date for such Store or Stores, (a) Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the amount by which the Inventory Price for such Store or Stores exceeds the Inventory Deposit for such Store or Stores, and (b) Buyer will instruct Escrow Agent to transfer and deliver the Inventory Price with respect to such Store or Stores to Seller, by wire transfer to an account designated in writing by Seller.  If the aggregate Inventory Deposit for all Stores having the same Closing Date exceeds the aggregate Inventory Price for such Stores, then Seller and Buyer shall provide written instructions to Escrow Agent to deliver the excess to Buyer at Closing.  The Base Deposit and, once deposited, the Inventory Deposit with respect to each Store will individually and collectively sometimes be referred to in this Agreement as the "Deposit".

3.3.4 *Certain Transaction Costs*.  All relevant rent, taxes (including real and personal property taxes and assessments), common area maintenance expenses and all other items of additional rent, utilities (including the pharmacy phone line, where applicable) and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding each Closing Date and will be a credit or debit, as the case may be, against the Base Purchase Price and Supplies Price payable at such Closing to the extent thereof (and then against the Inventory Price).  Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate.  Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.3.4 which apply to the period after the Closing for any Store shall survive the Closing for such Store.

3.3.5 *Sales Tax*.  Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom.  On Seller's request, Buyer agrees to provide Seller with a certificate stating that Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Seller or any governmental authority to document that sale of the Inventory is exempt from sales tax.  This paragraph 3.3.5 shall survive the Closing for each Store.

3.3.6 *Til Cash*.  On each Closing Date, Buyer shall pay to Seller in immediately available funds, by wire transfer to an account designated by Seller, an amount in cash up to $15,000.00 equal to the aggregate Til Cash for the Stores that are not Closed Stores subject to such Closing. By agreement between Buyer and Seller, any Til Cash in excess of $15,000 may be purchased by Buyer on a dollar-for-dollar basis.  If Buyer and Seller do not so agree, all of such excess Til Cash shall be the sole and exclusive property of Seller.

3.4 Inventory.

    3.4.1 *Count of Store Inventory.* Seller shall close each Store at a time designated by Seller (between 5:00 p.m. and 11:00 p.m.) on the Inventory Count Date, unless otherwise agreed to by Seller and Buyer. As soon as possible after the closing of each such Store, the parties will conduct a physical count (or measurement with respect to gasoline and other vehicle fuels) of the Inventory at each of such Stores (the "Inventory Count") with the assistance of the Inventory Service. Buyer and Seller will each have representatives present at each Store during the Inventory Count who will acknowledge in writing all computations before leaving the Store. Upon completion of such Inventory Count, except for manifest mathematical errors, other agreed upon changes and disputes regarding Excluded Inventory, the count of the Inventory Service shall be final and binding on the parties for all purposes of this Agreement.

    3.4.2 *Pharmacy Inventory.* With respect to each Store that includes a pharmacy, pharmaceutical Inventory will be inventoried by item as follows and the inventory forms for such Inventory will be signed by registered pharmacists representing Seller and Buyer:

        (a)    Schedule II drugs will be inventoried as exact counts and transferred on DEA 222 form supplied to Buyer by Seller and approved by Buyer; and

        (b)    Will-call prescriptions filled but not purchased by customers at the time of the Inventory Count will be returned for credit and included in the Inventory Count.

    3.4.3 *Valuation of Inventory.* The Inventory will be valued by applying the following methods to the count reported by the Inventory Service:

        (a)    With respect to pharmaceutical Inventory and gasoline, the value used will be Seller's true acquisition cost. For pharmaceutical Inventory, such cost will be that found on stickered products. If and only if the true acquisition cost is not available on each stickered product will pharmaceutical Inventory's true acquisition costs be as reflected on its records kept in the ordinary course of business. Partial bottles of pharmaceutical Inventory will be estimated to the nearest tenth. For gasoline, cost shall be last acquisition cost.

        (b)    With respect to all other Inventory the value used will be determined by taking Seller's standard retail shelf price (after

adjusting to remove temporary or special price reductions, promotions or discounts, coupon discounts or customer loyalty card discounts) for the applicable item and multiplying such price by the valuation percentage for each merchandise category indicated in the table below:

| | Category | Valuation Percentage |
|---|---|---|
| 1. | Grocery (food and non-food) | 72% |
| 2. | Dairy | 70% |
| 3. | Frozen Grocery | 61% |
| 4. | Frozen Meat and Seafood | 61% |
| 5. | General Merchandise & HBC | 65% |
| 6. | Tobacco | 78% |
| 7. | Packaged Lunch Meats | 68% |
| 8. | Beer and Wine | 78% |
| 9. | Produce | 60% |
| 10. | Deli | 60% |
| 11. | In Store Bakery | 55% |
| 12. | Fresh Meat | 60% |
| 13. | Fresh Seafood | 60% |
| 14. | Floral | 50% |

3.4.4  *Inventory Certificates; Inventory Closing Statement*.   Upon completion of the valuation of the Inventory for each Store, which shall be completed prior to the completion of Closing, the Buyer and Seller shall execute an Inventory Certificate, which shall contain the Inventory Price for the Inventory at such Store, and shall have incorporated therein a complete listing of the Inventory for such Store.  Following execution of the Inventory Certificates, if requested by Buyer, Seller or Escrow Agent, Buyer and Seller shall execute an Inventory Closing Statement, which shall contain the Inventory Price for the Inventory at such Store and shall otherwise be consistent with the Inventory Certificate, and shall have incorporated therein appropriate disbursement instructions to Escrow Agent.

3.4.5  *Inventory Services and Fees*.   Seller will engage the Inventory Service, but one-half of the fees of the Inventory Service will be billed to and paid by Buyer.  Buyer agrees to pay such fees at Closing or earlier if then due and in any event before delinquent.

3.5   Til Cash Determination.   On the relevant Closing Date, the parties will count the Til Cash at each Store with the assistance of the Inventory Service or

such other Person as they may mutually agree.  The parties' representatives present for such count shall approve, in writing, all computations prior to leaving the Store.  Upon completion of the count of the Til Cash for each Store, which shall be completed prior to the completion of Closing, the Buyer and Seller shall execute a Til Cash Determination Certificate.

3.6    Cooperation and Resolution of Disputes.    The parties agree to be cooperative and reasonable in connection with each Inventory Count and Til Cash Determination and will attempt, in good faith, to resolve any disputes respecting the quantity of Inventory, Excluded Inventory and Excluded Personal Property and amount of Til Cash that may arise during the Inventory Count or Til Cash Determination.    Any disputes that have not been resolved by the completion of Closing shall be separately listed and settled by Buyer Inventory Representative and Seller Inventory Representative with respect to the relevant Store as expeditiously as practicable thereafter or, if the parties cannot agree, by the Bankruptcy Court.  Any such determination of any dispute shall be final and binding on the parties.

3.7    Inventory Relating to Permits.    If by Closing Buyer shall not have obtained any required Permit contemplated by paragraph 10.2 of this Agreement, notwithstanding its commercially reasonable best efforts to do so, any tobacco, beer, wine, pharmaceuticals or other Inventory that under applicable law may not be transferred without such Permit will not be sold and transferred at Closing but will be segregated at the Store, in which case, unless the parties agree otherwise at or before Closing, (a) the relevant items of Inventory will be deemed to constitute Excluded Inventory, (b) the Bill of Sale to be delivered to Buyer at Closing will specifically exclude such Inventory, (c) the Inventory Price will be reduced by the Inventory Price allocable to such Inventory, and (d) Seller will remove such Inventory from the applicable Store in the same manner as other Excluded Property and with reasonable promptness after Closing; provided, however, that in no event shall such Excluded Inventory remain at a Store for more than seven calendar days after the applicable Closing related to such Store.  Notwithstanding the foregoing clause (d), if applicable law or regulation restricts Seller from removing from the Store (or transporting from the Store to a convenient location in which Seller will have continuing operations) any tobacco, beer, wine, pharmaceuticals or other Inventory that constitutes Excluded Property, then (i) Seller will have the right to segregate such Inventory at a secured location in the Store selected by Seller and reasonably acceptable to Buyer, and to maintain and protect such Inventory at such secured location for so long as Seller reasonably requires in order to obtain all Permits necessary to remove or transport such Inventory (or to sell or convey such Inventory to a third party entitled to do so), (ii) Seller will have reasonable access to such secured location to maintain and protect such Inventory and when appropriate remove such Inventory from the Store, and (iii) Seller will have the right but not the obligation to require Buyer to purchase such Inventory, at the Inventory Price allocable to such Inventory, at such time as Buyer has obtained such Permits as are required for Seller to do so; provided that as of such date such segregated

18

Inventory would not then constitute Excluded Inventory (other than by virtue of application of this paragraph 3.7).

3.8    Allocation of Base Purchase Price Among Assets at each Store.    Seller shall have the right to allocate the Base Purchase Price for each Store, for tax purposes and all other purposes, among the Assets at such Store other than Inventory and Supplies (as such Assets are described in paragraph 2.0 of this Agreement); provided, however, that such allocation shall not be binding upon Seller or determinative with respect to any allocation made by Seller of the Base Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case.  The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets at each Store on the applicable Closing Statement.

4.0    **Bankruptcy Court Approval.**

4.1    Condition Precedent.  It shall be a condition precedent to the obligations of each of the parties to this Agreement to consummate the transactions contemplated hereby that the Bankruptcy Court shall have entered after notice and a hearing (as defined in Section 102 of the Bankruptcy Code) the Sale Approval Order, approving the terms and conditions of this Agreement and authorizing Seller to perform all acts necessary to consummate the transactions contemplated hereby.

4.2    Approval of Sale.  Within ten (10) ) Business Days of the date of execution of this Agreement, Seller shall file the Sale Motion with the Bankruptcy Court seeking entry of the Sale Approval Order in the form and substance, in all material respects, of the Sale Approval Order attached hereto as Exhibit I.

4.3    Bankruptcy Court Approval.  Provided that Buyer is determined to have submitted the Successful Bid, Seller will use its reasonable efforts to obtain entry of the Sale Approval Order by July 29, 2005 (the "Outside Sale Approval Order Date"); provided, that Buyer shall be obligated to cooperate in all reasonable respects with such efforts by Seller, and, if and to the extent that the Bankruptcy Court requires the same, shall provide to the Bankruptcy Court with Adequate Assurance Information to the Bankruptcy Court's satisfaction.

4.4    Notices.  The Sale Motion, the notice of the hearing on the Sale Motion and the objection deadline shall, at a minimum, be served by Seller in accordance with Bankruptcy Rules 2002, 6004, 6006, 9014 (or as otherwise provided by the Bankruptcy Court) on all persons required to receive notice under the Bankruptcy Code (as modified by any Orders entered in the Bankruptcy Case), including all persons who have asserted Liens on all or any portion of the Assets, all non-debtor parties to the Leases and Subleases, to the extent that Winn-Dixie has the information in its possession and control, all mortgage lenders on any Real Property, all official committees, and the United States Trustee, including but not limited to:  (a) all local, state and federal taxing