authorities, and all state and federal environmental authorities, having jurisdiction over any of the Assets; and (b) all creditors who have otherwise filed notices of appearance in the Bankruptcy Case. Furthermore, notice of the Sale Motion, the hearing on the Sale Motion and the objection deadline shall be given by Seller by publication of a notice as contemplated by the Bidding Procedures Order.

4.5    Overbids. The Seller shall not accept one or more bids for any or all of the Assets that in the aggregate is not higher or better than the last bid submitted by Buyer for the Assets. Subject to the terms of the Bidding Procedures Order, Buyer shall have the right to overbid any offer or offers determined by Seller to be, in the aggregate, higher or better than the last offer submitted by the Buyer. The Buyer shall be entitled to credit the amount of the Break-Up Fee in making any such overbid.

5.0    **Buyer's Due Diligence.**

5.1    Acknowledgment. In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence regarding the Stores and the Assets and it has had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement. Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Stores and the Assets and to acquire such additional information about the Stores and the Assets as Buyer has reasonably requested. Buyer agrees that any physical access to or investigation of the Stores by Buyer or its representatives shall be reasonable in scope and only performed in the manner contemplated by paragraph 5.4.

5.2    Title. Buyer confirms and acknowledges that Seller has made the Initial Title Reports available to Buyer. Seller has or shall make an additional title report for each Store available to Buyer no less than ten (10) Business Days prior to the Closing in respect of a particular Store with an effective date no earlier than May 1, 2005 (the "Current Title Reports"), and Buyer may negotiate with the Title Insurer to obtain title insurance policies with respect to the Stores (the "Title Policies") at Closing. If any matter set forth in any Current Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present or continued use, value or occupancy of the affected Store as a supermarket, Buyer may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to CatherineIbold@winn-dixie.com within five (5) Business Days of the later of (i) the date such Current Title Report is either delivered to Buyer or posted on the Merrill Website, or (i) the Effective Date. To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #____" with the appropriate Store number set forth). If Buyer timely notifies Seller of any valid objection to any such matter set forth in any Current Title

20

Report with respect to any Store, and if Seller declines or is unable to cure any such objection, then Buyer will have the right to terminate this Agreement with respect to such Store at any time thereafter, with no liability to Seller to pay the portion of the Base Purchase Price attributable to such Store as set forth on the Take Down Allocation or otherwise. The Escrow Agent shall immediately return the Deposit to Buyer attributable to such Store or Stores as set forth on the Take Down Allocation, which return shall operate to terminate this Agreement with respect to such Store or Stores. If Buyer closes the purchase of the Assets with respect to any Store, then Buyer will be deemed to have waived any objection made under this paragraph 5.2 to any matter set forth in the Current Title Report with respect to such Store and such matter shall constitute a Permitted Encumbrance.

5.3  Environmental Reports. Buyer confirms and acknowledges that Seller has made available to Buyer for review on the Merrill Website a separate environmental report prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where the Store the report relates to is located (each, an "Environmental Report"), covering the Real Property relating to the Stores listed on Exhibit M, and Seller shall make additional Environmental Reports available to Seller for each Store not listed on such exhibit prior to the Closings of such Stores. If any matter set forth in any Environmental Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present or continued use, value or occupancy of the affected Store as a supermarket, Buyer may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to Catherinelbold@winn-dixie.com within five (5) Business Days of the later of (i) the date such Environmental Report is either delivered to Buyer or posted on the Merrill Website, or (ii) the Effective Date. To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER ENVIRONMENTAL OBJECTION NOTICE - WINN-DIXIE STORE #____" with the appropriate Store number set forth). If Buyer timely notifies Seller of any objectionable environmental condition set forth in any Environmental Report with respect to any Store, and if Seller declines or is unable to remedy any such condition, then Buyer will have the right to terminate this Agreement with respect to such Store at any time thereafter, with no liability to Seller to pay the portion of the Base Purchase Price attributable to such Store as set forth on the Take Down Allocation or otherwise. The Escrow Agent shall immediately return the Deposit to Buyer attributable to such Store or Stores as set forth on the Take Down Allocation, which return shall operate to terminate this Agreement with respect to such Store or Stores. If Buyer closes the purchase of the Assets with respect to any Store, then Buyer will be deemed to have waived any objection made under this paragraph 5.3 to any matter set forth in the Environmental Report with respect to such Store.

5.4  Investigation. Buyer will at all reasonable times following execution of this Agreement by Seller, and after giving reasonable advance notice to Seller, have

21

the privilege of going upon any of the Real Property with its agents and engineers as reasonably needed to inspect any of the Stores or the Assets, obtain surveys of the Real Property, or perform environmental testing at the Real Property if such testing is, in Buyer's reasonable discretion, warranted based on the Environmental Reports or such other engineering tests or studies as Buyer may reasonably request; provided that Seller may require that all visits include a representative of Seller so long as the presence (or lack thereof) of a Seller representative does not interfere or delay Buyer in its inspection of the Real Property.  Any investigation shall be conducted in a manner that will not unreasonably interfere with the operation of any Store.  Buyer hereby indemnifies and agrees to hold harmless Seller from and against any and all damage to the Real Property and all other assets (including the cost of restoring the Real Property to its pre-entry condition) and injury to any persons caused by Buyer or its agents in the course of exercising Buyer's due diligence rights under this Agreement.  Notwithstanding the preceding sentence, Buyer will have no obligation to indemnify or hold Seller harmless from those claims, demands, liabilities, costs, expenses, penalties, damages and losses arising out of or relating to: (a) the gross negligence or willful misconduct of Seller or any of its Affiliates, subtenants, licensees, employees, agents, officers, or directors, (b) a pre-existing condition of any of the Assets; or (c) the existence of information obtained by Buyer as a result of its investigation.  Such indemnification will survive the expiration or termination of this Agreement and/or the consummation of the transactions contemplated by this Agreement. Notwithstanding anything in this Agreement to the contrary, Buyer shall not conduct (or cause to be conducted) any physically intrusive investigation, examination or study of the Real Property without obtaining the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed.

6.0 **Representations and Warranties of Seller Relating to the Assets.** To induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer, as to each Store on the date hereof and as of the Closing Date applicable to such Store, that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

6.1   On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website: (i) copies of each of the Leases (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a)   copies of the site plans for the Stores;

(b)   copies of the fixture plans for the Stores; and

(c)   a list of Equipment (other than Excluded Personal Property) with respect to each Store as reflected in Seller's current records;

it being understood that the materials described in this paragraph 6.1 have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

6.2 At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Liens other than the Permitted Encumbrances to the extent provided under Section 363 of the Bankruptcy Code.

6.3 To Seller's Knowledge, the Assets are in material compliance with applicable zoning laws as well as any applicable deed restrictions, covenants, conditions, restrictions, easement agreements and any other applicable private land use restrictions, and Seller has not received any written notice of material violation of any of the foregoing that has not been remedied or cured.

6.4 To Seller's Knowledge, except for any Permitted Encumbrances, there are no condemnation, environmental, zoning or other land use regulation proceedings, either instituted or threatened, in writing, that would have a Material Adverse Effect on the use and operation of any Store as a supermarket.

6.5 Exhibit N lists separately all full-time and part-time employees at each Store as of the Effective Date. Exhibit N shall be updated by Seller on or before each Closing in respect of a Store that is not a Closed Store.

7.0 **General Representations and Warranties of Seller.** In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer, as to each Store on the date hereof that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

7.1 Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transactions contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

7.2 No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, (iii) those contemplated by or required under paragraph 3.7 of this Agreement, and (iv) Bankruptcy Court Approval.

23

7.3 Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4 Other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending or, to the Knowledge of Seller, threatened against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a Material Adverse Effect.

7.5 None of the employees employed by Seller in the Stores is covered by a union contract, collective bargaining agreement or other labor agreement.

7.6 Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

7.7 To Seller's Knowledge, entry into this Agreement or any of the closing documents to which Seller is or is to become a party by Seller will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Seller under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Seller is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a Material Adverse Effect.

8.0 **Buyer's Representations and Warranties.** In order to induce Seller to sell the Assets as provided above, BI-LO and SFM represent and warrant to Seller, as applicable, on the date hereof and as of each Closing Date, that:

8.1 BI-LO is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the power and authority to consummate the transaction contemplated hereunder. SFM is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required limited liability company action on behalf of Buyer.

8.2   No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained or will be obtained prior to the applicable Closing Date and are or will be in full force and effect, (ii) approvals, if any, required under the HSR Act, and (iii) those contemplated by or required under paragraph 3.7 of this Agreement.

8.3   This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

8.4   There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

8.5   Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

8.6   As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

9.0   **Covenants of Seller.**   Seller hereby covenants for the benefit of Buyer as follows:

9.1   Seller will (i) use commercially reasonable efforts to maintain the Assets until the relevant Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and, except with respect to any particular Stores in which Store operations were suspended

25

prior to the Effective Date or such Stores that are Closed Stores, will continue operation of the Stores, and (ii) will not sell, dispose of, abandon or remove from any Store any of the Assets or agree to do so except in the ordinary course of business; provided, however, it is expressly acknowledged and understood that, following the Effective Date, Seller will take certain actions to wind up its operations (including related marketing, promotions and advertising) at the relevant Store or Stores and eliminate or remove the Excluded Personal Property in preparation for the relevant Inventory Counts, Closings and the turnover of possession to Buyer.

9.2    Seller will use commercially reasonable efforts to remove all Excluded Personal Property and Excluded Inventory from the Stores on or before the relevant Closing Date, except that Buyer shall remove and dispose of or cover Seller's signs and panels and branded shopping carts that are part of the Excluded Personal Property as more fully provided in paragraph 10.3 of this Agreement.

9.3    On or after the entry of the Sale Approval Order, Seller will release to Buyer a schedule of Seller's current employees at the relevant Store or Stores (but not Closed Stores), and will permit Buyer, at reasonable times during normal business hours and with minimum impact on Seller's business, to arrange for personal interviews with Store managers and other Store employees, at times and places mutually agreeable to both Seller and Buyer, and to arrange for those relevant employees of Seller, who are interested, to interview with Buyer.

9.4    Seller will (except to the extent otherwise required by the Family Medical Leave Act) transfer or terminate all its employees working at each Store on the relevant Closing Date and any Closed Store at such time as it is closed, and bear all costs, if any, of any such transfers or terminations.

9.5    If this Agreement is determined to be the Successful Bid, Seller will use commercially reasonable efforts to obtain the entry of the Sale Approval Order as to the Stores.

9.6    Prior to the Closing, Seller will not cause or permit to be granted any material increase in the salaries, wages, benefits or other compensation payable or to become payable to employees working at the Stores, except for (i) merit and cost-of-living increases in the ordinary course of business and (ii) incentive bonuses or compensation granted by Seller in connection with Seller's winding up of its operations at the Stores.

9.7    Seller will cooperate reasonably with Buyer, upon written request, with respect to Buyer's performance of its covenants under paragraph 10.2 of this Agreement.

9.8    With respect to each Store, from the Effective Date through and including the Closing Date for such Store, Seller will comply at all times in all material

respects with its postpetition obligations under any applicable Lease and Sublease.

9.9 Seller will not place any Liens on the Assets that would survive the Closing or take any action that would cause Seller to be unable to perform its obligations under this Agreement (other than in connection with the discharge of its fiduciary duties, including considering higher or better bids for the Assets).

9.10 Seller will maintain insurance coverage (including fire and general liability insurance) for each Store on substantially the same terms and conditions as all other similarly situated supermarkets maintained by Seller.

9.11 Seller will pay all postpetition real estate and ad valorem property taxes when due and owing with respect to the ownership and operation of each of the Stores.

9.12 Except as contemplated by this Agreement to the contrary, Seller will operate the business conducted at the Stores generally consistent with past practice since the Filing Date and substantially in compliance with all applicable laws.

9.13 Seller shall close each Closed Store prior to the Closing Date for such Store.

9.14 Seller shall use its commercially reasonable efforts to obtain a Landlord Estoppel Certificate in the form of <u>Exhibit J</u> with respect to each Lease (without any adverse terms, limitations or conditions).

9.15 Seller shall use its commercially reasonable efforts to obtain a SNDA in favor of the applicable Buyer in the form of <u>Exhibit K</u> with respect to each mortgage, deed to secure debt of similar instrument encumbering any assigned Real Property (without any adverse terms, limitations or conditions).

9.16 Seller shall use its commercially reasonable efforts to have Title Insurer unconditionally commit to issue to Buyer, upon payment of the regular premiums therefor, ALTA leasehold title insurance policies ensuring Buyer has fee simple leasehold title to the Real Property pursuant to the Leases, free and clear of all Liens other than the Permitted Encumbrances.

10.0 **Covenants of Buyer.** Buyer for itself hereby covenants for the benefit of Seller as follows:

10.1 Buyer will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with each Closing and the issuance of the Title Policies, if any such policies are so requested by Buyer.

10.2 Buyer will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of

the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 12 of this Agreement, including without limitation all Permits necessary for Seller to sell and Buyer to buy the Inventory and the Pharmacy Scrips.

10.3   Within forty-eight (48) hours after the relevant Closing Date, Buyer shall, at Buyer's sole cost and expense, (i) either (A) remove from the Stores, destroy and lawfully dispose of, or (B) cover, all signs and panels that are part of the Excluded Personal Property, and (ii) either (A) remove from the Stores and lawfully dispose of all branded shopping carts or (B) remove all trademarks, trade names, logos and designs of Seller, Winn-Dixie or their Affiliates from all shopping carts and destroy and lawfully dispose of all such trademarks, trade names, logos and designs.  In the event Buyer covers signs and panels pursuant to clause (i)(B), Buyer shall remove from the Stores, destroy and lawfully dispose of such covered signs and panels within 30 days after the relevant Closing Date. Without limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 17.5 of this Agreement shall encompass any breach by Buyer of this paragraph 10.3.

10.4   Buyer will hire at least 80% of all qualified employees at each of the Stores that it acquires that is not a Closed Store.  No later than two business days prior to Closing Buyer will deliver to Seller, in writing, a list identifying all employees of Seller who have been hired by Buyer, or to whom offers of employment have been made by Buyer.  Buyer will have access to all employees of the Stores at all reasonable times, and after giving reasonable advance notice to Seller, for the purposes of meeting and interviewing Store employees; provided, that no such interviews will take place with employees of a Store until after this Agreement has been selected as the Successful Bid with respect to such Store or Stores.

10.5   Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

10.6   Buyer will use commercially reasonable efforts to obtain the entry of the Sale Approval Order as to the Stores, including by providing Adequate Assurance Information to Seller, the Bankruptcy Court, Landlords and Subtenants as may be reasonably requested.

11.0   **Conditions Precedent to Buyer's Obligations.**  The obligations of Buyer under this Agreement as to each Store are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement relating to such Store, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

28

11.1   Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard.  Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of paragraph 6.1 of this Agreement), all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date and all of Seller's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date.  A duly authorized officer of Seller shall have delivered to Buyer an officer's certificate certifying to the foregoing.

11.2   No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to any Store will be in effect.

11.3   The Bidding Procedures Order shall not have been amended, modified, rescinded, reversed, stayed, superceded or vacated in any material respect.

11.4   The Sale Approval Order with respect to each Store shall have been entered by the Bankruptcy Court and shall not have been vacated, reversed, stayed or amended.

11.5   The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

11.6   Seller shall have made available to Buyer for review on the Merrill Website the Current Title Report for each Store not posted to the Merrill Website as of the date hereof and listed on Exhibit L hereto and that is the subject of such Closing.

11.7   Seller shall have made available to Buyer for review on the Merrill Website any Environmental Report for a Store not posted to the Merrill Website as of the date hereof and listed on Exhibit M hereto and that is the subject of such Closing.

11.8   Seller shall have executed and delivered the Inventory Certificate for a Store that is the subject of such Closing.

11.9   Seller shall have executed and delivered the Til Cash Determination Certificate for a Store that is the subject of such Closing.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer shall have the right to terminate this Agreement pursuant to paragraph 16.1.4 of this Agreement; provided, however, that if any of

the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 17 of this Agreement rather than pursuant to paragraph 16.1.4.

12.0   **Conditions Precedent to Seller's Obligations.** The obligations of Seller under this Agreement as to each Store are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement relating to such Store, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

12.1   Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard. All of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date; and all of Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date.

12.2   No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

12.3   The Sale Approval Order with respect to each Store shall have been entered by the Bankruptcy Court and shall not have been vacated, reversed, stayed or amended.

12.4   The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

12.5   Buyer shall have executed and delivered the Inventory Certificate.

12.6   Buyer shall have executed and delivered the Til Cash Determination Certificate.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller shall have the right to terminate this Agreement pursuant to paragraph 16.1.5 of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and

obligations, including any right of termination, shall be determined in accordance with paragraph 17 of this Agreement rather than pursuant to paragraph 16.1.5.

13.0  **Loss by Fire or Other Casualty; Condemnation.** In the event that, prior to a Closing, any Store, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with any Store, either party will have the right, exercisable by giving notice of such decision to the other within five (5) Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement as to the Store affected by such loss, and thereafter none of the parties will have any further rights or obligations hereunder as to such Store and Buyer shall have no obligation to pay the portion of the Base Purchase Price attributable to such Store as set forth on the Take Down Allocation; provided, however, that this Agreement will be a continuing obligation of the parties as to the Stores not affected by such termination; provided further, however, that, if Buyer is not in breach of this Agreement, Buyer will be entitled to the immediate return from the Escrow Agent of the Deposit attributable to such Store or Stores as set forth on the Take Down Allocation. If neither party exercises its right of termination with respect to any Store affected by such casualty or proceeding and the Store is sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

14.0  **Possession.** Seller will turn over to Buyer exclusive physical possession of each Store and the Assets associated therewith (including, to the extent in Seller's possession, control or custody) all keys, combinations to safes, security codes and passwords, on the Closing Date upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Buyer to transfer to Seller, the entire Base Purchase Price, Inventory Price and the Supplies Price with respect to such Store. After conclusion of the Inventory Count for each Store and upon Seller's receipt of such written confirmation from Escrow Agent for such Store, Buyer may commence preparation for opening of such Store as a Buyer's store including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and commencing electrical and wiring work required in order to install Buyer's point of sale and other equipment, signage, and similar items.

15.0  **Closings.**

15.1  The Closing for each Store (which may occur on the same date as Closings for other Stores) will occur on the Closing Date for such Store as set forth in the applicable Closing Notice. The Closings will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from

31

escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement. Subject to the applicable Closing Notice, Closings for all of the Stores shall have occurred by the later of (the "<u>Final Closing Date</u>") September 2, 2005 and 30 days after the entry of the Sale Approval Order. A tentative Closing Schedule is set forth on Exhibit A-4.

15.2   On or before the Real Property Escrow Date for each Store, Seller will, subject to the conditions contained in <u>paragraph 12</u> of this Agreement, deliver the following ("<u>Seller's Escrowed Items</u>") to Escrow Agent:

(i)   Two counterparts of the relevant Lease Assignment, in recordable form, substantially in the form of <u>Exhibit G</u> to this Agreement (the "<u>Conveyance Instrument</u>"), executed by Seller;

(ii)   The relevant Bill of Sale, executed by Seller;

(iii)   Two counterparts of the relevant Closing Statement, executed by Seller;

(iv)   Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion;

(v)   An executed certificate of an officer of Seller issued to Buyer relating to each of the applicable Stores relating to satisfaction of the conditions under <u>paragraph 11.1</u>;

(vi)   If received by Seller, a Landlord Estoppel Certificate with respect to each Lease being assigned;

(vii)   If received by Seller, an SNDA with respect to each Lease being assigned; and

(viii)   Any other documents, instruments or agreements called for hereunder for delivery by Seller with respect to such Store that have not previously been delivered.

Buyer may waive compliance by Seller as to any of the foregoing items in a manner permitted by <u>paragraph 18.7</u> of this Agreement. Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent, will not be deemed to be an acknowledgement by Seller that the conditions of <u>paragraph 12</u> of this Agreement have been fulfilled or waived until Seller Delivery Confirmation. The "<u>Seller Delivery Confirmation</u>" will mean the later of (A) the relevant Real Property Escrow Date and (B) Seller's delivery to Escrow Agent, by

32

original counterpart or telecopy, of Seller's written confirmation that that the conditions of paragraph 12 of this Agreement have been fulfilled or waived. In any event such delivery and notice shall be subject to any circumstances that may affect such conditions between Seller Delivery Confirmation and the related Closing Date.

15.3   On or before the Real Property Escrow Date for each Store or Stores, Buyer will, subject to the conditions contained in paragraph 11 of this Agreement, deliver the following ("Buyer's Escrowed Items") to Escrow Agent:

(i)   Two counterparts of the relevant Conveyance Instrument, executed by Buyer;

(ii)   Two counterparts of the relevant Closing Statement, executed by Buyer;

(iii)   Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof;

(iv)   An executed certificate of an officer of Buyer issued to Seller relating to satisfaction of the conditions under paragraph 12.1;

(v)   Any other document, instrument or agreement called for hereunder for delivery by Buyer that has not previously been delivered; and

(vi)   All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to paragraph 3 of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by paragraph 18.7 of this Agreement. Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will be deemed to be an acknowledgement by Buyer that the conditions of paragraph 11 of this Agreement have been fulfilled as of the Real Property Escrow Date, subject to any circumstances that may affect such conditions between the Real Property Escrow Date and the related Closing Date.

15.4   At the Closing for each Store or Stores, Seller will, subject to the conditions contained in paragraph 12 of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in paragraph 11 of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items to Seller.

15.5   On each Closing Date, Seller and Buyer will each deposit such other instruments with the Title Insurer as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the relevant Assets in accordance with the terms hereof; provided, however, that in no event shall

Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

15.6   Except as provided in paragraph 16.3 or 17 of this Agreement, at or before Closing for each Store or Stores, or if Closing does not occur due to earlier termination of this Agreement in accordance with its terms with respect to any Store or Stores, (i) Seller will pay Seller's Closing Costs relating to such Store or Stores; and (ii) Buyer will pay Buyer's Closing Costs relating to such Store or Stores.

16.0   **Termination.**

16.1   Termination. This Agreement may be terminated, and the transactions contemplated hereby abandoned, as to any or all Stores not the subject of a completed Closing, only as follows:

16.1.1 by written consent of Seller and Buyer;

16.1.2 at the election of Seller if and to the extent permitted under paragraph 17.1 of this Agreement;

16.1.3 at the election of Buyer if and to the extent permitted under paragraph 5.2, 5.3 or 17.2 of this Agreement;

16.1.4 at the election of Buyer if any of the conditions set forth in paragraph 11 of this Agreement has not been satisfied or waived by Buyer on or before the Outside Date;

16.1.5 at the election of Seller if any of the conditions set forth in paragraph 12 of this Agreement has not been satisfied or waived by Seller on or before the Outside Date;

16.1.6 at the election of Buyer or Seller as provided in paragraph 13 of this Agreement;

16.1.7 at the election of Seller if the Cure Costs with respect to any Lease exceed 15% of the Base Purchase Price for the relevant Store, as shown on the Take Down Allocation provided that in such case Seller may terminate this Agreement pursuant to this paragraph 16.1.7 only with respect to such Store unless Buyer agrees to pay the excess of 15% of the Base Purchase Price of the relevant Store;

16.1.8 at the election of Buyer or Seller if the Sale Approval Order is not entered on or before August 30, 2005;

34

16.1.9      [INTENTIONALLY DELETED];

16.1.10     [INTENTIONALLY DELETED];or

16.1.11     By Buyer or Seller at any time (i) after Seller accepts an Upset Purchase Agreement from an Upset Purchaser, or (ii) if a plan of reorganization or liquidation that is inconsistent with this Agreement or the Bidding Procedures Order is filed in the Bankruptcy Case by Seller.

16.2 Effect of Termination.

16.2.1 In the event of a termination of this Agreement by the parties pursuant to paragraph 16.1.1, there shall be no liability by either Buyer or Seller to the other.

16.2.2 In the event of a termination of this Agreement by one of the parties pursuant to paragraph 16.1.2 or 16.1.3, there shall be no liability by either Buyer or Seller to the other, except as provided in paragraphs 17.1 or 17.2.

16.2.3 In the event of a termination of this Agreement by Buyer pursuant to paragraph 16.1.4, 16.1.6, 16.1.8, or 16.1.11, the Escrow Agent shall immediately return the Base Deposit attributable to all terminated Store or Stores as set forth on the Take Down Allocation to Buyer, and Buyer shall have no obligation to pay the portion of the Base Purchase Price attributable to all terminated Store or Stores as set forth on the Take Down Allocation. In the case of a termination under Section 16.1.11, Seller shall also pay any amounts payable to Buyer under paragraph 16.3.

16.2.4 In the event of a termination of this Agreement by Seller pursuant to paragraph 16.1.5, 16.1.6, 16.1.7, 16.1.8, or 16.1.11, the Escrow Agent shall immediately return the Base Deposit attributable to all terminated Store or Stores as set forth on the Take Down Allocation to Buyer, and Buyer shall have no obligation to pay the portion of the Base Purchase Price attributable to all terminated Store or Stores as set forth on the Take Down Allocation. In the case of a termination under Section 16.1.11, Seller shall also pay any amounts payable to Buyer under paragraph 16.3.

16.2.5 If this Agreement is terminated with respect to any Store or Stores for any reason, then, as to the Store or Stores affected by such termination, all materials provided by Seller to Buyer and all materials relating to the relevant Assets obtained by Buyer and all copies of any such materials will be delivered to Seller within 5 Business Days following termination. This paragraph shall not in

any way limit Buyer's duties to Seller or Winn-Dixie under the Confidentiality Agreement.

16.2.6 Upon any termination of this Agreement with respect to any Store or Stores pursuant to paragraph 16 of this Agreement, each party will retain those rights (if any) it may have under paragraph 17 of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

16.3 Break-up Fee.

16.3.1 Seller shall be obligated to pay Buyer a termination fee (the "Break-up Fee") in an amount equal to $270,000 (three percent (3%) of the Base Purchase Price if Seller accepts an agreement (an "Upset Purchase Agreement") from a third party (the "Upset Purchaser") to consummate a sale for all or any portion of the Assets, or otherwise designates a bid received at the conclusion of any auction for some or all of the Assets from an Upset Purchaser as the highest or best bid for the Assets.

16.3.2 The Break-up Fee shall be payable as an allowed super-priority administrative expense under Sections 503 and 507 of the Bankruptcy Code. The Break-up Fee shall be paid within five (5) Business Days of the execution of an Upset Purchase Agreement. When payable as provided above, Seller shall cause the Break-up Fee to be paid to Buyer by wire transfer from immediately available funds to an account designated by Buyer.

17.0 **Default and Remedies.**

17.1 Buyer's Default. If, at any time, there exists an uncured material breach of this Agreement by the Buyer, then Seller shall be entitled, as its sole and exclusive remedy for such uncured material breach, (A) (i) to terminate this Agreement or (ii) to terminate this Agreement with respect to all of the Stores which, on the date of such election, are still owned by Seller (the Store or Stores as to which this Agreement is terminated under clause (i) or (ii) being the "Terminated Stores"), and (B) to receive the Deposit attributable to all Terminated Stores as set forth on the Take Down Allocation (collectively, the "Liquidated Deposit") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof. Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity. Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages. The right to receive the Liquidated Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of an

36

uncured material breach of this Agreement by Buyer with respect to the Terminated Stores, and Seller hereby waives and releases any right to (and Seller hereby covenants that it shall not) sue Buyer with respect to the Terminated Stores: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit. Buyer hereby waives and releases any right to (and hereby covenants that it shall not) sue Seller or seek or claim a refund of the Liquidated Deposit (or any part thereof) on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages. This paragraph 17.1 is subject to paragraph 17.4 of this Agreement.

17.2  Default by Seller. If, at any time, there exists an uncured material breach of this Agreement by Seller, then Buyer shall, if such breach is not cured within five Business Days after written notice of such breach is given to Seller, as its sole and exclusive remedy for such uncured breach, have the right to terminate this Agreement and receive the immediate return of the Deposit which return shall operate to terminate this Agreement with respect to such Store or Stores and release Seller from any and all liability under this Agreement with respect to such Store or Stores. Buyer expressly waives and releases (i) any right to seek specific performance of Seller's obligations under this Agreement and (ii) any right to seek or collect any damages, including any actual, consequential, speculative, remote or punitive damages. This paragraph 17.2 is subject to paragraph 17.4 of this Agreement.

17.3  Notice of Default; Opportunity to Cure. Neither Seller nor Buyer shall be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within 5 Business Days after receipt of such notice; provided, however, that this paragraph 17.3 (i) shall not be applicable to Buyer's failure to deliver the Base Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Real Property Escrow Date or the Closing Date for any Store or Stores and, accordingly, and (ii) shall not have the effect of extending the Closing Date or the due date of the Base Deposit.

17.4  Recoverable Damages. In no event shall the provisions of paragraphs 17.1 and 17.2 of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to, a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreement and paragraphs 5.4, 17.5 and 18.4 of this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees or expenses under the Confidentiality Agreement and paragraph 3.3.4 of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs. In addition, if this Agreement is terminated for any reason with respect to any one or more Stores

or in its entirety, and Buyer or any Affiliate of Buyer asserts any claim or right to any Asset that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to any Asset, then Seller shall have all rights and remedies available at law or in equity with respect to such assertion by Buyer and any loss, damage or other consequence suffered by Seller as a result of such assertion.

17.5  **Buyer Indemnification of Seller.**  Buyer shall indemnify and save and hold harmless Seller and its Affiliates and representatives, from and against any and all costs, losses liabilities, damages, lawsuits, deficiencies, claims and expenses (whether or not arising out of third-party claims) including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (herein, the "Damages") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by Buyer (including any payment obligation), or the inaccuracy of any representation made by Buyer in or pursuant to this Agreement or other transaction documents, (b) any liability, obligation or commitment of any nature (absolute, accrued, contingent or otherwise) of Buyer that is due to or arises in connection with Buyer's acts or omissions prior to, on or after a Closing Date, including any claim, liability, or obligation that is assumed by Buyer pursuant to this Agreement or in any transaction documents signed by Buyer. Notwithstanding the foregoing, Buyer shall not be liable for any matter (i) with respect to which Seller has not given Buyer written notice within a reasonable period of time following Seller's receiving written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a material adverse effect on Buyer), or (ii) that is due Seller's acts or omissions. The provisions of this paragraph 17.5 shall cover all obligations and liabilities of whatsoever kind, nature or description relating, directly or indirectly, to product liability, third party litigation or third party claims against Buyer or Seller in connection with, arising out of, or relating to the Assets. This paragraph 17.5 shall survive the Closings or earlier termination of this Agreement.

18.0  **Miscellaneous.**

18.1  **Transition of Pharmacy Scrips.**  Seller and the Buyer shall cooperate with each other and shall use their reasonable best efforts in order to cause the timely transfer of the Pharmacy Scrips at a Store and included in the Assets so that the Buyer can incorporate such information into the Buyer's data processing systems and records on the Closing Date for such Store. Buyer shall retain a copy of all such Pharmacy Scrips for at least six (6) months after the applicable Closing Date. To the extent permissible under applicable law, Seller shall provide Buyer with reasonable access upon reasonable notice to inspect such Pharmacy Scrips at its expense.

18.2  **Notices.**  All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the

38

requirements of this paragraph 18.2 and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller, Winn-Dixie or any of their respective Affiliates:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn: Chief Financial Officer
Telefax No. 904 783 5646
e-mail: *bennettnussbaum@winn-dixie.com*

With a copy to:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn: Office of General Counsel
Telefax No. 904 783 5651
e-mail: *larryappel@winn-dixie.com*

and

King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia 30303
Attn: Timothy N. Tucker
Telefax No. 404-572-5148
e-mail: *ttucker@kslaw.com*

If to Buyer, to each of:

BI-LO, LLC