ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made effective as July 20, 2005 (the "Effective Date"), by and between

WINN-DIXIE STORES, INC., a Florida corporation ("Seller"), and

WAL-MART STORES, INC., a Delaware corporation, or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

RECITALS:

A.     Seller is the tenant of a supermarket store (the "Store"), which is listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under the lease, including amendments thereto (the "Lease") described on Exhibit A-2 to this Agreement. The Store occupies the leased premises as described in the Lease (the "Leased Premises"), within the parcel of real property described on Exhibit A-2 to this Agreement associated with the Lease. Seller's leasehold interest in the Leased Premises pursuant to the Lease, together with those additional items described in paragraph 2.1 of this Agreement relating to the Leased Premises, hereinafter collectively are referred to as the "Assets."

B.     Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.     Buyer intends to use the Store as a prototypical "Neighborhood Markets" store operated by Wal-Mart, which may include the sale of groceries, general merchandise and related items (the "Use").

D.     Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no. 05-03817-3F1 (the "Bankruptcy Case").

IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS of the parties hereto, it is agreed as follows:

1.0     **Defined Terms.**  Capitalized terms as used in this Agreement will have the following meanings when used herein.

"Adequate Assurance Information" will mean financial and other information provided by Buyer in connection with this Agreement, and any other information

as may be reasonably requested by Seller to demonstrate to the Bankruptcy Court that Landlord is adequately assured of Buyer's future performance under the Lease, as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's obligations under the Lease by an Affiliate of Buyer with sufficient assets to provide adequate assurance of future performance.

1.2.  "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3.  "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4.  "Approval Hearing" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.5.  "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.6.  "Bankruptcy Code" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

1.7.  "Bankruptcy Court" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

1.8.  "Bankruptcy Court Approval" will mean the entry of the Sale Order with respect to the Store by the Bankruptcy Court.

1.9.  "Bankruptcy Case" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

1.10.  "Bidding Procedures" will mean the procedures approved by the Bankruptcy Court that will govern the selection by Seller of the Successful Bid for the Store.

1.11.  "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at Closing the Improvements relating to the Store.

1.12.  "Building" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.13.  "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.14.  "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

1.15.  "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs,

including title examination fees and title insurance premiums for the Title Policy (and the cost of any simultaneous issue mortgagee title insurance policy and any loan-related title insurance endorsements thereon); (d) recording fees payable in connection with recording the Conveyance Instrument in the appropriate public records; (e) cost of the Environmental Report, including any supplements or updates, not to exceed $1,500.00, provided that Buyer receives a "reliance letter" from the issuer of the Environmental Report on or before Closing; (f) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the note and mortgage; and (g) the fees and costs of the Closing Escrow Agent.

1.16.  "<u>Buyer's Escrowed Items</u>" will have the meaning assigned in <u>paragraph 14.3</u> of this Agreement.

1.17.  "<u>Closing</u>" will mean the consummation of the assignment, assumption, sale and purchase of the Assets pursuant to this Agreement as indicated by delivery of the Conveyance Instrument and other documents contemplated by <u>paragraph 14</u> of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.18.  "<u>Closing Date</u>" will mean the date designated by Seller in writing, and reasonably acceptable to Buyer, following the Bankruptcy Court Approval with respect to the Store, but no later than the Outside Date.

1.19.  "<u>Closing Statement</u>" will mean a statement in the form of <u>Exhibit C</u> to this Agreement (or in such other form as is prepared by Seller and reasonable acceptable to Buyer) reflecting the net amount due Seller at Closing, after making the adjustments described in <u>paragraph 3.3.2</u> of this Agreement and in other provisions of this Agreement.

1.20.  "<u>Confidentiality Agreement</u>" will mean the existing letter agreement between Seller and Buyer, as modified, regarding, among other things, confidentiality relating to the subject matter of this Agreement.

1.21.  "<u>Conveyance Instrument</u>" will have the meaning assigned in <u>paragraph 14.2</u> of this Agreement.

1.22.  "<u>Credit Agreement Liens</u>" will mean liens and encumbrances created by Seller pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Seller and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Seller in connection with such Credit Agreement.

1.23.  "<u>Cure Costs</u>" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Lease.

1.24.  "<u>Damages</u>" will have the meaning assigned in <u>paragraph 16.5</u> of this Agreement.

1.25.   Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.26.   "Due Diligence Materials" will mean, collectively, (i) the Lease, the Sublease (if any), the Title Reports and the Environmental Report, (ii) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, on the Merrill Website, or otherwise prior to the date hereof and (iii) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.27.   "Effective Date" will have the meaning assigned in the initial paragraph of this Agreement.

1.28.   "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.29.   "Equipment" will mean Seller's trade fixtures and equipment located in the Building.

1.30.   "Escrow Agent" will mean Title Insurer, acting as escrow and closing agent.

1.31.   "Filing Date" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

1.32.   "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.33.   "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.34.   "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.35.   "Initial Title Report" will mean that certain title report issued by Lawyers Title Insurance Corporation and dated as of May 20, 2005 with respect to the Store that Seller has made available to Buyer for review on the Merrill Website as of the Effective Date. Buyer understands that such Initial Title Report may cover property in addition to the Real Property, insure the interests of parties other than Seller, or reflect Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.36.   "Inventory" will mean all inventories of goods and merchandise within the Store and owned by Seller and held for resale in the ordinary course of business of Seller conducted at the Store to retail customers.

1.37.   "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of

Robert Bray, Vice President, Real Estate, without any requirement of investigation or inquiry.

1.38. "Landlord" will mean the lessor under the Lease.

1.39. "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.40. "Lease" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.41. "Liquidated Deposit" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.42. "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Store for its current use or for Buyer's contemplated Use, taken as a whole, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Seller's Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.43. "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Jaguar" with respect to the disposition of the Store and other properties.

1.44. "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on the Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under the Lease or on any other Assets; (D) judgments that have attached to and become a lien against Seller's interest under the Lease or on any other Assets; and (E) any other liens against the Real Property that can be cured by the payment of money.

1.45. "ordinary course of business" means the ordinary course of business of Seller after the Filing Date.

1.46. "Outside Date" means September 30, 2005, as such date may be extended by the written agreement of Seller and Buyer; provided that Seller may elect to extend the Outside Date until October 15, 2005 by providing written notice to Buyer in the manner contemplated by Section 17.1.

1.47. "Permits" will have the meaning assigned in paragraph 6.2 of this Agreement.

1.48. "Permitted Encumbrances" will mean (i) all matters listed on Exhibit D to this Agreement, (ii) all other matters set forth as exceptions in the Initial Title Report, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in any additional Title Reports, other than Monetary Liens.

1.49. "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.50. "Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.51. "Real Property" will mean the Leased Premises and the Improvements together.

1.52. "Sale Order" will mean an order of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby.

1.53. "Seller" will have the meaning assigned in the initial paragraph of this Agreement.

1.54. "Seller's Brokers" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.55. "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; and (c) the Cure Costs.

1.56. "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.57. "Store" will have the meaning assigned in paragraph A of the Recitals to this Agreement with the indicated number listed on Exhibit A-1 to this Agreement.

1.58.   "Sublease" will mean the sublease of a portion of the Leased Premises listed on Exhibit A-5 to this Agreement, including amendments.

1.59.   "Subtenant" will mean the subtenant or sublessee under the Sublease.

1.60.   "Successful Bid" will mean the highest or otherwise best offer to purchase the Assets, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.61.   "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the preparation or merchandising of Inventory, located within the Store and owned by Seller.

1.62.   "Title Reports" will mean, collectively, (i) the Initial Title Report and (ii) any additional title reports and/or title insurance commitments with respect to the Store that Seller has made available to Buyer for review on the Merrill Website (with written notice thereof delivered to Buyer) or any update of any such reports obtained by Buyer.

1.63.   "Title Insurer" will mean First American Title Insurance Company or Near North National Title LLC, as agent for Lawyers Title Insurance Corporation, or any other nationally recognized title insurance company, as designated by Seller.

1.64.   "Title Policy" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.65.   "Use" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

## 2.0   Property Included in Sale.

2.1.   Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets, which are comprised of the following:

2.1.1   Seller's interest, as tenant, under the Lease and Seller's interest in any leasehold improvements;

2.1.2   Seller's interest in all fixtures (other than the Equipment) located in the Store building now existing on the Leased Premises (the "Building"), including, but not limited to Seller's interest in heating and air conditioning systems, facilities used to provide any utility services or other similar services to the Building, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures and flooring (collectively, the "Improvements"); and

2.1.3   to the extent transferable, any liquor license held by Seller with respect to the Store.

2.2.   Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are (a) subject to higher or otherwise better offers for the Assets pursuant to the Bidding Procedures, and (b) conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

## 3.0   Purchase Price.

3.1.   Amount. The purchase price to be paid by Buyer to Seller for the Assets is Two Million Fifty Thousand and No/100 Dollars ($2,050,000.00) (the "Purchase Price").

3.2.   Contract Consideration and Deposit. In accordance with the Bidding Procedures, Buyer has delivered, as of the Effective Date, to Escrow Agent, a base earnest money deposit with respect to the Store in the amount of Two Hundred Five Thousand and No/100 Dollars ($205,000.00) (the "Deposit"). The Deposit will be subject to refund to Buyer to the extent and in the circumstances described herein, including paragraphs 12, 15 and 16. The Deposit will be credited against the Purchase Price at Closing and will be held in an interest-bearing escrow account maintained by Escrow Agent prior to Closing. Whenever used herein, the term Deposit also will be deemed to include all interest accrued thereon; however, for state and federal income tax purposes, interest, if any, accrued on the Deposit will be deemed earned by Buyer. Buyer's federal taxpayer identification number (FEIN) is 71-0415188.

3.3.   Payment. The Purchase Price will be paid in the following manner:

3.3.1   *Purchase Price*. On the Closing Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Purchase Price (less the Deposit and with any adjustments with respect to the Purchase Price contemplated by the Closing Statement), and will, subject to the conditions set forth in paragraph 10 of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Purchase Price (as so adjusted) to Seller (by wire transfer to an account designated in writing by Seller).

3.3.2   *Certain Transaction Costs*. All relevant rent, taxes (including real and personal property taxes), utilities, and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Purchase Price payable at Closing to the extent thereof. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing

Statement will be taken into account at Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.3.2 which apply to the period after Closing shall survive Closing.

3.3.3    *Sales Tax*. Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. This paragraph 3.3.3 shall survive the Closing.

3.4.    Allocation of Purchase Price Among Assets. Seller shall have the right to allocate the Purchase Price, for tax purposes and all other purposes, among the Assets; provided, however, that such allocation shall not be binding upon Seller or determinative with respect to any allocation made by Seller of the Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case. The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets on the Closing Statement.

## 4.0    **Buyer's Due Diligence.**

4.1.    Acknowledgment. In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence, through access to the Merrill Website, regarding the Store and the Assets and it has had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement. Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Store and the Assets and to acquire such additional information about the Store and the Assets as Buyer has reasonably requested. Buyer agrees that any physical access to or investigation of the Store by Buyer or its representatives shall be reasonably limited by and shall comply in all respects with the reasonable written instructions and requirements of Seller.

4.2.    Title. Buyer confirms and acknowledges that Seller has made the Initial Title Report available to Buyer, and may make additional Title Reports available to Buyer, and Buyer may negotiate with the Title Insurer, or another title insurer of its choosing, to obtain a title insurance policy with respect to the Store (the "Title Policy") at Closing. If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with Buyer's proposed use or occupancy of the Store for the Use,

Buyer may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to CatherineIbold@winn-dixie.com within three business days of the date such additional Title Report is either delivered to Buyer or posted on the Merrill Website (with written notice thereof delivered to Buyer). To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #739". If Buyer timely notifies Seller of any valid objection to any such matter set forth in any additional Title Report, and if Seller declines or is unable to cure any such objection prior to the Closing Date, then Buyer will have the right to terminate this Agreement on or prior to the Closing Date and receive the Deposit, with no liability to Buyer. If Buyer closes the purchase of the Assets, then Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter, other than a Monetary Lien, set forth as an exception in an additional Title Report for which notice has been provided in accordance with this paragraph 4.2, and such matter shall constitute a Permitted Encumbrance.

4.3.    Environmental Reports. Buyer confirms and acknowledges that Seller has made available to Buyer for review on the Merrill Website that certain Phase I Environmental Site Assessment Report, dated as of June 1, 2005, issued by Aerostar Environmental Services, Inc. and that certain Phase I Environmental Site Assessment Report, dated as of June 24, 2005, issued by Aerostar Environmental Services, Inc. (collectively, the "Environmental Report"), covering the Real Property relating to the Store.

5.0    **Representations and Warranties of Seller Relating to the Assets.** To induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

5.1.    On or prior to the Effective Date, Seller has made available to Buyer for review on the Merrill Website: (i) a copy of the Lease (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a)    A copy of the site plan for the Store;

(b)    A copy of the fixture plan for the Store; and

(c)    A summary of the exclusive use clauses granted to Ross Department Stores and Service Merchandise, as provided by Landlord to Seller, a copy of which is attached to this Agreement as Exhibit A-3;

it being understood that the materials described in this paragraph 5.1 have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

-10-

5.2.   At Closing, Seller will own and convey the Assets free and clear of all Liens and Claims as hereinafter defined, including all Monetary Liens, other than the Permitted Encumbrances, as provided in the Sale Order.

6.0   **General Representations and Warranties of Seller.** In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

6.1.   Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

6.2.   No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) any governmental authorizations required in connection with the transfer of Seller's liquor license with respect to the Store and to the extent such license is transferable; (iii) approvals, if any, required under the HSR Act; and (iv) Bankruptcy Court Approval.

6.3.   Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.4.   Other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending or, to the Knowledge of Seller, threatened against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a Material Adverse Effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

-11-

6.5.    None of the employees employed by Seller in the Store is covered by a union contract, collective bargaining agreement or other labor agreement.

6.6.    Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

6.7.    Except for the Sublease pursuant to which the Subtenant occupies the Store, which Sublease shall be terminated or rejected pursuant to the terms hereof, there are no other occupancies, including any licensee pursuant to a license, of the Leased Premises, for which Buyer will be responsible or which will survive Closing.

7.0    **Buyer's Representations and Warranties.** Buyer represents and warrants to Seller as follows:

7.1.    Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required action on behalf of Buyer.

7.2.    No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated.

7.3.    This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4.    There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

7.5.    Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or

other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

7.6.     As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

8.0     **Covenants of Seller.** Seller hereby covenants for the benefit of Buyer as follows:

8.1.     Seller will (i) use commercially reasonable efforts to maintain the Assets until the Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, (ii) will not sell, dispose of, abandon or remove from the Store any of the Assets or agree to do so; provided, however, it is expressly acknowledged and understood that following the Effective Date, and prior to the Closing Date, Seller shall wind up its operations (including related marketing, promotions and advertising) at the Store and to eliminate or remove the Inventory, Equipment and Supplies from the Leased Premises in preparation for Closing and the turnover of possession to Buyer.

8.2.     Seller shall deliver possession of the Store to Buyer at Closing in a broom clean condition, with all Inventory, Equipment, Supplies and any other personal property not a part of the Assets removed therefrom.   To the extent that any Inventory, Equipment, Supplies or such other personal property remains at the Real Property at Closing, Buyer shall have the right to remove same from the Real Property at Seller's sole cost and expense. The provisions of this paragraph 8.2 shall survive Closing.

8.3.     To the extent transferable, Seller shall transfer any liquor license pertaining to the Store to Buyer at Closing.

8.4.     Seller will transfer or terminate all its employees working at the Store, effective on or prior to the Closing Date.

8.5.     If this Agreement is determined to be the Successful Bid, Seller will use commercially reasonable efforts to obtain the entry of a Sale Order.

8.6.     From the Effective Date through and including the Closing Date, Seller will comply at all times in all material respects with its post-petition obligations under the Lease.

8.7.     Seller will not place Liens on the Assets that would survive the Closing or take any action that would cause Seller to be unable to perform its obligations under this Agreement (other than in connection with the discharge of its fiduciary duties, including considering higher or better bids for the Assets).

-13-

8.8.    Seller will maintain insurance coverage (including fire and general liability insurance) for the Assets on substantially the same terms and conditions as all other similarly situated supermarkets maintained by Seller.

8.9.    Seller will terminate or reject the Sublease, which termination or rejection shall be effective on or prior to the Closing Date.

8.10.   Seller will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Buyer in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement. The provisions of this paragraph 8.10 shall survive Closing.

8.11.   Seller shall not permit the Lease to be deemed rejected, pursuant to section 365(d)(4) of the Bankruptcy Code, prior to Closing.

9.0    **Covenants of Buyer.** Buyer for itself hereby covenants for the benefit of Seller as follows:

9.1.    Buyer will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with the Closing and the issuance of the Title Policy, if any.

9.2.    Buyer will use commercially reasonable efforts to obtain all Permits, if any, required to perform the obligations of Buyer under this Agreement, and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11 of this Agreement.

9.3.    Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement. The provisions of this paragraph 9.3 shall survive Closing.

9.4.    If this Agreement is determined to be the Successful Bid, then Buyer will use commercially reasonable efforts to obtain the entry of a Sale Order, including by providing Adequate Assurance Information to Seller, the Bankruptcy Court and Landlord as may be reasonably requested.

10.0    **Conditions Precedent to Buyer's Obligations.** The obligations of Buyer under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

10.1.   Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a

-14-

Material Adverse Effect; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Subject to any limitations set forth in this Agreement, all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Seller's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

10.2.   No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

10.3.   The Sale Order shall have been entered by the Bankruptcy Court in substantially the form of Exhibit E to this Agreement and shall not have been (A) effectively stayed by a court of competent jurisdiction, or (B) materially modified or amended without the prior written consent of Buyer. The Sale Order shall provide that Buyer shall assume obligations under and be bound only by those pre-Closing documents with respect to the Assets (other than this Agreement) as are listed on Exhibit A-4 attached hereto, and that the failure of any party to object to the terms of the Sale Order shall forever bar and estop said party, its heirs, successors and assigns, and any predecessor in interest, of itself and anyone claiming by, through or under it or them, from asserting any claims against Buyer (or parties claiming through Buyer) or attempting to enforce any rights against Buyer (or parties claiming through Buyer) based on pre-Closing documents with respect to the Assets (other than this Agreement) not listed on Exhibit A-4.  Appropriate notice of this Agreement and the proposed terms of the Sale Order shall have been provided prior to the hearing on the Sale Order to all parties to the Lease, all relevant taxing authorities and other interested parties.

10.4.   The Sale Order shall approve the sale, assumption and assignment of the Lease as described on Exhibit A-2. If any additional lease agreement or amendment or any additional exclusive use clause (other than as stated on Exhibit A-2 and Exhibit A-3) which individually or in the aggregate with other matters, interferes in a material and adverse way with Buyer's proposed use or occupancy of the Store for the Use, including but not limited to, the rent, the term and extensions of the Lease, Buyer will have the right to terminate this Agreement by delivery of written notice of termination to Seller by email to Ttucker@kslaw.com with copy to CatherineIbold@winn-dixie.com within three Business Days of the date of entry of the Sale Order and shall include in the reference or subject matter line the following, in capital letters "BUYER TERMINATION NOTICE - WINN-DIXIE STORE #739". Buyer shall be entitled, as its sole and exclusive remedy, to

receive the return of the Deposit, which return shall operate to terminate this Agreement and release Seller from any and all liability under this Agreement (except for those obligations that survive the termination of this Agreement pursuant to the terms hereof). If Buyer fails to terminate this Agreement within the applicable three-day period described above, then Buyer will have no further right to terminate under this paragraph 10.4.

10.5.    The Sale Order shall provide that the transfer of the Assets to the Buyer pursuant to the Agreement shall be free and clear of all interests, mortgages, security interests, pledges, liens, inchoate liens, judgments, encumbrances or charges of any kind or nature, including all Monetary Liens, other than the Permitted Encumbrances (collectively, the "Liens"), and all claims (as defined in Section 101(5) of the Bankruptcy Code), whether arising prior to or subsequent to the Filing Date, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Claims") to the extent permitted under Section 363(f) of the Bankruptcy Code, and all such Liens and Claims shall attach to the Purchase Price in the order of their priority, and with the same validity, force and effect which they now have as against the Assets.

10.6.    Any motion filed by Seller seeking approval of this Agreement (i) will allege, to the best of Seller's knowledge, that the intended Use of the Store by the Buyer under its trade name complies with the use provisions of the Lease, (ii) will allege, to the best of Seller's knowledge, that the exclusive use clauses granted to Ross Department Stores and Service Merchandise (as described in Exhibit A-3 to this Agreement) is a full and complete representation of the exclusive use clauses to which the Lease is subject, and (iii) will attach a copy of Exhibit A-2 and Exhibit A-3 to this Agreement.

10.7.    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been effectively waived by the Bankruptcy Court or shall have expired.

10.8.    The Sublease with respect to the Store shall have been effectively terminated in accordance with its terms or rejected pursuant to an order entered by the Bankruptcy Court in the Bankruptcy Case pursuant to Section 365 of the Bankruptcy Code, which order has not been effectively stayed, vacated, reconsidered or overturned by a court of competent jurisdiction.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(iv) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1 (a)(iv).

-16-

11.0 **Conditions Precedent to Seller's Obligations.** The obligations of Seller under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

11.1. Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. All of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2. No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

11.3. The Sale Order shall have been entered by the Bankruptcy Court in substantially the form of Exhibit E to this Agreement and shall not have been (A) effectively stayed by a court of competent jurisdiction, or (B) materially modified or amended without the prior written consent of Seller, which shall not be unreasonably withheld.

11.4. The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(v) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1(a)(v).

12.0 **Loss by Fire or Other Casualty; Condemnation.** In the event that, prior to Closing, the Store, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with the Store, Buyer will have the right, exercisable by giving notice of such

-17-

decision to the Seller within 5 Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, and thereafter none of the parties will have any further rights or obligations hereunder; provided, however, that, if Buyer is not in breach of this Agreement, Buyer will be entitled to the return from the Escrow Agent of the Deposit. If Buyer does not exercise its right of termination described in the immediately preceding sentence and the Store is sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

13.0 **Possession.** Seller will turn over to Buyer exclusive physical possession of the Store and the Assets associated therewith (including, to the extent in Seller's possession, control or custody) all keys, combinations to safes, security codes and passwords, on the Closing Date free and clear of all occupancies, including any Subtenant with respect to the Store, and in the condition required by <u>paragraph 8</u> of this Agreement upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Buyer to transfer to Seller, the entire Purchase Price. The provisions of this <u>paragraph 13.0</u> shall survive Closing.

14.0 **Closing.**

14.1. Closing will occur on the Closing Date. Closing will be conducted by use of an escrow administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

14.2. On or before the Closing Date, Seller will, subject to the conditions contained in <u>paragraph 11</u> of this Agreement, deliver the following ("<u>Seller's Escrowed Items</u>") to Escrow Agent:

    (i)    Two counterparts of the Lease Assignment, substantially in the form of <u>Exhibit F</u> to this Agreement (the "<u>Conveyance Instrument</u>"), executed by Seller;

    (ii)    The Bill of Sale, executed by Seller;

    (iii)    Two counterparts of the Closing Statement, executed by Seller;

    (iv)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

-18-

> > (v)     Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered, including, without limitation, any instruments required to transfer to Buyer any liquor license pertaining to the Store if such license is transferable under applicable law.

Buyer may waive compliance by Seller as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement. Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent, will be deemed to be an acknowledgement by Seller that the conditions of paragraph 11 of this Agreement have been fulfilled or waived as of the Closing Date.

14.3.   On or before the Closing Date, Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, deliver the following ("Buyer's Escrowed Items") to Escrow Agent:

> > (i)     Two counterparts of the Conveyance Instrument, executed by Buyer;

> > (ii)    Two counterparts of the Closing Statement, executed by Buyer;

> > (iii)   Any other document, instrument or agreement called for hereunder for delivery by Buyer that has not previously been delivered; and

> > (iv)    All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to paragraph 3 of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement. Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will be deemed to be an acknowledgement by Buyer that the conditions of paragraph 10 of this Agreement have been fulfilled or waived as of the Closing Date.

14.4.   At Closing, Seller will, subject to the conditions contained in paragraph 11 of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items and the Purchase Price to Seller.

14.5.   On the Closing Date, Seller and Buyer will each deposit such other instruments with the Title Insurer as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the Assets in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion.

-19-

14.6. Except as provided in paragraph 16 of this Agreement, (i) Seller will be responsible for Seller's Closing Costs and shall pay same when due and payable; and (ii) Buyer will be responsible for Buyer's Closing Costs and shall pay same when due and payable. The provisions of this paragraph 14.6 shall survive the Closing or earlier termination of this Agreement.

## 15.0  **Termination.**

15.1. Termination.

(a)   This Agreement may be terminated, and the transactions contemplated hereby abandoned as follows, and as provided otherwise in this Agreement:

(i)   (i) by written consent of Seller and Buyer, in which case the Deposit shall be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the Deposit, then Escrow Agent shall pay over the Deposit to Seller as consideration for Seller's agreement to terminate this Agreement);

(ii)   at the election of Seller if and to the extent permitted under paragraph 16.1 of this Agreement, in which case the Deposit shall be disbursed as provided in such paragraph 16.1;

(iii)   at the election of Buyer if and to the extent permitted under paragraph 16.2 of this Agreement, in which case the Deposit shall be disbursed as provided in such paragraph 16.2;

(iv)   at the election of Buyer if any of the conditions set forth in paragraph 10 of this Agreement has not been satisfied or waived by Buyer on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(iv);

(v)   at the election of Seller if any of the conditions set forth in paragraph 11 of this Agreement has not been satisfied or waived by Seller on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any

-20-