relating to the Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where such Store is located.

5.0 **Representations and Warranties of Seller Relating to the Assets.** In addition to any representations and warranties contained elsewhere in this Agreement, Seller hereby makes the following representations and warranties (subject, however, to any exceptions noted on <u>Exhibit I</u> attached hereto and incorporated herein by this reference, which Exhibit will specifically refer to the applicable representation for each item listed) to and for the benefit of Buyer and its successors and permitted assigns, in connection with the Assets, each of which warranties and representations (a) is being relied upon by Buyer and (b) is true in all respects as of the date hereof (or such other date as may be indicated).

    5.1    On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website: (i) copies of the Lease (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

        (a)    copies of the site plan for the Store;

        (b)    copies of the as-built plan for the Buildings;

        (c)    copies of the fixture plan for the Store; and

        (d)    a list of Equipment (other than Excluded Personal Property) with respect to the Store as reflected in Seller's current records; and

        (e)    copies of all surveys in the possession of (or within or under the control of Seller or any Affiliate thereof relating to the Store (the "Surveys");

it being understood that the materials described in subparagraphs (a) through (e) of this <u>paragraph 5.1</u> have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

    5.2    At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Monetary Liens other than the Permitted Encumbrances to the extent provided under Section 363 of the Bankruptcy Code.

    5.3    To Seller's Knowledge, the Lease is in full force and effect. To Seller's Knowledge, except with respect to the Subleases (if any) identified on

   Exhibit A-2, there are no subleases, licenses, occupancy agreements or assignment agreements in effect with respect to the Leased Premises or Real Property. To Seller's Knowledge, the copy of the Lease on the Merrill Website or otherwise provided to Buyer is a true, correct and complete copy of the Lease (including all amendments with respect thereto) in effect on the Effective Date.

5.4 Except to the extent the filing of the Bankruptcy Case constitutes a default under the Lease, to Seller's knowledge no condition or occurrence exists which, with the passage of time and/or the giving of notice, would constitute a material default by Seller under the Lease.

5.5 Seller has not received any written notice from any governmental authority that any of the Real Property is in material violation of applicable building codes or zoning and land use laws.

5.6 To Seller's Knowledge, except as disclosed, or as to be disclosed, in the Environmental Reports, Seller has not received any written notice from any governmental authority that there exist any material violations of any Environmental, Health and Safety Requirements relating to the Leased Premises or the Real Property or any applicable laws of governmental authorities having jurisdiction over the Leased Premises or Real Property relating to any Hazardous Material, which material violations, individually or in the aggregate with other material violations, could (i) interfere in a material and adverse way with the present use or occupancy of the Store, (ii) expose Buyer or its customers, employees or suppliers to a risk of physical harm, or (iii) expose Buyer to significant regulatory or financial risk.

5.7 <u>Warranties and Guaranties</u>. To Seller's Knowledge, <u>Exhibit J</u> attached hereto and incorporated herein by this reference includes a true and correct summary of all Warranties and Guaranties concerning roofs of the Real Property.

5.8 <u>Insurance</u>. To Seller's Knowledge, the Assets are insured by Seller or for Seller's benefit, in amounts and against risks deemed adequate by Seller, subject to any deductibles and/or levels of self-insurance consistent with the ordinary course of business of Seller and neither Winn-Dixie nor Seller has received any notice or request from any insurance company or Board of Fire Underwriters or governmental agency, department, bureau or other entity requiring or demanding the performance of any work or alteration with respect to the Assets.

6.0 **General Representations and Warranties of Seller.** In addition to any representations and warranties contained elsewhere in this Agreement, Seller hereby makes the following representations and warranties (subject, however, to

-21-

\\COR\433614.5

any exceptions noted on <u>Exhibit I</u> attached hereto and incorporated herein by this reference, which Exhibit will specifically refer to the applicable representation for each item listed) to and for the benefit of Buyer and its successors and permitted assigns, in connection with the Assets, each of which warranties and representations (a) is being relied upon by Buyer and (b) is true in all respects as of the date hereof (or such other date as may be indicated).

6.1   Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

6.2   No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("<u>Permit</u>") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, (iii) those contemplated by or required under <u>paragraph 3.5</u> of this Agreement and (iv) Bankruptcy Court Approval.

6.3   Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.4   Other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

6.5 None of the employees employed by Seller in the Store is covered by a union contract, collective bargaining agreement or other labor agreement.

6.6 Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

7.0 **Buyer's Representations and Warranties.** Buyer represents and warrants to Seller as follows:

7.1 Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of North Carolina, and has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required corporate action on behalf of Buyer.

7.2 No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated other than those contemplated or required under paragraph 3.5 of this Agreement.

7.3 This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4 There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

7.5 Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease,

-23-

order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

7.6 As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

8.0 **Covenants of Seller.** Seller hereby covenants for the benefit of Buyer as follows:

8.1 Seller (i) will use commercially reasonable efforts to maintain the Assets until the Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and will continue operation of the Store in the ordinary course of business, (ii) will not sell, dispose of, abandon or remove from the Store any of the Assets or agree to do so except in the ordinary course of business; provided, however, it is expressly acknowledged and understood that, no sooner than one week prior to the anticipated Closing Date, Seller will take certain actions to wind up its operations (including related marketing, promotions and advertising) at the Store and eliminate or remove the Excluded Personal Property in preparation for the Inventory Count, Closing and the turnover of possession to Buyer; (iii) will not modify, amend or terminate the Lease, or any recorded easements, restrictions or covenants affecting the Real Property or Shopping Center, without the express written consent of Buyer; (iv) will not enter into any subleases, licenses, occupancy agreements or assignment agreements with respect to the Lease or Leased Premises nor any easements, covenants, conditions or restrictions with respect to the Real Property or Shopping Center, without the express written consent of Buyer; (v) will not cause any material alterations to the Buildings or Improvements for the Store other than repairs in the ordinary course of business; and (vi) will use its best efforts to promptly give Buyer copies of any notices given by any of the Landlord after the Effective Date; provided, however, that Seller will be required, without qualification, to promptly give Buyer copies of any notices of default given by the Landlord after the Effective Date.

8.2 Seller will use commercially reasonable efforts to remove all Excluded Personal Property from the Store on or before the relevant Closing Date, except that Buyer shall (i) remove and dispose of Seller's signs and panels, and (ii) remove and dispose of, or change the signs and panels of, Seller's branded shopping carts that are part of the Excluded Personal Property, as more fully provided in paragraph 9.3 of this Agreement.

-24-

\\COR\433614.5

8.3 Seller will (except to the extent otherwise required by the Family Medical Leave Act) transfer or terminate all its employees working at the Store on the relevant Closing Date.

8.4 The parties acknowledge that this Agreement has been determined to be the Successful Bid. Seller will use commercially reasonable efforts to obtain the entry of a Sale Order.

8.5 Prior to the Closing, Seller will not cause or permit to be granted any material increase in the salaries, wages, benefits or other compensation payable or to become payable to employees working at the Store, except for (i) merit and cost-of-living increases in the ordinary course of business and (ii) incentive bonuses or compensation granted by Seller in connection with Seller's winding up of its operations at the Store.

8.6 Unless required by applicable laws, Seller will not make any commitments or representations to any governmental authority, any adjoining tenants, the Landlord, any shopping center association, or any other Person that would in any manner be binding upon Buyer or the Real Property, whether for or in connection with proffers, public improvement agreements, Shopping Center improvements, or otherwise, without the prior written consent of Buyer.

8.7 Seller will cooperate reasonably with Buyer, upon written request, with respect to Buyer's performance of its covenants under paragraph 9.2 of this Agreement and will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with the issuance of the Title Policies; provided, however, that in no event shall Seller be required to indemnify Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion.

8.8 Seller will cooperate reasonably with Buyer in obtaining from the Landlord an estoppel certificate substantially in the form of Exhibit K attached hereto for the purpose of confirming that each Lease as posted on the Merrill Website is a true and complete copy of the same ("Estoppel Certificate").

8.9 Employee Information; Interviews. At Buyer's request, following the Effective Date Seller and Winn-Dixie will release to Buyer a list of each of Seller's employees employed at the Store, indicating rate of pay, number of employees enrolled in Seller's health and welfare benefit plan, position title and hire or re-hire date as shown in Seller's books and records (provided no representation is made as to the accuracy or completeness of such information), and will permit Buyer, at reasonable times during

-25-

normal business hours and with minimum impact on Seller's business, to arrange for personal interviews with the Store manager and other Store employees ("Store Employees"), at times and places mutually agreeable to Seller and Buyer, and to arrange for those relevant employees of Seller, who are interested, to interview with Buyer.

9.0 **Covenants of Buyer.** Buyer for itself hereby covenants for the benefit of Seller as follows:

    9.1    Buyer will execute and deliver such documents as may be reasonably required by the Escrow Agent and the Title Insurer, as applicable, in connection with the Closing and the issuance of the Title Policies.

    9.2    Buyer will use commercially reasonable efforts to obtain all Special Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11 of this Agreement, including without limitation all Special Permits necessary for Seller to sell and Buyer to buy the Inventory.

    9.3    As soon as reasonably practicable after the Closing Date, Buyer shall, at Buyer's sole cost and expense, (i) remove from the Store, destroy and lawfully dispose of all signs and panels that are part of the Excluded Personal Property, and (ii) either (A) remove from the Store and lawfully dispose of all branded shopping carts or (B) remove all trademarks, trade names, logos and designs of Seller, Winn-Dixie or their Affiliates from all shopping carts and destroy and lawfully dispose of all such trademarks, trade names, logos and designs. Without limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 16.5 of this Agreement shall encompass any breach by Buyer of this paragraph 9.3.

    9.4    Provided that such employees file an application for employment with Buyer and otherwise satisfy Buyer's employment requirements, Buyer shall, as soon as practicable, and in any event within seven (7) days after the Closing Date, offer employment to and, if such offer is accepted, hire no less than 70% of the full-time employees that are employed by Seller at the Store on the Closing Date, and assign such employees to a location in the trade area as Buyer's employment needs dictate; provided, however, that any full-time employees hired by Seller at the Store, or transferred to the Store, after the Effective Date shall not be included in the final number of full-time employees on which the 70% calculation is based. Buyer shall compensate and provide benefits to such employees at levels comparable to similarly situated employees of Buyer, but Buyer shall have no obligation to pay such employees wages or salaries at the levels existing prior to the Closing Date, or provide benefit plans comparable to those paid or offered by Seller. Any employee whose employment is terminated by Seller, Winn-Dixie or any direct or indirect subsidiary of Winn-Dixie and

-26-

who is subsequently hired by Buyer is herein referred to as a "<u>New Buyer Employee</u>" and collectively, as the "<u>New Buyer Employees</u>." Buyer shall be entitled to interview and directly solicit for employment any employee of Seller, Winn-Dixie or any direct or indirect subsidiary of Winn-Dixie in any manner Buyer deems reasonable, and to encourage any such employee to accept any employment offered by Buyer; <u>provided</u>, <u>however</u>, that, with respect to such employees whom Buyer has not already contacted, or been contacted by, prior to the Effective Date as permitted by the Confidentiality Agreement, and with respect to such employees whom Buyer has not been, and shall not have been, in contact with through generalized searches and solicitations or job fairs as described in the following sentence (either before or after the Effective Date), Buyer shall not interview or directly solicit for employment such employees until the date that is seven (7) days after the Effective Date. Nothing herein shall restrict or preclude Buyer in any way from making generalized searches and solicitations for employees by use of advertisements or postings in any medium or the holding of job fairs, or to hire any individual responding to such advertisements or postings or attending such job fairs. Nothing herein shall require Buyer to continue the employment of any New Buyer Employee for any period of time following his or her hiring. If Buyer hires any New Buyer Employee, Buyer shall not be required to give any such New Buyer Employee any credit for service as an employee of Seller, Winn-Dixie or any direct or indirect subsidiary of Winn-Dixie, as the case may be, prior to Closing for purposes of eligibility, vesting, eligibility for retirement and benefit accrual and participation in any retirement, pension or 401(k) plans, or for any deductibles, co-payments or applicable waiting periods under any benefit plans. So long as Buyer does not violate any other provisions of the Confidentiality Agreement, Buyer's exercise of its rights in this <u>paragraph 9.4</u> shall be deemed to not violate any provisions of the Confidentiality Agreement limiting the ability of Buyer to contact, employ or solicit for employment any employee of Seller, Winn-Dixie or any direct or indirect subsidiary of Winn-Dixie. No later than two (2) Business Days prior to the Closing Date, Buyer will deliver to Seller, in writing, a list identifying all employees of Seller, Winn-Dixie or any direct or indirect subsidiary of Winn-Dixie who have been hired by Buyer, or to whom offers of employment have been made by Buyer. Any other provision in this <u>paragraph 9.4</u> to the contrary notwithstanding, Buyer shall not actually employ any employees of Seller, Winn-Dixie or any direct or indirect subsidiary of Winn-Dixie prior to the Closing Date.

9.5   At any time prior to entry of the Sale Order, if Buyer intends to conduct employment interviews with any employees of Winn-Dixie as provided herein, Buyer shall, via e-mail, provide to Dedra Dogan at dedradogan@winn-dixie.com, at least twenty-four (24) hours notice of the day, starting time and location of such interviews so that Ms. Dogan or other human resources personnel of Winn-Dixie may be on premises

during or after such interviews to answer questions or otherwise communicate with any such Winn-Dixie employees about the employee transition process; provided, however, that neither Ms. Dogan nor any other human resources personnel of Winn-Dixie shall have the right to participate in or attend any such interviews or consent to the hire or refusal to hire of such Winn-Dixie employees; provided, further, that such notice need not specify which Winn-Dixie employees Buyer intends to interview. Failure of Seller or its representatives to be present as provided above shall not prohibit Buyer in any manner from proceeding with any such scheduled interviews, as Seller acknowledges that it in no manner desires to impede or slow the solicitation and hiring process in any respect.

9.6   Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

9.7   The parties acknowledge that this Agreement has been determined to be the Successful Bid. Buyer will use commercially reasonable efforts to obtain the entry of a Sale Order, including by providing Adequate Assurance Information to Seller, the Bankruptcy Court, the Landlord and Subtenants as may be reasonably requested.

10.0 **Conditions Precedent to Buyer's Obligations.** The obligations of Buyer under this Agreement are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

10.1  Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of paragraph 5.1 of this Agreement), all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Seller's representations and warranties contained in this

-28-

Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

10.2 No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

10.3 The Sale Order shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to Seller and Buyer and their respective counsel and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Buyer, which shall not be unreasonably withheld.

10.4 The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(iv) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1 (a)(iv).

11.0 **Conditions Precedent to Seller's Obligations.** The obligations of Seller under this Agreement are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

11.1 Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Subject to any limitations expressly set forth in this Agreement, all of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of

the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2  No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

11.3  The Sale Order shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to Seller and Buyer and their respective counsel and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Seller, which shall not be unreasonably withheld.

11.4  The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(v) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1(a)(v).

12.0  **Loss by Fire or Other Casualty; Condemnation**. In the event that, prior to a Closing, the Store, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with the Store, either party will have the right, exercisable by giving notice of such decision to the other within five (5) Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, and thereafter none of the parties will have any further rights or obligations hereunder; provided, however, that if Buyer is not in breach of this Agreement, Buyer will be entitled to the return from the Escrow Agent of the Deposit. If neither party exercises its right of termination and the Store is sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it. In the event that prior to Closing,

-30-

a material part of the Equipment is destroyed or materially damaged, but the Store is not destroyed or materially damaged, neither party shall have the right solely under this paragraph 12.0 to terminate this Agreement; provided, however, that in such circumstances, if the Closing occurs, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds in respect of such Equipment and will promptly pay over and deliver to Buyer any such proceeds received by it.

13.0 **Possession**. Seller will turn over to Buyer exclusive physical possession of the Store and the Assets associated therewith (including, to the extent in Seller's possession, control or custody) all keys, combinations to safes, security codes and passwords, on the Closing Date upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Buyer to transfer to Seller, the entire Base Purchase Price, Inventory Price and the Supplies Price. After conclusion of the Inventory Count and upon Seller's receipt of such written confirmation from Escrow Agent, Buyer may commence preparation for opening of the Store as a Buyer's store including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and commencing electrical and wiring work required in order to install Buyer's point of sale and other equipment, signage, and similar items.

14.0 **Closing**.

  14.1 The Closing will occur on the Closing Date. The Closing will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

  14.2 On or before the Real Property Escrow Date, Seller will, subject to the conditions contained in paragraph 11 of this Agreement, deliver the following ("Seller's Escrowed Items") to Escrow Agent:

    (i) Two counterparts of the Lease Assignment, substantially in the form of Exhibit G to this Agreement (the "Conveyance Instrument"), executed by Seller;

    (ii) The Bill of Sale, executed by Seller;

    (iii) Two counterparts of the Closing Statement, executed by Seller;

    (iv) Such other instruments as are reasonably required by the Escrow Agent and the Title Insurer, as applicable, in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Escrow Agent, the Title Insurer, Buyer, or

-31-

        any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion;

(v)     An assignment and assumption of Warranties and Guaranties executed by Seller and Winn-Dixie to Buyer, in the form set forth in <u>Exhibit L</u> attached hereto and incorporated herein by this reference (the "<u>Warranties and Guaranties Assignment</u>"); and

(vi)    Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered.

    Buyer may waive compliance by Seller as to any of the foregoing items in a manner permitted by <u>paragraph 17.6</u> of this Agreement. Except to the extent that Seller provides Buyer with prior or contemporaneous express written notice to the contrary, Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent, will be deemed to be an acknowledgement by Seller that the conditions of <u>paragraph 11</u> of this Agreement have been fulfilled, or waived until Seller Delivery Confirmation. The "<u>Seller Delivery Confirmation</u>" will mean the later of (A) the Real Property Escrow Date and (B) Seller's delivery to Escrow Agent, by original counterpart or telecopy, of Seller's written confirmation that that the conditions of <u>paragraph 11</u> of this Agreement have been fulfilled or waived. In any event such delivery and notice shall be subject to any circumstances that may affect such conditions between Seller Delivery Confirmation and the Closing Date.

14.3   On or before the Real Property Escrow Date, Buyer will, subject to the conditions contained in <u>paragraph 10</u> of this Agreement, deliver the following ("<u>Buyer's Escrowed Items</u>") to Escrow Agent:

(i)     Two counterparts of the Conveyance Instrument, executed by Buyer;

(ii)    Two counterparts of the Closing Statement, executed by Buyer;

(iii)   Such other instruments as are reasonably required by the Escrow Agent or the Title Insurer in accordance with the terms hereof;

(iv)   The Warranties and Guaranties Assignment, executed by Buyer;

(v)    Any other document, instrument or agreement called for hereunder for delivery by Buyer that has not previously been delivered; and

(vi)   All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to <u>paragraph 3</u> of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement. Except to the extent that Buyer provides Seller with prior or contemporaneous express written notice to the contrary, Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will be deemed to be an acknowledgement by Buyer that the conditions of paragraph 10 of this Agreement have been fulfilled, subject to any circumstances that may affect such conditions between the Real Property Escrow Date and the related Closing Date.

14.4 At the Closing, Seller will, subject to the conditions contained in paragraph 11 of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items and the Purchase Price to Seller.

14.5 On the Closing Date, Seller and Buyer will each deposit such other instruments with the Title Insurer and the Escrow Agent, as applicable, as are reasonably required by the Title Insurer for the issuance of the Title Policies or otherwise required by the Escrow Agent to consummate the purchase of the relevant Assets in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, the Escrow Agent, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion.

14.6 Except as provided in paragraph 16 of this Agreement, at or before Closing, or if Closing does not occur due to earlier termination of this Agreement in accordance with its terms, (i) Seller will pay Seller's Closing Costs; and (ii) Buyer will pay Buyer's Closing Costs.

15.0 **Termination**.

15.1 Termination.

(a) This Agreement may be terminated, and the transactions contemplated hereby abandoned, only as follows:

(i) by written consent of Seller and Buyer, in which case the Deposit shall be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the Deposit, then Escrow Agent shall pay over the Deposit to Seller as consideration for Seller's agreement to terminate this Agreement);

-33-

\\COR\433614.5

(ii) at the election of Seller if and to the extent permitted under paragraph 16.1 of this Agreement, in which case the Deposit shall be disbursed as provided in such paragraph 16.1;

(iii) at the election of Buyer if and to the extent permitted under paragraph 16.2 of this Agreement, in which case the Deposit shall be disbursed as provided in such paragraph 16.2;

(iv) at the election of Buyer if any of the conditions set forth in paragraph 10 of this Agreement has not been satisfied or waived by Buyer on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(iv);

(v) at the election of Seller if any of the conditions set forth in paragraph 11 of this Agreement has not been satisfied or waived by Seller on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(v);

(vi) at the election of Buyer or Seller as provided in paragraph 12 of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.1(a)(vi);

(vii) **Intentionally omitted.**

(viii) at the election of Seller if the Bankruptcy Court denies Bankruptcy Court Approval with respect to the Store, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time such

election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.1(a)(viii);

(ix) at the election of Seller if the Cure Costs with respect to the Lease exceed 50% of the Base Purchase Price, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.1(a)(ix);

(x) at the election of Buyer or Seller if the Closing will not have occurred on or before the Outside Date for any reason other than as contemplated in paragraphs 15.1(a)(i) through 15.1(a)(ix) of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided that neither Buyer nor Seller, as the case may be, will be entitled to terminate this Agreement pursuant to this paragraph 15.1(a)(x) if such party's breach of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(x); or

(xi) at the election of Buyer as provided in paragraph 4.2 of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.1(a)(xi).

(b) If this Agreement is terminated for any reason, then all materials provided by Seller to Buyer and all materials relating to the Assets obtained by Buyer and all copies of any such materials will be delivered to Seller within five (5) Business Days following

-35-

termination. This paragraph shall not in any way limit Buyer's duties to Seller or Winn-Dixie under the Confidentiality Agreement.

(c) Upon any termination of this Agreement pursuant to paragraphs 15.1(a)(ii) through (xi) of this Agreement, each party will retain those rights (if any) it may have under paragraph 16 of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

16.0 **Default and Remedies**.

16.1 Buyer's Default. If the Closing as contemplated under this Agreement is not consummated due to Buyer's breach of this Agreement, or if this Agreement is terminated due to Buyer's breach of this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such breach, (A) to terminate this Agreement and (B) to receive the Base Deposit (collectively, the "Liquidated Deposit") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof. Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity. Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages. The right to receive the Liquidated Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by Buyer, and Seller hereby waives and releases any right to (and Seller hereby covenants that it shall not) sue Buyer: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit. Buyer hereby waives and releases any right to (and hereby covenants that it shall not) Seller or seek or claim a refund of the Liquidated Deposit (or any part thereof) on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages. This paragraph 16.1 is subject to paragraph 16.4 of this Agreement.

16.2 Default by Seller. If the sale of the Store as contemplated under this Agreement is not consummated due to Seller's breach of this Agreement, or if this Agreement is terminated due to Seller's breach of this Agreement, then Buyer shall be entitled, as its sole and exclusive remedy for such breach, to receive the return of the Deposit, which return shall operate to terminate this Agreement and release Seller from any and all liability under this Agreement. Buyer expressly waives and releases (i) any right to seek specific performance of Seller's obligations under this Agreement and (ii) any right to seek or collect any damages, including any

-36-

\\COR\433614.5

actual, consequential, speculative, remote or punitive damages. This paragraph 16.2 is subject to paragraph 16.4 of this Agreement.

16.3   Notice of Default; Opportunity to Cure.  Neither Seller nor Buyer shall be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within five (5) Business Days after receipt of such notice; provided, however, that this paragraph 16.3 (i) shall not be applicable to Buyer's failure to deliver any Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Real Property Escrow Date or the Closing Date and, accordingly, (ii) shall not have the effect of extending the Closing Date or the due date of any Deposit.

16.4   Recoverable Damages.  In no event shall the provisions of paragraphs 16.1 and 16.2 of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to, a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreement and paragraphs 16.5 and 17.3 of this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees or expenses under the Confidentiality Agreement and paragraphs 3.3.3, 3.3.4 and 18 of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs. In addition, if this Agreement is terminated for any reason, and Buyer or any Affiliate of Buyer asserts any claim or right to any Asset that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to any Asset, then Seller shall have all rights and remedies available at law or in equity with respect to such assertion by Buyer and any loss, damage or other consequence suffered by Seller as a result of such assertion.

16.5   Buyer Indemnification of Seller. Buyer shall indemnify and save and hold harmless Seller and its Affiliates and representatives, from and against any and all costs, losses, liabilities, damages, lawsuits, deficiencies, claims and expenses arising solely out of third-party claims, including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (herein, the "Damages") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by Buyer (including any payment obligation), or the inaccuracy of any representation made by Buyer in or pursuant to this Agreement or other transaction documents, or (b) any liability, obligation or commitment of any nature (absolute, accrued, contingent or otherwise) of Buyer, including any liability, obligation or commitment assumed by Buyer pursuant to this Agreement, that is due to or arises in connection with Buyer's acts or

-37-

omissions prior to, on or after the Closing Date pursuant to this Agreement or any transaction documents signed by Buyer pursuant to this Agreement. Notwithstanding the foregoing, Buyer shall not be liable for any matter (i) with respect to which Seller has not given Buyer written notice within a reasonable period of time following Seller's receiving written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a material adverse effect on Buyer's ability to operate the Store), or (ii) to the extent that such liability arises from Seller's acts or omissions. The provisions of this paragraph 16.5 shall cover all obligations and liabilities of whatsoever kind, nature or description relating, directly or indirectly, to third party product liability, third party litigation or third party claims against Buyer in connection with, arising out of, or relating to this Agreement or any transaction documents signed by Buyer pursuant to this Agreement. This paragraph 16.5 shall survive the Closing or earlier termination of this Agreement.

17.0 **Miscellaneous.**

    17.1   Notices. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this paragraph 17.1 and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Winn-Dixie Raleigh, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn: Chief Financial Officer
Telefax No. 904 783 5646
e-mail: *bennettnussbaum@winn-dixie.com*

With a copy to:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn: Office of General Counsel
Telefax No. 904-783-5651
e-mail: *larryappel@winn-dixie.com*

and

King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia 30303
Attn: Timothy N. Tucker
Telefax No. 404-572-5148
e-mail: *ttucker@kslaw.com*

If to Buyer:

Alex Lee, Inc.
P.O. Box 800
120 Fourth Street SW
Hickory, North Carolina 28602
Attention: General Counsel
Telefax No. 828-725-4435
e-mail: *jorgain@alexlee.com*

With a copy to:

McGuireWoods LLP
Bank of America Corporate Center
100 North Tryon Street, Suite 2900
Charlotte, NC 28202-4011
Attn: Jane Whitt Sellers
Telefax No. 804-698-2170
e-mail: *jsellers@mcguirewoods.com*