# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

In re:                                            )    Case No.  05-03817-3F1
                                                  )
WINN-DIXIE STORES, INC., et al.,                  )    *Chapter 11*
                                                  )
Debtors.                                          )    Jointly Administered

## ORDER APPROVING DEBTORS' (A) SALE OF ASSETS FREE AND CLEAR OF LIENS, (B) ASSUMPTION AND ASSIGNMENT OF LEASES AND (C) RELATED RELIEF

( Alex Lee, Inc ) $2,000,000.00 )

These cases came before the Court on the motion of Winn-Dixie Stores,

Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-

possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a),

363, 365 and 1146(c) and Fed. R. Bankr. P. 6004 and 6006 (a) authorizing the

Debtors to sell those certain "Assets" as more specifically defined in that certain

Purchase Agreement, as amended, attached as Exhibit A related to store

number 805 as described in the Purchase Agreement ("Store"), free and clear of

liens, claims, interests and encumbrances to Alex Lee, Inc. or its permitted

assigns (the "Purchaser"), (b) determining that the sale is exempt from any

stamp, transfer, recording or similar tax, (c) authorizing the Debtors to assume

and assign the unexpired lease identified in the Purchase Agreement in

connection with the sale (the "Lease"), (d) fixing cure amounts for the Lease, and

(e) granting related relief (the "Motion"). By the Motion, the Debtors assert that

no amounts are due under the Lease and no other cure is required. The

Landlord had until July 14, 2005 to object to the Debtors' proposed cure and the

Landlord failed to file an objection.  The Court held a hearing on the Motion on July 29, 2005 to approve the sale (the "Sale Hearing").  The Court has reviewed the Motion and heard the representations of counsel.  Upon the representations of counsel and without objection by the United States Trustee or any other interested party, the Court makes the following findings of fact:

A.     This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

B.     The Debtors solicited highest or otherwise best offers for the Assets in accordance with bidding procedures approved by the Court by order (Docket No. 1801) entered June 20, 2005 (the "Bidding Procedures").  A competing bid was received for the Assets and the Debtors conducted an auction for the Assets on July 18, 2005 (the "Auction").  At the Auction, the Purchaser submitted the final bid set forth in the Purchase Agreement representing the highest or otherwise best offer received for the Assets.

C.     The Debtors have provided interested parties (including all parties asserting claims or interests in the Assets, if any) with proper notice of the Motion, the Sale Hearing,[1] the Auction, the assumption and assignment of the Lease, and the fixing of any cure amounts, in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365, Fed. R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order and the Bidding Procedures Order.  The Debtors provided all employees of the Store with notice of the sale

---

[1]     All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Motion.

hearing.  The notice provided by the Debtors is due, proper and sufficient notice to provide affected parties adequate opportunity to determine that their rights are to be affected and afforded such parties an opportunity to object to the sale of the Assets at the Sale Hearing.

D.    The Debtors marketed the Assets and conducted the sale process in compliance with the Bidding Procedures Order, the Bidding Procedures, the Bankruptcy Code and all other orders entered in these cases. Bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner.  The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets. In their sound business judgment, the Debtors determined that the bid submitted by the Purchaser at the Auction represented the highest or otherwise best offer for the Assets.

E.    The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A, and all related documents, and the sale of the Assets and assumption and assignment of the Lease has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

F.    The Debtors have the ability to convey the Assets to Purchaser on the terms and conditions of this Order and the Purchase Agreement.

G.    The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

H.    Neither the Purchaser, nor any of its affiliates, is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

I.    The Debtors and the Purchaser proposed, negotiated and entered into the Purchase Agreement, without collusion, in good faith and at arms'-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

J.    The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

K.    The consideration the Purchaser gave the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value.

L.    The Debtors' sale of the Assets and the assumption and assignment of the Lease will facilitate the formulation and confirmation of a plan of reorganization.  For this reason, the sale of the Assets and the assumption and assignment of the Lease constitute transfers to which 11 U.S.C. § 1146(c) applies.

M.    The Debtors' transfer of the Assets to the Purchaser pursuant to the Purchase Agreement will be a legal, valid, and effective transfer of the Assets.  The Debtors' transfer of the Assets and the Lease to the Purchaser, indefeasibly vests the Purchaser, with good and valid title in and to

the Assets free and clear of any Claims (as defined below) except the Permitted Encumbrances and the liabilities expressly assumed in the Purchase Agreement (the "Assumed Liabilities").    Any Claim that is not one of the Permitted Encumbrance or Assumed Liabilities, in or against the Debtors, their insiders, the Assets, or the Lease will attach to the net proceeds of the sale with the same effect, validity, enforceability and priority of such Claims, if any, as such Claims had against the Assets or Lease prior to the sale contemplated hereby, subject to any rights, claims, defenses and objections of the Debtors and all interested parties with respect to such Claims.

N.    The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the Purchase Agreement free and clear of all Claims (except the Permitted Encumbrances and the Assumed Liabilities) because any entity with any Claims in the Assets to be transferred (i) has consented to the sale (including the assumption and assignment of the Lease) or is deemed to have consented to the sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claims; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.    Holders of Claims, if any, who did not object, or who withdrew their objections to the Sale Motion are deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2).

O.    The Debtors will cause the proceeds from the sale to be paid in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and

9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

P.    The Debtors' assumption and assignment of the Lease in connection with the sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

Q.    The Debtors have provided the counter-party to the Lease with adequate assurance that they will promptly cure any defaults under the Lease pursuant to 11 U.S.C. §§ 365(b)(1).

R.    Pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006, no payment or other cure is due under the lease.

S.    The Purchaser has provided the counter-party to the Lease with adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B).

T.    No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under the Lease.

U.    Except as expressly set forth in the Purchase Agreement, the Purchaser will have no responsibility for any liability, claim or other obligation of or against the Debtors related to the Assets or the Lease by virtue of the transfer of the Assets and the assumption and assignment of the Lease to the

6

Purchaser. The Purchaser will not be deemed, as a result of any action taken in connection with the purchase of the Assets or the assumption and assignment of the Lease, to (i) be a successor to the Debtors (other than with respect to the Assumed Liabilities and any obligations arising under the assigned Lease from and after the Closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors. The Purchaser is not acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the Purchase Agreement or in the assigned Lease.

V.    A sale on the terms and conditions of the Purchase Agreement, including without limitation, entry of an order providing a sale free and clear of Claims and providing that the Purchaser is not a successor of the Debtors, is consistent with the Bankruptcy Code and promotes the policies of the Bankruptcy Code to maximize value. Absent such finding, the Purchaser would be unwilling to pay the price for the Assets and Lease as provided for in the Purchase Agreement.

W.    The Court's approval of the Purchase Agreement is in the best interests of the Debtors, their estates and their creditors.

X.    Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.    The Motion is granted.

2.    All objections to the entry of this order or to the relief granted and requested in the Motion, including any objection to the proposed Cure Amount, that has not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

3.     The Purchase Agreement is approved in all respects. Pursuant to 11 U.S.C. §§ 105(a) and 363(b), the Debtors are authorized and directed (subject to applicable Closing conditions set forth in the Purchase Agreement), to consummate the sale approved herein, including transferring and conveying the Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

4.     Upon Closing, the Debtors are authorized and directed, in accordance with 11 U.S.C. §§ 105(a), 363 and 365, to assume and assign the Lease to Purchaser.

5.     The Debtors have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2).

6.     The Lease will be assumed and assigned to the Purchaser, in accordance with its terms.  The assigned Lease will remain in full force and effect notwithstanding any provision in the Lease to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1) which prohibit, restrict or condition such assignment or transfer).  The DIP Lender and all non-debtor parties to the Lease are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the Purchase Agreement.

7.     Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized, directed and empowered to consummate and implement fully the Purchase Agreement, together with all additional instruments and documents that may be necessary to implement the Purchase Agreement.  The Debtors are authorized and directed to take all actions necessary for the purpose of assigning,

transferring, granting, conveying, and conferring the Assets and the Lease to Purchaser.

8.     Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties in accordance with the terms of the Purchase Agreement without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.     The Debtors will transfer the Assets to the Purchaser upon Closing of the sale free and clear of all Claims pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances and Assumed Liabilities).  All non-assumed Claims, if any, will attach to the proceeds of the sale, with the same validity, enforceability, priority, force and effect they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors and all interested parties with respect to such Claims and Interests.

10.    The Debtors will cause the proceeds from the sale to be paid in accordance with the terms of the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

11.    The Debtors' transfer of the Assets pursuant to the terms of the Purchase Agreement is a transfer pursuant to 11 U.S.C. § 1146(c). Accordingly, the making, delivery, filing or recording of any deeds, assignments or other transfer documents in connection with the sale (the "Transfer Instruments"), will not be taxed under any law imposing a recording tax, stamp

tax, transfer tax or similar tax (including without limitation, any transfer or recordation tax applicable to deeds and/or security interests). All filing and recording officers are directed to accept for filing or recording, and to file or record the Transfer Instruments immediately upon presentation without payment of any such taxes.

12.    The Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and applicable non-bankruptcy law. For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

13.    No cure amount is due, and all defaults, claims or other obligations of the Debtors arising or accruing under the Lease, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be deemed cured by the Debtors in accordance with the Purchase Agreement upon Closing. No other or further monetary amounts or obligations are due or existing under the Lease by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise.

14.    Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Lease to the Purchaser, (a) the Debtors and their estates are relieved from any and all liability for any breach of the Lease occurring after assignment to the Purchaser, and (b) the Purchaser is responsible for any and all claims and obligations under the Lease occurring or arising after the assignment.

15.    Subject to the terms of this Order and the Purchase Agreement, the Purchaser assumes all rights and obligations of the Debtors under the Lease.

16.    All non-Debtor parties to the Lease are forever enjoined and estopped from asserting that any cure or any other default exists against the Purchaser which existed as of the date of the Sale Hearing.

17.    Upon the Debtors assignment of the Lease to the Purchaser, no default will exist under the Lease.   Upon entry of this Order and the assumption and assignment of the Lease, the Purchaser is deemed to be in compliance with all terms and provisions of the Lease.

18.    All entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors.   Prior to or upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims in the Assets (except for the Permitted Encumbrances and Assumed Liabilities), if any.   In the event any creditor fails to release its Claims in the Assets, the Debtors and the Purchaser are each authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other documents on such creditor's behalf.   The Purchaser is also authorized to file, register or otherwise record a certified copy of this Order.   Once this Order is so filed, registered or otherwise recorded, the Order constitutes conclusive evidence of the release of all Claims against the Assets as of the Closing (except for the Assumed Liabilities).

19.    The Purchaser acted in good faith in purchasing the Assets and Lease under Purchase Agreement as that term is used in 11 U.S.C § 363(m).   For that reason, any reversal or modification of the Order on appeal

will not affect the validity of the sale to the Purchaser unless such authorization is duly stayed pending such appeal.

20.    The Debtors' transfer of the Assets to Purchaser and performance under the Lease will not result in (a) the Purchaser having any liability for any Claim (except for the Permitted Encumbrances or Assumed Liabilities) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

21.    The Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets, including, the Lease (other than the Permitted Encumbrances and the Assumed Liabilities as set forth in the Purchase Agreement).

22.    Except as to the Assumed Liabilities as more fully set forth in the Purchase Agreement, the transfer of the Assets to, and the assumption of the Lease by, Purchaser, on the Closing Date shall be free and clear of any and all liens, encumbrances, claims, charges, defenses, off-sets, recoupments and interests thereon and there against of whatever type or description, including, without limitation, restrictions on or conditions to transfer or assignment, liens, mortgages, security interests, pledges, hypothecations, control agreements, equities and other claims and interests (all such claims and interests described in this paragraph shall hereafter be referred to as the "Claim" or "Claims"), having arisen, existed or accrued prior to and through the Closing Date, whether direct or indirect, monetary or non-monetary, arising at law or in equity, contract or tort, absolute or contingent, matured or unmatured, voluntary or involuntary,

liquidated or unliquidated, of, by or against Debtors, insiders of the Debtors, the

Assets or the Lease and further including, without limitation, the following:

a. Claims arising through the Closing Date (as defined in the Purchase Agreement), if any, of any governmental unit for taxes; any Claim arising through the Closing Date relating to any executory contract or lease (whether of personal or real property, or otherwise) affecting or in any way related to the Assets, without limitation, Claims of Debtors' vendors, suppliers and/or customers arising from Debtors' failure to perform its obligations to said parties whether such failure occurred prior to or on the Closing Date or whether such failure arose as a result of a Purchaser's election or before the Closing Date not to accept and/or perform such vendors', suppliers' or customers' account and/or orders subsequent to the Closing Date;

b. Any Claim arising through the Closing Date relating to work performed by any contractor or materialman that would give rise to a mechanic's lien, or similar Claim, against the Assets;

c. Any Claim arising through the Closing Date for attorney's fees or other costs or expenses claimed by lessors, lessees, licensees or any other non-debtor parties to executory contracts or any lease;

d. Any Claim arising through the Closing Date based on acts or omissions of the Debtors arising in tort, contract or otherwise, including, without limitation, Claims for successor liability; and

e. Any Claim arising through the Closing Date relating to liability arising under federal, state or local revenue, tax, products liability, labor, employment, worker compensation or environmental laws, rules or regulations or with respect to Debtor's liability as distributor or a retailer.

f. Any claim by any person or entity relating to any health or welfare benefit for the benefit of any current or former employee of Debtors or their dependents or beneficiaries.

In addition, Purchaser and its affiliates, successors or assigns or their

respective properties (including the Assets), shall not be liable, by operation of

law or otherwise, for any Claim by virtue of Purchaser's purchase or subsequent

operation of the Assets or performance of the Lease including, without limitation,

claims of the type set forth in subparagraphs (a)-(f) above.

23.    Neither the purchase of the Assets by Purchaser, nor the subsequent operation of the Assets as grocery stores by Purchaser shall cause Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to be deemed a successor in any respect of the Debtors' business within the meaning of any laws, rules or regulations relating to any tax, revenue, pension, benefit, ERISA, environmental, labor, employment, products liability or other law, rule or regulation of any federal, state or local government.

24.    Upon closing, this Order constitutes a full and complete general assignment, conveyance and transfer of the Assets and the Lease and/or a deed or a bill of sale transferring good and marketable title in the Assets to Purchaser on the Closing Date free and clear of all Claims except for Permitted Encumbrances and Assumed Liabilities.   Each and every federal, state, and local governmental agency or department is directed to accept this Order as such an assignment, deed and/or bill of sale or any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.   If necessary, this Order shall be accepted for recordation on or after the Closing Date as conclusive evidence of the free and clear, unencumbered transfer of title to the Assets to Purchaser.

25.    This Order is effective as a determination that any and all Claims (except for the Permitted Encumbrances and Assumed Liabilities), if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets and Lease.

26.    This Order is binding upon all entities that may be required to accept, file, register or otherwise record or release any documents or

instruments, or who may be required to report or insure any title in or to any of the Assets.

27.    This Court retains exclusive jurisdiction to (a) enforce and implement the Purchase Agreement and any other agreements and instruments executed in connection with the Purchase Agreement, (b) compel delivery of possession of the Assets to Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement, and (d) interpret, implement and enforce the provisions of this Order.

28.    The terms and provisions of the Purchase Agreement and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

29.    All persons who hold Claims against the Debtors, insiders of the Debtors, or the Assets are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the sale.

30.    After the Closing Date, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser, any of its affiliates, any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any

Claims or (ii) for any period commencing before and concluding prior to or on the Closing Date or any pre-Closing portion of any period commencing before the Closing Date and concluding after the Closing, or (iii) assessed prior to and payable after the Closing Date, except as otherwise provided in the Purchase Agreement.  For purposes of this paragraph, any employee terminated as of the Closing Date will deemed to have been terminated prior to the Closing Date and any claims related to such termination, if any, are Claims against the Debtors and their respective estates.   No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

31.    The Debtors are authorized and directed to take such actions as are necessary and appropriate to terminate the employment by the Debtors of those employees affected by the sale.

32.    All amounts payable by the Debtors to the Purchaser under the Purchase Agreement and/or this Order shall be administrative expenses entitled to priority under section 507(a)(1) of the Bankruptcy Code.

33.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in the Purchase Agreement will control.

34.    Notwithstanding Fed. R. Bankr. P. 6004(g) and 6006(d), this Order will take effect immediately upon entry.

35.    To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by

Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

36.    Debtors are directed to serve on or before the Closing Date a full and complete copy of this Order by First Class U.S. Mail upon all employees of any Store comprising the Assets.  Debtors are further authorized and directed to post on or before the Closing Date a full and complete copy of this Order on any employee bulletin board or like display area where employee notices are regularly displayed in each of the Stores comprising the Assets. Debtors shall and promptly file a written certification of compliance with this provision.

### SPECIAL NOTICE TO EMPLOYEES OF THE STORES SUBJECT TO THIS SALE

Unless you have been notified by the Debtors otherwise, on the Closing Date your employment with the Debtors will be terminated. While it is the Debtors' belief that the Purchaser will extend offers of employment to a substantial number of the employees at each store, the Purchaser is under no obligation to do so. If you are subsequently hired by Purchaser, your employment date will commence upon the Closing Date of the sale or on such other date as you and the Purchaser may agree. Pursuant to this Order, any claims you may have arising from or relating to your employment relationship through and including your termination are claims against the Debtors. The Purchaser is not a successor employer, and unless the Purchaser elects to hire you as of the Closing Date or thereafter, the Purchaser shall not be deemed to be your employer for purposes of any labor or employment law. Employees who are not hired by Purchaser should contact the Debtors' Human Resources Department to obtain information regarding employee benefits, if any, including COBRA.

Dated this __5__ day of ~~July~~ August, 2005 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve a copy of this Order on all parties who received copies of the Motion.

\\FIN\251383.6

# **EXHIBIT A**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made effective as of July 18, 2005 (the "Effective Date"), by and between

**WINN-DIXIE RALEIGH, INC.,** a Florida corporation ("Seller"), and **ALEX LEE, INC.,** a North Carolina corporation, or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

## R E C I T A L S:

A.      Seller is the tenant of a supermarket store (the "Store"), listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under a lease, including amendments thereto (the "Lease") described on Exhibit A-2 to this Agreement. The Store occupies the leased premises as described in the Lease (the "Leased Premises"), within the parcel of real property described on Exhibit A-2 to this Agreement associated with the Lease. Seller's leasehold interest in the Leased Premises pursuant to the Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "Assets." The Store is part of a shopping center (the "Shopping Center") as described on Exhibit A-3 to this Agreement.

B.      Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.      Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no. 05-03817-3F1 (the "Bankruptcy Case").

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0     **Defined Terms.** Capitalized terms as used in this Agreement will have the following meanings when used herein.

      1.1     "Adequate Assurance Information" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that the Landlord and Subtenants are adequately assured of Buyer's future performance under the Lease, as required by

Section 365(f) of the Bankruptcy Code, including, if appropriate, a guaranty of Buyer's permitted assignee's obligations under the Lease and (where applicable) the Subleases by Buyer.

1.2     "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3     "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4     Intentionally omitted.

1.5     "Approval Hearing" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.6     "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.7     "Bankruptcy Code" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.8     "Bankruptcy Court" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.9     "Bankruptcy Court Approval" will mean the entry of one or more Sale Orders with respect to the Store by the Bankruptcy Court.

1.10    "Bankruptcy Case" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.11    "Base Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.12    "Base Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.13    "Bidding Procedures" will mean the procedures approved by the Bankruptcy Court that governed the selection by Seller of the Successful Bid relating to the Store.

1.14    "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at the Closing the Inventory, the Supplies, the Equipment and other tangible and intangible personal property constituting a the Assets.

-2-

1.15 "Buildings" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.16 "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.17 "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

1.18 "Buyer Inventory Representative" will mean such person or persons designated in writing by Buyer to act in such capacity.

1.19 "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policies (and the cost of any simultaneous issue mortgagee title insurance policies and any loan-related title insurance endorsements thereon); (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instruments; (e) recording fees payable in connection with recording the Conveyance Instruments in the appropriate public records; (f) cost of the Environmental Reports, including any supplements or updates, up to (but not exceeding) $3,000; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment, Supplies and Inventory; (i) the fees and costs of the Closing Escrow Agent; and (j) the fees and costs of the Inventory Service.

1.20 "Buyer's Escrowed Items" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.21 "Closing" with respect to the Store will mean the consummation of the assignment, assumption, sale and purchase of the Assets relating to the Store pursuant to this Agreement as indicated by delivery of the Conveyance Instrument and other documents contemplated by paragraph 14 of this Agreement and the Purchase Price as contemplated in this Agreement with respect to such Store, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.22 "Closing Date" will mean the date designated by Seller in writing, and reasonably acceptable to Buyer, that is between one day and 30 days following the satisfaction or waiver of all conditions to Closing with respect to the Store.

1.23    "<u>Closing Statement</u>" will mean a statement in the form of <u>Exhibit C-1</u> to this Agreement (or in such other form as is prepared by Seller and reasonable acceptable to Buyer) reflecting the net amount due Seller at each Closing (other than in respect of the Inventory Price), after making the adjustments described in <u>paragraph 3.3.3</u> of this Agreement and in other provisions of this Agreement.

1.24    "<u>Confidentiality Agreement</u>" will mean the existing letter agreement dated June 16, 2004 between Winn-Dixie and Buyer and that certain Addendum dated May 16, 2005 among Winn-Dixie, Buyer and Associated Wholesale Grocers, Inc. regarding, among other things, confidentiality relating to the subject matter of this Agreement.  Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.

1.25    "<u>Contract Warranties</u>" will have the meaning assigned in <u>paragraph 22.1</u> of this Agreement.

1.26    "<u>Conveyance Instrument</u>" will have the meaning assigned in <u>paragraph 14.2</u> of this Agreement.

1.27    "<u>Credit Agreement Liens</u>" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.28    "<u>Cure Costs</u>" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Lease and the Subleases.

1.29    "<u>Damages</u>" will have the meaning assigned in <u>paragraph 16.5</u> of this Agreement.

1.30    "<u>Deposit</u>" will have the meaning assigned in <u>paragraph 3.3.2</u> of this Agreement.

1.31    "<u>Due Diligence Materials</u>" will mean the items identified on <u>Schedule 1</u> to this Agreement.

1.32    "<u>Effective Date</u>" will have the meaning assigned in the initial paragraph of this Agreement.

1.33 "Environmental, Health and Safety Requirements" will mean all orders and applicable laws concerning or relating to public health and safety, the practice of pharmacy, worker/occupational health and safety, and pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, threatened release, control, or other action or failure to act involving cleanup of any Hazardous Materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise, or radiation, each as amended and as now in effect and in effect at Closing.

1.34 "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.35 "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.36 "Escrow Agent" will mean Near North National Title LLC, acting as escrow and closing agent.

1.37 "Excluded Fuel Operations" will mean all fuel Inventory, fuel pumps and related equipment relating to the Store.

1.38 "Excluded Inventory" will mean (i) any private label goods and merchandise; (ii) any goods and merchandise that are damaged, spoiled or distressed; (iii) any items that as of the Inventory Count Date are past Seller's "pull date," if any, or, with respect to dairy items, within five days of Seller's "pull date," if any, or, with respect to frozen foods, within 10 days of Seller's "pull date," if any; (iv) all perishables, including, but not limited to, produce, deli items, meat items (other than packaged lunch meats), floral items, seafood items and bakery items; (v) all pharmaceutical inventory; (vi) all fuel inventory; (vii) all video inventory; and (viii) if applicable, any inventory deemed to be Excluded Inventory under paragraph 3.5 of this Agreement.

1.39 "Excluded Personal Property" will mean: (i) all Excluded Inventory; (ii) all packaging materials and supplies not included in the term "Supplies"; (iii) all leased point-of-sale equipment and leased photo lab equipment; (iv) all other leased equipment as described on Exhibit D to this Agreement with respect to the Store; (v) all owned computer and related equipment that contains software subject to a license that restricts its transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed; (vi) all equipment and other personal property that is neither owned nor leased by Seller or Winn-Dixie, including by way of

example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners and equipment owned by product vendors; (vii) all branded (with a Winn-Dixie name or logo) shopping carts, other than any such carts from which the brand is removable and which brands are removed in accordance with paragraphs 8.2 and 9.3 of this Agreement; (viii) all over-the-road motor vehicles; (ix) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (x) all data files other than the Files and Records; (xi) all lottery equipment and tickets; (xii) all accounts receivable, bank accounts, cash and cash equivalents; (xiii) all trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates; (xiv) all building signs and panels in all pole and pylon signs that advertise Seller's business in the Store; (xv) all personal property associated with the Excluded Pharmacy Operations; (xvi) all personal property associated with the Excluded Fuel Operations; (xvii) all Video Equipment; (xviii) all intellectual property and rights relating to any of the foregoing; and (xix) all service agreements, leases of personal property, contracts and warranties relating to Seller's possession and operation of the Store except that Warranties and Guaranties pertaining to the construction of the Store and/or Improvements, or pertaining to any equipment or fixtures that are part of the Assets, if any, shall be included in the Assets to the extent assignable.

1.40    "Excluded Pharmacy Operations" will mean pharmacy Inventory and Pharmacy Scrips relating to the Store.

1.41    "Files and Records" will mean, to the extent in Seller's possession (or otherwise within or under its control) and currently existing, (a) all real estate files, documents, instruments, papers, books and records of Seller or Winn-Dixie relating to the Store, and (b) electronic files for the Store showing for each item of Inventory the item description, and UPC code and such other information as Buyer may reasonably request relating to such item of Inventory. Files and Records shall not include any materials that are (x) not related to the Store or Assets, (y) related to Excluded Personal Property, or (z) protected by privilege, the work-product doctrine, or any other relevant immunity or protection.

1.42    "Hazardous Material" will mean any hazardous or toxic substance, material or waste which is regulated by any governmental authority, including, but not limited to, any hazardous material, substance or waste which is defined as (i) a "Hazardous Material" or an "Extremely Hazardous Material" under any applicable federal or state laws; (ii) a hazardous substance under Section 311 of the Federal Water Pollution Control Act

(33 U.S.C. Section 1317); (iii) a hazardous waste under Section 1004 of the Federal Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et. seq.); (iv) a hazardous waste substance under Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, (42 U.S.C. Section 9601 et. seq.); or (v) a hazardous or toxic waste, substance or material in any applicable law enacted by the applicable state and/or the federal government.   To the extent not otherwise included, phenolic foam shall be considered a Hazardous Material.

1.43    "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.44    "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.45    "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.46    "Initial Title Reports" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Store that Seller has made available to Buyer for review on the Merrill Website or otherwise as of the Effective Date.   Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.47    "Inventory" will mean all inventories of goods and merchandise within the Store and owned by Seller on the Inventory Count Date and held for resale in the ordinary course of business of Seller conducted at the Store to retail customers, but excluding the Excluded Inventory.

1.48    "Inventory Certificate" will mean with respect to the Store a certificate executed by Buyer and Seller in connection with the Closing as contemplated by paragraph 3.4.4 of this Agreement, in the form attached hereto as Exhibit H to this Agreement.

1.49    "Inventory Closing Statement" will mean a statement in the form of Exhibit C-2 to this Agreement reflecting the net amount due Seller at the Closing in respect of the Inventory Price, after making the adjustments described in Exhibit C-2 and in other provisions of this Agreement.

1.50    "Inventory Count" will have the meaning assigned in paragraph 3.4.1 of this Agreement.

-7-

1.51    "Inventory Count Date" will mean, with respect to the Store, the day immediately preceding the Closing Date for the Store.

1.52    "Inventory Deposit" will have the meaning assigned in paragraph 3.3.2 of this Agreement.

1.53    "Inventory Price" will mean the purchase price for the Inventory determined pursuant to paragraph 3.4 of this Agreement.

1.54    "Inventory Service" will mean MSI Inventory Service Corporation or Accurate Inventory & Calculating Service, Inc., as designated by Seller, or such other inventory service as is selected by Seller and reasonably acceptable to Buyer.

1.55    "Knowledge" will mean (i) in the case of Seller, the actual knowledge of each of Winn-Dixie's Corporate Environmental and Safety Manager and its Director of Maintenance and the lawyers in the real estate section of its legal department, together with Larry Appel, Senior Vice President and General Counsel, in each case, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of John Orgain, Vice President and General Counsel, without any requirement of investigation or inquiry.

1.56    "Landlord" will mean the lessor under the Lease.

1.57    "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.0 of this Agreement.

1.58    "Lease" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.59    "Liquidated Deposit" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.60    "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Store for its current use, taken as a whole, except to the extent that fact, circumstance, change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions

-8-

contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.61  "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Jaguar" with respect to the disposition of the Store and other properties.

1.62  "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on any of Seller's leasehold interests or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction, mechanics' or materialmen's liens that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets; and (D) judgments that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets.

1.63   "New Buyer Employee" will have the meaning assigned in Paragraph 9.4 of this Agreement.

1.64  "ordinary course of business" means the ordinary course of business of Seller after the Filing Date.

1.65  "Outside Date" means September 2, 2005, as such date may be extended by the written agreement of Seller and Buyer.

1.66  "Permits" will have the meaning assigned in paragraph 6.2 of this Agreement.

1.67  "Permitted Encumbrances" will mean (i) all matters listed on Exhibit F to this Agreement, (ii) all other matters set forth as exceptions in the Initial Title Reports, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in any additional Title Reports, other than Monetary Liens.

1.68  "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

-9-

1.69    "<u>Pharmacy Scrips</u>" will mean all customer lists, prescription files, prescription registers, and operating and maintenance logs owned by Seller that relate to the pharmacy operated in the Store.

1.70    "<u>Purchase Price</u>" will mean the Base Purchase Price, the Inventory Price and the Supplies Price collectively.

1.71    "<u>Real Property</u>" will mean the Leased Premises and the Improvements together.

1.72    "<u>Real Property Escrow Date</u>" will mean the date that is two (2) Business Days prior to the Closing Date or such earlier date after the Bankruptcy Court Approval as Buyer and Seller may mutually designate.

1.73    "<u>Sale Order</u>" will mean an order or orders of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby.

1.74    "<u>Seller</u>" will have the meaning assigned in the initial paragraph of this Agreement.

1.75    "<u>Seller Inventory Representative</u>" will mean Michael Chlebovec or another person designated in writing by Michael Chlebovec or by Seller to act in such capacity.

1.76    "<u>Seller's Brokers</u>" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.77    "<u>Seller's Closing Costs</u>" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in <u>paragraph 17.3</u> of this Agreement; (c) the Cure Costs; and (d) the cost of the Environmental Reports to the extent in excess of $3,000.

1.78    "<u>Seller's Escrowed Items</u>" will have the meaning assigned in <u>paragraph 14.2</u> of this Agreement.

1.79    "<u>Shopping Center</u>" will have the meaning assigned in <u>Paragraph A</u> of the Recitals to this Agreement.

1.80    "<u>Special Permits</u>" will mean all permits and licenses, including, without limitation, liquor, beer, and similar licenses, required with respect to the use, ownership, operation (including the sale at retail of liquor, beer and other items where a permit or license is required) or maintenance of any of the Store or other Assets.  The term Special Permits will not include any

permits or licenses associated with the Excluded Pharmacy Operations or the Excluded Fuel Operations.

1.81    "<u>Store Employees</u>" will have the meaning assigned in <u>paragraph 8.9</u> of this Agreement.

1.82    "<u>Store</u>" will have the meaning assigned in <u>paragraph A</u> of the Recitals to this Agreement and, when followed by "#" and a number will refer to the Store with the indicated number listed on <u>Exhibit A-1</u> to this Agreement, including if applicable any associated gas station, liquor store, pharmacy or other specialty area operated by Seller at the Leased Premises.

1.83    "<u>Sublease</u>" will mean each sublease of a portion of the Leased Premises listed on <u>Exhibit A-2</u> to this Agreement (if any), including amendments. If no Sublease is listed on <u>Exhibit A-2</u> to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Sublease will be disregarded.

1.84    "<u>Subtenant</u>" will mean the subtenant or sublessee under each Sublease. If no Sublease is listed on <u>Exhibit A-2</u> to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Subtenant will be disregarded.

1.85    "<u>Successful Bid</u>" will mean the highest or otherwise best offer to purchase the Assets relating to the Store, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.  The parties acknowledge that this Agreement has been determined to be the Successful Bid for the Store.

1.86    "<u>Supplies</u>" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the preparation or merchandising of Inventory, located within the Store and owned by Seller on the Inventory Count Date, excluding, however, any such packaging materials and supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of their Affiliates.

1.87    "<u>Supplies Price</u>" will mean the purchase price payable by Buyer for the Supplies, which will be $2,500.00.

1.88    <u>Intentionally omitted</u>.

1.89    "<u>Title Reports</u>" will mean, collectively, (i) the Initial Title Reports and (ii) any additional  title reports and/or title insurance commitments with respect to the Store that Seller has made available to Buyer for review on the Merrill Website or otherwise.

1.90    "<u>Title Insurer</u>" will mean First American Title Insurance Company or any other nationally recognized title insurance company, as designated by Seller.

1.91    "<u>Title Policies</u>" will have the meaning assigned in <u>paragraph 4.2</u> of this Agreement.

1.92    "<u>Video Equipment</u>" will mean, collectively, all display racks and equipment utilized in connection with video sales and rentals in the Store, including computers, software, computer peripherals and data bases, but excluding sales counters and other fixtures attached to the permanent improvements.

1.93    "<u>Warranties and Guaranties</u>" will mean all assignable third party warranties, guaranties or similar rights owned by Seller or Winn-Dixie or inuring to Seller's or Winn-Dixie's benefit in connection with, and only to the extent of, the Assets.

1.94    "<u>Winn-Dixie</u>" will mean Winn-Dixie Stores, Inc.

2.0    **<u>Property Included in Sale</u>.**  Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets, which - excluding Excluded Personal Property - are comprised of the following:

2.1    Seller's interest, as tenant, under the Lease and Seller's interest in any leasehold improvements;

2.2    Seller's interest in all fixtures and all equipment located in the store buildings now existing on the Leased Premises (the "<u>Buildings</u>"), including but not limited to Seller's interest in (i) heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "<u>Improvements</u>"), and (ii) Seller's trade fixtures and equipment located in the Buildings (the "<u>Equipment</u>");

2.3    The Inventory;

2.4    The Supplies;

2.5    Seller's interest in the Subleases (if any);

2.6    Any assignable Special Permits;

2.7    The Warranties and Guaranties; and

-12-

2.8    The Files and Records.

Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are subject to higher or otherwise better offers for the Assets and conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

3.0    **Purchase Price.**

3.1    Amount.  The purchase price to be paid by Buyer to Seller for the Assets (other than the Inventory and Supplies) is $2,000,000.00 in the aggregate (the "Base Purchase Price").  The purchase price to be paid by Buyer to Seller for the Inventory is the total of the Inventory Price for each item of Inventory, and the purchase price to be paid by Buyer to Seller for the Supplies is the Supplies Price.

3.2    Contract Consideration and Base Deposit.  Seller and Buyer acknowledge that as specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer has delivered to Escrow Agent, by wire transfer to an account designated in writing by Seller, a base earnest money deposit in the amount of $200,000 (the "Base Deposit").  The Base Deposit will be subject to refund to Buyer to the extent and in the circumstances described in paragraphs 4.2, 12, 15 and 16.  The Base Deposit will be credited against the Base Purchase Price at the relevant Closing and will be held in an interest bearing escrow account maintained by Escrow Agent prior to the relevant Closing.  Whenever used herein, the term Base Deposit also will be deemed to include all interest accrued thereon; however, for state and federal income tax purposes, interest, if any, accrued on the Base Deposit will be deemed earned by Buyer.  Buyer's federal taxpayer identification number (FEIN) is 56-1780605.

3.3    Payment.  The Purchase Price will be paid in the following manner:

3.3.1    *Base Purchase Price and Supplies Price*.  On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Base Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the relevant Closing Statement), and the Supplies Price.  On the Closing Date, Buyer will, subject to the conditions set forth in paragraph 10 of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted) and the Supplies Price to Seller (by wire transfer to an account designated in writing by Seller).

3.3.2    *Inventory Deposit and Inventory Price*.  On the Real Property

-13-

Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) an inventory deposit in the amount of $660,000 (the "Inventory Deposit"). The Inventory Price shall be determined in the manner set forth in paragraph 3.4 of this Agreement. At the Closing, (a) Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the amount by which the Inventory Price exceeds the Inventory Deposit, and (b) Buyer will instruct Escrow Agent to transfer and deliver the Inventory Price to Seller, by wire transfer to an account designated in writing by Seller. If the Inventory Deposit exceeds the Inventory Price, then Seller and Buyer shall provide written instructions to Escrow Agent to deliver the excess to Buyer promptly following Closing. The Base Deposit and, once deposited, the Inventory Deposit will individually and collectively sometimes be referred to in this Agreement as the "Deposit". The provisions of this paragraph 3.3.2 which apply to the period after the Closing shall survive the Closing.

3.3.3    *Certain Transaction Costs*.  All relevant rent, taxes (including real and personal property taxes), utilities (including the pharmacy phone line, where applicable) and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Base Purchase Price and Supplies Price payable at such Closing to the extent thereof and then against the Inventory Price. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.3.3 which apply to the period after the Closing shall survive the Closing.

3.3.4    *Sales Tax*.  Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. On Seller's request, Buyer agrees to

-14-

provide Seller with a certificate stating that Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Seller or any governmental authority to document that sale of the Inventory is exempt from sales tax. This paragraph 3.3.4 shall survive the Closing.

3.4     Inventory.

3.4.1   *Count of Store Inventory.* Seller shall close the Store at a time designated by Seller between 5:00 p.m. and 11:00 p.m. on the Inventory Count Date, unless otherwise agreed to by Seller and Buyer. As soon as possible after the closing of the Store, the parties will conduct a physical count (or measurement with respect to gasoline and other vehicle fuels) of the Inventory at the Store (the "Inventory Count") with the assistance of the Inventory Service. Buyer and Seller will each have representatives present at the Store during the Inventory Count who will acknowledge in writing all computations before leaving the Store. Upon completion of such Inventory Count, except for mathematical errors, other agreed upon changes and disputes regarding Inventory and Excluded Inventory, the count of the Inventory Service shall be final and binding on the parties for all purposes of this Agreement.

3.4.2   Intentionally omitted.

3.4.3   *Valuation of Inventory.* The Inventory will be valued by applying the following methods to the count reported by the Inventory Service:

the value used will be determined by taking Seller's standard retail shelf price (after adjusting to remove temporary or special price reductions, promotions or discounts, coupon discounts or customer loyalty card discounts) for the applicable item and multiplying such price by the valuation percentage for each merchandise category indicated in the table below:

| | Category | Valuation Percentage |
|---|---|---|
| 1. | Grocery (food and non-food) | 77% |
| 2. | Dairy | 80% |
| 3. | Frozen Food | 65% |
| 4. | General Merchandise | 65% |
| 5. | Tobacco | 82% |
| 6. | Alcohol | 85% |
| 7. | Packaged Lunch Meats | 68% |

-15-

3.4.4 *Inventory Certificates; Inventory Closing Statement*. Upon completion of the valuation of the Inventory for the Store, which shall be completed prior to the completion of Closing, the Buyer and Seller shall execute an Inventory Certificate, which shall contain the Inventory Price for the Inventory at the Store, and shall have incorporated therein a complete listing of the Inventory for the Store. Following execution of the Inventory Certificate, if requested by Buyer, Seller or Escrow Agent, Buyer and Seller shall execute an Inventory Closing Statement, which shall contain the Inventory Price for the Inventory at the Store and shall otherwise be consistent with the Inventory Certificate, and shall have incorporated therein appropriate disbursement instructions to Escrow Agent.

3.4.5 *Cooperation and Resolution of Disputes*. The parties agree to be cooperative and reasonable in connection with each Inventory Count and will attempt, in good faith, to resolve any disputes respecting the quantity of Inventory, Excluded Inventory and Excluded Personal Property that may arise during the Inventory Count. Any disputes that have not been resolved by the completion of Closing shall be separately listed and settled by Buyer Inventory Representative and Seller Inventory Representative with respect to the relevant Store as expeditiously as practicable thereafter or, if the parties cannot agree, by the Bankruptcy Court. Any such determination of any dispute shall be final and binding on the parties.

3.4.6 *Inventory Services and Fees*. Seller and Buyer will jointly select and engage the Inventory Service, but the fees of the Inventory Service will be billed to and paid by Buyer. Buyer agrees to pay such fees at Closing or earlier if then due and in any event before delinquent.

3.5 <u>Inventory Relating to Special Permits</u>. If by Closing Buyer shall not have obtained any required Special Permit contemplated by <u>paragraph 9.2</u> of this Agreement, notwithstanding its best efforts to do so, any tobacco, liquor, beer, wine, or other Inventory that under applicable law may not be transferred without such Special Permit will not be sold and transferred at Closing but will be segregated at the Store, in which case, unless the parties agree otherwise at or before Closing, (a) the relevant items of Inventory will be deemed to constitute Excluded Inventory, (b) the Bill of Sale to be delivered to Buyer at Closing will specifically exclude such Inventory, (c) the Inventory Price will be reduced by the Inventory Price allocable to such Inventory, and (d) Seller will remove such Inventory from the Store in the same manner as other Excluded Property and with reasonable promptness after Closing. Notwithstanding the foregoing

-16-

clause (d), if applicable law or regulation restricts Seller from removing from the Store (or transporting from the Store to a convenient location in which Seller will have continuing operations) any tobacco, liquor, beer, wine, pharmaceuticals or other Inventory that constitutes Excluded Property, then (i) Seller will have the right to segregate such Inventory at a secured location in the Store selected by Seller and reasonably acceptable to Buyer, and to maintain and protect such Inventory at such secured location for so long as Seller reasonably requires in order to obtain all Special Permits necessary to remove or transport such Inventory (or to sell or convey such Inventory to a third party entitled to do so), (ii) Seller will have reasonable access to such secured location during normal business hours to maintain and protect such Inventory and when appropriate remove such Inventory from the Store, and (iii) Seller will have the right but not the obligation to require Buyer to purchase such Inventory, at the Inventory Price allocable to such Inventory, at such time as Buyer has obtained such Special Permits as are required for Seller to do so provided that such Inventory does not meet the definition of "Excluded Inventory" under paragraph 1.41(ii), (iii) or (iv) at such time as Buyer has obtained such Special Permits.

3.6    Allocation of Base Purchase Price Among Assets at the Store.   Seller shall have the right to allocate the Base Purchase Price for the Store, for tax purposes and all other purposes, among the Assets at the Store other than Inventory and Supplies (as such Assets are described in paragraph 2.0 of this Agreement) in accordance with the Internal Revenue Code of 1986, as amended, including Section 1060 thereof; provided, however, that such allocation shall not be binding upon Buyer or determinative with respect to any allocation made by Seller of the Base Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case.  The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets at the Store on the Closing Statement.

## 4.0    **Buyer's Due Diligence**.

4.1    Acknowledgment by Buyer.  In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct certain due diligence regarding the Store and the Assets and that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to acquire certain additional information about the Store and the Assets.  Notwithstanding the foregoing, Buyer and Seller acknowledge that Buyer desires to conduct additional due diligence regarding the Store and the Assets in order to satisfy itself that the conditions to Closing are being met.  Buyer agrees that any physical access to or investigation of the Store by Buyer or its representatives shall be limited by and shall comply in all respects with this Agreement and the written instructions of Seller.

-17-

4.1.1 From the Effective Date until Closing, (a) Buyer shall have the privilege at all reasonable times, and after giving Seller advance written or telephonic notice, of going upon any of the Real Property with its agents and engineers as needed to (i) investigate and inspect the Assets with respect to the Store, which investigation and inspection shall include, but not be limited to, taking photographs of, and collecting data on, the Real Property, the Assets and the Store, and contacting and having confidential discussions with any officers, directors or employees of Seller or Winn-Dixie regarding the business or operation of the Store, and (ii) conduct a Phase I environmental assessment with respect thereto to the extent that a recent assessment has not been posted to the Merrill Website and (iii) conduct a physical inventory of the Equipment located at the Store; provided, however, that such Phase I environmental assessments and physical inventories shall not be physically intrusive on the Store unless Seller permits otherwise in a prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed; and (b) Seller shall use commercially reasonable efforts to provide information (without representation or warranty as to its accuracy or completeness) reasonably requested by Buyer that is reasonably related to the physical condition of the Assets and Store; provided, however, that, in connection therewith, Seller shall not be required to provide any written or electronic information or materials relating to the Assets other than those expressly required or contemplated pursuant to the foregoing provisions in this paragraph 4.1.1 or any other terms of this Agreement (and in no event shall Seller be required to provide any books and records, sales records, trade secrets, and other proprietary information or materials that are proprietary in nature or any information or materials that are protected by any privilege, immunity, work-product doctrine or other such protection).

4.1.2 The rights provided to Buyer in paragraph 4.1.1 **SHALL IN NO WAY ABROGATE BUYER'S OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT; provided, however, that, so long as Buyer does not violate any other provisions of the Confidentiality Agreement, Buyer's exercise of its rights in paragraph 4.1.1(a) shall be deemed to not violate the provisions of subparagraph (b) of the fourth paragraph of the Confidentiality Agreement and the entire sixth paragraph of the Confidentiality Agreement**. Buyer hereby indemnifies and agrees to hold harmless Seller from and against any and all damage to the Real Property (including the cost of restoring the Real Property to its pre-entry condition) and injury to any persons caused by Buyer or its agents in the course of exercising Buyer's

-18-

due diligence rights under this Agreement.  Notwithstanding the preceding sentence, Buyer will have no obligation to indemnify or hold Seller harmless from those claims, demands, liabilities, costs, expenses, penalties, damages and losses arising out of or relating to: (a) the negligence or willful misconduct of Seller or any of its Affiliates, subtenants, licensees, employees, agents, officers, or directors, or (b) the existence of information obtained by Buyer as a result of its investigation or (c) a pre-existing condition of any of the Assets.   Such indemnification will survive the expiration or termination of this Agreement and/or the consummation of the transactions contemplated by this Agreement.   Notwithstanding anything in this Agreement to the contrary, Buyer shall not conduct (or cause to be conducted) any physically intrusive investigation, examination or study of the Real Property without obtaining the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed.

4.1.3   **Intentionally Omitted**.

4.2     Title.  Buyer confirms and acknowledges that Seller has made the Initial Title Reports available to Buyer, and intends to make additional Title Reports available to Buyer, and Buyer may negotiate with the Title Insurer to obtain title insurance policies with respect to the Store (the "Title Policies") at Closing.  If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present use or occupancy of the Store, Buyer may object to such matter by delivery of written notice of objection to Seller    by    email    to    TTucker@kslaw.com    with    copy    to Catherinelbold@winn-dixie.com within two (2) Business Days of the date such additional Title Report is either delivered to Buyer or posted on the Merrill Website.  To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #805".  If Buyer timely notifies Seller of any valid objection to any such matter set forth in any additional Title Report with respect to the Store, and if Seller declines or is unable to cure any such objection, then Buyer will have the right to terminate this Agreement on the earlier of (x) two (2) Business Days following Buyer's receipt of  notice from Seller that it will not cure such objection or (y) the Closing Date.  If Buyer fails to so terminate this Agreement, then Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter and such matter shall constitute a Permitted Encumbrance.

4.3     Environmental Reports.  Seller represents that it has made, or will make, available to Buyer for review on the Merrill Website an environmental report (each, an "Environmental Report"), covering the Real Property

-19-

**BAE SYSTEMS**

Enterprise Systems Incorporated
11487 Sunset Hills Road
Reston, Virginia 20190-5234

# CERTIFICATE OF SERVICE

```
District/off: 113A-3          User: cartes          Page 1 of 1                    Date Rcvd: Aug 05, 2005
Case: 05-03817               Form ID: pdfdoc        Total Served: 1
```

The following entities were served by first class mail on Aug 07, 2005.
```
aty        +Cynthia C. Jackson,    Smith Hulsey & Busey,    225 Water Street, Suite 1800,
            Jacksonville, FL 32202-4494
```

The following entities were served by electronic transmission.
```
NONE.                                                                              TOTAL: 0
```

```
            ***** BYPASSED RECIPIENTS *****
NONE.                                                                              TOTAL: 0
```

Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.

**I, Joseph Speetjens, declare under the penalty of perjury that I have served the attached document on the above listed entities in the manner shown, and prepared the Certificate of Service and that it is true and correct to the best of my information and belief.**

**First Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

**Date: Aug 07, 2005**                    **Signature:**    _Joseph Speetjens_