# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

## ORDER APPROVING DEBTORS' (A) SALE OF ASSETS FREE AND CLEAR OF LIENS, (B) ASSUMPTION AND ASSIGNMENT OF LEASES AND (C) RELATED RELIEF

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 (a) authorizing the Debtors to sell leasehold interests, equipment, inventory and if the respective store contains a pharmacy, the pharmacy scrips, including the assets described in the asset purchase agreement  (the "Purchase Agreement") attached as Exhibit A, including the leasehold interests in Store Numbers 1303, 1317, 1323, 1328, 1349, 1806, 2623, 2710, 2720, 2727, 2730, 2733, 2740 and 2743 (collectively, the "Assets"), free and clear of liens, claims, interests and encumbrances to the Buyers listed in the Purchase Agreement (collectively, the "Purchaser"), (b) determining that the sale is exempt from any stamp, transfer, recording or similar tax, (c) authorizing the Debtors to assume and assign all unexpired leases identified in the Purchase Agreement in connection with the sale (collectively, the "Leases"), (d) fixing cure amounts for the Leases, and (e) granting related relief (the "Motion").  By the Motion, the Debtors asserted that the only cure amounts required

under the Lease are those as set forth on the attached Exhibit B (the "Cure Amounts"). Only the landlords for Store Numbers 2710 and 2733 objected to the Debtors proposed cure amounts (the "Objections"). The Court will hold a hearing on the Objections at a later date and determine the cure amounts, if any (the "Disputed Cure Amounts"). The Court held a hearing on the Motion on July 29, 2005 to approve the sale (the "Sale Hearing"). The Court has reviewed the Motion and heard the representations of counsel. Upon the representations of counsel and without objection by the United States Trustee or any other interested party, the Court makes the following findings of fact:

      A.    This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

      B.    The Debtors solicited highest or otherwise best offers for the Assets, substantially in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 20, 2005 (the "Bidding Procedures"). A competing bid was received for the Assets and the Debtors conducted an auction for the Assets on July 18, 2005 (the "Auction"). At the Auction, Purchaser submitted the final bid of $4,703,143.00, representing the highest or otherwise best offer received for the Assets.

      C.    The Debtors have provided interested parties (including all parties asserting claims or interests in the Assets, if any) with proper notice of the Motion, the Sale Hearing,[1] the Auction, the assumption and assignment of the Leases, and the fixing of any cure amounts, in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365, Fed.

---

[1]    All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Motion.

R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order and the Bidding Procedures Order.

    D.    The Debtors marketed the Assets and conducted the sale process in compliance with the Bidding Procedures Order, the Bidding Procedures, the Bankruptcy Code and all other orders entered in these cases. Bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner. The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets. In their sound business judgment, the Debtors determined that the bid submitted by the Purchaser at the Auction represented the highest or otherwise best offer for the Assets.

    E.    The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A, the Assumption and Assignment Agreement attached to the Purchase Agreement, and all related documents, and the sale of the Assets and assumption and assignment of the Leases has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

    F.    The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

    G.    Neither the Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

3

H.      The Debtors and the Purchaser proposed, negotiated and entered into the Purchase Agreement, without collusion, in good faith and at arms'-length bargaining positions. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

I.      The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

J.      The consideration the Purchaser gave the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value.

K.      The Debtors' sale of the Assets and the assumption and assignment of the Leases will facilitate the formulation and confirmation of a plan of reorganization. For this reason, the sale of the Assets and the assumption and assignment of the Leases constitute transfers to which 11 U.S.C. § 1146(c) applies.

L.      The Debtors' transfer of the Assets to the Purchaser pursuant to the Purchase Agreement and the Assumption and Assignment Agreement will be a legal, valid, and effective transfer of the Assets. The Debtors' transfer of the Assets to the Purchaser vests the Purchaser with good and valid title in and to the Assets free and clear of any liens, claims, offsets, rights of recoupment, encumbrances, pledges, mortgages, security interests, charges, options or other interests of any kind or nature (collectively, the "Claims and/or Interests"), with the exception of the Permitted Encumbrances and the Assumed Liabilities, if any, as defined in the Purchase Agreement. Any non-assumed Claim and/or Interest will attach to the proceeds of the sale with the same validity,

4

enforceability and priority they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors, Wachovia Bank National Association, as Administrative Agent and Collateral Agent for itself ("Agent") and the other financial institutions from time to time parties to the Credit Agreement dated as of February 23, 2005, as may be amended or modified (collectively, "Lenders" and together with Agent, collectively the "DIP Lender") and all interested parties with respect to such Claims and/or Interests.

      M.    The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the Purchase Agreement free and clear of all Claims and/or Interests (except the Permitted Encumbrances and the Assumed Liabilities) because any entity with any Claims and/or Interests in the Assets to be transferred (i) has consented to the Sale (including the assumption and assignment of the Leases) or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claims and/or Interests; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. Holders of Claims and/or Interests, if any, who did not object, or who withdrew their objections to the Sale Motion are deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2).

      N.    The Debtors will cause the proceeds from the Sale to be paid in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay,

504190

(II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

O.    The Debtors' assumption and assignment of the Leases in connection with the Sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

P.    The Debtors have provided the landlord of the Leases with adequate assurance that they will promptly cure any defaults under the Leases pursuant to 11 U.S.C. §§ 365(b)(1).

Q.    Pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006, the amounts set forth on Exhibit B, if any, constitute all amounts due and owing under the Leases in connection with the assumption of the Leases and will be fixed and allowed for the Leases (the "Cure Amounts"). No other amounts are due and owing by the Debtors under the Leases. The Debtors will pay the Cure Amounts, if any, in accordance with the terms and provisions of the Purchase Agreement. Upon payment of the Cure Amounts, all defaults, if any, under the Leases will be deemed cured.

R.    The Purchaser has provided the landlord for the Leases with adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B).

S.    No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under the Leases.

6

T.      Except as expressly set forth in the Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser will have no responsibility for any liability, claim or other obligation of or against the Debtors related to the Assets or the Leases by virtue of the transfer of the Assets and the assumption and assignment of the Leases to the Purchaser.  The Purchaser will not be deemed, as a result of any action taken in connection with the purchase of the Assets or the assumption and assignment of the Leases to (i) be a successor to the Debtors (other than with respect to the Assumed Liabilities and any obligations arising under the assigned Leases from and after the closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors.  The Purchaser is not acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the Purchase Agreement or in any assigned Leases.

U.      To the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Bankruptcy Court expressly finds that there is no just reason for delay in the implementation of this Order.

V.      The Court's approval of the Purchase Agreement and the Assumption and Assignment Agreement is in the best interests of the Debtors, their estates and their creditors.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted.

2.      All objections to the entry of this Order or to the relief granted and requested in the Motion, including any objection to any proposed

7

Cure Amounts (other than as to the Disputed Cure Amounts), that have not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

3. The Purchase Agreement and the Assignment and Assumption Agreement are each approved in all respects. Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized (subject to applicable Closing conditions set forth in the Purchase Agreement), to consummate the Sale including transferring and conveying the Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

4. Upon Closing, the Debtors are authorized, in accordance with 11 U.S.C. §§ 105(a), 363 and 365, to assume and assign the Leases to Purchaser.

5. The Debtors have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2).

6. The Leases will be assumed and assigned to the Purchaser, in accordance with their respective terms. The assigned Leases will remain in full force and effect notwithstanding any provision in the Leases to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1)) which prohibit, restrict or condition such assignment or transfer). The DIP Lender and all non-debtor parties to the Leases are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the Purchase Agreement.

504190

7.      Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized and empowered to consummate and implement fully the Purchase Agreement and the Assignment and Assumption Agreement, together with all additional instruments and documents that may be necessary to implement the Purchase Agreement. The Debtors are authorized to take all actions necessary or desirable for the purpose of assigning, transferring, granting, conveying, and conferring the Assets and the Leases to Purchaser.

8.      Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties in accordance with the terms of the Purchase Agreement without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of (a) the DIP Lender and (b) the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.      The Debtors will transfer the Assets to the Purchaser upon closing free and clear of all Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances and Assumed Liabilities). The only Claims and/or Interests in the Assets are those of the landlord with respect to the applicable Lease being sold and assigned pursuant to the Purchase Agreement and the senior liens and superpriority administrative claims of the DIP Lender. The Claims and/or Interest of such landlord will be satisfied upon Closing by the Debtors' cure of any defaults under the respective

9

Leases and the Debtors and the Purchasers demonstration of adequate assurance of future performance under 11 U.S.C. §365. The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds of the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

10.     The Debtors will cause the proceeds from the Sale to be paid in accordance with the terms of the Final Financing Order and the Loan Documents.

11.     The Debtors' transfer of the Assets pursuant to the terms of the Purchase Agreement is a transfer pursuant to 11 U.S.C. § 1146(c). Accordingly, the making, delivery, filing or recording of any deeds, assignments or other transfer documents in connection with the sale (the "Transfer Instruments"), will not be taxed under any law imposing a recording tax, stamp tax, transfer tax or similar tax (including without limitation, any transfer or recordation tax applicable to deeds and/or security interests). All filing and recording officers are directed to accept for filing or recording, and to file or record the Transfer Instruments immediately upon presentation without payment of any such taxes.

12.     The Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and applicable non-bankruptcy law. For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

504190

13.     The Cure Amounts for the Leases are fixed in the respective amounts set forth on Exhibit B.  The Disputed Cure Amounts will be fixed upon further order of the Court.  All defaults, claims or other obligations of the Debtors arising or accruing under each of the Leases, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be cured by the Debtors in accordance with the Purchase Agreement, by paying the Cure Amounts.  The Disputed Cure Amounts will be paid upon adjudication by the Court.  No other or further monetary amounts or obligations are due or existing under the Leases by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise.

14.     Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Leases to the Purchaser, (a) the Debtors and their estates are relieved from any and all liability for any breach of the Leases occurring after assignment to the Purchaser, and (b) the Purchaser is responsible for any and all claims and obligations under the Leases occurring or arising after the assignment.

15.     Subject to the terms of this Order, the Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser assumes all rights and obligations of the Debtors under the Leases upon the assignment of such Leases to the Purchaser.

16.     All non-Debtor parties to the Leases are forever enjoined and estopped from contesting the Cure Amounts and, once adjudicated,

504190

the Disputed Cure Amounts, and from asserting any default against the Purchaser which existed as of the date of the Sale Hearing.

17.      Upon the Debtors' assignment of the Leases to the Purchaser, no default will exist under the Leases. Upon entry of this Order and the assumption and assignment of the Leases, the Purchaser is deemed to be in compliance with all terms and provisions of the Leases.

18.      Subject to the terms and conditions of this Order, all entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors. Prior to or upon the closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims and/or Interests in the Assets (except for the Permitted Encumbrances and Assumed Liabilities), if any. In the event any creditor fails to release its Claims and/or Interests in the Assets, the Debtors are authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other documents on such creditor's behalf. The Purchaser is also authorized to file, register or otherwise record a certified copy of this Order upon Closing in accordance with the terms of this Purchase Agreement and this Order. Once this Order is so filed, registered or otherwise recorded in accordance with the provisions of this Order, the Order constitutes conclusive evidence of the release of all Claims and/or Interests against the Assets as of the Closing (except for the Permitted Encumbrances and Assumed Liabilities).

504190

19.     Upon Closing of the Sale of Assets in accordance with the Purchase Agreement and this Order, the Purchaser will be deemed to have acted in good faith in purchasing the Assets and Leases under the Purchase Agreement as that term is used in 11 U.S.C § 363(m).   For that reason, any reversal or modification of the Order on appeal will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

20.     The Debtors' transfer of the Assets to Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances or Assumed Liabilities) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

21.     Other than the Permitted Encumbrances, the Assumed Liabilities and other obligations of the Purchaser as set forth in the Purchase Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets, including, the Leases.   The Debtors' transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory or under any employment contract, understanding or agreement, including without limitation,

13

collective bargaining agreements, employee pension plans or employee welfare or benefit plans.

22.     Upon closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets and the Leases and a bill of sale transferring good and marketable title in the Assets to Purchaser. Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

23.     This Order is effective as a determination that upon Closing any and all Claims and/or Interests (except for the Permitted Encumbrances and Assumed Liabilities), if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

24.     This Order is binding upon all entities who may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Assets.

25.     This Court retains exclusive jurisdiction to (a) enforce and implement the Purchase Agreement, the Assumption and Assignment Agreement, and any other agreements and instruments executed in connection with the Purchase Agreement, (b) compel delivery of possession of the Assets to Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement, Assignment Agreement, and any Claims

14

and/or Interests, including to enjoin the commencement or continuation of any action seeking to impose successor liability, and (d) interpret, implement and enforce the provisions of this Order.

26.    The terms and provisions of the Purchase Agreement, the Assignment Agreement and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, any and all chapter 7 and chapter 11 trustees thereof, the Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding. Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in these chapter 11 cases, any subsequent chapter 7 case into which any of these chapter 11 cases may be converted, or any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Order.

27.    Except as may otherwise be provided for in the Purchase Agreement and/or all related documents, including, without limitation, claims arising from the Purchaser's performance and obligations under the Purchase Agreement, all related documents and this Order, upon Closing, all persons who hold Claims and/or Interests against the Debtors are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their

15

respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

28.    After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Claims and/or Interests or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Purchase Agreement.  No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

29.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in this Order will control.

30.    Within ten (10) days after Closing, the Debtors will file a statement with the Bankruptcy Court as required by and in accordance with Rule 6004(f), Federal Rules of Bankruptcy Procedure.

504190

31.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. §158(a) and Rule 54 of the Federal Rules of Bankruptcy Procedure because there is no just reason for delay for appeal. Notwithstanding Fed. R. Bankr. P. 6004(g) and 6006(d), this Order will take effect immediately upon entry and the parties may consummate the sale of the Assets immediately upon entry of this Order.

Dated this _____ day of August, 2005 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve a copy of this Order on all parties who received copies of the Motion.

17

504190

# EXHBIT A

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made effective as of June 30, 2005 (the "Effective Date"), by and among

**WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation and **WINN-DIXIE RALEIGH, INC.,** a Florida corporation (collectively, the "Seller"), and

**THE BUYERS,** as listed on Schedule 1 attached hereto and incorporated herein , or their permitted assignees pursuant to paragraph 17.5 of this Agreement (each, a "Buyer"; collectively, the "Buyers").

## R E C I T A L S:

A.  Seller is the tenant of each of 37 supermarket stores and an adjacent fuel center (the "Stores"), each of which is listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under the respective leases, including amendments thereto (the "Leases") described on Exhibit A-2 to this Agreement. The Stores occupy the respective leased premises as described in each Lease (the "Leased Premises"), within the respective parcels of real property described on Exhibit A-2 to this Agreement associated with each Lease. Seller's leasehold interest in each Leased Premises pursuant to each Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "Assets."

B.  Seller desires to transfer and sell and Buyers have agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.  Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no. 05-03817-3F1 (the "Bankruptcy Case").

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0  **Defined Terms.**  Capitalized terms as used in this Agreement will have the following meanings when used herein.

1.1    "Adequate Assurance Information" will mean, with respect to each Buyer, financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that Landlords and Subtenants are adequately assured of such Buyer's future performance under the Leases, as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of such Buyer's obligations under the Leases and (where applicable) the Subleases by an Affiliate of such Buyer with sufficient assets to provide adequate assurance of future performance.

1.2    "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3    "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4    "Allocation Schedule" will mean the allocation of the Base Purchase Price, Base Deposit and Inventory Deposit to each of the Stores as provided on Exhibit E to this Agreement.

1.5    "Approval Hearing" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.6    "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.7    "Bankruptcy Code" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.8    "Bankruptcy Court" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.9    "Bankruptcy Court Approval" will mean the entry of one or more Sale Orders with respect to the Stores by the Bankruptcy Court.

1.10   "Bankruptcy Case" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.11   "Base Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.12   "Base Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.13   "Bidding Procedures" will mean the procedures approved by the Bankruptcy Court that will govern the selection by Seller of the Successful Bid relating to a particular Store.

1.14   "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to the applicable Buyer at each Closing the Inventory, the Supplies, the Equipment and other tangible and intangible personal property constituting a portion of the Assets relating to the one or more Stores being transferred at such Closing.

1.15   "Buildings" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.16   "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.17   "Buyer" and "Buyers" will have the meanings assigned in the initial paragraph of this Agreement.  As used herein, the term "Buyer" means, with respect to any particular Store or Stores (and related Assets), the Buyer that is purchasing such Store as provided in the Allocation Schedule.

1.18   "Buyer Delivery Confirmation" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.19   "Buyer Inventory Representative" will mean a person designated in writing by each Buyer to act in such capacity.

1.20   "Buyer's Closing Costs" will mean, with respect to each Buyer: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policies (and the cost of any simultaneous issue mortgagee title insurance policies and any loan-related title insurance endorsements thereon); (d) intentionally omitted; (e) recording fees payable in connection with recording the Conveyance Instruments in the appropriate public records; (f) cost of the Environmental Reports, including any supplements or updates; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment, Supplies and Inventory; (i) one half of the fees and costs of the Closing Escrow Agent; and (j) one half of the fees and costs of the Inventory Service.

1.21   "Buyer's Escrowed Items" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.22 "Closing" with respect to each Buyer and with respect to one or more Stores will mean the consummation of the assignment, assumption, sale and purchase of the Assets relating to such Store or Stores pursuant to this Agreement as indicated by delivery of the Conveyance Instruments and other documents contemplated by paragraph 14 of this Agreement and the Purchase Price as contemplated in this Agreement with respect to such Store or Stores, which will be deemed to occur at 12:01 a.m. on the Closing Date with respect to such Store or Stores.

1.23 "Closing Date" will mean the date as to a particular Store or Stores designated by Seller in writing, and reasonably acceptable to the applicable Buyer, that is between one day and 30 days following the Bankruptcy Court Approval with respect to such Store or Stores.

1.24 "Closing Statement" will mean a statement in the form of Exhibit C-1 to this Agreement (or in such other form as is prepared by Seller and reasonably acceptable to the applicable Buyer) reflecting the net amount due Seller at each Closing (other than in respect of the Inventory Price), after making the adjustments described in paragraph 3.3.3 of this Agreement and in other provisions of this Agreement.

1.25 "Confidentiality Agreements" will mean the existing letter agreements between (i) Winn-Dixie and SUPERVALU INC. and (ii) Winn-Dixie and each respective Buyer, regarding, among other things, confidentiality relating to the subject matter of this Agreement.    Each Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreements and is entitled to enforce all obligations of the respective Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.

1.26 "Conveyance Instrument" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.27 "Credit Agreement Liens" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.28 "Cure Costs" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Leases and the Subleases.

1.29 "Damages" will have the meaning assigned in paragraph 16.5 of this Agreement.

1.30    "Deposit" will have the meaning assigned in paragraph 3.3.2 of this Agreement.

1.31    "Due Diligence Materials" will mean, collectively, (i) the Leases, the Subleases (if any), the Title Reports and the Environmental Reports, (ii) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreements or otherwise) in hard copy, in electronic format, at the Stores, on the Merrill Website, or otherwise and (iii) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.32    "Effective Date" will have the meaning assigned in the initial paragraph of this Agreement, and shall also be the date that Seller accepts this Agreement.

1.33    "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.34    "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.35    "Escrow Agent" will mean Title Insurer, acting as escrow and closing agent.

1.36    "Excluded Inventory" will mean (i) any private label goods and merchandise; (ii) any goods and merchandise that are damaged, spoiled or distressed; (iii) any items that as of the Inventory Count Date are past Seller's "pull date", if any, or, with respect to dairy items, within five days of Seller's "pull date" or, with respect to frozen foods, within 10 days of Seller's "pull date", or with respect to pharmaceutical inventory (including diabetic supplies), within 30 days of the manufacturer's expiration date, if any; (iv) all goods and merchandise other than saleable, nonperishable, national-brand merchandise inventory in the categories commonly known as Grocery, Dairy, Frozen Food and GM/HBC (General Merchandise / Health, Beauty and Cosmetic); and (v) if applicable, any inventory deemed to be Excluded Inventory under paragraph 3.5 of this Agreement. Specifically, Excluded Inventory shall include without limitation tobacco, alcohol and perishable department product including bakery, deli, floral, produce and meat.

1.37    "Excluded Personal Property" will mean: (i) all Excluded Inventory; (ii) all packaging materials and supplies not included in the term "Supplies"; (iii) all leased point-of-sale equipment and leased photo lab equipment; (iv) all other leased equipment (including all other leased equipment described on Exhibit D to this Agreement with respect to each Store); (v) all owned computer and related equipment that contains software subject to a

license that restricts its transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed; (vi) all equipment and other personal property that is neither owned nor leased by Seller, including by way of example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners and equipment owned by product vendors; (vii) all over-the-road motor vehicles; (viii) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (ix) all data files other than Pharmacy Scrips; (x) all lottery equipment and tickets; (xi) all accounts receivable, bank accounts, cash and cash equivalents; (xii) all trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates; (xiii) all building signs and panels in all pole and pylon signs that advertise Seller's business in the Stores; (xiv) all intellectual property and rights (other than Pharmacy Scrips) relating to any of the foregoing; and (xv) all service agreements, leases of personal property, contracts and warranties relating to Seller's possession and operation of the Stores.

1.38   "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.39   "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.40   "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.41   "Initial Title Reports" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Stores that Seller has made available to Buyer for review on the Merrill Website or otherwise as of the Effective Date.  Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.42   "Inventory" will mean all inventories of goods and merchandise within the Stores and owned by Seller on the Inventory Count Date and held for resale in the ordinary course of business of Seller conducted at the Stores to retail customers, but excluding the Excluded Inventory.

1.43   "Inventory Certificate" will mean with respect to each Store a certificate executed by Buyer and Seller in connection with the Closing as

contemplated by paragraph 3.4.4 of this Agreement, in the form attached hereto as Exhibit H to this Agreement.

1.44 "Inventory Closing Statement" will mean a statement in the form of Exhibit C-2 to this Agreement reflecting the net amount due Seller at each Closing in respect of the Inventory Price, after making the adjustments described in Exhibit C-2 and in other provisions of this Agreement.

1.45 "Inventory Count" will have the meaning assigned in paragraph 3.4.1 of this Agreement.

1.46 "Inventory Count Date" will mean, with respect to each Store, the day immediately preceding the Closing Date for such Store.

1.47 "Inventory Deposit" will have the meaning assigned in paragraph 3.3 or this Agreement.

1.48 "Inventory Price" will mean the purchase price for the Inventory determined pursuant to paragraph 3.4 of this Agreement.

1.49 "Inventory Service" will mean MSI Inventory Service Corporation or Accurate Inventory & Calculating Service, Inc., as designated by Seller, or such other inventory service as is selected by Seller and reasonably acceptable to Buyer.

1.50 "Investigation Period" will mean the period commencing on the Effective Date and ending at 5:00 p.m. Eastern Time five (5) Business Days after the Effective Date.

1.51 "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, and (ii) in the case of each Buyer, the actual knowledge of the senior officer or officers of such Buyer having responsibility for legal affairs, without any requirement of investigation or inquiry.

1.52 "Landlords" will mean the lessors under the Leases.

1.53 "Lease Concessions" will have the meaning assigned in paragraph 4.4 of this Agreement.

1.54 "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.1 of this Agreement.

1.55  "Leases" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.56  "Liquidated Deposit" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.57  "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or any particular Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Store or Stores for their current use, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.58  "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Jaguar" with respect to the disposition of the Stores and other properties.

1.59  "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on any of Seller's leasehold interests or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets; and (D) judgments that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets.

1.60  "Negotiation Period" will mean the period commencing on the Effective Date and ending at 12:00 Noon Eastern Time on July 11, 2005.

1.61  "ordinary course of business" means the ordinary course of business of Seller after the Filing Date.

-8-

1.62   "Outside Date" means September 2, 2005, as such date may be extended by the written agreement of Seller and Buyer.

1.63   "Permits" will have the meaning assigned in paragraph 6.2 of this Agreement.

1.64   "Permitted Encumbrances" will mean (i) all matters listed on Exhibit F to this Agreement, (ii) all other matters set forth as exceptions in the Initial Title Reports, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in any additional Title Reports, other than Monetary Liens.

1.65   "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.66   "Pharmacy Scrips" will mean all customer lists, prescription files, prescription registers, and operating and maintenance logs owned by Seller that relate to the pharmacy operated in any of the stores.

1.67   "Purchase Price" will mean the Base Purchase Price, the Inventory Price and the Supplies Price collectively.

1.68   "Real Property" will mean the Leased Premises and the Improvements together.

1.69   "Real Property Escrow Date" with respect to one or more Stores will mean the date that is two Business Days prior to the Closing Date for such Store or Stores or such earlier date after the Bankruptcy Court Approval as Buyer and Seller may mutually designate.

1.70   "Sale Order" will mean an order or orders of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, in each case with respect to one or more of the Stores.

1.71   "Seller" will have the meaning assigned in the initial paragraph of this Agreement.  As used herein, the term "Seller" means, with respect to each Store and its related Assets located in Georgia, Winn-Dixie Raleigh, Inc., and with respect to each Store and its related Assets located in Alabama and Mississippi, Winn-Dixie Montgomery, Inc.

1.72   "Seller Delivery Confirmation" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.73    "Seller Inventory Representative" will mean Michael Chlebovec or another person designated in writing by Michael Chlebovec or by Seller to act in such capacity.

1.74    "Seller's Brokers" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.75    "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; (c) the Cure Costs; (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instruments; (e) one half of the fees and costs of the Closing Escrow Agent; and (f) one half of the fees and costs of the Inventory Service.

1.76    "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.77    "Stores" will have the meaning assigned in paragraph A of the Recitals to this Agreement and, when followed by "#" and a number will refer to the particular Store with the indicated number listed on Exhibit A-1 to this Agreement, including if applicable any associated gas station, liquor store, pharmacy or other specialty area operated by Seller at the Leased Premises.

1.78    "Sublease" will mean, with respect to each Store, each sublease of a portion of the Leased Premises listed on Exhibit A-2 to this Agreement (if any), including amendments. If no sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Sublease at such Store will be disregarded.

1.79    "Subtenant" will mean, with respect to each Store, the subtenant or sublessee under each Sublease. If no sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Subtenant at such Store will be disregarded.

1.80    "Successful Bid" will mean, with respect to a particular Store, the highest or otherwise best offer to purchase the Assets relating to such Store, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.81    "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the

preparation or merchandising of Inventory, located within the Stores and owned by Seller on the Inventory Count Date, excluding, however, any such packaging materials and supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of their Affiliates.

1.82   "Supplies Price" will mean the purchase price payable by Buyer for the Supplies, which will be $2,500.00 per Store.

1.83   "Terminated Stores" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.84   "Title Reports" will mean, collectively, (i) the Initial Title Reports and (ii) any additional title reports and/or title insurance commitments with respect to the Stores that Seller has made available to Buyer for review on the Merrill Website or otherwise.

1.85   "Title Insurer" will mean First American Title Insurance Company or Near North National Title LLC, as agent for Lawyers Title Insurance Corporation, or any other nationally recognized title insurance company, as designated by Seller.

1.86   "Title Policies" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.87   "Winn-Dixie" will mean Winn-Dixie Stores, Inc.

2.0    **Property Included in Sale.**  Seller agrees to assign, transfer, sell and convey to the applicable Buyer, and each Buyer, with respect to the Stores it is purchasing, agrees to assume and purchase from Seller, the Assets, which-excluding Excluded Personal Property-are comprised of the following:

2.1    Seller's interest, as tenant, under the Leases and Seller's interest in any leasehold improvements;

2.2    Seller's interest in all fixtures and all equipment located in the store buildings now existing on the Leased Premises (the "Buildings"), including but not limited to Seller's interest in (i) heating and air conditioning systems (including all refrigerants and gases), facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "Improvements"), and (ii) Seller's trade fixtures and equipment located in the Buildings (the "Equipment");

2.3    The Inventory;

-11-

2.4    The Supplies;

2.5    With respect to each Store that includes a pharmacy, the Pharmacy Scrips (provided Buyer has obtained all Permits necessary for Seller to lawfully convey the Pharmacy Scrips to Buyer at Closing) and, to the extent transferable, ownership and control of pharmacy phone lines;

2.6    Seller's interest in the Subleases (if any).

2.7    Each Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are (a) subject to higher or otherwise better offers for the Assets, and (b) conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement. Each Seller agrees and acknowledges that (i) this Agreement is a block bid by the Buyers for the Assets related to the Stores, and is to be considered as a whole, and (ii) Seller shall not be permitted to terminate this Agreement with respect to any particular Store or Stores, or with respect to any particular Buyer, except as specifically permitted in <u>paragraphs 15.1(a)(i), 15.1(a)(ii), 15.1(a)(v), 15.1(a)(vi), 15.1(a)(viii) and 15.1(a)(ix)</u> herein. If Seller selects this Agreement as the "Initial Bid" as defined in the Bidding Procedures, Seller may consider competing bids in accordance with the Bidding Procedures; provided, however, any such competing bid must exceed the Base Purchase Price for all Stores as set forth in this Agreement by at least five percent (5%). Notwithstanding the foregoing, however, after Seller has selected this Agreement as the Initial Bid, if this Agreement is terminated with respect to the Stores because this Agreement is not the Successful Bid with respect to the Stores, each Buyer shall be entitled to a termination fee of 3% of the cash portion of the Base Purchase Price allocated for the respective Buyer's Store or Stores as set forth in this Agreement, which fee shall be payable from the proceeds Seller receives after the closing of the sale of the Stores pursuant to a Successful Bid or Bids to any Person that is not SUPERVALU INC., a Buyer, or an Affiliate of SUPERVALU INC. or a Buyer; <u>provided, however,</u> that Buyer shall not be entitled to receive any termination fee if Buyer is in default of this Agreement at the time of termination of this Agreement.

3.0    **Purchase Price.**

3.1    <u>Amount</u>. The purchase price to be paid by Buyers to Seller for the Assets (other than the Inventory and Supplies) is Nine Million Five Hundred Thousand and no/100 Dollars ($9,500,000.00) in the aggregate (the "<u>Base Purchase Price</u>"), which will be allocated to each Store as set forth on the Allocation Schedule,. The purchase price to be paid by the applicable Buyer to Seller for the Inventory in respect of each Store is the total of the Inventory Price for each item of Inventory, and the purchase price to be paid by the applicable Buyer to Seller for the Supplies in respect of each Store is the Supplies Price. If this Agreement is terminated in accordance with its terms as to one or more, but not all, of the Stores, then (i) the

aggregate Base Purchase Price will be reduced based on the Allocation Schedule for each Store as to which this Agreement is so terminated and such reduced Base Purchase Price shall apply to the Stores that remain subject to the continuing force and effect of this Agreement; and (ii) the terms "Inventory", "Supplies" and "Subleases" will be deemed to exclude, respectively, all Inventory, Supplies and Subleases of the Stores with respect to which this Agreement is terminated.

3.2    Contract Consideration and Base Deposit.  As specific consideration for Seller's agreement to sell the Assets to Buyers in accordance with the terms and conditions of this Agreement, Buyers shall deliver to Escrow Agent, no later than two Business Days after Seller's execution and acceptance of this Agreement, provided Seller has delivered to each Buyer the Landlord contact information as required by paragraph 4.4 of this Agreement, a base earnest money deposit with respect to the Stores in an aggregate amount equal to the amount set forth in the Allocation Schedule (the "Base Deposit"), which will be allocated to each Store pursuant to the Allocation Schedule. Buyers shall make the Base Deposit by wire transfer to an account designated in writing by Escrow Agent. The Base Deposit will be subject to refund to Buyers to the extent and in the circumstances described in paragraphs 12, 15 and 16.  The applicable portion of the Base Deposit will be credited against the Base Purchase Price at the relevant Closing and will be held in an escrow account maintained by Escrow Agent prior to the relevant Closing.  Whenever used herein, the term Base Deposit also will be deemed to include all interest accrued thereon if the escrow account maintained by Escrow Agent is an interest bearing account; however, for state and federal income tax purposes, interest, if any, accrued on the Base Deposit will be deemed earned by Buyers.   Each of the Buyers' federal taxpayer identification numbers (FEIN) are identified on Schedule 1.

3.3    Payment.  The Purchase Price will be paid in the following manner:

3.3.1    *Base Purchase Price and Supplies Price*.  On the Real Property Escrow Date, each Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Base Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the relevant Closing Statement), and the Supplies Price with respect to such Store or Stores.  On the Closing Date for such Store or Stores, each Buyer will, subject to the conditions set forth in paragraph 10 of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted) and the Supplies Price with respect to such Store or Stores to Seller (by wire transfer to an account designated in writing by Seller).

3.3.2 *Inventory Deposit and Inventory Price*.   On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) an inventory deposit with respect to the applicable Store or Stores in the amount set forth in the Allocation Schedule (the "Inventory Deposit") with respect to such Store or Stores.  The Inventory Price for each Store shall be determined in the manner set forth in paragraph 3.4 of this Agreement.  At each Closing for one or more Stores, (a) Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the amount by which the Inventory Price for such Store or Stores exceeds the Inventory Deposit for such Store or Stores, and (b) Buyer will instruct Escrow Agent to transfer and deliver the Inventory Price with respect to such Store or Stores to Seller, by wire transfer to an account designated in writing by Seller.  If the Inventory Deposit for any Store or Stores being purchased by any one Buyer on any Closing Date exceeds the aggregate Inventory Price for such Stores, then Seller and Buyer shall provide written instructions to Escrow Agent to deliver the excess to the applicable Buyer promptly following the Closing for such Store or Stores.  The Base Deposit and, once deposited, the Inventory Deposit with respect to each Store will individually and collectively sometimes be referred to in this Agreement as the "Deposit".

3.3.3 *Certain Transaction Costs*.  All relevant rent, taxes (including real and personal property taxes), utilities (including the pharmacy phone line, where applicable) and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding each Closing Date and will be a credit or debit, as the case may be, against the Base Purchase Price and Supplies Price payable at such Closing to the extent thereof and then against the Inventory Price.  Following any proration of annual real and personal property taxes resulting in a credit to a Buyer, such Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate.  Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Each Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes.  The provisions of this paragraph 3.3.3 which apply to the period after the Closing for any Store shall survive the Closing for such store.

-14-

3.3.4 *Sales Tax*.  Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyers, unless such transfer is subject to an available exemption therefrom.  On Seller's request, each Buyer agrees to provide Seller with a certificate stating that such Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Seller or any governmental authority to document that sale of the Inventory is exempt from sales tax.  This paragraph 3.3.4 shall survive the Closing for each store.

3.4    Inventory.

3.4.1 *Count of Store Inventory*.  Seller shall close each Store at a time designated by Seller between 5:00 p.m. and 11:00 p.m. on the Inventory Count Date, unless otherwise agreed to by Seller and Buyer.  As soon as possible after the closing of each such Store, the parties will conduct a physical count (or measurement with respect to gasoline and other vehicle fuels) of the Inventory at each of such Stores (the "Inventory Count") with the assistance of the Inventory Service.  Buyer and Seller will each have representatives present at each Store during the Inventory Count who will acknowledge in writing all computations before leaving the Store.  Upon completion of such Inventory Count, except for mathematical errors, other agreed upon changes and disputes regarding Excluded Inventory, the count of the Inventory Service shall be final and binding on the parties for all purposes of this Agreement.

3.4.2 *Pharmacy Inventory*.  With respect to each Store that includes a pharmacy, pharmaceutical Inventory will be inventoried by item as follows and the inventory forms for such Inventory will be signed by registered pharmacists representing Seller and Buyer:

(a)    Schedule II drugs will be inventoried as exact counts and transferred on DEA 222 form supplied to Buyer by Seller and approved by Buyer; and

(b)    Will-call prescriptions filled but not purchased by customers at the time of the Inventory Count will be returned for credit and included in the Inventory Count.

3.4.3 *Valuation of Inventory*.  The Inventory will be valued by applying the following methods to the count reported by the Inventory Service:

(a)    with respect to pharmaceutical Inventory and gasoline the value used will be Seller's actual cost as reflected on its

records kept in the ordinary course of business (for gasoline, cost shall be last acquisition cost), and

(b) with respect to all other Inventory the value used will be determined by taking Seller's standard retail shelf price (after adjusting to remove temporary or special price reductions, promotions or discounts, coupon discounts or customer loyalty card discounts) for the applicable item and multiplying such price by the valuation percentage for each merchandise category indicated in the table below:

| | Category | Valuation Percentage |
|---|---|---|
| 1. | Grocery (food and non-food) | 60% |
| 2. | Dairy | 60% |
| 3. | Frozen Food | 60% |
| 4. | General Merchandise/Health, Beauty, and Cosmetic | 50% |

3.4.4 *Inventory Certificates; Inventory Closing Statement*. Upon completion of the valuation of the Inventory for each Store, which shall be completed prior to the completion of Closing, the applicable Buyer and Seller shall execute an Inventory Certificate, which shall contain the Inventory Price for the Inventory at such Store, and shall have incorporated therein a complete listing of the Inventory for such Store. Following execution of the Inventory Certificates, if requested by Buyer, Seller or Escrow Agent, Buyer and Seller shall execute an Inventory Closing Statement, which shall contain the Inventory Price for the Inventory at such Store and shall otherwise be consistent with the Inventory Certificate, and shall have incorporated therein appropriate disbursement instructions to Escrow Agent.

3.4.5 *Cooperation and Resolution of Disputes.* The parties agree to be cooperative and reasonable in connection with each Inventory Count and will attempt, in good faith, to resolve any disputes respecting the quantity of Inventory, Excluded Inventory and Excluded Personal Property that may arise during the Inventory Count. Any disputes that have not been resolved by the completion of Closing shall be separately listed and settled by Buyer Inventory Representative and Seller Inventory Representative with respect to the relevant Store as expeditiously as practicable thereafter or, if the parties cannot agree, by the Bankruptcy Court. Any such determination of any dispute shall be final and binding on the parties.

-16-

3.4.6 *Inventory Services and Fees*.   Seller will engage the Inventory Service, but the fees of the Inventory Service will be paid equally by Buyers and Seller.  Buyers and Seller agree to pay such fees at Closing or earlier if then due and in any event before delinquent.

3.5     Inventory Relating to Permits.  If by Closing any particular Buyer shall not have obtained any required Permit contemplated by paragraph 9.2 of this Agreement, notwithstanding its commercially reasonable efforts to do so, any pharmaceuticals or other Inventory that under applicable law may not be transferred without such Permit will not be sold and transferred at Closing but will be segregated at the applicable Store, in which case, unless the parties agree otherwise at or before Closing, (a) the relevant items of Inventory will be deemed to constitute Excluded Inventory, (b) the Bill of Sale to be delivered to such Buyer at Closing will specifically exclude such Inventory, (c) the Inventory Price for that Store will be reduced by the Inventory Price allocable to such Inventory, and (d) Seller will remove such Inventory from the applicable Store in the same manner as other Excluded Property and with reasonable promptness after Closing. Notwithstanding the foregoing clause (d), if applicable law or regulation restricts Seller from removing from the applicable Store (or transporting from such Store to a convenient location in which Seller will have continuing operations) any pharmaceuticals or other Inventory that constitutes Excluded Property, then (i) Seller will have the right to segregate such Inventory at a secured location in the Store selected by Seller and reasonably acceptable to Buyer, and to maintain and protect such Inventory at such secured location for so long as Seller reasonably requires in order to obtain all Permits necessary to remove or transport such Inventory (or to sell or convey such Inventory to a third party entitled to do so), (ii) Seller will have reasonable access to such secured location to maintain and protect such Inventory and when appropriate remove such Inventory from the Store, and (iii) Seller will have the right but not the obligation to require the applicable Buyer to purchase such Inventory, at the Inventory Price allocable to such Inventory, at such time as such Buyer has obtained such Permits as are required for Seller to do so.

3.6     Allocation of Base Purchase Price Among Assets at each Store.  Seller shall have the right to allocate the Base Purchase Price for each Store, for tax purposes and all other purposes, among the Assets at such Store other than Inventory and Supplies (as such Assets are described in paragraph 2.0 of this Agreement); provided, however, that such allocation shall not be binding upon the applicable Buyer or Seller or determinative with respect to any allocation made by Seller of the Base Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case.  The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets at each Store on the applicable Closing Statement.

**4.0**    **Buyers' Due Diligence.**

4.1    <u>Acknowledgment</u>.   In deciding to acquire the Assets pursuant to this Agreement, Buyers acknowledge that they have had the opportunity to conduct some due diligence regarding the Stores and the Assets and they have had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement. Buyers confirm and acknowledge that Seller has given Buyers and their representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Stores and the Assets and to acquire such additional information about the Stores and the Assets as Buyers have reasonably requested.

4.1.1 <u>Investigation Period</u>.   During the Investigation Period, (a) each Buyer shall have the privilege at all reasonable times, and after giving Seller advance written or telephonic notice, of going upon any of the Real Property with its agents and engineers as needed to investigate and inspect the Assets with respect to each Store to determine whether or not the same are in acceptable physical condition (in the applicable Buyer's reasonable determination) as further specified in <u>paragraph 4.1.3</u> below and to conduct a physical inventory of the Equipment located at each Store; <u>provided</u>, <u>however</u>, that any investigations or inspections shall not be physically intrusive on the Real Property unless Seller permits otherwise in a prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed; and (b) Seller shall use commercially reasonable efforts to provide information (without representation or warranty as to its accuracy or completeness) requested by the Buyer that is (i) related to the physical condition of the Assets and Stores, or (ii) related to or affecting the Leases; provided, however, in connection therewith Seller shall not be required to provide any written or electronic information or materials relating to the Stores or the Assets other than those expressly required or contemplated pursuant to the foregoing provisions in this <u>paragraph 4.1.1</u> or any other terms of this Agreement (and no event shall Seller be required to provide any books and records, sales records, trade secrets, and other proprietary information or materials that are proprietary in nature or any information or materials that are protected by any privilege, immunity, work-product doctrine or other such protection).

4.1.2 <u>Inspection</u>. The rights provided to each Buyer in <u>paragraph 4.1.1</u> SHALL IN NO WAY ABROGATE SUCH BUYER'S OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENTS. Each Buyer hereby indemnifies and agrees to hold harmless Seller from and against any and all damage to the Real Property and all other Assets (including the cost of restoring the Real Property to its pre-entry condition) and injury to any

-18-

persons caused by such Buyer or its agents in the course of exercising such Buyer's due diligence rights under this Agreement. Notwithstanding the preceding sentence, each Buyer will have no obligation to indemnify or hold Seller harmless from those claims, demands, liabilities, costs, expenses, penalties, damages and losses arising out of or relating to: (a) the negligence or willful misconduct of Seller or any of its Affiliates, subtenants, licensees, employees, agents, officers, or directors, (b) a pre-existing condition of any of the Assets; or (c) the existence of information obtained by a Buyer as a result of its investigation. Such indemnification will survive the expiration or termination of this Agreement and/or the consummation of the transactions contemplated by this Agreement. Notwithstanding anything in this Agreement to the contrary, each Buyer shall not conduct (or cause to be conducted) any physically intrusive investigation, examination or study of the Real Property without obtaining the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed.

4.1.3  Termination.  If a Buyer determines that physical condition of the relevant Assets or any Store or Stores are subject to (a) a material defect in any of the Equipment, Buildings or Improvements that could reasonably be expected to, individually or in the aggregate, have a material adverse effect on such Buyer's ability to operate such Store or Stores, or (b) the failure of the Buildings, Improvements or Leased Premises to comply with applicable law for use by such Buyer as a retail grocery store without significant material expenditures by such Buyer to modify such affected Buildings, Improvements or Leased Premises such that the operation of such affected Store by such Buyer would be economically unfeasible in such Buyer's opinion (any item specified in (a) or (b) above being a "Material Physical Defect"), then such Buyer may terminate this Agreement as to any such affected Store or Stores by notice to Seller (given by facsimile to Timothy N. Tucker at 404-572-5100 and by given by email to TTucker@kslaw.com with copy to CatherineIbold@winn-dixie.com) before the end of the Investigation Period, which notice, to be effective, shall specify the affected Store or Stores and specify with particularity the Material Physical Defect.  Any right of each Buyer to terminate this Agreement pursuant to this paragraph 4.1.3 as to any Store or Store on account of any Material Physical Defect shall be deemed waived if any such Buyer does not so terminate this Agreement as provided above before the end of the Investigation Period.  If this Agreement is terminated in accordance with this paragraph 4.1.3 as to one or more, but not all, of the Stores, then (i) the aggregate Base Purchase Price shall be reduced based on the Allocation Schedule for each Store as to which this Agreement is so terminated and such reduced Base Purchase Price shall apply to the Stores that remain subject to the continuing force and effect of this Agreement; and (ii) the terms "Inventory", "Supplies" and "Subleases" will be deemed to exclude,

respectively, all Inventory, Supplies and Subleases of the Stores with respect to which this Agreement is terminated. Except as specifically stated in the foregoing sentence, such termination shall not modify or affect this Agreement in any way as to the Stores where notice of termination has not been timely given in accordance with this paragraph 4.1.3. Upon termination of this Agreement with respect to any Store or Stores pursuant to this paragraph 4.1.3, Seller shall immediately instruct the Escrow Agent to return the applicable Base Deposit to the applicable Buyer within two (2) Business Days after expiration of the Investigation Period.

4.2     Title. Buyers confirm and acknowledge that Seller has made the Initial Title Reports available to Buyers, and intends to make additional Title Reports available to Buyers, and Buyers may negotiate with the Title Insurer to obtain title insurance policies with respect to the Stores (the "Title Policies") at Closing. If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present use or occupancy of the affected Store, a Buyer may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to Catherinelbold@winn-dixie.com within three business days of the date such additional Title Report is either delivered to Buyer or posted on the Merrill Website. To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #____" with the appropriate Store number set forth). If a Buyer timely notifies Seller of any valid objection to any such matter set forth in any additional Title Report with respect to any Store, and if Seller declines or is unable to cure any such objection, then Seller will have the right to terminate this Agreement with respect to such Store at any time thereafter, with no liability to the Buyer, unless the Buyer waives such objection by written notice received by Seller no later than the earlier of (x) one Business Day following Buyer's receipt of notice from Seller that it will not cure such objection or (y) the Closing Date. If a Buyer closes the purchase of the Assets with respect to any Store, then the Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter and such matter shall constitute a Permitted Encumbrance.

4.3     Environmental Reports. Buyers confirm and acknowledge that, with respect to some Stores, Seller has made available to Buyers for review on the Merrill Website a separate environmental report (each, an "Environmental Report"), covering the Real Property relating to each Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where such Store is located.

4.4    <u>Lease Negotiations</u>.    Within 24 hours after full execution of this Agreement, Seller shall provide Buyers with the current listing of contact information for the Landlords (and leasing agents, if applicable) in Seller's possession.  During the Negotiation Period, representatives of each Buyer shall be allowed to contact and have discussions with the Landlord(s) for the Store or Stores such Buyer intends to purchase hereunder to attempt to obtain from such Landlord(s) lease concessions as required by such Buyer in the categories set forth on <u>Exhibit A-3</u> (the "Lease Concessions"). The parties agree that <u>Exhibit A-3</u> has been appended to the executed copy of this Agreement but shall not be filed with the Court.  Each Buyer shall make reasonable efforts to contact the applicable Landlord(s) and, if such Landlord(s) engage in discussions with such Buyer, each Buyer shall make reasonable efforts to negotiate with the Landlord(s) in good faith and shall use commercially reasonable diligent efforts to obtain the Lease Concessions.  Each Buyer shall give Seller reasonable notice of any discussions with any Landlord and shall provide Seller with copies of all correspondence between such Buyer and each Landlord and all such discussions shall be subject to the terms of the Confidentiality Agreements.  If at the end of the Negotiation Period, a Buyer has not received from a Landlord assurance satisfactory to such Buyer that such Landlord will grant to such Buyer the Lease Concessions upon Closing, then such Buyer may terminate this Agreement as to any Store with respect to which the Lease Concessions were not granted by providing notice to Seller (given by facsimile to Timothy N. Tucker at 404-572-5100 and by email to TTucker@kslaw.com with copy to Catherinelbold@winn-dixie.com) before the end of the Negotiation Period, which notice, to be effective, shall specify the category(ies) of Lease Concessions that were not granted.  Failure or delay on the part of any Landlord(s) to timely or satisfactorily respond to a Buyer's efforts to contact or negotiate with such Landlord(s) shall not impact such Buyer's right to terminate this Agreement as to the applicable Store pursuant to this <u>paragraph 4.4</u>.  Any right of a Buyer to terminate this Agreement pursuant to this <u>paragraph 4.4</u> shall be deemed waived if such Buyer does not timely terminate this Agreement as provided above before the end of the Negotiation Period.  If this Agreement is terminated in accordance with this <u>paragraph 4.4</u> as to one or more, but not all, of the Stores, then (i) the aggregate Base Purchase Price will be reduced based on the Allocation Schedule for each Store as to which this Agreement is so terminated and such reduced Base Purchase Price shall apply to the Stores that remain subject to the continuing force and effect of this Agreement; and (ii) the terms "Inventory", "Supplies" and "Subleases" will be deemed to exclude, respectively, all Inventory, Supplies and Subleases of the Stores with respect to which this Agreement is terminated.  Except as specifically set forth in the foregoing sentence, such termination shall not modify or affect this Agreement in any way as to the Stores where notice of termination has not been timely given in accordance with this <u>paragraph 4.4</u>.  Upon

termination of this Agreement with respect to any Store or Stores pursuant to this paragraph 4.4, Seller shall immediately instruct the Escrow Agent to return the applicable Base Deposit to the applicable Buyer within two (2) Business Days after expiration of the Negotiation Period.

5.0    **Representations and Warranties of Seller Relating to the Assets.** To induce Buyers to purchase the Assets as provided above, each Seller, with respect to itself only, represents and warrants to the applicable Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials.

    5.1    On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website: (i) copies of each of the Leases (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

        (a)    copies of the site plans for the Stores;

        (b)    copies of the fixture plans for the Stores; and

        (c)    a list of Equipment (other than Excluded Personal Property) with respect to each Store as reflected in Seller's current records;

    it being understood that the materials described in this paragraph 5.1 have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

    5.2    At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Monetary Liens other than the Permitted Encumbrances as provided in the Sale Order.

6.0    **General Representations and Warranties of Seller.** In order to induce the Buyers to purchase the Assets as provided above, each Seller, with respect to itself only, represents and warrants to the applicable Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

    6.1    Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

6.2    No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("<u>Permit</u>") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, (iii) those contemplated by or required under <u>paragraph 3.5</u> of this Agreement and (iv) Bankruptcy Court Approval. To Seller's Knowledge, as of the Effective Date, Seller has all Permits required for Seller to occupy and operate the Stores, except to the extent that Seller's failure to have any such Permits would not have a Material Adverse Effect on Seller's occupancy or operation of the Stores.

6.3    Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.4    To Seller's Knowledge, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a Material Adverse Effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

6.5    None of the employees employed by Seller in the Stores is covered by a union contract, collective bargaining agreement or other labor agreement. To Seller's Knowledge, as of the Effective Date, with respect to the Stores, Seller is not a party to, or bound by, any collective bargaining or other labor or union agreement, and Seller is not involved in a labor dispute (relating to organized labor or collective bargaining, but not individual employment dispute), process or organization or collective bargaining with, or relating to, any of its employees.

6.6    Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

6.7    To Seller's Knowledge, as of the Effective Date, Seller has not received any notice (a) indicating that the Stores are not in compliance in any material respect with applicable laws of federal, state, local or other governments having jurisdiction (and all agencies thereof), including without limitation environmental laws, or (b) of any pending or threatened condemnation, zoning, eminent domain or similar proceeding affecting the Stores, except in the case of either (a) or (b), as otherwise would not have a Material Adverse Effect on the ability to operate the Stores as a supermarket.

7.0    **Buyers' Representations and Warranties.**  Each Buyer, with respect to itself only, represents and warrants to the applicable Seller as follows:

7.1    Each Buyer is an entity duly organized, validly existing and in good standing under the laws of the State, as indicated in Schedule 1 of this Agreement, and has the power and authority to consummate the transaction contemplated hereunder.  This Agreement and each of the closing documents to which each Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required action on behalf of each Buyer.

7.2    No Permit is or will be required in connection with the execution, delivery or performance by each Buyer of this Agreement or any closing document to which each Buyer is or is to become a party or the transactions herein or therein contemplated, except for pharmacy licenses and permits for the sale of beer, wine or other alcoholic beverages, which each Buyer agrees to use commercially reasonable efforts to obtain (provided that no Closing under this Agreement will be conditioned upon Buyer's receipt of such license or permit; provided, further, that the applicable Seller shall cooperate with each Buyer in obtaining such licenses and permits).  If as of Closing a Buyer, despite its reasonable efforts, is unable to obtain any such pharmacy license or permit for the sale of beer, wine or other alcoholic beverages, then (to the extent allowed by and in the manner permitted under applicable law and regulation) at such Buyer's request, the applicable Seller will enter into a customary management agreement or similar arrangement, reasonably acceptable to such Seller, that provides the applicable Buyer with the right to operate under the Seller's license or permit on a short-term basis while such Buyer continues to use commercially reasonable efforts to obtain such license or permit, which agreement shall include, among other matters,    (i) appropriate indemnification by the Buyer in favor of such Seller, (ii) reasonable compensation to the Seller based on a percentage of sales under such license or permit, (iii) requirements that the Buyer comply with all applicable laws and regulations, and (iv) other provisions customarily contained in such agreements.

-24-

7.3    This Agreement and each of the closing documents to which each Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of each Buyer, enforceable against each Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4    There is no action, suit or proceeding pending or, to the Knowledge of each Buyer, threatened against or affecting each Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which each Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against each Buyer) have a Material Adverse Effect on the ability of each Buyer to perform its obligations under this Agreement or the closing documents to which each Buyer is or is to become a party.

7.5    Entry into this Agreement or any of the closing documents to which each Buyer is or is to become a party by each Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by each Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which each Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a Material Adverse Effect on the ability of each Buyer to perform its obligations under this Agreement or any of the closing documents to which each Buyer is or is to become a party.

7.6    As of the Effective Date and at all times through and including the Closing Date, each Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

8.0    **Covenants of Seller.**  Each Seller for itself hereby covenants for the benefit of the applicable Buyer as follows:

8.1    Seller will (i) use commercially reasonable efforts to maintain the Assets until the relevant Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and, except with respect to any particular Stores in which Store operations were suspended prior to the Effective Date, will make commercially reasonable efforts to continue operation of the Stores in the

ordinary course of business, including without limitation employment of Store level employees and management, to the extent within Seller's reasonable ability to control, and (ii) will not sell, dispose of, abandon or remove from any Store any of the Assets or agree to do so except in the ordinary course of business; provided, however, it is expressly acknowledged and understood that, following the Effective Date, Seller will take certain actions to wind up its operations (including related marketing, promotions and advertising) at the relevant Store or Stores and eliminate or remove the Excluded Personal Property in preparation for the relevant Inventory Counts, Closings and the turnover of possession to Buyer.

8.2    Seller will use commercially reasonable efforts to remove all Excluded Personal Property from the Stores on or before the relevant Closing Date, except that Buyer shall remove and dispose of Seller's signs and panels that are part of the Excluded Personal Property as more fully provided in paragraph 9.3 of this Agreement.

8.3    After this Agreement is selected as the Successful Bid, Seller will release to each Buyer a schedule of Seller's current employees at the relevant Store or Stores, and will permit Buyer, at reasonable times during normal business hours and with minimum impact on Seller's business, to arrange for personal interviews with Store managers and other Store employees, at times and places mutually agreeable to both Seller and Buyer, and to arrange for those relevant employees of Seller, who are interested, to interview with Buyer.

8.4    Seller will (except to the extent otherwise required by the Family Medical Leave Act) transfer or terminate all its employees working at each Store on the relevant Closing Date.  Seller will have the sole and absolute responsibility for any financial or other commitments to its employees including, without limitation, any and all claims or obligations for severance pay and any and all claims and obligations arising under any collective bargaining agreement, employee benefit plan (including, without limitation, any withdrawal liability) or any local, state or federal law, rule or regulation (including, without limitation, the Worker Adjustment and Retaining Notification Act).

8.5    If this Agreement is determined to be the Successful Bid as to the Stores, Seller will use commercially reasonable efforts to obtain the entry of a Sale Order as to the Stores.  Seller shall file the motion for approval of the Sale Order within ten (10) Business Days after Seller selects this Agreement as the Initial Bid with respect to the Stores.  The Sale Order shall be in the form mutually agreed upon by Seller and Buyers.  Seller shall seek to have an 1146(c) finding in the Sale Order, but it shall not be a basis for termination of this Agreement if such a finding is not included in the Sale Order.

8.6    Prior to the Closing, Seller will not cause or permit to be granted any material increase in the salaries, wages, benefits or other compensation payable or to become payable to employees working at the Stores, except for (i) merit and cost-of-living increases in the ordinary course of business and (ii) incentive bonuses or compensation granted by Seller in connection with Seller's winding up of its operations at the Stores.

8.7    Seller will cooperate reasonably with Buyer, upon written request, with respect to Buyer's performance of its covenants under paragraph 9.2 of this Agreement.

8.8    Promptly following the Effective Date, Seller will provide Buyers with contact information for the providers of the POS equipment located in the Stores, so that Buyers may negotiate with such providers regarding retention of such POS equipment. Whether or not Buyers are able to reach resolution with such providers regarding retention of the POS equipment is not a contingency to Buyer's obligations under this Agreement.

9.0    **Covenants of Buyers.** Each Buyer for itself hereby covenants for the benefit of the applicable Seller as follows:

9.1    Buyer will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with each Closing and the issuance of the Title Policies.

9.2    Buyer will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11 of this Agreement, including without limitation all Permits necessary for Seller to sell and Buyer to buy the Inventory and the Pharmacy Scrips.

9.3    Buyer shall, at Buyer's sole cost and expense, (i) within five (5) days after the relevant Closing Date, cover all signs and panels that are part of the Excluded Personal Property, and as soon as reasonably possible after the relevant Closing Date, remove from the Stores, destroy and lawfully dispose of such signs and panels, and (ii) within five (5) days after the relevant Closing Date, either (A) remove from the Stores and lawfully dispose of all branded shopping carts or (B) cover so as to fully hide all trademarks, trade names, logos and designs of Seller, Winn-Dixie or their Affiliates from all shopping carts and as soon as reasonably possible after the relevant Closing Date, destroy and lawfully dispose of all such trademarks, trade names, logos and designs. Without limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 16.5 of this Agreement shall encompass any breach by Buyer of this paragraph 9.3.

9.4   Each Buyer will assess the employee base at each of the Stores it intends to acquire hereunder with a view toward hiring a sufficient number of such employees to avoid the notice requirements of the Worker Adjustment and Retaining Notification Act with respect to such Stores. From and after entry of the Sale Order, this paragraph 9.4 shall supersede any provision of the Confidentiality Agreements limiting the ability of Buyer to employ or solicit for employment the employees at such Stores. In addition, at Closing, each Buyer will hire (or offer to hire) those employees such Buyer deems qualified in its discretion based on such Buyer's standard employment criteria and planned operations for such Store. No later than two Business Days prior to Closing, Buyer will deliver to Seller, in writing, a list identifying all employees of Seller who have been hired by Buyer, or to whom offers of employment have been made by Buyer. Other than the specific obligations of each Buyer set forth in this paragraph 9.4 no Buyer shall have any contractual or other obligation with respect to assessing, hiring, offering to hire or employing any of Sellers' employees. In no event shall Buyer be obligated to commit to any particular usage of employees or to any particular benefits or wage rates.

9.5   Buyer will use commercially reasonable efforts to take or cause to be taken actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, those things necessary or appropriate to consummate and make effective, in as expeditious a manner as practicable, the transactions contemplated by this Agreement.

9.6   If this Agreement is determined to be the Successful Bid as to the Stores, provided the applicable Buyer has not terminated this Agreement pursuant to paragraph 4.1.3 or paragraph 4.4 above, then Buyer will use commercially reasonable efforts to assist Seller to obtain the entry of a Sale Order as to such Stores, including by providing Adequate Assurance Information to Seller, the Bankruptcy Court, Landlords and Subtenants as may be reasonably requested.

9.7   Intentionally Omitted.

10.0   **Conditions Precedent to Buyers' Obligations.** The obligations of each of the Buyers under this Agreement as to their relevant Store or Stores are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement relating to such Store or Stores, including, without limitation, each of the following (any of which may be waived by a Buyer in such Buyer's sole discretion, unless otherwise stated herein):

10.1   The applicable Seller will have performed in all material respects all of its covenants contained in this Agreement with respect to the Store or Stores

-28-

being purchased by such Buyer which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and the applicable Seller will have performed in all respects all of its covenants contained in this Agreement with respect to such Store or Stores which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of paragraph 5.1 of this Agreement), all of the applicable Seller's representations and warranties contained in this Agreement with respect to such Store or Stores which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of the applicable Seller's representations and warranties contained in this Agreement with respect to such Store or Stores which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

10.2    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

10.3    The Sale Order with respect to such Store shall have been entered by the Bankruptcy Court in a form reasonably agreed upon by Seller and Buyer and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Buyer, which shall not be unreasonably withheld.

10.4    With respect to such Store, the stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

10.5    The applicable Buyer shall not have exercised its termination rights pursuant to paragraph 4.1.3 or paragraph 4.4 above.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then the applicable Buyer shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(iv) of this Agreement with respect to the Store or Stores such Buyer is purchasing; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by the applicable Buyer or Seller, then the applicable Buyer's and Seller's respective rights, remedies and obligations, including any right of termination,

shall be determined in accordance with <u>paragraph 16</u> of this Agreement rather than pursuant to <u>paragraph 15.1 (a)(iv).</u>

11.0 **Conditions Precedent to Seller's Obligations.** The obligations of the applicable Seller under this Agreement as to each Store are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement relating to such Store, including each of the following (any of which may be waived by such Seller in its sole discretion, unless otherwise stated herein):

11.1 The applicable Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and the applicable Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. All of the applicable Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of the applicable Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2 No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

11.3 The Sale Order with respect to such Store shall have been entered by the Bankruptcy Court in a form reasonably agreed upon by Seller and Buyer, provided, however, failure of the Sale Order to contain an 1146(c) finding shall not be a condition to Seller's obligations hereunder, and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Seller, which shall not be unreasonably withheld.

11.4 The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then the applicable Seller shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(v) of this Agreement with respect to such Store or Stores; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by the applicable Buyer or Seller, then the applicable Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1(a)(v).

12.0    **Loss by Fire or Other Casualty; Condemnation**.  In the event that, prior to a Closing, any Store, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with any Store, either the applicable Seller or the applicable Buyer will have the right, exercisable by giving notice of such decision to the other within 5 Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement as to the Store affected by such loss, and thereafter none of these parties will have any further rights or obligations hereunder as to such Store; provided, however, that this Agreement will be a continuing obligation of the parties as to the Stores not affected by such termination and provided further, however, that, if the applicable Buyer is not in breach of this Agreement, such Buyer will be entitled to the return from the Escrow Agent of the Deposit attributable to such Store or Stores pursuant to the Allocation Schedule.  If neither party exercises its right of termination with respect to any Store affected by such casualty or proceeding and the Store is sold to the applicable Buyer pursuant to the terms of this Agreement, as the applicable Buyer's sole remedies, the applicable Seller will assign to such Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to such Buyer any such proceeds or compensation received by it.

13.0    **Possession**.  The applicable Seller will turn over to the applicable Buyer exclusive physical possession of each Store and the Assets associated therewith (including, to the extent in Seller's possession, control or custody) all keys, combinations to safes, security codes and passwords, on the Closing Date upon written confirmation to such Seller by Escrow Agent that Escrow Agent has received, and has been authorized by such Seller and such Buyer to transfer to Seller, the entire Base Purchase Price, Inventory Price and the Supplies Price with respect to such Store.  After conclusion of the Inventory Count for each Store and upon Seller's receipt of such written confirmation from Escrow Agent for such Store, the applicable Buyer may commence preparation for opening of such Store as a Buyer's store including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and commencing electrical and wiring work required in order to install Buyer's point of sale and other equipment, signage, and similar items.

14.0 **Closing.**

14.1  The Closing for each Store (which may occur on the same date as Closings for other Stores) will occur on the Closing Date for such Store. The Closings will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by the applicable Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

14.2  On or before the Real Property Escrow Date for each Store, the applicable Seller will, subject to the conditions contained in paragraph 11 of this Agreement, deliver the following ("Seller's Escrowed Items") to Escrow Agent:

    (i)  Two counterparts of the relevant Lease Assignment, substantially in the form of Exhibit G to this Agreement (the "Conveyance Instrument"), executed by such Seller;

    (ii)  The relevant Bill of Sale, executed by such Seller;

    (iii)  Two counterparts of the relevant Closing Statement, executed by such Seller;

    (iv)  Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; provided, however, that in no event shall such Seller be required to indemnify the Title Insurer, any Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

    (v)  Any other documents, instruments or agreements called for hereunder for delivery by such Seller with respect to such Store that have not previously been delivered.

A Buyer may waive compliance by such Seller as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement. The applicable Seller's delivery of all of the relevant Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent will not be deemed to be an acknowledgement by such Seller that the conditions of paragraph 11 of this Agreement have been fulfilled or waived until Seller Delivery Confirmation. The "Seller Delivery Confirmation" will mean the later of (A) the relevant Real Property Escrow Date and (B) Seller's delivery to Escrow Agent, by original counterpart or telecopy, of Seller's written confirmation that that the conditions of paragraph 11 of this Agreement have been fulfilled or waived. In any event such

delivery and notice shall be subject to any circumstances that may affect such conditions between Seller Delivery Confirmation and the related Closing Date.

14.3    On or before the Real Property Escrow Date for each Store or Stores, the applicable Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, deliver the following ("Buyer's Escrowed Items") to Escrow Agent:

(i)    Two counterparts of the relevant Conveyance Instrument, executed by the applicable Buyer;

(ii)    Two counterparts of the relevant Closing Statement, executed by the applicable Buyer;

(iii)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; and

(iv)    Any other document, instrument or agreement called for hereunder for delivery by the applicable Buyer that has not previously been delivered.

(v)    All funds required to be transferred and delivered by the applicable Buyer to Escrow Agent pursuant to paragraph 3 of this Agreement.

The applicable Seller may waive compliance by the applicable Buyer as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement. The applicable Buyer's delivery of all of the relevant Buyer's Escrowed Items (other than those waived by the applicable Seller) to Escrow Agent will not be deemed to be an acknowledgement by the applicable Buyer that the conditions of paragraph 10 of this Agreement have been fulfilled or waived until Buyer Delivery Confirmation. The "Buyer Delivery Confirmation" will mean the later of (A) the relevant Real Property Escrow Date, and (B) the applicable Buyer's delivery to Escrow Agent, by original counterpart or telecopy, of such the applicable Buyer's written confirmation that the conditions of paragraph 10 of this Agreement have been fulfilled or waived. In any event, such delivery and notice shall be subject to any circumstances that may affect such conditions between the Buyer Delivery Date and the related Closing Date.

14.4    At the Closing for each Store or Stores, Seller will, subject to the conditions contained in paragraph 11 of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items and the Purchase Price to Seller.

14.5   On each Closing Date, Seller and Buyer will each deposit such other instruments with the Title Insurer as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the relevant Assets in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

14.6   Except as provided in paragraph 16 of this Agreement, at or before Closing for each Store or Stores, or if Closing does not occur due to earlier termination of this Agreement in accordance with its terms with respect to any Store or Stores, (i) Seller will pay Seller's Closing Costs relating to such Store or Stores; and (ii) the Buyer will pay Buyer's Closing Costs relating to such Store or Stores.

15.0   **Termination**.

15.1   Termination.

(a)   Agreement may be terminated, and the transactions contemplated hereby abandoned, as to any or all Stores not the subject of a completed Closing, only as follows:

(i)   by written consent of the applicable Seller and the applicable Buyer, in which case the applicable Deposit shall be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the applicable Deposit, then Escrow Agent shall pay over the applicable Deposit to Seller as consideration for Seller's agreement to terminate this Agreement with respect to such Store or Stores);

(ii)   at the election of the applicable Seller if and to the extent permitted under paragraph 16.1 of this Agreement, in which case the applicable Deposit shall be disbursed as provided in such paragraph 16.1;

(iii)   at the election of the applicable Buyer with respect to any Store such Buyer is purchasing if and to the extent permitted under paragraph 16.2 of this Agreement, in which case the applicable Deposit shall be disbursed as provided in such paragraph 16.2;

(iv)   at the election of the applicable Buyer with respect to any Store such Buyer is purchasing if any of the conditions set forth in paragraph 10 of this Agreement has not been

satisfied or waived by such Buyer on or before the Outside Date with respect to such Store or Stores, in which case Seller shall direct Escrow Agent to return the applicable Deposit to the Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(iv);

(v)     at the election of Seller with respect to a Store if any of the conditions set forth in paragraph 11 of this Agreement has not been satisfied or waived by Seller on or before the Outside Date with respect to such Store, in which case Seller shall direct Escrow Agent to return the Deposit to the applicable Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(v);

(vi)    at the election of the applicable Buyer or Seller as provided in paragraph 12 of this Agreement, in which case Seller shall direct Escrow Agent to return the applicable Deposit to such Buyer; provided, however, that if at the time any such election is made, the applicable Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this Agreement rather than pursuant to this paragraph 15.1(a)(vi);

(vii)   at the election of Seller (A) if this Agreement is not the Successful Bid with respect to the Stores or (B) if the Bankruptcy Court denies Bankruptcy Court Approval with respect to the Stores or (C) if this Agreement is terminated by Seller to the for any reason other than as provided in paragraph 15.1(a)(viii) below, in which case Seller shall direct Escrow Agent to return the Deposit to Buyers; provided, however, that if at the time any such election is made, Buyers are in breach in respect of this Agreement, then Buyers' and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this

Agreement rather than pursuant to this paragraph 15.1(a)(vii);

(viii)    at the election of Seller with respect to any Store, if the Cure Costs with respect to the Lease at such Store exceed 15% of the Base Purchase Price for the Stores, provided that in such case Seller shall direct Escrow Agent to return the Deposit allocated to such Store to the applicable Buyer; provided, however, that if at the time any such election is made, Buyers are in breach in respect of this Agreement, then Buyers' and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this Agreement rather than pursuant to this paragraph 15.1(a)(viii); or

(ix)    at the election of the applicable Buyer or Seller with respect to any Store or Stores if the relevant Closing will not have occurred on or before the Outside Date for any reason other than as contemplated in paragraphs 15.1(a)(i) through 15.1(a)(viii) of this Agreement, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided that neither Buyer nor Seller, as the case may be, will be entitled to terminate this Agreement pursuant to this paragraph 15.1(a)(ix) if such party's breach of this Agreement has been the cause of, or resulted in, the failure of the relevant Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(ix).

(x)    at the election of any Buyer with respect to a Store such Buyer is purchasing, to the extent permitted pursuant to paragraph 4.1.3 and/or paragraph 4.4 of this Agreement, in which case Seller shall direct Escrow Agent to return the applicable Deposit to the Buyer.

(xi)    at the election of Buyers upon occurrence of any of the following: (a) Seller's failure to timely file the motion for entry of the Sale Order as set forth in paragraph 8.5 of this Agreement; (b) Seller's failure to obtain entry of the Sale Order within sixty (60) days after entry of the motion therefore unless a Buyer's failure to assist Seller pursuant to paragraph 9.6 materially contributes to such failure; or (c) entry of a Sale Order approving a sale of the Assets to any

-36-

Person that is not SUPERVALU INC., a Buyer, or an Affiliate of SUPERVALU INC. or a Buyer, in which, in the case of (a), (b), and (c), Seller shall direct Escrow Agent to return the Deposit attributable to each Store on the Allocation Schedule to the applicable Buyer and, in the case of (c), shall pay to each Buyer from the proceeds received from such sale a termination fee contemplated by Section 2.7 of this Agreement; provided, however, that if Buyers are in breach in respect of this Agreement, then Buyers' and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.1(a)(xi).

(b)     If this Agreement is terminated for any reason, then all materials provided by Seller to Buyers and all materials relating to the relevant Assets obtained by Buyers and all copies of any such materials will be delivered to Seller within 5 Business Days following termination.  This paragraph shall not in any way limit each Buyer's duties to Seller or Winn-Dixie under their respective Confidentiality Agreements.

(c)     Upon any termination of this Agreement with respect to any Store or Stores pursuant to paragraphs 15.1(a)(iii) through (x) of this Agreement, each party will retain those rights (if any) it may have under paragraph 16 of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

(d)     Notwithstanding anything to the contrary contained in this Agreement, each Seller agrees and acknowledges that (i) this Agreement is a block bid by the Buyers for the Assets related to the Stores, and is to be considered as a whole, and (ii) Seller shall not be permitted to terminate this Agreement with respect to any particular Store or Stores, or with respect to any particular Buyer, except as specifically permitted in paragraphs 15.1(a)(i), 15.1(a)(ii), 15.1(a)(v), 15.1(a)(vi), 15.1(a)(viii) and 15.1(a)(ix) herein.

## 16.0    Default and Remedies.

16.1    Buyer's Default.    If the Closing for any one or more Stores as contemplated under this Agreement is not consummated due to the applicable Buyer's breach of this Agreement, or if this Agreement is terminated as to any one or more Stores due to the applicable Buyer's breach of this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such breach,  (A) (i) to terminate this Agreement with respect to such Store or Stores only or  (ii) to terminate this Agreement

with respect to all of the Stores to be purchased by such defaulting Buyer which, on the date of such election, are still owned by Seller (the Store or Stores as to which this Agreement is terminated under clause (i) or (ii) being the "Terminated Stores"), and (B) to receive the Base Deposits for all Terminated Stores (collectively, the "Liquidated Deposit") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof.    Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity.  Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages.    The right to receive the Liquidated Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by a Buyer with respect to the Terminated Stores, and Seller hereby waives and releases any right to (and Seller hereby covenants that it shall not) sue such Buyer with respect to the Terminated Stores: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit.  Buyers hereby waive and release any right to (and hereby covenants that it shall not) sue Seller or seek or claim a refund of the Liquidated Deposit (or any part thereof) on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages.  This paragraph 16.1 is subject to paragraph 16.4 of this Agreement.

16.2    Default by Seller.  If the sale of any one or more Stores as contemplated under this Agreement is not consummated due to Seller's breach of this Agreement, or if this Agreement is terminated as to any one or more Stores due to Seller's breach of this Agreement, then the applicable Buyer shall be entitled, as its sole and exclusive remedy for such breach, to receive the return of the Base Deposit with respect to such Store or Stores, which return shall operate to terminate this Agreement with respect to such Store or Stores and release Seller from any and all liability under this Agreement with respect to such Store or Stores.  Buyers expressly waives and releases (i) any right to seek specific performance of Seller's obligations under this Agreement and (ii) any right to seek or collect any damages, including any actual, consequential, speculative, remote or punitive damages.  This paragraph 16.2 is subject to paragraph 16.4 of this Agreement.

16.3    Notice of Default; Opportunity to Cure.  Neither Seller nor any Buyer shall be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within 5 Business Days after receipt of such notice; provided, however, that this paragraph 16.3 (i) shall not be

applicable to Buyer's failure to deliver any Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Real Property Escrow Date or the Closing Date for any Store or Stores and, accordingly, (ii) shall not have the effect of extending the Closing Date or the due date of any Deposit.

16.4    <u>Recoverable Damages</u>.   In no event shall the provisions of <u>paragraphs 16.1 and 16.2</u> of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to, a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreements and <u>paragraphs 4.1.2, 16.5 and 17.3</u> of this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees or expenses under the Confidentiality Agreements and <u>paragraphs 3.3.3 and 3.4.3</u> of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs, or (iii) if applicable, payment of the termination fee as set forth in <u>paragraph 2</u> of this Agreement.  In addition, if this Agreement is terminated for any reason with respect to any one or more Stores or in its entirety, and the applicable Buyer or any Affiliate of such Buyer asserts any claim or right to any Asset that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to any Asset, then Seller shall have all rights and remedies available at law or in equity with respect to such assertion by such Buyer and any loss, damage or other consequence suffered by Seller as a result of such assertion.

16.5    <u>Buyer Indemnification of Seller</u>.  Each Buyer shall indemnify and save and hold harmless Seller and its Affiliates and representatives, from and against any and all costs, losses liabilities, damages, lawsuits, deficiencies, claims and expenses (whether or not arising out of third-party claims) including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (herein, the "<u>Damages</u>") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by such Buyer (including any payment obligation), or the inaccuracy of any representation made by such Buyer in or pursuant to this Agreement or other transaction documents, (b) any liability, obligation or commitment of any nature (absolute, accrued, contingent or otherwise) of such Buyer that is due to or arises in connection with such Buyer's acts or omissions prior to, on or after the Closing Date, including any claim, liability, or obligation that is assumed by such Buyer pursuant to this Agreement or in any transaction documents signed by such Buyer. Notwithstanding the foregoing, such Buyer shall not be liable for any matter (i) with respect to which Seller has not given such Buyer written notice within a reasonable period of time following Seller's receiving

written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a material adverse effect on Buyer), or (ii) that is due Seller's acts or omissions. The provisions of this <u>paragraph 16.5</u> shall cover all obligations and liabilities of whatsoever kind, nature or description relating, directly or indirectly, to product liability, third party litigation or third party claims against the applicable Buyer or Seller in connection with, arising out of, or relating to the Assets. This <u>paragraph 16.5</u> shall survive the Closings or earlier termination of this Agreement.

**17.0   <u>Miscellaneous</u>.**

17.1   <u>Notices</u>. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this <u>paragraph 17.1</u> and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Winn-Dixie Montgomery, Inc.
Winn-Dixie Raleigh, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn: Chief Financial Officer
Telefax No. 904 783 5646
e-mail: *bennettnussbaum@winn-dixie.com*

With a copy to:

Winn-Dixie Stores, Inc.

5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Office of General Counsel
Telefax No. 904 783 5651
e-mail: *larryappel@winn-dixie.com*

and

King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia 30303
Attn:  Timothy N. Tucker
Telefax No. 404-572-5148
e-mail: *ttucker@kslaw.com*

If to any Buyer:

SUPERVALU INC.
11840 Valley View Road
Eden Prairie, MN 55344
Attn:  Tony Pellegrin
Vice President, Corporate Development
Telefax No. (952) 828-8900
e-mail:  *Tony.J.Pellegrin@SUPERVALU.com*

or such other address as any party may from time to time specify by notice to the other.

17.2    <u>Notice of Certain Inquiries</u>.  If any party is contacted, whether before or after any Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to any transactions contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

17.3    <u>Brokers and Finders</u>.  The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Agreement other than that due by Seller to Seller's Brokers.  Seller agrees to pay all fees and commissions claimed by Seller's Brokers as a result of the transaction contemplated by this Agreement, which fees and commissions will be considered payable with respect to a Store only if, as and when the relevant Closing contemplated by this Agreement occurs.  Except for Seller's Brokers, neither Seller nor Buyers have dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the

sale of the Assets or this Agreement.  Seller and Buyers hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts, said indemnifications by Seller and Buyers to survive the Closings or earlier termination of this Agreement.

17.4    Successors and Assigns.  This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

17.5    Assignment.  Neither Seller nor any Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole discretion of the party whose consent is so required.  No assignment by any Buyer shall release or relieve such Buyer of its liabilities and obligations hereunder, which shall remain in full force and effect notwithstanding any such assignment.

17.6    Amendments.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller and any affected Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to Bankruptcy Court Approval, if applicable.

17.7    Governing Law; Conflicts.  The application and effect of this Agreement as to any particular Store or Stores will be governed by and construed in accordance with the laws of the State in which such Store or Stores is located; the application and effect of this Agreement as to any matter of the rights and obligations of the parties generally will be governed by and construed in accordance with the laws of the State of Florida.  In the event of a conflict between the terms of this Agreement and the Bidding Procedures, the terms and conditions of the Bidding Procedures shall control.

17.8    Merger of Prior Agreements.  This Agreement supersedes all prior agreements and understandings between the parties hereto, other than the Confidentiality Agreements, and (except for the Confidentiality Agreements) constitutes the entire agreement of the parties with respect to the matters contained herein.  **EACH BUYER ACKNOWLEDGES ITS OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENTS CONTINUE AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT.**

17.9    Survival.  Acceptance by each Buyer of the Conveyance Instrument with respect to any Store shall constitute an acknowledgement by such Buyer

that all of Seller's representations, covenants and obligations under this Agreement with respect to such Store and all conditions to such Buyer's obligations to close under this Agreement with respect to such Store have been performed, satisfied and/or waived. Seller's representations, warranties, covenants and obligations under this Agreement with respect to any Store shall not survive the Closing for such Store but shall merge into the Conveyance Instrument for such Store, and shall have no further force or effect after the Closing for such Store, except that those covenants of Seller under paragraphs 3.3.3, 3.3.4, and 17.3 of this Agreement with respect to any Store that are expressly provided to be performed after the Closing for such Store shall survive.    All representations, warranties, covenants of obligations of Buyer under this Agreement with respect to any Store shall survive the Closing for such Store.  In addition, all representations, covenants and obligations of each Buyer under the Confidentiality Agreements shall survive the termination or consummation of this Agreement.

17.10  Time is of the Essence.  Time is of the essence of this Agreement.

17.11  No Recordation.  This Agreement will not be recorded in any public office or court other than as part of the Bankruptcy Court Approval process except that upon default it may be presented to a court of competent jurisdiction.

17.12  Independent Obligations.  Each Buyer is independently responsible for its own obligations under this Agreement, and neither SUPERVALU INC. nor any Buyer is guarantying or otherwise assuming any liability for the obligations to be performed by any other Buyer.    Each Seller is independently responsible for its own obligations under this Agreement, and neither Winn-Dixie nor any Seller is guarantying or otherwise assuming any liability for the obligations to be performed by any other Seller.

18.0  **Escrow Agent**.

18.1  Duties.  By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon its receipt of funds from Buyer, Escrow Agent will receive and hold such funds, and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.

18.2  Indemnity.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent. If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any

and all loss, cost, damage, liability or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct. If the indemnity amounts payable hereunder result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts. Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.

18.3    <u>Dispute</u>. If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor. In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Buyer is not the prevailing party in such action or proceeding. If there is no prevailing party, Seller and Buyer each shall be responsible for one-half of such costs and fees.

18.4    <u>Execution by Escrow Agent</u>. Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this <u>paragraph 18.</u> Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this <u>paragraph 18</u> shall not be required.

19.0    **Waiver of Jury Trial**. Buyers and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transactions contemplated herein undesirable. Accordingly, Buyers and Seller each knowingly, voluntarily and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Agreement or the transactions contemplated herein.

20.0    <u>**Consent to Jurisdiction.**</u> **THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.**

Buyers and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth

in <u>paragraph 17.1</u> of this Agreement shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyers and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum. If a court finds that subject-matter jurisdiction is not available in the Bankruptcy Court, Buyers and Seller hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of the U.S. District Court for the Middle District of Florida, Jacksonville Division, or if such court shall not have jurisdiction, then to the appropriate courts of the State of Florida sitting in Duval County, Florida.

21.0 **<u>HSR Filings</u>.** The parties anticipate that the transactions contemplated hereby are exempt from review and filing under the HSR Act. However, if such is not the case, Seller and the applicable Buyer shall each seek regulatory approval or HSR clearance and prepare and submit, in a timely manner, all necessary filings for Seller and such Buyer in connection with this Agreement under the HSR Act and the rules and regulations thereunder. Seller and the applicable Buyer shall request expedited treatment of such HSR Filing by the Federal Trade Commission, shall make promptly any appropriate or necessary subsequent or supplemental filings, and shall furnish to each other copies of all HSR Filings at the same time as they are filed with the appropriate governmental authority except to the extent such party is legally restricted from providing or believes, based where appropriate on the advice of counsel, that it should not provide such copies.

22.0 **<u>Disclaimers and Waivers</u>.**

22.1 **<u>NO RELIANCE ON DOCUMENTS</u>. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN <u>PARAGRAPHS 5 AND 6</u> HEREOF (THE "<u>CONTRACT WARRANTIES</u>"), SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY OR ON BEHALF OF SELLER TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY. EACH BUYER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE) ARE PROVIDED TO BUYER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY BUYER SHALL BE AT THE SOLE RISK OF BUYER. WITHOUT LIMITING THE**

-45-

GENERALITY OF THE FOREGOING, EACH BUYER ACKNOWLEDGES AND AGREES THAT (A) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (B) BUYER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED BY SELLER OR ANY AFFILIATE TO BUYER, BUT RATHER WILL RELY ON ITS OWN INVESTIGATIONS AND ANY REPORTS COMMISSIONED BY BUYER WITH RESPECT THERETO, AND (C) NEITHER SELLER, ANY AFFILIATE OF SELLER NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL HAVE ANY LIABILITY TO BUYER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

22.2   <u>Disclaimers</u>.  EXCEPT FOR THE CONTRACT WARRANTIES, EACH BUYER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS.  EACH BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "<u>AS IS, WHERE IS, WITH ALL FAULTS</u>". EACH BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND NEITHER SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER OR ANY AFFILIATE, TO

WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE, OTHER THAN THE CONTRACT WARRANTIES.

EACH BUYER ACKNOWLEDGES THAT BUYER'S ACCESS AND INSPECTION RIGHTS HAVE BEEN LIMITED AS SET FORTH IN THIS AGREEMENT AND THAT BUYER UNDERSTANDS THE RISKS ASSOCIATED WITH PURCHASING THE ASSETS ON THE BASIS OF SUCH LIMITED INVESTIGATIONS. EACH BUYER REPRESENTS TO SELLER THAT NOTWITHSTANDING SUCH LIMITATIONS BUYER HAS CONDUCTED SUCH INVESTIGATIONS AS BUYER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE ASSETS AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE ASSETS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION), AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AFFILIATES, AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN THE CONTRACT WARRANTIES. UPON CLOSING, EACH BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS, AND EACH BUYER, UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER AND SELLER'S AFFILIATES (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT OR UNDER ANY ENVIRONMENTAL LAW), LOSSES, DAMAGES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AND SELLER'S AFFILIATE'S (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE ASSETS.

**EACH BUYER AGREES THAT SHOULD ANY INVESTIGATION, CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION) ON OR RELATED TO THE ASSETS BE REQUIRED AFTER THE DATE OF CLOSING, NEITHER SELLER NOR ANY AFFILIATE SHALL HAVE ANY LIABILITY TO BUYER TO PERFORM OR PAY FOR SUCH INVESTIGATION, CLEAN-UP, REMOVAL OR REMEDIATION, AND BUYER EXPRESSLY WAIVES AND RELEASES ANY CLAIM TO THE CONTRARY.**

**EACH BUYER FURTHER ACKNOWLEDGES THAT (1) THE CONTRACT WARRANTIES AS TO ANY STORE SHALL NOT SURVIVE THE CLOSING FOR SUCH STORE BUT SHALL MERGE INTO THE CONVEYANCE INSTRUMENT FOR SUCH STORE, AND SHALL HAVE NO FURTHER FORCE OR EFFECT AFTER THE CLOSING FOR SUCH STORE AND (2) THE LIABILITY OF SELLER UNDER OR WITH RESPECT TO THE CONTRACT WARRANTIES SHALL BE LIMITED TO THE EXPRESS REMEDIES OF BUYER SET FORTH IN THIS AGREEMENT.**

**EACH BUYER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY BUYER, AND BUYER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OF BUYER'S CHOICE WITH REGARD TO THE TERMS OF SUCH DISCLAIMERS, WAIVERS AND RELEASES. BUYER ACKNOWLEDGES AND WARRANTS THAT BUYER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS AND RELEASES IS FREE AND VOLUNTARY.**

22.3    <u>Effect and Survival of Disclaimers</u>.  Seller and Buyers acknowledge that the provisions of this <u>paragraph 22</u> are an integral part of the transactions contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller would not enter into this Agreement but for the provisions of this <u>paragraph 22</u>.  Seller and Buyers agree that the provisions of this <u>paragraph 22</u> shall survive Closing or any termination of this Agreement.

[Signature page follows]

-48-

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

SELLER:

**WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation

By:_____

Name:_____

Title:_____

SELLER:

**WINN-DIXIE    RALEIGH,    INC.,** a    Florida corporation

By:_____

Name:_____

Title:_____

**BUYER(S):**

**All American Quality Foods, Inc.**

By: _Gerald Taylor_____
Name: _Gerald Taylor_____
Title: _President_____

**CHANDLER'S JKE, INC.**

By: _____
Name:  Robert W. Chandler, Jr
Title:    President

**CHANDLER'S OF WEIR, INC.**

By: _____

Name:  Robert W. Chandler, Jr.
Title:   President

06/30/2005 12:38 FAX 1 318 487 0363        LA CVNTN CTN & HOTEL            NO.151    P.2/2  @002
      JUN.30.2005  12:10PM    BASS,BERRY&SIMS

KAYE FOOD COMPANIES, LLC

By:

Name:  Matt Kaye

Title:    Managing Member

**PREMIER FOODS, INC.**

By: _____

Name:  A.G. Helton

Title:    President

**RAMEY ENTERPRISES, INC.**

By: _____

Name:  Herbert E. Ramey, Jr.

Title:    President

**SOUTHEAST FOODS, INC.**

By: _____

Name:  Charles W. Dedmon, Jr.

Title:    Chief Financial Officer

**WAYFIELD FOODS, INC.**

By: _____

Name: Ronald Edenfield
Title:   President

**TRIPLE V, INC.**

By: _____

Name:   E.L Vowell
Title:     President

Acknowledged and agreed this ___ day of _____, 2005 for the limited purposes set forth in <u>paragraph 18</u> of this Agreement:

**ESCROW AGENT:**

**NEAR NORTH NATIONAL TITLE LLC**

By: _____

Name: _____

Title: _____

## LIST OF EXHIBITS

| | | |
|---|---|---|
| Schedule 1– | | Preliminary List of Buyers |
| Exhibit A-1 | - | List of Stores |
| Exhibit A-2 | - | Description of Leases and Leased Premises |
| Exhibit A-3 | - | Categories for Landlord Negotiations |
| Exhibit B | - | Form of Bill of Sale |
| Exhibit C-1 | - | Form of Closing Statement |
| Exhibit C-2 | - | Form of Inventory Closing Statement |
| Exhibit D | - | Schedule of Certain Excluded Personal Property |
| Exhibit E | - | Base Purchase Price Allocation; Deposits |
| Exhibit F | - | Permitted Encumbrances |
| Exhibit G | - | Form of Conveyance Instrument |
| Exhibit H | - | Form of Inventory Certificate |

## SCHEDULE 1
### To Asset Purchase Agreement

### Preliminary Information

| BUYER | FEIN | STORE NUMBERS |
|---|---|---|
| All American Quality Foods, Inc., a Georgia corporation | 58-116-3457 | 1806, 2702, 2704, 2705, 2708, 2709, 2710, 2711, 2713, 2714, 2715, 2716, 2717, 2719, 2720, 2723, 2724, 2727, 2728, 2729, 2732, 2734, 2736, 2737, 2740, 2743 |
| Chandler's JKE, Inc., a Mississippi corporation | 20-178-5606 | 1323 |
| Chandler's of Weir, Inc., a Mississippi corporation | 64-063-4848 | 1349 |
| Kaye Food Companies, LLC, a Mississippi limited liability company | 64-091-5514 | 1328, separate fuel station 1374 |
| Premier Food, Inc., a Mississippi corporation | 64-074-6324 | 1317 |
| Ramey Enterprises, Inc., a Mississippi corporation | 64-065-4544 | 1303 |
| Southeast Foods, Inc., a Mississippi corporation | 64-055-9432 | 1305, 2623, 2627 |
| Triple V, Inc., a Mississippi corporation | 64-062-9052 | 1346 |
| Wayfield Foods, Inc., a Georgia corporation | 58-146-3454 | 2730, 2733 |

EXHIBIT A-1
To Asset Purchase Agreement

<u>List of Stores</u>

| Store No. | Street Address | City | County | State |
|---|---|---|---|---|
| 1303 | 212 E. Government St. | Brandon | Rankin | MS |
| 1305 | 2526 Robinson Road | Jackson | Hinds | MS |
| 1317 | 301 E. Broadway St. | Yazoo City | Yazoo | MS |
| 1323 | 134 Marketplace | Hazlehurst | Copiah | MS |
| 1328 | 1206 Grand Ave. | Yazoo City | Yazoo | MS |
| 1346 | 476 W. 3rd St. | Forest | Scott | MS |
| 1349 | 481 Military St. | Hamilton | Marion | AL |
| 1374 | Fuel Center E. Broadway | Yazoo City | Yazoo | MS |
| 1806 | 2500 Limestone Pky. | Gainesville | Hall | GA |
| 2623 | 3111 Hwy. 80 East | Pearl | Rankin | MS |
| 2627 | 3188 W. Northside Dr. | Jackson | Hinds | MS |
| 2702 | 4100 Redan Road | Stone Mountain | Dekalb | GA |
| 2704 | 4489 GA Hwy 20 South | Conyers | Rockdale | GA |
| 2705 | 8777 Tara Blvd. | Jonesboro | Clayton | GA |
| 2708 | 2350 Spring Rd. | Smyrna | Cobb | GA |
| 2709 | 3121 Highway 34 East | Newman | Coweta | GA |
| 2710 | 2300 Salem Rd. | Conyers | Rockdale | GA |
| 2711 | 6335 Hwy 85 | Riverdale | Clayton | GA |
| 2713 | 4801 Lawrenceville Highway | Lilburn | Gwinnett | GA |
| 2714 | 6625 Hiram Douglasville | Douglasville | Paulding | GA |
| 2715 | 1404 Lawrenceville Suwanee | Lawrenceville | Gwinnett | GA |
| 2716 | 64 W. Bankhead Hwy. | Villa Rica | Carroll | GA |
| 2717 | 3030 Bankhead Hwy. | Austell | Douglas | GA |
| 2719 | 2985 Villa Rica Hwy | Dallas | Paulding | GA |
| 2720 | 2055 Beaver Ruin | Norcross | Gwinnett | GA |
| 2723 | 5755 Rockbridge Rd. | Stone Mountain | Dekalb | GA |
| 2724 | 1591 GA Hwy 20 North | Conyers | Rockdale | GA |

Exhibit A-1
Page 1 of 1

| | | | |
|---|---|---|---|
| **2727** | 3696 Highway 5 | Douglasville | Douglas | GA |
| **2728** | 2600 GA Hwy 138 | Stockbridge | Henry | GA |
| **2729** | 3101 Roswell Rd. | Marietta | Cobb | GA |
| **2730** | 2020 Headland Dr. | East Point | Fulton | GA |
| **2732** | 929 Joe Frank Harris Pkwy | Cartersville | Bartow | GA |
| **2733** | 3435 Roosevelt Hwy. | Red Oak | Fulton | GA |
| **2734** | 1575 Lawrenceville Hwy | Lawrenceville | Gwinnett | GA |
| **2736** | 6459 Hwy 42 | Rex | Clayton | GA |
| **2737** | 2116 Fairburn Rd. | Douglasville | Douglas | GA |
| **2740** | 4770 Britt Rd. | Norcross | Gwinnett | GA |
| **2743** | 6169 Highway 278 NW | Covington | Newton | GA |

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

<u>DESCRIPTION OF LEASES AND RELATED LAND</u>

## WINN-DIXIE STORE # 1303
Brandon, Mississippi

| | |
|---|---|
| Lease: | Lease dated November 6, 1994 between Eastgate Center, LLC, as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant' |
| | as evidenced by Memorandum of Lease dated November 6, 1994, recorded in Book 716, Page 337, of the public records of Rankin County, Mississippi |
| Amendments/ Guaranty: | Letter Agreement dated November 8, 1994 |
| | Assignment of Leases dated May 5, 1999 |
| | Memorandum of Assignment and Assumption of Lease dated January 11, 2001, recorded in Book 936, Page 326, of the public records of Rankin County, Mississippi |
| | Corporate Guaranty of Lease Obligations dated January 11, 2001 |
| Premises: | That certain store building and related improvements located at 212 E. Government Street, Brandon, Rankin County, Mississippi |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

**EXHIBIT A**

That certain parcel of land situated in the SW ¼ of Section 15, Town 5 North, Range 3 East, Town of Brandon, Rankin County, Mississippi described as follows:

Begin at the intersection of the South line of US Highway 80 with the East line of the SW ¼ of Section 15, Town 5 North, Range 3 East, Rankin County, Mississippi; thence run Westerly along the South R/O/W line of US Highway 80, 1300 feet to the POINT OF BEGINNING; thence run North 89° 00' West along the South R/O/W line of said US Highway 80, 279.5 feet to a point; thence run South 00° 45' West along a fence line, 425 feet to a point; thence run South 89° 00' East along a fence line, 308.5 feet to a point; thence run 03° 30' West, a distance of 426 feet to the POINT OF BEGINNING, and containing 2.9 acres, more or less.

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # 1305
Jackson, Mississippi

| | |
|---|---|
| Lease: | Lease dated July 15, 1999 between Westland Plaza Associates, L.P., as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant; |
| | as evidenced by Memorandum of Lease dated July 15, 1999, recorded in Book 5209, Page 73, of the public records of Hinds County, Mississippi |
| Amendments/ Guaranty: | Assignment and Assumption of Lease dated January 11, 2001, as evidenced by Memorandum of Assignment and Assumption of Lease dated January 11, 2001, recorded in Book 5335, Page 489, of the public records of Hinds County, Mississippi |
| | Corporate Guaranty of Lease Obligations dated February 28, 2001 |
| Premises: | That certain store building and related improvements located at 2526 Robinson Road, Jackson, Hinds County, Mississippi |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT A

BOOK 5209 PAGE 075

NE¼ 6-5-1E

**Parcel A:**
Being situated in the Northeast 1/4 of Section 6, Township 5 North, Range 1 East, City of Jackson, First Judicial District of Hinds County, Mississippi, and being more particularly described by metes and bounds as follows, to-wit:

Commence at the intersection of the North right of way line of Robinson Street with the West right of way line of Ellis Avenue, said intersection being the POINT OF BEGINNING for the parcel herein described; thence North 00° 14' 25" East for a distance of 866.48 feet along the said West right of way line of Ellis Avenue to the intersection of the said West right of way line of Ellis Avenue with the South right of way line of Oakmont Street, aka Oakmont Drive; thence North 89° 57' 39" West for a distance of 794.41 feet along the said South right of way line of Oakmont Street, aka Oakmont Drive, to the intersection of the said South right of way line of Oakmont Street, aka Oakmont Drive, with the West right of way line of Myer Avenue; thence North 00° 41' 12" East for a distance of 50.0 feet along the said West right of way line of Myer Avenue; thence North 89° 57' 39" West for a distance of 414.35 feet; thence South 00° 02' 21" West for a distance of 106.54 feet; thence South 89° 59' 29" West for a distance of 285.83 feet to the centerline of Lynch Creek; thence run 344.993 feet along the arc of a 643.58 foot radius curve to the left in the said centerline of Lynch Creek, said radius curve having a 340.877 foot chord which bears South 46° 44' 36" East; thence South 62° 05' 42" East for a distance of 9.56 feet along the said centerline of Lynch Creek; thence run 553.779 feet along the arc of a 575.50 foot radius curve to the right in the said centerline of Lynch Creek, said arc having a 532.56 foot chord which bears South 34° 31' 42" East; thence South 05° 56' 03" East for a distance of 124.02 feet along the said centerline of Lynch Creek to the said North right of way line of Robinson Street; thence South 89° 19' 01" East for a distance of 897.90 feet along the said North right of way line of Robinson Street to the POINT OF BEGINNING, containing 22.3819 acres more or less.

**Parcel B:**
Being situated in the Northeast 1/4 of Section 6, Township 5 North, Range 1 East, City of Jackson, First Judicial District of Hinds County, Mississippi, and being more particularly described by metes and bounds as follows, to-wit:

Commence at the intersection of the North right of way line of Robinson Street with the West right of way line of Ellis Avenue, and run thence North 00° 14' 25" East for a distance of 866.48 feet along the said West right of way line of Ellis Avenue to the intersection of the said West right of way line of Ellis Avenue with the South right of way line of Oakmont Street, aka Oakmont Drive; thence North 89° 57' 39" West for a distance of 794.41 feet along the said South right of way line of Oakmont Street, aka Oakmont Drive, to the intersection of the said South right of way line of Oakmont Street, aka Oakmont Drive, with the West right of way line of Myer Avenue; thence North 00° 41' 12" East for a distance of 50.0 feet along the said West right of way line of Myer Avenue; thence North 89° 57' 39" West for a distance of 414.35 feet to the POINT OF BEGINNING for the parcel herein described; thence South 00° 02' 21" West for a distance of 106.54 feet; thence South 89° 59' 29" West for a distance of 285.83 feet to the centerline of Lynch Creek; thence run 263.202 feet along the arc of a 643.58 foot radius curve to the right in the said centerline of Lynch Creek, said arc having a 260.922 foot chord which bears North 18° 46' 46" West; thence leave said creek and run North 89° 59' 29" East for a distance of 357.45 feet; thence South 00° 02' 21" West for a distance of 159.44 feet to the POINT OF BEGINNING, containing 1.9728 acres more or less.

1305
2526 Robinson Road
Jackson, MS

STATE OF MS
COUNTY OF HINDS
FILED - RECORDED

Feb 29 3 02 PM '00

BOOK 5209
PAGE 73
L. BLYNN PEPPER
CHANCERY CLERK

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # 1317
Yazoo City, Mississippi

Lease:

Lease Agreement dated September 1, 1977 between Mid-South Yazoo, L.P., as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant;

as evidenced by Lease dated September 1, 1977, recorded in Book 212A, Page 109, of the public records of Yazoo County, Mississippi

Amendments/
Guaranty:

Letter Agreement dated July 22, 1977

Letter Agreement dated December 23, 1977

Lease Modification Agreement #1 dated November 26, 1979

Agreement Amending Lease dated October 19, 1994, as evidenced by Memorandum of Agreement Amending Lease dated October 19, 1994, recorded in Book 229A, Page 270, of the public records of Yazoo County, Mississippi

Agreement Extending Lease dated February 26, 1996

Amendment and Consent Agreement dated March 1, 1996

Assignment and Assumption of Lease dated January 11, 2001, as evidenced by Memorandum of Assignment and Assumption of Lease dated January 11, 2001, recorded in Book 277A, Page 402, of the public records of Yazoo County, Mississippi

Corporate Guaranty of Lease Obligations dated January 11, 2001

Second Amendment to Lease dated August 22, 2002

Premises:

That certain store building and related improvements located at 301 E. Broadway Street, Yazoo City, Yazoo County, Mississippi

Legal Description:

The real property as more particularly described as follows:

Last Revised 6/21/2005

SEE ATTACHED LEGAL DESCRIPTION

All of Lots 47, 48, 49, 50 and 178 of the City of Ya-
zoo City, Mississippi, according to the official map
or plat thereof on file and of record in the Office of
the Chancery Clerk of Yazoo County, Mississippi

1317
301 E. Broadway Street
Yazoo City, MS

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 1323
Hazlehurst, Mississippi

Lease:              Lease dated April 30, 1989 between Bennett V. York, as Landlord, and Winn-
                    Dixie Montgomery, Inc., as Tenant;

                    as evidenced by Memorandum of Lease dated April 30, 1989, recorded in Book
                    12-J, Page 1, of the public records of Copiah County, Mississippi

Amendments/
Guaranty:           Agreement Supplementing Lease dated July 16, 1991, recorded in Book 12-N,
                    Page 455, of the public records of Copiah County, Mississippi

                    Second Agreement Supplementing Lease dated July 16, 1991, recorded in Book
                    12-N, Page 457 of the public records of Copiah County, Mississippi

                    Third Agreement Supplementing Lease dated April 18, 1994, recorded in Book
                    13-E, Page 630, of the public records of Copiah County, Mississippi

                    Agreement Amending Lease dated April 18, 1994

                    Corporate Guaranty of Lease Obligations dated January 11, 2001

Premises:           That certain store building and related improvements located at 134
                    Marketplace, Hazlehurst, Copiah County, Mississippi

Legal Description:  The real property as more particularly described as follows:


SEE ATTACHED LEGAL DESCRIPTION

**EXHIBIT A**     BOOK 13 E PAGE 632

5.88 acres of land situated in the NW1/4 of the NE1/4 of Sec.4, T10N, R8E, City of Hazlehurst, Copiah County, Mississippi, and being described as follows:

From the SW corner of the NW1/4 of the NE1/4 run East for 231.00 feet; thence North for 363.00 feet to the POINT OF BEGINNING; thence run East for 77.42 feet; thence N27°45'E for 107.40 feet; thence N40°36'E for 92.20 feet; thence North for 70.00 feet; thence N39°41'E for 157.10 feet to the West line of Claridge Inn land; thence N05°27'W for 199.18 feet; thence N90°00'W for 172.06 feet; thence N00°00'E to the South ROW line of MS Hwy 28; thence Westerly along said ROW line as follows: S80°45'W for 162.80 feet; N85°09'W for 82.50 feet; S80°45'W for 26.79 feet to the NE corner of Wal-Mart land; thence South for 705.67 feet; thence East for 172.58 feet to the POINT OF BEGINNING.

                                    1323
                                    134 Marketplace
                                    Hazlehurst, MS

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 1328
Yazoo City, Mississippi

| | |
|---|---|
| Lease: | Lease dated September 13, 1989 between Kathy Crowder Kirchmayr and Margaret Crowder Moore, Trustee under the Herman R. Crowder, Jr., Family U/A 8/14/97 and as General Partner of Sunset Realty Company, LP, collectively, as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant; |
| | as evidenced by Memorandum of Lease dated December 19, 1989, recorded in Book 197A, Page 343, of the public records of Yazoo County, Mississippi |
| Amendments/ Guaranty: | Agreement Supplementing Lease dated December 19, 1989 |
| | Agreement Amending Lease dated February 5, 1990 |
| | Agreement Amending Lease dated September 5, 2000 |
| | Letter Agreement dated January 8, 2001 |
| | Assignment and Assumption of Lease dated January 11, 2001, as evidenced by Memorandum of Assignment and Assumption of Lease dated January 11, 2001, recorded in Book 277A, Page 429, of the public records of Yazoo County, Mississippi |
| | Corporate Guaranty of Lease Obligations dated January 11, 2001 |
| Premises: | That certain store building and related improvements located at 1206 Grand Avenue, Yazoo City, Yazoo County, Mississippi |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

1328
Yazoo City, Mississippi

All of Lot 297 and the Easterly 160 feet of
the Southerly 1/2 and the Westerly 190 feet
of Lot 299 of the Lintonia Addition to Yazoo
City, Mississippi

1328
1206 Grand Avenue
Yazoo City, MS

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 1346
Forest, Mississippi

| | |
|---|---|
| Lease: | Lease dated April 23, 1992 between H.C. Plunkett, as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant; |
| | as evidenced by Memorandum of Lease dated April 23, 1992, recorded in Book 9-X, Page 117, of the public records of Scott County, Mississippi |
| Amendments/ Guaranty: | Agreement Amending Lease dated June 1, 1992 |
| | Agreement Supplementing Lease dated January 21, 1993 |
| | Assignment and Assumption of Lease dated January 11, 2001, as evidenced by Memorandum of Assignment and Assumption of Lease dated January 11, 2001, recorded in Book 12-A, Page 692, of the public records of Scott County, Mississippi |
| | Corporate Guaranty of Lease Obligations dated January 11, 2001 |
| Premises: | That certain store building and related improvements located at 476 W. 3rd Street, Forest, Scott County, Mississippi |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

## EXHIBIT A

A parcel of land containing 1.829 acres, more or less, being situated in the NE 1/4 of Section 16, Township 6 North, Range 8 East, City of Forest, Scott County, Mississippi, being bounded on the South by the Northerly right-of-way line of U. S. Highway No. 80, being bounded on the West by the East right-of-way line of Antley Street, being bounded on the North by the South right-of-way line of West Fourth Street and being more particularly described as follows:

BEGINNING at the intersection of the Northerly right-of-way line of U. S. Highway No. 80 with the East right-of-way line of Antley Street, both being paved public roads; run thence

Northerly and along said East right-of-way line with a bearing of North 02 degrees 22 minutes 56 seconds East for a distance of 239.02 feet to the point where said East right-of-way line intersects with the South right-of-way line of West Fourth Street, a paved public road, run thence

Easterly and along said South right-of-way line with a bearing of South 88 degrees 24 minutes 51 seconds East for a distance of 266.82 feet to a 3" X 1/2" flat iron representing the Northeast corner of that tract of land described in Deed Book 49 at page 426 of the land records on file in the Chancery Clerk's office at Forest, Scott County, Mississippi, reference of which is hereby made; run thence

South and along the East line of the above mentioned tract with a bearing of South 00 degrees 00 minutes 00 seconds for a distance of 91.83 feet to a point where said line intersects a fence line, said fence line representing the uncontested occupational line of those certain tracts of lands used and occupied by Marler Auto Company; run thence

Easterly and along said fence line with a bearing of South 87 degrees 26 minutes 55 seconds East for a distance of 29.94 feet to a point where said fence corners; run thence

Southerly and along said fence line with a bearing of South 00 degrees 16 minutes 09 seconds East for a distance of 140.76 feet to a point where said fence corners; run thence

Westerly and along said fence line with a bearing of South 86 degrees 09 minutes 55 seconds West for a distance of 30.90 feet to a point where said fence corners; run thence

Southerly and along said fence line and projection thereof with a bearing of South 02 degrees 56 minutes 07 seconds West for a distance of 71.67 feet to a point on the aforementioned Northerly right-of-way line of U. S. Highway No. 80; run thence

Northwesterly and along an arc of a curve to the right, in said right-of-way line for a distance of 220.80 feet, said curve having a radius of 1759.34 feet and a chord of North 75 degrees 11 minutes 44 seconds West a distance of 220.66 feet to the point of tangency of said curve; run thence

Northwesterly and along said Northerly right-of-way line with a bearing of North 71 degrees 36 minutes 00 seconds West for a distance of 62.59 feet back to the POINT OF BEGINNING of the above described parcel of land.

1346
476 W. 3rd Street
Forest, MS

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 1349
Hamilton, Alabama

| | |
|---|---|
| Lease: | Lease dated May 19, 1990 between Hamilton Square, LLC, as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant; |
| | as evidenced by Memorandum of Lease dated May 19, 1990, recorded in Book 287, Page 79 of the public records of Marion County, Alabama |
| Amendments/ Guaranty: | Guaranty dated May 19, 1998 |
| | Amended and Restated Lease dated January 9, 2001 |
| | Amended and Restated Memorandum of Lease dated January 9, 2001, recorded in Book 0449, Page 030, of the public records of Marion County, Alabama |
| | Memorandum of Assignment and Assumption of Lease dated January 11, 2001, recorded in Book 0449, Page 039, of the public records of Marion County, Alabama |
| | Corporate Guarantee of Lease Obligations dated January 11, 2001 |
| | Letter Agreement dated November 29, 2004 |
| Premises: | That certain store building and related improvements located at 481 Military Street, Hamilton, Marion County, Alabama |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

## EXHIBIT A

### TRACT ONE

BEGINNING at an iron pin located in the East right-of-way line of U. S. Highway 78 where the South boundary line of Lot 2 of the Coshlon Addition to Hamilton, Alabama, intersects said right-of-way; run thence South 81° 04' East 418 feet to a point in the center of a drainage ditch; run thence Southerly and meandering along the center of said ditch 125 feet to a point; run thence North 81° 04' West 508 feet to a point in the right-of-way line of said U. S. Highway 78; run thence at an angle to the right forming an interior angle of 85° 32' along said right-of-way line 185 feet to the POINT OF BEGINNING, containing 1.18 acres, lying and being situated in the NE 1/4 of the NE 1/4 of Section 3, Town 11 South, Range 14 West, in the Town of Hamilton, Marion County, Alabama.

### TRACT TWO

BEGINNING at an iron pin located in the East right-of-way line of U. S. Highway 78 where the South boundary line of Lot 3 of the Coshlon Addition to Hamilton, Alabama, intersects said right-of-way line; run thence South 81° 04' East 500 feet to a point in the center of a drainage ditch; run thence Southerly and meandering along the center of said ditch 170 feet to a point; run thence North 80° 00' West 484 feet to an iron pin located in the East right-of-way line of said U. S. Highway 78; run thence at an angle to the right forming an interior angle of 86° 28' a distance of 158 feet to the POINT OF BEGINNING, containing 1.77 acres, lying and being situated in the NE 1/4 of the NE 1/4 of Section 3, Town 11 South, Range 14 West, in the Town of Hamilton, Marion County, Alabama.

### TRACT THREE

BEGINNING at an iron pin located in the East right-of-way line of U. S. Highway 78, said iron pin being 922 feet South of the point where the North line of Section 3, Town 11 South, Range 14 West, crosses said right-of-way line; run thence at an angle to the left forming an interior angle of 93° 32' a distance of 644 feet to a 6 inch concrete post; run thence at an angle to the right forming an interior angle of 62° 28' a distance of 40 feet to a 6 inch concrete post; run thence at an angle to the right forming an interior angle of 125° 00' a distance of 445 feet to an iron pin located on the East right-of-way line of said Highway 78; run thence Northerly along said right-of-way line 94 feet to the POINT OF BEGINNING, containing 0.8 acres, lying and being situated in the NE 1/4 of the NE 1/4, Section 3, Town 11 South, Range 14 West, in the Town of Hamilton, Marion County, Alabama.

### TRACT FOUR

BEGINNING at a point 29.63 yards North of an iron pin at the root of a walnut tree on the Bankhead Highway; run thence along the East side of said Bankhead Highway North 59.25 yards to a point; run thence East 122 2/3 yards to a point; run thence South 59.25 yards to a point; run thence West 122 2/3 yards to the POINT OF BEGINNING, containing 1-3/4 acres, more or less, lying and being in the NE 1/4 of the NE 1/4, Section 3, Town 11, Range 14 West, in the Town of Hamilton, Marion County, Alabama.

### TRACT FIVE

BEGINNING at an iron pin at the root of a walnut tree on the East side of the Bankhead Highway; run thence North along the East side of said Bankhead Highway 30 yards to the Southwest corner of W. A. Bullins lot; run thence East along the South boundary line of said Bullins lot and an Eastward 130 yards to a point; run thence Southerly 30 yards to an iron pin at root of sweetgum tree; run thence West 136 yards to the POINT OF BEGINNING, lying and being in the NE 1/4 of the NE 1/4 of Section 3, Town 11, Range 14 West, in the Town of Hamilton, Marion County, Alabama, and in the N 1/2 of Lot No. 1, Block "B" of the Thomason Addition to the Town Of Hamilton, Marion County, Alabama, according to the map of said Addition as recorded in Deed Book 83 at Page 669 in the Probate Office of Marion County, Alabama.

EXHIBIT B 



Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 1806
Gainesville, Georgia

Lease:                  Lease dated August 18, 1994 between Limestone Partners, L.L.C., as Landlord,
                        and Winn-Dixie Raleigh, Inc., as Tenant;

                        as evidenced by Short Form Lease dated August 18, 1994, recorded in Book
                        2273, Page 284, of the public records of Hall County, Georgia

Amendments/
Guaranty:               Guaranty dated October 12, 1994

                        First Amendment to Short Form Lease dated August 23, 1995, recorded in Book
                        2444, Page 248, of the public records of Hall County, Georgia

                        Lease Assignment dated December 28, 2004

Premises:               That certain store building and related improvements located at 2500
                        Limestone Parkway, Gainesville, Hall County, Georgia

Legal Description:      The real property as more particularly described as follows:


SEE ATTACHED LEGAL DESCRIPTION



## LEGAL DESCRIPTION

### WINN-DIXIE TRACT

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING in Land Lot 125, 9th Land District, Hall County, Georgia as being more particularly described as follows:

TO FIND THE POINT OF BEGINNING commence at the intersection of the center line of Limestone Road and the center line of Clarks Bridge Road running thence South 81°10'13" East, a distance of 955.55 feet to a point (said point being located on the westerly side of a proposed 60' right-of-way along a proposed road) said point being THE POINT OF BEGINNING; thence South 20°39'28" East, a distance of 104.21 feet to a point; thence along the arc of a 20.00 foot radius curve to the left an arc distance of 7.27 feet said arc being subtended by a chord having a bearing of North 10°14'18" West, a distance of 7.23 feet to a point; thence along the arc of a 50.00 radius curve to the left an arc distance of 65.59 feet (said arc being subtended by a chord having a bearing of North 37°23'54" West, a distance of 69.99 feet) to a point; thence South 74°58'41" East, a distance of 144.75 feet to a point; thence South 29°58'41" East, a distance of 360.86 feet to a point; thence South 60°01'19" West, a distance of 587.98 feet to a point; thence North 29°58'41" West, a distance of 127.00 feet to a point; thence South 60°01'19" West, a distance of 174.30 feet to a point (said point being located on the easterly side of a 75' right-of-way from the center line of Limestone Road); thence continuing along said right-of-way North 29°58'41" West, a distance of 265.99 feet to a point; thence leaving said right-of-way North 60°01'19" East, a distance of 389.78 feet to a point; thence North 28°17'43" West, a distance of 259.21 feet to a point; thence North 11°31'31" East, a distance of 34.23 feet to a point; thence South 61°21'41" East, a distance of 35.56 feet to a point; thence North 61°22'31" East, a distance of 16.19 feet to a point; thence North 05°51'39" West, a distance of 44.62 feet to a point; thence South 84°36'04" East, a distance of 95.93 feet to a point; thence South 88°30'42" East, a distance of 57.28 feet to a point; thence North 36°12'06" East, a distance of 34.91 feet to a point; thence North 71°04'41" East, a distance of 30.01 feet to a point; thence North 10°33'06" East, a distance of 33.88 feet to a point; thence South 50°22'38" East, a distance of 14.41 feet to a point; said point also being THE POINT OF BEGINNING.

Said tract containing 7.9485 acres and being identified on that certain Survey for Limestone Partners, L.L.C., SouthTrust Bank, N.A., Winn-Dixie Atlanta, Inc. and First American Title Insurance Company, prepared by Cross, Floyd & Kytle, bearing the certification of Calvin A. Kytle, G.R.L.S. No. 2244, dated October 10, 1994.

1806
2500 Limestone Parkway
Gainesville, GA

EXHIBIT "B"

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2623
Pearl, Mississippi

| | |
|---|---|
| Lease: | Sublease Agreement dated June 22, 1987 between Wickes Asset Management, Inc., as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant; |
| | as evidenced by Sublease dated June 22, 1987, recorded in Book 534, Page 516, of the public records of Rankin County, Mississippi |
| Amendments/ Guaranty: | Agreement Amending Sublease dated August 22, 2001, recorded in Book 962, Page 70, of the public records of Rankin County, Mississippi |
| | Assignment and Assumption of Lease dated January 11, 2001, as evidenced by Memorandum of Assignment and Assumption of Lease dated January 11, 2001, recorded in Book 936, Page 464, of the public records of Rankin County, Mississippi |
| Lease: | Lease dated February 14, 2005 between McLaurin Mart, as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant |
| Eyecare Sublease: | Sublease Agreement dated December 29, 1996 between Winn-Dixie Montgomery, Inc., as Sublandlord, and Eyeline Optical East, Inc., as Subtenant |
| Amendments/ Guaranty: | Addendum dated January 31, 1997 |
| | Assignment of Sublease Agreement dated February 21, 1997 |
| | Sublease Modification Agreement #1 dated June 6, 1997 |
| Premises: | That certain store building and related improvements located at 3111 Highway 80 East, Pearl, Rankin County, Mississippi |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

BOOK 962 PAGE '73

## EXHIBIT A

Beginning at the intersection of the West boundary of Pemberton Drive, being 30 feet at right angles from centerline of said drive and the North boundary of Old Brandon Road, said point being 35 feet at right angles from centerline and go S64°17'W along said North boundary for 1677.0 feet, go N 1°05'W for 642.3 feet to South line of Humble Oil Company property, go N83°40'E along said South line for 175 feet, go N 1°05'W along East line of said Humble Oil Company property for 150 feet to point on South Right-of-way of Highway 80, go N84°15' E along said South Right-of-way for 1327.1 feet to point of intersection of said South Right-of-way and the West boundary of Pemberton Drive, go S 8°17'E along said West Boundary for 219.2 feet to the point of beginning.

Containing 17.07 acres, more or less, in the N 1/2 of Section 17, T5N, R2E, City of Pearl, Rankin County, Mississippi.

2623
3111 Highway 80 East
Pearl, MS



#2623

2623
3111 Highway 80 East
Pearl, MS

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # 2627
Jackson, Mississippi

Lease:  Lease dated August 26, 1988 between Northwest Junction Partners, as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant;

as evidenced by Memorandum of Lease dated August 26, 1988, recorded in Book 3518, Page 432, of the public records of Hinds County, Mississippi

Amendments/
Guaranty:  Assignment of Lease dated November 21, 1988

Agreement Supplementing and Amending Lease dated October 23, 1989

Letter Agreement dated April 4, 1991

Letter Agreement dated February 1, 1993

Letter Agreement dated June 5, 1995

Premises:  That certain store building and related improvements located at 3188 W. Northside Drive, Jackson, Hinds County, Mississippi

Legal Description:  The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION



BOOK **3518** PAGE **434**   EXHIBIT "A"

Legal description of subject land as shown by plat of survey by George Patton Guest dated December 23, 1987, last revision being August 26, 1988;

Commencing at a point on the Northerly right-of-way line of Northside Drive, as laid out and improved as of June, 1988, that is on the line between Sections 18 and 17 of Township 6 North, Range 1 East, City of Jackson, Hinds County First Judicial District, Mississippi; said point being on a concrete culvert's flared end section as witnessed by an iron pin 21.29 feet westerly of and along said right-of-way line from said point; run thence Westerly and along said right-of-way line with a bearing of North 89 degrees 53 minutes 10 seconds West for a distance of 527.41 feet to an iron pin and the POINT OF BEGINNING of the following described tract of land; run thence

Northerly and perpendicular to said right-of-way line with a bearing of North 00 degrees 06 minutes 30 seconds East for a distance of 700.00 feet to and iron pin; turn thence

Through an interior angle of 90 degrees 00 minutes 00 seconds and run westerly with a bearing of North 89 degrees 53 minutes 10 seconds West for a distance of 803.93 feet to a point on the westerly deed line of that certain tract of land described as Parcel 1 in Deed Book 2550 at page 463 of the land records of the First Judicial District of Hinds County, Mississippi, said point also being 6.26 feet westerly of the 1/16th line separating the SE 1/4 of the SE 1/4 from the SW 1/4 of the SE 1/4 of Section 18 T6N-R1E, Hinds County, Mississippi, said point also being 665.05 feet southerly of, measured along the westerly line of said Parcel 1, (Deed Book 2550-page 463), from the Northwest corner of said parcel; run thence

Southerly and along the westerly line of the above referenced parcel (Deed Book 2550-page 463) of land with a bearing of South 00 degrees 09 minutes 30 seconds East for a distance of 605.27 feet to a point which is on the Northerly deed line of that parcel described in Deed Book 3104 at page 589 of said land records, and said point being 6.59 feet westerly of the 1/16th line separating the SE 1/4 of the SE 1/4 from the SW 1/4 of the SE 1/4 of said Section 18; run thence

Easterly and along the above mentioned Northerly deed line (Deed Book 3104-page 589) with a bearing of South 89 degrees 23 minutes 30 seconds East for a distance of 202.02 feet to the Northeast corner of the above referenced parcel; run thence

Southerly and along the Easterly deed line (Deed Book 3104-page 589) of said parcel with a bearing of South 00 degrees 44 minutes 30 seconds East for a distance of 193.00 feet to a point on the Northerly right-of-way line of Northside Drive; run thence

Easterly and along said right-of-way line with a bearing of South 89 degrees 53 minutes 10 seconds East for a distance of 601.64 feet back to the POINT OF BEGINNING of the above described tract of land containing a gross acreage of 12.00 acres, more or less, in the above description and all lying in the SE 1/4 of Section 18, Township 6 North, Range 1 East, City of Jackson, Hinds County, Mississippi.

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2702
Stone Mountain, Georgia

| | |
|---|---|
| Lease: | Lease dated August 3, 1993 between Indian Creek Crossing (E&A), LLC, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated August 3, 1993, recorded in Book 7828, Page 131, of the public records of DeKalb County, Georgia |
| Amendments/ Guaranty: | Guaranty dated August 13, 1993 |
| | Supplemental Lease Agreement dated August 12, 1994 |
| | Letter Agreement dated December 4, 2001 |
| | Assignment and Assumption of Lease Agreement dated March 10, 2002 |
| Premises: | That certain store building and related improvements located at 4100 Redan Road, Stone Mountain, DeKalb County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

2702
Stone Mountain, Georgia

EXHIBIT "A"

All those tracts or parcels of land lying and being in Land Lots 222, 227, and 228 of the 15th District of DeKalb County, Georgia, and being more particularly described as follows:

BEGINNING at the intersection formed by the eastern right-of-way line of South Indian Creek Drive (variable right-of-way) and the northern right-of-way line of Redan Road (variable right-of-way) and running thence northerly along the eastern right-of-way line of South Indian Creek Drive (variable right-of-way) the following courses and distances: (1) north 05°11'31" east, 2.30 feet to a point; (2) counterclockwise along the arc of a curve, 244.48 feet to the west line of Land Lot 227 (said arc having a chord distance of 242.27 feet on a bearing of north 09°44'33" west and a radius of 524.070 feet); running thence south 00°48'19" east along the west line of Land Lot 227, 17.9 feet to a point on the eastern right-of-way line of South Indian Creek Drive where such right-of-way becomes 70 feet in width; running thence northwesterly along the northeastern right-of-way line of South Indian Creek Drive (70-foot right-of-way) the following courses and distances: (1) counterclockwise along the arc of a curve, 125.24 feet to a point (said arc having a chord distance of 124.99 feet on a bearing of north 26°15'27" west and a radius of 570.365 feet); (2) north 32°32'53" west, 75.83 feet to a point; thence departing the northeastern right-of-way line of South Indian Creek Drive, and running north 35°18'46" east, 159.00 feet to a point on the west line of Land Lot 227; running thence north 58°55'35" east, 254.53 feet to a point ("Point A"); running thence north 87°46'12" east, 252 feet, more or less, to a point on the centerline of Snapfinger Creek; running thence southeasterly along the centerline of Snapfinger Creek, and following the meanderings thereof, a distance of 486 feet, more or less, to a point; thence departing the centerline of Snapfinger Creek and running south 15°15'54" west, 317 feet, more or less, to a point ("Point D"); [to reach Point B from Point A, begin at Point A and run the following courses and distances: north 87°46'12" east, 201.45 feet to an iron pin placed; south 45°50'20" east, 192.17 feet to an iron pin placed; south 85°05'45" east, 91.66 feet to an iron pin placed; south 73°03'29" east, 117.87 feet to an iron pin placed; south 30°30'19" east, 89.18 feet to an iron pin found; south 15°15'54" west, 286.79 feet to Point B;] running thence south 89°45'09" west, 220.63 feet to a point; running thence south 00°14'51" east, 160.00 feet to a point on the northern right-of-way line of Redan Road (variable right-of-way); running thence westerly along the northern right-of-way line of Redan Road (variable right-of-way) the following courses and distances: (1) counterclockwise along the arc of a curve, 110.10 feet (said arc having a chord distance of 110.05 feet on a bearing of north 83°06'08" west and a radius of 1100.00 feet); (2) counterclockwise along the arc of a curve, 357.32 feet to the eastern right-of-way line of South Indian Creek Drive (variable right-of-way) and the POINT OF BEGINNING (said arc having a chord distance of 357.20 feet on a bearing of north 88°31'34" west and a radius of 4003.170 feet); said tracts containing 9.957 acres, more or less, and being depicted as Tracts One and Three on that certain plat of survey prepared for Wiley S. Ansley by Watts & Browning, Engineers, dated August 18, 1986, and last revised April 21, 1993.

2702
4100 Redan Road
Stone Mountain, GA

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # 2704
Conyers, Georgia

Lease:
Lease dated October 31, 1995 between A.M. Redd, Jr. and Margaret P. Staats d/b/a South Rockdale Shopping Center, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

as evidenced by Short Form Lease dated October 31, 1995, recorded in Book 1176, Page 249, of the public records of Rockdale County, Georgia

Amendments/
Guaranty:
Guaranty dated November 9, 1995

Supplemental Lease Agreement dated October 31, 1996

First Amendment to Lease dated November 19, 1996

First Amendment to Short Form Lease dated November 19, 1996

Letter Agreement dated December 5, 2001

Assignment and Assumption of Lease Agreement dated April 4, 2002

Premises:
That certain store building and related improvements located at 4489 GA. Highway 20 South, Conyers, Rockdale County, Georgia

Legal Description:
The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "A"

# LEGAL DESCRIPTION

ALL THAT TRACT or parcel of land lying and being in Land Lot 110 of the 10th District of Rockdale County, Georgia, and being more particularly described as follows:

BEGIN at an iron pin set at the intersection of the westerly right of way of Georgia Highway 20 (80 foot right of way) and the northern right of way of Oglesby Bridge Road (80 foot right of way); thence along the right of way Oglesby Bridge Road North 88 degrees 37 minutes 07 seconds West a distance of 287.29 feet to a point; thence North 88 degrees 55 seconds 28 seconds West a distnce of 595.59 feet to an iron pin set; thence leaving the right of way of Oglesby Bridge Road and running North 01 degrees 04 minutes 03 seconds East a distance of 721.68 feet to an iron pin set; thence South 88 degrees 55 minutess 57 seconds East a distance of 1020.39 feet to an iron pin set and the right of way of Georgia Highway 20; thence running along the right of way of Georgia Highway 20 South 14 degrees 10 minutes 12 seconds West a distance of 366.01 feet to a point; thence an arc distance of 371.40 feet to an iron pin set being the POINT OF BEGINNING (said arc being subtended by a chord having a chord bearing of South 09 degrees 31 minutes 24 seconds West and a chord distance of 370.89 feet). Said tract containing 15.61 acres, as per survey for Redd Realty Company, dated April 21, 1995, prepard by Louie D. Patrick, Georgia Registered Land Surveyor No. 1757.

2704
4439 GA. Highway 20 South
Conyers, GA

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2705
### Jonesboro, Georgia

| | |
|---|---|
| Lease: | Lease Agreement dated August 25, 1994 between Wilmington Trust Company and William J. Wade, as Co-Trustees of Southland Jonesboro WD, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated August 25, 1994, recorded in Book 2144, Page 114, of the public records of Clayton County, Georgia |
| Amendments/ Guaranty: | Guaranty Agreement dated August 25, 1994 |
| | Assignment and Assumption of Lease Agreement dated February 7, 2002 |
| Premises: | That certain store building and related improvements located at 8777 Tara Boulevard, Jonesboro, Clayton County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

## EXHIBIT "A"

### LEGAL DESCRIPTION

#### TRACT 1

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 242, 5th District, Clayton County, Georgia and being more particularly described as follows:

BEGINNING at a point on the westerly right-of-way line of U.S. Highway 19 and 41, said point being 462.05 feet southerly, as measured along said right-of-way line from the intersection of said right-of-way line and the southerly right-of-way line of Flint River Road; run thence North 76°01'59" East, a distance of 61.28 feet to an iron pin; thence run southerly along said right-of-way line of U.S. Highway 19 and 41 for an arc distance of 47.64 feet, said curve having a radius of 2422.01 feet and being subtended by a chord bearing South 17°57'05" East, a distance of 47.64 feet to an iron pin; thence run southerly for an arc distance of 270.69 feet, said curve having a radius of 5769.58 feet and being subtended by a chord bearing South 19°52'02" West, a distance of 270.66 feet to an iron pin; thence run North 68°47'19" West, a distance of 80.00 feet to a point; thence run southerly for an arc distance of 320.00 feet, said curve having a radius of 5689.58 feet and being subtended by a chord bearing South 22°49'21" West, a distance of 319.96 feet to an iron pin; thence run along the north property line of property now or formerly owned by Charles H. Camp and property now or formerly owned by William W. Camp South 89°54'47" West, a distance of 391.81 feet to an iron pin; thence run along the east property line of property now or formerly owned by M.S. Zakaria, M.D., P.C. Employee Money Purchase Pension Trust & Riverdale Surgery and Anesthesia, P.A. Profit Sharing Plan & Trust North 21°45'59" East, a distance of 669.77 feet to a point; thence run South 68°14'01" East, a distance of 109.31 feet to a point; thence run easterly for an arc distance of 118.46 feet, said curve having a radius of 455.01 feet and being subtended by a chord bearing South 75°41'32" East, a distance of 118.13 feet to a point; thence run South 83°09'03" East, a distance of 53.05 feet to a point; thence run easterly for an arc distance of 92.00 feet, said curve having a radius of 253.21 feet and being subtended by a chord bearing North 86°26'28" East, a distance of 91.49 feet to THE POINT OF BEGINNING.

Said tract contains 5.693 acres of land and is more particularly depicted on that certain As-Built Survey for Principal Mutual Life Insurance Company and ~~Lawyers~~ First American Title Insurance ~~Corporation~~ Company, as prepared by 2020 Surveying Company, David Barton, Georgia Registered Land Surveyor No. 2533.

#### TRACT 2

TOGETHER WITH those easements created by and more fully described in that certain Reciprocal Easement and Restrictive Covenant Agreement by and between M.S. Zakaria, M.D., P.C. Employee Money Purchase Pension Trust, Riverdale Surgery/Anesthesia Associates, P.A., Profit Sharing Plan and Trust and Sunbelt-Dix, Inc., a Delaware corporation, dated June 29, 1992, recorded in Deed Book 1805, Page 47, Clayton County, Georgia Records.

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 2708
Smyrna, Georgia

Lease:  Lease dated October 8, 1987 between E&A Southeast, Limited Partnership, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

as evidenced by Short Form Lease dated October 8, 1987, recorded in Book 4678, Page 331, of the public records of Cobb County, Georgia

Amendments/
Guaranty:  Guaranty dated October 12, 1987

Supplemental Lease Agreement dated December 9, 1988

First Amendment to Lease dated March 7, 1989

Assignment and Assumption of Lease Agreement dated February 3, 2002

Premises:  That certain store building and related improvements located at 2350 Spring Road, Smyrna, Cobb County, Georgia

Legal Description:  The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "B"

LEGAL DESCRIPTION

All that tract or parcel of land lying and being in Land Lot 775 of the 17th District of Cobb County, Georgia, containing 6.38 acres and being more particularly described as follows:

To arrive at the TRUE POINT OF BEGINNING, commence at a right-of-way line intersection of the southerly right-of-way line of Spring Road and the westerly right-of-way line of Campbell Road (said right-of-way line of Campbell Road being a mitre); thence along said right-of-way line of Spring Road South 88 degrees 55' 05" West a distance of 73.99 feet to a point; thence along the arc of a curve to the left a distance of 193.13 feet (chord bearing South 89 Degrees 18' 09" West, chord distance 193.12 feet, radius 14,373.94 feet) to a point being the intersection of the proposed Easterly right-of-way line of relocated Campbell Road and southerly right-of-way line of Spring Road; thence running along said Spring Road right-of-way along the arc of a curve to the left a distance of 50.00 feet (chord bearing South 89 degrees 47' 14" West; Chord distance 50.00 feet; Radius 14,373.94 feet) to a point being the intersection of the proposed westerly right-of-way of relocated Campbell Road and southerly right-of-way of Spring Road; said point also being the TRUE POINT OF BEGINNING; thence leaving said right-of-way line of Spring Road and continuing along the proposed westerly right-of-way line of Campbell Road South 00 degrees 07' 30" East a distance of 200.72 feet to a point; thence along the arc of a curve to the right a distance of 141.92 feet (chord bearing South 26 degrees 59' 45" West, chord distance 136.68 feet radius 150.00 feet) to a point being on the existing northerly right-of-way line of Campbell Road; thence continuing along the existing northerly right-of-way line South 54 degrees 05' 00" West a distance of 194.69 feet; thence along the arc of a curve to the right a distance of 445.31 feet (chord bearing South 48 minutes 20 seconds 25" West, chord distance 444.58 feet, radius 2,245.86') to a point; thence leaving said right-of-way line North 01 degrees 15' 50" West a distance of 741.06 feet to a point being on the southerly right-of-way line of Spring Road; thence along said right-of-way line South 88 degrees 40' 05" East a distance of 205.20 feet to a point; thence along the arc of a curve to the right a distance of 362.61 feet (chord bearing South 89 degrees 23' 25" East, chord distance 362.58 feet, radius 14,373.94 feet) to a point being on the proposed westerly right-of-way line of Campbell Road and the TRUE POINT OF BEGINNING.

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # 2709
Newnan, Georgia

| | |
|---|---|
| Lease: | Lease Agreement dated December 2, 1996 between Chester Dix Newman Corp., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Memorandum of Lease dated December 2, 1996, recorded in Book 1091, Page 488, of the public records of Coweta County, Georgia |
| Amendments/ Guaranty: | Guaranty dated December 2, 1996 |
| | Letter Agreement dated December 2, 1996 |
| | Assignment and Assumption of Lease Agreement dated February 21, 2002 |
| Premises: | That certain store building and related improvements located at 3121 Highway 34 East, Newnan, Coweta County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

ALL THAT TRACT OR PARCEL OF LAND lying at being in Land Lot 59, 6th District, Coweta County, Georgia and being more particularly described as follows:

TO FIND THE POINT OF BEGINNING begin at an iron pin located at the intersection of the eastern right-of-way line of Georgia Highway No. 154 (an 80.00 foot right-of-way) with the southwestern right-of-way line of Georgia Highway No. 34 (a 115.00 foot right-of-way) and run along said right-of-way line of Georgia Highway No. 34 South 80°18'40" East, a distance of 362.10 feet to a point, said point also being the POINT OF BEGINNING; thence continue along said right-of-way line of Georgia Highway No. 34 South 80°18'40" East, a distance of 402.97 feet to a point; thence leave said right-of-way line of Georgia Highway No. 34 and run South 09°48'12" West, a distance of 290.85 feet to a point; thence run South 09°48'12" West, a distance of 22.33 feet to a point; thence run South 80°07'33" East, a distance of 140.28 feet to a point; thence run South 80°07'33" East, a distance of 6.95 feet to a point; thence run along the arc of a curve to the left (said curve having a radius of 76.57 feet and being subtended by a chord bearing North 54°46'54" East and having a chord distance of 108.36 feet) an arc distance of 120.44 feet to a point; thence run North 09°41'20" East, a distance of 217.03 feet to a point; thence run North 07°02'42" West, a distance of 21.02 feet to a point located on the southwestern right-of-way line of Georgia Highway No. 34 (a 115.00 foot right-of-way); thence run along said right-of-way line of Georgia Highway No. 34 South 80°18'40" East, a distance of 78.86 feet to a point; thence leave said right-of-way line of Georgia Highway No. 34 and run South 34°49'52" West, a distance of 60.76 feet to a point; thence run South 09°41'20" West, a distance of 182.16 feet to a point; thence run along the arc of a curve to the right (said curve having a radius of 118.51 feet and being subtended by a chord bearing South 34°42'26" West and having a chord distance of 100.23 feet) an arc distance of 103.49 feet to a point; thence run along the arc of a curve to the right (said curve having a radius of 118.50 feet and being subtended by a chord bearing South 79°48'20" West and having a chord distance of 81.35 feet) an arc distance of 83.03 feet to a point; thence run North 80°07'33" West, a distance of 139.68 feet to a point; thence run South 44°24'32" West, a distance of 56.45 feet to a point; thence run South 09°52'27" West, a distance of 276.85 feet to a point located on the northern property line of property now or formerly owned by Phani Rajakumari Tummala and Rekha K. Shah; thence run along the northern property line of property now or formerly owned by Phani Rajakumari Tummala and Rekha K. Shah North 79°40'02" West, a distance of 510.15 feet to a point located on the eastern right-of-way line of Georgia Highway No. 154 (an 80.00 foot right-of-way); thence run along the arc of a curve to the left (said curve having a radius of 1729.76 feet and being subtended by a chord bearing North 04°38'51" West and having a chord distance of 73.12 feet ) an arc distance of 73.12 feet to a point; thence leave said right-of-way line of Georgia Highway No. 154 and run South 80°07'33" East, a distance of 120.66 feet to a point; thence run North 54°52'27" East, a distance of 21.19 feet to a point; thence run North 09°52'27" East, a distance of 74.11 feet to a point; thence run North 09°52'27" East, a distance of 138.88 feet to a point; thence run North 35°07'33" West, a distance of 28.28 feet to a point; thence run North 80°07'33" West, a distance of 138.11 feet to a point; thence run South 79°39'27" West, a distance of 35.14 feet to a point; thence run South 34°37'27" West, a distance of 28.28 feet to a point located on the eastern right-of-way line of Georgia Highway No. 154 (an 80.00 foot right-of-way); thence run along said right-of-way line of Georgia Highway No. 154 North 10°20'35" West, a distance of 110.54 feet to a point; thence leave said right-of-way line of Georgia Highway No. 154 and run North 87°58'20" East, a distance of 50.53 feet to a point; thence run South 55°57'43" East, a distance of 63.10 feet to a point; thence run South 80°07'33" East, a distance of 129.36 feet to a point; thence run North 54°50'20" East, a distance of 20.52 feet to a point; thence run North 09°47'17" East, a distance of 63.88 feet to a point located on the southeast corner of property now or formerly owned by The Bank Newnan; thence run along the eastern property line of property now or formerly owned by The Bank Newnan North 09°41'16" East, a distance of 225.48 to a point located on the southwestern right-of-way line of Georgia Highway No. 34 (a 115.00 foot right-of-way), said point also being the POINT OF BEGINNING.

EXHIBIT   CONTINUED

**TOGETHER WITH** easements contained in that certain Easement Agreement between Sunbelt-Dix, Inc. and The Bank of Newnan dated December 9, 1993, recorded in Deed Book 829, Page 547, aforesaid records.

**TOGETHER WITH** easements contained in that certain Reciprocal Easement and Restrictive Covenant Agreement dated July 22, 1994, recorded in Deed Book 868, Page 494, aforesaid records.

2709
3121 Highway 34 East
Newnan, GA

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2710
### Conyers, Georgia

Lease:              Lease Agreement dated August 25, 1994 between Peregrine Properties Limited
                    Partnership, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

                    as evidenced by Short Form Lease dated August 25, 1994, recorded in Book
                    1040, Page 162, of the public records of Rockdale County, Georgia

Amendments/
Guaranty:           Guaranty Agreement dated August 25, 1994

                    Assignment and Assumption of Lease Agreement dated March 24, 2002

Premises:           That certain store building and related improvements located at 2300
                    Salem Road, Conyers, Rockdale County, Georgia

Legal Description:  The real property as more particularly described as follows:


SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "A"

LEGAL DESCRIPTION

TRACT 1

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lots 214 and 215 of the 10th District of Rockdale County, Georgia and being more particularly described as follows:

BEGINNING at an iron pin at the intersection of the east right-of-way line of Salem Road (a/k/a SR No. 162) having an 80 foot right-of-way and the south right-of-way line of Flat Shoals Road, having a 100 foot right-of-way, said iron pin also being THE POINT OF COMMENCEMENT; thence run along the south right-of-way line of Flat Shoals Road having a 100' right-of-way the following courses: South 79°38'00" East, a distance of 200.00 feet to an iron pin; thence South 79°37'16" East, a distance of 183.05 feet to a point; thence South 79°31'30" East, a distance of 211.14 feet to a point; thence South 79°22'38" East, a distance of 90.77 feet to an iron pin; thence leave said south right-of-way line of Flat Shoals Road having a 100 foot right-of-way; thence run along the west property line of property now or formerly owned by Louis C. Guerra South 04°38'12" West, a distance of 325.00 feet to an iron pin, said iron pin also being THE POINT OF BEGINNING; thence run along the south property line of property now or formerly owned by Louis C. Guerra North 75°37'49" East, a distance of 130.00 feet to an iron pin; thence run along the south property line of property now or formerly owned by E.G. Abott, III South 84°15'02" East, a distance of 150.00 feet to an iron pin; thence run along the west property line of property now or formerly owned by Mrs. V.M. Edwards South 04°01'55" West, a distance of 311.10 feet to an iron; thence continue along the west property line of property now or formerly owned by Mrs. V.M. Edwards South 09°43'44" East, a distance of 118.09 feet to an iron pin; thence run along the north property line of property now or formerly owned by Atlanta Suburbia Estates, Ltd. South 71°22'16" West, a distance 258.38 feet to an iron pin; thence continue along the north property line of property now or formerly owned by Atlanta Suburbia Estates, Ltd. South 81°36'44" West, a distance of 78.74 feet to an iron pin; thence continue along the north property line of property now or formerly owned by Atlanta Suburbia Estates, Ltd. South 71°22'16" West, a distance of 301.50 feet to an iron pin; thence continue along the north property line of property now or formerly owned by Atlanta Suburbia Estates, Ltd. South 32°33'48" West, a distance of 64.60 feet to an iron pin, said iron pin also being on the east right-of-way line of Salem Road (a/k/a SR No. 162), right-of-way varies at this point; thence continue along said variable right-of-way North 14°39'22" West, a distance of 312.76 feet to a point; thence leave said right-of-way line of Salem Road (a/k/a/ SR No. 162) and run along the south and east property lines of property now or formerly owned by Atlanta Suburbia Estates, Ltd., the following courses: North 71°22'16" East, a distance of 106.91 feet to a point; thence run North 18°37'44" West, a distance of 91.80 feet to a point; thence run along the curve to the right having an arc distance of 74.12 feet, a radius of 150.50 feet and being subtended by a chord bearing North 04°31'01" West,  a distance of 73.38 feet to a point; thence run North 79°38'00" West, a distance of 5.01 feet to a point; thence run North 10°14'49" East, a distance of 130.42 feet to a point; thence run North 71°12'46" East, a distance of 166.02 feet to a point; thence run South 18°37'44" East, a distance of 155.08 feet to a point; thence run North 71°22'16" East, a distance of 160.61 feet to a point; thence run North 04°38'12" East, a distance of 70.56 to an iron pin; said iron pin also being THE POINT OF BEGINNING. Said tract contains 7.50 acres and is depicted on that certain survey for Sunbelt-Dix, Inc., Principal Mutual Life Insurance Company and Lawyers Title Insurance Company, prepared by East Metro Surveyors & Engineers, Inc., bearing the certification of E.G. Davis, Georgia Registered Land Surveyor No. 2363, dated May 24, 1994.  First American

TRACT 2

TOGETHER WITH those certain easements in favor of Sunbelt-Dix, Inc. contained in that certain Reciprocal Easement and Restrictive Covenants Agreement, dated May 26, 1993, by and between Atlanta Suburbia, Ltd. and Sunbelt-Dix, Inc., recorded in Deed Book 858, Page 324, Rockdale County, Georgia records.

Exhibit A - Sole Page
Conyers, Rockdale County, Georgia

2710
2300 Salem Road
Conyers, GA

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 2711
Riverdale, Georgia

Lease:             Lease dated May 17, 1999 between R. B. Riverdale, L.L.C., a s Landlord, and
                   Winn-Dixie Raleigh, Inc., as Tenant;

                   as evidenced by Short Form Lease dated May 17, 1999, recorded in Book 3942,
                   Page 236, of the public records of Clayton County, Georgia

Amendments/
Guaranty:          Corporate Guaranty of Lease Obligations dated May 17, 1999

                   Supplemental Lease Agreement dated December 26, 2000

                   Assignment and Assumption of Lease Agreement dated March 31, 2002


Premises:          That certain store building and related improvements located at 6335
                   Highway 85, Riverdale, Clayton County, Georgia

Legal Description:  The real property as more particularly described as follows:


SEE ATTACHED LEGAL DESCRIPTION

## EXHIBIT "B"

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lots 119 & 138 of the 13th District of Clayton County, Georgia, and being more particularly described as follows:

COMMENCE at a point located at the intersection of the westerly side of the right-of-way along Georgia Highway No. 85 (right-of-way varies), with the northerly side of the right-of-way along Adams Drive (right-of-way varies);

THENCE, continue along the aforementioned westerly side of the right-of-way along Georgia Highway No. 85 (right-of-way varies), a distance of 226.34 feet to a nail set, said nail set marking the POINT OF BEGINNING;

THENCE, leave the aforementioned westerly side of the right-of-way along Georgia Highway No. 85 (right-of-way varies), and continue North 82 degrees 50 minutes 38 seconds West a distance of 185.60 feet to an iron pin found;

THENCE, continue South 11 degrees 49 minutes 32 seconds West a distance of 235.48 feet to an iron pin set, said iron pin set being located along the northerly side of the right-of-way along Adams Drive (right-of-way varies);

THENCE, continue along the northerly side of the right-of-way along Adams Drive (right-of-way varies) North 85 degrees 42 minutes 59 seconds West a distance of 94.36 feet to an iron pin set;

THENCE, continue along the northerly side of the right-of-way along Adams Drive (right-of-way varies) South 04 degrees 17 minutes 01 seconds West a distance of 5.00 feet to an iron pin set;

THENCE, continue along the northerly side of the right-of-way along Adams Drive (right-of-way varies) North 85 degrees 42 minutes 59 seconds West a distance of 303.89 feet to an iron pin set;

THENCE, leave the northerly side of the right-of-way along Adams Drive (right-of-way varies) and continue North 03 degrees 06 minutes 08 seconds East a distance of 689.93 feet to 4 inch open top pipe found;

THENCE, continue South 87 degrees 18 minutes 04 seconds East a distance of 704.36 feet to an iron pin set, said iron pin being located on the westerly side of the right-of-way along Georgia Highway No. 85 (right-of-way varies);

2711
6335 Highway 85
Riverdale, GA

THENCE, continue along the aforementioned westerly side of the right-of-way along Georgia Highway No. 85 (right-of-way varies) South 14 degrees 07 minutes 02 seconds West a distance of 144.27 feet to a point;

THENCE, continue along the aforementioned westerly side of the right-of-way along Georgia Highway No. 85 (right-of-way varies) South 14 degrees 29 minutes 49 seconds West a distance of 30.19 feet to a point;

THENCE, continue along the aforementioned westerly side of the right-of-way along Georgia Highway No. 85 (right-of-way varies) South 12 degrees 43 minutes 02 seconds West a distance of 293.86 feet to a point;

THENCE, continue along the aforementioned westerly side of the right-of-way along Georgia Highway No. 85 (right-of-way varies) South 11 degrees 35 minutes 03 seconds West a distance of 17.72 feet to a nail set, said nail set marking the POINT OF BEGINNING;

Said above-described tract containing 9.273 acres, more or less, and being depicted on that certain certain ATLA/ASCM Land Title Survey prepared for R.B. Riverdale, L.L.C., Winn-Dixie Atlanta, Inc. and Lawyers Title Insurance Corporation prepared by Barton Surveying, Inc., bearing the certification and seal of David Barton, Georgia Registered Land Surveyor Number 2533, dated July 29, 1997, last revised January 19, 1999.

EXHIBIT "A"



WINN DIXIE
RIVERDALE, GEORGIA

6335 Highway 85
Riverdale, Georgia

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # 2713
Lilburn, Georgia

Lease:         Lease dated December 8, 1986 between CC Realty Intermediate Fund I, Ltd., as
               Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

               as evidenced by Short Form Lease dated December 8, 1986, recorded in Book
               3983, Page 44, of the public records of Gwinnett County, Georgia

Amendments/
Guaranty:      Guaranty dated December 11, 1986

               Assignment of Lease dated February 6, 1987

               Amendment to Lease dated September 23, 1987

               Supplemental Lease Agreement dated October 20, 1988

               Letter Agreement dated December 5, 2001

               Assignment and Assumption of Lease Agreement dated January 31, 2002

Premises:      That certain store building and related improvements located at 4801
               Lawrenceville Highway, Lilburn, Gwinnett County, Georgia

Legal Description:   The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "B"

(Shopping Center Legal Description)

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land
Lots 147 and 148 of the 6th District of Gwinnett County,
Georgia, which tract is being more particularly described as
follows:

TO FIND THE POINT OF BEGINNING commence at a point located at
the intersection of the northwesterly right-of-way line of U.S.
Highway 29/State Route 8 (right-of-way varies) and the
northerly right-of-way line of Hillcrest Road (right-of-way
varies), if said right-of-way lines were extended to form a
point; thence along the extended northerly right-of-way line of
Hillcrest Road North 52°15'00" West a distance of 15.00 feet to
a point located on the northerly right-of-way line of Hillcrest
Road; thence along the northerly right-of-way line of Hillcrest
Road North 52°15'00" West a distance of 88.42 feet to a point
located on said northerly right-of-way line; thence continuing
along said northerly right-of-way line and along the arc of a
curve to the left (said curve having a radius of 421.98 feet
and being subtended by a chord bearing North 58°57'23" West and
having a chord distance of 98.58 feet) an arc distance of 98.80
feet to a point located on said northerly right-of-way line;
thence continuing along said northerly right-of-way line and
along the arc of a curve to the left (said curve having a
radius of 421.98 feet and being subtended by a chord bearing
North 76°39'58" West and having a chord distance of 162.06
feet) an arc distance of 161.06 feet to a point located on said
northerly right-of-way line, said point being the POINT OF
BEGINNING; from said POINT OF BEGINNING as thus established,
thence continuing along said northerly right-of-way line North
87°40'09" West a distance of 180.34 feet to a point located on
said northerly right-of-way line; thence continuing along said
northerly right-of-way line and along the arc of a curve to the
right (said curve having a radius of 364.85 feet and being
subtended by a chord bearing North 80°00'08" West and having a
chord distance of 97.31 feet) an arc distance of 97.60 feet to
a point located on said northerly right-of-way line; thence
leaving the northerly right-of-way line of Hillcrest Road and
running North 26°49'15" West a distance of 1,408.30 feet to a
point; thence North 77°11'46" East a distance of 1,198.42 feet
to a point; thence South 28°18'24" East a distance of 110.00
feet to a point; thence South 71°28'50" West a distance of
100.05 feet to a point; thence South 26°17'51" East a distance
of 428.67 feet to a point; thence South 63°44'12" West a
distance of 108.00 feet to a point; thence South 27°19'16" East
a distance of 426.72 feet to a point; thence South 27°07'48"
West a distance of 230.10 feet to a point; thence South
62°52'12" East a distance of 200.00 feet to a point located on
the northwesterly right-of-way line of U.S. Highway 29/State
Route 8; thence along said northwesterly right-of-way line
South 27°07'48" West a distance of 327.75 feet to a point
located on said northwesterly right-of-way line; thence leaving
the northwesterly right-of-way line of U.S. Highway 29/State
Route 8 and running North 62°52'12" West a distance of 353.00
feet to a point; thence South 72°07'48" West a distance of
14.14 feet to a point; thence South 27°07'48" West a distance
of 102.75 feet to a point; thence South 42°03'41" West a
distance of 62.10 feet to a point; thence South 27°07'48" West
a distance of 17.25 feet to a point; thence South 22°00'55"
East a distance of 29.86 feet to a point located on the
northerly right-of-way line of Hillcrest Road, said point also
being the POINT OF BEGINNING, as per Site Plan entitled
"Lilburn Exchange" dated September 11, 1986, being last revised
October 8, 1986, prepared for Barry F. O'Neill, prepared by
Hensley-Schmidt, Inc.

2713
4801 Lawrenceville Highway
Lilburn, GA

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 2714
Douglasville, Georgia

| | |
|---|---|
| Lease: | Lease dated June 28, 1996 between Columbia Properties Partners, II, L.L.C., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated June 28, 1996, recorded in Book 527, Page 669, of the public records of Paulding County, Georgia |
| Amendments/ Guaranty: | Corporate Guaranty of Lease Obligations dated June 27, 1996 |
| | Supplemental Lease Agreement dated May 28, 1997 |
| | First Amendment to Lease Agreement dated May 28, 1997 |
| | Amendment to Short Form Lease dated May 28, 1997 |
| | Assignment and Assumption of Lease Agreement dated February 10, 2002 |
| Premises: | That certain store building and related improvements located at 6625 Hiram-Douglasville Highway, Douglasville, Paulding County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT A



BOOK - 527 PAGE 671

SITE PLAN

FOR: WINN•DIXIE

EXHIBIT "B"

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 357 of the 1st District, 3rd Section, Paulding County, Georgia, said tract being more particularly described as follows:

BEGIN at a concrete monument located at the southwestern end of the mitered corner of Georgia Highway 92 (right-of-way varies) and Brownsville Road (a/k/a Powder Springs Road) (80 foot right-of-way); thence run in a northeasterly direction along said mitered corner North 19° 12' 17" East a distance of 23.66 feet to a point located at the northeastern end of said mitered corner; thence run along the southeastern right-of-way line of Brownsville Road (a/k/a Powder Springs Road) and along the arc of a curve to the right (said curve having a radius of 1,884.91 feet and being subtended by a chord bearing North 74° 30' 07" East and having a chord distance of 751.46 feet) an arc distance of 756.53 feet to a point; thence continue running along said southeastern right-of-way line North 86° 00' 00" East a distance of 142.73 feet to an iron pin; thence leave said southeastern right-of-way line and run South 00° 00' 00" West a distance of 506.55 feet to a point; thence run South 73° 28' 05" West a distance of 342.72 feet to a point; thence run South 16° 31' 55" East a distance of 45.28 feet to a point; thence run South 73° 28' 05" West a distance of 341.19 feet to a point located on the northeastern right-of-way line of Georgia Highway 92; thence run along the northeastern right-of-way line of Georgia Highway 92 North 34° 13' 05" West a distance of 175.24 feet to a concrete monument; thence continue running along said northeastern right-of-way line and along the arc of a curve to the right (said curve having a radius of 2,942.40 feet and being subtended by a chord bearing North 22° 34' 22" West and having a chord distance of 391.43 feet) an arc distance of 391.73 feet to a concrete monument located at the southwestern end of the mitered corner of Georgia Highway 92 and Brownsville Road (a/k/a Powder Springs Road) and the POINT OF BEGINNING, as per Survey prepared for Winn-Dixie Stores, Inc., Columbia Properties Partners II, L.L.C., First American Title Insurance Company and SouthTrust Bank of Georgia, N.A., prepared by Barton Surveying, Inc., bearing the certification and seal of David Barton, Georgia Registered Land Surveyor Number 2333, dated October 17, 1995, last revised May 31, 1996.

TOGETHER WITH easements contained in that certain Declaration of Easements and Restrictive Covenants by Columbia Properties Partners II, L.L.C., dated _July 11, 1996_, filed for record _July 15, 1996_, recorded in Deed Book __527__, Page __645__, Paulding County, Georgia records.

2714
6625 Hiram-Douglasville
Highway

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 2715
Lawrenceville, Georgia

| | |
|---|---|
| Lease: | Lease Agreement dated March 4, 1998 between Principal Mutual Life Insurance Company, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Memorandum of Lease dated March 9, 1998, recorded in Book 15627, Page 12, of the public records of Gwinnett County, Georgia |
| Amendments/ Guaranty: | Guaranty of Lease Obligations dated March 9, 1998 |
| Premises: | That certain store building and related improvements located at 1404 Lawrenceville Suwanee Road, Lawrenceville, Gwinnett County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

#2715
Lawrenceville,
GA

EXHIBIT A

L E G A L   D E S C R I P T I O N
WINN DIXIE - LAWRENCEVILLE

All that tract or parcel of land lying and being in Land Lot 47 and 48 of the Seventh Land District in Gwinnett County, Georgia, containing approximately 30.384 acres of land and being more particularly described as follows:
Commencing at the mitered intersection of the Northerly margin of the 100 foot wide right of way for Riverside Parkway with the Westerly margin of the varied right of way for Lawrenceville Suwanee Road;
THENCE South 45 degrees 06 minutes 00 seconds West for a distance of 199.74 feet to a 1/2"rebar set along the Northerly margin of the 110 foot wide right of way for Riverside Parkway, said 1/2" rebar BEING THE TRUE POINT OF BEGINNING;
THENCE South 45 degrees 06 minutes 00 seconds West for a  distance of 197.75 feet to a 1/2"rebar set along the Northerly margin of the 110 foot wide right of way for Riverside Parkway;
THENCE along a curve to the left having a radius of 1492.75 feet and an arc length of 18.24 feet, being subtended by a chord of South 44 degrees 44 minutes 30 seconds West for a distance of 18.24 feet to a point on the Northerly margin of the 110 foot wide right of way for Riverside Parkway;
THENCE North 33 degrees 31 minutes 04 seconds West for a distance of 54.22 feet to a 1/2"rebar set;
THENCE North 62 degrees 11 minutes 22 seconds West for a distance of 249.58 feet to a 1/2"rebar set;
THENCE South 47 degrees 33 minutes 04 seconds West for a  distance of 131.38 feet to a 1/2"rebar found;
THENCE North 67 degrees 16 minutes 16 seconds West for a distance of 134.11 feet to a 1/2"rebar found;
THENCE South 70 degrees 26 minutes 56 seconds West for a distance of 134.51 feet to a 1/2"rebar found;
THENCE North 44 degrees 12 minutes 45 seconds West for a  distance of 151.53 feet to a 1/2"rebar found;
THENCE North 15 degrees 38 minutes 14 seconds West for a  distance of 200.18 feet to a 1/2" rebar found;
THENCE North 18 degrees 00 minutes 38 seconds East for a distance of 130.98 feet to a 1/2" rebar found;
THENCE North 23 degrees 21 minutes 33 seconds West for a distance of 38.13 feet to a 1/2 rebar set;
THENCE North 60 degrees 33 minutes 20 seconds East for a distance of 594.67 feet to a 1/2"rebar set along the Westerly margin of the varied right of way for Lawrenceville-Suwanee Road;
THENCE along a curve to the left having a radius of 3879.71 feet and an arc length of 144.16 feet, being subtended by a chord of South 38 degrees 31 minutes 28 seconds East for a distance of 144.15 feet to a point along the Westerly margin of the varied right of way for Lawrenceville-Suwanee Road;
THENCE along a curve to the left having a radius of 38.00 feet and an arc length of 10.62 feet, being subtended by a chord of South 83 degrees 00 minutes 19 seconds West for a distance of  10.56 feet to a point;
THENCE South 50 degrees 29 minutes 41 seconds West for a distance of 65.66 feet to a point;
THENCE South 27 degrees 48 minutes 37 seconds West for a distance of 142.53 feet to a point;
THENCE South 62 degrees 11 minutes 23 seconds East for a distance of 124.79 feet to a point;
THENCE North 27 degrees 48 minutes 37 seconds East for a distance of 22.71 feet to a point;
THENCE along a curve to the left having a radius of 148.00 feet and an arc length of 27.67 feet, being subtended by a chord of North 22 degrees 27 minutes 17 seconds East for a distance of   27.63 feet to a point;

THENCE North 17 degrees 05 minutes 58 seconds East for a distance of 23.03 feet
to a point;
THENCE along a curve to the right having a radius of 103.00 feet and an arc
length of 35.14 feet, being subtended by a chord of North 26 degrees 58 minutes
11 seconds East for a distance of  34.97 feet to a point;
THENCE along a curve to the right having a radius of 212.00 feet and an arc
length of 36.74 feet, being subtended by a chord of North 41 degrees 48 minutes
15 seconds East for a distance of  36.69 feet to a point;
THENCE along a curve to the left having a radius of 38.00 feet and an arc length
of 38.60 feet, being subtended by a chord of North 23 degrees 43 minutes 54
seconds East for a distance of 23.78 feet to a point along the Westerly margin
of the varied right of way for Lawrenceville-Suwanee Road;
THENCE along a curve to the left having a radius of 3879.73 feet and an arc
length of 267.76 feet, being subtended by a chord of South 43 degrees 00 minutes
00 seconds East for a distance of 267.78 feet to a point along the Westerly
margin of the varied right of way for Lawrenceville-Suwanee Road;
THENCE South 44 degrees 58 minutes 37 seconds East for a distance of 40.11 feet
to a 1/2" rebar set along the Westerly margin of the varied right of way for
Lawrenceville-Suwanee Road;
THENCE South 28 degrees 05 minutes 50 seconds West for a distance of 168.31 feet
to a point;
THENCE along a curve to the left having a radius of 30.00 feet and an arc length
of 38.33 feet, being subtended by a chord of South 08 degrees 34 minutes 05
seconds East for a distance of 35.69 feet to a point;
THENCE South 44 degrees 54 minutes 00 seconds East for a  distance of 117.61
feet to a 1/2"rebar set along the Northerly  margin of the 110 foot wide right
of way for Riverside Parkway, said 1/2"rebar ALSO BEING THE TRUE POINT OF
BEGINNING.


TOGETHER WITH all that right, title and interest in that certain Reciprocal Easement
Agreement between Bronze/Lawrenceville-Suwanee, L.P. and Sunbelt-Dix, Inc.
dated May 14, 1996, recorded May 15, 1996 in Deed Book 12698, page 226,
aforesaid records.

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2716
### Villa Rica, Georgia

| | |
|---|---|
| Lease: | Lease dated April 26, 1995 between Villa Rica Retail Properties, L.L.C., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated April 26, 1995, recorded in Book 880, Page 767, of the public records of Carroll County, Georgia |
| Amendments/ Guaranty: | Guaranty dated May 17, 1995 |
| | Supplemental Lease Agreement dated June 13, 1996 |
| | Assignment and Assumption of Lease Agreement dated February 21, 2002 |
| Premises: | That certain store building and related improvements located at 64 W. Bankhead Highway, Villa Rica, Carroll County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "B"

BOOK 880 PAGE 771

ALL THAT TRACT or parcel of land lying and being in Land Lots 158 and 163, 6th District of Carroll County, Georgia, being designated as "Retail Center, 10.44 Acs." on that certain Survey prepared for Villa Rica Retail Properties, L.C., First National Bank of Paulding County and Lawyers Title Insurance Corp. dated July 5, 1995, prepared by Ross A. Lynn, Georgia Registered Land Surveyor No. 2316, and recorded in Plat Book ___53___, Page 242 ___, Office of the Clerk, Superior Court of Carroll County, Georgia, and containing 10.44 acres.  Said property is exclusive of such property designated "Out Parcel #1", "Out Parcel #2", "Out Parcel #3", "Kiosk" and "Phase II".

k:\286\18\descrip.ro

JUL 14 1995

RECORDED_____KENNETH SKINNER, CLERK

2716
64 W. Bankhead Highway
Villa Rica, GA



EXHIBIT #A

This Page reserved for Site Plan

EXHIBIT "A"

2716
64 W. Bankhead Highway
Villa Rica, GA

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2717
Austell, Georgia

Lease:              Lease dated July 10, 1984 between New Plan Excel Realty Trust, Inc., as
                    Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

                    as evidenced by Short Form Lease dated July 10, 1984, recorded in Book _____,
                    Page _____, of the public records of Douglas County, Georgia

Amendments/
Guaranty:           Guaranty dated July 13, 1984

                    First Lease Amendment dated July 31, 1984

                    Second Lease Amendment dated August 15, 1985

                    First Short Form Lease Amendment dated August 15, 1985

                    Quitclaim Deed dated August 15, 1985

                    Third Lease Amendment dated January 23, 1986

                    Supplemental Lease Agreement dated February 27, 1986

                    Fourth Amendment to Lease dated March 20, 1992

                    Fifth Amendment to Lease dated July 12, 1993, recorded in Book 830, Page
                    594, of the public records of Douglas County, Georgia

                    Assignment and Assumption of Lease Agreement dated March 3, 2002

Premises:           That certain store building and related improvements located at 3030
                    Bankhead Highway, Austell, Douglas County, Georgia

Legal Description:  The real property as more particularly described as follows:


SEE ATTACHED LEGAL DESCRIPTION


2717
Austell, Georgia

EXHIBIT "A"

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lots 252, 253, 315 and 316 of the Eighteenth District, Second Section of Douglas County, Georgia, which tract is more particularly described as follows:

TO FIND THE POINT OF BEGINNING commence at the point which would be formed by the intersection of the southeasterly right-of-way line of Bankhead Highway (U.S. Highway 78 and Georgia Highway 8) and the northeasterly right-of-way line of Thornton Road (Georgia Highway 6), if said right-of-way lines were extended to form a point; running thence along the southeasterly right-of-way line of Bankhead Highway and along the arc of a curve to the left (said curve having a radius of 1,221.10 feet) an arc distance of 194.55 feet to a point located on said southeasterly right-of-way line; thence continuing along said southeasterly right-of-way line North 37° 24' 40" East a distance of 38.50 feet to a point located on said southeasterly right-of-way line, said point being the POINT OF BEGINNING; from said POINT OF BEGINNING as thus established, thence continuing along the southeasterly right-of-way line of Bankhead Highway North 37° 24' 40" East a distance of 237.10 feet to a point located on said southeasterly right-of-way line; thence continuing along the southeasterly right-of-way line of Bankhead Highway North 52° 35' 20" West a distance of 25.00 feet to a point located on said southeasterly right-of-way line; thence continuing along the southeasterly right-of-way line of Bankhead Highway North 37° 24' 40" East a distance of 186.41 feet to a point located on said southeasterly right-of-way line; thence leaving the southeasterly right-of-way line of Bankhead Highway and running South 52° 35' 20" East a distance of 200.00 feet to a point; thence North 37° 24' 40" East a distance of 250.00 feet to a point; thence North 52° 35' 20" West a distance of 200.00 feet to a point located on the southeasterly right-of-way line of Bankhead Highway (hereinafter referred to as "Point A"); thence continuing along the southeasterly right-of-way line of Bankhead Highway North 37° 24' 40" East a distance of 13.00 feet, more or less, to a point located on said southeasterly right-of-way line where it intersects with the centerline of an unnamed branch; thence leaving the southeasterly right-of-way line of Bankhead Highway and running in a northeasterly and southeasterly direction along the centerline of said unnamed branch and following the meanderings thereof a distance of 1020.00 feet, more or less, to a point at the intersection of the centerline of said unnamed branch and the centerline of Salt Spring Creek; thence in a southerly and southwesterly direction along the centerline of Salt Spring Creek and following the meanderings thereof a distance of 790.00 feet, more or less, to a point at the intersection of the centerline of Salt Spring Creek with the centerline of Sweetwater Creek; thence in a westerly and southwesterly direction along the centerline of Sweetwater Creek and following the meanderings thereof a distance of 590.00 feet, more or less, to a point at the intersection of the centerline of Sweetwater Creek and the northeasterly right-of-way line of Thornton Road; running thence along the northeasterly right-of-way line of Thornton Road North 61° 18' 41" West a distance of 56.00 feet, more or less to a point located on said northeasterly right-of-way line (hereinafter referred to as "Point B") (which Point B is located South 61° 18' 40" East a distance of 100.00 feet from a point located North 28° 41' 20" East a distance of 20.00 feet from a point located South 61° 18' 40" East a distance of 319.69 feet from a point located South 61° 18' 40" East a distance of 74.70 feet from the intersection of the northeasterly right-of-way line of Thornton Road and the southeasterly right-of-way line of Bankhead Highway, if said right-of-way line were extended to intersect and form a point), the aforesaid Point A and Point B being connected by traverse lines commencing at Point A and terminating at Point B as follows: South 83° 24' 07" East a distance of 131.90 feet; North 86° 54' 45" East a distance of 181.74 feet; South 40° 47' 34" East a distance of 148.86 feet; South 39° 13' 14" East a distance of 319.33 feet; South 24° 31' 09" West a distance of 209.16 feet; South 16° 06' 20" West a distance of 242.63 feet; North 75° 23' 49" West a distance of 279.59 feet; South 63° 06' 40" West a distance of 165.31 feet; and South 42° 27' 23" West a distance of 205.85 feet (to Point B);

2717
3030 Bankhead Highway
Austell, GA

running thence along the northeasterly right-of-way line of Thornton Road North 61° 18' 40" West a distance of 100.00 feet to a point located on said northeasterly right-of-way line; thence continuing along the northeasterly right-of-way line of Thornton Road South 28° 41' 20" West a distance of 20.00 feet to a point located on said northeasterly right-of-way line; thence continuing along the northeasterly right-of-way line of Thornton Road North 61° 18' 40" West a distance of 176.40 feet to a point located on said northeasterly right-of-way line; thence leaving the northeasterly right-of-way line of Thornton Road and running North 37° 24' 40" East a distance of 199.17 feet to a point; thence North 52° 35' 20" West a distance of 200.00 feet to a point located on the southeasterly right-of-way line of Bankhead Highway, said point also being the POINT OF BEGINNING, as per Boundary Line & Topographic Survey dated March 13, 1984 and being last revised November 1, 1984, prepared for Columbia Properties Incorporated, prepared by Huff & Associates and bearing the certification of Edward Sheldon Huff, Georgia Registered Land Surveyor No. 1772.

2717
3030 Bankhead Highway
Austell, GA

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 2719
Dallas, Georgia

| | |
|---|---|
| Lease: | Lease dated May 17, 1996 between New York Life Insurance Company, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated May 17, 1996, recorded in Book 516, Page 810, of the public records of Paulding County, Georgia |
| Amendments/ Guaranty: | Corporate Guaranty of Lease Obligations dated May 17, 1996 |
| | First Amendment to Lease Agreement dated September 26, 1996 |
| | Second Amendment to Lease Agreement dated May 28, 1997 |
| | Supplemental Lease Agreement dated May 28, 1997 |
| | Amendment to Short Form Lease dated May 28, 1997, recorded in Book 593, Page 706, of the public records of Paulding County, Georgia |
| | Assignment and Assumption of Lease Agreement dated February 7, 2002 |
| Premises: | That certain store building and related improvements located at 2985 Villa Rica Highway Suite A, Dallas, Paulding County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION



OCT 19 '98 10:34 FR LOBRANO KINCAID    904 3531332 TO 7835138    P.11

GEORGIA HIGHWAY 61

Exhibit "A"    BOOK 593 PAGE 708

SITE PLAN

OCT 19 '98 10:23

2719
985 Villa Rica Highway Suite

Dallas, GA

## EXHIBIT "B"

### (Shopping Center Tract and Detention Area)

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 806 of the 2nd District, 3rd Section, Paulding County, Georgia, said tract being more particularly described as follows:

TO FIND THE TRUE POINT OF BEGINNING commence at a point located at the corner common to Land Lots 778, 779, 806 and 807 of said District and Section; thence run along the Land Lot Line common to Land Lots 806 and 807 South 01° 23' 06" East a distance of 582.78 feet to an iron pin; thence continue running along said Land Lot Line South 01° 23' 06" East a distance of 575.00 feet to a 1/2 inch open top pipe located on the northern right-of-way line of Hiram-Sudie Road (Georgia 120 Connector) (80 foot right-of-way); thence run along the northern right-of-way line of Hiram-Sudie Road (Georgia 120 Connector) and along the arc of a curve to the right (said curve having a radius of 2752.21 feet and being subtended by a chord bearing South 82° 27' 44" West and having a chord distance of 282.30 feet) an arc distance of 282.42 feet to a point; thence continue running along said northern right-of-way line South 85° 24' 07" West a distance of 21.26 feet to a point and the TRUE POINT OF BEGINNING; from said TRUE POINT OF BEGINNING as thus established, thence continue running along said northern right-of-way line South 85° 24' 07" West a distance of 459.82 feet to a bolt; thence continue running along said northern right-of-way line South 85° 49' 20" West a distance of 99.83 feet to a 3/4 inch open top pipe; thence leave said northern right-of-way line and run North 03° 45' 18" West a distance of 199.93 feet to a 3/4 inch open top pipe; thence run South 86° 14' 08" West a distance of 199.61 feet to a 3/4 inch open top pipe located on the eastern right-of-way line of Georgia Highway 61 (100 foot right-of-way); thence run along the eastern right-of-way line of Georgia Highway 61 North 03° 37' 11" West a distance of 378.30 feet to a concrete monument; thence continue running along said eastern right-of-way line North 04° 33' 46" West a distance of 21.20 feet to an iron pin; thence leave said eastern right-of-way line and run North 86° 11' 23" East a distance of 800.90 feet to an iron pin; thence run South 03° 54' 13" East a distance of 216.58 feet to a point; thence run South 86° 11' 23" West a distance of 82.04 feet to a point; thence run South 03° 54' 13" East a distance of 215.50 feet to a nail; thence run South 17° 25' 00" East a distance of 74.40 feet to a point; thence run South 08° 03' 55" East a distance of 55.09 feet to a point; thence run along the arc of a curve to the left (said curve having a radius of 49.79 feet and being subtended by a chord bearing South 30° 21' 40" East and having a chord distance of 37.78 feet) and arc distance of 38.75 feet to a point located on the northern right of way of Hiram-Sudie Road (GA 120 Connector) and the TRUE POINT OF BEGINNING, as per ALTA/ACSM Land Title As-Built Survey prepared for New York Life Insurance Company, Lawyer's Title Insurance Company and Columbia Properties Partners I, L.L.C., prepared by Barton Surveying, Inc., bearing the certification and seal of David Barton, Georgia Registered Land Surveyor Number 2533, dated April 12, 1997, last revised May 21, 1997.

### LESS AND EXCEPT:

### (Shop Tract 1 and Expansion Tract)

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 806 of the 2nd District, 3rd Section, Paulding County, Georgia, said tract being more particularly described as follows:

TO FIND THE TRUE POINT OF BEGINNING commence at a point located at the corner common to Land Lots 778, 779, 806 and 807 of said District and Section; thence run along the Land Lot Line common to Land Lots 806 and 807 South 01° 23' 06" East a distance of 582.78 feet to an iron pin; thence leave said Land Lot Line and run South 86° 11' 23" West a distance of 366.48 feet to a point; thence run South 03° 54' 13" East a distance of 173.08 feet to a point; thence run South 86°

2719
2985 Villa Rica Highway Suite
A
Dallas, GA

05' 47" West a distance of 206.48 feet to a point and the TRUE POINT OF BEGINNING; from said TRUE POINT OF BEGINNING as thus established, thence run South 86° 05' 47" West a distance of 86.13 feet to a point; thence run North 00° 30' 07" East a distance of 19.38 feet to a point; thence run North 03° 54' 13" West a distance of 80.79 feet to a point; thence run North 86° 05' 47" East a distance of 84.64 feet to a point; thence run South 03° 54' 13" East a distance of 100.11 feet to a point and the TRUE POINT OF BEGINNING, as per ALTA/ACSM Land Title As-Built Survey prepared for New York Life Insurance Company, Lawyer's Title Insurance Company and Columbia Properties Partners I, L.L.C., prepared by Barton Surveying, Inc., bearing the certification and seal of David Barton, Georgia Registered Land Surveyor Number 2533, dated April 12, 1997, last revised May 21, 1997.

**ALSO LESS AND EXCEPT:**

**(Shop Tract 2)**

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 806 of the 2nd District, 3rd Section, Paulding County, Georgia, said tract being more particularly described as follows:

TO FIND THE TRUE POINT OF BEGINNING commence at a point located at the corner common to Land Lots 778, 779, 806 and 807 of said District and Section; thence run along the Land Lot Line common to Land Lots 806 and 807 South 01° 23' 06" East a distance of 582.78 feet to an iron pin; thence leave said Land Lot Line and run South 86° 11' 23" West a distance of 366.48 feet to a point; thence run South 03° 54' 13" East a distance of 393.27 feet to a point; thence run South 86° 05' 47" West a distance of 187.04 feet to a point and the TRUE POINT OF BEGINNING; from said TRUE POINT OF BEGINNING as thus established, thence run South 03° 54' 13" East a distance of 99.57 feet to a point; thence run South 86° 05' 47" West a distance of 100.05 feet to a point; thence run along the arc of a curve to the right (said curve having a radius of 2.71 feet and being subtended by a chord bearing North 02° 21' 38" West and having a chord distance of 5.41 feet) an arc distance of 8.34 feet to a point; thence run North 86° 05' 47" East a distance of 15.37 feet to a point; thence run North 03° 54' 13" West a distance of 80.50 feet to a point; thence run South 86° 05' 47" West a distance of 16.22 feet to a point; thence run along the arc of a curve to the right (said curve having a radius of 5.00 feet and being subtended by a chord bearing North 48° 58' 46" West and having a chord distance of 7.07 feet) an arc distance of 7.85 feet to a point; thence run North 03° 54' 13" West a distance of 8.67 feet to a point; thence run North 86° 05' 47" East a distance of 105.76 feet to a point and the TRUE POINT OF BEGINNING, as per ALTA/ACSM Land Title As-Built Survey prepared for New York Life Insurance Company, Lawyer's Title Insurance Company and Columbia Properties Partners I, L.L.C., prepared by Barton Surveying, Inc., bearing the certification and seal of David Barton, Georgia Registered Land Surveyor Number 2533, dated April 12, 1997, last revised May 21, 1997.

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 2720
Norcross, Georgia

| | |
|---|---|
| Lease: | Lease dated November 15, 1983 between Indian Village Group, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated November 15, 1983, recorded in Book 2696, Page 434, of the public records of Gwinnett County, Georgia |
| Amendments/ Guaranty: | Guaranty dated November 21, 1983 |
| | Supplemental Lease Agreement dated November 19, 1984 |
| | Letter Agreement dated December 5, 2001 |
| | Assignment and Assumption of Lease Agreement dated March 24, 2002 |
| | Letter Agreement (Tenant's Lease Term Renewal Option Exercise Notice) dated April 20, 2004 |
| Premises: | That certain store building and related improvements located at 2055 Beaver Ruin, Norcross, Gwinnett County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

<u>EXHIBIT "B"</u>

All that tract or parcel of land lying and being in Land
Lots 212 and 213 of the 6th District of Gwinnett County, Georgia
and being more particularly described as follows:

TO FIND THE TRUE POINT OF BEGINNING, begin at the point
which would be formed by the intersection of the southerly right-
of-way line of Beaver Ruin Road (130 foot right-of-way) and the
southwesterly right-of-way line of Indian Trail Road (100 foot
right-of-way), if such right-of-way lines were extended, and
running thence from said point South 4°41'00" East a distance of
32.49 feet to the southwesterly right-of-way line of Indian Trail
Road; thence South 4°41'00" East along said southwesterly right-
of-way line of Indian Trail Road a distance of 152.00 feet to
a point on the southwesterly right-of-way line of Indian Trail
Road and the True Point of Beginning; from said True Point of
Beginning as thus established, thence, continuing along said
southwesterly right-of-way line, South 4°41'00" East a distance
of 63.04 feet to a point; thence leaving said southwesterly right-
of-way line, South 60°35'00" West a distance of 605.89 feet to a
point; thence North 53°27'00" West a distance of 306.00 feet to
a point; thence North 25°11'00" West a distance of 405.00 feet
to a point; thence North 60°11'00" East a distance of 410.00 feet
to a point on the southerly right-of-way line of Beaver Ruin Road;
thence, northeasterly along said southerly right-of-way line of
Beaver Ruin Road and following the arc of a curve to the left
(said curve having a radius of 1650.00 feet) an arc distance of
65.84 feet to a point; thence, leaving said southerly right-of-
way line, South 60°11'00" West a distance of 140.00 feet to a
point; thence South 14°28'14" West a distance of 27.37 feet to
a point; thence South 53°27'00" East a distance of 120.00 feet to
a point; thence South 69°07'00" East a distance of 100.00 feet
to a point; thence North 20°53'00" East a distance of 156.00 feet
to a point on the southerly right-of-way line of Beaver Ruin Road;
thence northeasterly along said southerly right-of-way line of
Beaver Ruin Road and following the arc of a curve to the left (said
curve having a radius of 1650.00 feet) an arc distance of 277.46
feet to a point; thence, leaving said southerly right-of-way line,
South 20°53' West a distance of 150.00 feet to a point; thence
South 53°27' East a distance of 64.00 feet to a point; thence
South 77°23'11" East a distance of 153.71 feet to a point on the
southwesterly right-of-way line of Indian Trail Road and the True
Point of Beginning, said tract containing 8.61 acres as shown on
that certain Plot Plan entitled "Indian Village" prepared for
Columbia Properties, Inc. by Edward Sheldon Huff, Georgia Registered
Land Surveyor No. 1772, of Huff & Associates, dated May 18, 1983,
as last revised October 31, 1983.

TOGETHER WITH the pedestrian and vehicular ingress/egress easement
rights through the property connecting the shopping center with
Indian Trail Road, such property being more particularly described
in that certain Easement Agreement dated July 21, 1983 and recorded
in Book 2601, page 242, <u>et seq.</u> in the Office of Clerk of Superior
Court of Gwinnett County, Georgia.

2720
2055 Beaver Ruin
Norcross, GA

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 2723
## Stone Mountain, Georgia

| | |
|---|---|
| Lease: | Lease dated November 29, 1983 between Edens & Avant Financing II, Limited Partnership, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated November 29, 1983, recorded in Book 4896, Page 199, of the public records of DeKalb County, Georgia |
| Amendments/ Guaranty: | Guaranty dated December 9, 1983 |
| | First Amendment to Lease dated May 16, 1984 |
| | Second Lease Amendment dated May 16, 1984 |
| | Supplemental Lease Agreement dated November 19, 1984 |
| | Third Amendment to Lease dated January 18, 1993 |
| | Fourth Amendment to Lease dated September 15, 1994 |
| | Assignment and Assumption of Lease Agreement dated April 14, 2002 |
| Premises: | That certain store building and related improvements located at 5755 Rockbridge Road, Stone Mountain, DeKalb County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

2723
Stone Mountain, Georgia

EXHIBIT "B"

LEGAL DESCRIPTION OF SHOPPING CENTER

All that tract or parcel of land lying and being in Land Lots 20 and 36 of the 18th District, Dekalb County, Georgia, which tract is more particularly described as follows:

BEGINNING AT A POINT located on the southerly right-of-way line of Rockbridge Road (100 foot right-of-way), said point being located South 77°30'10" East a distance of 488.64 feet from the intersection of the southerly right-of-way line of Rockbridge Road and the northeasterly right-of-way line of Stone Mountain-Lithonia Road, (100 foot right-of-way); from said Point Of Beginning running thence along the southerly right-of-way line of Rockbridge Road South 77°30'10" East a distance of 9.62 feet to a point; thence running along the southerly right-of-way line of Rockbridge Road and along the arc of a curve to the left (said curve having a radius of 1,341.896 feet and being subtended by a chord bearing South 87°30' 47" East and having a chord distance of 466.41 feet) an arc distance of 468.77 feet to a point; thence South 2°18'48" East a distance of 139.73 feet to a point; thence North 87°41'12" East a distance of 140.0 feet to a point; thence North 2°18'48" West a distance of 160.0 feet to a point located on the southerly right-of-way line of Rockbridge Road; thence along the southerly right-of-way line of Rockbridge Road and along the arc of a curve to the left (said curve having a radius of 1,341.896 feet and being subtended by a chord bearing North 73°57'05" East and having a chord distance of 115.96 feet) an arc distance of 116.0 feet to an iron pin located on the southerly right-of-way line of Rockbridge Road; thence south 4°02'20" East a distance of 533.71 feet to an iron pin; thence South 87°41'12" West a distance of 992.74 feet to an iron pin located on the northeasterly right-of-way line of Stone Mountain-Lithonia Road; thence along the northeasterly right-of-way line of Stone Mountain-Lithonia Road North 21°08'57" West a distance of 67.69 feet to a point; thence North 87°41'12" East a distance of 160.00 feet to a point; thence North 2°18'48" West a distance of 150.0 feet to a point; thence South 87°41'12" West a distance of 211.17 feet to a point on the northeasterly right-of-way line of Stone Mountain-Lithonia Road; thence along the northeasterly right-of-way line of Stone Mountain-Lithonia Road North 21°08'57" West a distance of 212.85 feet to an iron pin located on the northeasterly right-of-way line of Stone Mountain-Lithonia Road; thence South 77°30'10" East a distance of 250.0 feet to a point; thence North 87°41'12" East a distance of 150.00 feet to a point; thence North 2°18'48" West a distance of 175.61 feet to a point located on the southerly right-of-way line of Rockbridge Road and the Point Of Beginning; as per site plan for Rockbridge Square, prepared for Columbia Properties, Inc. by J. Lancaster Associates, dated June 28, 1983, and last revised August 22, 1983.

Last Revised 8/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2724
Conyers, Georgia

| | |
|---|---|
| Lease: | Lease dated October 29, 1997 between AFDC, LLC, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated October 29, 1997, recorded in Book 1438, Page 212, of the public records of Rockdale County, Georgia |
| Amendments/ Guaranty: | Corporate Guaranty of Lease Obligations dated October 28, 1997 |
| | Supplemental Lease Agreement dated December 3, 1998 |
| | Assignment and Assumption of Lease Agreement dated February 17, 2002 |
| Premises: | That certain store building and related improvements located at 1591 GA. Highway 20 North, Conyers, Rockdale County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION



EXHIBIT "A"

EXHIBIT "B"                                    BOOK 1438 PAGE 215

LEGAL DESCRIPTION
( Winn Dixle Tract)

All that tract or parcel or land lying in Land Lots 302, 317 and 318 of the 16th District of Rockdale County, Georgia and being more particularly described as follows:

To find the POINT OF BEGINNING, commence at an iron pin point at the intersection of the southerly right-of-way of Broad Street (50 foot wide right-of-way) and the easterly right-of-way of Georgia Route 20 (100 foot wide right-of-way) and run along the easterly right-of-way of Georgia Route 20 and along a curve to the right having a radius of 2341.94 feet and an arc length of 746.58 feet, being subtended by a chord of South 25 degrees 16 minutes 25 seconds West for a distance of 743.42 feet to an iron pin;  Thence continuing along the easterly right-of-way of Georgia Route 20, run along a curve to the right having a radius of 2341.94 feet and an arc length of 4.87 feet, being subtended by a chord of South 34 degrees 27 minutes 56 seconds West for a distance of 4.87 feet to a point;  Thence continuing along the easterly right-of-way of Georgia Route 20, run South 34 degrees 31 minutes 31 seconds West for a distance of 31.13 feet to an iron rod;  Thence continuing along the easterly right-of-way of Georgia Route 20, run South 34 degrees 31 minutes 31 seconds West for a distance of 69.66 feet to the POINT OF BEGINNING thus established and leaving the right-of-way of Georgia Route 20, run South 55 degrees 30 minutes 13 seconds East for a distance of 109.97 feet to a point;  Thence run South 66 degrees 18 minutes 05 seconds East for a distance of 366.48 feet to a point;  Thence South 66 degrees 18 minutes 05 seconds East for a distance of 201.64 feet to a point, on the centerline of a creek;  Thence along the centerline of a creek, run South 16 degrees 08 minutes 48 seconds West for a distance of 280.99 feet to a point;  Thence along the centerline of a creek, run South 08 degrees 04 minutes 51 seconds West for a distance of 135.40 feet to a point;  Thence along the centerline of a creek, run North 88 degrees 28 minutes 49 seconds West for a distance of 102.45 feet to a point;  Thence along the centerline of a creek, run South 21 degrees 35 minutes 45 seconds West for a distance of 88.65 feet to a point;  Thence along the centerline of a creek, run South 34 degrees 56 minutes 50 seconds West for a distance of 20.66 feet to a point;  Thence leaving the centerline of a creek, run North 66 degrees 18 minutes 05 seconds West for a distance of 122.62 feet to a point;  Thence run South 71 degrees 15 minutes 04 seconds West for a distance of 169.05 feet to a point;  Thence run North 65 degrees 58 minutes 29 seconds West for a distance of 64.63 feet to a point;  Thence run South 69 degrees 01 minutes 31 seconds West for a distance of 30.67 feet to a point;  Thence run South 24 degrees 01 minutes 31 seconds West for a distance of 55.20 feet to a point;  Thence run South 42 degrees 19 minutes 35 seconds East for a distance of 72.03 feet to a point;  Thence run South 23 degrees 08 minutes 04 seconds East for a distance of 52.49 feet to a point;  Thence run South 18 degrees 46 minutes 28 seconds West for a distance of 53.69 feet to a point;  Thence run South 05 degrees 32 minutes 19 seconds East for a distance of 37.05 feet to a point on northerly line of Sigman Road (Georgia Route 20);  Thence, along the northerly right-of-way of Sigman Road, run North 72 degrees 45 minutes 18 seconds West for a distance of 134.19 feet to a point;  Thence, along the northerly right-of-way of Sigman Road, run along a curve to the right having a radius of 2805.18 feet and an arc length of 80.52

EXHIBIT "B"
Page 1 of 2

2724
1591 GA. Highway 20 North
Conyers, GA

BOOK 1438 PAGE 216

feet, being subtended by a chord of North 71 degrees 55 minutes 58 seconds West for a distance of 80.51 feet to a point; Thence leaving the northerly right-of-way of Sigman Road, run North 34 degrees 09 minutes 28 seconds East for a distance of 151.42 feet to a point; Thence run North 55 degrees 29 minutes 54 seconds West for a distance of 149.57 feet to a point; Thence run North 24 degrees 01 minutes 31 seconds East for a distance of 250.16 feet to a point; Thence run North 65 degrees 58 minutes 29 seconds West for a distance of 213.25 feet to a point of the easterly right-of-way of Georgia Route 20 (100 feet wide right-of-way); Thence run North 34 degrees 31 minutes 31 seconds East for a distance of 521.54 feet to the POINT OF BEGINNING.

Said property containing 11.2707 acres and being more particularly shown on that certain Boundary Survey for Ackerman & Co., ADF Limited Liability Company and Chicago Title Insurance Company, dated October 10, 1997, and last revised October 16, 1997, prepared by Daniel S. Mahan of W.L. Jorden & Co., Inc., G.R.L.S. No. 2275.

Together with easements and rights under that certain Cross Easement Agreement between Landlord and ADFC II, LLC dated November 25 , 1997 to be recorded in Rockdale County, Georgia records.

EXHIBIT "B"
Page 2 of 2

2

2724
1591 GA. Highway 20 North
Conyers, Georgia

Last Revised 5/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # 2727
Douglasville, Georgia

| | |
|---|---|
| Lease: | Lease dated August 4, 1987 between Barry F. O'Neill, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated August 4, 1987, recorded in Book 575, Page 343, of the public records of Douglas County, Georgia |
| Amendments/ Guaranty: | Guaranty dated August 11, 1987 |
| | Supplemental Lease Agreement dated October 21, 1988 |
| | Assignment and Assumption of Lease Agreement dated March 21, 2002 |
| Premises: | That certain store building and related improvements located at 3696 Highway 5, Douglasville, Douglas County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT " B "

(Shopping Center Tract)

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 126,
of the 2nd District, 5th Section of Douglas County, Georgia,
which tract is being more particularly described as follows:

BEGINNING at a point located at the intersection of the northerly
right-of-way line of Amber Drive (50' right-of-way) and the
northwesterly right-of-way line of Bill Arp Road/S.R.5 (80'
right-of-way); running thence along the northerly right-of-way
line of Amber Drive North 85 degrees 30 minutes 22 seconds West a
distance of 115.00 feet to a point located on said northerly
right-of-way line; thence leaving the northerly right-of-way line
of Amber Drive and running North 00 degrees 53 minutes 51 seconds
West a distance of 123.33 feet to a point; thence South 82
degrees 18 minutes 50 seconds West a distance of 84.87 feet to a
point; thence South 53 degrees 40 minutes 32 seconds West a
distance of 57.72 feet to a point; thence South 82 degrees 11
minutes 38 seconds West a distance of 78.27 feet to a point;
thence South 01 degrees 13 minutes 15 seconds East a distance of
69.78 feet to a point located on the northerly right-of-way line
of Amber Drive; thence along said northerly right-of-way line
South 89 degrees 52 minutes 30 seconds West a distance of 30.62
feet to a point located on said northerly right-of-way line;
thence leaving the northerly right-of-way line of Amber Drive and
running North 07 degrees 17 minutes 10 seconds West a distance of
608.64 feet to a point; thence North 87 degrees 19 minutes 37
seconds East a distance of 770.30 feet to a point located on the
southwesterly future right-of-way line of Central Church Road
(50' from the centerline of the present right-of-way); thence
continuing along said future right-of-way line and along the arc
of a curve to the left (said curve having a radius of 1,341.54
feet and being subtended by a chord bearing South 38 degrees 54
minutes 20 seconds East and having a chord distance of 135.40
feet) an arc distance of 135.45 feet to a point located on said
future southwesterly right-of-way line; thence leaving the future
southwesterly right-of-way line of Central Church Road and
running South 48 degrees 12 minutes 07 seconds West a distance of
104.26 feet to a point; thence South 87 degrees 19 minutes 37
seconds West a distance of 35.30 feet to a point; thence South 02
degrees 40 minutes 23 seconds East a distance of 49.23 feet to a
point; thence South 45 degrees 53 minutes 56 seconds East a
distance of 125.00 feet to a point; thence South 62 degrees 18
minutes 44 seconds East a distance of 39.84 feet to a point lying
on the northwesterly right-of-way line of Central Church
Connector (60' right-of-way); thence along said northwesterly
right-of-way line and along the arc of a curve to the left (said
curve having a radius of 430.00 feet and being subtended by a
chord bearing South 14 degrees 59 minutes 26 seconds West and
having a chord distance of 189.02 feet) an arc distance of 190.58
feet to a point lying on said northwesterly right-of-way line;
thence continuing along said northwesterly right-of-way line
South 02 degrees 17 minutes 37 seconds West a distance of 46.00
feet to a point lying at the point of intersection of the
northwesterly right-of-way line of Central Church Connector and
the northerly right-of-way line of Bill Arp Road/S.R.5; thence
running along said northerly right-of-way line of Bill Arp Road
and along the arc of a curve to the left (said curve having a
radius of 855.84 feet and being subtended by a chord bearing
South 77 degrees 25 minutes 28 seconds West and having a chord
distance of 396.57 feet) an arc distance of 400.21 feet to a
point located at the intersection of the northerly right-of-way
line of Amber Drive and the northerly right-of-way line of Bill
Arp Road, said point also being the POINT OF BEGINNING, as per
Site Plan for Cedar Mountain Village, dated April 29, 1987, and
being last revised July 31, 1987, prepared for Barry F. O'Neill
and prepared by Q-B Engineering & Surveying, Inc.

RECORDED Sept 15, 1987
JANE C. WILLIAMS, CLERK
SUPERIOR COURT, DOUGLAS CO.

BOOK 575 PAGE 346

2727
3696 Highway 5
Douglasville, GA

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2728
Stockbridge, Georgia

Lease:                 Lease dated December 15, 1997, between Four Seas Company, LLC, as
                       Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

                       as evidenced by Short Form Lease dated December 15, 1997, recorded in Book
                       2782, Page 266, of the public records of Henry County, Georgia

Amendments/
Guaranty:              Guaranty dated December 15, 1997

                       Assignment and Assumption of Lease dated December 21, 1997

                       First Amendment to Lease dated October 30, 1998

                       Second Amendment to Lease dated February 16, 1999

                       Supplemental Lease Agreement dated June 3, 1999

                       Assignment and Assumption of Lease Agreement dated February 24, 2002


Premises:              That certain store building and related improvements located at 2600
                       Georgia Highway 138, Stockbridge, Henry County, Georgia

Legal Description:     The real property as more particularly described as follows:


SEE ATTACHED LEGAL DESCRIPTION

BOOK 2782 PAGE 268

## EXHIBIT "A-1"
## LEGAL DESCRIPTION - PREMISES

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 133 of the 11th District of Henry County, Georgia, and being more particularly described as follows:

Commence at an point at the intersection of the southerly side of the right-of-way along Georgia Highway No. 138 (100' R/W), with the westerly side of the right-of-way along Georgia Highway No. 155 (100' R/W);

THENCE, continue along the aforementioned westerly side of the right-of-way along Georgia Highway No. 155 (100' R/W), South 03 degrees 30 minutes 11 seconds East a distance of 355.40 feet to a point;

THENCE, continue along the aforementioned westerly side of the right-of-way along Georgia Highway No. 155 (100' R/W) along the arc of a 219.09 foot curve to the left, said curve having a radius of 2549.86 feet and being subtended by a chord bearing South 05 degrees 57 minutes 52 seconds East and chord distance of 219.03 feet to a point;

THENCE, continue along the aforementioned westerly side of the right-of-way along Georgia Highway No. 155 (100' R/W), South 08 degrees 25 minutes 34 seconds East a distance of 199.14 feet to a point and the POINT OF BEGINNING;

THENCE, continue along the aforementioned westerly side of the right-of-way along Georgia Highway No. 155 (100' R/W), South 08 degrees 25 minutes 34 seconds East a distance of 13.06 feet to a point;

THENCE, continue along the aforementioned westerly side of the right-of-way along Georgia Highway No. 155 (100' R/W) along the arc of a 165.88 foot curve to the left, said curve having a radius of 4347.04 feet and being subtended by a chord bearing South 09 degrees 31 minutes 09 seconds East and chord distance of 165.87 feet to a nail found;

THENCE, leaving the aforementioned westerly side of the right-of-way along Georgia Highway No. 155, South 77 degrees 45 minutes 00 seconds West a distance of 299.87 feet to a 2 inch open top pipe found;

THENCE, North 86 degrees 35 minutes 24 seconds West a distance of 403.37 feet to a point;

THENCE, North 03 degrees 30 minutes 09 seconds West a distance of 441.76 feet to a point;

THENCE, North 57 degrees 36 minutes 30 seconds East a distance of 62.53 feet to a point;

2728
2600 Georgia Highway 138
Stockbridge, GA

BOOK 2782 PAGE 269

THENCE, North 02 degrees 46 minutes 30 seconds West a distance of 63.50 feet to a point;

THENCE, North 30 degrees 29 minutes 26 seconds West a distance of 91.90 feet to a point;

THENCE, North 46 degrees 34 minutes 25 seconds East a distance of 24.94 feet to a point, said point being located along the southerly side of the right-of-way along Georgia Highway No. 138 (100'R/W);

THENCE, continuing along the southerly side of the right-of-way along Georgia Highway No. 138 (100' R/W) North 59 degrees 19 minutes 48 seconds East a distance of 58.12 feet to a point;

THENCE, continuing along the southerly side of the right-of-way along Georgia Highway No. 138 (100' R/W) North 60 degrees 15 minutes 25 seconds East a distance of 216.26 feet to a point;

THENCE, continuing along the southerly side of the right-of-way along Georgia Highway No. 138 (100' R/W) North 61 degrees 11 minutes 31 seconds East a distance of 216.21 feet to a point;

THENCE, leaving the southerly side of the right-of-way along Georgia Highway No. 138 (100' R/W) South 28 degrees 00 minutes 43 seconds East a distance of 86.94 feet to a point;

THENCE, South 03 degrees 26 minutes 26 seconds East a distance of 390.47 feet to a point;

THENCE, South 86 degrees 29 minutes 51 seconds West a distance of 88.26 feet to a point;

THENCE, South 03 degrees 30 minutes 09 seconds East a distance of 193.81 feet to a point;

THENCE, North 86 degrees 29 minutes 51 seconds East a distance of 317.81 feet to a point, said point being located along the westerly side of the right-of-way along Georgia Highway No. 155 (100' R/W) and the POINT OF BEGINNING;

Said above-described tract containing 8.46 acres, more or less, and being shown on an American Land Title Survey for Limestone Partners, L.L.C., SouthTrust Bank, N. A. and Lawyers Title Insurance Company by Broward Davis & Associates, Inc., dated August 19, 1997.

BOOK 2782 PAGE 270

EXHIBIT "B"



SITE PLAN

2728
2600 Georgia Highway 138
Stockbridge, Georgia

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2729
Marietta, Georgia

Lease:                 Lease dated June 11, 1984 between Columbia Properties Partners V, LLC, as
                       Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

                       as evidenced by Short Form Lease dated June 11, 1984, recorded in Book _____,
                       Page 69, of the public records of Cobb County, Georgia

Amendments/
Guaranty:              Guaranty dated June 14, 1984

                       First Lease Amendment dated November 25, 1985

                       First Short Form Lease Amendment dated November 25, 1985, recorded in
                       Book 3828, Page 295, of the public records of Cobb County, Georgia

                       Supplemental Lease Agreement dated February 27, 1986

                       Second Lease Amendment dated June 3, 1987

                       Second Short Form Lease Amendment dated June 3, 1987

                       Third Lease Amendment dated August 27, 1987

                       Assignment and Assumption of Lease Agreement dated February 17, 2002

Premises:              That certain store building and related improvements located at 3101
                       Roswell Road, Marietta, Cobb County, Georgia

Legal Description:     The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

2729
Marietta, Georgia

EXHIBIT "A"

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land
Lots 910 and 963 of the 16th District, 2nd Section of Cobb
County, Georgia and being more particularly described as
follows:

BEGINNING at a point located at the common intersection of Land
Lots 910, 911, 962 and 963 of said District and Section (said
point located North 00°21'56" West along the westerly land lot
line of Land Lot 963 of said District and Section a distance of
179.89 feet from a point located at the intersection of the
northerly right-of-way line of Roswell Road-State Route 120
with said westerly land lot line); thence North 00°21'57" West
along said westerly land lot line of Land Lot 910 of said
District and Section a distance of 655.10 feet to a point on
said westerly land lot line; thence continuing along said
westerly land lot line North 01°13'08" East a distance of
157.14 feet to a point located on said westerly land lot line;
thence leaving the westerly land lot line of Land Lot 910 and
running South 88°18'07" East a distance of 747.23 feet to a
point lying on the westerly right-of-way line of Old Canton
Road; thence running along said westerly right-of-way line and
along the arc of a curve to the right (said curve having a
radius of 1259.40 feet and being subtended by a chord bearing
South 10°41'25" East and having a chord distance of 122.98
feet) an arc distance of 123.03 feet to a point lying on said
westerly right-of-way line; thence continuing along said
westerly right-of-way line and along the arc of a curve to the
right (said curve having a radius of 2125.40 feet and being
subtended by a chord bearing South 08°52'37" East and having a
chord distance of 194.66 feet) an arc distance of 194.73 feet
to a point lying on said westerly right-of-way line; thence
continuing along said westerly right-of-way line South
06°15'08" East a distance of 179.76 feet to a point; thence
leaving said westerly right-of-way line of Old Canton Road and
running South 83°44'52" West a distance of 200 feet to a point;
thence South 06°15'08" East a distance of 190 feet to a point;
thence South 06°43'45" East a distance of 2.58 feet to a point
located on said northerly right-of-way line of Roswell
Road-State Route 120; thence along the northerly right-of-way
line of Roswell Road and along the arc of a curve to the left
(said curve having a radius of 1486.90 feet and being subtended
by a chord bearing South 70°43'10" West and having a chord
distance of 406.06 feet) an arc distance of 407.33 feet to a
point lying on said northerly right-of-way line; thence
continuing along said northerly right-of-way line South
63°39'29" West a distance of 140.07 feet to a point located on
said northerly right-of-way line; thence continuing along said
northerly right-of-way line South 60°44'35" West a distance of
149.23 feet to a point located on said northerly right-of-way
line where it intersects with the westerly land lot line of
Land Lot 963 of said District and Section; thence leaving the
northerly right-of-way line of Roswell Road-State Route 120 and
running along said westerly land lot Line North 00°21'56" West
a distance of 179.89 feet to a point located at the common
intersection of Land Lots 910, 911, 962 and 963 of said
District and Section, said point also being the POINT OF
BEGINNING as per Site Plan entitled Olde Mill Shopping Center
prepared for Barry F. O'Neill, dated April 10, 1987 and being
last reviewed May 1, 1987, prepared by Q-B Engineering and
Surveying, Inc. and bearing the certification of Michael C.
Brown, Georgia Registered Land Surveyor No. 2329.

LESS AND EXCEPT ALL THAT TRACT OR PARCEL OF LAND lying and
being in Land Lot 910 of the 16th District, 2nd Section of Cobb
County, Georgia and being more particularly described as
follows:

Exhibit "B"  Page 1 of 2

2729
3101 Roswell Road
Marietta, GA

**Exhibit "B"    Page 2 Of 2**

TO FIND THE POINT OF BEGINNING commence at a point located at the common intersection of Land Lots 910, 911, 962 and 963 of said District and Section and run North 84°16'55" East a distance of 165.66 feet to a point, said point being the TRUE POINT OF BEGINNING; thence run North 26°20'00" East a distance of 147.72 feet to a point; thence South 63°40'00" East a distance of 20.00 feet to a point; thence North 26°20'00" East a distance of 30.00 feet to a point; thence North 00°11'32" West a distance of 64.00 feet to a point; thence North 83°19'19" East a distance of 135.83 feet to a point; thence South 05°55'17" East a distance of 162.69 feet to a point; thence along the arc of a curve to the left (said curve having a radius of 1540.40 feet and being subtended by a chord bearing South 69°50'53" West and having a chord distance of 249.73 feet) an arc distance of 250.00 feet to a point; thence North 38°00'00" West a distance of 22.41 feet to a point, said point also being the POINT OF BEGINNING, as per Site Plan entitled Olde Mill Shopping Center prepared for Barry F. O'Neill, dated April 10, 1987 and being last revised May 1, 1987, prepared by Q-B Engineering and Surveying, Inc. and bearing the certification of Michael C. Brown, Georgia Registered Land Surveyor No. 2329.

2729
3101 Roswell Road
Marietta, GA

- 2 -

#144#



Exhibit "A"

EXHIBIT A
PLOT PLAN
DATE 6-8-87
APPROVED BY:

2729
3101 Roswell Road
Marietta, Georgia

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2730
East Point, Georgia

| | |
|---|---|
| Lease: | Lease dated October 6, 1981 between United Realty Group, L.P., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated October 6, 1981, recorded in Book 7979, Page 482, of the public records of Fulton County, Georgia |
| Amendments/ Guaranty: | Guaranty dated October 9, 1981 |
| | Supplemental Lease Agreement dated August 14, 1982 |
| | First Amendment to Lease dated December 17, 1991 |
| | Assignment and Assumption of Lease Agreement dated March 14, 2002 |
| Premises: | That certain store building and related improvements located at 2020 Headland Drive, East Point, Fulton County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

2730
East Point, Georgia

EXHIBIT "B"

LEGAL DESCRIPTION OF SHOPPING CENTER

All that tract or parcel of land lying and being in Land Lot 165 of the 14th District of Fulton County, Georgia, being improved property known as Headland-DeLowe Shopping Center, as depicted on boundary and topographic survey for Halon D. Mimms Enterprises by Samuel G. Evans, Jr., Registered Land Surveyor, dated December 31, 1980, last revised September 4, 1981, being a parcel of 8.5281 acres designated as Parcel "B" on said plat of survey and more particularly described as follows:

Commencing at an iron pin found on the southern boundary of Headland Drive, which iron pin is located south 78 degrees 50 minutes 01 seconds east a distance of 150.31 feet from an iron pin found which is located at the intersection of the southern boundary of Headland Drive (60-foot right-of-way) and the eastern boundary of DeLowe Drive (50-foot. right-of-way); thence along the southern boundary of Headland Drive south 79 degrees 00 minutes 56 seconds east a distance of 187.53 feet to a point; thence continuing southeasterly along said southern boundary of Headland Drive a distance of 424.22 feet along an arc .(subtended by a chord south 66 degrees 08 minutes 43 seconds east a distance of 420.66 feet) to a point on the southwestern boundary of Headland Drive; thence south 08 degrees 46 minutes 35 seconds west a distance of 470.20 feet to a point; thence north 81 degrees 20 minutes 00 seconds west a distance of 678.19 feet to an iron pin found on the eastern boundary of DeLowe Drive; thence northerly along the eastern boundary of DeLowe Drive a distance of 239.93 feet northeasterly and northerly along an arc (subtended by a chord north 07 degrees 08 minutes 45 seconds east 239.23 feet) to a point; thence north 00 degrees 26 minutes 54 seconds west a distance of 200 feet to an iron pin found; thence south 88 degrees 49 minutes 31 seconds east a distance of 125.12 feet to an iron pin found; thence north 08 degrees 33 minutes 09 seconds east a distance of 135.07 feet to the iron pin found on the southern boundary. of Headland Drive and the point of beginning, all in accordance with said plat of survey.

ALSO TOGETHER WITH:

All that tract or parcel of land lying and being in Land Lot 165 of the 14th District of Fulton County, Georgia, being unimproved property designated as Parcel "C" on boundary and topographic survey for Halon D. Mimms Enterprises by Samuel G. Evans, Jr., Registered Land Surveyor, dated December 31, 1980, last revised September 4, 1981, and containing 2.8366 acres, and more particularly described as follows:

TO FIND THE POINT OF BEGINNING: commence at an iron pin found on the southern boundary of Headland Drive, which iron pin is located south 78 degrees 50 minutes 01 seconds east a distance of 150.31 feet from an iron pin found, which is located at the intersection of the southern boundary of Headland Drive (60-foot right-of-way) and the eastern boundary of Headland Drive (50-foot right-of-way); thence along the southern boundary of Headland Drive south 79 degrees 00 minutes 56 seconds east a distance of 187.53 feet to a point; thence continuing southeasterly along said southern boundary of Headland Drive a distance of 424.22 feet along an arc (subtended by a chord south 66 degrees 08 minutes 43 seconds east a distance of 420.66 feet) to a point on the southwestern boundary of Headland Drive, which is the point of beginning; from said point of beginning thence southeasterly along an arc 73.54 feet (subtended by a chord south 51 degrees 02 minutes 33 seconds east 73.52 feet) to a point; thence south 48 degrees 44 minutes 44 seconds east a distance of 318.37 feet to an iron pin found; thence south 32 degrees 49 minutes 58 seconds west a distance of 250.0 feet to an iron pin placed; thence north 81 degrees 20 minutes 00 seconds west a distance of 283.61 feet to a point; thence north 08 degrees 46 minutes 35 seconds east a distance of 470.20 feet to the point of beginning, all in accordance with said plat of survey.

2730
2020 Headland Drive
East Point, GA

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # 2732
Cartersville, Georgia

| | |
|---|---|
| Lease: | Lease dated June 17, 1985 between Bank of America, N.A., as Agent under Agreement with Larry B. Hooks, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated June 17, 1985, recorded in Book 518, Page 242, of the public records of Bartow County, Georgia. |
| Amendments/ Guaranty: | Guaranty dated July 2, 1985 |
| | Lease Modification Agreement #1 dated August 28, 1985 |
| | Assignment and Assumption of Lease dated August 28, 1985 |
| | Supplemental Lease Agreement dated August 8, 1986 |
| | Lease Amendment and Restrictive Covenant dated February 25, 1988 |
| | Third Amendment to Lease dated October 6, 1994 |
| | Fourth Amendment to Lease dated November 10, 1995 |
| | Assignment and Assumption of Lease Agreement dated February 21, 2002 |
| Premises: | That certain store building and related improvements located at 929 Joe Frank Harris Parkway, Cartersville, Bartow County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "B"

LEGAL DESCRIPTION

All that certain piece, parcel or tract of land lying and being situate
in Cartersville, Bartow County, Georgia, more particularly described as
follows:

Beginning at a point in the northerly line of Felton Road
(40 ft. wide R.O.W.) said point being distant 1076.31 feet,
easterly, as measured along the northerly line of Felton
Road,.from its intersection with the easterly line of
North Tennessee Street (80 ft. wide R.O.W.) and running thence,
N.39°-23'-00"W. 347.01 feet, to a point; thence, N.24°-08'-30"W.
190.00 feet to a point; thence, N.20°-51'-30"E. 450.00 feet, to
a point in the southerly line of U.S. Highway, Route No. 41;
thence, S.69°-08'-30"E. along the southerly line of Route No. 41,
245.00 feet to a point therein; thence, Easterly and Southeasterly
along the southerly line of Route No. 41, and along a curve to
the right, having a radius of 2191.83 feet, an arc distance of
915.62 feet, to a point; thence, S.1°-05'W. 298.51 feet, to a
point in the northerly line of Felton Road; thence, N.88°-55'W.,
along the northerly line of Felton Road, 589.39 feet to a point
therein; thence, N.89°-16'W. still along the northerly line of
Felton Road, 261.40 feet to the point or place of beginning.

containing 15.464 acres.

2732
929 Joe Frank Harris
Parkway
Catersvile . GA



**EXHIBIT "A"**

2732
929 Joe Frank Harris
Parkway
Catersville, GA

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

<u>DESCRIPTION OF LEASES AND RELATED LAND</u>

# WINN-DIXIE STORE # 2733
Red Oak, Georgia

| | |
|---|---|
| Lease: | Lease dated June 17, 1985 between Red Oak Associates, Ltd., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated June 17, 1985, recorded in Book 10412, Page 56, of the public records of Fulton County, Georgia |
| Amendments/ Guaranty: | Guaranty dated June 26, 1985 |
| | Supplemental Lease Agreement dated September 12, 1986 |
| | Assignment and Assumption of Lease Agreement dated March 17, 2002 |
| Premises: | That certain store building and related improvements located at 3435 Roosevelt Highway, Red Oak, Fulton County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "B"

LEGAL DESCRIPTION

ALL THAT TRACT OR PARCEL OF LAND lying and being located in land lot 64 of the 13th District, Fulton County, Georgia and being more particularly described as follows:

BEGINNING AT A POINT located on the northerly right-of-way line of Roosevelt Highway, U.S. Highway 29 (a 50 foot right-of-way) a distance of 613.80 feet as measured westerly along said northerly right-of-way line of Roosevelt Highway from the intersection of said northerly line of the right-of-way of Roosevelt Highway and the westerly line of the right-of-way of Campbell Drive (a 50 foot right-of-way); running thence North 07 degrees 10 minutes 16 seconds West, a distance of 196.43 feet to a point; running thence North 82 degrees 49 minutes 44 seconds East, a distance of 175.0 feet to a point; running thence North 07 degrees 10 minutes 16 seconds West, a distance of 3.57 feet to a point; running thence South 82 degrees 49 minutes 44 seconds West, a distance of 30.00 feet to a point; running thence North 07 degrees 16 minutes 20 seconds West, a distance of 238.96 feet to a point; running thence North 00 degrees 38 minutes 20 seconds West, a distance of 112.10 feet to a point; running thence South 89 degrees 33 minutes 40 seconds West, a distance of 230 feet to a point; running thence north 00 degrees 35 minutes 31 seconds West, a distance of 188.70 feet to a point located on the southerly line of the right-of-way of Lee Place (a 50 foot right-of-way), said point being located a distance of 747.20 feet as measured westerly along said southerly line of the right-of-way of Lee Place from the intersection of said southerly line of the right-of-way of Lee Place and the westerly line of the right-of-way of Campbell Drive; running thence South 89 degrees 33 minutes 40 seconds West along said southerly line of the right-of-way of Lee Place, a distance of 240.4 feet to a point; running thence South 00 degrees 33 minutes 31 seconds East, a distance of 818.32 feet to a point located on the northerly line of the right-of-way of Roosevelt Highway; running thence North 82 degrees 49 minutes 44 seconds East along said northerly line of the right-of-way of Roosevelt Highway, a distance of 382.0 feet to the POINT OF BEGINNING; said tract containing 7.129 acres and designated as Tract One on Staking Plan for Red Oak Shopping Center prepared for O'Neill Developments, Inc. by Joseph L. Lancaster, Georgia Registered Engineer No. 8296, dated June 11, 1985 and Revised September 12, 1985.

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # 2734
Lawrenceville, Georgia

Lease:
Lease dated June 24, 1986 between Barry F. O'Neill, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

as evidenced by Short Form Lease dated June 24, 1986, recorded in Book 3695, Page 104, of the public records of Gwinnett County, Georgia

Amendments/
Guaranty:
Guaranty dated July 1, 1986

Supplemental Lease Agreement dated December 18, 1987

First Lease Amendment dated August ___, 1988

First Short Form Lease Amendment dated August ____, 1988

Second Amendment to Lease dated February 9, 1993

Assignment and Assumption of Lease Agreement dated February 17, 2002

Premises:
That certain store building and related improvements located at 1575 Lawrenceville Highway, Lawrenceville, Gwinnett County, Georgia

Legal Description:
The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

JBS
11009.8
08/02/88
08/31/88

## EXHIBIT "B"

### (Shopping Center Legal Description)

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 79 of the 5th District of Gwinnett County, Georgia, which tract is being more particularly described as follows:

TO FIND THE POINT OF BEGINNING commence at a point located at the intersection of the center line of the right-of-way of Davis Mill Road (right-of-way varies) with the center line of the right-of-way of U.S. Highway 29/State Route 8 (right-of-way varies); from said point of intersection of said right-of-way center lines, thence North 89 degrees 08 minutes 54 seconds West a distance of 96.01 feet to a point located at the intersection of the northwesterly right-of-way line of U.S. Highway 29/State Route 8 and the right-of-way line (westerly) which is common to said northwesterly right-of-way line of U.S. Highway 29/State Route 8 and the southwesterly right-of-way line of Davis Mill Road; running thence along the northwesterly right-of-way line of U.S. Highway 29/State Route 8 and along the arc of a curve to the left (said curve having a radius of 1,200.00 feet and being subtended by a chord bearing South 54 degrees 23 minutes 45 seconds West and having a chord distance of 129.48 feet) an arc distance of 129.55 feet to a point located on said northwesterly right-of-way line, said point being the POINT OF BEGINNING; from said POINT OF BEGINNING as thus established, thence continuing along said northwesterly right-of-way line and along the arc of a curve to the left (said curve having a radius of 1,200.00 feet and being subtended by a chord bearing South 48 degrees 22 minutes 50 seconds West and having a chord distance of 122.35 feet) an arc distance of 122.41 feet to a point located on said northwesterly right-of-way line; thence continuing along said northwesterly right-of-way line South 45 degrees 27 minutes 30 seconds West a distance of 184.69 feet to a point located on said northwesterly right-of-way line; thence leaving the northwesterly right-of-way line of U.S. Highway 29/State Route 8 and running North 39 degrees 22 minutes 39 seconds West a distance of 200.43 feet to a point; thence South 44 degrees 39 minutes 39 seconds West a distance of 120.00 feet to a point; thence South 39 degrees 22 minutes 39 seconds East a distance of 29.78 feet to a point; thence South 44 degrees 39 minutes 39 seconds West a distance of 99.78 feet to a blade; thence North 40 degrees 53 minutes 00 seconds West a distance of 806.06 feet to a point; thence North 49 degrees 05 minutes 12 seconds East a distance of 159.30 feet to an iron pin; thence South 40 degrees 53 minutes 00 seconds East a distance of 225.00 feet to an iron pin; thence North 54 degrees 27 minutes 58 seconds East a distance of 550.66 feet to an iron pin located on the southwesterly right-of-way line of Davis Mill Road (80' right-of-way at this point); thence along the southwesterly right-of-way line of Davis Mill Road, the following courses and distances: along the arc of a curve to the right (said curve having a radius of 1,110.00 feet and being subtended by a chord bearing South 37 degrees 52 minutes 41 seconds East and having a chord distance of 157.44 feet) an arc distance of 157.58 feet to an iron pin, South 33 degrees 48 minutes 41 seconds East a distance of 155.46 feet to an iron pin, along the arc of a curve to the left (said curve having a radius of 1,040.00 feet and being subtended by a chord bearing South 37 degrees 31 minutes 50 seconds East and having a chord distance of 134.92 feet) an arc distance of 135.02 feet to a point, South 48 degrees 45 minutes 00 seconds West a distance of 10.00 feet to a point, along the arc of a curve to the left (said curve having a radius of 1,050.00 feet and being subtended by a chord bearing South 42 degrees 01 minutes 03 seconds East and having a chord distance of 28.13 feet to a point) an arc distance of 28.13 feet to a point and South 42 degrees 47 minutes 06 seconds East a distance of 20.52 feet to a point located on the southwesterly

- 1 -

JBS
11009.8
08/02/88
08/31/88

right-of-way line of Davis Mill Road; thence leaving the
southwesterly right-of-way line of Davis Mill Road and running
South 45 degrees 27 minutes 30 seconds West a distance of 153.10
feet to a point; thence South 44 degrees 32 minutes 30 seconds
East a distance of 165.64 feet to a point located on the
northwesterly right-of-way line of U.S. Highway 29/State Route 8,
said point being the POINT OF BEGINNING, as per As-Built Survey
entitled "Davis Mill Station", prepared for Barry F. O'Neill
dated September 29, 1987, being last revised August 12, 1988, and
prepared by Q-B Engineering & Surveying, Inc.

2734
1575 Lawrenceville Highway
Lawrenceville, GA

- 2 -

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 2736
Rex, Georgia

| | |
|---|---|
| Lease: | Lease dated January 23, 1989 between New Plan Excel Realty Trust, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated January 23, 1989, recorded in Book 1530, Page 405 of the public records of Clayton County, Georgia |
| Amendments/ Guaranty: | Guaranty dated January 23, 1989 |
| | First Lease Amendment dated December 1, 1989 |
| | Supplemental Lease Agreement dated June 14, 1990 |
| | Assignment and Assumption of Lease Agreement dated February 14, 2002 |
| Premises: | That certain store building and related improvements located at 6459 Highway 42, Rex, Clayton County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

JBS
11009.33
01/09/89

**EXHIBIT "B"**

(Shopping Center Legal Description)

**ALL THAT TRACT OR PARCEL OF LAND** lying and being in Land Lot 120 of the 12th Land District of Clayton County, Georgia, which tract is being more particularly described as follows:

**TO FIND THE POINT OF BEGINNING** at an iron pin located at the intersection of the southerly right-of-way line of Georgia State Route 42/U.S. Highway 23 (right-of-way varies) and the easterly right-of-way line of Dale Road (90' right-of-way); running thence along the southerly right-of-way line of Georgia State Route 42/U.S. Highway 23 and along the arc of a curve to the left (said curve having a radius of 1,949.86 feet and being subtended by a chord bearing North 84 degrees 21 minutes 28 seconds East and having a chord distance of 209.90 feet) an arc distance of 210.00 feet to a point located on said southerly right-of-way line, said point being the **POINT OF BEGINNING**; from said **POINT OF BEGINNING** as thus established, thence continuing along said southerly right-of-way line and along the arc of a curve to the left (said curve having a radius of 1,949.86 feet and being subtended by a chord bearing North 80 degrees 44 minutes 33 seconds East and having a chord distance of 36.05 feet) an arc distance of 36.05 feet to a point located on said southerly right-of-way line; thence continuing along said southerly right-of-way line North 81 degrees 47 minutes 43 seconds East a distance of 191.26 feet to a point located on said southerly right-of-way line; thence leaving the southerly right-of-way line of Georgia State Route 42/U.S. Highway 23 and running South 08 degrees 12 minutes 17 seconds East a distance of 475.00 feet to a point; thence North 81 degrees 47 minutes 43 seconds East a distance of 133.00 feet to a point; thence South 08 degrees 12 minutes 17 seconds East a distance of 349.46 feet to a point located on the northerly right-of-way line of Dale Road; thence along the northerly, northeasterly and easterly right-of-way line of Dale Road, the following courses and distances: South 81 degrees 48 minutes 09 seconds West a distance of 377.34 feet to a point, along the arc of a curve to the right (said curve having a radius of 282.40 feet and being subtended by a chord bearing North 48 degrees 22 minutes 08 seconds West and having a chord distance of 431.72 feet) an arc distance of 491.43 feet to a point and North 01 degrees 28 minutes 14 seconds East a distance of 323.43 feet to a point located on said easterly right-of-way line; thence leaving the easterly right-of-way line of Dale Road and running North 81 degrees 47 minutes 43 seconds East a distance of 241.13 feet to a point; thence North 08 degrees 12 minutes 17 seconds West a distance of 175.00 feet to a point located on the southerly right-of-way line of Georgia State Route 42/U.S. Highway 23, said point also being the **POINT OF BEGINNING**, as per Boundary Survey for Columbia Properties Incorporated, The First National Bank of Atlanta and Ticor Title Insurance Company of California dated October 2, 1988, being last revised January 6, 1989, prepared by Q-B Engineering and Surveying, Inc. and bearing the certification of Daniel F. Conroy, Georgia Registered Land Surveyor No. 2350.

**TOGETHER WITH** that certain parking easement created in the Reciprocal Easement Agreement dated January 10, 1989, by Columbia Properties Incorporated, a Georgia corporation and Rex Properties, a Joint Venture consisting of D. Oliver Wright, Joseph J. Shippen, Benjamin S. Shippen, Elizabeth H. Shippen,

2736
6459 Highway 42
Rex, GA

JBS
11009.33
01/09/89

Lucille S. Turner and Ellen S. Hendrix, to be recorded in the
Clayton County, Georgia records, and more fully described as all
that tract or parcel of land lying and being in Land Lot 120 of
the 12th Land District of Clayton County, Georgia, which tract is
being more particularly described as follows:

TO FIND THE POINT OF BEGINNING commence at an iron pin located at
the intersection of the southerly right-of-way line of Georgia
State Route 42/U.S. Highway 23 (right-of-way varies) and the
easterly right-of-way line of Dale Road (90' right-of-way);
running thence along the southerly right-of-way line of Georgia
State Route 42/U.S. Highway 23 and along the arc of a curve to
the left (said curve having a radius of 1,949.86 feet and being
subtended by a chord bearing North 83 degrees 49 minutes 41
seconds East and having a chord distance of 245.89 feet) an arc
distance of 246.05 feet to a point located on said southerly
right-of-way line; thence continuing along said southerly right-
of-way line North 81 degrees 47 minutes 43 seconds East a
distance of 191.26 feet to a point located on said southerly
right-of-way line; thence leaving the southerly right-of-way line
of Georgia State Route 42/U.S. Highway 23 and running South 08
degrees 12 minutes 17 seconds East a distance of 292.00 feet to a
point, said point being the POINT OF BEGINNING; from said POINT
OF BEGINNING as thus established, thence North 81 degrees 47
minutes 43 seconds East a distance of 173.00 feet to a point;
thence South 08 degrees 12 minutes 17 seconds East a distance of
183.00 feet to a point; thence South 81 degrees 47 minutes 43
seconds West a distance of 173.00 feet to a point; thence North
08 degrees 12 minutes 17 seconds West a distance of 183.00 feet
to a point, said point also being the POINT OF BEGINNING as per
Boundary Survey for Columbia Properties Incorporated, The First
National Bank of Atlanta and Ticor Title Insurance Company of
California dated October 2, 1988, being last revised January 6,
1989, prepared by Q-B Engineering and Surveying, Inc. and bearing
the certification of Daniel F. Conroy, Georgia Registered Land
Surveyor No. 2350.

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2737
Douglasville, Georgia

Lease:               Lease dated December 6, 1988 between Barry F. O'Neill, as Landlord, and
                     Winn-Dixie Raleigh, Inc., as Tenant;

                     as evidenced by Short Form Lease dated December 6, 1988, recorded in Book
                     629, Page 349, of the public records of Douglas County, Georgia

Amendments/
Guaranty:            Guaranty dated December 6, 1988

                     Supplemental Lease Agreement dated October 5, 1989

                     Assignment and Assumption of Lease Agreement dated February 28, 2002


Premises:            That certain store building and related improvements located at 2116
                     Fairburn Road, Douglasville, Douglas County, Georgia

Legal Description:   The real property as more particularly described as follows:


SEE ATTACHED LEGAL DESCRIPTION

JBS
11009.24
08/16/88

EXHIBIT "B "

(Shopping Center Legal Description)

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lots
911, 970 and 971 of the 18th District, 2nd Section, and Land Lot
82 of the 1st District, 5th Section, of Douglas County, Georgia,
which tract is being more particularly described as follows:

TO FIND THE POINT OF BEGINNING commence at a point located at the
intersection of the southerly right-of-way line of Fairburn Road
(State Route 92) (100' right-of-way) and the westerly right-of-
way line of Midway Road Extension (80' right-of-way); running
thence along the westerly right-of-way line of Midway Road
Extension South 15 degrees 09 minutes 38 seconds West a distance
of 192.00 feet to a point located on said westerly right-of-way
line, said point being the POINT OF BEGINNING; from said POINT OF
BEGINNING as thus established, thence continuing along said
westerly right-of-way line South 15 degrees 09 minutes 38 seconds
West a distance of 165.98 feet to a point located on said
westerly right-of-way line; thence continuing along said westerly
right-of-way line and along the arc of a curve to the left (said
curve having a radius of 942.19 feet and being subtended by a
chord bearing South 12 degrees 26 minutes 60 seconds West and
having a chord distance of 89.12 feet) an arc distance of 89.15
feet to a point located on said westerly right-of-way line;
thence leaving the westerly right-of-way line of Midway Road
Extension and running North 74 degrees 50 minutes 22 seconds West
a distance of 175.22 feet to a point; thence South 15 degrees 09
minutes 38 seconds West a distance of 54.00 feet to a point;
thence South 45 degrees 57 minutes 09 seconds West a distance of
169.96 feet to a point; thence South 74 degrees 50 minutes 22
seconds East a distance of 303.43 feet to a point located on the
westerly right-of-way line of Midway Road Extension; thence along
said westerly right-of-way line and along the arc of a curve to
the left (said curve having a radius of 942.19 feet and being
subtended by a chord bearing South 04 degrees 24 minutes 50
seconds East and having a chord distance of 56.26 feet) an arc
distance of 56.26 feet to a point located on said westerly
right-of-way line; thence leaving the westerly right-of-way line
of Midway Road Extension and running North 74 degrees 50 minutes
22 seconds West a distance of 919.27 feet to a point; thence
North 15 degrees 09 minutes 38 seconds East a distance of 700.00
feet to a point located on the southerly right-of-way line of
Fairburn Road (State Route 92); thence along the southerly
right-of-way line of Fairburn Road South 74 degrees 50 minutes 22
seconds East a distance of 57.00 feet to a point located on said
southerly right-of-way line; thence leaving the southerly right-
of-way line of Fairburn Road (State Route 92) and running South
15 degrees 09 minutes 38 seconds West a distance of 192.00 feet
to a point; thence South 74 degrees 50 minutes 22 seconds East a
distance of 176.00 feet to a point; thence North 15 degrees 09
minutes 38 seconds East a distance of 192.00 feet to a point
located on the southerly right-of-way line of Fairburn Road
(State Route 92); thence along said southerly right-of-way line
South 74 degrees 50 minutes 22 seconds East a distance of 124.00
feet to a point located on said southerly right-of-way line;
thence leaving the southerly right-of-way line of Fairburn Road
(State Route 92) and running South 15 degrees 09 minutes 38
seconds West a distance of 192.00 feet to a point; thence South
74 degrees 50 minutes 22 seconds East a distance of 175.00 feet
to a point; thence North 15 degrees 09 minutes 38 seconds East a
distance of 192.00 feet to a point located on the southerly
right-of-way line of Fairburn Road (State Route 92); thence along
said southerly right-of-way line South 74 degrees 50 minutes 22
seconds East a distance of 123.00 feet to a point located on said
southerly right-of-way line; thence leaving the southerly right-
of-way line of Fairburn Road (State Route 92) and running South

JBS
11009.24
08/16/88

15 degrees 09 minutes 38 seconds West a distance of 192.00 feet
to a point; thence South 74 degrees 50 minutes 22 seconds East a
distance of 200.00 feet to a point located on the westerly
right-of-way line of Midway Road Extension, said point also being
the POINT OF BEGINNING, described as Tract I according to that
certain Site Plan entitled "Midway Village" dated June 9, 1988,
being last revised July 26, 1988, and prepared by Q-B Engineering
and Surveying, Inc.

2737
2116 Fairburn Road
Douglasville, GA

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # 2740
Norcross, Georgia

| | |
|---|---|
| Lease: | Lease dated December 1, 1986 between Merchant's Square Shopping Center, L.L.C., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated December 1, 1986, recorded in Book 4034, Page 283, of the public records of Gwinnett County, Georgia |
| Amendments/ Guaranty: | Guaranty dated December 12, 1986 |
| | Supplemental Lease Agreement dated March 21, 1988 |
| | First Amendment to Lease dated March 1, 2000 |
| | Second Amendment to Lease dated October 14, 2002 |
| | Assignment and Assumption of Lease Agreement dated October 31, 2002 |
| Premises: | That certain store building and related improvements located at 4770 Britt Road, Norcross, Gwinnett County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "B"
LEGAL DESCRIPTION

All that tract and parcel of land lying and being in Land Lot 164 of the 6th District of Gwinnett County, Georgia, being particularly described as follows:

BEGINNING at an iron pin on the Southwesterly right of way of Jimmy Carter Boulevard (having a 100-foot right of way) 208.0 feet Northwesterly from the intersection of the Southwesterly right of way of Jimmy Carter Boulevard with the Northwesterly right of way of Britt Road (having an 80-foot right of way); thence South 45° 41' 41" West along the line of property now or formerly owned by Henry J. Dewhurst 208.0 feet to an iron pin; thence South 40° 48' 41" East also along the line of property now or formerly owned by Henry J. Dewhurst 208.0 feet to the iron pin on the Northwesterly right of way of Britt Road; thence Southwesterly along the Northwesterly right of way of Britt Road 286.19 feet along an arc having an interior radius of 778.511 feet (said distance being 284.58 feet along a chord South 60° 08' 08" West to a point); thence South 70° 40' 00" West along the Northwesterly right of way of said Britt Road 157.88 feet to a point; thence continuing Southwesterly along the Northerly right of way of Britt Road 346.13 feet along an arc having an exterior radius of 1,081.741 feet (said distance being represented by a chord of 344.66 feet, South 61° 30' 00" West to a point); thence South 52° 20' 00" West along the Northwesterly right of way of Britt Road 1.84 feet to an iron pin; thence North 18° 14' 00" West along the line of property of Perimeter Development Corporation 648.35 feet to an iron pin; thence North 60° 44' 22" East along the line of Block B, Unit 1, of Green Hills Subdivision 436.4 feet to a hollow tube found; thence South 39° 33' 22" East along the line of property now or formerly owned by Richard E. Lenhardt, et al, 189.6 feet to an iron pin; thence North 49° 10' 57" East along the line of said Richard E. Lenhardt 300.0 feet to an iron pin on the Southwesterly right of way of Jimmy Carter Boulevard (having a 100-foot right of way); thence South 40° 49' 46" East along the right of way of Jimmy Carter Boulevard 141.0 feet to an iron pin; thence South 40° 51' 35" East also along the right of way of said Jimmy Carter Boulevard 145.51 feet to the iron pin at the point of beginning; containing 10.8275 acres according to the survey prepared for Perimeter Development Corporation and Habersham Savings and Loan Association by Hannon, Meeks & Bagwell, Surveyors & Engineers, Inc., dated January 15, 1986, revised January 29, 1986, August 8, 1986, and August 19, 1986.

ALSO TOGETHER WITH:

an easement for ingress and egress measuring 15 feet on either side of the following line:

In Land Lot 164 of the 6th District of Gwinnett County, Georgia, BEGINNING at an iron pin on the Southwesterly right of way of Jimmy Carter Boulevard 494.51 feet Northwesterly from the intersection of the Southwesterly right of way of Jimmy Carter Boulevard (having a 100-foot right of way) with the Northwesterly right of way of Britt Road (having an 80-foot right of way); thence South 49°10'57" West along the line dividing the properties of TOWN AND COUNTRY from the properties of MOBLEY and POC 300.0 feet to an iron pin.

2740
4770 Britt Road
Norcross, GA

Last Revised 6/21/2005

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

# WINN-DIXIE STORE # 2743
## Covington, Georgia

| | |
|---|---|
| Lease: | Lease dated May 10, 1985 between The Peripety Group, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated May 10, 1985, recorded in Book 247, Page 94, of the public records of Newton County, Georgia |
| Amendments/ Guaranty: | Guaranty dated May 31, 1985 |
| | Lease Modification Agreement dated June 27, 1985 |
| | Supplemental Lease Agreement dated November 18, 1986 |
| | First Amendment to Lease dated July 19, 1994 |
| | Second Supplemental Lease Agreement dated February 9, 1995 |
| | Assignment and Assumption Agreement dated September 13, 2002 |
| Premises: | That certain store building and related improvements located at 6169 Highway 278 NW, Covington, Newton County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "B"

LEGAL DESCRIPTION

ALL THAT TRACT or parcel of land lying and being in the southeast quadrant of the intersection of the frontage road south of Interstate Highway 20 (U.S. Highway 278/State Route 12) and Clark Street (a/k/a Turner Road) in the City of Covington, and in the 462nd G.M.D., Newton County, Georgia, being more particularly described, measured and bounded as follows:

BEGINNING at a concrete right-of-way monument located on the easterly edge of the right-of-way of Clark Street (said monument is located at Station 6+00 Clark Street/50' as shown on State Highway Dept. of Ga. (now Department of Transportation) Right of Way Map, Pro. I-20-2(8), Newton County, Date Mar. 1, 1961, Rev. 9/7/67), and from said point run North 31°15'46" East a distance of 326.92 feet along the edge of a public right-of-way between the easterly edge of the right-of-way of Clark Street and the southerly edge of the right-of-way of the frontage road south of Interstate Highway 20 to a concrete right-of-way monument located in the the southerly edge of the right-of-way of the frontage road south of Interstate Highway 20 (said concrete monument being located at Station 281+00 Fr.Rd./70' on State Highway Dept. of Ga. Right of Way Map, Pro. I-20-2(8), Newton County, Date March 1, 1961, Rev. 9/7/67); thence South 84°01'00" East a distance of 308.96 feet along the southerly edge of the right-of-way of the said frontage road/U.S. Highway 278 to an iron pin; thence continuing along the southerly edge of said right-of-way South 79°39'33" East a distance of 222.71 feet to a concrete right-of-way monument; thence continuing along said right-of-way South 65°36'10" East a distance of 198.08 feet to a concrete right-of-way monument; thence North 24°12'51" East a distance of 33.08 feet to a concrete right-of-way monument; thence South 65°49'00" East a distance of 46.56 feet along the southerly edge of U.S. Highway 278 to an iron pin located at the northwest corner of property now or formerly owned or occupied by Davis House of Athens, Inc.; thence leaving said right-of-way run South 02°01'54" West a distance of 296.93 feet along said Davis House of Athens property line to an iron pin found in a sweetgum tree; thence South 58°05'37" West a distance of 341.57 feet to an iron pin; thence South 52°39'21" West a distance of 704.94 feet along the northwesterly boundary of property now or formerly owned by W. K. Campbell to an iron pin located on the easterly edge of the right-of-way of Clark Street; thence North 05°19'12" West a distance of 771.63 feet along the easterly edge of the right-of-way of Clark Street to the POINT OF BEGINNING. Said property is shown on a Survey for Retail Centers, Ltd. by Borders & Associates, Land Surveyors, Winder, Georgia, dated January 2, 1985, and said land contains, according to said Survey, 13.856 acres, said Survey and the above-referenced right-of-way map are incorporated herein by reference.

Less and except the parcels described on exhibit "B-1" attached hereto.

2743
6169 Highway 278 NW
Covington, GA

EXHIBIT "B"
LEGAL DESCRIPTION

Parcel No. 1

ALL THAT TRACT or parcel of land lying and being in the southeast quadrant of the intersection of the frontage road south of Interstate Highway 20 (U.S. Highway 278/State Route 12) and Clark Street (a/k/a Turner Road) in the City of Covington and in the 462nd G.M.D., Newton County, Georgia, being more particularly described, measured and bounded as follows:

To find the POINT OF BEGINNING, commence at a concrete right-of-way monument located on the easterly edge of the right-of-way of Clark Street (said monument is located at Station 6+00 Clark Street/50' as shown on State Highway Dept. of Ga. (now Department of Transportation) Right of Way Map, Pro. I-20-2(8), Newton County, Date Mar. 1, 1961, Rev. 9/7/67) and run South 05 degrees 19 minutes 12 seconds East along the easterly edge of said right-of-way a distance of 366.63 feet to the POINT OF BEGINNING. From the POINT OF BEGINNING, leave said right-of-way and run North 56 degrees 00 minutes 00 seconds East a distance of 127.00 feet to a point; thence run North 13 degrees 55 minutes 29 seconds East a distance of 110.00 feet to a point; thence run North 31 degrees 44 minutes 27 seconds West a distance of 115.00 feet to a point; thence run South 56 degrees 00 minutes 00 seconds West a distance of 110.00 feet to a point on the easterly edge of the right-of-way of Clark Street; thence continuing along said right-of-way South 05 degrees 19 minutes 12 seconds East a distance of 215.00 feet to the POINT OF BEGINNING. Said property is shown on a Survey for Retail Centers, Ltd. by Borders & Associates, Land Surveyors, Winder, Georgia, dated January 2, 1985, and said land contains, according to said Survey, 0.617 acres, said Survey and the above-referenced right-of-way map are incorporated herein by reference.

2152p(5)

2743
6169 Highway 278 NW
Covington, GA

EXHIBIT "B"

LEGAL DESCRIPTION

Parcel No. 2

ALL THAT TRACT or parcel of land lying and being in the southeast quadrant of the intersection of the frontage road south of Interstate Highway 20 (U.S. Highway 278/State Route 12) and Clark Street (a/k/a Turner Road) in the City of Covington and in the 462nd G.M.D., Newton County, Georgia, being more particularly described, measured and bounded as follows:

BEGINNING at a concrete right-of-way monument located on the easterly edge of the right-of-way of Clark Street (said monument is located at Station 6+00 Clark Street/50' as shown on State Highway Dept. of Ga. (now Department of Transportation) Right of Way Map, Pro. 1-20-2(8), Newton County, Date Mar. 1, 1961, Rev. 9/7/67), and from said point run North 31 degrees 15 minutes 46 seconds East a distance of 152.15 feet along the edge of a public right-of-way between the easterly edge of the right-of-way of Clark Street and the southerly edge of the right-of-way of the frontage road south of Interstate Highway 20 to a point on said right-of-way; thence leaving said right-of-way run South 32 degrees 30 minutes 00 seconds East a distance of 198.91 feet to a point; thence South 57 degrees 00 minutes 00 seconds West a distance of 205.00 feet to a point on the easterly edge of the right-of-way of Clark Street; thence continuing along said right-of-way run North 05 degrees 19 minutes 12 seconds West a distance of 150.00 feet to the POINT OF BEGINNING. Said property is shown on a Survey for Retail Centers, Ltd. by Borders & Associates, Land Surveyors, Winder, Georgia, dated January 2, 1985, and said land contains, according to said Survey, approximately 0.624 acres, said Survey and the above-referenced right-of-way map are incorporated herein by reference.

2152p(1)

EXHIBIT "B"

LEGAL DESCRIPTION

Parcel No. 3

ALL THAT TRACT or parcel of land lying and being in the southeast quadrant of the intersection of the frontage road south of Interstate Highway 20 (U.S. Highway 278/State Route 12) and Clark Street (a/k/a Turner Road) in the City of Covington and in the 462nd G.M.D., Newton County, Georgia, being more particularly described, measured and bounded as follows:

To find the POINT OF BEGINNING, commence at a concrete right-of-way monument located on the easterly edge of the right-of-way of Clark Street (said monument is located at Station 6+00 Clark Street/50' as shown on State Highway Dept. of Ga. (now Department of Transportation) Right of Way Map, Pro. I-20-2(8), Newton County, Date Mar. 1, 1961, Rev. 9/7/67), and from said point run North 31 degrees 15 minutes 46 seconds East a distance of 326.92 feet along the edge of a public right-of-way between the easterly edge of the right-of-way of Clark Street and the southerly edge of the right-of-way of the frontage road south of Interstate Highway 20 to a concrete right-of-way monument located in the southerly edge of the right-of-way of the frontage road south of Interstate Highway 20 (said concrete monument being located at Station 281 + 00 Fr.Rd./70' on State Highway Dept. of Ga. Right of Way Map, Pro. I-20-2(8), Newton County, Date March 1, 1961, Rev. 9/7/67) which is the POINT OF BEGINNING. From the POINT OF BEGINNING run South 84 degrees 01 minutes 30 seconds East a distance of 90.00 feet along the southerly edge of the right-of-way of said frontage road/U.S. Highway 278 to a point; thence leaving said right-of-way run South 32 degrees 35 minutes 00 seconds East a distance of 117.39 feet to a point; thence run South 57 degrees 25 minutes 00 seconds West a distance of 169.12 feet to a point; thence run North 32 degrees 35 minutes 00 seconds West a distance of 125.00 feet to a point on the edge of a public right-of-way between the easterly edge of the right-of-way of Clark Street and the southerly edge of the right-of-way of the frontage road south of Interstate Highway 20; thence run north 31 degrees 15 minutes 46 seconds East a distance of 110.00 feet to the POINT OF BEGINNING. Said property is shown on a Survey for Retail Centers, Ltd. by Borders & Associates, Land Surveyors, Winder, Georgia, dated January 2, 1985, and said land contains, according to said Survey, 0.573 acres, said Survey and the above-referenced right-of-way map are incorporated herein by reference.

2152p(2)

EXHIBIT "B"

LEGAL DESCRIPTION

Parcel No. 4

ALL THAT TRACT or parcel of land lying and being in the southeast quadrant of the intersection of the frontage road south of Interstate Highway 20 (U.S. Highway 278/State Route 12) and Clark Street (a/k/a Turner Road) in the City of Covington and in the 462nd G.M.D., Newton County, Georgia, being more particularly described, measured and bounded as follows:

To find the POINT OF BEGINNING, commence at a concrete right-of-way monument located on the easterly edge of the right-of-way of Clark Street (said monument is located at Station 6+00 Clark Street/50' as shown on State Highway Dept. of Ga. (now Department of Transportation) Right of Way Map, Pro. I-20-2(8), Newton County, Date Mar. 1, 1961, Rev. 9/7/67), and from said point run North 31 degrees 15 minutes 46 seconds East a distance of 326.92 feet along the edge of a public right-of-way between the easterly edge of the right-of-way of Clark Street and the southerly edge of the right-of-way of the frontage road south of Interstate Highway 20 to a concrete right-of-way monument located in the southerly edge of the right-of-way of the frontage road south of Interstate Highway 20 (said concrete monument being located at Station 281 + 00 Fr.Rd./70' on State Highway Dept. of Ga. Right of Way Map, Pro. I-20-2(8), Newton County, Date March 1, 1961, Rev. 9/7/67); thence run South 84 degrees 01 minutes 30 seconds East a distance of 90.0 feet along the southerly edge of the right-of-way of the said frontage road/U.S. Highway 278 to a point on said right-of-way which is the POINT OF BEGINNING. From the POINT OF BEGINNING, continue along the southerly edge of said right-of-way South 84 degrees 01 minutes 30 seconds East a distance of 557.77 feet to a point; thence leaving said right-of-way run South 57 degrees 25 minutes 00 seconds West a distance of 258.22 feet to a point; thence run North 32 degrees 35 minutes 00 seconds West a distance of 217.39 feet to the POINT OF BEGINNING. Said property is shown on a Survey for Retail Centers, Ltd. by Borders & Associates, Land Surveyors, Winder, Georgia, dated January 2, 1985, and said land contains, according to said Survey, 0.667 acres, said Survey and the above-referenced right-of-way map are incorporated herein by reference.

2152p(3)

2743
6169 Highway 278 NW
Covington, Georgia

EXHIBIT "B"

LEGAL DESCRIPTION

Parcel No. 5

ALL THAT TRACT or parcel of land lying and being in the southeast quadrant of the intersection of the frontage road south of Interstate Highway 20 (U.S. Highway 278/State Route 12) and Clark Street (a/k/a Turner Road) in the City of Covington and in the 462nd G.M.D., Newton County, Georgia, being more particularly described, measured and bounded as follows:

To find the POINT OF BEGINNING, commence at a concrete right-of-way monument located on the easterly edge of the right-of-way of Clark Street (said monument is located at Station 6+00 Clark Street/50' as shown on State Highway Dept. of Ga. (now Department of Transportation) Right of Way Map, Pro. I-20-2(8), Newton County, Date Mar. 1, 1961, Rev. 9/7/67), and from said point run North 31 degrees 15 minutes 46 seconds East a distance of 326.92 feet along the edge of a public right-of-way between the easterly edge of the right-of-way of Clark Street and the southerly edge of the right-of-way of the frontage road south of Interstate Highway 20 to a concrete right-of-way monument located in the southerly edge of the right-of-way of the frontage road south of Interstate Highway 20 (said concrete monument being located at Station 281 + 00 Fr.Rd./70' on State Highway Dept. of Ga. Right of Way Map, Pro. I-20-2(8), Newton County, Date March 1, 1961, Rev. 9/7/67); thence run South 84 degrees 01 minutes 30 seconds East a distance of 308.96 feet along the southerly edge of the right-of-way of the said frontage road/U.S. Highway 278 to an iron pin; thence continuing along the southerly edge of said right-of-way South 79 degrees 39 minutes 33 seconds East a distance of 222.71 feet to a concrete right-of-way monument which is the POINT OF BEGINNING. From the POINT OF BEGINNING, continue along said right-of-way South 65 degrees 36 minutes 10 seconds East a distance of 198.08 feet to a concrete right-of-way monument; thence run South 24 degrees 12 minutes 51 seconds West a distance of 120.00 feet to a point; thence run South 67 degrees 08 minutes 46 seconds West a distance of 65.00 feet to a point; thence run North 32 degrees 41 minutes 23 seconds West a distance of 180.00 feet to a point; thence run North 21 degrees 45 minutes 00 seconds East a distance of 70.00 feet to the POINT OF BEGINNING. Said property is shown on a Survey for Retail Centers, Ltd. by Borders & Associates, Land Surveyors, Winder, Georgia, dated January 2, 1985, and said land contains, according to said Survey, 0.560 acres, said Survey and the above-referenced right-of-way map are incorporated herein by reference.

2152p(4)

2743
6189 Highway 278 NW
Covington, Georgia

EXHIBIT B
To Asset Purchase Agreement

Form of Bill of Sale

## BILL OF SALE

**WINN-DIXIE _____, INC.**, a Florida corporation ("Seller"), in consideration of the mutual covenants set forth in that certain Asset Purchase Agreement dated effective _____, 200\_\_\_, among _____, a _____, ("Buyer") and Seller (the "Agreement"), does hereby grant, bargain, transfer, sell, assign and convey unto Buyer all of Seller's right, title and interest in the Assets described in the Agreement (other than the Leases and any sublease(s) or permit(s), which are subject to separate instruments of conveyance and assignment), relating to Seller's store locations as more particularly described on attached Schedule A.

This Bill of Sale is delivered by Seller to Buyer as required under the Agreement and in accordance with the Sale Order, and is made subject to the terms and conditions of the Agreement and the Sale Order.  All capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Agreement.

[SIGNATURES ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed by the undersigned as of this _____ day of _____, 200___.

"SELLER"

**WINN-DIXIE _____, INC.**, a Florida corporation

By: _____

Name: _____

Title: _____

**EXHIBIT C-1**
**To**
**Asset Purchase Agreement**
**FORM OF CLOSING STATEMENT**

**CLOSING STATEMENT SUMMARY**

**BUYER:**                    _____, a _____ _____

**SELLER:**                   Winn-Dixie _____, Inc., a Florida corporation

**ESCROW AGENT and**          _____
**SETTLEMENT AGENT:**

**PROPERTIES[1]:**            Store No. _____, _____, _____, ____ _____
                              Store No. _____, _____, _____, ____ _____
                              Store No. _____, _____, _____, ____ _____
                              Store No. _____, _____, _____, ____ _____

**CLOSING DATE:**             _____, 2005

---

**SELLER'S STATEMENT**

I.   **BASE PURCHASE PRICE:**

     Leasehold:                                              $_____

     FF&E:                                                   $_____

     TOTAL BASE PURCHASE PRICE:                              $_____

II.  **SUPPLIES PRICE:**                                     $_____

III. **TOTAL BASE PURCHASE PRICE AND**                       $_____
     **SUPPLIES PRICE:**

A.   **NET CREDIT/DEBIT TO SELLER:**        ($_____)   or $_____

B.   **TOTAL CLOSING COSTS PAYABLE BY**     ($_____)
     **SELLER:**

**AMOUNT DUE SELLER**                                    $ _____

---

[1] Itemized individual Closing Statements for each Property are attached
Exhibit C-1
Page 1 of 10

## BUYER'S STATEMENT

| I. | TOTAL BASE PURCHASE PRICE AND SUPPLIES PRICE: | | $_____. |
|----|----|----|----|
| A. | NET CREDIT/DEBIT TO BUYER: | ($_____) | or $_____. |
| B. | TOTAL CLOSING COSTS PAYABLE BY BUYER: | ($_____) | |
| C | BASE DEPOSIT | ($_____) | |
| | **AMOUNT DUE FROM BUYER** | | $_____. |

## TOTAL DISBURSEMENTS[2]

| 1. | Base Deposit from Escrow Agent | $_____ |
|----|----|----|
| 2. | Amount Due From Buyer | $_____ |
| | **TOTAL RECEIPTS:** | $_____ |
| 1. | Seller's Brokers Fees | ($_____) |
| 2. | Title Premiums, Title Examination Fees and related Costs, Recording and Escrow Fees | ($_____) |
| 3. | Inventory Service Fees | |
| 4. | Seller's Cure Costs | ($_____) |
| 5. | Seller's Proceeds | |
| [6.] | [Other] | ($_____) |
| | **TOTAL DISBURSEMENTS:** | |

## STIPULATIONS

1. <u>Purchase Agreement</u>. This transaction has been closed pursuant to the provisions set forth in that certain Asset Purchase Agreement between Seller and Buyer, dated effective as of _____, 2005 (the "Purchase Agreement"). Attached hereto are individual itemized closing statements for each of the Properties covered by the Purchase Agreement.

2. <u>Authorization to Disburse</u>. By their signatures below, Seller and Buyer hereby (a) authorize and direct the closing agent to (i) make the disbursements included in this Closing Statement and (ii) to wire the AMOUNT DUE SELLER to the following account:

_____
_____
_____
_____

---

[2] Refer to Individual Property Closing Statement for Itemization.

Exhibit C-1
Page 2 of 10

3. <u>Counterparts.</u> This Closing Statement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement and the signatures of any party to any counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart. To facilitate execution and delivery of this Closing Statement, the parties may execute and exchange counterparts of the signature pages hereof by telecopier or electronic mail, immediately followed by delivery of originals by overnight delivery services.

4. <u>Adjustments.</u>   Seller and Buyer acknowledge and agree that any amounts not determinable as of the Closing Date or reflected on this Closing Statement (including on the individual closing statements attached hereto) will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination. Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination.

The undersigned parties acknowledge and agree to the this Closing Statement as of this _____ day of _____, 2005, and hereby authorize _____ Title Insurance Company, as closing agent, to disburse the sums set forth herein in accordance herewith.

**SELLER:**                                                **BUYER:**

**WINN-DIXIE** _____,          _____,
a Florida corporation                       a _____

By: _____          By: _____

Name: _____          Name: _____

Title: Vice President                       Title: _____

                                              _____

Exhibit C-1
Page 3 of 10

## INDIVIDUAL PROPERTY CLOSING STATEMENT

**BUYER:**                   _____, a _____ _____

**SELLER:**                Winn-Dixie _____, Inc., a Florida corporation

**ESCROW AGENT and
SETTLEMENT AGENT:**     _____

**Property:**               Store No. _____, _____, _____, _____

**CLOSING DATE:**          _____, 2005

## SELLER'S STATEMENT

**ALLOCATED BASE PURCHASE
PRICE:**

Leasehold:                                    $_____

FF&E:                                        $_____

TOTAL BASE PURCHASE PRICE:        $_____

**SUPPLIES PRICE:**                    $_____

**TOTAL ALLOCATED  BASE
PURCHASE PRICE AND SUPPLIES
PRICE:**                                  $_____

**Less Adjustments (Debit):**

Seller's Prorated Share of Taxes and
Other Charges Payable Under Leases (1)     $_____

Buyer's Prorated Share of Rents Paid in
Advance **[Under Subleases (2)]**           $_____

**Total Debit Adjustments:**           $_____

**Plus Adjustments (Credit):**                $_____

Seller's Prorated Share of Rents and
Other Charges Paid in Advance Under
Leases (3)                              $_____

Environmental Assessment Costs Paid by
Seller                                    $_____

Exhibit C-1
Page 4 of 10

[Other]                                                          $_____

   **Total Credit Adjustments:**                                 $_____

**NET DEBIT/CREDIT TO SELLER**

**Less Closing Costs Payable by Seller:**

Seller's Attorneys' Fees & Costs                $_____

Seller's Brokerage Fees                         $_____

Cure Costs                                      $_____

One Half of Closing Escrow Fees                 $_____

One Half of Inventory Service Fees(8)           $_____

**Total Seller's Closing Costs:**

**AMOUNT DUE TO SELLER**                                         $_____


## BUYER'S STATEMENT

**ALLOCATED BASE PURCHASE PRICE:**             $_____

**SUPPLIES PRICE:**                            $_____

**TOTAL ALLOCATED  BASE
PURCHASE PRICE AND SUPPLIES
PRICE:**                                                        $_____

**Less Adjustments (Credit):**

Allocated Amount of Base Deposit                                $_____

Seller's Prorated Share of Rents and
Other Charges Paid in Advance Under
Leases (1)                                                      $_____

[Other]                                                         $_____

**Total Debit Adjustments:**

**Plus Adjustments (Debit):**                                   $_____

Exhibit C-1
Page 5 of 10

Seller's Prorated Share of Rents and
Other Charges Paid in Advance Under
Leases (3)                                    $_____

Environmental Assessment Costs Paid by        $_____
Seller

[Other]                                       $_____

   **Total Credit Adjustments:**                                 $_____

**NET DEBIT/CREDIT TO BUYER**

**Less Closing Costs Payable by Buyer:**

Buyer's Attorneys' Fees & Costs               $_____

Title Insurance Premiums(4)                   $_____

Title Examination Fees                        $_____

Buyer's Brokerage Fees                        $_____

One Half of Closing Escrow Fees               $_____

One Half of Inventory Service Fees(8)         $_____

**Total Buyer's Closing Costs:**                  $_____

**AMOUNT DUE FROM BUYER**                                      $_____

**ALLOCATED AMOUNT OF BASE**                                  $_____
**DEPOSIT**

**TOTAL AMOUNT DUE AT CLOSING**                               $_____

## SCHEDULE OF DISBURSEMENTS

1.   Allocated Amount of Base Deposit from Escrow Agent         $_____
2.   Amount Due From Buyer                                      $_____

**TOTAL RECEIPTS:**                                           $_____

1.   The Blackstone Group L.P.                                  ($_____)
   (Seller's Brokers Fees)
2.   The Food Partners, LLC                                     ($_____)
   (Seller's Brokers Fees)
3.   DJM Asset Management, LLC                                  ($_____)
   (Seller's Brokers Fees)

Exhibit C-1
Page 6 of 10

4.    _____ Title Insurance Company                    ($_____)
      Title Premiums, Title Examination Fees and related
      Costs, Recording and Escrow Fees

5.    _____
      Transfer/Documentary Taxes

6.    **[Name of Inventory Service]**                            ($_____)
      (Inventory Service Fees)

7.    _____                                     ($_____)
      (Lease Cure Costs, if any)

8.    _____                                     ($_____)
      (Sublease Cure Costs, if any)

9.    Seller                                                     ($_____)
      (Seller's Proceeds)

[10.]  [Other]                                                   ($_____)

**TOTAL DISBURSEMENTS:**

**Notes:**

(1)    <u>2005 Prorations - Amounts Not Yet Paid and Payable</u>.  Prorations are based
       on (i) estimate of 2005 real estate taxes derived from actual 2004 amounts
       paid by Seller in arrears in accordance with leases; and (ii) estimate of 2005
       insurance charges derived from actual 2004 amounts paid by Seller in arrears
       in accordance with applicable leases.    Buyer will be responsible for the
       payment of such charges for 2005 and subsequent years.

       **Real Estate Taxes**

       Store # _____
       - 2005 Real Estate Taxes                    $
       - Per Diem Tax Amount                       $
       - Seller's Share of 2005 Taxes
         (1/1/05 - __/__/05) (_____ days)         $ _____         _____
       **Total Real Estate Taxes:**

       **Personal Property Taxes**

       Store # _____
       - 2005 Personal Property Taxes              $
       - Per Diem Tax Amount                       $
       - Seller's Share of 2005 Taxes
         (1/1/05 - __/__/05) (_____ days)         $ _____         _____
       **Total Personal Property Taxes:**

       **CAM Charges**

       Store # _____
       - 2005 CAM Charges                          $

Exhibit C-1
Page 7 of 10

- Per Diem Amount                              $
- Seller's Share of 2005 CAM Charges
  (__/__/__ - __/__/05) (_____ days)    $_____      _____
**Total CAM Charges:**

**Insurance**

Store # _____
- 2005 Insurance                               $
- Per Diem Amount                              $
- Seller's Share of 2005 Insurance
  (__/__/__ - __/__/05) (_____ days)    $_____
**Total Insurance:**
**Total Amount of Seller's Prorated
Share  of 2005 Prorations:**                                    _____

(2)        _____, 2005 Sublease Prorations - Amounts Previously Received by
Seller.  Prorations are based on _____, 2005 rents previously paid to
Seller in accordance with applicable subleases.  Buyer will be responsible for
the collection of such charges that become due and payable for _____,
2005 and thereafter.  Prorations are as follows:

Store # _____
- Total _____, 2005 rent paid:          $
- Per diem rent:                               $
- Buyer's prorated share
  (__/__/__ - __/__/05) (_____ days)    $_____
**Total Amount of Seller's Prorated Share of _____ Prorations:**

(3)        _____, 2005 Prorations - Amounts Previously Paid by Seller.  Prorations
are based on _____, 2005 rents, common area maintenance
assessments and other charges previously paid by Seller in accordance with
applicable leases.  Buyer will be responsible for the payment of such charges
that become due and payable for _____, 2005 and thereafter.
Prorations are as follows:

**Rent**

Store # _____
- Total _____, 2005 rent paid:          $
- Per diem rent:                               $
- Buyer's prorated share
  (__/__/__ - __/__/05) (_____ days)    $_____
- Per diem rent:                               $
- Buyer's prorated share
  (__/__/__ - __/__/05) (_____ days)    $_____      _____

Exhibit C-1
Page 8 of 10

**Total Amount of Buyer's Prorated Share of _____ Prorations:**

(4)    <u>Title Premiums and Expenses</u>.  Title insurance fees and costs, including title examination fees and title insurance premiums, are as follows:

<u>Store #_____</u>
- Title Search Fees and Costs                    $                    -
- Title Premium                                        $_____ -
      **Total Amount of Title Fees and Expenses:**

(5)    <u>Utility Deposits and Charges</u>.  All utility deposits will be returned to Seller directly by the respective utility companies.  Seller will be responsible for payment of any portion of any utility charges attributable to utility service (including telephone service) provided through and including the date hereof.  Buyer will be responsible for payment of any new utility deposits which may be assessed by the respective utility companies and for payment of any portion of such utility charges attributable to utility service provided subsequent to the date hereof.  The party responsible for each share of such utility charges will pay such charges promptly and without demand therefor.  Each party agrees to indemnify and hold harmless the other party from and against liability for payment of the first party's share of such utility charges.

(6)    <u>Adjustments</u>.  Seller and Buyer acknowledge and agree that any amounts not determinable as of the Closing Date or reflected on this Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Buyer agrees that it will timely make all required notifications to appropriate taxing authorities to effect the change in party responsible for taxes.

(7)    <u>Inventory Purchase Price and Adjustments</u>.  To the extent Inventory has acquired inventory pursuant to the Purchase Agreement, the Inventory Price has been determined in good faith by the parties in accordance with the provisions set forth in the Purchase Agreement and is set forth in a separate Inventory Closing Statement  between Seller and Buyer dated as of even date herewith.  Seller and Buyer acknowledge and agree that if any dispute should arise as to the Inventory Price with respect to any item or items of Inventory, Seller and Buyer will resolve the dispute in accordance with the terms and provisions of the Purchase Agreement.

Exhibit C-1
Page 9 of 10

Exhibit C-2

To Asset Purchase Agreement

Form of Inventory Closing Statement

**INVENTORY CLOSING STATEMENT**

| | |
|---|---|
| **SELLER** | Winn-Dixie _____, Inc., a Florida corporation |
| **BUYER:** | _____ a _____ _____ |
| **TRANSACTION:** | Acquisition of Leasehold Interest in Store _____, _____, _____ |
| **BASE PURCHASE PRICE:** | Under Separate Closing Statement |

**INVENTORY PRICE (2):**

| | |
|---|---|
| Store _____ | $ |
| Store _____ | $ |
| Store _____ | $ |
| Store _____ | $ _____ |
| **Total Aggregate Inventory Price:** | $ |

**CLOSING DATE:** _____, 2005 _____

**SELLER'S STATEMENT**

Inventory Price                                          $

Less Adjustments:

    1.    Ten Percent of Inventory Price

          Retained by Escrow Agent          $ _____

          **Total Adjustments:**          $ _____          $    ( _____ )

**TOTAL AMOUNT DUE TO SELLER:**                              $ _____

**BUYER'S STATEMENT**

Aggregate Inventory Price                              $

Plus Closing Costs to be Paid by Buyer:

    1.    Inventory Service Fees (3)          _____ $

Exhibit C-2
Page 1 of 3

(Direct Payment or Reimbursement
to Seller)
   **Total Buyer's Inventory Closing
   Costs:**                              $                    $ _____

**AMOUNT DUE FROM BUYER:**                                   $ _____

The undersigned parties acknowledge and agree to the foregoing Inventory Closing Statement as of this day of _____, 2005, and hereby authorize **[Title Insurer]**, as closing agent, to disburse the sums set forth herein in accordance herewith.

**SELLER:**                                    **BUYER:**

**WINN-DIXIE**        , INC., a Florida        _____., a _____
corporation

By:_____               By:_____
Name:_____               Name:_____
Title: _____ President                Title: _____

**Notes:**

(1)    Adjustments. Seller and Buyer acknowledge and agree that any amounts not determinable as of the Closing Date or reflected on this Inventory Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination. Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in this Inventory Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination. Buyer agrees that it will timely make all required notifications to appropriate taxing authorities to effect the change in party responsible for taxes.

(2)    Inventory Price Adjustments. The Inventory Price has been determined in good faith by the parties in accordance with the provisions set forth in that certain Asset Purchase Agreement among Seller and Buyer, dated effective as of _____, 2005 (the "Purchase Agreement"), and shall be payable in accordance with the Purchase Agreement. Seller and Buyer agree that any disputes shall be reconciled as set forth in the Purchase Agreement. The balance of the Inventory Price, if any, shall be paid by Escrow Agent to Seller within five (5) Business Days after Buyer and Seller receive the final recapitulation sheet for the Inventory, and any excess payment held by Escrow Agent shall be refunded to Buyer within such five (5) Business Day period. To the extent that the Inventory Price is in excess of the amount stated herein, Buyer shall pay over to Seller the amount of such excess within such five (5) Business Day period.

Exhibit C-2
Page 2 of 3

(3)      <u>Inventory Service Fees</u>.  The recipient of any invoices for such charges agrees that it will promptly provide the other party with a copy of such invoices upon receipt of same.  Buyer will pay such invoices upon receipt, subject to adjustments as set forth in Note 1 above in the event of any discrepancy between the amount of the invoices and the amount for such services set forth in this Inventory Closing Statement.

(4)      <u>Capitalized Terms</u>.  Capitalized terms used herein shall have the meanings ascribed to them in the Purchase Agreement.

### DISBURSEMENT SCHEDULE

<u>RECEIPTS</u>:

1.      Total Amount Due From Buyer    $ _____

TOTAL CASH RECEIVED:          $              $ _____

<u>DISBURSEMENTS</u>:

1.      Winn-Dixie _____, Inc.          $ _____
(Seller's Proceeds and Reimbursement of Inventory Service Fee)

TOTAL DISBURSEMENTS:                    $ _____

BALANCE OF INVENTORY PRICE HELD IN ESCROW BY TITLE AGENT PURSUANT TO PURCHASE AGREEMENT:          $

Exhibit C-2
Page 3 of 3

EXHIBIT D
To Asset Purchase Agreement

Schedule of Certain Excluded Personal Property

[see attached schedules]

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.    Prepared by Management.

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1303 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1319 | 2/15/2001 | CLC | 27423 | $36.60 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0951 | 2/15/2001 | CLC | 27423 | $36.60 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YPDY6 | 2/15/2001 | CLC | 27423 | $5.27 | 48 | 11/11/1911 | Personal Computers |
| 1303 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YPKA4 | 2/15/2001 | CLC | 27423 | $5.27 | 48 | 11/11/1911 | Personal Computers |
| 1303 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TXC48 | 2/17/2001 | CLC | 27495 | $50.99 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TXC37 | 2/17/2001 | CLC | 27495 | $50.99 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TXCA1 | 2/17/2001 | CLC | 27495 | $50.99 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TCC296 | 2/17/2001 | CLC | 27495 | $50.99 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TXC42 | 2/17/2001 | CLC | 27495 | $50.99 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TXC49 | 2/17/2001 | CLC | 27495 | $50.99 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TXC44 | 2/17/2001 | CLC | 27495 | $51.05 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | K4K78 | 2/17/2001 | CLC | 27495 | $19.01 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KAG69 | 2/17/2001 | CLC | 27495 | $19.01 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HZZ69 | 2/17/2001 | CLC | 27495 | $19.01 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AGM15 | 2/17/2001 | CLC | 27495 | $19.01 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KAF59 | 2/17/2001 | CLC | 27495 | $19.01 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KAK95 | 2/17/2001 | CLC | 27495 | $19.01 | 48 | 11/11/1911 | POS |
| 1303 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KAK83 | 2/17/2001 | CLC | 27495 | $19.06 | 48 | 11/11/1911 | POS |
| 1303 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 1303 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 1303 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | ZY1F11 | 5/17/2002 | CLC | 31707 | $181.37 | 36 | 5/31/2005 | Servers |
| 1303 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | P0N111 | 5/17/2002 | CLC | 31707 | $68.44 | 36 | 5/31/2005 | Servers |
| 1303 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31707 | $0.00 | 36 | 5/31/2005 | Personal Computers |

Other Leased Equipment
Imagistics copier

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by Management.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1305 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1431 | 2/15/2001 CLC | 27424 | $38.60 | 48 | 11/1/1911 POS |
| 1305 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1467 | 2/15/2001 CLC | 27424 | $38.60 | 48 | 11/1/1911 POS |
| 1305 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDGA3 | 2/15/2001 CLC | 27424 | $5.27 | 48 | 11/1/1911 Personal Computers |
| 1305 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDGB7 | 2/15/2001 CLC | 27424 | $5.27 | 48 | 11/1/1911 Personal Computers |
| 1305 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TZN43 | 2/17/2001 CLC | 27496 | $51.00 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TZN25 | 2/17/2001 CLC | 27496 | $51.00 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TZN33 | 2/17/2001 CLC | 27496 | $51.00 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TZN37 | 2/17/2001 CLC | 27496 | $51.00 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TZN39 | 2/17/2001 CLC | 27496 | $51.00 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TZN35 | 2/17/2001 CLC | 27496 | $51.00 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TZN42 | 2/17/2001 CLC | 27496 | $51.00 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDY20 | 2/17/2001 CLC | 27496 | $51.00 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TZN40 | 2/17/2001 CLC | 27496 | $51.00 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TZN26 | 2/17/2001 CLC | 27496 | $51.00 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TZN41 | 2/17/2001 CLC | 27496 | $51.00 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBD17 | 2/17/2001 CLC | 27496 | $19.01 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBD12 | 2/17/2001 CLC | 27496 | $19.01 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBD02 | 2/17/2001 CLC | 27496 | $19.01 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBD04 | 2/17/2001 CLC | 27496 | $19.01 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBD06 | 2/17/2001 CLC | 27496 | $19.01 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBD07 | 2/17/2001 CLC | 27496 | $19.01 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBD15 | 2/17/2001 CLC | 27496 | $19.01 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AGF47 | 2/17/2001 CLC | 27496 | $19.01 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBD08 | 2/17/2001 CLC | 27496 | $19.01 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBD03 | 2/17/2001 CLC | 27496 | $19.01 | 48 | 11/1/1911 POS |
| 1305 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBD10 | 2/17/2001 CLC | 27496 | $19.08 | 48 | 11/1/1911 POS |
| 1305 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 ICC | 23001 | $99.96 | 48 | 6/30/2005 Software |
| 1305 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 ICC | 23001 | $31.74 | 48 | 6/30/2005 Software |
| 1305 | IBM | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 2Y1F11 | 5/17/2002 CLC | 31708 | $181.37 | 36 | 5/31/2005 Servers |
| 1305 | DCC | PV71SN | 1U | DELL NAS PV71SN W | 1 | L0N111 | 5/17/2002 CLC | 31708 | $68.44 | 36 | 5/31/2005 Servers |
| 1305 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 CLC | 31708 | $0.00 | 36 | 5/31/2005 Personal Computers |

Other Leased Equipment
Imagistics copier

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.   Prepared by Management.

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1317 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1580 | 2/15/2001 | CLC | 27433 | $36.60 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1542 | 2/15/2001 | CLC | 27433 | $36.60 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XOXB0 | 2/15/2001 | CLC | 27433 | $5.27 | 48 | 11/11/1911 | Personal Computers |
| 1317 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XOWW1 | 2/15/2001 | CLC | 27433 | $5.27 | 48 | 11/11/1911 | Personal Computers |
| 1317 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPK05 | 2/17/2001 | CLC | 27505 | $50.99 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPV23 | 2/17/2001 | CLC | 27505 | $50.99 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPK03 | 2/17/2001 | CLC | 27505 | $50.99 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPP71 | 2/17/2001 | CLC | 27505 | $50.99 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPK10 | 2/17/2001 | CLC | 27505 | $50.99 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDD35 | 2/17/2001 | CLC | 27505 | $50.99 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPV40 | 2/17/2001 | CLC | 27505 | $51.06 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AHX43 | 2/17/2001 | CLC | 27505 | $19.01 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AHZ55 | 2/17/2001 | CLC | 27505 | $19.01 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AHY10 | 2/17/2001 | CLC | 27505 | $19.01 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | QHY25 | 2/17/2001 | CLC | 27505 | $19.01 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AHZ53 | 2/17/2001 | CLC | 27505 | $19.01 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AGL51 | 2/17/2001 | CLC | 27505 | $19.01 | 48 | 11/11/1911 | POS |
| 1317 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AHR12 | 2/17/2001 | CLC | 27505 | $19.06 | 48 | 11/11/1911 | POS |
| 1317 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 1317 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 1317 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | PM3L11 | 7/17/2002 | CLC | 32611 | $181.37 | 36 | 7/31/2005 | Servers |
| 1317 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | YXRB11 | 7/17/2002 | CLC | 32611 | $88.44 | 36 | 7/31/2005 | Servers |
| 1317 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 7/17/2002 | CLC | 32611 | $0.00 | 36 | 7/31/2005 | Personal Computers |

Other Leased Equipment
Imagistics copier

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.   Prepared by Management.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1323 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1227 | 2/15/2001 CLC | 27437 | $36.60 | 48 | 11/1/1911 POS |
| 1323 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1362 | 2/15/2001 CLC | 27437 | $36.60 | 48 | 11/1/1911 POS |
| 1323 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDKL7 | 2/15/2001 CLC | 27437 | $5.27 | 48 | 11/1/1911 Personal Computers |
| 1323 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDKL5 | 2/15/2001 CLC | 27437 | $5.27 | 48 | 11/1/1911 Personal Computers |
| 1323 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TBD84 | 2/17/2001 CLC | 27509 | $50.99 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDC18 | 2/17/2001 CLC | 27509 | $50.99 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDY84 | 2/17/2001 CLC | 27509 | $50.99 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TBD85 | 2/17/2001 CLC | 27509 | $50.99 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDY83 | 2/17/2001 CLC | 27509 | $50.99 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDY85 | 2/17/2001 CLC | 27509 | $50.99 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TBD91 | 2/17/2001 CLC | 27509 | $50.99 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TBD90 | 2/17/2001 CLC | 27509 | $50.99 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDY86 | 2/17/2001 CLC | 27509 | $50.99 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDY88 | 2/17/2001 CLC | 27509 | $51.08 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBT18 | 2/17/2001 CLC | 27509 | $19.01 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AGND4 | 2/17/2001 CLC | 27509 | $19.01 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBV31 | 2/17/2001 CLC | 27509 | $19.01 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBR84 | 2/17/2001 CLC | 27509 | $19.01 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBV29 | 2/17/2001 CLC | 27509 | $19.01 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBV27 | 2/17/2001 CLC | 27509 | $19.01 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBR89 | 2/17/2001 CLC | 27509 | $19.01 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBV18 | 2/17/2001 CLC | 27509 | $19.01 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBM44 | 2/17/2001 CLC | 27509 | $19.01 | 48 | 11/1/1911 POS |
| 1323 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CAY71 | 2/17/2001 CLC | 27509 | $19.08 | 48 | 11/1/1911 POS |
| 1323 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 ICC | 23001 | $99.96 | 48 | 6/30/2005 Software |
| 1323 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | OKRL11 | 7/1/2001 ICC | 23001 | $31.74 | 48 | 6/30/2005 Software |
| 1323 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | | 7/17/2002 CLC | 32614 | $181.37 | 36 | 7/31/2005 Servers |
| 1323 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | YXRB11 | 7/17/2002 CLC | 32614 | $88.44 | 36 | 7/31/2005 Servers |
| 1323 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 7/17/2002 CLC | 32614 | $0.00 | 36 | 7/31/2005 Personal Computers |

Other Leased Equipment
Imagistics copier

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by Management.

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1328 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1227 | 2/15/2001 | CLC | 27441 | $36.60 | 48 | 11/1/1911 POS |
| 1328 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1242 | 2/15/2001 | CLC | 27441 | $36.60 | 48 | 11/1/1911 POS |
| 1328 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | GKPS2 | 2/15/2001 | CLC | 27441 | $5.27 | 48 | 11/1/1911 Personal Computers |
| 1328 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | GKPS4 | 2/15/2001 | CLC | 27441 | $5.27 | 48 | 11/1/1911 Personal Computers |
| 1328 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDY61 | 2/17/2001 | CLC | 27513 | $50.99 | 48 | 11/1/1911 POS |
| 1328 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDY52 | 2/17/2001 | CLC | 27513 | $50.99 | 48 | 11/1/1911 POS |
| 1328 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDY55 | 2/17/2001 | CLC | 27513 | $50.99 | 48 | 11/1/1911 POS |
| 1328 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDY61 | 2/17/2001 | CLC | 27513 | $50.99 | 48 | 11/1/1911 POS |
| 1328 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDA58 | 2/17/2001 | CLC | 27513 | $50.99 | 48 | 11/1/1911 POS |
| 1328 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDY57 | 2/17/2001 | CLC | 27513 | $60.99 | 48 | 11/1/1911 POS |
| 1328 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HPK82 | 2/17/2001 | CLC | 27513 | $51.05 | 48 | 11/1/1911 POS |
| 1328 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBV42 | 2/17/2001 | CLC | 27513 | $19.01 | 48 | 11/1/1911 POS |
| 1328 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBV26 | 2/17/2001 | CLC | 27513 | $19.01 | 48 | 11/1/1911 POS |
| 1328 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBV23 | 2/17/2001 | CLC | 27513 | $19.01 | 48 | 11/1/1911 POS |
| 1328 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBV41 | 2/17/2001 | CLC | 27513 | $19.01 | 48 | 11/1/1911 POS |
| 1328 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AGP67 | 2/17/2001 | CLC | 27513 | $19.01 | 48 | 11/1/1911 POS |
| 1328 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | CBX18 | 2/17/2001 | CLC | 27513 | $19.06 | 48 | 11/1/1911 POS |
| 1328 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 Software |
| 1328 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 Software |
| 1328 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 8PGL11 | 7/17/2002 | CLC | 32618 | $181.37 | 36 | 7/31/2005 Servers |
| 1328 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | 5YRB11 | 7/17/2002 | CLC | 32618 | $88.44 | 36 | 7/31/2005 Servers |
| 1328 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 7/17/2002 | CLC | 32618 | $0.00 | 36 | 7/31/2005 Personal Computers |

Other Leased Equipment
Imagistics copier

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by Management.

| 1346 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M0472 | 2/15/2001 CLC | 27458 | $36.60 | 48 11/11/1911 POS |
|------|-----|------|-----|-------------------|---------|---------------|-------|--------|-------------------|
| 1346 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M0895 | 2/15/2001 CLC | 27458 | $36.60 | 48 11/11/1911 POS |
| 1346 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XCZY8 | 2/15/2001 CLC | 27458 | $5.27 | 48 11/11/1911 Personal Computers |
| 1346 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XDAB5 | 2/15/2001 CLC | 27458 | $5.27 | 48 11/11/1911 Personal Computers |
| 1346 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TDD39 | 2/17/2001 CLC | 27529 | $51.00 | 48 11/11/1911 POS |
| 1346 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TPT56 | 2/17/2001 CLC | 27529 | $51.00 | 48 11/11/1911 POS |
| 1346 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TP207 | 2/17/2001 CLC | 27529 | $51.00 | 48 11/11/1911 POS |
| 1346 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TPT49 | 2/17/2001 CLC | 27529 | $51.00 | 48 11/11/1911 POS |
| 1346 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TVH52 | 2/17/2001 CLC | 27529 | $51.00 | 48 11/11/1911 POS |
| 1346 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TPY58 | 2/17/2001 CLC | 27529 | $51.00 | 48 11/11/1911 POS |
| 1346 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TXC40 | 2/17/2001 CLC | 27529 | $51.00 | 48 11/11/1911 POS |
| 1346 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TPT91 | 2/17/2001 CLC | 27529 | $51.00 | 48 11/11/1911 POS |
| 1346 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 AGH74 | 2/17/2001 CLC | 27529 | $19.01 | 48 11/11/1911 POS |
| 1346 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HYL38 | 2/17/2001 CLC | 27529 | $19.01 | 48 11/11/1911 POS |
| 1346 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HYN93 | 2/17/2001 CLC | 27529 | $19.01 | 48 11/11/1911 POS |
| 1346 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HYN83 | 2/17/2001 CLC | 27529 | $19.01 | 48 11/11/1911 POS |
| 1346 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HYR03 | 2/17/2001 CLC | 27529 | $19.01 | 48 11/11/1911 POS |
| 1346 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HYL89 | 2/17/2001 CLC | 27529 | $19.01 | 48 11/11/1911 POS |
| 1346 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HYL53 | 2/17/2001 CLC | 27529 | $19.01 | 48 11/11/1911 POS |
| 1346 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HYN92 | 2/17/2001 CLC | 27529 | $19.08 | 48 11/11/1911 POS |
| 1346 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | 7/1/2001 ICC | 23001 | $99.96 | 48 6/30/2005 Software |
| 1346 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | 7/1/2001 ICC | 23001 | $31.74 | 48 6/30/2005 Software |
| 1346 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 7N3L11 | 7/17/2002 CLC | 32832 | $181.37 | 36 7/31/2005 Servers |
| 1346 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 4YRB11 | 7/17/2002 CLC | 32832 | $68.44 | 36 7/31/2005 Servers |
| 1346 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | 7/17/2002 CLC | 32832 | $0.00 | 36 7/31/2005 Personal Computers |

Other Leased Equipment
Imagistics copier

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by Management.

1349

| 1349 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M1001 | 2/15/2001 CLC | 27461 | $38.60 | 48 | 11/11/1911 POS |
|------|-----|------|-----|-------------------|---------|----------------|-------|--------|----|----|
| 1349 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M0610 | 2/15/2001 CLC | 27461 | $36.60 | 48 | 11/11/1911 POS |
| 1349 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XCWV9 | 2/15/2001 CLC | 27461 | $5.27 | 48 | 11/11/1911 Personal Computers |
| 1349 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XCW72 | 2/15/2001 CLC | 27461 | $5.27 | 48 | 11/11/1911 Personal Computers |
| 1349 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TBT15 | 2/17/2001 CLC | 27532 | $51.00 | 48 | 11/11/1911 POS |
| 1349 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TBT18 | 2/17/2001 CLC | 27532 | $51.00 | 48 | 11/11/1911 POS |
| 1349 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TBT22 | 2/17/2001 CLC | 27532 | $51.00 | 48 | 11/11/1911 POS |
| 1349 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TBT16 | 2/17/2001 CLC | 27532 | $51.00 | 48 | 11/11/1911 POS |
| 1349 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TBT08 | 2/17/2001 CLC | 27532 | $51.00 | 48 | 11/11/1911 POS |
| 1349 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 TBT13 | 2/17/2001 CLC | 27532 | $51.00 | 48 | 11/11/1911 POS |
| 1349 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HTC13 | 2/17/2001 CLC | 27532 | $19.01 | 48 | 11/11/1911 POS |
| 1349 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HPW88 | 2/17/2001 CLC | 27532 | $19.01 | 48 | 11/11/1911 POS |
| 1349 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HPW93 | 2/17/2001 CLC | 27532 | $19.01 | 48 | 11/11/1911 POS |
| 1349 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HTA45 | 2/17/2001 CLC | 27532 | $19.01 | 48 | 11/11/1911 POS |
| 1349 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HPT83 | 2/17/2001 CLC | 27532 | $19.01 | 48 | 11/11/1911 POS |
| 1349 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 HTCD8 | 2/17/2001 CLC | 27532 | $19.05 | 48 | 11/11/1911 POS |
| 1349 | IBM | 4610 | TS4 | 4694 S45 TERMINAL | 1 | 6/17/2001 CLC | 29558 | $19.02 | 48 | 6/00/2005 POS |
| 1349 | IBM | 4694 | S45 | IBM SAV2 SOFTWARE | 1 | 7/1/2001 ICC | 29558 | $51.00 | 48 | 6/00/2005 POS |
| 1349 | IBM | SAV2 | SFTW | SAV2 SERVICES | 1 | 7/1/2001 ICC | 23001 | $99.96 | 48 | 6/00/2005 Software |
| 1349 | IBM | SAV2 | SVCS | POWEREDGE 2500 P3 | 1 7N3L11 | 7/1/2001 ICC | 23001 | $31.74 | 48 | 6/00/2005 Software |
| 1349 | DCC | 2500 | P3 | DELL NAS PV715N W | 1 6YRB11 | 7/17/2002 CLC | 32634 | $181.37 | 36 | 7/31/2005 Servers |
| 1349 | DCC | PV715N | 1U | DELL E551 15INCH | | 7/17/2002 CLC | 32634 | $68.44 | 36 | 7/31/2005 Servers |
| 1349 | DCC | E551 | 15MO | | | 7/17/2002 CLC | 32634 | $0.00 | 36 | 7/31/2005 Personal Computers |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| 1806 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1097 | 4/15/2001 | CLC | 28496 | $36.60 | 48 | 5/31/2005 | POS |
|------|-----|------|-----|-------------------|---|-------|-----------|-----|-------|--------|----|-----------|-----|
| 1806 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1254 | 4/15/2001 | CLC | 28496 | $36.60 | 48 | 5/31/2005 | POS |
| 1806 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | ZAYB1 | 4/15/2001 | CLC | 28496 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 1806 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | ZAYH3 | 4/15/2001 | CLC | 28496 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 1806 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 1806 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 1806 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 963L11 | 7/17/2002 | CLC | 32521 | $181.37 | 36 | 7/31/2005 | Servers |
| 1806 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | 4YRB11 | 7/17/2002 | CLC | 32521 | $68.44 | 36 | 7/31/2005 | Servers |
| 1806 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 7/17/2002 | CLC | 32521 | $0.00 | 36 | 7/31/2005 | Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.   Prepared by Management.

| 2623 | IBM | 8477 | 42Y | 1 | M1005 | NETFINITY 1000 PI | 27482 | 2/15/2001 | CLC | $36.60 | 48 | 11/11/1911 | POS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2623 | IBM | 8477 | 42Y | 1 | M1080 | NETFINITY 1000 PI | 27482 | 2/15/2001 | CLC | $36.60 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 6331 | B2N | 1 | XDKM0 | IBM BLACK E54 15I | 27482 | 2/15/2001 | CLC | $5.27 | 48 | 11/11/1911 | Personal Computers |
| 2623 | IBM | 6331 | B2N | 1 | XDKP9 | IBM BLACK E54 15I | 27482 | 2/16/2001 | CLC | $5.27 | 48 | 11/11/1911 | Personal Computers |
| 2623 | IBM | 4694 | S45 | 1 | TXC73 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TXC81 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TXK37 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TXC92 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TXC38 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TXD02 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TXC94 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TXB85 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TXD03 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TXK16 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TXC93 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TDY11 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TDC09 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TYK29 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TXC32 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $50.99 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4694 | S45 | 1 | TXD24 | 4694 S45 TERMINAL | 27554 | 2/17/2001 | CLC | $51.14 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | KBB67 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | KAX61 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | KBB28 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | KAG97 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | HYN74 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | KAY84 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | HYP33 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | KBB93 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | KBB90 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | KBB07 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | KBA91 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | AGM29 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | AGH61 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | KBA49 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | KBA97 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.01 | 48 | 11/11/1911 | POS |
| 2623 | IBM | 4610 | TS4 | 1 | KBB23 | IBM THERMAL LASER | 27554 | 2/17/2001 | CLC | $19.12 | 48 | 11/11/1911 | POS |
| 2623 | IBM | SAV2 | SFTW | 1 | | IBM SAV2 SOFTWARE | 23001 | 7/1/2001 | ICC | $99.96 | 48 | 6/30/2006 | Software |
| 2623 | IBM | SAV2 | SVCS | 1 | | SAV2 SERVICES | 23001 | 7/1/2001 | ICC | $31.74 | 48 | G532255 | Software |
| 2623 | TEL | PTC960 | XDS | 1 | 784487 | RF RE-MANUFACTURE | 31883 | 5/16/2002 | CLC | $19.33 | 36 | 5/31/2005 | Radio Frequency |
| 2623 | DCC | 2500 | P3 | 1 | ZQGL11 | POWEREDGE 2500 P3 | 32697 | 7/17/2002 | CLC | $181.37 | 36 | 7/31/2005 | Servers |
| 2623 | DCC | PV715N | 1U | 1 | SZRB11 | DELL NAS PV715N W | 32697 | 7/17/2002 | CLC | $68.44 | 36 | 7/31/2005 | Servers |
| 2623 | DCC | E551 | 15MO | 1 | | DELL E551 15INCH | 32697 | 7/17/2002 | CLC | $0.00 | 36 | 7/31/2005 | Personal Computers |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.   Prepared by Management.

| Store | Mfr | Model | Type | Description | Qty | Serial | Date | Code | Ref | Amount | Term | Expire / Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2627 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0478 | 2/15/2001 | CLC | 27486 | $36.60 | 48 | 11/1/1911 POS |
| 2627 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1082 | 2/15/2001 | CLC | 27486 | $36.60 | 48 | 11/1/1911 POS |
| 2627 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDFRA3 | 2/15/2001 | CLC | 27486 | $5.27 | 48 | 11/1/1911 Personal Computers |
| 2627 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDFM1 | 2/15/2001 | CLC | 27486 | $5.27 | 48 | 11/1/1911 Personal Computers |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPT68 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VBH87 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDY24 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPK42 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPT80 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPT67 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPT77 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VBK04 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TYH49 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPK46 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPV29 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPT70 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPV10 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VBH94 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPT72 | 2/17/2001 | CLC | 27558 | $50.99 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VBH89 | 2/17/2001 | CLC | 27558 | $51.15 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | JBC64 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBC71 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBA33 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AGP50 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | TPT58 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBC78 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBB95 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBC79 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBC70 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBC76 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBC73 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBC74 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBC68 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBC69 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBC75 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBC78 | 2/17/2001 | CLC | 27558 | $19.01 | 48 | 11/1/1911 POS |
| 2627 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KBC83 | 2/17/2001 | CLC | 27558 | $19.13 | 48 | 11/1/1911 POS |
| 2627 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.98 | 48 | 6/30/2005 Software |
| 2627 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/10/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 Software |
| 2627 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 5RGL11 | 7/17/2002 | CLC | 32701 | $181.37 | 36 | 7/31/2005 Servers |
| 2627 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | 1YRB11 | 7/17/2002 | CLC | 32701 | $88.44 | 36 | 7/31/2005 Servers |
| 2627 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 1 | 594500 | 12/16/2002 | CLC | 34375 | $19.93 | 36 | 12/31/2005 Radio Frequency |
| 2627 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 7/17/2002 | CLC | 32701 | $0.00 | 36 | 7/31/2005 Personal Computers |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.   Prepared by management.

| Store | Vendor | Model | Type | Description | Qty | Asset | Date | Loc | Acct | Price | Term | End | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2702 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALX47 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALX55 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALX56 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALX57 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALX63 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALX70 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALX72 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALX75 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALX85 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4694 | S45 | POS REGISTER | 1 | ALZ24 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4694 | S45 | POS REGISTER | 1 | VML74 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4694 | S45 | POS REGISTER | 1 | VMX54 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4694 | S45 | POS REGISTER | 1 | VMY14 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4694 | S45 | POS REGISTER | 1 | VMY92 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4694 | S45 | POS REGISTER | 1 | VMY94 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4694 | S45 | POS REGISTER | 1 | VNW18 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4694 | S45 | POS REGISTER | 1 | VNW22 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4694 | S45 | POS REGISTER | 1 | VPN75 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 4694 | S45 | POS REGISTER | 1 | VPN76 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2702 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNG77 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2702 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNG79 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2702 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNH06 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2702 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPW92 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2702 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPW99 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2702 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPX68 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2702 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPX69 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2702 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPX76 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2702 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPY00 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2702 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2702 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2702 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | CWGL11 | 6/17/2002 | CLC | 32158 | $161.37 | 36 | 6/30/2005 | Servers |
| 2702 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | HXRB11 | 6/17/2002 | CLC | 32158 | $58.44 | 36 | 6/30/2005 | Servers |
| 2702 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 6/17/2002 | CLC | 32158 | $0.00 | 36 | 6/30/2005 | Personal Computers |

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| 2704 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1121 | 6/15/2001 | CLC | 29608 | $38.60 | 48 | 7/31/2005 | POS |
| 2704 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2855 | 6/15/2001 | CLC | 29608 | $36.60 | 48 | 7/31/2005 | POS |
| 2704 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDMM2 | 6/15/2001 | CLC | 29608 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2704 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDMV7 | 6/15/2001 | CLC | 29608 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2704 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2704 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2704 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 97YH11 | 6/17/2002 | CLC | 32159 | $181.37 | 38 | 6/30/2005 | Servers |
| 2704 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | HXRB11 | 6/17/2002 | CLC | 32159 | $68.44 | 38 | 6/30/2005 | Servers |
| 2704 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 8/17/2002 | CLC | 32159 | $0.00 | 38 | 6/30/2005 | Personal Computers |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar Internal accounting records.   Prepared by management.

| | | | | Description | Qty | Serial | Date | | | Amount | Date | | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2705 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0875 | 5/15/2001 | CLC | 29153 | $36.60 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0931 | 5/15/2001 | CLC | 29153 | $36.60 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 6331 | B2N | IBM BLACK ES4 15I | 1 | YY763 | 5/15/2001 | CLC | 29153 | $5.27 | 6/30/2005 | 48 | Personal Computers |
| 2705 | IBM | 6331 | B2N | IBM BLACK ES4 15I | 1 | YY764 | 5/15/2001 | CLC | 29153 | $5.27 | 6/30/2005 | 48 | Personal Computers |
| 2705 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALM27 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALM42 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALM44 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALM45 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALM48 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALM96 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALN51 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALN57 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALN61 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALN82 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALP23 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4694 | S45 | POS REGISTER | 1 | VKN21 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4694 | S45 | POS REGISTER | 1 | VKN68 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4694 | S45 | POS REGISTER | 1 | VKN91 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4694 | S45 | POS REGISTER | 1 | VMY63 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4694 | S45 | POS REGISTER | 1 | VMY77 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4694 | S45 | POS REGISTER | 1 | VM234 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4694 | S45 | POS REGISTER | 1 | VM256 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4694 | S45 | POS REGISTER | 1 | VM261 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4694 | S45 | POS REGISTER | 1 | VM263 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 4694 | S45 | POS REGISTER | 1 | VM264 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | 48 | POS |
| 2705 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNK73 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | 48 | Personal Computers |
| 2705 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNK74 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | 48 | Personal Computers |
| 2705 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNK79 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | 48 | Personal Computers |
| 2705 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNL10 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | 48 | Personal Computers |
| 2705 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNL12 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | 48 | Personal Computers |
| 2705 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNL14 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | 48 | Personal Computers |
| 2705 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRG59 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | 48 | Personal Computers |
| 2705 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRG70 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | 48 | Personal Computers |
| 2705 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 6/30/2005 | 48 | Software |
| 2705 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 6/30/2005 | 48 | Software |
| 2705 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | CWGLI1 | 6/17/2002 | CLC | 32160 | $181.37 | 6/30/2005 | 36 | Servers |
| 2705 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | HXRB11 | 6/17/2002 | CLC | 32160 | $68.44 | 6/30/2005 | 36 | Servers |
| 2705 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 6/17/2002 | CLC | 32160 | $0.00 | 6/30/2005 | 36 | Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

Privileged and Confidential

| Store | MFG | Model | Type | Description | Qty | Item | Lease Date | Code | Asset | Amount | Mos | End Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2708 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0574 | 6/15/2001 | CLC | 29435 | $36.60 | 48 | 7/31/2005 | POS |
| 2708 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1882 | 6/15/2001 | CLC | 29435 | $36.60 | 48 | 7/31/2005 | POS |
| 2708 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDDN7 | 6/15/2001 | CLC | 29435 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2708 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDDN8 | 6/15/2001 | CLC | 29435 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2708 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HTG12 | 7/1/2001 | ICC | 22966 | $19.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HTG13 | 7/1/2001 | ICC | 22966 | $19.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HTN36 | 7/1/2001 | ICC | 22966 | $19.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HTP49 | 7/1/2001 | ICC | 22966 | $19.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HTP86 | 7/1/2001 | ICC | 22966 | $19.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HTR08 | 7/1/2001 | ICC | 22966 | $19.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HTV02 | 7/1/2001 | ICC | 22966 | $19.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HTV14 | 7/1/2001 | ICC | 22966 | $19.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HTV15 | 7/1/2001 | ICC | 22966 | $19.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HTV19 | 7/1/2001 | ICC | 22966 | $19.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HTV21 | 7/1/2001 | ICC | 22966 | $19.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HTV24 | 7/1/2001 | ICC | 22966 | $19.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4694 | S45 | POS REGISTER | 1 | TPT08 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4694 | S45 | POS REGISTER | 1 | TPV82 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4694 | S45 | POS REGISTER | 1 | TPX78 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4694 | S45 | POS REGISTER | 1 | TPX94 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4694 | S45 | POS REGISTER | 1 | VKM01 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4694 | S45 | POS REGISTER | 1 | VKP38 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4694 | S45 | POS REGISTER | 1 | VKV46 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4694 | S45 | POS REGISTER | 1 | VKV60 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4694 | S45 | POS REGISTER | 1 | VKV61 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4694 | S45 | POS REGISTER | 1 | VMN24 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 4694 | S45 | POS REGISTER | 1 | VNX15 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2708 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNN72 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2708 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNN73 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2708 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNN79 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2708 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNP23 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2708 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNP24 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2708 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNP30 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2708 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNP31 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2708 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.98 | 48 | 6/30/2005 | Software |
| 2708 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2708 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | G02F11 | 5/17/2002 | CLC | 31733 | $181.37 | 36 | 5/31/2005 | Servers |
| 2708 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | N0N111 | 5/17/2002 | CLC | 31733 | $52.44 | 36 | 5/31/2005 | Servers |
| 2708 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31733 | $0.00 | 36 | 5/31/2005 | Personal Computers |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.   Prepared by management.

| | | | | | Qty | Item | Date | Code | Number | Amount | End Date | Category | Term |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2709 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1034 | 6/15/2001 | CLC | 29436 | $36.60 | 7/31/2005 | POS | 48 |
| 2709 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2885 | 6/15/2001 | CLC | 29436 | $36.60 | 7/31/2005 | POS | 48 |
| 2709 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XFAD0 | 6/15/2001 | CLC | 29436 | $5.27 | 7/31/2005 | Personal Computers | 48 |
| 2709 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XFAF1 | 6/15/2001 | CLC | 29436 | $5.27 | 7/31/2005 | Personal Computers | 48 |
| 2709 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | HXH81 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | HZW34 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | HZW38 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | HZW40 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4510 | TS4 | THERMAL PRINTER | 1 | HZW42 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | HZW45 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | HZW49 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | HZX01 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | HZX14 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | HZX18 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | HZX22 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | HZY69 | 7/1/2001 | ICC | 22986 | $19.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | TPX91 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | TPZ19 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | TPZ23 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | TPZ72 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | TTA05 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | VKW15 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | VKW33 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | VMK34 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | VMK38 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | VMZ66 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | VNA18 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | VNA23 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 4694 | S45 | POS REGISTER | 1 | VNA25 | 7/1/2001 | ICC | 22980 | $51.00 | 6/30/2005 | POS | 48 |
| 2709 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNH63 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | Personal Computers | 48 |
| 2709 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNH65 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | Personal Computers | 48 |
| 2709 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNH66 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | Personal Computers | 48 |
| 2709 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNH71 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | Personal Computers | 48 |
| 2709 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNH73 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | Personal Computers | 48 |
| 2709 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNK19 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | Personal Computers | 48 |
| 2709 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNK25 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | Personal Computers | 48 |
| 2709 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNK27 | 7/1/2001 | ICC | 22991 | $5.25 | 6/30/2005 | Personal Computers | 48 |
| 2709 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | 125534 | 7/1/2001 | ICC | 23001 | $99.96 | 6/30/2005 | Software | 49 |
| 2709 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | LWGJ11 | 7/1/2001 | ICC | 23001 | $31.74 | 6/30/2005 | Software | 49 |
| 2709 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 1 | 125534 | 2/16/2002 | CLC | 31067 | $19.88 | 11/11/1811 | Radio Frequency | 36 |
| 2709 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | LWGJ11 | 6/17/2002 | CLC | 32182 | $181.37 | 6/30/2005 | Servers | 36 |
| 2709 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | HXRB11 | 6/17/2002 | CLC | 32182 | $68.44 | 6/30/2005 | Servers | 36 |
| 2709 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 6/17/2002 | CLC | 32162 | $0.00 | 6/30/2005 | Personal Computers | 36 |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar Internal accounting records.   Prepared by management.

| Div | Mfr | Model | Type | Description | Qty | Serial | Date | Loc | Amount | Number | End Date | Term | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2710 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1613 | 6/15/2001 | CLC | $36.60 | 29437 | 7/31/2005 | 48 | POS |
| 2710 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1760 | 6/15/2001 | CLC | $36.60 | 29437 | 7/31/2005 | 48 | POS |
| 2710 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDDG5 | 6/15/2001 | CLC | $5.27 | 29437 | 7/31/2005 | 48 | Personal Computers |
| 2710 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDDN0 | 6/15/2001 | CLC | $5.27 | 29437 | 7/31/2005 | 48 | Personal Computers |
| 2710 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | H2V22 | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | H2V27 | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | H2V32 | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | H2V98 | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | H2V99 | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | H2W03 | 7/1/2001 | ICC | $19.00 | 22998 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | H2W08 | 7/1/2001 | ICC | $19.00 | 22998 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | H2W13 | 7/1/2001 | ICC | $19.00 | 22998 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | H2W18 | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | H2W20 | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | H2Y16 | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4810 | TS4 | THERMAL PRINTER | 1 | H2Y79 | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4694 | S4S | POS REGISTER | 1 | TMY67 | 7/1/2001 | ICC | $51.00 | 22990 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4694 | S4S | POS REGISTER | 1 | TMY81 | 7/1/2001 | ICC | $51.00 | 22990 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4694 | S4S | POS REGISTER | 1 | TPX98 | 7/1/2001 | ICC | $51.00 | 22990 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4694 | S4S | POS REGISTER | 1 | TPY29 | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4694 | S4S | POS REGISTER | 1 | TPY33 | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4694 | S4S | POS REGISTER | 1 | VAW53 | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4694 | S4S | POS REGISTER | 1 | VGX26 | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4694 | S4S | POS REGISTER | 1 | VGX29 | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4694 | S4S | POS REGISTER | 1 | VGX37 | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4694 | S4S | POS REGISTER | 1 | VHV60 | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4694 | S4S | POS REGISTER | 1 | VHV92 | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 4694 | S4S | POS REGISTER | 1 | VKT06 | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | 48 | POS |
| 2710 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | HRX16 | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | 48 | Personal Computers |
| 2710 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | HRX18 | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | 48 | Personal Computers |
| 2710 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | HRX19 | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | 48 | Personal Computers |
| 2710 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | HRX26 | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | 48 | Personal Computers |
| 2710 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | HRX27 | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | 48 | Personal Computers |
| 2710 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | HRX28 | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | 48 | Personal Computers |
| 2710 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | HRY19 | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | 48 | Personal Computers |
| 2710 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | HRY26 | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | 48 | Personal Computers |
| 2710 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | HRY27 | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | 48 | Personal Computers |
| 2710 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | HRY28 | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | 48 | Personal Computers |
| 2710 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 |  | 7/1/2001 | ICC | $99.96 | 23001 | 6/30/2005 | 48 | Software |
| 2710 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 |  | 7/1/2001 | ICC | $31.74 | 23001 | 6/30/2005 | 48 | Software |
| 2710 | IBM | 2500 | P3 | POWEREDGE 2500 P3 | 1 | MWGJ11 | 6/17/2002 | CLC | $181.37 | 32163 | 6/30/2006 | 36 | Servers |
| 2710 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | HXRB11 | 6/17/2002 | CLC | $68.44 | 32163 | 6/30/2006 | 36 | Servers |
| 2710 | DCC | E551 | 15MO | DELL E551 15INCH | 1 |  | 6/17/2002 | CLC | $0.00 | 32163 | 6/30/2006 | 36 | Personal Computers |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| 2711 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M1860 | 6/15/2001 CLC | 29609 | $36.60 | 48 | 7/31/2005 POS |
|---|---|---|---|---|---|---|---|---|---|---|
| 2711 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M1917 | 6/15/2001 CLC | 29609 | $36.60 | 48 | 7/31/2005 POS |
| 2711 | IBM | 6331 | B2N | IBM BLACK E54 15i | 1 XDZT7 | 6/15/2001 CLC | 29609 | $5.27 | 48 | 7/31/2005 Personal Computers |
| 2711 | IBM | 6331 | B2N | IBM BLACK E54 15i | 1 XDZT8 | 6/15/2001 CLC | 29609 | $5.27 | 48 | 7/31/2005 Personal Computers |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRF42 | 7/1/2001 ICC | 22988 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRF48 | 7/1/2001 ICC | 22988 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRG04 | 7/1/2001 ICC | 22988 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRG09 | 7/1/2001 ICC | 22988 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRG12 | 7/1/2001 ICC | 22986 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRG15 | 7/1/2001 ICC | 22986 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRG18 | 7/1/2001 ICC | 22986 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRG23 | 7/1/2001 ICC | 22986 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRG26 | 7/1/2001 ICC | 22986 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRG32 | 7/1/2001 ICC | 22986 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRG38 | 7/1/2001 ICC | 22986 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRG60 | 7/1/2001 ICC | 22986 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRG78 | 7/1/2001 ICC | 22986 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HRK03 | 7/1/2001 ICC | 22986 | $19.00 | 48 | 6/30/2005 POS |
| 2711 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | 7/1/2001 ICC | 23001 | $99.96 | 48 | 6/30/2005 Software |
| 2711 | IBM | SAV2 | SVGS | SAV2 SERVICES | 1 | 7/1/2001 ICC | 23001 | $31.74 | 48 | 6/30/2005 Software |
| 2711 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 1 508389 | 3/16/2002 CLC | 31330 | $19.88 | 36 | 11/11/1911 Radio Frequency |
| 2711 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 NWGJ11 | 6/17/2002 CLC | 32164 | $181.37 | 36 | 6/30/2005 Servers |
| 2711 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 HXRB11 | 6/17/2002 CLC | 32164 | $68.44 | 36 | 6/30/2005 Servers |
| 2711 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | 6/17/2002 CLC | 32164 | $0.00 | 36 | 6/30/2005 Personal Computers |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2713 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1240 | 7/15/2001 | CLC | 29792 | $36.60 | 48 | 8/31/2005 | POS |
| 2713 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2742 | 7/15/2001 | CLC | 29792 | $36.60 | 48 | 8/31/2005 | POS |
| 2713 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDGD9 | 7/15/2001 | CLC | 29792 | $5.27 | 48 | 8/31/2005 | Personal Computers |
| 2713 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDGF6 | 7/15/2001 | CLC | 29792 | $5.27 | 48 | 8/31/2005 | Personal Computers |
| 2713 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.98 | 48 | 6/30/2005 | Software |
| 2713 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2713 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 1 | 0001S3 | 12/16/2001 | CLC | 30697 | $20.50 | 38 | 11/11/1911 | Radio Frequency |
| 2713 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | NWGJ1 | 6/17/2002 | CLC | 32165 | $181.37 | 36 | 6/30/2005 | Servers |
| 2713 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | HXRB11 | 6/17/2002 | CLC | 32165 | $68.44 | 36 | 6/30/2005 | Servers |
| 2713 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2713 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2713 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2713 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2713 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2713 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2713 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2713 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 6/17/2002 | CLC | 32165 | $0.00 | 36 | 6/30/2005 | Personal Computers |
| 2713 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2713 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| 2714 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M1674 | 5/15/2001 CLC | 28687 | $35.17 | 48 | 6/30/2005 POS |
|---|---|---|---|---|---|---|---|---|---|---|
| 2714 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M4921 | 5/15/2001 CLC | 28687 | $35.18 | 48 | 6/30/2005 POS |
| 2714 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XDGZ0 | 5/15/2001 CLC | 28687 | $6.69 | 48 | 6/30/2005 Personal Computers |
| 2714 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XDGZ8 | 5/15/2001 CLC | 28687 | $6.70 | 48 | 6/30/2005 Personal Computers |
| 2714 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | 7/1/2001 ICC | 23001 | $99.96 | 48 | 6/30/2005 Software |
| 2714 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | 7/1/2001 ICC | 23001 | $31.74 | 48 | 6/30/2005 Software |
| 2714 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 6H2F11 | 5/17/2002 CLC | 31724 | $181.37 | 36 | 5/31/2005 Servers |
| 2714 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 Q0N111 | 5/17/2002 CLC | 31724 | $88.44 | 36 | 5/31/2005 Servers |
| 2714 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | 5/17/2002 CLC | 31724 | $0.00 | 36 | 5/31/2005 Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| | | | | Description | Serial | Date | | Amount | Term | Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2715 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M1672 | 5/15/2001 CLC | 28771 | $35.17 | 48 | 6/30/2005 | POS |
| 2715 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M4932 | 5/15/2001 CLC | 28771 | $35.18 | 48 | 6/30/2005 | POS |
| 2715 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XCXK9 | 5/15/2001 CLC | 28771 | $6.69 | 48 | 6/30/2005 | Personal Computers |
| 2715 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XCXR3 | 5/15/2001 CLC | 28771 | $6.70 | 48 | 6/30/2005 | Personal Computers |
| 2715 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | 7/1/2001 ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2715 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | 7/1/2001 ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2715 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 PWGJ11 | 6/17/2002 CLC | 32166 | $161.37 | 36 | 6/30/2005 | Servers |
| 2715 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 NWRB11 | 6/17/2002 CLC | 32166 | $68.44 | 36 | 6/30/2005 | Servers |
| 2715 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | 6/17/2002 CLC | 32166 | $0.00 | 36 | 6/30/2005 | Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2716 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M2783 | 4/15/2001 CLC | 28499 | $36.60 | 48 | 5/31/2005 POS |
| 2716 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M4790 | 4/15/2001 CLC | 28499 | $36.60 | 48 | 5/31/2005 POS |
| 2716 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XDHX8 | 4/15/2001 CLC | 28499 | $5.27 | 48 | 5/31/2005 Personal Computers |
| 2716 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XDHY3 | 4/15/2001 CLC | 28499 | $5.27 | 48 | 5/31/2005 Personal Computers |
| 2716 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | 7/1/2001 ICC | 23001 | $99.96 | 48 | 6/30/2005 Software |
| 2716 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | 7/1/2001 ICC | 23001 | $31.74 | 48 | 6/30/2005 Software |
| 2716 | TEL | PTC960 | XDS | RF REMANUFACTURE | 1 664771 | 2/18/2002 CLC | 30096 | $19.87 | 36 | 1/1/1/1911 Radio Frequency |
| 2716 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 5H2F11 | 5/17/2002 CLC | 31721 | $181.37 | 36 | 5/31/2005 Servers |
| 2716 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 P0N111 | 5/17/2002 CLC | 31721 | $68.44 | 36 | 5/31/2005 Servers |
| 2716 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | 5/17/2002 CLC | 31721 | $0.00 | 36 | 5/31/2005 Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar Internal accounting records.  Prepared by management.

| 2717 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2717 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0996 | 4/15/2001 | CLC | 28175 | $36.60 | 48 | 5/31/2005 POS |
| 2717 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1290 | 4/15/2001 | CLC | 28175 | $36.60 | 48 | 5/31/2005 POS |
| 2717 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDWK8 | 4/15/2001 | CLC | 28175 | $5.27 | 48 | 5/31/2005 Personal Computers |
| 2717 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDWP4 | 4/15/2001 | CLC | 28175 | $5.27 | 48 | 5/31/2005 Personal Computers |
| 2717 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 Software |
| 2717 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 Software |
| 2717 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 7H2F11 | 5/17/2002 | CLC | 31725 | $181.37 | 36 | 5/31/2005 Servers |
| 2717 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | N0N111 | 5/17/2002 | CLC | 31725 | $88.44 | 36 | 5/31/2005 Servers |
| 2717 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLG | 31725 | $0.00 | 36 | 5/31/2005 Personal Computers |

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| 2719 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1734 | 5/15/2001 | CLC | 28688 | $35.17 | 48 | 6/30/2005 | POS |
| 2719 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2365 | 5/15/2001 | CLC | 28688 | $35.18 | 48 | 6/30/2005 | POS |
| 2719 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDCC5 | 5/15/2001 | CLC | 28688 | $6.69 | 48 | 6/30/2005 | Personal Computers |
| 2719 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDCF4 | 5/15/2001 | CLC | 28688 | $6.70 | 48 | 6/30/2005 | Personal Computers |
| 2719 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2719 | IBM | SAV2 | SVCS | SAV2 SERVICES | | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2719 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 1 | 744897 | 1/16/2002 | CLC | 30966 | $20.38 | 36 | 11/11/1911 | Radio Frequency |
| 2719 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | G02F11 | 5/17/2002 | CLC | 31727 | $181.37 | 36 | 5/31/2005 | Servers |
| 2719 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | N0N111 | 5/17/2002 | CLC | 31727 | $68.44 | 36 | 5/31/2005 | Servers |
| 2719 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31727 | $0.00 | 36 | 5/31/2005 | Personal Computers |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2720 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0433 | 4/15/2001 | CLC | 28500 | $36.60 | 48 | 5/31/2005 | POS |
| 2720 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M4685 | 4/15/2001 | CLC | 28500 | $36.60 | 48 | 5/31/2005 | POS |
| 2720 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDBY9 | 4/15/2001 | CLC | 28500 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 2720 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDB22 | 4/15/2001 | CLC | 28500 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 2720 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2720 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2720 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 1 | 745873 | 12/16/2001 | CLC | 30697 | $20.50 | 36 | 11/11/1911 | Radio Frequency |
| 2720 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 1 | 208579 | 12/16/2001 | CLC | 30697 | $20.58 | 36 | 11/11/1911 | Radio Frequency |
| 2720 | DCG | 2500 | P3 | POWEREDGE 2500 P3 | 1 | RWGJ11 | 6/17/2002 | CLC | 32168 | $181.37 | 36 | 6/30/2005 | Servers |
| 2720 | DCG | PV715N | 1U | DELL NAS PV715N W | 1 | HXRB11 | 6/17/2002 | CLC | 32168 | $88.44 | 36 | 6/30/2005 | Servers |
| 2720 | DCG | E551 | 15MO | DELL E551 15INCH | 1 | | 6/17/2002 | CLC | 32168 | $0.00 | 36 | 6/30/2005 | Personal Computers |

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records. Prepared by management.

| Site | MFG | Model | Type | Description | Qty | ID | Install | | Lease | Amount | Term | Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALN88 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALN91 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALN92 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALN7 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALP12 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALR50 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALR51 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALR53 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALR54 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALR63 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALR64 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALF70 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALY03 | 7/1/2001 | ICC | 22988 | $19.00 | 48 | 6/30/2005 | POS |
| 2724 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2724 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2724 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | RGMJ11 | 6/17/2002 | CLC | 32171 | $181.37 | 36 | 6/30/2005 | Servers |
| 2724 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | JXRB11 | 6/17/2002 | CLC | 32171 | $68.44 | 36 | 6/30/2005 | Servers |
| 2724 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 6/17/2002 | CLC | 32171 | $0.00 | 36 | 6/30/2005 | Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.   Prepared by management.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2727 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1396 | 4/15/2001 | CLC | 28505 | $36.60 | 48 | 5/31/2005 POS |
| 2727 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2366 | 4/15/2001 | CLC | 28505 | $36.60 | 48 | 5/31/2005 POS |
| 2727 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | ZBDY2 | 4/15/2001 | CLC | 28505 | $5.27 | 48 | 5/31/2005 Personal Computers |
| 2727 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | ZBHN7 | 4/15/2001 | CLC | 28505 | $5.27 | 48 | 5/31/2005 Personal Computers |
| 2727 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.98 | 48 | 6/30/2005 Software |
| 2727 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 Software |
| 2727 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 1 | 745359 | 12/16/2001 | CLC | 30697 | $20.50 | 36 | 11/11/911 Radio Frequency |
| 2727 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 1 | 745144 | 12/16/2001 | CLC | 30697 | $20.50 | 36 | 11/11/911 Radio Frequency |
| 2727 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | D02F11 | 5/17/2002 | CLC | 31722 | $181.37 | 36 | 5/31/2005 Servers |
| 2727 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | N0N111 | 5/17/2002 | CLC | 31722 | $68.44 | 36 | 5/31/2005 Servers |
| 2727 | DCC | E551 | 1SMO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31722 | $0.00 | 36 | 5/31/2005 Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| 2728 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0597 | 6/15/2001 | CLC | 29439 | $36.60 | 48 | 7/31/2005 | POS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2728 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1977 | 6/15/2001 | CLC | 29439 | $36.60 | 48 | 7/31/2005 | POS |
| 2728 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XCVP4 | 6/15/2001 | CLC | 29439 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2728 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XCVR2 | 6/15/2001 | CLC | 29439 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2728 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2728 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2728 | TEL | PTG960 | XDS | RF RE-MANUFACTURE | 1 | 125531 | 2/16/2002 | CLC | 31068 | $19.87 | 36 | 11/11/1911 | Radio Frequency |
| 2728 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | TGMJ11 | 6/17/2002 | CLC | 32173 | $181.37 | 36 | 6/30/2005 | Servers |
| 2728 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | HXRB11 | 6/17/2002 | CLC | 32173 | $68.44 | 36 | 6/30/2005 | Servers |
| 2728 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 6/17/2002 | CLC | 32173 | $0.00 | 36 | 6/30/2005 | Personal Computers |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2729 | IBM | 8477 | 42Y | 42Y | NETFINITY 1000 PI | 1 | M1602 | 5/15/2001 | CLC | 28773 | $35.18 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 8477 | 42Y | 42Y | NETFINITY 1000 PI | 1 | M2778 | 5/15/2001 | CLC | 28773 | $35.18 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 6331 | B2N | B2N | IBM BLACK E54 15I | 1 | XFAM7 | 5/15/2001 | CLC | 28773 | $8.69 | 48 | 6/30/2005 | Personal Computers |
| 2729 | IBM | 6331 | B2N | B2N | IBM BLACK E54 15I | 1 | XFAR3 | 5/15/2001 | CLC | 28773 | $6.70 | 48 | 6/30/2005 | Personal Computers |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VMM81 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VMN08 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VMN09 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VMN99 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VMP07 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VMT69 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VMW32 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VNA51 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VMZ66 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VMZ75 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VNA12 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VNA20 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 4694 | S45 | S45 | POS REGISTER | 1 | VNA24 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2729 | IBM | 6331 | M2N | M2N | WHITER MONITOR 15 | 1 | CNL60 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2729 | IBM | 6331 | M2N | M2N | WHITER MONITOR 15 | 1 | CNL62 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2729 | IBM | 6331 | M2N | M2N | WHITER MONITOR 15 | 1 | CNL64 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2729 | IBM | 6331 | M2N | M2N | WHITER MONITOR 15 | 1 | CNL72 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2729 | IBM | 6331 | M2N | M2N | WHITER MONITOR 15 | 1 | CNM13 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2729 | IBM | 6331 | M2N | M2N | WHITER MONITOR 15 | 1 | CNM15 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2729 | IBM | 6331 | M2N | M2N | WHITER MONITOR 15 | 1 | CNM17 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2729 | IBM | 6331 | M2N | M2N | WHITER MONITOR 15 | 1 | CNM20 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2729 | IBM | 6331 | M2N | M2N | WHITER MONITOR 15 | 1 | CNM22 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2729 | IBM | 6331 | M2N | M2N | WHITER MONITOR 15 | 1 | CNM24 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2729 | IBM | SAV2 | SFTW | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 22991 | $99.99 | 48 | 6/30/2005 | Software |
| 2729 | IBM | SAV2 | SVCS | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2729 | IBM | 2500 | P3 | P3 | POWEREDGE 2500 P3 | 1 | TGMJ11 | 6/17/2002 | CLC | 32174 | $181.37 | 36 | 6/30/2005 | Servers |
| 2729 | DCC | PV715N | 1U | 1U | DELL NAS PV715N W | 1 | OXRB11 | 6/17/2002 | CLC | 32174 | $68.44 | 36 | 6/30/2005 | Servers |
| 2729 | DCC | E551 | 15MO | 15MO | DELL E551 15INCH | | | 6/17/2002 | CLC | 32174 | $0.00 | 36 | 6/30/2005 | Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2730 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M0865 | 6/15/2001 CLC | 29440 | $36.60 | 48 | 7/31/2005 | POS |
| 2730 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M1070 | 6/15/2001 CLC | 29440 | $36.60 | 48 | 7/31/2005 | POS |
| 2730 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 X0MC6 | 6/15/2001 CLC | 29440 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2730 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 X0MC8 | 6/15/2001 CLC | 29440 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2730 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | 7/1/2001 ICC | 23001 | $99.98 | 48 | 6/30/2005 | Software |
| 2730 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | 7/1/2001 ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2730 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 F02F11 | 5/17/2002 CLC | 31731 | $181.37 | 36 | 5/31/2005 | Servers |
| 2730 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 HZM111 | 5/17/2002 CLC | 31731 | $88.44 | 36 | 5/31/2005 | Servers |
| 2730 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | 5/17/2002 CLC | 31731 | $0.00 | 36 | 5/31/2005 | Personal Computers |

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| | | | | | QTY | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2732 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0767 | 5/15/2001 CLC | 29052 | $36.60 | 48 | 6/30/2005 POS |
| 2732 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M4795 | 5/15/2001 CLC | 29052 | $36.60 | 48 | 6/30/2005 POS |
| 2732 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YY209 | 5/15/2001 CLC | 29052 | $5.27 | 48 | 6/30/2005 Personal Computers |
| 2732 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YY223 | 5/15/2001 CLC | 29052 | $5.27 | 48 | 6/30/2005 Personal Computers |
| 2732 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 ICC | 23001 | $99.96 | 48 | 6/30/2005 Software |
| 2732 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 ICC | 23001 | $31.74 | 48 | 6/30/2005 Software |
| 2732 | IBM | PTC860 | XDS | RF RE-MANUFACTURE | 1 000147 | | 12/16/2001 CLC | 30697 | $20.50 | 36 | 11/11/1911 Radio Frequency |
| 2732 | TEL | PTC860 | XDS | RF RE-MANUFACTURE | 1 874851 | | 2/16/2002 CLC | 30993 | $19.88 | 36 | 11/11/1911 Radio Frequency |
| 2732 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 VGMJ11 | | 6/17/2002 CLC | 32175 | $181.37 | 36 | 6/30/2005 Servers |
| 2732 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 NXRB11 | | 6/17/2002 CLC | 32175 | $88.44 | 36 | 6/30/2005 Servers |
| 2732 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 6/17/2002 CLC | 32175 | $0.00 | 36 | 6/30/2005 Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Source: Jaguar internal accounting records. Prepared by management.

Project Jaguar
Leased Equipment List

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2733 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1083 | 5/15/2001 CLC | 29053 | $36.60 | 48 | 6/30/2005 | POS |
| 2733 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M4743 | 5/15/2001 CLC | 29053 | $36.60 | 48 | 6/30/2005 | POS |
| 2733 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XFAK3 | 5/15/2001 CLC | 29053 | $5.27 | 48 | 6/30/2005 | Personal Computers |
| 2733 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XFAL4 | 5/15/2001 CLC | 29053 | $5.27 | 48 | 6/30/2005 | Personal Computers |
| 2733 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 ICC | 23001 | $89.98 | 48 | 6/30/2005 | Software |
| 2733 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2733 | TEL | PTC960 | X2S | RF RE-MANUFACTURE | 1 | 273175 | 12/16/2001 CLC | 30697 | $20.50 | 36 | 11/11/1911 | Radio Frequency |
| 2733 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 6H2F11 | 5/17/2002 CLC | 31732 | $161.37 | 36 | 5/31/2005 | Servers |
| 2733 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | N0N111 | 5/17/2002 CLC | 31732 | $98.44 | 36 | 5/31/2005 | Servers |
| 2733 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 CLC | 31732 | $0.00 | 36 | 5/31/2005 | Personal Computers |

Privileged and Confidential

Source: Jaguar internal accounting records.  Prepared by management.

Project Jaguar
Leased Equipment List

| 2734 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M1926 | 4/15/2001 CLC | 28506 | $36.60 | 48 5/31/2005 POS |
| 2734 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M1988 | 4/15/2001 CLC | 28506 | $36.60 | 48 5/31/2005 POS |
| 2734 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XDCG3 | 4/15/2001 CLC | 28506 | $5.27 | 48 5/31/2005 Personal Computers |
| 2734 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XDCP4 | 4/15/2001 CLC | 28506 | $5.27 | 48 5/31/2005 Personal Computers |
| 2734 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | 7/1/2001 ICC | 23001 | $99.96 | 48 6/30/2005 Software |
| 2734 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | 7/1/2001 ICC | 23001 | $31.74 | 48 6/30/2005 Software |
| 2734 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 VGMJ11 | 6/17/2002 CLC | 32176 | $181.37 | 36 6/30/2005 Servers |
| 2734 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 SXRB11 | 6/17/2002 CLC | 32176 | $68.44 | 36 6/30/2005 Servers |
| 2734 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | 6/17/2002 CLC | 32176 | $0.00 | 36 6/30/2005 Personal Computers |

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.   Prepared by management.

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2736 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M2149 | 29796 | 7/15/2001 CLC | 29796 | $36.60 | 48 | 8/31/2005 POS | |
| 2736 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 M4651 | 29798 | 7/15/2001 CLC | 29798 | $36.60 | 48 | 8/31/2005 POS | |
| 2736 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XDZN0 | 29799 | 7/15/2001 CLC | 29799 | $5.27 | 48 | 8/31/2005 | Personal Computers |
| 2736 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XDZN5 | 29799 | 7/15/2001 CLC | 29799 | $5.27 | 48 | 8/31/2005 | Personal Computers |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 CHY73 | 22888 | 7/1/2001 ICC | 22888 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 CHZ50 | 22888 | 7/1/2001 ICC | 22888 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HXH55 | 22888 | 7/1/2001 ICC | 22888 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HXL04 | 22886 | 7/1/2001 ICC | 22886 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HXL12 | 22886 | 7/1/2001 ICC | 22886 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HXL17 | 22886 | 7/1/2001 ICC | 22886 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HXL19 | 22886 | 7/1/2001 ICC | 22886 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HXL22 | 22886 | 7/1/2001 ICC | 22886 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HXL27 | 22886 | 7/1/2001 ICC | 22886 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HXL38 | 22886 | 7/1/2001 ICC | 22886 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HXL39 | 22886 | 7/1/2001 ICC | 22886 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HXM98 | 22886 | 7/1/2001 ICC | 22886 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 HXP07 | 22886 | 7/1/2001 ICC | 22886 | $19.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4694 | S45 | POS REGISTER | 1 TMY48 | 22980 | 7/1/2001 ICC | 22980 | $51.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4694 | S45 | POS REGISTER | 1 TPV32 | 22980 | 7/1/2001 ICC | 22980 | $51.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4694 | S45 | POS REGISTER | 1 TPV49 | 22980 | 7/1/2001 ICC | 22980 | $51.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4694 | S45 | POS REGISTER | 1 TPV52 | 22980 | 7/1/2001 ICC | 22980 | $51.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4694 | S45 | POS REGISTER | 1 VHA86 | 22980 | 7/1/2001 ICC | 22980 | $51.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4694 | S45 | POS REGISTER | 1 VHV98 | 22980 | 7/1/2001 ICC | 22980 | $51.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4694 | S45 | POS REGISTER | 1 VKW04 | 22980 | 7/1/2001 ICC | 22980 | $51.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4694 | S45 | POS REGISTER | 1 VPK92 | 22980 | 7/1/2001 ICC | 22980 | $51.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4694 | S45 | POS REGISTER | 1 VPK96 | 22980 | 7/1/2001 ICC | 22980 | $51.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4694 | S45 | POS REGISTER | 1 VPK98 | 22980 | 7/1/2001 ICC | 22980 | $51.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 4694 | S45 | POS REGISTER | 1 VPL01 | 22980 | 7/1/2001 ICC | 22980 | $51.00 | 48 | 6/30/2005 POS | |
| 2736 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 HTC29 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 HTC30 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 HTC31 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 HTC32 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 HTC33 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 HTC34 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 HTC35 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 HTC36 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 HTC37 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 HTC39 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 HTC40 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 HTC43 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | 8331 | M2N | WHITER MONITOR 15 | 1 HTC44 | 22991 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2736 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | 23001 | 7/1/2001 ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2736 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | 23001 | 7/1/2001 ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2736 | TEL | PTCSGO | XDS | RF RE-MANUFACTURE | 1 606282 | 30697 | 12/16/2001 CLC | 30697 | $20.50 | 36 | 11/11/1911 | Radio Frequency |
| 2736 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 N3NJ11 | 32178 | 6/17/2002 CLC | 32178 | $161.37 | 36 | 6/30/2005 | Servers |
| 2736 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 QXRB11 | 32178 | 6/17/2002 CLC | 32178 | $88.44 | 36 | 6/30/2005 | Servers |
| 2736 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | 32178 | 6/17/2002 CLC | 32178 | $0.00 | 36 | 6/30/2005 | Personal Computers |

Other Leased Equipment
Health Resource Computer System

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.   Prepared by management.

| | | | | | Qty | Serial | Date | Code | Amount | Ref | Date | Type | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2737 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M4601 | 7/15/2001 | CLC | $36.60 | 29797 | 8/31/2005 | POS | |
| 2737 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M4813 | 7/15/2001 | CLC | $36.60 | 29797 | 8/31/2005 | POS | |
| 2737 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDGW1 | 7/15/2001 | CLC | $5.27 | 29797 | 8/31/2005 | Personal Computers | |
| 2737 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDHA8 | 7/15/2001 | CLC | $5.27 | 29797 | 8/31/2005 | Personal Computers | |
| 2737 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | $99.98 | 23001 | 6/30/2005 | Software | |
| 2737 | NCR | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | $31.74 | 23001 | 6/30/2005 | Software | |
| 2737 | NCR | 7875 | 4694 | WD7875-4694-9E  W | 1 | 403713 | 11/1/2001 | ICC | $48.22 | 30868 | 11/11/1911 | POS | |
| 2737 | NCR | 7875 | 4694 | WD7875-4694-9E  W | 1 | 403714 | 11/1/2001 | ICC | $48.22 | 30868 | 11/11/1911 | POS | |
| 2737 | NCR | 7875 | 4694 | WD7875-4694-9E  W | 1 | 403715 | 2/16/2002 | CLC | $48.22 | 30868 | 11/11/1911 | POS | |
| 2737 | NCR | 7875 | 4694 | WD7875-4694-9E  W | 1 | 403716 | 2/16/2002 | CLC | $48.22 | 30868 | 11/11/1911 | POS | |
| 2737 | NCR | 7875 | 4694 | WD7875-4694-9E  W | 1 | 403717 | 2/16/2002 | CLC | $48.22 | 30868 | 11/11/1911 | POS | |
| 2737 | NCR | 7875 | 4694 | WD7875-4694-9E  W | 1 | 403718 | 2/16/2002 | CLC | $48.22 | 30868 | 11/11/1911 | POS | |
| 2737 | NCR | 7875 | 4694 | WD7875-4694-9E  W | 1 | 403719 | 2/16/2002 | CLC | $48.22 | 30868 | 11/11/1911 | POS | |
| 2737 | NCR | 7875 | 4694 | WD7875-4694-9E  W | 1 | 403720 | 2/16/2002 | CLC | $48.27 | 30868 | 11/11/1911 | POS | |
| 2737 | IBM | 4694 | S45I | INTEGRATED CK LN | 1 | 0YCD75 | 2/16/2002 | CLC | $86.85 | 30880 | 11/11/1911 | POS | |
| 2737 | IBM | 4694 | S45I | INTEGRATED CK LN | 1 | 0YAK05 | 2/16/2002 | CLC | $86.85 | 30880 | 11/11/1911 | POS | |
| 2737 | IBM | 4694 | S45I | INTEGRATED CK LN | 1 | | 2/16/2002 | CLC | $86.86 | 30880 | 11/11/1911 | POS | |
| 2737 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 1 | 333999 | 5/17/2002 | CLC | $19.87 | 31069 | 11/11/1911 | Radio Frequency | |
| 2737 | DOC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 6H2F11 | 5/17/2002 | CLC | $181.37 | 31723 | 5/31/2005 | Servers | |
| 2737 | DOC | PV715N | 1U | DELL NAS PV715N W | 1 | N0N111 | 5/17/2002 | CLC | $88.44 | 31723 | 5/31/2005 | Servers | |
| 2737 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | Personal Computers | |
| 2737 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | Personal Computers | |
| 2737 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | Personal Computers | |
| 2737 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | Personal Computers | |
| 2737 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | Personal Computers | |
| 2737 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | Personal Computers | |
| 2737 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 | ICC | $5.25 | 22991 | 6/30/2005 | Personal Computers | |
| 2737 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | $19.00 | 22988 | 6/30/2005 | POS | |
| 2737 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | $19.00 | 22988 | 6/30/2005 | POS | |
| 2737 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | POS | |
| 2737 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | POS | |
| 2737 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | POS | |
| 2737 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | POS | |
| 2737 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | POS | |
| 2737 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | POS | |
| 2737 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | POS | |
| 2737 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | | 7/1/2001 | ICC | $19.00 | 22986 | 6/30/2005 | POS | |
| 2737 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | $0.00 | 31723 | 5/31/2005 | Personal Computers | |
| 2737 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | POS | |
| 2737 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | POS | |
| 2737 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | POS | |
| 2737 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | POS | |
| 2737 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | FCG | |
| 2737 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | POS | |
| 2737 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | POS | |
| 2737 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | POS | |
| 2737 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | POS | |
| 2737 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | POS | |
| 2737 | IBM | 4694 | S45 | POS REGISTER | 1 | | 7/1/2001 | ICC | $51.00 | 22980 | 6/30/2005 | POS | |

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records.  Prepared by management.

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2740 | IBM | 8477 | 42Y | NETFINITY 1000 PI | M0710 | 6/15/2001 | CLC | 29500 | $36.60 | 48 | 7/31/2005 | POS |
| 2740 | IBM | 8477 | 42Y | NETFINITY 1000 PI | M0781 | 6/15/2001 | CLC | 29500 | $36.60 | 48 | 7/31/2005 | POS |
| 2740 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 7NMN11 | 8/17/2002 | CLC | 33176 | $181.37 | 36 | 8/31/2005 | Servers |
| 2740 | DCC | PV715N | 1U | DELL NAS PV715N W | D7CK11 | 8/17/2002 | CLC | 33176 | $88.44 | 36 | 8/31/2005 | Servers |
| 2740 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 751160 | 8/19/2002 | CLC | 33375 | $19.51 | 36 | 8/31/2005 | Radio Frequency |
| 2740 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 887585 | 8/19/2002 | CLC | 33375 | $19.51 | 36 | 8/31/2005 | Radio Frequency |
| 2740 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 121375 | 8/19/2002 | CLC | 33375 | $19.51 | 36 | 8/31/2005 | Radio Frequency |
| 2740 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 125532 | 8/19/2002 | CLC | 33375 | $23.74 | 36 | 8/31/2005 | Radio Frequency |
| 2740 | TEL | ARLAN | | ARLAN 630-900 MHZ | 003615 | 8/19/2002 | CLC | 33375 | $43.15 | 36 | 8/31/2005 | Radio Frequency |
| 2740 | NCR | 7875 | 4694 | WD7875-4694-9E W | 459546 | 9/9/2002 | CLC | 33224 | $43.15 | 36 | 9/30/2005 | POS |
| 2740 | NCR | 7875 | 4694 | WD7875-4694-9E W | 459547 | 9/9/2002 | CLC | 33224 | $43.15 | 36 | 9/30/2005 | POS |
| 2740 | NCR | 7875 | 4694 | WD7875-4694-9E W | 459548 | 9/9/2002 | CLC | 33224 | $43.15 | 36 | 9/30/2005 | POS |
| 2740 | NCR | 7875 | 4694 | WD7875-4694-9E W | 459549 | 9/9/2002 | CLC | 33224 | $43.15 | 36 | 9/30/2005 | POS |
| 2740 | NCR | 7875 | 4694 | WD7875-4694-9E W | 459550 | 9/9/2002 | CLC | 33224 | $43.15 | 36 | 9/30/2005 | POS |
| 2740 | NCR | 7875 | 4694 | WD7875-4694-9E W | 459551 | 9/9/2002 | CLC | 33224 | $43.15 | 36 | 9/30/2005 | POS |
| 2740 | NCR | 7875 | 4694 | WD7875-4694-9E W | 459552 | 9/9/2002 | CLC | 33224 | $43.15 | 36 | 9/30/2005 | POS |
| 2740 | NCR | 7875 | 4694 | WD7875-4694-9E W | 459553 | 9/9/2002 | CLC | 33224 | $43.15 | 36 | 9/30/2005 | POS |
| 2740 | NCR | 7875 | 4694 | WD7875-4694-9E W | 459554 | 9/9/2002 | CLC | 33224 | $43.15 | 36 | 9/30/2005 | POS |
| 2740 | NCR | 7875 | 4694 | WD7875-4694-9E W | 459555 | 9/9/2002 | CLC | 33224 | $43.17 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4694 | 245D | DIST. REGISTER NO | 1AGWW5 | 9/8/2002 | CLC | 33579 | $93.37 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4694 | 245D | DIST. REGISTER NO | 1VVN90 | 9/8/2002 | CLC | 33579 | $93.37 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4694 | 245D | DIST. REGISTER NO | 1VVH30 | 9/8/2002 | CLC | 33579 | $93.37 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4694 | 245D | DIST. REGISTER NO | 1B2HL2 | 9/8/2002 | CLC | 33579 | $93.37 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4694 | 245D | DIST. REGISTER NO | 1BXCD0 | 9/8/2002 | CLC | 33579 | $93.37 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4694 | 245D | DIST. REGISTER NO | 1VZX01 | 9/8/2002 | CLC | 33579 | $93.37 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4694 | 245D | DIST. REGISTER NO | 1BZHM6 | 9/8/2002 | CLC | 33579 | $93.37 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4694 | 245D | DIST. REGISTER NO | 1VVN71 | 9/8/2002 | CLC | 33579 | $93.37 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4694 | 245D | DIST. REGISTER NO | 1YVN14 | 9/8/2002 | CLC | 33579 | $93.37 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4694 | 245D | DIST. REGISTER NO | 1BZHK1 | 9/8/2002 | CLC | 33579 | $93.44 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4694 | 245I | INTEGRATED REGIST | 1VVH45 | 9/8/2002 | CLC | 33579 | $91.58 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4694 | 245I | INTEGRATED REGIST | 1AGXT7 | 9/8/2002 | CLC | 33579 | $91.58 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4610TS4 | PTR | 08L1854 THERMAL P | 1ZXB17 | 9/16/2002 | CLC | 33579 | $34.72 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4610TS4 | PTR | 08L1854 THERMAL P | 1ZXB10 | 9/16/2002 | CLC | 33579 | $34.72 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4610TS4 | PTR | 08L1854 THERMAL P | 1ZXB21 | 9/16/2002 | CLC | 33579 | $34.72 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4610TS4 | PTR | 08L1854 THERMAL P | 1ZW297 | 9/16/2002 | CLC | 33579 | $34.72 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4610TS4 | PTR | 08L1854 THERMAL P | 1ZXB00 | 9/16/2002 | CLC | 33579 | $34.72 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4610TS4 | PTR | 08L1854 THERMAL P | 1ZX834 | 9/16/2002 | CLC | 33579 | $34.72 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4610TS4 | PTR | 08L1854 THERMAL P | 1ZX846 | 9/16/2002 | CLC | 33579 | $34.72 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4610TS4 | PTR | 08L1854 THERMAL P | 1AGVN0 | 9/16/2002 | CLC | 33579 | $34.72 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4610TS4 | PTR | 08L1854 THERMAL P | 1AGVG3 | 9/16/2002 | CLC | 33579 | $34.72 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4610TS4 | PTR | 08L1854 THERMAL P | 1ZXD50 | 9/16/2002 | CLC | 33579 | $34.72 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4610TS4 | PTR | 08L1854 THERMAL P | 1AFFV5 | 9/16/2002 | CLC | 33579 | $34.72 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 4610TS4 | PTR | 08L1854 THERMAL P | 1ZXO64 | 9/16/2002 | CLC | 33579 | $34.73 | 36 | 9/30/2005 | POS |
| 2740 | IBM | 6331 | 47N | IBM 15 INCH BLACK | 6CPHT6 | 9/16/2002 | CLC | 33582 | $4.61 | 36 | 9/30/2005 | Personal Computers |
| 2740 | IBM | 6331 | 47N | IBM 15 INCH BLACK | 6CPGX4 | 9/16/2002 | CLC | 33582 | $4.61 | 36 | 9/30/2005 | Personal Computers |
| 2740 | IBM | 6331 | 47N | IBM 15 INCH BLACK | 6CPHT4 | 9/16/2002 | CLC | 33582 | $4.61 | 36 | 9/30/2005 | Personal Computers |
| 2740 | IBM | 6331 | 47N | IBM 15 INCH BLACK | 6CPGX1 | 9/16/2002 | CLC | 33582 | $4.61 | 36 | 9/30/2005 | Personal Computers |
| 2740 | IBM | 6331 | 47N | IBM 15 INCH BLACK | 6CPHT9 | 9/16/2002 | CLC | 33582 | $4.61 | 36 | 9/30/2005 | Personal Computers |
| 2740 | IBM | 6331 | 47N | IBM 15 INCH BLACK | 6CPHT3 | 9/16/2002 | CLC | 33582 | $4.61 | 36 | 9/30/2005 | Personal Computers |
| 2740 | IBM | 6331 | 47N | IBM 15 INCH BLACK | 6CPGX2 | 9/16/2002 | CLC | 33582 | $4.61 | 36 | 9/30/2005 | Personal Computers |
| 2740 | IBM | 6331 | 47N | IBM 15 INCH BLACK | 6CPHT5 | 9/16/2002 | CLC | 33582 | $4.61 | 36 | 9/30/2005 | Personal Computers |

Privileged and Confidential

Source: Jaguar internal accounting records. Prepared by management.

Project Jaguar
Leased Equipment List

| 2740 | IBM | 6331 | 47N | IBM 15 INCH BLACK | 1 | 6CPGW9 | 9/16/2002 | CLC | 33582 | $4.61 | 36 | 9/30/2005 | Personal Computers |
| 2740 | IBM | 6331 | 47N | IBM 15 INCH BLACK | 1 | 6CPHV1 | 9/16/2002 | CLC | 33582 | $4.70 | 36 | 9/30/2005 | Personal Computers |
| 2740 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 8/17/2002 | CLC | 33176 | $0.00 | 36 | 8/31/2005 | Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records. Prepared by management.

Privileged and Confidential

| Customer | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2743 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1780 | 5/15/2001 | CLC | 29154 | $36.60 | 48 | 6/30/2005 | POS |
| 2743 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2619 | 5/15/2001 | CLC | 29154 | $36.60 | 48 | 6/30/2005 | POS |
| 2743 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YZ022 | 5/15/2001 | CLC | 29154 | $5.27 | 48 | 6/30/2005 | Personal Computers |
| 2743 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YZ030 | 5/15/2001 | CLC | 29154 | $5.27 | 48 | 6/30/2005 | Personal Computers |
| 2743 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2743 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2743 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | Y51L11 | 7/17/2002 | CLC | 32527 | $181.37 | 36 | 7/31/2005 | Servers |
| 2743 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 7/17/2002 | CLC | 32527 | $0.00 | 36 | 7/31/2005 | Personal Computers |
| 2743 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | 6YRB11 | 7/17/2002 | CLC | 32527 | $69.44 | 36 | 7/31/2005 | Servers |

EXHIBIT E
To Asset Purchase Agreement

**Base Purchase Price Allocation; Base Deposit; Inventory Deposit**

The Base Purchase Price, Base Deposit, and Inventory Deposit shall be allocated as set forth in that certain Side Letter dated as of the Effective Date.

EXHIBIT F
To Asset Purchase Agreement

Permitted Encumbrances

1.  Taxes and assessments of any taxing authority that levies taxes or assessments on real property for the year 2005 and subsequent years.

2.  All applicable laws, ordinances, and regulations imposed by any applicable governmental authority, including, but not limited to, all applicable building, zoning, land use and environmental ordinances and regulations.

3.  Rights or claims of parties in possession, boundary line disputes, overlaps, encroachments, and any other matters which would be disclosed by an accurate survey and inspection of the Leased Premises, including but not limited to all matters shown or set forth on any survey, site plan or Environmental Report.

4.  Rights of Landlords under the Leases, including the rights of any Landlord's mortgagee.

5.  Rights of Subtenants under the Subleases.

6.  All matters set forth as exceptions in the Initial Title Reports or the site plans, other than Monetary Liens.

7.  All other matters set forth as exceptions in those Title Reports other than the Initial Title Reports, other than Monetary Liens, subject to the provisions of paragraph 4.2 of the Agreement.

8.  All other restrictions, reservations, covenants, agreements, easements, limitations and other matters appearing of record as of the date of this Agreement, other than Monetary Liens, and which do not, individually or in the aggregate, interfere in a material and adverse way with the present use of or occupancy of the affected Store.

EXHIBIT G
To Asset Purchase Agreement

Form of
Lease Assignment

## ASSIGNMENT AND ASSUMPTION OF LEASE
[Store #_____, _____, _____]

**THIS ASSIGNMENT AND ASSUMPTION OF LEASE** (this "Assignment") is made as of _____, 200___ (the "Assumption Effective Date"), by and between **WINN-DIXIE** _____, **INC.** a Florida corporation (hereinafter referred to as "Assignor"), and _____, a _____ (hereinafter referred to as "Assignee");

## RECITALS:

A.   Assignor has agreed to convey to Assignee certain assets in connection with Assignor's retail supermarket store location described on attached <u>Exhibit A</u> (the "Premises") as more particularly described in the Asset Purchase Agreement dated effective _____, 2005 by and among Assignor, as seller, Assignee, as buyer, as amended from time to time (the "Agreement").

B.   As part of the purchase and sale of Assignor's assets referenced above, Assignor has agreed to assign to Assignee (i) all of Assignor's right, title and interest, as tenant or lessee, in and to the lease, together with any and all amendments thereto, as described on the attached <u>Exhibit A</u> (the "Lease"), and all of Assignor's right, title and interest, as landlord or lessor, in and to the subleases, together with all amendments thereto, described on <u>Exhibit A</u> (the "Subleases"); and Assignee has agreed to assume and perform Assignor's liabilities and obligations arising under the Lease and the Subleases after the Effective Date, all subject to and in accordance with the terms of the Lease, the Subleases, the Agreement and this Assignment;

**NOW, THEREFORE,** in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.   **EFFECTIVE DATE**.  This Assignment shall be effective as of the Assumption Effective Date.

2.   **ASSIGNMENT**.

(a)   Assignor hereby assigns, transfers, and conveys unto Assignee all of Assignor's right, title, interest and obligation as tenant or lessee in and to the Lease and all of the rights, benefits and privileges of the tenant or

lessee thereunder.

(b)    Assignor hereby assigns, transfers and conveys unto Assignee all of Assignor's right, title, interest and obligation as landlord or lessor in and to the Subleases and all the rights, benefits and privileges of the landlord or lessor thereunder.

3.    **ASSUMPTION; ACCEPTANCE OF PREMISES**.

(a)    Assignee hereby accepts the aforesaid assignment of the Lease and assumes and agrees to pay and perform all liabilities and obligations of the tenant or lessee that accrue under the Lease from and after the Assumption Effective Date, and Assignee hereby indemnifies, and agrees to save, insure, defend, including without limitation payment of reasonable attorneys' fees, and hold harmless Assignor from and against all liabilities and obligations of the tenant or lessee that accrue under the Lease on or after the Assumption Effective Date.

(b)    Assignee hereby accepts the aforesaid assignment of the Subleases and assumes and agrees to pay and perform all liabilities and obligations of the landlord or lessor that accrue under the Subleases from and after the Assumption Effective Date, and Assignee hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignor from and against all liabilities and obligations of the landlord or lessor that accrue under the Subleases on or after the Assumption Effective Date.

(c)    Assignee acknowledges that it has had opportunity to make such environmental, physical, zoning, topographical, land use, survey, title and other examinations, inspections and investigations of the Premises as Assignee has determined, in its sole discretion, to be necessary and appropriate. Assignee acknowledges that the Premises is being assigned to Assignee in its "AS-IS" condition, and that possession and use of the Premises is subject to the terms of the Lease and to applicable legal requirements, title matters and rules and regulations.    Taking the foregoing into consideration, Assignee has determined that the Premises is satisfactory to Assignee in all respects, and has agreed to accept the Premises in accordance with the terms and conditions of this Assignment. In making such determination, Assignee has and will rely solely on Assignee's own independent examinations, inspections and investigations of the Premises and has not relied and will not rely on any representations of Assignor.    Assignee acknowledges and agrees that neither Assignor nor any of Assignor's agents, representatives or employees have made any representations to Assignee with regard to the Premises or the improvements located thereon, including, but not limited to, representations concerning the condition of the Premises or their fitness for Assignee's intended use, except as otherwise set forth in this

Assignment.

4.   **NOTICES**.  All notices, requests, demands, and other communications required or permitted to be given under this Assignment will be in writing and sent to the address(es) set forth below.  Each communication will be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested; (3) if given by nationally recognized or reputable overnight delivery service, on the next business day after receipted deposit with same; or (4) if given by telefax, when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient.

|  |  |
|---|---|
| If to Assignor: | Winn-Dixie _____, Inc.; Re: Store #_____<br>5050 Edgewood Court<br>Jacksonville, FL 32254-3699<br>Attn: Chief Financial Officer<br>Telefax No.: 904/783-5646 |
| With a copy to: | Winn-Dixie Stores, Inc.<br>5050 Edgewood Court<br>Jacksonville, FL 32254-3699<br>Attn: Office of General Counsel<br>Telefax No.: 904/783-5641 |

or to such other address or telefax number as Assignor may direct from time to time.

|  |  |
|---|---|
| If to Assignee: | _____<br>_____<br>_____<br>Telefax No.: _____ |

or to such other address or Telefax number as Assignee may direct from time to time.

5.   **NOTICE OF ASSIGNMENT**.  On the Assumption Effective Date, Assignor and Assignee shall execute and deliver a Notice of Assignment of Lease and record the same in the recording office of the county in which the Premises is located, for the purpose of placing third parties on notice of Assignor's assignment to Assignee of Assignor's right, title and interest as tenant or lessee in and to the Lease, and of the existence of certain limitations on Assignee's rights under the

Lease as set forth in this Assignment.

6.   **BINDING EFFECT**.  This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns.

7.   **FURTHER ASSURANCES**.  Assignor and Assignee each covenant and agree to execute or procure any additional documents as may be reasonably necessary to establish the rights of the other hereunder, provided however that under no circumstances shall Assignor be required to undertake any liability not expressly provided in this Agreement.

8.   **NO BROKERS**.  The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Assignment other than that due by Assignor to Assignor's Brokers, if any, as defined on the attached Exhibit B, and that due by Assignee to Assignee's Brokers, if any, as described on the attached Exhibit B.  Assignor agrees to pay all fees and commissions claimed by Assignor's Brokers arising out of this Assignment, and Assignee agrees to pay all fees and commissions, if any, claimed by Assignee's Brokers arising out of this Assignment.   Except for Assignor's Brokers and Assignee's Brokers, respectively, neither Assignor nor Assignee has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with this Assignment, the Lease or the Premises.  Assignor and Assignee hereby indemnify and agree to hold harmless each other from and against any claims by any other person or entity for brokerage fees, commissions or other similar costs related to this Assignment, the Lease or the Premises by reason of Assignor's or Assignee's own acts, said indemnifications by Assignor and Assignee to survive expiration or earlier termination of this Assignment.

9.   **Intentionally Omitted**

10.  **WAIVER OF JURY TRIAL**.  Assignor and Assignee each acknowledge and agree that the nature of this Assignment, the Premises, the Lease and the Subleases makes a jury determination of any dispute arising out of this Assignment, the Premises, the Lease or the Subleases undesirable. Accordingly, Assignor and Assignee each knowingly, voluntarily and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Assignment, the Premises, the Lease or the Subleases.

**IN WITNESS WHEREOF,** Assignor and Assignee have executed this Assignment as of the Assumption Effective Date.

**ASSIGNOR:**

Exhibit G
Page 4 of 8

Signed, sealed and delivered
in the presence of:

**WINN-DIXIE** _____, **INC.,** a
Florida corporation

_____

Name:_____

By:_____
Name: _____
Title: Vice President

_____

Name:_____

[CORPORATE SEAL]

[ADD ACKNOWLEDGMENT PER STATE-SPECIFIC REQUIREMENTS]

[SIGNATURES CONTINUED ON FOLLOWING PAGE]

Signed, sealed and delivered
in the presence of:

**ASSIGNEE:**

_____, a

_____

By:_____ _____

Name:_____ _____

Title:_____

_____

Name:_____

[SEAL]

_____

Name:_____

[ADD ACKNOWLEDGMENT PER STATE-SPECIFIC REQUIREMENTS]

Exhibit A

<u>Description of Premises and Lease</u>

<u>STORE #</u>:

<u>STREET ADDRESS</u>:

<u>SHOPPING CENTER</u>:

<u>LEASE</u>:

<u>AMENDMENTS TO LEASE</u>:

<u>SUBLEASES</u>:

<u>AMENDMENTS TO SUBLEASES</u>:

Exhibit B

Schedule of Brokers

## EXHIBIT B-1

## ASSIGNOR'S BROKERS:

The Blackstone Group L.P.
345 Park Avenue
New York, New York  10154

The Food Partners, LLC
1250 Eye Street, N.W.
Suite 850
Washington, D.C.  20005

DJM Asset Management, LLC
445 Broad Hollow Road
Suite 417
Melville, New York  11747

## EXHIBIT B-2

## ASSIGNEE'S BROKERS:

EXHIBIT H
to Asset Purchase Agreement

Form of Inventory Certificate

**INVENTORY CERTIFICATE**

| | | | |
|---|---|---|---|
| Store #: _____ | | Date: _____/_____/_____ | |
| Store Address: | | Time: _____ : _____ AM PM | |

| | Inventory Taken @ Retail | Valuation Percentage | Inventory @ Cost |
|---|---|---|---|
| Dry Grocery Taken @ Retail | $ | x 60.00% | $ |
| Frozen Grocery Taken @ Retail | $ | x 60.00% | $ |
| Dairy Taken @ Retail | $ | x 60.00% | $ |
| Pharmaceutical Taken @ Cost | | | $ |
| Gasoline Taken @ Cost | | | $ |
| General Merchandise and HBC Taken @ Retail | $ | x 50.00% | $ |
| | $ | x _____% | $ |
| | $ | x _____% | $ |
| Total Inventory | | | $ |

_____      ____/____/____
Seller's Authorized Agent                         Date

_____      ____/____/____
Buyer's Authorized Agent                          Date

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

**THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT** is made effective as of July 19, 2005 (the "Amendment Date"), by and among

**WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation and **WINN-DIXIE RALEIGH, INC.,** a Florida corporation (collectively, the "Seller"), and

**THE BUYERS,** as listed on Schedule 1 attached to the Agreement (as hereinafter defined) and signatory hereto or their permitted assignees pursuant to paragraph 17.5 of the Agreement (each, a "Buyer"; collectively, the "Buyers")

### R E C I T A L S:

A.    Seller and Buyers are parties to a certain Asset Purchase Agreement dated June 30, 2005 (the "Agreement").

B.    Subject to the provisions of this Amendment, the Agreement has been selected by Seller as the Successful Bid and is to be submitted to the Bankruptcy Court at the Approval Hearing.

C.    Seller and Buyers desire to amend the Agreement to reflect the terms on which Seller proposes to sell the Assets to Buyers, subject to the conditions contained in the Agreement.

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0    **Defined Terms.**  Capitalized terms used in this Amendment and not defined herein will have the meanings given to them in the Agreement.

2.0    **Amendments to Agreement.**  The Agreement is hereby amended as provided in Exhibit A to this Amendment.

3.0    **Expiration of Contingencies.**  Seller and Buyer hereby acknowledge and agree that the Investigation Period and the Negotiation Period have expired prior to the Amendment Date.

4.0    **Miscellaneous.**

4.1    Authority.  Seller represents and warrants that this Amendment has, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.  Each Buyer represents and warrants that this Amendment has been duly authorized by all required corporate action on behalf of such Buyer.

4.2   <u>Successors and Assigns</u>.  This Amendment will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

4.3   <u>Governing Law</u>.  The application and effect of this Amendment will be governed by the laws of the State of Florida.

4.4   <u>Time is of the Essence</u>.  Time is of the essence of this Amendment.

4.5   <u>Ratification of Agreement</u>.  Except as herein expressly modified or amended, all terms and conditions of the Agreement remain in full force and effect and Seller and Buyers hereby ratify and confirm the Agreement, as modified and amended hereby.

[Signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment as of the Amendment Date.

SELLER:

SELLER:

**WINN-DIXIE MONTGOMERY, ~~INC.~~,** a Florida corporation

By:_____
Name:_____
Title: Vice President

SELLER:

**WINN-DIXIE    RALEIGH,    ~~INC.~~,** a    Florida corporation

By:_____
Name:_____
Title: Vice President

**BUYERS:**

**ALL AMERICAN QUALITY FOODS, INC.**

By: _Gerald Taylor_____
Name: _Gerald Taylor_____
Title: _President_____



CHANDLER'S JKE, INC.

By _____

Name: Robert M. Chandler

Title: Pres.

-5-

Chandler's of Weir, Inc.

By: _____

Name: _____

Title: _____

**KAYE FOOD COMPANIES, LLC**

By: _____

Name: _Matt Kaye_____

Title: _Managing Member_____

PREMIER FOODS, INC.

By: _____

Name: _____

Title: _____

RAMEY ENTERPRISES, INC.

By:

Name:

Title:

**SOUTHEAST FOODS, INC.**

By: _____

Name: _____

Title: _____

**WAYFIELD FOODS, INC.**

By: _____

Name: _RONALD B EBENFIELD_

Title: _PRESIDENT_

**EXHIBIT A**
**TO FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT**
**(Supervalu)**

Amendments to the Agreement

- The term "Stores" is redefined to exclude the Store[s] designated as Seller's store[s] no. 1305, 1346, 2627, 2702, 2704, 2705, 2709, 2711, 2713, 2714, 2715, 2716, 2719, 2723, 2724, 2728, 2729, 2734, 2737, and the Assets to be conveyed to Buyer at the Closing shall not include Assets relating to such excluded Stores. All references to such excluded Store[s] in Schedule 1 and Exhibits A-1, A-2, and E to the Agreement and in the Side Letter referenced in Exhibit E to the Agreement, and all corresponding descriptions and dollar amounts, and all other references to such excluded Stores[s], in the Agreement and such Side Letter, are deleted, and any aggregate totals of the amounts of Base Purchase Price, Inventory Deposit and Total Deposit contained in such Side Letter shall be calculated after giving effect to such deletions.

- The Base Purchase Price specified in paragraph 3.1 of the Agreement is modified and shall be Five Million Seventy-Two Thousand One Hundred Forty Three and no/100 Dollars ($5,072,143.00).

- The aggregate amount of the Base Deposit specified in paragraph 3.2 of the Agreement and set forth in the Allocation Schedule is modified to and shall be $507,214.30.

- On or about the Amendment Date, Kaye Food Companies, LLC (one of the Buyers under the Agreement) transferred and assigned to Premier Food, Inc. (another of the Buyers under the Agreement) its right, title and interest in and to the Agreement, including without limitation the Deposit of $10,740, with respect to that certain fuel center known as Store no.1374 (located at East Broadway Street in Yazoo City, Mississippi) and Premier Food, Inc. has assumed the obligations of Buyer thereunder with respect to Store no. 1374.

# SUPERVALU

# EXHIBIT B

| Store No. | *Obligation | Landlord | Cure Amount |
|---|---|---|---|
| 1303 | CAM/INS/RET | Eastgate Center, LLC | $20,470.78 |
| 1317 | RET | Mid-South Yazoo | $10,410.46 |
| 1323 | CAM | Bennett V. York | $5,813.91 |
| 1328 | RET | Crowder Family Joint Venture | $14,683.16 |
| 1349 | N/A | Hamilton Square, LLC | $0.00 |
| 1806 | N/A | Jefferson-Pilot Life Insurance Co. | $0.00 |
| 2623 | RENT | MaLaurin Mart | $0.00 |
| 2710 | N/A | Southland Investors L.P. | $0.00 |
| 2720 | CAM | Indian Village Group, Inc. | $4,540.11 |
| 2727 | N/A | Cedar Mountain Village, LLC | $74,371.55 |
| 2730 | N/A | CHK & Associates | $0.00 |
| 2733 | CAM/INS/RET | Red Oak Shopping Center, LLC | $23,126.06 |
| 2740 | CAM/INS | Merchants Square Investment, LLC | $42,585.83 |
| 2743 | CAM/INS | Peripety Group, Inc. | $7,034.55 |
| | | | $203,036.41 |

00503996

1

# CERTIFICATE OF SERVICE

**BAE SYSTEMS**

**Enterprise Systems Incorporated**
**11487 Sunset Hills Road**
**Reston, Virginia 20190-5234**

```
District/off: 113A-3          User: cartes              Page 1 of 1                Date Rcvd: Aug 08, 2005
Case: 05-03817                Form ID: pdfdoc           Total Served: 1
```

```
The following entities were served by first class mail on Aug 10, 2005.
aty        +Cynthia C. Jackson,   Smith Hulsey & Busey,   225 Water Street, Suite 1800,
            Jacksonville, FL 32202-4494
```

```
The following entities were served by electronic transmission.
NONE.                                                                      TOTAL: 0

          ***** BYPASSED RECIPIENTS *****
NONE.                                                                      TOTAL: 0
```

```
Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.
```

**I, Joseph Speetjens, declare under the penalty of perjury that I have served the attached document on the above listed entities in the manner shown, and prepared the Certificate of Service and that it is true and correct to the best of my information and belief.**

**First Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

**Date: Aug 10, 2005**                    **Signature:**     *Joseph Speetjens*