# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

## ORDER APPROVING DEBTORS' (A) SALE OF ASSETS FREE AND CLEAR OF LIENS, (B) ASSUMPTION AND ASSIGNMENT OF LEASES AND (C) RELATED RELIEF

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 6004 and 6006 (a) authorizing the Debtors to sell those certain "Assets" as more specifically defined in that certain Asset Purchase Agreement attached as Exhibit A after giving effect to the various permitted terminations by Buyer as to certain stores (the "APA") related to that certain store listed on attached Exhibit B ("Store"),[1] free and clear of liens, claims, interests and encumbrances to Associated Wholesale Grocers, Inc. and Alex Lee, Inc. (collectively, the "Purchaser") or its designees (the "Third Party Purchasers") as identified at or before Closing (as defined in the APA), (b) determining that the sale is exempt from any stamp, transfer, recording or similar tax, (c) authorizing the Debtors to assume and assign all unexpired leases and executory contracts identified in the APA and assumed and assigned to the Third Party Purchaser in connection with the sale (collectively, the "Contracts and Leases"), (d) fixing cure amounts for the Contracts and Leases, and (e) granting related relief (the "Motion"). The Court held a

---

[1]    By Order entered August 5, 2005, the Court approved transactions under the APA pertaining to other store locations.

hearing on the Motion on July 29, 2005 to approve the sale (the "Sale Hearing"). The Court has reviewed the Motion, considered the evidence and heard argument of counsel. After due deliberation and good and sufficient cause existing, the Court makes the following findings of fact:

      A.     This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

      B.     The Debtors solicited highest or otherwise best offer for the Assets in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 20, 2005 (the "Bidding Procedures"). A competing bid was received for the Assets and the Debtors conducted an auction for the Assets on July 18, 2005 (the "Auction"). At the Auction, Purchaser submitted the final bid of Four Million Thirty-Seven Thousand Two Hundred Thirty-Six Dollars ($4,037,236)[2], representing the highest or otherwise best offer received for the Assets.

      C.     The Debtors have provided interested parties (including all parties asserting claims or interests in the Assets, if any) with proper notice of the Motion, the Sale Hearing,[3] the Auction, the assumption and assignment of the Contracts and Leases, and the fixing of any cure amounts, in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365, Fed. R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order and the Bidding Procedures Order. By the Motion, the affected landlords had until July 14, 2005 to

---

[2]     The Purchase Price has since been reduced pursuant to the APA to reflect assets relating to stores which have been removed from the transaction pursuant to the terms of the APA.

object to the cure amounts. An objection to the cure amount was filed with regard to the Store by the landlord. Unless the landlord of the Store and the Debtors reach an agreement, a hearing will be held as to the cure amounts with regard to the Store. Notice of the Sale Hearing has been provided by the Debtors to all employees of the Debtors' store which comprise the Assets. The notice provided by the Debtors is and was due, proper and sufficient notice to provide affected parties adequate opportunity to determine that their rights are to be affected and afforded such parties an opportunity to object to the sale of the Assets at the Sale Hearing.

      D.     The Debtors marketed the Assets and conducted the sale process in compliance with the Bidding Procedures Order, the Bidding Procedures, the Bankruptcy Code and all other orders entered in these cases. Bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner. The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets. In their sound business judgment, the Debtors determined that the bid submitted by the Purchaser at the Auction represented the highest or otherwise best offer for the Assets.

      E.     The Debtors (i) have full corporate power and authority to execute and consummate the APA, and all related documents, and the sale of the Assets and assumption and assignment of the Contracts and Leases has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the APA, are required to consummate the transactions contemplated by the APA.

      F.     The Debtors have the ability to convey the Assets to Purchaser and, as applicable, Third Party Purchasers on the terms and conditions of this Order and the APA.

---

[3]     All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Motion.

G.     The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

H.     Neither the Purchaser, any of its affiliates, the Third Party Purchasers nor their affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

I.     The Debtors and the Purchaser, and applicable Third Party Purchasers proposed, negotiated and entered into the APA, without collusion, in good faith and at arms'-length bargaining positions.  Neither the Debtors, the Purchaser, nor the Third Party Purchasers have engaged in any conduct that would cause or permit the APA to be avoided under 11 U.S.C. § 363(n).

J.     The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

K.     The consideration the Purchaser gave the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value.

L.     The Debtors' sale of the Assets and the assumption and assignment of the Contracts and Leases will facilitate the formulation and confirmation of a plan of reorganization. For this reason, the sale of the Assets and the assumption and assignment of the Contracts and Leases constitute transfers to which 11 U.S.C. § 1146(c) applies.

M.     The Debtors' transfer of the Assets to the Purchaser or Third Party Purchaser, as applicable, pursuant to the APA will be a legal, valid, and effective transfer of the Assets. The Debtors' transfer of the Assets and the Contracts and Leases to the Purchaser or Third Party Purchaser, as applicable, indefeasibly vests the Purchaser or Third Party Purchaser, as applicable, with good and valid title in and to the Assets free and clear of any Claims (as

defined below) except the Permitted Encumbrances (as such terms are defined in the APA, and expressly includes all lease restrictions and the provisions of any reciprocal easements, operating agreements or similar agreements, which may impact the Contracts and Leases and to which the Debtors were bound under the terms of the Contracts and Leases) and the liabilities expressly assumed in the APA ("Assumed Liabilities"), if any, as defined in the APA. Any Claim that is not one of the Permitted Encumbrance or Assumed Liabilities, in or against the Debtors, their insiders, the Assets, or the Contracts and Leases will attach to the net proceeds of the sale with the same effect, validity, enforceability and priority of such Claims, if any, as such Claims had against the Assets or Contracts and Leases prior to the sale contemplated hereby, subject to any rights, claims, defenses and objections of the Debtors and all interested parties with respect to such Claims.

N.      The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the APA free and clear of all Claims (except the Permitted Encumbrances and the Assumed Liabilities) because any entity with any Claims in the Assets to be transferred (i) has consented to the sale (including the assumption and assignment of the Contracts and Leases) or is deemed to have consented to the sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claims; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. Holders of Claims, if any, who did not object, or who withdrew their objections to the Sale Motion are deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2).

O.      The Debtors will cause the proceeds from the sale to be paid in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d)

of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

P.     The Debtors' assumption and assignment of the Contracts and Leases in connection with the sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

Q.     The Debtors have provided the counter-party to the Contracts and Leases with adequate assurance that they will promptly cure any defaults under the Contracts and Leases pursuant to 11 U.S.C. §§ 365(b)(1).

R.     Unless the landlord of the Store and the Debtors are able to reach an agreement regarding the cure amount, the Court will determine the cure amount due and owing under the Contracts and Leases pursuant to 11 U.S.C. § 365 for the Store (the "Cure Amount"). The Debtors will pay the Cure Amount in accordance with the terms and provisions of the APA upon the later of the Closing Date and the entry of an Order of this Court establishing the Cure Amount. Upon payment of the Cure Amount, all defaults, if any, under the Contracts and Leases will be deemed cured.

S.     The Purchaser or Third Party Purchaser, as applicable, has provided the counter-party to each of the Contracts and Leases with adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B), by, among other

things, providing the landlord of the Store with a guaranty (the "Guaranty") executed by Eligio

Pena, and executing an amendment of the sublease described in Exhibit A-2 of the APA

incorporating, among other agreed terms, the terms of that certain letter dated July 21, 2005 from

the landlord of the Store, a copy of which is attached hereto as Exhibit C (the "Amendment"), on

or before the Closing Date.

   T. No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under

the Contracts and Leases.

   U. Except as expressly set forth in the APA, the Purchaser and any Third

Party Purchaser will have no responsibility for any liability, claim or other obligation of or

against the Debtors related to the Assets or the Contracts and Leases by virtue of the transfer of

the Assets and the assumption and assignment of the Contracts and Leases to the Purchaser.  The

Purchaser and applicable Third Party Purchaser will not be deemed, as a result of any action

taken in connection with the purchase of the Assets or the assumption and assignment of the

Contracts and Leases to (i) be a successor to the Debtors (other than with respect to the Assumed

Liabilities and any obligations arising under the assigned Contracts and Leases from and after the

Closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors.  Neither the

Purchaser nor any Third Party Purchaser is acquiring or assuming any liability, warranty, or

other obligation of the Debtors, except as expressly set forth in the APA or in any of the assigned

Contracts and Leases.

   V. A sale on the terms and conditions of the APA, including without

limitation, entry of an order providing a sale free and clear of Claims and providing that the

Purchaser and any applicable Third Party Purchaser are not successors of the Debtors, is

consistent with the Bankruptcy Code and promotes the policies of the Bankruptcy Code to

maximize value. Absent such finding, the Purchaser and/or Third Party Purchasers would be unwilling to pay the price for the Assets and Contracts and Leases as provided for in the APA.

W.      The Court's approval of the APA is in the best interests of the Debtors, their estates and their creditors.

X.      Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted.

2.      All objections to the entry of this order or to the relief granted and requested in the Motion, including any objection to the proposed Cure Amount, that has not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits, except that the Court reserves for future determination the Cure Amount for the Store.

3.      The APA is approved in all respects. Pursuant to 11 U.S.C. §§ 105(a) and 363(b), the Debtors are authorized and directed (subject to applicable Closing conditions set forth in the APA), to consummate the sale approved in this order, including transferring and conveying the Assets to the Purchaser or Third Party Purchaser, as applicable, pursuant to and in accordance with the terms and conditions of the APA.

4.      Upon Closing, the Debtors are authorized and directed, in accordance with 11 U.S.C. §§ 105(a), 363 and 365, to assume and assign the Contracts and Leases to Purchaser or Third Party Purchaser, as applicable.

5.      The Debtors have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2) by, among other things, providing the landlord of the Store with the Guaranty and the Amendment on or before the Closing Date.

-8-

6.     The Contracts and Leases will be assumed and assigned to the Purchaser or Third Party Purchaser, as applicable, in accordance with their respective terms, and as modified pursuant to the Amendment and this Order.  The assigned Contracts and Leases will remain in full force and effect notwithstanding any provision in any such Contracts and Leases to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1)) which prohibit, restrict or condition such assignment or transfer).  The DIP Lender and all non-debtor parties to the Leases are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the APA.

7.     Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized, directed and empowered to consummate and implement fully the APA, together with all additional instruments and documents that may be necessary to implement the APA.  The Debtors are authorized and directed to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Assets and the Contracts and Leases to Purchaser or, as applicable, a Third Party Purchaser.

8.     Any agreements, documents, or other instruments executed in connection with the APA may be modified, amended, or supplemented by the parties in accordance with the terms of the APA without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.     The Debtors will transfer the Assets to the Purchaser or applicable Third Party Purchaser upon Closing of the sale free and clear of all Claims pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances and Assumed Liabilities).  All

non-assumed Claims, if any, will attach to the proceeds of the sale, with the same validity, enforceability, priority, force and effect they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors and all interested parties with respect to such Claims and Interests.

10.    The Debtors will cause the proceeds from the sale to be paid in accordance with the terms of the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

11.    The Debtors' transfer of the Assets pursuant to the terms of the APA is a transfer pursuant to 11 U.S.C. § 1146(c). Accordingly, the making, delivery, filing or recording of any deeds, assignments or other transfer documents in connection with the sale (the "Transfer Instruments"), will not be taxed under any law imposing a recording tax, stamp tax, transfer tax or similar tax (including without limitation, any transfer or recordation tax applicable to deeds and/or security interests). All filing and recording officers are directed to accept for filing or recording, and to file or record the Transfer Instruments immediately upon presentation without payment of any such taxes.

12.    The Purchaser or applicable Third Party Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and applicable non-bankruptcy law. For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

13.    All defaults, claims or other obligations of the Debtors arising or accruing under each of the Contracts and Leases, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be cured by the Debtors in accordance with the APA, by paying the Cure Amount. No other or

further monetary amounts or obligations are due or existing under the Contracts and Leases by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise. Unless the landlord of the Store and the Debtors are able to reach an agreement regarding the Cure Amount, the Debtors will pay any Cure Amount as further ordered by the Court in regard to the Store.

14.    Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Contracts and Leases to the Purchaser or applicable Third Party Purchaser, (a) the Debtors and their estates are relieved from any and all liability for any breach of the Contracts and Leases occurring after assignment to the Purchaser or applicable Third Party Purchaser, and (b) the Purchaser or applicable Third Party Purchaser is responsible for any and all claims and obligations under the Contracts and Leases occurring or arising after the assignment and any other obligations expressly assumed in the APA. The Purchaser shall not be responsible for such Contracts and Leases assigned to a Third Party Purchaser, nor shall a Third Party Purchaser be responsible for such Contracts and Leases assigned to Purchaser or another Third Party Purchaser.

15.    Notwithstanding any contrary provision in the APA, Purchaser or Third Party Purchaser, as applicable, assumes all rights and obligations of the Debtors under the Contracts and Leases as such rights and obligations are modified only by the express terms of this Order.

16.    All non-Debtor parties to the Contracts and Leases are forever enjoined and estopped from contesting the Cure Amount and from asserting any default against the Purchaser or applicable Third Party Purchaser which existed as of the date of the Sale Hearing.

17.    Upon the Debtors assignment of the Contracts and Leases to the Purchaser or applicable Third Party Purchaser, no default will exist under the Contracts and Leases. Upon entry of this Order and the assumption and assignment of the Contracts and Leases, the

Purchaser or Third Party Purchaser, as applicable, is deemed to be in compliance with all terms and provisions of the Contracts and Leases.

18.    All entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors. Prior to or upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims in the Assets (except for the Permitted Encumbrances and Assumed Liabilities), if any. In the event any creditor fails to release its Claims in the Assets, the Debtors and the Purchaser are each authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other documents on such creditor's behalf. The Purchaser or applicable Third Party Purchaser is also authorized to file, register or otherwise record a certified copy of this Order. Once this Order is so filed, registered or otherwise recorded, the Order constitutes conclusive evidence of the release of all Claims against the Assets as of the Closing (except for the Assumed Liabilities).

19.    The Purchaser and Third Party Purchasers acted in good faith in purchasing the Assets and Contracts and Leases under APA as that term is used in 11 U.S.C § 363(m). For that reason, any reversal or modification of the Order on appeal will not affect the validity of the sale to the Purchaser or applicable Third Party Purchaser, unless such authorization is duly stayed pending such appeal.

20.    The Debtors' transfer of the Assets to Purchaser or applicable Third Party Purchaser and performance under the Contracts and Leases will not result in (a) the Purchaser having any liability for any Claim (except for the Permitted Encumbrances or Assumed Liabilities) against the Debtors or against an insider of the Debtors or (b) the Purchaser or

applicable Third Party Purchaser having any liability to the Debtors except as expressly stated in the APA and this Order.

21.    The Purchaser (and its affiliates, successors or assigns) and the Third Party Purchasers (and their respective affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets, including, the Contracts and Leases (other than the Permitted Encumbrances and the Assumed Liabilities as set forth in the APA).

22.    Except as to the Assumed Liabilities as more fully set forth in the APA, the transfer of the Assets to, and the assumption of the Contracts and Leases by, Purchaser or Third Party Purchaser, as applicable, on the Closing Date shall be free and clear of any and all liens, encumbrances, claims, charges, defenses, off-sets, recoupments and interests thereon and there against of whatever type or description, including, without limitation, restrictions on or conditions to transfer or assignment, liens, mortgages, security interests, pledges, hypothecations, control agreements, equities and other claims and interests (all such claims and interests described in this paragraph shall hereafter be referred to as the "Claim" or "Claims"), having arisen, existed or accrued prior to and through the Closing Date, whether direct or indirect, monetary or non-monetary, arising at law or in equity, contract or tort, absolute or contingent, matured or unmatured, voluntary or involuntary, liquidated or unliquidated, of, by or against Debtors, insiders of the Debtors, the Assets or the Contracts and Leases and further including, without limitation, the following:

    a.    Claims arising through the Closing Date (as defined in the APA), if any, of any governmental unit for taxes; any Claim arising through the Closing Date relating to any executory contract or lease (whether of personal or real property, or otherwise) affecting or in any way related to the Assets, without limitation, Claims of Debtors' vendors, suppliers and/or customers arising from Debtors' failure to perform its obligations to said parties whether such failure occurred

prior to or on the Closing Date or whether such failure arose as a result of a Purchaser's or Third Party Purchaser's election or before the Closing Date not to accept and/or perform such vendors', suppliers' or customers' account and/or orders subsequent to the Closing Date;

b.    Any Claim arising through the Closing Date relating to work performed by any contractor or materialman that would give rise to a mechanic's lien, or similar Claim, against the Assets;

c.    Any Claim arising through the Closing Date for attorney's fees or other costs or expenses claimed by lessors, lessees, licensees or any other non-debtor parties to executory contracts or any lease;

d.    Any Claim arising through the Closing Date based on acts or omissions of the Debtors arising in tort, contract or otherwise, including, without limitation, Claims for successor liability; and

e.    Any Claim arising through the Closing Date relating to liability arising under federal, state or local revenue, tax, products liability, labor, employment, worker compensation or environmental laws, rules or regulations or with respect to Debtor's liability as distributor or a retailer.

f.    Any claim by any person or entity relating to any health or welfare benefit for the benefit of any current or former employee of Debtors or their dependents or beneficiaries.

In addition, Purchaser and its affiliates, successors or assigns or their respective properties (including the Assets), and the Third Party Purchasers, as applicable, or their respective affiliates, successors or assigns or their respective properties (including the Assets) shall not be liable, by operation of law or otherwise, for any Claim by virtue of Purchaser's or Third Party Purchaser's purchase or subsequent operation of the Assets or performance of the Contracts and Leases including, without limitation, claims of the type set forth in subparagraphs (a)-(f) above.

23.    Neither the purchase of the Assets by Purchaser or applicable Third Party Purchaser, nor the subsequent operation of the Assets as a grocery store by Purchaser or applicable Third Party Purchaser shall cause Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), or the Third Party Purchasers, as applicable, or

-14-

their respective affiliates, successors or assigns or their respective properties (including the Assets) to be deemed a successor in any respect of the Debtors' business within the meaning of any laws, rules or regulations relating to any tax, revenue, pension, benefit, ERISA, environmental, labor, employment, products liability or other law, rule or regulation of any federal, state or local government.

24.     Upon closing, this Order constitutes a full and complete general assignment, conveyance and transfer of the Assets and the Contracts and Leases and/or a deed or a bill of sale transferring good and marketable title in the Assets to Purchaser or Third Party Purchasers as applicable on the Closing Date free and clear of all Claims except for Permitted Encumbrances and Assumed Liabilities.  Each and every federal, state, and local governmental agency or department is directed to accept this Order as such an assignment, deed and/or bill of sale or any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.  If necessary, this Order shall be accepted for recordation on or after the Closing Date as conclusive evidence of the free and clear, unencumbered transfer of title to the Assets to Purchaser or applicable Ultimate Purchaser.

25.     This Order is effective as a determination that any and all Claims (except for the Permitted Encumbrances and Assumed Liabilities), if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets and Contracts and Leases.

26.     This Order is binding upon all entities that may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Assets.

27.    This Court retains exclusive jurisdiction to (a) enforce and implement the APA and any other agreements and instruments executed in connection with the APA, (b) compel delivery of possession of the Assets to Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the APA, and (d) interpret, implement and enforce the provisions of this Order.

28.    The terms and provisions of the APA and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser and its respective affiliates, successors and assigns, the Third Party Purchasers, as applicable, and their respective affiliates, successors and assigns, any affected third parties; provided, however, that the landlord of the Store shall only be bound by the terms of the Order and the Contracts and Leases as such documents may be modified by the express terms of this Order notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

29.    All persons who hold Claims against the Debtors, insiders of the Debtors, or the Assets are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, any applicable Third Party Purchasers, and their respective affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the sale.

30.    After the Closing Date, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser, any of its affiliates, Third Party Purchasers, or any of their respective affiliates any tax (or other amount

alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Claims or (ii) for any period commencing before and concluding prior to or on the Closing Date or any pre-Closing portion of any period commencing before the Closing Date and concluding after the Closing, or (iii) assessed prior to and payable after the Closing Date, except as otherwise provided in the APA; provided, however, that the Purchaser or Third Party Purchaser shall be liable to the landlord of the Store under the Contracts and Leases for any accrued and unbilled taxes, and common area, utility and maintenance charges with respect to the Store which become payable under the provisions of the Contracts and Leases, to the extent provided in the APA. For purposes of this paragraph, any employee terminated as of the Closing Date will deemed to have been terminated prior to the Closing Date and any claims related to such termination, if any, are Claims against the Debtors and their respective estates. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the APA.

31.    The Debtors are authorized and directed to take such actions as are necessary and appropriate to terminate the employment by the Debtors of those employees affected by the sale.

32.    All amounts payable by the Debtors to the Purchaser or any Third Party Purchaser under the APA and/or this order shall be administrative expenses entitled to priority under § § 503(b) and 507(a)(1) of the Bankruptcy Code.

33.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the APA and this Order, the provisions contained in the Order will control.

-17-

34.     Notwithstanding Fed. R. Bankr. P. 6004(g) and 6006(d), this Order will take effect immediately upon entry.

35.     To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

36.     Debtors are directed to serve on or before the Closing Date a full and complete copy of this Order by First Class U.S. Mail upon all employees of any Store comprising the Assets. Debtors are further authorized and directed to post on or before the Closing Date a full and complete copy of this Order on any employee bulletin board or like display area where employee notices are regularly displayed in the Store comprising the Assets. Debtors shall and promptly file a written certification of compliance with this provision.

*SPECIAL NOTICE TO EMPLOYEES OF THE STORE SUBJECT TO THIS SALE*

Unless you have been notified by the Debtors otherwise, on the Closing Date your employment with the Debtors will be terminated. While it is the Debtors' belief that the Purchaser or Third Party Purchaser, as applicable, will extend offers of employment to a substantial number of the employees at each store, the Purchaser or Third Party Purchaser is under no obligation to do so. If you are subsequently hired by Purchaser or Third Party Purchaser, as applicable, your employment date will commence upon the Closing Date of the sale or on such other date as you and the Purchaser or Third Party Purchaser, as applicable, may agree. Pursuant to this Order, any claims you may have arising from or relating to your employment relationship through and including your termination are claims against the Debtors. The Purchaser or Third Party Purchaser, as applicable, is not a successor employer, and unless the Purchaser or Third Party Purchaser elects to hire you as of the Closing Date or thereafter, neither the Purchaser nor Third Party Purchaser shall be deemed to be your employer for purposes of any labor or employment law. Employees who are not hired by Purchaser or a Third Party Purchaser, as applicable, should contact the Debtors' Human Resources Department to obtain information regarding employee benefits, if any, including COBRA.

Dated this __10__ day of August, 2005 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to
serve a copy of this Order on all
parties who received copies of the
Motion.

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made effective as of _July 15,_ 2005 (the "Effective Date"), by and among

**WINN-DIXIE STORES, INC.,** a Florida corporation, **WINN-DIXIE RALEIGH, INC.,** a Florida corporation, and **WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation (each the "Seller" with respect to the Store or Stores owned by it as set forth herein), and

**ASSOCIATED WHOLESALE GROCERS, INC.,** a Kansas corporation ("**AWG**") and **ALEX LEE, INC.,** a North Carolina corporation ("**Alex Lee**"; Alex Lee and AWG are collectively referred to herein as "**Buyer**").

### R E C I T A L S :

**The following Recitals are a material part of this Agreement and are being relied upon by Buyer and Seller in connection with the transaction contemplated hereby:**

A.    Seller is the tenant of each of twenty-nine (29) supermarket stores (the "Stores"), each of which is listed on Exhibit A to this Agreement by Seller's designated Store number, under the respective leases, including amendments thereto (the "Leases") described on Exhibit A-1 to this Agreement. The Stores occupy the respective leased premises as described in each Lease (the "Leased Premises"), within the respective parcels of real property described on Exhibit A-2 to this Agreement associated with each Lease. Seller's leasehold interest in each Leased Premises pursuant to each Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "Assets."

B.    Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.    Until the Stores are sold, Seller intends to continue to own and/or operate such stores as retail grocery stores in the ordinary course of business.

D.    In entering into this Agreement, Buyer, as to the majority of Stores, is acting as a facilitator to establish a conduit mechanism for the sale of the Assets, including the sale of the Stores to one or more of Buyer's Affiliates or retail members or customers (each, an "Ultimate Purchaser"), all within the terms and conditions set forth herein.

E.    Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the

Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no. 05-03817-3F1 (the "Bankruptcy Case").

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0  **Defined Terms.**  Capitalized terms as used in this Agreement will have the following meanings when used herein.

1.1  "Adverse Environmental Conditions" will mean the presence of Hazardous Materials (as defined below) or conditions existing in, on, under or in the vicinity of any Store with respect to the air, soil, surface waters, ground waters or stream sediments that is reasonably likely to (i) pose a threat to human health or to the environment and/or is reasonably likely to require remedial action under applicable Environmental Laws other than as a result of actions (e.g., remodeling requiring the removal of asbestos) taken by Buyer or an Ultimate Purchaser after the Closing, or (ii) constitute a violation of any Environmental Laws.

1.2  "Adequate Assurance Information" will mean financial and other information as may be reasonably requested by Seller to demonstrate to the Bankruptcy Court that Landlords and Subtenants under the respective Assumed Leases are adequately assured of the applicable Buyer's or the respective Ultimate Purchaser's future performance under the Assumed Leases, as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's or the Ultimate Purchaser's obligations under the Leases and (where applicable) the Subleases by an Affiliate of such Buyer or Ultimate Purchaser, as applicable, with sufficient assets to provide adequate assurance of future performance.

1.3  "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.4  "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.5  "Allocation Schedule" will mean the allocation of the Base Purchase Price, Base Deposit and Inventory Deposit among the Stores as provided on Exhibit J to this Agreement.

2

1.6    "Approval Hearing" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.7    "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.8    "Assumed Contracts" will mean any agreements to which Seller or Winn-Dixie is a party that relate to a Store or Stores and not to any other stores operated by Winn-Dixie or Seller or any of their Affiliates and are assignable to Buyer and/or the Ultimate Purchaser and that Buyer or the Ultimate Purchaser elects to assume by written notice given prior to the end of the Investigation Period; provided, however, that neither Bankruptcy Court approval of nor completion of any such assignment prior to Closing shall be a condition to Closing.

1.9    "Assumed Leases" will mean those Leases identified on Exhibit A-3 attached hereto and incorporated herein by this reference.

1.10    "Bankruptcy Code" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

1.11    "Bankruptcy Court" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

1.12    "Bankruptcy Court Approval" will mean the entry of one or more Sale Orders with respect to the Stores by the Bankruptcy Court.

1.13    "Bankruptcy Case" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

1.14    "Base Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.15    "Base Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.16    "Bidding Procedures" will mean the procedures approved by the Bankruptcy Court that will govern the selection by Seller of the Successful Bid relating to a particular Store.

1.17    "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer, or Ultimate Purchaser, as applicable, at each Closing the Inventory, the Supplies, the Equipment and other tangible and intangible personal property constituting a portion of the Assets relating to the one or more Stores being transferred at such Closing.

3

1.18   "Buildings" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.19   "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.20   "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

1.21   "Buyer Inventory Representative" will mean such person or persons designated in writing by Buyer to act in such capacity.

1.22   "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title examination fees for the Title Reports (up to, but not exceeding, $500 per Store) and other title insurance fees and costs, including title insurance premiums for the Title Policies (and the cost of any simultaneous issue mortgagee title insurance policies and any loan-related title insurance endorsements thereon); (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instruments; (e) recording fees payable in connection with recording the Conveyance Instruments in the appropriate public records; (f) cost of the Environmental Reports, including any supplements or updates, up to (but not exceeding) $1,500 per Store; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment, Supplies and Inventory; (i) one-half of the fees and costs of the Closing Escrow Agent; and (j) one-half of the fees and costs of the Inventory Service.

1.23   "Buyer's Escrowed Items" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.24   "Closing" with respect to one or more Stores will mean the consummation of the assignment, assumption, sale and purchase of the Assets relating to such Store or Stores pursuant to this Agreement as indicated by delivery of the Conveyance Instruments and other documents contemplated by paragraph 14 of this Agreement and the Purchase Price as contemplated in this Agreement with respect to such Store or Stores, which will be deemed to occur at 12:01 a.m. on the Closing Date with respect to such Store or Stores.

1.25 "Closing Date" will mean the date as to a particular Store or Stores designated by Buyer in writing, and reasonably acceptable to Seller, that is between one day and 30 days following the Bankruptcy Court Approval with respect to such Store or Stores.

1.26 "Closing Statement" will mean a statement in the form of Exhibit C-1 to this Agreement (or in such other form as is prepared by Seller and reasonable acceptable to Buyer) reflecting the net amount due Seller at each Closing (other than in respect of the Inventory Price), after making the adjustments described in paragraph 3.3.3 of this Agreement and in other provisions of this Agreement.

1.27 "Confidentiality Agreement" will mean the existing letter agreement dated May 12, 2004, between Winn-Dixie and AWG, that letter agreement dated June 16, 2004 between Winn-Dixie and Alex Lee and that certain Addendum dated May 16, 2005 between Winn-Dixie and Buyer, regarding, among other things, confidentiality relating to the subject matter of this Agreement. Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.

1.28 "Contract Warranties" will have the meaning assigned in paragraph 22.1 of this Agreement.

1.29 "Conveyance Instrument" will have the meaning assigned in paragraph 14.2(i) of this Agreement.

1.30 "Credit Agreement Liens" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.31 "Cure Costs" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Assumed Leases and the Subleases.

1.32 "DEA" will have the meaning assigned in paragraph 8.16 of this Agreement.

1.33 "Default Stores" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.34 "Deposit" will have the meaning assigned in paragraph 3.3.2 of this Agreement.

1.35  "Due Diligence Materials will mean the items identified on Schedule 1 to this Agreement.

1.36  "Effective Date" will have the meaning assigned in the initial paragraph of this Agreement.

1.37  "Environmental Laws" will mean any federal, state or local laws, statutes, ordinances, regulations or policies relating to the environment, health and safety, any Hazardous Materials (including, without limitation, the use, handling, transportation, production, disposal, discharge or storage thereof) or to industrial hygiene or the environmental conditions applicable to the Assets, including, without limitation, soil, subsurface and ground water conditions.

1.38  "Environmental Report" will have the meaning assigned in paragraph 4.4 of this Agreement.

1.39  "Equipment" will mean (other than those that are Excluded Personal Property) all trade fixtures, equipment, Supplies, machinery, telephone and computer lines (including pharmacy lines), control devices, totes, Small Wares, supplies that are not included within the definition of Supplies, outdoor signage and sign faces, (other than Winn-Dixie trade signage), complete with all additions, accessories and attachments thereto owned or to be owned by Seller or Winn-Dixie on or before the Closing Date and/or located at the Leased Premises and, in any such case, utilized in connection with Seller's business at the Leased Premises. The foregoing will also include all (other than those that are Excluded Personal Property) fuel pumps and related equipment located on the Leased Premises and used by Seller or Winn-Dixie in the operation of any motor vehicle fuel operations.

1.40  "Escrow Agent" will mean Near North National Title LLC, acting as escrow and closing agent.

1.41  "Estoppel Certificate" will have the mean assigned in paragraph 8.3 of this Agreement.

1.42  "Excluded Fuel Operations" will mean all fuel Inventory, fuel pumps and related equipment relating to the Limited Asset Stores.

1.43  "Excluded Inventory" will mean those items of Inventory described on Exhibit F attached hereto and incorporated herein by this reference.

1.44  "Excluded Personal Property" will mean: (i) all Excluded Inventory, all Excluded Pharmacy Operations and all Excluded Fuel Operations; (ii) all packaging materials and supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of their

Affiliates; (iii) all leased point-of-sale equipment that remains subject to an equipment lease with IBM or other lessor that is not assumed by an Ultimate Purchaser or that is not subject to a new lease between Ultimate Purchaser and IBM or other lessor; (iv) all leased photo lab equipment; (v) all other leased equipment described on Exhibit G to this Agreement; (vi) all owned computer and related equipment related to the Stores that contains software subject to a license that restricts its transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed, each of which is scheduled on Exhibit G attached hereto and incorporated herein by this reference; (vii) all equipment and other personal property that is neither owned nor leased by Seller, including by way of example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners and equipment owned by product vendors; (viii) all branded shopping carts unless the branding can be and is effectively removed or covered by Buyer or the Ultimate Purchaser; (ix) all over-the-road motor vehicles; (x) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (xi) all data files other than Pharmacy Scrips; (xii) all lottery equipment and tickets; (xiii) all accounts receivable, bank accounts, cash and cash equivalents; (xiv) all trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates; (xv) all building signs and panels in all pole and pylon signs that advertise Seller's business in the Stores; (xvi) all intellectual property and rights (other than Pharmacy Scrips) relating to any of the foregoing; and (xvii) all service agreements, leases of personal property, contracts and warranties relating to Seller's possession and operation of the Stores that have not been assumed by Buyer or the Ultimate Purchaser. Notwithstanding the foregoing, photo kiosks owned by Seller shall not constitute Excluded Personal Property.

1.45    "Excluded Pharmacy Operations" will mean pharmacy Inventory and Pharmacy Scrips relating to the Limited Asset Stores.

1.46    "Files and Records" will mean, to the extent in Seller's possession (or otherwise within or under its control) and currently existing, (a) all real estate files, documents, instruments, papers, books and records of Seller or Winn-Dixie relating to the Stores, and (b) electronic files for each Store showing for each item of Inventory the item description, and UPC code and such other information as Buyer may reasonably request relating to such item of Inventory. Files and Records shall not include any materials that are (x) not related to the Stores or Assets, (y) related to Excluded Personal Property, or (z) protected by privilege, the work-product doctrine, or any other relevant immunity or protection.

7

1.47  "Hazardous Materials" will mean any hazardous or toxic substance, material or waste which is regulated by local authorities, state and/or the federal government, including, but not limited to, any hazardous material, substance or waste which is defined as (a) a "Hazardous Material" or an "Extremely Hazardous Material" under any applicable federal or state laws; (b) a hazardous substance under Section 311 of the Federal Water Pollution Control Act (33 U.S.C. Section 1317); (c) a hazardous waste under Section 1004 of the Federal Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et. seq.); (d) a hazardous waste substance under Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, (42 U.S.C. Section 9601 et. seq.); or (e) a hazardous or toxic waste, substance or material in any statute, regulation, rule or law enacted by the applicable state and/or the federal government. To the extent not otherwise included, phenolic foam shall be considered a Hazardous Material.

1.48  "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.49  "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.50  "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.51  "Initial Title Reports" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Stores that Seller has made available to Buyer for review on the Merrill Website or otherwise as of the Effective Date. Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.52  "Inventory" will mean all inventories of goods and merchandise located at or within the Stores and owned by Seller on the Inventory Count Date and held for resale in the ordinary course of business of Seller conducted at the Stores to retail customers, but excluding the Excluded Inventory.

1.53  "Inventory Certificate" will mean with respect to each Store a certificate executed by Buyer and Seller, and the Ultimate Purchaser, as applicable, in connection with the Closing as contemplated by paragraph 3.4.4 of this Agreement, in the form attached hereto as Exhibit H to this Agreement.

1.54  "Inventory Closing Statement" will mean a statement in the form of Exhibit C-2 to this Agreement reflecting the net amount due Seller at each Closing

in respect of the Inventory Price, after making the adjustments described in <u>Exhibit C-2</u> and in other provisions of this Agreement.

1.55    "<u>Inventory Count</u>" will have the meaning assigned in <u>paragraph 3.4.1</u> of this Agreement.

1.56    "<u>Inventory Count Date</u>" will mean, with respect to each Store, the day immediately preceding the Closing Date for such Store.

1.57    "<u>Inventory Deposit</u>" will have the meaning assigned in <u>paragraph 3.3.2</u> of this Agreement.

1.58    "<u>Inventory Price</u>" will mean the purchase price for the Inventory determined pursuant to <u>paragraph 3.4</u> of this Agreement.

1.59    "<u>Inventory Service</u>" will mean MSI Inventory Service Corporation or Accurate Inventory & Calculating Service, Inc., as designated by Seller, or such other inventory service as is selected by Seller and reasonably acceptable to Buyer.

1.60    "<u>Investigation Period</u>" will mean the period commencing on July 12, 2005 and ending at 6:00 p.m., Eastern Time on July 19, 2005.

1.61    "<u>Landlords</u>" will mean the lessors under the Leases.

1.62    "<u>Leased Premises</u>" will have the meaning assigned in <u>paragraph A</u> of the Recitals to this Agreement, and will include the elements thereof as described in <u>paragraph 2.1</u> of this Agreement.

1.63    "<u>Leases</u>" will have the meaning assigned in <u>paragraph A</u> of the Recitals to this Agreement.

1.64    "<u>Limited Asset Stores</u>" will mean Store Nos. 808, 825, 827, 880, 882, 903, 912, 918, 1049, 1297, 2003, 2008, 2045, 2063, 2083, 2093 and 2099.

1.65    "<u>Liquidated Deposit</u>" will have the meaning assigned in <u>paragraph 16.1</u> of this Agreement.

1.66    "<u>Material Adverse Effect</u>" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or any particular Buyer's or Ultimate Purchaser's ability to consummate the transactions contemplated herein, or on the continued operation of the Store or Stores for their current use, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not

9

disproportionately adversely affect the affected Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.67   "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Jaguar" with respect to the disposition of the Stores and other properties.

1.68   "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on any of Seller's leasehold interests or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets; and (D) judgments that have attached to and become a lien against Seller's interest under any of the Leases or on any other Assets.

1.69   "NCPDP" will mean the National Council of Prescription Drug Programs.

1.70   "Negotiation Period" will mean, as to each Store where there is to be no Assumed Lease, that period commencing on July 12, 2005 and ending at 11:59 p.m. E.D.T. on July 22, 2005.

1.71   "Objection Notice" will have the meaning assigned in paragraph 4.1.3 of this Agreement.

1.72   "Objection Response" will have the meaning assigned in paragraph 4.1.3 of this Agreement.

1.73   "ordinary course of business" means the ordinary course of business of Seller after the Filing Date.

1.74   "Outside Date" means August 15, 2005, as such date may be extended by the written agreement of Buyer.

1.75   "Permits" will mean all permits and licenses, including, without limitation, pharmacy, liquor, beer, fuel pump and similar licenses, required with

respect to the use, ownership, operation (including the sale at retail of pharmacy, liquor, beer, fuel and other items where a permit or license is required) or maintenance of any of the Stores or other Assets.

1.76   "Permitted Encumbrances" will mean (i) all matters listed on Exhibit E to this Agreement, (ii) all other matters set forth as exceptions in the Initial Title Reports made available as of the date hereof, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in any additional Title Reports, other than Monetary Liens.

1.77   "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.78   "Pharmacy Scrips" will mean all customer lists, prescription files, prescription registers, and operating and maintenance logs owned by Seller that relate to the pharmacy operated in any of the stores.

1.79   "Purchase Price" will mean collectively the Base Purchase Price and the Inventory Price.

1.80   "Real Property" will mean the Leased Premises and the Improvements together.

1.81   "Real Property Escrow Date" with respect to one or more Stores will mean the date that is one (1) Business Day prior to the Closing Date for such Store or Stores or such earlier date after the Bankruptcy Court Approval as Buyer and Seller may mutually designate.

1.82   "Sale Motion" will have the meaning assigned in paragraph 8.17 of this Agreement.

1.83   "Sale Order" will mean an order or orders of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, in each case with respect to one or more of the Stores.

1.84   "Seller" will have the meaning assigned in the initial paragraph of this Agreement. For purposes of this Agreement, (1) Winn-Dixie Stores, Inc. is the Seller with respect to Store # 10; (2) Winn-Dixie Raleigh, Inc. is the Seller with respect to Stores # 808, 825, 827, 880, 882, 884, 903, 912, 918, 1049, 1297, 2001, 2003, 2008, 2045, 2063, 2083, 2093, 2099, 2718; and (3) Winn-Dixie Montgomery, Inc. is the Seller with respect to Stores # 1301, 1314, 1362, 1413, 1471, 1547, 2622, and 2640.   Each Seller is

11

independently responsible for its own obligations under this Agreement, and neither Winn-Dixie Stores, Inc. nor any other Seller is guaranteeing or otherwise assuming any liability for the obligations to be performed by any other Seller.

1.85   "Seller Inventory Representative" will mean Michael Chlebovec or another person designated in writing by Michael Chlebovec or by Seller to act in such capacity.

1.86   "Seller's Brokers" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.87   "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) the title examination fees for the Title Reports to the extent in excess of $500 per Store; (c) the cost of the Environmental Reports to the extent in excess of $1,500 per Store; (d) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; (e) one-half of the fees and costs of the Closing Escrow Agent; (f) one-half of the fees and costs of the Inventory Service; and (g) the Cure Costs.

1.88   "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.89   "Seller's Knowledge" will mean the actual knowledge of each of Winn-Dixie's Corporate Environmental and Safety Manager and its Director of Maintenance and the lawyers in the real estate section of its legal department, together with Larry Appel, Senior Vice President and General Counsel in each case without any requirement of investigation or inquiry; provided, however, that nothing in this paragraph shall effect a waiver of any applicable privilege including but not limited to the attorney-client privilege and the attorney work product doctrine.

1.90   "Small Wares" will mean all small wares used in connection with the Stores, such as knives, sharpeners, pots and pans.

1.91   "Store Employees" will have the meaning assigned in paragraph 8.12 of this Agreement.

1.92   "Stores" will have the meaning assigned in paragraph A of the Recitals to this Agreement and, when followed by "#" and a number will refer to the particular Store with the indicated number listed on Exhibit A to this Agreement, including if applicable any associated gas station, liquor store, pharmacy or other specialty area operated by Seller at the Leased Premises.

1.93 "Sublease" will mean, with respect to each Store, each sublease of a portion of the Leased Premises listed on Exhibit A-2 to this Agreement (if any), including amendments. If no sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Sublease at such Store will be disregarded.

1.94 "Subtenant" will mean, with respect to each Store, the subtenant or sublessee under each Sublease. If no sublease is listed on Exhibit A-2 to this Agreement with respect to a Store, then each reference in this Agreement and the Conveyance Instrument to any Subtenant at such Store will be disregarded.

1.95 "Successful Bid" will mean, with respect to a particular Store, the highest or otherwise best offer to purchase the Assets relating to such Store, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.96 "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the preparation or merchandising of Inventory, located within the Stores and owned by Seller on the Inventory Count Date, excluding, however, any such packaging materials and supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of their Affiliates.

1.97 "Supplies Price" will mean as to any given Store where Buyer or an Ultimate Purchaser is purchasing Inventory, $2,500.

1.98 Surveys" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.99 "Terminated Stores" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.100 "Title Insurer" will mean such nationally recognized title insurance company, as mutually agreed upon by Seller and Buyer.

1.101 "Title Policies" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.102 "Title Reports" will mean, collectively, (i) the Initial Title Reports and (ii) any additional title reports and/or title insurance commitments with respect to the Stores that Seller has made available to Buyer for review on the Merrill Website or otherwise.

1.103 "Ultimate Purchaser" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

1.104 "Video Equipment" will have the meaning assigned in paragraph 3.4.3(c) of this Agreement.

1.105 "Violations" will mean all material violations or notices of material violations of law or governmental ordinances, orders or requirements that exist or are noted in or issued by any housing and building, fire, labor, health, air resources, environmental, highways or any other Federal, state, county or municipal department, agency, authority or bureau having jurisdiction as to conditions affecting any of the Assets.

1.106 "WARN" will mean the Worker Adjustment and Retraining Notification Act.

1.107 "Warranties and Guaranties" will mean all assignable third party warranties, guaranties or similar rights owned by Seller or Winn-Dixie or inuring to Seller's or Winn-Dixie's benefit in connection with, and only to the extent of, the Assets.

1.108 "Winn-Dixie" will mean Winn-Dixie Stores, Inc.

2.0 **Property Included in Sale.** Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets, which—excluding Excluded Personal Property—are comprised of the following:

2.1 Seller's interest, as tenant, under the Leases and Seller's interest in any leasehold improvements;

2.2 Seller's interest in all fixtures and all equipment located in the store buildings now existing on the Leased Premises (the "Buildings"), including but not limited to Seller's interest in (i) heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "Improvements"), and (ii) the Equipment;

2.3 The Inventory;

2.4 With respect to each Store other than Limited Asset Stores that includes a pharmacy, the Pharmacy Scrips (provided Buyer, except as otherwise provided herein, has obtained all Permits necessary for Seller to lawfully convey the Pharmacy Scrips to Buyer at Closing) and, to the extent transferable, ownership and control of pharmacy phone lines;

2.5 Seller's interest in the Subleases (if any);

14

2.6    Any assignable Permits;

2.7    The Warranties and Guaranties;

2.8    The Assumed Contracts; and

2.9    The Files and Records.

2.10   Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are (a) subject to higher or otherwise better offers for the Assets, and (b) conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement. Each Seller agrees and acknowledges that (i) this Agreement is a block bid by the Buyer for the Assets related to the Stores, and is to be considered as a whole, and (ii) Seller shall not be permitted to terminate this Agreement with respect to any particular Store or Stores, or with respect to any particular Buyer, except as specifically permitted in paragraphs 15.1(a)(i), 15.1(a)(ii), 15.1(a)(v), 15.1(a)(vi), 15.1(a)(viii) and 15.1(a)(ix) herein. If Seller selected this Agreement as the "Initial Bid" as defined in the Bidding Procedures, Seller may consider competing bids in accordance with the Bidding Procedures; provided, however, any such competing bid must exceed the Base Purchase Price for all Stores as set forth in this Agreement by at least five percent (5%). If this Agreement is terminated with respect to the Stores because this Agreement is not the Successful Bid with respect to the Stores, Buyer shall be entitled to a termination fee of three percent (3%) of the cash portion of the Base Purchase Price, which fee shall be payable from the proceeds Seller receives after the closing of the sale of the Store pursuant to a Successful Bid or Bids to any Person that is not Buyer; provided, however, that Buyer shall not be entitled to receive any termination fee (y) if Buyer is in default of this Agreement at the time of termination of this Agreement, or (z) if, at the time Seller selects another offer that does not have open contingencies relating to due diligence or landlord negotiations as the Successful Bid as to a particular Store, either the Investigation Period or Negotiation Period remains open as to such Store (unless Buyer either irrevocably waives its rights to terminate this Agreement as to such Store pursuant to paragraphs 4.1.3 and 4.1.4 or elects to terminate this Agreement as to such Store, in either case prior to the selection of such other offer as the Successful Bid).

3.0    **Purchase Price.**

3.1    <u>Amount</u>.  The purchase price to be paid by Buyer to Seller for the Assets (other than the Inventory and Supplies) is $4,037,236 the aggregate (the "<u>Base Purchase Price</u>"), which will be allocated to each Store as set forth on the Allocation Schedule.  The purchase price to be paid by Buyer to Seller for the Inventory in respect of each Store is the total of the Inventory Price for each item of Inventory.  If this Agreement is terminated in accordance with its terms as to one or more, but not all, of the Stores, then (i) the aggregate Base Purchase Price will be adjusted based on the Allocation Schedule as to the Stores that remain subject to the continuing force and effect of this Agreement and the term "Stores" shall be deemed amended to reflect such termination; and (ii) the terms "Inventory", "Supplies" and "Subleases" will be deemed to exclude, respectively, all Inventory, Supplies and Subleases of the Stores with respect to which this Agreement is terminated.

3.2    <u>Contract Consideration and Base Deposit</u>.  As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer shall deliver to Escrow Agent, no later than two (2) Business Days Seller's execution and acceptance of this Agreement, a base earnest money deposit with respect to each Store in the amount set forth in the Allocation Schedule (the "<u>Base Deposit</u>").  Buyer shall make the Base Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Base Deposit will be subject to refund to Buyer to the extent and in the circumstances described in <u>paragraphs 12, 15 and 16</u>.  The applicable portion of the Base Deposit will be credited against the Base Purchase Price at the relevant Closing and will be held in an interest bearing escrow account maintained by Escrow Agent prior to the relevant Closing.  Whenever used herein, the term Base Deposit also will be deemed to include all interest accrued thereon if the escrow account maintained by Escrow Agent is an interest bearing account; however, for state and federal income tax purposes, interest, if any, accrued on the Base Deposit will be deemed earned by Buyer or the Ultimate Purchaser.

3.3  <u>Payment</u>.  The Purchase Price will be paid in the following manner:

3.3.1  <u>*Base Purchase Price and Supplies Price*</u>.  On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Base Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the relevant Closing Statement), and the Supplies Price with respect to such Store or Stores.  On the Closing Date for such Store or Stores, Buyer will, subject to the conditions set forth in paragraph 10 of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted)

and the Supplies Price with respect to such Store of Stores to Seller (by wire transfer to an account designated in writing by Seller).

3.3.2   *Inventory Deposit and Inventory Price*.   On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) an inventory deposit with respect to the applicable Store or Stores in the amount set forth in the Allocation Schedule eighty percent (80%) of the estimated Inventory Purchase Price (the "Inventory Deposit") with respect to such Store or Stores. The Inventory Price for each Store shall be determined in the manner set forth in paragraph 3.4 of this Agreement. Within forty-eight (48) hours after the Inventory Count Date for one or more given Stores, (a) Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the amount by which the Inventory Price for such Store or Stores exceeds the Inventory Deposit for such Store or Stores, and (b) Buyer will instruct Escrow Agent to transfer and deliver such amount with respect to such Store or Stores to Seller, by wire transfer to an account designated in writing by Seller. If the aggregate Inventory Deposit for all Stores having the same Closing Date exceeds the aggregate Inventory Price for such Stores, then Seller shall immediately provide written instructions to Escrow Agent to deliver the excess to Buyer within forty-eight (48) hours after the Inventory Count Date. The Base Deposit and, once deposited, the Inventory Deposit with respect to each Store will individually and collectively sometimes be referred to in this Agreement as the "Deposit". The provisions of this paragraph 3.3.2 which apply to the period after the Closing for any Store shall survive the Closing for such Store. Any assignment by Buyer to any Ultimate Purchaser of any rights hereunder shall not relieve Buyer of its obligations contemplated in this Section 3.3.2 to pay to Escrow Agent the amount by which the Inventory Price for any given Store exceeds the applicable Inventory Deposit for such Store.

3.3.3   *Proration of Certain Transaction Costs*.   All relevant rent, taxes (including real and personal property taxes), utilities (including the pharmacy phone line, where applicable) and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding each Closing Date and will be a credit or debit, as the case may be, against the Base Price and Supplies Price payable at such Closing to the extent thereof and then against the Inventory Price. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment

17

of such taxes to the appropriate taxing authorities or Landlord, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.3.3 which apply to the period after the Closing for any Store shall survive the Closing for such store.

3.3.4 *Sales Tax*. Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. On Seller's request, Buyer agrees to provide Seller with a certificate stating that Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Seller or any governmental authority to document that sale of the Inventory is exempt from sales tax. This paragraph 3.3.4 shall survive the Closing for each store.

3.4 Inventory.

3.4.1 *Count of Store Inventory.* With respect to each Store where Buyer or Ultimate Purchaser is purchasing Inventory, Seller shall close each Store at a time designated by Seller between 5:00 p.m. and 11:00 p.m. on the Inventory Count Date, unless otherwise agreed to by Seller and Buyer. As soon as possible after the closing of each such Store, the parties will conduct a physical count (or measurement with respect to gasoline and other vehicle fuels) of the Inventory at each of such Stores (the "Inventory Count") with the assistance of the Inventory Service. Seller and Buyer, or the Ultimate Purchaser, as applicable, will each have representatives present at each Store during the Inventory Count who will acknowledge in writing all computations before leaving the Store. Upon completion of such Inventory Count, except for mathematical errors, other agreed upon changes and disputes regarding Excluded Inventory, the count of the Inventory Service shall be final and binding on the parties for all purposes of this Agreement.

3.4.2 *Pharmacy Inventory.* With respect to each Store which is not a Limited Asset Store that includes a pharmacy, pharmaceutical Inventory will be inventoried by item as follows and the inventory forms for such Inventory will be signed by registered pharmacists

18

representing Seller, Buyer and the Ultimate Purchaser, as applicable:

(a)     Schedule II drugs will be inventoried as exact counts and transferred on DEA 222 form supplied to Buyer by Seller and approved by Buyer or the Ultimate Purchaser, as applicable; and

(b)     Will-call prescriptions filled but not purchased by customers at the time of the Inventory Count will be returned for credit and included in the Inventory Count.

3.4.3   *Valuation of Inventory.* The Inventory will be valued by applying the following methods to the count reported by the Inventory Service:

(a)     with respect to pharmaceutical Inventory and gasoline the value used will be Seller's actual cost as reflected on its records kept in the ordinary and customary course of business (for gasoline, cost shall be last acquisition cost), and

(b)     with respect to all other Inventory the value used will be determined by taking Seller's standard retail shelf price (after adjusting to remove temporary or special price reductions, promotions or discounts, coupon discounts or customer loyalty card discounts) for the applicable item and multiplying such price by the valuation percentage for each merchandise category indicated in the table below:

| | Category | Valuation Percentage |
|---|---|---|
| 1. | Grocery (food and non-food) | 70% |
| 2. | Dairy | 60% |
| 3. | Frozen Food | 60% |
| 4. | Tobacco | 80% |
| 5. | Alcohol | 80% |
| 6. | Meat | 55% |
| 7. | Produce | 50% |
| 8. | Seafood | 50% |
| 9. | Floral | 40% |
| 10. | Health and Beauty Care | 50% |
| 11. | General Merchandise | 40% |
| 12. | Greeting Cards | 25% |
| 13. | Deli | 45% |
| 14. | Bakery | 35% |

19

(c)     the amount to be paid by Buyer or an Ultimate Purchaser for all video tapes in the Stores, if any, will be mutually agreed upon by the parties on or before the Closing Date. In the event that the parties cannot agree upon such amount prior to the Closing Date (i) the video tapes shall be Excluded Personal Property for all purposes of this Agreement and shall be removed from the Stores and (ii) Seller may, at its option, designate as Excluded Personal Property all display racks and equipment utilized in connection with video sales and rentals in the Stores, including computers, software, computer peripherals and data bases, but excluding sales counters and other fixtures attached to the permanent improvements (collectively, "Video Equipment"). Upon any such designation, such Video Equipment shall be treated as Excluded Personal Property for all purposes of this Agreement and shall be removed from the Stores.

3.4.4    *Inventory Certificates; Inventory Closing Statement.* Upon completion of the valuation of the Inventory for each Store, which shall be completed prior to the completion of Closing, the Buyer, Seller and the Ultimate Purchaser, as applicable shall execute an Inventory Certificate, which shall contain the Inventory Price for the Inventory at such Store, and shall have incorporated therein a complete listing of the Inventory for such Store. Following execution of the Inventory Certificates, if requested by Buyer, Seller, Escrow Agent, or Ultimate purchaser, as applicable, Ultimate Purchaser or Buyer and Seller shall execute an Inventory Closing Statement, which shall contain the Inventory Price for the Inventory at such Store and shall otherwise be consistent with the Inventory Certificate, and shall have incorporated therein appropriate disbursement instructions to Escrow Agent.

3.4.5    *Cooperation and Resolution of Disputes.* The parties agree to be cooperative and reasonable in connection with each Inventory Count and will attempt, in good faith, to resolve any disputes respecting the quantity of Inventory, Excluded Inventory and Excluded Personal Property that may arise during the Inventory Count. Any disputes that have not been resolved by the completion of Closing shall be separately listed and settled by Buyer Inventory Representative and Seller Inventory Representative with respect to the relevant Store as expeditiously as practicable thereafter or, if the parties cannot agree, by the Bankruptcy Court. Any such determination of any dispute shall be final and binding on the parties.

3.4.6 *Inventory Services and Fees*.   Seller will engage the Inventory Service, but the fees of the Inventory Service will be billed to and paid by Buyer with appropriate credits given to Buyer on the Closing Statement.  Buyer agrees to pay such fees at Closing or earlier if then due and in any event before delinquent.

3.5     Intentionally Omitted.

3.6     Inventory Relating to Permits.  If by Closing, Buyer or Ultimate Purchaser, as applicable, shall not have obtained any required Permit contemplated by paragraph 9.2 of this Agreement, notwithstanding its commercially reasonable best efforts to do so, any tobacco, liquor, beer, wine, pharmaceuticals or other Inventory that under applicable law may not be transferred without such Permit will not be sold and transferred at Closing but will be segregated at the Store, in which case, unless the parties agree otherwise at or before Closing, (a) the relevant items of Inventory will be deemed to constitute Excluded Inventory, (b) the Bill of Sale to be delivered to Buyer at Closing will specifically exclude such Inventory, (c) the Inventory Price will be reduced by the Inventory Price allocable to such Inventory, and (d) Seller will remove such Inventory from the applicable Store in the same manner as other Excluded Property and with reasonable promptness after Closing.   Notwithstanding the foregoing clause (d), if applicable law or regulation restricts Seller from removing from the Store (or transporting from the Store to a convenient location in which Seller will have continuing operations) any tobacco, liquor, beer, wine, pharmaceuticals or other Inventory that constitutes Excluded Property, then (i) Seller will have the right to segregate such Inventory at a secured location in the Store selected by Seller and reasonably acceptable to Buyer, and to maintain and protect such Inventory at such secured location for so long as Seller reasonably requires in order to obtain all Permits necessary to remove or transport such Inventory (or to sell or convey such Inventory to a third party entitled to do so), (ii) Seller will have reasonable access to such secured location to maintain and protect such Inventory and when appropriate remove such Inventory from the Store, and (iii) Seller will have the right but not the obligation to require Buyer to purchase such Inventory provided such Inventory is not at such time Excluded Inventory, at the Inventory Price allocable to such Inventory, at such time as Buyer has obtained such Permits as are required for Seller to do so.

3.7     Allocation of Base Purchase Price Among Assets at each Store.  Seller and Buyer shall each have the right to allocate the Base Purchase Price for each Store, for their respective tax purposes and all other purposes, among the Assets at such Store in such manner as each shall determine without any necessity that any allocation made by one party be the same as the allocation made by the other party.

4.0 **Buyer's Due Diligence.**

4.1 Acknowledgment. Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to acquire such additional information about the Stores and the Assets as contemplated by this Agreement. Buyer agrees that any physical access to or investigation of the Stores by Buyer or its representatives shall be limited by and shall comply in all respects with the terms of this Agreement.

4.1.1 Investigation Period. As soon as reasonably possible after the Effective Date and to the extent not previously provided by Seller, Seller will make available the Due Diligence Material. During the Investigation Period, (a) Buyer shall have the privilege at all reasonable times, and after giving Seller advance written or telephonic notice, of going upon any of the Real Property with its agents and engineers as needed to (i) investigate and inspect the Assets with respect to each Store, which investigation and inspection shall include, but not be limited to, taking photographs of, and collecting data on, the Real Property, the Assets and the Stores, and contacting and having confidential discussions with any officers, directors or employees of Seller or Winn-Dixie regarding the business, operation, prospects or finances of any Store, and (ii) conduct a Phase I environmental assessment with respect thereto, to determine whether or not the same are in acceptable physical condition as determined by Buyer in its reasonable discretion as specified in paragraph 4.1.3 below, and to conduct a physical inventory of the Equipment located at each Store; and (b) Seller shall use commercially reasonable efforts to provide information (without representation or warranty as to its accuracy or completeness) reasonably requested by Buyer that is reasonably related to the physical condition of the Assets and Stores; provided, however, that, in connection therewith, Seller shall not be required to provide any written or electronic information or materials relating to the Assets other than those expressly required or contemplated pursuant to the foregoing provisions in this paragraph 4.1.1 or any other terms of this Agreement (and in no event shall Seller be required to provide any books and records, sales records, trade secrets, and other proprietary information or materials that are proprietary in nature or any information or materials that are protected by any privilege, immunity, work-product doctrine or other such protection). Should Seller fail to timely deliver the Due Diligence Material as to any Store or Stores to afford Buyer and a reasonably adequate period of time to review same, Buyer, at its option, may extend the Investigation Period as to such Store or Stores until such time as Buyer receives all such items and has had

22

a reasonably adequate period of time to review same (in no event shall any reasonably adequate period be less than two (2) Business Days nor more than six (6) Business Days). Buyer and Ultimate Purchaser shall not conduct (or cause to be conducted) any physically intrusive investigation, examination or study of the Real Property without obtaining the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed.

4.1.2 <u>Inspection</u>. The rights provided to Buyer in <u>paragraph 4.1.1</u> **SHALL IN NO WAY ABROGATE BUYER'S OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT**. Buyer hereby indemnifies and agrees to hold harmless Seller from and against any and all damage to the Real Property (including the cost of restoring the Real Property to its pre-entry condition) and injury to any persons caused by Buyer or its agents in the course of exercising Buyer's due diligence rights under this Agreement. Notwithstanding the preceding sentence, Buyer and Ultimate Purchaser will have no obligation to indemnify or hold Seller or Winn-Dixie harmless from those claims, demands, liabilities, costs, expenses, penalties, damages and losses arising out of or relating to: (a) the negligence or willful misconduct of Seller or Winn-Dixie or any of their Affiliates, subtenants, licensees, employees, agents, officers, or directors, (b) a pre-existing condition of any of the Assets; or (c) the existence of information obtained by Buyer and Ultimate Purchaser as a result of their investigation. Such indemnification will survive the expiration or termination of this Agreement and/or the consummation of the transactions contemplated by this Agreement. Notwithstanding anything in this Agreement to the contrary, Buyer shall not conduct (or cause to be conducted) any physically intrusive investigation, examination or study of the Real Property without obtaining the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed.

4.1.3 <u>Termination</u>. If Buyer reasonably and in good faith determines that (a) the physical condition of the Assets or any Store or Stores is subject to a material defect in any of the Buildings or Improvements that could reasonably be expected to, individually or in the aggregate, have a material adverse effect on Buyer's or Ultimate Purchaser's ability to operate such Store or Stores, (b) as a result of the physical condition of the Assets or any Store or Stores, the Buildings, Improvements or Leased Premises fail to comply with applicable law for use by Buyer or Ultimate Purchaser as a retail grocery store, and could not be made to comply without significant material expenditures by Buyer or Ultimate Purchaser to modify or repair such affected Buildings, Improvements or Leased Premises, (c) there exists any environmental matter or condition that,

individually or in the aggregate with other environmental matters or conditions, could (i) interfere in a material and adverse way with the present use or occupancy of any Store or Stores, (ii) expose Buyer or Ultimate Purchaser or its customers, employees or suppliers to a risk of physical harm, or (iii) expose Buyer or Ultimate Purchaser to significant regulatory or financial risk, (d) as a result of the Equipment, as to any given Store, not being materially sufficient to operate a grocery store at the given location, (e) as a result of any roof requiring repair in excess of $10,000 for which Seller has not agreed to repair prior to Closing (any item specified in (a), (b), (c), (d), or (e) above being a "Material Physical Defect") or (f) that material Due Diligence Material exists for any Store or Store and the same has not been made available to Buyer, then Buyer may terminate this Agreement as to any such affected Store or Stores by notice to Seller (given by email to TTucker@kslaw.com with copy to Catherinelbold@winn-dixie.com) before the end of the Investigation Period, which notice, to be effective, shall specify the affected Store or Stores and specify with particularity the Material Physical Defect or the Due Diligence Material not provided (as applicable).   Any right of Buyer to terminate this Agreement pursuant to this paragraph 4.1.3 as to any Store or Store on account of any Material Physical Defect or failure to provide Due Diligence Materials shall be deemed waived if Buyer does not so terminate this Agreement as provided above before the end of the Investigation Period.

4.1.4   Except to the extent previously provided, within twenty-four (24) hours after full execution of this Agreement, Seller shall provide Buyer with the current listing of contact information for the Landlords (and leasing agents, if applicable) in Seller's possession. During the Negotiation Period, representatives of Buyer or Ultimate Purchaser shall be allowed to contact and have discussions with the Landlord(s) for the Store or Stores not identified on Exhibit A-3, to attempt to obtain from such Landlord(s) lease concessions as required by such Buyer or Ultimate Purchaser in the categories set forth on Exhibit A-4 (the "Lease Concessions"). The parties agree that Exhibit A-4 has been appended to the executed copy of this Agreement but shall not be filed with the Court. Buyer and Ultimate Purchaser shall make reasonable efforts to contact the applicable Landlord(s) and, if such Landlord(s) engage in discussions with such Buyer or Ultimate Purchaser, Buyer or Ultimate Purchaser, as applicable, shall make reasonable efforts to negotiate with the Landlord(s) in good faith and shall use commercially reasonable diligent efforts to obtain the Lease Concessions. Buyer shall give Seller reasonable notice of any discussions with any Landlord and shall provide Seller with copies of all correspondence between such

Buyer or Ultimate Purchaser, as applicable, and each Landlord and all such discussions shall be subject to the terms of the Confidentiality Agreements. If at the end of the Negotiation Period, a Buyer or Ultimate Purchaser, as applicable, has not received from a Landlord assurance satisfactory to such Buyer or Ultimate Purchaser, as applicable, that such Landlord will grant to such Buyer or Ultimate Purchaser, as applicable, the Leas Concessions upon Closing, then Buyer may terminate this Agreement as to any Store with respect to which the Lease concessions were not granted by providing notice to Seller (given by facsimile to Timothy N. Tucker at 404-572-5100 and by email to TTucker@kslaw.com with copy to Catherinelbold@winn-dixie.com) before the end of the Negotiation Period, which notice, to be effective, shall specify the category(ies) of Lease concessions that were not granted. Failure or delay on the part of any Landlord(s) to timely or satisfactorily respond to Buyer's efforts to contact or negotiate with such Landlord(s) shall not impact Buyer's right to terminate this Agreement as to the applicable Store pursuant to this <u>paragraph 4.1.4</u>. Any right of Buyer to terminate this Agreement pursuant to this <u>paragraph 4.1.4</u> shall be deemed waived if buyer does not timely terminate this Agreement as provided above before the end of the Negotiation Period. If this Agreement is terminated in accordance with this <u>paragraph 4.1.4</u> as to one or more, but not all, of the Stores, then (i) the aggregate Base Purchase Price will be reduced based on the Allocation Schedule for each Store as to which this Agreement is so terminated and such reduced Base Purchase Price shall apply to the Stores that remain subject to the continuing force and effect of this Agreement; and (ii) the terms "Inventory", "Supplies" and "Subleases" will be deemed to exclude, respectively, all Inventory, Supplies and Subleases of the Stores with respect to which this Agreement is terminated. Except as specifically set forth in the foregoing sentence, such termination shall not modify or affect this Agreement in any way as to the Stores where notice of termination has not been timely given in accordance with this <u>paragraph 4.1.4</u>. Upon termination of this Agreement with respect to any Store or Stores pursuant to this <u>paragraph 4.1.4</u>, Seller shall immediately instruct the Escrow Agent to return the applicable Base Deposit to the Buyer within two (2) Business Days after expiration of the Negotiation Period.

4.2   <u>Title</u>. Buyer confirms and acknowledges that Seller has made the Initial Title Reports available to Buyer, and intends to make additional Title Reports available to Buyer, and Buyer may negotiate with the Title Insurer to obtain title insurance policies with respect to the Stores (the "<u>Title Policies</u>") at Closing. If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material

and adverse way with the present use or occupancy of the affected Store, Buyer may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to Catherinelbold@winn-dixie.com within five (5) Business Days of the date such additional Title Report is either delivered to Buyer or posted on the Merrill Website. To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #____" with the appropriate Store number set forth). If Buyer timely notifies Seller of any valid objection to any such matter set forth in any additional Title Report with respect to any Store, and if Seller declines or is unable to cure any such objection, then Buyer will have the right to terminate this Agreement with respect to such Store on the earlier of (x) two (2) Business Days following Buyer's receipt of notice from Seller that it will not cure such objection or (y) the Closing Date. If Buyer fails to so terminate this Agreement as to such Store, then Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter and such matter shall constitute a Permitted Encumbrance.

4.3     Surveys. Seller represents that Seller will make available to Buyer for review, copies of all surveys in the possession of (or within or under the control of) Seller, Winn-Dixie or any Affiliate thereof relating to any of the Stores (the "Surveys").

4.4     Environmental Reports. Seller represents that it has made, or will make, available to Buyer for review on the Merrill Website a separate environmental report (each, an "Environmental Report"), covering the Real Property relating to each Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where such Store is located.

4.5     Effect of Termination. In the event of any termination of this Agreement under paragraph 4.1.3 of this Agreement, none of the parties thereafter will have any further rights or obligations hereunder as to the terminated Store or Stores except with respect to the indemnifications given by Buyer to Seller as provided herein and except that Buyer will be entitled to the return from the Escrow Agent the portion of the Deposit allocated to such Store or Stores and a reduction of the Purchase Price as set forth in paragraph 3.1; provided, however, that this Agreement will be a continuing obligation of the parties as to the Stores not affected by such termination.

5.0     **Representations and Warranties of Seller Relating to the Assets.** In addition to any representations and warranties contained elsewhere in this Agreement, Seller hereby makes the following representations and warranties (subject, however, to any exceptions noted on Exhibit M attached hereto and incorporated herein by this reference, which Exhibit will specifically refer to the applicable

representation for each item listed) to and for the benefit of Buyer and the Ultimate Purchaser and their respective successors and assigns, in connection with the Assets, each of which warranties and representations (a) is being relied upon by Buyer and the Ultimate Purchaser, and (b) is true in all respects as of the date hereof (or such other date as may be indicated).

5.1    <u>Leases and Sublease Agreements</u>.  On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website: (i) copies of each of the Leases (including amendments with respect thereto) and Subleases as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a)    copies of the site plans for the Stores;

(b)    copies of the fixture plans for the Stores; and

(c)    a list of Equipment (other than Excluded Personal Property) with respect to each Store as reflected in Seller's current records;

it being understood that the materials described in this <u>paragraph 5.1</u> have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

5.2    <u>Ownership</u>.  At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all liens, claims and encumbrances other than the Permitted Encumbrances to the extent provided under Section 363 of the Bankruptcy Code.

5.3    **[intentionally omitted]**

5.4    **[intentionally omitted]**

5.5    <u>Lease Defaults</u>.  Except for proceedings pending in the Bankruptcy Court in the Bankruptcy Case, there is no action, suit or proceeding pending between Seller and any Landlord with respect to any Lease or between Seller and any sublessee with respect to any Sublease. In addition, other than defaults that may have arisen on account of the commencement of the Bankruptcy Cases, to Seller's Knowledge there is not any material default on the part of any party to the Leases or Sublease or any event that with notice or lapse of time would constitute such a default.

5.6    **[intentionally omitted]**

5.7    **[intentionally omitted]**

5.8 <u>Warranties and Guaranties</u>. To Seller's Knowledge, <u>Exhibit N</u> attached hereto and incorporated herein by this reference includes a true and correct summary of all Warranties and Guaranties concerning roofs of the Real Property.

5.9 <u>Taxes</u>. To Seller's Knowledge, all sales, excise, payroll, personal property, license, transaction, privilege, rental and real property taxes arising after the Filing Date due and payable in connection with Seller's or Winn-Dixie's ownership or operation of the Assets prior to the Closing have been, or at the Closing will be paid in the ordinary course of business, except to the extent escrowed by consent of Seller and Buyer.

5.10 <u>Insurance</u>. To Seller's Knowledge, Seller has not received any notice or request from any insurance company or Board of Fire Underwriters or governmental agency, department, bureau or other entity requiring or demanding the performance of any work or alteration with respect to the Assets. To Seller's Knowledge, the Assets are insured by Seller or for Seller's benefit, and will be so insured until possession is given to Buyer or the Ultimate Purchaser, in amounts and against risks deemed adequate by Seller, subject to any deductibles and/or levels of self-insurance consistent with the ordinary course of business of Seller and Winn-Dixie.

6.0 **General Representations and Warranties of Seller.** In addition to any representations and warranties contained elsewhere in this Agreement, Seller hereby makes the following representations and warranties (subject, however, to any exceptions noted on <u>Exhibit M</u> attached hereto and incorporated herein by this reference, which Exhibit will specifically refer to the applicable representation for each item listed) to and for the benefit of Buyer and the Ultimate Purchaser and their respective successors and assigns, each of which warranties and representations (a) is being relied upon by Buyer and the Ultimate Purchaser, and (b) is true in all material respects as of the date hereof (or such other date as may be indicated).

6.1 <u>Organization and Authority</u>. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

6.2 <u>Consents</u>. To Seller's Knowledge, no consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or

other action by, any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, (iii) those contemplated by or required under paragraph 3.6 of this Agreement and (iv) Bankruptcy Court Approval.

6.3    Labor Relations.  None of the employees employed by Seller in the Stores is covered by a union contract, collective bargaining agreement or other labor agreement.

6.4    Brokers.  Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

6.5    Employees.  To Seller's Knowledge, other than those proceedings, if any, that may be pending before the Bankruptcy Court in the Bankruptcy Case, there is no material litigation, grievance, proceeding, investigation, labor strike, labor dispute, or work slowdown, pending or threatened against Seller or Winn-Dixie regarding compensation, unfair labor practices, employment benefits or withholding taxes or other employment practice for its employees in the Stores (including, but not limited, to terms and conditions of employment, and prohibiting discrimination in employment and wage and hour laws) that could have adverse effect on the Stores or their operations.

6.6    Intentionally Omitted.

6.7    Conduct of Business.  To Seller's Knowledge, from April 1, 2005 through the Effective Date: (a) Seller and Winn-Dixie has conducted its business in accordance with covenants set out in paragraph 8.1 of this Agreement; (b) has not given and will not give any raises to employees working in the Stores, except pursuant to regular annual reviews and consistent with raises in prior years and except for additional compensation to provide incentives to such employees to remain employed at the Stores at least until Closing; and (c) has not made and will not make any changes to its retail pricing structure, except for changes due to cost of product or advertised specials.

7.0    **Buyer's Representations and Warranties**.  Buyer represents and warrants to Seller as follows:

7.1    Organization and Authority.  AWG is a corporation duly organized, validly existing and in good standing under the laws of the State of Kansas and Alex Lee is a corporation duly organized, validly existing and in good standing under the laws of the State of North Carolina, and both have the

29

power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required corporate action on behalf of Buyer.

7.2    <u>Consents</u>.    To Buyer's Knowledge, except for Permits, no consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by any governmental authority or third party. No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated.

7.3    <u>Enforceability</u>.    This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4    <u>Actions</u>.    There is no action, suit or proceeding pending or, to the knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

7.5    <u>Default Under Other Agreements</u>.    To Buyer's Knowledge, without investigation or inquiry, entry into this Agreement or any of the closing documents to which Buyer is, or, is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or, by which it, or any of its properties may be bound or subject that individually or in the aggregate could have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing or transaction documents contemplated herein to which Buyer is or is to become a party.

7.6     Available Funds.  As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

8.0     **Covenants of Seller.**  Seller hereby covenants for the benefit of Buyer as follows:

8.1     Conduct of Business.  Seller and Winn-Dixie will (a) conduct its business in the ordinary course and in a manner generally consistent with historical and industry practices, except to the extent consistent with industry practices for retail grocery chains exiting a given market and except to the extent reasonably, commercially appropriate to eliminate Excluded Inventory; (b) maintain levels and contents of Inventory generally consistent with past practices and current sales and projected sales, taking into account changes in store traffic that might be expected in the circumstances, and keep on all utilities and Equipment at the Stores and any related facilities until the Stores are delivered to Buyer or the Ultimate Purchaser; (c) will use commercially reasonable efforts to maintain the Assets until the relevant Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, including but not limited to retaining and utilizing until the Closing all service contracts relating to equipment maintenance, cleaning, pest control and waste removal (d) not give any raises to employees working in the Stores, except pursuant to regular annual reviews and consistent with raises in prior years and except for additional compensation to provide incentives to such employees to remain employed at the Stores at least until Closing; and (g) not without prior written consent of Buyer (i) engage in any extraordinary transactions with respects to the Assets (other than those contemplated by the Bidding Procedures); (ii) cease or (except as otherwise contemplated in this paragraph) curtail operations at any of the Stores and, except with respect to any particular Stores in which Store operations were suspended prior to the Effective Date, will continue operation of the Stores, (iii) will not sell, dispose of, abandon or remove from any Store any of the Assets; or (iv) materially change its pricing strategy with respect to Inventory, including abandonment or termination of any "sale" or discount programs, in a manner inconsistent with present practice except as otherwise contemplated by this paragraph, display signs indicating that Seller is moving its operations or closing its business, or conduct any going out of business or liquidation sales relating to the Inventory (as contrasted to the Excluded Inventory) or agree to do so except in the ordinary course of business; provided, however, it is expressly acknowledged and understood that, following the Effective Date, Seller will take certain actions to wind up its operations (including related marketing, promotions and advertising with regard to the sale of Excluded

Inventory) at the relevant Store or Stores and eliminate or remove the Excluded Personal Property in preparation for the relevant Inventory Counts, Closings and the turnover of possession to Buyer. Notwithstanding anything to the contrary contained in this Section 8.1 or elsewhere in this Agreement, Seller shall have the right to cease operations at any Store where Buyer or an Ultimate Purchaser is not acquiring Inventory.

8.2    Removal of Excluded Assets.    Seller will use commercially reasonable efforts to remove all Excluded Personal Property from the Stores on or before the relevant Closing Date but in any event no later than forty-eight (48) hours after the relevant Closing Date, except that Buyer shall remove and dispose of Seller's signs and panels and branded shopping carts that are part of the Excluded Personal Property as more fully provided in paragraph 9.3 of this Agreement; provided, however, that Seller shall have a temporary license for access at each Store for fourteen (14) days after the Closing Date, at which time this license shall expire, to remove all photo kiosks (to the extent such kiosks constitute Excluded Personal Property), Excluded Fuel Operations, and Excluded Pharmacy Operations from the Store all at Seller's risk, and Buyer will reasonably cooperate with Seller's requests for access to complete such removal (such removal to be conducted in such a manner as not to materially interfere with Buyer's operation of the Store and Seller to be responsible for all damage or injury caused by such removal). This Section 8.2 shall survive Closing.

8.3    Estoppel Certificates.    Seller and Winn-Dixie will use reasonable commercial efforts to cooperate with Buyer in obtaining from each of the Landlords an estoppel certificate substantially in the form of Exhibit P attached hereto and incorporated herein by this reference or in such substantively similar form as may be provided for under the particular Assumed Lease or Sublease ("Estoppel Certificate").

8.4    Title Documents.    Seller and Winn-Dixie will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with each Closing and the issuance of the Title Policies.

8.5    Cooperation.    Seller and Winn-Dixie will (a) furnish to Buyer such necessary information and reasonable assistance, as Buyer may reasonably request, in connection with its preparation of any filing, including HSR Filing, registration or declaration that is necessary under any law or regulation for the consummation of the transactions contemplated hereby.

8.6    Acquisition of Title to Leased Equipment.    On or before the delivery to Buyer of the Equipment that is currently leased, Seller and/or Winn-Dixie,

as applicable, shall cooperate with and assist Buyer and the Ultimate Purchasers with respect to Buyer's and the Ultimate Purchasers' efforts, should any of them so choose, to obtain, at such Ultimate Purchasers' expense, good, marketable and unencumbered title to such Equipment or their own lease of such Equipment from the lessor.

8.7    Maintenance of Assumed Contracts.  From the date Buyer advises Seller in writing of the identity of an agreement that Buyer intends to make an Assumed Contract, through and including the Closing Date, Seller and/or Winn-Dixie shall perform any and all obligations imposed upon it under such Assumed Contract.

8.8    Additional Actions.  Seller will use its reasonable efforts to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.  Seller shall, upon the reasonable request by Buyer, (a) execute and deliver to the other party such further instruments of transfer, assignment and conveyance and take such other action as Buyer may reasonably request to more effectively carry out and consummate the transactions contemplated by this Agreement and any other agreement, instrument or document relating to the transactions contemplated by this Agreement, (b) proceed diligently and use reasonable commercial efforts to cause the satisfaction of all conditions precedent contained herein as expeditiously as possible.  Seller agrees to use its reasonable efforts to coordinate the timing of the Closing and other Closing mechanics with Buyer so as to permit the transfer of the Assets and other assets to the Ultimate Purchaser; provided that Seller will not have to consummate Closings with respect to more than eight (8) Stores in any one day and not more than ten (10) Stores in any two (2) consecutive days.

8.9    Location of Equipment.  Seller agrees that the Equipment located in the Stores shall remain in each respective Store through the Closing Date. No Equipment will be moved by or at the direction of Seller or Winn-Dixie between and among the Stores or any other store or property owned, operated or closed by Seller or Winn-Dixie or any of their Affiliates, unless otherwise agreed to by Buyer in writing.

8.10    Intentionally Deleted.

8.11    Access to Premises and Properties.  Seller agrees that Buyer and/or the Ultimate Purchaser may access the Stores up to five (5) days prior to Closing for purposes of preparing for installation of new point of sale equipment, including, without limitation, laying computer cables therefore; provided that such access does not materially interrupt business at the Stores.

33

8.12    <u>Employee Information; Interviews</u>.  On the Effective Date Seller and Winn-Dixie will release to Buyer a list of each of Seller's employees employed at each Store, indicating rate of pay, number of employees enrolled in Seller's health and welfare benefit plan, position title and hire or re-hire date as shown in Seller's books and records (provided no representation is made as to the accuracy or completeness of such information), and will permit Buyer or the Ultimate Purchaser, at reasonable times during normal business hours after forty-eight (48) hours prior notice and with minimum impact on Seller's business, to arrange for personal interviews with Store managers, pharmacists and other Store employees ("<u>Store Employees</u>"), at times and places mutually agreeable to Seller and Buyer and/or the Ultimate Purchaser, and to arrange for those relevant employees of Seller, who are interested, to interview with Buyer or the Ultimate Purchaser.

8.13    <u>No Obligation of Buyer as to Employees</u>.  Seller will have the sole and absolute responsibility for any financial or other commitments to its employees including, without limitation, any and all claims or obligations for severance pay and any and all claims and obligations arising under any collective bargaining agreement, employee benefit plan (including, without limitation, any withdrawal liability) or any local, state or federal law, rule or regulation (including, without limitation, the Worker Adjustment and Retraining Notification Act).  Buyer and Ultimate Purchaser will assess the employee base at each of the Stores it intends to acquire hereunder with a view toward hiring a sufficient number of such employees to avoid the notice requirements of WARN with respect to such Stores.  From and after entry of the Sale Order, this <u>paragraph 8.13</u> shall supersede any provision of the Confidentiality Agreements limiting the ability of Buyer or Ultimate Purchaser to employ or solicit for employment the employees at such Stores.  In addition, at Closing, Buyer or Ultimate Purchaser will hire (or offer to hire) those employees such Buyer or Ultimate Purchaser deems qualified in its discretion based on such Buyer's or Ultimate Purchaser's standard employment criteria and planned operations for such Store.  No later than two (2) Business Days prior to Closing, Buyer will deliver to Seller, in writing, a list identifying all employees of Seller who have been hired by Buyer, or to whom offers of employment have been made by Buyer.  Other than the specific obligations of Buyer or Ultimate Purchaser set forth in this <u>paragraph 8.13</u> neither Buyer or Ultimate Purchaser shall have any contractual or other obligation with respect to assessing, hiring, offering to hire or employing any of Sellers' employees.  In no event shall Buyer or Ultimate Purchaser be obligated to commit to any particular usage of employees or to any particular benefits or wage rates.

8.14    <u>Termination</u>.

     a.    Seller will transfer or terminate all of its employees working at each Store on the relevant Closing Date.  Seller will have no obligation to

terminate any employee to the extent such termination violates the Family Medical Leave Act with such employee remaining an employee of Seller; however, neither Buyer nor any Ultimate Purchaser shall have an obligation to hire any such current or former employees of Seller.

b.    Following the Effective Date with respect to a Store or Stores and prior to the Closing Date, Seller will not and will cause its Affiliates to not transfer, without written consent of Buyer, any Store Employees of such Store or Stores prior to Buyer or the Ultimate Purchaser having completed interviewing such Store Employees, and having provided Seller a list of Store Employees that Buyer or the Ultimate Purchaser have chosen not to hire on the relevant Closing Date, which Buyer covenants to do as soon as reasonably practicable.

c.    Furthermore, Seller and Winn-Dixie shall not and shall cause Winn-Dixie to not enter into any agreements or other arrangements with Store Employees that will preclude or create a disincentive to Store Employees from being employed by Buyer or the Ultimate Purchaser.

Nothing herein expressed or implied is intended to confer upon any Store Employee or his or her legal representatives any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement, including without limitation, any rights of employment for a specified time period. Buyer and the Ultimate Purchaser shall not have any liability with respect to claims of Store Employees arising from Seller's or Winn-Dixie's conduct prior to or as of the Closing. Seller or Winn-Dixie shall have no liability with respect to claims or Claims of Store Employees hired by Buyer or the Ultimate Purchaser arising from Buyer's conduct after the Closing. Seller will proceed diligently and use commercially reasonable efforts to obtain the entry of a Sale Order as to such Stores in a form acceptable to Buyer.

8.15   Wages, Severance and Other Obligations.  Prior to the Closing, Seller will not cause or permit to be granted any material increase in the salaries, wages, benefits or other compensation payable or to become payable to employees working at the Stores, except for (i) merit and cost-of-living increases in the ordinary course of business and (ii) incentive bonuses or compensation granted by Seller in connection with Seller's winding up of its operations at the Stores.  As between Seller, Winn-Dixie, Buyer, and the Ultimate Purchaser, Seller and Winn-Dixie shall be liable to Store Employees for all wages, severance benefits, accrued vacations, unpaid sick, holiday pay and bonuses, and other obligations of any kind whatsoever, that accrue through and including the Closing and shall hold Buyer and the Ultimate Purchaser harmless from any and all such liabilities to such Store Employees.

Seller and Winn-Dixie will pay to Store Employees when due all earned and accrued vacation and bonuses relating to periods prior to the Closing Date. The Ultimate Purchaser shall be liable to any Store Employees whom it hires for all wages and benefits that accrue after the Closing. Seller and Winn-Dixie agree they shall not increase salaries to Store Employees, except in the ordinary course of business consistent with its policies and past practices, or establish new bonus programs for Store Employees after the execution of this Agreement, except for additional compensation to provide incentives to such employees to remain employed at the Stores at least until Closing.

8.16    Intentionally Omitted.

8.17    Bankruptcy.    As promptly as practicable after the execution of this Agreement and in no event later than two (2) Business Days thereafter, Seller will file with the Bankruptcy Court a motion and necessary supporting papers, in form and substance reasonably satisfactory to the Buyer seeking the sale of the Assets to Buyer (the "Sale Motion"). Buyer acknowledges and consents that the Sale Motion will seek to have all Leases assumed and assigned with the caveat that neither Buyer nor Ultimate Purchaser shall have any obligation to assume any Lease relating to a Store described as "TBN" on Exhibit A-1 if Buyer has terminated this Agreement as to such Store pursuant to Section 4.1.4 as a result of not obtaining concessions from the applicable Landlord. Seller will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers prepared by Seller relating to this Agreement (including forms of Orders and notices to interested parties) prior to the filing thereof in the Bankruptcy Case. If this Agreement is determined to be the Successful Bid as to the Stores contemplated to be purchased hereunder, Seller will use commercially reasonable efforts to obtain the entry of a Sale Order as to such Stores.

9.0    **Covenants of Buyer.** Buyer for itself hereby covenants for the benefit of Seller as follows:

9.1    Title Documents.    Buyer and Ultimate Purchaser will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with each Closing and the issuance of the Title Policies.

9.2    Consents.    Buyer and Ultimate Purchaser, as applicable, will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer and Ultimate Purchaser, as applicable, is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11 of this Agreement, including without limitation all Permits necessary for Seller to sell and Buyer and Ultimate Purchaser, as applicable, to buy the Inventory and the Pharmacy Scrips.

36

9.3   Removal of Signs and Panels.  Within forty-eight (48) hours after the relevant Closing Date, Buyer and Ultimate Purchaser shall, at Buyer's and Ultimate Purchaser's sole cost and expense, (i) remove from the Stores, destroy and lawfully dispose of all signs and panels that are part of the Excluded Personal Property, and (ii)  either (A) remove from the Stores and lawfully dispose of all branded shopping carts  or (B) remove all trademarks, trade names, logos and designs of Seller, Winn-Dixie or their Affiliates from all shopping carts and destroy and lawfully dispose of all such trademarks, trade names, logos and designs.  Without limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 16.5 of this Agreement shall encompass any breach by Buyer of this paragraph 9.3.

9.4   Cooperation.  Buyer will, or will cause the Ultimate Purchaser to, (a) furnish to Seller and Winn-Dixie such necessary information and reasonable assistance as Seller or Winn-Dixie may reasonably request in connection with its preparation of any filing, registration or declaration that is necessary under any law or regulation, including but not limited to, HSR filings and information necessary to establish adequate assurance of future performance as contemplated by Section 365 of the Bankruptcy Code, for the consummation of the transactions contemplated hereby, (b) keep Seller and Winn-Dixie apprised of the status of any communications with, and any inquiries or requests for additional information from, any governmental authority, and will comply promptly with any such inquiry or request, (c) use its best efforts to obtain any consent, approval, order or authorization of any governmental authority necessary in connection with the transactions contemplated hereby or to resolve any objections that may be asserted by any governmental authority with respect to such transactions, including by executing agreements and submitting to judicial or administrative orders to hold separate or divest assets constituting a part of the Assets, and (d) in the event any claim, action, suit, investigation or other proceeding by any Person is commenced that questions the validity or legality of any of the transactions contemplated hereby or seeks damages in connection therewith, cooperate with Seller and Winn-Dixie and use all reasonable efforts to defend against such claim, action, suit, investigation or other proceeding and, if an injunction or other order is issued in any such action, suit or other proceeding, use all reasonable efforts to have such injunction or other order lifted.

9.5   Pharmacy Scrips.  Buyer agrees and will cause the Ultimate Purchaser to comply with all applicable laws and regulations that may relate to its receipt and continued maintenance and administration of Pharmacies Scrips acquired by Buyer under this Agreement, including without limitation the "Privacy Rule" promulgated under the Health Insurance Portability and Accountability Act of 1996.

9.6     Pharmacy.  Buyer shall cause the Ultimate Purchaser (or other retailers that acquire Stores with pharmacy operations) to diligently pursue the procurement of NCPDP numbers.  Furthermore, Buyer shall cause the Ultimate Purchasers that acquire stores with pharmacy operations to diligently pursue the procurement of DEA numbers.  If as of Closing an Ultimate Purchaser, despite its reasonable efforts, is unable to obtain any such pharmacy license or permit, NCPDP number or DEA number, then (to the extent allowed by and in the manner permitted under applicable law and regulation) at such Ultimate Purchaser's request, Seller will enter into a customary management agreement or similar arrangement, reasonably acceptable to such Seller, that provides the applicable Ultimate Purchaser with the right to operate under the Seller's license, permit, NCPDP number or DEA number on a short-term basis while such Ultimate Purchaser continues to use commercially reasonable efforts to obtain such license or permit, which agreement shall include, among other matters, (i) appropriate indemnification by the Ultimate Purchaser in favor of such Seller, (ii) reasonable compensation to the Seller based on a percentage of sales under such license or permit, (iii) requirements that the Ultimate Purchaser comply with all applicable laws and regulations, and (iv) other provisions customarily contained in such agreements.

9.7     Liquor and Beer.  Buyer will, or will cause the Ultimate Purchaser to, use its reasonable efforts to obtain all Permits.

9.8     Additional Actions.  Buyer will use all commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement. Buyer shall promptly upon request by any other party, (a) correct any manifest defect or error that may be discovered in this Agreement or any other agreement, instrument or document relating to the transactions contemplated by this Agreement or in the execution, acknowledgment, or recordation of this Agreement or any such other agreement, instrument or document, (b) execute and deliver to the other party such further instruments of transfer, assignment and conveyance and take such other action as the other party may reasonably require to more effectively carry out and consummate the transactions contemplated, but only to the extent contemplated, by this Agreement and any other agreement, instrument or document relating to the transactions contemplated by this Agreement, (c) perform all respective acts or refrain from performing all respective omissions contemplated herein during the period from the signing of this Agreement through the Closing Date or such later date as may be specifically set forth herein, and (d) proceed diligently and use reasonable commercial efforts to cause the satisfaction of all conditions precedent

contained herein as expeditiously as possible. Buyer agrees to use its best efforts to coordinate, and to cause the Ultimate Purchasers to coordinate, the timing of the Closing and other Closing mechanics with Seller and Winn-Dixie so as to permit the transfer of the Assets and other assets to the Ultimate Purchaser.

9.9     Adequate Assurances.    If this Agreement is determined to be the Successful Bid as to one or more Stores, then Buyer will use commercially reasonable efforts to obtain the entry of a Sale Order as to such Stores in form reasonably acceptable to Buyer, including by providing Adequate Assurance Information to Seller, the Bankruptcy Court, Landlords and Subtenants as may be requested. In addition, Buyer shall provide and shall cause each Ultimate Purchaser to provide to Seller a declaration in the form of Exhibit I hereto (or otherwise reasonably satisfactory to Seller), provided that with respect to any Buyer or Ultimate Purchaser who is not assuming an Assumed Lease, paragraphs 6 and 7 of Exhibit I hereto shall be deleted therefrom.

10.0   **Conditions Precedent to Buyer's Obligations.** The obligations of Buyer under this Agreement as to each Store are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement relating to such Store, including, without limitation, each of the following (any of which may be waived by Buyer or the Ultimate Purchaser in Buyer's sole discretion, unless otherwise stated herein):

10.1   Covenants.    The applicable Seller will have performed in all material respects all of its covenants contained in this Agreement with respect to the Store or Stores being purchased by Buyer or a particular Ultimate Purchaser which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and the applicable Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of paragraph 5.1 of this Agreement), all of Seller's representations and warranties contained in this Agreement with respect to such Store or Stores which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of the applicable Seller's representations and warranties contained in this Agreement with respect to such Store or Stores which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be

39

expected to have a Material Adverse Effect.

10.2    <u>Intentionally Deleted</u>.

10.3    <u>Intentionally Deleted</u>.

10.4    <u>No Governmental Proceedings or Litigation</u>.    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

10.5    <u>Entry of Sale Order</u>.  The Sale Order with respect to such Store shall have been entered by the Bankruptcy Court in the form attached hereto as <u>Exhibit L</u> or with such modifications thereto as are reasonably satisfactory to Buyer and Seller and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Buyer, which shall not be unreasonably withheld.

10.6    <u>Legal Requirements</u>.    Buyer shall be reasonably satisfied that all requirements, if any, that in the reasonable opinion of legal counsel, need to be satisfied relating to the HSR Act, Department of Justice or Federal Trade Commission and any other approval by any applicable regulatory authority required to rule on this transaction have been satisfied or obtained and that no WARN qualifying event will result from this transaction, which condition precedent shall be deemed satisfied or waived if Buyer does not terminate this Agreement for failure to comply with this <u>paragraph 10.6</u> within the Inspection Period.

10.7    <u>Intentionally Deleted</u>.

10.8    <u>Lift of Stays</u>.    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer shall have the right to terminate this Agreement pursuant to <u>paragraph 15.1(a)(iv)</u> of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>paragraph 16</u> of this Agreement rather than pursuant to <u>paragraph 15.1 (a)(iv).</u>

11.0    <u>**Conditions Precedent to Seller's Obligations**</u>.  The obligations of Seller under this Agreement as to each Store are subject to the satisfaction on or before the

relevant Closing Date, or such other date as herein provided, of all conditions contained in this Agreement relating to such Store, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

11.1    <u>Covenants</u>.  Buyer will have performed all of its covenants contained in this Agreement, and all of Buyer's representations and warranties contained in this Agreement, will be true and accurate in all material respects on the Effective Date and as of such Closing Date and Buyer will have executed and delivered a certificate to that effect as contemplated by <u>paragraph 14.3(ix)</u> of this Agreement.

11.2    <u>No Governmental Proceedings or Litigation</u>.    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

11.3    <u>Entry of Sale Order</u>.  The Sale Order with respect to such Store shall have been entered by the Bankruptcy Court in a form reasonably satisfactory to Seller and approved by Buyer as set forth herein and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior written consent of Buyer, which shall not be unreasonably withheld.

11.4    <u>Lift of Stays</u>.    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller shall have the right to terminate this Agreement pursuant to <u>paragraph 15.1(a)(v)</u> of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>paragraph 16</u> of this Agreement rather than pursuant to <u>paragraph 15.1(a)(v)</u>.

12.0    **Loss by Fire or Other Casualty; Condemnation**.  In the event that, prior to a Closing, the relevant Assets or any material part thereof, are destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the relevant Real Property, Buyer or the Ultimate Purchaser will have the right, exercisable by giving notice of such decision to Seller or Winn-Dixie within five (5) Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement as to the Assets affected by such loss, and thereafter none of the parties will have any further rights or obligations hereunder as to such Assets; provided, however, that

this Agreement will be a continuing obligation of the parties as to the Stores not affected by such termination and provided further, however, except as otherwise provided herein, that Buyer will be entitled to the return from the Escrow Agent of the Deposit attributable to such Store or Stores. If Buyer does not exercise its right of termination with respect to the Assets affected by such casualty or proceeding and the Assets are sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer or the Ultimate Purchaser any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer or the Ultimate Purchaser any such proceeds or compensation received by it.

13.0  **Possession**. Seller will turn over exclusive physical possession of each Store and the Assets associated therewith, (including, to the extent in Seller's possession, control or custody), including all keys, combinations to safes, security codes and passwords, to Buyer or the Ultimate Purchaser, as Buyer may direct, at the conclusion of the Inventory Count for such Store provided that the Inventory Count for such Store commences no earlier than the close of business on the day immediately preceding the Closing Date for such Store; otherwise at the commencement of such Closing Date. After conclusion of the Inventory Count for each Store, or upon Closing for such Store, whichever is earlier, Buyer or the Ultimate Purchaser may commence preparation for opening of such Store as a Buyer's or Ultimate Purchaser's store including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and continuing electrical and wiring work required in order to install Buyer's or the Ultimate Purchaser's POS and other equipment, signage, etc.

14.0  **Closing.**

14.1  Closing Process. The parties agree to set Closing Dates for each Store or group of Stores mutually acceptable to the parties (taking into consideration that Stores will be acquired by different Ultimate Purchasers) as soon as practicable following the satisfaction or waiver of all conditions to the Closings on such Closing Dates other than deliveries and transfers to occur on the Closing Date. Each Closing will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and the Ultimate Purchaser and Seller based on satisfaction of the terms and conditions of this Agreement.

14.2  Seller's Escrowed Items. On or before the Real Property Escrow Date for each Store, Seller will, subject to the conditions contained in paragraph 11 of this Agreement, deliver the following ("Seller's Escrowed Items") to Escrow Agent:

(i)     Two counterparts of the relevant Lease Assignment, substantially in the form of Exhibit Y to this Agreement, transferring the Lease to Buyer or the Ultimate Purchaser, as Buyer shall direct (the "Conveyance Instrument"), executed by Seller;

(ii)    An assignment and assumption of any Sublease relating to such Store, substantially in the form of Sublease Assignment set forth in Exhibit AA attached hereto and incorporated herein by this reference (the "Sublease"), executed by Seller and Winn-Dixie to Buyer or the Ultimate Purchaser as Buyer shall direct;

(iii)   An assignment and assumption of Warranties and Guaranties executed by Seller and Winn-Dixie to Buyer or the Ultimate Purchaser as Buyer shall direct, in the form set forth in Exhibit BB attached hereto and incorporated herein by this reference (the "Warranties and Guaranties Assignment").

(iv)    An assignment and assumption of Assumed Contracts executed by Seller and Winn-Dixie to Buyer or the Ultimate Purchaser as Buyer shall direct, in the form set forth in Exhibit CC attached hereto and incorporated herein by this reference (the "Assumed Contracts Assignment").

(v)     The relevant Bill of Sale, executed by Seller in favor of Buyer or Ultimate Purchaser, as Buyer shall direct;

(vi)    Two counterparts of the relevant Closing Statement, executed by Seller;

(vii)   Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion;

(viii)  A DEA Power of Attorney in the form attached as Exhibit DD attached hereto and incorporated herein by this reference, executed by Seller and Winn-Dixie, for any Store where Buyer or Ultimate Purchaser is purchasing pharmacy assets;

(ix)    A certificate from an officer of Seller certifying that all representations and warranties of Seller contained in this Agreement are true and correct as of the Closing Date;

(x)  To the extent not previously provided to Buyer or Ultimate Purchaser, original Leases and Subleases or, in the event Seller or Winn-Dixie does not possess originals of the same, copies thereof.

(xi)  Any other documents, instruments or agreements called for hereunder for delivery by Seller or Winn-Dixie with respect to such Store that have not previously been delivered; and

Buyer may waive compliance by Seller as to any of the foregoing items. At Buyer's direction, Seller will prepare the Conveyance Instruments and other documents required hereby for conveyance directly to the Ultimate Purchaser.

14.3  Buyer's Escrowed Items. On or before the Real Property Escrow Date for each Store or Stores, Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, deliver the following ("Buyer's Escrowed Items") to Escrow Agent:

(i)  Two counterparts of the relevant Conveyance Instrument, executed by Buyer or the Ultimate Purchaser, as applicable;

(ii)  Any relevant Sublease Agreement Assignments, executed by Buyer or the Ultimate Purchaser, as applicable, and as determined by Buyer;

(iii)  The Warranties and Guaranties Assignment, executed by Buyer or the Ultimate Purchaser, as applicable, and as determined by Buyer;

(iv)  The Assumed Contracts Assignment, if any, executed by Buyer or the Ultimate Purchaser, as applicable, and as determined by Buyer;

(v)  The Approvals Assignment, executed by Buyer or the Ultimate Purchaser, as applicable, and as determined by Buyer;

(vi)  Two counterparts of the relevant Closing Statement, executed by Buyer or the Ultimate Purchaser, as applicable, and as determined by Buyer;

(vii)  Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; and.

(viii)  Any other documents, instruments or agreements called for hereunder for delivery by Buyer or Ultimate Purchaser that have not previously been delivered;

(ix)   A certificate from an officer of Buyer, certifying that all representations and warranties of Buyer contained in this Agreement are true and correct as of the Closing Date; and

(x)   All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to paragraph 3 of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items.

14.4   Delivery and Escrowed Items.  At the Closing for each Store or Stores, Seller will, subject to the conditions contained in paragraph 11 of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items and the Purchase Price to Seller.

14.5   Delivery to Title Insurer.  On each Closing Date, Seller and Buyer will each deposit such other instruments with the Title Insurer as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the relevant Assets in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

14.6   Except as provided in paragraph 16 of this Agreement, at or before Closing for each Store or Stores, or if Closing does not occur due to earlier termination of this Agreement in accordance with its terms with respect to any Store or Stores, (i) Seller will pay Seller's Closing Costs relating to such Store or Stores; and (ii) Buyer will pay Buyer's Closing Costs relating to such Store or Stores.

## 15.0   **Termination**.

15.1   Termination.

(a)   This Agreement may be terminated, and the transactions contemplated hereby abandoned, as to any or all Stores not the subject of a completed Closing, only as follows:

(i)   by written consent of Seller and Buyer, in which case the applicable Deposit shall be disbursed as provided in such written consent;

(ii)   at the election of Seller if and to the extent permitted under paragraph 16.1 of this Agreement, in which case the

applicable Deposit shall be disbursed as provided in such paragraph 16.1;

(iii)    at the election of Buyer if and to the extent permitted under paragraph 16.2 of this Agreement, in which case the applicable Deposit shall be disbursed as provided in such paragraph 16.2;

(iv)    at the election of Buyer as to the affected Store if any of the conditions set forth in paragraph 10 of this Agreement has not been satisfied or waived by Buyer with respect to the affected Store on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(iv);

(v)    at the election of Seller if any of the conditions set forth in paragraph 11 of this Agreement has not been satisfied or waived by Seller on or before the Outside Date as to a given Store, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(v);

(vi)    at the election of Buyer as provided in paragraph 12 of this Agreement, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this Agreement rather than pursuant to this paragraph 15.1(a)(vi);

(vii)    at the election of Buyer upon occurrence of any of the following (a) Seller's failure to timely file the motion for entry of the Sale Order as set forth in paragraph 8.17 of this Agreement; (b) Seller's failure to obtain entry of the Sale

46

Order within sixty (60) days after entry of the motion therefore unless a Buyer's failure to assist Seller pursuant to this Agreement materially contributes to such failure; or (c) entry of a Sale Order approving a sale of the Assets to any Person that is not Buyer, in which, in the case of (a), (b), and (c), Seller shall direct Escrow Agent to return the Deposit attributable to each Store on the Allocation Schedule to the applicable Buyer and, in the case of (c), shall pay to each buyer from the proceeds received from such sale a termination fee to the extent contemplated by paragraph 2.10 of this Agreement; provided, however, that if Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.1(a)(vii).

(viii)    at the election of Seller as to all Stores if the Bankruptcy Court denies Bankruptcy Court Approval in which case Seller shall direct Escrow Agent to return the entire Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.1 of this Agreement rather than pursuant to this paragraph 15.1(a)(viii).

(ix)    at the election of Seller if the portion of Cure Costs with respect to any Lease which arose prior to the Commencement of the Bankruptcy Case exceed forty percent (40%) of the Base Purchase Price for the relevant Store, as shown on the Allocation Schedule, provided that in such case Seller may terminate this Agreement under this clause only with respect to such Store, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this Agreement rather than pursuant to this paragraph 15.1(a)(ix); or

(x)    at the election of Buyer or Seller if the relevant Closing will not have occurred on or before the Outside Date for any reason other than as contemplated in paragraphs 15.1(a)(i)

47

through 15.1(a)(ix) of this Agreement, in which case Seller shall direct Escrow Agent to return the applicable Deposit to Buyer; provided that neither Buyer nor Seller, as the case may be, will be entitled to terminate this Agreement pursuant to this paragraph 15.1(a)(x), if such party's breach of this Agreement has been the cause of, or resulted in, the failure of the relevant Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(x);

(b)    If this Agreement is terminated with respect to any Store or Stores for any reason, then, as to the Store or Stores affected by such termination, all materials provided by Seller to Buyer and all materials relating to the relevant Assets obtained by Buyer and all copies of any such materials will be delivered to Seller within 5 Business Days following termination.   This paragraph shall not in any way limit Buyer's duties to Seller or Winn-Dixie under the Confidentiality Agreement.

(c)    Upon any termination of this Agreement with respect to any Store or Stores pursuant to paragraphs 15.1(a)(iii) through (xii) of this Agreement, each party will retain those rights (if any) it may have under paragraph 16 of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

(d)    Notwithstanding anything to the contrary contained in this Agreement, each Seller agrees and acknowledges that (i) this Agreement is a block bid by the Buyer for the Assets related to the Stores, and is to be considered as a whole, and (ii) Seller shall not be permitted to terminate this Agreement with respect to any particular Store or Stores, except as specifically permitted in paragraphs 15.1(a)(i), 15.1(a)(ii), 15.1(a)(v), 15.1(a)(vi), 15.1(a)(viii) and 15.1(a)(ix) herein.

## 16.0   Default and Remedies.

16.1   Buyer's Default.    If the Closing for any one or more Stores as contemplated under this Agreement is not consummated due to Buyer's breach of this Agreement, or if this Agreement is terminated as to any one or more Stores due to Buyer's breach of this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such breach, (A) to terminate this Agreement with respect to such Store or Stores only (the "Default Stores") and, if the breach is caused by an Ultimate Purchaser

who is designated to acquire additional Stores for which a Closing has yet to occur, such other Store or Stores which have yet to be sold to such breaching Ultimate Purchaser (such Store or Stores together with the Default Stores as to which this Agreement is terminated being the "Terminated Stores"), and (B) to receive the Base Deposits for all Default Stores (collectively, the "Liquidated Deposit") as liquidated damages for the breach of this Agreement and not as a penalty (with all other Deposits relating the Terminated Stores being remitted to Buyer), it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof.  Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity.  Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages.  The right to receive the Liquidated Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by Buyer with respect to the Terminated Stores, and Seller hereby waives and releases any right to (and Seller hereby covenants that it shall not) sue Buyer with respect to the Terminated Stores: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit.  Buyer hereby waives and releases any right to (and hereby covenants that it shall not) seek or claim a refund of the Liquidated Deposit (or any part thereof) from Seller on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages.  This paragraph 16.1 is subject to paragraph 16.4 of this Agreement.

16.2    Default by Seller.  If the sale of any one or more Stores as contemplated under this Agreement is not consummated due to Seller's breach of this Agreement, or if this Agreement is terminated as to any one or more Stores due to Seller's breach of this Agreement, then Buyer shall be entitled, as its sole and exclusive remedy for such breach, to receive the return of the Base Deposit with respect to such Store or Stores, which return shall operate to terminate this Agreement with respect to such Store or Stores and release Seller from any and all liability under this Agreement with respect to such Store or Stores.  Buyer expressly waives and releases (i) any right to seek specific performance of Seller's obligations under this Agreement and (ii) any right to seek or collect any damages, including any actual, consequential, speculative, remote or punitive damages.  This paragraph 16.2 is subject to paragraph 16.4 of this Agreement.

16.3    Notice of Default; Opportunity to Cure.  Neither Seller nor Buyer shall be deemed to be in default hereunder with respect to a curable default until and unless such party has been given written notice of its failure to comply

with the terms hereof and thereafter does not cure such failure within five (5) Business Days after receipt of such notice; provided, however, that this paragraph 16.3 (i) shall not be applicable to Buyer's failure to deliver any Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Real Property Escrow Date or the Closing Date for any Store or Stores and, accordingly, (ii) shall not have the effect of extending the Closing Date or the due date of any Deposit.

16.4   Recoverable Damages.   In no event shall the provisions of paragraphs 16.1 and 16.2 of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to, a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreement and paragraph 17.3 of this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees or expenses under the Confidentiality Agreement and paragraphs 3.3.2 and 3.4.3 of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs.   In addition, if this Agreement is terminated for any reason with respect to any one or more Stores or in its entirety, and Buyer or any Affiliate of Buyer asserts any claim or right to any Asset that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to any Asset, then Seller shall have all rights and remedies available at law or in equity with respect to such assertion by Buyer and any loss, damage or other consequence suffered by Seller as a result of such assertion.

16.5   Buyer Indemnification of Seller.   Buyer and Ultimate Purchaser shall indemnify and save and hold harmless Seller and its Affiliates and representatives, from and against any and all costs, losses, liabilities, damages, lawsuits, deficiencies, claims and expenses arising solely out of third-party claims including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (herein, the "Damages") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by Buyer or Ultimate Purchaser (including any payment obligation), or the inaccuracy of any representation made by such Buyer or Ultimate Purchaser in or pursuant to this Agreement or other transaction documents, or (b) any liability, obligation or commitment of any nature (absolute, accrued, contingent or otherwise) of such Buyer or Ultimate Purchaser that is due to or arises in connection with Buyer's or Ultimate Purchaser's acts or omissions prior to, on or after the Closing Date, including any claim, liability, or obligation that is assumed by such Buyer or Ultimate Purchaser pursuant to this Agreement or any transaction documents signed by such Buyer or Ultimate Purchaser. Notwithstanding the foregoing, such Buyer or Ultimate Purchaser shall not

be liable for any matter (i) with respect to which Seller has not given such Buyer or Ultimate Purchaser written notice within a reasonable period of time following Seller's receiving written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a material adverse effect on Buyer or such Ultimate Purchaser), or (ii) that is due to Seller's acts or omissions.    The provisions of this paragraph 16.5 shall cover all obligations and liabilities of whatsoever kind, nature or description relating, directly or indirectly, to product liability, third party litigation or third party claims against Buyer or Seller in connection with, arising out of, or relating to the Assets.  This paragraph 16.5 shall survive the Closings or earlier termination of this Agreement.

**17.0** **Miscellaneous.**

17.1   Notices. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this paragraph 17.1 and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Winn-Dixie Stores, Inc. / Winn-Dixie Raleigh, Inc. / Winn-Dixie
      Montgomery, Inc
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attention:    Chief Financial Officer
Telefax No.: 904 783 5646
e-mail:      *bennettnussbaum@winn-dixie.com*

51

With a copy to:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attention:     Office of General Counsel
Telefax No.:  904 783 5651
e-mail::        larryappel@winn-dixie.com

and

King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia  30303
Attention:     Timothy N. Tucker
Telefax No.:  404-572-5148
e-mail:         ttucker@kslaw.com

If to Buyer:

Associated Wholesale Grocers, Inc.
5000 Kansas Avenue
P. O. Box 2932
Kansas City, Kansas  66110-2932
Attention:     General Counsel
Telefax No.:  913-288-1573
E-Mail:         cpuhl@awginc.com

and

Alex Lee, Inc.
P. O. Box 800
120 Fourth Street SW
Hickory, North Carolina  28602
Attention:     General Counsel
Telefax:        828-725-4435
E-Mail:         jorgain@alexlee.com

or such other address as any party may from time to time specify by notice to the other.

17.2    Notice of Certain Inquiries.  If any party is contacted, whether before or after any Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to any transactions

contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

17.3    <u>Brokers and Finders</u>.    The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Agreement other than that due by Seller to Seller's Brokers. Seller agrees to pay all fees and commissions claimed by Seller's Brokers as a result of the transaction contemplated by this Agreement, which fees and commissions will be considered payable with respect to a Store only if, as and when the relevant Closing contemplated by this Agreement occurs. Except for Seller's Brokers, neither Seller nor Buyer has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement. Seller and Buyer hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts, said indemnifications by Seller and Buyer to survive the Closings or earlier termination of this Agreement.

17.4    <u>Successors and Assigns</u>. This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

17.5    <u>Assignment</u>. Neither Seller nor Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole discretion of the party whose consent is so required, except that Buyer may assign its rights and obligations under this Agreement with respect to one or more designated Stores to the Ultimate Purchaser of such Stores provided that such Ultimate Purchaser assumes in writing all of the duties and obligations of Buyer hereunder with respect to such designated Stores; provided, however, any assignment by Buyer of its obligations to the Ultimate Purchaser will not relieve Buyer of its obligations hereunder, with Seller and Winn-Dixie acknowledging and agreeing, however, that Buyer shall have no post-closing obligation to them in connection with any Assets (including, without limitation, any Lease) that is assigned or transferred to and assumed by an Ultimate Purchaser. Buyer, shall have no obligation to provide adequate assurance of future performance pursuant to Section 365(f) of the Bankruptcy Code in connection with any Assumed Leases or Assumed Contracts which are to be assigned by Seller to Ultimate Purchasers. Buyer shall cause Seller to be an intended third party beneficiary with respect to any and all agreements between Buyer and an Ultimate Purchaser pursuant to which any Ultimate Purchaser is assuming obligations of Buyer hereunder; provided that in

the event of a default by an Ultimate Purchaser Seller shall have no rights or remedies other than the right to retain any applicable Base Deposit pursuant to <u>paragraph 16.1</u> hereof.

17.6 <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller and Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to Bankruptcy Court Approval, if applicable.

17.7 <u>Governing Law</u>.  The application and effect of this Agreement as to any particular Store or Stores will be governed by and construed in accordance with the laws of the State in which such Store or Stores is located; the application and effect of this Agreement as to any matter of the rights and obligations of the parties generally will be governed by and construed in accordance with the laws of the State of North Carolina.

17.8 <u>Merger of Prior Agreements</u>.  This Agreement supersedes all prior agreements and understandings between the parties hereto, other than the Confidentiality Agreement, and (except for the Confidentiality Agreement) constitutes the entire agreement of the parties with respect to the matters contained herein.  Seller, by virtue of executing this Agreement, agrees to be a party to, and be bound by the terms of, the Confidentiality Agreement.  **THE PARTIES ACKNOWLEDGE THEIR OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT CONTINUE AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT.**

17.9 <u>Time is of the Essence</u>.  Time is of the essence of this Agreement.  A contemporaneous closing of all related transactions is imperative to Buyer to insure continuity of operations.  Seller agrees to use commercially reasonable best efforts to coordinate the timing of due diligence and the Closing with Buyer to permit the contemporaneous transfer of the Stores and other Assets to Buyer or the Ultimate Purchasers, as designated by Buyer, subject, however, to the terms and conditions of this Agreement.

17.10 <u>No Recordation</u>.  This Agreement will not be recorded in any public office or court other than as part of the Bankruptcy Court Approval process except that upon default it may be presented to a court of competent jurisdiction.

17.11 <u>Survival of Representations and Warranties</u>.  All of the representations, warranties and covenants contained in this Agreement or in any certificate delivered pursuant hereto shall be true as of the Closing Date, and shall not survive the Closing Date other than those representations, warranties

or covenants which by their express terms are intended to survive or be performed after the Closing Date.

17.12 <u>Further Assurances</u>. Both before and after the Closing Date each party will cooperate in good faith with the other and will take all appropriate action and execute any documents, instruments or conveyances of any kind that may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder, provided they create no obligations inconsistent with the terms of this Agreement, and to provide the other party with such information and copies of such documents as such other party may reasonably request and that may be provided without, in the providing party's reasonable discretion, adverse effect or risk to the providing party other than any adverse effect or risk that is immaterial.

17.13 <u>Multiple Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17.14 <u>Invalidity</u>. In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument and they shall be construed as if the invalid, illegal or unenforceable provision had never been present.

17.15 <u>Titles</u>. The titles, captions or headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

18.0 **<u>Escrow Agent</u>.**

18.1 <u>Duties</u>. By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon its receipt of funds from Buyer, Escrow Agent will receive and hold such funds, and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.

18.2 <u>Indemnity</u>. Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent. If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all loss, cost, damage, liability or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which

may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct. If the indemnity amounts payable hereunder result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts. Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.

18.3    <u>Dispute</u>.  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor. In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Buyer is not the prevailing party in such action or proceeding. If there is no prevailing party, Seller and Buyer each shall be responsible for one-half of such costs and fees.

18.4    <u>Execution by Escrow Agent</u>.  Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this <u>paragraph 18.</u>  Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this <u>paragraph 18</u> shall not be required.

19.0    **Waiver of Jury Trial**.  With respect to any matter properly before the Bankruptcy Court, Buyer and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transactions contemplated herein undesirable. Accordingly, Buyer and Seller each knowingly, voluntarily and intentionally waive any right to such a trial by jury that any of them may have in the Bankruptcy Court with respect to any action relating to this Agreement or the transactions contemplated herein.

20.0    **Consent to Jurisdiction.** THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Buyer and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in <u>paragraph 17.1</u> of this Agreement shall be effective service of process for any

action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

21.0 **Competition**.    Each party hereby acknowledges that it is a sophisticated participant in the grocery business and is in competition with each other party hereto.  Each party hereto has or is able to obtain general information regarding the identity, location and economic condition of the customers of, properties owned by and operations conducted by each other party through non-confidential channels.  Except as otherwise set forth in this Agreement, nothing contained herein shall in any way limit the ability of any party hereto to continue to compete with any other party hereto in the ordinary course of business.  Except as may be specifically agreed upon otherwise, any party hereto, including any shareholder, officer, director, employee, affiliate or other person or entity holding a legal or beneficial interest in any entity which is a party hereto, may engage in business activities or possess an interest in other business ventures of every nature and description, independently or with others, whether such activities or ventures are competitive with any party hereto or the transactions contemplated hereby or otherwise, including but not limited to, the acquisition, ownership, financing, leasing, operation, management, syndication, brokerage, sale, construction and development of assets or the solicitation and/or establishment of relationships of any kind with customers or potential customers from any source whatsoever; and no party shall have any right by virtue of this Agreement to object to, prevent or participate in such independent activities and/or ventures.

21.0 **HSR Filings.**  The parties anticipate that the transactions contemplated hereby are exempt from review and filing under the HSR Act.  However, if such is not the case, Seller and Buyer shall each seek regulatory approval or HSR clearance and prepare and submit, in a timely manner, all necessary filings for Seller and Buyer in connection with this Agreement under the HSR Act and the rules and regulations thereunder.  Seller and Buyer shall request expedited treatment of such HSR Filing by the Federal Trade Commission, shall make promptly any appropriate or necessary subsequent or supplemental filings, and shall furnish to each other copies of all HSR Filings at the same time as they are filed with the appropriate governmental authority except to the extent such party is legally restricted from providing or believes, based where appropriate on the advice of counsel, that it should not provide such copies.

22.0 **Disclaimers and Waivers**.

22.1 **NO RELIANCE ON DOCUMENTS**.    **EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT HEREOF (THE "CONTRACT WARRANTIES"), SELLER**

MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY OR ON BEHALF OF SELLER TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY. BUYER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE) ARE PROVIDED TO BUYER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY BUYER SHALL BE AT THE SOLE RISK OF BUYER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER ACKNOWLEDGES AND AGREES THAT (A) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (B) BUYER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED BY SELLER OR ANY AFFILIATE TO BUYER, BUT RATHER WILL RELY ON ITS OWN INVESTIGATIONS AND ANY REPORTS COMMISSIONED BY BUYER WITH RESPECT THERETO, AND (C) NEITHER SELLER, ANY AFFILIATE OF SELLER NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL HAVE ANY LIABILITY TO BUYER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

22.2    **Disclaimers.** EXCEPT FOR THE CONTRACT WARRANTIES, BUYER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS OR

OTHER INFORMATION PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS. BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "AS IS, WHERE IS, WITH ALL FAULTS". BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND NEITHER SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER OR ANY AFFILIATE, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE, OTHER THAN THE CONTRACT WARRANTIES.

BUYER ACKNOWLEDGES THAT BUYER'S ACCESS AND INSPECTION RIGHTS HAVE BEEN LIMITED AS SET FORTH IN THIS AGREEMENT AND THAT BUYER UNDERSTANDS THE RISKS ASSOCIATED WITH PURCHASING THE ASSETS ON THE BASIS OF SUCH LIMITED INVESTIGATIONS. BUYER REPRESENTS TO SELLER THAT NOTWITHSTANDING SUCH LIMITATIONS BUYER WILL HAVE CONDUCTED SUCH INVESTIGATIONS AS BUYER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE ASSETS AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE ASSETS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION), AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AFFILIATES, AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN THE CONTRACT WARRANTIES. UPON CLOSING, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS, AND BUYER, UPON CLOSING, EXCEPT FOR THE CONTRACT WARRANTIES, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER AND SELLER'S AFFILIATES (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT OR UNDER ANY ENVIRONMENTAL LAW), LOSSES, DAMAGES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH BUYER

MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AND SELLER'S AFFILIATE'S (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE ASSETS.

EXCEPT FOR THE CONTRACT WARRANTIES, BUYER AGREES THAT SHOULD ANY INVESTIGATION, CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION) ON OR RELATED TO THE ASSETS BE REQUIRED AFTER THE DATE OF CLOSING, NEITHER SELLER NOR ANY AFFILIATE SHALL HAVE NO LIABILITY TO BUYER TO PERFORM OR PAY FOR SUCH INVESTIGATION, CLEAN-UP, REMOVAL OR REMEDIATION, AND BUYER EXPRESSLY WAIVES AND RELEASES ANY CLAIM TO THE CONTRARY.

BUYER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY BUYER, AND BUYER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OF BUYER'S CHOICE WITH REGARD TO THE TERMS OF SUCH DISCLAIMERS, WAIVERS AND RELEASES. BUYER ACKNOWLEDGES AND WARRANTS THAT BUYER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS AND RELEASES IS FREE AND VOLUNTARY.

22.3    Effect and Survival of Disclaimers.  Seller and Buyer acknowledge that the provisions of this paragraph 22.3 are an integral part of the transactions contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller would not enter into this Agreement but for the provisions of this paragraph 22.3.  Seller and Buyer agree that the provisions of this paragraph 22.3 shall survive Closing or any termination of this Agreement.

23.0  **No Assumption of Liabilities**. This Agreement constitutes a sale of certain assets of Seller and Winn-Dixie only and is not a sale of any stock in any entity comprising Seller or Winn-Dixie.

23.1    By entering into this Agreement or performing any act or agreement hereunder, except as expressly set forth herein, Buyer does not assume any obligations or liabilities of Seller, Winn-Dixie or the Ultimate Purchaser and shall not be responsible for the payment of any liabilities of or obligations of Seller, Winn-Dixie or the Ultimate Purchaser whatsoever, including, without limitation, the following:

(a) Claims by Seller's, Winn-Dixie's or the Ultimate Purchaser's employees, former employees or others under any contract, agreement or the like or any state, Federal, local or other laws, statutes, executive order, regulations, ordinances, codes or the like including, but not limited to, claims in connection with employee wages, vacation pay, severance pay, holiday pay, sick leave pay, detrimental reliance claims, implied contract claims, WARN notice claims, worker's compensation claims, ERISA claims, COBRA claims, Civil Rights Laws claims, claims under the Fair Labor Standards Act or Labor Management Relations Act, Americans With Disabilities Act, Family Medical Leave Act, employment discrimination claims of all types, claims regarding health and welfare benefits or premiums, sexual harassment claims, disability claims, Family and Medical Leave Act claims, pension fund liability (whether for current or unfunded accrued liabilities), claims or other problems arising under OSHA, claims in connection with environmental problems, claims arising out of Seller's or Winn-Dixie's agreements with third parties or any other obligations of any kind or character arising out of Seller's, Winn-Dixie's or the Ultimate Purchaser's acts, omissions or agreements;

(b) Demands, causes of action, obligations or liabilities (including damages, costs and reasonable attorneys fees) from any claim of any third party arising out of Seller's, Winn-Dixie's or the Ultimate Purchaser's acts, omissions or agreements, including, but not limited to, those types of claims set forth in paragraph 23.1(a) above.

(c) There is no agency relationship between Seller, Winn-Dixie and Buyer or Buyer and the Ultimate Purchaser; Buyer is not a successor or assign or alter ego to Seller, Winn-Dixie or the Ultimate Purchaser. Seller, Winn-Dixie and Buyer and Buyer and the Ultimate Purchaser are not involved in a joint venture, Buyer is not required to continue operations at any of Seller's or Winn-Dixie's former facilities. If in its sole discretion, Buyer or the Ultimate Purchaser hires former employees, managers or supervisors of Seller or Winn-Dixie, these individuals shall be employed as new employees of Buyer or the Ultimate Purchaser. All individuals considered for employment by Buyer or the Ultimate Purchaser, if any, will be hired on the basis of qualifications, as determined by Buyer or the Ultimate Purchaser. Buyer or the Ultimate Purchaser does not assume and is not responsible for any liability Seller or Winn-Dixie may have to retired persons or former employees. Seller and Winn-Dixie represent that they desire to cease their current retail grocery operations at the Stores. Seller

and Winn-Dixie further represent to Buyer and the Ultimate Purchaser that they have, or will before the Closing Date, satisfy their liabilities and/or obligations accruing prior to the Closing Date to all other persons who are affected by the closing of Seller's or Winn-Dixie's business operations; provided, however, if such obligations are of a nature such that they cannot be satisfied prior to the Closing Date, Seller and Winn-Dixie shall diligently cause the satisfaction of such obligations as soon as practicable after the Closing Date.

24.0 **Third Party Beneficiaries.**  To the extent specifically set forth herein, the Ultimate Purchaser shall be an intended third party beneficiary hereunder.  In all other respects, only the parties hereto and their permitted successors and assigns shall have any rights and/or obligations hereunder.

25.0 **Exhibits.**  The exhibits and schedules described herein may be attached by the parties after execution by the parties of this Agreement; and. thereafter, updated from time to time until Closing by mutual agreement.

[Remainder of Page Intentionally Left Blank.  Signature Page Follows.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**SELLER:**

**WINN-DIXIE STORES, INC., a Florida corporation**

By: _____
Name: _____
Title: _____

**SELLER:**

**WINN-DIXIE MONTGOMERY, INC., a Florida corporation**

By: _____
Name: _____
Title: _____

**SELLER:**

**WINN-DIXIE RALEIGH, INC., a Florida corporation**

By: _____
Name: _____
Title: _____

**BUYER:**

**ASSOCIATED              WHOLESALE GROCERS, INC.,**
a Kansas corporation

By: _____
Name: Scott Wellington
Title: Vice President, Legal Affairs

63

**BUYER:**

**ALEX LEE, INC.**,
a North Carolina corporation

By: _Boyd L. George_
Name: _Boyd L. George_
Title: _Chairman_

Acknowledged and agreed this ___ day of _____, 2005 for the limited purposes set forth in underline paragraph 18 of this Agreement:

**ESCROW AGENT:**

**NEAR NORTH NATIONAL TITLE LLC**


By: _____
Name: _____
Title: _____

## LIST OF EXHIBITS

| | | |
|---|---|---|
| Schedule 1 | - | List of Due Diligence Materials |
| Exhibit A | | List of Stores |
| Exhibit A-1 | - | [Reserved] |
| Exhibit A-2 | - | Description of Leases and Related Land |
| Exhibit A-3 | - | List of Assumed Leases |
| Exhibit A-4 | | Information Relating to Landlord Negotiations |
| Exhibit B | - | Form of Bill of Sale |
| Exhibit C-1 | - | Form of Closing Statement |
| Exhibit C-2 | | Form of Inventory Closing Statement |
| Exhibit D | - | [Reserved] |
| Exhibit E | - | Permitted Encumbrances |
| Exhibit F | - | Excluded Inventory |
| Exhibit G | - | Certain Excluded Personal Property |
| Exhibit H | - | Form of Inventory Certificate |
| Exhibit I | - | Declaration |
| Exhibit J | - | Purchase Price Allocation; Base Deposits; Inventory Deposits |
| Exhibit K | - | [Reserved] |
| Exhibit L | - | Form of Sale Order |
| Exhibit M | - | Disclosure Schedule |
| Exhibit N | - | List of Known Roof Warranties and Guaranties |
| Exhibit O | - | [Reserved] |
| Exhibit P | - | Form of Landlord Estoppel Certificate |
| Exhibit Q | - | [Reserved] |
| Exhibit R | - | [Reserved] |
| Exhibit S | - | [Reserved] |
| Exhibit T | - | [Reserved] |
| Exhibit U | - | Form of Insurer Notification Letter |
| Exhibit V | - | [Reserved] |
| Exhibit W | - | [Reserved] |
| Exhibit X | - | [Reserved] |
| Exhibit Y | - | Form of Lease Assignment |
| Exhibit Z | - | [Reserved] |
| Exhibit AA | - | Form of Sublease Assignment |
| Exhibit BB | - | Form of Warranties and Guaranties Assignment |
| Exhibit CC | - | Form of Assumed Contracts Assignment |

**SCHEDULE 1**
**TO**
**ASSET PURCHASE AGREEMENT**

**LIST OF DUE DILIGENCE MATERIALS**

## DOCUMENTS POSTED ON MERRILL WEBSITE FOR CERTAIN STORES[1]

| Store No.? | Lease Docs? | Documents in Lease and Lease Amendments? | Site Plan? | History Plan? | Documents in Existing Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-2? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|---|
| 10 | Yes, dated 4/20/05 | Lease dated October 5, 1977 between Hall Properties, Inc., as Landlord, and Winn-Dixie Stores, Inc., as Tenant<br><br>Short Form Lease dated October 5, 1977 between Hall Properties, Inc., as Landlord, and Winn-Dixie Stores, Inc., as Tenant, recorded in Book 66, Page 358, of the public records of Evans County, Georgia<br><br>Supplemental Lease Agreement dated August 23, 1978 between Hall Properties, Inc., as Landlord, and Winn-Dixie Stores, Inc., as Tenant<br><br>First Amendment to Lease dated September 12, 1978 between Hall Properties, Inc., as Landlord, and Winn-Dixie Stores, Inc., as Tenant<br><br>First Amendment to Short Form Lease dated September 12, 1978 between Hall Properties, Inc., as Landlord, and Winn-Dixie Stores, Inc., as Tenant, recorded in Book 68, Page 713, of the public records of Evans County, Georgia<br><br>Second Amendment to Short Form Lease dated October 11, 1978 between Hall Properties, Inc., as Landlord, and Winn-Dixie Stores, Inc., as Tenant, recorded in Book 82, Page 408, of the public records of Evans County, Georgia<br><br>Third Amendment to Lease dated January 22, 1985 between Hall Properties, Inc., August Urbanek and Steve Urbanek and William Gundlach, successor trustees to the American National Bank and Trust Company of Fort Lauderdale, the Former Trustee under Indenture of Trust | Yes, by Architectural Assoc, dated 12/13/93 | Yes, dated 1/17/02 | Old Republic Owner's Policy dated 8/12/97 | First American Title Commitment, dated 6/15/2005 exception documents | Phase I Environmental Site Assessment prepared by Golder Associates, Inc. to Winn-Dixie Stores, Inc., dated June 6, 2005<br><br>Phase II Environmental Site Assessment prepared by Golder Associates, Inc. to Winn-Dixie Stores, Inc., dated June 24, 2005 | Owned Equipment List<br><br>Leased Equipment List | Yes | Yes |

| Store Number | Documents to Lease or Lease Guarantee | Site Plan? | Survey Plan? | Documents in Reports Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists A-2? Folder | Exhibit A-2? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 808 | dated 6/15/66, as Landlord, and Winn-Dixie Stores, Inc., as Tenant<br><br>Second Supplemental Lease Agreement dated December 27, 1985 between Hall Properties, Inc., August Urbanek and Steve Urbanek and William Gundlach, successor trustees to the American National Bank and Trust Company of Fort Lauderdale, the Former Trustee under Indenture of Trust dated 6/15/66, as Landlord, and Winn-Dixie Stores, Inc., as Tenant, recorded in Book 83, Page 195, of the public records of Evans County, Georgia<br><br>Third Supplemental Lease Agreement dated July 1, 1996 between August Urbanek, Trustee of the Urbanek Family Revocable Trust Agreement under Trust dated 9/8/93, as Landlord, and Winn-Dixie Stores, Inc., as Tenant<br><br>Fourth Amendment to Lease dated May 10, 1994 between August Urbanek, Trustee of the Urbanek Family Revocable Trust Agreement under Trust dated 9/8/93, as Landlord, and Winn-Dixie Stores, Inc., as Tenant<br><br>Bank Sublease dated July 31, 1995 between Winn-Dixie Stores, Inc., as Landlord, and Tippins Bank & Trust Company, as Tenant<br><br>Lease dated 3/16/1993 between Daniel G. Kamin, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>Guaranty dated March 24, 1993 by Winn-Dixie Stores, Inc. to Daniel G. Kamin<br><br>Short Form Lease dated March 16, 1993 between Daniel G. Kamin, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant, recorded in Book 5556, Page 267 of the Wake County, NC public records | Yes, by C&P Archi-tects, dated 8/13/92 | Yes, dated 1/22/03 | None | Lawyer's Title Commitment, dated 6/24/2005 with vesting deed and exception documents | Phase I Environmental Site Assessment prepared by LFR Levine-Fricke, to Winn-Dixie Stores, Inc. dated June 1, 2005<br><br>Phase I Level 2 Environmental Site | Owned Equipment List<br><br>Leased Equipment List | Yes | No |
| Yes, dated 4/20/05 | | | | | | | | | |

2

| | Description of Leases and Subleases/Amendments | Site Plan? | Status Plat? | Documents in Historic File Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-129 | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 825<br><br>Yes, dated 4/20/05 | First Amendment to Lease and Short Form Lease dated December 20, 1993 between Daniel G. Kamin, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>Supplemental Lease Agreement dated March 21, 1994 between Daniel G. Kamin, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>Second Amendment to Lease dated March 22, 1994 between Daniel G. Kamin, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>Letter Agreement dated June 5, 1995 between John T. Henley, Rebecca B. Henley, Wilson F. Yarborough and Mary B. Yarborough, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>Lease dated March 27, 1975 between John T. Henley, Rebecca B. Henley, Wilson F. Yarborough and Mary B. Yarborough, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>Guaranty dated April 1, 1975 from Winn-Dixie Stores, Inc. to John T. Henley, Rebecca B. Henley, Wilson F. Yarborough and Mary B. Yarborough<br><br>Short Form Lease dated March 27, 1975 between John T. Henley, Rebecca B. Henley, Wilson F. Yarborough and Mary B. Yarborough, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant, recorded in Book 2489, Page 296, of the public records of Cumberland County, North Carolina<br><br>Supplemental Lease Agreement dated December 22, 1975 between John T. Henley, Rebecca B. Henley, Wilson F. Yarborough and Mary B. Yarborough, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | Yes, by Gordon E. Peebe, dated 7/74 | Yes | None | None | Assessment prepared by LFR Levine-Fricke to Winn-Dixie Stores, Inc., dated June 27, 2005<br><br>Phase I Environmental Site Assessment prepared by LFR Levine-Fricke, to Winn-Dixie Stores, Inc., dated June 1, 2005<br><br>Phase I - Level 2 Environmental Site Assessment prepared by LFR Levine-Fricke to Winn-Dixie Stores, Inc., dated June 26, 2005 | Owned Equipment List<br><br>Leased Equipment List | Yes | No |

3

| Nature of Title Holder | Documents relating to the Lease and Lease Amendments | Site Plan? | Written Plat? | Documents in Recent Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-20 | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 827 | Letter Agreement dated June 8, 1978 between John T. Henley, Rebecca B. Henley, Wilson F. Yarborough and Mary B. Yarborough, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>First Amendment to Lease dated October 9, 1978 between John T. Henley, Rebecca B. Henley, Wilson F. Yarborough and Mary B. Yarborough, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>Second Amendment to Lease dated July 12, 1980 between John T. Henley, Rebecca B. Henley, Wilson F. Yarborough and Mary B. Yarborough, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>Letter Agreement dated May 12, 1998 between John T. Henley, Rebecca B. Henley, and Mary B. Yarborough, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>Letter Agreement dated June 22, 2001 between John T. Henley, Rebecca B. Henley, and Mary B. Yarborough, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>Letter Agreement dated August 8, 2002 between John T. Henley, Rebecca B. Henley, and Mary B. Yarborough, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>Letter Agreement dated December 12, 2002 between John T. Henley, Rebecca B. Henley, and Mary B. Yarborough, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as tenant<br><br>Lease dated November 16, 1983 between The Cameron Company, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant<br><br>Termination Agreement dated May 9, 1986 between | Yes, by Smith Sinnett Associates , PA. | Yes, dated 6/10/03 | Chicago Title personal undertaking, dated 7/31/92 | Lawyer's Title Commitment dated May 27, 2005 with vesting deed and exception | Phase I Environmental Site Assessment prepared by LFR Levine-Fricke, to Winn-Dixie Stores, | Owned Equipment List<br><br>Leased Equipment List | Yes | No |

| Store Number | Documents in Lease and Lease Amendments | Site Plan? | Historic Plan? | Documents in Historic Title Folder | Documents in Current File Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-22 | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 880 | The Cameron Company and Winn-Dixie Raleigh, Inc. (re: Purchase Agreement) | | | | | | | | |
| | Guaranty dated December 14, 1983 from Winn-Dixie Stores, Inc. to The Cameron Company | | | | | | | | |
| | Short Form Lease dated November 16, 1983 between The Cameron Company, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant, recorded in Book 352, Page 549, of the public records of Lee County, North Carolina | | | | | | | | |
| | Supplemental Lease Agreement dated December 27, 1984 between The Cameron Company, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | dated 5/6/91 | | | | | | | |
| | Letter Agreement dated June 10, 1986 between The Cameron Company, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | | | | | | | | |
| | Second Amendment to Lease dated August 15, 1991 between The Cameron Company, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | | | | | | | | |
| | Consent and Indemnification Agreement dated September 12, 1991 among The Cameron Company, as Borrower, Winn-Dixie Raleigh, Inc., as Tenant, Winn-Dixie Stores, Inc., as Guarantor, and Gulf Life Insurance Company, as Lender | | | | | | | | |
| | Third Amendment to Lease and First Amendment to Short Form Lease dated July 1, 1992 between The Cameron Company, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant, recorded in Book 484, Page 740, of the public records of Lee County, North Carolina | | | | | | | | |
| Yes, dated 4/20/05 | Short Form Lease dated September 17, 1962 between | Yes, by Lonnie G. Peterson, dated 12/1/87 | Yes, dated 10/20/97 | None | None | Inc., dated June 3, 2005 | Owned Equipment List | Yes | No |
| | Lease dated September 17, 1962 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | | | | | Phase I Environmental Site Assessment prepared by LFR Levine-Fricke, to Winn-Dixie Stores, | Leased Equipment List | | |
| | Short Form Lease dated September 17, 1962 between | | | | documents | Phase I - Level 2 Environmental Site Assessment prepared by LFR Levine-Fricke to Winn-Dixie Stores, Inc., dated June 27, 2005 | | | |

5

| Store Number / State | Documents in Lease and Lease Amendments | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-22? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| | Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant, recorded in Book 952, Page 325, of the public records of Cumberland County, North Carolina | | | | | Inc., dated June 1, 2005 | | | |
| | Guaranty dated October 9, 1962 from Winn-Dixie Stores, Inc. to Bordeaux Center, Inc. | | | | | Phase I - Level 2 Environmental Site Assessment prepared by LFR Levine-Fricke to Winn-Dixie Stores, Inc., dated June 26, 2005 | | | |
| | Amendment of Guaranty dated July 18, 1963 by Winn-Dixie Stores, Inc. to Bordeaux Center, Inc. | | | | | | | | |
| | Supplemental Lease Agreement dated November 20, 1963 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | | | | | | | | |
| | Letter Agreement dated May 16, 1969 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | | | | | | | | |
| | Letter Agreement dated April 9, 1979 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | | | | | | | | |
| | First Amendment to Short Form Lease dated May 11, 1979 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant, recorded in Book 2712, Page 371 of the public records of Cumberland County, North Carolina | | | | | | | | |
| | Fifth Amendment to Lease dated May 11, 1979 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | | | | | | | | |
| | Sixth Amendment to Lease dated July 17, 1987 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | | | | | | | | |
| | Letter Agreement dated June 22, 1998 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | | | | | | | | |

6

| Store Number | Other Store Notes? | Documents in Lease and Lease Amendments | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists A-2? | Exhibit A-2? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|---|
| 882 | Yes, dated 4/20/05 | Letter Agreement dated September 19, 2003 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; Amendment of Lease dated August 29, 1968 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; Amendment of Lease dated December 6, 1977 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; Seventh Amendment to Lease and Second Amendment to Short Form Lease dated May 8, 1989 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant, recorded in Book 3484, Page 782, of the public records of Cumberland County, North Carolina; Lease dated June 30, 1993 between Cliffdale Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; Guaranty dated July 7, 1993 by Winn-Dixie Stores, Inc. to Cliffdale Center, Inc.; Short Form Lease dated June 30, 1993, between Cliffdale Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant, recorded in Book 3591, Page 895, of the public records of Cumberland County, North Carolina; Supplemental Lease Agreement dated November 28, 1994 between Cliffdale Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; Amendment to Original Lease Agreement dated March 16, 1994 between Cliffdale Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | Yes, by Larry King & Assoc., dated 12/3/92 | Yes, dated 6/6/00 | Chicago Owner's Policy dated August 20, 1993 | Lawyer's Title Commitment, dated 6/24/2005 with vesting deed and exception documents | Phase I Environmental Site Assessment prepared by LFR Levine-Fricke, to Winn-Dixie Stores, Inc., dated June 1, 2005; Phase I- Level 2 Environmental Site Assessment prepared by LFR Levine-Fricke to Winn-Dixie Stores, Inc., dated June 23, 2005 | Owned Equipment List; Leased Equipment List | Yes | No |
| 884 | Yes | Lease dated December 18, 1997 between Cedar Creek Crossing, LLC, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant | Yes dated 12/3/97 | Yes dated 6/5/00 | Stewart Title Guaranty Company title | Lawyers Title Insurance Corporation title | Phase I Environmental Site Assessment | Owned Equipment List | Yes | No |

7

| Store/Lease Number | Currently Open? | Documents in Lease and Lease Amendments | Site Plan? | Fixture Plan? | Documents in History/Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental/Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit | Subtenant Chart? |
|---|---|---|---|---|---|---|---|---|---|---|
| 918 | Yes | Raleigh, Inc., as Tenant<br><br>Short Form Lease dated December 18, 1997, between Cedar Creek Crossing, LLC, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant (recorded in Book 4801, Page 510, of the public records of Cumberland County, North Carolina)<br><br>Supplemental Lease Agreement dated March 18, 1999 between Winn-Dixie Raleigh, Inc. and Cedar Creek Crossing, LLC<br><br>Indenture dated May 6, 1976 between Singer Housing Company d/b/a The Mitchell Company as Lessor and The Great Atlantic & Pacific Tea Company, Inc. as Lessee<br><br>Short Form of Lease dated May 6, 1976 by and between Singer Housing Company d/b/a The Mitchell Company as Lessor and The Great Atlantic & Pacific Tea Company, Inc. as Lessee<br><br>Assignment of Ground Lease dated September 1976 from Singer Housing Company d/b/a The Mitchell Company as Assignor and Goldsboro Associates as Assignee, recorded at Book 904, page 488 of the public records of Wayne County, NC<br><br>Subordination, Recognition and Non-Disturbance Agreement dated August 22, 1977 by The Greater Atlantic & Pacific Tea Company, Inc.<br><br>Consent Agreement (Ground Lessor) dated July 29, 1976 between J.W. Southerland and Frankie C. Southerland Rose as Ground Lessor, and the Great Atlantic & Pacific Tea Company, Inc. as Sublessee<br><br>First Amendment to Lease dated August 22, 1977 between Goldsboro Associates as Lessor and The Great Atlantic and Pacific Tea Company as Lessor<br><br>Second Amendment to Lease dated August 22, 1977 | Yes (illegible) | Yes dated 10/1/03 | None<br><br>commitment dated September 23, 2003 | Lawyers Title Insurance Corporation title commitment, effective date June 22, 2005 with Vesting Deed and with Exceptions 2-4, 6-7, 10-11<br><br>commitment dated June 29, 2005 with exceptions | Phase I Environmental Site Assessment Report dated June 5, 2005 by LFR Levine-Fricke<br><br>Phase I Environmental Site Assessment Report (Level 2 Submittal) dated June 23 by LFR Levine-Fricke<br><br>Phase I Environmental Site Assessment Report (Level 2 Submittal) dated June 23 by LFR Levine-Fricke | Leased Equipment List<br><br>Owned Equipment List<br><br>Leased Equipment List | A-22 | Yes<br><br>No |

| Model Store? | Documents in Lease and Lease Amendments Folder | Site Plan? | Fixture Plan? | Documents in Historic/Site Folder | Documents in Current Title Commitment Folder | Documents in Environmental/Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-27 | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 1049 | between Goldsboro Associates as Lessor and The Great Atlantic & Pacific Tea Company, Inc. as Lessee | | | | | | | | |
| Yes | Letter Agreement dated September 26, 1977 between The Mitchell Company and The Great Atlantic & Pacific Tea Company | | | | | | | | |
| | Letter Agreement dated November 18, 1977 between The Great Atlantic & Pacific Tea Company, Inc. and The Mitchell Company | | | | | | | | |
| | Guaranty dated August 12, 1988 by Winn-Dixie Stores, Inc. in favor of The Great Atlantic & Pacific Tea Company, Inc. | | | | | | | | |
| | Third Amendment to Lease dated September 6, 1994 between Goldsboro Associates as Landlord and Winn-Dixie Raleigh, Inc. | | | | | | | | |
| | Supplemental Lease Agreement dated October 5, 1995 between Goldsboro Associates as Landlord and Winn-Dixie Raleigh, Inc. as Tenant | | | | | | | | |
| | Lease dated August 11, 1982 between Robert M. Gallant and Charles A. Wilkins as Landlords, and Winn-Dixie Greenville, Inc., as Tenant; | Yes | Yes | None | Policy from Lawyers Title Insurance Corporation dated June 13, 2005 with no exceptions | Phase I Environmental Site Assessment dated June 4, 2005 by Golder Associates | Owned Equipment List | Yes | No |
| | Short Form Lease dated August 11, 1982 between Robert M. Gallant and Charles A. Wilkins as Landlord and Winn-Dixie Greenville, Inc. as Tenant (recorded in Book 14-Z, Page 324, of the public records of Oconee County, South Carolina | | | | | Level 2 Phase I Environmental Site Assessment dated June 20, 2005 by Golder Associates | Leased Equipment List | | |
| | Guaranty dated August 26, 1982 by Winn-Dixie Stores, Inc. as Guarantor in favor of Robert M. Gallant and Charles A. Wilkins as Landlord | | | | | | | | |
| | Letter Agreement dated December 27, 1982 between Robert M. Gallant and Charles A. Wilkins as Landlord and Winn-Dixie Greenville, Inc. as Tenant | | | | | | | | |

| Store Number | Documents in Lease and Lease Amendments Folder | Site Plan? | Existing Plans? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessment Folder | Documents in Equipment Lists A-22 Folder | Exhibit | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 1301 | Supplemental Lease Agreement dated November 30, 1983 between Applewood Shopping Center as Landlord and Winn-Dixie Greenville, Inc. as Tenant<br><br>First Amendment to Lease dated August 16, 1991 between Applewood Shopping Center as Landlord and Winn-Dixie Greenville, Inc. as Tenant<br><br>Second Amendment to Lease dated March 30, 1992 between Applewood Shopping Center as Landlord and Winn-Dixie Greenville, Inc. as Tenant (recorded in Book 690, Page 184, of the public records of Oconee County, South Carolina)<br><br>Certificate and Affidavit Re: Merger dated April 8, 2005 | Yes - dated 4/20/05 | Yes - dated 3/17/05 | None | Title Policy issued February 6, 2001 by First American Title Company (no exceptions) | Phase I Environmental Site Assessment issued June 6, 2005 by Golder Associates, Inc. to Winn-Dixie Stores, Inc. | Owned Equipment List<br>Leased Equipment List | Yes | No |
| 1297 | Lease dated May 13, 1992 between Westside City, Inc., as Landlord, and Winn-Dixie Greenville, Inc., as Tenant<br><br>Guaranty dated April 26, 1994 from Winn-Dixie Stores, Inc. to Westside City, Inc.<br><br>Short Form Lease dated May 13, 1992 between Westside City, Inc. as Landlord, and Winn-Dixie Greenville, Inc. as Tenant, recorded in Book 1482, Page 17, of the public records of Greenville County, South Carolina<br><br>Supplemental Lease Agreement dated April 28, 1993 between Westside City, Inc. as Landlord, and Winn-Dixie Greenville, Inc., as Tenant<br><br>Certificate and Affidavit Re: Merger dated April 8, 2005 (unrecorded)<br><br>Corporate Guaranty of Lease Obligations dated January 11, 2001 by Winn-Dixie Stores, Inc. to Bennett V. York and Kemp Real Estate Company<br><br>Certificate and Affidavit Re: Merger dated March 30, | Yes – dated 9/12/91 by Gray Engineering Consultants | Yes - dated 9/1/97 | None – We have received a current title commitment issued June 22, 2005 by Lawyers Title Insurance Corporation but the commitment has not yet been posted on the Merrill website. | Title Commitment issued June 15, 2005 by First American Title Company with exceptions | Level 2 Phase I Environmental Site Assessment Report issued June 20, 2005 by Golder Associates, Inc. to Winn-Dixie Stores, Inc. | Leased Equipment List | Yes | Yes |

| Store Number / Location | Documents in Lease and Lease Amendments Folder | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-20? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| | 2005, recorded in Book 6240, Page 663 of the Hinds County, MS records | g, dated 2/7/90 | | | | Phase I Environmental Site Assessment issued June 24, 2005 by Golder Associates, Inc. to Winn-Dixie Stores, Inc. | | | |
| | Sublease dated March 7, 2003 between Winn-Dixie Montgomery, Inc., as Lessor, and Sunray Entertainment, LLC d/b/a Blockbuster, as Lessee | | | | | | | | |
| | Supplemental Sublease Agreement dated April 10, 2003 between Winn-Dixie Montgomery, Inc., as Landlord, and Sunray Entertainment, LLC d/b/a Blockbuster, as Tenant | | | | | | | | |
| | Fourth Agreement Amending Lease dated March 4, 1999 between Bennett V. York and Kemp Real Estate Company, collectively, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant | | | | | | | | |
| | Agreement Amending Lease dated January 11, 1996 between Bennett V. York and Kemp Real Estate Company, collectively, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant | | | | | | | | |
| | Second Agreement Amending Lease dated December 20, 1994 between Bennett V. York and Kemp Real Estate Company, collectively, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant | | | | | | | | |
| | Agreement Supplementing and Amending Lease dated April 8, 1991 between Bennett V. York, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant | | | | | | | | |
| | Agreement Supplementing Lease dated April 8, 1991 between Bennett V. York, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant, recorded in Book 3862, Page 276, in the Hinds County, MS records | | | | | | | | |
| | Agreement Amending Lease dated August 14, 1989 between Bennett V. York, Nancy E. York, and Susan Paige York, collectively, as Landlord, and | | | | | | | | |

11

| Store Number | Documents in Lease and Lease Amendments Folder | Site Plan? | Elevate Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessment Folder | Documents in Equipment Lists Folder | Exhibit A-22? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 1314 | Lease dated April 7, 1989 between Bennett V. York, Nancy E. York, and Susan Paige York, collectively, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant<br><br>Memorandum of Agreement Amending Lease dated December 20, 1994 between Bennett V. York and Kemp Real Estate Company, collectively, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant, recorded in Book 4390, Page 505 of the Hinds County, MS records<br><br>Memorandum of Lease dated April 7, 1989 between Bennett V. York, Nancy E. York, and Susan Paige York, collectively, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant, recorded in Book 3590, Page 283 of the Hinds County, MS records<br><br>Jitney-Jungle Stores of America, Inc., as Tenant, recorded in Book 3644, Page 141 of the Hinds County, MS records<br><br>Agreement Supplementing Lease dated May 3, 1999 between E & A Southeast Limited Partnership, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant<br><br>Third Agreement Amending Lease dated September 9, 1998 between McCarty Holman Company, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant<br><br>Second Agreement Amending Lease dated May 12, 1998 between McCarty Holman Company, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant, recorded in Book 5519, Page 111 of the public records of Hinds County, MS<br><br>Amendment and Extension Agreement dated February 19, 1996 between Jitney-Jungle Stores of America, Inc. and Deposit Guaranty National Bank | Yes | Yes - dated 5/5/95 | Title Commitment issued January 29, 1996 by Lawyer's Title Insurance Corporation (no exceptions) | Title Commitment issued June 15, 2005 by First American Title Company (no exceptions) | Phase I Environmental Site Assessment issued June 6, 2005 by Golder Associates, Inc. to Winn-Dixie Stores, Inc.<br><br>Level 2 Phase I Environmental Site Assessment issued June 24, 2005 by Golder Associates, Inc. to Winn-Dixie Stores, Inc. | Owned Equipment List<br><br>Leased Equipment List | Yes | No. |

Yes - dated 4/2/05

| Documents in Lease and Lease Amendments Folder | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-2? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|
| Agreement Amending Lease dated July 31, 1989 between McCarty-Holman Company, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant | | | | | | | | |
| Lease dated October 3, 1988 between McCarty-Holman Company, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant | | | | | | | | |
| Assignment and Assumption of Lease dated January 11, 2001 by Jitney-Jungle Stores of America, Inc., as Assignor, and Winn-Dixie Louisiana, Inc., as Assignee. | | | | | | | | |
| Corporate Guaranty of Lease Obligations dated January 11, 2001 by Winn-Dixie Stores, Inc. to E&A Southeast Limited Partnership | | | | | | | | |
| Lease dated April 23, 1995 between McCarty-Holman Company, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant | | | | | | | | |
| Memorandum of Lease dated April 23, 1995 between McCarty-Holman Company, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant, recorded in Book 4440, Page 491 of the Hinds County, MS records | | | | | | | | |
| Assignment of Leases dated September 14, 1998 by McCarty-Holman Company, as Seller, to E&A Southeast Limited Partnership, as Purchaser | | | | | | | | |
| Certificate and Affidavit Re: Merger [Winn-Dixie Montgomery, Inc.] dated March 30, 2005, recorded in Book 6240, Page 665 of the Hinds County, MS records | | | | | | | | |
| Agreement dated October 24, 1994 between Jitney Jungle Stores of America, as Owner, and Deposit Guaranty National Bank, as Bank re: ATM machine | | | | | | | | |

13

| Store # / Lease # / Store Code | Documents in Lease and Lease Amendments | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit tenant 4-27 | Sub-tenant Check? |
|---|---|---|---|---|---|---|---|---|---|
| | Memorandum of Lease dated October 3, 1998 between McCarty-Holman Company, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant, recorded in Book 3550, Page 141 of the Hinds County, MS records | | | | | | | | |
| | Memorandum of Lease dated October 3, 1988 between McCarty-Holman Company, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant, recorded in Book 3346, Page 384 of the Hinds County, MS records | | | | | | | | |
| 1362 | Assignment and Assumption of Lease dated January 11, 2001, between Southern Jitney Jungle Company, and Pump and Save, Inc., collectively as Assignor, and Winn-Dixie Louisiana, Inc., as Assignee (NOT APPLICABLE TO THIS STORE) | Yes, by the Matt-ace Com-pany | Yes - dated 11/0/9. | Title Policy issued February 13, 2001 by First American Title Company (no exceptions) | Title Commitment issued June 10, 2005 by First American Title Company with exceptions | Phase I Environmental Site Assessment issued June 4, 2005 by Golder Associates, Inc. to Winn-Dixie Stores, Inc. | Owned Equipment List | Yes. | No. |
| Yes – dated 4/20/05 | Corporate Guaranty of Lease Obligations dated January 11, 2001 by Winn-Dixie Stores, Inc. to E&A Southeast Limited Partnership (NOT APPLICABLE TO THIS STORE) | | | | | Level 2 Phase I Environmental Site Assessment issued June 24, 2005 by Golder Associates, Inc. to Winn-Dixie Stores, Inc. | Leased Equipment List | | |
| | Fourth Amendment to Lease dated May 15, 2003 between Edens & Avant Properties Limited Partnership, as Landlord, and Winn-Dixie Louisiana, Inc., as Tenant (NOT APPLICABLE TO THIS STORE) | | | | | | | | |
| | Second Agreement Supplementing Lease dated June 28, 1994 between Mattiace Properties, Inc., as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant, recorded in Book 339, Page 636 of the Madison County, MS records | | | | | | | | |
| | Agreement Amending Lease dated April 19, 1994 between Mattiace Properties, Inc., as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant | | | | | | | | |
| | Agreement Supplementing Lease dated April 19, 1994 between Mattiace Properties, Inc. as Landlord, and | | | | | | | | |

14

| Store Number | Documents in Lease and Lease Amendments Folder | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-22? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 1413 | Jitney-Jungle Stores of America, Inc., as Tenant, recorded in Book 334, Page 655 of the Madison County, MS records | Yes – dated 6/25/03 last revised 11/12/03 by R. Chris Magill | Yes – dated 3/18/03 | Title Policy issued February 20, 2003 by Mississippi Valley Title Company and Old Republic National Title Insurance Company (no exceptions) | Title Commitment issued June 9, 2005 by First American Title Company (no exceptions) | Phase I Environmental Site Assessment issued June 1, 2005 by Acrostar Environmental Services, Inc. to Winn-Dixie Stores, Inc. | Owned Equipment List | Yes | No. |
| | Lease dated January 7, 1993 between Mattiace Properties, Inc., as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant | | | | | | | | |
| | Letter Agreement dated April 19, 1994 to Mattiace Properties, Inc. from Jitney-Jungle Stores of America, Inc. re: School Street Crossing Shopping Center | | | | | | | | |
| | Corporate Guaranty of Lease Obligations dated January 11, 2001 by Winn-Dixie Stores, Inc. to School Street Crossings, L.P. | | | | | | | | |
| | Certificate and Affidavit Re: Merger dated March 30, 2005, recorded in Book 21, Page 13 of the Madison County, MS records | | | | | | | | |
| | Memorandum of Lease dated January 7, 1993 between Mattiace Properties, Inc., as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant, recorded in Book 863, Page 99 of the Madison County, MS records | | | | | | | | |
| | First Amendment to Lease dated October 16, 2003 between North Shore Crossings, LLC, as Landlord, and Winn-Dixie Louisiana, Inc., as Tenant | | | | | | | | |
| | Lease dated February 27, 2003 between North Shore Crossings, LLC, as Landlord, and Winn-Dixie Louisiana, Inc., as Tenant | | | | | | | | |
| | Short Form Lease dated February 27, 2003 between North Shore Crossings, LLC, as Landlord, and Winn-Dixie Louisiana, Inc., as Tenant, recorded in Book 1037, Page 146 of the Rankin County, MS records | | | | | | Level 2 Submittal Phase I Environmental Site Assessment issued June 24, 2005 by Acrostar Environmental Services, Inc. to Winn-Dixie Stores, Inc. | | | |
| | Corporate Guaranty of Lease Obligations dated March | | | | | | | | |

15

| Store Number | Equipments in Lease and Lease Amendments | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-22? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 1471 | Yes – dated 4/20/05 | | | | | | | | |
| | 3, 2003 by Winn-Dixie Stores, Inc. to North Shore Crossings, LLC | | | | | | | | |
| | Letter Agreement dated October 22, 2003 from Winn-Dixie, Inc. to PGM Properties, LLC, re: acceptance of General Contractor | | | | | | | | |
| | Lease dated May 20, 1993 between East 19th St. Properties, Inc. as Landlord, and Winn-Dixie Louisiana, as Tenant | Yes – dated 4/7/93 by Paul F. Stewart Architect, LTD. | Yes – dated 2/2/04 | None | Title Commitment issued May 24, 2005 by Lawyer's Title Insurance Corporation with exceptions | Phase I Environmental Site Assessment issued June 1, 2005 by Aerostar Environmental Services, Inc. to Winn-Dixie Stores, Inc. | Owned Equipment List / Leased Equipment List | Yes | No. |
| | Short Form of Lease dated May 20, 1993 between East 19th St. Properties, Inc., as Landlord, and Winn-Dixie Louisiana, as Tenant (recorded in Book G-34, page 682 of the St. Landry Parish, LA records) | | | | | | | | |
| | Amendment to Lease dated July 7, 1993 between East 19th St. Properties, Inc., as Landlord, and Winn-Dixie Louisiana, as Tenant | | | | | Level 2 Subinitial Phase I Environmental Site Assessment issued June 24, 2005 by Aerostar Environmental Services, Inc. to Winn-Dixie Stores, Inc. | | | |
| | Second Amendment to Lease dated February 17, 1994 between East 19th St. Properties, Inc., as Landlord, and Winn-Dixie Louisiana, as Tenant | | | | | | | | |
| | Certificate and Affidavit Re: dated March 22, 2005, recorded in Book C-41, page 23 of the St. Landry Parish, LA records | | | | | | | | |
| | Supplemental Lease Agreement dated April 27, 1994 between LRS General Partnership, Inc., as Landlord, and Winn-Dixie Louisiana, as Tenant | | | | | | | | |
| | Lease dated February 4, 1994 between Winn-Dixie Louisiana, Inc., as Lessor, and American Security Bank, as Lessee | | | | | | | | |
| | Lease Termination Agreement dated August 11, 2001 between Winn-Dixie Stores, Inc., as Lessor, and Hancock Bank, as Lessee | | | | | | | | |
| | Guaranty dated June 11, 1993 by Winn-Dixie Stores, Inc. to East 19th St. Properties, Inc. | | | | | | | | |

| Store # | Deal Sheet? | Documents in Lease and Lease Amendments Folder | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-2? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|---|
| 1547 | Yes – dated 4/20/05 | Short Form Lease dated February 6, 1985 between The Mitchell Company, Landlord and Winn-Dixie Louisiana, Inc, Tenant, recorded in Book 1141, Page 152 of the Rapides Parish, LA records<br><br>Amendment No. 2 to Lease, dated June 30, 1986 between Pinebrook Associates, Ltd., as Landlord, and Winn-Dixie Louisiana, Inc, as Tenant<br><br>Certificate and Affidavit Re: Merger dated March 22, 2005,(recorded in Book 1718, page 873 of the Rapides Parish, LA records<br><br>Supplemental Lease Agreement dated April 11, 1986 between Pinebrook Associates, Ltd., as Landlord, and Winn-Dixie Louisiana, Inc., as Tenant<br><br>Amendment to Lease dated August 9, 1985 between The Mitchell Company, as Landlord and Winn-Dixie Louisiana, Inc., as Tenant<br><br>Lease dated February 6, 1985 between The Mitchell Company, Landlord and Winn-Dixie Louisiana, Inc., Tenant<br><br>Guaranty dated February 8, 1985 to The Mitchell Company, as Landlord by Winn-Dixie stores, Inc., as Guarantor | Yes | Yes – dated 9/15/93 last revised 11/29/93 | Title Commitment issued August 10, 1998 by First American Title Company (no exceptions) | Title Commitment issued May 11, 2005 by Lawyer's Title Insurance Corporation with exceptions | Phase I Environmental Site Assessment issued June 1, 2005 by Aerostar Environmental Services, Inc. to Winn-Dixie Stores, Inc.<br><br>Level 2 Submittal Phase I Environmental Site Assessment issued June 24, 2005 by Aerostar Environmental Services, Inc. to Winn-Dixie Stores, Inc. | Owned Equipment List<br>Leased Equipment List | Yes | No |
| 2001 | Yes – dated 4/20/05 | Lessee's Acceptance of Premises and Acknowledgement of Assignment dated October 1, 1987 to B.V. Belk, Jr. & Harriet C. Belk from Winn-Dixie Charlotte, Inc.<br><br>Lease dated April 7, 1986 between B.V. Belk, Jr., as Landlord, and Winn-Dixie Charlotte, Inc., as Tenant<br><br>Guaranty dated June 11, 1986 by Winn-Dixie Stores, Inc. to B.V. Belk, Jr.<br><br>Short Form Lease dated April 7, 1986 between B.V. Belk, Jr., as Landlord and Winn-Dixie Charlotte, | Yes | Yes – dated 8/11/03 | None | Title Commitment issued June 21, 2005 by Lawyers Title Insurance Corporation (with Vesting Deed and Exceptions 3 – 10, 13) | Phase I Environmental Site Assessment issued June 6, 2005 by Golder Associates, Inc. to Winn-Dixie Stores, Inc.<br><br>Level 2 Phase I Environmental Site Assessment issued June 20, 2005 by Golder Associates, Inc to Winn-Dixie Stores, | Owned Equipment List<br><br>Leased Equipment List | Yes | No |

| Store/Year Sharp? | Documents in Lease and Lease Amendments Folder | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-22? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 2003 | Inc., as Tenant, recorded in Book 5367, Page 405 of the public records of Mecklenburg County, North Carolina<br><br>First Amendment to Short Form Lease dated November 26, 1986, between B.V. Belk, Jr. & Harriet C. Belk, as Landlord, and Winn-Dixie Charlotte, Inc., as Tenant, recorded in Book 5456, Page 376 of the public records of Mecklenburg County, North Carolina<br><br>Supplemental Lease Agreement dated November 2, 1987 between B.V. Belk, Jr. & Harriet C. Belk, as Landlord, and Winn-Dixie Charlotte, Inc., as Tenant<br><br>Certificate and Affidavit Re: Merger dated April 21, 2005, recorded in Book 18648, Page 335 of the public records of Mecklenburg County, North Carolina | | | Title Commitment issued December 13, 1996 by Lawyers Title Insurance Corporation (no Exception documents) | | Phase I Environmental Site Assessment issued June 6, 2005 by Golder Associates, Inc. to Winn-Dixie Stores, Inc. | | | |
| Yes – dated 4/20/05 | Ground Lease dated July 29, 1985 between CNC Centers, as Landlord and Winn-Dixie Charlotte, Inc., as Tenant | Yes – dated 9/6/85 | Yes – dated 3/29/05 | | None | Level 2 Phase I Environmental Site Assessment issued June 20, 2005 by Golder Associates, Inc. to Winn-Dixie Stores, Inc. | Owned Equipment List | Yes | No |
| | Memorandum of Ground Lease dated July 29, 1985 between CNC Centers, as Landlord, and Winn-Dixie Charlotte, Inc., as Tenant (unrecorded) | | | | | Inc. | Leased Equipment List | | |
| | Guaranty dated July 29, 1985 by Winn-Dixie Stores, Inc. in favor of CNC Centers | | | | | | | | |
| | Supplemental Ground Lease Agreement dated September 16, 1986 between CNC Centers, as Landlord and Winn-Dixie Charlotte, Inc., as Tenant | | | | | | | | |
| | Ground Lease dated September 6, 1985 between CNC Centers, as Landlord, and Winn-Dixie Charlotte, Inc., as Tenant | | | | | | | | |
| | Guaranty dated September 10, 1985 by Winn-Dixie Stores, Inc. in favor of CNC Centers | | | | | | | | |

18

| Store Number | | Documents in Lease and Lease Agreements | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessment Folder | Documents in Equipment List Folder | Exhibit A-22? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | Yes – dated 4/2005 | Memorandum of Ground Lease dated September 6, 1985 between CNC Centers, as Landlord, and Wim-Dixie Charlotte, Inc., as Tenant, recorded in Book 5087, Page 741 of the public records of Mecklenburg County, North Carolina | | | | | | | Yes | No |
| | | Certificate and Affidavit Re: Merger dated April 21, 2005, recorded in Book 18648, Page 355, of the public records of Mecklenburg County, North Carolina | | | | | | | | |
| | | Short Form Sublease dated March 30, 1987 between Realty South Investors, Inc., as Landlord, and Wim-Dixie Charlotte, Inc., as Tenant, recorded in Book 5471, Page 977 of the public records of Mecklenburg County, North Carolina | | | | | | | | |
| | | Sublease dated March 30, 1987 between Realty South Investors, Inc., as Landlord, and Wim-Dixie Charlotte, Inc., as Tenant | | | | | | | | |
| | | Guaranty dated March 30, 1987 by Wim-Dixie Stores, Inc. to Realty South Investors, Inc. | | | | | | | | |
| | | Lease dated February 18, 1992 between Arrowood Limited Partnership, as Landlord, and Wim-Dixie Charlotte, Inc., as Tenant | Yes – dated 11/20/91 and revised 12/23/91 by Overcash Demitt Architects | Yes – dated 9/9/03 | Title Commitment issued April 14, 1998 by First American Title Insurance Company (no Exception documents) | Title Commitment issued June 7, 2005 by Lawyers Title Insurance Corporation (with Vesting Deed and Exceptions 3, 5, 6, and 8-17) | Phase I Environmental Site Assessment issued June 6, 2005 by Golder Associates, Inc. to Wim-Dixie Stores, Inc. | Owned Equipment List | | |
| | | Guaranty dated February 18, 1992 by Wim-Dixie Stores, Inc. in favor of Arrowood Limited Partnership | | | | | Phase I Environmental Site Assessment issued June 20, 2005 by Golder Associates, Inc. to Wim-Dixie Stores, Inc. | Leased Equipment List | | |
| | | Short Form Lease dated February 18, 1992 between Arrowood Limited Partnership, as Landlord, and Wim-Dixie Charlotte, Inc., as Tenant, recorded in Book 6796, Page 554 of the public records of Mecklenburg County, North Carolina | | | | | | | | |
| | | Supplemental Lease Agreement dated July 7, 1993 between Arrowood Limited Partnership, and Wim-Dixie Charlotte, Inc., as Tenant | | | | | | | | |

19

| Store Lease No.? | Documents in Lease and Lease Amendments | Site Plan? | Picture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-22 | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 2045 Yes – dated 4/20/05 | Certificate and Affidavit Re: Merger dated April 21, 2005, recorded in Book 18648, Page 335, of the public records of Mecklenburg County, North Carolina | Yes – dated 4/7/93 by Gary Williams Archi-tects | Yes – dated 1/25/05 | Leasehold Owner's Policy of Title Insurance Commitment Contract issued January 28, 1994 by Investors Title Insurance Company (no Exception documents) | Title Commitment issued June 6, 2005 by Lawyers Title Insurance Corporation (with Exceptions 4, and 7, 10) | Phase I Environmental Site Assessment issued June 3, 2005 by LFR Levine Fricke to Winn-Dixie Stores, Inc.

Phase I Environmental Site Assessment (Level 2 Submittal) issued June 23, 2005 by LFR Levine Fricke to Winn-Dixie Stores, Inc. | Owned Equipment List

Leased Equipment List | Yes | No |
|  | Letter Agreement dated August 13, 1992 between Arrowood Limited Partnership, as Landlord, and Winn-Dixie Charlotte, Inc., as Tenant |  |  |  |  |  |  |  |  |
|  | Lease Agreement dated February 10, 1984 between Flask Corporation, as Lessor, and Winn-Dixie Charlotte, Inc., as Lessee |  |  |  |  |  |  |  |  |
|  | Consent and Agreement by Winn-Dixie Charlotte, Inc. to Assignment of Lease from Flask Corporation to Duval Funding Corporation dated February 10, 1984 |  |  |  |  |  |  |  |  |
|  | Reassignment of Lease and Agreement from Duval Funding Corporation to Mellon Bank, N.A. and N.R. Smith dated February 10, 1984 |  |  |  |  |  |  |  |  |
|  | Memorandum of Lease dated February 10, 1984 between Flask Corporation, as Lessor, and Winn-Dixie Charlotte, Inc., as Lessee (unrecorded) |  |  |  |  |  |  |  |  |
|  | Guaranty dated February 10, 1984 from Winn-Dixie Stores, Inc. to Flask Corporation |  |  |  |  |  |  |  |  |
|  | Consent and Restatement of Reassignment of Lease and Agreement dated October 10, 1986 from Duval Funding Corporation to Mellon Bank, N.A. and N.R. Smith, recorded in Book 634, Page 381 of the public records of Richmond County, North Carolina |  |  |  |  |  |  |  |  |
|  | Memorandum of Modification of Lease dated October 10, 1986 between Joseph M. Reynolds and Peter W. Merner, as nominees for John H. O. LaGatta, as successor landlord to Flask Corporation, as Lessor, and Winn-Dixie Charlotte, Inc., as Tenant, recorded in Book 694, Page 368, of the public records of Richmond County, North Carolina |  |  |  |  |  |  |  |  |

20

| Store Number | Documents in Lease and Lease Amendments Folder | Site Plan? | Picture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-26 | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 2063 | Memorandum of Second Lease Modification Agreement dated January 6, 1994 between Helene Funk and Peter W. Merner, nominees for John H.O. LaGatta, as Lessor, and Winn-Dixie Charlotte, Inc., as Lessee (unrecorded)<br><br>Consent and Reaffirmation of Guaranty dated January 6, 1994 by Winn-Dixie Stores, Inc. to Helene Funk and Peter W. Merner<br><br>Consent and Agreement by Winn-Dixie Charlotte, Inc. to Supplement to Assignment of Lease from Helene Funk and Peter W. Merner, as nominees for John H.O. LaGatta to Duval Funding Corporation dated January 6, 1994<br><br>First Supplement to Reassignment of Lease and Agreement from Duval Funding Corporation to Bank of America National Trust and Savings Association and Jenni Minardi dated January 6, 1994<br><br>Second Lease Modification Agreement dated January 6, 1994 between Helene Funk and Peter W. Merner, as nominees for John H.O. LaGatta, as Lessor, and Winn-Dixie Charlotte, Inc., as Lessee<br><br>Notice of Transfer of Tenant's Interest in Lease dated June 29, 2000, recorded in Book 1080, Page 507, of the public records of Richmond County, North Carolina<br><br>General Assignment and Assignment of Leases dated June 29, 2000 between Winn-Dixie Charlotte, Inc. and Winn-Dixie Charlotte Transitory "A", Inc.<br><br>Lease dated April 13, 1989 between Hugh W. Johnston and Audrey S. Johnston, as Landlord, and Winn-Dixie Charlotte, Inc., as Tenant<br><br>Guaranty dated April 13, 1989 from Winn-Dixie | Yes – dated 4/20/05 | Yes – dated 2/10/99 by C&P Architects, Inc. | Yes – dated 4/5/05 | Owner's Policy of Title Insurance issued October 31, 1997 by Commonwealth Land Title Insurance<br><br>Title Commitment issued June 1, 2005 by Lawyers Title Insurance Corporation (with | Phase I Environmental Site Assessment issued May 31, 2005 by LFR Levine Fricke to Winn-Dixie Stores. | Owned Equipment List<br><br>Leased Equipment List | Yes | No |

21

| Store / Lease / Policy | Documents in Lease and Lease Amendments | Site Plan? | Fixture Plan? | Documents in Historical Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists / Folder | Exhibit "A"? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 2083 | Stores, Inc. to Hugh W. Johnston and Audrey S Johnston<br><br>Short Form Lease dated April 3, 1989 between Hugh W. Johnston and Audrey S. Johnston, as Landlord, and Winn-Dixie Charlotte, Inc., as tenant, recorded in Book 1972, Page 461, of the public records of Gaston County, North Carolina<br><br>Certificate and Affidavit Re: Merger dated April 21, 2005 (unrecorded)<br><br>Sunwise dated October 27, 1995 between Winn-Dixie Charlotte, Inc., as Landlord, and Cost Containment, Inc., as Tenant<br><br>Intercompany Memo dated July 13, 1990 from Charles P. Milford, Jr. to James Kufeldt and J.S. Bryan, Jr. re: Supplemental Lease Agreement<br><br>Supplemental Lease Agreement dated July 10, 1990 between Hugh W. Johnston and Audrey S. Johnston, as Landlord, and Winn-Dixie Charlotte, Inc., as Tenant<br><br>Letter Agreement dated March 13, 1990 between Hugh W. Johnston and Winn-Dixie Charlotte, Inc.<br><br>Intercompany Memo dated April 12, 1989 from Charles P. Milford, Jr. to James Kufeldt and J.S. Bryan, Jr. re: Lease and Short Form Lease | | | Company (no Exception documents) | Tax Bills, Vesting Deed and Exceptions 3-9) | Inc.<br><br>Phase I Environmental Site Assessment (Level 2 Submittal) issued June 27, 2005 by LFR Levine Fricke to Winn-Dixie Stores, Inc. | | | |
| Yes – dated 4/20/05 | Lease dated April 7, 1994 between Lowry Development, Inc., as Landlord, and Winn-Dixie Charlotte, Inc. as Tenant<br><br>Short Form Lease dated April 7, 1994 between Lowry Development, Inc., as Landlord, and Winn-Dixie Charlotte, Inc., as Tenant, recorded in Book 1909, Page 933, of the public records of Catawba County, North Carolina | Yes | Yes – dated 9/30/03 | None | Title Commitment issued June 24, 2005 by Lawyers Title Insurance Corporation (with Exceptions 3-11) | Phase I Environmental Site Assessment issued June 6, 2005 by LFR Levine Fricke to Winn-Dixie Stores, Inc.<br><br>Phase I Environmental Site Assessment (Level 2 Submittal) | Owned Equipment List<br><br>Leased Equipment List | Yes | No |

22

| Store Number | Documents in Lease and Lease Amendments | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-22 | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 2093 | Yes - Dated 4/20/05 | Yes – Dated 10/4/93 | Yes – Dated 10/1/03 | None | None | Phase I Environmental Site Assessment – Dated June 1, 2005 issued by LFR Levine Fricke to Wim-Dixie Stores, Inc. (Level II Submittal)<br><br>Phase I Environmental Site Assessment – Dated June 27, 2005 issued by LFR Levine Fricke to Wim-Dixie Stores, Inc | Owned Equipment List<br><br>Leased Equipment List | Yes | No |

Content of "Documents in Lease and Lease Amendments" column (top to bottom):

Guaranty dated April 15, 1994 from Wim-Dixie Stores, Inc. to Lowry Development, Inc.

Letter Agreement dated June 8, 1994 between Winn-Dixie Charlotte, Inc. and Lowry Development, Inc.

Supplemental Lease Agreement dated January 2, 1996 between Springs Corners, L.L.C., as Landlord, and Winn-Dixie Charlotte, Inc., as Tenant

Amendment to Lease and Short Form Lease dated February 2, 1996 between Springs Corners, L.L.C., as Landlord, and Winn-Dixie Charlotte, Inc., as Tenant, recorded in Book 1977, Page 49, of the public records of Catawba County, North Carolina

Certificate and Affidavit Re: Merger dated April 21, 2005 (unrecorded)

Ground Lease dated December 15, 1982 between Hugh M. Wilson under Trust Agreement dated February 1, 1980, as Lessor, and Dixon-Jenkins, Inc., as Lessee

Short Form of Lease/Memo of Ground Lease dated December 15, 1982 between Hugh M. Wilson under Trust Agreement dated February 1, 1980, as Lessor, and Dixon-Jenkins, Inc. as Lessee, recorded in Book 796 page 001 in the Office of the Register of Deeds of Caldwell County, North Carolina

Lease dated January 25, 1983 between Dixon-Jenkins, Inc. as Landlord and Wim-Dixie Charlotte, Inc., as Tenant

Guaranty dated February 15, 1983 by Wim-Dixie Charlotte, Inc. to Dixon-Jenkins, Inc.

Short Form of Lease/Memo of Lease dated January 25, 1983 between Dixon-Jenkins, Inc., as Landlord and Wim-Dixie Charlotte, Inc., as Tenant recorded in Book 800 page 351 in the Office of the Registrar of

| Store/Item Lease Number? | Documents in Lease and Lease Amendments | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-20 | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 2059<br><br>Yes – dated 4/20/05 | Deeds of Caldwell County, North Carolina<br><br>Letter Agreement dated April 7, 1983 between Winn-Dixie Charlotte, Inc. and Dixon-Jenkins, Inc.<br><br>Supplemental Lease dated May 14, 1984 between Pinewood Plaza Associates by LKH&G Associates as Landlord and Winn-Dixie Charlotte, Inc. as Tenant<br><br>First Amendment to Lease dated March 4, 1994 between Pinewood Plaza Associates, as Landlord and Winn Dixie Charlotte, Inc. as Tenant<br><br>Second Amendment to Lease dated May 23, 1994 between Pinewood Plaza Associates, as Landlord and Winn-Dixie Charlotte, Inc. as Tenant<br><br>Third Amendment to Lease dated December 14, 1995 between Pinewood Plaza Associates, as Landlord and Winn-Dixie Charlotte, Inc. as Tenant<br><br>Second Supplemental Lease dated December 21, 1995 between Pinewood Plaza Associates as Landlord and Winn-Dixie Charlotte, Inc. as Tenant<br><br>Certificate and Affidavit Re: Merger dated April 21, 2005 (unrecorded)<br><br>Construction Agreement dated March 2, 1988 between Palmer Development Co., Inc. and Winn-Dixie Charlotte, Inc.<br><br>Ground Lease dated March 22, 1988 between Palmer Development Co. Inc., as Landlord and Winn-Dixie Charlotte, Inc. as Tenant<br><br>Short Form of Lease/Memo of Ground Lease dated March 1988 between Palmer Development Co., Inc., as Landlord and Winn-Dixie Charlotte, Inc., as Tenant recorded in the public records of Lincoln County, North Carolina in Book 687 Page 592 | Yes – Dated 2/29/88 | Yes – Dated 8/11/03 | Title Policy issue by Lawyers Title Insurance Corporation on April 6, 1988 with no Exception documents | None | Phase I Environmental Site Assessment – Dated June 1, 2005 issued by LFR Levine Fricke to Winn-Dixie Stores, Inc.<br><br>Phase I Environmental Site Assessment – Dated June 27, 2005 issued by LFR Levine Fricke to Winn-Dixie Stores, Inc (Level II | Owned Equipment List<br><br>Leased Equipment List | Yes | No |

| Store/Item # | Documents in Lease and Lease Amendments | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder (Submittal) | Documents in Equipment Lists A-2? | Exhibit A-2? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 2622 | Lease dated March 14, 1989 between Palmer Development Company, Inc. as landlord and Winn-Dixie Charlotte, Inc., as Tenant<br><br>Party Wall Agreement dated March 22, 1988 between Palmer Development Company, Inc. and Winn-Dixie Charlotte, Inc. as recorded in the public records of Lincoln County, North Carolina in Book 687 Page 598<br><br>Short Form of Lease/Memo of Lease dated March 14, 1989 between Palmer Development Company, Inc. as landlord and Winn-Dixie Charlotte, Inc., as Tenant as recorded in the public records of Lincoln County, North Carolina in Book 731 Page 669<br><br>Amendment to Ground Lease dated May 16, 1989 between Palmer Development Company, Inc. as landlord and Winn-Dixie Charlotte, Inc., as Tenant as recorded in the public records of Lincoln County, North Carolina in Book 719 Page 594<br><br>First Amendment to Lease dated October 30, 1989 between Palmer Development Company, Inc. as landlord and Saddle Fund I I Limited Partnership, and Winn-Dixie Charlotte, Inc., as Tenant<br><br>Second Amendment to Lease dated December 1, 1989 between Saddle Fund I Limited Partnership as landlord and Winn-Dixie Charlotte, Inc., as Tenant<br><br>Certificate and Affidavit Re: Merger dated April 21, 2005 (unrecorded)<br><br>Lease Agreement dated December 22, 1976 between W.H. Holman, Jr., W.B. McCary, Jr., and Isabel R. McCary, d/b/a Ellis Isle, as landlord, and Southern Jimey Jungle Company as Tenant<br><br>Lease Modification Agreement #1 dated June 10, 1977 between W.H. Holman, Jr., W.B. McCary, Jr., and | Yes – dated 3/19/92 | Yes – dated 8/28/02 | Title Commitment dated May 26, 2004 issued by First American Title Insurance Company with no Exception documents | Title Commitment dated June 15, 2005 Dated by First American Title Insurance Company with no Exception documents | Phase I Environmental Site Assessment – Dated June 6, 2005 issued by Golder Associates, Inc. to Winn-Dixie Stores, Inc. | Owned Equipment List<br><br>Leased Equipment List | Yes | Yes |

| Stores/Test Sheets? | Documents in Lease and Lease Amendments Folder | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessment Folder | Documents in Equipment Lists Folder | Exhibit A-27 | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| | Isabel R. McCarty, d/b/a Ellis Isle, as Landlord, and Southern Jitney Jungle Company, as Tenant | | | | | Level 2 Phase I Environmental Site Assessment – Dated June 24, 2005 issued by Golder Associates, Inc. to Winn-Dixie Stores, Inc | | | |
| | Lease Modification Agreement #2 dated November 26, 1979 between Ellis Isle, as Landlord, and Southern Jitney Jungle Company, as Tenant | | | | | | | | |
| | Third Agreement Amending Lease dated September 16, 1992 between Ellis Isle, as Landlord, and Southern Jitney Jungle Company, as Tenant | | | | | | | | |
| | Fourth Agreement Amending Lease dated September 17, 1994 between Ellis Isle, as Landlord, and Southern Jitney Jungle Company, as Tenant | | | | | | | | |
| | Fifth Agreement Amending Lease dated April 13, 1998 between Ellis Isle Properties, LLC (formerly Ellis Isle), as Landlord and Southern Jitney Jungle Company, as Tenant | | | | | | | | |
| | Corporate Guaranty of Lease Obligations dated January 11, 2001 by Winn-Dixie Stores, Inc. as Guarantor in favor of E&A Southeast Limited Partnership as Landlord on behalf of Save Rite Grocery Warehouse, Inc. as Tenant | | | | | | | | |
| | Certificate and Affidavit Re: Merger dated March 31, 2005 as recorded in Book 1214 Page 0053 of the public records Lincoln County, Mississippi | | | | | | | | |
| | Sublease dated October 5, 1977 between Southern Jitney Jungle Company as Landlord and Irene Smith d/b/a Judy's Shoes as Tenant | | | | | | | | |
| | Sublease dated October 19, 1983 between Southern Jitney Jungle Co., Inc., as Landlord and Keith Perkins and Preston Roney as Tenant | | | | | | | | |
| | Sublease dated June 22, 1989 between Southern Jitney Jungle Company as Sublandlord and Clinton Bane, Jr. as Subtenant | | | | | | | | |

| Store Number | Master Lease? | Documents in Lease and Lease Amendments | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-2? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|---|
| 2640 | Yes – Dated 4/20/05 | Sublease dated June 27, 1996 between Southern Jitney Jungle Company as Sublandlord and Preston Roney as Subtenant<br><br>Agreement Amending Sublease dated May 31, 2002 between Save Rite Grocery Warehouse, Inc. as Landlord and Magnolia Laundries, LLC as Tenant<br><br>Lease Agreement dated February 21, 1983 between Canton Associates, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant<br><br>Agreement Amending Lease Agreement dated August 24, 1984 between The Green Lumber Company as Landlord and Southern Jitney Jungle Company as Tenant<br><br>Agreement Supplementing and Amending Lease dated March 21, 1984 between Canton Associates, as Landlord, and Jitney-Jungle Stores of America, Inc., as Tenant<br><br>Agreement Consolidating and Amending Lease dated April 27, 1992 between Daniel G. Kamin as Landlord and Southern Jitney Jungle Company as Tenant<br><br>Assignment and Assumption of Lease dated January 11, 2001 between Southern Jitney Jungle Company and Pump and Save, Inc. as Assignor and Winn-Dixie Louisiana, Inc., as Assignee<br><br>Memorandum of Assignment and Assumption of Lease dated February 7, 2001 as recorded in Book 1271 Page 155 of the public records of Jones County, Laurel, Mississippi<br><br>Corporate Guaranty of Lease Obligation dated January 11, 2001 by Winn-Dixie Stores, Inc., as Guarantor in favor of Tower Investors, Ltd., as Landlord, on behalf of Winn-Dixie Louisiana, Inc. as Tenant | Yes | Yes – dated 11/12/02 | Title Commitment dated March 9, 2001 issued by First American Title Insurance Company with no Exception documents | Title Commitment dated June 17, 2005 issued by First American Title Insurance Company with no Exception documents | Phase I Environmental Site Assessment – Dated June 6, 2005 issued by Golder Associates, Inc. to Winn-Dixie Stores, Inc.<br><br>Phase I Environmental Site Assessment – Dated June 24, 2005 issued by Golder Associates, Inc. to Winn-Dixie Stores, Inc | Owned Equipment List<br><br>Leased Equipment List | Yes | No |

| Store/Lease/Official Policy | First... Assignments in Lease and Lease Amendments | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Lists Folder | Exhibit A-22 | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| 2718 | Corporate Guaranty of Lease Obligation dated January 11, 2001 by Winn-Dixie Stores, Inc. as Guarantor in favor of Daniel G. Kamin, as Landlord, on behalf of Winn-Dixie Louisiana, Inc. as Tenant<br><br>Assignment and Assumption of Lease dated November 7, 2003 between Winn-Dixie Louisiana, Inc., as Assignor and Save Rite Grocery Warehouse, Inc., as Assignee<br><br>Notice of Assignment of Lease and Affidavit Re: Merger dated March 31, 2005 as recorded in Book 21 Page 23 of the public records Madison County, Mississippi.<br><br>Lease Agreement between The Bonny Corporation, as Landlord, and Winn-Dixie Atlanta, Inc., as Tenant, dated July 1, 1976.<br><br>Guaranty dated July 12, 1976 by Winn-Dixie Stores, Inc., as Guarantor on behalf of Winn-Dixie Atlanta, Inc., to The Bonny Corporation<br><br>Short Form Lease between The Bonny Corporation, as Landlord, and Winn-Dixie Atlanta, Inc., as Tenant, dated July 1, 1976 recorded in Book 3530, page 144 DeKalb County, Georgia.<br><br>Amendment to Lease between The Bonny Corporation, as Landlord, and Winn-Dixie Atlanta, Inc., as Tenant, dated December 26, 1978.<br><br>First Amendment to Lease between The Bonny Corporation, as Landlord and, Winn-Dixie Atlanta, Inc., as Tenant, dated November 2, 1979 re: termination of First Amendment to Lease referenced above.<br><br>Side Letter Agreement between Tenant and Landlord dated March 22, 1977. | Yes – dated 4/20/05 | Yes – dated 12-27-75 | Yes- dated 12/04/01 | American Land Title Association Commitment issued May 1, 1998 by Chicago Title Insurance Company with no Exception documents | First American Title Insurance Company dated April 15, 2005 with Exceptions | Phase I Environmental Site Assessment – Dated May 30, 2005 issued by ENVIRON to Winn-Dixie Stores, Inc.<br><br>Limited Phase I Environmental Site Assessment – Dated June 24, 2005 issued by ENVIRON to Winn-Dixie Stores, Inc (Level II) | Owned Equipment List<br><br>Leased Equipment List | Yes | No |

28

| Store # / Lease Related? | Documents in Lease and Lease Amendments | Site Plan? | Fixture Plan? | Documents in Historic Title Folder | Documents in Current Title Commitment Folder | Documents in Environmental Site Assessments Folder | Documents in Equipment Data Folder | Exhibit A-2? | Sub-tenant Chart? |
|---|---|---|---|---|---|---|---|---|---|
| | Side Letter Lease Amendment between Winn-Dixie Atlanta, Inc. as Tenant, and The Bonny Corporation, dated September 23, 1976 re: minor change to construction date. | | | | | | | | |
| | Letter Agreement dated December 29, 1981 between Winn-Dixie Stores, Inc. and The Bonny Corporation | | | | | | | | |
| | Fourth Amendment to Lease between Bonny Associates, as Landlord, and Winn-Dixie Atlanta, Inc. as Tenant, dated March 21, 1985 | | | | | | | | |
| | Fifth Amendment to Lease between Bonny Associates as Landlord and Winn-Dixie Atlanta, Inc., dated November 12, 1986 | | | | | | | | |
| | Sixth Amendment to Lease dated November 15, 1996 between The Bonny Corporation as Landlord and Winn-Dixie Atlanta, Inc. | | | | | | | | |
| | Notice of Merger and Name Change dated June 29, 2000 as recorded in Book 11519 Page 685 in the public records of DeKalb County, Georgia | | | | | | | | |
| | Assignment and Assumption of Lease Agreement dated March 28, 2002 between Winn-Dixie Montgomery, Inc. as Assignor and Save Rite Grocery Warehouse, Inc., as Assignee | | | | | | | | |
| | Certificate and Affidavit Re: Merger dated April 18, 2005 | | | | | | | | |

# EXHIBIT "A"
## TO
## ASSET PURCHASE AGREEMENT

### List of Stores

| # | Address | City | County | ST |
|---|---------|------|--------|-----|
| 10 | 403 N Duval St | Claxton | Evans | GA |
| 808 | 506 W Gannon Ave | Zebulon | Wake | NC |
| 825 | 3501 Hope Milles Rd | Hope Mills | Cumberland | NC |
| 827 | 2412 S Horner Blvd | Sanford | Lee | NC |
| 880 | 1790 Owen Dr | Fayetteville | Cumberland | NC |
| 882 | 690 S Reilly Rd | Fayetteville | Cumberland | NC |
| 884 | 600 Cedar Creek Rd | Fayetteville | Cumberland | NC |
| 903 | 1514 Garner Station Blvd | Raleigh | Wake | NC |
| 912 | 2441 Us Hwy 117 S | Goldsboro | Wayne | NC |
| 918 | 211 N Berkeley Blvd | Goldsboro | Wayne | NC |
| 1049 | 1561 Hwy 123 W | Seneca | Oconee | SC |
| 1297 | 642 Sulphur Springs Rd | Greenville | Greenville | SC |
| 1301 | 5777 Terry Rd. | Jackson | Hinds | MS |
| 1314 | 902 1/2-912 E. Fortification | Jackson | Hinds | MS |
| 1362 | 398 Hwy 51 North | Ridgeland | Madison | MS |
| 1413 | 1070 Spillway Circle | Brandon | Rankin | MS |
| 1471 | 2418 South Union | Opelousas | St. Landry | LA |
| 1547 | 3123 Hwy. 28 East | Pineville | Rapides | LA |
| 2001 | 5300 Sunset Rd | Charlotte | Mecklenburg | NC |
| 2003 | 3112 Milton Rd Ste #3112 | Charlotte | Mecklenburg | NC |
| 2008 | 818 E Arrowood Rd | Charlotte | Mecklenburg | NC |
| 2045 | 1206 Rockingham Rd | Rockingham | Richmond | NC |
| 2063 | 2557 W Franklin Blvd | Gastonia | Gaston | NC |
| 2083 | 2515 Springs Rd | Hickory | Catawba | NC |
| 2093 | 31 Pinewood Rd | Granite Falls | Caldwell | NC |
| 2099 | 2620 A E Main St | Lincolnton | Lincoln | NC |
| 2622 | 364 Monticello St | Brookhaven | Lincoln | MS |
| 2640 | 1150 East Peace Street | Canton | Madison | MS |
| 2718 | 5528 Peachtree Ind. Blvd. | Chamblee | Dekalb | GA |

**EXHIBIT "A-1"**
**TO**
**ASSET PURCHASE AGREEMENT**

**[Reserved]**

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # **10**
Claxton, Georgia

Lease:              Lease dated October 5, 1977 between August Urbanek, as Trustee of the
                    Urbanek Family Revocable Trust Agreement under Trust dated September 8,
                    1993, as Landlord, and Winn-Dixie Stores, Inc., as Tenant;

                    as evidenced by Short Form Lease dated October 5, 1977, recorded in Book 66,
                    Page 58, of the public records of Evans County, Georgia

Amendments/
Guaranty:           Supplemental Lease Agreement dated August 23, 1978

                    First Amendment to Lease dated September 12, 1978, as evidenced by First
                    Amendment to Short Form Lease dated September 12, 1978, recorded in Book
                    68, Page 713, of the public records of Evans County, Georgia

                    Second Amendment to Lease dated October 11, 1978, as evidenced by Second
                    Amendment to Short Form Lease dated October 11, 1978, recorded in Book 82,
                    Page 408, of the public records of Evans County, Georgia

                    Third Amendment to Lease dated January 22. 1985

                    Second Supplemental Lease Agreement dated December 27, 1985, recorded in
                    Book 83, Page 195, of the public records of Evans County, Georgia

                    Fourth Amendment to Lease dated May 10, 1994

                    Third Supplemental Lease Agreement dated July 1, 1996

Premises:           That certain store building and related improvements located at 403 N.
                    Duval Street, Claxton, Evans County, Georgia

Legal Description:  The real property as more particularly described as follows:


SEE ATTACHED LEGAL DESCRIPTION

LEGAL DESCRIPTION OF SHOPPING CENTER

ALL THAT PARCEL of land in the 1607th G.M.D. of Evans County, Claxton, Georgia, containing 9.19 acres and being more particularly described as follows:

BEGINNING at a point on the eastern right-of-way of U. S. Highway 301 and the northerly right-of-way of Plyler Street; thence along the right-of-way of U. S. Highway 301 North 37 degrees 50 minutes 00 seconds East for 1123.94 feet to a point; thence South 60 degrees 31 minutes 54 seconds East for 275.25 feet to a point on the western right-of-way of North River Street; thence along the right-of-way of North River Street South 28 degrees 16 minutes 42 seconds West for 748.75 feet to a point; thence along the right-of-way of North River Street South 27 degrees 06 minutes 00 seconds West for 176.43 feet to a point; thence along the right-of-way of North River Street South 22 degrees 21 minutes 36 seconds West for 136.76 feet to a point on the northern right-of-way of Plyler Street; thence along the right-of-way of Plyler Street North 66 degrees 39 minutes 30 seconds West for 481.32 feet to a point, said point being the point of beginning.  Said tract bound as follows: On the North by Claxton Oil Company, on the East by North River Street; on the South by Plyler Street, and on the West by U. S. Highway 301.

LESS AND EXCEPT that certain parcel of property containing .07 acre, more or less, and being more particularly described as follows:

COMMENCING at a point on the eastern right-of-way of U. S. Highway 301 and the northern right-of-way of Plyler Street; thence North 37 degrees    minutes 00 seconds East for 106.38 feet; thence South 52 degrees 10 minutes East for 25.00 feet to the point of BEGINNING; thence South 61 degrees 43 minutes 18 seconds East for 80.00 feet to a point; thence South 28 degrees 16 minutes 42 seconds West for 45.00 feet to a point; thence North 61 degrees 43 minutes 18 seconds West for 80.00 feet to a point; thence North 28 degrees 16 minutes 42 seconds East for 45.00 feet to the point of beginning.

AND, LESS AND EXCEPT all that parcel of land in the 1607th G.M.D. of Evans County, Claxton, Georgia, containing 1.35 acres and being more particularly described as follows:

COMMENCING at a point on the eastern right-of-way of U. S. Highway 301 and the northern right-of-way of Plyler Street; thence along the right-of-way of U. S. Highway 301 N. 37 degrees 50 minutes 00 seconds East for 809.71 feet to the point of beginning; thence along the right-of-way N. 37 degrees 50 minute 00 seconds for 314.23 feet to a point; thence S. 60 degrees 31 minutes 54 seconds East for 275.25 feet to a point on the western right-of-way of North River Street; thence along the right-of-way S. 28 degrees 16 minutes 42 seconds West for 44.92 feet to a point; thence North 61 degrees 43 minutes 18 seconds East for 130.00 feet to a point; thence South 28 degrees 16 minutes 42 seconds West for 259.22 feet to a point; thence North 61 degrees 43 minutes 18 seconds West for 197.37 feet to the POINT OF BEGINNING.

EXHIBIT "B"

10
403 N. Duval Street
Claxton, GA

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # **808**
Zebulon, North Carolina

Lease:    Lease dated March 16, 1993 between Daniel G. Kamin, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

as evidenced by Short Form Lease dated March 16, 1993, recorded in Book 5556, Page 267, of the public records of Wake County, North Carolina

Amendments/
Guaranty:    Guaranty dated March 24, 1993

Letter Agreement dated November 10, 1993

First Amendment to Lease and Short Form Lease dated December 20, 1993

Supplemental Lease Agreement dated March 21, 1994

Second Amendment to Lease dated March 22, 1994

Lessee's Acceptance of Premises and Acknowledgement of Assignment dated March 22, 1994

Letter Agreement dated May 13, 2003

Premises:    That certain store building and related improvements located at 506 W. Gannon Avenue, Zebulon, Wake County, North Carolina

Legal Description:    The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

LEGAL DESCRIPTION OF SHOPPING CENTER

Those certain pieces, parcels or tracts of land in the City of Zebulon, County of Wake, State of North Carolina, more particularly described as follows:

TRACT 1
BEGINNING AT AN EXISTING IRON PIPE IN THE CENTER-LINE OF STRATFORD DRIVE, SAID IRON BEING LOCATED IN THE NORTHERN R/W LINE OF NC 97; THENCE ALONG R/W OF NC 97 SOUTH 82 DEGREES 30 MINUTES WEST 353.61 FEET TO AN EXISTING IRON PIPE; THENCE SOUTH 82 DEGREES 35 MINUTES WEST 8.51 FEET TO A POINT, CORNER OF TRACT 3; THENCE ALONG LINE WITH TRACT 3 NORTH 05 DEGREES 06 MINUTES WEST 477.19 FEET TO A POINT IN THE LINE OF ESTES PROPERTY; THENCE ALONG LINE WITH ESTES NORTH 85 DEGREES 02 EAST MINUTES 30.00 FEET TO A POINT, CORNER OF TRACT 2; THENCE ALONG LINE WITH TRACT 2 NORTH 05 DEGREES 02 MINUTES EAST 175.00 TO A POINT, CORNER OF TRACT 2; THENCE ALONG LINE WITH ESTES NORTH 85 DEGREES 02 MINUTES EAST 68.55 FEET TO A POINT IN THE CENTER-LINE OF STRATFORD DRIVE; THENCE ALONG CENTER-LINE OF STRATFORD DRIVE SOUTH 32 DEGREES 04 MINUTES EAST 127.73 FEET, SOUTH 19 DEGREES 45 MINUTES EAST 100.00 FEET, SOUTH 11 DEGREES 21 MINUTES 100.00 FEET, SOUTH 02 DEGREES 52 MINUTES EAST 150.52 FEET TO THE POINT OF BEGINNING, CONTAING 3.71 ACRES

TRACT 2
BEGINNING AT A POINT IN THE NORTHERN LINE OF TRACT 1, POINT BEING LOCATED SOUTH 85 DEGREES 02 MINUTES WEST 68.55 FEET FROM AN EXISTING IRON PIPE IN THE CENTER-LINE OF STRATFORD DRIVE; THENCE ALONG LINE WITH TRACT 1 SOUTH 85 DEGREES 02 MINUTES WEST 175.00 FEET TO A POINT IN THE LINE OF ESTES PROPERTY; THENCE ALONG ESTES LINE NORTH 04 DEGREES 58 MINUTES WEST 8.00 FEET TO A POINT; THENCE NORTH 85 DEGREES 02 MINUTES EAST 175.00 FEET TO A POINT; THENCE SOUTH 04 DEGREES 58 MINUTES EAST 8.00 FEET TO THE POINT OF BEGINNING, CONTAINING 0.03 ACRE

TRACT 3
BEGINNING AT A POINT IN THE NORTHERN R/W OF NC 97, COMMON CORNER WITH TRACT 1; THENCE ALONG R/W OF NC 97 SOUTH 82 DEGREES 35 MINUTES WEST 9 FEET, SOUTH 82 DEGREES 55 MINUTES WEST 100.00 FEET, SOUTH 83 DEGREES 22 MINUTES WEST 100.00 FEET, SOUTH 84 DEGREES 21 MINUTES WEST 100.00 FEET, SOUTH 86 DEGREES 03 MINUTES WEST 79.00 FEET TO AN EXISTING IRON PIPE , CORNER OF WALKER PROPERTY; THENCE WITH WALKER'S LINE NORTH 05 DEGREES 02 MINUTES WEST 140.00 FEET TO AN EXISTING IRON PIPE; THENCE SOUTH 84 DEGREES 58 MINUTES WEST 148.13 FEET TO AN EXISTING IRON PIPE IN THE EASTERN R/W OF WEDGWOOD AVENUE; THENCE ALONG R/W OF WEDGWOOD AVENUE NORTH 12 DEGREES 17 MINUTES WEST 238.68 FEET TO AN EXISTING IRON PIPE; THENCE NORTH 20 DEGREES 43 MINUTES WEST 115.18 FEET TO AN EXISTING IRON PIPE, CORNER OF CRUTCHFIELD PROPERTY; THENCE ALONG LINE WITH CRUTCHFIELD NORTH 85 DEGREES 02 MINUTES EAST 679.08 FEET TO A POINT, CORNER WITH TRACT 1; THENCE ALONG LINE WITH TRACT 1 SOUTH 05 DEGREES 06 MINUTES EAST 477.19 FEET TO THE POINT OF BEGINNING, CONTAINING 6.61 ACRES

808
506 W. Gannon Avenue
Zebulon, North Carolina

EXHIBIT "A"

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # **825**
Hope Mills, North Carolina

| | |
|---|---|
| Lease: | Lease dated March 27, 1975 between John T. Henley, Rebecca B. Henley, and Mary B. Yarborough, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated March 27, 1975, recorded in Book 2489, Page 296, of the public records of Cumberland County, North Carolina |
| Amendments/ Guaranty: | Guaranty dated April 1, 1975 |
| | Supplemental Lease Agreement dated December 22, 1975 |
| | Letter Agreement dated June 8, 1978 |
| | First Amendment to Lease dated October 9, 1978 |
| | Second Amendment to Lease dated July 12, 1980 |
| | Letter Agreement dated June 5, 1995 |
| | Lease Term Extension Option Exercise Notice dated May 12, 1998 |
| | Letter Agreement dated June 22, 2001 |
| | Letter Agreement dated August 8, 2002 |
| | Letter Agreement dated December 12, 2002 |
| Premises: | That certain store building and related improvements located at 3501 Hope Mills Road, Hope Mills, Cumberland County, North Carolina |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "B"

HOPE MILLS SHOPPING PLAZA

Northeasterly Corner of the Intersection of
North Main Street and Brown Street
Hope Mills, Cumberland County, North Carolina

All that certain piece, parcel or tract of land lying and
being situated in the City of Hope Mills, Township of Rockfish,
County of Cumberland, State of North Carolina, together with all
improvements thereon or to be constructed thereon and all
appurtenances thereto belonging or in anywise appertaining,
particularly described as follows, to wit:

FIRST TRACT:

BEGINNING at the northwest corner of the Maggie Johnson
property, said beginning point being North 38 degrees 12 minutes
East 155.0 feet from the northern right of way margin of North
Main Street in Hope Mills, North Carolina, run thence South 63
degrees 25 minutes East 191.27 feet to a point, the northeast
corner of the aforesaid Maggie Johnson property; thence South
42 degrees 02 minutes West 49.24 feet to a point in the eastern
line of the aforesaid Maggie Johnson property; thence North 48
degrees 30 minutes West 184.36 feet to the POINT OF BEGINNING,
said property having been devised to Maggie Johnson by the will
of her mother, Elizabeth Phillips Johnson, of record in the Office
of the Clerk of Superior Court of Cumberland County, North
Carolina, and being the same property conveyed to John T. Henley
by Maggie Johnson, unmarried, by warranty deed dated August 12,
1974, recorded in Deed Book 2461 at Page 601, Office of Register
of Deeds, Cumberland County, North Carolina.

SECOND TRACT:

BEGINNING at a stake in the southwest corner of a lot
conveyed to S. H. Cotton by W. B. Johnson and wife, the same
being now a corner of lots owned by J. A. Fowler, Charles
Russell and the Estate of E. B. Johnson, run thence South 40
degrees West 228 feet to a stake in the northern margin of the
public road; thence with the northern margin of said road, North
45 degrees 45 minutes West 100 feet to the eastern margin of
Phillips Street at its intersection with the northern margin of
said public road; thence with the eastern margin of Phillips
Street, North 30 degrees East 169 feet to the southwest corner
of a lot conveyed to Angustus Fowler by W. B. Johnson and wife,
now J. A. Fowler's; thence with said Fowler's line, South 77
degrees 30 minutes East 142 feet to the POINT OF BEGINNING, being
the same property conveyed to James Thames (deceased husband of
Ethel B. Thames) by deed from Atlantic Coast Line Railroad, a
Virginia corporation, dated October 21, 1954, and recorded in
Deed Book 663 at Page 146, Office of Register of Deeds,
Cumberland County, North Carolina, and being the same property
conveyed to John T. Henley by Ethel B. Thames, widow, by warranty
deed dated October 9, 1974, recorded in Deed Book 2463 at
Page 805, Office of Register of Deeds, Cumberland County, North
Carolina.

THIRD TRACT:

Commencing at the center line intersection of Rockfish Road
and North Main Street, run thence westwardly along the center
line of North Main Street for a distance of 226.85 feet; thence

(continued on Page Two)

825

3501 Hope Mills Road
Hope Mills, North Carolina

EXHIBIT "B" (continued)

HOPE MILLS SHOPPING PLAZA

northeastwardly at right angles from last said center line a distance of 30 feet to the POINT OF BEGINNING, thence North 38 degrees 12 minutes East for a distance of 221.13 feet; thence North 27 degrees 13 minutes East for a distance of 93.02 feet; thence South 80 degrees 34 minutes East for a distance of 108.0 feet; thence North 15 degrees 53 minutes East for a distance of 9.0 feet; thence South 76 degrees 33 minutes East for a distance of 112.67 feet; thence South 69 degrees 51 minutes East for a distance of 9.37 feet; thence North 30 degrees 43 minutes East for a distance of 69.19 feet; thence South 76 degrees 34 minutes East for a distance of 69.0 feet; thence South 11 degrees 21 minutes West for a distance of 216.33 feet; thence South 23 degrees 59 minutes West for a distance of 114.60 feet; thence South 43 degrees 00 minutes West for a distance of 237.0 feet; thence North 48 degrees 30 minutes West for a distance of 141.0 feet; thence North 42 degrees 02 minutes East for a distance of 204.0 feet; thence North 63 degrees 25 minutes West for a distance of 191.27 feet; thence South 38 degrees 12 minutes West for a distance of 155.0 feet; thence North 48 degrees 30 minutes West for a distance of 30.0 feet to the POINT OF BEGINNING, containing 2.668 acres, more or less, and being shown on survey No. KK-97, dated November 1973, prepared by Rose & Purcell, Inc., Surveyors-Engineers-Planners, Hope Mills, North Carolina, which survey is by this reference made a part hereof, and being the same property conveyed to John T. Henley by Seaboard Coast Line Railroad Company, a Virginia corporation, by a deed dated March 15, 1974, recorded in Deed Book 2443 at Page 297, Office of Register of Deeds, Cumberland County, North Carolina.

825
3501 Hope Mills Road
Hope Mills, North Carolina

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 827
Sanford, North Carolina

Lease:            Lease dated November 16, 1983 between The Cameron Company, as Landlord,
                  and Winn-Dixie Raleigh, Inc., as Tenant;

                  as evidenced by Short Form Lease dated November 16, 1983, recorded in Book
                  352, Page 549, of the public records of Lee County, North Carolina

Amendments/
Guaranty:         Guaranty dated December 14, 1983

                  Supplemental Lease Agreement dated December 27, 1984

                  Letter Agreement dated June 10, 1986

                  Second Amendment to Lease dated August 15, 1991

                  Consent and Indemnification Agreement dated September 12, 1991

                  Third Amendment to Lease and First Amendment to Short Form Lease dated
                  July 1, 1992, recorded in Book 484, Page 740, of the public records of Lee
                  County, North Carolina

Premises:         That certain store building and related improvements located at 2412 S.
                  Horner Boulevard, Sanford, Lee County, North Carolina

Legal Description: The real property as more particularly described as follows:


SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "A"
LEGAL DESCRIPTION OF SHOPPING CENTER

Beginning at a stake, said stake being located at the intersection of the Northern Right of way of Main Street (Hwy 78) and the Western Right of way of Horner Blvd. (Hwy 421, 87) thence as the Right of way of Main Street S69 18 41W – 291.26 feet to a stake, thence continuing as the Right of way of Main Street, S67 30 22W – 151.63 feet to an iron pipe, thence leaving the Right of way of Main Street, N19 37 46W – 423.84 feet to an iron pipe, thence, N65 07 57E – 240.17 feet to an iron pipe, thence, N20 22 03W – 96.30 feet to an iron pipe, said iron pipe lying on the Southern Right of way of East Globe Street, thence as the southern right of way of Globe Street, N64 41 41E – 121.23 feet to an iron pipe said iron pipe lying on the Western Right of way of Horner Blvd., thence as the western right of way of Horner Blvd., the following calls, S30 31 46E – 94.36 feet, S35 03 52E – 104.40 feet, S33 41 19E – 26.67 feet, S37 38 12E – 160.10 feet, S41 56 45E – 93.59 feet, S12 55 41W – 98.57 feet to the point of beginning containing 4.54 acres. Above description being a survey of that property described in the following deeds, Book 47, Page 532; Book 114, Page 112; Book 102, Page 372; Book 77, Page 335 & Book 353, Page 791; Lee County Registry. See also Plat recorded in Plat Cabinet 4, Slide 264.

Note! Property described above is situated in Jonesboro Township, Lee County, North Carolina.

827

2412 S. Horner Boulevard
Sanford, North Carolina

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # **880**
Fayetteville, North Carolina

| | |
|---|---|
| Lease: | Lease dated September 17, 1962 between Bordeaux Center, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated September 17, 1962, recorded in Book 952, Page 325, of the public records of Cumberland County, North Carolina |
| Amendments/ Guaranty: | Guaranty dated October 9, 1962 |
| | Amendment of Guaranty dated July 18, 1963 |
| | Supplemental Lease Agreement dated November 20, 1963 |
| | Amendment of Lease dated August 29, 1968 |
| | Letter Agreement dated May 16, 1969 |
| | Amendment of Lease dated December 6, 1977 |
| | Letter Agreement dated April 9, 1979 |
| | First Amendment to Short Form Lease dated May 11, 1979, recorded in Book 2712, Page 371 of the public records of Cumberland County, North Carolina |
| | Sixth Amendment to Lease dated July 17, 1987 |
| | Seventh Amendment to Lease and Second Amendment to Short Form Lease dated May 8, 1989, recorded in Book 3484, Page 782, of the public records of Cumberland County, North Carolina |
| | Lease Term Extension Option Exercise Notice dated June 22, 1998 |
| | Lease Term Extension Option Exercise Notice dated September 19, 2003 |
| Premises: | That certain store building and related improvements located at 1790 Owen Drive C, Fayetteville, Cumberland County, North Carolina |

Legal Description:    The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

BOOK 952 PAGE 329

EXHIBIT  " A "

BORDEAUX SHOPPING CENTER

Owen Drive, between Boone Trail and Village Drive
Fayetteville, Cumberland County, North Carolina

Beginning at a point, the intersection of the southern margin
of Village Drive with the western margin of Owen Drive, and running
thence with the western margin of Owen Drive as it curves to the left,
an arc distance of 805.36 feet, said curve having a radius of 2539.08
feet; thence S38° 38'E 95.48 feet; thence S51° 22'W 150 feet; thence
S38° 38'E 150 feet; thence N51° 22'E 150 feet; thence S0° 20'E 155.1
feet; thence S37° 20'W 114.75 feet; thence N52° 40'W 200 feet; thence
S37° 20' W 100 feet; thence S52° 40'E 200 feet; thence S37° 20'W 100
feet; thence N52° 40'W 200 feet; thence S37° 20'W 90.01 feet; thence
N52° 40'W 459.64 feet; thence N46° 37'W 101.12 feet; thence N40° 40'W
106.95 feet; thence N26° 58'W 348.83 feet; thence N22° 36'W 186.24 feet;
thence S71° 22'W 200 feet to the western margin of Conover Drive; thence
with the western margin of Conover Drive along a curve to the right an
arc distance of 70.15 feet, said curve having a radius of 1546.18 feet;
thence N16° 02'W 71.58 feet to a point of curve; thence with the curve
to the right a distance of 39.27 feet to the point of curve in the
southern margin of Village Drive; thence with the southern margin of
Village Drive N73° 58'E 847.14 feet to the point of beginning.

880
1790 Owen Drive C
Fayetteville, North Carolina

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 882
Fayetteville, North Carolina

| | |
|---|---|
| Lease: | Lease dated June 30, 1993 between Cliffdale Corner, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated June 30, 1993, recorded in Book 3991, Page 895, of the public records of Cumberland County, North Carolina |
| Amendments/ Guaranty: | Guaranty dated July 7, 1993 |
| | Amendment to Original Lease Agreement dated March 16, 1994 |
| | Supplemental Lease Agreement dated November 28, 1994 |
| Premises: | That certain store building and related improvements located at 690 Reily Road, Fayetteville, Cumberland County, North Carolina |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "A"

LEGAL DESCRIPTION

BK 3991 PG 0901

SHOPPING CENTER TRACT

BEGINNING at a point, said point being the northernmost boundary corner of a tract owned by THE PANTRY, INC. recorded in Deed Book 3793, Page 207, Cumberland County Registry;

THENCE North 08 degrees 46 minutes 40 seconds West for a distance of 140.41 feet to a point;
THENCE along a curve to the right having a radius of 95.00 feet and an arc length of 47.12 feet, being subtended by a chord of South 83 degrees 53 minutes 04 seconds West for a distance of 45.93 feet to a point;
THENCE North 79 degrees 30 minutes 07 seconds West for a distance of 105.91 feet to a point;
THENCE along a curve to the left having a radius of 30.00 feet and an arc length of 94.93 feet, being subtended by a chord of South 54 degrees 41 minutes 13 seconds West for a distance of 49.38 feet to a point;
THENCE along a curve to the right having a radius of 695.48 feet and an arc length of 77.89 feet, being subtended by a chord of South 24 degrees 20 minutes 30 seconds West for a distance of 77.93 feet to a point in the northern margin of a proposed right of way of Cliffdale Road (right of way varies);
THENCE North 01 degrees 17 minutes 11 seconds West for a distance of 93.00 feet along said right of way margin to a point;
THENCE along a curve to the left having a radius of 653.00 feet and an arc length of 87.67 feet, being subtended by a chord of North 34 degrees 28 minutes 49 seconds East for a distance of 87.60 feet to a point;
THENCE along a curve to the right having a radius of 30.00 feet and an arc length of 58.43 feet, being subtended by a chord of North 39 degrees 12 minutes 49 seconds West for a distance of 49.58 feet to a point;
THENCE North 78 degrees 30 minutes 07 seconds West for a distance of 130.33 feet to a point;
THENCE North 10 degrees 23 minutes 53 seconds East for a distance of 197.97 feet to a point;
THENCE North 40 degrees 36 minutes 07 seconds West for a distance of 118.90 feet to a point;
THENCE North 29 degrees 23 minutes 53 seconds East for a distance of 361.90 feet to a point;
THENCE South 70 degrees 36 minutes 07 seconds East for a distance of 821.09 feet to a point;
THENCE South 19 degrees 04 minutes 56 seconds West for a distance of 31.00 feet to a point;
THENCE South 19 degrees 31 minutes 10 seconds West for a distance of 81.83 feet to a point;
THENCE North 15 degrees 21 minutes 39 seconds West for a distance of 85.00 feet to a point;
THENCE North 78 degrees 42 minutes 33 seconds West for a distance of 8.30 feet to a point;
THENCE South 10 degrees 23 minutes 56 seconds West for a distance of 131.19 feet to a point;
THENCE along a curve to the left having a radius of 35.00 feet and an arc length of 84.90 feet, being subtended by a chord of South 35 degrees 30 minutes 09 seconds East for a distance of 49.00 feet to a point;
THENCE South 79 degrees 30 minutes 07 seconds East for a distance of 100.92 feet to a point;
THENCE along a curve to the left having a radius of 60.00 feet and an arc length of 47.75 feet, being subtended by a chord of North 08 degrees 48 minutes 82 seconds East for a distance of 48.03 feet to a point in the western margin of a proposed right of way margin of Reilly Road (right of way varies);
THENCE South 23 degrees 18 minutes 00 seconds West for a distance of 65.96 feet along said western right of way margin to a point;
THENCE along a curve to the left having a radius of 90.00 feet and an arc length of 63.34 feet, being subtended by a chord of North 16 degrees 07 minutes 00 seconds West for a distance of 61.80 feet to a point;
THENCE North 70 degrees 30 minutes 07 seconds West for a distance of 100.01 feet to a point;
THENCE along a curve to the left having a radius of 35.00 feet and an arc length of 84.90 feet, being subtended by a chord of South 84 degrees 23 minutes 00 seconds West for a distance of 49.36 feet to a point;
THENCE South 19 degrees 23 minutes 56 seconds West for a distance of 149.80 feet to a point;
THENCE South 64 degrees 28 minutes 32 seconds East for a distance of 297.07 feet to a point in said western right of way margin;
THENCE South 21 degrees 30 minutes 43 seconds West for a distance of 132.08 feet along said western right of way margin to a point;
THENCE South 20 degrees 19 minutes 38 seconds West for a distance of 38.37 feet along said western right of way margin to a point;
THENCE North 80 degrees 31 minutes 10 seconds West for a distance of 100.00 feet to the point and place of BEGINNING;

Together with and subject to covenants, easements, and restrictions of record.

Said property contains 9.3103 acres more or less.

This description prepared by Larry King & Associates, R.L.S., P.A. on this 31st day of April, 1993.

882
690 Reily Road
Fayetteville, North Carolina

BK3991PG0902

Landlord hereby grants to Tenant, its successors and assigns, and does hereby give, grant and convey to Tenant, and to its employees, agents, suppliers, customers and invitees, a mutual, reciprocal and non-exclusive easement, right, license and privilege of ingress and egress, passage and use, for automotive and pedestrian use across the following described piece of land:

MAIN ENTRANCE TRACT

BEGINNING at a point, said point being North 28 degrees 50 minutes 17 seconds East 800.84 feet from the northernmost boundary corner of a tract owned by THE PANTRY, INC. recorded in Deed Book 3796, Page 297, Cumberland County Registry; said beginning point also being in the western margin of a proposed right of way of Reilly Road (right of way varies);

THENCE North 70 degrees 36 minutes 07 seconds West for a distance of 131.64 feet to a point;
THENCE along a curve to the left having a radius of 35.00 feet and an arc length of 54.98 feet, being subtended by a chord of South 64 degrees 23 minutes 53 seconds West for a distance of 49.50 feet to a point;
THENCE South 19 degrees 23 minutes 53 seconds West for a distance of 162.89 feet to a point;
THENCE North 70 degrees 36 minutes 07 seconds West for a distance of 77.02 feet to a point;
THENCE along a curve to the left having a radius of 35.00 feet and an arc length of 14.40 feet, being subtended by a chord of North 35 degrees 11 minutes 14 seconds East for a distance of 14.30 feet to a point;
THENCE North 19 degrees 23 minutes 53 seconds East for a distance of 195.90 feet to a point;
THENCE along a curve to the left having a radius of 35.00 feet and an arc length of 54.98 feet, being subtended by a chord of North 25 degrees 36 minutes 07 seconds West for a distance of 49.50 feet to a point;
THENCE North 70 degrees 36 minutes 07 seconds West for a distance of 164.99 feet to a point;
THENCE along a curve to the left having a radius of 90.00 feet and an arc length of 78.54 feet, being subtended by a chord of South 64 degrees 23 minutes 53 seconds West for a distance of 76.71 feet to a point;
THENCE South 19 degrees 23 minutes 53 seconds West for a distance of 164.89 feet to a point;
THENCE North 70 degrees 36 minutes 07 seconds West for a distance of 37.92 feet to a point;
THENCE along a curve to the left having a radius of 35.00 feet and an arc length of 14.40 feet, being subtended by a chord of North 31 degrees 11 minutes 14 seconds East for a distance of 14.30 feet to a point;
THENCE North 19 degrees 23 minutes 53 seconds East for a distance of 140.89 feet to a point;
THENCE along a curve to the right having a radius of 89.00 feet and an arc length of 133.92 feet, being subtended by a chord of North 64 degrees 23 minutes 53 seconds East for a distance of 120.21 feet to a point;
THENCE South 70 degrees 36 minutes 07 seconds East for a distance of 51.15 feet to a point;
THENCE along a curve to the left having a radius of 602.90 feet and an arc length of 99.81 feet, being subtended by a chord of South 74 degrees 54 minutes 56 seconds East for a distance of 99.72 feet to a point;
THENCE along a curve to the right having a radius of 602.90 feet and an arc length of 99.81 feet, being subtended by a chord of South 74 degrees 54 minutes 56 seconds East for a distance of 99.72 feet to a point;
THENCE South 70 degrees 36 minutes 07 seconds East for a distance of 124.44 feet to a point in said western margin of said proposed right of way of Reilly Road;
THENCE South 14 degrees 03 minutes 37 seconds West for a distance of 77.34 feet along said right of way to the point and place of BEGINNING.

Together with and subject to covenants, easements, and restrictions of record.

Said property contains 0.8469 acres more or less.

882
690 Reily Road
Fayetteville, North Carolina

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 884
Fayetteville, North Carolina

Lease:              Lease dated December 18, 1997 between Cedar Creek Crossing, LLC, as
                    Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

                    as evidenced by Short Form Lease dated December 18, 1997, recorded in Book
                    4801, Page 510, of the public records of Cumberland County, North Carolina

Amendments/
Guaranty:           Corporate Guaranty of Lease Obligations dated December 18, 1997

                    Supplemental Lease Agreement dated March 18, 1999


Premises:           That certain store building and related improvements located at 600 Cedar
                    Creek Road, Fayetteville, Cumberland County, North Carolina

Legal Description:  The real property as more particularly described as follows:


SEE ATTACHED LEGAL DESCRIPTION



EXHIBIT "A"

884
600 Cedar Creek Road
Fayetteville, North Carolina

EXHIBIT "B"    BK4801PG0514

SHOPPING CENTER LEGAL

BEGINNING at an existing concrete monument located on the northern right-of-way of Troy Drive, said point being 802.41 feet from the intersection of Cedar Creek Road (N.C. Highway 53 & 210) and Troy Drive; thence leaving said right-of-way of Troy Drive North 14 deg. 38 min. 03 sec. West, 694.35 feet to a point; thence North 73 deg. 26 min. 00 sec. East, 788.31 feet to a point located on the proposed western right-of-way of Cedar Creek Road (N.C. Highway 53 & 210); thence with a curve to the right having a radius of 5,557.26 feet and a chord bearing and distance of South 17 deg. 14 min. 03 sec. East, 119.70 feet to a point; thence continuing along said proposed right-of-way South 16 deg. 34 min. 00 sec. East, 265.67 feet to a point; thence with a curve to the left having a radius of 44.50 feet and a chord bearing and distance North 79 deg. 33 min. 11 sec. West, 40.42 feet to a point; thence South 73 deg. 26 min. 00 sec. West, 120.99 feet to a point; thence with a curve to the left having a radius of 19.50 feet and a chord bearing and distance of South 28 deg. 26 min. 00 sec. West, 27.58 feet to a point; thence South 16 deg. 34 min. 00 sec. East, 332.47 feet to a point; said point being on the northern right-of-way of Troy Drive; thence South 75 deg. 41 min. 00 sec. West, 637.17 feet to the POINT AND PLACE OF BEGINNING. Containing 11.631 acres more or less.

Together with a perpetual, non-exclusive easement for ingress and egress over and upon the following described land:

BEGINNING at a point located in the western right-of-way of Cedar Creek Road (N.C. Highway 53 &210), said point being located North 18 deg. 24 min. 27 sec. West, , 122.56 feet from the southeast corner of Tract 4; thence leaving said right-of-way along a curve to the left having a radius of 44.50 feet and a chord bearing and distance of North 80 deg. 31 min. 12 sec. West, 39.08 feet to a point; thence South 73 deg. 26 min. 00 sec. West, 18.65 feet to a point; thence with a curve to the right having a radius of 140.50 feet and a chord bearing and distance of South 84 deg. 22 min. 54 sec. West, 53.37 feet to a point; thence North 84 deg. 40 min. 13 sec. West, 106.89 feet to a point; thence with a curve to the left having a radius of 99.50 feet and a chord bearing and distance of South 19 deg. 38 min. 49 sec. West, 192.84 feet to a point; thence South 56 deg. 02 min. 10 sec. East, 44.15 feet to a point, said point being in the property line between Tracts 3 and 4; thence along said property line South 73 deg. 26 min. 00 sec. West, 91.05 feet to a point; thence with a curve to the left having a radius of 19.50 feet and a chord bearing and distance of North 13 deg. 52 min. 45 sec. East, 33.62 feet to a point; thence with a curve to the right having a radius of 140.50 feet and a chord bearing and distance of North 24 deg. 49 min. 38 sec. East, 264.89 feet to a point; thence South 84 deg. 40 min. 13 sec. East, 106.89 feet to a point; thence with a curve to the left having a radius of 99.50 feet and a chord bearing and distance of North 84 deg. 22 min. 54 sec. East, 37.79 feet to a point; thence North 73 deg. 26 min. 00 sec. East, 11.94 feet to a point; thence with a curve to the left having a radius of 44.50 feet and a chord bearing and distance of North 44 deg. 26 min. 25 sec. East, 43.14 feet to a point, said point being located in the western right-of-way of Cedar Creek Road (N.C. Highway 53 & 210); thence along said right-of-way with a curve to the right having a radius of 5557.26 feet and a chord bearing and distance of South 19 deg. 31 min. 23 sec. East, 79.18 feet to the POINT AND PLACE OF BEGINNING. Containing 0.533 acres more or less and being all of a 41-foot access easement.

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 903
Raleigh, North Carolina

Lease:              Lease dated December 5, 1988 between Garner Land Associates Limited
                    Partnership, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

                    as evidenced by Short Form Lease dated December 5, 1988, recorded in Book
                    4486, Page 576, of the public records of Wake County, North Carolina

Amendments/
Guaranty:           Guaranty dated _____ _____, 1988

                    First Amendment to Lease dated March 23, 1989

                    Second Amendment to Lease dated January 12, 1990

                    Letter Agreement dated February 23, 1990

                    Supplemental Lease Agreement dated June 21, 1990

                    Third Amendment to Lease dated April 10, 1991

                    Letter Agreement dated July 8, 1991

                    Letter Agreement dated September 7, 1995


Premises:           That certain store building and related improvements located at 1514
                    Garner Station Boulevard, Raleigh, Wake County, North Carolina

Legal Description:  The real property as more particularly described as follows:


SEE ATTACHED LEGAL DESCRIPTION

LAND DESCRIPTION FOR NORTH STATION SHOPPING CENTER

2-14-89

Beginning at an existing iron pin in the line dividing the property of now or formerly Algie Stephens and now or formerly Oakwood Mobile Homes, Inc., said iron pin also being located N 77°-19'-03" W, 800.56' from N.C.G.S. Monument "Carl"; thence in a southeasterly direction along the line of now or formerly Oakwood Mobile Homes, Inc. S 48°-23'-57" E, 243.71' to a point; thence S 44°-46'-02" W, 300.80' to a point; thence S 00°-13'-59" E, 188.21' to a point on the proposed northern right-of-way line of Garner's Station Boulevard; thence along the proposed northern right-of-way line of Garner's Station Boulevard in a westerly direction S 89°-46'-01" W, 1184.18' to a point; thence N 00°-13'-59" W, 332.72' to a point; thence N 60°-08'-14" W, 303.23' to a point on the proposed eastern right-of-way line of Junction Boulevard; thence as the right-of-way line of the proposed Junction Boulevard curves to the left with a radius of 560.00' and an arc length of 238.56' with a chord bearing of N 26°-52'-24" E, 236.76' to a point on the proposed right-of-way line of Junction Boulevard; thence heading in an easterly direction S 62°-32'-30" E, 235.32' to a point; thence S 79°-48'-17" E, 78.31' to an existing iron pin, said iron pin being the southwest corner of now or formerly property owned by Rebecca Hobgood; thence along the southern line of now or formerly Hobgood property N 89°-46'-01" E, 716.68' to an existing iron pin; said iron pin being the southwest corner of property now or formerly owned by Algia Stephens; thence continuing along the southern line of now or formerly Stephens property S 88°-54'-08" E, 367.85' to the point and place of beginning, containing 17.819 acres, more or less, lying in Wake County, North Carolina, as shown on plat dated February 14, 1989 entitled "North Station Shopping Center," prepared by Lehman Mehler Architects, P. A.

EXHIBIT   B

903
1514 Garner Station
Boulevard



903
1514 Garner Station
Boulevard

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # 912
Goldsboro, North Carolina

Lease:              Leased dated November 4, 1997 between Genoa Associates, LLC, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

as evidenced by Short Form Lease dated November 4, 1997, recorded in Book 1614, Page 886, of the public records of Wayne County, North Carolina

Amendments/
Guaranty:       Corporate Guaranty of Lease Obligations dated November 4, 1997

Supplemental Lease Agreement dated January 14, 1999

Premises:       That certain store building and related improvements located at 2441 US 117 South, Goldsboro, Wayne County, North Carolina

Legal Description:   The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION



EXHIBIT "A"

912
2441 US 117 South
Goldsboro, North Carolina

NEUSE RIVER SHOPPING CENTER
GENOA ASSOCIATES, LLC

EXHIBIT B-1

## PROPERTY DESCRIPTION

BEGINNING at an iron stake, said beginning point being located S. 41° 24' 58" W. 193.11 feet, S. 41° 09' 21" W. 81.68 feet, S. 34° 50' 21" W. 421.63 feet, S. 28° 21' 18" W. 200.10 feet, S. 67° 13' 25" E. 261.19 feet from a concrete monument within the most Southeastern intersectional corner of U. S. Highway No. 117 and N. C. Secondary Road No. 1926 (Old Mount Olive Highway), and said beginning point being located S. 67° 13' 25" E. 261.19 feet from an iron stake on the Eastern right of way of U. S. Highway No. 117, the most Southwestern corner of the property of Jeffrey K. Fordham as shown by deed recorded in Deed Book 1229, Page 187 in the Wayne County Registry, and said beginning point being located S. 67° 13' 25" E. 38.84 feet from an iron stake, Jeffrey K. Fordham's most Southeastern property corner as shown by deed recorded in Deed Book 1229, Page 187 in the Wayne County Registry; thence from the beginning, S. 67° 13' 25" E. 356.73 feet to an iron stake; thence N. 27° 48' 55" E. 180.34 feet to an iron stake; thence N. 67° 54' 43" E. 209.00 feet to an iron stake on the Southern right of way of N. C. Secondary Road No. 1926 (Old Mount Olive Highway), said iron stake being located N. 17° 55' 38" W. 122.02 feet, S. 67° 54' 43" W. 30.08 feet from a nail in the centerline of N. C. Secondary Road No. 1926 (Old Mount Olive Highway), the most Northeastern corner of the property of Genoa Associates, LLC as shown by deed recorded in Deed Book 1458, Page 783 in the Wayne County Registry, and said iron stake being located S. 67° 54' 43" W. 30.08 feet from a nail in the centerline of N. C. Secondary Road No. 1926 (Old Mount Olive Highway); thence with the Southern right of way of N. C. Secondary Road No. 1926 (Old Mount Olive Highway), N. 17° 55' 38" W. 412.83 feet to a point in the center of a ditch, Billy L. Talton's most Southeastern property corner as shown by deed recorded in Deed Book 1234, Page 472 in the Wayne County Registry; thence leaving the Southern right of way of N. C. Secondary Road No. 1926 (Old Mount Olive Highway), with the center of the ditch, the following bearings and distances: N. 63° 28' 59" W. 128.62 feet, N. 66° 18' 24" W. 100.83 feet, N. 79° 53' 33" W. 100.28 feet to a point in the center of a ditch, said point being located S. 79° 10' 07" E. 80.04 feet from an iron stake on the Eastern right of way of U. S. Highway No. 117, E. J. Pope & Son, Inc.'s most Southwestern property corner as shown by deed recorded in Deed Book 1528, Page 359 in the Wayne County Registry; thence leaving the center of the ditch and the line of the property of E. J. Pope & Son, Inc., S. 23° 20' 31" W. 30.00 feet to an iron stake; thence continuing S. 23° 20' 31" W. 308.43 feet to an iron stake; thence S. 67° 06' 49" E. 71.94 feet to an iron stake; thence S. 67° 13' 25" E. 45.04 feet to an iron stake; thence S. 23° 20' 21" W. 227.27 feet to an iron stake, the point of beginning containing 284,049 Square Feet or 6.521 Acres more or less.

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # **918**
Goldsboro, North Carolina

| | |
|---|---|
| Lease: | Indenture dated May 6, 1976 between Goldsboro Associates, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form of Lease dated May 6, 1976, recorded in the public records of Wayne County, North Carolina |
| Amendments/ Guaranty: | Assignment of Ground Lease dated September 22, 1976 |
| | First Amendment to Lease dated August 22, 1977 |
| | Second Amendment to Lease dated August 22, 1977 |
| | Letter Agreement dated September 26, 1977 |
| | Letter Agreement dated November 18, 1977 |
| | Lease Assignment and Assumption Agreement dated August 19, 1988 |
| | Guaranty dated August 12, 1988 |
| | Third Amendment to Lease dated September 6, 1994 |
| | Supplemental Lease Agreement dated October 5, 1995 |
| Premises: | That certain store building and related improvements located at 211 N. Berkeley Boulevard, Goldsboro, Wayne County, North Carolina |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "A" attached to Short Form of Lease, dated May 6, 1976, between SINGER HOUSING COMPANY d/b/a THE MITCHELL COMPANY, as Lessor, and THE GREAT ATLANTIC & PACIFIC TEA COMPANY, as Lessee, covering premises located at the Northeast corner of the intersection of Ash Street and Berkeley Boulevard at Ashley Square Shopping Center in the City of Goldsboro, County of Wayne, and State of North Carolina.

918
211 N. Berkeley Boulevard
Goldsboro, North Carolina

E X H I B I T  A

NORTH CAROLINA

WAYNE COUNTY

TRACT 1:

BEGINNING at an iron stake at the Northeastern intersection of the right-of-way of Berkeley Boulevard and Ash Street and runs thence with the right-of-way at said intersection N. 71° 37' 3" W. 109.41 feet to a concrete monument; thence with the Eastern edge of the right-of-way of Ash Street N. 37° 39' 19" W. 73.34 feet to an iron stake; thence N. 56° 18' 30" E. 169.79 feet to an iron stake; thence N. 36° 39' 30" E. 140 feet to an iron stake; thence N. 56° 18' 30" E. 69.87 feet to an iron stake; thence N. 36° 39' 30" W. 60 feet to an iron stake; thence continuing N. 36° 39' 30" W. 100 feet to a concrete monument at Ethelred Herring's corner; thence with the Herring line N. 56° 18' 30" E. 1082.04 feet to a concrete monument; thence S. 36° 09' 30" E. 15.01 feet to an iron stake; thence continuing S. 36° 09' 30" E. 705.26 feet to a concrete monument in the Northern right-of-way of Berkeley Boulevard; thence with the Northern right-of-way of Berkeley Boulevard S. 67° 15' W. 434.92 feet to a concrete right-of-way marker; thence with the Northern edge of said right-of-way S. 70° 51' 50" W. 166.09 feet to a concrete right-of-way marker; thence continuing with said right-of-way S. 67° 15' W. 675.03 feet to the point of beginning, containing 704,700 square feet, more or less. And being a part of the lands conveyed to J. M. Southerland and wife, Mary E. Southerland, by S. S. Smith and wife, Mamie C. Smith, by deed recorded in Book 114, Page 497 of the Wayne County Registry. Said tract of land is described herein in accordance with a plat designated as "Section Two, John E. Southerland Property" prepared by A. E. Little, Registered Surveyor, dated 30 April, 1976.

EXCEPTING, HOWEVER, such rights-of-way for access to Berkeley Boulevard as J. M. Fordham or E. W. Finch or their successors, heirs and assigns may have under the terms of certain lease agreements recorded in Book 731 at Page 661, Book 490 at Page 440, and Book 567 at Page 486 of the Wayne County Registry.

TRACT 2:

Landlord and Tenant agree that commencing on September 1, 1976, and throughout the primary term of this lease and any extensions hereof, Tenant shall have and landlord shall grant Tenant a sixty (60) foot easement as an entrance and exit for Tenant's shopping center on Ash Street. The exact location of the easement shall be mutually agreed upon; provided, however, that the entrance on Ash Street shall be generally opposite the intersection of Lee Drive with Ash Street and shall follow a generally northerly direction through the property currently under lease to J. M. Fordham, said lease being recorded in Book 490 at Page 440 of the Wayne County Registry. Tenant agrees that in the event it elects to construct said entrance, all construction and maintenance costs will be borne by Tenant. In addition, Tenant shall have a sign easement enabling Tenant to locate a pylon sign for the shopping center or the K-Mart store on Ash Street at the point of the easternmost line of the above said easement where it intersects with Ash Street.

NORTH CAROLINA, WAYNE COUNTY
The foregoing certificate(s) of _Vernona C. McEvoy_ N. P. of _Alabama State at Large_

and _____ N. P. of _____

each duly _____ N. P. of _____
is/are certified to be correct.

Filed for registration at _12:52_ o'clock _P_ M this _28_ day of _Dec_, 19 _76_

MARGARET M. PEATROS, Register of Deeds

By _Frieda Price_
Deputy/Assistant Register of Deeds

BOOK 904 PAGE 490

918
211 N. Berkeley Boulevard
Goldsboro, North Carolina

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # **1049**
Seneca, South Carolina

Lease:    Lease dated August 11, 1982 between Applewood Shopping Center, as
Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

as evidenced by Short Form Lease dated August 11, 1982, recorded in Book 14-
Z, Page 324, of the public records of Oconee County, South Carolina

Amendments/
Guaranty:    Guaranty dated August 26, 1982

Letter Agreement dated December 27, 1982

Assignment of Lease dated March 11, 1983

Supplemental Lease Agreement dated November 30, 1983

First Amendment to Lease dated August 16, 1991

Second Amendment to Lease dated March 30, 1992, recorded in Book 690,
Page 184, of the public records of Oconee County, South Carolina

Premises:    That certain store building and related improvements located at 1561 W
Highway 123, Seneca, Oconee County, South Carolina

Legal Description:    The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

LEGAL DESCRIPTION
OF
SHOPPING CENTER

All that certain piece, parcel, or tract of land, situate, lying and being in the County of Oconee, State of South Carolina, containing 19.83 Acres and composed of lands shown and designated as Parcels A, B, and C on a drawing entitled "Proposed Shopping Center, Seneca, S. C.", dated March 12, 1982 by John M. Ware, A.I.A., Atlanta, Georgia, and according to said drawing is more particularly described as follows:

BEGINNING at a point on the southern right-of-way of U. S. Hwy. 123 and 76 By-Pass at a concrete right-of-way marker (85 ft. from centerline) at highway station 29+00 which is approximately 0.23 miles northeast of the intersection of U. S. 123 and 76 By-Pass with Beltline Road, and running thence along the right-of-way of U. S. Hwy. 123 and 76 By-Pass N 72°-32' E 330.0 ft.; thence leaving the right-of-way of U. S. Hwy 123 and 76 By-Pass and running S 17°-28' E 260.0 ft. to a point; running thence N 72°-32' E 245.0 ft. to a point; thence N 58°-29'50" E 30.92 ft. to a point; thence N 72°-32' E 62.0 ft. to a point; thence along a curve the chord of which is S 80°-45' E 96.10 ft. to a point; thence S 52°-02' E 15.0 ft. to a point; thence S 75°-18'34" E 25.95 ft. to a point; thence S 37°-58' W 72.0 ft. to a point; thence N 52°-02' W 40.0 ft. to a point; thence along a curve the chord of which is N 80°-45' W 38.44 ft. to a point; thence S 72°-32' W 62.0 ft. to a point; thence S 86°-34'10"W 30.92 ft. to a point; thence S 72°-32' W 245.0 ft. to a point; thence S 17°-28' E 270.0 ft. to a point; thence S 72°-32' W 1504.6 ft. to a point on the right-of-way of Beltline Road; thence along the right-of-way of Beltline Road N 14°-35' W 345.42 ft. to a point; thence leaving the right-of-way of Beltline Road and running N 72°-32' E 160.0 ft. to a point; thence N 17°-28' W 250.0 ft. to a point on the right-of-way of U. S. Hwy. 123 and 76 By-Pass; thence along the right-of-way of U. S. Hwy. 123 and 76 By-Pass N 72°-32' E 997.2 ft. to a point; thence S 17°-28' E 20.0 ft. to the POINT OF BEGINNING.

1049
1561 W Highway 123
Seneca, South Carolina

EXHIBIT "B"

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

### WINN-DIXIE STORE # 1297
Greenville (Berea), South Carolina

Lease:            Lease dated May 13, 1992 between Westside City, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

                  as evidenced by Short Form Lease dated May 13, 1992, recorded in Book 1482, Page 17, of the public records of Greenville County, South Carolina

Amendments/
Guaranty:         Supplemental Lease Agreement dated April 28, 1993

                  Guaranty dated April 26, 1994

Premises:         That certain store building and related improvements located at 642 Sulphur Springs Road, Greenville (Berea), Greenville County, South Carolina

Legal Description:  The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

BOOK **1482** PAGE **21**

EXHIBIT "B"

LEGAL DESCRIPTION
OF
SHOPPING CENTER

That certain piece, parcel or tract of land situate lying and being in the City of Greenville, Greenville County, South Carolina more particularly described as follows:

PARCEL A

ALL that certain piece, parcel or tract of land, situate, lying and being in the State of South Carolina, County of Greenville, at the northerly intersection of the rights-of-way of Hunts Bridge Road and Sulphur Springs Road, being shown and designated on a revised plat entitled "Layout Plan-Westside City, Inc." prepared by Gray Engineering Consultants, Inc. dated November 12, 1991, and having, according to said plat, the following metes and bounds, to-wit:

BEGINNING at an iron pin at the northerly intersection of Hunts Bridge Road and Sulphur Springs Road and running thence along the westerly right-of-way of Sulphur Springs Road N. 58-22-00 E. 136.28 feet to an iron pin; thence N. 53-35-00 E. 150.00 feet to an iron pin; thence continuing N. 47-44-00 E. 40.00 feet to an iron pin; thence continuing N. 47-44-00 E. 110.00 feet to an iron pin; thence continuing N. 41-54-00 E. 50.00 feet to an iron pin; thence turning and leaving the right-of-way of Sulphur Springs Road N. 47-48-00 W. 90.00 feet to an iron pin; thence running N. 69-51-00 W. 230.00 feet to an iron pin; thence running S. 83-00-00 W. 99.80 feet to an iron pin; thence running S. 83-00-00 W. 54.30 feet to an iron pin on the easterly right-of-way of Hunts Bridge Road; thence turning and running along the easterly right-of-way of Hunts Bridge Road S. 07-19-00 E. 423.50 feet to an iron pin at the intersection thereof with the westerly right-of-way of Sulphur Springs Road, being the point of beginning.

PARCEL B

ALL that certain piece, parcel or tract of land, with improvements, thereon, situate, lying and being in the State of South Carolina, County of Greenville, at the northerly intersection of the rights-of-way of Hunts Bridge Road and Sulphur Springs Road, being shown and designated on a revised plat entitled "Layout Plan-Westside City, Inc." prepared by Gray Engineering Consultants, Inc. dated November 12, 1991, and having, according to said plat, the following metes and bounds, to-wit:

BEGINNING at an iron pin on the westerly right-of-way of Sulphur Springs Road at a joint corner with property described more fully on Exhibit "A" attached hereto and running thence along the westerly right-of-way of Sulphur Springs Road N. 41-54-00 E. 100.00 feet to an iron pin; thence continuing N. 36-17-00 E. 150.00 feet to an iron pin; thence continuing N. 31-09-00 E. 115.00 feet to an iron pin; thence continuing N. 26-43-00 E. 107.00 feet to an iron pin; thence continuing N. 22-41-00 E. 100.50 feet to an iron pin; thence continuing N. 21-16-00 E. 150.00 feet to an iron pin; thence turning and leaving the right-of-way of Sulphur Springs Road and running thence N. 68-42-00 W. 378.70 feet to an iron pin; thence turning and running N. 29-55-00 W. 254.90 feet to an iron pin; thence turning and running S. 59-30-00 W. 110.00 feet; thence turning and running S. 11-34-00 W. 813.54 feet to an iron pin at a joint corner with property described on Exhibit "A" attached hereto; thence running along a joint line with said parcel N. 83-00-00 E. 99.80 feet to an iron pin; thence continuing S. 69-51-00 E. 230.00 feet to an iron pin; thence continuing S. 47-48-00 E. 90.00 feet to an iron pin on the westerly right-of-way of Sulphur Springs Road, being the point of beginning.

1297
642 Sulphur Springs Road
Greenville (Berea), South
Carolina

Exhibit B

BOOK1482 PAGE 22

EXHIBIT "B"

LEGAL DESCRIPTION
OF
SHOPPING CENTER

That certain piece, parcel or tract of land situate lying and being in the City of Greenville, Greenville County, South Carolina more particularly described as follows:

PARCEL C

ALL that certain piece, parcel or tract of land, with improvements, situate, lying and being in the State of South Carolina, County of Greenville, at the northerly intersection of the rights-of-way of Hunts Bridge Road and Sulphur Springs Road, being shown and designated on a revised plat entitled "Layout Plan-Westside City, Inc." prepared by Gray Engineering Consultants, Inc. dated November 12, 1991, and having, according to said plat, the following metes and bounds, to-wit:

BEGINNING at an iron pin on the easterly right-of-way of Hunts Bridge Road at a joint corner with property described more fully on Exhibit "A" attached hereto and running thence along the easterly right-of-way of Hunts Bridge Road N. 07-17-00 W. 377.38 feet to an iron pin; thence continuing N. 07-19-00 W. 307.30 feet to an iron pin; thence leaving the right-of-way of Hunts Bridge Road and running thence N. 81-33-00 E. 125.00 feet to an iron pin; thence running N. 59-33-00 E. 209.40 feet to an iron pin; thence turning and running along a joint line with property described in Exhibit "B" attached hereto S. 11-34-00 W. 813.54 feet to an iron pin on a joint line with property described on Exhibit "A" attached hereto; thence running along said joint line S. 83-00-00 W. 54.30 feet to an iron pin on the easterly right-of-way of Hunts Bridge Road, being the point of beginning.

1297
642 Sulphur Springs Road
Greenville (Berea), South
Carolina



FILED FOR RECORD IN GREENVILLE
COUNTY SC RMC OFFICE AT 12:05 PM
07/24/92  RECORDED IN DEED
BOOK 1482  PAGE 0017
DOC # 92045924

45924

Exhibit B

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 1301
Jackson, Mississippi

| | |
|---|---|
| Lease: | Lease dated April 7, 1989 between Bennett V. York and KRE, LLC, collectively, as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant; |
| | as evidenced by Memorandum of Lease dated April 7, 1989, recorded in Book 3590, Page 283, of the public records of Hinds County, Mississippi |
| Amendments/ Guaranty: | Agreement Amending Lease dated August 14, 1989, recorded in Book 3644, Page 141, of the public records of Hinds County, Mississippi |
| | Agreement Supplementing Lease dated April 8, 1991, recorded in Book 3862, Page 276, of the public records of Hinds County, Mississippi |
| | Agreement Supplementing and Amending Lease dated April 8, 1991 |
| | Letter Agreement dated September 19, 1991 |
| | Second Agreement Amending Lease dated December 20, 1994, as evidenced by Memorandum of Agreement Amending Lease dated December 20, 1994, recorded in Book 4390, Page 505, of the public records of Hinds County, Mississippi |
| | Agreement Amending Lease dated January 11, 1996 |
| | Fourth Agreement Amending Lease dated March 4, 1999 |
| | Corporate Guaranty of Lease Obligations dated January 11, 2001 |
| Video Store Sublease: | Sublease dated March 7, 2003 between Winn-Dixie Montgomery, Inc., as Lessor, and Sunray Entertainment, LLC d/b/a Blockbuster, as Lessee |
| Premises: | That certain store building and related improvements located at 5777 Terry Road, Jackson, Hinds County, Mississippi |

Legal Description:    The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

TRACT I

A certain parcel of land lying and being situated in the Southwest Quarter of the Northwest Quarter and the Northwest Quarter of the Southwest Quarter of Section 13, Township 4 North, Range 1 West, Hinds County, Mississippi, and being more particularly described by metes and bounds, to-wit:

Beginning at the intersection of the North right of way of Siwell Road, having a 50 foot right of way, and the West right of way of Terry Road, having a 50 foot right of way, as both roads are laid out and in use at the time of this survey, dated February 13, 1989 and said point being 2049.2 feet South of and 521.4 feet East of an iron pipe in a fence corner marking the apparent Northwest Corner of the Southwest Quarter of the Northwest Quarter of said Section 13, Township 4 North, Range 1 West; thence North 51 degrees 08 minutes West along the said North right of way of Siwell Road a distance of 544.6 feet to an iron pin; thence leaving said North right of way, run North 40 degrees 59 minutes East a distance of 733.4 feet to an iron pin in a fence line; thence South 51 degrees 16 minutes East along said fence a distance of 55.5 feet to a corner marked by a "buggy axle"; thence North 65 degrees 55 minutes East a distance of 168.3 feet to an iron pin in a fence corner; thence South 41 degrees 51 minutes East along a fence line a distance of 421.4 feet to an iron pin in the said West right of way of Terry Road; thence  South 40 degrees 59 minutes West along the said West right of way of Terry Road a distance of 815.4 feet to the Point of Beginning.

LESS AND EXCEPT:  Commence at the intersection of the North right of way of Siwell Road, having a 50 foot right of way, and the West right of way of Terry Road, having a 50 foot right of way, and run North 40 degrees 59 minutes East a distance of 815.4 feet to the Easternmost corner of a certain 10.4 acre tract and marking the Point of Beginning of the tract herein described; thence South 40 degrees 59 minutes West along the said West right of way of Terry Road a distance of 80 feet; thence North 41 degrees 51 minutes West a distance of 456.8 feet to a point in the North line of that certain 10.4 acre tract; thence North 65 degrees 55 minutes East a distance of 83.4 feet to an iron pin marking the Northernmost corner of a certain 10.4 acre tract; thence South 41 degrees 51 minutes East along a fence marking the North line of that certain 10.4 acre tract a distance of 421.4 feet to the Point of Beginning, containing 0.8 acres, more or less.

Exhibit B
Page 1 of 3 Pages

1301
5777 Terry Road
Jackson, MS

ALSO LESS AND EXCEPT: A 33,716 square foot parcel, more or less, being situated in the Northwest Quarter of Southwest Quarter of Section 13, Township 4 North, Range 1 West, Hinds County, Mississippi and being more particularly described as follows:

Commencing at the Northwest corner of Southwest Quarter of Northwest Quarter of said Section 13, run thence South 2049.2 feet; thence run East 521.4 feet to the intersection of the North right of way of Siwell Road, having a 50 foot right of way, and the West right of way of Terry Road, having a 50 foot right of way; run thence North 40 degrees 59 minutes East - 529.16 feet along the West right of way of Terry Road to the Point of Beginning; run thence North 49 degrees 01 minute West - 180.00 feet; thence North 40 degrees 59 minutes East - 198.63 feet; thence South 41 degrees 51 minutes East - 181.42 feet to a point on the West right of way of Terry Road; run thence South 40 degrees 59 minutes West - 176.00 feet along said right of way to the Point of Beginning.

ALSO LESS AND EXCEPT:

A parcel of land situated in the Northwest Quarter (NW¼) of the Southwest Quarter (SW¼) of Section 13, Township 4 North, Range 1 West, Hinds County, Mississippi, and being a portion of the lands acquired by Bennett V. York by Warranty Deed recorded in Book 3590 at Page 278, as recorded in Book 3594 at Page 424, and being more particularly described as follows:

Commence at a point being 2,049.2 feet South of and 521.4 feet East of the apparent Northwest corner of the Southwest Quarter (SW¼) of the Northwest Quarter (NW¼) of the above mentioned Section 13, Township 4 North, Range 1 West, said point being what was the intersection of the North right-of-way of Siwell Road with the West right-of-way of Terry Road, at the time of conveyance of the above referenced parcel of land by Deed Book 3590, Page 278, as rerecorded in Book 3594 at Page 424, and was the Point of Beginning for said parcel; thence run N51°08'00"W along the above referenced North right-of-way of Siwell Road, 544.6 feet to the West line of the above referenced parcel of land; thence run along said West line N40°59'00"E, 12.25 feet to a point on the new North right-of-way of Siwell Road, as same exists this date (8/91); thence along said new North right-of-way, with a curve to the left, having an arc distance of 301.14 feet, a radius of 8,802.04 feet, a chord bearing and distance of S51°03'36"E, 301.12 feet to the Point of Beginning of the herein described parcel; thence leaving said new North right-of-way of Siwell Road, run N44°12'54"E, 171.50 feet; thence run S47°26'34"E, 207.00 feet

1301
5777 Terry Road
Jackson, MS

to a point on the new West right-of-way of Terry Road, as same
exists this date (8/91); thence run along said new West right-
of-way S35°16'22"W, 92.70 feet to a point on the
aforementioned new North right-of-way of Siwell Road; thence
run along said new North right-of-way N87°11'25"W, 104.41
feet; thence continue along said new North right-of-way, with
a curve to the right, having an arc distance of 144.00 feet,
a radius of 8,802.04 feet, a chord bearing and distance of
N52°30'32"W, 144.00 feet to the Point of Beginning containing
32,801 square feet or 0.75 acres, more or less.

TRACT II

A 6,188 square foot parcel, more or less, being situated
in the W ¼ of Section 13, T4N-R1W, Hinds County,
Mississippi, and being more particularly described as
follows:

Commencing at the Northwest corner of the SW ¼ of the NW
¼ of said Section 13, run thence South - 2049.2 ft.;
thence East - 621.4 ft. to the intersection of the north
right-of-way line of Siwell Rd., having a 50 ft. right of
way; with the west right-of-way of Terry Road, having a
50 ft. right-of-way; thence North 51 degrees 08 minutes
West - 544.60 ft. along the northerly right-of-way of
Siwell Road; run thence North 40 degrees 59 minutes East
- 283.40 ft. to the POINT OF BEGINNING; thence North 40
degrees 59 minutes East - 450.00 feet; thence run North
49 degrees 01 minute West 15.00 feet; thence South 40
degrees 59 minutes West - 375.00 ft.; South 29 degrees 40
minutes West - 76.49 ft. to the POINT OF BEGINNING.

TITLE\EXHIBITB.3P

Page 3 of 3 Pages



EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 1314
Jackson, Mississippi

| | |
|---|---|
| Lease: | Lease dated October 3, 1988 between Edens & Avant Properties Limited Partnership, as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant; |
| | as evidenced by Memorandum of Lease dated October 3, 1988, recorded in Book 3546, Page 384, of the public records of Hinds County, Mississippi |
| Amendments/ Guaranty: | Agreement Amending Lease dated July 13, 1989 |
| | Second Agreement Amending Lease dated May 12, 1988, recorded in Book 5519, Page 111, of the public records of Hinds County, Mississippi |
| | Third Agreement Amending Lease dated September 9, 1998 |
| | Assignment of Leases dated September 14, 1998 |
| | Agreement Supplementing Lease dated May 3, 1999 |
| | Assignment and Assumption of Lease dated January 11, 2001 |
| | Corporate Guaranty of Lease Obligations dated January 11, 2001 |
| Lease: | Lease dated April 23, 1995 between Edens & Avant Properties Limited Partnership, as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant |
| Amendments/ Guaranty: | Assignment of Leases dated September 14, 1998 |
| | Assignment and Assumption of Lease dated January 11, 2001 |
| Premises: | That certain store building and related improvements located at 902 1/2 - 912 E. Fortification, Jackson, Hinds County, Mississippi |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

BOOK **3546** PAGE **386**

### EXHIBIT A

A parcel of land containing 2.06 acres, more or less, being Lots 3, 4 and 5 of Block 0, North Park Addition and Lots 1, 2, 3, 4, 5 and 7 of May Fair Terrace Subdivision, and being further described as follows:

Commencing at the intersection of the south right-of-way of Carlisle Street and the east right-of-way of Jefferson Street as now laid out and in use; run thence along the east right-of-way of Jefferson Street S 00°13' 20"W, 74 feet to an iron pin and the Point of Beginning; thence, leaving the said east right-of-way, run S 89°38' 31"E, 160.00 feet to an iron pin; run thence N00°13'18"E, 75.00 feet to an iron pin on the south right-of-way of Carlisle Street; run thence along the south right-of-way of Carlisle Street, N89° 52'46"E, 239.58 feet to an iron pin on the south right-of-way of Carlisle Street; thence, leaving the said south right-of-way, run S00°11'04"W, 149.60 feet to an iron pin; run thence S89°58' 56"W, 120.00 feet to the southeast corner of Lot 3, May Fair Terrace Subdivision; run thence S00°05' 55"W, 150.10 feet to the southeast corner of Lot 4, May Fair Terrace Subdivision, said point being located on the north right-of-way of Fortification Street; run thence along the said north right-of-way S89°50'36"W, 280.00 feet to a point at the intersection of the north right-of-way of Fortification Street and the east right-of-way of Jefferson Street as now laid out and in use; run thence, following the east right-of-way of Jefferson Street, N00°13'20"E, 226.00 feet to the Point of Beginning.

1314
902 1/2 - 912 E.
Fortification MS

EXHIBIT A



1314
902 1/2 - 912 E.
Fortification MS

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 1362
Ridgeland, Mississippi

Lease:    Lease dated January 7, 1993 between School Street Crossing, L.P., as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant;

as evidenced by Memorandum of Lease dated January 7, 1993, recorded in Book 863, Page 99, of the public records of Madison County, Mississippi

Amendments/
Guaranty:    Letter Agreement dated April 19, 1994

Agreement Supplementing Lease dated April 19, 1994, recorded in Book 334, Page 655, of the public records of Madison County, Mississippi

Agreement Amending Lease dated April 19, 1994

Second Agreement Supplementing Lease dated June 28, 1994, recorded in Book 339, Page 636, of the public records of Madison County, Mississippi

Assignment and Assumption of Lease dated January 11, 2001, as evidenced by Memorandum of Assignment and Assumption of Lease dated January 11, 2001, recorded in Book 480, Page 489, of the public records of Madison County, Mississippi

Corporate Guaranty of Lease Obligations dated January 11, 2001

Premises:    That certain store building and related improvements located at 398 Highway 51 North, Ridgeland, Madison County, Mississippi

Legal Description:    The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

**EXHIBIT A**

A parcel of land located in the Southwest 1/4 of Section 30, Township 7 North, Range 2 East, Madison County, Mississippi, and being part of Lots 1 and 2, Block 24 Highland Colony Subdivision, City of Ridgeland, Madison County, Mississippi and being more particularly described as follows:

Beginning at an iron pin found marking the intersection of the South line of Lot 1 and Lot 2, Block 24, Highland Colony Subdivision as recorded in Plat Book 1, Page 6, in the Chancery Clerk's office of said county, with the Easterly right-of-way line of U.S. Highway No. 51 as it is now laid out and exist;

Thence N32°22'35"E, along said Easterly right-of-way line, a distance of 545.25 feet to an iron pin found;

Thence continuing along said Easterly right-of-way line, N57°24'44"E, a distance of 24.69 feet to an iron pin set;

Thence departing said Easterly right-of-way line, S85°30'52"E, a distance of 74.77 feet to an iron pin set;

Thence N89°51'24"E, a distance of 137.11 feet to an iron pin set at the point of curvature of a curve to the left;

Thence along the arc of said curve to the left, a distance of 19.81 feet to a iron pin set at the point of reverse curvature of a curve to the right.  Said curve to the left having a radius of 12.00 feet, and a chord bearing N42°33'09"E, a distance of 17.64 feet;

Thence along the arc of said curve to the right, a distance of 77.48 feet to an iron pin set at the point of reverse curvature of a curve to the left.  Said curve to the right having a radius of 165.50 feet, and a chord bearing N18°13'32"E, a distance of 76.77 feet;

Thence along the arc of said curve to the left, a distance of 61.73 feet to an iron pin set an the proposed South right-of-way line of East School Street.  Said curve to the left having a radius of 129.50 feet, and a chord bearing N17°58'54"E, a distance of 61.14 feet;

Thence S89°32'25"E along said proposed South right-of-way line of said East School Street, a distance of 31.06 feet to an iron pin set at the point of curvature of a curve to the right;

Thence departing said proposed South right-of-way line, run along the arc of said curve to the right, a distance of 78.60 feet to an iron pin set at the point of reverse curvature of a curve to the left.  Said curve to the right having a radius 160.50 feet, and a chord bearing S17°36'28"W, a distance of 77.81 feet;

Thence along the arc of said curve to the left, a distance of 57.71 feet to a iron pin set at the point of compound curvature of another curve to the left.  Said curve to the left having a radius of 134.50 feet, and a chord bearing S19°20'40"W, a distance of 57.27 feet;

Thence along the arc of said curve to the left, a distance of 22.40 feet to an iron pin set at the point of tangency.  Said curve to the left having a radius of 12.00 feet, and a chord bearing S36°39'50"E, a distance of 19.29 feet;

Thence N89°51'24"E, a distance of 201.19 feet to an iron pin set on the proposed West right-of-way line of Wheatley Street;

Thence S00°08'36"E, running parallel to and five feet West of the existing right-of-way line of said Wheatley Street as it is now laid out and exist, a distance of 493.91 feet to an iron pin set on the South line of the aforementioned Lot 1, Block 24;

Thence N88°54'07"W, a distance of 781.84 feet to The Point of Beginning, and containing 7.05 acres, (307,121 square feet), more or less.

1362
398 Highway 51 North
Ridgeland, MS





1362
398 Highway 51 North
Ridgeland, MS

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # **1413**
Brandon, Mississippi

Lease:                 Lease dated February 27, 2003 between North Shore Crossings, LLC, as
                       Landlord, and Winn-Dixie Montgomery, Inc., as Tenant;

                       as evidenced by Short Form Lease dated February 27, 2003, recorded in Book
                       1037, Page 146, of the public records of Rankin County, Mississippi

Amendments/
Guaranty:              Corporate Guaranty of Lease Obligations dated March 3, 2003

                       First Amendment to Lease dated October 16, 2003 (only executed by Landlord)

                       Letter Agreement dated October 22, 2003

Premises:              That certain store building and related improvements located at 1070
                       Spillway Circle, Brandon, Rankin County, Mississippi

Legal Description:     The real property as more particularly described as follows:


                       SEE ATTACHED LEGAL DESCRIPTION



PRELIMINARY SITE PLAN

1413
1070 Spillway Circle
Brandon, MS

EXHIBIT "B"

THE PROPERTY

Legal Description For The Pearl River Valley Water Supply District

Existing Shop Site

A parcel of land lying in the NE ¼ of the NE ¼ of Section 12, T6N, R2E, Rankin County, Mississippi and being more particularly described as follows:

Commencing at an iron pin marking the intersection of the East Right of Way of North Shore Causeway with the North Right of Way of Spillway Road and run thence N 46 degrees 23 minutes 13 seconds E - 230.30' to an iron pin and the POINT OF BEGINNING; run thence N 47 degrees 29 minutes 11 seconds E - 592.65' along the East Right of Way of North Shore Causeway; thence leaving the East Right of Way of North Shore Causeway, run S 58 degrees 03 minutes 11 seconds E - 552.20' to an iron pin on the Westerly Right of Way of Pelahatchie Shore Drive; run thence S 28 degrees 02 minutes 29 seconds W - 30.18' along the Westerly Right of Way of Pelahatchie Shore Drive to an iron pin marking the Point of Tangency of a 15 degree 25 minute 06 second curve bearing to the right in the Westerly Right of Way of Pelahatchie Shore Drive; said curve having a Delta Angle of 24 degrees 31 minutes 30 seconds and a Radius of 371.61'; run thence along the arc of said curve in the Westerly Right of Way of Pelahatchie Shore Drive for a chord bearing and distance of S 40 degrees 18 minutes 14 seconds W - 157.86' to an iron pin marking the Point of Curvature thereof; run thence S 52 degrees 33 minutes 59 seconds W - 150.91' along the Northerly Right of Way of Pelahatchie Shore Drive to an iron pin and the Point of Tangency of a 14 degree 58 minute 31 second curve bearing to the left in the Westerly Right of Way of Pelahatchie Shore Drive; said curve having a Delta Angle of 29 degrees 14 minutes 57 seconds and a Radius of 382.60'; run thence along the arc of said curve in the Westerly Right of Way of Pelahatchie Shore Drive for a chord bearing and distance of S 37 degrees 55 minutes 07 seconds W - 193.50' to an iron pin marking the Point of Curvature thereof; run thence S 23 degrees 19 minutes 02 seconds W - 37.77' along the Westerly Right of Way of Pelahatchie Shore Drive to an iron pin; thence leaving the Westerly Right of Way of Pelahatchie Shore Drive, run N 64 degrees 31 minutes 40 seconds W - 202.34'; run thence S 25 degrees 28 minutes 20 seconds W - 200.00' to an iron pin on the Northerly Right of Way of Spillway Road; run thence N 63 degrees 56 minutes 17 seconds W - 246.54' along the North Right of Way of Spillway Road; thence leaving the North Right of Way of Spillway Road, run N 31 degrees 34 minutes 36 seconds E - 234.44' to an iron pin; run thence N 58 degrees 25 minutes 24 seconds W - 197.23' to the POINT OF BEGINNING.

Containing 8.774 acres more or less.

1413
1070 Spillway Circle
Brandon, MS

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # 1471
Opelousas, Louisiana

Lease:                    Lease dated March 20, 1993 between LRS General Partnership, as Landlord,
                          and Winn-Dixie Montgomery, Inc., as Tenant;

                          as evidenced by Short Form Lease dated May 20, 1993 recorded in Book G-34,
                          Page 682, of the public records of St. Landry Parish, Louisiana.

Amendments/
Guaranty:                 Guaranty dated June 11, 1993

                          Amendment to Lease dated July 7, 1993

                          Second Amendment to Lease dated February 17, 1994

                          Supplemental Lease Agreement dated April 27, 1994

Premises:                 That certain store building and related improvements located at 2418
                          South Union, Opelousas, St. Landry County, Louisiana

Legal Description:        The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "B"

Southwesterly corner of the intersection of
Heather Lane and Louisiana Highway 182
Opelousas, St. Landry Parish, Louisiana

All that certain piece, parcel or tract of land, lying and being situated in the City of Opelousas, Parish of St. Landry, and State of Louisiana together with all improvements thereon or to be constructed thereon and all appurtenances thereto belonging or in anywise appertaining, more particularly described as follows, to wit:

A CERTAIN TRACT OR PARCEL OF LAND CONTAINING 5.8382 ACRES BEING SITUATED IN SECTIONS 150 AND 160, TOWNSHIP 6 SOUTH, RANGE 4 EAST, ST. LANDRY PARISH, LOUISIANA AND BEING BOUNDED ON THE NORTH BY THE EXTENSION OF HEATHER DRIVE AND EAST 19TH ST. PROPERTIES, INC.; ON THE SOUTH BY THE ESTATE OF R. S. TOMLINSON, SR. AND THE ESTATE OF E. E. PAVY, SR.; ON THE EAST BY LA. HWY. 182 AND EAST 19TH ST. PROPERTIES, INC. AND ON THE WEST BY THE ESTATE OF E. E. PAVY ESTATE AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE INTERSECTION OF THE NORTH PROPERTY LINE OF THE ESTATE OF R. S. TOMLINSON, SR. AND THE WEST RIGHT-OF-WAY OF LA. HWY. 182, THENCE S 86°35'23" W, A DISTANCE OF 490.00 FEET; THENCE N 03°24'37" W, A DISTANCE OF 450.00 FEET; THENCE N 86°35'23" E, A DISTANCE OF 517.19 FEET; THENCE S 03°24'37 E, A DISTANCE OF 100.00 FEET; THENCE S 64°47'58" E, A DISTANCE OF 160.00 FEET; THENCE ALONG A CURVE TO THE RIGHT HAVING AN ARC OF 265.98 FEET, A RADIUS OF 2824.93 FEET AND A CHORD OF S 27°53'53" W, A DISTANCE OF 265.88 FEET, THENCE S 29°08'03" W, A DISTANCE OF 54.83 FEET TO THE POINT OF BEGINNING. SAID TRACT OF LAND IS MORE CLEARLY SHOWN ON PLAT OF SURVEY BY ROBERT L. WOLFE, JR., DATED APRIL 16, 1993.

1471
2418 South Union
Opelousas, LA

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 1547
Pineville, Louisiana

Lease:  Lease dated February 6, 1985 between Pinebrook Associates, Ltd., as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant;

as evidenced by Short Form Lease dated February 6, 1875 recorded in Book 1141, Page 152, of the public records of Rapides Parish, Louisiana

Amendments/
Guaranty:  Guaranty dated February 8, 1985

Amendment to Lease dated August 9, 1985

Supplemental Lease Agreement dated April 11, 1986

Amendment No. 2 to Lease dated June 30, 1986

Premises:  That certain store building and related improvements located at 3123 Highway 28 East, Pineville, Rapides County, Louisiana

Legal Description:  The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "B"

NORTHEASTERLY CORNER OF THE INTERSECTION OF
LOUISIANA HIGHWAY #28 AND EDGEWOOD DRIVE
PINEVILLE, RAPIDES PARISH, LOUISIANA

A certain piece, parcel or lot of ground, together with all buildings and improvements thereon, rights, ways and privileges thereunto belonging or in any way appertaining, being, lying and situated in the City of Pineville, Louisiana and being more particular described as follows, to wit:

From the center of Section 8, Township 4 North, Range 1 East of the Louisiana Meridian, Rapides Parish, Louisiana, said point being further identified as the Northwest corner of Lot 9 of Green Mountain Subdivision, as recorded in plat Book 12, Page 104 at Rapides Parish, Louisiana, said point also being marked with a 1 1/2" diameter iron pipe, proceed West along the North line of the Northeast 1/4 of the Southwest 1/4 of said Section 8 a distance of 1314.3 feet to the corner common to the Northeast 1/4 of the Southwest 1/4 of said Section 8 and the Northwest 1/4 of the Southwest 1/4 of said Section 8, said corner being marked with a concrete monument;

thence turn left and proceed southward along the line common to the Northeast 1/4 of the Southwest 1/4 of said Section 8 and the Northwest 1/4 of the Southwest 1/4 of said Section 8 a distance of 1387.26 feet to the North right of way line of Louisiana Highway 28;

thence turn right and proceed along said right of way line to a point on said right of way line being 245.00 feet East of the East right of way line of Edgewood Drive and also being the POINT OF BEGINNING of the tract of land herein to be described:

from the POINT OF BEGINNING turn right and proceed North 0 degrees 21 minutes 00 seconds East, a distance of 216.73 feet to a point;

thence turn left and proceed North 89 degrees 39 minutes 00 seconds West, a distance of 214.89 feet to a point;

thence turn left and proceed South 0 degrees 21 minutes 00 seconds West, a distance of 15.00 feet to a point;

thence turn right and proceed North 89 degrees 39 minutes 00 seconds West, a distance of 30.00 feet to a point at the East right of way line of Edgewood Drive;

thence turn right and proceed North 0 degrees 21 minutes 00 seconds East along said right of way line, a distance of 45.00 feet to a point on the South line of the American Ace Hardware Company tract;

thence turn right and proceed South 89 degrees 39 minutes 00 seconds East along the South line of the American Ace Hardware tract, a distance of 114.20 feet to the Southeast corner of said tract;

thence turn left and proceed North 1 degree 38 minutes 00 seconds East along the East line of the American Ace Hardware tract, a distance of 178.80 feet to a point on the South line of the Raymond P. Sauve tract;

thence turn right and proceed South 89 degrees 39 minutes 00 seconds East along the South line of the Raymond P. Sauve tract, a distance of 216.50 feet to the Southeast corner of said tract;

thence turn left and proceed North 1 degree 08 minutes 00 seconds East along the East line of the Raymond P. Sauve tract, a distance of 150.45 feet to the Southwest corner of the Roger P. Wallace tract;

1547
3123 Highway 28 East
Pineville, LA

thence turn right and proceed South 89 degrees 40 minutes 00 seconds East along the South line of the Roger P. Wallace tract, a distance of 458.70 feet to the Southeast corner of said tract, being the corner common to Roger P. Wallace, James H. Price and the herein described property;

thence turn right and proceed South 0 degrees 27 minutes 00 seconds West along the West line of the James H. Price tract, a distance of 165.70 feet to the Southwest corner of said tract;

thence proceed South 0 degrees 21 minutes 00 seconds West, a distance of 125.59 feet to a point;

thence turn right and proceed South 45 degrees 21 minutes 00 seconds West, a distance of 42.43 feet to a point;

thence turn left and proceed South 0 degrees 21 minutes 00 seconds West, a distance of 194.00 feet to a point;

thence turn right and proceed South 66 degrees 14 minutes 00 seconds West, a distance of 134.18 feet to a point;

thence turn left and proceed South 01 degrees 55 minutes 00 seconds West, a distance of 17.00 feet to a point on the North right of way line of Louisiana Highway 28;

thence turn right and proceed North 88 degrees 05 minutes 00 seconds West along said right of way line, a distance of 181.42 feet to a point;

thence turn right and proceed North 0 degrees 21 minutes 00 seconds East, a distance of 175.18 feet to a point;

thence turn left and proceed North 89 degrees 39 minutes 00 seconds West, a distance of 186.00 feet to a point;

thence turn left and proceed South 0 degrees 21 minutes 00 seconds West, a distance of 170.00 feet to a point on the North right of way line of Louisiana Highway 28; .

thence turn right and proceed North 87 degrees 57 minutes 30 seconds West along said right-of-way, a distance of 30.00 feet to the POINT OF BEGINNING.

The above tract of land contains 6.70 acres more or less and is known as the Mitchell Company Shopping Center site in Pineville, Louisiana.

- o 0 o -

1547
3123 Highway 28 East
Pineville, LA

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2001
### Charlotte, North Carolina

| | |
|---|---|
| Lease: | Lease dated April 7, 1986 between B. Belk and H. Belk, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated April 7, 1986, recorded in Book 5367, Page 405, of the public records of Mecklenburg County, North Carolina |
| Amendments/ Guaranty: | First Amendment to Lease dated November 26, 1986, recorded in Book 5456, Page 376, of the public records of Mecklenburg County, North Carolina |
| | Lessee's Acceptance of Premises and Acknowledgement of Assignment dated October 1, 1987 |
| | Supplemental Lease Agreement dated November 2, 1987 |
| Premises: | That certain store building and related improvements located at 5300 Sunset Road, Charlotte, Mecklenburg County, North Carolina |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

REAL ESTATE
BOOK  PAGE
5456 0381

EXHIBIT "B"
LEGAL DESCRIPTION


All that certain piece, parcel or tract of land lying and being
situate in the City of Charlotte, County of Mecklenburg and
State of North Carolina, more particularly described as fol-
lows:


## PHASE I

Beginning at an old iron marking the Southeast corner of Allen A.
Bailey 21.95 acre tract shown as Tract 1 in Deed recorded in Book 4411
at Page 722 of the Mecklenburg County Register of Deeds and being also
the Northeast corner of Bruce Bailey as recorded in Book 4653 at Page
369, said iron being on the Western right-of-way line of U. S. Highway
21 - Statesville Road;

Thence with Allen A. Bailey Southern line N 62°06'20" W, 263.09 feet
to an old iron;  Thence S 67°38'54" W  271.49 feet to a point for the
Southwest corner of this tract, said point referenced by an old iron
at S 67°38'54" W  29.11 feet a corner of Allen A. Bailey 21.95 acres;
Thence severing Allen A. Bailey 21.95 acre tract with (4) calls,
N 05°17'34" W  374.26 feet to a point, S 84°42'26" W  35.00 feet to a
point, N 05°17'34" W  426.94 feet to a point, N 13°45'13" W  175.97
feet to a new iron in the Southern right-of-way line of Sunset Road,
said point referenced by an old iron along said right-of-way of Sunset
Road S 76°14'47" W  470.28 feet;  Thence with the Southern right-of-way
of Sunset Road N 75°14'47" E  298.50 feet to
a concrete right-of-way monument;  Thence along the arc of
a circular curve to the left, having a length of 35.70 feet, a radius of
776.20 feet and a central angle of 2°33'08" to a concrete right-of-way
monument;  Thence along the arc of a circular curve to the left, having a
length of 43.94 feet, a radius of 776.20 feet and a central angle of
3°14'37" to a point;                        Thence leaving said
right-of-way S 13°45'13" E  248.08 feet to a point;  Thence along the
arc of a circular curve to the right, having a length of 108.15 feet, a
radius of 143.02 feet and a central angle of 43°19'32" to a point;
Thence S 33°28'42" E  170.90 feet to a point;  Thence along the arc of
a circular curve to the left having a length of 57.87 feet, a radius of
79.49 feet and a central angle of 41°42'46" to a point;  Thence along
the arc of a circular curve to the left having a length of 99.27 feet, a
radius of 63.20 feet and a central angle of 90°00'00" to a new iron pin
on the Western right-of-way of U. S. Highway 21, said iron pin referenced
by a concrete monument along said right-of-way of U. S. Highway 21
located N 9°37'32" E  15.37 feet, and another concrete monument at the
intersection of U. S. Highway 21 and Sunset Road N 9°37'32" E  815 feet
along the right-of-way of U. S. Highway 21;  Thence along the right-of-way
of U. S. Highway 21 S 9°37'32" W  245.90 feet to a concrete monument;
Thence S 09°14'52" W  437.15 feet to the Point of Beginning and containing
11.711 acres of land, more or less.


## PHASE II
### TRACT A

Being a portion of that certain tract of land conveyed to
Bascom V. Belk, Jr., and wife Harriet C. Belk in Deed recorded in
Book 3315 at Page 35, and being a portion of 3.62 acre tract
conveyed to Ralph P. Cochrane and wife Dorothy J. Cochrane in
Deed recorded in Book 1781 at Page 3, and a portion of a 21.95
acre tract conveyed to William Bruce Hutchison as Tract 1 of Deed
recorded in Book 4411 at Page 722 of the Mecklenburg County
Registry and all being located in Long Creek Township;

BEGINNING at an old iron on the South right-of-way line of Sunset
Road, said iron being the northwest corner of the above-mentioned
21.95 acre tract conveyed to Hutchison; thence along the south
line of Sunset Road N 76°14'47" E a distance of 470.28 feet;
thence S 13°45'13" E 175.97 feet; thence S 5°17'34" E 426.04

2001
5300 Sunset Road
Charlotte, North Carolina

REAL ESTATE
BOOK  PAGE
5456 0382

EXHIBIT "B"
PAGE 2

feet; thence N 84°42'26" E 35 feet; thence S 5°17'34" E 374.26
feet; thence S 67°38'54" W passing an old iron at 29.11 feet,
a total of 414.37 feet to an old iron for the southeast corner of
Bradley tract and the southernmost corner of the tract herein
described; thence N 12°32'41" W 107.38 feet to an old iron;
thence S 78°10'22" W 538.24 feet to an old iron on the east
right-of-way line of Milhaven Lane (State Road 2100); thence
along Milhaven Lane N 00°32'30" W, passing an old iron for the
southwest corner of Belk tract at 128.86 feet, a total of 646.81
feet to an old iron; thence N 70°14'57" E 170.69 feet to an old
iron; thence N 75°06'52" E 162.17 feet to an old iron; thence
N 00°32'30" W 208.74 feet to an iron; thence N 12°30'00" W 45.15
feet to an iron; thence N 75°06'52" E 4.59 feet to a concrete
monument; thence N 13°50'04" W 10.00 feet to a concrete monument;
thence N 76°09'56" E 7.40 feet to a concrete monument; thence
N 76°09'56" E 17.83 feet to the place of beginning.

PHASE II
TRACT B

Being located in Long Creek Township of Mecklenburg County,
North Carolina and being a portion of that land located between
Sunset Road (State Road 2108), State Road 2168, and Statesville
Road (U.S. Highway 21) and being a portion of that same land
conveyed to William Bruce Hutchison as Tract II and recorded in
Deed Book 4411 at Page 722 of the Mecklenburg County Registry.
Said land being more particularly described as follows:

BEGINNING at a point from a concrete right-of-way monument
located at the Northwest right-of-way intersection of State Road
2168 and Sunset Road (State Road 2108) a radius of 776.20 feet, a
length of 43.94 feet, a central angle of 3°14'37" and a tangent
of 21.98 feet and runs; thence with the South right-of-way line
of Sunset Road with the arc of a circular curve to the left
a radius of 776.20 feet, a length of 121.67 feet, a central angle
of 12°13'29" and a tangent of 83.12 feet to a concrete monument;
thence with the arc of a circular curve, a radius of 776.20 feet,
a length of 160.45 feet, a central angle of 11°50'37" and a
tangent of 80.51 feet to a concrete monument; thence N 49°35'41"
E 248.52 feet to a concrete monument; thence S 75°31'06" E 56.65
feet to a concrete monument at the West right-of-way line of U.S.
Highway 21; thence along U.S. Highway 21 with the arc of a
circular curve to the right a radius of 2764.82 feet, a length of
169.89 feet, a central angle of 03°31'14", and a tangent of 84.97
feet to a point; thence S 09°36'57" W 515.40 feet to a concrete
monument at the intersection of State Road 2168 and U.S. Highway
21; thence S 9°37'31" W 15.37 feet to a new iron pin; thence
along the arc of a circular curve to the right, a radius of 63.20
feet, a length of 99.27 feet, a central angle of 90°00'00" and a
tangent of 63.20 feet; thence a radius of 79.49 feet, a length of
57.87 feet, a central angle of 41°42'46", and a tangent of 30.28
feet; thence N 38°39'42" W 170.90 feet; thence with the arc of a
circular curve to the left a radius of 143.02 feet, a length of
108.15 feet, a central angle of 43°19'32" and a tangent of 56.81
feet; thence N 13°45'13" W 248.88 feet to the point of beginning.

Recorded In Book 5456 Page 376
and Verified

2001
5300 Sunset Road
Charlotte, North Carolina

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # **2003**
Charlotte, North Carolina

| | |
|---|---|
| Lease: | Ground Lease dated July 29, 1985 between CNC Centers, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Memorandum of Ground Lease dated July 29, 1985, recorded in the public records of Mecklenburg County, North Carolina |
| Amendments/ Guaranty: | Guaranty dated July 29, 1985 |
| Lease: | Ground Lease dated September 6, 1985 between CNC Centers, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Memorandum of Ground Lease dated September 6, 1985, recorded in Book 5087, Page 741, of the public records of Mecklenburg County, North Carolina |
| Amendments/ Guaranty: | Guaranty dated September 10, 1985 |
| | Supplemental Ground Lease Agreement dated September 16, 1986 |
| Lease: | Sublease dated March 30, 1987 between Realty South Investors, Inc., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Sublease dated March 30, 1987, recorded in Book 5471, Page 977, of the public records of Mecklenburg County, North Carolina |
| Amendments/ Guaranty: | Guaranty dated March 30, 1987 |
| Premises: | That certain store building and related improvements located at 3112 Milton Road, Charlotte, Mecklenburg County, North Carolina |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "A"

Legal description of proposed Winn Dixie store building located in Newell Town Market in Mecklenburg County, Charlotte, N.C.

Beginning in the center line of the party wall between building #7 and 7A At the south face of the proposed Winn Dixie building; This point being located N-42° 58' 48" E, 422.28' from the southwest corner of the property known as the market place and runs thence with the center line of the wall commonly known as the party wall between building #7A and building #7 and runs thence N-3° 42' 16" E, 200'-00" to the north face of the Winn Dixie proposed building. Thence continuing the same course N-3° 42' 16" E, 17'-00" crossing the walkway to a point in the line of the north entrance way of the Winn Dixie store building. Thence with the north edge of the walkway and the Winn Dixie store building in part S-86° 17' 44" E,219'-00" to a point in the north edge of the walkway. Thence crossing the walkway S-3° 42' 16" W, 17'-00" to a point in the north face of the Winn Dixie store building in the center of the party wall between building #6 and building #7. Thence continuing with the same bearing S-3° 42' 16" W,199'-6" to the center line of the party wall between building #5 and building #7. Thence with the center line with the party wall between building #5 and building #7, N-86° 17' 44" W, 24'-6" to the face of building #5. Thence with the face of the wall of building #5, S-3° 42' 16" W, 14'-5" to a point in the wall of building #5. Thence leaving the wall of building #5, N-86° 17' 44" W, 20'-8½" to a point. Thence S-3° 42' 16" W, 20'-1½" to a point. Thence N-86° 17' 44" W, 29'-3" to a point. Thence N-3° 42' 16" E, 23'-11½" to a point. Thence N-86° 17' 44" W, 144'-6½" to a point in the center line projection of the west wall. Thence N-3° 42' 16" E, 10'-1" to the beginning containint 50,252 square feet.

The above description contains the area of building #7 and walkways and utilities and loading area in rear of building. The above legal description was prepared from plans provided by David I. Narramore, A.I.A., Inc., and a plat entitled "Newell Town Market", prepared by Dalton Morgan Shook & Partners, dated 7/11/85, Charlotte, N.C.

2003
3112 Milton Road
Charlotte, North Carolina

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2008
Charlotte, North Carolina

Lease:               Lease dated February 18, 1992 between Arrowood Limited Partnership,
                     Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

                     as evidenced by Short Form Lease dated February 18, 1992, recorded in Book
                     6796, Page 554, of the public records of Mecklenburg County, North Carolina

Amendments/
Guaranty:            Guaranty dated February 28, 1992

                     Letter Agreement dated August 10, 1992

                     Supplemental Lease Agreement dated July 7, 1993


Premises:            That certain store building and related improvements located at 818 E.
                     Arrowood Road, Charlotte, Mecklenburg County, North Carolina

Legal Description:   The real property as more particularly described as follows:


SEE ATTACHED LEGAL DESCRIPTION

LEGAL DESCRIPTION OF SHOPPING CENTER
EXHIBIT B

BEGINNING at a point in the approximate centerline of the right-of-way of the Southern Railroad (130' R/W), said point being located S. 09-00-19 E. 274.04 feet from a point marking the intersection of the southerly margin of the right-of-way of Arrowood Road (R/W varies) and the centerline of said right-of-way of the Southern Railroad, and running thence with the centerline of the right-of-way of the Southern Railroad S. 09-00-19 E. 591.56 feet to an existing iron in the northerly property line of the property conveyed to Hampton as the same is described in deed recorded in Deed Book 6484 at Page 579 in the Mecklenburg County Public Registry; thence with the northerly and westerly property lines of the aforesaid Hampton property two (2) calls and distances as follows: (1) S. 85-51-18 W. 441.45 feet to an existing iron; and (2) S. 05-23-12 E. 120.00 feet to an iron set; thence S. 80-50-05 W. 530.00 feet to an iron set; thence N. 64-48-53 W. 175.31 feet to an iron set in the easterly margin of the right-of-way of England Street (60' R/W); thence with the easterly margin of the aforesaid right-of-way in a northeasterly direction with the arc of a circular curve to the left, having a radius of 2,321.83 feet (chord bearing N. 14-02-52 E. and distance 763.56 feet), an arc distance of 767.05 feet to a point; thence N. 85-32-50 E. 158.13 feet to a point; thence in a southeasterly direction with the arc of a circular curve to the right, having a radius of 170.44 feet (chord bearing S. 84-51-08 E. and distance 56.85 feet), an arc distance of 57.12 feet to a point; thence S. 76-47-51 E. 99.19 feet to a point; thence in a northeasterly direction with the arc of a circular curve to the left, having a radius of 82.98 feet (chord bearing N. 30-39-53' E. and distance 63.61 feet), an arc distance of 65.28 feet to a point; thence in a northwesterly direction with the arc of a circular curve to the right, having a radius of 392.89 feet (chord bearing N. 11-54-01 W. and distance 212.52 feet), an arc distance of 215.20 feet to a point; thence N. 04-56-33 E. 67.83 feet to a point in the southerly margin of the right-of-way of Arrowood Road; thence with the southerly margin of the aforesaid right-of-way in a southeasterly direction with the arc of a circular curve to the left, having a radius of 1,486.23 feet (chord bearing S. 86-16-50 E. and distance 60.02 feet), an arc distance of 60.02 feet to a point; thence S. 04-56-33 W. 68.57 feet to a point; thence in a southeasterly direction with the arc of a circular curve to the left, having a radius of 332.89 feet (chord bearing S. 16-59-09 E. and distance 234.95 feet), an arc distance of 240.12 feet to a point; thence N. 67-06-03 E. 107.71 feet to a point; thence S. 87-47-14 E. 275.70 feet to a point, the point or place of BEGINNING, containing 15.842 acres, all as shown on survey prepared by James J. Cobb, N.C.R.L.S., dated August 22, 1991, reference to which survey is hereby made for a more particular description.

JCO/jbt/10-14-91/396

2008
818 E. Arrowood Road
Charlotte, North Carolina

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # **2045**
Rockingham, North Carolina

Lease:                  Lease Agreement dated February 10, 1984 between John H.O. LaGatta, as
                        Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

                        as evidenced by Memorandum of Lease dated February 10, 1984, recorded in
                        the public records of Richmond County, North Carolina

Amendments/
Guaranty:               Consent and Agreement dated February 10, 1984

                        Reassignment of Lease and Agreement dated February 10, 1984

                        Guaranty dated February 10, 1984

                        Consent and Restatement of Assignment of Lease dated October 10, 1986,
                        recorded in Book 694, Page 373, of the public records of Richmond County,
                        North Carolina

                        Consent and Restatement of Reassignment of Lease and Agreement dated
                        October 10, 1986, recorded in Book 694, Page 381, of the public records of
                        Richmond County, North Carolina

                        Modification of Lease dated October 10, 1986, as evidenced by Memorandum
                        of Modification of Lease dated October 10, 1986, recorded in Book 694, Page
                        368, of the public records of Richmond County, North Carolina

                        Second Lease Modification Agreement dated January 6, 1994, as evidenced by
                        Memorandum of Second Lease Modification Agreement dated January 6, 1994,
                        recorded in the public records of Richmond County, North Carolina

                        First Supplement to Reassignment of Lease and Agreement dated January 6,
                        1994

                        Consent and Agreement dated January 6. 1994

                        Consent and Reaffirmation of Guaranty dated January 6, 1994

Notice of Transfer of Tenant's Interest in Lease dated June 29, 2000, recorded in Book 1080, Page 507, of the public records of Richmond County, North Carolina

Premises:            That certain store building and related improvements located at 1206 Rockingham Road, Rockingham, Richmond County, North Carolina

Legal Description:   The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

wss.26093.1.ab9.26-JAN-94 11:46:32

## SCHEDULE A

### METES AND BOUNDS OF THE LAND

Rockingham,
North Carolina

BEGINNING at a point situate in the southern property line of the tract of land of which this parcel being described is a part; said point being situate South 71° 38' West 174 feet from a concrete monument located in the western right-of-way line of Rockingham Road (S.R. 1648); said monument being the original southeast corner of the tract of which this parcel is a part; thence from said beginning runs with said southern property line South 71° 38' West 215 feet to a point; thence a new line North 18° 48' West 249 feet to a point; thence a new line North 71° 38' East 215 feet to a point; thence a new line South 18° 48' East 249 feet to the point of beginning, containing 53,533 square feet or 1.23 acres, and being Parcel 1 as shown on that certain blueprint of survey entitled "A Boundary Survey for Winn-Dixie Shopping Center" prepared by Powell-Liles & Associates, Land Surveyors, on April 19, 1982, and recorded in Plat Book 23, Page 221, Richmond County Registry, reference to said recorded plat being had, and being a part of the property conveyed to grantor herein by Sammy L. Whitley Construction Co., Inc. and Cecil E. Jacobs, d/b/a Prelude, a General Partnership, which deed is duly recorded in the Richmond County Registry, TOGETHER with the easements, rights, licenses and privileges given by Grantor in that certain instrument executed by Grantor and entitled Declaration of Restrictions and Grant of Easements dated November 29, 1982, and recorded in Book 652, Page 847, Richmond County Registry, over Parcel 2 described in Exhibit "A" of said instrument and shown on a plat entitle "A Boundary Survey for Winn-Dixie Shopping Center" prepared by Powell-Liles & Associates, Land Surveyors, dated April 19, 1982, attached to said instrument as Exhibit "B" and also recorded in Plat Book 23, Page 221, Richmond County Registry.

2045
1206 Rockingham Road
Rockingham, North Carolina

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

**WINN-DIXIE STORE # 2063**
Gastonia, North Carolina

| | |
|---|---|
| Lease: | Lease dated April 3, 1989 between Hugh W. Johnston and Audrey S. Johnston, collectively, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated April 3, 1989, recorded in Book 1972, Page 461, of the public records of Gaston County, North Carolina |
| Amendments/ Guaranty: | Guaranty dated April 13, 1989 |
| | Supplemental Lease Agreement dated July 10, 1990 |
| Discount Wall Sublease: | Sublease dated October 27, 1995 between Winn-Dixie Raleigh, Inc., as Landlord, and Cost Containment, Inc., as Tenant |
| Premises: | That certain store building and related improvements located at 2557 W. Franklin Avenue, Gastonia, Gaston County, North Carolina |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

BOOK 1972 PAGE 479

EXHIBIT "A"

## LEGAL DESCRIPTION OF SHOPPING CENTER

That certain parcel of land lying and being in the City of Gastonia, Gaston County, North Carolina, and being more particularly described as follows:

BEGINNING at an old iron in the westerly edge of Bolding Street, said iron being the southeast corner of Lot No. 1 as shown in Plat Book 14, Page 19, and also being located at a point along the approximate extension of the northerly edge of West Second Avenue where it would intersect the westerly edge of Bolding Street; thence crossing said extension of West Second Avenue South 39-51-30 West 66.00 feet to a point, said point being the northeast corner of Lot No. 1 as shown in Plat Book 14, Page 38; thence with the northerly line of said Lot, North 74-42-30 West 150.33 feet to an old iron, the northwest corner of Lot No. 1; thence with the westerly line of said Lot South 20-36-30 West 90.50 feet to an old iron, the southwest corner of Lot No. 1; thence with the southerly line of said lot, South 69-32-30 East 150.03 feet to an old iron in the margin of Bolding Street, said iron being the southeast corner of Lot No. 1; thence with the westerly margin of Bolding Street South 20-41-30 West 435.65 feet to an old iron in the Irene Posey line (now or formerly); thence with the Posey line North 79-45 West 1121.72 feet to a concrete monument, the Ervin Sams corner (now or formerly) in the Posey line; thence with the Sams line North 04-29-30 East 650.87 feet to a concrete monument in the southerly edge of Highway 29-74; thence with the southerly edge of said highway, North 77-51 East 940.04 feet to an old iron, a corner of the Irene Torrence property (now or formerly); thence with the Torrence line South 11-49 East 199.72 feet to an old iron, another corner of the Torrence property; thence with another line of the Torrence property North 78-23-30 East 100.09 feet to an old iron in said line; thence continuing with said line North 85-12-30 East 162.83 feet to an old iron; thence South 15-22 West 299.95 feet to an old iron in the margin of a 32 foot street; thence with the margin of said street South 74-35-30 East 149.84 feet to an old iron, the place of BEGINNING, as shown by a physical survey of Dixie Village, Property of Hugh W. Johnston, prepared by Robinson & Sawyer, Inc. dated June, 1965, last revised December 22, 1981.

BEING in all respects the same property conveyed to Hugh W. Johnston and wife, Audrey S. Johnston, by deed from Lester L. Whitesides, et. al., dated September 9, 1959, of record in Book 746 at Page 380 in the Gaston County, North Carolina, Public Registry.

2063
2557 W. Franklin Avenue
Gastonia, North Carolina

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2083
Hickory, North Carolina

Lease: Lease dated April 7, 1994 between Springs Corners, L.L.C., as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

as evidenced by Short Form Lease dated April 7, 1994, recorded in Book 1909, Page 933, of the public records of Catawba County, North Carolina

Amendments/
Guaranty: Guaranty dated April 15, 1994

Letter Agreement dated June 8, 1994

Supplemental Lease Agreement dated January 2, 1996

Amendment to Lease and Short Form Lease dated February 2, 1996, recorded in Book 1977, Page 49, of the public records of Catawba County, North Carolina

Premises: That certain store building and related improvements located at 2515 12th Avenue NE, Hickory, Catawba County, North Carolina

Legal Description: The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

SPRINGS CORNERS SHOPPING CENTER

BOOK 1977 PAGE 50

Beginning at an iron pin set in the right-of-way of 24th Street, N.E.,
and running thence from said right-of-way and with the Southern line
of Lot 2 of Havenwood Development, Section 1, as is recorded in
Plat Book 14, Page 20, Catawba County Registry; North 81°53'07" East
8.23 feet and North 81°03'39" East 205.83 feet to a point; and
continuing thence with the Southern line of Lot 3 of Havenwood Develop-
ment, Section 1, North 81°02'41" East 109.92 feet to a point; and
continuing thence with the Southern line of Lot 4 of Havenwood,
North 81°05'02" East 120.39 feet to a point; and continuing thence
with the Southern line of Lot 5 of Havenwood, North 81°08'19" East
130.47 feet to an iron pipe; said pipe being set in the Northwestern
corner of Lot A of the plat recorded in Plat Book 36, Page 25,
Catawba County Registry; and running thence with the Northern line of
Lot A, North 81°04'38" East 74.75 feet to a point set in the Western
line of Lot C of the plat recorded in Plat Book 36, Page 25, Catawba
County Registry; and running thence with the line of Lot C South
06°35'54" West 188.65 feet; and continuing thence North 89°49'33" East
466.81 feet to a point set in the Western line of Lot 44 in St. Stephens
Park as is set forth in Plat Book 12, Page 77, Catawba County Registry;
and running thence with the Western line of Lots 44 through 47 the
following calls and distances; South 03°15'17" East 115.06 feet;
South 03°30'38" East 34.90 feet; South 03°11'06" East 88.63 feet;
South 03°23'43" East 100.05 feet; and South 03°20'52" East 110.04 feet;
and running thence with "Outlet A" the next 2(two) calls, North 89°35'03"
West 34.23 feet to a point, South 03°33'48" East 287.03 feet to a point
in the Northern right-of-way of 12th Avenue N.E.; thence running with
the Northern right-of-way of 12th Avenue N.E. the following calls and
distances; South 88°18'12" West 80.03 feet; South 87°21'26" West
145.40 feet; South 84°02'28" West 112.30 feet; thence along "Outlet B"
the following 4(four) calls and distances; North 03°49'56" West 152.58
feet; North 56°06'08" West 27.43 feet; South 85°20'38" West 225.08
feet; and South 11°18'54" West 23.06 feet to a 1" pipe the Northeastern
corner of Harold R. Poovey Jr.; thence North 79°05'50" West 91.35 feet
to a point set in the Eastern line of Kool Park Trailer Court; and
running thence with the Eastern line of Kool Park Trailer Court the
following calls and distances; North 11°27'25" East 93.37 feet;
North 11°31'20" East 362.92 feet; North 11°43'47" East 35.47 feet;
North 11°49'00" East 130.19 feet; and North 11°55'10" East 58.70 feet;
and running thence with the Northern line of Kool Park Trailer Court,
South 81°37'18" West 546.61 feet to a point set in the Eastern edge
of the right-of-way of 24th Street, N.E.; and running thence
North 02°16'47" West 109.37 feet to the point and place of BEGINNING;
and being 11.477 acres according to a survey prepared by Kevin D. Hefner,
Registered Surveyor, being entitled "Springs Corners, L.L.C." and
being dated October 4, 1995.

EXHIBIT "B"



EXHIBIT "B"

WINN DIXIE
44000 SQ.FT.

REVCO
8450 SQ.FT.

SHOPS
3300 SQ.FT.

SHOPS
3600 SQ.FT.

SHOPS
2400 SQ.FT.

RECEIVING ROOM

COOLER & FREEZER PADS

SALES ENTRANCE

LOT A

"OUTLOT B"
0.90 AC.

2083
2515 12th Avenue NE
Hickory, North Carolina

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2093
Granite Falls, North Carolina

Lease:

Lease dated January 25, 1983 between Pinewood Plaza Associates, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant;

as evidenced by Short Form Lease dated January 25, 1983, recorded in Book 800, Page 351, of the public records of Caldwell County, North Carolina

Amendments/
Guaranty:

Guaranty dated February 15, 1983

Letter Agreement dated April 7, 1983

Assignment Agreement dated January 31, 1984

Assignment Agreement dated January 31, 1984

Supplemental Lease Agreement dated May 14, 1984

First Amendment to Lease dated March 4, 1994

Second Amendment to Lease dated May 23, 1994

Third Amendment to Lease dated December 14, 1995

Second Supplemental Lease Agreement dated December 21, 1995

Premises:

That certain store building and related improvements located at 31 Pinewood Road, Granite Falls, Caldwell County, North Carolina

Legal Description:

The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT A          BOOK 796 PAGE 005

1.  The premises referred to in Section One of the Lease are as follows:

All that certain tract or parcel of land located in Lovelady Township, Caldwell County, North Carolina, near the intersection of U.S. Highway 321 and State Road 1109 and being more particularly described as follows:

BEGINNING on a p.k. nail located in U.S. Highway 321 near the point where it is intersected by State Road 1109 and running thence South 8°00' West 598.27 feet to a new iron pin; thence a new line North 88° 00' West 541.05 feet to a new iron pin; thence a new line North 2°10' 52" East passing an old iron pin at 159 feet, a total distance of 415.0 feet to another new iron pin; thence another new line South 88° 0' East 175.00 feet to a new iron pin; thence North 2°10'52" East 180.00 feet to a p.k. nail near the center of State Road 1109 in the old property line; thence with the old property line South 88°00' East 426.71 feet to the point of Beginning, containing 7.018 acres, more or less.

Said premises also include a right of way and easement for the construction and use by Lessee, its successors, assigns and customers, of a 40 foot wide roadway to be located from a point at or near the south-western corner of the above described tract of land and extending in a westerly direction to the Cedar Valley Road.

There is excepted and reserved unto Lessor, its successors and assigns, and their customers, the unrestricted right to jointly use any road constructed on the easement described hereinabove and all driveways, sidewalks and parking areas on the leased premises.

2.  The option to lease additional land owned by Lessor as set out in Section 21,A, shall apply only to the following described lands of Lessor and no other:

BEGINNING on the southernmost corner of the Dale Starnes lot and running with his line North 88°00' West 300 feet; thence a new line South 2°10'52" West 159 feet to a new corner; thence South 88°00' East 300 feet to a new corner; thence North 2°10'52" East 159 feet to the point of Beginning, containing 1.095 acres, more or less.

EXHIBIT A - Page 2

BOOK 796 PAGE 065

3. The limitation on the use by Lessee of its other lands as set forth in Section 21, B, shall apply only to lands of Lessor located northeast of the southernmost line in the description of the land contained in No. 1, hereinabove, namely, "North 88°00' West 541.05 feet" and the southernmost line in the land described in No. 2 hereinabove, namely, "South 88°00' East 300 feet". Said limitations shall not apply to other lands of Lessor lying to the southwest of said lines.

4. In addition to the premises described in No. 1 above, Lessor grants to Lessee the right and privilege of erecting a free-standing sign on the lands owned by Lessor adjoining the Cedar Valley Road on the condition that such sign complies with all local city and county ordinances.

5. In addition to the other restrictions contained in Section 21, B, Lessor agrees that no building will be located on the premises described therein that exceeds 18 feet in height from the present ground level.

EXHIBIT "B"          BOOK 800 PAGE 355

LEGAL DESCRIPTION OF SHOPPING CENTER


All that certain tract or parcel of land located in Lovelady Township, Caldwell County, North Carolina, near the intersection of U.S. Highway 321 and State Road 1109 and being more particularly described as follows:

BEGINNING on a p.k. nail located in U.S. Highway 321 near the point where it is intersected by State Road 1109 and running thence South 8°00' West 598.27 feet to a new iron pin; thence a new line North 88°00' West 541.05 feet to a new iron pin; thence a new line North 2°10'52" East passing an old iron pin at 159 feet, a total distance of 415.0 feet to another new iron pin; thence another new line South 88°0' East 175.00 feet to a new iron pin; thence North 2°10'52" East 180.00 feet to a p.k. nail near the center of State Road 1109 in the old property line; thence with the old property line South 88°00' East 426.71 feet to the point of Beginning, containing 7.018 acres, more or less.

Said premises also include a right of way and easement for the construction and use by Lessee, its successors, assigns and customers, of a 40 foot wide roadway to be located from a point at or near the southwestern corner of the above described tract of land and extending in a westerly direction to the Cedar Valley Road.


STATE OF NORTH CAROLINA
CALDWELL COUNTY

THE FOREGOING CERTIFICATE(S) OF ___GEORGE T WALLEY NP GASTON CO &___
NOTARY PUBLIC OF ___DEBRA F WALLACE NP STATE OF FLORIDA___
IS (ARE) CERTIFIED TO BE CORRECT. THIS INSTRUMENT WAS PRESENTED FOR
REGISTRATION THIS ___24___ DAY OF ___FEBRUARY___ 19 83 .
AT ___10:45___ A M, AND DULY RECORDED IN THE OFFICE OF THE REGISTER
OF DEEDS OF CALDWELL COUNTY NORTH CAROLINA, IN BOOK 800  PAGE 351 .
THIS ___24___ DAY OF ___FEBRUARY___ ,19 83 .


PATSY THOMAS FOWLER, REGISTER OF DEEDS BY: DEPUTY/ASSISTANT REGISTER

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2099
Lincolnton, North Carolina

| | |
|---|---|
| Lease: | Land Lease dated March 22, 1988 between Saddle Fund I Limited Partnership, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Memorandum of Lease dated March 22, 1988, recorded in Book 687, Page 258, of the public records of Lincoln County, North Carolina |
| Amendments/ Guaranty: | Construction Agreement dated March 2, 1988 |
| | Party Wall Agreement dated March 22, 1988, recorded in Book 687, Page 598, of the  public records of Lincoln County, North Carolina |
| | Agreement Amending Description dated May 16, 1989, recorded in Book 719, Page 594, of the public records of Lincoln County, North Carolina |
| | First Amendment to the Winn-Dixie Land and Store Lease dated October 30, 1989 |
| | Assignment of Leases dated November 22, 1989 |
| | Second Amendment to the Winn-Dixie Land Lease dated December 1, 1989 |
| Lease: | Lease dated March 14, 1989 between Saddle Fund I Limited Partnership, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated March 14, 1989, recorded in Book 731, Page 689, of the public records of Lincoln County, North Carolina |
| Amendments/ Guaranty: | Guaranty dated April 26, 1989 |
| | First Amendment to the Winn-Dixie Land and Store Lease dated October 30, 1989 |
| | Assignment of Leases dated November 22, 1989 |

Premises:            That certain store building and related improvements located at 2620 East
                     Main Street, Lincolnton, Lincoln County, North Carolina

Legal Description:   The real property as more particularly described as follows:


                          SEE ATTACHED LEGAL DESCRIPTION

## EXHIBIT "A"

BEGINNING at an existing iron spike in the southern line of
Carolina First National Bank and being the northeast corner
of Henry Hartman and runs thence with Carolina First National Bank's
southern line, North 67 deg. 20 min. East 130.16 feet to an iron
pin on the east side of a 10 foot cartway; thence with the
eastern side of 10 foot cartway North 29 deg. 25 min. West
(passing an old spike at 254.05 feet) 289.55 feet to a point
near the centerline of North Carolina Highway #27 and #150;
thence with and near centerline of said highway North 66 deg.
48 min. East 149.87 feet to a point near the centerline;
thence South 28 deg. 57 min. East (passing an old iron at
33.00 feet) with Fortenberry's line 290.67 feet to an old
iron; thence with Fortenberry's line North 67 deg. 20 min.
East 60.00 feet to an old iron, Hub Finger's corner; thence
with Hub Fingers line South 42 deg. 56 min East 50.99 feet
to another old iron, Hub Finger's corner; thence North
67 deg. 34 min. East 45.02 feet to an old iron, Hub Finger's
corner; thence South 37 deg. 29 min. East 156.19 feet to an old
iron, corner of Hub Finger and Ken Finger's northwest corner;
thence with Ken Finger's line South 19 deg. 15 min. East 310.18
feet to an old iron; thence continuing with Ken Finger's
line South 19 deg. 04 min East 251.30 feet to an old
iron in Ken Finger's line, corner of Lincoln County
Board of Education; thence with their line South 88 deg. 32 min.
West 467.00 feet to an old iron, corner of Lincoln County
Board of Education and Mauney; thence with Mauney's line North
16 deg. 51 min. West 112.52 feet to an old iron, Jack Harrill's
corner; thence with Harrill's line North 16 deg. 50 min. West
112.45 feet to an old iron, Rudisill's corner; thence with
Rudisill's line North 17 deg. 36 min. West 171.20 feet to an
old iron, Henry Hartman's corner; thence with Hartman's line
North 25 deg. 00 min. West 196.00 feet to an old spike, the point
of BEGINNING, containing 7.61 acres, more or less.

## LEGAL DESCRIPTION

### (7.61 AC.)

### NEW WINN-DIXIE SHOPPING CENTER

### -- LINCOLNTON, NC

2099
2620 East Main Street
Lincolnton, North Carolina

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # **2622**
Brookhaven, Mississippi

| | |
|---|---|
| Lease: | Lease Agreement dated December 22, 1976 between Eders & Avant Properties Limited Partnership, as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated December 22, 1976, recorded in Book 882, Page 629, of the public records of Lincoln County, Mississippi |
| Amendments/ Guaranty: | Lease Modification Agreement #1 dated June 10, 1977 |
| | Lease Modification Agreement #2 dated November 26, 1979 |
| | Third Agreement Amending Lease dated September 16, 1992 |
| | Fourth Agreement Amending Lease dated September 12, 1994 as evidenced by Memorandum of Agreement Amending Lease dated September 12, 1994, recorded in Book 938, Page 36, of the public records of Lincoln County, Mississippi |
| | Fifth Agreement Amending Lease dated April 13, 1998 as evidenced by Second Memorandum of Agreement Amending Lease dated April 13, 1998, recorded in the public records of Lincoln County, Mississippi |
| | Assignment and Assumption of Lease dated January 11, 2001 |
| | Corporate Guaranty of Lease Obligations dated January 11, 2001 |
| Shoe Store Sublease: | Sublease dated October 5, 1977 between Winn-Dixie Montgomery, Inc., as Landlord, and Irene Smith Meredith d/b/a Judy's Shoes, as Tenant |
| Amendments/ Guaranty: | Addendum dated November 29, 1977 |
| | Amendment to Lease Agreement dated January 14, 1987 |
| Drug Store | |

Sublease:          Sublease Agreement dated June 22, 1989 between Winn-Dixie Montgomery, Inc., as Sublandlord, and Bane Drugs, Inc., as Subtenant

Amendments/
Guaranty:          Addendum dated August 4, 1989

First Amendment to Sublease dated October 14, 2003

Dry Cleaners
Sublease:          Sublease Agreement dated June 27, 1996 between Winn-Dixie Montgomery, Inc., as Sublandlord, and Magnolia Laundrie, LLC, as Subtenant

Amendments/
Guaranty:          Assignment of Sublease and Extension Agreement dated August 31, 1998

Agreement Amending Sublease dated May 31, 2002

Premises:          That certain store building and related improvements located at 364 Monticello Street, Brookhaven, Lincoln County, Mississippi

Legal Description:      The real property as more particularly described as follows:

SEE ATTACHED LEGAL DESCRIPTION

A parcel of land in Block I in the NW ¼ of the NW ¼ of Section 18, Town 7 North, Range 8 East, in the City of Brookhaven, County of Lincoln and State of Mississippi, as outlined in red EXHIBIT A attached hereto and made a part hereof.

2622
364 Monticello Street
Brookhaven, MS

EXHIBIT A



2622
364 Monticello Street
Brookhaven, MS

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

## WINN-DIXIE STORE # 2640
Canton, Mississippi

| | |
|---|---|
| Lease: | Lease Agreement dated February 21, 1983 between Tower Associates, Ltd., as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant; |
| | as evidenced by Lease dated February 21, 1983, recorded in Book 530, Page 276, of the public records of Madison County, Mississippi |
| Amendments/ Guaranty: | Addendum dated February 21, 1983 |
| | Agreement Supplementing and Amending Lease dated March 21, 1984 |
| | Corporate Guaranty of Lease Obligations dated January 11, 2001 |
| | Assignment and Assumption of Lease Agreement dated November 7, 2003 |
| Premises: | That certain store building and related improvements located at 1150 East Peace Street, Canton, Madison County, Mississippi |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

### E X H I B I T   A

Commencing at the northeast corner of Meadow Lark Park
Subdivision and run South 68 degrees 40 minutes East
along the south right-of-way line of East Peace Street
(Mississippi State Highway No. 16) 310 feet to a point;
thence continuing along said right-of-way of East Peace
Street South 68 degrees 40 minutes East for 86.98 feet
to the northwest corner and POINT OF BEGINNING of the
property herein described; thence South 03 degrees 53
minutes East 115 feet to a point; thence South 86 degrees
07 minutes West for 85.02 feet to a point; thence South 01
degrees 30 minutes East for 47.81 feet to a point; thence
North 68 degrees 40 minutes West for 110 feet to a point;
thence South 06 degrees 32 minutes East for 224.3 feet to
a point; thence South 68 degrees 12 minutes East for
185.05 feet to a point; thence South 03 degrees 50 minutes
East for 379 feet to a point; thence South 69 degrees 10
minutes East for 282.1 feet to a point on the west right-
of-way of Mississippi State Highway No. 43; thence North
03 degrees 50 minutes West along the west right-of-way
of said Highway No. 43 for 373 feet; thence continuing
along the west right-of-way of said Highway No. 43, North 03
degrees 53 minutes West for 307.6 feet to a point; thence
South 86 degrees 07 minutes West for 132.0 feet to a point;
thence North 03 degrees 53 minutes West for 182.16 feet to
a point on the south right-of-way line of said East Peace
Street; thence North 68 degrees 40 minutes West along the
south right-of-way of said East Peace Street for 127.12
feet to the POINT OF BEGINNING.

The above described parcel contains approximately 5.28
acres, more or less, and subject to all legal rights-of-way.

The above described parcel is subject to reciprocal cross
parking and access easements with outlots A & B as shown
on site plan P2 dated 1/24/83, revised 2/8/83.

2640
1150 East Peace Street
Canton, MS

STATE OF MISSISSIPPI, County of Madison:

I, Billy V. Cooper, Clerk of the Chancery Court of said County, certify that the within instrument was filed
for record in my office this 23 day of ...March..., 19 84, at 9:00 o'clock A...M., and
was duly recorded the ....... day of ...MAR 26 1984......, 19 ......., Book No. 530 on Page 276 in
my office. Witness my hand and seal of office, this the .......of .......MAR 26 1984....., 19 ......

BILLY V. COOPER, Clerk

By ......................................., D.C.



EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT

DESCRIPTION OF LEASES AND RELATED LAND

WINN-DIXIE STORE # **2718**
Chamblee, Georgia

| | |
|---|---|
| Lease: | Lease dated July 1, 1976 between The Bonny Corporation, as Landlord, and Winn-Dixie Raleigh, Inc., as Tenant; |
| | as evidenced by Short Form Lease dated July 1, 1976, recorded in Book 3530, Page 144, of the public records of DeKalb County, Georgia |
| Amendments/ Guaranty: | Guaranty dated July 12, 1976 |
| | Letter Agreement dated September 23, 1976 |
| | First Amendment to Lease dated March 22, 1977 |
| | Amendment to Lease dated December 26, 1978 |
| | Letter Agreement dated November 2, 1979 |
| | Letter Agreement dated December 29, 1981 |
| | Fourth Amendment to Lease dated March 21, 1985 |
| | Fifth Amendment to Lease dated November 12, 1986, recorded in Book 5662, Page 321, of the public records of DeKalb County, Georgia |
| | Sixth Amendment to Lease dated November 15, 1996 |
| | Assignment and Assumption of Lease Agreement dated March 28, 2002 |
| Premises: | That certain store building and related improvements located at 5528 Peachtree Industrial Boulevard, Chamblee, DeKalb County, Georgia |
| Legal Description: | The real property as more particularly described as follows: |

SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "B"

CHAMBLEE PLAZA SHOPPING CENTER

Southwesterly corner of the intersection of
Peachtree Industrial Blvd. and Longview Drive
DeKalb County, Georgia

All that tract of parcel of land lying and being in Land Lot
308 of the 18th District of DeKalb County in the State of Georgia,
together with all improvements thereon or to be constructed thereon
and all appurtenances thereto belonging or in anywise appertaining,
more particularly described as follows, to wit:

Beginning at the point of intersection of the southwesterly side of
Longview Drive and the northwesterly side of Peachtree Industrial
Boulevard, running thence North 51 degrees 04 minutes west along
said southwesterly side of Longview Drive 253.7 feet to a point;
thence southwesterly 114.6 feet to a point; thence continuing south-
westerly but more westerly 26 feet to a point; thence continuing
southwesterly but more westerly 9.4 feet to a point; thence north-
westerly 181 feet to a point; thence continuing northeasterly 50 feet
to a point; on the westerly right of way of Longview Drive; thence
continuing northwesterly along the westerly right of way of Longview
Drive a distance of 98.3 feet to a point; thence south 70 degrees
30 minutes west 605.8 feet to a point; thence south 38 degrees 52
minutes west 429.56 feet to a point; thence south 1 degree 08 minutes
east 436.8 feet to a point; thence south 5 degrees 35 minutes east 100.0
feet to a point; thence south 83 degrees 11 minutes east 10 feet to a
point; thence south 11 degrees 36 minutes east 125 feet to the northerly
side of Ivy Lane.  Thence north 85 degrees 04 minutes east along said
northerly side of Ivy Lane 301.1 feet; thence south 51 degrees 04 minutes
east and continuing along said northerly side of Ivy Lane 117.95 feet to
the northwesterly side of Peachtree Industrial Boulevard; thence north
38 degrees 56 minutes east along said northwesterly side of Peachtree
Industrial Boulevard 1027.42 feet; thence south 51 degrees 04 minutes west
25 feet; thence north 38 degrees 56 minutes east along the northwesterly
side of Peachtree Industrial Boulevard 29.85 feet; thence north 51 degrees
04 minutes west 150 feet to a point; thence north 38 degrees 56 minutes
east 150 feet to a point; thence south 51 degrees 04 minutes east 150 feet
to the point of beginning.

2718
5528 Peachtree Industrial
Boulevard

Chamblee, GA



EXHIBIT "1"

# EXHIBIT "A-3"
# TO
# ASSET PURCHASE AGREEMENT

## List of Assumed Leases

| # | Address | City | County | ST | Lease (assume /Reject / or TBN) |
|---|---------|------|--------|----|-----|
| 10 | 403 N Duval St | Claston | Evans | GA | Assume |
| 880 | 1790 Owen Dr | Fayetteville | Cumberland | NC | Assume |
| 1471 | 2418 South Union | Opelousas | St. Landry | LA | Assume |
| 1547 | 3123 Hwy. 28 East | Pineville | Rapides | LA | Assume |
| 2008 | 818 E Arrowood Rd | Charlotte | Mecklenburg | NC | Assume |
| 2093 | 31 Pinewood Rd | Granite Falls | Caldwell | NC | Assume |
| 2622 | 364 Monticello St | Brookhaven | Lincoln | MS | Assume |

**EXHIBIT "B"**
**TO**
**ASSET PURCHASE AGREEMENT**

**Form of Bill of Sale**

**BILL OF SALE**

**WINN-DIXIE _____, INC.**, a Florida corporation ("Seller"), in consideration of the mutual covenants set forth in that certain Asset Purchase Agreement dated effective _____, 2005, among Associated Wholesale Grocers, Inc., a Kansas corporation and Alex Lee, Inc., a North Carolina corporation (collectively, "Buyer"), Winn-Dixie Stores, Inc., a Florida corporation, ("Winn-Dixie"), certain affiliates of Winn-Dixie and Seller (the "Agreement"), does hereby grant, bargain, transfer, sell, assign and convey unto [Buyer or _____, a _____ ("Ultimate Purchaser") as Buyer shall determine] all of Seller's right, title and interest in the Assets described in the Agreement (other than the Leases and any sublease(s) or permit(s), which are subject to separate instruments of conveyance and assignment), relating to Seller's store locations as more particularly described on attached Schedule A (the "Store Assets").

This Bill of Sale is delivered by Seller and Winn-Dixie to [Buyer/Ultimate Purchaser] as required under the Agreement, and is made subject to the terms and conditions of the Agreement. All capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Agreement.

[SIGNATURES ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, Seller and Winn-Dixie have caused this Bill of Sale to be executed by the undersigned as of this _____ day of _____, 2005.

**"SELLER"**

**WINN-DIXIE _____, INC.,**
a Florida corporation

By: _____
Name: _____
Title: _____

**"WINN-DIXIE"**

**WINN-DIXIE STORES, INC.,**
a Florida corporation

By: _____
Name: _____
Title: _____

Exhibit "A"
to
<u>Bill of Sale</u>


<u>Store Locations</u>

EXHIBIT "C-1"
TO
ASSET PURCHASE AGREEMENT

**Form of Closing Statement**

EXHIBIT C-1
To
Asset Purchase Agreement
FORM OF CLOSING STATEMENT

CLOSING STATEMENT SUMMARY

| | |
|---|---|
| **BUYER:** | _____, a _____ |
| **SELLER:** | Winn-Dixie _____, Inc., a Florida corporation |
| **ESCROW AGENT and SETTLEMENT AGENT:** | _____ |
| **PROPERTIES[1]:** | Store No. \_\_\_\_\_, _____, _____, _____ <br> Store No. \_\_\_\_\_, _____, _____, _____ <br> Store No. \_\_\_\_\_, _____, _____, _____ <br> Store No. \_\_\_\_\_, _____, _____, _____ |
| **CLOSING DATE:** | _____, 2005 |

SELLER'S STATEMENT

| | | | |
|---|---|---|---|
| **I.** | **BASE PURCHASE PRICE:** | | |
| | Leasehold: | | $_____ |
| | FF&E: | | $_____ |
| | TOTAL BASE PURCHASE PRICE: | | $_____ |
| **II.** | **SUPPLIES PRICE:** | | $_____ |
| **III.** | **TOTAL BASE PURCHASE PRICE AND SUPPLIES PRICE:** | | $_____ |

---

[1] Itemized individual Closing Statements for each Property are attached

| A. | NET CREDIT/DEBIT TO SELLER: | ($_____) | or $_____ |
|----|------------------------------|-------------|--------------|
| B. | TOTAL CLOSING COSTS PAYABLE BY SELLER: | ($_____) | |
| **AMOUNT DUE SELLER** | | | $_____ |

## BUYER'S STATEMENT

| I. | TOTAL BASE PURCHASE PRICE AND SUPPLIES PRICE: | | $_____ |
|----|------------------------------------------------|-------------|--------------|
| A. | NET CREDIT/DEBIT TO BUYER: | ($_____) | or $_____ |
| B. | TOTAL CLOSING COSTS PAYABLE BY BUYER: | ($_____) | |
| C | BASE DEPOSIT | ($_____) | |
| **AMOUNT DUE FROM BUYER** | | | $_____ |

## TOTAL DISBURSEMENTS[1]

| 1. | Base Deposit from Escrow Agent | $_____ |
|----|--------------------------------|-----------|
| 2. | Amount Due From Buyer | $_____ |
| **TOTAL RECEIPTS:** | | $_____ |
| 1. | Seller's Brokers Fees | ($_____) |
| 2. | Title Premiums, Title Examination Fees and related Costs, Recording and Escrow Fees | ($_____) |
| 3. | Inventory Service Fees | |
| 4. | Seller's Cure Costs | ($_____) |
| 5. | Seller's Proceeds | |
| [6.] | [Other] | ($_____) |
| **TOTAL DISBURSEMENTS:** | | |

## STIPULATIONS

1. <u>Purchase Agreement</u>. This transaction has been closed pursuant to the provisions set forth in that certain Asset Purchase Agreement between Seller and Buyer, dated effective as of _____, 2005 (the "Purchase Agreement"). Attached hereto are individual itemized closing statements for each of the Properties covered by the Purchase Agreement.

2. <u>Authorization to Disburse</u>. By their signatures below, Seller and Buyer hereby (a) authorize and direct the closing agent to (i) make the disbursements included in this

---

[1] Refer to Individual Property Closing Statement for Itemization.

Closing Statement and (ii) to wire the AMOUNT DUE SELLER to the following account:

_____
_____
_____
_____

3. <u>Counterparts</u>.  This Closing Statement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement and the signatures of any party to any counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart.  To facilitate execution and delivery of this Closing Statement, the parties may execute and exchange counterparts of the signature pages hereof by telecopier or electronic mail, immediately followed by delivery of originals by overnight delivery services.

4. <u>Adjustments</u>.  Seller and Buyer acknowledge and agree that any amounts not determinable as of the Closing Date or reflected on this Closing Statement (including on the individual closing statements attached hereto) will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination. Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination.

The undersigned parties acknowledge and agree to the this Closing Statement as of this _____ day of _____, 2005, and hereby authorize _____ Title Insurance Company, as closing agent, to disburse the sums set forth herein in accordance herewith.

**SELLER:**                          **BUYER:**

**WINN-DIXIE** _____,      _____,
a Florida corporation                a _____

By: _____        By: _____

Name: _____         Name: _____

Title: Vice President                Title: _____

                                     _____

## INDIVIDUAL PROPERTY CLOSING STATEMENT

| | |
|---|---|
| **BUYER:** | _____, a _____ |
| **SELLER:** | Winn-Dixie _____, Inc., a Florida corporation |
| **ESCROW AGENT and SETTLEMENT AGENT:** | _____ |
| **Property:** | Store No. _____, _____, _____, _____ |
| **CLOSING DATE:** | _____, 2005 |

## SELLER'S STATEMENT

| | | |
|---|---|---|
| **ALLOCATED BASE PURCHASE PRICE:** | | |
| Leasehold: | | $_____ |
| FF&E: | | $_____ |
| TOTAL BASE PURCHASE PRICE: | | $_____ |
| **SUPPLIES PRICE:** | | $_____ |
| **TOTAL ALLOCATED  BASE PURCHASE PRICE AND SUPPLIES PRICE:** | | $_____ |
| **Less Adjustments (Debit):** | | |
| Seller's Prorated Share of Taxes and Other Charges Payable Under Leases (1) | $_____ | |
| Buyer's Prorated Share of Rents Paid in Advance **[Under Subleases (2)]** | $_____ | |
| **Total Debit Adjustments:** | $_____ | |
| **Plus Adjustments (Credit):** | | $_____ |
| Seller's Prorated Share of Rents and Other Charges Paid in Advance Under Leases (3) | | $_____ |
| Environmental Assessment Costs Paid by Seller | | $_____ |

| | | |
|---|---|---|
| [Other] | | $_____ |
| **Total Credit Adjustments:** | | $_____ |
| **NET DEBIT/CREDIT TO SELLER** | | |
| **Less Closing Costs Payable by Seller:** | | |
| Seller's Attorneys' Fees & Costs | $_____ | |
| Seller's Brokerage Fees | $_____ | |
| Cure Costs | $_____ | |
| **Total Seller's Closing Costs:** | | |
| **AMOUNT DUE TO SELLER** | | $_____ |

## BUYER'S STATEMENT

| | | |
|---|---|---|
| **ALLOCATED BASE PURCHASE PRICE:** | $_____ | |
| **SUPPLIES PRICE:** | $_____ | |
| **TOTAL ALLOCATED BASE PURCHASE PRICE AND SUPPLIES PRICE:** | | $_____ |
| **Less Adjustments (Credit):** | | |
| Allocated Amount of Base Deposit | | $_____ |
| Seller's Prorated Share of Rents and Other Charges Paid in Advance Under Leases (1) | | $_____ |
| [Other] | | $_____ |
| **Total Debit Adjustments:** | | |
| **Plus Adjustments (Debit):** | | $_____ |
| Seller's Prorated Share of Rents and Other Charges Paid in Advance Under Leases (3) | $_____ | |

| | | |
|---|---|---|
| Environmental Assessment Costs Paid by Seller | $_____ | |
| [Other] | $_____ | |
| **Total Credit Adjustments:** | | $_____ |
| **NET DEBIT/CREDIT TO BUYER** | | |
| **Less Closing Costs Payable by Buyer:** | | |
| Buyer's Attorneys' Fees & Costs | $_____ | |
| Title Insurance Premiums(4) | $_____ | |
| Title Examination Fees | $_____ | |
| Transfer/Documentary Taxes | $_____ | |
| Buyer's Brokerage Fees | $_____ | |
| Closing Escrow Fees | $_____ | |
| Inventory Service Fees(8) | $_____ | |
| **Total Buyer's Closing Costs:** | $_____ | |
| **AMOUNT DUE FROM BUYER** | | $_____ |
| **ALLOCATED AMOUNT OF BASE DEPOSIT** | | $_____ |
| **TOTAL AMOUNT DUE AT CLOSING** | | $_____ |

## SCHEDULE OF DISBURSEMENTS

1.   Allocated Amount of Base Deposit from Escrow Agent          $_____
2.   Amount Due From Buyer                                                        $_____

**TOTAL RECEIPTS:**                                                                  $_____

1.   The Blackstone Group L.P.                                              ($_____)
     (Seller's Brokers Fees)
2.   The Food Partners, LLC                                                 ($_____)
     (Seller's Brokers Fees)
3.   DJM Asset Management, LLC                                          ($_____)
     (Seller's Brokers Fees)
4.   _____ Title Insurance Company                        ($_____)
     Title Premiums, Title Examination Fees and related

Costs, Recording and Escrow Fees

5. _____
Transfer/Documentary Taxes

6. **[Name of Inventory Service]**                                        ($_____)
(Inventory Service Fees)

7. _____                                                  ($_____)
(Lease Cure Costs, if any)

8. _____                                                  ($_____)
(Sublease Cure Costs, if any)

9. Seller                                                                 ($_____)
(Seller's Proceeds)

[10.] [Other]                                                             ($_____)

**TOTAL DISBURSEMENTS:**

**Notes:**

(1)    2005 Prorations - Amounts Not Yet Paid and Payable. Prorations are based on (i) estimate of 2005 real estate taxes derived from actual 2004 amounts paid by Seller in arrears in accordance with leases; and (ii) estimate of 2005 insurance charges derived from actual 2004 amounts paid by Seller in arrears in accordance with applicable leases. Buyer will be responsible for the payment of such charges for 2005 and subsequent years. **[Note: To be revised consistent with Note (6) in cases where 2005 taxes or insurance amounts are known as of Closing]**

**Real Estate Taxes**

Store # _____
- 2005 Real Estate Taxes                                $
- Per Diem Tax Amount                                   $
- Seller's Share of 2005 Taxes
  (1/1/05 - __/__/05) (_____ days)                     $ _____            _____
**Total Real Estate Taxes:**

**Personal Property Taxes**

Store # _____
- 2005 Personal Property Taxes                          $
- Per Diem Tax Amount                                   $
- Seller's Share of 2005 Taxes
  (1/1/05 - __/__/05) (_____ days)                     $ _____            _____
**Total Personal Property Taxes:**

**CAM Charges**

Store # _____
- 2005 CAM Charges                                      $
- Per Diem Amount                                       $

- Seller's Share of 2005 CAM Charges
( __/__/__ - __/__/05) ( _____ days)    $ _____        _____

**Total CAM Charges:**

**Insurance**

Store # _____
- 2005 Insurance                         $
- Per Diem Amount                        $
- Seller's Share of 2005 Insurance
( __/__/__ - __/__/05) ( _____ days)    $ _____

**Total Insurance:**
**Total Amount of Seller's Prorated**
**Share  of 2005 Prorations:**                                    _____

(2)        _____, 2005 Sublease Prorations - Amounts Previously Received by
Seller.  Prorations are based on _____, 2005 rents previously paid to
Seller in accordance with applicable subleases.  Buyer will be responsible for
the collection of such charges that become due and payable for _____,
2005 and thereafter.  Prorations are as follows:

Store # _____
- Total _____, 2005 rent paid:      $
- Per diem rent:                              $
- Buyer's prorated share
( __/__/__ - __/__/05) ( _____ days)         $ _____

**Total Amount of Seller's Prorated Share of _____ Prorations:**

(3)        _____, 2005 Prorations - Amounts Previously Paid by Seller.  Prorations
are based on _____, 2005 rents, common area maintenance
assessments and other charges previously paid by Seller in accordance with
applicable leases.  Buyer will be responsible for the payment of such charges
that become due and payable for _____, 2005 and thereafter.
Prorations are as follows:

**Rent**

Store # _____
- Total _____, 2005 rent paid:        $
- Per diem rent:                              $
- Buyer's prorated share
( __/__/__ - __/__/05) ( _____ days)         $ _____
- Per diem rent:                              $
- Buyer's prorated share
( __/__/__ - __/__/05) ( _____ days)         $ _____        _____

**Total Amount of Buyer's Prorated Share of _____ Prorations:**

(4)     Title Premiums and Expenses.  Title insurance fees and costs, including title examination fees and title insurance premiums, are as follows:

Store # _____
- Title Search Fees and Costs          $              -
- Title Premium                        $ _____ -

**Total Amount of Title Fees and Expenses:**

(5)     Utility Deposits and Charges.  All utility deposits will be returned to Seller directly by the respective utility companies.  Seller will be responsible for payment of any portion of any utility charges attributable to utility service (including telephone service) provided through and including the date hereof. Buyer will be responsible for payment of any new utility deposits which may be assessed by the respective utility companies and for payment of any portion of such utility charges attributable to utility service provided subsequent to the date hereof.  The party responsible for each share of such utility charges will pay such charges promptly and without demand therefor.  Each party agrees to indemnify and hold harmless the other party from and against liability for payment of the first party's share of such utility charges.

(6)     Adjustments.  Seller and Buyer acknowledge and agree that any amounts not determinable as of the Closing Date or reflected on this Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination. Buyer agrees that it will timely make all required notifications to appropriate taxing authorities to effect the change in party responsible for taxes.

(7)     Inventory Purchase Price and Adjustments.  To the extent Inventory has acquired inventory pursuant to the Purchase Agreement, the Inventory Price has been determined in good faith by the parties in accordance with the provisions set forth in the Purchase Agreement and is set forth in a separate Inventory Closing Statement between Seller and Buyer dated as of even date herewith.  Seller and Buyer acknowledge and agree that if any dispute should arise as to the Inventory Price with respect to any item or items of Inventory, Seller and Buyer will resolve the dispute in accordance with the terms and provisions of the Purchase Agreement.

(8)     <u>Inventory Service Fees</u>. Seller and Buyer acknowledge and agree that Buyer will be responsible for payment of the fees and costs of the inventory services that conducts the Inventory Count, as such term is defined in the Purchase Agreement, upon receipt of the final invoices.  Seller may pay the inventory service fee outside of closing, and Buyer will reimburse Seller for such costs. In the event the final invoices for such inventory charges is not available at the time of closing, the inventory service fee will be estimated at $800 per store. Upon receipt of final invoices for such services, if the inventory service cost differs by more than 10% from the estimated amount, then Buyer and Seller will reconcile such difference by payment to, or reimbursement from, Seller to account for the difference.

(9)     <u>Capitalized Terms</u>.  Capitalized terms used herein will have the meanings ascribed to them in the Purchase Agreement.

EXHIBIT "C-2"
TO
ASSET PURCHASE AGREEMENT

**Form of Inventory Closing Statement**

Form of Inventory Closing Statement

**INVENTORY CLOSING STATEMENT**

**SELLER**              Winn-Dixie _____, Inc., a Florida corporation

**BUYER:**              _____ a _____

**TRANSACTION:**        Acquisition of Leasehold Interest in Store _____, _____,
                        _____

**BASE PURCHASE PRICE:**    Under Separate Closing Statement

**INVENTORY PRICE (2):**

Store _____     $
Store _____     $
Store _____     $
Store _____     $ _____

**Total Aggregate Inventory Price:**    $

**CLOSING DATE:**    _____, 2005 _____

**SELLER'S STATEMENT**

**Inventory Price**                                        $

**Less Adjustments:**

    1.    Ten Percent of Inventory Price
        Retained by Escrow Agent        $ _____
        **Total Adjustments:**    $            $  ( _____ )

**TOTAL AMOUNT DUE TO SELLER:**                            $

**BUYER'S STATEMENT**

**Aggregate Inventory Price**                             $

**Plus Closing Costs to be Paid by Buyer:**

1.        Inventory Service Fees (3)    _____  $
                 (Direct Payment or Reimbursement
                 to Seller)
                 **Total Buyer's Inventory Closing
                 Costs:**           $        $ _____

**AMOUNT DUE FROM BUYER:**            $ _____

The undersigned parties acknowledge and agree to the foregoing Inventory Closing Statement as of this day of July, 2004, and hereby authorize **[Title Insurer],** as closing agent, to disburse the sums set forth herein in accordance herewith.

**SELLER:**

                                               **BUYER:**

**WINN-DIXIE**    , **INC.**, a Florida        _____ -, a _____
corporation

By: _____
Name: _____        By: _____
Title: _____ President        Name: _____
                                            Title: _____

**Notes:**

(1)        Adjustments.  Seller and Buyer acknowledge and agree that any amounts not determinable as of the Closing Date or reflected on this Inventory Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in this Inventory Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Buyer agrees that it will timely make all required notifications to appropriate taxing authorities to effect the change in party responsible for taxes.

(2)        Inventory Price Adjustments.  The Inventory Price has been determined in good faith by the parties in accordance with the provisions set forth in that certain Asset Purchase Agreement among Seller and Buyer, dated effective as of _____, 2005 (the "Purchase Agreement"), and shall be payable in accordance with the Purchase Agreement.  Seller and Buyer agree that any disputes shall be reconciled as set forth in the Purchase Agreement.  The balance of the Inventory Price, if any, shall be paid by Escrow Agent to Seller within five (5) Business Days after Buyer and Seller receive the final recapitulation sheet for the Inventory, and any excess payment held by Escrow Agent shall be refunded to Buyer within such five (5) Business Day period.  To the extent that the Inventory Price is in excess of the amount stated herein, Buyer shall pay over to Seller the amount of such excess within such five (5) Business Day period.

(3)        Inventory Service Fees.  The recipient of any invoices for such charges agrees that it will promptly provide the other party with a copy of such invoices upon receipt of same.  Buyer will pay such invoices upon receipt, subject to adjustments as set forth in Note 1 above in the event of any discrepancy between the amount of the invoices and the amount for such services set forth in this Inventory Closing Statement.

(4)        Capitalized Terms.  Capitalized terms used herein shall have the meanings ascribed to them in the Purchase Agreement.

## DISBURSEMENT SCHEDULE

RECEIPTS:

| | | | |
|---|---|---|---|
| 1. | Total Amount Due From Buyer | $ _____ | |
| TOTAL CASH RECEIVED: | | $ | $ _____ |

DISBURSEMENTS:

| | | |
|---|---|---|
| 1. | Winn-Dixie _____, Inc. (Seller's Proceeds and Reimbursement of Inventory Service Fee) | $ _____ |
| TOTAL DISBURSEMENTS: | | $ _____ |
| BALANCE OF INVENTORY PRICE HELD IN ESCROW BY TITLE AGENT PURSUANT TO PURCHASE AGREEMENT: | | $ |

**EXHIBIT "D"**
**TO**
**ASSET PURCHASE AGREEMENT**

**[Reserved]**

EXHIBIT "E"
TO
ASSET PURCHASE AGREEMENT

**Permitted Encumbrances**

1.  Taxes and assessments of any taxing authority that levies taxes or assessments on real property for the year 2005 and subsequent years.

2.  Boundary line disputes, overlaps, encroachments, and any matters which would be disclosed by an accurate survey and inspection of the Leased Premises, including but not limited to all matters shown or set forth on any survey or site plan, other than matters objected to by Buyer pursuant to paragraph 4.2 if Buyer obtains a current survey of the affected Real Property or if shown on a prior survey of the affected Real Property.

3.  Rights of Landlords under the Leases, including the rights of any Landlord's mortgagee.

4.  Rights of subtenants under the Subleases.

5.  All matters set forth as exceptions in the Initial Title Reports or the site plans, other than Monetary Liens.

# EXHIBIT "F"
## TO
## ASSET PURCHASE AGREEMENT

### Excluded Inventory

1.      Product that has an expired "sell by" date, is out of date or (other than with respect to pharmaceutical and dairy) is within fourteen (14) days of a "sell by" or "pull" date; with respect to pharmaceutical inventory (including diabetic supplies) and over-the-counter medicines, within forty-five (45) days of the manufacturer's expiration date, if any; and with respect to dairy, is within ten (10) days of a sell by or pull date.

2.      Product that is damaged, opened, bloated, spoiled, or in partial packages.

3.      Inventory on consignment.

4.      Firearms, ammunition and similar items, if any.

5.      Seasonal merchandise (which term shall not include merchandise that Seller customarily carries all year) that is out-of-season or that is carry-over seasonal merchandise.

6.      Merchandise with proprietary logos.

7.      All preprinted forms and labels.

8.      Any private label goods and merchandise.

9.      Any Inventory that is (i) transferred from another store or (ii) in the backroom or coolers in quantities greater than historical quantities or projected sales.

10.      Hazardous chemicals other than bleach, lighter fluid and other consumer products customarily sold at retail grocery supermarkets, in quantities that do not violate applicable law.

11.      Compounded prescriptions prepared for sale.

12.      Any "will call" merchandise (other than pharmaceutical merchandise) including, but not limited to, photo finishing that has been held for pick-up for over six (6) months.

**EXHIBIT "G"**
**TO**
**ASSET PURCHASE AGREEMENT**

**Certain Excluded Personal Property**

Project Jaguar
Leased Equipment List

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease # | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0010 | IBM | 8477 | 42V | NETFIN ITI | 1 | N4468 | 4/15/2001 | CLC | 28355 | $56.60 | 48 | 5/31/2005 | POS |
| 0010 | IBM | 8477 | 42V | NETFIN ITI | 1 | N4618 | 4/15/2001 | CLC | 28355 | $38.60 | 48 | 5/31/2005 | POS |
| 0010 | IBM | 6331 | B2N | IBM BLACI | 1 | XDFF8 | 4/15/2001 | CLC | 28355 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 0010 | IBM | 6331 | B2N | IBM BLACI | 1 | XDFG3 | 4/15/2001 | CLC | 28355 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 0010 | IBM | SAV2 | SFTW | IBM SAV2 | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 0010 | IBM | SAV2 | SVCS | IBM SAV2 | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 0010 | IBM | 2500 | P3 | SAV2 SER | 1 | F4PJ11 | 6/17/2002 | CLC | 32333 | $31.74 | 36 | 6/30/2005 | Servers |
| 0010 | DCC | PV715N | 1U | POWEREI | 1 | | 6/17/2002 | CLC | 32333 | $181.37 | 36 | 6/30/2005 | Servers |
| 0010 | DCC | PV715N | 1U | DELL NAS | 1 | YRB11 | 6/17/2002 | CLC | 32333 | $68.44 | 36 | 6/30/2005 | Servers |
| 0010 | DCC | E551 | 15MO | DELL E55' | 1 | | 6/17/2002 | CLC | 32333 | $0.00 | 36 | 6/30/2005 | Personal Computers |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Source: Jaguar internal accounting records. Prepared by management.

Privileged and Confidential

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease | Rent Amount | Lease Term | Exp Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0808 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0466 | 5/15/2001 | CLC | 23071 | $38.60 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1699 | 5/15/2001 | CLC | 23071 | $38.60 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YY229 | 5/15/2001 | CLC | 23071 | $5.27 | 48 | 6/30/2005 | Personal Computers |
| 0808 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YY261 | 5/15/2001 | CLC | 23071 | $5.27 | 48 | 6/30/2005 | Personal Computers |
| 0808 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AL160 | 7/1/2001 | ICC | 23986 | $19.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALN08 | 7/1/2001 | ICC | 23986 | $19.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALN31 | 7/1/2001 | ICC | 23986 | $19.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALN33 | 7/1/2001 | ICC | 23986 | $19.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALN36 | 7/1/2001 | ICC | 23986 | $19.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALV22 | 7/1/2001 | ICC | 23986 | $19.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALV25 | 7/1/2001 | ICC | 23986 | $19.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALV55 | 7/1/2001 | ICC | 23986 | $19.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALX05 | 7/1/2001 | ICC | 23986 | $19.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4694 | S45 | POS REGISTER | 1 | VHV95 | 7/1/2001 | ICC | 23980 | $51.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4694 | S45 | POS REGISTER | 1 | VHW42 | 7/1/2001 | ICC | 23980 | $51.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4694 | S45 | POS REGISTER | 1 | VHW46 | 7/1/2001 | ICC | 23980 | $51.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4694 | S45 | POS REGISTER | 1 | VHW50 | 7/1/2001 | ICC | 23980 | $51.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4694 | S45 | POS REGISTER | 1 | VHW57 | 7/1/2001 | ICC | 23980 | $51.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4694 | S45 | POS REGISTER | 1 | VHW68 | 7/1/2001 | ICC | 23980 | $51.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4694 | S45 | POS REGISTER | 1 | VKK68 | 7/1/2001 | ICC | 23980 | $51.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4694 | S45 | POS REGISTER | 1 | VKT65 | 7/1/2001 | ICC | 23980 | $51.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 4694 | S45 | POS REGISTER | 1 | VKT83 | 7/1/2001 | ICC | 23980 | $51.00 | 48 | 6/30/2005 | POS |
| 0808 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CMP88 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0808 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNX97 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0808 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNY30 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0808 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNY32 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0808 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNY39 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0808 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNY41 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0808 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNY84 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0808 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNY86 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0808 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 22991 | $99.96 | 48 | 6/30/2005 | Software |
| 0808 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 0808 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 58GFF11 | 5/17/2002 | ICC | 31832 | $181.37 | 36 | 5/31/2005 | Servers |
| 0808 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | QVRB11 | 5/17/2002 | ICC | 31832 | $68.44 | 36 | 5/31/2005 | Servers |
| 0808 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31832 | $0.00 | 36 | 5/31/2005 | Personal Computers |

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease . | Rent Amount | Lease Term | Expire Date | Category |
|--------|-----|------|-------|-------------|----------|--------|--------------|--------|---------|-------------|------------|-------------|----------|
| 0825 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2194 | 7/15/2001 | CLC | 29763 | $36.60 | 48 | 8/31/2005 | POS |
| 0825 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2639 | 7/15/2001 | CLC | 29763 | $36.60 | 48 | 8/31/2005 | POS |
| 0825 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YY318 | 7/15/2001 | CLC | 29763 | $5.27 | 48 | 8/31/2005 | Personal Computers |
| 0825 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YY324 | 7/15/2001 | CLC | 29763 | $5.27 | 48 | 8/31/2005 | Personal Computers |
| 0825 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/15/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 0825 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/15/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 0825 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 68GFI1 | 5/17/2002 | CLC | 31834 | $181.37 | 36 | 5/31/2005 | Servers |
| 0825 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | NVRB11 | 5/17/2002 | CLC | 31834 | $68.44 | 36 | 5/31/2005 | Servers |
| 0825 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31834 | $0.00 | 36 | 5/31/2005 | Personal Computers |

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0827 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1367 | 5/15/2001 | CLC | 29072 | $36.60 | 48 | 6/30/2005 | POS |
| 0827 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M4617 | 5/15/2001 | CLC | 29072 | $36.60 | 48 | 6/30/2005 | POS |
| 0827 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XFAH9 | 5/15/2001 | CLC | 29072 | $5.27 | 48 | 6/30/2005 | Personal Computers |
| 0827 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XFAK0 | 5/15/2001 | CLC | 29072 | $5.27 | 48 | 6/30/2005 | Personal Computers |
| 0827 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 0827 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 0827 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | NQKL11 | 7/17/2002 | CLC | 32852 | $181.37 | 36 | 7/31/2005 | Servers |
| 0827 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | Z6CK11 | 7/17/2002 | CLC | 32852 | $68.44 | 36 | 7/31/2005 | Servers |
| 0827 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 7/17/2002 | CLC | 32852 | $0.00 | 36 | 7/31/2005 | Personal Computers |

| Center | Mfg | Type | Model | Description | Quantity | Serial # | Install Date | Lessor # | Lease # | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0880 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2870 | 4/15/2001 CLC | | 28440 | $36.60 | 48 | 5/31/2005 | POS |
| 0880 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2852 | 4/15/2001 CLC | | 28440 | $36.60 | 48 | 5/31/2005 | POS |
| 0880 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDCM0 | 4/15/2001 CLC | | 28440 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 0880 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDLH7 | 4/15/2001 CLC | | 28440 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 0880 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 ICC | | 29001 | $99.96 | 48 | 6/30/2005 | Software |
| 0880 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 ICC | | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 0880 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 68GF11 | 5/17/2002 CLC | | 31835 | $181.37 | 36 | 5/31/2005 | Servers |
| 0880 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | PVRB11 | 5/17/2002 CLC | | 31835 | $68.44 | 36 | 5/31/2005 | Servers |
| 0880 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 CLC | | 31835 | $0.00 | 36 | 5/31/2005 | Personal Computers |

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lessee | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0882 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1488 | 5/15/2001 | CLC | 29168 | $36.60 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2662 | 5/15/2001 | CLC | 29168 | $36.60 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XC2C6 | 5/15/2001 | CLC | 29168 | $5.27 | 48 | 6/30/2005 | Personal Computers |
| 0882 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XC2D4 | 5/15/2001 | CLC | 29168 | $5.27 | 48 | 6/30/2005 | Personal Computers |
| 0882 | IBM | 4610 | I54 | THERMAL PRINTER | 1 | AI1T24 | 7/1/2001 | CLC | 2296R | $19.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AI1T67 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AHW19 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AHW40 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALX36 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALX49 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALZ23 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | ALZ49 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AMA65 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AMA73 | 7/1/2001 | ICC | 22980 | $19.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AMA87 | 7/1/2001 | ICC | 22980 | $19.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4694 | S45 | POS REGISTER | 1 | VDV99 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4694 | S45 | POS REGISTER | 1 | VKK86 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4694 | S45 | POS REGISTER | 1 | VKN86 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4694 | S45 | POS REGISTER | 1 | VML55 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4694 | S45 | POS REGISTER | 1 | VML60 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4694 | S45 | POS REGISTER | 1 | VMX69 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4694 | S45 | POS REGISTER | 1 | VMX90 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4694 | S45 | POS REGISTER | 1 | VMY76 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4694 | S45 | POS REGISTER | 1 | VMZ28 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4694 | S45 | POS REGISTER | 1 | VMZ32 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4694 | S45 | POS REGISTER | 1 | VMZ39 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0882 | IBM | 4694 | M2N | WHITER MONITOR 15 | 1 | CPT87 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0882 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPT88 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0882 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPT93 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0882 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPT97 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0882 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPV65 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0882 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPV67 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0882 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPV69 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0882 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPV74 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0882 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | | | | $99.96 | 48 | 6/30/2005 | Software |

| 0882 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 0882 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 68GF11 | 5/17/2002 | CLC | 31836 | $181.37 | 36 | 5/31/2005 | Servers |
| 0882 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | PVRB11 | 5/17/2002 | CLC | 31836 | $68.44 | 36 | 5/31/2005 | Servers |
| 0882 | NCR | 7837 | SCAN | 7837-1000-9090 H/ | 1 | 674760 | 11/18/2002 | CLC | 34187 | $11.04 | 36 | 11/30/2005 | POS |
| 0882 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31836 | $0.00 | 36 | 5/31/2005 | Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease Ref# | Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0884 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1744 | 6/15/2001 | CLC | 29488 | $36.60 | 48 | 7/31/2005 | POS |
| 0884 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1842 | 6/15/2001 | CLC | 29488 | $36.60 | 48 | 7/31/2005 | POS |
| 0884 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XFAC2 | 6/15/2001 | CLC | 29488 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 0884 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XFAN1 | 6/15/2001 | CLC | 29488 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 0884 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CHT99 | 7/1/2001 | ICC | 22996 | $19.00 | 48 | 6/30/2005 | POS |
| 0884 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HXF35 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0884 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HXF36 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0884 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HXF49 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0884 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | KAF68 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0884 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | KAH35 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0884 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | KAR32 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0884 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | KAR35 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0884 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | KAR36 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0884 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | KAX07 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0884 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | KAX27 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 0884 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23000 | $99.96 | 48 | 6/30/2005 | Software |
| 0884 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 0884 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 68GF11 | 5/17/2002 | CLC | 31838 | $181.37 | 36 | 5/31/2005 | Servers |
| 0884 | DCC | PV15N | 1U | DELL NAS PV715N W | 1 | | 5/17/2002 | CLC | 31838 | $68.44 | 36 | 5/31/2005 | Servers |
| 0884 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | QVRB11 | 5/17/2002 | CLC | 31838 | $0.00 | 36 | 5/31/2005 | Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

| Center | Mfg Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0903 | IBM | 8477 | 42Y | NETFINITY 1000 Pl | 1 M0892 | | 4/15/2001 | CLC | 28441 | $36.60 | 48 | 5/31/2005 | POS |
| 0903 | IBM | 8477 | 42Y | NETFINITY 1000 Pl | 1 M1148 | | 4/15/2001 | CLC | 28441 | $36.60 | 48 | 5/31/2005 | POS |
| 0903 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XDLM7 | | 4/15/2001 | CLC | 28441 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 0903 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 XDLN3 | | 4/15/2001 | CLC | 28441 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 0903 | IBM | 4694 | S45 | POS REGISTER | 1 VWF22 | | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0903 | IBM | 4694 | S45 | POS REGISTER | 1 VMP49 | | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0903 | IBM | 4694 | S45 | POS REGISTER | 1 VMX44 | | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0903 | IBM | 4694 | S45 | POS REGISTER | 1 VMX67 | | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0903 | IBM | 4694 | S45 | POS REGISTER | 1 VMY02 | | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0903 | IBM | 4694 | S45 | POS REGISTER | 1 VNA11 | | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0903 | IBM | 4694 | S45 | POS REGISTER | 1 VNA46 | | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0903 | IBM | 4694 | S45 | POS REGISTER | 1 VNP91 | | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0903 | IBM | 4694 | S45 | POS REGISTER | 1 VNV65 | | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0903 | IBM | 4694 | S45 | POS REGISTER | 1 VPN07 | | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0903 | IBM | 4694 | S45 | POS REGISTER | 1 VPN09 | | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0903 | IBM | 469x | S45 | POS REGISTER | 1 VN054 | | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0903 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 W0055 | | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0903 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 W0062 | | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0903 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 W0063 | | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0903 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 WN622 | | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0903 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 WN632 | | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0903 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 WN843 | | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0903 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 WN852 | | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0903 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/12/2001 | ICC | 22991 | $99.96 | 48 | 6/30/2005 | Software |
| 0903 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/12/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 0903 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 461453 | | 9/16/2002 | CLC | 33850 | $194.80 | 36 | 9/30/2005 | Servers |
| 0903 | DCC | E551 | 15MO | DELL E551 15INCH | 1 368042 | | 9/16/2002 | CLC | 33850 | $0.00 | 36 | 9/30/2005 | Servers |
| 0903 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 99CK11 | | 9/16/2002 | CLC | 33850 | $73.16 | 36 | 9/30/2005 | Servers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease # | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0912 | IBM | 8477 | 42Y | NETFINITY 1000 PII | 1 | M0544 | 6/15/2001 | CLC | 29583 | $36.60 | 48 | 7/31/2005 | POS |
| 0912 | IBM | 8477 | 42Y | NETFINITY 1000 PII | 1 | M1973 | 6/15/2001 | CLC | 29583 | $36.60 | 48 | 7/31/2005 | POS |
| 0912 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDZR6 | 6/15/2001 | CLC | 29583 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 0912 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDZT1 | 6/15/2001 | CLC | 29583 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 0912 | IBM | SAV2 | Sr-I W | IBM SAV2 SOFTWARE | 2 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 0912 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 0912 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 78GF11 | 5/17/2002 | CLC | 31840 | $181.37 | 36 | 5/31/2005 | Servers |
| 0912 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | PVRB11 | 5/17/2002 | CLC | 31840 | $68.44 | 36 | 5/31/2005 | Servers |
| 0912 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31840 | $0.00 | 36 | 5/31/2005 | Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease# | RentAmount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0918 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2028 | 5/15/2001 | CLC | 28834 | $35.17 | 48 | 6/30/2005 | POS |
| 0918 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M4954 | 5/15/2001 | CLC | 28834 | $35.18 | 48 | 6/30/2005 | POS |
| 0918 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDBA3 | 5/15/2001 | CLC | 28834 | $6.69 | 48 | 6/30/2005 | Personal Computers |
| 0918 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDBA5 | 5/15/2001 | CLC | 28834 | $6.70 | 48 | 6/30/2005 | Personal Computers |
| 0918 | IBM | 4924 | S15 | POS REGISTER | 1 | TMY79 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0918 | IBM | 4694 | S45 | POS REGISTER | 1 | TMY66 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0918 | IBM | 4694 | S45 | POS REGISTER | 1 | TMZ17 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0918 | IBM | 4694 | S45 | POS REGISTER | 1 | VKL87 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0918 | IBM | 4694 | S45 | POS REGISTER | 1 | VKL93 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0918 | IBM | 4694 | S45 | POS REGISTER | 1 | VKM17 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0918 | IBM | 4694 | S45 | POS REGISTER | 1 | VKM36 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0918 | IBM | 4694 | S45 | POS REGISTER | 1 | VKP17 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0918 | IBM | 4694 | S45 | POS REGISTER | 1 | VKP37 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 0918 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRB93 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0918 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRC12 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0918 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRC13 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0918 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRC19 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0918 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRC20 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0918 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRC24 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0918 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRD03 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 0918 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 0918 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 0918 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 78GF11 | 5/17/2002 | CLC | 31842 | $181.37 | 36 | 5/31/2005 | Servers |
| 0918 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | PVRB11 | 5/17/2002 | CLC | 31842 | $68.44 | 36 | 5/31/2005 | Servers |
| 0918 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31842 | $0.00 | 36 | 5/31/2005 | Personal Computers |

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records. Prepared by management.

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1049 | IBM | 8477 | 42Y | NETFINITY 1000 PI | | M3523 | 3/15/2001 | CLC | 27859 | $36.60 | 48 | 11/11/1911 | POS |
| 1049 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0712 | 3/15/2001 | CLC | 27859 | $36.60 | 48 | 11/11/1911 | POS |
| 1049 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDBR0 | 3/15/2001 | CLC | 27859 | $5.27 | 48 | 11/11/1911 | Personal Computers |
| 1049 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDBP9 | 3/15/2001 | CLC | 27859 | $5.27 | 48 | 11/11/1911 | Personal Computers |
| 1049 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | | | 3/15/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 1049 | IBM | SAV2 | SVCS | SAV2 SERVICES | | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 1049 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | GW0L11 | 7/1/2002 | CLC | 32711 | $181.37 | 36 | 7/31/2005 | Servers |
| 1049 | DCC | | PV715N | DELL NAS PV715N W | 1 | | 7/1/2002 | CLC | 32711 | $68.44 | 36 | 7/31/2005 | Servers |
| 1049 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | 3YRB11 | 7/1/2002 | CLC | 32711 | $0.00 | 36 | 7/31/2005 | Personal Computers |

Other Equipment
Konica    1,414.32

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records. Prepared by management.

| Center | Mfr | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease # | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1297 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | MZ107 | 5/15/2001 | CLC | 28694 | $35.17 | 48 | 6/30/2005 | POS |
| 1297 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M4866 | 5/15/2001 | CLC | 28694 | $35.18 | 48 | 6/30/2005 | POS |
| 1297 | IBM | 633i | BZN | IBM BLACK ES4 1SI | 1 | XJ7FR9 | 5/15/2001 | CLC | 28694 | $6.70 | 48 | 6/30/2005 | Personal Computers |
| 1297 | IBM | SFTW | | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 1297 | IBM | SAV2 | | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 1297 | IBM | SVCS | | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | | | | |
| 1297 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | QRGL11 | 7/17/2002 | CLC | 32733 | $181.37 | 36 | 7/31/2005 | Servers |
| 1297 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | T6CK11 | 7/17/2002 | CLC | 32733 | $68.44 | 36 | 7/31/2005 | Servers |
| 1297 | DCC | ES51 | 1SMO | DELL ES51 15INCH | 1 | | 7/17/2002 | CLC | 32733 | $0.00 | 36 | 7/31/2005 | Personal Computers |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Privileged and Confidential

Project Jaguar
Leased Equipment List

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Install Desc | Lease | Rent Amt | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1301 | IBM | 8577 | 737 | NETFINITY 7000 PII | 1 | M14X5 | 7/15/2001 | CLC | 27422 | $36.50 | 48 | ######## | POS |
| 1301 | IBM | 8477 | 42Y | NETFINITY 1000 PII | 1 | M1430 | 2/15/2001 | CLC | 27422 | $36.50 | 48 | ######## | POS |
| 1301 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDGAT | 2/15/2001 | CLC | 27422 | $5.27 | 48 | ######## | Personal Computers |
| 1301 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDGC0 | 2/15/2001 | CLC | 27422 | $5.27 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXC34 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXD40 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXK10 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXD39 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXD33 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXC51 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXD44 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXD50 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXD36 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXC80 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXD32 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TDY23 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXD42 | 2/17/2001 | CLC | 27464 | $50.99 | 48 | ######## | POS |
| 1301 | IBM | 4694 | S45 | IBM 4694 S45 TERMINAL | 1 | TXD43 | 2/17/2001 | CLC | 27464 | $51.12 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | MYX31 | 2/17/2001 | CLC | 27464 | $19.01 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | HYX11 | 2/17/2001 | CLC | 27464 | $19.01 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | TLY10 | 2/17/2001 | CLC | 27464 | $19.01 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | HYX06 | 2/17/2001 | CLC | 27464 | $19.01 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | HYX29 | 2/17/2001 | CLC | 27464 | $19.01 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | HYX03 | 2/17/2001 | CLC | 27464 | $19.01 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | HYX23 | 2/17/2001 | CLC | 27464 | $19.01 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | HYX32 | 2/17/2001 | CLC | 27464 | $19.01 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | HYX26 | 2/17/2001 | CLC | 27464 | $19.01 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | AGP51 | 2/17/2001 | CLC | 27464 | $19.01 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | HYX25 | 2/17/2001 | CLC | 27464 | $19.01 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | TLY51 | 2/17/2001 | CLC | 27464 | $19.01 | 48 | ######## | POS |
| 1301 | IBM | 4610 | TSA | IBM THERMAL LASER | 1 | HYZ70 | 2/17/2001 | CLC | 27464 | $19.11 | 48 | ######## | POS |
| 1301 | IBM | 4650 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/12/2001 | ICC | 23001 | $99.96 | 48 | 6/00/2005 | Software |
| 1301 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/12/2001 | ICC | 23001 | $31.74 | 48 | 5/01/2005 | Servers |
| 1301 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | YYYF11 | 5/17/2002 | CLC | 31706 | $181.37 | 36 | 5/01/2005 | Servers |
| 1301 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | Q0N111 | 5/17/2002 | CLC | 31706 | $68.44 | 36 | 5/01/2005 | Servers |
| 1301 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31706 | $0.00 | 36 | 5/01/2005 | Personal Computers |

Other Leased Equipment
Imagistics copier

Source: Jaguar internal accounting records. Prepared by Management.

Privileged and Confidential

Project Jaguar
Leased Equipment List

| Center | Mfgr | Type | Model | Description | Quantity | Serial | Install Dt | Lessee | Lease | Rent Amount | Lease Trm | Expire Dt | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1314 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | MX182 | 7/17/2001 | CLC | 27431 | $36.60 | 48 | ######## | POS |
| 1314 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1458 | 7/15/2001 | CLC | 27431 | $36.60 | 48 | ######## | POS |
| 1314 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDKN0 | 2/15/2001 | CLC | 27431 | $5.27 | 48 | ######## | Personal Computers |
| 1314 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDKN8 | 2/15/2001 | CLC | 27431 | $5.27 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TYK04 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TX037 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TXK25 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TYH04 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TYH06 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TYH12 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TXC74 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDC21 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDC214 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDD59 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TYH80 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TYH19 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TXC66 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TXC61 | 2/17/2001 | CLC | 27503 | $51.00 | 48 | ######## | POS |
| 1314 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | K6964 | 2/17/2001 | CLC | 27503 | $19.01 | 48 | ######## | POS |
| 1314 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | K6B65 | 2/17/2001 | CLC | 27503 | $19.01 | 48 | ######## | POS |
| 1314 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | K6A43 | 2/17/2001 | CLC | 27503 | $19.01 | 48 | ######## | POS |
| 1314 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KAW27 | 2/17/2001 | CLC | 27503 | $19.01 | 48 | ######## | POS |
| 1314 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | KAW79 | 2/17/2001 | CLC | 27503 | $19.01 | 48 | ######## | POS |
| 1314 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | K6B11 | 2/17/2001 | CLC | 27503 | $19.01 | 48 | ######## | POS |
| 1314 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | K6A10 | 2/17/2001 | CLC | 27503 | $19.01 | 48 | ######## | POS |
| 1314 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AKC78 | 2/17/2001 | CLC | 27503 | $19.01 | 48 | ######## | POS |
| 1314 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | H1L46 | 2/17/2001 | CLC | 27503 | $19.01 | 48 | ######## | POS |
| 1314 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | K6B52 | 2/17/2001 | CLC | 27503 | $19.01 | 48 | ######## | POS |
| 1314 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HYZ56 | 2/17/2001 | CLC | 27503 | $19.09 | 48 | ######## | POS |
| 1314 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HYZ33 | 2/17/2001 | CLC | 27503 | $19.09 | 48 | ######## | POS |
| **Other Leased Equipment** | | | | | | | | | | | | | |
| Health Resource Computer System | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| Health Clinic Blood Pressur Machine | IBM | SAV2 | SVCS | SAV2 SERVICES | | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| IVR Equipment | DCC | 2500 | P3 | POWEREDGE 2500 P3 | | 0Z1F11 | 5/17/2002 | CLC | 31713 | $191.37 | 36 | 5/01/2005 | Servers |
| Imagistics copier | DCC | PV715N | 1U | DELL NAS PV715N W | | | 5/17/2002 | CLC | 31713 | $68.44 | 36 | 5/01/2005 | Servers |
| 1314 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | P0H111 | 5/17/2002 | CLC | 31713 | $0.00 | 36 | 5/01/2005 | Personal Computers |

Source: Jaguar internal accounting records.  Prepared by Management.

Privileged and Confidential

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records. Prepared by Management.

| Owner | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Vendor | Lessor | Rent Mo | Lease Term | Expire | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1362 | IBM | 8477 | 42Y | NETFINITY 1000 P1 | 1 | M1359 | 2/15/2001 | CLC | 27172 | $35.60 | 48 | ######## | POS |
| 1362 | IBM | 8477 | 42Y | NETFINITY 1000 P1 | 1 | M0481 | 2/15/2001 | CLC | 27472 | $35.60 | 48 | ######## | POS |
| 1362 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YPRK1 | 2/15/2001 | CLC | 27472 | $5.27 | 48 | ######## | Personal Computers |
| 1362 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YPRKC4 | 2/15/2001 | CLC | 27472 | $5.27 | 48 | ######## | Personal Computers |
| 1362 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VAV51 | 2/17/2001 | CLC | 27543 | $51.00 | 48 | ######## | POS |
| 1362 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VBK51 | 2/17/2001 | CLC | 27543 | $51.00 | 48 | ######## | POS |
| 1362 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VAV83 | 2/17/2001 | CLC | 27543 | $51.00 | 48 | ######## | POS |
| 1362 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VAV50 | 2/17/2001 | CLC | 27543 | $51.00 | 48 | ######## | POS |
| 1362 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VAV58 | 2/17/2001 | CLC | 27543 | $51.00 | 48 | ######## | POS |
| 1362 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VAV65 | 2/17/2001 | CLC | 27543 | $51.00 | 48 | ######## | POS |
| 1362 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VPAK4 | 2/17/2001 | CLC | 27543 | $51.00 | 48 | ######## | POS |
| 1362 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VAV08 | 2/17/2001 | CLC | 27543 | $51.00 | 48 | ######## | POS |
| 1362 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TD058 | 2/17/2001 | CLC | 27543 | $51.00 | 48 | ######## | POS |
| 1362 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TC295 | 2/17/2001 | CLC | 27543 | $51.00 | 48 | ######## | POS |
| 1362 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VAV67 | 2/17/2001 | CLC | 27543 | $51.00 | 48 | ######## | POS |
| 1362 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | VBK44 | 2/17/2001 | CLC | 27543 | $51.00 | 48 | ######## | POS |
| 1362 | IBM | | SFTW | IBM 4694 SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | POS |
| 1362 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 1362 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | C0ZF11 | 5/17/2002 | CLC | 31718 | $181.37 | 35 | 5/01/2005 | Servers |
| 1362 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | P0H111 | 5/17/2002 | CLC | 31718 | $68.44 | 35 | 5/01/2005 | Servers |
| 1362 | TEL | PTC960 | XDS | RF RE-MANUFACTURE | 1 | 002306 | 6/16/2002 | CLC | 31979 | $19.93 | 36 | 5/01/2005 | Radio Frequency |
| 1362 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31718 | $0.00 | 36 | 5/01/2005 | Personal Computers |

Other Leased Equipment
Imagistics copier

Privileged and Confidential

| Division | Center | Mfg | Type | Model | Description | Quantity | Serial Number |
|---|---|---|---|---|---|---|---|
| 08 | 1413 | CIS | 2651 | XM | 2651XM HIGH PERFO | 1 | |
| 08 | 1413 | VFI | PINPAD | P003 | EVEREST PLUS PINP | 1 | 355497 |
| 08 | 1413 | VFI | PINPAD | P003 | EVEREST PLUS PINP | 0 | 376821 |
| 08 | 1413 | VFI | PINPAD | P003 | EVEREST PLUS PINP | 0 | 376822 |
| 08 | 1413 | VFI | PINPAD | P003 | EVEREST PLUS PINP | 0 | 376823 |
| 08 | 1413 | VFI | PINPAD | P003 | EVEREST PLUS PINP | 0 | 376824 |
| 08 | 1413 | VFI | PINPAD | P003 | EVEREST PLUS PINP | 0 | 376825 |
| 08 | 1413 | VFI | PINPAD | P003 | EVEREST PLUS PINP | 0 | 376826 |
| 08 | 1413 | VFI | PINPAD | P003 | EVEREST PLUS PINP | 0 | 376827 |
| 08 | 1413 | VFI | PINPAD | P003 | EVEREST PLUS PINP | 0 | 376828 |
| 08 | 1413 | VFI | PINPAD | P003 | EVEREST PLUS PINP | 0 | 376829 |
| 08 | 1413 | VFI | PINPAD | P003 | EVEREST PLUS PINP | 1 | 376830 |
| 08 | 1413 | VFI | PINPAD | P003 | EVEREST PLUS PINP | 1 | 376831 |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

| ipment Nur | PO Number | Purchase Cost | Install Date | Lessor | ase Numb | Rent Amount | Lease Term |
|---|---|---|---|---|---|---|---|
| 253943 | | $9,055.45 | 01-Jul-04 | CIS | 04574 | $110.98 | 48 |
| 230401 | 33160 | $220.50 | 17-Sep-02 | CLC | 33160 | $4.46 | 60 |
| 231701 | 33160 | $220.50 | 17-Sep-02 | CLC | 33160 | $4.44 | 60 |
| 231702 | 33160 | $220.50 | 17-Sep-02 | CLC | 33160 | $4.44 | 60 |
| 231703 | 33160 | $220.50 | 17-Sep-02 | CLC | 33160 | $4.44 | 60 |
| 231704 | 33160 | $220.50 | 17-Sep-02 | CLC | 33160 | $4.44 | 60 |
| 231705 | 33160 | $220.50 | 17-Sep-02 | CLC | 33160 | $4.44 | 60 |
| 231706 | 33160 | $220.50 | 17-Sep-02 | CLC | 33160 | $4.44 | 60 |
| 231707 | 33160 | $220.50 | 17-Sep-02 | CLC | 33160 | $4.44 | 60 |
| 231708 | 33160 | $220.50 | 17-Sep-02 | CLC | 33160 | $4.44 | 60 |
| 231709 | 33160 | $220.50 | 17-Sep-02 | CLC | 33160 | $4.44 | 60 |
| 231710 | 33160 | $220.50 | 17-Sep-02 | CLC | 33160 | $4.44 | 60 |
| 231711 | 33160 | $220.50 | 17-Sep-02 | CLC | 33160 | $4.44 | 60 |

| Expire Date | User Info | Category Number | Category Name | Sub-Category |
|---|---|---|---|---|
| 30-Jun-08 | | 720 | Network | Routers |
| 30-Sep-07 | | 260 | POS | Pinpads |
| 30-Sep-07 | | 260 | POS | Pinpads |
| 30-Sep-07 | | 260 | POS | Pinpads |
| 30-Sep-07 | | 260 | POS | Pinpads |
| 30-Sep-07 | | 260 | POS | Pinpads |
| 30-Sep-07 | | 260 | POS | Pinpads |
| 30-Sep-07 | | 260 | POS | Pinpads |
| 30-Sep-07 | | 260 | POS | Pinpads |
| 30-Sep-07 | | 260 | POS | Pinpads |
| 30-Sep-07 | | 260 | POS | Pinpads |
| 30-Sep-07 | | 260 | POS | Pinpads |
| 30-Sep-07 | | 260 | POS | Pinpads |

Project Jaguar
Leased Equipment List

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1471 | IBM | 8477 | 42Y | NETFINITY | 1 | M12147 | 4/15/2001 | CLC | 28084 | $38.60 | 48 | 5/31/2005 | POS |
| 1471 | IBM | 8477 | 42Y | NETFINITY | 1 | M11261 | 4/15/2001 | CLC | 28084 | $36.60 | 48 | 5/31/2005 | POS |
| 1471 | IBM | 6331 | B2N | IBM BLACK | 1 | XDD01 | 4/15/2001 | CLC | 28084 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 1471 | IBM | 6331 | B2N | IBM BLACK | 1 | XDDG2 | 4/15/2001 | CLC | 28084 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | TZA79 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | TZA82 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | TZA89 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | TZA90 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | VMK14 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | VMK74 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | VMM85 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | VMM86 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | VNA49 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | FCC |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | VNA56 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | VNA62 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | VNA67 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1471 | IBM | 4694 | S45 | POS REGI | 1 | VNA69 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1471 | IBM | 6331 | M2N | WHITER N | 1 | WC437 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1471 | IBM | 6331 | M2N | WHITER N | 1 | WC438 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1471 | IBM | 6331 | M2N | WHITER N | 1 | WC440 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1471 | IBM | 6331 | M2N | WHITER N | 1 | WC448 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1471 | IBM | 6331 | M2N | WHITER N | 1 | WC708 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1471 | IBM | 6331 | M2N | WHITER N | 1 | WC709 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1471 | IBM | 6331 | M2N | WHITER N | 1 | WC714 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1471 | IBM | 6331 | M2N | WHITER N | 1 | WC720 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1471 | IBM | 6331 | M2N | WHITER N | 1 | WC721 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1471 | IBM | SAV2 | SFTW | IBM SAV2 | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 1471 | IBM | SAV2 | SVCS | SAV2 SER | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 1471 | DCC | 2500 | P3 | POWEREL | 1 | 2NGLL11 | 7/17/2002 | CLC | 32658 | $181.37 | 36 | 7/31/2005 | Servers |
| 1471 | DCC | PV716N | 1U | DELL NAS | 1 | B2RB11 | 7/17/2002 | CLC | 32658 | $68.44 | 36 | 7/31/2005 | Servers |
| 1471 | DCC | E551 | 15MO | DELL E55 | 1 | | 7/17/2002 | CLC | 32658 | $0.00 | 36 | 7/31/2005 | Personal Computers |

Other Leased Equipment
Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

Source: Jaguar internal accounting records. Prepared by management.

Privileged and Confidential

**Project Jaguar**
**Leased Equipment List**

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease | Rent Amount | Lease Term | Expiration Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1547 | IBM | 8477 | 42Y | NETFINITY | 1 | M1805 | 5/15/2001 | CLC | 29163 | $36.60 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 8477 | 42Y | NETFINITY | 1 | M2417 | 5/15/2001 | CLC | 29163 | $36.60 | 48 | 5/30/2005 | POS |
| 1547 | IBM | 6331 | B2N | IBM BLACK | 1 | XDYL7 | 5/15/2001 | CLC | 29163 | $5.27 | 48 | 6/30/2005 | Personal Computers |
| 1547 | IBM | 6331 | B2N | IBM BLACK | 1 | XDY61 | 5/15/2001 | CLC | 29163 | $5.27 | 48 | 6/30/2005 | Personal Computers |
| 1547 | IBM | 4694 | TS4 | THERMAL | 1 | AGT49 | 7/12/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4610 | TS4 | THERMAL | 1 | AHH06 | 7/12/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4610 | TS4 | THERMAL | 1 | AHH11 | 7/12/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4610 | TS4 | THERMAL | 1 | AHH30 | 7/12/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4610 | TS4 | THERMAL | 1 | AHH31 | 7/12/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 1547 | IPM | 4610 | TS4 | THERMAL | 1 | AHH33 | 7/12/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4610 | TS4 | THERMAL | 1 | YD869 | 7/12/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4610 | TS4 | THERMAL | 1 | YD900 | 7/12/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4694 | S45 | POS REGI | 1 | VK680 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4694 | S45 | POS REGI | 1 | VKN84 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4694 | S45 | POS REGI | 1 | VKN75 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4694 | S45 | POS REGI | 1 | VKX21 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4694 | S45 | POS REGI | 1 | VML50 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4694 | S45 | POS REGI | 1 | VWP38 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4694 | S45 | POS REGI | 1 | VWX71 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 4694 | S45 | POS REGI | 1 | VWNA3 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 1547 | IBM | 6331 | MZN | WHITER N | 1 | CNH28 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1547 | IBM | 6331 | MZN | WHITER N | 1 | CNH53 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1547 | IBM | 6331 | MZN | WHITER N | 1 | CNK92 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1547 | IBM | 6331 | MZN | WHITER N | 1 | CNK95 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1547 | IBM | 6331 | MZN | WHITER N | 1 | CNK97 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1547 | IBM | 6331 | MZN | WHITER N | 1 | CNL42 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1547 | IBM | 6310 | M2N | WHITER N | 1 | CNL46 | 7/12/2001 | ICC | 23001 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 1547 | IBM | 6310 | SFTW | IBM SAV2 | 1 | | 7/10/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 1547 | DCC | 2500 | SVCS | POWEREE | 1 | GW0L11 | 7/17/2002 | CLC | 32673 | $31.74 | 48 | 6/30/2005 | Servers |
| 1547 | DCC | PV715N | P3 | DELL NAS | 1 | SZR811 | 7/17/2002 | CLC | 32673 | $181.37 | 36 | 7/31/2005 | Servers |
| 1547 | DCC | E551 | 15MO | DELL E55 | 1 | | 7/17/2002 | CLC | 32673 | $68.44 | 36 | 7/31/2005 | Personal Computers |
| 1547 | | | | | | | | | | $0.00 | 36 | 7/31/2005 | |

Source: Jaguar internal accounting records. Prepared by management.

Privileged and Confidential

| Center # | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M4628 | 4/15/2001 | CLC | 28466 | $36.60 | 48 | 5/31/2005 | POS |
| 2001 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M4969 | 4/15/2001 | CLC | 28466 | $36.60 | 48 | 5/31/2005 | POS |
| 2001 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDKR6 | 4/15/2001 | CLC | 28466 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 2001 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDKT4 | 4/15/2001 | CLC | 28466 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 2001 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2001 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2001 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 7H2F11 | 5/17/2002 | CLC | 31736 | $181.37 | 36 | 5/31/2005 | Servers |
| 2001 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | DZM111 | 5/17/2002 | CLC | 31736 | $68.44 | 36 | 5/31/2005 | Servers |
| 2001 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31736 | $0.00 | 36 | 5/31/2005 | Personal Computers |

| Center | Mfg. | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease # | Rent Amount | Lease Term | Expire Date | Category |
|--------|------|------|-------|-------------|----------|--------|--------------|--------|---------|-------------|------------|-------------|----------|
| 2003 | IBM | 8477 | 42Y | NETIFINITY 1000 PI | 1 | M4746 | 4/15/2001 | CLC | 28467 | $36.60 | 48 | 5/31/2005 | POS |
| 2003 | IBM | 8477 | 42Y | NETIFINITY 1000 PI | 1 | M4941 | 4/15/2001 | CLC | 28467 | $36.60 | 48 | 5/31/2005 | POS |
| 2003 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDBN6 | 4/15/2001 | CLC | 28467 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 2003 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDBY5 | 4/15/2001 | CLC | 28467 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 2003 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2003 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2003 | DCC | 2500 | P3 | POWEREDGE 2600 P3 | 1 | R4FF11 | 5/17/2002 | CLC | 31738 | $181.37 | 36 | 5/31/2005 | Servers |
| 2003 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | J0N111 | 5/17/2002 | CLC | 31738 | $68.44 | 36 | 5/31/2005 | Servers |
| 2003 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31738 | $0.00 | 36 | 5/31/2005 | Personal Computers |

| Center | Mfg | Type | Model | Description | Quantity | Serial # | Install Date | Lessor | Lease # | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0794 | 6/15/2001 | CLC | 29526 | $36.60 | 48 | 7/31/2005 | POS |
| 2008 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M2385 | 6/15/2001 | CLC | 29526 | $36.60 | 48 | 7/31/2005 | POS |
| 2008 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDMN5 | 6/15/2001 | CLC | 29526 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2008 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDMV2 | 6/15/2001 | CLC | 29526 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2008 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | C7YE8 | 7/1/2001 | ICC | 29986 | $19.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CKK42 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CKL68 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CKL83 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CKL90 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CKL95 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CKL99 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CKM20 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CKP03 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4694 | S45 | POS REGISTER | 1 | VDVW05 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4694 | S45 | POS REGISTER | 1 | VGZ28 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4694 | S45 | POS REGISTER | 1 | V-HV57 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4694 | S45 | POS REGISTER | 1 | V-HV70 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4694 | S45 | POS REGISTER | 1 | V-HV75 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4694 | S45 | POS REGISTER | 1 | V-HW07 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4694 | S45 | POS REGISTER | 1 | V-HW08 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4694 | S45 | POS REGISTER | 1 | VNM52 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 4694 | S45 | POS REGISTER | 1 | VNT60 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2008 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNP58 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2008 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNP59 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2008 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNP60 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2008 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNR07 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2008 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNR08 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2008 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNR09 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2008 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2008 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | S4FF11 | 5/17/2002 | CLC | 31741 | $31.74 | 36 | 5/31/2005 | Software |
| 2008 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | V0N111 | 5/17/2002 | CLC | 31741 | $181.37 | 36 | 5/31/2005 | Servers |
| 2008 | DCC | PV715N | 1U | DELL NAS PV715N V | 1 | | 5/17/2002 | CLC | 31741 | $68.44 | 36 | 5/31/2005 | Servers |
| 2008 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | | $0.00 | 36 | 5/31/2005 | Personal Computers |

**Other Leased Equipment**

Health Resource Computer System
Health Clinic Blood Pressur Machine
IVR Equipment

| Center | Mfg | Type | Model | Description | Quantity | Serial. | Install Date | Lessor | Lease# | Rent Amount. | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2045 | CAP | AU750 | | EMERSON UPS SYSTE | | 000384 | 1/16/1993 | CLC | 0053667 | $0.00 | 36 | 11/1/1911 | UPS |
| 2045 | IBM | 6275 | D2U | C3333.32MB.3.2 GB | 1 | | 4/15/1999 | CLC | 20860 | $14.77 | 36 | 11/11/1911 | Personal Computers |
| 2045 | IBM | 6275 | D2U | C3333.32MB.3.2 GB | 1 | | 4/15/1999 | CLC | 20860 | $14.77 | 36 | 11/11/1911 | Personal Computers |
| 2045 | IBM | 6275 | D2U | C3333.32MB.3.2 GB | 1 | | 4/15/1999 | CLC | 20860 | $14.78 | 36 | 11/11/1911 | Personal Computers |
| 2045 | IBM | 6275 | D2U | C3333.32MB.3.2 GB | 1 | | 4/15/1999 | CLC | 20860 | $14.77 | 36 | 11/11/1911 | Personal Computers |
| 2045 | IBM | 6546 | 0ANT | IBM G54 15 IN. CO | 1 | | 4/15/1999 | CLC | 20860 | $3.00 | 36 | 11/11/1911 | Personal Computers |
| 2045 | IBM | 6546 | 0ANT | IBM G54 15 IN. CO | 1 | | 4/15/1999 | CLC | 20860 | $3.00 | 36 | 11/11/1911 | Personal Computers |
| 2045 | IBM | 6546 | 0ANT | IBM G54 15 IN. CO | 1 | | 4/15/1999 | CLC | 20860 | $3.01 | 36 | 11/11/1911 | Personal Computers |
| 2045 | IBM | 6546 | 0ANT | IBM G54 15 IN. CO | 1 | | 4/15/1999 | CLC | 20860 | $3.01 | 36 | 11/11/1911 | Personal Computers |
| 2045 | LEX | 1255N | OPTS | LEX OPTRA S 1255N | | | 4/15/1999 | CLC | 20860 | $16.90 | 36 | 11/11/1911 | Printers |
| 2045 | IBM | 6275 | KXX | IBM KIOSK/TYPE AN | 1 | BGLGC | 5/20/2000 | CLM | 24694 | $15.05 | 36 | 11/11/1911 | Personal Computers |
| 2045 | IBM | 6331 | KXX | IBM KIOSK 15IN MO | 1 | RKK26 | 5/20/2000 | CLM | 24694 | $0.00 | 36 | 11/11/1911 | Personal Computers |
| 2045 | IBM | 8477 | 42Y | NETFINITY 1000 PI | | M1057 | 6/15/2001 | CLC | 23493 | $36.60 | 48 | 7/31/2005 | POS |
| 2045 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1174 | 6/15/2001 | CLC | 23493 | $36.60 | 48 | 7/31/2005 | POS |
| 2045 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDFC1 | 6/15/2001 | CLC | 23493 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2045 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDHG7 | 6/15/2001 | CLC | 23493 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2045 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AYN47 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AYP92 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AYV58 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AYW07 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AYW09 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AYW17 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AYY02 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AYY03 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AYY10 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | AYY23 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | TYH07 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4694 | S45 | POS REGISTER | 1 | TZA61 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4694 | S45 | POS REGISTER | 1 | TZB42 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4694 | S45 | POS REGISTER | 1 | TZB69 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4694 | S45 | POS REGISTER | 1 | TZD05 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4694 | S45 | POS REGISTER | 1 | TZM23 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4694 | S45 | POS REGISTER | 1 | TZM24 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4694 | S45 | POS REGISTER | 1 | V8K02 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4694 | S45 | POS REGISTER | 1 | V8K06 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 4694 | S45 | POS REGISTER | 1 | V8K08 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2045 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | WN958 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |

| Year | Vendor | Model | Code | Description | Qty | Serial | Date/Source | Acct | Price | Mo | Date / Category |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2045 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | WP147 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 Personal Computers |
| 2045 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | WP247 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 Personal Computers |
| 2045 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | WP248 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 Personal Computers |
| 2045 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | WP250 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 Personal Computers |
| 2045 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | WP251 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 Personal Computers |
| 2045 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | WP252 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 Personal Computers |
| 2045 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | WP257 | 7/15/2021 ICC | 22991 | $5.25 | 48 | 6/30/2005 Personal Computers |
| 2045 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | WP258 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 Personal Computers |
| 2045 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | WP260 | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 Personal Computers |
| 2045 | IBM | SAV2 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 Personal Computers |
| 2045 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 ICC | 23001 | $99.96 | 48 | 6/30/2005 Software |
| 2045 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 ICC | 23001 | $31.74 | 48 | 6/30/2005 Software |
| 2045 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | | 7/1/2001 ICC | 22991 | $5.25 | 48 | 6/30/2005 Personal Computers |
| 2045 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | L3VN11 | 8/17/2002 CLC | 33301 | $181.37 | 36 | 8/31/2005 Servers |
| 2045 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | K8CK11 | 8/17/2002 CLC | 33301 | $68.44 | 36 | 8/31/2005 Servers |
| 2045 | CAP | GXT700 | | LIEBERT GXT700 | 1 | | 5/16/1999 ICC | 21383 | $10.07 | 36 | 11/11/1911 UPS |
| 2045 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 8/17/2002 CLC | 33301 | $0.00 | 36 | 8/31/2005 Personal Computers |
| 2045 | CAP | GXT1500 | | UPS GXT1500 | 1 | | 4/15/1999 CLC | 20860 | $12.69 | 36 | 11/11/1911 UPS |

| Center | Mfg. | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2063 | IBM | 6331 | M2N | 15IN E54 PEARL MO | 1 | ADV44 | 2/16/2001 | CLC | 27027 | $9.55 | 36 | 11/11/1911 | Personal Computers |
| 2063 | IBM | 6331 | M2N | 15IN E54 PEARL MO | 1 | ADV50 | 2/16/2001 | CLC | 27027 | $9.55 | 36 | 11/11/1911 | Personal Computers |
| 2063 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | ADX63 | 4/15/2001 | CLC | 28469 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 2063 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1239 | 7/15/2001 | CLC | 28813 | $36.60 | 48 | 8/31/2005 | POS |
| 2063 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1312 | 7/15/2001 | CLC | 29913 | $36.60 | 48 | 8/31/2005 | POS |
| 2063 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | X0MM3 | 7/15/2001 | CLC | 29813 | $5.27 | 48 | 8/31/2005 | Personal Computers |
| 2063 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDMV9 | 7/15/2001 | CLC | 29813 | $5.27 | 48 | 8/31/2005 | Personal Computers |
| 2063 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CLH71 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2063 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | H2VM4 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2063 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRG94 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2063 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | WC912 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2063 | IBM | 4694 | S45 | POS REGISTER | 1 | VKK28 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2063 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPW22 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2063 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CPW24 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2063 | IBM | 4694 | S45 | POS REGISTER | 1 | VMM90 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2063 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | HXNN5 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2063 | IBM | 4694 | S45 | POS REGISTER | 1 | TNNV14 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2063 | IBM | 4694 | S45 | POS REGISTER | 1 | VNX18 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2063 | IBM | 4694 | S45 | POS REGISTER | 1 | VMX07 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2063 | IBM | 4694 | S45 | POS REGISTER | 1 | TZM29 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2063 | IBM | 4694 | S45 | POS REGISTER | 1 | TZM33 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2063 | IBM | 4694 | S45 | POS REGISTER | 1 | VAX02 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2063 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2063 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | KM2H11 | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2063 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | | | 6/17/2002 | CLC | 32027 | $181.37 | 36 | 6/30/2005 | Servers |
| 2063 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | DWRB11 | 6/17/2002 | CLC | 32027 | $68.44 | 36 | 6/30/2005 | Servers |
| 2063 | DCC | E551 | 15MO | DELL E551 15INCH | | | 6/17/2002 | CLC | 32027 | $0.00 | 36 | 6/30/2005 | Personal Computers |

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2083 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M607 | 5/15/2001 | CLC | 28791 | $35.17 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M626 | 5/15/2001 | CLC | 28791 | $35.18 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XFAB1 | 5/15/2001 | ICC | 28791 | $6.69 | 48 | 6/30/2005 | Personal Computers |
| 2083 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XFAB2 | 5/15/2001 | ICC | 28791 | $6.70 | 48 | 6/30/2005 | Personal Computers |
| 2083 | IBM | 4694 | S45 | POS REGISTER | 1 | TPYZ5 | 7/12/2001 | ICC | 22990 | $51.00 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 4694 | S45 | POS REGISTER | 1 | TPZ59 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 4694 | S45 | POS REGISTER | 1 | TPZ60 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 4694 | S45 | POS REGISTER | 1 | TPZ61 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 4694 | S45 | POS REGISTER | 1 | V8K82 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 4694 | S45 | POS REGISTER | 1 | VDT94 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 4694 | S45 | POS REGISTER | 1 | VDV03 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 4694 | S45 | POS REGISTER | 1 | VGX27 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 4694 | S45 | POS REGISTER | 1 | VGX31 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 4694 | S45 | POS REGISTER | 1 | VGX43 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | VKL20 | 7/12/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2083 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNK72 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2083 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNK80 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2083 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNL16 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2083 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNL17 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2083 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNL19 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2083 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNL24 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2083 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNL26 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2083 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CNL29 | 7/12/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2083 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2083 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2083 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | KM2H11 | 6/17/2002 | CLC | 32030 | $181.37 | 36 | 6/30/2005 | Servers |
| 2083 | DCC | PV716N | 1U | DELL NAS PV716N W | 1 | | 6/17/2002 | ICC | 32030 | $68.44 | 36 | 6/30/2005 | Servers |
| 2083 | DCC | E551 | 15MO | DELL E551 15INCH | 3 | WRB11 | 6/17/2002 | CLC | 32030 | $0.00 | 36 | 6/30/2005 | Personal Computers |

**Other Leased Equipment**
Health Resource Computer System
Health Clinic Blood Pressure Machine
IVR Equipment

| Center | Mfg. | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2093 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0891 | 3/15/2001 | CLC | 27865 | $38.60 | 48 | 11/11/1911 | POS |
| 2093 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | MM241 | 3/15/2001 | CLC | 27865 | $38.60 | 48 | 11/11/1911 | POS |
| 2093 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | ZAYB3 | 3/15/2001 | CLC | 27865 | $5.27 | 48 | 11/11/1911 | Personal Computers |
| 2093 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | ZAYG4 | 3/15/2001 | CLC | 27865 | $5.27 | 48 | 11/11/1911 | Personal Computers |
| 2093 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2093 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2093 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | SRGL11 | 7/17/2002 | CLC | 32748 | $181.37 | 36 | 7/31/2005 | Servers |
| 2093 | DCC | PVT15N | 1U | DELL NAS PVT15N W | 1 | N6CK11 | 7/17/2002 | CLC | 32748 | $68.44 | 36 | 7/31/2005 | Servers |
| 2093 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 7/17/2002 | CLC | 32748 | $0.00 | 36 | 7/31/2005 | Personal Computers |

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease # | Rent Amount | Lease Term | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2099 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M1915 | 6/15/2001 | CLC | 29531 | $36.60 | 48 | 7/31/2005 | POS |
| 2099 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M4803 | 6/15/2001 | CLC | 29531 | $36.60 | 48 | 7/31/2005 | POS |
| 2099 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDBB1 | 6/15/2001 | CLC | 29531 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2099 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDBB9 | 6/15/2001 | CLC | 29531 | $5.27 | 48 | 7/31/2005 | Personal Computers |
| 2099 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CLR20 | 7/1/2001 | ICC | 29996 | $19.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CLR37 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CLR80 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CLT22 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CLV02 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CLV05 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CLV06 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CLV12 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4610 | TS4 | THERMAL PRINTER | 1 | CLV13 | 7/1/2001 | ICC | 22986 | $19.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4694 | S45 | POS REGISTER | 1 | TTA07 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4694 | S45 | POS REGISTER | 1 | VHV39 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4694 | S45 | POS REGISTER | 1 | VKP22 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4694 | S45 | POS REGISTER | 1 | VKP25 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4694 | S45 | POS REGISTER | 1 | VKP31 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4694 | S45 | POS REGISTER | 1 | VKP63 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4694 | S45 | POS REGISTER | 1 | VKV54 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4694 | S45 | POS REGISTER | 1 | VKV58 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 4694 | S45 | POS REGISTER | 1 | VKV68 | 7/1/2001 | ICC | 22980 | $51.00 | 48 | 6/30/2005 | POS |
| 2099 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRB94 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2099 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRB98 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2099 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRC18 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2099 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRC23 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2099 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRC26 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2099 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRD00 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2099 | IBM | 6331 | M2N | WHITER MONITOR 15 | 1 | CRD04 | 7/1/2001 | ICC | 22991 | $5.25 | 48 | 6/30/2005 | Personal Computers |
| 2099 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 22991 | $99.96 | 48 | 6/30/2005 | Software |
| 2099 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | V4FF11 | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2099 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | | | CLC | 31750 | $181.37 | 36 | 5/31/2005 | Servers |
| 2099 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | R0N111 | 5/17/2002 | CLC | 31750 | $68.44 | 36 | 5/31/2005 | Servers |
| 2099 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 5/17/2002 | CLC | 31750 | $0.00 | 36 | 5/31/2005 | Personal Computers |

Project Jaguar
Leased Equipment List

Source: Jaguar internal accounting records. Prepared by Management.

| Center | Mfg | Type | Model | Description | Quantity | Serial | Install Dat | Lessor | Lessee | Rent Amou | Lease | Tel | Equip Dat | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2622 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | MH468 | 2/15/2001 | 27481 | 27481 | $35.60 | 48 | ####### | POS |
| 2622 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | MH122 | 2/15/2001 | 27481 | 27481 | $35.60 | 48 | ####### | POS |
| 2622 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDKL9 | 2/15/2001 | 27481 | 27481 | $5.27 | 48 | ####### | Personal Computers |
| 2622 | IBM | 6331 | B2N | IBM BLACK E54 15I | X | XDKP4 | 2/15/2001 | 27481 | 27481 | $5.27 | 48 | ####### | Personal Computers |
| 2622 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPK00 | 2/17/2001 | 27553 | 27553 | $50.99 | 48 | ####### | POS |
| 2622 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPK11 | 2/17/2001 | 27553 | 27553 | $50.99 | 48 | ####### | POS |
| 2622 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TD296 | 2/17/2001 | 27553 | 27553 | $50.99 | 48 | ####### | POS |
| 2622 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TD259 | 2/17/2001 | 27553 | 27553 | $50.99 | 48 | ####### | POS |
| 2622 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TD269 | 2/17/2001 | 27553 | 27553 | $50.99 | 48 | ####### | POS |
| 2622 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPH95 | 2/17/2001 | 27553 | 27553 | $59.99 | 48 | ####### | POS |
| 2622 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TQKC7 | 2/17/2001 | 27553 | 27553 | $59.99 | 48 | ####### | POS |
| 2622 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPY05 | 2/17/2001 | 27553 | 27553 | $50.99 | 48 | ####### | POS |
| 2622 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPK06 | 2/17/2001 | 27553 | 27553 | $50.99 | 48 | ####### | POS |
| 2622 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDZ92 | 2/17/2001 | 27553 | 27553 | $50.99 | 48 | ####### | POS |
| 2622 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TPK04 | 2/17/2001 | 27553 | 27553 | $50.99 | 48 | ####### | POS |
| 2622 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDZ93 | 2/17/2001 | 27553 | 27553 | $50.99 | 48 | ####### | POS |
| 2622 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTD78 | 2/17/2001 | 27553 | 27553 | $19.01 | 48 | ####### | POS |
| 2622 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTD46 | 2/17/2001 | 27553 | 27553 | $19.01 | 48 | ####### | POS |
| 2622 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTD62 | 2/17/2001 | 27553 | 27553 | $19.01 | 48 | ####### | POS |
| 2622 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTD70 | 2/17/2001 | 27553 | 27553 | $19.01 | 48 | ####### | POS |
| 2622 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTD42 | 2/17/2001 | 27553 | 27553 | $19.01 | 48 | ####### | POS |
| 2622 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTD50 | 2/17/2001 | 27553 | 27553 | $19.01 | 48 | ####### | POS |
| 2622 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTD72 | 2/17/2001 | 27553 | 27553 | $19.01 | 48 | ####### | POS |
| 2622 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTD52 | 2/17/2001 | 27553 | 27553 | $19.01 | 48 | ####### | POS |
| 2622 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTD61 | 2/17/2001 | 27553 | 27553 | $19.01 | 48 | ####### | POS |
| 2622 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTG57 | 2/17/2001 | 27553 | 27553 | $19.01 | 48 | ####### | POS |
| 2622 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTD14 | 2/17/2001 | 27553 | 27553 | $19.01 | 48 | ####### | POS |
| 2622 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTD45 | 2/17/2001 | 27553 | 27553 | $19.01 | 48 | ####### | POS |
| 2622 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | 23001 | 23001 | $19.10 | 48 | ####### | Software |
| 2622 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | 23001 | 23001 | $99.96 | 48 | 6/20/2005 | Software |
| 2622 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | YQGL11 | 7/17/2002 | 32896 | 32896 | $181.37 | 36 | 7/31/2005 | Servers |
| 2622 | DCC | PV715N | 15MO | DELL E551 15INCH W | 1 | YPRB11 | 7/17/2002 | 32896 | 32896 | $68.44 | 36 | 7/31/2005 | Personal Computers |

Page 1 of 1

Privileged and Confidential

Project: Jaguar
Leased Equipment List

| Center | Mfg | Type | Model | Description | Quantity | Serial | Rental Def Date | Lease# | Rent Amt | Lease Term | Expire Dt | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2640 | IBM | 8477 | 42Y | NETINFINITY 7000 PI | 1 | M0272 | 2/15/2001 CLC | 27463 | $36.60 | 48 | ######## | POS |
| 2640 | IBM | 8477 | 42Y | NETINFINITY 1000 PII | 1 | M0587 | 2/15/2001 CLC | 27463 | $36.60 | 48 | ######## | POS |
| 2640 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YPGY8 | 2/15/2001 CLC | 27463 | $5.27 | 48 | ######## | Personal Computers |
| 2640 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | YPK0B | 2/15/2001 CLC | 27463 | $5.27 | 48 | ######## | Personal Computers |
| 2640 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TCY71 | 2/17/2001 CLC | 27534 | $50.99 | 48 | ######## | POS |
| 2640 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TCY78 | 2/17/2001 CLC | 27534 | $50.99 | 48 | ######## | POS |
| 2640 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TCY65 | 2/17/2001 CLC | 27534 | $50.99 | 48 | ######## | POS |
| 2640 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TCY83 | 2/17/2001 CLC | 27534 | $50.99 | 48 | ######## | POS |
| 2640 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TDB05 | 2/17/2001 CLC | 27534 | $50.99 | 48 | ######## | POS |
| 2640 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TCY90 | 2/17/2001 CLC | 27534 | $50.99 | 48 | ######## | POS |
| 2640 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TCY85 | 2/17/2001 CLC | 27534 | $50.99 | 48 | ######## | POS |
| 2640 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TCY63 | 2/17/2001 CLC | 27534 | $50.99 | 48 | ######## | POS |
| 2640 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | TCY66 | 2/17/2001 CLC | 27534 | $50.99 | 48 | ######## | POS |
| 2640 | IBM | 4694 | S45 | 4694 S45 TERMINAL | 1 | PY3A7 | 2/17/2001 CLC | 27534 | $51.08 | 48 | ######## | POS |
| 2640 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTG87 | 2/17/2001 CLC | 27534 | $19.01 | 48 | ######## | POS |
| 2640 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTM55 | 2/17/2001 CLC | 27534 | $19.01 | 48 | ######## | POS |
| 2640 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTG82 | 2/17/2001 CLC | 27534 | $19.01 | 48 | ######## | POS |
| 2640 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTG84 | 2/17/2001 CLC | 27534 | $19.01 | 48 | ######## | POS |
| 2640 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTG78 | 2/17/2001 CLC | 27534 | $19.01 | 48 | ######## | POS |
| 2640 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTG80 | 2/17/2001 CLC | 27534 | $19.01 | 48 | ######## | POS |
| 2640 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | AOM17 | 2/17/2001 CLC | 27534 | $19.01 | 48 | ######## | POS |
| 2640 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTG81 | 2/17/2001 CLC | 27534 | $19.01 | 48 | ######## | POS |
| 2640 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTM60 | 2/17/2001 CLC | 27534 | $19.01 | 48 | ######## | POS |
| 2640 | IBM | 4610 | TS4 | IBM THERMAL LASER | 1 | HTG72 | 2/17/2001 CLC | 27534 | $19.08 | 48 | ######## | POS |
| 2640 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 2640 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/12/2001 ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2640 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | 7N3L11 | 7/17/2002 CLC | 32835 | $181.37 | 36 | 7/31/2005 | Servers |
| 2640 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 7/17/2002 CLC | 32835 | $0.00 | 36 | 7/31/2005 | Personal Computers |
| 2640 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | 7YRB11 | 7/17/2002 CLC | 32835 | $68.44 | 36 | 7/31/2005 | Servers |

Source: Jaguar internal accounting records. Prepared by Management

Privileged and Confidential

Project Jaguar
Leased Equipment List

| Center | Mfg | Type | Model | Descript | Quantity | Serial # | Install Dt | Lessor | Lease # | Rent Amt | Lease Ter | Expire Dt | Category |
|--------|-----|------|-------|----------|----------|----------|-----------|--------|---------|----------|-----------|-----------|----------|
| 2718 | IBM | SAV2 | SFTW | IBM SAV2 | 1 | | 7/1/2001 | ICC | 2300? | $59.96 | 48 | 6/30/2005 | Software |
| 2718 | IBM | SAV2 | SVCS | SAV2 SER | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 2718 | DCC | 2500 | P3 | POWEREL | 1 | QWGJ11 | 6/17/2002 | CLC | 3216? | $181.37 | 36 | 6/30/2005 | Servers |
| 2718 | DCC | PV715N | 1U | DELL NAS | 1 | BWRB11 | 6/17/2002 | CLC | 32167 | $68.44 | 36 | 6/30/2005 | Servers |
| 2718 | DCC | E551 | 15MO | DELL E55? | 1 | | 6/17/2002 | CLC | 32167 | $0.00 | 36 | 6/30/2005 | Personal Computers |

Source: Jaguar internal accounting records   Prepared by management.

Privileged and Confidential

**EXHIBIT "H"**
**TO**
**ASSET PURCHASE AGREEMENT**

**Form of Inventory Certificate**

**INVENTORY CERTIFICATE**

Seller: Winn-Dixie _____, Inc., a Florida corporation
Buyer: _____
Store #: _____
Store Address:

| | Inventory Taken @ Retail | Valuation Percentage | Inventory @ Cost |
|---|---|---|---|
| Grocery (Food and Non-Food) Taken @ Retail[1] | $ | x 70.00% | $ |
| Frozen Food Taken @ Retail | $ | x 60.00% | $ |
| Dairy Taken @ Retail | $ | x 60.00% | $ |
| Tobacco Taken @ Retail | $ | x 80.00% | $ |
| Alcohol Taken @ Retail | $ | x 80.00% | $ |
| Meats Taken @ Retail | $ | x 55.00% | $ |
| Produce Taken @ Retail | $ | x 50.00% | $ |
| Seafood Taken @ Retail | $ | x 50.00% | $ |
| Floral Taken @ Retail | $ | x 40.00% | $ |
| Health and Beauty Care Taken @ Retail | $ | x 50.00% | $ |
| General Merchandise Taken @ Retail | $ | x 40.00% | $ |
| Greeting Cards Taken @ Retail | $ | x 25.00% | $ |
| Deli Taken @ Retail | $ | x 45.00% | $ |
| Bakery Taken @ Retail | $ | x 35.00% | $ |
| Total Inventory | | | $ |

_____   ___/___/___
   Seller's Authorized Agent        Date

_____   ___/___/___
   Buyer's Authorized Agent  Date

EXHIBIT "I"
TO
ASSET PURCHASE AGREEMENT

**Form of Declaration**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | Case No. 05-03817-3F1 |
| | | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

## DECLARATION OF [AFFIANT]

I, **[Affiant]**, state and declare as follows:

I am a _____ of _____ (the "Purchaser"). I am duly authorized to make this Declaration on behalf of the Purchaser. I make this Declaration based on my own personal knowledge and based on my knowledge and review of the business records of the Purchaser. If called as a witness, I could truthfully and competently testify to the matters stated in this Declaration.

I submit this Declaration in connection with the Purchaser's offer to purchase certain assets (the "Bid") from Winn-Dixie Stores, Inc. and its debtor affiliates (collectively, the "Debtors"). The assets subject to the Bid constitute the stores identified on the attached Exhibit A (including their inventory, equipment, and related assets), which presently are operated by the Debtors (collectively, the "Stores").

The Purchaser is not an affiliate of the Debtors. The Purchaser has at all times dealt at arm's length and in good faith with the Debtors, has no connection with any

insider of the Debtors, and has not received any material non-public information regarding the Stores from the Debtors or their advisors except through the due diligence process established by the Debtors and their advisors in these Chapter 11 cases.

The Purchaser is not a party to any agreement among potential bidders for the Debtors' assets to conspire to chill bidding for such assets and does not intend to enter into any such agreement.

The Bid identifies certain executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Purchaser (collectively, the "Assigned Contracts"). With respect to each of the Assigned Contracts, the Purchaser intends to perform and has the financial capability to perform its obligations under such Assigned Contract arising from and after the date on which such Assigned Contract is assigned to the Purchaser.

Attached as Exhibit B are true and correct copies of the following: (a) the Purchaser's balance sheet as of the end of the most recent fiscal quarter for which financial results are available; (b) the Purchaser's income statement for the four quarters ending on the date of such balance sheet. **[If the Purchaser is a newly-organized entity with no operational history, substitute this sentence: Attached as Exhibit B hereto are true and correct copies of the following: (a) the balance sheet as of the end of the most recent fiscal quarter for which financial results are available of the affiliate of Purchaser that will guarantee the Purchaser's obligations under the Assigned Contracts; (b) such affiliate's income statement for the four quarters ending on the date of such balance sheet.]** The financial statements in Exhibit B have been prepared in accordance with generally accepted

accounting principles and fairly and accurately represent the financial condition and operating results of the Purchaser for the time periods specified.

All of the business records of the Purchaser to which I have referred in this Declaration or in the preparation of this Declaration were made at or near the time of the event recorded, by or from information transmitted by a person with knowledge of the matters recorded in such records, and were made and kept in the course of the Purchaser's regularly conducted business activities.  It is the regular practice of the Purchaser to make such records.

The Purchaser consents to the Debtors' providing a copy of this Declaration, including exhibits, to any non-Debtor party to an Assigned Contract.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on _____, 2005, at **[City, State]**.


_____

**[Affiant]**

Exhibit "A"
to
Declaration

<u>Stores</u>

<u>Store No.</u>                    <u>Location</u>

**EXHIBIT "J"**
**TO**
**ASSET PURCHASE AGREEMENT**

**<u>Stores and Deposit Allocation</u>**

**[TO BE ATTACHED]**

**EXHIBIT "K"**
**TO**
**ASSET PURCHASE AGREEMENT**

**[reserved]**

EXHIBIT "L"
TO
ASSET PURCHASE AGREEMENT

**Form of Sale Order**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

ORDER APPROVING DEBTORS' (A) SALE OF ASSETS
FREE AND CLEAR OF LIENS, (B) ASSUMPTION AND
ASSIGNMENT OF LEASES AND (C) RELATED RELIEF

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 6004 and 6006 (a) authorizing the Debtors to sell those certain "Assets" as more specifically defined in that certain Asset Purchase Agreement ("APA") attached as Exhibit A related to those certain stores listed on attached Exhibit B ("Stores"), free and clear of liens, claims, interests and encumbrances to _____(the "Purchaser") or its designees (the "Third Party Purchasers") as identified at or before Closing (as defined in the APA), (b) determining that the sale is exempt from any stamp, transfer, recording or similar tax, (c) authorizing the Debtors to assume and assign all unexpired leases and executory contracts

identified in the APA in connection with the sale (collectively, the "Contracts and Leases"), (d) fixing cure amounts for the Contracts and Leases, and (e) granting related relief (the "Motion").  [The Court held a hearing on the Motion on _____, to determine any cure amounts for the Contracts and Leases (the "Cure Hearing").]  The Court held a hearing on the Motion on [_____], 2005 to approve the sale (the "Sale Hearing").  **Alternatives, depending on the circumstance:** [The Court has reviewed the Motion and heard the representations of counsel.  Upon the representations of counsel and without objection by the United States Trustee or any other interested party, the Court makes the following findings of fact:]  **or** [The Court has reviewed the Motion, considered the evidence and heard argument of counsel.  After due deliberation and good and sufficient cause existing, the Court makes the following findings of fact:]

      A.     This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

      B.     The Debtors solicited highest or otherwise best offer for the Assets in accordance with bidding procedures approved by the Court by order (Docket No. _____) dated June 16, 2005 (the "Bidding Procedures").  **Alternatives, depending on circumstance:**  [A competing bid was received for the Assets and the Debtors conducted an auction for the Assets on _____ (the "Auction").  At the Auction, _____ submitted the final bid of _____, representing the highest or otherwise best offer received for the Assets.] **or** [No competing bid was received and the Debtors believe the

purchase price provided in the APA for the Assets which was attached to the Sale Motion represents the highest or otherwise best offer for the Assets].

      C.    The Debtors have provided interested parties (including all parties asserting claims or interests in the Assets, if any) with proper notice of the Motion, the Sale Hearing,[4] the Auction, the assumption and assignment of the Contracts and Leases, and the fixing of any cure amounts, in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365, Fed. R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order and the Bidding Procedures Order. Notice of the Sale Hearing has been provided to all employees of the Debtors' stores which comprise the Assets. The notice identified herein is due, proper and sufficient notice to provide affected parties adequate opportunity to determine that their rights are to be affected and afforded such parties an opportunity to object to the sale of the Assets at the Sale Hearing.

      D.    The Debtors marketed the Assets and conducted the sale process in compliance with the Bidding Procedures Order, the Bidding Procedures, the Bankruptcy Code and all other orders entered in these cases. Bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner. The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets. In their sound business judgment, the Debtors determined that: **alternatives depending on the circumstance:** [the purchase price provided in the APA attached to the Sale Motion was the highest or otherwise best offer] **or** [the bid submitted by the Purchaser at the Auction represented the highest or otherwise best offer] for the Assets.

E.    The Debtors (i) have full corporate power and authority to execute and consummate the APA attached as Exhibit A, and all related documents, and the sale of the Assets and assumption and assignment of the Contracts and Leases has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the APA, are required to consummate the transactions contemplated by the APA.

F.    The Debtors have the ability to convey the Assets to Purchaser and, as applicable, Third Party Purchasers on the terms and conditions of this Order and the APA.

G.    The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

H.    Neither the Purchaser, any of its affiliates, the Third Party Purchasers nor their affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

I.    The Debtors and the Purchaser, and applicable Third Party Purchasers proposed, negotiated and entered into the APA, without collusion, in good faith and at arms'-length bargaining positions. Neither the Debtors, the Purchaser, nor the Third Party Purchasers have engaged in any conduct that would cause or permit the APA to be avoided under 11 U.S.C. § 363(n).

J.    The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

K.    The consideration the Purchaser gave the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value.

L.    The Debtors' sale of the Assets and the assumption and assignment of the Contracts and Leases will facilitate the formulation and confirmation of a plan of reorganization.  For this reason, the sale of the Assets and the assumption and assignment of the Contracts and Leases constitute transfers to which 11 U.S.C. § 1146(c) applies.

M.    The Debtors' transfer of the Assets to the Purchaser or Third Party Purchaser, as applicable, pursuant to the APA will be a legal, valid, and effective transfer of the Assets.  The Debtors' transfer of the Assets and the Contracts and Leases to the Purchaser or Third Party Purchaser, as applicable, indefeasibly vests the Purchaser or Third Party Purchaser, as applicable, with good and valid title in and to the Assets free and clear of any Claims (as defined below) except the Permitted Encumbrances and the Assumed Liabilities (as such terms are defined in the APA), if any, as defined in the APA.  Any Claim that is not one of the Permitted Encumbrance or Assumed Liabilities, in or against the Debtors, their insiders, the Assets, or the Contracts and Leases will attach to the net proceeds of the sale with the same effect, validity, enforceability and priority of such Claims, if any, as such Claims had against the Assets or Contracts and Leases prior to the sale contemplated hereby, subject to any rights, claims, defenses and objections of the Debtors and all interested parties with respect to such Claims.

N.     The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the APA free and clear of all Claims (except the Permitted Encumbrances and the Assumed Liabilities) because any entity with any Claims in the Assets to be transferred (i) has consented to the sale (including the assumption and assignment of the Contracts and Leases) or is deemed to have consented to the sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claims; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Claims, if any, who did not object, or who withdrew their objections to the Sale Motion are deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2).

O.     The Debtors will cause the proceeds from the sale to be paid in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

P.    The Debtors' assumption and assignment of the Contracts and Leases in connection with the sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

Q.    The Debtors have provided the counter-party to the Contracts and Leases with adequate assurance that they will promptly cure any defaults under the Contracts and Leases pursuant to 11 U.S.C. §§ 365(b)(1).

R.    Pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006, the amounts set forth on Exhibit C, if any, constitute all amounts due and owing under the Contracts and Leases and will be fixed and allowed for the Contracts and Leases (the "Cure Amount").   No other amounts are due and owing by the Debtors under the Contracts and Leases.   The Debtors will pay the Cure Amount, if any, in accordance with the terms and provisions of the APA.   Upon payment of the Cure Amount, all defaults, if any, under the Contracts and Leases will be deemed cured.

S.    The Purchaser or Third Party Purchaser, as applicable, has provided the counter-party to each of the Contracts and Leases with adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B).

T.    No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under the Contracts and Leases.

U.    Except as expressly set forth in the APA, the Purchaser and any Third Party Purchaser will have no responsibility for any liability, claim or other obligation of or against the Debtors related to the Assets or the Contracts and Leases by virtue of the transfer of the Assets and the assumption and assignment of the

Contracts and Leases to the Purchaser. The Purchaser and applicable Third Party Purchaser will not be deemed, as a result of any action taken in connection with the purchase of the Assets or the assumption and assignment of the Contracts and Leases to (i) be a successor to the Debtors (other than with respect to the Assumed Liabilities and any obligations arising under the assigned Contracts and Leases from and after the Closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors. Neither the Purchaser nor any Third Party Purchaser is acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the APA or in any of the assigned Contracts and Leases.

V.     A sale on the terms and conditions of the APA, including without limitation, entry of an order providing a sale free and clear of Claims and providing that the Purchaser and any applicable Third Party Purchaser are not successors of the Debtors, is consistent with the Bankruptcy Code and promotes the policies of the Bankruptcy Code to maximize value. Absent such finding, the Purchaser and/or Third Party Purchasers would be unwilling to pay the price for the Assets and Contracts and Leases as provided for in the APA.

W.     The Court's approval of the APA is in the best interests of the Debtors, their estates and their creditors.

X.     Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.     The Motion is granted.

2.     All objections to the entry of this order or to the relief granted and requested in the Motion, including any objection to the proposed Cure Amount, that has

not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

3.     The APA is approved in all respects.  Pursuant to 11 U.S.C. §§ 105(a) and 363(b), the Debtors are authorized and directed (subject to applicable Closing conditions set forth in the APA), to consummate the sale approved herein, including transferring and conveying the Assets to the Purchaser or Third Party Purchaser, as applicable, pursuant to and in accordance with the terms and conditions of the APA.

4.     Upon Closing, the Debtors are authorized and directed, in accordance with 11 U.S.C. §§ 105(a), 363 and 365, to assume and assign the Contracts and Leases to Purchaser or Third Party Purchaser, as applicable.

5.     The Debtors have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2).

6.     The Contracts and Leases will be assumed and assigned to the Purchaser or Third Party Purchaser, as applicable, in accordance with their respective terms.  The assigned Contracts and Leases will remain in full force and effect notwithstanding any provision in any such Contracts and Leases to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1)) which prohibit, restrict or condition such assignment or transfer).  The DIP Lender and all non-debtor parties to the Leases are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the APA.

7.     Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized, directed and empowered to consummate and implement fully the APA, together with all

additional instruments and documents that may be necessary to implement the APA. The Debtors are authorized and directed to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Assets and the Contracts and Leases to Purchaser or, as applicable, a Third Party Purchaser.

8.    Any agreements, documents, or other instruments executed in connection with the APA may be modified, amended, or supplemented by the parties in accordance with the terms of the APA without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.    The Debtors will transfer the Assets to the Purchaser or applicable Third Party Purchaser upon Closing of the sale free and clear of all Claims pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances and Assumed Liabilities). All non-assumed Claims, if any, will attach to the proceeds of the sale, with the same validity, enforceability, priority, force and effect they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors and all interested parties with respect to such Claims and Interests.

10.    The Debtors will cause the proceeds from the sale to be paid in accordance with the terms of the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

11.    The Debtors' transfer of the Assets pursuant to the terms of the APA is a transfer pursuant to 11 U.S.C. § 1146(c). Accordingly, the making, delivery, filing or recording of any deeds, assignments or other transfer documents in connection

with the sale (the "Transfer Instruments"), will not be taxed under any law imposing a recording tax, stamp tax, transfer tax or similar tax (including without limitation, any transfer or recordation tax applicable to deeds and/or security interests). All filing and recording officers are directed to accept for filing or recording, and to file or record the Transfer Instruments immediately upon presentation without payment of any such taxes.

12.    The Purchaser or applicable Third Party Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and applicable non-bankruptcy law. For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

13.    The Cure Amount for the Contracts and Leases is fixed in the respective amounts set forth on Exhibit C. All defaults, claims or other obligations of the Debtors arising or accruing under each of the Contracts and Leases, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be cured by the Debtors in accordance with the APA, by paying the Cure Amount. No other or further monetary amounts or obligations are due or existing under the Contracts and Leases by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise. The Debtors will pay any Cure Amount in accordance with the terms and provisions set forth in Exhibit C.

14.    Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Contracts and Leases to the Purchaser or applicable Third Party Purchaser, (a) the Debtors and their estates are relieved from any and all liability for any breach of the Contracts and Leases occurring after assignment to the Purchaser or applicable Third

Party Purchaser, and (b) the Purchaser or applicable Third Party Purchaser is responsible for any and all claims and obligations under the Contracts and Leases occurring or arising after the assignment. The Purchaser shall not be responsible for such Contracts and Leases assigned to a Third Party Purchaser, nor shall a Third Party Purchaser be responsible for such Contracts and Leases assigned to Purchaser or another Third Party Purchaser.

15.    Subject to the terms of this Order, the APA, the Purchaser or Third Party Purchaser, as applicable, assumes all rights and obligations of the Debtors under the Contracts and Leases.

16.    All non-Debtor parties to the Contracts and Leases are forever enjoined and estopped from contesting the Cure Amounts and from asserting any default against the Purchaser or applicable Third Party Purchaser which existed as of the date of the Sale Hearing.

17.    Upon the Debtors assignment of the Contracts and Leases to the Purchaser or applicable Third Party Purchaser, no default will exist under the Contracts and Leases. Upon entry of this Order and the assumption and assignment of the Contracts and Leases, the Purchaser or Third Party Purchaser, as applicable, is deemed to be in compliance with all terms and provisions of the Contracts and Leases.

18.    All entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors. Prior to or upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims in the Assets (except for the Permitted

Encumbrances and Assumed Liabilities), if any.   In the event any creditor fails to release its Claims in the Assets, the Debtors and the Purchaser are each authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other documents on such creditor's behalf.  The Purchaser or applicable Third Party Purchaser is also authorized to file, register or otherwise record a certified copy of this Order.   Once this Order is so filed, registered or otherwise recorded, the Order constitutes conclusive evidence of the release of all Claims against the Assets as of the Closing (except for the Assumed Liabilities).

19.    The Purchaser and Third Party Purchasers acted in good faith in purchasing the Assets and Contracts and Leases under APA as that term is used in 11 U.S.C § 363(m).   For that reason, any reversal or modification of the Order on appeal will not affect the validity of the sale to the Purchaser or applicable Third Party Purchaser, unless such authorization is duly stayed pending such appeal.

20.    The Debtors' transfer of the Assets to Purchaser or applicable Third Party Purchaser and performance under the Contracts and Leases will not result in (a) the Purchaser having any liability for any Claim (except for the Permitted Encumbrances or Assumed Liabilities) against the Debtors or against an insider of the Debtors or (b) the Purchaser or applicable Third Party Purchaser having any liability to the Debtors except as expressly stated in the APA and this Order.

21.    The Purchaser (and its affiliates, successors or assigns) and the Third Party Purchasers (and their respective affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets,

including, the Contracts and Leases (other than the Permitted Encumbrances and the Assumed Liabilities as set forth in the APA).

22.     Except as to the Assumed Liabilities as more fully set forth in the APA, the transfer of the Assets to, and the assumption of the Contracts and Leases by, Purchaser or Third Party Purchaser, as applicable, on the Closing Date shall be free and clear of any and all liens, encumbrances, claims, charges, defenses, off-sets, recoupments and interests thereon and there against of whatever type or description, including, without limitation, restrictions on or conditions to transfer or assignment, liens, mortgages, security interests, pledges, hypothecations, control agreements, equities and other claims and interests (all such claims and interests described in this paragraph shall hereafter be referred to as the "Claim" or "Claims"), having arisen, existed or accrued prior to and through the Closing Date, whether direct or indirect, monetary or non-monetary, arising at law or in equity, contract or tort, absolute or contingent, matured or unmatured, voluntary or involuntary, liquidated or unliquidated, of, by or against Debtors, insiders of the Debtors, the Assets or the Contracts and Leases and further including, without limitation, the following:

a.     Claims arising through the Closing Date (as defined in the APA), if any, of any governmental unit for taxes; any Claim arising through the Closing Date relating to any executory contract or lease (whether of personal or real property, or otherwise) affecting or in any way related to the Assets, without limitation, Claims of Debtors' vendors, suppliers and/or customers arising from Debtors' failure to perform its obligations to said parties whether such failure occurred prior to or on the Closing Date or whether such failure arose as a result of a Purchaser's or Third Party Purchaser's election or before the Closing Date not to accept and/or perform such vendors', suppliers' or customers' account and/or orders subsequent to the Closing Date;

b.     Any Claim arising through the Closing Date relating to work performed by any contractor or materialman that would give rise to a mechanic's lien, or similar Claim, against the Assets;

c.     Any Claim arising through the Closing Date for attorney's fees or other

costs or expenses claimed by lessors, lessees, licensees or any other non-debtor parties to executory contracts or any lease;

d.    Any Claim arising through the Closing Date based on acts or omissions of the Debtors arising in tort, contract or otherwise, including, without limitation, Claims for successor liability; and

e.    Any Claim arising through the Closing Date relating to liability arising under federal, state or local revenue, tax, products liability, labor, employment, worker compensation or environmental laws, rules or regulations or with respect to Debtor's liability as distributor or a retailer.

f.    Any claim by any person or entity relating to any health or welfare benefit for the benefit of any current or former employee of Debtors or their dependents or beneficiaries.

**In addition, Purchaser and its affiliates, successors or assigns or their respective properties (including the Assets), and the Third Party Purchasers, as applicable, or their respective affiliates, successors or assigns or their respective properties (including the Assets) shall not be liable, by operation of law or otherwise, for any Claim by virtue of Purchaser's or Third Party Purchaser's purchase or subsequent operation of the Assets or performance of the Contracts and Leases including, without limitation, claims of the type set forth in subparagraphs (a)-(f) hereinabove.**

23.    Neither the purchase of the Assets by Purchaser or applicable Third Party Purchaser, nor the subsequent operation of the Assets as grocery stores by Purchaser or applicable Third Party Purchaser shall cause Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), or the Third Party Purchasers, as applicable, or their respective affiliates, successors or assigns or their respective properties (including the Assets) to be deemed a successor in any respect of the Debtors' business within the meaning of any laws, rules or regulations relating to any tax, revenue, pension, benefit, ERISA, environmental, labor,

employment, products liability or other law, rule or regulation of any federal, state or local government.

24.    Upon closing, this Order constitutes a full and complete general assignment, conveyance and transfer of the Assets and the Contracts and Leases and/or a deed or a bill of sale transferring good and marketable title in the Assets to Purchaser or Third Party Purchasers as applicable on the Closing Date free and clear of all Claims except for Permitted Encumbrances and Assumed Liabilities. Each and every federal, state, and local governmental agency or department is directed to accept this Order as such an assignment, deed and/or bill of sale or any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA. If necessary, this Order shall be accepted for recordation on or after the Closing Date as conclusive evidence of the free and clear, unencumbered transfer of title to the Assets to Purchaser or applicable Ultimate Purchaser.

25.    This Order is effective as a determination that any and all Claims (except for the Permitted Encumbrances and Assumed Liabilities), if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets and Contracts and Leases.

26.    This Order is binding upon all entities that may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Assets.

27.    This Court retains exclusive jurisdiction to (a) enforce and implement the APA and any other agreements and instruments executed in connection with the APA, (b) compel delivery of possession of the Assets to Purchaser, (c) resolve

any disputes, controversies or claims arising out of or relating to the APA, and (d) interpret, implement and enforce the provisions of this Order.

28.    The terms and provisions of the APA and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser and its respective affiliates, successors and assigns, the Third Party Purchasers, as applicable, and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

29.    All persons who hold Claims against the Debtors, insiders of the Debtors, or the Assets are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, any applicable Third Party Purchasers, and their respective affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the sale.

30.    After the Closing Date, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser, any of its affiliates, Third Party Purchasers, or any of their respective affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Claims or (ii) for any period commencing before and concluding prior to or on the Closing Date or any pre-Closing portion of any period

commencing before the Closing Date and concluding after the Closing, or (iii) assessed prior to and payable after the Closing Date, except as otherwise provided in the APA. For purposes of this paragraph, any employee terminated as of the Closing Date will deemed to have been terminated prior to the Closing Date and any claims related to such termination, if any, are Claims against the Debtors and their respective estates. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the APA.

31.    The Debtors are authorized and directed to take such actions as are necessary and appropriate to terminate the employment by the Debtors of those employees affected by the sale.

32.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the APA and this Order, the provisions contained in the APA will control.

33.    Notwithstanding Fed. R. Bankr. P. 6004(g) and 6006(d), this Order will take effect immediately upon entry.

34.    To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

35.    Debtors are directed to serve on or before the Closing Date a full and complete copy of this Order by First Class U.S. Mail upon all employees of any Store comprising the Assets.  Debtors are further authorized and directed to post on or before the Closing Date a full and complete copy of this Order on any employee bulletin

board or like display area where employee notices are regularly displayed in each of the Stores comprising the Assets.  Debtors shall and promptly file a written certification of compliance with this provision.

## SPECIAL NOTICE TO EMPLOYEES OF THE STORES SUBJECT TO THIS

## SALE

Unless you have been notified by the Debtors otherwise, on the Closing Date your employment with the Debtors will be terminated. While it is the Debtors' belief that the Purchaser or Third Party Purchaser, as applicable, will extend offers of employment to a substantial number of the employees at each store, the Purchaser or Third Party Purchaser is under no obligation to do so. If you are subsequently hired by Purchaser or Third Party Purchaser, as applicable, your employment date will commence upon the Closing Date of the sale or on such other date as you and the Purchaser or Third Party Purchaser, as applicable, may agree. Pursuant to this Order, any claims you may have arising from or relating to your employment relationship through and including your termination are claims against the Debtors. The Purchaser or Third Party Purchaser, as applicable, is not a successor employer, and unless the Purchaser or Third Party Purchaser elects to hire you as of the Closing Date or thereafter, neither the Purchaser nor Third Party Purchaser shall be deemed to be your employer for purposes of any labor or employment law. Employees who are not hired by Purchaser or a Third Party Purchaser, as applicable, should contact the Debtors' Human Resources Department to obtain information regarding employee benefits, if any, including COBRA.

Dated this _____ day of July, 2005 in Jacksonville, Florida.


_____

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to
serve a copy of this Order on all
parties who received copies of the
Motion.

**EXHIBIT "M"**
**TO**
**ASSET PURCHASE AGREEMENT**

**<u>Disclosure Schedule</u>**

[To Be Provided by Seller]

**EXHIBIT "N"**
**TO**
**ASSET PURCHASE AGREEMENT**

**List of Known Roof Warranties and Guaranties**

[To Be Provided by Seller]

**EXHIBIT "O"**
**TO**
**ASSET PURCHASE AGREEMENT**

**[Reserved]**

**EXHIBIT "P"**
**TO**
**ASSET PURCHASE AGREEMENT**

**Form of Landlord Estoppel Certificate**

WINN-DIXIE STORE #

Date: _____, 2005

Mr. Paul Novak
Winn-Dixie _____, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254

_____
_____
_____

RE:    Store #_____, _____, _____, _____
         (the "Premises")

Gentlemen:

        The undersigned landlord or lessor ("Landlord") is requested to execute this Certificate as an inducement for the addressees above to enter into an Assignment and Assumption of Lease regarding the referenced Premises (the "Assignment"). This is to confirm that Winn-Dixie _____, Inc., a Florida corporation ("Assignor") may assign its interests under the Lease to _____, a _____ ("Assignee"). The undersigned acknowledges that Assignee's willingness to enter into the Assignment is based, in part, on the reliance by Assignee on the truth and accuracy of the statements made herein and Landlord understands and agrees that Assignor and Assignee will and shall be entitled to rely upon this Certificate for such purposes. As of the date of this Certificate, Landlord hereby represents, warrants and certifies to Assignor and Assignee as follows:

        1.    Lease and Tenant. Landlord is the present landlord or lessor and Assignor is the present tenant under that certain lease, as modified or amended, as more particularly described on attached Exhibit A, a short form of which is recorded in Book _____, page _____ of _____ County, _____ public records (the "Lease"). The Lease is in full force and effect and has not, except as specifically stated in Exhibit A, been modified or amended in any manner whatsoever, and constitutes the entire agreement between the parties with respect to the Premises. Any capitalized

terms which are not otherwise defined herein shall have the meaning set forth in the Lease.

2.    <u>Premises</u>.  The Premises described in the Lease contains approximately _____ square feet, and is located in and upon the land legally described on Exhibit B (the "Land").  The Land is currently owned by and held in the name of Landlord.

3.    <u>Term</u>.  The Term of the Lease commenced on _____, _____, and expires on _____.  Tenant has the right to extend the term of the Lease for _____ (____) _____ option periods, each for _____ (___) years, by giving Landlord written notice of the exercise of any option to extend at least _____ (___) days prior to the expiration of the current term or option period.

4.    <u>Rent</u>.  The current base Rent under the Lease is $_____, payable [payment period]; the current [period] common area maintenance fees are $_____ payable [payment period], the aggregate amount paid by Tenant for common area maintenance for 2004 was $_____, the aggregate amount paid by Tenant for utilities for 2004 was $_____, and the current [period] sales tax on Rent is $_____ _____ payable [payment period].  Insurance premiums and real estate Insurance premiums and real estate taxes are payable annually in arrears at the end of each calendar year.  Percentage Rent, if any, under the Lease is payable based on the following formula: the amount, if any, by which _____ percent (_____%) of Tenant's gross sales made from the premises in each fiscal year of Tenant during the term of the Lease exceeds the minimum guaranteed annual rental.  Insurance premiums and real property taxes for 2004 were $_____ and S_____, respectively.  The estimated amount for the real estate taxes to be paid by Tenant for 2005 is $_____.  As of the date of this Certificate, Monthly Rent and all other amounts due and payable by Assignor to Landlord under the Lease are paid in full through _____, and no other amounts are due and payable to Landlord under the Lease, except as follows: _____ _____.  The next occurring rent payment is due on _____, _____.

5.    <u>Deposit</u>.  If applicable, Landlord currently holds a security deposit in the amount of $_____, as security for the payment and performance of Assignor's obligations under the Lease.

6.    <u>Default by Assignor</u>.  Landlord has no actual knowledge of: (a) any default by Assignor under any of the terms, covenants or conditions of the Lease on the part of Assignor to be observed or performed, (b) any event which has occurred and which with the passage of time or the giving of notice, or both, would constitute a default by Assignor under the Lease or would permit termination, modification or acceleration under the Lease, and (c) any construction-related obligation under the Lease that required either the performance or payment of money which Assignor failed to fulfill.

7.    Default by Landlord. Landlord has: (a) performed all obligations required to be performed by Landlord under the Lease, (b) committed no default, which remains uncured under any of the terms, covenants or conditions of the Lease on the part of Landlord to be observed or performed, and (c) no knowledge of any event which has occurred and which with the passage of time or the giving of notice, or both, would constitute a default by Landlord under the Lease.

8.    Right of First Refusal. Assignor does not have an option or right of first refusal    to    purchase    the    Premises    or    the    Land,    except    as    follows: _____.

9.    No Assignment. Landlord has not assigned, whether outright or by collateral assignment, all or any portion of its rights under the Lease, except as follows (please include the name, address and, if known, contact person for any such assignee): _____.

10.    Notices. Tenant should send rent payments and any other monetary obligations under the Lease to the following party at the following address (which is the current    address    used    to    send    rent    payments): _____. All notices from    Tenant    to    Landlord    should    be    sent    to    the    following    address: _____.

11.    No Action. Landlord has not commenced, and has no actual knowledge that Assignor has commenced, any action or has given or received any notice for the purpose of terminating the Lease.

12.    No Condemnation Notice. Landlord has not received any notice of any condemnation proceeding or eminent domain proceeding affecting the premises subject to the Lease or the shopping center in which such premises are located.

13.    Consent. To the extent that Landlord's consent is required under the Lease, Landlord hereby consents to the assignment of Assignor's interest in the Lease by Assignor to Assignee, and agrees that the execution of the Assignment by Assignor and Assignee will not constitute a default under the Lease.

14.    Miscellaneous. This Certificate shall be binding upon Landlord and inure to the benefit of the Assignor and Assignee hereto and their respective heirs, representatives, successors, and assigns. This Certificate is made and entered into under, and shall be construed according to the laws of the State in which the Premises is located. This Certificate may not be amended except by a written instrument signed by the Landlord, Assignor and Assignee.

**[Signatures on following page]**

Signed, Sealed and Delivered
in the presence of:

**"LANDLORD"**

_____

_____
Name:_____

By: _____
Name: _____
Its: _____

Address:

_____
Name:_____

_____
_____
Attn: _____
Fax No.: _____
Phone No.: _____

STATE OF _____
COUNTY OF _____

This instrument was acknowledged before me on this _____ day of _____
_____, 2005, by _____, the _____
of _____, a_____ _____, on behalf of
the _____. He/she either is [   ] personally known to me, or [   ] has provided
a _____driver's license as identification.

_____
Print Name:_____
Notary Public, State of _____
My Commission No.:_____
My Commission Expires:_____

Exhibit A
to
<u>Landlord Estoppel Certificate</u>

<u>Description of Lease and Amendments</u>

WINN-DIXIE STORE #_____
_____,_____, _____

Lease dated as of _____, between _____
_____, as landlord and _____, as tenant;

As evidenced by Memorandum of Lease (Short Form Lease) dated _____
recorded in Book _____, page _____, of the public records of _____
_____, County, _____;

As amended by First Amendment to lease dated _____; and

Exhibit B
to
<u>Landlord Estoppel Certificate</u>


<u>Legal Description of Land</u>

**EXHIBIT "Q"**
**TO**
**ASSET PURCHASE AGREEMENT**

**[Reserved]**

**EXHIBIT "R"**
**TO**
**ASSET PURCHASE AGREEMENT**

**[Reserved]**

**EXHIBIT "S"**
**TO**
**ASSET PURCHASE AGREEMENT**

**[Reserved]**

**EXHIBIT "T"**
**TO**
**ASSET PURCHASE AGREEMENT**

**<u>[Reserved]</u>**

**EXHIBIT "U"**
**TO**
**ASSET PURCHASE AGREEMENT**

**Form of Insurer Notification Letter**



_____, 2005

[Name and Address of Insurer]

RE:   Winn-Dixie Store #____ - Transfer of Ownership of the Pharmacy, located at
_____

Dear Sir/Madam:

Please be advised that **Winn-Dixie _____, Inc.,** will be transferring ownership
of the pharmacy located at _____, to _____, a _____ corporation.
The approximate date of the transfer and acquisition is _____, 2005.

[New owner will continue to use the same NCPDP number _____, until further
notification.]

Sincerely,

Name: _____
Vice President
Winn-Dixie _____, Inc.

**EXHIBIT "V"**
**TO**
**ASSET PURCHASE AGREEMENT**

**[Reserved]**

**EXHIBIT "W"**
**TO**
**ASSET PURCHASE AGREEMENT**

**[Reserved]**

**EXHIBIT "X"**
**TO**
**ASSET PURCHASE AGREEMENT**

**[Reserved]**

EXHIBIT "Y"
TO
ASSET PURCHASE AGREEMENT

**Form of Lease Assignment**

## ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT

This Assignment and Assumption of Lease Agreement ("Assignment") is made and entered into as of this _____ day of _____, 2005 ("Effective Date"), by and among **WINN-DIXIE** _____, **INC.**, a Florida corporation and **WINN-DIXIE STORES, INC.**, a Florida corporation (collectively, "Assignor"), with an address of 5050 Edgewood Court, Jacksonville, Florida 32254-3699, and _____, a _____ ("Assignee"), with an address of _____, with reference to the following:

## RECITALS:

A.    Assignor is the current tenant under that certain lease described on Exhibit A attached hereto and incorporated herein by reference, as amended (collectively, as amended, modified or supplemented, the "Lease").

B.    The Lease affects certain premises more particularly described therein (the premises which is the subject of the Lease is hereinafter called the "Premises"; the real estate of which the Premises is a part is hereinafter called the "Property").

C.    Assignor, Associated Wholesale Grocers, Inc., a Kansas corporation ("AWG") and Alex Lee, Inc., a North Carolina corporation ("Alex Lee"; collectively with AWG, "Buyer"), entered into that certain Asset Purchase Agreement dated _____, 2005 ("APA"). All capitalized terms not expressly defined in this Assignment will have the meanings assigned to such terms in the APA.

D.    The APA provides that Assignor shall sell, transfer, assign, convey and deliver to Buyer or Buyer's designee certain assets of Assignor, including, without limitation, certain leased real property as specified in the APA.

E.    AWG has designated Assignor, as Buyer's designee, to acquire the interests of Assignor in and to the Lease, the Premises, and the Property.

F.    An order, In re: Winn-Dixie Stores, Inc., et al., has been entered by the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, Case No. 05-03817-3F1 on _____, 2005 (the "Order") approving the transactions contemplated by the APA.

G.    In connection with the transactions contemplated by the APA and the Order, the applicable Assignor desires to sell, assign, transfer, convey and deliver to

Assignee, and Assignee desires to accept an assignment from the applicable Assignor, all of the applicable Assignor's right, title and interest in and to the Lease, the Premises and the Property upon and subject to the terms and conditions hereinafter set forth.

**NOW THEREFORE**, in consideration of the premises and of the mutual covenants and agreements set forth herein, in the APA and in the Order, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

1.    Assignment.  Assignor hereby sells, assigns, sets over, transfers and delivers to Assignee, its successors and assigns, (i) all of Assignor's right, title and interest in and to the Lease, the Premises, the Property, and (ii) other than Excluded Personal Property (as defined in the APA), all incidental and appurtenant rights in connection with the Lease, the Premises and the Property.  Assignor hereby agrees that it will remain, and will be, responsible for all liabilities and obligations of the tenant that have accrued under the Lease prior to the Effective Date, and Assignor hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignee from and against all liabilities and obligations of the tenant that have accrued under the Lease prior to the Effective Date.

2.    Assumption.  Assignee hereby accepts the assignment pursuant to paragraph 1, above, and assumes each and every obligation of Assignor which is to be performed from and after the Effective Date as tenant under the Lease and holder of any of the rights and interests transferred in paragraph 1, above.  Assignee further agrees to pay, perform and observe all of such obligations arising on and after the Effective Date and Assignee hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignor from and against all liabilities and obligations of the tenant that accrue under the Lease on or after the Effective Date.

3.    Terms of APA.  This Assignment is executed pursuant to the APA and is entitled to the benefits of and subject to the provisions of the APA and the Order.

4.    Binding Effect.  This Assignment shall inure to the benefit of Assignee and its successors and assigns, and shall be binding upon Assignor, Assignee and each of their respective successors and assigns.

5.    Governing Law.  This Assignment shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the laws of the state in which the Property is located.

6.    Amendment.  This Assignment may not be amended, modified or supplemented except by a document signed by all parties hereto.

7.    Headings.  The headings of the sections of this Assignment are for the convenience of the parties and do not form a part hereof and in no way modify, interpret or construe the meanings of the parties.

8.    <u>Counterparts</u>.    This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument.

**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the day and year first written above.

**ASSIGNOR:**

**WINN-DIXIE _____, INC.,**
a Florida corporation

By:     _____
Name:_____
Title:   _____


**WINN-DIXIE STORES, INC.,**
a Florida corporation


By:     _____
Name:_____
Title:   _____


**ASSIGNEE**:


_____,
a _____

By:     _____
Name:_____
Title:   _____


**[STATE APPROPRIATE ACKNOWLEDGMENT BLOCKS TO BE INSERTED]**

Exhibit A
to
<u>Assignment and Assumption of Lease Agreement</u>

[Lease Description]

**EXHIBIT "Z"**
**TO**
**ASSET PURCHASE AGREEMENT**

**[Reserved]**

EXHIBIT "AA"
TO
ASSET PURCHASE AGREEMENT

## Form of Sublease Assignment

## ASSIGNMENT AND ASSUMPTION OF SUBLEASE AGREEMENT

This Assignment and Assumption of Sublease Agreement ("Assignment") is made and entered into as of this _____ day of _____, 2005 ("Effective Date"), by and among **WINN-DIXIE** _____, **INC.**, a Florida corporation and **WINN-DIXIE STORES, INC.**, a Florida corporation (collectively, "Assignor"), with an address of 5050 Edgewood Court, Jacksonville, FL 32254-3699, and _____, a _____ ("Assignee"), with an address of _____, with reference to the following:

## RECITALS:

H.    Assignor is the current sublandlord under that certain sublease described on Exhibit A attached hereto and incorporated herein by reference, as amended (collectively, as amended, modified or supplemented, the "Sublease").

I.    The Sublease affects certain premises more particularly described therein (the premises which is the subject of the Sublease is hereinafter called the "Subleased Premises").

J.    Assignor, Associated Wholesale Grocers, Inc., a Kansas corporation ("AWG") and Alex Lee, Inc., a North Carolina corporation ("Alex Lee"; collectively with AWG, "Buyer"), entered into that certain Asset Purchase Agreement dated _____, 2005 ("APA"). All capitalized terms not expressly defined herein shall have the meaning given to them in the APA.

K.    The APA provides that Assignor shall sell, transfer, assign, convey and deliver to Buyer or Buyer's designee certain assets of Assignor, including, without limitation, certain subleases affecting real property as specified in the APA.

L.    An order, In re: Winn-Dixie Stores, Inc., et al., has been entered by the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, Case No. 05-03817-3F1 on _____, 2005 (the "Order") approving the transactions contemplated by the APA.

M.    In connection with the transactions contemplated by the APA and the Order, the applicable Assignor desires to sell, assign, transfer, convey and deliver to Assignee, and Assignee desires to accept an assignment from the applicable Assignor,

all of the applicable Assignor's right, title and interest in and to the Sublease upon and subject to the terms and conditions hereinafter set forth.

**NOW THEREFORE**, in consideration of the premises and of the mutual covenants and agreements set forth herein, in the APA and in the Order, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

1.    Assignment.   Assignor hereby assigns, transfers. and conveys unto Assignee all of Assignor's right, title, interest and obligation as sublandlord in and to the Sublease and all of the rights, benefits and privileges of the sublandlord thereunder. Assignor hereby agrees that it will remain, and will be, responsible for all liabilities and obligations of the sublandlord that have accrued under the Sublease prior to the Effective Date, and Assignor hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignee from and against all liabilities and obligations of the sublandlord that have accrued under the Sublease prior to the Effective Date.

2.    Assumption.   Assignee hereby accepts the aforesaid assignment and assumes and agrees to pay and perform all liabilities and obligations of the sublandlord that accrue under the Sublease from and after the Effective Date, and Assignee hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignor from and against all liabilities and obligations of the sublandlord that accrue under the Sublease on or after the Effective Date.

3.    Terms of APA.   This Agreement is executed pursuant to the APA and is entitled to the benefits of and subject to the provisions of the APA and the Order.

4.    Binding Effect.   This Agreement shall inure to the benefit of Assignee and its successors and assigns, and shall be binding upon Assignor, Assignee and each of their respective successors and assigns.

5.    Governing Law.   This Agreement shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the laws of the state in which the Property is located.

6.    Amendment.   This Agreement may not be amended, modified or supplemented except by a document signed by all parties hereto

7.    Headings.   The headings of the sections of this Agreement are for the convenience of the parties and do not form a part hereof and in no way modify, interpret or construe the meanings of the parties.

8.    Counterparts.   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument.

**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first written above.

ASSIGNOR:

**WINN-DIXIE _____, INC.,**
a Florida corporation

By: _____
Name: _____
Title: _____


**WINN-DIXIE STORES, INC.,**
a Florida corporation

By: _____
Name: _____
Title: _____


ASSIGNEE:

_____,

a _____

By: _____
Name: _____
Title: _____


**[STATE APPROPRIATE ACKNOWLEDGMENT BLOCKS TO BE INSERTED]**

**Exhibit "A"**
**to**
**<u>Assignment and Assumption of Sublease</u>**
**<u>Agreement</u>**


**[Sublease Description]**

EXHIBIT "BB"
TO
ASSET PURCHASE AGREEMENT

**Form of Warranties and Guaranties Assignment**

## ASSIGNMENT AND ASSUMPTION OF WARRANTIES AND GUARANTIES

**THIS ASSIGNMENT AND ASSUMPTION OF WARRANTIES AND GUARANTIES** ("Assignment") is made this _____ day of _____, 2005 by and among **WINN-DIXIE _____, INC.**, a Florida corporation and **WINN-DIXIE STORES, INC.**, a Florida corporation, (collectively, "Assignor") and _____, a _____ ("Assignee").

### R E C I T A L S :

A.     Assignor, Associated Wholesale Grocers, Inc., a Kansas corporation ("AWG") and Alex Lee, Inc., a North Carolina corporation ("Alex Lee"; collectively with AWG, "Buyer") are parties to that certain Asset Purchase Agreement dated _____, 2005 ("APA"). All capitalized terms not expressly defined in this Assignment will have the meanings assigned to such terms in the APA.

B.     The APA provides that Assignor shall sell, transfer, assign, convey and deliver to Buyer or Buyer's designee certain assets of Assignor, including, without limitation, certain Assets as specified in the APA.

C.     AWG has designated Assignee to acquire the Warranties and Guaranties as identified on attached Exhibit B and associated with the Stores identified on attached Exhibit A.

D.     An order, In re: Winn-Dixie Stores, Inc., et al., has been entered by the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, Case No. 05-03817-3F1 on _____, 2005 (the "Order") approving the transactions contemplated by the APA.

E.     In furtherance of the transfer and assignment of the Assets, Assignor and Assignee desire to enter into this Assignment to evidence the assignment and assumption of certain Warranties and Guaranties.

**NOW, THEREFORE**, for and in consideration of the foregoing recitals, which are incorporated herein, the mutual covenants contained herein and in the APA, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party, Assignor and Assignee agree as follows:

1.     Assignment.  Assignor hereby assigns, transfers and sets over unto Assignee all of Assignor's respective right, title, and interest in all Warranties and

Guaranties as the same relate solely to the Stores identified on attached Exhibit A, including without limitation those particular Warranties and Guaranties, if any, identified on attached Exhibit B, and all of their respective duties, obligations and liabilities under such Warranties and Guaranties arising or accruing from and after the date hereof, but not before, it being understood that Assignor will remain fully obligated for the payment and performance of any duties, obligations or liabilities accruing prior to the date hereof. Assignor agrees to indemnify and hold Assignee harmless from all such obligations and liabilities accruing prior to the date hereof.

2.      Assumption.  Assignee expressly assumes all of the right, title, interest, duties, obligations and liabilities of Assignor under all Warranties and Guaranties as the same relate solely to the Stores identified on attached Exhibit A, including without limitation those particular Warranties and Guaranties, if any, identified on attached Exhibit B, and all of their respective duties, obligations and liabilities under such Warranties and Guaranties arising or accruing from and after the date hereof, but not before.  Assignee agrees to indemnify and hold Assignor harmless from all such obligations and liabilities accruing from and after the date hereof.

3.      Terms of APA.  This Assignment is executed pursuant to the APA and is entitled to the benefits of and subject to the provisions of the APA and the Order.

4.      Further Assurances.  Each party agrees to execute and deliver such other assignments, affidavits, instruments or certifications as any other party reasonably may request as necessary or appropriate to effectuate the assignments contemplated in this Assignment.

5.      Governing Law.  This instrument shall be governed by and construed in accordance with the internal laws of the State of North Carolina.

6.      Binding Effect.  This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

7.      Amendment.  This Assignment may not be amended, modified or supplemented except by a document signed by all parties hereto.

8.      Headings.  The headings of the sections of this Assignment are for the convenience of the parties and do not form a part hereof and in no way modify, interpret or construe the meanings of the parties.

9.      Counterparts.  This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument.

**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the day and year first written above.

**ASSIGNOR:**

**WINN-DIXIE _____, INC.,**
a Florida corporation

By: _____
Name: _____
Title: _____

**WINN-DIXIE STORES, INC.,**
a Florida corporation

By: _____
Name: _____
Title: _____

**ASSIGNEE:**

_____

a _____

By: _____
Name: _____
Title: _____

**[STATE APPROPRIATE ACKNOWLEDGMENT BLOCKS TO BE INSERTED]**

Exhibit A
to
Assignment and Assumption of Warranties and Guaranties

[Schedule of Stores]

| Winn-Dixie Store No. | Address | City | State |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Exhibit B
to
<u>Assignment and Assumption of Warranties and Guaranties</u>

[Schedule of Warranties and Guaranties]

EXHIBIT "CC"
TO
ASSET PURCHASE AGREEMENT

**Form of Assumed Contracts Assignment**

**ASSIGNMENT AND ASSUMPTION OF ASSUMED CONTRACTS**

THIS **ASSIGNMENT AND ASSUMPTION OF ASSUMED CONTRACTS** ("Assignment") is made this ___ day of _____, 2005 by and among **WINN-DIXIE** _____, **INC.**, a Florida corporation and **WINN-DIXIE STORES, INC.**, a Florida corporation, (collectively, "Assignor") and _____, a _____ ("Assignee").

## R E C I T A L S :

E.    Assignor, Associated Wholesale Grocers, Inc., a Kansas corporation ("AWG") and Alex Lee, Inc., a North Carolina corporation ("Alex Lee"; collectively with AWG, "Buyer") are parties to that certain Asset Purchase Agreement dated _____, 2005 ("APA"). All capitalized terms not expressly defined in this Assignment will have the meanings assigned to such terms in the APA.

F.    The APA provides that Assignor shall sell, transfer, assign, convey and deliver to Buyer or Buyer's designee certain assets of Assignor, including, without limitation, certain Assets as specified in the APA.

G.    AWG has designated Assignee to acquire the Assumed Contracts as identified on attached Exhibit B and associated with the Stores identified on attached Exhibit A.

H.    An order, In re: Winn-Dixie Stores, Inc., et al., has been entered by the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, Case No. 05-03817-3F1 on _____, 2005 (the "Order") approving the transactions contemplated by the APA.

C.    In furtherance of the transfer and assignment of the Assets, Assignor and Assignee desire to enter into this Assignment to evidence the assignment and assumption of certain Assumed Contracts.

**NOW, THEREFORE**, for and in consideration of the foregoing recitals, which are incorporated herein, the mutual covenants contained herein and in the APA, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party, Assignor and Assignee agree as follows:

1.    Assignment. Assignor hereby assigns, transfers and sets over unto Assignee all of Assignor's respective right, title, and interest in all Assumed Contracts as the same

relate solely to the Stores identified on attached <u>Exhibit A</u> and as identified on attached <u>Exhibit B</u>, and all of their respective duties, obligations and liabilities under such Assumed Contracts arising or accruing from and after the date hereof, but not before, it being understood that Assignor will remain fully obligated for the payment and performance of any duties, obligations or liabilities accruing prior to the date hereof.  Assignor agrees to indemnify and hold Assignee harmless from all such obligations and liabilities accruing prior to the date hereof.  Assignor hereby warrants to Assignee that the Assumed Contracts are valid, in full force and effect and that neither Assignor nor any other party to the Assumed Contracts are in default.

2.  <u>Assumption</u>.  Assignee expressly assumes all of the right, title, interest, duties, obligations and liabilities of Assignor under all Assumed Contracts as the same relate solely to the Stores identified on attached <u>Exhibit A</u> and are identified on attached <u>Exhibit B</u>, and all of their respective duties, obligations and liabilities under such Assumed Contracts arising or accruing from and after the date hereof, but not before.  Assignee agrees to indemnify and hold Assignor harmless from all such obligations and liabilities accruing from and after the date hereof.

3.  <u>Terms of APA</u>.  This Assignment is executed pursuant to the APA and is entitled to the benefits of and subject to the provisions of the APA and the Order.

4.  <u>Further Assurances</u>.  Each party agrees to execute and deliver such other assignments, affidavits, instruments or certifications as any other party reasonably may request as necessary or appropriate to effectuate the assignments contemplated in this Assignment.

5.  <u>Governing Law</u>.  This instrument shall be governed by and construed in accordance with the internal laws of the State of North Carolina.

6.  <u>Binding Effect</u>.  This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

7.  <u>Amendment</u>.  This Assignment may not be amended, modified or supplemented except by a document signed by all parties hereto.

8.  <u>Headings</u>.  The headings of the sections of this Assignment are for the convenience of the parties and do not form a part hereof and in no way modify, interpret or construe the meanings of the parties.

9.  <u>Counterparts</u>.  This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which when taken together shall constitute but one and the same instrument.

**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF,** the parties have executed this Assignment as of the day and year first written above.

ASSIGNOR:

**WINN-DIXIE _____, INC.,**
a Florida corporation

By:      _____
Name: _____
Title:   _____


**WINN-DIXIE STORES, INC.,**
a Florida corporation

By:      _____
Name: _____
Title:   _____


ASSIGNEE:

_____
a _____


By:      _____
Name: _____
Title:   _____


**[STATE APPROPRIATE ACKNOWLEDGMENT BLOCKS TO BE INSERTED]**

Exhibit A
to
<u>Assignment and Assumption of Assumed Contracts</u>

[Schedule of Stores]

| Winn-Dixie Store No. | Address | City | State |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Exhibit B
to
<u>Assignment and Assumption of Assumed Contracts</u>

[Schedule of Assumed Contracts]

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

**THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT** is made effective as of July 19, 2005 (the "Amendment Date"), by and among

**WINN-DIXIE STORES, INC.,** a Florida corporation, **WINN-DIXIE RALEIGH, INC.,** a Florida corporation, and **WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation (each the "Seller" with respect to the Store or Stores owned by it as set forth in the Agreement), and

**ASSOCIATED WHOLESALE GROCERS, INC.,** a Kansas corporation ("AWG") and ALEX LEE, INC., a North Carolina corporation ("Alex Lee"; Alex Lee and AWG are collectively referred to herein as "Buyer").

### R E C I T A L S:

A.    Seller and Buyer are parties to a certain Asset Purchase Agreement dated July 15, 2005 (the "Agreement").

B.    Subject to the provisions of this Amendment, the Agreement has been selected by Seller as the Successful Bid and is to be submitted to the Bankruptcy Court at the Approval Hearing.

C.    Seller and Buyer desire to amend the Agreement to reflect the terms on which Seller proposes to sell the Assets to Buyer, subject to the conditions contained in the Agreement.

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0    **Defined Terms**. Capitalized terms used in this Amendment and not defined herein will have the meanings given to them in the Agreement.

2.0    **Amendments to Agreement.** The Agreement is hereby amended as provided in Exhibit A to this Amendment.

3.0    **Miscellaneous.**

3.1    Authority. Seller represents and warrants that this Amendment has, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller. Buyer represents and warrants that this Amendment has been duly authorized by all required corporate action on behalf of Buyer.

3.2   <u>Successors and Assigns</u>.  This Amendment will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

3.3   <u>Governing Law</u>.  The application and effect of this Amendment will be governed by the laws of the State of North Carolina.

3.4   <u>Time is of the Essence</u>.  Time is of the essence of this Amendment.

3.5   <u>Ratification of Agreement</u>.  Except as herein expressly modified or amended, all terms and conditions of the Agreement remain in full force and effect, and Seller and Buyer hereby ratify and confirm the Agreement, as modified and amended hereby.

[Signature pages follow]

2

**First Amendment to Asset Purchase Agreement**

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment as of the Amendment Date.

SELLER:

**WINN-DIXIE STORES, INC.,** a Florida
corporation

By:_____

Name:_____

Title: _____

SELLER:

**WINN-DIXIE MONTGOMERY, INC.,** a Florida
corporation

By:_____

Name:_____

Title: _____

SELLER:

**WINN-DIXIE RALEIGH, INC.,** a Florida
corporation

By:_____

Name:_____

Title: _____

BUYER:

**ASSOCIATED WHOLESALE GROCERS,
INC.,**
a Kansas corporation

By:_____

Name:_____

Title: _____

3

**First Amendment to Asset Purchase Agreement**

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment as of the Amendment Date.

**SELLER:**

**WINN-DIXIE STORES, INC.,** a Florida corporation

By:_____
    Name:_____
    Title: _____

**SELLER:**

**WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation

By:_____
    Name:_____
    Title: _____

**SELLER:**

**WINN-DIXIE RALEIGH, INC.,** a Florida corporation

By:_____
    Name:_____
    Title: _____

**BUYER:**

**ASSOCIATED WHOLESALE GROCERS, INC.,**
a Kansas corporation

By:_____
    Name: __Gary L. Phillips_____
    Title: __President ; CEO_____

3

**First Amendment to Asset Purchase Agreement**

**BUYER:**

**ALEX LEE, INC.,**
a North Carolina corporation

By: _____

Name: Boyd L. George

Title: Chairman + CEO

4

**EXHIBIT A**

**TO FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT BETWEEN WINN-DIXIE STORES, INC., WINN-DIXIE RALEIGH, INC., and WINN-DIXIE MONTGOMERY, INC. (each as the "Seller" with respect to the Store or Stores owned by it), and ASSOCIATED WHOLESALE GROCERS, INC., and ALEX LEE, INC. ("Alex Lee"; AWG and Alex Lee collectively referred to as "Buyer").**

Amendments to the Agreement

1. Reference is made to that certain Declaration of Restrictions and Grant of Easements (the "Declaration"), dated November 29, 1982, and recorded at Book 652, beginning at Page 847, Richmond County, North Carolina Public Registry, made by Combined Land Company, Inc. as the "Declarant" therein and signed by Winn-Dixie Charlotte, Inc. (the predecessor by assignment and merger to Winn-Dixie Raleigh, Inc.). The Declaration appears in the title to Store #2045 located at 1206 Rockingham Rd in Rockingham, Richmond County, North Carolina.

2. If at any time prior to Closing the Bankruptcy Court should determine that the covenant set forth in Section 6A of the Declaration is enforceable against Seller in the circumstances of this transaction, then either Seller or Buyer may at its election terminate this Agreement as to Store # 2045, in which case (i) Seller shall direct Escrow Agent to return the applicable Deposit to Buyer, (ii) the aggregate Base Purchase Price will be adjusted based on the Allocation Schedule as to the Stores that remain subject to the continuing force and effect of the Agreement and the term "Stores" shall be deemed amended to reflect such termination; and (ii) the terms "Inventory", "Supplies" and "Subleases" will be deemed to exclude, respectively, all Inventory, Supplies and Subleases of Store #2045.

3. That portion of Exhibit A-2 to the Agreement which relates to Store #10 is hereby deleted in its entirety and the attached Schedule 1 is hereby inserted in its place. All other portions of said Exhibit A-2 to the Agreement remain unchanged.

**Schedule 1**

**Replacement of <u>Exhibit A-2</u> with respect to Store #10**

<u>[See Attached]</u>

# EXHIBIT B

**EXHIBIT B**
<u>Store</u>

| # | Address | City | County | ST | Third Party Purchaser |
|---|---------|------|--------|----|-----------------------|
| 2003 | 3112 Milton Road | Charlotte | Mecklenburg | NC | E&T Foods, LLC |

**EXHIBIT C**

# bvbelkproperties

July 21, 2005

Dennis McCoy
VP, Retail Development
Merchants Distributors, Inc.
5001 Alex Lee Blvd.

Re:    Winn-Dixie Lease of Store number 2003

Dear Dennis:

This letter is to confirm the agreement we have reached with E & T Food, LLC d/b/a Compare Foods.

The terms are as follows:

The first option period of five years will be exercised and agreed upon from the onset.

The lease will be guaranteed by Eligio Pena based upon the financials provided.

The remainder of the original lease and the first option period to be exercised will be at a gross lease of $7.39 per square foot.

The second option period of 5 years will have a $0.25 per square foot increase to $7.64.

The third option period of 5 years will have a $0.50 per square foot increase to $8.14.

The final option period of 5 years will have a $0.75 per square foot increase to $8.89.

I believe these are the terms and look forward to having Mr. Pena in our center. I really do feel this is a great fit for both parties and look forward to a long and lasting relationship in this center and hopefully in others.

Again, I appreciate working with you on this matter.

Sincerely,

R. Keith Neely

**BAE SYSTEMS**

Enterprise Systems Incorporated
11487 Sunset Hills Road
Reston, Virginia 20190-5234

# CERTIFICATE OF SERVICE

```
District/off: 113A-3          User: cartes              Page 1 of 1                Date Rcvd: Aug 12, 2005
Case: 05-03817                Form ID: pdfdoc           Total Served: 1
```

```
The following entities were served by first class mail on Aug 13, 2005.
aty        +Cynthia C. Jackson,   Smith Hulsey & Busey,   225 Water Street, Suite 1800,
            Jacksonville, FL 32202-4494
```

```
The following entities were served by electronic transmission.
NONE.                                                                              TOTAL: 0
```

```
           ***** BYPASSED RECIPIENTS *****
NONE.                                                                              TOTAL: 0
```

```
Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.
```

**I, Joseph Speetjens, declare under the penalty of perjury that I have served the attached document on the above listed entities in the manner shown, and prepared the Certificate of Service and that it is true and correct to the best of my information and belief.**

**First Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

**Date: Aug 13, 2005**          **Signature:**    *Joseph Speetjens*