2949827.2

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made effective as of August 2, 2005 (the "Effective Date"), by and between

WINN-DIXIE STORES, INC., a Florida corporation ("Seller"), and

WAL-MART STORES, INC., a Delaware corporation, or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

## RECITALS:

A.   Seller is the tenant of a supermarket store (the "Store"), which is listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under the lease, including amendments thereto and all related documents, in each case as listed on Exhibit A-2 to this Agreement (such documents collectively, the "Lease"). The Store occupies the leased premises as described in the Lease (the "Leased Premises"), within the parcel of real property described on Exhibit A-2 to this Agreement associated with the Lease. Seller's leasehold interest in the Leased Premises pursuant to the Lease, together with those additional items described in paragraph 2.1 of this Agreement relating to the Leased Premises, hereinafter collectively are referred to as the "Assets."

B.   Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.   Buyer intends to use the Store as a prototypical "Neighborhood Markets" store operated by Wal-Mart, which may include the sale of groceries, general merchandise and related items as well as the operation of a pharmacy (the "Use").

D.   Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no. 05-03817-3F1 (the "Bankruptcy Case").

IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS of the parties hereto, it is agreed as follows:

1.0   **Defined Terms.**  Capitalized terms as used in this Agreement will have the following meanings when used herein.

2949827.2

1.1.  "Adequate Assurance Information" will mean financial and other information provided by Buyer in connection with this Agreement, and any other information as may be reasonably requested by Seller to demonstrate to the Bankruptcy Court that Landlord is adequately assured of Buyer's future performance under the Lease, as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's obligations under the Lease by an Affiliate of Buyer with sufficient assets to provide adequate assurance of future performance.

1.2.  "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3.  "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4.  "Approval Hearing" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.5.  "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.6.  "Bankruptcy Code" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

1.7.  "Bankruptcy Court" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

1.8.  "Bankruptcy Court Approval" will mean the entry of the Sale Order with respect to the Store by the Bankruptcy Court.

1.9.  "Bankruptcy Case" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

1.10.  "Bidding Procedures" will mean the procedures approved by the Bankruptcy Court by Order dated June 20, 2005, which will govern the selection by Seller of the Successful Bid for the Store.

1.11.  "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at Closing the Improvements relating to the Store.

1.12.  "Building" will have the meaning assigned in paragraph 2.1 of this Agreement.

1.13.  "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.14.  "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

2949827.2

1.15. "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policy (and the cost of any simultaneous issue mortgagee title insurance policy and any loan-related title insurance endorsements thereon); (d) recording fees payable in connection with recording the Conveyance Instrument in the appropriate public records; (e) cost of the Environmental Report, including any supplements or updates, not to exceed $1,500.00, provided that Buyer receives a "reliance letter" from the issuer of the Environmental Report on or before Closing; (f) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the note and mortgage; and (g) the fees and costs of the Closing Escrow Agent.

1.16. "Buyer's Escrowed Items" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.17. "Closing" will mean the consummation of the assignment, assumption, sale and purchase of the Assets pursuant to this Agreement as indicated by delivery of the Conveyance Instrument and other documents contemplated by paragraph 14 of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.18. "Closing Date" will mean the date designated by Seller in writing, and reasonably acceptable to Buyer, following the Bankruptcy Court Approval with respect to the Store, but no later than the Outside Date.

1.19. "Closing Statement" will mean a statement in the form of Exhibit C to this Agreement (or in such other form as is prepared by Seller and reasonably acceptable to Buyer) reflecting the net amount due Seller at Closing, after making the adjustments described in paragraph 3.3.2 of this Agreement and in other provisions of this Agreement.

1.20. "Confidentiality Agreement" will mean the existing letter agreement between Seller and Buyer, as modified, regarding, among other things, confidentiality relating to the subject matter of this Agreement.

1.21. "Conveyance Instrument" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.22. "Credit Agreement Liens" will mean liens and encumbrances created by Seller pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Seller and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Seller in connection with such Credit Agreement.

-3-

2949827.2

1.23.  "Cure Costs" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Lease.

1.24.  "Damages" will have the meaning assigned in paragraph 16.5 of this Agreement.

1.25.  Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.26.  "Due Diligence Materials" will mean, collectively, (i) the Lease, the Title Reports and the Environmental Report, (ii) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, on the Merrill Website, or otherwise prior to the date hereof and (iii) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.27.  "Effective Date" will have the meaning assigned in the initial paragraph of this Agreement.

1.28.  "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.29.  "Equipment" will mean Seller's trade fixtures and equipment located in the Building.

1.30.  "Escrow Agent" will mean Title Insurer, acting as escrow and closing agent.

1.31.  "Filing Date" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

1.32.  "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.33.  "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.34.  "Improvements" will have the meaning assigned in paragraph 2.1 of this Agreement.

1.35.  "Initial Title Report" will mean that certain title report issued by Lawyers Title Insurance Corporation and dated as of May 27, 2005 with respect to the Store that Seller has made available to Buyer for review on the Merrill Website as of the Effective Date. Buyer understands that such Initial Title Report may cover property in addition to the Real Property, insure the interests of parties other than Seller, or reflect Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.36.  "Inventory" will mean all inventories of goods and merchandise within the Store and owned by Seller and held for resale in the ordinary course of business of Seller conducted at the Store to retail customers.

2949827.2

1.37. "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of Robert Bray, Vice President, Real Estate, without any requirement of investigation or inquiry.

1.38. "Landlord" will mean the lessor under the Lease.

1.39. "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.40. "Lease" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.41. "Liquidated Deposit" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.42. "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Store for its current use or for Buyer's contemplated Use, taken as a whole, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Seller's Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.43. "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Jaguar" with respect to the disposition of the Store and other properties.

1.44. "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on the Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under the Lease or on any other Assets; (D) judgments that have attached to and become a lien against Seller's interest under the Lease or on any other Assets; and

2949827.2

(E) any other liens against the Real Property that can be cured by the payment of money.

1.45. "ordinary course of business" means the ordinary course of business of Seller after the Filing Date.

1.46. "Outside Date" means October 31, 2005, as such date may be extended by the written agreement of Seller and Buyer.

1.47. "Permits" will have the meaning assigned in paragraph 6.2 of this Agreement.

1.48. "Permitted Encumbrances" will mean (i) all matters listed on Exhibit D to this Agreement, (ii) all other matters set forth as exceptions in the Initial Title Report, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in any additional Title Reports, other than Monetary Liens.

1.49. "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.50. "Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.51. "Real Property" will mean the Leased Premises and the Improvements together.

1.52. "Sale Order" will mean an order of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby.

1.53. "Seller" will have the meaning assigned in the initial paragraph of this Agreement.

1.54. "Seller's Brokers" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.55. "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; and (c) the Cure Costs.

1.56. "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.57. "Store" will have the meaning assigned in paragraph A of the Recitals to this Agreement with the indicated number listed on Exhibit A-1 to this Agreement.

2949827.2

1.58.   "Successful Bid" will mean the highest or otherwise best offer to purchase the Assets, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.59.   "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the preparation or merchandising of Inventory, located within the Store and owned by Seller.

1.60.   "Title Reports" will mean, collectively, (i) the Initial Title Report and (ii) any additional title reports and/or title insurance commitments with respect to the Store that Seller has made available to Buyer for review on the Merrill Website (with written notice thereof delivered to Buyer) or any update of any such reports obtained by Buyer.

1.61.   "Title Insurer" will mean First American Title Insurance Company or Near North National Title LLC, as agent for Lawyers Title Insurance Corporation, or any other nationally recognized title insurance company, as designated by Seller.

1.62.   "Title Policy" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.63.   "Use" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

2.0   **Property Included in Sale.**

2.1.   Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets, which are comprised of the following:

   2.1.1   Seller's interest, as tenant, under the Lease and Seller's interest in any leasehold improvements;

   2.1.2   Seller's interest in all fixtures (other than the Equipment) located in the Store building now existing on the Leased Premises (the "Building"), including, but not limited to Seller's interest in heating and air conditioning systems, facilities used to provide any utility services or other similar services to the Building, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures and flooring (collectively, the "Improvements"); and

   2.1.3   to the extent transferable, any liquor license held by Seller with respect to the Store.

2.2.   Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are (a) subject to higher or otherwise better offers for the Assets pursuant to the Bidding Procedures, and (b) conditioned upon the entry of a Sale

2949827.2

Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

### 3.0 **Purchase Price.**

3.1. <u>Amount</u>. The purchase price to be paid by Buyer to Seller for the Assets is Thirty-Five Thousand and No/100 Dollars ($35,000) (the "<u>Purchase Price</u>").

3.2. <u>Contract Consideration and Deposit</u>. In accordance with the Bidding Procedures, Buyer has delivered, as of the Effective Date, to Escrow Agent, a base earnest money deposit with respect to the Store in the amount of Three Thousand Five Hundred and No/100 Dollars ($3,500) (the "<u>Deposit</u>"). The Deposit will be subject to refund to Buyer to the extent and in the circumstances described herein, including <u>paragraphs 12, 15 and 16</u>. The Deposit will be credited against the Purchase Price at Closing and will be held in an interest-bearing escrow account maintained by Escrow Agent prior to Closing. Whenever used herein, the term Deposit also will be deemed to include all interest accrued thereon; however, for state and federal income tax purposes, interest, if any, accrued on the Deposit will be deemed earned by Buyer. Buyer's federal taxpayer identification number (FEIN) is 71-0415188.

3.3. <u>Payment</u>. The Purchase Price will be paid in the following manner:

3.3.1 *Purchase Price*. On the Closing Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Purchase Price (less the Deposit and with any adjustments with respect to the Purchase Price contemplated by the Closing Statement), and will, subject to the conditions set forth in <u>paragraph 10</u> of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Purchase Price (as so adjusted, by wire transfer to an account designated in writing by Seller.

3.3.2 *Certain Transaction Costs*. All relevant rent, taxes (including real and personal property taxes and assessments), common area maintenance expenses and all other items of additional rent, utilities, and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Purchase Price payable at Closing to the extent thereof. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable

2949827.2

with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.3.2 which apply to the period after Closing shall survive Closing.

3.3.3    *Sales Tax*. Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. This paragraph 3.3.3 shall survive the Closing.

3.4.    Allocation of Purchase Price Among Assets. Seller shall have the right to allocate the Purchase Price, for tax purposes and all other purposes, among the Assets; provided, however, that such allocation shall not be binding upon Seller or determinative with respect to any allocation made by Seller of the Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case. The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets on the Closing Statement.

**4.0    Buyer's Due Diligence.**

4.1.    Acknowledgment. In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence, through access to the Merrill Website and otherwise, regarding the Store and the Assets and it has had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement. Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Store and the Assets and to acquire such additional information about the Store and the Assets as Buyer has reasonably requested. Buyer agrees that any physical access to or investigation of the Store by Buyer or its representatives shall be reasonably limited by and shall comply in all respects with the reasonable written instructions and requirements of Seller.

4.2.    Title. Buyer confirms and acknowledges that Seller has made the Initial Title Report available to Buyer, and may make additional Title Reports available to Buyer, and Buyer may negotiate with the Title Insurer, or another title insurer of its choosing, to obtain a title insurance policy with respect to the Store (the "Title Policy") at Closing. If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the Buyer's proposed Use or occupancy of the Store for the Use, Buyer may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to CatherineIbold@winn-dixie.com within three business days of the date such additional Title Report is

2949827.2

either delivered to Buyer or posted on the Merrill Website (with written notice thereof delivered to Buyer). To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #206". If Buyer timely notifies Seller of any valid objection to any such matter set forth in any additional Title Report, and if Seller declines or is unable to cure any such objection prior to the Closing Date, then Buyer will have the right to terminate this Agreement on or prior to the Closing Date and receive the Deposit, with no liability to Buyer. If Buyer closes the purchase of the Assets, then Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter, other than a Monetary Lien, set forth as an exception in an additional Title Report for which notice has been provided in accordance with this paragraph 4.2, and such matter shall constitute a Permitted Encumbrance.

4.3.    Environmental Reports. Buyer confirms and acknowledges that Seller has made available to Buyer for review on the Merrill Website that certain Phase I Environmental Site Assessment Report, dated as of June 6, 2005, issued by Golder Associates Inc. and that certain Phase I Environmental Site Assessment Report, dated as of June 24, 2005, issued by Golder Associates Inc. (collectively, the "Environmental Report"), covering the Real Property relating to the Store.

5.0    **Representations and Warranties of Seller Relating to the Assets.** To induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

5.1.    On or prior to the Effective Date, Seller has made available to Buyer for review on the Merrill Website and otherwise: (i) a copy of the Lease (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a)    A copy of the site plan for the Store; and

(b)    A copy of the fixture plan for the Store;

it being understood that the materials described in this paragraph 5.1 have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

5.2.    To Seller's Knowledge, the Assets are in material compliance with applicable zoning laws as well as any applicable deed restrictions, covenants, conditions, restrictions, easement agreements and any other applicable private land use restrictions, and Seller has not received any written notice of material violation of any of the foregoing that has not been remedied or cured.

5.3.    To Seller's Knowledge, except for any Permitted Encumbrances, there are no condemnation, environmental, zoning or other land use regulation proceedings,

2949827.2

either instituted or threatened, in writing, that would have a Material Adverse Effect on the Buyer's intended Use of the Store.

5.4.    At Closing, Seller will own and convey the Assets free and clear of all Liens and Claims as hereinafter defined, including all Monetary Liens, other than the Permitted Encumbrances, as provided in the Sale Order.

6.0    **General Representations and Warranties of Seller.** In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

6.1.    Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

6.2.    No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) any governmental authorizations required in connection with the transfer of Seller's liquor license with respect to the Store and to the extent such license is transferable; (iii) approvals, if any, required under the HSR Act; and (iv) Bankruptcy Court Approval.

6.3.    Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.4.    Other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending or, to the Knowledge of Seller, threatened against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a Material Adverse Effect on the ability of Seller to

-11-

2949827.2

perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

6.5.   None of the employees employed by Seller in the Store is covered by a union contract, collective bargaining agreement or other labor agreement.

6.6.   Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

6.7.   There are no subleases or other occupancies, including any licensee pursuant to a license, of the Leased Premises, for which Buyer will be responsible or which will survive Closing.

7.0   **Buyer's Representations and Warranties.** Buyer represents and warrants to Seller as follows:

7.1.   Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required action on behalf of Buyer.

7.2.   No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated.

7.3.   This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4.   There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

7.5.   Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or

-12-

2949827.2

other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

7.6.     As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

8.0     **Covenants of Seller.** Seller hereby covenants for the benefit of Buyer as follows:

8.1.     Seller will (i) use commercially reasonable efforts to maintain the Assets until the Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and (ii) will not sell, dispose of, abandon or remove from the Store any of the Assets or agree to do so; provided, however, it is expressly acknowledged and understood that, following the Effective Date, and prior to the Closing Date, Seller shall wind up its operations (including related marketing, promotions and advertising) at the Store and to eliminate or remove the Inventory, Equipment and Supplies from the Leased Premises in preparation for Closing and the turnover of possession to Buyer.

8.2.     Seller shall deliver possession of the Store to Buyer at Closing in a broom clean condition and free of any other tenancies and encumbrances (except Permitted Encumbrances).  All Inventory, Equipment, Supplies and any other personal property not a part of the Assets will be removed therefrom.  To the extent that any Inventory, Equipment, Supplies or other personal property remains at the Real Property at Closing, Buyer shall have the right to remove same from the Real Property at Seller's sole cost and expense.  The provisions of this paragraph 8.2 shall survive Closing.

8.3.     To the extent transferable, Seller shall transfer any liquor license pertaining to the Store to Buyer at Closing.

8.4.     Seller will transfer or terminate all its employees working at the Store, effective on or prior to the Closing Date.

8.5.     If this Agreement is determined to be the Successful Bid, Seller will use commercially reasonable efforts to obtain the entry of a Sale Order.

8.6.     From the Effective Date through and including the Closing Date, Seller will comply at all times in all material respects with its post-petition obligations under the Lease.

8.7.     Seller will not place Liens on the Assets that would survive the Closing or take any action that would cause Seller to be unable to perform its obligations under

2949827.2

this Agreement (other than in connection with the discharge of its fiduciary duties, including considering higher or better bids for the Assets).

8.8.   Seller will maintain insurance coverage (including fire and general liability insurance) for the Assets on substantially the same terms and conditions as all other similarly situated supermarkets maintained by Seller.

8.9.   Until Closing, Seller will pay all postpetition real estate and ad valorem property taxes when due and owing with respect to the ownership and operation of the Store.

8.10.  Seller will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Buyer in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement. The provisions of this paragraph 8.10 shall survive Closing.

8.11.  Seller shall not permit the Lease to be deemed rejected, pursuant to section 365(d)(4) of the Bankruptcy Code, prior to Closing.

9.0   **Covenants of Buyer.** Buyer for itself hereby covenants for the benefit of Seller as follows:

9.1.   Buyer will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with the Closing and the issuance of the Title Policy, if any.

9.2.   Buyer will use commercially reasonable efforts to obtain all Permits, if any, required to perform the obligations of Buyer under this Agreement, and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11 of this Agreement.

9.3.   Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement. The provisions of this paragraph 9.3 shall survive Closing.

9.4.   If this Agreement is determined to be the Successful Bid, then Buyer will use commercially reasonable efforts to obtain the entry of a Sale Order, including by providing Adequate Assurance Information to Seller, the Bankruptcy Court and Landlord as may be reasonably requested.

10.0  **Conditions Precedent to Buyer's Obligations.** The obligations of Buyer under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

-14-

2949827.2

10.1.  Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Subject to any limitations set forth in this Agreement, all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Seller's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

10.2.  No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

10.3.  The Sale Order shall have been entered by the Bankruptcy Court in substantially the form of Exhibit E to this Agreement and shall not have been (A) effectively stayed by a court of competent jurisdiction, or (B) materially modified or amended without the prior written consent of Buyer.  The Sale Order shall provide that Buyer shall assume obligations under and be bound only by those pre-Closing documents with respect to the Assets (other than this Agreement) as are listed on Exhibit A-3 attached hereto, and that the failure of any party to object to the terms of the Sale Order shall forever bar and estop said party, its heirs, successors and assigns, and any predecessor in interest, of itself and anyone claiming by, through or under it or them, from asserting any claims against Buyer (or parties claiming through Buyer) or attempting to enforce any rights against Buyer (or parties claiming through Buyer) based on pre-Closing documents with respect to the Assets (other than this Agreement) not listed on Exhibit A-3.  The Sale Order shall also provide that notwithstanding any provision in any lease, contract, reciprocal easement agreement ("REA") or applicable law, the Buyer is authorized to allow the Leased Premises to remain dark for up to eighteen (18) months after Closing, and Buyer shall not be deemed to have lost any exclusive or other rights under the Lease as a result of remaining dark for such eighteen (18) month period.  The Sale Order shall also provide that in connection with the opening and operating of a retail store at the Property, the Purchaser is authorized to perform alterations and remodeling to the extent necessary to conduct its typical retail operations and to replace and modify existing signage, notwithstanding any provision to the contrary in the Lease or any related document, including any provision requiring consent of any non-Debtor party for such work.  Appropriate notice of this Agreement and the proposed terms of the Sale Order shall have been provided prior to the hearing on the Sale Order to all

-15-

2949827.2

parties to the Lease, all relevant taxing authorities, the U.S. Trustee and all other interested parties.

10.4.   The Sale Order shall approve the sale, assumption and assignment of the Lease as described on Exhibit A-2.  If any additional lease agreement or amendment (other than as stated on Exhibit A-2) or any exclusive use clause which individually or in the aggregate with other matters, interferes in a material and adverse way with Buyer's proposed use or occupancy of the Store for the Use, including but not limited to, the rent, the term and extensions of the Lease, Buyer will have the right to terminate this Agreement by delivery of written notice of termination to Seller by email to Ttucker@kslaw.com with copy to CatherineIbold@winn-dixie.com within three (3) Business Days of the date of entry of the Sale Order and shall include in the reference or subject matter line the following, in capital letters "BUYER TERMINATION NOTICE - WINN-DIXIE STORE #206".  Buyer shall be entitled, as its sole and exclusive remedy, to receive the return of the Deposit, which return shall operate to terminate this Agreement and release Seller from any and all liability under this Agreement (except for those obligations that survive the termination of this Agreement pursuant to the terms hereof). If Buyer fails to terminate this Agreement within the applicable three-day period described above, then Buyer will have no further right to terminate under this paragraph 10.4.

10.5.   The Sale Order shall provide that the transfer of the Assets to the Buyer pursuant to the Agreement shall be free and clear of all interests, mortgages, security interests, pledges, liens, inchoate liens, judgments, encumbrances or charges of any kind or nature, including all Monetary Liens, other than the Permitted Encumbrances (collectively, the "Liens"), and all claims (as defined in Section 101(5) of the Bankruptcy Code), whether arising prior to or subsequent to the Filing Date, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "Claims") to the extent permitted under Section 363(f) of the Bankruptcy Code, and all such Liens and Claims shall attach to the Purchase Price in the order of their priority, and with the same validity, force and effect which they now have as against the Assets.

10.6.   Seller shall confirm that (i) to the best of Seller's knowledge, the intended Use of the Store by the Buyer under its trade name complies with the use provisions of the Lease and (ii) to the best of Seller's knowledge, other than as may be provided in the Lease, there are no applicable exclusive use clauses to which the Lease is subject.

10.7.   The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been effectively waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(iv) of this Agreement; provided, however, that if any of the foregoing

-16-

2949827.2

conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1 (a)(iv).

11.0 **Conditions Precedent to Seller's Obligations.** The obligations of Seller under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

11.1. Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. All of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2. No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

11.3. The Sale Order shall have been entered by the Bankruptcy Court in substantially the form of Exhibit E to this Agreement and shall not have been (A) effectively stayed by a court of competent jurisdiction, or (B) materially modified or amended without the prior written consent of Seller, which shall not be unreasonably withheld.

11.4. The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(v) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1(a)(v).

2949827.2

12.0    **Loss by Fire or Other Casualty; Condemnation.** In the event that, prior to Closing, the Store, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with the Store, Buyer will have the right, exercisable by giving notice of such decision to the Seller within five (5) Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, and thereafter none of the parties will have any further rights or obligations hereunder; provided, however, that, if Buyer is not in breach of this Agreement, Buyer will be entitled to the return from the Escrow Agent of the Deposit. If Buyer does not exercise its right of termination described in the immediately preceding sentence and the Store is sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

13.0    **Possession.** Seller will turn over to Buyer exclusive physical possession of the Store and the Assets associated therewith (including, to the extent in Seller's possession, control or custody) all keys, combinations to safes, security codes and passwords, on the Closing Date free and clear of all occupancies, including any Subtenant with respect to the Store, and in the condition required by paragraph 8 of this Agreement upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Buyer to transfer to Seller, the entire Purchase Price. The provisions of this paragraph 13.0 shall survive Closing.

14.0    **Closing.**

14.1.    Closing will occur on the Closing Date. Closing will be conducted by use of an escrow administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

14.2.    On or before the Closing Date, Seller will, subject to the conditions contained in paragraph 11 of this Agreement, deliver the following ("Seller's Escrowed Items") to Escrow Agent:

(i)    Two counterparts of the Assumption and Assignment Agreement, substantially in the form of Exhibit F to this Agreement (the "Conveyance Instrument"), executed by Seller;

(ii)    The Bill of Sale, executed by Seller;

(iii)    Two counterparts of the Closing Statement, executed by Seller;

(iv)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title

-18-

2949827.2

Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

(v) Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered, including, without limitation, any instruments required to transfer to Buyer any liquor license pertaining to the Store if such license is transferable under applicable law.

Buyer may waive compliance by Seller as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement. Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent, will be deemed to be an acknowledgement by Seller that the conditions of paragraph 11 of this Agreement have been fulfilled or waived as of the Closing Date.

14.3.   On or before the Closing Date, Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, deliver the following ("Buyer's Escrowed Items") to Escrow Agent:

(i) Two counterparts of the Conveyance Instrument, executed by Buyer;

(ii) Two counterparts of the Closing Statement, executed by Buyer;

(iii) Any other document, instrument or agreement called for hereunder for delivery by Buyer that has not previously been delivered; and

(iv) All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to paragraph 3 of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement. Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will be deemed to be an acknowledgement by Buyer that the conditions of paragraph 10 of this Agreement have been fulfilled or waived as of the Closing Date.

14.4.   At Closing, Seller will, subject to the conditions contained in paragraph 11 of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in paragraph 10 of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items and the Purchase Price to Seller.

14.5.   On the Closing Date, Seller and Buyer will each deposit such other instruments with the Title Insurer as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the Assets in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify

-19-

2949827.2

the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion.

14.6.   Except as provided in paragraph 16 of this Agreement, (i) Seller will be responsible for Seller's Closing Costs and shall pay same when due and payable; and (ii) Buyer will be responsible for Buyer's Closing Costs and shall pay same when due and payable.  The provisions of this paragraph 14.6 shall survive the Closing or earlier termination of this Agreement.

## 15.0   **Termination.**

15.1.   Termination.

(a)     This Agreement may be terminated, and the transactions contemplated hereby abandoned as follows, and as provided otherwise in this Agreement:

(i)     (i) by written consent of Seller and Buyer, in which case the Deposit shall be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the Deposit, then Escrow Agent shall pay over the Deposit to Seller as consideration for Seller's agreement to terminate this Agreement);

(ii)    at the election of Seller if and to the extent permitted under paragraph 16.1 of this Agreement, in which case the Deposit shall be disbursed as provided in such paragraph 16.1;

(iii)   at the election of Buyer if and to the extent permitted under paragraph 16.2 of this Agreement, in which case the Deposit shall be disbursed as provided in such paragraph 16.2;

(iv)    at the election of Buyer if any of the conditions set forth in paragraph 10 of this Agreement has not been satisfied or waived by Buyer on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(iv);

(v)     at the election of Seller if any of the conditions set forth in paragraph 11 of this Agreement has not been satisfied or waived by Seller on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided,

-20-

2949827.2

however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(v);

(vi)     at the election of Buyer or Seller as provided in paragraph 12 of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(vi);

(vii)    at the election of Seller or Buyer (A) if this Agreement is not the Successful Bid or (B) if the Bankruptcy Court denies Bankruptcy Court Approval, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if this Agreement is the Successful Bid and Bankruptcy Court Approval is denied as a result of Buyer being in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(vii); or

(viii)   at the election of Buyer or Seller if Closing will not have occurred on or before the Outside Date for any reason other than as contemplated in paragraphs 15.1(a)(i) through 15.1(a)(vii) of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided that neither Buyer nor Seller, as the case may be, will be entitled to terminate this Agreement pursuant to this paragraph 15.1(a)(viii) if such party's breach of this Agreement has been the cause of, or resulted in, the failure of Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(viii).

(b)     If this Agreement is terminated for any reason, then, all materials provided by Seller to Buyer and all materials relating to the Assets obtained by Buyer and all copies of any such materials will be destroyed or delivered to Seller within five (5) Business Days following termination. This paragraph shall not in any way limit Buyer's duties to Seller under the Confidentiality Agreement.

2949827.2

(c)    Upon any termination of this Agreement pursuant to paragraphs 15.1(a)(ii) through (viii) of this Agreement, each party will retain those rights (if any) it may have under paragraph 16 of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

## 16.0    **Default and Remedies.**

16.1.    Buyer's Default. If Closing as contemplated under this Agreement is not consummated due to Buyer's breach of this Agreement, or if this Agreement is properly terminated due to Buyer's breach of this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such breach, (A) to terminate this Agreement, and (B) to receive the Deposit (the "Liquidated Deposit") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof. Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity. Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages. Except for those obligations of Buyer that survive Closing as provided in paragraph 17.9, the right to receive the Liquidated Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by Buyer, and Seller hereby waives and releases any right to (and Seller hereby covenants that it shall not) sue Buyer with respect to the Store: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit. Buyer hereby waives and releases any right to (and hereby covenants that it shall not) sue Seller or seek or claim a refund of the Liquidated Deposit (or any part thereof) on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages. This paragraph 16.1 is subject to paragraph 16.4 of this Agreement.

16.2.    Default by Seller. If the sale as contemplated under this Agreement is not consummated due to Seller's breach of this Agreement, or if this Agreement is properly terminated due to Seller's breach of this Agreement, then Buyer shall be entitled to receive the return of the Deposit, which return shall operate to terminate this Agreement and release Seller from any and all liability under this Agreement (except for obligations of Seller hereunder that survive termination of this Agreement); provided, however, that in the event of a breach of this Agreement by Seller, Buyer may elect not to terminate this Agreement, but instead to seek specific performance of Seller's obligations under this Agreement. Except for those obligations of Seller that survive Closing as provided in paragraph 17.9, Buyer expressly waives and releases any right to seek or collect any damages, including any actual, consequential, speculative, remote or punitive damages. This paragraph 16.2 is subject to paragraph 16.4 of this Agreement.

2949827.2

The provisions of this paragraph 16.2 shall survive the termination of this Agreement.

16.3.   Notice of Default; Opportunity to Cure. Neither Seller nor Buyer shall be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within five (5) Business Days after receipt of such notice; provided, however, that this paragraph 16.3 (i) shall not be applicable to Buyer's failure to deliver the Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Closing Date and, accordingly, (ii) shall not have the effect of extending the Closing Date or the due date of the Deposit.

16.4.   Recoverable Damages. In no event shall the provisions of paragraphs 16.1 and 16.2 of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to, a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreement and this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees or expenses under the Confidentiality Agreement and paragraph 3.3.2 of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs.  In addition, if this Agreement is terminated for any reason, and Buyer or any Affiliate of Buyer wrongfully asserts any claim or right to any Asset that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to any Asset, then Seller shall have all rights and remedies available at law or in equity with respect to such assertion by Buyer and any loss, damage or other consequence suffered by Seller as a result of such assertion. Notwithstanding anything to the contrary contained herein, in no event shall Buyer be obligated to indemnify Seller hereunder, including pursuant to paragraph 16.5, for any amounts which, in the aggregate, exceed the amount of the Deposit, except (i) as expressly provided in the Confidentiality Agreement and (ii) with respect to any act or omission on or after the Closing Date, including any claim, liability, or obligation that is assumed by Buyer pursuant to this Agreement or in any transaction documents signed by Buyer.

16.5.   Buyer Indemnification of Seller. Buyer shall indemnify and save and hold harmless Seller and its Affiliates and representatives, from and against any and all costs, losses liabilities, damages, lawsuits, deficiencies, claims and expenses (whether or not arising out of third-party claims) including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (herein, the "Damages") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by Buyer (including any payment obligation), or the inaccuracy of any representation made by Buyer in or pursuant to this Agreement or other transaction documents, (b) any liability, obligation or commitment of any nature (absolute, accrued, contingent or otherwise) of Buyer that is due to or arises in connection with Buyer's acts or omissions prior to, on or

2949827.2

after the Closing Date, including any claim, liability, or obligation that is assumed by Buyer pursuant to this Agreement or in any transaction documents signed by Buyer. Notwithstanding the foregoing, Buyer shall not be liable for any matter (i) with respect to which Seller has not given Buyer written notice within a reasonable period of time following Seller's receiving written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a Material Adverse Effect on Buyer), or (ii) that is due to Seller's acts or omissions. The provisions of this paragraph 16.5 shall cover all obligations and liabilities of whatever kind, nature or description relating, directly or indirectly, to product liability, third party litigation or third party claims against Buyer or Seller in connection with, arising out of, or relating to the Assets. This paragraph 16.5 shall survive Closing or earlier termination of this Agreement. Except as otherwise expressly provided in this Agreement, including, without limitation, the provisions of this paragraph 16.5 above and paragraph 22 of this Agreement, or other transaction documents, the Buyer does not, pursuant to this Agreement or other transaction documents or otherwise, assume, agree to perform, pay, discharge or indemnify the Seller or its Affiliates and representatives against or otherwise have any responsibility for, any liabilities or obligations of the Seller, fixed, contingent or otherwise, known or unknown, relating to or arising out of the Assets arising prior to the Closing Date.

17.0 **Miscellaneous.**

17.1. <u>Notices</u>. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this paragraph 17.1 and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

2949827.2

If to Seller:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida  32254-3699
Attn: Chief Financial Officer
Telefax No. 904-783-5646
e-mail: *bennettnussbaum@winn-dixie.com*

With a copy to:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida  32254-3699
Attn: Office of General Counsel
Telefax No. 904-783-5651
e-mail: *larryappel@winn-dixie.com*

and

King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia  30303
Attn: Timothy N. Tucker
Telefax No. 404-572-5148
e-mail: *ttucker@kslaw.com*

If to Buyer:

Wal-Mart Stores, Inc.
2001 S.E. Tenth Street
Bentonville, Arkansas  72712
Attn: Karen Roberts
Telefax No.: 479-277-5991
e-mail: *karen.roberts@walmartlegal.com*

With a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York  10019
Attn: John C. Longmire, Esq.
Telefax No.: 212-728-8111
e-mail: *jlongmire@willkie.com*

or such other address as any party may from time to time specify by notice to the other.

2949827.2

17.2.  Notice of Certain Inquiries. If any party is contacted, whether before or after the Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to any transactions contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

17.3.  Brokers and Finders. The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Agreement other than that due by Seller to Seller's Brokers. Seller agrees to pay all fees and commissions claimed by Seller's Brokers as a result of the transaction contemplated by this Agreement. Except for Seller's Brokers, neither Seller nor Buyer has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement. Seller and Buyer hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts. The terms of this paragraph 17.3 shall survive Closing or earlier termination of this Agreement.

17.4.  Successors and Assigns. This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

17.5.  Assignment. Neither Seller nor Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole discretion of the party whose consent is so required; provided, however, that Buyer shall be permitted, without the consent of Seller, to assign its interests and obligations under this Agreement to one or more Affiliates of Buyer. In the event of such an assignment to an Affiliate of Buyer, (a) such Affiliate will promptly provide satisfactory Adequate Assurance Information to Seller or (b) Buyer will guarantee the obligations of such Affiliate hereunder. No assignment by Buyer shall release or relieve Buyer of its liabilities and obligations hereunder, which shall remain in full force and effect notwithstanding any such assignment.

17.6.  Amendments. Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller and Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to Bankruptcy Court Approval, if applicable.

17.7.  Governing Law. The application and effect of this Agreement will be governed by and construed in accordance with the laws of the State in which the Store is located; the application and effect of this Agreement as to any matter of the rights

-26-

2949827.2

and obligations of the parties generally will be governed by and construed in accordance with the laws of the State of Florida.

17.8.    Merger of Prior Agreements. This Agreement supersedes all prior agreements and understandings between the parties hereto, other than the Confidentiality Agreement, and (except for the Confidentiality Agreement) constitutes the entire agreement of the parties with respect to the matters contained herein. **BUYER ACKNOWLEDGES ITS OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT CONTINUE AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THE CONFIDENTIALITY AGREEMENT OR THIS AGREEMENT.**

17.9.    Survival. Except as otherwise expressly provided herein, acceptance by Buyer of the Conveyance Instrument shall constitute an acknowledgement by Buyer that all of Seller's representations, covenants and obligations under this Agreement and all conditions to Buyer's obligations to close under this Agreement have been performed, satisfied and/or waived. Seller's and Buyer's representations, warranties, covenants and obligations under this Agreement shall not survive Closing but shall merge into the Conveyance Instrument, and shall have no further force or effect after Closing, except those representations, warranties, covenants and obligations of Seller and Buyer that are expressly stated herein to survive Closing.

17.10.    Time is of the Essence. Time is of the essence of this Agreement.

17.11.    No Recordation. This Agreement will not be recorded in any public office or court other than as part of the Bankruptcy Court Approval process except that upon default it may be presented to a court of competent jurisdiction.

17.12.    State Specific Provisions:

    17.12.1    Radon Gas. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

18.0    **Escrow Agent.**

18.1.    Duties. By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon its receipt of funds from Buyer, Escrow Agent will receive and hold such funds in an interest-bearing account and in trust to be disposed of in accordance with the provisions of this Agreement.