# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made effective as of June 30, 2005 (the "Effective Date"), by and among

**WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation ("Seller"), and

**BAKER FOODS, INC.,** an Alabama Corporation, or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

## RECITALS:

A. Seller is the tenant of the supermarket store (the "Store"), listed on Exhibit A-1 to this Agreement by Seller's designated Store number, under the lease, including amendments thereto (the "Lease") described on Exhibit A-2 to this Agreement. The Store occupies the leased premises as described in the Lease (the "Leased Premises"), within the parcel or parcels of real property described on Exhibit A-2 to this Agreement associated with the Lease. Seller's leasehold interest in the Leased Premises pursuant to the Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to the Leased Premises, hereinafter collectively are referred to as the "Assets."

B. Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C. Seller filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being administered under case no. 05-03817-3F1 (the "Bankruptcy Case").

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0 **Defined Terms.** Capitalized terms as used in this Agreement will have the following meanings when used herein.

1.1 "Adequate Assurance Information" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that Landlord and Subtenant are adequately assured of Buyer's future performance under the Lease, as required by Section 365(f)

of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's obligations under the Lease and (where applicable) the Sublease by an Affiliate of Buyer with sufficient assets to provide adequate assurance of future performance.

1.2  "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3  "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4  "Approval Hearing" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.5  "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.6  "Bankruptcy Code" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.7  "Bankruptcy Court" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.8  "Bankruptcy Court Approval" will mean the entry of a Sale Order with respect to the Store by the Bankruptcy Court.

1.9  "Bankruptcy Case" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.10  "Base Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.11  "Base Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.12  "Bidding Procedures" will mean the procedures approved by the Bankruptcy Court that will govern the selection by Seller of the Successful Bid for the Store.

1.13  "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at the Closing the Inventory, the Supplies, the Equipment and other tangible and intangible personal property constituting a portion of the Assets relating to the Store.

1.14 "Building" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.15 "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.16 "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

1.17 "Buyer Inventory Representative" will mean Ronald Baker or Kenneth Barber or another person designated in writing by such person or by Buyer to act in such capacity.

1.18 "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to this transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policy (and the cost of any simultaneous issue mortgagee title insurance policy and any loan-related title insurance endorsements thereon); (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instrument; (e) recording fees payable in connection with recording the Conveyance Instrument in the appropriate public records; (f) cost of the Environmental Report, including any supplements or updates; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the note and mortgage; (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment, Supplies and Inventory; (i) the fees and costs of the Closing Escrow Agent; and (j) the fees and costs of the Inventory Service.

1.19 "Buyer's Escrowed Items" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.20 "Closing" will mean the consummation of the assignment, assumption, sale and purchase of the Assets pursuant to this Agreement as indicated by delivery of the Conveyance Instrument and other documents contemplated by paragraph 14 of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.21 "Closing Date" will mean the date designated by Seller in writing, and reasonably acceptable to Buyer, that is between one day and 30 days following the Bankruptcy Court Approval.

1.22 "Closing Statement" will mean a statement in the form of Exhibit C-1 to this Agreement (or in such other form as is prepared by Seller and reasonable acceptable to Buyer) reflecting the net amount due Seller at the Closing (other than in respect of the Inventory Price), after making the adjustments described in paragraph 3.3.3 of this Agreement and in other provisions of this Agreement.

1.23 "Confidentiality Agreement" will mean the existing letter agreement between Winn-Dixie and Buyer, regarding, among other things, confidentiality relating to the subject matter of this Agreement. Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.

1.24 "Conveyance Instrument" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.25 "Credit Agreement Liens" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.26 "Cure Costs" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Lease and the Sublease.

1.27 "Damages" will have the meaning assigned in paragraph 16.5 of this Agreement.

1.28 "Deposit" will have the meaning assigned in paragraph 3.3 of this Agreement.

1.29 "Due Diligence Materials" will mean, collectively, (i) the Lease, the Sublease (if any), the Title Reports and the Environmental Report, (ii) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, at the Store, on the Merrill Website, or otherwise and (iii) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.30 "Effective Date" will have the meaning assigned in the initial paragraph of this Agreement.

1.31 "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.32 "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.33 "Escrow Agent" will mean Title Insurer, acting as escrow and closing agent.

1.34 "Excluded Inventory" will mean (i) any private label goods and merchandise; (ii) any goods and merchandise that are damaged, spoiled or distressed; (iii) any items that as of the Inventory Count Date are past Seller's "pull date", if any, or with respect to pharmaceutical inventory (including diabetic supplies), within 30 days of the manufacturer's expiration date, if any; (iv) if applicable, any inventory deemed to be Excluded Inventory under paragraph 3.5 of this Agreement; (v) any dairy, frozen food, non-foods, HBC, packaged meat, general merchandise, and supplies; and (vi) any pharmacy inventory.

1.35 "Excluded Personal Property" will mean: (i) all Excluded Inventory; (ii) all packaging materials and supplies not included in the term "Supplies"; (iii) all leased point-of-sale equipment and leased photo lab equipment; (iv) all other leased equipment (including all other leased equipment described on Exhibit D to this Agreement with respect to the Store); (v) all owned computer and related equipment that contains software subject to a license that restricts its transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed; (vi) all equipment and other personal property that is neither owned nor leased by Seller, including by way of example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners and equipment owned by product vendors; (vii) all over-the-road motor vehicles; (viii) all computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property; (ix) all data files other than Pharmacy Scrips; (x) all lottery equipment and tickets; (xi) all accounts receivable, bank accounts, cash and cash equivalents; (xii) all trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates; (xiii) all building signs and panels in all pole and pylon signs that advertise Seller's business in the Store; (xiv) all intellectual property and rights (other than Pharmacy Scrips) relating to any of the foregoing; and (xv) all service agreements, leases of personal property, contracts and warranties relating to Seller's possession and operation of the Store.

1.36 "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.37 "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.38 "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.39 "Initial Title Reports" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Store that Seller has made available to Buyer for review on the Merrill Website or otherwise as of the Effective Date. Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.40 "Inventory" will mean all inventories of goods and merchandise within the Store and owned by Seller on the Inventory Count Date and held for resale in the ordinary course of business of Seller conducted at the Store to retail customers, but excluding the Excluded Inventory.

1.41 "Inventory Certificate" will mean a certificate executed by Buyer and Seller in connection with the Closing as contemplated by paragraph 3.4.4 of this Agreement, in the form attached hereto as Exhibit H to this Agreement.

1.42 "Inventory Closing Statement" will mean a statement in the form of Exhibit C-2 to this Agreement reflecting the net amount due Seller at the Closing in respect of the Inventory Price, after making the adjustments described in Exhibit C-2 and in other provisions of this Agreement.

1.43 "Inventory Count" will have the meaning assigned in paragraph 3.4.1 of this Agreement.

1.44 "Inventory Count Date" will mean the day immediately preceding the Closing Date.

1.45 "Inventory Deposit" will have the meaning assigned in paragraph 3.3 of this Agreement.

1.46 "Inventory Price" will mean the purchase price for the Inventory determined pursuant to paragraph 3.4 of this Agreement.

1.47 "Inventory Service" will mean MSI Inventory Service Corporation or Accurate Inventory & Calculating Service, Inc., as designated by Seller, or

such other inventory service as is selected by Seller and reasonably acceptable to Buyer.

1.48 "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of Ronald Baker without any requirement of investigation or inquiry.

1.49 "Landlord" will mean the lessor under the Lease.

1.50 "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.1 of this Agreement.

1.51 "Lease" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.52 "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Store for its current use, taken as a whole, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, or grocery industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.53 "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Jaguar" with respect to the disposition of the Store and other properties.

1.54 "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on any of Seller's leasehold interests or on any other Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the

responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under the Lease or on any other Assets; and (D) judgments that have attached to and become a lien against Seller's interest under the Lease or on any other Assets.

1.55 "ordinary course of business" means the ordinary course of business of Seller after the Filing Date.

1.56 "Outside Date" means September 2, 2005, as such date may be extended by the written agreement of Seller and Buyer.

1.57 "Permits" will have the meaning assigned in paragraph 6.2 of this Agreement.

1.58 "Permitted Encumbrances" will mean (i) all matters listed on Exhibit F to this Agreement, (ii) all other matters set forth as exceptions in the Initial Title Reports, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in any additional Title Reports, other than Monetary Liens.

1.59 "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.60 "Pharmacy Scrips" will mean all customer lists, prescription files, prescription registers, and operating and maintenance logs owned by Seller that relate to the pharmacy operated in the Store.

1.61 "Purchase Price" will mean the Base Purchase Price, the Inventory Price and the Supplies Price collectively.

1.62 "Real Property" will mean the Leased Premises and the Improvements together.

1.63 "Real Property Escrow Date" will mean the date that is two Business Days prior to the Closing Date or such earlier date after the Bankruptcy Court Approval as Buyer and Seller may mutually designate.

1.64 "Sale Order" will mean an order or orders of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby.

1.65 "Seller" will have the meaning assigned in the initial paragraph of this Agreement.

1.66 "Seller Delivery Confirmation" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.67 "Seller Inventory Representative" will mean Michael Chlebovec or another person designated in writing by Michael Chlebovec or by Seller to act in such capacity.

1.68 "Seller's Brokers" will mean one or more of The Blackstone Group, L.P., The Food Partners, LLC and DJM Asset Management, LLC, as designated by Seller with respect to this Agreement.

1.69 "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; and (c) the Cure Costs.

1.70 "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.71 "Store" will have the meaning assigned in paragraph A of the Recitals to this Agreement, including if applicable any associated gas station, liquor store, pharmacy or other specialty area operated by Seller at the Leased Premises.

1.72 "Sublease" will mean, collectively whether there is one or more, the sublease(s) of a portion of the Leased Premises listed on Exhibit A-2 to this Agreement (if any), including amendments. If no sublease is listed on Exhibit A-2 to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Sublease will be disregarded.

1.73 "Subtenant" will mean, collectively whether there is one or more, the subtenant or sublessee under each Sublease. If no sublease is listed on Exhibit A-2 to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Subtenant will be disregarded.

1.74 "Successful Bid" will mean the highest or otherwise best offer to purchase the Assets, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.75 "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the preparation or merchandising of Inventory, located within the Store and owned by Seller on the Inventory Count Date, excluding, however, any such packaging materials and supplies that contain trademarks, trade names,

private labels, logos or designs of Seller, Winn-Dixie or any of their Affiliates.

1.76 "Title Reports" will mean, collectively, (i) the Initial Title Reports and (ii) any additional title reports and/or title insurance commitments with respect to the Store that Seller has made available to Buyer for review on the Merrill Website or otherwise.

1.77 "Title Insurer" will mean First American Title Insurance Company or Near North National Title LLC, as agent for Lawyers Title Insurance Corporation, or any other nationally recognized title insurance company, as designated by Seller.

1.78 "Title Policy" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.79 "Winn-Dixie" will mean Winn-Dixie Stores, Inc.

2.0 **Property Included in Sale**. Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets, which—excluding Excluded Personal Property—are comprised of the following:

2.1 Seller's interest, as tenant, under the Lease and Seller's interest in any leasehold improvements;

2.2 Seller's interest in all fixtures and all equipment located in the store building or buildings now existing on the Leased Premises (the "Building"), including but not limited to Seller's interest in (i) heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Building, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "Improvements"), and (ii) Seller's trade fixtures and equipment located in the Building (the "Equipment");

2.3 The Inventory;

2.4 Seller's interest in the Sublease (if any).

Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are subject to higher or otherwise better offers for the Assets and conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

3.0 **Purchase Price**.

3.1 Amount. The purchase price to be paid by Buyer to Seller for the Assets (other than the Inventory and Supplies) is $225,000.00 (the "Base

Purchase Price"). The purchase price to be paid by Buyer to Seller for the Inventory is the total of the Inventory Price for each item of Inventory, and the purchase price to be paid by Buyer to Seller for the Supplies is the Supplies Price.

3.2   Contract Consideration and Base Deposit. As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer shall deliver to Escrow Agent, no later than two Business Days after Seller's execution and acceptance of this Agreement, a base earnest money deposit of $22,500.00 (the "Base Deposit"). Buyer shall make the Base Deposit by wire transfer to an account designated in writing by Escrow Agent. The Base Deposit will be subject to refund to Buyer to the extent and in the circumstances described in paragraphs 12, 15 and 16. The Base Deposit will be credited against the Base Purchase Price at the Closing and will be held in an escrow account maintained by Escrow Agent prior to the Closing. Whenever used herein, the term Base Deposit also will be deemed to include all interest accrued thereon if the escrow account maintained by Escrow Agent is an interest bearing account; however, for state and federal income tax purposes, interest, if any, accrued on the Base Deposit will be deemed earned by Buyer. Buyer's federal taxpayer identification number (FEIN) is 63-091113.

3.3   Payment. The Purchase Price will be paid in the following manner:

   3.3.1   *Base Purchase Price*. On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Base Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the Closing Statement). On the Closing Date, Buyer will, subject to the conditions set forth in paragraph 10 of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted) to Seller (by wire transfer to an account designated in writing by Seller).

   3.3.2   *Inventory Deposit and Inventory Price*. On the Real Property Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) an inventory deposit of $100,000.00 (the "Inventory Deposit"). The Inventory Price shall be determined in the manner set forth in paragraph 3.4 of this Agreement. At the Closing, (a) Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the amount by which the Inventory Price exceeds the Inventory Deposit, and (b) Buyer will instruct Escrow Agent to transfer and deliver the Inventory Price to Seller, by wire transfer to an account designated in writing by

Seller. If the Inventory Deposit exceeds the Inventory Price, then Seller and Buyer shall provide written instructions to Escrow Agent to deliver the excess to Buyer promptly following Closing. The Base Deposit and, once deposited, the Inventory Deposit will individually and collectively sometimes be referred to in this Agreement as the "Deposit".

3.3.3 *Certain Transaction Costs*. All relevant rent, taxes (including real and personal property taxes), utilities (including the pharmacy phone line, where applicable) and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Base Price and Supplies Price to the extent thereof and then against the Inventory Price. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Buyer and Seller as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination and notice to such party that such amount is due. Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.3.3 which apply to the period after the Closing shall survive the Closing.

3.3.4 *Sales Tax*. Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. On Seller's request, Buyer agrees to provide Seller with a certificate stating that Buyer is purchasing the Inventory for resale, and such other resale documentation as may be reasonably required by Seller or any governmental authority to document that sale of the Inventory is exempt from sales tax. This paragraph 3.3.4 shall survive the Closing.

3.4 Inventory.

3.4.1 *Count of Store Inventory.* Seller shall close the Store at a time designated by Seller between 5:00 p.m. and 11:00 p.m. on the Inventory Count Date, unless otherwise agreed to by Seller and Buyer. As soon as possible after the closing of the Store, the parties will conduct a physical count (or measurement with respect

to gasoline and other vehicle fuels) of the Inventory at the Store (the "Inventory Count") with the assistance of the Inventory Service. Buyer and Seller will each have representatives present at the Store during the Inventory Count who will acknowledge in writing all computations before leaving the Store. Upon completion of such Inventory Count, except for mathematical errors, other agreed upon changes and disputes regarding Excluded Inventory, the count of the Inventory Service shall be final and binding on the parties for all purposes of this Agreement.

3.4.2 *Intentionally Omitted.*

3.4.3 *Valuation of Inventory.* The Inventory will be valued by applying the following methods to the count reported by the Inventory Service:

(a) with respect to pharmaceutical Inventory and gasoline the value used will be Seller's actual cost as reflected on its records kept in the ordinary course of business (for gasoline, cost shall be last acquisition cost), and

(b) with respect to all other Inventory the value used will be determined by taking Seller's standard retail shelf price (after adjusting to remove temporary or special price reductions, promotions or discounts, coupon discounts or customer loyalty card discounts) for the applicable item and multiplying such price by the valuation percentage for each merchandise category indicated in the table below:

| | Category | Valuation Percentage |
|---|---|---|
| 1. | Grocery (food only) | 70% |

3.4.4 *Inventory Certificates; Inventory Closing Statement.* Upon completion of the valuation of the Inventory, which shall be completed prior to the completion of Closing, the Buyer and Seller shall execute an Inventory Certificate, which shall contain the Inventory Price for the Inventory, and shall have incorporated therein a complete listing of the Inventory. Following execution of the Inventory Certificate, if requested by Buyer, Seller or Escrow Agent, Buyer and Seller shall execute an Inventory Closing Statement, which shall contain the Inventory Price for the Inventory and shall otherwise be consistent with the Inventory Certificate, and shall have incorporated therein appropriate disbursement instructions to Escrow Agent.

      3.4.5 *Cooperation and Resolution of Disputes.* The parties agree to be cooperative and reasonable in connection with the Inventory Count and will attempt, in good faith, to resolve any disputes respecting the quantity of Inventory, Excluded Inventory and Excluded Personal Property that may arise during the Inventory Count. Any disputes that have not been resolved by the completion of Closing shall be separately listed and settled by Buyer Inventory Representative and Seller Inventory Representative as expeditiously as practicable thereafter or, if the parties cannot agree, by the Bankruptcy Court. Any such determination of any dispute shall be final and binding on the parties.

3.4.6 *Inventory Services and Fees*. Seller will engage the Inventory Service, but the fees of the Inventory Service will be billed to and paid by Buyer. Buyer agrees to pay such fees at Closing or earlier if then due and in any event before delinquent.

3.5 Inventory Relating to Permits. If by Closing Buyer shall not have obtained any required Permit contemplated by paragraph 9.2 of this Agreement, notwithstanding its best efforts to do so, any tobacco, liquor, beer, wine, pharmaceuticals or other Inventory that under applicable law may not be transferred without such Permit will not be sold and transferred at Closing but will be segregated at the Store, in which case, unless the parties agree otherwise at or before Closing, (a) the relevant items of Inventory will be deemed to constitute Excluded Inventory, (b) the Bill of Sale to be delivered to Buyer at Closing will specifically exclude such Inventory, (c) the Inventory Price will be reduced by the Inventory Price allocable to such Inventory, and (d) Seller will remove such Inventory from the Store in the same manner as other Excluded Property and with reasonable promptness after Closing. Notwithstanding the foregoing clause (d), if applicable law or regulation restricts Seller from removing from the Store (or transporting from the Store to a convenient location in which Seller will have continuing operations) any tobacco, liquor, beer, wine, pharmaceuticals or other Inventory that constitutes Excluded Property, then (i) Seller will have the right to segregate such Inventory at a secured location in the Store selected by Seller and reasonably acceptable to Buyer, and to maintain and protect such Inventory at such secured location for so long as Seller reasonably requires in order to obtain all Permits necessary to remove or transport such Inventory (or to sell or convey such Inventory to a third party entitled to do so), (ii) Seller will have reasonable access to such secured location to maintain and protect such Inventory and when appropriate remove such Inventory from the Store, and (iii) Seller will have the right but not the obligation to require Buyer to purchase such Inventory, at the Inventory Price allocable to such Inventory, at such time as Buyer has obtained such Permits as are required for Seller to do so.

    3.6 Allocation of Base Purchase Price Among Assets. Seller shall have the right to allocate the Base Purchase Price, for tax purposes and all other purposes, among the Assets other than Inventory and Supplies (as such Assets are described in paragraph 2.0 of this Agreement); provided, however, that such allocation shall not be binding upon Seller or determinative with respect to any allocation made by Seller of the Base Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case. The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets on the Closing Statement.

4.0 **Buyer's Due Diligence.**

4.1 Acknowledgment. In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence regarding the Store and the Assets and it has had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement. Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Store and the Assets and to acquire such additional information about the Store and the Assets as Buyer has reasonably requested. Buyer agrees that any physical access to or investigation of the Store by Buyer or its representatives shall be limited by and shall comply in all respects with the written instructions and requirements of Seller.

4.2 Title. Buyer confirms and acknowledges that Seller has made the Initial Title Reports available to Buyer, and intends to make additional Title Reports available to Buyer, and Buyer may negotiate with the Title Insurer to obtain a title insurance policy with respect to the Store (the "Title Policy") at Closing. If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present use or occupancy of the Store, Buyer may object to such matter by delivery of written notice of objection to Seller by email to TTucker@kslaw.com with copy to CatherineIbold@winn-dixie.com within three business days of the date such additional Title Report is either delivered to Buyer or posted on the Merrill Website. To be effective, any such notice of objection shall include in the reference or subject matter line the following, in capital letters "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE # 452" with the appropriate Store number set forth). If Buyer timely notifies Seller of any valid objection to any such matter set forth in any additional Title Report , and if Seller declines or is unable to cure any such objection, then Seller will have the right to terminate this Agreement at any time

thereafter, with no liability to Buyer, unless Buyer waives such objection by written notice received by Seller no later than the earlier of (x) one Business Day following Buyer's receipt of notice from Seller that it will not cure such objection or (y) the Closing Date. If Buyer closes the purchase of the Assets, then Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter and such matter shall constitute a Permitted Encumbrance.

4.3  Environmental Reports. Buyer confirms and acknowledges that Seller has made available to Buyer for review on the Merrill Website an environmental report (the "Environmental Report"), covering the Real Property relating to the Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where the Store is located.

5.0  **Representations and Warranties of Seller Relating to the Assets.** To induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

5.1  On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website: (i) a copy of the Lease (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a)  a copy of the site plan for the Store;

(b)  a copy of the fixture plans for the Store; and

(c)  a list of Equipment (other than Excluded Personal Property) at the Store as reflected in Seller's current records;

it being understood that the materials described in this paragraph 5.1 have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

5.2  At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Monetary Liens other than the Permitted Encumbrances to the extent provided under Section 363 of the Bankruptcy Code.

6.0  **General Representations and Warranties of Seller.** In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to

Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

6.1 Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

6.2 No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, (iii) those contemplated by or required under paragraph 3.5 of this Agreement and (iv) Bankruptcy Court Approval.

6.3 Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.4 To Seller's Knowledge, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

6.5 None of the employees employed by Seller in the Store is covered by a union contract, collective bargaining agreement or other labor agreement.

6.6 Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

7.0 **Buyer's Representations and Warranties**. Buyer represents and warrants to Seller as follows:

7.1 Buyer is a Corporation duly organized, validly existing and in good standing under the laws of the State of Alabama, and has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required corporate action on behalf of Buyer.

7.2 No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated.

7.3 This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4 There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

7.5 Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.