**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., <u>et al.</u>, | ) | *Chapter 11* |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |

**AMENDED MOTION FOR AN ORDER AUTHORIZING THE**
**DEBTORS (A) TO RETAIN LIQUIDATING AGENT AND**
**APPROVING AGENCY AGREEMENT, (B) TO SELL**
**FURNITURE, FIXTURES, EQUIPMENT AND RELATED ASSETS**
**FREE AND CLEAR OF LIENS AND EXEMPT FROM STAMP**
<u>**OR SIMILAR TAXES AND (C) GRANTING RELATED RELIEF**</u>

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates (collectively,

the "Debtors"), file this motion for entry of an order pursuant to 11 U.S.C. §§ 105, 363, and 1146

and Rules 2014 and 6004, of the Federal Rules of Bankruptcy Procedure (i) authorizing the

Debtors to employ and retain The Pride Capital Group, LLC, doing business as Great American

Group (the "Agent") as liquidating agent pursuant to the agreement attached as Exhibit A (the

"Agency Agreement") and approving the Agency Agreement, (ii) authorizing the Debtors to sell

furniture, fixtures and equipment as well as designated rolling stock  and excess equipment

located at the Debtors' distribution centers (collectively, the "Assets"), free and clear of liens,

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are Debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

claims and interests, and exempt from any stamp or similar tax, and (iii) granting related relief (the "Motion").  In support of the Motion, the Debtors respectfully represent:

## Background

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "New York Court").  By order dated April 13, 2005, the New York Court transferred venue of these cases to this Court.  The Debtors' cases are being jointly administered for procedural purposes only.

2.      The Debtors operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request has been made for the appointment of a trustee or examiner.  On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") to serve in these cases pursuant to Bankruptcy Code Sections 1102 and 1103.

3.      The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  At the Petition Date, the Debtors operated more than 900 stores in the United States.  Most of these stores are leased rather than owned.  The Debtors also lease or own ten distribution centers throughout the Southeast to service these stores.

4.      Prior to the Petition Date, the Debtors and their financial advisors began a comprehensive analysis of the Debtors' businesses to determine how best to maximize their value and to compete in today's marketplace.  In connection with this analysis, the Debtors

announced a series of actions designed to improve their competitive position, which the Debtors refer to as their Strategic Plan.

5.       In connection with the Strategic Plan, the Debtors and their financial advisors analyzed the various markets and determined that the Debtors should exit entirely from 14 of their 37 market areas and close a number of unprofitable stores within their remaining 23 market areas.  Prior to the Petition Date, the Debtors closed or sold 156 stores.

6.       Since the Petition Date, the Debtors have rejected 180 store leases.  The Debtors and their financial advisors have also identified another 326 stores that are either in markets from which the Debtors are exiting or are, nevertheless, unprofitable (collectively, the "Targeted Stores").  To date, the Debtors have sold (or are in the process of selling) their leasehold interests in 100 of these Targeted Stores.  The Debtors will reject the leases on each Targeted Store the Debtors are unable to sell.  Once the Targeted Stores are sold or closed, the Debtors will be left with 587 stores located in Florida, Alabama, Louisiana, Mississippi, Georgia and the Bahamas.

7.       As a result of this smaller footprint, the Debtors no longer need all of their distribution centers.  The Debtors intend to close four of their ten distribution centers located in market areas the Debtors are exiting altogether, Atlanta, Georgia, Charlotte, North Carolina, Greenville, South Carolina and Montgomery, Alabama (the "Closing Distribution Centers").  In addition, the Debtors intend to replace outdated equipment at its remaining distribution centers (the "Operating Distribution Centers") with equipment transferred from the Closing Distribution Centers and to sell outdated or excess equipment from the Operating Distribution Centers.  A list of the Operating Distribution Centers is attached as Exhibit B.  The Debtors need to promptly sell the Assets.

## Relief Requested

8.      By this Motion, the Debtors seek (i) authority to retain the Agent, (ii) approval of the Agency Agreement, and (iii) authority to sell the Assets free and clear of liens, claims and interests pursuant to section 363 of the Bankruptcy Code and exempt from stamp or similar tax pursuant to section 1146(b) of the Bankruptcy Code.

9.      The Agency Agreement provides the Debtors with the opportunity to dispose of the Assets and to maximize the proceeds for their estates.  The following is a summary of the material terms of the Agency Agreement: [2]

A.      Agent's Fee.  As compensation for the services being provided, the Agent will be entitled to a fee (the "Agent's Fee") in an amount equal to the following: (a) if Net Proceeds are less than $3,675,000, there will be no fee; (b) if Net Proceeds are equal to or greater than $3,675,000 up to $4,325,000, Agent shall receive a fee in the amount of twenty-five percent (25%) of the amount by which Net Proceeds exceed $3,675,000; (c) if Net Proceeds are greater than $4,325,000 up to $4,775,000, Agent shall receive a fee in the amount of thirty-five percent (35%) of the amount by which Net Proceeds exceed $4,325,000, plus the fee set forth in (b); (d) if Net Proceeds are greater than $4,775,000 up to $5,225,000, Agent shall receive a fee in the amount of fifty percent (50%) of the amount by which Net Proceeds exceed $4,775,000, plus the fee set forth in (b) and (c); and (e) if Net Proceeds are greater than $5,225,000, Agent shall receive a fee in the amount of sixty percent (60%) of the amount by which Net Proceeds exceed $5,225,000, plus the fee set forth in (b), (c) and (d).

B.      Control of Proceeds.  All cash proceeds from the sale will be deposited into the Debtors' depository bank accounts.

C.      Final Reconciliation.  Within 15 days after October 28, 2005 (the "Sale Termination Date"), the Agent and the Debtors will jointly prepare a final reconciliation including, without limitation, a summary of Proceeds, taxes, expenses, and any other accountings required (the "Final Reconciliation").  Within five days of completion of the Final Reconciliation, (i) any undisputed and unpaid expenses will be paid by the Debtors and (ii) any portion of the Agent's fee for which there is no disputed amount will be paid by the Debtors to the Agent.

---

[2] This summary of the Agency Agreement is provided as a convenience only.  To the extent that this summary differs in any way from the terms of the Agency Agreement, the terms of the Agency Agreement and related documents control.

D.    Expenses of the Sale.  All expenses of the sale will be borne by the Debtors consistent with an expense budget to be agreed to between the Agent and the Debtors and attached to the Agency Agreement (the "Expense Budget").  The Agent will pay expenses of the sale that exceed the Expense Budget.  In the event the Agent fails to timely vacate any of the Distribution Centers the Agent must reimburse the Debtors for any expense or claims incurred.

E.    Assets Subject to this Agreement.  The Assets substantially include all furniture, fixtures and equipment and specifically identified rolling stock located at the Closing Distribution Centers and excess equipment located at the Operating Distribution Centers.

F.    Additional Assets.  The Assets also include (i) additional equipment not located in the Distribution Centers on the Sale Commencement Date but but which the Debtors and the Agent mutually agree to include in the Sale on terms and conditions acceptable to the Debtors and the Agent in accordance with the terms of the Agreement and (ii) to the extent the Company provides written notice to Agent on or prior to September 22, 2005, any and all furniture, fixtures and equipment located at the Debtors' Montgomery Pizza facility located in Montgomery, Alabama and/or the Debtors' Highpoint Dairy located in Highpoint, North Carolina, subject to the Debtors and the Agent reaching an agreement on any appropriate and necessary modifications to the Expense Budget related to such additional Assets.  To the extent that any assets located at the Montgomery Pizza facility and/or the Highpoint Dairy are added to the Assets pursuant to Section 5.1 of the Agreement, the Montgomery Pizza facility and/or the Highpoint Dairy are deemed to be a Distribution Center under the Agreement.

G.    Vacating the Distribution Centers.  The sales under the Agency Agreement will commence immediately after entry of an order of this Court approving the Agreement and continue until the Sale Termination Date (subject to extension or acceleration with the mutual agreement of the Debtors and the Agent).  The Agent will provide the Debtors with not less than seven days' advance written notice of its intention to vacate any Distribution Center.  The Agent will be responsible for the removal of any unsold Assets by the Sale Termination Date.  On the Sale Termination Date, the Agent must vacate and leave the Closing Distribution Centers in "broom clean" condition (ordinary wear and tear excepted).

10.    By this Motion, the Debtors seek authority to sell the Assets through the Agent under the Agency Agreement.  The Debtors also seek authority to permit the Agent to conduct the sales without obtaining permits which may otherwise be required by federal, state or local laws, other than health and safety laws (the "Safety Laws") and without interference by the affected landlords of the Distribution Centers.  The Debtors' retention of the Agent under the

Agency Agreement, and prompt sale of the Assets is in the best interest of the Debtors' respective estates and creditors.

## Applicable Authority

**A.    The Debtors' Decision To Retain An Agent And Sell The Assets
Is Supported By A Sound Business Reason.**

11.    The Debtors seek authority to employ and retain the Agent to assist the Debtors in liquidating the Assets.  The Debtors believe that the sale results will be substantially enhanced by the Agent and that it would be more costly for the Debtors to undertake the sales without the Agent.  The Agency Agreement was negotiated at arms-length and in good faith by the Debtors and the Agent.  The terms of the Agency Agreement are fair and reasonable, and are consistent with those charged by liquidators in major liquidation sales of this nature.  The Debtors have confidence in the ability of the Agent to maximize the value of the Assets.

12.    Bankruptcy Code Section 363(b)(1) provides:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Bankruptcy Code Section 1107 (a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under Section 363(b)(1).

13.    Courts have held that transactions under Section 363(b)(1) should be approved when they are supported by a sound business reason.  *See In re BDK Health Mgmt., Inc.,* Case Nos. 98-00609-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a Section 363(b)

application must find from the evidence presented before him a good business reason to grant such application); *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (holding that a debtor in possession can sell assets of his estate outside the ordinary course of business if he has an articulated business justification); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that the business judgment test is the proper standard to apply when considering a debtor's motion to sell assets outside the ordinary course of business); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that a trustee must show that "there is a sound business purpose for conducting the sale prior to confirmation of a plan"); *In re Gulf States Steel, Inc. of Alabama,* 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002) ("[T]he Trustee has the burden to establish sound business reasons for the terms of the proposed sale").

14.     If a sound business reason exists, the law vests a debtor's decision to use property out of the ordinary course of business with a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. Of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest, or gross negligence." *Id.*

15.     The Debtors have a sound business reason to retain the Agent under the Agency Agreement and to sell the Assets.  The Debtors' sale of the Assets will bring substantial value to the Debtors' estates and these assets are no longer necessary for the Debtors because they are located at Closing Distribution Centers or are otherwise outdated or unused.

16.     Liquidation sales are a routine part of chapter 11 cases involving retail debtors. *See, e.g., In re Ames* Dep't *Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring Debtor to maximize estate assets").  Bankruptcy courts have granted similar relief in other cases involving retailers.  *See, e.g., In re Breuners Home Furnishings Corp.*, Case No. 04-12030 (Bankr. D. Del. July 30, 2004); *In re Mansour's, Inc.*, Case No. 04-10979 (Bankr. N.D. Ga. Apr. 20, 2004); *In re Heilig-Meyers Co.*, Case No. 00-34533 (Bankr. E.D. Va. Sept. 13, 2000); *In re London Fog, Inc.*, Case No. 99-3446 (Bankr. D. Del. Oct 7, 1999); *In re Starter Corp.*, Case No. 99-906 (Bankr. D. Del. July 2, 1999); *In re WSR Corp.*, Case No. 98-1241 (Bankr. D. Del. Oct. 28, 1998); *In re Montgomery Ward Holding Corp.*, Case No 97-1409 (Bankr. D. Del. Nov 7, 1997).

17.     The Debtors' request that the Agent not be required to obtain permits otherwise needed under federal, state and local laws is narrowly tailored to facilitate the successful consummation of the sales.  The Debtors and the Agent will comply with all applicable Safety Laws.

18.     Under these circumstances, bankruptcy courts have permitted the Debtors and their agents from complying with such permit requirements.   *See, e.g., In re Breuners Home Furnishings Corp.*, Case No. 04-12030 (Bankr. D. Del. July 30, 2004); *In re WSR Corp.*, Case No. 98-1241 (Bankr. D. Del. Oct. 28, 1998); *In re Montgomery Ward Holding Corp.*, Case No

97-1409 (Bankr. D. Del. Nov 7, 1997); *In re Edison Bros. Stores, Inc.*, Case No. 95-1354 (Bankr. D. Del. June 25, 1997).

**B.      The Debtors Should Be Permitted To Sell Assets Free**
**And Clear Of All Liens And Encumbrances.**

19.      The Debtors request that the sale and transfer of the Assets be approved free and clear of liens, claims and interest.  This relief is consistent with the provisions of 11 U.S.C. § 363(f).

20.      Pursuant to Section 363(f) of the Bankruptcy Code, after notice and a hearing, a debtor may sell property of the estate free and clear of all liens, interests and encumbrances.  *See In re Parrish*, 171 B.R. 138, 140 (Bankr. M.D. Fla. 1994) (noting that compliance with the requirements of Section 363(f) is a prerequisite to a sale free and clear of liens).

21.      The Debtors believe that there are no interests or claims in the Assets other than the senior liens and superpriority administrative claims of the DIP Lender and potential statutory liens, which will attach to the net proceeds received from the sales.  The interests of the DIP Lender will be satisfied because the Debtors will cause all net proceeds of the sales to be paid to the DIP Lenders to the extent required in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Lien Bases and Modify the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of All Claims of Debtors' Pre-Petition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).  Notwithstanding the

foregoing, the liens and claims of the DIP Lender (and any other liens encumbering the Assets) will not attach to the proceeds of sale that constitute the Agent's Fee under the Agency Agreement.

### C.     The Sale Should Be Exempt From Taxes.

22.     Bankruptcy Code Section 1146(c) provides that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax."  11 U.S.C. § 1146(c).  This language has been construed to include transfers pursuant to a sale outside of, but in furtherance of effectuating, a reorganization plan.  *Webster Classic Auctions, Inc.*, 318 B.R. 216, 218 (Bankr. M.D. Fla. 2004) (adopting rationale that purpose of Bankruptcy Code Section 1146(c) is to facilitate reorganizations and that transfers need not be postconfirmation); *BDK Health Mgmt.*, 1998 WL 34188241, at *8 (granting Bankruptcy Code Section 1146(c) relief outside of confirmed plan); *see also In re T.H. Orlando Ltd.*, 391 F.3d 1287, 1291 (11th Cir. 2004) (exemption applies where transfer is necessary to the consummation of a plan); *City of New York v. Jacoby-Bender, Inc.* (*In re Jacoby-Bender, Inc.*), 758 F.2d 840, 841-42 (2d Cir. 1985) (holding that where a transfer is necessary to the consummation of a plan, the transfer is "under a plan" within meaning of Bankruptcy Code section 1146(c)); *City of New York v. Smoss Enters. Corp.* (*In re Smoss Enters. Corp.*), 54 B.R. 950, 951 (E.D.N.Y. 1985) (stating that Section 1146(c) was designed to reach transfers on which "the plan hinged and which the court had to approve prior to the confirmation"), *aff'd mem.*, No. 85-5106, 1986 U.S. App. LEXIS 28677 (2d Cir. Mar. 31, 1986); *In re United Press Int'l, Inc.*, Case No. 91 B 13955 (FGC), 1992 Bankr. LEXIS 842, at *4, *6-7 (Bankr. S.D.N.Y. May 18, 1992) (holding that Bankruptcy Code Section 1146(c) exemption applied to Section 363 sale

where it found "the value of the Debtor's assets is likely to deteriorate [during the] time necessary to . . . confirm a plan"); *In re Permar Provisions, Inc.*, 79 B.R. 530, 533-34 (Bankr. E.D.N.Y. 1987) (stating that determination of applicability of Bankruptcy Code Section 1146(c) exemption is same for pre- and post-confirmation dispositions of property, namely "whether the sale of 'property is essential to confirmation of the plan'") (citation omitted).

23.     Although the Debtors have not yet filed a Chapter 11 plan of reorganization, an integral part of any plan will be the Debtors' ability to cease operations at the Closing Distribution Centers and to liquidate the Assets.  In light of the foregoing, the Debtors submit that the sale of the Assets is an integral part of, and a necessary predicate toward, the Debtors' Chapter 11 reorganization plan.  Accordingly, the sales should be exempt under Bankruptcy Code Section 1146(c) from any stamp, transfer, sales, recording or similar taxes.

**D.    Elimination of 10-Day Stay Under Rules 6004(g)**

24.     Pursuant to Bankruptcy Rule 6004(g), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to Section 363 of the Bankruptcy Code are automatically stayed for ten days after entry of the order.  Given the requirements of the Agency Agreement and the need to promptly sell the Assets, the Debtors request that the Court order and direct a waiver of the 10-day stay period.

## Notice

25.     Notice of this Motion has been given to: (a) counsel to the Creditor's Committee; (b) counsel to the DIP Lender; (c) all entities known to assert a lien, claim or interest in or on the Assets; (d) all non-debtor parties to the leases of the Distribution Centers; (e) the Office of the United States Trustee; (f) the Attorneys General for the State of Florida, Georgia, North Carolina, South Carolina, Louisiana and Alabama; and (g) all parties on the Master Service List.

## **Conclusion**

For the foregoing reasons, the Debtors respectfully request that the Court enter an order substantially in the form attached as Exhibit C: (a) authorizing the Debtors to retain the Agent pursuant to the Agency Agreement and approving the Agency Agreement; (b) authorizing the Debtors (through the Agent) to liquidate the Assets free and clear of liens, claims and interests and exempt from stamp or similar taxes; and (c) granting such other and further relief as the Court deems just and proper.

Dated: August 17, 2005

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By ___*/s/ D. J. Baker*___
    D. J. Baker
    Sally McDonald Henry
    Rosalie Gray
    Eric M. Davis

Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Attorneys for Debtors

SMITH HULSEY & BUSEY

By ___*/s/ Cynthia C. Jackson*___
    Stephen D. Busey
    James H. Post
    Cynthia C. Jackson. (F.B.N. 498882)
    Eric N. McKay

225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Attorneys for Debtors

**EXHIBIT A**

**EXECUTION COPY**

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is made as of this 16th day of August, 2005, by and between The Pride Capital Group, LLC d/b/a Great American Group, a California limited liability company (the "Agent"), and Winn-Dixie Stores, Inc. (the "Company"), a Florida corporation.

### RECITALS

WHEREAS, the Company, together with certain of its affiliates and subsidiaries, is a debtor and debtor in possession with a Chapter 11 case pending in the United States Bankruptcy Court for the Middle District of Florida ("Bankruptcy Court").

WHEREAS, the Company desires that Agent act as the Company's exclusive agent for the purpose of selling certain Assets (as defined herein), located at certain distribution centers identified on Exhibit "1" attached hereto and made part hereof (each a "Distribution Center" and collectively, the "Distribution Centers"), subject to the terms and conditions set forth herein (the "Sale");

WHEREAS, Agent is willing to serve as the Company's exclusive agent to conduct the Sale in accordance with the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and the Company hereby agree as follows:

Section 1.

1.1    Defined Terms. Capitalized terms as used in this Agreement will have the following meanings when used herein.

"Accounting Firm" means a nationally recognized accounting firm mutually acceptable to the Company and Agent.

"Agency Documents" means this Agreement and each other document and agreement contemplated hereby and executed and delivered in connection herewith.

"Agent" has the meaning set forth in the Preamble.

"Agent Claim" means any such claim, demand, penalty, loss, liability or damage that arises from the acts or omissions of Agent, or its supervisors, agents, independent contractors, employees located at any of the Distribution Centers, or the Company's employees being supervised by Agent in connection with or related to the Sale.

"Agent's Fee" has the meaning set forth in Section 3.1.

"Agent Indemnified Parties" means Agent and its officers, directors, employees, agents and independent contractors.

"Agreement" has the meaning set forth in the Preamble.

"Approval Order" means the order entered by the Bankruptcy Court (i) approving this Agreement, (ii) authorizing the conduct of the Sale pursuant to the terms of this Agreement (A) notwithstanding any state or local law or regulation otherwise governing or purporting to govern the licensing and conduct of the Sale (other than laws related to public health and safety and other similar items), (B) notwithstanding any provision in any lease, mortgage, or other occupancy agreement that purports to limit, govern or restrict the conduct of the Sale, and (C) without the necessity of obtaining any third-party consents, and (iii) which Approval Order shall not have been vacated or stayed.

"Assets" has the meaning set forth in Section 5.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Event of Default" means the Company's or Agent's failure to perform any of its respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party.

"Excludable Assets" has the meaning set forth in Section 5.3.

"Expenses" means all reasonable, out of pocket, documented and customary expenses incurred in the conduct of the Sale during the Sale Term consistent with and subject to the categories and aggregate amount set forth in the Expense Budget. Occupancy costs of the Distribution Centers will not be deemed Expenses of the Sale.

"Expense Budget" means an expense budget in the aggregate amount of not more than $450,000 which sets forth all Expenses related to the Sale during the Sale Term, substantially in the form attached hereto as Exhibit A, to be agreed to between Agent and the Company in writing prior to the Sale Commencement Date, together with any amended, modified or supplemented Expense Budget in form and substance satisfactory to the Company and Agent.

"Final Reconciliation" means a final reconciliation of the Sale including, without limitation, a summary of Proceeds, taxes, Expenses, and any other accountings required hereunder, prepared jointly by Agent and the Company within fifteen (15) days after the Sale Termination Date.

"Indemnification L/C" has the meaning set forth in Section 12.2(b).

"Interim Reconciliation" has the meaning set forth in Section 8.5.

"Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of the Company and certain affiliates of the Company under the name "Project jag2, WD

Distribution" with respect to the disposition of the Assets and located at
http://datasite.merrillcorp.com.

"Minimum Threshold" means the amount of Net Proceeds which must be generated
before the Agent's Fee is payable and is equal in amount to $3,675,000.

"Net Proceeds" means the aggregate Proceeds actually received by the Company at the
Distribution Centers during the Sale less Expenses.

"Proceeds" has the meaning set forth in Section 7.

"Remaining Assets" means all unsold Assets remaining, if any, in the Distribution
Centers at the Sale Termination Date.

"Sale" has the meaning set forth in the Recitals.

"Sale Commencement Date" means the date of the entry of the Approval Order.

"Sale Term" means the period from the Sale Commencement Date to the Sale
Termination Date.

"Sale Termination Date" means October 28, 2005, subject to Section 6.1.

"Sales Taxes" means all sales, excise, gross receipts, and other taxes attributable to sales
of the Assets (other than taxes on income) payable to any taxing authority having jurisdiction.

"Supervisors" means qualified supervisors to conduct the Sale and to manage the Sale
process and dispose of the Assets from the Distribution Centers.


1.2    Exhibits.  The following non-exclusive list of Exhibits and Schedules
annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Description |
| --- | --- |
| Exhibit A | Expense Budget |
| Exhibit 1 | Distribution Centers List |
| Exhibit 11.4 | Agent Insurance Policies |
| Exhibit 12.2(b) | Form of Indemnification L/C |

1.3    Currency.  Unless otherwise specified, all references to monetary amounts
refer to United States dollars.

Section 2.

2.1    Appointment of Agent.  Subject to the issuance of the Approval Order, the
Company hereby appoints Agent, and Agent hereby agrees to serve, as the Company's exclusive

agent for the limited purpose of conducting and overseeing the Sale in accordance with the terms and conditions of this Agreement.  Agent shall provide the Company with the following services in accordance with the terms hereof:

(a)   Sell or otherwise dispose of the Assets from the Distribution Centers.

(b)   Provide Supervisors to conduct the Sale and to manage the Sale process and dispose of the Assets and other assets located at any of the Distribution Centers.

(c)   Recommend and implement a Company-approved (i) external and internal advertising and signage, if any, necessary to effectively sell the Assets at the Distribution Centers in accordance with a "liquidation sale," auction or other mutually agreeable theme. (Agent shall deliver copies of all advertising materials for the Sale to the Company which shall have the right, within three (3) business days of such delivery, to approve such materials, which approval shall not be unreasonably withheld or delayed; provided, however, that the failure of the Company to reasonably respond to any request for approval within three (3) business days shall be deemed to be approval of the subject materials), (ii) pricing prior to an auction and presentation of the Assets, (iii) staffing levels for the Sale to be run within the Distribution Centers, and (vi) Distribution Center operation practices (i.e., ongoing services and housekeeping).

(d)   Recommend and implement a Company-approved Agent's operating plan for the Sale, including, (i) projections for anticipated revenues and expenses to be incorporated into and made a part of the Expense Budget, (ii) advertising and promotions plan, and (iii) supervision plan including, Assets supervision and central office supervision.

(e)   Maintain focused and constant communication with the Company's employees and managers to keep them abreast of strategy and timing, and maintain communication with landlords, if requested by the Company.

(f)   Maintain integrity and value of the Company's corporate image throughout the Sale.

(g)   Subject to the entry of the Approval Order, advise the Company with respect to the legal requirements of effecting the "liquidation sale," auction or other mutually agreeable theme in compliance with all federal, state, and local laws, rules, and regulations, including without limitation state and local permitting laws, to the extent (if at all) applicable following issuance of the Approval Order.

(h)   Establish, monitor and provide oversight of and conduct accounting functions for the Sale, including, without limitation, evaluation of sales of Assets by category, expense monitoring and reporting and updating the Expense Budget by providing weekly comparisons of actual and projected information, and sales tax compliance.

(i)   Supervise (if applicable) the operations of the Sale at each Distribution Center throughout the Sale Term such that the operation of each of the Distribution Centers is being properly maintained.

4

(j)    Recommend and implement the Company-approved staffing levels for the Sale at each of the Distribution Centers and appropriate bonus and/or incentive programs for employees, which are all subject to approval by the Company in its sole discretion.

(k)    Perform such other related services deemed by the parties to be necessary or prudent to facilitate the Sale.

Title to all Assets shall remain with the Company at all times during the Sale Term until such Assets is sold by or on behalf of the Company. All sales of Assets in the Distribution Centers shall be made on behalf of the Company.

2.2    In connection with the Sale, Agent shall directly retain and engage all Supervisors. The number and location of Supervisors to be retained and engaged by Agent with respect to the Sale shall be determined by Agent and the Company. The Agent and the Company shall confer periodically concerning the increase/decrease of the number of Supervisors needed during the course of the Sale Term, as the circumstances may dictate and shall agree on any such increases or decreases. The Supervisors are independent contractors engaged by Agent and are not and shall not be deemed to be employees or agents of the Company in any manner whatsoever; nor do the Supervisors have any relationship with the Company by virtue of this Agreement or otherwise which creates any liability or responsibility on behalf of the Company for such Supervisors. During the Sale Term, each Supervisor shall perform services during normal business hours and for the period of time required in connection with the Sale in Agent's discretion. In consideration of Agent's engagement of said Supervisors, the Company agrees to pay/reimburse Agent the amount of Agent's fees/expenses for such supervisory services, which amounts shall be set forth in the Expense Budget; provided, however, that the Company shall have no liability or obligation whatsoever to pay any such fees or expenses that exceed the budgeted amounts for such fees and expenses as set forth in the Expense Budget.

Section 3.    Agent's Fee.

3.1    Payments to the Company and Agent. As compensation for the services being provided pursuant to this agreement, Agent shall be entitled to a fee (the "Agent's Fee") in an amount calculated as follows:

(a)    If Net Proceeds are less than $3,675,000, there will be no fee paid to Agent;

(b)    If Net Proceeds are equal to or greater than $3,675,000 up to $4,325,000, Agent shall receive a fee in the amount of twenty-five percent (25%) of the amount by which Net Proceeds exceed $3,675,000;

(c)    If Net Proceeds are greater than $4,325,000 up to $4,775,000, Agent shall receive a fee in the amount of thirty-five percent (35%) of the amount by which Net Proceeds exceed $4,325,000, plus the fee set forth in 3.1(b);

(d)    If Net Proceeds are greater than $4,775,000 up to $5,225,000, Agent shall receive a fee in the amount of fifty percent (50%) of the amount by which Net Proceeds exceed $4,775,000, plus the fee set forth in 3.1(b) and 3.1(c); and,

5

(e)  If Net Proceeds are greater than $5,225,000, Agent shall receive a fee in the amount of sixty percent (60%) of the amount by which Net Proceeds exceed $5,225,000, plus the fee set forth in 3.1(b), 3.1(c) and 3.1(d).

The Agent's Fee shall be paid by the Company following the Final Reconciliation described in Section 3.3 below.

3.2     Control of Proceeds; Calculation of Net Proceeds.    All cash proceeds from the Sale shall be deposited by the Agent into accounts of the Company. For purposes of calculating Net Proceeds, Agent and the Company shall jointly keep (i) a strict count of gross receipts less applicable sales taxes, and (ii) cash reports of sales within each Distribution Center. All such records and reports shall be made available to Agent and the Company during regular business hours upon reasonable notice.

3.3     Final Reconciliation.

(a)  Within fifteen (15) days after the Sale Termination Date, Agent and the Company shall jointly prepare a Final Reconciliation of the Sale. Within five (5) days of completion of the Final Reconciliation, (i) any undisputed and unpaid Expenses shall be paid by the Company, and (ii) any portion of the Agent's Fee for which there is no disputed amount will be paid by the Company to Agent. Any (x) disputed amount(s) or (y) Agent's Fee shall not be paid until all disputes have been resolved by agreement of the parties or as determined in the manner prescribed in Section 3.3(b) hereof. During the Sale Term, and until all of the Agent's and the Company's obligations under this Agreement have been satisfied, the Company shall have full access to Agent's records with respect to Proceeds, taxes, Expenses, and other records related to the Sale to review and audit such records.

(b)  In the event that there is any dispute with respect to the Final Reconciliation, such dispute shall be promptly (and in no event later than the third business day following the request by either the Company or Agent) submitted to the Accounting Firm for resolution. The non-prevailing party shall bear the cost of the Accounting Firm. The parties shall request that the Accounting Firm render a final and binding decision on the dispute within seven (7) business days following the submission of the dispute.

Section 4.     Expenses.

4.1     Expenses of the Sale.

All Expenses of the Sale shall be borne by the Company in accordance with the Expense Budget; except that to the extent that the actual aggregate Expenses exceed the aggregate budgeted amount set forth on the Expense Budget, Agent shall pay such excess. A copy of the Expense Budget is attached hereto as Exhibit "A" and is incorporated herein by reference. Agent agrees that the actual Expenses incurred in connection with the Sale (to the extent such items are within the control of Agent) shall not exceed the aggregate amount of the Expense Budget unless the Company and Agent mutually agree in writing. Without limiting the generality of the foregoing, during the Sale Term, the Company shall provide Agent with (i) central administrative services related to payroll for Company employees used by Agent in accordance with the Expense Budget to administer the Sale and the remittance of Sales Taxes to

6

the relevant taxing authorities, (ii) employees at the Distribution Centers (to the extent deemed necessary by the Agent and the Company to effect the Sale and included in the Expense Budget), and (iii) peaceful use and occupancy of, and reasonable access (including reasonable before- and after- hours access and normal utilities/phone service) to, the Distribution Centers for the purpose of preparing for, conducting, and completing the Sale as contemplated hereby. It is anticipated that Agent will advance funds for certain categories of reasonable supervision and advertising expenses identified in the Expense Budget, and the Company shall reimburse Agent therefor (in connection with each Interim Reconciliation) upon presentation of invoices and statements for such expenses, which reimbursement shall be in addition to the Agent's Fee. In the event that Agent fails to timely vacate any of the Distribution Centers on or before the Sale Termination Date as required by Section 6.2 hereof, Agent shall reimburse the Company for any expenses and/or claims arising from or related to such Distribution Center after the Sale Termination Date.

     4.2     <u>Payment of Expenses</u>.

     On the third business day following each Interim Reconciliation, all undisputed Expenses submitted by Agent for the preceding period based upon invoices and other documentation reasonably satisfactory to the Company shall be paid by the Company; <u>provided</u>, <u>however</u>, that the Company has no obligation to pay any Expenses that exceed the aggregate amount of the Expense Budget or any particular line item category included in the Expense Budget, or that are inconsistent with the categories and aggregate amount set forth in the Expense Budget unless mutually agreed upon by the parties. To the extent the Company disputes that Agent is entitled to payment of any portion of its Expenses, the Company may withhold payment of the disputed amount and the parties shall work in good faith to resolve the dispute in the manner contemplated by Section 3.3(b).

     Section 5.     <u>Assets</u>.

     5.1     <u>Assets Subject to this Agreement</u>. For purposes of this Agreement, "Assets" shall mean all furniture, fixtures and equipment and certain rolling stock that is owned by the Company and specifically listed, from time to time, on the Merrill Website under the name "Project jag2, WD Distribution" with respect to the disposition of the Assets, and located in the Distribution Centers on the Sale Commencement Date or at any time during the Sale Term. Notwithstanding the foregoing, "Assets" shall not include: (1) equipment which belongs to sublessees or licensees of the Company; (2) furniture, fixtures and equipment that, at the Company's sole discretion, will be redeployed to any of the Company's other premises prior to the Sale Commencement Date (other than the Distribution Centers identified on Exhibit "1" annexed hereto); (3) improvements to real property at the Distribution Centers, (4) assets leased by the Company, (5) assets specifically identified on the Merrill Website as assets excluded from the Sale, and (6) Excludable Assets as described in Section 5.3. The Minimum Threshold will be adjusted downwards to reflect the value of any Assets excluded from the Sale pursuant to Section 5.1(2) or added to the Merrill Website as assets excluded from the Sale after the date of this Agreement. The Company and Agent shall mutually agree upon the value of any such excluded Assets and any adjustment to the Minimum Threshold. The Agent acknowledges that the Assets listed on the Merrill Website is a product of the Company's best efforts to list such Assets and is not an representation by the Company that all such Assets will be available for sale under this Agreement.

In addition to the foregoing, Assets shall also include (i) such additional equipment that is not located in the Distribution Centers on the Sale Commencement Date but which the Company and Agent mutually agree to include in the Sale on terms and conditions acceptable to the Company and Agent in accordance with the terms of this Agreement and (ii) to the extent Company provides written notice to Agent on or prior to September 22, 2005, any and all furniture, fixtures and equipment located at the Company's Montgomery Pizza facility located in Montgomery, Alabama and/or Highpoint Dairy located in Highpoint, North Carolina, subject to the Company and Agent reaching an agreement on any appropriate and necessary modifications to the Expense Budget related to such additional Assets. To the extent that any assets located at the Montgomery Pizza facility and/or the Highpoint Dairy are added to the Assets pursuant to this Section 5.1, the Montgomery Pizza facility and/or the Highpoint Dairy are deemed to be a Distribution Center hereunder.

   5.2  Fixtures. The Agent shall not sell any fixtures affixed to a wall or the floor unless (i) the proceeds to be received from the sale of such fixtures are substantially greater than the estimated cost of repairs to the relevant wall or floor; or (ii) the purchaser of such fixtures repairs the wall or floor in a commercially reasonable manner at its own expense.

   5.3  Excludable Assets. At any time prior to the Sale Termination Date, the Company reserves the right to exclude any and all Assets situated at any Distribution Center which the Company has determined will be sold as part of an assignment and sale to a third-party of a leasehold interest or fee simple interest in the applicable Distribution Center (the "Excludable Assets"). The Company shall provide notice of such designation to the Agent as soon as practicable. The Minimum Threshold will be adjusted downward to reflect the value of any such Excludable Assets excluded from the Sale. The Company and Agent shall mutually agree upon the value of any such Excluded Assets and any adjustment to the Minimum Threshold.

   Section 6.  Sale Term.

   6.1  Term. The Sale shall commence at the Distribution Centers on the Sale Commencement Date. Subject to the Approval Order, the Agent shall complete the Sale at each Distribution Center, and shall vacate each Distribution Center's premises in favor of the Company or its representative or assignee on or before the Sale Termination Date. The Sale Termination Date at any of the Distribution Centers may be (a) extended by mutual written agreement of Agent and the Company or (b) accelerated by Agent, in which case Agent shall provide the Company with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date.

   6.2  Vacating the Distribution Centers. Agent shall provide the Company with not less than seven (7) days' advance written notice of its intention to vacate any Distribution Center. On the Sale Termination Date, Agent shall vacate in favor of the Company or its representatives or assignee, and leave the Distribution Centers in "broom clean" condition (ordinary wear and tear excepted). Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent or licensee thereof) to any location during the Sale Term, ordinary wear and tear excepted. On or before the Sale Termination Date, Agent shall have removed or abandoned all then Remaining Assets; provided, however, that Agent shall not be permitted to abandon any Remaining Assets unless the owner and landlord of the relevant

Distribution Center shall have consented and shall have provided a waiver, in a form reasonably satisfactory to the Company, of any liability of the Company or any of its affiliates related to such abandonment.

Section 7.    <u>Sale Proceeds</u>. For purposes of this Agreement, "<u>Proceeds</u>" shall mean the total amount (in dollars) of all sales of Assets made under this Agreement, exclusive of Sales Taxes. Proceeds shall also include any buyer's premium that may be assessed to purchasers at any onsight or web cast auction conducted by the Agent.

Section 8.    <u>Conduct of the Sale</u>.

8.1    <u>Rights of Agent</u>.  Agent shall be permitted to conduct the Sale, on behalf of the Company, as a "Liquidation Sale," auction or similar theme sale in the Distribution Centers throughout the Sale Term in accordance with this Agreement.  In addition to any other rights granted to Agent hereunder, in performing its duties in connection with the Sale, Agent shall have the right for purposes of the Sale:

(a) to implement Sale prices and Distribution Centers hours in accordance with an agreed upon plan with the Company as set forth in the Expense Budget and subject to the terms of applicable leases, mortgages, or other occupancy agreements, and local laws or regulations, including, without limitation, Sunday closing laws;

(b) to request from the Company the use of, during the Sale Term in accordance with the Expense Budget all computer hardware and software, existing supplies located at the Distribution Centers, intangible assets (including the Company's name, logo, and tax identification numbers), keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Distribution Centers, and any other assets of the Company located at the Distribution Centers (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses.  Agent shall exercise due care and return to the Company immediately at the end of the Sale all materials and supplies except materials or supplies expended in the conduct of the Sale;

(c) to request from the Company the use of the Company's central office facilities, central administrative services, and personnel to process payroll, perform MIS, and provide other central office services necessary for the Sale to the extent that such services are normally provided by the Company in-house, at no cost to Agent subject, however, to the Expense Budget; <u>provided</u>, <u>however</u>, that in the event Agent expressly requests the Company to provide services other than those normally provided to the Distribution Centers and relating to the Sale as expressly contemplated by this Agreement, Agent shall be responsible to reimburse the Company for the actual incremental cost of such services incurred by the Company to a third

party (e.g., a party which is not affiliated with or related to the Company);

(d) to recommend and implement the Company-approved advertising, signage, and promotion programs consistent with a "Liquidation Sale," auction or similar theme sale (including, without limitation, by means of media advertising, banners, A-frame, and similar signage). (Agent shall deliver copies of all advertising materials for the Sale to the Company which shall have the right, within three (3) business days of such delivery, to approve such materials, which approval shall not be unreasonably withheld or delayed; provided, however, that the failure of the Company to reasonably respond to any request for approval within three (3) business days shall be deemed to be approval of the subject materials);

(e) to recommend and implement the Company-approved (i) pricing during any orderly liquidation phase of the Sale and presentation of the Assets, (ii) staffing levels relating to the Sale for the Distribution Centers, and (iii) Distribution Center operation practices relating to the Sale (i.e., ongoing services and housekeeping).

8.2    Terms of Sales, Compliance with Law. All sales of the Assets will be "final sales" and "as is," and all advertisements and sales receipts will reflect the same. Agent shall not warrant the Assets in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to purchasers. All sales will be made only for cash or bank or cashier's check; provided, however, that if Agent determines to accept personal checks, Agent shall bear the risk of loss relating thereto. Except as may otherwise be provided in the Approval Order, Agent shall comply with all applicable laws and regulations in its conduct of the Sale, including laws and regulations governing the advertising of the Sale, pricing, and employment. If Agent fails to perform its responsibilities in accordance with this Section 8.2, Agent shall indemnify and hold harmless the Company from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties which the Company sustains or incurs as a result or consequence of the failure by Agent to comply with applicable laws and regulations.

8.3    Sales Taxes. During the Sale Term, all Sales Taxes shall be added to the sales price of Assets, if applicable, and collected by Agent, on the Company's behalf, and be immediately deposited in the Company's existing accounts, trust accounts, or other accounts, as designated by the Company. With Agent's cooperation, the Company shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Provided Agent performs its responsibilities in accordance with this Section 8.3, the Company shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties which Agent sustains or incurs as a result or consequence of the failure by the Company to promptly pay such taxes to the proper taxing authorities and/or the failure by the Company to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided the Company complies with its obligations hereunder, Agent shall indemnify and

hold harmless the Company from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties which the Company sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable the Company to file any requisite returns with such taxing authorities.

    8.4  _Weekly Reports_. Agent shall prepare and deliver to the Company (i) reports of sales on a weekly basis, in a form to be agreed upon between the Company and the Agent, and (ii) from time to time upon request, such other reports as the parties mutually agree are reasonably necessary to properly effect the Sale. Each party to this Agreement shall, at all times during the Sale Term and during the one-year period thereafter, provide the other with access to all information, books, and records relating to the Sale and to this Agreement. All records and reports shall be made available to Agent and the Company during regular business hours upon reasonable notice.

    8.5  _Sale Reconciliation_. On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and the Company shall cooperate to reconcile Expenses and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (_i.e._, Sunday through Saturday), all pursuant to procedures agreed upon by the Company and Agent (each such reconciliation, an "Interim Reconciliation"). Agent and the Company shall complete the Final Reconciliation in accordance with Section 3.3, the written results of which shall be certified by representatives of each of the Company and Agent as a final settlement of accounts between the Company and Agent.

    Section 9.  _Conditions Precedent_. The willingness of Agent and the Company to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

    (a) All representations and warranties of the Company and Agent hereunder shall be true and correct in all material respects (provided that neither party shall be able to terminate this Agreement pursuant to Section 14.10 if any breaches of representations or warranties that would cause this Section 9(a) to be failed to be satisfied have been cured in the time contemplated by Section 13).

    (b) On or before September 10, 2005, the Court shall have entered the Approval Order.

    Section 10.  _Representations, Warranties, and Covenants_.

    10.1  _The Company's Representations, Warranties, and Covenants_. The Company hereby represents, warrants, and covenants in favor of Agent as follows:

    (a) The Company (i) is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation; (ii) has all requisite corporate power and authority to own, lease, and operate its assets and properties and to carry

on its business as presently conducted and, subject to the requirement of Bankruptcy Court approval, has the power and authority to consummate the transactions contemplated by this Agreement; and (iii) is and during the Sale Term will continue to be duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Distribution Centers are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Company to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)   Subject to the issuance and entry of the Approval Order, the Company has the right, power, and authority to execute and deliver the Agency Documents and to perform fully its obligations thereunder. Subject to the issuance and entry of the Approval Order, the Company has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval on the part of the Company is required for the Company to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Subject to the issuance and entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by the Company and constitutes the legal, valid, and binding obligation of the Company enforceable in accordance with its terms. Subject to the issuance and entry of the Approval Order, no court order or decree of any federal, state, or local governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for the Company's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of the Company to execute and deliver this Agreement and perform fully its obligations hereunder. Other than for those contracts or agreements identified by the Company to Agent on or prior to the Sale Commencement Date, if any, no contract or other agreement to which the Company is a party or by which the Company is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)   Subject to the right of the Company to maintain a separate Assets liquidator and to continue to use and occupy each Distribution Center, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, each of the Distribution Centers, in order to perform its obligations described in this Agreement. Other than as identified by the Company to Agent on or prior to the Sale Commencement Date, to the extent necessary in furtherance of the Sale, the Company shall throughout the Sale Term maintain in a manner consistent with its customary and historic practices, at its sole expense (except as otherwise provided herein), heating systems, refrigeration, air conditioning systems, elevators, escalators, alarm systems, and all other mechanical devices used in the ordinary course of operation of the Distribution Centers or, if applicable, use reasonable efforts to cause any applicable landlord to comply with its obligations under applicable lease and occupancy agreements with respect to any such matter.

10.2    <u>Agent's Representations, Warranties, and Covenants</u>.  Agent hereby represents, warrants, and covenants in favor of the Company as follows:

(a)  Agent: (i) is a California limited liability company, duly formed, and validly existing, and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)  Agent hereby acknowledges and warrants that prior to the execution of this Agreement, Agent has had an opportunity to inspect the Distribution Centers and the Assets.

(c)  Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor. No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(d)  No action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Agent, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(e)  During the Sale Term, Agent shall maintain (i) a safe working environment in the Distribution Centers; and (ii) the cleanliness of the Distribution Centers in a manner at least consistent with the Company's past practices for the Distribution Centers.

(f)  Except as may otherwise be provided in the Approval Order, during the Sale Term, Agent shall comply with all federal, state, and local laws, rules, and regulations applicable to Agent in connection with the transactions contemplated by this Agreement.

13

Section 11.    Insurance.

11.1    The Company's Liability Insurance. The Company shall continue until the Sale Termination Date, in such amounts and on such terms and conditions as are consistent with the Company's ordinary course operations, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability, and umbrella liability insurance, covering injuries to persons and property in, or in connection with the Company's operation of, the Distribution Centers, and shall cause Agent to be named an additional named insured with respect to all such policies. Prior to the Sale Commencement Date, the Company shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. In the event of a claim under any such policies, the Company shall be responsible for the payment of all deductibles, retentions, or self-insured amounts to the extent said claim arises from or relates to the alleged acts or omissions of the Company or its employees, agents (other than Agent's employees), or independent contractors (other than Agent and independent contractors hired by Agent in conjunction with the Sale or the Company's employees being supervised by Agent).

11.2    The Company's Casualty Insurance. The Company shall continue until the Sale Termination Date, in such amounts and on such terms and conditions as are consistent with the Company's ordinary course operations, fire, flood, theft, and extended coverage casualty insurance covering the Assets in a total amount equal to no less than the cost value thereof. In the event of a loss to the Assets on or after the date of this Agreement, the proceeds of such insurance attributable to the Assets (net of any deductible) shall constitute Proceeds. Prior to the Sale Commencement Date, the Company shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent.

11.3    Workers' Compensation Insurance. The Company shall continue until the Sale Termination Date, in such amounts and on such terms and conditions as are consistent with the Company's ordinary course operations, workers' compensation insurance (including employer liability insurance) covering all of the Company's employees then currently employed at the Distribution Centers in compliance with all statutory requirements. Prior to the Sale Commencement Date, the Company shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

11.4    Agent's Insurance. Agent shall maintain at Agent's cost and expense throughout the Sale Term, in such amounts and on such terms and conditions as are acceptable to the Company in its reasonable discretion, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in, or in connection with Agent's duties at, the Distribution Centers, and shall cause the Company to be named an additional insured with respect to such policies. Exhibit 11.4 attached hereto contains a description of all such policies. Prior to the Sale Commencement Date, Agent shall deliver to the Company certificates evidencing such insurance policies, setting forth the duration thereof and naming the Company as an additional insured, in form and substance reasonable satisfactory to the Company. In the event of a claim under such policies, Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors.

14

11.5    Risk of Loss.

Without limiting any other provision of this Agreement, the Company acknowledges that Agent is conducting the Sale on behalf of the Company solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Distribution Centers or the assets located therein or associated therewith, or of the Company's employees located at the Distribution Centers, except, however, that Agent shall be responsible for supervising the conduct of the Company's employees in connection with the Sale, and (ii) except as expressly provided in this Agreement, Agent does not assume any of the Company's obligations or liabilities with respect to any of the foregoing, other than with respect to supervising the conduct of the Company's employees. Agent shall not be deemed to be a successor employer. The Company and Agent agree that, subject to the terms of this Agreement, the Company shall bear all responsibility for liability claims of purchasers, employees, and other persons arising from events occurring at the Distribution Centers during and after the Sale Term, except for any Agent Claims. In the event of any liability claim other than an Agent Claim, the Company shall administer such claim and shall present such claim to the Company's liability insurance carrier in accordance with the Company's policies and procedures existing immediately prior to the Sale Commencement Date. To the extent that the Company and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to the Company. In the event that the Company and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party at the address specified in Section 14.1 hereof.

Section 12.    Indemnification.

12.1    The Company Indemnification.  The Company shall indemnify and hold the Agent Indemnified Parties harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from or related to:

(a)    the Company's material breach of or failure to comply with any of its agreements, covenants, representations, or warranties contained in any Agency Document;

(b)    any failure of the Company to pay to its employees any wages, salaries, or benefits due to such employees during the Sale Term;

(c)    any liability or other claims asserted by customers, any of the Company's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, workers' compensation or under the WARN Act), except for Agent Claims and such other claims for which Agent has indemnified the Company elsewhere in this Agreement;

(d)    the gross negligence or willful misconduct of the Company or any of its officers, directors, employees, agents (other than Agent), or representatives.

15

Notwithstanding anything to the contrary contained in this section 12.1, the Company's aggregate obligation to indemnify Agent under the terms of the Agreement shall expire the earlier of (i) three (3) months after the Sale Termination Date or (ii) termination of this Agreement pursuant to Section 14.10 hereof, and shall not exceed $50,000 in the aggregate.

        12.2    <u>Agent Indemnification</u>. (a) Agent shall indemnify and hold the Company and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against the Company resulting from or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of the Agent):

        (i)    Agent's material breach of or failure to comply with any local, state, or federal laws or regulations, or any of its agreements, covenants, representations or warranties contained in any Agency Document;

        (ii)    any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of the Company by Agent or any of its employees, agents, independent contractors, or other officers, directors, or representatives of Agent;

        (iii)    any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

        (iv)    any Agent Claims; and

        (v)    the negligence or willful misconduct of Agent or any of its officers, directors, employees, agents, or representatives.

        (b)    To secure Agent's indemnity obligations under this Section 12.2, Agent shall deliver to the Company an irrevocable standby letter of credit in the original face amount of $250,000, naming the Company as the beneficiary, substantially in the form of Exhibit 12.2(b) attached hereto (the "<u>Indemnification L/C</u>"). The Indemnification L/C shall be delivered to the Company one (1) business day following the Sale Commencement Date, and shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to the Company. In the event that Agent shall become obligated to indemnify the Company any amount hereunder, the Company shall be entitled to draw on the Indemnification L/C to fund such amount following five (5) days written notice to Agent of the Company's intention to do so. The Indemnification L/C shall expire no earlier than sixty (60) days after the Sale Termination Date; provided, that, in the event that at the date that is ten (10) days prior to the scheduled expiration date of the Indemnification L/C there remains any unresolved dispute as to any amounts due under this Section 12.2 from Agent to the Company, the Company may, in its discretion, exercise the right to require Agent to have the expiration date of the Indemnification L/C extended for thirty (30) day intervals (or such other longer duration as the Company and Agent may agree) until such time as the subject dispute has been resolved and any additional amounts due hereunder have been paid to the Company, it being agreed that if Agent has for any reason not so extended the expiry date of the Indemnification L/C by the

date which is five (5) days prior to the then expiry date, the Company shall have the right to make a drawing under the Indemnification L/C in an amount equal to the amounts the Company asserts are then owing to the Company; provided further, that, in the event that Agent shall have paid to the Company all amounts due under this Section 12.2 prior to such date and the Company agrees that no further amounts may be owing in the future, the Company agrees to surrender the original Indemnification L/C to the issuer thereof together with written notification that the Indemnification L/C may be terminated.

12.3    Indemnification Procedure. The party seeking indemnity under this Agreement shall:  (a) fully and promptly notify the other party of any claim or proceeding, or threatened claim or proceeding; (b) permit the indemnifying party to take full control of such claim or proceeding; (c) cooperate in the investigation and defense of such claim or proceeding; (d) not compromise or otherwise settle any such claim or proceeding without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned, or delayed; and (e) take all reasonable steps to mitigate any loss or liability in respect of any such claim or proceeding. Notwithstanding anything contained herein, no party shall be liable to indemnify the other party for any claims, demands, penalties, losses, liability, or damage arising from the other party's gross negligence or willful misconduct.

Section 13.    Defaults. In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder.

Section 14.    Miscellaneous.

14.1    Notices. All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, as follows:

If to the Agent:

                    Great American Group
                    6330 Variel Ave
                    Woodland Hills CA  91367
Attn:  Mark Weitz
Tel:   (818) 884-3737
Fax:  (818) 884-2976

with a copy to:

                    Great American Group
                    One Parkway North, Suite 520
                    Deerfield IL  60015
Attn:  Mark P. Naughton
Tel:   (847) 444-1400
Fax:  (847) 444-1401

If to the Company:

|  |  |
|---|---|
|  | Winn-Dixie Stores, Inc. |
|  | 5050 Edgewood Ct. |
|  | Jacksonville, FL  32254 |
| Attn: | John Young |
| Tel: | (904) 783-5000 |
| Fax: | (949) 567-1799 |

with a copy to:

|  |  |
|---|---|
|  | King & Spalding LLP |
|  | 1185 Avenue of the Americas |
|  | New York, NY  10036 |
| Attn: | George B. South III |
| Tel: | (212) 556-2231 |
| Fax: | (212) 556-2222 |

14.2    <u>Governing Law: Consent to Jurisdiction</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of Florida, without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court shall retain jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the exclusive jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

14.3    <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

14.4    <u>Amendments</u>.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

14.5    <u>No Waiver</u>.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

14.6    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon Agent and the Company, including, but not limited to, any Chapter 11 or Chapter 7 trustee.  Agent shall not be permitted to assign its obligations under this Agreement.

14.7     Execution in Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement. This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

14.8     Section Headings. The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

14.9     Reporting. If requested by the Company, Agent shall prepare weekly reports including, without limitation, reports that comply with the Company's current weekly cash reporting to its central office, reflecting the progress of the Sale, which shall specify the Proceeds received to date. During the course of the Sale, the Company shall have the right to have representatives continually act as observers of the Sale in the Distribution Centers so long as they do not interfere with the conduct of the Sale.

14.10     Termination. This Agreement shall remain in full force and effect until the first to occur of: (i) receipt by the Company of written notice from Agent that any of the conditions specified in Section 9 hereof have not been satisfied; (ii) receipt by Agent of written notice from the Company that any of the conditions specified in Section 9 hereof have not been satisfied; or (iii) the expiration of the Sale Term and completion and certification by the Company and Agent of the Final Reconciliation pursuant to Section 3.3 above. Notwithstanding the foregoing, the provisions of Sections 3.3, 11 and 12 above shall survive the termination of this Agreement pursuant to this Section 14.10.

IN WITNESS WHEREOF, Agent and the Company hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

THE PRIDE CAPITAL GROUP, LLC d/b/a
GREAT AMERICAN GROUP


By:     _____
Name:     Thomas E. Pabst
Title:     Chief Administrative Officer

WINN-DIXIE STORES, INC.


By:     _____
Name:     Bennett Nussbaum
Title:     Chief Financial Officer

LEGAL APPROVED
ATTY: C B
DATE: 8/16/05

**EXHIBIT A**
**WINN DIXIE**
**EXPENSE BUDGET**
**INCLUDES (11) DC LOCATIONS AND (2) DAIRY LOCATIONS**

| | |
|---|---|
| (6) X GREAT AMERICAN  SUPERVISORS<br>BASED ON $2500 PER WEEK FOR 7 WEEKS | $ 105,000.00 |
| LABOR FOR (5) LOCATIONS | $  42,000.00 |
| (2) LABORERS PER LOCATION FOR (7) WEEKS | |
| LABOR FOR (7) PARTIAL LOCATIONS<br>BASED ON $600 PER WEEK PER LABORER, (1) LABORER PER LOCATION<br>FOR (3) WEEKS | $  13,000.00 |
| (6) X CONSULTANT AIRFARE<br>(1) ROUND TRIP AIR FARE EACH | $   4,500.00 |
| ADVERTISING   PER LOCATION<br>BASED ON (5) WEB CAST AUCTIONS | $  75,000.00 |
| DC CLEANUP/DUMPSTER | $  45,500.00 |
| MISC PER DC<br>TO INCLUDE SHIPPING, SUPPLIES, CATALOGS, ETC | $  40,000.00 |
| AUCTION DAY CREWS<br>TO INCLUDE ACCOUNTING, DATA, CLERICAL AND SECURITY | $  37,500.00 |
| AUCTION CREW TRAVEL<br>TO INCLUDE, AUCTIONEERS, ACCOUNTING, DATA AND CLERICAL | $  50,000.00 |
| WEB CAST COSTS PER SALE<br>INCLUDES BANDWIDTH, MEDIA PRESENTATION AND TECH SUPPORT | $  37,500.00 |
| TOTAL | $ 450,000.00 |

# EXHIBIT "1"

## DISTRIBUTION CENTERS

| DISTRIBUTION CENTER | ADDRESS |
|---|---|
| Greenville | 2819 Wade Hampton Blvd., #8<br>Taylors, SC  29687-2711 |
| Atlanta | 5400 Fulton Industrial Blvd<br>Atlanta, GA  30336 |
| Charlotte | 2425 Nevada Blvd.<br>Charlotte, NC  28273-6423 |
| Montgomery | 1550 Jackson Ferry Road<br>Montgomery, AL  36104-1718 |
| Greenville Dairy | 2819 Wade Hampton Blvd., #8<br>Taylors, SC  29687-2711 |
| Montgomery Dairy | 1550 Jackson Ferry Road<br>Montgomery, AL  36104-1718 |
| Miami | 3300 N.W. 123 Street<br>Miami, FL  33167 |
| Pompano | 1141 S.W. 12th Avenue, #1<br>Pompano Beach, FL  33069 |
| Hammond | 3925 Highway 190 West<br>Hammond, LA  70401 |
| Jacksonville-Baldwin | 15500 West Beaver Street<br>Jacksonville, FL  32234 |
| Jacksonville-GMD | 5050 Edgewood Court<br>Jacksonville, FL  32234 |
| Orlando | 4401 Seaboard Road<br>Orlando, FL  32808 |

**EXHIBIT 11.4**

# ACORD CERTIFICATE OF LIABILITY INSURANCE | 08/15/2005

| PRODUCER (661)702-6000   FAX (661)702-6060 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | |
|---|---|---|
| L&W Insurance & Financial Services, Inc. 28055 Smyth Drive Valencia, CA 91355 | **INSURERS AFFORDING COVERAGE** | **NAIC #** |
| INSURED The Pride Capital Group, LLC | INSURER A: Hartford Insurance Group | 0048 |
| | INSURER B: | |
| 6330 Variel Ave. Woodland Hills, CA 91367 | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE | POLICY EXPIRATION DATE | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY**<br>[X] COMMERCIAL GENERAL LIABILITY<br>[ ] CLAIMS MADE [X] OCCUR | 72UUNUQ8405 | 02/01/2005 | 02/01/2006 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 50,000 |
| | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>[ ] POLICY [X] PRO-JECT [ ] LOC | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| A | | **AUTOMOBILE LIABILITY**<br>[ ] ANY AUTO<br>[ ] ALL OWNED AUTOS<br>[ ] SCHEDULED AUTOS<br>[X] HIRED AUTOS<br>[X] NON-OWNED AUTOS<br>[X] Physical Damage | 72UUNUQ8405 | 02/01/2005 | 02/01/2006 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY**<br>[ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN EA ACC<br>AUTO ONLY: AGG | $ |
| A | | **EXCESS/UMBRELLA LIABILITY**<br>[X] OCCUR [ ] CLAIMS MADE<br>[ ] DEDUCTIBLE<br>[ ] RETENTION $ | 72RHUUQ8360 | 02/01/2005 | 02/01/2006 | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | AGGREGATE | $ 10,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | | | | [ ] WC STATU-TORY LIMITS [ ] OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| A | | OTHER<br>Equipment, Property<br>Inland Marine | 72RSUQ8853 | 02/01/2005 | 02/01/2006 | $3,000,000<br>Deductible: $5,000 | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

| **CERTIFICATE HOLDER** | **CANCELLATION** |
|---|---|
| Proof of Insurance | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br>AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08) | ©ACORD CORPORATION 1988

**EXHIBIT 12.2(b)**

**FORM OF INDEMNIFICATION L/C**

[NAME OF ISSUING BANK]

[ADDRESS]

Date: _____, 2005

Irrevocable Standby Letter of Credit Number: _____

BENEFICIARY:    Winn-Dixie Stores, Inc.
                5050 Edgewood Ct.
                Jacksonville, FL  32254
Attn:           John Young
Tel:            (904) 783-5000
Fax:            (949) 567-1799

Credit Number:
Opener's Reference No:

Gentlemen:

BY ORDER OF:    The Pride Capital Group, LLC d/b/a Great American Group:

We hereby open in your favor our Irrevocable Standby Letter of Credit (the "Letter of Credit") for the account of The Pride Capital Group, LLC d/b/a Great American Group, a California limited liability company (the "Agent") for a sum or sums not exceeding a total of two hundred and fifty thousand U.S. Dollars ($250,000.00) available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS on _____, 2005, or such earlier date on which the beneficiary shall notify us in writing that this Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original of this Letter of Credit and a signed statement in the form attached hereto as **Exhibit A** signed by WINN-DIXIE STORES, INC. (the "Company" and the "Beneficiary").

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from beneficiary in the form attached as **Exhibit B**.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. _____ dated _____ _____ of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practices for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500".

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention _____, mention our reference number as it appears above.  Telephone inquiries can be made to _____ at _____.

Very truly yours,


Authorized official

## EXHIBIT A OF INDEMNIFICATION L/C

TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Drawing for Amounts Due to:

|  |  |
|---|---|
|  | Winn-Dixie Stores, Inc. |
|  | 5050 Edgewood Ct. |
|  | Jacksonville, FL  32254 |
| Attn: | John Young |
| Tel: | (904) 783-5000 |
| Fax: | (949) 567-1799 |

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit").  The undersigned, duly [authorized officer/authorized agent] of Winn-Dixie Stores, Inc., a debtor and debtor-in-possession (the "Company" and the "Beneficiary"), and the Beneficiary of the Letter of Credit hereby certifies to you that:

(i)     The Pride Capital Group, LLC d/b/a Great American Group, a California limited liability company (the "Agent") is obligated to the Company under certain indemnification provision pursuant to that certain Agency Agreement dated as of August 16, 2005 among the Company, on the one hand, and Agent, on the other.

(ii)    The amount to be drawn is $_____ (the "Amount Owing").

(iii)   Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the Letter of Credit as of the date hereof .

(iv)    The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(v)     The payment hereby demanded is requested to be made no later than two (2) business days after the date of delivery of this certificate, by wire transfer to the following account:

[_____]
[_____]
[_____]
Further Credit to: [Account Title]
[Account No.]

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this _____ day of _____, 2005.

Very truly yours,

WINN-DIXIE STORES, INC.

By: _____
      Name:
      Title

## EXHIBIT B OF INDEMNIFICATION L/C

### IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Reduction of Face Amount:

> Winn-Dixie Stores, Inc.
> 5050 Edgewood Ct.,
> Jacksonville, FL 32254
> Attn:  John Young
> Tel:   (904) 783-5000
> Fax:   (949) 567-1799

Ladies and Gentlemen:

We refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly [authorized officer/authorized agent] of Winn-Dixie Stores, Inc. (the "Beneficiary"), hereby confirms to you that the face amount of the Letter of Credit No. _____ shall be reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this __ day of _____, 2005.

> Very truly yours,
>
> WINN-DIXIE STORES, INC.
>
> By: _____
>       Name:
>       Title

**EXHIBIT B**

## DC & Manufacturing Equipment Sales

### Continuing DCs Containing Other Equipment & Rolling Stock to be Auctioned

Miami
Richard Meoni
305-769-6655
3300 N.W. 123 Street
Miami, FL  33167

Pompano
Jimmy Williams
954-783-2845
1141 S.W. 12th Avenue, #1
Pompano Beach, FL  33069

Hammond
Gregg Miles
985-549-6790
3925 Highway 190 West
Hammond, LA  70401

Jacksonville-Baldwin
Mike Cooper
904-266-8135
15500 West Beaver Street
Jacksonville, FL  32234

Jacksonville GMD - Perishable
Bob Stewart
904-783-5104
5050 Edgewood Court
Jacksonville, FL  32234

Orlando
Charles Butler
407-578-4068
4401 Seaboard Road
Orlando, FL  32808

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| _____ | ) | |

**ORDER (A) AUTHORIZING THE DEBTORS TO RETAIN
LIQUIDATING AGENT AND APPROVING AGENCY
AGREEMENT, (B) AUTHORIZING THE DEBTORS TO SELL
FURNITURE, FIXTURES, EQUIPMENT AND RELATED
ASSETS FREE AND CLEAR OF LIENS AND EXEMPT FROM
STAMP OR SIMILAR TAXES AND (C) GRANTING RELATED RELIEF**

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and

twenty-three of its subsidiaries and affiliates (collectively, the "Debtors") for an Order

(A) Authorizing the Debtors to Retain Liquidating Agent and Approving Agency

Agreement, (B) Authorizing the Debtors to Sell Furniture, Fixtures, Equipment and

Related Assets Free and Clear of Liens and Exempt From Stamp or Similar Taxes and

(C) Granting Related Relief (Docket No. _____) (the "Motion")[2].  The Court has

reviewed the Motion, considered the evidence and heard argument of counsel.  After due

deliberation, the Court finds that (i) the Court has jurisdiction over this Motion pursuant

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are Debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

[2]        Capitalized terms used but not defined in this Order have the meanings ascribed to such terms in the Agency Agreement or, if not defined in the agreement, as defined in the Motion.

to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (iii) notice of the Motion and the hearing on the Motion was adequate under the circumstances, (iv) the Assets sales set forth in the Motion are based upon the sound business judgment of the Debtors and the Debtors' means of carrying them out as set forth in the Motion are reasonable, necessary and in the best interests of the Debtors' estates, (v) the Debtors and The Pride Capital Group, LLC, doing business as Great American Group (the "Agent") entered into the Agency Agreement dated as of August 16, 2005 attached to the Motion as Exhibit A and incorporated by reference, as amended, (the "Agency Agreement") in good faith within the meaning of section 363(m) of the Bankruptcy Code 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") and the Debtors' sales of Assets under the Agency Agreement will be good faith sales within the meaning of section 363(m) of the Bankruptcy Code, (vi) the Agency Agreement has been negotiated in good faith and at arm's-length between the Debtors and the Agent, and (vii) just cause exists for the relief granted. Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted on the terms and conditions provided by this Order.

2.      In accordance with section 363 of the Bankruptcy Code, the Debtors are authorized and empowered to cease operations at the Closing Distribution Centers.

3.      In accordance with sections 363(b) and 105(a) of the Bankruptcy Code, the Debtors are authorized and empowered to conduct the Assets sales at the Closing Distribution Centers and the Operating Distribution Centers through the Agent on the terms and conditions set forth in the Agency Agreement and in accordance with the terms of this Order.

4.      The terms of the Agency Agreement are approved and this Order and the Agency Agreement are binding upon the Debtors, all creditors of the Debtors, and any trustees appointed in these proceedings or any trustees appointed in any subsequent proceedings under chapter 7 or chapter 11 of the Bankruptcy Code relating to the Debtor.

5.      Pursuant to section 363(f) of the Bankruptcy Code, all Assets to be sold by the Debtors are sold free and clear of any and all liens, claims and interests, with any liens, claims and interests to attach to the net proceeds after payment of the Agent's Fee in the order of priority provided by the Final Financing Order and the Loan Documents. The Agent is entitled to the protection of section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

6.      The Agent Fee is payable by the Debtors pursuant to the terms and conditions of the Agency Agreement and without further order of the Court.  After payment of the Agent Fee, the Debtors shall cause the net proceeds from the Assets sales to be paid to the DIP Lender to the extent required in accordance with the terms and conditions of the Final Financing Order and the Loan Documents.

7.      Subject to the restrictions set forth in this Order, the Debtors and the Agent are authorized to take any and all actions as may be necessary to implement the Agency Agreement in accordance with and subject to the terms of this Order and each of the transactions contemplated by the Agency Agreement.  Any actions taken by the Debtors and the Agent necessary to implement the Agency Agreement prior to the date of this Order are approved and ratified in accordance with this Order.

8.      The Debtors and their officers, employees, and agents (subject to the Debtors' internal policies and procedures) are authorized to execute such documents as

necessary to carry out the Assets sales and related actions including, without limitation, the Agency Agreement.

9.      All landlords of the Distribution Centers and all those acting for or on their behalf, are jointly and severally restrained and enjoined from interfering with or otherwise impeding the Debtors' and the Agent's sales of the Assets or the Agent's right to use the Distribution Centers and all services, furniture, fixtures, equipment and other assets of the Debtors which the Agent is granted the right to use in the Agency Agreement.

10.     The Agent is authorized and empowered to conduct the sales in accordance with the Agency Agreement and this Order, including, without limitation, transferring Assets between the Distribution Centers, without obtaining licenses or permits otherwise required by any federal, state or local law, rule, statute, regulation or ordinance.  Notwithstanding the foregoing, the Agent shall comply with any Safety Laws.

11.     The Agent is authorized and empowered to conduct the sale of the Assets in accordance with the Agency Agreement and this Order and to take all actions necessary to implement the terms and conditions set forth in the Agency Agreement.

12.     The Agency Agreement and attached Exhibits may be modified, amended or supplemented by the parties without further order of the Court; provided, however, that the parties will obtain the prior written consent of the DIP Lender and the Creditors' Committee, which consent shall not be unreasonably withheld; and provided further, that any such modification, amendment or supplement shall neither be materially adverse nor materially adversely change the economic substance of the transactions contemplated by the Agency Agreement and this Order.  The Debtors shall provide the U.S. Trustee with a

copy of any amendment or modification that requires the consent of the DIP Lender and the Creditors' Committee.

13.     Except as expressly set forth in the Agency Agreement, the Agent is not liable for any claims against the Debtors, and the Agent will have no successor liabilities whatsoever.

14.     No bulk sales law or any similar law of any state or other jurisdiction will apply in any way to the transactions authorized by this Order.

15.     Pursuant to section 1146(c) Bankruptcy Code, no transfer, stamp or similar tax will apply to the transactions authorized by this Order.

16.     The transfer of Assets between and among the Distribution Centers is authorized in accordance with and subject to the terms contained in the Agency Agreement and this Order.

17.     To the extent of any conflict between this Order, the Agency Agreement, the Motion, or any other order entered in these cases, the terms of this Order shall govern.

18.     This Court retains exclusive jurisdiction to resolve any dispute arising from or relating to the sale of the Assets, the Agency Agreement or this Order.

19.     Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy Procedure, this Order will take effect immediately upon signature.

20.     This Order is the "Approval Order" described in the Agency Agreement.

Dated this _____ day of August, 2005 in Jacksonville, Florida.

_____
Jerry A. Funk
United States Bankruptcy Judge

00504996

5