ASSET DESCRIPTION
----------------
SCHULT ELECTRIX STEAMER
NISSHON NONREFRIG ISL FOR SF SAUCES

OSD DESK WITH DOORS
IBM STORE CONTROLLER/ORDERING VEHIC

UNIVERSAL ALUMINUM CARTS - 26
LOAD KING ALUM FLORAL CARTS - 2
LOAD KING DAIRY CARTS - 5
LOAD KING ALUM F CARTS - 5
LOAD KING ALUM I E CARTS - 6
LOAD KING ALUM I L CARTS - 6
LOAD KING FISH PREP CART
LOAD KING STAINLESS SEAFOOD CART
LOAD KING ALUM CARTS FOR MEAT - 2
LOAD KING ALUM CARTS FOR MEAT - 5
LOAD KING MEAT FOR MEAT - 5
LOAD KING 6 X 8 ALUM CARS - 4
MAX CART
DELI CART
CART
UNIVERSAL ALUM CARTS - 20

COPPER TUBING
COPPER TUBING
COPPER TUBING
COPPER TUBING
COPPER TUBING

29 GAL RECEPTACLE - 2
45 GAL DOME TOP TRASH RECEPTACLES-6
BALER

PALLET JACK RIDER
PALLET JACK SLIDER
PALLET JACK SLIDER
PALLET JACK SLIDER
SERCO DOCK LEVELERS
SERCO DOCK LEVELERS
SERCO DOCK LEVELERS
CRANE W/PORTABLE BASE

---

ASSET DESCRIPTION
----------------
2K GENERATOR & TRANSFER SWITCH

WIRE FENCE

DELI PREP TABLE
MEAT PREP TABLE
LOAD KING BAKERY PREP TABLES - 2
LOAD KING PREP TABLE W/LABEL RACK
LOAD KING SALAD PREP TABLES - 2
LOAD KING PRODUCE PREP TABLES - 3
LOAD KING FISH PREP TABLE
LOAD KING FISH PREP TABLE
LOAD KING MEAT PREP TABLE
LOAD KING MEAT PREP TABLES - 5
LOAD KING MEAT PREP TABLE
LOAD KING 2-TIER MEAT GRIND TABLE
LOAD KING PRESTIGE MEAT TABLE
LOAD KING PREP TABLE
LOAD KING PREP TABLES - 5
LOAD KING PREP DUMPING TABLES - 2
LOAD KING DELI PREP TABLE W/LABEL
3/5 WORK TABLE W/STIK - SALAD BAR
EUROPEAN MAPLE TABLE W/CASTERS
EUROPEAN MAPLE TABLE W/CASTERS
PRESTIGE MEAT PREP TABLE
SEAFOOD PREP TABLE
DELI PREP TABLE PREP TABLE
PRODUCE PREP TABLES - 2
2-TIER GRIND TABLE
YEB-10G EUROPEAN TABLES - 3

ICE TABLE SPOT MERCHANDISER
ICE TABLE SPOT MERCHANDISER
NISSHAN END WITH MIRROR
4' CAMEO HIGH BACK STEP ENDS - 4
POWER BUYS W/BUMPER & TRIM - 4
POWER BUYS W/DISPLAYWALL BACK - 2
POWER BUYS W/DISPLAYWALL BACK - 2
ROLLING TABLE
FROZEN FOOD BLUFF
WALL OF VALUE BLUFF
DISPLAY WALL BLUFF
16' WINE RACK
ISLAND SPOT CASE END DISPLAYS - 4

---

ASSET DESCRIPTION
----------------
HATCO FLAV-R-FRESH DISPLAY

MADIX SHELVING
MADIX SHELVING
NISSHAN SHELVING
NISSHAN SHELVING
NISSHAN SHELVING
MADIX SHELVING
12 GLASS SHELVES
NISSHAN LIGHTED SHELVING

ELECTRIC AIR CURTAINS - 2
AIR CURTAINS

HANDICAP CART
SUPPLY VESTIBULE
VESTIBULE PORTABLE DESK FOR MEAT
LOAD KING PORTABLE DESK
LOAD KING PORTABLE DESK
LOAD KING LOCKERS - 2
LOAD KING LOCKERS - 2
LOAD KING LOCKERS - 7
LOAD KING DESK-FROM DAIRY/MEAT - 3
LOAD KING DESK FOR SALAD PREP DEPT
PANTRY VIDEO CONSOLE
LOCATION DECOR
LUXOR VIDEO CONSOLE
BICYCLE RACK
BRITE LITE INTERIOR NEON GRAPHICS
BLOWER
F-1 SHOPPER HANDICAP CARTS - 2
DIAPER DECK
6" OAK BENCHES - 2
6" OAK BENCHES - 2
4' OAK BENCH
3' OAK BENCH
KEY-MAKING COUNTER
"DRY CLEANING" SIGN
WALL DECOR FOR WINE DEPT
COPPER INTERIOR DECOR
LOAD KING 3 S FREESTANDING DESK
TV/VCR COMBO
PERSON WEIGHER

SHOPPING CARTS

BACKROOM SUPPLIES

06720\40153
LP ID No. 8

EXHIBIT "D"
TO LEASE

FORM OF COMPLETION CERTIFICATE

This Certificate is being delivered by Winn-Dixie Stores, Inc. (the "Tenant"), pursuant to paragraph 3(f) of the Lease Agreement, dated as of August 25, 1994 (the "Lease"), between Peregrine Properties Limited Partnership, an Iowa limited partnership, as landlord, and Tenant, as tenant. Tenant hereby warrants, represents and certifies as follows (capitalized terms used herein and not otherwise defined have the meanings set forth in the Lease):

(a) The Improvements are substantially complete and are ready for their intended use by Tenant as a retail food store.

(b) The Cost actually incurred as of the date hereof by Tenant with respect to the Leased Premises is not less than as set forth below:

Cost of Land . . . . . . . . . . . . . . . . . . $_____

Cost of Improvements based upon an approved appraisal (including site work and architects' and engineers' fees) . . . . . . . . $_____

Cost of Landlord's Equipment . . . . . . . . . . . . $_____

Capitalized Expenses (including capitalized interest, financing costs and other items included in the definition of Cost in the Lease) . . . . . . . . . . . . . . . . . . . . . . $_____

TOTAL    $_____

(c) All certificates of occupancy and other governmental consents needed for the use of the Leased Premises have been obtained.

(d) There are no claims of any person which are past due and unpaid relating to the construction of the Improvements or acquisition of the Landlord's Equipment except claims which are being contested as permitted by the Lease.

Exhibit D - Page 1

Exhibit A

(e)   The Lease is in full force and effect on the date hereof.  The Lease has not been amended and no Event of Default has occurred and is continuing thereunder.

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this certificate this _____ day of _____, 1994.

WINN-DIXIE STORES, INC.,
a Florida corporation


By:_____
Name:_____
Title:_____

Attest:


Name:_____
Title:_____

Exhibit D - Page 2


Exhibit A

06720\40153
LP ID No. 8

### EXHIBIT "E"
### TO LEASE

### BASIC RENT PAYMENTS

1. <u>Basic Rent</u>. Basic Rent shall be $287,215.60 per annum, payable on each March 1, June 1, September 1 and December 1 commencing on December 1, 1994, and continuing throughout the Initial Term (provided, however, if there is no Extended Term, the final installment of the Initial Term shall be made on August 31, 2014), in equal installments of $71,803.90 each, except that if the Commencement Date shall not occur on September 1, 1994, the installment of Basic Rent due on the first Basic Rent Payment Date shall be equal to the product of (a) the quarterly rent installment and (b) the fraction whose numerator is the number of days from (and including) the Commencement Date through (and including) November 30, 1994 and whose dominator is ninety.

2. <u>Basic Rent During Extended Terms</u>. Basic Rent shall be $287,215.60 per annum, payable on each March 1, June 1, September 1 and December 1 commencing on December 1, 2014, and continuing thereafter throughout each of the Extended Terms (provided, however, the final payment of the last Extended Term shall be made on the last August 31 occurring during the final Extended Term of this Lease).

Exhibit A

06720\40153
LP ID No. 8

EXHIBIT "F"
TO LEASE

PURCHASE PRICES

The Cost of the Leased Premises is $3,062,000.00. Upon the purchase of the Leased Premises by Tenant pursuant to paragraph 3(f), 13(b), 14(g), 16 or 29 of this Lease, the purchase price payable shall be an amount equal to the sum of (i) the unpaid principal amount of the Note together with interest accrued and unpaid thereon and any applicable Make Whole Premium (based on Treasuries plus 50 basis points for paragraphs 3(f), 16 and 29, and Treasuries plus 25 basis points for the penultimate sentence of paragraph 16) and (ii) the Equity Constant Percentage times the Cost of the Leased Premises plus $12,200.44 compounded quarterly at the rate of 10% per annum from the Commencement Date to the Termination Date. The "Equity Constant Percentage" means the amount (calculated to 6 places to the right of the decimal point) determined by dividing $4,430,554.93 by $69,018,000.00.

Exhibit F - Page 1

Exhibit A

06720\40153
LP ID No. 8

## EXHIBIT "G"

### LESSEE ESTOPPEL CERTIFICATE

The undersigned, _____, a _____ (the "**Tenant**") is the tenant or lessee under a Lease Agreement (the "**Lease**") dated as of _____, 1994, between Tenant and _____, a _____, as Landlord (the "**Landlord**") of certain real property located in _____, in the State of Georgia as described on attached Exhibit A (the "**Premises**"). With the understanding that _____, a _____ ("**Lender**"), will rely upon the representations made herein in making a loan of $_____ (the "**Loan**") to Landlord evidenced by a Real Estate Note (the "**Note**") in said amount executed by Landlord in favor of Lender and secured by a Deed to Secure Debt and Security Agreement (the "**Mortgage**") creating a first lien on the Premises and an Assignment of Lessor's Interest in Leases creating a direct and absolute assignment to Lender all of Landlord's rights, title and interest as Landlord in and to the Lease, Tenant hereby represents and certifies as follows:

1.    The Tenant is the owner and holder of all rights, title and interest in the Lease.

2.    [The construction of the Improvements and installation of the Equipment on the Premises has been substantially completed, and such construction complies with the requirements of all laws, ordinances, rules and regulations applicable thereto.]

3.    The Landlord does not have any unsatisfied obligations to the Tenant arising out of or incurred in connection with the construction of the Improvements on the Premises, the sale of the Premises to the Landlord or the leasing of the Premises to the Tenant, and no right of termination or offset exists with respect to any rents or other sums payable or to become payable by the Tenant under the Lease.

4.    All building permits [except certificates of occupancy], if any, required for the operation of the Premises by the Tenant have been obtained, and under applicable zoning and use laws, ordinances, rules and regulations, as well as environmental protection laws, the Premises may be used for the purposes contemplated by the Tenant.

5.    The Lease is in full force and effect and has not been modified, supplemented, canceled or amended in any respect except as stated above.

Exhibit G - Page 1

Exhibit A

6.    The term of the Lease commenced on _____, 1994, and continues through at least _____, 20_____.   The Tenant is obligated to pay rent in quarterly instalments in an amount not less than $_____ each, which rent obligation is continuing and is not past due or delinquent in any respect.  No instalment of rent has been or will be prepaid.

7.    The Premises comprise an approximately _____ square foot retail grocery store.

8.    No event has occurred or is continuing which would constitute a default by either the Tenant or the Landlord under the Lease or would constitute such a default but for the requirement that notice be given or that a period of time elapse or both.   No offset exists with respect to any rents or other sums payable or to become payable by the Tenant under the Lease.

9.    Landlord hereby directs Tenant to make all rent and other payments directly to Lender until otherwise advised in writing by Lender.   Landlord and Tenant hereby acknowledge the Landlord's authorization and direction to Tenant to make all payments due under the Lease directly to Lender (and whether or not any default ever occurs under the Note or Mortgage) after the date hereof to a bank designated in writing at least 10 business days prior to a rent payment date by Lender.

10.    The Tenant agrees to pay to Lender all rentals and any other sums due Landlord whatsoever under the Lease on the due date thereof without offset, counterclaim, deduction, defense, abatement, deferment or diminution for any reason (except as otherwise provided in paragraph 15 of the Lease), on or before such date such payments are due to the Landlord under the Lease and Tenant will not, for any reason whatsoever, seek to recover from Lender any monies paid to the Lender by virtue of the Lease notwithstanding that the Landlord shall not have had good right or lawful authority to lease the Premises to Tenant pursuant to the Lease.

11.    The Tenant agrees to deliver to Lender duplicate original copies of all notices, offers, undertakings, demands, statements, documents or other communications which it may deliver pursuant to the Lease.

12.    Any provisions of the Lease notwithstanding and so long as the Note is outstanding, Tenant agrees that it will not cause or permit any termination of the Lease by reason of the default of Landlord without first giving written notice to Lender ("Tenant's Notice") and affording to Lender the opportunity to cure the default within the periods (the "Cure Periods") hereinafter set forth.   Tenant's Notice shall be set forth with particularity the nature and extent of Landlord's default.   If such action requires only the payment of money, Lender shall have twenty (20) days from the date of its receipt of Tenant's Notice within which to cure the

Exhibit G - Page 2

Exhibit A

default. If such action requires more than the payment of money, Lender shall have sixty (60) days and shall have such additional time as is necessary provided that Lender commences action to cure such default and diligently proceeds with said actions until the cure is complete. In this connection, Lender shall have the right, but not the obligation, to do any act or thing which is necessary or proper to be done in the performance or observance of the agreements, covenants and conditions of the Lease to be performed or observed by Landlord to prevent or avoid termination of the Lease by reason of Landlord's default. In any event, the Lease shall be and remain in full force and effect during the Cure Periods and thereafter if Landlord's default set forth in Tenant's Notice are timely cured within the Cure Period, and Tenant shall not withhold or reduce the rent or any instalment of rent during such Cure Period.

13. Without the prior written consent of the Lender, Tenant agrees not to enter into any agreement subordinating or terminating the Lease nor to enter into any agreement amending or modifying the Lease and any attempted subordination, amendment or termination shall be void. In the event that the Lease shall be amended, modified or supplemented with the Lender's prior written consent, the Lease as so amended, modified or supplemented shall continue to be subject to the provisions of this Certificate. Tenant covenants and agrees with Lender that Tenant shall remain obligated under the Lease in accordance with its terms and that it will not take any action to terminate, rescind or avoid the Lease notwithstanding the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding up or other proceedings affecting the Landlord or any assignee of the Landlord, and notwithstanding any action with respect to the Lease which may be taken by an assignee or receiver of the Landlord or any such assignee or by any court in any such proceedings.

14. Tenant agrees that if pursuant to paragraph [3(f)], 13(b), 14(g), 16 or 29 of the Lease, the Tenant shall offer to purchase the Premises, or any part thereof, notice of acceptance of such offer shall be deemed validly given for all purposes if given by the Lender. If the Tenant shall become obligated to purchase the Premises, or any part thereof, pursuant to paragraph [3(f)], 13(b), 14(g), 16 or 29 of the Lease, a deed or other instrument conveying and transferring the Premises, or any part thereof, which is executed and delivered by the Lender, reciting Lender as agent and attorney in fact of the Landlord will be acceptable as being in compliance with the provisions of the Lease, provided that said deed or other instrument shall otherwise be in compliance with the provisions of the Lease. The Tenant further agrees that if it shall become necessary for the Lender or any other party to institute any foreclosure or other judicial proceeding so that the title to the Premises, or any part thereof, may be conveyed to the Tenant, the time permitted for the delivery of the deed or other instrument relating to such conveyance shall be extended to the extent necessary to permit the Lender or such other party to

institute and conclude such foreclosure or other judicial proceedings, and the Tenant agrees that the Lease shall not terminate but shall continue in full effect until the expiration of such period of extension; provided, however, that the Tenant may, in lieu of waiting for the conclusion of such foreclosure or other judicial proceedings, terminate the Lease upon the purchase by the Tenant from the Lender without warranty or recourse, the Note, the Mortgage and all of the Lender's interest under the other documents and instruments evidencing, governing and securing the Loan for a purchase price equal to the lesser of (1) the outstanding principal balance of the Note and the accrued interest thereon, or (2) the purchase price (as determined pursuant to paragraph [3(f)], 13(b), 14(g), 16 or 29 of the Lease) and further provided that if the Lender shall fail, refuse or be unable to sell to the Tenant the Note, the Mortgage and the Lender's interest under the loan documents evidencing the Loan, then the Lease shall terminate upon the expiration of 60 days following the Tenant's offer to purchase the same.

15.    This Certificate may not be modified orally or in any manner other than by an agreement, in writing, signed by the parties hereto and their respective successors in interest.  This Certificate shall inure to the benefit of and be binding upon the parties hereto, and their respective successors and assigns, and to no other persons or entities, and any representations, warranties and agreements made herein shall survive the closing of the Loan between the Lender and Landlord.

16.    In the event title to the Premises, or any part thereof, is acquired or becomes vested in the Tenant (other than pursuant to paragraph [3(f)], 13(b), 14(g), 16 or 29 of the Lease), whether pursuant to the Lease or otherwise, there shall be no merger of estates and the Lease shall not terminate or be affected thereby.

17.    For so long as the Note is outstanding, Lender or its designee may upon reasonable notice enter upon the Premises during regular business hours to visit or inspect the Premises and discuss the affairs, finances and accounts of Tenant applicable to the property or the Lease at such reasonable times as Lender or its designee may request.

18.    Neither the execution, delivery or performance of the Lease or this Certificate by Tenant violates any applicable law, order, writ, injunction or decree of any court or government authority of competent jurisdiction or results in any default under the terms of any agreement or instrument to which Tenant is a party or creates any lien, charge or encumbrance upon said property except those expressly created or permitted by the Lease.

19.    The Lease and this Certificate have been duly authorized, executed and delivered by Tenant and constitute legal, valid and binding instruments enforceable against Tenant in accordance with their respective terms, except as such terms may be limited by

Exhibit G - Page 4


Exhibit A

bankruptcy, insolvency or similar laws affecting creditor's rights generally.

20.    The provisions of the Lease, including the rents payable thereunder, were negotiated at arms length and no consent, authorization or approval of any government authority is necessary in connection with Tenant's execution, delivery or performance of the Lease or this Certificate.

21.    All notices, demands, requests or other communications to be given to Tenant or Lender pursuant hereto shall be in writing and shall be delivered by hand or sent by certified mail return receipt requested or by a reputable national service guaranteeing overnight delivery, postage prepaid, to (i) in the case of Tenant, _____, Attention: _____, (b) in the case of Lender, _____ _____, Attention: _____, or (c) at such other address as the party to be notified shall have specified by notice in writing.   Notices shall be effective upon receipt or upon refusal to accept delivery.

22.    Except as set forth herein, between Landlord and Tenant, the execution and delivery of this Certificate shall in no way expand the rights and obligations of the Landlord and Tenant arising under the Lease.

23.    This Certificate and the representations made herein shall be governed by the laws of the State of Georgia.

24.    Any capitalized terms used in this Certificate not otherwise herein defined shall have the same meaning as ascribed to such capitalized term in the Lease.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit G - Page 5

Exhibit A

In witness whereof, this Certificate has been duly executed, sealed and delivered by the authorized officers of the undersigned as of _____, 19_____.

**TENANT:**

_____,
a _____

By:_____
Name:_____
Title:_____

[CORPORATE SEAL]

Exhibit G - Page 6

Exhibit A

**LANDLORD**

_____,
a _____

By:_____
Name:_____
Title:_____

[CORPORATE SEAL]

**LENDER:**

_____,
a _____

By:_____
Name:_____
Title:_____

[CORPORATE SEAL]

**Exhibit G - Page 7**

## REAL ESTATE NOTE

$2,872,931.50                    Waycross, Georgia                    August 25, 1994

   FOR VALUE RECEIVED, the undersigned, PEREGRINE PROPERTIES LIMITED
PARTNERSHIP, an Iowa limited partnership authorized to transact business in Georgia as
Peregrine Ownership and Leasing Limited Partnership (hereinafter referred to as the "Maker"),
promises to pay to the order of PRINCIPAL MUTUAL LIFE INSURANCE COMPANY, an Iowa
corporation [hereinafter referred to as the "Payee"; the Payee, together with any subsequent
holder(s) hereof, hereinafter collectively referred to as the "Holder"], at the office of the Payee at
711 High Street, Des Moines, Iowa, 50392, or at such other place as the Holder may designate to
the Maker in writing from time to time, the principal sum of Two Million Eight Hundred Seventy-
Two Thousand Nine Hundred Thirty-One and 50/100 Dollars ($2,872,931.50) or so much thereof as
shall from time to time have been advanced, together with interest on the unpaid balance of said
sum from the date funds are advanced hereunder, at the rate of seven and nine hundred ten
thousand four hundred sixteen one-millionths (7.910416%) per annum, computed on the basis of a
360 day year composed of twelve 30-day months, in installments as follows:

> On December 1, 1994, principal and interest shall be due and payable
> in the amount of Seventy One Thousand One Hundred Seventy-Two
> and 62/100 Dollars ($71,172.62), with quarterly installments consisting
> of principal and interest in the total amount of Seventy-One Thousand
> Eight Hundred Three and 90/100 Dollars ($71,803.90) being due and
> payable on the first day of each March, June, September and
> December thereafter until said principal and interest are fully paid,
> except that all remaining principal and interest shall be due and
> payable on August 31, 2014 ("Maturity Date"). Each installment shall
> be credited first upon interest then accrued and the remainder upon
> principal, and interest shall cease to accrue upon principal so credited.
> If on the date of the first installment, interest is accrued for more or
> less than one installment period, the amount of said installment shall
> be increased or decreased by the amount that the interest accrued
> exceeds or is less than the interest for one installment period based on
> the actual number of days elapsed to the date of said installment. All
> principal and interest shall be paid in lawful money of the United
> States of America.

   No privilege is reserved by the Maker to prepay any principal of this note prior to the
Maturity Date, except that so long as no default or Event of Default exists under this note or any
instrument by which it is secured, privilege is reserved, after giving sixty (60) days' prior written
notice to the holder of this note, to prepay in full, but not in part, all principal and interest to the
date of payment, along with all sums, amounts, advances, or charges due under any instrument or
agreement by which this note is secured, upon the payment of a "Make Whole Premium." The

-2-

Make Whole Premium shall be the greater of (a) one percent (1%) of the principal amount to be prepaid, or (b) the excess, if any, of

    (i)    the aggregate present value as of the date of payment or prepayment noticed as set forth above (hereinafter, the "**Payment Date**") of each dollar of principal being paid or prepaid (taking into account the application of such prepayment as set forth herein) and the amount of interest (exclusive of interest accrued to the Payment Date) that would have been payable in respect of such dollar of principal being paid or prepaid if such payment or prepayment had not been made, determined by discounting such amounts monthly at a rate which is equal to the "**Treasury Rate**" from the due date of this note, <u>over</u>

    (ii)    100% of the principal amount being paid or prepaid.

The "**Treasury Rate**" will be equal to the arithmetic mean of the yields to maturity converted to a monthly equivalent of United States Treasury obligations with a constant maturity (as compiled by and published in the United States Federal Reserve Bulletin [H.R. 15] (hereinafter "**H.R. 15**") or its successor publication for each of the two weeks immediately preceding the Payment Date) most nearly equal to the remaining "Weighted Average Life to Maturity" of this note as of the Payment Date. If the yields referred to in the preceding sentence shall not have been so published, the yields corresponding to the Payment Date shall be calculated on the basis of the arithmetic mean of the arithmetic means of the secondary market ask rates, as of approximately 3:30 P.M., New York City time, on the last business days of each of the two weeks preceding the Payment Date, for the actively traded U.S. Treasury security or securities with a maturity or maturities most closely corresponding to the "Weighted Average Life to Maturity", as reported by three primary United States Government securities dealers in New York City of national standing selected in good faith by the holder of this note. If no maturity exactly corresponding to such remaining "Weighted Average Life to Maturity" should appear therein, yields for the next longer and the next shorter published maturities shall be calculated pursuant to the foregoing sentence and the Treasury Rate shall be interpolated from such yields on a straight-line basis (rounding to the nearest month).

The "**Weighted Average Life to Maturity**" with respect to this note means, at the Payment Date, the number of years obtained by dividing the "Remaining Dollar-years" of this note by the outstanding principal amount hereof. "**Remaining Dollar-years**" means the sum of the product obtained by multiplying (A) the amount of each then remaining required principal repayment (including repayment of any principal at the due date of this note) by (B) the number of years (rounded to the nearest one-twelfth) which will elapse between the Payment Date and the date such required payment is due.

    The Maker agrees that if the Holder accelerates the whole or any part of the principal sum evidenced hereby, or applies any proceeds as if such application had been made as a result of such acceleration, pursuant to the provisions of the "Security Instrument" (as hereinafter defined), between the Maker and Principal Mutual Life Insurance Company, the Maker waives any right to prepay said principal sum in whole or in part without premium and agrees to pay, as liquidated damages and not as a penalty, a "**Make Whole Premium**." Maker and Holder acknowledge and

06720/40153
LP I.D. No. 8

-3-

agree that the actual loss of Holder in the event of any payment after acceleration, as herein
provided, is impossible to ascertain as of the date of this Note and that the Make Whole Premium
is a reasonable estimate of such loss. The Make Whole Premium shall be the greater of (a) one
percent (1%) of the principal amount to be prepaid, or (b) the excess, if any, of

(i)  the aggregate present value as of the date of payment or prepayment noticed as set
forth above (hereinafter, the **"Payment Date"**) of each dollar of principal being paid or
prepaid (taking into account the application of such prepayment as set forth herein) and
the amount of interest (exclusive of interest accrued to the Payment Date) that would
have been payable in respect of such dollar of principal being paid or prepaid if such
payment or prepayment had not been made, determined by discounting such amounts
monthly at a rate which is equal to the **"Treasury Rate"** from the due date of this note,
<u>over</u>

(ii)  100% of the principal amount being paid or prepaid.

The **"Treasury Rate"** will be equal to the arithmetic mean of the yields to maturity converted to a
monthly equivalent of United States Treasury obligations with a constant maturity (as compiled by
and published in the United States Federal Reserve Bulletin [H.R. 15] (hereinafter **"H.R. 15"**) or its
successor publication for each of the two weeks immediately preceding the Payment Date) most
nearly equal to the remaining "Weighted Average Life to Maturity" of this note as set forth the Payment
Date. If the yields referred to in the preceding sentence shall not have been so published, the
yields corresponding to the Payment Date shall be calculated on the basis of the arithmetic mean of
the arithmetic means of the secondary market ask rates, as of approximately 3:30 P.M., New York
City time, on the last business days of each of the two weeks preceding the Payment Date, for the
actively traded U.S. Treasury security or securities with a maturity or maturities most closely
corresponding to the "Weighted Average Life to Maturity", as reported by three primary United
States Government securities dealers in New York City of national standing selected in good faith
by the holder of this note. If no maturity exactly corresponding to such remaining "Weighted
Average Life to Maturity" should appear therein, yields for the next longer and the next shorter
published maturities shall be calculated pursuant to the foregoing sentence and the Treasury Rate
shall be interpolated from such yields on a straight-line basis (rounding to the nearest month).

The **"Weighted Average Life to Maturity"** with respect to this note means, at the Payment Date, the
number of years obtained by dividing the "Remaining Dollar-years" of this note by the outstanding
principal amount hereof. **"Remaining Dollar-years"** means the sum of the product obtained by
multiplying (A) the amount of each then remaining required principal repayment (including
repayment of any principal at the due date of this note) by (B) the number of years (rounded to
the nearest one-twelfth) which will elapse between the Payment Date and the date such required
payment is due.

It is hereby expressly agreed that should any default be made in the payment as stipulated
above of either principal or interest which remains unpaid ten (10) days after due, or should Maker
default in either conveying to Holder the undivided interest or making the payment abovesaid, or
should any Event of Default as defined in the Security Instrument be made in the performance of

Exhibit B

-4-

any of the covenants or conditions contained therein or in any other document concerning or given as security for the indebtedness evidenced hereby, the principal of this obligation or any unpaid part thereof and all unpaid interest accrued thereon shall, at the option of the Holder, at once become due and payable and may be collected forthwith, regardless of the Maturity Date. Interest shall accrue on the outstanding principal balance of this note from the date of such default or Event of Default (so long as the same continues), regardless of whether or not there has been an acceleration of the principal indebtedness evidenced hereby at the rate equal to two percent (2%) in excess of that which would have accrued hereunder had such default or Event of Default not occurred. Time is of the essence of this note. The Maker agrees to pay all costs of collection including, but not limited to Holder's reasonable attorney's fees. In addition to the foregoing, a late charge shall be payable by Maker for any installment payment of principal or interest which is not paid within five (5) days following the due date thereof, and said late charge shall equal two percent (2%) of the amount paid late, to defray the expenses incurred in handling such delinquent payments.

Notwithstanding anything herein or in any instrument by which this note may be secured to the contrary, no provision contained herein or therein which purports to obligate the Maker to pay any amount of interest or any fees, costs or expenses which are in excess of the maximum permitted by applicable law, shall be effective to the extent it calls for the payment of any interest or other amount in excess of such maximum. Any such excess shall, at the option of the Holder, either be paid to the Maker or be credited to principal.

Presentment for payment, demand, protest and notice of demand, protest and non-payment are hereby waived by the Maker. Failure to accelerate the debt evidenced hereby by reason of default in the payment of a monthly installment, or the acceptance of a past due installment, shall not be construed as a novation of this note or as a waiver of the right of the Holder thereafter to insist upon strict compliance with the terms of this note without previous notice of such intention being given to the Maker. This note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, or discharge is sought.

The Maker hereby waives and renounces for itself, its legal representatives, successors, and assigns, all rights to the benefits of any appraisement, exemption, and homestead now provided or which may hereafter be provided by the Constitution and laws of the United States of America and of any state thereof to and in all his property, real and personal, against the enforcement and collection of the obligations evidenced by this note.

The Maker hereby transfers, conveys, and assigns to the Holder a sufficient amount of such homestead or exemption as may be set apart in bankruptcy, to pay this note in full, with all costs of collection, and does hereby direct any trustee in bankruptcy having possession of such homestead or exemption to deliver to the Holder a sufficient amount of property or money set apart as exempt to pay the indebtedness evidenced hereby, or any renewal thereof, and does hereby appoint the Holder the attorney-in-fact for the Maker to claim any and all such homestead or exemptions allowed by law.

REAL ESTATE NOTE

06720/40153
LP I.D. No. 8

-5-

The indebtedness evidenced by this note and the obligations created hereby are secured by that certain Deed to Secure Debt and Security Agreement (herein referred to as the "Security Instrument") entered into on even date herewith between the Maker and the Payee concerning certain Premises located in Waycross, Ware County, Georgia, which Security Instrument is to be filed for record on or about the date hereof in the appropriate public records of said County wherein said Premises is located.

This note is intended to constitute a contract under and shall be construed and enforceable in accordance with the laws of said State wherein is located the Premises conveyed by the Security Instrument.

As used herein, the terms "Maker," "Payee," and "Holder" shall be deemed to include their respective heirs, successors, legal representatives, and assigns, whether voluntary by action of the parties or involuntary by operation of law.

The following provisions shall govern Maker's personal liability:

(a)   Notwithstanding any provision to the contrary in this note, the Security Instrument or any other instrument or agreement by which this note is secured (collectively referred to herein as the "**Loan Documents**"), and except as otherwise provided in this paragraph, the liability of Maker under the Loan Documents shall be limited to the interest of Maker in the Premises and the rents, issues, proceeds and profits thereof.  In the event of foreclosure of the liens evidenced by the Loan Documents, no judgment for any deficiency upon the indebtedness evidenced by the Loan Documents shall be sought or obtained by the holder hereof against  .  Maker.  Nothing contained in this paragraph shall:

(i)     prevent the failure of Maker to make any payment or to perform any obligation under any of the Loan Documents within the time periods provided therein from being an Event of Default thereunder;

(ii)    be construed as limiting the obligations of Maker to any tenant under any lease of the Premises;

(iii) in any way limit or impair the lien or enforcement of the Loan Documents pursuant to the terms thereof; or

(iv)   limit the obligations of any indemnitor or guarantor, if any, of Maker's obligations under the Loan Documents.

(b)   Notwithstanding subparagraph (a) above, Maker shall be personally liable to the holder hereof for:

(i)     Maker's failure to comply with paragraphs 1.02 (taxes) and 1.03 (insurance) of the Security Instrument;

06720/40153
                                                                                          LP I.D. No. 8

Exhibit B

-6-

(ii)   any event or circumstance for which Maker indemnifies the holder hereof under paragraph 1.06(g) of the Security Instrument (environmental indemnity);

(iii) Maker's failure to pay utilities on or before the date such payments are due;

(iv)   operation and maintenance of the Premises;

(v)   any sums expended by the holder hereof in fulfilling the obligations of Maker as lessor under any lease of the Premises prior to a sale of the Premises pursuant to foreclosure or power of sale, a bona fide sale (permitted by the terms of the Security Instrument or consented to in writing by the holder hereof) to an unrelated third party or upon conveyance to the holder hereof of the Premises by a deed acceptable to the holder hereof in form and content (each of which shall be referred to as a "Sale" for purposes of this paragraph) or expended by the holder hereof after a Sale of the Premises for obligations of Maker which arose prior to a Sale of the Premises;

(vi)   any rents or other income regardless of type or source of payment (including, but not limited to, CAM charges, lease termination payments, refunds of any type, prepayment of rents, settlements of litigation, or settlements of past due rents) from the Premises, which Maker has received or has a right to receive after an Event of Default under the Loan Documents or an event which, with the passage of time, the giving of notice, or both, would constitute an Event of Default, either or both of which has occurred and is continuing, and which are not applied to (A) expenses of operation and maintenance of the Premises and the taxes, assessments, charges and insurance of the Premises, taking into account sufficient reserves for the same and for replacements and recurring items, and (B) payment of principal, interest and other charges when due under the Loan Documents; provided that any payments to parties related to Maker shall be considered expenses of operation only if they are at market rates or fees consistent with market rates or fees for the same or similar services;

(vii) any security deposits of tenants not turned over to the holder hereof upon conveyance of the Premises to the holder hereof pursuant to foreclosure or power of sale or by a deed acceptable to the holder hereof in form and content;

(viii) misapplication or misappropriation of tax reserve accounts, tenant improvement reserve accounts, security deposits, prepaid rents or other similar sums paid to or held by Maker or any other entity or person in connection with the operation of the Premises;

(ix)   any waste committed or allowed by Maker with respect to the Premises; and

(ix)   any insurance or condemnation proceeds or other similar funds or payments applied by Maker in a manner other than as expressly provided in the Loan Documents.

-7-

(c)   Notwithstanding anything to the contrary in the Loan Documents, the limitation on liability contained in subparagraph (a) above SHALL BECOME NULL AND VOID and shall be of no further force and effect in the event:

(i)   of any breach or violation of paragraph 1.17 (due on sale or encumbrance) of the Security Instrument; or

(ii)   of any fraud or willful misrepresentation by Maker regarding the Premises, the making or delivery of any of the Loan Documents or in any materials or information provided by Maker in connection with the loan evidenced hereby.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

-8-

IN WITNESS WHEREOF, the Maker has executed this Note under seal on the date first above written.

PEREGRINE PROPERTIES LIMITED
PARTNERSHIP, an Iowa limited partnership
authorized to transact business in Georgia
as Peregrine Ownership and Leasing Limited
Partnership

By:  Equity FC, Ltd., an Iowa corporation,
     its general partner

By: *Karen A. Pearston*
Name: Karen A. Pearson
Title: Counsel


By: *Leanne M. Swenson*
Name: LEANNE M. SWENSON
Title: Counsel


[CORPORATE SEAL]

REAL ESTATE NOTE

J:\RE\06720\40153\lp8\NOTE2.189

06720/40153
LP I.D. No. 8
August 23, 1994

Exhibit B