**EXHIBIT B**

**EXECUTION COPY**

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is made as of this 24th day of August, 2005, by and between a joint venture consisting of The Gordon Company, Inc., a Florida corporation, NREL, Inc., a Michigan corporation, The Branford Industrial Group, LLC, a Connecticut limited liability company, Vision Equipment and Auction Company, Inc., a Georgia corporation, and Rabin Worldwide, Inc., a California corporation (collectively, the "Agent"), and Winn-Dixie Stores, Inc. (the "Company"), a Florida corporation.

## RECITALS

WHEREAS, the Company, together with certain of its affiliates and subsidiaries, is a debtor and debtor in possession with a Chapter 11 case pending in the United States Bankruptcy Court for the Middle District of Florida ("Bankruptcy Court").

WHEREAS, the Company desires that Agent act as the Company's exclusive agent for the purpose of selling Equipment (as defined herein), located at the Company's Astor Foods facility in Jacksonville, Florida (the "Facility"), subject to the terms and conditions set forth herein (the "Sale");

WHEREAS, Agent is willing to serve as the Company's exclusive agent to conduct the Sale in accordance with the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and the Company hereby agree as follows:

Section 1.

1.1     Defined Terms.  Capitalized terms as used in this Agreement will have the following meanings when used herein.

"Accounting Firm" means a nationally recognized accounting firm mutually acceptable to the Company and Agent.

"Additional Return" has the meaning set forth in Section 3.1(b).

"Agency Accounts" has the meaning set forth in Section 3.3(c).

"Agency Documents" means this Agreement and each other document and agreement contemplated hereby and executed and delivered in connection herewith.

"Agent" has the meaning set forth in the Preamble.

"Agent Claim" means any such claim, demand, penalty, loss, liability or damage that arises from the acts or omissions of Agent, or its supervisors, agents, independent contractors,

employees located at the Facility, or the Company's employees being supervised by Agent in connection with or related to the Sale.

"Agent Indemnified Parties" means Agent and its officers, directors, employees, agents and independent contractors.

"Agreement" has the meaning set forth in the Preamble.

"Approval Order" means the order entered by the Bankruptcy Court in form and substance reasonably acceptable to Agent and the Company (i) approving this Agreement, (ii) authorizing the conduct of the Sale pursuant to the terms of this Agreement (A) notwithstanding any state or local law or regulation otherwise governing or purporting to govern the licensing and conduct of the Sale (other than laws related to public health and safety and other similar items), (B) notwithstanding any provision in any lease, mortgage, or other occupancy agreement that purports to limit, govern or restrict the conduct of the Sale, and (C) without the necessity of obtaining any third-party consents, (iii) containing such provisions as may be reasonably acceptable to Agent and the Company, and (iv) which Approval Order shall not have been vacated or stayed.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Benefits Cap" has the meaning set forth in Section 4.1(c).

"Buyer's Premium" means a premium added to the successful bid received from purchasers of Equipment in an amount not to exceed ten percent (10%) of such successful bid and which shall be paid by the purchasers of the Equipment.

"Company Expenses" has the meaning set forth in Section 4.2.

"Equipment" has the meaning set forth in Section 5.

"Event of Default" means the Company's or Agent's failure to perform any of its respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party.

"Expenses" has the meaning set forth in Section 4.1.

"Facility" has the meaning set forth in the Recitals.

"Final Reconciliation" means a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Additional Return, taxes, Expenses, and any other accountings required hereunder, prepared jointly by Agent and the Company within thirty (30) days after the Sale Termination Date.

"Interim Reconciliation" has the meaning set forth in Section 8.5.

"Guaranteed Amount" has the meaning set forth in Section 3.1(a).

"Proceeds" has the meaning set forth in Section 7.

"Recovery Amount" has the meaning set forth in Section 3.1(b).

"Remaining Equipment" means all unsold Equipment remaining, if any, in the Facility at the Sale Termination Date.

"Sale" has the meaning set forth in the Recitals.

"Sale Commencement Date" means the date of entry of the Approval Order.

"Sale Term" means the period from the Sale Commencement Date to the Sale Termination Date.

"Sale Termination Date" means November 30, 2005.

"Sales Taxes" means all sales, excise, gross receipts, and other taxes attributable to sales of the Equipment (other than taxes on income) payable to any taxing authority having jurisdiction.

"Supervisors" means qualified supervisors retained by Agent to conduct the Sale and to manage the Sale process and dispose of the Equipment from the Facility.

1.2     Exhibits. The following list of Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Description |
|---------|-------------|
| Exhibit 1 | List of Equipment |
| Exhibit 8.4 | Form of Weekly Report |
| Exhibit 12.4 | Agent Insurance Policies |

1.3     Currency. Unless otherwise specified, all references to monetary amounts refer to United States dollars.

Section 2.

2.1     Appointment of Agent. Subject to the issuance of the Approval Order, the Company hereby appoints Agent, and Agent hereby agrees to serve, as the Company's exclusive agent for the limited purpose of conducting and overseeing the Sale in accordance with the terms and conditions of this Agreement. Agent shall provide the Company with the following services in accordance with the terms hereof:

(a)    Sell or otherwise dispose of the Equipment from the Facility.

3

(b)  Provide Supervisors to conduct the Sale and to manage the Sale process and dispose of the Equipment and other assets located at the Facility.

(c)  Recommend and implement Company-approved (i) external and internal advertising and signage, if any, necessary to effectively sell the Equipment at the Facility in accordance with a "liquidation sale," auction or other mutually agreeable theme. (Agent shall deliver copies of all advertising materials for the Sale to the Company which shall have the right, within three (3) business days of such delivery, to approve such materials, which approval shall not be unreasonably withheld or delayed; provided, however, that the failure of the Company to reasonably respond to any request for approval within three (3) business days shall be deemed to be approval of the subject materials), (ii) pricing and presentation of the Equipment, (iii) staffing levels for the Facility, and (vi) Facility operation practices (i.e., ongoing services and housekeeping).

(d)  Recommend and implement a Company-approved Agent's operating plan for the Sale, including, (i) projections for anticipated revenues and expenses to be incorporated into and made a part of the Expense Budget, (ii) advertising and promotions plan, and (iii) supervision plan including, Equipment supervision and central office supervision.

(e)  Maintain focused and constant communication with the Company's employees and managers to keep them abreast of strategy and timing, and maintain communication with landlords, if applicable.

(f)  Maintain integrity and value of the Company's corporate image throughout the Sale.

(g)  Subject to the entry of the Approval Order, advise the Company with respect to the legal requirements of effecting the "liquidation sale," auction or other mutually agreeable theme in compliance with all federal, state, and local laws, rules, and regulations, including without limitation state and local permitting laws, to the extent (if at all) applicable following issuance of the Approval Order.

(h)  Establish, monitor and provide oversight of and conduct accounting functions for the Sale, including, without limitation, evaluation of sales of Equipment by category, expense monitoring and reporting and by providing weekly comparisons of actual and projected information, and sales tax compliance.

(i)  Supervise the Facility throughout the Sale Term such that the operation of each of the Facility is being properly maintained.

(j)  Perform such other related services deemed by the parties to be necessary or prudent to facilitate the Sale.

Subject to Sections 3.2 and 6.2, title to all Equipment shall remain with the Company at all times during the Sale Term until such Equipment is sold by or on behalf of the Company. All sales of Equipment in the Facility shall be made on behalf of the Company.

2.2    In connection with the Sale, Agent shall directly retain and engage all Supervisors. The Supervisors are independent contractors engaged by Agent and are not and shall not be deemed to be employees or agents of the Company in any manner whatsoever; nor do the Supervisors have any relationship with the Company by virtue of this Agreement or otherwise which creates any liability or responsibility on behalf of the Company for such Supervisors. During the Sale Term, each Supervisor shall perform services in connection with the Sale in Agent's discretion.

Section 3.    <u>Guaranteed Amount and Other Payments</u>

3.1    <u>Payments to the Company and Agent</u>

(a)    As a guaranty of Agent's performance hereunder, in addition to the payment of Expenses as provided for in Section 4.1 hereof, Agent guarantees that the Company shall receive Five Hundred and Seventy Five Thousand Dollars ($575,000) (the "<u>Guaranteed Amount</u>").

(b)    The Proceeds generated by the Sale shall be distributed in the following order:

(i)    <u>first</u>, the first Proceeds generated from the Sale up to and including $575,000, shall be paid to Agent;

(ii)    <u>second</u>, the next $50,000 of Proceeds generated from the Sale shall be paid to Company;

(iii)    <u>third</u>, the next $50,000 of Proceeds generated from the Sale shall be shared seventy-five percent (75%) to the Company and twenty-five percent (25%) to Agent;

(iv)    <u>fourth</u>, the next $50,000 of Proceeds generated from the Sale shall be shared sixty-five percent (65%) to the Company and thirty-five percent (35%) to Agent;

(v)    <u>fifth</u>, the next $50,000 of Proceeds generated from the Sale shall be shared fifty-five percent (55%) to the Company and forty-five percent (45%) to Agent; and

(vi)    <u>sixth</u>, all Proceeds generated from the Sale in excess of $775,000 shall be shared fifty percent (50%) to Company and fifty percent (50%) to Agent.

The amounts due to the Company pursuant to this Section 3.1(b) are referred to herein as the "Additional Return."

The amounts due to the Agent pursuant to this Section 3.1(b) are referred to herein as the "Residual Proceeds."

(c)    Agent shall pay to the Company the Guaranteed Amount and Additional Return in the manner and at the times specified in Section 3.3 below.

3.2    <u>Payments to Agent</u>.  Agent shall retain the entire amount of the Buyer's Premium, and after payment in full of the Guaranteed Amount and the Additional Return, Agent shall be entitled to retain the Residual Proceeds.  All Equipment remaining at the conclusion of the Sale ("<u>Remaining Equipment</u>") shall become the property of Agent, free and clear of all liens, claims and encumbrances; <u>provided</u>, <u>however</u>, that (i) the Agent shall remove all of the Remaining Equipment from the Facility, and (ii) the proceeds realized upon a sale or other disposition of the Remaining Equipment shall constitute Proceeds hereunder for purposes of, *inter alia*, calculating any Additional Return due the Company and any Residual Proceeds due to the Agent.

3.3    <u>Time of Payments and Control of Proceeds</u>

(a)    <u>Payment of Guaranteed Amount and Additional Return</u>.  On the first business day following entry of the Approval Order, Agent shall pay the Company the Guaranteed Amount by wire transfer to the Company's depository account(s) at Wachovia Bank designated by the Company.  The Additional Return shall be paid by Agent by wire transfer to the Company's depository account(s) at Wachovia Bank designated by the Company as part of the Interim Reconciliation conducted pursuant to Section 8.5 hereof and the Final Reconciliation conducted pursuant to Section 3.4 hereof.

(b)    <u>Control of Proceeds</u>.  Prior to the Sale Commencement Date, Agent shall establish its own accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "<u>Agency Accounts</u>") and the Company shall promptly upon Agent's request execute and deliver all necessary documents to permit Agent to open and maintain the Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts; provided, however, upon request, Agent shall deliver to the Company copies of all bank statements and other information relating to such accounts.  The Company shall not be responsible for and Agent shall pay all bank fees and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term.  Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale shall be deposited into the Agency Accounts.

3.4    <u>Final Reconciliation</u>.

(a)    Within thirty (30) days after the Sale Termination Date, Agent and the Company shall jointly prepare a Final Reconciliation of the Sale including, without limitation, a summary of Proceeds, Additional Return, Sales Taxes, and any other accountings required hereunder.  Within five (5) days of completion of the Final Reconciliation, any undisputed and unpaid Additional Return shall be paid by the Agent.  Any disputed amount(s) shall not be paid until all disputes have been resolved by agreement of the parties or as determined in the manner prescribed in Section 3.4(b) hereof.  During the Sale Term, and until all of the Agent's and the Company's obligations under this Agreement have been satisfied, the Company shall have full access to Agent's records with respect to Proceeds, Sales Taxes, and other records related to the Sale to review and audit such records.

(b)    In the event that there is any dispute with respect to the Final Reconciliation, such dispute shall be promptly (and in no event later than the third business

day following the request by either the Company or Agent) submitted to the Accounting Firm for resolution. The non-prevailing party shall bear the cost of the Accounting Firm. The parties shall request that the Accounting Firm render a final and binding decision on the dispute within seven (7) business days following the submission of the dispute.

Section 4.    Expenses of the Sale

4.1    Expenses. Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale during the Sale Term, which expenses shall be paid directly by Agent. As used herein, "Expenses" shall mean all advertising, sale, disposal and removal expenses of the Sale which arise during the Sale Term at the Facility, limited to, the following:

(a)    actual costs of Agent's employees (including, but not limited to, salaries, payroll expenses, taxes, commissions and benefits), agents, Supervisors, other on-site supervision, and related travel and bonuses;

(b)    banners and signs which are produced for the Sale;

(c)    promotional costs including, without limitation, advertising and direct mail;

(d)    the costs and expenses of obtaining supplies as may be required by Agent in the conduct of the Sale;

(e)    long distance telephone, postage/overnight delivery/courier charges;

(f)    fees and expenses of Agent in any way related to the transactions contemplated by this Agreement (including, without limitation, fees and expenses of legal counsel);

(g)    trash removal and ordinary course third party cleanings;

(h)    costs and expenses related to the Agent's Insurance as defined in Section 12.4;

(i)    costs and expenses related to the removal of any of the Equipment from the Facility, including the removal of any Remaining Equipment in accordance with Sections 3.2 and 6.2, and the repair of any damage to the Facility caused by such removal; and

(j)    any all costs and/or expenses directly related to the Agent's conduct of the Sale in accordance with this Agreement, other than Company Expenses.

"Expenses" shall not include: (i) Company Expenses; and (ii) any other costs and expenses not specifically set forth in Section 4.1.

4.2    Company Expenses

Company shall be unconditionally responsible for all Company Expenses incurred in conducting the Sale during the Sale Term, which expenses shall be paid directly by Company. As used herein, "Company Expenses" shall mean the following:

(a)    payroll and commissions, if applicable, for all Company employees not utilized by Agent in the conduct of the Sale; provided, that the Company acknowledges that the Agent shall have no obligation to pay for any technical or other support provided by the Company or its employees, in the Company's sole discretion, related to the Equipment or the Sale;

(b)    any amounts payable by the Company for benefits for Company employees not utilized by Agent in the conduct of the Sale (including, but not limited to, FICA, unemployment taxes, workers' compensation and health care insurance benefits);

(c)    the Company's casualty insurance premiums attributable to the Equipment for the Sale Term;

(d)    third party payroll processing fees related to the Company's employees not utilized by Agent in the conduct of the Sale;

(e)    security and building alarm service at the Facility;

(f)    routine repair and maintenance costs of the Facility;

(g)    rent and other occupancy expenses of the Facility; and

(h)    all other costs and expenses that are not Expenses.

Agent expressly acknowledges that nothing in this Section 4.2 shall obligate the Company to incur any Company Expenses other than with respect to subsections (c), (f) and (g) of this Section 4.2 and subsection (e) but only to the extent of the security and building alarm service currently provided by the Company at the Facility.

Section 5.    Equipment.

5.1    Equipment Subject to this Agreement.  For purposes of this Agreement, including without limitation, the calculation of the Guaranteed Amount, "Equipment" shall mean all furniture, fixtures and equipment that is owned by the Company and stored in the Facility, including, without limitation, those items listed on Exhibit 1 attached hereto.  The Company acknowledges that the Equipment listed on Exhibit 1 will be available for sale under this Agreement.  The Company will provide access to Agent to the Facility for the purpose of conducting a physical examination of the Equipment to be sold.

5.2    Fixtures.  The Agent may sell any fixtures affixed to a wall or the floor provided either the Agent or the purchaser of such fixtures repairs the wall or floor in a commercially reasonable manner at its own expense.

8

Section 6.     Sale Term

6.1     Term.     The Sale shall commence at the Facility on the Sale Commencement Date. Subject to the Approval Order, the Agent shall complete the Sale at the Facility, and shall vacate the Facility's premise in favor of the Company or its representative or assignee on or before the Sale Termination Date. The Sale Termination Date at the Facility may be (a) extended by mutual written agreement of Agent and the Company or (b) accelerated by Agent, in which case Agent shall provide the Company with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date.

6.2     Vacating the Facility.     Agent shall provide the Company with not less than seven (7) days' advance written notice of its intention to vacate any Facility. On the Sale Termination Date, Agent shall vacate in favor of the Company or its representatives or assignee, and leave the Facility in "broom clean" condition (ordinary wear and tear excepted). Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent or licensee thereof) to any location during the Sale Term, ordinary wear and tear excepted. On or before the Sale Termination Date, Agent shall have removed or abandoned all then Remaining Equipment; provided, however, that Agent shall not be permitted to abandon any Remaining Equipment unless the owner and landlord of the Facility shall have consented and shall have provided a waiver, in a form reasonably satisfactory to the Company, of any liability of the Company or any of its Affiliates related to such abandonment.

Section 7.     Sale Proceeds.     For purposes of this Agreement, "Proceeds" shall mean the total amount (in U.S. dollars) of all sales of Equipment made under this Agreement, exclusive of Sales Taxes and Buyer's Premium.

Section 8.     Conduct of the Sale.

8.1     Rights of Agent.     Agent shall be permitted to conduct the Sale, on behalf of the Company, as a "Liquidation Sale," auction, or similar theme sale in the Facility throughout the Sale Term in accordance with this Agreement. In addition to any other rights granted to Agent hereunder, in performing its duties in connection with the Sale, Agent shall have the right for purposes of the Sale:

> (a)     to the unrestricted use of the Facility at all times for the purpose of preparing for and conducting the Sale as described above, and for the timely removal of any Remaining Equipment in accordance with the terms of this Agreement and the Approval Order;

> (b)     the use of, during the Sale Term all computer hardware and software, existing supplies located at the Facility, intangible assets (including the Company's name, logo, and tax identification numbers), keys, security codes, and safe and lock combinations required to gain access to and operate the Facility, and any other assets of the Company located at the Facility (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses. Agent shall exercise due care and

return to the Company immediately at the end of the Sale all materials and supplies except materials or supplies expended in the conduct of the Sale;

(c)     [INTENTIONALLY OMITTED]

(d)     to implement the Company-approved advertising, signage, and promotion programs consistent with a "Liquidation Sale," auction or similar theme sale (including, without limitation, by means of media advertising, banners, A-frame, and similar signage). (Agent shall deliver copies of all advertising materials for the Sale to the Company which shall have the right, within three (3) business days of such delivery, to approve such materials, which approval shall not be unreasonably withheld or delayed; provided, however, that the failure of the Company to reasonably respond to any request for approval within three (3) business days shall be deemed to be approval of the subject materials).

8.2     Terms of Sale, Compliance with Law.  All sales of the Equipment will be "final sales" and "as is," and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Equipment in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to purchasers.  All sales will be made only for cash or cashier's check; provided, however, that if Agent determines to accept personal checks, Agent shall bear the risk of loss relating thereto.  Except as may otherwise be provided in the Approval Order, Agent shall comply with all applicable laws and regulations in its conduct of the Sale, including laws and regulations governing the advertising of the Sale, pricing, and employment.  If Agent fails to perform its responsibilities in accordance with this Section 8.2, Agent shall indemnify and hold harmless the Company from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties which the Company sustains or incurs as a result or consequence of the failure by Agent to comply with applicable laws and regulations.

8.3     Sales Taxes.  During the Sale Term, all Sales Taxes shall be added to the sales price of Equipment, if applicable, and collected by Agent, on the Company's behalf, and be immediately deposited in the Company's existing accounts, trust accounts, or other accounts, as designated by the Company.  With Agent's cooperation, the Company shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities.  Provided Agent performs its responsibilities in accordance with this Section 8.3, the Company shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties which Agent sustains or incurs as a result or consequence of the failure by the Company to promptly pay such taxes to the proper taxing authorities and/or the failure by the Company to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided the Company complies with its obligations hereunder, Agent shall indemnify and hold harmless the Company from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties which the Company sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or, to the extent Agent is required hereunder to prepare reports and other

documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable the Company to file any requisite returns with such taxing authorities.

8.4    <u>Weekly Reports</u>.    Agent shall prepare and deliver to the Company (i) reports of sales on a weekly basis, in the form attached hereto as Exhibit 8.4, and (ii) from time to time upon request, such other reports as the parties mutually agree are reasonably necessary to properly effect the Sale.  Each party to this Agreement shall, at all times during the Sale Term and during the one-year period thereafter, provide the other with access to all information, books, and records relating to the Sale and to this Agreement.  All records and reports shall be made available to Agent and the Company during regular business hours upon reasonable notice.

8.5    <u>Sale Reconciliation</u>.    On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and the Company shall cooperate to reconcile and reallocate, if necessary, the payment of any Expenses, any Additional Return then owing and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), all pursuant to procedures agreed upon by the Company and Agent (each such reconciliation, an "<u>Interim Reconciliation</u>").  Agent and the Company shall complete the Final Reconciliation in accordance with Section 3.4, the written results of which shall be certified by representatives of each of the Company and Agent as a final settlement of accounts between the Company and Agent.

Section 9.    [INTENTIONALLY OMITTED]

Section 10.    <u>Conditions Precedent</u>.  (a)  The willingness of Agent and the Company to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(i)    All representations and warranties of the Company and Agent hereunder shall be true and correct in all material respects (provided that neither party shall be able to terminate this Agreement pursuant to Section 15.10 if any breaches of representations or warranties that would cause this Section 10(a)(i) to be failed to be satisfied have been cured in the time contemplated by Section 14).

(ii)    On or before September 26, 2005, the Bankruptcy Court shall have entered the Approval Order.

(b)    Agent hereby agrees and acknowledges that Company's obligations under this Agreement are subject to higher or otherwise better offers for the Equipment or for the right to be the Company's liquidation agent in respect thereof after the conduct of an auction in accordance with the bidding procedures approved by the Bankruptcy Court by order dated June 20, 2005 (the "<u>Bidding Procedures Order</u>"), and conditioned upon the entry of the Approval Order approving the terms and conditions of this Agreement.

(c)    Pursuant to the Bidding Procedures Order, the Company hereby agrees to pay Agent a termination fee in the amount of $15,000 in the event that Agent is not the successful bidder at the auction.

Section 11.    <u>Representations, Warranties, and Covenants</u>.

11.1    <u>The Company's Representations, Warranties, and Covenants</u>.    the Company hereby represents, warrants, and covenants in favor of Agent as follows:

(a)    The Company (i) is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation; (ii) has all requisite corporate power and authority to own, lease, and operate its assets and properties and to carry on its business as presently conducted and, subject to the requirement of Bankruptcy Court approval, has the power and authority to consummate the transactions contemplated by this Agreement; and (iii) is and during the Sale Term will continue to be duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Facility are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Company to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Subject to the issuance and entry of the Approval Order, the Company has the right, power, and authority to execute and deliver the Agency Documents and to perform fully its obligations thereunder.  Subject to the issuance and entry of the Approval Order, the Company has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval on the part of the Company is required for the Company to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Subject to the issuance and entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by the Company and constitutes the legal, valid, and binding obligation of the Company enforceable in accordance with its terms.  Subject to the issuance and entry of the Approval Order, no court order or decree of any federal, state, or local governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for the Company's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of the Company to execute and deliver this Agreement and perform fully its obligations hereunder.  Other than for those contracts or agreements identified by the Company to Agent on or prior to the Sale Commencement Date, if any, no contract or other agreement to which the Company is a party or by which the Company is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)    Subject to the right of the Company to use and occupy the Facility for purposes of maintaining the Facility and the Equipment and for purposes of operating and cleaning the Facility consistent with Section 11.1(e), Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of the Facility, in order to perform its obligations described in this Agreement.  To the extent necessary in furtherance of the Sale, the Company shall throughout the Sale Term maintain in a manner

consistent with its customary and historic practices, at its sole expense, heating systems, refrigeration, air conditioning systems, elevators, escalators, and alarm systems, or, if applicable, use reasonable efforts to cause any applicable landlord to comply with its obligations under applicable lease and occupancy agreements with respect to any such matter

(d)    Prior to October 15, 2005, the Company shall, at its sole cost and expense, (a) remove all environmental hazards, refrigerants, radioactive, and/or other types of hazardous material in any form whatsoever or requiring special handling, treatment or disposal (collectively, "Hazardous Materials") that may exist within or on any of the Equipment, and/or around or about any of the Equipment which may impair or restrict the removal, disposition and transportation of the Equipment at the Facility and (b) remove and evacuate all refrigerants in the coolers and freezers, if any, at the Facility.  Subject to the terms of Section 11.2(f), the Company shall indemnify and hold the Agent harmless from any liability arising from any Hazardous Materials affecting the Equipment and the Facility, unless such liability arises from the gross negligence or willful misconduct of the Agent or any of its officers, directors, employees, agents or representatives.

(e)    The Company currently intends to be operating its business at the Facility until September 30, 2005.  The Facility shall be in "broom clean" condition on or before October 15, 2005; provided, however, that the Company shall have no obligation to clean, repair or otherwise leave in "broom clean" condition any situation, circumstance or condition created or caused by Agent or its employees or agents.

(f)    The Company is the legal and equitable owner of all of the Equipment and upon entry of the Approval Order, the Agent shall be allowed to sell the Equipment free and clear of all liens, claims and encumbrances.

11.2    Agent's Representations, Warranties, and Covenants.    Agent hereby represents, warrants, and covenants in favor of the Company as follows:

(a)    Each entity comprising the Agent: (i) is duly formed, and validly existing, and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)    Agent hereby acknowledges and warrants that prior to the execution of this Agreement, Agent has had an opportunity to inspect the Facility and the Equipment.

(c)    Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding

obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor. No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(d)  No action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Agent, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(e)  During the Sale Term, Agent shall maintain (i) a safe working environment in the Facility; and (ii) the cleanliness of the Facility in a manner at least consistent with the Company's past practices for the Facility.

(f)  Except as may be required to remove and dispose any of the Equipment, the Agent shall not bring any Hazardous Materials into the Facility or onto the premises surrounding the Distribution Centers. The Agent shall indemnify and hold the Company harmless from any liability arising from any Hazardous Materials brought into the Facility or onto the premises surrounding the Facility by Agent, its agents and employees, unless such liability arises from the gross negligence or willful misconduct of the Company or any of its officers, directors, employees, agents or representatives.

(g)  Except as may otherwise be provided in the Approval Order, during the Sale Term, Agent shall comply with all federal, state, and local laws, rules, and regulations applicable to Agent in connection with the transactions contemplated by this Agreement.

Section 12.    Insurance.

12.1    The Company's Liability Insurance.  The Company shall continue until the Sale Termination Date, in such amounts and on such terms and conditions as are consistent with the Company's ordinary course operations, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability, and umbrella liability insurance, covering injuries to persons and property in, or in connection with the Company's operation of, the Facility, and shall cause Agent to be named an additional named insured with respect to all such policies.  Prior to the Sale Commencement Date, the Company shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  In the event of a claim under any such policies, the Company shall be responsible for the payment of all deductibles, retentions, or self-insured amounts to the extent said claim arises from or relates to the alleged acts or omissions of the Company or its employees, agents (other than Agent's employees), or independent contractors (other than Agent and independent contractors

hired by Agent in conjunction with the Sale or the Company's employees being supervised by Agent).

12.2    The Company's Casualty Insurance.  The Company shall continue until the Sale Termination Date, in such amounts and on such terms and conditions as are consistent with the Company's ordinary course operations, fire, flood, theft, and extended coverage casualty insurance covering the Equipment in a total amount equal to no less than the Sale Value thereof.  In the event of a loss to the Equipment on or after the date of this Agreement, the proceeds of such insurance attributable to the Equipment (net of any deductible) shall constitute Proceeds.  Prior to the Sale Commencement Date, the Company shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent.

12.3    Workers' Compensation Insurance.  The Company shall continue until the Sale Termination Date, in such amounts and on such terms and conditions as are consistent with the Company's ordinary course operations, workers' compensation insurance (including employer liability insurance) covering all of the Company's employees then currently employed at the Facility in compliance with all statutory requirements.  Prior to the Sale Commencement Date, the Company shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4    Agent's Insurance.  Agent shall maintain at Agent's cost and expense throughout the Sale Term, in such amounts and on such terms and conditions as are acceptable to the Company in its reasonable discretion, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in, or in connection with Agent's duties at, the Facility (the "Agent's Insurance"), and shall cause the Company to be named an additional insured with respect to such policies.  Exhibit 12.4 attached hereto contains a description of all such policies.  Prior to the Sale Commencement Date, Agent shall deliver to the Company certificates evidencing such insurance policies, setting forth the duration thereof and naming the Company as an additional insured, in form and substance reasonable satisfactory to the Company.  In the event of a claim under such policies, Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors.

12.5    Risk of Loss.

Without limiting any other provision of this Agreement, the Company acknowledges that Agent is conducting the Sale on behalf of the Company solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Facility or the assets located therein or associated therewith, or of the Company's employees located at the Facility, except, however, that Agent shall be responsible for supervising the conduct of the Company's employees in connection with the Sale, and (ii) except as expressly provided in this Agreement, Agent does not assume any of the Company's obligations or liabilities with respect to any of the foregoing, other than with respect to supervising the conduct of the Company's employees.  Agent shall not be deemed to be a successor employer.  the Company and Agent agree that, subject to the terms of this Agreement,

the Company shall bear all responsibility for liability claims of purchasers, employees, and other persons arising from events occurring at the Facility during and after the Sale Term, except for any Agent Claims.  In the event of any liability claim other than an Agent Claim, the Company shall administer such claim and shall present such claim to the Company's liability insurance carrier in accordance with the Company's policies and procedures existing immediately prior to the Sale Commencement Date.  To the extent that the Company and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to the Company.  In the event that the Company and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party at the address specified in Section 15.1 hereof.

Section 13.    Indemnification.

13.1    The Company Indemnification.  the Company shall indemnify and hold the Agent Indemnified Parties harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from or related to:

(a)  the Company's material breach of or failure to comply with any of its agreements, covenants, representations, or warranties contained in any Agency Document;

(b)  any failure of the Company to pay to its employees any wages, salaries, or benefits due to such employees during the Sale Term (other than Expenses);

(c)  any liability or other claims asserted by customers, any of the Company's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, workers' compensation or under the WARN Act), except for Agent Claims and such other claims for which Agent has indemnified the Company elsewhere in this Agreement;

(d)  the gross negligence or willful misconduct of the Company or any of its officers, directors, employees, agents (other than Agent), or representatives.

Notwithstanding anything to the contrary contained in this Section 13.1, the Company's aggregate obligation to indemnify Agent under the terms of the Agreement shall expire the earlier of (i) three (3) months after the Sale Termination Date or (ii) termination of this Agreement pursuant to Section 15.10 hereof, and shall not exceed $50,000 in the aggregate provided, that, the foregoing time and dollar limits shall not apply to (1) the amounts due Agent pursuant to Section 3.2 or any other amounts due to Agent under this Agreement other than the Company's indemnity obligations under this Section 12.1, and (2) the representation, warranty and indemnification of the Company pursuant to Sections 11.1(d) and (e) of this Agreement.

13.2    Agent Indemnification.  Agent shall indemnify and hold the Company and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable

attorneys' fees and expenses, asserted directly or indirectly against the Company resulting from or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of the Agent):

> (a)   Agent's material breach of or failure to comply with any local, state, or federal laws or regulations, or any of its agreements, covenants, representations or warranties contained in any Agency Document;

> (b)   any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of the Company by Agent or any of its employees, agents, independent contractors, or other officers, directors, or representatives of Agent;

> (c)   any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

> (d)   any Agent Claims; and

> (e)   the gross negligence or willful misconduct of Agent or any of its officers, directors, employees, agents, or representatives.

13.3    <u>Indemnification Procedure</u>.   The party seeking indemnity under this Agreement shall: (a) fully and promptly notify the other party of any claim or proceeding, or threatened claim or proceeding; (b) permit the indemnifying party to take full control of such claim or proceeding; (c) cooperate in the investigation and defense of such claim or proceeding; (d) not compromise or otherwise settle any such claim or proceeding without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned, or delayed; and (e) take all reasonable steps to mitigate any loss or liability in respect of any such claim or proceeding.   Notwithstanding anything contained herein, no party shall be liable to indemnify the other party for any claims, demands, penalties, losses, liability, or damage arising from the other party's gross negligence or willful misconduct.

Section 14.    <u>Defaults</u>.   In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder.

Section 15.    <u>Miscellaneous</u>.

15.1    <u>Notices</u>.   All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, as follows:

If to the Agent:

The Gordon Company, Inc.
515 Sea Breeze Boulevard
Ft. Lauderdale, Florida 33316

| | |
|---|---|
| | Attn:  Jeff Gordon |
| | Tel:  (305) 216-7500 |
| | Fax:  (954) 785-0661 |
| with a copy to: | Cohen Tauber Spievack & Wagner LLP |
| | 420 Lexington Avenue – Suite 2400 |
| | New York, New York 10170 |
| | Attn:  Robert A. Boghosian, Esq. |
| | Tel:  (212) 381-8726 |
| | Fax:  (212) 586-5095 |
| If to the Company: | Winn-Dixie Stores, Inc. |
| | 5050 Edgewood Ct. |
| | Jacksonville, FL  32254 |
| | Attn:  John Young |
| | Tel:   (904) 783-5000 |
| | Fax:   (949) 567-1799 |
| with a copy to: | |
| | King & Spalding LLP |
| | 1185 Avenue of the Americas |
| | New York, NY 10036 |
| Attn: | George B. South III |
| Tel: | (212) 556-2231 |
| Fax: | (212) 556-2222 |

15.2    <u>Governing Law: Consent to Jurisdiction</u>.    This Agreement shall be governed and construed in accordance with the laws of the State of Florida, without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court shall retain jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the exclusive jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

15.3    <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

15.4    <u>Amendments</u>.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

15.5    <u>No Waiver</u>.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on

the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

15.6     Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon Agent and the Company, including, but not limited to, any Chapter 11 or Chapter 7 trustee. Agent shall not be permitted to assign its obligations under this Agreement.

15.7     Execution in Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement. This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

15.8     Section Headings. The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

15.9     Reporting. If requested by the Company, Agent shall prepare weekly reports including, without limitation, reports that comply with the Company's current weekly cash reporting to its central office, reflecting the progress of the Sale, which shall specify the Proceeds received to date. During the course of the Sale, the Company shall have the right to have representatives continually act as observers of the Sale in the Facility so long as they do not interfere with the conduct of the Sale.

15.10    Termination. This Agreement shall remain in full force and effect until the first to occur of: (i) receipt by the Company of written notice from Agent that any of the conditions specified in Section 10 hereof have not been satisfied; (ii) receipt by Agent of written notice from the Company that any of the conditions specified in Section 10 hereof have not been satisfied; or (iii) the expiration of the Sale Term and completion and certification by the Company and Agent of the Final Reconciliation pursuant to Section 3.4 above. Notwithstanding the foregoing, the provisions of Sections 3.3, 3.4, 12 and 13 above shall survive the termination of this Agreement pursuant to this Section 15.10.

**[REMAINDER OF PAGE INTENTIONALLY OMITTED]**

IN WITNESS WHEREOF, Agent and the Company hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

**THE GORDON COMPANY, INC.**

By:      _____
Name:   _____
Title:    _____

**NREL, INC.**

By:      _____
Name:   _____
Title:    _____

**THE BRANFORD INDUSTRIAL GROUP, LLC**

By:      _____
Name:   _____
Title:    _____

**VISION EQUIPMENT AND AUCTION COMPANY, INC.**

By:      _____
Name:   _____
Title:    _____

**RABIN WORLDWIDE, INC.**

By:      _____
Name:   _____
Title:    _____

**[SIGNATURES CONTINUED ON NEXT PAGE]**
Signature Page for Gordon-Astor Foods Liquidator Agreement dated August, 2005

IN WITNESS WHEREOF, Agent and the Company hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

**THE GORDON COMPANY, INC.**

By: _____

Name: _JEFFREY GORDON_

Title: _CEO_

**NREL, INC.**

By: _____

Name: _____

Title: _____

**THE BRANFORD INDUSTRIAL GROUP, LLC**

By: _____

Name: _____

Title: _____

**VISION EQUIPMENT AND AUCTION COMPANY, INC.**

By: _____

Name: _____

Title: _____

**RABIN WORLDWIDE, INC.**

By: _____

Name: _____

Title: _____

**[SIGNATURES CONTINUED ON NEXT PAGE]**

20

IN WITNESS WHEREOF, Agent and the Company hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

**THE GORDON COMPANY, INC.**

By: _____
Name: _____
Title: _____

**NREL, INC.**

By: _~Jim Grimwade~_____
Name: _Jim Grimwade_____
Title: _President_____

**THE BRANFORD INDUSTRIAL GROUP, LLC**

By: _____
Name: _____
Title: _____

**VISION EQUIPMENT AND AUCTION COMPANY, INC.**

By: _____
Name: _____
Title: _____

**RABIN WORLDWIDE, INC.**

By: _____
Name: _____
Title: _____

**[SIGNATURES CONTINUED ON NEXT PAGE]**

20

IN WITNESS WHEREOF, Agent and the Company hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

**THE GORDON COMPANY, INC.**

By: _____
Name: _____
Title: _____

**NREL, INC.**

By: _____
Name: _____
Title: _____

**THE BRANFORD INDUSTRIAL GROUP, LLC**

By: _~~James Gordon~~_
Name: _James Gordon_
Title: _Senior Vice President_

**VISION EQUIPMENT AND AUCTION COMPANY, INC.**

By: _____
Name: _____
Title: _____

**RABIN WORLDWIDE, INC.**

By: _____
Name: _____
Title: _____

**[SIGNATURES CONTINUED ON NEXT PAGE]**

20

IN WITNESS WHEREOF, Agent and the Company hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

**THE GORDON COMPANY, INC.**

By: _____
Name: _____
Title: _____

**NREL, INC.**

By: _____
Name: _____
Title: _____

**THE BRANFORD INDUSTRIAL GROUP, LLC**

By: _____
Name: _____
Title: _____

**VISION EQUIPMENT AND AUCTION COMPANY, INC.**

By: _Joe Mabrey_
Name: _Joe Mabrey_
Title: _President_

**RABIN WORLDWIDE, INC.**

By: _____
Name: _____
Title: _____

**[SIGNATURES CONTINUED ON NEXT PAGE]**

20

Agreement by their duly authorized representatives as of the day and year first written above.

**THE GORDON COMPANY, INC.**

By: _____
Name: _____
Title: _____

**NREL, INC.**

By: _____
Name: _____
Title: _____

**THE BRANFORD INDUSTRIAL GROUP, LLC**

By: _____
Name: _____
Title: _____

**VISION EQUIPMENT AND AUCTION COMPANY, INC.**

By: _____
Name: _____
Title: _____

**RABIN WORLDWIDE, INC.**

By: _____
Name: _Michael R. Beal_
Title: _SVP_

**[SIGNATURES CONTINUED ON NEXT PAGE]**

20

**WINN-DIXIE STORES, INC.**

By: _____

Name: RICHARD C. JUDD

Title: _____
      Senior Vice-President

LEGAL APPROVED
ATTY: _____
DATE: 8/22/05

Reviewed By
XRoads
Date: 3/22/05

Signature Page for Gordon-Astor Foods Liquidator Agreement dated August, 2005

O:/Closing Documents/Gordon-Astor Liquidator Agreement

21

# Exhibit "1"

Winn dixie
Astor Products
Edgewood Court
Jacksonville, FL

**QA LAB**
V lab PK blender,
(2) VWR lab ovens
Cupping room with Jabez Burns & Sons (4) barrel
roaster/grinder, and cupping lazy susan table

**WAREHOUSE**
(3) Toyota electric 3 wheel fork lifts
(3) Toyota electric 4 wheel fork lifts
8' and 16' high pallet racking located in Finished Goods
warehouse, most 4 pallet high reach in pallet racking

**FINISHED GOODS #2**
16' high, 4 pallet high reach in pallet racking
(2) Lantech semi-automatic stretch pallet wrappers

**BLUE ARROW WAREHOUSE #3**
Tenant model 7400 floor sweeper
12' high, 3 pallet high reach in pallet racking
Bridgeport mill and Farquhar 12" lathe
Consolidated 4 head capper
12' high, 3 pallet high reach in pallet racking
Torit dust collector and Vacu-Max vacuum pump (all part of spice
line in next door room)

**BLUE ARROW WAREHOUSE #3 LOADING DOCK**
Rigid pipe threader, portable welder
Charger stations for electric fork lifts includes (8) assorted
chargers and (3) electric pallet jacks
Surplus Equipment including: Mateer single head auger filler
(Neotron System controls), Angelus 59P seamer disk feed, looks
like 401 can size, (2) Audiolabe pressure sensitive labelers, and
Crown Simplimatic case or tray erector.

**MACHINE SHOP**
Includes 12" lathe, sand blast system, lincoln welder, bertical
band saw, grinder, drill press and Jet mill
(4) Videojet Excel Series 100 ink jet printers (various state of
repair)
Upstairs parts area includes hand tools in closet.

**COMMERCIAL SPICE ROOM**
All-Fill single head filler,  Video Jet excel series 100 labeler,
Capem 6-head capper w/ hopper, Lepel induction sealer,  World
labeler,  3M taper

**Mill Room**

Littlefird mixer B-25 s/s ribbon blender
Floor scale
PK V blender m/s
Fitzmill comminuter 12" s/s
Fitzmill comminuter  6" s/s
Micro mill
Torrit downflo dust collector
Cinnamon mill system w/ dust collector , Mill,  Tru-Balance sifter,
hammermill 12"
Hammermill 24"
Pepper mix system w/ sifter, grinder 3-deck sifter
Mettler scale roll around
Forklift Toyota 3-wheel

**Spice Fill Room**
Pepper line: (can filling line) 1 oz. to 16 oz. cans. Rotary
volumetric 30 pocket filler w/ 2 Mateer auger fillers analog
controls w/ Fuller blower, High Speed check weigher, Plastic
capper (pressure type) with Syntron feeder, tray overwrapper
with shrink tunnel, 3M case taper with Videojet coder
Gourmet line (glass & plastic bottles) 1 oz. to 5.5 oz. bottle
hopper & feeder. Omega twist drive bottle cleaner w/ blower.
Rotary volumetric bottle filler, 24-station w/ all fill single head
auger filler, Over cap filment placer, 4 head caper with cap
feeder, VideoJet coder, Lepel induction sealer, Labeler, 3M case
taper with Marsh coder
Chef Line plastic (chef & economy size): Omega unscrambler
with hopper, bottle inverter/cleaner, (2) Klocker-Bertelt single
head auger fillers, Perry rotary filler, Capem 4 head capper,
Lepel induction sealer, labeler, 3M case taper and VideoJet
Maxium case coder.
Torrit bust collector

**Warehouse Area**
AR Pac shrink wrap bundler w/ tunnel
API s/s shrink wrap bundler w/ tunnel 24" opening

**Drink Mix Area**
Depalletizer single high

**Bend Room**
Littleford mixer m/s 4' x 5' long w/ dust collector (sugar)
Day Ribbon blender 18" x 4' x 24" deep w/ Torit dust collector
(cocoa)
s/s bucket elevator Universal Industries
(2) s/s screw conveyors
s/s bucket elevator

**Dry mix Fill Room**

Fill line with Nablach 16-head volumetric piston filler, New England cap unscrabler and 3 head capper (model NER CC-3), Axon sleever with shrink tunnel and 3M case taper (line used to fill plastic jars with koolaid style mix)

**Tea Packaging Room**
Family pack line includes Universal Pak large tea bag maker (no string), hand pack station, tray overwraper, Videojet coder, 3M case taper with Maxim coders

48 Bag Pak (String Bag) lines with Box former, (2) D&W bag machines with string & tag attachment, extended delivery, (1) Pnuematic Scale bag machine with string & tag attachment
(2) D&W bag machines w/ string & tag attachment
Tagless bag line (110/300 bag) 10 up vertical FF&S tagless bagger machine, Universal Pak w/ bucket elevator, packaged in Triangle FF&S machine (model SB72PR) feed directly from bucket elevator no scale
Triangle FF&S machine, model SB72PR #17411, system 21, no scale

**Tea Mix Area**
Tea dump w/ sifter
blender
Forklift Yale electric 3-wheel
s/s platform scale w/ 2 s/s tables

**Coffee Room**
(4) Jabez Barnes rotary coffee roasters, 500lb capacity, model 23RS, Honeywell controls with rotary coolers
Green coffee bean blending & Green bag dump sysyrmwith elevators
(3) Bunns coffee grinders, Gump floating flavor coffee granulizer, 3-deck with elevators
(8) Storage hoppers ms live bottom
(Roof) After burner
Coffee lab with shaker & model E-10 Agtron color analyzer

**Coffee Bussing (Brix Lines)**
(2) Fresco  System Brix Pak machines, 11.5 oz intermittent machine with lateral head scales, 30 bags/min
Tray maker
Videojet Excel Series 100 inkjet
(2) Markum case coders

**Can Lines**
One Lb Line: Parsons 9-head in-line filler with Cont'l Can rotary can  cingher pre seamer, and vacum seamer model 78-VDS-3, with SK roll thru labeler (400 can size)
2 lb can Line: Parsons 10 head in line filler, Canco 08 single head seamer, SK roll thru labeler (600 can size)
(3) Vacuum pumps, water cooled

AR Pack tray shrink wrap 36" with tunnel
(2) Can de-palletizers, (1) double high waterfall, (1) single high
table top
Lantech pallet shrink wrap semi-automatic
Bag House (cooling tower)

**Air Compressor Room**
Curtis recip air compressor
Joy 480 twist air with dryer

**Outside**
(2) Air compressors, Joy Twistair 480, Gardner Denver Elec-Sav
II
(2) M/S Pepper tanks - spray insulated air locks, 10 dia x 8'
straight side, cone bottom on legs
Sugar silo 20' x 10 dia with blower & dust collector

**Bag Warehouse**
(19) Assorted forklifts (9) propane, (10) elect, (2) sweepers &
Repair lift (condition unknown)
Gardner Denver air compressor

**Gravey Warehouse**
Do Boy 2000 cartoner

**Gravey Room #1**
Bartelt filler
Hispeed checkweigher
All-Fill auger filler "Cerebus"
3M case taper

**Gravey Room #2**
(2) Bartelt Machines "Packer" 33966 & "Packager" 3180
Checkmate 2 high speed checkweigher
(2) Dust collectors

**Gravy Room #3**
Bartlelt #3296 9" centers, rotary scale commander 2 update
electric
Checkmate check weigher checkmate 2
FMS cartoner
Bartlelt #3476L with rotary scale Commander 2
FW cartoner
(2) 3M case tapers w/ Maxum coders

**Mezzanine**
Rotary mixer
Vacuum pump system
(14) Assorted s/s dump hoppers for Bartelts
(2) Drum handlers

**Outside**

Chevy pu model F150 longbed
White/GMC conventional 3 axle tractor
International 3 axle tractor conventional

TOTAL AUCTION VALUE

# Exhibit "8.4"

## EXHIBIT 8.4
## [FORM OF WEEKLY REPORT]

| Week | Gross Proceeds Before Deduction of Buyer's Premium and Sales Tax | Buyer's Premium | Sales Tax | Net Proceeds | Additional Return to Company | Agent's Residual Proceeds |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

# Exhibit "12.4"

POLICYHOLDER COPY

**STATE**
**COMPENSATION**
**INSURANCE**   P.O. BOX 420807, SAN FRANCISCO, CA 94142-0807

**FUND**   CERTIFICATE OF WORKERS' COMPENSATION INSURANCE

ISSUE DATE: 03-01-2005

GROUP:
POLICY NUMBER:          1605934-2005
CERTIFICATE ID:         2
CERTIFICATE EXPIRES: 02-14-2006
                     02-14-2005/02-14-2006

RABIN WORLDWIDE
298 SAN BRUNO AVENUE
SAN FRANCISCO   CA 94103

This is to certify that we have issued a valid Worker's Compensation insurance policy in a form approved by the California Insurance Commissioner to the employer named below for the policy period indicated.

This policy is not subject to cancellation by the Fund except upon 30 days advance written notice to the employer.

We will also give you 30 days advance notice should this policy be cancelled prior to its normal expiration.

This certificate of insurance is not an insurance policy and does not amend, extend or alter the coverage afforded by the policy listed herein. Notwithstanding any requirement, term or condition of any contract or other document with respect to which this certificate of insurance may be issued or to which it may pertain, the insurance afforded by the policy described herein is subject to all the terms, exclusions, and conditions, of such policy.

*[signature]*

AUTHORIZED REPRESENTATIVE

*Dianne C. Oki*

PRESIDENT

EMPLOYER'S LIABILITY LIMIT INCLUDING DEFENSE COSTS: $1,000,000 PER OCCURRENCE.

ENDORSEMENT #1600 - IRVING RABIN, P - EXCLUDED.

ENDORSEMENT #2065 ENTITLED CERTIFICATE HOLDERS' NOTICE EFFECTIVE 02-14-2005 IS ATTACHED TO AND FORMS A PART OF THIS POLICY.

EMPLOYER

RABIN WORLDWIDE (A CORP)
298 SAN BRUNO AVE
SAN FRANCISCO CA 94103

[B13,NB]

SCIF 10262E        Accept this certificate only if you see a faint watermark that reads "OFFICIAL STATE FUND DOCUMENT"
                                          03/01/2005   12:10PM

PRINTED: 03-01-2005
PAGE 1 OF 1

Mar. 1. 2005 12:11PM                                              No. 3166   P. 2

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

|  | DATE (MM/DD/YYYY) |
|---|---|
| OP ID DU RABIN-1 | 03/01/05 |

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| California Coastal Insurance<br>License #0381524<br>2262 Camino Ramon  PO BOX 5076<br>San Ramon CA 94583-1328<br>Phone: 925-866-7050  Fax: 925-866-8275 | |

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|

| INSURED | INSURER A: Hartford Insurance Company | 22357 |
|---|---|---|
| | INSURER B: | |
| Rabin Worldwide Inc.<br>298 San Bruno Avenue<br>San Francisco CA 94103 | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | GENERAL LIABILITY<br>X COMMERCIAL GENERAL LIABILITY<br>CLAIMS MADE X OCCUR | 57UUNUL8563 | 09/21/04 | 09/21/05 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $300,000 |
| | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY PRO-JECT LOC | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| A | | AUTOMOBILE LIABILITY<br>X ANY AUTO<br>ALL OWNED AUTOS<br>SCHEDULED AUTOS<br>X HIRED AUTOS<br>X NON-OWNED AUTOS | 57UUNUL8563 | 09/21/04 | 09/21/05 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY<br>ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN  EA ACC<br>AUTO ONLY:  AGG | $<br>$ |
| A | | EXCESS/UMBRELLA LIABILITY<br>X OCCUR  CLAIMS MADE | 57RHUUL8322 | 09/21/04 | 09/21/05 | EACH OCCURRENCE | $4,000,000 |
| | | | | | | AGGREGATE | $4,000,000 |
| | | DEDUCTIBLE<br>RETENTION  $ | | | | | $<br>$ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | SEE SEPARATE CERTIFICATE<br>BY STATE FUND | | | WC STATU-TORY LIMITS  OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| | | OTHER | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
All Operations by Named Insured

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| EVIDE-1<br><br>Evidence Purposes Only | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL _____ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br>AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)                                        © ACORD CORPORATION 1988