**UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

**ORDER APPROVING DEBTORS' ASSET PURCHASE AND LEASE
TERMINATION
AGREEMENT AND GRANTING RELATED RELIEF**

These cases came before the Court on the motion of Winn-Dixie Stores,
Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-
possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 363, 365
and 1146(c) and Fed. R. Bankr. P. 6004 and 6006 authorizing the Debtors (i) to assume
and assign leases and sell their leasehold interests in the Targeted Stores free and clear of
liens, claims and encumbrances and exempt from taxes, (ii) in their sole discretion after
consultation with the DIP Lender Agent Representatives and the Committee's
Professionals, to reject leases for Targeted Stores the Debtors are unable to sell, and (iii)
granting related relief (the "Motion"). [1]   The Court has reviewed the Motion and heard
the representations of counsel.   Upon the representations of counsel and without
objection by the United States Trustee or any other interested party, the Court makes the
following findings of fact:

---

[1]      All capitalized terms not otherwise defined in this Order have the same meaning provided to them
in the Motion.

A.      This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

B.      The Debtors received the highest or otherwise best offer for the termination of the lease for Store 1566 (the "Targeted Lease") and furniture, fixtures and equipment located at Store 1566 in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 16, 2005 (the "Bidding Procedures"). The Debtors held an auction for the Targeted Lease and related furniture, fixtures and equipment on August 9, 2005 (the "Auction"). McDaniel Food Management of Alexandria, Inc. (the "Purchaser") submitted the final bid for the furniture, fixtures and equipment located at Store 1566, other than those items identified on Schedule 1 of the Termination Agreement, (the "FF&E") and termination of the Targeted Lease, as more particularly described on the Asset Purchase and Lease Termination Agreement (the "Termination Agreement") attached to this Order as Exhibit A, in the amount of $100,000.00 (the "Termination Fee"), representing the highest or otherwise best offer received for the FF&E.     In addition, pursuant to the Termination Agreement, P.S. Franklin, Ltd. (the "Landlord"), the owner of the premises on which Store 1566 is located and the lessor under the Targeted Lease, and Winn-Dixie Montgomery, Inc., the tenant under the Targeted Lease, have agreed to terminate the Targeted Lease on the Termination Date and the Landlord has agreed to release Winn-Dixie Montgomery, Inc. and Winn-Dixie Stores, Inc, which guaranteed the Targeted Lease, from all claims relating to the Targeted Lease, except as otherwise provided in the Termination Agreement. The Purchaser has agreed, pursuant to the Termination Agreement, to pay

$25,000 to the Landlord in consideration of the Landlord's agreement to enter into the Termination Agreement.

   C. The Debtors' transfer of the FF&E to the Purchaser pursuant to the Termination Agreement will be a legal, valid, and effective transfer of the FF&E. The Debtors' transfer of the FF&E to the Purchaser vests the Purchaser with good and valid title in and to the FF&E free and clear of any liens, claims, encumbrances, pledges, mortgages, security interests, charges, options or other interests of any kind or nature.

   D. Except as expressly set forth in the Termination Agreement, the Purchaser will have no responsibility for any liability, claim or other obligation of or against the Debtors related to the FF&E by virtue of the transfer of the FF&E to the Purchaser. The Purchaser will not be deemed as a result of any action taken in connection with the transfer of the FF&E or consummation of the transaction contemplated by the Termination Agreement to (i) be a successor to any of the Debtors; or (ii) have, *de facto* or otherwise, merged with or into any of the Debtors. The Purchaser is not acquiring or assuming any liability, warranty, or other obligation of the Debtors.

   E. The Debtors have provided interested parties (including all parties asserting claims or interests in the Targeted Lease or FF&E) with proper notice of the Motion, the sale hearing, Auction, the sale of the FF&E and the termination of the Targeted Lease, in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365, Fed. R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order and the Bidding Procedures Order.

   F. The Debtors marketed the Targeted Lease and the FF&E and conducted the sale process in compliance with the Order approving the Bidding

Procedures, the Bidding Procedures, the Bankruptcy Code and all other Orders entered in these cases. The bidding on the Targeted Lease and the FF&E and the Auction were conducted in a non-collusive, fair and good faith manner. The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Targeted Lease and FF&E. The Debtors did not receive any offers for the Targeted Lease. In their sound business judgment, the Debtors determined that the bid submitted by the Purchaser represented the highest or otherwise best offer for the FF&E.

G.      The Debtors (i) have full corporate power and authority to execute and consummate the Termination Agreement and all related documents, and the termination of the Targeted Lease and the sale of the FF&E has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Termination Agreement, are required to consummate the transactions contemplated by the Termination Agreement.

H.      The consideration the Purchaser is providing to the Debtors for termination of the Targeted Lease and the sale of the FF&E (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value.

I.      The Debtors' termination of the Targeted Lease pursuant to the Termination Agreement will be a legal, valid, and effective termination of the Targeted Lease.

H.      Notwithstanding the Targeted Lease terms, but subject to the terms of the Termination Agreement, the Debtors will have the right to remain in the premises

00506840.DOC                           4

up to the Termination Date (as defined in the Termination Agreement) to discontinue its operations and to conduct a store closing sale in accordance with the Court's Order of July 27, 2005 (Docket No. 2537) (the "Store Closing Order").

       I.      Until the Termination Date, the Debtors will pay all amounts and perform all obligations under the Targeted Lease in accordance with 11 U.S.C. §365(d)(3) and the Termination Agreement.

       J.      The Debtors will cause the Termination Fee to be paid to the DIP Lender to the extent required in accordance with the terms and conditions of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

       K.      The Debtors' entry into the Termination Agreement is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

L.      The Court's approval of the Termination Agreement is in the best interests of the Debtors, their estates and their creditors.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted.

2.      All objections to the entry of this order or to the relief granted and requested in the Motion, that have not been withdrawn, waived or settled at or before the hearing, are denied and overruled on the merits.

3.      The Termination Agreement is approved in all respects. The Targeted Lease is terminated effective on the Termination Date.

4.      Notwithstanding the terms of the Lease, but subject to the terms of the Termination Agreement, the Debtors are authorized to remain on the premises up to the Termination Date, to discontinue operations and to conduct store closing sales on the premises pursuant to the Store Closing Order.

5.      Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized and empowered to consummate and implement fully the Termination Agreement, together with all additional instruments and documents to the extent necessary to implement the Termination Agreement.  The Debtors are authorized to take all actions necessary for the purpose of terminating the Targeted Lease and transferring the FF&E to the Purchaser.

6.      The Debtors will transfer the FF&E to the Purchaser upon closing free and clear of all Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f).  The only Claims and/or Interests in the FF&E are the senior liens and superpriority administrative claims of the DIP Lender.  The senior liens and superpriority

administrative Claims and/or Interests of the DIP Lender will attach to the Termination Fee in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

7.      Any agreements, documents, or other instruments executed in connection with the Termination Agreement may be modified, amended, or supplemented by the parties in accordance with the terms of the Termination Agreement without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of (a) the DIP Lender and (b) the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

8.      The Debtors will cause the Termination Fee to be paid in accordance with the terms of the Final Financing Order and the Loan Documents.

9.      The Debtors' transfer of the FF&E pursuant to the terms of the Termination Agreement is a transfer pursuant to 11 U.S.C. § 1146(c). Accordingly, the making, delivery, filing or recording of any deeds, assignments or other transfer documents in connection with the sale (the "Transfer Instruments"), will not be taxed under any law imposing a recording tax, stamp tax, transfer tax or similar tax (including without limitation, any transfer or recordation tax applicable to deeds and/or security interests).

10.     The Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the termination of the Targeted Lease and the transfer of the FF&E under the Bankruptcy Code and applicable non-bankruptcy law. In addition, the Debtors and the Purchaser proposed, negotiated and entered into the

Termination Agreement without collusion and at arms length. For those reasons, the transfer may not be avoided under 11 U.S.C. § 363(n).

11.     The Purchaser acted in good faith in purchasing the FF&E under the Termination Agreement as that term is used in 11 U.S.C § 363(m).  For that reason, any reversal or modification of the Order on appeal will not affect the validity of the Termination Agreement, unless such authorization is duly stayed pending such appeal.

12.     This Court retains exclusive jurisdiction to (a) enforce and implement the Termination Agreement and any other agreements and instruments executed in connection with the Termination Agreement, and (b) interpret, implement and enforce the provisions of this Order.

13.     The terms and provisions of the Termination Agreement and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser, the Landlord and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

14.     Within ten days after Closing, the Debtors will file a statement with the Bankruptcy Court as required by and in accordance with Rule 6004(f), Federal Rules of Bankruptcy Procedure.

15.        Notwithstanding  Fed.  R.  Bankr.  P.  6004(g)  and 6006(d), this Order will take effect immediately upon entry.

Dated this ____ day of September, 2005 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to
serve a copy of this Order on all parties
who received copies of the Motion.

# **EXHIBIT A**

### ASSET PURCHASE AND LEASE TERMINATION AGREEMENT

**THIS ASSET PURCHASE AND LEASE TERMINATION AGREEMENT** (the "Agreement") made as of the 9th day of August, 2005, by and between P.S. Franklin Ltd. (as successor in interest to Benjamin Chaves) ("Landlord"), McDaniel Food Management of Alexandria, Inc. ("McDaniel"), Winn-Dixie Montgomery, Inc., a Florida Corporation ("Tenant"), and Winn-Dixie, Stores, Inc., a Florida corporation ("Guarantor").

### Recitals

A. Landlord and Tenant entered into a lease dated May 15, 1992 (as the same may have been amended supplemented or modified from time to time, and together with any and all other agreements, the "Lease") by which the Landlord leased to the Tenant property known as Winn-Dixie's Store No. 1566, located at 4617 Shreveport Highway, Pineville, Louisiana more fully described in the Lease (the "Premises"). Guarantor executed a guaranty dated June 2, 1992 (as the same may have been amended supplemented or modified from time to time, the "Guaranty") by which Guarantor guaranteed the obligations of Tenant under the Lease.

B. On February 21, 2005, Guarantor, Tenant, and twenty-two of their affiliates (collectively, the "Debtors") filed voluntary petitions for reorganization under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq., as amended (the "Bankruptcy Code").

C. On May 27, 2005, the Debtors filed a motion (the "Motion") for an order establishing bidding procedures for the sale of assets (the "Bidding Procedures"). The Bidding Procedures provide a mechanism for the Debtors to sell assets, including leasehold interests.

D. On June 16, 2005, the Bankruptcy Court entered an order approving the Motion and authorized the Debtors to implement the Bidding Procedures.

E. Pursuant to the Bidding Procedures, Tenant has solicited offers for the Lease and certain related assets, which resulted in McDaniel submitting a bid (the "McDaniel Bid") for Tenant's interest in (i) all fixtures in the store buildings now existing on the Leased Premises (the

1

"Buildings"), including but not limited to Tenant's interest in heating and air conditioning systems (including all refrigerants and gases), facilities used to provide any utility services, or other similar services to the Buildings, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "Improvements"), and (ii) trade fixtures, furniture and equipment now existing and located in the Buildings, including shopping carts, which are owned by Tenant and used in connection with the operation of Tenant's business at the Premises (the "Equipment" and, collectively with the Improvements, the "Store 1566 FF&E"), other than the items identified on Schedule 1 to this Agreement (the "Excluded Property"), pursuant to the terms and conditions contained in this Agreement. McDaniel acknowledges and agrees that all materials, data and information delivered and made available by Tenant or any affiliate of Tenant to McDaniel in connection with the transaction contemplated hereby (whether delivered or made orally, in writing, in electronic format or on the Merrill website) are provided to McDaniel as a convenience only. No representation or warranty as to accuracy, completeness, or any other issue has been provided by Tenant or any affiliate of Tenant.

      F.   Tenant has not received any other offers for the Lease or the Store 1566 FF&E other than the McDaniel Bid. McDaniel has tendered a deposit (the "Deposit") of ten thousand dollars ($10,000) to the Tenant in connection with the McDaniel Bid.

      G.  The Tenant desires to convey the Store 1566 FF&E to McDaniel and the parties desire to terminate the Lease and the Guaranty and end the Lease term both effective as of the later of: (i) the date of entry of an order of the Bankruptcy Court, in a form drafted by Tenant and reasonably acceptable to McDaniel, approving termination of the Lease and conveyance of the Store 1566 FF&E to McDaniel free and clear of any and all liens, claims or encumbrances to the maximum extent permitted under the Bankruptcy Code; or (ii) the date of delivery of the Leased Premises by the Tenant to the Landlord after completion of the Tenant's store closing sale at the Premises (the "Termination Date").

**NOW, THEREFORE,** in consideration of the mutual covenants contained below and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

1. **Termination Date.** Subject to the provisions of this Agreement, the Lease and tenancy created by the Lease will remain in full force and effect until 11:59 p.m., E.T., on the Termination Date, at which time the Lease and the Lease term will end and terminate. Tenant will continue to pay and remain liable for all rent and additional rent, if any, due and owing under the Lease accruing after February 21, 2005, up to and including the Termination Date. The Tenant shall remove all Excluded Property from the Premises on or before the Termination Date. After the Termination Date, neither Tenant nor Landlord will have any further rights or obligations under the Lease. Within ninety-six (96) hours of the Termination Date, McDaniel shall, at its sole cost and expense, either (a) remove from the Premises and lawfully dispose of all branded shopping carts or (b) remove all trademarks, trade names, logos and designs of Tenant, Winn-Dixie or their Affiliates from all shopping carts and destroy and lawfully dispose of all such trademarks, trade names, logos and designs. Subject to the provisions of this Agreement, at 11:59 p.m., E.T., on the Termination Date, the Guaranty will terminate.

2. **Surrender of Premises and Sale of Store 1566 FF&E.** Tenant will vacate and surrender the Premises on or before the Termination Date and leave it in its "As Is" condition with all Store 1566 FF&E to remain on the Premises. Landlord acknowledges and agrees that neither Tenant nor its employees, representatives or agents have made any express representations or warranties regarding the condition of the Premises. Landlord further agrees that, notwithstanding any provision to the contrary contained in the Lease, the Tenant shall have no obligation under the Lease or this Agreement to restore the Premises to the condition that existed at the inception of the Lease, or to remove any additions or alterations to the Premises. This provision will survive the termination of the Lease. Tenant acknowledges and agrees that in consideration of the FF&E Fee (defined hereafter), Tenant will convey the Store 1566 FF&E to McDaniel by bill of sale (without warranty or representations as to merchantability or fitness for a particular purpose) free and clear of any and all liens, claims or encumbrances to the maximum extent permitted under the Bankruptcy Code.

3

3. **Right to "Go Dark" and Conduct Store Closing Sale.** Notwithstanding anything to the contrary contained in the Lease, including any covenant requiring Tenant to continuously operate or not "go dark," Tenant may discontinue its operations at the Premises prior to the Termination Date. Notwithstanding anything to the contrary contained in the Lease, Tenant has the right to conduct a store closing or similar sale at the Premises prior to the Termination Date in accordance with the Bankruptcy Court's Orders approving store closing sales entered July 27, 2005 (docket no. 2537) and August 5, 2005 (docket no. 2830). The foregoing notwithstanding, Tenant shall not, on or before the Termination Date, remove any Store 1566 FF&E from the Premises, other than in the ordinary course of business, or cause utility service to the Premises to be discontinued or render any of the Store 1566 FF&E inoperable, including, but not limited to, by draining freon from refrigeration equipment. Tenant shall permit McDaniel access to the Premises on a date and time selected by McDaniel and reasonably acceptable to Tenant for the purpose of inspecting and inventorying the Store 1566 FF&E. Tenant may observe any such inspection and inventorying process.

4. **Termination Fee.** On the Termination Date, McDaniel will (a) direct the escrow agent or other person then in possession of the Deposit to transfer the Deposit to the Tenant and will pay an additional ninety thousand dollars ($90,000) directly to the Tenant (collectively, the "FF&E Fee"), and (b) pay twenty-five thousand dollars ($25,000) to Landlord (the "Termination Fee"), all as consideration for entering into this Agreement.

5. **Reimbursement of Prepaid Expenses.** Any prepaid rents, common area maintenance fees, association fees, real estate taxes, utility expenses or any other amounts the Tenant prepaid pursuant to the terms of the Lease or otherwise in connection with the Premises will be prorated and on or prior to the Termination Date, Landlord will reimburse Tenant for amounts allocable to the period of time after the Termination Date. The Landlord will also return to the Tenant any security deposit made in connection with the Lease. On or before the Termination Date, the Tenant will pay, or reimburse to McDaniel, all personal property taxes related to Tenant's ownership of the Store 1566 FF&E prior to the Termination Date (calculated on an accrual basis).

6. **Irrevocable Bid.** McDaniel and Landlord acknowledge that, in accordance with the Bidding Procedures, all bids made at auction or otherwise in accordance with the Bidding Procedures remain irrevocable until the earlier to occur of (i) 60 days after entry of an order by the Bankruptcy Court approving the sale or (ii) closing of the sale with another party. McDaniel and Landlord acknowledges that they are bound by the terms and conditions of the Bidding Procedures. In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of the Bidding Procedures, the provisions of the Bidding Procedures shall govern. The foregoing notwithstanding, any party hereto may terminate this Agreement by written notice to the other parties delivered on or before October 7, 2005 in the event the Termination Date has not occurred by September 30, 2005.

7.  **Representations.** Landlord has not assigned, transferred, encumbered or otherwise disposed of Landlord's rights under the Lease, and no consent to this Agreement is required for Landlord to execute, deliver and fully perform its obligations under this Agreement. Tenant has not assigned, transferred, encumbered or otherwise disposed of Tenant's rights under the Lease or any sublease, and no consent to this Agreement is required for Tenant to execute, deliver and fully perform its obligations under this Agreement. McDaniel and Tenant each represent that (a) it is a corporation duly organized, validly existing and in good standing under the laws of its organization, and has the power and authority to consummate the transactions contemplated hereunder, and (b) this Agreement and each of the closing documents to which McDaniel or Tenant is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required corporate action on behalf of such party.

8. **Release.** As of the Termination Date, except as to the obligations of Tenant pursuant to this Agreement, Landlord waives, releases and discharges Tenant, Guarantor, their successors and assigns, their estates, their affiliates and the Debtors from all manner of actions or claims in law or in equity that Landlord ever had, currently has, or may have against Tenant, Guarantor or their successors and assigns relating to or arising out of the Lease, the Guaranty, this Agreement or the Premises, including lease rejection claims under Section 502 of the Bankruptcy Code, administrative expense claims under Section 503 of the Bankruptcy Code or any other claims

5

relating to the Tenant's use and occupancy of the Premises.  To the extent Landlord has filed, or files, a proof of claim with respect to the claims released in this Agreement, Landlord consents to the disallowance and expungement of such claim, with prejudice.

9.  **Loss by Fire or Other Casualty; Condemnation**.  In the event that, prior to the Termination Date, the Store 1566 FF&E, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Store 1566 FF&E or the Premises, McDaniel will have the right, exercisable by giving notice of such decision to the other parties within 10 days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, and thereafter none of the parties will have any further rights or obligations hereunder and McDaniel will be entitled to the return of the Deposit.  If McDaniel doe not exercise its right of termination and the Store 1566 FF&E is sold to McDaniel pursuant to the terms of this Agreement, as McDaniel's sole remedy, Tenant will assign to McDaniel any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to McDaniel any such proceeds or compensation received by it.

10.  **Entire Agreement.**  This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof and is binding upon and will inure to the benefit of the Landlord, McDaniel and Tenant and their respective heirs, executors, administrators successors and assigns.  The provisions of this Agreement supersede all provisions of the Lease and the Guaranty that are inconsistent.  No modification, amendment, waiver or release of any provision of this Agreement is valid unless in writing and executed by the party against whom the same is sought to be enforced.

11.  **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which is deemed an original of this Agreement, but all of which constitute one and the same Agreement.

12.  **Severability.**  Should any provision of this Agreement be declared invalid or unenforceable, all other provisions will be unaffected and will remain valid and enforceable.

Post-It® Fax Note    7671    Date 8/24/05  # of pages ▸ 1
To Robert Ladonsky    From PS Franklin Ltd

13. **Bankruptcy Court Approval.** This Agreement is subject to approval by the Bankruptcy Court, and Landlord, McDaniel, Tenant and Guarantor agree to cooperate in obtaining such approval.

14. **Discharge of Memorandum.** If Landlord and Tenant have executed and recorded a memorandum of the Lease, on the Termination Date, Landlord and Tenant will execute and acknowledge a discharge of memorandum of lease and Landlord, at its sole cost and expense, will file or record the discharge of memorandum in the applicable recorder's office.

15. **Jurisdiction.** The Bankruptcy Court will retain exclusive jurisdiction over any matter, claim, or dispute arising from or relating to this Agreement, and Landlord and McDaniel consent to such exclusive jurisdiction.

16. **Governing Law.** This Agreement is governed by and construed in accordance with the laws of the state in which the Premises is located.

**IN WITNESS WHEREOF,** the Landlord , Tenant and McDaniel have executed this Agreement as of the day and year first above written.

**Landlord: P.S. Franklin Ltd.**

By: _____

Name: JAMES SGADIO

Title: pres of gen Partner.

**McDaniel Food Management of Alexandria, Inc.**

By:

Name: _____

Title: _____

7

13. **Bankruptcy Court Approval**. This Agreement is subject to approval by the Bankruptcy Court, and Landlord, McDaniel, Tenant and Guarantor agree to cooperate in obtaining such approval.

14. **Discharge of Memorandum**. If Landlord and Tenant have executed and recorded a memorandum of the Lease, on the Termination Date, Landlord and Tenant will execute and acknowledge a discharge of memorandum of lease and Landlord, at its sole cost and expense, will file or record the discharge of memorandum in the applicable recorder's office.

15. **Jurisdiction**. The Bankruptcy Court will retain exclusive jurisdiction over any matter, claim, or dispute arising from or relating to this Agreement, and Landlord and McDaniel consent to such exclusive jurisdiction.

16. **Governing Law**. This Agreement is governed by and construed in accordance with the laws of the state in which the Premises is located.

**IN WITNESS WHEREOF**, the Landlord , Tenant and McDaniel have executed this Agreement as of the day and year first above written.

**Landlord: P.S. Franklin Ltd.**

By:_____

Name:_____

Title:_____

**McDaniel Food Management of Alexandria, Inc.**

By:

Name: _Clan R M Daniel Jr_

Title: _President_

7

**Tenant: Winn-Dixie Montgomery, Inc.**

By:_____

Name:_____

Title:_____


**Guarantor: Winn-Dixie Stores, Inc.**

By:_____

Name:_____

Title:_____

## **SCHEDULE 1**

### **Schedule of Excluded Equipment**

Source: Jaguar internal accounting records.  Prepared by management.

Project Jaguar
Leased Equipment List

| Center | Mfr | Type | Model | Description | Quantity | Serial | Install Date | Lessor | Lease # | Rent Amo | Lease Ter | Expire Date | Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1566 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0887 | 4/15/2001 | CLC | 28412 | $36.60 | 48 | 5/31/2005 | POS |
| 1566 | IBM | 8477 | 42Y | NETFINITY 1000 PI | 1 | M0942 | 4/15/2001 | CLC | 28412 | $36.60 | 48 | 5/31/2005 | POS |
| 1566 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDLF3 | 4/15/2001 | CLC | 28412 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 1566 | IBM | 6331 | B2N | IBM BLACK E54 15I | 1 | XDLF7 | 4/15/2001 | CLC | 28412 | $5.27 | 48 | 5/31/2005 | Personal Computers |
| 1566 | IBM | SAV2 | SFTW | IBM SAV2 SOFTWARE | 1 | | 7/1/2001 | ICC | 23001 | $99.96 | 48 | 6/30/2005 | Software |
| 1566 | IBM | SAV2 | SVCS | SAV2 SERVICES | 1 | | 7/1/2001 | ICC | 23001 | $31.74 | 48 | 6/30/2005 | Software |
| 1566 | DCC | 2500 | P3 | POWEREDGE 2500 P3 | 1 | HQGL11 | 7/17/2002 | CLC | 32680 | $181.37 | 36 | 7/31/2005 | Servers |
| 1566 | DCC | PV715N | 1U | DELL NAS PV715N W | 1 | L6CK11 | 7/17/2002 | CLC | 32680 | $68.44 | 36 | 7/31/2005 | Servers |
| 1566 | DCC | E551 | 15MO | DELL E551 15INCH | 1 | | 7/17/2002 | CLC | 32680 | $0.00 | 36 | 7/31/2005 | Personal Computers |

Privileged and Confidential