## CORPORATE GUARANTY OF LEASE OBLIGATIONS

**THIS CORPORATE GUARANTY OF LEASE OBLIGATIONS** ("Guaranty") is given as of the date indicated below by **WINN-DIXIE STORES, INC.**, a Florida corporation ("Guarantor") to and in favor of **STATE PROPERTIES, LLC,** a North Carolina limited liability company ("Landlord") on behalf and for the account of **WINN-DIXIE RALEIGH, INC.,** a Florida corporation ("Tenant").

### R E C I T A L S :

1.       Landlord and Tenant intend to be parties to that certain lease dated September 4, 1997 (the "Lease"), pursuant to which Landlord has agreed to lease to Tenant certain real property and related improvements located in Wake County, North Carolina, as more particularly described in the Lease (the "Premises").

2.       Landlord is unwilling to lease the Premises to Tenant unless Guarantor executes and delivers this Guaranty.

3.       Landlord's leasing of the Premises to Tenant will, directly or indirectly, materially benefit Guarantor, and therefore, Guarantor has agreed to execute and deliver this Guaranty.

**NOW THEREFORE,** for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.       The foregoing recitals are true and correct and incorporated herein.

2.       If Tenant fails, after notice and an opportunity to cure as provided in the Lease, to timely perform its obligations under the Lease, then Guarantor shall:

(a)       With respect to monetary defaults, following ten (10) days written notice from Landlord, cure such monetary default(s) of Tenant to the extent that Tenant does not have a right, under the Lease, to offset any amount due to Landlord because of any default by Landlord under the Lease;

(b)       With respect to nonmonetary defaults, following thirty (30) days written notice from Landlord, cure such nonmonetary default(s) of Tenant, provided, however, that if the nature of such nonmonetary default is such that the default is not capable of a cure within thirty (30) days, then Guarantor's obligation under this Guaranty shall be to commence a cure and diligently prosecute the same to completion within a reasonable time after receipt of Landlord's notice.

3.       No amendment, modification, or extension of the Lease which has the effect of increasing or extending Guarantor's obligations under this Guaranty shall be valid or enforceable against Guarantor without Guarantor's written consent.

4.       All notices required or permitted to be given under this Guaranty shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All payments made under this Guaranty shall be sent to Landlord at the address below or at such other address as Landlord shall provide by written notice from time to time. Each communication shall be deemed duly given and received: (a) as of the date and time the same is personally delivered with a receipted copy; (b) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (c) if delivered by U.S. Mail, three (3) days after depositing with

29

the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (d) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord :

STATE PROPERTIES, LLC
Post Office Box 51507
Durham, North Carolina 27717-1507
Attention: Ted Royall
Telecopy:_____

With a copy to:

William A. Mann, Esquire
CrossPointe Plaza
2840 Plaza Place, Suite 400
Raleigh, North Carolina 27612
Telecopy:_____

or at such other address as Landlord may direct from time to time.

Guarantor:

Winn-Dixie Stores, Inc.
Attn: P. Christopher Wrenn, Esquire
5050 Edgewood Court
P.O. Box B
Jacksonville, FL 32203-0297
Telecopy: (904) 783-5138

or to such other address as Guarantor may direct from time to time.

5.    This Guaranty shall inure to the benefit of Landlord and its successors and assigns and shall bind Guarantor, its successors and assigns.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date indicated below.

WINN-DIXIE STORES, INC.

By:_____
    James Kufeldt

Its:_____President_____
Date:_____9-4-97_____

30



## EXHIBIT "A"

### SCHEDULE OF DEFINED TERMS

"Additional Rent" shall have the meaning assigned to such term in paragraph 5(b) of this Lease.

"Affiliate" means any person directly or indirectly controlling or controlled by or under direct or indirect common control with any other specified person.

"Alterations" means all changes, additions, improvements or repairs to, all alterations, reconstructions, renewals or removals of, and all substitutions or replacements for, any of the Improvements or Landlord's Equipment, whether interior or exterior, structural or non-structural, or ordinary or extraordinary.

"Assignment" means an assignment of this Lease and any related Guaranty executed by Landlord in favor of a Mortgagee.

"Basic Rent" shall have the meaning assigned to such term in paragraph 5(a) of this Lease.

"Basic Rent Payment Dates" shall have the meaning assigned to such term in paragraph 5(a) of this Lease.

"Business Day" means any day on which financial institutions located in New York, New York, are open for regular business.

"Change of Control" means the acquisition by any person or more than one person, acting in concert, together with any Affiliates thereof, of (i) fifty percent (50%) or more of the beneficial interest in the voting capital stock of Winn-Dixie or (ii) the control of a majority of Winn-Dixie's Board of Directors, provided that such acquisition or control, directly or indirectly, by the Davis Family or Affiliates thereof shall not constitute a Change of Control. For the purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have the meanings correlative to the foregoing. "Davis Family" means relatives (by birth or marriage) and descendants of Mr. A.D. Davis, Mr. James E. Davis, Mr. M. Austin Davis and Tine W. Davis, trusts, estates, corporations and other entities involving any of them and their associates whether now living or existing or hereafter coming into existence.

"Claims" means, individually and collectively, any claims, actions, administrative proceedings, judgments, damages, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses (including reasonable attorneys' fees and costs, whether incurred in enforcing this Lease, collecting any sums due hereunder, settlement negotiations, at trial or on appeal), consultant fees and expert fees, together with all other costs and expenses of any kind or nature, that arise directly or indirectly from or in connection with the existence or suspected existence of a Hazardous Condition, whether occurring or suspected to have occurred before, on or after the date of this Lease or caused by any person or entity. Without limiting the generality of the foregoing definition, Claims specifically will include claims, whether by related or third parties, for personal injury or real or personal property damage, and capital, operating and maintenance costs incurred in connection with any Remedial Work.    However, notwithstanding the foregoing, Claims will not be deemed to include claims, actions, administrative proceedings, judgments, damages, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses, that arise in connection with any Hazardous Condition that is determined by proper judicial or administrative procedure to have been introduced to the Leased Premises

32

by Landlord or during any period while Landlord or Mortgagee is in possession of the Leased Premises to the exclusion of the Tenant after an Event of Default has occurred or after expiration of the Term.

"Commencement Date" shall have the meaning assigned to such term in Article 7D of this Lease.

"Condemnation" means a Taking or a Requisition.

"Cost" means, without duplication, the aggregate actual cost paid by or on behalf of Tenant in connection with the construction and acquisition of the Leased Premises, including, without limitation, all fees and expenses in connection with the placement, issuance and sale of the Note and any interim financing of the Leased Premises, title transfer fees, title insurance premiums and recording expenses and taxes (including transfer taxes), indirect construction costs such as capitalized interest, taxes and insurance and other allocable costs during construction and fees to and disbursements of professionals such as attorneys, architects, engineers and surveyors.

"Default" shall mean any breach of any term, covenant or condition of, or obligation under, this Lease which, but for the giving of notice or the passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean an interest rate of eight percent (8%) per annum.

"Environmental Laws" will mean any applicable present or future federal, state or local laws, ordinances, rules or regulations pertaining to Hazardous Substances, industrial hygiene or environmental conditions, including without limitation the following statutes and regulations, as amended from time to time: (i) the Federal Clean Air Act, 42 U.S.C. Section 7401 et seq.; (ii) the Federal Clean Water Act, 33 U.S.C. Section 1151 et seq.; (iii) the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq. ("RCRA"); (iv) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601 et seq. ("CERCLA") and the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 ("SARA"); (v) the Hazardous Materials Transportation Act, 49 U.S.C. Section 1802; (vi) the National Environment Policy Act, 42 U.S.C. Section 1857 et seq.; (vii) The Toxic Substance Control Act of 1976, 15 U.S.C. Section 2601 et seq.; (viii) the regulations of the Environmental Protection Agency, 33 CFR and 40 CFR; (ix) regulations of the Occupational Safety and Health Administration ("OSHA") relating to asbestos; and (x) similar statutes, rules and regulations of the State.

"Event of Default" means the occurrence of any of the events described in paragraph 22(a) of this Lease, and the giving of notice or the passage of any applicable grace or cure period, or both, as provided in said paragraph.

"Extended Term" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Guarantor" means Winn-Dixie; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Guarantor in this Lease shall be deemed deleted and of no effect.

"Guaranty" means the guaranty of this Lease, dated this date, executed by Guarantor in favor of Landlord; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Guaranty in this Lease shall be deemed deleted and of no effect.

"Hazardous Condition" will mean the presence, discharge, disposal, storage or release of any Hazardous Substance on or in the Improvements, air, soil, groundwater, surface water or soil vapor on or about the Leased Premises, or that migrates, flows, percolates, diffuses or in any way moves onto or into the

33

Improvements, air, soil, groundwater, surface water or soil vapor on or about the Leased Premises, or from the Leased Premises into adjacent or other property.

"Hazardous Substances" means any hazardous or toxic substances, materials or wastes, including without limitation any flammable explosives, radioactive materials, friable asbestos, kepone, polychlorinated biphenyls (PCB's), electrical transformers, batteries, paints, solvents, chemicals, petroleum products, or other man-made materials with hazardous, carcinogenic or toxic characteristics, and such other solid, semi-solid, liquid or gaseous substances which are radioactive, toxic, ignitable, corrosive, carcinogenic or otherwise dangerous to human, plant, or animal health or well-being, and those substances, materials, and wastes listed in the United States Department of Transportation Table (49 CFR 972.101) or by the Environmental Protection Agency, as hazardous substances (40 CFR Part 302, and amendments thereto) or such substances, materials and wastes which are or become regulated under any applicable local, State or federal law including without limitation any material, waste or substance which is (i) petroleum, (ii) asbestos, (iii) PCB's, (iv) designated as a "hazardous substance," "hazardous waste," "hazardous materials," "toxic substances," "contaminants," or (v) other pollution under any applicable Environmental Laws.

"Impositions" shall have the meaning assigned to such term in paragraph 12(a) of this Lease.

"Improvements" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Initial Term" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Land" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Landlord" shall have the meaning assigned to such term in the introductory paragraph of this Lease.

"Landlord's Assignee" shall mean a Mortgagee which takes an Assignment as additional collateral for its loan to Landlord.

"Landlord's Equipment" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Lease" shall have the meaning assigned to such term in the introductory paragraph of this Lease and shall include all supplements and amendments permitted by this Lease.

"Leased Premises" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Legal Requirements" means all present and future laws (including Environmental Laws), codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency (but excluding those by their terms not applicable to Tenant or the Leased Premises as a result of some grandfather clause or similar provision), and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant or to the Leased Premises, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of the Leased Premises, even if compliance therewith necessitates structural changes or Improvements or results in interference with the use or enjoyment of the Leased Premises.

"Lien" means charge, encumbrance, title retention agreement, pledge, lien, security interest, mortgage and/or deed of trust.

"Mortgage" means a first mortgage, deed of trust, deed to secure debt or similar security instrument creating a Lien on the Leased Premises in favor of a Mortgagee.

"Mortgagee" means a person or entity which is the holder of a Note of Landlord, secured by a Mortgage and an Assignment; however, if there is no Mortgagee, then any reference to Mortgagee or Mortgage in this Lease shall be deemed deleted and of no effect except to the extent that the context of this Lease contemplates that Mortgagee will act as an escrow agent for the holding and disposition of any Net Award or Net Proceeds, in which event such term shall be deemed to refer to a title insurance company or financial institution, reasonably acceptable to Landlord and Tenant, serving as escrow agent for the purposes contemplated in this Lease.

"Net Award" means the entire award payable by reason of a Condemnation, less any expenses incurred by Landlord, Tenant or a Mortgagee in collecting such award, and less any portion of such award retained by Tenant pursuant to paragraph 15.

"Net Proceeds" means the entire proceeds of any insurance required under paragraph 13, together with any self insurance payment required of Tenant, less any expenses incurred by Landlord, Tenant or a Mortgagee in collecting such proceeds or payment.

"Note" means a secured note or promissory note executed by Landlord in favor of Mortgagee secured by a Mortgage and an Assignment.

"Overdue Payment" means any installment of Basic Rent or any payment of Additional Rent (including Additional Rent which Landlord or Mortgagee shall have paid on behalf of Tenant) due from Tenant that is not paid within five (5) days after Landlord's notice to Tenant of nonpayment.

"Permitted Encumbrances" means:

    (i)    easements, rights-of-way, servitudes, other similar reservations, rights and restrictions and other defects and irregularities in the title to the Leased Premises, none of which materially lessens the value of the Leased Premises or materially impairs the use of the Leased Premises for the purposes held by Tenant;

    (ii)    matters identified as exceptions to title in the mortgagee title insurance policy delivered to and accepted by any Mortgagee on the Commencement Date;

    (iii)    any condemnation right reserved to or vested in any municipality or public authority with respect to the Leased Premises; and

    (iv)    any Liens for Impositions not then delinquent and any Liens of mechanics, materialmen and laborers for work or services performed or materials furnished in connection with the Leased Premises which are not then overdue or the amount or validity of which is being contested by Tenant pursuant to, and as permitted by, paragraph 19.

"Property Loss" means any physical damage to or destruction of the Leased Premises or any part thereof by fire, windstorm, flood, earthquake, war or civil insurrection, accident, or other casualty.

"Purchase Offer" means an irrevocable offer by Tenant to Landlord to purchase the Leased Premises on the Termination Date specified therein and, in case a Purchase Offer is made pursuant to paragraph 14(b) or

15(b), any Net Proceeds or Net Award, as applicable, and at the purchase price therefor determined pursuant to Exhibit "F".

"Remedial Work" means any investigation or monitoring of site conditions, any clean-up, containment, remediation, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any nongovernmental entity or person due to the existence or suspected existence of a Hazardous Condition.

"Replaced Equipment" shall have the meaning assigned to such term in paragraph 8(c) of this Lease.

"Replacement Equipment" shall have the meaning assigned to such term in paragraph 8(c) of this Lease.

"Requisition" means any temporary requisition or confiscation of the use or occupancy of the Leased Premises by any governmental authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"State" means the state in which the Leased Premises is located.

"Substitute Assignment" shall have the meaning assigned to such term in paragraph 11(f) of this Lease.

"Substitute Guaranty" shall have the meaning assigned to such term in paragraph 11(f) of this Lease; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Substitute Guaranty in this Lease shall be deemed deleted and of no effect.

"Substitute Lease" shall have the meaning assigned to such term in paragraph 11(f) of this Lease.

"Substitute Mortgage" shall have the meaning assigned to such term in paragraph 11(f) of this Lease.

"Substitute Note" shall have the meaning assigned to such term in paragraph 11(f) of this Lease.

"Substitute Property" shall have the meaning assigned to such term in paragraph 11 of this Lease.

"Substitution Date" means the date on which Landlord and Tenant effectuate the substitution of the Leased Premises for another premises pursuant to the Substitution Option.

"Substitution Option" means any right Tenant may have to substitute other premises for the Leased Premises pursuant to paragraph 11 and paragraph 14, 15 or 16 of this Lease.

"Taking" means any taking of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding or by any other means, or any de facto condemnation.

"Tenant" means the Tenant named in the introductory paragraph of this Lease together with any entity succeeding thereto by consolidation, merger or acquisition of its assets substantially as an entirety.

"Tenant's Business" means the business of operating retail food stores, commonly referred to as supermarkets, with grocery, delicatessen, bakery, meat and seafood, vegetable/fruit/produce, and beer and

wine sales operations, and sometimes including in-store pharmacy, photo lab, automated teller and/or bank, and dry-cleaning operations or concessions.

"Tenant's Equipment" shall have the meaning assigned to such term in paragraph 3 of this Lease.

"Term" means the Initial Term, any Extended Term or the Initial Term together with any Extended Term.

"Termination Date" means the Basic Rent Payment Date established in Tenant's Purchase Offer given pursuant to paragraph 14(g), 15(b), 16 or 29 of this Lease, as the termination date of this Lease pursuant to any such paragraph, which date shall be not less than one hundred twenty (120) days nor more than two hundred forty (240) days after the effective date of such notice to Landlord.

"Winn-Dixie" means Winn-Dixie Stores, Inc., a Florida corporation, together with any entity succeeding thereto by consolidation, merger or acquisition of its assets substantially as an entirety.

37

EXHIBIT "B"

BEGINNING at an existing iron pin located at the South right of way of North Carolina Highway 98,

THENCE, along the South right-of-way of N.C. Hwy. 98 North 67° 44' 27" East 27.01 feet to an existing iron pin;

THENCE, departing the South right-of-way of N.C. Hwy 98 along a line South 00° 00' 43" East 190.66 feet to an existing iron pin;

THENCE, North 89° 59' 17" East  152.15 feet to an existing iron pin, said existing iron pin being at the beginning of a curve to the left having a radius of 31.33 feet, an internal angle of 42° 51' 44", a chord bearing of South 68° 33' 25" West, and a chord length of 22.89 feet, a distance along said curve of 23.44 feet to a existing iron pin, said existing iron pin being a point of tangency;

THENCE, North 47° 07' 33" East  196.56 feet to a existing iron pin, said existing iron pin is located in the West right-of-way of U.S. Hwy 1 Service Road;

THENCE, along the West right-of-way of U.S. Hwy. 1 Service Road South 42° 52' 27" East 81.61 feet to a point;

THENCE, departing the West right of way of U.S. Hwy. 1 Service Road South 47° 08' 59" West 43.81 feet to a point;

THENCE, South 00° 00' 43" East 369.89 feet to a point;

THENCE, South 89° 59' 17" West 194.66 feet to a point in the west right-of-way of U.S. Hwy. 1 Service Road, said point being a non-tangent intersection of a curve to the right with a radius of 1869.86 feet, an internal angle of 01° 26' 26", a chord bearing of South 01° 04' 04" East, and a chord length of 47.01 feet, a distance along said curve 47.01 feet to a point;

THENCE,  departing said curve and the West right-of-way of U.S. Hwy. 1 Service Road in a non-tangent direction South 89° 59' 17" West 209.03 feet to a point

THENCE, South 00° 00' 43" East 254.67 feet to a point;

THENCE, North 89° 59' 17" East 193.11 feet to a point in the West right-of-way of U.S. Hwy. 1 Service Road, said point being a non-tangent intersection of a curve to the right with a radius of 1869.86 feet, an internal angle of 00° 38' 54", a chord bearing of South 07° 48' 05" West, and a chord length of 21.16 feet, a distance along said curve of 21.16 feet to an existing iron pin;

Property Description – Parcel 1 of Lot 2
Revised August 19, 1997

THENCE, continuing along the right-of-way of U.S. Hwy 1 Service Road, South 08° 07' 33" West 42.62 feet to a point;

THENCE, departing the West right-of-way of U.S. Hwy 1 Service Road along the new north property line of Calvin Ray & Beatrice Jones, South 89° 59' 17" West 530.15 feet to a point;

THENCE, North 00° 00' 43" West  99.98 feet to an existing iron pin at the southeast corner of the Mattingly & Smith property;

THENCE, along the eastern property line of Mattingly & Smith, North 00° 00' 43" West 247.46 feet to an existing iron pin;

THENCE, along the eastern property line of Marric, L.L.C., North 00° 00' 43" West 492.97 feet to the POINT OF BEGINNING, and containing 6.27 acres, more or less.

## EXHIBIT "C"

### LANDLORD'S EQUIPMENT

All machinery, apparatus, equipment, fittings, appliances and fixtures of every kind and nature whatsoever including all electrical, anti-pollution, heating, lighting, laundry, incinerating, power, air conditioning, plumbing, lifting, cleaning, fire prevention, fire extinguishing, refrigerating, ventilating, communication, garage and cooking systems, devices, machinery, apparatus, equipment, fittings, appliances, engines, pipes, pumps, tanks, motors, conduits, ducts, compressors and switch-boards, and all storm doors and windows, dishwashers, attached cabinets and partitions and all articles of personal property of every kind and nature whatsoever now or hereafter affixed to, attached to, placed upon, used or usable in any way in connection with the use, enjoyment, occupancy or operation of the Leased Premises and Improvements, but excluding Tenant's Equipment.

## EXHIBIT "D"

## TENANT'S EQUIPMENT

All coolers, freezers, trade fixtures, goods, inventory, furniture and other personalty belonging to Tenant.

40

## EXHIBIT "E"

### SCHEDULE OF RENT

Basic Rent during the Initial Term and any Extended Term shall be $448,047.00 per annum, payable in equal installments of $37,337.25 on the first day of each calendar month of the Initial Term and any Extended Term.

## EXHIBIT "F"

## PURCHASE OFFERS

The amount of Tenant's Purchase Offer shall be obtained by multiplying the factor set forth below attributable to the month of the Initial Term in which the Purchase Offer is made by $5,250,000.00.

| MONTH | FACTOR |
|-------|--------|
| 1 | .99 17 |
| 2 | .99 00 |
| 3 | .98 93 |
| 4 | .98 65 |
| 5 | .98 48 |
| 6 | .98 31 |
| 7 | .98 13 |
| 8 | .97 95 |
| 9 | .97 78 |
| 10 | .97 60 |
| 11 | .97 42 |
| 12 | .97 24 |
| 13 | .97 05 |
| 14 | .96 87 |
| 15 | .96 68 |
| 16 | .96 50 |
| 17 | .96 31 |
| 18 | .96 12 |
| 19 | .95 93 |
| 20 | .95 74 |
| 21 | .95 55 |
| 22 | .95 35 |
| 23 | .95 16 |
| 24 | .94 96 |
| 25 | .94 76 |
| 26 | .94 57 |
| 27 | .94 36 |
| 28 | .94 16 |
| 29 | .93 96 |
| 30 | .93 76 |
| 31 | .93 55 |
| 32 | .93 34 |
| 33 | .93 13 |
| 34 | .92 92 |
| 35 | .92 71 |
| 36 | .92 50 |
| 37 | .92 29 |
| 38 | .92 07 |
| 39 | .91 85 |
| 40 | .91 63 |
| 41 | .91 41 |
| 42 | .91 19 |
| 43 | .90 97 |

| | |
|---|---|
| 44 | .90 75 |
| 45 | .90 52 |
| 46 | .90 29 |
| 47 | .90 06 |
| 48 | .89 83 |
| 49 | .89 60 |
| 50 | .89 37 |
| 51 | .89 13 |
| 52 | .88 90 |
| 53 | .88 66 |
| 54 | .88 42 |
| 55 | .88 18 |
| 56 | .87 93 |
| 57 | .87 69 |
| 58 | .87 44 |
| 59 | .87 19 |
| 60 | .86 94 |
| 61 | .86 69 |
| 62 | .86 44 |
| 63 | .86 19 |
| 64 | .85 93 |
| 65 | .85 57 |
| 66 | .85 41 |
| 67 | .85 15 |
| 68 | .84 89 |
| 69 | .84 62 |
| 70 | .84 35 |
| 71 | .84 09 |
| 72 | .83 82 |
| 73 | .83 54 |
| 74 | .83 27 |
| 75 | .82 99 |
| 76 | .82 72 |
| 77 | .82 44 |
| 78 | .82 16 |
| 79 | .81 87 |
| 80 | .81 59 |
| 81 | .81 30 |
| 82 | .81 01 |
| 83 | .80 72 |
| 84 | .80 43 |
| 85 | .80 13 |
| 86 | .79 84 |
| 87 | .79 54 |
| 88 | .79 24 |
| 89 | .78 93 |
| 90 | .78 63 |
| 91 | .78 32 |
| 92 | .78 01 |
| 93 | .77 70 |
| 94 | .77 39 |
| 95 | .77 08 |

| | |
|---|---|
| 96 | .76 76 |
| 97 | .76 44 |
| 98 | .76 12 |
| 99 | .75 80 |
| 100 | .75 47 |
| 101 | .75 14 |
| 102 | .74 81 |
| 103 | .74.48 |
| 104 | .74 15 |
| 105 | .73 81 |
| 106 | .73 47 |
| 107 | .73 13 |
| 108 | .72 79 |
| 109 | .72 44 |
| 110 | .72 09 |
| 111 | .71 74 |
| 112 | .71 39 |
| 113 | .71 03 |
| 114 | .70 68 |
| 115 | .70 32 |
| 116 | .69 96 |
| 117 | .69 59 |
| 118 | .69 22 |
| 119 | .68 85 |
| 120 | .68 48 |
| 121 | .68 11 |
| 122 | .67 73 |
| 123 | .67 35 |
| 124 | .66 97 |
| 125 | .66 59 |
| 126 | .66 20 |
| 127 | .65 81 |
| 128 | .65 42 |
| 129 | .65 02 |
| 130 | .64 62 |
| 131 | .64 22 |
| 132 | .63 82 |
| 133 | .63 42 |
| 134 | .63 01 |
| 135 | .62 60 |
| 136 | .62 18 |
| 137 | .61 77 |
| 138 | .61 35 |
| 139 | .60 93 |
| 140 | .60 50 |
| 141 | .60 07 |
| 142 | .59 64 |
| 143 | .59 21 |
| 144 | .58 77 |
| 145 | .58 34 |
| 146 | .57 89 |
| 147 | .57 45 |

| | |
|---|---|
| 148 | .57 00 |
| 149 | .56 55 |
| 150 | .56 10 |
| 151 | .55 64 |
| 152 | .55 18 |
| 153 | .54 72 |
| 154 | .54 25 |
| 155 | .53 78 |
| 156 | .53 31 |
| 157 | .52 83 |
| 158 | .52 35 |
| 159 | .51 87 |
| 160 | .51 39 |
| 161 | .50 90 |
| 162 | .50 41 |
| 163 | .49 91 |
| 164 | .49 41 |
| 165 | .48 91 |
| 166 | .48 41 |
| 167 | .47 90 |
| 168 | .47 39 |
| 169 | .46 87 |
| 170 | .46 36 |
| 171 | .45 83 |
| 172 | .45 31 |
| 173 | .44 78 |
| 174 | .44 25 |
| 175 | .43 71 |
| 176 | .43 17 |
| 177 | .42 63 |
| 178 | .42 08 |
| 179 | .41 53 |
| 180 | .40 98 |
| 181 | .40 42 |
| 182 | .39 86 |
| 183 | .39 29 |
| 184 | .38 72 |
| 185 | .38 15 |
| 186 | .37 58 |
| 187 | .37 00 |
| 188 | .36 41 |
| 189 | .35 82 |
| 190 | .35 23 |
| 191 | .34 63 |
| 192 | .34 03 |
| 193 | .33 43 |
| 194 | .32 82 |
| 195 | .32 21 |
| 196 | .31 59 |
| 197 | .30 97 |
| 198 | .30 35 |
| 199 | .29 72 |

| | |
|---|---|
| 200 | .29 09 |
| 201 | .28 45 |
| 202 | .27 81 |
| 203 | .27 16 |
| 204 | .26 51 |
| 205 | .25 86 |
| 206 | .25 20 |
| 207 | .24 54 |
| 208 | .23 87 |
| 209 | .23 20 |
| 210 | .22.52 |
| 211 | .21 84 |
| 212 | .21 16 |
| 213 | .20 47 |
| 214 | .19 77 |
| 215 | .19 07 |
| 216 | .18 37 |
| 217 | .17 66 |
| 218 | .16 95 |
| 219 | .16 23 |
| 220 | .15 51 |
| 221 | .14 78 |
| 222 | .14 05 |
| 223 | .13 31 |
| 224 | .12 57 |
| 225 | .11 82 |
| 226 | .11 07 |
| 227 | .10 31 |
| 228 | .9 55 |
| 229 | .8 78 |
| 230 | .8 01 |
| 231 | .7 23 |
| 232 | .6 45 |
| 233 | .5 66 |
| 234 | .4 87 |
| 235 | .4 07 |
| 236 | .3 27 |
| 237 | .2 46 |
| 238 | .1 65 |
| 239 | .0 83 |
| 240 | .0 00 |

**EXHIBIT "G"**

**FORM OF ESTOPPEL CERTIFICATE**

_____, a _____ [insert "Landlord" or "Tenant" as applicable] hereby certifies to [insert "Landlord" or "Tenant" as applicable], that, as of _____ (the "Certificate Date"), the following is true and correct:

1.      Winn-Dixie _____, Inc., a _____, is the tenant under a currently effective lease (as amended as described below, the "Lease") with _____, a _____, as the current landlord, dated _____, 199___, conveying a leasehold estate of the property described therein (the "Premises"), and the Lease has been amended or supplemented only as follows:

2.      The term of the Lease commenced _____, and is scheduled to expire on _____ unless renewed or terminated in accordance with the terms of the Lease.  Pursuant to the Lease, Tenant is entitled to renew the Lease for five (5) terms of five (5) years each.

3.      To the best of [insert Landlord's or Tenant's, as applicable] knowledge, Tenant is not in material Default under the Lease, and all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199___, and Tenant currently as no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease, except as follows:

4.      To the best of [insert Landlord's or Tenant's, as applicable] knowledge, Landlord is not in material Default under the Lease, except as follows:

5.      The Lease contains provisions requiring Tenant to offer to purchase the Premises or to substitute the Premises for other leased premises upon the occurrence of certain events.

6.      [insert Landlord or Tenant, as applicable] has received no notice of any sale, transfer, assignment, or pledge of the interest of [insert Landlord or Tenant, as applicable] in the Lease [or in the case of Landlord's interest, in the rent due thereunder], except as follows:

7.      [insert Landlord or Tenant, as applicable] is not the subject of any transfer for the benefit of creditors, or any bankruptcy or reorganization filing under any applicable bankruptcy law.

**IN WITNESS WHEREOF,** the undersigned has executed this certificate, which may be relied upon by [insert Landlord or Tenant, as applicable] and any mortgagee, successor or assign of [insert Landlord or Tenant, as applicable].

[insert appropriate signature blocks for certifying party, witnesses and notary public, as applicable]

**EXHIBIT "H"**

**FORM OF MEMORANDUM OF LEASE**

[insert document headings as appropriate for recordation]

**THIS MEMORANDUM OF LEASE** is hereby executed this _____, by and between _____, a _____, whose mailing address is _____, _____ ("Landlord") and **WINN-DIXIE** _____, INC., a _____ corporation, whose mailing address is _____, _____ ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

**W I T N E S S E T H :**

**WHEREAS,** Landlord and Tenant did enter into a Lease, dated as of _____, 19___ (the "Lease"); and

**WHEREAS,** Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on attached Exhibit "B" and as depicted on the Site Plan attached as Exhibit "C", together with all Improvements now or hereafter located thereon (collectively the "Premises").

The term of the lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, on the date which is exactly twenty (20) years following the Commencement Date. Annual rent, payable in monthly installments on the first day of each calendar month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of six (6) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each.

The Lease contains the following provision:

Liens.   TENANT SHALL NOT, DIRECTLY OR INDIRECTLY, CREATE OR PERMIT TO BE CREATED OR TO REMAIN, AND SHALL PROMPTLY DISCHARGE, ANY LIEN (OTHER THAN THE MORTGAGE, THE ASSIGNMENT, ANY PERMITTED ENCUMBRANCE, OR ANY LIEN CREATED BY OR RESULTING FROM ANY ACTION BY LANDLORD NOT CONSENTED TO BY TENANT IN ADVANCE AND IN WRITING), WHETHER CREATED OR ARISING BEFORE, ON OR AFTER THE COMMENCEMENT DATE, ON THE LEASED PREMISES OR ANY BASIC RENT, ADDITIONAL RENT OR ANY OTHER SUMS PAYABLE BY TENANT UNDER THIS LEASE.  NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIAL FURNISHED OR TO BE FURNISHED TO TENANT, OR TO ANYONE HOLDING THE LEASED PREMISES THROUGH OR UNDER TENANT, OTHER THAN LABOR, SERVICES OR MATERIAL FURNISHED IN CONNECTION WITH CONSTRUCTION OF THE LEASED PREMISES DESCRIBED IN ARTICLE 7B OF THIS LEASE, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN THE LEASED PREMISES.

45

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Memorandum of Lease shall be deemed to constitute a single instrument or document. This Memorandum of Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Memorandum of Lease, the Lease shall control.

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Memorandum of Lease to be executed as of the date and year first above written.

[insert appropriate signature blocks for certifying party, witnesses and notary public, as applicable]

46

EXHIBIT "I"

## DECLARATION OF RESTRICTIVE COVENANTS

THIS DECLARATION OF RESTRICTIVE COVENANTS (this "Declaration") is made _____, 199__ by STATE PROPERTIES, LLC, a North Carolina limited liability company (together with its successors and assigns and any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, "Owner").

## R E C I T A L S

1.      Owner is the owner of that certain real property located in the County of Wake, State of North Carolina, as described on Exhibit "B" attached hereto (the "Premises") and shown on the Site Plan attached hereto as Exhibit "A" (the "Site Plan"), "FUTURE DEVELOPMENT - Lot 2" and "FUTURE DEVELOPMENT - Lot 3" (the "Outparcels"), and Owner may own certain other real property hereinafter referred to as "Owner's Remaining Land", which term shall refer to all real property other than the Outparcels owned or controlled by Owner and located within one-quarter (1/4) of a mile of any boundary of the Premises.

2.      Owner is the landlord under that certain lease dated _____ between Owner and WINN-DIXIE RALEIGH, INC., a Kentucky corporation ("Tenant") pursuant to which Tenant leases the Premises.

3.      Owner intends by this Declaration to grant certain easement and other rights and impose certain use restrictions upon the Premises, the Outparcels, and Owner's Remaining Land for the benefit of Owner, its future tenants, licensees, invitees, and other occupants and for the benefit of Tenant.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby declares that the Premises, Outparcels, and Owner's Remaining Land, shall be sold, transferred, leased, conveyed, owned, and occupied subject to the following:

I.
## RESTRICTIONS

1.1      Restrictions on Use. (a) The Premises and Outparcels shall be restricted against use of all or any portion thereof as any of the following: dance hall, bar, tavern or lounge; "teen lounge," pawn shop, massage parlor, strip joint, spa, health club, or pornographic store; carnival, theater, fair or entertainment facility; church; flea market; pool hall, bowling alley, video arcade, bingo parlor, or game room; roller rink; funeral home or undertaking business; penal or correctional institution; or storage or manufacture of explosives or other flammable or hazardous materials; a business or use which creates strong, unusual or offensive odors, fumes, dust or vapors which is a public or private nuisance or which emits noise or sound which are objectionable to a person of reasonable judgment due to intermittence, beat, frequency, shrillness or loudness or which creates unusual or unreasonable risk of fire, explosion or other hazards or damage to property or injury to or death of one or more persons.

(b) No portion of the Outparcels or Owner's Remaining Land shall be used as a supermarket, grocery store, meat market, fish, seafood, fruit or vegetable market, bakery, delicatessen, dairy products or frozen food business, with the exceptions that a restaurant located on the Outparcels may sell prepared, ready-to-eat food items for consumption either on or off site.

47

1.2    <u>Restrictions on Building Height and Size</u>. Construction of buildings and other improvements in the Outparcel shall be restricted to 25% of the ground area of the Outparcel, with the remainder of the Outparcel to be comprised of Common Areas consisting of parking and landscaped areas. No structure on the Outparcel shall exceed a maximum vertical building height of 25 feet measured from ground level.

The foregoing restrictions shall terminate upon the first to occur of the following (1) seventy-five (75) years after the date hereof, or (2) the date that Tenant permanently ceases to operate a mercantile, retail, or service business in the Store.

## II.
## ATTORNEYS' FEES/ENFORCEMENT

Owner and WD shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other owners.

If Owner or WD commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

## III.
## MODIFICATION

This Declaration may be modified or amended by owners owning one hundred percent (100%) of the real property comprising the Premises, Outparcel, and Owner's Remaining Land, which modification or amendment shall become effective upon (1) the written consent of WD, which may be granted or withheld in its sole discretion, and (2) filing same in the real property records of Wake County, North Carolina.

## IV.
## EASEMENTS

4.1    <u>Ingress and Egress</u>.

(a)    Owner hereby grants to each tenant of the Premises and the Outparcels (but only so long as such tenant remains a tenant of the Premises or Outparcels), to WD, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through the drives existing from time to time on the Premises and the Outparcels.

(b)    Owner shall have the right to temporarily close any part of said drives to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Owner shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Premises and Outparcels.

(c)    Owner shall have the right to temporarily close any part of the said drives as necessary to prevent the public from obtaining prescriptive rights therein, provided that (1) such closure does not exceed the minimum time period required pursuant to applicable law

to prevent such prescriptive rights, and (2) Owner uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Premises or Outparcels.

## V.
## GENERAL PROVISIONS

5.1    Covenants Run With the Land.  The provisions of this Declaration shall operate as covenants running with the land comprising the Premises, Outparcels, and Owner's Remaining Land and shall inure to the benefit of WD, its successors and assigns.

5.2    Severability.  If any term or provision of this Declaration or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Declaration shall be valid and shall be enforced to the extent permitted by law.

5.3    Pronouns.  When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.

5.4    Captions.  The captions in this Declaration are for convenience only and do not constitute a part of the provisions hereof.

5.5    Governing Law.  This Declaration shall be construed and enforced in accordance with, and governed by, the law of the State of North Carolina.

5.6    No Presumption.  This Declaration shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against any owner.

5.7    Exhibits.  The following Exhibits attached hereto are hereby incorporated into this Declaration by reference:

Exhibit "A" -    Site Plan

Exhibit "B" -    Legal Description of the Premises

Exhibit "C" -    Legal Description of the Outparcels

49

1.2    _Restrictions on Building Height and Size_. Construction of buildings and other improvements in the Outparcel shall be restricted to 25% of the ground area of the Outparcel, with the remainder of the Outparcel to be comprised of Common Areas consisting of parking and landscaped areas. No structure on the Outparcel shall exceed a maximum vertical building height of 25 feet measured from ground level.

The foregoing restrictions shall terminate upon the first to occur of the following (1) seventy-five (75) years after the date hereof, or (2) the date that Tenant permanently ceases to operate a mercantile, retail, or service business in the Store.

## II.
## ATTORNEYS' FEES/ENFORCEMENT

Owner and WD shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other owners.

If Owner or WD commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

## III.
## MODIFICATION

This Declaration may be modified or amended by owners owning one hundred percent (100%) of the real property comprising the Premises, Outparcel, and Owner's Remaining Land, which modification or amendment shall become effective upon (1) the written consent of WD, which may be granted or withheld in its sole discretion, and (2) filing same in the real property records of Wake County, North Carolina.

## IV.
## EASEMENTS

4.1    _Ingress and Egress_.

(a)    Owner hereby grants to each tenant of the Premises and the Outparcels (but only so long as such tenant remains a tenant of the Premises or Outparcels), to WD, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through the drives existing from time to time on the Premises and the Outparcels.

(b)    Owner shall have the right to temporarily close any part of said drives to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Owner shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Premises and Outparcels.

(c)    Owner shall have the right to temporarily close any part of the said drives as necessary to prevent the public from obtaining prescriptive rights therein, provided that (1) such closure does not exceed the minimum time period required pursuant to applicable law

48

to prevent such prescriptive rights, and (2) Owner uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Premises or Outparcels.

## V.
## GENERAL PROVISIONS

5.1     <u>Covenants Run With the Land</u>. The provisions of this Declaration shall operate as covenants running with the land comprising the Premises, Outparcels, and Owner's Remaining Land and shall inure to the benefit of WD, its successors and assigns.

5.2     <u>Severability</u>. If any term or provision of this Declaration or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Declaration shall be valid and shall be enforced to the extent permitted by law.

5.3     <u>Pronouns</u>. When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.

5.4     <u>Captions</u>. The captions in this Declaration are for convenience only and do not constitute a part of the provisions hereof.

5.5     <u>Governing Law</u>. This Declaration shall be construed and enforced in accordance with, and governed by, the law of the State of North Carolina.

5.6     <u>No Presumption</u>. This Declaration shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against any owner.

5.7     <u>Exhibits.</u> The following Exhibits attached hereto are hereby incorporated into this Declaration by reference:

Exhibit "A" -      Site Plan

Exhibit "B" -      Legal Description of the Premises

Exhibit "C" -      Legal Description of the Outparcels

49

**IN WITNESS WHEREOF**, this Declaration has been executed as of the date first above written.

Witnesses:                                    Owner:

                                              **STATE PROPERTIES, LLC**, a North Carolina
                                              limited liability company

Print name:_____

Print name:_____        By: _Theodore S. Rogell, Jr_____

                                             Its: _Member_____
                                             Date: _8/19/1997_____

ACKNOWLEDGMENT

50



EXHIBIT "A"

EXHIBIT "B"

BEGINNING at an existing iron pin located at the South right of way of North Carolina Highway 98,

THENCE, along the South right-of-way of N.C. Hwy. 98 North 67° 44' 27" East 27.01 feet to an existing iron pin;

THENCE, departing the South right-of-way of N.C. Hwy 98 along a line South 00° 00' 43" East 190.66 feet to an existing iron pin;

THENCE, North 89° 59' 17" East  152.15 feet to an existing iron pin, said existing iron pin being at the beginning of a curve to the left having a radius of 31.33 feet, an internal angle of 42° 51' 44", a chord bearing of South 68° 33' 25" West, and a chord length of 22.89 feet, a distance along said curve of 23.44 feet to a existing iron pin, said existing iron pin being a point of tangency;

THENCE, North 47° 07' 33" East  196.56  feet to a existing iron pin, said existing iron pin is located in the West right-of-way of U.S. Hwy 1 Service Road;

THENCE, along the West right-of-way of U.S. Hwy. 1 Service Road South 42° 52' 27" East 81.61 feet to a point;

THENCE, departing the West right of way of U.S. Hwy. 1 Service Road South 47° 08' 59" West 43.81 feet to a point;

THENCE, South 00° 00' 43" East 369.89 feet to a point;

THENCE, South 89° 59' 17" West 194.66 feet to a point in the west right-of-way of U.S. Hwy. 1 Service Road, said point being a non-tangent intersection of a curve to the right with a radius of 1869.86 feet, an internal angle of 01° 26' 26", a chord bearing of South 01° 04' 04" East, and a chord length of 47.01 feet, a distance along said curve 47.01 feet to a point;

THENCE,  departing said curve and the West right-of-way of U.S. Hwy. 1 Service Road in a non-tangent direction South 89° 59' 17" West 209.03 feet to a point

THENCE, South 00° 00' 43" East 254.67 feet to a point;

THENCE, North 89° 59' 17" East 193.11 feet to a point in the West right-of-way of U.S. Hwy. 1 Service Road, said point being a non-tangent intersection of a curve to the right with a radius of 1869.86 feet, an internal angle of 00° 38' 54", a chord bearing of South 07° 48' 05" West, and a chord length of 21.16 feet, a distance along said curve of 21.16 feet to an existing iron pin;

Property Description – Parcel 1 of Lot 2
Revised August 19, 1997

THENCE, continuing along the right-of-way of U.S. Hwy 1 Service Road, South 08° 07' 33" West 42.62 feet to a point;

THENCE, departing the West right-of-way of U.S. Hwy 1 Service Road along the new north property line of Calvin Ray & Beatrice Jones, South 89° 59' 17" West 530.15 feet to a point;

THENCE, North 00° 00' 43" West  99.98 feet to an existing iron pin at the southeast corner of the Mattingly & Smith property;

THENCE, along the eastern property line of Mattingly & Smith, North 00° 00' 43" West 247.46 feet to an existing iron pin;

THENCE, along the eastern property line of Marric, L.L.C., North 00° 00' 43" West 492.97 feet to the POINT OF BEGINNING, and containing 6.27 acres, more or less.

EXHIBIT "C"

COMMENCING at an existing iron pin located at the South right-of-way of North Carolina Highway 98,

THENCE, along the South right-of-way of N.C. Hwy. 98, North 67° 44' 27" East 222.42 feet to an existing iron pin;

THENCE, along a right-of-way corner clip of N.C. Hwy. 98 and U.S. Hwy. 1 Service Road, South 70° 53' 15" East 67.65 feet to an existing iron pin in the west right-of-way of U.S. Hwy. 1 Service Road and the beginning of a curve to the left;

THENCE, along the west right-of-way of U.S. Hwy. 1 Service Road, and along said curve to the left with a radius of 449.26', an internal angle of 14° 49' 51", a chord bearing of South 35° 27' 30" East, and a chord length of 115.97 feet, a distance along said curve of 116.29 feet to a point;

THENCE, South 42° 52' 27" East distance of 167.64 to a point, said point being at the beginning of a curve to the right with a radius of 369.26 feet, an internal angle of 37° 59' 59", a chord bearing of North 23° 52' 28" West, and a chord length of 240.44 feet, a distance along said curve of 244.90 feet to a existing iron pin, said existing iron pin being a point of tangency of a compound curve to the right;

THENCE, along said compound curve to the right having a radius of 1869.86 feet, an internal angle of 04° 31' 38", a chord bearing of South 87° 25' 06" West, and a chord length of 147.70 feet, a distance along the curve of 147.74 feet to the Point of Beginning.

BEGINNING at said point and continuing along the west right-of-way of U.S. Hwy. 1 Service Road along a curve to the right, having a radius of 1869.86 feet, an internal angle of 07° 49' 29", a chord bearing of South 03° 33' 53" West, and a chord length of 255.17 feet, a distance along said curve of 255.37 feet;

THENCE, departing the west right-of-way of U.S. Hwy. 1 Service Road South 89° 59' 17" West 193.11 feet to a point;

THENCE, South 00° 00' 43" East 254.67 feet to a point;

THENCE, North 89° 59' 17" East 209.03 feet to the west right-of-way of U.S. Hwy. 1 Service Road and the POINT OF BEGINNING, and containing 1.19 acres, more or less.

EXHIBIT "C"

### Property Description
### for the Proposed 1.31 Acre Outparcel
### Southwest Intersection of US Hwy. 1 & NC Hwy. 98

### Parcel 3 of Lot 2
Revised August 19, 1997

COMMENCING at an existing iron pin located at the South right-of-way of North Carolina Highway 98,

THENCE, along the South right-of-way of N.C. Hwy. 98, North 67° 44' 27" East 222.42 feet to an existing iron pin;

THENCE, along a right-of-way corner clip of N.C. Hwy. 98 and U.S. Hwy. 1 Service Road, South 70° 53' 15" East 67.65 feet to an existing iron pin in the west right-of-way of U.S. Hwy. 1 Service Road and the beginning of a curve to the left;

THENCE, along the west right-of-way of U.S. Hwy. 1 Service Road, and along said curve to the left with a radius of 449.26', an internal angle of 14° 49' 51", a chord bearing of South 35° 27' 30" East, and a chord length of 115.97 feet, a distance along said curve of 116.29 feet to a point;

THENCE, South 42° 52' 27" East a distance of 89.71 feet to the Point of Beginning.

BEGINNING at said point and continuing along the west right-of-way of U.S. Hwy. 1 Service Road, South 42° 52' 27" East 77.93 feet to an existing iron pin, said existing iron pin being at the beginning of a curve to the right with a radius of 369.26 feet, an internal angle of 37° 59' 59", a chord bearing of North 23° 52' 28" West, and a chord length of 240.44 feet, a distance along said curve of 244.90 feet to a existing iron pin, said existing iron pin being a point of tangency of a compound curve to the right;

THENCE, along said curve to the right having a radius of 1869.86 feet, an internal angle of 03° 05' 12", a chord bearing of North 86° 41' 53" West, and a chord length of 100.72 feet, a distance along said curve of 100.73 feet to a point;

THENCE, departing along the west right-of-way of U.S. Hwy. 1 Service Road South 89° 59' 17" West 194.66 feet to a point;

THENCE, South 00° 00' 43" East 369.89 feet to a point;

THENCE, North 47° 08' 59" East 43.81 feet to the west right-of-way of U.S. Hwy. 1 Service Road and the POINT OF BEGINNING, and containing 1.31 acres, more or less.

**EXHIBIT "J"**

**FORM OF SURVEYOR'S CERTIFICATE**

TO:    WINN-DIXIE RALEIGH, INC. ("Owner")

_____ Title Insurance Corporation ("Title Company")

RE:    File No._____ Drawing No. _____ Title: _____

The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that (1) this plat of survey and the property description with respect thereto are true and correct and prepared from an actual on-the-ground survey of the real property (the "Property") shown hereon; (2) such survey was conducted by the Surveyor, or under his supervision; (3) all monuments shown herein actually exist, and the location, size and type of material thereof are correctly shown; (4) except as shown herein, there are no visible encroachments onto the Property or protrusions therefrom, there are no visible easements or rights-of-way on the Property and there are no visible discrepancies, conflicts, shortages in area or boundary line conflicts; (5) the size, location and type of improvements are as shown hereon, and all are located within the boundaries of the Property; (6) the location of all adjoining streets and roads and the distance to and location of the nearest intersecting street or road is as shown; (7) the Point of Beginning of the Property Description is accurate; (8) the Property has access to and from a _____ foot wide public roadway by: (name all streets or other rights-of-way) as shown on the survey; (9) all recorded easements and other exceptions, as noted in _____ Title Insurance Company's Commitment for Title Insurance No. _____, dated _____ have been correctly platted hereon and indicated by official records book and page number; (10) the boundaries, dimensions and other details shown herein are true and correct; (11) the Property is not located in a 100-Year Flood Plain or in an identified "flood prone area", as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Insurance Rate Map Panel # _____, dated _____, which such map panel covers the area in which the Property is situated; (12) the following matters, to the extent such exist on the Property, are shown on the survey: location of all utilities serving the Property, all strips, gores and overlaps with adjacent properties, all interior lot lines, high water marks, if the Property is located on or contains a body of water, elevations of the Property and any natural or constructed objects affecting the Property; (13) the Property is zoned _____; (14) the _____ and _____ boundaries of the Property abut the streets and highways as shown on the survey; and (15) the survey meets or exceeds the minimum technical requirements for surveys pursuant to the statutes of the State of _____ and the most recently promulgated minimum standard detail requirements for ALTA-ACSM surveys.

Executed this the _____ day of _____, 199\_\_\_.

_____

Registered Land Surveyor No._____

Address:_____

**(SURVEYOR'S SEAL)**

51

## EXHIBIT "K"

### (ZONING/LAND USE AGENCY LETTERHEAD)

(DATE)

Re: _____, Wake County, State of North Carlina

To Whom It May Concern:

This is to advise you that the zoning and use of the above-captioned Premises is governed by the laws and regulations of the County of Wake, and the Premises have been zoned to allow an establishment or facility which includes the retail sale of food and drugs, sundries and notions, books and stationery, delicatessen, bakery, beer and wine for off-site consumption, video rental, and similar uses, a bank, photo developing, and a dry cleaning business under Section _____ of the Zoning Code of the County of Wake, relating to uses permitted in the _____ District. The aforesaid zoning permits the use of the improvements located or to be located on the Premises as described above. The aforesaid Zoning District is appropriate for this state's comprehensive plan's future land use designation (if any exists).

As of the date hereof, we are not aware of any facts with respect to the Premises that constitute a violation of any building or zoning laws, rule or regulations. Any nonconforming elements of the development are considered valid nonconforming elements under the current building and zoning law.

Should you have further questions in this regard, please advise.

Very truly yours,

(Name)
(Title)

Attachments
- Zoning Regulations for Permitted Use of Premises
- Zoning Regulations for Non-conforming Uses

52

<u>EXHIBIT "L"</u>

<u>SUPPLEMENTAL LEASE AGREEMENT</u>

**THIS SUPPLEMENTAL LEASE AGREEMENT** (the "Agreement") is made this _____, 199___, between **WINN-DIXIE RALEIGH, INC.,** a Florida corporation, (the "Tenant") and **STATES PROPERTIES, LLC.,** a North Carolina limited liability company (the "Landlord").

**WHEREAS,** Tenant and Landlord entered into a Lease dated _____, as amended and/or evidenced by: (a) Short Form Lease dated , recorded in Volume ___, page ___ of the public records of _____ County, _____; (b) Letter Agreement dated _____; (c) First Amendment to Lease dated _____; (d) Second Amendment to Lease dated_____ (the "Lease") for the use and occupancy of the Premises described therein;

**NOW, THEREFORE,** pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1. The Commencement Date of the Term is _____.

2. The Term shall expire at midnight Eastern Time on _____, unless earlier terminated or later extended as provided for in the Lease.

3. All undefined capitalized terms used herein are as defined in the Lease.

**IN WITNESS WHEREOF,** the parties hereto have signed and sealed this Agreement on the date first set forth above.

Witnesses:

Print name:_____

Print name:_____

**STATE PROPERTIES, LLC,** a North Carolina limited liability company

By:_____

Its:_____

Print name:_____

Printed Name:_____

**WINN-DIXIE RALEIGH, INC.,**

By:_____

Its:_____

53

STATE OF_____ )
COUNTY OF_____ )

I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____ personally appeared before me this day and acknowledged that he/she is a Member  of STATE PROPERTIES, LLC., a North Carolina limited liability company, and that,  by authority duly given and as the act of the company, the foregoing instrument was signed in its name by _____ _____, its Member,  with full authority.

Witness my hand and official seal, this the _____ day of _____, 1997.

Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)


STATE OF FLORIDA    )
COUNTY OF DUVAL    )

I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____ personally appeared before me this day and acknowledged that he/she is _____ Secretary of Winn-Dixie Raleigh, Inc., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

Witness my hand and official seal, this the _____ day of _____, 1997.

Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

54

## CONSENT

_____, a _____, the owner and holder of a mortgage upon the Shopping Center, hereby consents to the terms and conditions of this Supplemental Lease Agreement.

_____

By:_____

Its:_____
Date:_____

STATE OF FLORIDA    )
COUNTY OF DUVAL    )

I, _____, a Notary Public, State and County aforesaid, do hereby certify that _____ personally appeared before me this day and acknowledged that he/she is _____ Secretary of _____, a _____ corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _____ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

Witness my hand and official seal, this the _____ day of _____, 1997.

_____
Printed Name:_____
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

55

## AMENDMENT TO LEASE

**THIS AMENDMENT TO LEASE** ("Amendment") is made as of _April 24_, 1998, by **STATE PROPERTIES, LLC**, a North Carolina limited liability company ("Landlord") and **WINN-DIXIE RALEIGH, INC.**, a Florida corporation ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### RECITALS:

1.      Landlord and Tenant are parties to that certain Lease dated September 4, 1997, as amended and/or evidenced by Short Form Lease dated September 4, 1997, to be recorded in the public records of Wake County, North Carolina.

2.      The Lease established certain deadlines for commencement and completion of the improvements and Landlord has requested and Tenant has agreed to extend those deadlines.

**NOW THEREFORE**, Landlord and Tenant agree as follows:

1.      The foregoing recitals are true and correct and incorporated herein by reference.

2.      The first sentence of Article 7C of the Lease shall be deleted and shall be replaced with the following:

> "Construction of the Store shall begin not later than August 31, 1998 (the"Construction Start Date") and shall be completed not later than August 31, 1999 (the "Initial Deadline"); and if not begun or completed by the Construction Start Date and the Initial Deadline, respectively, then Tenant may terminate this Lease or may extend Landlord additional time for the beginning or completion of construction; provided, however, that if, after the beginning of construction, Landlord's failure to complete the Store by the Initial Deadline shall be due to Force Majeure, as hereinafter defined, and provided further that construction shall be completed with all due diligence and, notwithstanding anything to the contrary in this Lease, in any event not later than October 31, 1999 (the "Outside Completion Date"), this option to terminate shall not arise."

3.      Except as expressly modified by this Amendment, the Lease remains in full force and effect.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Amendment as of the date first

o:\transfer\raleigh\0811\amend.01
April 21, 1998

above written.

Signed, sealed and delivered
in the presence of:
Witnesses:

Print name: _KATHLEEN C. McCURRE_

Print name: _Debra H. Leach_

**STATE PROPERTIES, LLC,** a North Carolina limited
liability company

By: _Theodore Stan + Rozay J_

Its: _MEMBER / MANAGER_

Print name: _Rebecca L Sawyer_

Printed Name: _BRENDA J. BABCOCK_

**WINN-DIXIE RALEIGH, INC.,**

By: _R. P. McCook_
     R. P. McCook

Its: _Vice President_

Attest: _R. O. Pott_

Its: Assistant Secretary

2

STATE OF *North Carolina*)
COUNTY OF *Wake*            )

I, *Kathleen C. McConnell*    , a Notary Public, State and County aforesaid, do hereby certify that *Theodore S. Royal, Jr.* personally appeared before me this day and acknowledged that he/she is a Member/ of STATE PROPERTIES, LLC., a North Carolina limited liability company, and that, by authority duly given /*Manager* and as the act of the company, the foregoing instrument was signed in its name by *Theodore S. Royal, Jr.*    , its Member/ with full authority.
                        *Manager*

Witness my hand and official seal, this the **24**th day of *April*            , 1998.

Printed Name: *Kathleen C. McConnell*
Notary Public, State and County aforesaid
My commission expires: *12/10/2002*
(NOTARIAL SEAL)

KATHLEEN C. McCONNELL
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 12-10-2002


STATE OF FLORIDA    )
COUNTY OF DUVAL    )

I,    Rebecca L. Sawyer            , a Notary Public, State and County aforesaid, do hereby certify that    Ronald D. Peterson            personally appeared before me this day and acknowledged that he/she is Assistant Secretary of Winn-Dixie Raleigh, Inc., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its  **Vice**    President, sealed with its corporate seal, and attested by her/himself as its  **ASST.** Secretary.

Witness my hand and official seal, this the **22** day of *April*            , 1998.

Printed Name: Rebecca P. Sawyer
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

NOTARY PUBLIC
STATE OF FLORIDA

REBECCA L. SAWYER
My Comm. Exp. June 2, 2002
Comm. No. CC 372310

3

**CONSENT**

**SOUTHTRUST BANK, N.A.**, as the owner and holder of a mortgage upon the Shopping Center or the Premises, hereby consents to the terms and conditions of this Amendment.

**SOUTHTRUST BANK, N.A.**

Print name: _KATHLEEN C. McCONNELL_

Print name: _____

By: _Gustavus Bass_

Its: _Assistant Vice President_

Date: _4/24/98_

STATE OF _NORTH CAROLINA_ )
COUNTY OF _WAKE_ )

I, _KATHLEEN C. McCONNELL_ , a Notary Public, State and County aforesaid, do hereby certify that _GUSTAVUS BASS_ personally appeared before me this day and acknowledged that he/she is _Assist. Vice President_ of **SOUTHTRUST BANK, N.A.**, a national banking association, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its _Assist Vice_ President, sealed with its corporate seal, and attested by her/himself as its _____ Secretary.

Witness my hand and official seal, this the _24th_ day of _April_ , 1998.

Printed Name: _KATHLEEN C. McCONNELL_
Notary Public, State and County aforesaid
My commission expires: _12/10/2002_
(NOTARIAL SEAL)

KATHLEEN C. McCONNELL
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 12-10-2002

O:\TRANSFER\RALEIGH\0811\AMEND.01

4

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE ("Amendment") is made as of *June 4* 1999, by STATE PROPERTIES, LLC, a North Carolina limited liability company ("Landlord") and WINN-DIXIE RALEIGH, INC., a Florida corporation ("Tenant"). Landlord and Tenant shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### RECITALS:

1.      Landlord and Tenant entered into a Lease dated September 4, 1997, as amended and/or evidenced by: (a) a Memorandum of Lease dated September 4, 1997, recorded in Book 805, Page 1095 in the Register of Deeds of Wake County, North Carolina (b) Amendment to Lease dated April 24, 1998 (the "Lease") for the use and occupancy of the Premises described therein;

2.      The Lease established certain deadlines for commencement and completion of the improvements and Landlord has requested and Tenant has agreed to further modify and amend those deadlines.

NOW THEREFORE, Landlord and Tenant agree as follows:

1.      The foregoing recitals are true and correct and incorporated herein by reference.

2.      The first sentence of Article 7C of the Lease shall be deleted and shall be replaced with the following:

> "Construction of the Store shall begin not later than March 15, 1999 (the "Construction Start Date") and shall be completed not later than March 15, 2000 (the "Initial Deadline"); and if not begun or completed by the Construction Start Date and the Initial Deadline, respectively, then Tenant may terminate this Lease or may extend Landlord additional time for the beginning or completion of construction; provided, however, that if, after the beginning of construction, Landlord's failure to complete the Store by the Initial Deadline shall be due to Force Majeure, as hereinafter defined, and provided further that construction shall be completed with all due diligence and, notwithstanding anything to the contrary in this Lease, in any event not later than May 15, 2000 (the "Outside Completion Date"), this option to terminate shall not arise."

3.      The legal description of the Leased Premises referenced in Article 2 of the Memorandum of Lease as being attached as Exhibit "B" thereto is hereby amended and restated so that the legal description of the shopping center attached hereto as Exhibit "B-1" is substituted in the place of Exhibit "B". The Site Plan referenced in Article 2 of the Lease Agreement prepared by Rice & Associates dated

raleigh.811.2amend
3.15.99.tlm

1

July 14, 1997, is replaced by Site Plan prepared by Rice & Associates dated October 6, 1998.

4.     Except as expressly modified by this Amendment, the Lease remains in full force and effect.

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Amendment as of the date first above written.

Signed, sealed and delivered
in the presence of.
Witnesses:

1)_____
Print name>......................................

2) _____
Print name> *HATHLEEN C. MCGINNESS*

 

**STATE PROPERTIES, LLC,**
a North Carolina limited liability company

By: _____ (SEAL)
Print Name> *THEODORE S. ROGAN, JR.*
       Its         President *MANAGER*

 

1) _____
Print name>   JOAN B. STOOPS

2) _____
Printed Name>   BRENDA J. BABCOCK

 

**WINN-DIXIE RALEIGH, INC.,**

By: _____
Print Name>  James Kufeldt
     Its:  Vice  President

Attest: _____
   Its: Assistant Secretary

raleigh.811.2amend
3.15.99.tlm

2

STATE OF *North Carolina* )
COUNTY OF *Wake* )


I, *Kathleen C. McConnell*, a Notary Public, State and County aforesaid, do hereby certify that *Theodore S. Rozml, Jr* personally appeared before me this day and acknowledged that he/she is a Member of STATE PROPERTIES, LLC., a North Carolina limited liability company, and that, by authority duly given and as the act of the company, the foregoing instrument was signed in its name by _____ *HIM*, its Member, with full authority.

Witness my hand and official seal, this the *20th* day of *April*, 1999.

Printed Name: *Kathleen C. McConnell*
Notary Public, State and County aforesaid
My commission expires: *12/10/2002*
(NOTARIAL SEAL)

KATHLEEN C. McCONNELL
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 12-10-2002


STATE OF FLORIDA )
COUNTY OF DUVAL )


I, *Rebecca L Sawyer*, a Notary Public, State and County aforesaid, do hereby certify that *Ronald D. Peterson* personally appeared before me this day and acknowledged that he/she is Assistant Secretary of Winn-Dixie Raleigh, Inc., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its *Vice* President, sealed with its corporate seal, and attested by her/himself as its *Asst*. Secretary.

Witness my hand and official seal, this the *4* day of *June*, 1999.

Printed Name: *Rebecca L. Sawyer*
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Exp. June 2. 2002
Comm. No CC 372310


raleigh.811.2amend
5.15.99.tlm

3

## CONSENT

**SOUTHTRUST BANK, N.A.**, as the owner and holder of a mortgage upon the Shopping Center or the Premises, hereby consents to the terms and conditions of this Amendment.

1) _____
Print name>..............................................

2) _____
Print name> KATHLEEN C. MCCONNELL

**SOUTHTRUST BANK, N.A.**

By: _____ (SEAL)
Print name> WILLIAM H. H. CRAWFORD II

Its _____VICE_____ President

STATE OF NORTH CAROLINA )
COUNTY OF WAKE )

I, KATHLEEN C. MCCONNELL, a Notary Public, State and County aforesaid, do hereby certify that WILLIAM H. H. CRAWFORD II personally appeared before me this day and acknowledged that he/she is VICE ~~Secretary~~ PRESIDENT of SOUTHTRUST BANK, N.A., a national banking association, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its HIM ~~President, sealed with its corporate seal, and attested by her/himself as its~~ _____ ~~Secretary~~.

Witness my hand and official seal, this the 30TH day of APRIL, 1999.

_____
Printed Name: _____
Notary Public, State and County aforesaid
My commission expires: 12/10/2002
(NOTARIAL SEAL)

KATHLEEN C. McCONNELL
NOTARY PUBLIC
WAKE COUNTY, N.C.
My Commission Expires 12-10-2002

raleigh 811.24mend
3.15.99.tlm

4

**EXHIBIT "B-1"**

Lot 2, Winn-Dixie Marketplace, as shown on map recorded in Book of Maps 1999, Page ___, Wake County, North Carolina

raleigh.811.2amend
3 15.99.tlm

DEC- 9-99 THU 12:43 PM  DJHC
OCT-29-1999 12:24

Case 3:05-bk-03817-JAF  Doc 3486-2  Filed 09/16/05  Page 49 of 50  P. 2

RAGSDALE LIGGETT PLLC

FAX NO. 919 821 5801

919 783 8991  P.07/07



Form **W-9**
(Rev. November 1999)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer
# Identification Number and Certification

Give form to the requestor. Do NOT send to the IRS

Please print or type

Name (If a joint account or you changed your name, see Specific Instructions on page 2.)

F.R.O., L.L.C., VII  by  5225 WISCONSIN ASSOCIATES  (F.R.O, L.L.C, VII is wholly Owned by 5225 WISCONSIN ASSOCIATES)

Business name, if different from above (See Specific Instructions on page 2)

N/A

Check appropriate box: ☐ Individual/Sole proprietor  ☐ Corporation  ☒ Partnership  ☐ Other ▶

Address (number, street, and apt. or suite no.)

c/o James Hastings, CPA, 305 Piping Rock Drive

Requestor's name and address (optional)

City, state, and ZIP code

Silver Spring  MD  20905

## Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. For individuals, this is your social security number (SSN). However, if you are a resident alien OR a sole proprietor, see the instructions on page 2. For other entities, it is your employer identification number (EIN). If you do not have a number, see How To get a TIN on page 2.

**Note:** If the account is in more than one name, see the chart on page 2 for guidelines on whose number to enter.

Social security number

OR

Employer identification number

X 52 - 6099424

List account number(s) here (optional)

## Part II  For Payees Exempt From Backup Withholding (See the instructions on page 2.)

## Part III  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

**Certification Instructions.** – You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN (See the instructions on page 2.)

Sign Here  Signature ▶ X _F.R.O., L.L.C. VII_  Date ▶ 5/31/00

**Purpose of form.** A person who is required to file an information return with the IRS must get your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9, if you are a U.S. person including a resident alien), to give your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify the TIN you are giving is correct (or you are waiting for a number to be issued).

2. Certify you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are an exempt payee.

If you are a foreign person, IRS prefers you use a Form W-8 (certificate of foreign status). After December 31, 2000, foreign persons must use an appropriate Form W-8.

**Note:** If a requester gives you a form other than W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**What is Backup Withholding?** – Persons making certain payments to you must withhold and pay to the IRS 31% of such payments under certain conditions. This is called "backup withholding." Payments that may be subject to backup withholding include interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

If you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return, payments you receive will not be subject to backup withholding. Payments you receive will be subject to backup withholding if:

1. You do not furnish your TIN to the requester, or

2. You do not certify your TIN when required, (see the Part III instructions on page 2 for details), or

3. The IRS tells the requester that you furnished an incorrect TIN, or

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 3 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the Part II instructions and the separate Instructions for the Requester of Form W-9.

**Penalties**

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of Federal law, the requester may be subject to civil and criminal penalties.

USA
6/W9050 �2 000

Form **W-9** (Rev. 11-99)