```
1                UNITED STATES BANKRUPTCY COURT
                  MIDDLE DISTRICT OF FLORIDA
2                    JACKSONVILLE DIVISION

3

4   IN RE:

5

6   WINN-DIXIE STORES, INC.,        CASE NO.: 05-3817-3F1
    et al.
7
                    Debtors.
8                                    /

9

10                  TRANSCRIPT OF PROCEEDINGS

11

12

13          Hearing on Motions, before the Honorable

14   Jerry A. Funk, U.S. Bankruptcy Judge, to commence at

15   approximately 1:00 p.m., on Thursday, August 4, 2005,

16   at the United States Courthouse, Courtroom 4D, 300

17   North Hogan Street, Jacksonville, Florida, before

18   Elizabeth M. Masters, RPR, and a Notary Public in and

19   for the State of Florida at Large.

20

21                          - - -
22

23

24            STATEWIDE REPORTING SERVICE
                606 BLACKSTONE BUILDING
25           JACKSONVILLE, FLORIDA  32202
                  (904) 353-7706
```

```
 1                    A P P E A R A N C E S

 2

 3

 4

 5        STEPHEN D. BUSEY, ESQUIRE
          CYNTHIA C. JACKSON, ESQUIRE
 6        D. J. BAKER, ESQUIRE

 7        Attorneys for Debtors

 8
          ELENA ESCAMILLA, ESQUIRE
 9
          Attorney for the U. S. Trustee
10

11        DAVID OTERO, ESQUIRE
          MICHAEL COMERFORD, ESQUIRE
12
          Attorneys for the Unsecured Creditors'
13        Committee

14
          JONATHAN HELFAT, ESQUIRE
15
          Attorney for Wachovia Bank, NA
16

17        EDWIN W. HELD, JR., ESQUIRE

18        Attorney for Catamount Rockingham, et al.

19
          C. TIMOTHY CORCORAN, III, ESQUIRE
20
          Attorney for Transamerica Life Insurance Company
21

22

23

24

25
```

1                    T A B L E   O F   C O N T E N T S

2

3
     EXHIBITS                                    PAGE
4

5    Re: Application for Payment of
     Administrative Expenses filed by
6    Transamerica Life Insurance Company

7

8    Landlord's 1, lease                          62

9
     Landlord's 2, billing                        62
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2  August 4, 2005                      1:00 p.m.

 3                       - - -

 4         THE COURT:  Good afternoon.  We're here on

 5     the case of the Winn-Dixie Stores.  The Court

 6     intends to take matters in the order they appear

 7     on the latest agenda unless there's any objection

 8     or suggestion to the contrary.

 9         The first matter is the Motion for Order

10     Deeming Utilities Adequately Assured.

11         MR. BUSEY:  Your Honor, Steve Busey on behalf

12     of the Debtors.

13         This is the Debtors' motion, asking the Court

14     to determine that its utilities, some 800

15     utilities, are adequately assured of future

16     payment and, therefore, do not need deposits.

17         We've had a number of objections to this

18     motion.  They have all now been adjudicated or

19     resolved with the single exception of Florida

20     Power Corporation.

21         The Debtors and Florida Power Corporation

22     have agreed to continue the motion as to Florida

23     Power Corporation until our next hearing, on

24     August 18th, with the Court's permission.

25         THE COURT:  Very well.  It's continued until
```

1    August 18th.  The announcement is made in open

2    Court.  No further notice need be given.

3        The next matter on the agenda is a Motion to

4    Reject Executory Contracts as of July 14th, filed

5    by the Debtor.

6        Mr. Busey.

7        MR. BUSEY:  Your Honor, by this motion, the

8    Debtors seek to reject executory contracts

9    identified in the motion.

10       We have one objection by Frankford Dallas.

11   We have resolved that objection.  And we have a

12   proposed order that is satisfactory to the

13   objector.

14       THE COURT:  If you will pass it up.

15       MR. BUSEY:  (Tenders order.)

16       THE COURT:  The order is signed and this

17   hearing is concluded.

18       Motion for Order Authorizing Debtors to Renew

19   Certain Insurance Programs and Assume Workers'

20   Compensation Program.

21       MR. BUSEY:  Your Honor, by this motion, the

22   Debtors seek the Court's authority to renew its

23   workers' compensation insurance program, its

24   automobile casualty program.  These are necessary

25   programs.  These self-insurance programs have a

1      self-insured retention and they have a first layer

2      of excess.   They are programs brokered through Ace

3      American Insurance Company.

4           The cost to the Debtors is approximately $4.6

5      million this year in terms of premiums.   That's

6      actually a reduction of about ten percent from

7      last year.

8           This would ordinarily be an ordinary course

9      of action by the Debtor, not requiring Court

10     approval, but Ace American Insurance Company asks

11     that the Debtors obtain approval due to the

12     magnitude of the program.   That's why we're here

13     today.   Which we have a proposed order.   (Tenders

14     order.)

15          THE COURT:   Are there any objections?   Are

16     there any other comments?

17          (No response.)

18          Court will grant the motion.

19          The order is signed, and this matter is

20     concluded.

21          Motion for Determination of Adequate

22     Assurance of Payment of Utilities.

23          MR. BUSEY:   Your Honor, there was an order

24     that was in place by Judge Drain before the

25     transfer of this case to the Middle District of

1    Florida which provided a system for resolution of

2    objections by utilities or utilities who wanted

3    deposits.

4         And, in the absence of resolution through

5    that system, the Debtor would bring a motion to

6    the Court asking the Court to determine the

7    Debtors' determination that no deposits are

8    required.

9         By reason of that process and Judge Drain's

10   order, the Debtors have brought this motion to the

11   Court.

12        There are a total now of seven remaining

13   utilities that have not been resolved, and we've

14   asked the Court by this motion to determine that

15   we don't need to make deposits for those seven

16   utilities.

17        There was -- there are no objections now.

18   Those seven utilities have basically not objected

19   to the relief requested by this motion, with the

20   exception of the City of Plaquemine.  The City of

21   Plaquemine has filed its own motion asking the

22   Court to require a deposit.  The City of

23   Plaquemine contacted -- and that matter is on the

24   calendar later here as a contested matter.

25        The City of Plaquemine has asked that we

1    continue that hearing, because of an agreement

2    with the City of Plaquemine's lawyer, until

3    September 1st.  The Debtors have agreed to do

4    that.

5         By reason of that circumstance, the Debtors

6    now ask the Court to grant this motion, with the

7    exception of the City of Plaquemine, and continue

8    it as to the City of Plaquemine until the Court

9    hears the City of Plaquemine's motion on September

10   1st, and, otherwise, to grant this motion in the

11   manner that's stated in the motion for the

12   remaining utilities.

13        THE COURT:  All right.  Any objection?  Any

14   comments?

15        (No response.)

16        There being none, the Court will grant the

17   motion with the exception of the City of

18   Plaquemine.

19        MR. BUSEY:  (Tenders order.)

20        THE COURT:  Order is signed.  The matter is

21   concluded.

22        Now we get to the application of Skadden,

23   Arps, Slate, Meagher & Flom for Allowance and

24   Payment of Compensation for Fees for Attorney for

25   Debtors.

1          MR. BUSEY:  As to the applications by

2     professionals retained by the Debtor or by the

3     Committee, there have been no objections made to

4     these applications.

5          But on Monday of this week, the Debtors

6     received a motion from Wachovia, as agent for its

7     postpetition credit facility, asking that the

8     Court appoint a fee examiner in this case and to

9     defer ruling on these applications until that fee

10     examiner may be employed and put to work and

11     receive his report.

12          I think that it would be appropriate at this

13     point, because of the agreement that the Debtors

14     have reached with Wachovia, to depart from the

15     agenda and to permit Wachovia to speak at this

16     point to its application for the appointment of a

17     fee examiner.

18          THE COURT:  Very well.  We'll take up the

19     application by Wachovia.

20          MR. HELFAT:  Thank you, Your Honor.  I'm

21     Jonathan Helfat.  I'm co-counsel with Ms. Cox, at

22     Rogers Towers, representing Wachovia Bank, NA.

23          First, Your Honor, let me apologize for

24     Wachovia in terms of the interim fee objection

25     deadline.  We wanted to get the motion heard at

1    the same time as the interim fees, and we

2    apologize if we have inconvenienced the Court or

3    any of the other litigants.

4        I'm not going to repeat our motion -- it's

5    been served -- but I would like to make a few

6    points.

7        Winn-Dixie, by any standard, is a mega case.

8    It's a very large case.  And from what we can see

9    in most every mega case, whether it's Friedman's

10   or Montgomery Ward or K mart, there is fee

11   oversight.  And we believe that there could be

12   some fee oversights in this case as well.

13       In the last hundred days, there have been $15

14   million in fees accrued.  We think a lot of very

15   positive things have happened during this last

16   hundred days.  And the fees -- we're not here to

17   object to the fees or to say that those fees

18   weren't earned, because certainly, when Mr. Busey

19   speaks again, I think he will go through some very

20   positive things that have happened in this case

21   and very early on.

22       But what we do believe is that the fee

23   applications are not uniform.  And it's nobody's

24   fault.  And we are certainly not here to object.

25   But there are differences in project codes,

1    different people spend different amounts of time

2    on the same conference calls.  All the

3    applications don't all cover the same time period,

4    so you can't tell if there is duplication.  There

5    are just issues that arise with large cases and

6    substantial fee applications.

7         As Your Honor may know, there are 2,900 pages

8    of fee applications.  We think it would be an

9    excessive burden on the Office of the United

10   States Trustee and an excessive burden on the

11   Court to have to go through all of these

12   applications, and we believe that a fee examiner

13   would serve that purpose.

14        We would like to basically modify, Your

15   Honor, the position we took in our motion.  We

16   have spent a lot of time negotiating and talking

17   to the company.  They are in favor of a fee

18   examiner.  And I'll talk to that in a moment.  So

19   I would like the Court to know as far as Wachovia,

20   we are orally modifying our motion.

21        We have no objection to the professionals

22   getting their interim fees, one hundred percent,

23   no twenty-percent holdback.  We're no longer

24   objecting to that.

25        And as far as the Bain application, which is

1    a final application, we understand that that was a

2    highly negotiated arrangement between Bain, the

3    company and the Creditors' Committee, and we do

4    not have an objection to the final application for

5    Bain.

6        In our view, Your Honor, a fee examiner would

7    be a third party who would be basically selected

8    by the Debtor after consulting with various

9    parties.  And this fee examiner would issue a

10   report to the Court, to the U.S. Trustee, to the

11   other parties in interest, which could be used by

12   the parties.

13       THE COURT:  Excuse me.  I hate to interrupt.

14   You still have an objection to the final

15   application of Togut, Segal & Segal?

16       MR. HELFAT:  It is my understanding, although

17   Mr. Togut can speak for himself, we have no

18   objection to him being paid as long as the

19   language that we have worked out with Smith,

20   Hulsey and Skadden, whereby his fee remains

21   subject to review by a fee examiner at a later

22   date is inserted, we have no objection to him

23   being paid.

24       THE COURT:  I'm sorry to interrupt you.

25   Continue.

1    MR. HELFAT:  My fault, Your Honor.  I should

2    have mentioned that.

3    And it is our view that the fee examiner

4    would issue a report, and that report would be

5    used by the parties, the Court, the U.S. Trustee,

6    to support various applications or if people wish

7    to make objections.

8    Our view of a fee examiner is that there

9    would be an independent third party who would

10   basically have the right to challenge the

11   applicants and earn a fee based upon what he saved

12   the estate.

13   We don't think that that would be fair.  That

14   is not our intent by making this motion for a fee

15   examiner.  It is our view, and I believe it is

16   supported by all of the parties who are making

17   interim fee applications today, as well as Mr.

18   Togut, that the fee examiner, once appointed,

19   would be able to review the interim -- this

20   interim that you are ruling on today as well as

21   the interim in the finals that are going forward.

22   We have proposed a form of order which we

23   have circulated to the parties.  I do not believe

24   it is yet right to submit to the Court because we

25   are looking for input from both the Debtors and

1    the Creditors' Committee.  Therefore, while we do

2    have a form of order, I think it will take a bit

3    of time before we are able to submit it to the

4    Court.

5    We are not trying to change anyone's

6    compensation arrangements.  Some of the

7    professionals are on a flat-fee basis.  We

8    understand that.  We are just trying to get

9    oversight over the process.

10    We believe strongly, as I'm sure every one of

11    the parties in this courtroom do, in the integrity

12    of the process, and we believe that a fee examiner

13    would be in the best interest of all parties.

14    And based on that, Your Honor, that is our

15    request for the Court today.  And I believe that

16    we have done a lot of work in the last four days

17    to bring the parties together.

18    And I believe that with the help of Mr. Busey

19    and Ms. Henry, I believe that, at least as far as

20    the company is concerned, we have an understanding

21    as to how a fee examiner would work going forward,

22    if the Court was to enter such an order.

23    Thank you.

24    THE COURT:  Thank you.

25    MR. BUSEY:  On behalf of the company, Your

1      Honor, counsel is correct that the Debtors believe

2      that the appointment of a fee examiner is in the

3      best interest of the estate.

4           I have with me at counsel table this morning

5      Larry Appel, who is the general counsel of

6      Winn-Dixie.  Mr. Appel is personally charged with

7      the responsibility of the administration of the

8      professional fees in this case.  The company is

9      very mindful of their stewardship responsibilities

10     as Debtors-in-Possession, not only over the entire

11     estate but particularly over the -- of the

12     oversight of professional fees in the case.

13          But because of the magnitude of the efforts

14     by the professionals, because of the number of

15     professionals, because of the scope of these

16     applications, it's the company's belief that a fee

17     examiner would be useful in terms of the

18     administration of the estate.

19          As you can see from the comments of

20     Mr. Helfat, we have suggested to Wachovia, and

21     Wachovia has agreed, that these applications go

22     forward today as opposed to the motion which asks

23     that they be continued, because, as a practical

24     matter, we don't think a fee examiner can be

25     employed and complete this task on these interim

1    applications and get back to the Debtors and to

2    the Court and to the U.S. Trustee in a reasonable

3    period of time.  It's just going to take a long

4    time to do that.

5         And for that reason, we have suggested, and

6    Wachovia has agreed, that the orders entered

7    today, if they are approving the interim

8    applications, contain language which we've agreed

9    upon which will state that the order entering the

10   -- approving the application authorizing and

11   directing the Debtors to pay the amounts requested

12   are done so without any determination at this time

13   by the Court as to the reasonableness of the fee

14   and that the awards are subject to further review

15   by the fee examiner, by the U.S. Trustee, by any

16   interested party.  And, that is, any awards that

17   are made pursuant to these orders are subject to

18   disgorgement, if necessary.

19        And with that, that concludes our comments on

20   Mr. Helfat's motion.  We have not agreed on the

21   form of an order yet, and we'll subsequently

22   submit one to the Court.

23        THE COURT:  Yes.

24        MR. HELFAT:  You know, Mr. Busey asked me

25   something yesterday which I think is important to

1    the Court.

2         It's our view that the fee examiner should

3    examine all fees that have to be paid from the

4    estate.  So Wachovia does get paid from the

5    estate, and our fees also would be subject to the

6    fee examiner, and there are certain third parties

7    that do get paid from the estate.  And we will

8    certainly fulfill the requirements of the fee

9    examiner.

10         MR. BUSEY:  That was the suggestion of the

11    company when presented with this motion of

12    Wachovia.  Mr. Helfat was very gracious in his

13    response.

14         THE COURT:  Any other comments?

15         MR. OTERO:  Good afternoon, Your Honor.  May

16    it please the Court.  David Otero of Akerman

17    Senterfitt.  Michael Comerford of Milbank, Tweed

18    is also here.

19         On behalf of considering -- after considering

20    Wachovia's motion as modified in Court today, the

21    Committee does not object to the relief sought and

22    hopes it will prove to be a prudent decision that

23    will benefit the estate and the creditors.

24         The motion was just filed on Monday, and we

25    would have liked the opportunity to have explored

1    the opportunity of a fee committee with the

2    parties as well, but -- and we would like to

3    reserve our right to agree or disagree with any

4    portion of the fee examiner's recommendations with

5    respect to the professionals.  But we do not

6    object to the relief sought.

7        Thank you.

8        THE COURT:  Yes, sir.

9        MR. TOGUT:  Your Honor, I'm Albert Togut from

10   Togut, Segal & Segal.  I just have a couple of

11   comments to make.

12       We did not know that an exception was being

13   made.  It was our understanding that all the

14   applicants were submitting to the fee examiner.

15   And so I was asked if we had any objection -- any

16   objection submitting to the fee examiner, too, and

17   we don't.

18       I leave that up to whether the Court wants us

19   involved in this process, which is time consuming

20   and costly, or not.

21       We've done this in Enron, where we are

22   co-counsel with Weil & Gotshall, so we understand

23   how the drill works.  And we're perfectly happy to

24   have our fees reviewed.

25       But our involvement in the case is done.

1          THE COURT:  Thank you very much.

2          U.S. Trustee.

3          MS. ESCAMILLA:  Your Honor, we have no

4     opposition to the motion to appoint a fee

5     examiner.  In a case of this magnitude, it makes

6     sense to do this.  It's been done in many other

7     mega cases.

8          Regarding what the examiner will do and what

9     guidelines to follow is not quite as clear because

10    this Court doesn't have clear guidelines as to

11    what expenses are allowed or what are not.

12         There are U.S. Trustee guidelines which are

13    very generic.  There are none regarding -- none

14    regarding specific expenses, intermeeting

15    conferences, things like that, which would be very

16    helpful to a fee examiner, if one was appointed.

17         We have no problem with the interim fees

18    being paid at this time.  Mr. Busey is correct,

19    we've come up with language in there that really

20    is true in any interim fee application, that

21    they're subject to final review at the end of the

22    case and any fees paid are subject to

23    disgorgement.  And that language has been

24    circulated and is in all the orders.

25         Bain is an exception.  There was a compromise

1      with the Creditors' Committee of a substantial

2      reduction in the amount requested.  And there was

3      a Notice of Compromise, and that Notice of

4      Compromise has been approved by this Court.

5          So in regards to Bain, they would probably --

6      we do not have an objection to their fee being

7      paid at this time and not being subject to a fee

8      examiner if the Court appoints one.

9          Regarding Togut, I just received a copy of

10     the proposed order, and it calls it a final

11     order.  We would like it to be called an interim

12     order, because just the connotation of a final

13     order means that you've approved it based on

14     reasonableness, et cetera.  So we would just like

15     some modifications as to the wording in the Togut

16     order.

17         We have been dealing with the bank and we

18     have been talking with the Debtors' counsel as to

19     what other mechanisms might be available.  I can

20     tell the Court that our program does not like fee

21     committees.  We have not found them, around the

22     country, to be as successful.  The fee examiners

23     that we have seen in bigger cases around the

24     country, they're firms that specialize in this

25     particular area.

1          My understanding is that the Debtor would

2     actually file some type of application, along with

3     an affidavit of the fee examiner, subject to Court

4     approval, pursuant to either 327 or 105.

5          THE COURT:  Thank you.

6          MS. ESCAMILLA:   Thank you.

7          THE COURT:  Does anybody else have any

8     comments?  Objections?

9          MR. PULIGNANO:  Good afternoon, Your Honor.

10    Nick Pulignano on behalf of Bain & Company.

11         I believe ours is an order that needs to be

12    signed and doesn't need to wait.  I think Mr.

13    Busey can confirm that.

14         THE COURT:  Thank you.

15         Anything else, Mr. Busey?

16         MR. BUSEY:  No, Your Honor.  I suggest, after

17    you rule on Wachovia's motion, that we take the

18    applications one at a time.

19         THE COURT:  First of all, it's this Court's

20    understanding that interim compensation is just

21    that, interim.  And I never anticipated ever

22    waiving any rights to go back to day one, with my

23    20/20 hindsight, and see who benefited the estate

24    and who didn't.  So there should be no problem

25    with that.  But I don't mind that being

1    articulated in any orders that we do enter

2    approving the interim fee application.

3        I think it probably would benefit the estate

4    to have the fee examiner.  Unfortunately, I've

5    already gone through these books, you know,

6    because I didn't know I was going to have a fee

7    examiner until Monday, and I have already read all

8    that stuff.  But I'll see if he agrees with me or

9    not, if they get appointed.

10       As to the two final fee applications, I think

11   one was Bain, and the parties have agreed that

12   that can be allowed in toto because it's related

13   in a settlement.

14       As to Togut, that's fine.  But to the extent

15   that they have to do something, in other words,

16   reformat their application and all, they're

17   entitled to increase their fee to the time they

18   quit doing that.

19       I would recommend that it's de minimis in the

20   scheme of things and that the examiner just see

21   what they've done and take care of it.  But if he

22   wants them to reformat their application, I think

23   that they would be entitled to a nominal fee for

24   taking care of that.

25       That being said, the Court will grant the

1    motion of Wachovia as amended in open Court and in

2    accordance with the representations of their

3    counsel and Mr. Busey.

4        And I would look to, I assume, Wachovia or

5    the Debtors for an appropriate order, or whoever

6    the committee is that's doing the order.

7        That doesn't appoint the examiner, right?

8    There will be a normal application and the Trustee

9    will have an opportunity to review the

10   qualifications and so forth of the fee examiner?

11       MR. BUSEY:  It is the contemplation of the

12   Debtor that the Debtor will pass this by all of

13   the constituencies in the case, including the U.S.

14   Trustee, and, absent an objection, will bring that

15   appointment to you with the entry of an order

16   appointing that fee examiner.

17       MR. HELFAT:  That's our understanding as

18   well, Your Honor.

19       THE COURT:  Very well.

20       MR. HELD:  For the record, Eddie Held.  Your

21   Honor, with respect to the prospective examiner,

22   I'm not clear, but I assume this is after notice

23   of hearing.

24       THE COURT:  I think that's what the Code

25   requires, notice of hearing, which means notice

1    and opportunity for a hearing.  I would anticipate

2    that.

3         MR. HELD:  I mean, it wasn't clear whether

4    Mr. Busey intended it to be submitted ex parte or

5    not.

6         THE COURT:  Do you want to respond to that,

7    Mr. Busey?

8         MR. BUSEY:  I really didn't think that we

9    would let all 900 landlords speak to it.

10        We were going to provide it to the United

11   States Trustee, to Wachovia, to the Creditors'

12   Committee and then, with a consensus among those

13   groups, we would bring the identity to the Court

14   for appointment.

15        MR. HELD:  I request that it be after notice

16   of hearing, Your Honor.

17        THE COURT:  All right.  I'll take that issue

18   under advisement for a few minutes so I can deal

19   with the rest of the matters.

20        MR. BUSEY:  Okay.  Anything else to help us

21   earn fees in the case, Your Honor.

22        THE COURT:  We'll take the applications in

23   the order they appear on the agenda.

24        MR. BUSEY:  Thank you, Your Honor.

25        What I would like to do, because these

1    matters are going to be subject -- and I take your

2    comments about the fact that they are interim

3    applications, they're not final, so, necessarily,

4    they are subject to further review.

5        We all understand that what the Code says is

6    what the law contemplates, but you would be

7    surprised how many different lawyers have ways of

8    writing that.  But because of that fact that these

9    all are subject to review by the U.S. Trustee, by

10   the fee examiner, by any interested party and by

11   the Court, that there is no finding of

12   reasonableness at this time.

13       And, furthermore, keeping in mind that these

14   applications that you're going to hear today have

15   been pretty thoroughly vetted, because Judge

16   Drain's order provided a procedure that monthly

17   bills would be provided to the company and to the

18   Committee and to Wachovia and to the U.S.

19   Trustee.

20       And in the absence of an objection within 20

21   days, the company was authorized and directed to

22   pay those monthly bills at 80 percent of the fees

23   and a hundred percent of the expenses.

24       And then Judge Drain's order contemplated

25   quarterly applications, in which the professionals

 1      could request this Court to pay, on an interim

 2      basis, the balance of 20-percent compensation.

 3           So that what they are really here for today

 4      is to ask the Court to direct and authorize the

 5      Debtors to pay that holdback, that 20-percent

 6      holdback, on an interim basis, pursuant to the

 7      terms of the orders that we're going to provide

 8      you.

 9           For those reasons, and in the absence of any

10      objection, there have been no -- we went through

11      that process of doing monthly bills.  There were

12      no objections.  And we got the application.  And

13      the application has been noticed, and there were

14      no objections to the application.

15           So in the absence of any objections, we don't

16      intend to put, on behalf of the Debtors'

17      professionals, any evidence on the stand in

18      support of the applications for all of those

19      reasons.

20           But I do want to make a general statement to

21      the Court regarding the scope of efforts by the

22      Debtor and its professionals during the first

23      hundred days in the case, which these application

24      periods generally address.

25           As Mr. Helfat said, this is -- and the U.S.

1    Trustee said, this is a mega case.

2        I have a hard time with what a mega case

3    means.  One time I was talking to Judge Killian,

4    from Tallahassee, about what a mega case was in

5    the Northern District of Florida, and he described

6    the mega case in Tallahassee as being a double

7    wide.

8        But I do know that Winn-Dixie is the largest

9    Chapter 11 proceeding filed in the U.S. this

10   year.  This is huge by any sense.

11       The DIP facility, which was negotiated at

12   length among the constituencies of this case while

13   it was still in the Southern District of New York,

14   approved over $800 million in postpetition

15   financing.

16       The PACA claims in this case, there are 127

17   PACA claims for $35 million.

18       There were dozens of first-day motions which

19   were noticed, heard, argued, briefed.  There are

20   900 leases in the case.  The schedules in this

21   case are over 6,000 pages that were required and

22   timely filed with the Court.

23       The case cash management is -- first-day

24   order approving the cash management system and

25   subsequent final orders in this case were very

1    complex because of the number of Debtors in this

2    case and the need to approve the intercompany flow

3    of funds and to protect all of the creditor

4    constituencies of the different Debtors.

5        Early in the case, the company set about, as

6    this Court is well aware of this effort, to

7    restructure the case to define a new footprint and

8    to work with its advisors to do all of that.

9        I'm giving you a glimpse of all of the

10   extraordinary efforts.  You heard the culmination

11   of the three months that it took to resolve 485

12   reclamation claims, totaling $129 million, which

13   was done entirely consensually and brought to this

14   court last Friday.  That process started early on,

15   in the beginning of this case.

16       It's been an immense undertaking.  At

17   Skadden, Arps alone, there were dozens of lawyers

18   working on this case.

19       Skadden's application is the first one that's

20   before you.  It seeks a total of approximately $3

21   million in compensation and $144,000 in expenses

22   and the holdback of $602,525.60.

23       For the reasons that I've suggested, and in

24   the absence of an objection, and because it's an

25   interim application, we ask the Court to enter an

1    order approving the interim first application.

2         THE COURT:  There being no objections, the

3    Court will approve the application.

4         Do you have an order?

5         MR. BUSEY:  (Tenders order.)

6         Skadden's application is from the petition

7    date, which is February 21st, through April 30th.

8         THE COURT:  The order is signed.

9         Next.

10        MR. BUSEY:  The next one, Your Honor, is

11   Smith, Hulsey & Busey.  It sort of pales by

12   comparison.  The application is for $124,000,

13   $3,000 in expenses and the holdback amount is

14   $24,988.90.

15        Your Honor, obviously, we're later in the

16   case.  We didn't get involved until March 28th.

17   This application is only for a one-month period,

18   from the period through April 30th.

19        THE COURT:  There being no objection, the

20   Court will approve the application.

21        MR. BUSEY: (Tenders order.)

22        THE COURT:  Order is signed, hearing

23   concluded.

24        Next.

25        MR. BUSEY:  The next is Bain & Company, Your

1      Honor.  Your Honor has already addressed it.  And

2      we have a proposed order approving the final

3      application of Bain & Company.  Their services are

4      terminated.

5          THE COURT:  The Court will grant the motion

6      for the application for compensation.

7          Order is signed, and this matter is

8      concluded.

9          MR. BUSEY:  Application of Carlton Fields for

10     the period February 21st through May 31st, seeking

11     compensation for approximately $107,000 and

12     expenses of about $6,000.

13         THE COURT:  The application is approved.

14         MR. BUSEY:  Carlton Fields is real estate

15     counsel.  (Tenders order.)

16         THE COURT:  Order is signed, matter is

17     concluded.

18         Deloitte Consulting.

19         MR. BUSEY:  Deloitte Consulting provides

20     consulting services to the Debtor in the operation

21     of their stores.  There's no objection for the

22     period of May 16th through May 31st.  The

23     consulting fees are approximately $185,000 and

24     expenses were approximately $21,000.

25         THE COURT:  Court approves the application.

```
1           MR. BUSEY: (Tenders order.)

2           THE COURT:  Order is signed, hearing

3    concluded.

4           Application of King & Spalding.

5           MR. BUSEY:  King & Spalding from Atlanta.

6    King & Spalding provided services to the Debtor

7    prepetition.  Postpetition, they have been

8    substantially involved in the disposition of the

9    stores that are targeted to be closed or sold.

10   They've had substantial involvement in the

11   processes you have been hearing on the enterprise

12   sales and going-out-of-business sales.

13          Their application is for the period of

14   February 21st through May 31st, and they seek a

15   total of $771,739.

16          THE COURT:  Court will approve the

17   application.

18          MR. BUSEY: (Tenders order.)

19          THE COURT:  Order is signed, this matter is

20   concluded.

21          Kirschner & Legler.

22          MR. BUSEY:  Kirschner & Legler is a

23   Jacksonville law firm that has also been involved

24   in the transactional aspects of the sales of the

25   stores and they provide substantial services.
```

1          Their application is for the period of March

2     4th through May 31st, seeking total compensation

3     and expenses of $308,000.

4          THE COURT:  Court will approve the

5     application.

6          MR. BUSEY: (Tenders order.)

7          THE COURT:  I don't think this is the right

8     order, Mr. Busey.

9          MR. BUSEY:  It was just a test, Your Honor.

10          THE COURT:  Well, it's a mega case.  It's

11     easy to get all these confused, right?

12          MR. BUSEY:  (Tenders order.)

13          THE COURT:  Okay, Kirschner & Legler are

14     getting compensation of $93,264; is that correct?

15     That's what the order says.  I'm not sure if

16     that's what you articulated.

17          MR. BUSEY:  Just a moment, Your Honor.

18          MS. ESCAMILLA:  Your Honor, that was the

19     amount requested in their application.

20          THE COURT:  I realize that sometimes things

21     get confused.

22          MR. BUSEY:  You're right.

23          THE COURT:  Court approves it.  Order is

24     signed, this matter is concluded.

25          Now, the application of KPMG, LLP.

1          MR. BUSEY:  Yes, Your Honor.  KPMG are the

2     company's auditors.  This was a substantial

3     undertaking for a company of this size.

4          Their application is for the period of

5     February 21st through May 31st.  The total

6     compensation sought is $653,321.

7          THE COURT:  Court will approve the

8     application.

9          MR. BUSEY: (Tenders order.)

10          THE COURT:  Order is signed, the matter

11     concluded.

12          Application of PriceWaterhouseCoopers.

13          MR. BUSEY:  PriceWaterhouseCoopers is seeking

14     application for the period February 22nd through

15     May 31st.  And the total amount is $935,769.88 for

16     services provided to the Debtors.

17          THE COURT:  Court will approve the

18     application.

19          MR. BUSEY: (Tenders order.)

20          THE COURT:  Order is signed, matter is

21     concluded.

22          Application of Smith, Gambrell & Russell.

23          MR. BUSEY:  Smith, Gambrell & Russell is a

24     law firm out of Georgia and Jacksonville which

25     have provided substantial services in connection

1    with the Debtors closing 300-some-odd stores, the

2    enterprise sales and the going-out-of-business

3    sales.

4        Their application is for the period of

5    February 21st through May 31st.  They seek total

6    compensation and expenses of $619,543.47.

7        THE COURT:  The Court will approve the

8    application.

9        MR. BUSEY: (Tenders order.)

10       THE COURT:  Order is signed and the matter

11   concluded.

12       Application of The Blackstone Group.

13       MR. BUSEY:  Your Honor, The Blackstone Group

14   is the group who employs Flip Huffard, who you

15   heard last Friday in Court on the reclamations.

16   You could tell from his testimony, just with

17   regard to reclamation matters, their significance

18   to the company.

19       Their application is for the period February

20   21st through May 31st.  They seek compensation and

21   expenses in the total amount of $588,209.23.

22       THE COURT:  Court will approve the

23   application.

24       MR. BUSEY: (Tenders order.)

25       THE COURT:  Order is signed, matter

1    concluded.

2         Togut, Segal & Segal.

3         MR. BUSEY:  You've already heard this matter

4    on Togut, Segal & Segal.  This is a final

5    application.  We've put language in the order that

6    makes it subject to a review by the fee examiner

7    appointed by the Court, as are all the other

8    interim orders we've entered.

9         THE COURT:  Very well.  Court will approve

10    the application.

11         MR. BUSEY: (Tenders order.)

12         MS. ESCAMILLA:  Your Honor, that's the order

13    that I had a problem with regarding it being a

14    final application.  I'm sorry, a final order.

15         It's titled "Final Order," and it has a

16    provision inside of the order that says that

17    they're subject to review by a fee examiner.

18         THE COURT:  The thing, the body of the order,

19    takes precedence over what it's called, don't you

20    think?

21         MS. ESCAMILLA:  It's a matter of whether it's

22    appealable or not, Your Honor.

23         MR. BUSEY:  It would be difficult to appeal

24    it in the absence of an objection, Your Honor.  I

25    think we've made a record of all the stipulations

1    that go with this.

2         THE COURT:  Whatever happens, the order is

3    being signed as is.  Hearing concluded.

4         Application of XRoads Solutions.

5         MR. BUSEY:  These people call themselves

6    XRoads (different pronunciation), Your Honor.

7         THE COURT:  XRoads.

8         MR. BUSEY:  You've heard from Ms. Holly

9    Etlin, who's in the courtroom.

10         THE COURT:  I have.

11         MR. BUSEY:  And Ms. Etlin is with XRoads.

12    And you've heard what her company has done with

13    the Debtors.  They've had dozens and dozens of

14    people in house at Winn-Dixie.  They have been

15    responsible for restructuring to define a new

16    footprint.

17         The marketing plan is a part of the

18    restructuring plan.  And it's an extraordinary

19    effort that they've made on behalf of the

20    Debtors.  It has resulted in extraordinary

21    success, as you've seen with the sales you held in

22    this courtroom last week.

23         Their application is for the period of

24    February 21st through May 28th, 2005, and they

25    seek compensation of $4,534,122.50 and expenses of

1    $326,995.50.  (Tenders order.)

2         THE COURT:  Court will approve the

3    application.

4         The order is signed.

5         Milbank, Tweed.

6         MR. BUSEY:  Your Honor, Milbank, Tweed is the

7    counsel for the Committee.  They don't think they

8    should be paid.

9         (Laughter.)

10        I'll let the Committee present their

11   application.

12        MR. OTERO:  That was very amusing.

13        The first application for the Committee is

14   the application of Milbank, Tweed, counsel to the

15   Committee.  This is for the period of March 1st

16   through May 31st.  The total for services during

17   that period is $1,303,272.01.  The amount that

18   they seek payment of is $582,253.73.

19        And we have an order that's been reviewed by

20   the U.S. Trustee.  (Tenders order.)

21        THE COURT:  Very well.  There being no

22   objection, the Court will grant the application.

23        Order is signed, this matter is concluded.

24        Alvarez and Marsal.

25        MR. OTERO:  Thank you, Your Honor.

1          Your Honor, Alvarez is the operations and

2     real estate advisor to the Committee.   The

3     application period is from March 4th, 2005 through

4     May 31st, 2005.

5          Their arrangement is a $100,000 per month

6     flat fee.   And the total amount sought is

7     $308,738.74, with the balance being expenses.

8          I have a proposed order that's been reviewed

9     by the Trustee, U.S. Trustee.   (Tenders order.)

10          THE COURT:   Court will approve the

11     application.   The order is signed, and this matter

12     is concluded.

13          Application of Houlihan, Lokey, Howard &

14     Zukin.

15          MR. OTERO:   Thank you, Your Honor.

16          Houlihan is the financial advisor to the

17     Committee.   The application period is March 3,

18     2005 through May 31st, 2005.

19          The fee arrangement is also $100,000 per

20     month, including expenses.   The total amount

21     sought is $313,225.07.

22          We'll have to submit an order on this, Your

23     Honor.

24          THE COURT:   Court will approve the

25     application, and look to you for an order in due

1    course.

2           Hearing is concluded.

3           MR. OTERO:  Thank you, Your Honor.

4           THE COURT:  Motion by Heritage Mint to

5    Shorten Time for Debtor to Assume or Reject.

6           Mr. Busey.

7           MR. BUSEY:  Your Honor, Heritage Mint and the

8    Debtors have agreed to continue this matter until

9    the next hearing, on August the 18th, and we would

10   ask the Court to do so.

11          THE COURT:  The Court will continue this

12   until August 18th.  The announcement is made in

13   open court.  No further notice need be given.

14          Motion for Modification of Security Deposit.

15   That's the one we've already continued; is that

16   correct?

17          MR. BUSEY:  Yes.  That's the City of

18   Plaquemine's.  And we've agreed to continue the

19   matter until September 1st, 2005.

20          THE COURT:  September 1st, 2005.  The

21   announcement is made in open court.  No further

22   notice need be given.

23          Application for Payment of Administrative

24   Expenses filed by Transamerica Life Insurance

25   Company.

1          MR. CORCORAN:  Good Afternoon, Your Honor.

2     I'm Timothy Corcoran.  I'm here on behalf of

3     Transamerica Life Insurance Company, the

4     applicant.

5          My client, Your Honor, is the landlord of

6     Winn-Dixie store 1908, in Huntsville, Alabama.

7          This application presents the question of the

8     allowance as an administrative expense of

9     reimbursement to a landlord postpetition for taxes

10    and common area maintenance that the landlord has

11    paid on behalf of the tenant in a prepetition

12    period.

13         That's an issue, Your Honor, as to which

14    there's conflicting authority, and it's an issue

15    as to which there is no controlling authority in

16    our circuit.

17         To assist the Court and counsel, I've

18    prepared a little hearing notebook that I think

19    has all the relevant documents and authorities.

20         THE COURT:  Thank you.

21         MR. CORCORAN:  This is for Judge Funk.  And

22    there are two exhibits there, too (tenders

23    documents to the courtroom administrator).

24         MR. CORCORAN:  Mr. Busey (tenders documents

25    to Mr. Busey).

1          Your Honor, we have in the hearing notebook

2     an outline of my argument just in kind of

3     bullet-point, executive-summary fashion.  We also

4     have the relevant applications and oppositions and

5     the like.

6          We have a copy of the lease, which is

7     Landlord's Exhibit Number 1, as well as the

8     billing that the landlord provided to the debtors

9     as Landlord's Exhibit Number 2.  Those two

10    documents are at Tabs F and G of the binder.

11         And then the remaining tabs of the binder are

12    the authorities that the parties would be citing

13    to the Court.

14         The facts as gleaned from the application as

15    well as the opposition that the debtor filed are,

16    I think, rather undisputed.  The debtors

17    acknowledge that the applicant is the landlord of

18    the relevant store for the relevant periods of

19    time.  One of the debtors is the tenant, another

20    debtor is the guarantor of the lease.

21         On the 16th of February, a few days before

22    the filing of the debtors' bankruptcy cases, the

23    landlord mailed to the debtors a statement of 2004

24    taxes and common area maintenance charges.  And

25    that statement appears in the record here at Tab

1    G, Debtors' Exhibit Number 2 -- I say "debtors."

2    It's Landlord's Exhibit Number 2.  We're talking

3    about, in round numbers, $76,000.

4        In the opposition, the debtor acknowledges

5    receiving that statement on the 3rd of March, a

6    few days after the bankruptcy filing.  It also

7    acknowledges that it owes the money, with the

8    exception of about $500 that it disputes, that,

9    obviously, the parties can resolve one way or the

10    other.  It's also undisputed that these are

11    amounts that were for 2004.

12        In the lease, which is Landlord's Exhibit

13    Number 1, which appears at Tab F to the binder,

14    the provisions that call for the payment of these

15    charges are paragraphs 31 and 37.  And I have

16    excerpted in the outline of argument, Tab A at

17    page 3, the relevant key provision as to the

18    payment.  And that is that the amounts -- and I'm

19    paraphrasing here -- shall be payable within 15

20    days following the furnishing by the landlord to

21    the tenant of a detailed statement.

22        Now, we contend that these charges, as

23    itemized in this February 16th statement, are

24    administrative expenses required to be paid by the

25    debtors under Section 365(d)(3) of the Bankruptcy

1    Code, and indeed under the Court's May 6th order

2    that required that all postpetition obligations on

3    the unexpired nonresidential leases be paid,

4    because, quoting the language of the statute,

5    "They are obligations arising from and after the

6    order for relief under the unexpired lease."

7        We say that under the plain language of the

8    lease, these additional rental obligations arose

9    and became due and payable 15 days after they were

10   noticed, which is a day after the filing of the

11   bankruptcy cases.

12       Again, the chronology, the notice is sent on

13   February 16, the debtors file on February 21.

14   March 1 is 15 days after the date of the giving of

15   the notice.  The notice was received by the

16   debtors on March 3, and March 18 is the date 15

17   days after that.

18       So whether you run the calculus from the date

19   of giving the notice or you run the calculus from

20   the date of receipt of the notice, 15 days

21   thereafter is when the claim arose, when the

22   obligation arose, and that's why, in either case,

23   it follows in the postpetition period and is

24   entitled to administrative expense priority under

25   Section 365(d)(3).

1          Now, I mentioned that there was a split of

2     authority, and no controlling authority whatsoever

3     in our circuit.

4          At Tab H, I have given you the 3rd Circuit's

5     2001 Montgomery Ward case which is a decision

6     which says that what a Court such as Your Honor,

7     faced with these issues, does is look to the terms

8     of the lease.  And if the obligation under the

9     terms of the lease became due and became a legally

10    enforceable obligation in the postpetition period,

11    it's an administrative expense, even though it

12    does, in point of fact, relate to reimbursing the

13    landlord for prepetition taxes, common area

14    maintenance and the like.

15         We say that case is on all four feet with our

16    situation, and we would invite the Court's

17    attention to that case.

18         There are some other authorities that have

19    taken that same approach that are set forth in the

20    next three tabs after Tab H.

21         Now, the leading authority on the contrary

22    side is the 7th Circuit's Handy Andy case that was

23    decided in 1998, several years before the

24    Montgomery Ward case was decided.

25         Now, the Handy Andy case takes the position

1    that what one does is look to when the obligations

2    accrued.  And because these were taxes, they kind

3    of accrued on a daily basis.  And in these

4    situations, since the ones that we're talking

5    about today were clearly from the 2004 prepetition

6    period, the Handy Andy case would say that those

7    are prepetition expenses, they accrued

8    prepetition, and they would not be afforded

9    administrative expense priority status.

10         There are other authorities.  I've given the

11   Handy Andy decision at Tab L.

12         There was a decision of Judge Aronovitz, back

13   in 1994, in a bankruptcy appeal from Judge Cristol

14   in the Southern District of Florida, that is

15   well-regarded and well-cited.  And I've given that

16   decision at Tab M.

17         Now, in these situations, I think that I

18   would be overreaching if I tried to stand up and

19   tell the Court all of the reasons why the Handy

20   Andy decision is bad and wrong and all of the

21   reasons why the Montgomery Ward decision is the

22   only way to go.

23         The fact of the matter is they are

24   conflicting authorities.  They can't be resolved

25   other than by reading them and having the Court

1    make its own mind up which analysis it thinks is

2    better reasoned.

3        I can tell the Court that, if you read the

4    decisions, all of the arguments that are given in

5    favor of each case attempt to be refuted in the

6    other case.  And so all I would be, frankly, would

7    be a parrot if I were standing up here, trying to

8    lay that all out for you.

9        I think what you're going to have to do is

10   simply read the cases and make your mind up.  And

11   the good news, of course, is that absent some

12   appellate authority, you get the last word.

13       So I'm not going to try to be that parrot.

14   But there are a couple of observations that I

15   would make and ask you to keep in mind as you do

16   review these cases in deciding, in your own view,

17   which one you think is a better statement of the

18   law and makes more sense.

19       The first point that I would make to you is

20   not to fall for the rhetorical device that the

21   debtors very cleverly employed in their opposition

22   papers.

23       And the first thing that they did was, you

24   know, define terms and use disparaging terms for

25   the Montgomery Ward line of cases and use

1    bolstering terms for the Handy Andy line of

2    cases.  And the way they did that was talk about

3    majority rule, minority rule and that kind of

4    thing.

5         I think that the important thing is that

6    these decisions not be labeled as favored or

7    disfavored, majority or minority, but that the

8    Court simply decide which is better reasoned.  And

9    only the court can do that upon reading them.

10        I think it is particularly noteworthy, in

11   using disparaging language about Montgomery Ward

12   in calling it a minority line of cases, I think it

13   is very important to keep in mind that the 3rd

14   Circuit, in deciding Montgomery Ward, had the

15   Handy Andy case before it and specifically chose

16   not to follow it and specifically outlined in the

17   decision why they chose not to follow it, why they

18   thought it was wrongly decided.

19        And whenever a Court does that in the face of

20   clear circuit authority, I always stand up and

21   take notice.  And so I think that the Montgomery

22   Ward decision is worthy of that standing up and

23   taking notice.

24        The second point that I wanted to make that

25   might be helpful to Your Honor as you review these

1    cases is to keep in mind that both the Handy Andy

2    line of cases as well as the debtors', in arguing

3    them to Your Honor, they do so in connection with

4    arguing what they think is best as a matter of

5    national bankruptcy policy and what they discern

6    was the congressional intent in adopting Section

7    365(d)(3) in the 1984 amendments.

8        The Court knows, however, that engineering an

9    outcome to give effect to a preferred policy or a

10   perceived congressional intent is indeed the role

11   of the Congress and not the role of the courts.

12       When the language of the statutes is clear

13   and unambiguous as it is here, as we submit it is

14   here, as the Montgomery Ward case and its line of

15   cases say, it is the role of the Court to give

16   effect to that language.

17       The Supreme Court, of course, has written a

18   couple of recent times on this point, many quotes

19   of which are well-cited.  And I'll mention a few

20   of them because I think they're on point, because

21   I think that the Montgomery Ward case follows this

22   Supreme Court reasoning.

23       The Supreme Court, in Connecticut National

24   Bank v. Germain, 1992, wrote that "We have stated

25   time and again that courts must presume that a

1    legislature says in a statute what it means and

2    means in a statute what it says there."

3         And then again, in the Hartford Underwriters

4    Insurance Company versus Union Planters Bank case,

5    in 2000, said, "In any event, we do not sit to

6    assess the relative merits of different approaches

7    to various bankruptcy problems.  It suffices that

8    the natural reading of the text produces the

9    result we announce.  Achieving a better policy

10   outcome is a task for Congress, not the courts."

11        Now, I would also point out, for what it's

12   worth, that the Montgomery Ward decision

13   specifically finds that the legislative history of

14   section 365(d)(3) supports the proposition that

15   payments that come due postpetition in these

16   circumstances be paid timely and be accorded

17   administrative expense priority status.

18        So the decisions argue about what the

19   legislative history means.  You can argue it

20   either way.  The courts do that.

21        My point is that that's really for the

22   Congress to worry about.  And if the statute says

23   these obligations that arise after the order for

24   relief are to be timely paid under the terms of

25   the lease -- my paraphrase -- then that's what the

1    result needs to be.

2        Now, in conclusion, let me say that the

3    debtors also argue that even under the billing

4    date approach, which is sometimes the label used

5    to refer to the Montgomery Ward line of cases,

6    that the additional rents in this case that are

7    included in the February 16th statement are not

8    administrative expenses because the landlord

9    billed them prepetition, a few days before the

10   filing of the bankruptcy case.

11       It is certainly true that the courts have

12   referred to the Montgomery Ward line of decisions

13   as the billing date approach.  But that's really a

14   misnomer.  If you look at those cases, the billing

15   date is not important unless the lease says it's

16   important.  And in some of the cases, the lease

17   says it's due when billed, and so, hence, the

18   billing date approach.

19       What the cases really say is it's due when

20   the lease says it's due.  And sometimes that's

21   when it's billed, if that's what the lease says,

22   and sometimes it's some other time.

23       And, in our case, we would argue that we have

24   a lease that says it's due 15 days after it's

25   billed.

1          Now, on that point, I would point out that

2     one of the cases upon which we rely, that is Tab J

3     in your binder, DeCicco of Montvale, has lease

4     language very much like the 15-day language that

5     is in paragraph 31 of our lease.

6          And the courts, contrary to what I'm arguing

7     to you now, in DeCicco, suggested that, well, that

8     means it's due when you send the statement, and

9     then it goes into default, if you will, at the end

10    of that period.

11         In the DeCicco case, I think it was 30 days,

12    not 15 like we have in our case.  And I would

13    argue that that is not the way this language

14    should be interpreted.  It clearly says it's due,

15    as I read it, at the end of that 15-day period.

16         But, importantly, even if the Court were to

17    be persuaded that DeCicco is the better view, or

18    the point that I'm arguing now, I think it is

19    important to underscore for the Court that DeCicco

20    also says that, in interpreting this same kind of

21    language, that the key date is the date of

22    receipt, not the date of sending.

23         In that case, 30 days after the date of

24    receipt.  In our case, 15 days after the date of

25    receipt, which would put it into the postpetition

1    period clearly.

2        So even if the Court disagrees with my

3    argument because of DeCicco, that the key date is

4    15 days after, even under the suggestion of

5    DeCicco, one would calculate that from the date of

6    receipt and we would be in the postpetition

7    period.

8        I think that I have probably said about as

9    much as I can helpfully say.  I think the Court

10   has to read the cases and make your decision.  And

11   we'll abide by whatever that decision is.

12       If I can answer any questions; otherwise,

13   I'll hear from distinguished counsel.

14       THE COURT:  I'm going to let Mr. Busey speak

15   before I ask any questions.

16       MR. BUSEY:  Your Honor, thank you.

17       I think that was a fairly objective

18   presentation by the landlord.  Permit me, I may be

19   something more of an advocate.  But, first,

20   there's two things I want to talk about, the facts

21   and the law.

22       On the facts, I will largely agree with

23   Mr. Corcoran about what the facts are.  But

24   there's one distinction that I think is important

25   to the Court.

1        You see from his statement, which was dated

2    February 16, 2005, which was five days before the

3    petition date, the landlord bills the debtors

4    $76,000.  But it's broken down:  $36,000 is for

5    common area maintenance, $2,500 is for insurance

6    and $36,000 is for property tax.

7        The language that Mr. Corcoran read to you,

8    and he has in his bullet point, that it's due 15

9    days from the date we send you the itemization of

10   expenses -- this is from paragraph 31 -- which is

11   common area maintenance.

12       You have to look at paragraph 37 about real

13   estate taxes, though, and it doesn't have that

14   language in it.

15       Paragraph 37 about taxes says, "During the

16   term of this lease and any extensions thereof, the

17   tenant agrees to pay the landlord, as additional

18   rental, the amount of the landlord's ad valorem

19   real estate taxes levied against the demised

20   premises."

21       And if there's any question about the intent

22   of the parties, about the fact that we're going to

23   accrue this on a month-to-month basis and you pay

24   for what months you're responsible for, is the

25   next sentence that says, "The tenant shall be

```
 1          responsible for its prorata share of such taxes

 2          for fractional years occurring at the beginning

 3          and expiration of the term of this lease."

 4              I just think that's relevant to the intent of

 5          the parties about the fact that there's going to

 6          be a proration here, and that should be relevant

 7          to the Court's consideration.

 8              So even if the Court were to adopt the

 9          billing date approach, you need to be mindful that

10          the billing date is February 16th and the

11          obligation -- and that there's no 15 days in here

12          for real estate taxes.

13              But I don't think that's how the Court should

14          resolve this matter.  I think you need to back up

15          and look at the bigger jurisprudential issue here

16          that's presented by the cases that Mr. Corcoran

17          referred to, the Handy Andy case and the

18          Montgomery Ward case.

19              And that is, fundamentally, what is the

20          debtors' obligation?  Is it the date the bill is

21          sent, February 16th, or do they have an

22          obligation, under 365(d), that accrues?

23              And Handy Andy says -- and that is the 7th

24          Circuit, which is a Judge Posner decision, says

25          that it's when it accrues, not when it's billed.
```

1          And in the Montgomery Ward decision,
2     Mr. Corcoran says it's when it's billed, it's not
3     when it's accrued.  And it's a straight
4     disagreement.
5          And he's absolutely right.  When the 3rd
6     Circuit decided the Montgomery Ward case, they
7     said, "We know that we are by this decision
8     creating a split of authority in the circuits."
9          But now what I'd like to do is to walk you
10    through those cases and a case that occurred from
11    a bankruptcy appellate panel subsequent to Handy
12    Andy and subsequent to Montgomery Ward which
13    considered them both and adopted the Handy Andy
14    rationale.
15         And I want to walk you through that
16    jurisprudence.  I won't parrot it, but I do want
17    to bring to your attention pieces of it that I
18    think will be persuasive to you as you decide
19    which is the better jurisprudence that you wish to
20    adopt in this case.
21         And I hear Mr. Corcoran saying that you need
22    to make a publishable decision here, so maybe
23    that's what we're going to get to.
24         But first let me bring you to Judge
25    Aronovitz's decision -- I want to start there --

1    which Mr. Corcoran referred to.  This is a

2    decision of the Southern District of Florida on

3    appeal from Judge Cristol.  And Judge Cristol

4    adopted the accrual approach, and Judge Aronovitz

5    affirmed Judge Cristol.

6         This is a 1994 decision of the Southern

7    District.  I'm just going to read some very

8    pertinent sentences out of the decision.

9         "The issue before the Bankruptcy Court was

10   whether the debtor's obligation to pay the 1992

11   real property taxes arose before or after the

12   petition filing date (February 25, 1993) and

13   whether that obligation to pay was subject to the

14   timely performance requirement of 365(d)."

15        The Bankruptcy Court determined that the

16   debtor's obligation to pay the 1992 real property

17   taxes arose when the taxes accrued, not when

18   payment was due under the lease.

19        The legislative history provides a compelling

20   evidence that Congress did not intend 365(d) to

21   include debtor-tenant's rental obligations arising

22   prepetition but billed postpetition.  That was a

23   fine congressional intent.  Nothing in the

24   legislative history indicates that Congress

25   intended 365(d)(3) to overturn the long-standing

1     practice under 503(b)(1) of prorating
2     debtor-tenant's rent to cover only the
3     postpetition prerejection period, regardless of
4     the billing date.
5          The Court agrees with the well-reasoned
6     analysis and conclusion set forth in In re Child
7     World, which is a Southern District decision,
8     1993, that is, the payment date under the lease is
9     not determinative when the debtor's obligation to
10    pay the 1992 real property taxes arose, rather,
11    the obligation arose when the '92 real property
12    taxes accrued.
13         And from there, let me go to the Handy Andy
14    decision, which was the 7th Circuit's decision by
15    Judge Posner, in 1998, addressing the same issue.
16         And it says, "In economic terms, the
17    prioritizing of postpetition debt enables the
18    debtor to ignore sunk costs, treat bygones as
19    bygones, and continue operating as long as the
20    debtor's business is yielding a net economic
21    benefit."  It adopted the accrual approach just
22    like Judge Aronovitz did.
23         And then the Montgomery Ward decision was
24    decided by the 3rd Circuit in 2001.  Handy Andy
25    was by the 7th Circuit in 1999.  The Montgomery

1        Ward decision was in 2001, which went exactly the

2        opposite way and rejected the accrual approach,

3        and it recognized by the decision the 7th Circuit

4        was creating a conflict.

5            But then let's go to In re Furr's

6        Supermarkets, which was a 2002 decision by the

7        bankruptcy appellate panel in the 10th Circuit

8        which considered both Handy Andy and Montgomery

9        Ward.

10           And after setting up the issue -- and it was

11       the same issue that was -- that Judge Cristol had

12       and that Judge Aronovitz had, and it was the same

13       issue that was in Handy Andy and Montgomery.

14           It says, "The issue in this case is whether

15       the appellants as lessors are entitled to the

16       payment under 365(d) for all payments coming due

17       under the lease after the conversion date even if

18       those payments are attributable to rent, taxes or

19       other lease obligations that accrued prior to the

20       conversion date."

21           There's a split among the circuits that have

22       addressed the issue.  And two rules have emerged

23       in the interpretation of 365(d), the proration

24       rule and the performance rule.

25           The leading case for the proration rule is

1    Handy Andy, the leading case for the performance
2    rule is Montgomery Ward.
3         Under the proration rule, the lessors are
4    entitled to lease payments under 365(d) arising
5    during and attributable to the period after the
6    order for relief or, in this case, the conversion
7    date.
8         Under the performance rule, the lessors are
9    entitled to lease payments under 365(d) for any
10   payment that comes due under the lease after the
11   order for relief, even if the lease payments are
12   attributable to periods prior to the order for
13   relief.
14        We conclude that the proration rule, as
15   explained by Judge Posner's decision in the
16   formulation of Handy Andy, is the better reasoned
17   approach and is more consistent with the
18   legislative purpose underlying Section 365(d)(3).
19        The appellant's reading of 365(d) unravels
20   the priority scheme of the Bankruptcy Code.
21   Consistent with this, we hold that lease
22   obligations arise under 365(d) as the obligations
23   accrue, not simply when they are billed, and that
24   the debtor or the trustee is required to pay only
25   those lease obligations that accrue after the

1     conversion date and prior to the date of the

2     rejection or assumption.

3          The citation for this decision is 283 BR 60.

4     And it was a BAP decision in the 10th Circuit in

5     2002, In re Furr's Supermarkets.

6          And I encourage you to the first supermarket

7     case because it's a thoughtful consideration of

8     the competing jurisprudence of Handy Andy and

9     Montgomery Ward.  And, for the reasons stated, it

10    adopts the Handy Andy reasoning.

11         We agree with that.  We think that if you mix

12    postpetition and prepetition obligations here and

13    say it's all postpetition, you're upsetting the

14    priority scheme intended by Congress in Chapter

15    11.

16         And it is particularly absurd on the facts of

17    this case when these are 2004 lease obligations

18    which were billed prepetition.

19         We ask the Court to deny the application.

20         MR. CORCORAN:  Your Honor, if I might be

21    heard in very brief reply.

22         You've heard it from Mr. Busey.  You'll have

23    to decide whether it's your job to read the

24    language that Congress wrote in Section 365(d)(3)

25    and do what they told you to do or whether you

1    want to join the train that some other judges have

2    taken, that Mr. Busey urges you to take today, and

3    do what you think is best.  And you'll simply have

4    to decide.

5         From my argument, you can understand that we

6    think that the role the Court should play is to do

7    what the Congress told you to do.  And if they

8    should consider changing it, then that's what they

9    get paid to do.

10        Finally, let me say, with regard to

11   Mr. Busey's point about paragraph 37 and prorating

12   taxes, I didn't mention paragraph 37 in terms of

13   quoting it because, as I read that section, the

14   proration language that he read to Your Honor,

15   that you can see in Tab F, paragraph 37, relates

16   to what happens at the end of the lease, at the

17   expiration or the termination of the lease, not as

18   an ongoing matter.

19        Thank you, sir.

20        THE COURT:  Thank you very much.

21        Based on the presentations and arguments of

22   counsel, the Court finds that there are no

23   relevant facts in dispute in this matter.

24        The documents contained in Mr. Corcoran's

25   submissions will be deemed admitted into evidence

1    as to the lease, I think, primarily.

2         (Whereupon, the documents last-above referred

3    to, having been previously marked for

4    identification, were received in evidence as

5    Landlord's Exhibit Number 1 and Landlord's Exhibit

6    Number 2.)

7         The Court will take this matter under

8    advisement.  Do either of you need any time to

9    make any further submissions of law?

10        MR. BUSEY: (Shakes head negatively.)

11        THE COURT:  Mr. Busey says no.

12        Mr. Corcoran?

13        MR. CORCORAN:  No, Your Honor.  Thank you.

14        THE COURT:  I have the one case you gave me,

15   and the others are contained in your objection.

16   Do you stand on that law?

17        MR. BUSEY:  Yes, Your Honor.  And the case

18   that I gave you is in the objection as well.

19        THE COURT:  It is?

20        MR. BUSEY:  Yes, sir.

21        THE COURT:  Very well.  I will take it under

22   advisement and get an order out in due course.

23        Thank you very much.  This matter is

24   concluded for the day.

25        MR. CORCORAN:  Your Honor, if I might be

1    excused to return home.

2        THE COURT:  If you don't want to sit and

3    watch, Mr. Corcoran, you're free to go.

4        MR. CORCORAN:  Thank you.

5        THE COURT:  Nice to see you.

6        MR. CORCORAN:  Thank you, sir.

7        THE COURT:  Take the matter of Motion for

8    Order Authorizing Retroactive Rejection of Real

9    Property Leases.

10       Mr. Busey, I notice it's marked on my memo

11   here that the objection to this has been

12   withdrawn; is that correct?

13       MR. BUSEY:  Yes, Your Honor.  And we have an

14   agreed order which we're prepared to submit.

15       THE COURT:  Mr. Held.

16       MR. HELD:  Your Honor, I am co-counsel with

17   Mr. Motsinger.  I believe everything has been

18   worked out.  I've been told that.

19       But Mr. Motsinger has requested, since there

20   were a few minor provisions in the order that

21   still needed to be ironed out, nothing really

22   substantive, that he be allowed to see the order

23   before it's signed.

24       MR. BUSEY:  That's fine, Your Honor.  We'll

25   make sure that it happens.

```
 1          THE COURT:  Very well.  I'll mark it settled

 2    until further notice or you send in a consent

 3    order.

 4          MR. BUSEY:  The Debtors will get you an

 5    order, Your Honor, after review with the

 6    objector.

 7          THE COURT:  Very well.  Thank you very much.

 8    And this matter is concluded.

 9          And the only thing remaining is the matter

10    I've taken under advisement at the request of Mr.

11    Held concerning the appointment of a fee examiner;

12    is that correct?

13          MR. HELD:  Yes, Your Honor.

14          I do have one housekeeping matter that will

15    take one minute when we conclude.

16          THE COURT:  Mr. Busey, the Court will go with

17    that procedure.  Once a fee examiner is located or

18    appointed, if you have a specific objection,

19    anybody can come in and file a motion, within ten

20    days of the order of appointment, seeking the

21    Court to review it.

22          And if Mr. Held has some interest and you

23    maybe want to put him in on the loop, that's up to

24    you.  I know you're not seeking to drag the thing

25    out.
```

1       MR. BUSEY:  That's correct, Your Honor.

2   Unfortunately, I talk to Mr. Held every day.

3       THE COURT:  I don't think that would be

4   unfortunate.  You should say fortunately.

5       MR. HELD:  I feel fortunate to speak with Ms.

6   Jackson.

7       So if I could be brought into the loop.  I

8   think Mr. Busey knows my concerns, which are very

9   limited.  And I have the utmost faith in Mr. Appel

10   to pick the proper person to be the fee examiner.

11   And if I could be brought into the loop for that

12   limited basis, I have no problem.

13       THE COURT:  You can always communicate with

14   the U.S. Trustee.  She's sort of there to hear

15   what you've got to say in response of those

16   arguments.  She believes in them, too.

17       However you work it out.

18       MR. HELD:  Thank you, Your Honor.

19       THE COURT:  You said you had another matter

20   to discuss?

21       MR. HELD:  I just have a housekeeping

22   matter.

23       With respect to the trade vendor, the

24   approval of the order concerning the trade vendor

25   stipulation.  The order was entered at the hearing

1      on July 29th, and then there was an order

2      correcting that order which inadvertently left out

3      paragraph 6, which, in essence, cured my objection

4      with respect -- or my comments with respect to the

5      trade vendor stipulation.

6           And I just -- Mr. Busey has indicated that

7      another order will be submitted --

8           THE COURT:  That's what I understand.

9           MR. HELD:  -- curing that inadvertence.  And

10     I wanted that for the record.

11          THE COURT:  I understand that's on the way.

12          That was my fault.  I drafted that thing so

13     fast, and in typing it I left it out.  I apologize

14     if I caused any problems.

15          MR. HELD:  Thank you, Your Honor.

16          THE COURT:  That being said, the hearings are

17     concluded.

18          ALL COUNSEL:  Thank you, Your Honor.

19          COURTROOM ADMINISTRATOR:  All rise.  Court is

20     in recess.

21          (Whereupon, the hearings were concluded at

22     2:35 p.m.)

23                        - - -

24

25

1                  C E R T I F I C A T E

2    STATE OF FLORIDA )

3    COUNTY OF DUVAL  )

4           I, Elizabeth M. Masters, RPR, and Notary

5    Public, State of Florida at Large, do hereby certify

6    that the attached material represents the proceedings

7    before the United States Bankruptcy Court, Middle

8    District of Florida, Jacksonville Division, before the

9    Honorable Jerry A. Funk, Bankruptcy Judge, in the

10   matter of In Re:  Winn-Dixie, Inc., et al.; such

11   transcript is an accurate recordation of the

12   proceedings which took place.  A transcript of this

13   proceeding has been produced on September 13, 2005.

14

15

16

17                         STATEWIDE REPORTING SERVICE

18

19

20

21                         ELIZABETH M. MASTERS, RPR

22

23

24

25