# Exhibit "C"

*Law Offices of*
**CARL SCOTT SCHULER**

644 Cesery Boulevard, Suite 340
Jacksonville, Florida 32211
Phone: (904) 396-1911
Fax: (904) 396-1941

e-mail: scott@schulerlaw.com

August 26, 2005

Ms. Angela Walker, Claims Adjuster
Sedgwick CMS, Inc.
P. O. Box 24787
Jacksonville, Florida 32241-4787

        Re:    My client: Maxine Simmons
                 Claim No.: A211207658
                 Date of Loss: 6/11/02

Dear Ms. Walker:

      This office represents Ms. Maxine Simmons in her claim for injuries she sustained after she fell in the Winn-Dixie Store in Callahan on June 11, 2002. I am writing this letter to present the facts of this claim on behalf of my client, in an attempt to settle this claim amicably without the necessity of litigation.

      On June 11, 2002, Ms. Simmons was walking down an aisle shopping at the Winn-Dixie store in Callahan when, without warning, her feet came out from under her and she fell. Ms. Simmons fell on her left knee, and her body twisted with her hip and back, hitting the ground. She later learned that there was water in the middle of the floor in this aisle. She did not see this water before she slipped and fell because of it. After she fell, some Winn-Dixie employees called a rescue unit to help her, while the other employees helped her off of the floor. Ms. Simmons could not see any cart tracks or footprints in the water but the water was dirty like it had been there for some time. A Winn-Dixie staff member commented to her that the water must have been caused by some ice that had melted and formed a puddle.

      It is clear that there were no warning signs in the aisle area for shoppers to take notice of the dangerous condition that the water in the aisle caused to customers. Ms. Simmons' status at Winn-Dixie at the time of the incident was that of a business invitee. As such, Winn-Dixie owed her the duty to maintain its premises in a condition that is reasonably safe for the use of its visitors. Winn-Dixie clearly breached that duty to Ms. Simmons, causing her injuries.

## MEDICAL TREATMENT

      Rescue came to evaluate her, but Ms. Simmons did not wish to go with them because she felt more comfortable having her own doctor see her first. She then proceeded to go to Dr. William

Pennick, at St. Vincent's Primary Care. Dr. Pennick diagnosed Ms. Simmons with a contusion of her left knee and cervical and lumbar strain. He also gave her work restrictions of no lifting, pushing, or pulling to exceed 20 pounds, no sitting more than 60 minutes without breaks, and to stretch at 15 minute intervals. She was given Zanaflex and Bextra (muscle relaxers/pain medication) for her use, and was given a prescription for physical therapy three times per week for two weeks. Ms. Simmons proceeded to have a total of eight visits with HealthSouth Rehabilitation.

Dr. Pennick referred Ms. Simmons to Baptist Medical Center for x-rays of her cervical and lumbar spines and a left knee series of x-rays. Even though the left knee and lumbar spine x-rays read to be normal, the cervical spine x-ray indicated disc changes at C4/5, C5/6 and moderate disc space narrowing at C6/7. Ms. Simmons presented back to Dr. Pennick in July 2002 and August 2002, still with complaints of back pain stiffness with spasms, and with pain on the left side of her neck. Further, Ms. Simmons complained of discomfort in her left shoulder with tightening up and her back getting worse with spasms. Dr. Pennick continued her with physical therapy with a scheduled appointment to see an orthopedic physician regarding her symptoms. Ms. Simmons proceeded to have six treatments of physical therapy through Heartland Rehabilitation, but with no lessening of her symptoms.

Ms. Simmons was evaluated by Dr. William Pujadas, a general orthopedic surgeon with the Jacksonville Orthopedic Institute on January 31, 2003 with regard to her lumbar complaints. Dr. Pujadas found that Ms. Simmons exhibited tenderness in her lumbar spine and her range of motion in lumbar spine was decreased secondary to her pain. He indicated that he did not find any evidence of radiculopathy in her lumbar area, but suggested follow up with pain management. On March 13, 2003, Ms. Simmons was evaluated by Dr. Gregory Keller, an orthopedic surgeon at Jacksonville Orthopedic Institute regarding her neck and shoulder complaints. Dr. Keller indicated that Dr. Pujadas had seen Ms. Simmons in the past, but had recommended that she see him for her neck complaints. Dr. Keller noted that treatment to date had included medications of Soma, Flexeril, Darvocet and Mobic, and that she had therapy and some injections. Dr. Keller's initial evaluation of Ms. Simmons revealed evidence of neck pain and radicular complaints. He recommended an MRI from the complaints which was completed, which revealed multi-level disc protrusions in her cervical spine. This significant finding then led Dr. Keller to prescribe a cervical myelogram, which again revealed multi level protrusions and disc bulging. Dr. Keller prescribed Ms. Simmons Skelaxin and gave her a home traction unit for therapy. Further, on May 1, 2003, Ms. Simmons underwent a cervical epidural steroid injection with Dr. Frank Collier, a neurosurgeon; however, this provided little to no relief.

On October 30, 2003, Dr. Keller discussed a surgical option to alleviate her cervical pain, but was concerned about its usefulness. After discussion of the treatment options, Ms. Simmons elected pain management, and Dr. Keller referred her to Dr. Orlando Florete, a pain management specialist. Dr. Keller has produced a report regarding his findings of Ms. Simmons, which is attached. (**Dr. Keller has indicated that Ms. Simmons would have a permanent impairment rating of 5% per the AMA guidelines.**) Dr. Keller recommends that she see someone in pain management, such as Dr. Florete or a physiatriast for ongoing care. He also indicated that Ms. Simmons may need to see him on an as-needed basis. Dr. Keller indicated that Ms. Simmons will have to live with ongoing discomfort, but was hopeful that this would be able to be controlled through pain management.

On March 16, 2004, Ms. Simmons presented to Dr. Orlando Florete with complaints of a

throbbing neck pain, with sharp burning that radiates to the bilateral shoulder blades and down the right upper extremity, associated with headaches and a burning sensation. Dr. Keller noted that the pain is worse with stress, exercise, working and turning her neck, and that physical therapy and the cervical steroid injection has not done much to relieve the pain. On physical examination of her neck, Dr. Florete noted pain on flexion and rotation, and significant change in the cervical curvature. He noted that tenderness was rampant throughout palpation across the cervical spine and upper extremity strength was lessened. Dr. Florete indicated in his impression multiple levels of herniated discs, and suggested formal epidurals under fluoroscopic guidance, which was agreed to by Ms. Simmons. He also started Ms. Simmons on Neurontin three times a day and Ultram, along with Percocet and Bextra for medications. The epidural steroid injections were completed on May 5, May 12 and May 19 of 2004. Ms. Simmons presented to Dr. Florete on May 25, 2004, indicating that her pain had decreased and her radicular symptoms had also decreased. At this point, Dr. Florete indicated for her to return to start procedures for her lumbar spine. Ms. Simmons noted that she still was having episodes of spasms in her neck, and occasional pain, but overall was getting better.

However, on June 22, 2004, Ms. Simmons presented to Dr. Florete, indicating increased episodes of spasms still in her cervical spine with occasional pain, and also complained of spasms, stiffness and tightness in her lumbar spine. Dr. Florete recommended lumbar epidural steroid injections, which were completed on July 28, August 11 and September 1, 2004. Ms. Simmons continued with her medications of Bextra and Neurontin, with Flexeril and Ultram being continued also.

Dr. Florete has continued to treat Ms. Simmons for both her lumbar and epidural pain and injuries, and has most recently performed right sacroiliac joint injections to alleviate pain as a result of her lumbar condition. Dr. Florete has produced a report on Ms. Simmons current condition, which is attached. He indicates that Ms. Simmons would continue to need to have pain management as she will suffer chronic pain for the remainder of her life. Dr. Florete has indicated that Ms. Simmons would benefit from monthly office visits, physical therapy, medications and injection therapy. A copy of all medical records in our possession is attached for your review.

## DAMAGES

As of this date, Ms. Simmons past medical bills total $21,688. A copy of these medical bills is attached. Using Dr. Florete's recommendations for future medical care and treatment, a future Life Care Plan for Ms. Simmons has been created by Mr. William Gray, a certified rehabilitation specialist and life care planner. This life care plan is enclosed. The total value of this life care plan, without reduction to present value, is between $314,387 and $419,417. Although we have not had these numbers reduced to present value yet, I would anticipate that the present value numbers would exceed $150,000 as the minimum and $250,000 as the high.

Ms. Simmons continues to work for the Baptist Medical Center Surgical Unit as a Health Unit Coordinator. Her job requires her to sit for long periods of time, which puts great strain on her neck and back, thereby exacerbating her injuries. Because of her injuries, she was not able to return to work until ten days after the fall. Even after she returned to work, she found it difficult to continue working. The restrictions that had been put on her by her physicians were somewhat incompatible with her job duties at Baptist Medical, which caused her to miss even more work time. Even though she has been able to work with the supervisors at her work with these restrictions and

her needs because of her injuries, it is anticipated that she will continue to lose work in the future for various flare-ups of pain, and also for office visits and physical therapy that is needed. We have not done calculations on any past lost wages, nor future lost wages that Ms. Simmons will suffer in the future, but I believe that these damages would be substantial.

Because of this fall and the injuries that she has sustained, Ms. Simmons has and will continue to suffer pain and limitation in both her lower back and neck throughout the remainder of her life. She has also had to undergo the emotional pain of not being able to adequately support her household, and not being able to perform her duties as both a mother and wife because of the pain that she goes through every day because of these injuries. These limitations can easily be seen, but there is no magic formula for measuring the amount of Ms. Simmons' intangible losses. At a minimum, I believe that the reasonable value would at least equal the amount of her economic damages, giving a damages total for her non economic damages of $171,688 to $272,688. Therefore, we believe that total damages in this case (not including damages for past and future lost wages) would easily exceed $350,000 at a minimum.

## DEMAND

Winn-Dixie was clearly negligent in this case. Ms. Simmons was and is a devoted mother to her children and wife to her husband. She was the primary wage earner in this family, and her ability to earn this wage has been severely limited because of this fall. Because of this fall, Ms. Simmons sustained serious and permanent injuries, and will continue to suffer pain and limitation from these injuries throughout the remainder of her life. In light of all the above, we hereby make demand of $350,000 to settle her claim with Winn-Dixie at this time. This offer will remain open for 30 days, after which it may be withdrawn and suit filed.

Sincerely,

BRIAN J. LEE

BJL/mq

Enclosures

cc:   Ms. Maxine Simmons (w/o enc.)