UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al.; | ) | Chapter 11 |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

## ORDER (I) AUTHORIZING THE DEBTORS (A) TO RETAIN LIQUIDATING AGENT AND APPROVING AGENCY AGREEMENTS, AND (B) TO SELL EQUIPMENT LOCATED AT THE FITZGERALD AND ASTOR FACILITIES FREE AND CLEAR OF LIENS AND EXEMPT FROM STAMP OR SIMILAR TAXES AND (II) GRANTING RELATED RELIEF

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and

twenty-three of its subsidiaries and affiliates (collectively, the "Debtors") for an Order (I)

Authorizing the Debtors (A) to Retain Liquidation Agent and Approving Agency

Agreements, Subject to Higher and Better Offers, and (B) to Sell Furniture, Fixtures and

Equipment Free and Clear of Liens, Claims and Interests and Exempt from Stamp or

Similar Taxes, and (II) Granting Related Relief (the "Motion")[2]. The Court has read the

Motion and considered the representations of counsel. Upon the representations of

counsel and without objection from the United States Trustee or any other interested

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are Debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

[2] Capitalized terms used but not defined in this Order have the meanings ascribed to such terms in the Agency Agreements or, if not defined in the Agency Agreements, as defined in the Motion.

party, the Court finds that (i) the Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (iii) notice of the Motion and the hearing on the Motion was adequate under the circumstances, (iv) the sales of the Equipment are based upon the sound business judgment of the Debtors and the Debtors' means of carrying out the sales as set forth in the Motion are reasonable, necessary and in the best interests of the Debtors' estates, (v) the Debtors and a joint venture composed of The Gordon Company, Inc., NREL, Inc., Bradford Industrial Group, LLC, Vision Equipment and Auction Company, Inc. and Rabin Worldwide, Inc. (collectively, the "Gordon Group") entered into the Agency Agreements dated as of August 24, 2005, attached to the Motion as Exhibit A (the "Fitzgerald Agency Agreement") and Exhibit B (the "Astor Agency Agreement"), both subject to higher and better offers, (vi) a competing higher offer was submitted as to the Fitzgerald Agency Agreement and as a result, the Debtors conducted an auction on September 20, 2005 (the "Auction"), (vii) at the conclusions of the Auction, the Gordon Group submitted the highest and best offer with respect to the Fitzgerald Agency Agreement, (viii) no competing bid was submitted as the Astor Agency Agreement, (ix) at the conclusion of Auction, the Debtors and the Gordon Group entered into a revised Fitzgerald Agency Agreement, a copy of which is attached (the revised Fitzgerald Agency Agreement and the Astor Agency Agreement are referred to in this Order collectively as the "Agency Agreements", (x) the Debtors and the Gordon Group entered into the Agency Agreements in good faith within the meaning of section 363(m) of the Bankruptcy Code 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") and the Debtors' sales of the Equipment under the Agency Agreements will be good faith sales within the

meaning of section 363(m) of the Bankruptcy Code, (xi) the Agency Agreements have been negotiated in good faith and at arm's-length between the Debtors and the Gordon Group, and (xii) just cause exists for the relief granted. Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted on the terms and conditions provided by this Order.

2.      In accordance with sections 363(b) and 105(a) of the Bankruptcy Code, the Debtors are authorized and empowered to sell the Equipment through the Gordon Group on the terms and conditions set forth in each of the Agency Agreements and in accordance with the terms of this Order.

3.      The Debtors are authorized and empowered to enter into each of the Agency Agreements and to employ and retain the Gordon Group as their liquidation agent in accordance with the terms and conditions of each of the Agency Agreements, including, without limitation, the payment by Winn-Dixie Stores, Inc. ("Winn-Dixie") to the Gordon Group of the Residual Proceeds free and clear of all liens, claims encumbrances and interests, and without the need for further Court approval or fee application or similar procedure. The terms of the Agency Agreements are approved and this Order and the Agency Agreements are binding upon the Debtors, all creditors of the Debtors, and any trustees appointed in these proceedings or any trustees appointed in any subsequent proceedings under chapter 7 or chapter 11 of the Bankruptcy Code relating to the Debtor.

4.      To the extent that any Remaining Equipment is sold by the Gordon Group subsequent to the date of the Final Reconciliation, the Gordon Group shall, within five (5) days after such sale, pay the Additional Return related to such sale to Winn-Dixie.

This Court retains jurisdiction to resolve any disputes arising from or related to the payment of such amounts.

5.    Pursuant to section 363(f) of the Bankruptcy Code, all Equipment to be sold by the Debtors and/or the Gordon Group under each of the Agency Agreements are sold free and clear of any and all liens, claims, encumbrances and interests, with any liens, claims and interests to attach to that portion of the Proceeds which are the Guaranteed Amount, the Additional Return and any other amounts payable to the Debtors pursuant to the Agency Agreements in the order of priority provided by the Final Financing Order and the Loan Documents. Each member of the Gordon Group is entitled to the protection of section 363(m) of the Bankruptcy Code in connection with the sale of the Equipment.

6.    The Debtors shall cause that portion of the amounts which are the Guaranteed Amount, the Additional Return and any other amounts payable to the Debtors pursuant to the Agency Agreements to be paid to the DIP Lender to the extent required in accordance with the terms and conditions of the Final Financing Order and the Loan Documents.

7.    Subject to the restrictions set forth in this Order, the Debtors and each member of the Gordon Group are authorized to take any and all actions as may be necessary to implement each of the Agency Agreements in accordance with and subject to the terms of this Order and each of the transactions contemplated by each of the Agency Agreements, and any actions taken by the Debtors and the Gordon Group necessary to implement each of the Agency Agreements prior to the date of this Order are approved and ratified in accordance with this Order.

8.    The Debtors and their officers, employees, and agents (subject to the Debtors' internal policies and procedures) are authorized to execute such documents as necessary to carry out the sales of the Equipment  and related actions including, without limitation, each of the Agency Agreements.

9.    All parties and persons of every nature and description, including but not limited to landlords, utility companies, governmental agencies, sheriffs, marshals or other public officers, creditors, newspapers, other advertising mediums, and all those acting for or on their behalf, are jointly and severally restrained and enjoined from (a) charging advertising rates in excess of the rates charged pursuant to the Debtors' prepetition advertising agreements or, if no such agreements exist, charging advertising rates in excess of rates regularly charged to non-bankrupt customers in the ordinary course, (b) in any way interfering with or otherwise impeding the sale of the Equipment conducted in accordance with each of the Agency Agreements and this Order, or the Gordon Group's right to use the Facilities, and all services, furniture, fixtures, equipment and other assets of the Debtors which the Gordon Group is granted the right to use in each of the Agency Agreements, or (c) instituting any action or proceeding in any court (other than this Court) or other administrative body having as its objective the obtaining of an order or judgment that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Equipment sales, the operation of the Facilities, or the performance by the Debtors of their obligations under each of the Agency Agreements; provided, however, that notwithstanding the authority granted to the Debtors and the Gordon Group to conduct the sales of the Equipment in accordance with

each of the Agency Agreements and this Order, this Order does not exempt the Debtor or the Gordon Group or their assigns from complying with Safety Laws.

10.    The Gordon Group is authorized and empowered to conduct the Equipment sales in accordance with each of the Agency Agreements and this Order and take all actions necessary to implement the terms and conditions set forth in each of the Agency Agreements, including, without limitation, refusing to accept the return of Equipment and advertising the sales as "Liquidation Sales," auction or similar themes in media advertisements and on interior and exterior banners and other signage that the Gordon Group deems appropriate, without complying with federal, state or local laws, rules, statutes, ordinances, licensing requirements, regulations and procedures of any kind or nature, including, without limitation, laws, rules, statutes, ordinances, licensing or consent requirements, regulations and procedures with respect to licenses and permits, state and local waiting periods or time limits and advertising; provided, however, that the Gordon Group shall comply with Safety Laws.

11.    The Debtors, the Gordon Group (and its members) and their officers, employees, and agents are not required (a) to obtain the approval of any federal, state, or local government agency, department or other authority, and landlord or any other third parties to conduct the Equipment sales and to take the related actions authorized by the Order or (b) to execute, obtain or file releases, termination statements, assignments, consents, or other instruments to effect, consummate and implement the provisions of this Order.

12.    The Debtors and Gordon Group may modify, amend or supplement any provision of the Agency Agreements without further order of the Court, provided that (i)

the Debtors first obtain prior written consent with (a) the DIP Lender and (b) the Creditors' Committee, which consent will not be unreasonably withheld, and (ii) any such modification, amendment, or supplement does not have a material adverse affect on the Debtors' estates.

13.    The Gordon Group is granted a limited license and right to use, during the Sale Term, the trade names, logos and customer lists of the Debtors relating to and used in connection with the operation of the Facilities, solely for the purpose of conducting the Equipment sales.

14.    Except as expressly set forth in each of the Agency Agreements, the Gordon Group is not liable for any claims against the Debtors, and the Gordon Group will have no successor liabilities whatsoever.

15.    No bulk sales law or any similar law of any state or other jurisdiction will apply in any way to the transactions authorized by this Order.

16.    Pursuant to section 1146(c) Bankruptcy Code, no transfer, stamp or similar tax will apply to the transactions authorized by this Order.

17.    To the extent that any of the Equipment is owned by a Debtor other than Winn-Dixie Store's Inc., each such Debtor shall be deemed to be included in the definition of the Company as such term is used in each of the Agency Agreements, solely with respect to Equipment owned by such Debtor.

18.    To the extent of any conflict between this Order, the Agency Agreements, the Motion, or any other order entered in these cases, the terms of this Order shall govern.

19.    This Court retains exclusive jurisdiction to resolve any dispute arising from or relating to the sales of the Equipment, the Agency Agreements and this Order.

20.    Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy Procedure, this Order will take effect immediately upon signature.

21.    This Order is the "Approval Order" described in each of the Agency Agreements.

Dated this _22_ day of September, 2005 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

**EXECUTION COPY**

**AGENCY AGREEMENT**

This Agency Agreement (the "Agreement") is made as of this 20th day of September, 2005, by and between a joint venture consisting of The Gordon Company, Inc., a Florida corporation, NREL, Inc., a Michigan corporation, The Branford Industrial Group, LLC, a Connecticut limited liability company, Vision Equipment and Auction Company, Inc., a Georgia corporation, and Rabin Worldwide, Inc., a California corporation (collectively, the "Agent"), and Winn-Dixie Stores, Inc. (the "Company"), a Florida corporation.

RECITALS

WHEREAS, the Company, together with certain of its affiliates and subsidiaries, is a debtor and debtor in possession with a Chapter 11 case pending in the United States Bankruptcy Court for the Middle District of Florida ("Bankruptcy Court");

WHEREAS, the Company desires that Agent act as the Company's exclusive agent for the purpose of selling Equipment (as defined herein), located at the Deep South Products, Inc. facility in Fitzgerald, Georgia (the "Facility"), subject to the terms and conditions set forth herein (the "Sale");

WHEREAS, Agent is willing to serve as the Company's exclusive agent to conduct the Sale in accordance with the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and the Company hereby agree as follows:

Section 1.

1.1     Defined Terms.  Capitalized terms as used in this Agreement will have the following meanings when used herein.

"Accounting Firm" means a nationally recognized accounting firm mutually acceptable to the Company and Agent.

"Additional Return" has the meaning set forth in Section 3.1(b).

"Agency Accounts" has the meaning set forth in Section 3.3(c).

"Agency Documents" means this Agreement and each other document and agreement contemplated hereby and executed and delivered in connection herewith.

"Agent" has the meaning set forth in the Preamble.

"Agent Claim" means any such claim, demand, penalty, loss, liability or damage that arises from the acts or omissions of Agent, or its supervisors, agents, independent contractors,

employees located at the Facility, or the Company's employees being supervised by Agent in connection with or related to the Sale.

"Agent Indemnified Parties" means Agent and its officers, directors, employees, agents and independent contractors.

"Agreement" has the meaning set forth in the Preamble.

"Approval Order" means the order entered by the Bankruptcy Court in form and substance reasonably acceptable to Agent and the Company (i) approving this Agreement, (ii) authorizing the conduct of the Sale pursuant to the terms of this Agreement (A) notwithstanding any state or local law or regulation otherwise governing or purporting to govern the licensing and conduct of the Sale (other than laws related to public health and safety and other similar items), (B) notwithstanding any provision in any lease, mortgage, or other occupancy agreement that purports to limit, govern or restrict the conduct of the Sale, and (C) without the necessity of obtaining any third-party consents, (iii) containing such provisions as may be reasonably acceptable to Agent and the Company, and (iv) which Approval Order shall not have been vacated or stayed.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Benefits Cap" has the meaning set forth in Section 4.1(c).

"Buyer's Premium" means a premium added to the successful bid received from purchasers of Equipment in an amount not to exceed ten percent (10%) of such successful bid and which shall be paid by the purchasers of the Equipment.

"Company Expenses" has the meaning set forth in Section 4.2.

"Equipment" has the meaning set forth in Section 5.

"Event of Default" means the Company's or Agent's failure to perform any of its respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party.

"Expenses" has the meaning set forth in Section 4.1.

"Facility" has the meaning set forth in the Recitals.

"Final Reconciliation" means a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Additional Return, taxes, Expenses, and any other accountings required hereunder, prepared jointly by Agent and the Company within thirty (30) days after the Sale Termination Date.

"Interim Reconciliation" has the meaning set forth in Section 8.5.

2

"Guaranteed Amount" has the meaning set forth in Section 3.1(a).

"Proceeds" has the meaning set forth in Section 7.

"Recovery Amount" has the meaning set forth in Section 3.1(b).

"Remaining Equipment" means all unsold Equipment remaining, if any, in the Facility at the Sale Termination Date.

"Sale" has the meaning set forth in the Recitals.

"Sale Commencement Date" means the date of entry of the Approval Order.

"Sale Term" means the period from the Sale Commencement Date to the Sale Termination Date.

"Sale Termination Date" means December 23, 2005.

"Sales Taxes" means all sales, excise, gross receipts, and other taxes attributable to sales of the Equipment (other than taxes on income) payable to any taxing authority having jurisdiction.

"Supervisors" means qualified supervisors retained by Agent to conduct the Sale and to manage the Sale process and dispose of the Equipment from the Facility.

     1.2    Exhibits. The following list of Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Description |
|---|---|
| Exhibit 1 | List of Equipment |
| Exhibit 8.4 | Form of Weekly Report |
| Exhibit 12.4 | Agent Insurance Policies |

     1.3    Currency. Unless otherwise specified, all references to monetary amounts refer to United States dollars.

     Section 2.

     2.1    Appointment of Agent. Subject to the issuance of the Approval Order, the Company hereby appoints Agent, and Agent hereby agrees to serve, as the Company's exclusive agent for the limited purpose of conducting and overseeing the Sale in accordance with the terms and conditions of this Agreement. Agent shall provide the Company with the following services in accordance with the terms hereof:

     (a)   Sell or otherwise dispose of the Equipment from the Facility.

(b)  Provide Supervisors to conduct the Sale and to manage the Sale process and dispose of the Equipment and other assets located at the Facility.

(c)  Recommend and implement Company-approved (i) external and internal advertising and signage, if any, necessary to effectively sell the Equipment at the Facility in accordance with a "liquidation sale," auction or other mutually agreeable theme.  (Agent shall deliver copies of all advertising materials for the Sale to the Company which shall have the right, within three (3) business days of such delivery, to approve such materials, which approval shall not be unreasonably withheld or delayed; provided, however, that the failure of the Company to reasonably respond to any request for approval within three (3) business days shall be deemed to be approval of the subject materials), (ii) pricing and presentation of the Equipment, (iii) staffing levels for the Facility, and (vi) Facility operation practices (i.e., ongoing services and housekeeping).

(d)  Recommend and implement a Company-approved Agent's operating plan for the Sale, including, (i) projections for anticipated revenues and expenses to be incorporated into and made a part of the Expense Budget, (ii) advertising and promotions plan, and (iii) supervision plan including, Equipment supervision and central office supervision.

(e)  Maintain focused and constant communication with the Company's employees and managers to keep them abreast of strategy and timing, and maintain communication with landlords, if applicable.

(f)  Maintain integrity and value of the Company's corporate image throughout the Sale.

(g)  Subject to the entry of the Approval Order, advise the Company with respect to the legal requirements of effecting the "liquidation sale," auction or other mutually agreeable theme in compliance with all federal, state, and local laws, rules, and regulations, including without limitation state and local permitting laws, to the extent (if at all) applicable following issuance of the Approval Order.

(h)  Establish, monitor and provide oversight of and conduct accounting functions for the Sale, including, without limitation, evaluation of sales of Equipment by category, expense monitoring and reporting and by providing weekly comparisons of actual and projected information, and sales tax compliance.

(i)  Supervise the Facility throughout the Sale Term such that the operation of each of the Facility is being properly maintained.

(j)  Perform such other related services deemed by the parties to be necessary or prudent to facilitate the Sale.

Subject to Sections 3.2 and 6.2, title to all Equipment shall remain with the Company at all times during the Sale Term until such Equipment is sold by or on behalf of the Company.  All sales of Equipment in the Facility shall be made on behalf of the Company.

4

2.2     In connection with the Sale, Agent shall directly retain and engage all Supervisors. The Supervisors are independent contractors engaged by Agent and are not and shall not be deemed to be employees or agents of the Company in any manner whatsoever; nor do the Supervisors have any relationship with the Company by virtue of this Agreement or otherwise which creates any liability or responsibility on behalf of the Company for such Supervisors. During the Sale Term, each Supervisor shall perform services in connection with the Sale in Agent's discretion.

Section 3.     Guaranteed Amount and Other Payments

3.1     Payments to the Company and Agent

(a)     As a guaranty of Agent's performance hereunder, in addition to the payment of Expenses as provided for in Section 4.1 hereof, Agent guarantees that the Company shall receive One Million and One Hundred and Twenty Five Thousand Dollars ($1,125,000) (the "Guaranteed Amount").

(b)     The Proceeds generated by the Sale shall be distributed in the following order:

(i)     first, the first Proceeds generated from the Sale up to and including $1,125,000, shall be paid to Agent;

(ii)    second, the next $50,000 of Proceeds generated from the Sale shall be paid to Company;

(iii)   third, the next $50,000 of Proceeds generated from the Sale shall be shared seventy-five percent (75%) to the Company and twenty-five percent (25%) to Agent;

(iv)    fourth, the next $50,000 of Proceeds generated from the Sale shall be shared sixty-five percent (65%) to the Company and thirty-five percent (35%) to Agent;

(v)     fifth, the next $50,000 of Proceeds generated from the Sale shall be shared fifty-five percent (55%) to the Company and forty-five percent (45%) to Agent; and

(vi)    sixth, all Proceeds generated from the Sale in excess of $1,325,000 shall be shared fifty percent (50%) to Company and fifty percent (50%) to Agent.

The amounts due to the Company pursuant to this Section 3.1(b) are referred to herein as the "Additional Return."

The amounts due to the Agent pursuant to this Section 3.1(b) are referred to herein as the "Residual Proceeds."

(c)     Agent shall pay to the Company the Guaranteed Amount and Additional Return in the manner and at the times specified in Section 3.3 below.

3.2    Payments to Agent.  Agent shall retain the entire amount of the Buyer's Premium, and after payment in full of the Guaranteed Amount and the Additional Return, Agent shall be entitled to retain the Residual Proceeds.  All Equipment remaining at the conclusion of the Sale ("Remaining Equipment") shall become the property of Agent, free and clear of all liens, claims and encumbrances; provided, however, that (i) the Agent shall remove all of the Remaining Equipment from the Facility, and (ii) the proceeds realized upon a sale or other disposition of the Remaining Equipment shall constitute Proceeds hereunder for purposes of, inter alia, calculating any Additional Return due the Company and any Residual Proceeds due to the Agent.

3.3    Time of Payments and Control of Proceeds

(a)    Payment of Guaranteed Amount and Additional Return.  On the first business day following entry of the Approval Order, Agent shall pay the Company the Guaranteed Amount by wire transfer to the Company's depository account(s) at Wachovia Bank designated by the Company.  The Additional Return shall be paid by the Agent by wire transfer to the Company's depository account(s) at Wachovia Bank designated by the Company as part of the Interim Reconciliation conducted pursuant to Section 8.5 hereof and the Final Reconciliation conducted pursuant to Section 3.4 hereof.

(b)    Control of Proceeds.  Prior to the Sale Commencement Date, Agent shall establish its own accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts") and the Company shall promptly upon Agent's request execute and deliver all necessary documents to permit Agent to open and maintain the Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts; provided, however, upon request, Agent shall deliver to the Company copies of all bank statements and other information relating to such accounts.  The Company shall not be responsible for and Agent shall pay all bank fees and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term.  Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale shall be deposited into the Agency Accounts.

3.4    Final Reconciliation.

(a)    Within thirty (30) days after the Sale Termination Date, Agent and the Company shall jointly prepare a Final Reconciliation of the Sale including, without limitation, a summary of Proceeds, Additional Return, Sales Taxes, and any other accountings required hereunder.  Within five (5) days of completion of the Final Reconciliation, any undisputed and unpaid Additional Return shall be paid by the Agent.  Any disputed amount(s) shall not be paid until all disputes have been resolved by agreement of the parties or as determined in the manner prescribed in Section 3.4(b) hereof.  During the Sale Term, and until all of the Agent's and the Company's obligations under this Agreement have been satisfied, the Company shall have full access to Agent's records with respect to Proceeds, Sales Taxes, and other records related to the Sale to review and audit such records.

(b)    In the event that there is any dispute with respect to the Final Reconciliation, such dispute shall be promptly (and in no event later than the third business

day following the request by either the Company or Agent) submitted to the Accounting Firm for resolution. The non-prevailing party shall bear the cost of the Accounting Firm. The parties shall request that the Accounting Firm render a final and binding decision on the dispute within seven (7) business days following the submission of the dispute.

Section 4.    Expenses of the Sale

4.1    Expenses.  Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale during the Sale Term, which expenses shall be paid directly by Agent.  As used herein, "Expenses" shall mean all advertising, sale, disposal and removal expenses of the Sale which arise during the Sale Term at the Facility, limited to, the following:

(a)    actual costs of Agent's employees (including, but not limited to, salaries, payroll expenses, taxes, commissions and benefits), agents, Supervisors, other on-site supervision, and related travel and bonuses;

(b)    banners and signs which are produced for the Sale;

(c)    promotional costs including, without limitation, advertising and direct mail;

(d)    the costs and expenses of obtaining supplies as may be required by Agent in the conduct of the Sale;

(e)    long distance telephone, postage/overnight delivery/courier charges;

(f)    fees and expenses of Agent in any way related to the transactions contemplated by this Agreement (including, without limitation, fees and expenses of legal counsel);

(g)    trash removal and ordinary course third party cleanings;

(h)    cost and expenses related to the Agent's Insurance as defined in Section 12.4;

(i)    costs and expenses related to the removal of any of the Equipment from the Facility, including the removal of any Remaining Equipment in accordance with Sections 3.2 and 6.2, and the repair of any damage to the Facility caused by such removal; and

(j)    any all costs and/or expenses directly related to the Agent's conduct of the Sale in accordance with this Agreement, other than Company Expenses.

"Expenses" shall not include: (i) Company Expenses; and (ii) any other costs and expenses not specifically set forth in Section 4.1.

4.2    Company Expenses

Company shall be unconditionally responsible for all Company Expenses incurred in conducting the Sale during the Sale Term, which expenses shall be paid directly by Company. As used herein, "Company Expenses" shall mean the following:

(a)    payroll and commissions, if applicable, for all Company employees not utilized by Agent in the conduct of the Sale; provided, that the Company acknowledges that the Agent shall have no obligation to pay for any technical or other support provided by the Company or its employees, in the Company's sole discretion, related to the Equipment or the Sale;

(b)    any amounts payable by the Company for benefits for Company employees not utilized by Agent in the conduct of the Sale (including, but not limited to, FICA, unemployment taxes, workers' compensation and health care insurance benefits);

(c)    the Company's casualty insurance premiums attributable to the Equipment for the Sale Term;

(d)    third party payroll processing fees related to the Company's employees not utilized by Agent in the conduct of the Sale;

(e)    security and building alarm service at the Facility;

(f)    routine repair and maintenance costs of the Facility;

(g)    rent and other occupancy expenses of the Facility; and

(h)    all other costs and expenses that are not Expenses.

Agent expressly acknowledges that nothing in this Section 4.2 shall obligate the Company to incur any Company Expenses other than with respect to subsections (c), (f) and (g) of this Section 4.2 and subsection (e) but only to the extent of the security and building alarm service currently provided by the Company at the Facility.

Section 5.    Equipment.

5.1    Equipment Subject to this Agreement. For purposes of this Agreement, including without limitation, the calculation of the Guaranteed Amount, "Equipment" shall mean all furniture, fixtures and equipment that is owned by the Company and stored in the Facility, including, without limitation, those items listed on Exhibit 1 attached hereto. The Company acknowledges that the Equipment listed on Exhibit 1 will be available for sale under this Agreement. The Company will provide access to Agent to the Facility for the purpose of conducting a physical examination of the Equipment to be sold.

5.2    Fixtures. The Agent may sell any fixtures affixed to a wall or the floor provided either the Agent or the purchaser of such fixtures repairs the wall or floor in a commercially reasonable manner at its own expense.

8

Section 6.      Sale Term

6.1      Term.      The Sale shall commence at the Facility on the Sale Commencement Date. Subject to the Approval Order, the Agent shall complete the Sale at the Facility, and shall vacate the Facility's premise in favor of the Company or its representative or assignee on or before the Sale Termination Date. The Sale Termination Date at the Facility may be (a) extended by mutual written agreement of Agent and the Company or (b) accelerated by Agent, in which case Agent shall provide the Company with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date.

6.2      Vacating the Facility.      Agent shall provide the Company with not less than seven (7) days' advance written notice of its intention to vacate any Facility. On the Sale Termination Date, Agent shall vacate in favor of the Company or its representatives or assignee, and leave the Facility in "broom clean" condition (ordinary wear and tear excepted). Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent or licensee thereof) to any location during the Sale Term, ordinary wear and tear excepted. On or before the Sale Termination Date, Agent shall have removed or abandoned all then Remaining Equipment; provided, however, that Agent shall not be permitted to abandon any Remaining Equipment unless the owner and landlord of the Facility shall have consented and shall have provided a waiver, in a form reasonably satisfactory to the Company, of any liability of the Company or any of its Affiliates related to such abandonment.

Section 7.      Sale Proceeds.      For purposes of this Agreement, "Proceeds" shall mean the total amount (in U.S. dollars) of all sales of Equipment made under this Agreement, exclusive of Sales Taxes and Buyer's Premium.

Section 8.      Conduct of the Sale.

8.1      Rights of Agent.      Agent shall be permitted to conduct the Sale, on behalf of the Company, as a "Liquidation Sale," auction, or similar theme sale in the Facility throughout the Sale Term in accordance with this Agreement. In addition to any other rights granted to Agent hereunder, in performing its duties in connection with the Sale, Agent shall have the right for purposes of the Sale:

(a)      to the unrestricted use of the Facility at all times for the purpose of preparing for and conducting the Sale as described above, and for the timely removal of any Remaining Equipment in accordance with the terms of this Agreement and the Approval Order;

(b)      the use of, during the Sale Term all computer hardware and software, existing supplies located at the Facility, intangible assets (including the Company's name, logo, and tax identification numbers), keys, security codes, and safe and lock combinations required to gain access to and operate the Facility, and any other assets of the Company located at the Facility (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses. Agent shall exercise due care and

return to the Company immediately at the end of the Sale all materials and supplies except materials or supplies expended in the conduct of the Sale;

(c)    [INTENTIONALLY OMITTED]

(d)    to implement the Company-approved advertising, signage, and promotion programs consistent with a "Liquidation Sale," auction or similar theme sale (including, without limitation, by means of media advertising, banners, A-frame, and similar signage). (Agent shall deliver copies of all advertising materials for the Sale to the Company which shall have the right, within three (3) business days of such delivery, to approve such materials, which approval shall not be unreasonably withheld or delayed; provided, however, that the failure of the Company to reasonably respond to any request for approval within three (3) business days shall be deemed to be approval of the subject materials).

8.2    Terms of Sale, Compliance with Law. All sales of the Equipment will be "final sales" and "as is," and all advertisements and sales receipts will reflect the same. Agent shall not warrant the Equipment in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to purchasers. All sales will be made only for cash or cashier's check; provided, however, that if Agent determines to accept personal checks, Agent shall bear the risk of loss relating thereto. Except as may otherwise be provided in the Approval Order, Agent shall comply with all applicable laws and regulations in its conduct of the Sale, including laws and regulations governing the advertising of the Sale, pricing, and employment. If Agent fails to perform its responsibilities in accordance with this Section 8.2, Agent shall indemnify and hold harmless the Company from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties which the Company sustains or incurs as a result or consequence of the failure by Agent to comply with applicable laws and regulations.

8.3    Sales Taxes. During the Sale Term, all Sales Taxes shall be added to the sales price of Equipment, if applicable, and collected by Agent, on the Company's behalf, and be immediately deposited in the Company's existing accounts, trust accounts, or other accounts, as designated by the Company. With Agent's cooperation, the Company shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Provided Agent performs its responsibilities in accordance with this Section 8.3, the Company shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties which Agent sustains or incurs as a result or consequence of the failure by the Company to promptly pay such taxes to the proper taxing authorities and/or the failure by the Company to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided the Company complies with its obligations hereunder, Agent shall indemnify and hold harmless the Company from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties which the Company sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or, to the extent Agent is required hereunder to prepare reports and other

documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable the Company to file any requisite returns with such taxing authorities.

8.4    <u>Weekly Reports</u>.    Agent shall prepare and deliver to the Company (i) reports of sales on a weekly basis, in the form attached hereto as Exhibit 8.4, and (ii) from time to time upon request, such other reports as the parties mutually agree are reasonably necessary to properly effect the Sale. Each party to this Agreement shall, at all times during the Sale Term and during the one-year period thereafter, provide the other with access to all information, books, and records relating to the Sale and to this Agreement. All records and reports shall be made available to Agent and the Company during regular business hours upon reasonable notice.

8.5    <u>Sale Reconciliation</u>.    On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and the Company shall cooperate to reconcile and reallocate, if necessary, the payment of any Expenses, any Additional Return then owing and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), all pursuant to procedures agreed upon by the Company and Agent (each such reconciliation, an "<u>Interim Reconciliation</u>"). Agent and the Company shall complete the Final Reconciliation in accordance with Section 3.4, the written results of which shall be certified by representatives of each of the Company and Agent as a final settlement of accounts between the Company and Agent.

Section 9.    [INTENTIONALLY OMITTED]

Section 10.    <u>Conditions Precedent</u>. (a) The willingness of Agent and the Company to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(i)    All representations and warranties of the Company and Agent hereunder shall be true and correct in all material respects (provided that neither party shall be able to terminate this Agreement pursuant to Section 15.10 if any breaches of representations or warranties that would cause this Section 10(a)(i) to be failed to be satisfied have been cured in the time contemplated by Section 14).

(ii)    On or before September 26, 2005, the Bankruptcy Court shall have entered the Approval Order.

(b)    Agent hereby agrees and acknowledges that Company's obligations under this Agreement are subject to higher or otherwise better offers for the Equipment or for the right to be the Company's liquidation agent in respect thereof after the conduct of an auction in accordance with the bidding procedures approved by the Bankruptcy Court by order dated June 20, 2005 (the "<u>Bidding Procedures Order</u>"), and conditioned upon the entry of the Approval Order approving the terms and conditions of this Agreement.

(c)    Pursuant to the Bidding Procedures Order, the Company hereby agrees to pay Agent a termination fee in the amount of $25,000 in the event that Agent is not the successful bidder at the auction.

Section 11.    <u>Representations, Warranties, and Covenants</u>.

11.1    <u>The Company's Representations, Warranties, and Covenants</u>.    the Company hereby represents, warrants, and covenants in favor of Agent as follows:

(a)    The Company (i) is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation; (ii) has all requisite corporate power and authority to own, lease, and operate its assets and properties and to carry on its business as presently conducted and, subject to the requirement of Bankruptcy Court approval, has the power and authority to consummate the transactions contemplated by this Agreement; and (iii) is and during the Sale Term will continue to be duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Facility are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Company to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Subject to the issuance and entry of the Approval Order, the Company has the right, power, and authority to execute and deliver the Agency Documents and to perform fully its obligations thereunder. Subject to the issuance and entry of the Approval Order, the Company has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval on the part of the Company is required for the Company to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Subject to the issuance and entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by the Company and constitutes the legal, valid, and binding obligation of the Company enforceable in accordance with its terms. Subject to the issuance and entry of the Approval Order, no court order or decree of any federal, state, or local governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for the Company's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of the Company to execute and deliver this Agreement and perform fully its obligations hereunder. Other than for those contracts or agreements identified by the Company to Agent on or prior to the Sale Commencement Date, if any, no contract or other agreement to which the Company is a party or by which the Company is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)    Subject to the right of the Company to use and occupy the Facility for purposes of maintaining the Facility and the Equipment, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of the Facility, in order to perform its obligations described in this Agreement. To the extent necessary in furtherance of the Sale, the Company shall throughout the Sale Term maintain in a manner consistent with its customary and historic practices, at its sole expense, heating systems,

refrigeration, air conditioning systems, elevators, escalators, and alarm systems, or, if applicable, use reasonable efforts to cause any applicable landlord to comply with its obligations under applicable lease and occupancy agreements with respect to any such matter

(d)   Prior to the Sale Commencement Date, the Company shall, at its sole cost and expense, (a) remove all environmental hazards, refrigerants, radioactive, and/or other types of hazardous material in any form whatsoever or requiring special handling, treatment or disposal (collectively, "Hazardous Materials") that may exist within or on any of the Equipment, and/or around or about any of the Equipment which may impair or restrict the removal, disposition and transportation of the Equipment at the Facility and (b) remove and evacuate all refrigerants in the coolers and freezers, if any, at the Facility. Subject to the terms of Section 11.2(f), the Company shall indemnify and hold the Agent harmless from any liability arising from any Hazardous Materials affecting the Equipment and the Facility, unless such liability arises from the gross negligence or willful misconduct of the Agent or any of its officers, directors, employees, agents or representatives.

(e)   The Facility shall be in "broom clean" condition on or before the Sale Commencement Date.

(f)   The Company is the legal and equitable owner of all of the Equipment and upon entry of the Approval Order, the Agent shall be allowed to sell the Equipment free and clear of all liens, claims and encumbrances.

11.2    Agent's Representations, Warranties, and Covenants.   Agent hereby represents, warrants, and covenants in favor of the Company as follows:

(a)   Each entity comprising the Agent: (i) is duly formed, and validly existing, and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)   Agent hereby acknowledges and warrants that prior to the execution of this Agreement, Agent has had an opportunity to inspect the Facility and the Equipment.

(c)   Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms. No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor.

No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(d)  No action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Agent, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(e)  During the Sale Term, Agent shall maintain (i) a safe working environment in the Facility; and (ii) the cleanliness of the Facility in a manner at least consistent with the Company's past practices for the Facility.

(f)  Except as may be required to remove and dispose any of the Equipment, the Agent shall not bring any Hazardous Materials into the Facility or onto the premises surrounding the Distribution Centers.  The Agent shall indemnify and hold the Company harmless from any liability arising from any Hazardous Materials brought into the Facility or onto the premises surrounding the Facility by Agent, its agents and employees, unless such liability arises from the gross negligence or willful misconduct of the Company or any of its officers, directors, employees, agents or representatives.

(g)  Except as may otherwise be provided in the Approval Order, during the Sale Term, Agent shall comply with all federal, state, and local laws, rules, and regulations applicable to Agent in connection with the transactions contemplated by this Agreement.

Section 12.    Insurance.

12.1    The Company's Liability Insurance.  The Company shall continue until the Sale Termination Date, in such amounts and on such terms and conditions as are consistent with the Company's ordinary course operations, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability, and umbrella liability insurance, covering injuries to persons and property in, or in connection with the Company's operation of, the Facility, and shall cause Agent to be named an additional named insured with respect to all such policies.  Prior to the Sale Commencement Date, the Company shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  In the event of a claim under any such policies, the Company shall be responsible for the payment of all deductibles, retentions, or self-insured amounts to the extent said claim arises from or relates to the alleged acts or omissions of the Company or its employees, agents (other than Agent's employees), or independent contractors (other than Agent and independent contractors hired by Agent in conjunction with the Sale or the Company's employees being supervised by Agent).

12.2    The Company's Casualty Insurance.  The Company shall continue until the Sale Termination Date, in such amounts and on such terms and conditions as are consistent

with the Company's ordinary course operations, fire, flood, theft, and extended coverage casualty insurance covering the Equipment in a total amount equal to no less than the Sale Value thereof. In the event of a loss to the Equipment on or after the date of this Agreement, the proceeds of such insurance attributable to the Equipment (net of any deductible) shall constitute Proceeds. Prior to the Sale Commencement Date, the Company shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent.

12.3     Workers' Compensation Insurance. The Company shall continue until the Sale Termination Date, in such amounts and on such terms and conditions as are consistent with the Company's ordinary course operations, workers' compensation insurance (including employer liability insurance) covering all of the Company's employees then currently employed at the Facility in compliance with all statutory requirements. Prior to the Sale Commencement Date, the Company shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4     Agent's Insurance. Agent shall maintain at Agent's cost and expense throughout the Sale Term, in such amounts and on such terms and conditions as are acceptable to the Company in its reasonable discretion, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in, or in connection with Agent's duties at, the Facility (the "Agent's Insurance"), and shall cause the Company to be named an additional insured with respect to such policies. Exhibit 12.4 attached hereto contains a description of all such policies. Prior to the Sale Commencement Date, Agent shall deliver to the Company certificates evidencing such insurance policies, setting forth the duration thereof and naming the Company as an additional insured, in form and substance reasonable satisfactory to the Company. In the event of a claim under such policies, Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors.

12.5     Risk of Loss.

Without limiting any other provision of this Agreement, the Company acknowledges that Agent is conducting the Sale on behalf of the Company solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Facility or the assets located therein or associated therewith, or of the Company's employees located at the Facility, except, however, that Agent shall be responsible for supervising the conduct of the Company's employees in connection with the Sale, and (ii) except as expressly provided in this Agreement, Agent does not assume any of the Company's obligations or liabilities with respect to any of the foregoing, other than with respect to supervising the conduct of the Company's employees. Agent shall not be deemed to be a successor employer. the Company and Agent agree that, subject to the terms of this Agreement, the Company shall bear all responsibility for liability claims of purchasers, employees, and other persons arising from events occurring at the Facility during and after the Sale Term, except for any Agent Claims. In the event of any liability claim other than an Agent Claim, the Company shall administer such claim and shall present such claim to the Company's liability insurance carrier in accordance with the Company's policies and procedures existing immediately prior to

15

the Sale Commencement Date. To the extent that the Company and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to the Company. In the event that the Company and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party at the address specified in Section 15.1 hereof.

Section 13.    Indemnification.

13.1    The Company Indemnification. the Company shall indemnify and hold the Agent Indemnified Parties harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from or related to:

(a) the Company's material breach of or failure to comply with any of its agreements, covenants, representations, or warranties contained in any Agency Document;

(b) any failure of the Company to pay to its employees any wages, salaries, or benefits due to such employees during the Sale Term (other than Expenses);

(c) any liability or other claims asserted by customers, any of the Company's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, workers' compensation or under the WARN Act), except for Agent Claims and such other claims for which Agent has indemnified the Company elsewhere in this Agreement;

(d) the gross negligence or willful misconduct of the Company or any of its officers, directors, employees, agents (other than Agent), or representatives.

Notwithstanding anything to the contrary contained in this Section 13.1, the Company's aggregate obligation to indemnify Agent under the terms of the Agreement shall expire the earlier of (i) three (3) months after the Sale Termination Date or (ii) termination of this Agreement pursuant to Section 15.10 hereof, and shall not exceed $50,000 in the aggregate provided, that, the foregoing time and dollar limits shall not apply to (1) the amounts due Agent pursuant to Section 3.2 or any other amounts due to Agent under this Agreement other than the Company's indemnity obligations under this Section 12.1, and (2) the representation, warranty and indemnification of the Company pursuant to Sections 11.1(d) and (e) of this Agreement.

13.2    Agent Indemnification. Agent shall indemnify and hold the Company and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against the Company resulting from or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of the Agent):

        (a)  Agent's material breach of or failure to comply with any local, state, or federal laws or regulations, or any of its agreements, covenants, representations or warranties contained in any Agency Document;

        (b)  any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of the Company by Agent or any of its employees, agents, independent contractors, or other officers, directors, or representatives of Agent;

        (c)  any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

        (d)  any Agent Claims; and

        (e)  the gross negligence or willful misconduct of Agent or any of its officers, directors, employees, agents, or representatives.

        13.3    <u>Indemnification Procedure</u>.  The party seeking indemnity under this Agreement shall: (a) fully and promptly notify the other party of any claim or proceeding, or threatened claim or proceeding; (b) permit the indemnifying party to take full control of such claim or proceeding; (c) cooperate in the investigation and defense of such claim or proceeding; (d) not compromise or otherwise settle any such claim or proceeding without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned, or delayed; and (e) take all reasonable steps to mitigate any loss or liability in respect of any such claim or proceeding.  Notwithstanding anything contained herein, no party shall be liable to indemnify the other party for any claims, demands, penalties, losses, liability, or damage arising from the other party's gross negligence or willful misconduct.

        Section 14.    <u>Defaults</u>.  In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder.

        Section 15.    <u>Miscellaneous</u>.

        15.1    <u>Notices</u>.  All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, as follows:

        If to the Agent:

> The Gordon Company, Inc.
> 515 Sea Breeze Boulevard
> Ft. Lauderdale, Florida 33316
> Attn:  Jeff Gordon
> Tel:  (305) 216-7500
> Fax:  (954) 785-0661

|                      |                                           |
|----------------------|-------------------------------------------|
| with a copy to:      | Cohen Tauber Spievack & Wagner LLP        |
|                      | 420 Lexington Avenue – Suite 2400         |
|                      | New York, New York 10170                  |
|                      | Attn:   Robert A. Boghosian, Esq.         |
|                      | Tel:  (212) 381-8726                      |
|                      | Fax:  (212) 586-5095                      |

|                      |                                           |
|----------------------|-------------------------------------------|
| If to the Company:   | Winn-Dixie Stores, Inc.                   |
|                      | 5050 Edgewood Ct.                         |
|                      | Jacksonville, FL  32254                   |
|                      | Attn:   John Young                        |
|                      | Tel:    (904) 783-5000                    |
|                      | Fax:    (949) 567-1799                    |

with a copy to:
   Office of General Counsel
   Winn-Dixie Stores, Inc.
   5050 Edgewood Ct.
   Jacksonville, FL 32254

|                      |                                           |
|----------------------|-------------------------------------------|
| with a copy to:      | King & Spalding LLP                       |
|                      | 1185 Avenue of the Americas               |
|                      | New York, NY 10036                        |
| Attn:                | George B. South III                       |
| Tel:                 | (212) 556-2231                            |
| Fax:                 | (212) 556-2222                            |

15.2    <u>Governing Law: Consent to Jurisdiction</u>.    This Agreement shall be governed and construed in accordance with the laws of the State of Florida, without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court shall retain jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the exclusive jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

15.3    <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

15.4    <u>Amendments</u>.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

15.5    <u>No Waiver</u>.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

18

15.6     Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and the Company, including, but not limited to, any Chapter 11 or Chapter 7 trustee.  Agent shall not be permitted to assign its obligations under this Agreement.

15.7     Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

15.8     Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

15.9     Reporting.  If requested by the Company, Agent shall prepare weekly reports including, without limitation, reports that comply with the Company's current weekly cash reporting to its central office, reflecting the progress of the Sale, which shall specify the Proceeds received to date.  During the course of the Sale, the Company shall have the right to have representatives continually act as observers of the Sale in the Facility so long as they do not interfere with the conduct of the Sale.

15.10    Termination.  This Agreement shall remain in full force and effect until the first to occur of: (i) receipt by the Company of written notice from Agent that any of the conditions specified in Section 10 hereof have not been satisfied; (ii) receipt by Agent of written notice from the Company that any of the conditions specified in Section 10 hereof have not been satisfied; or (iii) the expiration of the Sale Term and completion and certification by the Company and Agent of the Final Reconciliation pursuant to Section 3.4 above.  Notwithstanding the foregoing, the provisions of Sections 3.3, 3.4, 12 and 13 above shall survive the termination of this Agreement pursuant to this Section 15.10.

**[REMAINDER OF PAGE INTENTIONALLY OMITTED]**

IN WITNESS WHEREOF, Agent and the Company hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

**THE GORDON COMPANY, INC.**

By:
Name: JEFFREY GORDON
Title: CEO

**NREL, INC.**

By:
Name:
Title:

**THE BRANFORD INDUSTRIAL GROUP, LLC**

By:
Name: JAMES GARDNER
Title: Senior VP

**VISION EQUIPMENT AND AUCTION COMPANY, INC.**

By:
Name:
Title:

**RABIN WORLDWIDE, INC.**

By:
Name: Michael R Bani
Title: SVP

**[SIGNATURES CONTINUED ON NEXT PAGE]**

20

**WINN-DIXIE STORES, INC.**

By:

Name:  Bennett L. Nussbaum

Title:  Senior Vice-President

Reviewed By

XRoads

Date:

LEGAL APPROVED
ATTY:
DATE: 9/20/05

Signature Page for Gordon-Fitzgerald Liquidator Agreement dated
September, 2005.

# Exhibit "1"

**Winn Dixie**
**DEEP SOUTH PRODUCTS INC**
**FITZGERALD, GA**

**Peanut Butter**
**Roast Room**
Proctor & Schwartz roaster, 8' x 40', s/s plate belt oven, (4) fan w/ cooling zone
Bag hoist
MS basket destoner elevator, (2) destoner beds, roto screen beds, blancher elevator, (3) balnchers, electric eye MS storage bin
Maveral s/s bucket elevator
Urschel crunchy chopped nut machine, model N, s/n 142
Peanut Butter pump
Crunchy peanut shaker

**Grind Room**
(2) Bauer 30" grinders
Urschel grinder, model 900, s/n 117
S/S deareator tank, dome top, cone bottom, heavy duty tall, sweep agitator 3' x 36" straight side
(4) Peanut butter pumps, vari drive, 3.5 hp
s/s auger conveyor 8" x 20'

**Peanut Butter Filler Room**
Elgin 12-head monobloch filler/capper (8 head)
Crepaco crunchy feeder (blender)
Enerco induction cap sealer
s/s cap hopper/unscrambler
s/s feed tank jacketed, 325 gallon Perma-San, flip top, flat bottom, full sweep agitator 4' x 4'
(2) pumps

**Packaging Floor**
OMS (Quellette)empty jar depalletizer (glass) double high, automatic slip sheet, model BKD-110WS-550-SP, #310 w/ pallet stacker
s/s table top plastic link belt conveyor
Uni-Twist bottle washer
Cherry Burrell (Votator) (4) barrells thermutators, scrape surface horizontal heat exchangers 1991, UL, 90277HA, (2) cooling jackets, (2) steam jackets, s/s skid
s/s accumulating table 4' x 10'
s/s indexing conveyor
Krones conmatic labeler (1996), s/n 073-F26, single magazine wrap around label
SWF box/tray former (Tra-matic)
Hartness drop case packer, s/n 8478 with Marsh case coder
API s/s shrink tray wrapper w/ tunnel

s/s peanut oil tank 7500 gallon insulated 10' x 12' closed top, top bottom

**Mayonnaise**
**Mayonnaise Processing/Filling**
s/s oil rerun hopper w/ APV pump
s/s lemon spice tank 2' x 2', top mount agitator
Bran Lubbe metering pump 1"
Triclove pump 1" x 1-1/2"
(8) s/s spice tanks 25-50 gallon, (2) w/ lightnin agitators
Bran-Lubbe homogenizing pump 3-head
s/s rerun/pickle hopper w/ APV pump
Breddo single wall liqultier 30" x 24"
Waukesha pump
(2) Cherry Burrell double stacked mayo mills
s/s pipe, valves, fittings, etc
s/s Pacific Pack 12-head piston filler w/ feed hopper & pump
US Bottle s/s 10-head capper
s/s table top link belt conveyor
s/s accumulating conveyor 3' x 14' empy bottle
s/s cap feeder/descrambler/hopper

**Packaging**
OMS empty jar (plastic) double high depalletizer w/ auto slip shed & pallet
magazine
s/s falt top Unipak conveyors
s/s plastic jar blower twist type
Sonic air knives
Krones Canmatic 1999, s/n 073-193 single magazine
Eneron s/s induction sealer
Linx laser jet bottle coder
s/s table top link belt conveyor
Unipak s/s accumulating table 4' x 24'
Hartness drop case packer, s/n 8338 w/ case coder
SWF trag matic tray maker
PMI tray shrink wrap machine w/ tunnel

Columbia automatic case palletizer system w/ pallet magazine (1965)

**Syrup Oil**
**Syrup/Starch Process**
(2) Crepaco/Feldmeier (2001) s/s process tanks jacketed UL stamped, full
sweep, top center mounted agitator, top mounted mixer agitator, dome
top, dish bottom, 800 gallon, 125 psi, 5' dia x 4'
(4) Flow Data s/s flow meters
s/s pipe valves fittings, filters
s/s gum mix tank, high speed, sheer mixer 3' x 5'
(2) s/s dome top holding tanks 5' x 5', cone bottom, side mahole
(3) Waukesha 2" pumps (new)
(1) Waukesha 2" pump (old)
s/s plate & frame heat exchanger w/ timing pump 48" plates

s/s Alpha Laval plate & frame heat exchanger w/ timing pump 36" plates

Refrigerated egg tanks, oil, and vinegar tank area with tanks & pumps.

**Syrup/Oil Filler Room**
US Bottler s/s filler 20-head filler model WSC 20, s/n 1350
s/s new Resina NRU 40-130, caper 9' (1996)
Peco gamma 101 level monitor
Enercon induction sealer
s/s feed tank w/ Waukesha pump & Tri-Clover

**Packaging**

s/s open & accumulating table (dump table) (manual bottle unloading
station). Indexing & combining inline conveyors w/ empty case conveyor
Bottle orienter
s/s empty bottle table top conveyor
s/s bottle washer/rinser New England
Resina RU20 caper
Assorted s/s table top conveyor
Krones canmatic labeler (1999) single magazine
Krones (2) magazines Bonamatic labeler 1991 front & back
Ink jet coder
Hartness drop case packer w/ empty case conveyor from unloading
station (860)
SK box sealer w/ coder Nordson gluer
Columbia case palletizer FL150 (1996)

**TOMATO PRODUCTS**
**Ketchup/Sauce Processing**
Hot hold area includes stainless steel holding tank, dome top, cone
bottom, 5' x 4' 1000 gal Waukesha pump, s/s flip top tank 3' x 3', Alfa
Laval plate & frame heat exchanger, with timing pump
Tote unloading station with (2) stainless steel 4" Sandpiper diaphragm
pumps
(2) Stainless steel holding tanks, dome top, cone bottom, double agitator,
full sweep & high speed, 1000 gal
Stainless steel Fitzmill communitor, 12"
Waukesha pump
Tetra Pak homogenizer (model Tetraaiex25) sn T4625257
Shihi vacuum pump
DA tank with Waukesha pump and tube in shell heat box
Waukesha pump
Tri Clover pumps
Stainless steel inline magnet
Waukesha pump
(4) Flow Safe flow meters for tomato process only
(2) Tri Clover pumps
Stainless steel hopper with APV pump
Feldmeier stainless steel tube in tube pasteurizer, (12) high, (10) wide, 1"
tube, 14' long (2002)

**Tomato Product Filler Room**
Table top conveyor

Serac stainless steel  model DT18/1080 18-head rotary filler
Resina RU130 capper
Enercon induction sealer stainless steel

**Tomato Packaging Room**
Peco Gamma 101P dud detector fill level monitor
Stainless steel tunnel type cooler, 10' x 48' CATPA
Ambec full jar conveyors
Krones Rondella roll thru labeler
Krones Supermatic front & back labeler, (3) magazines with neck labeler, front & back
Hartness drop case packer with empty case conveyor from manual unload stations
Hartness case gluer & coder
Manual unloading station with conveyors to washer
Bottle washer gripper type
Stainless steel bottle lowevator with conveyor (not used)
Avery case palletizer with pallet magazine, model 881 with Orion shrink wrapper automatic


**JELLY**
**Jelly Process Room**
Stainless steel 200 gallon jacketed kettle with Tri Clover pump
Stainless steel single wall holding tank with top mounted agitator, closed top, dish bottom, 4' x 4'
Stainless steel 300 gallon jacketed kettle with Tri Clover pump
Stainelss steel hopper with APV pump
Sihi (Fristam?) pump with magnet
Stainelss steel tank with Tri-Clover pump
(2) Stainless steel tanks
Waukesha pump
Stainless steel Sandpiper diaphragm pump. 3"

(4) Stainless steel jacketed kettles, Groen RA 250, full sweep agitators

(2) Stainless steel L&A process jacketed vacuum cookers (1200 gallon)
(2) Stainless steel rotary coil cookers, 600 gallon
Stainless steel fluid flow meters
Stainless steel pipe & controls

**Filling Room**
Elmar 21-head piston filler, RPE 521I
Empty glass jar twist rinser
Manual case unloader with conveyors
Full jar conveyor from filler to cooler
Stainless steel tunnel style cooler, 10' x 50, standard metal products
Peco dud detector
Stainless steel accumulating table, 5' x 10

Krones Supermatic labeler, (2) magazines, front & back, s/n 53-269, 1983

Krones Rondelia labeler, 1995
Linx coder
Hartness drop case packer with empty bin conveyor
Rockford case sealer with case coder
Columbia F100 case palletizer

Total

# Exhibit "8.4"

EXHIBIT 8.4
[FORM OF WEEKLY REPORT]

| Week | Gross Proceeds Before Deduction of Buyer's Premium and Sales Tax | Buyer's Premium | Sales Tax | Net Proceeds | Additional Return to Company | Agent's Residual Proceeds |
|------|------|------|------|------|------|------|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

# Exhibit "12.4"

POLICYHOLDER COPY

**STATE COMPENSATION INSURANCE FUND**    P.O. BOX 420807, SAN FRANCISCO, CA 94142-0807

**CERTIFICATE OF WORKERS' COMPENSATION INSURANCE**

ISSUE DATE: 03-01-2005

GROUP:
POLICY NUMBER:        1805534-2005
CERTIFICATE ID:       2
CERTIFICATE EXPIRES:  02-14-2006
                      02-14-2005/02-14-2006

RABIN WORLDWIDE
298 SAN BRUNO AVENUE
SAN FRANCISCO  CA 94103

This is to certify that we have issued a valid Worker's Compensation insurance policy in a form approved by the California Insurance Commissioner to the employer named below for the policy period indicated.

This policy is not subject to cancellation by the Fund except upon 30 days advance written notice to the employer.

We will also give you 30 days advance notice should this policy be cancelled prior to its normal expiration.

This certificate of insurance is not an insurance policy and does not amend, extend or alter the coverage afforded by the policy listed herein. Notwithstanding any requirement, term or condition of any contract or other document with respect to which this certificate of insurance may be issued or to which it may pertain, the insurance afforded by the policy described herein is subject to all the terms, exclusions, and conditions, of such policy.

AUTHORIZED REPRESENTATIVE

Dianne C. Oki
PRESIDENT

EMPLOYER'S LIABILITY LIMIT INCLUDING DEFENSE COSTS: $1,000,000 PER OCCURRENCE.

ENDORSEMENT #1600 - IRVING RABIN; P - EXCLUDED.

ENDORSEMENT #2065 ENTITLED CERTIFICATE HOLDERS' NOTICE EFFECTIVE 02-14-2005 IS ATTACHED TO AND FORMS A PART OF THIS POLICY.

EMPLOYER

RABIN WORLDWIDE (A CORP)
298 SAN BRUNO AVE
SAN FRANCISCO CA 94103

[B13,NB]

SCIF 10262E          Accept this certificate only if you see a faint watermark that reads "OFFICIAL STATE FUND DOCUMENT"

PRINTED: 03-01-2005
PAGE 1 OF 1

03/01/2005  12:10PM

Mar. 1. 2005 12:11PM                No. 3166  P. 2

## ACORD. CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| OP ID PU RABIN-1 | 03/01/05 |

| PRODUCER | |
|---|---|
| California Coastal Insurance<br>License #0381524<br>2262 Camino Ramon  PO BOX 5076<br>San Ramon CA 94583-1328<br>Phone: 925-866-7050  Fax:925-866-8275 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|
| INSURER A: Hartford Insurance Company | 22357 |
| INSURER B: | |
| INSURER C: | |
| INSURER D: | |
| INSURER E: | |

**INSURED**

Rabin Worldwide Inc.
298 San Bruno Avenue
San Francisco CA 94103

### COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>CLAIMS MADE [X] OCCUR | 57UUNUL8563 | 09/21/04 | 09/21/05 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY [ ] PRO-JECT [ ] LOC | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| A | | **AUTOMOBILE LIABILITY**<br>X ANY AUTO<br>ALL OWNED AUTOS<br>SCHEDULED AUTOS<br>X HIRED AUTOS<br>X NON-OWNED AUTOS | 57UUNUL8563 | 09/21/04 | 09/21/05 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY**<br>ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN  EA ACC<br>AUTO ONLY:  AGG | $<br>$ |
| A | | **EXCESS/UMBRELLA LIABILITY**<br>X OCCUR [ ] CLAIMS MADE<br>DEDUCTIBLE<br>RETENTION $ | 57RHUUL8322 | 09/21/04 | 09/21/05 | EACH OCCURRENCE | $ 4,000,000 |
| | | | | | | AGGREGATE | $ 4,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | SEE SEPARATE CERTIFICATE<br>BY STATE FUND | | | WC STATU-TORY LIMITS [ ]  OTH-ER [ ] | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | OTHER | | | | E.L. DISEASE - POLICY LIMIT | $ |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS**

All Operations by Named Insured

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| EVIDE-1<br><br>Evidence Purposes Only | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL ____ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br>AUTHORIZED REPRESENTATIVE |

ACORD 25 (2001/08)                            © ACORD CORPORATION 1988

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER OTHER THAN THOSE PROVIDED IN THE POLICY. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES LISTED HEREIN.

| PRODUCER | COMPANY |
| --- | --- |
| MARSH USA, INC.<br>3475 PIEDMONT ROAD, N.E., SUITE 1200<br><br>ATLANTA, GA 30305<br><br>J25376-repla-prop.-2005    5050   EDGE- WOOD   COURT | ZURICH INS. CO,<br>ERP930424403 |

| INSURED | LOAN NUMBER | | POLICY NUMBER |
| --- | --- | --- | --- |
| Winn-Dixie Stores, Inc.<br>Attn: Dale Bitter<br>5050 Edgewood Court<br>Jacksonville, FL 32203-0297 | | | (See Avove) |

| EFFECTIVE DATE (MM/DD/YY) | EXPIRATION DATE (MM/DD/YY) | CONT. UNTIL TERMINATED IF CHECKED |
| --- | --- | --- |
| 04/30/05 | 04/30/06 | |

THIS REPLACES PRIOR EVIDENCE DATED:

## PROPERTY INFORMATION

LOCATION / DESCRIPTION

5050 EDGEWOOD CT., JACKSONVILLE, FL - JACKSONVILLE HEADQUARTERS DIST. CTR., & MANUFACTURING FACILITY. ZSFF-WD JACKSONVILLE, LLC IS INCLUDED AS AN ADDITONAL INSURED.

## COVERAGE INFORMATION | This certificate supersedes and replaces any previously issued certificate for the policy period noted below

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED HEREIN HAVE BEEN ISSUED TO THE INSURED NAMED HEREIN FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THE CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES LISTED HEREIN IS SUBJECT TO ALL THE TERMS, CONDITIONS AND EXCLUSIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| COVERAGES / PERILS / FORMS | AMOUNT OF INSURANCE ($) | DEDUCTIBLE |
| --- | --- | --- |
| "ALL RISK" OF DIRECT PHYSICAL LOSS OR DAMAGE | 5,000,000 | |
| INCLUDING FLOOD & EARTHQUAKE ON REAL AND PERSONAL PROPERTY | | |
| INCLUDING IMPROVEMENTS SUBJECT TO POLICY TERMS AND CONDITIONS. | | |
| REPLACEMENT COST | | |
| NO COINSURANCE | | |
| TERRORISM INCLUDED | | |

## REMARKS (Including Special Conditions)

## CANCELLATION

SHOULD ANY OF THE POLICIES LISTED HEREIN BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE INSURER AFFORDING COVERAGE WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED HEREIN, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER AFFORDING COVERAGE, ITS AGENTS OR REPRESENTATIVES, OR THE ISSUER OF THIS CERTIFICATE.

## CERTIFICATE HOLDER

| NAME AND ADDRESS | NATURE OF INTEREST | |
| --- | --- | --- |
| ZSF-WD JACKSONVILLE, LLC<br>% EUCLID WAREHOUSES, INC.<br>ONE CHASE MANHATTAN PLAZA<br>NEW YORK, NY 10005 | ☐ MORTGAGEE | ☐ ADDITIONAL INSURED |
| | ☐ LOSS PAYEE | ☐ (OTHER) |

MARSH USA INC.

BY Judy Gay Cera

| MMS (3/02) | VALID AS OF: 05/05/05 |
| --- | --- |

**PRODUCER**

MARSH USA, INC.
3475 PIEDMONT ROAD, N.E., SUITE 1200

ATLANTA, GA 30305

J25376-repla-prop.-2005    5050    EDGE- WOOD  COURT

| COMPANIES AFFORDING COVERAGE |
| --- |

**COMPANY**
E

**COMPANY**
F

**INSURED**

Winn-Dixie Stores, Inc.
Attn: Dale Bitter
5050 Edgewood Court
Jacksonville, FL 32203-0297

**COMPANY**
G

**COMPANY**
H

---

**TEXT**

CONTINUED FROM DESCRIPTION SECTION:

---

**CERTIFICATE HOLDER**

ZSF-WD JACKSONVILLE, LLC
% EUCLID WAREHOUSES, INC.
ONE CHASE MANHATTAN PLAZA
NEW YORK, NY 10005

**MARSH USA INC. BY**

Judy Gay Cera

# MARSH — EVIDENCE OF PROPERTY INSURANCE

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER OTHER THAN THOSE PROVIDED IN THE POLICY. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES LISTED HEREIN.

**CERTIFICATE NUMBER:** ATL-000251447-09

**PRODUCER**
MARSH USA, INC.
3475 PIEDMONT ROAD, N.E., SUITE 1200

ATLANTA, GA 30305

J25376-repla-prop.-2005    255    JACK- SON- VILLE  HWY

**COMPANY**
ZURICH INS. CO,
ERP930424403

**INSURED**
Winn-Dixie Stores, Inc.
Attn: Dale Bitter
5050 Edgewood Court
Jacksonville, FL 32203-0297

**LOAN NUMBER**

**POLICY NUMBER**
(See Avove)

**EFFECTIVE DATE (MM/DD/YY)** 04/30/05
**EXPIRATION DATE (MM/DD/YY)** 04/30/06
**CONT. UNTIL TERMINATED IF CHECKED**

THIS REPLACES PRIOR EVIDENCE DATED:

## PROPERTY INFORMATION

**LOCATION / DESCRIPTION**
255 JACKSONVILLE HWY, FITZGERALD, GA - MANUFACTURING FACILITY. WACHOVIA BANK, NATIONAL ASSOCIATION, AS MASTER SERVICER ON BEHALF OF, BANKERS TRUST COMPANY, AS TRUSTEE FOR THE BENEFIT OF THE CERTIFICATE HOLDERS OF, WINN-DIXIE PASS-THROUGH CERTIFICATES: SERIES 1999-1, P.O. BOX 391690, SOLON, OH 44139-1690. ZSF-WD FITZGERALD, LLC IS INCLUDED AS AN ADDITIONAL INSURED.

## COVERAGE INFORMATION  This certificate supersedes and replaces any previously issued certificate for the policy period noted below.

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED HEREIN HAVE BEEN ISSUED TO THE INSURED NAMED HEREIN FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THE CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES LISTED HEREIN IS SUBJECT TO ALL THE TERMS, CONDITIONS AND EXCLUSIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| COVERAGES / PERILS / FORMS | AMOUNT OF INSURANCE ($) | DEDUCTIBLE |
|---|---|---|
| "ALL RISK" OF DIRECT PHYSICAL LOSS OR DAMAGE | 5,000,000 | |
| INCLUDING FLOOD & EARTHQUAKE ON REAL AND PERSONAL PROPERTY | | |
| INCLUDING IMPROVEMENTS SUBJECT TO POLICY TERMS AND CONDITIONS. | | |
| REPLACEMENT COST | | |
| NO COINSURANCE | | |
| TERRORISM INCLUDED | | |

## REMARKS (Including Special Conditions)

## CANCELLATION

SHOULD ANY OF THE POLICIES LISTED HEREIN BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE INSURER AFFORDING COVERAGE WILL ENDEAVOR TO MAIL **30** DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED HEREIN, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER AFFORDING COVERAGE, ITS AGENTS OR REPRESENTATIVES, OR THE ISSUER OF THIS CERTIFICATE.

## CERTIFICATE HOLDER

**NAME AND ADDRESS**
ZSF-WD FITZGERALD, LLC
% EUCLID WAREHOUSES, INC.
ONE CHASE MANHATTAN PLAZA
NEW YORK, NY 10005

**NATURE OF INTEREST**

[X] MORTGAGEE        [ ] ADDITIONAL INSURED

[ ] LOSS PAYEE        [ ] (OTHER)

MARSH USA INC.
BY  Judy Gay Cera

MM3 (3/02)

**VALID AS OF:** 05/05/05

# ADDITIONAL INFORMATION

DATE (MM/DD/YY)
05/05/05

**PRODUCER**

MARSH USA, INC.
3475 PIEDMONT ROAD, N.E., SUITE 1200

ATLANTA, GA 30305

J25376-repla-prop.-2005    255    JACK- SON- VILLE HWY

**INSURED**

Winn-Dixie Stores, Inc.
Attn: Dale Bitter
5050 Edgewood Court
Jacksonville, FL 32203-0297

**COMPANIES AFFORDING COVERAGE**

COMPANY
E

COMPANY
F

COMPANY
G

COMPANY
H

## TEXT

CONTINUED FROM DESCRIPTION SECTION:

## CERTIFICATE HOLDER

ZSF-WD FITZGERALD, LLC
% EUCLID WAREHOUSES, INC.
ONE CHASE MANHATTAN PLAZA
NEW YORK, NY 10005

MARSH USA INC. BY

Judy Gay Cera

# CERTIFICATE OF INSURANCE

**CERTIFICATE NUMBER** ATL-000028086-20

| PRODUCER | |
|---|---|
| MARSH USA, INC.<br>3475 PIEDMONT ROAD, NE.<br>SUITE 1200<br>ATLANTA, GA 30305<br>Attn: Grace Wey 404-995-2874  fax 404-760-5720 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER OTHER THAN THOSE PROVIDED IN THE POLICY. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES DESCRIBED HEREIN. |

J25376-GLUMB-XSWC-04     5050     EDGE- WOOD  COURT

| | **COMPANIES AFFORDING COVERAGE** |
|---|---|
| | COMPANY<br>A       ACE AMERICAN INSURANCE COMPANY |

| INSURED | COMPANY<br>B     N/A |
|---|---|
| WINN-DIXIE STORES, INC.<br>ATTN: MR. DALE BITTER<br>5050 EDGEWOOD COURT<br>JACKSONVILLE, FL 32254 | COMPANY<br>C |
| | COMPANY<br>D |

## COVERAGES      This certificate supersedes and replaces any previously issued certificate for the policy period noted below

THIS IS TO CERTIFY THAT POLICIES OF INSURANCE DESCRIBED HEREIN HAVE BEEN ISSUED TO THE INSURED NAMED HEREIN FOR THE POLICY PERIOD INDICATED NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THE CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, CONDITIONS AND EXCLUSIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY<br>X COMMERCIAL GENERAL LIABILITY<br>☒ CLAIMS MADE ☐ OCCUR<br>☐ OWNER'S & CONTRACTOR'S PROT<br>X $2,000,000 SELF-INSURED RETENTION | XSLG20587519 | 07/01/05 | 07/01/06 | GENERAL AGGREGATE | $ 5,000,000 |
| | | | | | PRODUCTS - COMP/OP AGG | $ 5,000,000 |
| | | | | | PERSONAL & ADV INJURY | $ 1,500,000 |
| | | | | | EACH OCCURRENCE | $ 1,500,000 |
| | | | | | FIRE DAMAGE (Any one fire) | $ N/A |
| | | | | | MED EXP (Any one person) | $ N/A |
| | AUTOMOBILE LIABILITY<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS<br>☐ SCHEDULED AUTOS<br>☐ HIRED AUTOS<br>☐ NON-OWNED AUTOS | | | | COMBINED SINGLE LIMIT | $ |
| | | | | | BODILY INJURY (Per person) | $ |
| | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE | $ |
| | GARAGE LIABILITY<br>☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | OTHER THAN AUTO ONLY: | |
| | | | | | EACH ACCIDENT | $ |
| | | | | | AGGREGATE | $ |
| A | EXCESS LIABILITY<br>X UMBRELLA FORM<br>☐ OTHER THAN UMBRELLA FORM | XOOG2290985A | 07/01/05 | 07/01/06 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | AGGREGATE | $ 5,000,000 |
| A<br>A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY<br><br>THE PROPRIETOR/ PARTNERS/EXECUTIVE OFFICERS ARE: ☐ INCL ☐ EXCL | WLRQ01206001<br>WLRC43957934 | 07/01/05<br>07/01/05 | 07/01/06<br>07/01/06 | X WC STATU-TORY LIMITS / OTHER | |
| | | | | | EL EACH ACCIDENT | $ 1,000,000 |
| | | | | | EL DISEASE-POLICY LIMIT | $ 1,000,000 |
| | OTHER | | | | EL DISEASE-EACH EMPLOYEE | $ 1,000,000 |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS
RE: 5050 EDGEWOOD COURT, JACKSONVILLE, FL. JACKSONVILLE HEADQUARTERS DISTRIBUTION CENTER & MANUFACTURING FACILITY. ZSF-WD JACKSONVILLE, LLC IS INCLUDED AS AN ADDITIONAL INSURED ON THE ABOVE EXCESS GENERAL LIABILITY POLICY BUT ONLY WITH RESPECT TO LIABILITY ARISING OUT OF THE OPERATIONS/PRODUCTS OF THE NAMED INSURED.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| ZSF-WD JACKSONVILLE, LLC<br>% EUCLID WAREHOUSES, INC.<br>105 E. 17TH STREET, 4TH FL.<br>NEW YORK, NY 10003 | SHOULD ANY OF THE POLICIES DESCRIBED HEREIN BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF. THE INSURER AFFORDING COVERAGE WILL ENDEAVOR TO MAIL ___30___ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED HEREIN, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER AFFORDING COVERAGE, ITS AGENTS OR REPRESENTATIVES, OR THE ISSUER OF THIS CERTIFICATE.<br>MARSH USA INC.<br>BY:   Judy Gay Cera |
| MM1(3/02) | VALID AS OF :06/30/05 |

DATE (MM/DD/YY)
06/30/05

**PRODUCER**

MARSH USA, INC.
3475 PIEDMONT ROAD, NE.
SUITE 1200
ATLANTA, GA 30305
Attn: Grace Wey 404-995-2874    fax 404-760-5720

J25376-GLUMB-XSWC-04    5050    EDGE- WOOD COURT

**COMPANIES AFFORDING COVERAGE**

COMPANY
E

COMPANY
F

COMPANY
G

COMPANY
H

**INSURED**

WINN-DIXIE STORES, INC.
ATTN: MR. DALE BITTER
5050 EDGEWOOD COURT
JACKSONVILLE. FL 32254

**TEXT**

The following are included as additional insureds, as their interests
may appear:

Bankers Trust Company, as Indenture Trustee
3 Park Plaza
Irvine, CA 92614

First Union National Bank, as Administrator
230 S. Tryon Street, NC 1179
Charlotte, NC 28288

First Union National Bank, as Servicer
8739 Research Drive, URP-4
Charlotte, NC 28288-1075

**CERTIFICATE HOLDER**

ZSF-WD JACKSONVILLE, LLC
% EUCLID WAREHOUSES, INC.
105 E. 17TH STREET, 4TH FL.
NEW YORK, NY 10003

MARSH USA INC. BY

Judy Gay Cera

**CERTIFICATE OF INSURANCE**

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER OTHER THAN THOSE PROVIDED IN THE POLICY. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES DESCRIBED HEREIN.

PRODUCER
MARSH USA, INC.
3475 PIEDMONT ROAD, NE
SUITE 1200
ATLANTA, GA .30305
Attn: Grace Wey 404-995-2874  fax 404-760-5720

U25376-GLUMB-XSWC-04      STORE 255

INSURED
WINN-DIXIE STORES, INC.
ATTN: MR. DALE BITTER
5050 EDGEWOOD COURT
JACKSONVILLE, FL 32254

**COMPANIES AFFORDING COVERAGE**

| | |
|---|---|
| COMPANY A | ACE AMERICAN INSURANCE COMPANY |
| COMPANY B | N/A |
| COMPANY C | |
| COMPANY D | |

**COVERAGES**    This certificate supersedes and replaces any previously issued certificate for the policy period noted below.

THIS IS TO CERTIFY THAT POLICIES OF INSURANCE DESCRIBED HEREIN HAVE BEEN ISSUED TO THE INSURED NAMED HEREIN FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THE CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, CONDITIONS AND EXCLUSIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | GENERAL LIABILITY<br>[X] COMMERCIAL GENERAL LIABILITY<br>[ ] CLAIMS MADE [ ] OCCUR<br>[ ] OWNER'S & CONTRACTOR'S PROT<br>[X] $2,000,000 SELF-INSURED RETENTION | XSLG20587519 | 07/01/05 | 07/01/06 | GENERAL AGGREGATE | $ 5,000,000 |
| | | | | | PRODUCTS - COMP/OP AGG | $ 5,000,000 |
| | | | | | PERSONAL & ADV INJURY | $ 1,500,000 |
| | | | | | EACH OCCURRENCE | $ 1,500,000 |
| | | | | | FIRE DAMAGE (Any one fire) | $ N/A |
| | | | | | MED EXP (Any one person) | $ N/A |
| | AUTOMOBILE LIABILITY<br>[ ] ANY AUTO<br>[ ] ALL OWNED AUTOS<br>[ ] SCHEDULED AUTOS<br>[ ] HIRED AUTOS<br>[ ] NON-OWNED AUTOS | | | | | COMBINED SINGLE LIMIT | $ |
| | | | | | BODILY INJURY (Per person) | $ |
| | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE | $ |
| | GARAGE LIABILITY<br>[ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | OTHER THAN AUTO ONLY: | |
| | | | | | EACH ACCIDENT | $ |
| | | | | | AGGREGATE | $ |
| A | EXCESS LIABILITY<br>[X] UMBRELLA FORM<br>[ ] OTHER THAN UMBRELLA FORM | XOOG2290985A | 07/01/05 | 07/01/06 | EACH OCCURRENCE | $ 5,000,000 |
| | | | | | AGGREGATE | $ 5,000,000 |
| | | | | | | $ |
| A A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY<br>THE PROPRIETOR/ PARTNERS/EXECUTIVE OFFICERS ARE: [ ] INCL [ ] EXCL | WLRQ01206001<br>WLRC43957934 | 07/01/05<br>07/01/05 | 07/01/06<br>07/01/06 | [X] WC STATU-TORY LIMITS [ ] OTHER | |
| | | | | | EL EACH ACCIDENT | $ 1,000,000 |
| | | | | | EL DISEASE-POLICY LIMIT | $ 1,000,000 |
| | | | | | EL DISEASE-EACH EMPLOYEE | $ 1,000,000 |
| | OTHER | | | | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS
RE: STORE # 255 - JACKSONVILLE HWY., FITZGERALD, GA.- MANUFACTURING FACILITY. ZSF-WD FITZGERALD, LLC IS INCLUDED AS AN ADDITIONAL INSURED ON THE ABOVE EXCESS GENERAL LIABILITY POLICY BUT ONLY WITH RESPECT TO LIABILITY ARISING OUT OF THE OPERATIONS OF THE NAMED INSURED.  WACHOVIA BANK, NATIONAL ASSOCIATION, AS MASTER SERVICER ON BEHALF OF BANKERS TRUST COMPANY, AS TRUSTEE FOR THE BENEFIT OF THE CERTIFICATE HOLDERS OF, SERIES 1999-1, P. O. BOX 391690, SOLON, OHIO 44139-1690.

**CERTIFICATE HOLDER**

ZSF-WD FITZGERALD, LLC
% EUCLID WAREHOUSED, INC.
105 E. 17TH STREET, 4TH FL.
NEW YORK, NY 10003

**CANCELLATION**

SHOULD ANY OF THE POLICIES DESCRIBED HEREIN BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE INSURER AFFORDING COVERAGE WILL ENDEAVOR TO MAIL ___30___ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED HEREIN, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER AFFORDING COVERAGE, ITS AGENTS OR REPRESENTATIVES, OR THE ISSUER OF THIS CERTIFICATE.

MARSH USA INC.
BY:  Judy Gay Cera

MM1(3/02)                    VALID AS OF: 06/30/05

AR-000028091-20    DATE (MM/DD/YY) 06/30/05

| PRODUCER | COMPANIES AFFORDING COVERAGE |
|---|---|
| MARSH USA, INC.<br>3475 PIEDMONT ROAD, NE.<br>SUITE 1200<br>ATLANTA, GA 30305<br>Attn: Grace Wey 404-995-2874   fax 404-760-5720 | COMPANY<br>E |
| J25376-GLUMB-XSWC-04        STORE 255 | COMPANY<br>F |
| INSURED<br>WINN-DIXIE STORES, INC.<br>ATTN: MR. DALE BITTER<br>5050 EDGEWOOD COURT<br>JACKSONVILLE, FL 32254 | COMPANY<br>G |
|  | COMPANY<br>H |

**TEXT**

The following are included as additional insureds, as their interests
may appear:

Bankers Trust Company, as Indenture Trustee
3 Park Plaza
Irvine, CA 92614

First Union National Bank, as Administrator
230 S. Tryon Street, NC 1179
Charlotte, NC 28288

First Union National Bank, as Servicer
8739 Research Drive, URP-4
Charlotte, NC 28288-1075

**CERTIFICATE HOLDER**

ZSF-WD FITZGERALD, LLC
% EUCLID WAREHOUSED, INC.
105 E. 17TH STREET, 4TH FL.
NEW YORK, NY 10003

MARSH USA INC. BY

Judy Gay Cera