EXHIBIT "A"
TO LEASE

DESCRIPTION OF LEASED PREMISES

Legal Description

**TRACT 1**

Lot 2, Block 1, WALNUT CREEK PLAZA WEST, an Addition to the City of Mansfield, Tarrant County, Texas, according to the plat recorded in Cabinet A, Slide 947, Plat Records, Tarrant County, Texas.

**TRACT 2**

Easement estate over and across the following described tract of land as created in that certain Reciprocal Non-Exclusive Easement for Pedestrian and Vehicular Access, dated October 9, 1991, executed by and between Crow and Associates, Inc. and Denver Hollabaugh, recorded in Volume 10502, Page 102, Volume 10512, Page 1331 and Volume 10521, Page 2409, Deed Records, Tarrant County, Texas, and described as follows:

Being an easement situated in the F.B. Waddell Survey, Abstract No. 1658, Tarrant County, Texas, said easement being a portion of that certain tract of land described in a deed to Denver Hollabaugh, as recorded in Volume 10349, Page 549, County Records, Tarrant County, Texas, said easement being more particularly described by metes and bounds as follows:

Commencing at the most westerly corner of said tract, being a point in the northerly right of way line of U.S. Highway 287;

Thence S 71°03'13" E, along the north line of said tract 291.16 feet to the point of beginning;

Thence S 71°03'13" E continuing along the north line of said tract 26.28 feet;

Thence S 36°54'24" W, 108.71 feet to a point in the northerly right of way line of said Highway 287, the beginning of a non-tangent curve to the right;

Thence 25.04 feet along said right of way line and along the arc of said curve through a central angle of 01°01'23" a radius of 1402.40 feet, the long chord of which bears N 56°18'45" W, 25.04 feet;

Thence N 36°54'24" E, 102.01 feet to the point of beginning and containing 0.060 acres of land, more or less.

1

06720/40153
LP I.D. No. 19

**TRACT 3**

Easement Estate over and across the following described tract of land as created in that certain Closing Agreement dated January 15, 1992, executed by and between Crow and Associates, Inc. and Sunbelt-Dix, Inc., recorded in Volume 10505, Page 1585, Deed Records, Tarrant County, Texas, and described as follows:

Being a tract of land situated in the Henry McGehee Survey, Abstract No. 998 and the P.B. Waddell Survey, Abstract No. 1658, City of Mansfield, Tarrant County, Texas, and being a portion of two tracts of land (Tract I and Tract II) as described in Deed to Crow and Associates, Inc. and recorded in Volume 5635, Page 167, County Records, Tarrant County, Texas and being a 30' wide strip along the west boundary of the following described tract of land:

Beginning at a 5/8 inch iron rod with cap stamped "Carter and Burgess" found at the northwest corner of Lot 1, Block 1, Walnut Creek Plaza West, an addition to the City of Mansfield as recorded in Volume 388-219, Page 4, said County Records, said point being in the southerly line of a 100 foot drainage and utility easement as recorded in Plat Volume 388-125, Page 28, said County Records;

Thence S 05°14'40" W, 149.66 feet along the westerly line of said Lot 1 to a 5/8 inch iron rod with cap stamped "Carter and Burgess" found, the southwest corner of said lot;

Thence S 86°59'31" E, 247.04 feet along the Southerly line of said Lot 1 to a 5/8 inch iron rod with cap stamped "Carter and Burgess" set in the westerly right of way line of Walnut Creek Drive;

Thence S 07°00'29" W 201.51 feet along said westerly right of way line to a 5/8 inch iron rod with cap stamped "Carter and Burgess" set;

Thence N 82°59'31" W, 630.54 feet to a 5/8 inch iron rod with cap stamped "Carter and Burgess" set, the beginning of a non-tangent curve to the left;

Thence 16.16 feet along the arc of said non-tangent curve to the left through a central angle of 00°50'30" a radius of 1100.00 feet and a long chord of N 01°08'12" E, 16.16 feet to a 5/8 inch iron rod with cap stamped "Carter and Burgess" found;

Thence N 00°42'57" E, 355.31 feet to a 5/8 inch iron rod with cap stamped "Carter and Burgess" found in the Southerly line of the aforementioned 100 foot drainage and utility easement, the beginning of a non-tangent curve to the left;

Thence N 241.08 feet along the arc of said non-tangent curve to the left through a central angle of 39°27'54", a radius of 350.00 feet and a long chord of S 69°21'29" E, 236.34 feet to a 5/8 inch iron rod with cap stamped "Carter and Burgess" found;

2

Thence S 89°05'25" E, 191.49 feet to the point of beginning, containing 4.086 acres of land.

**TRACT 4**

EASEMENT ESTATE over and across the following described tract of land as created in that            isement dated October 9, 1991, executed by and between Denver Hollabaugh and Crow and Associates, Inc., recorded in Volume 10502, Page 0097 and Volume 10521, Page 2403, Deed Records, Tarrant County, Texas and described as follows:

BEING an easement situated in the F. B. Waddell Survey, Abstract No. 1658, Tarrant County, Texas, said easement being a portion of that certain tract of land described in a deed to Denver Hollabaugh, as recorded in Volume 10349, Page 549, County Records, Tarrant County, Texas, said easement being more particularly described by metes and bounds as follows:

BEGINNING at the most westerly corner of said tract, being a point in the northerly right of way line of U. S. Highway 287;

THENCE:   S 71°03'13" E, along the north line of said tract, 81.76 feet;

THENCE:   S 42°24'09" W, 32.54 feet to the north right of way line of said highway;

THENCE:   N 47°35'51" W, along said right of way line, 75.00 feet to the PLACE OF BEGINNING and containing 0.028 acres of land, more or less.

**TRACT 5**

EASEMENT ESTATE over and across the following described tract of land as created in that certain Agreement Creating Mutual Easements, dated June 6, 1985, executed by and between The Southland Corporation and 287/Mansfield Joint Venture, as recorded in Volume 8208, Page 228, County Records, Tarrant County, Texas and described as follows:

BEING part of Lot 1, Block 1, 287 Country Club Addition, an addition in the City of Mansfield, Tarrant County, Texas, as recorded in Volume 388-183, Page 7, Tarrant County Plan Records and being more particularly described by metes and bounds as follows:

BEGINNING at a Highway Monument at the intersection of the south line of Walnut Creek Drive and the north line of U. S. Highway No. 287, said point being the southeast corner of said Lot 1, said point also being the beginning of a non-tangent curve to the left whose radius is 984.93 feet and whose long chord bears N 57°51'16" W, 117.25 feet;

EXHIBIT 'A' TO
LEASE AGREEMENT

06720/40153
LP I.D. No. 19

THENCE:  Along the north line of said U. S. Highway No. 287, and along said curve, in a westerly direction, through a central angle of 06°49'29", a distance of 117.32 feet to a Highway Monument at the end of said curve;

THENCE:  N 61°16'00" W, continuing along the north line of said U. S. Highway No. 287, a distance of 79.49 feet to a 1/2 inch iron at the southwest corner of said Lot 1;

THENCE:  N 18°59'27" E, along the west line of said Lot 1, a distance of 139.56 feet to a 1/2 inch iron rod at the northwest corner of said Lot 1;

THENCE:  S 71°00'33" E, along the North line of said Lot 1, a distance of 189.58 feet to a 1/2 inch iron rod at the northeast corner of said Lot 1 in the west line of said Walnut Creek Drive;

THENCE:  S 05°47'52" W, along the west line of said Walnut Creek Drive, 154.49 feet to a 1/2 inch iron rod at the most easterly southeast corner of said Lot 1;

THENCE:  S 66°49'00" W, 43.62 feet to the PLACE OF BEGINNING and containing 0.758 acres or 33,000 square feet of land.

4

06720/40153
LF I.D. No. 19

## EXHIBIT "B"
## TO LEASE

### LANDLORD'S EQUIPMENT

All machinery, apparatus, equipment, fittings, appliances and fixtures of every kind and nature whatsoever including all electrical, anti-pollution, heating, lighting, laundry, incinerating, power, air conditioning, plumbing, lifting, cleaning, fire prevention, fire extinguishing, refrigerating, ventilating, communication, garage and cooking systems, devices, machinery, apparatus, equipment, fittings, appliances, engines, pipes, pumps, tanks, motors, conduits, ducts, compressors and switch-boards, and all storm doors and windows, dishwashers, attached cabinets and partitions and all articles of personal property of every kind and nature whatsoever now or hereafter affixed to, attached to, placed upon, used or usable in any way in connection with the use, enjoyment, occupancy or operation of the Leased Premises and Improvements but excluding coolers, trade fixtures, inventory, furniture and other personalty constituting Tenant's Equipment.

06720/40153
LP I.D. No. 19

## EXHIBIT "C"
## TO LEASE

### TENANT'S EQUIPMENT

All coolers, freezers, trade fixtures, inventory, furniture and other personalty belonging to Tenant, including the items listed on Schedule C-1.

EXHIBIT "C" TO
LEASE AGREEMENT

06720/40153
LP I.D. No 19

## SCHEDULE C-1

| ASSET DESCRIPTION |
| --- |
| IBM POS 2 POS TERMINAL |
| IBM POS 2 POS TERMINAL |
| IBM POS 2 POS TERMINAL |
| IBM POS SCANNER SCALE |
| IBM POS SCANNER SCALE |
| IBM POS SCANNER SCALE |
| IBM POS SCANNER SCALE |
| IBM POS SCANNER SCALE |
| IBM POS SCANNER SCALE |
| IBM POS SCANNER SCALE |
| IBM POS 1 POS TERMINAL |
| IBM POS 1 POS TERMINAL |
| IBM POS 1 POS TERMINAL |
| IBM POS 1 POS TERMINAL |
| SURGE SUPPRESSOR |
| LOAD KING COMPLETE CHECKOUT LANE |
| LOAD KING COMPLETE CHECKOUT LANE |
| LOAD KING COMPLETE CHECKOUT LANE |
| LOAD KING COMPLETE CHECKOUT LANE |
| LOAD KING COMPLETE CHECKOUT LANE |
| LOAD KING COMPLETE CHECKOUT LANE |
| LOAD KING COMPLETE CHECKOUT LANE |
| LOAD KING COMPLETE CHECKOUT LANE |
| LOAD KING COMPLETE CHECKOUT LANE |
| LOAD KING COMPLETE CHECKOUT LANE |

| ASSET DESCRIPTION |
| --- |
| LOAD KING COMPLETE CHECKOUT LANE |
| CUSTOMER SERVICE COUNTER |
| SOFTWARE |
| IBM 4690 REMOTE OPERATING SOFTWARE |
| IBM OPERATING SOFTWARE |
| ENCODER |
| BATCH ENCODER |
| STANDARD REGISTER BATCH ENCODER |
| SAFE W/MEDICAL RELOCKERS |
| MOUNT P450-Z W/CART |
| MOUNT P450-Z W/CART |
| MOUNT P450-Z W/CART |
| MOUNT P450-Z W/CART |
| MOUNT P450-Z W/CART |
| MOUNT SOFTW-Z POINT OF SALE SCALE |
| MOUNT SP150-Z PRINTER |
| MOUNT SP150-Z SCALE |
| MOUNT SP150-Z SCALE |
| MOUNT SP150-Z SCALE |
| MOUNT SP150-Z SCALE |
| MOUNT SP150-Z SCALE W/DISH PAN |
| MOUNT SP150-Z SCALE |
| MOUNT SP150-Z SCALE |
| MOUNT SP150-Z SCALE |
| MOUNT SPS SCALE |

| ASSET DESCRIPTION |
| --- |
| HOBART DEALPMASTER COMP MODULE |
| HOBART CHOPPER |
| HOBART 4246-Z MIXER/GRINDER |
| HOBART 5001-Z MEAT SAW |
| HOBART MEAT SAW |
| HOBART 403 TENDERIZER |
| SLICER STAND |
| SLICER STAND |
| HOBART 1612E-1 ENHANCED SLICER |
| HOBART 1612E-1 ENHANCED SLICER |
| HOBART 1612E-1 ENHANCED SLICER |
| HOBART 1612E-1 ENHANCED SLICER |
| HOBART 1712E-1 ENHANCED SLICER |
| USED SLICER W/STAND |
| EVAPORATOR COIL FOR DAIRY COOLER |
| EVAPORATOR COIL FOR MEAT COOLER |
| STANDALONE COIL FOR MEAT COOLER |
| EVAPORATOR COIL FOR SEAFOOD FREEZER |
| EVAPORATOR COIL FOR DELI FREEZER |
| EVAPORATOR COIL FOR MEAT PREP |
| EVAPORATOR COIL FOR BAKERY FREEZER |
| EVAPORATOR COIL FOR SALAD COOLER |
| EVAPORATOR COIL FOR PRODUCE COOLER |
| EVAPORATOR COIL FOR DELI COOLER |
| EVAPORATOR COIL FOR FLORAL COOLER |
| EVAPORATOR COIL FOR DAIRY COOLER |
| EVAPORATOR COIL FOR BAKERY FREEZER |
| EVAPORATOR COIL FOR #1 FREEZER |
| EVAPORATOR COIL FOR #7 FREEZER |

**ASSET DESCRIPTION**

EVAPORATOR COIL FOR IC FREEZER

---

CONDENSER
CONDENSER
CONDENSER

SPRI/MALL REFRIG COUNTER
LOW TEMP COMP COIL SYSTEM - RACK A
LOW TEMP COMP COIL SYSTEM - RACK B
MED TEMP COMP COIL SYSTEM - RACK C
MED TEMP COMP COIL SYSTEM - RACK D
HUSSMAN TALK CONDENSING UNIT

REACH-IN FREEZER
REACH-IN FREEZER
REACH-IN ICE CREAM FREEZER
REACH-IN PRODUCE COOLER
REACH-IN MEAT COOLER
REACH-IN SEAFOOD FREEZER
REACH-IN SEAFOOD COOLER
REACH-IN DELI COOLER
REACH-IN DELI FREEZER
REACH-IN BAKERY COOLER
REACH-IN BAKERY FREEZER
REACH-IN FLORAL COOLER
REACH-IN ICE CREAM FREEZER

SPECIAL CABINET - WINE CASE
HUSSMAN SELF-CONTAINED WINE CASE
HUSSMAN 8' DELI & JUICE CASE
HUSSMAN 8' DELI & JUICE CASE
HUSSMAN 8' SOLID BACK DAIRY CASE
HUSSMAN 8' SOLID BACK DAIRY CASE
HUSSMAN 8' SOLID BACK DAIRY CASE
HUSSMAN 8' SOLID BACK DAIRY CASE
HUSSMAN 8' SOLID BACK DAIRY CASE
HUSSMAN 12' SOLID BACK DAIRY CASE
HUSSMAN 12' SOLID BACK DAIRY CASE
HUSSMAN 12' SOLID BACK DAIRY CASE

---

**ASSET DESCRIPTION**

HUSSMAN 12' SOLID BACK DAIRY CASE

---

5/5 4-DR REFRIG CABINET - SALAD BAR
FOOD PROCESSOR
LITTONZ COFFEE
TOOLSON SOUP KETTLE
TOOLSON SOUP KETTLE

PROTEK FOOD DISPLAY CASE
PROTEK FOOD DISPLAY CASE
HUSSMAN REACH-IN ICE CREAM CASE
HUSSMAN REACH-IN ICE CREAM CASE
HUSSMAN REACH-IN ICE CREAM CASE
HUSSMAN REACH-IN FROZEN FOOD CASE
HUSSMAN REACH-IN FROZEN FOOD CASE
HUSSMAN REACH-IN FROZEN FOOD CASE
HUSSMAN REACH-IN FROZEN FOOD CASE
HUSSMAN REACH-IN FROZEN FOOD CASE
HUSSMAN REACH-IN FROZEN FOOD CASE
HUSSMAN REACH-IN FROZEN FOOD CASE
HUSSMAN REACH-IN FROZEN FOOD CASE
HUSSMAN REACH-IN FROZEN FOOD CASE
HUSSMAN REACH-IN FROZEN FOOD CASE
HUSSMAN REACH-IN FROZEN MEAT CASE
HUSSMAN REACH-IN FROZEN MEAT CASE
HUSSMAN REACH-IN FROZEN MEAT CASE
HUSSMAN REACH-IN FROZEN MEAT CASE

SERVICE FRESH MEAT CASE
HUSSMAN DUAL-TEMP FROZEN MEAT CASE
HUSSMAN DUAL-TEMP FROZEN MEAT CASE
HUSSMAN DUAL-TEMP FROZEN MEAT CASE
HUSSMAN DUAL-TEMP FROZEN MEAT CASE
HUSSMAN DUAL-TEMP FROZEN MEAT CASE
HUSSMAN 12' MULTI-DECK FROZEN MEAT
HUSSMAN 8' MULTI-DECK LUNCH MEAT

---

**ASSET DESCRIPTION**

HUSSMAN 8' MULTI-DECK LUNCH MEAT
HUSSMAN 8' MULTI-DECK LUNCH MEAT
HUSSMAN 8' MULTI-DECK LUNCH MEAT
HUSSMAN 12' MULTI-DECK LUNCH MEAT
HUSSMAN 12' MULTI-DECK LUNCH MEAT
HUSSMAN 12' MULTI-DECK LUNCH MEAT
HUSSMAN 12' MULTI-DECK ICE TEMP MEAT
HUSSMAN 12' MULTI-DECK ICE TEMP MEAT
HUSSMAN MED TEMP MEAT
HUSSMAN MED TEMP MEAT
HUSSMAN 12' SELF-SERVICE POULTRY CASE
HUSSMAN WIDE ISLAND REFRIG MEAT

FLORAL WALL MERCHANDISER
FOCAL POINT MERCHANDISER
3-TIER CIRCULAR FLORAL DISPLAY
3-TIER CIRCULAR FLORAL DISPLAY
3-STEP FLORAL DISPLAY
SERVICE COUNTER
MULTIPLE GLASS CUBE CONFIGURATION
3-TIER ALMOND BUNKER
3-TIER ALMOND BUNKER
WORK COUNTER
8' TERMINAL FOR FLORAL DEPT
OPEN FLORAL MERCHANDISER - RACK II
OPEN FLORAL MERCHANDISER - RACK II

---

**ASSET DESCRIPTION**

HUSSMAN BANANA CASE - 8
HUSSMAN MULTI-DECK FRESH PREPACK
HUSSMAN 8' MULTI-DECK REFRIG PROD
HUSSMAN 8' MULTI-DECK REFRIG PROD
HUSSMAN 8' MULTI-DECK REFRIG PROD
HUSSMAN 12'MULTI-DECK REFRIG PROD
HUSSMAN ISLAND NON-REFRIG PROD
HUSSMAN ISLAND NON-REFRIG PROD
HUSSMAN ISLAND NON-REFRIG PROD
HUSSMAN ISLAND NON-REFRIG PROD
HUSSMAN ISLAND NON-REFRIG PROD
HUSSMAN ISLAND NON-REFRIG PROD
HUSSMAN ISLAND NON-REFRIG PROD
HUSSMAN WIDE ISLAND NON-REFRIG PRODUCT

ASSET DESCRIPTION

ASSET DESCRIPTION

ASSET DESCRIPTION

ASSET DESCRIPTION

HOBART ELECTRIC STEAMER
HUSSMAN NONREFRIG SS. FOR SF SAUCES

DSD DESK WITH DOORS
IBM STORE CONTROLLER/ORDERING VEHIC

UNIVERSAL ALUMINUM CARTS - 26
LOAD KING ALUM FLORAL CARTS - 2
LOAD KING ALUM DAIRY CARTS - 3
LOAD KING ALUM F F CARTS - 3
LOAD KING ALUM I C CARTS - 6
LOAD KING STAINLESS SEAFOOD CART
LOAD KING ALUM CARTS FOR MEAT - 2
LOAD KING ALUM CARTS FOR MEAT - 5
LOAD KING G H W ALUM CARTS - 4
MAX CART
DELI CART
CART
UNIVERSAL ALUM CARTS - 20

COPPER TUBING
COPPER TUBING
COPPER TUBING
COPPER TUBING
COPPER TUBING

29 GAL RECEPTACLE - 2
45 GAL DOME TOP TRASH RECEPTACLES-6
BALER

PALLET JACK SLIDER
PALLET JACK SLIDER
PALLET JACK SLIDER
SERCO DOCK LEVELER
SERCO DOCK LEVELERS
SERCO DOCK LEVELERS
CRANE W/PORTABLE BASE

ASSET DESCRIPTION

8K GENERATOR & TRANSFER SWITCH

WIRE FENCE

DELI PREP TABLE
MEAT PREP TABLE
LOAD KING BAKERY PREP TABLES - 2
LOAD KING PREP TABLE W/LABEL RACK
LOAD KING SALAD PREP TABLES - 2
LOAD KING PRODUCE PREP TABLES - 3
LOAD KING FISH PREP TABLE
LOAD KING FISH PREP TABLE
LOAD KING MEAT PREP TABLES - 5
LOAD KING MEAT PREP TABLE
LOAD KING 2-TIER MEAT GRIND TABLE
LOAD KING PRESTIGE MEAT TABLE
LOAD KING PREP TABLE
LOAD KING PREP TABLES - 5
LOAD KING DELI DUMPING TABLES - 2
LOAD KING DELI PREP TABLEW/LABEL
S/S WORK TABLE W/SINK - SALAD BAR
EUROPEAN MAPLE TABLE W/CASTERS
EUROPEAN MAPLE TABLE W/CASTERS
PRESTIGE MEAT PREP TABLE
SEAFOOD PREP TABLE
DELI PREP TABLE
PRODUCT PREP TABLES - 2
2-TIER GRIND TABLE
VEG-706 EUROPEAN TABLES - 3

ICE TABLE SPOT MERCHANDISER
ICE TABLE SPOT MERCHANDISER
HUSSMAN END WITH MIRROR
4' CAMEO HIGH BACK STEP ENDS - 4
POWER DUYS W/BUMPER & TRIM - 4
POWER BUYS W/DISPLAYWALL BACK - 2
.ROLLING SAMPLING TABLE
FROZEN FOOD BLUFF
WALL OF VALUE BLUFF
DISPLAY WALL BLUFF
16' WINE RACK
ISLAND SPOT CASE END DISPLAYS - 4

ASSET DESCRIPTION

MATCO FLAV-R-FRESH DISPLAY

MADIX SHELVING
MADIX SHELVING
HUSSMAN SHELVING
HUSSMAN SHELVING
MADIX SHELVING
12 GLASS SHELVES
HUSSMAN LIGHTED SHELVING

ELECTRIC AIR CURTAINS - 2
AIR CURTAINS

HANDICAP CART
SUPPLY CABINET
LOAD KING PORTABLE DESK FOR MEAT
LOAD KING PORTABLE DESK
LOAD KING LOCKERS - 2
LOAD KING LOCKERS - 7
LOAD KING DESKS-PROD,DAIRY,MEAT - 3
LOAD KING DESK FOR SALAD PREP DEPT
PARTY FAVORS GONDOLA
LOCATION DECOR
LUXOR VIDEO CONSOLE
BICYCLE RACK
BRITE LITE INTERIOR NEON GRAPHICS
BLOWER
E-Z SHOPPER HANDICAP CARTS - 2
DIAPER DECK - 2
6' OAK BENCHES - 2
4' OAK BENCH
3' OAK BENCH
KEY-MAKING COUNTER
"DRY CLEANING" SIGN
WALL DECOR FOR WINE DEPT
COMPUTER INTERFACE
LOAD KING S S FREESTANDING DESK
TV/VCR COMBO
PERSON WEIGHER

SHOPPING CARTS

BACKROOM SUPPLIES

EXHIBIT "D"
TO LEASE

[Reserved]

06720/40153
LP I.D. No. 19

EXHIBIT "E"
TO LEASE

BASIC RENT PAYMENTS

1.  **Basic Rent.**    Basic Rent shall be $301,567.00 per
annum, payable on the first day of each March, June, September and
December commencing on December 1, 1994, and continuing thereafter
throughout the Initial Term (provided, however, if there is no
Extended Term, the final installment of the Initial Term shall be
made on August 31, 2014), in equal installments of $75,391.75 each,
except that if the Commencement Date shall not occur on September
1, 1994, the installment of Basic Rent due on the first Basic Rent
Payment Date shall be equal to the product of (a) the quarterly
rent installment and (b) the fraction whose numerator is the number
of days from (and including) the Commencement Date through (and
including) November 30, 1994 and whose dominator is ninety.

2.  **Basic Rent During Extended Terms.**    Basic Rent shall
be $301,567.00 per annum, payable on the first day of each March,
June, September and December commencing on December 1, 2014, and
continuing thereafter throughout each of the Extended Terms;
provided, however, the final payment of the last Extended Term
shall be made on the last August 31 occurring during the final
Extended Term of this Lease.

**EXHIBIT "F"**
**TO LEASE**

**PURCHASE PRICES**

The Cost of the Leased Premises is $3,215,000.00.   Upon the purchase of the Leased Premises by Tenant pursuant to paragraph 13(b), 14(g), 16 or 29 of this Lease, the purchase price payable shall be an amount equal to the sum of (i) the unpaid principal amount of the Note together with interest accrued and unpaid thereon and any applicable Make Whole Premium (based on Treasuries plus 50 basis points for paragraphs 16 and 29, and Treasuries plus 25 basis points for the penultimate sentence of paragraph 16) and (ii) the Equity Constant Percentage times the Cost of the Leased Premises plus $ 12,810.06 compounded quarterly at the rate of 10% per annum from the Commencement Date to the Termination Date.   The "Equity Constant Percentage" means the amount (calculated to 6 places to the right of the decimal point) determined by dividing $4,430,554.93 by $69,018,000.00.

### EXHIBIT "G"

### LESSEE ESTOPPEL CERTIFICATE

The undersigned, _____, a
_____ (the "Tenant") is the tenant or lessee under a
Lease Agreement (the "Lease") dated as of August 25, 1994, between
_____ and _____, a
_____, as Landlord (the "Landlord") of certain real property
located in _____ in the State of Texas as
described on attached Exhibit A (the "Premises"). With the
understanding that _____
("Lender") will rely upon the representations made herein in making
a loan of $_____ (the "Loan") to Landlord evidenced by a
_____ Promissory Note (the "Note") in said amount executed by
Landlord in favor of Lender and secured by a
_____ (the "Mortgage") creating a first lien on
the Premises and an Assignment of Leases and Rents creating a
direct and absolute assignment to Lender all of Landlord's rights,
title and interest as Landlord in and to the Lease, Tenant hereby
represents and certifies as follows:

1.    The Tenant is the owner and holder of all rights, title
and interest in the Lease.

[2.    The construction of the Improvements and installation of
the Equipment on the Premises have been substantially completed,
and such construction complies with the requirements of all laws,
ordinances, rules and regulations applicable thereto.]

3.    The Landlord does not have any unsatisfied obligations to
the Tenant arising out of or incurred in connection with the
construction of the Improvements on the Premises, the sale of the
Premises to the Landlord or the leasing of the Premises to the
Tenant, and no right of termination or offset exists with respect
to any rents or other sums payable or to become payable by the
Tenant under the Lease.

4.    All building permits [except certificates of occupancy],
if any, required for the operation of the Premises by the Tenant
have been obtained, and under applicable zoning and use laws,
ordinances, rules and regulations, as well as environmental
protection laws, the Premises may be used for the purposes
contemplated by the Tenant.

5.    The Lease is in full force and effect and has not been
modified, supplemented, canceled or amended in any respect except
as stated above.

6.    The term of the Lease commenced on _____, 1994, and
continues through at least _____, 20____. The Tenant is
obligated to pay rent in quarterly instalments in an amount not

less than $_____ each, which rent obligation is continuing and is not past due or delinquent in any respect. No instalment of rent has been or will be prepaid.

7.    The Premises comprise an approximately _____ square foot retail grocery store.

8.    No event has occurred or is continuing which would constitute a default by either the Tenant or the Landlord under the Lease or would constitute such a default but for the requirement that notice be given or that a period of time elapse or both. No offset exists with respect to any rents or other sums payable or to become payable by the Tenant under the Lease.

9.    Landlord hereby directs Tenant to make all rent and other payments directly to Lender until otherwise advised in writing by Lender. Landlord and Tenant hereby acknowledge the Landlord's authorization and direction to Tenant to make all payments due under the Lease directly to Lender (and whether or not any default ever occurs under the Note or Mortgage) after the date hereof to a bank designated in writing at least 10 business days prior to a rent payment date by Lender.

10.    The Tenant agrees to pay to Lender all rentals and any other sums due Landlord whatsoever under the Lease on the due date thereof without offset, counterclaim, deduction, defense, abatement, deferment or diminution for any reason (except as otherwise provided in paragraph 15 of the Lease), on or before such date such payments are due to the Landlord under the Lease and Tenant will not, for any reason whatsoever, seek to recover from Lender any monies paid to the Lender by virtue of the Lease notwithstanding that the Landlord shall not have had good right or lawful authority to lease the Premises to Tenant pursuant to the Lease.

11.    The Tenant agrees to deliver to Lender duplicate original copies of all notices, offers, undertakings, demands, statements, documents or other communications which it may deliver pursuant to the Lease.

12.    Any provisions of the Lease notwithstanding and so long as the Note is outstanding, Tenant agrees that it will not cause or permit any termination of the Lease by reason of the default of Landlord without first giving written notice to Lender ("Tenant's Notice") and affording to Lender the opportunity to cure the default within the periods (the "Cure Periods") hereinafter set forth. Tenant's Notice shall be set forth with particularity the nature and extent of Landlord's default. If such action requires only the payment of money, Lender shall have twenty (20) days from the date of its receipt of Tenant's Notice within which to cure the default. If such action requires more than the payment of money, Lender shall have sixty (60) days and shall have such additional

time as is necessary provided that Lender commences action to cure such default and diligently proceeds with said actions until the cure is complete. In this connection, Lender shall have the right, but not the obligation, to do any act or thing which is necessary or proper to be done in the performance or observance of the agreements, covenants and conditions of the Lease to be performed or observed by Landlord to prevent or avoid termination of the Lease by reason of Landlord's default. In any event, the Lease shall be and remain in full force and effect during the Cure Periods and thereafter if Landlord's default set forth in Tenant's Notice are timely cured within the Cure Period, and Tenant shall not withhold or reduce the rent or any instalment of rent during such Cure Period.

13. Without the prior written consent of the Lender, Tenant agrees not to enter into any agreement subordinating or terminating the Lease nor to enter into any agreement amending or modifying the Lease and any attempted subordination, amendment or termination shall be void. In the event that the Lease shall be amended, modified or supplemented with the Lender's prior written consent, the Lease as so amended, modified or supplemented shall continue to be subject to the provisions of this Certificate and Agreement. Tenant covenants and agrees with Lender that Tenant shall remain obligated under the Lease in accordance with its terms and that it will not take any action to terminate, rescind or avoid the Lease notwithstanding the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding up or other proceedings affecting the Landlord or any assignee of the Landlord, and notwithstanding any action with respect to the Lease which may be taken by an assignee or receiver of the Landlord or any such assignee or by any court in any such proceedings.

14. Tenant agrees that if pursuant to paragraph 13(b), 14(g), 16 or 29 of the Lease, the Tenant shall offer to purchase the Premises, or any part thereof, notice of acceptance of such offer shall be deemed validly given for all purposes if given by the Lender. If the Tenant shall become obligated to purchase the Premises, or any part thereof, pursuant to paragraph 13(b), 14(g), 16 or 29 of the Lease, a deed or other instrument conveying and transferring the Premises, or any part thereof, which is executed and delivered by the Lender, reciting Lender as agent and attorney in fact of the Landlord will be acceptable as being in compliance with the provisions of the Lease, provided that said deed or other instrument shall otherwise be in compliance with the provisions of the Lease. The Tenant further agrees that if it shall become necessary for the Lender or any other party to institute any foreclosure or other judicial proceeding so that the title to the Premises, or any part thereof, may be conveyed to the Tenant, the time permitted for the delivery of the deed or other instrument relating to such conveyance shall be extended to the extent necessary to permit the Lender or such other party to institute and conclude such foreclosure or other judicial proceedings, and the

3

Tenant agrees that the Lease shall not terminate but shall continue in full effect until the expiration of such period of extension; provided, however, that the Tenant may, in lieu of waiting for the conclusion of such foreclosure or other judicial proceedings, terminate the Lease upon the purchase by the Tenant from the Lender without warranty or recourse, the Note, the Mortgage and all of the Lender's interest under the other documents and instruments evidencing, governing and securing the Loan for a purchase price equal to the lesser of (1) the outstanding principal balance of the Note and the accrued interest thereon, or (2) the purchase price (as determined pursuant to paragraph 13(b), 14(g), 16 or 29 of the Lease) and further provided that if the Lender shall fail, refuse or be unable to sell to the Tenant the Note, the Mortgage and the Lender's interest under the loan documents evidencing the Loan, then the Lease shall terminate upon the expiration of 60 days following the Tenant's offer to purchase the same.

15.   This Certificate and Agreement may not be modified orally or in any manner other than by an agreement, in writing, signed by the parties hereto and their respective successors in interest. This Certificate and Agreement shall inure to the benefit of and be binding upon the parties hereto, and their respective successors and assigns, and to no other persons or entities, and any representations, warranties and agreements made herein shall survive the closing of the Loan between the Lender and Landlord.

16.   In the event title to the Premises, or any part thereof, is acquired or becomes vested in the Tenant (other than pursuant to paragraph 13(b), 14(g), 16 or 29 of the Lease), whether pursuant to the Lease or otherwise, there shall be no merger of estates and the Lease shall not terminate or be affected thereby.

17.   For so long as the Note is outstanding, Lender or its designee may upon reasonable notice enter upon the Premises during regular business hours to visit or inspect the Premises and discuss the affairs, finances and accounts of Tenant applicable to the property or the Lease at such reasonable times as Lender or its designee may request.

18.   Neither the execution, delivery or performance of the Lease or this Certificate and Agreement by Tenant violates any applicable law, order, writ, injunction or decree of any court or government authority of competent jurisdiction or results in any default under the terms of any agreement or instrument to which Tenant is a party or creates any lien, charge or encumbrance upon said property except those expressly created or permitted by the Lease.

19.   The Lease and this Certificate and Agreement have been duly authorized, executed and delivered by Tenant and constitute legal, valid and binding instruments enforceable against Tenant in accordance with their respective terms, except as such terms may be

4

limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally.

20. The provisions of the Lease, including the rents payable thereunder, were negotiated at arms length and no consent, authorization or approval of any government authority is necessary in connection with Tenant's execution, delivery or performance of the Lease or this Certificate and Agreement.

21. All notices, demands, requests or other communications to be given to Tenant or Lender pursuant hereto shall be in writing and shall be delivered by hand or sent by certified mail return receipt requested or by a reputable national service guaranteeing overnight delivery, postage prepaid, to (i) in the case of Tenant, _____, _____, Attention: _____, (b) in the case of Lender, _____, Attention: _____ _____, or (c) at such other address as the party to be notified shall have specified by notice in writing. Notices shall be effective upon receipt or upon refusal to accept delivery.

22. Except as set forth herein, between Landlord and Tenant, the execution and delivery of this Certificate and Agreement shall in no way expand the rights and obligations of the Landlord and Tenant arising under the Lease.

23. _____, a _____, as Guarantor of the Lease, represents, and certifies, that Tenant is Guarantor's wholly-owned subsidiary; and Guarantor joins in each and every representation, certificate and undertaking of Tenant.

24. THIS CERTIFICATE AND AGREEMENT AND THE REPRESENTATIONS MADE HEREIN SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS.

25. Any capitalized terms used in this Certificate and Agreement not otherwise herein defined shall have the same meaning as ascribed to such capitalized term in the Lease.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

In witness whereof, this Certificate has been duly executed and delivered by the authorized officers of the undersigned as of _____, 19_____.

TENANT:

_____.
a _____

By:_____
Name:_____
Title:_____

GUARANTOR:

_____
a _____

By:_____
Name:_____
Title:_____

**LANDLORD**

a _____

By: _____
Name: _____
Title: _____

**LENDER:**

a _____

By: _____
Name: _____
Title: _____

7