UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In Re:

WINN-DIXIE STORES, INC., et al.,

      Debtor,

Case No. 05-03817-3F1

Chapter 11

Jointly Administered

## MOTION OF SCHREIBER FOODS, INC. TO HAVE THE COURT SET A SPECIFIC DATE FOR THE DEBTOR TO ASSUME OR REJECT EXECUTORY CONTRACT, PURSUANT TO BANKRUPTCY CODE §365(D)(2)

This Motion is filed by Schreiber Foods, Inc. ("SFI"), an unsecured creditor of the Debtor, by and through its duly authorized undersigned counsel. Pursuant to this Motion and Bankruptcy Code §365(d)(2), SFI requests that the Court enter an order setting a specific date by which the Debtor must assume or reject the executory contract which SFI has with the Debtor. In support of this Motion, SFI represents and asserts as follows:

## BACKGROUND

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed their voluntary petitions for reorganization relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101-1330, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "New York Court"). The Debtors' cases are being jointly administered for procedural purposes only.

2.     The Debtors are currently operating their businesses and managing their properties as debtors-in-possession pursuant to §1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner.  In addition, the Office of the United States Trustee has appointed a Creditor's Committee to serve in these cases pursuant to Bankruptcy Code §§1102 and 1103.  The U.S. Trustee's office has also appointed an Equity Committee pursuant to Bankruptcy Code §§1102 and 1103.

3.     The Debtors are grocery and drug retailers operating in the southeast United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  According to papers previously filed in this case, the Debtors have represented to the Court that as of the Petition Date, the Debtors were considered to be the eighth largest food retailer in the United States and one of the largest in the southeast, with more than 900 stores in the United States. The Debtors have also announced to the Court and in public that they are engaged in a "footprint" reduction that is expected to result in the sale or closure of 326 or more stores.

4.     SFI is in the business of manufacturing and distributing various food products and the Debtor is one of its customers.  In this instance, the Debtor buys from SFI natural and processed cheese.

5.     The statutory predicates for the relief requested by this Motion are §365(d)(2) of the Bankruptcy Code, and such relief is subject to Rule 6006(b) and (c) and Rule 9001(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

6.     On or about April 2, 2002, SFI and the Debtor entered into a Supply Agreement under which SFI agreed to manufacture, sell and deliver to the Debtor, and the Debtor agreed to purchase, certain products that were grouped into the following classes:  (i) natural cheese; (ii)

processed cheese; and (iii) imitation cheese, as determined by the Code of Federal Regulations. A copy of the Supply Agreement is attached hereto, marked as Exhibit "A" and incorporated herein as if fully set forth at length.

7.    The Supply Agreement is an executory contract as defined by the Bankruptcy Code.

8.    Since the filing of the Debtors' Chapter 11 Petition, both parties have been performing under the Supply Agreement.

9.    Because the Debtors' purchases are what is known as "private labeled product," SFI maintains an inventory of the product with Debtors' logos and banners as per their terms of business.

10.    Historically, SFI maintains in its inventory at any one time Winn-Dixie printed packaging, cheese and ingredients inventory with a cost in excess of $1,000,000.00.

11.    SFI requires certainty in its dealings with the Debtor in order to manage packaging and product inventory levels, and wishes to not be left in doubt concerning its status vis-à-vis the Debtor.

## RELIEF REQUESTED

12.    By this Motion, SFI seeks entry of an Order pursuant to Bankruptcy Code §365(d)(2), Bankruptcy Rule 6006, and Bankruptcy Rule 9014 in which a date is set by which the Debtor must assume or reject the Supply Agreement with SFI, (Exhibit "A" hereto), and SFI specifically requests that the date be 30 days from that date from which the Court enters its Order on this Motion.

## BASIS FOR RELIEF

13.    Because it is a private label supplier of cheese products to the Debtor, and because the Supply Agreement has an annual target of 32,000,000 pounds of cheese products, SFI must maintain sufficient inventory of Winn-Dixie private label packaging and cheese products in order to meet the supply end of the agreement between the Debtor and SFI.

14.    In order for SFI to properly prepare and plan for its business, it needs a definitive decision from the Debtors about assumption or rejection of the Supply Agreement between the parties. The purpose of §365(d)(2) is to prevent parties in contractual relationships with a debtor from being left in doubt concerning their status vis-à-vis the estate or the future of their business with a debtor.

15.    Thirty days from the date in which the Court enters an Order on this Motion is a reasonable period of time, considering the fact that the Debtor has already been in Chapter 11 proceedings for approximately eight months.

## NOTICE

Notice of this Motion has been provided to (a) counsel of the United States Trustee, (b) counsel for the Debtors' post-petition secured lenders, (c) counsel for the Creditor's Committee, (d) counsel for the Equity Committee, and (e) the parties listed in the Local Rule 1007-2 Parties in Interest List maintained in these cases. No other or further notice need be given.

WHEREFORE, based upon the foregoing, SFI respectfully requests that the Court enter an Order setting a specific date within which the Debtor must assume or reject the executory contract with SFI, and for such other and further relief as this Court deems just and proper

DATED, this 7th day of October, 2005.


LIEBMAN, CONWAY, OLEJNICZAK & JERRY, S.C

By: S/
    Jerome E. Smyth, Esquire
    231 S. Adams Street
    P.O. Box 23200,
    Green Bay, Wisconsin 54305-3200
    920.437.0476
    920.437.2868 Facsimile
    jes@lcojlaw.com

    Co-Counsel for Schreiber Foods, Inc.


QUARLES & BRADY LLP

By:
    Ned R. Nashban, Esquire
    Florida Bar No. 717230
    Attorneys for Creditor
    One Lincoln Place
    1900 Glades Road, Suite 355
    Boca Raton, FL  33431
    561.368.5400
    561.368.1996 Facsimile
    nrn@quarles.com

    Co-Counsel for Schreiber Foods, Inc.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing *Motion of Schreiber Foods, Inc to Have the Court Set a Specific Date for the Debtor to Assume or Reject Executory Contract, Pursuant to Bankruptcy Code §365(d)(2)* has been served electronically and/or by First Class U.S. Mail, postage prepaid, to all Parties on the attached Local Rule 1007-2 Parties in Interest List, this 7th day of October, 2005.

QUARLES & BRADY LLP

By:

Ned R. Nashban, Esquire
Florida Bar No. 717230
nrn@quarles.com
Co-Counsel for Schreiber Foods, Inc.
1900 Glades Road
Suite 355
Boca Raton, FL   33431
561.368.5400 Telephone
561.368.1996 Facsimile

**ALL PRICES HAVE BEEN REDACTED BECAUSE OF CONFIDENTIALITY**

# EXHIBIT A



## SUPPLY AGREEMENT

**THIS SUPPLY AGREEMENT** (the "Agreement") is made effective this 2nd day of April, 2002, by and between WINN-DIXIE STORES, INC., a corporation organized and existing under the laws of the State of Florida (hereinafter referred to as "Winn-Dixie"), and SCHREIBER FOODS, INC., a Wisconsin corporation (hereinafter referred to as "SFI"). SFI and Winn-Dixie may be referred to individually as a "Party" or collectively as the "Parties".

## RECITALS:

**WHEREAS**, the Parties have entered into that certain Asset Purchase Agreement, dated the 2nd day of April, 2002 (the "Purchase Agreement"), pursuant to which SFI acquired from Winn-Dixie the facilities and certain assets used in connection with the manufacture and sale of natural and processed cheese and related food products, located in Gainesville, Georgia; and

**WHEREAS**, pursuant to the Purchase Agreement, SFI has agreed to manufacture, sell, and deliver to Winn-Dixie, and Winn-Dixie has agreed to purchase, Products (as defined below) under the terms and conditions set forth in this Agreement.

**NOW THEREFORE**, in consideration of the above recitals, and the mutual promises, covenants, terms and conditions set forth herein, the Parties agree as follows:

I.     **DEFINITIONS**.  Unless expressly provided otherwise, the terms in this Agreement shall have the meanings set forth below:

A.  "Advance" shall mean the sum of

B.  "Affiliates" shall have the meaning set forth in the Purchase Agreement.

C.  "Annual Target" means the sum of 32,000,000 pounds of Products.

D.  "Change of Control" means, in the case of Winn-Dixie, the acquisition by any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities and Exchange Act of 1934), other than the Davis family members and their Affiliates, directly or indirectly, in one or a series of related transactions, of (x) more than 35% of Winn-Dixie's total outstanding voting stock and (y) more voting stock than Davis family members and their Affiliates then beneficially own, or the sale, transfer, or other disposition of all or substantially all of the assets of Winn-Dixie (whether in a single transaction or series of related transactions), or the merger, reorganization or similar business combination of Winn-Dixie with a third-party, provided that Winn-Dixie is not the surviving entity.

E. "Change of Control" means, in the case of SFI, the sale, transfer, or other disposition of all or substantially all of the assets of SFI (whether in a single transaction or series of related transactions), or the merger, reorganization or similar business combination of SFI with a third-party, provided that SFI is not the surviving entity.

F. "Contract Year" means the twelve (12) month period coinciding with Winn-Dixies's fiscal year beginning on June 27, 2002 and during each successive fiscal year thereafter.

G. "Event of Default" shall be as defined in Section VIII(B) below.

H. "Force Majeure" shall mean a fire, flood, storm, strike, lockout, or other labor trouble, riot, war, terrorism, rebellion, accident, or acts of God.

I. "Product" or "Products" refers to and is limited to those items manufactured and/or processed pursuant to this Agreement and that are more fully described on attached **Exhibit A**, as modified from time to time by written agreement signed by SFI and Winn-Dixie.

J. "Product Line" means the grouping of the Products into each of the following classes: (i) natural cheese; (ii) processed cheese; and (iii) imitation cheese, as determined by the Code of Federal Regulations (and as amended from time to time), all as initially reflected on attached **Exhibit A**.

K. "Specifications" refers to and includes the Product specifications, quality standards and requirements presently in effect with respect to the Products and as determined mutually by the Parties from time to time.

L. "Term" shall be for a period of ten (10) years from the effective date of this Agreement or such shorter period ending with the earlier termination of this Agreement pursuant to its express provisions.

II. **SUPPLY OF PRODUCTS**. Subject to the provisions set forth herein, Winn-Dixie agrees to purchase exclusively from SFI, and SFI hereby agrees to sell to Winn-Dixie, all of Winn-Dixie's (including its subsidiaries') requirements of Products. The Parties agree to meet on a quarterly basis, at a time and place mutually agreeable to both Parties, to forecast the estimated quantities of Products required by Winn-Dixie by Product Line. The Parties agree that if at any time and from time to time during the Term (but no more than one time during any Contract Year) Winn-Dixie is able to procure a bona fide offer from a third party to supply all of a Product Line for a period between 355-370 consecutive days (the "Suspension Period") with pricing (the "Better Pricing") more favorable to Winn-Dixie than the then current pricing for such Products under this

2

Agreement (and not less favorable than 98% of the current pricing provided for herein), upon ten (10) business days' prior notice (the "Notice Period") to SFI, Winn-Dixie may accept such offer and be relieved of its purchase and exclusivity obligations under this Agreement with respect to such Product Line during the Suspension Period unless SFI agrees within the Notice Period to meet or beat the Better Pricing with respect to such Product Line during the Suspension Period. The Better Pricing of a Product Line offered by the third party must involve the supply of Products which are of substantially like kind, quality and volume to those Winn-Dixie shall purchase from SFI pursuant to the terms hereof. In no event shall any increase in the price of the Products under the Resolution of Patent Dispute entered into contemporaneously hereto be considered for purposes of the Better Pricing. All rebates herein shall be factored in to reduce the pricing of SFI compared to the Better Pricing proposal.

III.    **PRICE.** On the date of shipment for all periods after May 31, 2002, the price for Products shall be as determined in accordance with the attached **Exhibit B.**

IV.    **ADVANCE AND VOLUME ADJUSTMENTS.** In consideration for Winn-Dixie's covenant and promise (subject to the express provisions of this Agreement) to purchase its requirements for Products from SFI hereunder during the Term, SFI shall provide the Advance to Winn-Dixie by wire transfer immediately following execution of this Agreement. In the event this Agreement shall be terminated for any reason, then Winn-Dixie shall refund to SFI that portion of the Advance as indicated on **Exhibit C.** The foregoing rights of SFI shall in no way constitute any form of liquidated damages or otherwise invalidate or result in the waiver by SFI of any other right or remedy available to SFI under this Agreement, at law or in equity. In the event Winn-Dixie's (including its subsidiaries') purchases of Product during any Contract Year exceed the Annual Target, SFI shall make a payment to Winn-Dixie equal to        times the number of pounds of Product in excess of the Annual Target. In the event Winn-Dixie's (including its subsidiaries') purchases of Product during any Contract Year exceed 40,000,000 pounds, SFI shall make an additional payment to Winn-Dixie equal to        (in addition to the        provided in the preceding sentence) times the number of pounds in excess of 40,000,000 pounds. Commencing during Winn-Dixie's 2003 fiscal year, in the event Winn-Dixie's (including its subsidiaries') purchases of Product during any Contract Year are less than the Annual Target, Winn-Dixie shall make a payment to SFI equal to        times the difference between the Annual Target and the number of pounds of Product actually purchased by Winn-Dixie (and its subsidiaries) during the applicable fiscal year. Annual payments hereunder shall be made by the thirtieth (30th) day following the relevant Contract Year.

V.    **QUALITY OF PRODUCTS.**

A.    Warranty of Quality. SFI warrants and represents that, at the time of delivery, all Products supplied by SFI to Winn-Dixie pursuant to this Agreement shall comply

3

with the Specifications and all state and federal laws, rules, and regulations, as applicable to Products. Further, SFI guarantees, as of the time of such delivery, that the Products will not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act (the "Act"). However, to the extent the Products are packed, shipped or delivered under a label furnished by Winn-Dixie or mishandled by Winn-Dixie, this guaranty shall not apply as against misbranding resulting from the use of such labels or as a result of Winn-Dixie's mishandling, or other act(s) of negligence, with respect to the Products. In furtherance thereof, SFI agrees that Winn-Dixie may perform (at Winn-Dixie's sole expense), at any SFI facility that manufactures Product for delivery pursuant to this Agreement, annual quality control inspections. In addition, Winn-Dixie shall be entitled to reasonable periodic inspections of applicable SFI facilities following any recall of Products. Winn-Dixie agrees to abide by SFI's customary confidentiality procedures during any such plant visit, including the execution by Winn-Dixie and its agents of the form confidentiality agreement SFI requires a third party to execute prior to entry to SFI's facilities.

B.    <u>Product Guarantee and Return Procedure</u>. All Products packaged by SFI are guaranteed from the date of packaging until the expiration date on the package to be free from defects. No credits will be given pursuant to this Product guarantee unless the Products in question are returned to SFI. Notwithstanding the foregoing, SFI shall not be responsible to replace or reimburse Winn-Dixie for Products to the extent that the unacceptability of such Products resulted from the negligence or misconduct of Winn-Dixie (and/or its customers), in the handling or storage of the Products. All Products returned to SFI, regardless of reasons or credits sought, must be preceded by a communication relating the Product identification, number of cases or weight involved, reason for the return, anticipated return date and the method of return. Without prior agreement to the contrary, SFI must approve (which approval will not be unreasonably delayed or withheld) all return Product transport arrangements or the cost of such transportation shall be borne by Winn-Dixie. When Product is returned for full credit, SFI must be notified within ten (10) days following the expiration date on the package and have actual receipt of the Product within thirty (30) days from the date of SFI's approval of transport arrangements; provided, however, the ten (10) day limitation shall not apply if the return relates to Products that have been recalled as a result of an FDA recommendation or order or have been withdrawn by Winn-Dixie or any of its Affiliates as a result of a good faith belief such withdrawal is necessary to avoid a negative impact on sales. Upon receipt at SFI, quality assurance personnel will inspect all returned Product and evaluate the reasons for the return.

C.    <u>Labels and Packaging</u>. All labels must be approved by and meet Winn-Dixie's standards for quality and design, must be UPC scannable and must set forth SFI's

4

initials by the UPC code. SFI is responsible to assure all labels and packaging meets all governmental regulations, including with respect to the nutritional panel. All packages must have prominently marked an "open code date", "best if used date", or other code date (all of which shall be considered expiration dates for purposes of this Agreement) approved by Winn-Dixie, such approval not to be unreasonably withheld or delayed.

VI.    **DELIVERY OF PRODUCTS; TITLE & RISK OF LOSS**.

A.    <u>Product Order & Delivery</u>. At such time as Winn-Dixie desires Product, it shall submit a purchase order to SFI by mail, facsimile, e-mail, or such other method as agreed to in writing by the Parties, which sets forth the type and quantity of Products required and the requested delivery date. All Products ordered by Winn-Dixie shall be delivered F.O.B. at SFI's distribution facility. SFI agrees to ship all orders for Product within ten (10) business days of the effective date of such order. The Parties agree that the effective date for orders of Product shall be one (1) business day following the date SFI receives Winn-Dixie's purchase order. No purchase order of Winn-Dixie shall conflict with or supplement the terms or conditions of this Agreement unless SFI shall have specifically waived in writing any condition, term or agreement contained herein. All deliveries shall be made in accordance with Winn-Dixie's pallet policy as reflected in the latest version provided to SFI from time to time by Winn-Dixie. A copy of such policy on the date hereof is attached as **Exhibit D**.

B.    <u>Title</u>. Title to all Products SFI provides to Winn-Dixie pursuant to this Agreement shall pass to Winn-Dixie upon completion of delivery of the Products to the destination designated by Winn-Dixie. Should Winn-Dixie reject tender or revoke its acceptance of any Products, title to such Products shall pass to SFI at such time as the Products are loaded for delivery to SFI, F.O.B. Winn-Dixie's facility.

VII.    **PAYMENT**. SFI shall invoice Winn-Dixie for all Products sold and delivered under this Agreement on date of shipment, at the price established in Section III, above. Winn-Dixie shall pay all invoices by electronic funds transfer on or before the fifteenth (15th) day after receipt by Winn-Dixie of the Product at the applicable SFI distribution facility.

VIII.    **TERM; TERMINATION; EVENT OF DEFAULT**.

A.    <u>Term.</u> This Agreement shall be for the Term.

B.    <u>Event of Default</u>. Either Party may, in addition to other remedies available at law or equity, at any time during the continuation of an Event of Default terminate

5

this Agreement upon written notice to the other if (the occurrence of which is referred to as an "Event of Default") any of the following events occur:

(1)     *Material Breach.*  The other Party breaches a material obligation under this Agreement, other than a payment obligation which is the subject of Section VIII(B)(3) below, and such breach continues without cure for a period of fifteen (15) days after written notice thereof; provided, however, if the breach is not one which is capable of being cured within such 15 day period and the breaching Party has substantially commenced to cure the breach within such time and continues to do so diligently and in good faith, then the breaching Party shall be granted an extension for a reasonable period of time, not to exceed 45 days (including the initial fifteen (15) days) in any event.

(2)     *Cessation of Business.*  The other Party ceases to conduct business in the normal course, becomes insolvent, enters into suspension of payments, moratorium, reorganization or bankruptcy, makes a general assignment for the benefit of creditors, admits its inability to pay debts as they mature, suffers or permits the appointment of a receiver for its business or assets, or avails itself of or becomes subject (for more than 60 days if not voluntary) to any other judicial or administrative proceeding that relates to its insolvency or to the protection of the rights of its creditors.

(3)     *Failure to Pay Amounts Due.*  Winn-Dixie fails to pay any amount due hereunder, which failure is not remedied within fifteen (15) days following receipt by Winn-Dixie of a written demand for payment by SFI unless such payment is being withheld by Winn-Dixie in good faith in connection with a bona fide dispute between SFI and Winn-Dixie relating to a specific shipment(s) of Product, with such withholding to only apply to the specific shipment(s) of Product to which Winn-Dixie has asserted a dispute with reasonable particularity.

(4)     *Change of Control.*  Upon sixty (60) days advance written notice, and at the discretion of the Party not then subject to the Change of Control, such Party shall have the option to terminate this Agreement within 120 days following a Change of Control by the other Party.  Notwithstanding the foregoing sixty (60) day notice requirement, Winn-Dixie shall immediately refund the Advance to SFI in accordance with Section IV (and Exhibit C) upon receipt of SFI's written notice of SFI's election to terminate this Agreement based upon a Change of Control by Winn-Dixie.

6

## IX.  INDEMNIFICATION; INSURANCE; AND REMEDIES.

A.  <u>Indemnification of Winn-Dixie</u>. SFI agrees to protect, defend, indemnify and hold Winn-Dixie, its Affiliates and its and their officers, directors, shareholders, agents and employees (all of which shall be included within any reference to Winn-Dixie in this paragraph) harmless from and against any and all causes of action, suits, losses, liabilities, claims, demands, judgments, penalties, fines, proceedings, costs, expenses (including reasonable attorney's fees and costs as they are incurred), and damages whether foreseen or unforeseen at the present time and whether based upon law or equity, contract or tort, or whether judicial or administrative in nature, and whether based upon bodily injury, property damage or otherwise, related to or arising out of or in any manner connected with:

(1)  any breach of warranty or representations expressed by SFI herein;

(2)  any breach of any other duty, covenant, representation, warranty, or obligation assumed or to be performed by SFI under the terms of this Agreement; or

(3)  any claims, actions or suits (collectively, "Product Claims Indenmnified by SFI") brought by any person or entity against Winn-Dixie for the recovery of damages for the injury, emotional distress, illness and/or death of any person or damage to property arising out of the purchase, sale, consumption or exposure to Product sold by SFI to Winn-Dixie under this Agreement; or

(4)  any claims, actions or suits brought by any person or entity against Winn-Dixie with respect to the infringement of patent interests resulting from the purchase, sale and/or use of Product sold to Winn-Dixie under this Agreement, but excluding any claims, actions or suits related to the use of a Kustner Model KE Hot Fill Cheese Singles Machine (hereinafter "Kustner Model KE Machine") by Winn-Dixie or any Affiliate.

The foregoing shall be collectively referred to as "Claims Indemnified by SFI".

SFI shall, at its own expense and with counsel reasonably acceptable to Winn-Dixie, defend any Claim Indemnified by SFI that is the subject of this duty of indemnity and SFI shall pay all reasonable attorney's fees, costs and other expenses (including expenses of investigation and witnesses as they are incurred) arising therefrom. Winn-Dixie agrees to provide SFI with prompt notice following receipt of notice of any claim, legal proceeding or other action against Winn-Dixie that is the subject of this indemnification but any failure to do so will not reduce or otherwise affect SFI's indemnification obligations except to the

7

extent SFI is prejudiced thereby. In the event Winn-Dixie tenders the defense of a Claim Indemnified by SFI to SFI, SFI shall have sole and exclusive control over the defense and Winn-Dixie agrees to cooperate and/or provide such information or documents as may be necessary to defend the Claim. Nothing in this Section shall prevent Winn-Dixie from retaining, at its own expense, separate counsel to participate in the defense of such Claim. SFI agrees that it will not settle, consent to the entry of any judgment, or otherwise compromise any Claim without obtaining the prior written consent of Winn-Dixie, which Winn-Dixie agrees it shall not unreasonably withhold or delay. In no event shall consent be needed from Winn-Dixie for any monetary settlement not involving the payment of money by Winn-Dixie or any of its Affiliates. Winn-Dixie shall not be required to consent to any settlement involving the imposition of equitable remedies on Winn-Dixie or any of its Affiliates or the imposition of any other obligation on it other than financial obligations for which Winn-Dixie will be indemnified hereunder.

B.    <u>Indemnification of SFI</u>. Winn-Dixie agrees to protect, defend, indemnify and hold SFI and its Affiliates, officers, directors, shareholders, agents and employees (all of which shall be included within any reference to SFI in this paragraph), harmless from and against any and all causes of action, suits, losses, liabilities, claims, demands, judgments, penalties, fines, proceedings, costs, expenses (including reasonable attorney's fees and costs), and damages whether foreseen or unforeseen at the present time and whether based upon law or equity, contract or tort, or whether judicial or administrative in nature, and whether based upon bodily injury, property damage or otherwise, related to or arising out of or in any manner connected with the breach of any duty, covenant, representation, warranty or obligation assumed or to be performed by Winn-Dixie under the terms of this Agreement. The foregoing shall be collectively referred to as "Winn- Dixie Indemnified Claims."

Winn-Dixie shall, at its own expense and with counsel reasonably acceptable to SFI, defend any Winn-Dixie Indemnified Claim that is not subject to indemnification under Section IX(A) and Winn-Dixie shall pay all reasonable attorney's fees, costs and other expenses arising therefrom. SFI agrees to provide Winn-Dixie with prompt notice following receipt of notice of any legal proceeding or other action against SFI that is the subject of this indemnification, but any failure to do so will not reduce or otherwise affect Winn-Dixie's indemnification obligations except to the extent Winn-Dixie is prejudiced thereby. In the event SFI tenders the defense of a Winn-Dixie Indemnified Claim to Winn-Dixie, Winn-Dixie shall have sole and exclusive control over the defense and SFI agrees to cooperate and/or provide such information or documents as may be necessary to defend the Winn-Dixie Indemnified Claim. Nothing in this Section shall prevent SFI from retaining, at its own expense, separate counsel to

8

participate in the defense of such Winn-Dixie Indemnified Claim. Winn-Dixie agrees that it will not settle, consent to the entry of any judgment, or otherwise compromise any Winn-Dixie Indemnified Claim without obtaining the prior written consent of SFI, which SFI agrees it shall not unreasonably withhold. In no event shall consent be needed from SFI for any monetary settlement not involving the payment of money by SFI. SFI shall not be required to consent to any settlement involving the imposition of equitable remedies on SFI or the imposition of any other obligation on it other than financial obligations for which SFI will be indemnified hereunder.

C.   Right to Contribution. Notwithstanding anything in this Agreement to the contrary, SFI (and/or its insurers) shall have the right to pursue a claim for contribution or indemnity against Winn-Dixie to the extent of the proportion of damages found to be attributable to Winn-Dixie's negligence for any Claim Indemnified by SFI following a judicial determination and exhaustion of all appeals.

D.   Insurance. Each Party agrees that it will obtain and maintain in force during the Term and for one (1) year thereafter, with insurers reasonably acceptable to the other Party, comprehensive general liability and umbrella insurance coverage, providing usual and customary coverages of such insurance and including product liability/completed operations, contractual liabilities and vendors coverage, in coverage amounts of not less than $10,000,000.00 each occurrence and $50,000,000.00 general aggregate, subject to any customary deductibles or self-insurance amounts.

E.   Remedies. The remedies of the Parties as set forth in this Agreement are cumulative.

X.   **COVENANT NOT TO MANUFACTURE PRODUCTS.**

A.   Covenant. Winn-Dixie covenants and agrees that during the Term, and for one (1) year thereafter, it will not, whether directly or indirectly, and whether as owner, manager, operator, consultant, contractor or otherwise, manufacture the Products in the United States to or for the benefit of itself or for the benefit of any other person or entity other than SFI.

B.   Remedies. Winn-Dixie recognizes that irreparable injury may result to SFI in the event of a breach by Winn-Dixie of any of the covenants contained in this Section X and acknowledges that Winn-Dixie's agreement to be bound by the provisions of this Section X is a significant reason for SFI's decision to enter into this Agreement and the Asset Purchase Agremenent signed contempraneously hereto. In the event that Winn-Dixie shall engage in any act or behavior in violation of

9

these covenants, Winn-Dixie agrees that SFI shall be entitled, in addition to such other remedies and damages as may be available to it by law or under this Agreement, to preliminary and/or permanent injunctive relief, without the necessity of posting a bond, prohibiting Winn-Dixie from engaging in such act or behavior; provided, however, that if any court of record shall finally adjudicate that the involved restraint, as provided herein, is too broad as to the area or time covered, Winn-Dixie agrees that said area or time may be reduced to whatever extent the court deems reasonable and the restraint may be enforced as to such reduced area or time.    The provision of this paragraph shall survive the termination of this Agreement.

XI.     **NOTICES.**  Notices hereunder shall be in writing signed by the Party serving the same and shall be sent, if mailed, by Registered or Certified U.S. Mail, Return Receipt Requested, postage prepaid; by a nationally recognized overnight courier; by telefax; or by e-mail; and

If intended for Winn-Dixie, shall be addressed to:

> 5050 E. Edgewood Court
> Jacksonville, Florida 32254
> Attention:     Richard P. McCook
> Senior Vice President and
> Chief Financial Officer
> Phone:     (904) 783-5221
> Telefax:     (904) 783-5294
> e-mail: rickmccook@winn-dixie.com

and a copy to:

> Kenneth M. Kirschner, Esq.
> Kirschner & Legler, P. A.
> 300A Wharfside Way
> Jacksonville, FL 32207
> Phone:     (904) 346-3200
> Telefax:     (904) 346-3299
> e-mail: kmkirschner@leglerlaw.com

If intended for SFI, shall be addressed to:

> Schreiber Foods, Inc.
> 425 Pine Street
> P.O. Box 19010
> Green Bay, Wisconsin 54307-9010
> Attention:     Brian P. Liddy

10

JK 193845.4 80130 05059 04/02/02 01:33pm

Senior Vice President and
Chief Financial Officer

Phone:          (920) 455-6202
Telefax:        (920) 455-2226
e-mail: brian.liddy@schreiberfoods.com

and a copy to:          Gregory B. Conway, Esq.
Liebmann, Conway, Olejniczak & Jerry, S.C.
231 South Adams Street
P.O. Box 23200
Green Bay, Wisconsin 54305-3200
Phone:          (920) 437-0476
Telefax:        (920) 437-2868
e-mail: gbc@lcojlaw.com

Or to such other address as either Party may have furnished in a notice to the other from
time to time as a place for the service of notice. Any notice so mailed shall be deemed to
have been given as of the time said notice is received.

XII.    **CONFIDENTIAL INFORMATION.** Each Party acknowledges that in conducting its
operations, each employs certain trade secrets and other confidential and proprietary
information and know-how which are valuable, special, unique, and proprietary assets of
their respective businesses, and which each takes reasonable steps to protect from
disclosure to third parties (hereinafter "Confidential Information"). Each Party
acknowledges that as a result of the relationship between them, certain Confidential
Information (including, without limitation, volume, delivery, customer and pricing
information under this Agreement), may come into the possession of the other and/or its
key employees. Each Party agrees that it will not, except as may in good faith be
believed to be required by law, directly or indirectly make use of or knowingly disclose
to any third-parties, including guests or invitees, such Confidential Information without
first obtaining the prior written consent of the other or until such Party can establish that
the same shall have lawfully become a matter of public knowledge through no fault of the
recipient Party. All plant visits made by Winn-Dixie personnel or their representative(s)
to an SFI facility will require the signing of the standard SFI confidentiality agreement at
the time of the visit.

Each Party agrees that a breach of this covenant on Confidential Information will result in
irreparable and continuing damage to the non-breaching Party for which money damages
may not provide adequate relief. Each Party therefore agrees that breach of this covenant
concerning Confidential Information shall entitle the other to both preliminary and
permanent injunctive relief, as well as money damages insofar as they can be determined
under the circumstances, together with such other legal and equitable remedies as may be

11

available. This section concerning Confidential Information shall survive the expiration or termination of this Agreement.

XIII. **FORCE MAJEURE**. Excluding any payment obligations herein, if either Party hereto is prevented from complying either totally or in part, with any of the terms or provisions of this Agreement by reason of Force Majeure, then upon written notice to the other Party that based on such cause, the requirements of this Agreement, or such of its provisions as may be affected, to the extent affected, will be suspended and the performance of this Agreement by the Party affected by the Force Majuere may be suspended without causing a breach or default of this Agreement during the period of such disability (without, however, any concomitant extension of the Term);  provided, however, that any Party prevented from complying shall make all reasonable good faith efforts to remove such disability as soon as practicable.  Failure to make such reasonable good faith efforts shall constitute grounds for the termination of this Agreement by the other Party. Notwithstanding any provision of this Agreement to the contrary, should an event of Force Majeure prevent SFI from supplying Winn-Dixie's requirements of Product, SFI agrees to allocate and supply to Winn-Dixie its then available supply of Product on a basis that is substantially proportional to the volume of Product SFI allocates and supplies to similarly situated retail customers.  Such allocation shall be based on the then current volumes of Products purchased by Winn-Dixie and SFI's similarly situated retail customers.  Should the occurrence of an event of Force Majeure prevent SFI, or be reasonably expected to prevent SFI, from supplying Winn-Dixie with its requirements of Product beyond 45 days, Winn-Dixie shall have the right to enter into a requirements purchasing arrangement for such Products (and only such Product as SFI shall not be able to supply Winn-Dixie); provided, however, that SFI shall first have the right upon not less than five (5) business days advance notice to either agree to reimburse Winn-Dixie for the pricing difference between a long term commitment and shorter pricing commitment extended by the competitive supplier, or allow Winn-Dixie to enter into such long term supply commitment not to exceed 365 days in any instance (unless an event of Force Majeure continues, or could be expected to continue, for more than 365 consecutive days).

XIV. **INTELLECTUAL PROPERTY RIGHTS**.  Neither Party may use, without prior written consent, any patents, trademarks, trade names, trade secrets, copyright materials, trade dress or other similar intellectual property of the other Party.

XV. **ASSIGNMENT**.  This Agreement shall not be assignable by either Party except upon the written consent of the other Party, which such consent may be withheld for any reason whatsover.

XVI. **SUCCESSORS AND ASSIGNS**.  This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and their respective successors and assigns (as such are permitted).

12

XVII. **NON-WAIVER**.  The failure of Winn-Dixie or SFI to enforce any of the rights given to either of them under this Agreement, shall not be construed as a waiver of the right of Winn-Dixie or SFI to exercise any such rights as to any subsequent violations of such covenants, or as a waiver of any of the rights given to Winn-Dixie or SFI by reason of any of the other covenants of this Agreement.

XVIII. **CONSTRUCTION OF AGREEMENT**.  Words of any gender used in this Agreement shall be held to include any other gender, and word in the singular number shall be held to include the plural, when the sense requires.  Wherever used herein the words "Winn-Dixie" or "SFI" shall be deemed to include the heirs, personal representatives, successors, and permitted assignees of such Parties, unless the context excludes such construction.  All exhibits attached to this Agreement are a part of and are incorporated into this Agreement.  This Agreement has been drafted jointly by the Parties and shall not be construed against either Party.

XIX. **INVALIDITY OF PROVISIONS**.  If any term or provision of this Agreement or the application thereof to any person, entity or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to any person, entity or circumstance other than those to which it is held invalid or unenforceable, shall not be affected thereby.

XX. **HEADINGS**.  It is understood and agreed that the headings are inserted only as a matter of convenience and for reference, and in no way define, limit, or describe the scope or intent of this Agreement, nor in any way affect this Agreement.

XXI. **GOVERNING LAW**.  This Agreement shall be construed in accordance with the substantive laws of the State of Florida, without regard to the application of any conflict of law principles.

XXII. **NO RELATIONSHIP**.  This Agreement shall not constitute or be construed so as to give rise to a partnership or joint venture between the Parties.  All operations by either Party under the terms of this Agreement shall be carried on by such Party independently and not as agent of the other.  It is intended that Winn-Dixie and SFI shall at all times be independent of each other in all operations and actions under this Agreement.

XXIII. **INTEGRATION.**  This Agreement contains the entire agreement and understanding concerning the subject matter hereof between Winn-Dixie and SFI, and supercedes and replaces any and all prior negotiations, proposed agreements and agreements, written or oral.  Except as otherwise provided herein, this Agreement shall not be modified, amended or supplemented, and no provision of this Agreement shall be waived by purchase orders, acknowledgments of purchase orders, invoices or other documents exchanged between the Parties, except by an agreement in writing signed by both Parties.

XXIV. **COUNTERPARTS.**  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

XXV. **NO RIGHT OF SET OFF.**  Neither Party shall set off or declare an offset against any payment obligation to the other except as specifically provided herein.

XXVI. **COUNTERPARTS.**  This Agreement may be executed in one or more counterparts , each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[Signature page follows]

14

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their duly and lawfully authorized officers of legal representatives.

**WINN-DIXIE STORES, INC.**

By: _____

Name: Dennis M. Sheehan

Its: Sr. Vice President

**SCHREIBER FOODS, INC.**

By: _____

Name: Brian P. Liddy

Its: Senior Vice President

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly and lawfully authorized officers of legal representatives.

### WINN-DIXIE STORES, INC.

By: _____
       Name: _____
       Its: _____

### SCHREIBER FOODS, INC.

By: _____
       Name: ~~George W. Bowman~~ Brian P. Liddy
       Its: Senior Vice President Finance

**EXHIBIT A**

**PRODUCTS**

**[See attached 2 page Exhibit]**

**Winn Dixie Supply Agreement**
**Products by Category**

**Naturals:**

| CODE | UPC | PACK/SIZE | DESCRIPTION | SUPPLIER | ANNUAL MOVE. |
|------|-----|-----------|-------------|----------|--------------|
| 84591 | 34129 | 12    6 OZ. | FANCY SHREDDED SWISS CHEESE | Masters Gallery | 89,336 |
| 84884 | 34115 | 12    4 OZ. | SHREDDED CHEDDAR        (Conventional) | Masters Gallery | 78,000 |
| 85060 | 34180 | 12    8 OZ. | MILD CHEDDAR CUBE | Masters Gallery | 162,890 |
| 85061 | 34181 | 12    8 OZ. | COLBY JACK CHEDDAR CUBE | Masters Gallery | 142,740 |
| 85062 | 34182 | 12    8 OZ. | HOT PEPPER CHEDDAR CUBE | Masters Gallery | 181,740 |
| 84824 | 30755 | 12    8 OZ. | NO SALT ADDED CHEESE | McCadam Cheese | 60,840 |
| 84853 | 30765 | 12    8 OZ. | PEPPER JACK CHEESE | McCadam Cheese | 583,206 |
| 84876 | 30744 | 12    4 OZ. | Superbrand RFG ROMANO CHEESE WEDGE REGULAR 4OZ | WD Corporate | 12,372 |
| 84593 | 34200 | 12    6 OZ. | Superbrand RFG MOZZARELLA CHEESE STRING 6OZ | WD Corporate | 56,766 |
| 87946 | 30754 | 12  12 OZ. | Superbrand RFG MOZZARELLA CHEESE STRING 12OZ | WD Corporate | 122,739 |
| 84719 | 34190 | 12    5 OZ. | Superbrand RFG PARMESAN CHEESE GRATED 5OZ | WD Corporate | 27,627 |
| 84724 | 34191 | 13    5 OZ. | Superbrand RFG ROMANO CHEESE SHREDDED 5OZ | WD Corporate | 17,458 |
| 84738 | 34192 | 12  15 OZ. | Superbrand RFG REGULAR RICOTTA CHEESE WHOLE 15OZ | WD Corporate | 253,494 |
| 84740 | 34194 | 12  15 OZ. | Superbrand RFG REGULAR RICOTTA CHEESE PART SKIM 15OZ | WD Corporate | 149,541 |
| 84728 | 34196 | 12  15 OZ. | Superbrand RFG REGULAR RICOTTA CHEESE FAT FREE 15OZ | WD Corporate | 87,239 |
| 84733 | 34198 | 6   32 OZ. | Superbrand RFG REGULAR RICOTTA CHEESE PART SKIM 32OZ | WD Corporate | 230,810 |
| 84732 | 34199 | 6   32 OZ. | Superbrand RFG REGULAR RICOTTA CHEESE WHOLE 32OZ | WD Corporate | 298,115 |
| 84989 | 34103 | 12    8 OZ. | Superbrand ITALIAN GRATED CHEESE REGULAR 8OZ | WD Corporate | 84,820 |
| 84964 | 34114 | 24    3 OZ. | Superbrand RFG PARMESAN CHEESE GRATED 3OZ | WD Corporate | 117,117 |
| 84963 | 34121 | 12    8 OZ. | Superbrand RFG PARMESAN CHEESE GRATED 8OZ | WD Corporate | 519,368 |
| 87544 | 30655 | 6   48 OZ. | Superbrand RFG CHEESE FOOD CHEESE SLICE 48OZ | WD Corporate | 194,998 |
| 84771 | 30790 | 12  16 OZ. | Superbrand RFG SWISS CHEESE SLICED 16OZ | WD Corporate | 114,688 |
| 84886 | 30795 | 12    6 OZ. | Superbrand RFG SWISS CHEESE SLICED REGULAR 6OZ | WD Corporate | 89,985 |
| 84840 | 30600 | 12  12 OZ. | Superbrand RFG SWISS CHEESE SLICED 12OZ | WD Corporate | 92,510 |
| 84980 | 31025 | 12    6 OZ. | Superbrand RFG MOZZARELLA CHEESE SLICED 6OZ | WD Corporate | 107,394 |
| 84841 | 31035 | 12    8 OZ. | Superbrand RFG SWISS CHEESE SLICED REGULAR 8OZ | WD Corporate | 93,130 |
| 84981 | 31055 | 12    6 OZ. | Superbrand RFG PROVOLONE CHEESE SLICED 6OZ | WD Corporate | 82,979 |
| 84778 | 30743 | 12    4 OZ. | Superbrand RFG PARMESAN CHEESE WEDGE REGULAR 4OZ | WD Corporate | 28,943 |
| 917900 | | 1/40 LBS. | MILD CHEDDAR BLOCK | Great Lakes | 1,495,000 |
| 917902 | | 1/40 LBS. | QUESO BLANCO BLOCK | Great Lakes | 0 |
| 917940 | | 1/9 LBS. | DANISH CREAM HAVARTI | Great Lakes | 1,495 |
| 917945 | | 4/6 LBS. | IMPORTED SMOKED GOUDA (HOLLAND) | Great Lakes | 8,645 |
| 917964 | | 1/6 LBS. | DOMESTIC BLUE WHEEL CHEESE | Great Lakes | 2,236 |
| 917970 | | 2/8 LBS. | DOMESTIC SWISS CHEESE | Great Lakes | 20,800 |
| 917974 | | 4/15 LBS. | LONGHORN COLBY | Great Lakes | 8,190 |
| 917976 | | 2/5 LBS. | BABY SWISS ROUND | Great Lakes | 7,280 |
| 917981 | | 2/6 LBS. | RED RIND MUENSTER LOAF | Great Lakes | 4,680 |
| 917983 | | 2/6 LBS. | RINDLESS PROVOLONE | Great Lakes | 18,850 |
| 917986 | | 2/6 LBS. | MOZZARELLA LOAF | Great Lakes | 76,700 |
| 918020 | | 8/12 OZ. | MILD CHEDDAR CHUNK | Great Lakes | 6,370 |
| 918022 | | 8/12 OZ. | SWISS CHUNK | Great Lakes | 9,490 |
| 918023 | | 8/12 OZ. | MUENSTER SQ CHUNK | Great Lakes | 1,430 |
| 918026 | | 8/12 OZ. | COLBY JACK HALFMOON CHUNK | Great Lakes | 4,940 |
| 918027 | | 8/12 OZ. | COLBY HALFMOON CHUNK | Great Lakes | 0 |
| 918028 | | 8/12 OZ. | PEPPER JACK SQ CHUNK | Great Lakes | 10,400 |
| 918017 | | 12/12 OZ. | MILD CHEDDAR PARTY CUBE | Great Lakes | 1,300 |
| 918008 | | 12/12 OZ. | COLBY/JACK PARTY CUBE | Great Lakes | 1,755 |
| 918009 | | 12/12 OZ. | HOT PEPPER PARTY CUBE | Great Lakes | 2,925 |
| | 030720 | 12    8 OZ. | Mild Cheddar Stick | Gainesville Plant | 1,156,000 |
| | 030787 | 12    8 OZ. | Colby Stick | Gainesville Plant | 578,000 |
| | 030785 | 12    8 OZ. | Mozzarella Stick | Gainesville Plant | 651,000 |
| | 030780 | 12    8 OZ. | Monterey Jack Stick | Gainesville Plant | 423,500 |
| | 030745 | 12    8 OZ. | Muenster Stick | Gainesville Plant | 228,300 |
| | 030765 | 12    8 OZ. | PEPPER JACK STICK | Gainesville Plant | |
| | 030730 | 12    8 OZ. | Medium Cheddar Stick | Gainesville Plant | 976,900 |
| | 030735 | 12    8 OZ. | Sharp Cheddar Stick | Gainesville Plant | 1,142,000 |
| | 030740 | 12    8 OZ. | NY Sharp Cheddar Stick | Gainesville Plant | 337,200 |
| | 034130 | 12  10 OZ. | Half Moon LH Mild Ched Chk | Gainesville Plant | 327,200 |
| | 034132 | 12  10 OZ. | Half Moon LH Colby | Gainesville Plant | 181,300 |
| | 031000 | 12  12 OZ. | Mild Cheddar Chunk | Gainesville Plant | 98,100 |
| | 031020 | 12  12 OZ. | Sharp Cheddar Chunk | Gainesville Plant | 96,183 |
| | 032045 | 20  16 OZ. | Mild Cheddar Chunk | Gainesville Plant | 336,400 |
| | 032090 | 20  16 OZ. | Mozzarella Chunk | Gainesville Plant | 218,600 |
| | 032011 | 20  16 OZ. | Colby Jack Stick | Gainesville Plant | 203,300 |
| | 034146 | 20  16 OZ. | Halfmoon LH Mild Cheddar | Gainesville Plant | 68,120 |

**Winn Dixie Supply Agreement**
Products by Category

**Naturals:**

| CODE | UPC | PACK/SIZE | DESCRIPTION | SUPPLIER | ANNUAL MOVE. |
|------|-----|-----------|-------------|----------|--------------|
| | 032050 | 20 | 16 OZ. | Medium Cheddar Chunk | Gainesville Plant | 296,200 |
| | 032070 | 20 | 16 OZ. | Sharp Cheddar Chunk | Gainesville Plant | 157,200 |
| | 032080 | 20 | 16 OZ. | NY Sharp Cheddar Chunk | Gainesville Plant | 89,200 |
| | 032074 | 20 | 16 OZ. | NY Ex Shp Cheddar Chunk | Gainesville Plant | 90,200 |
| | 033036 | 20 | 16 OZ. | Old Fash Hoop Ched Wedge | Gainesville Plant | 125,800 |
| | 033038 | 20 | 16 OZ. | Sharp Daisy Style Ched | Gainesville Plant | 29,600 |
| | 032401 | 15 | 24 OZ. | Super Hunk Mild Cheddar | Gainesville Plant | 372,960 |
| | 032404 | 15 | 24 OZ. | Super Hunk Colby | Gainesville Plant | 276,400 |
| | 032405 | 15 | 24 OZ. | Super Hunk Mozzarella | Gainesville Plant | 221,700 |
| | 032406 | 15 | 24 OZ. | Super Hunk Monterey Jack | Gainesville Plant | 129,570 |
| | 032402 | 15 | 24 OZ. | Super Hunk Med Cheddar | Gainesville Plant | 412,290 |
| | 032403 | 15 | 24 OZ. | Super Hunk Sharp Cheddar | Gainesville Plant | 608,828 |
| | 034150 | 12 | 8 OZ. | Shredded Ched Zip Pak | Gainesville Plant | 419,460 |
| | 034151 | 12 | 8 OZ. | Shredded Mozz Zip Pak | Gainesville Plant | 421,854 |
| | 034113 | 12 | 8 OZ. | Shredded Sharp Cheddar | Gainesville Plant | 227,448 |
| | 034158 | 12 | 8 OZ. | Fcy Shred Cheddar Chs | Gainesville Plant | 841,244 |
| | 034159 | 12 | 8 OZ. | Fcy Shred LMPS Mozz | Gainesville Plant | 517,680 |
| | 034156 | 12 | 8 OZ. | Fcy Shred Pizza Combo | Gainesville Plant | 378,200 |
| | 034166 | 12 | 8 OZ. | Fcy Shred 4 Cheese Mex | Gainesville Plant | 173,718 |
| | 034175 | 12 | 8 OZ. | Shred Country Medley Blend | Gainesville Plant | 132,900 |
| | 034167 | 12 | 8 OZ. | Fcy Shred 4 Cheese Italian | Gainesville Plant | 126,288 |
| | 034148 | 12 | 8 OZ. | Fancy Shred Ched Jack | Gainesville Plant | 244,086 |
| | 034152 | 12 | 12 OZ. | Shredded Ched Zip Pak | Gainesville Plant | 161,550 |
| | 034153 | 12 | 12 OZ. | Shredded Mozz Zip Pak | Gainesville Plant | 214,650 |
| | 034154 | 12 | 16 OZ. | Shredded Ched Zip Pak | Gainesville Plant | 219,300 |
| | 034155 | 12 | 16 OZ. | Shredded Mozz Zip Pak | Gainesville Plant | 255,744 |
| | 034160 | 12 | 24 OZ. | Reg Shred Ched Cheese | Gainesville Plant | 163,200 |
| | 034161 | 12 | 24 OZ. | Reg Shred LMPS Mozz | Gainesville Plant | 159,600 |
| | 034185 | 10 | 40 OZ. | Fancy Shred Cheddar | Gainesville Plant | 209,300 |
| | 034186 | 10 | 40 OZ. | Fancy Shred Mozzarella | Gainesville Plant | 166,200 |

**Process:**

| CODE | UPC | PACK/SIZE | DESCRIPTION | SUPPLIER | ANNUAL MOVE. |
|------|-----|-----------|-------------|----------|--------------|
| 84965 | 30622 | 12 | 15 OZ. | CHEESE SAUCE - PLAIN | Great Lakes | 83,200 |
| 84993 | 30650 | 12 | 2 LB. | CHEESE SPREAD CARTON | Great Lakes | 326,170 |
| 84852 | 35017 | 24 | 10 OZ. | 16 SL SANDWICH SLICES | Great Lakes | 812,656 |
| 84842 | 30677 | 24 | 12 OZ. | Superbrand RFG SWISS PROCESSED CHEESE SLICE 12OZ | WD Corporate | 304,886 |
| 85008 | 30685 | 12 | 16 OZ. | Superbrand RFG CHEESE FOOD CHEESE SLICE 16OZ | WD Corporate | 831,193 |
| 917942 | | | 6/5 LBS. | WHITE AMERICAN LOAF | Great Lakes | 173,160 |
| 917943 | | | 4/5 LBS. | PRB SLICE 120 CT WHITE AMERICAN | Great Lakes | 891,800 |
| 917957 | | | 4/5 LBS. | PRB SLICE 120 CT YELLOW AMERICAN | Great Lakes | 1,427,660 |
| 917960 | | | 1/10 LBS. | ULTRA SHP PROCESS CHEDDAR | Great Lakes | 4,940 |
| 917987 | | | 6/5 LBS. | AMERICAN LOAF (YELLOW) | Great Lakes | 192,075 |
| 917994 | | | 2/5 LBS. | AMERICAN W/HOT PEPPER LOAF | Great Lakes | 10,400 |
| | 030693 | 24 | 8 OZ. | 12 SL IWS Ch FD | Gainesville Plant | 186,176 |
| | 030675 | 24 | 12 OZ. | 16 SL IWS Ch Fd Color | Gainesville Plant | 1,949,200 |
| | 030680 | 24 | 16 OZ. | 24 SL IWS Ch Fd | Gainesville Plant | 2,420,568 |
| | 038107 | 12 | 7 OZ. | P Farms Pim w/Pickles | Gainesville Plant | 78,367 |
| | 038110 | 12 | 7 OZ. | P Farms Pim Spread | Gainesville Plant | 164,400 |
| | 038105 | 12 | 7 OZ. | P Farms Pim w/Jalapeno | Gainesville Plant | 111,342 |
| | 038108 | 12 | 12 OZ. | P Farms Pim w/Pickles | Gainesville Plant | 173,124 |
| | 038111 | 12 | 12 OZ. | P Farms Pim Spread | Gainesville Plant | 488,376 |
| | 038112 | 12 | 12 OZ. | P Farms Chunky Spread | Gainesville Plant | 241,164 |
| | 038106 | 12 | 12 OZ. | P Farms Pim w/Jalapeno | Gainesville Plant | 202,824 |
| | 038109 | 12 | 12 OZ. | Lite Pim Regular (with veg-oil)  (Disc) | Gainesville Plant | 164,187 |
| | 038124 | 6 | 24 OZ. | Party Pack Pim Cheese | Gainesville Plant | 148,338 |

**Grand Total - Supply Agreement Baseline**    **32,014,010**

**EXHIBIT B**

<u>PRICE</u>

**EXHIBIT C**

**REFUND OF ADVANCE SCHEDULE**

| Contract Year of Termination | Refund |
|:---:|:---:|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |

## EXHIBIT D

## WINN-DIXIE PALLET REQUIREMENTS

Effective April 1, 2002

All wooden pallets used for products purchased by and shipped to Winn-Dixie through its warehouse/distribution centers must be either supplied by CHEP or PECO or meet the following specification for Grade A, GMA pallets.

Pallet Specifications For GMA-Grade A Pallet

1. 4 way entry
2. All hardwood
3. 6" lead board on top & bottom
4. No blocks, No corrugates, No metal plates, No pine, Good color
5. Flush lead boards
6. Minimum board thickness of 5/8"
7. Standard 5 bottom beveled board configuration
8. Standard 7 top board configuration
9. 48"x 40"

Product delivered to the warehouses on pallets that do not meet these specs will result in a charge of      per pallet plus the cost of restacking the product onto pallets supplied by Winn-Dixie that meet the above specification.