UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:                                      )
                                            )
WINN-DIXIE STORES, INC., et al.,            )        Case No. 05-03817-3F1
                                            )        Chapter 11
            Debtors.                        )
                                            )

NOTICE OF TRANSFER OF CLAIMS FOR SECURITY
(CLAIMS NO. 11036, 11037, 11889 AND 11890)

        First Commercial Bank ("FCB"), a secured creditor of Deerfoot Marketplace LLC

("Deerfoot"), hereby files its Notice of Transfer of Claims for Security (the "Notice") pursuant to

Rule 3001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") with respect

to the proofs of claim numbered 11036, 11037, 11889 and 11890 filed by Deerfoot (the "Proofs

of Claim"). In support of such Notice, FCB states as follows:

        1.      Pursuant to a lease dated December 19, 2001 (the "Lease"), Deerfoot, as

lessor, agreed to lease certain real estate to Winn-Dixie of Montgomery, Inc. ("WD-

Montgomery"), one of the debtors in the above-styled cases.

        2.      Pursuant to a Corporate Guaranty of Lease Obligations dated December

18, 2001 (the "Guaranty"), Winn-Dixie Stores, Inc., another debtor in the above-styled cases

("WD-Stores"), guaranteed the obligations of WD-Montgomery under the Lease.

        3.      On or about September 8, 2005, this Court entered an order granting the

motion of WD-Montgomery (and other affiliated debtors) to reject the Lease (the "Rejection

Order").

4.    Pursuant to (a) a Mortgage and Security Agreement and Assignment of Rents and Leases dated December 19, 2001 between Deerfoot and FCB (the "Mortgage"), (b) an Amendment to Mortgage, Assignment of Rents and Leases and Security Agreement dated March 1, 2002 between Deerfoot and FCB (the "Mortgage Amendment"), and (c) an Assignment of Rents and leases dated March 1, 2002 between Deerfoot and FCB (the "Assignment of Rents"), Deerfoot assigned its interest in the Lease and in all rents and proceeds derived therefrom to FCB to secure any and all obligations of Deerfoot to FCB.    True and correct copies of the duly recorded Mortgage, the Mortgage Amendment, and the Assignment of Rents are attached hereto respectively as Exhibits A , B, and C and incorporated herein by reference.

5.    Deerfoot is indebted to FCB, and such indebtedness is secured by the Mortgage, the Mortgage Amendment, and the Assignment of Rents.

6.    WD-Montgomery's rejection of the Lease constitutes a breach of the Lease and an Event of Default under the Mortgage, Mortgage Amendment, and Assignment of Rents.    As a result of such Events of Default, FCB is entitled to collect any and all rents and other sums due under the Lease.

7.    Deerfoot has filed the four Proofs of Claims with respect to its claims under the Lease and the Guaranty for rents and other sums due under the Lease.    Specifically, Deerfoot has filed (a) a proof of claim in the amount of $23,109.12 against WD-Stores on or about August 1, 2005 (claim no. 11036), (b) a proof of claim in the amount of $23,109.12 against WD-Montgomery on or about August 1, 2005 (claim no. 11037), (c) a proof of claim in the amount of $1,644,921.94 against WD-Stores on or about October 7, 2005 (claim no. 11889), and

(d) a proof of claim in the amount of $1,644,921.94 against WD-Montgomery on or about October 7, 2005 (claim no. 11890).

8.    Pursuant to Bankruptcy Rule 3001(e), FCB hereby gives notice that the Proofs of Claims were transferred by Deerfoot to FCB prior to the filing of the Proofs of Claims as security for its outstanding obligations to FCB.

9.    No agreement has yet been reached between FCB and Deerfoot regarding their relative rights respecting voting of the Proofs of Claims, payment of dividends thereon, or participation in the administration of the Debtors' estates.   FCB asserts that it is entitled to exercise all of such rights pursuant to its agreements with Deerfoot.

Respectfully submitted this the 17th day of October, 2005.

/s/ Danielle K. Greco
Jay R. Bender
Danielle K. Greco
Counsel for First Commercial Bank

**OF COUNSEL:**
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Phone:  (205) 521-8000
Fax:  (205) 521-8800

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the above and foregoing on:

Deerfoot Marketplace, LLC
c/o Dick Schmalz
RGS Properties, Inc.
6 Office Park Circle, Suite 100
Birmingham, AL  35223

Edward J. Ashton, Esq.
Counsel for Deerfoot Marketplace LLC
Walston, Wells, Anderson & Bains, LLP
One Federal Place
1819 5th Avenue North, Suite 1100
Birmingham, AL 35203

by placing a copy of same in the United States Mail, first-class postage prepaid and addressed to
their regular mailing address, on this 17th day of October, 2005.


/s/ Danielle K. Greco
OF COUNSEL

EXHIBIT A

*O K*
*pv*

200116/0735

**THIS MORTGAGE AND SECURITY AGREEMENT SERVES AS A FINANCING STATEMENT FILED AS A FIXTURE FILING, PURSUANT TO SECTION 7-9-402(6), CODE OF ALABAMA, 1975, AS AMENDED.**

STATE OF ALABAMA            )
                            )
COUNTY OF JEFFERSON         )

## MORTGAGE AND SECURITY AGREEMENT AND ASSIGNMENT OF RENTS AND LEASES

THIS MORTGAGE AND SECURITY AGREEMENT AND ASSIGNMENT OF RENTS AND LEASES, made this *19* day of *December*, 2001, between **DEERFOOT MARKETPLACE, LLC**, an limited liability company, (hereinafter called the "Borrower"), Mortgagor, whose address is c/o Dick Schmalz, RGS Properties, Inc., 6 Office Park Circle, Suite 100, Birmingham, Alabama 35223, and **FIRST COMMERCIAL BANK**, an Alabama banking corporation (hereinafter called the "Lender"), Mortgagee, whose address is 800 Shades Creek Parkway, Birmingham, Alabama 35209.

## WITNESSETH

WHEREAS, Borrower is justly indebted to Lender in the principal sum of $1,200,000 pursuant to a loan in said initial principal amount (the "Loan") said Loan being evidenced by a Promissory Note in said principal amount made payable to the order of Lender (the "Note"); and

WHEREAS, as a condition to making the Loan, Lender has required that Borrower mortgage, pledge, assign, and convey to it the real estate and interests more particularly described herein.

NOW, THEREFORE, the undersigned, in consideration of the indebtedness above mentioned, and to secure the prompt payment of same, with the interest thereon, and any extensions or renewals of same, and further to secure the performance of the covenants, conditions and agreements hereinafter set forth, and to secure all other indebtedness of every description of Borrower to Lender, have bargained and sold and do hereby grant, bargain, sell, alien and convey unto the Lender, its successors and assigns, the following described land, real estate, buildings, improvements, fixtures, furniture, and other personal property (which together with any additional such property hereafter acquired by the Borrower and subject to the lien of this Mortgage, or intended to be so, as the same may be from time to time constituted is hereinafter sometimes referred to as the "Mortgaged Property") to-wit:

915185.1

(a)      All that tract or parcel of land particularly described in Exhibit A attached hereto and made a part hereof.

(b)      All buildings, structures, and improvements of every nature whatsoever now or hereafter situated on the property described in Exhibit A, and all fixtures, machinery, equipment, furniture and furnishings and personal property of every nature whatsoever now or hereafter owned by the Borrower and located in, on, or used or intended to be used in connection with or with the operation of said property, buildings, structures or other improvements, including all extensions, additions, improvements, betterments, renewals and replacements to any of the foregoing.

(c)      All building materials, equipment, fixtures, fittings and personal property of every kind or character now owned or hereafter acquired by the Borrower for the purpose of being used or useful in connection with the improvements located or to be located on the real estate described herein, whether such materials, equipment, fixtures, fittings and personal property are actually located on or adjacent to said real estate or not, and whether in storage or otherwise, wheresoever the same may be located, including, but without limitation, all lumber and lumber products, bricks, building stones and building blocks, sand and cement, roofing material, paint, doors, windows, hardware, nails, wires and wiring, plumbing and plumbing fixtures, heating and air conditioning equipment and appliances, electrical and gas equipment and appliances, pipes and piping, ornamental and decorative fixtures, furniture, ranges, refrigerators, dishwashers, disposals, and in general all building materials and equipment of every kind and character used or useful in connection with said improvements.

**TOGETHER** with all easements, rights of way, gores of land, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments, and appurtenances whatsoever, in any way belonging, relating or appertaining to any of the property hereinabove described, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by the Borrower, and the reversion and reversions, remainder and remainders, rents, issues, and profits thereof, and all the estate, right, title, interest, property, possession, claim and demand whatsoever at law, as well as in equity, of the Borrower of, in and to the same, including but not limited to:

(a)      All rents, profits, issues and revenues of the Mortgaged Property from time to time accruing, whether under leases or tenancies now existing or hereafter created, reserving to Borrower, however, so long as Borrower is not in default hereunder, the right to receive and retain the rents, issues and profits thereof; and

(b)      All judgments, awards of damages and settlements hereafter made resulting from condemnation proceedings or the taking of the premises or any part thereof under the power of eminent domain, or for any damage (whether caused by such taking or otherwise) to the premises or the improvements thereon or any part thereof, or to any rights appurtenant thereto, including any award for change of grade of streets. Lender is hereby authorized on behalf and in the name of Borrower to execute and deliver valid acquittances for, and appeal from, any such judgments or

awards. Lender may apply to all such sums or any part thereof so received, after the payment of all its expenses, including costs and attorney's fees, on the indebtedness secured hereby in such manner as it elects, or at its option, the entire amount or any part thereof so received may be released.

**TO HAVE AND TO HOLD** the Mortgaged Property and all parts thereof unto the Lender, its successors and assigns forever, subject however to the terms and conditions herein:

**PROVIDED, HOWEVER,** that these presents are upon the condition that, if the Borrower shall pay or cause to be paid to the Lender the principal and interest payable in respect to the Note, at the times and in the manner stipulated therein and herein, all without any deduction or credit for taxes or other similar charges paid by the Borrower, and shall keep, perform and observe all and singular the covenants and promises in the Note, and in this Mortgage expressed to be kept, performed, and observed by and on the part of the Borrower, and all other indebtedness of every description owed by Borrower to Lender, all without fraud or delay, then this Mortgage, and all the properties, interest and rights hereby granted, bargained, and sold shall (except as provided in Section 1.14 hereof) cease, determine and be void, but shall otherwise remain in full force and effect.

**AND** the Borrower covenants and agrees with the Lender as follows:

## ARTICLE I

1.01. **Performance of Note and Mortgage.** The Borrower will perform, observe and comply with all provisions hereof and of the Note secured hereby and will duly and punctually pay to the Lender the sum of money expressed in the Note with interest thereon and all other sums required to be paid by the Borrower pursuant to the provisions of this Mortgage, and will perform, fulfill and pay all its obligations under all other security agreements, guaranty agreements, pledges, assignments, notes and other documents, writings and instruments (collectively, with the Note and the Mortgage, the "Loan Documents"), all without any deductions or credit for taxes or other similar charges paid by the Borrower.

1.02. **Warranty of Title.** The Borrower is lawfully seized of an indefeasible estate in fee simple in the land and real property hereby Mortgaged and has good and absolute title to all existing personal property hereby Mortgaged and has good right, full power and lawful authority to sell, convey and mortgage the same in the manner and form aforesaid; that, except as otherwise set forth on Exhibit A hereto, the same is free and clear of all liens, charges, and encumbrances whatsoever, including, as to the personal property and fixtures, conditional sales contracts, chattel Mortgages, security agreements, financing statements, and anything of a similar nature, and that Borrower shall and will warrant and forever defend the title thereto unto the Lender, its successors and assigns, against the lawful claims of all persons whomsoever.

1.03. **Monthly Tax Deposits.** If required by the Lender, the Borrower will pay to the Lender on the first day of each month together with and in addition to the regular payment of

interest, until the Note are fully paid, an amount equal to one-twelfth (1/12) of the yearly taxes and assessments as estimated by the Lender to be sufficient to enable the Lender to pay, at least thirty (30) days before they become due, all taxes, assessments, and other similar charges against the Mortgaged Property or any part thereof. Such added payments shall not be, nor be deemed to be, trust funds, but may be commingled with the general funds of the Lender; and no interest shall be payable in respect thereof. Upon demand of the Lender, the Borrower agrees to deliver to the Lender such additional moneys as are necessary to make up any deficiencies in the amounts necessary to enable the Lender to pay such taxes, assessments and similar charges. In the event of a default by the Borrower in the performance of any of the terms, covenants or conditions in the Note, the Loan Documents or Mortgage, the Lender may apply to the reduction of the sums secured hereby, in such manner as the Lender shall determine, any amount under this Section 1.03 remaining to the Borrower's credit.

**1.04. Other Taxes, Utilities and Liens.**

(a)    The Borrower will pay promptly, when and as due, and will promptly exhibit to the Lender receipts for the payment of, all taxes, assessments, water rates, dues, charges, fines and impositions of every nature whatsoever imposed, levied or assessed or to be imposed, levied or assessed upon or against the Mortgaged Property or any part thereof, or upon the interest of the Lender in the Mortgaged Property (other than any of the same for which provision has been made in Section 1.03 hereof), as well as all income taxes, assessments and other governmental charges lawfully levied and imposed by the United States of America or any state, county, municipality, borough or other taxing authority upon the Borrower or in respect of the Mortgaged Property or any part thereof, or any charge which, if unpaid, would become a lien or charge upon the Mortgaged Property prior to or equal to the lien of this Mortgage for any amounts secured hereby or would have priority or equality with this Mortgage in distribution of the proceeds of any foreclosure sale of the Mortgaged Property or any part thereof.

(b)    The Borrower will promptly pay all charges by utility companies, whether public or private, for electricity, gas, water, sewer or other utilities.

(c)    The Borrower shall promptly pay and will not suffer any mechanic's, laborer's, statutory or other lien which might or could be prior to or equal to the lien of this Mortgage to be created or to remain outstanding upon any of the Mortgaged Property.

(d)    In the event of the passage of any state, federal, municipal or other governmental law, order, rule or regulation, subsequent to the date hereof, in any manner changing or modifying the laws now in force governing the taxation of mortgages or debts secured by mortgages or the manner of collecting taxes so as to affect adversely the Lender, the entire balance of the principal sum secured by this Mortgage and all interest accrued thereon shall without notice become due and payable forthwith at the option of the Lender.

915185.1                          4

1.05. **Insurance.** The Borrower will procure for, deliver to, and maintain for the benefit of, the Lender during the life of this Mortgage, insurance policies, in such amounts as the Lender shall require, insuring the Mortgaged Property against fire, extended coverage, war damage (if available), and such other insurable hazards, casualties and contingencies as the Lender may require. The form of such policies and the companies issuing them shall be acceptable to the Lender. All policies shall contain a New York standard, non-contributory mortgagee endorsement making losses payable to the Lender. At least fifteen (15) days prior to the expiration date of all such policies, renewals thereof satisfactory to the Lender shall be delivered to the Lender. The Borrower shall deliver to the Lender receipts evidencing the payment of all such insurance policies and renewals. In the event of the foreclosure of this Mortgage or any other transfer of title to the Mortgaged Property in extinguishment of the indebtedness secured hereby, all right, title and interest of the Borrower in and to all insurance policies then in force shall pass to the purchaser or grantee.

The Lender is hereby authorized and empowered, at its option, to adjust or compromise any loss under any insurance policies on the Mortgaged Property, and to collect and receive the proceeds from any such policy or policies. Each insurance company is hereby authorized and directed to make payment for all such losses, directly to the Lender, instead of to the Borrower and Lender jointly. After deducting from said insurance proceeds any expenses incurred by it in the collection or handling of said fund, the Lender may apply the net proceeds, at its option, either toward restoring the improvements, or as a credit on any portion of the Mortgage indebtedness selected by it, whether then matured or to mature in the future, or at the option of the Lender, such sums either wholly or in part may be paid over to the Borrower to be used to repair such buildings or to build new buildings in their place or for any other purpose or object satisfactory to the Lender without affecting the lien of the Mortgage for the full amount secured hereby before such payment took place. Lender shall not be held responsible for any failure to collect any insurance proceeds due under the terms of any policy regardless of the cause of such failure.

If required by the Lender, the Borrower will pay to the Lender on the first day of each month, together with and in addition to the regular payment of interest and monthly tax deposit (as required by Section 1.03 hereof) until the Note are fully paid, an amount equal to one-twelfth (1/12) of the yearly premiums for insurance. Such amount shall be used by Lender to pay such insurance premiums when due. Such added payments shall not be, nor be deemed to be, trust funds, but may be commingled with the general funds of the Lender, and no interest shall be payable in respect thereof. Upon demand of the Lender, the Borrower agrees to deliver to the Lender such additional moneys as are necessary to make up any deficiencies in the amounts necessary to enable the Lender to pay such insurance premiums. In the event of a default by the Borrower in the performance of any of the terms, covenants and conditions in the Note, this Mortgage or the other Loan Documents, the Lender may apply to the reduction of the sums secured hereby, in such manner as the Lender shall determine, any amount paid in accordance herewith remaining to the Borrower's credit.

1.06. **Condemnation.** If all or any part of the Mortgaged Property shall be damaged or taken through condemnation (which term when used in this Mortgage shall include any damage or taking by any governmental authority, and any transfer by private sale in lieu thereof), either

temporarily or permanently, the entire indebtedness secured hereby shall at the option of the Lender become immediately due and payable. The Lender shall be entitled to compensation, awards, and other payments or relief therefor and is hereby authorized, at its option, to commence, appear in and prosecute, in its own or the Borrower's name, any action or proceedings relating to any condemnation, and to settle or compromise any claim in connection therewith.  All such compensation, awards, damages, claims, rights of action and proceeds and the right thereto are hereby assigned by the Borrower to the Lender, who, after deducting therefrom all its expenses, including attorney's fees, may release any moneys so received by it without affecting the lien of this Mortgage or may apply the same in such manner as the Lender shall determine to the reduction of the sums secured hereby, and any balance of such moneys then remaining shall be paid to the Borrower. The Borrower agrees to execute such further assignments of any compensations, awards, damages, claims, rights of action and proceeds as the Lender may require.

### 1.07.   Care of the Property.

(a)   The Borrower will preserve and maintain the Mortgaged Property in good condition and repair, and will not commit or suffer any waste and will not do or suffer to be done anything which will increase the risk of fire or other hazard to the Mortgaged Property or any part thereof.

(b)   Except as otherwise provided herein, no buildings, fixtures, personal property, or other part of the Mortgaged Property shall be removed, demolished or substantially altered without the prior written consent of the Lender. The Borrower may sell or otherwise dispose of, free from the lien of this Mortgage, furniture, furnishings, equipment, tools, appliances, machinery, fixtures or appurtenances, subject to the lien hereof, which may become worn out, undesirable, obsolete, disused or unnecessary for use in the operation of the Mortgaged Property, not exceeding in value at the time of disposition thereof One Thousand Dollars ($1,000.00) for any single transaction, or a total of Five Thousand Dollars ($5,000.00) in any one year, upon replacing the same by, or substituting for the same, other furniture, furnishings, equipment, tools, appliances, machinery, fixtures, or appurtenances not necessarily of the same character, but of at least equal value to the Borrower and costing not less than the amount realized from the property sold or otherwise disposed of, which shall forthwith become, without further action, subject to the lien of this Mortgage.

(c)   If the Mortgaged Property or any part thereof is damaged by fire or any other cause, the Borrower will give immediate written notice of the same to the Lender.

(d)   The Lender is hereby authorized to enter upon and inspect the Mortgaged Property at any time during normal business hours.

(e)   The Lender is hereby authorized to cause the Mortgaged Property to be appraised and reappraised from time to time, as deemed necessary by the Lender, whether or not an Event of Default has occurred hereunder, and the Borrower agrees to pay all expenses incurred by

the Lender in connection therewith. Bank agrees to pay the cost of any appraisal required in excess of one per calendar year.

(f)     The Borrower will promptly comply with all present and future laws, ordinances, rules and regulations of any governmental authority affecting the Mortgaged Property or any part thereof, including, without limitation, the Americans with Disabilities Act.

(g)     If all or any part of the Mortgaged Property shall be damaged by fire or other casualty, the Borrower will promptly restore the Mortgaged Property to the equivalent of its original condition, regardless of whether or not there shall be any insurance proceeds therefor. If a part of the Mortgaged Property shall be physically damaged through condemnation, the Borrower will promptly restore, repair or alter the remaining property in a manner satisfactory to the Lender.

1.08.   **Further Assurances; After Acquired Property.** At any time, and from time to time, upon request by the Lender, the Borrower will make, execute and deliver or cause to be made, executed and delivered, to the Lender and, where appropriate, to cause to be re-recorded and/or filed and from time to time thereafter to be re-recorded and/or re-filed at such time and in such offices and places as shall be deemed desirable by the Lender any and all such other and further mortgages, instruments of further assurance, certificates and other documents as may, in the opinion of the Lender, be necessary or desirable in order to effectuate, complete, enlarge, or perfect, or to continue and preserve the obligations of the Borrower under the Note, this Mortgage or the other Loan Documents, and the lien of this Mortgage as a first and prior lien upon all of the Mortgaged Property, whether now owned or hereafter acquired by the Borrower. Upon any failure by the Borrower so to do, the Lender may make, execute, and record any and all such mortgages, instruments, certificates, and documents for and in the name of the Borrower and the Borrower hereby irrevocably appoints the Lender the agent and attorney-in-fact of the Borrower so to do. The lien hereof will automatically attach, without further act, to all after acquired property attached to and/or used in the operation of the Mortgaged Property or any part thereof.

1.09.   **Leases Affecting Mortgaged Property.** The Borrower will comply with and observe its obligations as landlord under all leases affecting the Mortgaged Property or any part thereof. If requested by Lender, Borrower will furnish Lender with executed copies of all leases now or hereafter created on said premises; and all leases now or hereafter entered into will be in form and substance subject to the approval of Lender. Borrower will not accept payment of rent more than one (1) month in advance without the express written consent of Lender. Borrower assigns to the Lender as additional security all such leases, whether now existing or hereafter created, including, without limitation, all rents, royalties, issues and profits of the premises from time to time accruing, and will not cancel, surrender or modify any lease so assigned without the written consent of the Lender.

1.10.   **Expenses.** The Borrower will pay or reimburse the Lender for all reasonable attorney's fees, costs and expenses incurred by the Lender in any action, proceeding or dispute of any kind in which the Lender is made a party, or appears as party plaintiff or defendant, affecting the

Note, this Mortgage, the other Loan Documents, Borrower or the Mortgaged Property, including but not limited to the foreclosure of this Mortgage, any condemnation action involving the Mortgaged Property, or any action to protect the security hereof; and any such amounts paid by the Lender shall bear interest at the Default Rate, shall be payable upon demand, and shall be secured by the lien of this Mortgage.

1.11.    **Performance by Lender of Defaults by Borrower.**  If the Borrower shall default in the payment of any tax, lien, assessment or charge levied or assessed against the premises; in the payment of any utility charge, whether public or private; in the payment of insurance premiums; in the procurement of insurance coverage and the delivery of the insurance policies required hereunder; or in the performance or observance of any covenant, condition or term of this Mortgage, then the Lender, at its option, may perform or observe the same, and all payments made for costs or expenses incurred by the Lender in connection therewith, shall be secured hereby and shall be, without demand, immediately repaid by the Borrower to the Lender with interest thereon at the Default Rate. The Lender shall be the sole judge of the legality, validity and priority of any such tax, lien, assessment, charge, claim and premium; of the necessity for any such actions and of the amount necessary to be paid in satisfaction thereof.  The Lender is hereby empowered to enter and to authorize others to enter upon the premises or any part thereof for the purpose of performing or observing any such defaulted covenant, condition or term, without thereby becoming liable to the Borrower or any person in possession holding under the Borrower.

1.12.    **Books and Records.**  The Borrower shall keep and maintain at all times full, true and accurate books of accounts and records, adequate to reflect correctly the results of the operation of the Mortgaged Property.  The Borrower will furnish to the Lender within ninety (90) days after the end of the Borrower's fiscal year, a balance sheet and a statement of income and expenses, both in reasonable detail and form satisfactory to Lender and certified by the Borrower (or a member, manager, or other officer thereof), and audited by a Certified Public Accountant satisfactory to the Lender, and a rent schedule of the Mortgaged Property, certified by the Borrower (or a member, manager, or other officer thereof), showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date and the rent paid.

1.13.    **Estoppel Affidavits.**  The Borrower, within ten (10) days after written request from the Lender, shall furnish a written statement, duly acknowledged, setting forth the unpaid principal of, and interest on, the Note and whether or not any offsets or defenses exist against such principal and interest.

1.14.    **Compliance with Applicable Environmental Law.**  The term "Applicable Environmental Law" shall be defined as any statutory law or case law pertaining to health or the environment, or petroleum products, or oil, or hazardous substances, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") as codified at 42 U.S.C. § 9601 et. seq.; the Resource Conservation and Recovery Act of 1976, as amended, as codified at 42 U.S.C. § 6901 et seq.; the Superfund Amendments and Reauthorization Act of 1986, as codified at 42 U.S.C. § 9671, et seq.; and the Hazardous Wastes Management and

Minimization Act as codified at Code of Ala. 1975 § 22-30-1 et. seq., as amended; the terms "hazardous substance" and "release" shall have the meanings specified in CERCLA; provided, in the event CERCLA is amended to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment; and provided, to the extent that the laws of the State of Alabama establish a meaning for "hazardous substance" or "release" which is broader than that specified in CERCLA, such broader meaning shall apply. The Borrower represents and warrants to the Lender that the Mortgaged Property and the Borrower are not in violation of or subject to any existing, pending or threatened investigation or inquiry by any governmental authority or any response costs or remedial obligations under any Applicable Environmental Law and this representation and warranty would continue to be true and correct following disclosure to the applicable governmental authorities of all relevant facts, conditions and circumstances, if any, pertaining to the Mortgaged Property; that the Borrower has not obtained and is not required to obtain any permits, licenses or similar authorizations to construct, occupy, operate or use any buildings, improvements, fixtures or equipment forming a part of the Mortgaged Property by reason of any Applicable Environmental Law; that the Borrower has taken all steps necessary to determine and has determined that no petroleum products, oil, hazardous substances, or solid wastes have been disposed of or otherwise released on the Mortgaged Property; and that the use which the Borrower has made, makes or intends to make of the Mortgaged Property will not result in the location on or disposal or other release of any petroleum products, oil, hazardous substances or solid waste on or to the Mortgaged Property. The Borrower hereby agrees to pay any fines, charges, fees, expenses, damages, losses, liabilities, or response costs arising from or pertaining to the application of any such Applicable Environmental Law to the Mortgaged Property and to indemnify and forever save the Lender harmless from any and all judgments, fines, charges, fees, expenses, damages, losses, liabilities, response costs, or attorneys' fees and expenses arising from the application of any such Applicable Environmental Law to the Mortgaged Property or the Lender; and this indemnity shall survive any foreclosure of this Mortgage or the taking by the Lender of a deed in lieu of foreclosure. The Borrower agrees to notify the Lender in the event that any governmental agency or other entity notifies the Borrower that it may not be in compliance with any Applicable Environmental Laws. The Borrower agrees to permit the Lender to have access to the Mortgaged Property at all reasonable times in order to conduct, at the Borrower's expense, any tests which the Lender deems are necessary to ensure that the Borrower and the Mortgaged Property are in compliance with all Applicable Environmental Laws.

## ARTICLE II

2.01. **Event of Default.** The term Event of Default, wherever used in this Mortgage, shall mean any one or more of the following events:

        (a)    Failure by the Borrower to pay as and when due and payable under the Note, this Mortgage, any other Loan Document, any installments or other payments of principal, interest or escrow deposits; or

915185.1

9

(b)    The occurrence of an "Event of Default" as defined in the Note or any other Loan Document; or

(c)    Failure by the Borrower to duly observe any other covenant, condition or agreement of the Note, this Mortgage or any other Loan Document or any other document or instrument evidencing or securing the indebtedness secured hereby; or

(d)    The filing by the Borrower of a voluntary petition in bankruptcy or the Borrower's adjudication as a bankrupt or insolvent, or the filing by the Borrower of any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, or the Borrower's seeking or consent to or acquiescence in the appointment of any trustee, receiver or liquidator of the Borrower or of all or any substantial part of the Mortgaged Property or of any or all of the rents, revenues, issues, earnings, profits or income thereof, or the making of any general assignment for the benefit of creditors or the admission in writing of its inability to pay its debts generally as they become due; or

(e)    The entry by a court of competent jurisdiction of an order, judgment, or decree approving a petition filed against the Borrower seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency, or other relief for debtors, which order, judgment or decree remains unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the date of entry thereof, or the appointment of any trustee, receiver or liquidator of the Borrower or of all or any substantial part of the Mortgaged Property or of any or all of the rents, revenues, issues, earnings, profits or income thereof without the consent or acquiescence of the Borrower which appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive); or

(f)    The sale or other transfer of all or any portion of the Mortgaged Property, or any interest therein, without the prior written consent of the Lender, which consent may be granted or refused by the Lender in its sole discretion; or

(g)    The creation or suffering to exist by the Borrower of any lien or encumbrance on the Mortgaged Property, other than the lien of this Mortgage and the lien for ad valorem taxes not then delinquent, without the prior written consent of the Lender, which consent may be granted or refused by the Lender in its sole discretion; or

(h)    In the event the Borrower is a partnership, corporation or joint venture, the sale or other transfer by any partner, member, shareholder or venturer (or any partner, member, shareholder or venturer of any entity which is itself a partner, shareholder or venturer in the Borrower) of any interest in the Borrower (or any such entity) without the prior written consent of the Lender, which consent may be granted or refused by the Lender in its sole discretion.

915185.1                               10

2.02.    **Acceleration of Maturity.** If an Event of Default shall have occurred, then the entire principal amount of the indebtedness secured hereby with interest accrued thereon shall, at the option of the Lender, become due and payable without notice or demand, time being of the essence; and any omission on the part of the Lender to exercise such option when entitled to do so shall not be considered as a waiver of such right.

2.03.    **Right of Lender to Enter and Take Possession.**

(a)    If an Event of Default shall have occurred and be continuing, the Borrower, upon demand of the Lender, shall forthwith surrender to the Lender the actual possession, and if and to the extent permitted by law, the Lender may enter and take possession, of all the Mortgaged Property, and may exclude the Borrower and its agents and employees wholly therefrom.

(b)    Upon every such entering upon or taking of possession, the Lender may hold, store, use, operate, manage and control the Mortgaged Property and conduct the business thereof, and, from time to time (i) make all necessary and proper maintenance, repairs, renewals, replacements, additions, betterments and improvements thereto and thereon and purchase or otherwise acquire additional fixtures, personalty and other property; (ii) insure or keep the Mortgaged Property insured; (iii) manage and operate the Mortgaged Property and exercise all the rights and powers of the Borrower in its name or otherwise, with respect to the same; (iv) enter into any and all agreements with respect to the exercise by others of any of the powers herein granted the Lender, all as the Lender from time to time may determine to be to its best advantage; and the Lender may collect and receive all the income, revenues, rents, issues and profits of the same including those past due as well as those accruing thereafter, and, after deducting (A) all expenses of taking, holding, managing and operating the Mortgaged Property (including compensation for the services of all persons employed for such purposes); (B) the cost of all such maintenance, repairs, renewals, replacements, additions, betterments, improvements, purchases and acquisitions; (C) the cost of such insurance; (D) such taxes, assessments and other charges prior to the lien of this Mortgage as the Lender may determine to pay; (E) other proper charges upon the Mortgaged Property or any part thereof; and (F) the reasonable compensation, expenses and disbursements of the attorneys and agents of the Lender; shall apply the remainder of the moneys so received by the Lender to the payment of accrued interest, to the payment of tax and insurance deposits required in Sections 1.03 and 1.05 hereof, and to the payment of overdue installments of principal, all in such order and priority as the Lender may determine.

(c)    Whenever all such Events of Default have been cured and satisfied, the Lender may, at its option, surrender possession of the Mortgaged Property to the Borrower, its successors or assigns. The same right of taking possession, however, shall exist if any subsequent Event of Default shall occur and be continuing.

**2.04.  Receiver.**

(a)     If an Event of Default shall have occurred and be continuing, the Lender, upon application to a court of competent jurisdiction, shall be entitled, without notice and without regard to the adequacy of any security for the indebtedness hereby secured or the solvency of any party bound for its payment, to the appointment of a receiver to take possession of and to operate the Mortgaged Property and to collect the rents, profits, issues, and revenues thereof.

(b)     The Borrower will pay to the Lender upon demand all expenses, including receiver's fees, attorney's fees, costs and agent's compensation, incurred pursuant to the provisions contained in this Section 2.04; and all such expenses shall be secured by this Mortgage.

**2.05.  Lender's Power of Enforcement.**  If an Event of Default shall have occurred and be continuing, the Lender may, either with or without entry or taking possession as hereinabove provided or otherwise, proceed by suit or suits at law or in equity or any other appropriate proceeding or remedy (a) to enforce payment of the Note, any other Loan Document, or the performance of any term thereof or any other right, (b) to foreclose this Mortgage and to sell, as an entirety or in separate lots or parcels, the Mortgaged Property, as provided by law, and (c) to pursue any other remedy available to it, all as the Lender shall deem most effectual for such purposes. The Lender shall take action either by such proceedings or by the exercise of its powers with respect to entry or taking possession, as the Lender may determine.

**2.06.  Power of Sale.**  If an Event of Default shall have occurred, Lender may sell the Mortgaged Property at public outcry to the highest bidder for cash in front of the Court House door in the county where said property is located, either in person or by auctioneer, after having first given notice of the time, place and terms of sale by publication once a week for three (3) successive weeks prior to said sale in some newspaper published in said county, and, upon payment of the purchase money, Lender or any person conducting the sale for Lender is authorized to execute to the Purchaser at said sale a deed to the premises so purchased. Lender may bid at said sale and purchase said premises, or any part thereof, if the highest bidder therefor. At the foreclosure sale the Mortgaged Property may be offered for sale and sold as a whole without first offering it in any other manner or may be offered for sale and sold in any other manner Lender may elect.

**2.07.  Application of Foreclosure Proceeds.**  The proceeds of any foreclosure sale pursuant to Section 2.06 shall be applied as follows:

(a)     First, to the expenses of making the sale, including a reasonable attorney's fee for such services as may be necessary in the collection of said indebtedness or the foreclosure of this Mortgage;

(b)     Second, to the repayment of any money, with interest thereon at a rate equal to the Default Rate, which Lender may have paid, or become liable to pay, or which it may then be

necessary to pay for taxes, insurance, assessments or other charges, liens, or debts as hereinabove provided;

(c)     Third, to the payment and satisfaction of the indebtedness hereby secured with interest to date of sale; and

(d)     Fourth, the balance, if any, shall be paid to the party or parties appearing of record to be the owner of the premises at the time of the sale after deducting any expense of ascertaining who is such owner.

2.08.   **Lender's Option on Foreclosure.**  At the option of the Lender, this Mortgage may be foreclosed as provided by law or in equity, in which event a reasonable attorney's fee shall, among other costs and expense, be allowed and paid out of the proceeds of the sale. In the event Lender exercises its option to foreclose the Mortgage in equity, Lender may, at its option, foreclose this Mortgage subject to the rights of any tenants of the Mortgaged Property, and the failure to make any such tenants parties defendants to any such foreclosure proceeding and to foreclose their rights will not be, nor be asserted to be by the Borrower, a defense to any proceedings instituted by the Lender to collect the sum secured hereby, or any deficiency remaining unpaid after the foreclosure sale of the Mortgaged Property.

2.09.   **Waiver of Exemption.**  Borrower waives all rights of exemption pertaining to real or personal property as to any indebtedness secured by or that may be secured by this Mortgage.

2.10.   **Suits to Protect the Mortgaged Property.**  The Lender shall have power (a) to institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Mortgaged Property by any acts which may be unlawful or any violation of this Mortgage, (b) to preserve or protect its interest in the Mortgaged Property and in the income, revenues, rents and profits arising therefrom, and (c) to restrain the enforcement of or compliance with any legislation or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with, such enactment, rule or order would impair the security hereunder or be prejudicial to the interest of the Lender.

2.11.   **Delay or Omission No Waiver.**  No delay or omission of the Lender or of any holder of the Note to exercise any right, power or remedy accruing upon any default shall exhaust or impair any such right, power or remedy or shall be construed to be a waiver of any such default, or acquiescence therein; and every right, power and remedy given by this Mortgage or the Loan Documents to the Lender may be exercised from time to time and as often as may be deemed expedient by the Lender.

2.12.   **No Waiver of One Default to Affect Another, etc.**  No waiver of any default hereunder shall extend to or shall affect any subsequent or any other then existing default or shall impair any rights, powers or remedies consequent thereon.

If the Lender (a) grants forbearance or an extension of time for the payment of any sums secured hereby; (b) takes other or additional security for the payment thereof; (c) waives or does not exercise any right granted herein or in the Note; (d) releases any part of the Mortgaged Property from the lien of this Mortgage or otherwise changes any of the terms of the Note or this Mortgage; (e) consents to the filing of any map, plat or replat thereof; (f) consents to the granting of any easement thereon; or (g) makes or consents to any agreement subordinating the lien or charge hereof, any such act or omission shall not release, discharge, modify, change, or affect the original liability under the Note, this Mortgage or any other Loan Document or otherwise of the Borrower or any subsequent purchaser of the Mortgaged Property or any part thereof, or any maker, co-signer, endorser, surety or guarantor; nor shall any such act or omission preclude the Lender from exercising any right, power or privilege herein granted or intended to be granted in the event of any other default then made or of any subsequent default, nor, except as otherwise expressly provided in an instrument or instruments executed by the Lender shall the lien of this Mortgage be altered thereby. In the event of the sale or transfer by operation of law or otherwise of all or any part of the Mortgaged Property, the Lender, at its option, without notice to any person or corporation is hereby authorized and empowered to deal with any such vendee or transferee with reference to the Mortgaged Property or the indebtedness secured hereby, or with reference to any of the terms or conditions hereof, as fully and to the same extent as it might deal with the original parties hereto and without in any way releasing or discharging any of the liabilities or undertakings hereunder.

2.13.    **Discontinuance of Proceedings - Position of Parties Restored.** In case the Lender shall have proceeded to enforce any right or remedy under this Mortgage by foreclosure, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Lender, then and in every such case the Borrower and the Lender shall be restored to their former positions and rights hereunder, and all rights, powers and remedies of the Lender shall continue as if no such proceeding had been taken.

2.14.    **Remedies Cumulative.** No right, power, or remedy conferred upon or reserved to the Lender by this Mortgage is intended to be exclusive of any right, power or remedy, but each and every such right, power and remedy shall be cumulative and concurrent and shall be in addition to any other right, power and remedy given hereunder or now or hereafter existing at law or in equity or by statute.

# ARTICLE III

3.01.    **Successors and Assigns Included in Parties.** Whenever in this Mortgage one of the parties hereto is named or referred to, the heirs, administrators, executors, successors and assigns of such party shall be included, and all covenants and agreements contained in this Mortgage by or on behalf of the Borrower or by or on behalf of Lender shall bind and inure to the benefit of their respective heirs, administrators, executors, successors and assigns, whether so expressed or not.

3.02.   **Headings, etc.** The headings of the articles, sections, paragraphs and subdivisions of this Mortgage are for convenience of reference only, are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof.

3.03.   **Invalid Provisions to Affect No Others.** In case any one or more of the covenants, agreements, terms or provisions contained in this Mortgage, in the Note or in any other Loan Document shall be invalid, illegal or unenforceable in any respect, the validity of the remaining covenants, agreements, terms and provisions contained herein, in the Note or any other Loan Document shall be in no way affected, prejudiced or disturbed thereby.

3.04.   **Security Agreement.** This Mortgage shall also be construed to be, and shall be construed as, a security agreement with respect to any of the properties described herein which are characterized by law as fixtures or personal property, of whatever nature (hereinafter referred to as the "Collateral").

   (a)   **Assembly of Collateral.** Upon default hereunder and acceleration of the indebtedness pursuant to the provisions hereof, of the Note or any other Loan Document secured hereby, the Lender may, at its discretion, require the Borrower to assemble the Collateral and make it available to the Lender at a place reasonably convenient to both parties to be designated by the Lender.

   (b)   **Manner of Sale.** Upon default hereunder and acceleration of the indebtedness pursuant to the provisions hereof, of the Note or any Loan Document secured hereby, all or any part of the Collateral may, at the sole discretion of the Lender, be combined with the real property covered hereby and sold together with such real property as an entirety, or the Collateral (or any part of the Collateral not sold together with the real property) may be sold separately, as one parcel or in such parcels, manner, or order as the Lender, in its sole discretion, may elect.

   (c)   **Notice of Sale.** The Lender shall give the Borrower notice, by registered or certified mail, postage prepaid, of the time and place of any public sale of any Collateral or of the time after which any private sale or other intended disposition thereof is to be made by sending notice to the Borrower at least ten (10) days before the time of the sale or other disposition, which provisions for notice the Borrower and Lender agree are reasonable.

   (d)   **Additional Documents.** The Borrower will, from time to time, within fifteen (15) days after request by the Lender, execute, acknowledge and deliver any financing statement, certificate, continuation statement, inventory, or other similar documents as the Lender may request in order to protect, preserve, continue, extend, or maintain the security interest under the priority of this Mortgage and will, upon demand, pay any expenses incurred by the Lender in the preparation, execution, and filing of any such documents.

(e)     **Alabama Uniform Commercial Code.**  Except as specifically set forth herein, the Lender shall have, with respect to the Collateral, all rights and privileges of a secured party under the Alabama Uniform Commercial Code.

(f)     **Mortgage to Serve as Financing Statement.** This Mortgage shall constitute a financing statement under the Alabama Uniform Commercial Code.

3.05.    **Future Advances.** A portion of the Loan secured by this Mortgage will be advanced to the Borrower by the Lender from time to time in accordance with the Note or other agreements to be entered into between Borrower and Lender.  **THIS MORTGAGE SECURES FUTURE ADVANCES, IF ANY, MADE PURSUANT TO THE NOTE.**

3.06.    **Partial Release.** Lender agrees that if it is paid $99,000 to be applied to the Loan on or before the maturity date of the Note, Lender shall execute and deliver to the Borrower an instrument in recordable form releasing Parcel 3 from the lien of this Mortgage.

**IN WITNESS WHEREOF,** the Borrower has executed this Mortgage, or has caused this Mortgage to be executed, the day and year first above written.

DEERFOOT MARKETPLACE, LLC

By: _____
Its: _____

STATE OF ALABAMA    )
                    )
_Jefferso_ COUNTY   )

I, _Thomas W. CRAWFORD_ a Notary Public in and for said County in said State, hereby certify that _Richard G Schwartz_, whose name as _MEMBER_ of Deerfoot Marketplace, LLC, an Alabama limited liability company, is signed to the foregoing Mortgage and Security Agreement, and who is known to me, acknowledged before me on this day that, being fully informed of the contents of the foregoing, he, as such officer and with full authority, executed the same voluntarily for and as the act of said company.

Given under my hand this _19_ day of _December_, 2001.

_Thomas W Crawford_

Notary Public
My Commission Expires: _12-27-03_

This instrument was prepared by George M. Taylor, III, 420 North 20th Street, Suite 3100, Birmingham, Alabama 35203

915185.1

17

## EXHIBIT A

Parcel 1-A

That part of the Northeast quarter of the Southeast quarter of Section 26, Township 15 South, Range 1 West, situated in Jefferson County, Alabama, more particularly described as follows:

Commence at the Northwest corner of said quarter-quarter section and run southerly along the west line of said quarter-quarter section for a distance of 1209.61 feet to the POINT OF BEGINNING; thence turn a deflection angle of 87 degrees 44 minutes 06 seconds to the left and run in a easterly direction for a distance of 151.90 feet; thence turn a deflection angle of 22 degrees 09 minutes 52 seconds to the left and run in a northeasterly direction for a distance of 99.47 feet; thence turn a deflection angle of 90 degrees 53 minutes 03 seconds to the left and run in a northwesterly direction for a distance of 149.04 feet; thence turn a deflection angle of 88 degrees 58 minutes 00 seconds to the right and run in a northeasterly direction for a distance of 413.38 feet to a point on the westerly right of way line of Deerfoot Parkway and a curve to the right, said curve having a radius of 2,999.79 feet, a central angle of 00 degrees 13 minutes 50 seconds and a chord distance of 12.07 feet; thence turn a deflection angle left to chord of said curve 77 degrees 37 minutes 16 seconds and run in a northwesterly direction along the arc of said curve and said right of way line for a distance of 12.07 feet; thence turn a deflection angle from chord of said curve 00 degrees 06 minutes 55 seconds to the left and run in a northwesterly direction for a distance of 159.49 feet; thence turn a deflection angle of 10 degrees 18 minutes 26 seconds to the left and run in a northwesterly direction along said right of way line for a distance of 24.50 feet; thence leaving said right of way line turn a deflection angle of 90 degrees 16 minutes 10 seconds to the left and run in a southwesterly direction for a distance of 293.90 feet; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the left and run in a southeasterly direction for a distance of 49.50 feet; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the right and run in a southwesterly direction for a distance of 133.20 feet; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the right and run in a northwesterly direction for a distance of 154.54 feet; thence turn a deflection angle of 07 degrees 24 minutes 07 seconds to the right and run in a northwesterly direction for a distance of 157.14 feet to a point on the southerly right of way line of Old Springville Road and a curve to the right, said curve having a radius of 843.51 feet, a central angle of 04 degrees 42 minutes 58 seconds and a chord distance of 69.41 feet; thence turn a deflection angle left to chord of said curve 85 degrees 06 minutes 56 seconds and run southwesterly along the arc of said curve and said right of way line for a distance of 69.43 feet to a point on the westerly line of said quarter-quarter section; thence turn a deflection angle from chord of said curve 82 degrees 23 minutes 12 seconds to the left and run in a southerly direction along said quarter-quarter line for a distance of 5.67 feet to point on a curve to the right, said curve having a radius of 849.15 feet, a central angle of 01 degrees 18 minutes 30 seconds and a chord distance of 19.39 feet; thence turn a deflection angle right to chord of said curve 85 degrees 26 minutes 02 seconds and run in a southwesterly direction along the arc of said curve for a distance of 19.39 feet; thence turn a deflection angle from chord of said curve 85 degrees 26 minutes 02 seconds to the left and run in a southerly direction leaving said right of way line for a distance of 90.00 feet; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the left and run in a easterly direction for a distance of 19.33 feet to a point on the west line of said quarter-quarter section; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the right and run southerly along said quarter-quarter line for a distance of 513.60 feet to the POINT OF BEGINNING.

## EXHIBIT A

**Parcel 1-B**
That part of the Northeast quarter of the Southeast quarter of Section 26, Township 15 South, Range 1 West, situated in Jefferson County, Alabama, more particularly described as follows:

Commence at the Northwest corner of said quarter-quarter section and run southerly along the west line of said quarter-quarter section for a distance of 1209.61 feet; thence turn a deflection angle of 87 degrees 44 minutes 06 seconds to the left and run in a easterly direction for a distance of 151.90 feet; thence turn a deflection angle of 22 degrees 09 minutes 52 seconds to the left and run in a northeasterly direction for a distance of 99.47 feet to the POINT OF BEGINNING; thence continue along last described course for a distance of 385.72 feet to a point on the westerly right of way line of Deerfoot Parkway and a curve to the right, said curve having a radius of 2,999.79 feet, a central angle of 03 degrees 08 minutes 51 seconds and a chord distance of 167.78 feet; thence turn a deflection angle left to chord of said curve 81 degrees 13 minutes 40 seconds and run in a northwesterly direction along the arc of said curve and said right of way line for a distance of 164.80 feet; thence leaving said right of way line turn a deflection angle from chord of said curve 100 degrees 41 minutes 23 seconds to the left and run in a southwesterly direction for a distance of 413.38 feet; thence turn a deflection angle of 88 degrees 58 minutes 00 seconds to the left and run in a southeasterly direction for a distance of 149.04 feet to the POINT OF BEGINNING.

**Parcel 3**

That part of the Northeast quarter of the Southeast quarter of Section 26, Township 15 South, Range 1 West, situated in Jefferson County, Alabama, more particularly described as follows:

Commence at the Northwest corner of said quarter-quarter section and run southerly along the west line of said quarter-quarter section for a distance of 784.90 feet; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the left and run in a easterly direction for a distance of 117.97 feet; thence turn a deflection angle of 19 degrees 53 minutes 59 seconds to the left and run in a northeasterly direction for a distance of 155.32 feet; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the left and run in a northwesterly direction for a distance of 6.50 feet to the POINT OF BEGINNING; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the right and run in a northeasterly direction for a distance of 149.99 feet; thence turn a deflection angle of 90 degrees 00 minutes 40 seconds to the left and run in a northwesterly direction for a distance of 165.31 feet to a point on the southerly right of way line of Old Springville Road; thence turn a deflection angle of 91 degrees 51 minutes 43 seconds to the left and run in a southwesterly direction along said right of way line for a distance of 12.38 feet; thence turn a deflection angle of 14 degrees 36 minutes 26 seconds to the right and run in a northwesterly direction for a distance of 80.52 feet to a point on a curve to the right, said curve having a radius of 843.51 feet, a central angle of

04 degrees 00 minutes 45 seconds and a chord distance of 59.06 feet; thence turn a deflection angle left to the chord of said curve 14 degrees 02 minutes 14 seconds and run in a southwesterly direction along the arc of said curve and along said right of way line for a distance of 59.07 feet; thence turn a deflection angle from the chord of said curve 88 degrees 41 minutes 49 seconds to the left and run in a southeasterly direction leaving said right of way line for a distance of 181.31 feet to the POINT OF BEGINNING.

State of Alabama - Jefferson County
I certify this instrument filed on:
2001 DEC 21 A.M. 10:04
Recorded and $ 1,800.00    Mtg. Tax
and $ 52.00    Deed Transfer Tax Amt.
Total $ 1,852.00
MICHAEL F. BOLIN, Judge of Probate

200116/07

Jefferson County,
I, the Undersigned, as Judge of Probate Court in and for Jefferson County, Alabama, hereby certify that the foregoing is a full, true and correct copy of the instrument with the filing of same as appears of record in this office. Given under my hand and official seal, this the _____ day of _____.

JUDGE OF PROBATE

EXHIBIT B

*This instrument prepared by:*

George M. Taylor, III
Burr & Forman LLP
420 North 20th Street, Suite 3100
Birmingham, Alabama 35203

2 0 0 2 0 5 / 6 7 9 8

STATE OF ALABAMA           )
                           )
COUNTY OF JEFFERSON        )

## AMENDMENT TO MORTGAGE, ASSIGNMENT OF RENTS AND LEASES AND SECURITY AGREEMENT

THIS AMENDMENT TO MORTGAGE, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT (this "Amendment") dated as of the 1st day of March, 2002, is entered into by and between **DEERFOOT MARKETPLACE, L.L.C.**, an Alabama limited liability company, (hereinafter called the "Borrower"), Mortgagor, whose address is c/o Richard G. Schmalz, RGS Properties, Inc., 6 Office Park Circle, Suite 100, Birmingham, Alabama 35223, and **FIRST COMMERCIAL BANK**, an Alabama banking corporation (hereinafter called the "Lender"), Mortgagee, whose address is First Commercial Bank, 800 Shades Creek Parkway, Suite 200, Birmingham, Alabama 35209.

## R E C I T A L S :

On or about December 19, 2001, Borrower executed in favor of Bank Mortgage, Assignment of Rents and Security Agreement pursuant to which Borrower pledged as collateral for certain indebtedness of Borrower to Bank certain real property and interests therein located in Jefferson County, Alabama, said instrument having been recorded as Instrument No. 200116/0735 in the records of the Probate Judge of Jefferson County, Alabama (the "Mortgage"). The Mortgages secured Borrower's promissory note to Bank dated December 19, 2001, in the initial aggregate principal amount of $1,200,000 (the "Note"). The Note was executed in anticipation of the issuance by Borrower of its Floating Rate Notes, to be dated as of March 1, 2002, in the aggregate principal amount of $5,300,000.

In connection with the issuance of the Floating Rate Notes, Borrower has asked Bank to issue its irrevocable direct-pay letter of credit to secure the same, and Bank has agreed to do so but only condition that the Mortgage be amended to secure said indebtedness. **As a result of issuance of the Notes, the indebtedness secured by the Mortgage hereby by will be increased by the sum of $4,198,933.34.**

924062.1

## AGREEMENT

**NOW, THEREFORE,** for the consideration described in the forgoing recitals, and other good and valuable consideration, the receipt of which is hereby acknowledged, Borrower hereby agrees with Bank, and represents and warrants to Bank, as follows:

1.      The first recital paragraph of each of the Mortgages is hereby amended to read in its entirety as follows:

**WHEREAS,** Borrower is justly indebted to Lender in the aggregate principal amount of $5,398,933.34, pursuant to a Credit and Security Agreement dated as of March 1, 2002, pursuant to which Lender has made available to Borrower its direct pay, irrevocable letter of credit in the aggregate amount of $5,398,933.34 to secure those $5,300,000 Deerfoot Marketplace, L.L.C., Floating Rate Notes, Series 2002 (the "Corporate Notes"). Said letter of credit facility is herein referred to as the "Credit Facility" and said agreement is herein referred to as the Credit Agreement. Capitalized terms used herein but not otherwise defined herein shall have the respective meanings ascribed to them in the Credit Agreement.

2.      The Mortgage is hereby further amended by changing the words "Note" and "Promissory Note" and "Loan" wherever the same shall appear to "Credit Facility".

3.      The Mortgage is hereby further amended by changing the words "Loan Agreement" wherever the same may appear to "Credit Agreement".

4.      The Mortgage is hereby further amended by changing the words "Loan Documents" wherever the same may appear to "Credit Documents".

5.      Section 2.01 of each of the Mortgages is hereby amended to add the following additional Event of Default:

The occurrence of any "Event of Default" under that certain Credit and Security Agreement between Borrower and Lender dated as of March 1, 2002 or the occurrence of any breach, default or event of default under or with respect any "Credit Document" or "Financing Document" referenced therein.

Said new Event of Default will be designated paragraph "(i)" in Mortgage.

6.      Section 3.05 of the Mortgage is hereby amended to read in its entirety as follows:

3.05. **Note Issuance.**   This Mortgage initially secured that certain Promissory Note of Borrower to Lender in the initial aggregate principal amount of $1,200,000 (the "Original Note"). By Credit and Security Agreement dated as of March 1, 2002 (the "Credit Agreement") between Borrower and Lender, Lender is issuing its irrevocable direct-pay letter of credit (the "Letter of Credit") to secure those certain $5,300,000 Deerfoot Marketplace, L.L.C., Floating Rate Notes (the "Corporate Notes"). The proceeds from the sale of the Notes will repay the outstanding Original Note in full. From and after March 1, 2002,

references in this Mortgage to the Obligations shall expressly include the obligation of Borrower to reimburse Lender for draws made under the Letter of Credit and shall also include all "Obligations" of Borrower to Lender as the same are defined in the Credit Agreement. This Mortgage secures future advances made pursuant to said Credit Agreement. Notwithstanding anything to the contrary contained in this Mortgage or in the Credit Facility secured hereby, or in any other instrument securing the loan evidenced by said Credit Facility, the Lender may at its option declare the entire indebtedness secured hereby, and all interest thereon and all advances made by Lender hereunder, immediately due and payable upon the occurrence of an Event of Default under the Credit Agreement and said Credit Agreement is, by reference thereto, herein incorporated to the same extent and effect as though set forth herein in full.

7.     Borrower acknowledges and agrees that the Mortgage, as amended and enlarged hereby, remain in full force and effect and is fully enforceable in accordance with its terms. Nothing in this Amendment shall be interpreted or construed to alter or impair the priority of the lien and security interest of the Mortgage as it existed prior to the execution, delivery, and/or recordation of this Amendment.

IN WITNESS WHEREOF, Borrower and Bank have caused this Amendment to be executed by their duly authorized representatives, and their seals to be hereunto affixed, the day and year first above written.

BORROWER:

DEERFOOT MARKETPLACE, L.L.C.

By: _____
Its: _____

Witnesses:

_____

_____

BANK:
FIRST COMMERCIAL BANK

By: _____
Its: _____

924062.1                                    3

## ACKNOWLEDGMENTS

**STATE OF ALABAMA**　　　　)
　　　　　　　　　　　　　　　)
_Jefferson_ **COUNTY**　　　)

  I, the undersigned, a notary public in and for said County, in said State, hereby certify that _Richard G Scheck_, whose name as _Member_ of Deerfoot Marketplace, L.L.C., an Alabama limited liability company, is signed to the foregoing Amendment to Mortgage, Assignment of Rents and Leases and Security Agreement, and who is known to me, acknowledged before me on this day that being informed of the contents of this instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said entity.

  Given under my hand and official seal this _20th_ day of _March_, 2002.

[SEAL]

_Georgia Ann Dole_
Notary Public
My Commission Expires: _8/5/02_

924062.1　　　　　4

## CERTIFICATE OF MORTGAGEE

Pursuant to ALA. CODE § 40-22-2, First Commercial Bank, as mortgagee, does hereby certify to the Judge of Probate of Jefferson County, Alabama, that, for the purposes of calculating the privilege tax that is due and payable upon the recordation of this Amendment to Mortgage, Assignment of Rents and Leases and Security Agreement, (this "Amendment"), the amount of *additional* principal indebtedness presently incurred and secured by the Mortgage, Assignments of Rents and Leases and Security Agreement described above, as amended by this Amendment, is $4,198,933.34.

Dated this 21ᵗʰ day of ⌐⌐⌐⌐⌐ , 2002.

                                        **FIRST COMMERCIAL BANK**


                                        By: _____
                                        Its: _____


> State of Alabama - Jefferson County
> I certify this instrument filed on:
> **2002 APR 12 P.M. 16:28**
> Recorded and $    **6,298.50** Mtg. Tax
> and $              Deed Tax and Fee Amt.
> $    **14.50** Total $    **6,313.00**
> MICHAEL F. BOLIN, Judge of Probate
>
> 200205/6798

EXHIBIT C

2 0 0 2 0 5 / 6 7 9 9

## ASSIGNMENT OF RENTS AND LEASES

THIS ASSIGNMENT OF RENTS AND LEASES (this "Assignment") made as of this 1st day of March, 2002, by **DEERFOOT MARKETPLACE, L.L.C.**, an Alabama limited liability company, (the "Borrower"), whose address is c/o Dick Schmalz, RGS Properties, Inc., 6 Office Park Circle, Suite 100, Birmingham, Alabama 35223, in favor of **FIRST COMMERCIAL BANK,** an Alabama banking corporation ("Lender"), the mailing address of which is 800 Shades Creek Parkway, Suite 200, Birmingham, Alabama 35209.

### W I T N E S S E T H

FOR VALUE RECEIVED, Borrower hereby grants, transfers, and assigns to Lender and its successors and assigns all right, title and interest of Borrower in and to all those certain leases now or hereafter in effect with respect to occupancy of space located on the land being more particularly described on Exhibit A attached hereto and by this reference made a part hereof (hereinafter referred to as the "Property"), including, without limitation, the Lease Agreement listed on Exhibit "B" hereto, together with (i) any extensions, modifications or renewals thereof and (ii) any guarantees of the lessees' obligations thereunder (all of said leases, if any, together with all such guarantees, modifications, extensions or renewals thereof, being hereinafter collectively referred to as the "Leases"), and (iii) any and all security deposits received by Borrower or any agent of Borrower in connection therewith, for the purpose of securing (a) payment of all sums now or at any time hereafter due Lender and secured by that certain Mortgage and Security Agreement and Assignment of Rents and Leases by Borrower to Lender, dated as of December 19, 2001, as amended by instrument bearing even date herewith, all as recorded, or to be recorded, among the public records of Jefferson County, Alabama (as the same may be amended from time to time, the "Mortgage"), together with any future advances made thereunder to the extent permitted under applicable law, and (b) performance and discharge of each obligation, covenant and agreement of Borrower contained herein or contained in the Mortgage, in the "Credit Agreement" referred to in the Mortgage or in the "Credit Documents" as defined in the Credit Agreement; such documents, together with any other instruments now or hereafter evidencing, securing or otherwise relating to the "Obligations" as defined in the Credit Agreement as the same may be amended from time to time, are collectively referred to as the "Loan Documents"). This assignment is intended to be an absolute, present assignment from Borrower to Lender. The rents, issues and profits of the Property are hereby assigned absolutely by Borrower to Lender, contingent only upon the occurrence of an Event of Default as defined hereinbelow.

### ARTICLE I
### WARRANTIES AND COVENANTS

1.01    **Warranties of Borrower.**  Borrower hereby warrants and represents to Lender that:

(a)    Borrower is the sole owner of landlord's interest under the Leases, is entitled to receive the rents, issues, profits and security deposits under the Leases and from the

915271.1

Property, and has good right to sell, assign, transfer and set over the same and to grant to and confer upon Lender the rights, interests, powers and authorities herein granted and conferred.

(b)    Borrower has neither made nor permitted to be made any assignment other than this Assignment of any of its rights under the Leases to any person or entity.

(c)    Borrower has not done any act or omitted to do any act which might prevent Lender from, or limit Lender in, acting under any of the provisions of this Assignment.

(d)    Borrower has not accepted rent under any of the Leases more than thirty (30) days in advance of its due date except as approved in writing by Lender.

(e)    To the best knowledge of Borrower, there is no default by any of the lessees under the terms of any of the Leases.

(f)    Borrower is not prohibited under any agreement with any other person or entity or under any judgment or decree from the execution and delivery of this Assignment or of the Leases, from the performance of each and every covenant of Borrower hereunder and under the Leases, or from the meeting of each and every condition contained herein or in the Leases.

(g)    No action has been brought or threatened which in any way would interfere with the right of Borrower to execute this Assignment and perform all of Borrower's obligations herein contained.

1.02    **Covenants of Borrower.**    Borrower hereby covenants and agrees with Lender as follows:

(a)    Borrower shall (i) fulfill, perform and observe each and every condition and covenant of Borrower contained in the Leases; (ii) at the sole cost and expense of Borrower, diligently seek to enforce the performance and observance of each and every covenant and condition of the Leases to be performed or observed by the lessees thereunder; and (iii) appear in and defend any action growing out of, or in any manner connected with, any of the Leases or the obligations or liabilities of Borrower, as lessor thereunder, or of any of the lessees or guarantors thereunder.

(b)    Borrower shall not without the prior written consent of Lender (i) modify the lease form approved by Lender; (ii) except in the ordinary course of business, terminate the term or accept the surrender of any of the Leases thereof; (iii) except in the ordinary course of business, waive, or release the lessees from, the performance or observance by the lessees of any obligation or condition of the Leases; (iv) except as approved in writing by Lender, permit the prepayment of any rents under any of the Leases for more than thirty (30) days prior to the accrual thereof; or (v) except in the ordinary course of business, give any consent to any assignment by any of the lessees of any of the Leases of any sublease of any part or portion of the Property.

(c)    Upon the occurrence of an Event of Default hereunder, Borrower shall authorize and direct, and does hereby authorize and direct each and every present and future

tenant under the Leases to pay rental directly to Lender upon receipt of written demand from Lender to pay the same.

(d)    Lender shall not be obligated to perform or discharge any obligation of Borrower under any of the Leases, and Borrower agrees to indemnify and hold Lender harmless from and against any and all liability, loss or damage which Lender may incur under any of the Leases or under or by reason of this Assignment and from and against all claims and demands whatsoever which may be asserted against it by reason of an act of Lender under this Assignment or under any of the Leases.

1.03    **Covenants of Lender.**  Lender, by acceptance hereof, covenants and agrees with Borrower that:

(a)    Although this Assignment constitutes a present and current assignment of all rents, issues and profits of the Property, so long as there shall exist no Event of Default as hereinafter defined, Borrower shall have the right (i) to collect, but not more than thirty (30) days prior to accrual (except as approved in writing by Lender), all such rents, issues and profits from the Property and to retain, use and enjoy the same, and (ii) to maintain the security deposits in a separate, identifiable account in a bank in which funds are federally insured acceptable to Lender.

(b)    Upon the payment in full of all indebtedness secured hereby, as evidenced by the recording or filing of an instrument of satisfaction or full release of the Mortgage without the recording of another security instrument in favor of Lender affecting the Property, this Assignment shall become and be void and of no further effect.

## ARTICLE II
## DEFAULT

2.01    **Event of Default.**  The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

(a)    The failure by Borrower to perform or observe any covenant of Borrower contained in this Assignment;

(b)    The failure by Borrower to cause to be true and not misleading any warranty of Borrower contained herein;

(c)    The occurrence of a default or "Event of Default" under any of the Loan Documents; or

(d)    The occurrence of a default by Borrower under any of the Leases, which default is not cured after the expiration of any applicable notice and cure periods set forth in such Lease if the default would have a material adverse effect on the Borrower's ability to repay the Obligations.

2.02 **Remedies.** Upon the occurrence of any Event of Default, Lender may at its option, with or without notice or demand of any kind (except) as may be provided in any of the Loan Documents), exercise any or all of the following remedies:

(a) Declare any part or all of the indebtedness evidenced by the Loan Documents to be due and payable, whereupon the same shall become immediately due and payable;

(b) Perform any and all obligations of Borrower under any or all of the Leases or this Assignment and exercise any and all rights of Borrower herein or therein as fully as Borrower itself could do, including, without limiting the generality of the foregoing: enforcing, modifying, extending or terminating any or all of the Leases; collecting, modifying, compromising, waiving or increasing any or all of the rents payable thereunder; and obtaining new tenants and entering into new leases on the Property on any terms and conditions deemed desirable by Lender, and, to the extent Lender shall incur any costs in connection with the performance of any such obligations of Borrower, including costs of litigation, then all such reasonable costs shall become a part of the indebtedness secured by the Loan Documents, shall bear interest from the incurrence thereof at the Default Rate specified in the Credit Agreement, and shall be due and payable on demand;

(c) In Borrower's or Lender's name, institute any legal or equitable action which Lender in its sole discretion deems desirable to collect and receive any or all of the rents, issues and profits assigned herein;

(d) Collect the rents, issues and profits and any other sums due under the Leases with respect to the Property, and apply the same in such order as Lender in its sole discretion may elect to pay (i) all costs and expenses, including reasonable attorneys' fees, in connection with the operation of the Property, the performance of Borrower's obligations under the Leases and collection of the rents thereunder; (ii) all costs and expenses, including reasonable attorneys' fees, in the collection of any or all of the indebtedness secured by the Loan Documents, including all costs, expenses and reasonable attorneys' fees in seeking to realize on or to protect or preserve Lender's interest in any other collateral securing any or all of the indebtedness secured by the Loan Documents; and (iii) any or all unpaid principal, interest or other charges due under or secured by the Loan Documents. Any amounts remaining after such application shall be applied to the payment of the indebtedness secured by the Loan Documents or to monthly payments thereof, and upon the payment in full of the indebtedness secured by the Loan Documents; then this Assignment and all rights of Lender hereunder shall cease and terminate;

Entry upon and taking possession of the Property and the collection of the rents and the application thereof as aforesaid, shall in no wise operate to cure or waive any default or Event of Default hereunder or under any other of the Loan Documents, or prohibit the taking of any other action by Lender under any of the Loan Documents or at law or in equity to enforce the payment of such indebtedness or to realize on any other security. Lender shall have the full right to exercise any or all of the foregoing remedies without regard to the adequacy of security for any or all of the indebtedness, and with or without the commencement of any legal or equitable action or the appointment of any receiver or trustee, and shall have the full right to enter upon,

take possession of, use and operate all or any portion of the Property which Lender in its sole discretion deems desirable to effectuate any or all of the foregoing remedies. In no event shall Lender be liable to any lessee under any of the Leases for the return of any security deposit in any amount in excess of the amount delivered to Lender by Borrower.

## ARTICLE III
## GENERAL PROVISIONS

3.01    **Successors and Assigns.**  This Assignment shall inure to the benefit of and be binding upon Borrower and Lender and their respective heirs, executors, legal representatives, successors and assigns. Whenever a reference is made in this Assignment to "Borrower" or "Lender," such reference shall be deemed to include a reference to the heirs, executors, legal representatives, successors and assigns of Borrower or Lender.

3.02    **Terminology and Capitalized Terms.**  All personal pronouns used in this Assignment, whether used in the masculine, feminine or neuter gender, shall include all other genders, and the singular shall include the plural, and vice versa. Titles of Articles and Sections are for convenience only and neither limit nor amplify the provisions of this Assignment.

3.03    **Severability.**  If any provision of this Assignment or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Assignment and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

3.04    **Applicable Law.**  This Assignment shall be interpreted, construed and enforced according to the Laws of the State of Alabama.

3.05    **No Third Party Beneficiaries.**  This Assignment is made solely for the benefit of Lender and its assigns. No tenant under any of the Leases nor any other person shall have standing to bring any action against Lender as the result of this Assignment, or to assume that Lender will exercise any remedies provided herein, and no person other than Lender shall under any circumstances be deemed to be a beneficiary of any provision of this Assignment.

3.06    **No Oral Modifications.**  Neither this Assignment nor any provisions hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

3.07    **Cumulative Remedies.**  The remedies herein provided shall be in addition to and not in substitution for the rights and remedies vested in Lender in any of the Loan Documents or in law or equity, all of which rights and remedies are specifically reserved by Lender. The remedies herein provided or otherwise available to Lender shall be cumulative and may be exercised concurrently. The failure to exercise any of the remedies herein provided shall not constitute a waiver thereof, nor shall use of any of the remedies herein provided prevent the subsequent or concurrent resort to any other remedy or remedies. It is intended that this clause shall be broadly construed so that all remedies herein provided or otherwise available to Lender shall continue and be each and all available to Lender until the indebtedness evidenced by the Loan Documents shall have been paid in full.

3.08    **Cross-Default.**  An Event of Default by Borrower under this Assignment shall constitute an Event of Default under all other Loan Documents.

3.09    **Counterparts.**  This Assignment may be executed in any number of counterparts all of which taken together shall constitute one and the same instrument.

3.10    **Further Assurances.**  At any time and from time to time, upon request by Lender, Borrower will make, execute and deliver, or cause to be made, executed and delivered, to Lender and, where appropriate, cause to be recorded and/or filed and from time to time thereafter to be re-recorded and/or refiled at such time and in such offices and places as shall be deemed desirable by Lender, any and all such other and further assignments, deeds to secure debt, mortgages, deeds of trust, security agreements, financing statements, continuation statements, instruments of further assurance, certificates and other documents as may, in the reasonable opinion of Lender, be necessary or desirable in order to effectuate, complete, or perfect, or to continue and preserve (a) the obligations of Borrower under this Assignment and (b) the security interest created by this Assignment as a first and prior security interest upon the Leases and the rents, issues, profits and security deposits from the Property.  Upon any failure by Borrower so to do, Lender may make, execute, record, file, re-record and/or refile any and all such assignments, deeds to secure debt, mortgages, deeds of trust, security agreements, financing statements, continuation statements, instruments, certificates and documents for and in the name of Borrower, and Borrower hereby irrevocably appoints Lender the agent and attorney-in-fact of Borrower so to do.

3.11    **Notices.**  Any and all notices, elections or demands permitted or required to be made under this Assignment shall be made in accordance with the provisions relating to notice set forth in the Mortgage.

3.12    **Modifications, etc.**  Borrower hereby consents and agrees that Lender may at any time and from time to time, without notice to or further consent from Borrower, either with or without consideration, surrender any property or other security of any kind or nature whatsoever held by it or by any person, firm or corporation on its behalf or for its account securing the indebtedness evidenced by the Loan Documents; extend or renew the Obligations or any other of the Loan Documents for any period; grant releases, compromises and indulgences with respect to the Obligations or any other of the Loan Documents to any persons or entities now or hereafter liable thereunder or hereunder; release any guarantor or endorser of the Obligations, the Mortgage or any other of the Loan Documents; or take or fail to take any action of any type whatsoever, and no such action with Lender shall take or fail to take in connection with the Loan Documents, or any of them, or any security for the payment of the indebtedness evidenced by the Loan Documents or for the performance of any obligations or undertakings of Borrower, nor any course of dealing with Borrower or any other person, shall release Borrower's obligations hereunder, affect this Assignment in any way or afford Borrower any recourse against Lender. The provisions of this Assignment shall extend and be applicable to all renewals, amendments, extensions, consolidations and modifications of the Loan Documents and the Leases, and any and all references herein to the Loan Documents or the Leases shall be deemed to include any such renewals, amendments, extensions, consolidations or modifications thereof.

    **3.13**  <u>Waiver of Jury Trial</u>. BORROWER HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS ASSIGNMENT, OR (II) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS ASSIGNMENT OR IN CONNECTION WITH THE TRANSACTIONS RELATED HERETO OR CONTEMPLATED HEREBY OR THE EXERCISE OF EITHER PARTY'S RIGHTS AND REMEDIES HEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. BORROWER AGREES THAT LENDER MAY FILE A COPY OF THIS WAIVER WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED AGREEMENT OF BORROWER IRREVOCABLY TO WAIVE ITS RIGHT TO TRIAL BY JURY, AND THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER BETWEEN BORROWER AND LENDER SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

    **IN WITNESS WHEREOF,** Borrower has executed this Assignment, as of the day and year first above written.

                    **DEERFOOT MARKETPLACE, L.L.C.**

                    By: _____

                    Its: _____

915271.1

7

STATE OF ALABAMA        )
                        )
JEFFERSON COUNTY        )

    I, _George A. Bolin_, a Notary Public in and for said County in said State, hereby certify that _Richard D. Schooly_, whose name is signed to the foregoing as _Member_ of Deerfoot Marketplace, L.L.C., and who is known to me, acknowledged before me on this day that, being fully informed of the contents of said instrument and with full authority, he executed the same voluntarily for and as the act of said entity and for the purposes indicated.

    Given under my hand this _20th_ day of _March_, 2002.

_George A. Bolin_
Notary Public
My Commission Expires: _8 / 5 / 02_

This instrument was prepared by George M. Taylor, III, Burr & Forman, 420 North 20th Street, Suite 3100, Birmingham, Alabama 35203

915271.1

8

## EXHIBIT A

### Legal Description

<u>PARCEL I:</u>

That part of the Northeast quarter of the Southeast quarter of Section 26, Township 15 South, Range 1 West, situated in Jefferson County, Alabama, more particularly described as follows:

Commence at the Northwest corner of said quarter-quarter section and run southerly along the west line of said quarter-quarter section for a distance of 1209.61 feet to the POINT OF BEGINNING; thence turn a deflection angle of 87 degrees 44 minutes 06 seconds and run in a southeasterly direction for a distance of 151.90 feet; thence turn a deflection angle of 22 degrees 09 minutes 52 seconds and run in a northeasterly direction for a distance of 99.47 feet; thence continue along last described course for a distance of 385.72 feet to a point on the westerly right of way line of Deerfoot Parkway and a curve to the right, said curve having a radius of 2,999.79 feet, a central angle of 03 degrees 22 minutes 42 seconds and a chord distance of 176.78 feet; thence turn a deflection angle left to chord of said curve 81 degrees 06 minutes 45 seconds and run in a northwesterly direction along the arc of said curve and said right of way line for a distance of 176.87 feet; thence turn a deflection angle from chord of said curve 01 degree 41 minutes 21 seconds right and run in a northwesterly direction along said right of way line for a distance of 159.49 feet; thence turn a deflection angle of 10 degrees 18 minutes 26 seconds to the left and run in a northwesterly direction for a distance of 24.50 feet; thence leaving said right of way line turn a deflection angle of 90 degrees 16 minutes 10 seconds to the left and run in a southwesterly direction for a distance of 293.90 feet; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the left and run in a southeasterly direction for a distance of 49.50 feet; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the right and run in a southwesterly direction for a distance of 133.20 feet; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the right and run in a northwesterly direction for a distance of 154.54 feet; thence turn a deflection angle of 07 degrees 24 minutes 07 seconds to the right and run in a northwesterly direction for a distance of 157.14 feet to a point on the southerly right of way line of Old Springville Road and a curve to the right, said curve having a radius of 843.51 feet, a central angle of 04 degrees 42 minutes 58 seconds and a chord distance of 69.41 feet; thence turn a deflection angle left to chord of said curve 85 degrees 06 minutes 56 seconds and run southwesterly along the arc of said curve and said right of way line for a distance of 69.43 feet to a point on the westerly line of said quarter-quarter section; thence turn a deflection angle from chord of said curve 82 degrees 23 minutes 12 seconds to the left and run in a southerly direction along said quarter-quarter line for a distance of 5.67 feet to point on a curve to the right, said curve having a radius of 849.15 feet, a central angle of 01 degrees 18 minutes 30 seconds and a chord distance of 19.39 feet; thence turn a deflection angle right to chord of said curve 85 degrees 26 minutes 02 seconds and run in a southwesterly direction along the arc of said curve for a distance of 19.39 feet; thence turn a deflection angle from chord of said curve 85 degrees 26 minutes

02 seconds to the left and run in a southerly direction leaving said right of way line for a distance of 90.00 feet; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the left and run in a easterly direction for a distance of 19.33 feet to a point on the west line of said quarter-quarter section; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the right and run southerly along said quarter-quarter line for a distance of 513.60 feet to the POINT OF BEGINNING

PARCEL III:

That part of the Northeast quarter of the Southeast quarter of Section 26, Township 15 South, Range 1 West, situated in Jefferson County, Alabama, more particularly described as follows:

Commence at the Northwest corner of said quarter-quarter section and run southerly along the west line of said quarter-quarter section for a distance of 784.90 feet; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the left and run in a easterly direction for a distance of 117.97 feet; thence turn a deflection angle of 19 degrees 53 minutes 59 seconds to the left and run in a northeasterly direction for a distance of 155.32 feet; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the left and run in a northwesterly direction for a distance of 6.50 feet to the POINT OF BEGINNING; thence turn a deflection angle of 90 degrees 00 minutes 00 seconds to the right and run in a northeasterly direction for a distance of 149.99 feet; thence turn a deflection angle of 90 degrees 00 minutes 40 seconds to the left and run in a northwesterly direction for a distance of 165.31 feet to a point on the southerly right of way line of Old Springville Road; thence turn a deflection angle to the right of 91 degrees 51 minutes 43 seconds to the left and run in a southwesterly direction along said right of way line for a distance of 12.38 feet; thence turn a deflection angle of 14 degrees 36 minutes 26 seconds to the right and run in a northwesterly direction for a distance of 80.52 feet to a point on a curve to the right, said curve having a radius of 843.51 feet, a central angle of 04 degrees 00 minutes 45 seconds and a chord distance of 59.06 feet; thence turn a deflection angle left to the chord of said curve 14 degrees 02 minutes 14 seconds and run in a southwesterly direction along the arc of said curve and along said right of way line for a distance of 59.07 feet; thence turn a deflection angle from the chord of said curve 88 degrees 41 minutes 49 seconds to the left and run in a southeasterly direction leaving said right of way line for a distance of 181.31 feet to the POINT OF BEGINNING.

PARCEL IV:

Together with all easements and rights described in that certain Declaration of Protective Covenants and Restrictions and Grant of Easements dated 12/21/01 and recorded in Instrument #200116/0727, in the Office of the Judge of Probate of Jefferson County, Alabama.

EXHIBIT "B"

## LEASES

Lease Agreement dated as of December 19, 2001, between Deerfoot Marketplace,
L.L.C, as Landlord, and Winn-Dixie Montgomery, Inc., as Tenant

State of Alabama - Jefferson County
I certify this instrument filed on:

2002 APR 12 P.M. 16:29
Recorded and $

and $                                    Mtg. Tax

$                                        Deed Tax and Fee Amt.
        29.50    Total $        29.50
MICHAEL F. BOLIN, Judge of Probate

200205/6799

915271.1