# EXHIBIT 1

| UNITED STATES BANKRUPTCY COURT | MIDDLE | DISTRICT OF | FLORIDA | PROOF OF CLAIM |
|---|---|---|---|---|

| Name of Debtor<br>WINN-DIXIE RALEIGH, INC. | Case Number<br>05-3837 |
|---|---|

NOTE: This form should NOT be used to make a claim for an administrative expense arising after the commencement of the ase. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>Daniel G. Kamin<br>c/o Kamin Realty Co.<br>490 South Highland Avenue<br>Pittsburgh, PA 15206 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case. |
|---|---|
| Name & address where notices should be sent<br>Sara E. Lorber<br>Seyfarth Shaw LLP<br>55 E. Monroe St., Suite 4200<br>Chicago, IL 60603<br>Telephone number: 312.269.8970 | ☐ Check box if the address differs from the address on the envelope sent to you by the court.<br><br>THIS SPACE IS FOR COURT USE ONLY |
| Account or other number by which creditor identifies debtor:<br>Store No. 808 | Check here ☐ replaces<br>if this claim ☒ amends     a previously filed claim, dated July 28, 2005 |

**1. Basis for Claim**

☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other   Lease Rejection Claim

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of SS#:_____
Unpaid compensation for services performed
from _____ to _____
(date)                        (date)

**2. Date debt was incurred:**
Lease Term

**3. If court judgment, date obtained:**

**4. Total claim of Claim at Time Case Filed:** $1,126,312.97 ____     $15,130.56 ____     $1,141,443.53 ____
(unsecured)            (secured)     (Administrative priority)     (Total)

☐ If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest, or other charges in addition, to the principal amount of the claim. Attach an itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff)

Brief description of collateral:
☐ Real Estate   ☐ Motor Vehicle
☐ Other _____

Value of collateral: $ _____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $ _____

**6. Unsecured Non Priority Claim $** $1,126,312.97

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☒ Check this box if you have an unsecured priority claim.
Amount entitled to priority: $15,130.56
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition, or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan.- 11 U.S.C. § 507(a)(4)
☐ Up to $2,225* of deposits toward purchase, lease or rental of property or services for personal, family or household use - 11 U.S.C. § 507(a)(6)
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child- 11 U.S.C. § 507(a)(7)
☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8)
☐ OTHER-Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years there-after with respect to cases commenced on or after the date of adjustment. $10,000 and 180 day limits apply to cases filed on or after 4/20/05.Pub.L. 109-8.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** Attach copies of supporting documents, such as promissory notes purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and a copy of this proof of claim.

THIS SPACE FOR COURT USE ONLY

| Date:<br>10/25/05 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>_Sara VL   Counsel for Daniel G. Kamin_ |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571

American LegalNet, Inc.<br>www.USCourtForms.com

*In re Winn-Dixie Raleigh Inc.* Case No. 05-3837

## Attachment to Daniel G. Kamin's Proof of Claim
## For Lease Rejection Damages

This attachment further explains the basis for the claim referenced on the attached Proof

of Claim, and is incorporated therein by reference.

1.      Daniel G. Kamin ("Landlord") and Winn-Dixie Raleigh, Inc. ("Tenant") are

parties to a lease (the "Lease") for certain real property located in Zebulon, North Carolina,

which property has been designated as Store No. 808.   A copy of the Lease is attached as

**Exhibit A**.

2.      The Lease runs through March 2, 2014 ("Termination Date").

3.      On September 8, 2005, Debtors filed a Notice of Rejection of Unexpired Lease

indicating their intent to reject the Lease.  *See* **Exhibit B**.  On September 29, 2003, Debtors sent

Landlord a letter formally closing Store 808 and turning over the keys to the property.  *See*

**Exhibit C**.   Thus, the Lease was rejected effective September 30, 2005.

4.      Landlord's asserts a lease rejection claim in the amount of $1,141,443.53, which

is broken down as follows:

| | |
|---|---:|
| Section 502(b)(6) Damages | $885,036.37 |
| Damages Not Subject to Cap (**Exhibit D**) | $241,276.60 |
| Administrative Claim for Real Estate Taxes (**Exhibit E** | $15,130.56 |
| **Total:** | **$1,141,443.53** |

*See* **Exhibit F.**

5.      Landlord reserves the right to amend, modify, supplement or withdraw this Proof

of Claim at any time.  By preparing, signing and/or filing this Proof of Claim, or taking any

action in connection with this Proof of Claim, Landlord is not (and does not intend to), (a) in any

manner whatsoever, waiving or relinquishing any rights Landlord may have against any entity liable for all or any part of the matters set forth herein, (b) consenting to the jurisdiction of the Bankruptcy Court with respect to any proceedings commenced in this case, (c) waiving the right to withdraw the reference with respect to objections, cases or proceedings, or (d) electing any remedy which waives or otherwise affects any other remedy.

6.      Landlord also reserves the right to assert further claims against Debtors related to unpaid post-petition obligations entitled to priority under Section 503(b)(1) of the Bankruptcy Code.

2

# EXHIBIT A

SC-1

# LEASE

THIS LEASE, made this _____16_____ day of ____March____, 19 _93_

between ___DANIEL G. KAMIN, individually,___

_____

_____

_____ ("Landlord")

and ___WINN-DIXIE RALEIGH, INC., a Florida corporation duly qualified___

___to transact business in the State of North Carolina,___

_____ ("Tenant");

which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or

plural, and the heirs, legal representatives, successors and assigns of the respective parties;

**PREMISES**

WITNESSETH:

That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and demise unto

Tenant and the Tenant hereby agrees to take and lease from the Landlord, for the term hereinafter specified,

the following described premises:

That certain store building, approximately _____200_____ feet in width by _____175_____

feet in depth, together with a 922 sq. ft. front vestibule, concrete pads

at rear of building for installation of Tenant's exterior freezers

and/or coolers,

and the land on which the same shall stand (hereinafter collectively called "demised premises"),

which store building and related improvements are to be constructed by the Landlord according

to plans and specifications to be approved by the parties as herein provided, and shall be in

the location and of the dimensions as outlined in red on the Plot Plan___entitled___

___"Expansion of Wedgewood Shopping Center", prepared by C & P___

___Architects, Charlotte, N.C., last revised October 3, 1991___

attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in detail on

Exhibit "A"), known as ___Wedgewood Terrace___

("shopping center"), located ___at the northeasterly corner of the intersection___

___of N.C. State Highway #97 and Wedgewood Avenue___

_____

in the City of___Zebulon___, County of___Wake___,

State of___North Carolina___, the legal description of the shopping center being set

forth on Exhibit "B" attached hereto and by this reference made a part hereof.

APPROVED
AS TO FORM

Division Mgr.

Legal Dept.
Winn-Dixie Stores,
Inc.
WD-32-36 (Rev. 3/89)

This instrument was prepared by
Charles P. Milford, Jr., Attorney -
at-Law whose address is P. O.
Box B, Jacksonville, Florida 32203

RIOR
LASE

It is understood that Tenant occupies certain demised premises in the shopping center by virtue of a certain Lease dated May 5, 1967 wherein Landlord herein is Landlord and Tenant herein is Tenant, a Short Form being recorded in Book 1766 page 606 of the Office of Register of Deeds for Wake County, North Carolina. The current term of said Lease is now fixed to expire at midnight on February 28, 1999. It is hereby understood and agreed by and between the parties hereto that all rents and other charges payable under the said Lease (hereinafter called "Prior Lease") shall cease to accrue and shall be apportioned on and as ninety (90) days after the date upon which rent begins to accrue under the within Lease pursuant to the provisions of paragraph 5 hereof. Thus, the term of the Prior Lease shall continue for a period of ninety days after the date upon which rent begins to accrue under paragraph 5 of the within Lease; and during said ninety day period Tenant shall have the right to remove its trade fixtures, merchandise, equipment and other personalty from the premises demised to Tenant under the Prior Lease. At the end of the said ninety day period, possession of the premises encumbered by the Prior Lease shall be surrendered by Tenant to Landlord. Within said thirty day period, Tenant shall pay to Landlord the sum of $172,000.00 in consideration of Landlord's expenses which may be related to accommodations made to other tenants affected by the within Lease and by the termination of the Prior Lease. Landlord will, as soon as practicale after the relocation of Tenant, undertake at Landlord's sole cost to remodel the fascia of the existing shopping center, all in accordance with the plans and specifications for such work, hereinafter described in this Lease. Landlord further agrees that upon commencement of the term of the within Lease and continuing during any extensions thereof, the provisions of paragraph 28 of the within Lease which give Tenant exclusive rights in the "Shopping Center" shall be interpreted to include within the "Shopping Center" the premises covered by the Prior Lease.

**TERM**

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens the demised premises for the transaction of its business for an initial term of __Twenty (20)__ years from the commencement date. The parties agree to execute a supplemental agreement documenting the commencement date.

This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

**RENTAL**

1. The Tenant agrees to pay to the Landlord as minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of __Two Hundred__

__Six Thousand Five Hundred and No/100----------------------------__

Dollars ($206,500.00_____) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of __Seventeen Thousand Two Hundred Eight and__

__33/100-----------------------------------------------------__

Dollars ($ 17,208.33_____) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

In addition, the Tenant agrees to pay to the Landlord a percentage rental equal to one percent (1%) of Tenant's gross sales from the demised premises in each fiscal year of Tenant ending approximately June 30 during the term of this Lease and any extensions thereof in excess of the sum of $20,650,000.00.

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of the percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculation of the percentage rental due hereunder, the Tenant's fiscal year shall be approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as herein provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINITION OF "GROSS SALES"**    1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold in or from the demised premises, both for cash and on credit. Such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

**RECORD OF SALES**    1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

**USE**    2. The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail or service business (including discount businesses). The above notwithstanding, Tenant agrees that the demised premises or any part thereof will not be used for the operation of any of the following (except as incidental to the operation of a supermarket): drug store, beauty aids store, pharmacy, rack-type shoe sales, barber shop, hair styling salon, bank, automatic fund transfer machines, fitness or health club.

(see also Article 26 hereof).

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of the premises, as such shall relate to the cleanliness and use of the premises and the character and manner of operation of the business conducted in or at the premises.

ONSTRUCTION
F SHOPPING
ENTER

3. It is understood that the shopping center is presently existing except for Tenant's new store building, designated "New Winn-Dixie Store" on Exhibit "A". Landlord, at its sole cost and expense, shall construct the new building to be demised to Tenant hereunder in the location and of the dimensions shown on Exhibit "A", and shall also construct all additional ramps, sidewalks, streets, entranceways, parking areas, service areas, driveways, utility lines, water detention and retention facilities and related improvements, such improvements (excluding buildings) being sometimes referred to as "common areas". The Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the shopping center and the tenants and their employees during the term of this lease and any extensions thereof. The arrangement and location of all store buildings and common areas (including parking area) within the shopping center shall at all times during the term of this lease, or any extensions thereof, be maintained as shown on Exhibit "A" and shall not be changed without the written consent of the Tenant. The exterior of the shopping center (including any store buildings and the demised premises) shall not be materially modified without Tenant's prior written consent. If not shown on Exhibit "A", Tenant expressly reserves the right to approve the finish grade elevations of all store buildings and common areas (including parking and service areas) within the shopping center which are to be constructed concurrently with Tenant's store building. Tenant shall not unreasonably withheld or delay any consent or approval. If Landlord requests consent or approval from Tenant and Tenant fails to respond within thirty (30) days, then such consent or approval shall be deemed to have been given by Tenant.

Landlord also agrees, within ninety (90) days after Tenant vacates the store building presently demised to it in the shopping center, to commence the remodeling and other construction described in the article entitled "Prior Lease" on page 2 hereof.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to construct the store building for occupancy by Tenant in accordance with the plans and specifications to be approved by both Landlord and Tenant. Plans and specifications shall be approved when initialed by both parties, and when initialed shall constitute a part of this lease. The plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job."

COMPLETION
DATE

4.    Landlord covenants and agrees that the construction of the new store building shall begin not later than July 1, 1993 and shall be substantially completed, weather and other factors beyonds Landlord's control permitting, not later than April 30, 1994; and if the same shall not be begun or substantially completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this Lease or may extend the Landlord additional time for the beginning or completion of construction. "Construction of the shopping center" shall be deemed to have begun when the first concrete footings have been poured. If pursuant to this article Tenant shall cancel or terminate this Lease or may extend the Landlord additional time for the beginning or completion of construction; provided, however, that additional time will be extended for the beginning or completion of construction if Landlord is proceeding with all due diligence under the circumstances. If Landlord fails to commence or complete construction of the shopping center by the above dates, Landlord agrees that for a period of three (3) years after such cancellation or termination Tenant shall have "first refusal" of the right to operate any food supermarket in the shopping center, provided however, Tenant must accept or reject any such offer within sixty (60) days after receiving same from Landlord.

SC-5

**COMMENCE-
MENT DATE**  5. The Tenant shall open its store for business within sixty (60) days following performance of the following:

substantially

(a) Tenant's store building and other improvements constructed on the premises shall have been delivered to Tenant completed in accordance with the plans and specifications, and Landlord shall have delivered to Tenant, at Landlord's expense, a Certificate of Occupancy or equivalent document for the demised store building;

(b) Construction of all of the common areas shall have been completed substantially as shown on Exhibit "A";

(c) All drives, entrances, median cuts, acceleration and deceleration lanes and traffic control devices shown on Exhibit "A" in or connecting the common areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic.

In the event that all the above requirements shall not have been met on or prior to the outside completion date, the Tenant at its sole option may cancel and terminate this lease.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of sixty (60) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

Notwithstanding the other provisions of Articles 4 and 5 hereof, Landlord agrees that if for any reason the requirements of Article 5 are met by Landlord on or after December 1 of any year and on or before January 31 of the succeeding year, Tenant shall not be required to open its store for business and rent shall not begin to accrue until the later of February 1 of the succeeding year, or 30 days after the requirements of Article 5 are met, unless Tenant actually opens its store for business sooner.

**OTHER
TENANTS**  6. As a condition and inducement to Tenant's entering into this lease, Landlord represents and warrants that it has entered into firm commitments for leases with the tenant. listed below for the terms and for the amount of floor space indicated:

Article 6
Intentionally
Ommitted.



| Name | Minimum Term Years | Minimum Floor Area (sq. ft.) |
|---|---|---|
| Revco Drugs | 10 | 7,600 |

Landlord further warrants and represents that said tenant has signed a lease which includes the minimum term and minimum floor area above stated and which is for space in the location indicated on Exhibit "A". The lease to said tenant is non-cancellable by Landlord, except upon default of said tenant.

SC-6

ETAIL AND
ERVICE
TORES
NLY

7.   Without the prior written consent of Tenant herein, only retail and/or service stores shall be allowed to operate in the shopping center, or any enlargement thereof within 250 feet of the nearest point of Tenant's demised store building, it being the intent of the parties hereto that no non-retail or non-service stores shall be permitted within such 250 foot area.   The parties acknowledge that this provision shall not apply to any existing businesses which are non-retail or non-service in nature as of the date of this Lease.   The parties further agree that not in excess of 5,000 sq. ft. of business and professional office space shall be permitted in the shopping center.

PARKING
AND
COMMON
AREAS

8. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks. Tenant may use the sidewalks adjacent to the demised premises or exterior surfaces of its building for the display and sale of merchandise and services.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a) a minimum ratio of at least_____5.5_____ automobile parking spaces for each 1,000 sq. ft. of gross building area (including additional floor levels) in the shopping center, and

(b) facilities for convenient parking of at least_____586_____ automobiles (minimum);

and in the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord at its expense during Tenant's food store shopping hours, and Landlord further agrees that no signboards or other construction shall be erected in any of the said common areas shown on Exhibit "A" or so as to obstruct the view of the demised premises from the adjoining public streets. Without prior written consent of Tenant herein, no carnivals, fairs or shows nor sales by merchants utilizing vehicles or booths in the common areas shall be allowed in the shopping center, or any enlargement thereof.

Tenant agrees that the parking facilities presently existing at the shopping center meet the requirements hereof.

SERVICE
AREA

9. Landlord agrees to provide for the exclusive use of the Tenant at its service entrances parking spaces for two large trailer trucks for continuous use. Landlord further agrees that Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for its store into and from trucks and trailers at such service entrances.

Landlord shall not be responsible for interference by trespassers with Tenant's access to and use of said entrances and areas.

SC-7

**UTILITIES**  10. The Tenant agrees to pay all charges for telephone, electricity, water, gas and other utilities and services used by Tenant at the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities. Tenant shall not be responsible for any charges for the fire alarm system, static or flowing water to supply the fire sprinkler system, or any "hook up" fees or other charges incident to providing access to any utility.

Landlord shall not be liable for the discontinuance of any service or utility unless the same is within the exclusive control of Landlord.

**TENANT'S**  11. Upon completion of construction by Landlord and acceptance of the demised premises by Tenant,
**REPAIRS**  Tenant agrees to keep the interior of the demised premises in good condition and repair, excepting structural repairs and all repairs which are the responsibility of the Landlord or which are made necessary by reason of fire or the elements or other casualty covered by Landlord's fire and extended coverage insurance, and excepting reasonable wear and tear.

Within the maintenance and repair responsibilities of Tenant shall be included: heating and air conditioning systems and equipment, automatic sliding doors, windows and plate glass (except damage caused by faulty construction or settling of the building or such as is covered by Landlord's fire and extended coverage insurance, all of which shall be Landlord's responsibility); floor surfacing; sewer systems, including traps, but only inward from the exterior perimeter of the building; and water, gas and electric lines, but only inward from the exterior perimeter of the building. Landlord agrees to accord to Tenant the benefit of any warranties extended by the manufacturers and installers of any and all items for which Tenant has repair and maintenance responsibility.

**LANDLORD'S**  12. The Landlord shall, at its cost and expense, keep and maintain, in good condition and repair, the com-
**REPAIRS**  mon areas, the exterior of Tenant's store building, including the ███████████████████████████████
roof, gutter, downspouts, exterior painting, masonry walls, foundation and structural members, the automatic exterior
sprinkler system (including central alarm system therefor, if required by governmental authority), the plumbing (including septic tank, if any),/wiring,~~.............~~ and exterior ~~............................~~ of the store building in good condition and repair, and shall make any and all structural repairs to both the exterior and interior of said premises. If any portion of the common areas (as defined in Article 3 hereof) or any portion of the store building, which is the responsibility of the Landlord, shall at any time be in need of repair, Landlord will repair same immediately upon receipt of written notice from Tenant to do so, except that the Landlord shall not be obligated to make or pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of the Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements, or other casualty covered by Landlord's fire and extended coverage insurance.

If in order to protect persons or property it shall be necessary to make emergency repairs which are the responsibility of the Landlord, or if the Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas, as defined in Article 3 hereof, which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs. Landlord further covenants that the store building will be so constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that the premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated.

In the event of any emergency requiring repairs, Tenant shall first endeavor to notify Landlord and give Landlord the opportunity to make the repairs. At any time during which Tenant expends money for which Landlord may be liable, Tenant shall take reasonable steps to ascertain that the amounts expended are fair and reasonable.

-7-

**SIGNS**　　13. Tenant may place, erect and maintain any signs on the roof, walls, and any other places on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs.

Landlord will not object to Tenant's erection, at Tenant's cost, of a pylon sign in the location shown on Exhibit "A", together with all electrical underground conduit and wiring necessary therefor, it being understood that the cost of illuminating the sign shall be borne by the Tenant.

**FIXTURES AND ALTERATIONS**　　14. The Tenant, at its own expense, shall have the right from time to time during the term of this lease to make any interior or exterior alterations, additions and improvements, including doors and partitions, in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. This right of Tenant shall include the erection of interior partitions and the installation of additional front and rear doors. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

Tenant may construct and build or install in the premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from the premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to the premises resulting from the installation or removal of such items.

**INDEMNIFI-CATION**　　15. Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises. Likewise, Landlord shall indemnify and save harmless the Tenant from any claim or loss (including costs of investigation, court costs and reasonable attorneys' fees) by reason of an accident or damage to any person or property happening on or about all common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, comprehensive general liability insurance coverage with Tenant named as an additional insured on all common areas (as defined in Article 3 hereof) of the shopping center, in a company qualified to transact business in the state where the premises are located, stipulating limits of liability of not less than $2,000,000.00. Certificate of such coverage from the insurer providing 30 days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant.

During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of the premiums for Landlord's liability insurance above described. Tenant shall be responsible for its pro-rata share of such premiums, Tenant's pro-rata share to be an apportionment made in the ratio which the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floor of all buildings from time to time existing in the shopping center. The amount of premiums for which Tenant is to reimburse Landlord shall be less any available abatements, discounts or refunds thereon. Landlord shall at all times use its best and earnest efforts to obtain such coverage at the most reasonable rates available. Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums. Notwithstanding the above, it is agreed that Tenant's obligations to make the payments herein described is expressly conditioned upon receipt from Landlord of the written invoice for such insurance premiums no later than twelve (12) months after the due date thereof. Further, Tenant shall not be required to make the payments herein described unless and until Tenant is furnished with photocopies of the applicable insurance policy to include the declaration page. Tenant will comply with the reasonable requests of Landlord's insurance carriers.

**CLEANLINESS**　　16. Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the delivery areas at the rear of the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the demised premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

**FIRE**

17. In the event that Tenant's demised premises shall be totally destroyed or damaged to the extent of 75% or more of the value thereof by fire or other casualty, then Tenant may elect within thirty (30) days after such damage, to terminate this lease by giving to the Landlord a written notice of termination, and thereupon both parties shall stand released of and from all further liability under this lease. If Tenant's demised premises shall thereby suffer damage to any extent less than 75% of the value thereof, or if Tenant does not elect to terminate as aforesaid, then the Landlord agrees to proceed promptly and without expense to the Tenant to repair the damage or restore the improvements, remitting a fair and just portion of the rent, according to the unusable space, until said premises are completely reinstated or restored. If at any time during the term of this lease or any extensions thereof any of the buildings in the shopping center, exclusive of Tenant's demised premises, are damaged by fire or by the elements or otherwise, Landlord shall immediately commence and diligently prosecute to completion repair of all such damage and shall restore said improvements to their condition prior to such damage.

During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of the premiums for Landlord's fire and extended coverage insurance allocable to the demised premises. If such premiums shall not be billed separately upon Tenant's demised store premises the same shall be fairly apportioned to determine Tenant's share thereof. Such apportionment shall be made in the ratio which the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floor of all buildings from time to time existing in the shopping center. The amount of premiums for which Tenant is to reimburse Landlord shall be less any available abatements, discounts or refunds thereon. Landlord shall at all times use its earnest and best efforts to obtain such fire and extended coverage insurance at the most reasonable rates available. Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums. Notwithstanding the above, it is agreed that Tenant's obligations to make the payments herein described is expressly conditioned upon receipt from Landlord of the written invoice for such insurance premiums no later than six (6) months after the due date thereof. Further, Tenant shall not be required to make the payments herein described unless and until Tenant is furnished with photocopies of the applicable insurance policy to include the declaration page.

Landlord shall carry fire and extended coverage insurance on Tenant's demised premises and any additions, alterations and improvements made thereto by Landlord or Tenant and on all other buildings within the shopping center in the amount of full insurable value thereof, above foundation walls, and hereby expressly waives any and all claims against the Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the Tenant, its agents, servants or employees.

**QUIET
ENJOYMENT**

18. The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.
(and see Article 29 hereof.)

to the best of his knowledge
The Landlord warrants|the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a mercantile, retail or service business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a mercantile, retail or service business or using the common areas (as defined in Article 3 hereof) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

-9-

SC-10

**TAXES AND LIENS**

19. All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord prior to delinquency. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the demised premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the demised premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law.

(And see article 37 hereof)

**CONDEM-NATION**

20. If any part of the demised premises or more than twenty per cent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of____ten____ per cent (10    %) or reduce the number of cars which may be conveniently parked to less than____517____, the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking.

**DEFAULT**

21. In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.

SC-11

**BANKRUPTCY**   22.  The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

**CONSTRUCTION RISKS**   23.  Nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing the improvements, and the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated and to request change orders to be paid by Tenant. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing the improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing the improvements or from any faulty construction thereof.

Nothing contained herein will require Landlord or Landlord's contractor to accept any change order proposed by Tenant without the inclusion in such change order of an appropriate extension of time to complete the construction and an appropriate adjustment to the contract price.

**NOTICES**   24.  All notices required to be given to Landlord hereunder shall be sent by registered or certified mail or delivery service with receipt to, and all rent payments shall be made to Landlord at _____

c/o Kamin Realty Company

P. O. Box 10234, Shadyside Station

Pittsburgh, PA.  15232

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail or delivery service with receipt.

All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at

2201 S. Wilmington Street

Raleigh, NC  27603

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail or delivery service with receipt.

**END OF TENANCY**   25.  The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state. Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant; except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, for consumption either on or off the premises, shall not be deemed a violation hereof. With the exception of ▓▓▓▓▓▓▓▓▓ **the existing A.B.C. store** only Tenant may sell beer and wine in the shopping center for off-premises consumption. Only Tenant may operate a bakery, delicatessen or similar department in the shopping center.

Notwithstanding the above, as to the store premises occupied by Revco Drugs, up to 1,500 square feet of sales area may be devoted to the sale of food items.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any provisions herein to the the contrary, the Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation. If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument.

**SUBORDINATE** 29. The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

**NOTICE TO LENDER** 30. Tenant agrees that it will give notice to any holder of a first mortgage (which term shall include all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, the Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 12 of this lease.

**COMMON AREA MAINTENANCE** 31. Landlord agrees to operate and maintain in good condition and repair all the common areas, as defined in Article 3 hereof, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping at least three (3) times weekly, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and watering and maintenance of landscaped areas. If the Landlord, after fifteen (15) days following receipt of written notice from Tenant to do so, shall fail to make the repairs or perform the services described in this Article, the Tenant shall have the right to make such repairs or cause such services to be performed in its behalf and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred therein.

-13-

ASSIGNMENT
AND
SUBLEASING

26.    The Tenant may without the consent of Landlord vacate the demised premises or assign this Lease or sublease the demised premises in whole or in part to any corporation or entity which is the parent of or subsidiary to or affiliated with Tenant, and to any corporation or entity with which Tenant merges or consolidates or to which it sells all or substantially all of its business in the state where the demised premises are located, providing that in the case of such assignment or subletting, the premises continue to be used as a supermarket operation and provided that Tenant herein shall continue to remain responsible for the payment of rentals and due performance of all other terms, covenants and conditions required of Tenant in this Lease.

For a period of nine (9) months following the date when Tenant may cease doing business in the demised premises, Tenant may not assign or sublease without Landlord's written consent, which shall not be unreasonably withheld.   If Tenant intends to assign or sublease the demised premises for any purpose other than for the conduct of a food supermarket, it shall notify Landlord of such intent and identify the proposed assignee or sublessee and advise the use of which the demised premises are to be put, whereupon, Landlord, may at his sole option elect by written notice, delivered to Tenant for a period of thirty (30) days after receiving such notification from Tenant, either approve the proposed assignment or sublease or disapprove the proposed assignment or sublease.   If Landlord's reply to Tenant's notice is not delivered to Tenant within the 30 day period above described, then in such event the proposed assignment or sublease shall be deemed approved.

Should Tenant vacate the entire demised premises or cease operating a supermarket therein for a period of nine (9) months, Landlord shall have the continuing option for thirty (30) days after such nine (9) month period to cancel this Lease upon fifteen (15) days' written notice of its election to do so.   Should Landlord not elect to cancel this Lease during the 10th month following Tenant's vacating of the demised premises, then at the conclusion of such ten (10) month period, Tenant shall have the right to assign this Lease or sublease the entire demised premises for any use which might not violate the exclusive use of any other then tenant in the shopping center provided Landlord has given Tenant written notice of the exclusive right of such tenant.

In the event of any assignment or subleasing by Tenant, Tenant herein shall continue to remain responsible for the payment of rentals and the due performance of all other terms, covenants and conditions required of Tenant in this Lease.

EXTENSIONS    27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of _____
_____five_____ ( 5 ) successive extensions of this lease, each extension to be for a period of
_____five_____ ( 5 ) years and at the same rentals and upon the same terms and conditions as required herein for the initial term,

Such option privilege may be exercised by Tenant giving to the Landlord a notice in writing at least
___six (6) months_____ before the expiration of the initial term, and if
extended, at least_____six (6) months_____ before the expiration of such extended term, stating the intention of the Tenant to exercise such option and the period for which such option is exercised and thereupon this lease shall be so extended without the execution of any other or further document.

Landlord shall send to Tenant a written reminder notice concerning the expiration of the initial term or of an option term, the reminder to be sent not less than eight (8) months prior to expiration.   If Landlord fails to render such notice, the sole effect shall be that Tenant shall have a continuing right to renew this Lease as hereinabove provided at any time up to sixty (60) days prior to the expiration date.

EXCLUSIVE
SUPERMARKET

28. Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business

-12-

For such services, Tenant shall pay to Landlord, as additional rental hereunder and as reimbursement for the annual cost thereof, the following sums:

(a) For years 1 through 5 of the initial 20-year lease term, an amount equal to the square footage of Tenant's demised store building premises times 25¢ per square foot.

(b) For years 6 through 10 of the initial 20-year lease term, an amount equal to the square footage of Tenant's demised store building premises times 30¢ per square foot.

(c) For years 11 through 15 of the initial 20-year lease term, an amount equal to the square footage of Tenant's demised store building premises times 35¢ per square foot.

(d) For years 16 through 20 of the initial 20-year lease term, an amount equal to the square footage of Tenant's demised store building premises times 40¢ per square foot.

(e) During any exercised option extensions of the Lease, an amount equal to the square footage of Tenant's demised store building premises times 45¢ per square foot.

All such annual payments shall be made in twelve (12) equal monthly installments in advance on the first day of each and every calendar month of the lease term and any extensions thereof. Tenant shall not reimbursement Landlord for any expense not reasonably connected with the necessary maintenance and repair of the shopping center common areas. Examples of expenses for which Tenant shall not make reimbursement are rental insurance premiums and shopping center management fees and administrative costs. Tenant shall not be required to make any such payments when the detailed statement of such cost is delivered to Tenant later than December 31 of the calendar year following the year for which the payment were due.

**BENEFIT** 32. This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

**TRANSFER BY LANDLORD** 33. In the event Landlord transfers Landlord's interest in this lease, Landlord agrees to promptly provide Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's interest in this lease.

**SHORT FORM LEASE** 34. The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease in form permitting its recording.

**MARGINAL TITLES** 35. The marginal titles appearing in this lease are for reference only and shall not be considered as part of this lease or in any way to modify, amend or affect the provisions thereof.

**COMPLETE AGREEMENT** 36. This written lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

-14-

REAL
ESTATE
TAXES

37.     During the term of this lease and any extensions thereof, Tenant shall pay to Landlord as additional rental the amount of ad valorem real estate taxes levied against the demised premises, and, if any other taxes imposed against Landlord with respect to the demised premises by federal, state or local taxing authorities as a substitute for or in addition to the current method of property taxation used for the funding of governmental services, such substitute or additional tax.

If such taxes shall not be assessed separately, but shall be included within an assessment of the demised premises and others, said assessments shall be fairly apportioned to determine Tenant's share thereof. Such apportionment shall be made in the ratio which the square footage of Tenant's store building bears to the total square footage of all store buildings (including additional floor levels) from time to time existing in the shopping center. The amount of taxes attributable to the shopping center, and for which Tenant is to reimburse Landlord in part, shall be less any abatements, discounts or refunds thereon. Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements as evidence of the basis upon which any increase in taxes is chargeable to Tenant and an "as built" survey of the shopping center, and such additional rental shall be payable by Tenant on demand after payment by Landlord. All taxes, other than ad valorem real estate taxes, including special assessments, improvement liens and the like shall remain the sole responsibility of the Landlord. However, Tenant shall remain responsible for sales taxes on rentals levied by law on lessees or for any other tax substituted for any such rent tax.

Tenant shall have the right from time to time to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned, and to institute such proceedings in the name of the Landlord as the Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to the Landlord.

Notwithstanding the above, it is agreed that Tenant's obligation to make the payments herein described is expressly conditioned upon receipt from Landlord of a written statement for such ad valorem real estate tax increase contributions (as well as the other documents described herein if requested by Tenant) no later than December 31 of the calendar year following the year in which the taxes were due.

EXPANSION
OPTION

38.     The Tenant is hereby granted the option and privilege, at any time during the term of this lease, or any extensions thereof, of requiring the enlargement of the store building herein contemplated by the addition of not to exceed 60 feet in width by 175 feet in depth on the easterly side of its store building, which area shall be reserved for such enlargement and pending same may be utilized only for paved parking. This option may be exercised by the Tenant giving to the Landlord a notice in writing of its exercise of such option, and upon such notice, the Landlord agrees to construct such addition, at its sole cost and expense, in accordance with plans and specifications to be approved by the parties hereto, with all due diligence and of a like quality of construction as the original building. Upon completion of such building addition, if there shall not at such date remain at least ten (10) years of the then current term of this lease, such current term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date. Thereafter, during such extended term, the annual minimum guaranteed rental (and the base for computation of percentage rental hereunder) shall be increased by the greater of: an amount equal to 12% of the cost of such addition, or an amount equal to $5.90 per square foot of the enlargement area, or an amount equal to a computed percentage times the cost of such addition, such percentage consisting of 3% plus the current prime interest rate charged by New York City banks at the time of the exercise of the option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant, with the final cost of the addition upon completion to be certified to by the general contractor performing the work. During such extended term, the provisions of the lease shall remain in effect and the option periods herein provided (if any shall then remain) shall be construed to follow upon the end of the extended term and the rentals to remain as adjusted in consequence of the addition. Upon completion of the addition, it shall be and become a portion of the demised premises and this lease thereby be taken and construed as so amended.

Nothing herein contained shall constitute any express or implied obligation on the part of the holder of a first mortgage encumbering the fee simple title to the demised premises, or of any purchaser at a sale under foreclosure of such mortgage, to comply with the terms and provisions of this Article, it being the understanding of the parties that the obligation to cause such expansion is the sole obligation of the Landlord, its heirs, legal representatives, successors and assigns, but this paragraph shall not limit Tenant's right to construct the expansion at its own cost as provided herein.

-15-

In the event Landlord shall for any reason fail or refuse to construct the building addition contemplated hereunder after Tenant has properly exercised its option herein, the Tenant, at its option, shall have the right at its own expense to construct the building addition of the size and quality set forth above. If Tenant constructs the enlargement, Tenant agrees to cause any mechanics' liens incurred by and in connection with such expansion to be promptly discharged and agrees to indemnify and hold harmless the Landlord from any expense occasioned thereby. Upon completion of such building addition and occupancy thereof by Tenant, if there shall not at such date remain at least ten (10) years of the then term of this lease, the lease term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date. Upon completion of the building addition and occupancy thereof by Tenant, during the remaining lease term and any extensions thereof, there shall be no additional minimum guaranteed annual rental payable by Tenant in respect of such addition.

**LANDLORD'S LIABILITY AND SELF-HELP**

39. Notwithstanding anything to the contrary provided in this lease, if Landlord or any successor in interest of Landlord shall be an individual, joint venture, tenancy in common, firm or partnership, general or limited, it is specifically understood and agreed that there shall be absolutely no personal liability on the part of such individual or on the part of the members of such firm, partnership or joint venture with respect to any of the terms, covenants and conditions of this lease, and that Tenant shall look _demised premises_ solely to the equity of Landlord or such successor in interest in the ~~shopping center~~ for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this lease to be performed by Landlord, such exculpation of personal liability to be absolute and without any exception whatsoever.

If Landlord shall default in the performance or observance of any agreement or condition in this lease contained on its part to be performed or observed, and if Landlord shall not cure such default within thirty (30) days after notice from Tenant specifying the default (or shall not within said period commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Tenant may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter cure such default for the account of the Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord and the Landlord agrees to reimburse Tenant therefor or save Tenant harmless therefrom; provided that Tenant may cure any such default as aforesaid prior to the expiration of said waiting period, but after said notice to Landlord, if the curing of such default prior to the expiration of said waiting period is reasonably necessary to protect the real estate or Tenant's interest therein or to prevent injury or damage to persons or property. If Landlord shall fail to reimburse Tenant upon demand for any amount paid for the account of Landlord hereunder, said amount may be deducted by Tenant from the next or any succeeding payments of rent or any other payments due hereunder.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this agreement the day and year first above written.

Signed, sealed and delivered
in the presence of:

_Terry Mastandrea_
Witness
_Karen L. Majetic_
As to Landlord

_Carl G Kamin_ (SEAL)
DANIEL G. KAMIN, Individually

LANDLORD

_le will ford_
Witness
_Susan G. Clarkson_
As to Landlord

WINN~~-DIXIE~~ RALEIGH, INC.

By: _[signature]_
Its ~~Vice~~ President

Attest: _[signature]_
Its Secretary

(CORPORATE SEAL)

TENANT

-16-

STATE OF ~~NORTH CAROLINA~~ *Pennsylvania*                )
                                                          )
COUNTY OF *Allegheny*                                     )

    I, _____ *Andrew L. Lasser* _____,

a Notary Public, State and County aforesaid, do hereby certify

that DANIEL G. KAMIN personally came before me this day and

acknowledged that he signed the same in my presence.

    Witness my hand and official seal, this the ___16th___ day of

_____ *March* _____, 1993.

*Andrew L. Lasser*
Notary Public
State and County aforesaid
My commission expires:

      NOTARIAL SEAL
  ANDREW L. LASSER, Notary Public
   Pittsburgh, Alleghany County
My Commission Expires May 29, 1995                        (NOTARIAL SEAL)

STATE OF FLORIDA                                          )
                                                          )
COUNTY OF DUVAL                                           )

    I, ___ *Susan G. Clarkson* _____,

a Notary Public, State and County aforesaid, do hereby certify

that _____ ~~Wayne E. Ripley, Jr.~~ _____

personally came before me this day and acknowledged that s/he is

_____ Secretary of WINN-DIXIE RALEIGH, INC., and that, by

authority duly given and as the act of the corporation, the

foregoing instrument was signed in its name by its: ___Vice___

President, sealed with its corporate seal, and attested by

her/himself as its _____ Secretary.

    Witness my hand and official seal, this the __24th__ day of

___ *March* _____, 1993.

*Susan G. Clarkson*
Notary Public                  Notary Public, State of Florida
State and County aforesaid        SUSAN G. CLARKSON
My commission expires:         My Comm. Exp. Jan. 15, 1996
                               Comm. No. CC 174382        (NOTARIAL SEAL)

STATE OF FLORIDA                                          )
                                                          )
COUNTY OF DUVAL                                           )

    I, ____ *Susan G. Clarkson* _____,

a Notary Public, State and County aforesaid, do hereby certify

that _____ ~~Wayne E. Ripley, Jr.~~ _____

personally came before me this day and acknowledged that s/he is

_____ Secretary of WINN-DIXIE STORES, INC., and that, by

authority duly given and as the act of the corporation, the

foregoing instrument was signed in its name by its _____

President, sealed with its corporate seal, and attested by

her/himself as its _____ Secretary.

    Witness my hand and official seal, this the __24th__ day of

*March* _____, 1993.

*Susan G. Clarkson*
Notary Public                  Notary Public, State of Florida
State and County aforesaid        SUSAN G. CLARKSON
My commission expires:         My Comm. Exp. Jan. 15, 1996
                               Comm. No. CC 174382        (NOTARIAL SEAL)

### GUARANTY

In consideration of the sum of Ten Dollars ($10.00) paid by DANIEL G. KAMIN, individually, hereinafter called "Landlord", to WINN-DIXIE STORES, INC., a Florida corporation with its principal office at 5050 Edgewood Court, Jacksonville, Florida 32205, hereinafter called "Guarantor", the receipt and sufficiency whereof are hereby acknowledged, Guarantor does hereby guarantee unto Landlord, its heirs, legal representatives, successors and assigns, the due performance and observance by WINN DIXIE RALEIGH, INC., a Florida corporation duly qualified to transact business in the State of North Carolina, hereinafter called "Tenant", of all the terms, covenants and conditions on the part of Tenant to be performed and observed including, without limitation, payment of rentals under the attached and foregoing lease agreement dated _March 16, 1993_, ~~199~~, covering certain premises located in a shopping center development known as "Wedgewood Terrace", situated at the northeasterly corner of the intersection of N.C. State Highway #97 and Wedgewood Avenue, Zebulon, Wake County, North Carolina.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed in its corporate name and its corporate seal to be hereunto affixed and attested by its officers thereunto duly authorized this _24th_ day of _March_, 199~~3~~.

Signed, sealed and delivered
in the presence of:

WINN-DIXIE STORES, INC.

_____
Witness

By _____
Its                President

_____
As to Guarantor

Attest _____
Its                Secretary

GUARANTOR

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

### NOTICE OF REJECTION OF UNEXPIRED LEASE

TO:    Daniel G. Kamin
       P.O. Box 10234
       Pittsburg, PA  15232-0234

Re:    **Winn-Dixie Store 808, located in Zebulon, North Carolina**
       Lease dated March 16, 1993, and any amendments, modifications or supplements
       relating to the lease (collectively, the "Lease").


**PLEASE TAKE NOTICE** that on September 8, 2005 the United States Bankruptcy

Court for the Middle District of Florida, Jacksonville (the "Bankruptcy Court") entered an order

Granting the Debtors' Motion (i) to Sell Leasehold Interests in Targeted Stores Free and Clear of

Liens, Claims and Interests and Exempt from Taxes, (ii) to Assume and Assign Leases, (iii) to

Reject Targeted Leases the Debtors are Unable to Sell, and (iv) Granting Related Relief (Docket

No. 3405) (the "Order").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Order, the

Debtors provide notice of their intent to reject the Lease. Pursuant to the terms of the Order, the

Lease is deemed rejected effective on the later of (i) the tenth (10th) calendar day following the

service of the Rejection Notice; and (ii) the date on which Debtors have (a) vacated and

surrendered possession of the premises; and (b) delivered the keys to the leased premises to the

affected landlord at the mall management office where the leased premises are located (the "Rejection Date").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Order, if you hold a claim or claims against the Debtors arising from the rejection of the Lease, you must submit a proof of claim for rejection damages, if at all, to Logan and Company, Inc. at 546 Valley Road, Upper Montclair, New Jersey 07043 within thirty (30) days following the applicable Rejection Date, or be forever barred from asserting a claim for rejection damages.

WINN DIXIE STORES, INC, and its
Subsidiaries and affiliates as
Debtors and Debtors-In-Possession,

By its attorneys,

*s/ Cynthia C. Jackson*
Stephen D. Busey
James H. Post
Cynthia C. Jackson (FBN 498882)

225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Debtors

Dated: September 14, 2005

# EXHIBIT C



VIA FEDERAL EXPRESS

September 29, 2005

DANIEL G KAMIN
490 S. Highland Ave.
ATTN: Kathy
PITTSBURG PA 15206

RE: CLOSED WINN-DIXIE STORE
#808
PITTSBURG PA 15206, NC

Attention DANIEL G KAMIN:

Enclosed is the front door key to the above referenced property.

**Please note you are only receiving the front door key.** Once you enter the store, the keys to the remaining locks, etc., will be located on the front counter of the store.

Please also be advised that the utilities will be terminated within five (5) days. You may contact Cynthia Leo at 904.370.6746 or via email CynthiaLeo@winn-dixie.com for further information regarding the transfer of utilities. Please refer to the Winn-Dixie store number in your correspondence.

Sincerely,

*Vanessa S. Bodie*

Vanessa S. Bodie
Real Estate Department
904.370.6183- Office
904.783.5600- Fax

# EXHIBIT D

# Zebulon-Wedgewood Terrace
## STATEMENT
### As of February 22, 2005

02/22/05

| Type | Date | Memo | Due Date | Aging | Amount | Open Balance |
|------|------|------|----------|-------|--------|--------------|
| **WINN DIXIE #808** | | | | | | |
| Invoice | 2/1/2005 | 2004 CAM | 2/1/2005 | 21 | 276.60 | 276.60 |
| Total WINN DIXIE #808 | | | | | 276.60 | 276.60 |
| TOTAL | | | | | 276.60 | 276.60 |

**Kamin Realty Company**

# Memo

**To:** Daniel G. Kamin

**From:** Chuck Reall

**CC:** Kathy Cochran

**Date:** 10/25/2005

**Re:** Winn-Dixie Locations – Maintenance Items

---

## Following is a list of maintenance items that will need to be addressed at the following locations.

## ZEBULON, NC

1. **H.V.A.C.** – Repair existing system. – Estimated cost - $85,000.00.

2. **ROOF** – Replace existing roof. – Estimated cost - $144,000.00.

3. **CLEAN UP SPACE** – Estimated cost - $12,000.00.

   ### TOTAL ESTIMATED COST -- $241,000.00.

● Page 2

# EXHIBIT E

WAKE COUNTY REVENUE DEPARTMENT
PO BOX 2331
RALEIGH NC 27602-2331


**WAKE COUNTY**
NORTH CAROLINA

# PROPERTY TAX NOTICE

**Visit our Web page at www.WakeGov.com**
**ON-LINE PAYMENT ACCESS CODE: 34109**
**(see reverse for details)**

- **DUE DATE:** Property taxes are due and payable September 1 and delinquent if paid after the date shown below.
- **FAILURE TO PAY:** Delinquent taxes are subject to garnishment of wages, levy on personal property, and foreclosure proceedings immediately upon becoming delinquent.
- **INTEREST:** Accrues at the rate of 2% for January & 3/4 of 1% each following month.
- **INSTALLMENTS:** For your convenience, partial payments will be accepted. Account must be paid in full prior to becoming delinquent.
- **RESIDENTIAL WASTE REDUCTION FEE:** This annual fee supports various waste reduction programs that benefit all residents and the environment.
- **ESCROW/MORTGAGE ACCOUNTS:** The property owner is responsible for ensuring full payment of this obligation. If funds are held in escrow to pay this notice, forward to the appropriate mortgage holder.

T951 P1 ***************AUTO**MIXED AADC 275
DANIEL G KAMIN ZEBULON ENTERPRISES
PO BOX 10234
PITTSBURGH PA 15232-0234

| Account Number | Tax Year/Year For | Bill Type | Bill Date | Due Date | Delinquent After |
|---|---|---|---|---|---|
| 0000098099 | 2005/2005 | 000000 | 07/18/2005 | 09/01/2005 | 01/05/2006 |

| | | | | |
|---|---|---|---|---|
| Description: | TR 1 & 2 PROP DANIEL G KAMIN BM93-100 | | Real Value: | 1,383,049 |
| Location Address: | 506 W GANNON AV | | Deferred Value: | |
| Acreage: | 3.41 | | Use Value: | 1,383,049 |
| Year For: | 2005 | | Excluded Value: | |
| Pin Number: | 2705.13 04 1662 000 | | Total Value: | 1,383,049 |

| TAXING DISTRICT | RATE PER $100 VALUE | AMOUNT DUE |
|---|---|---|
| WAKE COUNTY (Public School Operating) | 0.33890 | 4,687.15 |
| DISTRIBUTION: (School Building Program) | 0.12170 | 1,683.17 |
| (County Services) | 0.14340 | 1,983.30 |
| **TOTAL WAKE COUNTY** | **0.60400** | **8,353.62** |
| MUNICIPALITY: ZEBULON | 0.49000 | 6,776.94 |
| FIRE DISTRICT: | | |
| SPECIAL DISTRICT: | | |
| **TOTAL TAX** | | **15,130.56** |
| RESIDENTIAL WASTE REDUCTION FEE: | | |
| LATE LIST FEES: | | |
| **TOTAL TAX & FEES** | | **15,130.56** |
| LESS CREDIT FOR PREPAID TAXES | | |
| **TOTAL DUE** | | **15,130.56** |

| HOW YOUR COUNTY PROPERTY TAX DOLLAR IS SPENT | |
|---|---|
| WAKE COUNTY SCHOOLS OPERATING | 56.10% |
| SCHOOL CAPITAL PROGRAM | 20.19% |
| COUNTY CAPITAL PROGRAM | 7.18% |
| HUMAN SERVICES | 5.55% |
| GENERAL GOVERNMENT | 4.45% |
| SHERIFF | 3.24% |
| COMMUNITY SERVICES | 1.07% |
| PUBLIC SAFETY | .91% |
| WAKE TECH COMMUNITY COLLEGE | .92% |
| ENVIRONMENTAL SERVICES | .38% |
| TOTAL | 100% |

| HOW YOUR TOWN OF ZEBULON PROPERTY TAX DOLLAR IS SPENT | |
|---|---|
| POLICE | 20.30% |
| TRANSPORTATION | 16.00% |
| GENERAL GOVERNMENT | 13.80% |
| CULTURE & RECREATION | 11.70% |
| SANITATION | 10.40% |
| BUILDING MAINTENANCE | 8.10% |
| FIRE | 7.30% |
| GOVERNING BODY | 2.40% |
| TOTAL | 100% |

WCTPL 316958    137741

| BILL CODE | ACCOUNT NUMBER | BILL DATE | DUE DATE | CORRECT IF PAID BY | TOTAL AMOUNT DUE | AMOUNT PAID |
|---|---|---|---|---|---|---|
| 01 | 0000098099 | 07/18/2005 | 09/01/2005 | 01/05/2006 | 15,130.56 | |

**PLEASE DO NOT MAIL CORRESPONDENCE WITH PAYMENTS. MAIL TO PO BOX 2331 RALEIGH NC 27602.**

**MAKE CHECK PAYABLE & REMIT TO:**

TO CHANGE YOUR MAILING ADDRESS, PLEASE FILL IN CORRECT ADDRESS BELOW

NAME:
ADDRESS:
CITY/STATE/ZIP:

WAKE COUNTY REVENUE DEPARTMENT
PO BOX 96084
CHARLOTTE NC 28296-0084

DANIEL G KAMIN ZEBULON ENTERPRISES
PO BOX 10234
PITTSBURGH PA 15232-0234

# EXHIBIT F

## CALCULATION OF LEASE REJECTION DAMAGES

### I. Damages Capped Under Section 502

#### A. Rent Reserved Under Lease for Full Lease Term

| Year | Months Remaining | Base Rent | Real Estate Taxes | Insurance | CAM | Total |
|---|---|---|---|---|---|---|
| 2005 | 5 | $401,052.72 | $6,309.24 | $16,741.00 | $10,776.60 | $434,879.56 |
| 2006 | 12 | $401,052.72 | $15,596.45 | $16,741.00 | $10,776.60 | $444,166.77 |
| 2007 | 12 | $401,052.72 | $15,752.41 | $16,741.00 | $10,776.60 | $444,322.73 |
| 2008 | 12 | $401,052.72 | $15,909.94 | $16,741.00 | $10,776.60 | $444,480.26 |
| 2009 | 12 | $401,052.72 | $16,069.04 | $16,741.00 | $10,776.60 | $444,639.36 |
| 2010 | 12 | $401,052.72 | $16,229.73 | $16,741.00 | $10,776.60 | $444,800.05 |
| 2011 | 12 | $401,052.72 | $16,392.03 | $16,741.00 | $10,776.60 | $444,962.35 |
| 2012 | 12 | $401,052.72 | $16,555.95 | $16,741.00 | $10,776.60 | $445,126.27 |
| 2013 | 12 | $401,052.72 | $16,721.51 | $16,741.00 | $10,776.60 | $445,291.83 |
| 2014 | 12 | $401,052.72 | $16,888.72 | $16,741.00 | $10,776.60 | $445,459.04 |
| 2015 | 12 | $401,052.72 | $17,057.61 | $16,741.00 | $10,776.60 | $445,627.93 |
| 2016 | 12 | $401,052.72 | $17,228.18 | $16,741.00 | $10,776.60 | $445,798.50 |
| 2017 | 12 | $401,052.72 | $17,400.47 | $16,741.00 | $10,776.60 | $445,970.79 |
| 2018 | 3 | $100,263.18 | $17,574.47 | $4,185.25 | $2,694.15 | $124,717.05 |
|  | 152 | $5,313,948.54 | $221,685.74 | $221,818.25 | $142,789.95 | $5,900,242.48 |
|  | 15% |  |  |  |  | $885,036.37 |

#### B. One Year Rent Reserved Based on Average Year Under the Lease

| Year | Months Remaining | Base Rent | Real Estate Taxes | Insurance | CAM | Total |
|---|---|---|---|---|---|---|
|  | 12 | $401,052.72 | $17,501.51 | $16,741.00 | $10,776.60 | $446,071.83 |

#### C. Three Years' Rent Reserved Based on Average Year Under the Lease

| Year | Months Remaining | Base Rent | Real Estate Taxes | Insurance | CAM | Total |
|---|---|---|---|---|---|---|
|  | 36 | $1,203,158.16 | $52,504.52 | $50,223.00 | $32,329.80 | $1,338,215.48 |

## II. LEASE REJECTION DAMAGES NOT SUBJECT TO CAP UNDER SECTION 502

|  |  |  |  |
|---|---|---|---|
| A. Repairs to HVAC System | $85,000.00 |  |  |
| B. Roof Repairs/Replacement | $144,000.00 |  |  |
| C. Clean-up Costs | $12,000.00 |  |  |
| D. CAM Charges | $276.60 |  |  |
| **Total:** | **$241,276.60** |  |  |

## III. ADMINISTRATIVE CLAIM

|  |  |
|---|---|
| 2004/2005 Real Estate Taxes | $15,130.56 |

## IV. TOTAL DAMAGES

|  |  |
|---|---|
| Section 502(b)(6) Damages | $885,036.37 |
| Actual Damages | $241,276.60 |
| Administrative Claim | $15,130.56 |
| **Total:** | **$1,141,443.53** |

### *Notes to Calculation of Claim*

**Real Estate Taxes:** Debtor was obligated to pay real estate taxes under the Lease. The taxes for 2003/2004 were $14,992.26. The taxes for 2004/2005 are $15,130.56, and thus increased by 1%. The real estate taxes for the remaining years under the Lease was determined applying a 1% inflation factor based upon this increase.