UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| In re:<br><br>**WINN-DIXIE STORES, INC. et.al.,**<br><br>Debtors | Chapter 11<br><br>Case No. 05-03817-3F1<br><br>(Jointly Administered) |

### APPLICATION FOR PAYMENT OF ADMINISTRATIVE CLAIMS

COMES NOW, 12th Street & Washington Associates, L.P., an Arizona limited partnership ("12th Street"), by and through its undersigned counsel, and pursuant to §§ 365(d) and 503(b) of the United States Bankruptcy Code (the "Bankruptcy Code), and submits this Application for Payment of Administrative Claims, and states as follows:

### Background

1. Debtors filed these cases under Chapter 11 of the Bankruptcy Code on February 21, 2005, in the United States Bankruptcy Court of the Southern District of New York. On April 13, 2005, that court transferred the venue of the cases to this Court.

2. 12th Street is a creditor of the Debtors by virtue of being the landlord with respect to a lease of nonresidential real property located in Spartanburg, South Carolina, on which Winn-Dixie Raleigh, Inc. ("WD Raleigh") operated store number 1264 (the "12th Street Lease"). A copy of the 12th Street Lease is attached hereto as Exhibit "A". Winn-Dixie Stores, Inc. ("WD") is the guarantor of the 12th Street Lease (WD Raleigh and WD shall be cumulatively referred to as the "Tenant").

### Orders and Pleadings Relating to the Rejection of Leases of Nonresidential Real Property

3. In the Order Under 11 U.S.C. § 365(d)(4) Granting Extension of Time to Assume or Reject Unexpired Leases of Nonresidential Real Property entered on May 6, 2005 (Docket

No. 1070) (the "May Extension Order"), this Court directed the Debtors to honor all Postpetition Rental Obligations arising under the unexpired leases of nonresidential real property.

4. The Court entered a subsequent Order Under 11 U.S.C. § 365(d)(4) Granting Further Extension of Time to Assume or Reject Unexpired Leases of Nonresidential Real Property on September 12, 2005 (Docket No. 3434) (the "Rejection/Extension Order"), which recited that any lessor may file a motion seeking to compel the Debtors to honor Postpetition Rental Obligations and that Debtors would not oppose a lessor's request for an expedited hearing on such a motion. The Rejection/Extension Order also recited that any Targeted Lease (as defined in the Rejection/Extension Order) not sold, assumed or explicitly rejected via a Rejection Notice (as defined in the Rejection/Extension Order) by September 30, 2005 would be deemed rejected as of September 30, 2005. By virtue of the Rejection/Extension Order, the 12th Street Lease was rejected as of September 30, 2005.

5. This Court also entered that certain Order Granting Amended Motion of the Debtors For Order Authorizing the Debtors (I) To Sell Leasehold Interest in Targeted Stores Free and Clear of Liens, Claims and Interests and Exemption From Taxes, (II) To Assume and Assigned Leases, (III) To Reject Targeted Leases the Debtors are Unable to Sell, and (IV) Granting Related Relief on September 8, 2005 (Docket No. 3405) (the "September Sale Order"), which provided with respect to any lease being rejected, "the Debtors must vacate any such Targeted Store in the condition required by the applicable lease (the "Closed Store"), provided, however, that the failure to leave the Store in the condition required by the applicable lease shall not give rise to contempt of court and provided further that this Order is without prejudice to any party's right to dispute the validity and priority of any claim allegedly arising from any such failure." (September Sale Order, ¶ 4).

6. On August 31, 2005, the Debtors filed that certain Debtors' Notice of Intent to Abandon Furniture, Fixtures and Equipment dated September 1, 2005 (Docket No. 3303) (the "Abandonment Notice"). In the Abandonment Notice, the Debtors sought authority to abandon to the applicable landlord furniture, fixtures and equipment ("FF&E") located in the stores that the Debtor planned to potentially reject. The Debtors recognized in the Abandonment Notice that absent abandonment, they "are at risk of incurring additional administrative obligations in the form of rent and other overhead until the FF&E is removed,..." (Abandonment Notice, ¶ 8). In response the Abandonment Notice, 12th Street filed a Limited Objection to Notice of Intent to Abandon Furniture, Fixtures and Equipment on September 19, 2005 (Docket No. 3510) (the "Limited Objection"). In the Limited Objection, 12th Street argued that the 12th Street Lease requires FF&E to be removed upon the termination of the 12th Street Lease, and therefore the relief requested by the Debtors would violate the 12th Street Lease. Alternatively, 12th Street requested that if abandonment of FF&E was allowed, that the cost of removal of said FF&E be granted priority as an administrative expense. To date, there has been no ruling or hearing with respect to the Abandonment Notice or Limited Objection, although, as set forth herein, the 12th Street Lease has been rejected as of September 30, 2005.

## 12th Street is Entitled to Immediate Payment of Post-Petition, Pre-Rejection Rent

7. Pursuant to the May Extension order, the September Rejection/Extension Order, and § 365(d)(3) of the Bankruptcy Code, Tenant is required to comply with all provisions of the 12th Street Lease.

8. Pursuant to the terms of the 12th Street Lease, Tenant is required to pay its pro-rata share of real property taxes (12th Street Lease, ¶ 37), insurance (12th Street Lease, ¶ 37), and common area maintenance expenses (12th Street Lease, ¶ 31) relating to its use of the leased premises. Real property taxes, insurance and common area maintenance expenses ("CAM") are

defined as "additional rent" under the 12th Street Lease. CAM is billed quarterly pursuant to the 12th Street Lease. Taxes and insurance are to reimbursed to 12th Street within thirty (30) days of being billed for the same.

9.  As indicated above, the 12th Street Lease was rejected as of September 30, 2005. The Debtor has failed to pay the following post-petition, pre-rejection CAM (copies of the bills for CAM are attached hereto as Exhibit "B"):

| Quarter | Amount | Outstanding Balance |
|---|---|---|
| 1st 05 (post-petition - 39 days) | $11,002.45 | $4,767.73 |
| 2nd 05 (April - June, 2005) | $7,120.20 | $7,120.20 |
| 3rd 05 (July - September, 2005) | $8,757.67 | $8,757.67 |
| TOTAL: | | $20,645.60 |

10.  The Debtor has also failed to pay post-petition, pre-rejection real estate taxes. Pursuant to the records of the Spartanburg County, South Carolina Treasurer, real property taxes in the amount of $76,287.56 are due in connection with the leased premises. Copies of the tax bills are attached hereto as Exhibit "C". The number of post-petition, pre-rejection days is 222 (February 21, 2005 through September 30, 2005). Thus, Debtor is obligated to pay post-petition, pre-rejection real property taxes in the amount of $46,399.55 (222/365 x $76,287.56 = $46,399.55).

11.  Finally, post-petition, pre-rejection insurance in has not been paid for the period April 10, 2005 through September 30, 2005 (174 days). The total due for the policy period of April 10, 2005 to April 10, 2006 is $7,248.00. A copy of the insurance bill is attached hereto as Exhibit "D". Therefore, the total due to 12th Street is $3,455.21 (174/365 x $7,248.00 = $3,455.21).

12.  "A debtor or trustee must pay all normal rental payments in commercial space until the lease is rejected." In re Florida Lifestyle Apparel, Inc., 221 B.R. 897, 900 (Fla. M.D.

Bkrtcy. 1997). A landlord need not show any actual value received by the estate preceding the rejection of the lease. Id. at 899.

13. Therefore, 12th Street is entitled to the immediate payment of $70,500.36, in post-petition, pre-rejection administrative rent.

### 12th Street is Entitled to an Administrative Claim for Post-Petition Damage Done to the Leased Premises and Failure to Remove FF&E

14. The 12th Street Lease requires Tenant to maintain the leased premises. Relevant provisions of the 12th Street Lease with respect to maintenance and repairs are set forth below:

Tenants Repairs:

11. Upon completion of construction by Landlord and acceptance of the demised premises by Tenant, Tenant agrees to keep the interior of the demised premises in good condition and repair, excepting structural repairs and all repairs which are the responsibility of the Landlord or which are made necessary by reason of fire or the elements or other casualty covered by Landlord's fire and extended coverage insurance, and excepting reasonable wear and tear.

Within such repair responsibility of Tenant shall be included: the air conditioning and heating equipment, including duct work, provided, however, Landlord shall accord to Tenant the benefit of any warranties extended by the manufacturers or the installers of such equipment; the floor surfacing; the replacement of any plate glass damaged or broken, except that covered by Landlord's fire and extended coverage insurance; the compactor or baler; the interior exposed plumbing and plumbing fixtures, including any stoppages thereof, except such as may be caused by structural defects or faulty construction; the automatic doors; the interior and exterior painting; the interior spray heads (only) of the automatic fire sprinkler system; and the interior wiring extending to the weatherhead.

Landlord's Repairs.

12. If any portion of the common areas (including parking area, sidewalks, ramps and service areas) or any portion of the store building which is the responsibility of the Landlord, shall at any time be in need of repair, Landlord will repair same with due diligence upon receipt of written notice from Tenant to do so except that the Landlord shall not be obligated to pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements or other casualty covered by Landlord's fire and extended coverage insurance.

Cleanliness

16. Tenant shall at all times keep the interior or the store building in a reasonably neat and orderly condition and shall keep the delivery areas at the rear of the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the demised premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

End of Tenancy

25. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment, and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting and damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state. Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extension thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

15. Tenant has violated the 12th Street lease by maintaining the leased premises in unsafe condition, failing to carry out its maintenance and repair obligations, committing waste with respect to the Leased Premises, and failing to yield up the demised premises in the same condition as at the beginning of the tenancy, reasonable wear and tear excepted.

16. Following the rejection of the 12th Street Lease, 12th Street retained the services of Altman Engineering, Inc. ("Altman") to conduct an inspection and prepare a report on the condition of the leased premises. A copy of Altman's report is attached hereto as Exhibit "E" (the "Altman Report"). Without limitation, the Altman Report details the following failures by Tenant with respect to its obligations under the 12th Street Lease:

- The building has been vacated in an unsafe and unusable condition. Power wiring has been improperly terminated and circuits not disconnected or turned off at the power panel.

- Building mechanical systems are in an advanced state of disrepair. The roof mounted central air conditioning system maintenance records indicate that the equipment has not been serviced since May of 2001. Filters appear not to have been changed frequently, fan belts are not uniformly tensioned, and the fan cowl (located after the filters) is caked with dirt. The equipment curb of this unit was observed to be in a state of disrepair with ineffective caulking placed at the perimeter in an attempt to prevent water leakage into the building. The flashing is deteriorated and requires repair.

- Insulation is deteriorated or fallen away from exposed refrigerant lines to and from the primary building air conditioner at roof level. Lines originally insulated no longer are insulated.

- Self-contained zone air conditioners for the Deli, Pharmacy and Office are in disrepair. Site observations indicated that these units did not have filters installed in the unit filter section and the filter cover was dislodged and left open to atmospheric conditions. Convenience outlet covers were observed to be removed exposing the outlet to outside conditions, and the power disconnects were observed to be removed exposing the outlet to outside conditions, and the power disconnects were observed to be in a deteriorated condition. One unit's condensate piping discharged directly to the pitch pocket where the power conduit was routed through the roof.

- A combination exhaust/make-up air unit was removed from the Southwest side of the roof area. The roof curb has been partially patched and power wiring supporting the unit left exposed on the roof. The roof penetration has not been properly sealed nor has the power wiring that fed the unit been properly terminated.

- A combination exhaust/make-up air unit (similar to that referred to in Item #4 above) has component panels missing. No filters were observed to be installed on any of these units. The units are required by code to separate exhaust air from the intake air by at least 10 feet. With the panels missing, one of the systems operates in violation of the mechanical code.

- The roof membrane is in need of repair. The built-up roof surfaces are intended to be sealed with a tar and gravel final finish. This covering has been "worn away" at many locations, especially near the rear of the building where all of the rain water is drained from the roof into gutters. Approximately 12" to 18" of the roofing near the gutters is clear of tar and gravel and shows evidence of cracking.

- Exterior walls on the West and South (rear) sides show large accumulations of mold where roof drainage apparently overflows the gutter systems. The exterior wall coating was observed to be "flaking" and exposing the block surface.

- The building has been vacated with an unsightly exterior slab with perimeter remnants of support elements for an adjacent building space addition that was partially removed. The exterior wall has been closed with masonry yet the

interface of the appendage "room" shows evidence of damage that will require repair.

- Power wiring was left exposed at locations where equipment was removed.

- Phone, computer and accessory wiring was observed to be cut at the location of conduit penetration to rooms. This cable will require removal or extensive work to identify and trace.

- Ceilings throughout the facility are excessively dirty as a direct result of lack of maintenance. Dirt from within the building appears to have circulated through the air conditioning systems, supply diffusers and return air grilles and propagated to the ceiling areas during the recirculation process. Replacement of all ceiling tile will be necessary. Lighting fixtures and grilles must be cleaned.

- Ductwork is excessively dirty due to the lack of filtering systems used. Before any ceilings or fixtures are cleaned and placed back into service, the ductwork and air handling equipment must be cleaned or the new ceilings and fixtures will be exposed to dirt carried from the interior surfaces of the ductwork.

- Compressors supporting the coolers are leaking oil on the floor of the equipment mezzanine. A pool of oil has accumulated on the floor near the compressor installation.

- Sales and cashier area floors are significantly damaged. It could not be determined if the damage was the result of fork truck traffic during removal of shelving and reach-in frozen food equipment or as a result of other means. In any event, floor tile is warped, dislodged, torn or absent at many locations. Areas beneath the sales coolers are excessively dirty, power conduits left exposed, and wires protruding from the conduit.

- Many coolers remain in place as with the supporting cooling equipment compressors and roof mounted condenser systems. This equipment is of value but will require a directed effort to sell and an especially significant work effort to remove. Some of the coolers penetrate exterior walls. Removal of this equipment will require masonry closure of the resulting exterior wall opening. The condensers at roof level are mounted on roof supports that will require closure or resealing after the roof mounted equipment is removed.

- All equipment roof curbs were observed to be in need of repair due to exposure to the outside elements and sun. The curb flashing and sealing is cracking and appears at many locations to be leaking.

17.     12th Street just recently obtained the Altman Report on October 21, 2005. 12th Street has not yet received bids for the necessary repairs. However, 12th Street estimates the damages suffered as a result of Debtor's failure to satisfy its lease repair and maintenance

obligations prior to Lease rejection total no less than $500,000.00. 12th Street will supplement this application with the exact amount of its claim resulting from the breaches of the 12th Street Lease described herein when said repair bids are obtained.

18.     The portion of 12th Street's claim for damages arising from the Debtor's breach of the foregoing provisions of the 12th Street Lease that occurred post-petition is an administrative claim. See In re Atlantic Container Corp., 133 B.R. 980, 991 (Bankr. N.D. Ill. 1991) ("The DIP's and the Trustee's failure to perform their post-petition repair and maintenance obligations gives rise to an administrative expense claim for any damages resulting therefrom."). Moreover, any claim for damages resulting from said breaches is independent of and in addition to 12th Street's claim for lease rejection damages. See Id. at 988 ("Thus, whether they are considered damages for breaches of covenants to repair and maintina or unpaid past-due rent, the Landlords' claims for expenses incurred to remedy damage to the leased Premises are not subject to the 502(b)(6) ceiling." See also In re Best Products Co. Inc., 229 B.R. 673 (E.D. Va. 1998); In re Bob's Sea Ray Boats, 143 B.R. 229 (Bankr. D. N.D. 1992).

19.     In addition and in the alternative, 12th Street is entitled to an administrative claim in amount equal to the fair market value of what it would cost the Tenant to store the personal property that remains on in leased premises. As noted above, although it has sought to abandon the personal property in question by virtue of the Abandonment Notice, the Court has not issued a ruling with respect to that issue. By storing its personal property in the leased premises, Tenant is deriving a benefit at no cost (storage in the leased premises). This is an administrative expense pursuant to § 503(b)(1) of the Bankruptcy Code. See In re Tucci, 47 B.R. 328 (Bkrtcy. E.D. Va. 1985) (awarding a landlord administrative rent for storage of

personal property left in a leased premises after rejection of the lease where no order authorizing the abandonment of said personal property had been entered.

WHEREFORE, 12th Street and Associates, L.P. respectfully requests that the Court enter an order: (a) granting 12th Street's application for the immediate payment of $67,045,15, representing post-petition, pre-rejection administrative rent; (b) granting 12th Street's application for payment of an administrative claim for Tenant's failure to comply with post-petition maintenance and repair obligations; (c) holding that any damages resulting from Tenant's failure to comply with any maintenance and repair obligations are separate and apart from any claim asserted in connection with the rejection of the 12th Street Lease; (d) holding that 12th Street is entitled to an administrative claim in amount equal to the fair market value of what it would cost the Tenant to store the personal property that remains on in leased premises; (e) granting such other and further relief it deems appropriate.

_____
Zachary J. Bancroft
Florida Bar No. 0145068
Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
450 S. Orange Avenue, Suite 800 (32801)
Post Office Box 2809
Orlando, Florida 32802-2809
Telephone: (407) 843-4600
Facsimile: (407) 843-444
Attorneys for 12th Street & Washington Associates, L.P., an Arizona limited partnership

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Application for Payment of Administrative Claims has been served via the CM/ECF system and also vial U.S. Mail, and email (if an email address is indicated in connection with a party on the service list), this 31 day of October 2005, to those parties listed on the service list below.

_____
Zachary J. Bancroft

## SERVICE LIST

D.J. Baker
Sally McDonald Henry
Rosalie Walker Gray
SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP
Four Time Square
New York, New York 10036
Email: djbaker@skadden.com

Stephen D. Busey
James H. Post
Cynthia C. Jackson
SMITH HULSY & BUSEY
225 Water Street, Suite 1800
Jacksonville, Florida 32202
Email: cjackson@smithhulsey.com

Kenneth C. Meeker
Assistant U.S. Trustee
135 West Central Blvd.
Room 620
Orlando, Florida 32801