**Exhibit "A"**

SC-1

# LEASE

THIS LEASE, made this __24th__ day of __November__ 1992 __

between __Hidden Hills Partnership, a South Carolina partnership by__

__HPR Consultants, Inc., an Illinois Corporation__

_____

_____ ("Landlord")

and __Winn-Dixie Greenville, Inc., a Florida corporation qualified to transact__

__business in South Carolina__

_____ ("Tenant"),

which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or

plural, and the heirs, legal representatives, successors and assigns of the respective parties;

## WITNESSETH:

**PREMISES**

That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and demise unto

Tenant and the Tenant hereby agrees to take and lease from the Landlord, for the term hereinafter specified,

the following described premises:

That certain store building, approximately __220__ feet in width by __200__

feet in depth, __together with a vestibule across the front measuring 27 feet__

__in width by 12 feet in depth and concrete pads for coolers, freezers and__

__compactor at the rear and loading dock at the rear__ _____

and the land on which the same shall stand (hereinafter collectively called "demised premises"),

which store building and related improvements are to be constructed by the Landlord according

to plans and specifications to be approved by the parties as herein provided, and shall be in

the location and of the dimensions as outlined in red on the Plot Plan __prepared by__

__Gray Engineering Consultants, Inc., Greenville, South Carolina, dated__

__October 28, 1991, last revised July 10, 1992__

attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in detail on

Exhibit "A"), known as __Winn-Dixie Shopping Center__

("shopping center"), located __at the southeasterly corner of the intersection__

__of Reidville Road and Hidden Hills Road__

_____

in the City of __Spartanburg__ County of __Spartanburg__

State of __South Carolina__ the legal description of the shopping center being set

forth on Exhibit "B" attached hereto and by this reference made a part hereof.

APPROVED
AS TO FORM

Div. from Mgr.

Legal Dept.
Winn-Dixie Stores,
Inc.

This instrument was prepared by
Emil Rossi Greenville, Attorney

Oct 28 05 03:23p     Mark D Svejda                    4809919563                    P.5

12. 13. 94   03:32 PM,  *BLANCHARD CALHOUN CM P01

SC-2

Post-It™ brand fax transmittal memo 7671  # of pages ▸

To  Mark Svejda          From  Mark Senn
Co.                       Co.  BCPC
Dept.                     Phone #
Fax #  602-264-3436       Fax #  706-722-5565
                                 706-722-6960

**TERM**

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens the demised premises for the transaction of its business for an initial term of _twenty (20)_ years from the commencement date. The parties agree to execute a supplemental agreement documenting the commencement date.

This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

**RENTAL**

1. The Tenant agrees to pay to the Landlord as minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of _Two Hundred Ninety Six_

_Thousand and No/100_——————————————————————————————————————

Dollars ($_296,000.00_————) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of _Twenty Four Thousand Six Hundred Sixty Six and 67/100_—

Dollars ($_24,666.67_————) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

In addition, the Tenant agrees to pay the Landlord a percentage rental equal to the amount, if any, by which ——_one_—————per cent (—————1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant during the term of this lease, and any extensions thereof, exceeds the minimum guaranteed annual rental.

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of this lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of the percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculation of the percentage rental due hereunder, the Tenant's fiscal year shall be approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINITION OF "GROSS SALES"**

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold in or from the demised premises, both for cash and on credit. Such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

-2-

12. 13. 94   03:32 PM   *BLANCHARD CALHOUN CM P02

SC-3a

**RECORD OF SALES**

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

**USE**

2. The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail or service business (including discount businesses).

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of the premises, as such shall relate to the cleanliness and use of the premises and the character and manner of operation of the business conducted in or at the premises.

**CONSTRUCTION OF SHOPPING CENTER**

3. The Landlord, at its sole cost and expense, shall construct the shopping center, substantially as shown on Exhibit "A", consisting of all the buildings shown thereon, together with all ramps, sidewalks, streets, entranceways, malls, parking areas, service areas, driveways, utility lines, water detention and retention facilities and related improvements, such improvements (excluding buildings) being sometimes hereinafter referred to as "common areas". The Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the shopping center and the tenants and their employees during the term of this lease and any extensions thereof. The arrangement and location of all store buildings and common areas (including parking area) within the shopping center shall at all times during the term of this lease, or any extensions thereof, be maintained as shown on Exhibit "A" and shall not be changed without the written consent of the Tenant. The exterior of the shopping center (including any store buildings and the demised premises) shall not be materially modified without Tenant's prior written consent. If not shown on Exhibit "A", Tenant expressly reserves the right to approve the finish grade elevations of all store buildings and common areas (including parking and service areas) within the shopping center which are to be constructed concurrently with Tenant's store building.

Provided, notwithstanding the foregoing provisions of this paragraph, the Landlord shall be permitted to make minor changes which do not affect the layout of the shopping center or ingress or egress drives nor materially alter the layout of parking areas.

Notwithstanding the foregoing, it is understood that Landlord intends initially to construct only Tenant's store building, together with all of the common areas of the shopping center, including, without limitation, all the sidewalks, drives, entranceways, service areas and parking areas shown on Exhibit "A". Landlord reserves the right, but shall not be required, to construct additional buildings, not to exceed the indicated sizes, within the areas reserved therefor as shown on Exhibit "A", with the depth and interior dimensioning of same to be in Landlord's discretion, provided, however, such additional buildings shall be of like structural and architectural quality as the building for Tenant, and all such buildings shall be set back from the streets adjoining the shopping center or the property lines thereof distant at least within the sidewalk lines or building outlines as shown on Exhibit "A". Throughout the shopping center, in conjunction with the construction of any additional buildings, at least the ratio of automobile parking area to gross building area as hereinafter required in this Lease shall be maintained at all times. Pending construction on any future building sites shown on Exhibit "A" the sites shall be maintained as paved parking areas or as grassed and landscaped areas and kept free of weeds, trash and underbrush. Landlord agrees that Tenant shall have uninterrupted use and enjoyment of the demised premises and the common areas during any such additional construction without unreasonable interference by reason of such construction work. Landlord agrees that at all times during the term of this Lease and during any extensions of the Lease term there shall be maintained, open to vehicular traffic, a service drive at least thirty (30) feet wide adjoining the rear of the buildings in the shopping center, permitting a circular traffic pattern around the entire perimeter of the shopping center.

SC-4

Concurrently with the above construct, Landlord agrees at its sole cost and expense, to construct the store ...ding for occupany by Tenant in accordance with the plans and specifications to be approved by both Landlord and Tenant. Plans and specifications shall be approved when initialed by both parties, and when initialed shall constitute a part of this lease. Any changes to plans made after plans are signed by Landlord and Tenant shall be deemed a change and charged accordingly. The plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job." and shall include, but without limitation the following:

environmental control panel, heat reclaim coil, automatic sliding doors, interior partitions, all plumbing and plumbing fixtures, drains, electrical wiring, lighting fixtures to Tenant's requirements, a $10,000.00 allowance for connection of Tenant's trade fixtures to plumbing and electrical outlets, air conditioning and heating systems and equipment (including insulated ducts, registers and grilles), music and P.A. systems (except microphones and amplifiers to be furnished by Tenant), manager's office, delicatessen department, vinyl composite, quarry and ceramic tile floor coverings as specified (color at Tenant's option), interior partitions, automatic sprinkler system (including A.D.T. or other approved alarm system therefor if required by applicable building codes) concrete pad and connections for Tenant's baler/compactor; concrete truck unloading pads at rear of building and connection to all utilities. Tenant shall furnish and erect its own baler at the job site on the concrete pad therefor to be erected by Landlord, with all other installation and connection to electrical, water, plumbing and plumbing fuel systems, ready for use, to be performed by Landlord. Tenant shall also furnish its own trade fixtures. Any and all such equipment and fixtures furnished by Tenant shall remain its property and may be removed from the demised premises by Tenant at any time.

**COMPLETION DATE** 4. Landlord covenants and agrees that the construction of the shopping center shall begin not later than _November 15, 1992_____and shall be completed not later than _June 1, 1993_____, and if the same shall not be begun or completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this lease or may extend the Landlord additional time for the beginning or completion of construction, provided, however, that if after the beginning of construction the Landlord's failure to complete the improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than _August 1, 1993_____ (the "outside completion date"), this option to terminate shall not arise "Construction of the shopping center" shall be deemed to have begun when the first concrete footings have been poured. If pursuant to this paragraph Tenant shall cancel or terminate this lease or if Landlord fails to commence or complete construction of the shopping center by the above dates, Landlord agrees for a period of three (3) years after such failure or cancellation or termination not to permit or consent to the use as a supermarket of the demised premises or any portion of the shopping center, or any enlargement thereof, except by Tenant.

**COMMENCE-MENT DATE** 5. The Tenant shall open its store for business within sixty (60) days following performance of the following:

(a) Tenant's store building and other improvements constructed on the premises shall have been delivered to Tenant completed in accordance with the plans and specifications, and Landlord shall have delivered to Tenant, at Landlord's expense, a Certificate of Occupancy or equivalent document for the demised store building;

(b) Construction of all of the common areas shall have been completed substantially as shown on Exhibit "A";

(d) Landlord shall have recorded upon the public records of Spartanburg County, South Carolina, and delivered to Tenant in form satisfactory to Tenant, a Reciprocal Easement Agreement between Landlord, Tenant and Arlie, Inc.

SC-5

In the event that all the above requirements shall not have been met on or prior to the outside completion date, the Tenant at its sole option may cancel and terminate this lease.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of sixty (60) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

Notwithstanding the other provisions of Articles 4 and 5 hereof, Landlord agrees that if for any reason the requirements of Article 5 are met by Landlord on or after December 1 of any year and on or before January 31 of the succeeding year, Tenant shall not be required to open its store for business and rent shall not begin to accrue until the later of February 1 of the succeeding year, or 30 days after the requirements of Article 5 are met, unless Tenant actually opens its store for business sooner.

Article 6 intentionally deleted in its entirety.

**RETAIL AND SERVICE STORES ONLY**

7. Without the prior written consent of Tenant herein only retail and/or service stores shall be allowed to operate in the shopping center, or any enlargement thereof, it being the intent of the parties hereto that no spa, lounge, bar, "teen lounge", bowling alley, skating rink, bingo or electronic or other game parlor, theatre (either motion picture or legitimate), business or professional offices, sales of automobiles, or health, recreational or entertainment-type activities, non-retail or non-service type activities, shall be permitted. Despite the above provisions of this paragraph Landlord shall be permitted to lease not more than 3,500 square feet of space in the shopping center for general or professional office use provided such space is not within fifty (50') feet of the nearest point of Tenant's demised store premises.

**PARKING AND COMMON AREAS**

8. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks. Tenant may use the sidewalks adjacent to the demised premises or exterior surfaces of its building for the display and sale of merchandise and services.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a) a minimum ratio of at least ____5.62____ automobile parking spaces for each 1,000 sq. ft. of gross building area (including additional floor levels) in the shopping center, provided, however, said ratios may change by reason of the enlargement of Tenant's store building pursuant to Article 37 hereof; and

(b) facilities for convenient parking of at least ____336____ automobiles (minimum); and in the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord during Tenant's food store shopping hours. Tenant shall incur the expense of leasing the lighting while Landlord shall retain the expense of maintaining the lighting fixtures. Landlord further agrees that no signboards or other construction shall be erected in any of the said common areas shown on Exhibit "A" or so as to obstruct the view of the demised premises from the adjoining public streets. Without prior written consent to Tenant herein, no carnivals, fairs or shows nor sales by merchants utilizing vehicles or booths in the common areas shall be allowed in the shopping center, or any enlargement thereof.

**SERVICE AREA**

9. Landlord agrees to provide for the exclusive use of the Tenant at its service entrances parking spaces for two large trailer trucks for continuous use. Landlord further agrees that Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for its store into and from trucks and trailers at such service entrances.

SC-6

**UTILITIES**

10. The Tenant agrees to pay all charges for telephone, electricity, water, gas and other utilities and services used by Tenant at the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities. Tenant shall not be responsible for any charges for the fire alarm system, static or flowing water to supply the fire sprinkler system, or any "hook up" fees or other charges incident to providing access to any utility.

**TENANT'S REPAIRS**

11. Upon completion of construction by Landlord and acceptance of the demised premises by Tenant, Tenant agrees to keep the interior of the demised premises in good condition and repair, excepting structural repairs and all repairs which are the responsibility of the Landlord or which are made necessary by reason of fire or the elements or other casualty covered by Landlord's fire and extended coverage insurance, and excepting reasonable wear and tear.

Within such repair responsibility of Tenant shall be included: the air conditioning and heating equipment, including duct work, provided, however, Landlord shall accord to Tenant the benefit of any warranties extended by the manufacturers or the installers of such equipment; the floor surfacing; the replacement of any plate glass damaged or broken, except that covered by Landlord's fire and extended coverage insurance; the compactor or baler; the interior exposed plumbing and plumbing fixtures, including any stoppages thereof, except such as may be caused by structural defects or faulty construction; the automatic doors; the interior and exterior painting; the interior spray heads (only) of the automatic fire sprinkler system; and the interior wiring extending to the weatherhead.

**LANDLORD'S REPAIRS**

12. The Landlord shall, at its cost and expense, keep and maintain the common areas (including parking areas, sidewalks, ramps and service areas) in good condition and repair, and shall maintain the exterior and structural portions of Tenant's store building, including roof, gutters, downspouts, masonry walls, concrete floor, outside canopy structure and brick columns, foundation and structural members and steel, automatic fire sprinkler system and alarm(s) therefor, the utility lead-ins and mains including without limitation the sewers (from the exterior walls of the building), the electric power facilities from the weatherhead to the public or private supply source, and the gas lines from the meter to the public or private gas supply source, and Landlord shall also make any and all structural repairs to both the interior and exterior of Tenant's demised premises. Landlord shall be responsible only for those repairs hereinabove described, and Tenant shall have full repair responsibility for all other repairs to Tenant's building of whatsoever type or kind. If any portion of the common areas (including parking areas, sidewalks, ramps and service areas) or any portion of the store building which is the responsibility of the Landlord, shall at any time be in need of repair, Landlord will repair same with due diligence upon receipt of written notice from Tenant to do so, except that the Landlord shall not be obligated to pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements or other casualty covered by Landlord's fire and extended coverage insurance.

Within the repair responsibilities of Landlord shall be included the control and extermination of termites.

If in order to protect persons or property it shall be necessary to make emergency repairs which are the responsibility of the Landlord, or if the Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas, as defined in Article 3 hereof, which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs. Landlord further covenants that the store building will be so constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that the premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated, except that Landlord shall not be responsible therefor if such non-conformity shall be the result of (a) a new regulation adopted after execution of this lease or (b) as a result of Tenant's specific use of the demised store premises, except that nothing herein contained shall in anywise impair or affect Tenant's option to terminate the Lease, as set forth in Article 17 hereof.

Oct 28 05 03:24p    Mark D Svejda              4809919563                P.10

12. 13. 94   03:32 PM   *BLANCHARD CALHOUN CM P03

SC.7

**SIGNS**

13. Tenant may place, erect and maintain any signs on the roof, walls, and any other places on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs.

Landlord agrees to construct and maintain, including painting, one (1) shopping center pylon and planter in the shopping center entrance adjacent to the shopping center entrance from Reidville Road in the location as shown on Exhibit "A". Tenant agrees to contribute Tenant's pro-rata share (to be determined in the same manner as set forth in Article 37 hereof) to the cost of construction of the pylon. Tenant shall be permitted to affix thereon electrically illuminated sign panels advertising its business, to be installed by Tenant and connected to power outlets installed by Landlord. It is understood that Landlord will at its sole cost, lay and install suitable underground conduit and wiring extending from Tenant's building to the junction box at the pylon site and shall also construct and install the necessary concrete base and pylon, but Tenant shall bear the expense of its sign lettering and the cost of electric power for its sign panels. Landlord shall maintain the pylon and base at its expense. Tenant shall maintain its own sign panels located on the pylon. Sign panels of other tenants may be located on the pylon below those of Tenant provided the other tenants' signs are connected to separate electrical supply lines.

**FIXTURES AND ALTERATIONS**

14. The Tenant, at its own expense, shall have the right from time to time during the term of this lease to make any interior or exterior alterations, additions and improvements, including doors and partitions, in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. This right of Tenant shall include the erection of interior partitions and the installation of additional front and rear doors. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

Tenant may construct and build or install in the premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from the premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to the premises resulting from the installation or removal of such items.

**INDEMNIFI-CATION**

15. Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises. Likewise, Landlord shall indemnify and save harmless the Tenant from any claim or loss (including costs of investigation, court costs and reasonable attorneys' fees) by reason of an accident or damage to any person or property happening on or about all common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, comprehensive general liability insurance coverage with Tenant named as an additional insured on all common areas (as defined in Article 3 hereof) of the shopping center, in a company qualified to transact business in the state where the premises are located, stipulating limits of liability of not less than $2,000,000.00. Certificate of such coverage from the insurer providing 30 days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant.

**CLEANLINESS**

16. Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the delivery areas at the rear of the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the demised premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

SC-8

**FIRE**

17  In the event that Tenant's demised premises shall be totally destroyed or damaged to the extent of 75% or more of the value thereof by fire or other casualty, then Tenant may elect within thirty (30) days after such damage, to terminate this lease by giving to the Landlord a written notice of termination, and thereupon both parties shall stand released of and from all further liability under this lease. If Tenant's demised premises shall thereby suffer damage to any extent less than 75% of the value thereof, or if Tenant does not elect to terminate as aforesaid, then the Landlord agrees to proceed promptly and without expense to the Tenant to repair the damage or restore the improvements, remitting a fair and just portion of the rent, according to the unusable space, until said premises are completely reinstated or restored. If at any time during the term of this lease or any extensions thereof any of the buildings in the shopping center, exclusive of Tenant's demised premises, are damaged by fire or by the elements or otherwise, Landlord shall immediately commence and diligently prosecute to completion repair of all such damage and shall restore said improvements to their condition prior to such damage.

Landlord shall carry fire and extended coverage insurance on Tenant's demised premises and any additions, alterations and improvements made thereto by Landlord or Tenant and on all other buildings within the shopping center in the amount of full insurable value thereof, above foundation walls, and hereby expressly waives any and all claims against the Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the Tenant, its agents, servants or employees.

**QUIET ENJOYMENT**

18.  The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a mercantile, retail or service business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a mercantile, retail or service business or using the common areas (as defined in Article J hereof) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

**TAXES AND LIENS**

19  All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord prior to delinquency. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the demised premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the demised premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law.

**CONDEMNATION**

20.  If any part of the demised premises or more than twenty per cent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit ''A'', be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of ——-——-—— per cent (——10 %) or reduce the number of cars which may be conveniently parked to less than ___101___ the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking.

SC-9

**DEFAULT**

21. In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts thereto, and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.

**BANKRUPTCY**

22. The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

**CONSTRUCTION RISKS**

23. Nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing the improvements, and the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated and to request change orders to be paid by Tenant. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing the improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing the improvements or from any faulty construction thereof.

**NOTICES**

24. All notices required to be given to Landlord hereunder shall be sent by registered or certified mail or delivery service with receipt to, and all rent payments shall be made to Landlord at _____

_____ First Union Tower, Suite 400 _____

_____ 699 Broad Street _____

_____ Augusta, GA 30901 _____

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail or delivery service with receipt.

All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at

_____ P. O. Box 1088 _____

_____ Greenville, SC 29602-1088 _____

_____ Attention: Real Estate Manager _____

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail or delivery service with receipt.

**END OF TENANCY**

25. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state. Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

SC-10

**ASSIGNMENT AND SUBLEASING** 26. The Tenant may without the consent of the Landlord assign this lease, or sublease or vacate the demised premises in whole or in part, provided the Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this lease.

In the event Tenant shall voluntarily vacate the entire demised premises or cease selling merchandise therein for in excess of a period of one (1) year while the demised premises are usable for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant or resulting from construction activities), Landlord shall have the option (unless Tenant shall have reoccupied the premises) to terminate and cancel this lease for a sixty (60) day period upon sixty (60) days' written notice to Tenant of its election so to do, unless within such sixty (60) day period Tenant shall advise Landlord that Tenant had prior to receipt of such notice in good faith committed to assign or sublease the demised premises to a third party, in which event the provisions of the preceding sub-paragraph shall govern.

Tenant agrees that it shall not assign or sublease the demised premises, in whole or in part, for any use prohibited by Article 7. of this Lease.

**EXTENSIONS** 27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of _____ __five_____ (---5--) successive extensions of this lease, each extension to be for a period of __five_____ (---5--) years and at the same rentals and upon the same terms and conditions as required herein for the initial term.

Such option privilege may be exercised by Tenant giving to the Landlord a notice in writing at least __six (6) months_____ before the expiration of the initial term, and if extended, at least __six (6) months_____ before the expiration of such extended term, stating the intention of the Tenant to exercise such option and the period for which such option is exercised and thereupon this lease shall be so extended without the execution of any other or further document.

**EXCLUSIVE SUPERMARKET** 28. Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant; except that the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, for consumption either on or off the premises, shall not be deemed a violation hereof. With the exception of package stores, only Tenant may sell beer and wine in the shopping center for off-premises consumption. Only Tenant may operate a bakery, delicatessen or similar department in the shopping center.

Only Tenant may operate a prescription drug department or pharmacy in the shopping center or any enlargement thereof. provided, if Tenant shall cease operation of a pharmacy for twelve (12) consecutive months this exclusive shall be terminable upon thirty (30) days written notice from Landlord. In event Tenant's pharmacy exclusive is terminated Tenant shall still be permitted to operate a pharmacy on a non-exclusive basis.

SC-11

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any provisions herein to the the contrary, the Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation. If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument.

**SUBORDINATE**  29.  The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord, and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination, provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

**NOTICE TO LENDER**  30.  Tenant agrees that it will give notice to any holder of a first mortgage (which term shall include all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, the Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 12 of this lease.

SC-12

**COMMON AREA**
**MAINTENANCE**

31. Landlord hereby agrees to operate and maintain all of the common areas, as herein defined, and to provide therefor all such services as are reasonably required to operate, maintain, insure, and replace such common areas. The term "common areas" is hereby defined as all areas, equipment, facilities and services of the shopping center made available by Landlord for the benefit or convenience of tenants and their employees, subtenants, customers and invitees in the shopping center, including by way of illustration, but without limitation, those areas as defined in Article 3 hereof, and including landscaping, electrical meter and distribution rooms outside of individual tenant's premises, fencing, lighting facilities illuminating areas outside of individual stores and similar facilities available for the common use of tenants and their employees, subtenants, customers and invitees. Tenant and its employees, agent, contractors and customers shall have the right to use or benefit, in common with other tenant's landlord and their employees, agents, contractors, customers and invitees, the common areas for the purposes for which they are intended and to the extent and in a manner reasonably designated by Landlord and permitted under this Lease, without charge except as hereinafter provided. The common areas shall be under the exclusive control and management of Landlord.

For such services of Landlord in operating and maintaining the common areas, Tenant agrees to pay to Landlord as additional rental hereunder and as reimbursement for the actual annual cost thereof, the amount of Tenant's pro-rata share of Landlord's "calendar year common area operating cost" as hereinafter defined, paying one-(fourth (1/4) of Tenant's annual pro-rata share of such costs quarterly, in arrears, within thirty (30) days of receipt of Landlord's documented quarterly statement for common area maintenance. Tenant's pro-rata share shall be determined by using its same pro-rata fraction as defined under Article 37 hereof.

The term "calendar year common area operating cost" shall mean all costs and expenses reasonably incurred by Landlord in good faith in the best interest of the shopping center each calendar year for repair, replacement, maintenance and operation of the common areas, including but without limitation, safeguarding, cleaning and sweeping, lighting, snow and refuse removal, gardening and landscaping, restriping of the parking lot, filling of potholes, resealing and maintenance of parking areas, walkways, sidewalks and the like, maintenance of light fixtures and replacement of bulbs, electric costs, compensation for management not to exceed 2% of minimum annual compensation to personnel carrying out such services directing parking, policing the common areas, or providing safeguarding, rental paid for maintenance machinery, and similar amounts which are not properly chargeable to a capital account under generally accepted accounting principles. Charges for equipment and for financing shall not be included in operating costs. It is understood and agreed that any of these services may be provided by bona fide independent contractors at reasonable rates in the general geographic area of the shopping center.



Initial Change
Approval

;uaranteed rent,

Within twenty (20) days after the end of each quarter of each calendar year, or such lesser period as may occur upon commencement or termination of the term of this Lease, Landlord shall furnish Tenant a quarterly statement in reasonable detail of the actual common area operating costs. Each quarterly statement made by Landlord as to the calendar year common area operating costs shall bear the certificate of Landlord's chief accounting officer. Notwithstanding the above, it is agreed that Tenant's obligations to make payments herein described is expressly conditioned upon receipt from Landlord of the written invoice for such prorata share of such common area operating costs no later than twelve (12) months after payment.

Landlord shall maintain, and for such period Tenant shall have the right to inspect, and as may be the case object to and claim credits against payments made same, through its designated agents, all receipts, cancelled checks and other records of the payments and other charges reflected in the calendar year common area operating costs in the form of complete and accurate books and records of such costs for not less than one (1) year after it delivers to Tenant the quarterly certificate described above, with the audit to be conducted in a manner not to unreasonably interfere with Landlord's business, with such agent being employed and paid by Tenant.

If the Landlord after receipt of written notice from Tenant to do so shall fail to make the repairs or perform the services described in this Article, the Tenant shall have the right to make such repairs or cause such services to be performed on Landlord's behalf and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse Tenant for the money expended or expense incurred therein.

SC-13

**BENEFIT**    32.  This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

**TRANSFER BY**    33.  In the event Landlord transfers Landlord's interest in this lease, Landlord agrees to promptly provide
**LANDLORD**    Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's interest in this lease.

**SHORT**    34.  The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease
**FORM**    in form permitting its recording.
**LEASE**

**MARGINAL**    35.  The marginal titles appearing in this lease are for reference only and shall not be considered as part
**TITLES**    of this lease or in any way to modify, amend or affect the provisions thereof.

**COMPLETE**    36.  This written lease contains the complete agreement of the parties with reference to the leasing of the
**AGREEMENT**    demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**TAXES AND**    37.  During the term of this lease, and any extensions thereof, Tenant agrees
**INSURANCE**    to pay to Landlord as additional rental the amount of the annual ad valorem real estate taxes levied against the demised premises (and a proportionate part of the common areas within the shopping center allocable thereto apportioned as provided below) and also the annual premium cost of fire and extended coverage insurance on the building on the demised premises.  The amount of taxes attributable to the demised premises and for which Tenant is to reimburse Landlord shall be less the maximum amount of any abatements, discounts or refunds permitted by law thereon.  Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements and insurance premium statements as evidence of the taxes and insurance premiums chargeable to Tenant, and such additional rental shall be payable by Tenant within thirty (30) days after tender by Landlord to Tenant of such paid tax and insurance statements.  Any payments made by Tenant to Landlord under the provisions of this Article shall be prorated for fractional years occurring at the beginning and expiration of the term of this lease, or any extensions thereof.  Tenant shall have the right from time to time to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned, and to institute such proceedings in the name of the Landlord as the Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to Landlord.  All taxes, other than ad valorem real estate taxes, including special assessments, improvement liens and the like, shall remain the sole responsibility of Landlord.

Landlord agrees to make every reasonable effort to obtain from the authorities separate ad valorem real estate tax statements as to the demised premises.  However, if such taxes shall not be assessed separately as to the demised premises, but shall be included within an assessment of the demised premises and other premises, said assessment shall be fairly apportioned to determine Tenant's share thereof.  Such apportionment shall be made in the ratio which the total square foot floor area of Tenant's building bears to the total square foot floor area of all store buildings and improvements from time to time existing in the shopping center.  Notwithstanding the above, it is agreed that Tenant's obligations to make the payments herein described is expressly conditioned upon receipt from Landlord of the written invoice for such insurance premiums no later than twelve (12) months after payment.

It is understood that in the event the shopping center is constructed in two or more phases and the Tenant's demised store building is constructed in the initial phase a correction of the tax computation base year shall be made. The parties hereto agree to amend this article so as to provide a new base year for computing Tenant's allocable contribution to ad valorem taxes as above set forth at such time as construction of any succeeding phase of the center has been completed, with the result that following completion of each such phase, Tenant's prorata share of the ad valorem real estate taxes levied

SÇ ï.

upon the entire shopping center sha.. .e based upon a new allocation of the taxes in respect of the demised premises and a proportionate part of the common areas. It is further understood that this paragraph shall not be applicable in the event Tenant's demised store building is assessed separately from the shopping center.

If at any time during the term of this lease the methods of taxation prevailing at the commencement of the term hereof shall be altered so that in lieu of or as a supplement to or a substitute for the whole or any part of the real estate taxes now levied or imposed on the shopping center, there shall be levied or imposed (i) a tax, levy, imposition or charge, wholly or partially as a capital levy or otherwise, on the rents received therefrom, or (ii) a tax, levy (including but not limited to any municipal, state or federal levy), imposition or charge measured by or based in whole or in part upon the shopping center and imposed upon the Landlord, or (iii) a license fee measured by the rent payable under this lease, then all such taxes, levies, impositions and charges, or the part thereof so measured or based (excluding, however, any estate, inheritance, succession, transfer, net income, profits, property or similar taxes imposed on Landlord by reason of its receipt of rental income or other payments payable under this lease) shall be deemed to be included in the general real estate taxes payable by Tenant pursuant to this section to the extent that such taxes, levies, impositions and charges would be payable if the shopping center were the only property of Landlord subject thereto, and the Tenant shall pay and discharge the same as herein provided in respect to the payment of general real estate taxes. Tenant shall also be responsible for and pay promptly when due any sales or other tax imposed upon the rent payable pursuant to this lease.

**EXPANSION OPTION**    38. Tenant is hereby granted the option and privilege at any time during the term of this lease, or during any extensions thereof, of requiring the enlargement of its demised store premises by incorporating therein an addition consisting of the area to the easterly side of the existing demised store premises, such addition not to exceed sixty (60) feet in width by two hundred (200) feet in depth. This option may be exercised only at such times as the adjoining 60 feet of storerooms may be vacant, or at five (5) year intervals, it being contemplated and required that Landlord shall not lease such area to other tenants for in excess of five (5) years, and that Tenant shall have the expansion privilege herein described no later than five (5) years from the commencement date of this lease and at five (5) year intervals thereafter. Landlord shall give notice to Tenant of the expiration date of any tenant lease in the expansion area at least six (6) months prior to such expiration date and, during the period between six (6) months and three (3) months prior to such expiration date, afford to Tenant the opportunity to exercise this option. Upon Tenant giving to Landlord a notice in writing of its exercise of this option, Landlord agrees to construct such addition, or prepare such enlargement area for occupancy by Tenant, in accordance with plans and specifications to be approved in writing by the parties hereto, with the construction to be completed with all due diligence following the vacation of the necessary area by any other tenant, and the enlarged portion of the building to be of a like quality of construction as the original building for Tenant.

In order to facilitate the expansion of Tenant's demised store building as herein contemplated, Landlord agrees that any adjacent building or buildings within the expansion area shall be of like structural quality and in architectural harmony with Tenant's store building, shall front on a line which is an extension of the interior sidewalk line of Tenant's demised store building and shall have the same finish floor level, roof and ceiling heights as Tenant's demised store building. Further, Landlord agrees that the wall of Tenant's demised store building adjoining the expansion area shall be constructed with steel column supports therein equivalently spaced to the nearest row of steel column supports in the open front sales area of Tenant's demised store building and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original and expanded building width.

Upon completion of such building addition, or tender of such additional space to Tenant, if there shall not at such date remain at least ten (10) years of the then term of this Lease, such term shall be extended for a period of time as shall be necessary to provide a full ten (10) years from such date. Thereafter, during such extended term, if any, the annual minimum guaranteed rental (and the base for computation of percentage rental hereunder) shall be increased by the greater of: an amount equal to twelve (12%) percent of the cost of such addition area, or an amount equal to $6.59 per square foot of the enlargement area, or an amount equal to a computed percentage times the

SC-5

cost of such addition, such percentage consisting of four percent (4%) plus the current prime interest rate charged by New York City banks at the time of the exercise of the option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant with the final cost of the addition upon completion to be certified to by the general contractor performing the work. During the remaining term of Lease or during such extended term, the provisions of this Lease shall remain in effect and the option periods provided in the Lease, if any shall remain, shall be construed to follow upon the end of the initial or extended initial term and the rentals to remain as adjusted in consequence of the addition. Upon completion of the addition, it shall become a portion of the demised store premises and this Lease shall be construed as so amended.

In the event Landlord shall for any reason fail or refuse to construct the building addition contemplated hereunder after Tenant has properly exercised its option herein, the Tenant, at its option, shall have the right at its own expense to construct the building addition of the size and quality set forth above. If Tenant constructs the enlargement, Tenant agrees to cause any mechanic's lien incurred in connection with such expansion to be promptly discharged and agrees to indemnify and hold harmless the Landlord from any expense occasioned thereby. Upon completion of such building addition and occupancy thereof by Tenant, if there shall not at such date remain at least ten (10) years of the then term of this Lease, the lease term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date and the option periods provided in the lease, if any shall remain, shall be construed to follow upon the end of the initial or extended initial term. Thereafter, during the remaining lease term and any extensions thereof, there shall be no additional minimum guaranteed annual rental payable by Tenant in respect of such addition.

Nothing herein contained shall constitute any express or implied obligation on the part of the holder of a first mortgage encumbering the fee simple title to the demised premises or of any purchaser at a sale under foreclosure of such mortgage, to comply with the terms and provisions of this Article, it being the understanding of the parties that the obligation to cause such expansion is the sole obligation of the Landlord, its heirs, legal representatives, successors and assigns.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this agreement the day and year first above written.

Signed, sealed and delivered
In the presence of:

HIDDEN HILLS PARTNERSHIP, a South Carolina Partnership

BY: MPR CONSULTANTS, INC.

By: _____ Its _____ President

By: _Pamela Bruin_ Its _____ Secretary

(CORPORATE SEAL)

LANDLORD

WINN-DIXIE GREENVILLE, INC.

By: _____ Its _____ President

Attest: _____ Its _____ Secretary

STATE OF _Georgia_ )
COUNTY OF _Richmond_ )

  Personally appeared before me _Allison Sullivan_,
who being duly sworn says that he saw _Victor J Mills_ and
_Pamela B. Mills_, as Authorized Signatory General Partners
for MPR CONSULTANTS, INC., an Illinois Corporation, sign, seal,
and as their act and deed, deliver the foregoing instrument and
that _Ralph Kitchens_ with _Sharon Sullivan_
witnessed the execution and delivery thereof as the act and deed
of the said HIDDEN HILLS PARTNERSHIP, a South Carolina Partner-
ship.

       _Allison Sullivan_

Sworn to and subscribed before me
this _6_ day of _Nov._, 1992

_Andra Ford_
Notary Public for _____
My commission expires _____

   (NOTARIAL SEAL)

STATE OF FLORIDA   )
                   )
COUNTY OF DUVAL    )

    Personally appeared before me _____ Laura C. Baughman _____,
who being duly sworn says that she saw the corporate seal of WINN-
DIXIE GREENVILLE, INC., a Florida corporation, affixed to the
foregoing instrument, and that she saw _____ James Kufeldt _____, Vice
President, and ___ Wayne E. Ripley, Jr. ___ , _____ Secretary of WINN-
DIXIE GREENVILLE, INC., both personally known to deponent to be
such officers of such corporation, respectively sign and attest
this instrument and deliver same for and on behalf of such
corporation, and the deponent, with _____ Barbara A. Smucygz _____
witnessed the execution and delivery thereof as the act and deed
of WINN-DIXIE GREENVILLE, INC.

              _Laura C. Baughman_

Sworn to and subscribed before me
this 25ᵗʰ day of November, 1992.

_Barbara Ann Smucygz_
Notary Public for Florida
My commission expires: 1/4/96

 (NOTARIAL SEAL)   Notary Public, State of Florida
           BARBARA ANN SMUCYGZ
           My Comm. Exp Jan. 8, 1996
           Comm. No. CC 178607

GUARANTY

In consideration of the sum of Ten Dollars ($10.00) paid by HIDDEN HILLS PARTNERSHIP, a South Carolina Partnership by MPR CONSULTANTS, INC., an Illinois Corporation hereinafter called "Landlord", to WINN-DIXIE STORES, INC., a Florida corporation with its principal office at 5050 Edgewood Court, Jacksonville, Florida 32205, hereinafter called "Guarantor", the receipt and sufficiency whereof are hereby acknowledged, Guarantor does hereby guarantee unto Landlord, its heirs, legal representatives, successors and assigns, the due performance and observance by WINN-DIXIE GREENVILLE, INC., a Florida corporation hereinafter called "Tenant", of all the terms, covenants and conditions on the part of Tenant to be performed and observed including, without limitation, payment of rentals under the lease agreement dated _November 24_, 1992, covering certain premises located in a shopping center development known as Winn-Dixie Shopping Center, located at the southeastly corner of the intersection of Reidville Road and Hidden Hills Road, in the City of Spartanburg, Spartanburg County, South Carolina.

Guarantor has caused this Guaranty to be executed in its corporate name and its corporate seal to be affixed and attested by its duly authorized officers as of _November 24_, 1992.

Signed, sealed and delivered                WINN-DIXIE STORES,    INC.
in the presence of:

_Laurel K Baughman_                          By _____
                                               Its                President

_Barbara A Smucycz_                          Attest: _____
                                                     Its          Secretary

EXHIBIT "D"
LEGAL DESCRIPTION
OF
SHOPPING CENTER

ALL THAT LOT OR PARCEL OF LAND LOCATED IN SPARTANBURG COUNTY,
SOUTH CAROLINA ON THE SOUTHERN SIDE OF THE REIDVILLE ROAD AND
KNOWN AS PARCEL C ON A PARCEL LAYOUT PLAN FOR WINN-DIXIE SHOPPING
CENTER BY GRAY ENGINEERING CONSULTANTS, INC. FROM WHICH THE
FOLLOWING DESCRIPTION WAS TAKEN:

BEGINNING AT AN IRON PIN FOUND LOCATED ON THE SOUTHERN RIGHT OF
WAY OF THE REIDVILLE ROAD (S.C.296) WHICH POINT IS THE COMMON
FRONT CORNER WITH SPARTANBURG ENTERPRISES AND IS 440 FT. EAST OF
THE CENTERLINE OF HIDDEN HILLS ROAD THENCE WITH THE ROAD RIGHT OF
WAY N 85°46'00" E 268.17 FT. TO AN IRON PIN FOUND; THENCE WITH
THE LINE OF CAROLINA COUNTRY BARBECUE S 4°13'47" E 314.48 FT. TO
AN IRON PIN FOUND; THENCE WITH THE LINE OF PARCEL D WINN-DIXIE
SHOPPING CENTER S 85°46'00" W 25.35 FT. TO A POINT; THENCE CON-
TINUING WITH THE LINE OF PARCEL D S 4°15'01" E 385.24 FT. TO A
POINT; THENCE WITH THE LINE OF BROWN FLOURNOY EQUITY INCOME S
85°44'59" W 280.0 FT. TO A POINT; THENCE WITH THE LINE OF PARCEL
B OF WINN-DIXIE SHOPPING CENTER N 4°15'01" W 334.45 FT. TO A
POINT; THENCE WITH THE LINE OF PARCEL B N 85°46'00" E 36.62 FT.
TO A POINT; THENCE WITH THE LINE OF PARCEL B N 4°02'52" W 51.11
FT. TO A POINT; THENCE WITH THE LINE OF SPARTANBURG ENTERPRISES S
4°02'52" W 314.1 FT. TO THE BEGINNING CORNER AND CONTAINING 4.370
ACRES.

STATE OF FLORIDA )
                 )
COUNTY OF DUVAL  )

      Personally appeared before me _____ Laura F Boughman _____,
who being duly sworn says that she saw the corporate seal of WINN-
DIXIE STORES, INC., a Florida corporation, affixed to the
foregoing instrument, and that she saw _____ James Kufeldt _____, ~~Vice~~
President, and _____ Wayne E. Ripley, Jr. _____, _____ Secretary of WINN-
DIXIE STORES, INC., both personally known to deponent to be such
officers of such corporation, respectively sign and attest this
instrument and deliver same for and on behalf of such corporation,
and the deponent, with _____ Barbara A. Smucygz _____ witnessed the
execution and delivery thereof as the act and deed of WINN-DIXIE
STORES, INC.

                                      _Laura F Boughman_

Sworn to and subscribed before me
this 25ᵗʰ day of _November_, 1992.

_Barbara Ann Smucygz_
Notary Public for Florida
My commission expires: _1/9/96_

{NOTARIAL SEAL}    Notary Public, State of Florida
                   BARBARA ANN SMUCYGZ
                   My Comm. Exp Jan. 9, 1996
                   Comm. No. CC 179607