Hearing Date: December 1, 2005, 1:00 p.m.
Objection Deadline: November 24, 2005, 4:00 p.m.

# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
|  | ) |  |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
|  | ) |  |
| Debtors.[1] | ) | Jointly Administered |
|  | ) |  |

## APPLICATION FOR AUTHORITY TO RETAIN DELOITTE & TOUCHE LLP TO PROVIDE RISK ASSESSMENT, QUALITY ASSESSMENT, AND JOURNAL ENTRY TESTING SERVICES TO THE DEBTORS

Winn-Dixie Stores, Inc. and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), move the Court for entry of an order under 11 U.S.C. § 327(a) approving the retention of Deloitte & Touche LLP ("Deloitte & Touche"), effective as of November 14, 2005, to provide risk assessment, quality assessment, journal entry testing, and, as necessary, other internal audit support services to the Debtors during these cases (the "Application"). In support of the Application, the Debtors state as follows:

### Background

1.     On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 as amended (the "Bankruptcy Code"). The Debtors' cases are being jointly administered for procedural purposes only.

---

[1]     In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

2.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request has been made for the appointment of a trustee or examiner.  On March 1, 2005, pursuant to section 1102 of the Bankruptcy Code, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases.  On August 17, 2005, the U.S. Trustee appointed an official committee of equity security holders (the "Equity Committee").

3.      The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion.  As of the Petition Date, the Debtors were considered to be the eighth-largest food retailer in the United States and one of the largest in the Southeast with more than 900 stores in the United States.  Following the filing of these cases, the Debtors have been engaged in a footprint reduction program to sell or close 326 of their stores.

4.      This Court has jurisdiction over the Motion under 28 U.S.C. § 1334.  Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      The statutory predicate for the relief requested by this Application is section 327(a) of the Bankruptcy Code, and such relief is subject to Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Relief Requested

6.      By this Application, the Debtors are requesting an order pursuant to section 327(a) of the Bankruptcy Code, approving the retention of Deloitte & Touche, effective as of

November 14, 2005, to provide risk assessment, quality assessment, journal entry assessment, and, as necessary, other services in connection with the Debtors' internal auditing needs.  The Debtors request that Deloitte & Touche be retained to provide such services on the terms provided in this Application and in the letter agreement between the Debtors and Deloitte & Touche dated September 28, 2005 (the "Engagement Letter").  A copy of the Engagement Letter is attached as Exhibit A to this Application.[2]

## Basis for Relief

7.    To enhance the effectiveness of their internal auditing processes, the Debtors have traditionally employed the services of outside professionals to assist with projects for which the Debtors lack the staffing or internal expertise to complete independently.  In this vein, prior to the Petition Date, the Debtors relied upon Deloitte & Touche to assist with internal auditing projects related to information security, fraud investigations, and best practice.

8.    In order to assure the continued high quality of their internal auditing processes and consistent with past practice, the Debtors seek to retain Deloitte & Touche to provide risk assessment, quality assessment, journal entry assessment, and, as necessary, other services in connection with the Debtors' internal auditing needs.  Specifically, subject to further order of this Court and as more fully described in the Engagement Letter, the services for which the Debtors propose to retain Deloitte & Touche include the following:

(a)    <u>Internal Audit Risk Assessment Services</u>: Deloitte & Touche will assist the Debtors' internal auditing department in completing the annual company-wide risk assessment designed to identify and prioritize the significant financial, operational, regulatory, compliance, fraud, and information systems risks facing the Debtors.

---

[2]    The services for which the Debtors seek to retain Deloitte & Touche are ordinary course professional services that would normally be subject to the Order Authorizing Debtors to Retain and Compensate Professionals Used in the Ordinary Course of Business dated March 4, 2005 (the "OCP Order").  The Debtors are filing this Application to retain Deloitte & Touche under Bankruptcy Code section 327(a) because they anticipate that the cost of the services that they will require from Deloitte & Touche will exceed the monthly and case caps provided in the OCP Order.

Deloitte & Touche will analyze and review (i) the audit universe and auditable entities that have been identified by the Debtors and (ii) the risk models that have been developed by the Debtors' internal auditing department.  Furthermore, Deloitte & Touche will assist the Debtors' internal auditing department in refining the models and in prioritizing and ranking the internal audit universe's auditable entities into "high," "medium," and "low" risk areas.  Deloitte & Touche will prepare a recommended, risk-based assessment for review and approval by Debtors' director of internal audit.  If approved, the results of the assessment will be presented to the Debtors' external auditors for feedback.  Deloitte & Touche will then assist the Debtors' director of internal audit in developing the recommended risk-based annual internal audit plan to be presented to the Debtors' audit committee for approval.

(b)    <u>Quality Assessment Review of Internal Audit</u>: The International Standards for the Professional Practice of Internal Audit requires internal audit functions to undergo an independent quality assessment review ("QAR") by January 1, 2007.  As part of the QAR process, Deloitte & Touche will review the Debtors' internal audit procedures and criteria for identifying significant risk areas and setting audit priorities.  Deloitte & Touche will identify management's expectations regarding the Debtors' internal audit function and its role in the organization and will assess the performance of the function in meeting those expectations. In addition, Deloitte & Touche will compare the Debtors' practices to "leading practices" Deloitte & Touche has encountered in the course of serving other organizations.  The resulting report prepared by Deloitte & Touche will identify areas of strength and identify opportunities for improvement.

(c)    <u>Journal Entry Testing</u>: Deloitte & Touche will, on a quarterly basis, assist the Debtors' internal auditing department in completing analytical review-based tests of general ledger journal entries designed to identify potentially unusual transactions being posted to the general ledger.  The tests will employ predetermined parameters agreed to by the Debtors and will involve the execution of computer assisted audit techniques using data analytics.  Such testing is designed to increase the likelihood of identifying unusual transactions.

Furthermore, subject to the future agreement of the parties, the Debtors seek authority to employ

Deloitte & Touche to provide such additional services as are necessary to satisfy the Debtors'

internal auditing needs on the same or more favorable terms as those provided in the Engagement

Letter without further leave of the Court.[3]

---

[3]    The Engagement Letter contemplates that, upon execution of a separate engagement agreement and on terms mutually acceptable to the Debtors and Deloitte & Touche, Deloitte & Touche may provide the Debtors with additional services not described in the Engagement Letter.  To be clear, the Debtors here seek only authorization to employ Deloitte & Touche for such additional services to the extent that the parties agree that Deloitte & Touche will provide the services on the same or more favorable terms as those described in the Engagement Letter.  The Debtors would seek the Court's authorization to employ Deloitte & Touche for additional projects under terms that are more onerous that those described in the Engagement Letter.

9.      The proposed retention of Deloitte & Touche as contemplated by this Application is critical to ensure the continued enhancement of the Debtors' internal auditing processes.  Deloitte & Touche has, in the past, assisted the Debtors with a variety of internal auditing projects related to information security, fraud investigations, and best practice.  As a result, Deloitte & Touche has acquired significant institutional knowledge of the Debtors' internal auditing processes and is uniquely qualified to assist the Debtors in undertaking such projects.  Accordingly, the Debtors' retention of Deloitte & Touche on the terms set forth in this Application and in the Engagement Letter is in the best interest of the Debtors, their estates, creditors, and other parties in interest.

10.      The Debtors have also employed the services of KPMG LLP ("KPMG"), PricewaterhouseCoopers LLP ("PwC"), and CFO Services in connection with their auditing and accounting needs.  The services for which the Debtors here seek to retain Deloitte & Touche are not duplicative of the services provided by KPMG, PwC or CFO Services.  The services proposed to be provided by Deloitte & Touche are internal audit support services relating to risk assessment, quality assessment, and journal entry assessment.  By contrast, the services provided by KPMG are external auditing services required by law as well as tax advisory services.  Furthermore, the services provided by PwC have been focused upon the Debtors' overall governance controls and information technology controls regarding compliance with the annual Sarbanes-Oxley internal controls assessment.  The services provided by CFO Services are focused upon the Debtors' accounting processes.  Moreover, Deloitte & Touche will consult with the Debtors and, as necessary, the Debtors' professionals throughout the pendency of these cases to ensure that there will be no duplication of services provided to the Debtors.

11.     Subject to the Court's approval of this Application, Deloitte & Touche has indicated its willingness to provide the risk assessment, quality assessment, journal entry assessment, and, as necessary, other internal auditing services required by the Debtors during these cases.

12.     To the best of the Debtors' knowledge, except as set forth in this Application and in the affidavit of Richard Serafini, attached as Exhibit B to this Application (the "Serafini Affidavit"): (a) Deloitte & Touche neither holds nor represents any interest adverse to the Debtors' estates; (b) Deloitte & Touche has had no affiliation with the Debtors, their creditors or any party in interest, or to the Debtors' attorneys that are known to Deloitte & Touche to be assisting the Debtors in these cases, and the personnel expected to provide services to the Debtors on behalf of Deloitte & Touche pursuant to the Engagement Letter are not related to the United States Trustee assigned to these cases, any person employed in the office of such United States Trustee, or the Bankruptcy Judge presiding over these cases; and (c) Deloitte & Touche is a "disinterested person" within the meaning of sections 101(14) and 327(a) of the Bankruptcy Code.[4]

13.     Consistent with the Engagement Letter and as described in the Serafini Affidavit, the Debtors have agreed to pay Deloitte & Touche in accordance with the following hourly rates for the projects and services described in the Engagement Letter: (a) $315 for partners, (b)

---

[4]     As of the Petition Date, Deloitte Consulting LLP ("Deloitte Consulting"), an affiliate of Deloitte & Touche that has been retained to provide in-store consulting services to the Debtors under section 327(a) of the Bankruptcy Code, was owed $209,411 for services provided to the Debtors and expenses incurred.  Subsequent to the Petition Date, but prior to May 16, 2005 (the date on which Deloitte Consulting was retained in these cases), Deloitte Consulting provided services to the Debtors totaling $95,842 and incurred $18,003 in expenses, each in support of certain initiatives relating to the Debtors' perishable trading network (such amounts and the $209,411 prepetition claim collectively, the "DC Pre-Engagement Claim").  In the interest of continuing its relationship with the Debtors and to meet the requirements of disinterestedness under the Bankruptcy Code in connection with its separate retention application (which was approved by an order of this Court dated June 16, 2005 and filed at Docket No. 1749), Deloitte Consulting agreed that it would not seek any recovery from the Debtors for the DC Pre-Engagement Claim.

$250 for senior managers, (c) $175 for managers, and (d) $135 for consultants.[5]  The Debtors are advised that these rates reflect a significant discount from Deloitte & Touche's normal hourly rates. In addition, the Debtors will compensate Deloitte Consulting for reasonable and necessary expenses incurred, which expenses may include travel, telephone costs, meals, and other necessary costs in providing services to the Debtors in accordance with Deloitte & Touche's customary reimbursement policies.  Deloitte & Touche has indicated that its estimated professional fees for the services described in the Engagement Letter will be between $300,000 and $330,000.

14.     Deloitte & Touche will file fee applications with the Court in accordance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules, and orders of this Court.

15.     The Engagement Letter also provides for (a) a limitation on any damages that may be recoverable by the Debtors against Deloitte & Touche, except to the extent any such damages result from gross negligence, willful misconduct, bad faith, or self-dealing by Deloitte & Touche, and (b) an indemnification from the Debtors in favor of Deloitte & Touche against claims of third parties, except to the extent any such claims result from gross negligence, willful misconduct, bad faith, or self-dealing by Deloitte & Touche.

### Notice

16.     Notice of this Motion has been provided to (a) counsel to the United States Trustee, (b) counsel for the Debtors' postpetition secured lenders, (c) counsel for the Creditors Committee, (e) counsel for the Equity Committee, (f) the other parties in interest named on the

---

[5]      These hourly rates apply only to the risk assessment, quality assessment, and journal entry testing services described in the Engagement Letter.  The Engagement Letter also contemplates that the Debtors may engage Deloitte & Touche to perform additional services not encompassed by the Engagement Letter.  To the extent that the Debtors do engage Deloitte & Touche to provide such additional services, the parties will execute a signed engagement letter specifying terms and conditions that are acceptable to, both, the Debtors and Deloitte & Touche.

Master Service List maintained in these cases, and (g) Deloitte & Touche.  No other or further notice need be given.

          WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court (a) enter an order in the form of Exhibit C under section 327(a) of the Bankruptcy Code approving the retention of Deloitte & Touche, effective as of November 14, 2005, to provide risk assessment, quality assessment, journal entry testing, and, as necessary, other internal audit support services to the Debtors during these cases and (b) grant such other and further relief as the Court deems just and proper.

Dated:  November 10, 2005.

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By    *s/ D. J. Baker*   
     D. J. Baker
     Sally McDonald Henry
     Rosalie Walker Gray
     David M. Turetsky
Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Counsel for the Debtors

SMITH HULSEY & BUSEY

By    *s/ Cynthia C. Jackson*   
     Stephen D. Busey
     James H. Post
     Cynthia C. Jackson,
      Florida Bar Number 498882
225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for the Debtors

**Exhibit A**

# Deloitte.

Deloitte & Touche LLP
Suite 2801
One Independent Drive
Jacksonville, FL 32202-5034
USA

Tel: +1 904 665 1400
Fax: +1 904 665 1600
www.deloitte.com

September 28, 2005

Mr. Jeff Gleason
Director of Internal Audit
Winn-Dixie Stores, Inc
5050 Edgewood Ct.
Jacksonville, FL  32254-3699

Dear Mr. Gleason:

Deloitte & Touche LLP ("Deloitte & Touche") is pleased to have been selected to provide certain internal audit services to assist the Winn-Dixie Stores, Inc. (the "Company") Internal Audit function with several projects. These projects (collectively referred to herein as "Projects") consist of assisting in the execution of the Company's risk assessment process used for purposes of planning the Company's 2006 Internal Audit Plan; performing the Institute of Internal Auditors' (IIA) required Quality Assessment of the Internal Audit function; and assisting the Company's Internal Audit function with quarterly general ledger journal entry testing. The purpose of this engagement letter is to confirm the terms of our engagement described below, including our fees for the engagement.

*Scope of Work to be Performed*

## Internal Audit Risk Assessment

Deloitte & Touche will assist the Company's Internal Audit function in completing the annual company-wide risk assessment designed to assist management in identifying and prioritizing the significant financial, operational, regulatory, compliance, fraud and information systems risks facing the Company for inclusion in the Annual Internal Audit Plan that the Company's Internal Audit function will present to the Audit Committee of the Company's Board of Directors for approval.

**Scope and Approach**
The scope and approach of the risk assessment will be limited to the areas and risk factors that have already been identified by the Company's Internal Audit function. The Company's Internal Audit function has performed the following tasks:

- Identified the Audit Universe and Auditable Entities

Member of
Deloitte Touche Tohmatsu

- Developed risk models as the basis for risk measurement
  - o Identified risk factors that affect the achievement of business objectives that are measured in *likelihood* and *impact* of occurrence
  - o Identified risk considerations that are areas of interest affecting the risk factors

Deloitte & Touche will review this work and conduct discussions regarding it with the following parties:

- The Audit Committee
- Senior Management
- External Audit
- Select key management in Finance and Operations

Specifically, Deloitte & Touche will interview the above-mentioned parties. Interviews will be aimed at understanding the risk model already developed by the Company and soliciting other relevant feedback regarding specific risks and other concerns, including risks due to the Company's Chapter 11 filing.

Deloitte & Touche will provide written feedback to the Director of Internal Audit based on these interviews and will suggest changes to the Company's current risk model. Deloitte & Touche will assist Internal Audit management in defining a risk ranking mechanism that will assist the Company in prioritizing and ranking the internal audit universe's auditable entities into "high," "medium," and "low" risk areas.

## Deliverables

Deloitte & Touche will prepare a recommended, risk-based assessment for the Director of Internal Audit's review and approval. If approved, the Director of Internal Audit will present the results of the risk assessment to the external auditors and solicit feedback. Deloitte & Touche will then assist the Director of Internal Audit in developing the recommended risk-based annual internal audit plan that will be presented to the Audit Committee for approval.

## Quality Assessment Review of Internal Audit

### Scope and Approach

The International Standards for the Professional Practice of Internal Audit requires Internal Audit functions that have adopted these standards to undergo an independent Quality Assessment Review (QAR) by January 1, 2007. The purpose of a Quality Assessment Review of the Internal Audit function is to review the function for compliance with The Institute for Internal Auditors' (IIA) International Standards for the

2

Professional Practice of Internal Auditing, and also to provide comments and recommendations related to leading practices based on our experience in the broader market place.

## The Quality Assessment Review

As a part of the QAR process, Deloitte & Touche will review the Company's Internal Audit procedures and criteria for identifying significant risk areas and setting audit priorities. Deloitte & Touche will identify management's expectations regarding the Company's Internal Audit function and its role in the organization and will assess the performance of the function in meeting those expectations. In addition, Deloitte & Touche will compare the Company's practices to "leading practices" Deloitte & Touche has encountered in the course of serving other organizations. The resulting report will identify areas of strength and identify opportunities for improvement.

This QAR will assist management in determining the extent to which Internal Audit is:

- Achieving its overall objectives, including ensuring business integrity, recommending ways to enhance business effectiveness and efficiencies, supporting the Company's business initiatives, and encouraging internal audit staff development.
- Complying with The Institute for Internal Auditors' International Standards for the Professional Practice of Internal Auditing (as required by these Standards by January 1, 2007).
- Maximizing the effectiveness and efficiency of audit technologies.
- Maintaining the ability to deliver valuable and sound business advice to the Audit Committee and management.

Deloitte & Touche will also assist the Company in determining the extent to which the Company's Internal Audit function's:

- Role in corporate governance, as it relates to compliance with laws and regulations, is reasonable and consistent with best practices.
- Risk assessment process, audit universe identification, and audit methodologies reflect current leading practices and incorporate changing business, regulatory, competitive, and quality environments.

## Deloitte & Touche Responsibilities

Deloitte & Touche will begin the assessment by gathering information, in various ways, including:

- Conducting a series of interviews. These interviews will include reviewing the mechanisms used by Internal Audit to identify and analyze risks as well as assessing access to and oversight by the Audit Committee. Deloitte & Touche will also attempt to

3

obtain feedback on how Internal Audit is perceived by its "clients" and whether there are any significant expectation gaps.

- Reviewing a sample of Internal Audit reports and working papers.

- Analyzing the procedures used to conduct audits.

- Examining various documents relating to the mission and capabilities of the Internal Audit function, such as the charter, size, and organizational structure; employee background; professional development programs; job descriptions; long-range plans for the function; minutes; and other records from relevant meetings.

- Reviewing the adequacy of the Company's Internal Audit function to address areas of risk and the appropriateness of the organizational structure and personnel competencies to support the needs of the Company's Internal Audit function's clients.

- Inquiring about: unaudited areas; the balance and integration of operational, financial, and information systems audits and consultative services provided; the effectiveness of communication; the use of technology; and the movement of personnel between the Company's Internal Audit function and operational or functional divisions of the Company.

- Discussing leading practice ideas.

- Evaluating Audit Committee members' input in the overall internal audit process and the level of interaction between Internal Audit management and the Audit Committee.

- Conducting confidential survey of Internal Audit staff in the areas of training, professional development, etc. and comparing those results to Deloitte & Touche's proprietary database.

- Conducting a comparison of the Company Internal Audit process against peers contained in the IIA's GAIN database.

Deloitte & Touche's approach will also include spending time in meetings with selected members of the Company's internal audit team, the Audit Committee, executive management, operating management and external auditor, as appropriate. Deloitte & Touche would request your assistance in furnishing copies of internal audit reports and other documents, scheduling interviews, and coordinating access to selected work papers. Our experience suggests that this review will take 6-8 weeks.

**Deliverables**

At the conclusion of the work we will issue a report of our observations. The written report will:

- Provide an executive summary

- Document the extent of compliance with each of the IIA Attribute and Performance Standards

- Provide comments on the independence and effectiveness of Internal Audit as compared to common practices
- Provide detailed recommendations on how Internal Audit might create additional value to the Company and improve its perception (where applicable)
- Include recommendations to further enhance the Company's Internal Audit function

During the review, we will discuss observations, comments, and recommendations with the Director of Internal Audit.   In addition, we will be prepared to make a presentation of the final report to senior management and/or the Audit Committee, as appropriate.

## Journal Entry Testing

**Objective:**
Deloitte & Touche will, for the four fiscal quarters beginning September 30, 2005 and ending June 30, 2006, assist the Company's Internal Audit function  in completing analytical review based tests of general ledger journal-entries designed to identify potentially unusual transactions (using predetermined parameters as agreed to by the Company) being posted to the general ledger.

This suite of tests is designed to increase the likelihood of identifying unusual transactions. The testing will involve execution of computer-assisted-audit-techniques using data analytics.  While the tests have been effective in a number of instances for a variety of other companies, there is no assurance that they will identify any instances of fraudulent activity or instances of intentional or unintentional errors.

**Scope and Approach:**
Testing of the journal entries are designed to identify journal entry transactions with the following characteristics:

1. Entries made to unrelated, unusual or seldom-used accounts
2. Entries made by individuals who typically do not make entries
3. Entries recorded at the end of the period or as post-closing entries that have little or no explanation or description
4. Entries made that do not have account numbers
5. Entries that contain round numbers or consistent ending numbers

The following steps will be followed by Deloitte & Touche while conducting the journal entry testing:
1. Deloitte & Touche will design a data request letter to be used by Company personnel to extract the general ledger data, trial balance data and chart of account

information. The Company's system and associated general ledger to be tested shall be identified by the Company personnel.

2. Prior to performing testing, detailed journal entry data for the testing period will be obtained by Company personnel from the general ledger system and any other sub-system deemed necessary to provide the required level of transaction detail to produce a meaningful analysis.

3. Reconciliation of this data to general ledger account balances to the trial balance provided will be performed by Deloitte & Touche to ensure that the correct population of journal entries has been provided for the analysis and that such population appears complete.

4. The Company's Internal Audit function will establish parameters that will be used for the profiling analysis and parameter-based testing.

5. With the Company's Internal Audit function, Deloitte & Touche will review the spreadsheet containing reconciliations, data quality analyses, profiling analyses and parameter-based testing to identify criteria for selections of potentially unusual activity.

6. Deloitte & Touche will extract the associated line items and the related journal entry for review by the Company's Internal Audit function.

The identification of unusual transactions in this engagement is not designed to detect fraud or intentional errors. It is limited to the identification of transactions that fall outside of the predetermined parameters. The decision as to what, if any, further testing or analysis is undertaken with these transactions is the responsibility of the Company's Internal Audit function.

It is understood that the testing procedures will occur on a quarterly basis allowing for timely review of output and follow-up of journal selections made. The execution of the analysis will require assistance of personnel from the Company's Accounting and Information Systems groups. This assistance will primarily be required for data extraction as well as data reconciliation.

**Deliverables**

At the conclusion of our work we will issue a report of our observations based upon procedures performed. The document will:

- Provide a synopsis
- Document the output of the aforementioned phased approach

The Company's Internal Audit function will be responsible for providing the following:

1. Knowledgeable individuals to assist Deloitte & Touche in developing an understanding of applicable general ledger and subsidiary ledger systems.

2. Data extracts in a consistent structure and in an agreed-upon timeframe.

3. Access for Deloitte & Touche to client personnel as needed for additional understanding of systems and data and availability to discuss observations disclosed.

### Timing of the Work

We expect to begin work on the tasks described above during October 2005 subject to approval of this engagement letter by the bankruptcy court as referenced below. During the first week of the engagement, we will conduct a detailed planning meeting with you to determine more specific timing, milestones, and to customize our approach for your specific circumstances. We will endeavor to schedule activities at times that are most convenient for the Company, consistent with the necessity that we receive timely access to key individuals and documents, and authorization to proceed with the work.

### Reporting

At the conclusion of each project, we will provide the deliverables discussed above. Prior to issuing any deliverables, we will review preliminary drafts with the Director of Internal Audit and other company personnel as deemed appropriate.

The engagement will be performed in accordance with the International Standards for the Professional Practice of Internal Auditing that are promulgated by The Institute of Internal Auditors (the "IIA Standards"). The procedures to be performed will not constitute an audit, a review, or a compilation of the Company's financial statements or any part thereof, nor an examination of management's assertions concerning the effectiveness of the Company's internal-control systems or an examination of compliance with laws, regulations or other matters. Accordingly, our performance of the procedures will not result in the expression of an opinion or any other form of assurance on the Company's financial statements or any part thereof, nor an opinion or any other form of assurance on the Company's internal-control systems or its compliance with laws, regulations, or other matters.

We will not perform any management functions, make management decisions, or perform in a capacity equivalent to that of an employee of the Company.

### Management's Responsibilities

The Company is, and will continue to be, solely responsible for establishing and maintaining an effective internal control system, including, without limitation, systems designed to assure compliance with policies, procedures, and applicable laws and regulations.

The Company agrees that any reports issued by Deloitte & Touche will not be used by or circulated, quoted, disclosed, or distributed to, nor will reference to such reports be made to, anyone who is not a member of management or a member of the Board of Directors of the Company, or its regulators without the prior written consent of Deloitte & Touche.

### Access to Working Papers and Reports

The working papers prepared by Deloitte & Touche in connection with performing the procedures are the property of Deloitte & Touche. Upon request, copies of any or all working papers that Deloitte & Touche considers to be nonproprietary related to issued reports will be provided to management of the Company. Such copies may not be made available to any other third party without prior written consent from Deloitte & Touche.

Other third parties will not be granted access to nonproprietary working papers retained by Deloitte & Touche (including related reports) until the Company provides Deloitte & Touche with a written consent and an appropriate communication has been submitted to the third party and the third party acknowledges their understanding of the purpose for which the working papers and reports were prepared. A representative from Deloitte & Touche will also be present during the period that the third party, including external auditors, is provided access to nonproprietary working papers retained by Deloitte & Touche.

Third parties will not be provided with a photocopy of any working paper for their retention without the prior consent of Deloitte & Touche. The Company has the responsibility to timely communicate material weaknesses or reportable conditions in internal controls, misstatements of financial statements, or similar matters to its external auditors, the Audit Committee, the Board of Directors, and when required, regulators.

### Use of Software

Deloitte & Touche will utilize software that is currently owned and/or licensed to Deloitte & Touche in connection with the performance of its services. If the Company would like us to use other software, such software is to be acquired by and licensed to the Company, with Deloitte & Touche as a sublicensee for use in connection with the performance of its services to the Company. With respect to software that is owned and/or licensed to Deloitte & Touche, if Company personnel will access or use such software, the Company agrees to become a licensee in accordance with terms established by Deloitte & Touche.

### Engagement Team

Mr. Richard Serafini will serve as the Lead Client Service Partner. He will be assisted by Partner Robert Antoine and Senior Managers Steven Henchock and David Kay.

### Fees and Other Services

Fees for this engagement will be billed as the work progresses on a time and material basis. In addition, reasonable and necessary expenses will be billed separately. Deloitte & Touche will invoice for professional fees and expenses in accordance with guidelines that

may be established by the Bankruptcy Court. The following rates will be in effect for the three above mentioned projects.

| | |
|---|---|
| Partner | $315/hr |
| Senior Manager | 250/hr |
| Manager | 175/hr |
| Consultant | 135/hr |

Professional fees for the engagement detailed above are estimated at $300,000-$330,000. During the term of this engagement, the Company may request that Deloitte & Touche perform additional services that are not encompassed by this engagement letter. Deloitte & Touche may perform such additional services upon receipt of a separate signed engagement letter with terms and conditions that are acceptable to the Company and Deloitte & Touche.

The Company agrees that it will promptly seek Bankruptcy Court approval of this engagement. The application, proposed order and other supporting documents (collectively, the "Application") submitted to the Bankruptcy Court seeking its approval of the engagement must be satisfactory to Deloitte & Touche in all respects. In addition to Deloitte & Touche's other rights or remedies hereunder, Deloitte & Touche may, in its sole discretion and without any liability arising therefrom, terminate this engagement in the event that (a) a third party objects or threatens to object, or Deloitte & Touche reasonably believes that a third party may object, in the form of an objection or otherwise, to Deloitte & Touche's retention by the Company in the case on the terms and conditions set forth in this letter, (b) a final order authorizing the employment of Deloitte & Touche as consultants for the Company is not issued by the Bankruptcy Court on or before sixty (60) days from the date of the filing of the Application on the terms and conditions set forth herein or on such other terms and conditions as are satisfactory to Deloitte & Touche, or (c) the Application is denied by the Bankruptcy Court. In such event, the Company hereby agrees to withdraw or amend, promptly upon Deloitte & Touche's request, any Application filed or to be filed with the Bankruptcy Court to retain Deloitte & Touche's services in the Chapter 11 proceeding. The "Bankruptcy Court" shall mean the United States Bankruptcy Court having jurisdiction over chapter 11 cases of the Company and its affiliates.

This engagement letter, together with the General Business Terms attached hereto, constitutes the entire agreement between the Company and Deloitte & Touche with respect to this engagement; supersedes all other oral and written representations, understandings, or agreements relating to this engagement; and may not be amended except by the mutual written agreement of the Company and Deloitte & Touche. In the event of any inconsistency between this engagement letter and the General Business Terms attached hereto, the following order of priority shall apply: (1) General Business Terms, and (2) engagement letter.

Please indicate your acceptance of this agreement by signing in the space provided below and returning this engagement letter to us. A duplicate of this engagement letter is provided for your records.

We value our relationship and sincerely appreciate the opportunity to serve you on this important project. Please call Richard Serafini at (904) 665-1559 or Robert Antoine (904) 665-1564 should you have any questions.

Yours truly,

Deloitte & Touche, LLP

Accepted and Agreed to for Winn-Dixie Stores, Inc:

By: _____

Title: _____CFO_____

Date: ____10-11-2005_____

LEGAL APPROVED
ATTY: JFC
DATE: 10/10/05

AUDIT DIRECTOR
10-10-2005

## GENERAL BUSINESS TERMS

**1.      Services.** It is understood and agreed that Deloitte & Touche's (as defined in paragraph 12) services (the "Services") under the engagement letter to which these terms are attached (the "Engagement Letter") may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by Winn-Dixie Stores, Inc, (the "Client").

**2.      Payment of Invoices.** Subject to any applicable requirements of the United States Bankruptcy code, the Federal Rules of Bankruptcy Procedures, the Local Rules of the Bankruptcy Court for the Middle District of Florida, or orders of the Bankruptcy Court, Deloitte & Touche's invoices are due upon presentation. Invoices upon which payment is not received within thirty (30) days of the invoice date shall accrue a late charge of the lesser of (a) $1\frac{1}{2}\%$ per month or (b) the highest rate allowable by law, in each case compounded monthly to the extent allowable by law. Not withstanding the foregoing, Deloitte & Touche will not be entitled to payments of a late charge or interest with respect to payments made by the Debtors within the timeframes contemplated by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court for the Middle District of Florida, or orders of the Bankruptcy Court. Without limiting its rights or remedies, Deloitte & Touche shall have the right to halt or terminate the Services entirely if payment is not received within thirty (30) days of the invoice date.  The Client shall be responsible for all taxes imposed on the Services or on the transaction, other than income taxes imposed on a net basis or by withholding, and other than taxes imposed on Deloitte & Touche's property.

**3.      Term.** Unless terminated sooner in accordance with its terms, this engagement shall terminate on the completion of the Services.  This engagement may be terminated by either party at any time, with or without cause, by giving written notice to the other party not less than thirty (30) days before the effective date of termination, provided that, in the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period. Deloitte & Touche may terminate this engagement upon written notice to the Client if it determines that (a) a governmental, regulatory, or professional entity (including, without limitation, the American Institute of Certified Public Accountants, the Public Company Accounting Oversight Board, or the Securities and Exchange Commission), or an entity having the force of law has introduced a new, or modified an existing, law, rule, regulation, interpretation, or decision, the result of which would render Deloitte & Touche's performance of any part of the engagement illegal or otherwise unlawful or in conflict with independence or professional rules, or (b) circumstances change (including, without limitation, changes in ownership of the Client or any of its affiliates) such that Deloitte & Touche's performance of any part of the engagement would be illegal or otherwise unlawful or in conflict with independence or professional rules. Upon termination of the engagement, subject to any applicable requirements of the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules at the Bankruptcy Court for the Middle District of Florida, or orders of the Bankruptcy Court, the Client will compensate Deloitte & Touche under the terms of the Engagement Letter for the Services performed and expenses incurred through the effective date of termination.

**4.    Deliverables.**

a)    Deloitte & Touche has created, acquired, or otherwise has rights in, and may, in connection with the performance of the Services, employ, provide, modify, create, acquire, or otherwise obtain rights in, works of authorship, materials, information, and other intellectual property (collectively, the "Deloitte & Touche Technology").

b)    Except as provided below, upon full and final payment to Deloitte & Touche hereunder, the tangible items specified as deliverables or work product in the Engagement Letter (the "Deliverables") shall become the property of the Client.  To the extent that any Deloitte & Touche Technology is contained in any of the Deliverables, Deloitte & Touche hereby grants the Client, upon full and final payment to Deloitte & Touche hereunder, a royalty-free, fully paid-up, worldwide, nonexclusive license to use such Deloitte & Touche Technology in connection with the Deliverables.

c)    To the extent that Deloitte & Touche utilizes any of its property (including, without limitation, the Deloitte & Touche Technology or any hardware or software of Deloitte & Touche) in connection with the performance of the Services, such property shall remain the property of Deloitte & Touche and, except for the license expressly granted in the preceding paragraph, the Client shall acquire no right or interest in such property.  Notwithstanding anything herein to the contrary, the parties acknowledge and agree that (1) Deloitte & Touche shall own all right, title, and interest, including, without limitation, all rights under all copyright, patent, and other intellectual property laws, in and to the Deloitte & Touche Technology and (2) Deloitte & Touche may employ, modify, disclose, and otherwise exploit the Deloitte & Touche Technology (including, without limitation, providing services or creating programming or materials for other clients).  Deloitte & Touche does not agree to any terms that may be construed as precluding or limiting in any way its right to (1) provide consulting or other services of any kind or nature whatsoever to any person or entity as Deloitte & Touche in its sole discretion deems appropriate or (2) develop for itself, or for others, materials that are competitive with or similar to those produced as a result of the Services, irrespective of their similarity to the Deliverables.

d)    To the extent any Deloitte & Touche Technology provided to the Client hereunder is a product (to the extent it constitutes merchandise within the meaning of section 471 of the Internal Revenue Code), such Deloitte & Touche Technology is licensed to the Client by Deloitte & Touche as agent for Deloitte & Touche Products Company LLC on the terms and conditions herein.  The assignment and license grant in this paragraph 4(d) do not apply to any Deloitte & Touche Technology (including any modifications or enhancements thereto or derivative works based thereon) that is subject to a separate license agreement between the Client and a third party, including without limitation, Deloitte & Touche Products Company LLC.

**5.    Limitation on Warranties. THIS IS A SERVICES ENGAGEMENT. DELOITTE & TOUCHE WARRANTS THAT IT SHALL PERFORM THE SERVICES IN GOOD FAITH AND WITH DUE PROFESSIONAL CARE. DELOITTE & TOUCHE DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE CLIENT'S EXCLUSIVE REMEDY FOR ANY BREACH OF THIS WARRANTY SHALL BE FOR DELOITTE & TOUCHE, UPON RECEIPT OF WRITTEN NOTICE, TO USE DILIGENT EFFORTS TO CURE SUCH BREACH, OR, FAILING ANY CURE IN A REASONABLE PERIOD OF TIME, THE RETURN OF PROFESSIONAL FEES PAID TO DELOITTE & TOUCHE HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH.**

**6.**     **Limitation on Damages and Indemnification.**

a)     The Client agrees that Deloitte & Touche, its subcontractors, and their respective personnel shall not be liable to the Client for any claims, liabilities, or expenses relating to this engagement ("Claims") for an aggregate amount in excess of the fees paid by the Client to Deloitte & Touche pursuant to this engagement, except to the extent finally judicially determined to have resulted primarily from the gross negligence, bad faith, willful misconduct or self-dealing of Deloitte & Touche or its subcontractors. In no event shall Deloitte & Touche, its subcontractors, or their respective personnel be liable for any loss of use, data, goodwill, revenues or profits (whether or not deemed to constitute a direct claim ) consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement.

b)     The Client shall indemnify and hold harmless Deloitte & Touche, its subcontractors, and their respective personnel from all Claims, except to the extent finally judicially determined to have resulted primarily from the gross negligence, bad faith, willful misconduct or self-dealing of Deloitte & Touche or its subcontractors.

c)     In circumstances where all or any portion of the provisions of this paragraph 6 are finally judicially determined to be unavailable, the aggregate liability of Deloitte & Touche, its subcontractors, and their respective personnel for any Claim shall not exceed an amount that is proportional to the relative fault that Deloitte & Touche's conduct bears to all other conduct giving rise to such Claim.

d)     With respect to indemnification Claims arising during the Client's chapter 11 cases, but prior to the effective date of a confirmed plan of reorganization in such cases, all requests for indemnity under the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Bankruptcy Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought; provided, however, that in no event shall Deloitte & Touche be indemnified in the case of its own gross negligence, bad faith, willful misconduct or self-dealing.

**7.**     **Client Responsibilities.** The Client shall cooperate with Deloitte & Touche in the performance by Deloitte & Touche of the Services, including, without limitation, providing Deloitte & Touche with reasonable facilities and timely access to data, information, and personnel of the Client. The Client shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to Deloitte & Touche for purposes of the performance by Deloitte & Touche of the Services. The Client acknowledges and agrees that Deloitte & Touche's performance is dependent upon the timely and effective satisfaction of the Client's responsibilities hereunder and timely decisions and approvals of the Client in connection with the Services. Deloitte & Touche shall be entitled to rely on all decisions and approvals of the Client. The Client shall be solely responsible for, among other things: (a) making all management decisions and performing all management functions; (b) designating a competent management member to oversee the Services; (c) evaluating the adequacy and results of the Services; (d) accepting responsibility for the results of the Services; and (e) establishing and maintaining internal controls, including, without limitation, monitoring ongoing activities.

**8.**     **Force Majeure.** Except for the payment of money, neither party shall be liable for any delays or nonperformance resulting from circumstances or causes beyond its reasonable control, including, without limitation, acts or omissions or the failure to cooperate by the other party (including, without limitation, entities or individuals under its control, or any of their respective

officers, directors, employees, other personnel and agents), acts or omissions or the failure to cooperate by any third party, fire or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order, or requirement of any governmental agency or authority.

**9.      Limitation on Actions.** No action, regardless of form, relating to this engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for nonpayment may be brought by a party not later than one year following the date of the last payment due to the party bringing such action.

**10.      Independent Contractor.** It is understood and agreed that each party hereto is an independent contractor and that neither party is, nor shall be considered to be, the other's agent, distributor, partner, fiduciary, joint venturer, co-owner, or representative. Neither party shall act or represent itself, directly or by implication, in any such capacity or in any manner assume or create any obligation on behalf of, or in the name of, the other.

**11.      Confidentiality and Internal Use.**

a)      The Client agrees that all Services and Deliverables shall be solely for the Client's informational purposes and internal use, and are not intended to be, and should not be, used by any person or entity other than the Client. Except as otherwise specifically provided in the Engagement Letter, the Client further agrees that such Services and Deliverables shall not be circulated, quoted, disclosed, or distributed to, nor shall reference to such Services or Deliverables be made to, any person or entity other than the Client.

b)      To the extent that, in connection with this engagement, either party (each, the "receiving party") comes into possession of any trade secrets or other proprietary or confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the disclosing party's consent. The disclosing party hereby consents to the receiving party disclosing such information (1) to subcontractors, whether located within or outside of the United States, that are providing services in connection with this engagement and that have agreed to be bound by confidentiality obligations similar to those in this paragraph 11(b); (2) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards or rules, or in connection with litigation pertaining hereto; or (3) to the extent such information (i) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency and available to the public) other than as the result of a disclosure in breach hereof, (ii) becomes available to the receiving party on a nonconfidential basis from a source other than the disclosing party that the receiving party believes is not prohibited from disclosing such information to the receiving party by obligation to the disclosing party, (iii) is known by the receiving party prior to its receipt from the disclosing party without any obligation of confidentiality with respect thereto, or (iv) is developed by the receiving party independently of any disclosures made by the disclosing party to the receiving party of such information. In satisfying its obligations under this paragraph 11(b), each party shall maintain the other's trade secrets and proprietary or confidential information in confidence using at least the same degree of care as it employs in maintaining in confidence its own trade secrets and proprietary or confidential information, but in no event less than a reasonable degree of care. Nothing in this paragraph 11(b) shall alter the Client's obligations under paragraph 11(a). Notwithstanding anything to the contrary herein, the Client acknowledges that Deloitte & Touche, in connection with performing the Services, may develop or acquire experience, skills, knowledge, and ideas that are retained in the unaided memory of its personnel. The Client acknowledges and agrees that Deloitte & Touche may use and disclose such experience, skills, knowledge, and ideas.

**12.      Survival and Interpretation.** All paragraphs herein relating to payment of invoices, deliverables, limitation on warranties, limitation on damages and indemnification, limitation on actions, confidentiality and internal use, survival and interpretation, assignment, nonexclusivity, waiver of jury trial, nonsolicitation, and governing law shall survive the expiration or termination of this engagement. For purposes of these terms, "Deloitte & Touche" shall mean Deloitte & Touche LLP and for purposes of paragraph 6 shall also mean Deloitte & Touche Products Company LLC, one of its subsidiaries. The Client acknowledges and agrees that no affiliated or related entity of Deloitte & Touche, whether or not acting as a subcontractor, shall have any liability hereunder to the Client or any other person and the Client will not bring any action against any such affiliated or related entity in connection with this engagement. Without limiting the foregoing, affiliated and related entities of Deloitte & Touche are intended third-party beneficiaries of these terms, including, without limitation, the limitation on liability and indemnification provisions of paragraph 6, and the agreements and undertakings of the Client contained in the Engagement Letter. Any affiliated or related entity of Deloitte & Touche may in its own right enforce such terms, agreements, and undertakings. **The provisions of paragraphs 6, 9, 12, 14, and 17 hereof shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise notwithstanding the failure of the essential purpose of any remedy.**

**13.      Assignment and subcontracting.** Except as provided below, neither party may assign, transfer, or delegate any of its rights or obligations hereunder (including, without limitation, interests or Claims) without the prior written consent of the other party. The Client hereby consents to Deloitte & Touche assigning or subcontracting any of Deloitte & Touche's rights or obligations hereunder to (a) any affiliate or related entity, whether located within or outside of the United States, or (b) any entity that acquires all or a substantial part of the assets or business of Deloitte & Touche. Services performed hereunder by Deloitte & Touche's subcontractors shall be invoiced as professional fees on the same basis as services performed by Deloitte & Touche's personnel unless otherwise agreed.

**14.      Waiver of Jury Trial. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS ENGAGEMENT.**

**15.      Nonsolicitation.** During the term of this engagement and for a period of one (1) year thereafter, each party agrees that its personnel (in their capacity as such) who had direct and substantive contact in the course of this engagement with personnel of the other party shall not, without the other party's consent, directly or indirectly employ, solicit, engage, or retain the services of such personnel of the other party. In the event a party breaches this provision, the breaching party shall be liable to the aggrieved party for an amount equal to thirty percent (30%) of the annual base compensation of the relevant personnel in his or her new position. Although such payment shall be the aggrieved party's exclusive means of monetary recovery from the breaching party for breach of this provision, the aggrieved party shall be entitled to seek injunctive or other equitable relief. This provision shall not restrict the right of either party to solicit or recruit generally in the media.

**16.      Entire Agreement, Amendment, and Notices.** These terms, and the Engagement Letter, including exhibits, constitute the entire agreement between the parties with respect to this engagement; supersede all other oral and written representations, understandings, or agreements relating to this engagement; and may not be amended except by written agreement signed by the parties. In the event of any conflict, ambiguity, or inconsistency between these terms and the

15

Engagement Letter, these terms shall govern and control.  All notices hereunder shall be (a) in writing, (b) delivered to the representatives of the parties at the addresses first set forth above, unless changed by either party by notice to the other party, and (c) effective upon receipt.

**17.     Governing Law, Jurisdiction and Venue, and Severability.**  These terms, the Engagement Letter, including exhibits, and all matters relating to this engagement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof).   If any provision of these terms or the Engagement Letter is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

**<u>Exhibit B</u>**

UNITED STATES BANKRUPTCY COURT

Middle District of Florida (Jacksonville)

| | |
|---|---|
| In re: | Chapter 11 |
| Winn-Dixie Stores, Inc., | Case No. 05-03840 |
| | Jointly Administered |
| et al., | |
| Debtors. | |

**AFFIDAVIT OF RICHARD SERAFINI IN SUPPORT OF APPLICATION FOR AN ORDER AUTHORIZING EMPLOYMENT AND RETENTION OF DELOITTE & TOUCHE LLP TO PROVIDE RISK ASSESSMENT, QUALITY ASSESSMENT, AND JOURNAL ENTRY TESTING SERVICES FOR THE DEBTORS IN POSSESSION NUNC PRO TUNC TO NOVEMBER 14, 2005**

**Richard Serafini, being duly sworn, deposes and says:**

1.       I am a principal of the firm of Deloitte & Touche LLP ("Deloitte & Touche"), which has an office located at One Independent Drive, Jacksonville, Florida 32202.  I make this affidavit based the affidavit of Anthony Forcum filed in connection with the retention of Deloitte Consulting LLP ("Deloitte Consulting"), an affiliate of Deloitte & Touche, and upon inquiries made by myself or on my behalf in support of the application (the "Retention Application") for an order  pursuant to section 327(a) of the Bankruptcy Code (as defined in the Retention Application) authorizing the approval of Deloitte & Touche to provide risk assessment, quality assessment, journal entry testing and, as necessary and as agreed to by the parties, other internal audit support services for the above-captioned debtors and debtors-in-possession (the "Debtors") nunc pro tunc to November 14, 2005.

1

2.     To my knowledge based on reasonable inquiry, (1) Deloitte & Touche,

Richard Serafini, a principal of Deloitte & Touche and Robert Antoine, a partner of

Deloitte & Touche (the "Deloitte & Touche Partners/Principals"), who are anticipated to

provide services as part of the engagement team on the engagement for which Deloitte &

Touche is to be retained in these Chapter 11 cases (the "Winn-Dixie Engagement

Team"), and the employees of Deloitte & Touche who are anticipated to provide the

services as part of the Winn-Dixie Engagement Team, do not hold or represent any

interest adverse to any of the Debtors with respect to the matters on which Deloitte &

Touche is to be retained in these Chapter 11 cases, and (2) as set forth below and, to the

best of my knowledge, information and belief, Deloitte & Touche and the Deloitte &

Touche Partners/Principals have no relationship to any of the Debtors, any of the

Debtors' significant creditors, other known parties-in-interest in these Chapter 11 cases

(as identified by the Debtors), or to the Debtors' attorneys that are known to be assisting

the Debtors in these Chapter 11 cases, except as described herein or as set forth on

Exhibit A, attached hereto, (3) the personnel anticipated to provide services to the

Debtors in connection herewith are not related to the United States Trustee assigned to

these Chapter 11 case, any persons employed in the office of such United States Trustee

or the Bankruptcy Judge presiding over such cases and (4) Deloitte & Touche and the

Deloitte & Touche Engagement Partners/Principals are "disinterested persons" as that

term is defined in section 101(14) of the Bankruptcy Code, as modified by section

1107(b) of the Bankruptcy Code.

3.     From time to time, Deloitte & Touche or its affiliates have provided,

currently provide or may currently provide services and likely will continue to provide

2

services, to certain creditors of the Debtors and various other parties potentially adverse to the Debtors in matters unrelated to these Chapter 11 cases.

4.      As described below, Deloitte Consulting undertook an internal search to determine whether it or its affiliates, including Deloitte & Touche, are or have been employed by or had other relationships with any entities that were listed on a schedule provided to Deloitte Consulting by the Debtors in connection with these Chapter 11 cases.  As noted herein, certain of these creditors, other parties-in-interest, attorneys, or accountants have or may have provided goods or services to, currently provide or may currently provide goods or services to, and may in the future provide goods or services to Deloitte & Touche and its affiliates and the Deloitte & Touche Partners/Principals in matters unrelated to these Chapter 11 cases.

5.      To check upon and disclose possible relationships with parties-in-interest in these Chapter 11 cases, Deloitte Consulting researched its client databases and performed reasonable due diligence to determine whether it or its affiliates, including Deloitte & Touche, had any relationships with the entities that were listed on a schedule provided to Deloitte Consulting by the Debtors in connection with these chapter 11 cases, which included the following:

- the Debtors and their affiliates;

- the Debtors' key personnel, including its current and former directors and officers;

- the Debtors' pre-petition senior secured lenders;

- the Debtors' top 50 unsecured trade creditors;

- the Indenture Trustee for the senior unsecured noteholders, the senior unsecured noteholders, and related funds and administrators;

3

- the publicly identified shareholders of the Debtors;

- parties with filed UCC financing statements;

- the Debtors' mortgage holder;

- the Debtors' material lessors of real property;

- the attorneys and other professionals that the Debtors have sought authority to employ in these chapter 11 cases;

- the members of the Official Creditors' Committee and its attorneys; and

- other potential parties-in-interest as identified by the Debtors.

6.      Despite the efforts described above to identify and disclose Deloitte & Touche's and its affiliates' connections with the parties-in-interest in these Chapter 11 cases, because Deloitte & Touche and its affiliates are large firms with many personnel, and because the Debtors are a large enterprise, Deloitte & Touche is unable to state with certainty that every client relationship or other connection with it or its affiliates has been disclosed.  In this regard, if Deloitte & Touche discovers additional material information that it determines requires disclosure, it will file a supplemental disclosure promptly with the Court.

7.      From this internal search, Deloitte & Touche has determined that certain relationships should be disclosed as follows.

(a)      Deloitte & Touche and/or its affiliates provides services in matters unrelated to these Chapter 11 cases to certain of the Debtors' parties in interest or certain affiliated entities listed on Exhibit "A".  Deloitte & Touche will not provide services to these entities in connection with these Chapter 11 cases.

(b)      JPMorgan Chase (f/k/a BankOne), Sun Trust, Bank of America (f/k/a Fleet Retail Finance), Wachovia, Wells Fargo, and Credit Suisse First Boston have been identified by the Debtors as pre-petition lenders to the Debtors.   These institutions and/or their affiliates are all lenders to Deloitte & Touche or its affiliates or to their respective members.

(e)     Deloitte & Touche has provided, may currently provide and may in the future provide services to Skadden, Arps, Slate, Meagher & Flom LLP, and King & Spalding LLP, counsel to the Debtor, in matters unrelated to these chapter 11 cases. Each of the law firms (including Skadden, Arps, Slate, Meagher & Flom LLP, and King & Spalding LLP) listed on Exhibit A hereto may have provided, may currently provide or may in the future provide legal services to Deloitte & Touche or its affiliates in matters unrelated to these Chapter 11 cases

(f)     In the ordinary course of its business, Deloitte & Touche and/or its affiliates has business relationships in unrelated matters with its principal competitors, including KPMG and PriceWaterhouseCoopers, which together with their affiliates, has been identified by the Debtors as potential parties-in-interest in these Chapter 11 cases. For example, from time to time, Deloitte & Touche and/or its affiliates and one or more of such entities may work on assignments for the same client or may otherwise engage each other for various purposes.

(g)     Certain parties in interest identified on Exhibit A may be adverse to and/or involved in litigation matters with Deloitte Consulting or its affiliates in connection with matters unrelated to these Chapter 11 cases.

8.    Except as may be disclosed herein, to the best of my knowledge, Deloitte & Touche and the Deloitte & Touche Partners/Principals do not hold or represent any interest adverse to the Debtors, and I believe that Deloitte & Touche and the Deloitte & Touche Partners/Principals are "disinterested persons" as that term is defined in Section 101(14) of the Bankruptcy Code, as modified by Section 1107(b) of the Bankruptcy Code.

9.    As set forth in the Engagement Letter (as defined in the Application), the nature and extent of the services that Deloitte & Touche proposes to render, as may be requested by the Debtors and as may be agreed to by Deloitte & Touche, are:

- Internal Audit Risk Assessment – Deloitte & Touche will assist the Debtors' internal audit function in completing its annual company-wide risk assessment designed to assist management in identifying and prioritizing the significant financial, operational, regulatory, compliance, fraud and information systems risks facing the Debtors for inclusion in the Annual Internal Audit Plan that the

Debtors' internal audit function will present to the Audit Committee of the Debtors' board.

- Quality Assessment Review of Internal Audit – As part of the QAR process, Deloitte & Touche will review the Debtors' internal audit procedures and criteria for identifying significant risk areas and setting audit priorities. Deloitte & Touche will identify management's expectations regarding the Debtors' internal audit function and its role in the organization and will assess the performance of the function in meeting those expectations. In addition, Deloitte & Touche will compare the Debtors' practices to "leading practices" Deloitte & Touche has encountered in the course of serving other organizations.

- Journal Entry Testing --  For the four fiscal quarters beginning September 30, 2005 and ending June 30, 2006, Deloitte & Touche will assist the Debtors' internal audit function in completing analytical review based tests of general ledger journal entries designed to identify potentially unusual transactions (using predetermined parameters as agreed to by the Debtors) being posted to the general ledger.

10.    Furthermore, the Application proposes that, subject to the future agreement by the Debtors and Deloitte & Touche, the Debtors be authorized to employ Deloitte & Touche to perform such other internal audit services as are necessary to satisfy the Debtors' internal audit needs on the same or more favorable terms as those provided in the Engagement Letter without further leave of the Court.

11.    Deloitte & Touche has significant qualifications and experience in performing the scope of work described above that is the subject of Deloitte & Touche's retention to provide post-petition services to the Debtors.  Subject to the Court's approval of Deloitte & Touche's retention hereunder, the scope of post-petition services Deloitte & Touche anticipates providing to the Debtors is limited to those services described above.

12.    Some services incidental to the tasks to be performed by Deloitte & Touche in these Chapter 11 cases may be performed by personnel employed by or associated with affiliates of Deloitte & Touche.  The fees and expenses with respect to such services, if

any, will be included in the fee applications of Deloitte & Touche.

13.     Deloitte & Touche understands that the Debtors have also employed the services of KPMG LLP, PricewaterhouseCoopers LLP and CFO Services in connection with their auditing and accounting needs. Deloitte & Touche will consult with the Debtors and, as necessary, the Debtors' professionals throughout the pendency of these Chapter 11 cases to ensure that there will be no duplication of services provided to the Debtors.

14.     Deloitte & Touche intends to apply to the Court for allowance of compensation and reimbursement of expenses consistent with the terms of the Engagement Letter, the Retention Application and this Affidavit, the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court of the Middle District of Florida (Jacksonville), the United States Trustee's Guidelines and the Orders of this Court.

15.     Deloitte & Touche will charge the hourly rates as specified in the Engagement Letter in performing the aforementioned services. For all services, the range of rates is as follows:

| *Staff Classification* | *Hourly Billing Rate* |
| --- | --- |
| Partner/Principals/Directors | $ 315 per hour |
| Senior Managers | $ 250 per hour |
| Managers | $ 175 per hour |
| Consultants | $ 135 per hour |

16.     The professional fees charged for Deloitte & Touche's services are calculated from the actual hours expended in providing the services multiplied by the

hourly billing rates for the specific personnel involved.  In addition, reasonable expenses, including, without limitation, travel and delivery services will be included in the total amount billed.

17.    Deloitte & Touche requests that it be permitted to submit monthly invoices for fees and expenses. Such invoices will contain reasonable detail consistent with any rules, guidelines, and/or administrative orders promulgated by the Court that apply to these Chapter 11 cases.  Deloitte & Touche requests that the invoices, after appropriate review, be paid in a manner consistent with the payment of other retained professionals in this matter, consistent with any administrative orders, if any, that would apply to interim payments.

18.    Deloitte Consulting, Deloitte & Touche and/or certain of their affiliates did provide services to the Debtors prior to the inception of these Chapter 11 cases. Such services included:

    (a)    Assistance with implementation of Winn-Dixie's Procurement Process Redesign project.  Activities included guidance and assistance related to the following:

        (i)    organizational change management associated with the transition of 400+ associates into a new Central Procurement organization structure,

        (ii)    process redesign with respect to financial analysis capabilities within the Central Procurement function,

        (iii)    process improvements and work-flow redesign related to advertising and promotions processes,

        (iv)    identification of tools, processes, and technologies to improve item/store level forecasting,

        (v)    enhanced processes related to assortment planning and category analysis,

        (vi)    development of a pricing strategy function,

        (vii)    design and implementation of vendor management processes and tools,

(viii)   evaluation of trading network alternatives for perishables, and

(ix)    development of scorecards to track performance of individual components of Winn-Dixie's Merchandising and Supply Chain function.

(b)    Assistance with identification of opportunities to improve store inventory ordering processes, Direct Store Delivery (DSD) functions and "Front End operations" inside each of Winn-Dixie's stores;

(c)    Assistance to Winn-Dixie's Internal Audit Department related to scope and approach to internal audits of purchasing and procurement functions and fraud risk assessments (performed by Deloitte & Touche);

(d)    In addition, by an agreement effective on May 24, 2004, Deloitte & Touche Tax Technologies LLC ("D&T Tax Technologies"), an affiliate of Deloitte Consulting, licensed corporate sales tax software for a term of one year to Winn-Dixie Stores, Inc. ("WDS"), a Debtor. As of the Petition Date, no amounts were due under this license agreement. WDS may seek to extend the term of the license pursuant to and, in accordance with, the terms of the license agreement in which case further license payments would become due. Subsequent to the execution of the license agreement, D&T Tax Technologies and Deloitte & Touche entered into an engagement letter to provide certain services to WDS associated with the implementation of the licensed software. D&T Tax Technologies and Deloitte & Touche LLP were paid for these services.

19.    Deloitte Consulting, an affiliate of Deloitte & Touche, received $2,268,100 and D&T Tax Technologies received $18,100 from the Debtors within 90 days prior to the inception of these Chapter 11 cases for the services described above. Deloitte Consulting was owed $209,411 by the Debtors as of the Petition Date. Deloitte Consulting will not seek any recovery with respect to such amounts. Subsequent to the Petition Date, but prior to May 16, 2005, Deloitte Consulting provided services to the Debtor totaling $95,842 and incurred $18,003 of expenses in support of the Debtors' initiatives related to implementation of the selected perishable trading network and pricing strategy capability described above. Deloitte Consulting will also not seek any recovery with respect to such amounts. As of the Petition Date, Deloitte & Touche was

not owed any fees in connection with the prior services provided to the Debtors.

20.    Deloitte & Touche has received no promises regarding compensation in these Chapter 11 cases other than in accordance with the Bankruptcy Code and as set forth in this Affidavit.  Deloitte & Touche has no agreement to share its revenues from the services for which it is seeking to be retained hereunder with any nonaffiliated entity.

Richard Serafini
Principal

Sworn to and subscribed before me,
this _10_th day of November, 2005.

JULIA SAFFER
MY COMMISSION # DD 322192
EXPIRES: July 2, 2006
Bonded Thru Notary Public Underwriters

11

## Exhibit C

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| In re: | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**ORDER AUTHORIZING DEBTORS TO RETAIN DELOITTE & TOUCHE LLP**
**TO PROVIDE RISK ASSESSMENT, QUALITY ASSESSMENT, AND**
**JOURNAL ENTRY TESTING SERVICES TO THE DEBTORS**

These cases came before the Court for hearing on December 1, 2005, upon the application of Winn-Dixie Stores, Inc. and its subsidiaries and affiliates in the above-captioned jointly-administered cases, as debtors and debtors-in-possession (collectively, the "Debtors"), for entry of an order authorizing the Debtors to retain Deloitte & Touche LLP ("Deloitte & Touche"), effective as of November 14, 2005, to provide risk assessment, quality assessment, journal entry testing, and, as necessary, other internal audit support services to the Debtors during these cases (the "Application").[1]   The Court has reviewed the Application and the supporting affidavit of Richard Serafini (the "Serafini Affidavit") and considered the representations of counsel.  Based upon the representations of counsel, after due deliberation and finding proper notice has been given, the Court determines that good cause exists to grant the relief requested in the Application and that granting such relief is in the best interest of these estates and creditors.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Application is granted.

---

[1]      All capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them in the Application.

2.      The Debtors are authorized to retain Deloitte & Touche, effective as of November 14, 2005, pursuant to section 327(a) of the Bankruptcy Code, to provide risk assessment, quality assessment, journal entry testing, and, as necessary, other internal audit support services to the Debtors during these cases on the terms set forth in the Application, the Serafini Affidavit, and the letter agreement between the Debtors and Deloitte & Touche dated September 28, 2005 and attached as Exhibit A to the Application (the "Engagement Letter").

3.      If any supplemental affidavits are filed and served after the entry of this Order, absent any objections filed within twenty (20) days after the filing and service of such supplemental affidavits, Deloitte & Touche's employment shall continue as authorized pursuant to this Order.

4.      Deloitte & Touche shall be compensated upon appropriate application in accordance with Sections 330 and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules, and orders of this Court.

5.      With respect to indemnification claims based on acts occurring after the Petition Date but prior to the effective date of a confirmed plan of reorganization in the Debtors' chapter 11 cases, all requests for indemnity under the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought; provided, however, that in no event shall Deloitte & Touche be indemnified in the case of its own gross negligence, bad faith, willful misconduct, or self-dealing.

6.      No work performed by Deloitte & Touche shall be duplicative of work performed by any other professional retained by the Debtors in these cases.

2

7.      The Debtors' retention of Deloitte & Touche pursuant to this Order shall not be deemed to constitute an assumption of any prepetition agreement between the Debtors and Deloitte & Touche or any of its affiliates and shall in no way impact upon the rights of the Debtors, Deloitte & Touche, or Deloitte & Touche's affiliates with respect to the assumption or rejection of any such agreement pursuant to section 365 of the Bankruptcy Code.

8.      The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated December ___, 2005 in Jacksonville, Florida.

_____

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve
a copy of this Order on all parties included
on the Master Service List.