**Exhibit A**

11/1/05 REVISION

## REAL ESTATE PURCHASE AGREEMENT
[Dallas GA Outparcels]

**THIS REAL ESTATE PURCHASE AGREEMENT** (this "Agreement") is made as of November
_1_, 2005 (the "Effective Date"), between

**WD GEORGIA, LLC**, a Georgia limited liability company ("Buyer"), and

**WINN-DIXIE MONTGOMERY, INC.**, a Florida corporation ("Seller").

1.      SALE AND PURCHASE. Seller agrees to sell, assign, transfer and convey to Buyer,
and Buyer agrees to purchase from Seller, those certain tracts of land identified as
Outparcel A, Outparcel B, and Outparcel C, situated in Paulding County, Georgia,
each as more generally depicted on attached Exhibit A, together with all
appurtenances, rights, easements, rights-of-way, tenements and hereditaments
incident thereto (each, a "Parcel" and collectively, the "Property"). The actual legal
description of the Property will be determined by reference to the Survey, as defined
below.

2.      PURCHASE PRICE AND PAYMENT. In consideration of the conveyance of the Property
to Buyer, Buyer will pay to Seller the sum of $925,000 (the "Purchase Price"),
payable as follows:

(a)     An earnest money deposit of $450,000 (the "Deposit") will be due and
payable to Smith, Gambrell & Russell, LLP, through its Jacksonville, Florida
office, as escrow agent ("Escrow Agent") under the provisions of
paragraph 14 within 3 days after the Effective Date, and will be refundable to
Buyer only as expressly provided in this Agreement.

(b)     At Closing, the Deposit will be credited against the Purchase Price, and the
unpaid balance of the Purchase Price will be due and payable in cash (as
adjusted by prorations and payment of expenses as herein provided).

(c)     Any reference in this Agreement to the "Deposit" will include any interest
earned thereon. Buyer will be responsible for payment of taxes, if any,
associated with interest accrued on the Deposit. Buyer's FEI number for
federal income tax reporting purposes is [13-5674085].

3.      PROPERTY CONDITION AND INVESTIGATION.

(a)     Property Conveyed AS IS. BUYER ACKNOWLEDGES AND AGREES THAT UPON
CLOSING, SELLER WILL SELL AND CONVEY TO BUYER AND BUYER WILL
ACCEPT THE PROPERTY **"AS IS, WHERE IS,"** WITH ALL FAULTS, AND THERE
ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS
COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER OR ANY THIRD
PARTY. THE TERMS AND CONDITIONS OF THIS PARAGRAPH WILL
EXPRESSLY SURVIVE THE CLOSING AND NOT MERGE THEREIN.



(b)     Investigation Period.

    (I)     Buyer will have a period commencing on the Effective Date and expiring at 5:00 p.m. on Wednesday, November 9, 2005, in which to investigate and inspect the Property to determine whether or not the same is satisfactory to Buyer (the "Investigation Period"). During the Investigation Period, Buyer will be provided access to the Property to inspect the physical condition thereof, verify zoning, conduct appraisals, engineering and environmental studies, feasibility studies, obtain any financing desired by Buyer, make soil tests, determine allowable uses under zoning or the applicable comprehensive land use plan, test for hazardous materials, and to determine the availability of water, sewer and other utilities.    All such investigations, tests, verifications, copies and examinations will be made by Buyer at Buyer's sole expense.

    (ii)    Buyer indemnifies and agrees to defend and hold harmless Seller from and against any loss, damages or liability arising out of Buyer's investigation of the Property, including reasonable attorneys' fees. Buyer further indemnifies and agrees to defend and hold harmless Seller from and against all claims or liens against Seller or the Property filed by contractors, materialmen or laborers performing work and tests for Buyer. If this sale does not close, or if Buyer otherwise elects to terminate this Agreement as provided herein, Buyer will restore the Property to its original condition prior to such termination.

    (iii)   Within 5 business days after the Effective Date, Seller will deliver to Buyer, to the extent in the possession of Seller or its legal counsel, copies of all documents listed as Permitted Encumbrances, a copy of Seller's most recent available boundary survey or site plan, environmental site assessment report, and engineering reports, if any, relating to the Property (collectively, the "Property Reports"). Buyer acknowledges that the Property Reports are provided for informational purposes only, are not warranted by Seller for accuracy, completeness, or fitness for a particular purpose, and are not a substitute for Buyer's own investigation and inspection of the Property using its own due diligence service providers. If Buyer fails to close for any reason, all materials provided by Seller to Buyer (including without limitation, the Property Reports), all materials relating to the Property obtained by Buyer, and all copies of any such materials, will be delivered to Seller promptly, and in any event not later than 10 business days following such termination.

    (iv)    Buyer agrees to accept the transfer and conveyance of the Property by Seller without any warranty or representation concerning the quantity, quality, or condition of the Property, the availability of water, sewer, utilities or necessary governmental authorizations, or any other matter not expressed in this Agreement. Buyer is accepting the Property "AS IS" with all faults. Seller has no obligation to make any independent investigation or verification of the condition of the Property. THERE ARE NO EXPRESS OR IMPLIED WARRANTIES GIVEN TO BUYER IN CONNECTION WITH THE SALE OF THE SUBJECT PROPERTY (other than

2

M M

the warranties set forth in the Special Warranty Deed to be delivered by Seller to Buyer at Closing).

(v)     If Buyer determines, for any reason or no reason, that Buyer does not wish to proceed with the acquisition of the Property, then Buyer may, by written notice to Seller and Escrow Agent given not later than the expiration of the Investigation Period, terminate this Agreement and thereupon Buyer will have no further obligations hereunder except with respect to the indemnifications and restoration obligations given by Buyer to Seller as provided in this paragraph 3.  Upon such termination notice timely given, Escrow Agent will refund the Deposit to Buyer. In the event Buyer fails to terminate this Agreement prior to expiration of the Investigation Period, then Buyer will be deemed to have elected to proceed with the acquisition of the Property, and thereupon, the Deposit will be nonrefundable to Buyer except in the event of: (A) a material default by Seller under this Agreement that is not cured by Seller on or before the Closing Date; (B) Seller's failure or inability to deliver title pursuant to paragraph 4; (C) failure of the Approval Condition pursuant to paragraph 6; or (D) a loss or condemnation event pursuant to paragraph 7 as a result of which Buyer timely elects not to acquire the Property. In the event that Buyer timely elects to terminate this Agreement, Seller agrees to promptly execute and deliver to Escrow Agent all releases and documentation required to refund the Deposit to Buyer and Escrow Agent agrees to release the Deposit to Buyer.

4.      TITLE AND SURVEY MATTERS.

(a)     Title Commitment. Not later than the Effective Date, Seller will obtain and deliver to Buyer a title insurance commitment (the "Commitment") from Fidelity National Title Insurance Company (the "Title Insurer") committing to insure Buyer's fee simple title to the Property for the amount of the Purchase Price, and stating all exceptions and conditions to such title, including, without limitation, those encumbrances created pursuant to the Credit Agreement dated as of February 23, 2005, as amended, between Seller and certain banks and financial institutions, and certain documents executed by Winn-Dixie Stores, Inc. or Seller in connection with such Credit Agreement (the "Credit Agreement Liens"), any other liens and encumbrances affecting the Property ("Other Liens"), the additional encumbrances as more fully described on the Schedule of Permitted Encumbrances attached as Exhibit B (the "Permitted Encumbrances"), and all other easements, restrictions, covenants, reservations, and other encumbrances (collectively, the "Exceptions"). The Commitment delivered to Buyer will include copies of all Exceptions. Buyer will have until 5:00 pm Tuesday, November 8, 2005 (the "Review Deadline"), to examine the Commitment. It is a condition of Buyer's obligation to close and pay to Seller the Purchase Price that title to the Property is marketable or insurable subject only to the Permitted Encumbrances and those other Exceptions that are acceptable to Buyer. If Buyer reasonably determines that any matter (other than Permitted Encumbrances) renders Seller's title to the Property unmarketable, Buyer will notify Seller in writing of Buyer's objections on or before the Review Deadline (the "Objection Notice").

(b) Boundary Survey. Not later than 5:00 pm Friday, November 4, 2005, Seller will obtain and deliver to Buyer and Title Insurer a current ALTA/ASCM survey of the Property (the "Survey"). The Survey will be prepared by a licensed surveyor, prepared in accordance with the minimum standard detail requirements for ALTA/ASCM surveys under the laws of the state in which the Property is located, certified to Buyer, Seller and Title Insurer, and show a metes and bounds legal description for the Property (the "Legal Description"). Buyer will have until the Review Deadline to review the Survey and to deliver in the Objection Notice its objections to any matters that render Seller's title to the property unmarketable (other than Permitted Encumbrances) disclosed by such Survey, including, without limitation, objections as to the accuracy or consistency with the Commitment or the Legal Descriptions.

(c) Seller's Cure of Objections. If Buyer timely delivers the Objection Notice to Seller, Seller will have until the end of the Investigation Period to attempt to cure such objections, it being understood, however, that the Credit Agreement Liens and Other Liens will not be cured until issuance of the Sale Order and Closing but will be removed as a condition of closing. If Seller is unable or unwilling to cure any objections other than the Credit Agreement Liens and Other Liens prior to the end of the Investigation Period, then Buyer will have until the expiration of the Investigation Period to elect, by written notice to Seller, whether to (i) waive the unsatisfied objections and complete the purchase of the Property subject to the objectionable matters, or (ii) terminate this Agreement and cause the Deposit to be refunded to Buyer. Notwithstanding the foregoing, Seller agrees to convey title free and clear of all liens, claims and encumbrances under Section 363 of the Bankruptcy Code.

5. REPRESENTATIONS AND WARRANTIES OF SELLER AND BUYER.

(a) Seller's Representations and Warranties. Seller represents and warrants to Buyer as follows:

(i) Corporate Existence and Authority. Seller is a Florida corporation and its status is active. Subject to the satisfaction of the Approval Condition pursuant to paragraph 6 below, Seller has the corporate power and authority to enter this Agreement and to consummate the transactions contemplated herein.

(ii) Title to Property. Seller owns fee simple title to the Property, subject only to the Permitted Encumbrances and the Credit Agreement Liens.

(iii) Power to Convey. To Seller's knowledge, and subject to satisfaction of the Approval Condition pursuant to paragraph 6 below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Seller of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Seller's knowledge, other than the Bankruptcy Cases, as defined in paragraph 6 below, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which would become a cloud on the title to the Property or any portion

4

M M

thereof or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

(b)  <u>Buyer's Representations and Warranties</u>. Buyer represents and warrants to Seller as follows:

   (i)  <u>Existence and Authority</u>. Buyer, or its permitted assigns, has full power and authority to enter this Agreement and to consummate the transactions contemplated herein, and if Buyer's assign is a business entity, such entity is duly authorized, validly existing and active in the state of its formation.

   (ii)  <u>Power to Acquire</u>. To Buyer's knowledge, and subject to satisfaction of the Approval Condition pursuant to <u>paragraph 6</u> below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Buyer of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Buyer's knowledge, other than the Bankruptcy Cases, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

   (iii)  <u>Financial Condition</u>.  Buyer has and will have the sufficient funds on hand as of the Effective Date and continuing through the Closing Date to perform its obligations under this Agreement, including payment of the Purchase Price at Closing.

(c)  <u>Survival of Warranties</u>. The respective warranties of Buyer and Seller above will not survive the Closing but will merge into the Deed, and will have no further force or effect after the Closing, and the liability of Seller under or with respect to the warranties will be limited to the express remedies of Buyer set forth in this Agreement.

6.   CLOSING CONDITIONS.

   (a)  Approval Condition.

      (i)  Chapter 11 Cases. Winn-Dixie Stores, Inc., a Florida corporation, and its subsidiaries, including Seller, filed voluntary petitions for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and have operated their businesses as debtors-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date (the "Bankruptcy Cases"). By order entered on April 13, 2005, the Bankruptcy Cases were transferred to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the

5

"Bankruptcy Court") where they are being jointly administered under
Case No. 05-03817-3F1.

(ii)    Competitive Bid Process.   By Order dated June 20, 2005, the
        Bankruptcy Court approved bidding procedures and bid protections for
        use in the sale of assets in the Bankruptcy Cases (the "Bidding
        Procedures"). This Agreement is subject to the competitive bid
        process described in the Bidding Procedures. Promptly following
        expiration of the Investigation Period, provided that Buyer has not
        earlier terminated this Agreement in accordance with paragraphs 3 or
        4 above, Seller will file a motion with the Bankruptcy Court seeking
        approval of the transactions contemplated by this Agreement, subject
        to higher or better offers, and the transfer of the Property free and
        clear of all claims and liens including the Credit Liens, other than
        Permitted    Encumbrances,    pursuant,   inter alia,    to   11 U.S.C.
        Sections 105, 363 and 1146(c) (the "Sale Motion"). The Bankruptcy
        Court will set a date for hearing on the Sale Motion and to consider
        entry of the Sale Order relating to the successful bid (the "Sale
        Hearing").   Prior to the Sale Hearing, the debtors will conduct an
        auction pursuant to the Bidding Procedures (the "Auction"). The
        Bidding Procedures allow Seller to accept competitive bids on
        individual parcels and aggregate such bids to determine the successful
        bid for the Property, subject to the Overbid Protection as set forth in
        subparagraph (iii) below. The party submitting the successful bid for
        the Property as selected by Seller is referred to as the "Successful
        Bidder".   Buyer may participate in the Auction, and may submit
        purchase terms different from those set forth in this Agreement as
        Buyer may deem appropriate in seeking to become the Successful
        Bidder.   Prior to the Sale Hearing, upon consultation with the
        Creditors' Committee and DIP Lender, Seller will select the highest or
        otherwise best offer to purchase the Property, as determined by Seller
        in its sole discretion in accordance with the Bidding Procedures, as the
        Successful Bid (as defined in the Bidding Procedures). Seller will
        submit the Successful Bid to the Bankruptcy Court at the Sale Hearing,
        for entry of a Sale Order with respect to the Property by the
        Bankruptcy Court, either (a) approving this Agreement and all of the
        terms and conditions hereof and authorizing Seller to consummate the
        transactions contemplated hereby, if Buyer is the Successful Bidder
        under the terms of this Agreement (or as modified during the Auction)
        or (b) approving the more favorable terms of purchase and sale
        offered by the Successful Bidder, whether Buyer or otherwise (the
        "Sale Order").

(iii)   Overbid Protection. Seller agrees, subject to Bankruptcy Court
        approval, that the initial minimum overbid that may be accepted by
        Seller in the competitive bid process will have a value of at least
        $943,500 (two percent (2%) higher than the Purchase Price).

(iv)    Sale Order Approving Agreement. It will be a condition to the Closing
        of the transaction contemplated by this Agreement that the
        Bankruptcy Court will have issued the Sale Order approving this
        Agreement and all of the terms and conditions hereof and authorizing
        Seller to consummate the transactions contemplated hereby, and such

6

Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Approval Condition") and the Title Insurer shall be prepared to insure title to the Property free of any exceptions relating to the Bankruptcy Cases.

(v)    <u>Continuing Effectiveness of Agreement</u>. Notwithstanding that Buyer may not be the Successful Bidder following the Bidding Procedures, this Agreement, as modified by Buyer's last bid made during the Bidding Procedures, will remain in effect in accordance with, and will remain binding on Seller and subject to, the Bidding Procedures, including Seller's right to sell the Property to the next highest bidder if that bidder is not Buyer. If the Approval Condition is not otherwise satisfied by December 30, 2005 or if the sale of the Property closes with another Successful Bidder, then this Agreement automatically will terminate and Escrow Agent will refund the Deposit to Buyer, and the parties will have no further obligations to the other.

(b)    <u>Conditions Precedent to Seller's Obligations</u>. The obligations of Seller under this Agreement are subject to the Approval Condition and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

(i)    Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard. All of Buyer's representations and warranties contained in this Agreement will be true and accurate in all material respects as of the Effective Date and the Closing Date.

(ii)    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to the Property will be in effect.

If any of the foregoing conditions has not been satisfied on or before the Closing Date, then Seller will have the right to terminate this Agreement; provided, however, that if any of the foregoing conditions have not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations will be determined in accordance with <u>paragraph 13</u> of this Agreement.

7.    <u>LOSS BY FIRE OR OTHER CASUALTY: CONDEMNATION</u>. If, prior to Seller's legal delivery of the Deed and Buyer's delivery of the Purchase Price, the Property or any material part thereof, is destroyed or materially damaged, or made the subject of a condemnation action, then either party will have the right, exercisable by giving notice of such decision to the other within 5 business days after receiving written notice of such damage, destruction or threatened condemnation, to terminate this Agreement, and thereafter neither of the parties will have any further rights or

7

obligations hereunder; provided, however, that Buyer will be entitled to the Deposit. If neither party exercises its right of termination, Buyer will purchase the Property pursuant to the terms of this Agreement, and then as Buyer's sole remedy, Seller will assign to Buyer any assignable rights it may have to recover insurance or condemnation proceeds and will promptly pay over and deliver to Buyer any such proceeds Seller receives.

8.    CLOSING AND CLOSING DATE. The consummation of the transactions contemplated herein by Buyer and Seller (the "Closing") will be held on or before that date which is 10 days following the satisfaction of the Approval Condition (the "Closing Date"), at a time and place mutually acceptable to the parties, but if none is agreed to, at the offices of Escrow Agent in Jacksonville, Florida. Closing may be conducted by use of mail-away procedures including escrow and Closing disbursement and delivery of documents and funds administered by Escrow Agent, as closing agent.

9.    CLOSING DELIVERIES. On the Closing Date, Seller will execute and deliver a limited warranty deed (the "Deed") to Buyer as will be required to convey title to the Property to Buyer subject only to the Permitted Encumbrances and in accordance with this Agreement.    The Deed will be in form and substance reasonably satisfactory to Seller and Buyer and in proper form for recording. Additionally, on the Closing Date, Seller will execute and deliver the title affidavit as required by the Title Insurer to allow the issuance of the title insurance policy without the standard exceptions other than for taxes for the year of Closing, subject to proration between Seller and Buyer, those standard exceptions required under the laws of the state in which the Property is located, and for specific matters disclosed by the Survey and not objected to by Buyer as provided herein, and a non-foreign affidavit as required under the Internal Revenue Code. At Closing, Buyer and Seller will execute and deliver a closing statement setting forth the disbursement of the Purchase Price and closing costs associated with the transactions contemplated herein. On the Closing Date, Seller will turn over exclusive physical possession of the Property to Buyer upon confirmation to Seller by the Escrow Agent that Escrow Agent has received and holds the entire Purchase Price for disbursement without further condition.

10.   CLOSING COSTS. At or prior to Closing, Seller will pay the cost of transfer taxes on the Deed (if required to be paid), the cost of the commission payable to Seller's Brokers as disclosed in paragraph 12, and Seller's attorneys' fees and costs ("Seller's Closing Costs").    At or prior to Closing, Buyer will pay the cost of the title commitment and insurance policy to be issued pursuant to the Commitment in the amount of the Purchase price, the cost of the Survey (unless Buyer is not the Successful Bidder or the ultimate purchaser of the Property pursuant to paragraphs 6(a)(ii) or 6(a)(v)), its due diligence investigations of the Property, recording fees, all financing costs of Buyer incurred to purchase or develop the Property including simultaneous issue mortgagee title insurance and related endorsements, Buyer's attorneys' fees and costs and all other fees, costs and expenses incurred by the Buyer in connection herewith ("Buyer's Closing Costs"). If this transaction fails to close for any reason, and without waiving any right or remedy that either party may have against the other in the event of a default hereunder, Seller promptly will pay Seller's Closing Costs, and Buyer promptly will pay Buyer's Closing Costs, if and to the extent payable in the absence of a Closing; provided, however, that if Buyer is not the Successful Bidder or the ultimate purchaser of the Property pursuant to paragraphs 6(a)(ii) or 6(a)(v), then Buyer will not be obligated to pay the cost of the Survey.



8

11.   PRORATIONS. All ad valorem taxes for the year 2005 will be prorated between Seller and Buyer as of midnight immediately preceding the Closing Date.   The proration will be based upon the latest available tax figures with known changes (based on earliest payment discount, if any). All 2005 taxes will be paid at Closing.

12.   BROKERAGE. Seller and Buyer warrant each to the other (and it is agreed that this warranty will survive delivery of the Deed) that no broker or agent has been employed with respect to the sale of the Property, other than (a) Seller's brokers, DJM Asset Management, LLC ("Seller's Broker"), which has been retained by Seller pursuant to Order Authorizing Debtors to Retain DJM Asset Management, LLC as Special Real Estate Consultants to the Debtors, issued by the Bankruptcy Court on June 10, 2005 (the "Retention Order"), and (b) Black Diamond Advisors NY, LLC ("Black Diamond"), pursuant to a certain consulting agreement that will be terminated as to the Property on or prior to the Closing Date.   Seller will be responsible for payment of the brokerage commission to Seller's Broker pursuant to the Retention Order and Buyer will be responsible for the payment to Black Diamond. Each party indemnifies and agrees to hold harmless the other from any claim made by brokers or agents who claim to act for the party sought to be charged for a commission, compensation, brokerage fees, or similar payment in connection with this transaction and against any and all expense or liability arising out of any such claim.

13.   REMEDIES.

   (a)   Seller's Default. In the event that Seller defaults in the performance of its obligations under this Agreement, and such default is not cured on or before the Closing Date, then Buyer will be entitled to terminate this Agreement upon written notice to Seller and Escrow Agent and obtain a refund of the Deposit.    Additionally, following satisfaction of the Approval Condition, if Seller's default is Seller's refusal to close the transaction contemplated herein, and Buyer otherwise is ready, willing and able to close, then Buyer further will be entitled to recover from Seller Buyer's actual documented out-of-pocket expenses, including reasonable attorneys' fees and costs, incurred in negotiating this Agreement, investigating the feasibility of acquiring the Property, and preparation for closing, up to a maximum amount of $10,000. Buyer waives all other remedies it may have at law or in equity, except with respect to the indemnifications provided in paragraph 12 above, which indemnification will survive separately from the termination of this Agreement.

   (b)   Buyer's Default. If Buyer fails to make the Deposit when due or to comply with or perform any of the covenants, agreements, or obligations to be performed by Buyer under the terms and provisions of this Agreement, then Seller will be entitled to terminate this Agreement upon written notice to Buyer and Escrow Agent, and the Deposit will be paid to Seller as reasonable liquidated damages. Seller waives all other remedies it may have at law or in equity, except with respect to the indemnifications provided under paragraph 3(b)(ii) and paragraph 12 above, which indemnifications will survive separately from the termination of this Agreement.

9

14. **ESCROW AGENT.**

    (a)    <u>Duties</u>. By joining in the execution of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon receipt, Escrow Agent will hold the Deposit in trust, and deposit the same into an interest bearing escrow account (money market rates), to be disposed of in accordance with the provisions of this Agreement.

    (b)    <u>Indemnity</u>. Escrow Agent will not be liable to either party except for claims resulting from the negligence or willful misconduct of Escrow Agent.

    (c)    <u>Role as Counsel</u>. The parties acknowledge that Escrow Agent also serves as special real estate counsel to Seller. In the event of a dispute between Seller and Buyer concerning this Agreement to the Property, Escrow Agent may continue to serve both in its capacity as counsel to Seller and in its capacity as Escrow Agent, it being understood that Escrow Agent's duties and obligations as Escrow Agent are purely ministerial in nature.

    (d)    <u>Withdrawal</u>. No party will have the right to withdraw any monies or documents deposited by it with Escrow Agent prior to the Closing or termination of this Agreement except in accordance with the terms of this Agreement.

    (e)    <u>Written Objection</u>. If a written objection is filed with Escrow Agent, or Escrow Agent otherwise is in doubt as to its duties, Escrow Agent may continue to hold the funds in escrow until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court having jurisdiction of the dispute or the Escrow Agent may interplead the same in the Circuit Court and be relieved of any and all liability therefor. In any action or proceeding regarding the Deposit brought by Escrow Agent or to which Escrow Agent is made a party Escrow Agent will be entitled to recover its reasonable costs and attorney's fees (through appeal).

15. <u>NOTICES</u>. All notices, demands, requests and other communications hereunder will be in writing and will be deemed to have been given (i) on the same business day if delivered personally, (ii) 3 business days following mailing by registered or certified mail, return receipt requested, postage prepaid, or (iii) on the same business day if sent by telefax, to Buyer, Seller or Escrow Agent at its respective address set forth below:

If to Seller:                        Winn-Dixie Montgomery, Inc.
                                   5050 Edgewood Court
                                   Jacksonville, Florida 32254
                                   Attention: Catherine Ibold
                                   Telefax No.: 904 783 5138

with a copy to:                    Smith, Gambrell & Russell, LLP
                                     50 N. Laura Street, Suite 2600
                                   Jacksonville, Florida 32202
                                   Attention: Douglas G. Stanford
                                   Telefax No.: 904 598 6226

MM

Real Estate Purchase Agreement – WD Georgia, LLC
Dallas GA Outparcels - Georgia
SGRJAX\73282.7

| If to Buyer: | Merrill Lynch |
|---|---|
| | 4 World Financial Center |
| | Floor 7 |
| | New York, New York 10080 |
| | Attention: Nicholas Griffiths |
| | Telefax No.: 212 449 3247 |
| with a copy to: | Solomon and Weinberg LLP |
| | 900 Third Avenue |
| | 29th Floor |
| | New York, New York 10022 |
| | Attention: Gary S. Kleinman |
| | Telefax No.: 212 605 0999 |
| If to Escrow Agent: | Smith, Gambrell & Russell, LLP |
| | 50 N. Laura Street, Suite 2600 |
| | Jacksonville, Florida 32202 |
| | Attention: Douglas G. Stanford |
| | Telefax No.: 904 598 6226 |

or at such other address as the party may specify from time to time by written notice to the other party.

16.    MISCELLANEOUS PROVISIONS.

    (a)    Successors And Assigns; Assignment Of Agreement. All terms of this Agreement will be binding upon, and will inure to the benefit of and be enforceable by the parties hereto and their respective legal representatives, heirs, successors and assigns. Except as set forth below, this Agreement may not be assigned by either party without the express written consent of the other. Notwithstanding the foregoing   to the contrary, Buyer may freely assign its rights under this Agreement, without Seller's consent, as long as Buyer remains liable under this Agreement, and Buyer and its assignee have executed a written instrument pursuant to which such assignee expressly assumes Buyer's obligations hereunder, and a copy of such written assignment is delivered to Seller.

    (b)    Governing Law. This Agreement will be governed and construed in accordance with the laws of the State of Georgia. Any dispute arising out of or under this Agreement will be litigated in the Bankruptcy Court.

    (c)    Captions. The captions of this Agreement are inserted for convenience or reference only and not to define, describe or limit the scope or the intent of this Agreement or any term hereof.

    (d)    Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same instrument.

    (e)    Changes And Modifications; Prior Agreements. This Agreement may not be orally changed, modified or terminated; it supersedes any and all prior understandings and/or letter agreements; other matters of similar nature will

11

be deemed to be of no force or effect in the interpretation of this Agreement, it being intended that this Agreement represents the entire understanding of the parties. No waiver of any provision hereof will be valid unless in writing and signed by a party against whom it is to be enforced.

(f)     Waiver. No failure of either party to exercise any power given hereunder or to insist upon strict compliance with any obligations specified herein, and no custom or practice at variance with the terms hereof, will constitute a waiver of any party's right to demand exact compliance with the terms hereof; provided, however, that any party may, at its sole option, waive any requirement, covenant or condition herein established for the benefit of such party without affecting any of the other provisions of this Agreement.

(g)     Further Assurances. Seller and Buyer each agree to execute and deliver to the other such further documents and instruments as may be reasonable and necessary in furtherance of and to effectuate the intent of the parties as expressed by the terms and conditions hereof.

(h)     Attorneys' Fees. If either party commences an action against the other to enforce any of the terms hereof or because of the breach by either party of any of the covenants, terms or conditions hereof, the losing or defaulting party will pay to the prevailing party reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution and defense of such action.

(i)     Time Of Essence. Time is of the essence of each party's performance of this Agreement.

(j)     Business Day. Whenever a date specified herein shall fall on a Saturday, Sunday or legal holiday, the date shall be extended to the next succeeding Business Day. For purposes of the foregoing, "Business Day" will mean any day, other than a Saturday, Sunday or legal holiday.

(k)     WAIVER OF TRIAL BY JURY. BUYER AND SELLER EACH AGREE THAT THE NATURE OF THIS AGREEMENT MAKES A JURY DETERMINATION OF ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR THE PROPERTY UNDESIRABLE. ACCORDINGLY, BUYER AND SELLER EACH SPECIFICALLY WAIVE ANY RIGHT TO A TRIAL BY JURY THAT EITHER OF THEM MAY HAVE IN ANY COURT WITH RESPECT TO ANY ACTION RELATING TO THIS AGREEMENT OR THE PROPERTY. THE FOREGOING WAIVER IS MADE KNOWINGLY, VOLUNTARILY AND INTENTIONALLY BY BOTH BUYER AND SELLER.

(l)     CONSENT TO JURISDICTION OF BANKRUPTCY COURT. THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Buyer and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in paragraph 15 of this Agreement will be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court.

**[Signature page follows]**

13

**IN WITNESS WHEREOF,** Buyer and Seller have executed this Agreement as of the Effective Date.

**SELLER:**

Signed, sealed and delivered
In the presence of:

**WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation

Name: ~~ANDREW KEITH DAW~~

By: _____
Name: ~~RICHARD G. JUDD~~
Title: Vice President

Name: SUSAN MAGABGINO

LEGAL APPROVED
ATTY: _____        [Corporate Seal]    Reviewed By _____
DATE: 11/1/05                                    XRoads
                                                 Date: 11/1/05

**BUYER:**

Signed, sealed and delivered
In the presence of:

**WD GEORGIA, LLC,** a Georgia limited liability company

Name: NICHOLAS D. GRIFFITHS

By: _____
Name: Martin McIntyre
Title: Vice President

Name: Christopher Dougherty

[Seal]

**SCHEDULE OF EXHIBITS:**

Exhibit A - Legal Description of Property
Exhibit B - Schedule of Permitted Encumbrances

14

The undersigned, Escrow Agent, hereby consents and joins in the execution of this Real Estate Purchase Agreement for the limited purposes stated herein.

**SMITH, GAMBRELL & RUSSELL, LLP**

By: _____
Name: Douglas G. Stanford
Title: Partner

Dated: November ____, 2005

## EXHIBIT A

### LEGAL DESCRIPTION OF PROPERTY

## OUT LOT ONE

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 251 AND 252 OF THE 2ND DISTRICT, 3RD SECTION, PAULDING COUNTY, GEORGIA, SAID TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO REACH THE TRUE POINT OF BEGINNING, COMMENCE AT AN IRON PIN SET AT THE LAND LOT CORNER COMMON TO LAND LOTS 251, 252, 253 AND 254; THENCE RUNNING ALONG THE SOUTHERLY LINE OF LAND LOT 252, SOUTH 87°54'43" EAST, A DISTANCE OF 202.56 FEET TO A 3/8 INCH REINFORCING ROD FOUND; THENCE CONTINUING ALONG THE SOUTHERLY LINE OF LAND LOT 252, SOUTH 87°57'04" EAST, A DISTANCE OF 100.09 FEET TO A 1/2 INCH REINFORCING ROD FOUND; THENCE LEAVING SAID SOUTHERLY LAND LOT LINE AND RUNNING NORTH 01°52'21" EAST, A DISTANCE OF 621.92 FEET TO AN IRON PIN SET; THENCE NORTH 89°25'35" WEST, A DISTANCE OF 100.03 FEET TO AN IRON PIN SET; THENCE NORTH 89°21'40" WEST, A DISTANCE OF 159.69 FEET TO A POINT, SAID POINT BEING THE TRUE POINT OF BEGINNING; THENCE SOUTH 06°23'14" EAST, A DISTANCE OF 162.86 FEET TO A POINT; THENCE SOUTH 83°33'34" WEST, A DISTANCE OF 345.33 FEET TO A POINT; THENCE NORTH 25°55'11" WEST, A DISTANCE OF 100.00 FEET TO A POINT ON THE SOUTHERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 120 (VARIABLE WIDTH RIGHT-OF-WAY); THENCE RUNNING ALONG THE SOUTHERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 120 THE FOLLOWING COURSES AND DISTANCES: NORTH 64°02'19" EAST, A DISTANCE OF 189.51 FEET TO AN IRON PIN SET; THENCE SOUTH 26°02'45" EAST, A DISTANCE OF 35.03 FEET TO A CONCRETE RIGHT-OF-WAY MONUMENT FOUND; THENCE NORTH 64°04'26" EAST, A DISTANCE OF 60.00 FEET TO A CONCRETE RIGHT-OF-WAY MONUMENT FOUND; THENCE NORTH 60°33'53" EAST, A DISTANCE OF 70.19 FEET TO A CONCRETE RIGHT-OF-WAY MONUMENT FOUND; THENCE LEAVING SAID RIGHT-OF-WAY OF GEORGIA HIGHWAY 120, SOUTH 87°29'24" EAST, A DISTANCE OF 25.08 FEET TO AN IRON PIN SET; THENCE SOUTH 89°21'40" EAST, A DISTANCE OF 42.83 FEET TO A POINT, SAID POINT BEING THE TRUE POINT OF BEGINNING.

TOGETHER WITH:

OUT LOT TWO

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 254, 2ND DISTRICT, 3RD SECTION, PAULDING COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO REACH THE TRUE POINT OF BEGINNING, COMMENCE AT AN IRON PIN SET AT THE INTERSECTION OF THE NORTHEASTERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 92 (VARIABLE WIDTH RIGHT-OF-WAY) WITH THE NORTHWESTERLY RIGHT-OF-WAY OF OLD HIRAM ROAD (50 FOOT RIGHT-OF-WAY AND 30 FEET FROM CENTERLINE); THENCE RUNNING ALONG THE NORTHEASTERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, NORTH 25°15'42" WEST, A DISTANCE OF 519.76 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 4.91 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 25°11'52" WEST, A CHORD DISTANCE OF 4.91 FEET AND HAVING A RADIUS OF 2325.68 FEET) TO A POINT; THENCE CONTINUING ALONG THE RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 112.61 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 23°45'12" WEST, A CHORD DISTANCE OF 112.60 FEET AND HAVING A RADIUS OF 2325.68 FEET) TO A POINT, SAID POINT BEING THE TRUE POINT OF BEGINNING: THENCE CONTINUING ALONG THE NORTHEASTERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 268.00 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 19°03'53" WEST, A CHORD DISTANCE OF 267.85 FEET AND HAVING A RADIUS OF 2325.68 FEET) TO A POINT; THENCE NORTH 16°34'51" WEST, A DISTANCE OF 5.21 FEET TO A POINT; THENCE NORTH 24°11'47" EAST, A DISTANCE OF 15.46 FEET TO A POINT; THENCE NORTH 73°48'00" EAST, A DISTANCE OF 82.62 FEET TO A POINT; THENCE SOUTH 87°11'38" EAST, A DISTANCE OF 175.15 FEET TO A POINT; THENCE SOUTH 02°48'22" WEST, A DISTANCE OF 189.91 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 119.91 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 37°09'31" WEST, A CHORD DISTANCE OF 112.86 FEET, AND HAVING A RADIUS OF 100.00 FEET) TO A POINT, THENCE SOUTH 66°31'42" WEST, A DISTANCE OF 49.15 FEET TO A POINT, THENCE NORTH 75°44'58" WEST, A DISTANCE OF 50.65 FEET TO A POINT, SAID POINT BEING THE TRUE POINT OF BEGINNING.



TOGETHER WITH:

OUT LOT THREE

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 254 OF THE 2ND DISTRICT, 3RD SECTION, PAULDING COUNTY, GEORGIA, SAID TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIN SET AT THE INTERSECTION OF THE NORTHEASTERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 92 (VARIABLE WIDTH RIGHT-OF-WAY) WITH THE NORTHWESTERLY RIGHT-OF-WAY OF OLD HIRAM ROAD (50 FOOT RIGHT-OF-WAY AND 30 FEET FROM CENTERLINE); THENCE RUNNING WITH THE NORTHEASTERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, NORTH 25°15'42" WEST, A DISTANCE OF 519.76 FEET TO A POINT; THENCE CONTINUING ALONG THE RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, ALONG A CURVE TO THE RIGHT AN ARC DISTANCE OF 4.91 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 25°11'52" WEST, A CHORD DISTANCE OF 4.91 FEET AND HAVING A RADIUS OF 2325.68 FEET) TO A POINT; THENCE LEAVING SAID RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, NORTH 30°57'55" EAST, A DISTANCE OF 18.59 FEET TO A POINT; THENCE NORTH 64°44'16" EAST, A DISTANCE OF 68.50 FEET TO A POINT; THENCE NORTH 67°14'52" EAST, A DISTANCE OF 9.80 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE LEFT, AN ARC DISTANCE OF 169.15 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 38°04'44" EAST, A CHORD DISTANCE OF 160.67 FEET AND HAVING A RADIUS OF' 153.00 FEET) TO A POINT; THENCE NORTH 06°24'17" EAST, A DISTANCE OF 85.97 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 38.65 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 12°57'29" EAST, A CHORD DISTANCE OF 38.57 FEET AND HAVING A RADIUS OF 169.00 FEET) TO A POINT; THENCE SOUTH 70°29'26" EAST, A DISTANCE OF 27.66 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE LEFT, AN ARC DISTANCE OF 84.84 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 28°01'34" EAST, A CHORD DISTANCE OF 75.03 FEET AND HAVING A RADIUS OF 50.00 FEET TO AN IRON PIN SET; THENCE RUNNING ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 26.71 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 38°25'23" EAST, A CHORD DISTANCE OF 24.77 FEET AND HAVING A RADIUS OF 20.00 FEET) TO AN IRON PIN SET, THENCE SOUTH 00°09'33" EAST, A DISTANCE OF 108.09 FEET TO AN IRON PIN SET; THENCE SOUTH 01°50'18" WEST, A DISTANCE OF 366.90 FEET TO AN IRON PIN SET; THENCE SOUTH 00°27'52" EAST, A DISTANCE OF 191.67 FEET TO AN IRON PIN SET; THENCE SOUTH 36°42'54" WEST, A DISTANCE OF 20.60 FEET TO AN IRON PIN SET, THENCE NORTH 80°14'02" WEST, A DISTANCE OF 28.88 FEET TO AN IRON PIN SET AND THE TRUE POINT OF BEGINNING.

MM

TOGETHER WITH EASEMENTS CONTAINED IN THAT CERTAIN RECIPROCAL EASEMENT AND RESTRICTIVE COVENANT AGREEMENT DATED JUNE, 1997 BY AND BETWEEN WILLIAM C. HATHCOCK AND SUNBELT-DIX, INC., FILED AND RECORDED SEPTEMBER 22, 1997 IN DEED BOOK 620, PAGE 765, AS AMENDED BY FIRST AMENDMENT TO RECIPROCAL EASEMENT AND RESTRICTIVE COVENANT AGREEMENT DATED AUGUST 14, 1998 AND FILED MARCH 12, 1999, IN DEED BOOK 767, PAGE 580, BOTH OF THE PAULDING COUNTY, GEORGIA RECORDS.

TOGETHER WITH EASEMENTS CONTAINED IN THAT CERTAIN DECLARATION OF RECIPROCAL EASEMENTS AND RESTRICTIVE COVENANTS BETWEEN SUNBELT-DIX, INC. AND WINN-DIXIE ATLANTA, INC., DATED OF EVEN DATE HEREWITH AND RECORDED OR TO BE RECORDED IN THE PAULDING COUNTY GEORGIA RECORDS.

LESS AND EXCEPT any portion of the property set forth above contained in that certain Order and Judgment, Condemnation Action No. 02-CB-0081, Superior Court of Paulding County, Georgia, filed February 3, 2005 and recorded in Deed Book 1816, Page 724, records of the Superior Court of Paulding County, Georgia.



Real Estate Purchase Agreement
Dallas GA Outparcels - Georgia
SGRJAX\73282.7

## EXHIBIT B

### SCHEDULE OF PERMITTED ENCUMBRANCES

1. All taxes and assessments for the year 2006 and subsequent years, not yet due and payable.

2. Permit to Cut or Trim Trees from Carlos Jones Construction Co., Inc. to Georgia Power Company, dated January 22, 1975, recorded in Deed Book 7-O, Page 706, Paulding County, Georgia.

3. Easement from Mrs. L. T. Moss by her attorney-in-fact Hazel Morris to Southern Bell Telephone and Telegraph Company, dated March, 1985, recorded in Deed Book 65, Page 191, aforesaid records.

4. Right-of-Way Easement from Rhonda Graves Conn and Michael Lynn Conn, Sr. to Greystone Power Company, dated January 15, 1996, recorded in Deed Book 516, Page 91, aforesaid records.

5. Right-of-Way Easement from Wallace W. Keys to Douglas County Electric Membership Corporation, dated September 31, 1985, recorded in Deed Book 73, Page 740, aforesaid records.

6. Reciprocal Easement and Restrictive Covenant Agreement dated June 1997, by and between William C. Hathcock and Sunbelt-Dix, Inc., filed and recorded September 22, 1997, in Deed Book 620, Page 765, aforesaid records; as amended by First Amendment to Reciprocal Easement and Restrictive Covenant Agreement dated August 14, 1998, by and between William C. Hathcock and Sunbelt-Dix, Inc., filed for record March 12, 1999, and being recorded in Deed Book 767, Page 580, aforesaid records.

7. Terms and conditions of the Declaration of Reciprocal Easements and Restrictive Covenants effective August 26, 1999, by Sunbelt-Dix, Inc., a Delaware corporation, and Winn-Dixie Atlanta, Inc., a Florida corporation, filed for record September 1, 1999, and being recorded in Deed Book 811, Page 1041, aforesaid records.

8. Certain easement rights in favor of the Department of Transportation pursuant to that certain Order and Judgment, Condemnation Action No. 02-CB-0081, Superior Court of Paulding County, Georgia, filed February 3, 2005 and recorded in Deed Book 1816, Page 724, aforesaid records.