**Hearing Date:  December 1, 2005**
**Objection Deadline:**
**November 25, 2005 at 4:00 p.m. (E.T.)**

### UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., <u>et al.</u>, | ) | *Chapter 11* |
| Debtors.[1] | ) | Jointly Administered |

### AMENDED MOTION FOR AN ORDER (A) AUTHORIZING THE DEBTORS TO SELL DALLAS, GEORGIA OUTPARCELS AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS AND EXEMPT FROM DOCUMENTARY <u>OR SIMILAR TAX, AND (B) GRANTING RELATED RELIEF</u>

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), move the Court for entry of an order pursuant to 11 U.S.C. §§ 105(a), 363 and 1146 and Fed. R. Bankr. P. 6004(g): (a) authorizing Winn-Dixie Montgomery, Inc. ("WD Montgomery") to sell three tracts of land located in Dallas, Georgia, more particularly described on Exhibit A attached to this Motion (collectively, the "Dallas, Georgia Outparcels") together with all related appurtenances, rights, easements, rights-of-way, tenements and hereditaments to WD Georgia, LLC (the "Purchaser"), or to a party submitting a higher or better offer, free and clear of

---

[1]        In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc.,

liens, claims and interests and exempt from stamp, transfer, recording or similar tax, and (b) granting related relief.  In support of the Motion, the Debtors respectfully state as follows:

## Background

1.    On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered for procedural purposes only.

2.    The Debtors operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No request has been made for the appointment of a trustee or examiner.  On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases pursuant to Bankruptcy Code sections 1102 and 1103.  On August 17, 2005, an equity committee was appointed.

3.    The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  As of the Petition Date, the Debtors were considered the eighth-largest food retailer in the United States and one of the largest in the Southeast with more than 900 stores.

---

Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

2

4.      The Debtors have announced and are engaged in a footprint reduction that is expected to result in the sale or closure of 326 stores and related facilities (the "Targeted Stores").  To date, the Debtors have sold more than 100 Targeted Stores and sent rejection notices for another 300 Targeted Stores.

5.      The Dallas, Georgia Outparcels are located adjacent to a Targeted Store in a market the Debtors have exited.  As such, the Debtors no longer need the Dallas, Georgia Outparcels.  The sale of the Dallas, Georgia Outparcels will generate cash for the Debtors.

6.      The Debtors have marketed the Dallas, Georgia Outparcels extensively through DJM Asset Management, Inc. ("DJM").  DJM sent over 10,000 sale notices of sale to potential purchasers.  Through DJM's efforts, the Debtors have received four offers for the Dallas, Georgia Outparcels, including the offer by the Purchaser for $925,000.00.  After reviewing all offers, including all terms of all offers, the Debtors have determined that the Purchaser's offer is the highest and best offer for the Dallas, Georgia Outparcels.

### Relief Requested

7.      By this Motion, the Debtors request authority to sell WD Montgomery's  fee simple title interest in the Dallas, Georgia Outparcels and all related appurtenances, rights, easements, rights-of-way, tenements and hereditaments (collectively, the "Assets"), free and clear of liens, claims and interests and exempt from stamp, transfer, recording or similar tax, subject to

higher or better offers.  The Assets are more fully described in the Real Estate

Purchase Agreement (defined below).

### The Real Estate Purchase Agreement

8.     On November 1, 2005, the Debtors and the Purchaser entered into

the Real Estate Purchase Agreement attached to this Motion as Exhibit A (the

"Purchase Agreement").

9.     A summary of the material terms of the transaction with the

Purchaser, subject to this Court's approval, are as follows:[2]

(a)     Assets.  The assets to be sold and transferred to the Purchaser
include:

(i)     WD Montgomery's fee simple title interest in the
Dallas, Georgia Outparcels; and

(ii)    WD Montgomery's interest in all related
appurtenances, rights, easements, rights-of-way,
tenements and hereditaments.

(b)     Purchase Price.  On the terms and subject to the conditions set
forth in the Purchase Agreement, the net aggregate purchase
price for the Assets is $925,000.00 (the "Purchase Price").
The Purchase Price is to be paid by the Purchaser on or before
the Closing Date, as defined in the Purchase Agreement.  A
deposit of $450,000.00 has been paid by the Purchaser.

(c)     Sale Free and Clear.  The Purchase Agreement provides that
the Assets are to be transferred free and clear of any liens,
claims, interests and encumbrances other than the Permitted
Encumbrances, as defined in the Purchase Agreement.

---

[2]     This summary of the Purchase Agreement is provided as a convenience only.  To the extent that
this summary differs in any way from the terms of the Purchase Agreement, the terms of the
Purchase Agreement control.

10.     The Debtors now move for authority to consummate the sale of the Assets with the Purchaser or, alternatively, to the party submitting a higher or better offer for the Assets.

## Solicitation of Higher and Better Offers

11.     Notwithstanding that the Assets have been sufficiently marketed, the Debtors are soliciting higher and better bids for the Assets.  Any person or entity interested in submitting a higher and better bid for the Assets must submit such bid so that it is received by James Avallone at DJM, 445 Broadhollow Road, Suite 417, Melville, NY 11747 with a copy to undersigned counsel for the Debtors no later than 12:00 p.m. (prevailing Eastern Time) on Monday, November 28, 2005. All bids must comply with the bidding procedures approved by order of the Bankruptcy Court dated June 21, 2005 (Docket No. 1801).  To qualify as a competing bid, the offer must net the Debtors' estates at least $943,500.00 and be accompanied by a certified check made out to Winn-Dixie Stores, Inc. in an amount equal to 10% of the competing bid.  The required deposit must be sent to undersigned counsel.  Bidders may submit bids for one or two tracts of land at a price less than that set forth above.  The Debtors may aggregate such bids to establish a competing bid if the aggregated bid amounts would qualify as a competing bid as set forth above.

12.     If the Debtors receive a higher or better offer for the Assets, they will conduct an auction (the "Auction") for the Assets in accordance with the

Bidding Procedures Order.  The Auction will take place at 10:00 a.m. (prevailing Eastern Time) at the offices of Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida on Wednesday, November 30, 2005 (the "Auction Date").  The Debtors will conduct the Auction in consultation with the Creditors' Committee and the DIP Lender and on terms the Debtors determine to be in the best interests of their estates and their creditors.

## Applicable Authority

A.    Bankruptcy Code Section 363(b) Authorizes the Sale.

13.    Bankruptcy Code section 363(b)(1) provides:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Bankruptcy Code section 1107 (a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under section 363(b)(1).  See 11 U.S.C. § 1107(a).

14.    A Debtors' sale under section 363(b)(1) should be approved when supported by a sound business reason.  See In re B.D.K. Health Mgmt., Inc. ("B.D.K. Health Mgmt."), Case Nos. 98-00609-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business

reason to grant such application); <u>Comm. of Equity Sec. Holders v. Lionel Corp.</u> (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); <u>Fulton State Bank v. Schipper</u> (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991); <u>Stephens Indus., Inc. v. McClung</u>, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); <u>In re Del. & Hudson Ry. Co.</u>, 124 B.R. 169, 175-76 (D. Del. 1991).

15.    Once a court is satisfied that a sound business reason for the sale exists, the Court must also consider whether (a) the sale price is fair and reasonable, (b) the purchaser is proceeding in good faith, and (c) the Debtor has provided interested parties with adequate and reasonable notice.   <u>Delaware & Hudson</u>, 124 B.R. at 175-176.

16.    The Debtors have a sound business reason for the sale of the Assets. The Debtors no longer use the Outparcels and remain liable for the costs associated with the tracts.

17.    The Debtors' sale of the Assets to the Purchaser is subject to competing bids, ensuring that the Debtors will receive the highest or best value for the Assets.    Thus, the fairness and reasonableness of the consideration to be received for the Assets ultimately will be demonstrated by a "market check" and auction process -- the best means for establishing whether a fair and reasonable price is being paid.

18.     If required, the Debtors are prepared to present further evidence of good faith during the course of the Sale Hearing that the Debtors believe will satisfy this Court and the mandates of Bankruptcy Code section 363(m).

19.     In accordance with Local Rule 2002-1, the Debtors will serve notice of the Motion on the following parties: (a) each taxing authority known to the Debtors to have a potential interest in the Assets, (b) all parties that expressed interest in purchasing the Assets; (c) the Purchaser; (d) counsel for the DIP Lenders; (e) counsel for the Creditors' Committee; (f) counsel for the Equity Committee; (g) all known holders of Interests and Claims (as defined below) in the Assets; (h) all entities having requested notices pursuant to Fed. R. Bankr. P. 2002; and (i) the Office of United States Trustee.

**B.      Bankruptcy Code Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

20.     The Debtors request that their sale of the Assets be approved free and clear of any liens, claims or interests.  Pursuant to Bankruptcy Code section 363(f), a debtor may sell property of the estate free and clear of all liens, claims and interests after notice and hearing.  See In re Parrish, 171 B.R. 138 (Bankr.M.D.Fla. 1994).

21.     The Debtors believe that with the exception of the Permitted Encumbrances (as defined in the Purchase Agreement), there are no interests in or claims against the Assets other than the interest of Wachovia Bank, National Association, as Administrative Agent and Collateral Agent (collectively, the "DIP

Lender"). The interest of the DIP Lender will be satisfied because the Debtors will cause the proceeds from the sale to be paid in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of All Claims of Debtors' Pre-petition Secured Lenders dated March 23, 2005 (Docket No. 501) (the "Final Financing Order") and the Loan Documents (as defined in the Final Financing Order).

**C.     Good Faith Purchaser**

22.     The Debtors request that the Court find that the Purchaser, or the party who ultimately submits the highest or best offer for the Assets, acted in good faith within the meaning of Bankruptcy Code section 363(m).

23.     Bankruptcy Code section 363(m) provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m)

24.     The Bankruptcy Code does not define the term "good faith."  Courts,
however, indicate that a party would have to show fraud or collusion between the
purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of
good faith.

> The requirement that a purchaser act in good faith . . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

> In re Apex Oil Co., 2 B.R. 847, 865
> (Bankr. E.D. Mo. 1988)

Accord Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill
Assocs.), 111 F.3d 269, 276 (2d Cir. 1997).  No such facts exist here.

25.     The Debtors assert that:  (a) the proposed sale is the subject of arm's
length negotiations with the Purchaser and is made in good faith; (b) the Purchaser
has no affiliation with the Debtors; (c) the Assets were marketed extensively and
the purchase price is fair and reasonable; (d) to the best of the Debtors' knowledge,
the Purchaser has taken no action to chill or otherwise collude with any other party
to restrict bidding on the Assets; and (e) the marketing process that occurred and
the notice of the Sale Hearing ensure that the Purchaser has not exerted undue
influence over the Debtors.  Accordingly, the Debtors request that the Court find
that the Purchaser, or the party submitting a higher or better offer, acted in good
faith within the meaning of Bankruptcy Code section 363(m).  See B.D.K. Health

Mgmt., 1998 WL, at *4 (finding that the purchaser is entitled to the protections of

Bankruptcy Code section 363(m) because the sale was negotiated at arms-length,

proposed in good faith and the consideration for the assets was fair and

reasonable).  The Debtors' proposed sale of the Assets is the product of arm's

length negotiations with the Purchaser and was made in good faith.  The Purchaser

has no affiliation with the Debtors, and the ability of third parties to make higher

or better bids ensures that the Purchaser has not exerted any undue influence over

the Debtors.

**D.    The Sale Should be Exempt from Taxes**

26.    Bankruptcy Code section 1146(c) provides that "[t]he issuance,

transfer, or exchange of a security, or the making or delivery of an instrument of

transfer under a plan confirmed under section 1129 of this title, may not be taxed

under any law imposing a stamp tax or similar tax."  11 U.S.C. § 1146(c).  This

language has been construed to include transfers pursuant to a sale outside of, but

in furtherance of effectuating, a reorganization plan.  Webster Classic Auctions,

Inc., 318 B.R. 216, 218 (Bankr. M.D. Fla. 2004) (adopting rationale that purpose

of Bankruptcy Code section 1146(c) is to facilitate reorganizations and that

transfers need not be postconfirmation); BDK Health Mgmt., 1998 WL 34188241,

at *8 (granting Bankruptcy Code section 1146(c) relief outside of confirmed plan);

see also In re T.H. Orlando Ltd., 391 F.3d 1287, 1291 (11th Cir. 2004) (exemption

applies where transfer is necessary to the consummation of a plan.); City of New

York v. Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.), 758 F.2d 840, 841-42 (2d Cir. 1985) (holding that where a transfer is necessary to the consummation of a plan, the transfer is "under a plan" within meaning of Bankruptcy Code section 1146(c)); City of New York v. Smoss Enters. Corp. (In re Smoss Enters. Corp.), 54 B.R. 950, 951 (E.D.N.Y. 1985) (stating that section 1146(c) was designed to reach transfers on which "the plan hinged and which the court had to approve prior to the confirmation"), aff'd mem., No. 85-5106, 1986 U.S. App. LEXIS 28677 (2d Cir. Mar. 31, 1986); In re United Press Int'l, Inc., Case No. 91 B 13955 (FGC), 1992 Bankr. LEXIS 842, at *4, *6-7 (Bankr. S.D.N.Y. May 18, 1992) (holding that Bankruptcy Code section 1146(c) exemption applied to Section 363 sale where it found "the value of the Debtor's assets is likely to deteriorate [during the] time necessary to . . . confirm a plan"); In re Permar Provisions, Inc., 79 B.R. 530, 533-34 (Bankr. E.D.N.Y. 1987) (stating that determination of applicability of Bankruptcy Code section 1146(c) exemption is same for pre- and post-confirmation dispositions of property, namely "whether the sale of 'property is essential to confirmation of the plan'") (citation omitted).

27.    Although the Debtors have not yet filed a Chapter 11 plan of reorganization, an integral part of any plan will be the Debtors' ability to divest themselves of the Assets.  In light of the foregoing, the Debtors respectfully submit that the sale of the Assets is an integral part of, and a necessary predicate toward, the Debtors' Chapter 11 reorganization plan.  Accordingly, the sale should

be exempt under Bankruptcy Code section 1146(c) from any stamp, transfer, sales, recording or similar taxes.

**E.   Elimination of 10-Day Stay Under Rules 6004(g)**

28.   Pursuant to Rule 6004(g), F.R. Bankr. P., unless the Court orders otherwise, all orders authorizing the sale of property outside of the ordinary course of business pursuant to Bankruptcy Code section 363 are automatically stayed for ten days after entry of the order.   Given the requirements of the Purchase Agreement and the need to close the sale as promptly as possible, the Debtors request that the Court waive the 10-day stay period.

**F.   Objection Deadline**

31.   Only objections filed and served on Sally McDonald Henry at shenry@skadden.com, Skadden, Arps, Slate, Meagher, & Flom, LLP, Four Times Square, New York, New York 10036 and on Cynthia C. Jackson at cjackson@smithhulsey.com, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 so as to be received by November 25, 2005 at 4:00 p.m. (E.T.) will be considered by the Bankruptcy Court at the Hearing.

**<u>Conclusion</u>**

For the foregoing reasons, the Debtors respectfully request that the Court enter an order substantially in the form attached as Exhibit B (a) granting the Motion and authorizing the sale of the Assets to the Purchaser in accordance with the Purchase Agreement, or to the party submitting a higher or otherwise better offer for the Assets; (b) authorizing the Debtors to take all actions reasonably necessary to effectuate the sale of the Assets in accordance with the Purchase Agreement; and (c) granting such other and further relief as the Court deems just and proper.

Dated: November 11, 2005

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By   */s/ D. J. Baker*
    D. J. Baker
    Sally McDonald Henry
    Rosalie W. Gray

Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Counsel for Debtors

SMITH HULSEY & BUSEY

By   */s/ Cynthia C. Jackson*
    Stephen D. Busey
    James H. Post
    Cynthia C. Jackson  (F.B.N. 498882)

225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Debtors

00513237.doc.3

14

**Exhibit A**

11/1/05 REVISION

## REAL ESTATE PURCHASE AGREEMENT
[Dallas GA Outparcels]

**THIS REAL ESTATE PURCHASE AGREEMENT** (this "Agreement") is made as of November ∕, 2005 (the "Effective Date"), between

**WD GEORGIA, LLC**, a Georgia limited liability company ("Buyer"), and

**WINN-DIXIE MONTGOMERY, INC.**, a Florida corporation ("Seller").

1. SALE AND PURCHASE. Seller agrees to sell, assign, transfer and convey to Buyer, and Buyer agrees to purchase from Seller, those certain tracts of land identified as Outparcel A, Outparcel B, and Outparcel C, situated in Paulding County, Georgia, each as more generally depicted on attached Exhibit A, together with all appurtenances, rights, easements, rights-of-way, tenements and hereditaments incident thereto (each, a "Parcel" and collectively, the "Property"). The actual legal description of the Property will be determined by reference to the Survey, as defined below.

2. PURCHASE PRICE AND PAYMENT. In consideration of the conveyance of the Property to Buyer, Buyer will pay to Seller the sum of $925,000 (the "Purchase Price"), payable as follows:

   (a) An earnest money deposit of $450,000 (the "Deposit") will be due and payable to Smith, Gambrell & Russell, LLP, through its Jacksonville, Florida office, as escrow agent ("Escrow Agent") under the provisions of paragraph 14 within 3 days after the Effective Date, and will be refundable to Buyer only as expressly provided in this Agreement.

   (b) At Closing, the Deposit will be credited against the Purchase Price, and the unpaid balance of the Purchase Price will be due and payable in cash (as adjusted by prorations and payment of expenses as herein provided).

   (c) Any reference in this Agreement to the "Deposit" will include any interest earned thereon. Buyer will be responsible for payment of taxes, if any, associated with interest accrued on the Deposit. Buyer's FEI number for federal income tax reporting purposes is [13-5674085].

3. PROPERTY CONDITION AND INVESTIGATION.

   (a) Property Conveyed AS IS. BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING, SELLER WILL SELL AND CONVEY TO BUYER AND BUYER WILL ACCEPT THE PROPERTY **"AS IS, WHERE IS,"** WITH ALL FAULTS, AND THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER OR ANY THIRD PARTY. THE TERMS AND CONDITIONS OF THIS PARAGRAPH WILL EXPRESSLY SURVIVE THE CLOSING AND NOT MERGE THEREIN.



(b)    Investigation Period.

     (i)    Buyer will have a period commencing on the Effective Date and expiring at 5:00 p.m. on Wednesday, November 9, 2005, in which to investigate and inspect the Property to determine whether or not the same is satisfactory to Buyer (the "Investigation Period"). During the Investigation Period, Buyer will be provided access to the Property to inspect the physical condition thereof, verify zoning, conduct appraisals, engineering and environmental studies, feasibility studies, obtain any financing desired by Buyer, make soil tests, determine allowable uses under zoning or the applicable comprehensive land use plan, test for hazardous materials, and to determine the availability of water, sewer and other utilities.   All such investigations, tests, verifications, copies and examinations will be made by Buyer at Buyer's sole expense.

     (ii)   Buyer indemnifies and agrees to defend and hold harmless Seller from and against any loss, damages or liability arising out of Buyer's investigation of the Property, including reasonable attorneys' fees. Buyer further indemnifies and agrees to defend and hold harmless Seller from and against all claims or liens against Seller or the Property filed by contractors, materialmen or laborers performing work and tests for Buyer. If this sale does not close, or if Buyer otherwise elects to terminate this Agreement as provided herein, Buyer will restore the Property to its original condition prior to such termination.

     (iii)  Within 5 business days after the Effective Date, Seller will deliver to Buyer, to the extent in the possession of Seller or its legal counsel, copies of all documents listed as Permitted Encumbrances, a copy of Seller's most recent available boundary survey or site plan, environmental site assessment report, and engineering reports, if any, relating to the Property (collectively, the "Property Reports"). Buyer acknowledges that the Property Reports are provided for informational purposes only, are not warranted by Seller for accuracy, completeness, or fitness for a particular purpose, and are not a substitute for Buyer's own investigation and inspection of the Property using its own due diligence service providers. If Buyer fails to close for any reason, all materials provided by Seller to Buyer (including without limitation, the Property Reports), all materials relating to the Property obtained by Buyer, and all copies of any such materials, will be delivered to Seller promptly, and in any event not later than 10 business days following such termination.

     (iv)   Buyer agrees to accept the transfer and conveyance of the Property by Seller without any warranty or representation concerning the quantity, quality, or condition of the Property, the availability of water, sewer, utilities or necessary governmental authorizations, or any other matter not expressed in this Agreement. Buyer is accepting the Property "AS IS" with all faults. Seller has no obligation to make any independent investigation or verification of the condition of the Property. THERE ARE NO EXPRESS OR IMPLIED WARRANTIES GIVEN TO BUYER IN CONNECTION WITH THE SALE OF THE SUBJECT PROPERTY (other than

2

the warranties set forth in the Special Warranty Deed to be delivered by Seller to Buyer at Closing).

(v)     If Buyer determines, for any reason or no reason, that Buyer does not wish to proceed with the acquisition of the Property, then Buyer may, by written notice to Seller and Escrow Agent given not later than the expiration of the Investigation Period, terminate this Agreement and thereupon Buyer will have no further obligations hereunder except with respect to the indemnifications and restoration obligations given by Buyer to Seller as provided in this paragraph 3.   Upon such termination notice timely given, Escrow Agent will refund the Deposit to Buyer. In the event Buyer fails to terminate this Agreement prior to expiration of the Investigation Period, then Buyer will be deemed to have elected to proceed with the acquisition of the Property, and thereupon, the Deposit will be nonrefundable to Buyer except in the event of: (A) a material default by Seller under this Agreement that is not cured by Seller on or before the Closing Date; (B) Seller's failure or inability to deliver title pursuant to paragraph 4; (C) failure of the Approval Condition pursuant to paragraph 6; or (D) a loss or condemnation event pursuant to paragraph 7 as a result of which Buyer timely elects not to acquire the Property. In the event that Buyer timely elects to terminate this Agreement, Seller agrees to promptly execute and deliver to Escrow Agent all releases and documentation required to refund the Deposit to Buyer and Escrow Agent agrees to release the Deposit to Buyer.

4.     TITLE AND SURVEY MATTERS.

(a)     Title Commitment. Not later than the Effective Date, Seller will obtain and deliver to Buyer a title insurance commitment (the "Commitment") from Fidelity National Title Insurance Company (the "Title Insurer") committing to insure Buyer's fee simple title to the Property for the amount of the Purchase Price, and stating all exceptions and conditions to such title, including, without limitation, those encumbrances created pursuant to the Credit Agreement dated as of February 23, 2005, as amended, between Seller and certain banks and financial institutions, and certain documents executed by Winn-Dixie Stores, Inc. or Seller in connection with such Credit Agreement (the "Credit Agreement Liens"), any other liens and encumbrances affecting the Property ("Other Liens"), the additional encumbrances as more fully described on the Schedule of Permitted Encumbrances attached as Exhibit B (the "Permitted Encumbrances"), and all other easements, restrictions, covenants, reservations, and other encumbrances (collectively, the "Exceptions"). The Commitment delivered to Buyer will include copies of all Exceptions. Buyer will have until 5:00 pm Tuesday, November 8, 2005 (the "Review Deadline"), to examine the Commitment. It is a condition of Buyer's obligation to close and pay to Seller the Purchase Price that title to the Property is marketable or insurable subject only to the Permitted Encumbrances and those other Exceptions that are acceptable to Buyer. If Buyer reasonably determines that any matter (other than Permitted Encumbrances) renders Seller's title to the Property unmarketable, Buyer will notify Seller in writing of Buyer's objections on or before the Review Deadline (the "Objection Notice").

3

(b)     Boundary Survey.  Not later than 5:00 pm Friday, November 4, 2005, Seller
will obtain and deliver to Buyer and Title Insurer a current ALTA/ASCM survey
of the Property (the "Survey"). The Survey will be prepared by a licensed
surveyor, prepared in accordance with the minimum standard detail
requirements for ALTA/ASCM surveys under the laws of the state in which the
Property is located, certified to Buyer, Seller and Title Insurer, and show a
metes and bounds legal description for the Property (the "Legal Description").
Buyer will have until the Review Deadline to review the Survey and to deliver
in the Objection Notice its objections to any matters that render Seller's title
to the property unmarketable (other than Permitted Encumbrances) disclosed
by such Survey, including, without limitation, objections as to the accuracy or
consistency with the Commitment or the Legal Descriptions.

(c)     Seller's Cure of Objections.  If Buyer timely delivers the Objection Notice to
Seller, Seller will have until the end of the Investigation Period to attempt to
cure such objections, it being understood, however, that the Credit
Agreement Liens and Other Liens will not be cured until issuance of the Sale
Order and Closing but will be removed as a condition of closing.  If Seller is
unable or unwilling to cure any objections other than the Credit Agreement
Liens and Other Liens prior to the end of the Investigation Period, then Buyer
will have until the expiration of the Investigation Period to elect, by written
notice to Seller, whether to (i) waive the unsatisfied objections and complete
the purchase of the Property subject to the objectionable matters, or
(ii) terminate this Agreement and cause the Deposit to be refunded to Buyer.
Notwithstanding the foregoing, Seller agrees to convey title free and clear of
all liens, claims and encumbrances under Section 363 of the Bankruptcy
Code.

5.     REPRESENTATIONS AND WARRANTIES OF SELLER AND BUYER.

(a)     Seller's Representations and Warranties.  Seller represents and warrants to
Buyer as follows:

(i)     Corporate Existence and Authority.  Seller is a Florida corporation and
its status is active.   Subject to the satisfaction of the Approval
Condition pursuant to paragraph 6 below, Seller has the corporate
power and authority to enter this Agreement and to consummate the
transactions contemplated herein.

(ii)    Title to Property.  Seller owns fee simple title to the Property, subject
only to the Permitted Encumbrances and the Credit Agreement Liens.

(iii)   Power to Convey.  To Seller's knowledge, and subject to satisfaction of
the Approval Condition pursuant to paragraph 6 below, the execution
of this Agreement and the performance of its terms will not constitute
or result in a violation or breach by Seller of any agreement,
judgment, order, writ, injunction or decree issued against or imposed
upon it, or result in a violation of any applicable law, order, rule or
regulation of any governmental authority. To Seller's knowledge,
other than the Bankruptcy Cases, as defined in paragraph 6 below,
there is no action, suit, proceeding or investigation pending which
would prevent the transactions contemplated by this Agreement or
which would become a cloud on the title to the Property or any portion

4

thereof or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

(b) <u>Buyer's Representations and Warranties</u>. Buyer represents and warrants to Seller as follows:

   (i) <u>Existence and Authority</u>. Buyer, or its permitted assigns, has full power and authority to enter this Agreement and to consummate the transactions contemplated herein, and if Buyer's assign is a business entity, such entity is duly authorized, validly existing and active in the state of its formation.

   (ii) <u>Power to Acquire</u>. To Buyer's knowledge, and subject to satisfaction of the Approval Condition pursuant to <u>paragraph 6</u> below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Buyer of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Buyer's knowledge, other than the Bankruptcy Cases, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

   (iii) <u>Financial Condition</u>. Buyer has and will have the sufficient funds on hand as of the Effective Date and continuing through the Closing Date to perform its obligations under this Agreement, including payment of the Purchase Price at Closing.

(c) <u>Survival of Warranties</u>. The respective warranties of Buyer and Seller above will not survive the Closing but will merge into the Deed, and will have no further force or effect after the Closing, and the liability of Seller under or with respect to the warranties will be limited to the express remedies of Buyer set forth in this Agreement.

6. <u>CLOSING CONDITIONS</u>.

(a) <u>Approval Condition</u>.

   (i) <u>Chapter 11 Cases</u>. Winn-Dixie Stores, Inc., a Florida corporation, and its subsidiaries, including Seller, filed voluntary petitions for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, U.S.C. §101 <u>et seq.</u>, as amended (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "<u>Filing Date</u>") and have operated their businesses as debtors-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date (the "<u>Bankruptcy Cases</u>"). By order entered on April 13, 2005, the Bankruptcy Cases were transferred to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the

5

"Bankruptcy Court") where they are being jointly administered under Case No. 05-03817-3F1.

(ii)     Competitive Bid Process.    By Order dated June 20, 2005, the Bankruptcy Court approved bidding procedures and bid protections for use in the sale of assets in the Bankruptcy Cases (the "Bidding Procedures"). This Agreement is subject to the competitive bid process described in the Bidding Procedures. Promptly following expiration of the Investigation Period, provided that Buyer has not earlier terminated this Agreement in accordance with paragraphs 3 or 4 above, Seller will file a motion with the Bankruptcy Court seeking approval of the transactions contemplated by this Agreement, subject to higher or better offers, and the transfer of the Property free and clear of all claims and liens including the Credit Liens, other than Permitted Encumbrances, pursuant, inter alia, to 11 U.S.C. Sections 105, 363 and 1146(c) (the "Sale Motion"). The Bankruptcy Court will set a date for hearing on the Sale Motion and to consider entry of the Sale Order relating to the successful bid (the "Sale Hearing"). Prior to the Sale Hearing, the debtors will conduct an auction pursuant to the Bidding Procedures (the "Auction"). The Bidding Procedures allow Seller to accept competitive bids on individual parcels and aggregate such bids to determine the successful bid for the Property, subject to the Overbid Protection as set forth in subparagraph (iii) below. The party submitting the successful bid for the Property as selected by Seller is referred to as the "Successful Bidder". Buyer may participate in the Auction, and may submit purchase terms different from those set forth in this Agreement as Buyer may deem appropriate in seeking to become the Successful Bidder. Prior to the Sale Hearing, upon consultation with the Creditors' Committee and DIP Lender, Seller will select the highest or otherwise best offer to purchase the Property, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, as the Successful Bid (as defined in the Bidding Procedures). Seller will submit the Successful Bid to the Bankruptcy Court at the Sale Hearing, for entry of a Sale Order with respect to the Property by the Bankruptcy Court, either (a) approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, if Buyer is the Successful Bidder under the terms of this Agreement (or as modified during the Auction) or (b) approving the more favorable terms of purchase and sale offered by the Successful Bidder, whether Buyer or otherwise (the "Sale Order").

(iii)    Overbid Protection. Seller agrees, subject to Bankruptcy Court approval, that the initial minimum overbid that may be accepted by Seller in the competitive bid process will have a value of at least $943,500 (two percent (2%) higher than the Purchase Price).

(iv)    Sale Order Approving Agreement. It will be a condition to the Closing of the transaction contemplated by this Agreement that the Bankruptcy Court will have issued the Sale Order approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, and such

6

Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Approval Condition") and the Title Insurer shall be prepared to insure title to the Property free of any exceptions relating to the Bankruptcy Cases.

(v)     Continuing Effectiveness of Agreement. Notwithstanding that Buyer may not be the Successful Bidder following the Bidding Procedures, this Agreement, as modified by Buyer's last bid made during the Bidding Procedures, will remain in effect in accordance with, and will remain binding on Seller and subject to, the Bidding Procedures, including Seller's right to sell the Property to the next highest bidder if that bidder is not Buyer. If the Approval Condition is not otherwise satisfied by December 30, 2005 or if the sale of the Property closes with another Successful Bidder, then this Agreement automatically will terminate and Escrow Agent will refund the Deposit to Buyer, and the parties will have no further obligations to the other.

(b)   Conditions Precedent to Seller's Obligations. The obligations of Seller under this Agreement are subject to the Approval Condition and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

(i)     Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard. All of Buyer's representations and warranties contained in this Agreement will be true and accurate in all material respects as of the Effective Date and the Closing Date.

(ii)    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to the Property will be in effect.

If any of the foregoing conditions has not been satisfied on or before the Closing Date, then Seller will have the right to terminate this Agreement; provided, however, that if any of the foregoing conditions have not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations will be determined in accordance with paragraph 13 of this Agreement.

7.   LOSS BY FIRE OR OTHER CASUALTY; CONDEMNATION. If, prior to Seller's legal delivery of the Deed and Buyer's delivery of the Purchase Price, the Property or any material part thereof, is destroyed or materially damaged, or made the subject of a condemnation action, then either party will have the right, exercisable by giving notice of such decision to the other within 5 business days after receiving written notice of such damage, destruction or threatened condemnation, to terminate this Agreement, and thereafter neither of the parties will have any further rights or

7

obligations hereunder; provided, however, that Buyer will be entitled to the Deposit. If neither party exercises its right of termination, Buyer will purchase the Property pursuant to the terms of this Agreement, and then as Buyer's sole remedy, Seller will assign to Buyer any assignable rights it may have to recover insurance or condemnation proceeds and will promptly pay over and deliver to Buyer any such proceeds Seller receives.

8.    CLOSING AND CLOSING DATE.  The consummation of the transactions contemplated herein by Buyer and Seller (the "Closing") will be held on or before that date which is 10 days following the satisfaction of the Approval Condition  (the "Closing Date"), at a time and place mutually acceptable to the parties, but if none is agreed to, at the offices of Escrow Agent in Jacksonville, Florida. Closing may be conducted by use of mail-away procedures including escrow and Closing disbursement and delivery of documents and funds administered by Escrow Agent, as closing agent.

9.    CLOSING DELIVERIES.  On the Closing Date, Seller will execute and deliver a limited warranty deed (the "Deed") to Buyer as will be required to convey title to the Property to Buyer subject only to the Permitted Encumbrances and in accordance with this Agreement.    The Deed will be in form and substance reasonably satisfactory to Seller and Buyer and in proper form for recording.  Additionally, on the Closing Date, Seller will execute and deliver the title affidavit as required by the Title Insurer to allow the issuance of the title insurance policy without the standard exceptions other than for taxes for the year of Closing, subject to proration between Seller and Buyer, those standard exceptions required under the laws of the state in which the Property is located, and for specific matters disclosed by the Survey and not objected to by Buyer as provided herein, and a non-foreign affidavit as required under the Internal Revenue Code. At Closing, Buyer and Seller will execute and deliver a closing statement setting forth the disbursement of the Purchase Price and closing costs associated with the transactions contemplated herein.  On the Closing Date, Seller will turn over exclusive physical possession of the Property to Buyer upon confirmation to Seller by the Escrow Agent that Escrow Agent has received and holds the entire Purchase Price for disbursement without further condition.

10.   CLOSING COSTS.  At or prior to Closing, Seller will pay the cost of transfer taxes on the Deed (if required to be paid), the cost of the commission payable to Seller's Brokers as disclosed in paragraph 12, and Seller's attorneys' fees and costs ("Seller's Closing Costs").    At or prior to Closing, Buyer will pay the cost of the title commitment and insurance policy to be issued pursuant to the Commitment in the amount of the Purchase price, the cost of the Survey (unless Buyer is not the Successful Bidder or the ultimate purchaser of the Property pursuant to paragraphs 6(a)(ii) or 6(a)(v)), its due diligence investigations of the Property, recording fees, all financing costs of Buyer incurred to purchase or develop the Property including simultaneous issue mortgagee title insurance and related endorsements, Buyer's attorneys' fees and costs and all other fees, costs and expenses incurred by the Buyer in connection herewith ("Buyer's Closing Costs").  If this transaction fails to close for any reason, and without waiving any right or remedy that either party may have against the other in the event of a default hereunder, Seller promptly will pay Seller's Closing Costs, and Buyer promptly will pay Buyer's Closing Costs, if and to the extent payable in the absence of a Closing; provided, however, that if Buyer is not the Successful Bidder or the ultimate purchaser of the Property pursuant to paragraphs 6(a)(ii) or 6(a)(v), then Buyer will not be obligated to pay the cost of the Survey.



8

11.     PRORATIONS. All ad valorem taxes for the year 2005 will be prorated between Seller and Buyer as of midnight immediately preceding the Closing Date. The proration will be based upon the latest available tax figures with known changes (based on earliest payment discount, if any). All 2005 taxes will be paid at Closing.

12.     BROKERAGE. Seller and Buyer warrant each to the other (and it is agreed that this warranty will survive delivery of the Deed) that no broker or agent has been employed with respect to the sale of the Property, other than (a) Seller's brokers, DJM Asset Management, LLC ("Seller's Broker"), which has been retained by Seller pursuant to Order Authorizing Debtors to Retain DJM Asset Management, LLC as Special Real Estate Consultants to the Debtors, issued by the Bankruptcy Court on June 10, 2005 (the "Retention Order"), and (b) Black Diamond Advisors NY, LLC ("Black Diamond"), pursuant to a certain consulting agreement that will be terminated as to the Property on or prior to the Closing Date. Seller will be responsible for payment of the brokerage commission to Seller's Broker pursuant to the Retention Order and Buyer will be responsible for the payment to Black Diamond. Each party indemnifies and agrees to hold harmless the other from any claim made by brokers or agents who claim to act for the party sought to be charged for a commission, compensation, brokerage fees, or similar payment in connection with this transaction and against any and all expense or liability arising out of any such claim.

13.     REMEDIES.

    (a)     Seller's Default. In the event that Seller defaults in the performance of its obligations under this Agreement, and such default is not cured on or before the Closing Date, then Buyer will be entitled to terminate this Agreement upon written notice to Seller and Escrow Agent and obtain a refund of the Deposit. Additionally, following satisfaction of the Approval Condition, if Seller's default is Seller's refusal to close the transaction contemplated herein, and Buyer otherwise is ready, willing and able to close, then Buyer further will be entitled to recover from Seller Buyer's actual documented out-of-pocket expenses, including reasonable attorneys' fees and costs, incurred in negotiating this Agreement, investigating the feasibility of acquiring the Property, and preparation for closing, up to a maximum amount of $10,000. Buyer waives all other remedies it may have at law or in equity, except with respect to the indemnifications provided in paragraph 12 above, which indemnification will survive separately from the termination of this Agreement.

    (b)     Buyer's Default. If Buyer fails to make the Deposit when due or to comply with or perform any of the covenants, agreements, or obligations to be performed by Buyer under the terms and provisions of this Agreement, then Seller will be entitled to terminate this Agreement upon written notice to Buyer and Escrow Agent, and the Deposit will be paid to Seller as reasonable liquidated damages. Seller waives all other remedies it may have at law or in equity, except with respect to the indemnifications provided under paragraph 3(b)(ii) and paragraph 12 above, which indemnifications will survive separately from the termination of this Agreement.

9

14.  **ESCROW AGENT.**

    (a)   Duties. By joining in the execution of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon receipt, Escrow Agent will hold the Deposit in trust, and deposit the same into an interest bearing escrow account (money market rates), to be disposed of in accordance with the provisions of this Agreement.

    (b)   Indemnity. Escrow Agent will not be liable to either party except for claims resulting from the negligence or willful misconduct of Escrow Agent.

    (c)   Role as Counsel. The parties acknowledge that Escrow Agent also serves as special real estate counsel to Seller. In the event of a dispute between Seller and Buyer concerning this Agreement to the Property, Escrow Agent may continue to serve both in its capacity as counsel to Seller and in its capacity as Escrow Agent, it being understood that Escrow Agent's duties and obligations as Escrow Agent are purely ministerial in nature.

    (d)   Withdrawal. No party will have the right to withdraw any monies or documents deposited by it with Escrow Agent prior to the Closing or termination of this Agreement except in accordance with the terms of this Agreement.

    (e)   Written Objection. If a written objection is filed with Escrow Agent, or Escrow Agent otherwise is in doubt as to its duties, Escrow Agent may continue to hold the funds in escrow until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court having jurisdiction of the dispute or the Escrow Agent may interplead the same in the Circuit Court and be relieved of any and all liability therefor. In any action or proceeding regarding the Deposit brought by Escrow Agent or to which Escrow Agent is made a party Escrow Agent will be entitled to recover its reasonable costs and attorney's fees (through appeal).

15.  NOTICES. All notices, demands, requests and other communications hereunder will be in writing and will be deemed to have been given (i) on the same business day if delivered personally, (ii) 3 business days following mailing by registered or certified mail, return receipt requested, postage prepaid, or (iii) on the same business day if sent by telefax, to Buyer, Seller or Escrow Agent at its respective address set forth below:

    If to Seller:                        Winn-Dixie Montgomery, Inc.
                                       5050 Edgewood Court
                                       Jacksonville, Florida 32254
                                       Attention: Catherine Ibold
                                       Telefax No.: 904 783 5138

    with a copy to:                 Smith, Gambrell & Russell, LLP
                                           50 N. Laura Street, Suite 2600
                                       Jacksonville, Florida 32202
                                       Attention: Douglas G. Stanford
                                       Telefax No.: 904 598 6226

MM

10

If to Buyer:                          Merrill Lynch
                                      4 World Financial Center
                                      Floor 7
                                      New York, New York  10080
                                      Attention: Nicholas Griffiths
                                      Telefax No.: 212 449 3247

with a copy to:                       Solomon and Weinberg LLP
                                      900 Third Avenue
                                      29th Floor
                                      New York, New York  10022
                                      Attention: Gary S. Kleinman
                                      Telefax No.: 212 605 0999

If to Escrow Agent:                   Smith, Gambrell & Russell, LLP
                                      50 N. Laura Street, Suite 2600
                                      Jacksonville, Florida  32202
                                      Attention: Douglas G. Stanford
                                      Telefax No.: 904 598 6226

or at such other address as the party may specify from time to time by written notice to the
other party.

16.    MISCELLANEOUS PROVISIONS.

     (a)    Successors And Assigns: Assignment Of Agreement. All terms of this
Agreement will be binding upon, and will inure to the benefit of and be
enforceable by the parties hereto and their respective legal representatives,
heirs, successors and assigns. Except as set forth below, this Agreement may
not be assigned by either party without the express written consent of the
other. Notwithstanding the foregoing   to the contrary, Buyer may freely
assign its rights under this Agreement, without Seller's consent, as long as
Buyer remains liable under this Agreement, and Buyer and its assignee have
executed a written instrument pursuant to which such assignee expressly
assumes Buyer's obligations hereunder, and a copy of such written
assignment is delivered to Seller.

     (b)    Governing Law. This Agreement will be governed and construed in
accordance with the laws of the State of Georgia. Any dispute arising out of
or under this Agreement will be litigated in the Bankruptcy Court.

     (c)    Captions. The captions of this Agreement are inserted for convenience or
reference only and not to define, describe or limit the scope or the intent of
this Agreement or any term hereof.

     (d)    Counterparts. This Agreement may be executed in any number of
counterparts, each of which will be deemed to be an original but all of which
together will constitute one and the same instrument.

     (e)    Changes And Modifications; Prior Agreements. This Agreement may not be
orally changed, modified or terminated; it supersedes any and all prior
understandings and/or letter agreements; other matters of similar nature will

11

be deemed to be of no force or effect in the interpretation of this Agreement, it being intended that this Agreement represents the entire understanding of the parties. No waiver of any provision hereof will be valid unless in writing and signed by a party against whom it is to be enforced.

(f)   Waiver. No failure of either party to exercise any power given hereunder or to insist upon strict compliance with any obligations specified herein, and no custom or practice at variance with the terms hereof, will constitute a waiver of any party's right to demand exact compliance with the terms hereof; provided, however, that any party may, at its sole option, waive any requirement, covenant or condition herein established for the benefit of such party without affecting any of the other provisions of this Agreement.

(g)   Further Assurances. Seller and Buyer each agree to execute and deliver to the other such further documents and instruments as may be reasonable and necessary in furtherance of and to effectuate the intent of the parties as expressed by the terms and conditions hereof.

(h)   Attorneys' Fees. If either party commences an action against the other to enforce any of the terms hereof or because of the breach by either party of any of the covenants, terms or conditions hereof, the losing or defaulting party will pay to the prevailing party reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution and defense of such action.

(i)   Time Of Essence. Time is of the essence of each party's performance of this Agreement.

(j)   Business Day. Whenever a date specified herein shall fall on a Saturday, Sunday or legal holiday, the date shall be extended to the next succeeding Business Day. For purposes of the foregoing, "Business Day" will mean any day, other than a Saturday, Sunday or legal holiday.

(k)   WAIVER OF TRIAL BY JURY. BUYER AND SELLER EACH AGREE THAT THE NATURE OF THIS AGREEMENT MAKES A JURY DETERMINATION OF ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR THE PROPERTY UNDESIRABLE. ACCORDINGLY, BUYER AND SELLER EACH SPECIFICALLY WAIVE ANY RIGHT TO A TRIAL BY JURY THAT EITHER OF THEM MAY HAVE IN ANY COURT WITH RESPECT TO ANY ACTION RELATING TO THIS AGREEMENT OR THE PROPERTY. THE FOREGOING WAIVER IS MADE KNOWINGLY, VOLUNTARILY AND INTENTIONALLY BY BOTH BUYER AND SELLER.

(l)   CONSENT TO JURISDICTION OF BANKRUPTCY COURT. THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

12

Buyer and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in paragraph 15 of this Agreement will be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court.

**[Signature page follows]**

13

**IN WITNESS WHEREOF,** Buyer and Seller have executed this Agreement as of the Effective Date.

**SELLER:**

Signed, sealed and delivered
In the presence of:

**WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation

Name: ~~ANDREW KEITH DAW~~

By: _____
Name: ~~RICHARD G. JUDD~~
Title: Vice President

Name: ~~SUSAN MAGABUINO~~

LEGAL APPROVED           [Corporate Seal]    Reviewed By
ATTY: C.B.Y                                  _____
DATE: 11/1/05                                XRoads
                                             Date: 11/1/05

**BUYER:**

Signed, sealed and delivered
In the presence of:

**WD GEORGIA, LLC,** a Georgia limited liability company

Name: NICHOLAS D. GRIFFITHS

By: _____
Name: Martin McInerney
Title: Vice President

Name: Christopher Dougherty

[Seal]

**SCHEDULE OF EXHIBITS:**

Exhibit A - Legal Description of Property
Exhibit B - Schedule of Permitted Encumbrances

14

The undersigned, Escrow Agent, hereby consents and joins in the execution of this Real Estate Purchase Agreement for the limited purposes stated herein.

**SMITH, GAMBRELL & RUSSELL, LLP**

By: _____

Name: Douglas G. Stanford

Title: Partner

Dated: November ____, 2005

## EXHIBIT A

### LEGAL DESCRIPTION OF PROPERTY

OUT LOT ONE

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 251 AND 252 OF THE 2ND DISTRICT, 3RD SECTION, PAULDING COUNTY, GEORGIA, SAID TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO REACH THE TRUE POINT OF BEGINNING, COMMENCE AT AN IRON PIN SET AT THE LAND LOT CORNER COMMON TO LAND LOTS 251, 252, 253 AND 254; THENCE RUNNING ALONG THE SOUTHERLY LINE OF LAND LOT 252, SOUTH 87°54'43" EAST, A DISTANCE OF 202.56 FEET TO A 3/8 INCH REINFORCING ROD FOUND; THENCE CONTINUING ALONG THE SOUTHERLY LINE OF LAND LOT 252, SOUTH 87°57'04" EAST, A DISTANCE OF 100.09 FEET TO A 1/2 INCH REINFORCING ROD FOUND; THENCE LEAVING SAID SOUTHERLY LAND LOT LINE AND RUNNING NORTH 01°52'21" EAST, A DISTANCE OF 621.92 FEET TO AN IRON PIN SET; THENCE NORTH 89°25'35" WEST, A DISTANCE OF 100.03 FEET TO AN IRON PIN SET; THENCE NORTH 89°21'40" WEST, A DISTANCE OF 159.69 FEET TO A POINT, SAID POINT BEING THE TRUE POINT OF BEGINNING; THENCE SOUTH 06°23'14" EAST, A DISTANCE OF 162.86 FEET TO A POINT; THENCE SOUTH 83°33'34" WEST, A DISTANCE OF 345.33 FEET TO A POINT; THENCE NORTH 25°55'11" WEST, A DISTANCE OF 100.00 FEET TO A POINT ON THE SOUTHERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 120 (VARIABLE WIDTH RIGHT-OF-WAY); THENCE RUNNING ALONG THE SOUTHERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 120 THE FOLLOWING COURSES AND DISTANCES: NORTH 64°02'19" EAST, A DISTANCE OF 189.51 FEET TO AN IRON PIN SET; THENCE SOUTH 26°02'45" EAST, A DISTANCE OF 35.03 FEET TO A CONCRETE RIGHT-OF-WAY MONUMENT FOUND; THENCE NORTH 64°04'26" EAST, A DISTANCE OF 60.00 FEET TO A CONCRETE RIGHT-OF-WAY MONUMENT FOUND; THENCE NORTH 60°33'53" EAST, A DISTANCE OF 70.19 FEET TO A CONCRETE RIGHT-OF-WAY MONUMENT FOUND; THENCE LEAVING SAID RIGHT-OF-WAY OF GEORGIA HIGHWAY 120, SOUTH 87°29'24" EAST, A DISTANCE OF 25.08 FEET TO AN IRON PIN SET; THENCE SOUTH 89°21'40" EAST, A DISTANCE OF 42.83 FEET TO A POINT, SAID POINT BEING THE TRUE POINT OF BEGINNING.

TOGETHER WITH:

OUT LOT TWO

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 254, 2ND DISTRICT, 3RD SECTION, PAULDING COUNTY, GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

TO REACH THE TRUE POINT OF BEGINNING, COMMENCE AT AN IRON PIN SET AT THE INTERSECTION OF THE NORTHEASTERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 92 (VARIABLE WIDTH RIGHT-OF-WAY) WITH THE NORTHWESTERLY RIGHT-OF-WAY OF OLD HIRAM ROAD (50 FOOT RIGHT-OF-WAY AND 30 FEET FROM CENTERLINE); THENCE RUNNING ALONG THE NORTHEASTERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, NORTH 25°15'42" WEST, A DISTANCE OF 519.76 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 4.91 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 25°11'52" WEST, A CHORD DISTANCE OF 4.91 FEET AND HAVING A RADIUS OF 2325.68 FEET) TO A POINT; THENCE CONTINUING ALONG THE RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 112.61 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 23°45'12" WEST, A CHORD DISTANCE OF 112.60 FEET AND HAVING A RADIUS OF 2325.68 FEET) TO A POINT, SAID POINT BEING THE TRUE POINT OF BEGINNING: THENCE CONTINUING ALONG THE NORTHEASTERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 268.00 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 19°03'53" WEST, A CHORD DISTANCE OF 267.85 FEET AND HAVING A RADIUS OF 2325.68 FEET) TO A POINT; THENCE NORTH 16°34'51" WEST, A DISTANCE OF 5.21 FEET TO A POINT; THENCE NORTH 24°11'47" EAST, A DISTANCE OF 15.46 FEET TO A POINT; THENCE NORTH 73°48'00" EAST, A DISTANCE OF 82.62 FEET TO A POINT; THENCE SOUTH 87°11'38" EAST, A DISTANCE OF 175.15 FEET TO A POINT; THENCE SOUTH 02°48'22" WEST, A DISTANCE OF 189.91 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 119.91 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 37°09'31" WEST, A CHORD DISTANCE OF 112.86 FEET, AND HAVING A RADIUS OF 100.00 FEET) TO A POINT, THENCE SOUTH 66°31'42" WEST, A DISTANCE OF 49.15 FEET TO A POINT, THENCE NORTH 75°44'58" WEST, A DISTANCE OF 50.65 FEET TO A POINT, SAID POINT BEING THE TRUE POINT OF BEGINNING.



Real Estate Purchase Agreement
Dallas GA Outparcels - Georgia
SGRJAX\73282.7

TOGETHER WITH:

OUT LOT THREE

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 254 OF THE 2ND DISTRICT, 3RD SECTION, PAULDING COUNTY, GEORGIA, SAID TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIN SET AT THE INTERSECTION OF THE NORTHEASTERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 92 (VARIABLE WIDTH RIGHT-OF-WAY) WITH THE NORTHWESTERLY RIGHT-OF-WAY OF OLD HIRAM ROAD (50 FOOT RIGHT-OF-WAY AND 30 FEET FROM CENTERLINE); THENCE RUNNING WITH THE NORTHEASTERLY RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, NORTH 25°15'42" WEST, A DISTANCE OF 519.76 FEET TO A POINT; THENCE CONTINUING ALONG THE RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, ALONG A CURVE TO THE RIGHT AN ARC DISTANCE OF 4.91 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 25°11'52" WEST, A CHORD DISTANCE OF 4.91 FEET AND HAVING A RADIUS OF 2325.68 FEET) TO A POINT; THENCE LEAVING SAID RIGHT-OF-WAY OF GEORGIA HIGHWAY 92, NORTH 30°57'55" EAST, A DISTANCE OF 18.59 FEET TO A POINT; THENCE NORTH 64°44'16" EAST, A DISTANCE OF 68.50 FEET TO A POINT; THENCE NORTH 67°14'52" EAST, A DISTANCE OF 9.80 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE LEFT, AN ARC DISTANCE OF 169.15 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 38°04'44" EAST, A CHORD DISTANCE OF 160.67 FEET AND HAVING A RADIUS OF 153.00 FEET) TO A POINT; THENCE NORTH 06°24'17" EAST, A DISTANCE OF 85.97 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 38.65 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF NORTH 12°57'29" EAST, A CHORD DISTANCE OF 38.57 FEET AND HAVING A RADIUS OF 169.00 FEET) TO A POINT; THENCE SOUTH 70°29'26" EAST, A DISTANCE OF 27.66 FEET TO A POINT; THENCE RUNNING ALONG A CURVE TO THE LEFT, AN ARC DISTANCE OF 84.84 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 28°01'34" EAST, A CHORD DISTANCE OF 75.03 FEET AND HAVING A RADIUS OF 50.00 FEET TO AN IRON PIN SET; THENCE RUNNING ALONG A CURVE TO THE RIGHT, AN ARC DISTANCE OF 26.71 FEET (SAID ARC BEING SUBTENDED BY A CHORD BEARING OF SOUTH 38°25'23" EAST, A CHORD DISTANCE OF 24.77 FEET AND HAVING A RADIUS OF 20.00 FEET) TO AN IRON PIN SET, THENCE SOUTH 00°09'33" EAST, A DISTANCE OF 108.09 FEET TO AN IRON PIN SET; THENCE SOUTH 01°50'18" WEST, A DISTANCE OF 366.90 FEET TO AN IRON PIN SET; THENCE SOUTH 00°27'52" EAST, A DISTANCE OF 191.67 FEET TO AN IRON PIN SET; THENCE SOUTH 36°42'54" WEST, A DISTANCE OF 20.60 FEET TO AN IRON PIN SET, THENCE NORTH 80°14'02" WEST, A DISTANCE OF 28.88 FEET TO AN IRON PIN SET AND THE TRUE POINT OF BEGINNING.

TOGETHER WITH EASEMENTS CONTAINED IN THAT CERTAIN RECIPROCAL EASEMENT AND RESTRICTIVE COVENANT AGREEMENT DATED JUNE, 1997 BY AND BETWEEN WILLIAM C. HATHCOCK AND SUNBELT-DIX, INC., FILED AND RECORDED SEPTEMBER 22, 1997 IN DEED BOOK 620, PAGE 765, AS AMENDED BY FIRST AMENDMENT TO RECIPROCAL EASEMENT AND RESTRICTIVE COVENANT AGREEMENT DATED AUGUST 14, 1998 AND FILED MARCH 12, 1999, IN DEED BOOK 767, PAGE 580, BOTH OF THE PAULDING COUNTY, GEORGIA RECORDS.

TOGETHER WITH EASEMENTS CONTAINED IN THAT CERTAIN DECLARATION OF RECIPROCAL EASEMENTS AND RESTRICTIVE COVENANTS BETWEEN SUNBELT-DIX, INC. AND WINN-DIXIE ATLANTA, INC., DATED OF EVEN DATE HEREWITH AND RECORDED OR TO BE RECORDED IN THE PAULDING COUNTY GEORGIA RECORDS.

LESS AND EXCEPT any portion of the property set forth above contained in that certain Order and Judgment, Condemnation Action No. 02-CB-0081, Superior Court of Paulding County, Georgia, filed February 3, 2005 and recorded in Deed Book 1816, Page 724, records of the Superior Court of Paulding County, Georgia.



Real Estate Purchase Agreement
Dallas GA Outparcels - Georgia
SGRJAX\73282.7

## EXHIBIT B

### SCHEDULE OF PERMITTED ENCUMBRANCES

1. All taxes and assessments for the year 2006 and subsequent years, not yet due and payable.

2. Permit to Cut or Trim Trees from Carlos Jones Construction Co., Inc. to Georgia Power Company, dated January 22, 1975, recorded in Deed Book 7-O, Page 706, Paulding County, Georgia.

3. Easement from Mrs. L. T. Moss by her attorney-in-fact Hazel Morris to Southern Bell Telephone and Telegraph Company, dated March, 1985, recorded in Deed Book 65, Page 191, aforesaid records.

4. Right-of-Way Easement from Rhonda Graves Conn and Michael Lynn Conn, Sr. to Greystone Power Company, dated January 15, 1996, recorded in Deed Book 516, Page 91, aforesaid records.

5. Right-of-Way Easement from Wallace W. Keys to Douglas County Electric Membership Corporation, dated September 31, 1985, recorded in Deed Book 73, Page 740, aforesaid records.

6. Reciprocal Easement and Restrictive Covenant Agreement dated June 1997, by and between William C. Hathcock and Sunbelt-Dix, Inc., filed and recorded September 22, 1997, in Deed Book 620, Page 765, aforesaid records; as amended by First Amendment to Reciprocal Easement and Restrictive Covenant Agreement dated August 14, 1998, by and between William C. Hathcock and Sunbelt-Dix, Inc., filed for record March 12, 1999, and being recorded in Deed Book 767, Page 580, aforesaid records.

7. Terms and conditions of the Declaration of Reciprocal Easements and Restrictive Covenants effective August 26, 1999, by Sunbelt-Dix, Inc., a Delaware corporation, and Winn-Dixie Atlanta, Inc., a Florida corporation, filed for record September 1, 1999, and being recorded in Deed Book 811, Page 1041, aforesaid records.

8. Certain easement rights in favor of the Department of Transportation pursuant to that certain Order and Judgment, Condemnation Action No. 02-CB-0081, Superior Court of Paulding County, Georgia, filed February 3, 2005 and recorded in Deed Book 1816, Page 724, aforesaid records.

MW

Real Estate Purchase Agreement
Dallas GA Outparcels · Georgia
SGRJAX\73282.7

**Exhibit B**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| WINN-DIXIE STORES, INC., <u>et al.</u>, | ) | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

**ORDER (A) AUTHORIZING THE DEBTORS TO SELL**
**DALLAS, GEORGIA OUTPARCELS AND RELATED ASSETS FREE AND**
**CLEAR OF LIENS, CLAIMS AND INTERESTS AND EXEMPT FROM**
<u>**DOCUMENTARY OR SIMILAR TAX AND (B) GRANTING RELATED RELIEF**</u>

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 363, 1146 and Fed. R. Bankr. P. 6004 (a) authorizing Winn-Dixie Montgomery, Inc. ("WD Montgomery") to sell their Dallas, Georgia Outparcels and related assets to WD Georgia, LLC (the "Purchaser") or to the party submitting a higher or otherwise better offer, free and clear of liens, claims, interests and encumbrances and (b) granting related relief (the "Motion").[1]  A hearing on the Motion was held by the Court on December 1, 2005 (the "Sale Hearing").  The Court has read the Motion and considered the representations of counsel.  Upon the representations of Counsel and without objection from the United

---

[1]      All capitalized terms not otherwise defined by this Order will have the meaning ascribed to them in the Motion or the Purchase Agreement.

WD- Order Sale of Dallas  Georgia Outparcels (00513463).DOC

States Trustee or any other interested party, the Court makes the following findings of fact:

A.    This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

B.    The Debtors solicited the highest or otherwise best offer for the Assets described in the Purchase Agreement (the "Assets") in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 16, 2005 (the "Bidding Procedures").

C.    The Debtors have provided interested parties (including all parties asserting claims on interests of the Assets, if any) with proper notice of the Motion, the Auction, the Sale Hearing and the transactions contemplated by the Sale pursuant to 11 U.S.C. §§ 102(1), 105(a), 363 and Fed. R. Bankr. P. 2002 and 6004 and Local Rule 2002-1, the Bidding Procedures Order and the Notice Procedures Order.

D.    A reasonable opportunity to object or be heard with respect to the Motion and the sale of the Assets has been afforded to all parties in interest (including all third parties asserting Interests or Claims (as such terms are defined below) in, to or against the Assets, if any).

E.    The Debtors marketed the Assets and conducted the Sale process in compliance with the Bidding Procedures Order.  The bidding on the Assets and the Auction (if any) were conducted in a non-collusive, fair and good faith manor.  Through the Debtors' marketing efforts and Auction process, the Debtors afforded all interested parties a reasonable opportunity to make higher or betters offers to purchase the Assets.

F.    The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A and all related documents, and the sale of the Assets has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

G.    The Debtors have good business reasons to sell the Assets prior to filing a plan or reorganization pursuant to 11 U.S.C. § 363(b).

H.    Neither Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

I.    The Purchase Agreement was proposed, negotiated and entered into by the Debtors and the Purchaser without collusion, in good faith and at arms'-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

J.    The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m).

K.    The consideration being provided by the Purchaser to the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value and fair consideration for the Assets.

L.    WD Montgomery's transfer of the Assets to the Purchaser pursuant to the Purchase Agreement will be a legal, valid, and effective transfer of the Assets, and

3

will vest the Purchaser with good and valid title in and to the Assets free and clear of any lien, interest or encumbrance of any kind or nature (collectively, the "Interests") and claim (as such term is defined in 11 U.S.C. § 101(5)) ("Claims") with the exception of the Permitted Encumbrances, as defined in the Purchase Agreement.

   M.  WD Montgomery may sell and transfer the Assets free and clear of all Interests and Claims (other than the Permitted Encumbrances) because any entity with any Interests or Claims, if any, in the Assets to be transferred (i) has consented to the sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Interests and Claims, if any, who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2).

   N.  The Debtors will cause the proceeds net from the Sale to be paid to the extent required in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order"), and the Loan Documents (as defined in the Final Financing Order).

WD- Order Sale of Dallas  Georgia Outparcels (00513463).DOC

O.      The Court's approval of the Purchase Agreement and the sale of the Assets to the Purchaser, is in the best interests of the Debtors, their estates, their creditors and other parties in interest.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted.

2.      Any objections to the entry of this Order or to the relief granted and requested in the Motion that have not been withdrawn, waived or settled are denied and overruled on the merits.

3.      The terms and conditions of the Purchase Agreement are approved. Pursuant to 11 U.S.C. §§ 105(a), 363(b) and this Order, the Debtors are authorized to consummate the Sale in accordance with the terms and conditions of the Purchase Agreement.

4.      WD Montgomery is authorized to consummate and implement fully the Purchase Agreement, together with all additional instruments and documents that may be necessary to implement the Purchase Agreement, and the Debtors are authorized to take all further actions as may reasonably be necessary or appropriate for the purpose of conveying the Assets to the Purchaser, or as may be necessary or appropriate to the performance of the Debtors' obligations under the Purchase Agreement.

5.      Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties without further order of the Court; provided, however, that, (a) the Debtors will first obtain the prior written consent of (i) the DIP Lender, and (ii) the Creditors'

5

Committee, which consent will not be unreasonably withheld and (b) any such modification, amendment or supplement does not have a materially adverse effect on the Debtors' estates.

6.      WD Montgomery will transfer the Assets to the Purchaser upon Closing free and clear of all Interests and Claims (except for the Permitted Encumbrances).   The only Claims and/or Interests in the Assets are those with the DIP Lender.   The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds of the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

7.      WD Montgomery's transfer of the Assets to the Purchaser is a legal, valid, and effective transfer of the Assets and will vest the Purchaser with all right, title and interest of the Debtors in and to the Assets, free and clear of all Interests and Claims (except for the Permitted Encumbrances).

8.      The Debtors will cause the net proceeds from the sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Financing Order and the Loan Documents.

9.      The consideration provided by the Purchaser for the Assets constitutes reasonably equivalent value and fair and reasonable consideration under the Bankruptcy Code and applicable non-bankruptcy law, and may not be avoided under 11 U.S.C. § 363(n).

10.     Upon Closing of the Sale in accordance with the Purchase Agreement and this Order, the Purchaser is deemed to have acted in good faith in purchasing the Assets, as that term is used in 11 U.S.C § 363(m).   Accordingly, the

reversal or modification on appeal of the authorization to consummate the sale of the Assets will not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

11.     All entities who are presently in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors.  Each of the Debtors' creditors is authorized and directed to execute any and all documents and take all other actions as may be necessary to release its Interests in and Claims against the Assets (except for the Permitted Encumbrances) (provided that the taking of such actions will not require such creditor to incur any material costs) as such Interests and Claims may have been recorded or may otherwise exist.  In the event any creditor fails to release its Interests in or Claims against the Assets, the Debtors are authorized to file or record a copy of this Order.  Once filed, registered or otherwise recorded, this Order will constitute conclusive evidence of the release of all Interests in and Claims against the Assets (except for the Permitted encumbrances).

12.     WD Montgomery's transfer of the Assets pursuant to the terms of the Purchase Agreement is a transfer pursuant to 11 U.S.C. § 1146(c).  Accordingly, the making, delivery, filing or recording of any deeds, assignments or other transfer documents in connection with the sale (the "Transfer Instruments"), will not be taxed under any law imposing a recording tax, stamp tax, transfer tax or similar tax (including without limitation, any transfer or recordation tax applicable to deeds and/or security interests).  All filing and recording officers are directed to accept for filing or recording, and to file or record the Transfer Instruments immediately upon presentation without payment of any such taxes.

7

WD- Order Sale of Dallas  Georgia Outparcels (00513463).DOC

13.     WD Montgomery's transfer of the Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances or Assumed Liabilities) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

14.     Other than the Permitted Encumbrances, the Assumed Liabilities and other obligations of the Purchaser as set forth in the Purchase Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets.  The Debtors' transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

15.     This Order is and will be effective as a determination that any and all Interests or Claims are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

16.     Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to the Purchaser.  Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

17.     This Order is binding in all respects upon, and inures to the benefit of, the Debtors, their estates and creditors, the Purchaser and its respective affiliates, successors and assigns, and this Order is binding in all respects upon all persons asserting an Interest in or Claim against the Debtors' estates or the Assets.  The sale is enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee of the Debtors and their estates.

18.     During the pendency of the Debtors' jointly administered cases, this Court will retain exclusive jurisdiction (a) to enforce and implement the Purchase Agreement and any agreements and instruments executed in connection with the Purchase Agreement, (b) to compel delivery of possession of the Assets to the Purchaser, (c) to resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement and (d) to interpret, implement, and enforce the provisions of this Order.

19.     All persons and entities that hold Interests in or Claims against the Debtors or the Assets are forever barred, estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the sale of the Assets.

20.     Nothing contained in any plan of reorganization or liquidation confirmed in these chapter 11 cases, or any order of this Court confirming such a plan, or any other order entered in these chapter 11 cases or in any subsequent chapter 7 cases will conflict with or derogate from the terms of this Order.

WD- Order Sale of Dallas  Georgia Outparcels (00513463).DOC

21.    The failure specifically to include any particular provision of the Purchase Agreement in this Order will not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

22.    After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Purchase Agreement.   No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

23.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in the this Order will control.

10

WD- Order Sale of Dallas  Georgia Outparcels (00513463).DOC

24.    Notwithstanding Fed. R. Bankr. P. 6004(g), this Order will take effect immediately upon entry.

Dated this ____ day of November, 2005 in Jacksonville, Florida.

_____
Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed
to serve a copy of this Order
on all persons served with
the Motion.

11