UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | CASE NO. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et. al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |

**SUMMARY OF SECOND INTERIM FEE APPLICATION FOR ALLOWANCE AND PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES OF XROADS SOLUTIONS GROUP, LLC, AS FINANCIAL AND OPERATIONS RESTRUCTURING CONSULTANTS FOR THE PERIOD MAY 29, 2005 TO OCTOBER 1, 2005**

1. Name of Applicant:  XRoads Solutions Group, LLC
2. Role of Applicant:  Financial Advisors and Operations Restructuring Consultants for the Debtors
3. Name of Certifying Professional:  Holly Felder Etlin
4. Date Case Filed:  February 21, 2005
5. Date of Application for Employment:  February 21, 2005
6. Date of Order Approving Employment:  June 2, 2005 (final Order)
7. If Debtor's counsel, date of disclosure of Compensation form:  N/A
8. Date of this Application:  November 10, 2005
9. Dates of Services Covered:  May 29, 2005 through October 1, 2005[1]

**FEES:**

10. Amount of 100% compensation sought as actual, reasonable and necessary:  $ 5,984,350.00

**EXPENSES:**

11. Amount of 100% expense reimbursement sought as actual, reasonable and necessary:  $   374,713.55

**TOTALS:**

12. Total Amount Requested for 2nd Interim:  **$ 6,359,063.55**
13. Total of Fees and Expenses paid to date:  ($3,819,736.85)
14. **Total Balance Due for 2nd Interim Period:**  **$   2,539,326.70**

---

[1] Time and Expenses covered in the monthly fee application of September 2005 is for the dates of August 28, 2005 through October 1, 2005, due to XRoads' month end reporting cycle.

1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **CASE NO. 05-03817-3F1** |
| | ) | |
| **WINN-DIXIE STORES, INC., et. al.,** | ) | **Chapter 11** |
| | ) | |
| **Debtors.** | ) | **Jointly Administered** |

**SECOND INTERIM FEE APPLICATION FOR ALLOWANCE AND PAYMENT OF COMPENSATION AND REIMBURSEMENT OF EXPENSES OF XROADS SOLUTIONS GROUP, LLC, AS FINANCIAL AND OPERATIONS RESTRUCTURING CONSULTANTS FOR THE PERIOD MAY 29, 2005 TO OCTOBER 1, 2005**

XRoads Solutions Group, LLC ("XRoads" or "Applicant"), financial advisors and operations restructuring consultants to the debtors and debtors-in-possession in the above-captioned cases (Winn-Dixie Stores, Inc. is hereinafter sometimes referred to as the "Company", and the debtors-in-possession are collectively referred to as the "Debtors"), hereby makes its Second Interim Application for Allowance and payment of Compensation and Reimbursement of Expenses for services rendered and costs incurred in this Chapter 11 proceeding from May 29, 2005 through October 1, 2005 (the "Application") [2]. This Application is filed pursuant to 11 U.S.C § 330 and Federal Rule of Bankruptcy Procedure 2016, as well as the Court's Order Establishing Procedures to Permit Monthly Payment of Interim Fee Applications of Chapter 11 professionals entered on March 15, 2005. This is the second interim application filed by the XRoads, financial and operations restructuring consultants for the Debtors and is not an amendment or supplement to a previous Fee Application. The Exhibits attached to this Application, pursuant to the Guidelines are:

    **Exhibit "1"** – Retention Order
    **Exhibit "2"** – Application to Employ XRoads
    **Exhibit "3"** – Summary of Professionals' Time
    **Exhibit "4"** – Summary of Requested Reimbursement of Expenses
    **Exhibit "5"** – XRoads' complete time records, in chronological order, by activity code for the time period covered in this Application. The requested fees are itemized to the tenth of an hour.
    **Exhibit "6"** – XRoads' complete expense records, in chronological order, by activity code for the time period covered in this Application.

In support of this Application, XRoads respectfully represents as follows:

---

[2] Time and Expenses covered in the monthly fee application for September 2005 is for the dates of August 28, 2005 through October 1, 2005, due to XRoads' month end reporting cycle.

2

**GENERAL BACKROUND**

1. The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on February 21, 2005 (the "Petition Date").

2. The Debtors will continue in possession of their property and will operate and manage their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtors are grocery and drug retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners. The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion. The Debtors currently operate more than 900 stores in the United States. Substantially all of the Debtors' store locations are leased rather than owned.

4. The Debtors operate in a highly competitive supermarket industry that is generally characterized by intense competition and narrow profit margins. The Debtors compete directly with national, regional, and local supermarket chains and independent supermarkets, as well as with Wal-Mart, similar super centers, and other non-traditional grocery retailers such as dollar discount stores, drug stores, convenience stores, warehouse club stores, and conventional department stores.

5. XRoads has filed one previous interim fee application for services rendered and costs incurred in this Chapter 11 proceeding from February 21, 2005 through May 28, 2005 which included professional and non-professional services totaling $4,534,122.50. The overall hourly rate charged during this initial period averaged $290.69 based on total gross hours incurred, both billable and non-billable. No objections were filed and XRoads' fees were approved as presented.

6. As authorized in the Order approving Interim Compensation Procedures for Professionals in Debtors' Case, XRoads has submitted monthly requests for payment of fees and reimbursement of expenses to the Debtors during the Application Period, with copies to the Office of the United States Trustee, counsel to the Committee of Unsecured Creditors and counsel for the Debtors. No objections to XRoads' monthly requests for payment have been submitted. As such, the Company has paid XRoads 80% of its fees and 100% of its expenses incurred through August, 2005.

**RETENTION OF XROADS**

7. By Final Order dated June 6, 2005 under section 327(a) of the Bankruptcy Code (the "Retention Order"), XRoads was authorized to be employed by the Debtors as Financial and Operations

Restructuring Consultant in connection with the Chapter 11 cases *nunc pro tunc* to February 21, 2005. A true and correct copy of the Retention Order is attached hereto as Exhibit "1." and true and correct copy of the Application by Debtors to Employ XRoads Solutions Group, LLC as Financial and Operations Restructuring Consultants is attached hereto as Exhibit "2." Pursuant to the Engagement Letter dated March 4, 2005, which was attached to the Application by Debtors to Employ XRoads Solutions Group, LLC as Financial and Operations Restructuring Consultants, the computation for XRoads' fees earned during this Application Period includes a base monthly rate of $200,000 for the first 400 hours of service plus $400 per hour for all hours over the 400 hour threshold.

8. XRoads incurred a gross amount of 16,710.20 hours of professional services during this Application Period. XRoads charged the Debtors a net amount of 13,968.10 hours. The first 1,600 hours (400 x 4 months) is capped at $800,000. The remaining 12,368.10 hours were billed at $400 per hour (or $4,947,240.00).

9. In addition, non-professional services have been charged at rates of $85 to $160 per hour in accordance with XRoads' engagement agreement, and clerical and secretarial services have been provided free of charge. Costs incurred by the "on-client site" clerical and secretarial support while at the Debtors' location have not been charged to the Estate. XRoads incurred a gross amount of 2,772.00 hours for non-professional services during this Application Period of which 1,780.50 were billed (or $237,110.00).

10. Combined, fees for professional and non-professional services for this Application Period total $5,984,350.00. The overall hourly rate charged to the Debtors for this Application Period averages $380 based on net billable hours (or an average hourly rate of $307 based on total gross hours incurred).

**OVERVIEW OF XROADS' KEY ACCOMPLISHMENTS**

11. During this billing period, XRoads continued to implement the key initiatives described more fully below, but these efforts were complicated by, and took on greater intensity on August 29, 2005, when Hurricane Katrina hit the Gulf States, impacting approximately 120 stores in the New Orleans operating area. By mid-September, all but 23 stores had re-opened (subsequently through today's date all except 13 have reopened). While it is anticipated that insurance will cover a great deal of the costs associated with this disaster, the impact of the storm on business operations created the need for XRoads and the Debtor to work together to update all of the financial forecasts, bank plan and initiatives. While the hurricane impacted the entire XRoads team in some manner, as described below, the greatest impact has been on the real estate group

which has been responsible for working with the landlords at all 120 impacted stores, adding to work they were already doing as part of the implementation of the new footprint.

12. The five major initiatives lead by XRoads include: (1) footprint downsizing, (2) headquarters and divisional realignment, (3) non-merchandise cost reductions and outsourcing, (4) real estate and occupancy cost reductions, and (5) PACA and reclamation claims settlement negotiations.

　　a. <u>Footprint Downsizing:</u>  The footprint reduction is now largely complete, on time and on budget.  In fact, the inventory going-out-of-business ("GOB") sale portion of the project was completed 2 weeks ahead of schedule, which provided for additional cost savings to the estate.  This result was achieved through strong leadership combined with communication and cooperation throughout the entire organization from finance to supply chain, real estate to merchandising.

　　b. <u>Headquarters and Divisional Realignment:</u>  The headquarters and divisional realignment process included an analysis of uneconomic IT leases, which represent over 25% of the Company's total IT leasing costs.  Based on its analysis, XRoads was able to renegotiate the primary IT contract resulting in an estimated savings of over $11.0 million in FY 2006.

　　c. <u>Non-merchandise Cost Reductions and Outsourcing:</u>  XRoads strategic sourcing group continues to pursue alternative sourcing opportunities in 8 indirect overhead categories resulting in the identification of approximately $2.9 million of savings.  In order to track sourcing savings and the soft benefits, XRoads designed a scorecard system and trained Winn-Dixie's staff in the use of these tools.  A second phase of sourcing is under way with targeted supplemental savings of approximately $9 million dollars.

　　d. <u>Real Estate and Occupancy Cost Reductions:</u>  During this Application Period, XRoads real estate group has completed the rejection of 181 leases (with creditor committee and court approval), resulting in the reduction of the monthly lease payments by approximately $5.0 million and reduction of total lease liabilities by approximately $451 million.  In addition, XRoads managed the lease disposition process, including negotiations with landlords, equipment sales, the orderly closure of stores and the GOB process.  To date, this has resulted in the sale of 81 stores to grocery operators and the liquidation of 245 stores. Proceeds from enterprise store sales were approximately $75 million and net proceeds from the liquidation were approximately $136 million.  XRoads also oversaw the removal and retention of

approximately 200,000 pounds of Freon from 125 stores valued at approximately $750,000 - $1,000,000 resulting in a dollar for dollar savings against the FY 06 Freon budget. This project is believed to be the largest Freon-removal ever implemented.

e. <u>PACA and Reclamation Claims Settlement:</u>  XRoads completed the analysis, reconciliation, negotiation and payment of 127 claims totaling approximately $34 million. XRoads assisted the Debtors' in settling the disputed claims saving the estate roughly $4.0 million. XRoads also reconciled over 480 Reclamation Claims totaling more than $129 million[3] and participated in the negotiations regarding the treatment of the reclamation claims, which resulted in court approval for the Trade Lien Program. The key features of the Trade Lien Program include payment of an allowed reclamation claim over 9 months beginning September 30, 2005 and the restoration of trade terms by the vendors to the Company. To date, the vendors who have opted in to this program have restored over $113 million in trade credit to the Company which has had a significant impact on cash flow and borrowing requirements.

**ROLES AND RESPONSIBILITIES OF THE CROSS-FUNCTIONAL TEAMS**

13. XRoads established cross-functional teams to oversee and manage the initiatives outlined above. XRoads' teams include: (1) real estate planning and management, (2) treasury and finance, which covers vendor management, cash management and financial reporting and lender communications, (3) strategic advisory, (4) procurement/strategic sourcing, and (5) case management services. These activities of the cross-functional teams and initiatives are discussed in more detail below.

a. <u>Real Estate Management:</u>  XRoads is tasked with reducing occupancy costs and cash outflows and maximizing asset recoveries from stores, warehouses, distribution centers, aircraft and manufacturing facilities throughout the organization. In addition, XRoads is managing the lease disposition process, including negotiations with landlords, equipment sales, the orderly closure of stores and the GOB process. XRoads developed and implemented a work-plan and timeline for store dispositions including coordination between functional areas of Debtors to ensure that disposition proceeds are maximized and that other

---

[3] XRoads identified merchandise delivered outside of the reclamation window which produced a reduction in reclamation claims of approximately 21% (or $27 million). This process also included researching inventory turn rates to develop a strategy for negotiating the consumption offset, and analyzing other setoffs to the reclamation demands.

6

        goals of the Debtors are met. XRoads negotiated all liquidation agreements and conducted the auctions for lease interests, pharmacy assets, and manufacturing / distribution equipment. XRoads also established a due diligence data site for potential purchasers of leases, and improved the quality and accuracy of the Company's real property database in order to produce a comprehensive and timely reporting tool for internal and external constituencies.

b.    <u>Treasury and Finance:</u>  A XRoads team member continues to be the acting head of this department for the Debtor. This XRoads team is responsible for cash management, borrowing base computations, covenant reporting and forecasting.  In addition to the credit facility reporting requirements, the financial reporting is a key piece of the Debtors' external communications to creditors and lenders.  Working with the Company, XRoads developed the 12-week rolling cash flow model which allows the Debtors to forecast and monitor weekly revenue and disbursements by category and track its overall cash burn rate.  During this Application Period, XRoads turned over the maintenance and updating of the cash flow forecast to the Company's finance department, however, the Company asked XRoads to assist with an emergency update to the 12 week cash forecast needed to address the immediate and mid-term impact to cash caused by hurricane Katrina. The XRoads team continues to support the Company's cash management, borrowing base computations, covenant reporting and forecasting and serves in a liaison role working with the DIP bank agent and the financial advisors to the UCC regarding cash performance, asset sale and disposition analysis, and variance analysis requirements.

c.    <u>Strategy and Advisory:</u>  This XRoads team integrates the information provided by other XRoads groups and the Company to develop strategic alternatives and recommendations. Specifically, this team advised the Company, along with its other advisors, with respect to the evaluation of offers for the Debtors' various manufacturing facilities. This advice included addressing operational matters related to the sales; preparing sensitivity analyses of the facilities operations for purposes of evaluating the proposals; preparing liquidation analyses for each facility; and providing coordination to the equipment liquidation process such that all excess equipment could be liquidated in the most efficient matter. XRoads worked closely with Blackstone and the Company's internal and external legal counsel in this effort and

      divided responsibilities in advance in order to minimize costs. The team manages the coordination, communication and analysis in support of the strategic and tactical advice given to the Company as it relates to store closing decisions, development of financial projections, management of the interface between the Unsecured Creditors' Committee and the Debtors as well as various other bankruptcy and restructuring related matters as more fully described below.

d. <u>Procurement/Strategic Sourcing:</u>  A XRoads team member continues to be the acting leader of this function for the Debtor. During this Application Period, the XRoads team began the execution of a strategic sourcing program for 8 indirect overhead categories resulting in the identification of approximately $2.9 million of savings. XRoads continued training the Company's personnel and provided one-on-one coaching on initiative-specific activities. In order to effectuate a sustainable program, XRoads developed a standard set of tools and templates to facilitate industry analysis, supplier research, RFP creation, negotiation execution, and savings tracking. XRoads also restructured the purchasing department through job eliminations and department realignment, drafted new job descriptions and skill requirements and conducted the hiring process to fill the new departmental organization. XRoads also reviewed surety bonding requirements and was heavily involved in the negotiations for an expanded surety line of credit with the incumbent provider. When complete, the surety line has the potential to generate $7 to 15 million of additional liquidity.

e. <u>Case Management Services:</u>  In addition to the work done by this team on the PACA and Reclamation Claims, XRoads analyzed the Company's executory contracts to provide the procurement group with information on potential leverage/input points for their negotiations. XRoads initially identified over 2,900 contracts which XRoads abstracted and entered into a database, creating a single centralized database for the debtors. Taking control of the contract database, and identifying and inputting key variables for each contract, facilitated the assessment of the contracts to determine the affect of the footprint redesign on the leases and contracts and the ability to use the bankruptcy process to legally eliminate unproductive contracts. In addition to the contract rejection process, this information has also been critical to the claims reconciliation process and computation of cure payments. XRoads has gathered

and analyzed essential contract-related information required for the life of the bankruptcy case in a single review, rather than an expensive, piecemeal approach. XRoads created (through imaging and tracking numbers) a permanent repository of contracts that can be immediately accessed, reducing unnecessary time spent looking for documents, as well as administrative costs of assembling files and documents. .

## THE SECOND INTERIM APPLICATION

14. For the Second Interim Application Period beginning May 29, 2005 and ending October 1, 2005, XRoads incurred professional and non-professional fees of $5,984,350.00 and expenses of $374,713.55 for a total of $6,359,063.55. XRoads has received payment in the amount of $3,537,181.20 for professional fees (approximately 80% fees) and $282,555.65 for expenses (100% expenses) for a total of $3,819,736.85 for the period of May 29, 2005 through October 1, 2005. Accordingly, XRoads requests an interim allowance of compensation for professional services XRoads rendered to the Debtors' for the period May 29, 2005 to October 1, 2005 in the amount of $6,359,063.55 and payment for the balance of the 20% holdback for May 29, 2005 through October 1, 2005 totaling $2,539,326.70.

15. XRoads seeks approval of the fees and expenses incurred during the Application Period in the amounts as summarized in the following table:

| Monthly Statements | Capped Fees to 400 hours | Fees over 400 Hours @ $400 per hr | Admin Fees | Total Fees | Expenses | Total Fees & Expenses | Payments 80% Fees – 100% Exp |
|---|---|---|---|---|---|---|---|
| June, 2005 | $200,000.00 | $1,404,520.00 | $58,842.50 | $1,663,362.50 | $106,822.89 | $1,770,185.39 | $ 1,437,870.49 |
| July, 2005 | $200,000.00 | $1,146,200.00 | $68,162.50 | $1,414,362.50 | $ 90,436.97 | $1,504,799.47 | $ 1,221,926.97 |
| August, 2005 | $200,000.00 | $1,098,160.00 | $42,424.50 | $1,340,584.50 | $ 85,295.79 | $1,425,880.29 | $ 1,159,939.39 |
| September, 2005 | $200,000.00 | $1,298,360.00 | $67,680.50 | $1,566,040.50 | $ 92,157.90 | $1,658,198.40 | $ 0.00 |
| Totals | $800,000.00 | $4,947,240.00 | $237,110.00 | $5,984,350.00 | $374,713.55 | $6,359,063.55 | $3,819,736.85 |
| Amount Due for 2nd Interim Period | | | | | | | $2,539,326.70 |

16. The professional services and related expenses for which XRoads requests an interim allowance of compensation and reimbursement of expenses were rendered and incurred in connection with this case in the discharge of XRoads' professional responsibilities as financial and operations restructuring consultants for the Debtors in these Chapter 11 cases. XRoads' services have been substantial, necessary and beneficial to the Debtors and their estates, creditors and other parties-in-interest. The variety and complexity of issues

9

involved in this case and the need to act or respond on an expedited basis to those issues have required substantial time on a daily basis.

17. XRoads has maintained written records of the time expended by its professionals and staff in this case as required in the Middle District of Florida. Time records are maintained contemporaneously with the rendering of services by each of XRoads' professionals and staff in the ordinary course of business. Such records set forth in detail the services rendered on behalf of the Debtors, the dates upon which services were rendered, the nature of the services, the time spent and the identity of the professional or staff who performed such services during the Second Interim Application Period, and are annexed hereto as Exhibits 3 to 5. A schedule setting forth the number of hours expended by the individual professional and staff personnel during the Second Interim Application Period are annexed hereto as Exhibit 3.

## SUMMARY OF SERVICES RENDERED

18. During the Second Interim Application Period, XRoads provided extensive services to the Debtors in furtherance of XRoads' professional responsibilities as financial and operations restructuring consultants. Moreover, the number of hours expended by XRoads' professionals and staff were actual, necessary and beneficial to the Debtors. XRoads encountered numerous complex financial advisory, restructuring and case management issues during the Application Period. XRoads was called upon to respond, often upon very short notice, to a host of issues and demands. XRoads professionals have rendered advice in all of these areas with skill and great dispatch. The single most important factor this Court should consider when determining Applicant's allowance in these proceedings is the value of XRoads' services as measured by the results obtained. XRoads can show that the work it is performing in these bankruptcy cases is beneficial to the Debtors. The full breadth of XRoads services are reflected in the attached XRoads time records, and annexed hereto as Exhibit "5".

19. The following summary of services rendered during the Application Period is not intended to be a detailed description of the work performed, as those day-to-day services and the time expended in performing such services are more fully available by reviewing Exhibit "5". Rather, it is merely an attempt to highlight certain of those areas in which services were rendered to the Debtors, as well as to identify some of the issues that XRoads was required to address. XRoads has attempted to place the services it has provided to the Debtor in the particular category that best relates to such services. However, because certain services may relate to one or more categories, services pertaining to one category may be included in another category.

A. **ACCOUNTING (75.40 hours):** This billing category includes accounting work done by the XRoads' treasury and finance team in their work on cash management, borrowing base computations, covenant reporting and forecasting.

B. **ASSET ANALYSIS (22.20 hours):** This billing category includes analysis done by XRoads' real estate group to evaluate asset recoveries from stores, warehouses, distribution centers, aircraft and manufacturing facilities throughout the organization and make recommendations to Debtors' and the Court in order to maximize value to the estate.

C. **ASSET SALE (2,537.60 hours):** This billing category includes time spent on the inventory GOB sale process and well as the sale of on-going store operations and overseeing the closing of all of the sales approved by the Court. As outlined above, these sales generated over $144.0 million in liquidation proceeds and the reduction of lease liabilities exceeding $489.0 million.

D. **BUSINESS ANALYSIS (4,524.80 hours):** This is the largest billing category and includes work done by all of the cross-functional teams described above including: modeling and cash flow analyses done by the treasury and finance team, analysis of real property leases done by the real estate group, preparation of the business plan and analysis of alternative scenarios done by the strategic planning team and analysis of other contracts and vendor agreements done by the procurement group.

E. **BUSINESS OPERATIONS (2,654.70 hours):** This billing category includes Xroads involvement in the management of on-going day-to-day operations of the Debtors' business. A large portion of the time in this category has been incurred by the real estate team, who have essentially been running the Debtors' real estate department after the departure of several senior level real estate executives. This also includes work being done by the treasury group in the collection of accounts receivable and the strategic planning group in areas such as merchandising, KERP negotiations and vendor communications.

F. **CASE ADMINISTRATION (170.60 hours):** This billing category includes communications between the cross-functional teams to ensure that critical tasks are identified and coordinated as the reorganization initiatives are implemented.

G. **CLAIMS (1,596.80 hours):** This billing category includes all of the work described above on the PACA Claims reconciliation and preparation of the PACA report as well as the Reclamation Claims analysis, reconciliation and negotiation. As outlined above, the work done by Xroads on the PACA claims has saved the estate approximately $4 million, and the work done on the reclamation claims may produce a reclassification of close to $30 million from an administrative claim to a general unsecured claim, which could have a significant impact on the Debtors' cash flow and its ability to emerge from the chapter 11. This billing category also includes all of the time spent by XRoads negotiating with trade vendors and exchanging documents to complete the process of opting into the Trade Lien Program. To date, over 215 vendors have opted into this program providing additional liquidity estimated at $113.0 million.

H. **CORPORATE FINANCE (37.50 hours):** This billing category includes executive level meetings to discuss the analysis of various restructuring options and their impact on the exit strategy.

I. **CREDITOR MEETING (104.60 hours):** This billing category not only includes the time spent at meetings with creditors, but the preparation for those meetings including the presentations for the Unsecured Creditor's Committee and the Bank Group. It also includes meetings with the ad hoc committee representing the Reclamation Claimants.

J. **FEE APPLICATION (31.80 hours):** This billing category includes the preparation of the First Interim Fee Application, the narrative sections of the monthly fee statements as well as a portion of the accounting work done by Xroads' billing department to prepare and file the monthly fee statements.

K. **HURRICANE KATRINA (166.70 HOURS):** This billing category was established following the August 29, 2005 hurricane which not only caused extensive property damage, but also a significant disruption to the Company's business operations. This category is intended to capture additional hours that were incurred as a direct result of

hurricane Katrina. As outlined above, the majorty of the time was incurred by the real estate team, but the hurricane also created additional work for the treasury and finance team as they re-worked all of the forecasts and financial projections and on the strategy and advisory team as it impacted the Company's options moving forward.

L. **LITIGATION (15.20 hours):** This category includes the time incurred by XRoads working with the Company's legal department to settle pending litigation and analyze the impact of on-going litigation on the Company's claims pool.

M. **OPERATIONS IMPROVEMENT (1,963.80 hours):** This category captures the time incurred by XRoads strategic sourcing (vendor management) team to identify and effectuate overhead cost savings. As outlined above, this team is already responsible for reducing the Debtors' IT costs by over $11.0 million in FYE 2006, and has identified other cost savings that will continue to reduce the Company's overhead as they are implemented.

N. **PLAN (17.10 hours):** This billing category includes time spent by XRoads on the initial planning and analysis of options for the Plan of Reorganization. As the case moves into the next phase, we expect the hours billed to categories such as asset sales to decline, as the time spent on the Plan of Reorganization increases.

O. **TAX (49.30 hours):** This billing category includes time incurred by XRoads in connection with the analysis of the Company's tax liabilities and identification of strategies for reducing the tax liabilities through reassessment as well as footprint reductions.

## SUMMARY OF EXPENSES REQUESTED

20. Applicant seeks reimbursement for actual, necessary expenses (the "Expenses") incurred in rendering services during the Second Fee Application Period. The total amount of the Expenses is $374,713.55.

21. Section 330 of the Bankruptcy Code authorizes "reimbursement for actual, necessary expenses" incurred by a professional person employed by the Debtors. Attached hereto as Exhibit "6" is XRoads' complete expense records, in chronological order, by activity code for the time period covered in this Application.

22. The following is a brief cost summary as to the different types of expenses for which XRoads is seeking reimbursement:

    A.    <u>Airfare</u>: All of XRoads professionals flew coach fare and booked flights in advance, whenever necessary and possible, to reduce costs for the Debtors. In this case, XRoads incurred airfare charges of $188,673.31 during the Application Period on behalf of the Debtors.

    B.    <u>Ground</u>: XRoads incurred the sum of $47,042.08 in ground transportation charges including car rentals, gas, taxi, mileage, parking and tolls. XRoads' policy for car rentals is that whenever possible, XRoads' professionals share rental cars to lower the cost of car per person. For the period May 29, 2005, through October 1, 2005, the total cost for rental cars was $49,609.38. XRoads voluntarily discounted the cost for the rental car expense in the amount of $27,429.32 to lower the car usage per professional to a ratio of 1:3. In addition, XRoads' voluntarily discounted transportation to/from residence to the airport (capped at $35.00) and travel from the hotel to the Company's office (capped at $40.00) for ground transportation costs.

    C.    <u>Lodging</u>: XRoads entered into several short term apartment lease agreements to offset the cost of hotel charges to the estate. XRoads conducted an analysis of the cost of hotel rates versus the cost of apartments. The study indicated the estate would benefit if XRoads professionals reduced hotel stays and took apartments. The actual effect is a savings realized in the amount of $65,846 to the estate for this Application Period. XRoads incurred total apartment costs in the amount of $93,556.14 for the months of June through September, 2005. This amount is for 1220 night stays or a daily average lodging cost of $76.69. Numerous XRoads professionals "doubled up" to reduce lodging costs to the estate. In the event that XRoads professionals are not assigned to an apartment or one was not available, whenever possible, XRoads negotiated corporate rates to reduce the cost of lodging, however, hotel rates do fluctuate based on availability at the time of reservation. XRoads incurred total hotel expenses in the amount of $16,598.18

        for the period May 29, 2005 through October 1, 2005. This amount is for 121 night stays or a daily average lodging cost of $137.00. The total amount of lodging expenses incurred for the period May 29, 2005 through October 1, 2005 is $110,154.32.

    D.    <u>Meals</u>: XRoads incurred the sum of $56,091.39 in meal charges while traveling to and from and working at Company's offices, however, these meal charges were not billed to the Debtors. Pursuant to the Bankruptcy Guidelines, XRoads did not charge the Debtors for breakfast, lunch or dinner unless XRoads was participating, during the meal, in a necessary meeting respecting the case. XRoads has only billed the sum of $2,475.35 in accordance with the Bankruptcy Guidelines.

    E.    <u>Telephone</u>: XRoads incurred the sum of $10,321.57 in telephone charges related to this case.

    F.    <u>Federal Express</u>: XRoads incurred the sum of $2,891.60 in Federal Express charges directly related to this case and required by the circumstances.

    G.    <u>Facsimile Charges</u>: XRoads incurred the sum of $61.50 in facsimile charges directly related to this case.

    H.    <u>Photocopy Charges</u>: XRoads incurred the sum of $10,697.85 in photocopy charges directly related to this case.

23.    Applicant maintains the following policies with respect to Expenses:

    a.    No amortization of the cost of any investment, equipment, or capital outlay is included in the Expenses.

    b.    Applicant uses FedEx or similar express mail delivery only for emergency or exigent circumstances (<u>i.e.</u>, when next-day response from the recipient was necessary) and when less costly than other available alternatives in light of the time constraints involved.

    c.    In-house photocopying by Applicant is charged at $.15 per page. To the extent practicable, Applicant generally uses and will continue to use less expensive, outside copying services.

    d.    All expenses for which Applicant seeks reimbursement are of the kind, and at the least expensive rate, Applicant customarily charges nonbankruptcy/insolvency clients.

  e. All amounts paid to third party providers of goods and services are billed by Applicant at actual cost, without enhancements for handling or other administrative charges.

  f. No portion of the expenses represent secretarial time, secretarial overtime, word processing time, charges for after-hour and/or weekend air conditioning and other utilities, cost of meals or transportation provided to professionals and staff who work late or on weekends or other office overhead.

  g. Any and all automotive travel expenses are billed in accordance with the amount allowed by the Internal Revenue Service pursuant to IRC §274(d) and the current applicable I.R.B. Announcement.

## LEGAL ARGUMENT

24. XRoads believes that the requested fee amount of $5,984,350.00 for 15,748.60 hours worked, is reasonable considering the twelve factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), made applicable to bankruptcy proceedings by In re *First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977), as follows:

### TIME AND LABOR REQUIRED

25. Applicant's professionals rendered a total of 15,748.60 hours of services on behalf of the Debtors during the Applicable Period. The time expended and expenses incurred were necessary, reasonable and appropriate under the circumstances of these cases based on the complex and time sensitive matters addressed.

### THE NOVELTY AND DIFFICULTY OF THE SERVICE

26. Applicant represents and would demonstrate to this Court that its role as financial and operations restructuring consultants to the Debtors' in these cases has involved significant sophistication and expertise.

### THE SKILL REQUISITE TO PERFORM THE SERVICES PROPERLY

27. Due to the nature of the financial and operating issues presented in these cases, a relatively high degree of skill is required by Applicant in its representation of the Debtors. Applicant's experience and expertise is facilitating and expediting the results being achieved in these cases, without incurring the extra time and expense had less experienced financial advisors handled these matters.

28. Admittedly, the criterion of "the skill requisite to perform the services properly" is a subjective standard. XRoads submits that the paramount factor that the Court should consider in applying this standard, however, is whether the results being achieved by Applicant are beneficial to the estates. Applicant believes that the answer to such a query justifies allowance of the fees and costs requested in this Application.

## THE PRECLUSION OF OTHER EMPLOYMENT BY THE PROFESSIONAL
## DUE TO THE ACCEPTANCE OF THE CASE

29.   Due to the expedited manner in which these cases are being handled, work on other clients and matters were often deferred or delayed as a result.

## THE CUSTOMARY FEE

30.   Applicant represents and would demonstrate that the rates charged by Applicant for the services performed herein are competitive and customary for the degree of skill and expertise required in the performance of similar services rendered by other experienced financial advisors in bankruptcy matters and in the Middle District of Florida.

## WHETHER THE FEE IS FIXED OR CONTINGENT

31.   Applicant's fee is neither fixed nor contingent (other than the contingency of court-allowance and available assets to pay professionals).  It is based primarily upon the actual total number of hours worked, plus the actual costs incurred.

## TIME LIMITATIONS IMPOSED BY THE CLIENT
## OR OTHER CIRCUMSTANCES

32.   Throughout these bankruptcy cases and XRoads' involvement herein, there were many expedited hearings.  Because of the size and complexity of this case, in many instances, XRoads has assisted the Debtors' and Debtors' counsel in preparing for multiple hearings covering a wide range of issues impacting many constituencies heard on the same day resulting in increased time constraints placed upon Applicant to effectively represent the Debtors' interests herein.

## EXPERIENCE, REPUTATION AND ABILITY OF APPLICANT

33.   The professionals who provided services on behalf of Applicant in this case are thoroughly experienced in all matters of bankruptcy, insolvency, and reorganization.  The ability of XRoads' professionals who have assisted the Debtors should be considered by this Court in measuring the results obtained.

## THE UNDESIRABILITY OF THE CASE

34.   The uncertainty of success or payment for services rendered, or for reimbursement of out-of-pocket expenses incurred in this case, could cause this case to be considered undesirable.  Notwithstanding

the difficulties imposed by the uncertainty of payment, Applicant was nevertheless willing to undertake these risks.

## THE NATURE AND LENGTH OF THE PROFESSIONAL RELATIONSHIP WITH THE CLIENT

35. Applicant has been employed by the Debtors since the Court's entry of its Employment Order, effective February 21, 2005. None of the members of the Debtors are members of Applicant, and Applicant has not agreed to share any fees received in the Bankruptcy Case with anyone other than members of Applicant.

## AWARDS IN SIMILAR CASES

36. Applicant represents and would demonstrate that the compensation sought in connection with the services rendered and expenses incurred in these cases is not excessive and is commensurate with the compensation sought or awarded in similar cases under the Bankruptcy Code. The amounts sought in this Application are based in part on the usual and customary hourly rates which Applicant charges other clients in similar matters. Applicant routinely scrutinizes its bills to ensure that its fees are in compliance with the customary rates in this District and voluntarily writes off certain fees and all overhead expenses, including its use of counsel, secretarial overtime, after-hour utilities, tabs and binders, etc. Moreover, Applicant believes its billing rates are equivalent to or may even be less than those charged by other nationally recognized financial advisors in the bankruptcy community. Therefore, taking into consideration the time and labor spent, the nature and extent of the representation and the nature of this proceeding, Applicant believes the allowance prayed for herein is reasonable and just.

## REASONABLENESS OF XROADS' FEES

37. The general areas of focus in this stage of the case as described earlier in this Application are certainly not exhaustive of the variety or number of issues and problems encountered in connection with its role as financial and operations restructuring consultants herein. XRoads has been asked to assist, and represent the Debtors throughout these cases on time-consuming and difficult tasks. Many of the issues have arisen under exigent circumstances and have required XRoads to dedicate significant resources exclusively to these cases within a very compressed period of time.

38. XRoads represents and would demonstrate that the fees and expenses requested herein are not excessive and are, in its opinion, fair and reasonable in connection with the services provided by XRoads on behalf of the Debtors. The rates charged by XRoads are competitive and customary for the degree of skill and

expertise necessary for cases of this type and are consistent with, or below, rates charged by other nationally recognized financial advisors with similar experience in the Middle District of Florida.

39. XRoads would show that the work it has performed during the Application Period has been beneficial to the Debtors and its constituency as set forth above and in the Fee Statements attached hereto. Taking into consideration the time and labor spent, the nature and extent of the representation and the nature of these proceedings, XRoads believes the allowance prayed for herein is reasonable and just.

## **CONCLUSION**

40. For the foregoing reasons, XRoads requests approval and allowance of the interim compensation requested herein in connection with its representation of the Debtors during the Application Period, representing all fees in the amount of $5,984,350.00 (100%) and actual and necessary out-of-pocket expenses in the amount of $374,713.55 (100%), for a total of $6,359,063.55 incurred during the time period beginning May 29, 2005 through October 1, 2005.

WHEREFORE, PREMISES CONSIDERED, XRoads respectfully requests that, after appropriate notice and a hearing, this Court approve and allow the interim compensation and reimbursement of expenses incurred on behalf of the Debtors during the Application Period, as more particularly set forth above, authorize and direct the Debtors to remit payment of such allowed fees and reimbursement of costs to XRoads as approved by the Court, and grant such other and further relief to which it may show itself to be justly entitled.

Dated:  November 10, 2005                                    Respectfully submitted:

By:_____

Holly Felder Etlin
XRoads Solutions Group, LLC
9 Executive Circle, Suite 190
Irvine, CA   92614

FINANCIAL ADVISORS AND
OPERATIONS RESTRUCTURING
CONSULTANTS FOR THE DEBTORS

## CERTIFICATION

1.  I have been designated by Xroads Solutions Group, LLC (the "Applicant") as the professional with responsibility in this case for compliance with the "Guidelines for Fee Applications for Professionals in the Middle District of Florida in Bankruptcy Cases" (the Guidelines").

2.  I have read the Applicant's Application for Compensation and Reimbursement of Expenses (the "Application"). The Application complies with the Guidelines, and the fees and expenses sought fall within the guidelines, except as specifically noted in this Certification and described in the Application.

3.  The fees and expenses sought are billed at rates and in accordance with practices customarily employed by the Applicant and generally accepted by the Applicant's clients.

4.  In seeking reimbursement for the expenditures described on Exhibit "2", the Applicant is seeking reimbursement only for the actual expenditure and has not marked-up the actual cost to provide a profit or to recover the amortized cost of invstment in staff time or equiptment or capital outlay (except to the extent that the Applicant has elected to charge for in-house photocopies and outgoing facsimily transmissions at the maximum rates permitted by the Guidelines).

5.  In seeking reimbursement for any service provided by a third party, the Applicant is seeking reimbursement only for the amount actually paid by the Application to third party.

6.  The following are the variances with the provisions of the Guidelines, the date of each Court Order approving the variance, and the justification for the variance: <u>NONE</u>

Xroads Solutions Group, LLC

_____
Holly Felder Etlin
XRoads Solutions Group, LLC
9 Executive Circle, Suite 190
Irvine, CA   92614

FINANCIAL ADVISORS AND OPERATIONS
RESTRUCTURING CONSULTANTS FOR THE
DEBTORS