# LEASE

THIS LEASE, made this 1st day of May, 1996, between LAKE POINT CENTRE ASSOCIATES, LTD., a Florida limited partnership ("Landlord") and WINN-DIXIE STORES, INC., a Florida corporation ("Tenant"); which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

## WITNESSETH:

**PREMISES**

That Landlord, in consideration of the covenants of Tenant, does hereby lease and demise unto Tenant and Tenant hereby agrees to take and lease from Landlord, for the term hereinafter specified, the following described premises:

That certain store building, approximately 222 feet in width by 231 feet in depth, together with a front vestibule, rear receiving room and exterior concrete pads at rear of building for installation of Tenant's freezers and/or coolers, and the land on which the same shall stand (hereinafter collectively called "demised premises"), which store building and related improvements are to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided, and shall be in the location and the dimensions as outlined in red on the Plot Plan entitled "Winn-Dixie Store" prepared by Ashlar Architects, Inc., Coral Springs, Florida, dated June 9, 1995, last revised April 30, 1996, attached hereto marked Exhibit "A" and by reference made a part hereof.

The demised premises are located in a shopping center development (shown in detail on Exhibit "A"), known as Lake Point Centre ("shopping center"), located at the northeasterly corner of the intersection of Okeechobee Boulevard and Jog Road in the City of West Palm Beach, County of Palm Beach, State of Florida, the legal description of the shopping center being set forth on Exhibit "B" attached hereto and by this reference made a part hereof.

C:\TRANSFER\MIAMI\LAKEPNT\WESTPALM.NL
March 29, 1996

This instrument was prepared by Kim Rice Bongiovanni, Attorney-at-Law whose address is P. O. Box B, Jacksonville, Florida 32203

EXHIBIT "A"

**TERM**

**FOR TENANT TO HAVE AND TO HOLD** from the date when Tenant opens the demised premises for the transaction of its business for an initial term of twenty (20) years from the commencement date. The parties agree to execute a supplemental agreement documenting the commencement date.

This Lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

**RENTAL**

1. Tenant agrees to pay to Landlord as minimum guaranteed rental for the demised premises during years one (1) through ten (10) this Lease, the sum of Three Hundred Eighty-Seven Thousand Seven Hundred Seventy-Two and NO/100 Dollars ($ 387,772.00 ) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of Thirty-Two Thousand Three Hundred Fourteen and 37/100 Dollars ($ 32,314.37) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the term.

In addition, Tenant agrees to pay to Landlord a percentage rental equal to one percent (1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant ending approximately June 30 during the term of this Lease and any extensions thereof in excess of the sum of Thirty-Eight Million Seven Hundred Seventy-Seven Thousand Two Hundred and NO/100 Dollars ($38,777,200.00).

Tenant agrees to pay to Landlord as minimum guaranteed rental for the demised premises during the remainder of the initial lease term and any extension periods thereafter, if any, the sum of Four Hundred Thousand Six Hundred Ninety Eight and NO/100 Dollars ($400,698.00) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of Thirty-Three Thousand Three Hundred Ninety-One and 52/100 ($33,391.52) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the remaining lease term and any exercised option extension periods provided in this Lease.

In addition, Tenant agrees to pay to Landlord a percentage rental equal to one percent (1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant ending approximately June 30 during the term of this Lease and any extensions thereof in excess of the sum of Forty Million Sixty-Nine Thousand Eight Hundred and NO/100 Dollars ($40,069,800.00).

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the Lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of the percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculation the percentage rental due hereunder, Tenant's fiscal year shall be approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the Lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINITION OF "GROSS SALES"**

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold in or from the demised premises, both for cash and on credit. Such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency however, franchise, occupancy or corporate stock tax or income or similar tax based on profits shall not be deductible from gross sales; (2) transfers of merchandise made by Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in

connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises

**RECORD OF SALES**

1b. Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by Tenant at the office address designated for notices At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable, Tenant shall submit to Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year Such statement of sales shall be treated as confidential by Landlord and shall be conclusive unless Landlord, within six (6) months after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by Landlord In the event such an audit reveals an understatement by Tenant in its gross sales made by Tenant from the demised premises during the preceding fiscal year in excess of three percent (3%) then, in such event, Tenant shall pay the cost of such audit. Otherwise, Landlord shall bear the cost thereof.

**USE**

2 The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail or service business (including discount businesses). Landlord agrees that Tenant shall have the right in the shopping center to operate automatic fund transfer machines, a bank, a dry cleaner (any dry cleaning use will be limited to customer drop-off and pick-up, and Tenant will not perform dry cleaning at the Premises), a photo processing operation. Tenant shall have the right to operate a pharmacy in the shopping center, however, this shall not prevent Landlord from selling one (1) out-parcel or leasing space in the shopping center to a regional pharmacy, regional being defined as a chain of at least ten (10) stores in any state

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of the premises, as such shall relate to the cleanliness and use of the premises and the character and manner of operation of the business conducted in or at the premises and any improvements or alterations constructed by Tenant

**CONSTRUCTION OF SHOPPING CENTER**

3. Landlord at its sole cost and expense, shall undertake such construction of the shopping center substantially as shown on Exhibit "A", consisting of all the buildings shown thereon, together with all ramps, sidewalks, streets, entranceways, malls, parking areas, service areas, driveways, utility lines, water detention and retention facilities and related improvements, such improvements (excluding buildings) being sometimes hereinafter referred to as "common areas" Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the shopping center and Tenants and their employees during the term of this Lease and any extensions thereof. The arrangement and location of all store buildings and common areas (including parking area) within the shopping center shall at all times during the term of this Lease, or any extensions thereof, be maintained as shown on Exhibit "A" and shall not be substantially changed without the written consent of Tenant. The exterior of the shopping center (including any store buildings and the demised premises) shall not be materially modified without Tenant's prior written consent. Tenant shall be deemed to have approved Landlord's plans and specifications of the proposed exterior elevations if Tenant fails to notify Landlord of Tenant's disapproval of them (with written reasons for any disapproval) within thirty (30) days after receipt of same from Landlord. Tenant shall grant consent to the plans and specifications provided that the proposed exterior elevations will not materially and adversely affect the premises. If not shown on Exhibit "A", Tenant expressly reserves the right to approve the finish grade elevations of all store buildings and common areas (including parking and service areas) within the shopping center which are to be constructed concurrently with Tenant's store building

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to construct the store building for occupancy by Tenant in accordance with the plans and specifications to be approved by both Landlord and Tenant Tenant shall deliver guide plans and specifications within thirty (30) days from full execution of this Lease, and final approvals by both parties of the final plans and specifications shall occur no later than thirty (30) days from receipt of the final plans and specifications by Tenant from Landlord. Plans and specifications shall be approved when initialed by both parties, and when initialed shall

constitute a part of this Lease The plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job".

Landlord reserves the right, but shall not be required, to construct additional out-parcel buildings in the shopping center, provided, however, such out-parcel buildings shall be of like structural and architectural quality as the building for Tenant and must be only in the locations and of the dimensions shown on Exhibit "A" (identified as "Retail A", "Retail F", "Retail G", and "Gas Station"). Landlord agrees that Tenant shall have uninterrupted use and enjoyment of the demised premises and the shopping center common areas during any such additional construction without unreasonable interference therewith by reason of such construction work. Landlord agrees that all out-parcel building areas shall be sodded, maintained and kept free of debris by Landlord until such time as the out-parcel buildings are constructed

In the event Landlord should lease any portion within such out-parcels, or any part thereof and shall develop the same for the operation of retail and service businesses, it is agreed that Tenant's exclusive rights and the restriction on the same of food products as stated further in Articles 7 and 27 hereof shall apply to these out-parcels It is further agreed that Tenant, its successors and assigns, and the other occupants of the shopping center described herein, and their respective servants, agents, employees, customers, invitees, shall have reciprocal rights of user in all of the common areas constructed on such out-parcels with right of ingress and egress between such out-parcels and the development of the shopping center and, similarly, the occupants of the out-parcels and their respective servants, agents, employees, invitees shall have reciprocal rights of user in the common areas constructed within the shopping center described herein Further, in connection with the construction of any additional buildings in such out-parcels of land Landlord agrees to maintain at least minimum code requirement for parking so as to be self-sufficient or self-contained as to parking requirements, and Landlord shall also provide additional buildings with adequate service drives and areas. Further, should Landlord convey all or any portion of said out-parcels, Landlord agrees to provide in the Deed or other instrument of conveyance of the same restrictive covenants encumbering the out-parcels with Tenant's exclusive rights and restrictions on the sale of food products as set forth in Articles 7 and 27 of the within Lease, such covenants to run with the land

Finally, Landlord agrees that the out-parcel buildings shown on the plot plan shall not exceed twenty-four feet (24') in height

**COMPLETION DATE**

4. Landlord covenants and agrees that the construction of the shopping center shall begin not later than November 15, 1996 and shall be substantially completed not later than September 15, 1997; and if the same shall not be begun or completed by the respective dates, Tenant, at its option, may, in either of such events, cancel and terminate this Lease or may extend Landlord additional time for the beginning or completion of construction; provided, however, that if after the beginning of construction Landlord's failure to complete the improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than October 15, 1997 (the "outside completion date"), this option to terminate shall not arise It is further agreed that in the event Tenant initiates (at Tenant's sole request) any changes (except caused by errors and omissions) in the aforesaid plans and specifications, that increases Landlord's costs or delay the completion of the premises. Landlord shall be reimbursed for said costs and the time of completion shall be extended accordingly "Construction of the shopping center" shall be deemed to have begun upon the commencement of pouring of footers for the demised premises

**COMMENCEMENT DATE**

5. Tenant shall open its store for business within sixty (60) days following performance of the following:

(a) Tenant's store building and other improvements constructed on the premises shall have been delivered to Tenant completed in accordance with the plans and specifications and Landlord shall have delivered to Tenant, at Landlord's expense, a permanent or final Certificate of Occupancy for the demised store building;

(b) Construction of all of the common areas shall have been completed substantially as shown on Exhibit "A";

(c) All drives, entrances, median cuts, acceleration and deceleration lanes and traffic control devices shown on Exhibit "A" in or connecting the common areas to the

adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(d) Construction of at least 426 lineal feet of store frontage and 36,000 sq. ft. of total building area (excluding Tenant's store building) shall have been completed as shown on Exhibit "A";

(e) All the construction described in Article 3 hereof shall have been substantially completed; and

(f) The stores to be operated by the following tenants shall have been completed with firm commitments for leases or binding outparcel sales simultaneous with Tenant:

20,000 square feet of other tenant space (in-line), or, alternatively, a minimum 12,000 square feet in-line tenant space plus minimum 10,000 square feet outparcel building(s).

In the event that all the above requirements shall not have been met on or prior to the outside completion date, Tenant at its sole option may cancel and terminate this Lease.

Rent shall begin to accrue hereunder upon the date Tenant opens its store for business, or upon the expiration of sixty (60) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this Lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

Notwithstanding the other provisions of Articles 4 and 5 hereof, Landlord agrees that if for any reason the requirements of Article 5 are met by Landlord on or after December 15 of any year and on or before January 14 of the succeeding year, Tenant shall not be required to open its store for business and rent shall not begin to accrue until the later of January 15 of the succeeding year, or 30 days after the requirements of Article 5 are met, unless Tenant actually opens its store for business sooner.

**PARKING AND COMMON AREAS**

6. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this Lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks. Tenant may use the sidewalks adjacent to the demised premises or exterior surfaces of its building for the display and sale of merchandise and services.

Landlord shall at all times during the term of this Lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a) a minimum ratio of at least 4.26 automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in the shopping center, and

(b) facilities for convenient parking of at least 580 automobiles (minimum) and

(c) Landlord will maintain sufficient numbers of parking spaces in the shopping center to comply with local governmental requirements and will construct any additional spaces as may be necessary to comply with local governmental requirements in the event of the construction of an addition to Tenant's demised store building premises in the area reserved therefor on Exhibit "A" (see article 38 hereof). Further, Landlord agrees that there shall in no event ever be a reduction of Tenant's primary parking field of angled spaces as presently shown on Exhibit "A".

In the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, Tenant at its option shall have the right to terminate this Lease, unless Landlord has commenced and is diligently proceeding to cure, provided, that the termination of the Lease for such a default may be prevented and the Lease reinstated by Landlord

curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord at its expense during Tenant's food store shopping hours, and Landlord further agrees that no signboards or other construction shall be erected in any of the said common areas shown on Exhibit "A" or so as to unreasonably obstruct the view of the demised premises from the adjoining public streets. Without the prior written consent of Tenant herein, no carnivals, fairs or shows nor sales by merchants utilizing vehicles or booths in the common areas shall be allowed in the shopping center, or any enlargement thereof. However, nothing herein shall prohibit Landlord from allowing food service tenants to maintain outdoor tables and seating on the sidewalk adjacent to their premises, provided, however, there remains sufficient area for the flow of pedestrian traffic and such outdoor seating area should be no closer than 256 feet from Tenant's demised premises and limited to the south side of Tenant's demised premises.

**RETAIL AND SERVICE STORES ONLY**

7. Without the prior written consent of Tenant and Landlord herein only retail and/or service stores shall be allowed to operate in the shopping center, or any enlargement thereof, it being the intent of the parties hereto that no spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theatre (either motion or legitimate), modeling or photographic studio, billiard hall, processing or rendering plant other than Tenant's meat, seafood or other departments, warehouse, factory, manufacturing facility, carnival, meeting hall, massage parlor, flea market, sale of pornographic materials, sales of automobiles, medical business or professional offices, recreational or entertainment-type activities, non-retail or non-service type activities, shall be permitted. There shall be no pay telephone within one hundred feet (100') of the demised premises. Notwithstanding the foregoing, Landlord shall be allowed to lease space in the shopping center to a travel agency, insurance agency, medical, dental or optometrist offices, bank, or a "mailboxes/pack 'n ship outlet", so long as those uses are not within __130__ feet from the nearest point of the demised premises (pre-expansion), excepting one such use which may be closer provided it does not exceed 1,600 square feet in size. The aggregate square footage in the shopping center occupied by these uses shall not, however, exceed 20,000 square feet.

**SERVICE AREA**

8. Landlord agrees to provide for the exclusive use of Tenant at its service entrances parking spaces for two large trailer trucks for continuous use. Landlord further agrees that Tenant shall have 24-hour a day ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for its store into and from trucks and trailers at such service entrances, subject to all applicable deed restrictions and governmental laws and regulations.

**UTILITIES**

9. Tenant agrees to pay all charges for telephone, electricity, water, gas and other utilities and services used by Tenant at the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities sufficient to meet Tenant's requirements. Landlord is not responsible for nor is the Tenant entitled to abate rent should there be any stoppage in utilities through no fault of Landlord. Tenant shall not be responsible for any charges for static or flowing water to supply the fire sprinkler system, or any "hook up" fees or other charges incident to providing access to any utility.

**TENANT'S REPAIRS**

10. Upon completion of construction by Landlord and acceptance of the demised premises by Tenant, Tenant agrees to keep the interior of the demised premises in good condition and repair, excepting structural repairs and all repairs which are the responsibility of Landlord or which are made necessary by reason of fire or the elements or other casualty covered by Landlord's fire and extended coverage insurance, and excepting reasonable wear and tear.

Within such repair and maintenance responsibility of Tenant shall be included, automatic doors, door openers, air conditioning and heating systems and equipment, central alarm system, lighting fixtures and interior wiring to main circuit breakers, interior exposed plumbing and fixtures (including stoppages originating from Tenant), the floor surfacing, and windows and plate glass (except damage caused by faulty construction or settling of the building or such as is covered by Landlord's fire and extended coverage insurance, all of which should be Landlord's responsibility). Landlord shall accord to Tenant the benefit of any warranties extended by the manufacturers or installers of such items of equipment for which Tenant has the maintenance and repair responsibility.

**LANDLORD'S REPAIRS**

11. Landlord shall, at its cost and expense, keep and maintain, in good condition and repair, the common areas, the exterior of Tenant's store building, including the roof, gutter, downspouts, exterior painting, masonry walls, foundation and structural members, the automatic sprinkler system

the plumbing (including septic tank, if any, but excluding any interior exposed plumbing or plumbing fixtures) and wiring of the store building (but excluding lighting fixtures and interior wiring to the main circuit breakers) in good condition and repair, and shall make any and all structural repairs to both the exterior and interior of said premises. If any portion of the common areas (as defined in Article 3 hereof) or any portion of the store building, which is the responsibility of Landlord, shall at any time be in need of repair, Landlord will diligently proceed to repair upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements, or other casualty covered by Landlord's fire and extended coverage insurance

If in order to protect persons or property it shall be necessary to make emergency repairs which are the responsibility of Landlord, or if Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas, as defined in Article 3 hereof, which are the responsibility of Landlord, Tenant shall have the right to make such repairs and to request reimbursement from Landlord, and if Landlord fails to promptly reimburse Tenant, then Tenant may deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse Tenant for the money reasonably expended or expense incurred by it in making such repairs Notwithstanding the foregoing, before it offsets any self-help expenses from rent, Tenant shall provide Landlord with supporting backup documentation including paid receipts as reasonably required by Landlord Landlord further covenants that the store building will be so constructed and maintained at all times so as to structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any structural changes or alterations in the premises which may become necessary in order that the premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated, including, but not limited to, ADA requirements and all environmental compliance. Provided, however, the foregoing is not applicable to a material change of use by an assignee or subtenant which is not affiliated to Tenant

Landlord shall indemnify and save Tenant harmless from any claim, damage or loss resulting from Landlord's failure to comply with the ADA or with the environmental requirements, which indemnification shall survive the termination of this Lease

**SIGNS**

12. With the consent of Landlord, not to be unreasonably withheld or delayed, (it being contemplated that Landlord will accord its consent to signs usual in Tenant's business and limited and limited to Winn-Dixie as Tenant) and in conformity with applicable laws and ordinances, Tenant may place, erect and maintain any signs on the exterior walls, and any other places on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this Lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs Subject to prior approval of Tenant, not to be unreasonably withheld, Landlord agrees to erect and maintain, at its cost, two (2) electrically illuminated pylon signs at the primary entrances on Okeechobee Boulevard and Jog Road, in the locations shown on "Exhibit A", and of a maximum height and size as permitted by governing codes and Tenant shall have the right to install its sign panels thereon in the uppermost and more dominant presentation. Tenant shall, upon completion of such pylon signs and commencement of this Lease, reimburse to Landlord, Tenant's prorata contribution of the initial cost of such pylon signs, calculated on a square footage basis as to Tenant's occupancy of such signage, up to a maximum total reimbursement of $5,000.00.

**FIXTURES AND ALTERATIONS**

13. Tenant, at its own expense, shall have the right from time to time during the term of this Lease to make any interior or exterior alterations, additions and improvements, including doors and partitions, in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities This right of Tenant shall include the erection of interior partitions and the installation of additional front and rear doors All permanent structural improvements shall belong to Landlord and become a part of the premises upon termination or expiration of this Lease. Tenant shall obtain Landlord's prior written approval which shall not be unreasonably withheld or delayed before it makes any material exterior alterations, additions and/or improvements

Tenant may construct and build or install in the premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in

Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of Tenant, and Tenant shall have the right to remove all or any part of the same from said premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to the premises resulting from the installation or removal of such items. Tenant shall, if required by Landlord, remove all of its racks, counters, shelves and other fixtures and equipment from the demised premises upon expiration or other termination of this Lease, and repair any damage resulting from such removal.

In connection with any such work performed by Tenant or in connection with any repair and maintenance performed by Tenant pursuant to its obligations set forth in this Lease, Tenant shall indemnify Landlord and save Landlord harmless from and against: all mechanics'; materialmens', subcontractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Tenant, Tenant's contractors, subcontractors or by any of their employees, agents or servants during the progress of the work in performing such construction items, maintenance or repairs or from any faulty construction or work in connection therewith

**INDEMNIFICATION**

14. Tenant agrees to indemnify and save harmless Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises unless due to Landlord's negligence. Tenant also agrees to indemnify and save harmless Landlord from any claim or loss by reason of an accident or damage to any person or property arising in connection with Tenant's actual use of areas and sidewalks adjacent to the demised premises arising solely from Tenant's own negligence; provided, however, that parking by Tenant's invitees in parking areas of the shopping center shall not be deemed Tenant's use for purposes of the indemnification contemplated by this sentence, nor shall any accident or damage arising from the negligence of any other party, including Landlord or Tenant's customers or invitees. Likewise, Landlord shall indemnify and save harmless Tenant from any claim or loss unless due to Tenant's negligence (including costs of investigation, court costs and reasonable attorney's fees) by reason of an accident or damage to any person or property happening on or about all common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, comprehensive general liability insurance coverage with Tenant named as an additional insured on all common areas (as defined in Article 3 hereof) of the shopping center, in a company qualified to transact business in the state where the premises are located, stipulating limits of liability of not less than $2,000,000.00. Certificate of such coverage from the insurer providing 30 days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant

During the term of this Lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of the premiums for Landlord's liability insurance above described. Tenant shall be responsible for its prorata share of such premiums, Tenant's prorata share to be an apportionment made in the ratio which the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floor of all buildings from time to time existing in the shopping center. The amount of premiums for which Tenant is to reimburse Landlord shall be less any available abatements, discounts or refunds thereon. Landlord shall at all times use its commercially reasonable and earnest efforts to obtain such coverage at the most reasonable rates available. Tenant shall be entitled to receive from the Landlord copies of the statements for such insurance premiums. Notwithstanding the above, it is agreed that Tenant's obligations to make the payments herein described is expressly conditioned upon receipt from Landlord of the written invoice for such insurance premiums no later than six (6) months after the due date thereof. Further, Tenant shall not be required to make the payments herein described unless and until Tenant is furnished with photocopies of the applicable insurance policy to include the declaration page.

**CLEANLINESS**

15. Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the delivery areas, waste and grease storage, dumpster, and cardboard compactor areas at the rear of the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the demised premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers

**FIRE**

16. In the event that Tenant's demised premises shall be totally destroyed or damaged to the extent of 75% or more of the value thereof by fire or other casualty, Landlord will be required to promptly commence repairs and reconstruction and will complete restoration within a reasonable period of time not to exceed one (1) year, except if longer is necessitated by an act of God. If

Tenant's demised premises shall thereby suffer damage to any extent less than 75% of the value thereof, or if Tenant does not elect to terminate as aforesaid, then Landlord agrees to proceed promptly and without expense to Tenant to repair the damage or restore the improvements, remitting a fair and just portion of the rent, according to the unusable space, until said premises are completely reinstated or restored. If at any time during the term of this Lease or any extensions thereof any of the buildings in the shopping center, exclusive of Tenant's demised premises, are damaged by fire or by the elements or otherwise, Landlord shall immediately commence and diligently prosecute to completion repair of all such damage and shall restore said improvements to their condition prior to such damage. Landlord shall not be obligated to rebuild casualty exceeding fifty percent (50%) or more of the value of the demised premises which occurs during the last three (3) years of the lease term

Landlord shall carry fire and extended coverage insurance on Tenant's demised premises and any additions, alterations and improvements made thereto by Landlord or Tenant and on all other buildings within the shopping center in the amount of full insurable value thereof, above foundation walls, and hereby expressly waives any and all claims against Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

During the term of this Lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of the premiums for Landlord's fire and extended coverage insurance allocable to the demised premises. If such premiums shall not be billed separately upon Tenant's demised store premises the same shall be fairly apportioned to determine Tenant's share thereof. Such apportionment shall be made in the ratio which the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floor of all buildings from time to time existing in the shopping center. The amount of premiums for which Tenant is to reimburse Landlord shall be less any abatements, discounts or refunds actually received thereon. Landlord shall at all times use its earnest and commercially reasonable efforts to obtain such fire and extended coverage insurance at the most reasonable rates available. Tenant shall be entitled to receive from Landlord copies of the statements for such insurance premiums. Notwithstanding the above, it is agreed that Tenant's obligations to make the payments herein described is expressly conditioned upon receipt from Landlord of the written invoice for such insurance premiums no later than six (6) months after the due date thereof. Further, Tenant shall not be required to make the payments herein described unless and until Tenant is furnished with photocopies of the applicable insurance policy to include the declaration page. Payment of additional rent due under this Section shall be due and payable within sixty (60) days from the date received by Tenant provided the backup invoice is included

Any additional rental payable hereunder by Tenant may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due hereunder, it being intended that such credit shall be made annually in respect of the insurance premiums for the previous lease year at the time percentage rentals are payable, but if there shall not be any percentage rentals due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional and fractional months occurring at the beginning and end of the lease term or any extensions thereof shall be pro-rated on the basis of the annual credit

**QUIET ENJOYMENT**

17 Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that Landlord has full right and power to execute and perform this Lease and to grant the estate demised herein; and that Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this Lease and any extensions thereof. (but see Article 28 hereof.)

Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a mercantile, retail or service business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this Lease, preventing or restricting Tenant from conducting a mercantile, retail or service business or using the common areas (as defined in Article 3 hereof) in conjunction therewith, Tenant at its option may terminate this Lease and shall stand released of and from all further liability hereunder

**TAXES AND LIENS**

18 All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by Landlord prior to delinquency. Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of Landlord which may threaten its enjoyment of the demised premises, and if it does so it shall be subrogated to all rights of the obligee against Landlord or the demised premises or both and shall be reimbursed by Landlord for resulting reasonable expenses and disbursements, together with interest thereon at the maximum rate allowed by law. This paragraph shall be inapplicable to liens arising by or through Tenant Unless an earlier notice period is necessary in order to avert any threat to Tenant's enjoyment of the demised premises, Landlord shall be afforded a sixty (60) day notice and cure period before Tenant will be entitled to satisfy the lien or encumbrance

**CONDEMNATION**

19. If any part of the demised premises or more than twenty percent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to termination of this Lease at its option (under the conditions set forth in Article 3 hereof) and any unearned rent or other charges paid in advance shall be refunded to Tenant In the event Tenant does not elect to terminate this Lease, Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements out of the condemnation proceeds, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the Lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of ten percent (10%), Tenant may, at its option, terminate this Lease and shall be liable for rent only up to the time of such taking

**DEFAULT**

20. In the event Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from Landlord to pay such rent or to cure such violation or failure, then, in any such event, Landlord, at its option, may either (a) terminate this Lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default The enumerations of remedies herein above shall in no way restrict the right of Landlord to pursue any other remedies permitted under the laws of the state of Florida The enumeration of remedies hereinabove shall in no way restrict the right of Landlord to pursue any other remedies permitted under the laws of Florida nor to charge interest to Tenant on past due rentals at the highest rate allowed by law

As used in this paragraph, rent includes all charges which are payable by the Tenant under this Lease. If Tenant fails to perform any of its obligations within the above-stated cure period, Landlord may immediately thereafter perform such obligation for the account of Tenant, and any amounts so expended by Landlord shall be immediately due and payable together with interest at the highest rate allowed by law. In the event any performance or nonperformance by Tenant of any of its obligations results in an emergency situation, Landlord will have all rights set forth in this paragraph immediately without the necessity of providing Tenant with notice thereof.

**BANKRUPTCY**

21. Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then Landlord may, at its option, declare the term of this Lease agreement at an end and shall forthwith be entitled to immediate possession

of the said premises. The parties agree that Landlord is entitled to adequate assurance of future performance of the terms and provisions of the Bankruptcy Code. For purposes of any such assumption or assignment of this Lease, the parties agree that the term "adequate assurance" shall include, without limitation, at least the following: (i) any proposed assignee must have, as demonstrated to Landlord's satisfaction, a net worth (as defined in accordance with generally accepted accounting principles consistently applied) in an amount sufficient to assure that the proposed assignee will have the resources to meet the financial responsibilities under this Lease, including the payment of all rent; the financial condition and resources of Tenant are material inducements to Landlord entering into this Lease; (ii) any proposed assignee must have engaged in operating a retail food store for at least five (5) years prior to any such proposed assignment; (iii) any assumption of this Lease by a proposed assignee shall not adversely affect Landlord's relationship with any of the remaining tenants in the shopping center taking into consideration any and all other "use" clauses and/or "exclusivity" clauses which may then exist under their leases with Landlord; and (iv) any proposed assignee must not be engaged in any business or activity which it will conduct on the demised premises and which will subject the demised premises to contamination by any hazardous materials.

**CONSTRUCTION RISKS**

22. Nothing herein contained shall constitute Landlord as the agent in any sense of Tenant in constructing said improvements, and that Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of Tenant's store building for the causes stated in herein and to request change orders to be paid by Tenant. Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing the improvements pursuant to the terms of this Lease. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing the improvements or from any faulty construction thereof. The indemnity of Landlord as set forth herein shall be limited to work performed by it or at its direction.

**NOTICES**

23. All notices required to be given to Landlord hereunder shall be sent by registered or certified mail or delivery service with receipt to, and all rent payments shall be made to Landlord at

**7000 W. Palmetto Park Road, Suite 408**
**Boca Raton, Florida 33433**

or such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail or delivery service with receipt.

All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at **P. O. BOX 408300**
**FT. LAUDERDALE, FLORIDA 33340-8300**
**1141 S. W. 12TH AVENUE**
**POMPANO, FLORIDA 33069-4671**

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail or delivery service with receipt.

**END OF TENANCY**

24. Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state. Any holding over by Tenant of the demised premises after the expiration of the term of this Lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this Lease. Any holding over by Tenant shall automatically invoke the provisions of Section 83.06, Florida Statutes.

Winn-Dixie - Lake Point

**ASSIGNMENT AND SUBLEASING**

25. Tenant may without the consent of Landlord assign this Lease, or sublease or vacate the demised premises in whole or in part, provided Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this Lease.

In the event of any assignment or sublease or vacating of the entire premises, the annual rental thereafter shall be the sum of: (a) the average percentage rental, if any, paid by Tenant for the two full fiscal years of Tenant immediately preceding such assignment, vacating or subletting, and (b) the minimum guaranteed rental provided for herein; provided, however, this provision shall not apply in the event such assignment or sublease shall be to any corporation or entity which is the parent of, subsidiary to or affiliated with Tenant or to any corporation or entity with which Tenant merges or consolidates or to which it sells all of its business in the state where the demised premises are situated. The provisions of this paragraph shall not be construed to limit or restrict the right of Tenant to sublease a portion or department of the demised premises without consent of Landlord to any concessionaire or licensee or otherwise in connection with the operation of Tenant's business in the demised premises, provided the sales of such concessionaire or licensee shall be included within the gross sales of Tenant, as defined hereinabove in Article 1a

In the event Tenant shall vacate the entire demised premises or cease selling merchandise therein for in excess of a period of six (6) months, while the demised premises are usable for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant), Landlord shall have the continuing option thereafter for a period of sixty (60) days (unless Tenant shall have reoccupied the premises) to terminate and cancel this Lease upon fifteen (15) days' written notice to Tenant of its election so to do, unless within such fifteen (15) day period Tenant shall advise Landlord that Tenant had prior to receipt of such notice in good faith committed to assign this Lease or sublease the demised premises to a third party for occupancy within two (2) months

**EXTENSIONS**

26 It is further agreed that Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of this Lease, each extension to be for a period of five (5) years and at the same rentals and upon the same terms and conditions as required herein for the initial term

Such option privilege may be exercised by Tenant giving to Landlord a notice in writing at least six (6) months before the expiration of the initial term, and if extended, at least six (6) months before the expiration of such extended term, stating the intention of Tenant to exercise such option and the period for which such option is exercised and thereupon this Lease shall be so extended without the execution of any other or further document. Tenant shall not be permitted to exercise any renewal term unless it (i) previously exercised all options for prior renewal terms and (ii) is not in default at the time thereof

**EXCLUSIVE SUPERMARKET**

27 Landlord covenants and agrees that Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property (which may be owned by Landlord) located within the shopping center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of Tenant; except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, for consumption either on or off the premises, shall not be deemed a violation hereof. With the exception of package stores, only Tenant may sell beer and wine in the shopping center for off-premises consumption Only Tenant may operate a bakery, delicatessen or similar department in the shopping center.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any provisions herein to the contrary, Tenant shall have no right to cancel or terminate this Lease or to withhold rental

payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights or recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation. If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument. Notwithstanding the foregoing, the operation of one (1) frozen yogurt or ice cream store (of not to exceed 1,600 square feet) or the operation of one (1) bagel restaurant similar in nature to that run by Progressive Bagels, Offerdahl's, Einstein Brothers, or Bageeland (of not to exceed 3,600 square feet) shall not be deemed a violation hereof, provided none of these excepted uses are located closer than two hundred fifty-six (256) feet to the nearest point of Tenant's demised store premises. Furthermore, the Walgreen Co or Eckerd Drug Company shall be permitted to sell food items in up to 1,500 square feet of sales area in its demised store premises, and Amoco Oil Company shall be permitted to sell convenience-type food items in up to 900 square feet of sales area.

**SUBORDINATE**

28. Tenant agrees that this Lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this Lease, its tenancy shall not be disturbed, nor shall this Lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this Lease, the rights of Tenant hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

**NOTICE TO LENDER**

29. Tenant agrees that it will give notice to any holder of a first mortgage (which term shall include all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rental payable hereunder, specifying the nature of the default by Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this Lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 9 of this Lease.

**REAL ESTATE TAXES**

30. During the term of this Lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of Landlord's ad valorem real estate taxes levied against the demised premises. Tenant shall be responsible for its pro-rata share of such taxes for fractional years occurring at the beginning and expiration of the term of this Lease, and any extensions thereof; provided, however, any additional rental payable hereunder by Tenant may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due hereunder, it being intended that such credit shall be made annually in respect of the tax payments for the previous tax year at the time percentage rentals are payable, but if there shall not be any percentage rentals due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning of the period in which Tenant is responsible for such tax payments, or at the end of the lease term or any extensions thereof, shall be pro-rated on the basis of the annual credit. Tenant shall be responsible only for its pro-rata share of such taxes for fractional years occurring at the beginning and expiration of the term of this Lease, and any extensions thereof.

If such taxes shall not be assessed separately, but shall be included within an assessment of the demised premises and others, said assessment shall be fairly apportioned to determine

Tenant's share thereof. Such apportionment shall be made in the ratio which the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floor of all store buildings (including additional floor levels) from time to time existing in the shopping center. The amount of taxes attributable to the shopping center, and for which Tenant is to reimburse Landlord in part, shall be less any available abatements, discounts or refunds thereon, whether or not taken by Landlord. Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements as evidence of the basis upon which any taxes are chargeable to Tenant and an "as built" survey of the shopping center, and such additional rental shall be payable by Tenant on demand after payment by Landlord. All taxes, other than ad valorem real estate taxes, including special assessments, improvement liens, and the like, shall remain the sole responsibility of Landlord. However, Tenant shall remain responsible for sales taxes on rentals levied by law on lessees.

Tenant shall have the right from time to time to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned, and to institute such proceedings in the name of Landlord as Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by Tenant and such proceedings conducted free of all expense to Landlord; and provided still further, that Tenant shall take no contest or protest action which results in the institution of any foreclosure proceedings or similar action by the holder of a security deed against the demised premises.

Notwithstanding the above, it is agreed that Tenant's obligation to make the payments herein described is expressly conditioned upon receipt from Landlord of a written statement for such ad valorem real estate tax contributions (as well as the other documents described herein if requested by Tenant) no later than December 31 of the calendar year following the year in which the taxes were due.

**BENEFIT**

31. This Lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

**COMMON AREA MAINTENANCE**

32. Landlord agrees to operate, insure and maintain in good condition and repair all the common areas, as defined in Article 3 hereof, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping at least three (3) times weekly, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and watering and maintenance of landscaped areas. If Landlord, after sixty (60) days following receipt of written notice from Tenant to do so, shall fail to make the repairs or perform the services described in this Article, Tenant shall have the right to make such repairs or cause such services to be performed in its behalf and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse Tenant for the money expended or expense incurred therein.

For such services, Tenant shall pay to Landlord at the end of each quarter, as additional rental hereunder and as reimbursement for the cost thereof, the amount of Tenant's pro-rata share thereof, computed in the proportion which the square footage of Tenant's store building bears to the total square footage of all buildings (including additional floor levels) existing in the shopping center from time to time. Tenant shall not reimburse Landlord for any expense not reasonably connected with the necessary maintenance and repair of the shopping center common areas. Examples of expenses for which Tenant shall not make reimbursement are rental insurance premiums, any type of intangible costs and shopping center management fees and administrative costs. Notwithstanding the above, it is agreed that Tenant's obligation to make the payments herein described is expressly conditioned upon receipt from Landlord of such detailed statement of costs no later than four (4) months following the end of the quarter for which such payments were due. Tenant shall not be required to make any such payments when the detailed statement of such costs, with paid invoices attached, is delivered to Tenant no later than one year following the quarter for which the payments were due. The estimated quarterly charges shall be adjusted at calendar year end. Payment of this additional rent shall be due sixty (60) days following submission of written invoice to Tenant.

Any additional rental payable hereunder by Tenant may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due hereunder, it being intended that such credit shall be made annually in respect of the common area payments for the previous lease year at the time percentage rentals are payable, but if there shall not be any percentage rentals due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive

no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning and end of the lease term or any extensions thereof shall be pro-rated on the basis of the annual credit.

**TRANSFER BY LANDLORD**

33 In the event Landlord transfers Landlord's interest in this Lease, Landlord agrees to promptly provide Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's interest in this Lease. Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed that there shall be absolutely no personal liability on the part of Landlord or, if Landlord or any successor in interest of Landlord shall be an individual, joint venture, tenancy in common firm or partnership or joint venture, on the part of such individual members of such firm, joint tenants, partnership or joint venture with respect to any of the terms, covenants and conditions of this Lease, and that Tenant shall look solely to the equity of Landlord or such successor in interest in the shopping center for the satisfaction of each and every remedy of this Lease to be performed by Landlord, such exculpation of personal liability to be absolute and without any exception whatsoever

**SHORT FORM LEASE**

34. Landlord agrees that any time on request of Tenant it will execute a short form of this Lease in form permitting its recording. Any recorded document must be reasonably acceptable to and approved in advance by Landlord. Further, it shall be a condition to Tenant's exercise of any cancellation right in this Lease that Tenant terminate the recorded document of record

**MARGINAL TITLES**

35 The marginal titles appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend or affect the provisions thereof

**COMPLETE AGREEMENT**

36. This written Lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this Lease No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**RADON GAS**

37 Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit

**HAZARDOUS SUBSTANCES**

38. Tenant shall indemnify and hold Landlord harmless from any and all claims, actions, judgments, criminal penalties and costs, damages and liabilities, in anywise resulting out of Tenant's having stored, used or sold hazardous substances (as the same are defined by federal and state statutes and regulation of governmental agencies having jurisdiction over the same) in the demised premises.

Upon advance reasonable notice not less frequently than once per year (except that Landlord may enter the demised premises more frequently if it reasonably suspects that hazardous substances have been released therein), Landlord shall (i) be entitled to conduct tests which do not unreasonably interfere with Tenant's use of the demised premises and (ii) require Tenant to submit written reports as reasonably requested by Landlord concerning the presence of hazardous materials used or discharged by Tenant. If any testing by Landlord reveals the release of hazardous materials by Tenant in contravention of this Lease, Tenant shall pay for the cost of such testing

Similarly, Landlord shall indemnify and hold Tenant harmless from any and all claims, actions, judgments, criminal penalties and rulings of regulatory agencies in anywise resulting out of the fact that the shopping center and/or the demised premises were erected on ground that was or is polluted with hazardous substances as the same are defined by federal and state statutes and regulation of governmental agencies having jurisdiction over the same

**EXPANSION OPTION**

39 Tenant is hereby granted the option and privilege at any time during the term of this Lease, or any extensions thereof, of enlarging its store building by incorporating therein the area to the

westerly (left) side thereof, such addition of 60 feet in width by 231 feet in depth This option may be exercised only at such times as the adjoining storerooms may be unleased, or at five (5) year intervals, it being contemplated that Landlord shall not lease such area to other tenants for in excess of five (5) years, and that Tenant shall have the expansion privilege herein described no later than five (5) years from the commencement date hereof and at five (5) year intervals thereafter. If Tenant wishes to exercise an expansion option, it (i) must not then be in default of this Lease and (ii) shall give Landlord notice of such exercise not less than three (3) months nor more than six (6) months prior to the expiration date of any such five (5) year interval Upon exercise of an expansion option, Landlord, and upon Tenant giving to Landlord a notice in writing of its exercise thereof, Landlord agrees to construct such addition, or prepare such enlargement area for occupancy by Tenant, in accordance with plans and specifications to be approved by the parties hereto, with the construction to be completed with all due diligence following the vacation of the necessary area by any other tenant, and the enlarged portion of the building to be of a like quality of construction as the original building for Tenant In order to facilitate the expansion of Tenant's demises store building as herein contemplated, Landlord agrees that any adjacent building or buildings within the expansion area shall be of like structural quality and in architectural harmony with Tenant's store building, shall front on a line which is the interior sidewalk line of Tenant's demised store building extended and shall have a finish floor level, roof and ceiling heights which shall be at the same elevations as the finish floor level, roof and ceiling heights of Tenant's demised store building. Further, Landlord agrees that the wall of Tenant's demised store building adjoining the expansion area shall be constructed with steel column supports therein equivalently spaced to the nearest row of steel column supports within the open area of Tenant's demised store building and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original and of the expanded building width. Upon completion of such building addition, or tender of such additional space to Tenant, if there shall not at such date remain at least ten (10) years of the then term of this Lease, such term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date. Thereafter, during such extended term, the annual minimum guaranteed rental (and the base for computation of percentage rental hereunder) shall be increased by the greater of: an amount equal to 12% of the cost of such addition, or an amount equal to $7.50 per square foot during the first ten (10) years and $7.75 per square foot thereafter, of the enlargement area, or an amount equal to a computed percentage times the cost of such addition, such percentage consisting of 3% plus the current prime interest rate charged by New York City banks at the time of the exercise of the option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant, with the final cost of the addition upon completion to be certified to by the general contractor performing the work During such extended term the provisions of this Lease shall remain in effect and the option periods herein provided, if any shall remain, shall be construed to follow upon the end of the extended term and the rentals to remain as adjusted in consequence of the addition. upon completion of the addition, it shall be and become a portion of the demised premises and this Lease thereby be taken and construed as so amended

Nothing herein contained shall constitute any express or implied obligation on the part of the holder of a first mortgage encumbering the fee simple title to the demised premises or of any purchaser at a sale under foreclosure of such mortgage, to comply with the terms and provisions of this Article, it being the understanding of the parties that the obligation to cause such expansion is the sole obligation of Landlord, its heirs, legal representatives, successors and assigns, but this paragraph shall not limit Tenant's right to construct the expansion at its own cost as provided herein.

In the event Landlord shall for any reason fail or refuse to construct the building addition contemplated hereunder after Tenant has properly exercised its option herein, Tenant, at its option, shall have the right at its own expense to construct the building addition of the size and quality set forth above If Tenant constructs the enlargement, Tenant agrees to cause any mechanics' liens incurred by and in connection with such expansion to be promptly discharged and agrees to indemnify and hold harmless Landlord from any expense occasioned thereby. Upon completion of such building addition and occupancy thereof by Tenant, if there shall not at such date remain at least ten (10) years of the then term of this Lease, the lease term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date. Upon completion of the building addition and occupancy thereof by Tenant, during the remaining lease term and any extensions thereof, there shall be no additional minimum guaranteed annual rental payable by Tenant in respect of such addition The increased area of Tenant's store building resulting from the expansion shall be taken into consideration in computing the amounts of Tenant's common area, real estate tax, and insurance contributions required by Articles 14, 16, 30 and 32 hereof, and Tenant's non-cumulative credit rights against percentage rentals shall also continue to apply.

**ESTOPPEL CERTIFICATE**

**40.** Within a reasonable time, but no more than ten (10) business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form

attached hereto as Exhibit "C" (an "Estoppel Certificate") Notwithstanding the forgoing, Landlord shall not request, and Tenant shall not be required to deliver more than two (2) Estoppel Certificates per calendar year, unless Landlord pays to Tenant in advance, $500.00 per additional requested Estoppel Certificate.

**ACCESS BY LANDLORD**

41. Landlord or Landlord's agents shall have the right to enter the demised premises at reasonable times to examine the same and to show them to prospective purchasers of the shopping center, and to make such repairs, alterations, improvements or additions as Landlord may deem necessary or desirable. During the six (6) months period prior to the expiration of the term of the Lease or any renewal term Landlord may exhibit the demised premises to prospective tenants or purchasers

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this agreement the day and year first above written

**Signed, sealed and delivered in the presence of:**

Printed Name: BARBARA ALICIA

Printed Name: Danine Garbarino
As to Landlord

**LAKE POINT CENTER ASSOCIATES, LTD.,**
**a Florida limited partnership**

**By: K SOUTH, INC., a Florida corporation**

By
Its President
Printed Name: FRED P. STEINMARK
Address: 7000 W. PALMETTO PARK RD 408
BOCA RATON FL 33433

Attest
Its Secretary
Printed Name: Maria S. Ashenfelter
Address: 7000 W. Palmetto Pk Rd
Boca Raton, Fl 33433

**(CORPORATE SEAL)**

**LANDLORD**

Printed Name: Cynthia N. Crossland

Printed Name: Rebecca L. Sawyer
As to Tenant

**WINN-DIXIE STORES, INC**

By
Its President
Printed Name: James Kufeldt
Address: P. O. Box B
Jacksonville, FL 32203-0297

Attest
Its Assistant Secretary
Printed Name: W. O. Scaife, Jr.
Address: P. O. Box B
Jacksonville, FL 32203-0297

**(CORPORATE SEAL)**

**TENANT**

STATE OF FLORIDA

COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this 1st day of MAY, 1996, by FRED P. STEINMARK and MARIA S. ASHENFELTER the ✓ President and ✓ Secretary, respectively, of K South, Inc., a Florida, on behalf of the corporation Such person: *(notary must check applicable box)*

☒ is/are personally known to me

☐ produced a current Florida driver's license as identification

☐ produced ______________________ as identification

{Notary Seal must be affixed}

Arlene Adelkopff
Signature of Notary

ARLENE ADELKOPFF
Name of Notary (typed, Printed or Stamped)
Commission Number (if not legible on seal): ______
My Commission Expires (if not legible on seal): ______

NOTARY PUBLIC STATE OF FLORIDA
ARLENE ADELKOPF
COMMISSION # CC 505091
EXPIRES OCT 24, 1999
BONDED THRU
ATLANTIC BONDING CO. INC.

STATE OF FLORIDA

COUNTY OF DUVAL

The foregoing instrument was acknowledged before me this 17th day of May, 1996, by James Kufeldt and W. O. Scaife, Jr. the ______ President and Assistant Secretary, respectively, of Winn-Dixie Stores, Inc., a Florida corporation, on behalf of the corporation Such person: *(notary must check applicable box)*

☒ is/are personally known to me

☐ produced a current Florida driver's license as identification

☐ produced ______________________ as identification

{Notary Seal must be affixed}

Jane Elizabeth DeWitte
Signature of Notary

______
Name of Notary (typed, Printed or Stamped)
Commission Number (if not legible on seal): ______
My Commission Expires (if not legible on seal): ______

NOTARY PUBLIC STATE OF FLORIDA
JANE ELIZABETH DeWITTE
My Comm Exp May 18, 1996
Comm No CC 201960

Kim Rice Bongiovanni, Attorney-at-Law whose address is P O Box B Jacksonville Florida 32203

96-304835
7420 Pg 1873

(Reserved for Clerk)

WILL CALL HOLLAND & KNIGHT

SHORT FORM LEASE

**THIS SHORT FORM LEASE** made this 1st day of May 1996 between **LAKE POINT CENTRE ASSOCIATES, LTD.**, Florida limited partnership (hereinafter called "Landlord") and **WINN-DIXIE STORES INC**, a Florida corporation (hereinafter called "Tenant") which terms "Landlord" and "Tenant" shall include wherever the context admits or requires singular or plural and the heirs legal representatives successors and assigns of the respective parties

WITNESSETH:

That Landlord in consideration of the covenants of Tenant does hereby lease and demise unto Tenant and Tenant hereby agrees to take and lease from Landlord for the term hereinafter specified the following described premises

> That certain store building, approximately 222 feet in width by 231 feet in depth together with a front vestibule, rear receiving room and exterior concrete pads at rear of building for installation of Tenant's freezers and/or coolers and the land on which the same shall stand (hereinafter collectively called "demised premises"), which store building and related improvements are to be constructed by Landlord according to plans and specifications to be approved by the parties hereto and shall be in the location and of the dimensions as outlined in red on the Plot Plans attached as Exhibit "A" to a certain collateral lease agreement executed by the parties hereto and of even date herewith
>
> The demised premises are located in a shopping center development known as Lake Point Centre" (hereinafter called "shopping center") located at the northeasterly corner of the intersection of Okeechobee Boulevard and Jog Road, in the City of West Palm Beach County of Palm Beach, State of Florida, the legal description of the shopping center being attached hereto as Exhibit "B" and by this reference made a part hereof

**FOR TENANT TO HAVE AND TO HOLD** from the date when Tenant opens said premises for the transaction of its business for an initial term of twenty (20) years

**IT IS FURTHER AGREED** that Tenant at its option shall be entitled to the privilege of five (5) successive extensions of this Lease each extension to be for a period of five (5) years

Without the prior written consent of Tenant and Landlord herein only retail and/or service stores shall be allowed to operate in the shopping center or any enlargement thereof, it being the intent of the parties hereto that no spa lounge bar "teen lounge" bowling alley pawn shop skating rink bingo or electronic or other game parlor theatre (either motion or legitimate) modeling or photographic studio billiard hall processing or rendering plant other than Tenant's meat, seafood or other departments warehouse factory manufacturing facility carnival meeting hall massage parlor flea market sale of pornographic materials sales of automobiles medical business or professional offices recreational or entertainment type activities non retail or non-service type activities shall be permitted There shall be no pay telephone within one hundred feet (100) of the demised premises Notwithstanding the foregoing Landlord shall be allowed to lease space in the shopping center to a travel agency insurance agency medical dental or optometrist offices bank or a "mailboxes/pack n ship outlet" so long as those uses are not within __130__ feet from the nearest point of the demised premises (pre-expansion) excepting one such use which may be closer provided it does not exceed 1 600 square feet in size The aggregate square footage in the shopping center occupied by these uses shall not however exceed 20 000 square feet

Landlord covenants and agrees that the construction of the shopping center shall begin not later than November 15 1996 and shall be substantially completed not later than September 15 1997 and if the same shall not be begun or completed by the respective dates Tenant, at its option may in either of such events cancel and terminate this Lease or may extend Landlord additional time for the beginning or completion of construction provided however that if after the beginning of construction Landlord's failure to complete the improvements within the stipulated time shall be due to acts of God strikes riots fire flood war delay of carriers material shortages embargoes or inclement weather or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than October 15 1997 (the outside completion date ) this option to terminate shall not arise It is further agreed that in the event Tenant initiates (at Tenant's sole request) any changes (except caused by errors and omissions) in the aforesaid plans and specifications that increases Landlord's costs or delay the completion of the premises Landlord shall be reimbursed for said costs and the time of completion shall be extended accordingly "Construction of the shopping center" shall be deemed to have begun upon the commencement of pouring of footers for the demised premises

Landlord covenants and agrees that Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property (which may be owned by Landlord) located within the shopping center or within 1 000 feet of any exterior boundary thereof for occupancy as a supermarket grocery store meat fish or vegetable market nor will Landlord permit any tenant or occupant of any such property to sublet in any manner directly or indirectly any part thereof to any person firm or corporation engaged in any such business without written permission of Tenant and Landlord further covenants and agrees not to permit or suffer any property

OR 5420 PG 1875

located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of Tenant, except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, for consumption either on or off the premises, shall not be deemed a violation hereof. With the exception of package stores, only Tenant may sell beer and wine in the shopping center for off-premises consumption. Only Tenant may operate a bakery, delicatessen or similar department in the shopping center.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any provisions herein to the contrary, Tenant shall have no right to cancel or terminate this Lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights or recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation. If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument. Notwithstanding the foregoing, the operation of one (1) frozen yogurt or ice cream store (of not to exceed 1,600 square feet) or the operation of one (1) bagel restaurant similar in nature to that run by Progressive Bagels, Offerdahl's, Einstein Brothers, or Bageeland (of not to exceed 3,600 square feet) shall not be deemed a violation hereof, provided none of these excepted uses are located closer than two hundred fifty-six (256) feet to the nearest point of Tenant's demised store premises. Furthermore, the Walgreen Co. or Eckerd Drug Company shall be permitted to sell food items in up to 1,500 square feet of sales area in its demised store premises, and Amoco Oil Company shall be permitted to sell convenience-type food items in up to 900 square feet of sales area.

**IT IS UNDERSTOOD AND AGREED** that this is a Short Form Lease which is for the rents and upon the terms, covenants and conditions contained in the aforesaid collateral lease agreement executed by the parties hereto and bearing even date herewith, which collateral lease agreement is and shall be a part of this instrument as fully and completely as if the same were set forth herein.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this instrument the day and

OR 5420 Pg 1876

year first above written

**Signed, sealed and delivered in the presence of:**

**LAKE POINT CENTER ASSOCIATES, LTD., a Florida limited partnership**

By: **K SOUTH, INC., a Florida corporation**

Printed Name [illegible]
As to Landlord

By [signature]
Its President
Printed Name FRED P. STEINMARK
Address 7000 W. PALMETTO PARK RD 408
BOCA RATON, FL 33433

Attest [signature]
Its Secretary
Printed Name MARIA S. ASHENFELTER
Address 7000 W. PALMETTO PARK ROAD 408
BOCA RATON, FL 33433

(CORPORATE SEAL)

LANDLORD

**WINN-DIXIE STORES, INC**

Printed Name Cynthia N. Crossland

Printed Name Rebecca L. [illegible]
As to Tenant

By [signature]
Its President
Printed Name James Kufeldt
Address P. O Box B
Jacksonville FL 32203-0297

Attest [signature]
Its Assistant Secretary
Printed Name W. O. [illegible], Jr.
Address P O Box B
Jacksonville FL 32203-0297

(CORPORATE SEAL)

TENANT

**Landlord's Address:** **7000 W. Palmetto Park Road, Suite 408, Boca Raton, Florida 33433**

**Tenant's Address:** **P. O Box 408300, Ft. Lauderdale, Florida 33340-8300**

STATE OF ______

COUNTY OF ______

The foregoing instrument was acknowledged before me this ____ day of ______, 1996, by ______ and ______, the ____ President and ____ Secretary respectively of K South Inc a Florida on behalf of the corporation Such person *(notary must check applicable box)*

☒ is/are personally known to me

☐ produced a current Florida driver's license as identification

☐ produced ______________ as identification

[Notary Seal must be affixed]

______________
Signature of Notary

ARLENE ADELKOPF
COMMISSION # CC 505001
EXPIRES OCT 24, 1999
BONDED THRU
ATLANTIC BONDING CO. INC.

______________
Name of Notary (typed, Printed or Stamped)
Commission Number (if not legible on seal)
My Commission Expires (if not legible on seal)

STATE OF FLORIDA

COUNTY OF DUVAL

The foregoing instrument was acknowledged before me this 11 day of ______ 1996 by James Kufeldt and W. O. Scaife, Jr the ______ President and Assistant Secretary respectively of Winn-Dixie Stores Inc a Florida corporation on behalf of the corporation Such person *(notary must check applicable box)*

☒ is/are personally known to me

☐ produced a current Florida driver's license as identification

☐ produced ______________ as identification

[Notary Seal must be affixed]

______________
Signature of Notary

______________
Name of Notary (typed, Printed or Stamped)
Commission Number (if not legible on seal)
My Commission Expires (if not legible on seal)

# EXHIBIT "A"

## LEGAL DESCRIPTION OF SHOPPING CENTER

LEGAL DESCRIPTION

A PARCEL OF LAND SITUATE IN THE SOUTHWEST ONE-QUARTER (SW 1/4) OF SECTION 22, TOWNSHIP 43 SOUTH, RANGE 42 EAST, PALM BEACH COUNTY, FLORIDA BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 22; THENCE ALONG THE WEST LINE OF SECTION 22, NORTH 01-27-19 EAST, A DISTANCE OF 100.87 FEET TO A POINT ON THE NORTH RIGHT-OF-WAY LINE OF OKEECHOBEE BOULEVARD (SR 704) AS SHOWN ON THE STATE OF FLORIDA DEPARTMENT OF TRANSPORTATION RIGHT-OF-WAY MAP SECTION 93[illegible]-115; THENCE CONTINUE ALONG THE WEST LINE OF SECTION 22, NORTH 01-27-19 EAST, A DISTANCE OF 1050.80 FEET TO INTERSECT A LINE PARALLEL WITH AND 1150.01 FEET NORTHERLY FROM, MEASURED AT RIGHT ANGLES TO, THE SOUTH LINE OF SAID SECTION 22; THENCE ALONG SAID LINE, SOUTH 88-45-31 EAST, A DISTANCE OF 62.43 FEET TO INTERSECT THE EAST RIGHT-OF-WAY LINE OF JOG ROAD PER RIGHT-OF-WAY WARRANTY DEED GRANTED TO PALM BEACH COUNTY RECORDED IN OFFICIAL RECORD BOOK 4000 AT PAGES 1098 THROUGH 1101 OF THE PUBLIC RECORDS OF SAID PALM BEACH COUNTY, FLORIDA, AND THE POINT OF BEGINNING.

FROM THE POINT OF BEGINNING; THENCE CONTINUE ALONG THE AFOREMENTIONED NORTH LINE OF THE SOUTH 1150.01 FEET OF SECTION 22, SOUTH 88-45-34 EAST, A DISTANCE OF 744.56 FEET TO INTERSECT THE WEST BOUNDARY LINE OF PARCEL 22 AS SHOWN ON "VISTA CENTER OF PALM BEACH PLAT 3" AS RECORDED IN PLAT BOOK 66 AT PAGES 111 THROUGH 121 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY; THENCE ALONG THE WEST BOUNDARY LINE OF SAID PLAT, SOUTH 01-14-26 WEST, A DISTANCE OF 980.66 FEET TO INTERSECT THE NORTH RIGHT-OF-WAY LINE OF OKEECHOBEE BOULEVARD AS DEEDED TO PALM BEACH COUNTY IN OFFICIAL RECORD BOOK 5762, PAGE 189, SAID LINE BEING 170.00 FEET NORTH OF AND PARALLEL WITH THE SOUTH LINE OF SECTION 22; THENCE ALONG SAID PARALLEL LINE NORTH 88-45-34 WEST, A DISTANCE OF 621.09 FEET TO INTERSECT THE AFOREMENTIONED EAST RIGHT-OF-WAY LINE OF JOG ROAD; THENCE ALONG SAID EAST RIGHT-OF-WAY LINE AND DEPARTING FROM THE NORTH RIGHT-OF-WAY LINE OF OKEECHOBEE BOULEVARD, NORTH 44-51-30 WEST, A DISTANCE OF 35.40 FEET; THENCE NORTH 00-54-48 WEST, A DISTANCE OF 41.41 FEET TO THE BEGINNING OF A CURVE HAVING A RADIUS OF 3154.79 FEET FROM WHICH A RADIAL LINE BEARS SOUTH 89-03-12 WEST; THENCE NORTHWESTERLY ALONG THE ARC OF SAID CURVE SUBTENDING A CENTRAL ANGLE OF 02-12-10, A DISTANCE OF 140.31 FEET TO A POINT OF COMPOUND CURVATURE HAVING A RADIUS OF 3385.86 FEET FROM WHICH A RADIAL LINE BEARS SOUTH 86-50-42 WEST; THENCE NORTHWESTERLY ALONG THE ARC OF SAID CURVE SUBTENDING A CENTRAL ANGLE OF 04-01-10, A DISTANCE OF 110.17 FEET TO A POINT OF REVERSE CURVATURE HAVING A RADIUS OF 2792.89 FEET FROM WHICH A RADIAL LINE BEARS NORTH 82-18-42 EAST; THENCE NORTHWESTERLY ALONG THE ARC OF SAID CURVE SUBTENDING A CENTRAL ANGLE OF 09-[illegible]-10, A DISTANCE OF 448.88 FEET TO THE POINT OF BEGINNING.

THE ABOVE DESCRIBED PARCEL CONTAINS 15.925 ACRES OF LAND MORE OR LESS.

SUBJECT TO RIGHTS-OF-WAY, EASEMENTS AND/OR RESERVATIONS OF RECORD, IF ANY.

BEARINGS REFER TO AN ASSUMED BEARING OF NORTH 01-27-19 EAST ALONG THE WEST LINE OF THE SOUTHWEST ONE-QUARTER OF SECTION 22, TOWNSHIP 43 SOUTH, RANGE 42 EAST, PALM BEACH COUNTY, FLORIDA.

SUPPLEMENTAL LEASE AGREEMENT

**THIS SUPPLEMENTAL LEASE AGREEMENT** (the "Agreement") is made this ____________ ______, 1998, between **Winn-Dixie Stores, Inc.**, a Florida corporation, (the "Tenant") and **Lake Point Centre Associates, Ltd.**, , a Florida limited partnership (the "Landlord")

**WHEREAS,** Tenant and Landlord entered into a Lease dated May 1, 1996, as amended and/or evidenced by: (a) Short Form Lease dated May 1, 1996, recorded in Official Records Book 9420, page 1873 of the public records of Palm Beach County, Florida; (b) Letter Agreements dated August 28, 1996, December 20, 1996 and July 24, 1997 (the "Lease") for the use and occupancy of the Premises described therein;

**NOW, THEREFORE,** pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1 The Commencement Date of the Term is September 18, 1997

2 The Term shall expire at midnight Eastern Time on September 17, 2017, unless earlier terminated or later extended as provided for in the Lease

3 All undefined capitalized terms used herein are as defined in the Lease.

**IN WITNESS WHEREOF,** the parties hereto have signed and sealed this Agreement on the date first set forth above

Signed, sealed and delivered in the presence of:

[signature]
Print name: LAURA L. ANDREWS

[signature]
Print name: Cynthia N. Crossland

TENANT:

**Winn-Dixie Stores, Inc.**

By: [signature]
R. P. McCook
Its: Vice President
Date: 3/18/98

[signature]
Print name: Barbara H. Werner

[signature]
Print name: Barbara Barrett

LANDLORD:

**Lake Point Centre Associates, Ltd.**,
By: K. South, Inc. its general partner

By: [signature]
Fred P. Steinmark
Its: President
Date: March 30, 1998

O:\TRANSFER\MIAMI\0223\SLA.WPD
March 16, 1998

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this March 18, 1998, by R. P. McCook, as Vice President of Winn-Dixie Stores, Inc , Florida corporation, on behalf of the corporation, who is personally known to me.

Jane E. DeWitte
Printed Name: ______________________
Notary Public, State and County aforesaid
My Commission Expires: ______________
Notary ID No.: ______________________
(NOTARIAL SEAL)

NOTARY PUBLIC STATE OF FLORIDA
JANE E. DeWITTE
My Comm. Exp May 18, 2000
Comm. No CC 527798

STATE OF ______________ )
COUNTY OF ____________ )

The foregoing instrument was acknowledged before me this ________ ____, 1998, by __________________, as ______________ of Lake Point Centre Associates, Ltd., , a Florida limited partnership, on behalf of the limited partnership, who **[PLEASE CHECK ONE]** ______is personally known to me or ________has produced ________________ as identification.

______________________________
Printed Name: ______________________
Notary Public, State and County aforesaid
My Commission Expires: ______________
Notary ID No.: ______________________
(NOTARIAL SEAL)

**CONSENT**

Teachers Insurance and Annuity Association of America, a New York corporation the owner and holder of a mortgage upon the Shopping Center, hereby consents to the terms and conditions of this Supplemental Lease Agreement

**Teachers Insurance and Annuity Association of America**

By:______________________________
______________________________
Its:______________________________
Date:______________________________

STATE OF ______________ )
COUNTY OF ____________ )

The foregoing instrument was acknowledged before me this ____________ ___, 1998, by ______________________as ___________________ of Teachers Insurance and Annuity Association of America, a New York corporation, on behalf of the corporation, who **[PLEASE CHECK ONE]** _______is personally known to me or _________has produced ______________________ as identification

______________________________
Printed Name:____________________
Notary Public, State and County aforesaid
My Commission Expires:____________
Notary ID No.:____________________
(NOTARIAL SEAL)

O:\TRANSFER\MIAM\0223\SLA.WPD



This instrument prepared by
and to be returned to:

Mayer, Brown & Platt
2000 Pennsylvania Avenue, N.W.,
Suite 6500
Washington, D.C 20006
Howard A Parelskin, Esq
(202) 463-2000

Nov-13-1998 02:06pm 98-442530
ORB 10750 Pg 288
Con 14,493,000.00 Doc 101,451.00

Property Control No. 74 42 43 22 00 000 7030

Tax Identification No. of Grantee: ____________

390 N. ORANGE AVE., SUITE 150
ORLANDO, FLORIDA 32801

## SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED, made this 30th day of October, 1998 between LAKE POINT CENTRE ASSOCIATES, LTD, a Florida limited partnership, whose address is c/o Konover Property Trust, Inc., 7000 West Palmetto Park Road, Suite 408, Boca Raton, Florida 33433 ("Grantor"), and KPT PROPERTIES, L P, a Delaware limited partnership, whose address is 11000 Regency Parkway, Suite 300, Cary, North Carolina 27511 ("Grantee").

WITNESSETH, That, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10 00), and other good and valuable consideration to Grantor in hand paid by Grantee, the receipt whereof is hereby acknowledged, Grantor does hereby grant, bargain, sell and convey unto Grantee, and Grantee's successors and assigns forever, the following described property, situate, lying and being in Palm Beach County Florida (the "Property"), to-wit:

The land being more particularly described in Exhibit A which is attached hereto and made a material part hereof;

TOGETHER with all the improvements located thereon and all the easements, tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining or rights of way relating thereto;

SUBJECT TO all easements, encumbrances, restrictions and conditions of record set forth in Exhibit B which is attached hereto and made a material part hereof, insofar as they may lawfully affect the Property.

TO HAVE AND TO HOLD the same in fee simple forever

ORB 10750 Pg 289

Grantor hereby covenants with Grantee that Grantor is lawfully seized of said Property in fee simple; that Grantor has good right and lawful authority to sell and convey said Property, and hereby warrants the title to the Property, and will defend the same against the lawful claims of all persons claiming by, through or under Grantor

IN WITNESS WHEREOF, Grantor has hereunto set Grantor's hand and seal the day and year first above written

Signed, sealed and delivered in the presence of:

Nancy A. Tighe
Print Name: Nancy A. Tighe

Lana A. Parker
Print Name: Lana A. Parker

LAKE POINT CENTRE ASSOCIATES, LTD., a Florida limited partnership [SEAL]

By: K. SOUTH, INC
Its: General Partner [SEAL]

By: ____________
Simon Konover
Its Chairman
Duly Authorized

STATE OF CONNECTICUT )
COUNTY OF HARTFORD )

The foregoing instrument was acknowledged before me this 2nd day of October, 1998, by Simon Konover, the Chairman of K. SOUTH, INC., the General Partner of LAKE POINT CENTRE ASSOCIATES, LTD., a Florida limited partnership, on behalf of said limited partnership, who X is personally known to me, OR ________ has produced ____________ as identification

Sandra G. Silvay
NOTARY PUBLIC
NOTARY NAME: SANDRA G. SILVAY
My Commission Expires: 5/31/02

(NOTARY SEAL)

48376_1C.DOC

EXHIBIT "A"

Parcel I:

Tracts A, C and L of LAKE POINT CENTRE, according to the Plat thereof recorded in Plat Book 79, at Page 61, of the Public Records of Palm Beach County, Florida

Parcel II:

Non-Exclusive Easement for compensating water storage as created by Compensating Water Storage Easement recorded in Official Records Book 9451, Page 1985, of the Public Records of Palm Beach County, Florida, which Easement is more particularly described as follows:

A parcel of land lying in Section 20, Township 43 South, Range 42 East, Palm Beach County, Florida, being more particularly described as follows:

COMMENCING at the Southeast corner of said Section 20; thence, North 88 degrees 45 minutes 53 seconds West, along the Southerly line of said Section 20, a distance of 1,848.35 feet; thence North 00 degrees 00 minutes 00 seconds East, departing the South line of said Section 20, a distance of 3,780.45 feet for a POINT OF BEGINNING; thence continue North 00 degrees 00 minutes 00 seconds East, a distance of 350.00 feet; thence North 90 degrees 00 minutes 00 seconds West, a distance of 746.74 feet; thence South 00 degrees 00 minutes 00 seconds West, a distance of 350.00 feet; thence South 90 degrees 00 minutes 00 seconds East, a distance of 746.74 feet to the POINT OF BEGINNING

Parcel III:

Non-Exclusive right, privilege and easement to the use and benefit of those portions of the "Site" that do not contain improvements with Floor Area, for public or private underground utility services and access to gas, water, storm and sanitary sewage systems and for the drainage of surface and underground storm water, as defined in, and subject to, that Declaration, recorded in Official Records Book 9420, Page 1846, Palm Beach County, as amended, as said utilities are installed, used, operated, maintained, repaired, relocated, replaced or enlarged from time to time

EXHIBIT B
PERMITTED EXCEPTIONS

1. Taxes and assessments for the year 1998 and subsequent years, which are not yet due and payable

2. Terms, provisions, covenants, restrictions and easements, but omitting any covenant or restriction based on race, color, religion, sex, handicap familial status or national origin unless 42 USC 3067 or (b) relates to handicap but does not discriminate against handicap persons, contained in Declaration of Construction Operating and Reciprocal Easements recorded in Official Records Book 9420, page 1846, as supplemented by instruments recorded in Official Records Book 9420, page 1867, Official Records Book 9539, page 880, Official Records Book 9743, page 634 and Official Records Book 9747, page 1896.

3. Restrictions as set forth in Warranty Deeds from Henry J. Rolfe, recorded in Official Records Book 3873, page 1008 and in Official Records Book 4192, page 839.

4. Terms and provisions of that certain Lease made by Lake Point Centre Associates, Ltd., a Florida limited partnership, Lessor, to Winn-Dixie Stores, Inc., a Florida corporation, Lessee, dated May 1, 1996 and short form thereof recorded in Official Records Book 9420, page 1873; as affected by Subordination, Non-Disturbance and Attornment Agreement recorded in Official Records Book 9420, Page 1937 and Official Records Book 10311, Page 592; and affected by Affidavit recorded in Official Records Book 9747; page 1898.

5. Terms, provisions and conditions as set forth in Development Agreement by and between the City of West Palm, Florida, a Florida municipal corporation, and Arvida/JMB Partners, a Florida general partnership, dated August 29, 1994, recorded October 5, 1994 in Official Records Book 8454, page 253.

6. Terms, provisions and conditions as set forth in Development Agreement by and between the City of West Palm Beach, Florida, a Florida municipal corporation, and Arvida/JMB Partners, a Florida general partnership, dated February 13, 1995, recorded June 9, 1995 in Official Records Book 8784, page 1391.

7. Matters contained in Notice and Disclosure of Taxing Authority filed by Northern Palm Beach County Water Control District recorded in Official Records Book 6318, page 1377.

8. All terms and provisions of existing unrecorded leases and all rights thereunder of the Lessees and any person claiming by, through or under said Lessees.

9 Restrictions, dedications and easements set out on the Plat of Lake Point Centre, recorded in Plat Book 79, Page 61.

10 Easement granted to Florida Power & Light Company recorded in Official Records Book 10114, page 358. (as to Tract C)

11. Terms and provisions contained in lease between Lake Point Centre Associates, Ltd., lessor and Walgreen Co. Lessee dated December 19, 1996 a Memorandum of said Lease is recorded in Official Records Book 9756, page 1593, as affected by Subordination, Non-Disturbance and Attornment Agreement recorded in Official Records Book 9756, page 1584 and Official Records Book 10325, Page 1942.

12. Resolution Fixing Setback requirements recorded in Deed Book 1104, page 155 and amended in Deed Book 1125, page 442 (as to Tract C).

13. Subject to the matters shown on the survey prepared by Bench Mark dated November 6, 1997, last revised May 15, 1998, and referred to as File P180-ASB.dwg.

14 Subject to terms and conditions of that Mortgage executed by Lake Point Centre Associates, Ltd., a Florida limited partnership, in favor of Bankatlantic, a federal savings bank, bearing the date August 29, 1996, recorded September 1, 1996 in Official Records Book 9420, at Page 1879; Mortgage Modification Agreement filed March 12, 1998, in Official Records Book 10276, Page 1300; assigned to Teachers Insurance and Annuity Association of America in Official Records Book 10311; affected by Agreement recorded in Official Records Book 10311; Page 504 and that mortgage recorded in Official Records Book 10311, Page 506; together with the following loan related documentation:

a) Assignment of Rents, Leases and Deposits recorded in Official Records Book 9420, Page 1916, and assigned to Teachers Insurance and Annuity Association of America in Official Records Book 13011, Page 496;

b) UCC-1 Financing Statement recorded in Official Records Book 9420, Page 1928, and assigned to Teachers Insurance and Annuity Association of America in Official Records Book 13011, Page 496;

c) Assignment of leases from Lake Point Centre Associates, Ltd. to Teachers Insurance and Annuity Association of America recorded in Official Records Book 13011, Page 564; and

d) UCC - 1 Financing Statement from Lake Point Centre Associates, Ltd. to Teachers Insurance and Annuity Association of America recorded in Official Records Book 13011, Page 585; and

ORB 10750 Pg 293
DOROTHY H WILKEN, CLERK PB COUNTY, FL

15    Any restrictions or limitations imposed by governmental authority, and any and all
      provisions of any ordinance, municipal regulation, public or private law, inclusive of
      zoning, building, planning, inland wetlands and water courses laws, rules and
      regulations as established in and for the City of West Palm Beach, or any other
      applicable governmental authority.

**ESTOPPEL CERTIFICATE**

WINN-DIXIE STORE #223
Lake Point Centre
West Palm Beach, Florida

The undersigned officer of Winn-Dixie Stores, Inc., a Florida corporation ("WD") hereby certifies, on behalf of WD, that as of June 1, 1998 (the "Certificate Date"), the following is true and correct:

1. That WD is the tenant ("Tenant") under a currently effective lease (as amended as described below, the "Lease") with Lake Point Centre Associates, Ltd , , a Florida limited partnership, as the current landlord ("Landlord") dated May 1, 1996, conveying a leasehold estate of the property described therein (the "Premises") located in a shopping center known as Lake Point Centre (the "Shopping Center"), and the Lease has been amended or is evidenced only by:

(a) Short Form Lease dated May 1, 1996, recorded in Official Records Volume 9420, page 1873 of the public records of Palm Beach County, Florida;
(b) Letter Agreement dated August 26, 1996;
(c) Letter Agreement dated December 20, 1996;
(d) Letter Agreement dated July 24, 1997

2 That the term of the Lease commenced September 18, 1997, and is scheduled to expire on September 17, 2017 unless renewed or terminated in accordance with the terms of the Lease Pursuant to the Lease, Tenant is entitled to renew the Lease for five (5) terms of five (5) years each

3 That to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Lease, all rent and other charges due from Tenant to Landlord have been paid through and including June 30, 1998, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease

4 That to the best of Tenant's knowledge, Landlord is not in default under the Lease

5. That the Lease contains no provision for purchase of the Premises by Tenant

6. Tenant has received no notice of any sale, transfer, assignment, or pledge of Landlord's interest in the Lease or the rent due thereunder to any party except: BankAtlantic and Teachers Insurance and Annuity Association of America.

7. Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law

8 Notwithstanding anything to the contrary herein:

(a) No acceptance or possession of the Premises, opening for or operation of business by Tenant therein, execution of this certificate, or payment of rent under the Lease constitutes or will constitute acceptance by Tenant of work or materials that are defective or not completed in accordance with Tenant's plans and specifications, or a waiver of Tenant's rights against Landlord in connection therewith

(b) Tenant makes no representation or warranty that the Premises or the Shopping Center, or any portion thereof is in compliance with the Americans With Disabilities Act or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

9 The address for notices to Tenant is 1141 S. W. 12th Avenue, Pompano Beach, Florida 33069, with a copy to: General Counsel, Winn Dixie Stores, Inc , 5050 Edgewood Ct , P O. Box B, Jacksonville, FL 32203-0297

10 This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant.

**IN WITNESS WHEREOF**, the undersigned has executed this certificate on behalf of Tenant

**Winn-Dixie Stores, Inc.**
By: ______________________
James Kufeldt
Its: President

The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge Further, Landlord certifies that Tenant has fully performed its obligations under the Lease to date and Tenant is not in default thereunder

**IN WITNESS WHEREOF**, the undersigned has executed this certificate on behalf of Landlord

**Lake Point Centre Associates, Ltd.**,
a Florida limited partnership

By: K. SOUTH, INC
it's General Partner
By: ______________________
Fred P. Steinmark
Its: President
Date: 7/6/98

This Instrument Prepared By:

Robbin Newman, Esq.
Holland & Knight LLP
One East Broward Boulevard
13th Floor
Fort Lauderdale, FL 33301

STATE OF FLORIDA )
)
COUNTY OF PALM BEACH)

AFFIDAVIT

Before me, the undersigned authority, personally appeared Fred P. Steinmark, as president of K. South, Inc., general partner of Lake Point Centre Associates, Ltd , a Florida limited partnership, who, after first being duly sworn by me under oath, said:

1. That he is president of K. South, Inc., a Florida corporation, which is the general partner of Lake Point Centre Associates, Ltd., a Florida limited partnership ("Partnership"), and that he is making this Affidavit in such capacity on behalf of the Partnership

2. That the Partnership is the owner of the following described property ("Property"):

All of the Plat of LAKE POINT CENTRE, according to the Plat thereof, recorded in Plat Book 79, Pages 61-64, Public Records of Palm Beach County, Florida

3. That attached hereto is a true and correct copy of an amendment ("Amendment") to that certain lease ("Lease") between the Partnership and Winn-Dixie Stores, Inc dated May 1, 1996, a memorandum of which is recorded in Official Records Book ____, Page ____, Public Records of Palm Beach County, Florida ("Memorandum"), with respect to the property as described in said Lease.

4 That the purpose of this Affidavit is to clarify as matter of record that certain provisions of the Lease, as set forth in the Memorandum, have been amended in accordance with the terms of the Amendment attached hereto, which Amendment affects Amoco Oil Company who is acquiring fee simple title to that certain portion of the Property known as Tract "B" of LAKE POINT CENTRE, according to the Plat thereof, recorded in Plat Book 79, Pages 61-64, Public Recods of Palm Beach County, Florida, simultaneously with the recording of this Affidavit

5 That the Affiant and the Partnership disclaim any liability to any party that may review or rely upon this Affidavit

Fred P. Steinmark, as
President of K. South, Inc.

SWORN TO AND SUBSCRIBED before me this 11 day of April, 1997, by Fred P Steinmark, as President of K. South Inc., general partner of Lake Point Centre Associates Ltd. He is personally known to me or has produced ________ as identification.

Notary Public
Name printed: R. E. McWhorter
MY COMMISSION # CC554983 EXPIRES July 6, 2000
BONDED THRU TROY FAIN INSURANCE INC.

My Commission number is:
My Commission expiration is: