# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors.[1] | ) | Jointly Administered |

## SUMMARY OF SECOND INTERIM APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP FOR ALLOWANCE AND PAYMENT OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED (MAY 1, 2005 THROUGH SEPTEMBER 30, 2005)

| | |
|---|---|
| Name of applicant: | Skadden, Arps, Slate, Meagher & Flom LLP |
| Authorized to provide professional services to: | Winn-Dixie Stores, Inc., et al., Debtors |
| Date of retention: | February 21, 2005, Petition Date |
| Period for which compensation and reimbursement are sought: | 05/01/05 – 09/30/05 |
| Amount of compensation sought as actual, reasonable, and necessary: | $4,158,012.50 |
| Amount of reimbursement sought as actual, reasonable, and necessary: | $145,055.82 |
| Amount of compensation paid/to be paid as actual, reasonable, and necessary: | $3,326,413.00 |
| Amount of reimbursement paid/to be paid as actual, reasonable, and necessary: | $145,055.82 |
| Total amount of holdback fees sought: | $831,599.50 |
| This is a: | X  Quarterly Application      __ Final Application |

---

[1]    In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

Summary of monthly statements:

| DATE SUBMITTED/ PERIOD COVERED | TOTAL FEES REQUESTED | TOTAL EXPENSES REQUESTED | FEES PAID/ TO BE PAID (80%) | EXPENSES PAID/TO BE PAID (100%) | HOLDBACK FEES TO BE SOUGHT |
|---|---|---|---|---|---|
| May 24, 2005 First Monthly 02/21/05 – 02/28/05 | $226,065.50 | $2,790.83 | $180,852.40 | $2,790.83 | $45,213.10 |
| May 23, 2005 Second Monthly 03/01/05 - 03/31/05 | $1,602,540.00[2] | $87,053.45 | $1,282,032.00 | $87,053.45 | $320,508.00 |
| June 17, 2005 Third Monthly 04/01/05 - 04/30/05 | $1,212,305.50 | $54,639.91 | $969,844.40 | $54,639.91 | $242,461.10 |
| Interim Subtotal[3] | $3,012,628.00 | $144,484.19 | $2,410,102.40 | $144,484.19 | $602,525.60 |
| September 13, 2005 Fourth Monthly 05/01/05 – 05/31/05 | $1,157,668.00 | $25,844.71 | $926,134.40 | $25,844.71 | $231,533.60 |
| September 13, 2005 Fifth Monthly 06/01/05 - 06/30/05 | $1,001,608.00 | $34,312.07 | $801,286.40 | $34,312.07 | $200,321.60 |
| October 25, 2005 Sixth Monthly 07/01/05 - 07/31/05 | $658,542.50 | $40,860.71 | $526,834.00 | $40,860.71 | $131,708.50 |
| October 28, 2005 Seventh Monthly 08/01/05 - 08/31/05 | $663,027.00 | $30,805.51 | $530,421.60 | $30,805.51 | $132,605.40 |
| November 9, 2005 Eighth Monthly 09/01/05 - 09/30/05 | $677,167.00 | $13,232.82 | $541,736.60 | $13,232.82 | $135,430.40 |
| Interim Subtotal | $4,158,012.50 | $145,055.82 | $3,326,413.00 | $145,055.82 | $831,599.50 |
| GRAND TOTALS | $7,170,640.50 | $289,540.01 | $5,736,515.40 | $289,540.01 | $1,434,125.10 |

Summary of interim applications:

| DATE FILED/ PERIOD COVERED | TOTAL FEES REQUESTED | TOTAL EXPENSES REQUESTED | TOTAL FEES ALLOWED | TOTAL EXPENSES ALLOWED | TOTAL FEES/EXPENSES DISALLOWED |
|---|---|---|---|---|---|
| July 16, 2005 First Interim 02/21/05 – 04/30/05 | $3,012,628.00 | $144,484.19 | $3,012,628.00 | $144,484.19 | $0.00 |
| November 11, 2005 Second Interim 05/01/05 - 09/30/05 | $4,158,012.50 | $145,055.82 | N/A | N/A | N/A |

---

[2]    Subsequently, Skadden, Arps voluntarily made a reduction in the fees requested in the amount of $28,283.00, reflecting the amount previously charged for non-working travel time.

[3]    The grand totals take into account the adjustment described in Note 2, above.

**Skadden, Arps, Slate, Meagher & Flom LLP**

**CUMULATIVE TIME SUMMARY**
**(MAY 1, 2005 THROUGH SEPTEMBER 30, 2005)**

| NAME | YEAR OF ADMISSION | RATE** | HOURS | AMOUNT |
|------|-------------------|--------|-------|--------|
| **PARTNERS*** | | | | |
| D. J. (Jan) Baker (1980) | 1973 | $825 | 404.20 | $333,465.00 |
| | | 835 | 97.40 | 81,329.00 |
| Ronald C. Barusch (1987) | 1978 | 780 | 18.00 | 14,040.00 |
| | | 795 | 35.80 | 28,461.00 |
| Katherine M. Bristor (1988) | 1981 | 825 | 18.40 | 15,180.00 |
| Eric M. Davis (2002) | 1992 | 630 | 46.90 | 29,547.00 |
| Sally McDonald Henry (1991) | 1983 | 680 | 589.30 | 400,724.00 |
| | | 730 | 82.20 | 60,006.00 |
| | | 0 | 9.10 | 0.00 |
| Peter J. Neckles (1987) | 1978 | 825 | 6.00 | 4,950.00 |
| | | 835 | 29.80 | 24,883.00 |
| Regina Olshan (1998) | 1991 | 695 | 9.70 | 6,741.50 |
| Wallace L. Schwartz (1985) | 1978 | 795 | 1.70 | 1,351.50 |
| | | | | |
| * The year after each partner's name indicates the year in which the individual became a partner at Skadden, Arps or at a previous firm. | | | | |
| | **TOTAL PARTNERS** | | **1,348.50** | **$1,000,678.00** |
| | | | | |
| **COUNSEL** | | | | |
| Stephanie R. Feld | 1982 | $535 | 561.30 | $300,295.50 |
| | | 560 | 84.10 | 47,096.00 |
| Rosalie W. Gray | 1982 | 535 | 403.90 | 216,086.50 |
| | | 560 | 56.70 | 31,752.00 |
| Thomas J. Matz | 1976 | 535 | 486.00 | 260,010.00 |
| | | | | |
| | **TOTAL COUNSEL** | | **1,592.00** | **$855,240.00** |
| | | | | |
| **ASSOCIATES** | | | | |
| Aileen A. Dowd | 2001 | $460 | 102.60 | $47,196.00 |
| Steven Eichel | 1988 | 495 | 508.90 | 251,905.50 |

| NAME | YEAR OF ADMISSION | RATE** | HOURS | AMOUNT |
|---|---|---|---|---|
| | | 540 | 155.40 | 83,916.00 |
| Stacey-Ann J. Elvy | 2005 | 295 | 11.00 | 3,245.00 |
| Laura Engelhardt | 2001 | 430 | 2.50 | 1,075.00 |
| Mordecai L. Geisler | 2003 | 375 | 19.80 | 7,425.00 |
| Michael D. Horwitz | 2005 | 295 | 104.70 | 30,886.50 |
| Denise Kaloudis | 2003 | 375 | 644.50 | 241,687.50 |
| | | 440 | 162.10 | 71,324.00 |
| Suling Lam | 1998 | 480 | 13.30 | 6,384.00 |
| | | 540 | 10.70 | 5,778.00 |
| Kimberly A. LaMaina | 2001 | 395 | 687.90 | 271,720.50 |
| | | 465 | 107.20 | 49,848.00 |
| | | 0 | 3.00 | 0.00 |
| Jane M. Leamy | 1995 | 495 | 396.20 | 196,119.00 |
| | | 540 | 100.60 | 54,324.00 |
| | | 0 | 8.00 | 0.00 |
| William B. Mack, III | 2004 | 335 | 2.40 | 804.00 |
| Jessenia Paoli | 2005 | 295 | 130.50 | 38,497.50 |
| Adam S. Ravin | 1995 | 480 | 479.60 | 230,208.00 |
| | | 540 | 50.90 | 27,486.00 |
| Abraham A. Reshtick | 2001 | 395 | 5.50 | 2,172.50 |
| Keith Sambur | 2005 | 295 | 5.00 | 1,475.00 |
| Douglas W. Squasoni | 2001 | 485 | 25.50 | 12,367.50 |
| Christopher W. Stuart | 2003 | 375 | 7.50 | 2,812.50 |
| Stephanie L. Teicher | 1997 | 495 | 3.00 | 1,485.00 |
| Sina Toussi | 1995 | 495 | 429.50 | 212,602.50 |
| David M. Turetsky | 2002 | 375 | 542.00 | 203,250.00 |
| | | 440 | 165.20 | 72,688.00 |
| | | 0 | 14.00 | 0.00 |
| Christopher J. Ulery | 1997 | 495 | 4.40 | 2,178.00 |
| | | 540 | 16.60 | 8,964.00 |
| Joseph N. Wharton | 1998 | 430 | 7.20 | 3,096.00 |
| Jennifer L. Wilson | 2003 | 295 | 5.00 | 1,475.00 |
| | | | | |
| | **TOTAL ASSOCIATES** | | **4,932.20** | **$2,144,395.50** |
| | | | | |
| **PARAPROFESSIONALS** | | | | |
| Nkiruka Amalu | | 125 | 7.00 | $875.00 |
| Luisa Bonachea | | 125 | 393.70 | 49,212.50 |
| | | 175 | 64.50 | 11,287.50 |
| Bella P. Burgos | | 175 | 6.20 | 1,085.00 |
| Michael L. Kreiner | | 170 | 122.40 | 20,808.00 |

| NAME | YEAR OF ADMISSION | RATE** | HOURS | AMOUNT |
|------|------------------|--------|-------|--------|
| Jasper Liou | | 125 | 27.60 | 3,450.00 |
| Johan Mathew | | 125 | 304.40 | 38,050.00 |
| Krystal R. Reaves | | 55 | 6.50 | 357.50 |
| Joseph J. Roman | | 70 | 196.90 | 13,783.00 |
| | | 75 | 7.60 | 570.00 |
| Adriana G. Salazar | | 125 | 19.00 | 2,375.00 |
| Stephanie Skelly | | 170 | 21.00 | 3,570.00 |
| Toy-Fung N. Tung | | 195 | 5.00 | 975.00 |
| Cora L. Yeung | | 125 | 0.50 | 62.50 |
| Andrew F. Zsoldos | | 90 | 80.40 | 7,236.00 |
| | | 145 | 27.60 | 4,002.00 |
| | | | | |
| | TOTAL PARAPROFESSIONALS | | 1,290.30 | $157,699.00 |
| | | | | |
| | | TOTAL | 9,163.00 | $4,158,012.50 |
| | **BLENDED HOURLY RATE** | | | $453.78 |

** The firm adjusts its hourly rates from time to time. A firm-wide adjustment in the firm's rate structure was implemented as of September 1, 2005. In these cases, Skadden, Arps, did not charge for non-working travel time through July 2005, as reflected in the $0.00 hourly rate referenced above. As of August 2005, hours billed for non-working travel time represent 50% of the actual time spent traveling.

**Skadden, Arps, Slate, Meagher & Flom LLP**

## CUMULATIVE PROJECT CATEGORY SUMMARY
### (MAY 1, 2005 THROUGH SEPTEMBER 30, 2005)

| Project Category | Total Hours | Total Fees |
|---|---|---|
| General Corporate Advice | 74.70 | $60,355.50 |
| Asset Analysis / Recovery | 14.10 | 6,556.50 |
| Asset Dispositions / General | 365.00 | 177,952.50 |
| Asset Dispositions / Real Property | 24.30 | 10,609.50 |
| Automatic Stay / Relief Actions | 117.30 | 59,356.00 |
| Business Operations / Strategic Planning | 107.00 | 79,693.00 |
| Case Administration | 574.10 | 137,474.00 |
| Claims Administration / General | 251.00 | 123,997.00 |
| Claims Administration / Reclamation / Trust Funds | 2,287.70 | 937,605.50 |
| Claims Administration (PACA / PASA) | 199.40 | 99,100.50 |
| Creditor Meetings / Statutory Committees | 450.10 | 229,562.50 |
| Disclosure Statement / Voting Issues | 1.30 | 643.50 |
| Employee Matters / General | 448.50 | 233,678.00 |
| Environmental Matters | 3.20 | 1,264.00 |
| Executory Contracts / Personalty | 454.70 | 220,186.50 |
| Financing (DIP and Emergence) | 185.10 | 102,991.50 |
| Insurance | 162.90 | 86,856.50 |
| Lease (Real Property) | 946.90 | 412,475.00 |
| Litigation (General) | 67.40 | 30,483.50 |

| Project Category | Total Hours | Total Fees |
|---|---|---|
| Non-Working Travel Time | 7.30 | 4,394.00 |
| | 34.10 | 0.00[4] |
| Regulatory and SEC Matters | 9.50 | 5,125.00 |
| Reorganization Plan / Plan Sponsors | 206.00 | 128,638.50 |
| Reports and Schedules | 50.40 | 25,140.50 |
| Retention / Fee Matters (SASM&F) | 499.90 | 223,574.50 |
| Retention / Fee Matters / Objections (Others) | 322.40 | 164,175.00 |
| Tax Matters | 52.00 | 32,281.50 |
| U.S. Trustee Matters | 9.80 | 7,679.00 |
| Utilities | 1,163.70 | 513,629.50 |
| Vendor Matters | 73.20 | 42,534.00 |
| **TOTAL** | **9,163.00** | **$4,158,012.50** |

---

[4]    Skadden, Arps did not charge for non-working travel time through July 2005.  As of August 2005, hours billed for non-working travel time represent 50% of the actual time spent traveling.

**Skadden, Arps, Slate, Meagher & Flom LLP**

**CUMULATIVE EXPENSE SUMMARY**
**(MAY 1, 2005 THROUGH SEPTEMBER 30, 2005)**

| Expense Category | Total Expenses |
|---|---|
| Computer Legal Research | $58,450.81 |
| Long Distance Telephone | 5,008.13 |
| In-House Reproduction (@ $.10 per page) | 16,110.70 |
| Reproduction / Color | 531.50 |
| Outside Reproduction | 8,558.62 |
| Outside Research | 5,758.61 |
| Filing / Court Fees | 189.95 |
| Court Reporting | 5,427.40 |
| Local Travel | 648.67 |
| Out of Town Travel | 23,072.76 |
| Business Meals | 5,490.62 |
| Other Out of Pocket | 2,485.94 |
| Courier & Express Carriers (e.g., Federal Express) | 1,159.07 |
| Postage | 4,152.02 |
| Electronic Document Management | 1,011.02 |
| Other | 7,000.00 |
| **TOTAL** | **$145,055.82** |

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors.[5] | ) | Jointly Administered |

**SECOND INTERIM APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER &**
**FLOM LLP FOR ALLOWANCE AND PAYMENT OF COMPENSATION FOR**
**SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED**
**(MAY 1, 2005 THROUGH SEPTEMBER 30, 2005)**

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps"), bankruptcy

counsel for Winn-Dixie Stores, Inc. and certain of its subsidiaries and affiliates, as debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), files its second

interim application for allowance and payment of compensation for services rendered and

reimbursement of expenses incurred (the "Second Application") for the period from May 1, 2005

through September 30, 2005 (the "Application Period"). In support of this Second Application,

Skadden, Arps respectfully represents the following:

JURISDICTION

1.     This Court has jurisdiction to consider this Second Application under

28 U.S.C. §§ 157 and 1334.  Consideration of this Second Application is a core proceeding under

---

[5]     In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases:  Astor
Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling
Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy
Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc.,
Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige
Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc.,
Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

28 U.S.C. § 157(b)(2).  The relief requested may be granted in accordance with the provisions of 11 U.S.C. §§ 330 and 331.

BACKGROUND

A.    The Chapter 11 Cases

2.    On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "New York Court").  By order dated April 13, 2005, the New York Court transferred venue of these cases to this Court.  The Debtors' cases are being jointly administered for procedural purposes only.

3.    The Debtors are operating their businesses and managing their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.

4.    On March 1, 2005, an official committee of unsecured creditors (the "Creditors Committee") was appointed to serve in these cases under Bankruptcy Code sections 1102 and 1103.  On August 17, 2005, an official committed of equity holders (the "Equity Committee") was appointed to serve in these cases under Bankruptcy Code sections 1102 and 1103.

5.    The Debtors are filing monthly operating reports and paying their quarterly fees. Ordinary course administrative obligations are being paid in the ordinary course of the Debtors' business, and fees and expenses incurred by professionals are or are anticipated to be paid under procedures established by the New York Court.

6.    On August 10, 2005, this Court entered an order providing for the appointment of a fee examiner in these cases.  The Debtors subsequently selected Stuart, Maue, Mitchell &

2

James, Ltd. ("Stuart Maue") to serve as the fee examiner. On November 10, 2005, the Debtors filed an application with this Court to retain Stuart Maue in these cases.

7.      On September 8, 2005, this Court extended the Debtors' exclusive periods for plan proposal and plan acceptance to December 19, 2005 and February 20, 2006, respectively.

B.      The Debtors' Business

8.      The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners. The Debtors' business was founded in 1925 with a single grocery store and has grown through acquisitions and internal expansion. As of the Petition Date, the Debtors were considered to be the eighth-largest food retailer in the United States, with more than 900 stores in the United States. The Debtors are engaged in a footprint reduction that is expected to result in the sale or closure of 326 stores.

C.      Retention of Skadden, Arps

9.      On February 21, 2005, the Debtors filed the Application for Authority to Retain Skadden, Arps, Slate, Meagher & Flom LLP as Lead Restructuring and Bankruptcy Counsel to the Debtors (Docket No. 68, the "Employment Application"). A copy of the Employment Application is attached to this Second Application as Exhibit A.

10.      The Employment Application was supported by the Declaration of D. J. Baker and Disclosure of Compensation, a copy of which is included as part of Exhibit A.[6]

11.      On March 7, 2005, the New York Court entered an interim order approving the Employment Application. On March 15, 2005, the New York Court entered a final order (the

---

[6]      On May 18, 2005, Skadden, Arps filed its First Supplemental Declaration of D. J. Baker. On August 2, 2005, and October 10, 2005, Skadden, Arps filed its Second and Third Supplemental Declarations of D. J. Baker, respectively. These supplemental declarations are included as part of Exhibit A.

"Employment Order") authorizing the Debtors to retain Skadden, Arps effective as of the Petition Date. A copy of the Employment Order is attached to this Second Application as Exhibit B.[7]

12.     Skadden, Arps continues to hold prepetition retainer funds for application against prepetition fees and expenses as permitted by the Employment Order. As of the date of this Second Application, Skadden, Arps estimates that remaining retainer funds are in the amount of $341,350.98.

D.     Interim Payment Procedures

13.     The procedures governing the right of Skadden, Arps and other professionals to obtain interim payment for services rendered and expenses incurred are set forth in the Final Order Approving Interim Compensation Procedures for Professionals (Docket No. 434, the "Interim Payment Order").

14.     Under the Interim Payment Order, professionals may be paid on a monthly basis up to 80% of fees earned and 100% of expenses incurred, by the submission of monthly statements to the Debtors. Such payments are subject to ratification, and the remaining 20% of fees are payable, after court approval of interim fee applications. Interim fee applications are to be submitted approximately every four to six months.

15.     The first interim fee application covered the period from the Petition Date through April 30, 2005. The first interim fee application was approved by the Court on August 4, 2005.

---

[7]     King & Spalding, LLP was originally to be retained as co-counsel for the Debtors to assist Skadden, Arps with a variety of matters pursuant to Bankruptcy Code section 327(a). Subsequent to filing King & Spalding's retention application, King & Spalding's role was limited. As a result, some matters originally designated to be handled by King & Spalding were transferred to Skadden, Arps. These matters included insurance and utilities issues.

16.    This Second Application covers the period from May 1, 2005 through September 30, 2005. Under the monthly statement procedures of the Interim Payment Order, for the period of June 1 through June 30, 2005, the Debtors have paid Skadden, Arps $801,276.40 (80% of $1,001,608.00) for services rendered and $34,312.07 (100% of $34,312.07) for expenses incurred, for a total payment in the amount of $835,598.47. The Debtors have advised Skadden, Arps that they are in the process of paying the invoices for May, July and August and are reviewing the invoices for September.

<u>COMPENSATION AND REIMBURSEMENT REQUESTED</u>

17.    By this Second Application, Skadden, Arps requests that this Court authorize and order on an interim basis: (a) allowance of compensation for professional services rendered by Skadden, Arps during the Application Period on behalf of the Debtors in the amount of $4,158,012.50, representing 100% of the fees earned, and payment of such fees to the extent not previously paid and (b) allowance of actual necessary expenses incurred by Skadden, Arps during the Application Period in connection with the rendition of such professional services in the amount of $145,055.82, representing 100% of expenses incurred by Skadden, Arps during the Application Period[8] and payment of such expenses to the extent not previously paid.

18.    All legal services performed by Skadden, Arps were performed for and on behalf of the Debtors and not for or on behalf of any other individual or entity. These services were rendered in discharge of Skadden, Arps' professional responsibilities as bankruptcy counsel for the Debtors in these cases. Skadden, Arps' services have been substantial, necessary and of significant benefit to the Debtors and their estates.

---

[8]    It is possible that Skadden, Arps has not yet received invoices from some vendors. Accordingly, Skadden, Arps reserves the right to seek reimbursement for additional expenses that may have been incurred during the Application Period, but which have not yet been processed.

19.     No agreement or understanding exists between Skadden, Arps and any other

entity for the sharing of compensation to be received for services rendered in connection with

these cases. See Exhibit A.

20.     Skadden, Arps expended an aggregate of 9,163.00 hours during the Application

Period, resulting in an average billing rate of $453.78 per hour. The rates charged by Skadden,

Arps are the normal hourly bundled billing rates that were in effect during the Application

Period.[9] The summary preceding this Second Application contains a list of the attorneys and

paraprofessionals who have performed services on behalf of the Debtors during the Application

Period, as well as a breakdown of the hours, hourly rates and fees attributable to those

individuals. Also included is a summary of total hours and fees by project category.

21.     Skadden, Arps maintains written records of the time expended by attorneys and

paraprofessionals in the rendition of professional services to the Debtors. Such time records are

made contemporaneously with the rendition of services by the person rendering such services.

Skadden, Arps' daily time records for each monthly segment of the Application Period, allocated

by matter, listing the name of the attorney or paraprofessional, the date on which the services

were performed, and the amount of time expended in performing the services, are attached to this

Second Application as Exhibit C-1 for the period of May 1 through May 31, 2005, Exhibit D-1

for the period of June 1 through June 30, 2005, Exhibit E-1 for the period of July 1 through July

31, 2005, Exhibit F-1 for the period of August 1 through August 31, 2005, and Exhibit G-1 for

the period of September 1 through September 30, 2005.

---

[9]     As set forth in its Employment Application, Skadden, Arps adjusts its hourly rates from time to time. A
firm-wide adjustment in the bundled rate structure was implemented by Skadden, Arps effective as of
September 1, 2005.

22.    Skadden, Arps also maintains records of all actual and necessary out-of-pocket expenses incurred in connection with its rendition of services on behalf of the Debtors. The summary preceding this Second Application includes a breakdown of expenses incurred during the Application Period. The detail for such expenses is attached to this Second Application as Exhibit C-2 for the period of May 1 through May 31, 2005, Exhibit D-2 for the period of June 1 through June 30, 2005, Exhibit E-2 for the period of July 1 through July 31, 2005, Exhibit F-2 for the period of August 1 through August 31, 2005, and Exhibit G-2 for the period of September 1 through September 30, 2005. Skadden, Arps has included in this Second Application all disbursements processed by its accounting department for the Application Period. It is possible that Skadden, Arps has not yet received invoices from some vendors. Accordingly, Skadden, Arps reserves the right to seek reimbursement for additional expenses that may have been incurred during the Application Period, but which have not yet been processed.

## SUMMARY OF SERVICES RENDERED

23.    The daily time records attached as Exhibit C-1, Exhibit D-1, Exhibit E-1, Exhibit F-1, and Exhibit G-1 provide a detailed description of the services rendered by Skadden, Arps during the Application Period. For convenience of the Court, the following summary[10] identifies the areas to which Skadden, Arps devoted substantial time and attention during the Application Period:

(a)    General Corporate Advice

During the Application Period, Skadden, Arps attended board of directors meetings and governance meetings with the Debtors. Skadden, Arps assisted the Debtors with reviewing board materials and advising on board of directors issues. Skadden, Arps further prepared board responses for the Debtors to address inquiries from the Creditors

---

[10]    The summary is presented in matter number order, consistent with the order in which the time records are organized.

Committee, the Equity Committee, the Debtors' postpetition secured lenders (the "DIP Lenders") and from other constituencies.

Skadden, Arps further assisted the Debtors with audit committee meetings and advised the Debtors on a wide variety of general corporate bankruptcy issues, including, without limitation, the fiduciary duties of the Debtors and their management, issues implicating the Debtors' corporate structure and matters of corporate governance.

During the Application Period, Skadden, Arps professionals devoted a total of 74.7 hours to this category, for which compensation is sought in the aggregate amount of $60,355.50.

(b)    Asset Dispositions[11]

During the Application Period, Skadden, Arps continued to assist the Debtors with various asset dispositions.

Skadden, Arps briefed the Debtors on the requirements for court approval of asset sales and information needed to obtain such approval. Skadden, Arps spent time researching applicable law, negotiating and reviewing purchase agreements, preparing and filing various sale documents and responding to informal comments and objections from counsel for the Creditors Committee, the U.S. Trustee and the DIP Lenders. Skadden, Arps also reviewed and responded to inquiries from various landlords, prepared hearing outlines, declarations and witness testimony and assisted with post-sale closing issues.

Skadden, Arps also spent considerable time preparing for and hosting public auctions. The auctions were designed to increase the purchase price for the assets and, thus, the auctions maximized the value of the Debtors' assets for the benefit of the Debtors' estates and creditors.

For these services, nearly $80 million was realized for the Debtors' estates during the Application Period. Below is a brief description of several asset sale transactions that Skadden, Arps worked on during the Application Period.

Pharmaceutical Prescriptions from North Carolina Store

On April 20, 2005, Skadden, Arps filed a motion seeking to sell customer pharmaceutical prescriptions and inventory from one of the Debtors' stores in North Carolina. Skadden, Arps filed the sale motion on an expedited basis due to the closing of

---

[11] To coordinate and prevent duplicative work with respect to asset sales it was determined that it was in the best interests of the Debtors' estates to transfer asset sale work to SH&B. Skadden, Arps does not expect to bill substantial time in this category in the future.

the store and state law that would subject the Debtors to penalties if the assets were not transferred by a certain date.

After filing the sale motion and during the Application Period, Skadden, Arps (i) received and responded to inquiries raised from counsel for the Creditors Committee on the purchase agreement, (ii) assisted the Debtors with the resolution of several business issues relating to the sale and (iii) prepared for the sale hearing. Preparations for the sale hearing included preparing the Debtors' witness and revising sale documents. Skadden, Arps also worked with the Creditors Committee to resolve its concern regarding an indemnification provision in the purchase agreements.

Prior to the hearing, Skadden, Arps worked with the Debtors to ensure a smooth transition of the assets in compliance with applicable laws. In this regard, the target prescriptions were transferred to the purchaser upon the store's closing to allow customers access to their prescriptions. The prescription inventory was transferred for use in another Winn-Dixie store and the purchase agreements were modified accordingly. The purchase price for the assets was agreed to be (and was) escrowed pending approval of the sale.

On May 6, 2005, this Court approved the transaction and the Debtors received $85,000.00 for the benefit of their estates and creditors.

2002 Gulfstream G-200 s/n 072 Aircraft

On the Petition Date, the Debtors owned two airplanes. Prior to the Application Period, Skadden, Arps assisted the Debtors in filing and completing a sale transaction for the sale of one of the two of the Debtors' airplanes ("Plane 1"). On the day of the sale hearing for Plane 1, the Debtors conducted an auction outside the courtroom resulting in an additional $400,000.00 for Plane 1. The Court approved the sale transaction, and the Debtors received over $15.5 million for the benefit of their estates and creditors.

While Skadden, Arps was working with the Debtors on selling Plane 1, Skadden, Arps and the Debtors were working simultaneously on a potential sale for the Debtors' second plane ("Plane 2"). In this regard, Skadden, Arps (i) worked with the Debtors and the Debtors' aviation counsel, (ii) addressed issues raised by counsel for the Creditors Committee on the purchase agreement, and (iii) researched issues concerning letters of intent and competing offers.

On April 29, 2005, Skadden, Arps filed a motion seeking to (i) sell the Debtors' second airplane and related airplane equipment to Studio City Aviation 04, LLC or to a party submitting a higher or otherwise better offer and (ii) pay a broker fee in connection with the sale. The motion requested interested parties to submit bids by May 15, 2005 and scheduled an auction for May 19, 2005, if a higher or better offer was received.

After filing the motion, Skadden, Arps (i) ensured that notice of the sale went to all interested parties, (ii) received and responded to informal objections raised by counsel for the Creditors Committee and the U.S. Trustee and (iii) negotiated and prepared bidding and auction procedures.

Skadden, Arps, thereafter, (i) conducted an analysis of competing bids and presented its findings to the Debtors and (ii) with counsel for the Creditors Committee, ascertained whether any bids received were higher or better offers for the assets. The Debtors determined that Leading Edge Aviation Solutions, LLC ("Leading Edge") submitted a higher and better offer and the auction for the sale of the Debtors' second plane was scheduled for May 17, 2005.

Prior to the start of the auction, Skadden, Arps, along with counsel for the Creditors Committee and the DIP Lenders, worked to ensure that the two purchase agreements for Plane 2 were an "apples to apples" match, with price as the only variable. In this regard, Skadden, Arps together with the Debtors and counsel for the Creditors Committee spent considerable time negotiating and resolving issues relating to title and warranty changes requested by Leading Edge in its purchase agreement. In order to have an "apples to apples" comparison, the Debtors (in consultation with counsel for the Creditors Committee) concluded that there should be a $25,000.00 deduction applied to the Leading Edge bid to reflect the changes proposed.

After further negotiation on several points, Leading Edge signed a revised asset purchase agreement, as negotiated with the Debtors and the Creditors Committee. Thereafter, Leading Edge's bid was determined to be a higher and better offer, thus enabling the auction to commence.

The auction began with an initial bid of $15,375,000.00 based on Leading Edge's purchase agreement. At the end of the auction, Leading Edge submitted the last bid in the amount of $16,435,000.00. The Debtors accepted this bid.

Two days later, on May 19, 2005, this Court approved the sale of Plane 2 to Leading Edge. Following approval of the sale transaction with Leading Edge, Skadden, Arps worked closely with the Debtors and the Debtors' aviation counsel to ensure a successful closing on the transaction. The sale closed in June. The Debtors received $16,435,000.00 for the benefit of their estates and creditors.

<u>Food Lion Transaction</u>

On April 20, 2005, Skadden, Arps filed a motion seeking (i) to assume and assign three store leases to Food Lion, LLC, a competitor of the Debtors, pay cure amounts and obtain exemption from transfer taxes and (ii) to sell certain equipment and inventory from the three leased stores to Food Lion, LLC.

After filing the motion and during the Application Period, Skadden, Arps spent time ensuring that notice of the sale went to all interested parties. Skadden, Arps spent

10

substantial time responding to inquiries and providing information on this transaction to counsel for the Creditors Committee, the U.S. Trustee, counsel for the DIP Lenders and landlords, as well as the purchaser, Food Lion, LLC. Skadden, Arps, along with co-counsel, Smith Hulsey & Busey ("SH&B"), assisted the Debtors on numerous issues that arose after filing the sale motion that necessitated the prompt attention of several professionals.

One such issue went to the very essence of the sale transaction -- the assets being sold. Shortly before the hearing on the sale motion, Food Lion, LLC notified the Debtors of alleged defaults in the purchase agreement and its desire to either exit the agreement or purchase only two of the three targeted stores. The Debtors could not afford to lose the entire transaction and wanted the ability to sell all three stores or at least sell two of the three stores because the stores were not profitable for them and were determined not to be profitable in the future for the Debtors.

On May 6, 2005, the sale transaction was approved by this Court. In June, the sale closed on the sale of two stores and the Debtors received $1,500,000.00 for the benefit of their estates and creditors.

Footprint Auctions

Skadden, Arps, along with XRoads Solutions Group, LLC ("XRoads"), assisted the Debtors on various issues relating to the exploration of additional store sales, including formulating sale procedures and reviewing sale documents and information memoranda. In connection therewith, Skadden, Arps engaged in extensive discussions with the Debtors and their professionals regarding planned dispositions of specific idle facilities and obtaining escrowed funds owed to them.

During the Application Period, the Debtors planned and undertook a national effort to sell certain targeted stores to better position themselves upon exit from bankruptcy. To achieve this result, Skadden, Arps, provided substantial advice to the Debtors and co-counsel, SH&B. As a result of the plan's implementation, Skadden, Arps worked closely with the Debtors and their brokers and arranged for and held successful public auctions for the sale of the targeted stores. Skadden, Arps spent considerable time developing and working on procedures designed to maximize value for the assets. Public auctions for the sale of certain targeted store leases and other assets were held in New York in July and in September. These auctions were a massive process involving the coordination of hundreds of participants. As a result of these auctions, the Debtors received over $60 million for the benefit of their estates and creditors.

Lastly, during the Application Period, Skadden, Arps assisted the Debtors with asset sales related issues, including issues relating to the payment of brokers.

During the Application Period, Skadden, Arps professionals devoted a total of 365 hours to this category, for which compensation is sought in the aggregate amount of $177,952.50.

(c)    <u>Automatic Stay / Relief Actions</u>

During the Application Period, Skadden, Arps assisted the Debtors in addressing the issues raised by The Dannon Company Inc.'s ("Dannon") motion seeking to modify the automatic stay in order to setoff (i) fees that Dannon agreed to pay to the Debtors in exchange for the Debtors' placement of certain Dannon products at a location on the Debtors' shelves and (ii) the Debtors' entitlement to a credit for their purchases of certain Dannon goods that were damaged and/or otherwise could not be sold to a customer against its claims against the Debtors.

Skadden, Arps advised the Debtors and their restructuring advisors of the significance of the relief requested and its potential effect on the Debtors' reclamation trade lien program. Skadden, Arps continually communicated with the Debtors and their restructuring advisors regarding the motion, the issues in dispute, and strategy. In addition, the firm also negotiated with Dannon's counsel, reviewed documents, researched setoff and related issues and prepared an objection to Dannon's motion. As the hearing approached, Skadden, Arps communicated with SH&B with respect to litigation strategy. As a result of the efforts of Skadden, Arps and SH&B, the parties are in the process of negotiating a settlement. The consensual resolution of the matter prevented unnecessary distraction from the trade lien program.

During the Application Period, Skadden, Arps also assisted the Debtors with respect to the lift stay motions filed by Wah Hong Go ("Wah") and Thrivent Financial for Lutherans f/k/a Lutheran Brotherhood ("Thrivent"). With respect to Wah, the firm reviewed the lift stay motion, reviewed and provided comments to the lift stay stipulation and communicated with SH&B regarding the issues. Similarly, with respect to Thrivent, the firm communicated with SH&B regarding the lift stay motion and the related issues.

During the Application Period, Skadden, Arps professionals devoted a total of 117.3 hours to this category, for which compensation is sought in the aggregate amount of $59,356.00.

(d)    <u>Business Operations / Strategic Planning</u>

During the Application Period, Skadden, Arps advised the Debtors' management on numerous business operational issues. Skadden, Arps' efforts included analyzing numerous short-term and long-term operational issues and advising the Debtors as to the resolution of such issues. Skadden, Arps engaged in weekly conference calls with the Debtors' management and advisors to strategize regarding upcoming matters, employee issues and public relations issues.

Skadden, Arps advised the Debtors on issues relating to the reconfiguring of their business, including store sales, store operations and store leases. Specifically, Skadden, Arps assisted with numerous legal issues affecting the Debtors' desire to conduct a nationwide sale of certain stores that were not profitable to them as well as on the logistics of engaging in such sales. Skadden, Arps worked alongside the Debtors and with other professionals in these cases in advising on strategies for store sales and implementing such plans to achieve a successful result for the Debtors' estates and their creditors.

During the Application Period, Skadden, Arps professionals devoted a total of 107 hours to this category, for which compensation is sought in the aggregate amount of $79,693.00.

(e)     Case Administration

During the Application Period, Skadden, Arps committed time to case administration matters typical of the time necessarily expended in any large chapter 11 case.

In particular, Skadden, Arps professionals devoted time during the Application Period to (i) coordinating required notices and mailings; (ii) reviewing creditor correspondence and responding to creditor inquiries; (iii) preparing for hearings; (iv) conducting conferences with the Debtors' management, professionals and various interested parties, including regular update calls with the Debtors and their professional advisors; (v) monitoring the Court's docket; (vi) updating and distributing on a weekly basis a case calendar of upcoming events and deadlines; (vii) monitoring the status and staffing of pending matters; (viii) maintaining on a daily basis various files and databases critical to running the Debtors' chapter 11 cases; and (ix) coordinating case responsibilities between various professionals of the Debtors. With respect to many case administration matters, Skadden, Arps worked closely with SH&B to ensure compliance with the rules of practice and procedure in Florida.

Skadden, Arps also spent time researching applicable precedent and formulating template documents to more efficiently prepare required court documents.

During the Application Period, Skadden, Arps professionals devoted a total of 574.1 hours to this category, for which compensation is sought in the aggregate amount of $137,474.00.

(f)     Claims Administration / General

During the Application Period, Skadden, Arps assisted the Debtors with numerous issues relating to chapter 11 claims and claims-related processes and procedures. In this regard, Skadden, Arps (i) arranged for publication of the bar date notice; (ii) coordinated with Logan & Company, Inc. ("Logan") as to the proper and complete dissemination of the bar date notice to all potential claimants; (iii) responded to inquiries from creditors

13

generated by the bar date notices, including taxing authorities; (iv) responded to numerous issues raised by the Debtors and creditors with respect to proof of claim filing requirements and the bar date; and (v) monitored updated claims reports prepared by Logan, reflecting the filings of additional proofs of claim.

In conjunction with Logan, Skadden, Arps further organized and attended a preliminary claims process kickoff meeting at the Debtors' corporate headquarters to assist the Debtors in commencing the claims reconciliation and objection process. In connection with the objection to, and resolution of, claims, Skadden, Arps drafted and obtained court approval of a motion authorizing omnibus claim objections and schedule amendment procedures. Skadden, Arps also coordinated with SH&B as to the handling of certain litigation claims outside of the omnibus claim objection process.

During the Application Period, Skadden, Arps professionals devoted a total of 251 hours to this category, for which compensation is sought in the aggregate amount of $123,997.00.

(g)     Claims Administration / Reclamation / Trust Funds

During the Application Period, Skadden, Arps spent significant time resolving the numerous reclamation claims asserted against the Debtors. The Debtors received approximately 480 reclamation demands asserting aggregate claims of approximately $125 million. In order to foster good vendor relations and avoid massive litigation, the Debtors embarked on a path toward consensually resolving their vendors' reclamation claims. In this regard, Skadden, Arps negotiated with several of the Debtors' reclamation vendors and reached a resolution of reclamation procedures to be applied in these cases, which is reflected in the final reclamation order, dated April 4, 2005 (the "Final Reclamation Order") (Docket No. 626). Under the Final Reclamation Order, as modified by order dated May 19, 2005, Skadden, Arps assisted XRoads and the Debtors in reviewing, analyzing and reconciling, from the Debtors' perspective, each vendor's reclamation claim (including asserting appropriate defenses with respect to each reclamation claim) and served the approximately 480 statements of reclamation upon the reclamation vendors. After the statements of reclamation were served upon the reclamation vendors, Skadden, Arps and XRoads responded to the numerous daily inquiries regarding the reconciliation of vendors' reclamation claims and continually communicated with the reclamation vendors to resolve their reclamation claims.

During the Application Period, while the Debtors were preparing the statements of reclamation, Skadden, Arps, on behalf of the Debtors, and certain reclamation trade vendors entered into discussions which resulted in an agreement for, among other things, (i) the establishment of a trade vendor lien program and (ii) procedures for the calculation and treatment of trade vendors' reclamation and general trade claims for those trade vendors that participate in the trade vendor lien program (the "Reclamation Trade Lien Stipulation"). By order dated August 5, 2005, this Court granted the motion approving the Reclamation Trade Lien Stipulation. The Reclamation Trade Lien Stipulation benefited the Debtors by (i) reducing reclamation litigation (none to date),

14

(ii) adding $134 million in trade credit from those vendors who have opted into the Reclamation Trade Lien Stipulation, and (iii) fostering good vendor relations. With respect to the reclamation vendors whose statements of reclamation were not reconciled by the end of September, on September 30, 2005, Skadden, Arps prepared a Motion for Determination of Unresolved Reclamation Claims (the "Reclamation Determination Motion"). On November 4, 2005, the court granted the Reclamation Determination Motion, which (i) narrowed many outstanding reclamation issues with respect to some of the reclamation vendors, and (ii) provided the Debtors and their reclamation vendors additional time to consensually resolve the vendors' reclamation claims before court intervention would be required. As a result of the overall efforts of Skadden, Arps and XRoads, approximately 50% of the reclamation claims have been resolved in a very short time period, and substantially all of the reclamation vendors with resolved reclamation claims opted into the Reclamation Trade Lien Stipulation with more vendors opting into the Reclamation Trade Lien Stipulation every day.

     During the Application Period, Skadden, Arps professionals devoted a total of 2,287.7 hours to this category, for which compensation is sought in the aggregate amount of $937,605.50.

(h)    Claims Administration / PACA

     During the Application Period, the Debtors and their professionals continued working on resolving the numerous claims filed pursuant to the Perishable Agricultural Claims Act (the "PACA Claims"). In total, Skadden, Arps professionals and the Debtors' other advisors reviewed potential PACA Claims seeking payment in the amount of approximately $36 million. Skadden, Arps, with the assistance of the Debtors and their advisors, prepared a report (the "PACA Report"), setting forth the resolution of the PACA Claims, including defenses thereto to certain claims which did not qualify under PACA. The PACA Report contained the Debtors' analysis of 127 properly filed PACA Claims seeking payment of $32.5 million of which the Debtors paid approximately $30 million. The Debtors received only limited objections to the PACA Report, except for the objection filed by Old Dixie Produce, Inc. ("Old Dixie"). In September 2005, the Debtors settled the claim of Old Dixie.

     Skadden, Arps and the Debtors' advisors significantly reduced the Debtors' liability under PACA by assisting the Debtors in verifying that the claimants presenting PACA Claims adhered to the strict statutory requirements of PACA. Through the reconciliation process and negotiations, Skadden, Arps and the Debtors' advisors resolved all but 7 of the potential PACA Claims for a total of approximately $30 million. The Debtors continue to work with the holders of these PACA Claims to resolve outstanding issues.

     During the Application Period, Skadden, Arps professionals devoted a total of 199.4 hours to this category, for which compensation is sought in the aggregate amount of $99,100.50.

(i)     Creditor Meetings / Statutory Committees

During the Application Period, Skadden, Arps provided a variety of services relating to statutory committee issues.

Skadden, Arps advised the Debtors with respect to numerous issues related to the appointment of the Equity Committee. In this regard, Skadden, Arps (i) advised the Debtors regarding responding to the renewed requests by two institutional equity security holders to the U.S. Trustee for the appointment of an Equity Committee, (ii) provided the Debtors with legal advice concerning the factors to be considered in determining the propriety of an Equity Committee, given the facts and circumstances of these cases, and (iii) drafted a legal memorandum to the Debtors with respect to the appointment of an Equity Committee.

After considering the facts and circumstances of these cases, the Debtors concluded that the appointment of an Equity Committee was appropriate and in the best interests of their estates. Thereafter, Skadden, Arps drafted a letter to the U.S. Trustee supporting the appointment of an Equity Committee. The U.S. Trustee determined that the appointment of an Equity Committee was appropriate and appointed the Equity Committee on August 17, 2005.

Following the appointment of the Equity Committee, Skadden, Arps, together with the Debtors' financial advisors, the Blackstone Group LLP, participated in a lengthy introductory presentation to the Equity Committee's proposed financial advisors and legal counsel regarding the Debtors' businesses. During the Application Period, Skadden, Arps consulted with the proposed Equity Committee counsel regularly to address various issues arising in connection with these cases and matters involving the interests of the Equity Committee's constituency.

Moreover, Skadden, Arps provided extensive assistance to the Debtors in connection with the Creditors Committee's motion to disband the Equity Committee (the "Disbandment Motion"). Upon learning that the Creditors Committee planned to file the Disbandment Motion, Skadden, Arps assisted the Debtors in addressing the Debtors' concerns that the Disbandment Motion and pleadings filed in response to the Disbandment Motion (collectively, the "Disbandment Pleadings") would contain confidential commercial information about the Debtors' businesses that would be compromised if the Disbandment Pleadings were publicly filed. In this regard, Skadden, Arps (i) advised the Debtors regarding the legal requirements for having the Disbandment Pleadings filed under seal; (ii) corresponded with counsel for the Creditors Committee and the proposed counsel for the Equity Committee to enlist their support for having the Disbandment Pleadings filed under seal; (iii) filed a motion with the Court requesting an order requiring that the Disbandment Pleadings be filed under seal to preserve the confidentiality of confidential commercial information about the Debtors' businesses (the "Sealing Motion"); (iv) assisted the Debtors in responding to, and resolving, (a) the concerns expressed by the Securities and Exchange Commission with respect to the Sealing Motion and (b) the limited objection to the Sealing Motion filed by that certain

Ad Hoc Retiree Committee; (v) assisted in the formulation of the Debtors' arguments in response to the U.S. Trustee's objection to the Sealing Motion which were presented by SH&B at the hearing on the contested Sealing Motion that took place on September 8, 2005 (the "Sealing Hearing"); and (vi) assisted in preparing the Debtors' witness for the Sealing Hearing. In large part as a result of Skadden, Arps' efforts working in conjunction with SH&B, the Court entered an order, dated September 12, 2005, approving the Sealing Motion, requiring the Disbandment Pleadings to be filed under seal and, thereby, sparing the Debtors' estates from the potential ill effects of having confidential commercial information about the Debtors' businesses publicly disclosed.

Furthermore, Skadden, Arps assisted the Debtors in responding to the Disbandment Motion. Skadden, Arps (i) advised the Debtors with respect to the legal issues raised by the Disbandment Motion; (ii) advised the Debtors in addressing requests for production of documents made by the Creditors Committee in connection with the Disbandment Motion; (iii) worked with the Debtors, U.S. Trustee, Creditors Committee, Equity Committee, and Ad Hoc Retiree Committee to obtain the September 19, 2005 consent order from the Court regarding the scheduling and discovery issues related to the Disbandment Motion; and (iv) drafted the Debtors' motion dated September 28, 2005, asserting that the appropriate standard for reviewing the appointment of the Equity Committee was abuse of discretion and that summary judgment denying the Disbandment Motion should be entered based upon the undisputed facts that were before the Court. The Court entered an order dated, October 18, 2005, determining that the abuse of discretion standard was the appropriate standard of review, but declining to decide the merits of the Disbandment Motion at that time.

Skadden, Arps also assisted the Debtors in responding to a motion by certain of the Debtors' retirees for appointment of a second official committee of unsecured creditors to represent the interests of retirees (the "Retiree Motion"). Specifically, Skadden, Arps provided the Debtors with legal advice regarding the propriety of having an official retiree committee, given the facts and circumstances of these cases. Skadden, Arps also drafted an objection to the Retiree Motion on behalf of the Debtors. In large part as a result of Skadden, Arps' efforts working in conjunction with SH&B, on July 6, 2005 the Court entered an order denying the Retiree Motion.

Additionally, Skadden, Arps continued to consult with counsel for the Creditors Committee on a regular basis to address issues arising in connection with these cases and matters involving the interests of the Creditor's Committee's constituency and attended a meeting with the Creditors Committee to address certain of such issues.

During the Application Period, Skadden, Arps professionals devoted a total of 450.1 hours to this category, for which compensation is sought in the aggregate amount of $229,562.50.

(j)    Employee Matters / General

During the Application Period, Skadden, Arps provided a variety of services relating to employee matters.

Skadden, Arps advised the Debtors with respect to a number of issues relating to the Debtors' chapter 11 key employee retention plan (the "KERP") and comprehensive severance program covering all employees (the "Severance Program"). The KERP and the Severance Program are integral components of the Debtors' efforts to retain key employees, reduce the significant risk of attrition in the Debtors' workforce during the pendency of these cases, and increase employee morale.

Together with certain other of the Debtors' professionals, Skadden, Arps assisted the Debtors in developing the KERP and Severance Program. In this regard, Skadden, Arps (i) drafted a motion on behalf of the Debtors seeking approval of the KERP and Severance Program (the "KERP Motion"), (ii) assisted the Debtors in negotiating with the Creditors Committee and the DIP Lenders to resolve certain concerns regarding the KERP and the Severance Program, and (iii) drafted a notice of compromise (the "Notice of Compromise") reflecting the agreement reached by the Debtors, the Creditors Committee, and the DIP Lenders regarding the KERP and Severance Program. In addition, Skadden, Arps, together with SH&B, assisted (a) in responding to the inquiries of, and the discovery requested by, the U.S. Trustee and certain Winn-Dixie retirees (the U.S. Trustee and such retirees collectively, the "KERP Objectors") in connection with objections to the KERP Motion filed by the KERP Objectors, (b) in witness preparation for the hearing to consider the KERP Motion, and (c) in the prosecution of the KERP Motion at that hearing. In large part as a result of Skadden, Arps' efforts working in conjunction with SH&B, an order approving the KERP Motion, as modified by the Notice of Compromise, was entered on June 28, 2005. Following entry of the order approving the KERP Motion, Skadden, Arps (i) advised the Debtors with respect to a variety of issues relating to communications sent to employees regarding the KERP and the Severance Program, and (ii) assisted the Debtors in finalizing plan documents for the KERP and the Severance Program.

Furthermore, Skadden, Arps advised the Debtors on a variety of issues relating to the Management Security Plan and the Supplemental Retirement Plan (together, the "Non-Qualified Plans"). Among other things, Skadden, Arps assisted the Debtors in (a) analyzing the impact of the chapter 11 process on benefits offered under the Non-Qualified Plans, (b) responding to employee inquiries regarding such benefits, and (c) preparing a letter and information package for participants in the Non-Qualified Plans in connection with filing proofs of claim.

In addition to the foregoing, Skadden, Arps advised the Debtors on a variety of issues relating to the Debtors' restricted stock plan and other employee matters.

During the Application Period, Skadden, Arps professionals devoted a total of 448.5 hours to this category, for which compensation is sought in the aggregate amount of $233,678.00.

(k)    Executory Contracts / Personalty

During the Application Period, Skadden, Arps assisted the Debtors with various executory contract and personal property lease issues. Skadden, Arps spent substantial time advising the Debtors as to (i) their rights and obligations under the Bankruptcy Code and (ii) their ability to assume or reject contracts and the consequences of either course of action, including the treatment of prepetition arrearages.

The Debtors estimate that, as of the Petition Date, they were parties to at least 2,800 executory contracts and leases of personal property. The contracts pertain to almost all aspects of the Debtors' business, including supply contracts with vendors for thousands of different products sold in the Debtors' stores and contracts with independent contractors that provide numerous services to the Debtors. The personal property leases include leases of several different types of computer equipment, customer check-out equipment, security equipment and other items. In certain circumstances, the Debtors lease hundreds of pieces of equipment under these leases.

During the Application Period, Skadden, Arps (i) reviewed various contracts and leases and answered questions from the Debtors as to the specific contract or lease term; (ii) evaluated multiple contracts and leases to determine whether they should be assumed or rejected; (iii) responded to inquiries from certain contract and lease parties and coordinated with the Debtors to resolve issues raised by such parties; and (iv) assisted the Debtors with enforcement issues with respect to various contracts.

Skadden, Arps filed three motions to reject unprofitable or unnecessary contracts. Through Skadden, Arps' work on the rejection motions and its assisting the Debtors with determining which contracts to reject, the estates were relieved of over $12 million in liability.

During the Application Period, Skadden, Arps professionals devoted a total of 454.7 hours to this category, for which compensation is sought in the aggregate amount of $220,186.50.

(l)    Financing / DIP / Emergence

During the Application Period, Skadden, Arps assisted the Debtors on matters related to (i) their $800 million debtor-in-possession credit facility (the "DIP Facility"), (ii) their insurance premium financing agreement with AFCO Premium Credit LLC ("AFCO"), and (iii) the entry of a final cash management order.

Prior to the Application Period, Skadden, Arps spent considerable time negotiating the DIP Facility. The DIP Facility has been a critical source of adequate

postpetition credit, which has enabled the Debtors to continue to manage and operate their businesses. The DIP Facility also enabled the Debtors to eliminate the substantial costs, fees and expenses associated with the Debtors' prepetition credit facility. The DIP Facility has further provided confidence to the Debtors' vendors, which has enabled and encouraged them to resume ongoing credit relationships with the Debtors.

During the Application Period, Skadden, Arps assisted the Debtors on matters related to the negotiation of a second amendment to the DIP Facility and on matters related to the Debtors' day-to-day compliance obligations under the DIP Facility. The second amendment, signed on July 29, 2005, permitted the post-petition trade lien program with trade vendors established by the Debtors concurrently therewith and modified the definition of "permitted liens" to allow the Debtors to sell certain assets in accordance with the Debtors' restructuring plan. In connection with the trade lien program, Skadden, Arps also negotiated a junior security agreement with counsel for certain large trade vendors, the Creditors Committee and the DIP Lenders.

Additionally, during the Application Period, Skadden, Arps provided advice to and assisted the Debtors with various other issues in connection with the DIP Facility, including, among other things, proposed asset dispositions and lease transactions, a proposed corporate credit card arrangement for its employees, ongoing cooperation with the Creditors Committee's review of prepetition liens, negotiation of a temporary waiver of certain covenants related to the delivery of year-end financial information to the DIP Lenders, and advice to the Debtors concerning updates to the disclosure in its annual report concerning DIP-related matters.

Furthermore, during the Application Period, Skadden, Arps continued working on matters relating to the Debtors' financing with AFCO and the premiums arising under certain of the Debtors' insurance policies. The Debtors have various forms of insurance that were, and are, essential to the Debtors' business. The Debtors' decision to finance the insurance premiums, as opposed to paying them in full, is consistent with the Debtors' cash flow needs. In the days prior to the Application Period, Skadden, Arps negotiated, and drafted a motion for approval of a postpetition premium finance agreement with AFCO (the "AFCO Motion"). In this motion, the Debtors sought authority to (i) finance approximately $9.7 million in insurance premiums for necessary forms of insurance for a one-year period beginning April 30, 2005, and (ii) establish a more streamlined notice/consent procedure for obtaining approval of the Debtors' entry into future, substantially similar premium finance agreements with AFCO. After filing the AFCO Motion, the Debtors continued to finalize their agreement with AFCO and prepare for the hearing. Preparations included negotiating and resolving issues related to the proposed form of order raised by the U.S. Trustee and the DIP Lenders. On May 19, 2005, this Court approved the AFCO Motion. Thereafter, Skadden, Arps utilized the more streamlined notice/consent procedures that had been established in such order to obtain authority to enter into a subsequent premium finance agreement with AFCO.

Lastly, during the Application Period, Skadden, Arps assisted the Debtors with various bank account and cash management issues. Specifically, Skadden, Arps worked with the U.S. Trustee, counsel for the Creditors Committee and counsel for the DIP Lenders to address issues prior to the entry of a final cash management order. Skadden, Arps negotiated with the U.S. Trustee and the DIP Lenders concerning compliance with Bankruptcy Code section 345. After successful negotiations, on May 20, 2005, this Court entered a final order authorizing the Debtors to maintain their existing bank accounts and cash management system and the continued use of their existing checks and investment guidelines.

During the Application Period, Skadden, Arps professionals devoted a total of 185.1 hours to this category, for which compensation is sought in the aggregate amount of $102,991.50.

(m)     Insurance

During the Application Period, Skadden, Arps advised the Debtors with respect to legal issues concerning the Debtors' insurance policies, worker's compensation policies, premiums and refunds as well as issues relating to the use of letters of credit as security devices.

Prior to the Petition Date, the Debtors maintained certain insurance payments with ACE American Insurance Company ("ACE"), including primary general liability, automobile liability and workers' compensation program (collectively, the "ACE Policies"). The Debtors determined that renewal of the ACE Policies was critical for their business. To maintain the ACE Policies, ACE required the Debtors to, among other things, (i) assume the workers' compensation program and (ii) increase the letter of credit. Skadden, Arps spent considerable time discussing ACE's requirements with the Debtors and prepared and filed a motion necessary to maintain the ACE Policies (the "ACE Motion").

Thereafter, Skadden, Arps spent considerable time preparing for the hearing due to the complexity of the issues involved. No objections were filed. On August 4, 2005, this Court approved the ACE Motion.

During the Application Period, Skadden, Arps professionals devoted a total of 162.9 hours to this category, for which compensation is sought in the aggregate amount of $86,856.50.

(n)     Leases / Real Property

During the Application Period, Skadden, Arps (i) advised the Debtors with respect to various real property lease issues and their rights and obligations under the Bankruptcy Code with respect to such leases and (ii) devoted significant time to negotiating a myriad of different issues with numerous landlords.

21

As of the Petition Date, the Debtors were party to over 900 unexpired real property leases, including several subleases. Skadden, Arps also spent significant time during the Application Period (i) reviewing the Debtors' lease files, including lease assignments, subleases and general lease correspondence, (ii) analyzing issues related to the proper classification of certain leases and the Debtors' rights to assume and assign or reject leases, and (iii) drafting motions to reject leases and other documents concerning the disposition of the Debtors' leases.

Notably, during the Application Period, Skadden, Arps assisted the Debtors in their efforts to reject leases that the Debtors determined were no longer necessary to their operations. In this regard, Skadden, Arps drafted several lease rejection motions seeking authority to reject approximately twenty-five leases and subleases that related to both operating and non-operating facilities. Certain of these motions drew objections, the majority of which were resolved through extensive negotiations undertaken by Skadden, Arps. Ultimately, as a result of Skadden, Arps' efforts during the Application Period, the Debtors obtained authority to reject dozens of leases and subleases, thus allowing the Debtors' estates to shed the burdens and administrative expenses that otherwise would have been incurred with respect to such leases and subleases.

Additionally, during the Application Period the Debtors filed a Motion for Order Authorizing and Approving (i) Rejection of Real Property Leases and Subleases, (ii) Abandonment of Related Personal Property, and (iii) the Settlement Agreement with E.W. James. In addition to seeking the rejection of several leases and corresponding subleases, this motion sought the approval of an agreement pursuant to which E.W. James agreed, inter alia, to release all claims that E.W. James had against the Debtors as a result of the rejection of the subleases. An objection to the motion was filed by a landlord that which party to one of the primary leases that the Debtors' motion sought to reject. The Court approved the motion as to all of the other leases and subleases and continued the hearing only with respect to the lease that was the subject of the landlord's objection. The approval of this motion benefited the Debtors' estates by eliminating burdens associated with such leases and subleases and certain claims flowing from their rejection.

Moreover, during the Application Period, Skadden, Arps continued to assist the Debtors in their efforts to extend the Debtors' deadline for assuming or rejecting unexpired leases pursuant to Bankruptcy Code section 365(d)(4). Skadden, Arps' work in this regard related to two motions seeking such approval (each such motion, a "365(d)(4) Extension Motion"). The first 365(d)(4) Extension Motion was filed on March 18, 2005. At the time of the May 6, 2005 hearing on the first 365(d)(4) Extension Motion, two objections remained outstanding. An order approving the first 365(d)(4) Extension Motion was entered on May 6, 2005, which order (i) extended the Debtors' time to reject the vast majority of its unexpired nonresidential real property leases to September 19, 2005 and (ii) continued the hearing on the two objections to a later omnibus hearing. Thereafter, Skadden, Arps attorneys negotiated with counsel for the two objecting parties, and ultimately were successful in resolving all objections to the motion.

Later in the Application Period, the Debtors drafted and filed the second 365(d)(4) Extension Motion. Four objections to the motion were filed. By the time of the hearing on the motion, Skadden, Arps had successfully negotiated the resolution of two of the objections. On September 12, 2005, the Debtors obtained an order that (i) extended their time to decide whether to assume or reject the majority of their unexpired real property leases to December 19, 2005 and (ii) continued the hearing on the two unresolved objections to September 22, 2005. Thereafter, Skadden, Arps worked with the remaining objecting parties and, during the Application Period, was able to obtain the withdrawal of one of the objections. The hearing to consider the remaining objection was continued to a date beyond the Application Period, but was ultimately resolved through Skadden, Arps' efforts. Additionally, during the Application Period, Skadden, Arps attorneys drafted hearing outlines and other materials to be used at the hearings on each of the 365(d)(4) Extension Motions.

Finally, Skadden, Arps worked on numerous other matters pertaining to the Debtors' leased properties. For instance, Skadden, Arps handled and responded to innumerable daily inquiries by landlords regarding their respective leases and assisted the Debtors in resolving disputes with various parties relating to leased properties, including disputes pertaining to postpetition rent, tax, and common area maintenance charges. In most instances, these issues were resolved without the necessity of resorting to litigation. In at least one specific instance, however, Skadden, Arps prepared and filed an objection to a motion filed by Penman Plaza Associates, Ltd. seeking to compel the Debtors' assumption or rejection of a real property lease. The parties ultimately settled the matter by agreeing that the lease in question would be assumed or rejected by November 18, 2005. Additionally, during the Application Period, Skadden, Arps conducted research on several legal issues related to the assumption and rejection of unexpired real property leases.

During the Application Period, Skadden, Arps professionals devoted a total of 946.9 hours to this category, for which compensation is sought in the aggregate amount of $412,475.00.

(o)     Litigation / General

During the Application Period, Skadden, Arps (i) advised the Debtors with respect to various issues related to pending lawsuits, including setoff rights and entering into settlements for the benefit of the estate; (ii) oversaw litigation efforts by other professionals to ensure protection of the Debtors' interests; (iii) researched complex issues regarding state law jurisdiction; and (iv) assisted SH&B with the development of settlement procedures for litigation claims.

During the Application Period, Skadden, Arps professionals devoted a total of 67.4 hours to this category, for which compensation is sought in the aggregate amount of $30,483.50.

(p)    Regulatory and SEC Matters

During the Application Period, Skadden, Arps assisted the Debtors with certain securities reporting requirements and other SEC issues implicated by the chapter 11 filings. In particular, Skadden, Arps reviewed and provided comments and advice on several reporting documents and assisted with audit letters.

During the Application Period, Skadden, Arps professionals devoted a total of 9.5 hours to this category, for which compensation is sought in the aggregate amount of $5,125.00.

(q)    Reorganization Plan / Plan Sponsors

During the Application Period, Skadden, Arps assisted the Debtors with the preparation and filing of two motions to further extend the Debtors' exclusive periods for plan proposal and plan acceptance (each such motion, an "Exclusivity Motion"). Although most of the work with respect to the first Exclusivity Motion was completed prior to the Application Period, certain review and revision of such motion took place during the Application Period. On June 16, 2005, the Court entered an order extending the Debtors' exclusive period to propose a plan and solicit acceptance on a plan to September 19, 2005, and November 21, 2005, respectively. During the Application Period, Skadden, Arps drafted, reviewed and revised the second Exclusivity Motion. As a result of Skadden, Arps' efforts, on September 8, 2005, the Court entered an order extending the Debtors' exclusive period to propose a plan and solicit acceptance on a plan to December 19, 2005, and February 20, 2006, respectively.

In addition, Skadden, Arps continued to assist the Debtors with preliminary issues involving the timetable for formulation of potential exit strategies and issues concerning possible terms of a plan of reorganization. This assistance also involved analysis of various issues related to possible plan structures.

During the Application Period, Skadden, Arps professionals devoted a total of 206 hours to this category, for which compensation is sought in the aggregate amount of $128,638.50.

(r)    Reports and Schedules

During the Application Period, Skadden, Arps assisted the Debtors with amendments to their schedules of assets, liabilities and executory contracts (the "Amended Schedules"), including extensive work to ensure the identification and tracking of all contracts. The Amended Schedules were filed on July 20, 2005.

Skadden, Arps also assisted the Debtors with various issues involving the monthly operating report requirements. Skadden, Arps reviewed and provided comments on the Debtors' monthly reports.

During the Application Period, Skadden, Arps professionals devoted a total of 50.4 hours to this category, for which compensation is sought in the aggregate amount of $25,140.50.

(s)     Retention / Fee Matters / Skadden, Arps

During the Application Period, Skadden, Arps performed services associated with the firm's compliance with the Bankruptcy Code's retention and compensation requirements. Skadden, Arps continued reviewing disclosure parties to ensure compliance with all applicable rules and procedures relating to its retention in these cases. In connection therewith, the firm prepared and filed supplemental declarations disclosing connections with parties in interest and other necessary information.

In addition, under an administrative order governing payment of professionals, Skadden, Arps prepared monthly statements which contain detailed records of services rendered and expenses incurred. Preparation of monthly statements is time-consuming as it requires a review of all time and expense entries to ensure that they are properly charged to the Debtors, that they are recorded in the proper category and that they do not reveal privileged information.

In the ordinary course of the Debtors' business, the Debtors utilize a legal services company, Examen, that reviews fee statements by Winn-Dixie professionals. Examen employed several procedures under which professionals were directed to submit fee statements. To satisfy Examen's standards and procedures, Skadden, Arps spent considerable time communicating with Examen and revising the format of its time records to comply with Examen's standards for submission.

Through the fee review process, Skadden, Arps refines its bills and voluntarily makes reductions in charges. For example, total voluntary reductions made with respect to the months covered by the Application Period for fees and expenses were approximately $301,340.41.

During the Application Period, Skadden, Arps professionals devoted a total of 499.9 hours to this category, for which compensation is sought in the aggregate amount of $223,574.50.

(t)     Retention / Fee Matters / Objections / Others

During the Application Period, Skadden, Arps performed services associated with retention and compensation issues involving professionals other than Skadden, Arps, including other professionals retained by the Debtors and the professionals retained by the Creditors Committee. Skadden, Arps assisted the Debtors in resolving (a) the U.S. Trustee's and the Creditors Committee's objections to the Debtors' employment of (i) Bain & Company, Inc. ("Bain"); (ii) Blackstone Group, L.P.; (iii) XRoads; (iv) Carlton Fields, P.A.; and (v) Togut, Segal & Segal LLP and (b) the Debtors' issues regarding the Creditors Committee's employment of (i) Houlihan Lokey Howard & Zukin

Capital, (ii) Alvarez & Marsal, LLC, and (iii) Akerman Senterfitt. In connection with resolving these objections, Skadden, Arps advised the Debtors and communicated with the professionals to be retained, counsel for the Creditors Committee and the U.S. Trustee. In large part as a result of Skadden, Arps' efforts, the objections were resolved and the professionals were retained. Moreover, with respect to Bain, Skadden, Arps also assisted in preparing the stipulation approving its retention and the corresponding motion and order.

During the Application Period, Skadden, Arps also assisted the Debtors with the retention of ordinary course professionals. In this regard, Skadden, Arps communicated with the Debtors, the potential ordinary course professionals, and prepared the supplements to the list of ordinary course professionals and the corresponding submissions of completed retention questionnaires for filing with the Court. As a result of Skadden, Arps' efforts, the Debtors retained additional necessary ordinary course professionals.

In addition, Skadden, Arps communicated with the Debtors, and counsel for the Creditors Committee regarding issues related to the appointment of a fee examiner.

Lastly, Skadden, Arps assisted the Debtors with respect to the retention of DJM Asset Management, LLC and The Food Partners, LLC, the Debtors' brokers for the sales of their stores.

During the Application Period, Skadden, Arps professionals devoted a total of 322.4 hours to this category, for which compensation is sought in the aggregate amount of $164,175.00.

(u)    Tax Matters

During the Application Period, Skadden, Arps assisted the Debtors with addressing claims, notices and inquiries received from certain taxing authorities and worked with the Debtors' tax advisors on tax planning initiatives and the implications of the chapter 11 filings on certain tax treatment matters.

During the Application Period, Skadden, Arps professionals devoted a total of 52 hours to this category, for which compensation is sought in the aggregate amount of $32,281.50.

(v)    U.S. Trustee Matters

During the Application Period, Skadden, Arps assisted the Debtors with responding to the U.S. Trustee's requests for information. In this regard, Skadden, Arps advised the Debtors regarding such requests and prepared the Debtors' responses to such requests.

Other services associated with the U.S. Trustee are reflected in substantive project categories.

During the Application Period, Skadden, Arps professionals devoted a total of 9.8 hours to this category, for which compensation is sought in the aggregate amount of $7,679.00.

(w)    <u>Utilities</u>

During the Application Period, Skadden, Arps assisted the Debtors with addressing issues raised by approximately eighty-one (81) utility companies that have provided utility services to the Debtors.

Specifically, during this Application Period, Skadden, Arps on behalf of the Debtors continued to negotiate with utility companies which objected (the "Utility Objections") to the Debtors' first-day motion seeking the continuation of utility services and establishing a procedure under which utilities could seek additional adequate assurance of payment (the "Utilities Motion"). While the New York Court entered an order granting the Utilities Motion (the "Utilities Order"), the Utilities Order was not binding on the thirteen (13) objecting utility companies (and certain of their affiliates) (the "Objecting Utility Companies"). During the Application Period, Skadden, Arps on behalf of the Debtors successfully negotiated and documented resolutions with certain of the Objecting Utility Companies. Skadden, Arps resolved the balance of the Utility Objections after the Application Period.

Under the Utilities Order, the Debtors received approximately forty-five (45) requests for additional adequate assurance (the "Adequate Assurance Requests"), in addition to the adequate assurance requests included in the Utility Objections. During the Application Period, Skadden, Arps continued its efforts in obtaining supplemental information from the requesting utility companies, and in coordinating and supervising the process of reconciling account balances and other information by the Debtors and the requesting utility companies. During the Application Period, Skadden, Arps assisted the Debtors in achieving and documenting successful resolutions regarding the Adequate Assurance Requests.

In addition, approximately thirty-three (33) utility companies have made demands on surety bonds which secured the payment of prepetition utility services to the Debtors (the "Bond Demands"). During the Application Period, Skadden, Arps negotiated and documented resolutions regarding the Bond Demands, including their rescission to prevent a call on the bonds.

With respect to the resolutions of the Utility Objections, the Adequate Assurance Requests, and the Bond Demands, Skadden, Arps provided appropriate notice of such resolutions to the notice parties under the final order granting the Debtors general settlement authority to resolve disputes with utility companies and addressed any comments a notice party may have had with respect to such resolutions. In addition,

Skadden, Arps coordinated with the Debtors and the applicable utility companies in implementing the resolutions.

During the Application Period, Skadden, Arps advised the Debtors and assisted the Debtors and SH&B in successfully contesting the Utility Objections filed by JEA, Duke Power Company ("Duke"), Orlando Utilities Commission ("OUC"), and American Electric Power ("AEP"). Specifically, Skadden, Arps conducted research and analyzed the relevant issues, including the factors courts consider in determining adequate assurance requests. In addition, Skadden, Arps assisted the Debtors in analyzing their payment history with these utility companies, together with other relevant factors in preparation for the hearings on these matters.

After the Debtors' obtained the favorable rulings denying the Utility Objections of JEA, Duke, OUC, and AEP, Skadden, Arps made written requests to utility companies, which submitted Adequate Assurance Requests and which were similarly situated with respect to prepetition deposits as JEA, Duke, OUC, and AEP, to withdraw their Adequate Assurance Requests (the "Withdrawal Requests"). As a result of Skadden, Arps' efforts, twenty-four (24) of the thirty-five (35) utility companies contacted withdrew their Adequate Assurance Requests.

With respect to the eleven (11) utility companies, which refused to comply with the Withdrawal Requests, Skadden, Arps assisted the Debtors in preparing and filing a Motion for Determination of Adequate Assurance of Payment of Utilities (the "Motion for Determination"), seeking a determination that these eleven (11) utility companies were not entitled to additional adequate assurance. In preparing the Motion for Determination, Skadden, Arps assisted the Debtors in analyzing relevant historic and other information relating to their relationship with such utility companies. Skadden, Arps on behalf of the Debtors successfully obtained an order granting the Motion for Determination.

During the Application Period, Skadden, Arps, on behalf of the Debtors, prepared a response to the motion filed by the City of Plaquemine, seeking a modification of its security deposit. Skadden, Arps further assisted the Debtors to successfully obtain an order denying the motion filed by the City of Plaquemine.

During the Application Period, Skadden, Arps has continued to address various issues regarding noncompliance by utility companies with the Utilities Order, including misapplication of postpetition payments and misallocation of utility service charges by noncomplying utility companies. Skadden, Arps, on behalf of the Debtors, contacted the noncomplying utility companies and successfully resolved the various issues concerning them.

During the Application Period, Skadden, Arps professionals devoted a total of 1,163.7 hours to this category, for which compensation is sought in the aggregate amount of $513,629.50.

(x)    <u>Vendor Matters</u>

During the Application Period, Skadden, Arps continued to assist the Debtors with various matters involving their vendor relationships and the impact of the chapter 11 filings on such relationships.

Skadden, Arps continued to assist the Debtors in resolving problems with certain important vendors in an effort to reestablish credit terms and solidify ongoing relationships. Skadden, Arps successfully addressed certain critical vendor issues, including continuing Hobart's prepetition level of service postpetition.

During the Application Period, Skadden, Arps assisted the Debtors in resolving Heritage Mint Ltd.'s ("Heritage") motion requesting an order shortening the time for the Debtors to assume or reject an executory contract with Heritage for the purchase of goods without agreeing to assume or reject the contract or shorten the time to make such a decision. Skadden, Arps communicated the issues and their implication with the Debtors and their restructuring advisors and negotiated a settlement pursuant to which (i) Heritage accepted returned goods, (ii) the automatic stay was modified to permit the setoff, and (iii) Heritage paid the Debtors the balance of money owed to the Debtors as a result of the returned merchandise. As a result of Skadden, Arps' efforts, the motion was resolved successfully in that it allowed the Debtors to (i) continue their good relationship with a long-term vendor, (ii) return unused goods and receive the appropriate credit for such returns, and (iii) receive $217,474 owed to it.

During the Application Period, Skadden, Arps professionals devoted a total of 73.2 hours to this category, for which compensation is sought in the aggregate amount of $42,534.00.

<u>SUPPORT FOR ALLOWANCE OF COMPENSATION</u>

24.    Bankruptcy Code section 330 authorizes the Court to award "reasonable compensation for actual, necessary services rendered by the . . . professional person . . . ." 11 U.S.C. § 330(a)(1)(A). In order to evaluate services rendered by a professional person, a court must determine whether such services were necessary and reasonable.

25.    Skadden, Arps respectfully submits that the fees requested in this Second Application are allowable pursuant to the factors generally considered by courts in awarding compensation in chapter 11 cases. Those factors and the applicability of each factor to the services performed by Skadden, Arps in these cases are set forth below:

(a)    Time and Labor Required

During the Application Period, Skadden, Arps expended an aggregate of 9,163 hours in the representation of the Debtors at a blended rate of approximately $453 per hour. A detailed description of the services rendered during the Application Period is set forth fully in Exhibit C-1, Exhibit D-1, Exhibit E-1, Exhibit F-1, and Exhibit G-1. All of the services rendered were necessary to enable the Debtors to perform their statutory duties, fulfill their fiduciary obligations and progress through reorganization.

(b)    Nature and Complexity of the Cases

The chapter 11 cases are certainly large and complex and require work in a broad range of fields, involving a vast array of legal issues. These cases involve 24 estates, thousands of creditors, shareholders and other parties in interest and billions of dollars in assets and claims.

(c)    Skill Requisite to Perform Legal Services

Skadden, Arps respectfully submits that it has the specialized skill necessary to perform the legal services required by the Debtors. In order to address the issues presented during the Application Period, Skadden, Arps utilized its skills and expertise in bankruptcy, banking, corporate, employee, insurance, litigation and tax law.

Skadden, Arps is among the largest law firms, with one of the largest restructuring groups, in the country. Skadden, Arps restructuring attorneys and attorneys from other practice areas have extensive knowledge and experience in dealing with the multitude of fast-paced issues that arise in chapter 11 cases. Accordingly, Skadden, Arps' depth of experience in chapter 11 matters has ensured that a number of pressing matters could be addressed promptly.

(d)    Preclusion from Other Employment

Skadden, Arps was not precluded from other employment during the Application Period, although it has been necessary to reduce other client commitments of certain attorneys on the team to ensure proper coverage of issues on behalf of the Debtors.

(e)    Customary Fee

The hourly rates at which Skadden, Arps' fees have been charged by each professional are set forth in the summary preceding this Second Application. The rates are those customarily charged by Skadden, Arps to its clients in bankruptcy related matters according to its bundled rate structure, as increased from time to time. These hourly rates compare favorably with rates charged by other national law firms for similar legal services.

(f)     <u>Whether the Fee is Fixed or Contingent</u>

Skadden, Arps has agreed to be compensated, and has calculated its fee, on the basis of a fixed hourly rate for the services performed. Skadden, Arps' fees are contingent only to the extent that they are subject to this Court's approval and an administratively solvent estate.

(g)     <u>Time Limitations Imposed by Client or Circumstances</u>

In general, the circumstances of these cases have at times imposed significant time constraints on Skadden, Arps' services. Certain Skadden, Arps attorneys have committed almost all of their available time to providing services to the Debtors.

(h)     <u>Amounts Involved and Results Obtained</u>

Exhibit C-1, Exhibit D-1, Exhibit E-1, Exhibit F-1, and Exhibit G-1 set forth detailed descriptions of the services rendered by Skadden, Arps and the charges associated with such services. Skadden, Arps respectfully submits that the services provided were necessary to enable the Debtors to operate as debtors-in-possession, fulfill their fiduciary obligations and begin the process of restructuring their debts.

(i)     <u>Experience, Reputation and Ability of Attorneys</u>

Skadden, Arps respectfully submits that it and its attorneys are experienced, capable and have an excellent reputation in the national restructuring industry. Skadden, Arps has extensive experience representing debtors in bankruptcy cases throughout the country.

(j)     <u>Undesirability of Case</u>

Skadden, Arps believes that this factor is not applicable to its representation of the Debtors in the current cases.

(k)     <u>Nature and Length of Relationship with Client</u>

On February 7, 2005, the Debtors retained Skadden, Arps for the specific purpose of assisting them with their reorganization efforts. By order dated March 15, 2005, Skadden, Arps' retention in these cases was effective as of the Petition Date.

(l)     <u>Awards in Similar Cases</u>

Skadden, Arps submits that the fees requested in this Second Application are comparable to fees requested and awarded in other chapter 11 bankruptcy cases of this size, nature and complexity.

31

## SUPPORT FOR EXPENSE REIMBURSEMENT

26.    Bankruptcy Code section 330(a)(1)(B) provides for reimbursement to approved professionals for all "actual, necessary expenses." 11 U.S.C. § 330(a)(1)(B). According to the engagement agreement entered into between Skadden, Arps and the Debtors (the "Engagement Agreement"),[12] Skadden, Arps and the Debtors have agreed that Skadden, Arps' bundled rate structure will apply to these cases. Therefore, Skadden, Arps is not seeking to be compensated separately for certain staff, clerical and resource charges. Moreover, under the bundled rate structure applicable to the Debtors, copying costs are charged at $0.10 per page, computerized research and telephone calls are billed at provider cost without reference to Skadden, Arps' internal capital costs or overhead, and document production (including secretarial and word processing time), facsimile services, proofreading, overtime meals and overtime travel allowances are not charged for separately on an incurrence basis.

27.    Consistent with the firm's policy with respect to its other clients, Skadden, Arps is seeking compensation for other charges and disbursements incurred as out-of-pocket expenses in the rendition of necessary services to the Debtors and their estates. These charges and disbursements include costs for telephone charges, photocopying, travel, business meals, computerized research, messengers, couriers, postage and, when applicable, witness fees and other fees related to trials and hearings.

28.    A complete description of each disbursement is included in Exhibit C-2, Exhibit D-2, Exhibit E-2, Exhibit F-2, and Exhibit G-2. Skadden, Arps' policy requires all attorneys to retain and submit for review receipts and/or invoices for all disbursements incurred through

---

[12]    The Engagement Agreement is Exhibit A to the Employment Application, which is attached as Exhibit A to this Second Application.

outside vendors. Skadden, Arps maintains all receipts and/or invoices related to each client's disbursement account in a central storage facility, and such records can be produced upon request.

NOTICE OF SECOND APPLICATION

29.    Notice of this Second Application has been provided to (i) the U.S. Trustee; (ii) counsel for the DIP Lenders; (iii) counsel for the Creditors Committee; (iv) counsel for the Equity Committee; and (v) other parties named on the Master Service List and the Interim Payment Order.

WHEREFORE, Skadden, Arps requests that the Court (i) approve Skadden, Arps'
fees in the amount of $4,158,012.50, and expenses in the amount of $145,055.82 for the period
of May 1, 2005 through September 30, 2005; (ii) authorize payment of the foregoing amounts in
full, including any and all amounts previously withheld; and (iii) grant Skadden, Arps such other
and further relief as the Court deems just and proper.

Dated: November 11, 2005

> SKADDEN, ARPS, SLATE,
> MEAGHER & FLOM LLP
>
> By: *D. J. Baker*
>     D. J. Baker
>     Sally McDonald Henry
>     Rosalie Walker Gray
>     Four Times Square
>     New York, New York 10036
>     (212) 735-3000
>     (917) 777-2150 (facsimile)
>
> Attorneys for the Debtors