*EXHIBIT A*



# DEED OF LEASE

### STORE #969

## Winterpock Shopping Center
## U.S. Highway 360 and (Hull Street) and Winterpock Road
# CHESTERFIELD COUNTY, VIRGINIA

*Handles The closed stores*
*Telesa Tinsley    404-346-2424*

*Steve Perry   919-215-3920 (cell)*
*John Lewis   919-215-9885 (cell)*

*Carol Kennedy*
*919-772-5987*
*919-427-6374 (cell)*

## DEED OF LEASE

THIS DEED OF LEASE is made this _//−/3 −98_ , between **JNB COMPANY OF VIRGINIA, L.L.C.,** a Virginia limited liability company ("Landlord") and **WINN-DIXIE RALEIGH, INC.,** a Florida corporation ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### WITNESSETH:

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

**PREMISES**
1. Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, a store building, approximately 222 feet in width by 231 feet in depth, with a front vestibule and rear receiving room(s), to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided (collectively, the "Store"), together with exterior pads at the rear for installation of freezers and coolers, a loading dock area, and the land on which all of the same shall stand and Landlord hereby grants to Tenant a nonexclusive right and easement to use during the Term as hereinafter defined, all ramps, sidewalks, streets, entrances, exits, roadways, walkways, trash collection facilities and dumpsters, if any, malls, landscaped areas, parking areas, service areas, driveways, traffic signals, medians, curb cuts, access points, utility lines, water detention and retention facilities and related improvements shown on the Site Plan, as hereinafter defined (the "Common Areas" and together with the Store, collectively, the "Premises").

The Premises are located in a shopping center development (shown in detail on Exhibit "A," a site plan prepared by Timmons, Engineers, Architects, etc., dated October 28, 1998, the "Site Plan"), known as Winterpock Village (as the same may be enlarged from time to time, and including the Common Areas as defined herein, the "Shopping Center"), located on the northerly side of Highway #360 (Hull Street) near its intersection with Winterpock Road in the County of Chesterfield, Commonwealth of Virginia. The legal description of the Shopping Center is set forth on Exhibit "B".

**TERM**
2. (a) _Initial Term._ The term of this Deed of Lease shall commence on the Commencement Date, as herein defined and shall be for an initial term of twenty (20) years (the "Initial Term").

(b) _Extension Term(s)._ Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the Term of this Deed of Lease, each extension to be for a period of five (5) years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term").

Tenant may extend the Term provided that it is not in material or monetary default under this Deed of Lease by giving to Landlord a notice in writing at least one hundred eighty (180) days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document. If Tenant is, but for the giving of notice and/or the passage of time, in material or monetary default under this Deed of Lease at the time it notifies Landlord that it desires to extend the Term and Tenant cures such default within applicable cure periods, then Tenant's extension notice shall become effective upon such cure.

(c)    Return of Premises. Tenant will yield up the Premises and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in broom clean condition, reasonable wear and tear, damage by fire and other casualties and condemnation or appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct. Tenant shall not be required to restore the Premises to their original state. Tenant shall not remove from or assert any rights in or to any conduits, fixtures, ducts or other apparatus not constituting Tenant's Trade Fixtures. Tenant shall surrender to Landlord all keys to or for the Store and shall inform Landlord of all combinations of locks, safes, and vaults, if any, in the Store.

(d)    Any holding over by Tenant of the Premises after the expiration of the Term shall operate and be construed as a tenancy from month to month, at the same rent and upon the same terms and conditions applicable to the Term.

**RENT**

3.    Tenant shall pay the following without notice, demand, counterclaim, or offset except as expressly provided in this Deed of Lease or as provided by law.

(a)    Basic Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord as basic rent for the Premises during the Term, the sum of $398,264.00 per annum. ("Basic Rent"). Basic Rent shall be paid in twelve (12) equal monthly installments of $33,189.00 per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the Term.

(b)    Percentage Rent. In addition, beginning on the Commencement Date, as hereinafter defined, Tenant shall pay Landlord percentage rent equal to the amount, if any, by which one percent (1%) of Gross Sales (as hereinafter defined) exceeds Basic Rent ("Percentage Rent"). Any Percentage Rent which may become due shall be payable within sixty (60) days after the expiration of each Fiscal Year, as hereinafter defined. However, upon final termination of the Term, any Percentage Rent due shall be payable within sixty (60) days after such termination or expiration of the Term. The Percentage Rent for each Fiscal Year shall be calculated separately and without reference to any other Fiscal Year. For purposes of calculation the Percentage Rent due hereunder, Tenant's fiscal year shall be approximately July 1st to June 30th of each year (the "Fiscal Year"). Notwithstanding anything to the contrary in this Deed of Lease, Tenant shall be entitled to deduct from the amount of Percentage Rent otherwise due in any Fiscal Year the amount paid or payable by Tenant during the same Fiscal Year for Real Estate Taxes and Shopping Center Insurance, each as hereinafter defined.

"Gross Sales" shall mean the aggregate sales price of all merchandise (including, without limitation, food and beverages) sold in or from the Store by Tenant during each fiscal year of the Term, both for cash and on credit (less bad debt expenses). Gross Sales shall not include (i) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (ii) transfers of merchandise made by Tenant from the Premises to any other stores or warehouses of Tenant or its affiliated companies; (iii) credits or refunds made to customers for merchandise returned or exchanged; (iv) all sales of cigarettes and tobacco; (v) all receipts from vending machines, banks, automatic teller machines and public telephones; (vi) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds, savings stamps, or similar items; (vii) returns of merchandise to suppliers or manufacturers; (viii) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts, or coupons for exchange of merchandise or other things of value; (ix) merchandise or other things of value issued as a premium in connection with any sales promotion program; and (x) gift certificates or like vouchers

2

until such time as the same have been converted into a sale of merchandise. Tenant makes no representation or warranty as to the amount of Gross Sales it expects to make in or from the Premises. Landlord shall not release and shall keep confidential all information disclosed to or discovered by it concerning Gross Sales, and shall require Landlord's Auditor to keep the same confidential. Landlord may, however, disclose Gross Sales to its attorneys and accountants and to lenders, prospective lenders, and to prospective purchasers of the Shopping Center (collectively, "Interested Parties") provided that such Interested Parties agree in writing or are otherwise legally obligated to keep Gross Sales information confidential.

Tenant shall keep complete and accurate books and records of its Gross Sales. At the end of each Fiscal Year, or at the end of the Term, if it sooner occurs, Tenant shall submit to Landlord a written statement of Gross Sales for the preceding Fiscal Year. Such statement of Gross Sales shall be treated as confidential by Landlord and shall be conclusive unless Landlord, within ninety (90) days after receipt thereof, shall give written notice to Tenant of its intent to audit Tenant's Gross Sales figures for the prior year. The Landlord may then, at its cost and expense, cause applicable records to be audited at Tenant's place of business in a manner not to unreasonably interfere with Tenant's business by a certified public accountant contracted for and paid by Landlord (the "Landlord's Auditor"). Landlord's Auditor shall provide a copy of its findings and report of audit to Tenant. If Landlord's Auditor finds and it can reasonably demonstrate that Tenant has underpaid Percentage Rent due under this Deed of Lease, the Tenant shall pay to Landlord the amount of such underpayment within thirty (30) days of receipt of satisfactory documentation thereof from Landlord's Auditor and if Tenant understated Gross Sales for the preceding year by more than three percent (3%), Tenant shall also pay to Landlord the reasonable out-of-pocket cost of Landlord's Auditor. If Landlord's Auditor finds and it can reasonably demonstrate that Tenant has overpaid Percentage Rent due under this Deed of Lease, then Landlord shall promptly pay the amount of any such overpayment to Tenant.

(c)     Additional Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay as Additional Rent a portion of (i) Common Area Maintenance Expenses, (ii) Real Estate Taxes, (iii) Shopping Center Insurance, and (iv) Approved Security Expenses (each as hereinafter defined, and collectively, "Additional Rent"). Landlord shall use reasonable efforts to minimize Additional Rent. With respect to all amounts charged to Tenant as Additional Rent under this Deed of Lease, Landlord shall maintain for a period of one full calendar year from the last day of the year for which such Additional Rent is due, complete books and records in accordance with generally accepted accounting principles, and all receipts or other evidences of payment by Landlord (the "Payment Evidence"). On or before ninety (90) days after the end of each calendar year of the Term, Landlord shall provide to Tenant an itemized statement showing in reasonable detail the Additional Rent payable for the prior year and copies of the Payment Evidence. Tenant shall not be liable with respect to any amount expended by Landlord and not listed in such itemized statement. Failure of Landlord to timely deliver such itemized statement (unless caused by Force Majeure, as hereinafter defined) shall relieve Tenant of the obligation to pay any Additional Rent above the estimated amount paid by Tenant during the prior year. Tenant shall have the right, within one hundred eighty (180) days of receiving Landlord's statement of Additional Rent, to audit during normal business hours at Landlord's offices Landlord's records regarding Additional Rent. Tenant shall provide a report of such audit to Landlord. If, based upon such audit, it can reasonably be demonstrated that Tenant has underpaid Additional Rent, Tenant shall pay the amount of such underpayment to Landlord within thirty (30) days of completing its audit. If, based upon such audit, Tenant has overpaid Additional Rent, Landlord shall pay the amount of such overpayment to Tenant within thirty (30) days of receiving Tenant's audit report and if it can reasonably be demonstrated that Tenant has overpaid Additional Rent by more than three percent (3%), Landlord shall also pay to Tenant the reasonable, out-of-pocket cost of Tenant's audit.

3

(1)    Common Area Maintenance Expenses.  Tenant shall pay its Pro-rata Share of "Common Area Maintenance Expenses". Common Area Maintenance Expenses shall be payable monthly on the first day of each calendar month in the Term, and shall initially be based upon one-twelfth (1/12) of Landlord's estimate of the amount of such Common Area Maintenance Expenses to be due for the upcoming year which, for the first year, is estimated to be $3,205.13 per month.  For succeeding years, the basis for a year's Common Area Maintenance Expenses shall be the amount actually paid by Tenant for the prior year.

Common Area Maintenance Expenses include those reasonable and customary expenses actually incurred in good faith by Landlord in maintaining the Common Areas, as hereinafter defined, including those maintenance functions required to be performed in, on, or to the Common Areas under this Deed of Lease, including, without limitation, painting, cleaning, traffic control, inspecting, landscaping (only as shown in Tenant's Plans, as hereinafter defined), maintaining any sprinkler and septic systems and storm water detention facilities required for operation of the Shopping Center, restriping the parking areas, lighting during the Standard Hours, as hereinafter defined, and otherwise repairing and maintaining the Common Areas.

Common Area Maintenance Expenses do not include upgrading the Shopping Center to a level of service or condition beyond or above that which exists as of the Commencement Date, merchant's association dues or the like, management or administrative fees, the cost of repairs or other work required due to any casualty or other peril (whether insured, uninsured, or uninsurable), costs of correcting defects (including latent defects) in the construction of the Store or the Shopping Center, the costs of individual tenant improvements or items or services that benefit other tenants to an extent greater than such items or services benefit Tenant, special services or excess utilities provided to or used in the Common Areas as a result of other tenants, any utility or other expense paid for directly by Tenant, advertising or marketing expenses, holiday decorations, penalties for or the cost (including attorneys' fees), of disputes relating to Landlord's failure to timely pay fees or taxes or for Landlord's breach of any other agreement to which Landlord is a party, leasing commissions, Landlord's income taxes, depreciation expense, principal, interest, or late charges   on mortgages to which the Shopping Center is subject, the replacement of capital investment items or capital improvements (including repaving of asphalt parking areas or resurfacing concrete parking areas as opposed to repairing potholes or other day-to-day maintenance) unless, in Tenant's reasonable judgment, such items and improvements are likely to and in fact do result in the operating efficiency of the Shopping Center being increased such that the cost of such improvements will be wholly offset by such increased operating efficiency during the Term and the increased efficiency will be reflected accordingly in lower Common Area Maintenance Expenses or unless such capital improvements are mandated by subsequently enacted Legal Requirements, and the cost thereof is amortized over the maximum allowable useful life of such capital improvements the cost of investigating, testing for, removing, abating, or otherwise cleaning up any matter that constitutes a violation of any environmental law, bad debt or real losses or reserves therefor, costs associated with the operation of Landlord as a business entity, such as entity formation costs, entity accounting, etc., costs of selling, syndicating, financing or refinancing Landlord's interest in the Shopping Center, cellular phone charges or pager expenses, travel expenses, or any single expense over

4

fifteen percent (15%) of the estimated Common Area Maintenance Expenses for the current year (i) incurred without the prior written consent of Tenant, which consent shall not unreasonably be withheld or delayed provided, however, that on or before ten (10) days after receipt if Tenant fails to consent to or reject any Common Area Maintenance expense submitted by Landlord, such expense shall be deemed approved or (ii) not based upon competitive, arms-length bids obtained no more infrequently than once per year.

(2)      Real Estate Taxes. Tenant shall pay to Landlord, within thirty (30) days of receipt of Landlord's statement and a paid receipt therefor, or directly to the taxing authority if presented with an unpaid bill therefor, its Pro-rata Share of "Real Estate Taxes" assessed upon the Shopping Center. Real Estate Taxes includes all ad valorem and general real estate taxes and special assessments for improvements made either on-site or off-site by the taxing authorities as part of a special improvement district (e.g. special assessments for sidewalks or for road widening), less any abatements, early payment discounts, or refunds permitted by law. Real Estate Taxes does not include any special assessment for improvements previously installed or in the process of installation or installed after the Execution Date in connection with the initial development of the Shopping Center, Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Shopping Center. To the extent Tenant is required to pay for any special assessment for improvements, Tenant's obligation shall be determined by treating the special assessment as payable in as many installments as is lawful, and charging Tenant with Tenant's Pro-rata Share of each installment. Any annual special assessment deemed payable after the expiration or termination of this Deed of Lease shall not be Tenant's obligation. Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense. Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing. If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge shall be at Landlord's sole cost and expense, unless Landlord obtains Tenant's written approval in advance, which may be granted or withheld in Tenant's sole discretion or unless Tenant declines in writing to institute its own challenge and Landlord's challenge results in a net savings to Tenant, in which case, Tenant shall pay its Pro-rata Share of the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

(3)      Shopping Center Insurance. Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Shopping Center Insurance". Shopping Center Insurance means the reasonable cost of insurance required to be maintained for the Shopping Center under the terms of this Deed of Lease. Shopping Center Insurance shall not include the costs of any abnormal or increased premiums for such types of insurance resulting from the acts or omissions of other tenants in the Shopping Center nor business interruption, or rent loss insurance carried by Landlord, nor the excess cost of any insurance policies over that which could be purchased in an arm's length transaction between Landlord and an insurer.

(4)      Approved Security Expenses. Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Approved

5

Security Expenses". Approved Security Expenses include the reasonable, out-of-pocket cost of providing necessary safety and security devices and personnel pre-approved by Tenant's designated security officer. If Landlord determines, in its reasonable judgment, that security devices or personnel are necessary to fulfill its obligations under this Deed of Lease to keep the Shopping Center and the common areas safe and secure, it shall submit a written plan for providing such services to Tenant. Tenant shall submit such plan to its security officer for review. If the plan meets with the approval of Tenant's security officer, Tenant shall advise Landlord of the same. No expense associated with security devices or personnel not approved by Tenant's security officer will be considered for payment. Approved Security Expenses shall not include any expenses not based upon competitive, arms-length bids obtained no more infrequently than once per year. Payment of Approved Security Expenses or nonpayment of unapproved security expenses by Tenant shall not be interpreted and Landlord shall not claim that such payment or nonpayment should be interpreted as assertion of control over the common areas by Tenant.

Tenant's "Pro-rata Share" shall be 74.88% unless and until Tenant completes construction of the Addition described in Article 44 ("Expansion") hereof, whereupon Tenant's "Pro-rata Share" shall be 84.25%.

Basic Rent, Percentage Rent, and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated based upon a three hundred sixty-five (365) day year and Tenant shall pay any sales or rent tax due thereon to Landlord or at Tenant's option, directly to the taxing authorities.

TITLE

4.      On or before ten (10) days after the date on which the last of both Landlord and Tenant shall have executed this Deed of Lease (the "Execution Date"), Landlord shall order from a title insurance company reasonably acceptable to Tenant (the "Title Company") and deliver to Tenant's counsel at the address provided hereunder for copies of notices, a signed title insurance commitment dated no earlier than the Execution Date naming Tenant as the proposed insured and committing to insure Tenant's leasehold and any easement rights granted to Tenant in connection therewith and shall provide Tenant with copies of all title exceptions (the "Commitment"). It shall be a condition to Tenant's obligation to pay rent under this Deed of Lease that title to Tenant's leasehold and the related easements, if any, be subject only to those exceptions that are acceptable to Tenant or to which Tenant fails to timely object (collectively, the "Permitted Exceptions"). Landlord shall deliver the Commitment to Tenant on or before thirty (30) days after the Execution Date (the "Delivery Deadline"), and Tenant shall have thirty (30) days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment. If title is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Title Objection Notice"). If Tenant timely sends to Landlord Tenant's Title Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Commencement Date ("Landlord's Title Objection Response"). If Landlord is unable or unwilling to cure the objections, Tenant may terminate the Deed of Lease. Notwithstanding the foregoing, Landlord shall cure or cause to be removed any Exceptions that can be cured solely by the payment of money [i.e. taxes due and payable, mortgages or other encumbrances (unless all payments due under any such mortgage or encumbrance are current and Landlord provides Tenant with an SNDA as hereinafter defined), mechanics' or construction liens, etc.], shall terminate and cause the eviction of any tenants under any other leases to the

6

Store, shall deliver evidence of Landlord's status, power, and authority as required by the Title Company, and shall execute and deliver an owners and nonforeign affidavit. On or before the Commencement Date, Landlord, at Landlord's sole expense, shall cause the Title Company to issue to Tenant a leasehold title policy showing Landlord as the owner of the Shopping Center and insuring leasehold and any easements granted in connection therewith subject only to the Permitted Exceptions in the amount of $500,000.00 (the "Title Policy").

**SURVEY**

5.    On or before ten (10) days after the Execution Date, Landlord shall order from a surveyor licensed in the state in which the Shopping Center is located and deliver to Tenant's counsel at the address provided hereunder for copies of notices, six (6) sealed copies of an actual survey of the real property comprising the Shopping Center conducted or updated within ninety (90) days of the date of the Commitment, showing all improvements currently located thereon and the projected location of the Store, the Common Areas, and the other buildings to be included in the Premises (the "Survey"). Landlord shall deliver the Survey to Tenant on or before the Delivery Deadline. The Survey shall show the metes and bounds or plat legal description of the Shopping Center as shown on the Commitment, shall locate all easements and exceptions shown in the Commitment that are capable of being so located, shall bear the certificate and comply with the survey protocol attached hereto as Exhibit "D", and shall be otherwise sufficient to permit deletion of the survey exception from the Commitment and the Title Policy. Tenant shall have until the Title/Survey Review Deadline to review the Survey. If the Survey is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Survey Objection Notice"). If Tenant timely sends to Landlord Tenant's Survey Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Survey Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Commencement Date ("Landlord's Survey Objection Response"). Within sixty (60) days after the Commencement Date, as defined in this Deed of Lease, Landlord shall provide to Tenant six (6) sealed copies of the Survey revised to show the Store "as built" (the "As-Built Survey").

**ENVIRONMENTAL AUDIT**

6.    On or before fifteen (15) days after the Execution Date, Landlord shall order and deliver to Tenant's counsel at the address provided hereunder for copies of notices on or before the Delivery Deadline, from an environmental consultant reasonably satisfactory to Tenant, an environmental audit of the Shopping Center addressed to Tenant, which audit analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental site assessment pursuant to current ASTM standards (an "Audit"). Instead of providing the Audit, Landlord may provide a copy of an Audit issued to Landlord within the three (3) month period immediately prior to the Execution Date together with a letter from the environmental consultant which prepared such Audit stating that Tenant may rely thereon (the "Prior Audit"). Tenant shall have fifteen (15) days following receipt to review either the Audit or the Prior Audit. If either reveals any environmental condition that, if unremedied, would constitute a violation of applicable Legal Requirements (an "Environmental Violation") Tenant shall notify Landlord in writing. Landlord may elect to cure such Environmental Violation or may terminate the Deed of Lease. If Landlord elects to cure, Landlord shall use reasonable efforts and shall have until sixty (60) days prior to the Commencement Date to cure any such Environmental Violation. If Landlord fails to cure such Environmental Violation in sixty (60) days, Tenant may terminate the Deed of Lease.

**USE**

7.    (a)    Permitted Use.    The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business (including discount businesses) (the "Permitted Use").

(b)    Exclusives. Tenant shall have the exclusive right to:

(i) operate a supermarket, grocery, sell staple or fancy groceries, meat, fish, seafood, vegetables, fruits, dairy products, frozen foods, bakery goods, and delicatessen items, it being understood that Tenant's right to operate a bakery and delicatessen shall persist for only so long as Tenant or its successor or assignee is operating a bakery or delicatessen, as the case may be;

(ii) sell meat, seafood, and vegetables/fruits/produce, dairy products, frozen foods or other foods and food products;

(iii) operate a pharmacy or prescription drug store;

(iv) sell beer and wine for off-premises consumption except for sale by a package store (each an "Exclusive Use").

Landlord will not directly, or indirectly permit any party other than Tenant to use for any Exclusive Use any portion of the Shopping Center, Outparcels, or Owner's Remaining Land. Notwithstanding the foregoing, Landlord may lease to a "Subway"-type sandwich shop or a deli-restaurant selling prepared sandwiches for on- or off-premises consumption, so long as such deli-restaurant is restricted against selling delicatessen meats or other items "by the pound" or otherwise for off-premises preparation and consumption. Additionally, (1) the sale for off-premises consumption of staple or fancy groceries, meat, fish, seafood, vegetables, fruits, dairy products, frozen foods, bakery goods, and delicatessen items, in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom as incidental only to the conduct of another business, (2) the sale by restaurant operations of prepared, ready-to-eat food items, either for consumption on or off the premises, (3) a candy store, bagel or doughnut store, not exceeding 2000 square feet; (4) the sale of beer and wine by an automotive filling station (on the Outparcels only), and (5) the sale of food items described in subparagraph 7(b)(ii) above in less than 1000 square feet of sales area of a gasoline station/convenience store, shall not be violations of this paragraph.

If acquired by Landlord, its successor, assign, or any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, the Northeast Parcel (10 ± Ac.), as shown on the Site Plan, will have been restricted against any use thereon as a supermarket, grocery store, meat, fish, or vegetable market, bakery or delicatessen by virtue of an instrument executed and recorded so as to survive the foreclosure of any lien affecting the Northeast Parcel.

(c)    Prohibitions. Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center and on the Outparcels, or any enlargements thereof, and no spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theater (either motion or legitimate), business or professional offices, medical offices or clinics, automobile dealership, church, or health, recreational or entertainment-type activities, shall be permitted to operate thereon. Notwithstanding the foregoing, a restaurant located on Outparcel "C" only will not be deemed a "bar" for purposes of this section if less than fifty percent (50%) of all revenues derived from such restaurant are attributable to the sale of alcoholic beverages.    Additionally, notwithstanding the prohibition against business or professional offices, business or professional offices of a type commonly found in retail shopping centers and dealing with the public such as, but not limited to, travel agencies, medical or dental offices, real estate sales and rental offices, and tax preparation offices, may be permitted on the Shopping Center and the Outparcels so long as no single office use in the Shopping Center

8

maintains more than ten (10) employees or owners or is located within 60 feet of any exterior wall of the Store.

**COMPLIANCE WITH LAWS**

8.     Tenant shall at all times comply with all current and future applicable laws, ordinances, rules, codes, orders, and regulations of every lawful authority (collectively "Legal Requirements") having jurisdiction over the Store, as such shall relate to Tenant's operation of the Store for the Permitted Use.

Landlord shall at all times fully comply with all Legal Requirements applicable to Landlord and to fulfillment of Landlord's obligations under this Deed of Lease.

**CONSTRUCTION OF SHOPPING CENTER**

9.     Landlord, at its sole cost and expense, shall construct or cause to be constructed and diligently pursued to completion the Shopping Center, substantially as shown on the Site Plan, shall grade and surface as provided in Tenant's Plans, as hereinafter defined, all paved portions of the Common Areas, including the "Phase I Truck Access as shown on the Site Plan, and shall install proper and adequate water drainage and lighting for the Shopping Center. All design, installation, and construction by or on behalf of Landlord shall comply in every respect with all applicable Legal Requirements, and shall be completed in a first-class manner by contractors, architects, and engineers, as required, which are licensed and insured. The arrangement and location of all buildings and Common Areas shall be constructed and at all times during the Term be maintained substantially as shown on the Site Plan and shall not be changed without the prior written consent of Tenant, which consent shall not unreasonably be withheld, conditioned, or delayed. Landlord shall not subdivide, parcel, or otherwise alter the Premises or create any easements in the Common Areas without the prior written consent of Tenant, which consent shall not unreasonably be withheld, conditioned, or delayed. The exterior facade of the Shopping Center shall not be materially modified without Tenant's prior written consent, which shall not unreasonably be withheld, conditioned, or delayed.

Concurrently with the above construction, Landlord agrees, at its sole cost and expense, to construct or cause to be constructed the Store in accordance with Tenant's Plans, as hereinafter defined, which shall be drawn based on guidelines submitted by Tenant to Landlord's architect (the "Guideplans"), and with the final plans and specifications to be approved by both Landlord and Tenant which shall include complete civil engineering drawings for the Store and for the Shopping Center showing, among other things, the location of all buildings, finished grade elevations, the location of all utility lines, stormwater drainage facilities, parking spaces (including handicap spaces) and landscaping ("Tenant's Plans"). Landlord shall cause the architect to notify Tenant in writing of any discrepancies between the Guideplans and the final plans prior to Tenant's approval. Minor deviations in Tenant's Plans which do not materially affect Tenant will not be deemed violations of Tenant's Plans. Tenant's Plans shall be approved when initialed by both parties, and when initialed shall constitute a part of this Deed of Lease, provided, however, that in the event of a conflict between the Guideplans and Tenant's Plans, Tenant's Plans shall control. Tenant's Plans shall provide for a completed Store, commonly referred to as a "turnkey" or "lock and key job". Tenant shall furnish, install and connect its own trade fixtures, and its own compactor (or baler) on concrete pads to be installed by Landlord. This Deed of Lease shall not be effective or enforceable against Tenant unless and until Landlord and Tenant have so approved Tenant's Plans. Tenant shall pay directly to Landlord's contractor the cost of any change to Tenant's Plans requested by Tenant (a "Change Order") and any deadlines for completion of the Store or the Shopping Center contained in this Deed of Lease shall be extended for a reasonable time for any delay caused by a Change Order.

**COMPLETION DATE**

10.     Construction of the Premises shall begin not later than March 1, 1999 (the "Construction Start Date"), and shall be completed not later than March 1, 2000 (the "Initial Deadline"); and if not begun or completed by the Construction Start Date and the Initial

9

Deadline, respectively, then Tenant may terminate this Deed of Lease or may extend Landlord additional time for the beginning or completion of construction; provided, however, that if, after the beginning of construction, Landlord's failure to complete the Shopping Center by the Initial Deadline shall be due to Force Majeure, as hereinafter defined, or due to substantial changes by Tenant in Tenant's Plans, and provided further that construction shall be completed with all due diligence and, notwithstanding anything to the contrary in this Deed of Lease, in any event not later than June 1, 2000 (the "Outside Completion Date"), this option to terminate shall not arise. The Construction Start Date shall be the date as of which (1) Landlord shall have obtained a building permit issued by the appropriate governmental authorities, (2) the first concrete footings have been poured and (3) Landlord shall have erected in a manner and location reasonably satisfactory to Tenant, a "Coming Soon" sign in accordance with the specifications listed on Exhibit "H" hereto. If, pursuant to this paragraph, Tenant shall terminate this Deed of Lease, then Landlord agrees to give Tenant the first right of refusal on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to be exercised within sixty (60) days of receipt of written notice of the terms and conditions thereof from Landlord, to occupy any portion of the Premises or immediately adjoining land which Landlord may offer for use as a food supermarket. This first right of refusal shall be operative and effective until the earlier of (a) three (3) years from the date of such cancellation, or (b) the date upon which Tenant or its agent commences construction of a supermarket building located within one (1) mile of the Premises. However, if offered to Tenant within six (6) months after cancellation of this Deed of Lease, the Deed of Lease term provisions shall be the same as those contained in this Deed of Lease.

**COMMENCEMENT DATE**

11.    Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to accrue hereunder upon the date Tenant opens the Store for business, or upon the expiration of sixty (60) days following the performance of all the requirements listed below (collectively, the "Conditions"), whichever date shall sooner occur (the "Commencement Date").

(a)    The Premises shall have been delivered to Tenant completed in substantial accordance with the Site Plan and Tenant's Plans, as certified by Landlord's architect (except for "punch list" items which Landlord agrees, in a side letter, to complete with due diligence) and Tenant shall have received, (i) the Title Policy, (ii) the Survey, and (iii) the Audit (each as defined in this Deed of Lease), and an approval letter from any local authority requisite allowing Tenant to commence fixturing in the Store. (For purposes of this Deed of Lease, a "punch list" shall be deemed a list of items connected to construction and development, none of which constitutes an integral part of Tenant's supermarket operation, but which are required pursuant to Tenant's Plans.)

(b)    Construction of all of the Common Areas shall have been completed substantially as shown on the Site Plan;

(c)    All drives, entrances, median cuts, access points, acceleration and deceleration lanes, and traffic control devices shown on the Site Plan in or connecting the Common Areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(d)    Construction of at least 5,200 square feet of total building area (excluding the Store) in the Shopping Center shall have been completed as shown on the Site Plan;

(e)    Tenant shall have received a letter, substantially in the form attached hereto as Exhibit "F", from appropriate governmental authorities regarding the zoning and comprehensive plan regulations, if any, applicable to the Premises.

10

(f)    The Declaration and the Cross Easement as hereinafter defined, shall have been recorded and evidence of recordation provided to Tenant's satisfaction;

(g)    If owned by Landlord, the Northeast Parcel (10 ± Ac.), as shown on the Site Plan will have been restricted against any use thereon as a supermarket, grocery store, meat, fish, or vegetable market, bakery or delicatessen by virtue of an instrument executed and recorded so as to survive the foreclosure of any lien affecting the Northeast Parcel.

Provided that the conditions are timely fulfilled, Tenant shall open the Store for business on or before sixty (60) days after the Conditions have been met.

Landlord and Tenant shall execute a supplemental document establishing and confirming the Commencement Date in the form attached hereto as Exhibit "J" . No acceptance of possession of the Premises, opening for business by Tenant, nor payment of rent under this Deed of Lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with Tenant's Plans, or a waiver of any of the Conditions.

If, for any reason, the Conditions are met on or after December 1st of any year and on or before January 31st of the succeeding year, rent shall not begin to accrue until the later of February 1st of the succeeding year, or sixty (60) days after the Conditions are met, unless Tenant actually opens the Store for business sooner.

**CONSTRUCTION WARRANTIES**

12.    Landlord shall execute and deliver an assignment, in a form reasonably satisfactory to Tenant, of all of Landlord's right, title, and interest in, to, and under any guaranties or warranties relating to construction or the condition of the Store and the Common Areas within ninety (90) days following the Commencement Date. Landlord shall pay a penalty equal to $100.00 per day for each day after such ninety (90) days in which it has failed to execute and deliver such assignment.

**PARKING AND COMMON AREAS**

13.    Tenant, its employees, agents, suppliers, licensees, customers, and invitees, shall have the nonexclusive right at all times to use (subject to the Permitted Exceptions), free of charge, during the Term, the Common Areas. Tenant may use the sidewalks immediately adjacent to the Store and the exterior surfaces thereof for the display and sale of merchandise and services so long as such use is permitted by applicable Legal Requirements and does not unreasonably interfere with pedestrian traffic or the rights of other tenants in the Shopping Center to use the Common Areas.

Landlord shall not designate any portion of the Common Areas for the exclusive use of any party and shall at all times during the Term provide and maintain a surfaced parking area substantially as shown on the Site Plan, and of sufficient area to provide:

11

Prior to construction of the Addition, as hereinafter defined:

(a)    a minimum ratio of at least  4.92 ten (10) foot wide automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in the Shopping Center, and

(b)    facilities for convenient parking of at least 344 automobiles (minimum); on the basis of arrangement as provided on the Site Plan and

*4.92 per 1000 Sq Ft*

*52,474        258 spaces*

*344 spaces*

ction of the Addition, as hereinafter defined:

iimum ratio of at least  4.4 ten (10) foot wide automobile parking spaces re feet of gross building area (including additional floor levels) in the I

es for convenient parking of at least 334  automobiles (minimum).

going, if Legal Requirements mandate that a greater number of parking maintained, such Legal Requirements shall control.  If the parking area y time be materially less, and such deficiency of parking facilities shall ) days after written notice thereof is sent to Landlord giving reasonable ave the right to terminate this Deed of Lease.  Without Tenant's prior will not seek or permit another tenant of the  Shopping Center  to seek rom the minimum parking requirements applicable to the  Shopping Legal Requirements.  No signboards, buildings, or other construction ., the Common Areas or so as to materially obstruct the view of the Store from the adjoining public streets.  Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, "park and ride" lots, or sales by merchants utilizing vehicles or booths in the Common Areas shall be allowed in the  Shopping Center.

**SERVICE AREA**    **14.**    Landlord shall provide parking spaces for two (2) large trailer trucks for the exclusive and continuous use of Tenant at the service entrances to the Store.  Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the Store and the exclusive right to such spaces  as may be  reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for the Store into and from trucks and trailers at such service entrances. Tenant shall use reasonable efforts not to impede other traffic in any service drives or lanes in the Shopping Center.  Tenant shall not use trailers for permanent merchandise storage.

**UTILITIES**    **15.**    Landlord shall cause to be separately plumbed, wired, installed, as applicable, and separately metered and Tenant shall contract for and pay all charges measured by consumption or use for telephone, electricity, water, gas, and other utilities and services such as garbage removal and recycling, if any, used by Tenant at the Store.  Landlord shall not take or permit any other  tenant to take  any action that would interfere with access to such utilities sufficient to meet Tenant's needs.  Tenant shall not be responsible for  environmental impact charges, or any "hook up" fees or other charges incident to providing access to any utility.  All of the Common Areas (including parking area) shall be adequately lighted during the hours of ½ hour before dusk until midnight (the "Standard Hours").  Landlord shall cause to be separately metered and Tenant shall pay all charges during any time other than the Standard Hours for those parking area lights located in the area outlined in green on the Site Plan.  Tenant shall not tap into any utility lines dedicated for fire alarm or fire sprinkler systems.  Tenant shall be responsible for its pro-rata share of the cost of any maintenance of stormwater drainage facilities utilized by the

12

Store assessed by local authority or by the Owner's Association pursuant to local authority requirements, such pro-rata share to be determined on Tenant's percentage of use of such facilities.

**TENANT'S MAINTENANCE**

16.    Tenant shall keep the interior of the Store in reasonably neat and orderly, good condition and repair, excepting structural repairs, repairs which are the responsibility of Landlord, repairs made necessary by reason of fire or the elements or other insured casualty, and reasonable wear and tear. Tenant's repair responsibilities shall include, without limitation, automatic sprinkler system, windows and plate glass, automatic doors, the plumbing from, but not including, the water meter and point of discharge into the sewer main, and the electrical wiring from the various outlets in the Store to and including the main panel, air-conditioning and heating systems and floor surfacing. Tenant shall keep the delivery areas of the Store reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the Premises or permit anything to be done in or upon the Premises creating an unreasonable nuisance thereon. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon the Premises for the purpose of making repairs for which it is responsible and for examining or showing the same to prospective purchasers.

**LANDLORD'S MAINTENANCE**

17.    (a)    Store. Landlord shall, at its cost and expense and not as part of Common Area Maintenance Expenses, keep and maintain in good condition and repair, and replace as necessary the facade of the Store, the exterior walls and structural portions of the Store (including painting of the exterior walls as needed), roof, gutter, downspouts, masonry walls, foundation and structural members of the Store, the exterior plumbing (including and from the water meter for the Store and including septic tank, if any), and the exterior wiring including and beyond the main disconnect or electrical panel of the Store.

(b)    Common Areas. Landlord shall comply with or perform the following, the costs of which shall be billable as a portion of Common Area Maintenance Expenses, subject to the limitations provided in this Deed of Lease:

Landlord shall maintain, repair, and replace as necessary all structural, exterior portions of the Shopping Center (excluding the Store). Landlord shall also operate and maintain in good condition and repair during the Term all the Common Areas, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding or other security services, cleaning and sweeping as needed but at least three (3) times weekly, lighting during the Standard Hours in accordance with Tenant's Plans and this Deed of Lease and maintenance and cleaning of lighting fixtures as needed, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and maintenance of landscaped areas. Landlord shall keep all exterior surfaces of buildings in the Shopping Center clean and graffiti free at all times. Landlord will complete such repairs and provide such services as needed but in any event promptly upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to the Store or the Shopping Center rendered necessary by the wilful misconduct of Tenant, or any of its servants, agents, or employees, unless Landlord may be reimbursed for the cost thereof pursuant to insurance policies covering the Shopping Center and/or the Premises.

If, in order to protect persons or property, it shall be necessary for Tenant to make emergency repairs or to perform acts of maintenance or to provide services which are the responsibility of Landlord under this Deed of Lease, or if Landlord after receipt of notice as above provided fails or neglects to perform services, maintenance, or repairs, required of it hereunder to the Store, Tenant shall have the right to do so and to deduct from the Basic Rent, Additional Rent, and/or Percentage Rent due or thereafter to become due such sums as may

13

be necessary to reimburse Tenant for the money expended or expense incurred by it in making such repairs.

**SIGNS**　　　　　　**18.**　　Subject to and in accordance with applicable Legal Requirements, Tenant may place, erect, and maintain any signs, antennae, and satellite dishes on the roof, walls, and any other places on or about the Store, which signs antennae, and satellite dishes shall remain the property of Tenant and may be removed at any time during the Term and shall be removed at the end of the Term and provided Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Premises resulting from the installation or removal of such signs, antennae, and satellite dishes. If installation of any sign, antenna, or satellite dish requires roof penetration or a change in the structure of the Store, Tenant shall obtain Landlord's prior written consent, which shall not unreasonably be withheld, delayed, or conditioned.

Tenant shall construct, install, and maintain, at its cost, its free-standing, electrically illuminated pylon sign advertising its business in the location marked on the Site Plan if permitted by applicable Legal Requirements. The pylon sign may be of the maximum height and size permitted by applicable Legal Requirements. If such free-standing sign is not permitted by applicable Legal Requirements, Landlord shall construct a shopping center pylon sign in such location and Tenant shall be permitted to affix in the uppermost space thereon its sign panel advertising its business. Landlord shall maintain the pylon sign as a Common Area Maintenance Expense. Tenant shall maintain its sign panel.

**FIXTURES AND**　**19.**　　Tenant, at its own expense, shall have the right from time to time during the Term to
**INTERIOR**　make any interior alterations, additions, and improvements, including additional or alternatively
**ALTERATIONS**　located doors and interior partitions, in and to the Store which do not adversely affect its structural integrity and, provided Tenant has first obtained Landlord's written approval (which shall not unreasonably be withheld, conditioned, or delayed) may make other alterations, additions, or improvements (excluding Tenant's Trade Fixtures, as hereinafter defined "Tenant Modifications"). If Landlord's consent is required in connection with any Tenant Modification, Tenant shall provide to Landlord a reasonably detailed description of the proposed work prior to commencement thereof. Landlord's consent shall be deemed given if Landlord does not send written notice of its disapproval on or before ten (10) days after the date Tenant requested Landlord's approval. Landlord shall cooperate with Tenant in obtaining any government approvals necessary or desirable in connection with any permitted and/or approved Tenant Modifications, provided that Landlord shall not be required to incur any out-of-pocket expense in connection therewith. Tenant shall make all Tenant Modifications in a good, workmanlike manner and in accordance with all Legal Requirements applicable thereto. All permanent structural Tenant's Modifications shall belong to Landlord and become a part of the Store upon termination or expiration of the Term and all other Tenant Modifications shall, at Landlord's option, either be removed, or shall remain in place at the end of the Term.

Tenant may construct and build or install in the Store any and all racks, counters, shelves, and other fixtures, personal property, and equipment of every kind and nature as may be necessary or desirable in Tenant's business ("Tenant's Trade Fixtures"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant. Tenant shall have the right to and shall at the end of the Term remove all or any part of Tenant's Trade Fixtures at any time, Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of repairing any damage to the Premises resulting from the installation or removal of Tenant's Trade Fixtures or nonstructural nonpermanent Tenant Modifications.

**INDEMNIFICATION**　**20.**　　Tenant agrees to indemnify and save harmless Landlord from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage not

14

covered or reimbursable by insurance to any person or property happening in the Store unless caused by the negligence or wilful misconduct of Landlord, its agents, or employees. Likewise, Landlord shall indemnify and save harmless Tenant from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage to any person or property not covered or reimbursable by insurance happening on or about all Common Areas or any portion of the Shopping Center other than the Store, unless caused by the negligence or wilful misconduct of Tenant, its agents or employees.

The foregoing indemnities shall survive the expiration or early termination of the Term of this Deed of Lease.

**CASUALTY**    **21.**    If (i) the Store is totally destroyed or damaged by fire or other casualty to the extent of fifty percent ( 50%) or more of the value thereof based upon replacement costs or to. an extent that renders the Store untenantable in Tenant's reasonable judgment, or (ii) all or a portion of the Shopping Center (exclusive of the Store) is damaged or destroyed such that, in Tenant's reasonable judgment, the damage or destruction materially affects the value of Tenant's leasehold or its ability to successfully operate the Store for the Permitted Use (a "Major Casualty," anything less being hereinafter referred to as a "Minor Casualty") then:

(a)    if a Major Casualty occurs during the first  seventeen (17) years of the Initial Term or a Minor Casualty occurs at any time during the Term, then Landlord shall proceed promptly (but in any event within  one hundred eighty (180) days of destruction or damage) and without expense to Tenant to repair the damage or restore the Store, or the Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall be adjusted in accordance with Tenant's Pro-rata share as affected by the Casualty until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored . Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof.. Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Deed of Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable  mortgage documents, to the payment of any debt secured by such mortgage documents;

(b)    if a Major Casualty occurs during the last  three (3) years of the Initial Term or during any Extension Term then either Landlord or Tenant shall have the option, exercisable by written notice to the other within  thirty (30) days of the date of the Major Casualty to terminate this Deed of Lease;

(1)    If Landlord so terminates this  Deed of Lease, Tenant may nevertheless reverse and void Landlord's termination by electing, within  fifteen (15) days of receipt of Landlord's termination notice, to extend the  Deed of Lease for the next successive Extension Term. Landlord shall be obligated to extend the Term upon timely receipt of Tenant's election notice;

(2)    If Tenant terminates this  Deed of Lease, or does not reverse and void Landlord's timely termination, then this  Deed of Lease shall terminate as of the date of the Major Casualty and all Basic Additional, and Percentage Rent shall be pro-rated as of such date;

15

(3)    If neither Tenant nor Landlord timely terminates this Deed of Lease or if Tenant reverses and voids Landlord's timely termination, then Landlord shall to proceed promptly (but in any event within  one hundred fifty (150) days of destruction or damage) and without expense to Tenant to repair the damage or restore the Store, or the  Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant.  Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall  be adjusted in accordance with Tenant's Pro-rata share as affected by the Casualty until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored.  Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the  Shopping Center or any portion thereof.  Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this  Deed of Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

(4)    If fire or other casualty destroys or damages any portion of the Common Areas at any time during the term and if, had such destruction or damage occurred to the Store, Landlord would be obligated to repair the Store, then  Landlord shall repair the destruction or damage to the Common Areas substantially simultaneously with repair of the Store.

**LANDLORD'S**
**INSURANCE**

22.    (a)    *Landlord.*  Landlord shall carry or cause to be carried the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of <u>Best's Insurance Report</u>.  Certificates of insurance (Form ACORD-27 or equivalent) shall be furnished to Tenant prior to the Commencement Date, shall show Tenant as an additional insured, shall contain waivers of subrogation,  and shall provide thirty (30) days notice to Tenant prior to cancellation, material reduction in policy limits, or any other change adverse to Tenant's interests.

(1)    <u>Liability Insurance.</u>  Landlord shall carry comprehensive general liability insurance coverage on the Shopping Center, stipulating limits of liability of not less than nor more than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate and deductibles of not more than $100,000.00.  Landlord hereby expressly waives any and all claims against Tenant for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Deed of Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(2)    <u>Casualty Insurance.</u>  Landlord shall carry or cause to be carried all-risk commercial property insurance on the Shopping Center and any permanent or structural additions, alterations, and improvements made thereto by Landlord or Tenant, including flood, windstorm, and earthquake coverage if the Shopping Center is located in a flood or earthquake prone area, in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00, and hereby expressly waives any and all claims against Tenant for

16

loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Deed of Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(b)     *Tenant.* Tenant shall carry or cause to be carried the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of <u>Best's Insurance Report</u>. Certificates of insurance shall be furnished to Landlord and any Mortgagee prior to the Commencement Date, shall show Landlord and any such Mortgagee as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Landlord and any such Mortgagee prior to cancellation, material reduction in policy limits, or any other change adverse to Landlord's or such Mortgagee's interests. Notwithstanding the foregoing, so long as Tenant (or Winn-Dixie Stores, Inc. if it is not the Tenant hereunder, but has executed a guaranty of Tenant's obligations hereunder) maintains a net worth in excess of $100 Million, Tenant shall self-insure and shall not be required to provide any insurance certificates to Landlord or any such Mortgagee.

(1)     <u>Liability Insurance.</u> Tenant shall carry, at its sole expense, comprehensive general liability insurance coverage on the Store, stipulating limits of liability of not less than $2,000,000.00 and deductibles of not more than $250,000.00. Tenant hereby expressly waives any and all claims against Landlord for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Deed of Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

(2)     <u>Casualty Insurance.</u> Tenant shall carry or cause to be carried all-risk commercial property insurance on the interior nonstructural portions of the Store that it is responsible for maintaining under this Deed of Lease and for its personal property, and Tenant's Trade Fixtures in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00, and hereby expressly waives any and all claims against Landlord for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Deed of Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

If Tenant has "self insured" and a claim is made or a loss incurred which would be covered by the insurance described in subparagraphs (i) or (ii) above, then Tenant shall be liable to and shall indemnify and hold harmless Landlord and/or a Mortgagee (as their interests may appear) against any such claim or loss and shall pay any settlement or judgment resulting therefrom. As to casualty losses, Tenant shall pay the replacement cost thereof. Tenant's indemnity obligation under this paragraph in the case of a claim or loss due to "self insurance" shall exist notwithstanding and shall survive any termination of this Deed of Lease pursuant to paragraph 21 of this Deed of Lease.

**QUIET ENJOYMENT     23.**     Landlord covenants, warrants and represents that:

(a)     the Shopping Center is and shall remain free and clear of all liens and encumbrances superior to the leasehold hereby created, unless the lienor has executed an

17

SNDA, as hereinafter defined, or unless consented to in advance and in writing by Tenant, which consent may be withheld or conditioned in Tenant's sole discretion;

(b)    As of the Execution Date Landlord is a duly organized, validly existing limited liability company, has full right and power to execute, deliver, and perform this Deed of Lease and to grant the estate demised herein, and such execution, delivery, performance, and grant have been duly authorized by all necessary limited liability company action and does not and will not constitute a breach of or default under any contract, Mortgage, order, or judgment by which Landlord or the Shopping Center or any portion thereof is bound, and any future landlord which is a business entity shall be duly organized and maintain its valid existence in its commonwealth of organization, and shall have the power and authority to assume and perform this Deed of Lease, shall have duly authorized such assumption and performance, and such assumption and performance shall not constitute a breach of or default under any contract, Mortgage, order, or judgment by which such future landlord or the Shopping Center or any portion thereof is bound;

(c)    no consent, approval, or authorization of any other party is necessary to grant to Tenant the rights and privileges intended to be granted under this Deed of Lease;

(d)    Tenant, on paying the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anyways appertaining thereto, during the Term subject to the Permitted Exceptions and matters revealed by the Survey or the Audit and approved or waived in writing by Tenant;

(e)    As of the Execution Date, there is no zoning, comprehensive plan, or other restriction or Legal Requirement preventing or restricting use of the Premises for the Permitted Use or use of the portion of Common Areas constituting parking areas for parking purposes;

(f)    As of the Execution Date, Landlord has not previously, either directly or indirectly, leased any portion of the Shopping Center, sold any portion of the Shopping Center, or otherwise permitted any portion of the Shopping Center or any other property owned or controlled by Landlord to be used in a manner as would be prohibited by or violate this Deed of Lease.

**TAXES AND LIENS**    **24.**    Except for taxes to be paid directly by Tenant as provided elsewhere in this Deed of Lease, all taxes, assessments, and charges on land or improvements and obligations secured by mortgage or other lien upon the Shopping Center (collectively, "Landlord's Obligations") shall be promptly paid by Landlord or transferred to acceptable bond or other adequate security reasonably acceptable to Tenant prior to delinquency and, if Tenant is responsible under this Deed of Lease for paying any portion of any of Landlord's Obligations, Landlord shall pay the same in such a manner as to take maximum advantage of any rebate, abatement, or early payment discount available. Tenant shall hold Landlord harmless from and against any failure to pay or any penalty for late payment of any taxes upon any personal property of Tenant or upon Tenant's Trade Fixtures.

**CONDEMNATION**    **25.**    If any part of the Store or more than twenty percent (20%) of the Shopping Center, exclusive of the Store, is taken for any public or quasi-public use, under any Legal Requirement or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to terminate this Deed of Lease at its option by written notice to Landlord within sixty (60) days of such taking or purchase, and any unearned Basic Rent, Percentage Rent, Additional Rent or other charges paid in advance shall promptly be refunded to Tenant. If a lesser taking occurs or if Tenant does not elect to terminate this Deed of Lease, Landlord shall promptly commence and diligently prosecute to completion any repairs and restoration reasonably necessary and feasible to put the Store or the Shopping Center in a condition comparable to their condition at the time

18

of taking and this Deed of Lease shall continue, but Basic Rent shall be reduced in proportion to the floor area taken compared to the floor area of the Store existing prior to the taking.

If any portion of the Common Areas or any drive, entrance, median cut, access point, route or mode of access thereto depicted on the Site Plan, is obstructed for longer than one hundred eighty (180) days or appropriate governmental authorities notify Tenant that the same will be obstructed for one hundred eighty (180) days or longer or taken for any public or quasi-public use, under any Legal Requirement or by right of eminent domain, or private purchase in lieu thereof, so as to unreasonably interfere with the conduct of Tenant's business in the Store or prevent its use of or access to or through the Common Areas, or any drive, entrance, median cut, access point whether or not the same is compensable under applicable Legal Requirements or so as to reduce the required parking area by an amount in excess of ten percent (10%), Tenant may, at its option, terminate this Deed of Lease within sixty (60) days of the obstruction, taking, or purchase and shall be liable for Basic, Additional, and Percentage Rent only up to the time of such obstruction, taking, or purchase. In the case of a reduction in the required parking area by an amount in excess of ten percent (10%) following which Tenant desires to terminate this Deed of Lease, however, Tenant shall notify Landlord and Landlord shall have fifteen (15) days after the date of Tenant's notice to propose alternative replacement parking area. If the alternative replacement parking area meets with Tenant's reasonable approval, Landlord will proceed to promptly pave and provide such alternative parking and this Deed of Lease shall continue. If the alternative parking area does not meet with Tenant's reasonable approval, Tenant may terminate this Deed of Lease as above provided.

If any zoning, comprehensive plan provision, or other Legal Requirement is altered or enacted subsequent to the Execution Date and such alteration or enactment materially limits Tenant's use of the Store for the Permitted Use or its use of or access to the Common Areas (collectively, a "Zoning Change"), then any such Zoning Change shall be deemed to be a taking or condemnation and shall entitle Tenant to terminate this Deed of Lease in accordance with the foregoing provisions of this Section.

Except with respect to the Addition, as hereinafter defined, if constructed and financed by Tenant, any business loss or loss of goodwill or cost of dislocation claimed by Tenant, and the cost of removing nonstructural Tenant Modifications or Tenant's Trade Fixtures from the condemned area or the cost of rebuilding the Premises following a partial taking that does not result in a termination of this Deed of Lease, Tenant waives its rights to the proceeds of any condemnation award granted to Landlord.

Notwithstanding any of the foregoing, any Mortgagee shall be entitled to control disbursement of any condemnation proceeds (other than those, if any, awarded to Tenant for its fixtures, business losses, or other reason) to ensure proper application of the same toward restoration or repair if required by this Deed of Lease, unless Tenant terminates this Deed of Lease, in which case any such condemnation proceeds may be applied by such Mortgagee, in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

**DEFAULT**      **26.**    Tenant:

(a) Tenant shall be in default under this Deed of Lease if:

(1)    Tenant fails to pay any Basic Rent, Additional Rent, or Percentage Rent due under this Deed of Lease within five (5) days after receipt of notice from Landlord stating that such sums are past due and remain unpaid (a "Payment Default"); or

19

(2)     Tenant fails to perform any other of its material obligations under this Deed of Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure provided that Tenant notifies Landlord in writing that Tenant has in fact undertaken a cure and will prosecute the same to completion in a reasonable and diligent manner).

Following an uncured default by Tenant, Landlord may exercise any and all remedies available at law or in equity, provided, however, that Landlord shall use reasonable and diligent efforts to mitigate its damages. Notwithstanding the foregoing, subject to Landlord's obligation to mitigate its damages, Landlord shall have the following specific remedies following an uncured Tenant Default:

(A)     Landlord may expel Tenant from the Premises without terminating this Deed of Lease, in which case Landlord shall use reasonable and diligent efforts to re-let the Premises; Tenant shall remain liable for (i) any past due and unpaid Basic, Additional, or Percentage Rent; (ii) the worth at the time of award by a court having jurisdiction thereof of the amount by which the present value of the unpaid rent and other charges due under this Deed of Lease from Tenant to Landlord for the balance of the Term exceeds the present value of the market rent for the Premises for the balance of the Term; (iii) the actual out-of-pocket costs to make repairs to the Premises necessitated by removal of Tenant's Trade Fixtures or nonpermanent Tenant Modifications; (iv) reasonable and customary brokerage commissions paid in connection with re-letting the Premises.

(B)     Landlord may terminate this Deed of Lease, in which case Tenant shall nevertheless remain liable for any past due and unpaid Basic, Additional, or Percentage Rent and for any out-of-pocket costs incurred due to any default other than a Payment Default accruing prior to the date of termination.

(C)     Amounts due and owing to Landlord and constituting a Payment Default shall bear interest at the higher of the rate of twelve percent (12%) per annum or the highest rate allowed by law (the "Default Rate") on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Tenant.

(b)     Landlord: Landlord shall be in default under this Deed of Lease if:

(1)     Landlord fails to reimburse or pay to Tenant any amount due to Tenant from Landlord within ten (10) days after receipt of a written statement from Tenant (a "Repayment Default"); or

(2)     Landlord fails to perform any other of its material obligations under this Deed of Lease within thirty (30) days after receipt of notice from Tenant (or such longer period as may reasonably be required to effectuate a cure provided that Landlord notifies Tenant in writing that Landlord shall and has in fact undertaken a cure and will prosecute the same to completion in a reasonable manner).

20

Following an uncured default by Landlord, Tenant may exercise any and all remedies available at law or in equity, provided, however, that Tenant shall use reasonable and diligent efforts to mitigate its damages.

Notwithstanding the foregoing, subject to Tenant's obligation to mitigate its damages, Tenant shall have the following specific remedies in the following specific instances:

(A)    In the case of a Repayment Default, Tenant, Tenant shall be entitled to offset such amount against all Basic, Additional, and Percentage Rent due under the Deed of Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Landlord or recouped by offset.

If Landlord fails, following notice as outlined above, to:

(B)    timely commence or complete construction of the Store or the Shopping Center, Tenant may either (i) extend to Landlord such additional time to complete such construction or reconstruction, as Tenant deems reasonable, in its reasonable discretion, (ii) cause the same to be completed, in which case Tenant shall be entitled to offset the reasonable cost of the same against all rent due under the Deed of Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost of the same until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset or (iii) terminate this Deed of Lease by written notice to Landlord without waiving Tenant's rights to damages against Landlord.

(3)    timely provide the Commitment or the Title Policy or cure to the defects properly objected to by Tenant, Tenant shall notify Landlord in writing and if, on or before thirty (30) days after the date of such notice Tenant still has not received the Commitment or the Title Policy, as the case may be, Tenant may either (i) extend to Landlord such additional time to deliver the Commitment or the Title Policy as Tenant deems reasonable, in its reasonable discretion; (ii) terminate this Deed of Lease or (iii) obtain the Commitment or the Title Policy from another source, in which case Tenant shall be entitled to offset the cost of the Commitment and/or the Title Policy against all rent due under the Deed of Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost of the Commitment and/or the Title Policy and the cost of curing defects until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

(4)    timely provide the Survey or to timely cure survey defects or to timely provide the As-Built-Survey as required under this Deed of Lease, Tenant shall notify Landlord in writing and if, on or before thirty (30) days after the date of such notice Tenant still has not received the Survey or if Landlord still has not cured survey defects, as the case may be, Tenant may either (i) extend to Landlord such additional time to so deliver or cure as Tenant deems

21

reasonable, in its reasonable discretion; (ii) terminate this Deed of Lease; or (iii) obtain the Survey or the As-built Survey from another source or undertake the cure of the survey defects, in which case Tenant shall be entitled to offset the cost of the same against all rent due under the Deed of Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost thereof until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

(5)     timely provide the Audit or to cure Environmental Violations revealed thereby to Tenant's reasonable satisfaction, as required by this Deed of Lease, Tenant may (i) extend to Landlord such additional time to obtain the Audit or to cure such Environmental Violations as Tenant deems reasonable, in its reasonable discretion; (ii) terminate this Deed of Lease.

(6)     If Tenant is prevented or prohibited from constructing or enjoying the Addition by any acts or omissions of Landlord (including any prior or successor landlord), or by reason of a breach of any covenant, representation, or warranty made or given by Landlord in this Deed of Lease or failure of any condition to be performed by Landlord under this Deed of Lease, then Tenant may terminate this Deed of Lease.

(7)     If any representation or warranty made by Landlord in paragraph 23(a), 23(d), 23(f) or 41(a) of this Deed of Lease is determined during the Term to be false, or if any other representation or warranty made by Landlord in this Deed of Lease is determined to have been false when made and such falsity materially affects Tenant's use of the Store for the Permitted Use, its access to or use of the Common Areas, and Landlord has not corrected the falsity or alleviated the material adverse effects to Tenant's reasonable satisfaction within thirty (30) days of written notice from Tenant, Tenant at its option may terminate this Deed of Lease by written notice to Landlord. Tenant shall stand released of and from all further liability hereunder from and after the date of such termination and Landlord shall be liable to Tenant for all loss, cost, and expense resulting from or in connection with Landlord's false representation, including, without limitation, the cost of Tenant's relocating its business.

(8)     Tenant shall have the termination rights provided for in the paragraphs of this Deed of Lease relating to Casualty and Condemnation.

(9)     If, in order to protect persons or property from harm or injury, it shall be necessary for Tenant to make emergency repairs or if Landlord after receipt of notice as above provided fails or neglects to perform services, maintenance, or repairs, required of it hereunder to the Shopping Center or Common Areas, Tenant shall have the right to do so and failure of Landlord to reimburse Tenant for the reasonable out-of-pocket cost therefor within ten (10) days of receipt of a written statement therefore, shall constitute a Repayment Default.

(10)     If a release of Hazardous Substances or other environmental condition occurs that is not the result of Tenant's actions or the actions of Tenant's agents, contractors, subcontractors, vendors, invitees or employees, which release or environmental condition materially impairs for more than thirty (30) days after written notice of same to Landlord Tenant's ability to use the Premises for the Permitted Use (the "Impairment Period") and, if unremedied,

22

would constitute a violation of applicable Legal Requirements (an "Environmental Violation"), Tenant may (i) cure such Environmental Violation and offset the cost of such cure against all Basic, Additional and Percentage Rent due under this Deed of Lease or (ii) terminate this Deed of Lease by written notice to Landlord on or before thirty (30) days after the end of the Impairment Period.

(11)    Tenant may, but shall not be obligated to, perform, acquire, or satisfy any lien, encumbrance, agreement, or obligation of Landlord which (if not performed, acquired, or satisfied) would, in Tenant's reasonable judgment, constitute a material threat to its use or enjoyment of the Premises, and if it does so it shall be subrogated to all rights of the obligee against Landlord or the Premises or both and if not promptly reimbursed by Landlord for resulting expenses and disbursements, shall be entitled to offset the cost of the same against all rent due under the Deed of Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost thereof until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

In the event of an uncured default or a dispute arising out of or in connection with this Deed of Lease, the nondefaulting or prevailing party shall be entitled, in addition to whatever other damages or remedies such party is entitled to, to reimbursement for reasonable attorney's fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy.

**CONSTRUCTION RISKS**

**27.**    Nothing herein contained shall in any sense constitute Landlord as the agent of Tenant in constructing the Store or the Shopping Center, Tenant shall have no control or authority over the construction of the Store or the Shopping Center, beyond the right to reject the tender of the Store for the causes herein stated and to request change orders to be paid by Tenant. Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the wilful misconduct, negligence, or carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, materialmen's, employees, agents, or servants by reason of Landlord's constructing the Store or the Shopping Center pursuant to the terms of this Deed of Lease or Tenant's Plans. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor, or from any negligence or wilful misconduct of Landlord, Landlord's contractors, sub-contractors, materialmen's, or any of their respective employees, agents, or servants during the progress of the work in constructing the Store or the Shopping Center, or from any faulty construction thereof. Tenant shall indemnify and hold Landlord harmless from and against mechanics, materialmen's, contractor's or subcontractor's or similar liens and any claims or suits for damage to persons or property from defects in materials or the use of unskilled labor or from negligence or wilful misconduct of Tenant, its agents, employees, or contractors and subcontractors in connection with construction of Tenant Modifications, installation of Tenant's Trade Fixtures, and construction of the Addition, as hereinafter defined, or any other construction activities engaged in by Tenant pursuant to the terms of this Deed of Lease. No interest of Landlord shall be subject to any lien for mechanics, materialmen's, contractor's or subcontractor's or similar liens or any claims or suits in connection with construction activities engaged in by Tenant pursuant to this Deed of Lease. Tenant shall inform all of its agents and contractors of the provisions of this Section of this Deed of Lease and Landlord may record a memorandum hereof without Tenant's signature or consent.

**NOTICES**

**28.**    All notices, requests, demands, and other communications required or permitted to be given under this Deed of Lease shall be in writing and sent to the address(es) or telecopy

number(s) set forth below. All rent payments shall be sent to Landlord at the address below. Each communication shall be deemed duly given and received: (i) as of the date and time the same is personally delivered with a receipted copy; (ii) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

> Landlord :    JNB COMPANY OF VIRGINIA, L.L.C.
> 3961-D Stillman Parkway
> Glen Allen, Virginia  23060

or such other address as Landlord may direct from time to time.

> Tenant:    WINN-DIXIE RALEIGH, INC.  Re: [Store #969]
> 833 Shotwell Road
> Clayton, North Carolina  27520

> With a copy to:  Winn-Dixie Stores, Inc.
> Attn: General Counsel
> 5050 Edgewood Court
> P.O. Box B
> Jacksonville, FL 32203-0297
> Telecopy: (904) 783-5138

or to such other address as Tenant may direct from time to time.

**ASSIGNMENT AND SUBLEASING**

29.    Tenant may assign this Deed of Lease, or sublease or vacate the Premises in whole or in part without the consent of Landlord, provided Tenant shall continue to remain liable and responsible for the payment of rent and due performance of all other terms, covenants, and conditions of this Deed of Lease. Notwithstanding the foregoing, if Tenant assigns this Deed of Lease to an assignee having the same or a better rating as Tenant's Guarantor in the most recent edition of Best's Insurance Report, Tenant shall be released from all liability hereunder accruing after such assignment.

**SUBORDINATE**

30.    Provided that, with respect to any first priority or primary mortgage, deed of trust, security deed or other security instrument executed by any landlord in favor of a lender or other financier and securing a construction or permanent loan upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, and any other security documents executed in connection therewith, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement substantially in the form attached hereto as Exhibit "C" (an "SNDA"), this Deed of Lease shall at all times be subject and subordinate to the lien of such Mortgage. Landlord hereby irrevocably directs Tenant to comply with any notice received from any Mortgagee requesting, requiring, or directing that Tenant pay any or all Basic, Additional, and/or Percentage Rent to such Mortgagee (a "Rent Payment Notice") notwithstanding any contrary direction, instruction, or request from Landlord. Tenant shall be entitled to rely upon any Rent Payment Notice and shall have no duty to controvert or challenge any Rent Payment Notice. Tenant's compliance with any Rent Payment Notice shall not be deemed to violate, breach, or constitute a default under this Deed of Lease. Landlord hereby indemnifies and releases Tenant

24

and shall hold Tenant harmless from and against any and all loss, cost, expense, or damage (including attorneys' fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) arising from any claim based upon or in connection with Tenant's compliance with any Rent Payment Notice. Landlord shall look solely to the Mortgagee with respect to any claim Landlord may have on account of an incorrect or wrongful Rent Payment Notice. Tenant shall be entitled to full credit under this Deed of Lease for any and all Basic, Additional, and/or Percentage Rent paid to any Mortgagee pursuant to any Rent Payment Notice to the same extent as if such rent were paid to Landlord. No Mortgage shall encumber Tenant's Trade Fixtures or any nonpermanent, nonstructural Tenant Modifications. Tenant assumes no liability or obligation under the Mortgage or with respect to the indebtedness secured thereby.

**ESTOPPEL CERTIFICATE**

**31.**     Within a reasonable time, but no less than ten (10) business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "E" (an "Estoppel Certificate"). Notwithstanding the foregoing, Landlord shall not request, and Tenant shall not be required to deliver more than two (2) Estoppel Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500.00 per additional requested Estoppel Certificate.

**LENDER'S CURE**

**32.**     Simultaneously with any such notice to Landlord, Tenant shall give notice to any holder of a recorded Mortgage (a "Mortgagee") encumbering the Premises (provided that such Mortgagee has entered into an SNDA with Tenant and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Deed of Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord. The Mortgagee shall have the right, but not the obligation, to cure such default within the same cure periods provided to Landlord hereunder. Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Deed of Lease.

**BENEFIT**

**33.**     This Deed of Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises.

**TRANSFER BY LANDLORD**

**34.**     If Landlord transfers Landlord's interest in the Shopping Center or the right to collect rent under this Deed of Lease, Landlord agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under this Deed of Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under this Deed of Lease, (collectively, the "Transfer Requirements") and/or (d) such other information as Tenant may reasonably require. Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in this Deed of Lease. The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to temporarily withhold rent in trust pending receipt of Transfer Requirements.

25

**SHORT FORM**
**DEED OF LEASE**

35.    Landlord shall execute a short form of this Deed of Lease in the form attached hereto as Exhibit "G", and Tenant may cause its recording at Tenant's expense in the public records of the county or parish in which the Premises are located. Neither Landlord nor Tenant shall record this entire Deed of Lease.

**MARGINAL TITLES**

36.    The marginal titles appearing in this Deed of Lease are for reference only and shall not be considered a part of this Deed of Lease or in any way to modify, amend, or affect the provisions thereof.

**COMPLETE**
**AGREEMENT**

37.    This Deed of Lease contains the complete agreement of the parties with reference to the leasing of the Premises, except for Tenant's Plans to be formally approved by the parties prior to the Commencement Date and supersedes any prior agreement with respect to the subject matter hereof. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**DECLARATION**

38.    Landlord shall have recorded in the public records of Chesterfield County, Virginia, declaration(s) of covenants and restrictions substantially in the form attached hereto as Exhibit "I" (collectively, the "Declaration"), as a primary encumbrance(s) and so as not be subject to foreclosure or removal without the express written permission of Tenant.

**EXHIBITS**

39.    The following Exhibits attached hereto are hereby incorporated into this Deed of Lease by reference:

| | | |
|---|---|---|
| Exhibit "A" | - | Site Plan |
| Exhibit "B" | - | Legal Description of Shopping Center |
| Exhibit "C" | - | SNDA |
| Exhibit "D" | - | Surveyor's Certificate |
| Exhibit "E" | - | Estoppel Certificate |
| Exhibit "F" | - | Zoning Letter |
| Exhibit "G" | - | Short Form Deed of Lease |
| Exhibit "H" | - | "Coming Soon" Sign Specifications |
| Exhibit "I" | - | Declaration |
| Exhibit "J" | - | Supplemental Lease Agreement |

**FORCE**
**MAJEURE**

40.    If there shall occur, during the Term, (i) strike(s), lockout(s), or labor dispute(s); (ii) the inability to obtain labor or materials or reasonable substitutes therefor; (iii) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other conditions beyond the control of the party required to perform (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Deed of Lease (except for the obligation to pay money), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

26

**ENVIRONMENTAL CONDITION**

41.   (a)   Landlord. Landlord represents and warrants to Tenant that it has not prior to the commencement of this Deed of Lease, and will not during the term of this Deed of Lease or any renewal thereof, cause or permit to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. Landlord certifies to Tenant that to its knowledge no other tenant of the Shopping Center has caused or permitted to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. "Hazardous Substance" includes, without limitation, any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to Legal Requirements. "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal.

Landlord shall, at its sole cost and expense, take such action as is reasonable, prudent, or required by law as a result of any breach of the foregoing representations and warranties and shall indemnify, protect, and save Tenant, its officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements) of any kind or nature whatsoever (collectively the "Indemnified Matters") which may at any time be imposed upon, incurred by or asserted or awarded against Tenant and arising from or out of any Hazardous Substances on, in, under or affecting all or any portion of the Premises or the Shopping Center, which Hazardous Substances are not the result of Tenant's use or operation of the Premises. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision.

Landlord shall provide to Tenant copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Shopping Center which Landlord receives from any governmental unit or agency overseeing environmental matters and copies received by landlord of any such notices, letters, or requests for information sent to any other tenant of the Shopping Center.

(b)   Tenant. Tenant shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed of on, in or about the Premises except in accordance with applicable Legal Requirements without obtaining Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. If any Hazardous Substance is used, stored, generated, or disposed of on, in, or about the Premises except as permitted above, or if the Premises or the Shopping Center become contaminated in any manner as a result of any breach of the foregoing covenant or any act or omission of Tenant or any of its agents, contractors, subcontractors, or employees and such contamination results in an Environmental Violation, Tenant shall indemnify and hold harmless Landlord, its officers, directors, shareholders, and employees from any and all claims, demands, actions, damages fines, judgments, penalties, costs (including attorneys', consultants', and experts' fees), liabilities, losses (including without limitation, any decrease in value of the Store or Tenant's business operations therein, damages due to loss or restriction of rentable or usable space, or any damages due to adverse impact on marketing of the space in the Shopping Center or the Store), and expenses arising during or after the term of this Deed of Lease and arising as a result of such contamination. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes the presence of any Hazardous Substance on, in or about the Premises except in accordance with applicable Legal

27

any governmental unit or agency overseeing environmental matters.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Deed of Lease and the transfer of Landlord's or Tenant's interests hereunder.

**NO BROKERS**

42.   Neither Landlord nor Tenant has discussed this Deed of Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee. Each shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

**FLORIDA MANDATED PROVISION**

43.   The following provision is included to satisfy Florida requirements and are applicable only if the Premises are located in Florida and should otherwise be disregarded.

Radon Gas Disclosure.  Radon is a naturally occurring radioactive gas that when it has

Requirements or with Landlord's consent and the same results in an Environmental Violation, Tenant, at its sole expense, shall promptly perform such remediation. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld, conditioned, or delayed.

Notwithstanding the foregoing, this indemnification shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Premises or that of its agents, employees, vendors and invitees. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination on or under the Premises, the Common Areas or any other portion of the Shopping Center resulting from Landlord's ownership, use or operation, or the use of operation by any third party not acting by, through, under or on behalf of Tenant.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Deed of Lease and the transfer of Landlord's or Tenant's interests hereunder.

**NO BROKERS**   **42.**   Neither Landlord nor Tenant has discussed this Deed of Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee. Each shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

**FLORIDA**   **43.**   The following provision is included to satisfy Florida requirements and are applicable only
**MANDATED**   if the Premises are located in Florida and should otherwise be disregarded.
**PROVISION**

Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

**EXPANSION**   **44.**   As a material inducement to Tenant's entering into this Deed of Lease, Landlord grants to Tenant the option and privilege (Tenant's Enlargement Option") of requiring the enlargement of the Store to incorporate therein an addition consisting of the area to the most southerly side of the Store measuring approximately 60 feet in width by 231 feet in depth, as shown on the Site Plan (the "Addition" or the "Additional Space"), which area shall be reserved for construction of the Addition except that pending same may be partially paved for parking or Landlord may construct a building thereon and rent space in such building. To facilitate construction of the Addition, Landlord initially shall construct the southerly wall of the Store with steel column supports equivalently spaced to the nearest row of steel column supports in the open front sales area of the Store and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original Store and the Addition.

28

Tenant may exercise Tenant's Enlargement Option by giving to Landlord written notice 180 days prior to the expiration of the seventh year from the Commencement Date or 180 days prior to expiration of each five year interval thereafter of its exercise of such option, or at any time if the Additional Space is vacant and Landlord has not Leased the Additional Space to another tenant in a manner consistent with this Deed of Lease, together with a proposed amendment to this Deed of Lease (the "Amendment") to provide for those terms and conditions described below and such additional terms and conditions with respect to the Addition as to which Landlord and Tenant shall subsequently agree. (Tenant's written notice and the Amendment are hereinafter referred to as the "Option Exercise Notice").

On or before ten (10) days after receipt of the Option Exercise Notice, Landlord shall notify Tenant in writing whether it intends, subject to execution and delivery of the Amendment, to construct the Addition, at its sole cost. The Amendment shall include, among other things, the following:

(a)     If Landlord constructs the Addition, Landlord shall obtain and pay all costs, fees and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition. If Landlord does not pay such costs, fees or expenses or obtain such permit(s) and waiver(s), Tenant may obtain and pay for same and deduct the amounts paid or costs incurred from all Basic, Additional, and Percentage Rent payable under this Deed of Lease. Upon completion of the Addition and commencement of business therein by Tenant, Basic Rent (and the base for computation of Percentage Rent hereunder) shall be increased by the greater of: an amount equal to twelve percent (12%) of the cost of the Addition, or an amount equal to $8.00 per square foot of the Addition, or an amount equal to a computed percentage times the cost of the Addition, such percentage consisting of two percent (2%) plus the prime rate, as published in the Wall Street Journal or similar public source, at the time of the exercise of Tenant's Enlargement Option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant, with the final cost of the Addition upon completion to be certified by the general contractor performing the work. Tenant shall obtain, at its cost and expense, such information or investigations concerning the status of the title, environmental condition, and boundaries of the land upon which the Addition shall be constructed as it shall desire, and it shall be a condition of Tenant's obligation to pay Basic Rent with respect to the Addition that it be satisfied with such information and investigations; or

(b)     If Landlord shall for any reason fail or refuse to construct the Addition after Tenant has properly exercised Tenant's Enlargement Option, Tenant shall have the right but not the obligation to construct the Addition at its sole cost and expense. If Tenant constructs the Addition, Tenant shall obtain and pay all costs, fees, and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition, shall cause any mechanics' lien incurred in connection with such expansion to be promptly discharged, and shall indemnify and hold harmless the Landlord from any expense occasioned thereby. Landlord shall provide, in consideration of Tenant's constructing the Addition, an endorsement to the Title Policy, the Survey, and the Audit. Tenant's optional construction of the Addition shall be contingent upon Tenant's satisfaction with the Title Policy, the Survey, the Audit, and the provisions of then applicable zoning and land use regulations. Upon completion of the Addition by Tenant, no Basic Rent shall be payable by Tenant in respect of the Addition for the remainder of the Term and no Percentage Rent shall be payable until Tenant shall have recouped the cost of the Addition in Percentage Rent that would otherwise be due under this Deed of Lease; and

29

(c)      Regardless of who constructs the Addition, upon completion of the Addition, it shall become a portion of the Store. If at that time there shall not at such date remain at least ten (10) years of the Initial Term, Tenant shall be granted three (3) additional Extension Terms of five (5) years each, and Tenant's remaining Extension Terms under this Deed of Lease, if any, shall be preserved.

**TAKE OVER AND**
**RELEASE**

*Apr 4, 2005*

45.      If Tenant or its assignee or sublessee of the entire Store fails to operate a business in the Store for  ninety (90) continuous days or longer, and such failure to operate is not due to permitted remodeling or enlargement, or a result of casualty or other Force Majeure (a "Store Closing"), Landlord may terminate this  Deed of Lease by written notice to Tenant within  ninety (90) days of such Store Closing  and from and after the date of such notice neither Landlord nor Tenant shall have any further liability to the other, except as expressly provided otherwise in this Deed of Lease.

**LIMITATION OF**
**LIABILITY**

46.      Notwithstanding anything to the contrary provided in this Deed of Lease, if Landlord or any successor-in-interest of Landlord shall be an individual, tenancy-in-common, firm or partnership, general or limited, limited liability company, or corporation, there shall be absolutely no personal liability on the part of such individual, tenancy-in-common, firm, corporation, partnership, limited liability company or the members of any such firm, partnership , joint venture, corporation or limited liability company with respect to any of the terms, covenants and conditions of this Deed of Lease, and Tenant shall look solely to the equity of Landlord or such successor-in-interest in the Shopping Center for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Deed of Lease to be performed by Landlord, such exculpation of personal liability to be absolute and without any exception whatsoever.

**SELF-HELP**

47.      If Landlord defaults in the performance or observance of any agreement or condition contained in this Deed of Lease on its part to be performed or observed, and if Landlord fails to cure such default within thirty (30) days after notice from Tenant specifying the default (or fails within such period to commence to cure such default and thereafter to prosecute the curing of such default to completion with due diligence), Tenant may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter, cure such default for the account of the Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord. Landlord agrees to reimburse Tenant such amount and indemnify Tenant from and against any and all liability arising from Tenant's cure, provided such cure is reasonable. Tenant may cure any default prior to the expiration of said thirty (30) days which is reasonably necessary to protect the Premises or Tenant's interest therein or to prevent injury or damage to persons or property. If Landlord fails to reimburse Tenant upon demand for any amount paid for the account of Landlord, pursuant to this Article, such amount may be deducted by Tenant from the next or any succeeding installment of Basic Rent due under this Deed of Lease. This Article shall not be construed to abrogate the lender notice requirements imposed by Article 32 of this Deed of Lease.

**BANKRUPTCY**

48.      If, at any time, Tenant or Guarantor is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of Tenant is appointed and shall not be discharged within 90 days after such appointment, then Landlord may, at its option, terminate the Deed of Lease and Tenant shall return the Premises as set forth in Article 2(c) of this Deed of Lease.

30

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Deed of Lease the day and year indicated below.

Witnesses:

_____
Print name: JIM LOVE

_____
Print name: CRISTAL ALSTON BAYTON

LANDLORD:

JNB COMPANY OF VIRGINIA, L.L.C.

By: _____

Its: _____

Date: 11-11-98

_____
Print name: LUCY W. McCOOK

_____
Print name: Rebecca C. _____

WINN-DIXIE RALEIGH, INC.

By: _____

James Kufeldt

Its: Vice President

Date: 11-13-98

31

COMMONWEALTH OF _Virginia_ )
COUNTY OF _Henrico_ )

    Personally appeared before me _James W. Rowe_ (name of first witness) who being first duly sworn, deposed and said that he/she saw the within named **WNB COMPANY OF VIRGINIA, L.L.C.**, a Virginia limited liability company, by _Robert Glover III_ , its _Manager_ (title) sign and, as its act and deed, deliver the within _Deed of Lease_ (type of document) and that he/she with _Crystal Barton_ (name of second witness) witnessed the execution thereof.

_Jim Roe_
(Signature of First Witness)

Sworn to before me this 11th day of _Nov_, 1998 .

_Crystal Alston-Barton_
Notary Public
State and County aforesaid
My commission expires: 12-31-00
(Notarial Seal)


STATE OF FLORIDA )
COUNTY OF DUVAL )

    Personally appeared before me _LUCY W. McCOOK_ (name of first witness) who being first duly sworn, deposed and said that he/she saw the within named **WINN-DIXIE RALEIGH, INC.**, a Florida corporation, by _James Kufeldt_ , its _Vice President_ (title) sign and, as its act and deed, deliver the within _Deed of Lease_ (type of document) and that he/she with _____ (name of second witness) witnessed the execution thereof.

_Lucy W. McCook_
(Signature of First Witness)

Sworn to before me this 13 day of _November_, 199 8 .

_Rebecca L. Sawyer_
Notary Public
State and County aforesaid
My commission expires
(Notarial Seal)

REBECCA L. SAWYER
My Comm. Exp. June 2, 2002
Comm. No. CC 372310

## CORPORATE GUARANTY OF LEASE OBLIGATIONS

THIS CORPORATE GUARANTY OF LEASE OBLIGATIONS ("Guaranty") is given as of the date indicated below by WINN-DIXIE STORES, INC., a Florida corporation ("Guarantor") to and in favor of JNB COMPANY OF VIRGINIA, a Virginia limited liability company("Landlord") on behalf and for the account of WINN-DIXIE RALEIGH, INC., a Florida corporation ("Tenant").

### RECITALS:

1.      Landlord and Tenant intend to be parties to that certain Deed of Lease dated _November 18, 1998_ (the "Deed of Lease"), pursuant to which Landlord has agreed to Deed of Lease to Tenant certain real property and related improvements located in Chesterfield County, Virginia, as more particularly described in the Deed of Lease (the "Premises").

2.      Landlord is unwilling to lease the Premises to Tenant unless Guarantor executes and delivers this Guaranty.

3.      Landlord's leasing of the Premises to Tenant will, directly or indirectly, materially benefit Guarantor, and therefore, Guarantor has agreed to execute and deliver this Guaranty.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.      The foregoing recitals are true and correct and incorporated herein.

2.      If Tenant fails, after notice and an opportunity to cure as provided in the Deed of Lease, to timely perform its obligations under the Deed of Lease, then Guarantor shall:

(a)     With respect to monetary defaults, following ten (10) days written notice from Landlord, cure such monetary default(s) of Tenant to the extent that Tenant does not have a right, under the Deed of Lease, to offset any amount due to Landlord because of any default by Landlord under the Deed of Lease;

(b)     With respect to nonmonetary defaults, following thirty (30) days written notice from Landlord, cure such nonmonetary default(s) of Tenant, provided, however, that if the nature of such nonmonetary default is such that the default is not capable of a cure within thirty (30) days, then Guarantor's obligation under this Guaranty shall be to commence a cure and diligently prosecute the same to completion within a reasonable time after receipt of Landlord's notice.

3.      No amendment, modification, or extension of the Deed of Lease which has the effect of increasing or extending Guarantor's obligations under this Guaranty shall be valid or enforceable against Guarantor without Guarantor's written consent.

4.      All notices required or permitted to be given under this Guaranty shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All payments made under this Guaranty shall be sent to Landlord at the address below or at such other address as Landlord shall provide by written notice from time to time. Each communication shall be deemed duly given and received: (a) as of the date and time the same is personally delivered with a receipted copy; (b) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (c) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested,

or (d) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord :       JNB COMPANY OF VIRGINIA, L.L.C.
                        3961-D Stillman Parkway
                        Glen Allen, Virginia 23060
                        Telecopy: _____

or at such other address as Landlord may direct from time to time.

Guarantor:      Winn-Dixie Stores, Inc.
                        Attn: General Counsel
                        5050 Edgewood Court
                        P.O. Box B
                        Jacksonville, FL 32203-0297
                        Telecopy: (904) 783-5138

or to such other address as Guarantor may direct from time to time.

     5.      This Guaranty shall inure to the benefit of Landlord and its successors and assigns and shall bind Guarantor, its successors and assigns.

     IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date indicated below.

                        WINN-DIXIE STORES, INC.

                        By: _____
                        Its: James Kufeldt    President
                        Date: 11-13-98

O:\TRANSFER\RALEIGH\0969\DRAFT3.NEW



SITE DATA:
PHASE I:
WINN DIXIE: 52,474 sq.ft.
SHOPS TOTAL: 17,600 sq.ft.
PARKING SPACES: 344
SPACES PER 1000 sq.ft.: 4.92

PHASE II:
WINN DIXIE: 52,474 sq.ft.
WINN DIXIE ADDITION: 13,860 sq.ft.
SHOPS: 12,400 sq.ft.
TOTAL BLDG. AREA: 78,734 sq.ft.
SPACES PER 1000 sq.ft.: 4.40
TOTAL SITE AREA 9.13 ACRES

VICINITY MAP
SCALE: 1" = 2,000'

NORTHEAST PARCEL
10± Ac.
OWNED BY OTHERS

LEGEND

TYPICAL HANDICAP PARKING
AND
STANDARD PARKING DETAIL

WINN DIXIE
52,474 SQ. FT.
1 STORE

WINN DIXIE
FUTURE EXPANSION

OUTPARCEL "A"
0.93± Ac.

OUTPARCEL "B"
0.85± Ac.

OUTPARCEL "C"
0.96± Ac.

U.S. ROUTE 1060    (HULL STREET ROAD)

EXHIBIT "A"

OCT. 28, 1998

EXHIBIT "B"
LEGAL DESCRIPTION
WINN-DIXIE 9.247 ACRES PARCEL

Beginning at a point on the northern right-of-way line of Hull Street Road (U.S. Route 360) and the east line of Lake Harbor Drive (private), said point being N 84°05'27" E 7.00' from a nail in pavement.

Thence along the northern right-of-way line of Hull Street Road S 84°05'27" W 555.45' to a point, said point being the true and actual point-of-beginning;

Thence continuing along said right-of-way S 84°5'27" W 710.76' to a point;

Thence N 06°04'52" W 337.81' to a point;

Thence along a curve to the right having a Radius of 40.00', a Delta of 27°28'30", a Length of 19.18' and a Chord of N 07°39'23" E 19.00' to a point;

Thence along a curve to the left having a Radius of 47.00', a Delta of 62 °29'02", a Length of 51.26' and a Chord of N 09°50'53" W 48.75' to a point;

Thence N 58°08'28" E 6.90' to a point;

Thence along a curve to the left having a Radius of 83.93', a Delta of 15°00'47", a Length of 21.99' and a Chord of N 68°04'16" E 21.93' to a point;

Thence N 53°11'23" E 152.75' to a point;

Thence along a curve to the left having a Radius of 35.00', a Delta of 37°48'20", a Length of 23.09' and a Chord of N 34°17'13" E 22.68' to a point;

Thence along a curve to the right having a Radius of 93.43', a Delta of 19°21'29", a Length of 31.57' and a Chord of N 18°58';04" E 31.42' to a point;

Thence N 34°40'06" E 42.11' to a point;

Thence N 84°06'08" E 63.27' to a point;

Thence S 05°49'15" E 25.10' to a point;

Thence N 84°05'27" E 107.32' to a point;

Thence along a curve to the right having a Radius of 50.00', a Delta of 33°00'51", a Length of 28.81' and a Chord of S 79°24'07" E 28.41' to a point;

Thence S 62°53'41" E 9.01' to a point;

Thence along a curve to the left having a Radius of 50.00', a Delta of 33°00'51", a Length of 28.81' and a Chord of S 79°24'07" E 28.41' to a point;

Thence N 84°05'27" E 262.11' to a point;

Thence S 05°54'33" E 230.08' to a point;

Thence N 84°06'08" E 520.35' to a point;

Thence along a non-tangent curve to the left having a Radius of 15.00', a Delta of 60°53'36", a Length of 15.94' and a Chord of S 65°22'34" E 124.86' to a point;

Thence S 05°43'19" E 161.95' to a point;

Thence S 84°05'27" W 79.76' to a point;

Thence N 05°53'52" W 215.01' to a point;

Thence along a curve tot he left having a Radius of 726.44', a Delta of 02°50'51", a Length of 36.10' and a Chord of N 13°15'38" W 36.10' to a point;

Thence along a curve to the left having a Radius of 726.44', a Delta of 02°50'51", a Length of 36.10' and a Chord of N 13°15'38" W 36.10' to a point;

Thence along a curve to the right having a Radius of 36.91', a Delta of 20°42'42", a Length of 13.34' and a Chord of N 13°32'36" W 13.27' to a point;

Thence S 84°06'08" W 464.43' to a point;

Thence S 05°54'33" E 263.98' to a point-of-beginning and containing 9.247 acres of land.

## EXHIBIT "C"

### SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE, AND ATTORNMENT AGREEMENT (this "Agreement"), made this _____, between _____, a _____, whose address is _____ (together with its successors, assigns, and transferees "Lender") and WINN-DIXIE RALEIGH, INC., a Florida corporation, whose address is 2201 South Wilmington Street, Raleigh, North Carolina (together with its successors and assigns, "Winn-Dixie");

### RECITALS:

1. Lender has made or is about to make a loan to JNB COMPANY OF VIRGINIA, L.L.C., a Virginia limited liability company ("Landlord"), secured by a mortgage, deed of trust, security deed, or other financing instrument recorded or to be recorded in the Official Records of Chesterfield County, Virginia (together with any modifications, consolidations, extensions, replacements, or renewals thereof, the "Mortgage"), encumbering the real estate known as "Winterpock Village Shopping Center" at the Highway #360 (Hull Street) and Winterpock Road, in Richmond, Chesterfield County, Virginia, and more particularly described in the Mortgage and on Exhibit "A" attached hereto and incorporated herein (the "Shopping Center"); and

2. By Deed of Lease dated _____ (as amended by _____ and as otherwise to be amended from time to time, the "Deed of Lease"), Landlord did Lease unto Winn-Dixie, as tenant, those certain premises which constitute a portion of the Shopping Center and are more particularly described in the Deed of Lease (the "Premises"); and

3. Lender and Winn-Dixie desire that the Deed of Lease shall not terminate but rather shall remain in full force and effect in accordance with its terms if the Mortgage is foreclosed or any transfer of the Premises is made in lieu thereof.

NOW THEREFORE, for valuable consideration the receipt and sufficiency of which are hereby acknowledged, Lender and Winn-Dixie agree as follows:

1. Provided Winn-Dixie is not in material default under the terms of the Deed of Lease, then in the course of or following any exercise of any remedy under the Mortgage, any foreclosure sale of the Shopping Center, or any transfer of the Shopping Center thereafter or in lieu of foreclosure (together with any similar events, a "Foreclosure Event"):

   (a) The right of possession of Winn-Dixie to the Premises and Winn-Dixie's rights arising out of the Deed of Lease shall not be affected or disturbed by Lender.

   (b) Winn-Dixie shall not be named as a party defendant unless required by law.

   (c) The Deed of Lease shall not be terminated or affected by any Foreclosure Event.

2. Following a Foreclosure Event, Winn-Dixie shall attorn to Lender as its new landlord and the Deed of Lease shall continue in full force and effect as a direct Deed of Lease between Winn-Dixie and Lender. Notwithstanding the foregoing, Lender shall not be:

37

(a)      liable for any act or omission of any prior landlord (including Landlord), unless such action was taken at the direction of or with the approval of Lender; or

(b)      subject to any offsets or defenses which Winn-Dixie might have against any prior landlord (including Landlord) except those which arose out of such landlord's default under the Deed of Lease and accrued after Winn-Dixie has notified Lender and given Lender an opportunity to cure as provided in the Deed of Lease; or

(c)      bound by any rent Winn-Dixie paid for more than the then current month to any prior landlord (including Landlord); or

(d)      bound by any modification of the Deed of Lease made after the date hereof without Lender's consent.

3.      Following a Foreclosure Event, Lender promptly shall give notice thereof to Winn-Dixie, stating its current address and providing evidence of Lender's title to the Shopping Center.

4.      The Deed of Lease is subject and subordinate to the lien of the Mortgage and to all advances made or to be made thereunder as though the Mortgage had been executed and recorded prior in point of time to the execution of the Deed of Lease. Notwithstanding the foregoing, subordination of the Deed of Lease to the Mortgage should not be construed to constitute Tenant's consent or agreement to any term, condition, or provision of the Mortgage or any related loan document which is inconsistent with or purports to modify, alter, or amend the Deed of Lease.

5.      The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto. However, Winn-Dixie agrees to execute and deliver to Lender such other instrument as Lender shall reasonably request to evidence such provisions.

6.      Winn-Dixie agrees it will not, without the prior written consent of Lender (i) modify the Deed of Lease or any extensions or renewals thereof in such a way as to reduce rent, accelerate rent payment, shorten the original term, or change any renewal option; (ii) terminate the Deed of Lease, except as provided by its terms; (iii) tender or accept a surrender of the Deed of Lease or make a prepayment in excess of one (1) month of any rent thereunder; or (iv) subordinate or knowingly permit subordination of the Deed of Lease to any lien subordinate to the Mortgage, except for those liens that are superior to the Mortgage by law, if any. Any such purported action without such consent shall be void as against Lender.

7.      Winn-Dixie will give notices to Lender in accordance with paragraph 32 of the Deed of Lease at the address set forth in the first paragraph of this Agreement or at such other address as Lender may advise from time to time. Lender shall be entitled to the cure periods provided in paragraph 32 under the Deed of Lease.

8.      No Mortgage shall encumber Tenant's Trade Fixtures or any nonpermanent, nonstructural Tenant Modifications. Tenant assumes no liability or obligation under the Mortgage or with respect to the indebtedness secured thereby.

9.      If Landlord transfers Landlord's interest in the Shopping Center or the right to collect rent under this Deed of Lease, Landlord agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity

collecting rent under this Deed of Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under this Deed of Lease, (collectively, the "Transfer Requirements") and/or (d) such other information as Tenant may reasonably require. Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in this Deed of Lease. The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to <u>temporarily</u> withhold rent in trust pending receipt of Transfer Requirements.

       **IN WITNESS WHEREOF**, Lender and Winn-Dixie have executed this Agreement the day and year first above written.

Witnesses:

_____     _____
Print name:_____

_____     By:_____
Print name:_____     _____
                         Its:_____
                         Date:_____

_____     **WINN-DIXIE RALEIGH, INC.**
Print name:_____

_____     By:_____
Print name:_____     _____
                         Its:_____
                         Date:_____

COMMONWEALTH OF _____ )
COUNTY OF _____ )

    Personally appeared before me _____(name of first witness) who being first duly sworn, deposed and said that he/she saw the within named _____, a _____ corporation, by _____, its _____(title) sign and, as its act and deed, deliver the within _____ (type of document) and that he/she with _____ (name of second witness) witnessed the execution thereof.

 

_____
(Signature of First Witness)

Sworn to before me this ____ day of _____, 199___.

_____
Notary Public
State and County aforesaid
My commission expires:
(Notarial Seal)

 

STATE OF FLORIDA   )
COUNTY OF DUVAL   )

    Personally appeared before me _____(name of first witness) who being first duly sworn, deposed and said that he/she saw the within named **WINN-DIXIE RALEIGH, INC.**, a Florida corporation, by _____, its _____(title) sign and, as its act and deed, deliver the within _____ (type of document) and that he/she with _____ (name of second witness) witnessed the execution thereof.

_____
(Signature of First Witness)

Sworn to before me this ____ day of _____, 199___.

_____
Notary Public
State and County aforesaid
My commission expires:
(Notarial Seal)

**EXHIBIT "D"**

**WINN-DIXIE SURVEY PROTOCOL AND ORDER FORM**
(Form SP-1)

This protocol presents the minimum scope of work Winn-Dixie Stores, Inc. or its subsidiaries or affiliates require for its boundary and improvements surveys. The following protocol has been developed to assist the surveyor in the preparation of the survey. The survey should include the following:

1.  A Surveyor's Certificate in the form attached hereto should be included on the face of the map. No other certifications should appear on the face of the map which deal with the same issues that are contained within the Surveyor's Certificate, except those otherwise required by this protocol.

2.  The survey must be certified to the persons or entities checked below or as otherwise requested by Winn-Dixie:

    | | |
    |---|---|
    | _____ | Winn-Dixie _____, Inc. |
    | _____ | National Westminster Bank, Plc, as agent |
    | _____ | Sunbelt-Dix, Inc. |
    | _____ | _____ (Title Company) |
    | _____ | _____ (Legal Counsel) |
    | _____ | _____ (Lender's Counsel) |
    | _____ | _____ (Other) |

3.  The Surveyor's Certificate should refer to the title commitment, a copy of which (together with copies of the exceptions listed therein) will be provided to the surveyor as soon as possible.

4.  The legal description should refer to County, range, township, section and/or lot, and should match the legal description contained in the title commitment. If the legal description in the title commitment is not a metes and bounds description, the legal description on the map should also include the metes and bounds description, including a point of beginning and all of the calls therefor, together with a certification that both descriptions describe one and the same property. The metes and bounds calls should be labeled on the boundary lines and the metes and bounds description should be printed separately on the survey. The survey should show interior lot lines, if any. If the property is made up of several different parcels or lots, the following will be required: (a) separate descriptions for each parcel or lot, (b) a legal description that tracks around the outer boundary of the overall parcel, and (c) a surveyor's certification that they are one and the same property and that the parcels or lots are contiguous. If the record legal description and the actual measurements differ, both should be labeled as to each call and should be separately printed on the map, together with a certification that both descriptions describe one and the same property.

5.  The legal description should include a statement of acreage.

6.  The map should show the size (including gross square footage), location, and type of all existing buildings and the distance of such buildings from each boundary line, and show all "permanent" and significant improvements other than buildings, such as signs, parking areas or structures, etc. If there are existing improvements on the subject property, the map should indicate the number of existing and required handicapped, motorcycle, regular, and other parking spaces. A note should be added indicating the number of parking spaces required by applicable zoning regulations.

7.  The map should indicate the location of water/gas/sewer mains or telephone/electric/utility lines or irrigation lines serving the subject property as evidenced by on-site observation by showing manholes, catch basins, crossing wires or cables, valve vaults and other surface indications.

41

8.  The map should show fences or walls and their dimensions and nature of use.

9.  The map should indicate any encroachments onto the subject property from any exterior source or onto adjacent property from the subject property and should indicate any visible easements or rights-of-way (other than those of record)

10. The map should show the widths of all streets and identify all streets as being either public or private rights of way and include arrows from all rights of way up to the edge of the property line to indicate that there are no gaps. The map should show points of access (curb cuts) from public rights of way (street or road) into the subject property. The map should contain a vicinity map showing the property surveyed in reference to nearby highway(s) or major street intersection(s). If the property is not abutted by a public roadway, the survey should show the location of the nearest public roadway and its distance from the property.

11. The map should identify and show setback, height and bulk restrictions of record or disclosed by applicable zoning or building codes (in addition to those recorded in subdivision maps) (and should note the source of same). If none, the map should so state.

12. The map should show all easements of record, including those that benefit the property, and identify same with the applicable recording information (Official Records Book and Page number). If an easement or other recorded document listed in the title commitment does not affect the subject property, is blanket in nature, or is not locateable, this should be noted.

13. Monuments must be placed (or a reference monument or witness to the corner) at all major corners of the boundary of the property, unless already marked or referenced by an existing monument or witness to the corner.

14. The map should show any retention or detention ponds or drainage structures or facilities.

15. The map should indicate names of all adjoining property owners on all sides of the subject property.

16. The map should indicate the flood zone designation for the subject property (with proper annotation based on Federal Flood Insurance Rate Maps or the state or local equivalent, by scaled map location and graphic plotting only).

17. The map should state the street address of the subject property or state that no street address has been assigned.

18. Significant observations not otherwise required to be disclosed should be noted on the map.

19. If checked below, a separate topographical survey should be completed.

    Topographical Required: _____ yes _____ no

20. If the property is unimproved at the time the survey is prepared, in an effort to assist Winn-Dixie in correctly locating the property improvements, the surveyor should contact Winn-Dixie's Store Design Department. Upon the surveyor's receipt of information from either Winn-Dixie's Store Design Department or their architect, the surveyor should prepare, in addition to the survey, a separate map showing the following:

    (a)  The projection of the location of the footprint of the contemplated improvements;

(b)    If the contemplated improvements are used as a **[check one]** _____ supermarket; _____ warehouse; or _____ manufacturing facility, the following applies with respect to parking spaces:

|  | Existing Parking Spaces | Required (by applicable building and zoning coded) |
|---|---|---|
| Regular (10') | | |
| Handicapped | | |
| Motorcycle | | |

21.    The survey should note and the separate map (if any is prepared) should note any encroachments of existing (or proposed) improvements onto the subject property, onto adjacent property or over establishing building setback lines or easement areas.

22.    In addition to the above, the surveyor should furnish a copy of the declaration page of the surveyor's professional liability insurance policy.

43

## EXHIBIT "D"

### SURVEYOR'S CERTIFICATE

Certified to: _____

RE:    File #_____ Drawing No. _____ Title:_____

The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that:

1.    This survey was prepared from an actual on-the-ground survey of the real property shown hereon (the "Property") and was conducted by the Surveyor or under the Surveyor's supervision;

2.    Monuments have been duly located or placed and actually exist at all major corners of the boundaries of the Property and such monuments are located, are of the size, and consist of the materials, as shown on this Survey;

3.    The survey and the legal description of the Property, including the point of beginning and all calls, is true, correct, and accurate, is identical to the legal description contained in _____ Title Insurance Company's commitment for title insurance No. _____, dated _____ (the "Commitment") and there are no visible discrepancies, conflicts, shortages in area, boundary line conflicts, visible encroachments onto or protruding from the Property, or visible easements or rights-of-way (other than those which exist pursuant to recorded instruments) except as noted hereon;

4.    All recorded easements or other instruments or exceptions noted in the Commitment ("Exceptions") and capable of being located have been correctly located hereon and are indicated by official recording information [book and page], and those Exceptions which cannot be located or do not affect the Property are noted hereon either as "blanket" Exceptions that affect the entire Property or as not affecting the Property;

5.    The following, if they exist on the Property, have been located on this Survey:

        (a)    buildings (labeled as to type, dimensions and gross square footage, and distance from each boundary line;

        (b)    significant other improvements other than buildings, such as signs, parking areas, or other structures such as fences or walls (labeled as to dimensions and nature of use);

        (c)    water/gas/sewer mains and telephone/electric/utility lines (as determined by on site surface observation only);

        (d)    water retention or detention ponds;

        (e)    high water marks, if the Property is located on or contains a body of water;

        (f)    interior lot lines; and

        (g)    any natural or constructed objects affecting the Property.

6.    Lines indicating all setback restrictions of record or disclosed by applicable building or zoning codes are drawn hereon and any height or bulk restrictions of record or disclosed by applicable building or zoning codes, if any, are noted hereon and the source for either type of restriction is indicated on this Survey. If no such restrictions affect or apply to the Property, a note has been placed hereon to so indicate;

7.    If a street address has been assigned for the Property, it is noted on this Survey;

8.    A vicinity map is contained on this Survey and such vicinity may shows the Property in reference to nearby public rights-of-way and major street intersections. This Survey shows the names and widths of all rights-of-way bounding the Property and indicates (a) whether such rights-of-way are public or private; (b) by use of arrows drawn to the Property boundary line that there are no gaps between the Property boundaries and the borders of such rights-of-way; (c) existing curb cut access points to any such rights-of-way which are public; and (d) that the Property has access to and from a public roadway as shown on the Survey. This Survey shows the distance to and location of the nearest intersecting public street or road (if access is by easement or private right of way);

9.    Based upon a review of Federal Flood Insurance Rate Maps (or the state or local equivalent if no federal map exists), the Surveyor has determined by scaled map location and graphic plotting only that the Property is not located in a 100 year Flood Plain or in an identified "flood prone area" as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Insurance Rate Map Panel #_____, dated _____, which such map panel covers the area in which the Property is situated;

10.    The    Property    contains    approximately    _____    acres    and    currently    is    zoned
_____.

11.    The name of the owners of the properties adjoining the Property are indicated on this Survey;

12.    This Survey meets or exceeds the minimum technical standards established pursuant to the laws of the Commonwealth in which the Property is located and meets the requirements set forth in the Winn-Dixie Survey Protocol (Form SP-1).

13.    This is to certify that this map or plat and the survey on which it is based were made (i) in accordance with "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by ALTA and ACSM in 1992, and includes items 1, 2, 3, 4, 6, 7, 8, and 10 of the Table A thereof, and (ii) pursuant to the Accuracy Standards (as adopted by ALTA and ACSM and in effect on the date of this certification) of a(n) _____ [insert "Urban", "Suburban, " "Rural," or "Mountain/Marshland" here] Survey.


Signature:_____    Registered Land Surveyor No._____

Address:_____

Phone:_____    Fax:_____

## EXHIBIT "E"

### ESTOPPEL CERTIFICATE

WINN-DIXIE STORE #969

Winterpock Village Shopping Center, Richmond, Virginia

The undersigned officer of WINN-DIXIE RALEIGH, INC., a Florida corporation ("WD") hereby certifies, on behalf of WD, that as of _____ (the "Certificate Date"), the following is true and correct:

1.     That WD is the tenant ("Tenant") under a currently effective Deed of Lease (as amended as described below, the "Deed of Lease") with JNB COMPANY OF VIRGINIA, L.L.C., a Virginia limited liability company, as the current landlord ("Landlord") dated _____, conveying a leasehold estate of the property described therein (the "Premises") located in a shopping center known as Winterpock Village Shopping Center (the "Shopping Center"), and the Deed of Lease has been amended or is evidenced only by:

     (a)    Short Form Deed of Lease dated _____, recorded in Official Records Volume _____, page ____ of the public records of Chesterfield, Virginia;

     (b)    Letter Agreement(s) dated _____;

     (c)    Supplemental Lease Agreement dated _____;

     (d)    First Amendment to Deed of Lease dated _____;

     (e)    Second Amendment to Deed of Lease dated _____.

2.     That the term of the Deed of Lease commenced _____, and is scheduled to expire on _____ unless renewed or terminated in accordance with the terms of the Deed of Lease. Pursuant to the Deed of Lease, Tenant is entitled to renew the Deed of Lease for five (5) terms of five (5) years each.

3.     That, to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Deed of Lease, all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199__, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Deed of Lease.

4.     That, to the best of Tenant's knowledge, Landlord is not in default under the Deed of Lease, except that Landlord has failed to perform the following maintenance items as required under the Deed of Lease:

     (a)    _____

     (b)    _____

     (c)    _____

     (d)    _____

5.     That the Deed of Lease contains no provision for purchase of the Premises by Tenant.

6.     Tenant has received no notice of any sale, transfer, assignment, or pledge of Landlord's interest in the Deed of Lease or the rent due thereunder to any party except: _____ and _____.

7.     Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law.

8.    Notwithstanding anything to the contrary herein:

   (a)    No acceptance or possession of the Premises, opening for or operation of business by Tenant therein, execution of this certificate, or payment of rent under the Deed of Lease constitutes or will constitute acceptance by Tenant of work or materials that are defective or not completed in accordance with Tenant's plans and specifications, or a waiver of Tenant's rights against Landlord in connection therewith.

   (b)    Tenant makes no representation or warranty that the Premises or the Premises, or any portion thereof is in compliance with the Americans With Disabilities Act or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

   9.    The address for notices to Tenant is 2201 South Wilmington Street, Raleigh, North Carolina, with a copy to: General Counsel, Winn-Dixie Stores, Inc., 5050 Edgewood Ct., P.O. Box B, Jacksonville, FL 32203-0297.

   10.    This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant.

47

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Tenant.

**WINN-DIXIE RALEIGH, INC.**

By:_____

Its:_____

The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge. Further, Landlord certifies that Tenant has fully performed its obligations under the Deed of Lease to date and Tenant is not in default thereunder.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Landlord.

**JNB COMPANY OF VIRGINIA, L.L.C.**

By:_____

Its:_____

## EXHIBIT "F"

### (ZONING/LAND USE AGENCY LETTERHEAD)

(DATE)

Re:     _____, Chesterfield County, Commonwealth of Virginia

To Whom It May Concern:

This is to advise you that the zoning and use of the above-captioned Premises is governed by the laws and regulations of the County of Chesterfield, and the Premises have been zoned to allow an establishment or facility which includes the retail sale of food and drugs, sundries and notions, books and stationery, delicatessen, bakery, beer and wine for off-site consumption, video rental, and similar uses, a bank, photo developing, and a dry cleaning business under Section _____ of the Zoning Code of the County of Chesterfield, relating to uses permitted in the _____" District.   The aforesaid zoning permits the use of the improvements located or to be located on the Premises as described above.  The aforesaid Zoning District is appropriate for this Commonwealth's comprehensive plan's future land use designation (if any exists).

As of the date hereof, we are not aware of any facts with respect to the Premises that constitute a violation of any building or zoning laws, rule or regulations.  Any nonconforming elements of the development are considered valid nonconforming elements under the current building and zoning law.

Should you have further questions in this regard, please advise.

Very truly yours,

(Name)
(Title)

Attachments
- Zoning Regulations for Permitted Use of Premises
- Zoning Regulations for Non-conforming Uses

49

## EXHIBIT "G"

### SHORT FORM DEED OF LEASE

THIS SHORT FORM DEED OF LEASE is hereby executed this _____, 1998, by and between **JNB COMPANY OF VIRGINIA, L.L.C.**, a Virginia limited liability company, whose mailing address is 3961-C Stillman Parkway, Glen Allen, Virginia ("Landlord") and **WINN-DIXIE RALEIGH, INC.**, a Florida corporation, whose mailing address is 2201 South Wilmington Street, Raleigh, North Carolina ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H:

WHEREAS, Landlord and Tenant did enter into a Deed of Lease, dated _____, 1998, (the "Deed of Lease"); and

WHEREAS, Landlord and Tenant desire to memorialize the terms and conditions of the Deed of Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on Exhibit "B" attached hereto and depicted on the Site Plan attached as Exhibit "A" attached hereto and by these references made a part hereof together with the nonexclusive right to use the Common Areas as described and provided in the Deed of Lease (collectively the "Premises").

The term of the Deed of Lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Deed of Lease and shall terminate, unless sooner terminated or extended as provided in the Deed of Lease, twenty (20) years thereafter. Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Deed of Lease and Landlord and Tenant agree to abide by the terms of the Deed of Lease. Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the term of the Deed of Lease, each extension to be for a period of five (5) years each. Tenant has no option to purchase the Premises under the Deed of Lease.

All the terms, conditions, provisions and covenants of the Deed of Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Deed of Lease and this Short Form Deed of Lease shall be deemed to constitute a single instrument or document. This Short Form Deed of Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Deed of Lease and, to the extent there may be any conflict or inconsistency between the Deed of Lease or this Short Form Deed of Lease, the Deed of Lease shall control.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Short Form Deed of Lease to be

50

executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

**LANDLORD:**

_____
Print Name:_____

**JNB COMPANY OF VIRGINIA, L.L.C.**

_____
Print Name:_____

     As to Landlord

By:_____

    Its:_____

**TENANT:**

_____
Print Name:_____

**WINN-DIXIE RALEIGH, INC.**

_____
Print Name:_____

    As to Tenant

By:_____

    Its:_____

COMMONWEALTH OF _____ )
COUNTY OF _____ )

    Personally appeared before me _____(name of first witness) who being first duly sworn, deposed and said that he/she saw the within named **JNB COMPANY OF VIRGINIA, L.L.C.,** a Virginia limited liability company, by _____, its _____(title) sign and, as its act and deed, deliver the within _____ (type of document) and that he/she with _____ (name of second witness) witnessed the execution thereof.

_____
(Signature of First Witness)

Sworn to before me this ____ day of _____, 199___.

_____
Notary Public
State and County aforesaid
My commission expires:
(Notarial Seal)

STATE OF FLORIDA    )
COUNTY OF DUVAL    )

    Personally appeared before me _____(name of first witness) who being first duly sworn, deposed and said that he/she saw the within named **WINN-DIXIE RALEIGH, INC.,** a Florida corporation, by _____, its _____(title) sign and, as its act and deed, deliver the within _____ (type of document) and that he/she with _____ (name of second witness) witnessed the execution thereof.

_____
(Signature of First Witness)

Sworn to before me this ____ day of _____, 199___.

_____
Notary Public
State and County aforesaid
My commission expires:
(Notarial Seal)

## EXHIBIT "H"

Coming Soon Sign Specifications

**Text of Sign:** Coming Soon —
Winn-Dixie
Marketplace

**Size:** Maximum size permitted by applicable law and
restrictions of record and otherwise reasonably
acceptable to Landlord and Tenant

53

## EXHIBIT "I"

## DECLARATION OF RESTRICTIVE COVENANTS

THIS DECLARATION OF RESTRICTIVE COVENANTS AND CROSS EASEMENTS (this "Declaration") is made _____, 199__ by JNB COMPANY OF VIRGINIA, L.L.C., a Virginia limited liability company, (together with its successors and assigns and any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, "Owner").

## R E C I T A L S

1.      Owner is the owner of that certain real property located in the County of Chesterfield, Commonwealth of Virginia as described on Exhibit "B" attached hereto (the "Shopping Center") and shown on the Site Plan attached hereto as Exhibit "A" (the "Site Plan"), and is or may become the owner of certain other real property located within 1,000 feet of any boundary of the Premises ("Owner's Remaining Land"), and those abutting parcel(s) known as "Outparcels" described on Exhibit "C" attached hereto.

2.      Owner is the landlord under that certain Deed of Lease dated _____ between Owner and WINN-DIXIE RALEIGH, INC., a Florida corporation (together with its successors and assigns, "Tenant") pursuant to which Tenant leases the Premises.

3.      Owner intends by this Declaration to grant certain easement and other rights and impose certain use restrictions upon the Shopping Center, Owner's Remaining Land, and the Outparcels, for the benefit of Owner, its future tenants, licensees, invitees, and other occupants and for the benefit of Tenant.

NOW, THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby declares that the Shopping Center, Owner's Remaining Land, and the Outparcels shall be sold, transferred, leased, conveyed, owned, and occupied subject to the following:

I.
## RESTRICTIONS

### 1.1    Restrictions on Use.

(a)  Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center and on the Outparcels, or any enlargements thereof, and no spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theater (either motion or legitimate), business or professional offices, medical offices or clinics, automobile dealership, church, or health, recreational or entertainment-type activities,  shall be permitted to operate thereon.  Notwithstanding the foregoing, a restaurant located on Outparcel "C" only  will not be deemed a "bar" for purposes of this section if less than fifty percent (50%) of all revenues derived from such restaurant are attributable to the sale of alcoholic beverages.  Additionally, notwithstanding the prohibition against business or professional offices, business or professional offices of a type commonly found in retail shopping centers and dealing with the public such as, but not limited to, travel agencies, medical or dental offices, real estate sales and rental offices, and tax preparation offices, may be permitted on the Shopping Center and on  the Outparcels so long as so single office use on the Shopping Center  maintains more than ten (10) employees or owners or is located within 60 feet of any exterior wall of the Store.

54

The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business (including discount businesses) (the "Permitted Use").

(b)    <u>Exclusives.</u>    Tenant shall have the exclusive right to:

(i) operate a supermarket, grocery, sell staple or fancy groceries, meat, fish, seafood, vegetables, fruits, dairy products, frozen foods, bakery goods, and delicatessen items, it being understood that Tenant's right to operate a bakery and delicatessen shall persist for only so long as Tenant or its successor or assignee is operating a bakery or delicatessen, as the case may be;

(ii) sell meat, seafood, and vegetables/fruits/produce, dairy products, frozen foods or other foods and food products;

(iii) operate a pharmacy or prescription drug store;

(iv) sell beer and wine for off-premises consumption except for sale by a package store (each an "Exclusive Use").

Landlord will not directly or indirectly permit any party other than Tenant to use for any Exclusive Use any portion of the Shopping Center, Owner's Remaining Land, or the Outparcels. Notwithstanding the foregoing, Landlord may lease to a "Subway"-type sandwich shop or a deli-restaurant selling prepared sandwiches for on- or off-premises consumption, so long as such deli-restaurant is restricted against selling delicatessen meats or other items "by the pound" or otherwise for off-premises preparation and consumption. Additionally, (1) the sale for off-premises consumption of staple or fancy groceries, meat, fish, seafood, vegetables, fruits, dairy products, frozen foods, bakery goods, and delicatessen items, in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom as incidental only to the conduct of another business, (2) the sale by restaurant operations of prepared, ready-to-eat food items, either for consumption on or off the premises, (3) a candy store, bagel or doughnut store, not exceeding 2000 square feet; (4) the sale of beer and wine by a gasoline station/convenience store (on the Outparcels only); and (5) the sale of food items described in subparagraph 1.1(b)(ii) above in less than 1000 square feet of sales area of a gasoline station/convenience store, shall not be violations of this paragraph.

If acquired by Landlord, its successors, assigns, or any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, the Northeast Parcel (10 ± Ac.), as shown on the Site Plan, shall be restricted against any use thereon as a supermarket, grocery store, meat, fish, or vegetable market, bakery or delicatessen.

1.2    <u>Restrictions on Building Height and Size; Parking</u>.  Construction of buildings and other improvements on the Outparcels shall be restricted to a maximum building area of 25 percent (25%) of the ground area of each such parcel, with the remainder of the parcel to be comprised of Common Areas consisting of parking and landscaped areas.  The Outparcels shall maintain at all times sufficient self-contained parking to meet all applicable state and local laws, statutes and regulations.  No structure, other than the Store, erected on the Outparcels shall exceed a maximum vertical building height of twenty-five (25) feet measured from ground level, excluding cupolas, weather vanes and similar architectural adornments.

The foregoing restrictions shall terminate upon expiration or termination of the Deed of Lease.

II.
## ATTORNEYS' FEES/ENFORCEMENT

Owner and Tenant shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other owners.

If Owner or Tenant commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

III.
## MODIFICATION

This Declaration may be modified or amended by owners owning one hundred percent (100%) of the real property comprising the Shopping Center and Owner's Remaining Land and the Outparcels, which modification or amendment shall become effective upon (1) the written consent of Tenant, which may be granted or withheld in its sole discretion, and (2) filing same in the real property records of Chesterfield County, Virginia.

IV.
## EASEMENTS

4.1    Ingress and Egress: Parking.

(a)    Owner hereby grants to each tenant of the Shopping Center and the Outparcels (but only so long as such tenant remains a tenant of the Shopping Center or Outparcels), to Tenant, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic, but not vehicular parking, where applicable, upon, over, across, and through the ramps, sidewalks, streets, entrances, exits, roadways, walkway, landscaped areas, parking areas, service areas, driveways, traffic signals, medians, curb cuts, access points, utility lines, water detention and retention facilities (the "Common Areas" ) located in the Shopping Center or on the Outparcels.

(b)    Owner and Tenant and the owners and tenants of the Outparcels shall have the right to temporarily close any part of the Common Areas located on their parcels to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that they shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Shopping Center or on the Outparcels.

(c)    Owner and Tenant and the owners and tenants of the Outparcels shall have the right to temporarily close any part of the Common Areas located on their parcels as necessary to prevent the public from obtaining prescriptive rights therein, provided that (1) such closure does not exceed the minimum time period required pursuant to applicable law to prevent such prescriptive rights, and (2) they use reasonable efforts to minimize any adverse impact on the operation of any business within the Shopping Center or on the Outparcels.

**V.**
## GENERAL PROVISIONS

5.1     <u>Covenants Run With the Land</u>. The provisions of this Declaration shall operate as covenants running with the land comprising the Shopping Center, the Store, and Owner's Remaining Land and the Outparcels and shall inure to the benefit of Tenant.

5.2     <u>Severability</u>. If any term or provision of this Declaration or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Declaration shall be valid and shall be enforced to the extent permitted by law.

5.3     <u>Pronouns</u>. When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.

5.4     <u>Captions</u>. The captions in this Declaration are for convenience only and do not constitute a part of the provisions hereof.

5.5     <u>Governing Law</u>. This Declaration shall be construed and enforced in accordance with, and governed by, the law of the Commonwealth of Virginia.

5.6     <u>No Presumption</u>. This Declaration shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against any owner.

5.7     <u>Exhibits.</u> The following Exhibits attached hereto are hereby incorporated into this Declaration by reference:

> Exhibit "A" -   Site Plan
> Exhibit "B" -   Legal Description of the Shopping Center
> Exhibit "C" -   Legal Description of the Outparcels

**IN WITNESS WHEREOF**, this Declaration has been executed as of the date first above written.

Witnesses:                              Owner:

_____        **JNB COMPANY OF VIRGINIA, L.L.C.**
Print name:_____

_____        By:_____
Print name:_____
                                        Its:_____
                                        Date:_____

57

COMMONWEALTH OF _____ )
COUNTY OF _____ )

    Personally appeared before me _____**(name of first witness)** who being first duly sworn, deposed and said that he/she saw the within named **JNB COMPANY OF VIRGINIA, L.L.C.**, a Virginia limited liability company, by _____, its _____(title) sign and, as its act and deed, deliver the within _____ (type of document) and that he/she with _____ **(name of second witness)** witnessed the execution thereof.

 

_____
(Signature of First Witness)

Sworn to before me this ____ day of _____, 199___.

_____

Notary Public
State and County aforesaid
My commission expires:
(Notarial Seal)



EXHIBIT "B"
LEGAL DESCRIPTION
WINN-DIXIE 9.247 ACRES PARCEL

Beginning at a point on the northern right-of-way line of Hull Street Road (U.S. Route 360) and the east line of Lake Harbor Drive (private), said point being N 84°05'27" E 7.00' from a nail in pavement.

Thence along the northern right-of-way line of Hull Street Road S 84°05'27" W 555.45' to a point, said point being the true and actual point-of-beginning;

Thence continuing along said right-of-way S 84°5'27" W 710.76' to a point;

Thence N 06°04'52" W 337.81' to a point;

Thence along a curve to the right having a Radius of 40.00', a Delta of 27°28'30", a Length of 19.18' and a Chord of N 07°39'23" E 19.00' to a point;

Thence along a curve to the left having a Radius of 47.00', a Delta of 62 °29'02", a Length of 51.26' and a Chord of N 09°50'53" W 48.75' to a point;

Thence N 58°08'28" E 6.90' to a point;

Thence along a curve to the left having a Radius of 83.93', a Delta of 15°00'47", a Length of 21.99' and a Chord of N 68°04'16" E 21.93' to a point;

Thence N 53°11'23" E 152.75' to a point;

Thence along a curve to the left having a Radius of 35.00', a Delta of 37°48'20", a Length of 23.09' and a Chord of N 34°17'13" E 22.68' to a point;

Thence along a curve to the right having a Radius of 93.43', a Delta of 19°21'29", a Length of 31.57' and a Chord of N 18°58';04" E 31.42' to a point;

Thence N 34°40'06" E 42.11' to a point;

Thence N 84°06'08" E 63.27' to a point;

Thence S 05°49'15" E 25.10' to a point;

Thence N 84°05'27" E 107.32' to a point;

Thence along a curve to the right having a Radius of 50.00', a Delta of 33°00'51", a Length of 28.81' and a Chord of S 79°24'07" E 28.41' to a point;

Thence S 62°53'41" E 9.01' to a point;

Thence along a curve to the left having a Radius of 50.00', a Delta of 33°00'51", a Length of 28.81' and a Chord of S 79°24'07" E 28.41' to a point;

Thence N 84°05'27" E 262.11' to a point;

Thence S 05°54'33" E 230.08' to a point;

Thence N 84°06'08" E 520.35' to a point;

Thence along a non-tangent curve to the left having a Radius of 15.00', a Delta of 60°53'36", a Length of 15.94' and a Chord of S 65°22'34" E 124.86' to a point;

Thence S 05°43'19" E 161.95' to a point;

Thence S 84°05'27" W 79.76' to a point;

Thence N 05°53'52" W 215.01' to a point;

Thence along a curve tot he left having a Radius of 726.44', a Delta of 02°50'51", a Length of 36.10' and a Chord of N 13°15'38" W 36.10' to a point;

Thence along a curve to the left having a Radius of 726.44', a Delta of 02°50'51", a Length of 36.10' and a Chord of N 13°15'38" W 36.10' to a point;

Thence along a curve to the right having a Radius of 36.91', a Delta of 20°42'42", a Length of 13.34' and a Chord of N 13°32'36" W 13.27' to a point;

Thence S 84°06'08" W 464.43' to a point;

Thence S 05°54'33" E 263.98' to a point-of-beginning and containing 9.247 acres of land.

EXHIBIT "C"
LEGAL DESCRIPTION
OUTPARCEL "A"


Beginning at a nail in pavement on the northern right-of-way line of Hull Street Road (U.S. Route 360), said nail being 7.00' northeast of the east line of Lake Harbor Drive (Private).
 Thence along said right-of-way line of Hull Street Road (U.S. Route 360) S 84°05'27" W 395.46' to a point, said point being the true and actual point-of-beginning;
 Thence S 84°05'27" W 160.00' to a point;
 Thence N 05°54'33" W 255.00' to a point;
 Thence N 84°05'27" E 160.00' to a point;
 Thence S 05°54'33" E 255.00' to the true and actual point-of-beginning and containing 0.937 acre of land.


LEGAL DESCRIPTION
OUTPARCEL "B"


Beginning at a nail in pavement on the northern right-of-way line of Hull Street Road (U.S. Route 360), said nail being 7.00' northeast of the east line of Lake Harbor Drive (Private).
 Thence along said right-of-way line of Hull Street Road (U.S. Route 360) S 84°05'27" W 235.78' to a point, said point being the true and actual point-of-beginning;
 Thence S 84°05'27" W 146.00' to a point;
 Thence leaving said right-of-way N 05°54'30" W 255.41' to a point;
 Thence N 84°05'27" E 146.00' to a point;
 Thence S 05°53'52" E 255.41' to the true and actual point-of-beginning and containing 0.856 acre of land.


LEGAL DESCRIPTION
OUTPARCEL "C"


Beginning at a nail in pavement on the northern right-of-way line of Hull Street Road (U.S. Route 360), said nail being 7.00' northeast of the east line of Lake Harbor Drive (Private).
 Thence along said right-of-way line of Hull Street Road (U.S. Route 360) S 84°05'27" W 83.99' to a point, said point being the true and actual point-of-beginning;
 Thence S 84°05'27" W 164.85' to a point;
 Thence leaving said right-of-way N 05°54'30" W 255.41' to a point;
 Thence N 84°05'27" E 158.44' to a point;
 Thence along a curve to the right having a Radius of 500.33', a Delta of 06°05'59" and a Length of 53.24' to a point;
 Thence S 05°53'52" E 202.54' to the true and actual point-of-beginning and containing 0.963° acre of land.

**EXHIBIT "J"**

**SUPPLEMENTAL LEASE AGREEMENT**

THIS SUPPLEMENTAL LEASE AGREEMENT (the "Agreement") is made this _____, 199___, between WINN-DIXIE RALEIGH, INC., a Florida corporation, (the "Tenant") and JNB COMPANY OF VIRGINIA, L.L.C., a Virginia limited liability company (the "Landlord").

WHEREAS, Tenant and Landlord entered into a Deed of Lease dated _____, as amended and/or evidenced by: (a) Short Form Deed of Lease dated _____, recorded in Volume ___, page ___ of the public records of Chesterfield County, Virginia; (b) Letter Agreement dated _____; © First Amendment to Deed of Lease dated _____; (d) Second Amendment to Deed of Lease dated_____ (the "Deed of Lease") for the use and occupancy of the Premises described therein;



THIS SUPPLEMENTAL LEASE AGREEMENT (the "Agreement") is made this _____, 199___, between WINN-DIXIE RALEIGH, INC., a Florida corporation, (the "Tenant") and JNB COMPANY OF VIRGINIA, L.L.C., a Virginia limited liability company (the "Landlord").

WHEREAS, Tenant and Landlord entered into a Deed of Lease dated _____, as amended and/or evidenced by: (a) Short Form Deed of Lease dated _____, recorded in Volume ___, page ___ of the public records of Chesterfield County, Virginia; (b) Letter Agreement dated _____; © First Amendment to Deed of Lease dated _____; (d) Second Amendment to Deed of Lease dated_____ (the "Deed of Lease") for the use and occupancy of the Premises described therein;

NOW, THEREFORE, pursuant to the provisions of the Deed of Lease, Tenant and Landlord mutually agree as follows:

COMMONWEALTH OF _____ )
COUNTY OF _____ )

     Personally appeared before me _____**(name of first witness)** who being first duly sworn, deposed and said that he/she saw the within named **JNB COMPANY OF VIRGINIA, L.L.C.,** a Virginia limited liability company, by _____, its _____**(title)** sign and, as its act and deed, deliver the within _____ **(type of document)** and that he/she with _____ **(name of second witness)** witnessed the execution thereof.

                           _____
                           (Signature of First Witness)

Sworn to before me this ____ day of _____, 199___.

_____
Notary Public
State and County aforesaid
My commission expires:
(Notarial Seal)

STATE OF FLORIDA    )
COUNTY OF DUVAL    )

     Personally appeared before me _____**(name of first witness)** who being first duly sworn, deposed and said that he/she saw the within named **WINN-DIXIE RALEIGH, INC.,** a Florida corporation, by _____, its _____**(title)** sign and, as its act and deed, deliver the within _____ **(type of document)** and that he/she with _____ **(name of second witness)** witnessed the execution thereof.

                           _____
                           (Signature of First Witness)

Sworn to before me this ____ day of _____, 199___.

_____
Notary Public
State and County aforesaid
My commission expires:
(Notarial Seal)

## CONSENT

_____, a _____ _____ the owner and holder of a mortgage upon the Premises, hereby consents to the terms and conditions of this Supplemental Lease Agreement.

_____

By:_____

Its:_____

Date:_____

STATE OF_____ )
COUNTY OF _____ )

    Personally appeared before me _____**(name of first witness)** who being first duly sworn, deposed and said that he/she saw the within named _____, a _____ corporation, by _____, its _____**(title)** sign and, as its act and deed, deliver the within _____ **(type of document)** and that he/she with _____ **(name of second witness)** witnessed the execution thereof.

_____

(Signature of First Witness)

Sworn to before me this _____ day of _____, 199___.

_____

Notary Public
State and County aforesaid
My commission expires:
(Notarial Seal)