# EXHIBIT "B" PART 2

respective addresses stated in the introductory paragraph of this Lease, or addressed to Mortgagee or Guarantor at their respective addresses stated below:

|  |  |
|---|---|
| If to Mortgagee: | First Security Bank, National Association<br>and Val T. Orton, Trustees<br>79 South Main Street<br>Salt Lake City, Utah 84111<br>Telefax No.: 801 246 5053 |
| If to Guarantor: | Winn-Dixie Stores, Inc.<br>5050 Edgewood Court<br>Jacksonville, Florida 32254<br>Attention: General Counsel<br>Telefax No.: 904 783 5294 |

For the purposes of this paragraph 24, any person may substitute its address by giving 15 days' notice to the other persons in the manner provided above.

25.   **ESTOPPEL CERTIFICATE.**  Landlord and Tenant shall, at any time and from time to time, upon not less than 20 days' prior request by the other, execute, acknowledge and deliver to the other, an estoppel certificate substantially in the form attached as Exhibit G.  It is intended that any such statements may be relied upon by Mortgagee, the recipient of such statements or their assignees, or by any prospective purchaser or mortgagee of the Leased Premises.

26.   **SURRENDER AND HOLDING OVER.**  Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises (except for any portion thereof with respect to which this Lease has previously terminated) to Landlord in broom clean condition, and otherwise in the same condition in which the Leased Premises were originally received from Landlord on the Commencement Date, except as repaired, rebuilt, restored, altered, replaced or added to as permitted or required by any provision of this Lease, and except for ordinary wear and tear.  Tenant shall remove, at Tenant's sole cost and expense, from the Leased Premises on or prior to such expiration or earlier termination all property situated thereon which is owned by Tenant or third parties other than Landlord, and Tenant at its expense shall, on or prior to such expiration or earlier termination, repair any damage caused by such removal.  Property not so removed at the end of the Term or within 30 days after the earlier termination of the Term for any reason whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises.  The cost of removing and disposing of such property and repairing any damage to the Leased Premises caused by such removal shall be borne by Tenant.  Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of Landlord as a result of such expiration or earlier termination.

Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the term of this Lease or any extensions thereof shall operate and be construed as a tenancy from month to month only, at double the Rent reserved herein and upon the same terms and conditions as contained in this Lease. Notwithstanding the foregoing, any holding over shall entitle Landlord, in addition to collecting double rentals, to exercise all rights and remedies provided by law or in equity, including the remedies of paragraph 22(b).

27.    **NO MERGER OF TITLE**. There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (i) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate, and (ii) the fee estate or ownership of the Leased Premises or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities (including any Mortgagee) having any interest in (x) this Lease or the leasehold estate created by this Lease, and (y) the fee estate in or ownership of the Leased Premises sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

28.    **ALTERATION AND EXPANSION**.

(a)    Alterations Generally.  Tenant may, at its expense make any Alterations, construct upon the Land any additions to the Improvements or install equipment in the Improvements or accessions to the Landlord's Equipment without Landlord's consent, provided that (i) the character of the Leased Premises shall not be materially changed and the market value of the Leased Premises shall not be materially lessened by any such Alteration, construction or installation (it being agreed that a Store Expansion, or any expansion or enlargement referred to in subparagraph (b) below, shall not be deemed to constitute a material change in the character of the Leased Premises), nor shall the usefulness or structural integrity of the Leased Premises be impaired thereby, (ii) all such work of Alteration, construction and installation shall be performed in a good and workmanlike manner, (iii) all such Alterations, construction and installation shall be expeditiously completed in compliance with all Legal Requirements, (iv) all work done in connection with any such Alteration, construction or installation shall comply with the requirements of any insurance policy required to be maintained by Tenant hereunder, (v) Tenant shall promptly pay all costs and expenses of any such Alteration, construction or installation, and Tenant shall discharge all Liens filed against the Leased Premises arising out of the same, and (vi) Tenant shall procure and pay for all permits and licenses required in connection with any such Alteration, construction or installation.    In the case of any other proposed Alteration, construction or installation, Tenant shall first obtain Landlord's and Mortgagee's consents, which consents may be withheld in Landlord's or Mortgagee's sole

discretion.  All such Alterations, construction and installations (except Tenant's Equipment) shall be the property of Landlord and shall be subject to this Lease.

(b)    Alterations Involving Expansion of Improvements.  It is understood that Tenant may at future times during the Term wish to enlarge the Improvements by a Store Expansion or otherwise by constructing Alterations and additions thereto. Except as provided in paragraphs 28(c) and (d) below, Tenant shall have the sole responsibility for negotiating and providing for such Store Expansion, Alterations or additions as may be necessary for its expansion plans.  If Tenant is able to obtain agreements and contracts for the Alterations and additions at a cost satisfactory to it, Tenant may then request that Landlord purchase such Alterations and additions and incorporate the same into this Lease upon terms and conditions negotiated by the parties; provided, however, that Landlord shall have no obligation to purchase such Alterations and additions.  If the parties are unable to agree on the purchase of such Alterations and additions, then Tenant shall have the right to construct Alterations and additions at its own expense and to make such changes as are necessary to make the entire enlarged building suitable for use and occupancy by Tenant in the conduct of its business; but Tenant shall not have the right to mortgage or pledge this Lease or the leasehold estate created hereby or its interest in such Alterations to finance such Alterations, except as herein permitted.  Prior to commencement of construction of such Alterations, Tenant shall provide Landlord and Mortgagee with a set of plans and specifications for such Alterations.  Following substantial completion of such Alterations, Tenant shall provide Landlord and Mortgagee with (i) copies of certificates of occupancy or completion, if required by Legal Requirements, (ii) an as-built survey of the Alterations demonstrating that the Alterations do not encroach upon or violate any easements, covenants, conditions or restrictions affecting the Leased Premises, and (iii) a modification of the Site Plan to materially reflect such Alterations.  Subject to the following sentence, all such Alterations and additions shall be subject to the terms of this Lease to the same extent as if owned by Landlord and leased under this Lease. Title to such Alterations and additions as necessary to meet any Legal Requirements shall pass to Landlord without cost or expense to Landlord, Tenant shall execute additional documents as necessary to complete such transfer.

(c)    Mortgagee's Financing of Alterations Involving Expansion.  Subject to the conditions set forth below, during the Initial Term, Tenant may construct a Store Expansion at its own initial expense, and upon written notice by Tenant given to Landlord not later than 90 days prior to the anticipated date of substantial completion of such Store Expansion, Landlord shall reimburse Tenant for the Expansion Cost pursuant to the Expansion Financing.  The Expansion Financing obtained by Landlord shall be evidenced by an Expansion Note made by Landlord payable to Mortgagee, having a term commencing on the Expansion Financing Date and expiring on the last day of the Initial Term, with payments of principal and interest payable quarterly in amounts necessary to fully amortize the Expansion

Note with interest over the remainder of the Initial Term. The interest rate under the Expansion Note shall be a fixed rate determined by agreement among Landlord, Tenant and Mortgagee based on the same or substantially similar standards as used to determined the interest rate under the Note, with appropriate and reasonable adjustments based on Tenant's then-current debt rating, and then-current market factors and applicable indexes for similar debt instruments with similar maturities. Funding of the Expansion Financing will occur on the Expansion Financing Date, which shall be a Rent Payment Date unless otherwise agreed among Landlord, Tenant and the Mortgagee providing such Expansion Financing. All costs and expenses of the Expansion Financing, including, without limitation, the reasonable attorneys fees of Landlord and Mortgagee, shall be paid by Tenant on the Expansion Financing Date, and at Tenant's election, may be considered part of the Expansion Cost to be financed pursuant to the Expansion Financing, subject to the remaining conditions of this paragraph 28(c). Landlord shall have no obligation to reimburse Tenant for the Expansion Cost unless Landlord is able to satisfy the conditions and requirements of the Mortgage for issuance of the Expansion Notes and the following conditions shall have been satisfied by Tenant on or before the Expansion Financing Date:

(A)    Tenant shall have materially complied with the requirements for Alterations as set forth in paragraphs 28(a) and (b) above, and with the requirements set forth in this paragraph 28(c), and shall have delivered the Completion Certificate substantially in the form attached as Exhibit I.

(B)    The Expansion Cost shall be at least $1,000,000, as certified to Landlord pursuant to the Completion Certificate delivered pursuant to subparagraph (A) above.

(C)    Prior to the Expansion Financing Date, Tenant shall deliver to Landlord and Mortgagee, at Tenant's sole cost and expense, an appraisal of the Store Expansion prepared by an appraiser reasonably acceptable to Landlord and Mortgagee, which shall indicate that the value of the Store Expansion, when completed, is not less than the Expansion Cost, or alternatively, that the value of the Leased Premises including the Store Expansion, is not less than the Cost, including the Expansion Cost. If the Expansion Cost exceeds the value of the Store Expansion, or if the Cost exceeds the value of the Leased Premises, as indicated by such appraisal, Tenant shall pay the amount by which the Expansion Cost or Cost exceeds such appraised value.

(D)    On or before the Expansion Financing Date, Tenant shall deliver to Landlord and Mortgagee, at Tenant's sole cost and expense, a commitment to endorse Landlord's and Mortgagee's existing title insurance policies (or to issue replacement title insurance policies, if required by

applicable state title insurance regulations), to increase the coverage amounts for each policy by the amount of the Expansion Cost reimbursed to Tenant, and to reflect the modification of the Loan Documents and this Lease free and clear of any construction liens or other liens or encumbrances (other than those created by Landlord) arising subsequent to the effective dates of such policies.

(E)    There is no Default or Event of Default existing under this Lease as of the Expansion Financing Date.

(F)    Tenant shall have delivered, or caused to be delivered, such documents, certificates, legal opinions or affidavits as reasonably may be requested by Landlord or Mortgagee to facilitate the Expansion Financing, of the same or similar nature to those required in connection with the Loan.

Effective on the Expansion Financing Date, Rent will be increased in accordance with the provisions of attached Exhibit E, the Cost of the Leased Premises as set forth on attached Exhibit F will be adjusted to account for the addition of the Expansion Cost to the original Cost, and the Leased Premises shall be as delineated on the modified Site Plan delivered pursuant to paragraph 28(b). At Landlord's request, on the Expansion Financing Date, Landlord and Tenant shall enter into an amendment of this Lease and/or a modification of any memorandum of this Lease, to reflect the foregoing adjustments and modifications.

(d)    Third Party Financing of Alterations Involving Expansion. If all of the conditions in paragraph 28(c) above have been satisfied but Landlord, Tenant and Mortgagee are unable to reach an agreement, in good faith, on the interest rate or other material financial terms of the Expansion Financing, then Landlord shall, upon Tenant's written request, obtain the Expansion Financing from an Institutional Investor selected by Tenant or from Guarantor but otherwise on the same terms, covenants and conditions as set forth in paragraph 28(c) above, which Expansion Financing shall be secured by a mortgage lien encumbering the Leased Premises which is *pari passu* (as between the Mortgagee and such Institutional Investor or Guarantor) with the Mortgage, subject to the terms of an intercreditor agreement to be entered between Mortgagee and such Institutional Investor or Guarantor, which intercreditor agreement shall provide that decisions shall be made by the holders of 51% of the aggregate principal amount of debt secured by such Mortgages. The Loan Documents given by Landlord to Mortgagee shall include provisions permitting Landlord to issue such a parity mortgage on the Leased Premises in accordance with the foregoing terms and conditions, and governing the terms of an intercreditor agreement between Mortgagee and such Institutional Investor or Guarantor.

(e)    Tenant's Self-Funding of Alterations Involving Expansion. If, after the exercise of diligent and good faith efforts, Landlord is unable to obtain the Expansion Financing either from the Mortgagee or from an Institutional Investor or

Guarantor in accordance with the foregoing provisions, then Tenant may pay for the Store Expansion without reimbursement by Landlord, and the failure to have obtained financing with either the Mortgagee or an Institutional Lender shall not be considered a default of Landlord hereunder. In the event of such self-funding by Tenant, and provided that Tenant first has subordinated its leasehold interest in the Leased Premises to the lien of the Mortgage pursuant to paragraph 8(f) above, Tenant may finance the Expansion Cost by mortgaging its leasehold interest in the Leased Premises, notwithstanding the provisions of paragraph 18 above.

(f)    New Store Construction.  If construction of the Improvements and installation of Landlord's Equipment and Tenant's Equipment has not commenced, or has commenced but has not been completed as of the Commencement Date, the following provisions shall apply:

(A)    Tenant shall substantially complete construction of the Improvements in accordance with the Site Plan, in the same manner as if the Improvements were Alterations, and subject to the requirements of paragraph 28(a) and 28(b) above.

(B)    Within 30 days after the date of substantial completion of the Improvements, Tenant shall deliver to Landlord and Mortgagee a Certificate of Completion substantially in the form of attached Exhibit I, a certificate of occupancy or its equivalent issued by the applicable governmental agencies, if required by Legal Requirements, and an as-built survey of the Land demonstrating that the Improvements do not encroach upon or violate any easements, covenants, conditions or restrictions affecting the Leased Premises or the additional land, and an as-built survey of the Leased Premises showing the completed Improvements.

(C)    If Tenant fails to substantially complete construction of the Improvements or deliver the documentation to Landlord and Mortgagee as required by this paragraph 28(f), and Tenant shall have notified Landlord of Tenant's election to exercise the Substitution Option pursuant to paragraph 11 above on a Termination Date specified in such notice, Tenant shall and shall be deemed to have elected to make a Purchase Offer (which shall be subject to paragraph 10 above) to purchase the Leased Premises on the Termination Date stated in such notice.

29.    **MISCELLANEOUS.**  The paragraph headings in this Lease and the Table of Contents preceding this Lease are for convenience only and are not to be used in determining the intent of the parties or otherwise interpreting this Lease. As used in this Lease, the singular shall include the plural as the context requires, and the following words and phrases shall have the following meanings: (i) "including" shall mean "including but not limited to"; (ii) "provisions"

shall mean "provisions, terms, agreements, covenants and/or conditions"; and (iii) "obligation" shall mean "obligation, duty, agreement, liability, covenant or condition". Any act which Tenant is required to perform under this Lease shall be performed at Tenant's sole cost and expense. This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought and consented to by Mortgagee. The covenants of this Lease shall run with the land and bind Tenant and all successors and assigns of Tenant and shall inure to the benefit of and bind Landlord, its successors and assigns. If any one or more of the provisions contained in this Lease shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease but this Lease shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. This Lease may be simultaneously executed in several counterparts, each of which when so executed and delivered shall constitute an original, fully enforceable counterpart for all purposes. This Lease shall be governed by and construed according to the laws of the State. All Exhibits and attachments to this Lease are by reference incorporated into, and form a part of, this Lease. A memorandum of this Lease substantially in the form attached as Exhibit H shall be recorded in the records of the appropriate public office having custody of the real property records of the county in which the Leased Premises is located.

Radon Gas: Radon gas is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health department.


[THIS SPACE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

Witnesses:                              **LANDLORD:**

                                        **ORLANDO 99-FL, LLC**, a Delaware limited liability company

                                        By:   Principal Net Lease Investors, L.L.C., a Delaware limited liability company, its sole member

                                              By:   Principal Life Insurance Company, an Iowa corporation, its sole member

Name: _L S Unknown_                                 By: _____
                                                    Name: **CLARE TANDE**
Name: _____                                 Title: **COUNSEL**

Name: _L S Unknown_                                 By: _Karen A Pearst_
                                                    Name:   **KAREN A. PEARSTON**
Name: _____                                 Title:       **COUNSEL**

                                        [CORPORATE SEAL]

STATE OF _Iowa_ )
COUNTY OF _Polk_ )

     The foregoing instrument was acknowledged before me this _11th_ day of August, 1999, by _Clare Tande_ and _Karen A. Pearston_, the _Counsel_ and _Counsel_, respectively, of PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation, on behalf of the corporation, as the sole member of PRINCIPAL NET LEASE INVESTORS, L.L.C., a Delaware limited liability company, the sole member of ORLANDO 99-FL, LLC, a Delaware limited liability company. Each of them either [X] is personally known to me or [ ] has produced a _____ state drivers license as identification.

                              _Helen L. Boles_
                              NOTARY PUBLIC, State of _Iowa_
[NOTARIAL SEAL]              Printed Name: _____
                              Commission No.: _00706_
                              My commission expires:

HELEN L. BOLES
MY COMMISSION EXPIRES
April 7, 2002

JK 128865.1 80130 02051
8/1/99 1:07 PM                    41          Store #2294
                                              Orlando, Seminole County, Florida

[Continuation of Signature Page of Lease Agreement]

**TENANT:**

**WINN-DIXIE STORES, INC.,**
a Florida corporation

Name: R. D. Peterson

Name: _denise R. Long_

By: _R. A. McCook_
Name: _R. P. McC_
Title: _Vice_ President

[CORPORATE SEAL]

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this 5th day of August, 1999, by _R. P. McCook_, the _Vice_ president of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation. He either [ ] is personally known to me or [ ] has produced _____ state drivers license as identification.

NOTARY PUBLIC, State of _FL_
Printed Name: _____
Commission No.: _____
My commission expires: _____

[NOTARIAL SEAL]

EXHIBIT A TO LEASE AGREEMENT - SCHEDULE OF DEFINED TERMS

"Additional Monetary Obligations" shall have the meaning assigned to such term in paragraph 5(b) of this Lease.

"Affiliate" means any person directly or indirectly controlling or controlled by or under direct or indirect common control with any other specified person.

"Alterations" means all changes, additions, improvements or repairs to, all alterations, reconstructions, renewals or removals of, and all substitutions or replacements for, any of the Improvements or Landlord's Equipment, whether interior or exterior, structural or non-structural, or ordinary or extraordinary.

"Assignment" means an assignment of this Lease and any related Guaranty executed by Landlord in favor of a Mortgagee.

"Business Day" means any day on which financial institutions located in New York, New York, are open for regular business.

"Claims" means, individually and collectively, any claims, actions, administrative proceedings, judgments, damages, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses (including reasonable attorneys' fees and costs; whether incurred in enforcing this Lease, collecting any sums due hereunder, settlement negotiations, at trial or on appeal), consultant fees and expert fees, together with all other costs and expenses of any kind or nature, that arise directly or indirectly from or in connection with the existence or suspected existence of a Hazardous Condition, whether occurring or suspected to have occurred before, on or after the date of this Lease or caused by any person or entity. Without limiting the generality of the foregoing definition, Claims specifically will include claims, whether by related or third parties, for personal injury or real or personal property damage, and capital, operating and maintenance costs incurred in connection with any Remedial Work. However, notwithstanding the foregoing, Claims will not be deemed to include claims, actions, administrative proceedings, judgments, damages, punitive damages, penalties, fines, costs, liabilities, sums paid in settlement, interest, losses or expenses, that arise in connection with (i) any Hazardous Condition that is determined by proper judicial or administrative procedure to have been introduced to the Leased Premises by Landlord or during any period while Landlord or Mortgagee is in possession of the Leased Premises to the exclusion of the Tenant after an Event of Default has occurred or after expiration of the Term or earlier termination of the Lease, or (ii) solely as to Tenant's indemnification of Landlord (and with no effect whatsoever on that indemnification of Mortgagee) as provided in paragraph 20, any Hazardous

Condition that is determined by proper judicial or administrative procedure to have been introduced to the Leased Premises by Landlord during the Term.

"Commencement Date" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Condemnation" means a Taking or a Requisition.

"Consolidated Tangible Net Worth" means the tangible net worth, as determined on a consolidated basis under generally accepted accounting principles consistently applied, of a business organization and its subsidiaries.

"Construction Requirements" if applicable, are set forth in paragraph 28(f) of this Lease.

"Cost" means, without duplication, the aggregate actual cost paid by or on behalf of Tenant in connection with the construction and acquisition of the Leased Premises, including, without limitation, all fees and expenses in connection with the initial placement, issuance and sale of the Note and any interim financing of the Leased Premises, title transfer fees, title insurance premiums and recording expenses and taxes (including transfer taxes), indirect construction costs such as capitalized interest, taxes and insurance and other allocable costs during construction, and fees and costs of professionals such as attorneys, architects, engineers, surveyors and appraisers; together with the Expansion Cost, if any, applicable to the Leased Premises.

"Default" shall mean any breach of any term, covenant or condition of, or obligation under, this Lease which, but for the giving of notice or the passage of time, or both, would constitute an Event of Default.

"Default Rate" shall mean 9.57%.

"Environmental Laws" will mean any applicable present or future federal, state or local laws, ordinances, rules or regulations pertaining to Hazardous Substances, industrial hygiene or environmental conditions, including without limitation the following statutes and regulations, as amended from time to time: (i) the Federal Clean Air Act, 42 U.S.C. Section 7401 et seq.; (ii) the Federal Clean Water Act, 33 U.S.C. Section 1151 et seq.; (iii) the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq. ("RCRA"); (iv) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601 et seq. ("CERCLA") and the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 ("SARA"); (v) the Hazardous Materials Transportation Act, 49 U.S.C. Section 1802; (vi) the National Environment Policy Act, 42 U.S.C. Section 1857

et seq.; (vii) The Toxic Substance Control Act of 1976, 15 U.S.C. Section 2601 et seq.; (viii) the regulations of the Environmental Protection Agency, 33 CFR and 40 CFR; (ix) regulations of the Occupational Safety and Health Administration ("OSHA") relating to asbestos; and (x) similar statutes, rules and regulations of the State.

"Event of Default" means the occurrence of any of the events described in paragraph 22(a) of this Lease, and the giving of notice or the passage of any applicable grace or cure period, or both, as provided in said paragraph.

"Expansion Cost" means, without duplication, the aggregate actual cost paid by or on behalf of Tenant in connection with a Store Expansion, including, without limitation, direct construction costs of the Store Expansion, all fees and expenses in connection with the issuance of the Expansion Note, title insurance fees and premiums and recording expenses and taxes (including transfer taxes, if any), indirect construction costs such as capitalized interest, taxes and insurance and other allocable costs during construction, and fees and costs of professionals such as attorneys, architects, engineers, surveyors and appraisers.

"Expansion Financing" means the mortgage financing, if any, obtained by Landlord from a Mortgagee to finance the Expansion Cost, pursuant to the Expansion Note, on terms (other than interest rate, amortization and other payment terms of the Expansion Notes) substantially equivalent to the terms of the Loan Documents.

"Expansion Financing Date" means the effective date of funding of the Expansion Financing and Landlord's reimbursement of the Expansion Cost to Tenant, which date shall be on a Rent Payment Date.

"Expansion Note" means the note, if any, made by Landlord payable to a Mortgagee to evidence the Expansion Financing, as secured by the Mortgage, as modified to describe the Expansion Note as an additional obligation of Landlord, or by a separate mortgage having *pari passu* status with the Mortgage.

"Extended Term" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Guarantor" means Winn-Dixie; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Guarantor in this Lease shall be deemed deleted and of no effect.

"Guaranty" means the guaranty of this Lease, dated this date, executed by Guarantor in favor of Landlord; however, if Winn-Dixie is the Tenant under this

Lease, then any reference to Guaranty in this Lease shall be deemed deleted and of no effect.

"Hazardous Condition" will mean the presence, discharge, disposal, storage or release of any Hazardous Substance on or in the Improvements, air, soil, groundwater, surface water or soil vapor on or about the Leased Premises, or that migrates, flows, percolates, diffuses or in any way moves onto or into the Leased Premises, or from the Leased Premises into adjacent or other property.

"Hazardous Substances" means any hazardous or toxic substances, materials or wastes, including without limitation any flammable explosives, radioactive materials, friable asbestos, kepone, polychlorinated biphenyls (PCB's), electrical transformers, batteries, paints, solvents, chemicals, petroleum products, or other man-made materials with hazardous, carcinogenic or toxic characteristics, and such other solid, semi-solid, liquid or gaseous substances which are radioactive, toxic, ignitable, corrosive, carcinogenic or otherwise dangerous to human, plant, or animal health or well-being, and those substances, materials, and wastes listed in the United States Department of Transportation Table (49 CFR 972.101) or by the Environmental Protection Agency, as hazardous substances (40 CFR Part 302, and amendments thereto) or such substances, materials and wastes which are or become regulated under any applicable local, State or federal law including without limitation any material, waste or substance which is (i) petroleum, (ii) asbestos, (iii) PCB's, (iv) designated as a "hazardous substance," "hazardous waste," "hazardous materials," "toxic substances," "contaminants," or (v) other pollution under any applicable Environmental Laws.

"Impositions" shall have the meaning assigned to such term in paragraph 12(a) of this Lease.

"Improvements" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Initial Term" shall have the meaning assigned to such term in paragraph 4 of this Lease.

"Institutional Investor" shall mean any of the following persons existing under the laws of the United States or any state thereof or of the District of Columbia or Canada or any province thereof: (i) any bank, trust company, national banking association or savings and loan association, acting for its own account or in a fiduciary capacity, (ii) any charitable foundation, eleemosynary institution, church or fraternal order, (iii) any insurance company, (iv) any pension, profit-sharing, retirement trust or fund for which any bank, trust company, national banking association or savings and loan association or investment advisor registered under the Investment Advisers Act of 1940, as amended, is acting as trustee or

agent, or if self-managed, having funds of at least $50,000,000, (y) any investment company, as defined in the Investment Company Act of 1940, as amended, (vi) any college or university, or (vii) any government, any public employees' pension or retirement system, or any other governmental agency supervising the investment of public funds.

"Land" shall have the meaning assigned to such term in paragraph 2 of this Lease, and which is legally described on attached Exhibit B-1.

"Landlord" shall have the meaning assigned to such term in the introductory paragraph of this Lease.

"Landlord's Assignee" shall mean a Mortgagee which takes an Assignment as additional collateral for its loan to Landlord.

"Landlord's Equipment" shall have the meaning assigned to such term in paragraph 2 of this Lease, and will include the Replacement Equipment.

"Lease" shall have the meaning assigned to such term in the introductory paragraph of this Lease and shall include all supplements and amendments permitted by this Lease.

"Leased Premises" shall have the meaning assigned to such term in paragraph 2 of this Lease.

"Legal Requirements" means all present and future laws (including Environmental Laws), codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency (but excluding those by their terms not applicable to Tenant or the Leased Premises as a result of some grandfather clause or similar provision), and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant or to the Leased Premises, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of the Leased Premises, even if compliance therewith necessitates structural changes to the Improvements or results in interference with the use or enjoyment of the Leased Premises.

"Lien" means charge, encumbrance, title retention agreement, pledge, lien, security interest, mortgage and/or deed of trust.

"Loan" means the mortgage loan, if any, obtained by Landlord from a Mortgagee to finance the acquisition of the Leased Premises, as evidenced by the Loan Documents, or in connection with the Expansion Financing, if any.

"Loan Documents" means the Note, the Note Agreements, the Mortgage and the Assignment, collectively.

"Make-Whole Amount" means the greater of (x) the amount, if any, by which (i) the present value of all future payments of principal and interest due on that portion of the unpaid principal amount of the Note to be prepaid, payable from the date of prepayment to the Maturity Date calculated by discounting each such future payment from the due date thereof to such date of prepayment at a rate per annum equal to 50 basis points over the Treasury Constant Maturity Yield Index exceeds (ii) 100% of that portion of the principal amount of the Note to be prepaid on the date of prepayment and (y) 0.5% of the amount of principal to be so prepaid.

"Material Adverse Effect" means a material adverse effect on (a) the business, condition (financial or otherwise), assets, liabilities or operations of Tenant or Guarantor, if any, on a consolidated basis, which has caused or could reasonably be expected to cause the Consolidated Tangible Net Worth of Tenant or Guarantor, if any, to decline by ten percent (10%) or more from its level immediately prior to the event causing such decline, (b) the ability of Tenant and Guarantor, if any, taken together, to perform Tenant's obligations under this Lease, (c) the validity or enforceability of this Lease or the rights and remedies of Landlord hereunder, or (d) the value, utility or useful life of the Leased Premises, which has caused or could reasonably be expected to cause a decline in the fair market value of the Leased Premises by five percent (5%) or more from the fair market value of the Leased Premises immediately prior to the event causing such decline, or the use, or ability to use, the Leased Premises for the purpose for which it was intended.

"Mortgage" means a first mortgage, deed of trust, deed to secure debt or similar security instrument issued with respect to and creating a Lien on the Leased Premises in favor of a Mortgagee.

"Mortgagee" means a person or entity that is the trustee for the holder(s) of the Loan Documents; however, if there is no Mortgagee, then any reference to Mortgagee or Mortgage in this Lease shall be deemed deleted and of no effect except to the extent that the context of this Lease contemplates that Mortgagee will act as an escrow agent for the holding and disposition of any Net Award or Net Proceeds, in which event such term shall be deemed to refer to a title insurance company or financial institution, reasonably acceptable to Landlord and Tenant, serving as escrow agent for the purposes contemplated in this Lease.

"Net Award" means the entire award payable by reason of a Condemnation, less any expenses incurred by Landlord, Tenant or a Mortgagee in collecting such

award, and less any portion of such award retained by Tenant pursuant to paragraph 15.

"Net Proceeds" means the entire proceeds of any insurance required under paragraph 13, together with any self-insurance payment required of Tenant, less any expenses incurred by Landlord, Tenant or a Mortgagee in collecting such proceeds or payment.

"Note" means any secured note or notes or promissory note relating to the Leased Premises executed by Landlord in favor of a holder and secured by a Mortgage and an Assignment issued with respect to the Leased Premises.

"Note Agreement" means any Note Purchase Agreement or similar agreement between Landlord and the purchaser or purchasers of any Note or Notes relating to the Leased Premises.

"Overdue Payment" means any installment of Rent or any payment of Additional Monetary Obligations (including Additional Monetary Obligations which Landlord or Mortgagee shall have paid on behalf of Tenant) due from Tenant that is not paid when due.

"Permitted Encumbrances" means:

(i)     easements, rights-of-way, servitudes, other similar reservations, rights and restrictions and other defects and irregularities in the title to the Leased Premises, none of which materially lessens the value of the Leased Premises or materially impairs the use of the Leased Premises for the purposes held by Tenant;

(ii)    matters set forth in Schedule B, Part I of the loan title insurance policy relating to the Leased Premises issued to the Mortgagee pursuant to the Note Agreement in connection with the issuance of the Notes;

(iii)   any condemnation right reserved to or vested in any municipality or public authority with respect to the Leased Premises or any interest therein; and

(iv)    any Liens for Impositions not then delinquent and any Liens of mechanics, materialmen and laborers for work or services performed or materials furnished in connection with the Leased Premises which are not then overdue or the existence, amount or validity of which is being contested by Tenant pursuant to, and as permitted by, paragraph 19.

"Property Loss" means any physical damage to or destruction of the Leased Premises or any part thereof by fire, windstorm, flood, earthquake, war or civil insurrection, accident, or other casualty.

"Purchase Offer" means an irrevocable offer by Tenant to Landlord to purchase the Leased Premises on the Termination Date specified therein and, in case a Purchase Offer is made pursuant to paragraph 14(b) or 15(b), any Net Proceeds or Net Award, as applicable, and at the purchase price therefor determined pursuant to Exhibit F.

"Remedial Action" means any investigation or monitoring of site conditions, any clean-up, containment, remediation, removal or restoration work required or performed by any federal, state or local governmental agency or political subdivision or performed by any nongovernmental entity or person, or any fines, penalties, or cost contributions paid or payable by any nongovernmental entity or person, due to the existence or suspected existence of a Hazardous Condition.

"Rent" shall have the meaning assigned to such term in paragraph 5(a) of this Lease.

"Rent Payment Dates" shall have the meaning assigned to such term in paragraph 5(a) of this Lease.

"Replaced Equipment" shall have the meaning assigned to such term in paragraph 8(c) of this Lease.

"Replacement Equipment" shall have the meaning assigned to such term in paragraph 8(c) of this Lease.

"Requisition" means any temporary requisition or confiscation of the use or occupancy of the Leased Premises by any governmental authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

"Site Plan" shall have the meaning assigned to such term in paragraph 2 of this Lease, and which is shown on attached Exhibit B-2.

"State" means the state in which the Leased Premises is located.

"Store Expansion" means Tenant's construction of an addition to the Improvements to expand the floor area or other facilities of the retail supermarket store building constituting Improvements, which may be within the area(s) delineated on the Site Plan as "Expansion" or "Expansion Area," or within other areas within the Leased

Premises or, subject to the conditions of <u>paragraph 28(b)</u> above, on additional land adjacent to the Leased Premises.

"<u>Substitute Guaranty</u>" shall have the meaning assigned to such term in <u>paragraph 11(f)</u> of this Lease; however, if Winn-Dixie is the Tenant under this Lease, then any reference to Substitute Guaranty in this Lease shall be deemed deleted and of no effect.

"<u>Substitute Lease</u>" shall have the meaning assigned to such term in <u>paragraph 11(f)</u> of this Lease.

"<u>Substitute Loan Documents</u>" shall have the meaning assigned to such term in <u>paragraph 11(f)</u> of this Lease.

"<u>Substitute Property</u>" shall have the meaning assigned to such term in <u>paragraph 11</u> of this Lease.

"<u>Substitution Date</u>" means the date on which Landlord and Tenant effectuate the substitution of the Leased Premises for another premises pursuant to the Substitution Option.

"<u>Substitution Option</u>" means any right Tenant may have to substitute other premises for the Leased Premises pursuant to <u>paragraph 11 and paragraph 14, 15 or 16</u> of this Lease.

"<u>Taking</u>" means any taking of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceeding or by any other means, or any de facto condemnation.

"<u>Tenant</u>" means the Tenant named in the introductory paragraph of this Lease together with any entity succeeding thereto by consolidation, merger or acquisition of its assets substantially as an entirety.

"<u>Tenant's Business</u>" means the retail grocery and supermarket business, including the distribution and warehousing, for eventual sale to consumers, of grocery items, delicatessen items, bakery items, meat and seafood, vegetable/fruit/produce, beer and wine sales, pharmacy items, and photographic items

"<u>Tenant's Equipment</u>" shall have the meaning assigned to such term in <u>paragraph 3</u> of this Lease.

"Term" means the Initial Term, any Extended Term or the Initial Term together with any Extended Term.

"Termination Date" means the Rent Payment Date established in Tenant's Purchase Offer given pursuant to paragraph 14(g), 15(b) or 16 of this Lease, as the termination date of this Lease pursuant to any such paragraph, which date shall be not less than 120 days nor more than 240 days after the effective date of such notice to Landlord.

"Treasury Constant Maturity Yield Index" means (i) the yields reported, as of 10:00 a.m. (New York City time) on the third Business Day preceding the date of prepayment, on the display designated as "USD" on the Bloomberg Financial Markets Commodities News Screen or the equivalent screen provided by Bloomberg Financial Markets News (or any nationally recognized publicly available on-line source of similar market data) for actively traded U.S. Treasury securities having a maturity equal to the remaining average life of the Note, or (ii) if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day  for which such yields have been so reported as of the third Business Day preceding the date of prepayment, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury Securities having a maturity equal to the remaining life of the Note.  Such implied yield will be determined, if necessary, by (a) converting U.S. Treasury bill quotations to bond-equivalent yields in accordance with accepted financial practice and (b) interpolating linearly between (1) the actively traded U.S. Treasury security having a maturity closest to and greater than the remaining life of the Note and (2) the actively traded U.S. Treasury security having a maturity closest to and less than the remaining life of the Note.

"Winn-Dixie" means Winn-Dixie Stores, Inc., a Florida corporation, together with any entity succeeding thereto by consolidation, merger or acquisition of its assets substantially as an entirety.

"Year 2000 Compliant and Ready" means that (a) Tenant's hardware and software systems with respect to the operation of its business and its general business plan will: (i) handle date information involving any and all dates before, during and/or after January 1, 2000, including accepting input, providing output, and performing date calculations in whole or in part; (ii) operate, accurately without interruption on and in respect of any and all dates before, during and/or after January 1, 2000 and without any change in performance; and (iii) store and provide date input information without creating any ambiguity as to the century; and (b) Tenant has developed alternative plans to ensure business continuity in the event of the failure of any or all of items (i) through (iii) above.

EXHIBIT B-1

THAT PART OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 LYING SOUTH AND EAST OF STATE ROAD NO. 426 (ALOMA AVENUE) AND NORTH AND EAST OF DEAN ROAD, SECTION 31, TOWNSHIP 21 SOUTH, RANGE 31 EAST, SEMINOLE COUNTY, FLORIDA.

TOGETHER WITH: THAT PART OF THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 LYING NORTH OF OAK HOLLOW LANE, AS RECORDED IN OFFICIAL RECORD BOOK 2279, PAGE 35 OF THE PUBLIC RECORDS OF SEMINOLE COUNTY, FLORIDA AND LYING EAST OF DEAN ROAD, SECTION 31, TOWNSHIP 21 SOUTH, RANGE 31 EAST, SEMINOLE COUNTY, FLORIDA.  SAID LANDS BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHEAST CORNER OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 OF SECTION 31, TOWNSHIP 21 SOUTH , RANGE 31 EAST, SEMINOLE COUNTY, FLORIDA:  THENCE RUN NORTH 89° 44' 24" WEST ALONG THE SOUTH LINE OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4, A DISTANCE OF 685.87 FEET TO THE SOUTHEAST CORNER OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 OF SAID SECTION 31; THENCE DEPARTING THE SOUTH LINE OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 OF SAID SECTION 31, RUN NORTH 00° 07' 31" EAST ALONG THE EAST LINE OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4, A DISTANCE OF 19.81 FEET TO THE POINT OF BEGINNING; SAID POINT LYING ON THE NORTHERLY RIGHT OF WAY OF OAK HOLLOW LANE; THENCE CONTINUE NORTH 00° 07' 31" EAST ALONG SAID EAST LINE OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4, A DISTANCE OF 1212.20 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY OF STATE ROAD NO. 426 (ALOMA AVENUE PER O.R. BOOK 3617 PAGE 1918): THENCE DEPARTING SAID EAST LINE OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 RUN ALONG SAID EASTERLY RIGHT OF WAY OF ALOMA AVENUE SOUTH 29° 29' 01" WEST,  A DISTANCE OF 285.81 FEET; THENCE DEPARTING SAID EASTERLY RIGHT OF WAY RUN SOUTH 60° 30' 59" EAST, A DISTANCE OF 149.29 FEET; THENCE RUN SOUTH 00° 07' 31" WEST, A DISTANCE OF 52.53 FEET; THENCE RUN SOUTH 29° 29' 01" WEST, A DISTANCE OF 144.21 FEET; THENCE RUN NORTH 60° 30' 59" WEST, A DISTANCE OF 175.05 FEET TO THE AFOREMENTIONED EASTERLY RIGHT OF WAY OF ALOMA AVENUE; THENCE RUN ALONG SAID EASTERLY RIGHT OF WAY THE FOLLOWING COURSES; SOUTH 29° 29' 01" WEST A DISTANCE OF 298.44 FEET TO THE POINT OF CURVATURE OF A CURVE CONCAVE NORTHWESTERLY HAVING THE FOLLOWING ELEMENTS: A CENTRAL ANGLE OF 12° 56' 10", A RADIUS OF 1206.28 FEET, A CHORD LENGTH OF 271.77 FEET AND A CHORD BEARING OF SOUTH 35° 57' 06" WEST; THENCE FROM A TANGENT BEARING OF SOUTH 29° 29' 01" WEST RUN SOUTHWESTERLY ALONG THE ARC OF SAID CURVE 272.35 FEET TO THE END OF SAID CURVE; SAID POINT ALSO BEING THE BEGINNING OF A NON-TANGENT CURVE CONCAVE EASTERLY HAVING THE FOLLOWING ELEMENTS: A CENTRAL ANGLE OF 48° 40' 19", A RADIUS OF 217.44 FEET; A CHORD LENGTH OF 179.21 FEET AND A CHORD BEARING OF SOUTH 06° 51' 28" EAST; THENCE FROM A TANGENT BEARING OF NORTH 42° 25' 11" EAST RUN SOUTHEASTERLY ALONG THE ARC OF SAID CURVE 184.71 FEET TO THE END OF SAID NON-TANGENT CURVE; SAID POINT LYING ON THE NORTHEASTERLY RIGHT OF WAY OF DEAN ROAD; THENCE DEPARTING SAID CURVE RUN ALONG SAID NORTHEASTERLY RIGHT OF WAY THE FOLLOWING COURSES: SOUTH 54° 08' 20" EAST, A DISTANCE OF 333.71 FEET TO THE POINT OF CURVATURE OF A CURVE CONCAVE SOUTHWESTERLY HAVING THE

A CHORD LENGTH OF 32.49 FEET AND A CHORD BEARING OF SOUTH 53° 04' 05" EAST; THENCE RUN SOUTHEASTERLY ALONG THE ARC OF SAID CURVE 32.49 FEET TO THE POINT OF REVERSE CURVATURE OF A CURVE CONCAVE NORTHERLY HAVING THE FOLLOWING ELEMENTS: A RADIUS OF 25.00 FEET, A CENTRAL ANGLE OF 80° 07' 09", A CHORD LENGTH OF 32.18 FEET AND A CHORD BEARING OF NORTH 87° 56' 37" EAST; THENCE DEPARTING SAID NORTHEASTERLY RIGHT OF WAY OF DEAN ROAD FROM A TANGENT BEARING OF SOUTH 51° 59' 49" EAST, RUN EASTERLY ALONG THE ARC OF SAID CURVE 34.96 FEET TO A POINT OF REVERSE CURVATURE OF A CURVE CONCAVE SOUTHEASTERLY HAVING THE FOLLOWING ELEMENTS: A RADIUS OF 285.00 FEET, A CENTRAL ANGLE OF 41° 29' 10", A CHORD LENGTH OF 201.88 FEET AND A CHORD BEARING OF NORTH 68° 37' 37" EAST; SAID POINT ALSO LYING ON THE NORTHERLY RIGHT OF WAY OF OAK HOLLOW LANE; THENCE RUN NORTHEASTERLY ALONG THE ARC OF SAID CURVE AND NORTHERLY RIGHT OF WAY LINE A DISTANCE OF 206.36 FEET TO THE PONT OF BEGINNING.

LESS:

THAT PART OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 LYING SOUTH AND EAST OF STATE ROAD NO. 426 (ALOMA AVENUE) AND NORTH AND EAST OF DEAN ROAD, SECTION 31, TOWNSHIP 21 SOUTH, RANGE 31 EAST, SEMINOLE COUNTY, FLORIDA; BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHEAST CORNER OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 OF SECTION 31, TOWNSHIP 21 SOUTH, RANGE 31 EAST, SEMINOLE COUNTY, FLORIDA; THENCE RUN NORTH 89° 44' 24" WEST ALONG THE SOUTH LINE OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4, A DISTANCE OF 685.87 FEET TO THE SOUTHEAST CORNER OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 OF SAID SECTION 31; THENCE DEPARTING THE SOUTH LINE OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 OF SAID SECTION 31, RUN NORTH 00° 07'31" EAST ALONG THE EAST LINE OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4, A DISTANCE OF 19.81 FEET; SAID POINT LYING ON THE NORTHERLY RIGHT OF WAY OF OAK HOLLOW LANE; THENCE CONTINUE NORTH 00°07'31" EAST ALONG SAID EAST LINE OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4, A DISTANCE OF 332.79 FEET; THENCE DEPARTING SAID EAST LINE OF THE WEST 1/2 OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 RUN NORTH 89°52'29" WEST, A DISTANCE OF 347.50 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH 89°52'29" WEST, A DISTANCE OF 64.00 FEET; THENCE RUN SOUTH 00°07'31" WEST, A DISTANCE OF 137.00 FEET; THENCE RUN SOUTH 89°52'29" EAST, A DISTANCE OF 44.00 FEET; THENCE RUN SOUTH 00°07'31" WEST, A DISTANCE OF 28.67 FEET; THENCE RUN SOUTH 89°52'29" EAST A DISTANCE OF 20.00 FEET; THENCE RUN NORTH 00°07'31" EAST, A DISTANCE OF 165.67 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH EASEMENTS CONTAINED IN DECLARATION OF RECIPROCAL EASEMENTS AND RESTRICTIVE COVENANTS RECORDED DECEMBER 18, 1997, RECORDED IN OFFICIAL RECORDS BOOK 3342, PAGE 1596, IN THE PUBLIC RECORDS OF SEMINOLE COUNTY, FLORIDA, AND IN DECLARATION OF RECIPROCAL EASEMENTS AND RESTRICTIVE COVENANTS BETWEEN SUNBELT-DIX, INC. AND WINN-DIXIE STORES, INC., RECORDED OR TO BE RECORDED IN THE PUBLIC RECORDS OF SEMINOLE COUNTY, FLORIDA.

EXHIBIT B-2



EXHIBIT C TO LEASE AGREEMENT - LANDLORD'S EQUIPMENT

All machinery, apparatus, equipment, fittings, appliances and fixtures of every kind and nature whatsoever including all electrical, anti-pollution, heating, lighting, laundry, incinerating, power, air conditioning, plumbing, lifting, cleaning, fire prevention, fire extinguishing, refrigerating, ventilating, communication, garage and cooking systems, devices, machinery, apparatus, equipment, fittings, appliances, engines, pipes, pumps, tanks, motors, conduits, ducts, compressors and switch-boards, and all storm doors and windows, dishwashers, attached cabinets and partitions and all articles of personal property of every kind and nature whatsoever now or hereafter affixed to, attached to, placed upon, used or usable in any way in connection with the use, enjoyment, occupancy or operation of the Leased Premises and Improvements, but excluding Tenant's Equipment.

EXHIBIT D TO LEASE AGREEMENT - TENANT'S EQUIPMENT

All coolers, freezers, trade fixtures, goods, inventory, furniture and other personalty belonging to Tenant.

Store #2294
Orlando, Seminole County, Florida

EXHIBIT E TO LEASE AGREEMENT - SCHEDULE OF RENT

A.    PRORATED RENT. On the date of execution of this Lease by both Landlord and Tenant, Tenant shall pay Landlord prorated Rent in the amount of $1,033.43 per day for the period beginning on the date of execution of this Lease and ending August 31, 1999.

B.    RENT DURING INITIAL TERM.

Rent during the Initial Term shall be $435,824.68 per annum, payable quarterly on the first day of December, March, June and September of each calendar year, commencing September 1, 1999, and continuing thereafter throughout the Initial Term, in equal installments of $108,956.17.

C.    ADJUSTMENT TO RENT DURING INITIAL TERM FOLLOWING FINANCING OF STORE EXPANSION.

Effective immediately upon Landlord's payment of the Expansion Cost pursuant to paragraphs 28(c) or 28(d) of the Lease, Rent for the remainder of the Initial Term will be increased by an amount per annum equal to the annual debt service, including repayment of principal, payable by Landlord to the holder of the Note or Notes in connection with the Expansion Financing. Increased Rent will be payable quarterly commencing on the first Rent Payment Date following the Expansion Financing Date, and continuing through the last Rent Payment Date of the Initial Term. Additionally, upon Landlord's payment of the Expansion Cost pursuant to paragraphs 28(c) or 28(d) of the Lease, Tenant will pay to Landlord an amount representing Landlord's increased debt service obligation resulting from the Expansion Financing for the period beginning on the date of such payment by Landlord and ending on the day preceding the next Rent Payment Date. Said amount will not be considered rent under the Lease.

D.    RENT DURING ANY EXTENDED TERM.

Rent during any Extended Term shall be $392,242.20 per annum, payable quarterly on the first day of December, March, June and September of each calendar year, commencing on the first day of the first calendar quarter of such Extended Term and continuing thereafter through each Extended Term(s), in equal installments of $98,060.55.

All local, state and federal sales tax, if any, due in connection with the payment of Rent or Additional Monetary Obligations will be paid by Tenant directly to the taxing authority as Impositions.

## EXHIBIT F TO LEASE AGREEMENT - PURCHASE PRICE

The following schedule lists the Purchase Price on the applicable Termination Date as a percentage
of the Cost of the Leased Premises stated below.

A. Purchase Price in event of Casualty or Condemnation.
   For a Purchase Offer made pursuant to paragraphs 14 or 15 of this Lease, the Purchase Price is the Cost
   of the Leased Premises multiplied by the Percentage Amount listed below for the applicable Termination Date.

B. Purchase Price in event of Economic Abandonment.
   For a Purchase Offer made pursuant to paragraph 16 of this Lease, the Purchase Price is the sum of (a) the Cost
   of the Leased Premises multiplied by the Percentage Amount listed below for the applicable Termination Date
   plus (b) the Make-Whole Amount required for prepayment of the Notes on the applicable Termination Date.

Cost of the Leased Premises:    $   5,114,000.00          Location:    Orlando

| Sequential Number | Termination Date | Percentage Amount | Sequential Number | Termination Date | Percentage Amount |
|---|---|---|---|---|---|
| 1 | 9/1/99 | 102.45353645% | 41 | 9/1/09 | 91.16552113% |
| 2 | 12/1/99 | 102.24725464% | 42 | 12/1/09 | 90.78884002% |
| 3 | 3/1/00 | 102.03771035% | 43 | 3/1/10 | 90.40675248% |
| 4 | 6/1/00 | 101.82485790% | 44 | 6/1/10 | 90.01919883% |
| 5 | 9/1/00 | 101.60865072% | 45 | 9/1/10 | 89.62611978% |
| 6 | 12/1/00 | 101.38904258% | 46 | 12/1/10 | 89.22745604% |
| 7 | 3/1/01 | 101.16598641% | 47 | 3/1/11 | 88.82314828% |
| 8 | 6/1/01 | 100.93943459% | 48 | 6/1/11 | 88.41313748% |
| 9 | 9/1/01 | 100.70933877% | 49 | 9/1/11 | 87.99736398% |
| 10 | 12/1/01 | 100.47565071% | 50 | 12/1/11 | 87.57576868% |
| 11 | 3/1/02 | 100.23832155% | 51 | 3/1/12 | 87.14829310% |
| 12 | 6/1/02 | 99.99730203% | 52 | 6/1/12 | 86.71487814% |
| 13 | 9/1/02 | 99.75254197% | 53 | 9/1/12 | 86.27546485% |
| 14 | 12/1/02 | 99.50399109% | 54 | 12/1/12 | 85.82999491% |
| 15 | 3/1/03 | 99.25159891% | 55 | 3/1/13 | 85.37841038% |
| 16 | 6/1/03 | 98.99531433% | 56 | 6/1/13 | 84.92065346% |
| 17 | 9/1/03 | 98.73508576% | 57 | 9/1/13 | 84.45666647% |
| 18 | 12/1/03 | 98.47086134% | 58 | 12/1/13 | 83.98639270% |
| 19 | 3/1/04 | 98.20258821% | 59 | 3/1/14 | 83.50977530% |
| 20 | 6/1/04 | 97.93021394% | 60 | 6/1/14 | 83.02675813% |
| 21 | 9/1/04 | 97.65368542% | 61 | 9/1/14 | 82.53728537% |
| 22 | 12/1/04 | 97.37294855% | 62 | 12/1/14 | 82.04130208% |
| 23 | 3/1/05 | 97.08794982% | 63 | 3/1/15 | 81.53875436% |
| 24 | 6/1/05 | 96.79863446% | 64 | 6/1/15 | 81.02958777% |
| 25 | 9/1/05 | 96.50494787% | 65 | 9/1/15 | 80.51374983% |
| 26 | 12/1/05 | 96.20683506% | 66 | 12/1/15 | 79.99118829% |
| 27 | 3/1/06 | 95.90424059% | 67 | 3/1/16 | 79.46185165% |
| 28 | 6/1/06 | 95.59710840% | 68 | 6/1/16 | 78.92568981% |
| 29 | 9/1/06 | 95.28538227% | 69 | 9/1/16 | 78.38265359% |
| 30 | 12/1/06 | 94.96900593% | 70 | 12/1/16 | 77.83269426% |
| 31 | 3/1/07 | 94.64792252% | 71 | 3/1/17 | 77.27576500% |
| 32 | 6/1/07 | 94.32207506% | 72 | 6/1/17 | 76.71181944% |
| 33 | 9/1/07 | 93.99140637% | 73 | 9/1/17 | 76.14081319% |
| 34 | 12/1/07 | 93.65585851% | 74 | 12/1/17 | 75.56270331% |
| 35 | 3/1/08 | 93.31537368% | 75 | 3/1/18 | 74.97744733% |
| 36 | 6/1/08 | 92.96989374% | 76 | 6/1/18 | 74.38500508% |
| 37 | 9/1/08 | 92.61936064% | 77 | 9/1/18 | 73.78533776% |
| 38 | 12/1/08 | 92.26371556% | 78 | 12/1/18 | 73.17840833% |
| 39 | 3/1/09 | 91.90289980% | 79 | 3/1/19 | 72.56418141% |
| 40 | 6/1/09 | 91.53685466% | 80 | 6/1/19 | 71.94262374% |

8/18/99

EXHIBIT G TO LEASE AGREEMENT - FORM OF ESTOPPEL CERTIFICATE

_____, a _____ [insert "Landlord" or "Tenant" as applicable] hereby certifies to [insert "Landlord" or "Tenant" as applicable], that, as of _____ (the "Certificate Date"), the following is true and correct:

1.    _____, Inc., a _____ corporation, is the tenant under a currently effective lease (as amended as described below, the "Lease") with _____, a _____, as the current landlord, dated as of August ____, 1999, conveying a leasehold estate of the property described therein (the "Premises"), and the Lease has been amended or supplemented only as follows:

2.    The term of the Lease commenced August ___, 1999, and is scheduled to expire on August 31, 2019 unless renewed or terminated in accordance with the terms of the Lease. Pursuant to the Lease, Tenant is entitled to renew the Lease for 6 successive terms of 5 years each.

3.    To the best of [insert Landlord's or Tenant's, as applicable] knowledge, Tenant is not in material Default under the Lease, and all rent and other charges due from Tenant to Landlord have been paid through and including _____, ____, and Tenant currently as no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease, except as follows:

4.    To the best of [insert Landlord's or Tenant's, as applicable] knowledge, Landlord is not in material Default under the Lease, except as follows:

5.    The Lease contains a right of first refusal in favor of Tenant, and other provisions requiring Tenant to offer to purchase the Premises or to substitute the Premises for other leased premises upon the occurrence of certain events.

6.    [insert Landlord or Tenant, as applicable] has received no notice of any sale, transfer, assignment, or pledge of the interest of [insert Landlord or Tenant, as applicable] in the Lease [or in the case of Landlord's interest, in the rent due thereunder], except as follows:

7.    [insert Landlord or Tenant, as applicable] is not the subject of any transfer for the benefit of creditors, or any bankruptcy or reorganization filing under any applicable bankruptcy law.

**IN WITNESS WHEREOF,** the undersigned has executed this certificate, which may be relied upon by [insert Landlord or Tenant, as applicable] and any mortgagee, successor or assign of [insert Landlord or Tenant, as applicable].

[insert appropriate signature blocks for certifying party, witnesses and notary public, as applicable]

EXHIBIT H TO LEASE AGREEMENT - FORM OF MEMORANDUM OF LEASE

[insert document headings as appropriate for recordation]

### MEMORANDUM OF LEASE

**THIS MEMORANDUM OF LEASE** is hereby executed this _____ day of August, 1999, by and between:

**ORLANDO 99-FL, LLC**, a Delaware limited liability company ("Landlord"), whose mailing address is c/o Principal Net Lease Investors, L.L.C., 711 High Street, Des Moines, Iowa 50392-0301 Attention: Gary Lines;

and

**WINN-DIXIE STORES, INC.**, a Florida corporation ("Tenant"), whose mailing address is 5050 Edgewood Court, Jacksonville, Florida 32254 Attention: Chief Financial Officer;

which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H:

**WHEREAS,** Landlord and Tenant did enter into a Lease Agreement dated as of August ____, 1999 (the "Lease"); and

**WHEREAS,** Landlord and Tenant desire to memorialize the terms and conditions of the Lease as a matter of public record.

**NOW, THEREFORE, FOR VALUABLE CONSIDERATION,** the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant, and Tenant does hereby lease from Landlord, the property more particularly described on attached <u>Exhibit A</u> and as depicted on the Site Plan attached as an exhibit to the Lease, together with all Improvements now or hereafter located thereon (collectively the "Premises").

The Term of the Lease shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, on August 31, 2019. Annual rent, payable in quarterly installments on the 1st day of each December, March, June and September during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of 6 successive extensions of the term of the Lease, each extension to be for a period of 5 years each. Tenant has a right of first refusal to purchase the Premises under the Lease.

The Lease contains the following provision:

Liens.  TENANT SHALL NOT, DIRECTLY OR INDIRECTLY, CREATE OR PERMIT TO BE CREATED OR TO REMAIN, AND SHALL PROMPTLY DISCHARGE, ANY LIEN (OTHER THAN THE MORTGAGE, THE ASSIGNMENT, ANY PERMITTED ENCUMBRANCE, OR ANY LIEN CREATED BY OR RESULTING FROM ANY ACTION BY LANDLORD NOT CONSENTED TO BY TENANT IN ADVANCE AND IN WRITING), WHETHER CREATED OR ARISING BEFORE, ON OR AFTER THE COMMENCEMENT DATE, ON THE LEASED PREMISES OR ANY RENT, ADDITIONAL MONETARY OBLIGATIONS OR ANY OTHER SUMS PAYABLE BY TENANT UNDER THIS LEASE.  NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIAL FURNISHED OR TO BE FURNISHED TO TENANT, OR TO ANYONE HOLDING THE LEASED PREMISES THROUGH OR UNDER TENANT, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN THE LEASED PREMISES.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Memorandum of Lease shall be deemed to constitute a single instrument or document.  This Memorandum of Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Memorandum of Lease, the Lease shall control.

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Memorandum of Lease as of the date first above written.

Witnesses:                          **LANDLORD:**

                                    **ORLANDO 99-FL, LLC**, a Delaware limited liability company

                                    By:   Principal Net Lease Investors, L.L.C., a Delaware limited liability company, its sole member

                                          By:   Principal Life Insurance Company, an Iowa corporation, its sole member

Name: _____              By: _____
                                         Name: _____
                                         Title: _____
Name: _____

Name: _____              By: _____
                                         Name: _____
                                         Title: _____
Name: _____

                                         [CORPORATE SEAL]

STATE OF _____ )
COUNTY OF _____ )

     The foregoing instrument was acknowledged before me this _____ day of August, 1999, by _____ and _____, the _____ and _____, respectively, of PRINCIPAL LIFE INSURANCE COMPANY, an Iowa corporation, on behalf of the corporation, as the sole member of PRINCIPAL NET LEASE INVESTORS, L.L.C., a Delaware limited liability company, the sole member of ORLANDO 99-FL, LLC, a Delaware limited liability company.  Each of them either [ ] is personally known to me or [ ] has produced a _____ state drivers license as identification.


                                         _____
                                         NOTARY PUBLIC, State of _____
                                         Printed Name: _____
          [NOTARIAL SEAL]                Commission No.: _____
                                         My commission expires: _____

**TENANT:**

**WINN-DIXIE STORES, INC.,**
a Florida corporation

Name: _____          By: _____
                                 Name: _____
_____                Title: _____ President
Name: _____

[CORPORATE SEAL]

STATE OF FLORIDA )
COUNTY OF DUVAL )

     The foregoing instrument was acknowledged before me this _____ day of August, 1999, by _____ , the _____ president of WINN-DIXIE STORES, Inc., a Florida corporation, on behalf of the corporation.  He either [  ] is personally known to me or [  ] has produced _____ state drivers license as identification.

                                 _____
                                 NOTARY PUBLIC, State of _____
                                 Printed Name: _____
[NOTARIAL SEAL]                  Commission No.: _____
                                 My commission expires: _____

EXHIBIT I TO LEASE AGREEMENT - FORM OF COMPLETION CERTIFICATE

This Certificate is being delivered by _____ ("Tenant"), pursuant to paragraph 28 of the Lease Agreement dated as of August ___, 1999 (the "Lease"), between _____ ("Landlord") and Tenant. Tenant hereby warrants, represents and certifies to Landlord as of this ____ day of _____, ____, as follows (capitalized terms used herein and not otherwise defined have the meanings set forth in the Lease):

(a)   The Improvements are substantially complete in accordance with the provisions of paragraph 28 of the Lease and are ready for operation in Tenant's Business.

(b)   The Cost actually incurred as of the date hereof by Tenant with respect to the Leased Premises as set forth below [supply data as applicable]:

Cost of Land:

Cost of Improvements based upon an approved appraisal (including site work and architects' and engineers' fees):

Cost of Landlord's Equipment:

Capitalized Expenses (including capitalized interest, financing costs and other items included in the definition of Cost in the Lease):

TOTAL COST:

(c)   All certificates of occupancy and other governmental consents needed for the use of the Leased Premises have been obtained.

(d)   There are no claims of any person which are past due and unpaid relating to the construction of the Improvements or acquisition of the Landlord's Equipment except claims which are being contested as permitted by the Lease.

(e)   Title to the Improvements and the Landlord's Equipment is vested in Landlord free and clear of all Liens other than the Lease and Permitted Encumbrances and Tenant accepts the Leased Premises in accordance with the provision of the Lease.

(f)   The Lease is in full force and effect on the date hereof. The Lease has not been amended and no Event of Default has occurred and is continuing thereunder.

IN WITNESS WHEREOF, the undersigned has duly executed, sealed and delivered this certificate on this the date first above written.

[Witness Signature Blocks]                          [Tenant's Signature Block]

**THIS INSTRUMENT PREPARED BY
AND RECORD AND RETURN TO:**

Douglas G. Stanford, Esq.
LeBoeuf, Lamb, Greene & MacRae, L.L.P.
50 North Laura Street, Suite 2800
Jacksonville, Florida 32202

---

## MEMORANDUM OF LEASE

    **THIS MEMORANDUM OF LEASE** is hereby executed this _2b_ day of August, 1999, by and between:

**ORLANDO 99-FL, LLC**, a Delaware limited liability company ("Landlord"), whose mailing address is c/o Principal Net Lease Investors, L.L.C., 711 High Street, Des Moines, Iowa 50392-0301 Attention: Gary Lines;

and

**WINN-DIXIE STORES, INC.**, a Florida corporation ("Tenant"), whose mailing address is 5050 Edgewood Court, Jacksonville, Florida 32254 Attention: Chief Financial Officer;

which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

## W I T N E S S E T H:

    **WHEREAS,** Landlord and Tenant did enter into a Lease Agreement dated as of even date herewith (the "Lease"); and

    **WHEREAS,** Landlord and Tenant desire to memorialize the terms and conditions of the Lease as a matter of public record.

    **NOW, THEREFORE, FOR VALUABLE CONSIDERATION,** the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant, and Tenant does hereby lease from Landlord, the property more particularly described on attached Exhibit A and as depicted on the Site Plan attached as an exhibit to the Lease, together with all Improvements now or hereafter located thereon (collectively the "Premises").

The Term of the Lease shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, on August 31, 2019. Annual rent, payable in quarterly installments on the 1st day of each December, March, June and September during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of 6 successive extensions of the term of the Lease, each extension to be for a period of 5 years each. Tenant has a right of first refusal to purchase the Premises under the Lease.

The Lease contains the following provision:

Liens. TENANT SHALL NOT, DIRECTLY OR INDIRECTLY, CREATE OR PERMIT TO BE CREATED OR TO REMAIN, AND SHALL PROMPTLY DISCHARGE, ANY LIEN (OTHER THAN THE MORTGAGE, THE ASSIGNMENT, ANY PERMITTED ENCUMBRANCE, OR ANY LIEN CREATED BY OR RESULTING FROM ANY ACTION BY LANDLORD NOT CONSENTED TO BY TENANT IN ADVANCE AND IN WRITING), WHETHER CREATED OR ARISING BEFORE, ON OR AFTER THE COMMENCEMENT DATE, ON THE LEASED PREMISES OR ANY RENT, ADDITIONAL MONETARY OBLIGATIONS OR ANY OTHER SUMS PAYABLE BY TENANT UNDER THIS LEASE. NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIAL FURNISHED OR TO BE FURNISHED TO TENANT, OR TO ANYONE HOLDING THE LEASED PREMISES THROUGH OR UNDER TENANT, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN THE LEASED PREMISES.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Memorandum of Lease shall be deemed to constitute a single instrument or document. This Memorandum of Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Memorandum of Lease, the Lease shall control.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Memorandum of Lease as of the date first above written.

Witnesses:

**LANDLORD:**

**ORLANDO 99-FL, LLC**, a Delaware limited liability company

By:    Principal Net Lease Investors, L.L.C., a Delaware limited liability company, its sole member

By:    Principal Life Insurance Company, an Iowa corporation, its sole member

Name: L S Valentine

Name:

By: _____
Name: _____  CLARE TANDE
Title: _____  COUNSEL

Name: L S Valentine

Name:

By: _Karen A Pearson_
Name: _____  KAREN A. PEARSTON
Title: _____  COUNSEL

[CORPORATE SEAL]

STATE OF _Iowa_ )
COUNTY OF _Polk_ )

The foregoing instrument was acknowledged before me this _11th_ day of August, 1999, by _Clare Tande_ and _Karen A. Pearston_, the _Counsel_ and _Counsel_, respectively, of Principal Life Insurance Company, an Iowa corporation, on behalf of the corporation, as the sole member of Principal Net Lease Investors, L.L.C., a Delaware limited liability company, the sole member of ORLANDO 99-FL, LLC, a Delaware limited liability company. Each of them either [X] is personally known to me or [  ] has produced a _____ state drivers license as identification.

_Helen L. Boles_
NOTARY PUBLIC, State of _Iowa_
Printed Name: _____
Commission No.: _CC7065_
My commission expires: _____

[NOTARIAL SEAL]

HELEN L. BOLES
MY COMMISSION EXPIRES
April 7, 2002

JK 128827.1 80130 02051
7/31/99 4:20 PM

3

Store #2294,
Orlando, Seminole County, Florida

**TENANT:**

**WINN-DIXIE STORES, INC.,**
a Florida corporation

Name: R. D. Peterson

Name: Mary Kay Vega

By: _R. P. McCook_
Name: _R. P. McCook_
Title: _Vice_ President

[CORPORATE SEAL]

STATE OF FLORIDA )
COUNTY OF DUVAL )

    The foregoing instrument was acknowledged before me this 5th day of August, 1999, by _R. P. McCook_ , the _Vice_ president of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation. He either [X] is personally known to me or [ ] has produced _____ state drivers license as identification.

NOTARY PUBLIC, State of _Fla_
Printed Name: _____
Commission No.: _____
My commission expires: Mary Kay Vega

[NOTARIAL SEAL]

MY COMMISSION # CC577749 EXPIRES
September 29, 2000
BONDED THRU TROY FAIN INSURANCE, INC.