# EXHIBIT A

## ASSET PURCHASE AGREEMENT

### (MIAMI PLANT)

**THIS ASSET PURCHASE AGREEMENT** is made effective as of November 17, 2005 (the "Effective Date"), by and among **WINN-DIXIE STORES, INC.,** a Florida corporation ("Winn-Dixie Stores"), **WINN-DIXIE LOGISTICS, INC.**, a Florida corporation and wholly owned subsidiary of Winn-Dixie Stores ("W-D Logistics", and, together with Winn-Dixie Stores, "Seller"), and **SOUTHEAST MILK, INC,** a Florida cooperative corporation, or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

### R E C I T A L S:

A.    Winn-Dixie Stores and its subsidiaries are engaged in the retail supermarket business primarily in the southeastern United States and, in connection therewith, Winn-Dixie Stores owns or leases, directly and through subsidiaries, retail supermarket facilities and related distribution and manufacturing facilities.

B.    W-D Logistics currently leases the dairy facilities located in Miami, Florida (hereinafter referred to as the "Miami Plant" or the "Leased Plant"), on the land comprising the Leased Real Estate pursuant to the Lease (as defined herein).

C.    Seller currently does not operate the Miami Plant.  Winn-Dixie Stores used certain equipment and assets at the Miami Plant for its business (the "Business") of producing dairy products.

D.    Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Miami Plant and the Lease, together with the other Assets (as defined herein), subject to the terms and conditions contained in this Agreement.

E.    In connection with the consummation of the transactions contemplated by this Agreement, (i) W-D Logistics and Buyer intend to enter into an Assignment and Assumption Agreement with respect to the Lease (as defined herein) substantially in the form of Exhibit A-1 (the "Lease Assignment"), to be effective as of the Closing Date and pursuant to which W-D Logistics has agreed to assign and Buyer has agreed to assume the liabilities and obligations relating to the Lease and (ii) Winn-Dixie Stores intend to enter into an Assignment and Assumption Agreement in the form of Exhibit A-2 (the "Contract Assignment"), to be effective as of the Closing Date.

F.    In connection with the consummation of the transactions contemplated by this Agreement, Winn-Dixie Stores and Buyer may enter into a Supply Agreement with respect to the Miami Plant on such terms as such parties may agree (the "Supply Agreement"), to be effective as of the Closing Date or subsequently, as the such parties may agree.

G.    Each of Winn-Dixie Stores and W-D Logistics and certain of their Affiliates filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11

of Title 11 of the United States Code, 11 U.S.C. §101 <u>et seq.</u>, as amended (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "<u>Filing Date</u>") and each has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Winn-Dixie Stores and W-D Logistics (and their Affiliates) was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "<u>Bankruptcy Court</u>") where it is being procedurally administered under case no. 05-03817-3F1 (the "<u>Bankruptcy Case</u>").

**IN CONSIDERATION OF THE PREMISES CONTAINED HEREIN AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0    **Defined Terms.**  Capitalized terms as used in this Agreement will have the following meanings when used herein.

1.1    "<u>Adequate Assurance Information</u>" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that lessors and non-debtor parties to Assumed Contracts are adequately assured of Buyer's future performance under the Lease and the Assumed Contracts as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's obligations under the Lease by a guarantor with sufficient assets to provide adequate assurance of future performance.

1.2    "<u>Affiliate</u>" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3    "<u>Agreement</u>" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4    "<u>Allocation Schedule</u>" will mean the allocation of the purchase price among Winn-Dixie Stores and W-D Logistics, as provided on <u>Exhibit C</u>.

1.5    "<u>Approval Hearing</u>" will mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

1.6    "<u>Assets</u>" will mean, with respect to each Seller, all of the assets, properties and rights of such Seller (including all guarantees, warranties, indemnities and similar rights of Seller with respect to any of the Assets), of every type and description, real, personal and mixed, located at the Miami Plant, including the Leased Real Estate, the Assumed Contracts (if any), the Sales, General and Administrative Property, the Intellectual Property (other than Intellectual Property comprising or related to the Excluded

Assets), all machinery, equipment, tools, dairy supplies and furnishings, permits (to the extent they are assignable), and other fixed or tangible assets known or unknown, fixed or unfixed, choate or inchoate, accrued, absolute, contingent or otherwise, whether or not reflected on the books and records of such Seller and relating to the Miami Plant, excluding only the Excluded Assets.

1.7    "Assumed Contracts" will mean, if any with respect to a Seller, the agreements, contracts commitments and undertakings of such Seller with respect to the Business that are listed on Exhibit D.

1.8    "Assumed Liabilities" will mean all debts, obligations and liabilities relating to the Assets arising with respect to any period beginning on or after the Closing Date, whether known or unknown, fixed, absolute, contingent, material or immaterial, matured or unmatured, and in any case including the following:

(i)    all liabilities and obligations of each Seller under the Lease and Assumed Contracts arising with respect to any period beginning on or after the Closing Date;

(ii)    all debts, liabilities and obligations for state and local real and personal property taxes that are imposed directly with respect to an Asset and payable after the Closing Date;

(iii)    all debts, liabilities and obligations with respect to all actions, suits, proceedings, disputes, claims or investigations arising out of, resulting from, or relating to the Business or the Assets with respect to any period beginning on or after the Closing Date, at law, in equity or otherwise; and

(iv)    all debts, liabilities and obligations arising out of the ownership or operation of any Assets or the Business on or after the Closing Date.

1.9    "Bankruptcy Code" will have the meaning assigned in paragraph G of the Recitals to this Agreement.

1.10    "Bankruptcy Court" will have the meaning assigned in paragraph G of the Recitals to this Agreement.

1.11    "Bankruptcy Court Approval" will mean the entry of the Sale Order with respect to the Miami Plant by the Bankruptcy Court.

1.12    "Bankruptcy Case" will have the meaning assigned in paragraph G of the Recitals to this Agreement.

1.13    "<u>Base Purchase Price</u>" will mean the amount set forth in <u>paragraph 3.1</u> of this Agreement.

1.14    "<u>Bidding Procedures</u>" will mean the procedures set forth in the Order of the Bankruptcy court dated June 20, 2005 (docket no. 1801).

1.15    "<u>Bill of Sale</u>" will mean a bill of sale substantially in the form of <u>Exhibit E</u> transferring all right, title and interest in the Assets other than the Leased Real Estate from Winn-Dixie Stores to Buyer.

1.16    "<u>Business</u>" will have the meaning assigned in <u>paragraph C</u> of the Recitals to this Agreement.

1.17    "<u>Business Day</u>" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.18    "<u>Buyer</u>" will have the meaning assigned in the initial paragraph of this Agreement

1.19    "<u>Buyer's Closing Costs</u>" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) recording fees payable in connection with recording any instruments in the appropriate public records; (d) cost of the new Environmental Report delivered on or before the Effective Date, not to exceed $6,000.00; (e) cost of the updated Title Report delivered on or before the Effective Date, and the Title Policy, including title examination fees and premiums at minimum promulgated rates; (f) cost of the new Survey delivered on or before the Effective Date, not to exceed $9,000.00; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; (h) sales taxes, if any, payable in connection with the purchase and sale of the Assets; and (i) the fees and costs of the Escrow Agent.

1.20    "<u>Buyer's Escrowed Items</u>" will have the meaning assigned in <u>paragraph 14.3</u> of this Agreement.

1.21    "<u>Closing</u>" will mean the consummation of the transfer, assignment, assumption, sale and purchase of the Assets relating to the Miami Plant pursuant to this Agreement as indicated by delivery of the documents contemplated by <u>paragraph 14</u> of this Agreement and the Base Purchase Price as contemplated in this Agreement with respect to the Miami Plant, which will be deemed to occur at 12:01 a.m. on the Closing Date with respect to the Miami Plant.

1.22    "Closing Date" will mean the date designated by Seller in writing, and reasonably acceptable to Buyer, that is between one day and 30 days following the Bankruptcy Court Approval.

1.23    "Closing Statement" will mean a statement in the form of Exhibit F-1 with respect to the sale and assignment of Assets by Winn-Dixie Stores and in the form of Exhibit F-2 with respect to the sale and assignment of Assets by W-D Logistics (or in such other form as is prepared by Seller and reasonably acceptable to Buyer) reflecting the net amount due the applicable Seller at the Closing, after making the adjustments described in this Agreement.

1.24    "Confidentiality Agreement" will mean the existing letter agreement between Winn-Dixie Stores and Buyer, regarding, among other things, confidentiality relating to the subject matter of this Agreement.    Buyer acknowledges and agrees that W-D Logistics is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie Stores under such agreement, acting alone or acting jointly with Winn-Dixie Stores.

1.25    "Contract Assignment" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

1.26    "Contract Warranties" will have the meaning assigned in paragraph 22.1 of this Agreement.

1.27    "Credit Agreement Liens" will mean liens and encumbrances created by Seller pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie Stores and certain of its Affiliates, Wachovia Bank, N.A., as agent and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Seller in connection with such Credit Agreement.

1.28    "Cure Costs" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Lease and the Assumed Contracts.

1.29    "Damages" will have the meaning assigned in paragraph 16.5 of this Agreement.

1.30    "Deposit" will have the meaning assigned in paragraph 3.3 of this Agreement.

1.31    "Due Diligence Materials" will mean, collectively, (i) all documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, at the Miami Plant, on the Merrill Website, or otherwise and (ii) all

documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.32 "Effective Date" will have the meaning assigned in the initial paragraph of this Agreement.

1.33 "Encumbrance" will mean any mortgage, deed of trust, lien, pledge, encumbrance, claim, lease, easement, license, option, right of first refusal, preemptive right, charge, security interest, conditional sales contract, restriction or other matter causing a defect or imperfection in title.

1.34 "Environmental Reports" will mean collectively, (i) any prior report or study of the environmental condition of the land comprising the Owned Real Estate or the Leased Real Estate and (ii) an updated or new Phase I environmental site assessment report of the land comprising the Owned Real Estate and the Leased Real Estate that Seller has made available to Buyer for review on the Merrill Website or otherwise has delivered or will deliver to Buyer pursuant to paragraph 4.4 of this Agreement.

1.35 "Equipment" will mean all equipment included in the Assets.

1.36 "Escrow Agent" will mean Smith, Gambrell & Russell, LLP, Jacksonville, Florida.

1.37 "Escrow Date" will mean the date that is two Business Days prior to the Closing Date or such earlier date after the Bankruptcy Court Approval as Buyer and Seller may mutually designate.

1.38 "Excluded Assets" will mean any equipment listed on Exhibit G-1, any over-the-road motor vehicles, any computer software subject to a license that restricts its transfer other than any such software that resides on equipment listed on Exhibit G-2, any computer software that resides on equipment comprising Excluded Assets, accounts receivable and other receivables, including intercompany receivables, deposits paid by Seller, insurance proceeds attributable to events that occurred prior to the Closing (except as otherwise specifically provided herein), tax refunds or other tax benefits relating to taxes paid by Seller or their Affiliates, cash and cash equivalents and trademarks, trade names, logos or designs of Seller, and all Intellectual Property relating to any of the foregoing.

1.39 "Excluded Liabilities" will mean all debts, claims, or liabilities whatsoever arising with respect to any period ending before the Closing Date, which Excluded Liabilities include but are not limited to:

(i)     any claim arising from the condition of the property prior to Closing, except as specifically assumed under the Lease;

(ii)    any claim arising from any action or neglect of Seller prior to Closing;

(iii)    any obligations or liabilities of the Business for products processed or sold prior to the Closing Date.

(iv)    any obligations arising out of, under or in connection with contracts that are not Assumed Contracts and, with respect to Assumed Contracts, liabilities in respect of a breach by or default of Seller accruing under such contracts with respect to any period prior to Closing;

(v)    all Cure Costs;

(vi)    any obligations arising out of, under or in connection with any indebtedness of Seller or its Affiliates;

(vii)    any liabilities for taxes of Seller and taxes relating to Assets or the Assumed Liabilities for taxable periods ending before the Closing Date (except for those which have been prorated at Closing and a credit has been given to the Buyer for taxes accrued before the Closing Date); and

(viii)    any obligations relating to amounts required to be paid by Seller hereunder.

1.40    "<u>Hazardous Materials or Substances</u>" will mean any substance or material presently tested, defined, designated or classified as toxic, hazardous, radioactive or dangerous by any law or statute, including but not limited to any substance or material that is regulated as to exposure, use, or discharge.  This term expressly includes any derivative or by-product of any of the foregoing.

1.41    [Intentionally omitted]

1.42    [Intentionally omitted]

1.43    "<u>Initial Title Reports</u>" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Miami Plant that Seller has made available to Buyer for review on the Merrill Website or otherwise as of the Effective Date.  Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Leased Real Estate, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.44 "Intellectual Property" will mean, if used or employed exclusively by Seller at the Miami Plant in the provision, production, or marketing of any services or products now provided, produced, or proposed to be provided, produced, or marketed by Seller at the Miami Plant, the following: all U.S. and foreign issued design patents and utility patents, all pending applications relating to any inventions and all reissues, divisions, continuations-in-part and extensions of them; all registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, trade names, trade dress, logos and designs, and unique product configurations; and all U.S. copyrights and copyright applications and all copyright renewals and extensions; and all material trade secrets, confidential business information and know-how including, without limitation, invention disclosures, new product development information, formulas, software, and vendor and customer lists.  The Intellectual Property specifically includes the sole and exclusive right to assert claims, prosecute claims, collect damages and retain damages arising out of any past, present or future infringement, dilution, misappropriation or other violation, known or unknown, of the Intellectual Property, to the extent applicable, regardless of whether such claim has already been asserted against any third party by or on behalf of Seller.

1.45 "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel of Winn-Dixie Stores, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of Calvin Covington, Chief Executive Officer, without any requirement of investigation or inquiry.

1.46 "Lease" will mean the lease dated August 10, 1999, between ZSF/WD Opa Locka, LLC as Lessor and Winn-Dixie Stores as Lessee, assigned by Winn-Dixie Stores to W-D Logistics as successor Lessee, and any amendments or supplements thereto between Lessor and Winn-Dixie Stores or W-D Logistics.

1.47 "Lease Assignment" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

1.48 "Leased Plant" will have the meaning assigned in paragraph B of the Recitals to this Agreement.

1.49 "Leased Real Estate" will mean the leasehold interests of Seller in all real property listed on Exhibit H.

1.50 "Lessor" will mean the lessor under the Lease with respect to the Leased Real Estate.

1.51    "<u>Liquidated Deposit</u>" will have the meaning assigned in <u>paragraph 16.1</u> of this Agreement.

1.52    "<u>Material Adverse Effect</u>" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the use of the Assets or continued operations of the Miami Plant for its current use, taken as a whole, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the beverage and dairy industry that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.53    "<u>Merrill Website</u>" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Barracuda" with respect to the disposition of the Plants and other properties.

1.54    "<u>Miami Plant</u>" will have the meaning assigned in <u>paragraph B</u> of the Recitals to this Agreement.

1.55    [Intentionally deleted]

1.56    "<u>Outside Date</u>" will mean January 31, 2005, as such date may be extended by the written agreement of Seller and Buyer.

1.57    "<u>Permit</u>" will have the meaning assigned in <u>paragraph 6.2</u> of this Agreement.

1.58    "<u>Permitted Encumbrances</u>" will mean (i) all matters listed on <u>Exhibit I</u>, (ii) liens for current taxes and assessments not yet due and payable or that do not materially detract from the value thereof or the use to which such property is presently subject, (iii) minor imperfections of title, if any, that, taken as whole, do not materially detract from the value or impair the use of the property subject thereto, or impair the operations of a Plant, (iv) zoning laws, recorded easements, covenants, utility easements, building restrictions and other land use restrictions that do not impair the present or

anticipated use of the relevant Plant, and (v) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth in any additional Title Reports

1.59  "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.60  "Plant" will have the meaning assigned in paragraph B of the Recitals to this Agreement.

1.61  "Products" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.62  "Sale Order" will mean an order of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, in each case with respect to the Miami Plant, substantially in the form attached as Exhibit J.

1.63  "Sales, General and Administrative Property" will mean all customer and supplier lists, files, catalogues, brochures, pricing lists, books and records generally located at the Plant, Plant telephone and fax numbers, computer programs, software and systems and other sales, general administrative and miscellaneous property of every kind and nature related to and generally located at the Plant, other than any of the foregoing that are or are related to the Excluded Assets.

1.64  "Seller" will have the meaning assigned in the initial paragraph of this Agreement.

1.65  "Seller Delivery Confirmation" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.66  "Seller's Broker" will mean The Blackstone Group, L.P.

1.67  "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; and (b) commissions payable to Seller's Broker as provided in paragraph 17.3 of this Agreement.

1.68  "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.69  "Seller's Retained Names" will have the meaning assigned in paragraph 9.3 of this Agreement.

1.70   "<u>Successful Bid</u>" will mean the highest or otherwise best offer to purchase the Assets relating to the Miami Plant and which equals or exceeds 105% the Purchase Price, as determined by Seller in accordance with the Bidding Procedures.

1.71   "<u>Supply Agreement</u>" will have the meaning assigned in <u>paragraph F</u> of the Recitals to this Agreement

1.72   [Intentionally deleted]

1.73   "<u>Survey</u>" will mean collectively, (i) any prior survey or site plan and (ii) a current boundary survey of the land comprising the Leased Real Estate that Seller has made available to Buyer for review on the Merrill Website or otherwise has delivered or will deliver to Buyer pursuant to <u>paragraph 4.3</u> of this Agreement.

1.74   "<u>Title Reports</u>" will mean, collectively, (i) the Initial Title Reports and (ii) any additional title reports and/or title insurance commitments with respect to the Plants that Seller has made available to Buyer for review on the Merrill Website or otherwise has delivered or will deliver to Buyer pursuant to <u>paragraph 4.2</u> of this Agreement.

1.75   "<u>Title Insurer</u>" will mean First American Title Insurance Company or any other nationally recognized title insurance company designated by Seller.

1.76   "<u>Title Policies</u>" will have the meaning assigned in <u>paragraph 4.2</u> of this Agreement.

1.77   "<u>W-D Logistics</u>" will have the meaning assigned in the initial paragraph of this Agreement.

1.78   "<u>Winn-Dixie Stores</u>" will have the meaning assigned in the initial paragraph of this Agreement.

2.0   **Purchase and Sale of Assets; Assumption of Assumed Liabilities.**

2.1   <u>Transfer of Assets</u>.  Upon the terms and subject to the conditions contained herein, on the Closing Date, each Seller shall sell, transfer, assign and deliver to Buyer, and Buyer shall purchase, acquire and accept from such Seller, the Assets applicable to such Seller, free and clear of all liens, encumbrances or interests (other than Permitted Encumbrances) to the extent provided in Section 363(f) of the Bankruptcy Code, for the purchase price specified in <u>paragraph 3.0</u> of this Agreement.  Excluded from the purchase price herein are the Excluded Assets, which Seller shall retain.

Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are subject to higher or otherwise better offers for the Assets and conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

2.2   <u>Assumed Liabilities</u>.  From and after the Closing Date, Buyer shall assume and agrees to pay, perform and discharge when due and/or required, the Assumed Liabilities.

2.3   <u>Excluded Liabilities</u>.  Notwithstanding anything in this Agreement to the contrary, Buyer shall not assume, and shall be deemed not to have assumed, any Excluded Liabilities.

3.0   **Purchase Price.**

3.1   <u>Amount</u>.  The purchase price to be paid by Buyer to Seller for the Assets is $5,256,000 in the aggregate (the "<u>Base Purchase Price</u>"), which will be allocated between Winn-Dixie Stores and W-D Logistics as set forth on the Allocation Schedule.

3.2   <u>Contract Consideration and Deposit</u>.  As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer shall deliver to Escrow Agent, no later than two Business Days after Seller's execution and acceptance of this Agreement, an earnest money deposit in the amount of $525,600 (the Deposit").  Buyer shall make the Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Deposit will be subject to refund to Buyer to the extent and in the circumstances described in <u>paragraphs 4.2, 4.4, 12, 15 and 16</u> of this Agreement.  The applicable portion of the Deposit will be credited against the Base Purchase Price at the Closing and will be held in an escrow account maintained by Escrow Agent prior to the Closing.  Whenever used herein, the term Deposit also will be deemed to include all interest accrued thereon if the escrow

account maintained by Escrow Agent is an interest bearing account; however, for state and federal income tax purposes, interest, if any, accrued on the Deposit will be deemed earned by Buyer. Buyer's federal taxpayer identification number (FEIN) is 59-0769519.

3.3     <u>Payment</u>. The Base Purchase Price will be paid in the following manner:

3.3.1    *Base Purchase Price*. On the Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the Closing Statements). On the Closing Date, Buyer will, subject to the conditions set forth in <u>paragraph 10</u> of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase Price (as so adjusted) to Seller (by wire transfer to an account designated in writing by Seller).

3.3.2    [Intentionally deleted]

3.3.3    *Certain Transaction Costs*. All relevant rent, taxes (including real and personal property taxes), utilities and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Base Purchase Price to the extent thereof.

3.3.4    *Sales Tax*. Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. This <u>paragraph 3.3.4</u> shall survive the Closing.

3.4     *Cure Costs*. Cure Costs, if any, will be paid by Seller at the Closing.

3.5     <u>Allocation of Base Purchase Price Among Assets at the Miami Plant</u>. Seller shall have the right to allocate the Base Purchase Price, for tax purposes and all other purposes, among the Assets at the Miami Plant; provided, however, that such allocation shall not be binding upon Seller or determinative with respect to any allocation made by Seller of the Base Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case. The allocation contemplated in the immediately preceding sentence shall be set forth with respect to the Assets on the Closing Statements.

4.0     **Buyer's Due Diligence.**

4.1     <u>Acknowledgment</u>. In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to

conduct due diligence regarding the Miami Plant and the Assets and it has had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement.  Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Miami Plant and the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Miami Plant and the Assets and to acquire such additional information about the Miami Plant and the Assets as Buyer has reasonably requested.  Seller agrees that, prior to the Closing Date, Buyer shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make at its own cost and expense such investigation of the Miami Plant and the Assets, and such examination of the books, records and financial condition thereof, as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted, on at least two Business Days' prior written notice to Seller, during regular business hours and under reasonable circumstances, and Seller shall cooperate fully therein; provided that Buyer shall have no right to perform invasive investigations of the Leased Real Estate or the building comprising the Miami Plant.  Buyer's inspection and investigation will expressly include the right to proceed with certain testing of equipment at the Miami Plant, including, but not limited to, starting and testing equipment and applying for permits and approvals to operate. Buyer agrees that any physical access to, inspection of or equipment testing at the Miami Plant by Buyer or its representatives shall comply in all respects with the written instructions and requirements of Seller.   In addition, Buyer hereby indemnifies and agrees to defend and hold harmless Seller from and against any loss, damages or liability arising out of Buyer's access to, investigation of and equipment testing at the Leased Premises and the Miami Plant, including reasonable attorney's fees.  No investigation by the Buyer prior to or after the date of this Agreement shall diminish or obviate any of the representations, warranties, covenants or agreements of Seller contained in this Agreement.  The foregoing indemnification provisions will survive the expiration or termination of this Agreement and/or the Closing and not be merged therein.

4.2     Title.  Buyer confirms and acknowledges that Seller has made the Initial Title Reports available to Buyer, and that Seller has delivered on or before the Effective Date an additional Title Report to Buyer, and that Buyer may negotiate with the Title Insurer to obtain title insurance policies with respect to the Miami Plant (the "Title Policies") at or prior to Closing.  If any matter set forth in such additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present use or occupancy of the Miami Plant, Buyer may object to such matter by delivery of written notice to Seller by email to

johnjames@winn-dixie.com within five (5) Business Days of the Effective Date.  If Buyer timely notifies Seller of any valid objection to any such matter set forth in such additional Title Report, and if W-D Logistics fails or declines to cure any such objection, then Buyer will have the right to terminate this Agreement with no liability to Buyer, provided Buyer sends written notice to Seller no later than the earlier of (x) one Business Day following Buyer's receipt of notice from W-D Logistics that it will not cure such objection or (y) the Closing Date.  If Buyer terminates this Agreement pursuant to this <u>paragraph 4.2</u>, Seller and Buyer shall promptly direct Escrow Agent to refund the Deposit to Buyer, and the parties will be relieved of further obligations related to this Agreement.  If Buyer closes the purchase of the Assets with respect to the Miami Plant, then Buyer will be deemed to have waived any objection made or that could have been made under this <u>paragraph 4.2</u> to any matter and such matter shall constitute a Permitted Encumbrance.

4.3   <u>Surveys</u>.  In addition to any prior surveys or site plans that Seller has made available to Buyer by posting on the Merrill Website, Seller has delivered to Buyer, on or before the Effective Date, a new Survey of the land comprising the Leased Real Estate, prepared by a licensed land surveyor selected by Seller, and certified to Buyer, Buyer's lenders (if applicable) and Title Insurer.  If any matter set forth in the new Survey, individually or in the aggregate with other matters, interferes in a material and adverse way with the present use or occupancy of the affected Plant, Buyer may object to such matter by delivery of written notice to Seller by email to <u>johnjames@winn-dixie.com</u> within three Business Days of the Effective Date or, if later, within three Business Days of the date such new Survey is delivered to Buyer.  If Buyer timely notifies Seller of any valid objection to any such matter set forth in the new Survey, and if W-D Logistics fails or declines to cure any such objection, then Buyer will have the right to terminate this Agreement with no liability to Buyer, provided Buyer sends written notice to Seller no later than the earlier of (x) one Business Day following Buyer's receipt of notice from W-D Logistics that it will not cure such objection or (y) the Closing Date.  If Buyer terminates this Agreement pursuant to this <u>paragraph 4.3</u>, Seller and Buyer shall promptly direct Escrow Agent to refund the Deposit to Buyer, and the parties will be relieved of further obligations related to this Agreement.  If Buyer closes the purchase of the Assets with respect to the Leased Plant, then Buyer will be deemed to have waived any objection made or that could have been made under this <u>paragraph 4.3</u> to any matter and such matter shall constitute a Permitted Encumbrance.

4.4   <u>Environmental Reports</u>.  Buyer confirms and acknowledges that Seller has made available to Buyer for review on the Merrill Website prior environmental reports covering the Leased Real Estate.  Seller has delivered to Buyer, on or before the Effective Date, a new Environmental Report (Phase I) covering the land comprising the Leased Real Estate,

prepared by Golder Associates, Inc. or another reputable environmental consultant or engineer selected by Seller, and certified to Buyer and Buyer's lenders (if applicable).  If any matter set forth in the new Environmental Report, individually or in the aggregate with other matters, indicates the need to do further testing of the soil, ground water or other conditions upon, within or beneath the Leased Real Estate, indicates the presence of Hazardous Materials or Substances in quantities in excess of allowable limits under applicable law, or interferes in a material and adverse way with the present use or occupancy of the Miami Plant, Buyer may object to such matter by delivery of written notice to Seller by email to johnjames@winn-dixie.com within three Business Days of the Effective Date or, if later, the date such new Environmental Report is delivered to Buyer.  If Buyer timely notifies Seller of any valid objection to any such matter set forth in the new Environmental Report with respect to the Miami Plant, and if W-D Logistics fails or is declines to cure any such objection, then Buyer will have the right to terminate this Agreement with no liability to Buyer, provided Buyer sends written notice to Seller no later than the earlier of (x) three Business Days following Buyer's receipt of notice from W-D Logistics that it will not cure such objection or (y) the Closing Date.  If Buyer terminates this Agreement pursuant to this paragraph 4.4, Seller and Buyer shall promptly direct Escrow Agent to refund the Deposit to Buyer, and the parties will be relieved of further obligations related to this Agreement.  If Buyer closes the purchase of the Assets with respect to the Leased Plant, then Buyer will be deemed to have waived any objection made or that could have been made under this paragraph 4.4 to any matter and such matter shall constitute a Permitted Encumbrance.

5.0   **Representations and Warranties of Seller Relating to the Assets.**  To induce Buyer to purchase the Assets as provided above, each Seller represents and warrants to Buyer, severally and not jointly, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials, as follows:

5.1   On or prior to the Effective Date, (i) W-D Logistics represents and warrants that it has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website a copy of the Lease (including all amendments with respect thereto) relating to the Miami Plant as in effect on the Effective Date, and (ii) the indicated Seller represents and warrant that it has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website the following materials, to the extent such items currently exist and are in the possession or control of such Seller:

(a)   with respect to Winn-Dixie Stores, a list of material Equipment (which is attached as Exhibit G-2), with respect to the Miami Plant as reflected in such Seller's current records;

(b)     with respect to Winn-Dixie Stores, a list of any contracts for services (including utility services), supply contracts (other than those that may not be disclosed because of an obligation of confidentiality), and leases of equipment that relate to the Business but not to other assets or operations of Seller or any Affiliates; and

(c)     with respect to each Seller as to it, plans and other schematics for the Miami Plant;

it being understood that the materials described in clause (ii) of this paragraph 5.1 have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

5.2     At Closing, the Assets shall include the assets listed on Exhibit G-2.

6.0     **General Representations and Warranties of Seller.**  In order to induce Buyer to purchase the Assets as provided above, each Seller, as to itself but not as to the other, represents and warrants to Buyer, severally and not jointly, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials, as follows:

6.1     Such Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of its organization and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transactions contemplated hereunder. This Agreement and each of the closing documents to which such Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of such Seller.

6.2     No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery or performance by such Seller of this Agreement or any closing document to which such Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, and (iii) Bankruptcy Court Approval.

6.3     Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which such Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency,

reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.4     To the Knowledge of such Seller, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against such Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which such Seller, is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against such Seller) have a material adverse effect on the ability of such Seller to perform its obligations under this Agreement or the closing documents to which such Seller is or is to become a party.

6.5     There are no employees employed by such Seller with respect to the Miami Plant.

6.6     Such Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Broker.

6.7     The Lease as posted to the Merrill Website as of August 12, 2005, is a true, accurate and complete copy of the Lease and there are no amendments or modifications thereto.

7.0     **Buyer's Representations and Warranties.**   Buyer represents and warrants to Seller as follows:

7.1     Buyer is a cooperative corporation duly organized, validly existing and in good standing under the laws of the State of Florida, and has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required corporate action on behalf of Buyer.

7.2     No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated, except, if the Supply Agreement is entered into, such operational Permits as may be required by governmental entities as a condition to Buyer operating the Plant.

7.3     This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof by all parties thereto constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the

respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4    There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

7.5    Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

7.6    As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Base Purchase Price and any other amounts to be paid by it hereunder.

8.0    **Covenants of Seller.**    Seller hereby covenants for the benefit of Buyer as follows:

8.1    Seller will (i) use commercially reasonable efforts to maintain the Assets until the relevant Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and (ii) will not sell, dispose of, abandon or remove from the Miami Plant any of the Assets or agree to do so.   It is expressly acknowledged and understood that Seller will have no obligation to commence operations at the Miami Plant prior to or in preparation for the relevant Closing and the turnover of possession to Buyer of the Miami Plant.

8.2    Seller will until the Closing Date maintain property insurance on the Miami Plant for its full replacement value, subject to policy deductibles, and will

pay all sums due under the Lease, as well as otherwise comply with all obligations under the Lease.

8.3     If this Agreement is determined to be the Successful Bid as to the Miami Plant, Seller will use commercially reasonable efforts to obtain the entry of a Sale Order as to the Miami Plant.

9.0     **Covenants of Buyer.**  Buyer for itself hereby covenants for the benefit of Seller as follows:

9.1     Buyer will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11 of this Agreement.

9.2     From and after the Closing Date (and except as otherwise allowed under the Supply Agreement, if it is entered into), Buyer agrees not to use, or permit any Affiliate to use, any name or derivative thereof or any logos, trademarks or tradenames associated with the Business (including but not limited to "Superbrand Dairy Products" and derivatives thereof) or otherwise owned or used by Seller or its Affiliates (such intellectual property being referred to as "Seller's Retained Names") in any manner or form, oral or visual, and within five (5) days after Closing agrees to destroy any letterhead, stationery, materials, etc. containing Seller's Retained Names.

9.3     Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

9.4     If this Agreement is determined to be the Successful Bid as to the Miami Plant, then Buyer will use commercially reasonable efforts to obtain the entry of a Sale Order as to the Miami Plant, including by providing Adequate Assurance Information (which shall include without limitation a Declaration substantially in the form of Exhibit K) to Seller, the Bankruptcy Court, Lessor and parties to the Assumed Contracts, if any, and others as may be reasonably requested.

10.0    **Conditions Precedent to Buyer's Obligations.**  The obligations of Buyer under this Agreement as to the Miami Plant are subject to the satisfaction on or before the relevant Closing Date, or such other date as herein provided, of each of the following conditions (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

10.1    Seller will have performed in all material respects all of its covenants contained in this Agreement that are not qualified by reference to a materiality standard, and Seller will have performed in all respects all of its covenants contained in this Agreement that are qualified by reference to a materiality standard.  Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of <u>paragraph 5.1</u> of this Agreement), all of Seller's representations and warranties contained in this Agreement that are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, and all of Seller's representations and warranties contained in this Agreement that are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date.

10.2    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to the Miami Plant will be in effect.

10.3    The Sale Order with respect to the Miami Plant shall have been entered by the Bankruptcy Court (i) authorizing the sale of the Assets to Buyer free and clear of all liens, encumbrances and interests of any kind or nature, other than the Permitted Encumbrances, to the extent provided under Section 363(f) of the Bankruptcy Code, (ii) finding that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to all of the protection afforded thereby, (iii) and authorizing the assumption and assignment of the Lease to Buyer, and (iv) is otherwise substantially in the form posted on the Merrill Website and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior consent of Buyer, which shall not be unreasonably withheld.

10.4    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied by the Outside Date, then Buyer shall have the right to terminate this Agreement pursuant to <u>paragraph 15.1(a)(iv)</u> of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>paragraph 16</u> of this Agreement rather than pursuant to <u>paragraph 15.1 (a)(iv)</u> of this Agreement.

11.0    **<u>Conditions Precedent to Seller's Obligations.</u>**  The obligations of Seller under this Agreement as to the Miami Plant are subject to the satisfaction on or before

the relevant Closing Date, or such other date as herein provided, of each of the following conditions (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

11.1    Buyer will have performed in all material respects all of its covenants contained in this Agreement that are not qualified by reference to a materiality standard, and Buyer will have performed in all respects all of its covenants contained in this Agreement that are qualified by reference to a materiality standard.    All of Buyer's representations and warranties contained in this Agreement that are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, and all of Buyer's representations and warranties contained in this Agreement that are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date.

11.2    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to the Miami Plant will be in effect.

11.3    The Sale Order with respect to the Miami Plant shall have been entered by the Bankruptcy Court (i) authorizing the sale of the Assets to Buyer free and clear of all liens, encumbrances and interests of any kind or nature, other than Permitted Encumbrances, (ii) finding that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to all of the protection afforded thereby, (iii) and authorizing the assumption and assignment of the Lease to Buyer, and (iv) is otherwise substantially in the form posted on the Merrill Website and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior consent of Seller, which shall not be unreasonably withheld.

11.4    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller shall have the right to terminate this Agreement pursuant to paragraph 15.1(a)(v) of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to paragraph 15.1(a)(v) of this Agreement.

12.0   **Loss by Fire or Other Casualty; Condemnation**.  In the event that, prior to a Closing, the Miami Plant or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the real property associated with the Miami Plant, Buyer will have the right, exercisable by giving notice of such decision to the other within 5 Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, and thereafter none of the parties will have any further rights or obligations hereunder; provided, however, that, if Buyer is not in breach of this Agreement, Buyer will be entitled to the return from the Escrow Agent of the Deposit.  If Buyer does not timely exercise its right of termination with respect to the Miami Plant and the Miami Plant is sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

13.0   **Possession**.  Seller will turn over to Buyer exclusive physical possession of the Assets associated with the Miami Plant (including, to the extent in Seller's possession, control or custody) all keys, combinations to safes, security codes and passwords, on the Closing Date upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Buyer to transfer to Seller, the entire Base Purchase Price.

14.0   **Closing.**

14.1   The Closing for the Miami Plant will occur on the Closing Date.  The Closing will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

14.2   On or before the Escrow Date for the Miami Plant, Seller will, subject to the conditions contained in paragraph 11 of this Agreement, deliver the following ("Seller's Escrowed Items") to Escrow Agent:

(i)    The Lease Assignment executed by W-D Logistics;

(ii)   The Contract Assignment, if any, executed by Seller (relating to the Assumed Contracts and certain Assumed Liabilities);

(iii)  The Bill of Sale executed by Winn-Dixie Stores;

(iv)   The Supply Agreement executed by Winn-Dixie Stores, if applicable;

(v)    Two counterparts of each Closing Statement executed by the applicable Seller;

(vi)     An affidavit substantially in the form of <u>Exhibit L</u>, made under penalty or perjury and duly executed by each Seller, that provides such Seller's United States taxpayers identification number and states that such Seller is not a foreign person for purposes of Section 1445 of the Code; and

(vii)    Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered.

Buyer may waive compliance by Seller as to any of the foregoing items in a manner permitted by <u>paragraph 17.6</u> of this Agreement.  Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent, will not be deemed to be an acknowledgement by Seller that the conditions of <u>paragraph 11</u> of this Agreement have been fulfilled or waived until Seller Delivery Confirmation.  "<u>Seller Delivery Confirmation</u>" will mean the later of (A) the relevant Escrow Date and (B) Seller's delivery to Escrow Agent, by original counterpart or telecopy, of Seller's written confirmation that the conditions of <u>paragraph 11</u> of this Agreement have been fulfilled or waived.  In any event such delivery and notice shall be subject to any circumstances that may affect such conditions between Seller Delivery Confirmation and the related Closing Date.

14.3    On or before the Escrow Date for the Miami Plant, Buyer will, subject to the conditions contained in <u>paragraph 10</u> of this Agreement, deliver the following ("<u>Buyer's Escrowed Items</u>") to Escrow Agent:

(i)      The Lease Assignment executed by Buyer (relating to the Leases);

(ii)     The Contract Assignment executed by Buyer (relating to the Assumed Contracts and the Assumed Liabilities);

(iii)    The Supply Agreement executed by Buyer (if applicable);

(iv)     Two counterparts of each Closing Statement executed by Buyer;

(v)      Any other document, Instruments or agreement called for hereunder for delivery by Buyer that has not previously been delivered; and

(vi)     All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to <u>paragraph 3</u> of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by <u>paragraph 17.6</u> of this Agreement. Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will be deemed to be an acknowledgement by Buyer that the conditions of <u>paragraph 10</u> of this Agreement have been fulfilled as of the Escrow Date, subject to any circumstances that may

affect such conditions between the Escrow Date and the related Closing Date.

14.4    At the Closing, Seller will, subject to the conditions contained in <u>paragraph 11</u> of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in <u>paragraph 10</u> of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items and the Base Purchase Price.

14.5    Except as provided in <u>paragraph 16</u> of this Agreement, at or before Closing, (i) Seller will pay Seller's Closing Costs; and (ii) Buyer will pay Buyer's Closing Costs.

15.0    **<u>Termination</u>**.

15.1    <u>Termination</u>.

(a)        This Agreement may be terminated, and the transactions contemplated hereby abandoned only as follows:

(i)        by written consent of Seller and Buyer, in which case the applicable Deposit shall be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the Deposit, then Escrow Agent shall pay over the Deposit to Seller as consideration for Seller's agreement to terminate this Agreement with respect to such Plant or Plants);

(ii)        at the election of Seller if and to the extent permitted under <u>paragraph 16.1</u> of this Agreement, in which case the Deposit shall be disbursed as provided in such <u>paragraph 16.1</u>;

(iii)        at the election of Buyer if and to the extent permitted under <u>paragraph 16.2</u> of this Agreement, in which case the Deposit shall be disbursed as provided in such <u>paragraph 16.2</u>;

(iv)        at the election of Buyer if any of the conditions set forth in <u>paragraph 10</u> of this Agreement has not been satisfied or waived by Buyer by the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>paragraph 16</u> of this Agreement rather than pursuant to this <u>paragraph 15.1(a)(iv)</u>;

(v)     at the election of Seller if any of the conditions set forth in paragraph 11 of this Agreement has not been satisfied or waived by Seller on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(v);

(vi)    at the election of Buyer as provided in paragraph 12 of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this Agreement rather than pursuant to this paragraph 15.1(a)(vi);

(vii)   at the election of Seller, (A) if this Agreement is not the Successful Bid with respect to the Miami Plant or (B) if the Bankruptcy Court denies Bankruptcy Court Approval with respect to the Miami Plant, in each of which cases Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with paragraph 16.2 of this Agreement rather than pursuant to this paragraph 15.1(a)(vii); or

(viii)  at the election of Buyer or Seller if the Closing will not have occurred on or before the Outside Date for any reason other than as contemplated in paragraphs 15.1(a)(i) through 15.1(a)(vii) of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided that neither Buyer nor Seller, as the case may be, will be entitled to terminate this Agreement pursuant to this paragraph 15.1(a)(viii) if such party's breach of this Agreement has been the cause of, or resulted in, the failure of the relevant Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with

paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(viii).

(b)     If this Agreement is terminated for any reason, all materials provided by Seller to Buyer and all materials relating to the relevant Assets obtained by Buyer and all copies of any such materials will be delivered to Seller within 5 Business Days following termination. This paragraph shall not in any way limit Buyer's duties to Seller or Winn-Dixie Stores under the Confidentiality Agreement.

(c)     Upon any termination of this Agreement with respect to the Miami Plant pursuant to paragraphs 15.1(a)(ii) through (viii) of this Agreement, each party will retain those rights (if any) it may have under paragraph 16 of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

(d)     If this Agreement is terminated pursuant to paragraph 15.1(a)(vii)(A) of this Agreement and Buyer has not breached this Agreement, upon the Closing, should it occur, of the sale of the Assets to the bidder with the Successful Bid, Seller shall pay or cause to be paid to Buyer the sum of $157,068 as an agreed-upon fee for all of Buyer's costs and expenses related to entering into this Agreement (the "Break-up Fee").  Seller acknowledges and agrees that the Break-up Fee is a fair and reasonable estimate of the cost to Buyer for the time, effort and expenses of Buyer.

16.0    **Default and Remedies**.

16.1    Buyer's Default.  If the Closing as contemplated under this Agreement is not consummated due to Buyer's breach of this Agreement, or if this Agreement is terminated due to Buyer's breach of this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such breach, (A) to terminate this Agreement), and (B) to receive the Deposit (the "Liquidated Deposit") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof.   Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity. Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages.  The right to receive the Liquidated Deposit as full liquidated damages is Seller's only remedy in the event of breach of this Agreement by Buyer, and Seller hereby waives and releases any right to (and Seller hereby covenants that it shall not) sue Buyer: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit.

Buyer hereby waives and releases any right to (and hereby covenants that it shall not) seek or claim a refund of the Liquidated Deposit (or any part thereof) on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages.  This <u>paragraph 16.1</u> is subject to <u>paragraph 16.4</u> of this Agreement.

16.2    <u>Seller's Default</u>.  If the sale of the Miami Plant as contemplated under this Agreement is not consummated due to Seller's breach of this Agreement, or if this Agreement is terminated due to Seller's breach of this Agreement, then Buyer shall be entitled, as its only remedies for such breach, to either (a) receive the return of the Deposit, which return shall operate to terminate this Agreement and release Seller from any and all liability under this Agreement, or (b) seek specific performance of Seller's obligations under this Agreement. Buyer expressly waives any right to seek or collect any damages, including any actual, consequential, speculative, remote or punitive damages.  This <u>paragraph 16.2</u> is subject to <u>paragraph 16.4</u> of this Agreement.

16.3    <u>Notice of Default; Opportunity to Cure</u>.  Neither Seller nor Buyer shall be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within 5 Business Days after receipt of such notice; <u>provided, however</u>, that this <u>paragraph 16.3</u> (i) shall not be applicable to Buyer's failure to deliver any Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Escrow Date or the Closing Date for any Plant or Plants and, accordingly, (ii) shall not have the effect of extending the Closing Date or the due date of any Deposit.

16.4    <u>Recoverable Damages</u>.  In no event shall the provisions of <u>paragraphs 16.1 and 16.2</u> of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying  party due to, a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreement and <u>paragraphs 16.5 and 17.3</u> of this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees or expenses under the Confidentiality Agreement and <u>paragraphs 3.3.3 and 3.3.8</u> of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs.  In addition, if this Agreement is terminated for any reason with respect to any one or more Plants or in its entirety, and Buyer or any Affiliate of Buyer asserts any claim or right to any Asset that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to any Asset, then Seller shall have all rights and remedies available at law or in equity

with respect to such assertion by Buyer and any loss, damage or other consequence suffered by Seller as a result of such assertion.

16.5    <u>Buyer Indemnification of Seller</u>.  Buyer shall indemnify and save and hold harmless Seller and its Affiliates and representatives from and against any and all costs, losses, liabilities, damages, lawsuits, deficiencies, claims and expenses (whether or not arising out of third-party claims) including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (herein, the "<u>Damages</u>") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by Buyer (including any payment obligation herein), or the inaccuracy of any representation made by Buyer in or pursuant to this Agreement or other transaction documents, or (b) any liability, obligation or commitment of any nature (absolute, accrued, contingent or otherwise) of Buyer that is due to or arises in connection with Buyer's acts or omissions prior to, on or after the Closing Date, including any claim, liability, or obligation that is assumed by Buyer pursuant to this Agreement or in any transaction documents signed by Buyer.  Notwithstanding the foregoing, Buyer shall not be liable for any matter (i) with respect to which Seller has not given Buyer written notice within a reasonable period of time following Seller's receiving written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a material adverse effect on Buyer), or (ii) that is due Seller's acts or omissions.  The provisions of this <u>paragraph 16.5</u> shall cover all obligations and liabilities of whatsoever kind, nature or description relating, directly or indirectly, to product liability, third party litigation or third party claims against Buyer or Seller in connection with, arising out of, or relating to the Assets.  This <u>paragraph 16.5</u> shall survive the Closings or earlier termination of this Agreement.

17.0    **<u>Miscellaneous</u>.**

17.1    <u>Notices</u>. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this <u>paragraph 17.1</u> and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal

business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Chief Financial Officer
Telefax No. 904 783 5646
e-mail: *bennettnussbaum@winn-dixie.com*

With a copy to:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Office of General Counsel
Telefax No. 904 783 5651
e-mail: *larryappel@winn-dixie.com*

and

Smith, Gambrell & Russell, LLP
50 N. Laura Street, Suite 2600
Jacksonville, Florida  32202
Attn:  Douglas G. Stanford
Telefax No. 904-598-6226
e-mail:  *dgstanford@sgrlaw.com*

If to Buyer:

Mr. Calvin Covington
Chief Executive Officer
Southeast Milk, Inc.
1950 Southeast Highway 484
Belleview, Florida 34420
Telefax No. 352 307-5522
e-mail:  *ccovington@southeastmilk.org*

With copy to:

Peter G. Latham, Esq.
Gronek & Latham, LLP
390 North Orange Avenue
Suite 600
Orlando, Florida  32801
Telefax No. 407-481-5801
e-mail:  *platham@groneklatham.com*

or such other address as any party may from time to time specify by notice to the other.

17.2    <u>Notice of Certain Inquiries</u>.  If any party is contacted, whether before or after any Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to any transactions contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

17.3    <u>Brokers and Finders</u>.  The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Agreement other than that due by Seller to Seller's Broker.  Seller agrees to pay all fees and commissions claimed by Seller's Broker as a result of the transaction contemplated by this Agreement, which fees and commissions will be considered payable with respect to the Miami Plant only if, as and when the relevant Closing contemplated by this Agreement occurs.  Except for Seller's Broker, neither Seller nor Buyer has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement.  Seller and Buyer hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts, said indemnifications by Seller and Buyer to survive the Closings or earlier termination of this Agreement.

17.4 <u>Successors and Assigns</u>.  This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

17.5 <u>Assignment</u>.    Except for an assignment to a subsidiary controlled by Southeast Milk, Inc., wherein Southeast Milk, Inc. continues to be liable for the Buyer's obligations, Buyer may not assign or delegate any duties or obligations under this Agreement without the prior written consent of Seller, which consent may be granted or withheld in the sole discretion of Seller.  No assignment by Buyer in accordance with this provision shall release or relieve Buyer of its liabilities and obligations hereunder, which shall remain in full force and effect notwithstanding any such assignment.

17.6 <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written Instruments executed by Seller and Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to Bankruptcy Court Approval, if applicable.

17.7 <u>Governing Law</u>.    The application and effect of this Agreement will be governed by and construed in accordance with the laws of the State of Florida; the application and effect of this Agreement as to any matter of the rights and obligations of the parties generally will be governed by and construed in accordance with the laws of the State of Florida.

17.8 <u>Merger of Prior Agreements</u>.    This Agreement supersedes all prior agreements and understandings between the parties hereto, other than the Confidentiality Agreement, and (except for the Confidentiality Agreement) constitutes the entire agreement of the parties with respect to the matters contained herein.  **BUYER ACKNOWLEDGES ITS OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT CONTINUE AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT**.

17.9 <u>Survival</u>.  Seller's representations, warranties, covenants and obligations under this Agreement shall not survive the Closing and shall have no further force or effect after the Closing, except that those covenants of Seller under <u>paragraphs 3.3.2 and 17.3</u>  of this Agreement that are expressly provided to be performed after the Closing shall survive.  All representations, warranties, covenants of obligations of Buyer under this Agreement shall survive the Closing.  In addition, all representations, covenants and obligations of Buyer under the Confidentiality Agreement shall survive the termination or consummation of this Agreement.

17.10 <u>Time is of the Essence</u>.  Time is of the essence of this Agreement.

17.11 <u>No Recordation</u>.  This Agreement will not be recorded in any public office or court other than as part of the Bankruptcy Court Approval process except that upon default it may be presented to a court of competent jurisdiction.

17.12 <u>Radon Gas</u>. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county health department.

18.0 **<u>Escrow Agent</u>**.

18.1 <u>Duties</u>.  By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent.  Upon its receipt of funds from Buyer, Escrow Agent will receive and hold such funds, and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.

18.2 <u>Indemnity</u>.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent.  If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all loss, cost, damage, liability or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct.  If the indemnity amounts payable hereunder result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts.  Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.

18.3 <u>Dispute</u>.  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor.  In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Buyer is not the prevailing party in such action or proceeding.  If there is no prevailing party, Seller and Buyer each shall be responsible for one-half of such costs and fees.

18.4    <u>Execution by Escrow Agent</u>.  Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this <u>paragraph 18.</u>    Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this <u>paragraph 18</u> shall not be required.

18.5    <u>Role as Counsel</u>.  The parties acknowledge that Escrow Agent also serves as special real estate counsel to Seller.  In the event of a dispute between Seller and Buyer concerning this Agreement or the Assets, Escrow Agent may continue to serve both in its capacity as counsel to Seller and in its capacity as Escrow Agent, it being understood that Escrow Agent's duties and obligations as Escrow Agent are purely ministerial in nature.

19.0    **Waiver of Jury Trial**.  Buyer and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transactions contemplated herein undesirable.  Accordingly, Buyer and Seller each knowingly, voluntarily and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Agreement or the transactions contemplated herein.

20.0    **Consent to Jurisdiction.** **THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.**

21.0    Buyer and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in <u>paragraph 17.1</u> of this Agreement shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above.  Each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.  If a court finds that subject-matter jurisdiction is not available in the Bankruptcy Court, Buyer and Seller hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of the U.S. District Court for the Middle District of Florida, Jacksonville Division, or if such court shall not have jurisdiction, then to the appropriate courts of the State of Florida sitting in Duval County, Florida.

22.0 **Disclaimers and Waivers**.

22.1 **NO RELIANCE ON DOCUMENTS**. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN **PARAGRAPHS 5 AND 6** HEREOF (THE "**CONTRACT WARRANTIES**"), SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY OR ON BEHALF OF SELLER TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY. BUYER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE) ARE PROVIDED TO BUYER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY BUYER SHALL BE AT THE SOLE RISK OF BUYER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER ACKNOWLEDGES AND AGREES THAT (A) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (B) BUYER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED BY SELLER OR ANY AFFILIATE TO BUYER, BUT RATHER WILL RELY ON ITS OWN INSPECTIONS AND INVESTIGATIONS OF THE ASSETS AND ANY REPORTS COMMISSIONED BY BUYER WITH RESPECT THERETO, AND (C) NEITHER SELLER, ANY AFFILIATE OF SELLER NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL HAVE ANY LIABILITY TO BUYER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

22.2 **Disclaimers**. EXCEPT FOR THE CONTRACT WARRANTIES, BUYER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS

WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS.  BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "<u>AS IS, WHERE IS, WITH ALL FAULTS</u>".  BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND NEITHER SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER OR ANY AFFILIATE, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE, OTHER THAN THE CONTRACT WARRANTIES.

BUYER REPRESENTS TO SELLER THAT BUYER HAS CONDUCTED SUCH INVESTIGATIONS OF THE ASSETS, INCLUDING BUT NOT LIMITED TO THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS BUYER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE ASSETS AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE ASSETS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION), AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN THE CONTRACT WARRANTIES.  UPON CLOSING, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS, AND BUYER, UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER (AND SELLER AND SELLER'S AFFILIATES' RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT OR UNDER ANY ENVIRONMENTAL LAW), LOSSES, DAMAGES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE), LOSSES, DAMAGES,

LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AND SELLER'S AFFILIATES (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES AND AGENTS) AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE ASSETS.

BUYER AGREES THAT SHOULD ANY INVESTIGATION, CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION) ON OR RELATED TO THE ASSETS BE REQUIRED AFTER THE DATE OF CLOSING, NEITHER SELLER NOR ANY AFFILIATE SHALL HAVE ANY LIABILITY TO BUYER TO PERFORM OR PAY FOR SUCH INVESTIGATION, CLEAN-UP, REMOVAL OR REMEDIATION, AND BUYER EXPRESSLY WAIVES AND RELEASES ANY CLAIM TO THE CONTRARY.

BUYER FURTHER ACKNOWLEDGES THAT (1) THE CONTRACT WARRANTIES AS TO ANY PLANT SHALL NOT SURVIVE THE CLOSING FOR SUCH PLANT, AND SHALL HAVE NO FURTHER FORCE OR EFFECT AFTER THE CLOSING FOR SUCH PLANT AND (2) THE LIABILITY OF SELLER UNDER OR WITH RESPECT TO THE CONTRACT WARRANTIES SHALL BE LIMITED TO THE EXPRESS REMEDIES OF BUYER SET FORTH IN THIS AGREEMENT.

BUYER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY BUYER, AND BUYER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OF BUYER'S CHOICE WITH REGARD TO THE TERMS OF SUCH DISCLAIMERS, WAIVERS AND RELEASES.  BUYER ACKNOWLEDGES AND WARRANTS THAT BUYER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS AND RELEASES IS FREE AND VOLUNTARY.

22.3    Effect and Survival of Disclaimers.  Seller and Buyer acknowledge that the provisions of paragraph 22 are an integral part of the transactions contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller would not enter into this Agreement but for the provisions of paragraph 22.  Seller and Buyer agree

that the provisions of <u>paragraph 22</u> shall survive Closing or any termination of this Agreement.

22.4   <u>Obligations Several and Not Joint</u>**.**   All representations, warranties, covenants and agreements of Seller hereunder are several and not joint.

[Signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

**SELLER:**

**WINN-DIXIE STORES, INC.,** a Florida corporation

By:_____
    Name:
    Title: Vice President

**WINN-DIXIE LOGISTICS, INC.,** a Florida corporation:

By:_____
    Name:
    Title: Vice President

**BUYER:**

**SOUTHEAST MILK, INC,**
a Florida cooperative corporation:

By:_____
    Name: Calvin Covington
    Title:   Chief Executive Officer

Acknowledged and agreed this ___ day of _____, 2005 for the limited purposes set forth in paragraph 18 of this Agreement:

**ESCROW AGENT:**

Smith, Gambrell & Russell, LLP

By: _____
Name:  Douglas G. Stanford
Title: Partner

**Exhibits**

| | |
|---|---|
| Exhibit A-1 | Form of Lease Assignment |
| Exhibit A-2 | Form of Contract Assignment |
| Exhibit B | [Intentionally Omitted} |
| Exhibit C | Allocation Schedule |
| Exhibit D | Assumed Contracts |
| Exhibit E | Form of Bill of Sale |
| Exhibit F-1 | Form of Closing Statement—Winn-Dixie Stores |
| Exhibit F-2 | Form of Closing Statement—W-D Logistics |
| Exhibit G-1 | Excluded Equipment |
| Exhibit G-2 | List of Equipment |
| Exhibit H | Leased Real Estate |
| Exhibit I | Permitted Encumbrances |
| Exhibit J | Form of Sale Order |
| Exhibit K | Form of Declaration |
| Exhibit L | Form of Title Affidavit |