## Miami Dairy Facility Purchase Agreement

### LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A-1 | Form of Lease Assignment |
| Exhibit A-2 | Form of Assignment and Assumption Agreement |
| Exhibit B | [Intentionally Omitted] |
| Exhibit C | Allocation Schedule |
| Exhibit D | Assumed Contracts |
| Exhibit E | Form of Bill of Sale |
| Exhibit F-1 | Closing Statement – Winn-Dixie Stores |
| Exhibit F-2 | Closing Statement – Winn-Dixie Logistics |
| Exhibit G-1 | Excluded Equipment |
| Exhibit G-2 | List of Equipment |
| Exhibit H | Leased Real Estate |
| Exhibit I | Permitted Encumbrances |
| Exhibit J | Form of Sale Order |
| Exhibit K | Declaration |
| Exhibit L | Title Affidavit |

**EXHIBIT A-1**
**to Asset Purchase Agreement**

Form of Lease Assignment

**THIS ASSIGNMENT AND ASSUMPTION OF LEASE** (this "Assignment") is made as of this _____ day of _____, 2005 (the "Effective Date"), by and between

**WINN-DIXIE LOGISTICS, INC.**, a Florida corporation ("Assignor"),

and

**SOUTHEAST MILK, INC.**, a Florida cooperative corporation ("Assignee").

**R E C I T A L S:**

A.   Assignor is the successor tenant, and owner and holder, of a leasehold interest in and to the premises described on attached Exhibit A (the "Premises") under that certain Lease Agreement dated as of August 10, 1999, by and between ZSF/WD Opa Locka, LLC, a Delaware limited liability company, as landlord ("Landlord"), and Winn-Dixie Stores, Inc., as tenant, a memorandum of which is recorded in Official Records Book 18796, Page 547; re-recorded in Official Records Book 18943, Page 1161; and Official Records Book 19015, Page 4148; as affected by Subordination, Non-Disturbance and Attornment Agreement, recorded in Official Records Book 18796, Page 600; re-recorded in Official Records Book 18943, Page 1214; and Official Records Book 19015, Page 4196, and as assigned to Assignor by Assignment of Lease dated _____ , and evidenced by Notice of Assignment of Lease recorded in Official Records Book____, page _____, all of the public records of Miami-Dade County, Florida (collectively, the "Lease"), a true and complete copy of which is attached hereto as Exhibit B.

B.   Assignor and Assignee have entered into a certain Asset Purchase Agreement dated as of _____, 2005 (the "Purchase Agreement"), providing for the purchase and sale of certain assets of Assignor.

C.   Pursuant to the Purchase Agreement, Assignor has agreed to assign to Assignee, and Assignee has agreed to assume from Assignor, all of Assignor's right, title and interest as tenant under the Lease and in the Premises, all subject to and in accordance with the terms of the Lease, the Purchase Agreement and this Assignment.

**NOW, THEREFORE**, in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.   **RECITALS; DEFINITIONS; EFFECTIVE DATE**.  The foregoing Recitals are true and correct and are a material part of this Assignment.  Capitalized terms not

2

otherwise defined in this Assignment will have the meanings assigned to such terms in the Lease. This Assignment will be effective as of the Effective Date.

2.    **ASSIGNMENT**.  Assignor hereby assigns, transfers, and conveys unto Assignee all of Assignor's right, title, interest and obligation as tenant or lessee in and to the Lease and all of the rights, benefits and privileges of the tenant or lessee thereunder, subject only to certain reserved rights and obligations as otherwise set forth in this Assignment.

3.    **ASSUMPTION**.    Assignee hereby accepts the aforesaid assignment and assumes and agrees to pay and perform all liabilities and obligations of the tenant or lessee that arise under the Lease from and after the Effective Date, and Assignee hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignor from and against all liabilities and obligations of the tenant or lessee that arise under the Lease on or after the Effective Date.

4.    **ACKNOWLEDGMENT OF LEASE TERMS; RELEASE OF ASSIGNOR**.

a.    Assignee acknowledges the specific terms, covenants and conditions of the Lease, and agrees to be bound thereby to the same extent as if Assignee was an original party tenant to the Lease; provided, however, that Assignee shall not be deemed to have made any warranties or representations of Assignor contained in Sections 20.01(f), (g) and (l) of the Lease.  Assignee further acknowledges that, pursuant to the terms of that certain Order _____, dated _____, 2005, issued by the United States Bankruptcy Court for the Middle District of Florida under case no. 05-03817 (the "Order"), Assignor and Winn-Dixie Stores, Inc., as predecessor lessee under the Lease, are released and discharged from all obligations and liabilities that may arise or accrue under the Lease from and after the Effective Date.  In furtherance of the foregoing, except as otherwise provided herein, from and after the Effective Date, the term "Lessee" as defined in the Lease will mean and refer solely to Assignee.

b.    Assignee acknowledges that the Lease, the leasehold estate, and all rights of Assignee, as Lessee thereunder, are and will be subject and subordinate to the Mortgage and to all renewals, modifications, consolidations, replacements and extensions of the Mortgage.  Assignee agrees to execute and deliver a commercially reasonable subordination, nondisturbance and attornment agreement with Lessor and Lender.

5.    **REPRESENTATION OF ASSIGNOR**.  A true and complete copy of the Lease is attached hereto as Exhibit B.

6. **REPRESENTATION OF ASSIGNEE**.

Assignee is not (i) a tax-exempt entity (within the meaning of Section 168(h) of the Code) or (ii) a debtor or debtor-in-possession in a voluntary or involuntary bankruptcy proceeding at the commencement of this Assignment.

7. **NOTICES**.  All notices, requests, demands, and other communications required or permitted to be given under this Assignment will be in writing and sent to the address(es) set forth below.  Each communication will be deemed duly given and received: (a) as of the date and time the same is personally delivered with a receipted copy; (b) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested; (c) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same; or (d) if given by telefax, when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received  by the transmitting party if not during normal business hours for the recipient.

> If to Assignor:       Winn-Dixie Logistics, Inc.; Re:  Miami Dairy Facility
> 5050 Edgewood Court
> Jacksonville, Florida  32254
> Attention: _____
> Telefax No.: 904 _____
>
> With a copy to:    Winn-Dixie Stores, Inc.
> 5050 Edgewood Court
> Jacksonville, Florida  32254
> Attention: General Counsel
> Telefax No.: 904 783 5138

or to such other address or telefax number as Assignor may direct from time to time.

> If to Assignee:       _____
> _____
> _____
> Attention: _____
> Telefax No.:_____
>
> With a copy to:    _____
> _____
> _____
> Attention: _____
> Telefax No.:_____

or to such other address or telefax number as Assignee may direct from time to time.

8.     **NOTICE OF ASSIGNMENT**.  On the Effective Date, Assignor and Assignee will execute and deliver a Notice of Assignment of Lease (in a mutually acceptable form) and record the same in the recording office of the county in which the Premises is located, for the purpose of placing third parties on notice of Assignor's assignment to Assignee of Assignor's right, title and interest as tenant or lessee in and to the Lease.

9.     **FURTHER ASSURANCES**.  Assignee agrees to execute such instruments and other documents and provide such further assurances as Lessor and Indenture Trustee reasonably may request to ensure that this Assignment and Assignee's leasehold interest in the Premises pursuant to this Assignment and the Lease is and remains subject to the Assignment of Lease and the other Debt Documents and is enforceable.

10.     **RADON DISCLOSURE**.  Assignee acknowledges the following Radon Gas disclosures required by Florida Statute 404.056, Subsection 8:

11.     **RADON GAS**:  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding Radon and Radon testing may be obtained from county public health units.

[END OF PAGE]

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment as of the Effective Date.

Signed, sealed and delivered
in the presence of:

**ASSIGNOR:**

**WINN-DIXIE LOGISTICS, INC.**, a Florida corporation

_____
Name:_____

By:_____
Name: _____
Title: Vice President

_____
Name:_____

[CORPORATE SEAL]

[ADD ACKNOWLEDGMENT PER FLORIDA REQUIREMENTS]

[SIGNATURES CONTINUED ON FOLLOWING PAGE]

Signed, sealed and delivered
in the presence of:

**ASSIGNEE:**

_____, a
_____

_____
Name:_____

By:_____
Name:_____
Title: _____

_____
Name:_____

[SEAL]

[ADD ACKNOWLEDGMENT PER FLORIDA REQUIREMENTS]

Schedule of Exhibits

Exhibit A – Legal Description of Premises
Exhibit B – Lease Agreement

**Exhibit A-2**
**to Asset Purchase Agreement**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Agreement") is made and entered into effective as of _____, 2005 by and between **WINN-DIXIE STORES, INC.,** a Florida corporation ("Winn-Dixie Stores"), **WINN-DIXIE LOGISTICS, INC.**, ("Logistics", and together with Winn-Dixie Stores, "Assignor"), and **SOUTHEAST MILK, INC.,** a Florida cooperative corporation ("Assignee").  Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to them in the Purchase Agreement (as defined below).

**WITNESSETH**:

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement, dated as of _____ 2005, (the "Purchase Agreement"); and

WHEREAS, pursuant to and as a condition of the transactions contemplated by the Purchase Agreement, Assignor desires, by this instrument, to assign and transfer all of its rights, title and interest in and to the Assets (other than the Leased Real Estate) to Assignee, pursuant to the Purchase Agreement and Assignee desires to assume the Assumed Liabilities (other than the Lease).

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and conditions set forth below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.1    Assignment of Assets.  Subject to the terms of the Purchase Agreement, Assignor hereby sells, assigns, transfers, conveys and delivers to Assignee, its successors and assigns, forever, of all of its rights, title and interest in, to and under all of the Assets (other than the Leased Real Estate), and Assignee hereby accepts the sale, assignment, transfer, conveyance and delivery of such Assets.  Notwithstanding anything to the contrary contained herein, the Assets transferred hereby shall not include the Excluded Assets.

1.2    Assumption.  Subject to the terms of the Purchase Agreement, Buyer hereby assumes and agrees to pay, perform and discharge as and when they become due, the Assumed Liabilities.  Notwithstanding anything to the contrary contained herein, the Assumed Liabilities shall not include the Excluded Liabilities.

1.3    Relationship to the Purchase Agreement.  This Agreement is in all respects subject to the Purchase Agreement and is not intended in any way to supersede, limit, qualify, enlarge or modify any provision thereof.  To the extent any

conflict or inconsistency exists between the provisions of this Agreement and the Purchase Agreement, the provisions of the Purchase Agreement shall control.

1.4    <u>Benefits and Binding Effect</u>.  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their successors and assigns.  This Agreement shall not confer any rights or benefits upon any person or entity other than the parties hereto and their respective successors and assigns.

1.5    <u>Enforcement of Certain Rights</u>.  Nothing expressed or implied herein is intended, or shall be construed, to confer upon or give any Person other than the parties hereto, and their successors or permitted assigns, any right, remedy, obligation or liability under or by reason of this Agreement, or result in such Person being deemed a third-party beneficiary hereof.

1.6    <u>Amendment</u>.  This Agreement shall not be modified or amended except by written instrument executed by each party hereto.

1.7    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Florida (regardless of the laws that might otherwise govern under applicable principles of conflicts laws thereof), as to all matters, including matters of validity, construction, effect, performance and remedies

1.8    <u>Counterpart Execution</u>.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

ASSIGNOR:

WINN-DIXIE LOGISTICS, INC., a Florida corporation


By: _____
Name:
Title:

WINN-DIXIE STORES, INC., a Florida corporation


By: _____
Name:
Title:


ASSIGNEE:

SOUTHEAST MILK, INC., a Florida cooperative corporation


By: _____
Name:
Title:

**Exhibit B**
**to Asset Purchase Agreement**

[Intentionally Omitted]

**Exhibit C**
**to Asset Purchase Agreement**

<u>Allocation Schedule</u>

Winn-Dixie Stores, Inc.                    $2,190,000

Winn-Dixie Logistics, Inc.                 $3,066,000

**Exhibit D**
**to Asset Purchase Agreement**

<u>Assumed Contracts</u>

None

**EXHIBIT E**
**to Asset Purchase Agreement**

**<u>Form of  Bill of Sale</u>**


**WINN-DIXIE STORES, INC.**, a Florida corporation ("<u>Seller</u>"), in consideration of the mutual covenants set forth in that certain Asset Purchase Agreement dated _____, 2005, among Southeast Milk, Inc., a Florida cooperative corporation ("<u>Buyer</u>"), and Seller (the "<u>Agreement</u>"), does hereby grant, bargain, transfer, sell, assign and convey unto Buyer all of Seller's right, title and interest in the Assets (other than the Lease).

This Bill of Sale is delivered by Seller to Buyer as required under the Agreement, and is made subject to the terms and conditions of the Agreement.  All capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Agreement.

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed by the undersigned as of this _____ day of _____, 2005.

"SELLER"

WINN-DIXIE STORES, INC., a Florida corporation


By: _____
Name: _____
Title: _____

14

**EXHIBIT F-1**
**to Asset Purchase Agreement**

Form of Closing Statement – WINN-DIXIE STORES

**SELLER:**          **Winn-Dixie Stores, Inc.**, a Florida corporation

**BUYER:**

**TRANSACTION:**   Acquisition of Personal Property Assets (1) Relating to
[facility name][facility address].  Pursuant to Asset Purchase Agreement dated
_____, 2005, among Southeast Milk, Inc., Winn-Dixie Stores, Inc. and Winn-Dixie
Logistics, Inc.  Italicized terms shall have the meanings ascribed to such terms in
such Asset Purchase Agreement.

**PURCHASE PRICE:**                                          **$          -**

**CLOSING DATE:**                    , 2005

**SELLER'S STATEMENT**

**Purchase Price- Personal Property**                       $          -

**Less Adjustments (Debit):**

   1.      Seller's Prorated Share of Personal Property
       Taxes and Other Charges Payable (2)(3)      $          -

       **Total Debit Adjustments:**      $       -       $    -

**Less Closing Costs to be Paid by Seller:**
   1.      Seller's Attorneys' Fees & Costs                P.O.C.
   2.      Seller's Brokers Fees                $          -

       **Total Seller's Closing Costs:**      $       -       $    -

**TOTAL AMOUNT DUE TO SELLER:**                                      $    -

## BUYER'S STATEMENT

| | | | | |
|---|---|---|---|---|
| **Total Purchase Price** | | | $ | - |
| **Less Adjustments (Credits):** | | | | |
| Seller's Prorated Share of Personal Property Taxes and Other Charges Payable (2)(3) | $ | - | | |
| **Total Credit Adjustments:** | $ | - | $ | - |
| | | | | |
| **Plus Closing Costs to be Paid by Buyer:** | | | | |
| 1. Buyer's Attorney's Fees & Costs | | P.O.C. | | |
| 2. Closing Escrow Fee | $ | - | | |
| 3. Sales Taxes | $ | - | | |
| **Total Buyer's Closing Costs:** | $ | - | $ | - |

**SUBTOTAL AMOUNT DUE FROM BUYER:**                                    $        -

**GROSS AMOUNT DUE FROM BUYER AND ESCROW AGENT:**        $        -

The undersigned parties acknowledge and agree to the foregoing Closing Statement as of this _____ day of _____, 2005, and hereby authorize Smith, Gambrell & Russell, LLP, as *Escrow Agent*, to disburse the sums set forth herein in accordance herewith.

**SELLER:**                                                      **BUYER:**


**WINN-DIXIE STORES, INC.**, a Florida corporation

**SOUTHEAST MILK, INC.**, a Florida cooperative corporation


By:_____          By:_____

Name:_____          Name:_____

Title: _____ President              Title: _____ President

**NOTES:**

(1)    <u>Assets Included</u>.  This Closing Statement applies to Seller's conveyance of all non-real property *Assets* of Seller.

(2)    <u>2005 Prorations - Amounts Not Yet Paid and Payable</u>.  Proration is based on estimate of 2005 personal property taxes derived from actual 2004 amounts paid by Seller in arrears in accordance with *Lease*.  Buyer shall be responsible for the payment of such taxes for 2005 and subsequent years.  Proration is as follows:

| | | |
|---|---|---|
| - 2004 Personal Property Taxes (estimated) | $ - | |
| - Per Diem Tax Amount | $ - | |
| - Seller's Share of 2005 Taxes (1/1/05 - __/__/05) (_____ days) | $ - | $ - |
| **Total Personal Property Tax Proration:** | | $ - |

(3)    <u>Utility Deposits and Charges</u>.  All utility deposits will be returned to Seller directly by the respective utility companies.  Seller will be responsible for payment of any portion of any utility charges attributable to utility service (including telephone service) provided through and including the date hereof.  Buyer will be responsible for payment of any new utility deposits that may be assessed by the respective utility companies and for payment of any portion of such utility charges attributable to utility service provided subsequent to the date hereof.  The party responsible for each share of such utility charges shall pay such charges promptly and without demand therefor.

(4)    <u>Adjustments</u>.  Seller and Buyer acknowledge and agree that any amounts not determinable as of the *Closing Date* or reflected on this *Closing Statement* will be taken into account at the *Closing* based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the *Closing Statement* with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Buyer agrees that it will timely make all required notifications to appropriate taxing authorities to effect the change in party responsible for taxes.

**EXHIBIT F-2**
**to Asset Purchase Agreement**

Form of Closing Statement – WINN-DIXIE LOGISTICS

**SELLER:**        **Winn-Dixie Logistics, Inc.**, a Florida corporation

**BUYER:**

**TRANSACTION:**    Acquisition of Lease (1) relating to
[facility name][facility address].  Pursuant to Asset Purchase Agreement dated
_____, 2005, among Southeast Milk, Inc., Winn-Dixie Stores, Inc. and Winn-Dixie
Logistics, Inc.  Italicized terms shall have the meanings ascribed to such terms in
such Asset Purchase Agreement.

**PURCHASE PRICE:**                      $        -

**CLOSING DATE:**    _____, 2005

**SELLER'S STATEMENT**

| | | | | | |
|---|---|---|---|---|---|
| Purchase Price | | | | $ | - |
| **Less Adjustments (Debit):** | | | | | |
| 1. | Seller's Prorated Share of Real Estate Taxes and Other Charges Payable (2) | $ | - | | |
| | **Total Debit Adjustments:** | $ | - | $ | - |
| **Plus Adjustments (Credit):** | | | | | |
| 1. | Seller's Prorated Share of Rents and Other Charges Paid in Advance Under *Lease* (3) | $ | - | | |
| | **Total Credit Adjustments:** | $ | - | $ | - |
| **Less Closing Costs to be Paid by Seller:** | | | | | |
| 1. | Seller's Attorneys' Fees & Costs | | P.O.C. | | |
| 2. | Seller's Brokers Fees | $ | - | | |
| | **Total Seller's Closing Costs:** | $ | - | $ | - |
| **TOTAL AMOUNT DUE TO SELLER:** | | | | $ | - |

### BUYER'S STATEMENT

**Total Purchase Price** $ -

**Plus Adjustments (Debits):**

1. Base Deposit with Escrow Agent $ -

2. Seller's Prorated Share of Rents and Other Charges Paid in Advance Under *Lease* (3) $ -

**Total Debit Adjustments:** $ - $ -

**Less Adjustments (Credits):**

1. Seller's Prorated Share of Real Estate Taxes and Other Charges Payable (2) $ -

**Total Credit Adjustments:** $ - $ -

**Less Closing Costs to be Paid by Buyer:**

1. Buyer's Attorney's Fees & Costs P.O.C.
2. Title Premium (Owner's Policy) $ -
3. Title Examination/Search Fees $ -
4. Survey Fees $ -
5. Environmental Site Assessment Fees $ -
6. Closing Escrow Fee $ -
7. Recording and Filing Fees
8. Transfer Taxes $ -

**Total Buyer's Closing Costs:** $ - $ -

$ -

**SUBTOTAL AMOUNT DUE FROM BUYER:**

**PLUS BASE DEPOSIT FROM ESCROW AGENT:** $ -

**GROSS AMOUNT DUE FROM BUYER AND ESCROW AGENT:** $ -

The undersigned parties acknowledge and agree to the foregoing Closing Statement as of this _____ day of _____, 2005, and hereby authorize Smith, Gambrell & Russell, LLP, as *Escrow Agent*, to disburse the sums set forth herein in accordance herewith.

**SELLER:**                                              **BUYER:**

**WINN-DIXIE LOGISTICS, INC.**, a Florida        **SOUTHEAST MILK, INC.**, a Florida cooperative
corporation                                              corporation

By:_____        By:_____

Name:_____        Name:_____

Title:  _____ President              Title:  _____ President

**NOTES:**

(1)      <u>Assets Included</u>.  This Closing Statement applies to Seller's conveyance of the Lease.

(2)      <u>2005 Prorations - Amounts Not Yet Paid and Payable</u>.  Proration is based on estimate of 2005 real estate taxes derived from actual 2004 amounts paid by Seller in arrears in accordance with lease.  Buyer shall be responsible for the payment of such taxes for 2005 and subsequent years.  Proration is as follows:

| | | |
|---|---|---|
| - 2005 Real Estate Taxes (estimated) | $           - | |
| - Per Diem Tax Amount | $           - | |
| - Seller's Share of 2005 Taxes (1/1/05 - __/__/05) (_____ days) | $_____-_____ | $           - |
| **Total Real Estate Tax Proration:** | | $           - |

(3)      <u>_____, 2005 Prorations – Rent Paid By Seller for Month of Closing</u>.  Proration is based on actual monthly rental amount paid for the month of closing.  Buyer shall be responsible for the payment of the next monthly rental payment that becomes due under the lease after closing.  Proration is as follows:

| | | |
|---|---|---|
| - Total _____, 2005 rent paid: | $           - | |
| - Per diem rent amount: | $           - | |
| - Buyer's prorated share of _____ 2005 Rent (01/__/05 - __/__/05) (_____ days) | $_____-_____ | $           - |
| | | |
| - ESA Report Updated | $           - | |
| - current Phase I ESA Report | $_____-_____ | |
| TOTAL  COST PAID BY SELLER: | | |

(4)      <u>Adjustments</u>.  Seller and Buyer acknowledge and agree that any amounts not determinable as of the Closing Date or reflected on this Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination.   Buyer agrees that it will timely make all required notifications to appropriate taxing authorities to effect the change in party responsible for taxes.

# EXHIBIT G-1
## to Asset Purchase Agreement

**Assets Not at Plant / Excluded**

| | | | | |
|---|---|---|---|---|
| BOSSY CART | MFG EQUIP | 177,899 | 27,052 | 150,848 |
| REFRIGERATOR | MFG STRCTR | 285 | 285 | - |
| LIQUID SWEETNER SYSTEM | MFG EQUIP | 19,240 | 19,240 | - |
| FOULD BATTERY | MFG EQUIP | 1,756 | 1,756 | - |
| STANDARDIZING SYSTEM | MFG EQUIP | 57,342 | 57,342 | - |
| WATER FILTRATION SYSTEM FOR JU | MFG EQUIP | 52,528 | 52,528 | - |
| CHARM SCIENCES MILK TESTING EQ | MFG EQUIP | 5,624 | 5,624 | - |
| RODEM INTERFACE MODULE & SOCKE | MFG EQUIP | 2,211 | 2,211 | - |
| RODEM VACUUM BREAKERS | MFG EQUIP | 1,985 | 1,985 | - |
| 1994SKYJACK SCISSOR LIFT | MFG EQUIP | 11,685 | 11,685 | - |
| MILK OSCAN 50" TOT. ANALYSER | MFG EQUIP | 8,718 | 8,718 | - |
| MILKO SCAN | MFG EQUIP | 23,782 | 23,782 | - |
| RO SYSTEM WITH CIP SYSTEM | MFG EQUIP | 42,371 | 34,514 | 7,857 |
| CLARKE 321 AUTO SCRUBBER | MFG EQUIP | 8,486 | 6,912 | 1,574 |
| RO SYSTEM WITH CIP SYSTEM | MFG EQUIP | 54,477 | 43,504 | 10,973 |
| CREAM FAT MONITORING SYSTEM | MFG EQUIP | 37,629 | 23,973 | 13,656 |
| OIL SPEPERATOR | MFG ENVIRN | 166,025 | 91,451 | 74,574 |
| REFRACTOMETER | MFG EQUIP | 10,572 | 4,148 | 6,425 |
| YALE FORKLIFT | MISC | 17,795 | 821 | 16,974 |
| YALE FORKLIFT | MISC | 17,795 | 821 | 16,974 |
| DOWN-TIME MONITORS (3) | | 6,684 | | |
| LASER PRINTER | | 1,622 | | |
| ARCTIC REACH IN REF. UNIT | | 1,172 | | |

# EXHIBIT G-2
## to Asset Purchase Agreement

### List of Equipment

**Winn-Dixie Stores**
**Equipment List -- Miami Dairy --**
**FINAL**

| Status | Unit | Asset ID | Acq Date | DeptID | Acct | Category | Descr |
|---|---|---|---|---|---|---|---|
| M | WDPOM | 03000040 | 1967-02-08 | 103118 | 132610 | MFEQP | TOLEDO SCALE |
| M | WDPOM | 03000041 | 1967-02-08 | 103118 | 132610 | MFEQP | SIMPLEX TIME RECORDER |
| M | WDPOM | 03000097 | 1970-07-22 | 103118 | 132610 | MFEQP | VACU MATIC BOTTLE FILLER |
| M | WDPOM | 03000146 | 1971-02-03 | 103118 | 132610 | MFEQP | UNILOY BLOW MOLD MACHINE |
| M | WDPOM | 03000147 | 1971-02-03 | 103118 | 132610 | MFEQP | CHERRY BURRELL SILO TANK |
| M | WDPOM | 03000278 | 1973-02-07 | 103118 | 132610 | MFEQP | FEDERAL FILLER |
| M | WDPOM | 03000354 | 1973-07-25 | 103118 | 132610 | MFEQP | TOLEDO PLATFORM SCALE |
| M | WDPOM | 03000653 | 1976-02-04 | 103118 | 132610 | MFEQP | BATTERY CHARGER |
| M | WDPOM | 03001696 | 1979-07-25 | 103118 | 132610 | MFEQP | 25000 GAL VERTICAL SILO T |
| M | WDPOM | 03001906 | 1980-02-06 | 103118 | 132610 | MFEQP | SUGAR TANK |
| M | WDPOM | 03002945 | 1981-07-22 | 103118 | 132610 | MFEQP | FEDERAL VACU MATIC FILLER |
| M | WDPOM | 03002947 | 1981-07-22 | 103118 | 132610 | MFEQP | MILK TANK |
| M | WDPOM | 03002948 | 1981-07-22 | 103118 | 132610 | MFEQP | WATER TOWER |
| M | WDPOM | 03003295 | 1982-02-03 | 103118 | 132610 | MFEQP | 8FT COOLING BED - 1 |
| M | WDPOM | 03003296 | 1982-02-03 | 103118 | 132610 | MFEQP | BLOWMOLDING MACH - 50% DE |
| M | WDPOM | 03003297 | 1982-02-03 | 103118 | 132610 | MFEQP | BLOWMOLD MACH PARTS |
| M | WDPOM | 03003298 | 1982-02-03 | 103118 | 132610 | MFEQP | BLOWMOLD MACHINE |
| M | WDPOM | 03003299 | 1982-02-03 | 103118 | 132610 | MFEQP | APV HEAT EXCHANGER - 25% D |
| M | WDPOM | 03003300 | 1982-02-03 | 103118 | 132610 | MFEQP | 3 VERTICAL SILO TANKS |
| M | WDPOM | 03003301 | 1982-02-03 | 103118 | 132610 | MFEQP | CIP TANKS - OJ CONCENTRATE |
| M | WDPOM | 03003302 | 1982-02-03 | 103118 | 132610 | MFEQP | HTST EQUIPMENT |
| M | WDPOM | 03003303 | 1982-02-03 | 103118 | 132610 | MFEQP | CONVEYOR EQUIPMENT |
| M | WDPOM | 03003304 | 1982-02-03 | 103118 | 132610 | MFEQP | PROCESS PIPING |
| M | WDPOM | 03003305 | 1982-02-03 | 103118 | 132610 | MFEQP | 1 - 2 STAGE HVA HOMOGIZER |
| M | WDPOM | 03003306 | 1982-02-03 | 103118 | 132610 | MFEQP | 800 AMP FEEDER |
| M | WDPOM | 03003307 | 1982-02-03 | 103118 | 132610 | MFEQP | DRIVE-IN RACK |
| M | WDPOM | 03003308 | 1982-02-03 | 103118 | 132610 | MFEQP | WIRING FOR NEW EQUIP |
| M | WDPOM | 03003521 | 1982-07-28 | 103118 | 132610 | MFEQP | SPLIT STARWHEEL W/SS HUB |
| M | WDPOM | 03003522 | 1982-07-28 | 103118 | 132610 | MFEQP | DUAL SPLIT STARWHEEL W/SS |
| M | WDPOM | 03003689 | 1983-02-09 | 103118 | 132610 | MFEQP | CARBON FILTER SYSTEM |
| M | WDPOM | 03003690 | 1983-02-09 | 103118 | 132610 | MFEQP | CARBON FILTER SYSTEM |
| M | WDPOM | 03003691 | 1983-02-09 | 103118 | 132610 | MFEQP | FILTER SYSTEM |
| M | WDPOM | 03003692 | 1983-02-09 | 103118 | 132610 | MFEQP | CARBON FILTER SYSTEM |
| M | WDPOM | 03008220 | 1987-02-04 | 103118 | 132610 | MFEQP | CREAM TANK |
| M | WDPOM | 03009967 | 1988-06-29 | 103118 | 132610 | MFEQP | AUTOCLAVE BENCH TOP |
| M | WDPOM | 03010162 | 1988-09-21 | 103118 | 132610 | MFEQP | TRIMMER 10041 |
| M | WDPOM | 03015659 | 1991-02-06 | 103118 | 132610 | MFEQP | HYSTER MODEL E30XL LIFT TRUCK |
| M | WDPOM | 03020293 | 1992-07-22 | 103118 | 132610 | MFEQP | ATLAS AIR COMPRESSOR |
| M | WDPOM | 03020664 | 1992-08-19 | 103118 | 132610 | MFEQP | BATTERY |
| M | WDPOM | 03021875 | 1993-01-06 | 103118 | 132610 | MFEQP | HYSTER LIFT TRUCK |

| M | WDPOM | 03023205 | 1993-06-30 | 103118 | 132610 | MFEQP | ATLAS COMPCO COMPRESSOR |
|---|-------|----------|------------|--------|--------|-------|-------------------------|
| M | WDPOM | 03024861 | 1993-10-20 | 103118 | 132610 | MFEQP | C LINE BATTERY |
| M | WDPOM | 03024862 | 1993-10-20 | 103118 | 132610 | MFEQP | C LINE BATTERY |
| M | WDPOM | 03024863 | 1993-10-20 | 103118 | 132610 | MFEQP | C LINE BATTERY |
| M | WDPOM | 03024952 | 1993-10-20 | 103118 | 132610 | MFEQP | FERRO CHARGER |
| M | WDPOM | 03024953 | 1993-10-20 | 103118 | 132610 | MFEQP | FERRO CHARGER |
| M | WDPOM | 03025095 | 1993-11-17 | 103118 | 132610 | MFEQP | SILO/BLOW MOLDS |
| M | WDPOM | 03026121 | 1994-02-09 | 103118 | 132610 | MFEQP | BLOW MOLD EQUIPMENT AND CONVEY |
| M | WDPOM | 03026122 | 1994-02-09 | 103118 | 132610 | MFEQP | PACKER, DEBAGGER, ANNEALING UN |
| M | WDPOM | 03026123 | 1994-02-09 | 103118 | 132610 | MFEQP | SILO TANK |
| M | WDPOM | 03026124 | 1994-02-09 | 103118 | 132610 | MFEQP | PCP PROCESSOR LESS OUTLET VALV |
| M | WDPOM | 03026125 | 1994-02-09 | 103118 | 132610 | MFEQP | SVW SILO STORAGE TANK |
| M | WDPOM | 03026126 | 1994-02-09 | 103118 | 132610 | MFEQP | SVW SILO STORAGE TANK |
| M | WDPOM | 03026127 | 1994-02-09 | 103118 | 132610 | MFEQP | SVW SILO STORAGE TANK |
| M | WDPOM | 03026171 | 1994-02-09 | 103118 | 132610 | MFEQP | HTST SYSTEM/ HEAT EXCHANGER |
| M | WDPOM | 03026172 | 1994-02-09 | 103118 | 132610 | MFEQP | PROCESS EQUIPMENT FOR PASTEURI |
| M | WDPOM | 03026173 | 1994-02-09 | 103118 | 132610 | MFEQP | ELECTRICAL COMPONENT EQUIPMENT |
| M | WDPOM | 03026257 | 1994-03-09 | 103118 | 132610 | MFEQP | WATER SOFTNER SYSTEM |
| M | WDPOM | 03026472 | 1994-03-09 | 103118 | 132610 | MFEQP | AUTO-LABE LABEL APPLICATOR |
| M | WDPOM | 03026851 | 1994-04-06 | 103118 | 132610 | MFEQP | WRENN BRUNGART HYSTER LIFT TRU |
| M | WDPOM | 03026852 | 1994-04-06 | 103118 | 132610 | MFEQP | WRENNBRUNGART BLUE GIANT LIFT |
| M | WDPOM | 03026853 | 1994-04-06 | 103118 | 132610 | MFEQP | STORAGE RACKS FOR DRY INGREDIE |
| M | WDPOM | 03027891 | 1994-07-27 | 103118 | 132610 | MFEQP | STAINLESS STEEL TRANSFER LINE |
| M | WDPOM | 03030306 | 1995-02-08 | 103118 | 132610 | MFEQP | OFFICE CARPETING |
| M | WDPOM | 03030307 | 1995-02-08 | 103118 | 132610 | MFEQP | BOILER INSTR SYSTEMS |
| M | WDPOM | 03030308 | 1995-02-08 | 103118 | 132610 | MFEQP | STEAM BOILER |
| M | WDPOM | 03030309 | 1995-02-08 | 103118 | 132610 | MFEQP | BOILER FEED SYSTEM |
| M | WDPOM | 03030310 | 1995-02-08 | 103118 | 132610 | MFEQP | WATER SOFTENER |
| M | WDPOM | 03030311 | 1995-02-08 | 103118 | 132610 | MFEQP | CHEMICAL FEED SYSTEM |
| M | WDPOM | 03030312 | 1995-02-08 | 103118 | 132610 | MFEQP | BLOW DOWN SEPARATOR |
| M | WDPOM | 03030313 | 1995-02-08 | 103118 | 132610 | MFEQP | REFRIG CONTROLLER |
| M | WDPOM | 03030315 | 1995-02-08 | 103118 | 132610 | MFEQP | DOUBLE FACED PYLON SIGN |
| M | WDPOM | 03030316 | 1995-02-08 | 103118 | 132610 | MFEQP | REGULATORY SIGNS |
| M | WDPOM | 03030318 | 1995-02-08 | 103118 | 132610 | MFEQP | 43X32 FILE - 5 DRAWER |
| M | WDPOM | 03031125 | 1995-04-05 | 103118 | 132610 | MFEQP | PALLET RACK |
| M | WDPOM | 03031126 | 1995-04-05 | 103118 | 132610 | MFEQP | CASE WASH PLATFORM |
| M | WDPOM | 03031127 | 1995-04-05 | 103118 | 132610 | MFEQP | SCALE FOUNDATION |
| M | WDPOM | 03031128 | 1995-04-05 | 103118 | 132610 | MFEQP | SEPERATOR FOUNDATION |
| M | WDPOM | 03031815 | 1995-05-31 | 103118 | 132610 | MFEQP | TRUCK PLATFORM |
| M | WDPOM | 03034302 | 1995-10-18 | 103118 | 132610 | MFEQP | INDUSTRIAL BATTERY |
| M | WDPOM | 03034303 | 1995-10-18 | 103118 | 132610 | MFEQP | INDUSTRIAL BATTERY |
| M | WDPOM | 03034304 | 1995-10-18 | 103118 | 132610 | MFEQP | INDUSTRIAL BATTERY |
| M | WDPOM | 03034305 | 1995-10-18 | 103118 | 132610 | MFEQP | INDUSTRIAL BATTERY |
| M | WDPOM | 03035041 | 1995-12-13 | 103118 | 132610 | MFEQP | FORKLIFT E30XL |
| M | WDPOM | 03035042 | 1995-12-13 | 103118 | 132610 | MFEQP | FORKLIFT E30XL |
| M | WDPOM | 03037800 | 1996-05-29 | 103118 | 132610 | MFEQP | PSM MANNUALS |
| M | WDPOM | 03039882 | 1996-07-24 | 103118 | 132610 | MFEQP | PSM MANUAL AND STUDY |
| M | WDPOM | 03040893 | 1996-09-18 | 103118 | 132610 | MFEQP | CONVEYOR DRIVE |
| M | WDPOM | 03040894 | 1996-09-18 | 103118 | 132610 | MFEQP | CONVEYOR DRIVE |
| M | WDPOM | 03040895 | 1996-09-18 | 103118 | 132610 | MFEQP | ENERGY FREE GALLON CASER |

| M | WDPOM | 03040896 | 1996-09-18 | 103118 | 132610 | MFEQP | ENERGY FREE GALLON CASER |
|---|-------|----------|------------|--------|--------|-------|--------------------------|
| M | WDPOM | 03042959 | 1996-10-16 | 103118 | 132610 | MFEQP | PSM MANUALS |
| M | WDPOM | 03053216 | 1998-12-09 | 103118 | 132610 | MFEQP | REFRIGERATOR |
| M | WDPOM | 03053217 | 1998-12-09 | 103118 | 132610 | MFEQP | CASE WASHER |
| M | WDPOM | 03053674 | 1999-06-30 | 103118 | 132610 | MFEQP | CONVEYOR/HYDRAULIC PIPING |
| M | WDPOM | 03060206 | 1999-09-01 | 103118 | 132310 | WHEQP | MITSUBISHI FORK LIFT |
| M | WDPOM | 03060207 | 1999-09-22 | 103118 | 132310 | WHEQP | MITSUBISHI FORK LIFT |
| M | WDPOM | 03061292 | 2000-03-08 | 103118 | 132610 | MFEQP | ORGA PAK-STRAPPER |
| M | WDPOM | 03061520 | 2000-06-20 | 103118 | 132610 | MFEQP | SHIPPING/PICK SYSTEM |
| M | WDPOM | 03061521 | 2000-06-20 | 103118 | 132610 | MFEQP | PSM |
| M | WDPOM | 03061522 | 2000-06-20 | 103118 | 132610 | MFEQP | STORMWATER DISCHARGE |
| M | WDPOM | 03076042 | 2003-12-24 | 103118 | 132610 | MFEQP | BATTERY |
| M | WDPOM | 03077655 | 2003-12-11 | 103118 | 132610 | MFEQP | SHIPPING/PICK SYSTM IMPROVEMNT |
| M | WDPOM | 03078296 | 2004-04-20 | 103118 | 132610 | MFEQP | SURGE SUPPRESSION |
| M | WDPOM | 03078297 | 2004-04-20 | 103118 | 132610 | MFEQP | SEPARATOR CONTROLS |
| M | WDPOM | 03078321 | 2003-12-18 | 103118 | 132610 | MFEQP | BLOW MOLD 1 DRIVE |
| M | WDPOM | 03080353 | 2002-03-08 | 103118 | 132610 | MFEQP | RELIEF HEADER MODIFICATION |

**Total**

| | | | | |
|---|---|---|---|---|
| GARDNER-DENVER COMPRESSOR | MFG EQUIP | 12,903 | 12,903 | - |
| C LINE BATTERY | MFG EQUIP | 3,192 | 3,192 | - |
| LIFT TRUCK- WRENN BRUNGART | MFG EQUIP | 15,395 | 15,395 | - |
| BRUNGART FORKLIFT | MFG EQUIP | 11,697 | 11,697 | - |
| FEDERAL CAP DETECTOR SYSTEM | MFG ENVIRN | 1,514 | 1,514 | - |
| FEDERAL CAP DETECTOR SYSTEM | MFG ENVIRN | 1,514 | 1,514 | - |
| FEDERAL CAP DETECTOR SYSTEM | MFG ENVIRN | 1,514 | 1,514 | - |
| LOCKERS AND BENCHES | MFG EQUIP | 6,745 | 6,745 | - |
| MOTOR TRUCK SCALE | MFG EQUIP | 25,000 | 25,000 | - |
| DIGITAL WALL FOR TRUCK SCALE | MFG EQUIP | 1,562 | 1,562 | - |
| PRINTER FOR TRUCK SCALE | MFG EQUIP | 1,562 | 1,562 | - |
| INSTR., CABLE FOR TRUCK SCALE | MFG EQUIP | 1,562 | 1,562 | - |
| LIGHTNING PROTECTOR | MFG EQUIP | 1,562 | 1,562 | - |
| SCALE SOFTWARE | MFG EQUIP | 1,562 | 1,562 | - |
| RODEM BATT. EL-11600-0022 120V | MFG EQUIP | 584 | 584 | - |
| PUMP MOTOR | MFG EQUIP | 1,431 | 1,120 | 311 |
| SINGLE SAMPLE CRYOSCOPE | MFG EQUIP | 4,394 | 4,394 | - |
| FERRO CHARGER | MFG EQUIP | 1,704 | 1,704 | - |
| PIPE RP UNIT | MFG EQUIP | 61,935 | 48,455 | 13,480 |
| MILK&JUICE PLATE REPLACMENT | MFG EQUIP | 34,941 | 3,494 | 31,446 |

**EXHIBIT H**
**to Asset Purchase Agreement**

<u>Leased Real Estate</u>

Lot 505, Ninth Addition to Seaboard Industrial Park, according to the Plat thereof, as recorded in Plat Book 143, Page 17, of the Public Records of Miami-Dade County, Florida.

**EXHIBIT I**
**to Asset Purchase Agreement**

**PERMITTED ENCUMBRANCES**

1.     Taxes and assessments for the year 2006 and subsequent years, which are not yet due and payable.

2.     Restrictions, dedications, conditions, reservations, easements and other matters as shown on Plat recorded in Plat Book 114, Page 96; Plat recorded in Plat Book 121, Page 90; Plat recorded in Plat Book 142, Page 57; and Plat recorded in Plat Book 143, Page 17.

3.     Water & Sewer Agreement recorded in Official Records Book 15609, Page 2991.

4.     Grant of Easement(s) as set forth in instrument(s) recorded in Official Records Book 16150, Page 246.

5.     Easement(s) granted to Florida Power & Light Co., as set forth in instrument(s) recorded in Official Records Book 16124, Page 1007.

6.     Easement(s) granted to Florida Power & Light Co., as set forth in instrument(s) recorded in Official Records Book 16124, Page 1010.

7.     All of the terms and provisions set forth and contained in that certain Lease between ZSF/WD Opa Locka, LLC, a Delaware limited liability company, Lessor, and Winn-Dixie Stores, Inc., a Florida corporation, Lessee, a memorandum of which is recorded in Official Records Book 18796, Page 547; re-recorded in Official Records Book 18943, Page 1161; and Official Records Book 19015, Page 4148; as affected by: Subordination, Non-Disturbance and Attornment Agreement, recorded in Official Records Book 18796, Page 600; re-recorded in Official Records Book 18943, Page 1214; and Official Records Book 19015, Page 4196.

8.     Mortgage executed by ZSF/WD Opa Locka, LLC, a Delaware limited liability company in favor of Bankers Trust Company, a New York banking corporation, recorded September 27, 1999 in Official Records Book 18796, Page 573 ; re-recorded in Official Records Book 18943, Page 1187; and Official Records Book 19015, Page 4169.

9.     Lease Assignment and Agreement from ZSF/WD Opa Locka, LLC, a Delaware limited liability company to Bankers Trust Company, a New York banking corporation, recorded September 27, 1999, in Official Records Book

18796, Page 558 ; re-recorded in Official Records Book 18943, Page 1172; and Official Records Book 19015, Page 4154.

10. UCC-1 Financing Statement naming Bankers Trust Company, as Trustee as secured party and ZSF/WD Opa Locka, LLC as debtor, filed September 27, 1999, recorded in Official Records Book 18796, Page 611; re-recorded in Official Records Book 18943, Page 1225; and in Official Records Book 19015, Page 4207; as affected by: Continuation, recorded in Official Records Book 22179, Page 2900.

11. Matters as shown on Survey prepared by Freeland-Surveyors & Engineers Associates, Inc., dated August 24, 2005, under Drawing No. 57374-ALTA.

All Plat Book, Official Records Book and Page references are to the public records of Miami-Dade County, Florida.

**EXHIBIT J**
**to Asset Purchase Agreement**

Form of Sale Order

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

**ORDER APPROVING DEBTORS' (A) SALE OF ASSETS**
**FREE AND CLEAR OF LIENS, (B) ASSUMPTION AND**
**ASSIGNMENT OF LEASE AND (C) RELATED RELIEF**

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 6004 and 6006 (a) authorizing the Debtors to sell their leasehold interests in a dairy facility located in Miami, Florida, and the related equipment, inventory and other assets (the "Assets"), including the assets described in the asset purchase agreement attached hereto as Exhibit A (the "Purchase Agreement), free and clear of liens, claims, interests and encumbrances to Southeast Milk, Inc. (the "Purchaser"), (b) determining that the sale is exempt from any stamp, transfer, recording or similar tax, (c) authorizing the Debtors to assume and assign the related unexpired lease (the "Lease") and executory contracts (the "Contracts") identified in the Purchase Agreement (including the Exhibits thereto) in connection with the sale, (d) fixing cure amounts for the Lease and the Contracts, (e) authorizing the Debtors to enter into a supply agreement for

product with the Purchaser,  and (f) granting related relief (the "Motion"). The Court held a hearing on the Motion on [_____], 2005 to approve the sale (the "Sale Hearing").

**Alternatives, depending on the circumstance:** [The Court has reviewed the Motion and heard the representations of counsel. Upon the representations of counsel and without objection by the United States Trustee or any other interested party, the Court makes the following findings of fact:] **or** [The Court has reviewed the Motion, considered the evidence and heard argument of counsel. After due deliberation and good and sufficient cause existing, the Court makes the following findings of fact:]

A.     This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

B.     The Debtors solicited the highest or otherwise best offer for the assets described in the Purchase Agreement (the "Assets"), in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 16, 2005 (the "Bidding Procedures").

**Alternatives, depending on circumstance:** [A competing bid was received for the Assets and the Debtors conducted an auction for the Assets on _____ (the "Auction"). At the Auction, _____ submitted the final bid of _____, representing the highest or otherwise best offer received for the Assets.] **or** [No competing bid was received and the Debtors believe the purchase price provided in the Asset Purchase Agreement for the Assets which was attached to the Sale Motion represents the highest or otherwise best offer for the Assets].

C.     The Debtors have provided interested parties (including all parties asserting claims or interests in the Assets, if any) with proper notice of the Motion, the Sale Hearing,[1] the Auction, the assumption and assignment of the Lease and Contracts, and the fixing of any cure amounts, in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365, Fed. R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order and the Bidding Procedures Order.

D.     The Debtors marketed the Assets and conducted the sale process in compliance with the Order approving the Bidding Procedures, the Bidding Procedures, the Bankruptcy Code and all other Orders entered in these cases. The bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner. The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets. In their sound business judgment, the Debtors determined that: **alternatives depending on the circumstance:** [the purchase price provided in the Asset Purchase Agreement attached to the Sale Motion was the highest or otherwise best offer] **or** [the bid submitted by the Purchaser at the Auction represented the highest or otherwise best offer] for the Assets.

E.     The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A, the Assumption and Assignment Agreements and Supply Agreement attached to the Purchase Agreement, and all related documents, and the sale of the Assets and the assumption and assignment of the Lease and Contracts has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in

---

[1]   All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Motion.

the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

F.      The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

G.      Neither the Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

H.      The Debtors and the Purchaser proposed, negotiated and entered into the Purchase Agreement, without collusion, in good faith and at arms'-length bargaining positions. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

I.      The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

J.      The consideration the Purchaser is providing to the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value.

K.      The Debtors' sale of the Assets and the assumption and assignment of the Lease and Contracts will facilitate the formulation and confirmation of a plan of reorganization.  For this reason, the Debtors' sale of the Assets and the assumption and assignment of the Lease and Contracts constitute transfers to which 11 U.S.C. § 1146(c) applies.

L.      The Debtors' transfer of the Assets to the Purchaser pursuant to the Purchase Agreement and the Assumption and Assignment Agreement will be a legal, valid, and effective transfer of the Assets. The Debtors' transfer of the Assets to the Purchaser vests the Purchaser with good and valid title in and to the Assets free and clear of any liens, claims, encumbrances,

pledges, mortgages, security interests, charges, options or other interests of any kind or nature (collectively, the "Claims and/or Interests"), with the exception of the Permitted Encumbrances and the Assumed Liabilities, if any, as defined in the Purchase Agreement. Any non-assumed Claim and/or Interest will attach to the proceeds of the sale with the same validity, enforceability and priority they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors, Wachovia Bank National Association, as Administrative Agent and Collateral Agent for itself ("Agent") and the other financial institutions from time to time parties to the Credit Agreement dated as of February 23, 2005, as may be amended or modified (collectively, "Lenders" and together with Agent, collectively, the "DIP Lender") and all other interested parties with respect to such Claims and/or Interests.

M.     The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the Purchase Agreement free and clear of all Claims and/or Interests (except the Permitted Encumbrances and the Assumed Liabilities) because any entity with any Claims and/or Interests in the Assets to be transferred (i) has consented to the Sale (including the assumption and assignment of the Lease and Contracts) or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claims and/or Interests; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. Holders of Claims and/or Interests, if any, who did not object, or who withdrew their objections to the Sale Motion are deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2).

N.     The Debtors shall cause all proceeds from the Sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105,

361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

O.       The Debtors' assumption and assignment of the Leases and Contracts in connection with the Sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

P.       The Debtors have provided the landlord of the Leases and Contracts with adequate assurance that they will promptly cure any defaults under the Lease and Contracts pursuant to 11 U.S.C. §§ 365(b)(1).

Q.       Pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006, the amounts set forth on Exhibit B, if any, constitute all amounts due and owing under the Lease and Contracts and will be fixed and allowed for the Lease and Contracts (the "Cure Amount"). No other amounts are due and owing by the Debtors under the Lease or Contracts. The Debtors will pay the Cure Amount, if any, in accordance with the terms and provisions of the Purchase Agreement. Upon payment of the Cure Amount, all defaults, if any, under the Lease and Contracts will be deemed cured.

R.       The Purchaser has provided the landlord for the Lease and Contracts with adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B).

S.       No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under the Lease and Contracts.

T.       Except as expressly set forth in the Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser will have no responsibility for any liability, claim or other obligation of or against the Debtors related to the Assets or the Lease and Contracts by virtue of the transfer of the Assets and the assumption and assignment of the Lease and Contracts to the Purchaser. The Purchaser will not be deemed, as a result of any action taken in connection with the purchase of the Assets or the assumption and assignment of the Lease and Contracts to (i) be a successor to the Debtors (other than with respect to the Assumed Liabilities and any obligations arising under the assigned Lease and Contracts from and after the closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors. The Purchaser is not acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the Purchase Agreement or in any assigned Lease and Contracts.

U.       The Debtors' entry into the Supply Agreement in connection with the Sale is (i) an exercise of their sound business judgment, and (ii) in the best interest of the Debtors' estate and creditors.

V.       The Court's approval of the Purchase Agreement and the Assumption and Assignment Agreements and the Supply Agreement is in the best interests of the Debtors, their estates and their creditors. Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.       The Motion is granted to the extent set forth herein.

2.      All objections to the entry of this order or to the relief granted and requested in the Motion, including any objection to the proposed Cure Amount, that has not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

3.      The Purchase Agreement, the Assignment and Assumption Agreements and the Supply Agreement are each approved in all respects. Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized (subject to applicable Closing conditions set forth in the Purchase Agreement), to consummate the Sale including transferring and conveying the Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

4.      Upon Closing, the Debtors are authorized, in accordance with 11 U.S.C. §§ 105(a), 363 and 365 and this Order, to assume and assign the Lease and Contracts to Purchaser and to enter into the Supply Agreement with the Purchaser.

5.      The Debtors have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2).

6.      The Lease and Contracts will be assumed and assigned to the Purchaser, in accordance with their respective terms. The assigned Lease and Contracts will remain in full force and effect notwithstanding any provision in the Lease and Contracts to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1)) which prohibit, restrict or condition such assignment or transfer). All non-debtor parties to the Lease and Contracts are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the Purchase Agreement.

7.      Pursuant to 11 U.S.C. § 363(b) and subject to the restrictions contained in this Order, the Debtors are authorized and empowered to consummate and implement fully the Purchase Agreement, the Assignment and Assumption Agreements and the Supply Agreement,

together with all additional instruments and documents to the extent necessary to implement the Purchase Agreement in accordance with and subject to the terms and conditions conrtained therein and in this Order. The Debtors are authorized to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Assets and the Lease and Contracts to Purchaser.

8.      Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties in accordance with the terms of the Purchase Agreement without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of (a) the DIP Lender, and (b) the Creditors' Committee, which consent will not be unreasonably withheld, and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.      The Debtors will transfer the Assets to the Purchaser upon closing free and clear of all Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances and Assumed Liabilities). The only Claims and/or Interests in the Assets are those of the landlord with respect to the applicable Lease being sold and assigned pursuant to the Purchase Agreement and the senior liens and superpriority administrative claims of the DIP Lender. The Claims and/or Interests of such landlord will be satisfied upon Closing by the Debtors' cure of any defaults under the respective Lease and Contracts.  Moreover, the Debtors and the Purchasers have demonstrated adequate assurance of future performance under 11 U.S.C. §365. The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds of the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

10.    The Debtors will cause the proceeds from the Sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Financing Order and the Loan Documents.

11.    The Debtors' transfer of the Assets pursuant to the terms of the Purchase Agreement is a transfer pursuant to 11 U.S.C. § 1146(c).  Accordingly, the making, delivery, filing or recording of any deeds, assignments or other transfer documents in connection with the sale (the "Transfer Instruments"), will not be taxed under any law imposing a recording tax, stamp tax, transfer tax or similar tax (including without limitation, any transfer or recordation tax applicable to deeds and/or security interests). All filing and recording officers are directed to accept for filing or recording, and to file or record the Transfer Instruments immediately upon presentation without payment of any such taxes.

12.    The Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and applicable non-bankruptcy law. For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

13.    The Cure Amount for the Lease and Contracts is fixed in the respective amounts set forth on Exhibit B. All defaults, claims or other obligations of the Debtors arising or accruing under each of the Lease and Contracts, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be cured by the Debtors in accordance with the Purchase Agreement, by paying the Cure Amount. No other or further monetary amounts or obligations are due or existing under the Lease and Contracts by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise. The Debtors will pay any Cure Amount in accordance with the terms and provisions set forth in the Purchase Agreement.

14.    Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Lease and Contracts to the Purchaser, (a) the Debtors and their estates are relieved from any and all liability for any breach of the Lease and Contracts occurring after assignment to the Purchaser, and (b) the Purchaser is responsible for any and all claims and obligations under the Lease and Contracts occurring or arising on and after the assignment.

15.    Subject to the terms of this Order, the Purchase Agreement, the Assumption and Assignment Agreements and the Supply Agreement, the Purchaser assumes all rights and obligations of the Debtors under the Lease and Contracts.

16.    All non-Debtor parties to the Lease and Contracts are forever enjoined and estopped from contesting the Cure Amounts and from asserting any default against the Purchaser which existed as of the date of the Sale Hearing.

17.    Upon the Debtors assignment of the Lease and Contracts to the Purchaser, no default will exist under the Lease and Contracts. Upon entry of this Order and the assumption and assignment of the Lease and Contracts, the Purchaser is deemed to be in compliance with all terms and provisions of the Lease and Contracts.

18.    Subject to the terms and conditions of this Order, all entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors. Prior to or upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims and/or Interests in the Assets (except for the Permitted Encumbrances and Assumed Liabilities), if any. In the event any creditor fails to release its Claims and/or Interests in the Assets upon Closing, the Debtors are authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other

documents on such creditor's behalf. The Purchaser is also authorized to file, register or otherwise record a certified copy of this Order upon Closing in accordance with the terms of the Purchase Agreement and this Order. Once this Order is so filed, registered or otherwise recorded in accordance with the provisions of this Order, the Order constitutes conclusive evidence of the release of all Claims and/or Interests against the Assets as of the Closing (except for the Permitted Encumbrances and Assumed Liabilities).

19.     Upon Closing of the Sale of Assets in accordance with the Purchase Agreement and this Order, the Purchaser will be deemed to have acted in good faith in purchasing the Assets and Lease and Contracts under the Purchase Agreement as that term is used in 11 U.S.C § 363(m). For that reason, any reversal or modification of the Order on appeal will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

20.     The Debtors' transfer of the Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances or Assumed Liabilities) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

21.     Other than the Permitted Encumbrances, the Assumed Liabilities and other obligations of the Purchaser as set forth in the Purchase Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets, including, the Lease and Contracts. The Debtors' transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to any liability for

Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

22.     Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets and the Lease and Contracts and a bill of sale transferring good and marketable title in the Assets to Purchaser. Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

23.     This Order is effective as a determination that upon Closing any and all Claims and/or Interests (except for the Permitted Encumbrances and Assumed Liabilities), if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

24. This Order is binding upon all entities that may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Assets.

25.     This Court retains exclusive jurisdiction to (a) enforce and implement the Purchase Agreement, the Assumption and Assignment Agreements, the Supply Agreement, and any other agreements and instruments executed in connection with the Purchase Agreement, (b) compel delivery of possession of the Assets to Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement or Assignment Agreement, and (d) interpret, implement and enforce the provisions of this Order; provided, however, that in the event this Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause or is without jurisdiction, such abstention, refusal or lack of

jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

26.     The terms and provisions of the Purchase Agreement, the Assignment Agreements and the Supply Agreement and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

27.     Except as may otherwise be provided for in the Purchase Agreement and/or all related documents, including, without limitation, claims arising from the Purchaser's performance and obligations under the Purchase Agreement, all related documents and this Order, upon Closing, all persons who hold Claims and/or Interests against the Debtors are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

28.     After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as

otherwise provided in the Purchase Agreement. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

29.     To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in this Order will control.

30.     The provisions of this Order are non-severable and mutually dependent.

31.     Notwithstanding Fed. R. Bankr. P. 6004(g) and 6006(d), this Order will take effect immediately upon entry.

Dated this _____ day of _____, 2005, in Jacksonville, Florida.


_____
Jerry A. Funk
United States Bankruptcy Judge


Cynthia C. Jackson is directed to
serve a copy of this Order on all
parties who received copies of the
Motion.

**EXHIBIT K**
**to Asset Purchase Agreement**

**Form of Declaration**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re | ) | |
| | | |
| WINN-DIXIE STORES, INC., et al., | ) | Case No. 05-03817-3F1 |
| | | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

_____

**<u>DECLARATION OF CALVIN COVINGTON</u>**

I, Calvin Covington, state and declare as follows:

I am the Chief Executive Officer of Southeast Milk, Inc. (the "Purchaser").  I am duly authorized to make this Declaration on behalf of the Purchaser.  I make this Declaration based on my own personal knowledge and based on my knowledge and review of the business records of the Purchaser.  If called as a witness, I could truthfully and competently testify to the matters stated in this Declaration.

I submit this Declaration in connection with the Purchaser's offer to purchase assets (the "Bid") from Winn-Dixie Stores, Inc. and its debtor affiliates (collectively, the "Debtors").  The assets subject to the Bid consist of the Debtors' leasehold interests in a dairy facility located in Opa Locka, Florida (and related inventory, equipment, and other assets), which is presently owned by the Debtors (the "Facility").

The Purchaser is not an affiliate of the Debtors.  The Purchaser has at all times dealt at arm's length and in good faith with the Debtors, has no connection with any insider of the Debtors, and has not received any material non-public information regarding the Facility from

the Debtors or their advisors except through the due diligence process established by the Debtors and their advisors in these Chapter 11 cases.

The Purchaser is not a party to any agreement among potential bidders for the Debtors' assets and does not intend to enter into any such agreement or otherwise to conspire to chill bidding for such assets.

The Bid identifies executory contracts and unexpired leases to be assumed by the Debtors and assigned to the Purchaser (collectively, the "Assigned Contracts").  With respect to each of the Assigned Contracts, the Purchaser intends to perform and has the financial capability to perform its obligations under such Assigned Contract arising from and after the date on which such Assigned Contract is assigned to the Purchaser.

Attached as Exhibit A are true and correct copies of the following:  (a) the Purchaser's balance sheet as of June 30, 2005; (b) the Purchaser's income statement for the three quarters ending on the date of such balance sheet; and (c) audited financial statement for the last fiscal year ending September 30, 2004.  The financial statements in Exhibit A have been prepared in accordance with generally accepted accounting principles and fairly and accurately in all material respects represent the financial condition and operating results of the Purchaser for the time periods specified.

The Bid includes a provision that permits the Purchaser, in certain circumstances, to assign its rights to acquire the Facility to one or more affiliates of the Purchaser.  Should the Purchaser exercise that option, (a) the obligations of the Purchaser's assignee acquiring the Facility will be guaranteed by the Purchaser, and (b) all of the foregoing statements will be deemed to refer, with respect to the Facility, collectively to the Purchaser and its assignee acquiring the Facility, and such statements will be accurate if interpreted in that manner.

All of the business records of the Purchaser to which I have referred in this Declaration or in the preparation of this Declaration were made at or near the time of the event recorded, by or from information transmitted by a person with knowledge of the matters recorded in such records, and were made and kept in the course of the Purchaser's regularly conducted business activities.  It is the regular practice of the Purchaser to make such records.

The Purchaser consents to the Debtors' providing a copy of this Declaration, including exhibits, to any non-Debtor party to an Assigned Contract.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on _____, 2005, in Orlando, Florida.

_____
Calvin Covington

**<u>Exhibit A</u>**

Financial Statements

**<u>Exhibit B</u>**

Financial Statements

**EXHIBIT L**
**to Asset Purchase Agreement**

<u>Form of Affidavit</u>

**<u>Seller's and Non-Foreign Title Affidavit</u>**

STATE OF _____  )          Commitment No. _____

                                      )          Issued by _____Title Insurance

COUNTY OF_____  )          Company ("<u>Title Company</u>")

        BEFORE ME, the undersigned Notary Public, this _____ day of _____, 200_, personally appeared _____ (the "<u>Affiant</u>"), who either [  ] is personally known to me, or [  ] has produced a _____ drivers license as identification, and who being by me first duly sworn, deposes and says the following:

        1.        That Affiant is over eighteen (18) years of age and is competent to execute this Affidavit.

        2.        That Affiant is the _____ of _____, a _____ (the "<u>Company</u>"), and is duly authorized an empowered by the Company, pursuant to all necessary and appropriate corporate action, to execute this Affidavit on behalf of the Company.

        3.        That the Company has a leasehold interest in that certain real property, including all improvements located thereon, lying, situate and being in Miami, Florida, as more particularly described in the Commitment, a copy of which is attached hereto as <u>Exhibit A</u> (the "<u>Property</u>").

        4.        That application has been made or is being made to Title Company for a policy of title insurance to insure the leasehold interest of Southeast Milk, Inc., a Florida cooperative corporation ("<u>Buyer</u>"), and Affiant makes this affidavit to induce Title Company to issue said policy.

        5.        That the Company has not contracted for, authorized or directed that any work be done or materials supplied for work to be done on or about the Property for which a construction lien could attach to the Property pursuant to Florida Statutes, or to the extent that any work has been done, such work has been paid for in full.

        6.        That, except as shown on the Commitment, there are no encumbrances, mortgages, liens, claims, judgments, taxes, assessments, demands or bills outstanding and unpaid at this time against the Property, and that the Company has not taken any action or omitted to take any action that would result in the placement of any encumbrances, mortgages, liens, claims, judgments, taxes, assessments, demands or bills either outstanding or of record against the Property, of any nature, kind or

description whatsoever, excepting for the lien of real estate taxes for the current year and subsequent years.

7. That, except as shown on the Commitment, the Company is in sole possession of the Property and there is no person or entity owning or claiming to own any interest in the title to the Property or any appurtenance thereto adverse to that of the Company.

8. That there are no matters pending against the Company that could give rise to a lien or encumbrance that would attach to the Property between the date of the Commitment and the disbursing of the funds.

9. That the Company has not executed, and will not execute, any instrument that would adversely affect the title or interest to be insured by Title Company.

10. That the Company is not a "foreign person" as defined under Section 1445 of the Internal Revenue Code, and the regulations thereunder, and the Company understands that Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person. This affidavit is given to inform Buyer that withholding of tax is not required upon the Company's disposition of a United States real property interest.

11. That the Company is not a nonresident alien for purposes of United States income taxation.

12. That the Company's United States Taxpayer Identification Number (F.E.I. Number) is _____ and the Company's address is _____.

13. That the Company understands that this certification may be disclosed to the Internal Revenue Service by Buyer, and any false statement made herein could expose the Company to punishment by fine, imprisonment or both.

Under penalties of perjury, Affiant declares that he/she has examined the foregoing certifications numbered 10 through 13, and to the best of his/her knowledge and belief, they are true and complete.

14. That Affiant understands that Title Company is disbursing funds related to the transaction for which this Affidavit is given, and Title Company is relying on this Affidavit in so doing.

15. That the Company does hereby indemnity and agree to protect, defend and hold harmless Title Company and _____, as title agent ("Title Agent") of and from any and all loss, costs, damages, claims or expense of any kind, including attorneys' and paralegals' fees whether at trial or on appeal, which Title Company or Title Agent shall or may suffer, expend, incur or become liable as a direct or indirect result of such parties' reliance on the statements made herein.

_____
Print Name: _____

_____
Print Name: _____
NOTARY PUBLIC, State of _____
Commission Number: _____
My Commission Expires: _____

[NOTARIAL SEAL]

Exhibit A

[Title Commitment]