EXHIBIT A

Rev. 4/10/96
9/4/96
SC-1

# LEASE

THIS LEASE, made this 20th day of September, 19 96

between __SOUTHWEST FLORIDA BUILDING GROUP, INC.__

_____

_____

_____("Landlord")

and ____WINN-DIXIE STORES, INC., a Florida corporation,____

_____

_____ ("Tenant");

which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or

plural, and the heirs, legal representatives, successors and assigns of the respective parties;

**PREMISES**

WITNESSETH:

That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and demise unto

Tenant and the Tenant hereby agrees to take and lease from the Landlord, for the term hereinafter specified,

the following described premises:

That certain store building, approximately __220__ feet in width by __200__

feet in depth, __together with vestibule and pad-mounted coolers and__

__freezers on the rear thereof,__ _____

_____

and the land on which the same shall stand (hereinafter collectively called "demised premises"),

which store building and related improvements are to be constructed by the Landlord according

to plans and specifications to be approved by the parties as herein provided, and shall be in

the location and of the dimensions as outlined in red on the Plot Plan __prepared by__

__Source, Inc., Cape Coral, Florida, entitled "San Carlos Center",__

__dated May 3, 1996,__ _____

attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in detail on

Exhibit "A"), known as _____"San Carlos Center"_____

("shopping center"), located __at the northeasterly corner of the intersection__

__of Constitution Boulevard and U.S. Highway 41__ _____

_____

in the City of__San Carlos Park__, County of __Lee__,

State of __Florida__, the legal description of the shopping center being set

forth on Exhibit "B" attached hereto and by this reference made a part hereof.

WD 33-36 (10/92

**TERM**

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens the demised premises for the transaction of its business for an initial term of ___twenty (20) years and two (2) months___ ~~years~~ from the commencement date. The parties agree to execute a supplemental agreement documenting the commencement date.

This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

___Subsequent to the first two months of the initial lease term,___

**RENTAL**

1./ the Tenant agrees to pay to the Landlord as minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of ___THREE HUNDRED EIGHTEEN___

___THOUSAND NINE HUNDRED EIGHTY and 00/100-------------------------------------___ Dollars ($__318,980.00__) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of ___TWENTY-SIX THOUSAND FIVE HUNDRED EIGHTY-ONE and 67/100___

___--------------------------------------------------------------___ Dollars ($__26,581.67__) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

In addition, the Tenant agrees to pay the Landlord a percentage rental equal to the amount, if any, by which___ ---one---___ per cent (----------1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant during the term of this lease, and any extensions thereof, exceeds the minimum guaranteed annual rental.

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of the percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculation of the percentage rental due hereunder, the Tenant's fiscal year shall be approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINITION OF "GROSS SALES"**

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold in or from the demised premises, both for cash and on credit. Such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers; including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

2

**RECORD OF SALES**

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within sixty (60) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord. If, as a result of Landlord's inspection and audit, the gross sales vary from those reported by two percent (2%) or more, Tenant shall, upon demand, pay Landlord's cost of the inspection and audit.

**USE**

2. The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail or service business (including discount businesses).

Notwithstanding the foregoing, should the demised premises be assigned or subleased by the Tenant, then the demised premises shall not be assigned or subleased to a tenant (other than a tenant primarily engaged in the supermarket business) whose business would be in violation of any non compete agreements granted by the Landlord to other tenants in the shopping center, provided that the Landlord notifies the Tenant of all non compete agreements granted by the Landlord to other tenants.

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of the premises, as such shall relate to the cleanliness and use of the premises and the character and manner of operation of the business conducted in or at the premises.

**CONSTRUCTION OF SHOPPING CENTER**

3. The Landlord, at its sole cost and expense, shall construct the shopping center, substantially as shown on Exhibit "A", consisting of all the buildings shown thereon, together with all ramps, sidewalks, streets, entranceways, malls, parking areas, service areas, driveways, utility lines, water detention and retention facilities and related improvements, such improvements (excluding buildings) being sometimes hereinafter referred to as "common areas". The Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the shopping center and the tenants and their employees during the term of this lease and any extensions thereof. The arrangement and location of all store buildings and common areas (including parking area) within the shopping center shall at all times during the term of this lease, or any extensions thereof, be maintained as shown on Exhibit "A" and shall not be changed without the written consent of the Tenant. The exterior of the shopping center (including any store buildings and the demised premises) shall not be materially modified without Tenant's prior written consent. If not shown on Exhibit "A", Tenant expressly reserves the right to approve the finish grade elevations of all store buildings and common areas (including parking and service areas) within the shopping center which are to be constructed concurrently with Tenant's store building.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to construct the store building for occupancy by Tenant in accordance with the plans and specifications to be approved by both Landlord and Tenant. Plans and specifications shall be approved when initialed by both parties, and when initialed shall constitute a part of this lease. The plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job."

covenants and agrees that the construction of the shopping center shall begin not later
ril 1, 1997 _____and shall be completed not later than
November 1, 1997 _____; and if the same shall not be begun or
y the respective dates, the Tenant, at its option, may, in either of such events, cancel and ter-
ease or may extend the Landlord additional time for the beginning or completion of construc-
ed, however, that if after the beginning of construction the Landlord's failure to complete the
is within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay
material shortages, embargoes or inclement weather, or other similar happenings which are
ontrol of Landlord, and provided further the improvements shall be completed with all due diligence
e completion date"), this option to terminate shall not arise. "Construction of the shopping
l be deemed to have begun when the first concrete footings have been poured. If pursuant
graph Tenant shall cancel or terminate this lease, then the Landlord agrees to give the
irst right of refusal, on the same terms and conditions as Landlord is willing to grant to
hirty party, to be exercised within sixty (60) days after receipt of notice of the terms and
rom the Landlord, to occupy any premises within the shopping center which Landlord
or use as a food supermarket. The first right of refusal shall be operative and effective
i of three (3) years from the date of such cancellation. However, if offered to Tenant
) months after cancellation of this lease, the lease terms and provisions shall be the same

ant shall open its store for business within sixty (60) days following performance of the

nt's store building and other improvements constructed on the premises shall have been delivered
nant completed in accordance with the plans and specifications, and Landlord shall have
ered to Tenant, at Landlord's expense, a Certificate of Occupancy or equivalent document for
lemised store building;

truction of all of the common areas shall have been completed substantially as shown on Ex-
"A";

rives, entrances, median cuts, acceleration and deceleration lanes and traffic control devices
n on Exhibit "A" in or connecting the common areas to the adjacent rights-of-way shall have
installed and opened for use by vehicular traffic.

000 square feet of local shops completed and ready to deliver to local shop tenants.

ant that all the above requirements shall not have been met on or prior to the outside comple-
e Tenant at its sole option may cancel and terminate this lease.

ll begin to accrue hereunder upon the date the Tenant opens its store for business, or upon
n of sixty (60) days following the performance of all the above requirements, whichever date
occur. No acceptance of possession of the demised premises, opening for business by Tenant
of rent under this lease shall constitute acceptance by Tenant of defective work or materials
ot completed in accordance with plans and specifications.

tanding the other provisions of Articles 4 and 5 hereof, Landlord agrees that if for any reason
nts of Article 5 are met by Landlord on or after December 1 of any year and on or before
of the succeeding year, Tenant shall not be required to open its store for business and rent
n to accrue until the later of February 1 of the succeeding year, or 30 days after the requirements
are met; unless Tenant actually opens its store for business sooner.

4

**OTHER TENANTS**

6.   (Article 6 is hereby deleted in its entirety)

**RETAIL AND SERVICE STORES ONLY**

7. Without the prior written consent of Tenant herein only retail and/or service stores shall be allowed to operate in the shopping center, or any enlargement thereof, it being the intent of the parties hereto that no spa, lounge, bar, "teen lounge", bowling alley, skating rink, bingo or electronic or other game parlor, theatre (either motion picture or legitimate), pawn shops, business or professional offices, sales of automobiles, or health, recreational or entertainment-type activities, non-retail or non-service type activities, shall be permitted; provided, however, the operation of not in excess of 12,000 square feet of business and professional offices therein shall not be deemed a violation hereof.

(a)   Any building which may be constructed on Out-Parcel "A" as shown on the site plan attached hereto as Exhibit "A" shall not be allowed to exceed twenty-five feet (25') in height nor shall it exceed twenty-five percent (25%) of the square footage of the parcel it occupies.

**PARKING AND COMMON AREAS**

8. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks. Tenant may use the sidewalks adjacent to the demised premises or exterior surfaces of its building for the display and sale of merchandise and services.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a) a minimum ratio of at least____5.0_____ automobile parking spaces for each 1,000 sq. ft. of gross building area (including additional floor levels) in the shopping center, and

(b) facilities for convenient parking of at least____403_____ automobiles (minimum);

and in the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. Without the prior written consent of Tenant herein, no carnivals, fairs or shows nor sales by merchants utilizing vehicles or booths in the common areas shall be allowed in the shopping center, or any enlargement thereof. All of the common areas (including parking area) shall be adequately lighted by Landlord from 9:00 A.M. to 10:00 P.M., and at Tenant's expense for such portion as it wishes lighted at other hours, Tenant's expense to be based upon actual billings for such usage if available or based upon the kilowatt usage of the fixtures times the applicable utility rates times the number of hours of use, prorated on a square footage basis with other tenants open for business during such extended hours. The Tenant shall pay such expense upon documentation thereof as provided under Article 31 hereof. It is understood that a portion of the parking lot lights may be wired to Tenant's meter and switching system, as shown on the Lighting Plan in the approved Plans and Specifications. Tenant may utilize the sidewalk areas adjacent to its store premises for sale of merchandise, provided however, the indemnification provisions of Article 15 below shall specifically apply to such areas as are so used by Tenant, and further provided that pedestrian access will remain for other tenants of the shopping center and their invitees.

5

**SERVICE AREA**

9. Landlord agrees to provide for the exclusive use of the Tenant at its service entrances parking spaces for two large trailer trucks for continuous use. Landlord further agrees that Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for its store into and from trucks and trailers at such service entrances.

**UTILITIES**

10. The Tenant agrees to pay all charges for telephone, electricity, water, gas and other utilities and services used by Tenant at the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities. Tenant shall not be responsible for any charges for the fire alarm system, static or flowing water to supply the fire sprinkler system, or any "hook up" fees or other charges incident to providing access to any utility, but Tenant shall pay all charges for the maintenance, monitoring, and testing of the alarm system.

**TENANT'S REPAIRS**

11. Upon completion of construction by Landlord and acceptance of the demised premises by Tenant, Tenant agrees to keep the interior of the demised premises in good condition and repair, excepting structural repairs and all repairs which are the responsibility of the Landlord or which are made necessary by reason of fire or the elements or other casualty covered by Landlord's fire and extended coverage insurance, and excepting reasonable wear and tear.

Within the repair responsibilities of Tenant shall be included: the roof, truck dock equipment, gutter, downspouts, exterior painting, exposed plumbing and plumbing fixtures, including stoppages not caused by Landlord's negligence; maintenance of air conditioning and heating equipment; the floor surfacing; all wiring extending to the main circuit breaker panels and lighting fixtures; automatic doors; the windows and plate glass except that covered by Landlord's fire and extended coverage insurance; the trash compactor; Tenant's refrigeration lines and equipment; its sign on the shopping center pylon; and the automatic sprinkler system.

(except for exterior painting which shall be
the responsibility of Tenant)

**LANDLORD'S REPAIRS**

12. The Landlord shall, at its cost and expense, keep and maintain, in good condition and repair, the common areas, the exterior of Tenant's store building, including the ~~windows and plate glass enclosure doors,~~ ~~roof, gutters, downspouts, exterior painting,~~ masonry walls, foundation and structural members, ~~the automatic~~ ~~sprinkler system (including control alarm system therefor) if required by governmental authority; the plumb-~~ ~~ing (including septic tank if any), wiring, air conditioning and heating systems and floor surfacing~~ of the store building in good condition and repair, and shall make any and all structural repairs to both the exterior and interior of said premises. If any portion of the common areas (as defined in Article 3 hereof) or any portion of the store building, which is the responsibility of the Landlord, shall at any time be in need of repair, Landlord will repair same immediately upon receipt of written notice from Tenant to do so, except that the Landlord shall not be obligated to make or pay for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of the Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements, or other casualty covered by Landlord's fire and extended coverage insurance.

and which have not been reimbursed to Tenant by
Landlord within thirty (30) days of such repairs.

If in order to protect persons or property it shall be necessary to make emergency repairs which are the responsibility of the Landlord, or if the Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas, as defined in Article 3 hereof, which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs. Landlord further covenants that the store building will be so constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that the premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated.

6

**SIGNS**

13. Tenant may place, erect and maintain any signs on the roof, walls, and any other places on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs.

Landlord agrees to share in the construction of a shopping center pylon to be constructed in the shopping center in the location as shown on Exhibit "A", and Tenant, together with the other tenants in the center, shall be permitted to affix thereon an electrically illuminated sign panel advertising its business, to be installed by Tenant and connected to power outlets to be installed by Landlord. The cost of the shopping center pylon, including foundation, support posts and the shopping center sign shall be shared on a cost basis as follows: each of the tenants who affixes a sign to the pylon shall bear a portion of the cost of constructing the pylon on a prorata basis, based upon the size which the tenant's sign bears to the entire square footage area of all signs affixed to the pylon sign, Landlord's prorata share being based upon the square footage of the shopping center sign affixed to the pylon. Landlord at its expense shall lay and install suitable underground conduit and wiring extending to the pylon from Tenant's building.

**FIXTURES AND ALTERATIONS**

14. The Tenant, at its own expense, shall have the right from time to time during the term of this lease to make any interior or exterior alterations, additions and improvements, including doors and partitions, in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good, workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. This right of Tenant shall include the erection of interior partitions and the installation of additional front and rear doors. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

Any alterations, additions and improvements contemplated hereunder which may involve or affect the structure of the building must be first approved in writing by Landlord and its Mortgagee.

Tenant may construct and build or install in the premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from the premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to the premises resulting from the installation or removal of such items.

Tenant shall not permit any mechanic's or other liens to stand against the demised premises or the shopping center for work or material furnished to Tenant. In the event any mechanic's or materialman's or other lien is filed against the demised premises or shopping center as a result of any work or act of Tenant, Tenant, at its expense, shall discharge or bond off the same within ten (10) days from the filing thereof. If Tenant fails to discharge said mechanic's or other lien, Landlord may bond or pay the same without inquiring into the validity or merits of such lien, and all sums advanced by Landlord shall be paid by Tenant on demand as additional rent. Landlord hereby gives notice to all persons that any liens claimed by any person as a result of improving the demised premises pursuant to a contact with the Tenant or any person other than the Landlord shall extend to and only to the right, title and interest, if any, of the person who contacts for said improvements. In no event shall said lien extend to the interest of the Landlord, its successors or assigns in the demised premises and shopping center. Landlord hereby expressly prohibits any such liability. This paragraph shall be construed so as to prohibit, in accordance with the provisions of Chapter 713, Florida Statutes, the interest of the Landlord in the demised premises, the shopping center or any part thereof, from being subject to a lien for any improvements made by Tenant or any third party to the demised premises.

(including costs of investigations, court costs and reasonable attorneys' fees)

or from signs in-
stalled by Tenant,

**INDEMNIFI-CATION**  15.  Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises. Likewise, Landlord shall indemnify and save harmless the Tenant from any claim or loss (including costs of investigation, court costs and reasonable attorneys' fees) by reason of an accident or damage to any person or property happening on or about all common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, comprehensive general liability insurance coverage with Tenant named as an additional insured on all common areas (as defined in Article 3 hereof) of the shopping center, in a company qualified to transact business in the state where the premises are located, stipulating limits of liability of not less than $2,000,000.00. Certificate of such coverage from the insurer providing 30 days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant.  The premium cost of said liability coverage shall be included in those items under Article 31 for which Tenant shall reimburse Landlord for its pro-rata share.

**CLEANLINESS**  16.  Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the delivery areas at the rear of the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the demised premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

neither party elects

other party

and/or Landlord

**FIRE**  17.  In the event that Tenant's demised premises shall be totally destroyed or damaged to the extent of 75% or more of the value thereof by fire or other casualty, then Tenant may elect within thirty (30) days after such damage, to terminate this lease by giving to the Landlord a written notice of termination, and thereupon both parties shall stand released of and from all further liability under this lease. If Tenant's demised premises shall thereby suffer damage to any extent less than 75% of the value thereof, or if Tenant does not elect to terminate as aforesaid, then the Landlord agrees to proceed promptly and without expense to the Tenant to repair the damage or restore the improvements, remitting a fair and just portion of the rent, according to the unusable space, until said premises are completely reinstated or restored. If at any time during the term of this lease or any extensions thereof any of the buildings in the shopping center, exclusive of Tenant's demised premises, are damaged by fire or by the elements or otherwise, Landlord shall immediately commence and diligently prosecute to completion repair of all such damage and shall restore said improvements to their condition prior to such damage.

Landlord shall carry fire and extended coverage insurance on Tenant's demised premises and any additions, alterations and improvements made thereto by Landlord or Tenant and on all other buildings within the shopping center in the amount of full insurable value thereof, above foundation walls, and hereby expressly waives any and all claims against the Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the Tenant, its agents, servants or employees; and Tenant hereby expressly waives any and all claims against Landlord for loss or damage to Tenant's merchandise, fixtures and equipment due to fire, explosion, windstorm or other casualty covered by standard fire and extended insurance policies, regardless of cause of such damage, including, without limitation, damage resulting from negligence of Landlord, its agents, servants, or employees.

8

Except for a first mortgage lien and subject to Article 29, herein,

except ad valorem real estate
taxes for the current year,

**QUIET
ENJOYMENT**

18.    Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a mercantile, retail or service business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a mercantile, retail or service business or using the common areas (as defined in Article 3 hereof) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

**TAXES
AND
LIENS**

19.  All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord prior to delinquency ╱    Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the demised premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the demised premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law.

unless Landlord is legally contesting the amount or legality of any such taxes, assessment or charge, in which event they shall be paid within five (5) business days after final resolution of such contest. Upon thirty (30) days' prior notice to Landlord and the opportunity to cure, the

**CONDEM-
NATION**

20.  If any part of the demised premises or more than twenty per cent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

If Tenant does not elect to terminate this lease, the right of Tenant to a division of condemnation proceeds shall extend only to such portion of the award as may be attributable by the Court to disturbance of Tenant's established business and to Tenant's trade fixtures, equipment, leasehold improvements and moving expenses, and Tenant shall not thereby be entitled to any portion of the award attributable to the land and building or to the value of the unexpired portion of the Tenant's term.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the number of cars which may be conveniently parked in the shopping center to less than four (4) parking spaces for every square foot of leasable space contained within the shopping center, then the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the later of the time of such taking, or the time the Tenant vacates the demised premises.

**DEFAULT**   21.  In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.

**BANKRUPTCY**   22.  The Tenant further covenants and agrees that if, at any time, ~~Tenant is adjudged a bankrupt or insolvent under the laws of the United States or of any state~~, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall ~~forthwith~~ be entitled to immediate possession of the said premises.

Tenant files a voluntary petition in bankruptcy for adjudication as a bankrupt or insolvent, or the failure to timely discharge within thirty (30) days of filing a petition filed against Tenant seeking any reorganization, rearrangement, recomposition, readjustment, liquidation, dissolution or similar relief under any present or future federal, state or other statute, law or regulation related to bankruptcy, insolvency or other relief for debtors.

**CONSTRUCTION RISKS**   23.  Nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing the improvements, and the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated and to request change orders to be paid by Tenant. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing the improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing the improvements or from any faulty construction thereof.

Acceptance of possession by Tenant of the demised premises shall be conclusive evidence that Landlord's work to the date of possession had been fully performed in the manner required, except for latent defects.  Any items of Landlord's work which are not completed as of delivery of possession shall be identified by Tenant on a punch list to be submitted to Landlord within thirty (30) days after such delivery and Landlord shall thereafter complete the same, provided such punch list items are Landlord's responsibility according to the approved plans and specifications.  Any items of Landlord's work which are not timely identified on such punch list shall be deemed completed.

**NOTICES**    24. All notices required to be given to Landlord hereunder shall be sent by registered or certified mail

or delivery service with receipt to, and all rent payments shall be made to Landlord at _____

19091 Tamiami Trail, S.E.
Ft. Myers, Florida 33908,
_____

WITH COPY TO
_____

H.D.C. Corp., Box 203
Sky Valley, Dillard, Georgia 30537
_____

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant
by registered or certified mail or delivery service with receipt.

All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at

P.O. Box 440
_____

Tampa, Florida 33601
_____

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord
by registered or certified mail or delivery service with receipt.

**END OF TENANCY**    25. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state. Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

**ASSIGNMENT AND SUBLEASING**    26. The Tenant may without the consent of the Landlord assign this lease, or sublease or vacate the demised premises in whole or in part, provided the Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this lease.

In the event of any assignment or sublease or vacating of the entire premises, the rental thereafter shall be a fixed rental only consisting of the average percentage rental, if any, paid by Tenant for the two years immediately preceding such assignment, vacating or subletting plus the minimum guaranteed rental provided for herein; provided, however, this provision shall not apply in the event such assignment or sublease shall be to any corporation or entity which is the parent of, subsidiary to or affiliated with Tenant or to any corporation or entity with which Tenant merges or consolidates or to which it sells all or substantially all of its business in the state where the demised premises are situated. The provisions of this paragraph shall not be construed to limit or restrict the right of Tenant to sublease a portion or department of the demised premises without consent of Landlord to any concessionaire or licensee or otherwise in connection with the operation of Tenant's business in the demised premises, provided the sales of such concessionaire or licensee shall be included within the gross sales of Tenant, as defined hereinabove in Article 1a.

In the event Tenant shall vacate the entire demised premises or cease selling merchandise therein for in excess of a period of six (6) months, while the demised premises are usable for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant), Landlord shall have the continuing option thereafter (unless Tenant shall have reoccupied the premises) to terminate and cancel this lease upon fifteen (15) days written notice to Tenant of its election to do so, unless within such fifteen (15) day period Tenant shall advise Landlord that Tenant had, prior to receipt of such notice in good faith committed to assign this lease or sublease the demised premises to a third party for occupancy within two (2) months.

Notwithstanding anything in this Article to the contrary, it is expressly agreed that any assignment or subletting hereunder shall be subject to the permitted use provisions set forth in Article 2 hereinabove.

11

**EXTENSIONS**    27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of _____

if Tenant is not in default,

five _____ ( 5 ) successive extensions of this lease, each extension to be for a period of
five _____ ( 5 ) years and at the same rentals and upon the same terms and con-
ditions as required herein for the initial term.

Such option privilege may be exercised by Tenant giving to the Landlord a notice in writing at least
six (6) months _____ before the expiration of the initial term, and if
extended, at least___six (6) months_____ before the expiration of such
extended term, stating the intention of the Tenant to exercise such option and the period for which such
option is exercised and thereupon this lease shall be so extended without the execution of any other or
further document.

**EXCLUSIVE**    28. Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket
**SUPERMARKET**    in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not
directly or indirectly lease or rent any property located within the shopping center, or within 1000 feet of any
exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market,
nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or
indirectly, any part thereof to any person, firm or corporation engaged in any such business without written
permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property
located within the shopping center to be used for or occupied by any business dealing in or which shall
keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, seafood,
vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant;
except the sale of such items is not to exceed the lesser of 500 square feet of sales area or 10% of the
square foot area of any storeroom within the shopping center, as an incidental only to the conduct of
another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, for
consumption either on or off the premises, shall not be deemed a violation hereof. With the exception of
package stores, only Tenant may sell beer and wine in the shopping center for off-premises consumption.
Only Tenant may operate a bakery, delicatessen or similar department in the shopping center,
provided the restriction on the operation of a bakery, delicatessen, or similar department shall not
prevent the operation of such a department in a restaurant which serves food for "on premises"
consumption.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been
notified in writing of the name and address of the holder thereof) and so long as said mortgage shall en-
cumber the demised premises, and notwithstanding any provisions herein to the the contrary, the Tenant
shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation
of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary
of the shopping center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord,
its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by
law, in the event of any such violation. If the holder of such first mortgage should succeed to ownership
of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or
otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage
as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first
mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument.

**SUBORDINATE**    29. The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mort-
gage (which term shall include all security instruments) that may be placed on the demised premises by
the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form accep-
table to Tenant) as may be required to effectuate such subordination; provided, however, as a condition
to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing,
which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge
the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not
be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of
foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound
to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease
shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of
its obligations hereunder.

**NOTICE TO LENDER**

30. Tenant agrees that it will give notice to any holder of a first mortgage (which term shall include all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, the Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 12 of this lease.

**COMMON AREA MAINTENANCE**

31. Landlord agrees to operate and maintain in good condition and repair all the common areas, as defined in Article 3 hereof, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping at least three (3) times weekly, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and watering and maintenance of landscaped areas. If the Landlord, after fifteen (15) days following receipt of written notice from Tenant to do so, shall fail to make the repairs or perform the services described in this Article, the Tenant shall have the right to make such repairs or cause such services to be performed in its behalf and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred therein.

For such services, Tenant shall pay to Landlord at the end of each calendar month, as additional rental hereunder and as reimbursement for the estimated annual cost thereof, the amount of Tenant's prorata share thereof, computed in the proportion which the square footage of Tenant's store building bears to the total square footage of all buildings (including additional floor levels) existing in the shopping center from time to time. Such amount shall be payable on a non-cumulative basis at the end of each calendar month for the expenses of the previous month and within fifteen (15) days following the furnishing by Landlord to Tenant of a detailed statement of such costs. All such billings shall provide reasonable supporting information, and Landlord shall promptly furnish to Tenant such additional information as Tenant may reasonably require prior to payment. Landlord shall retain all invoices and other records in connection therewith, of such costs, and Tenant shall have the right to audit at its own expense any such costs and expenses within six (6) months following submission of such statement. Tenant shall not reimburse Landlord for any expense not reasonably connected with the necessary maintenance and repair of the shopping center common areas. Examples of expenses for which Tenant shall not make reimbursement are rental insurance premiums and shopping center management fees and administrative costs. Notwithstanding the above, it is agreed that Tenant's obligation to make the annual adjustment payments herein described is expressly conditioned upon receipt from Landlord of such detailed statement of costs no later than six (6) months following the end of the calendar year for which any such additional payments were due. Any additional rental payable hereunder by the Tenant may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due hereunder, it being intended that such credit shall be made annually in respect of the common area payments for the previous lease year at the time rentals due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning and end of the lease term shall be prorated on the basis of the annual credit.

Notwithstanding Tenant's obligation to pay a portion of Landlord's common area maintenance expenses hereunder, Tenant shall in no way be responsible for cost of testing, removing, abating, or otherwise dealing with hazardous substances or other violations of environmental laws, ordinances, rules, regulations or written policies now or hereafter existing, including, but not limited to, the Toxic Substances Control Act, Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Clean Water Act, Rivers and Harbors Acts of 1899 and 1910, Clean Air Act or the like, as amended and as now existing or hereinafter adopted or amended, except for those caused by the intentional or negligent activities of Tenant, its employees, officers and agents.

13

**BENEFIT**

32. This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

**TRANSFER BY LANDLORD**

33. In the event Landlord transfers Landlord's interest in this lease, Landlord agrees to promptly provide Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's interest in this lease.

**SHORT FORM LEASE**

34. The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease in form permitting its recording.

**MARGINAL TITLES**

35. The marginal titles appearing in this lease are for reference only and shall not be considered as part of this lease or in any way to modify, amend or affect the provisions thereof.

**COMPLETE AGREEMENT**

36. This written lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**TAXES AND INSURANCE**

37. During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the prorata share (as determined in paragraph 31) of the annual ad valorem real estate taxes levied against the shopping center and also the annual premium cost of fire and extended coverage insurance on the building on the shopping center. Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements and insurance premium statements as evidence of the taxes and insurance premiums chargeable to Tenant, and such additional rentals shall be payable by Tenant with the next installment of rental due hereunder not less than fifteen (15) days after receipt of such paid tax and insurance statements. Any payments due by Tenant to Landlord under the provisions of this Article 37 shall be prorated for fractional years occurring at the beginning and expiration of the term of this lease, or any extensions thereof. Tenant shall have the right from time to time to contest or protest any proceedings or in such other manner as may be provided by law, any such taxes, assessments or other governmental impositions and to institute such proceedings in the name of Landlord as Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to Landlord. Tenant shall also be responsible for and pay promptly when due any sales or other tax imposed upon the rent or other charges payable pursuant to this lease. All other taxes, including special assessments, improvement liens and the like, shall remain the sole responsibility of Landlord.

Should the ad valorem taxes for the demised premises be separately assessed, then the Tenant shall be responsible for the payment of the ad valorem taxes directly to the governmental body upon presentation of the ad valorem tax bill to Tenant by Landlord.

If such taxes shall not be assessed separately, but included within an assessment of the demised premises and others, or if such insurance premiums are included within the premium cost of others within the shopping center, the assessments or insurance bill shall be fairly apportioned to determine Tenant's share thereof. Such apportionment shall be made in the ratio which the square footage of Tenant's store building bears to the total square footage of all store buildings (including additional floor levels, if any) from time to time existing in the shopping center, as determined from an as built survey, a copy of which shall be furnished to Tenant. Tenant shall have the option to furnish such insurance coverage on its demised premises separately if, in its reasonable judgment, the premium determined by proration or obtained by Landlord is excessive, provided however, any such coverage placed by the Tenant shall be with a "Triple A" insuror acceptable to the Landlord.

14

Before any billing for such insurance contribution shall be due, Landlord shall furnish to Tenant the policy Declarations pages, or such additional information as necessary, indicating the schedule of insured property, schedule of coverages, basis of the premium, and premium of the insured property, together with the calculation of the insurance premium prorated to Tenant. Tenant's reimbursement for insurance coverages, whether under Articles 17 or 31 hereof shall not included loss of rents, liability within the demised premises or other coverages not within those required hereunder.

Notwithstanding the above, it is agreed that Tenant's obligation to make the payments herein described is expressly conditioned upon receipt from Landlord of a written statement for such ad valorem real estate tax contributions (as well as the other documents described herein if requested by Tenant) no later than December 31 of the calendar year following the year in which the taxes were due.

**OPTION FOR EXPANSION**

38. Tenant is hereby granted the option and privilege at any time during the term of this lease, or any extensions thereof, of enlarging its store building by incorporating therein the area to the northerly side thereof, such addition to be sixty (60') feet in width by two hundred (200') feet in depth as shown on Exhibit "A". It is intended that the expansion is to be accomplished during the first ten (10) years of the initial term of this lease only (a) at such times as the expansion area shall remain undeveloped, or if any adjoining storerooms have been constructed thereon, at such time as the same may be vacant and not under lease, or (b) at the expiration of the tenth (10th) year of the initial term of this lease, it being contemplated that Landlord shall lease such area to other tenants only for such periods as will expire concurrently with the expiration of the tenth (10th) year of the initial term of this lease. Thereafter, the option may be exercised at 5-year intervals, it being contemplated that Landlord shall lease such area to other tenants only for such periods as will expire at 5-year intervals dating from the expiration of the tenth (10th) year of the initial term of this lease. Landlord shall give notice to Tenant of any such expiration date and, during the period between six (6) months and three (3) months prior to such expiration date, afford to Tenant the opportunity to exercise this option, and upon Tenant giving to Landlord a notice in writing of its exercise thereof, Landlord agrees to construct such addition, or prepare such enlargement area for occupancy by Tenant, in accordance with plans and specifications to be approved by the parties hereto, with the construction to be completed with all due diligence following the vacation of the necessary area by any other tenant, and the enlarged portion of the building to be of a like quality of construction as the original building for Tenant. In order to facilitate the expansion of Tenant's demised store building as herein contemplated, Landlord agrees that any adjacent building or buildings within the expansion area shall be of like structural quality and in architectural harmony with Tenant's store building, shall front on a line which is the interior sidewalk line of Tenant's demised store building extended and shall have a finish floor level, roof and ceiling heights which shall be at the same elevations as the finish floor level, roof and ceiling heights of Tenant's demised store building. Further, Landlord agrees that the wall of Tenant's demised store building, adjoining the expansion area shall be constructed with steel column supports therein equivalently spaced to the nearest row of steel column supports within the open area of Tenant's demised store building and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original and of the expanded building width.

Upon completion of such building addition, or tender of such additional space to Tenant, if there shall not at such date remain at least ten (10) years of the then term of this lease, such term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date. Also upon completion of said addition, the annual minimum guaranteed rental (and the base for computation of percentage rental hereunder) shall be increased by the greater of: an amount equal to fourteen percent (14%) of the cost of such addition, or an amount equal to $7.12 per square foot of the enlargement area, or an amount equal to a computed percentage times the cost of such addition, such percentage consisting of four percent (4%) plus the current prime interest rate charged by New York City banks at the time of the exercise of the option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant, with the final cost of the addition upon completion to be certified to by the general contractor performing the work. During such extended term the provisions of this lease shall remain in effect and the option periods herein provided, if any shall then remain, shall be construed to follow upon the end of the extended term and the rentals to remain as adjusted in consequence of the addition. Upon completion of the addition, it shall be and become a portion of the demised premises and this lease thereby be taken and construed as so amended.

15

If after Tenant has requested Landlord to enlarge Tenant's building in accordance with the foregoing option the parties are unable to reach a mutually satisfactory agreement as to the terms and conditions upon which the enlargement is to be accomplished at Landlord's expense, or if after such agreement has been reached Landlord is for any reason unable or refuses to construct said addition, Tenant, at its option, shall have the right, at its own expense, to commence promptly after such notice the construction of the building addition of like quality of construction as the original building within the area reserved therefor up to but not in excess of the stipulated size in accordance with plans and specifications to be provided by the Tenant and to be approved by the parties hereto, which approval shall not be unreasonably withheld by Landlord. Upon completion and occupancy of such building addition by Tenant the lease term hereof shall be extended on the same terms and conditions for such period of time as shall be necessary to provide a full ten (10) years from such date (without Tenant's exercise of any renewal options) and Tenant shall be entitled to occupy the enlarged area during construction and for a ten (10) year period thereafter without obligation to pay any minimum guaranteed rental in respect of such enlargement area, and percentage rentals due hereunder, if any, shall be adjusted as described in the paragraph appearing immediately following just as if guaranteed rentals had been increased as described in the said paragraph next below.

With respect to the Tenant's constructing the said addition at its expense, upon the expiration of the extended 10-year term hereinabove described, and for the remainder of the lease term hereof including any extended or renewal periods, the annual minimum guaranteed rental for the total premises as so enlarged shall be increased by a sum equal to the same minimum guaranteed rental per square foot of the enlargement area that Tenant is then paying for the original building, with guaranteed rentals for fractional years and fractional months occurring at the beginning and end of the said remaining lease term to be prorated between the rentals payable before and those payable after the rental adjustments provided herein, and the percentage rentals due hereunder shall be adjusted to equal the amount, if any, by which one percent (1%) of Tenant's gross sales as herein defined made from the said enlarged demised premises in each fiscal year of Tenant ending approximately June 30 exceeds said increased annual minimum guaranteed rental hereinabove stipulated.

After completion of the building addition herein described the provisions of this lease shall remain in effect and the option periods herein provided, is any shall then remain, shall be construed to follow upon the end of the extended term. Upon completion of the addition, it shall be and become a portion of the demised premises and this lease shall be taken and construed as so amended.

Tenant agrees to cause any mechanics' liens incurred by it in connection with such expansion to be promptly discharged and hereby agrees to indemnify and hold harmless Landlord from any expense occasioned thereby. Neither Landlord nor Tenant will make, nor will they be required to make, any future expansion which will violate the minimum ratio of automobile parking area to building areas as provided for in this lease. Tenant agrees that any expansion work performed by it shall not unreasonably interfere with the business of other tenants in the shopping center.

Nothing herein contained shall constitute any express or implied obligation on the part of the holder of a first mortgage (which term "mortgage" shall include all security instruments) encumbering the fee simple title to the demised premises, or of any purchaser at a sale under foreclosure of such mortgage, to comply with the terms and provisions of this Article, it being the understanding of the parties that the obligation to cause such expansion is the sole obligation of the Landlord, its heirs, legal representatives, successors and assigns.

The increased area of Tenant's building resulting from the expansion and any increased taxes and insurance premiums resulting therefrom shall be taken into consideration in computing the amounts of Tenant's common areas and tax contributions required by Articles 31 and 37 hereof.

**LIMITATION OF LIABILITY**    39.  The Tenant shall look solely to the Landlord's interest in the shopping center and in the Landlord's personal property used in connection with the shopping center for the satisfaction of any judgment or decree requiring the payment of money by the Landlord, based upon any default hereunder, and no other property or asset of the Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of such judgment or decree.

**SELF-HELP**

40. If Landlord shall default in the performance or observance of any agreement or condition in this lease contained on its part to be performed or observed, and if Landlord shall not cure such default within thirty (30) days after notice from Tenant specifying the default (or shall not within said period commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Tenant may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter cure such default for the account of the Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord and the Landlord agrees to reimburse Tenant therefor or save Tenant harmless therefrom; provided that Tenant may cure any such default as aforesaid prior to the expiration of said waiting period, but after said notice to Landlord, if the curing of such default prior to the expiration of said waiting period is reasonably necessary to protect the real estate or Tenant's interest therein or to prevent injury or damage to persons or property. If Landlord shall fail to reimburse Tenant upon demand for any amount paid for the account of Landlord hereunder, said amount may be deducted by Tenant from the next or any succeeding payments of rent due hereunder.

**RADON GAS**

41. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

**ESTOPPEL CERTIFICATE**

42. Recognizing that Landlord may find it necessary to establish to third parties, such as accountants, bank, mortgagees or prospective purchasers, the then current status of performance hereunder, Tenant, on the written request of Landlord made from time to time, and within twenty days of the request, will furnish a written certification to the third parties specified by Landlord, consisting of statements in a form satisfactory to Tenant's attorney:

    (i)    that this lease is in full force and effect and has not been assigned, modified, supplemented or amended (except as may be stated);

    (ii)    of the date through which rentals have been paid;

    (iii)    of the dates of the commencement and termination of this lease;

    (iv)    that no default, or state of facts, which, with the passage of time or notice, would constitute a default, exists on the part of either party (except as may be stated);

    (v)    that there are no defenses or offsets against the enforcement of this lease by the Landlord (except as may be stated); or

    (vi)    concerning any other information that may be reasonably requested by the third party.

Any such certification as may be requested above shall also include a reciprocal provision whereby the Landlord affirms and certifies to the Tenant that the above statements are true and correct as of said date.

**IN WITNESS WHEREOF,** the Landlord and Tenant have executed this instrument the day and year first above written.

Signed, sealed and delivered
in the presence of:

Printed Name: Cheryl Ennen


Printed Name: Bill Ennen


As to Landlord


Printed Name: Rebecca L. Sawyer


Printed Name: BRENDA J. BABCOCK


As to Tenant

**SOUTHWEST FLORIDA
BUILDING GROUP, INC.**

By: Alan C. B_____
    Its             President

Printed Name: Alan C. Freeman
Address: 19031 Tamiami Trail S.E.
    Ft Myers FL 33908

Attest _____
    Its             Secretary
Printed Name: Paul H. Freeman
Address: 19091 Tamiami Trail S.E.
    Ft Myers FL 33908

(CORPORATE SEAL)

**LANDLORD**

**WINN-DIXIE STORES, INC.**

By: _____
    Its             President
Printed Name: James Kufeldt
Address: P. O. Box B
Jacksonville, FL 32203-0297

Attest _____
    Its             Secretary
Printed Name: _____
Address: P. O. Box B
Jacksonville, FL 32203-0297

(CORPORATE SEAL)
**TENANT**

18

STATE OF _FLORIDA_

COUNTY OF _LEE_ )

The foregoing instrument was acknowledged before me by _Alan C. Freeman_

_____ President and by _Paul H. Freeman_ _____ Secretary of **SOUTHWEST**

**FLORIDA BUILDING GROUP, INC.**, a Florida corporation, on behalf of the corporation, who

are:

(check one)

___✓___ personally known to me   **OR** _____ who have produced _____.

as identification.

Given under my hand and official seal this _20th_ day of _September_, 1996.

```
CAROL J. SACCOMANI
MY COMMISSION # CC 369859
EXPIRES: May 1, 1998
Bonded Thru Notary Public Underwriters
```

Printed Name: _CAROL J. SACCOMANI_

Notary Public, State and County aforesaid.

My Commission Expires:_____

Notary ID No.:_____

STATE OF FLORIDA  )

COUNTY OF DUVAL  )

The foregoing instrument was acknowledged before me by _James Kufelar_

_____ President and by _Judith W. Dixon_ _____ Secretary, of **WINN-DIXIE**

**STORES, INC.**, a Florida corporation, on behalf of the corporation, who are  personally known to me.

Given under my hand and official seal this _22nd_ day of _November_ 1996.

Printed Name: _BRENDA J. BABCOCK_

Notary Public, State and County aforesaid.

My Commission Expires: _11/20/99_

Notary ID No.:_____

EXHIBIT "A"

RESERVED FOR PLOT PLAN



EXHIBIT "B"

Northeasterly corner of the intersection of
Constitution Boulevard and U.S. Highway 41
San Carlos Park, Lee County, Florida

All that certain piece, parcel or tract of land, lying and being situated in the City of San Carlos Park,
County of Lee, and State of Florida together with all improvements thereon or to be constructed
thereon and all appurtenances thereto belonging or in anywise appertaining, more particularly
described as follows, to wit:

# DESCRIPTION :  ( AS FURNISHED BY CLIENT )

A TRACT OF LAND LYING IN SECTIONS 17 AND 8 , TOWNSHIP 46 SOUTH , RANGE 25 EAST , LEE
COUNTY , FLORIDA BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF THE NORTHWEST QUARTER (NW 1/4) OF THE NORTHWEST
QUARTER (NW 1/4) OF SECTION 17 , TOWNSHIP 46 SOUTH, RANGE 25 EAST;  THENCE EASTERLY ALONG
THE SOUTH LINE OF THE NORTHWEST QUARTER (NW 1/4) OF THE NORTHWEST QUARTER (NW 1/4)
OF SAID SECTION 17 FOR 328.46 FEET TO A POINT ON THE CENTERLINE OF U.S. HIGHWAY 41 (STATE
ROAD 45);  THENCE N. 20'35'30"W. ALONG SAID CENTERLINE FOR 1750.28 FEET;  THENCE
N. 69'24'30"E. FOR 153.00 FEET;  THENCE N. 69'19'18"E. FOR 280.00 FEET TO THE
POINT OF BEGINNING;  THENCE S. 20'35'30"E. FOR 30.19 FEET TO A POINT OF CURVATURE
ON THE ARC OF A CURVE CONCAVE SOUTHWESTERLY;  THENCE SOUTHEASTERLY 89.92 FEET ALONG
SAID CURVE HAVING A RADIUS OF 170.00 FEET AND A CENTRAL ANGLE OF 30'18'28"
TO A POINT OF REVERSE CURVATURE;  THENCE SOUTHEASTERLY 68.77 FEET ALONG THE ARC OF
SAID CURVE HAVING A RADIUS OF 130.00 FEET AND A CENTRAL ANGLE OF 30'18'33" TO A
POINT OF TANGENCY;  THENCE S. 20'35'30"E. FOR 449.21 FEET TO A POINT OF CURVATURE ON THE
ARC OF A CURVE CONCAVE NORTHEASTERLY;  THENCE SOUTHEASTERLY 117.11 FEET ALONG THE ARC OF SAID
CURVE HAVING A RADIUS OF 80.00 FEET AND A CENTRAL ANGLE OF 83'52'34" TO A POINT OF TANGENCY;
THENCE S. 75'31'56"W. FOR 59.14 FEET TO A POINT OF CURVATURE ON THE
ARC OF A CURVE CONCAVE SOUTHWESTERLY;  THENCE SOUTHEASTERLY FOR 186.20 FEET
ALONG THE ARC OF SAID CURVE HAVING A RADIUS OF 120.00 FEET AND A CENTRAL
ANGLE OF 88'54'19" TO A POINT OF NON – TANGENCY;  THENCE N. 06'21'30"W. FOR 136.63 FEET
TO A POINT OF CURVATURE ON THE ARC OF A CURVE CONCAVE SOUTHEASTERLY;  THENCE
NORTHEASTERLY 19.84 FEET ALONG THE ARC OF SAID CURVE HAVING A RADIUS OF 15.00 FEET
AND A CENTRAL ANGLE OF 75'46'00" TO A POINT OF TANGENCY;  THENCE N. 69'24'30"E. FOR
292.92 FEET;  THENCE N. 00'48'59"W. FOR 280.36 FEET;  THENCE N. 28'50'27.5"E FOR
217.59 FEET;  THENCE N. 00'59'23"W. FOR 148.96 FEET;  THENCE S. 89'00'37"W. FOR
470.00 FEET;  THENCE S. 69'19'18"W. FOR 404.42 FEET TO THE POINT OF BEGINNING.

TRACT CONTAINING 11.49 ACRES MORE OR LESS ,

TOGETHER WITH ,

AN EASEMENT OVER A TRACT OF LAND SITUATED IN THE STATE OF FLORIDA, COUNTY OF LEE, BEING
A PART OF SECTION 17, TOWNSHIP 46 SOUTH, RANGE 25 EAST AND FURTHER BOUNDED AND DESCRIBED
AS FOLLOWS:

STARTING AT A CONCRETE MONUMENT AT THE SOUTHWEST CORNER OF THE NORTHWEST 1/4 OF THE NORTHWEST
1/4 OF THE AFORESAID SECTION 17; THENCE N. 88'57'23" E. ALONG A SOUTHERLY LINE OF THE
AFORESAID FRACTION OF A SECTION A DISTANCE OF 466.34 FEET TO A POINT ON THE NORTHEASTERLY
RIGHT–OF–WAY LINE OF U.S. HIGHWAY 41 (STATE ROAD #45 – 200 FEET WIDE); THENCE N. 20'35'30" W.
ALONG SAID NORTHEASTERLY RIGHT–OF–WAY LINE A DISTANCE OF 705.88 FEET TO A
POINT ON A CURVE TO THE RIGHT HAVING A RADIUS OF 25 FEET FOR 29.51 FEET (CHORD BEARING
N. 13'13'30" E.) TO A POINT OF COMPOUND CURVATURE; THENCE RUN NORTHEASTERLY ALONG
THE ARC OF A CURVE TO THE RIGHT OF RADIUS 957.00 FEET FOR 280.00 FEET (CHORD BEARING
N. 55'25'30" E.); TO THE POINT OF BEGINNING.

FROM SAID POINT OF BEGINNING RUN S. 34'30'30" E. FOR 401.00 FEET MORE OR LESS TO THE WATERS
OF A LAKE; THENCE RUN WESTERLY ALONG SAID WATERS A DISTANCE OF 15.66 FEET; THENCE
RUN N. 34'30'30" WESTERLY A DISTANCE OF 398.57 FEET; THENCE RUN ALONG THE ARC OF A CURVE TO THE
RIGHT OF RADIUS 957.00 FEET FOR 15.14 FEET (CHORD BEARING N. 63'21'18" E.) TO THE POINT OF BEGINNING

EASEMENT CONTAINS .14 ACRES MORE OR LESS.