# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re:                                         Case No. 05-03817-3FI

WINN-DIXIE STORES, INC., et al.,               Chapter 11

Debtors.                                       Jointly Administered

_____/

## PINES-CARTER OF FLORIDA'S 1) OBJECTION TO DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. § 365(d)(4) GRANTING THIRD EXTENSION OF TIME WITHIN WHICH DEBTORS MAY ASSUME OR REJECT UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY; AND 2) MOTION TO COMPEL DEBTOR TO ASSUME OR REJECT UNEXPIRED LEASE OF NONRESIDENTIAL REAL PROPERTY (STORE #658, LOCATED AT 15200 MUNICIPAL DRIVE, MADEIRA BEACH, PINELLAS COUNTY, FLORIDA)

PINES-CARTER OF FLORIDA, INC. ("Pines-Carter" or "Landlord), by and through his

undersigned counsel, pursuant to 11 U.S.C. § 365(d)(4), objects to the Debtors' Motion for Order

Under 11 U.S.C. § 365(d)(4) Granting Third Extension of Time Within Which Debtors May

Assume or Reject Unexpired Leases of Nonresidential Real Property (the "Third Extension

Motion").  Alternatively, pursuant to 11 U.S.C. § 365(d)(4) and the express provisions of this

Court's Order Under 11 U.S.C. § 365(d)(4) Granting Further Extension of Time to Assume or

Reject Unexpired Leases of Real Property dated September 12, 2005 (the "Second Extension

Order"), Pines-Carter moves for the entry of an Order compelling the Debtor, WINN-DIXIE

STORES, INC. (the "Debtor"), to assume or reject a lease of non-residential real property owned

by Pines-Carter, which is more commonly known by the Debtor as Store #658, located at 15200

Municipal Drive, Madeira Beach, Pinellas County, Florida, within ten (10) days from the entry of

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD,  MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

{J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.}

the Court's Order.  As grounds for its Motion, Pines-Carter states:

## Introduction

1.      On February 21, 2005 (the "Petition Date"), Winn-Dixie Stores, Inc. (the "Debtor") and twenty-three of its subsidiaries and affiliates (collectively, the "Debtors")[1] filed voluntary petitions for relief under chapter 11 of title 11 ofthe United States Code (the "Bankruptcy Code").  The Debtors' cases are being jointly administered for procedural purposes only.

2.      The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107( a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner. On March 1, 2005, an official committee of unsecured creditors (the "Creditors Committee") was appointed to serve in these cases pursuant to section 1103 of the Bankruptcy Code.

3.      The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners. As of the Petition Date, the Debtors have represented in court papers filed in this case that they were considered to be the eighth-largest food retailer in the United States and one of the largest in the

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

Case No. 05-03817-3FI

Southeast, with more than 900 stores in the United States.

**The Debtors' multiple requests for enlargments of time to assume or reject leases**

4.     The Debtors have previously alleged that prior to the Petition Date, the Debtors

and their financial advisors began a comprehensive analysis of the Debtors' businesses to

determine how best to maximize their value.  In connection with this analysis, the Debtors

purportedly announced a series of actions to improve their competitive position, which the

Debtors refer to as their "Strategic Plan."

5.     In connection with the Strategic Plan, the Debtors have alleged that they and their

financial advisors analyzed the Debtors' market areas and determined that some of these markets

are noncore, with limited opportunities for the Debtors and unprofitable operations in the

aggregate. Prepetition, the Debtors have alleged that they sold or closed 111 stores in these

noncore areas and another 45 unprofitable stores located in core market areas. Postpetition, the

Debtors have alleged that they determined that all stores in the noncore areas should be sold or

closed.

6.     The Debtors and their financial advisors have alleged that they are continuing to

analyze all of the Debtors' stores, including each store's market share, cash flow, profitability,

real estate quality and financial outlook. Based upon this analysis, the Debtors have rejected

approximately 180 unexpired leases, including approximately 150 effective as of the Petition

Date.

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

7.      On March 17, 2005, the Debtors filed their Motion for Order Under 11 U.S.C. §

365(d)(4) Extending Time Within Which Debtors May Assume or Reject Unexpired Leases of

Nonresidential Real Property pursuant to which they sought to extend the 60-day initial period

during which the Debtors must assume or reject unexpired nonresidential real property leases

(the "Initial Extension Motion").

8.      On May 6, 2005, the Court entered an Order granting the Initial Extension Motion

(the "Initial Extension Order"), and extended the deadline by which the Debtors must assume or

reject unexpired leases to September 19, 2005.

9.      On or about August 12, 2005, the Debtors filed their Motion for Order Under 11

U.S.C. § 365(d)(4) Further Extending Time Within Which Debtors May Assume or Reject

Unexpired Leases of Nonresidential Real Property pursuant to which they sought to extend

September 19, 2005 deadline by which the Debtors had to assume or reject unexpired

nonresidential real property leases under the Initial Extension Order for an additional 90-day

period through and including December 19, 2005 (the "Second Extension Motion").

10.     By way of the Second Extension Motion, the Debtors alleged that as of the date of

such Motion, there were lessees under more than 900 unexpired leases of nonresidential real

property (collectively, the "Unexpired Leases").   The Debtors further alleged that with the

assistance of their advisors, they were analyzing the remaining Unexpired Leases to determine

which will be critical to their reorganization.  In considering their options with respect to the

remaining Unexpired Leases, the Debtors stated that they were evaluating a variety of factors to

4

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

Case No. 05-03817-3FI

determine whether it is appropriate to assume, assign or reject particular Unexpired Leases. The Debtors then stated that given the large number of Unexpired Leases that still exist in these proceedings, the Debtors required an extension of the section 365(d)(4) deadline for an additional 90-day period in order to fully and adequately determine whether to assume or reject particular remaining Unexpired Leases.

11.     On September 12, 2005, this Court entered its Order under 11 U.S.C. § 365(d)(4) Granting Further Extension of Time to Assume or Reject Unexpired Leases of Nonresidential Real Property (the "Second Extension Order"), pursuant to which the Court granted the Second Extension Motion and extended the period within which the Debtors must move to assume or reject the Unexpired Leases through December 19, 2005. However, the Court also ordered that: **"the entry of this Order is without prejudice to the right of any lessor under an Unexpired Lease to request from this Court, upon reasonable notice to the Debtors and all other necessary parties-in-interest, an order compelling the Debtors to assume or reject any Unexpired Lease by an earlier date, or the Debtors' right to oppose any such request."**

12.     On or about November 23, 2005, the Debtors filed their Motion for Order Under 11 U.S.C. § 365(d)(4) Granting Third Extension of Time Within Which Debtors May Assume or Reject Unexpired Leases of Nonresidential Real Property (the "Third Extension Motion"), seeking a third extension of time through and including March 20, 2006 to assume or reject more than 630 unexpired leases of nonresidential real property under which the Debtors are lessees (collectively, the "Unexpired Leases"). The Debtors proposed in the Third Extension Motion

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

Case No. 05-03817-3FI

that: "each Lessor be permitted to seek to shorten the Extension Period for cause with respect to a particular Unexpired Lease. This ability to request relief from the Extension Period ensures that no Lessor will be prejudiced by the requested [third] extension of time." *Third Extension Motion* at p.7, ¶ 21.

### The Debtor's Lease with Pines for Store #658

13.     On March 25, 1974, the Debtor entered into a lease of non-residential real property (the "Lease") located in a shopping center known as "Carter Plaza," situated at the northwest corner of the intersection of Madeira Way and 151st Avenue, in the City of Madeira Beach, County of Pinellas, with the street address of 15200 Municipal Drive, Madeira Beach, Pinellas County, Florida (the "Leased Premises"). A true and correct copy of the Lease, as amended by five separate Amendments to the Lease[2] is attached hereto as Composite Exhibit "A," and incorporated herein by this reference.

14.     Pines-Carter owns and holds all right, title, and interest in the Lease with the Debtor. Pines-Carter also owns and/or controls 100% of the ownership interests in the underlying real estate and shopping center upon which the Premises are situated (the "Property").

---

[2]On July 16, 1975, the Debtor entered into a Supplemental Lease Agreement (the "First Lease Amendment"). On February 15, 1983, the Debtor entered into a Second Amendment of Lease (the "Second Lease Amendment"). On June 6, 1994, the Debtor entered into a Third Amendment of Lease (the "Third Lease Amendment"). On August 30, 1994, the Debtor entered into a Fourth Amendment of Lease (the "Fourth Lease Amendment"). On April 28, 1997, the Debtor entered into a Fifth Amendment of Lease (the "Fifth Lease Amendment"). The Lease, as amended by the First, Second, Third, Fourth and Fifth Lease Amendments shall be collectively referred to as the "Lease."

6

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

Case No. 05-03817-3FI

15.    The Lease has an initial term which is due to expire on January 12, 2015, plus five

(5) optional extension periods each for five (5) years.  The current annual rent due from the

Debtor under the Lease is $249,215.00, due and payable in advance in twelve (12) equal monthly

installments of $20,767.92 each due on the first day of each and every calendar month of the

Lease term, as extended.  Furthermore, the Debtor also agreed to pay Landlord a percentage

rental equal to the amount, if any, by which one percent (1%) of the Debtor's gross sales made

from the Premises in each fiscal year of the Debtor ending approximately June 30th during the

term of the Lease as extended, and any extensions thereof, exceeds $249,215.00 (the "Rent

Kicker").

16.    Store #658 loses money for the Debtor.  Pines-Carter insisted upon placing the

Rent Kicker in the Lease in order to share in Store #658's profitability with the Debtor.

However, the Lease's Rent Kicker has never "kicked in." Because of poor revenue at Store #658,

the Debtor has never been required to pay any extra rent attributable to Store #658's profitability

to Pines-Carter: i.e. 1% of the Debtor's gross sales from Store #658 has always been less than

$249,215.00.  For the Debtor's fiscal year June 30, 2004, Store #658's gross sales declined were

$13,292,493.70 (1% = $132,924.94), and for the Debtor's fiscal year ended June 29, 2005, Store

#658's gross sales declined to $12,939,722.46 (1% = $129,397.22).  Copies of letters from the

Debtor to Pines-Carter dated August 17, 2004 and August 17, 2005 advising of its gross sales for

these years are attached hereto as Composite Exhibit "B," and incorporated herein by this

reference.

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

17.     On May 23, 2005, Pines-Carter filed a proof of claim in the Debtor's bankruptcy

estate in the amount of $23,799.04 relating to CAM charges due under the Lease that the Debtor

failed and refused to pay for the months of July, 2004 through the Petition Date (the "Arrearage

Claim").

### Store #658 is unprofitable for the Debtor and the Lease should be rejected

18.     The Debtors have retained DJM Asset Management, LLC ("DJM") as

professionals in this case to assist and advise the Debtors regarding their decisions on which

Unexpired Leases to assume, and which to reject in conjunction with their Strategic Plan to

reorganize the Debtors and make the Debtors more profitable.

19.     As stated previously, Store #658 is an unprofitable retail store for the Debtor and

is exactly the type of Winn-Dixie store that should be closed down as part of its efforts to

restructure in Chapter 11.

20.     Pines-Carter's belief that Store #658 is unprofitable for the Debtor and the Lease

should be rejected by the Debtor in this bankruptcy case is evidenced by DJM's efforts to extract

serious and damaging rent concessions from Pines-Carter regarding the Premises.

21.     On August 1, 2005, Thomas H. Davidson ("Davidson") at DJM sent Pines-Carter

a letter in which DJM stated, on behalf of the Debtor, that there were "necessary concessions and

other leasehold modifications that are requested by the Debtor" with respect to the Store #658

Premises." Included among the "concessions" demanded by the Debtor for the Lease was the

Debtor's demand that "effective September 1, 2005 through September 6, 2005, the annual base

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

rent will be reduced from $249,215/yr, payable at the rate of $20,768 monthly to $199,215/yr,

payable at the rate of $16,601.25 monthly." A copy of such letter is attached hereto as Exhibit

"C," and incorporated herein by this reference.

22.    On August 10, 2005, Pines-Carter sent DJM a letter, in which Pines-Carter

notified the Debtor c/o DJM, that Pines-Carter was rejecting the Debtor's "demand" for

unilateral concessions regarding the Lease, and that Pines-Carter will insist upon strict

compliance with the terms of the existing Lease. A copy of such letter is attached hereto as

Exhibit "D," and incorporated herein by this reference.

**The Debtor refused to accept lucrative offers to terminate the Lease**
**from a party interested in purchasing the Property**

23.    On April 7, 2005, the Pines-Carter and Pines Ventures, Ltd, as Seller, entered into

a Contract for Sale and Purchase of the Property (the "Sale Contract") with Gulf Beach Partners,

LLC, as Buyer ("Gulf Beach"), pursuant to which Gulf Beach agreed to purchase the shopping

center upon which the Store #658 Premises are located for the purchase price of $22,400,000.00

(the " Sale Contract").

24.    Gulf Beach, the Buyer under the Sale Contract, wants to purchase the Property on

which Store #658 is located for redevelopment. Gulf Beach would like for the Debtor to reject

its unprofitable Lease with Pines-Carter, and quit the Premises, so that Gulf Beach would then be

unrestricted in its efforts to redevelop the Property in accordance with its plans.

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

25.     Pines-Carter and Gulf Beach have attempted to negotiate with the Debtor a termination of the Lease for several months. The Debtor, Winn-Dixie, has simply stated that it has not been able to analyze whether the Premises should be assumed or rejected and therefore was not in a position to negotiate a termination of the Lease.

### Applicable Law

Section 365(d)(4) of the Bankruptcy Code provides, in relevant part, as follows:

> ... [I]n a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of *nonresidential* real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

11 U.S.C. § 365(d)(4) (emphasis supplied).

The 60-day time limitation imposed by Congress in 11 U.S.C. § 365(d)(4) upon a debtor that is a party to an unexpired lease of *nonresidential* real property, was one of the amendments enacted by Congress to the Code in 1984 in order to institute "measures that correct problems for owners of shopping centers and their tenants, and other owners of real estate, *whose leases are tied up in reorganization proceedings*." *In re Care Givers, Inc.,* 113 B.R. 263, 267 (Bankr. N.D.Tex. 1989)(citing 130 *Cong.Rec.S.* 8890 (daily ed. June 29, 1984) *reprinted in* 1984 *U.S.Code Cong. & Ad.News* 576, 587)(emphasis supplied). Congress further evidenced its intent to avoid having nonresidential real property "tied up" in reorganization proceedings when it amended section 365(d)(4) of the Code as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Indeed, if this case had been filed subsequent to

the effective date of BAPCPA's amendment to section 365(d)(4), the Debtor's 210 day *maximum*

period to assume or reject the Lease would have already expired approximately two months ago,

in September, 2005.[3]

Section 365(d)(4) of the Code allows the Court to grant a debtor an extension of time to

assume or reject an unexpired lease(s) of nonresidential real property.  However, *Norton* states

that

> [t]he Bankruptcy Code provides no guidance as to the amount of time which may
> be given.  If an unlimited time extension is given the trustee or debtor in
> possession would have as much time to assume or reject leases as a residential
> tenant debtor under Code § 365(d)(2).  It would be anomalous to place the debtor
> subject to Code § 365(d)(4), which was intended to benefit 'commercial'
> landlords, in a position similar to that provided under Code § 365(d)(2).  Thus, the
> court in *In re Wedtech Corp.*, observed that granting an open-ended extension
> '*defeats the whole purpose of § 365(d)(4) and effectively reinstates Section*
> *365(d)(2) [as it existed] before the [BAFJA 1984] amendment [to the Bankruptcy*
> *Code].*

2 *Norton Bankr. L. & Prac.* 2d § 39:41 (2005)(emphasis supplied)(citing *In re Wedtech Corp.*, 72

B.R. 464 (Bankr. S.D.N.Y. 1987); and *Net Realty Holding Trust v. R.H. Macy & Co., Inc.*, 1992

WL 322288 at *2 (reversing open-ended extension granted by bankruptcy court and suggesting

---

[3]After BAPCPA, Section 365(d(4) of the Code states as follows:

(A) Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the
lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the
lessor, if the trustee does not assume or reject the unexpired lease by the earlier of--
     (i) the date that is 120 days after the date of the order for relief; or
     (ii) the date of the entry of an order confirming a plan.
(B)(i) The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day
period, for 90 days on the motion of the trustee or lessor for cause.
(ii) If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior
written consent of the lessor in each instance.

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

Case No. 05-03817-3FI

that "perhaps a six-month or other reasonable extension" might be in order)).

This Court has already recognized the applicability of Section 365(d)(4) of the Code in this case when it stated in the Second Extension Order, which granted the Debtor until December 19, 2005 within which to assume or reject the Lease, that : "the entry of this Order is without prejudice to the right of any lessor under an Unexpired Lease to request from this Court, upon reasonable notice to the Debtors and all other necessary parties-in-interest, an order compelling the Debtors to assume or reject any Unexpired Lease by an earlier date, or the Debtors' right to oppose any such request." *Second Extension Order* at ¶7.   Indeed, the Debtors have requested this same provision in paragraph 4 of their proposed Order Granting the Debtors' *Third Extension Motion*, which was attached as an exhibit to such Motion.   Pines-Carter now objects to the Debtors' *Third Extension Motion* as to Pines-Carter's Lease, or, in the alternative, requests this Court to compel the Debtor to assume or reject Pines-Carter's Lease within ten (10) days of the hearing on this Motion in accordance with the Debtors' proposed *Third Extension Order*.

As of the date of filing this Motion, the Debtors have already had the benefit of over a seven month extension of time to make their decisions regarding whether to assume or reject unexpired leases of nonresidential real property.   This is already beyond the six month period of "reasonableness" suggested in the *R.H. Macy* case.   *R.H. Macy & Co., Inc.*, 1992 WL 322288 at *2. By providing in the *Second Extension Order* and the Debtors' proposed *Third Extension Order* for the ability of any affected lessor to seek to compel the Debtors to assume or reject a *particular* unexpired lease of nonresidential real property, in effect, this Court recognized the

12

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

potential extent to which this Court's granting of mulitiple extensions of time for these Debtors

to assume or reject their Unexpired Leases, conflicted with Congressional policy to limit the time

that nonresidential shopping-center lessors should be kept in doubt regarding the status of their

commercial property.

What constitutes "[a] 'reasonable time' must be determined on a case-by-case basis in

light of the circumstances of the case." 2 *Norton Bankr. L. & Prac.* 2d § 39:15 (citing *Matter of*

*Whitcomb & Keller Mortg. Co., Inc.*, 715 F.2d 375 (7th Cir. 1983); *Adelphia Communications*,

291 B.R. at 292 (citing *In re Burger Boys,* 94 F.3d 755, 760 (2d Cir.1996) (in context of debtor-

lessee's motion to extend section 365(d)(4) period); *Theatre Holding Corp. v. Mauro (In re*

*Theatre Holding Corp.),* 681 F.2d 102, 105 (2d Cir.1982) (in context of motion by landlord, prior

to 1984 enactment of section 365(d)(4), to shorten debtor-lessee's time to assume or reject

commercial lease)).

At least with respect to Pines-Carter's Lease, the Debtor has already had a "reasonable"

period of time within which to make its decision to assume or reject the Lease.  The Debtors'

*Third Extension Motion* should be denied, at least as to Pines-Carter's Lease for this reason.

Although this Court has already granted the Debtors the Second Extension through December 19,

2005 within which to assume or reject the Lease, the Court's *Second Extension Order* which

allows nonresidential lessors the right to seek to compel the Debtors to assume or reject any

particular unexpired lease(s) of nonresidential real property by an earlier date mandates that the

Court determine at this time whether or not the Debtor, Winn-Dixie, has already had a

Case No. 05-03817-3FI

"reasonable time" to make its decision whether to assume or reject Pines-Carters' Lease, given its predicament.

What constitutes a "reasonable time" for a debtor-in-possession to assume an unexpired lease of nonresidential real property under the Bankruptcy Code is a discretionary matter for this Court based upon a number of important considerations, including:

(1) whether the debtor was "paying for the use of the property";

(2) whether 'the debtor's continued occupation ... could damage the lessor [ ] beyond the compensation available under the Bankruptcy Code';

(3) whether the lease is the debtor's primary asset;

(4) whether the debtor has had sufficient time to formulate a plan of reorganization;

(5) the complexity of the case facing the debtor;

(6) the number of leases that the debtor must evaluate; and

(7) 'the need for judicial determination of whether a lease exists.'

*Burger Boys*, 94 F.3d at 755 (citing *Theatre Holding Corp. v. Mauro*, 681 F.2d 102 (2d Cir.1982); and *Wedtech Corp.*, 72 B.R. at 471); *Accord Adelphia Communications*, 291 B.R. at 293 (listing factors for determining whether to compel debtor-in-possession to assume or reject an executory contract under 11 U.S.C. § 365(d)(2)).

The Debtors' *Third Extension Motion* should be denied as to the Pines-Carter Lease. Alternatively, Pines-Carter requests this Court to compel the Debtor to assume or reject the Lease within ten (10) days of the Court's Order granting this Motion. Applying the factors discussed in

14

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

*Burger Boys* regarding whether a debtor has been given a "reasonable time" to make a decision

whether to assume or reject an unexpired lease, it is clear that the Debtor in this case has been

given more than a reasonable time to assume or reject the Pines-Carter Lease:

1. <u>The Debtor is paying for the use of the Property</u>.  Although the Debtor has

   paid Pines-Carter all base rent due under the Lease, the Debtor has failed

   to pay the sum of $7,814.76 in postpetition real estate taxes due on the

   Property.

2. <u>Pines-Carter will suffer damage beyond the compensation available under the</u>

   <u>Bankruptcy Code</u>.  Pines-Carter is at risk of losing a $23 million deal to sell the

   underlying Property that will not be compensated with a "rejection damage claim"

   under section 365(g) of the Code.  The Debtor wasted a "golden opportunity" to

   terminate the Lease for the unprofitable Store #658 Winn-Dixie store location.  If

   the Lease had been terminated by agreement of Pines-Carter, the Debtor would

   have saved the estate the cost of an unsecured "rejection damage claim" pursuant

   to 11 U.S.C. § 365(g).  It is hard to conceive of an instance where a bankruptcy

   debtor could more greatly abuse its discretion to exercise its business judgment in

   the best interests of its estate and its creditors.

3. <u>The Lease is an insignificant asset for the Debtor</u>.  The Pines-Carter Lease is only

   one of more than 630 remaining Unexpired Leases of the Debtors.  Critically, the

   Lease relates to an unprofitable Winn-Dixie store, that by all rights should be shut

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

Case No. 05-03817-3FI

down as part of the Debtor's restructuring efforts.  The Lease is not only not important to the Debtor's business and reorganization, it is actually detrimental to the Debtor's reorganization efforts.

4.    The Debtor has (had) more than enough time to determine whether the Pines-Carter Lease should be part of the Debtor's future business plans in conjunction with the development of its plan of reorganization .  This case has been pending since February 21, 2005.  The Debtor has had approximately nine months to make a decision whether to assume or reject the Lease for an unprofitable Winn-Dixie Store, including two enlargements of time to make a decision on whether to assume or reject the Lease (the first extension from April 19, 2005 to September 19, 2005 and the second extension for September 19, 2005 to December 19, 2005).  During that time, by its own admission in court papers filed by them, the Debtors have already made decisions to assume or reject hundreds of store-location unexpired leases in this case.

6.    The complexity of the case facing the debtor and the number of leases that the debtors must evaluate.  Even if these cases are relatively complex and the number of leases to review large, the Debtors have had almost one year to evaluate the benefits and detriments of their nonresidential leases of real property, where Congress apparently believed that 60 days was sufficient.  Nevertheless, Pines-Carter is only objecting to the Debtors' *Third Extension Motion* as to its one

16

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

Case No. 05-03817-3FI

Lease, or, alternatively, requesting this Court to compel the Debtor to make a

decision to assume or reject its *one* lease at this time for important business

reasons.

7.    <u>There is no need for judicial determination as to whether an unexpired lease</u>

<u>exists</u>.  There is no dispute that the Lease is a "true lease."

## Conclusion

Pines-Carter objects to the Debtors' *Third Extension Motion* as to Pines-Carter's Lease.

Alternatively, pursuant to the provisions of this Court's *Second Extension Order*, and the

Debtors' proposed *Third Extension Order*, Pines-Carter requests this Court to enter an Order

compelling the Debtor to assume or reject the Lease within 10 (ten) days from the entry of an

Order granting this Motion.  Pines-Carter's Sale Contract with Gulf Beach represents a unique

and special situation, calling for specialized action by the Debtor to review the Lease for Store

#658 now.  Store #658 loses money.  If the Sale Contract "falls through" because of the Debtor's

refusal to address the Lease at this time, it is unlikely that the Debtor will subsequently assume

the Lease.  The Debtor will almost certainly reject the Lease at some later date, at which time the

Debtor's estate will not only suffer the liabilities of Pines-Carter's prepetition Arrearage Claim

and rejection damage claim, but Pines-Carter will have lost the opportunity to sell its shopping

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

Case No. 05-03817-3FI

center Property for $23,000,000.00.  This Court should not allow the machinations of the

Debtor's inefficient decision-making bureaucracy to harm Pines-Carter, the Debtor's estate and

its creditors.

WHEREFORE, based upon the foregoing, Pines-Carter of Florida, Inc. respectfully

requests that the Court (i) deny the Debtors' *Third Extension Motion* as to the Pines-Carter

Lease; or, in the alternative (ii) enter an order compelling the Debtor to assume or reject the

Unexpired Lease for Store #658 within ten (10) days from the entry of the Court's Order; and (iv)

grant such other and further relief as is just and proper.

**DATED** this 8th day of December, 2005

/s/ Jonathan R. Williams
Jonathan R. Williams, Esquire
Florida Bar No. 0178810
MELAND RUSSIN HELLINGER
 & BUDWICK, P.A.
3000 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

LAW OFFICES OF MELAND RUSSIN HELLINGER & BUDWICK, P.A.
3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

J:\DOCS\CLIENTS\5047\5047-1\00110177.DOC.

*C.A.*  *2272.../9₂*

## Lease

THIS LEASE, made this __25th__ day of __March__, 19~~73~~ 74

between ___ESKRAUGH CORPORATION, a Florida corporation___

_____ ,

_____ (hereinafter called "Landlord")

and ___WINN-DIXIE STORES, INC., a Florida Corporation,___

_____

(hereinafter called "Tenant"); _____/

which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires,

singular or plural, and the heirs, legal representatives, successors and assigns of the respective

parties;

### WITNESSETH:

**PREMISES**    That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and

demise unto said Tenant and the Tenant hereby agrees to take and lease from the Landlord,

for the term hereinafter specified, the following described premises:

That certain store building, approximately __160__ feet in width by __142__

feet in depth,xxxgathexxxthxxxxxxx _____

and the land on which the same shall stand (hereinafter collectively called "demised

premises"), which store building and related improvements are to be constructed by

Landlord according to plans and specifications to be approved by the parties as herein

provided, and shall be in the location and of the dimensions as outlined in red on the

Plot Plan __last revised December 4, 1973, by Mudano Associates,__

__Architects, Inc., Clearwater, Florida, entitled "Madeira__

__Beach Shopping Ctr., Madeira Beach, Florida"__ ,

attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in

detail on Exhibit "A"), known as _____

(hereinafter called "shopping center"), located __at the northwest corner of__

__the intersection of Madeira Way and 151st Avenue__

in the City of ___Madeira Beach___ County of ___Pinellas___ .

State of ___Florida___ , the legal description of the shopping center being

as follows:

See Exhibit "B" attached hereto and by
this reference made a part hereof for
legal description of shopping center.

This instrument was prepared by
Charles P. Millard, Jr., Attorney-
at-Law, whose address is 5050
Edgewood Court, Jacksonville,
Florida 32203.

Composite

**Exhibit "A"**

Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of said percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the lease-hold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculating the percentage rental due hereunder, the Tenant's fiscal year shall be from July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINITION OF "GROSS SALES"**

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold, and gross charges for all services rendered in or from the demised premises, both for cash and on credit; provided, however, such term shall not include (1) any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) accommodation sales, such as sales of postage stamps, government bonds or savings stamps or similar items; (5) returns of merchandise to suppliers or manufacturers; (6) net amount of discounts allowed to any customer, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (7) merchandise or other things of value issued in redemption of trading stamps or as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

**RECORD OF SALES**

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address hereinafter designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable by Tenant as hereinabove provided, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause its accurate records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

**USE**

2. The demised premises may be used for a retail food market, dealing primarily in, but not limited to foods and general mercantile business; provided, however, the demised premises shall not be used, nor assigned in terms of Paragraph 26 herein, for any use or business which shall be in direct competition with the primary use or business then tenant in the shopping center to whom Landlord has granted a right of exclusive use, of which Tenant has been given prior notice of prohibition, further, the demised premises shall not be used

Tenant at all times shall fully and promptly comply with the provisions of every lawful authority having jurisdiction of the cleanliness and use of said premises and the character conducted in or at said premises.

*drugs or drugs required to be dispensed by a

OF SHOPPING
CENTER.

3. The Landlord, at _____ cost and expense, shall construct _____ shopping center, substantially as shown on Exhibit "A" consisting of all the buildings shown thereon, together with all side-walks, streets, entranceways, malls, parking areas, service drives, driveways and related improvements, said improvements (excluding buildings) being sometimes hereinafter referred to as "common areas." The Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the shopping center and the tenants and their employees during the term of this lease and any extensions thereof. The arrangement and location of all store buildings and common areas (including parking area) within the shopping center shall at all times during the term of this lease, or any extensions thereof, be maintained as shown on Exhibit "A" and shall not be changed without the written consent of the Tenant. If not shown on Exhibit "A", Tenant expressly reserves the right to approve the finish elevations of all store buildings and common areas (including parking and service areas) within the shopping center which are to be constructed concurrently with Tenant's store building, such approval not to be unreasonably withheld.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to construct the store building for occupancy by Tenant in accordance with the plans and specifications to be approved by both Landlord and Tenant. Plans and specifications shall be approved when initialed by both parties, and when initialed shall constitute a part of this lease. Said plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job," and shall include, but without limitation the following: automatic doors, interior partitions, all plumbing and plumbing fixtures, drains, electrical wiring, lighting fixtures to Tenant's requirements, connection of Tenant's trade fixtures to plumbing and electrical outlets, automatic sprinkler system, air conditioning and heating systems and equipment including insulated ducts, music and P. A. systems (except microphones and amplifiers to be furnished by Tenant), storm shutters, delicatessen department, two-inch bonded to concrete terrazzo floors in sales area and vinyl asbestos, quarry tile and ceramic tile floor coverings as specified in other areas (color at Tenant's option) and connections to all utilities. Tenant at its own expense shall furnish its own trade fixtures. Any and all such equipment and fixtures furnished by Tenant shall remain its property and may be removed from the demised premises at any time. Any damage incurred to the premises as a result of the removal of such fixtures and equipment shall be repaired by Tenant at Tenant's expense.

MPLETION
TE

4. Landlord covenants and agrees that the construction of the shopping center shall begin not later than ____July 1, 1974____ and shall be completed not later than ____May 1, 1975____; and if the same shall not be begun or completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this lease or may extend the Landlord additional time for the beginning or completion of construction; provided, however, that if after the beginning of construction the Landlord's failure to complete said improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than ____July 1, 1975____, said option to terminate shall not arise. If pursuant to this paragraph Tenant shall cancel or terminate this lease, then the Landlord agrees to give the Tenant the first right of refusal, on the same terms and conditions as Landlord is willing to grant to a bona fide third party, to be exercised within sixty (60) days after receipt of notice of the terms and conditions from the Landlord, to occupy any premises within the shopping center which Landlord may offer for use as a food supermarket. The first right of refusal shall be operative and effective for a period of three (3) years from the date of such cancellation. However, if offered to Tenant within six (6) months after cancellation of this lease, the lease terms and provisions shall be the same as this lease.

-4-

IT DATE of the following:

(a) Tenant's store building and other improvements constructed on the demised premises shall have been delivered to Tenant completed in accordance with the plans and specifications;

(b) Construction of all of the common areas (including parking area hereinafter specifically required) shall have been completed substantially as shown on Exhibit "A";

(c) Construction of at least _____310_____ lineal feet of store frontage and __28,000__ sq. ft. of total building area (excluding Tenant's store building) shall have been completed as shown on Exhibit "A" and said area leased to other tenants and opened for business or readied for opening for business simultaneously with Tenant; and

(d) The stores to be operated by each of the following tenants shall have been completed and opened for business or been readied for opening for business simultaneously with Tenant:

    Eckerd Drugs
    Other local tenants - 10,000 square feet

In the event that all the above requirements shall not have been met on or prior to _____July 1, 1975_____, the Tenant at its sole option may cancel and terminate this lease.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of thirty (30) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

**RETAIL AND SERVICE STORES ONLY**

It is agreed that without the prior written consent of Tenant herein only retail and/or service stores shall be allowed to operate in the shopping center including any enlargement thereof, it being the intent of the parties hereto that no spa, bowling alley, skating rink, bingo parlor, theatre (either motion picture or legitimate), office building, or health, recreational or entertainment-type activities, or non-retail or non-service type activities, shall be permitted.

tER IANTS

6. As a condition and inducement to Tenant's entering into this lease, Landlord represents and warrants that it has entered into firm commitments for leases with the tenants listed below for the terms and for the amount of floor space indicated:

| Name | Term Years | Floor Area (sq. ft.) |
|------|-----------|---------------------|
| Eckerd Drugs | 20 | 10,000 |

Landlord further warrants and represents that such tenants shall occupy the space in the shopping center in the locations indicated on Exhibit "A" and in the minimum amounts set opposite their respective names above; and Landlord agrees, on demand, to furnish evidence satisfactory to Tenant, prior to and as a further condition to the establishment of the commencement date of this lease, that Landlord has entered into non-cancellable leases, except for default, with such tenants.

IKING D MMON IAS

7. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, including parking area, as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a) a minimum ratio of at least _____3.0_____ square feet of automobile parking area to each square foot of gross building area (including additional floor levels) in the shopping center, and

(b) facilities for convenient parking of at least __280__ automobiles;

and in event the parking area furnished should at any time be substantially less, and such defi-
ciency of parking facilities shall continue for thirty (30) days after written notice thereof is re-
ceived by Landlord giving reasonable details, the Tenant at its option shall have the right to ter-
minate this lease, provided, that the termination of the lease for such a default may be prevented
and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of
such notice of termination. All of the common areas (including parking area) shall be adequately
lighted by Landlord at its expense during customary food store shopping hours, and Landlord
further agrees that no signboards or other construction shall be erected in any of the common
areas (including the parking area) shown on Exhibit "A" or so as to obstruct the view of the de-
mised premises from the adjoining public streets.

In the event the demised premises are at any time subject to a first
mortgage (provided Tenant has been notified in writing of the name and
address of the holder thereof), Tenant shall give 30 days notice in
writing to the holder of any such mortgage of its intention to terminate
this lease on account of a deficiency in the parking facilities as above
contemplated, and such mortgage holder shall have a period of at least
60 days after delivery of such notice in which to replace any lost or
unusable parking facilities with substitute parking area of comparable
size and located in comparable proximity to the demised premises, and upon
such curing of the parking deficiency, the Tenant's termination right
shall be deemed extinguished and the lease shall be reinstated.

:VICE
EA

8. Landlord further agrees to provide for the exclusive use of the Tenant at its grocery service
entrances a parking space for two large trailer trucks for continuous use and further agrees that
Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised
premises and the exclusive right to such space as may be reasonably needed by Tenant for load-
ing and unloading merchandise for its store into and from trucks and trailers at such service
entrances.

LITIES

9. The Tenant agrees to pay all charges for public or private
utility, telephone, garbage collection, electricity, water, gas
and other utilities used by Tenant on the demised premises, and
Landlord agrees at all times to provide Tenant with access to
such utilities.

NANT'S
PAIRS

10. Upon completion of construction by Landlord and acceptance of the demised premises by
Tenant, Tenant agrees to keep the interior of the demised premises in good condition and re-
pair, excepting structural repairs and all repairs which are the responsibility of the Landlord
or which are made necessary by reason of fire and other unavoidable casualties covered by Land-
lord's fire and extended coverage insurance, and excepting reasonable wear and tear.

Within the repair responsibilities of Tenant shall be included the
floor surfacing; windows and plate glass except such damage caused by
faulty construction or settling of the building or covered by
Landlord's fire and extended coverage insurance which shall be the
responsibility of Landlord; and Tenant further agrees to be responsible
for routine repairs to and maintenance of air conditioning and heating
equipment, provided in each instance its said liability for both
parts and labor shall not exceed $500.00. Should repairs to the air
conditioning and heating system be necessitated through the fault
or negligence of Tenant, Tenant shall pay for such repairs.

ANDLORD'S
EPAIRS

11. The Landlord shall, at its cost and expense, keep and
maintain the common areas (including without limitation, park-
ing area, sidewalks, ramps and service areas) in good condition
and repair, and shall maintain the exterior of Tenant's store
building, including the roof, gutter, downspouts, exterior painting,
masonry walls, foundation and structural members, the plumbing
(including sprinkler system and septic tank, if any), the wiring,
and shall make any and all structural repairs to both
the exterior and interior of said premises. If any portion of
the common areas (including without limitation, parking area,
sidewalks, ramps and service areas) or any portion of the store
building, which is the responsibility of the Landlord, shall at
any time be in need of repair, Landlord will repair same im-
mediately upon receipt of written notice from Tenant to do so,
except that the Landlord shall not be obligated to make or pay .

for any repairs to Tenant's store building rendered necessary by the fault, act or negligence of the Tenant, or any of its servants, agents or employees, except in the case of damage by fire or the elements, or other casualty covered by Landlord's fire and extended coverage insurance. (Landlord further agrees that in each in- stance where the air conditioning and heating equipment need repairs or replacement, the cost thereof in excess of $500.00 (including both parts and labor) shall be borne by Landlord.)

If in order to protect the Tenant's property in the store building it shall be necessary to make emergency repairs to any portion thereof which is the responsibility of the Landlord to repair, or if the Landlord after receipt of notice as above provided fails or neglects to make with all due diligence such other repairs to the store building or common areas (including parking area) which are the responsibility of the Landlord, the Tenant shall have the right to make such repairs and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred by it in making such repairs. Landlord further covenants that the store building will be so constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that said premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated.

If at any time the demised premises shall be subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof), Tenant shall not have the right to make repairs which are the responsibility of the Landlord or to deduct the cost of such repairs from the rental installments until Tenant shall have given a notice in writing to such mortgage holder, who shall have a period of thirty (30) days in which to cure the Landlord's defaults (and a reasonable additional time if the circumstances will not permit performance within such period) and upon the curing of any such default by the mortgage holder, Tenant's right to make such repairs or deduct the cost thereof from rental installments shall be extinguished, provided, however, the Tenant shall not be required to deliver such notice or give such mortgage holder an opportunity to perform in respect of emergency repairs which the Tenant is permitted to make under the provisions of this Paragraph 11.

Any accumulated offsets of Tenant against rentals under the provisions of this paragraph 11 shall not be operative against such mortgage holder should it assume the status of Landlord by virtue of foreclosure of the mortgage, or otherwise, with the exception, however, of those offsets which may remain after notice and opportunity to cure Landlord's defaults has been given to such mortgage holder, but nevertheless it has failed to cause the defaults giving rise to such offsets to be cured.

Except on the roof, and provided no signs shall project above the parapet,

SIGNS

12. Tenant may place, erect and maintain any signs on the [...] walls, and any other place on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs. Tenant shall not display paper signs on the outside of the demised premises. This shall not prohibit Tenant from displaying its usual signs on the inside of the windows of the demised premises.

FIXTURES AND INTERIOR ALTERATIONS

13. The Tenant, at its own expense, may from time to time during the term of this lease make any interior alterations, additions and improvements in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

-7-

Tenant may construct and build or install in said premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from said premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to said premises resulting from the installation or removal of such items.

**INDEMNIFI-CATION**     14. Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises. Tenant further agrees to carry, at its expense, public liability insurance coverage on the demised premises, with a con-tractual liability endorsement on the policy, in a company qualified to transact business in the state in which the demised premise are located, stipulating limits of liability of not less than $200,000 for an accident affecting any one person; and not less tha $500,000 for an accident affecting more than one person; and $50,00 property damage. Certificate of such coverage from the insuror providing 30 days' notice to Landlord prior to cancellation or termination shall be furnished to Landlord.

Likewise, Landlord shall indemnify and save harmless the Tenant from any claim or loss by reason of an accident or damage to any person or property happening on or about all common areas (including, without limitation, parking area, sidewalks, ramps and service areas) of the shopping center, and Landlord further agrees to carry, at its expense, public liability insurance coverage on all common areas (including, without limitation, parking area, sidewalks, ramps and service areas) of the shopping center, with a contractual liability endorsement on the policy, in a company qualified to transact business in the state in which the demised premises are located, stipulating limits of liability of not less than $200,000 for an accident affecting any one person; and not less than $500,000 for an accident affecting more than one person; and $50,000 property damage. Certificate of such coverage from the insuror providing 30 days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant.

**CLEANLINESS**     15. Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the entryways and delivery areas adjoining the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for making repairs and for examining or showing the same to prospective purchasers.

**FIRE**     16. In the event that Tenant's building shall be totally destroyed or damaged to any extent by fire or other casualty, Landlord agrees to proceed, without expense to Tenant, to repair the damage and to restore the premises to the same condition as existed prior to such damage. In the event that Landlord shall fail within a reasonable time, not to exceed forty-five (45) days following such damage, to proceed with and within a reasonable time commensurate with the amoun of damage, not to exceed eight (8) months following such damage, to complete the repairs and restore the premises, Tenant may, at its option, in either of such events, terminate this lease by giving to Landlord written notice thereof. If Landlord's failure to commenc or complete said repairs within the stipulated times shall be due to strikes, war, material shortages, weather conditions or similar happenings beyond its control, and provided further, the repairs are completed with all due diligence commensurate with such delay, such option to terminate shall not arise.

If damage to Tenant's building in excess of fifty percent (50%) of the value thereof shall occur within the last three (3) years of the initial term or any of the option extension periods provided for

herein, the obligation of Landlord to restore the premises shall no
arise unless Tenant shall give notice to Landlord within thirty (30
days after such damage of its desire to extend the term of this lea
for an additional period so as to expire seven (7) years from the
date of such damage, and on the same conditions and for the same
rentals.  Upon such notice, Landlord agrees with all due diligence
repair and restore Tenant's building and the lease shall continue
and the remaining option periods, if any, shall be construed to
follow upon the end of such extended term.  Failing such notice
to extend, Landlord at its option shall have the right to terminate
this lease or to restore the premises and the lease shall continue
for the remainder of the then unexpired term.

Tenant shall be entitled to an abatement of a fair and just
portion of the rent, according to the unusable space, from the date
of such damage until said premises are completely reinstated or
restored.

If at any time during the term of this lease or any extensions
thereof any of the buildings in the shopping center, exclusive of
Tenant's store building, are damaged by fire or by the elements or
otherwise, Landlord shall promptly commence and diligently prosecut
to completion the repair and restoration, to substantially their
condition prior to such damage, of so much of such damaged building
as necessary to meet the greater of the following requirements:  (1
all those buildings required to be restored under the lease agree-
ments Landlord may have with the particular tenants affected (provi
such tenants shall not have canceled their leases), and (2) at leas
seventy-five percent (75%) of the buildings then in the shopping ce
ter, exclusive of Tenant's store building.

Landlord agrees to carry fire and extended coverage insurance on Tenant's
building and any additions, alterations and improvements made thereto by Land-
lord or Tenant and on all other buildings within the shopping center in the
amount of full insurable value thereof, above foundation walls, and hereby
expressly waives any and all claims against the Tenant for loss or damage due
to fire, explosion, windstorm or other casualty covered by such insurance,
regardless of the cause of such damage, including without limitation, damage
resulting from the negligence of the Tenant, its agents, servants or employees.

**QUIET**
**ENJOYMENT**
17. The Landlord covenants, warrants and represents that upon commencement of the lease
term, the shopping center, including the demised premises, will be free and clear of all liens
and encumbrances superior to the leasehold hereby created; that the Landlord has full right
and power to execute and perform this lease and to grant the estate demised herein; and that
the Tenant on paying the rent herein reserved and performing the covenants and agreements
hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights,
easements, appurtenances and privileges belonging or in anywise appertaining thereto, during
the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or
restricting use of the demised premises for the conduct of a general mercantile business or use
of common areas for parking purposes, and that should such zoning or other restriction be in ef-
fect or adopted at any time during the term of this lease, preventing or restricting Tenant from
conducting a general mercantile business or using the common areas (including parking area) in
conjunction therewith, the Tenant at its option may terminate this lease and shall stand released
of and from all further liability hereunder.; provided, however, such option shal:
not arise if Tenant is permitted to continue a general mercantile business
and to use the common areas as a non-conforming use.

**TAXES**
**AND**
**LIENS**
18. All taxes, assessments and charges on land or improvements and obligations secured by
mortgage or other lien upon the demised premises or the shopping center shall be promptly paid
by the Landlord when due. The Tenant may perform, acquire or satisfy any lien, encumbrance,
agreement or obligation of the Landlord which may threaten its enjoyment of the premises, and
if it does so it shall be subrogated to all rights of the obligee against the Landlord or the premises
or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, to-
gether with interest thereon at six per cent (6%) per annum.

NDEM-
TION

19.  If any part of the demised premises in excess of ten percent (10%) thereof, or any lesser part thereof which would materially or substantially interfere with the conduct of Tenant's business therein, or more than twenty percent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease as aforesaid, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustment as shall be just and equitable under all circumstances.

'In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of _____ten_____ per cent ( 10 %) or

reduce the number of cars which may be conveniently parked to less than _____252_____, the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking.

DEFAULT

20.  In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.

BANKRUPTCY

21.  The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

CONSTRUCTION
RISKS

22. It is understood and agreed that nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing said improvements, and that the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing said improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing said improvements or from any faulty construction thereof.

NOTICES

23. All notices required to be given to Landlord hereunder shall be sent by registered or certified mail to, and all rent payments shall be made to Landlord at __4134 Central Avenue,__

__St. Petersburg, Florida 33711__

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail.

All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at __P. O. Box 440, Tampa, Florida 33601__

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail.

END OF
TENANCY

24. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct.

ARBITRATION

25. In the event there should arise any misunderstanding between the parties hereto as to the compliance with the terms and conditions of this lease upon the part of either of the parties hereto, or as to whether the Tenant's store building tendered by the Landlord has been improved in substantial conformity with the plans and specifications approved by the parties, or whether the common areas, including parking area, comply with the agreement of the parties hereto, or as to whether either party has ground hereunder entitling it to terminate this lease, it is mutually agreed that such differences, if they cannot be satisfactorily adjusted between the parties hereto within thirty (30) days, shall be submitted to a single arbitrator, if the parties hereto agree upon one; otherwise, to a board of three arbitrators, of whom one shall be selected by each party within ten (10) days after such 30-day period, and a third person shall be selected by these two; and the decision and award of such single arbitrator, if only one is used, or any two of such board, if three are used, as the case may be, shall be final and binding upon the said parties and their successors and assigns respectively, and shall have the same force and effect as though such decision had been handed down by a court of final jurisdiction. Each of the parties hereto covenants to abide by any such arbitration decision.

ASSIGNMENT
AND
SUBLEASING

26. The Tenant may without the consent of the Landlord assign this lease, or sublease or vacate the demised premises in whole or in part, provided the Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this lease.

In the event of any assignment or sublease or vacating of the entire premise the minimum rental thereafter shall be the average percentage rental, if any paid by Tenant for the two years immediately preceding such assignment, vacating or subletting plus the minimum guaranteed rental provided for here: provided, however, this provision shall not apply in the event such assignment or sublease shall be to any corporation or entity which is the parent of, subsidiary to or affiliated with Tenant or to any corporation or entity with which Tenant merges or consolidates or to which it sells all or substantial all of its business in the state where the demised premises are situated. The provisions of this paragraph shall not be construed to limit or restrict the right of Tenant to sublease a portion or department of the demised premises without consent of Landlord to any concessionaire or licensee or otherwise in connection with the operation of Tenant's business in the demised premise provided the sales of such concessionaire or licensee shall be included with the gross sales of Tenant, as defined hereinabove in Article 1a. In the event Tenant shall vacate the entire demised premises or cease selling merchandise therein for in excess of a period of three (3) months, while the demised premises are usable for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant), Landlord shall have the continuing option thereafter to terminate and cancel this lease upon fifteen (15) days' written notice to Tenant of its election so to do, unless within such fifteen (15) day period Tenant shall advise Landlord that Tenant had prior to receipt of such notice in good faith committed to sublease the demised premises to a third party for occupancy within two (2) months.

EXTENSIONS

27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of _____ five _____ ( 5 ) successive extensions of this lease, each extension to be for

a period of _____ five _____ ( 5 ) years and on the same terms and conditions and at the same rentals as provided herein for the initial term.

Such option privilege may be exercised by the Tenant giving to the Landlord a notice in writing at least _____ six (6) months _____ before the expiration of the initial term, and if extended, at least _____ six (6) months _____ before the expiration of such extended term, stating the intention of the Tenant to exercise such option and the period for which such option is exercised and thereupon this lease shall be so extended without the execution of any other or further document.

EXCLUSIVE
SUPERMARKET

28. Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods or frozen foods without permission of the Tenant, except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant or "fast food"operation of prepared ready-to-eat food items, either for consumption on or off the premises, shall not be deemed a violation hereof; provided, however, as to the storeroom to be occupied by Eckerd Drug Store only, the permitted sale of such food items shall be expanded to 1,000 square feet of sales area.

-12-

:It is further agreed that Tenant herein shall have the option, at
any time, to operate in the shopping center, including any
enlargement thereof, a bakery and/or delicatessen or any de-
partment or concession which constitute the equivalent thereof.

In the event the demised premises are at any time subject to a first
mortgage (provided Tenant has been notified in writing of the name and
address of the holder thereof) and so long as said mortgage shall encumber
the demised premises, and notwithstanding any provisions herein to the
contrary, the Tenant shall have no right to cancel or terminate this lease
or to withhold rental payments because of a violation of the terms of
this exclusive provision as to property located within 1000 feet of any
exterior boundary of the shopping center, but nothing herein shall deprive
Tenant of any rights of recourse against Landlord, its successors and
assigns, by way of suit for damages or injunctive relief, or as otherwise
provided by law, in the event of any such violation. If the holder of such
first mortgage should succeed to ownership of the demised premises by virtue
of foreclosure, or transfer of title thereto in lieu of such foreclosure
or otherwise, in such event the terms of this exclusive provision shall
apply to the holder of such first mortgage as owner-landlord only with res-
pect to the land which was formerly encumbered by the lien of said first
mortgage.

SUBORDINATE   29. The Tenant agrees that this lease shall at all times be subject and subordinate to the
lien of any mortgage (which term shall include all security instruments) that may be placed
on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to
execute any instrument as may be required to effectuate such subordination; provided, however,
as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee
an agreement in writing, which shall be delivered to Tenant, providing in substance that, so
long as Tenant shall faithfully discharge the obligations on its part to be kept and performed
under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected
by any default under such mortgage, and in the event of foreclosure or any enforcement of any
such mortgage, the rights of Tenant hereunder shall expressly survive, and this lease shall in
all respects continue in full force and effect, provided, however, that Tenant fully performs all
of its obligations hereunder.

BENEFIT   30. This lease and all of the covenants and provisions thereof shall inure to the benefit of and
be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each
provision hereof shall be deemed both a covenant and a condition and shall run with the land.

SHORT        31. The Landlord agrees that at any time on request of the Tenant it will execute a short form
FORM         of this lease in form permitting its recording.
LEASE

MARGINAL     32. The marginal titles appearing in this lease are for reference only and shall not be con-
TITLES       sidered a part of this lease or in any way to modify, amend or affect the provisions thereof.

COMPLETE     33. This written lease contains the complete agreement of the parties with reference to the
AGREEMENT    leasing of the demised premises, except plans and specifications for Tenant's store and related
improvements to be formally approved by the parties prior to the effective date of this lease.
No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself
or any subsequent breach thereof.

TAXES 34.   During the term of this lease and any extensions thereof,
Tenant agrees to pay to Landlord as additional rental the amount
of any increase in ad valorem real estate taxes levied against
the demised premises in excess of the amount of such taxes levied
thereon for the first (1st)      full calendar year of the lease term
in which both the value of the land and the buildings thereon shall
be assessed for tax purposes; provided, however, any additional
rental payable hereunder by the Tenant may be credited on a non-
cumulative basis against any and all percentage rental, if any,
which may become due hereunder, it being intended that such credit
shall be made annually in respect of the tax payments for the pre-
vious tax year at the time percentage rentals are payable, but if
there shall not be any percentage rentals due or the amount thereof
shall be insufficient to allow the full credit, Tenant shall receive
no credit, or only a partial credit, as the case may be; and the
credit for fractional years and fractional months occurring at the
beginning of the period in which Tenant is responsible for such tax
payments, or at the end of the lease term or any extensions thereof,
shall be prorated on the basis of the annual credit. Tenant shall
be responsible only for its pro rata share of such taxes for fractiona
years occurring at the beginning and expiration of the term of this
lease, and any extensions thereof.

If such taxes shall not be assessed separately, but shall be included
within an assessment of the demised premises and others, said assess-
ments shall be fairly apportioned to determine Tenant's share thereof.
Such apportionment shall be made in the ratio which the square footage
of Tenant's store building bears to the total square footage of all
store buildings (including additional floor levels) from time to time
existing in the shopping center.  The amount of taxes attributable to
the shopping center, and for which Tenant is to reimburse Landlord in
part, shall be less any abatements, discounts or refunds thereon.
Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid
tax statements as evidence of the basis upon which any increase in
taxes is chargeable to Tenant, and such additional rental shall be
payable by Tenant on demand after payment by Landlord.  All taxes,
other than ad valorem real estate taxes, including special assessments
improvement liens and the like, shall remain the sole responsibility
of the Landlord.  However, Tenant shall remain responsible for sales
taxes on rentals levied by law on lessees.


In the event that Tenant's store building shall be enlarged as herein
contemplated, the responsibility of Tenant hereunder to contribute to
increases in ad valorem real estate taxes shall apply, as well, to
any increases in such taxes which may be expected as a result of the
expansion of Tenant's building.

Tenant shall have the right from time to time to contest or protest
or review by legal proceedings or in such other manner as may be
provided, any such taxes, assessments or other governmental impositions
aforementioned, and to institute such proceedings in the name of the
Landlord as the Tenant may deem necessary; provided, however, any
expense incurred by reason thereof shall be borne by the Tenant and
such proceedings conducted free of all expense to the Landlord.

OPTION FOR       35. Tenant is hereby granted the option and privilege at any
EXPANSION        time during the term of this lease, or any extensions thereof,
            of enlarging its store building by incorporating therein the
area to the southeasterly side thereof, such addition not to exceed forty
(40) feet in width by one hundred forty-two (142) feet in depth.  This
option may be exercised only at such times as the adjoining storerooms
may be vacant, or at five (5) year intervals, it being contemplated that
Landlord shall not lease such area to other tenants for in excess of
five (5) years, and that Tenant shall have the expansion privilege
herein described no later than five (5) years from the commencement
date hereof and at five (5) year intervals thereafter.  Landlord shall
give notice to Tenant of any such expiration date and, during the
period between six (6) months and three (3) months prior to such expira-
tion date, afford to Tenant the opportunity to exercise this option, and
upon Tenant giving to Landlord a notice in writing of its exercise there-
of, Landlord agrees to construct such addition, or prepare such enlarge-
ment area for occupancy by Tenant, in accordance with plans and specifi-
cations to be approved by the parties hereto, with the construction to
be completed with all due diligence following the vacation of the neces-
sary area by any other tenant, and the enlarged portion of the building
to be of a like quality of construction as the original building for
Tenant.  Upon completion of such building addition, or tender of such
additional space to Tenant, if there shall not at such time remain at
least ten (10) years of the then term of this lease, such term shall be
extended for such period of time as shall be necessary to provide a
full ten (10) years from such date.  Thereafter, during such extended
term, the annual minimum guaranteed rental shall be increased by the
greater of:  an amount equal to twelve percent (12%) of the cost of such
addition, or an amount equal to $2.75 per square foot of the enlargement
area, or an amount equal to a computed percentage times the cost of such
addition, such percentage consisting of four percent (4%) plus the current
prime interest rate charged by New York City banks at the time of the

exercise of the option.  At Tenant's request, construction cost shall
established by bids obtained by Landlord from at least three (3) reput
contractors acceptable to Tenant, with the final cost of the addition
upon completion to be certified to by the general contractor performing
the work.  During such extended term the provisions of this lease shal
remain in effect and the option periods herein provided, if any shall
remain, shall be construed to follow upon the end of the extended term
and the rentals to remain as adjusted in consequence of the addition.
Upon completion of the addition, it shall be and become a portion of th
demised premises and this lease thereby be taken and construed as so
amended.

(if any shall then remain)

Nothing herein contained shall constitute any express or implied obliga
tion on the part of the holder of a first mortgage encumbering the fee
simple title to the demised premises, or of any purchaser at a sale und
foreclosure of such mortgage, to comply with the terms and provisions c
this Article, it being the understanding of the parties that the obliga
tion to cause such expansion is the sole obligation of the Landlord, it
heirs, legal representatives, successors and assigns.

COMMON AREA  36.  Landlord agrees to operate and maintain all the common areas
MAINTENANCE  as herein defined, and provide therefor all such services as are
reasonably required, including, but without limitation, cleaning
and sweeping, lighting, policing, if necessary, general repair and
maintenance of all paved surfaces, repainting of parking area striping
and watering and maintenance of landscaped areas.  For such services,
Tenant shall pay to Landlord, as additional rental hereunder and as re-
imbursement for the annual cost thereof, the sum of $2,272.00 per year,
payable in twelve (12) equal monthly installments of $189.34 per month
in advance on the first day of each and every calendar month of the lea:
term, and any extensions thereof.  If the Landlord after receipt of wri
notice from Tenant to do so shall fail to make the repairs or perform t:
services described in this Article, the Tenant shall have the right to r
such repairs or cause such services to be performed in its behalf and t
deduct from the rental installments then due or thereafter to become due
such sums as may be necessary to reimburse the Tenant for the money ex-
pended or expense incurred therein.

LIMITATION  37.  The Tenant shall look solely to the Landlord's interest in
OF  the shopping center and in the Landlord's personal property used
LIABILITY  in connection with the shopping center for the satisfaction of
any judgment or decree requiring the payment of money by the Lan
Lord, based upon any default hereunder, and no other property or asset
of the Landlord shall be subject to levy, execution or other enforcement
procedure for the satisfaction of such judgment or decree.

SELF-HELP  38.  If Landlord shall default in the performance or observance c
any agreement or condition in this lease contained on its part
to be performed or observed, and if Landlord shall not cure such default
within thirty (30) days after notice from Tenant specifying the default,
(or shall not within said period commence to cure such default and there
after prosecute the curing of such default to completion with due dili-
gence), Tenant may, at its option, without waiving any claim for damages
for breach of agreement, at any time thereafter cure such default for
the account of the Landlord, and any amount paid or any contractual
liability incurred by Tenant in so doing shall be deemed paid or incurre
for the account of Landlord and Landlord agrees to reimburse Tenant
therefor or save Tenant harmless therefrom; provided that Tenant may cur
any such default as aforesaid prior to the expiration of said waiting
period, but after said notice to Landlord, if the curing of such default
prior to the expiration of said waiting period is reasonably necessary
to protect the real estate or Tenant's interest therein or to prevent
injury or damage to persons or property.  If Landlord shall fail to
reimburse Tenant upon demand for any amount paid for the account of
Landlord hereunder, said amount may be deducted by Tenant from the next
or any succeeding payments of rent due hereunder.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof), Tenant agrees to give at least thirty (30) days' prior written notice to the holder of any such first mortgage before Tenant exercises its right of offset against rentals as contemplated in the preceding sub-paragraph. Upon such notification, the holder of such first mortgage shall have like rights as the Landlord as above provided to cure any such default, and upon the curing of any such default by the mortgage holder, the Tenant's right of offset shall be thereby extinguished. In the event any such first mortgage holder, through foreclosure or otherwise, shall acquire title to the shopping center (or the mortgaged premises of which the demised premises are a part), the above limitation of liability in respect of Landlord as set forth in the first sub-paragraph of this Article shall be deemed also to apply to such first mortgage holder.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this instrument the day and year first above written.

Signed, sealed and delivered
in the presence of:

ESKRAUGH CORPORATION

By _____
  Its                     President

Attest _____
  Its                     Secretary

_____
As to Eskraugh Corporation

LANDLORD

(CORPORATE SEAL)

WINN-DIXIE STORES, INC.

By _____
  Its                     President

Attest: _____
  Its                     Secretary

_____
As to Winn-Dixie Stores, Inc.

TENANT

(CORPORATE SEAL)

Florida - double corporate

STATE OF                    )
                            )
COUNTY OF                   )

    I HEREBY CERTIFY that on this day, before me, an officer duly
authorized in the State and County aforesaid to take acknowledgments,

personally appeared *F. PATRICK QUINN* and *MAITLAND F. KNAPP*,
to me known to be the persons described in and who, respectively, as

_____ President and _____ Secretary of ___ESKRAUGH CORPORATION___

_____, a ____Florida____ corporation, executed
the foregoing instrument on behalf of said corporation; and they
severally acknowledged before me that they executed said instrument as
such officers of said corporation in the name of and on behalf of said
corporation; that said _____ Secretary affixed and attested the
seal of said corporation to said instrument; that such acts were done
by authority of said corporation for the uses and purposes in said
instrument set forth; and that the foregoing instrument is the free act
and deed of said corporation.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed
my official seal this _5_ day of ___April___, 19 _74_, at
_St. Petersburg, Fla._, in said State and County.

(Notarial Seal)                 _Leigh Bailey Etter_
                                Notary Public, State and County
                                aforesaid.  My commission expires:

                                _6-14-76_

STATE OF        FLORIDA      )
                            )
COUNTY OF       DUVAL        )

    I HEREBY CERTIFY that on this day, before me, an officer duly
authorized in the State and County aforesaid to take acknowledgments,

personally appeared *Joe H. Adams* and *J.S. Bryan Jr.*,
to me known to be the persons described in and who, respectively, as

*Exec Vice* President and _____ Secretary of ___WINN-DIXIE STORES, INC.,___

_____, a ____Florida____ corporation,
executed the foregoing instrument on behalf of said corporation; and they
severally acknowledged before me that they executed said instrument as
such officers of said corporation in the name of and on behalf of said
corporation; that said _____ Secretary affixed and attested the
seal of said corporation to said instrument; that such acts were done
by authority of said corporation for the uses and purposes in said
instrument set forth; and that the foregoing instrument is the free act
and deed of said corporation.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed
my official seal this _25th_ day of ___March___, 19 _74_, at
_____Jacksonville_____, in said State and County.

(Notarial  Seal)                _Nancy E. Peckham_
                                Notary Public, State and County
                                aforesaid.  My commission expires:
                                Notary Public State of Florida at Large.
                                My commission expires June 24, 1977,