## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| In re: | : |
| | : Case No.: 3-05-bk-03817-JAF |
| WINN-DIXIE STORES, INC., et al., | : Chapter 11 |
| | : JOINTLY ADMINISTERED |
| Debtor(s). | : |
| | : |

## MOTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR ORDER APPOINTING AN EXAMINER PURSUANT TO SECTION 1104 OF THE BANKRUPTCY CODE

The Official Committee of Equity Security Holders (the "Equity Committee") appointed in the above-referenced proceedings by the United States Trustee, by and through its proposed undersigned counsel, hereby files this *Motion of the Official Committee of Equity Security Holders for Order Appointing an Examiner Pursuant to Section 1104 of the Bankruptcy Code* (the "Motion"). In support of this Motion, the Equity Committee shows as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

**A.      The Bankruptcy Case**

2.      On February 21, 2005 (the "Petition Date"), Winn-Dixie Stores, Inc., et al. (the "Debtors") filed their petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Bankruptcy Cases"). The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.      On March 1, 2005, the United States Trustee appointed an official committee of

unsecured creditors (the "Creditors Committee").

4.      On or about June 3, 2005, the Debtors sent a letter to the U.S. Trustee supporting

the appointment of an equity stating that "the appointment of the Equity Committee in these

cases and at this time is appropriate and in the best interests of their estates." After providing

notice to parties-in-interest, on or about June 28, the U.S. Trustee in its discretion determined

that the appointment of an Equity Committee was appropriate.

5.      On August 17, 2005, pursuant to Section 1102(a)(1) of the Bankruptcy Code, the

United States Trustee appointed the following five (5) equity security holders to serve as

members of the Equity Committee in these cases: (i) Mr. Houston Maddox; (ii) Mr. Greg Rippel

on behalf of the Brandes Investment Partners, L.P. Profit Sharing Plan; (iii) Mr. Paul Madsen;[1]

(iv) Mr. Michael Nakonechny; and (v) Mr. Kenneth Thomas.

6.      On or about October 25, 2005, Winn-Dixie Stores, Inc. ("Winn-Dixie") filed its

Form 10-K for the fiscal year ending June 29, 2005 (the "Winn-Dixie 10-K) with the Securities

and Exchange Commission (the "SEC"). A copy of the Winn-Dixie 10-K is attached hereto as

Exhibit A.

7.      On or about October 27, 2005, Winn-Dixie filed its Proxy Statement Pursuant to

Section 14(a) of the Securities Exchange Act of 1934 (the "Proxy Statement") seeking (i)

election of the Class III directors, John E. Anderson, Julia B. North and Carlton T. Rider

(collectively, the "Class III Directors"); and (ii) ratification of the appointment of KPMG LLP

---

[1] On or about September 23, 2005, Mr. Madsen resigned from the Equity Committee.

("KPMG") as independent registered public accounting firm for the fiscal year 2006 (the "KPMG Ratification").[2]  A copy of the Proxy Statement is attached hereto as <u>Exhibit B</u>.

8.      As set forth in the Proxy Statement, the Board of Directors recommended that shareholders vote for the re-election of each of the Class III Directors and ratification of the appointment of the independent registered public accounting firm.  <u>See</u> Proxy Statement, pp. 9 and 18.  Winn-Dixie's Proxy Statement failed to disclose whether any investigation had been conducted to substantiate the Board of Directors' recommendations to re-elect the Class III Directors and ratification of KPMG's appointment.

9.      Following receipt and review of the Winn-Dixie 10-K and Proxy Statement, on November 2, 2005, counsel for the Equity Committee sent counsel for the Debtors a letter requesting that Winn-Dixie Stores, Inc.'s ("Winn-Dixie") Board of Directors form an independent committee with independent counsel to investigate potential pre-petition claims the estate may have against its pre-petition officers and directors, senior management and possibly other professionals whose actions or failure to act led to Winn-Dixie's deteriorated financial condition and the Chapter 11 bankruptcy filings.[3]  A copy of the November 2, 2005 letter is attached hereto as <u>Exhibit C</u> (the "November 2 Letter").

---

[2] Prior to his appointment as Chairman of Winn-Dixie's Board of Directors as of 2004, H. Jay Skelton was employed by Winn-Dixie's financial auditors, KPMG, from 1962 to 1988, including serving as the Managing Partner of KPMG's Jacksonville, Florida office from 1978 to 1988.

[3] As set forth in the Declaration of Bennett L. Nussbaum Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions and Applications [Docket No. 3] (the "First Day Affidavit"), prior to filing for bankruptcy protection, Winn-Dixie announced a series of actions designed to improve its competitive position (the "Strategic Plan") which included, among other things: (i) a review of business strategies and marketing programs; (ii) an expense reduction plan; (iii) a market positioning review; (iv) an image makeover program; and (v) a process re-engineering initiative.  First Day Affidavit, ¶ 12.  Despite the implementation of the Strategic Plan, Winn-Dixie continued to experience significant sales declines and market-share losses which, among other factors, led to the Chapter 11 filings.

LEGAL_US_E # 70193632.8

10.     As the letter reflects, the Equity Committee requested confirmation of the investigation prior to the annual shareholder meeting scheduled for December 8, 2005 (the "Annual Meeting") at which Winn-Dixie sought to re-elect the Class III Directors and ratify KPMG's appointment as independent accountants.  As set forth in the letter, the Equity Committee focused on whether Winn-Dixie was taking on an unnecessary obligation without having completed an independent investigation as there is no legal requirement to ratify the appointment of a company's independent auditors.  Actions proposed by Winn-Dixie could either intentionally or unintentionally waive possible claims against the Class III Directors and KPMG without even conducting an investigation or otherwise disclosing to shareholders that Winn-Dixie had no basis for its recommendations.

11.     On November 9, 2005, counsel for the Debtors responded stating the Board of Directors would consider the November 2 Letter at the next Board meeting scheduled for December 8, 2005.  A copy of the November 9, 2005 letter is attached hereto as <u>Exhibit D</u> (the "November 9 Letter").

12.     Following receipt of the November 9 Letter, counsel for the Equity Committee requested in a letter dated November 15, 2005 that Winn-Dixie delay the proposed re-election of the Class III Directors and ratification of KPMG's appointment as independent accountants until the requested independent investigation into the actions or inactions of the directors, officers, senior management and professionals could be conducted and completed.  The Equity Committee reiterated its concern that Winn-Dixie's recommendation and support for the re-election of the Class III Directors and ratification of KPMG constituted a waiver of any potential claims against these individuals for conduct, or lack thereof, that led to Winn-Dixie's Chapter 11

4

filing and caused Winn-Dixie's shareholders serious and possibly irreparable injury. A copy of the November 15, 2005 letter is attached hereto as Exhibit E (the "November 15, 2005").

13.    Winn-Dixie's failure to disclose in the Proxy Statement what, if any, investigation supports Winn-Dixie's recommendations to its shareholders constitutes a material omission making the Proxy Statement defective and misleading.

14.    Counsel for the Equity Committee continued to pursue discussions with Debtors' counsel regarding the postponement of the Annual Meeting because of the need for an independent investigation. During these discussions, the Debtors' counsel acknowledged that the Debtors had not conducted any investigation, independent or otherwise, regarding the actions or inactions of Winn-Dixie's Board of Directors, senior management and professional advisors and there was no basis for Winn-Dixie's recommendations set forth in the Proxy Statement.

15.    As a result of the Equity Committee's discussions with the Debtors, Winn-Dixie postponed its Annual Meeting scheduled for December 8, 2005 issuing a press release (the "Press Release") to this effect on December 1, 2005. During these discussions, Winn-Dixie also agreed to file a Form 8-K regarding the postponement of its Annual Meeting but despite their agreement to do so, no Form 8-K has been filed with the SEC.

16.    Since November 15, 2005 counsel for the Debtors and the Equity Committee have engaged in discussions regarding the Debtors' acknowledgement of the need for an independent investigation, the scope of the investigation and how such investigation should be conducted and by whom.

17.    On December 5, 2005, counsel for the Equity Committee advised the U.S. Trustee of the Equity Committee's actions in the Bankruptcy Case. A copy of the letter to the U.S. Trustee is attached hereto as Exhibit F.

5

18.    On December 7, 2005, Debtors' counsel proposed proceeding with an investigation under FLA. STAT. ANN. §607.7401. The Debtors acknowledged the Board of Directors was not independent and proposed an independent entity be retained to conduct the investigation. The Debtors were unwilling to stipulate to the appointment of an examiner under Section 1104 of the Bankruptcy Code and expressed their desire to retain additional professionals to conduct the investigation under FLA. STAT. ANN. §607.7401.

19.    The Debtors' proposal, while a step in the right direction, fails to provide this estate the same protections that can be provided by appointment of an examiner, namely clear bankruptcy court jurisdiction and supervision of the examiner and the examination process, including established procedures for dealing with the disclosure and filing of the examiner's report and implementation of the findings.

20.    While the postponement of the Annual Meeting provides time for the much needed independent investigation regarding whether any claims or causes of action may be asserted against Winn-Dixie's pre-petition directors, officers, senior management and third party professionals to take place, the Equity Committee cannot accept the Debtors' proposal under FLA. STAT. ANN. §607.7401 because the more appropriate way to proceed in a Chapter 11 is with the appointment of an examiner after notice and a hearing. It is important that all interested parties receive notice of the issues creating the need for an independent investigation, and the need for the appointment of an examiner. Moreover, the professionals fees in this case for the Debtors exceed $34 million and it is clear this process would be better managed by this Court's appointment and judicial supervision of an examiner. Lastly, appointment of an examiner ensures that the process will be controlled and monitored by the bankruptcy court and transparent to all creditors and interest holders as intended by Section 1104 of the Bankruptcy Code.

LEGAL_US_E # 70193632.8

21.     The Equity Committee intends to file a letter with the SEC addressing the deficiencies in the Proxy Statement and advising the SEC of Winn-Dixie's failure to conduct any investigation or provide any basis for the Board of Directors' recommendation to re-elect the Class III Directors and ratify KPMG's appointment as independent auditors.

22.     The Equity Committee now seeks the appointment of an examiner, pursuant to Section 1104 of the Bankruptcy Code, to conduct an independent investigation under this Court's direction and supervision.  As set forth below, neither Winn-Dixie's Board of Directors nor the Debtors' professionals are sufficiently independent to conduct the necessary investigation and there is no reason to look to Florida state law when the Bankruptcy Code provides an appropriate remedy.

**B.      The Board of Directors and the Debtors' Professionals Cannot Conduct an Independent Investigation**

23.     Winn-Dixie's Proxy Statement identifies the following nine (9) directors currently sitting on Winn-Dixie's Board of Directors:  (i) John E. Anderson; (ii) Julia B. North; (iii) Carleton T. Rider; (iv) Peter L. Lynch; (v) Edward W. Mehrer, Jr.; (vi) Ronald Townsend; (vii) T. Wayne Davis; (viii) H. Jay Skelton; and (ix) Charles P. Stephens.  As set forth below, with the exception of Peter L. Lynch, none of the remaining directors are sufficiently independent to supervise or conduct an investigation into the actions or inactions of the Board of Directors, officers and senior management that resulted in the Chapter 11 filings.

24.     The following table identifies the directors and service on the Board of Directors:

| Board Member | Year Appointed | Committees |
|---|---|---|
| John E. Anderson | 2002 | • Audit Committee<br>• Nominating and Corporate Governance Committee |
| Julia B. North | 1994 | • Nominating and Corporate Governance Committee<br>• Compensation Committee |

7

| Board Member | Year Appointed | Committees |
|---|---|---|
| Carleton T. Rider | 1992 | • Audit Committee<br>• Nominating and Corporate Governance Committee |
| Peter L. Lynch | 2004 | None |
| Edward W. Mehrer, Jr. | 2003 | • Audit Committee<br>• Compensation Committee |
| Ronald Townsend | 2000 | • Audit Committee<br>• Nominating and Corporate Governance Committee |
| T. Wayne Davis | 1981 | None |
| H. Jay Skelton | 2004 | None |
| Charles P. Stephens | 1982 | • Compensation Committee |

25.     Each of the directors, with the exception of Peter Lynch and H. Jay Skelton,

served on Winn-Dixie's Board of Directors while the following occurred:

- significant decline in Winn-Dixie's financial condition over a 12-month period during 2003 to 2004.

- issuance of dividends from 2000 to 2004 despite Winn-Dixie's declining financial condition.

- the filing of the 2000 through 2002 tax returns subject to the IRS audits.[4]

- the 2003 payment by Winn-Dixie of $52.0 million in taxes and interest to the IRS to settle issues related to the company-owned life insurance policy.

- the actions, or inaction, giving rise to the claims asserted in the Securities Class Action (as defined below).

- the actions, or inaction, giving rise to the claims asserted in the ERISA Class Action (as defined below).

- the actions, or inaction, giving rise to the claims asserted in the Shareholder Demand (as defined below).

- the actions, or inaction, subject to the Grand Jury Investigation (as defined below).

---

[4] Edward J. Mehrer, Jr. was appointed to the Board of Directors in 2003. It is unclear whether he served on the Board of Directors which authorized the filing of the 2002 tax return.

8

- the continuing material weaknesses in Winn-Dixie's accounting policies and procedures identified in the Winn-Dixie 10-K.

26.     Moreover, each of the Class III Directors served on Winn-Dixie's Nominating and Corporate Governance Committee.   With three (3) of the four (4) members of the Nominating and Corporate Governance Committee up for re-election, Winn-Dixie's recommendation to re-elect such Class III Directors is wholly unsubstantiated in light of Winn-Dixie's acknowledgement that no investigation, independent or otherwise, has been conducted.

27.     Three (3) of the nine (9) directors have direct ties to the Davis Family and DDI, Inc., Winn-Dixie's controlling shareholder.   T. Wayne Davis is a member of the Davis Family. Charles P. Stephens is the spouse of a member of the Davis Family. H. Jay Skelton served as President and Director of DDI from 1989 to 2004 and currently serves as DDI's Vice-Chairman. Accordingly, none of these directors are sufficiently independent to conduct or oversee an independent investigation.

28.     H. Jay Skelton also worked for KPMG from 1962 to 1988 and served as the Managing Partner of KPMG's Jacksonville, Florida office from 1978 to 1988. As set forth below, the Winn-Dixie 10-K identifies material issues which could, depending on the outcome of the investigation, give rise to potential claims against KPMG. In light of these potential claims and his ties to KPMG and the Davis Family, Mr. Skelton is not sufficiently independent to conduct or oversee an independent investigation.

29.     While Peter Lynch was recently appointed to the Board of Directors in 2004, he serves as Winn-Dixie's President and Chief Executive Officer. As acknowledged by Winn-Dixie in the Proxy Statement, Mr. Lynch is "not independent because he is our employee." Proxy Statement, p. 10. Moreover, Mr. Lynch as President and Chief Executive Officer continues to focus his efforts on Winn-Dixie's business operations and restructuring efforts.

9

30.    None of the members of Winn-Dixie's Board of Directors is sufficiently independent to conduct or supervise a truly independent investigation into whether, and what, claims and causes of action may be asserted against Winn-Dixie's pre-petition management, officers, directors and third party professionals for actions or inaction that caused or contributed to the bankruptcy filings. To allow the current Board of Directors to conduct or oversee the investigation would in effect permit the members to investigate themselves calling into question the validity of any conclusions reached. A disinterested examiner is essential if the investigation is to be independent and thorough.

31.    As set forth below, the timing of the issuance of dividends by Winn-Dixie in light of its financial condition and performance at the time the dividends were issued and the matters identified in the Winn-Dixie 10-K and Proxy Statement suggest the existence of significant potential claims against the Debtors' pre-petition management, officers, directors and third party professionals, including Winn-Dixie's Board of Directors. As a result, the Equity Committee seeks the appointment of an examiner pursuant to Section 1104 of the Bankruptcy Code because Winn-Dixie is operating as a Chapter 11 debtor, subject to this Court's jurisdiction, and the appointment of an examiner is the appropriate remedy under the Bankruptcy Code and the circumstances described herein.

C.    **Historical Issuance of Dividends**

32.    As set forth in Winn-Dixie's prior public filings, Winn-Dixie historically issued dividends to shareholders. The following table summarizes the dividends issued by Winn-Dixie since 2000 along with Winn-Dixie's reported earnings:[5]

---

[5] The information was gathered from Winn-Dixie's Form 10-Ks for the fiscal years ending June 28, 2000, June 27, 2001, June 26, 2002, June 25, 2003, June 30, 2004 and June 29, 2005.

LEGAL_US_E # 70193632.8

| | | | | Winn Dixie Dividend Table[6] |
|---|---|---|---|---|
| Year | Earnings | Earnings Per Share | Dividends Per Share | Shareholder Equity |
| 2005 | $(832,602) | $(5.91) | $0.00 | $59,294 |
| 2004 | $(100,404) | $(0.71) | $0.15 | $917,345 |
| 2003 | $239,230 | $1.70 | $0.20 | $1,028,504 |
| 2002 | $86,866 | $0.62 | $0.36 | $812,384 |
| 2001 | $45,311 | $0.32 | $1.02 | $771,654 |
| 2000 | $(228,895) | $(1.57) | $1.02 | $867,835 |

33.     As set forth in the table, Winn-Dixie had earnings of $239,230,000 in 2003 and issued dividends of $0.20 per share.  During the first three quarters of 2004, Winn-Dixie issued dividends of $0.05 per share for each quarter.[7]  It was not until the fourth quarter of 2004, the last quarter before filing for bankruptcy, that Winn-Dixie showed negative earnings and did not issue a dividend to shareholders.  None of Winn-Dixie's prior public filings disclose any information regarding the sudden adverse change in earnings or even remotely suggest the possibility of a Chapter 11 filing.

34.     There are no disclosures in any of Winn-Dixie's public filings which establish that a solvency review was conducted prior to the issuance of each dividend or that Winn-Dixie otherwise complied with applicable law in connection with approving the dividends, the timing of the payment of the dividends and the amounts thereof.

35.     During the period of significant decline in earnings, each of the Class III Directors served on Winn-Dixie's Board of Directors and KPMG served as Winn-Dixie's auditor.  Of Winn-Dixie's other six (6) Board members, four (4) were also on the Board during this period.  Despite the deterioration in Winn-Dixie's financial condition which occurred during the Class III

---

[6] All amounts in thousands except per share data.

[7] See Winn-Dixie 10-K, p. 14.

Directors' tenure on the Board of Directors and KPMG's retention as independent auditors,

Winn-Dixie failed to disclose:

- whether the nominating and corporate governance committee performed an evaluation as to whether the Class III Directors are qualified to continue to serve as directors of Winn-Dixie and the basis for the committee's recommendation that shareholders re-elect the Class III Directors;[8]

- whether, and what, claims or causes of actions Winn-Dixie may have against the Class III Directors for actions or inactions which led to the financial deterioration of Winn-Dixie and the Chapter 11 filings; and

- whether, and what, claims or causes of action may exist against the Class III Directors, KPMG, and others in connection with the payment of dividends when reviewed in light of Winn-Dixie's earnings.

36.    Winn-Dixie's public filings also fail to address the cause of such a significant

decline in earnings over a short period of time.  In light of the significant change in Winn-Dixie's

financial condition over a 12-month period, an investigation into what caused the deterioration in

Winn-Dixie's financial condition and performance is necessary to preserve the assets of the

bankruptcy estate and prevent the intentional or unintentional waiver of potential claims that may

exist against directors serving on the Board of Directors during 2000-2005 and KPMG for action

or failure to act during the years 2000 through 2005.

37.    In light of Winn-Dixie's admission that it has conducted no investigation,

independent or otherwise, it is necessary that an examiner be appointed to ensure that the

investigation is independent and thorough.  Moreover, because a majority of the Board of

Directors served as Board members during this period of significant financial deterioration, such

Board members cannot be sufficiently independent to conduct or oversee an independent

investigation of possible claims against pre-petition directors, officers, senior management or

---

[8] Indeed, each of the Class III Directors served on Winn-Dixie's nominating and corporate governance committee during the 2005 fiscal year. See Winn-Dixie 10-K, p. 13.

12

third party professionals as a result of their actions or inactions which caused or contributed to the bankruptcy filings.

**D.     Winn-Dixie's Form 10-K is Deficient**

38.     In the Winn-Dixie 10-K, Winn-Dixie discloses:

> As a result of an Internal Revenue Service ("IRS") audit of fiscal years 2000 through 2002, the Company was assessed approximately $49.0 million in taxes and penalties in 2005. The Company filed a protest and believes it is probable that its position will be sustained. No amount in respect of this matter was accrued in the Consolidated Financial Statements.

Winn-Dixie 10-K, p. 63. Winn-Dixie fails to disclose any additional information regarding the IRS audits, specifically whether any claims or causes of action may exist against the Class III Directors, KPMG, or other current directors, for their action, or inactions, in connection with the underlying matters at issue in the audits.[9]

39.     Winn-Dixie also discloses:

> The Company held company-owned life insurance ("COLI") policies and deducted interest on outstanding loans from March 1993 to December 1997. In the fall of 1996, Congress passed legislation phasing out such deduction over a three-year period. In 2000, the Company established a reserve for taxes and interest related to this issue since the IRS issued both an unfavorable opinion and a computational decision. During 2003, the Company paid $52.0 million in taxes and interest to the IRS to settle this issue and reversed the remaining COLI tax reserve of $28.0 million.

Winn-Dixie 10-K, p. 63. Winn-Dixie fails to disclose any additional information regarding the IRS decisions, specifically whether any claims or causes of action may exist against the Class III Directors, KPMG, or other current directors, for their action, or inactions, in connection with the

---

[9] Despite numerous requests from the Equity Committee, the Debtors have failed to provide to the Equity Committee information regarding the IRS audits.

company-owned insurance policies and the reasons for the $52.0 million payment to the IRS.[10]

Winn-Dixie also fails to address transactions between Winn-Dixie and insurance entities owned

or controlled by the Davis Family, the Davis Family's sale of such entities and whether or not

such activities have impacted the audits or the need for the audits.

40.     In the Winn-Dixie 10-K, Winn-Dixie states:

> In February 2004, several putative class action lawsuits were filed
> in the United States District Court for the Middle District of
> Florida against us and certain present and former executive officers
> alleging claims under federal securities laws.

Winn-Dixie 10-K, p. 11.[11] Winn-Dixie fails to disclose any additional information regarding the

Securities Class Action, specifically whether the allegations may extend to actions taken by

either the Class III Directors, KPMG, or other current directors, senior management and

professionals.

41.     In addition to the Securities Class Action, Winn-Dixie states:

> In March and April 2004, three other putative class action lawsuits
> were filed in the United States District Court for the Middle
> District of Florida against us and certain of our present and former
> executive officers and employees, alleging claims under the
> Employee Retirement Income Security Act of 1974, as amended

---

[10] Despite numerous requests from the Equity Committee, the Debtors have failed to provide to the Equity Committee information regarding the company-owned insurance policies and the purchase and maintenance of such policies.

[11] While Winn-Dixie failed to disclose case numbers in the Winn-Dixie 10-K, upon review of the cases filed with the United States District Court for the Middle District of Florida, the following class action cases were filed against Winn-Dixie during February 2004: (i) Rubenstein v. Winn-Dixie Stores, Inc., et al., Case No. 3:04-cv-71-J-99MCR; (ii) Garfield v. Winn-Dixie Stores, Inc., et al., Case No. 3-04-cv-78-J-HES-MCR; (iii) Nunziata v. Winn-Dixie Stores, Inc., et al., Case No. 3:04-cv-79-J-HES-TEM; (iv) Friends of Ariel Center for Policy Research v. Winn-Dixie Stores, Inc., et al., Case No. 3:04-cv-84-J-HES-MCR; (v) Rosenberg v. Winn-Dixie Stores, Inc., et al., Case No. 3:04-cv-94-J-HES-HTS; (vi) Chang v. Winn-Dixie Stores, Inc., et al., Case No. 3:04-cv-103-J-HES-MMH; (vii) Wechsler v. Winn-Dixie Stores, Inc., et al., Case No. 3:04-cv-111-J-HES-MMH; and (viii) Malvan v. Winn-Dixie Stores, Inc., et al., Case No. 3:04-cv-138-J-99MCR; (ix) Smith v. Winn-Dixie Stores, Inc., et al., Case No. 3:04-cv-153-J-99MCR; and (x) Worry v. Winn-Dixie Stores, Inc., et al., Case No. 3:04-cv-154-J-99MMH. A copy of the complaints are attached hereto as Exhibit G. On August 31, 2004, the court consolidated the cases under the caption of In re: Winn Dixie Stores, Inc. Securities Litigation, Case No. 3:04-cv-71-J-HES-MCR (the "Securities Class Action"). A copy of the order consolidating the cases is attached as Exhibit H.

> ("ERISA") relating to our Profit Sharing/401(k) plan (the "Plan"). The actions purport to be brought on behalf of class consisting of the Plan and participants and beneficiaries under the Plan whose individual accounts held shares in the Winn-Dixie Stock Fund during the period from May 6, 2002 through and including January 29, 2004 (the "Class Period"). More specifically, the complaints generally allege that, during the Class Period, the defendants breached their fiduciary duties to the Plan, its participants, failing to adequately monitor and review Company stock performance as a prudent investment option, failing to manage Plan assets with reasonable care, skill, prudence and diligence and other matters.

Winn-Dixie 10-K, p. 11.[12]  Winn-Dixie fails to disclose any additional information regarding the

ERISA Class Action, specifically whether the allegations may extend to actions taken by either

the Class III Directors, KPMG, or other current directors, senior management and professionals.

42.    Winn-Dixie disclosed in the Winn-Dixie 10-K that it received the following

written demand (the "Shareholder Demand"):

> that it commence a derivative legal proceeding on behalf of the Company against the Board of Directors and our officers and directors who served from May 6, 2002 through July 23, 2004. This demand contends that these various individuals violated their fiduciary duties to the Company by allegedly filing and issuing false and misleading financial statements, by allegedly causing the Company to engage in unlawful conduct or failing to oversee the Company to prevent such misconduct, and by allegedly receiving without entitlement certain retirement benefits, long-term compensation and bonuses.

Winn-Dixie 10-K, p. 12.  Winn-Dixie goes on to state "[w]e believe that all of these claims are

without merit and we intend to defend ourselves vigorously.  Moreover, any derivative claim

would belong to the Company's Chapter 11 estate and the automatic stay would prevent any

---

[12] While Winn-Dixie failed to disclose case numbers in the Winn-Dixie 10-K, upon review of the cases filed with the United States District Court for the Middle District of Florida, the following class action cases were filed against Winn-Dixie during March 2004: (i) Dorminey v. Winn-Dixie Stores, Inc., et al., Case No. 3:04-cv-194-J-20HTS; (ii) Smith v. Winn-Dixie Stores, Inc., et al., Case No. 3:04-cv-195-J-16MMH; and (iii) Barfield v. Winn-Dixie Stores, Inc., et al., Case No. 3:04-cv-308-J-20MMH.  A copy of the complaints are attached as Exhibit I.  The cases were consolidated under the caption In re: Winn-Dixie Stores, Inc. ERISA Litigation, Case No. 3:04-cv-194-J-20HTS (the "ERISA Class Action").  A copy of the order consolidating the cases is attached hereto as Exhibit J.

LEGAL_US_E # 70193632.8

party other than the Company from pursuing such claims." Winn-Dixie 10-K, p. 12. Winn-Dixie fails to disclose any additional information regarding the Shareholder Demand, specifically whether the allegations may extend to actions taken by either the Class III Directors, KPMG, or other current directors, senior management and professionals. Moreover, Winn-Dixie fails to disclose any basis for its blanket assertion that "these claims are without merit." Lastly, Winn-Dixie fails to disclose what if any steps it has taken to pursue these claims or otherwise provide support for its statement that the claims lack merit.

43.    Winn-Dixie also discloses in the Winn-Dixie 10-K that it received a letter from the United States Attorney for the Southern District of Florida which indicated that a federal grand jury was investigating (the "Grand Jury Investigation"):

> possible violations of federal criminal law arising out of activities related to illegal importation, possession, transportation and sale of undersized lobster in and within the United States and the State of Florida, and that the Company is a target of the investigation. The laws potentially applicable are intended to protect the breeding stock of lobsters (and feeding stock of other fish and wildlife).

Winn-Dixie 10-K, p. 12. Winn-Dixie fails to disclose any additional information regarding the Grand Jury Investigation, specifically whether the allegations may extend to actions taken by either the Class III Directors, KPMG or other current directors, senior management and professionals.

44.    As to Winn-Dixie's accounting policies and procedures, which have been audited in the past by KPMG,[13] Winn-Dixie discloses in the Winn-Dixie 10-K that:

> As of June 29, 2005, we did not have appropriate policies and procedures in place to review terms in multi-year incentive contracts in order to determine the proper application of generally

---

[13] Pursuant to Winn-Dixie's proxy statements for 2003 and 2004, KPMG's appointment as independent auditors for the fiscal year 2004 and 2005 was ratified.

> acceptable accounting principles. As a result of the deficiency, errors occurred in the Company's accounting for multi-year contract incentives when preparing the Company's financial statements as of and for the year ended June 29, 2005. This deficiency results in more than a remote likelihood that a material misstatement of the Company's annual or interim financial statements would not be prevented or detected.

Winn-Dixie 10-K, p. 95.

45.    In the Report of Independent Registered Public Accounting Firm included in the

Winn-Dixie 10-K, KPMG states:

> In our opinion, management's assessment that Winn-Dixie Stores, Inc. did not maintain effective internal control over financial reporting as of June 29, 2005, is fairly stated, in all material respects, based on criteria established in Internal Control-Integrated Framework issued by COSO. Also, in our opinion, because of the effect of the material weakness described above on the objectives of control criteria, Winn-Dixie Stores, Inc. has not maintained effective internal control over financial reporting as of June 29, 2005, based on criteria established in Internal Control-Integrated Framework issued by COSO.

Winn-Dixie 10-K, p. 98. Winn-Dixie fails to disclose whether the deficiencies may have been

caused by actions taken, or inaction, by either the Class III Directors, KPMG or any of the other

current directors, senior management and professionals. Moreover, Winn-Dixie fails to disclose

what steps it took to address these and other material weaknesses in their financial accounting

processes and procedures.[14]

**E.    Proposed Plan of Reorganization**

46.    As of the date hereof, the Debtors have not filed a proposed plan of

reorganization. On or about August 12, 2005, the Debtors filed their *Motion for Order Further

Extending Exclusive Periods for Filing Chapter 11 Plans and Obtaining Acceptances of Such*

---

[14] Despite numerous requests from the Equity Committee's professionals, including both Jefferies & Company, Inc. and Paul, Hastings, Janofsky & Walker LLP, the Debtors have failed to provide to the Equity Committee information regarding their accounting procedures, specifically the Debtors' accounting manual.

17

*Plans* [Docket No. 2981] (the "Exclusivity Motion"). On or about September 8, 2005, the Court

entered its *Order Further Extending Exclusive Periods for Filing Chapter 11 Plans and*

*Obtaining Acceptances of Such Plans* [Docket No. 3401] (the "Exclusivity Order") pursuant to

which the exclusive period for the Debtors to propose a plan of reorganization was extended to

December 19, 2005.

47.    On or about November 23, 2005, the Debtors filed a *Motion for Order Granting*

*Third Extension of Exclusive Periods for Filing Chapter 11 Plans and Obtaining Acceptances of*

*such Plans* seeking an extension to and including March 20, 2006 to file plans of reorganization.

In their motion for a third extension, the Debtors identify certain activities that have taken place

in these proceedings but fail to identify any specific steps toward identifying terms for a

proposed plan much less presenting parties with a proposed term sheet or plan, despite having

incurred and billed these bankruptcy estates over $34 million in fees and costs.[15]

48.    It is in the best interests of all parties to move forward in an expedited manner in

these Bankruptcy Cases. To that end, potential significant claims disclosed in the Winn-Dixie

10-K must be investigated and addressed.[16] Despite the assertion of such claims, including the

Shareholder Demand, and the lack of independence of the members of Winn-Dixie's Board of

Directors, Winn-Dixie (i) has not conducted any investigation, evaluation or other performance

review in connection with claims which have been asserted or could be asserted against the

members of the Board of Directors, senior management and auditors for actions or inaction that

---

[15] This number excludes ordinary course professionals and fees and costs incurred and billed by the Creditors Committee.

[16] The Debtors' directors and officers insurance coverage is significant and well above the average coverage levels for similarly situated companies.

caused or contributed to the bankruptcy filings; and (ii) has wholly failed to provide any basis for its statement that the claims asserted in the Shareholder Demand are "without merit."

49.    Throughout the Bankruptcy Case, the Creditors Committee ignored these issues. Appointed on March 1, 2005, the Creditors Committee has not focused on protecting or preserving the estates' claims against who caused or contributed to the bankruptcy filings whether by action or inaction. No other third party has filed any claims or motions or otherwise taken an active role in this case to address or otherwise protect and preserve the bankruptcy estates' potential claims against these individuals.

50.    Accordingly, the Equity Committee seeks the appointment of an examiner under Section 1104 of the Bankruptcy Code to investigate whether the Debtors may assert any claims or causes of action against Winn-Dixie's directors, officers, senior management and professionals for action or inaction that caused or contributed to the bankruptcy filings, including, without limitation, each and every matter identified in the Winn-Dixie 10-K, and 10-Ks filed in prior years, and any other matter deemed appropriate by the examiner.

## Legal Basis for Relief

51.    The Equity Committee submits that investigation of whether and what claims the Debtors may assert against the Board of Directors, pre-petition senior management or the Debtors' third party professionals should be conducted by a disinterested examiner and that the investigation be completed before any of the claims are either intentionally or unintentionally waived by Winn-Dixie. To date Winn-Dixie's Board of Directors has wholly failed to conduct any investigation. A disinterested examiner supervised by this Court will be able to undertake the investigation in an independent, professional, and timely manner and allow the Debtors to focus on the Debtors' reorganization process while the examiner proceeds with the investigation.

19

52.    Requests for the appointment of an examiner are governed by Section 1104(c) of the Bankruptcy Code, which provides in relevant part:

> [O]n request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtors of or by current or former management of the debtor, if –
>
> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debtors, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

53.    Section 1106 of the Bankruptcy Code provides that an examiner shall "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan." 11 U.S.C. §1106.

54.    Bankruptcy courts have utilized examiners in complex cases to investigate all aspects of a debtor's bankruptcy proceeding, including investigating acts, conduct, assets, liabilities and financial condition of the debtor. See In the matter of First American Health Care of Georgia, Inc., 208 B.R. 992, 994 (Bankr. S.D. Ga. 1996) ("Section 1104 clearly contemplates that if an investigation of any fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor by current or former management is necessary either to protect the interests of creditors, equity security holders, and the estate, or if the debtor's unsecured debt exceeds $5 million, the Court shall order the appointment of an examiner on motion and after notice and a hearing"); In re Public Serv. Co. of New Hampshire, 99 B.R. 177 (Bankr. D. N.H. 1989) (holding that the examiner shall "investigate acts, conduct,

assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and

the desirability of the continuance of such business, and any other matter relevant to the case or

to the formulation of a plan") and In re A.H. Robins Co., 88 B.R. 742 (Bankr. E.D. Va. 1986)

(appointing an examiner with authority to monitor the progress of the formulation of a plan of

reorganization and to evaluate and suggest proposed elements of plan of reorganization).

55.    An independent, disinterested examiner is needed to perform the investigation

without any bias or undue pressure from any constituency that has a conflict of interest with the

Debtors. See In the matter of First American Health Care of Georgia, Inc., 208 B.R. at 995

("[t]he involvement of an examiner will contribute valuable perspective to a case with many

competing interests at stake").

56.    In this case, Winn-Dixie's financial condition and payment of dividends in 2000

through 2004, despite an acknowledged decline in financial condition, is sufficient cause to

justify the appointment of an independent examiner. When the other items addressed herein,

including the lack of independence of the members of the Board of Directors, are considered

with Winn-Dixie's total failure to conduct any investigation, an examiner is warranted and

clearly appropriate. Winn-Dixie's Board of Directors is not independent and it would be

improvident to allow Winn-Dixie to investigate itself.

57.    In addition the Winn-Dixie 10-K identifies several tax issues where a special

investigation is necessary. As set forth in the Winn-Dixie 10-K, the IRS conducted an audit of

Winn-Dixie for the fiscal years 2000 through 2002. As a result of these audits, Winn-Dixie was

assessed approximately $49.0 million in taxes and penalties in 2005. While the Company has

filed a protest, an independent examiner is necessary to investigate whether, and what, claims or

causes of actions may be asserted against Winn-Dixie's pre-petition directors, officers, senior

21

management and third party professionals for any actions, or inactions, in connection with the returns for fiscal years 2000 through 2002 that triggered the IRS audits and any penalty resulting from such audits.

58.     Winn-Dixie also disclosed a significant payment to the IRS in connection with Winn-Dixie's company-owned life insurance policies.  As set forth in the Winn-Dixie 10-K, during 2003, Winn-Dixie paid $52.0 million in taxes and interest to the IRS to settle issues relating to the company-owned life insurance policies.  In light of Winn-Dixie's failure to investigate whether claims exist in connection with purchase and maintenance of the company-owned life insurance policies, an independent examiner is necessary to ensure that any such claims are preserved for the benefit of the estate.  This includes an investigation into the terms and conditions pursuant to which Winn-Dixie purchased the policies and whether the entity had any relationship with Winn-Dixie including ownership interests held directly or indirectly by the Davis Family.

59.     The Winn-Dixie 10-K also identifies other matters where a special investigation is necessary to identify whether and what claims or causes of action Winn-Dixie may assert against Winn-Dixie's pre-petition directors, officers, senior management, and third party professionals for fraud, dishonesty, misconduct, or mismanagement, among other things.  In addition to the possible impropriety in payment of dividends, the Winn-Dixie 10-K discloses, among other things, the following items which require a timely independent investigation to ensure that Winn-Dixie, as debtor and debtor-in-possession, protects, preserves and asserts claims against pre-petition directors, officers, senior management and third party professionals as may be appropriate:

22

- Class action lawsuits filed in the United States District Court for the Middle District of Florida against Winn-Dixie and certain present and former executive officers alleging claims under federal securities laws. Winn-Dixie 10-K, p. 11.

- Class action lawsuits filed in the United States District Court for the Middle District of Florida against Winn-Dixie and certain present and former executive officers alleging claims under ERISA relating to Winn-Dixie's Profit Sharing/401(k) plan. Winn-Dixie 10-K, p. 11.

- Shareholder demand requesting that a derivative proceeding be commenced against the Board of Directors and officers and directors who served from May 6, 2002 through July 23, 2004 asserting that the such parties violated their fiduciary duties to the Winn-Dixie. Winn-Dixie 10-K, p. 12.

- Federal grand jury investigation of possible violations of federal criminal law arising out of activities related to illegal importation, possession, transportation and sale of undersized lobsters. Winn-Dixie 10-K, p. 12.

60.     Moreover, the Winn-Dixie 10-K discloses significant deficiencies in Winn-Dixie's accounting policies and procedures. In the Winn-Dixie 10-K, Winn-Dixie states:

> As of June 29, 2005, we did not have appropriate policies and procedures in place to review terms in multi-year incentive contracts in order to determine the proper application of generally acceptable accounting principles. As a result of the deficiency, errors occurred in the Company's accounting for multi-year contract incentives when preparing the Company's financial statements as of and for the year ended June 29, 2005. This deficiency results in more than a remote likelihood that a material misstatement of the Company's annual or interim financial statements would not be prevented or detected.

Winn-Dixie 10-K, p. 95.

61.     Since at least 1994 KPMG has served as Winn-Dixie's independent auditors. Despite KPMG's history as Winn-Dixie's independent auditors it was not until the most recent Winn-Dixie 10-K that Winn-Dixie and KPMG discovered the deficiencies in Winn-Dixie's accounting policies and procedures. In its Report of Independent Registered Public Accounting Firm included in the Winn-Dixie 10-K, KPMG states:

> In our opinion, management's assessment that Winn-Dixie Stores, Inc. did not maintain effective internal control over financial

LEGAL_US_E # 70193632.8

> reporting as of June 29, 2005, is fairly stated, in all material respects, based on criteria established in Internal Control – Integrated Framework issued by COSO. Also, in our opinion, because of the effect of the material weakness described above on the objectives of control criteria, Winn-Dixie Stores, Inc. has not maintained effective internal control over financial reporting as of June 29, 2005, based on criteria established in Internal Control – Integrated Framework issued by COSO.

Winn-Dixie 10-K, p. 96.[17]  In light of KPMG's prior relationship with the Chairman of the Board of Winn-Dixie, H. Jay Skelton, a former KPMG partner, it is important that an independent examiner conduct an investigation of (i) whether other material weaknesses exist in Winn-Dixie's financial processes and procedures; and (ii) whether, and what, claims or causes of action Winn-Dixie may assert against KPMG in connection with the services provided to Winn-Dixie, particularly KPMG's failure to identify possible deficiencies in Winn-Dixie's accounting procedures and policies prior to the 2004 Winn-Dixie 10-K.

62.     The Debtors have failed to perform any investigation, evaluation or performance review to determine whether the estates may assert claims against Winn-Dixie's pre-petition management, directors, officers and/or third party professionals.  Moreover, the Debtors' cases involve complex legal and factual issues, including, but not limited to, (a) deficiencies in financial and tax reporting; (b) the Chairman of the Board's close ties to KPMG, Winn-Dixie's independent auditors; and (c) control of over 36% of the issued and outstanding shares effectively held by one control group, the Davis Family and/or DDI, Inc. ("DDI"), a Davis Family entity.

---

[17] Upon the Equity Committee's demand, Winn-Dixie continued the Annual Meeting and the proposed (i) re-election of the Class III Directors; and (ii) ratification of KPMG's appointment as independent auditors pending the completion of an independent investigation.  An examiner is now necessary and appropriate to ensure accurate information can be obtained and analyzed and the additional information necessary to correct the deficient Proxy Statement provided.

24

63.    As set forth above, the Equity Committee seeks appointment of an examiner to independently investigate whether, and what, claims or causes of action Winn-Dixie may assert against its pre-petition directors, officers, senior management and third party professionals for actions or inactions that caused or contributed to the bankruptcy filing, including, but not limited to:

- The decline of Winn-Dixie's financial condition and events leading up to the Chapter 11 filings.

- The Internal Revenue Service audit of fiscal years 2000 through 2002, including, but not limited to, Winn-Dixie's appeal of the IRS' decisions.

- The issuance of dividends from 2000 through 2004 and whether Winn-Dixie complied with corporate governance requirements in issuing the dividends.

- Winn-Dixie's company-owned life insurance policies and any IRS investigation of such policies.

- Class action lawsuits filed in the United States District Court for the Middle District of Florida against Winn-Dixie and certain present and former executive officers alleging claims under federal securities laws. Winn-Dixie 10-K, p. 11.

- Class action lawsuits filed in the United States District Court for the Middle District of Florida against Winn-Dixie and certain present and former executive officers alleging claims under ERISA relating to Winn-Dixie's Profit Sharing/401(k) plan. Winn-Dixie 10-K, p. 11.

- Shareholder demand requesting that a derivative proceeding be commenced against the Board of Directors and officers and directors who served from May 6, 2002 through July 23, 2004 asserting that the such parties violated their fiduciary duties to the Winn-Dixie. Winn-Dixie 10-K, p. 12.

- Federal grand jury investigation of possible violations of federal criminal law arising out of activities related to illegal importation, possession, transportation and sale of undersized lobsters. Winn-Dixie 10-K, p. 12.

- Any and all matters identified in any filing made by Winn-Dixie in the bankruptcy case or with the SEC.

- Such other matters as the examiner deems appropriate.

## No Prior Relief Requested

64.    The Equity Committee has not made a prior motion for the relief requested herein.

LEGAL_US_E # 70193632.8

### Notice

65.    Notice of this Motion will be provided to: (i) counsel for the Debtors; (ii) the United States Trustee; (iii) counsel for the Creditors Committee; (iv) counsel for the Debtors' lenders; (v) counsel to the SEC; (vi) counsel for the ad hoc committee of retirees; and (vii) all parties requesting special notice pursuant to Bankruptcy Rule 2002.  The Equity Committee submits that no other or further notice need be provided.

### Conclusion

66.    Accordingly, by this Motion, the Equity Committee respectfully requests entry of an order appointing an examiner and granting such other and further relief as the Court deems necessary and proper.

[signature on next page]

LEGAL_US_E # 70193632.8

Respectfully submitted this _8th_ day of December, 2005

PAUL, HASTINGS, JANOFSKY & WALKER LLP

Karol K. Denniston
Ga. Bar No. 218333
Carolyn (Keri) Chayavadhanangkur
Ga. Bar No. 122152
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Telephone: (404) 815-2400
karolkdenniston@paulhastings.com
carolynchayavadhanangkur@paulhastings.com

And

PAUL, HASTINGS, JANOFSKY & WALKER LLP
James D. Wareham
DC Bar No. 411799
875 15th Street
Washington, DC  20005
Telephone: (202) 551-17000
jameswareham@paulhastings.com

And

JENNIS & BOWEN, P.L.

/s/David Jennis
David Jennis
Fla. Bar No. 775940
Chad S. Bowen
Fla. Bar No. 0138290
400 North Ashley Drive
Suite 2540
Tampa, FL 33602
Telephone: (813) 229-1700
djennis@jennisbowen.com
cbowen@jennisbowen.com

***Proposed Co-Counsel for the Official Committee of
Equity Holders***

27