# LEASE AGREEMENT

by and between

**BEIL PROPERTIES, INC.,**
a Florida corporation

as Landlord,

and

**WINN-DIXIE STORES, INC.,**
a Florida corporation

as Tenant

DATED: _____ July _____, 1997

# TABLE OF CONTENTS

PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TITLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SURVEY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ENVIRONMENTAL AUDIT . . . . . . . . . . . . . . . . . . . . . . . . . . 3

USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

COMPLIANCE WITH LAWS . . . . . . . . . . . . . . . . . . . . . . . . . 3

CONSTRUCTION OF SHOPPING CENTER . . . . . . . . . . . . . . . . . . 3

COMPLETION DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

COMMENCEMENT DATE . . . . . . . . . . . . . . . . . . . . . . . . . . 3

OTHER TENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PARKING AND COMMON AREAS . . . . . . . . . . . . . . . . . . . . . . 3

SERVICE AREA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

TENANT'S MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . 4

LANDLORD'S MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . 4

SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

FIXTURES AND INTERIOR ALTERATIONS . . . . . . . . . . . . . . . . . 4

INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

CASUALTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

QUIET ENJOYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TAXES AND LIENS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CONSTRUCTION RISKS . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ASSIGNMENT AND SUBLEASING . . . . . . . . . . . . . . . . . . . . . . 10

SUBORDINATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ESTOPPEL CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . 11

LENDER'S CURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

BENEFIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

TRANSFER BY LANDLORD . . . . . . . . . . . . . . . . . . . . . . 11
SHORT FORM LEASE . . . . . . . . . . . . . . . . . . . . . . . . . 12
MARGINAL TITLES . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
COMPLETE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . 12
DECLARATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
ENVIRONMENTAL CONDITION . . . . . . . . . . . . . . . . . . 12
NO BROKERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
FLORIDA MANDATED PROVISION . . . . . . . . . . . . . . . . 13
EXPANSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
TAKE OVER AND RELEASE . . . . . . . . . . . . . . . . . . . . . 13
GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
NO JOINT VENTURE . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# LEASE

THIS LEASE by and between **BELL PROPERTIES, INC.**, a Florida corporation ("Landlord") and **WINN-DIXIE STORES, INC.**, a Florida corporation ("Tenant"), effective as of the date on which the last of Landlord and Tenant has executed this Lease (the "Execution Date"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

## WITNESETH:

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

1. **PREMISES**

Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, that certain parcel of land located in the City of St. Petersburg, Pinellas County, Florida, more particularly described on **Exhibit "A"**, including all ramps, sidewalks, streets, entrances, exits, roadways, walkways, trash collection facilities and dumpsters, if any, malls, landscaped areas, parking areas, service areas, driveways, traffic signals, medians, curb cuts, access points, utility lines, water detention and retention facilities and related improvements shown on the Site Plan, as hereinafter defined (the "Common Areas"), together with a store building, approximately 220 feet in width by 200 feet in depth, with a front vestibule and rear receiving room(s), together with exterior pads at the rear of the Store for installation of freezers and coolers, a loading dock area (collectively, the "Store"). The Common Areas and the Store, collectively, are hereinafter known as the "Premises".

2. **TERM:**

(a)   **Initial Term.**  The term of this Lease shall commence on the Commencement Date, as herein defined, and shall be for an initial term of 20 years (the "Initial Term").

(b)   **Extension Term(s).**  Tenant, at its option, shall be entitled to the privilege of 5 successive extensions of the Term of this Lease, each extension to be for a period of 5 years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term").

Tenant may extend the Term provided that it is not in material or monetary default under this Lease by giving to Landlord a notice in writing at least 180 days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document.  If Tenant is, but for the giving of notice and/or the passage of time, in material or monetary default under this Lease at the time it notifies Landlord that it desires to extend the Term and Tenant cures such default within applicable cure periods, then Tenant's extension notice shall become effective upon such cure.

(c)   **Return of Premises.**  Tenant will yield up the Premises and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in broom clean condition, reasonable wear and tear, damage by fire and other casualties and condemnation or appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct. Tenant shall not be required to restore the Premises to their original state. Tenant shall not remove from or assert any rights in or to any conduits, fixtures, ducts or other apparatus not constituting Tenant's Trade Fixtures. Tenant shall surrender to Landlord all keys to or for the Store and shall inform Landlord of all combinations of locks, safes, and vaults, if any, in the Store.

(d)   **Holding Over.**  Any holding over by Tenant of the Premises after the expiration of the Term shall operate and be construed as a tenancy at sufferance from month to month, at 150% of the Basic Rent but otherwise upon the same terms and conditions applicable to the Term.

3. **RENT**

Tenant shall pay the following without notice, demand, counterclaim, or offset except as expressly provided in this Lease or as provided by law.

(a)   **Basic Rent.**  Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord as basic rent for the Premises during the Term, the sum of $234,766.53 per annum ("Basic Rent").  Basic Rent shall be paid in twelve (12) equal monthly installments of $19,563.88 per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the Term.

(b)      Percentage Rent.  In addition, beginning on the Commencement Date, as hereinafter defined, Tenant shall pay Landlord percentage rent equal to the amount, if any, by which one percent (1%) of Gross Sales (as hereinafter defined) exceeds Basic Rent ("Percentage Rent").  Any Percentage Rent which may become due shall be payable within 60 days after the expiration of each Fiscal Year, as hereinafter defined.  However, upon final termination of the Term, any Percentage Rent due shall be payable within 60 days after such termination or expiration of the Term.  The Percentage Rent for each Fiscal Year shall be calculated separately and without reference to any other Fiscal Year.  For purposes of calculation the Percentage Rent due hereunder, Tenant's fiscal year shall be approximately July 1st to June 30th of each year (the "Fiscal Year").  Notwithstanding anything to the contrary in this Lease, Tenant shall be entitled to deduct from the amount of Percentage Rent otherwise due in any Fiscal Year the amount paid or payable by Tenant during the same Fiscal Year for Real Estate Taxes and Premises Insurance, each as hereinafter defined.

"Gross Sales" shall mean the aggregate sales price of all merchandise (including, without limitation, food and beverages) sold in or from the Store by Tenant during each fiscal year of the Term, both for cash and on credit (less bad debt expenses).  Gross Sales shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by Tenant from the Premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks, automatic teller machines and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds, savings stamps, or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts, or coupons for exchange of merchandise or other things of value; (9) merchandise or other things of value issued as a premium in connection with any sales promotion program; and (10) gift certificates or like vouchers until such time as the same have been converted into a sale of merchandise.  Tenant makes no representation or warranty as to the amount of Gross Sales it expects to make in or from the Premises.  Landlord shall not release and shall keep confidential all information disclosed to or discovered by it concerning Gross Sales, and shall require Landlord's Auditor to keep the same confidential.  Landlord may, however, disclose Gross Sales to its attorneys and accountants and to lenders, prospective lenders, and to prospective purchasers of the Premises (collectively, "**Interested Parties**") provided that such Interested Parties agree in writing or are otherwise legally obligated to keep Gross Sales information confidential.

Tenant shall keep complete and accurate books and records of its Gross Sales.  At the end of each Fiscal Year, or at the end of the Term, if it sooner occurs, Tenant shall submit to Landlord a written statement of Gross Sales for the preceding Fiscal Year.  Such statement of Gross Sales shall be treated as confidential by Landlord and shall be conclusive unless Landlord, within 90 days after receipt thereof, shall give written notice to Tenant of its intent to audit Tenant's Gross Sales figures for the prior year.  The Landlord may then, at its cost and expense, cause applicable records to be audited at Tenant's place of business in a manner not to unreasonably interfere with Tenant's business by a certified public accountant contracted for and paid by Landlord (the "**Landlord's Auditor**").  Landlord's Auditor shall provide a copy of its findings and report of audit to Tenant.  If Landlord's Auditor finds and it can reasonably demonstrate that Tenant has underpaid Percentage Rent due under this Lease, the Tenant shall pay to Landlord the amount of such underpayment within 30 days of receipt of satisfactory documentation thereof from Landlord's Auditor and if Tenant understated Gross Sales for the preceding year by more than 3%, Tenant shall also pay to Landlord the reasonable out-of-pocket cost of Landlord's Auditor.  If Landlord's Auditor finds and it can reasonably demonstrate that Tenant has overpaid Percentage Rent due under this Lease, then Landlord shall promptly pay the amount of any such overpayment to Tenant.

(c)      Additional Rent.  Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord, within 30 days of receipt of Landlord's statement and a paid receipt therefor, or directly to the taxing authority if presented with an unpaid bill therefor, "Real Estate Taxes" assessed upon the Premises.  Real Estate Taxes includes all ad valorem and general real estate taxes and special assessments for improvements made either on-site or off-site by the taxing authorities as part of a special improvement district (e.g. special assessments for sidewalks or for road widening), less any abatements, early payment discounts, or refunds permitted by law.  Real Estate Taxes does not include, Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Premises.  To the extent Tenant is required to pay for any special assessment for improvements, Tenant's obligation shall be determined by treating the special assessment as payable in as many installments as is lawful, and charging Tenant with Tenant's Pro-rata Share of each installment.  Any annual special assessment deemed payable after the expiration or termination of this Lease shall not be Tenant's obligation.  Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense.  Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing.  If Landlord institutes any action to challenge any assessment or Real Estate Taxes, Landlord's written approval in advance, which may be granted or withheld in Tenant's sole discretion or unless Tenant declines in writing to institute its own challenge and Landlord's challenge results in a net savings to Tenant, in which case, Tenant shall pay the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

2

Basic Rent, Percentage Rent, and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated based upon a 365 day year and Tenant shall pay any sales or rent tax due thereon to Landlord or at Tenant's option, directly to the taxing authorities.

4.    **TITLE**

It shall be a condition to Tenant's obligation to pay rent under this Lease that title to Tenant's leasehold and the related easements, if any, be subject only to those exceptions listed on **Exhibit "B"** attached hereto (the "**Permitted Exceptions**"). Landlord shall cure or cause to be removed any title exceptions created by, through, or under Landlord that can be cured solely by the payment of money (i.e. taxes due and payable, mortgages or other encumbrances (unless all payments due under any such mortgage or encumbrance are current and Tenant obtains an SNDA as hereinafter defined), mechanics' or construction liens, etc.), and shall deliver evidence of Landlord's status, power, and authority as required by the title insurance company, and shall execute and deliver an owners and non-foreign affidavit.

5.    **SURVEY**    [intentionally omitted]

6.    **ENVIRONMENTAL AUDIT**    [intentionally omitted]

7.    **USE**

(a)    Permitted Use.    The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business (including discount businesses) (the "**Permitted Use**").

8.    **COMPLIANCE WITH LAWS**

Tenant shall at all times comply with all current and future applicable laws, ordinances, rules, codes, orders, and regulations of every lawful authority (collectively "**Legal Requirements**") having jurisdiction over the Store, as such shall relate to Tenant's operation of the Store for the Permitted Use.

Landlord shall at all times fully comply with all Legal Requirements applicable to Landlord and to fulfillment of Landlord's obligations under this Lease.

9.    **CONSTRUCTION OF SHOPPING CENTER**    [intentionally omitted]

10.    **COMPLETION DATE**    [intentionally omitted]

11.    **COMMENCEMENT DATE**

Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to accrue hereunder upon the date on which Landlord completes its acquisition of the Premises from Tenant (the "**Commencement Date**").

12.    **OTHER TENANTS**

[intentionally omitted]

13.    **PARKING AND COMMON AREAS**

Tenant, its employees, agents, suppliers, licensees, customers and invitees, shall have the exclusive right at all times to use (subject to the Permitted Exceptions), free of charge, during the Term, the Common Areas. Tenant may use the sidewalks adjacent to the Store and the exterior surfaces thereof for the display and sale of merchandise and services.

Throughout the Term there shall be a surfaced parking area substantially of sufficient area to provide:

(a)    a minimum ratio of at least five (5) ten foot (10') wide automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in the Premises, but not less than

(b)    facilities for convenient parking of at least 270 automobiles (minimum); on the basis of arrangement as provided on the Site Plan attached hereto as **Exhibit "A-2"**.

Tenant acknowledges, however, that the surfaced parking area existing as of the date of this Lease on the Premises, together with the surfaced parking area existing as of the date of this Lease on the adjacent property described as Lot 1 and Lot 3 subject and pursuant to that certain Declaration of Restrictions and Grant of Easements by and between Morris Developments of Florida, Inc. and Tenant, dated June 22, 1986 and recorded in Official Records Book 6316, at Page 510 of the Public Records of Pinellas County, Florida (the "**Declaration**"), is acceptable to Tenant.

MFC55367    07/16/97

3

Webb City, St. Petersburg

Notwithstanding the foregoing, if Legal Requirements mandate that a greater number of parking spaces be provided and maintained, such Legal Requirements shall control. Without Tenant's prior written consent, Landlord will not seek or permit another tenant of the Premises to seek a variance or waiver from the minimum parking requirements applicable to the Premises pursuant to such Legal Requirements. No signboards, buildings, or other construction shall be erected in any of the Common Areas or so as to materially obstruct the view of the Store from the adjoining public streets. Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, "park and ride" lots, or sales by merchants utilizing vehicles or booths in the Common Areas shall be allowed in the Premises.

14.   SERVICE AREA   [intentionally omitted]

15.   UTILITIES

Tenant shall contract for and pay all charges measured by consumption or use for telephone, electricity, water, gas, and other utilities and services such as garbage removal and recycling, if any, used by Tenant at the Store. Landlord shall not take or permit any other party under its control to take any action that would interfere with access to such utilities sufficient to meet Tenant's needs.

16.   TENANT'S MAINTENANCE

Tenant shall keep the exterior and interior of the Store in reasonably neat and orderly, good condition and shall repair or replace all facilities and components comprising the Store or the Common Areas as needed including, without limitation, the roof, foundation, and structural members of the Store, the windows and plate glass, automatic doors, air conditioning and heating systems and floor surfacing of the Store, the facade of the Store, the exterior walls of the Store (including painting of the exterior walls as needed), the automatic sprinkler system (including central alarm system therefor, if required by governmental authority) and electrical and plumbing systems except for reasonable wear and tear. Tenant shall keep the delivery areas of the Store reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the Premises or permit anything to be done in or upon the Premises creating an unreasonable nuisance thereon. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon the Premises for the purpose of making repairs and for examining or showing the same to prospective purchasers or lenders.

Tenant shall have all the rights of Landlord arising under the Declaration and shall perform all of Landlord's obligations arising pursuant to the Declaration during the term of this Lease.

17.   LANDLORD'S MAINTENANCE

[intentionally omitted]

18.   SIGNS

Subject to and in accordance with applicable Legal Requirements, Tenant may place, erect, and maintain any signs, antennae, and satellite dishes on the roof, walls, and any other places on or about the Store or within the Premises, which signs antennae, and satellite dishes shall remain the property of Tenant and may be removed at any time during the Term and shall be removed at the end of the Term and provided Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Premises resulting from the installation or removal of such signs, antennae, and satellite dishes. If installation of any sign, antenna, or satellite dish requires roof penetration or a change in the structure of the Store, Tenant shall obtain Landlord's prior written consent, which shall not unreasonably be withheld, delayed, or conditioned.

19.   FIXTURES AND INTERIOR ALTERATIONS

Tenant, at its own expense, shall have the right from time to time during the Term to make any interior alterations, additions, and improvements, including additional or alternatively located doors and interior partitions, in and to the Store which do not adversely affect its structural integrity and, provided Tenant has first obtained Landlord's written approval (which shall not unreasonably be withheld, conditioned, or delayed) may make other alterations, additions, or improvements (excluding Tenant's Trade Fixtures, as hereinafter defined "Tenant Modifications"). If Landlord's consent is required in connection with any Tenant Modification, Tenant shall provide to Landlord a reasonably detailed description of the proposed work prior to commencement thereof. Landlord's consent shall be deemed given if Landlord does not send written notice of its disapproval on or before 10 days after the date Tenant requested Landlord's approval. Landlord shall cooperate with Tenant in obtaining any government approvals necessary or desirable in connection with any permitted and/or approved Tenant Modifications, provided that Landlord shall not be required to incur any out-of-pocket expense in connection therewith. Tenant shall make all Tenant Modifications in a good, workmanlike manner and in accordance with all Legal Requirements applicable thereto. All permanent structural Tenant's Modifications shall belong to Landlord and become a part of the Store upon termination or expiration of the Term and all other Tenant Modifications shall, at Landlord's option, either be removed, or shall remain in place at the end of the Term.

Tenant may construct and build or install in the interior of the Store any and all racks, counters, shelves, and other fixtures, personal property, and equipment of every kind and nature as may be necessary or desirable in Tenant's business ("**Tenant's Trade Fixtures**"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant. Tenant shall have the right to and shall at the end of the Term remove all or any part of Tenant's Trade Fixtures at any time, and Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of repairing any damage to the Premises resulting from the installation or removal of Tenant's Trade Fixtures or nons-permanent nonpermanent Tenant Modifications.

### 20.   INDEMNIFICATION

Tenant agrees to indemnify and save harmless Landlord and any Mortgagee from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage not covered or reimbursable by insurance to any person or property happening in the Store or the Common Areas unless caused by the negligence or wilful misconduct of Landlord, or such Mortgagee or their respective agents, or employees, or by Landlord's breach of its obligations under this Lease.

The foregoing indemnities shall survive the expiration or early termination of the Term of this Lease.

### 21.   CASUALTY

If (1) the Store is totally destroyed or damaged by fire or other casualty to the extent of 50% or more of the value thereof based upon replacement costs or to an extent that renders the Store untenantable in Tenant's reasonable judgment, (a "**Major Casualty**," anything less being hereinafter referred to as a "**Minor Casualty**") then:

(a)    if a Major Casualty occurs during the first 17 years of the Initial Term or a Minor Casualty occurs at any time during the Term, then Tenant shall proceed promptly (but in any event within 180 days of destruction or damage) and without expense to Landlord to repair the damage or restore the Store, or the Premises, as the case may be, in accordance with Tenant's plans or as otherwise agreed to in writing by Landlord. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored or (z) the date a reasonable person using qualified construction contractors could reasonably have been expected to have completely repaired or restored the damage or destruction. Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents;

(b)    if a Major Casualty occurs during the last 3 years of the Initial Term or during any Extension Term then either Landlord or Tenant shall have the option, exercisable by written notice to the other within 30 days of the date of the Major Casualty to terminate this Lease;

(i)    If Landlord so terminates this Lease, Tenant may nevertheless reverse and void Landlord's termination by electing, within 15 days of receipt of Landlord's termination notice, to extend the Lease for the next successive Extension Term. Landlord shall be obligated to extend the Term upon timely receipt of Tenant's election notice;

(ii)    If Tenant terminates this Lease, or does not reverse and void Landlord's timely termination, then this Lease shall terminate as of the date of the Major Casualty and all Basic, Additional, and Percentage Rent shall be pro-rated as of such date;

(iii)    If neither Tenant nor Landlord timely terminates this Lease or if Tenant reverses and voids Landlord's timely termination, then Tenant shall to proceed promptly (but in any event within 150 days of destruction or damage) and without expense to Tenant to repair the damage or restore the Store, or the Premises, as the case may be, in accordance with Tenant's plans or as otherwise agreed to in writing by Landlord. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored. The obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Premises or any portion thereof. Notwithstanding the foregoing, any Mortgagee shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

(iv)    If fire or other casualty destroys or damages any portion of the Common Areas at any time during the term and if, had such destruction or damage occurred to the Store, Tenant would be

5

obligated to repair the Store, then Tenant shall repair the destruction or damage to the Common Areas substantially simultaneously with repair of the Store.

22.   INSURANCE

Tenant shall carry or cause to be carried the types of insurance listed below, placed with a company licensed to transact business in the state where the Premises is located and rated at least "A." or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Certificates of insurance shall be furnished to Landlord and any Mortgagee prior to the Commencement Date, shall show Landlord and any Mortgagee as an additional insured, shall contain waivers of subrogation, and shall provide thirty (30) days notice to Landlord prior to cancellation, material reduction in policy limits, or any other change adverse to Landlord's or such Mortgagee's interests. Notwithstanding the foregoing, so long as Tenant (or Winn-Dixie Stores, Inc. if it is not the Tenant hereunder, but has executed a guaranty of Tenant's obligations hereunder) maintains a net worth in excess of $100 Million, Tenant shall self-insure and shall not be required to provide any insurance certificates to Landlord or any Mortgagee.

(a)   Liability Insurance.   Tenant shall carry, at its sole expense, comprehensive general liability insurance coverage on the Store, stipulating limits of liability of not less than $2,000,000.00 and deductibles of not more than $250,000.00. Tenant hereby expressly waives any and all claims against Landlord for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

(b)   Casualty Insurance.   Tenant shall carry or cause to be carried all-risk commercial property insurance on the Store and any permanent or structural additions, alterations, and improvements made thereto and on the interior nonstructural portions of the Store that it is responsible for maintaining under this Lease and for its personal property, and Tenant's Trade Fixtures in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00, and hereby expressly waives any and all claims against Landlord for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

If Tenant has "self insured" and a claim is made or a loss incurred which would be covered by the insurance described in subparagraphs (i) or (ii) above, then Tenant shall be liable to and shall indemnify and hold harmless Landlord and/or a Mortgagee (as their interests may appear) against any such claim or loss and shall pay any settlement or judgment resulting therefrom. As to casualty losses, Tenant shall pay the replacement cost thereof. Tenant's indemnity obligation under this paragraph in the case of a claim or loss due to "self insurance" shall exist notwithstanding and shall survive any termination of this Lease pursuant to paragraph 21 of this Lease.

23.   QUIET ENJOYMENT

Landlord covenants, warrants and represents that:

(a)   the Premises is and shall remain free and clear of all liens and encumbrances superior to the leasehold hereby created, unless the lienor has executed an SNDA, as hereinafter defined, or unless consented to in advance and in writing by Tenant, which consent may be withheld or conditioned in Tenant's sole discretion;

(b)   As of the Execution Date Landlord is a duly organized, validly existing Florida corporation, has full right and power to execute, deliver, and perform this Lease and to grant the estate demised herein, and such execution, delivery, performance, and grant have been duly authorized by all necessary corporate action and does not and will not constitute a breach of or default under any contract, Mortgage, order, or judgment by which Landlord or the Premises or any portion thereof is bound, and any future landlord which is a business entity shall be duly organized and maintain its valid existence in its state of organization, and shall have the power and authority to assume and perform this Lease, shall have duly authorized such assumption and performance, and such assumption and performance shall not constitute a breach of or default under any contract, Mortgage, order, or judgment by which such future landlord or the Premises or any portion thereof is bound;

(c)   no consent, approval, or authorization of any other party is necessary to grant to Tenant the rights and privileges intended to be granted under this Lease;

(d)   Tenant, on paying the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anyways appertaining thereto, during the Term subject to the Permitted Exceptions and matters approved or waived in writing by Tenant;

(e)   As of the Execution Date, Landlord has not previously, either directly or indirectly, leased any portion of the Premises, sold any portion of the Premises, or otherwise permitted any portion of the Premises or any other property owned or controlled by Landlord to be used in a manner as would be prohibited by or violate this Lease.

Webb City, St. Petersburg

24.   **TAXES AND LIENS**

Except for taxes to be paid directly by Tenant as provided elsewhere in this Lease including Real Estate Taxes, all other taxes, assessments, and charges on land or improvements and obligations secured by mortgage or other lien upon the Premises (collectively, "**Landlord's Obligations**") shall be promptly paid by Landlord or transferred to acceptable bond or other adequate security reasonably acceptable to Tenant prior to delinquency and, if Tenant is responsible under this Lease for paying any portion of any of Landlord's Obligations, Landlord shall pay the same in such a manner as to take maximum advantage of any rebate, abatement, or early payment discount available. Tenant shall hold Landlord harmless from and against any failure to pay or any penalty for late payment of any taxes upon any personal property of Tenant or upon Tenant's Trade Fixtures.

25.   **CONDEMNATION**

If any part of the Store is taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to terminate this Lease at its option by written notice to Landlord within 60 days of such taking or purchase, and any unearned Basic Rent, Percentage Rent, Additional Rent or other charges paid in advance shall promptly be refunded to Tenant. If a Tenant does not elect to terminate this Lease, Tenant shall promptly commence and diligently prosecute to completion any repairs and restoration reasonably necessary and feasible to put the Premises in a condition comparable to their condition at the time of taking and this Lease shall continue but Tenant shall be entitled to such division of proceeds and abatement of Basic Rent, Additional Rent, and other charges as shall be just and equitable under all circumstances.

If any portion of the Premises, including, without limitation, any parking area and access thereto or truck driveway to Fourth Avenue South depicted on the Site Plan, is taken for any public or quasi-public use, under any Legal Requirement or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the Store or prevent its use of or access to or through either one of the truck driveways to Fourth Avenue South as shown on the Site Plan or so as to reduce the required parking area by an amount in excess of 10%, Tenant may, at its option, terminate this Lease within 60 days of the obstruction, taking, or purchase. In the case of a reduction in the required parking area by an amount in excess of ten percent (10%) following which Tenant desires to terminate this Lease, however, Tenant shall notify Landlord and Landlord shall have 15 days after the date of Tenant's notice to propose alternative replacement parking area. If the alternative replacement parking area meets with Tenant's reasonable approval, Landlord will proceed to promptly pave and provide such alternative parking and this Lease shall continue. If the alternative parking area does not meet with Tenant's reasonable approval, Tenant may terminate this Lease as above provided.

Except with respect to any business loss or loss of goodwill or cost of dislocation claimed by Tenant, and the cost of removing nonstructural Tenant Modifications or Tenant's Trade Fixtures from the condemned area or the cost of rebuilding the Premises following a partial taking that does not result in a termination of this Lease, Tenant waives its rights to the proceeds of any condemnation award granted to Landlord.

Notwithstanding any of the foregoing, any Mortgagee shall be entitled to control disbursement of any condemnation proceeds (other than those, if any, awarded to Tenant for its fixtures, business losses, or other reason) to ensure proper application of the same toward restoration or repair if required by this Lease, unless Tenant terminates this Lease, in which case any such condemnation proceeds may be applied by such Mortgagee, in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

26.   **DEFAULT**

**By Tenant:**   Tenant shall be in default under this Lease if:

(a)      Tenant fails to pay any Basic Rent, Additional Rent, or Percentage Rent due under this Lease within 10 days after receipt of notice from Landlord stating that such sums are past due and remain unpaid (a "**Payment Default**"); or

(b)      Tenant fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure provided that Tenant notifies Landlord in writing that Tenant has in fact undertaken a cure and will prosecute the same to completion in a reasonable manner).

Following an uncured default by Tenant, Landlord may exercise any and all remedies available at law or in equity, provided, however, that Landlord shall use reasonable and diligent efforts to mitigate its damages. Notwithstanding the foregoing, subject to Landlord's obligation to mitigate its damages, Landlord shall have the following specific remedies following an uncured Tenant Default:

(i)      Landlord may expel Tenant from the Premises without terminating this Lease, in which case Landlord shall use reasonable and diligent efforts to re-let the Premises; Tenant shall

remain liable for (i) any past due and unpaid Basic, Additional, or Percentage Rent; (ii) the worth at the time of award by a court having jurisdiction thereof of the amount by which the present value of the unpaid rent and other charges due under this Lease from Tenant to Landlord for the balance of the Term exceeds the present value of the market rent for the Premises for the balance of the Term; (iii) the actual out-of-pocket costs to make repairs to the Premises necessitated by removal of Tenant's Trade Fixtures or nonpermanent Tenant Modifications; (iv) reasonable and customary brokerage commissions paid in connection with re-letting the Premises.

(ii)     Landlord may terminate this Lease, in which case Tenant shall nevertheless remain liable for any past due and unpaid Basic, Additional, or Percentage Rent and for any out-of-pocket costs incurred due to any default other than a Payment Default accruing prior to the date of termination.

(iii)    Amounts due and owing to Landlord and constituting a Payment Default shall bear interest at the higher of the rate of twelve percent (12%) per annum or the highest rate allowed by law (the "**Default Rate**") on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Tenant.

**By Landlord:**   Landlord shall be in default under this Lease if:

(c)     Landlord fails to reimburse or pay to Tenant any amount due to Tenant from Landlord within 10 days after receipt of a written statement from Tenant (a "**Repayment Default**"); or

(d)     Landlord fails to perform any other of its material obligations under this Lease within 30 days after receipt of notice from Tenant (or such longer period as may reasonably be required to effectuate a cure provided that Landlord notifies Tenant in writing that Landlord shall and has in fact undertaken a cure and will prosecute the same to completion in a reasonable manner.)

Following an uncured default by Landlord, Tenant may exercise any and all remedies available at law or in equity, provided, however, that Tenant shall use reasonable and diligent efforts to mitigate its damages.

Notwithstanding the foregoing, subject to Tenant's obligation to mitigate its damages, Tenant shall have the following specific remedies in the following specific instances:

(i)     In the case of a Repayment Default, Tenant, Tenant shall be entitled to offset such amount against all Basic, Additional, and Percentage Rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Landlord or recouped by offset.

(ii)     If any representation or warranty made by Landlord in paragraph 23(a), 23(d) or 41(a) of this Lease is determined during the Term to be false when made and such falsity materially affects Tenant's use of the Store for the Permitted Use, its access to or use of the Common Areas, and Landlord has not corrected the falsity or alleviated the adverse effects to Tenant's reasonable satisfaction within 30 days of written notice from Tenant, Tenant at its option may terminate this Lease by written notice to Landlord. Tenant shall stand released of and from all further liability hereunder from and after the date of such termination and Landlord shall be liable to Tenant for all loss, cost, and expense resulting from or in connection with Landlord's false representation, including, without limitation, the cost of Tenant's relocating its business.

(iii)    Tenant shall have the termination rights provided for in the paragraphs of this Lease relating to Casualty and Condemnation.

(iv)     If a release of Hazardous Substances or other environmental condition occurs that is not the result of Tenant's actions or the actions of Tenant's agents, contractors, subcontractors, or employees, which release or environmental condition materially impairs for more than thirty (30) days after written notice of same to Landlord Tenant's ability to use the Premises for the Permitted Use (the "**Impairment Period**") and, if unremedied, would constitute a violation of applicable Legal Requirements (an "**Environmental Violation**"), Tenant may (1) cure such Environmental Violation and offset the cost of such cure against all Basic, Additional and Percentage Rent due under this Lease or (2) terminate this Lease by written notice to Landlord on or before thirty (30) days after the end of the Impairment Period.

(v)     Tenant may, but shall not be obligated to, perform, acquire, or satisfy any lien, encumbrance, agreement, or obligation of Landlord which (if not performed, acquired, or satisfied) would, in Tenant's reasonable judgment, constitute a material threat to its use or enjoyment of the Premises, and if it does so it shall be subrogated to all rights of the obligee against Landlord or the Premises or both and

8

if not promptly reimbursed by Landlord for resulting expenses and disbursements, shall be entitled to offset the cost of the same against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost thereof until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

In the event of an uncured default or a dispute arising out of or in connection with this Lease, the nondefaulting or prevailing party shall be entitled, in addition to whatever other damages or remedies such party is entitled to, to reimbursement for reasonable attorney's fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy.

27.    **CONSTRUCTION RISKS**

Tenant shall indemnify and hold Landlord harmless from and against mechanics, materialmen's, contractor's or subcontractor's or similar liens and any claims or suits for damage to persons or property from defects in materials or the use of unskilled labor or from negligence or wilful misconduct of Tenant, its agents, employees, or contractors and subcontractors in connection with construction of Tenant Modifications and installation of Tenant's Trade Fixtures or any other construction activities engaged in by Tenant pursuant to the terms of this Lease. No interest of Landlord shall be subject to any lien for mechanics, materialmen's, contractor's or subcontractor's or similar liens or any claims or suits in connection with construction activities engaged in by Tenant pursuant to this Lease. Tenant shall inform all of its agents and contractors of the provisions of this Section of this Lease and Landlord may record a memorandum hereof without Tenant's signature or consent.

28.    **NOTICES**

All notices, requests, demands, and other communications required or permitted to be given under this Lease shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All rent payments shall be sent to Landlord at the address below. Each communication shall be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (3) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (4) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord:     Beil Properties, Inc.
              Attn: Walter E. Beil
              247 Ocean View
              Newport Beach, CA 92663

or such other address as Landlord may direct from time to time.

Tenant:       Winn-Dixie Stores, Inc.
              Re: Webb City Store No. 620
              Attn: Real Estate Manager
              Post Office Box 440
              Tampa, FL 33601

With a copy to:   Winn-Dixie Stores, Inc.
                  Attn: General Counsel
                  5050 Edgewood Court
                  P.O. Box B
                  Jacksonville, FL 32203-0297
                  Telecopy: (904) 783-5138

or to such other address as Tenant may direct from time to time.

29.    **ASSIGNMENT AND SUBLEASING**

Tenant may assign this Lease, or sublease or vacate the Premises in whole or in part without the consent of Landlord, provided Tenant shall continue to remain liable and responsible for the payment of rent and due performance of all other terms, covenants, and conditions of this Lease. Tenant shall notify Landlord in writing of any assignment or sublease of Tenant's leasehold.

30.    **SUBORDINATE**

Provided that, with respect to any first priority or primary mortgage, deed of trust, security deed or other security instrument executed by any landlord in favor of a lender or other financier and securing a construction or permanent loan upon the Premises (together with any renewals, modifications, extensions, or replacements thereof,

MFC55367  07/11/97

9

Webb City, St. Petersburg

and any other security documents executed in connection therewith, a "**Mortgage**"), Landlord obtains from the holder of such Mortgage (the "**Mortgagee**") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement substantially in the form attached hereto as **Exhibit "C"** (an "**SNDA**"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage. Landlord hereby irrevocably directs Tenant to comply with any notice received from any Mortgagee requesting, requiring, or directing that Tenant pay any or all Basic, Additional, and/or Percentage Rent to such Mortgagee (a "**Rent Payment Notice**") notwithstanding any contrary direction, instruction, or request from Landlord. Tenant shall be entitled to rely upon any Rent Payment Notice and shall have no duty to controvert or challenge any Rent Payment Notice. Tenant's compliance with any Rent Payment Notice shall not be deemed to violate, breach, or constitute a default under this Lease. Landlord hereby indemnifies and releases Tenant and shall hold Tenant harmless from and against any and all loss, cost, expense, or damage (including attorneys' fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) arising from any claim based upon or in connection with Tenant's compliance with any Rent Payment Notice. Landlord shall look solely to the Mortgagee with respect to any claim Landlord may have on account of an incorrect or wrongful Rent Payment Notice. Tenant shall be entitled to full credit under this Lease for any and all Basic, Additional, and/or Percentage Rent paid to any Mortgagee pursuant to any Rent Payment Notice to the same extent as if such rent were paid to Landlord. No Mortgage shall encumber Tenant's Trade Fixtures or any nonpermanent, nonstructural Tenant Modifications. Tenant assumes no liability or obligation under the Mortgage or with respect to the indebtedness secured thereby.

31.   ESTOPPEL CERTIFICATE

Within a reasonable time, but no less than 10 business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as **Exhibit "D"** (an "**Estoppel Certificate**"). Notwithstanding the forgoing, Landlord shall not request, and Tenant shall not be required to deliver more than 2 Estoppel Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500.00 per additional requested Estoppel Certificate.

32.   LENDER'S CURE

Simultaneously with any such notice to Landlord, Tenant shall give notice to any holder of a recorded Mortgage (a "**Mortgagee**") encumbering the Premises (provided that such Mortgagee has entered into an SNDA with Tenant and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord. The Mortgagee shall have the right, but not the obligation, to cure such default within the same cure periods provided to Landlord hereunder. Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Lease.

33.   BENEFIT

This Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises.

34.   TRANSFER BY LANDLORD

If Landlord transfers Landlord's interest in the Premises or the right to collect rent under this Lease, Landlord agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord) in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under this Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under this Lease, (collectively, the "**Transfer Requirements**") and/or (d) such other information as Tenant may reasonably require. Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in this Lease. The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to temporarily withhold rent in trust pending receipt of Transfer Requirements.

35.   SHORT FORM LEASE

Landlord shall execute a short form of this Lease in the form attached hereto as **Exhibit "E"** containing the restriction on use of Owner's Remaining Land (as defined therein), and cause its recording in the public records of the county or parish in which the Premises are located. Neither Landlord nor Tenant shall record this entire Lease.

36.  **MARGINAL TITLES**

The marginal titles appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend, or affect the provisions thereof.

37.  **COMPLETE AGREEMENT**

This Lease contains the complete agreement of the parties with reference to the leasing of the Premises, except for Tenant's plans to be formally approved by the parties prior to the Commencement Date and supersedes any prior agreement with respect to the subject matter hereof. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

38.  **DECLARATION**

[Intentionally omitted]

39.  **EXHIBITS**

The following Exhibits attached hereto are hereby incorporated into this Lease by reference:

| | | |
|---|---|---|
| Exhibit "A" | - | Legal Description of Premises |
| Exhibit "B" | - | Permitted Exceptions |
| Exhibit "C" | - | SNDA |
| Exhibit "D" | - | Estoppel Certificate |
| Exhibit "E" | - | Short Form Lease |

40.  **FORCE MAJEURE**

If there shall occur, during the Term, (1) strike(s), lockout(s), or labor dispute(s); (2) the inability to obtain labor or materials or reasonable substitutes therefor; (3) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other conditions beyond the control of the party required to perform (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Lease (except for the obligation to pay money), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

41.  **ENVIRONMENTAL CONDITION**

(a)  Landlord.  Landlord represents and warrants to Tenant that it will not during the term of this Lease or any renewal thereof, cause or permit to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Premises except in accordance with applicable Legal Requirements.  "Hazardous Substance" includes, without limitation, any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to Legal Requirements.  "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal.

Landlord shall, at its sole cost and expense, take such action as is reasonable, prudent, or required by law as a result of any breach of the foregoing representations and warranties and shall indemnify, protect, and save Tenant, its officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements) of any kind or nature whatsoever (collectively the "**Indemnified Matters**") which may at any time be imposed upon, incurred by or asserted or awarded against Tenant and arising from our out of any Hazardous Substances on, in, under or affecting all or any portion of the Premises or the Premises, which Hazardous Substances are the result of Landlord's use or operation of the Premises.  This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision.

Landlord shall provide to Tenant copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Landlord receives from any governmental unit or agency overseeing environmental matters and copies received by landlord of any such notices, letters, or requests for information sent to any other tenant of the Premises.

(b)  Tenant.  Tenant shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed of on, in or about the Premises except in accordance with applicable Legal Requirements without obtaining Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion.  If any Hazardous Substance is used, stored, generated, or disposed of on, in, or about the Premises except as permitted above, or if the Premises or the Premises become contaminated in any manner as a result of

MFC55367  07/11/97

11

Webb City, St. Petersburg

any breach of the foregoing covenant or any act or omission of Tenant or any of its agents, contractors, subcontractors, or employees and such contamination results in an Environmental Violation, Tenant shall indemnify and hold harmless Landlord, its officers, directors, shareholders, and employees from any and all claims, demands, actions, damages fines, judgments, penalties, costs (including attorneys', consultants', and experts' fees), liabilities, losses (including without limitation, any decrease in value of the Store or Tenant's business operations therein, damages due to loss or restriction of rentable or usable space, or any damages due to adverse impact on marketing of the space in the Premises or the Store), and expenses arising during or after the term of this Lease and arising as a result of such contamination. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes the presence of any Hazardous Substance on, in or about the Premises except in accordance with applicable Legal Requirements or with Landlord's consent and the same results in an Environmental Violation, Tenant, at its sole expense, shall promptly perform such remediation. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld, conditioned, or delayed.

Notwithstanding the foregoing, this indemnification shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Premises or that of its agents or employees. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination on or under the Premises, the Common Areas or any other portion of the Premises resulting from Landlord's ownership, use or operation, or the use of operation by any third party not acting by, through, under or on behalf of Tenant.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Lease and the transfer of Landlord's or Tenant's interests hereunder.

42.    NO BROKERS

Neither Landlord nor Tenant has discussed this Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee. Each shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

43.    FLORIDA MANDATED PROVISION

The following provision is included to satisfy Florida requirements and are applicable only if the Premises are located in Florida and should otherwise be disregarded.

Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

44.    EXPANSION

[Intentionally omitted]

45.    TAKE OVER AND RELEASE

If Tenant or its assignee or sublessee of the entire Store fails to operate a business in the Store for 90 continuous days or longer, and such failure to operate is not due to permitted remodeling or enlargement, or a result of casualty or other Force Majeure (a "Store Closing"), Landlord may terminate this Lease by written notice to Tenant within 90 days of such Store Closing and from and after the date of such notice neither Landlord nor Tenant shall have any further liability to the other, except as expressly provided otherwise in this Lease.

46.    GOVERNING LAW

This Lease shall be governed by and construed in accordance with the laws of the State in which the Store is located.

47. **NO JOINT VENTURE**

This is a Lease between a Landlord and a Tenant and not an agreement of partnership or joint venture; neither Landlord nor Tenant is the agent of the other.

48. **TIME**

Time is of the essence of this Lease.

In the event that Tenant becomes the owner of fee title to the Store or the Premises, the fee title and the leasehold granted hereunder shall not merge but shall remain separate and distinct interests and estates.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease the day and year indicated below.

Witnesses:

Print name: _KATHI LUGALLO_

Print name: _CHRIS TYE SPENCER_

LANDLORD:

BEIL PROPERTIES, INC.,
a Florida corporation

By: _Walter Beil_
Name:   Walter E. Beil
Its: _WALTER Beil_
Date: _____

TENANT:

WINN-DIXIE STORES, INC.,,
a Florida corporation

By: _____
As: President
Date: 6/27/97

Print name: Rebecca T. Sawyer

Print name: Helen S. Lundquist

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me on _____, 1997, by WALTER E. BEIL, as President of Beil Properties, Inc., a Florida corporation, on behalf of the corporation, who [PLEASE CHECK ONE] _____ is personally known to me or _____ has produced _____ as identification.

_____
Printed Name:
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this 22nd day of June, 1997, by James Kufeldt, as _____ President of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation, who is personally known to me.

_____
Printed Name: Rebecca L. Sawyer
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

REBECCA L. SAWYER
My Comm. Exp. June 2, 1998
Comm. No. CC 372310

MFC55367  06/26/97

14

Webb City, St. Petersburg

TENANT:

**WINN-DIXIE STORES, INC.,**
a Florida corporation

By: _____
Its: _____
Date: _____

Print name: _____

Print name: _____

STATE OF ___CALIFORNIA___
COUNTY OF ___ORANGE___

The foregoing instrument was acknowledged before me on ___JUNE 2nd___, 1997, by WALTER E. BEIL, as President of Beil Properties, Inc., a Florida corporation, on behalf of the corporation, who [PLEASE CHECK ONE] _X_ is personally known to me or ___ has produced ___(CA DL)___ as identification.

_____
Printed Name: ___KATHI DANA MIGLINO___
Notary Public, State and County aforesaid.
My Commission Expires: ___SEPT 04, 1999___
Notary ID No.: ___1071357___
(NOTARIAL SEAL)

KATHI DANA MIGLINO
COMM. #1071357
Notary Public – California
LOS ANGELES COUNTY
My Comm. Exp. Sept. 4, 1999

STATE OF FLORIDA
COUNTY OF DUVAL

The foregoing instrument was acknowledged before me this _____, 1997, by _____, as _____ President of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation, who is personally known to me.

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

## EXHIBIT "A"

## LEGAL DESCRIPTION

Lot 2, Block 1, WEBB CITY REPLAT FIRST ADDITION, according to the Plat thereof, as recorded in Plat Book 94, Page 40 public records of Pinellas County, Florida, together with easement rights created by virtue of declaration recorded in Official Records Book 6316, Page 510.

A-1

Webb City, St. Petersburg

MFC55367    07/11/97

Exhibit "A-2"

# SECTION 19, TOWNSHIP 31 SOUTH, RANGE 17 EAST

## PINELLAS COUNTY FLORIDA

## MAP OF SURVEY

VICINITY MAP
SUBJECT
3RD AVENUE SOUTH
ASPHALT PAVEMENT 100' R/W (PER PLAT)
4TH AVENUE SOUTH
8TH STREET SOUTH
9TH STREET SOUTH
BLOCK-1
LOT-1
NOT INCLUDED
LOT-2
LOT-3
NOT INCLUDED
1 STORY
MASONRY BUILDING
WINN DIXIE STORE
#850
ASPHALT PAVEMENT
PROPERTY BOUNDARY AND RIGHT-OF-WAY LINE
N89°56'27"E 363.00'
S89°56'27"W 410.00'

GRAPHIC SCALE

( IN FEET )
1 INCH = 30'

| LEGEND | |
|---|---|
| F. | Found |
| S. | Set |
| I.P. | Iron Pipe |
| I.R. | Iron Rod |
| C.M. | Concrete Monument |
| C. | Capped |
| N.& D. | Nail & Disk |
| P.K.N. | P.K. Nail |
| R.R.S. | Railroad Spike |
| (P) | Plat |
| (F) | Field |
| (D) | Deed |
| (C) | Calculated |
| ⊘ | Power Pole |
| OHW | Overhead Wires |

DESCRIPTION AS FURNISHED

Lot 2, Block 1, WEBB CITY REPLAT FIRST ADDITION, according to the Plat thereof, as recorded in Plat Book 44, page 40 Public Records of Pinellas County, Florida, together with easement rights created by virtue of declaration recorded in Official Records Book 6316, page 510.

Containing 3.01 acres, more or less.

SPECIFIC NOTES:

1) THE PROPERTY SHOWN AND DESCRIBED HEREON IS SUBJECT TO DECLARATION OF RESTRICTIONS AND GRANT OF EASEMENTS PER O.R. 6316, PAGE 510.

2) THE PROPERTY SHOWN AND DESCRIBED HEREON IS SUBJECT TO AN AGREEMENT PER O.R. 6284, PAGE 1602 AND AN AGREEMENT PER O.R. 6347, PAGE 863.

3) THE OVERALL AREA INCLUDING LOTS 1, 2 AND 3 CONTAINS 262 REGULAR PARKING SPACES AND 8 HANDI-CAPPED PARKING SPACES.

CERTIFIED TO:

1) WALTER DEL
2) WINN-DIXIE STORES, INC.
3) LAWYERS TITLE INSURANCE CORP.
4) RUDNICK + WOLFE
5) GUARANTEE LIFE INSURANCE COMPANY

NOTE: A SEPARATE SURVEYOR'S CERTIFICATE IS ATTACHED HERETO.

BOUNDARY + LOCATION SURVEY 4-24-97

I hereby certify that this plat accurately represents a survey of the lands shown and described hereon, and meets or exceeds the Minimum Standard Requirements of Chapter 61G17-6 Florida Administrative Code pursuant to Chapter 472.

[signature] 6-12-97

Darrell Copeland — Date
Registered Land Surveyor
Florida Certificate #4529

NOT VALID WITHOUT THE SIGNATURE AND THE ORIGINAL RAISED SEAL OF A FLORIDA LICENSED SURVEYOR AND MAPPER.

D + E SURVEYING, INC. AND CERTIFYING LAND SURVEYOR ACCEPT NO RESPONSIBILITY FOR RIGHTS OF WAY, EASEMENTS, RESTRICTIONS OF OTHER MATTERS AFFECTING TITLE TO LANDS SURVEYED OTHER THAN THOSE RECITED IN CURRENT DEED AND/OR OTHER INSTRUMENTS OF RECORD FURNISHED BY

**D & E SURVEYING, INC.**
111 FLAMINGO DRIVE • APOLLO BEACH, FLORIDA 33572 (LB#4887) (813) 645-3086

WINN-DIXIE STORES, INC.

BOUNDARY & LOCATION SURVEY

ENGINEERING SURVEY

SHEET 1 OF 1

FILE NO. D-418

## EXHIBIT "B"

### PERMITTED EXCEPTIONS

1. Taxes for the year 1997 and any taxes and assessments levied or assessed subsequent to the date of this policy and taxes or assessments which are not shown as existing liens by the public records.

2. Easements as shown on plat recorded in Plat book 94, Page 40.

3. Terms, conditions, provisions, easements and restrictions as incorporated in that certain declaration recorded in Official Records Book 6316, Page 510.

4. Provisions as set forth in that certain unrecorded agreement dated April 30, 1987, a memorandum of which having been recorded in Official Records Book 6547, Page 863.

B-1

## EXHIBIT "C"

## SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT (this "Agreement"), made this _____ day of _____, 1997 between GUARANTEE LIFE INSURANCE COMPANY, a Nebraska corporation, whose address is 8801 Indian Hills Drive, Omaha, Nebraska 68114-4066 (together with its successors, assigns, and transferees "Lender") and WINN-DIXIE STORES, INC., a Florida corporation, whose address is _____, (together with its successors and assigns, "Winn-Dixie");

R E C I T A L S :

1.    Lender has made or is about to make a loan to _____, a _____ ("Landlord"), secured by a mortgage, deed of trust, security deed, or other financing instrument recorded or to be recorded in the Official Records of Pinellas County, Florida (together with any modifications, consolidations, extensions, replacements, or renewals thereof, the "Mortgage"), encumbering the real estate known as "_____" Premises at the _____, in St. Petersburg, Pinellas County, Florida, and more particularly described in the Mortgage and on Exhibit "A" attached hereto and incorporated herein (the "Premises"); and

2.    By Lease dated _____ (as amended by _____ and as otherwise to be amended from time to time, the "Lease"), Landlord did lease unto Winn-Dixie, as tenant, those certain premises which constitute a portion of the Premises and are more particularly described in the Lease (the "Premises"); and

3.    Lender and Winn-Dixie desire that the Lease shall not terminate but rather shall remain in full force and effect in accordance with its terms if the Mortgage is foreclosed or any transfer of the Premises is made in lieu thereof.

NOW THEREFORE, for valuable consideration the receipt and sufficiency of which are hereby acknowledged, Lender and Winn-Dixie agree as follows:

1.    Provided Winn-Dixie is not in material default under the terms of the Lease, then in the course of or following any exercise of any remedy under the Mortgage, any foreclosure sale of the Premises or the Premises, or any transfer of the Premises or the Premises thereafter or in lieu of foreclosure (together with any similar events, a "Foreclosure Event"):

    (a)    The right of possession of Winn-Dixie to the Premises and Winn-Dixie's rights arising out of the Lease shall not be affected or disturbed by Lender.

    (b)    Winn-Dixie shall not be named as a party defendant unless required by law.

    (c)    The Lease shall not be terminated or affected by any Foreclosure Event.

2.    Following a Foreclosure Event, Winn-Dixie shall attorn to Lender as its new landlord and the Lease shall continue in full force and effect as a direct lease between Winn-Dixie and Lender. Notwithstanding the foregoing, Lender shall not be:

    (a)    liable for any act or omission of any prior landlord (including Landlord), unless such action was taken at the direction of or with the approval of Lender; or

    (b)    subject to any offsets or defenses which Winn-Dixie might have against any prior landlord (including Landlord) except those which arose out of such landlord's default under the Lease and accrued after Winn-Dixie has notified Lender and given Lender an opportunity to cure as provided in the Lease; or

    (c)    bound by any rent Winn-Dixie paid for more than the then current month to any prior landlord (including Landlord); or

(d)    bound by any modification of the Lease made after the date hereof without Lender's consent; or

(e)    bound by any cancellation or termination of the Lease unless made by Tenant pursuant to and in accordance with the provisions of the Lease and this Agreement; or

(f)    obligated to perform any obligations of Landlord under the Lease unless and until it acquires title to, or right of possession of, the Premises or, upon acquisition of title or right of possession, be liable for any prior acts or prior omissions of any prior landlord (including Landlord), provided that in no event shall this clause affect or impair the rights and remedies available to Winn-Dixie under the Lease, or otherwise, in the event of a breach by Landlord of any term or condition of the Lease.

3.    Following a Foreclosure Event, Lender promptly shall give notice thereof to Winn-Dixie, stating its current address and providing evidence of Lender's title to the Premises.

4.    The Lease is subject and subordinate to the lien of the Mortgage and to all advances made or to be made thereunder as though the Mortgage had been executed and recorded prior in point of time to the execution of the Lease. Notwithstanding the foregoing, subordination of the Lease to the Mortgage should not be construed to constitute Tenant's consent or agreement to any term, condition, or provision of the Mortgage or any related loan document which is inconsistent with or purports to modify, alter, or amend the Lease.

5.    The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto. However, Winn-Dixie agrees to execute and deliver to Lender such other instrument as Lender shall reasonably request to evidence such provisions.

6.    Winn-Dixie agrees it will not, without the prior written consent of Lender (i) modify the Lease or any extensions or renewals thereof in such a way as to reduce rent, accelerate rent payment, shorten the original term, or change any renewal option; (ii) terminate the Lease, except as provided by its terms; (iii) tender or accept a surrender of the Lease or make a prepayment in excess of one (1) month of any rent thereunder; or (iv) subordinate or knowingly permit subordination of the Lease to any lien subordinate to the Mortgage, except for those liens that are superior to the Mortgage by law, if any. Any such purported action without such consent shall be void as against Lender.

7.    Winn-Dixie will give notices to Lender in accordance with paragraph 32 of the Lease at the address set forth in the first paragraph of this Agreement or at such other address as Lender may advise from time to time. Lender shall be entitled to the cure periods provided in paragraph 32 under the Lease.

8.    If Lender, or its assignee, obtains Landlord's interest in the Shopping Center or enforces it right to collect rent under this Lease, Lender agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or authorized transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under the Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under the Lease, (collectively, the "**Transfer Requirements**") and/or (d) such other information as Tenant may reasonably require. Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in the Lease. The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to temporarily withhold rent in trust pending receipt of Transfer Requirements.

9.    Winn-Dixie hereby acknowledges receipt of direction by Landlord and Winn-Dixie hereby agrees to pay all rent and other sums payable under the Lease to Lender (and to comply with such direction to pay without determining whether an event of default exists under the Mortgage) until further notice from

MFCS5367   07/11/97                                                    C-2                                          Webb City, St. Petersburg

Lender, and Landlord hereby expressly agrees by its execution below that any such payment shall discharge any obligation of Winn-Dixie to Landlord under the Lease to the extent of such payment.

10.    It is the express intention of Landlord and Winn-Dixie that the acquisition by either party of the right, title, interest, or estate of the other party in and to the Premises shall not result in termination or cancellation of the Lease by operation of the principle of merger of estates or otherwise, notwithstanding any applicable law to the contrary; provided, however, that in the event Winn-Dixie acquires the right, title, interest or estate of Landlord in and to the Premises, whether pursuant to any purchase option or right of first refusal granted in the Lease or otherwise, if either (a) the indebtedness secured by the Mortgage is satisfied or (b) Winn-Dixie assumes the indebtedness secured by the Mortgage to the reasonable satisfaction of Lender, then in such event the estates of Landlord and Winn-Dixie in and to the Premises shall merge and the Lease will be extinguished.

11.    Each party to this Agreement represents, warrants, and confirms that it has full right, power, and authority to execute, deliver, and perform this Agreement, that it has duly authorized the execution, delivery, and performance of this Agreement, and that this Agreement constitutes a legal, valid, and binding obligation of such party, enforceable against such party in accordance with its terms.

IN WITNESS WHEREOF, Landlord, Lender and Winn-Dixie have executed this Agreement the day and year first above written.

Witnesses:

LENDER:

GUARANTEE LIFE INSURANCE COMPANY,
a Nebraska corporation

Print Name: _____

By: _____
Its: _____
Date: _____

Print Name: _____

LANDLORD:

_____
a

By: _____
Its: _____
Date: _____

Print Name: _____

Print Name: _____

TENANT:

WINN-DIXIE STORES, INC.,
a Florida corporation

Print Name: _____

By: _____
Its: _____
Date: _____

Print Name: _____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me on _____, 1997, by _____ as _____ of _____, a

personally known to me or _____ has produced _____, who **[PLEASE CHECK ONE]** _____ is _____ as identification.

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _____, 1997, by _____, as _____ President of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation, who is personally known to me.

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

MFC$53367  07/11/97

C-4

Webb City, St. Petersburg

EXHIBIT "D"

ESTOPPEL CERTIFICATE
WINN-DIXIE STORE # _____
St. Petersburg, Pinellas County, Florida

The undersigned officer of WINN-DIXIE STORES, INC., a Florida corporation ("WD") hereby certifies, on behalf of WD, that as of _____ (the "Certificate Date"), the following is true and correct:

1.    That WD is the tenant ("Tenant") under a currently effective lease (as amended as described below, the "Lease") with _____, a _____, as the current landlord ("Landlord") dated _____, 199__, conveying a leasehold estate of the property described therein (the "Premises") located in a Premises known as _____ (the "Premises"), and the Lease has been amended and is evidenced only by:

(a)    Short Form Lease dated _____, recorded in Official Records Volume _____, page _____ of the public records of Pinellas County, Florida;
(b)    Letter Agreement(s) dated _____
(c)    Supplemental Lease Agreement dated _____
(d)    First Amendment to Lease dated _____
(e)    Second Amendment to Lease dated _____

2.    That the term of the Lease commenced _____ and is scheduled to expire on _____ unless renewed or terminated in accordance with the terms of the Lease.  Pursuant to the Lease, Tenant is entitled to renew the Lease for five (5) terms of five (5) years each.

3.    That, to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Lease, all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199__, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease.

4.    That, to the best of Tenant's knowledge, Landlord is not in default under the Lease, except that Landlord has failed to perform the following maintenance items as required under the Lease:

(a)    _____
(b)    _____
(c)    _____
(d)    _____

5.    That the Lease contains no provision for purchase of the Premises by Tenant.

6.    Tenant has received no notice of any sale, transfer, assignment, or pledge of Landlord's interest in the Lease or the rent due thereunder to any party except: _____ and _____

7.    Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law.

8.    Notwithstanding anything to the contrary herein:

(a)    No acceptance or possession of the Premises, opening for or operation of business by Tenant therein, execution of this certificate, or payment of rent under the Lease constitutes or will constitute acceptance by Tenant of work or materials that are defective or not completed in accordance with Tenant's plans and specifications, or a waiver of Tenant's rights against Landlord in connection therewith.

(b)    Tenant makes no representation or warranty that the Premises or the Premises, or any portion thereof is in compliance with the Americans With Disabilities Act or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

9.    The address for notices to Tenant is _____ with a copy to: General Counsel, Winn-Dixie Stores, Inc., 5050 Edgewood Ct., P.O. Box B, Jacksonville, FL 32203-0297.

MFC55367  07/11/97

D-1

Webb City, St. Petersburg

10.     This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Tenant.

**WINN-DIXIE STORES, INC., a Florida corporation**

By: _____
Name: _____
Its: _____

The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge. Further, Landlord certifies that Tenant has fully performed its obligations under the Lease to date and Tenant is not in default thereunder.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of Landlord.

By: _____
Name: _____
Its: _____

Webb Cty, St. Petersburg

D-2

MFC55367   07/11/97

## EXHIBIT "E"

### SHORT FORM LEASE

THIS SHORT FORM LEASE is hereby executed this _____, by and between WINN-DIXIE STORES, INC., a Florida corporation, whose mailing address is _____, a _____ corporation, whose mailing address is _____, and _____ ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

W I T N E S E T H:

WHEREAS, Landlord and Tenant did enter into a Lease, dated _____ (the "Lease"); and

WHEREAS, Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on Exhibit "B" attached hereto and depicted on the Site Plan attached as Exhibit "A" attached hereto and by these references made a part hereof together with the nonexclusive right to use the Common Areas as described and provided in the Lease (collectively the "Premises").

The term of the Lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, twenty (20) years thereafter. Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each. Tenant has no option to purchase the Premises under the Lease.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Short Form Lease shall be deemed to constitute a single instrument or document. This Short Form Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Short Form Lease, the Lease shall control.

Landlord further agrees that, in the event that Landlord or any entity owned or controlled indirectly or directly by Landlord or any entity controlled by, controlling, or under common control with Landlord, is or may become the owner of certain other real property ("Landlord's Remaining Land") located within 1,000 feet of any boundary of the Premises, Landlord shall not directly or indirectly permit any party other than Tenant to use any portion of Owner's Remaining Land for any of the following purposes: (i) operation of a supermarket, bakery, grocery, or delicatessen; (ii) sale of meat, seafood, vegetables/fruits/produce, dairy products, or frozen foods; (iii) operation of a pharmacy or prescription drug concession; (iv) operation of a photo lab or film development business; (v) sale of beer or wine for off-premises consumption; or (vi) operation of an automatic teller machine or banking business.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Short Form Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

LANDLORD:

Print Name: _____

_____

Print Name: _____        By: _____
                                   Name: _____
                                   Its: _____

As to Landlord

MFC553367   07/11/97                                    E-1        Webb City, St. Petersburg

TENANT:

WINN-DIXIE STORES, INC., a Florida corporation

Print Name: _____

By: _____
Name: _____
Its: _____

Print Name: _____

As to Tenant

STATE OF _____ )
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____, 1997, by _____, as _____, of _____, on behalf of the _____, a _____, who [PLEASE CHECK ONE] _____ is personally known to me or _____ has produced _____ as identification.

Print Name: _____
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _____, 1997, by _____, as _____ President of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation, who is personally known to me.

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)