**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

**ORDER APPROVING DEBTORS' (A) SALE OF MIAMI DAIRY ASSETS**
**FREE AND CLEAR OF LIENS, (B) ASSUMPTION AND**
**ASSIGNMENT OF MIAMI DAIRY LEASE AND (C) RELATED RELIEF**

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and

twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession

(collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c)

and Fed. R. Bankr. P. 6004 and 6006 (a) authorizing Winn-Dixie Logistics, Inc., to assign its

leasehold interests under a Lease dated August 10, 1999 (the "Lease") with ZSF/WD Opa

Locka, LLC (the "Landlord") in a dairy facility located in Miami, Florida and Winn-Dixie

Stores, Inc., to sell its interests in equipment located at the leased premises, and related

inventory and other assets (collectively, the "Assets"), including the assets described in the

Asset Purchase Agreement attached hereto as Exhibit A (the "Purchase Agreement), free

and clear of liens, claims, interests and encumbrances to McArthur Dairy, Inc., a Florida

corporation (the "Purchaser"), Suiza Dairy Group, Inc., a Delaware corporation ("Suiza

Dairy"), and Dean Dairy Holdings, LLC, a Delaware limited liability company ("Dean Dairy",

and, together with Suiza Dairy, the "Lease Assignee"), (b) determining that the sale is

exempt from any stamp, transfer, recording, sales or similar tax, (c) authorizing the

Debtors to assume and assign the Lease, in accordance with and pursuant to the terms and

conditions of this Order, the related unexpired Lease; the related subordination, non-

disturbance and attornment agreement; and any and all other documents related to the

foregoing  (collectively, the "Lease Documents") and executory contracts (the "Contracts")

identified in the Purchase Agreement (including the Exhibits thereto) in connection with the sale, (d) fixing any cure amount for the Lease, (e) releasing Winn-Dixie Logistics, Inc., and Winn-Dixie Stores, Inc., from any further liability under the Lease and (f) granting related relief (the "Motion").  By the Motion, the Debtors assert that there is no cure amount due under the Lease Documents, that the Landlord had until December 5, 2005 to object to the cure amount, and that the Landlord failed to object to the cure amount.  The Court held a hearing on the Motion on December 15, 2005 to approve the sale (the "Sale Hearing").  The Court has reviewed the Motion, considered the evidence and heard the representations of counsel.  Upon the representations of counsel and without objection by the United States Trustee or any other interested party, and after due deliberation and good and sufficient cause existing, the Court makes the following findings of fact:

A.  This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

B.  The Debtors solicited the highest or otherwise best offer for the Assets, in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 16, 2005 (the "Bidding Procedures"). A competing bid was  received for the Assets and the Debtors conducted an auction for the Assets on December 13, 2005 (the "Auction").   At the Auction, the Purchaser submitted the final bid of $5,750,000.00, representing the highest or otherwise best offer received for the Assets.

C.  The Debtors have provided interested parties (including all parties asserting claims or interests in the Assets, if any, and all parties which are parties to either the Lease Documents or the Contracts) with proper notice of the Motion, the Sale Hearing,[1] the Auction, the assumption and assignment of the Lease Documents and Contracts, and the fixing of any cure amount, in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365,

---

[1]     All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Motion.

Fed. R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order and the Bidding Procedures Order.

D.   The Debtors marketed the Assets and conducted the sale process in compliance with the Order approving the Bidding Procedures, the Bidding Procedures, the Bankruptcy Code and all other Orders entered in these cases.   The bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner.   The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets.   In their sound business judgment, the Debtors determined that the bid submitted by the Purchaser at the Auction represented the highest or otherwise best offer for the Assets.

E.   The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A, and the Assumption and Assignment Agreements attached to the Purchase Agreement, and all related documents, and the sale of the Assets and the assumption and assignment of the Lease Documents and Contracts has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

F.   The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

G.   Neither the Purchaser, the Lease Assignee nor any of their respective affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

H.   The Debtors and the Purchaser proposed, negotiated and entered into the Purchase Agreement, without collusion, in good faith and at arms'-length bargaining positions.   Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

I.    Each of the Purchaser and the Lease Assignee, as applicable, is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

J.    The consideration the Purchaser is providing to the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value.

K.    The Debtors' transfer of the Assets to the Purchaser and the Lease Assignee, as applicable, pursuant to the Purchase Agreement and the Assumption and Assignment Agreement will be a legal, valid, and effective transfer of the Assets.  The Debtors' transfer of the Assets to the Purchaser and the Lease Assignee, as applicable, vests the Purchaser and the Lease Assignee, as applicable, with good and valid title in and to the Assets free and clear of any and all liens, claims, encumbrances, pledges, mortgages, security interests, charges, options or other interests of any kind or nature (collectively, the "Claims and/or Interests"), with the exception of the Permitted Encumbrances and the Assumed Liabilities, if any, as defined in the Purchase Agreement.  Any and all non-assumed Claims and/or Interests will attach to the proceeds of the sale with the same validity, enforceability and priority they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors, Wachovia Bank National Association, as Administrative Agent and Collateral Agent for itself ("Agent") and the other financial institutions from time to time parties to the Credit Agreement dated as of February 23, 2005, as may be amended or modified (collectively, "Lenders" and together with Agent, collectively, the "DIP Lender") and all other interested parties with respect to such Claims and/or Interests.

L.    The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the Purchase Agreement free and clear of all Claims and/or Interests (except the Permitted Encumbrances and the Assumed Liabilities) because any entity with any Claims and/or Interests in the Assets to be transferred (i) has consented to the Sale (including the assumption and assignment of the Lease Documents and Contracts) or is

deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claims and/or Interests; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Claims and/or Interests, if any, who did not object, or who withdrew their objections to the Sale Motion are deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2).

M.  The Debtors shall cause all proceeds from the Sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

N.  The Debtors' assumption and assignment of the Lease Documents and Contracts in connection with the Sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

O.    The Debtors have provided the Landlord of and other parties to the Lease Documents and Contracts with adequate assurance that they will promptly cure any defaults under the Lease Documents and Contracts pursuant to 11 U.S.C. §§ 365(b)(1).

P.    Pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006, the amounts set forth on Exhibit B, constitute the cure amount, if any, due and owing under the Lease Documents, and cure amounts, if any, due under the Contracts (collectively, the "Cure Amounts") and will be fixed and allowed for the Lease Documents and Contracts. No other amounts are due and owing by the Debtors under the Lease Documents or Contracts. The

Debtors will pay such Cure Amounts, if any, in accordance with the terms and provisions of the Purchase Agreement, and neither the Purchaser nor the Lease Assignee shall have any obligation to pay such Cure Amounts, and the Lease Assignee shall be responsible only for the obligations under the Lease that arise after the date of the assignment of the Lease. Upon payment of such amounts by the Debtors, all monetary and non-monetary defaults, if any, under and related to the Lease Documents and Contracts will be deemed cured. Upon the assignment of the Lease Documents, the Lease Assignee shall be deemed to be in full compliance with all provisions of the Lease Documents. The Lease Assignee will abide by the requirements of the Lease except as follows:

(i)     the Lease Assignee will not be required to meet the net worth or investment grade debt standards set forth in Article 9 of the Lease in order to self-insure any portion of the required insurance coverage. Any portion of the required coverage that is not covered by an insurance company will be funded by a letter of credit acceptable to the Landlord in form and substance and issued by a money center bank acceptable to the Landlord (or if the Landlord consents, a bond) at all times. In the case of the property casualty coverage, the retention or deductible will be funded by a letter of credit (or if the Landlord consents, a bond) equal to the difference between the amount of the Lease Assignee's deductible and $200,000. In the event a letter of credit or bond is drawn upon, it will be replaced.

(ii)    the Lease Assignee will promptly provide the Landlord with its annual audited financials and its interim un-audited non-GAAP combining consolidated income statement and combining consolidated balance sheet, as same become available, in full satisfaction of the financial reporting requirements in Section 25.29(a) of the Lease.

The foregoing provisions of the Lease otherwise prohibit, restrict, and/or condition the assignment of the Lease under 11 U.S.C. § 365(f)(1), and the landlord is adequately protected by the provisions of this paragraph.

Q.  The Purchaser and the Lease Assignee, as applicable, have provided the Landlord under the Lease Documents, and contractors under the Contracts, with adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B).

R.  No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under the Lease Documents and Contracts.

S.  Except as expressly set forth in the Purchase Agreement and the Assumption and Assignment Agreement, neither the Purchaser nor the Lease Assignee will have any responsibility for any liability, claim or other obligation of or against the Debtors related to the Assets or the Lease Documents and Contracts by virtue of the transfer of the Assets and the assumption and assignment of the Lease Documents and Contracts to the Purchaser and the Lease Assignee, as applicable.  As a result of any action taken in connection with the purchase of the Assets or the assumption and assignment of the Lease Documents and Contracts, the Purchaser and the Lease Assignee will be deemed not to (i) be a successor to the Debtors (other than with respect to the Assumed Liabilities and any obligations arising under the assigned Lease Documents and Contracts from and after the closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors.  Neither the Purchaser nor the Lease Assignee is acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the Purchase Agreement or in any assigned Lease Documents and Contracts.

T. The Court's approval of the Purchase Agreement and the Assumption and Assignment Agreements is in the best interests of the Debtors, their estates and their creditors.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.  The Motion is granted to the extent set forth herein.

2.  All objections to the entry of this order or to the relief granted and requested in the Motion, including any objection to the proposed Cure Amounts, if any, that has not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

3.  The Purchase Agreement and the Assignment and Assumption Agreements (and all documents related thereto) are each approved in all respects.  Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized (subject to applicable Closing conditions set forth in the Purchase Agreement), to consummate the Sale including transferring and conveying the Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

4.  Upon Closing, Winn-Dixie Logistics, Inc., is authorized, in accordance with 11 U.S.C. §§ 105(a), 363 and 365 and this Order, to assume and assign the Lease Documents and Contracts to Purchaser and the Lease Assignee, as applicable.

5.  The Debtors have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2).

6.  The Lease Documents and Contracts will be assumed and assigned to the Purchaser and the Lease Assignee, as applicable, in accordance with their respective terms and in accordance with the findings of the Court in this Order.  The assigned Lease Documents and Contracts will remain in full force and effect notwithstanding any provision in the Lease Documents and Contracts to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1)) which prohibit, restrict or condition such assignment or transfer).  All non-debtor parties to the Lease Documents and Contracts are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the Purchase Agreement.

7.  Pursuant to 11 U.S.C. § 363(b) and subject to the restrictions contained in this Order, the Debtors are authorized and empowered to consummate and implement fully the

Purchase Agreement and the Assignment and Assumption Agreements, together with all additional instruments and documents to the extent necessary to implement the Purchase Agreement in accordance with and subject to the terms and conditions contained therein and in this Order.  The Debtors are authorized to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Assets and the Lease Documents and Contracts to Purchaser and the Lease Assignee, as applicable.  The Debtors are authorized and directed to execute and deliver to the Purchaser and the Lease Assignee such further instruments of conveyance and transfer as the Purchaser or the Lease Assignee may reasonably request in order more effectively to convey and transfer the Assets (including, without limitation, any permits included within the Assets) to the Purchaser and the Lease Assignee, as applicable, for aiding, assisting, collecting and reducing to possession any of the Assets and exercising rights with respect thereto or otherwise to consummate the transactions contemplated by the Purchase Agreement.  The Purchaser and the Lease Assignee shall have the authority to act as the true and lawful attorney of the Debtors, with full power and authority in the name of the Debtors, at any time and from time to time, to demand, sue for, recover, and receive any and all rights, demands, claims, causes of action, and warranties of every kind and description whatsoever incident or relating to the Assets, and to execute any documents or instruments with respect to the foregoing, for the purpose of fully vesting in the Purchaser and the Lease Assignee, as applicable, all and singular, all the right, title, and interest in and to the Assets.

8.   Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties in accordance with the terms of the Purchase Agreement without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of (a) the DIP Lender, and (b) the Creditors' Committee, which consent will not be unreasonably withheld, and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.  The Debtors will transfer the Assets to the Purchaser and the Lease Assignee, as applicable, upon closing free and clear of all Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances and Assumed Liabilities). The only Claims and/or Interests in the Assets are those of the landlord with respect to the applicable Lease Documents being sold and assigned pursuant to the Purchase Agreement and the senior liens and superpriority administrative claims of the DIP Lender.  The Claims and/or Interests of such landlord will be satisfied upon Closing by the Debtors' cure of any defaults under the respective Lease Documents and Contracts.  Moreover, the Debtors, the Purchaser and the Lease Assignee have demonstrated adequate assurance of future performance under 11 U.S.C. §365.  The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds of the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

10.  The Debtors will cause the proceeds from the Sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Financing Order and the Loan Documents.

11.  The Purchaser and the Lease Assignee provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and applicable non-bankruptcy law, and the sale price in the Purchase Agreement was not controlled by an agreement among potential bidders.  For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

12.    The Cure Amounts, if any, for the Lease Documents and Contracts are fixed in the respective amounts set forth on Exhibit B. All defaults, claims or other obligations of the Debtors arising or accruing under each of the Lease Documents and Contracts, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be cured by the Debtors in accordance with the Purchase Agreement, by paying the Cure Amounts, if any, and neither the Purchaser nor

the Lease Assignee shall have any obligation to pay the Cure Amounts. No other or further monetary amounts or obligations are due or existing under or related to the Lease Documents and Contracts by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise. The Debtors will pay the Cure Amounts, if any, in accordance with the terms and provisions set forth in the Purchase Agreement and this Order.

13. Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Lease Documents and Contracts to the Purchaser and the Lease Assignee, as applicable, (a) the Debtors (including both Winn-Dixie Stores, Inc., and Winn-Dixie Logistics, Inc.) and their estates are relieved from any and all liability for any breach of the Lease Documents and Contracts occurring after assignment to the Purchaser and the Lease Assignee, as applicable, and (b) and the Lease Assignee shall be responsible only for the obligations under the Lease that arise after the date of the assignment of the Lease.

14. Subject to the terms of this Order, the Purchase Agreement and the Assumption and Assignment Agreements, the Purchaser and the Lease Assignee, as applicable, assumes all rights and obligations of the Debtors under the Lease Documents and Contracts.

15. All non-Debtor parties to the Lease Documents and Contracts are forever enjoined and estopped from contesting the Cure Amounts, if any, and from asserting any default against the Purchaser and the Lease Assignee which existed as of the date of the Sale Hearing. Upon the assignment of the Lease Documents, the Lease Assignee shall be deemed to be in full compliance with all provisions of the Lease Documents. The Lease Assignee will abide by the requirements of the Lease except as follows:

(a) the Lease Assignee will not be required to meet the net worth or investment grade debt standards set forth in Article 9 of the Lease in order to self-insure any portion of the required insurance coverage. Any portion of the required coverage that is not covered by an insurance company will be funded by a letter of credit acceptable to the Landlord in form and substance and issued by a money center bank acceptable to the Landlord (or if the Landlord

consents, a bond) at all times.  In the case of the property casualty coverage, the retention or deductible will be funded by a letter of credit (or if the Landlord consents, a bond) equal to the difference between the amount of the Lease Assignee's deductible and $200,000.  In the event a letter of credit or bond is drawn upon, it will be replaced.

(b)     the Lease Assignee will promptly provide the Landlord with its annual audited financials and its interim un-audited non-GAAP combining consolidated income statement and combining consolidated balance sheet, as same become available, in full satisfaction of the financial reporting requirements in Section 25.29(a) of the Lease.

16.   Upon the Debtors' assignment of the Lease Documents and Contracts to the Purchaser, and the Lease Assignee, as applicable, no monetary or non-monetary default will exist under or related to the Lease Documents and Contracts (or any documents related thereto).   Upon entry of this Order and the assumption and assignment of the Lease Documents and Contracts, the Purchaser and the Lease Assignee are deemed to be in compliance with all terms and provisions of the Lease Documents and Contracts.

17.   Subject to the terms and conditions of this Order, all entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Purchaser and the Lease Assignee, as applicable. Prior to or upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims and/or Interests in the Assets (except for the Permitted Encumbrances and Assumed Liabilities), if any.  In the event any creditor fails to release its Claims and/or Interests in the Assets upon Closing, the Purchaser and the Lease Assignee are authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other documents on such creditor's behalf.   The Purchaser and the Lease Assignee are also authorized to file, register or otherwise record a certified copy of this Order upon Closing in

accordance with the terms of the Purchase Agreement and this Order.  Once this Order is so filed, registered or otherwise recorded in accordance with the provisions of this Order, the Order constitutes conclusive evidence of the release of all Claims and/or Interests against the Assets as of the Closing (except for the Permitted Encumbrances and Assumed Liabilities).

18.  Upon Closing of the Sale of Assets in accordance with the Purchase Agreement and this Order, the Purchaser and the Lease Assignee will be deemed to have acted in good faith in purchasing the Assets and Lease Documents and Contracts under the Purchase Agreement as that term is used in 11 U.S.C § 363(m).  For that reason, any reversal or modification of the Order on appeal will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

19. The Debtors' transfer of the Assets to the Purchaser and the Lease Assignee, as applicable, will not result in (a) the Purchaser or the Lease Assignee having any liability for any Claim and/or Interest (except for the Permitted Encumbrances or Assumed Liabilities) against the Debtors or against an insider of the Debtors or (b) the Purchaser or the Lease Assignee having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

20. Other than the Permitted Encumbrances, the Assumed Liabilities and other obligations of the Purchaser and the Lease Assignee as specifically set forth in the Purchase Agreement and this Order, neither the Purchaser nor the Lease Assignee (nor their respective affiliates, successors or assigns) will have any responsibility for any liability of the Debtors arising under or related to the Assets, including, the Lease Documents and Contracts.  The Debtors' transfer of the Assets to the Purchaser and the Lease Assignee, as applicable, does not and will not subject the Purchaser, the Lease Assignee or their respective affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests which may be asserted against the

Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

21.     Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets and the Lease Documents and Contracts and a bill of sale transferring good and marketable title in the Assets to Purchaser and the Lease Assignee, as applicable.  Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

22.  This Order is effective as a determination that upon Closing any and all Claims and/or Interests (except for the Permitted Encumbrances and Assumed Liabilities), if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

23. This Order is binding upon all entities that may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Assets.

24.     This Court retains exclusive jurisdiction to (a) enforce and implement the Purchase Agreement and the Assumption and Assignment Agreements, and any other agreements and instruments executed in connection with the Purchase Agreement, (b) compel delivery of possession of the Assets to Purchaser and the Lease Assignee, as applicable, (c) resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement or Assignment Agreement, and (d) interpret, implement and enforce the provisions of this Order; provided, however, that in the event this Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

25.    The terms and provisions of the Purchase Agreement and the Assignment Agreements and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser, the Lease Assignee and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

26.    Except as may otherwise be provided for in the Purchase Agreement and/or all related documents, including, without limitation, claims arising from the Purchaser's or the Lease Assignee's performance and obligations under the Purchase Agreement, all related documents and this Order, upon Closing, all persons who hold Claims and/or Interests against the Debtors are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, the Lease Assignee, their respective affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

27.    After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser, the Lease Assignee or any of their respective affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Purchase Agreement or (iv) any other transfer tax or fee with respect to the transactions under the Purchase Agreement.  No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

28.  To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed or assigned in connection with the Purchase Agreement and this Order, the provisions contained in this Order will control.

29.  Within ten days after Closing, the Debtors will file a statement with the Bankruptcy Court as required by and in accordance with Rule 6004(f), Federal Rules of Bankruptcy Procedure.

30.  The provisions of this Order are non-severable and mutually dependent.

31.  Notwithstanding Fed. R. Bankr. P. 6004(g) and 6006(d), this Order will take effect immediately upon entry.

32.  Upon Closing, the Debtors shall pay to Southeast Milk, Inc. ("SMI") the deposit and the break-up fee that SMI is entitled to receive under the Motion.

Dated this 22 day of December, 2005, in Jacksonville, Florida.

_____
Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to
serve a copy of this Order on all
parties who received copies of the
Motion.

# ASSET PURCHASE AGREEMENT

## (MIAMI PLANT)

**THIS ASSET PURCHASE AGREEMENT** is made effective as of December ___, 2005 (the "Effective Date"), by and among **WINN-DIXIE STORES, INC.,** a Florida corporation ("Winn-Dixie Stores"), **WINN-DIXIE LOGISTICS, INC.,** a Florida corporation and wholly owned subsidiary of Winn-Dixie Stores ("W-D Logistics", and, together with Winn-Dixie Stores, "Seller"), and **MCARTHUR DAIRY, INC.,** a Florida corporation, or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

## R E C I T A L S:

A.    Winn-Dixie Stores and its subsidiaries are engaged in the retail supermarket business primarily in the southeastern United States and, in connection therewith, Winn-Dixie Stores owns or leases, directly and through subsidiaries, retail supermarket facilities and related distribution and manufacturing facilities.

B.    W-D Logistics (as assignee of Winn-Dixie Stores) currently leases the dairy facilities located in Miami, Florida (hereinafter referred to as the "Miami Plant" or the "Leased Plant"), on the land comprising the Leased Real Estate pursuant to the Lease (as defined herein).

C.    Seller currently does not operate the Miami Plant.  Winn-Dixie Stores used certain equipment and assets at the Miami Plant for the business of producing dairy products (the "Business").

D.    Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Miami Plant and the Lease, together with the other Assets (as defined herein), subject to the terms and conditions contained in this Agreement.

E.    In connection with the consummation of the transactions contemplated by this Agreement, (i) Winn-Dixie Stores, W-D Logistics, Suiza Dairy Group, Inc., a Delaware corporation and affiliate of Buyer ("Suiza Dairy Group"), and Dean Dairy Holdings, LLC, a Delaware limited liability company and affiliate of Buyer ("Dean Dairy Holdings", and together with Suiza Dairy Group, the "Lease Assignee"), intend to enter into an Assignment and Assumption Agreement with respect to the Lease (as defined herein) substantially in the form of Exhibit A-1 (the "Lease Assignment"), to be effective as of the Closing Date and pursuant to which Winn-Dixie Stores and W-D Logistics have agreed to assign and the Lease Assignee has agreed to assume the liabilities and obligations relating to the Lease (ii) Winn-Dixie Stores, W-D Logistics and Buyer intend to enter into an Assignment and Assumption Agreement in the form of Exhibit A-2 (the "Contract Assignment"), to be effective as of the Closing Date and (iii) Winn-Dixie Stores, W-D Logistics and the Lease Assignee intend to enter into an Assignment and Assumption of SNDA in the form of Exhibit A-3 (the "SNDA Assignment"), to be effective as of the Closing Date.

APA.DOC

F.   In connection with the consummation of the transactions contemplated by this Agreement, Winn-Dixie Stores and Buyer may enter into a Supply Agreement with respect to the Miami Plant on such terms as such parties may agree (the "Supply Agreement"), to be effective as of the Closing Date or subsequently, as such parties may agree.

G.   Each of Winn-Dixie Stores and W-D Logistics and certain of their Affiliates filed a voluntary petition (the "Petition") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and each has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date.  By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Winn-Dixie Stores and W-D Logistics (and their Affiliates) was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where it is being procedurally administered under case no.  05-03817-3F1 (the "Bankruptcy Case").

**IN CONSIDERATION OF THE PREMISES CONTAINED HEREIN AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0   **Defined Terms**.  Capitalized terms as used in this Agreement will have the following meanings when used herein.

1.1   "Adequate Assurance Information" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that lessors and non-debtor parties to Assumed Contracts are adequately assured of Buyer's future performance under the Lease and the Assumed Contracts as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's obligations under the Lease by a guarantor with sufficient assets to provide adequate assurance of future performance.

1.2   "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3   "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4   "Allocation Schedule" will mean the allocation of the purchase price among Winn-Dixie Stores and W-D Logistics, as provided on Exhibit C.

1.5   [intentionally omitted]

1.6   "Assets" will mean, with respect to each Seller, all of the assets, properties and rights of such Seller (including all guarantees, warranties, indemnities

APA.DOC

and similar rights of Seller with respect to any of the Assets), of every type and description, real, personal and mixed, located at the Miami Plant, including the Leased Real Estate, the Assumed Contracts (if any), the Sales, General and Administrative Property, the Intellectual Property (other than Intellectual Property comprising part of the Excluded Assets), all machinery, equipment (including, but not limited to, the equipment identified on Exhibit G-2), tools, dairy supplies and furnishings, Permits (to the extent they are assignable), and other fixed or tangible assets known or unknown, fixed or unfixed, choate or inchoate, accrued, absolute, contingent or otherwise, whether or not reflected on the books and records of such Seller and relating to the Miami Plant, excluding only the Excluded Assets.

1.7   "Assumed Contracts" will mean, if any with respect to a Seller, the agreements, contracts commitments and undertakings of such Seller with respect to the Business that are listed on Exhibit D.

1.8   "Assumed Liabilities" will mean all debts, obligations and liabilities relating to the Assets, to the extent arising with respect to any period beginning on or after the Closing Date, whether known or unknown, fixed, absolute, contingent, material or immaterial, matured or unmatured, and in any case including the following:

   (i)    all liabilities and obligations of each Seller under the Lease and Assumed Contracts arising with respect to any period beginning on or after the Closing Date;

   (ii)   all debts, liabilities and obligations for state and local real and personal property taxes that are imposed directly with respect to any Asset arising with respect to any period beginning on or after the Closing Date, and with respect to periods that have been prorated at Closing and a credit has been given to Buyer for taxes accrued before the Closing Date pursuant to the Closing Statement, but only to the extent of such credit;

   (iii)  all debts, liabilities and obligations with respect to all actions, suits, proceedings, disputes, claims or investigations arising out of, resulting from, or relating to the Assets with respect to any period beginning on or after the Closing Date, at law, in equity or otherwise; and

   (iv)   all debts, liabilities and obligations arising out of the ownership or operation of any Assets on or after the Closing Date.

1.9   "Bankruptcy Code" will have the meaning assigned in paragraph G of the Recitals to this Agreement.

APA.DOC

1.10  "<u>Bankruptcy Court</u>" will have the meaning assigned in <u>paragraph G</u> of the Recitals to this Agreement.

1.11  "<u>Bankruptcy Court Approval</u>" will mean the entry of the Sale Order with respect to the Miami Plant by the Bankruptcy Court.

1.12  "<u>Bankruptcy Case</u>" will have the meaning assigned in <u>paragraph G</u> of the Recitals to this Agreement.

1.13  "<u>Base Purchase Price</u>" will mean the amount set forth in <u>paragraph 3.1</u> of this Agreement.

1.14  "<u>Bidding Procedures</u>" will mean the procedures set forth in the Order of the Bankruptcy court dated June 20, 2005 (docket no. 1801).

1.15  "<u>Bill of Sale</u>" will mean a bill of sale substantially in the form of <u>Exhibit E</u> transferring all right, title and interest in the Assets other than the Leased Real Estate from Winn-Dixie Stores to Buyer.

1.16  "<u>Business</u>" will have the meaning assigned in <u>paragraph C</u> of the Recitals to this Agreement.

1.17  "<u>Business Day</u>" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.18  "<u>Buyer</u>" will have the meaning assigned in the initial paragraph of this Agreement

1.19  "<u>Buyer's Closing Costs</u>" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) recording fees payable in connection with recording any instruments in the appropriate public records; (d) cost of the new Environmental Report delivered on or before the Effective Date, not to exceed $6,000.00; (e) cost of the updated Title Report delivered on or before the Effective Date, and the Title Policy, including title examination fees and premiums at minimum promulgated rates; (f) cost of the new Survey delivered on or before the Effective Date, not to exceed $9,000.00; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; (h) sales taxes, if any, payable in connection with the purchase and sale of the Assets; and (i) the fees and costs of the Escrow Agent.

1.20  "<u>Buyer's Escrowed Items</u>" will have the meaning assigned in <u>paragraph 14.3</u> of this Agreement.

APA.DOC

1.21    "Closing" will mean the consummation of the transfer, assignment, assumption, sale and purchase of the Assets pursuant to this Agreement as indicated by delivery of the documents contemplated by paragraph 14 of this Agreement and the Base Purchase Price, which will be deemed to occur at 12:01 a.m. on the Closing Date with respect to the Miami Plant.

1.22    "Closing Date" will mean the date designated by Seller in writing, and reasonably acceptable to Buyer, that is between one day and 30 days following the Bankruptcy Court Approval.

1.23    "Closing Statement" will mean a statement in the form of Exhibit F-1 with respect to the sale and assignment of Assets by Winn-Dixie Stores and in the form of Exhibit F-2 with respect to the sale and assignment of Assets by W-D Logistics (or in such other form as is prepared by Seller and reasonably acceptable to Buyer) reflecting the net amount due the applicable Seller at the Closing, after making the adjustments described in this Agreement.

1.24    "Confidentiality Agreement" will mean the existing letter agreement between Winn-Dixie Stores and Buyer, regarding, among other things, confidentiality relating to the subject matter of this Agreement.    Buyer acknowledges and agrees that W-D Logistics is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie Stores under such agreement, acting alone or acting jointly with Winn-Dixie Stores.

1.25    "Contract Assignment" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

1.26    "Contract Warranties" will have the meaning assigned in paragraph 22.1 of this Agreement.

1.27    "Cure Costs" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Lease and the Assumed Contracts, which Cure Costs will be payable solely by Seller.

1.28    "Damages" will have the meaning assigned in paragraph 16.5 of this Agreement.

1.29    "Dean Dairy Holdings" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

1.30    "Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.31    "Due Diligence Materials" will mean, collectively, (i) all documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format,

APA.DOC

at the Miami Plant, on the Merrill Website, or otherwise and (ii) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.32   "<u>Effective Date</u>" will have the meaning assigned in the initial paragraph of this Agreement.

1.33   "<u>Encumbrance</u>" will mean any mortgage, deed of trust, lien, pledge, encumbrance, claim, lease, easement, license, option, right of first refusal, preemptive right, charge, security interest, conditional sales contract, restriction or other matter causing a defect or imperfection in title.

1.34   "<u>Environmental Reports</u>" will mean collectively, (i) any prior report or study of the environmental condition of the land comprising the Leased Real Estate and (ii) an updated or new Phase I environmental site assessment report of the land comprising the Leased Real Estate that Seller has made available to Buyer for review on the Merrill Website or otherwise has delivered or will deliver to Buyer pursuant to <u>paragraph 4.4</u> of this Agreement.

1.35   "<u>Equipment</u>" will mean all equipment included in the Assets.

1.36   "<u>Escrow Agent</u>" will mean Smith, Gambrell & Russell, LLP, Jacksonville, Florida.

1.37   "<u>Escrow Date</u>" will mean the date that is one Business Day prior to the Closing Date or such earlier date after the Bankruptcy Court Approval as Buyer and Seller may mutually designate.

1.38   "<u>Excluded Assets</u>" will mean any equipment listed on <u>Exhibit G-1</u>, any over-the-road motor vehicles, any computer software subject to a license that restricts its transfer other than any such software that resides on equipment listed on <u>Exhibit G-2</u>, any computer software that resides on equipment comprising Excluded Assets, accounts receivable and other receivables, including intercompany receivables, deposits paid by Seller, insurance proceeds attributable to events that occurred prior to the Closing (except as otherwise specifically provided herein), tax refunds or other tax benefits relating to taxes paid by Seller or their Affiliates, cash and cash equivalents and trademarks, trade names, logos or designs of Seller, and all Intellectual Property relating to any of the foregoing.

1.39   "<u>Excluded Liabilities</u>" will mean all debts, claims, or liabilities whatsoever arising with respect to any period ending before the Closing Date, which Excluded Liabilities include but are not limited to:

(i)      any claim arising from the condition of the Assets prior to Closing, except as specifically assumed under the Lease;

APA.DOC

(ii)    any claim arising from any action of or omission by Seller prior to the Closing Date;

(iii)   any obligations or liabilities of the Business for products processed or sold prior to the Closing Date;

(iv)   any obligations arising out of, under or in connection with contracts that are not Assumed Contracts and, with respect to Assumed Contracts, liabilities in respect of a breach by or default of Seller accruing under such contracts with respect to any period prior to the Closing Date;

(v)    all Cure Costs;

(vi)   any obligations arising out of, under or in connection with any indebtedness of Seller or its Affiliates;

(vii)  any liabilities for taxes of Seller and taxes relating to Assets or the Assumed Liabilities for taxable periods ending before the Closing Date (except for those which have been prorated at Closing and a credit has been given to the Buyer for taxes accrued before the Closing Date); and

(viii) any obligations relating to amounts required to be paid by Seller hereunder.

1.40   "Hazardous Materials or Substances" will mean any substance or material presently tested, defined, designated or classified as toxic, hazardous, radioactive or dangerous by any law or statute, including but not limited to any substance or material that is regulated as to exposure, use, or discharge. This term expressly includes any derivative or by-product of any of the foregoing.

1.41   [Intentionally omitted]

1.42   "Initial Title Reports" will mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Miami Plant that Seller has made available to Buyer for review on the Merrill Website or otherwise as of the Effective Date. Buyer understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Leased Real Estate, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.43   "Intellectual Property" will mean, if used or employed exclusively by Seller at the Miami Plant in the provision, production, or marketing of any

services or products now provided, produced, or proposed to be provided, produced, or marketed by Seller at the Miami Plant, the following: all U.S. and foreign issued design patents and utility patents, all pending applications relating to any inventions and all reissues, divisions, continuations-in-part and extensions of them; all registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, trade names, trade dress, logos and designs, and unique product configurations; and all U.S. copyrights and copyright applications and all copyright renewals and extensions; and all material trade secrets, confidential business information and know-how including, without limitation, invention disclosures, new product development information, formulas, software, and vendor and customer lists.    The Intellectual Property specifically includes the sole and exclusive right to assert claims, prosecute claims, collect damages and retain damages arising out of any past, present or future infringement, dilution, misappropriation or other violation, known or unknown, of the Intellectual Property, to the extent applicable, regardless of whether such claim has already been asserted against any third party by or on behalf of Seller.

1.44    "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel of Winn-Dixie Stores, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of Edward F. Fugger, an authorized representative of Buyer, without any requirement of investigation or inquiry.

1.45    "Lease" will mean the lease dated August 10, 1999, between ZSF/WD Opa Locka, LLC as Lessor and Winn-Dixie Stores as Lessee, assigned by Winn-Dixie Stores to W-D Logistics as successor Lessee, and any amendments or supplements thereto between Lessor and Winn-Dixie Stores or W-D Logistics.

1.46    "Lease Assignee" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

1.47    "Lease Assignment" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

1.48    "Leased Plant" will have the meaning assigned in paragraph B of the Recitals to this Agreement.

1.49    "Leased Real Estate" will mean the leasehold interests of Seller in all real property listed on Exhibit H.

1.50    "Lessor" will mean the lessor under the Lease with respect to the Leased Real Estate.

APA.DOC

1.51    "Liquidated Deposit" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.52    "Material Adverse Effect" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the use of the Assets or operation of the Miami Plant, taken as a whole, except to the extent that fact, circumstance change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the beverage and dairy industry that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; or (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates.

1.53    "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Barracuda" with respect to the disposition of the Miami Plant and other Assets.

1.54    "Miami Plant" will have the meaning assigned in paragraph B of the Recitals to this Agreement.

1.55    [Intentionally deleted]

1.56    "Outside Date" will mean January 31, 2006, as such date may be extended by the written agreement of Seller and Buyer.

1.57    "Permit" will have the meaning assigned in paragraph 6.2 of this Agreement.

1.58    "Permitted Encumbrances" will mean (i) all matters listed on Exhibit I, (ii) liens for current taxes and assessments not yet due and payable or that do not materially detract from the value thereof or the use in the Business, (iii) minor imperfections of title, if any, that, taken as whole, do not materially detract from the value or impair the use of the property subject thereto in the Business, or impair the operations of the Miami Plant, (iv) zoning laws, recorded easements, covenants, utility easements, building restrictions and other land use restrictions that do not impair the present or

anticipated use of the Miami Plant, and (v) all other matters set forth in any Title Reports.

1.59 "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.60 [intentionally omitted]

1.61 [intentionally omitted]

1.62 "Sale Order" will mean an order of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, substantially in the form attached as Exhibit J.

1.63 "Sales, General and Administrative Property" will mean all customer and supplier lists, files, catalogues, brochures, pricing lists, books and records generally located at the Miami Plant, Miami Plant telephone and fax numbers, computer programs, software and systems and other sales, general administrative and miscellaneous property of every kind and nature related to and generally located at the Miami Plant, other than any of the foregoing that are Excluded Assets.

1.64 "Seller" will have the meaning assigned in the initial paragraph of this Agreement.

1.65 "Seller Delivery Confirmation" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.66 "Seller's Broker" will mean The Blackstone Group, L.P.

1.67 "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; and (b) commissions payable to Seller's Broker as provided in paragraph 17.3 of this Agreement.

1.68 "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.69 "Seller's Retained Names" will have the meaning assigned in paragraph 9.3 of this Agreement.

1.70 "SNDA" will mean the subordination, non-disturbance and attornment agreement dated August 10, 1999, among Bankers Trust Company as trustee, ZSF/WD Opa Locka, LLC as Lessor and Winn-Dixie Stores as Lessee, and any amendments or supplements thereto.

1.71 "SNDA Assignment" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

1.72 "Successful Bid" will mean the highest or otherwise best offer to purchase the Assets relating to the Miami Plant and which equals or exceeds 105% the Purchase Price, as determined by Seller in accordance with the Bidding Procedures.

1.73 "Suiza Dairy Group" will have the meaning assigned in paragraph E of the Recitals to this Agreement.

1.74 "Supply Agreement" will have the meaning assigned in paragraph F of the Recitals to this Agreement.

1.75 "Survey" will mean collectively, (i) any prior survey or site plan and (ii) a current boundary survey of the land comprising the Leased Real Estate that Seller has made available to Buyer for review on the Merrill Website or otherwise has delivered or will deliver to Buyer pursuant to paragraph 4.3 of this Agreement.

1.76 "Title Reports" will mean, collectively, (i) the Initial Title Reports and (ii) any additional title reports and/or title insurance commitments with respect to the Miami Plant that Seller has made available to Buyer for review on the Merrill Website or otherwise has delivered or will deliver to Buyer pursuant to paragraph 4.2 of this Agreement.

1.77 "Title Insurer" will mean First American Title Insurance Company or any other nationally recognized title insurance company designated by Seller.

1.78 "Title Policies" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.79 "W-D Logistics" will have the meaning assigned in the initial paragraph of this Agreement.

1.80 "Winn-Dixie Stores" will have the meaning assigned in the initial paragraph of this Agreement.

2.0 **Purchase and Sale of Assets; Assumption of Assumed Liabilities.**

2.1 Transfer of Assets. Upon the terms and subject to the conditions contained herein, on the Closing Date, each Seller shall sell, transfer, assign and deliver to Buyer, and Buyer shall purchase, acquire and accept from such Seller, the Assets applicable to such Seller, free and clear of all liens, encumbrances or interests (other than Permitted Encumbrances) to the extent provided in Section 363(f) of the Bankruptcy Code, for the purchase price specified in paragraph 3.0 of this Agreement; provided, that the Lease and the SNDA will be assigned to the Lease Assignee.

APA.DOC

Excluded from the purchase price herein are the Excluded Assets, which Seller shall retain.

2.2    <u>Assumed Liabilities</u>.  From and after the Closing Date, Buyer (or, with respect to the Lease and the SNDA, the Lease Assignee) shall assume and agrees to pay, perform and discharge when due and/or required, the Assumed Liabilities.

2.3    <u>Excluded Liabilities</u>.  Notwithstanding anything in this Agreement to the contrary, neither Buyer nor the Lease Assignee shall assume, and shall not be deemed to have assumed, any Excluded Liabilities.

3.0    **Purchase Price.**

3.1    <u>Amount</u>.  The purchase price to be paid by Buyer (or, with respect to the Lease and the SNDA, by Buyer on behalf of the Lease Assignee) to Seller for the Assets is $5,750,000 in the aggregate (the "<u>Base Purchase Price</u>"), which will be allocated between Winn-Dixie Stores and W-D Logistics as set forth on the Allocation Schedule.  Dean Foods Company will cause the Base Purchase Price to be paid by Buyer to Seller.

3.2    <u>Contract Consideration and Deposit</u>.  As specific consideration for Seller's agreement to sell the Assets to Buyer (or, with respect to the Lease and the SNDA, to the Lease Assignee) in accordance with the terms and conditions of this Agreement, Buyer has delivered to Escrow Agent an earnest money deposit in the amount of $575,000 (the "Deposit").  Buyer made the Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Deposit will be subject to refund to Buyer to the extent and in the circumstances described in <u>paragraphs 12, 15 and 16</u> of this Agreement.  The applicable portion of the Deposit will be credited against the Base Purchase Price at the Closing and will be held in an escrow account maintained by Escrow Agent prior to the Closing.  Whenever used herein, the term Deposit also will be deemed to include all interest accrued thereon if the escrow account maintained by Escrow Agent is an interest bearing account; however, for state and federal income tax purposes, interest, if any, accrued on the Deposit will be deemed earned by Buyer.  Buyer's federal taxpayer identification number (FEIN) is 59-0608937.

3.3    <u>Payment</u>.  The Base Purchase Price will be paid in the following manner:

3.3.1    *<u>Base Purchase Price</u>*.  On the Escrow Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Base Purchase Price (less the Deposit and with any adjustments with respect to the Base Purchase Price contemplated by the Closing Statements).  On the Closing Date, Buyer will, subject to the conditions set forth in <u>paragraph 10</u> of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Base Purchase

Price (as so adjusted) to Seller (by wire transfer to an account designated in writing by Seller).

3.3.2 [Intentionally deleted]

3.3.3 *Certain Transaction Costs*. All relevant rent, taxes (including real and personal property taxes), utilities and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Base Purchase Price to the extent thereof.

3.3.4 *Sales Tax*. Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom. This paragraph 3.3.4 shall survive the Closing.

3.4 *Cure Costs*. Cure Costs, if any, will be paid by Seller at the Closing.

3.5 Allocation of Base Purchase Price Among Assets at the Miami Plant. Seller shall have the right to allocate the Base Purchase Price, for all purposes relevant to the calculation of federal or state taxes, among the Assets; provided, however, that (a) in making such allocation, Seller shall take into account the reasonable requests of Buyer; (b) Buyer and Seller shall use such allocation for purposes of filing all required tax returns; and (c) such allocation shall not be binding upon Seller or determinative with respect to any allocation made by Seller of the Base Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Case. The allocation contemplated in subsection (c) of the immediately preceding sentence shall be set forth with respect to the Assets on the Closing Statements.

4.0 **Buyer's Due Diligence.**

4.1 Acknowledgment. In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence regarding the Miami Plant and the Assets and it has had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement. Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Miami Plant and the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Miami Plant and the Assets and to acquire such additional information about the Miami Plant and the Assets as Buyer has reasonably requested. Seller agrees that, prior to the Closing Date, Buyer shall be entitled, through its officers, employees

APA.DOC

and representatives (including, without limitation, its legal advisors and accountants), to make at its own cost and expense such investigation of the Miami Plant and the Assets, and such examination of the books, records and financial condition thereof, as it reasonably requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted, on at least two Business Days' prior written notice to Seller, during regular business hours and under reasonable circumstances, and Seller shall cooperate fully therein; provided that Buyer shall have no right to perform invasive investigations of the Leased Real Estate or the building comprising the Miami Plant. Buyer's inspection and investigation will expressly include the right to proceed with certain testing of equipment at the Miami Plant, including, but not limited to, starting and testing equipment and applying for permits and approvals to operate. Buyer agrees that any physical access to, inspection of or equipment testing at the Miami Plant by Buyer or its representatives shall comply in all respects with the written instructions and requirements of Seller. In addition, Buyer hereby indemnifies and agrees to defend and hold harmless Seller from and against any loss, damages or liability arising out of Buyer's access to, investigation of and equipment testing at the Leased Premises and the Miami Plant, including reasonable attorney's fees. No investigation by the Buyer prior to or after the date of this Agreement shall diminish or obviate any of the representations, warranties, covenants or agreements of Seller contained in this Agreement. The foregoing indemnification provisions will survive the expiration or termination of this Agreement and/or the Closing and not be merged therein.

4.2    Title.  Buyer confirms and acknowledges that Seller has made the Initial Title Reports available to Buyer, and that Seller has delivered on or before the Effective Date an additional Title Report to Buyer, and that Buyer may negotiate with the Title Insurer to obtain title insurance policies with respect to the Miami Plant (the "Title Policies") at or prior to Closing.

4.3    Surveys.  In addition to any prior surveys or site plans that Seller has made available to Buyer by posting on the Merrill Website, Seller has delivered to Buyer, on or before the Effective Date, a new Survey of the land comprising the Leased Real Estate, prepared by a licensed land surveyor selected by Seller, and certified to Buyer, Buyer's lenders (if applicable) and Title Insurer.

4.4    Environmental Reports.  Buyer confirms and acknowledges that Seller has made available to Buyer for review on the Merrill Website prior environmental reports covering the Leased Real Estate.  Seller has delivered to Buyer, on or before the Effective Date, a new Environmental Report (Phase I) covering the land comprising the Leased Real Estate, prepared by Golder Associates, Inc. or another reputable environmental

consultant or engineer selected by Seller, and certified to Buyer and Buyer's lenders (if applicable).

5.0 **Representations and Warranties of Seller Relating to the Assets**. To induce Buyer to purchase the Assets as provided above, each Seller represents and warrants to Buyer, severally and not jointly, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials, as follows:

5.1 On or prior to the Effective Date, (i) W-D Logistics represents and warrants that it has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website a copy of the Lease (including all amendments with respect thereto) relating to the Miami Plant as in effect on the Effective Date, and (ii) the indicated Seller represents and warrants that it has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format or on the Merrill Website the following materials, to the extent such items currently exist and are in the possession or control of such Seller:

(a) with respect to Winn-Dixie Stores, a list of material Equipment (which is attached as Exhibit G-2), with respect to the Miami Plant as reflected in such Seller's current records;

(b) with respect to Winn-Dixie Stores, a list of any contracts for services (including utility services), supply contracts (other than those that may not be disclosed because of an obligation of confidentiality), and leases of equipment that relate to the Business but not to other assets or operations of Seller or any Affiliates; and

(c) with respect to each Seller as to it, plans and other schematics for the Miami Plant;

it being understood that the materials described in clause (b) of this paragraph 5.1 have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

5.2 At Closing, the Assets shall include, without limitation. the assets listed on Exhibit G-2, which assets are owned by Seller.

6.0 **General Representations and Warranties of Seller**. In order to induce Buyer to purchase the Assets as provided above, each Seller, as to itself but not as to the other, represents and warrants to Buyer, severally and not jointly, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials, as follows:

6.1 Such Seller is a corporation duly organized, validly existing and in good standing under the laws of the state of its organization and, subject to the

requirement of Bankruptcy Court Approval, has the power and authority to consummate the transactions contemplated hereunder. This Agreement and each of the closing documents to which such Seller is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of such Seller.

6.2 No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery or performance by such Seller of this Agreement or any closing document to which such Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, and (iii) Bankruptcy Court Approval.

6.3 Subject to the requirement of Bankruptcy Court Approval, this Agreement and each of the closing documents to which such Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

6.4 To the Knowledge of such Seller, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against such Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which such Seller, is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against such Seller) have a Material Adverse Effect on the ability of such Seller to perform its obligations under this Agreement or the closing documents to which such Seller is or is to become a party.

6.5 There are no employees employed by such Seller with respect to the Miami Plant.

6.6 Such Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Broker.

6.7 The Lease as posted to the Merrill Website as of August 12, 2005, is a true, accurate and complete copy of the Lease and there are no amendments or modifications thereto.

APA.DOC

7.0 **Buyer's Representations and Warranties.**  Buyer represents and warrants to Seller as follows:

7.1   Buyer is a corporation or other limited liability entity duly organized, validly existing and in good standing under the laws of the State of Florida, and has the power and authority to consummate the transaction contemplated hereunder.  This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required corporate action on behalf of Buyer.

7.2   No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated, except, if the Supply Agreement is entered into, such operational Permits as may be required by governmental entities as a condition to Buyer operating the Miami Plant.

7.3   This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof by all parties thereto constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4   There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

7.5   Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

7.6    As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Base Purchase Price and any other amounts to be paid by it hereunder.

8.0    **Covenants of Seller.**    Seller hereby covenants for the benefit of Buyer as follows:

8.1    Seller will (i) use commercially reasonable efforts to maintain the Assets until the Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and (ii) will not sell, dispose of, abandon or remove from the Miami Plant any of the Assets or agree to do so.    It is expressly acknowledged and understood that Seller will have no obligation to commence operations at the Miami Plant prior to or in preparation for the Closing and the turnover of possession to Buyer of the Miami Plant.

8.2    Seller will until the Closing Date maintain property insurance on the Miami Plant for its full replacement value, subject to policy deductibles, and will pay all sums due under the Lease, as well as otherwise comply with all obligations under the Lease.

8.3    If this Agreement is determined to be the Successful Bid as to the Miami Plant, Seller will use commercially reasonable efforts to obtain the entry of a Sale Order as to the Miami Plant.

9.0    **Covenants of Buyer.**    Buyer for itself hereby covenants for the benefit of Seller as follows:

9.1    Buyer will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11 of this Agreement.

9.2    From and after the Closing Date (and except as otherwise allowed under the Supply Agreement, if it is entered into), Buyer agrees not to use, or permit any Affiliate to use, any name or derivative thereof or any logos, trademarks or tradenames associated with the Business (including but not limited to "Superbrand Dairy Products" and derivatives thereof) or otherwise owned or used by Seller or its Affiliates (such intellectual property being referred to as "Seller's Retained Names") in any manner or form, oral or visual, and within five (5) days after Closing agrees to destroy any letterhead, stationery, materials, etc. containing Seller's Retained Names.

APA.DOC

-18-

9.3     Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

9.4     If this Agreement is determined to be the Successful Bid as to the Miami Plant, then Buyer will use commercially reasonable efforts to obtain the entry of a Sale Order as to the Miami Plant, including by providing Adequate Assurance Information (which shall include without limitation a Declaration substantially in the form of <u>Exhibit K</u>) to Seller, the Bankruptcy Court, Lessor and parties to the Assumed Contracts, if any, and others as may be reasonably requested.

10.0    **<u>Conditions Precedent to Buyer's Obligations</u>.**  The obligations of Buyer under this Agreement as to the Miami Plant are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of each of the following conditions (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

10.1    Seller will have performed in all material respects all of its covenants contained in this Agreement that are not qualified by reference to a materiality standard, and Seller will have performed in all respects all of its covenants contained in this Agreement that are qualified by reference to a materiality standard.  Subject to any limitations set forth in this Agreement (including, without limitation, the last clause of <u>paragraph 5.1</u> of this Agreement), all of Seller's representations and warranties contained in this Agreement that are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, and all of Seller's representations and warranties contained in this Agreement that are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date.

10.2    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to the Miami Plant will be in effect.

10.3    The Sale Order with respect to the Miami Plant shall have been entered by the Bankruptcy Court (i) authorizing the sale of the Assets to Buyer free and clear of all liens, encumbrances and interests of any kind or nature, other than the Permitted Encumbrances, to the extent provided under Section 363(f) of the Bankruptcy Code, (ii) finding that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to all of the protection afforded thereby, (iii) and authorizing the assumption and assignment of the Lease to Buyer, and (iv)

APA.DOC

is otherwise substantially in the form of <u>Exhibit J</u>, is final and non-appealable, and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior consent of Buyer, which shall not be unreasonably withheld.

10.4    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied by the Outside Date, then Buyer shall have the right to terminate this Agreement pursuant to <u>paragraph 15.1(a)(iv)</u> of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>paragraph 16</u> of this Agreement rather than pursuant to <u>paragraph 15.1 (a)(iv)</u> of this Agreement.

11.0    <u>**Conditions Precedent to Seller's Obligations.**</u>  The obligations of Seller under this Agreement as to the Miami Plant are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of each of the following conditions (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

11.1    Buyer will have performed in all material respects all of its covenants contained in this Agreement that are not qualified by reference to a materiality standard, and Buyer will have performed in all respects all of its covenants contained in this Agreement that are qualified by reference to a materiality standard.    All of Buyer's representations and warranties contained in this Agreement that are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, and all of Buyer's representations and warranties contained in this Agreement that are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date.

11.2    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to the Miami Plant will be in effect.

11.3    The Sale Order with respect to the Miami Plant shall have been entered by the Bankruptcy Court (i) authorizing the sale of the Assets to Buyer free and clear of all liens, encumbrances and interests of any kind or nature, other than Permitted Encumbrances, (ii) finding that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and is entitled to all of the protection afforded thereby, (iii) and authorizing

the assumption and assignment of the Lease to Buyer, and (iv) is otherwise substantially in the form of <u>Exhibit J</u>, is final and non-appealable, and shall not have been (A) reversed, vacated or stayed, or (B) materially modified or amended without the prior consent of Seller, which shall not be unreasonably withheld.

11.4   The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller shall have the right to terminate this Agreement pursuant to <u>paragraph 15.1(a)(v)</u> of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>paragraph 16</u> of this Agreement rather than pursuant to <u>paragraph 15.1(a)(v)</u> of this Agreement.

12.0   **Loss by Fire or Other Casualty; Condemnation**.  In the event that, prior to the Closing, the Miami Plant or any material part thereof or any material part of the other Assets, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the real property associated with the Miami Plant, Seller will promptly provide written notice of such to Buyer and Buyer will have the right, exercisable by giving notice of such decision to the other within 5 Business Days after receiving written notice from Seller of such damage, destruction or condemnation proceedings, to terminate this Agreement, and thereafter none of the parties will have any further rights or obligations hereunder; <u>provided, however</u>, that, if Buyer is not in breach of this Agreement, Buyer will be entitled to the return from the Escrow Agent of the Deposit.   If, following such destruction or damage, Buyer does not timely exercise its right of termination and the Assets are sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedy, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

13.0   **Possession**.  Seller will turn over to Buyer exclusive physical possession of the Assets associated with the Miami Plant (including, to the extent in Seller's possession, control or custody) all keys, combinations to safes, security codes and passwords, on the Closing Date upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Buyer to transfer to Seller, the entire Base Purchase Price.

14.0  **Closing**.

14.1  The Closing will occur on the Closing Date.  The Closing will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

14.2  On or before the Escrow Date, Seller will, subject to the conditions contained in <u>paragraph 11</u> of this Agreement, deliver the following ("<u>Seller's Escrowed Items</u>") to Escrow Agent:

(i)  The Lease Assignment executed by Winn-Dixie Stores and W-D Logistics;

(ii)  The Contract Assignment, if any, executed by Seller (relating to the Assumed Contracts and certain Assumed Liabilities);

(iii)  The Bill of Sale executed by Winn-Dixie Stores;

(iv)  The Supply Agreement executed by Winn-Dixie Stores, if applicable;

(v)  Two counterparts of each Closing Statement executed by the applicable Seller;

(vi)  The SNDA Assignment executed by Winn-Dixie Stores and W-D Logistics;

(vii)  An affidavit substantially in the form of <u>Exhibit L</u>, made under penalty of perjury and duly executed by each Seller, that provides such Seller's United States taxpayers identification number and states that such Seller is not a foreign person for purposes of Section 1445 of the Code; and

(viii)  Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered.

Buyer may waive compliance by Seller as to any of the foregoing items in a manner permitted by <u>paragraph 17.6</u> of this Agreement.  Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent, will not be deemed to be an acknowledgement by Seller that the conditions of <u>paragraph 11</u> of this Agreement have been fulfilled or waived until Seller Delivery Confirmation.  "<u>Seller Delivery Confirmation</u>" will mean the later of (A) the Escrow Date and (B) Seller's delivery to Escrow Agent, by original counterpart or telecopy, of Seller's written confirmation that the conditions of <u>paragraph 11</u> of

APA.DOC

this Agreement have been fulfilled or waived.  In any event such delivery and notice shall be subject to any circumstances that may affect such conditions between Seller Delivery Confirmation and the Closing Date.

14.3   On or before the Escrow Date, Buyer will, subject to the conditions contained in <u>paragraph 10</u> of this Agreement, deliver the following ("<u>Buyer's Escrowed Items</u>") to Escrow Agent:

    (i)   The Lease Assignment executed by the Lease Assignee (relating to the Lease);

    (ii)   The Contract Assignment, if any, executed by Buyer (relating to the Assumed Contracts and the Assumed Liabilities);

    (iii)   The Supply Agreement executed by Buyer (if applicable);

    (iv)   Two counterparts of each Closing Statement executed by Buyer;

    (v)   The SNDA Assignment executed by the Lease Assignee;

    (vi)   Any other document, Instruments or agreement called for hereunder for delivery by Buyer that has not previously been delivered; and

    (vii)   All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to <u>paragraph 3</u> of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by <u>paragraph 17.6</u> of this Agreement. Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will be deemed to be an acknowledgement by Buyer that the conditions of <u>paragraph 10</u> of this Agreement have been fulfilled as of the Escrow Date, subject to any circumstances that may affect such conditions between the Escrow Date and the Closing Date.

14.4   At the Closing, Seller will, subject to the conditions contained in <u>paragraph 11</u> of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in <u>paragraph 10</u> of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items and the Base Purchase Price to Seller.

14.5   Except as provided in <u>paragraph 16</u> of this Agreement, at or before Closing, or within a reasonable time following Closing, (i) Seller will pay Seller's Closing Costs; and (ii) Buyer will pay Buyer's Closing Costs.

APA.DOC

15.0 **Termination**.

15.1  Termination.

(a)  This Agreement may be terminated, and the transactions contemplated hereby abandoned only as follows:

(i)  by written consent of Seller and Buyer, in which case the applicable Deposit shall be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the Deposit, then Escrow Agent shall pay over the Deposit to Seller as consideration for Seller's agreement to terminate this Agreement with respect to such Plant or Plants);

(ii)  at the election of Seller if and to the extent permitted under paragraph 16.1 of this Agreement, in which case the Deposit shall be disbursed as provided in such paragraph 16.1;

(iii)  at the election of Buyer if and to the extent permitted under paragraph 16.2 of this Agreement, in which case the Deposit shall be disbursed as provided in such paragraph 16.2;

(iv)  at the election of Buyer if any of the conditions set forth in paragraph 10 of this Agreement has not been satisfied or waived by Buyer by the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(iv);

(v)  at the election of Seller if any of the conditions set forth in paragraph 11 of this Agreement has not been satisfied or waived by Seller on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 16 of this Agreement rather than pursuant to this paragraph 15.1(a)(v);

APA.DOC

(vi)    at the election of Buyer as provided in <u>paragraph 12</u> of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; <u>provided</u>, <u>however</u>, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with <u>paragraph 16.2</u> of this Agreement rather than pursuant to this <u>paragraph 15.1(a)(vi)</u>;

(vii)    at the election of Seller, (A) if this Agreement is not the Successful Bid with respect to the Miami Plant or (B) if the Bankruptcy Court denies Bankruptcy Court Approval with respect to the Miami Plant, in each of which cases Seller shall direct Escrow Agent to return the Deposit to Buyer; <u>provided</u>, <u>however</u>, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with <u>paragraph 16.2</u> of this Agreement rather than pursuant to this <u>paragraph 15.1(a)(vii)</u>; or

(viii)    at the election of Buyer or Seller if the Closing will not have occurred on or before the Outside Date for any reason other than as contemplated in <u>paragraphs 15.1(a)(i) through 15.1(a)(vii)</u> of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided that neither Buyer nor Seller, as the case may be, will be entitled to terminate this Agreement pursuant to this <u>paragraph 15.1(a)(viii)</u> if such party's breach of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with <u>paragraph 16</u> of this Agreement rather than pursuant to this <u>paragraph 15.1(a)(viii)</u>.

(b)    If this Agreement is terminated for any reason, all materials provided by Seller to Buyer and all materials relating to the relevant Assets obtained by Buyer and all copies of any such materials will be delivered to Seller within 5 Business Days following termination. This paragraph shall not in any way limit Buyer's duties to Seller or Winn-Dixie Stores under the Confidentiality Agreement.

APA.DOC