**Exhibit D**
**to Asset Purchase Agreement**

<u>Assumed Contracts</u>

None

**EXHIBIT E**
**to Asset Purchase Agreement**

<u>**Form of Bill of Sale**</u>

    **WINN-DIXIE STORES, INC.**, a Florida corporation ("Winn-Dixie Stores"), and **WINN DIXIE LOGISTICS, INC.**, a Florida corporation and wholly owned subsidiary of Winn-Dixie Stores ("W-D Logistics", and, together with Winn-Dixie Stores, "Seller"), in consideration of the mutual covenants set forth in that certain Asset Purchase Agreement dated _____, 2005, among McArthur Dairy, Inc., a Florida corporation ("<u>Buyer</u>"), and Seller (the "<u>Agreement</u>"), does hereby grant, bargain, transfer, sell, assign and convey all of Seller's right, title and interest in the Assets (other than the Lease and SNDA (each as defined in the Agreement), which will be assigned to Suiza Dairy Group, Inc., a Delaware corporation, and Dean Dairy Holdings, LLC, a Delaware limited liability company, under that certain Assignment and Assumption of Lease and Assignment and Assumption of SNDA, each dated _____, 2005), together with all certificates of title, manuals, handbooks, warranties, and other documents relating to the Assets, to the extent that such documents are (a) located at the Miami Plant (as defined in the Agreement) or (b) readily available to Seller, to Buyer and its successors and assigns, to and for its use and benefit forever, free and clear of any and all liabilities, obligations, liens, claims, taxes, fees, and encumbrances of every kind and character whatsoever.

    This Bill of Sale is delivered by Seller to Buyer as required under the Agreement, and is made subject to the terms and conditions of the Agreement.  All capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Agreement.

    **IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed by the undersigned as of this _____ day of _____, 2005.

SELLER

WINN-DIXIE STORES, INC., a Florida corporation

By: _____
Name: _____
Title: _____

WINN DIXIE LOGISTICS, INC., a Florida corporation

By: _____

APA exhibits.doc

Name: _____
Title: _____

**EXHIBIT F-1**
**to Asset Purchase Agreement**

Form of Closing Statement – WINN-DIXIE STORES

**SELLER:**          **Winn-Dixie Stores, Inc.**, a Florida corporation

**BUYER:**

**TRANSACTION:**     Acquisition of Personal Property Assets (1) Relating to  [facility name][facility address].  Pursuant to Asset Purchase Agreement dated _____, 2005, among McArthur Dairy, Inc., Winn-Dixie Stores, Inc. and Winn-Dixie Logistics, Inc. Italicized terms shall have the meanings ascribed to such terms in such Asset Purchase Agreement.

**PURCHASE PRICE:**                           $          -

**CLOSING DATE:**                    , 2005

**SELLER'S STATEMENT**

Purchase Price- Personal Property                    $          -

**Less Adjustments (Debit):**

　1.          Seller's Prorated Share of Personal Property
            Taxes and Other Charges Payable (2)(3)        $          -
            **Total Debit Adjustments:**        $          -      $          -

**Less Closing Costs to be Paid by Seller:**
　1.          Seller's Brokers Fees                $          -

            **Total Seller's Closing Costs:**        $          -      $          -

**TOTAL AMOUNT DUE TO SELLER:**                          $          -

## BUYER'S STATEMENT

| | | | | |
|---|---|---|---|---|
| **Total Purchase Price** | | | $ | - |
| **Less Adjustments (Credits):** | | | | |
| | Seller's Prorated Share of Personal Property Taxes and Other Charges Payable (2)(3) | $        - | | |
| | **Total Credit Adjustments:** | $      - | $ | - |
| | | | | |
| **Plus Closing Costs to be Paid by Buyer:** | | | | |
| 1. | Closing Escrow Fee | $     - | | |
| 2. | Sales Taxes | $     - | | |
| | **Total Buyer's Closing Costs:** | $     - | $     - | |

**SUBTOTAL AMOUNT DUE FROM BUYER:**                           $      -

**GROSS AMOUNT DUE FROM BUYER AND ESCROW AGENT:**        $      -


The undersigned parties acknowledge and agree to the foregoing Closing Statement as of this _____ day of _____, 2005, and hereby authorize Smith, Gambrell & Russell, LLP, as *Escrow Agent*, to disburse the sums set forth herein in accordance herewith.

**SELLER:**                                          **BUYER:**


**WINN-DIXIE STORES,  INC.,** a Florida
corporation

                                                     **MCARTHUR DAIRY, INC.,** a Florida corporation


By:_____        By:_____

Name:_____        Name: Edward F. Fugger

Title:  _____ President              Title:  Authorized Representative

**NOTES:**

(1)     <u>Assets Included</u>.  This Closing Statement applies to Seller's conveyance of all non-real property *Assets* of Seller.

(2)     <u>2005 Prorations - Amounts Not Yet Paid and Payable</u>.  Proration is based on estimate of 2005 personal property taxes derived from actual 2004 amounts paid by Seller in arrears in accordance with *Lease*.  Buyer shall be responsible for the payment of such taxes for 2005 and subsequent years.  Proration is as follows:

| | | | |
|---|---|---|---|
| - 2004 Personal Property Taxes (estimated) | $ | - | |
| - Per Diem Tax Amount | $ | - | |
| - Seller's Share of 2005 Taxes (1/1/05 - __/__/05) (_____ days) | $ | - | $ - |
| **Total Personal Property Tax Proration:** | | | $ - |

(3)     <u>Utility Deposits and Charges</u>.  All utility deposits will be returned to Seller directly by the respective utility companies.  Seller will be responsible for payment of any portion of any utility charges attributable to utility service (including telephone service) provided through and including the date hereof.  Buyer will be responsible for payment of any new utility deposits that may be assessed by the respective utility companies and for payment of any portion of such utility charges attributable to utility service provided subsequent to the date hereof.  The party responsible for each share of such utility charges shall pay such charges promptly and without demand therefor.

(4)     <u>Adjustments</u>.  Seller and Buyer acknowledge and agree that any amounts reflected on this *Closing Statement* that are not determinable as of the *Closing Date* are based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the *Closing Statement* with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Buyer agrees that it will timely make all required notifications to appropriate taxing authorities to effect the change in party responsible for taxes.

APA exhibits.doc

**EXHIBIT F-2**
**to Asset Purchase Agreement**

Form of Closing Statement – WINN-DIXIE LOGISTICS

**SELLER:**            **Winn-Dixie Logistics, Inc.**, a Florida corporation

**BUYER:**

**TRANSACTION:**    Acquisition of Lease (1) relating to
[facility name][facility address].  Pursuant to Asset Purchase Agreement dated
_____, 2005, among McArthur Dairy, Inc., Winn-Dixie Stores, Inc. and Winn-Dixie
Logistics, Inc.  Italicized terms shall have the meanings ascribed to such terms in
such Asset Purchase Agreement.


**PURCHASE PRICE:**                                    $              -

**CLOSING DATE:**            _____, 2005

**SELLER'S STATEMENT**

| | | | | | |
|---|---|---|---|---|---|
| **Purchase Price** | | | | $ | - |
| **Less Adjustments (Debit):** | | | | | |
| 1. | Seller's Prorated Share of Real Estate Taxes and Other Charges Payable (2) | $ | - | | |
| | **Total Debit Adjustments:** | $ | - | $ | - |
| | | | | | |
| **Plus Adjustments (Credit):** | | | | | |
| 1. | Seller's Prorated Share of Rents and Other Charges Paid in Advance Under *Lease* (3) | $ | - | | |
| | **Total Credit Adjustments:** | $ | - | $ | - |
| **Less Closing Costs to be Paid by Seller:** | | | | | |
| 1. | Seller's Brokers Fees | $ | - | | |
| | **Total Seller's Closing Costs:** | $ | - | $ | - |
| **TOTAL AMOUNT DUE TO SELLER:** | | | | $ | - |

**BUYER'S STATEMENT**

**Total Purchase Price**                                                    $         -

**Plus Adjustments (Debits):**

    1.    Base Deposit with Escrow Agent    $         -

            Seller's Prorated Share of Rents and Other
    2.    Charges Paid in Advance Under *Lease* (3)    $         -

            **Total Debit Adjustments:**    $         -    $         -

**Less Adjustments (Credits):**

            Seller's Prorated Share of Real Estate Taxes
    1.    and Other Charges Payable (2)    $         -

            **Total Credit Adjustments:**    $         -    $         -

**Less Closing Costs to be Paid by Buyer:**

    1.    Title Premium (Owner's Policy)    $         -
    2.    Title Examination/Search Fees    $         -
    3.    Survey Fees    $         -
    4.    Environmental Site Assessment Fees    $         -
    5.    Closing Escrow Fee    $         -
    6.    Recording and Filing Fees
    7.    Transfer Taxes    $         -

            **Total Buyer's Closing Costs:**    $         -    $         -
                                  $

**SUBTOTAL AMOUNT DUE FROM BUYER:**    -

**PLUS BASE DEPOSIT FROM ESCROW AGENT:**    $         -

**GROSS AMOUNT DUE FROM BUYER AND ESCROW AGENT:**    $         -

The undersigned parties acknowledge and agree to the foregoing Closing Statement as of this _____ day of _____, 2005, and hereby authorize Smith, Gambrell & Russell, LLP, as *Escrow Agent*, to disburse the sums set forth herein in accordance herewith.

**SELLER:**                                                    **BUYER:**


**WINN-DIXIE LOGISTICS, INC.**, a Florida corporation


                                                               **MCARTHUR DAIRY, INC.**, a Florida corporation

By:_____         By:_____

Name:_____         Name: Edward F. Fugger

Title: _____ President                    Title:  Authorized Representative

APA exhibits.doc

27

**NOTES:**

(1)      <u>Assets Included</u>.  This Closing Statement applies to Seller's conveyance of the Lease.

(2)      <u>2005 Prorations - Amounts Not Yet Paid and Payable</u>.  Proration is based on estimate of 2005 real estate taxes derived from actual 2004 amounts paid by Seller in arrears in accordance with lease.  Buyer shall be responsible for the payment of such taxes for 2005 and subsequent years.  Proration is as follows:

- 2005 Real Estate Taxes (estimated)     $          -
- Per Diem Tax Amount          $          -
- Seller's Share of 2005 Taxes
  (1/1/05 - __/__/05) (_____ days)      $          -          $          -
**Total Real Estate Tax Proration:**           $          -

(3)      _____, 2005 Prorations – Rent Paid By Seller for Month of Closing.  Proration is based on actual monthly rental amount paid for the month of closing.  Buyer shall be responsible for the payment of the next monthly rental payment that becomes due under the lease after closing.  Proration is as follows:

- Total _____, 2005 rent paid:     $          -
- Per diem rent amount:          $          -
- Buyer's prorated share of _____ 2005 Rent
  (01/__/05 - __/__/05) (_____ days)     $          -          $          -

- ESA Report Updated          $          -
- current Phase I ESA Report          $          -
TOTAL  COST PAID BY SELLER:

(4)      <u>Adjustments</u>.  Seller and Buyer acknowledge and agree that any amounts reflected on this Closing Statement that are not determinable as of the Closing Date are based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Buyer agrees that it will timely make all required notifications to appropriate taxing authorities to effect the change in party responsible for taxes.

APA exhibits.doc

# EXHIBIT G-1
## to Asset Purchase Agreement

**Assets Not at Plant / Excluded**

| | | | | |
|---|---|---|---|---|
| BOSSY CART | MFG EQUIP | 177,899 | 27,052 | 150,848 |
| REFRIGERATOR | MFG STRCTR | 285 | 285 | - |
| LIQUID SWEETNER SYSTEM | MFG EQUIP | 19,240 | 19,240 | - |
| FOULD BATTERY | MFG EQUIP | 1,756 | 1,756 | - |
| STANDARDIZING SYSTEM | MFG EQUIP | 57,342 | 57,342 | - |
| WATER FILTRATION SYSTEM FOR JU | MFG EQUIP | 52,528 | 52,528 | - |
| CHARM SCIENCES MILK TESTING EQ | MFG EQUIP | 5,624 | 5,624 | - |
| RODEM INTERFACE MODULE & SOCKE | MFG EQUIP | 2,211 | 2,211 | - |
| RODEM VACUUM BREAKERS | MFG EQUIP | 1,985 | 1,985 | - |
| 1994SKYJACK SCISSOR LIFT | MFG EQUIP | 11,685 | 11,685 | - |
| MILK OSCAN 50" TOT. ANALYSER | MFG EQUIP | 8,718 | 8,718 | - |
| MILKO SCAN | MFG EQUIP | 23,782 | 23,782 | - |
| RO SYSTEM WITH CIP SYSTEM | MFG EQUIP | 42,371 | 34,514 | 7,857 |
| CLARKE 321 AUTO SCRUBBER | MFG EQUIP | 8,486 | 6,912 | 1,574 |
| RO SYSTEM WITH CIP SYSTEM | MFG EQUIP | 54,477 | 43,504 | 10,973 |
| CREAM FAT MONITORING SYSTEM | MFG EQUIP | 37,629 | 23,973 | 13,656 |
| OIL SEPERATOR | MFG ENVIRN | 166,025 | 91,451 | 74,574 |
| REFRACTOMETER | MFG EQUIP | 10,572 | 4,148 | 6,425 |
| YALE FORKLIFT | MISC | 17,795 | 821 | 16,974 |
| YALE FORKLIFT | MISC | 17,795 | 821 | 16,974 |
| DOWN-TIME MONITORS (3) | | 6,684 | | |
| LASER PRINTER | | 1,622 | | |
| ARCTIC REACH IN REF. UNIT | | 1,172 | | |

# EXHIBIT G-2
## to Asset Purchase Agreement

### List of Equipment

**Winn-Dixie Stores**
Equipment List -- Miami Dairy --
FINAL

| Status | Unit | Asset ID | Acq Date | DeptID | Acct | Category | Descr |
|---|---|---|---|---|---|---|---|
| M | WDPOM | 03000040 | 1967-02-08 | 103118 | 132610 | MFEQP | TOLEDO SCALE |
| M | WDPOM | 03000041 | 1967-02-08 | 103118 | 132610 | MFEQP | SIMPLEX TIME RECORDER |
| M | WDPOM | 03000097 | 1970-07-22 | 103118 | 132610 | MFEQP | VACU MATIC BOTTLE FILLER |
| M | WDPOM | 03000146 | 1971-02-03 | 103118 | 132610 | MFEQP | UNILOY BLOW MOLD MACHINE |
| M | WDPOM | 03000147 | 1971-02-03 | 103118 | 132610 | MFEQP | CHERRY BURRELL SILO TANK |
| M | WDPOM | 03000278 | 1973-02-07 | 103118 | 132610 | MFEQP | FEDERAL FILLER |
| M | WDPOM | 03000354 | 1973-07-25 | 103118 | 132610 | MFEQP | TOLEDO PLATFORM SCALE |
| M | WDPOM | 03000653 | 1976-02-04 | 103118 | 132610 | MFEQP | BATTERY CHARGER |
| M | WDPOM | 03001696 | 1979-07-25 | 103118 | 132610 | MFEQP | 25000 GAL VERTICAL SILO T |
| M | WDPOM | 03001906 | 1980-02-06 | 103118 | 132610 | MFEQP | SUGAR TANK |
| M | WDPOM | 03002945 | 1981-07-22 | 103118 | 132610 | MFEQP | FEDERAL VACU MATIC FILLER |
| M | WDPOM | 03002947 | 1981-07-22 | 103118 | 132610 | MFEQP | MILK TANK |
| M | WDPOM | 03002948 | 1981-07-22 | 103118 | 132610 | MFEQP | WATER TOWER |
| M | WDPOM | 03003295 | 1982-02-03 | 103118 | 132610 | MFEQP | 8FT COOLING BED - 1 |
| M | WDPOM | 03003296 | 1982-02-03 | 103118 | 132610 | MFEQP | BLOWMOLDING  MACH - 50% DE |
| M | WDPOM | 03003297 | 1982-02-03 | 103118 | 132610 | MFEQP | BLOWMOLD MACH PARTS |
| M | WDPOM | 03003298 | 1982-02-03 | 103118 | 132610 | MFEQP | BLOWMOLD MACHINE |
| M | WDPOM | 03003299 | 1982-02-03 | 103118 | 132610 | MFEQP | APV HEAT EXCHANGER - 25% D |
| M | WDPOM | 03003300 | 1982-02-03 | 103118 | 132610 | MFEQP | 3 VERTICAL SILO TANKS |
| M | WDPOM | 03003301 | 1982-02-03 | 103118 | 132610 | MFEQP | CIP TANKS - OJ CONCENTRATE |
| M | WDPOM | 03003302 | 1982-02-03 | 103118 | 132610 | MFEQP | HTST EQUIPMENT |
| M | WDPOM | 03003303 | 1982-02-03 | 103118 | 132610 | MFEQP | CONVEYOR EQUIPMENT |
| M | WDPOM | 03003304 | 1982-02-03 | 103118 | 132610 | MFEQP | PROCESS PIPING |
| M | WDPOM | 03003305 | 1982-02-03 | 103118 | 132610 | MFEQP | 1 - 2 STAGE HVA HOMOGIZER |
| M | WDPOM | 03003306 | 1982-02-03 | 103118 | 132610 | MFEQP | 800 AMP FEEDER |
| M | WDPOM | 03003307 | 1982-02-03 | 103118 | 132610 | MFEQP | DRIVE-IN RACK |
| M | WDPOM | 03003308 | 1982-02-03 | 103118 | 132610 | MFEQP | WIRING FOR NEW EQUIP |
| M | WDPOM | 03003521 | 1982-07-28 | 103118 | 132610 | MFEQP | SPLIT STARWHEEL W/SS HUB |
| M | WDPOM | 03003522 | 1982-07-28 | 103118 | 132610 | MFEQP | DUAL SPLIT STARWHEEL W/SS |
| M | WDPOM | 03003689 | 1983-02-09 | 103118 | 132610 | MFEQP | CARBON FILTER SYSTEM |
| M | WDPOM | 03003690 | 1983-02-09 | 103118 | 132610 | MFEQP | CARBON FILTER SYSTEM |
| M | WDPOM | 03003691 | 1983-02-09 | 103118 | 132610 | MFEQP | FILTER SYSTEM |
| M | WDPOM | 03003692 | 1983-02-09 | 103118 | 132610 | MFEQP | CARBON FILTER SYSTEM |
| M | WDPOM | 03008220 | 1987-02-04 | 103118 | 132610 | MFEQP | CREAM TANK |
| M | WDPOM | 03009967 | 1988-06-29 | 103118 | 132610 | MFEQP | AUTOCLAVE BENCH TOP |
| M | WDPOM | 03010162 | 1988-09-21 | 103118 | 132610 | MFEQP | TRIMMER 10041 |
| M | WDPOM | 03015659 | 1991-02-06 | 103118 | 132610 | MFEQP | HYSTER MODEL E30XL LIFT TRUCK |
| M | WDPOM | 03020293 | 1992-07-22 | 103118 | 132610 | MFEQP | ATLAS AIR COMPRESSOR |
| M | WDPOM | 03020664 | 1992-08-19 | 103118 | 132610 | MFEQP | BATTERY |
| M | WDPOM | 03021875 | 1993-01-06 | 103118 | 132610 | MFEQP | HYSTER LIFT TRUCK |

APA exhibits.doc

| M | WDPOM | 03023205 | 1993-06-30 | 103118 | 132610 | MFEQP | ATLAS COMPCO COMPRESSOR |
|---|-------|----------|------------|--------|--------|-------|-------------------------|
| M | WDPOM | 03024861 | 1993-10-20 | 103118 | 132610 | MFEQP | C LINE BATTERY |
| M | WDPOM | 03024862 | 1993-10-20 | 103118 | 132610 | MFEQP | C LINE BATTERY |
| M | WDPOM | 03024863 | 1993-10-20 | 103118 | 132610 | MFEQP | C LINE BATTERY |
| M | WDPOM | 03024952 | 1993-10-20 | 103118 | 132610 | MFEQP | FERRO CHARGER |
| M | WDPOM | 03024953 | 1993-10-20 | 103118 | 132610 | MFEQP | FERRO CHARGER |
| M | WDPOM | 03025095 | 1993-11-17 | 103118 | 132610 | MFEQP | SILO/BLOW MOLDS |
| M | WDPOM | 03026121 | 1994-02-09 | 103118 | 132610 | MFEQP | BLOW MOLD EQUIPMENT AND CONVEY |
| M | WDPOM | 03026122 | 1994-02-09 | 103118 | 132610 | MFEQP | PACKER, DEBAGGER, ANNEALING UN |
| M | WDPOM | 03026123 | 1994-02-09 | 103118 | 132610 | MFEQP | SILO TANK |
| M | WDPOM | 03026124 | 1994-02-09 | 103118 | 132610 | MFEQP | PCP PROCESSOR LESS OUTLET VALV |
| M | WDPOM | 03026125 | 1994-02-09 | 103118 | 132610 | MFEQP | SVW SILO STORAGE TANK |
| M | WDPOM | 03026126 | 1994-02-09 | 103118 | 132610 | MFEQP | SVW SILO STORAGE TANK |
| M | WDPOM | 03026127 | 1994-02-09 | 103118 | 132610 | MFEQP | SVW SILO STORAGE TANK |
| M | WDPOM | 03026171 | 1994-02-09 | 103118 | 132610 | MFEQP | HTST SYSTEM/ HEAT EXCHANGER |
| M | WDPOM | 03026172 | 1994-02-09 | 103118 | 132610 | MFEQP | PROCESS EQUIPMENT FOR PASTEURI |
| M | WDPOM | 03026173 | 1994-02-09 | 103118 | 132610 | MFEQP | ELECTRICAL COMPONENT EQUIPMENT |
| M | WDPOM | 03026257 | 1994-03-09 | 103118 | 132610 | MFEQP | WATER SOFTNER SYSTEM |
| M | WDPOM | 03026472 | 1994-03-09 | 103118 | 132610 | MFEQP | AUTO-LABE LABEL APPLICATOR |
| M | WDPOM | 03026851 | 1994-04-06 | 103118 | 132610 | MFEQP | WRENN BRUNGART HYSTER LIFT TRU |
| M | WDPOM | 03026852 | 1994-04-06 | 103118 | 132610 | MFEQP | WRENNBRUNGART BLUE GIANT LIFT |
| M | WDPOM | 03026853 | 1994-04-06 | 103118 | 132610 | MFEQP | STORAGE RACKS FOR DRY INGREDIE |
| M | WDPOM | 03027891 | 1994-07-27 | 103118 | 132610 | MFEQP | STAINLESS STEEL TRANSFER LINE |
| M | WDPOM | 03030306 | 1995-02-08 | 103118 | 132610 | MFEQP | OFFICE CARPETING |
| M | WDPOM | 03030307 | 1995-02-08 | 103118 | 132610 | MFEQP | BOILER INSTR SYSTEMS |
| M | WDPOM | 03030308 | 1995-02-08 | 103118 | 132610 | MFEQP | STEAM BOILER |
| M | WDPOM | 03030309 | 1995-02-08 | 103118 | 132610 | MFEQP | BOILER FEED SYSTEM |
| M | WDPOM | 03030310 | 1995-02-08 | 103118 | 132610 | MFEQP | WATER SOFTENER |
| M | WDPOM | 03030311 | 1995-02-08 | 103118 | 132610 | MFEQP | CHEMICAL FEED SYSTEM |
| M | WDPOM | 03030312 | 1995-02-08 | 103118 | 132610 | MFEQP | BLOW DOWN SEPARATOR |
| M | WDPOM | 03030313 | 1995-02-08 | 103118 | 132610 | MFEQP | REFRIG CONTROLLER |
| M | WDPOM | 03030315 | 1995-02-08 | 103118 | 132610 | MFEQP | DOUBLE FACED PYLON SIGN |
| M | WDPOM | 03030316 | 1995-02-08 | 103118 | 132610 | MFEQP | REGULATORY SIGNS |
| M | WDPOM | 03030318 | 1995-02-08 | 103118 | 132610 | MFEQP | 43X32 FILE - 5 DRAWER |
| M | WDPOM | 03031125 | 1995-04-05 | 103118 | 132610 | MFEQP | PALLET RACK |
| M | WDPOM | 03031126 | 1995-04-05 | 103118 | 132610 | MFEQP | CASE WASH PLATFORM |
| M | WDPOM | 03031127 | 1995-04-05 | 103118 | 132610 | MFEQP | SCALE FOUNDATION |
| M | WDPOM | 03031128 | 1995-04-05 | 103118 | 132610 | MFEQP | SEPERATOR FOUNDATION |
| M | WDPOM | 03031815 | 1995-05-31 | 103118 | 132610 | MFEQP | TRUCK PLATFORM |
| M | WDPOM | 03034302 | 1995-10-18 | 103118 | 132610 | MFEQP | INDUSTRIAL BATTERY |
| M | WDPOM | 03034303 | 1995-10-18 | 103118 | 132610 | MFEQP | INDUSTRIAL BATTERY |
| M | WDPOM | 03034304 | 1995-10-18 | 103118 | 132610 | MFEQP | INDUSTRIAL BATTERY |
| M | WDPOM | 03034305 | 1995-10-18 | 103118 | 132610 | MFEQP | INDUSTRIAL BATTERY |
| M | WDPOM | 03035041 | 1995-12-13 | 103118 | 132610 | MFEQP | FORKLIFT E30XL |
| M | WDPOM | 03035042 | 1995-12-13 | 103118 | 132610 | MFEQP | FORKLIFT E30XL |
| M | WDPOM | 03037800 | 1996-05-29 | 103118 | 132610 | MFEQP | PSM MANNUALS |
| M | WDPOM | 03039882 | 1996-07-24 | 103118 | 132610 | MFEQP | PSM MANUAL AND STUDY |
| M | WDPOM | 03040893 | 1996-09-18 | 103118 | 132610 | MFEQP | CONVEYOR DRIVE |
| M | WDPOM | 03040894 | 1996-09-18 | 103118 | 132610 | MFEQP | CONVEYOR DRIVE |
| M | WDPOM | 03040895 | 1996-09-18 | 103118 | 132610 | MFEQP | ENERGY FREE GALLON CASER |

| M | WDPOM | 03040896 | 1996-09-18 | 103118 | 132610 | MFEQP | ENERGY FREE GALLON CASER |
|---|---|---|---|---|---|---|---|
| M | WDPOM | 03042959 | 1996-10-16 | 103118 | 132610 | MFEQP | PSM MANUALS |
| M | WDPOM | 03053216 | 1998-12-09 | 103118 | 132610 | MFEQP | REFRIGERATOR |
| M | WDPOM | 03053217 | 1998-12-09 | 103118 | 132610 | MFEQP | CASE WASHER |
| M | WDPOM | 03053674 | 1999-06-30 | 103118 | 132610 | MFEQP | CONVEYOR/HYDRAULIC PIPING |
| M | WDPOM | 03060206 | 1999-09-01 | 103118 | 132310 | WHEQP | MITSUBISHI FORK LIFT |
| M | WDPOM | 03060207 | 1999-09-22 | 103118 | 132310 | WHEQP | MITSUBISHI FORK LIFT |
| M | WDPOM | 03061292 | 2000-03-08 | 103118 | 132610 | MFEQP | ORGA PAK-STRAPPER |
| M | WDPOM | 03061520 | 2000-06-20 | 103118 | 132610 | MFEQP | SHIPPING/PICK SYSTEM |
| M | WDPOM | 03061521 | 2000-06-20 | 103118 | 132610 | MFEQP | PSM |
| M | WDPOM | 03061522 | 2000-06-20 | 103118 | 132610 | MFEQP | STORMWATER DISCHARGE |
| M | WDPOM | 03076042 | 2003-12-24 | 103118 | 132610 | MFEQP | BATTERY |
| M | WDPOM | 03077655 | 2003-12-11 | 103118 | 132610 | MFEQP | SHIPPING/PICK SYSTM IMPROVEMNT |
| M | WDPOM | 03078296 | 2004-04-20 | 103118 | 132610 | MFEQP | SURGE SUPPRESSION |
| M | WDPOM | 03078297 | 2004-04-20 | 103118 | 132610 | MFEQP | SEPARATOR CONTROLS |
| M | WDPOM | 03078321 | 2003-12-18 | 103118 | 132610 | MFEQP | BLOW MOLD 1 DRIVE |
| M | WDPOM | 03080353 | 2002-03-08 | 103118 | 132610 | MFEQP | RELIEF HEADER MODIFICATION |

**Total**

| | | | | |
|---|---|---|---|---|
| GARDNER-DENVER COMPRESSOR | MFG EQUIP | 12,903 | 12,903 | - |
| C LINE BATTERY | MFG EQUIP | 3,192 | 3,192 | - |
| LIFT TRUCK- WRENN BRUNGART | MFG EQUIP | 15,395 | 15,395 | - |
| BRUNGART FORKLIFT | MFG EQUIP | 11,697 | 11,697 | - |
| FEDERAL CAP DETECTOR SYSTEM | MFG ENVIRN | 1,514 | 1,514 | - |
| FEDERAL CAP DETECTOR SYSTEM | MFG ENVIRN | 1,514 | 1,514 | - |
| FEDERAL CAP DETECTOR SYSTEM | MFG ENVIRN | 1,514 | 1,514 | - |
| LOCKERS AND BENCHES | MFG EQUIP | 6,745 | 6,745 | - |
| MOTOR TRUCK SCALE | MFG EQUIP | 25,000 | 25,000 | - |
| DIGITAL WALL FOR TRUCK SCALE | MFG EQUIP | 1,562 | 1,562 | - |
| PRINTER FOR TRUCK SCALE | MFG EQUIP | 1,562 | 1,562 | - |
| INSTR., CABLE FOR TRUCK SCALE | MFG EQUIP | 1,562 | 1,562 | - |
| LIGHTNING PROTECTOR | MFG EQUIP | 1,562 | 1,562 | - |
| SCALE SOFTWARE | MFG EQUIP | 1,562 | 1,562 | - |
| RODEM BATT. EL-11600-0022 120V | MFG EQUIP | 584 | 584 | - |
| PUMP MOTOR | MFG EQUIP | 1,431 | 1,120 | 311 |
| SINGLE SAMPLE CRYOSCOPE | MFG EQUIP | 4,394 | 4,394 | - |
| FERRO CHARGER | MFG EQUIP | 1,704 | 1,704 | - |
| PIPE RP UNIT | MFG EQUIP | 61,935 | 48,455 | 13,480 |
| MILK&JUICE PLATE REPLACMENT | MFG EQUIP | 34,941 | 3,494 | 31,446 |

**EXHIBIT H**
**to Asset Purchase Agreement**

<u>Leased Real Estate</u>

Lot 505, Ninth Addition to Seaboard Industrial Park, according to the Plat thereof, as recorded in Plat Book 143, Page 17, of the Public Records of Miami-Dade County, Florida.

**EXHIBIT I**
**to Asset Purchase Agreement**

**PERMITTED ENCUMBRANCES**

1.    Taxes and assessments for the year 2006 and subsequent years, which are not yet due and payable.

2.    Restrictions, dedications, conditions, reservations, easements and other matters as shown on Plat recorded in Plat Book 114, Page 96; Plat recorded in Plat Book 121, Page 90; Plat recorded in Plat Book 142, Page 57; and Plat recorded in Plat Book 143, Page 17.

3.    Water & Sewer Agreement recorded in Official Records Book 15609, Page 2991.

4.    Grant of Easement(s) as set forth in instrument(s) recorded in Official Records Book 16150, Page 246.

5.    Easement(s) granted to Florida Power & Light Co., as set forth in instrument(s) recorded in Official Records Book 16124, Page 1007.

6.    Easement(s) granted to Florida Power & Light Co., as set forth in instrument(s) recorded in Official Records Book 16124, Page 1010.

7.    All of the terms and provisions set forth and contained in that certain Lease between ZSF/WD Opa Locka, LLC, a Delaware limited liability company, Lessor, and Winn-Dixie Stores, Inc., a Florida corporation, Lessee, a memorandum of which is recorded in Official Records Book 18796, Page 547; re-recorded in Official Records Book 18943, Page 1161; and Official Records Book 19015, Page 4148; as affected by: Subordination, Non-Disturbance and Attornment Agreement, recorded in Official Records Book 18796, Page 600; re-recorded in Official Records Book 18943, Page 1214; and Official Records Book 19015, Page 4196.

8.    Mortgage executed by ZSF/WD Opa Locka, LLC, a Delaware limited liability company in favor of Bankers Trust Company, a New York banking corporation, recorded September 27, 1999 in Official Records Book 18796, Page 573 ; re-recorded in Official Records Book 18943, Page 1187; and Official Records Book 19015, Page 4169.

9.    Lease Assignment and Agreement from ZSF/WD Opa Locka, LLC, a Delaware limited liability company to Bankers Trust Company, a New York banking corporation, recorded September 27, 1999, in Official Records Book

18796, Page 558 ; re-recorded in Official Records Book 18943, Page 1172; and Official Records Book 19015, Page 4154.

10.    UCC-1 Financing Statement naming Bankers Trust Company, as Trustee as secured party and ZSF/WD Opa Locka, LLC as debtor, filed September 27, 1999, recorded in Official Records Book 18796, Page 611; re-recorded in Official Records Book 18943, Page 1225; and in Official Records Book 19015, Page 4207; as affected by: Continuation, recorded in Official Records Book 22179, Page 2900.

11.    Matters as shown on Survey prepared by Freeland-Surveyors & Engineers Associates, Inc., dated August 24, 2005, under Drawing No. 57374-ALTA.

All Plat Book, Official Records Book and Page references are to the public records of Miami-Dade County, Florida.

APA exhibits.doc

**EXHIBIT J**
**to Asset Purchase Agreement**

<u>Form of Sale Order</u>

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

**ORDER APPROVING DEBTORS' (A) SALE OF ASSETS**
**FREE AND CLEAR OF LIENS, (B) ASSUMPTION AND**
<u>**ASSIGNMENT OF LEASE AND (C) RELATED RELIEF**</u>

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 6004 and 6006 (a) authorizing the Debtors to sell their leasehold interests in a dairy facility located in Miami, Florida, and the related equipment, inventory and other assets (the "Assets"), including the assets described in the asset purchase agreement attached hereto as Exhibit A (the "Purchase Agreement), free and clear of liens, claims, interests and encumbrances to McArthur Dairy, Inc., a Florida corporation (the "Purchaser"), Suiza Dairy Group, Inc., a Delaware corporation ("Suiza Dairy"), and Dean Dairy Holdings, LLC, a Delaware limited liability company ("Dean Dairy", and, together with Suiza Dairy, the "Lease Assignee"), (b) determining that the sale is exempt from any stamp, transfer, recording or similar tax, (c) authorizing the Debtors to assume and assign, in accordance with and pursuant to the terms and conditions of

this Order, the related unexpired lease; the subordination, non-disturbance and attornment agreement; and any and all other documents related to the foregoing (collectively, the "Lease Documents") and executory contracts (the "Contracts") identified in the Purchase Agreement (including the Exhibits thereto) in connection with the sale, (d) fixing cure amounts for the Lease Documents and the Contracts, (e) authorizing the Debtors to enter into a supply agreement for product with the Purchaser, and (f) granting related relief (the "Motion"). The Court held a hearing on the Motion on December 15, 2005 to approve the sale (the "Sale Hearing"). The Court has reviewed the Motion, considered the evidence and heard argument of counsel. After due deliberation and good and sufficient cause existing, the Court makes the following findings of fact:

A.      This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

B.      The Debtors solicited the highest or otherwise best offer for the Assets, in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 16, 2005 (the "Bidding Procedures"). A competing bid was received for the Assets and the Debtors conducted an auction for the Assets on December 13, 2005 (the "Auction"). At the Auction, the Purchaser submitted the final bid of $5,750,000.00, representing the highest or otherwise best offer received for the Assets.

C.      The Debtors have provided interested parties (including all parties asserting claims or interests in the Assets, if any, and all parties which are parties to either the Lease Documents or the Contracts) with proper notice of the Motion, the Sale Hearing,[1] the Auction,

---

[1]   All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Motion.

APA exhibits.doc

the assumption and assignment of the Lease Documents and Contracts, and the fixing of any cure amounts, in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365, Fed. R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order and the Bidding Procedures Order.

D.    The Debtors marketed the Assets and conducted the sale process in compliance with the Order approving the Bidding Procedures, the Bidding Procedures, the Bankruptcy Code and all other Orders entered in these cases. The bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner. The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets. In their sound business judgment, the Debtors determined that the bid submitted by the Purchaser at the Auction represented the highest or otherwise best offer for the Assets.

E.    The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A, and the Assumption and Assignment Agreements attached to the Purchase Agreement, and all related documents, and the sale of the Assets and the assumption and assignment of the Lease Documents and Contracts has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

F.    The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

G.    Neither the Purchaser, the Lease Assignee nor any of their respective affiliates are "insiders" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

H.     The Debtors and the Purchaser proposed, negotiated and entered into the Purchase Agreement, without collusion, in good faith and at arms'-length bargaining positions. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

I.     Each of the Purchaser and the Lease Assignee, as applicable, is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

J.     The consideration the Purchaser is providing to the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value.

K.     The Debtors' sale of the Assets and the assumption and assignment of the Lease Documents and Contracts will facilitate the formulation and confirmation of a plan of reorganization.   For this reason, the Debtors' sale of the Assets and the assumption and assignment of the Lease Documents and Contracts constitute transfers to which 11 U.S.C. § 1146(c) applies.

L.     The Debtors' transfer of the Assets to the Purchaser and the Lease Assignee, as applicable, pursuant to the Purchase Agreement and the Assumption and Assignment Agreement will be a legal, valid, and effective transfer of the Assets. The Debtors' transfer of the Assets to the Purchaser and the Lease Assignee, as applicable, vests the Purchaser and the Lease Assignee, as applicable, with good and valid title in and to the Assets free and clear of any and all liens, claims, encumbrances, pledges, mortgages, security interests, charges, options or other interests of any kind or nature (collectively, the "Claims and/or Interests"), with the exception of the Permitted Encumbrances and the Assumed Liabilities, if any, as defined in the Purchase

Agreement. Any and all non-assumed Claims and/or Interests will attach to the proceeds of the sale with the same validity, enforceability and priority they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors, Wachovia Bank National Association, as Administrative Agent and Collateral Agent for itself ("Agent") and the other financial institutions from time to time parties to the Credit Agreement dated as of February 23, 2005, as may be amended or modified (collectively, "Lenders" and together with Agent, collectively, the "DIP Lender") and all other interested parties with respect to such Claims and/or Interests.

M.    The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the Purchase Agreement free and clear of all Claims and/or Interests (except the Permitted Encumbrances and the Assumed Liabilities) because any entity with any Claims and/or Interests in the Assets to be transferred (i) has consented to the Sale (including the assumption and assignment of the Lease Documents and Contracts) or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claims and/or Interests; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. Holders of Claims and/or Interests, if any, who did not object, or who withdrew their objections to the Sale Motion are deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2).

N.    The Debtors shall cause all proceeds from the Sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition

Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

O.    The Debtors' assumption and assignment of the Lease Documents and Contracts in connection with the Sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

P.    The Debtors have provided the landlord of and other parties to the Lease Documents and Contracts with adequate assurance that they will promptly cure any defaults under the Lease Documents and Contracts pursuant to 11 U.S.C. §§ 365(b)(1).

Q.    Pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006, the amounts set forth on Exhibit B, if any, constitute all amounts due and owing under the Lease Documents and Contracts and will be fixed and allowed for the Lease Documents and Contracts (the "Cure Amount"). No other amounts are due and owing by the Debtors under the Lease Documents or Contracts. The Debtors will pay the Cure Amount, if any, in accordance with the terms and provisions of the Purchase Agreement, and neither the Purchaser nor the Lease Assignee shall have any obligation to pay the Cure Amount, and the Lease Assignee shall be responsible only for the obligations under the Lease that arise after the date of the assignment of the Lease. Upon payment of the Cure Amount, all monetary and non-monetary defaults, if any, under and related to the Lease Documents and Contracts will be deemed cured.  Upon the assignment of the Lease Documents, the Lease Assignee shall be deemed to be in full compliance with all provisions of the Lease Documents, including, without limitation:

APA exhibits.doc

(i)     the Lease Assignee's insurance coverage (as described in the Declaration of Edward F. Fugger) and the posting by the Lease Assignee of a bond (in a form and issued by an indemnitor reasonably acceptable to the landlord) for the benefit of the landlord, in the amount of the difference between (a) the deductible or retention amount under the Lease Assignee's property casualty policy and (b) $200,000, shall be deemed to satisfy the insurance requirements under Article 9 of the Lease, and after the assignment of the Lease, a Lease Event of Default under Article 16 of the Lease shall not be declared as long as the Lease Assignee continues to maintain such insurance coverage; and

(ii)    the delivery, within the time period specified in Section 25.29(a) of the Lease, of the Reports on Form 10-Q and 10-K of Dean Foods Company, prepared in compliance with the requirements therefor and filed with the Securities and Exchange Commission, shall be deemed to satisfy the financial reporting requirements under Section 25.29(a) of the Lease and, after the assignment of the Lease, shall not provide a basis for declaring a Lease Event of Default under Article 16 of the Lease.

The foregoing provisions of the Lease otherwise prohibit, restrict, and/or condition the assignment of the Lease under 11 U.S.C. § 365(f)(1), and the landlord is adequately protected by the provisions of this paragraph.

R.     The Purchaser and the Lease Assignee, as applicable, have provided the landlord for the Lease Documents and Contracts with adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B).

S.      No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under the Lease Documents and Contracts.

T.      Except as expressly set forth in the Purchase Agreement and the Assumption and Assignment Agreement, neither the Purchaser nor the Lease Assignee will have any responsibility for any liability, claim or other obligation of or against the Debtors related to the Assets or the Lease Documents and Contracts by virtue of the transfer of the Assets and the assumption and assignment of the Lease Documents and Contracts to the Purchaser and the Lease Assignee, as applicable.  As a result of any action taken in connection with the purchase of the Assets or the assumption and assignment of the Lease Documents and Contracts, the Purchaser and the Lease Assignee will be deemed not to (i) be a successor to the Debtors (other than with respect to the Assumed Liabilities and any obligations arising under the assigned Lease Documents and Contracts from and after the closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors. Neither the Purchaser nor the Lease Assignee is acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the Purchase Agreement or in any assigned Lease Documents and Contracts.

U.      The Court's approval of the Purchase Agreement and the Assumption and Assignment Agreements is in the best interests of the Debtors, their estates and their creditors. Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted to the extent set forth herein.

2.      All objections to the entry of this order or to the relief granted and requested in the Motion, including any objection to the proposed Cure Amount, that has not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

APA exhibits.doc

43

3.      The Purchase Agreement and the Assignment and Assumption Agreements (and all documents related thereto) are each approved in all respects. Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized (subject to applicable Closing conditions set forth in the Purchase Agreement), to consummate the Sale including transferring and conveying the Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

4.      Upon Closing, the Debtors are authorized, in accordance with 11 U.S.C. §§ 105(a), 363 and 365 and this Order, to assume and assign the Lease Documents and Contracts to Purchaser and the Lease Assignee, as applicable.

5.      The Debtors have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2).

6.      The Lease Documents and Contracts will be assumed and assigned to the Purchaser and the Lease Assignee, as applicable, in accordance with their respective terms and in accordance with the findings of the Court in this Order. The assigned Lease Documents and Contracts will remain in full force and effect notwithstanding any provision in the Lease Documents and Contracts to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1)) which prohibit, restrict or condition such assignment or transfer). All non-debtor parties to the Lease Documents and Contracts are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the Purchase Agreement.

7.      Pursuant to 11 U.S.C. § 363(b) and subject to the restrictions contained in this Order, the Debtors are authorized and empowered to consummate and implement fully the Purchase Agreement and the Assignment and Assumption Agreements, together with all

additional instruments and documents to the extent necessary to implement the Purchase

Agreement in accordance with and subject to the terms and conditions contained therein and in

this Order. The Debtors are authorized to take all actions necessary for the purpose of assigning,

transferring, granting, conveying, and conferring the Assets and the Lease Documents and

Contracts to Purchaser and the Lease Assignee, as applicable.  The Debtors are authorized and

directed to execute and deliver to the Purchaser and the Lease Assignee such further instruments

of conveyance and transfer as the Purchaser or the Lease Assignee may reasonably request in

order more effectively to convey and transfer the Assets (including, without limitation, any

permits included within the Assets) to the Purchaser and the Lease Assignee, as applicable, for

aiding, assisting, collecting and reducing to possession any of the Assets and exercising rights

with respect thereto or otherwise to consummate the transactions contemplated by the Purchase

Agreement.  The Purchaser and the Lease Assignee shall have the authority to act as the true and

lawful attorney of the Debtors, with full power and authority in the name of the Debtors, at any

time and from time to time, to demand, sue for, recover, and receive any and all rights, demands,

claims, causes of action, and warranties of every kind and description whatsoever incident or

relating to the Assets, and to execute any documents or instruments with respect to the foregoing,

for the purpose of fully vesting in the Purchaser and the Lease Assignee, as applicable, all and

singular, all the right, title, and interest in and to the Assets.

      8.      Any agreements, documents, or other instruments executed in connection with the

Purchase Agreement may be modified, amended, or supplemented by the parties in accordance

with the terms of the Purchase Agreement without further order of the Court, provided that (i)

the Debtors first obtain the prior written consent of (a) the DIP Lender, and (b) the Creditors'

Committee, which consent will not be unreasonably withheld, and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.      The Debtors will transfer the Assets to the Purchaser and the Lease Assignee, as applicable, upon closing free and clear of all Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances and Assumed Liabilities). The only Claims and/or Interests in the Assets are those of the landlord with respect to the applicable Lease Documents being sold and assigned pursuant to the Purchase Agreement and the senior liens and superpriority administrative claims of the DIP Lender. The Claims and/or Interests of such landlord will be satisfied upon Closing by the Debtors' cure of any defaults under the respective Lease Documents and Contracts.  Moreover, the Debtors, the Purchaser and the Lease Assignee have demonstrated adequate assurance of future performance under 11 U.S.C. §365. The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds of the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

10.      The Debtors will cause the proceeds from the Sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Financing Order and the Loan Documents.

11.      The Debtors' transfer of the Assets pursuant to the terms of the Purchase Agreement is a transfer pursuant to 11 U.S.C. § 1146(c).  Accordingly, the making, delivery, filing or recording of any deeds, assignments or other transfer documents in connection with the sale (the "Transfer Instruments"), will not be taxed under any law imposing a recording tax, stamp tax, transfer tax or similar tax (including without limitation, any transfer or recordation tax applicable to deeds and/or security interests). All filing and recording officers are directed to

APA exhibits.doc

accept for filing or recording, and to file or record the Transfer Instruments immediately upon presentation without payment of any such taxes.

12.    The Purchaser and the Lease Assignee provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and applicable non-bankruptcy law, and the sale price in the Purchase Agreement was not controlled by an agreement among potential bidders. For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

13.    The Cure Amount for the Lease Documents and Contracts is fixed in the respective amounts set forth on Exhibit B. All defaults, claims or other obligations of the Debtors arising or accruing under each of the Lease Documents and Contracts, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be cured by the Debtors in accordance with the Purchase Agreement, by paying the Cure Amount, and neither the Purchaser nor the Lease Assignee shall have any obligation to pay the Cure Amount. No other or further monetary amounts or obligations are due or existing under or related to the Lease Documents and Contracts by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise. The Debtors will pay any Cure Amount in accordance with the terms and provisions set forth in the Purchase Agreement.

14.    Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Lease Documents and Contracts to the Purchaser and the Lease Assignee, as applicable, (a) the Debtors and their estates are relieved from any and all liability for any breach of the Lease Documents and Contracts occurring after assignment to the Purchaser and the Lease Assignee, as applicable, and (b) and the Lease Assignee shall be responsible only for the obligations under the Lease that arise after the date of the assignment of the Lease.

APA exhibits.doc

15.    Subject to the terms of this Order, the Purchase Agreement and the Assumption and Assignment Agreements, the Purchaser and the Lease Assignee, as applicable, assumes all rights and obligations of the Debtors under the Lease Documents and Contracts.

16.    All non-Debtor parties to the Lease Documents and Contracts are forever enjoined and estopped from contesting the Cure Amounts and from asserting any default against the Purchaser and the Lease Assignee which existed as of the date of the Sale Hearing.  Upon the assignment of the Lease Documents, the Lease Assignee shall be deemed to be in full compliance with all provisions of the Lease Documents, including, without limitation:

(a)    the Lease Assignee's insurance coverage (as described in the Declaration of Edward F. Fugger) and the posting by the Lease Assignee of a bond (in a form and issued by an indemnitor reasonably acceptable to the landlord) for the benefit of the landlord, in the amount of the difference between (a) the deductible or retention amount under the Lease Assignee's property casualty policy and (b) $200,000, shall be deemed to satisfy the insurance requirements under Article 9 of the Lease, and after the assignment of the Lease, a Lease Event of Default under Article 16 of the Lease shall not be declared as long as the Lease Assignee continues to maintain such insurance coverage; and

(b)    the delivery, within the time period specified in Section 25.29(a) of the Lease, of the Reports on Form 10-Q and 10-K of Dean Foods Company, prepared in compliance with the requirements therefor and filed with the Securities and Exchange Commission, shall be deemed to satisfy the financial reporting requirements under Section 25.29(a) of the Lease and, after the assignment of the

Lease, shall not provide a basis for declaring a Lease Event of Default under Article 16 of the Lease.

17.    Upon the Debtors' assignment of the Lease Documents and Contracts to the Purchaser and the Lease Assignee, as applicable, no monetary or non-monetary default will exist under or related to the Lease Documents and Contracts (or any documents related thereto). Upon entry of this Order and the assumption and assignment of the Lease Documents and Contracts, the Purchaser and the Lease Assignee are deemed to be in compliance with all terms and provisions of the Lease Documents and Contracts.

18.    Subject to the terms and conditions of this Order, all entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Purchaser and the Lease Assignee, as applicable. Prior to or upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims and/or Interests in the Assets (except for the Permitted Encumbrances and Assumed Liabilities), if any. In the event any creditor fails to release its Claims and/or Interests in the Assets upon Closing, the Purchaser and the Lease Assignee are authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other documents on such creditor's behalf. The Purchaser and the Lease Assignee are also authorized to file, register or otherwise record a certified copy of this Order upon Closing in accordance with the terms of the Purchase Agreement and this Order. Once this Order is so filed, registered or otherwise recorded in accordance with the provisions of this Order, the Order constitutes conclusive evidence of the release of all Claims and/or Interests against the Assets as of the Closing (except for the Permitted Encumbrances and Assumed Liabilities).

APA exhibits.doc

19.     Upon Closing of the Sale of Assets in accordance with the Purchase Agreement and this Order, the Purchaser and the Lease Assignee will be deemed to have acted in good faith in purchasing the Assets and Lease Documents and Contracts under the Purchase Agreement as that term is used in 11 U.S.C § 363(m). For that reason, any reversal or modification of the Order on appeal will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

20.     The Debtors' transfer of the Assets to the Purchaser and the Lease Assignee, as applicable, will not result in (a) the Purchaser or the Lease Assignee having any liability for any Claim and/or Interest (except for the Permitted Encumbrances or Assumed Liabilities) against the Debtors or against an insider of the Debtors or (b) the Purchaser or the Lease Assignee having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

21.     Other than the Permitted Encumbrances, the Assumed Liabilities and other obligations of the Purchaser and the Lease Assignee as specifically set forth in the Purchase Agreement and this Order, neither the Purchaser nor the Lease Assignee (nor their respective affiliates, successors or assigns) will have any responsibility for any liability of the Debtors arising under or related to the Assets, including, the Lease Documents and Contracts. The Debtors' transfer of the Assets to the Purchaser and the Lease Assignee, as applicable, does not and will not subject the Purchaser, the Lease Assignee or their respective affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests which may be asserted against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

22.    Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets and the Lease Documents and Contracts and a bill of sale transferring good and marketable title in the Assets to Purchaser and the Lease Assignee, as applicable. Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

23.    This Order is effective as a determination that upon Closing any and all Claims and/or Interests (except for the Permitted Encumbrances and Assumed Liabilities), if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

24.    This Order is binding upon all entities that may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Assets.

25.    This Court retains exclusive jurisdiction to (a) enforce and implement the Purchase Agreement and the Assumption and Assignment Agreements, and any other agreements and instruments executed in connection with the Purchase Agreement, (b) compel delivery of possession of the Assets to Purchaser and the Lease Assignee, as applicable, (c) resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement or Assignment Agreement, and (d) interpret, implement and enforce the provisions of this Order; provided, however, that in the event this Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit

APA exhibits.doc

51

or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

26.     The terms and provisions of the Purchase Agreement and the Assignment Agreements and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser, the Lease Assignee and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

27.     Except as may otherwise be provided for in the Purchase Agreement and/or all related documents, including, without limitation, claims arising from the Purchaser's or the Lease Assignee's performance and obligations under the Purchase Agreement, all related documents and this Order, upon Closing, all persons who hold Claims and/or Interests against the Debtors are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, the Lease Assignee, their respective affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

28.     After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser, the Lease Assignee or any of their respective affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to

APA exhibits.doc

and payable after Closing, except as otherwise provided in the Purchase Agreement. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

29.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed or assigned in connection with the Purchase Agreement and this Order, the provisions contained in this Order will control.

30.    The provisions of this Order are non-severable and mutually dependent.

31.    Notwithstanding Fed. R. Bankr. P. 6004(g) and 6006(d), this Order will take effect immediately upon entry.

Dated this _____ day of _____, 2005, in Jacksonville, Florida.

_____

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to
serve a copy of this Order on all
parties who received copies of the
Motion.

APA exhibits.doc

**EXHIBIT K**
**to Asset Purchase Agreement**

**Form of Declaration**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | Case No. 05-03817-3F1 |
| | | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

_____

**DECLARATION OF EDWARD F. FUGGER**

I, Edward F. Fugger, state and declare as follows:

I am an Authorized Representative of McArthur Dairy, Inc. (the "Purchaser"). I am duly authorized to make this Declaration on behalf of the Purchaser. I make this Declaration based on my own personal knowledge and based on my knowledge and review of the business records of the Purchaser. If called as a witness, I could truthfully and competently testify to the matters stated in this Declaration.

I submit this Declaration in connection with the offer of the Purchaser (and its affiliates) to purchase assets (the "Bid") from Winn-Dixie Stores, Inc. and its debtor affiliates (collectively, the "Debtors"). The assets subject to the Bid consist of the Debtors' leasehold interests in a dairy facility located in Opa Locka, Florida (and related inventory, equipment, and other assets), which is presently owned by the Debtors (the "Facility").

The Purchaser is not an affiliate of the Debtors. The Purchaser has at all times dealt at arm's length and in good faith with the Debtors, has no connection with any insider of the Debtors, and has not received any material non-public information regarding the Facility from

APA exhibits.doc

the Debtors or their advisors except through the due diligence process established by the Debtors and their advisors in these Chapter 11 cases.

The Purchaser is not a party to any agreement among potential bidders for the Debtors' assets and does not intend to enter into any such agreement or otherwise to conspire to chill bidding for such assets.

The Bid identifies executory contracts to be assumed by the Debtors and assigned to the Purchaser (collectively, the "Assigned Contracts") and an unexpired lease and related documents (collectively, the "Lease") to be assumed by the Debtors and assigned to affiliates of the Purchaser, Suiza Dairy Group, Inc. and Dean Dairy Holdings, LLC (collectively, the "Lease Assignee"). With respect to each of the Assigned Contracts and the Lease, the Purchaser and the Lease Assignee, as applicable, intend to perform and has the financial capability to perform its obligations under the Assigned Contracts and the Lease arising from and after the date on which the Assigned Contracts and the Lease are assigned to the Purchaser and the Lease Assignee, as applicable.

Attached as Exhibit A are true and correct copies of the following documents of the Lease Assignee: (a) Combined Financial Statements and Supplemental Schedules for the Years Ended December 31, 2004 and 2003 and Independent Auditors' Report and (b) Supplemental Schedules for the Six Months Ended June 30, 2005 and 2004. Attached as Exhibit B are true and correct copies of the following documents of Dean Foods Company (the parent company of the Purchaser and the Lease Assignee): (a) most recent annual report; (b) most recent Form 10-Q and 10-K (which were filed with the Securities and Exchange Commission); and (c) a summary of the insurance coverage which the Purchaser would maintain on the Facility. The financial statements in Exhibit A have been prepared in accordance with generally accepted accounting

principles and fairly and accurately in all material respects represent the financial condition and operating results of Dean Foods Company for the time periods specified.

The Bid includes a provision that permits the Purchaser, in certain circumstances, to assign its rights to acquire the Facility to one or more affiliates of the Purchaser. Should the Purchaser exercise that option, (a) the obligations of the Purchaser's assignee acquiring the Facility will be guaranteed by the Purchaser, and (b) all of the foregoing statements will be deemed to refer, with respect to the Facility, collectively to the Purchaser and its assignee acquiring the Facility, and such statements will be accurate if interpreted in that manner.

All of the business records of the Purchaser to which I have referred in this Declaration or in the preparation of this Declaration were made at or near the time of the event recorded, by or from information transmitted by a person with knowledge of the matters recorded in such records, and were made and kept in the course of the Purchaser's regularly conducted business activities. It is the regular practice of the Purchaser to make such records.

The Purchaser consents to the Debtors' providing a copy of this Declaration, including exhibits, to any non-Debtor party to an Assigned Contract or the Lease.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on _____, 2005, in Dallas, Texas.

_____
Edward F. Fugger

APA exhibits.doc

56

**Exhibit A**

Financial Statements

**Exhibit B**

Financial Statements

**EXHIBIT L**
**to Asset Purchase Agreement**

Form of Affidavit

**Seller's and Non-Foreign Title Affidavit**

STATE OF _____  )         Commitment No. _____
                        )         Issued by _____Title Insurance
COUNTY OF_____    )         Company ("Title Company")

  BEFORE ME, the undersigned Notary Public, this _____ day of _____, 200_, personally appeared _____ (the "Affiant"), who either [ ] is personally known to me, or [  ] has produced a _____ drivers license as identification, and who being by me first duly sworn, deposes and says the following:

  1. That Affiant is over eighteen (18) years of age and is competent to execute this Affidavit.

  2. That Affiant is the _____ of _____, a _____ (the "Company"), and is duly authorized an empowered by the Company, pursuant to all necessary and appropriate corporate action, to execute this Affidavit on behalf of the Company.

  3. That the Company has a leasehold interest in that certain real property, including all improvements located thereon, lying, situate and being in Miami, Florida, as more particularly described in the Commitment, a copy of which is attached hereto as Exhibit A (the "Property").

  4. That application has been made or is being made to Title Company for a policy of title insurance to insure the leasehold interest of McArthur Dairy, Inc., a Florida corporation ("Buyer"), and Affiant makes this affidavit to induce Title Company to issue said policy.

  5. That the Company has not contracted for, authorized or directed that any work be done or materials supplied for work to be done on or about the Property for which a construction lien could attach to the Property pursuant to Florida Statutes, or to the extent that any work has been done, such work has been paid for in full.

  6. That, except as shown on the Commitment, there are no encumbrances, mortgages, liens, claims, judgments, taxes, assessments, demands or bills outstanding and unpaid at this time against the Property, and that the Company has not taken any action or omitted to take any action that would result in the placement of any encumbrances, mortgages, liens, claims, judgments, taxes, assessments, demands or bills either outstanding or of record against the Property, of any nature, kind or

description whatsoever, excepting for the lien of real estate taxes for the current year and subsequent years.

7.    That, except as shown on the Commitment, the Company is in sole possession of the Property and there is no person or entity owning or claiming to own any interest in the title to the Property or any appurtenance thereto adverse to that of the Company.

8.    That there are no matters pending against the Company that could give rise to a lien or encumbrance that would attach to the Property between the date of the Commitment and the disbursing of the funds.

9.    That the Company has not executed, and will not execute, any instrument that would adversely affect the title or interest to be insured by Title Company.

10.    That the Company is not a "foreign person" as defined under Section 1445 of the Internal Revenue Code, and the regulations thereunder, and the Company understands that Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person. This affidavit is given to inform Buyer that withholding of tax is not required upon the Company's disposition of a United States real property interest.

11.    That the Company is not a nonresident alien for purposes of United States income taxation.

12.    That the Company's United States Taxpayer Identification Number (F.E.I. Number) is _____ and the Company's address is _____.

13.    That the Company understands that this certification may be disclosed to the Internal Revenue Service by Buyer, and any false statement made herein could expose the Company to punishment by fine, imprisonment or both.

Under penalties of perjury, Affiant declares that he/she has examined the foregoing certifications numbered 10 through 13, and to the best of his/her knowledge and belief, they are true and complete.

14.    That Affiant understands that Title Company is disbursing funds related to the transaction for which this Affidavit is given, and Title Company is relying on this Affidavit in so doing.

15.    That the Company does hereby indemnity and agree to protect, defend and hold harmless Title Company and _____, as title agent ("Title Agent") of and from any and all loss, costs, damages, claims or expense of any kind, including attorneys' and paralegals' fees whether at trial or on appeal, which Title Company or Title Agent shall or may suffer, expend, incur or become liable as a direct or indirect result of such parties' reliance on the statements made herein.

APA exhibits.doc

_____
Print Name: _____

_____
Print Name: _____
NOTARY PUBLIC, State of _____
Commission Number: _____
My Commission Expires: _____

[NOTARIAL SEAL]

Exhibit A

[Title Commitment]