1                    UNITED STATES BANKRUPTCY COURT
                       MIDDLE DISTRICT OF FLORIDA
2                        JACKSONVILLE DIVISION

3

4
   IN RE:
5

6
   WINN-DIXIE STORES, INC.,          CASE NO.: 05-3817-3F1
7

8
                    Debtors.
9                                        /

10

11

12                     TRANSCRIPT OF PROCEEDINGS

13

14           Excerpt of Hearings re Motions before the

15   Honorable Jerry A. Funk, U.S. Bankruptcy Judge, to

16   commence at approximately 1:00 p.m., on Thursday,

17   December 1, 2005, at the United States Courthouse,

18   Courtroom 4D, 300 North Hogan Street, Jacksonville,

19   Florida, before Elizabeth M. Masters, RPR, and a Notary

20   Public in and for the State of Florida at Large.

21

22                           - - -

23

24                    STATEWIDE REPORTING SERVICE
                        606 BLACKSTONE BUILDING
25                  JACKSONVILLE, FLORIDA  32202
                          (904) 353-7706

```
 1                    A P P E A R A N C E S

 2

 3

 4

 5      STEPHEN BUSEY, ESQUIRE
        CYNTHIA JACKSON, ESQUIRE
 6
             Attorneys for Debtors
 7

 8      ELENA ESCAMILLA, ESQUIRE

 9           Attorney for the United States Trustee

10
        JOHN MACDONALD, ESQUIRE
11      ROBERT WINTER, ESQUIRE

12           Attorneys for Unsecured Creditors Committee

13
        JERRETT McCONNELL, ESQUIRE
14
             Attorney for Ad Hoc Committee of Winn-Dixie Retirees
15

16      KAROL DENNISTON, ESQUIRE

17           Attorney for Equity Committee

18
        DAVIS JENNIS, ESQUIRE
19
             Attorney for Equity Committee (local counsel)
20

21      HENRY BEAR, JR., ESQUIRE

22           Attorney for Jefferies & Company

23

24

25
```

```
 1              P R O C E E D I N G S
 2  December 1, 2005                        1:30 p.m.
 3                        - - -
 4  ...
 5          THE COURT:  The Court has before it now the
 6      Application for Employment and Retention of Paul,
 7      Hastings, Janofsky & Walker.
 8          MS. DENNISTON:  Thank you, Your Honor.  Good
 9      afternoon.  Karol Denniston, on behalf of Paul
10      Hastings, Janofsky & Walker, proposed counsel for
11      the equity committee.
12          Your Honor, the objection deadline was
13      November 23rd.  We received three objections, from
14      the creditors committee, the ad hoc committee of
15      retirees and Mr. Ehster.
16          Those objections, in short, we addressed in a
17      reply brief that was filed initially to the
18      creditors committee, which basically advises the
19      Court that the committee was properly constituted
20      under 1102, and, under 1102, the committee is
21      entitled to counsel.
22          And we seek to be retained today, along with
23      local counsel, Jennis & Bowen, and the financial
24      advisers to the committee.
25          The committee has been active in this case,
```

1      not only defending its existence in connection

2      with the motion to disband, but there have been

3      several other activities that have gone on

4      directly with the debtor about concerns that are

5      unique to the equity committee, the most

6      noteworthy of which is the publicly announced

7      announcement today of the continuation of the

8      annual shareholders meeting at the request of the

9      equity committee because of matters raised by the

10     equity committee in connection with the proxy

11     statement and certain information that needs to be

12     further investigated and provided.

13         So the equity committee continues to fulfill

14     its obligations to this bankruptcy estate, and at

15     this point it is appropriate that the

16     professionals be retained subject to the rules

17     under the bankruptcy code, and recognizing that

18     that retention would need to be addressed in the

19     event that the committee were to be disbanded.

20         Obviously, the equity committee and its

21     professionals do not believe that that will

22     occur.  But the committee at this point, being

23     duly constituted, is entitled to counsel, and we

24     would ask the court for an order approving the

25     retention of Paul, Hastings, Jennis & Bowen and

1    Jefferies today.

2        THE COURT:  Objections or comments?

3        MR. WINTER:  Good afternoon, Your Honor.

4    Robert Winter, Milbank, Tweed, on behalf of the

5    unsecured creditors committee.

6        As Ms. Denniston has indicated, the creditors

7    committee did file a limited objection to the

8    retention of Paul, Hastings and Jennis & Bowen,

9    essentially on the grounds that these motions are

10    premature.

11        As the Court is aware, the committee has

12    pending its motion to disband the equity

13    committee.  We agreed to abate that motion to give

14    the U.S. Trustee time to complete a detailed

15    review of whether an equity committee should be

16    disbanded, and we understand that process is

17    nearing completion.  Therefore, we believe the

18    Court should have the benefit of the U.S.

19    Trustee's decision before it makes a ruling on

20    whether Paul, Hastings and Jennis & Bowen should

21    be retained.

22        We believe that the retention application

23    should be carried to the next omnibus hearing,

24    which, I understand, is December 15th, and that

25    would give time for the Trustee to complete its

1    review.

2        We don't believe there would be any harm to

3    either Paul, Hastings or Jennis & Bowen from

4    carrying these motions.  If the Trustee decides to

5    support the existence of the equity committee,

6    well, each of the retention applications was filed

7    nunc pro tunc, so there's no prejudice there.

8        If the Trustee decides to disband the equity

9    committee, then, again, we believe the Court needs

10   to have the benefit of that information before it

11   decides whether retention is appropriate at all.

12       So we would ask the Court to adjourn the

13   hearing on these matters; if not, if the court is

14   not inclined to do that, then we would ask that

15   the retention only be approved on an interim

16   basis, subject to review as soon as the U.S.

17   Trustee issues its final decision on whether the

18   committee should be disbanded.

19       And, in any event, the committee would

20   preserve its right to object to any fee

21   applications by counsel, requiring that they

22   demonstrate a benefit to the estate.

23       Thank you.

24       MR. MACDONALD:  Your Honor, may I rise also

25   on behalf of the committee?

1          THE COURT:  You may.

2          MR. MACDONALD:  Thank you, Your Honor.

3          I want to respond particularly with respect

4     to the application for retention of Jefferies &

5     Company.  That application is somewhat unique

6     compared to the other two because it seeks

7     approval for retention --

8          THE COURT:  I'm sorry, I'm only here right

9     now taking them one at a time.

10          MR. MACDONALD:  I understand, Your Honor.

11     I thought Ms. Denniston asked for approval of all

12     three.

13          THE COURT:  I have to deal with them one at a

14     time.  My mind only works in that direction.

15          MR. MACDONALD:  That's the way mine does,

16     Your Honor, so I'll sit down.

17          Thank you.

18          THE COURT:  Are there any other comments or

19     objections?

20          MR. McCONNELL:  Good afternoon, Your Honor.

21     May it please the Court.  Jerrett McConnell on

22     behalf of the Ad Hoc Committee of Winn-Dixie

23     Retirees.

24          Your Honor, the retirees at this time would

25     also like to object to the application for the

1       retention of Paul, Hastings, in that the committee

2       has two arguments.

3           First of all, this argument would go along

4       with that of the creditors committee, and that

5       would be the argument that the retention of any

6       professionals, at least to the extent that the

7       estate is responsible for their fees, is

8       premature.

9           As stated by Mr. Winter, currently, the U.S.

10      Trustee is reviewing the need for the committee,

11      and all challenges to the propriety of the equity

12      committee are abated pending the U.S. Trustee's

13      decision.

14          With that, in our point of view, it

15      hamstrings us from fully attacking all the issues

16      that the committee sees with the retention of the

17      proposed counsel, so we believe that it would be

18      appropriate to postpone any review of the

19      application until the December 15th deadline

20      proposed by Mr. Winter.

21          Until the U.S. Trustee makes a decision, it

22      does not make logical sense to the retirees to

23      bestow upon the committee all the investitures of

24      a fully constituted committee.  We don't know

25      where the U.S. Trustee is going to go with her

 1    decision.  It doesn't make sense for the debtor to

 2    incur costs, to be responsible for costs, of a

 3    committee that is ultimately disbanded.

 4         And that stated, Your Honor, at this time

 5    there are issues that were raised in the motion to

 6    abate -- excuse me -- that were raised in the

 7    original objection or motion filed by the

 8    creditors committee to the -- seeking disbandment

 9    of the equity committee.  And since those issues

10    are abated, we believe that that has a direct

11    impact on our ability to argue fully the issues

12    with the retention of this proposed counsel.

13         The counsel did a great job.  Their

14    applications to hire these professionals were

15    timely, and they were filed nunc pro tunc.  The

16    equity committee, as far as the retirees are

17    concerned, are protected, and we don't see any

18    reason why this matter should be postponed -- or

19    how they would be harmed if this matter was

20    postponed until December 15th.

21         In the past, the courts have been reluctant

22    -- and this was raised in the response that

23    Ms. Denniston referred to -- the courts have been

24    reluctant to approve fees for work done prior to

25    approval of application.  However, all those cases

1    revolved around the untimely filing of an

2    application.

3         If the Court does review the case law cited

4    in the response filed by the equity committee to

5    the objection of the creditors committee, it will

6    see that it's not really applicable here.

7         The equity committee has done what it needs

8    to do to protect its rights with regard to the

9    hiring of the counsel and those expenses.  It

10   doesn't make any sense to address the issue before

11   we're going to see if they're still going to be

12   around.

13        And nothing prevents the equity committee in

14   the future from hiring professionals on their own

15   and at their own expense, because certainly the

16   retirees have done so, and they see no reason why

17   these majority of the committee members or large

18   corporations can't afford to hire their own

19   attorneys.

20        And as the Court is well aware, even should

21   the committee be disbanded, they could seek

22   reimbursement at a later date for value added to

23   the estate.

24        So for all those reasons, Your Honor, the

25   retirees committee would also argue that this

1    matter should be put off until the omnibus hearing

2    date of December 15th.

3        THE COURT:  Thank you very much.

4        Does anybody else want to make a comment or

5    propound an objection?

6        Ms. Denniston.

7        MS. DENNISTON:  Your Honor, if I could be

8    heard briefly in reply, I would say to the court

9    three things.

10        First of all, this committee exists.  It may

11    be under attack, and the committee acknowledges

12    that, but under 1102, this committee is entitled

13    to counsel and financial advisers.

14        This committee is not an ad hoc committee.

15    This committee was formed by the U.S. Trustee.

16    And while its existence may be the subject of

17    debate, I don't think that, by December 15th,

18    we're going to have a definitive answer as to this

19    committee's existence.  We may have more

20    information from the U.S. Trustee.

21        It doesn't change the fact that the committee

22    has been properly and duly organized under 1102.

23    It also doesn't change the fact that, under the

24    bankruptcy code, this committee is entitled to

25    counsel of its choice for as long as it may exist.

```
 1              This committee has selected counsel.  Counsel
 2       has been proceeding with the committee's agenda,
 3       which includes, among other things, defending its
 4       existence, and trying to do so in an economic
 5       fashion so as not to jeopardize or injure the
 6       estate any further with the attack on the
 7       committee.
 8              But there are a number of items that this
 9       committee has pursued that justify the committee's
10       existence in terms of the need for adequate
11       representation to a significant group of equity
12       holders that otherwise had no representation prior
13       to the committee's existence.
14              I think the committee's dialog with the
15       debtor has been constructive in terms of the
16       deficiencies with the proxy statement and the
17       request for an independent investigation.
18              The debtors' acknowledgment of that in the
19       press release released earlier today is evidence
20       of the committee's agenda in terms of protecting
21       those rights of the underrepresented
22       constituency.
23              I don't think that it is fair or appropriate
24       under the bankruptcy code to deny the committee
25       counsel of its choice and to deny counsel the
```

1     protections that come with a court order saying

2     that we have been through this process in terms of

3     retention.

4          Nothing is jeopardized by way of the amount

5     billed or the expenses.  That all remains subject

6     to the rules, the bankruptcy rules, the code and

7     the fee order, the fee examiner and the comments

8     and objections of everybody in this case, which

9     I'm sure will be interesting and probably

10    lengthy.

11         But everybody's rights are fully protected

12    except for the equity committee, who at this point

13    is entitled, under 1102, to the counsel of its

14    choice.  And we ask the Court that counsel be

15    appointed, recognizing that all the other rights

16    and remedies to object to the fees, to object to

17    the expenses and everything else as set forth in

18    this case are still out there.

19         This is an engagement for an underrepresented

20    constituency that has not had an active role in

21    this case until the committee was appointed, has

22    taken that role seriously, and is so far seeing

23    positive results.

24         MR. WINTER:  May I respond further briefly,

25    Your Honor, very short?

1           THE COURT:  If you respond, I have to let

2     Ms. Denniston respond.  If you don't mind her

3     -- she has the opportunity to always speak last.

4           MR. WINTER:  That's fine, Your Honor.

5           Again, Robert Winter for the unsecured

6     creditors committee, Your Honor.

7           Your Honor, just briefly, 1103(a) provides

8     that, with the Court's approval, a committee may

9     select and authorize the employment of attorneys

10    or accountants.

11          So I only rise to challenge Ms. Denniston's

12    statement that the equity committee has an

13    unrestricted right to select the counsel of its

14    choice.  That is simply not the bankruptcy code.

15          We believe Your Honor's approval is required,

16    is appropriate, and that Your Honor should make

17    that determination after all of the facts are

18    known.

19          An additional short delay would not be

20    prejudicial to any party, we believe.

21          Thank you.

22          THE COURT:  Thank you.

23          MS. DENNISTON:  Your Honor, I certainly

24    didn't mean to undercut the Court's authorities

25    with my statement.  But at the end of the day, it

```
 1      is appropriate at this point that the committee's
 2      professional advisers be appointed in recognition
 3      of the ongoing obligations of the equity committee
 4      to this Court to the bankruptcy estate.
 5          THE COURT:  Mr. McConnell.
 6          MR. McCONNELL:  Thank you, Your Honor.  Just
 7      briefly.
 8          I just had to stand up and disagree with the
 9      statement that -- regarding the absolute right to
10      counsel and the protections.
11          In a case actually cited by Ms. Denniston and
12      the equity committee in the response, the Standard
13      Steel sections, it had a situation where the Court
14      found that there was a properly constituted
15      committee, and the Court decided not to allow them
16      to hire attorneys at the cost of the estate.  They
17      actually found that the need was not necessary.
18          There is no absolute right under 1103(a) or
19      1102.  And the retirees committee will once again
20      assert that the decision is premature and should
21      be put off until the December 15th date.
22          THE COURT:  Is there anybody else that
23      wants to talk?  Let's let them all gang up at one
24      time.
25          The U.S. Trustee hasn't filed any objection.
```

1    Are there any comments the U.S. Trustee wants to
2    make?
3        MS. ESCAMILLA:  Your Honor, an equity
4    committee does exist.  I see no harm at this point
5    to authorize the employment of Paul, Hastings.  I
6    also see no harm in waiting until December 15th.
7        But I realize that Paul, Hastings has been
8    working for a while without an order.  Their fees
9    will still be subject to review under Section 330
10   even if the Court enters the order today
11   authorizing their employment and even if the
12   equity committee is disbanded.
13       So I see no harm in entering an order
14   regarding Paul, Hastings today.
15       THE COURT:  All right.  My other question to
16   you, as the United States Trustee, and I'll look
17   to you, have you examined the application for
18   employment and the affidavits attached thereto,
19   and do they raise any flags or any questions
20   in the mind, forgetting the disbandment, you know,
21   but just the retention of this particular law
22   firm?
23       I don't want to get down the road and have
24   something come up.
25       MS. ESCAMILLA:  A motion to disqualify?

```
 1          THE COURT:  Right.  Is there anything in
 2     there that --
 3          MS. ESCAMILLA:  We would have raised those
 4     issues, Your Honor, had we had those.
 5          They did file a lengthy affidavit.  They do
 6     have prior relationships with members on the
 7     equity committee, as happens in all cases where
 8     there are big creditors, and, in this case, equity
 9     holders.
10          But they're not currently representing those
11     equity holders in other matters.  And had we seen
12     those type of grounds to object, we would have
13     done so, Your Honor.
14          THE COURT:  Thank you very much.
15          Ms. Denniston, finally.
16          MS. DENNISTON:  Your Honor, I'm going to quit
17     while I'm ahead.  I don't have very many friends
18     in this courtroom.  And I will take the U.S.
19     Trustee's comments, and we will close our
20     presentation.
21          THE COURT:  All right.
22          The Court will approve the employment of
23     Paul, Hastings, et al., and I'll do it nunc pro
24     tunc.
25          I think the committee does exist.  And I
```

```
 1     don't think it makes a difference one way or the

 2     other, but I think they're more comfortable having

 3     an appointment.

 4          And if the committee continues, then we'll

 5     deal with that, and then we'll deal with their

 6     applications in due course.

 7          Do you have an appropriate order?

 8          MS. DENNISTON:  I do, Your Honor, if I might

 9     approach.

10          (Tenders order.)

11          THE COURT:  The order is signed, hearing is

12     concluded.

13          MS. DENNISTON:  Thank you, Your Honor.

14          THE COURT:  I just signed the order for your

15     firm.  You passed up another order.  I haven't

16     dealt with that one yet.

17          MS. DENNISTON:  I'm sorry, Your Honor.  I

18     must have had a duplicate.  I do have a Paul,

19     Hastings order.

20          THE COURT:  I signed one Paul, Hastings

21     order.  See if that's the one I signed.  I'm not

22     going to sign it again.

23          MS. DENNISTON:  It's a duplicate.

24          THE COURT:  Okay.

25          MS. DENNISTON:  Thank you.
```

```
 1          THE COURT:  All right.  Now we'll take up the
 2     retention of Jefferies & Company, the financial
 3     adviser.
 4          MR. JENNIS:  Your Honor, David Jennis, as
 5     proposed local counsel for the equity committee.
 6     You have our application next.
 7          But I would like to introduce Mr. Henry Bear,
 8     Jr., as counsel for Jefferies.  Mr. Bear is an
 9     attorney licensed to practice in the state of New
10     York and the District -- excuse me -- the
11     Commonwealth of Massachusetts.
12          He is not a resident of Florida, and he is
13     not licensed to practice in Florida, but we would
14     ask for his special appearance today under local
15     Rule 2091(c).
16          And, if the Court thinks it's appropriate, we
17     would designate as the local designate to act on
18     behalf of Mr. Bear until he finds separate local
19     counsel.
20          THE COURT:  I will allow him to appear for
21     today.
22          MR. JENNIS:  Thank you, Your Honor.
23          MR. BEAR:  Thank you, Your Honor.  Henry
24     Bear, from Lathem & Watkins, on behalf of
25     Jefferies.
```

1          The motion that has been filed to retain

2     Jefferies & Company as the financial advisors for

3     the official equity committee, there were actually

4     three objections filed to the application of

5     Jefferies as well.

6          I think that the grounds for those objections

7     closely mirror the objections to the previous

8     professionals which the Court has just

9     considered.

10         I would imagine that most of the issues that

11    were raised in those objections will be adequately

12    covered by the discussion that was just before

13    this Court regarding the need and the adequacy of

14    professional representation for the equity

15    committee while it's appointed and acting in its

16    duties in this case.

17         I suppose, most appropriately, I would like

18    any party who may still have a standing objection

19    to put that objection on the record and I can

20    address them as they -- as they --

21         THE COURT:  You need to explain to me why we

22    need more financial advisers and why you need

23    somebody different than the creditors committee

24    and the debtor and the other people that we have

25    that, I assume, you have access to, or the

```
 1      creditors committee has access to.
 2           You convince me that you need your own
 3      expert.
 4           MR. BEAR:  On behalf of the equity committee,
 5      Your Honor, I would like the equity committee
 6      counsel to address that.
 7           MS. DENNISTON:  Thank you, Your Honor.
 8           The equity committee finds itself with four
 9      members, Your Honor, none of which have the skills
10      that could fill the role of a financial adviser in
11      terms of analyzing the breadth and depth of
12      financial information that has been provided by
13      Blackstone, XRoads, and we've yet to see the
14      creditors committee financial information.
15           This Court has probably already surmised,
16      given the attack on the equity committee, the
17      motion to disband and the questions about whether
18      or not there is going to be a return to equity,
19      it's important that the equity committee have an
20      independent financial adviser that can take
21      existing information and build off of that to
22      determine and to test the assumptions.
23           I think it is a given, based on the record
24      before this court, what the creditors committee
25      thinks vis-a-vis about a potential return to
```

1    equity, so it's not likely that we're going to be

2    of one mind in terms of financial advice,

3    analysis, projections and the ultimate valuation

4    issue that is inevitable in this case.

5        It's just a question of at what time will the

6    valuations that is going to be presented, or is

7    expected to be presented, by the debtors be tested

8    by the creditors committee and the equity

9    committee.

10        In order for the equity committee to fully

11    test that valuation and to have a seat at the

12    table that's meaningful in terms of asserting

13    rights to valuation and in asserting a right to a

14    distribution and establishing the evidence that

15    this Court will need to approve a distribution to

16    equity, the equity committee needs an independent

17    financial adviser.

18        Jefferies has been selected because of its

19    ability to be a quick study, not to reinvent any

20    of the work that has been done by any of the

21    professionals already in this case.

22        In fact, the due diligence that's been

23    conducted thus far has been based on a very

24    cooperative relationship between Jefferies, XRoads

25    and Blackstone.

1          There have been a number of due diligence
2      meetings.  It is not the intention of this
3      financial adviser or the equity committee to
4      reinvent any work.
5          The product here is being tested, the
6      assumptions are being questioned, additional ideas
7      are being discussed.  But the role for Jefferies
8      is to test the debtors' assumptions and to be in a
9      position to respond to the creditors committee's
10     assertions that there should be no return to
11     equity.
12         Without an independent financial adviser,
13     this committee would be handicapped in a way that
14     would jeopardize its ability to work toward a
15     significant return to equity, and it's for that
16     reason that we seek an independent financial
17     adviser on a limited basis to test and retest and
18     question, not to reinvent or redo.
19         We have had several meetings, the
20     professionals, including Jefferies, Blackstone and
21     XRoads and with the debtors' counsel, to look at
22     the work product.  I've had the same access that's
23     been provided to the creditors committee.
24         But I am aware, as Jefferies can testify,
25     that there are significant differences in terms of

1    what the debtors' numbers mean as between

2    Jefferies and Houlihan and the creditors

3    committee.

4        It's for that reason we ask the Court to

5    approve an additional financial adviser to ensure

6    that there is an independent review and that the

7    equity committee is adequately represented in that

8    regard so that it can conduct meaningful

9    negotiations and discussions with the other

10   constituencies in the case.

11       THE COURT:  Thank you very much.

12       Mr. Macdonald.

13       MR. MACDONALD:  Thank you, Your Honor.

14       Your Honor, the creditors committee requests

15   that if only as to this application it be

16   adjourned until December 15th, because it is

17   a horse of completely different stripes than

18   the Paul, Hastings or the Jennis & Bowen

19   application.

20       The Jefferies & Company application seeks

21   approval of this Court for retention under 328(a)

22   with no 330 protections referenced within the

23   application itself.

24       And just so we know what we're dealing with,

25   the compensation formula which is proposed in the

1    underlying letter agreement and set forth in the

2    application seeks a monthly fee of $125,000 per

3    month until the aggregate of $375,000 is paid, and

4    then it drops to a more conservative $100,000 per

5    month, monthly.

6        In addition to a success fee, which is paid

7    to a scaled formula of one percent, one and a

8    quarter percent and one and a half percent, based

9    upon a scaled recovery to equity, the application

10   seeks to have that success fee fully earned upon

11   approval of retention.  And then as to the monthly

12   fee, it seeks nunc pro tunc approval to September

13   1.

14       And so while the debtor very skillfully

15   conducted an auction at some expense and time and

16   effort yesterday to save this estate merely -- or

17   to gain the estate $45,000, we are being asked

18   today to approve, in one swipe of the pen, the

19   payment of $375,000, being nunc pro tunc for three

20   months, back to September 1, to Jefferies &

21   Company, with no ability for 330 section review

22   for reasonableness.

23       It's that type of snowball that's about to be

24   shoved off the cliff and we're going to head down

25   that slippery slope to create the very prejudice

1     to this estate that the disbandment motion seeks

2     to prevent.

3         Or, we believe, if the U.S. Trustee were to

4     reach her own decision to have disbandment of the

5     committee, it would be avoided by her action in

6     that regard.

7         So as an initial point of concern, let's not

8     push that rolling stone down the hill under 328(a)

9     until all the facts are on the table so that we

10    can determine whether 328(a) treatment is

11    appropriate in this instance.

12        If Your Honor is inclined to consider the

13    application at this time, then we submit that

14    328(a) is wholly inappropriate for the approval of

15    compensation to Jefferies, and, instead, in all

16    instances, it should be an interim application,

17    with all compensation subject to a review of

18    reasonableness under 330.

19        And we submit that it not to be approved nunc

20    pro tunc, but, rather, to be approved as of a

21    point in time when Jefferies & Company contributed

22    value to the case.

23        And I have no ad hominem argument against

24    Jefferies & Company.  It's a very capable,

25    upright, outstanding, solid company that many

1        debtors and many committees and many interested

2        parties rely upon in many cases across the United

3        States.   They're a very capable company.

4            But we've already heard from Ms. Denniston

5        that the substantial majority of their attention,

6        the committee's attention has been to justifying

7        their existence.

8            And so if some portion of this monthly fee,

9        or, I suspect, a substantial portion of that

10       monthly fee, has been attributable to justifying

11       the committee's existence, which may or may not

12       continue, then this Court needs the ability, under

13       330, to review whether the services contributed to

14       the value of -- contribute to the value to the

15       estate as opposed to efforts to justify a sinking

16       ship.

17           So, Your Honor, we submit first that because

18       this is a zebra compared to the other two horses,

19       to put this one off to December 15 and let's see

20       what develops between now and then that will

21       completely change the landscape for consideration

22       of whether 328(a) treatment should be afforded to

23       this professional.

24           We also echo Your Honor's concerns that this

25       is the -- the approval of a professional, this

1    character, this quality and at this compensation

2    level is the very harm that Mr. Busey referred to

3    very early in the case when opposing

4    Mr. McConnell's client, and, that is, when you

5    bring another player to the table, it creates a

6    geometrically larger expense in the interplay of

7    all those other underlying professionals.

8         So we urge Your Honor that we not create that

9    geometric problem at this point and that we let

10   the facts spin out to see whether this committee,

11   long-term, will need that financial adviser to

12   test something which need not be tested.

13        Thank you, Your Honor.

14        THE COURT:  Anybody else before

15   Ms. Escamilla?

16        (No response.)

17        MS. ESCAMILLA:  I did want to address some

18   concerns that we raised with this application and,

19   I believe, have been resolved to some extent that

20   the Court is not aware of.

21        There is some broad indemnification

22   provisions in this agreement.  Jefferies has

23   agreed to limit the language of the

24   indemnification, and that there would be no

25   indemnification for gross negligence, willful

1    misconduct, and a proposed order has changed those

2    terms.

3        They would also have to come to this Court to

4    seek indemnification and to ensure that this

5    letter agreement is complied with.

6        Regarding the 328 issue, if the Court will

7    recall, we have four other financial advisers that

8    have various fee arrangements under Section 328.

9        The United States Trustee objected to the

10   employment under 328, and those fee advisers, or

11   consultants, have agreed in the other fee adviser

12   case instances to allow the United States Trustee

13   to have Section 330 review.

14       If the Court recalls a case here in the

15   Middle District where the Court approved 328

16   compensation -- and it was in the P*I*E case --

17   that the Court approved it and an order -- Judge

18   Proctor entered an order under 328.  And it was a

19   huge PI -- it wasn't personal injury, I believe it

20   was a legal malpractice lawsuit, and there was a

21   huge recovery.

22       Judge Proctor cut the fees, pursuant to 330.

23   It went on appeal, and the Court -- the appeal

24   level stated that the Court had no ability to

25   review the fees under Section 330 because they had

1    reviewed it under section -- they had approved the

2    application pursuant to 328.

3        And I just say that to the court because

4    there are other professionals that were employed

5    under 328.  The United States Trustee was

6    concerned with that.  We understand what the case

7    law is.

8        And so Jefferies has agreed to allow the

9    United States Trustee and, I believe, the fee

10   examiner, to have 330 review.

11       In the other fee adviser applications, we

12   also requested that, since no one actually gets

13   these applications except the people on the master

14   service list, and, basically, we're preapproving

15   fees when we approve under 328, that they send out

16   a notice to all creditors.  That was a huge

17   expense.

18       And what the debtors, the financial advisers

19   and the creditors committee counsel did, was they

20   prepared a one-page document, with front and back,

21   and it was sent out to all creditors, providing

22   them a 30-day time frame to object to the 328

23   provisions, and they summarized those 328

24   provisions.

25       And so we have requested that Jefferies

```
 1    actually do that, also, and make sure that
 2    creditors and interested parties that did not
 3    receive their initial application have the
 4    opportunity to do that.  I believe that they have
 5    also agreed to do that.
 6         And I say this because there's been a new
 7    counsel that's come in just recently and the form
 8    of the order has not been totally resolved.  But I
 9    believe those terms have been agreed to.
10         The problem with sending out that notice is
11    that we don't know at this point where we are
12    going to be on the motion to disband the equity
13    committee, and so to send out the mail-out on that
14    would be a huge expense.  I think it's necessary,
15    and I know they've agreed to it, but it is a huge
16    expense.
17         And I think that a delay in mailing that out
18    would be prudent until the United States Trustee
19    has made a determination whether the equity
20    committee will continue or whether the equity
21    committee should be disbanded.
22         And we believe that we should have that
23    decision prior to December 15th, Your Honor.
24         THE COURT:  Thank you very much.
25         Mr. McConnell.
```

1          MR. McCONNELL:  Thank you, Your Honor.

2          Judge, if you would indulge me for just

3     a moment before I get into the meat of my

4     argument, which is very much along the same lines

5     as to Mr. Macdonald, who spoke earlier, I think

6     it's very important that perhaps the Court

7     understand.  And because this question was posed

8     to me by one of the other counsels, I think they

9     perhaps don't understand why I'm here and why my

10    clients care.

11         And that was the question that was expressly

12    addressed to me:  Why do your clients care?

13         And when the question was addressed to me, I,

14    quite honestly, was taken aback.  I thought it was

15    perfectly obvious why my clients would care, but

16    apparently it wasn't.

17         And I would like the Court to understand why

18    we're here and everyone else to understand why

19    we're here.

20         The ad hoc committee of Winn-Dixie retirees

21    represents about a thousand retirees that worked

22    for Winn-Dixie.  It represents men and women

23    across the country who worked all their working

24    lives for Winn-Dixie.

25         It represents men like Terry Qualls, who was

```
 1          director of accounting when he retired from
 2          Winn-Dixie after working for 40 years; it
 3          represents men like Larry May, Jr., who sits in
 4          the back here, who started working with Winn-Dixie
 5          in 1964 as a produce associate and worked his way
 6          up to, when he retired in 2001, he was vice
 7          president and director of human resources for
 8          Winn-Dixie.
 9              These men and women gave the best years of
10          their lives to Winn-Dixie.  They love this
11          company.
12              It never ceases to amaze me, when I meet with
13          them, how they have their Winn-Dixie rings and
14          their Winn-Dixie watches on.  Winn-Dixie was their
15          lives, and they gave the best part of their lives
16          to this company.
17              And, to their credit, when the vast majority
18          of these men and women retired, Winn-Dixie was
19          still a cash operation and had a stock, publicly
20          traded stock, that was in the $70 range.  They did
21          a very good job with what they did.
22              Now, as they're moving into retirement, a new
23          generation has come on board and taken the reins
24          of Winn-Dixie.  And here we are, we're in a
25          bankruptcy proceeding.
```

1          These men and women who worked very hard to

2     save and prepare for retirement and worked very

3     hard for Winn-Dixie now see a company, the company

4     they built, suffering $40 million a month in

5     losses.

6          In the process, they've also watched their

7     retirement security slip away.  They've watched

8     retirement plans lose hundreds of thousands of

9     dollars.

10         They've received paperwork in the mail that

11    said that the wages they deferred into these

12    retirement plans are now property of the

13    bankruptcy estate, and they had to file a proof of

14    claim if they want to have access to those funds.

15    And that's very disturbing to them.

16         And they watched the very management team

17    that guided Winn-Dixie from the cash operation to

18    where it is now, in Chapter 11, continue to

19    receive retention bonuses.

20         So, basically, Your Honor, that's why we're

21    here, and that's why we care.

22         And that being said, the committee would

23    strongly object to the retention of Jefferies, not

24    because they're not qualified, they certainly are

25    qualified, but for all the reasons that

1       Mr. Macdonald stated and for the fact that, Your

2       Honor, for a committee that's, as Ms. Denniston

3       has said, is interested in developing shareholder

4       equity, they sure don't have any problems spending

5       it.

6           The vast majority of the members of the

7       Winn-Dixie ad hoc committee of retirees are

8       shareholders of Winn-Dixie, they have equity

9       shares in Winn-Dixie.  They don't see the need for

10      this committee.  They certainly don't see the need

11      for any further money being spent.  What they see

12      is duplicitous work.

13          And on that basis, Your Honor, they would

14      respectfully request that this application at

15      least be put off until December 15th, until the

16      Trustee makes her decision.  But they would

17      request that this application be denied.

18          Thank you.

19          THE COURT:  Mr. Busey.

20          MR. BUSEY:  Your Honor, the debtors have

21      filed an objection to the retention of Jefferies,

22      a limited objection, objecting not to the fact of

23      the retention but to several of the proposed

24      terms.

25          Like Ms. Escamilla, I believe that most of

1    the objections articulated by the debtors have

2    been resolved by agreement, but I'm uncertain

3    about that, because we have not seen yet the

4    proposed final order, which we will need to

5    inspect.

6        But I want to mention two of our concerns.

7    One is that there is a success fee proposed by the

8    engagement letter.  And the success fee says that

9    the form of its payment, whether it's cash or

10   securities or some other form of distribution that

11   may be made to the equity, it will be up to the

12   equity committee and Jefferies.

13       And we've objected to that because the

14   debtors do not believe -- the debtors believe if

15   the equity received in the distribution is not

16   cash but it's some form of warrants or other

17   security, and that it may be a nominal present

18   value but some future value, that any success fee

19   payable to Jefferies should be paid in the same

20   currency.  And there has been a disagreement

21   between the debtors and Jefferies on this issue.

22       The last I heard, I believe that Jefferies

23   and the equity committee are agreeable to

24   postponing, for the time being, the resolution of

25   that issue until another hearing, and permitting

1        the retention of Jefferies today without any

2        determination as to the form of the payment of the

3        success fee.

4            If that's so, that's satisfactory to the

5        debtors, and we can deal with the issue on a

6        subsequent day.

7            The second issue that we wanted to address

8        was the 328 issue.  As Ms. Escamilla said, she,

9        the United States Trustee, at the request of the

10       United States Trustee, the other four financial

11       advisers in the case have been retained pursuant

12       to 328, but with an express reservation to the

13       U.S. Trustee of a full 330 right of review at the

14       end of the day.

15           And Ms. Escamilla requested that, and we

16       agreed that that should be a condition to this

17       retention as well.

18           Further, another requirement of the United

19       States Trustee, as Ms. Escamilla said, was that

20       the 328 retention be the subject of notice and an

21       opportunity to object to all parties in interest

22       in the case, which required, as Ms. Escamilla

23       described, a notice to all parties in interest

24       upon the retention of the other four financial

25       advisers, and would require that notice now to all

1    parties in interest.

2         That notice does have a significant expense

3    to the estate to send that notice, and therefore

4    our objection says that if the 328 retention is

5    approved, subject to those two conditions by the

6    United States Trustee, including notice and an

7    opportunity to object, that the debtors not be

8    obligated to provide that notice and incur that

9    expense until after a determination by the United

10   States Trustee on the issue of disbandment, so we

11   postpone the notice period.  And if that would be

12   a requirement, we would want to see any retention

13   order as well.

14        Those were our two concerns.

15        THE COURT:  Thank you.

16        Yes.

17        MR. BEAR:  Your Honor, Hank Bear again, from

18   Lathem & Watkins, on behalf of Jefferies.

19        Jefferies is very mindful of the expense to

20   the estate, as is every other professional

21   involved, as is the estate, as is, I'm sure, the

22   Court.

23        However, I don't think that that necessarily

24   makes it appropriate to enforce the costs and

25   expenses of the estate on Jefferies itself simply

1    because it's the last professional to be proposed

2    to the Court.

3         I think, as the committee counsel has

4    suggested, that Jefferies is somehow a horse of a

5    different color, or, I believe, he said of

6    different stripes.

7         I'm not so sure that that's true.  I think

8    that to the extent that we have already considered

9    today that the equity committee has been in fact

10   appointed and is in fact an existing committee

11   under the code, it has a right to counsel, and I

12   believe it also has a right to financial advisers,

13   for all the reasons that counsel for the committee

14   so concisely expressed.

15        So the only question at that point becomes

16   the terms under which they would be appropriately

17   retained.

18        As I think this Court is aware, from the

19   numerous applications that it has seen in the

20   past, the application and the terms that were

21   proposed for Jefferies are actually quite

22   reasonable and are what I would consider to be

23   market rate.

24        The 328 retention for financial advisers is

25   standard.  That's what every financial adviser

1    gets.  And that's based on the type of retention

2    and the type of work that the financial advisers

3    do.

4        I don't think that 328 retention, especially

5    with the exceptions that have been agreed to by

6    Jefferies and every other financial adviser in the

7    case, specifically 330 examination by the U.S.

8    Trustee and the fee examiner, I think that that

9    provides adequate protection for the

10   reasonableness of any fees.

11       I think that the monthly fees that are at

12   stake in this case for Jefferies are eminently

13   reasonable.  And when you compare them to every

14   other financial adviser in this case, I think that

15   becomes clear, that they have among the lowest.

16       I think that the only difference between

17   their fees and the other absolute lowest would be

18   the slight bump in the first three months that's

19   necessary for Jefferies to get, quote, unquote, up

20   to speed, because they were brought on board, I

21   believe, six months after everybody else in these

22   cases had proceeded.

23       So the only question, then, assuming that the

24   monthly fees are in line and very much reasonable

25   and appropriate with every other financial adviser

1    brought in in the case, that 328 retention is an

2    appropriate market and in line with every other

3    financial adviser brought into the case and would

4    be the success fee that we've talked about.

5        It's important to realize that the success

6    fee in this case is only paid to the extent that

7    there is a greater than $50-million recovery to

8    the equity.

9        So to the extent that we're concerned about

10   an excessive recovery or an excessive success fee

11   to Jefferies, that would only be under the

12   bankruptcy code after every single other creditor,

13   including the retirees and all of the unsecured

14   creditors, have been paid in full and the equity

15   received a substantial recovery in this case.

16       So I don't think that it's a legitimate

17   concern to state that there could be some excess

18   windfall to Jefferies at the expense of the

19   estate, because that only comes if the equity

20   committee itself and the equity participants get a

21   substantial recovery in this case.

22       I think it's understandable the concern for

23   the expense on the notice that needs to go out.

24   However, that is a notice that is a statutory or,

25   at least, rule-based requirement that all parties

1    get a chance to object.

2        I don't think it's meaningful to grant 328

3    review today but to not allow the statutory notice

4    to go out.  That would, in essence, make it that

5    it's not a 328 retention yet.  And that would put

6    Jefferies, as the lone professional in this case,

7    exposed to not being retained under the code while

8    we're waiting on the decision of the U.S. Trustee

9    or this Court regarding certain motions.

10        I think it's appropriate to, you know,

11    recognize the expense.  I think that every

12    professional in this case has it incumbent upon

13    them to do their best to operate appropriately,

14    economically and efficiently.

15        I don't think it's appropriate to single out

16    Jefferies as the only professional in this case

17    that's not entitled to market compensation, that's

18    not entitled to market or reasonable protections

19    under the bankruptcy code, and that it is expected

20    to proceed operating for a statutorily appointed

21    committee without the protections of a retention

22    order.

23        With all of that in mind, I would propose --

24    and I agree with debtors' representation -- that

25    we would be willing to put off to a later date

 1     consideration of the type of consideration that

 2     would be included if, in fact, there were a

 3     success fee.

 4          It's important to note that the way it's

 5     drafted right now is actually almost identical to

 6     the way that it's drafted for Houlihan, who is, I

 7     believe, financial adviser for the committee, and,

 8     that is, that it would be -- although it's drafted

 9     in the alternative for the committee.  But, in

10     essence, they would get in kind, in other words,

11     plan consideration unless the equity committee

12     elected otherwise.

13          The equity committee, who, presumably, at

14     that point would be the only parties in interest

15     in this case that had not been paid in full, would

16     have the opportunity to decide how they wanted to

17     pay their advisers, whether they thought it was in

18     their own best interest to pay them in cash or in

19     kind.

20          However, with that said, as debtors' counsel

21     suggested, we would be willing to put that lone

22     piece off to decide exactly what type of

23     consideration they would get.  In the event that

24     there was a success fee, we would be willing to

25     put that off until a later day.

1    Which leaves, of course, only the question of

2    what is the reasonable retention terms and

3    compensation of a retained professional in this

4    case.

5    With that in mind, Your Honor, I would urge

6    this Court to allow Jefferies to proceed in this

7    case in its role as a financial adviser for the

8    committee along the same terms and with the same

9    protections as every other professional in this

10   case.

11   Thank you.

12   THE COURT:  Anybody else?

13   Ms. Denniston.

14   MS. DENNISTON:  Your Honor, I'll be brief.

15   On behalf of the equity committee, I think

16   there's a couple of things this Court should at

17   least have in mind as it considers its ruling.

18   The first being that the equity committee

19   interviewed a number of professionals before it

20   made a selection.  The equity committee also

21   reviewed the professional retention terms of the

22   other financial advisers.

23   It selected Jefferies based on the fact that

24   it believed that it could get the services it

25   required at terms that were not only commiserate

1       but slightly less than the market that was already

2       established in this case.

3             And that's the reason why we see the numbers

4       that we see.  And they are lower than Houlihan and

5       they're lower than Blackstone.  And that was

6       intentional, and that was at the instruction of

7       the equity committee.

8             The equity committee has been very cognizant

9       of the need to handle this matter as efficiently

10      and as economically as possible.

11            But, I think, in terms of some of the

12      commentary that the Court has heard today along

13      the lines of the motion to disband, there's two

14      things that we need to keep in mind here.

15            From the equity committee's perspective,

16      whatever happens on that motion to disband, it's

17      going to end in here with a hearing before you.

18            And at that hearing, Your Honor, we're going

19      to be arguing two things.  We're going to be

20      arguing the need for adequate representation of

21      this constituency.  We're also going to be arguing

22      that there is enough value in this case, or at

23      least the prospect of value in this case, for a

24      return to equity.

25            That is a critical -- that is a critical and

1    necessary need for the equity committee to have a

2    financial adviser that has been fully engaged and

3    is motivated to work on behalf of the equity

4    committee.

5        The equity committee needs Jefferies.  It

6    needs Jefferies' attention to the detail, it needs

7    Jefferies' mind in terms of reviewing and

8    questioning and adding to.

9        If this estate is to reap the benefit of

10   having an equity committee formed, it's critical

11   that it have professionals that are motivated to

12   perform particularly well and particularly

13   efficient over the next two to three months as we

14   finalize this open issue on disbandment.

15       The equity committee has been formed.  It

16   should have a shot at having all the professionals

17   that it has requested in terms of establishing for

18   this Court the prospects for this debtor.

19       If the equity committee is successful, and it

20   fully expects to be, it will demonstrate its value

21   to the case.  And we expect that to play out over

22   time.

23       But we cannot get there handicapped, without

24   having a financial adviser that is willing to

25   fulfill the role that has been described to the

1    Court today.

2        And with that, I would ask that the Court

3    approve Jefferies at this time on the terms that

4    have been discussed by the debtor, the U.S.

5    Trustee and Jefferies' counsel.

6        THE COURT:  Does anybody else need to say

7    anything?

8        (No response.)

9        It seems to me that the equity committee

10   probably does need somebody that -- a financial

11   adviser, again, not to recreate the wheel but to

12   analyze the reports coming from the financial

13   advisers to the creditors committee and the debtor

14   and try to put them in some perspective, I guess,

15   in case they're slanted in favor of their

16   constituencies.

17       And I like every constituency to be

18   represented, either through a standing committee

19   or an ad hoc committee, and I would like everybody

20   to be here.

21       And, of course, I would really love to see

22   equity get money, which means everybody's paid and

23   everybody stays in place.  And I think that's what

24   most bankruptcy judges want.  It's not that we

25   are debtor oriented, but success is what we look

1    for.

2        That being said, it seems like Jefferies is a

3    good company and should be employed.  But I'm not

4    going to do that today.  I'm going to wait until

5    December the 15th, at the next omnibus hearing.

6        That will give you time to hear what the U.S.

7    Trustee has to say.  Work out any wording that you

8    have in the event that we need to have an order

9    signed, with the right to review under 330

10    reserved for the benefit of any objection made by

11    the U.S. Trustee or the fee examiner, and to work

12    out the right wording on any bonus to the

13    financial adviser which only can be paid out of

14    funds that are to be received by the equity

15    holders.

16        They shouldn't be paid by the debtor over and

17    above, I don't think.  I think that's what Mr.

18    Busey was talking about.  And I think we'll deal

19    with that at that time.

20        The committee has been appointed.  On the

21    other hand, Ms. Denniston, if the Trustee had in

22    their discretion not appointed an equity committee

23    and you filed a motion seeking to have one

24    appointed, saying it was an abuse of discretion,

25    and there was a question as to whether there would

 1    be any money for equity, the people seeking the

 2    appointment would have to hire their own financial

 3    adviser to deal in that case.  So, I mean, I

 4    understand that much.

 5        So we'll see you in two weeks on this issue.

 6    It's continued until that date.  The announcement

 7    is made in open court, no further notice need be

 8    given.

 9        All right, the next matter is Jennis & Bowen

10    as, quote, local counsel.

11        MS. DENNISTON:  Your Honor, Karol Denniston,

12    on behalf of the equity committee.

13        We seek to employ Jennis & Bowen to serve as

14    the local counsel primarily, Your Honor, to

15    provide those services to ensure that the equity

16    committee complies with all of the local rules

17    and is available to make appearances when it would

18    be more cost effective for Jennis & Bowen to make

19    such an appearance, and to utilize them in a way

20    that would minimize the cost to the estate of the

21    representation required by the equity committee.

22        It is --

23        THE COURT:  Let me just ask you a few

24    questions.

25        MS. DENNISTON:  Yes.

1          THE COURT:   Jennis & Bowen, they're out of

2     Tampa.

3          MS. DENNISTON:  Yes, Your Honor.

4          THE COURT:   They're not here.

5          MS. DENNISTON:  That's correct.

6          THE COURT:   They're 45 minutes away by

7     airplane.

8          MS. DENNISTON:   That's right, Your Honor.

9          THE COURT:   You're in Atlanta.

10         MS. DENNISTON:   I am, Your Honor.

11         THE COURT:   You're 45 minutes away by

12    airplane --

13         MS. DENNISTON:   I am, Your Honor.

14         THE COURT:   -- give or take.   Forget the

15    security and all that.   I mean, it's three hours

16    or four hours for the both of you.

17         They don't have a presence here in

18    Jacksonville.   You have a copy of our local

19    rules.   Why do we need them?

20         MS. DENNISTON:   To be frank, Your Honor, in

21    terms of the cost of this estate, it is cheaper

22    for me to send them a draft pleading and say am I

23    in compliance than it is for us to fly spec it.

24    And are there other things that we should be aware

25    of in terms of local practice?

1            We have utilized them in terms of discussions

2        about strategy, compliance with this Court's

3        rules.

4            We did look for counsel here, and we were

5        unable to find anyone that was able to meet the

6        Court's requirements in terms of electronic filing

7        and wasn't otherwise conflicted out.

8            So it has added a level of efficiency to the

9        case, and it also helps us keep the fees down

10       internally as to the Paul, Hasting's bills.  And

11       that's the primary reason that we seek to have

12       them retained.

13           THE COURT:  No offense, because these people

14       have a great reputation, but nobody in

15       Jacksonville?

16           MS. DENNISTON:  Your Honor, as I said earlier

17       in this hearing, we don't have very many friends

18       here in this case right now.  And despite my best

19       efforts, I was unable to identify someone that

20       would accept this representation.

21           THE COURT:  Go ahead.

22           MS. DENNISTON:  At any rate, we believe, and

23       Paul, Hastings believes as well, Your Honor, that

24       Jennis & Bowen is a value added in terms of

25       creating efficiencies and also reducing the amount

 1        of time that Paul, Hastings deals with procedural

 2        items, because they're able to do it at a lower

 3        cost and with a lower overhead, and that it does

 4        benefit the estate.

 5            THE COURT:  Does the committee have

 6        something?

 7            Are you through?

 8            MS. DENNISTON:  I'm finished, Your Honor.

 9            THE COURT:  The committee?  You filed an

10        objection.

11            MR. WINTER:  Thank you, Your Honor.  Robert

12        Winter, from the official committee of unsecured

13        creditors.

14            I rise briefly just to repeat our earlier

15        comments.  We believe that the application of

16        Jennis & Bowen should be put over to the December

17        15th hearing for the same reasons that we have

18        requested that the other applications be put

19        over.

20            Let's wait and see what the U.S. Trustee does

21        before we decide if one more layer of

22        professionals is appropriate here.  Again, we see

23        no harm for an additional two weeks' delay.

24            THE COURT:  Thank you.

25            Mr. McConnell, you didn't file an objection,

1    but I'll listen to you anyway.

2         MR. McCONNELL:  Your Honor, actually, I did

3    file an objection.

4         THE COURT:  It just didn't show up on my

5    sheet.

6         MR. McCONNELL:  Yes, Your Honor, an objection

7    was filed.  I believe it's 4492, is the docket

8    number.

9         Your Honor, you've addressed the same

10   concerns that the retirees committee has.  They're

11   a qualified local firm, but they're not local

12   counsel.  And I don't know who Ms. Denniston

13   contacted, but I can think of at least three

14   attorneys offhand that would love to be their

15   local counsel.

16        And the bottom line here, Judge, is they say

17   it's more efficient, but here we are with another

18   hearing and another application that we're trying

19   to review.

20        I just don't see how it's efficient to hire

21   another law firm and involve another law firm,

22   especially one that's not from Jacksonville and

23   familiar with Your Honor and the way we like to do

24   things here.

25        Judge, I was just -- this whole afternoon has

1    reminded me of a cartoon I saw when I was a little

2    child where there's this caveman and they kept

3    dropping boulders on his head.  And all he kept on

4    saying was:  When does the hurting stop?

5         When does the hurting stop?  When do the

6    costs stop?  Once again, as I said before, there's

7    more and more reasons to spend money.  And we're

8    just asking the Court to draw a halt to it.

9         Ms. Denniston is highly qualified, it's just

10   as easy to get here from Atlanta as it is from

11   Tampa.

12        We think it would be appropriate for the

13   court to deny this motion, or this application.

14        THE COURT:  Thank you.

15        Mr. Jennis.

16        MR. JENNIS:  Your Honor, thank you.  David

17   Jennis, as proposed local counsel.

18        Your Honor, I apologize that we're not from

19   Jacksonville.  I can understand -- I can

20   understand a number of the arguments that are

21   being made.  And I have two words to respond to

22   that:  Southwest Airlines.  Its plane fare is very

23   cheap from Tampa and it's very quick.  It is 45

24   minutes.

25        I understand the reasons why a lot of the

1    people in this courtroom would require or think

2    that Jacksonville counsel would be more

3    appropriate than our firm, and in some ways I

4    agree with them.

5        We were called in August, right after the

6    committee was retained.  The committee was not

7    able to get, at the time, a Jacksonville

8    presence.

9        They needed someone that had UCF filing

10    capabilities, which we do.  They needed someone

11    that was familiar with the local rules and

12    procedures.  The local rules for this court are

13    the same as in our district, in Tampa.  I realize

14    that there may be some nuances, and I will do my

15    best to learn them if the Court confirms our

16    employment.

17        But what I really wanted to bring to the --

18    to really put out to the Court is, we have --

19    being last on today's docket was an enlightening

20    experience.

21        We understand the burden or the cost that the

22    professionals in this case are having on this

23    case, so we can understand how some of the

24    constituencies would be concerned, particularly

25    being the last professional seeking employment

1     today.

2          We have done everything we can to work with

3     Ms. Denniston's firm and really minimize the

4     duplication of services, the duplication of

5     efforts.  We're acting as a local advisory.  We're

6     assisting them in filing when it's cheaper.

7          I have not appeared at any of the other

8     hearings, and, frankly, unless Ms. Denniston

9     decides she doesn't plan on coming back, I don't

10    plan on coming back unless it's an issue of my

11    employment or my fees.

12         We're really trying very, very hard to make

13    sure that we do not add to the administrative

14    burden that is on this case.

15         I need to respond to the objections in

16    twofold.

17         The unsecured creditors committee and the

18    retirees committee indicated that our employment

19    was premature.  I'm not going to repeat it.

20    Ms. Denniston has addressed that, and I think the

21    Court has considered those arguments in its

22    rulings on Paul, Hastings' fee application.

23         The retiree committee also spoke to our fee

24    structure.  Your Honor, we've done a survey, we've

25    done a survey in Tampa in connection with this,

1    and we did a survey the best we could in

2    Jacksonville, and we believe our rates are well

3    within the market rate for Jacksonville rate --

4    for Jacksonville rates.

5        And, frankly, Your Honor, the time to

6    determine whether our fees were reasonable for the

7    market and under the services rendered would be at

8    the time you consider fee applications.

9        So we would just simply state to the Court

10   that we don't plan on duplicating services.  We're

11   not here as another layer of expense.  The

12   committee asked us to do a job if they had a

13   conflict problem, and we have tried to address it,

14   and have done so since August 18th.

15       So we would ask the Court to consider those

16   in considering our application.

17       THE COURT:  The Court will approve or grant

18   the application, and it will be nunc pro tunc.

19       It's up to the United States Trustee and the

20   fee examiners to examine the fees of all of the

21   attorneys in this case and their local counsel and

22   to make sure that there is no duplication, or

23   a lot of duplication, of services.  And we rely on

24   them primarily for that information.  And then, if

25   there is duplication, the Court will deal with

1    that.

2        These are professionals, and I'm sure that

3    they will not take advantage of the estate.

4        Mr. McConnell, this is a tremendous case, and

5    there are tremendous fees that are going to be

6    paid here.  It's all a matter of perspective.  And

7    it's rough.  I just hope there's something left

8    when it's all said and done.

9        But I don't think the fees that will be --

10    assuming they stay around long enough to submit

11    fee applications and get paid the fees awarded and

12    paid to these people, they are going to be, just

13    in the scheme of things, not that large, with all

14    due respect and no disrespect intended.

15        Accordingly, I'll sign an order, if you have

16    one.  Or I may have one already.

17        Wait.  I've got an order right here.

18        MR. JENNIS:  Or Ms. Denniston may have handed

19    up one copy.  I have another copy.

20        THE COURT:  Yes.  Well, I just signed one.

21    And we'll scan them in, right?

22        COURTROOM ADMINISTRATOR:  Right.

23        THE COURT:  Order is signed, the hearing is

24    concluded.

25        And I think that concludes the calendar.

1            MR. BUSEY:  Yes, Your Honor.  That's all we

2       have on the agenda.

3  ...

4            (Whereupon, the proceedings were concluded at

5       2:30 p.m.)

6                       - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2  STATE OF FLORIDA )

 3  COUNTY OF DUVAL  )

 4          I, Elizabeth M. Masters, RPR, and Notary

 5  Public, State of Florida at Large, do hereby certify

 6  that the attached material represents the proceedings

 7  before the United States Bankruptcy Court, Middle

 8  District of Florida, Jacksonville Division, before the

 9  Honorable Jerry A. Funk, Bankruptcy Judge, in the

10  matter of In Re:  Winn-Dixie Stores, Inc.; such

11  transcript is an accurate recordation of the

12  proceedings which took place.  A transcript of this

13  proceeding has been produced on December 26th, 2005,

14  the original copy of which was delivered to the

15  Transcript Copy Custodian, Jacksonville, Florida.

16

17

18

19                      STATEWIDE REPORTING SERVICE

20

21

22

23                      ELIZABETH M. MASTERS, RPR

24

25
```