Exhibit "A"

**LEASE REVIEW**

DATE OF REVIEW: 3/7/94

**LANDLORD:** Mattiace Properties, Inc.

**TENANT:**   Jitney Jungle Stores of America, Inc.

**GUARANTY:**

**DATE:**   January 7, 1993

**PREMISES:**

**SHOPPING CENTER DESCRIPTION:** School Street Crossing Shopping
Center, Hwy 51 N. Ridgeland, Ms

|    |    |    | PAGE/SECTION |
|----|----|----|----|
| **1.** | **RENT:** | | |
|  | (A) | Minimum Fixed: $17,733.33/20yrs | 2/8 |
|  | (B) | Percentage: See overage payment | 5/28 |
|  |  | Exclusions: Deductions from overages | 5/28 |
|  | (C) | C.A.M.: Prorated but not as to structural | 5/26 |
|  | (D) | Taxes: Ad valorem-Prorated | 5/25 |
|  | (E) | Insurance: Fire & extended coverage Prorated | 5/27 |

**2.**   **TERM:** Twenty (20) years                                  1/6
**Renewal Options:** (4) Four for 5 years each              2/6
**Rent:** $17,733.33 per mo. during primary term           2/8
1st renewal $19,633.33, 2nd $20,266.66,
3rd $20,900, 4th $21,533.33
See paragraph 28 re: overage payment

**3.**   **USES PERMITTED:**  See Covenant 827/656,            6/29
Paragraph 29 of lease

**4.**   **USES RESTRICTED:** See Covenants 827/656            6/29
Paragraph 29 of lease

**5.**   **ASSIGNMENT AND SUBLET:** O.K. for any reason.      6/30
Tenant remains liable under lease.

**6.**   **CONSTRUCTION:**

|    |    |    |    |
|----|----|----|----|
|  | (A) | Other Buildings Obligated: Drug Store 6000 sq. ft. | 2/9 |
|  | (B) | Permitted: Alterations - O.K. Major w/Landlords permission | 3/15 |
|  | (C) | Tenant Provides: Fixtures and Damage | 3/17 |
|  | (D) | Begin: Deliver: Extensions: | 1/6 |
|  |  | Outside Date: 18 mos. from date or either party may terminate. | 6/2 |

7.  **PARKING:**
   (A)  **Per Text of Lease:** 4.6 cars per        /3
       1,000 sq. ft of gross leaseable space
   (B)  **Per Plot Plan:**

8.  **SIGNS:** Tenant pays for on its Building.    /14
     Pylon sign-Tenant at its own expense
     may be featured on same.

9.  **REPAIRS:**

| | Landlord | Tenant | |
|---|---|---|---|
| **Structural** | (X) | ( ) | 2/11 |
| **Exterior** | (X) | ( ) | 3/12 |
| **Roof** | (X) | ( ) | |
| **Interior** | ( ) | (X) | |
| **H.V.A.C.** | ( ) | (x) | |
| **Glass** | ( ) | (X) | unless caused by |
| **Emergency  $_____** | ( ) | ( ) | Landlord |
| **Common Area** | ( ) | ( ) | Prorated |

10. **FIRE:**
   **Leased Premises:** Landlord to insure Bldg to    4/19
   80% of value . Tenant to insure its fixtures
   & merchandise.

   **Other Premises:** Fire Insurance & ad valorem taxes
   prorated.

11. **INDEMNITY AND INSURANCE:**
   **Liability:**
    **By Tenant:**

       **Indemnity:**               3/13
       **Insurance:**             /19,13
       **Certificate:**
       **See Tenants Contribution re: Insurance**   5/27

    **By Landlord:**

       **Indemnity:**               3/13
       **Insurance:**             /19,13
       **Certificate:** Provide to tenant on
              current basis.

   **Hazard:**
   **By Tenant:**
   **Cover:** Inventory & fixtures to be
       insured by Tenant
   **Amount:**
   **Cost:**

   **By Landlord:**
    **Cover:**  Buildings
    **Amount:** 80% of value      4/19
    **Cost:**

   **Subrogation Waivers:**
    **Landlord vs. Tenant:** Waived
    **Tenant vs. Landlord:**     4/19

12. **CONDEMNATION:**        4/21

   **A. Parking:**        4/21

   **B. Building:** All part of premises.  Tenant  4/21
    may terminate. Rent may be reduced
    proportionally.

    **C. Other Buildings:**           4/21
    **D. Award:** Tenant may claim damages   4/21

**13. TITLE:**
    **Vested in:**  Mattiace
    **Excepts:**  See paragraph 22     4/22

**14. Default:**              6/32
    **Tenant:**
        **Event:** Rent or other charges    6/32
        **Right:** No acceleration      6/32
        **Event:**
        **Right:**

    **Landlord:**
        **Condition:** Tenant may make repairs and  6/33
        deduct from rent.
        Other Landlord defaults      6/33

**15. SUBORDINATION AND ATTORNMENT:**    4/23
    Lessee to subordinate to 1st Mortgage.
    Mortgagee to execute non-disturbance &
    attornment agreement.

**16. EXCULPATION:** Hold harmless, mutual   3/13

**17. NOTICES TO MORTGAGEE:**       7/33

**18. EXECUTION:** 1-7-93 OK       7/

**19. PLOT PLAN:** Attached.

**MISCELLANEOUS:**

Drug Store required.         2/9

<u>LEASE</u>

THIS IS A LEASE ("Lease") dated _JANUARY 7_ , 1993, by and between MATTIACE PROPERTIES, INC., a Mississippi corporation ("Landlord"), and JITNEY-JUNGLE STORES OF AMERICA, INC., a Mississippi corporation ("Tenant").

1.   <u>LEASE.</u>   For and in consideration of the mutual covenants, conditions and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of all of which are acknowledged, Landlord does hereby lease and demise to Tenant, and Tenant does hereby take and lease from Landlord, a store-room, which shall be approximately one hundred ninety-four (194) feet in width by one hundred forty-eight (148) feet in depth, together with a vestibule entry, receiving area and cooler/freezer pads, all of which for the purposes of this Lease shall be construed to be no more then thirty thousand four hundred (30,400) square feet ("Premises"), which is to be part of a shopping center to be constructed by Landlord on a portion of the tract of land situated at the Southeast corner of U. S. Hwy 51 and School Street in the City of Ridgeland, County of Madison, and State of Mississippi, being more particularly described in legal description attached hereto as EXHIBIT A and made a part hereof, together with all rights, privileges, easements and appurtenances thereto ("Land"). The layout of the shopping center to be constructed by Landlord is shown on the site plan attached hereto as EXHIBIT B and made a part hereof.

2.   <u>SURVEY.</u>   Within thirty (30) days after the date of this Lease, Landlord shall, at Landlord's expense, have a topographic survey of the Land, including boundary line measurements, conforming to the legal description set forth in EXHIBIT A prepared by a licensed surveyor and deliver three (3) copies of such survey to Tenant. If the dimensions shown by such survey vary materially, in Tenant's sole judgment, with reasonable discretion, from the description set forth in EXHIBIT A, or from those shown on the site plan attached as EXHIBIT B, Tenant may, within ten (10) days of receipt of such survey, terminate this Lease by notice to Landlord, whereupon all obligations of the parties hereunder shall cease.

3.   <u>SHOPPING CENTER, COMMON AREA.</u>   Landlord shall, at Landlord's expense, prepare the Land and construct thereon the shopping center as shown on EXHIBIT B including the Premises which are outlined in red thereon ("Shopping Center"). Landlord covenants and agrees that the Premises and the entire Shopping Center will be well built, properly constructed, structurally safe and sound, suitable and fit, and that Landlord shall during the term of this Lease, at Landlord's expense, so maintain them subject, however, to the provisions of Paragraph 12 hereof. EXHIBIT B designates the size and location of all buildings and structures in the Shopping Center, sidewalks and walkways, entrances and exits, driveways and accessways, the parking layout (which shall be sufficient for at least 4.6 cars per one thousand (1,000) square feet of gross leasable building area), parcel pick up lanes, and delivery service areas. All that portion of the Land not covered by buildings is to be common area for the joint use of all tenants, customers, invitees, and employees ("Common Area"). Landlord covenants and agrees that no part of the Common Area shall be occupied or obstructed by any additional buildings, structures or otherwise, nor may the parking layout including, but not limited to, entrances, exits, parking spaces, aisles, driveways, and walkways, be altered or removed without the prior written consent of Tenant. Landlord further covenants and agrees that Landlord shall not permit all or any part of the Common Area to be used for parking or any other purpose by any occupant or occupants or customers or invitees of any such occupant or occupants of adjacent or contiguous property (which includes property which would be adjacent or contiguous to the Common Area but for any intervening road, street, highway or waterway), and promptly upon request of Tenant, Landlord shall erect (and maintain as part of the Common Area) a fence or fences or any other barriers meeting Tenant's requirements to separate the Common Area from any such adjacent or contiguous property in order to prevent any such use. Notwithstanding anything contained herein to the contrary, Landlord may allow the occupants of the parcels shown as "OUTPARCEL 1" AND "OUTPARCEL 2" on EXHIBIT B and such occupants' customers and invitees to use the driveways of the Common Area for ingress and egress to and from each respective outparcels pursuant to a mutual driveway easement agreement to be executed by Landlord and the owners of said outparcels. Landlord shall, at Landlord's expense: (a) maintain the Common Area in good condition and repair which shall include, but not be limited to, keeping all paved areas smooth and free of pot-holes, keeping the parking area properly striped to assist in the orderly parking of cars, and keeping all of the Common Area clean including removing snow and ice therefrom; (b) keep all of the Common Area adequately lighted during hours of darkness when stores are open for business; (c) provide adequate security in the Common Area; and (d) maintain Public Liability and Property Damage insurance with a combined single limit of not less than $1,000,000.00 against claims arising from or out of the injury or death of persons while in the Common Area and against claims for damage to property therein, respectively. Landlord agrees that said insurance shall name Tenant as an additional insured and to furnish Tenant with a certificate of said insurance on a current basis. Notwithstanding anything contained hereinabove to the contrary, Tenant shall, at Tenant's sole cost and expense, keep the sidewalk in front of the Premises and the service area at the rear thereof (including truck docks/wells and compactor pads) clean and free of debris and litter from Tenant's operation on the Premises.

4.   <u>PLANS.</u>   Within thirty (30) days after the date of this Lease, Tenant shall furnish Landlord guide plans and general specifications setting forth Tenant's requirements for the construction of the Premises. It shall be the responsibility of Landlord to insure that the Premises, when completed, satisfy the requirements set forth in said guide plans and general specifications furnished by Tenant, and are complete and ready for installation of all Tenant's fixtures and equipment. The Premises shall be constructed according to final plans and specifications to be prepared by Landlord's architect ("Plans and Specifications"). Tenant shall have the right to approve the Plans and Specifications, but approval thereof shall not imply its approval of the structural or engineering design or the quality or fitness of any material or device used. The Plans and Specifications must be approved by Tenant prior to commencement of construction of the Premises by Landlord. Prior to the commencement of the construction of the Shopping Center, Landlord shall furnish to Tenant, for Tenant's approval, the final plans and specifications for the construction of the paving, grading, drainage, and utility installation, together with the final site plan showing the sidewalks, walkways, parking layout, parking lot lighting, driveways, service areas, and the size and location of all entrances and exits. It is understood and agreed between the parties hereto that Tenant's execution of this Lease incorporating the site plan attached as EXHIBIT B does not constitute Tenant's approval of the final site plan.

5.   <u>TENANT'S RIGHT TO INSTALL FIXTURES.</u>   Prior to completion of construction of the Shopping Center by Landlord, Tenant shall have the right and privilege to receive, store and install its trade fixtures in or on the Premises; provided, however, such receiving, storing, and installing shall be in a manner that will not interfere with Landlord's work. It is expressly agreed by the parties hereto that such action by Tenant shall not constitute acceptance of the Premises.

6.   <u>TERM.</u>   The primary term of this Lease shall be for a period of twenty (20) years commencing on the earlier of: (a) ninety (90) days after the date of delivery of possession of the Premises to Tenant, or (b) on the date Tenant opens for business in the Premises; and shall end on the last day of the month following the twentieth (20th) anniversary of the date of commencement. The date of delivery of possession of the Premises to Tenant shall be that date on which construction of the Premises is fully completed in accordance with the Plans and Specifications, that all tools, scaffolding, surplus building materials, waste, debris and rubbish

1

of every sort in or about the Premises resulting from Landlord's construction have been removed, that all required certificates of inspection or similar approvals have been delivered to Tenant, and that Tenant is in exclusive possession of the Premises. Landlord shall give Tenant notice specifying the date of delivery of possession of the Premises to Tenant at least seven (7) days in advance thereof. It is understood and agreed that within thirty (30) days after the commencement date of the primary term of this Lease, Landlord and Tenant shall execute a supplemental agreement, in recordable form, setting forth the actual commencement date hereof. Notwithstanding anything contained herein to the contrary, if the term of this Lease has not commenced within eighteen (18) months of the date hereof, either party may terminate this Lease by notice to the other party whereupon all obligations of the parties hereunder shall cease.

7.   RENEWAL OPTIONS. Tenant shall be entitled to four (4) successive renewals hereof, each for a term of five (5) years, upon the same terms and conditions as herein set forth, except as to rent, term and number of renewals and, unless Tenant shall notify Landlord not less than one hundred eighty (180) days prior to the expiration of the primary term, or of any renewal thereof, of its intention not to exercise its right to renew this Lease, Tenant shall be deemed to have exercised its option to renew this Lease for the next ensuing term and shall not be required to give Landlord any further notice of its intention to avail itself of such renewal term. In the event Tenant shall give notice of its intention not to exercise its right to renew this Lease, all succeeding renewals shall thereupon terminate. Should Tenant remain in possession of the Premises after any termination of this Lease or of any renewal term of which Tenant shall have availed itself or after any earlier termination provided or permitted herein, it shall be a tenant from month-to-month at the same rental and on the same conditions, except as to term, as provided herein.

8.   RENT. Tenant shall pay to Landlord, as rent for the Premises:

A. during the primary term of this Lease, the sum of Seventeen Thousand Seven Hundred Thirty-three and 33/100 Dollars ($17,733.33) per month;

B. during the first five (5) year renewal term, the sum of Nineteen Thousand Six Hundred Thirty-three and 33/100 Dollars ($19,633.33) per month;

C. during the second five (5) year renewal term, the sum of Twenty Thousand Two Hundred Sixty-six and 66/100 Dollars ($20,266.66) per month;

D. during the third five (5) year renewal term, the sum of Twenty Thousand Nine Hundred and 00/100 Dollars ($20,900.00) per month; and

E. during the last five (5) year renewal term, the sum of Twenty-one Thousand Five Hundred Thirty-three and 33/100 Dollars ($21,533.33) per month.

Each monthly installment of rent shall be payable in advance on the first day of the month. Rent for any period less than a calendar month shall be prorated. Subject to the provisions of Paragraph 9 hereof, rental hereunder shall commence on the first day of the term hereof. If at any time rent should become due for a part of a month, such rent shall be prorated and paid on or before the tenth (10th) day of the following month.

9.   CONDITIONS PRECEDENT. Notwithstanding anything contained in this Lease to the contrary, Landlord and Tenant agree that the rent and other monetary charges provided herein shall not accrue, or be payable by Tenant to Landlord, notwithstanding the commencement of the primary term, unless and until the following conditions obtain: (a) Landlord has entered into leases with the following tenant for occupancy in the Shopping Center as shown on EXHIBIT B:

| Tenant | Premises | Term |
|--------|----------|------|
| Drug Store | Minimum 6,000 SF | 15 years |

and such tenant is open, or are stocking its premises preparatory to opening, for business; and (b) all of the sidewalks and walkways, entrances and exits, driveways and accessways, the parking lot, parcel pick up lanes, and delivery service areas of the Shopping Center shown on EXHIBIT B are completed and open to traffic.

10.   COMPLIANCE WITH LAWS. Landlord represents and warrants to Tenant that on the date of delivery of possession of the Premises to Tenant, the Premises and the Shopping Center shall be in compliance with all laws, ordinances, orders, rules, regulations, and other governmental requirements relating to the use, condition, and occupancy thereof including the Americans with Disabilities Act and those relating to public health and safety and protection of the environment, and all rules, orders, regulations, and requirements of the National Board of Fire Underwriters or any similar body having jurisdiction over the Premises and the Shopping Center. With respect to both the Premises and the Shopping Center, Landlord shall indemnify and hold harmless Tenant, from and against any and all losses, claims, damages, penalties, and liability, including court costs and reasonable attorney's fees, arising, directly or indirectly, out of the use, generation, storage, release, or disposal of hazardous materials by Landlord, its agents, employees or tenants, or by any prior owner or occupant of the Land, and from and against the cost of any required repair, cleanup, or detoxification and any closure or other required plans to the full extent that such action is attributable, directly or indirectly, to the presence or use, generation, storage, release, threatened release, or disposal of hazardous materials by such parties. Tenant represents and warrants to Landlord that Tenant shall comply with all laws, ordinances, orders, rules, regulations, and other governmental requirements relating to the use and occupancy of the Premises by Tenant including the Americans with Disabilities Act and those relating to public health and safety and protection of the environment, and all rules, orders, regulations, and requirements of the National Board of Fire Underwriters or any similar body having jurisdiction over the Premises. With respect to both the Premises and the Shopping Center, Tenant shall indemnify and hold harmless Landlord, from and against any and all losses, claims, damages, penalties, and liability, including court costs and reasonable attorney's fees, arising, directly or indirectly, out of the use, generation, storage, release, or disposal of hazardous materials by Tenant, its agents, employees or subtenants, and from and against the cost of any required repair, cleanup, or detoxification and any closure or other required plans to the full extent that such action is attributable, directly or indirectly, to the presence or use, generation, storage, release, threatened release, or disposal of hazardous materials by such parties. The term "hazardous materials" as used in this paragraph shall include, but is not limited to, substances defined as "hazardous substances", "hazardous materials" or "toxic substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. # 9601 et. seq.; the Hazardous Materials Transportation Act, 49 U.S.C. # 1801, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. # 6901, et seq.; and those substances defined as hazardous, toxic, hazardous wastes, toxic wastes, or as hazardous or toxic substances by any law or statute now or after this date in effect in the State of Mississippi; and in the regulations adopted and publications promulgated pursuant to those laws.

11.   LANDLORD REPAIRS. Landlord shall, at Landlord's expense, supply any apparatus, appliance or material and shall cause any work to be done in and about the Premises which may be required or ordered by any lawful

2

authority unless such requirement is brought about specifically by Tenant's particular type of business operation, in which case Tenant shall, at Tenant's expense, supply and install the same. Landlord shall, at Landlord's expense, maintain all structural portions of the Premises and the exterior of thereof including, but not limited to, repair and/or replacement of, footings, foundations, floor slabs, support columns, joists, the roof, utility service lines, loading docks, truck wells, and exterior walls, canopies, gutters and downspouts (including painting); provided, however, Landlord's obligation of repair and maintenance shall not extend to repair or maintenance due to gross negligence or willful misconduct of Tenant, its agents or employees. Landlord has both the right and the responsibility to enter the Premises periodically, at any reasonable time, to inspect the condition of the Premises and make repairs. All repairs, restorations, alterations and/or additions, which are obligations of the Landlord, shall be completed with due diligence and shall be performed so as to cause the least possible interference with Tenant's operation. Any damage to Tenant's property or otherwise occurring by reason of Landlord's failure to maintain and repair the Premises as set forth in this paragraph shall be borne by Landlord.

**12.  TENANT REPAIRS.**  Tenant shall, at Tenant's expense, maintain the interior of the Premises including, but not limited to, repair and/or replacement of, the ceiling, interior walls, floor coverings, interior and exterior doors and door mechanisms, plumbing, HVAC, electrical and sprinkler systems, and shall redecorate the interior of the Premises from time to time as necessary; provided, however, Tenant's obligation of repair and maintenance shall not extend to repair or maintenance due to structural defects or to defective materials or work of Landlord, its agents or employees, and Landlord assumes liability for plate glass breakage during the term of this Lease unless caused by Landlord, its agents or employees, or structural defects or failure. Tenant shall pay all connection fees and charges for utilities and services used by it in the Premises. Upon the expiration or sooner termination of this Lease, Tenant shall surrender possession of the Premises to Landlord in as good condition as when received; normal wear and tear and damage fire, the elements or other casualty excepted.

**13.  HOLD HARMLESS.**  Landlord shall indemnify and hold Tenant harmless from any and all claims which may arise from, on, in or about the Premises and Common Area when such claims arise out of or are caused in whole or in part by a defective, dangerous, or unsafe condition of the Premises or Common Areas, equipment, fixtures, or appurtenances required by the terms of this Lease to be maintained in good repair by Landlord; and Tenant shall indemnify and hold Landlord harmless from any and all claims which may arise from, on, in or about the Premises when such claims arise out of or are caused in whole or in part by a defective, dangerous, or unsafe condition of the Premises, equipment, fixtures, or appurtenances required by the terms of this Lease to be maintained in good repair by Tenant.

**14.  SIGNS.**  Tenant shall have the right, at Tenant's expense, in conformity with all applicable laws and ordinances, to erect, and thereafter to replace if Tenant shall so elect, signs on the exterior of the Premises. If Landlord shall at any time erect a pylon sign advertising the occupants of the Shopping Center, Tenant shall have the right, at Tenant's expense, to be prominently featured thereon. If Tenant elects to be so featured then, in that event, the design and location of the pylon sign shall be subject to Tenant's prior written consent, which consent shall not be unreasonably withheld or delayed, and Tenant shall pay to Landlord Tenant's pro rata share of the cost of erecting and maintaining said pylon sign based on the area of Tenant's sign to the total area of all signs to be placed on said pylon.

**15.  ALTERATIONS.**  Any remodeling, alterations, and additions to the interior of the Premises which Tenant may deem necessary shall be made by Tenant, at Tenant's expense, and Landlord hereby consents thereto. Major structural changes to, and any changes which alter the North and West exterior elevations of, the Premises shall be made only with Landlord's written consent, which consent shall not be unreasonably withheld or delayed. Tenant shall be under no obligation to restore or remove any such changes upon any termination of this Lease.

**16.  ENLARGEMENT.**  Tenant is hereby granted the right, at the end of the fifth (5th), tenth (10th) and fifteenth (15th) lease years, to enlarge the Premises into that area immediately adjacent to the Premises, which is outlined in green on EXHIBIT B. Tenant shall exercise such right by giving Landlord notice thereof on or before the beginning of such lease year. The financing and other terms and conditions of such enlargement and the rent therefor shall be as negotiated in good faith between Landlord and Tenant. If no agreement is reached between the parties within twelve (12) months after such notice then, in that event, Tenant's right to enlarge at that time shall terminate forthwith. Such enlargement shall be of the same architectural style and building quality as the original building and shall be constructed to plans and specifications approved by Landlord and Tenant. In order to facilitate the expansion of the Premises as contemplated herein, Landlord agrees that the buildings within the expansion area shall be of like structural quality and in architectural harmony with the Premises and shall have a finished floor level, roof and ceiling heights which shall be at the same elevation as the finished floor level, roof and ceiling heights of the Premises. Further, Landlord agrees that the wall of the Premises adjoining the expansion area shall be constructed with steel column supports therein equivalently spaced to the nearest row of steel column supports within the Premises and such steel column supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the Premises and of the expansion area.

**17.  TENANT'S FIXTURES.**  All fixtures and equipment, of whatsoever nature, placed or installed in or upon the Premises by Tenant shall remain its property, and Tenant shall have the right to remove the same at any time; provided, however, Tenant shall repair any damage to the Premises caused by such removal, normal wear and tear excepted.

**18.  DAMAGE, DESTRUCTION.**  If any part of the Shopping Center, including the Common Area, shall be damaged or destroyed by fire, casualty or other causes, Landlord shall commence promptly, and with due diligence continue, to restore same to the same condition as existed immediately preceding such damage or destruction. If the Premises shall be damaged or destroyed by fire, casualty or other causes, Landlord shall commence promptly, and with due diligence continue, to restore same to the same condition as existed immediately preceding such damage or destruction, and until restored there shall be an abatement or a reduction of the rent in proportion to the area of the Premises rendered unusable by such damage or destruction; provided, however, if at any time during the last two (2) years of the primary term, or any renewal term, the Premises shall become damaged or destroyed by fire, casualty or other causes so as to render them wholly untenantable, then either party shall have the right, exercisable by notice to the other within thirty (30) days after damage or destruction, to terminate this Lease whereupon all obligations of the parties hereto shall cease except that any rental paid in advance and at the time unearned shall be refunded by Landlord to Tenant. Notwithstanding the foregoing, if at the time of such damage or destruction there remains any unexercised option to renew the term of this Lease, and Landlord shall have elected to terminate this Lease as aforesaid, Tenant shall have the right to nullify such election by giving Landlord notice of its election to renew the term hereof, which notice must be given no later than fifteen (15) days after the giving of Landlord's notice to terminate, and Landlord shall thereupon commence promptly, and with due diligence continue, to restore the Premises to the same condition as existed immediately preceding such damage or destruction, and until restored, there shall be an abatement of rent.

3

19. **LANDLORD TO INSURE.** Except as otherwise provided herein, Landlord shall not be liable for any damage to the fixtures or merchandise of Tenant caused by fire or other hazards normally covered by fire and extended coverage insurance, regardless of the cause thereof, and Tenant does hereby expressly release Landlord of and from all liability for such damages. Tenant shall not be liable for any damage to the Premises, or any part thereof, caused by fire or other insurable hazards, regardless of the cause thereof, and Landlord does hereby expressly release Tenant of and from all liability for such damage. Landlord shall keep the Premises insured for fire and extended coverage under a so-called "All Risk" policy, for at least eighty percent (80%) of the insurable value thereof in responsible insurance companies authorized to do fire and extended coverage insurance business in the State of Mississippi. Landlord agrees that said policy shall include a clause waiving rights of subrogation against Tenant and to furnish Tenant with a certificate of said insurance on a current basis.

20. **RESTRICTION OF ACCESS.** If any street, adjoining right of way, or all or any part of the Common Area is obstructed or blocked by Landlord or any third party for construction, repairs, reconstruction or otherwise, to the extent the operation of Tenant's business is adversely affected, a proportionate reduction of rent shall be made. If customer access to the Premises is blocked, rent shall abate. Notwithstanding anything herein to the contrary, there shall be no reduction or abatement of rent if Tenant's business shall be adversely affected by any of the enumerated events if such events are caused by third parties over whom Landlord has no control, provided Landlord uses its best efforts to minimize any such interference.

21. **CONDEMNATION.** In the event the Premises or any part thereof, are taken in condemnation proceedings, either party may terminate this Lease by notice to the other party, whereupon all obligations of the parties hereunder shall cease. In the event that neither party terminates this Lease then, in that event, Landlord shall promptly commence, and with due diligence continue, to restore the Premises to proper tenantable condition forthwith, and until restored there shall be an abatement or a reduction of the rent in proportion to the area of the Premises rendered unusable during such restoration. Thereafter rent shall be reduced in proportion to the amount of building area lost. In the event any part of the buildings of the Shopping Center or of the Common Area or of the rights-of-way adjoining or of the approaches to the Shopping Center are taken in condemnation proceedings so that in the judgment of the Tenant the Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may terminate this Lease by giving Landlord notice, or at its option, retain the Premises, in which event Landlord shall restore the remaining Shopping Center to proper tenantable condition forthwith. Until the Shopping Center is restored to proper tenantable condition, rent shall abate in proportion to the area of the Common Area rendered unusable during such restoration. Thereafter rent shall be reduced in proportion to the amount of Land and/or building area lost. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings. Nothing herein contained shall constitute a waiver of Tenant's right to compensation for damages. Tenant agrees to exercise its judgment reasonably.

22. **TITLE.** Landlord represents and warrants to Tenant that Landlord has or will acquire lawful title to the Land and has the right to enter into this Lease for the term aforesaid and that upon the commencement of the term of this Lease, the Premises and the entire Shopping Center shall be free and clear of any and all liens and encumbrances except: (a) any first mortgage or deed of trust and related financing documents covering the development of the Shopping Center; (b) any prior reservation or conveyance of oil, gas or other minerals in, on or under the Land; (c) that certain Easement to Mississippi Power and Light Company recorded in Book 11 at Page 471 in the Office of the Chancery Clerk of Madison County, Mississippi; (d) terms and conditions contained in that certain Deed to the City of Ridgeland recorded in Book 179 at Page 504 in the Office of the Chancery Clerk of Madison County, Mississippi; (e) any mutual driveway easement agreements as contemplated in Paragraph 3 hereof; (f) real estate taxes and assessments for the current year and thereafter which will be paid by Landlord as they become due and payable. Landlord further represents and warrants to Tenant that items (c) and (d) above do not adversely affect the utilization of the Premises or the Shopping Center; that Landlord will put Tenant into complete and exclusive possession of the Premises, including joint use of the Common Area, free from all orders, restrictions and notices of any governmental or quasi-governmental authority; and that if Tenant shall pay the rental and perform all the covenants and provisions of this Lease to be performed by Tenant, Tenant shall, during the term of this Lease, freely, peaceably and quietly occupy and enjoy the full possession of the Premises, including the joint use of the Common Area, without molestation or hindrance from persons claiming by or through Landlord. Landlord and Tenant have executed a Memorandum of Lease ("Memorandum") simultaneously with the execution hereof. Landlord covenants and agrees that if it is the fee owner of the Land on the date hereof, it shall record the Memorandum not later than five (5) days after said date and that, if Landlord is not the fee owner on said date, it shall record the Memorandum on the date on which Landlord shall purchase said Land. Landlord further covenants and agrees that, within fifteen (15) days after the date of recording of the Memorandum, Landlord shall return the original recorded Memorandum to Tenant together with an attorney's certificate of title or a commitment for title insurance showing the Memorandum of record and the title to be as warranted and represented in this Lease. If the state of title as indicated by such certificate or commitment, as the case may be, shall be other than as warranted and represented, Tenant may, in addition to any other rights it may have hereunder, terminate this Lease by giving Landlord notice, whereupon all obligations of the parties hereunder shall cease. Landlord and Tenant agree that only the Memorandum and supplemental agreement set forth in Paragraph 6 shall be recorded. In the event Landlord shall assign all or any part of the interest of Landlord in the Shopping Center or this Lease, Landlord shall within ten (10) days after such assignment give Tenant notice of the name and address of such assignee and a copy of the document evidencing such assignment.

23. **SUBORDINATION.** Tenant agrees that this Lease may be made subject and subordinate to the lien of any first mortgage or deed of trust that may be placed on the Shopping Center by Landlord; provided, however, as a condition to such subordination, Landlord shall obtain from any such mortgagee or trustee a subordination, non-disturbance and attornment agreement, in a form acceptable to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this Lease, its tenancy shall be and remain undisturbed, that this Lease shall not be affected by any default under any such mortgage or deed of trust, and that in the event of foreclosure or any enforcement of any such mortgage or deed of trust, the rights of Tenant hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect. In the event Landlord shall place a mortgage or deed of trust on all or any part of the Shopping Center, Landlord shall within ten (10) days after the placing of such mortgage or deed of trust give Tenant notice of the name and address of the holder of such mortgage or deed of trust.

24. **ESTOPPEL CERTIFICATES.** Each of the parties to this Lease shall, without charge to the other, at any reasonable time and from time to time, within ten (10) days after notice from the other party, deliver an estoppel certificate to such party or to any third party specified by such party, duly executed and acknowledged, certifying: that this Lease is unmodified and is in full force and effect or, if modified, that this Lease is in full force and effect as modified and specifying such modifications; the dates to which the rent and any other payments payable by Tenant under this Lease have been paid in advance; that, to the best knowledge of the signer of such certificate that the other party is not in default in the performance of any of the terms, covenants or conditions of this Lease, and if so, specifying the nature of each such default of which the signer may have knowledge; whether or not there are any then-existing setoffs or defenses against the

4

enforcement of any of the terms, covenants and conditions of this Lease, and if so, specifying the nature of same; and to such other statements of fact relating to this Lease as may be reasonably requested.

**25. TENANT'S CONTRIBUTION - TAXES.** Tenant agrees to pay all ad valorem taxes on Tenant's stock, trade fixtures and equipment located in the Premises. Tenant further agrees, subject to the terms and conditions contained herein, to pay to Landlord Tenant's pro rata share of real estate ad valorem taxes assessed against the Shopping Center, computed by multiplying the total amount of such taxes by a fraction, the denominator of which shall be the aggregate square footage of gross leasable area in the Shopping Center and numerator of which shall be the total number of square feet in the Premises. Landlord shall, within ninety (90) days following receipt of the tax bills for each tax year, furnish Tenant copies of said tax bills for such tax year and copies of the assessments on which such tax bills are based and all facts, data and information needed to calculate Tenant's share of such taxes as provided in this paragraph, and payment from Tenant shall be due within thirty (30) days thereafter. Tenant shall not be liable for the payment of any interest or penalty incurred by Landlord on such tax bill as a result of late payment so long as payment from Tenant is received within such thirty (30) day period. Should Landlord fail to present such tax bills and other information within such ninety (90) day period, Tenant shall be relieved of the obligation to pay Landlord its share of such taxes included in such payment. Tenant shall have the right in the name of Landlord, but at Tenant's expense, to take whatever action (including litigation) Tenant deems necessary to contest the validity or amount of the assessed valuation of the Premises or of the Shopping Center or of the ad valorem tax for any tax year, and Tenant, at Tenant's expense, may undertake by appropriate proceedings in the name of Landlord, or Tenant, to contest or effect a review of the validity or amount of the assessed valuation of the ad valorem tax for any tax year; provided, however, that Tenant provides adequate security to prevent the foreclosure of any tax lien during the course of or upon the conclusion of any such contest or review. If there is any remission or refund of all or any part of Tenant's tax payment for any tax year for which Tenant's tax payment has been paid, Tenant shall be entitled, without demand, to an appropriate refund of such taxes.

**26. TENANT'S CONTRIBUTION - CAM.** Tenant shall pay to Landlord Tenant's pro rata share of Landlord's expense in maintaining, repairing, striping, cleaning, lighting, providing security and insuring the Common Area as provided in Paragraph 3 hereof; provided, however, Tenant shall not be obligated to pay to Landlord any share of any such expense arising from repair and/or maintenance due to structural defects or failure, defective materials or work of Landlord, or to negligence of Landlord, its employees or agents. Tenant shall pay to Landlord, with the rent, the amount of Six Hundred and 00/100 Dollars ($600.00) per month to apply against Tenant's pro rata share of such expenses (which amount may be changed from time to time by mutual agreement of Landlord and Tenant). Landlord shall, within ninety (90) days following the end of each calendar year, furnish Tenant copies of paid invoices for such expenses for the preceding calendar year and all facts, data and information needed to calculate Tenant's share of such expenses as provided in this paragraph. Any excess paid by Tenant by means of said monthly payments shall be promptly refunded by Landlord to Tenant therewith, and any deficiency shall be paid by Tenant to Landlord within thirty (30) days thereafter. Should Landlord fail to present such paid invoices within such ninety (90) day period, Tenant shall be relieved of the obligation to pay Landlord the amount of any such deficiency for such calendar year. If Landlord, after receipt of notice from Tenant, shall fail to perform such services in a reasonable time, Tenant shall have the right to cause such services to be performed for Landlord's account and Landlord shall reimburse Tenant, promptly upon demand, any and all amounts so paid by Tenant. Tenant's pro rata share of such expenses shall be determined in the same manner as its share for ad valorem taxes.

**27. TENANT'S CONTRIBUTION - INSURANCE.** Tenant shall pay to Landlord Tenant's pro rata share of the annual premium paid by Landlord for fire and extended coverage insurance as provided in Paragraph 19 hereof. Tenant shall pay to Landlord, with the rent, the sum of Two Hundred and 00/100 Dollars ($200.00) per month to apply against Tenant's pro rata share of such premiums (which amount may be changed from time to time by mutual agreement of Landlord and Tenant). Landlord shall furnish Tenant, within ninety (90) days of payment of such annual insurance premiums, copies of the premium notices and all facts, data and information needed to calculate Tenant's share of such insurance premiums as provided in this paragraph. Any excess paid by Tenant by means of said monthly payments shall be promptly refunded by Landlord to Tenant therewith, and any deficiency shall be paid by Tenant to Landlord within thirty (30) days thereafter. Should Landlord fail to present such premium notices and other information within such ninety (90) day period, Tenant shall be relieved of the obligation to pay Landlord its share of such deficiency for such period. Upon any termination of this Lease, Landlord shall pay to Tenant the amount of any unearned premium for which Tenant has reimbursed Landlord pursuant to the provisions hereof. Tenant's pro rata share of such insurance shall be determined in the same manner as its share for ad valorem taxes.

**28. OVERAGE PAYMENT.** Tenant agrees to pay to Landlord as additional payment to Landlord a sum of money computed and payable as follows: within sixty (60) days following the end of each lease year, and also within sixty (60) days following any termination of this Lease, Tenant agrees to deliver to the Landlord a statement showing the gross sales (as herein defined) made in or from the Premises during the preceding lease year. Tenant shall pay to Landlord, at the time such statement is delivered, an amount, if any, by which the following percentages of gross sales made by Tenant during the preceding lease year exceed the annual rent and any contributions for real estate taxes, Common Area maintenance, and/or insurance paid by Tenant under paragraphs 25, 26 and 27 hereof for such period:

   A. during the primary term of this Lease: one percent (1%) of gross sales from $21,280,000.00 to $23,280,000.00; one-half percent (1/2%) of gross sales from $23,280,000.00 to $25,280,000.00; and one-quarter percent (1/4%) of gross sales in excess of $25,280,000.00;

   B. during the first five (5) year renewal term: one percent (1%) of gross sales from $23,560,000.00 to $25,560,000.00; one-half percent (1/2%) of gross sales from $25,560,000.00 to $27,560,000.00; and one-quarter percent (1/4%) of gross sales in excess of $27,560,000.00; and

   C. during the second five (5) year renewal term: one percent (1%) of gross sales from $24,320,000.00 to $26,320,000.00; one-half percent (1/2%) of gross sales from $26,320,000.00 to $28,320,000.00; and one-quarter percent (1/4%) of gross sales in excess of $28,320,000.00;

   D. during the third five (5) year renewal term: one percent (1%) of gross sales from $25,080,000.00 to $27,080,000.00; one-half percent (1/2%) of gross sales from $27,080,000.00 to $29,080,000.00; and one-quarter percent (1/4%) of gross sales in excess of $29,080,000.00; and

   E. during the last five (5) year renewal term: one percent (1%) of gross sales from $25,840,000.00 to $27,840,000.00; one-half percent (1/2%) of gross sales from $27,840,000.00 to $29,840,000.00; and one-quarter percent (1/4%) of gross sales in excess of $29,840,000.00.

The term "gross sales" as used herein, shall mean the total amount of all sales made in or from the Premises after deducting therefrom rebates; refunds; allowances to customers; sales taxes imposed by any governmental authority; cash discounts; sales of cigarettes and other tobacco products, alcoholic beverages and motor vehicle fuels; cost of trading stamps; receipts from sales of money orders, U.S. Postage stamps or postal or

5

similar services; income from check cashing, collection of utility bills or banking activities; or sales of lottery tickets, hunting or fishing licenses or insurance; or receipts from video or vending machines; or value added, sales or excise taxes.  The term "lease year" shall mean a period of twelve (12) successive months.  If this Lease commences other than on the first day of the month, then the gross sales for the fractional part of the first month shall be included with the gross sales made in the next twelve (12) month period.  In the event the Premises are ever occupied under a month-to-month tenancy, the percentage payment hereunder shall either be calculated on an annual basis if the Premises are occupied for a full year, or, if not occupied for a full year, shall be calculated on the basis of the sales made in or from the Premises during the proportionate part of the year in which rent is paid for the Premises by Tenant.  Payment in such case shall be made within sixty (60) days following the end of each year of such tenancy or other earlier termination of such tenancy.  Nothing herein contained shall be construed to indicate that such payments are rentals and Tenant shall at no time be liable for any such payments except those specified herein resulting from actual sales (as hereinabove defined) by Tenant.

**29.  RESTRICTIVE COVENANTS.**    Landlord covenants and agrees, from and after the date of this Lease and so long as this Lease shall be in effect, not to lease, rent, occupy, or suffer or permit to be occupied, any part of the Shopping Center or any other premises owned or controlled, directly or indirectly, by Landlord which are within one (1) mile of the Shopping Center for the purpose of conducting therein or for use as, a food store or a food department or for the storage or sale for off-premises consumption of groceries, meats, produce, dairy products, bakery products, or any of them; and further, that if Landlord owns any land, or hereafter during the term of this Lease Landlord acquires any land, within such distance of the Shopping Center, neither will convey the same without imposing thereon a restriction to secure compliance with the terms of this paragraph; provided, however, that nothing contained herein shall prevent any tenant in the Shopping Center from storing and selling such products as an incidental part of its other and principal business so long as the total number of square feet devoted by such tenant to the storage and display for sale of such products does not exceed ten percent (10%) of the total number of square feet of building area leased by such tenant in the Shopping Center, or one thousand (1,000) square feet (including, in either such case, 1/2 of the aisle space adjacent to any storage or display area), whichever is smaller.  Notwithstanding the foregoing, it is understood and agreed that if any first Mortgagee shall become the owner of the Shopping Center, this paragraph shall not be applicable to any property, other than the Shopping Center, which such Mortgagee may then or thereafter own.  This covenant shall run with the land.  Landlord further covenants and agrees, from and after the date of this Lease and so long as this Lease shall be in effect, not to lease, rent occupy, or suffer or permit to be occupied, any part of the Shopping Center for use as an arcade, pool hall, game room and the like; or as a nightclub, bar, lounge and the like; or as a funeral home, theater, banquet hall, bowling alley and the like; or as a so called "adult book store", "adult video shop" and the like; and that no more than five percent (5%) of the gross leasable area of the Shopping Center shall be leased for medical, insurance or real estate offices and the like.  Tenant is hereby granted the exclusive right and option to operate a gas island for the sale of motor vehicle fuels within the Shopping Center.

**30.  USE, ASSIGNMENT, SUBLEASING.**  Tenant shall have the right to use the Premises for any lawful purpose, and to assign this Lease or sublet all or any part of the Premises without obtaining the consent of Landlord therefor.  In the event of any such subletting or assignment, however, Tenant shall remain liable to Landlord for the performance of all of the terms and conditions of this Lease.

**31.  NOTICES.**  Rent and other sums due hereunder shall be sent to Landlord at:

> 1818 Crane Ridge Drive
> Jackson, MS 39216

All notices required under this Lease shall be in writing and shall be deemed properly served if hand delivered, or sent certified or Express Mail, or by Federal Express or similar courier service, with acknowledgment of receipt, postage or fee prepaid, to Landlord at the above address or to Tenant at:

> 453 North Hill Street (Zip: 39202)
> P.O. Box 3409
> Jackson, MS 39207
> Attn: Real Estate Department

or to any subsequent address which either may designate by notice to the other for such purpose.  Date of service of any notice shall be the date on which such notice is deposited in the mail or with the courier service directed to the appropriate address as set forth herein.

**32.  DEFAULT BY TENANT.**  The failure of Tenant to pay any rent or other charges payable under this Lease on or before the due date of the same and the continued failure to pay the same for ten (10) days after notice thereof, or the failure of Tenant to fully and promptly perform any other act required of it in the performance of this Lease or to otherwise comply with any other term or provision hereof and the continuance of such default remains uncorrected for a period of thirty (30) days after notice thereof (unless such default is of a nature that cannot be cured within thirty (30) days and Tenant has within said period of time commenced to cure the same and thereafter, with due diligence, effects the curing of same) shall constitute a default by Tenant.  In the event of any such default by Tenant, Landlord may: (a) perform such obligations on behalf, and at the expense, of Tenant, and Tenant shall reimburse Landlord promptly upon demand any and all amounts so paid by Landlord as additional rents secured hereunder; or (b) terminate this Lease and Tenant's rights hereunder, and declare all matured rents and other matured sums due and payable; or (c) re-enter Premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, relet the Premises at the best possible rent readily obtainable (making reasonable efforts therefor), and receive the rent therefrom; provided, however, Tenant shall remain liable for the equivalent of the amount of all rent reserved herein less the avails of reletting, if any, after deducting therefrom the reasonable cost of obtaining possession of the Premises and of any repairs and alterations necessary to prepare the Premises for reletting.  Any and all monthly deficiencies so payable by Tenant shall be paid monthly on the date herein provided for the payment of rent.  Landlord's remedies as provided herein shall not be deemed to be all-inclusive of Landlord's remedies as Landlord, in addition, shall have all remedies available to Landlord at law and in equity provided Landlord shall, in all instances, be required to mitigate damages.  If a petition in bankruptcy shall be filed by Tenant, or if Tenant shall be adjudicated bankrupt, or if Tenant shall make a general assignment for the benefit of creditors, or if in any proceeding based upon the insolvency of Tenant a receiver or all the property of Tenant shall be appointed and shall not be discharged within one hundred eighty (180) days after such appointment then, in that event, Landlord may terminate this Lease by notice to Tenant; provided, however, neither bankruptcy, insolvency, an assignment for the benefit of creditors nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of Tenant to be performed shall be performed by Tenant or any person claiming by or through Tenant.

**33.  DEFAULT BY LANDLORD.**  The failure of Landlord to fully and promptly perform any act required of Landlord in the performance of this Lease, including but not limited to repairs and/or maintenance of the Premises or of the Shopping Center including the Common Area, or to otherwise comply with any other term or

provision of this Lease and such default continues for a period of thirty (30) days after notice from Tenant (unless such default is of a nature that cannot be cured within thirty (30) days and Landlord has within said period of time commenced to cure the same and thereafter, with due diligence, effects the curing of same) shall constitute a default by Landlord. In the event of any such default by Landlord, Tenant may make such repairs, perform such maintenance and/or such other obligations all on behalf, and at the expense, of Landlord and Landlord shall reimburse Tenant promptly upon demand any and all amounts so paid by Tenant failing which Tenant may, without liability or forfeiture of its term or terms under this Lease, deduct such amounts from the rent and other payments thereafter payable; and/or sue for injunctive relief, specific performance, and/or damages, as the case may be. In the event of a material default by Landlord, Tenant may terminate this Lease by notice to Landlord. Tenant's remedies as provided in this paragraph shall not be deemed to be all-inclusive of Tenant's remedies as Tenant, in addition, shall have all remedies available to Tenant at law and in equity. The performance of each and every agreement of this Lease on the part of Landlord to be performed shall be a condition precedent to the right of Landlord to collect rent and other sums hereunder and/or to enforce the terms of this Lease against Tenant. Tenant agrees to give notice to the holder of any first mortgage or deed of trust encumbering the Premises (provided Tenant has first been given notice of the name and address of such holder) of any default of Landlord, and thereupon the holder of such mortgage or deed of trust shall have the right, but not the obligation, to cure such default, and Tenant shall not exercise its rights under this paragraph by reason of such default unless and until Tenant has afforded such holder thirty (30) days after such notice in which to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said thirty (30) day period. Notwithstanding anything contained in this paragraph to the contrary, Tenant may, at any time, make emergency repairs otherwise required to be made by Landlord on behalf, and at the expense, of Landlord provided Tenant shall use reasonable efforts to contact Landlord by telephone or other means to advise Landlord of the need for such emergency repairs prior to making same. Landlord shall reimburse Tenant promptly upon demand any and all amounts paid by Tenant for all such emergency repairs failing which Tenant may, without liability or forfeiture of its term or terms under this Lease, deduct such amounts from the rent and other payments thereafter payable. Emergency repairs shall be deemed those necessary for prevention of eminent injury of persons or loss or damage to property. Landlord hereby releases Tenant from any and all liability with respect to any repairs, maintenance and/or other obligations undertaken by Tenant on behalf of Landlord.

**34.  FORCE MAJEURE.** Anything in this Lease to the contrary notwithstanding, neither Landlord nor Tenant shall be deemed in default with respect to the performance of any of the terms, conditions or covenants of this Lease to be performed by either of them if such failure or performance shall be due to any strike, labor dispute, picketing, inability to obtain necessary materials, Act of God, or due to any other similar cause whatever beyond the control of either party, and the time for performing by Landlord and/or Tenant shall be extended by the period of delay resulting from or due to any of said causes.

**35.  GENERAL PROVISIONS.** Time is of the essence of this Lease, but no delay or failure of either party to exercise any right hereunder or to insist upon strict compliance with the terms and provisions hereof shall constitute a waiver of any right hereunder or a waiver of the right thereafter to insist upon strict compliance with the terms and provisions hereof. No obligation not stated herein shall be imposed on either party hereto.

The headings in this Lease are for convenience only and are not part of this Lease and do not in any way limit or amplify the terms and provisions hereof.

If any term, covenant or condition of this Lease or the application thereof to any circumstance is found by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remainder of the terms, covenants and conditions of this Lease shall not be affected thereby.

Landlord shall not be construed or held to be a partner or associate of Tenant in the conduct of Tenant's business, it being expressly understood and agreed that the relationship between the parties hereto is, and shall at all times remain during the term of this Lease, that of Landlord and Tenant.

In the event of any litigation between the parties involving this Lease, the non-prevailing party to such litigation shall reimburse the prevailing party for its reasonable attorney fees.

This is a Mississippi contract and is to be construed in accordance with, and governed by, the laws of the State of Mississippi.

**36.  ENTIRETY, EXECUTION, SUCCESSION.** This Lease merges and supersedes all prior representations and agreements, and constitutes the entire contract between Landlord and Tenant concerning the leasing of the Premises and the consideration therefor. Neither this Lease nor any agreement amending, supplementing or terminating this Lease shall be binding on Tenant unless and until it is signed in Tenant's behalf by a representative duly authorized by its Board of Directors. This Lease and all options herein shall bind and inure to the benefit of Landlord and Tenant, their successors and assigns.

**37.  AUTHORITY.** Each party executing this Lease represents and warrants that they are a party hereto, or an agent of a party hereto, duly authorized to execute this Lease on behalf of such party and to bind that party to the performance of such party's obligation hereunder.

**EXECUTED** as of the date first herein specified.

LANDLORD:                                       TENANT:

MATTIACE PROPERTIES, INC.                       JITNEY-JUNGLE STORES OF AMERICA, INC.

By: _____                         By: _____
    T. Andrew Mattiace, President                   W. H. Holman, Jr., President

                                                Attest: _____
                                                        Roger P. Friou, Secretary

7

### EXHIBIT A

A parcel of land located in the Southwest 1/4 of Section 30, Township 7 North, Range 2 East, Madison County, Mississippi, and being part of Lots 1 and 2, Block 24, Highland Colony Subdivision, City of Ridgeland, Madison County, and being more particularly described as follows:

Begin at the intersection of the South right of way line of East School Street with the West right of way line of Wheatley Street, as they are now laid out and exist (January 16, 1991); thence South 00 degrees 08 minutes 36 seconds East along said West right of way of Wheatley Street for a distance of 632.0 feet to the South line of Lot 1, Block 24, Highland Colony Subdivision, marked by a tree; thence leaving said West right of way run North 88 degrees 54 minutes 07 seconds West along said South line for a distance of 786.85 feet to the Easterly right of way line of U.S. Highway 51; thence North 32 degrees 22 minutes 35 seconds East along said Easterly right of way for a distance of 545.25 feet to the Southwest corner of a parcel as described in Deed Book 179 at Page 504; thence North 57 degrees 24 minutes 44 seconds East for a distance of 82.76 feet; thence North 32 degrees 22 minutes 35 seconds East along said Easterly right of way for a distance of 135.78 feet; thence South 89 degrees 32 minutes 25 seconds along the South right of way of East School Street for a distance of 350.73 feet to the Point of Beginning, containing 365,041 square feet, 8.38 acres, more or less.

EXHIBIT B



MEMORANDUM OF LEASE

THIS IS A LEASE ("Lease") dated JANUARY 7 , 1993, by and between MATTIACE PROPERTIES, INC., a Mississippi corporation ("Landlord"), and JITNEY-JUNGLE STORES OF AMERICA, INC., a Mississippi corporation ("Tenant").

LANDLORD has leased and demised, and does hereby lease and demise to Tenant, a storeroom, which is to be part of a shopping center to be constructed by Landlord on a portion of the tract of land situated at the Southeast corner of U. S. Hwy 51 and School Street in the City of Ridgeland, County of Madison, and State of Mississippi, being more particularly described in legal description attached hereto as EXHIBIT A and made a part hereof, together with all rights, privileges, easements and appurtenances thereto ("Shopping Center"), for a period of twenty (20) years commencing on the earlier of: ninety (90) days after the date the store- room is ready for occupancy, or on the date Tenant opens for business; with options in Tenant to renew the Lease for four (4) additional periods of five (5) years each; and upon all other covenants and conditions of the Lease between Landlord and Tenant of even date herewith which is, by this reference, incorporated herein and made a part thereof. Said Lease contains certain subordination requirements and the following restric- tive covenants:

Landlord covenants and agrees, from and after the date of this Lease and so long as this Lease shall be in effect, not to lease, rent, occupy, or suffer or permit to be occu- pied, any part of the Shopping Center or any other premises owned or controlled, directly or indirectly, by Landlord which are within one (1) mile of the Shopping Center for the purpose of conducting therein or for use as, a food store or a food department or for the storage or sale for off-premises consumption of groceries, meats, produce, dairy products, bakery products, or any of them; and further, that if Landlord owns any land, or hereafter during the term of this Lease Landlord acquires any land, within such distance of the Shop- ping Center, neither will convey the same without imposing thereon a restriction to secure compliance with the terms of this paragraph; provided, however, that nothing contained herein shall prevent any tenant in the Shopping Center from storing and selling such prod- ucts as an incidental part of its other and principal business so long as the total number of square feet devoted by such tenant to the storage and display for sale of such products does not exceed ten percent (10%) of the total number of square feet of building area leased by such tenant in the Shopping Center, or one thousand (1,000) square feet (includ- ing, in either such case, 1/2 of the aisle space adjacent to any storage or display area), whichever is smaller. Notwithstanding the foregoing, it is understood and agreed that if any first Mortgagee shall become the owner of the Shopping Center, this paragraph shall not be applicable to any property, other than the Shopping Center, which such Mortgagee may then or thereafter own. This covenant shall run with the land. Landlord further covenants and agrees, from and after the date of this Lease and so long as this Lease shall be in ef- fect, not to lease, rent occupy, or suffer or permit to be occupied, any part of the Shop- ping Center for use as an arcade, pool hall, game room and the like; or as a nightclub, bar, lounge and the like; or as a funeral home, theater, banquet hall, bowling alley and the like; or as a so called "adult book store", "adult video shop" and the like; and that no more than five percent (5%) of the gross leasable area of the Shopping Center shall be leased for medical, insurance or real estate offices and the like. Tenant is hereby grant- ed the exclusive right and option to operate a gas island for the sale of motor vehicle fuels within the Shopping Center.

EXECUTED as of the date first herein specified.

LANDLORD:

MATTIACE PROPERTIES, INC.

By: _____
T. Andrew Mattiace, President

TENANT:

JITNEY-JUNGLE STORES OF AMERICA, INC.

By: _____
W. H. Holman, Jr., President

Attest: _____
Roger P. Friou, Secretary

STATE OF MISSISSIPPI
COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named T. Andrew Mattiace, who acknowledged that he is the duly constituted and acting President of Mattiace Properties, Inc., a Mississippi corporation, and who acknowledged further that in such capacity he signed, executed and delivered the above and foregoing instrument for and on behalf of said corporation, and as its act and deed, having first been duly authorized so to do.

Given under my hand and seal of office, this _7th_ day of Ꭻanuary1993.

Sandra Fleuris
Notary Public

My Commission expires:

MY COMMISSION EXPIRES 5/30/94


STATE OF MISSISSIPPI
COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named W. H. Holman, Jr. and Roger P. Friou, who acknowledged that they are the duly constituted and acting President and Secretary, respectively, of Jitney-Jungle Stores of America, Inc., a Mississippi corporation, and who acknowledged further that in such capacity they signed, executed and delivered the above and foregoing instrument for and on behalf of said corporation, and as its act and deed, having first been duly authorized so to do.

Given under my hand and seal of office, this _13TH_ day of _JANUARY_ , 1993.

Notary Public

My Commission expires:

MY COMMISSION EXPIRES JULY 25, 1995

## EXHIBIT A

A parcel of land located in the Southwest 1/4 of Section 30, Township 7 North, Range 2 East, Madison County, Mississippi, and being part of Lots 1 and 2, Block 24, Highland Colony Subdivision, City of Ridgeland, Madison County, and being more particularly described as follows:

Begin at the intersection of the South right of way line of East School Street with the West right of way line of Wheatley Street, as they are now laid out and exist (January 16, 1991); thence South 00 degrees 08 minutes 36 seconds East along said West right of way of Wheatley Street for a distance of 632.0 feet to the South line of Lot 1, Block 24, Highland Colony Subdivision, marked by a tree; thence leaving said West right of way run North 88 degrees 54 minutes 07 seconds West along said South line for a distance of 786.85 feet to the Easterly right of way line of U.S. Highway 51; thence North 32 degrees 22 minutes 35 seconds East along said Easterly right of way for a distance of 545.25 feet to the Southwest corner of a parcel as described in Deed Book 179 at Page 504; thence North 57 degrees 24 minutes 44 seconds East for a distance of 82.76 feet; thence North 32 degrees 22 minutes 35 seconds East along said Easterly right of way for a distance of 135.78 feet; thence South 89 degrees 32 minutes 25 seconds along the South right of way of East School Street for a distance of 350.73 feet to the Point of Beginning, containing 365,041 square feet, 8.38 acres, more or less.

## MEMORANDUM OF LEASE

THIS IS A LEASE ("Lease") dated JANUARY 7 , 1993, by and between MATTIACE PROPERTIES, INC., a Mississippi corporation ("Landlord"), and JITNEY-JUNGLE STORES OF AMERICA, INC., a Mississippi corporation ("Tenant").

LANDLORD has leased and demised, and does hereby lease and demise to Tenant, a storeroom, which is to be part of a shopping center to be constructed by Landlord on a portion of the tract of land situated at the Southeast corner of U. S. Hwy 51 and School Street in the City of Ridgeland, County of Madison, and State of Mississippi, being more particularly described in legal description attached hereto as EXHIBIT A and made a part hereof, together with all rights, privileges, easements and appurtenances thereto ("Shopping Center"), for a period of twenty (20) years commencing on the earlier of: ninety (90) days after the date the storeroom is ready for occupancy, or on the date Tenant opens for business; with options in Tenant to renew the Lease for four (4) additional periods of five (5) years each; and upon all other covenants and conditions of the Lease between Landlord and Tenant of even date herewith which is, by this reference, incorporated herein and made a part thereof.  Said Lease contains certain subordination requirements and the following restrictive covenants:

Landlord covenants and agrees, from and after the date of this Lease and so long as this Lease shall be in effect, not to lease, rent, occupy, or suffer or permit to be occupied, any part of the Shopping Center or any other premises owned or controlled, directly or indirectly, by Landlord which are within one (1) mile of the Shopping Center for the purpose of conducting therein or for use as, a food store or a food department or for the storage or sale for off-premises consumption of groceries, meats, produce, dairy products, bakery products, or any of them; and further, that if Landlord owns any land, or hereafter during the term of this Lease Landlord acquires any land, within such distance of the Shopping Center, neither will convey the same without imposing thereon a restriction to secure compliance with the terms of this paragraph; provided, however, that nothing contained herein shall prevent any tenant in the Shopping Center from storing and selling such products as an incidental part of its other and principal business so long as the total number of square feet devoted by such tenant to the storage and display for sale of such products does not exceed ten percent (10%) of the total number of square feet of building area leased by such tenant in the Shopping Center, or one thousand (1,000) square feet (including, in either such case, 1/2 of the aisle space adjacent to any storage or display area), whichever is smaller.  Notwithstanding the foregoing, it is understood and agreed that if any first Mortgagee shall become the owner of the Shopping Center, this paragraph shall not be applicable to any property, other than the Shopping Center, which such Mortgagee may then or thereafter own.  This covenant shall run with the land.  Landlord further covenants and agrees, from and after the date of this Lease and so long as this Lease shall be in effect, not to lease, rent occupy, or suffer or permit to be occupied, any part of the Shopping Center for use as an arcade, pool hall, game room and the like; or as a nightclub, bar, lounge and the like; or as a funeral home, theater, banquet hall, bowling alley and the like; or as a so called "adult book store", "adult video shop" and the like; and that no more than five percent (5%) of the gross leasable area of the Shopping Center shall be leased for medical, insurance or real estate offices and the like.  Tenant is hereby granted the exclusive right and option to operate a gas island for the sale of motor vehicle fuels within the Shopping Center.

EXECUTED as of the date first herein specified.

LANDLORD:                                    TENANT:

MATTIACE PROPERTIES, INC.                    JITNEY-JUNGLE STORES OF AMERICA, INC.

By: _____               By: _____
T. Andrew Mattiace, President                W. H. Holman, Jr., President

                                             Attest: _____
                                             Roger P. Friou, Secretary

STATE OF MISSISSIPPI
COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named T. Andrew Mattiace, who acknowledged that he is the duly constituted and acting President of Mattiace Properties, Inc., a Mississippi corporation, and who acknowledged further that in such capacity he signed, executed and delivered the above and foregoing instrument for and on behalf of said corporation, and as its act and deed, having first been duly authorized so to do.

Given under my hand and seal of office, this _7th_ day of _January_, 1993.

_Sandra Sierra_
Notary Public

My Commission expires:

MY COMMISSION EXPIRES 5/30/94


STATE OF MISSISSIPPI
COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named W. H. Holman, Jr. and Roger P. Friou, who acknowledged that they are the duly constituted and acting President and Secretary, respectively, of Jitney-Jungle Stores of America, Inc., a Mississippi corporation, and who acknowledged further that in such capacity they signed, executed and delivered the above and foregoing instrument for and on behalf of said corporation, and as its act and deed, having first been duly authorized so to do.

Given under my hand and seal of office, this _13th_ day of _January_, 1993.

Notary Public

My Commission expires:
MY COMMISSION EXPIRES JULY 25, 199

## EXHIBIT A

A parcel of land located in the Southwest 1/4 of Section 30, Township 7 North, Range 2 East, Madison County, Mississippi, and being part of Lots 1 and 2, Block 24, Highland Colony Subdivision, City of Ridgeland, Madison County, and being more particularly described as follows:

Begin at the intersection of the South right of way line of East School Street with the West right of way line of Wheatley Street, as they are now laid out and exist (January 16, 1991); thence South 00 degrees 08 minutes 36 seconds East along said West right of way of Wheatley Street for a distance of 632.0 feet to the South line of Lot 1, Block 24, Highland Colony Subdivision, marked by a tree; thence leaving said West right of way run North 88 degrees 54 minutes 07 seconds West along said South line for a distance of 786.85 feet to the Easterly right of way line of U.S. Highway 51; thence North 32 degrees 22 minutes 35 seconds East along said Easterly right of way for a distance of 545.25 feet to the Southwest corner of a parcel as described in Deed Book 179 at Page 504; thence North 57 degrees 24 minutes 44 seconds East for a distance of 82.76 feet; thence North 32 degrees 22 minutes 35 seconds East along said Easterly right of way for a distance of 135.78 feet; thence South 89 degrees 32 minutes 25 seconds along the South right of way of East School Street for a distance of 350.73 feet to the Point of Beginning, containing 365,041 square feet, 8.38 acres, more or less.

## AGREEMENT AMENDING LEASE

THIS IS AN AGREEMENT ("Agreement") dated April _19_, 1994, by and between MATTIACE PROPERTIES, INC., a Mississippi corporation ("Landlord"), and JITNEY-JUNGLE STORES OF AMERICA, INC., a Mississippi corporation ("Tenant").

AMENDING the Lease dated January 7, 1993, between Landlord and Tenant ("Lease"), covering a storeroom and its appurtenances known as Jitney-Jungle #62 ("Premises"), 398 Hwy 51 North, School Street Crossing Shopping Center ("Shopping Center"), in the City of Ridgeland, County of Madison, and State of Mississippi, a Memorandum of which Lease is recorded in Book 863 at Page 99 in the Office of the Chancery Clerk of said County.

FOR AND IN CONSIDERATION of the Premises, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant agree that, effective as of the date hereof:

1.  Paragraph 16 of the Lease is hereby amended to read and provide, in its entirety, as follows:

    "16. ENLARGEMENT. Tenant is hereby granted the right, at the end of the fifth (5th), tenth (10th) and fifteenth (15th) lease years, to enlarge the Premises into that area immediately adjacent to the Premises on the South, which area is outlined in green on EXHIBIT B. Tenant shall exercise such right by giving Landlord notice thereof on or before the beginning of such lease year. The financing and other terms and conditions of such enlargement and the rent therefor shall be as negotiated in good faith between Landlord and Tenant at that time. If no agreement is reached between the parties within twelve (12) months after such notice then, in that event, Tenant's right to enlarge at that time shall terminate forthwith. Such enlargement shall be constructed in accordance with plans and specifications approved by Landlord and Tenant."

2.  Paragraph 25 of the Lease is hereby amended to read and provide, in its entirety, as follows:

    "25. TENANT'S CONTRIBUTION - TAXES. Tenant agrees to pay all ad valorem taxes on Tenant's stock, trade fixtures and equipment located in the Premises. Tenant further agrees, subject to the terms and conditions contained herein, to pay to Landlord Tenant's pro rata share of real estate ad valorem taxes assessed against the Shopping Center, computed by multiplying the total amount of such taxes by a fraction, the denominator of which shall be the aggregate square footage of gross leasable area in the Shopping Center and numerator of which shall be the total number of square feet in the Premises. Tenant shall pay to Landlord, with the rent, the amount of Two Hundred and 00/100 Dollars ($200.00) per month to apply against Tenant's pro rata share of such taxes (which amount may be changed from time to time by mutual agreement of Landlord and Tenant). Landlord shall, within ninety (90) days following receipt of the tax bills for each tax year, furnish Tenant copies of said tax bills for such tax year and copies of the assessments on which such tax bills are based and all facts, data and information needed to calculate Tenant's share of such taxes as provided in this paragraph. Any excess paid by Tenant by means of said monthly payments shall be promptly refunded by Landlord to Tenant therewith, and any deficiency shall be paid by Tenant to Landlord within thirty (30) days thereafter. Tenant shall not be liable for the payment of any interest or penalty incurred by Landlord on such tax bill as a result of late payment so long as payment from Tenant is received within such thirty (30) day period. Should Landlord fail to present such tax bills and other information within such ninety (90) day period, Tenant shall be relieved of the obligation to pay Landlord its share of such taxes included in such payment. Tenant shall have the right in the name of Landlord, but at Tenant's expense, to take whatever action (including litigation) Tenant deems necessary to contest the validity or amount of the assessed valuation of the Premises or of the Shopping Center or of the ad valorem tax for any tax year, and Tenant, at Tenant's expense, may undertake by appropriate proceedings in the name of Landlord, or Tenant, to contest or effect a review of the validity or amount of the assessed valuation of the ad valorem tax for any tax year; provided, however, that Tenant provides adequate security to prevent the foreclosure of any tax lien during the course of or upon the conclusion of any such contest or review. If there is any remission or refund of all or any part of Tenant's tax payment for any tax year for which Tenant's tax payment has been paid, Tenant shall be entitled, without demand, to an appropriate refund of such taxes."

3.  The restrictive covenants set forth in Paragraph 29 of the Lease are hereby waived with respect to OUTPARCEL 1 as shown on EXHIBIT B to the Lease, which OUTPARCEL 1 is the subject of that certain Purchase and Sale Agreement dated January 7, 1993 between Landlord, as Seller, and Tenant, as Buyer.

4.  The legal description of the Shopping Center attached to the Lease as EXHIBIT A is hereby deleted and that attached hereto is hereby substituted in lieu thereof.

5.  The Lease, as hereby amended, is ratified, confirmed and continued.

6.  This Agreement shall bind and benefit Landlord and Tenant, their successors and assigns.

7.  Each party executing this Agreement represents and warrants that they are a party hereto, or an agent of a party hereto, duly authorized to execute this Agreement on behalf of such party and to bind that party to the performance of such party's obligation hereunder.

    EXECUTED as of the date first herein specified.

LANDLORD:                                          TENANT:

MATTIACE PROPERTIES, INC.                          JITNEY-JUNGLE STORES OF AMERICA, INC.


By: _____                      By: _____
T. Andrew Mattiace, President                          W. H. Holman, Jr., President

                                                   Attest: _____
                                                           Roger P. Friou, Secretary

**EXHIBIT A**

A parcel of land located in the Southwest 1/4 of Section 30, Township 7 North, Range 2 East, Madison County, Mississippi, and being part of Lots 1 and 2, Block 24 Highland Colony Subdivision, City of Ridgeland, Madison County, Mississippi and being more particularly described as follows:

Beginning at an iron pin found marking the intersection of the South line of Lot 1 and Lot 2, Block 24, Highland Colony Subdivision as recorded in Plat Book 1, Page 6, in the Chancery Clerk's office of said county, with the Easterly right-of-way line of U.S. Highway No. 51 as it is now laid out and exist;

Thence N32°22'35"E, along said Easterly right-of-way line, a distance of 545.25 feet to an iron pin found;

Thence continuing along said Easterly right-of-way line, N57°24'44"E, a distance of 24.69 feet to an iron pin set;

Thence departing said Easterly right-of-way line, S85°30'52"E, a distance of 74.77 feet to an iron pin set;

Thence N89°51'24"E, a distance of 137.11 feet to an iron pin set at the point of curvature of a curve to the left;

Thence along the arc of said curve to the left, a distance of 19.81 feet to a iron pin set at the point of reverse curvature of a curve to the right. Said curve to the left having a radius of 12.00 feet, and a chord bearing N42°33'09"E, a distance of 17.64 feet;

Thence along the arc of said curve to the right, a distance of 77.48 feet to an iron pin set at the point of reverse curvature of a curve to the left. Said curve to the right having a radius of 165.50 feet, and a chord bearing N18°13'32"E, a distance of 76.77 feet;

Thence along the arc of said curve to the left, a distance of 61.73 feet to an iron pin set an the proposed South right-of-way line of East School Street. Said curve to the left having a radius of 129.50 feet, and a chord bearing N17°58'54"E, a distance of 61.14 feet;

Thence S89°32'25"E along said proposed South right-of-way line of said East School Street, a distance of 31.06 feet to an iron pin set at the point of curvature of a curve to the right;

Thence departing said proposed South right-of-way line, run along the arc of said curve to the right, a distance of 78.60 feet to an iron pin set at the point of reverse curvature of a curve to the left. Said curve to the right having a radius 160.50 feet, and a chord bearing S17°36'28"W, a distance of 77.81 feet;

Thence along the arc of said curve to the left, a distance of 57.71 feet to a iron pin set at the point of compound curvature of another curve to the left. Said curve to the left having a radius of 134.50 feet, and a chord bearing S19°20'40"W, a distance of 57.27 feet;

Thence along the arc of said curve to the left, a distance of 22.40 feet to an iron pin set at the point of tangency. Said curve to the left having a radius of 12.00 feet, and a chord bearing S36°39'50"E, a distance of 19.29 feet;

Thence N89°51'24"E, a distance of 201.19 feet to an iron pin set on the proposed West right-of-way line of Wheatley Street;

Thence S00°08'36"E, running parallel to and five feet West of the existing right-of-way line of said Wheatley Street as it is now laid out and exist, a distance of 483.91 feet to an iron pin set on the South line of the aforementioned Lot 1, Block 24;

Thence N88°54'07"W, a distance of 781.84 feet to The Point of Beginning, and containing 7.05 acres, (307,121 square feet), more or less.

## AGREEMENT SUPPLEMENTING LEASE

**THIS IS AN AGREEMENT** ("Agreement") dated April _19_, 1994, by and between MATTIACE PROPERTIES, INC., a Mississippi corporation ("Landlord"), and JITNEY-JUNGLE STORES OF AMERICA, INC., a Mississippi corporation ("Tenant").

**SUPPLEMENTING** the lease dated January 7, 1993, between Landlord and Tenant ("Lease"), covering a storeroom and its appurtenances known as Jitney-Jungle #62 ("Premises"), 398 Hwy 51 North, School Street Crossing Shopping Center ("Shopping Center"), in the City of Ridgeland, County of Madison, and State of Mississippi, a memorandum of which Lease is recorded in Book 863 at Page 99 in the Office of the Chancery Clerk of said County.

**FOR AND IN CONSIDERATION** of the Premises, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant agree that, effective as of the date hereof:

1. The legal description of the Shopping Center attached to the Lease as EXHIBIT A is hereby deleted and that attached hereto is hereby substituted in lieu thereof.

2. The restrictive covenants set forth in the Lease are hereby waived with respect to that certain outparcel to the Shopping Center which is described in EXHIBIT B attached hereto and made a part hereof.

3. The Lease, as hereby supplemented, is ratified, confirmed and continued.

4. This Agreement shall bind and benefit Landlord and Tenant, their successors and assigns.

5. Each party executing this Agreement represents and warrants that they are a party hereto, or an agent of a party hereto, duly authorized to execute this Agreement on behalf of such party and to bind that party to the performance of such party's obligation hereunder.

**EXECUTED** as of the date first herein specified.

LANDLORD:                                          TENANT:

MATTIACE PROPERTIES, INC.                          JITNEY-JUNGLE STORES OF AMERICA, INC.

By: _____                      By: _____
T. Andrew Mattiace, President                      W. H. Holman, Jr., President

                                                   Attest: _____
                                                   Roger P. Friou, Secretary


STATE OF MISSISSIPPI
COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named T. Andrew Mattiace, who acknowledged that he is the duly constituted and acting President of Mattiace Properties, Inc., a Mississippi corporation, and who acknowledged further that in such capacity he signed, executed and delivered the above and foregoing instrument for and on behalf of said corporation, and as its act and deed, having first been duly authorized so to do.

Given under my hand and seal of office, this _19th_ day of April, 1994.

_____
Notary Public

My Commission expires:
NOTARY PUBLIC STATE OF MISSISSIPPI AT LARGE
MY COMMISSION EXPIRES April 22, 1997
BONDED THRU HEIDEN-MARCHETTI, INC.


STATE OF MISSISSIPPI
COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named W. H. Holman, Jr. and Roger P. Friou, who acknowledged that they are the duly constituted and acting President and Secretary, respectively, of Jitney-Jungle Stores of America, Inc., a Mississippi corporation, and who acknowledged further that in such capacity they signed, executed and delivered the above and foregoing instrument for and on behalf of said corporation, and as its act and deed, having first been duly authorized so to do.

Given under my hand and seal of office, this _19th_ day of April, 1994.

_____
Notary Public

My Commission expires:
MY COMMISSION EXPIRES 5/30/94

**EXHIBIT A**

A parcel of land located in the Southwest 1/4 of Section 30, Township 7 North, Range 2 East, Madison County, Mississippi, and being part of Lots 1 and 2, Block 24 Highland Colony Subdivision, City of Ridgeland, Madison County, Mississippi and being more particularly described as follows:

Beginning at an iron pin found marking the intersection of the South line of Lot 1 and Lot 2, Block 24, Highland Colony Subdivision as recorded in Plat Book 1, Page 6, in the Chancery Clerk's office of said county, with the Easterly right-of-way line of U.S. Highway No. 51 as it is now laid out and exist;

Thence N32°22'35"E, along said Easterly right-of-way line, a distance of 545.25 feet to an iron pin found;

Thence continuing along said Easterly right-of-way line, N57°24'44"E, a distance of 24.69 feet to an iron pin set;

Thence departing said Easterly right-of-way line, S85°30'52"E, a distance of 74.77 feet to an iron pin set;

Thence N89°51'24"E, a distance of 137.11 feet to an iron pin set at the point of curvature of a curve to the left;

Thence along the arc of said curve to the left, a distance of 19.81 feet to a iron pin set at the point of reverse curvature of a curve to the right. Said curve to the left having a radius of 12.00 feet, and a chord bearing N42°33'09"E, a distance of 17.64 feet;

Thence along the arc of said curve to the right, a distance of 77.48 feet to an iron pin set at the point of reverse curvature of a curve to the left. Said curve to the right having a radius of 165.50 feet, and a chord bearing N18°13'32"E, a distance of 76.77 feet;

Thence along the arc of said curve to the left, a distance of 61.73 feet to an iron pin set an the proposed South right-of-way line of East School Street. Said curve to the left having a radius of 129.50 feet, and a chord bearing N17°58'54"E, a distance of 61.14 feet;

Thence S89°32'25"E along said proposed South right-of-way line of said East School Street, a distance of 31.06 feet to an iron pin set at the point of curvature of a curve to the right;

Thence departing said proposed South right-of-way line, run along the arc of said curve to the right, a distance of 78.60 feet to an iron pin set at the point of reverse curvature of a curve to the left. Said curve to the right having a radius 160.50 feet, and a chord bearing S17°36'28"W, a distance of 77.81 feet;

Thence along the arc of said curve to the left, a distance of 57.71 feet to a iron pin set at the point of compound curvature of another curve to the left. Said curve to the left having a radius of 134.50 feet, and a chord bearing S19°20'40"W, a distance of 57.27 feet;

Thence along the arc of said curve to the left, a distance of 22.40 feet to an iron pin set at the point of tangencey. Said curve to the left having a radius of 12.00 feet, and a chord bearing S36°39'50"E, a distance of 19.29 feet;

Thence N89°51'24"E, a distance of 201.19 feet to an iron pin set on the proposed West right-of-way line of Wheatley Street;

Thence S00°08'36"E, running parallel to and five feet West of the existing right-of-way line of said Wheatley Street as it is now laid out and exist, a distance of 483.91 feet to an iron pin set on the South line of the aforementioned Lot 1, Block 24;

Thence N88°54'07"W, a distance of 781.84 feet to The Point of Beginning, and containing 7.05 acres, (307,121 square feet), more or less.

## EXHIBIT B

A parcel of land located in the Southwest 1/4 of Section 30, Township 7 North, Range 2 East, Madison County, Mississippi, and being part of Lot 1, Block 24, Highland Colony Subdivision, City of Ridgeland, Madison County, Mississippi and being more particularly described as follows:

Commencing at an iron pin found at the intersection of the existing South right-of-way line of East School Street and the existing Easterly right-of-way of U.S. Highway No. 51, as they are now laid out and exist, said iron pin also being on the Easterly line of a parcel of land conveyed to the City of Ridgeland as recorded in Deed Book 179, Page 504;

Thence S32°22'35"W, along the existing right-of-way of said U.S. Highway No. 51, a distance of 7.33 feet to an iron pin set for the Northwest corner and the Point of Beginning of the herein described parcel. Said iron pin also being on the proposed South right-of-way line of said East School Street;

Thence S89°32'25"E, along the proposed South line of said East School Street, a distance of 148.76 feet to an iron pin set on the arc of a curve to the right;

Thence along the arc of said curve to the right, a distance of 61.73 feet to an iron pin set at the point of reverse curvature of a curve to the left. Said curve to the right having a radius of 129.50 feet, and a chord bearing S17°58'54"W, a distance of 61.14 feet;

Thence along the arc of said curve to the left, a distance of 77.48 feet to an iron pin set at the point of reverse curvature of a curve to the right. Said curve to the left having a radius of 165.50 feet, and a chord bearing S18°13'32"W, a distance of 76.77 feet;

Thence along the arc of said curve to the right, a distance of 19.81 feet to an iron pin set at the point of tangency. Said curve to the right having a radius of 12.00 feet, and a chord bearing S42°33'09"W, a distance of 17.64 feet;

Thence S89°51'24"W, a distance of 137.11 feet to an iron pin set at an angle point;

Thence N85°30'52"W, a distance of 74.77 feet to an iron pin set on the aforementioned Easterly right-of-way line of U.S. Hwy. No. 51 as it is now laid out and exist;

Thence along said Easterly right-of-way line, N57°24'44"E, a distance of 58.07 feet to a iron pin found;

Thence N32°22'35"E, a distance of 128.45 feet to the Point of Beginning and containing 0.58 acres, (25,175 square feet) of land, more or less.

<u>SECOND AGREEMENT SUPPLEMENTING LEASE</u>

THIS IS AN AGREEMENT ("Agreement") dated June _28_ , 1994, by and between MATTIACE PROPERTIES, INC., a Mississippi corporation ("Landlord"), and JITNEY-JUNGLE STORES OF AMERICA, INC., a Mississippi corporation ("Tenant").

SUPPLEMENTING the lease dated January 7, 1993, between Landlord and Tenant, as heretofore supplemented and amended ("Lease"), covering a storeroom and its appurtenances known as Jitney-Jungle #62 ("Premises"), 398 Hwy 51 North, School Street Crossing Shopping Center ("Shopping Center"), in the City of Ridgeland, County of Madison, and State of Mississippi, a memorandum of which Lease is recorded in Book 863 at Page 99 in the Office of the Chancery Clerk of said County.

FOR AND IN CONSIDERATION of the Premises, and other good and valuable consideration,  the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant agree that:

1.    Tenant opened its storeroom for business in the Premises, as contemplated by the Lease, on May 11, 1994.

2.    The initial term of the Lease began on May 11, 1994, and shall end on May 31, 2014 (subject to any rights of termination or extension provided in the Lease).

3.    Rent commenced to accrue under the lease on May 11, 1994.

4.    The Lease, as heretofore supplemented and amended, and hereby supplemented, is ratified, confirmed and continued.

5.    This Agreement shall bind and benefit Landlord and Tenant, their successors and assigns.

6.    Each party executing this Agreement represents and warrants that they are a party hereto, or an agent of a party hereto, duly authorized to execute this Agreement on behalf of such party and to bind that party to the performance of such party's obligation hereunder.

EXECUTED as of the date first herein specified.

LANDLORD:

MATTIACE PROPERTIES, INC.

By: _____
     T. Andrew Mattiace, President

TENANT:

JITNEY-JUNGLE STORES OF AMERICA, INC.

By: _____
     W. H. Holman, Jr., President

Attest: _____
         Roger P. Friou, Secretary

STATE OF MISSISSIPPI
COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named T. Andrew Mattiace, who acknowledged that he is the duly constituted and acting President of Mattiace Properties, Inc., a Mississippi corporation, and who acknowledged further that in such capacity he signed, executed and delivered the above and foregoing instrument for and on behalf of said corporation, and as its act and deed, having first been duly authorized so to do.

Given under my hand and seal of office, this _28th_ day of June, 1994.

_____
Notary Public

My Commission expires:

My Commission Expires October 31, 1996

STATE OF MISSISSIPPI
COUNTY OF HINDS

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, the within named W. H. Holman, Jr. and Roger P. Friou, who acknowledged that they are the duly constituted and acting President and Secretary, respectively, of Jitney-Jungle Stores of America, Inc., a Mississippi corporation, and who acknowledged further that in such capacity they signed, executed and delivered the above and foregoing instrument for and on behalf of said corporation, and as its act and deed, having first been duly authorized so to do.

Given under my hand and seal of office, this _7th_ day of July, 1994.

_____
Notary Public

My Commission expires:

NOTARY PUBLIC STATE OF MISSISSIPPI AT LARGE.
MY COMMISSION EXPIRES: May 29, 1998.
BONDED THRU NOTARY PUBLIC UNDERWRITERS.

*CC: Mark Davis*
*601-949-4649*

# FAX TRANSMISSION

**Stephanie Pilkington**
Associate General Counsel
**ASSOCIATED WHOLESALE GROCERS, INC.**
P.O. Box 2932
Kansas City, Kansas 66110-2932
(913) 288-1423
Fax: (913) 288-1573

| | | | |
|---|---|---|---|
| **To:** | Andrew Mattiace | **Date:** | August 15, 2005 |
| **Fax #:** | 601-352-1820 | **Pages** | 7, including this cover sheet |
| **From:** | Stephanie Pilkington | | |
| **Subject:** | Third Amendment to Lease Agreement | | |

## COMMENTS:

Please call me to discuss.

---

If you have not received all of the transmitted copies, please call the above number.

**PRIVILEGED AND CONFIDENTIAL** information intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient(s), please note that any dissemination, distribution or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

## THIRD AMENDMENT TO LEASE AGREEMENT
### (School Street Shopping Center)

**THIS THIRD AMENDMENT TO LEASE AGREEMENT ("Amendment")** is made and entered on this _____ day of August, 2005, by and between **MATTIACE PROPERTIES, INC.**, a Mississippi corporation **("Landlord")**, and **DOUBLE R FOODS, LLC**, a Mississippi limited liability company **("Tenant")**.

### RECITALS:

**The following recitals are a material part of this Amendment.**

A.     Landlord and Winn-Dixie Montgomery, Inc. **("Winn-Dixie")** (successor-in-interest to Jitney-Jungle Stores of America, Inc.) entered into that certain Lease dated January 7, 1993, as amended by that certain Letter Agreement dated April 19, 1994, and further amended by that certain Agreement Supplementing Lease dated April 19, 1994, and that certain Amendment to Lease dated April 19, 1994, and that certain Second Agreement Supplementing Lease dated June 28, 1994 (collectively, the **"Lease"**) whereby Landlord leased to Tenant a building (approximately 30,400 square feet), the land thereunder and the loading docks and other appurtenances to said building (the **"Premises"**) located in and being a part of the School Street Shopping Center (the **"Shopping Center"**) located in the City of Ridgeland, County of Madison, State of Mississippi. The Premises is located on property legally described in **Exhibit "A"** attached hereto and made a part hereof.

B.     Tenant is in the process of acquiring the fixtures and inventory owned by Winn-Dixie located within the Premises. As part of such acquisition, Tenant desires to assume the rights and obligations of Winn-Dixie to and under the Lease with regard to the Premises as and from the Effective Date.

C.     Landlord desires to have Tenant assume the rights and obligations of tenant to and under the Lease.

D.     Landlord and Tenant now desire to modify and amend the Lease in accordance with the terms and conditions herein stated below.

**NOW, THEREFORE,** in consideration of the mutual covenants herein granted and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree that the Lease is hereby modified and amended as follows:

1.     This Amendment shall be effective as of the effective date of that certain Assignment and Assumption of Lease Agreement by and between Tenant and Winn-Dixie (current tenant under the Lease) (**"Effective Date"**). If for any reason, the Lease is not assigned to Tenant by Winn-Dixie on or before October 1, 2005, this Amendment shall be of no force or effect and shall not

be binding on either Landlord or Tenant. Landlord acknowledges that Tenant shall have no obligations with regard to compliance with terms and provisions of the Lease prior to the Effective Date, and Tenant shall have no liability for any defaults or other failures of Winn-Dixie (including but not limited to payment of all rent, additional rent or other charges) due prior to the Effective Date.

2.  The parties hereby acknowledge that the primary term of the Lease expires on May 31, 2014 and that Tenant shall have the right to four (4) successive renewals of the Lease as set forth in Section 7 of the Lease

3.  As of the Effective Date through the end of the term of the Lease, as it may be extended, Section 8 of the Lease is hereby deleted in its entirety and replaced with the following:

Tenant shall pay to Landlord rental for the Premises:

   (a)   during the remainder of the primary term of this Lease, the sum of $174,800.00 per year ($14,566.67 per month) commercial gross; and

   (b)   during the first option period of this Lease, the sum of $197,600.00 per year ($16,466.67 per month) commercial gross; and

   (c)   during the second option period of this Lease, the sum of $212,800.00 per year ($17,733.33 per month) commercial gross; and

   (d)   during the third option period of this Lease, the sum of $228,000.00 per year ($19,000.00 per month) commercial gross; and

   (e)   during the fourth option period of this Lease, the sum of $243,200.00 per year ($20,266.67 per month).

Each monthly installment of rent shall be payable in advance on the first day of each month. If at any time rent should become due for a part of a month, such rent shall be prorated and paid on or before the tenth day of the following month.

3.  As of the Effective Date through the end of the term of the Lease, as it may be extended, Section 28 of the Lease is hereby deleted in its entirety and replaced with the following:

Overage Payment.  Tenant agrees to make as additional payment to Landlord a sum of money computed and payable as follows: within sixty (60) days of the end of each lease year, and also within sixty (60) days of the

2

termination of this Lease, Tenant agrees to deliver to Landlord a statement showing the gross sales (as herein defined) made in or from the Premises during the preceding lease year.

During the primary term, Tenant shall pay to Landlord, at the time such statement is delivered, the following:

(a)  one and one-half percent (1.5%) of gross sales made by Tenant in or from the Premises during the preceding lease year between $8,200,000 and $10,000,000;

(b)  two percent (2%) of gross sales made by Tenant in or from the Premises during the preceding lease year between 10,000,001 and $11,000,000;

(c)  two and one-half percent (2.5%) of gross sales made by Tenant in or from the Premises during the preceding lease year between 11,000,001 and $12,000,000; and

(d)  three percent (3%) of gross sales made by Tenant in or from the Premises during the preceding lease year in excess of $12,000,000.

For example: If Tenant's annual gross sales in or from the Premises equal $14,000,000, Tenant's overage payment to Landlord for such year shall equal $131,999.93.

1.5% times 1,800,000 [10,000,000 – 8,200,000] = $27,000.00
2% times 999,999 [11,000,000 – 10,000,001] = $19,999.98
2.5% times 999,999 [12,000,000 – 11,000,001] = $24,999.98
3% times 1,999,999 [14,000,000 – 12,000,001] = $59,999.97

During any and all renewal periods, Tenant shall pay to Landlord, at the time such statement is delivered, one and one-half percent (1.5%) of gross sales made by Tenant in or from the Premises during the preceding lease year less net rent (such net rent figure shall include that portion of CAM, insurance and taxes that assessed, but not paid to Landlord, by Tenant as calculated in Sections 25, 26 and 27 of the Lease).

For example, if in a given lease year during the first renewal period:

Tenant's pro rata share of CAM is $27,000
Tenant's pro rata share of taxes is $25,000
Tenant's pro rata share of insurance is $5,000
Tenant's annual rent is $197,600
Tenant's gross sales in or from the Premises are $15,000,000

3

Tenant's overage payment to Landlord for such year shall equal $0 [1.5% * 15,000,000 − 254,600].

The term "gross sales" as used herein, shall mean the total amount of all sales made in or from the Premises after deducting therefrom rebates; refunds; allowances to customers; sales taxes imposed by any governmental authority; cash discounts; sales of cigarettes and other tobacco products, alcoholic beverages and motor vehicle fuels; cost of trading stamps; receipts from sales of money orders, U.S. Postage Stamps or postal or similar services; income from check cashing, collection of utility bills or banking activities; or sales of lottery tickets, hunting or fishing licenses or insurance; or receipts from video or vending machines or value added, sales or excise taxes. The words "lease year" shall mean a period of twelve (12) successive months, running each April 1 through March 31 throughout the term of the Lease, as may be extended.

In the event the Premises are ever occupied under a month-to-month tenancy, the percentage payment hereunder shall either be calculated on an annual basis, if the Premises are occupied for a full year, or if not occupied for a full year, shall be calculated on the basis of the sales made in or from the Premises during the proportionate part of the year in which rent is paid for the Premises by Tenant. Payment in such case shall be made within sixty (60) days after the end of each year of such tenancy or other earlier termination of such tenancy. Nothing herein contained shall be construed to indicate that percentage payments are rentals and Tenant shall at no time be liable for any percentage payments except those specified herein resulting from actual sales (as herein described) by Tenant.

4.      Notwithstanding anything to the contrary contained herein, as of the Effective Date through the end of the term of the Lease, as it may be extended, Tenant shall have no obligation to pay any amounts as described in Section 26 (Tenant's Contribution − CAM) or Section 27 (Tenant's Contribution − Insurance). Additionally, Tenant shall have no obligation to pay any amounts as described in Section 25 (Tenant's Contribution − Taxes); provided, however, Tenant agrees to pay all ad valorem taxes on Tenant's stock, trade fixtures and equipment located in the Premises. It being understood by the parties that during the term of the Lease, as it may be extended, Tenant's only payment obligations to Landlord under the terms of the Lease shall be to pay rent (on a commercial gross basis) and overage payments as set forth herein.

4

5.    <u>Ratification of Lease</u>. It is understood and agreed that, except as specifically amended herein, all of the terms, conditions, provisions and covenants contained in the Lease remain unchanged and in full force and effect, and are hereby ratified and affirmed.

6.    <u>Binding Effect</u>. This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

## [SIGNATURES ON FOLLOWING PAGE]

5

**IN WITNESS WHEREOF**, the parties have caused this Third Amendment to Lease Agreement to be executed as of the day and year first written above.

**LANDLORD:**

**MATTIACE PROPERTIES, INC.,**
a Mississippi corporation

By: _____
     Andrew Mattiace, President

**TENANT:**

**DOUBLE R FOODS, LLC,**
a Mississippi limited liability company

By: _____
     Herbert Bradford Ramey
     Managing Member

Composite Exhibit "B"

**2003 CAM, Tax, & Insurance Reconciliation**
**School Street Shopping Center**
**Ridgeland, Mississippi**

| 50138 | Misc Admin Expenses | $ | 831.92 — *Not CAM* |
|---|---|---|---|
| 50148 | Repairs: Building | $ | 89.88 |
| 50225 | Exterminator | $ | 321.00 |
| 50243 | Irrigation | $ | 2,606.39 |
| 50255 | Landscape | $ | 11,312.55 |
| 50257 | Lighting | $ | 3,056.86 |
| 50260 | Management Fee | $ | 0.00 |
| 50265 | Parking Lot Repair & Paint | $ | 11,877.65 |
| 50270 | Parking Lot Sweeping | $ | 4,599.69 |
| 50295 | Trash Removal | $ | 9,300.00 — *Not CAM* |
| 50901 | Utilities, Electricity | $ | 7,612.51 |
| 50903 | Utilities, Water and Sewer | $ | 362.12 |
| | **Total CAM Charges** | $ | 51,970.57  41,838.65 |
| | | | |
| 56610 | **Insurance, Property, Casualty** | $ | 9,784.50 ✓ |
| | | | |
| 57001 | **Taxes, Real Property** | $ | 59,240.33 |

*Waste Management*

$$CAM \ Due$$

$ 41,838.65
X 45.08433%

18,862.68
(7,200.00)  600.00 x 12 mo

$ 11,662.68

$$Insurance \ Due$$

9,784.50
X 45.08433%

4,485.54
(2,400.00)  200.00 x 12 mo.

$ 2,085.54

*Tax Paul Syprett 5/13/04*

*#1*

School Street Shopping Center
% The Mattiace Company
P O Box 13809
Jackson, MS  39236-3809

JUL 2 2 2003

date:     March 31, 2003

## School Street Shopping Center, CAM billing
expense reconciliation

Invoice: 11 01 01

Invoice to: **WINN DIXIE 1362**

|                                           |            |
|-------------------------------------------|-----------:|
| Tenant Square Footage                     | 30,400.00  |
| Total Square Footage                      | 67651.00   |
| Percentage for allocation of expenses     | 44.936512% |

*44.7890*

Expenses paid by Landlord, recoverable from tenants        ~~$77,037.44~~  *38,991.49*

Tenant  share via Percentage for allocation of expenses          $34,617.94

*17,455.91*  ~~$34,617.94~~
$0.00
~~$34,617.94~~
✓ $7,200.00
~~$27,417.94~~  $27,417.94

|                                        |      |            |
|----------------------------------------|------|-----------:|
| total                                  |      |            |
| ✗ Prior Billings                       | 2002 |            |
| ✗ Balance due of prorata share of expenses |  |            |

*✗ 600.00 x 12mo CAM*
*200.00 x 12mo Insurance*

$27,417.94

total amount due

At this same time we are sending **separate calculations of CAM , Tax and Insurance.**
If you have any questions please contact Mark McCormack 601.352.1818

Thank you.

*Called 4/7/03 Ryd Backup*
*Called 5/9/03 Still Ryd Backup*

*Pay ➔ 10,255.91*

*Check to Jackson*

Jul 08 03 11:39a   THE MATTINGE CO

\# 1

## 2002
## SCHOOL STREET CROSSING
## CAM EXPENSES

| | | |
|---|---|---|
| Management Fees | $23.978.99 | — Not CAM |
| Hazard Insurance | 4.874.00 | |
| Liability Insurance | 3 648.00 | |
| Real Estate Taxes | 59.240.33 | — Not CAM |
| Postage/Copies | 235.26 | — Not CAM |
| Electricity | 14.241.06 ✓ | |
| Water | 201.25 ✓ | |
| Building Repairs | 4.266.14 | |
| Landscape | 12.744.27 | |
| Drives and Parking | 7.677.38 | |
| Electrical Repairs | 1.965.30 | — Not CAM |
| Garbage Disposal | 9.505.99 | |
| Painting/Decorating | 2.221.80 | |

|  | |
|---|---|
| | $144.799.77 |
| Less Insurance | - 8.522.00 |
| Less Real Estate Tax | - 59.240.33 |

$ 77 037.44

(A) Misc. 4,335.73 → Not CAM
see attached

```
     77,037.44+
     23,978.99-
        235.26-
      9,505.99-
      4,335.73-
  -003
     38,981.47*

     38,981.47+            17,516.92+
  001                       7,200.00-
     38,981.47◊          000
                           10,316.92*
     38,981.47×
     44,938512%K
     17,516.92*
```

Balance Due 1
No Change

Balance Due
10,255.91

Exhibit "C"



| | | | Voucher ID | Gross Amount | Discount Available | Paid Amount |
|---|---|---|---|---|---|---|
| WDHDQ | 1362CAM02 | 31.Mar.2003 | 00408952 | 10,255.91 | 0.00 | 10,255.91 |
| WDHDQ | 13621NS01/02 | 31.Mar.2003 | 00409000 | 1,415.83 | 0.00 | 1,415.83 |

Check No.    006948148

4670.

*Paid amt.
#2*

4670.

8813

AUG 0 4 2003

| Vendor Number | | Name | | Total Discounts | |
|---|---|---|---|---|---|
| 0000777125 | | SCHOOL ST CROSSING LP | | $0.00 | |
| Check Number | Date | | Total Amount | Discounts Taken | Total Paid Amount |
| | | | | | 3,577.40 |

Exhibit "D"

Report Date: 01/04/2006

# THE MATTIACE COMPANY

Page:    2

## Tenant History

**08/01/2003 To 08/31/2003**

**WINN-DIXIE #1362**

#2.83

| Owner | SCH - SCHOOL STREET CROSSING LP |
| Property | SCH - SCHOOL STREET SHOPPING CENTER |
| Suite | 001 - |

| Effective | Processed | Type | Deposit Slip | Description | Charges | Payments | Check# | Comments | Balance |
|-----------|-----------|------|--------------|-------------|---------|----------|--------|----------|---------|
| | | | | Beginning Balance | 53,068.21 | | | | 53,068.21 |
| 07/31/2003 | 07/31/2003 | | | | | | | | |
| 08/01/2003 | 08/01/2003 | CHG | | INSURANCE | 200.00 | | | | 53,268.21 |
| 08/01/2003 | 08/01/2003 | CHG | | BASE RENT | 17,733.33 | | | | 71,001.54 |
| 08/01/2003 | 08/01/2003 | CHG | | CAM | 600.00 | | | | 71,601.54 |
| 08/04/2003 | 08/04/2003 | CHG | | CAM RECONCILIATION | -17,162.03 | | | credit for overcharge | 54,439.51 |
| 08/04/2003 | 08/04/2003 | CHG | | INSURANCE RECONCI | -13.34 | | | credit for overcharge | 54,426.17 |
| 08/04/2003 | 08/05/2003 | PMT | SCH217 | INSURANCE RECONCI | | 1,429.17 | 6948148 | | 52,997.00 |
| 08/04/2003 | 08/05/2003 | PMT | SCH217 | CAM RECONCILIATION | | 27,417.94 | 6948148 | (11671.74) | 25,579.06 |
| 08/04/2003 | 08/05/2003 | PMT | SCH217 | INSURANCE RECONCI | | -13.34 | 6948148 | | 25,592.40 |
| 08/04/2003 | 08/05/2003 | PMT | SCH217 | CAM RECONCILIATION | | -17,162.03 | 6948148 | | 42,754.43 |
| 08/06/2003 | 08/06/2003 | PMT | SCH218 | INSURANCE | | 200.00 | 6950122 | | 42,554.43 |
| 08/06/2003 | 08/06/2003 | PMT | SCH218 | BASE RENT | | 17,733.25 | 6950122 | (18533.25) | 24,821.18 |
| 08/06/2003 | 08/06/2003 | PMT | SCH218 | CAM | | 600.00 | 6950122 | | 24,221.18 |
| 08/08/2003 | 08/08/2003 | PMT | SCH220 | TAX RECONCILIATION | | 21,127.82 | 6954753 | (21127.82) | 3,093.36 |
| 08/18/2003 | 08/18/2003 | CHG | | TAX RECONCILIATION | -3,092.72 | | | CREDIT-TAX | 0.64 |

**Summary**

| | | | | Description | Charges | Payments | | | Balance |
|---|---|---|---|-------------|---------|----------|---|---|---------|
| | | | | Beginning Balance | 53,068.21 | 0.00 | | | 53,068.21 |
| | | | | BASE RENT | 17,733.33 | 17,733.25 | | | 0.08 |
| | | | | CAM | 600.00 | 600.00 | | | 0.00 |
| | | | | CAM RECONCILIATION | -17,162.03 | 10,255.91 | | | -27,417.94 |
| | | | | INSURANCE | 200.00 | 200.00 | | | 0.00 |
| | | | | INSURANCE RECONC | -13.34 | 1,415.83 | | | -1,429.17 |
| | | | | TAX RECONCILIATION | -3,092.72 | 21,127.82 | | | -24,220.54 |
| | | | | | 51,333.45 | 51,332.81 | | | |

| **Balance** | **0.64** |

Exhibit "E"

School Street Shopping Center
% The Mattiace Company
P O Box 13809
Jackson, MS  39236-3809

date:              16-Mar-04

**CAM, Tax and Insurance reconciliation as per lease**

expense reconciliation                                    Invoice:
                                                          Space I.D.#    001

Invoice to:        **WINN DIXIE 1362**

Tenant Square Footage                    30500
Total Square Footage                     67651
Percentage for allocation of expenses    45.084330%

|  | | Tenants Share | if paid monthly |
|---|---|---|---|
| Expenses paid by Landlord, recoverable from tenant: | | | |
| CAM | 51,970.56 | 23,430.58 | 1,952.55 |
| TAX | 59,250.33 | 26,742.61 | 2,226.05 |
| INSURANCE | 9,785.50 | 4,411.73 | 367.84 |

Billed During Last Calendar Year:    monthly
CAM                                  600.00    2,400.00    7,200.00
TAX                                                        OK
INSURANCE

Reconciliation Billing Amount:       for Year 2003
CAM                                  16,230.58
TAX                                  26,712.61
INSURANCE                            4,411.73

total amount due                     $47,354.92

*Check to follow*        Pay $13,748.22

If you have any questions please contact Mark McCormack 801.352.181

Thank you.                  Jay 601-352-1810

                                     CAM $11,662.68
                                     Insurance 2,085.54

Rev. CAM & Ins.
600.00 X 12    CAM 7,200.00          **APPROVED**
200 X 12       Ins 2,400.00          DIVISIONS 8 #cap 1362
               Jay Paul repair 5/13  MAY 18 2004

                                     JAY ARCHAMBAULT
                                     AREA PROPERTY MGR
                                     777125

16-Mar-04  G:\1DATA\1DATAWB\ACCOUNTG\CAM\2003\SCH\SCH_ALL.qpw

Exhibit "F"

#15

# Winn Dixie Louisiana Inc.

600 Edwards Ave. Harahan, La. 70123
PO Box 51059 New Orleans, La. 70151
504-731-2211    504-731-2309 Fax
JayArchambault@winn-dixie.com

Date 3/30/04

To _Mark McCormack_

RE:  INSURANCE BILLING

RE:  Winn Dixie Store # _1362_

Under the provisions of our lease covering the above retail store location, Landlord is required to remit an Insurance Bill alone with the Statements, Certificate of Insurance and Declaration Pages. This is now required in order to set up for payment.

The above requires your prompt attention in order to process for payment. Your response should be addressed to Jay Archambault, Real Estate Property Manager, at the letterhead address.

Sincerely

Winn Dixie Louisiana, Inc.

Jay Archambault
Real Estate Property Manager

Exhibit "G"



**Mark W. McCormack**
*Vice President, Property Management*

May 4, 2004

Jay Archambault
Real Estate Property Manager
Winn Dixie Louisiana Inc.
600 Edwards Ave.
P.O. Box 51059
New Orleans, LA 70151

RE:    Winn Dixie Store # 1362

Dear Jay:

We have received your request for more information on Common Area Maintenance and Real Estate Tax billings for the above referenced location.  We are currently processing the copies of all CAM related invoices, and will forward them to you as soon as possible.

However, please consider our notice on March 16, 2004 as the only information regarding Real Estate Taxes we find necessary to send you.  In accordance with your Lease, Section 25, we forwarded a copy of the tax bill within ninety (90) days of our receipt of the bill.  Please consider this as sufficient notice, and forward the tenant's pro rata portion of the tax bill accordingly.

Please feel free to contact me if you have any questions regarding this matter.

Sincerely,


Mark W. McCormack

MWM/ab

Enclosure

Exhibit "H"

Report Date: 01/04/2006                    **THE MATTIACE COMPANY**                    Page:   2

### Tenant History

05/01/2004 To 06/30/2004

WINN-DIXIE #1362

#7₹8

| Owner | SCH - SCHOOL STREET CROSSING LP |
|---|---|
| Property | SCH - SCHOOL STREET SHOPPING CENTER |
| Suite | 001 - |

| Effective | Processed | Type | Deposit Slip | Description | Charges | Payments | Check# | Comments | Balance |
|---|---|---|---|---|---|---|---|---|---|
| 04/30/2004 | 04/30/2004 | | | Beginning Balance | 47,356.20 | | | | 47,356.20 |
| 05/01/2004 | 04/27/2004 | CHG | | INSURANCE | 200.00 | | | | 47,556.20 |
| 05/01/2004 | 04/27/2004 | CHG | | CAM | 600.00 | | | | 48,156.20 |
| 05/01/2004 | 04/27/2004 | CHG | | BASE RENT | 17,733.33 | | | | 65,889.53 |
| 05/06/2004 | 05/06/2004 | PMT | SCH127 | BASE RENT | | 17,733.25 | 7214667 | (18533.25) | 48,156.28 |
| 05/06/2004 | 05/06/2004 | PMT | SCH127 | INSURANCE | | 200.00 | 7214667 | | 47,956.28 |
| 05/06/2004 | 05/06/2004 | PMT | SCH127 | CAM | | 600.00 | 7214667 | | 47,356.28 |
| 05/25/2004 | 05/25/2004 | CHG | | INSURANCE RECONCI | -2,326.19 | | | CREDIT TO INSURANCI | 45,030.09 |
| 05/25/2004 | 05/25/2004 | CHG | | CAM RECONCILIATION | -4,567.90 | | | CREDIT TO CAM | 40,462.19 |
| 05/25/2004 | 05/27/2004 | PMT | SCH148 | CAM RECONCILIATION | | 4,567.90 | | | 35,894.29 |
| 05/25/2004 | 05/27/2004 | PMT | SCH148 | INSURANCE RECONCI | | 2,326.19 | | | 33,568.10 |
| 05/25/2004 | 05/27/2004 | PMT | SCH148 | CAM RECONCILIATION | | -4,567.90 | | | 38,136.00 |
| 05/25/2004 | 05/27/2004 | PMT | SCH148 | INSURANCE RECONCI | | -2,326.19 | | | 40,462.19 |
| 06/01/2004 | 05/28/2004 | CHG | | INSURANCE | 200.00 | | | | 40,662.19 |
| 06/01/2004 | 05/28/2004 | CHG | | CAM | 600.00 | | | | 41,262.19 |
| 06/01/2004 | 05/28/2004 | CHG | | BASE RENT | 17,733.33 | | | | 58,995.52 |
| 06/01/2004 | 06/02/2004 | PMT | SCH154 | CAM RECONCILIATION | | 11,662.68 | 7234658 | (13748.22) 5/26 | 47,332.84 |
| 06/01/2004 | 06/02/2004 | PMT | SCH154 | INSURANCE RECONCI | | 2,085.54 | 7234658 | | 45,247.30 |
| 06/07/2004 | 06/08/2004 | PMT | SCH160 | BASE RENT | | 17,733.25 | 7242696 | (18533.25) | 27,514.05 |
| 06/07/2004 | 06/08/2004 | PMT | SCH160 | INSURANCE | | 200.00 | 7242696 | | 27,314.05 |
| 06/07/2004 | 06/08/2004 | PMT | SCH160 | CAM | | 600.00 | 7242696 | | 26,714.05 |
| 06/07/2004 | 06/08/2004 | PMT | SCH160 | TAX RECONCILIATION | | 26,662.57 | 7244354 | | 51.48 |
| 06/07/2004 | 06/08/2004 | PMT | SCH160 | TAX RECONCILIATION | | -26,662.57 | 7244354 | VOIDED RECEIPT | 26,714.05 |
| 06/07/2004 | 06/08/2004 | PMT | SCH160 | TAX RECONCILIATION | | 26,662.57 | 7244354 | (26662.57) | 51.48 |

**Summary**

| | | | | Description | Charges | Payments | | | Balance |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Beginning Balance | 47,356.20 | 0.00 | | | 47,356.20 |
| | | | | BASE RENT | 35,466.66 | 35,466.50 | | | 0.16 |
| | | | | CAM | 1,200.00 | 1,200.00 | | | 0.00 |
| | | | | CAM RECONCILIATIOI | -4,567.90 | 11,662.68 | | | -16,230.58 |
| | | | | INSURANCE | 400.00 | 400.00 | | | 0.00 |
| | | | | INSURANCE RECONC | -2,326.19 | 2,085.54 | | | -4,411.73 |
| | | | | TAX RECONCILIATIOM | 0.00 | 26,662.57 | | | -26,662.57 |
| | | | | | 77,528.77 | 77,477.29 | | | |

| | Balance | 51.48 |
|---|---|---|

Exhibit "I"

## Mark McCormack

**From:** Jay Archambault [JayArchambault@winn-dixie.com]
**Sent:** Tuesday, February 22, 2005 9:22 AM
**To:** Mark McCormack
**Subject:** RE: question for Ridgeland, MS

Please send bills.
Thanks, jay

-----Original Message-----
**From:** Mark McCormack [mailto:MMcCormack@mattiace.com]
**Sent:** Tuesday, February 22, 2005 9:05 AM
**To:** JayArchambault@winn-dixie.com
**Subject:** question for Ridgeland, MS

Jay:

You may have had this asked already, and if so, I'm sorry for repeating it, but how does this news today affect our CAM, Tax, & Insurance billings for 2004?  Should we send those to you this week as planned?

Thanks for any advice you can give,

Mark

Mark W. McCormack
Vice President, Asset Management
The Mattiace Company
mmccormack@mattiace.com

08/16/2005

Composite Exhibit "J"

**2004 CAM, Tax & Insurance Reconciliation**
**School Street Shopping Center**
**Ridgeland, Mississippi**

Totals for Shopping Center:

| | |
|---|---|
| *Square Footage:* | 67,891 |
| *Property Taxes:* | **$59,240.33** |
| *Insurance:* | **$11,429.00** |

CAM Detail:

| | |
|---|---|
| Admin Expenses | $157.52 |
| Building Repairs | $0.00 |
| Exterminator | $112.35 |
| Irrigation | $569.52 |
| Landscape Services | $9,398.24 |
| Parking Lot Lighting | $1,889.05 |
| Management Fee | $28,576.07 |
| Parking Lot Repair & Maint | $11,208.35 |
| Parking Lot Sweeping | $9,509.60 |
| Trash Removal | $9,769.17 |
| Utilities, Electricity | $9,908.58 |
| Utilities, Water & Sewer | $1,379.21 |

| | |
|---|---|
| *CAM Total* | **$82,477.66** |
| Total Expense Per Square Foot | $2.26 |

**2004 CAM, Tax & Insurance Reconciliation**
**School Street Shopping Center**
**Ridgeland, Mississippi**

| | |
|---|---|
| Tenant: | Winn Dixie 1362 |
| Months Occupied: | 12 |
| Square Footage: | 30,400 |
| Pro Rata Percentage: | 44.78% |

**Full Year Prorations:**

| | |
|---|---|
| Taxes | $26,526.43 |
| Insurance | $5,117.64 |
| CAM | |
| Admin Expenses | $70.53 |
| Building Repairs | $0.00 |
| Exterminator | $50.31 |
| Irrigation | $255.02 |
| Landscape Services | $4,208.31 |
| Parking Lot Lighting | $845.87 |
| Management Fee | $0.00 |
| Parking Lot Repair & Maint | $5,018.84 |
| Parking Lot Sweeping | $4,258.18 |
| Trash Removal | $4,374.41 |
| Utilities, Electricity | $4,436.83 |
| Utilities, Water & Sewer | $617.58 |
| CAM Total | $24,135.87 |

| | |
|---|---|
| Partial Year Prorated, If Applicable | 100% |

**Less Actual Charged Estimates, Per Lease:**

| | |
|---|---|
| Taxes | $0.00 |
| Insurance | $2,400.00 |
| CAM | $7,200.00 |

**Net Due For Year:**

| | |
|---|---|
| Taxes | $26,526.43 |
| Insurance | $2,717.64 |
| CAM | $16,935.87 |
| Total | $46,179.94 |

Exhibit "K"

APR-04-2005 MON 02:19 PM WINN-DIXIE REAL ESTATE    FAX NO. 504 731 2309    P. 01

*#1362*

# Winn Dixie Louisiana Inc.

600 Edwards Ave. Harahan, La. 70123
PO Box 51059 New Orleans, La. 70151
504-731-2211    504-731-2309 Fax
JayArchambault@winn-dixie.com

601-352-1830
FAX

Date __4/4/05__

To __Mark McCormick__

✱ RE:   INSURANCE BILLING

RE:   Winn Dixie Store # __1362__

✱ Under the provisions of our lease covering the above retail store location, Landlord is required to remit an **Insurance Bill** alone with the Statements, Certificate of Insurance and Declaration Pages. This is now required in order to set up for payment.

The above requires your prompt attention in order to process for payment. Your response should be addressed to Jay Archambault, Real Estate Property Manager, at the letterhead address.

Sincerely,

Winn Dixie Louisiana, Inc.

Jay Archambault
Real Estate Property Manager

Exhibit "L"

**THE BOTTRELL AGENCY**
**DIV OF TRUSTMARK NATIONAL BANK**
**P.O. BOX 1490**
**JACKSON, MS 39215-1490**
**601-960-8200**

**INVOICE**

INVOICE NO.
103

INVOICE DATE
December 31, 2003

TO:

School Street Crossing, L.P.
c/o The Mattiace Company
P.O. Box 13809
Jackson, MS 39236

## Charges

| AMOUNT | DESCRIPTION |
|---|---|
| $11,429.00 | 12/31/03-12/31/04 Insurance Package Renewal Travelers Property Casualty Policy Numbers: 630935K605A, 810935K605A, and CUP935K605A<br><br>Property $5,516; Liability $3,560; Umbrella $1,833 Boiler $520 |

| | |
|---|---|
| **$11,429.00** | **TOTAL** |

Please remit to:

Travelers Property & Casualty
c/o The Bottrell Agency
P. O. Box 1490
Jackson. MS 39215-1490

Exhibit "M"

APR-04-2005 MON 02:19 PM WINN-DIXIE REAL ESTATE    FAX NO. 504 731 2309

# Winn Dixie Louisiana Inc.

600 Edwards Ave. Harahan, La. 70123

PO Box 51059 New Orleans, La. 70151

504-731-2211    504-731-2309 Fax

JayArchambault@winn-dixie.com

Date  4/4/05

To:  Mark McCormick

⚹ RE:  Common Area Maintenance Billings

⚹ RE:  Cancelled Check or Paid Receipt for Taxes Paid

RE:  Winn Dixie Store # 1362

⚹ Under the provisions of our lease covering the above retail store location, Landlord is required to remit copies of all invoices with your CAM Billing. This is now required in order to set up for payment.

The above requires your prompt attention in order to process for payment. Your response should be addressed to Jay Archambault, Real Estate Property Manager, at the letterhead address.

Sincerely,

Winn-Dixie Louisiana Inc.

Jay Archambault
Real Estate Property Manager