## EXHIBIT A

**U.S. Trustee's Information Request**

**(filed under seal pursuant to the Seal Order)**

## EXHIBIT B

### SEC Letter

**(filed under seal pursuant to the Seal Order)**

## EXHIBIT C

**January 17, 2006 Letter to the U.S. Trustee**

**(see attached)**

# Paul Hastings
ATTORNEYS

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, N.E. • Twenty-Fourth Floor • Atlanta, GA 30308
telephone 404 815 2400 • facsimile 404 815 2424 • www.paulhastings.com

Atlanta
Beijing
Brussels
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, DC

(404) 815-2347
karolkdenniston@paulhastings.com

January 17, 2006                                                              59559.00013

**VIA E-MAIL**

Elena Escamilla, Esq.
U.S. Department of Justice
Office of the United States Trustee
135 W. Central Boulevard, Suite 620
Orlando, FL 32801

Re:    Winn-Dixie Stores, Inc., et al. (the "Debtors"), Case No. 3-05-bk-03817-JAF,
       U.S. Bankruptcy Court for the Middle District of Florida (the "Bankruptcy
       Court")

Dear Elena:

This letter is to follow up on the Motion for Order Appointing an Examiner Pursuant to
Section 1104 of the Bankruptcy Code [Docket No. 4536] (the "Examiner Motion"). We
understand from your comments in Court on January 12, 2006 that the U.S. Trustee's
Office is speaking with the Debtors, Creditors Committee and the Debtors' DIP Lender
regarding the need for an examiner. We also understand that the U.S. Trustee may be
proceeding with its own motion to appoint an examiner.

The Examiner Motion identifies the most serious reasons known to the Equity
Committee as to why an examiner is necessary. It is of the utmost importance to all of the
parties in this case that the examination be independent and not improperly limited by the
conflicting interests of the Debtors, Creditors Committee or DIP Lender as reflected in
their responsive pleadings to the Examiner Motion.[1]

The issues addressed in the Examiner Motion are serious and the scope of the
investigation requested in the Examiner Motion specifically designed to determine
whether and what claims may exist against pre-petition directors, officers, senior
management and professionals for actions or inactions that caused or contributed to the
bankruptcy filings. This is particularly true in light of the Debtors' stated intention to

---

[1] The Debtors filed their Response to Motion of the Equity Committee for the Appointment of an
Examiner [Docket No. 5003] on January 5, 2006. The Creditors Committee filed its Response to Request
for Scheduling Conference with Respect to Motion of Official Committee of Equity Security Holders for
Order Appointing an Examiner Pursuant to Section 1104 of the Bankruptcy Code [Docket No. 5071] on
January 10, 2006. Wachovia Bank, National Association filed its Response to Motion of the Equity
Committee for the Appointment of an Examiner [Docket No. 5090] on January 10, 2006.
LEGAL_US_E # 70389008.1

Paul*Hastings*
ATTORNEYS

Elena Escamilla, Esq.
January 17, 2006
Page 2

move forward with the plan confirmation process which created the clear need for an
independent investigation into whether plan releases for pre-petition directors, officers,
senior management and professionals are appropriate.

No interested party should be permitted to limit the scope of the examination by
restricting the cost of the examination or by placing unreasonable and artificial deadlines
on the completion of the examination. To the extent limitations on the timing and cost of
the examination are appropriate, and they may well be, they should not be determined
without the input of the appointed examiner and then only after review by the Bankruptcy
Court.

We remain very concerned that the efforts of the Debtors, Creditors Committee and DIP
Lender will improperly restrict the scope of the examination thus reducing the value of
the examination to the bankruptcy estates and seriously jeopardizing or minimizing the
claims the bankruptcy estates may have against the pre-petition directors, officers, senior
management and professionals. To this end, we urge the U.S. Trustee to proceed quickly
to obtain the appointment of an independent examiner and to take appropriate steps to
ensure that the investigation is not limited or impaired in any way.

If we can be of assistance in any way, we hope that you will feel free to give us a call.
Since we prepared the Examiner Motion, we would be happy to answer any questions or
provide any non-privileged information that may be helpful.

Lastly, with regard to the Notice of Disbandment filed on January 12, 2006, we will be
filing the following pleadings on Tuesday, January 17, 2006:

- Objection and Motion to Set Aside the United States Trustee's Notice of
  Disbandment of Equity Security Holders Committee and Motion for
  Appointment of Equity Security Holders Committee Nunc Pro Tunc to January
  11, 2006; and

- Motion for Order Unsealing the Pleadings and Proceedings Related to the Motion
  of Official Committee of Unsecured Creditors for Entry of Order, Under 11
  U.S.C. §§ 105 and 1102, Disbanding Official Committee of Equity Security
  Holders.

Consistent with our discussion at the hearing on January 12, 2006, I will give you a call
once the pleadings are filed to discuss scheduling. We will be asking the Court for an
emergency/expedited hearing so that the matter can be addressed quickly and equity
holders not denied representation during this critical time in the bankruptcy proceeding.

**Paul*Hastings***
ATTORNEYS

Elena Escamilla, Esq.
January 17, 2006
Page 3

Please let me know if you have any questions, I look forward to speaking with you soon.

Best regards,

*Karol K. Denniston*

Karol K. Denniston
of PAUL, HASTINGS, JANOFSKY & WALKER LLP

## EXHIBIT D

**Portions of Transcript from December 15, 2005 Hearing**

**(see attached)**

1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


IN RE:

WINN-DIXIE STORES, INC.,          CASE NO.: 05-3817-3F1

          Debtor.
_____/




TRANSCRIPT OF PROCEEDINGS




          Hearings on various motions before the

Honorable Jerry A. Funk, U. S. Bankruptcy Judge,

commencing at 1:00 p.m., on Thursday, December 15,

2005, at the United States Courthouse, Room 4D, 300

North Hogan Street, Jacksonville, Florida, as

reported by Cindy Danese, Notary Public in and for

the State of Florida at Large.



               -  -  -


**STATEWIDE REPORTING SERVICE**
606 BLACKSTONE BUILDING
JACKSONVILLE, FLORIDA 32202
(904) 353-7706               249-9952
EXPERTS IN MEDICAL, TECHNICAL & EXPEDITED TRANSCRIPTS

RED STAMP INDICATES
CERTIFIED
COPY

2

1            A P P E A R A N C E S

2

3    STEPHEN BUSEY, ESQUIRE
     CYNTHIA JACKSON, ATTORNEY-AT-LAW
     JAMES H. POST, ESQUIRE
4         Attorneys for the Debtors.

5

6    CHARLES DITTMAR, ESQUIRE
          Attorney for Lesco Medisearch.

7

8    JOHN HUTTON, ESQUIRE
          Attorney for Credit Suisse First Boston.

9

10   PETER RUSSIN, ESQUIRE
          Attorney for Pines-Carter of Florida, Inc.

11

12   HENRY BAER, ESQUIRE
          Attorney for Jefferies & Company.

13

14   JOHN MACDONALD, ESQUIRE
          Attorney for the Unsecured Creditors
          Committee.
15

16   JERRETT MCCONNELL, ESQUIRE
          Attorney for the Ad Hoc Committee.
17

18   KAROL DENNISTON, ATTORNEY-AT-LAW
          Attorney for Equity Committee.
19

20   ELENA ESCAMILLA, ATTORNEY-AT-LAW
          Attorney for the U.S. Trustee.
21

22   JOHN SCHWARTZ, ESQUIRE
          Attorney for Dean Foods Group.
23

24   EDDIE HELD, ESQUIRE
          Attorney for Morrisville Markets.
25

3

1                    APPEARANCES (Continued)

2

3        JIMMY PARRISH, ESQUIRE
             Attorney for Southeast Milk.

4

5        MATTHEW BARR, ESQUIRE
             Attorney for Unsecured Creditors Committee.

6

7        BETSY COX, ATTORNEY-AT-LAW
             Attorney for Wachovia Bank.

8

9        IAN KUKOFF, ESQUIRE
             Attorney for Anthony & Dorothy Balzebre.

10

11       MICHAEL BOWLUS, ESQUIRE
             Attorney for Penman Plaza.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

# T A B L E   O F   C O N T E N T S

PAGE

Motion to Allow as Timely Late-Filed
Claim(s) Filed by Lesco Mediseach                                  6

Motion to Deem Claims as Timely Filed
filed by Credit Suisse First Boston LLC                            8

Motion for Order Authorizing (1) Rejection
of Leases and Subleases and (II) Abandonment
of Related Personal Property Filed by Debtor                       9

Motion (I) for Authority to Reject Ground
Leases and Airport Hangar Lease Retroactively
and (II) to Establish Bar Date for Any
Rejection Damage Claims Filed by Debtor                           10

Motion to Compel Debtor to Assume or Reject
Unexpired Lease of Nonresidential Real
Property (Store #658) Filed by Pines-Carter
of Florida, Inc.                                                  11

First Omnibus Objection to Equity Claims
and Duplicate Liability Note Claims filed
by Debtor                                                         13

Application of Retention of Jefferies
& Company, Inc. as Financial Advisor to the
Official Committee of Equity Security Holders                     15

Motion for Order (A) Authorizing the Sale of
Assets Free and Clear of Liens, Claims and
Interests and Exempt from Taxes, (B) Authorizing
the Assumption and Assignment of Leases and (C)
Granting Related Relief Filed by Debtor                           37

Motion for Order Granting Third Extension of
Exclusive Periods for Filing Chapter 11 Plans
and Obtaining Acceptances of Such Plans Filed
by Debtor                                                         47

**HOLLY ETLIN**

    Direct Examination
        by Mr. Busey                                              48

5

# TABLE OF CONTENTS (Continued)

Cross-Examination
    by Mr. Barr                                    75

Cross-Examination
    by Ms. Denniston                               80

Redirect Examination
    by Mr. Busey                                   82

Recross-Examination
    by Mr. Barr                                    84

Further Redirect Examination
    by Mr. Busey                                   87

Argument by Mr. Barr                              90
Argument by Ms. Denniston                         97
Argument by Ms. Cox                              100
Argument by Mr. Busey                            101

Motion for Order Under 11 USC 365(d)(4)
Granting Third Extension of Time Within
Which Debtors May Assume or Reject Unexpired
Leases of Nonresidential Real Property Filed
by Debtor                                        107

**HOLLY ETLIN (Recalled)**

Direct Examination
    by Mr. Busey                                  107

Cross-Examination
    by Mr. Kukoff                                 111

Cross-Examination
    by Mr. Held                                   115

Argument by Mr. Kukoff                           116

Motion to Implement Order on Penman Plaza
Associates, Ltd's Motion to Compel Filed by
Debtor                                           124

- - -

1          MR. BUSEY:  Thank you, Your Honor.

2                  **DIRECT EXAMINATION**

3    BY MR. BUSEY:

4          Q    Ms. Etlin, what is your position with

5    XRoads?

6          A    I am a principal with the firm.

7          Q    How long have you been with XRoads?

8          A    Since June of 2002.

9          Q    What is XRoads' role in Winn-Dixie's

10   reorganization?

11         A    XRoads are the turnaround and restructuring

12   advisors to the debtor.

13         Q    And how long has that been so?

14         A    We were hired just prior to the debtor's

15   bankruptcy filing.  I think our official date of our

16   employment was February 16th of this year.

17         Q    And what are your primary responsibilities

18   in connection with XRoads' efforts in Winn-Dixie's

19   reorganization?

20         A    I spend somewhere between six days and I

21   think a low of three days a week at the debtor since

22   the filing, and I'm responsible for delivery of all of

23   the services that XRoads has provided to the debtor

24   during the pendency of this case.

25         Q    Give us, please, a brief review of the

1    debtor's financial structure.

2         A    Certainly.  The debtor currently has a DIP

3    financing facility outstanding.  In addition to that,

4    the debtor has normal trade liabilities and accrued

5    liabilities, et cetera.  And the debtor has

6    liabilities subject to compromise that are currently

7    estimated to be approximately $1.1 billion.

8         Q    Is the DIP facility in addition to that

9    debt?

10        A    Yes, it is.

11        Q    And how much is the DIP facility?

12        A    Oh, boy.  We paid most of it down.  I don't

13   know what the exact -- I know what the availability is

14   because that's what I focus on.

15             We've got over $200 million currently

16   available on the line.  I don't remember what the

17   borrowed balance is currently.

18        Q    What was the original amount of the DIP

19   facility?

20        A    The gross amount of the facility is $800

21   million.

22        Q    And then you have publicly traded equity

23   securities?

24        A    Yes, we do.

25        Q    What is the debtor's corporate structure?

1        A      The debtor consists of approximately two

2    dozen legal entities that are filed in these cases,

3    and then there are nonfiled entities that are the

4    operations in the Bahamas.

5        Q      What's the business of the debtors?

6        A      The debtor operates grocery stores.

7        Q      Approximately how many stores did the

8    debtors operate at the petition date?

9        A      Approximately 918.

10        Q      Are you aware that the Bankruptcy Code

11    establishes a period within which the debtor enjoys

12    an exclusive right to file and solicit acceptances of

13    a plan of reorganization?

14        A      Yes, I am.

15        Q      Are you aware that the Court has extended

16    the company's statutory period of exclusivity in this

17    case through December 19th?

18        A      Yes, I am.

19        Q      And are you aware that by this motion the

20    debtors are seeking to extend this period

21    approximately 90 more days until March 20th?

22        A      Yes, I am.

23        Q      Let's discuss the reorganization efforts of

24    the debtors since the petition date.

25              Can you tell me what the company has done in

1    connection with its market area reduction?

2        A    Yes.  I believe I previously testified on

3    this process in this court.

4            We refer to this internally in the company

5    as the footprint process, that it was a determination

6    that the debtor made to rationalize the number of

7    geographical markets and stores in which it operated

8    to focus on those markets in geographies in which it

9    felt it could be competitive going forward.

10           And so the company as part of that process

11   has closed or sold approximately 326 stores since the

12   beginning of this case, almost all of them

13   accomplished in about a 90-day period over this

14   summer.

15       Q    Leaving the debtors with approximately how

16   many stores?

17       A    The debtors currently operate 587 stores.

18       Q    In your experience, how ordinary or out of

19   the ordinary is it for a retail operator such as the

20   debtors to design, implement and execute a reduction

21   of that magnitude in the period of time to which you

22   refer?

23       A    I've been in this business, Mr. Busey,

24   almost 30 years now and I specialize almost

25   exclusively in retail and consumer products

1    companies.  I have not seen a debtor that was not in
2    full liquidation manage to close while it focused also
3    on continuing operations, close or sell 326 stores in
4    one group over a period just exceeding 90 days in the
5    history of my time in this business.
6         Q    You would describe that as extraordinary?
7         A    I would certainly like to, but I think I'd
8    probably be patting myself on the back.
9         Q    And you would never do that, would you, Ms.
10   Etlin.
11             (Laughter.)
12   BY MR. BUSEY:
13        Q    You talked about while they continued their
14   operations.  Let's talk about the operations for a
15   minute.
16             What are the company's efforts since the
17   petition date with regard to its merchandising
18   initiatives in its stores in which it's continuing
19   operations?
20        A    As we've previously spoken about and as
21   Peter Lynch has spoken about in the press during the
22   pendency of this case, the company prior to entering
23   this process had had several years of comp sales
24   declines.  There are actually very few retailers that
25   can survive year over year declines in same store

1  sales the way this company had prior to the beginning

2  of this process.

3          It was very clear to Mr. Lynch and to his

4  management team that one of the key ways to save the

5  company, in addition to really determining what the

6  core group of stores was where the company could be

7  competitive, was to implement a series of initiatives

8  to really change the way in which the stores operate,

9  to improve things like customer service and

10  merchandising and product selection and cleanliness

11  and focus.  It's the Getting Better All The Time ad

12  campaign, but it's also the getting-better-all-the-

13  time initiative which is what the company has been

14  focused on.

15          So the company, during this same period in

16  which we were getting rid of all these stores, has

17  implemented things like Project Jump-Start, which is

18  the thing that Deloitte Consulting is employed to do,

19  which is actually retraining people in every store in

20  the chain about better ways to score-card vendors so

21  that, if you have a vendor that's making direct

22  deliveries to the store, you want them to make those

23  deliveries during times that are not disruptive to

24  your business.  You want them to give you the right

25  product, not the product that happens to be on the

1    FritoLay guy's truck today.  You want them to stock

2    the shelves properly, et cetera.

3              So literally we're going through every

4    store.  There are about 80 stores complete now.

5         Q    How many?

6         A    80 of the 587 are complete now, and the

7    balance are scheduled to be retrained and completed

8    between now and June.

9              And the outcome of that is lower shrink,

10   better product selection for the customer, fewer out

11   of stocks.  And there's a front-end piece, which is

12   cashiering behavior and cashier staffing which is

13   focused on getting the customers in and out of the

14   store more quickly.

15             In addition, there has been --

16        Q    Wait.  You said "lower shrink."

17        A    Yes.

18        Q    Tell us what you mean by "shrink."

19        A    Shrink in a retail environment is product

20   that becomes not saleable when it's in the store or

21   disappears from the store, which is what most people

22   are used to.

23             In a grocery store environment, what it

24   means is not over ordering perishable product, having

25   the right perishable product in the store.  Because

1    when you go into a supermarket and you want to buy

2    milk, you're not going to buy the milk that's at the

3    front that has an expiration date two days from now.

4    But the store always has to have milk.

5            So you want to be able to balance the

6    ordering of that product so that you can reduce the

7    amount of that product that you have to throw away but

8    you have the right selection for the customer.

9        Q    In addition to the Project Jump Start and

10   the merchandising initiatives that you've described,

11   what has the company done about refreshing the stores

12   for capital investment?

13       A    Well, as part of the company's business

14   plan, the company has a very focused initiative to

15   begin remodeling over the next several years

16   substantially all of the stores in the chain that

17   require remodeling.

18           The company has worked very, very hard on a

19   variety of model stores to determine that which is not

20   only the best for the customer and presents the

21   greatest store but is a good use of the company's

22   dollars and is the most cost effective.

23           And Mr. Lynch and the management team have

24   been working over the last several months refining

25   their concepts around that and testing a variety of

1    concepts in stores in the company's chain to determine

2    that kind of look and feel for the stores going

3    forward that's really going to continue to jump start

4    sales.

5         Q    You heard reference earlier in the courtroom

6    to the monthly operating reports that the debtors

7    filed last week.  Can you discern from those monthly

8    operating reports any progress or traction these

9    merchandising initiatives have realized to date?

10        A    Yes.  The most significant of those is, as I

11   previously testified the company has had several years

12   of consecutive sales declines in its stores.  For the

13   first time in several years the company is positive.

14   The sales are positive.

15             For the eight weeks that ended November

16   16th, which was right before Thanksgiving, the company

17   had positive comp sales chainwide of 2.9 percent, and

18   that's a significant turnaround in the business.

19             You know, we've talked about the fact that

20   we expected sales to bottom out and start to come

21   back, and that shows it.

22        Q    In addition to the new footprint and your

23   operational initiatives, what has the company done

24   about reducing its corporate overhead since the

25   petition date?

1       A       As I testified, I think the last time I was

2   in court, we were talking about our plans with regard

3   to the corporate overhead.  The company has completed

4   -- it's substantially completed its process to reduce

5   its corporate overhead by approximately 37 percent or

6   $100 million annually.

7              The company started out by every department

8   within corporate headquarters and in the field with a

9   blank sheet of paper and relooked at its

10  organizational structure from top to bottom, and then

11  didn't just take the existing employees and put their

12  names in the boxes, but in every department in the

13  company, people reinterviewed for their jobs.  They

14  were not told that they were guaranteed at having a

15  job.  They had to show why they were qualified to have

16  their name be in that box on that new sheet of paper.

17             And so, not only did we end up with cost

18  reductions and less money spent, but we ended up, I

19  think, with the very best team at the company to take

20  the company forward.

21      Q       And where is the company now in the process

22  of that accomplishing and executing on that 37-percent

23  overhead reduction?

24      A       That process is substantially complete.  We

25  have been challenged by Peter, XRoads, and the finance

1   team has been challenged to find additional nonhead-

2   count cost reductions, and those are -- that goal is

3   incorporated in the company's business plan, and we're

4   in the process of going and looking for that

5   additional cost savings.  But that's in a nonhead-

6   count format.  It's in the form of supplies and

7   various kinds of indirect spending that the company

8   makes.

9       Q    In addition to the footprint restructuring,

10  the operational initiatives, the overhead reduction,

11  what has the company done since the petition date

12  regarding claims management?

13      A    Well, a number of things have been done.  I

14  think Your Honor has heard about the reclamation claim

15  process.

16          Originally there were just under 500 claims

17  filed that totalled approximately $125 million.  We

18  have substantially resolved all of those claims.  I

19  think there are going to be a few that we're going to

20  have to ultimately object to, but it's a handful now.

21          The vast majority of those claimants have

22  actually opted into the company's stipulation that was

23  entered into with regard to reclamation, and the

24  actual reconciled claim amount for reclamation claims

25  has been reduced from $125 million to $95 million, a

1   savings from the original filed amounts of over $30

2   million.

3           In addition, the company has resolved and

4   paid approximately $36 million in PACA claims since

5   the beginning of the case, and we have commenced to

6   reconcile the claims, the general claims, that have

7   been filed in the case.

8           The company had an initial claims register

9   that was $21 billion in claims.  There were few

10  duplicates in that process.  And we now estimate that

11  that those claims in that register will be

12  approximately $1.1 to $1.2 billion consistent with

13  that which is reflected in the company's most recently

14  filed MOR.

15          We're about 60 days into the claim

16  reconciliation process.  We actually retained a small

17  group of people that would otherwise have exited the

18  company during the head-count reduction process at

19  corporate, and they are staying on solely to reconcile

20  claims and then they will be departing.  They're

21  working with a team from XRoads with a goal to having

22  all of the claims reconciled prior to when the company

23  exits Chapter 11 in June.

24      Q    That reduction from $20 billion to

25  approximately $1.1 billion, approximately how many

1   claims does that represent?

2        A     I think it's 20-some thousand.  I'm not

3   entirely sure.

4        Q     In addition to claims management, what has

5   the company done since the petition date regarding

6   executory contracts?

7        A     The company has 28 --

8        Q     Non-real estate executory contracts.

9        A     Yes, non-real estate.  The company has

10  approximately 2800 non-real estate executory

11  contracts.  They consist of things like equipment

12  leases and vendor purchase contracts and maintenance

13  agreements for the stores, many different maintenance

14  vendors, supply vendors, cleaning supplies, copier

15  leases, all of those kinds of things.

16            And we're already well into a process of not

17  only the contracts have all been identified, they've

18  all been placed for the very first time into a

19  centralized database for the company.  The company

20  didn't have a central database prior to the beginning

21  of this process.  And approximately 800 of those

22  contracts have actually had a business decision made

23  with them, and approximately just under a hundred of

24  those contracts have actually been filed with the

25  Court for some form of resolution.

1           The savings to date of those that have

2    actually been through the court process is

3    approximately $15 million annually to the company as a

4    result of either the rejection or in many cases the

5    renegotiation or settlement of that contract.

6        Q    $15 million annually, you said?

7        A    That's correct.

8        Q    In addition to what we've talked about so

9    far, what has been, while you've been doing all those

10   things, the impact on the company of the hurricanes

11   this year?

12       A    Yeah, that complicated matters a little

13   bit.  I think as everyone is aware, the company had

14   approximately 125 stores that were in the region

15   affected by Hurricane Katrina.  Approximately 90 of

16   the company's stores had a direct impact from the

17   hurricane.

18           The company has worked diligently, not only

19   to reopen its stores and reopen its stores ahead of

20   its competitors in that area, and currently we're very

21   proud to say that we only have 13 stores that still

22   are not reopened in the New Orleans area, and

23   Winn-Dixie was ahead of most of its competitors

24   reopening in that area.

25           But Winn-Dixie also had to find employees

1   that were displaced all over the country from that

2   area, most of whom had lost their homes completely.

3   And the company was able to restart its operations in

4   its Hammond Distribution Center in Louisiana without

5   any interruption and get those stores up and running.

6          Probably less well known is the impacts of

7   Hurricane Wilma.  The company actually had more

8   stores, but with less severe impact, but more stores

9   actually affected.  Well in excess of a hundred stores

10  of the company were affected by Hurricane Wilma in

11  some form, either through actual damage to the store,

12  water damage, structural damage, broken glass, or with

13  damage or disruption just associated with lack of

14  power.

15         And for a number of weeks, the company had

16  to not only get these stores reopened, and again were

17  reopened in many markets ahead of Publix, but also

18  continue to supply those stores with disrupted issues

19  around transportation, gasoline.  And many of those

20  stores, because of issues with the South Florida

21  utilities company, had to operate to serve the public

22  on generator power for an extended period of time.

23         Q    So give us some idea of what was the impact

24  or cost to the company in terms of the diversion of

25  resources, energy and manpower to address those

1   hurricane issues.

2        A    Well, the company has filed insurance

3   claims.   To date I believe we've filed in excess of

4   $30 million of claims to date, and it may be higher

5   than that at this point, relating to both lost

6   inventory, actual damage not covered by a landlord's

7   policy, as well as, you know, other kinds of issues.

8        Q    In addition to everything else we've talked

9   about so far, has the company focused on the

10  development of the business plan?

11       A    Yes.

12       Q    And what do you mean when we use the term

13  "business plan"?

14       A    Well, business plan just isn't numbers on a

15  page.   It's the company articulating for its creditors

16  and its shareholders its actual strategies, both its

17  business strategies, its competitive strategies, its

18  initiatives, its plans with regard to everything from

19  how it's going to continue the remerchandising of the

20  stores and fixing of the stores to its capital

21  expenditure plans over a multiyear process.

22            And then when those strategies and

23  initiatives and competitive things are put to paper,

24  then also showing why it is the company believes

25  they're achievable and then boiling those down

1    actually to numbers in a multiple-year business plan.

2         Q    And the company has produced a business

3    plan?

4         A    Yes.

5         Q    Approximately how thick is it?

6         A    It's about this thick (indicating).

7         Q    Two and a half inches?

8         A    Inch and a half.

9         Q    Has the company delivered that business plan

10   to its creditor constituencies?

11        A    Yes.  The business plan was delivered to the

12   DIP lender, the creditors committee and the equity

13   committee on approximately Monday, November 7th.

14        Q    What discussions have occurred among the

15   company and the committees regarding the plan?

16        A    Well, we had discussions with the creditors

17   committee professionals the very next day, a short set

18   of discussions while they absorbed the contents of the

19   plan, because again it is an inch and a half thick.

20             And then we actually met in person in

21   Jacksonville with the creditors committee and their

22   advisors on the 9th, that Wednesday of that week.  And

23   then we also met with the equity committee and the

24   equity committee's advisors, partially in person and

25   partially by phone, on the very next day, on Thursday

1   of that same week.

2           In addition, there were due diligence

3   sessions that commenced in connection with the

4   professionals for both of those committees being

5   on site in Jacksonville, and they had in-person

6   meetings with Peter Lynch, and Tom Robbins, who is in

7   charge of merchandising, and Mark Sellers, who is the

8   group VP of operations, and Bennett Nussbaum, the CFO,

9   and Larry Pell, the general counsel, and us on various

10  aspects of the business plan both days, both the

11  equity committee's advisors as well as the creditors

12  committee's advisors.

13          In addition, there have been an ongoing

14  dialogue for the last few weeks then subsequent to

15  that with information requests, follow-up conference

16  calls both with Blackstone, with us, and with

17  individual members of management to answer additional

18  questions on the business plan.

19      Q    And what, in general, to date has been the

20  reaction by the committees and their professionals to

21  the company's proposed business plan?

22      A    The professionals from the committee have

23  indicated --

24      Q    Which committee?

25      A    I'm sorry.  The unsecured creditors

1    committee have indicated to us that, while they do

2    have some additional due diligence questions that

3    they're going to proffer to us over the next few days

4    based upon questions raised during the committees

5    meeting this week, that the committee is generally

6    pleased with the company's business plan and with the

7    efforts of the management team and the turnaround

8    efforts that have occurred to date and that are

9    planned.

10        Q    And what discussion has there been with the

11   creditors committee regarding the transformation of

12   the business plan into a formal plan of

13   reorganization?

14        A    We've been speaking for the last several

15   weeks on an ad hoc basis with the committee's

16   professionals.  We had an official call last week with

17   the committee's professionals to specifically discuss

18   plan of reorganization, sort of process, outline, et

19   cetera.  That was about a two-hour conference call

20   last week.

21            The debtor has committed to deliver a plan

22   of reorganization term sheet to the unsecured

23   creditors committee, it's either the first or second

24   week of January.  I know Mr. Barr will correct me if

25   I'm mistaken.  I think he's indicating it's the first

1    week of January.

2         Q    After delivery of that term sheet the first

3    week of January, what do you anticipate will follow in

4    connection with the development of a consensual plan

5    of reorganization?

6         A    Well, I think there are a variety of issues

7    that we're going to need to discuss.  Obviously, a

8    plan of reorganization of a company this size doesn't

9    get done in a week or two.

10             There need to be a whole series of

11   discussions around a variety of open issues, the

12   treatment of various kinds of specialized claims, tax

13   claims in particular, bar dates associated with those

14   things, substantive consolidation issues which we just

15   really started to have very detailed conversations on,

16   et cetera.

17             So I would anticipate that under a normal

18   process we would engage very heavily in trying to

19   define and resolve all of those issues with all of the

20   official committees in the case during the months of

21   January and February with the idea of basically

22   getting to full conclusion so that a plan can be

23   drafted.

24             Again, typically for a case this size it

25   takes two, three or four weeks to draft a plan,

1    circulate drafts to all the parties, make sure

2    everyone's happy.

3            The goal is obviously to get a plan on file

4    here in March so that the company can exit in June.

5        Q    Can you tell us whether it's preferable for

6    the company to first try to negotiate a consensual

7    plan with its creditors rather than unilaterally

8    filing a plan upon which no agreement has been

9    achieved?

10       A    I think that's a fairly obvious question,

11   but I'll be happy to answer it.

12           Particularly in a case in which the number

13   of professionals that are engaged here, you don't want

14   to create opportunities to create more controversy,

15   more legal fees, et cetera.

16           Filing an unconsensual plan is just an

17   invitation to have a variety of parties hire lawyers

18   and start filing various kinds of objections to the

19   plan.

20           It's a very important process between the

21   debtor and its committees to engage in a process of

22   coming to consensus about what to do with the company

23   going forward, and it's never advisable to file an

24   unconsensual plan.

25       Q    One of the open issues that you identified

1    that needs to be addressed and resolved, you said, was

2    substantive consolidation.  Tell us what you meant by

3    that, please.  What is the issue?

4        A    Certainly.  Again, as I think I testified to

5    before, the debtor consists of approximately 24 legal

6    entities.  Now, much of this structure is set up for a

7    variety of reasons over time, be it the source of

8    various acquisitions, be it tax planning strategies,

9    et cetera.

10        But it becomes very important in the context

11   of a bankruptcy case, particularly one like this,

12   where there may be creditors who may be creditors of

13   one entity but not of another, and really determining

14   whether there really are separate and distinct types

15   of creditors that really are creditors of certain

16   entities but not of others, and then how the value of

17   the debtor and the assets of the debtor break out

18   between those various entities, and then go to the

19   various recoveries that each of those creditor

20   constituencies might be due.

21        And it can become a very complex process.

22   You can choose the easy way, which is to substantively

23   consolidate everything and pay all unsecured creditors

24   the same amount of money or other form of compensation

25   in the case, or you can choose that the issues as

1    between the various types of creditors and the various

2    entities are so divergent that you have to pay

3    different kinds of compensation to them as part of the

4    plan.

5         Q    Depending on which debtor they're a creditor

6    of.

7         A    That's correct.  So it's something not to be

8    taken lightly because you certainly don't want to

9    disadvantage a particular creditor who might be due a

10   differential recovery because of their situation.

11              Then again, it gets more complex when you

12   have to do it that way.

13              So there are arguments on both sides.

14        Q    And what's the status of the discussions

15   between the debtor and the creditors committee on that

16   issue?

17        A    Well, Houlihan, who are the financial

18   advisors to the committee, and Blackstone, who are the

19   debtor's financial advisors, and XRoads have been

20   working through the latter part of the summer and into

21   the fall on sort of high-level issues and areas of

22   inquiry with regard to this issue; in other words,

23   sort of where to start, what kind of information

24   should we have.

25              Some of that did get put aside while the

1    company finished its business plan, and the committee

2    consensually agreed with us to wait while we completed

3    our business plan to then really engage in this

4    process.

5            Now that process has been ongoing.  We were

6    working with Houlihan on their kind of sort of

7    approach to it.

8            We also received from the committee's

9    counsel a set of very detailed questions that they

10   wished to have answered, and I know they have been

11   engaging with Skadden, the debtor's counsel, back and

12   forth on what they really need and clarifying what

13   they need and how they need it and what kind of

14   evidence they need to support the answer, because it's

15   not just good enough to put an answer on a piece of

16   paper, they want support for those answers.  And, by

17   the way, who at the company might be willing to

18   testify to that.

19           I think there's a list of -- I don't know

20   Mr. Barr, what is it, 50-some questions that we're

21   working on?  I think it's 50-some questions.  I'm

22   sorry.

23      Q    I ask the questions, you answer them.

24      A    It's 50-some questions that we're working

25   on, in addition to other financial stuff that Houlihan

1   has requested of us.

2            So we've been going back and forth with them

3   working fairly diligently on trying to get stuff

4   done.  I would say that we're probably not working at

5   the speed at which they would like us to be working on

6   this topic, but we're working as quickly as we can to

7   try to get it done.

8       Q    Given what you've said so far, what do you

9   see unfolding in January and February and March in

10  terms of the plan process in this case?

11      A    Well, we had just delivered to them on the

12  substantive consolidation, we delivered the binder of

13  material, I think, yesterday.  But that's not nearly

14  the full complement of what the unsecured creditors

15  committee has asked for with regard to this issue.

16           So we need to get the rest of those

17  information requests done.  I would suspect that's

18  going to take some period of time.

19           Right now I know people on my team were on

20  the phone last night until about 11:30 trying to hash

21  out what it was going to take to be responsive to

22  those requests.

23           We've obviously got to get through all of

24  the other issues with regard to the negotiations with

25  both sets of committees on the plan and make sure that

1   all the parties in interest are sort of satisfied with
2   where we end up.
3            And then of course the lawyers have to draft
4   the plan and everybody gets to comment on it, which
5   isn't a short process.
6        Q    So what's your time frame for the next three
7   months?
8        A    Well, I think as I specifically said, we're
9   going to negotiate the plan and deal with all of the
10  substantive consolidation issues and hopefully get to
11  a consensual conclusion with the committees on those
12  issues in January and February, draft the plan as
13  quickly as it can be drafted in March, get it filed in
14  March, again with the goal to be exiting in June.
15       Q    Do you believe that a 30-day period
16  extension of exclusivity, as advocated by the
17  unsecured creditors committee, makes sense in light of
18  what you just testified?
19       A    No, I don't.  As a matter of fact, I'm not a
20  lawyer, but as I understand, when pleadings have to be
21  filed, that would mean that we would have to be filing
22  a new pleading two weeks from now.
23       Q    A new pleading to do what?
24       A    To extend exclusivity further.
25       Q    Do you think it's in the debtor's best

1    interest and that of all of its constituencies to

2    grant the debtor's motion to extend the exclusive

3    period for another 90 days?

4         A    Yes, I do.  I think the debtor's taking this

5    process very, very seriously.  It's just it's a very

6    complex case, there are a lot of moving parts.  We're

7    in one of the debtor's busier times of year, and we're

8    just going to need to try to work through these issues

9    consensually and get this done, but it's not going to

10   happen overnight.

11        Q    In your experience, Ms. Etlin, in cases of

12   this magnitude, how is the debtor doing in terms of

13   what it's accomplished to date and the time period

14   within which it's accomplished it?

15        A    I think the debtor's made extraordinary

16   progress to do what you have to do to turn a company

17   around like this.

18             I mean, typically retailers sit in

19   bankruptcy about a year, at least under the old law.

20   They sit in bankruptcy about a year so that they can

21   prove to people they've really turned around, and then

22   they commence some form of plan negotiations.

23             We're commencing those prior to getting to

24   the actual one-year anniversary in this case with the

25   goal to getting this company out as quickly as

1    possible.

2              MR. BUSEY:  No further questions, Your

3        Honor.

4              THE COURT:  Cross-examination.

5              MR. BARR:  Thank you, Your Honor.  Matthew

6        Barr with Milbank, Tweed, Hadley & McCloy on

7        behalf of the official committee of unsecured

8        creditors.

9                    **CROSS-EXAMINATION**

10   BY MR. BARR:

11       Q    Good afternoon, Ms. Etlin.

12       A    Good afternoon.

13       Q    I have a few questions for you.  You were

14   retained or got involved in the case February of this

15   year?

16       A    That is correct.

17       Q    So prepetition you were involved in the case

18   for a short period of time.

19       A    Yes.

20       Q    Do you know the history of the company prior

21   to commencing the Chapter 11 case?

22       A    I'm familiar with the history of the

23   company, yes.

24       Q    Can you tell the Court when Winn-Dixie

25   Stores, Inc., a nondebtor, commenced its

1   reorganization efforts outside of Chapter 11?

2        A    Winn-Dixie Stores, Inc., a nondebtor.  I'm

3   sorry, I don't --

4        Q    If I can explain a little, maybe that will

5   help you with the question.

6             When the debtors filed for Chapter 11, they

7   were in the middle of an out-of-court, internal

8   reorganization, were they not?

9        A    No, I don't believe so.

10       Q    Did the debtors prepetition decide to reduce

11  their footprint store plan?

12       A    The debtors had commenced a process to take

13  a very serious look at how they might reduce their

14  store plan and were underway with the planning for

15  that effort prepetition, yes.

16       Q    Do you know when Mr. Lynch joined

17  Winn-Dixie?

18       A    In December of 2004.

19       Q    Do you know why Mr. Lynch was brought in?

20  Was one of the reasons why Mr. Lynch was brought in to

21  reorganize this entity?

22       A    Well, by "reorganize" you mean take the

23  company through a Chapter 11 proceeding, I think Mr.

24  Lynch would vehemently disagree with you.

25             If what you mean by "reorganize" meaning

1    turn the company around and take efforts to turn the

2    company around, the answer would be yes.

3         Q    And when did he start those efforts?

4         A    December, January.  I mean, shortly after he

5    arrived.

6         Q    So is it fair to say that this company has

7    been in a reorganization mode since December 2004 or

8    January of 2005?

9         A    It's fair to say the company was in a

10   restructuring mode, yes.

11        Q    Thank you.

12             With respect to claims management, you've

13   been around restructurings for approximately 30

14   years.  The estimate that the company is now putting

15   out in its monthly operating reports, between $1.1 and

16   $1.2 billion, that's the company's estimate of what it

17   believes its total liability is after a claims-

18   reconciliation process could be?

19        A    That is correct.

20        Q    In your experience, is that the number that

21   you would use to formulate a description in a

22   disclosure statement?

23        A    On a gross basis, yes.  There are obviously

24   issues with regard to the underlying components of

25   some of those claims.  Some of those claims may have

1  administrative or priority status, which obviously

2  have different treatment.

3      Q    Sure.  But typically, in your experience

4  when you formulate a disclosure statement, you need to

5  plug in a number to give creditors an opportunity to

6  decide whether or not they believe the distributions

7  under the plan are appropriate based upon the company

8  with their professionals' estimate of those numbers.

9      A    Yes.  And, as I recall, you also need to

10 take that number and break it down into the various

11 forms of classes of claims with some reasonable degree

12 of accuracy as to their various priorities.

13     Q    Absolutely.  Thank you.

14         With respect to the business plan, do you

15 know if there is a draft plan of reorganization on

16 Skadden Arps's system?  Not system, I apologize.  I

17 mean word-processing system.

18     A    Yes, I understood you.  If by a "draft plan

19 of reorganization," do you mean that they have various

20 forms of plans of reorganization on their system, I'm

21 105-percent sure that they do.

22         If by a "draft plan," you mean one that has

23 been drafted specifically for Winn-Dixie and its

24 reorganization efforts, I don't believe that is the

25 case.

1    Q    The last topic, I guess, of the afternoon

2  will be substantive consolidation, and thank you for

3  going through with Mr. Busey what it is so we don't

4  have to do that.

5         Do you recall when discussions about

6  substantive consolidation commenced with the

7  committee?

8    A    We started discussing, as I think I

9  testified at the substantive consolidation issues with

10  Houlihan, I think it was sometime over the latter part

11  of the summer, after we got through the first sort of

12  big hump of the store dispositions.

13    Q    And do you recall when the committee sent

14  its first diligence requests on substantive

15  consolidation issues?

16    A    Well, I know we received the list from

17  Milbank in October.  I don't know if there was an

18  actual written list before then.

19         I know that we had verbal conversations with

20  Houlihan with regard to their requests for data, and

21  we were in the process of putting those things

22  together.  That initial request was encompassed in

23  that notebook that I hope, I think, was delivered this

24  week to you.  I'm sorry.

25    Q    Would it shock you if told you that an

1   e-mail was sent by XRoads to a team led by somebody at

2   -- I'm sorry -- by Alvarez & Marsal to a team led by

3   XRoads with due diligence questions in July or August

4   of this year?

5       A    No.  As I said, we started discussions with

6   the committee's financial advisors specifically on

7   sort of high-level issues and the kinds of things that

8   we did in the summer.  So that doesn't surprise me at

9   all.

10              MR. BARR:   Thank you.

11              THE COURT:   Ms. Denniston, do you want to

12         ask any questions?

13              MS. DENNISTON:   Just a few, Your Honor.

14                  **CROSS-EXAMINATION**

15   BY MS. DENNISTON:

16       Q    I believe you testified that you've been

17   speaking with professionals for the creditors

18   committee and you had a two-hour call.  Are you aware

19   of any calls with the equity committee professionals?

20       A    Not that have involved us.  I'm not sure

21   that they have reached out to us on plan issues at

22   this time.

23       Q    You also testified that you believe that the

24   debtor intended to cooperate with both committees, I

25   believe; is that correct?

1        A     That is absolutely true.

2        Q     Is it your understanding that the debtor

3    intends to provide the equity committee with the term

4    sheet that first or second week of January, whenever

5    it's delivered to the creditors committee?

6        A     I would assume that, to the extent the

7    equity committee is in existence, we would provide the

8    same term sheet.

9        Q     What information has been provided in

10   connection with these discussions with the creditors

11   committee by XRoads?

12       A     You mean the plan discussions?  I'm sorry.

13       Q     Yes.

14       A     Other than the business plan, I don't

15   believe we have.  Just the substantive consolidation

16   issues that are going back and forth.

17       Q     And I take it there wouldn't be any problem

18   making that information available to the equity

19   committee?

20       A     I don't think so.  To the extent it's

21   applicable, yes.

22       Q     With regard to the business plan, is the

23   business plan public at this time?

24       A     No, it is not.

25       Q     Is there any summary of the business plan

1   public?

2        A    Not that I'm aware of.

3        Q    And I apologize for bouncing around.  With

4   regard to substantive consolidation, has the debtor

5   made a proposal to the creditors committee as to what

6   it intends to do vis-a-vis substantive consolidation?

7        A    No, we have not.  We're still in a fact

8   gathering mode.

9            MS. DENNISTON:  Thank you.  I have no

10           further questions.

11           THE COURT:  Anybody else have any

12           cross-examination of Ms. Etlin?

13           (No response.)

14           THE COURT:  Redirect, Mr. Busey?

15                   **REDIRECT EXAMINATION**

16   BY MR. BUSEY:

17        Q    Ms. Etlin, the company's people who are

18   responsible for the preparation of the monthly

19   operating report, the accounting people who are

20   responsible for the operation and the preparation of

21   the monthly operating reports and the 10-Q, are those

22   the same people who prepared or are involved in the

23   preparation of the business plan?

24        A    Yes.  To some degree, yes.  But certainly

25   they're the people who are very involved in the issues

1    around substantive consolidation.

2        Q    That was my next question.

3        A    Sorry.

4        Q    So you've got the MORs, the 10-Q, the

5    business plan and substantive consolidation.  Who are

6    those people that we're talking about?

7        A    It's about a dozen people in the finance

8    team led by one very overworked chief accounting

9    officer.

10       Q    And have they been working pretty diligently

11   on all these issues in the last couple of months?

12       A    Substantive consolidation, we have sort of

13   stepped back from them.  Obviously, the issues that

14   have been raised at the company with regard to getting

15   the 10-K filed and the 10-Q and the MORs filed took

16   absolute precedence.

17            I mean, this is a public company with equity

18   security holders and equity securities that are

19   continuing to trade, the company took it very

20   seriously that it was not able to get its SEC filings

21   prepared timely because of issues associated with

22   satisfying its independent auditors.

23            And it was a very unfortunate environment.

24   People worked extraordinary quantities of time, and

25   the main focus was getting those things on file to

1    protect all of the people who rely on that public data

2    information.

3         So, frankly, we had asked the committees'

4    professionals if they could give us a little latitude

5    until we could get those things filed with regard to

6    some of the more detailed accounting analysis, because

7    we were going to have to work around and outside the

8    finance team in order to get that done.

9         MR. BUSEY:  No further questions, Your

10        Honor.

11        MR. BARR:  Thank you.

12                  **RECROSS-EXAMINATION**

13   BY MR. BARR:

14        Q    Is substantive consolidation a legal

15   analysis, or a financial business analysis?

16        A    It is ultimately -- as I understand it, Mr.

17   Barr, it's ultimately a legal analysis, but it's based

18   on actual financial business practices of the debtor.

19   It's sort of my layman's explanation of it.

20        So it's some of both.  I know that there is

21   legal structure and legal analysis that goes with it,

22   and then there's also legal conclusions that are

23   supported by actual financial business practices.

24        Q    Sure.  And is it fair to say that a

25   significant amount of the information that would be

1    used could be culled by lawyers looking through

2    information in rooms at Winn-Dixie?

3         A    You know, I honestly can't -- I'm not trying

4    to be evasive.  I really honestly couldn't say that.

5              I am obviously most focused on those things

6    that I'm responsible for trying to go get, and there's

7    quite a stack of that.  I mean, everything from which

8    individual of the company's, I forget, hundred

9    thousand employees works for which legal entity and

10   what their job description is and all of that

11   associated with the things that have been asked for.

12             There's just a lot of accounting and payroll

13   and HR data that's necessary to support some of the

14   questions that I've been asked by the committee.  I've

15   been focused on that.

16             If there's a whole bunch of other stuff that

17   the lawyers can do, I'm just not focused on that.

18        Q    And who's leading the charge for the debtors

19   and Winn-Dixie in the substantive consolidation

20   analysis?

21        A    First of all, we're taking our direction

22   from Skadden, and then it involves both Blackstone and

23   XRoads.  XRoads more for the on-site day-to-day

24   accounting and financially based kinds of things.

25        Q    So you're not sure if there's any legal due

1    diligence or people from a legal perspective there

2    looking for documentation?

3         A    I'm sorry.  The question was:  Do we have

4    legal people on site right now working?

5         Q    Looking for the information necessary to

6    make the legal analysis for substantive

7    consolidation.

8         A    Oh, I think they are.  Everybody's working

9    on the list pretty hard right now to try to get you

10   everything that you have asked for.

11             I don't know whether Skadden's actually put

12   somebody on site, but, as you will remember, the

13   company also has a fairly large in-house lawyer team

14   who are also assisting us with putting that data

15   together.  So I just don't know who's doing what as it

16   pertains to legal aspects of the information

17   requests.

18             I know that the person at the company who is

19   in charge of our process is Jay Castle who sits in the

20   general counsel's office.

21        Q    And when do you think that you will have all

22   the information required that we've asked that we

23   expected yesterday?

24        A    I'm sorry.

25        Q    That's okay.

1        A    Well, there's an initial binder of data that

2    should be to you.  I think, however, based upon the

3    questions that -- the subsequent questions that you

4    and Skadden have been working on, I really need some

5    further clarification about the documentation that's

6    going to be required, because when my guys got

7    finished last night and I met with them before I came

8    to our attorneys' offices this morning, they told me

9    it could take as long as a month to put some of this

10   data together, and I'm sure that was not the intent of

11   the detailed nature of your request.

12            So I'm hoping we can have a further

13   conversation at some point to see whether we can get

14   you stuff much more quickly, or you really don't need

15   it to the extent that maybe it's been outlined to us.

16            So, you know, hopefully sometime in the next

17   30 days.  Hopefully less than that.

18            MR. BARR:  Okay.

19            THE COURT:  Mr. Busey?

20            MR. BUSEY:  Thank you, Your Honor.

21              **FURTHER REDIRECT EXAMINATION**

22   BY MR. BUSEY:

23       Q    Ms. Etlin, if the company does not do a

24   substantive consolidation in its plan of

25   reorganization, what is the financial analysis that

1    has to be done in order to determine which of the

2    20,000 claimants in the case receive what respective

3    distributions from their various debtors?

4        A    Well, it's going to depend on the nature of

5    what you're deciding to do if you're not substantively

6    consolidating.

7            For example, you could make a distinction

8    that says all vendors.  You know, all vendors is a lot

9    easier than vendors who sold us X, and X being some

10   subset of that.

11           So it will depend, because of course what

12   you're going to have to do is figure out what the

13   differential value is for each of those creditors as

14   to the entity of which they are a creditor, and then

15   make sure you've got the right groups of creditors

16   into which bucket.

17       Q    And you have vendors and you have landlords

18   and you have bondholders and you have people who have

19   guarantees; is that right?

20       A    And I think -- and we have tax claimants and

21   a variety of other people as well.

22       Q    And where is the company in the process of

23   the financial analysis of trying to see what that

24   picture would look like?

25       A    If by that question you mean where are we

1   with regard to the analysis that Mr. Barr has been
2   asking about, we've done some pieces of it.  But the
3   additional information requests that -- the more
4   detailed information requests that we have received,
5   we're just at the beginning of putting that material
6   together.
7       Q    And from your prior testimony, I take it it
8   is your objective that you will gather that material,
9   do the analysis and have that discussion with the
10  creditors committee and come to some resolution of
11  that hopefully by the end of January.
12      A    Oh, absolutely.  I'm hoping it could be
13  sooner than that, but it's going to -- I'm very
14  conscious of -- we take a lot of shots in the press
15  for the professional fees in this case, not only from
16  press but from others associated with this case, and
17  I'm very conscious of not spending the company and, at
18  the end of the day, the creditors' and the equity
19  holders' money unnecessarily.
20           Right now I'm looking at something that my
21  guys tell me is going to take an extraordinary amount
22  of time and I'm going to have to put extra people down
23  here, which of course is going to make Peter Lynch
24  crazy, among others.
25           So I want to see if we can shortcut this

1   process, a, to get the committee what they'd like a

2   little bit sooner, and, b, not to spend the company's

3   money to that degree, because right now it looks like

4   this gigantic prelitigation project.

5        Q    And in the process determine what's in the

6   best interest of the debtor and the creditors.

7        A    Yes, absolutely.

8             MR. BUSEY:  No further questions, Your

9        Honor.

10            THE COURT:  Thank you very much.  You may

11       step down.

12                      (Witness excused.)

13            MR. BUSEY:  Your Honor, that's all of the

14       evidence we have with regard to this motion.

15            THE COURT:  Anybody else wish to present

16       evidence?

17            (No response.)

18            THE COURT:  Anybody objecting to the

19       motion?

20            THE COURT:  Mr. Barr.

21            MR. BARR:  Thank you, Your Honor.

22            As Ms. Etlin just testified and, as I think

23       all of the pleadings in this contested matter

24       prove, the debtors and the professionals have

25       already completed almost all of the significant

1       tasks that need to be completed before we can

2       consensually negotiate and get in front of Your

3       Honor a plan of reorganization to get these

4       entities out of Chapter 11 as soon as possible.

5           We heard about the footprint reduction, we

6       heard about the rejection of leases, we heard

7       about the new management team, we heard about

8       operational initiatives that have been

9       implemented.

10          Luckily, for all the stakeholders in this

11      case, the two hurricanes or the natural disasters

12      have not had a huge impact on the company or

13      these cases, and we commend management for that.

14          The business plan has now been absorbed by

15      the creditors committee.

16          And, Your Honor, this company has been in a

17      restructuring mode for quite a long time, and

18      it's time now to get out of Chapter 11 and

19      preserve the value for all the stakeholders, and

20      obviously our view is for the general unsecured

21      creditors of these estates.

22          Experience shows, Your Honor, that giving

23      people and giving debtors time, they use all the

24      time and then they ask for more time.

25          We're at a critical juncture in this case

1    that we need now to get out.  We need now to

2    focus everything that needed to be focused on

3    before to get to the place where we can get this

4    company reorganized, on its feet and out.  You

5    hear it's starting to operationally turn around.

6    Lets get the company out.

7         Let's, fortunately, stop some of the

8    distractions that we have inside a Chapter 11

9    context.  Let's have the plan formulated, let's

10   have it solicited, let's have whatever fight we

11   potentially are going to have in front of Your

12   Honor so that we don't erode value for the real

13   stakeholders in this case, which we believe is

14   the general unsecured creditors.

15        Your Honor, we don't think it's appropriate

16   for the debtors now to ask for their typical 90

17   days.  We think we're long past that.  We think

18   we are at a stage where 30 days is more than

19   appropriate.

20        I'm not going to go through a litany of

21   everything the debtors have done already.  You've

22   heard it from Ms. Etlin and you've actually seen

23   all of the different pleadings.

24        We also believe that the business plan is

25   pretty clear.  We also believe that we can have a

1    consensual plan very, very quickly.

2        I know you hear that there's all these

3    different things that need to be done, but these

4    are all different things that are done during a

5    plan negotiation process.

6        So 30 days from now, we're going to know the

7    number that goes into a disclosure statement for

8    people to think about.  30 days from now or 60

9    days from now or let's go out 80 days from now,

10   and that's the period of time I'm talking about,

11   Your Honor, where we have a plan on file.  That

12   plan needs to go out to creditors with the

13   disclosure statement.

14       So then you have, let's call it, 25 days'

15   notice of a disclosure statement hearing and

16   another 25 days' notice of a confirmation

17   hearing.  You add that to the 30 days we're

18   requesting, that's 80 days.

19       The banks say there are these what we all

20   call the bubble stores, Your Honor, that there

21   are these stores that everybody's looking at that

22   maybe we do or don't need.

23       Well, there's a period of time in which you

24   negotiate a plan, you send it out on notice, you

25   solicit votes prior to confirmation, and I'm sure

1        the debtors are going to propose a plan that
2        allows them to reject leases up until the time of
3        confirmation when they file that schedule of
4        assumed leases or rejected leases.
5              So they're going to have 75, 80 days from
6        the 30-day extension that we're asking, so even
7        more from today to look at those bubble stores.
8        They don't need 90 days to start this plan
9        process.  They have that process built in, Your
10       Honor.
11             We need to keep people focused on what the
12       goal is, which is to get this company out of
13       Chapter 11 and to preserve the value for the
14       general unsecured creditors, in our view.
15             The committee thought long and hard about
16       the requested extension, and they believe 30 days
17       is more than enough.
18             As I said last time, Your Honor, we are
19       ready.  We have the resources.  We want to
20       negotiate this plan and get it on file.
21             We've heard from the debtors that we'll have
22       a term sheet the first week of January.  Should
23       that term sheet say what everybody expects it to
24       say based upon the business plan, it should be a
25       very, very easy plan to get on file within a

1      couple of weeks, absolutely.

2           You also heard that Skadden has a great

3      database, Your Honor.  Plans are difficult

4      documents, but we're not starting from scratch.

5      There's drafts that can be done now.

6           Substantive consolidation issues you've

7      heard about.  People have views of what those

8      answers should be.  People need to do their

9      diligence, absolutely, to get to the right answer

10     in that process, but, again, that's something

11     that should be done and can be done rather

12     quickly.

13          To say we need all the time to then start

14     the plan negotiations is not the way it should be

15     done, Your Honor.  These are all things that can

16     run concurrently.  And with all due respect, we

17     submit that 30 days is more than enough.

18          Also, to sit by, we are increasingly

19     concerned that being in Chapter 11 longer and

20     longer, we have more of sidetracks which will

21     erode the business potentially or erode the

22     value, which will cause management to have to

23     deal with things that they should not otherwise

24     have to deal with and potentially would not deal

25     with outside of Chapter 11.

1             With respect to some of the issues raised by

2     the banks, the impending holiday season, and

3     unfortunately they're correct that the committee

4     will be working around the clock, but there are a

5     fair amount of professionals retained in this

6     case, there's a fair amount of bodies, there's

7     more than enough for us to get this done over the

8     next 30 days.

9             The holiday season is a busy time for the

10    company, that's fair.  But you heard Blackstone

11    takes a lead role in this, you heard XRoads takes

12    a lead role in this.  Absolutely management will

13    have to take a role in this.

14            The sale process is done.  Blackstone is a

15    financial advisor and absolutely involved day to

16    day with the company, but a lot of their role was

17    to sell and to market stores.  So, Your Honor,

18    there's plenty of professionals on their side of

19    the table that are ready during this holiday

20    season to get a deal done.

21            And, again, based upon what we've heard and

22    what we've seen, in our view it's a very, very

23    easy plan to get done.

24            With respect to other issues raised by the

25    banks or others, we're at a stage in this case,

1      it's time.  90 days is not the right amount of

2      time.  We think 30 is.  Let's get a plan in front

3      of Your Honor, let's get it solicited by the

4      creditors, whoever stakeholders need to vote on

5      it.  Let's get this company out of Chapter 11.

6           The management team has done a great job.

7      They've preserved the value for the creditors.

8      They've put all these initiatives in place.  The

9      company is on an uptick.  But we're poised to

10     craft this plan and let's get out.

11          THE COURT:  Ms. Denniston, do you have

12     anything to say?

13          MS. DENNISTON:  Your Honor, the equity

14     committee filed a limited objection, and we had

15     three concerns.  I think that they've kind of all

16     been articulated through the testimony and

17     comments of counsel.

18          Number one, we support the extension of

19     exclusivity, and we believe the debtor's request

20     for 90 days is reasonable.

21          As the Court heard, the debtor is getting

22     better all the time.  The operations are good,

23     and the debtor needs to have the opportunity to

24     have the time to further expand on that improving

25     trend.  That trend has been a constant trend

1    since the U.S. Trustee made the decision to

2    appoint the committee back in June.

3        But the concern that the equity committee

4    has is this is a very expensive case and there

5    are a lot of professionals, and we don't want to

6    see this drag on any longer than necessary, so we

7    would urge the Court that this be the last

8    extension for exclusivity.

9        And, lastly, it's the equity committee's

10   position, I guess to put it really bluntly, if

11   we're going to have a fight, Your Honor, and I

12   believe we are, then we need to have a fair

13   fight.

14       If the equity committee's got a seat at the

15   table right now, it needs to have access to the

16   same information.  There's a whole constituency

17   out there that's still in the dark.  The business

18   plan is not out there.  There's a number of

19   creditors and shareholders that call that want

20   information.

21       With the release of the monthly operating

22   reports, the positive information that was

23   contained in those, and the debtor finally

24   getting the most recent Q on file, I think it's

25   important that we have this extension, but it

1    should be an extension with a message from the

2    Court that says -- and I believe, for one thing I

3    can agree with the committee on is, we need to do

4    this quickly, we need to be efficient and we need

5    to cap these professional fees.  Another 90 days

6    and, if that's not it, then we move on.

7         But, at the end of the day, the 90 days, I

8    believe, is reasonable based on the information

9    I've been provided, and particularly what I saw

10   that was released to the public toward the end of

11   last week.

12        I think that it is very important and

13   incumbent upon all the professionals in the case

14   to cooperate with and be sure that the equity

15   committee is a part of the discussions.

16   Otherwise, the 90 days is a waste of time,

17   because we cannot get to a consensus if you have

18   a represented constituency that's excluded from

19   the dialogue.

20        And that was the point of the objection that

21   we filed.  We do support the debtor's request.

22        THE COURT:  Anyone else want to be heard?

23        MR. BUSEY:  The debtor would like to be

24   heard, Your Honor.

25        THE COURT:  I know, but I want everybody

1      else to talk first, Mr. Busey, so that you can

2      respond to everybody if you need to.

3           MS. COX:  Good afternoon, Your Honor, Betsy

4      Cox on behalf of Wachovia Bank, which is the

5      agent for itself and the other postpetition

6      lenders.

7           We filed a written response yesterday

8      supporting the debtor's motion, and we reiterate

9      what we said in that response and fully support

10     the debtor's position.  We think it's a

11     reasonable position.

12          We think the debtors have shown, through Ms.

13     Etlin's testimony, that they have established the

14     good cause required by Section 1121(d) for an

15     additional 90 days.

16          They have made a lot of progress so far, and

17     they also have shown the additional work that's

18     necessary to formulate and propose a plan that

19     hopefully will be a confirmable plan.

20          The creditors committee seems to be trying

21     to rush the whole process by saying 30 days,

22     which appears to be an arbitrary number not

23     supported by anything, is a sufficient amount of

24     time, and I think what the debtors are talking

25     about here is not starting plan negotiations in

1       90 days, but having a confirmable plan ready to

2       be filed in 90 days.

3           The bank has been monitoring everything very

4       closely and carefully, believes the debtors are

5       doing what they need to be doing, and additional

6       time is needed and the 90 days is reasonable.

7           Thank you.

8           THE COURT:  U.S. Trustee have any position

9       here?

10          MS. ESCAMILLA:  Your Honor, we have no

11      objection to the request.

12          THE COURT:  Mr. Busey, I'll now hear from

13      you.

14          MR. BUSEY:  Thank you, Your Honor.

15          Your Honor, the 90-day statutory exclusivity

16      period was designed by Congress for a typical

17      bankruptcy case, and this is not a typical

18      bankruptcy case.

19          In cases of this magnitude, that statutory

20      exclusivity period is commonly extended, as Ms.

21      Cox says, for good cause shown.

22          I think we've made an adequate record here

23      for good cause.  We've shown a remarkable, if not

24      unprecedented, effort by this company, a company

25      of this size, a retailer of this size, to at the

1      same time restructure its business by a 35-

2      percent downsizing in the number of stores and

3      corporate overhead, and at the same time in the

4      remaining operating stores institute operational

5      initiatives, design, implement and institute

6      operational initiatives which have already begun

7      to show traction in the monthly operating

8      reports.

9          You heard Ms. Etlin say that after years of

10     declining same store sales, this company now has

11     shown a stop in that decline, and in fact the

12     sales are going up.  All of that in less than a

13     year since the case was filed, in addition to

14     extraordinary claims management and other asset

15     disposition issues that we've done.

16         The debtor is a debtor-in-possession with a

17     fiduciary responsibility for all of its

18     constituencies to reorganize and to produce

19     value.  It has shown that it's doing that.

20         It needs the assistance of this Court for

21     the extension of exclusivity now to take

22     advantage of what is done to date and to propose,

23     negotiate, formulate, draft and file a consensual

24     plan of reorganization.

25         As Ms. Etlin said, if we were put in the

1    position of filing a nonconsensual plan because

2    of a short time period on exclusivity, which is

3    what we'd have to do, if you granted the

4    committee's objection and we only had a 30-day

5    extension of exclusively, we would either have to

6    file another motion and have this exercise in two

7    more weeks, or we'd need to file a plan that

8    could not be, on the record we've made today,

9    consensual.

10        And either of those opportunities would

11   simply drive more professional fees in this case

12   because it would generate contentiousness and

13   litigation in your courtroom, and the whole idea

14   of this proceeding is that it be a consensual

15   proceeding.

16        We have shown why we need 90 days.  We need

17   January to propose to our constituencies a plan

18   that would address all of the issues, including

19   the very sticky issues of how do we address what

20   kind of different distributions to the different

21   creditors or the different debtors in this case,

22   or, alternatively, propose substantive

23   consolidation, which raises a whole other set of

24   issue.

25        And we hope to resolve by consensus by the

1    end of January.  That's pretty ambitious.  And if

2    we do that, negotiate a plan, literally a plan,

3    draft and circulate and comments and negotiate a

4    plan in February, so that that can be filed in

5    March, and then we go through the process of

6    disclosure statement and vote solicitation.

7         That in and of itself, that process that

8    we've shown we need to do, is ambitious.

9         One thing that I would disagree about what

10   the equity committee has told you, I don't think

11   this Court should be sending messages and I don't

12   think you need today to rule on matters that are

13   not before you, and that is whether or not

14   there's going to be another motion to extend

15   exclusivity or not, it simply would depend what

16   happens in the next 90 days, if that motion is

17   filed and what record is made on it, and you

18   don't need to be predicting today.

19        We've told you what we plan to do.  We've

20   shown you that the company has shown a track

21   record of accomplishment of its goals.  We're

22   hopeful that we will achieve, on behalf of all

23   the constituencies of this case, a consensual

24   plan in short order which will capture the

25   maximum value.

1          I think you should honor our track record,

2     we've shown cause, and you should grant our

3     motion.

4          THE COURT:  The Court will grant the motion

5     and extend the exclusivity period for the period

6     requested of 90 days.

7          The evidence presented to this Court is not

8     controverted.  The experts that the debtor is

9     paying lots of money to says that they need the

10    90 days.  Hopefully they won't.  Maybe everybody

11    gets on board, and there's no reason why it could

12    be filed the middle of February or the first of

13    March and move the thing along.  I don't see why

14    not.

15         I think the equity committee is a committee,

16    and they're valid, and they've got financial

17    advisors and legal advisors and, as long they're

18    there, they need to be included in the loop, and

19    we don't need to have any litigation and request

20    for production and discovery situations here.

21    They just sidetrack things.

22         This case has gone well.  There's been no

23    evidence or even allegations that the debtor

24    hasn't been diligent in the operation of this

25    business.

1          It has been complicated.  There's a lot

2     going on.  It's not a little corporation.  They

3     have accomplished quite a bit.  And a lot of

4     these things have to be accomplished before you

5     can even formulate the plan.  You have to go

6     through these claims and you have to deal with

7     the PACA situation and you have to deal with

8     these other matters so you get at least some

9     handle on what you owe, and until you do that

10    you're really just blowing smoke in the air and

11    filing a plan.

12         And the other thing, from my experience

13    before and being on the bench, anybody can file a

14    plan that everybody will vote for.  The question

15    is can the debtor accomplish that.

16         I mean, you can file a plan that says we're

17    going to pay everybody a hundred cents on the

18    dollar, you know, sure they'll vote on that, but

19    feasibility is always a problem.

20         And the only success is if everybody gets

21    together and work together and negotiate.  And

22    this case has so far been operated on a

23    professional level and a lot of matters have been

24    negotiated and worked out, and hopefully that

25    will work and be successful.

1          That being said, the Court will approve the

2     motion.  I'll look to Mr. Busey to prepare the

3     order, and this hearing is concluded.

4          Mr. Busey, now we'll return to the extension

5     of time to assume or reject unexpired leases.  Is

6     that --

7          MR. BUSEY:  Yes, sir, Your Honor.

8          THE COURT:  -- the next thing?  I'll hear

9     from you.

10          MR. BUSEY:  Thank you, Your Honor.

11          We ask the Court, for the purpose of this

12     motion, to take notice of the evidence that we

13     just offered on the exclusivity motion, and with

14     that we'll call Ms. Etlin back to the stand and

15     ask her a few more questions.

16          THE COURT:  Very well.  Ms. Etlin, you are

17     still under oath.

18   WHEREUPON,

19                        **HOLLY ETLIN**

20   was called as a witness herein, and having been

21   previously sworn by the Courtroom Administrator, was

22   examined and testfied further as follows:

23                   **DIRECT EXAMINATION**

24   BY MR. BUSEY:

25     Q    Ms. Etlin, by the debtors' motion, you're

1    aware that debtors are seeking a further extension of

2    their period, under Section 365 of the Bankruptcy

3    Code, within which they may assume or reject unexpired

4    leases of nonresidential real property.

5         A    Yes.

6         Q    And we're seeking that extension for a

7    parallel period of time with exclusivity to March

8    20th, 2006.

9         A    Yes.

10        Q    Why does the debtor need additional time

11   until March 20th in order to determine whether to

12   assume or reject those leases which have not already

13   been the subject of proceedings in this court?

14        A    Well, first of all, it's a matter of common

15   practice in retail cases in which leases are a very

16   significant issue in the case that you have the leases

17   run concurrent with exclusivity.

18             From a business point of view, however, the

19   issue comes down to this:  We've spoken now about the

20   great things that Winn-Dixie has done to turn around

21   its business, and we've spoken about the fact that the

22   store sales are turning and all of that.

23             However, the debtor is a good and conscious

24   business just like any other retailer, and it's always

25   looking very actively at its store base with regard to

1   the relative performance of the stores.

2          And while no further closures are

3   contemplated at this time, there may be some balancing

4   of the remaining chain that the debtor might choose to

5   have occur, and, frankly, the debtor wants to have the

6   additional time to see what the ultimate results are

7   of these continuing merchandising initiatives to make

8   sure that it's not making or cause to make premature

9   decisions on either positive or negative as it

10  pertains to any individual store.

11      Q    Do you believe it's in the debtor's best

12  interest to continue the Section 365 time to assume or

13  reject until March 20th?

14      A    Absolutely.  If you were forced to make a

15  premature decision, a, you might make the wrong

16  decision and that might be bad for value, and also you

17  might create a claim where you might not necessarily

18  have to do so.

19          On the other side, you might choose to

20  assume something that at the end of the day you might

21  not want to assume if you had further time to evaluate

22  it.

23          The debtor had hoped to be through this

24  process by now, but, frankly, this is a process that's

25  not just based upon financial performance.  You have

1  to take a very, very hard look at every remaining

2  store, the prospects for future growth around that

3  store, the prospects for the real estate market around

4  that store, the quality of the real estate, et

5  cetera.  Those are things that happen in the field.

6          And needless to say, over the past few

7  months with the two major hurricanes, the field's been

8  a little distracted, and some of those stores, in

9  particular the stores that the debtor may want to take

10  a much closer look at, are located in South Florida,

11  for example.  And so you had a very significant

12  distraction associated with the hurricanes.

13          MR. BUSEY:  No further questions, Your

14      Honor.

15          THE COURT:  Cross-examination.

16          MR. KUKOFF:  Thank you, Your Honor.  Ian

17      Kukoff here on behalf of --

18          COURT REPORTER:  I didn't hear him.

19          MR. KUKOFF:  I'm sorry.

20          THE COURT:  Stand behind the microphone

21      when you talk.  We can't hear anybody if they're

22      not behind the microphone.

23          MR. KUKOFF:  Ian Kukoff, Blaxberg, Grayson,

24      Kukoff & Siegel on behalf of landlords Anthony

25      and Dorothy Balzebre, store location 370.

111

1                    CROSS-EXAMINATION

2   BY MR. KUKOFF:

3       Q    You had testified earlier that the business

4   plan was essentially complete at this point and has

5   been distributed to the creditors committee for

6   review?

7       A    Yes.

8       Q    And is that going to form the foundation for

9   the term sheet for the plan of reorganization?

10      A    Yes, it is.

11      Q    And in connection with the preparation and

12  completion of that business plan, was there a

13  determination made in regards to which leases would be

14  assumed as part of a reorganization plan?

15      A    The business plan as drafted contemplates

16  substantially all of the existing footprint going

17  forward.  No permanent decision has been made,

18  although we've made both the committees aware that the

19  debtor continues to evaluate certain stores.

20      Q    Has there been any decision made concerning

21  any of the remaining leases, that the debtor intends

22  to assume any of those leases as part of its

23  reorganization plan?

24      A    As I think I previously testified, the

25  debtor has made no specific final decision as it

112

1   pertains to any of the existing 587 stores, either

2   positive or negative, and is continuing to evaluate

3   all of those stores.

4           The debtor believes it has the right

5   footprint today, but there are a variety of operating

6   initiatives underway and they're looking at how every

7   store is responding to those various initiatives.

8           Q    Have you had an opportunity to look at Store

9   370, which is located at Sunset Drive and Galloway

10  Drive in South Miami, Florida?

11          A    Yes, I have.

12          Q    Can you tell the Court what the performance

13  of that store has been?

14          A    Certainly.  The store, from fiscal 2003 to

15  2004, had an excess of a 12-percent sales decline year

16  over year.

17          From 2004 to 2005, the sales actually

18  stablized.  That's fiscal, by the way, so that means

19  2005 ended in June.

20          The sales level actually stablized.

21  However, the net profit before administrative expenses

22  at store level actually declined from fiscal 2004 and

23  2005.

24          This store is one that the debtor is looking

25  very closely at with regard to the effect of its

1    operating initiatives and its need to improve its

2    operations.

3              We're very hopeful that the store will be

4    part of the final go-forward chain, but, frankly,

5    given the historical issues around the operation of

6    this store, the debtor's taking a very, very close

7    look at it and, as I mentioned, it is one of the South

8    Florida stores that have also had impacts from the

9    hurricane.

10       Q    Speaking of the impact of the hurricane,

11   what specifically was that impact?

12       A    There was disruption in a variety of the

13   stores down in the South Florida area as to either

14   loss of power, closure and other kinds of issues

15   associated with the hurricane.

16       Q    Do you know what the impact was with respect

17   to this specific store?

18       A    No, I do not.

19       Q    The debtor had undertaken an analysis of all

20   of the stores in order to determine which of them

21   would be targeted stores for either rejection or

22   assumption and sale; is that right?  From the

23   commencement of the bankruptcy, that's what the debtor

24   had done, and ultimately that resulted in the

25   summertime rejection and sale of several of the

1  stores; is that right?

2      A    Yes.  The debtor's footprint process was

3  specifically focused on entire geographical markets

4  that the debtor was choosing to exit because the

5  debtor did not believe it could be effective.

6          Store 370 is located in the debtor's core

7  go-forward market.

8      Q    So this lease was assumed, was it not?  Not

9  assumed.  This lease was extended.  In other words,

10  there was a renewal option in the Store 370 lease, was

11  there not?

12     A    I'm not sure.  Again, I don't run the real

13  estate department personally.

14     Q    You're not aware that in September of this

15  year that the renewal option was exercised and that

16  this lease was extended than for another five years

17  after the targeted stores were auctioned off in

18  August?

19     A    Well, I believe every -- our operating mode

20  for the debtor has been that, for every lease that's

21  subject to renewal in this process, to the extent that

22  the debtor continues to operate those stores, we're

23  exercising those renewal options to preserve the

24  debtor's option with regard to those stores.

25          So, if there was a renewal option on your

1  store, I'm sure the debtor did exercise it

2  specifically to keep its options open.

3      Q    Isn't it true that, in assuming the lease,

4  the debtor would actually increase the potential

5  rejection damages if this lease was going to expire on

6  December of this year if it in fact ultimately rejects

7  it?

8      A    You're asking me to draw a legal conclusion,

9  and I'm not a lawyer.

10         MR. KUKOFF:  I have nothing further, Your

11     Honor.

12         THE COURT:  Thank you very much.

13         Anyone else have any questions of Ms. Etlin

14     on this issue?

15         MR. HELD:  Thank you, Your Honor.  Eddie

16     Held on behalf of Morrisville Markets.

17                    CROSS-EXAMINATION

18  BY MR. HELD:

19     Q    Ms. Etlin, your testimony earlier has

20  indicated that, as part of the footprint, the debtors

21  have exited the North Carolina area; is that correct?

22     A    Among other areas, that is correct.

23     Q    And with respect to North Carolina, does the

24  debtor have any current operations in North Carolina?

25     A    I don't believe we do.

1        Q    As part of the debtor's business plan, does

2    it intend to have any current operations in the future

3    in North Carolina?

4        A    No, it does not.

5             MR. HELD:  No further questions, Your Honor.

6             THE COURT:  Any other questions of the

7        witness?

8             (No response.)

9             THE COURT:  Mr. Busey, any redirect?

10            MR. BUSEY:  No, Your Honor.

11            THE COURT:  Thank you very much.  You may

12       step down.

13                              (Witness excused.)

14            THE COURT:  Additional evidence, Mr. Busey?

15            MR. BUSEY:  No, Your Honor.

16            THE COURT:  Does anybody else wish to offer

17       evidence on this issue?

18            (No response.)

19            THE COURT:  Mr. Kukoff, I'll hear from you.

20       Do you have an objection?

21            MR. KUKOFF:  Yes, Your Honor, we do.

22            May it please the Court, the purpose of 365

23       (d)(4) is to protect the landlord.

24            As I stated in our objection, this is

25       severely prejudicing this particular landlord at

1    location 370.   Approximately 38 percent of the

2    rentals due and owing for 2005 have not been paid

3    in this case.

4         There's a base rent of approximately $6,000

5    per year that this landlord collects from

6    Winn-Dixie as base rent, and it strongly and

7    heavily relies on percentage rents.

8         Based upon the timing of the filing of the

9    bankruptcy, my client's been denied $61,000 in

10   rent, which totals close to 40 percent of its

11   rentals for that year that creates an incredible

12   strain on the landlord and is burdensome to that

13   landlord.

14        And in this particular instance, the

15   testimony is that this is part of the debtor's

16   core plan going forward and that there is a

17   likelihood that this lease will ultimately be

18   assumed.

19        And if it's not, then we want to know now

20   whether it's going to be assumed or not, because

21   for my client to have to carry that kind of a

22   rental shortfall for a year until this debtor

23   decides it's going to assume or reject the lease

24   is extremely burdensome, not to mention that

25   there is a technical breach of the lease at this

1       point because the debtor didn't pay November rent

2       time.  They didn't pay it at all in November,

3       they paid it in December.

4            There's an obligation under 365 to timely

5       keep the rent current.  They did in fact pay

6       November rent in December, but they unilaterally

7       decided to abate the rent by $600, which may not

8       seem like a lot but it's 10 percent of the

9       monthly base rental.

10           They purport to rely on a provision in the

11      lease which allows for an abatement, but that

12      only applies -- and I've attached a copy of the

13      relevant provisions of the lease -- in the event

14      that there's a catastrophe or a casualty that

15      results in the need to rebuild the facility, or

16      there's a 75-percent cost involved of the

17      existing cost to the store.

18           There's no need for this landlord to have to

19      come before the Court to try to get this debtor

20      to timely comply with its obligations.

21           We've also sought the compliance with the

22      payment of the real estate obligation.  The

23      landlord recently received the real estate bill.

24      There's a $47,000 obligation that's an element of

25      rent that is owed by this tenant.  Although we've

1   spoken with the debtor and they've said the check

2   is in the mail, it has not yet been received.

3        That's an additional strain and burden that

4   this landlord has to deal with and shouldn't have

5   to come to this Court to ask be complied with.

6        Your Honor, based upon the prejudice to this

7   landlord insofar as the shortfall in rent and the

8   amount that he's had to carry and will have to

9   carry going forward until this lease is finally

10  assumed, the fact that there are technical

11  breaches under the lease that still have not yet

12  been cured and need to be cured, and the fact

13  that we believe that this lease ultimately will

14  be assumed and that this really is an effort to

15  try to avoid paying cure amounts, we would

16  respectfully ask that the Court require that the

17  debtor assume this lease.

18        And if, as they say, this lease is not

19  performing, that it reject so at least this

20  landlord has some closure on this and that it

21  knows with some certainty where we're going with

22  regard to this location so the landlord can move

23  on and either release the premises to somebody

24  who is going to pay a much higher rent -- this is

25  an old lease, Your Honor.

1       This lease was entered into in 1970.  In 30

2   years the rentals have approximately doubled,

3   and, as I said, there's only a $6,000 monthly

4   base rent obligation plus the percentage rents.

5   There is a sweet lease deal for Winn-Dixie.

6       And clearly there would be detriment to the

7   landlord if, number one, they're are not required

8   to pay the shortfall in the rent, which is

9   substantial.

10      Like I said, this is a tenant that occupies

11  approximately 40 percent of the entire shopping

12  center and has not paid 40 percent of the rentals

13  that the debtor has attributed to prepetition

14  rent based upon percentage rents.

15      At this juncture, Your Honor, we would ask

16  that the debtor's motion, at least with respect

17  to the Balzebres, be denied and that it be

18  compelled to either assume or reject this lease

19  within the time prescribed by the Court's prior

20  order of December 19th.

21      Thank you.

22      THE COURT:  Thank you.

23      Any other objections?

24      MR. RUSSIN:  Your Honor, we had filed an

25  objection -- Peter Russin on behalf of

1      Pines-Carter -- previously, but that was

2      resolved, but it might be on the docket as an

3      objection.

4              THE COURT:  Is that Pines-Carter?

5              MR. RUSSIN:  Yes, Your Honor.

6              THE COURT:  That's been withdrawn?

7              MR. RUSSIN:  Yes.  It was resolved through

8      our motion where the debtors agreed to assume or

9      reject within 10 days.

10             THE COURT:  Thank you.

11             Any other objections?

12             MR. RUSSIN:  May I be excused, Your Honor?

13             THE COURT:  You certainly may.

14             The issue as to whether or not the debtor

15     should get an extension of time to assume or

16     reject the leases is primarily based -- it's a

17     business decision of the debtor, and the only

18     evidence before the Court was the testimony of

19     Ms. Etlin, a financial reorganization advisor to

20     the debtor, who said that it's in the debtor's

21     interest to have the time to assume or reject

22     extended for the 90 days.

23             I certainly understand the position of Mr.

24     and Mrs. Balzebre, but I've had no evidence

25     presented.  I appreciate what you say, but this

1    is scheduled as an evidentiary hearing and the

2    Court has to make its findings based on the

3    evidence and not on representations of counsel.

4    There was no stipulation to any of those facts.

5        The Court will grant the motion.  Once

6    again, this motion is without prejudice to any

7    landlord filing its own motion to require the

8    debtor to assume or reject, and the Court will

9    deal with those on a case-by-case basis.

10       And, once again, I strongly urge the debtor

11   that if any landlord has a specific problem,

12   sales of a shopping center or something of that

13   nature that's pending, you should try to make a

14   decision on that particular lease as soon as

15   possible or if it's creating some extreme

16   hardship on a particular landlord.

17       That being said, Mr. Busey, do you have an

18   order?

19       MR. BUSEY:  No.  We'll submit an order, Your

20   Honor.

21       THE COURT:  Very well.  I'll look to you for

22   THE order, and the hearing is concluded.

23       Yes, sir.

24       MR. HELD:  Prior to the conclusion, Your

25   Honor, with respect to Morrisville Markets to

1       come full circle as to --

2               THE COURT:  Who is Morrisville Markets?

3               MR. HELD:  That's what I'm about to explain

4       to you.  It's referred to as Store Number 802,

5       and it sort of got under the radar.

6               But in any event, it's in North Carolina, in

7       Wake County, and it was a store that was under

8       construction as part of a shopping center that

9       the construction was never completed as a result

10      of the Chapter 11 filing.

11              The debtors, subject to Your Honor's

12      approval, have agreed, with respect to the

13      extension to assume or reject and the granting of

14      the debtors' motion, to carve Morrisville Market

15      out so that, in essence, the lease will be deemed

16      rejected.

17              In addition to or with respect to that

18      agreement, the Morrisville Market has agreed to

19      release -- the parties will mutually release each

20      other from any and all claims and just go on

21      about their business.

22              And subject to Your Honor's approval, the

23      debtors have agreed to allow that carve-out in

24      the order.

25              THE COURT:  Mr. Busey, is that your

1     agreement, or Ms. Jackson?

2          MR. BUSEY:  Your Honor, we're unable to find

3     any source on the debtor's side for that

4     agreement, so we're going to have to talk to Mr.

5     Held about it.  We received no objection.  He

6     mentioned it to us for the first time today.  You

7     have no evidence before you.

8          THE COURT:  I'm not ruling.  He's just

9     stepping up here.  I don't have that before me.

10          MR. BUSEY:  We'll deal with him.

11          (Laughter.)

12          THE COURT:  Very well.  Thank you very much.

13          MR. HELD:  Thank you, Your Honor.

14          THE COURT:  Motion to implement order on

15     Penman Plaza Associates filed by the debtor.

16          MS. JACKSON:  Your Honor, this is a lease,

17     Store Number 18 located in Neptune Beach, and

18     the debtors have filed a motion to assume this

19     lease.

20          The motion cites proposed cure costs of

21     about $100,000.  After the motion was filed, the

22     landlord filed an objection asking for additional

23     cure amounts.  Those cure amounts were amounts

24     that actually became due after we filed the

25     motion.  The debtors do not need those additional

125

1   cure amounts.

2       The landlord also asked for a copy of a

3   certificate of insurance.

4       The landlord asked for all of that

5   information, both the cure of the default, the

6   postpetition default, and provision of its

7   insurance certificate, within 30 days of entry of

8   an order approving the motion to assume, and the

9   debtors are in agreement.  We will provide that

10  to the landlord.

11      So we ask the Court to grant our motion to

12  assume.

13      THE COURT:  Mr. Bowlus?

14      MR. BOWLUS:  If I'm understanding this

15  correctly, the additional sums will be paid to

16  cure?

17      MS. JACKSON:  Yes, within 30 days.

18      MR. BOWLUS:  And the proof of insurance will

19  be supplied, and you'll send me an order to that

20  effect and we'll submit it to the Judge.

21      MS. JACKSON:  Yes.

22      MR. BOWLUS:  Just saved a lot of time.

23  Thank you.

24      THE COURT:  Okay, good.  Look to you for the

25    order, Ms. Jackson.  This hearing is concluded.

1       MS. JACKSON:  I will submit one, Your Honor.

2       THE COURT:  The motion to compel debtor to

3   assume or reject filed by By-Pass Partnership.

4       Mr. Post?

5       MR. POST:  May it please the Court, Jim Post

6   on behalf of the debtors.

7       Your Honor, we've been authorized by the

8   attorney for this movant, By-Pass, to request the

9   Court -- both parties request that the Court

10  continue the hearing on this motion, to be

11  scheduled upon a notice by other party or

12  further order of the Court.

13      THE COURT:  Very well, it will be continued

14  until further notice.

15      MR. POST:  Thank you, Your Honor.

16      THE COURT:  Is there anything further before

17  the Court?  Anybody have any further matters that

18  are on the record?

19      MR. BUSEY:  Not on behalf of the debtors,

20  Your Honor.  Thank you.

21      THE COURT:  Very well.  These hearings are

22  concluded.  Thank you very much.  Good to see all

23  of you.

24      (Thereupon, at 3:00 p.m., the hearings were

25  concluded.)

128

1                    C E R T I F I C A T E

2    STATE OF FLORIDA )

3    COUNTY OF DUVAL   )

4             I, Cindy Danese, Notary Public, State of

5    Florida at Large, do hereby certify that the attached

6    excerpt represents the proceedings before the United

7    States Bankruptcy Court, Middle District of Florida,

8    Jacksonville Division, before the Honorable Jerry A.

9    Funk, Bankruptcy Judge, in the matter of In Re:

10   Winn-Dixie Stores, Inc.; such transcript is an

11   accurate recordation of the proceedings which took

12   place.  A transcript of this proceeding has been

13   produced on January 13, 2006.

14

15

16

17                          STATEWIDE REPORTING SERVICE

18

19

20   _____

21                      CINDY DANESE

22

23                      

24

25