1

```
 1              UNITED STATES BANKRUPTCY COURT
                 MIDDLE DISTRICT OF FLORIDA
 2                 JACKSONVILLE DIVISION

 3

 4     IN RE:

 5     WINN-DIXIE STORES, INC.,      CASE NO.: 05-3817-3F1

 6              Debtor.
                              /
 7

 8

 9

10              TRANSCRIPT OF PROCEEDINGS

11

12

13          Hearings on various motions before the

14     Honorable Jerry A. Funk, U. S. Bankruptcy Judge,

15     commencing at 1:00 p.m., on Thursday, December 15,

16     2005, at the United States Courthouse, Room 4D, 300

17     North Hogan Street, Jacksonville, Florida, as

18     reported by Cindy Danese, Notary Public in and for

19     the State of Florida at Large.

20

21                         - - -

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2
            STEPHEN BUSEY, ESQUIRE
 3          CYNTHIA JACKSON, ATTORNEY-AT-LAW
            JAMES H. POST, ESQUIRE
 4               Attorneys for the Debtors.

 5
            CHARLES DITTMAR, ESQUIRE
 6               Attorney for Lesco Medisearch.

 7
            JOHN HUTTON, ESQUIRE
 8               Attorney for Credit Suisse First Boston.

 9
            PETER RUSSIN, ESQUIRE
10               Attorney for Pines-Carter of Florida, Inc.

11
            HENRY BAER, ESQUIRE
12               Attorney for Jefferies & Company.

13
            JOHN MACDONALD, ESQUIRE
14               Attorney for the Unsecured Creditors
                 Committee.
15

16          JERRETT MCCONNELL, ESQUIRE
                 Attorney for the Ad Hoc Committee.
17

18          KAROL DENNISTON, ATTORNEY-AT-LAW
                 Attorney for Equity Committee.
19

20          ELENA ESCAMILLA, ATTORNEY-AT-LAW
                 Attorney for the U.S. Trustee.
21

22          JOHN SCHWARTZ, ESQUIRE
                 Attorney for Dean Foods Group.
23

24          EDDIE HELD, ESQUIRE
                 Attorney for Morrisville Markets.
25
```

3

```
 1                    APPEARANCES (Continued)

 2
         JIMMY PARRISH, ESQUIRE
 3           Attorney for Southeast Milk.

 4
         MATTHEW BARR, ESQUIRE
 5           Attorney for Unsecured Creditors Committee.

 6
         BETSY COX, ATTORNEY-AT-LAW
 7           Attorney for Wachovia Bank.

 8
         IAN KUKOFF, ESQUIRE
 9           Attorney for Anthony & Dorothy Balzebre.

10
         MICHAEL BOWLUS, ESQUIRE
11           Attorney for Penman Plaza.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    T A B L E   O F   C O N T E N T S

2                                                          PAGE

3    Motion to Allow as Timely Late-Filed
     Claim(s) Filed by Lesco Mediseach               6
4
     Motion to Deem Claims as Timely Filed
5    filed by Credit Suisse First Boston LLC         8

6    Motion for Order Authorizing (1) Rejection
     of Leases and Subleases and (II) Abandonment
7    of Related Personal Property Filed by Debtor    9

8    Motion (I) for Authority to Reject Ground
     Leases and Airport Hangar Lease Retroactively
9    and (II) to Establish Bar Date for Any
     Rejection Damage Claims Filed by Debtor         10
10
     Motion to Compel Debtor to Assume or Reject
11   Unexpired Lease of Nonresidential Real
     Property (Store #658) Filed by Pines-Carter
12   of Florida, Inc.                                11

13
     First Omnibus Objection to Equity Claims
14   and Duplicate Liability Note Claims filed
     by Debtor                                       13
15
     Application of Retention of Jefferies
16   & Company, Inc. as Financial Advisor to the
     Official Committee of Equity Security Holders   15
17
     Motion for Order (A) Authorizing the Sale of
18   Assets Free and Clear of Liens, Claims and
     Interests and Exempt from Taxes, (B) Authorizing
19   the Assumption and Assignment of Leases and (C)
     Granting Related Relief Filed by Debtor         37
20
     Motion for Order Granting Third Extension of
21   Exclusive Periods for Filing Chapter 11 Plans
     and Obtaining Acceptances of Such Plans Filed
22   by Debtor                                       47

23   HOLLY ETLIN

24        Direct Examination
               by Mr. Busey                          48
25

5

1                    TABLE OF CONTENTS (Continued)

2

        Cross-Examination
3            by Mr. Barr                                    75

4       Cross-Examination
            by Ms. Denniston                               80
5
        Redirect Examination
6            by Mr. Busey                                  82

7       Recross-Examination
            by Mr. Barr                                    84
8
        Further Redirect Examination
9            by Mr. Busey                                  87

10
    Argument by Mr. Barr                                   90
11  Argument by Ms. Denniston                              97
    Argument by Ms. Cox                                    100
12  Argument by Mr. Busey                                  101

13  Motion for Order Under 11 USC 365(d)(4)
    Granting Third Extension of Time Within
14  Which Debtors May Assume or Reject Unexpired
    Leases of Nonresidential Real Property Filed
15  by Debtor                                              107

16  HOLLY ETLIN (Recalled)

17      Direct Examination
            by Mr. Busey                                   107
18
        Cross-Examination
19           by Mr. Kukoff                                 111

20      Cross-Examination
            by Mr. Held                                    115
21

22  Argument by Mr. Kukoff                                 116

23  Motion to Implement Order on Penman Plaza
    Associates, Ltd's Motion to Compel Filed by
24  Debtor                                                 124

25
                            - - -

6

```
 1              P R O C E E D I N G S
 2   December 15, 2005                        1:00 p.m.
 3                      - - -
 4          THE COURT:  Good afternoon.  We're here
 5      today on the case of Winn-Dixie Stores, Inc.
 6          We have several matters on the calendar.
 7      The Court will take those motions in the order
 8      they appear on the final agenda that's been
 9      furnished to the Court.
10          Mr. Busey, are you in charge today, of your
11      side, that is?
12          MR. BUSEY:  Yes, Your Honor.  Actually,
13      you're in charge.
14          (Laughter.)
15          MR. BUSEY:  I am here on behalf of the
16      debtors, Your Honor.
17          The first motion on the Court's agenda is a
18      motion of Lesco Medisearch.
19          THE COURT:  Correct.
20          MR. DITTMAR:  May it please the Court, I'm
21      Charlie Dittmar for Lesco.
22          THE COURT:  On your motion.
23          MR. DITTMAR:  Yes, Your Honor.
24          Your Honor, this was for a Proof of Claim
25      for Lesco that was not timely filed, the bar date
```

1          being August 1.  I, getting back from a rather

2          lengthy time away from the office, believed that

3          I could get the claim filed on August 1 with my

4          client signing the claim that day, that it could

5          be filed electronically.

6               I did not catch on to the fact that it had

7          to be mailed up to Logan in, I believe it was,

8          Tennessee or wherever that was.  Oh, New Jersey.

9               At any rate, it was sent, the claim was, by

10         FedEx and arrived August 2, so it was filed

11         exactly one day late.

12              The debtor has scheduled a claim for Lesco

13         in $101,000.  Our Proof of Claim is actually

14         $129,000.

15              We just ask that the Court allow this

16         because there is no prejudice to any other party

17         other than Lesco if the relief is denied.

18              THE COURT:  There being no objections, it

19         appears that the late filing, if there was any

20         neglect, it was excusable, and the Court will

21         grant the motion.  The claim will be allowed as a

22         timely claim.

23              Do you have an order?

24              MR. DITTMAR:  No, Your Honor.  I'll have to

25         submit one for you.

1           THE COURT:  We'll look to you for the order.

2           MR. DITTMAR:  Yes, sir.  It will be

3      submitted in the usual course.

4           THE COURT:  The order can be submitted

5      electronically.

6           MR. DITTMAR:  Yes, sir.  I've done that

7      before, sir.

8           THE COURT:  Motion to deem claim as timely

9      filed by Credit Suisse First Boston.

10          MR. HUTTON:  Good afternoon, Your Honor.

11     John Hutton from Greenberg Traurig on behalf of

12     Credit Suisse First Boston.

13          Your Honor, this is also a motion to deem a

14     claim timely filed.

15          As with the prior matter, this claim was --

16     two claims filed on behalf of Credit Suisse First

17     Boston were 23 hours late.  This was a result of

18     a courier delivery error.

19          The motion was supported by two affidavits

20     and exhibits indicating the circumstances of the

21     late filing.  The two affiants are actually here

22     in the courtroom, but I don't believe there's any

23     objection to the relief requested in the motion.

24     We've asked that the two claims be deemed timely

25     filed on grounds of excusable neglect.

1      THE COURT:  Your motion came to me this

2  morning (displaying document).  It took all this

3  just to tell me what you told me in about two

4  minutes.

5      MR. HUTTON:  I can go on, Your Honor, but

6  under the circumstances I'm not sure it's

7  necessary.

8      THE COURT:  I find that, if there was any

9  neglect, it's excusable.  I don't find there

10  would be any prejudice to allow the claim to be

11  filed 23 hours late.

12      The Court will grant the motion.  The claim

13  will be deemed timely filed.

14      I'll look to you for an order.

15      MR. HUTTON:  I don't have one with me, Your

16  Honor, but I will submit one.

17      THE COURT:  Electronically, not by DHL,

18  please.

19      MR. HUTTON:  That will be the case, Your

20  Honor.

21      Your Honor, may I be excused, please?

22      THE COURT:  Certainly.

23      Take up the motion for order authorizing

24  rejection of leases and subleases and abandonment

25  of related property filed by the debtor.

1          MR. BUSEY:  Your Honor, this motion by the

2     debtor, Docket Number 4143, is a motion which the

3     Court has heard before with regard to other

4     leases, but has been continued until this date as

5     to Store Number 1857 and the leases which are

6     described in the motion as the Buehler leases.

7          There is no objection.  We've worked out all

8     of the disputes with regard to the rejection of

9     the leases and subleases for the store and the

10    Buehler leases, and we have a proposed order

11    which identifies the leases and subleases in the

12    order and authorizes the debtor to reject them.

13         THE COURT:  Any other comments?  There being

14    none, the Court will grant the motion.

15         Pass up the order, please.

16         This order is signed, and this hearing is

17    concluded.

18         Now we'll take up a motion for authority to

19    reject ground leases and airport hangar lease

20    retroactively, and to establish bar date for any

21    rejection damages filed by the debtor.

22         Mr. Busey?

23         MR. BUSEY:  Your Honor, by this motion,

24    which is Docket Number 4513, the debtors ask for

25    authority to reject the leases for Store Number

1    1402, 2099, 2177, 2382 and 2629, as well as the

2    debtors' lease at the Jacksonville International

3    Airport with Air Command for hangar space for the

4    airplanes that we've now sold.

5        There are no objections, and we have a

6    proposed order.

7        THE COURT:  Any other comments?  There being

8    none, the Court will grant the motion.

9        If you'll pass up the order.

10       Order is signed, and this hearing is

11   concluded.

12       Take up the motion to compel debtor to

13   assume or reject unexpired lease of

14   nonresidential real property filed by Pines-

15   Carter of Florida.

16       MR. RUSSIN:  Thank you, Your Honor.  Peter

17   Russin of Meland, Russin, Hellinger & Budwick in

18   Miami.

19       We represent Pines-Carter and filed this

20   motion pursuant to Your Honor's prior order

21   inviting those tenants, or landlords, that is,

22   that believe that timing was of the essence for

23   their particular project or property to be

24   resolved.

25       We have been in discussions with debtors'

1    counsel.  Our understanding is that they intend

2    to file a motion to assume our lease.

3        The genesis of the motion, frankly, was my

4    client's interest in selling its property, which

5    is a shopping center which contains as the anchor

6    tenant the Winn Dixie store at issue here.  It's

7    a $22.4-million deal at issue.

8        We had been trying to get the debtor to come

9    to terms on a termination of the lease.

10   Significant dollars were offered, but the debtor

11   for a number of months has told us that it is

12   just unable to make a decision with regard to

13   this store.

14       Given the fact that a $22.4-million deal

15   hung in the balance, we felt it appropriate to

16   file the motion to compel to have the debtor make

17   this decision.

18       I have a witness prepared to testify today,

19   but if the debtor is essentially going to cut the

20   legs out from under the motion to compel by

21   agreeing to it, that probably moots the issue.

22       THE COURT:  Mr. Busey?

23       MR. BUSEY:  Your Honor, the debtors have

24   agreed with this landlord to file a motion within

25   10 days to assume or reject the contract.  That

1          is, the lease.  That is, we're agreeing to the

2          relief requested by the motion.

3              THE COURT:  The Court will grant the motion,

4          and the debtor must assume or reject the lease

5          within 10 days from date of the order.

6              MR. RUSSIN:  And I will submit an order,

7          Your Honor.

8              THE COURT:  You will submit an order in due

9          course.

10             Hearing is concluded.

11             Take the matter of the first omnibus

12         objection to equity claims and duplicate

13         liability note claims filed by the debtor.

14             MR. BUSEY:  Your Honor, Mr. Post will

15         present this on behalf of the debtors.

16             THE COURT:  Mr. Post?

17             MR. POST:  May it please the Court, this is

18         the first of a series of omnibus objections to

19         claims filed by the debtors in these cases.

20             Since this Court entered its claims bar date

21         order establishing August 1st, 2005 as the claims

22         bar date, over 12,300 proofs of claims have been

23         filed in this case against the debtors.

24             By this first omnibus objection, the debtor

25         is seeking an order disallowing the claims

1    identified in Exhibit A because those claims are

2    based on the claimants' ownership of the debtors'

3    common stock.

4        And in this first omnibus objection, the

5    debtors are seeking an order disallowing the

6    claims identified in Exhibit B as duplicate

7    claims.  That is, a Master Proof of Claim was

8    filed by Wilmington Trust Company, a successor

9    indentured trustee on behalf of noteholders, and

10   the claimants identified in Exhibit B are

11   individual members of that trust.

12       We have received two objections.  We served

13   this, of course, on all of the persons filed on

14   these claims.  We received two objections with

15   respect to the Exhibit B claimants, that is, the

16   duplicate liability note claims.

17       In our proposed order we have carved them

18   out, and we are going to deal with them at a

19   separate time upon notice and hearing before this

20   Court.

21       And we received one objection with respect

22   to the Exhibit A.  A lady by the name of Sally

23   Huff filed a letter with this Court which was

24   docketed by the clerk as an objection.  Her

25   letter has attached to it a Proof of Claim in

1    which she identifies herself as an owner of 300

2    shares of stock.

3         We're asking the Court in this order to

4    overrule that objection to the extent it

5    qualifies as an objection, and I have prepared a

6    proposed order for the Court's consideration.

7         THE COURT:  The response you're talking

8    about is Sally Huff.  Is Sally Huff present or

9    represented?  Let the record reflect she is not.

10        The Court will sustain the objections as to

11   all of the creditors except the two that you

12   mentioned.

13        Do you have an order?

14        MR. POST:  Yes, Your Honor.

15        THE COURT:  Order is signed.  This hearing

16   is concluded.

17        MR. POST:  Thank you, Your Honor.

18        THE COURT:  Application for retention of

19   Jefferies & Company as financial advisor to the

20   official creditors committee.

21        MR. BAER:  Good afternoon, Your Honor, Hank

22   Baer from Latham & Watkins on behalf of Jefferies

23   & Company.

24        As Your Honor is aware, we were here two

25   weeks ago to consider the same application to

1        retain Jefferies.  There were several objections

2        that were filed to the retention application at

3        that point.

4            I believe that the objections can be

5        summarized in three basic categories.  One is

6        that there was some concern about the type of

7        consideration that any success fee would be

8        paid.  There was a concern about the cost of

9        serving the 328 notice at this point in the

10       case.  And based on those two concerns, I believe

11       there was a request, sort of a general request,

12       to put off consideration of the retention

13       application for a few weeks.

14           And as Your Honor well knows, because we're

15       here today, Your Honor agreed and put off the

16       consideration of the application until today.

17           I believe that we have resolved all the

18       issues regarding the first two concerns.  We have

19       agreed with the debtors and we have agreed with

20       the U.S. Trustee that the consideration of -- the

21       form of consideration -- pardon the language --

22       for the success fee would be considered at a

23       later date, and we've attempted to craft into

24       that order some recognition that it would be

25       considered at the first omnibus hearing following

1        the final resolution of the formation of an

2        equity committee.

3            We've also agreed with the trustee on the

4        notice that will be sent out, and we've agreed

5        that that notice will be sent out also following

6        final resolution of the equity committee

7        formation question.

8            So I believe with those two issues

9        consensual with the debtors, and I will admit

10       we've provided it to the debtors, they've agreed

11       in concept.  The order that we provided to them

12       they have not yet signed off on, but I believe

13       they've agreed in concept, and the U.S. Trustee

14       has also signed off.

15           I don't believe there's any other issue

16       that's open right now, and I don't believe

17       there's any further need to a joint consideration

18       of this application.

19           So for the protection of the equity

20       committee as well as for Jefferies as a

21       professional, we would ask that that application

22       be approved on those terms today.

23           THE COURT:  The unsecured creditors

24       committee have a position?

25           MR. MACDONALD:  Thank you, Your Honor.  John

1        Macdonald on behalf of the committee.

2               On December 1, one of the major factors that

3        I think led to an adjournment of the matter

4        through today was the pending decision by the

5        United States Trustee on her action with respect

6        to potential disbandment of the equity

7        committee.

8               Unfortunately, the shoes we were waiting to

9        have dropped have not dropped, and there's no

10       decision that we're aware of at this point, and

11       so we find ourselves just simply 14 days later

12       with the same issues.

13              The committee maintains, for that same

14       reason, that the issue remains premature.

15       However, if the Court is inclined to grant it, we

16       still are concerned about the substance of the

17       fee application request, specifically the nunc

18       pro tunc treatment of the monthly fee back to

19       December 1 that's still proposed to be earned

20       under 328 with no 330 review.

21              I understand that there is a proposed order

22       that has been circulated.  I have not seen it.

23       So we have that concern that there be preserved

24       for this Court the opportunity to review the

25       reasonableness of that monthly fee under a 330

1    standard as opposed to entering an order that

2    grants 328 entitlement immediately.  That's a

3    huge number, $375,000, that would go right off

4    the top of residual cash.

5        Secondly, the success fee.  We had urged the

6    Court that if the success fee is to be

7    authorized, that it be paid solely from the

8    equity's share should they receive some

9    distribution under the plan, and in that event be

10   limited solely to the same currency in which that

11   share is paid.  If they get cash, it's paid in

12   cash.  If they get stock, it's paid in stock.  So

13   there's no cash obligation of the debtor under

14   the obligation of the plan.

15       So, Your Honor, we still believe it is

16   premature, but we voice those substantive

17   concerns regarding the application.  And if the

18   Judge is inclined to consider the application, we

19   would hope to participate in the preparation of

20   that proposed order.

21       Thank you, Your Honor.

22       THE COURT:  Thank you.

23       Debtor?

24       MR. BUSEY:  Counsel for Jefferies has

25   correctly stated our concerns and has agreed to a

```
1          form of order that would adjourn those two issues
2          until a later date, and so we're satisfied as to
3          the form of the order.
4               There remains, however, an objection to the
5          very retention by the ad hoc committee of
6          retirees.  That was really the reason that this
7          matter was rolled over from December 1st to
8          today.
9               And it seems appropriate, Your Honor, that
10         the $100,000 ticket for these people, whether
11         it's nunc pro tunc or not, doesn't start until
12         the equity committee issue has been resolved.
13              And so it seems to the debtors that it makes
14         sense to further adjourn this matter until the
15         United States Trustee makes a decision as to
16         whether or not she is going to disband the equity
17         committee and thus there would be no reason for
18         this retention.
19              I talked to Ms. Escamilla this morning, and
20         she says that that decision which we thought was
21         going to be made by today is imminent but it
22         hasn't been made yet.
23              THE COURT:  What about the issue on the 330
24         review, what's the debtor's position there that
25         Mr. Macdonald had raised?
```

1           MR. BUSEY:  The debtor thinks, in fairness

2      to the professionals involved, that the issue of

3      the 328 versus 330 review ought to be consistent

4      among all the financial advisors in the case, and

5      I believe that the creditors committee financial

6      advisors do not have that 330 review aspect.

7           And therefore, what we said to Jefferies was

8      that we think it ought to parallel the financial

9      advisors to the creditors committee.  And I think

10     that would provide for 328 protection once the

11     notice contemplated is given to all creditors.

12          THE COURT:  Thank you.

13          Ad hoc committee?

14          MR. MCCONNELL:  Thank you, Your Honor.  May

15     it please the Court, Jerrett McConnell on behalf

16     of the ad hoc committee.

17          At this time, given how things have

18     progressed the last two weeks, the committee does

19     not take a stand or position one way or the other

20     as to the application by Jefferies.

21          THE COURT:  Thank you.

22          Anybody else want to speak on this issue?

23          Ms. Denniston, you want to speak?

24          MS. DENNISTON:  Yes, Your Honor, just

25     briefly on behalf of the equity committee.

1           As the Court knows, last Friday the debtor

2     released a quarterly report filing with the SEC

3     and also three months of the monthly operating

4     reports.

5           We've reached a juncture in the case where

6     it's become critical.  If the equity committee is

7     to keep up, it does need access to Jefferies.

8     And we have a great concern about whether or if

9     Jefferies will continue to work with the

10    committee if we can't reach a resolution on their

11    retention.

12          Consistent with the position taken by the

13    debtor's counsel just now, we believe the fair

14    and equitable thing to do would be to accept the

15    proposed order and treat Jefferies like every

16    other professional in this case subject to the

17    terms of the order that's being proposed, and we

18    would ask the Court enter that order in that

19    form.

20          THE COURT:  Thank you.

21          Ms. Escamilla on behalf of the United States

22    Trustee?

23          MS. ESCAMILLA:  Your Honor, I don't easily

24    make assertions or dates that I don't think we

25    can meet, and I apologize that our office has not

1          been able to make a decision at this point.

2               One of the major factors that we did not was

3          that there was three months of monthly operating

4          reports that were filed on Friday as well as the

5          SEC filing for the quarter, and that material is

6          something that we have to consider in making our

7          decision.

8               And regarding the application of Jefferies,

9          there are provisions in it that deal with our

10         concerns.

11              The United States Trustee retains 330

12         review, the fee examiner retains 330 review, and

13         then we're just holding off on the notice

14         provisions and on the form of the success fee if

15         in fact an equity committee continues.

16              I believe that the order still allows other

17         people to come in and object once that notice

18         goes out, but not the people that have already

19         received notice.

20              THE COURT:  I understand.

21              MS. ESCAMILLA:  Thank you, Your Honor.

22              THE COURT:  Anybody else?

23              Mr. Baer?

24              MR. BAER:  Your Honor, if I just might

25         clarify, I believe that the form of order may

1        actually resolve some of the remaining issues

2        that were raised.

3            The form of order does indeed contemplate

4        that the form of consideration that the success

5        fee would be paid would still be subject to

6        review by this Court at the later date.  So to

7        the extent that it's going to be paid in equity

8        or other some form or be paid in cash, that

9        determination will be made once the equity

10       committee formation issue was fully resolved.

11           In addition, the issue of the success fee

12       itself, the payment of that success fee, also

13       obviously just by the structure of the deal

14       itself would necessarily be, although that would

15       be approved as part of this order, but I think

16       the form that that consideration would be paid

17       would be for a later time.

18           I don't think that there's any question

19       that, at least as far as I know, that a

20       professional that's been properly retained,

21       although not by this Court, by a duly appointed

22       fully formed committee while the committee is

23       actually formed is going to be entitled to the

24       reasonable fees for its work while the committee

25       was formed.

1          So I don't think that there's a question

2     today about whether or not Jefferies would

3     eventually be entitled to get paid for the work

4     that it's done while the committee's been

5     formed.

6          The question is whether or not they would be

7     entitled to any kind of a fee after the committee

8     was dissolved if it were dissolved.  Again,

9     because of the structure of the success fee and

10    because of the consideration of the type of

11    consideration to be paid to Jefferies would be

12    considered at a later date, that also should not

13    be an issue for today.

14         So I believe that the issue should be

15    resolved by the form of order that has been

16    agreed to, and I don't think that there's any

17    reasonable basis to ask Jefferies to continue to

18    work without any kind of a protection of a

19    retention order, especially a retention order

20    that has been so closely crafted to address all

21    the various concerns that have been raised.

22         It does indeed allow for any party that has

23    not gotten notice of the 328 retention will have

24    30 days after that notice is sent, which will not

25    be for several months or several weeks, who

1    knows, but it will not be sent until the equity

2    committee issue has been resolved; that any party

3    that has not gotten that notice in the past will

4    then have an opportunity to come in and object to

5    the retention of Jefferies under 328, or I should

6    say the review of fees under 328 as opposed to

7    under 330.

8        THE COURT:  But any success fee once that's

9    determined is paid by the equity security

10   holders, it's not paid by the debtor.  It's paid

11   out of whatever they receive.  That's the

12   understanding I'm getting, at least that's --

13       MR. BAER:  Well, I know --

14       THE COURT:  -- to me.

15       MR. BAER:  I apologize, Your Honor, I didn't

16   mean to interrupt.

17       It's clearly not considered that way, it's

18   not written into the contract that way.

19       My understanding, however, is that, just by

20   the necessity of the structure, it would be.  The

21   equity holders are the residual value holders of

22   this estate.  To the extent that there is any

23   success fee, that is because the residual value

24   that goes to equity will be greater than $50

25   million.  This necessarily comes out of that

1        residual value.

2            It's not written into the contract that

3        way.  It would be paid by the debtor, but

4        necessarily it would mean that there was that

5        much less of residual value that would be

6        distributed.

7            I believe that is the way it's done in all

8        cases.  I believe that's the way it done for the

9        committee.  I believe it's necessarily structured

10       that way because it's simply the necessity of the

11       case.  You don't have to craft it that way.

12           THE COURT:  I also understand the way

13       financial advisors work is they really don't keep

14       simultaneous time records like attorneys do, so

15       we just sort of have to take their word that this

16       is what they have done and what they're entitled

17       to when the time comes; is that correct?

18           MR. BAER:  I think that's true to the extent

19       that it's true for any financial advisor.

20           They have agreed with the U.S. Trustee to

21       keep time records that will be consistent with

22       the time records kept by other financial advisors

23       in this case as well as other cases in this

24       jurisdiction, and that is included in there.

25           But, yes, it is true that the time keeping

1        systems for financial advisors is different than

2        that for attorneys.

3            THE COURT:  Anybody else want to say

4        anything?

5            MR. MACDONALD:  May I respond momentarily,

6        Your Honor?

7            THE COURT:  I want everybody to get it all

8        out of their system before I make a decision.

9            MR. MACDONALD:  Your Honor, the thrust of

10       our concern is not so much prospectively where

11       Jefferies will be working hand in hand with many

12       of the other professionals from the other

13       constituencies, but we are greatly concerned

14       about the monthly fee payable from September 1

15       during a time period when, at least from our

16       perspective, we have questions as to what value

17       was being provided to the estate and what work

18       was being done beyond analysis of the committee's

19       own legitimacy, the equity committee's own

20       legitimacy.

21           So our concern is what has happened for that

22       $375,000.  As Your Honor said, do we have to go

23       on faith that they did something?  They may not

24       maintain contemporary records, but there needs to

25       be some mechanism for a 330 review of what was

1       done to justify $375,000.

2              Secondly, as to the success fee, I

3       understand how it is done in many cases, but this

4       is this case, and we maintain that the same

5       currency for the equity distribution should apply

6       to the success fee.

7              And finally, Your Honor, I've heard a lot of

8       talk about a proposed order and that it will be

9       the salvation of all these issues, but I've seen

10      no proposed order, nor am I aware that the

11      committee has, and so we need to be involved in

12      that process.

13             Thank you, Your Honor.

14             MR. BAER:   I apologize, Your Honor, I will

15      be quick.

16             I obviously would be quite concerned about

17      making any fees for past work that has been done

18      since September 1st at risk.  I think that that

19      would be horrifically unfair.  That would be

20      terrifying to most professionals, including law

21      firms who file retention applications several

22      months after a case starts.

23             I don't think it would be appropriate or

24      just to punish Jefferies for operating in good

25      faith throughout this case, negotiating in good

1      faith and continuing to work in good faith for an

2      equity committee under these circumstances.

3          I think they're entitled to the same

4      protections as every other financial advisor, for

5      that matter for every other professional in this

6      case, to have their retention admitted nunc pro

7      tunc to the date that they were retained to the

8      date that they've been working.

9          I don't think that the work that they have

10     done will have to be taken on faith any more than

11     the work that's done of a law firm who identifies

12     in writing what their time is or any other

13     financial professional in this case.

14         I think they are entitled to retention,

15     they're entitled to be paid for the work that

16     they've done, and I would seek that the proposed

17     order be entered today.  And of course we will

18     circulate and make sure that the issues that we

19     discussed today are in fact accurately addressed

20     in the proposed order.

21         THE COURT:  Ms. Denniston, you constantly in

22     your motions scream and yell about all the

23     bleeding and money and all, but, when it comes to

24     your side, it seems like it's okay.

25         Let me hear why you feel so confident that

1    we should write these people immediately a check

2    for hundreds of thousands of dollars.

3        MS. DENNISTON:  Your Honor, I would say

4    three things about that.

5        Yeah, we are screaming about the amount of

6    money that's been spent thus far, and I think

7    part of that is because there hasn't been a check

8    or a balance from a perspective that has not been

9    heard from, and that would be our constituency.

10       The fees that Jefferies' charging, the 375

11   for the number of months that it is, have been

12   utilized, Your Honor, to do two things: one, to

13   prepare for an active participation and

14   negotiation of the plan process.

15       As the counsel that's coordinating the case,

16   we had two goals: one, to do the review of the

17   information that the debtor had gathered

18   initially, to determine what was happening with

19   the debtor operationally, and whether or not we

20   could continue in good faith to come down here

21   and tell you that we believe, if things are

22   managed appropriately and the debtor continues to

23   enjoy the success it's enjoying, as evidenced by

24   the filings last Friday, that there should be a

25   return for equity.

1          But that's going to require some head

2     banging, it's going to require some restructuring

3     and it's going to require people to think out of

4     the box.

5          And I think that's the value that Jefferies

6     and the equity committee can bring to this table,

7     is to be out there saying:  Let's not consider

8     what we assume would be the case, let's look at

9     this in a way that maximizes a return to all of

10    the creditors and to equity.

11         The work that Jefferies has been asked to do

12    on behalf of the committee has been supervised

13    aggressively by the committee.  We have some

14    people on the committee that are well aware of

15    the necessity of having a valuation.

16         The committee is certainly cognizant of the

17    fact that it's going to have one shot to convince

18    you that there is a potential for return for

19    equity, and that's whether it comes up in a

20    context of a hearing on whether or not the

21    committee continues, or it comes up in the

22    context of the plan.  What Jefferies has been

23    doing is to lay out a valuation that can be

24    presented based on the information available to

25    date.

1            Jeffries hasn't been on any boondoggles.  We

2       have looked at the assets that are available to

3       the estate.  There's been some analysis done in

4       terms of things that Jefferies thinks would be

5       necessary to have business discussions with the

6       debtor at an appropriate time.

7            But without that foundation, the committee

8       can't possibly have a voice at the table or in

9       the case, and I think the fact that the fee drops

10      off after some number of months, that value is

11      returned.

12           I think that over time the equity committee

13      is probably going to be a bargain for this case,

14      particularly if it's successful, in causing

15      people to view the potential capital structure

16      and exit for this debtor in a way that maximizes

17      the return.

18           So I would urge the Court to look at this

19      from the perspective that, if you're going to

20      have a committee and the trustee last month or

21      like two weeks ago when we considered Paul

22      Hastings, it's an official committee.

23           Until that changes, that committee needs to

24      represent the constituency, and in order for us

25      to do that effectively we have to be able to show

1          this Court what the perspective is from the

2          equity in terms of the debtor's operations and

3          its hopes for the future.

4              Right now, I can tell the Court that there's

5          probably some differences of opinion in terms of

6          how the debtor and the creditors committee see

7          the world.  And that's what Jefferies' role will

8          be, to highlight those for this Court at the

9          appropriate time.

10             And without the monthly fee and the amount

11         of work to read into the case to visit with the

12         debtors and their multiple professional,

13         Jefferies would not in be in a position to

14         deliver that up.  It's not something that can be

15         accomplished in 30 days, as I think the creditors

16         committee would suggest, when they have been in

17         the case for eight months.

18             THE COURT:  At the last hearing you

19         convinced me that obviously -- and nobody really

20         said you don't need financial advisors, and you

21         assured me that it would not be there to

22         duplicate the services performed by the other

23         financial advisors for the debtor and the

24         creditors committee, and that the creditors

25         committee and the debtor indicated they would

1          hopefully furnish information to you so that your

2          -- financial advisors don't have to recreate

3          every wheel to come up with the answers.

4               My only question was this nunc pro tunc type

5          of employment at this time, when we don't know

6          one way or the other.  You are a committee,

7          you're formed, and we need to move this case on.

8               The Court is inclined to go ahead and

9          approve the retention of Jefferies.  The nunc pro

10         tunc part is what bothers the Court to approve

11         that at this time.  I'm not saying I wouldn't

12         once I know everybody is going to be here for the

13         long haul or not, but I'm approving something

14         that there's been no application filed at this

15         point, I don't think.

16              Has there been any interim requests filed to

17         the U.S. Trustee, Ms. Escamilla?

18              MS. ESCAMILLA:  No, Your Honor.  The interim

19         order that the court entered in New York for fees

20         basically says that, once they're approved, they

21         can send their bills to the debtor and then get

22         paid their fees.  But in this case, since

23         Jefferies has not been employed, they have not --

24              THE COURT:  Are you still a watchdog on

25         Jefferies just like you would on the other

1       professionals?

2            MS. ESCAMILLA:  Well, Your Honor, even if

3       the Court would go nunc pro tunc approval with

4       this, we'd still have the 330 reasonableness

5       standard as well as a fee examiner as to fees

6       provided in September, October and November.

7       They're already past -- the first three months

8       for $375,000, and then they dropped down to

9       $100,000.

10           THE COURT:  Okay.

11           MS. ESCAMILLA:  The creditors committee

12      financial advisors, Your Honor, are $200,000 a

13      month.  They have two financial advisors and

14      they're $100,000 a month each.  We won't go into

15      the debtor's.

16           THE COURT:  The Court will approve it

17      subject to everybody agreeing on the form of

18      order.  If we have a problem with the order,

19      contact me and we'll either have a special

20      hearing or a meeting to resolve that, but I would

21      hope that we all can put together a form order

22      that everybody can live with.  When I say

23      "everybody," I mean the U.S. Trustee, the

24      creditors committee, the equity committee, the

25      debtor, and the ad hoc committee if they want to

1        participate, the ad hoc of retirees.

2            That being said, I'll look to you guys for

3        the order, and the hearing is concluded.

4            MS. DENNISTON:  Thank you, Your Honor.

5            THE COURT:  Motion for order authorizing

6        sale of assets free and clear of liens, claims

7        and interests and exempt from taxes, authorizing

8        the assumption and assignment of leases, and

9        granting other related relief.  I believe this

10       filed by the debtor.

11           Mr. Busey.

12           MR. BUSEY:  Thank you, Your Honor.  Mrs.

13       Jackson will present this to the Court.

14           MS. JACKSON:  Good afternoon, Your Honor.

15           THE COURT:  Good afternoon.

16           MS. JACKSON:  This is a sale of the debtor's

17       leasehold interest in equipment in their Miami

18       dairy facility.  We originally had a bid from

19       Southeast Milk for $5,250,000.

20           After we filed the motion to sell, we

21       received a competing bid from The Dean Group for

22       $5,750,000.

23           Because we received a competing bid, we held

24       an auction a couple of days ago in our offices.

25       At the auction, however, no other bid was made,

1       so the highest offer stands at the competing bid

2       of The Dean Food Group.

3            THE COURT:  How much was that?

4            MS. JACKSON:  $5,750,000.  And it's for the

5       sale of leasehold interest and equipment.  It's a

6       leased facility.

7            THE COURT:  Right.  You're seeking approval

8       of that.

9            MS. JACKSON:  Yes, Your Honor.

10           THE COURT:  Anybody here want to advance an

11      objection?

12           MR. SCHWARTZ:  Your Honor, John Schwartz

13      from Fulbright & Jaworski of Dallas representing

14      the Dean Foods Group and its various affiliates.

15           Your Honor, I'm not admitted into this

16      district, but we have a couple of agreements that

17      we've reached with the landlord that I'd like to

18      read into the record and request the ability to

19      appear for that matter to read those

20      announcements into the record.

21           Your Honor, since the auction on Tuesday

22      we've had a couple of discussions with the

23      landlord about questions about the terms of the

24      lease, and we've reached an agreement this

25      morning with the landlord that the Dean Foods'

1     affiliate that will be the assignee under the

2     lease will accept the terms of the lease with the

3     following modifications:

4          There are two provisions.  One will relate

5     to the covenants to carry insurance coverage.

6     The Dean Foods' affiliate will abide by these

7     covenants, but there is a condition with respect

8     to the insurance relating to requirements of

9     keeping certain net worth and investment grade

10    status on debt in order to have the ability to

11    self-insure.

12         Under the agreement that we have with the

13    landlord, we will not need to keep the net worth

14    or investment grade debt requirements in order to

15    self-insure any of the required insurance

16    coverage.

17         Any liabilities that would not be covered by

18    the insurance coverage that the Dean Foods'

19    affiliates will have will be protected by a

20    letter of credit, or, if we get the consent of

21    the landlord, by a bond.

22         For the property casualty coverage, the

23    retention or deductible amount will be funded by

24    a letter of credit or a bond, if the landlord

25    consents, which is going to be equal to the

1    difference between the lessee's deductible and

2    $200,000.

3        If the letter of credit or bond is drawn, it

4    will be replaced to that amount.  And the letter

5    of credit will be in a form acceptable to the

6    landlord in form and substance and issued by a

7    money center bank acceptable to the landlord.

8        The second agreement we have is with respect

9    to financial reporting.  The terms of the lease

10    require annual audited financial statements in

11    addition to quarterly financial statements that

12    are audited and prepared by gap.

13        In lieu of the requirements under the lease

14    for financial reporting, the lessee will promptly

15    provide its annual audited financials and will

16    also provide interim unaudited nongap combined

17    income statements and combined balance sheets as

18    they become available.

19        These are the two agreements that we've

20    reached with the landlord.  We are working on the

21    terms of the order and will work that into the

22    order that is submitted to the Court.

23        THE COURT:  Ms. Jackson?

24        MS. JACKSON:  Those are agreements with the

25    landlord, Your Honor.

1            THE COURT:  Does that have any adverse

2        effect on the debtor?

3            MS. JACKSON:  No, Your Honor.

4            THE COURT:  Does it create any future

5        liability or responsibility on the debtor?

6            MS. JACKSON:  No, Your Honor.

7            THE COURT:  Any contingent liability that

8        comes back to the debtor?

9            MS. JACKSON:  No, Your Honor.  Under 365,

10        paying the assignment releases us from any

11        further liability.

12            THE COURT:  Whatever is between you and the

13        landlord is between you and the landlord.  I

14        don't see where I need to approval it unless

15        you've got a landlord representative here that

16        wants to consent to that being in an order.

17            There's no motion before the Court to modify

18        this lease in any way, and I don't see how I

19        could sign an order including modifications

20        unless the landlords steps in and says:  We

21        consent to this order.

22            MR. SCHWARTZ:  Your Honor, the landlord has

23        consented to it.  We've discussed these

24        provisions with them.

25            Because 365 usually requires the lease to be

1        assigned in full without any modifications, we

2        would need to get these modifications with the

3        landlord and we've agreed to put that language

4        into the terms of the order that we'll be

5        submitting.

6            THE COURT:  Well, make sure it says that

7        they consented to it, and the Court is signing it

8        on the representations that the landlord have

9        consented to each and every modification.

10           MR. SCHWARTZ:  We'll have that language in

11       there, Your Honor.

12           THE COURT:  Thank you very much.

13           MR. SCHWARTZ:  Thank you, Your Honor.  Now

14       may I be excused?

15           THE COURT:  Anybody else need to talk to Mr.

16       Schwartz or going to call him as a witness or

17       anything?  (Laughter.)  I guess you're released.

18           MR. HELD:  I'd like to make a comment, Your

19       Honor.

20           THE COURT:  Are you one of the

21       representatives of the landlord in this case.

22           MR. HELD:  Yes, Your Honor.  I'm Eddie Held,

23       for the record, on behalf of the landlord.

24           We were retained by the Kramer Levin firm,

25       Neil Tucker, late yesterday afternoon, and I'm

1        not able to at this point state that anything

2        that has been stated by counsel previously is

3        correct or incorrect.

4              However, I believe a deal has been struck,

5        and with respect to the landlord, the landlord

6        obviously needs to approve whatever the proposed

7        order may be.

8              THE COURT:  You heard what I said.

9              MR. HELD:  I heard what you said.

10             THE COURT:  Counsel makes the

11       representations in the order or your client

12       signs, I don't care how you do it.  It's not a

13       problem to me as long as the landlord and the

14       purchaser agree to the modification.

15             MR. SCHWARTZ:  We'll go ahead and circulate

16       a copy of the order to the landlord, make sure

17       they're fine with what we put in it.

18             THE COURT:  Sounds good to me.

19             Thank you, Mr. Held.  I appreciate your

20       input.

21             MR. HELD:  Thank you, Your Honor.

22             THE COURT:  Back to the case at hand.

23             MR. PARRISH:  Good afternoon, Your Honor,

24       Jimmy Parrish of Gronek & Latham in Orlando,

25       representing Southeast Milk.

1          Your Honor, as Ms. Jackson indicated to the

2     Court, Southeast Milk was the stocking horse

3     bidder in the sale, but was not the ultimate

4     successful bidder.

5          As such, we just have two issues that we

6     want to raise.  One is that under the agreement

7     with Southeast Milk and the debtor, there's a

8     breakup fee of $157,068 as well as a deposit of

9     $525,600, and we were just going to inquire as to

10    whether or not final approval of return of those

11    was going to be approved in this sale order, and

12    when exactly those would be paid, if they'd be

13    paid at closing.

14          THE COURT:  I can't answer that.

15          Ms. Jackson, can you answer that?

16          MS. JACKSON:  Your Honor, we intend to put

17    those provisions for payment of the breakup fee

18    and the return of the deposit in the order, and

19    it will be paid after the closing of the first

20    deal with Dean Food, because under the bidding

21    procedures, if the deal with Dean Food for some

22    reason does not go through, then Southeast is

23    still a bidder and their bid was irrevocable.

24          So we would only give them back their

25    breakup fee and their deposit after the first

1       deal closes and if the first deal closes.

2            THE COURT:  Does that answer your question?

3            MR. PARRISH:  It does answer my question,

4       but it raises a second issue, Your Honor, and

5       it's not an issue that we have decide today, and

6       that is Southeast Milk is not interested in being

7       a backup bidder to Dean Foods.

8            Ms. Jackson indicated that that's out of

9       Southeast Milk's hands and there's already an

10      order entered saying that the bid is irrevocable

11      no matter what.

12           We don't know if that's true or if it's not

13      true, but we would like to at least --

14           THE COURT:  I'm not ruling on any of that.

15      That's not before me.  I can only rule on what's

16      on the calendar.  Nobody's filed anything for me

17      to consider at this point.

18           That will be dealt with in due course, or

19      you'll file -- you lawyers always think of things

20      to file, and you will protect your client's

21      interest.

22           Thank you very much.

23           MS. JACKSON:  Thank you, Your Honor.

24           THE COURT:  Anybody else have a comment

25      concerning this issue?  There were some

1    objections filed.  Apparently they're not being

2    prosecuted, therefore the Court deems them

3    withdrawn.

4         MS. JACKSON:  We'll send an order, Your

5    Honor.

6         THE COURT:  I'll look to you for an

7    appropriate order, and the hearing is concluded.

8         Court has before it a motion for order

9    granting third extension of time within which

10    debtors may assume or reject unexpired leases of

11    nonresidential real property filed by the

12    debtor.

13         Mr. Busey.

14         MR. BUSEY:  Your Honor, the next item on the

15    agenda after the one to which you just referred

16    is the debtor's motion for an order granting an

17    extension of its exclusive periods.

18         We intend to make an evidentiary record with

19    regard to the exclusivity motion that I think

20    would be material and have a bearing on the

21    debtors' motion to extend the 365 period.  And

22    so, therefore, with the Court's permission, we'd

23    like to take the exclusivity motion next, out of

24    order.

25         THE COURT:  You can do that.

1           MR. BUSEY:  Thank you, Your Honor.

2           THE COURT:  We'll take up the motion for

3       order granting third extension of exclusive

4       periods for filing Chapter 11 plans and obtaining

5       acceptances of such plans filed by the debtor.

6           Mr. Busey.

7           MR. BUSEY:  Thank you, Your Honor.

8           Your Honor, I would like to offer evidence

9       in support of the debtor's motion in the face of

10      objections to the motion, and for that reason

11      we'd like to call Holly Etlin to the stand.

12          COURTROOM ADMINISTRATOR:  Be seated in the

13      witness stand, please.

14  WHEREUPON,

15                      HOLLY ETLIN

16  was called as a witness herein, and having been first

17  duly sworn by the Courtroom Administrator, was

18  examined and testfied as follows:

19          COURTROOM ADMINISTRATOR:  Would you state

20      your name and current home or business address,

21      and include the city and state.

22          THE WITNESS:  Holly Etlin, XRoads Solutions

23      Group, 400 Madison Avenue, New York, New York

24      10016.

25          THE COURT:  You may inquire.

1           MR. BUSEY:  Thank you, Your Honor.

2                   DIRECT EXAMINATION

3    BY MR. BUSEY:

4        Q    Ms. Etlin, what is your position with

5    XRoads?

6        A    I am a principal with the firm.

7        Q    How long have you been with XRoads?

8        A    Since June of 2002.

9        Q    What is XRoads' role in Winn-Dixie's

10   reorganization?

11       A    XRoads are the turnaround and restructuring

12   advisors to the debtor.

13       Q    And how long has that been so?

14       A    We were hired just prior to the debtor's

15   bankruptcy filing.  I think our official date of our

16   employment was February 16th of this year.

17       Q    And what are your primary responsibilities

18   in connection with XRoads' efforts in Winn-Dixie's

19   reorganization?

20       A    I spend somewhere between six days and I

21   think a low of three days a week at the debtor since

22   the filing, and I'm responsible for delivery of all of

23   the services that XRoads has provided to the debtor

24   during the pendency of this case.

25       Q    Give us, please, a brief review of the

1   debtor's financial structure.

2        A     Certainly.  The debtor currently has a DIP

3   financing facility outstanding.  In addition to that,

4   the debtor has normal trade liabilities and accrued

5   liabilities, et cetera.  And the debtor has

6   liabilities subject to compromise that are currently

7   estimated to be approximately $1.1 billion.

8        Q     Is the DIP facility in addition to that

9   debt?

10       A     Yes, it is.

11       Q     And how much is the DIP facility?

12       A     Oh, boy.  We paid most of it down.  I don't

13  know what the exact -- I know what the availability is

14  because that's what I focus on.

15             We've got over $200 million currently

16  available on the line.  I don't remember what the

17  borrowed balance is currently.

18       Q     What was the original amount of the DIP

19  facility?

20       A     The gross amount of the facility is $800

21  million.

22       Q     And then you have publicly traded equity

23  securities?

24       A     Yes, we do.

25       Q     What is the debtor's corporate structure?

1       A       The debtor consists of approximately two

2   dozen legal entities that are filed in these cases,

3   and then there are nonfiled entities that are the

4   operations in the Bahamas.

5       Q       What's the business of the debtors?

6       A       The debtor operates grocery stores.

7       Q       Approximately how many stores did the

8   debtors operate at the petition date?

9       A       Approximately 918.

10      Q       Are you aware that the Bankruptcy Code

11  establishes a period within which the debtor enjoys

12  an exclusive right to file and solicit acceptances of

13  a plan of reorganization?

14      A       Yes, I am.

15      Q       Are you aware that the Court has extended

16  the company's statutory period of exclusivity in this

17  case through December 19th?

18      A       Yes, I am.

19      Q       And are you aware that by this motion the

20  debtors are seeking to extend this period

21  approximately 90 more days until March 20th?

22      A       Yes, I am.

23      Q       Let's discuss the reorganization efforts of

24  the debtors since the petition date.

25              Can you tell me what the company has done in

1   connection with its market area reduction?

2       A    Yes.   I believe I previously testified on

3   this process in this court.

4           We refer to this internally in the company

5   as the footprint process, that it was a determination

6   that the debtor made to rationalize the number of

7   geographical markets and stores in which it operated

8   to focus on those markets in geographies in which it

9   felt it could be competitive going forward.

10          And so the company as part of that process

11  has closed or sold approximately 326 stores since the

12  beginning of this case, almost all of them

13  accomplished in about a 90-day period over this

14  summer.

15      Q    Leaving the debtors with approximately how

16  many stores?

17      A    The debtors currently operate 587 stores.

18      Q    In your experience, how ordinary or out of

19  the ordinary is it for a retail operator such as the

20  debtors to design, implement and execute a reduction

21  of that magnitude in the period of time to which you

22  refer?

23      A    I've been in this business, Mr. Busey,

24  almost 30 years now and I specialize almost

25  exclusively in retail and consumer products

```
 1    companies.  I have not seen a debtor that was not in
 2    full liquidation manage to close while it focused also
 3    on continuing operations, close or sell 326 stores in
 4    one group over a period just exceeding 90 days in the
 5    history of my time in this business.
 6         Q    You would describe that as extraordinary?
 7         A    I would certainly like to, but I think I'd
 8    probably be patting myself on the back.
 9         Q    And you would never do that, would you, Ms.
10    Etlin.
11              (Laughter.)
12    BY MR. BUSEY:
13         Q    You talked about while they continued their
14    operations.  Let's talk about the operations for a
15    minute.
16              What are the company's efforts since the
17    petition date with regard to its merchandising
18    initiatives in its stores in which it's continuing
19    operations?
20         A    As we've previously spoken about and as
21    Peter Lynch has spoken about in the press during the
22    pendency of this case, the company prior to entering
23    this process had had several years of comp sales
24    declines.  There are actually very few retailers that
25    can survive year over year declines in same store
```

1    sales the way this company had prior to the beginning

2    of this process.

3           It was very clear to Mr. Lynch and to his

4    management team that one of the key ways to save the

5    company, in addition to really determining what the

6    core group of stores was where the company could be

7    competitive, was to implement a series of initiatives

8    to really change the way in which the stores operate,

9    to improve things like customer service and

10   merchandising and product selection and cleanliness

11   and focus.  It's the Getting Better All The Time ad

12   campaign, but it's also the getting-better-all-the-

13   time initiative which is what the company has been

14   focused on.

15          So the company, during this same period in

16   which we were getting rid of all these stores, has

17   implemented things like Project Jump-Start, which is

18   the thing that Deloitte Consulting is employed to do,

19   which is actually retraining people in every store in

20   the chain about better ways to score-card vendors so

21   that, if you have a vendor that's making direct

22   deliveries to the store, you want them to make those

23   deliveries during times that are not disruptive to

24   your business.  You want them to give you the right

25   product, not the product that happens to be on the

1    FritoLay guy's truck today.  You want them to stock

2    the shelves properly, et cetera.

3            So literally we're going through every

4    store.  There are about 80 stores complete now.

5        Q    How many?

6        A    80 of the 587 are complete now, and the

7    balance are scheduled to be retrained and completed

8    between now and June.

9            And the outcome of that is lower shrink,

10   better product selection for the customer, fewer out

11   of stocks.  And there's a front-end piece, which is

12   cashiering behavior and cashier staffing which is

13   focused on getting the customers in and out of the

14   store more quickly.

15           In addition, there has been --

16       Q    Wait.  You said "lower shrink."

17       A    Yes.

18       Q    Tell us what you mean by "shrink."

19       A    Shrink in a retail environment is product

20   that becomes not saleable when it's in the store or

21   disappears from the store, which is what most people

22   are used to.

23           In a grocery store environment, what it

24   means is not over ordering perishable product, having

25   the right perishable product in the store.  Because

1    when you go into a supermarket and you want to buy

2    milk, you're not going to buy the milk that's at the

3    front that has an expiration date two days from now.

4    But the store always has to have milk.

5         So you want to be able to balance the

6    ordering of that product so that you can reduce the

7    amount of that product that you have to throw away but

8    you have the right selection for the customer.

9    Q    In addition to the Project Jump Start and

10   the merchandising initiatives that you've described,

11   what has the company done about refreshing the stores

12   for capital investment?

13   A    Well, as part of the company's business

14   plan, the company has a very focused initiative to

15   begin remodeling over the next several years

16   substantially all of the stores in the chain that

17   require remodeling.

18        The company has worked very, very hard on a

19   variety of model stores to determine that which is not

20   only the best for the customer and presents the

21   greatest store but is a good use of the company's

22   dollars and is the most cost effective.

23        And Mr. Lynch and the management team have

24   been working over the last several months refining

25   their concepts around that and testing a variety of

1   concepts in stores in the company's chain to determine

2   that kind of look and feel for the stores going

3   forward that's really going to continue to jump start

4   sales.

5       Q    You heard reference earlier in the courtroom

6   to the monthly operating reports that the debtors

7   filed last week.  Can you discern from those monthly

8   operating reports any progress or traction these

9   merchandising initiatives have realized to date?

10      A    Yes.  The most significant of those is, as I

11  previously testified the company has had several years

12  of consecutive sales declines in its stores.  For the

13  first time in several years the company is positive.

14  The sales are positive.

15           For the eight weeks that ended November

16  16th, which was right before Thanksgiving, the company

17  had positive comp sales chainwide of 2.9 percent, and

18  that's a significant turnaround in the business.

19           You know, we've talked about the fact that

20  we expected sales to bottom out and start to come

21  back, and that shows it.

22      Q    In addition to the new footprint and your

23  operational initiatives, what has the company done

24  about reducing its corporate overhead since the

25  petition date?

1      A    As I testified, I think the last time I was

2   in court, we were talking about our plans with regard

3   to the corporate overhead.  The company has completed

4   -- it's substantially completed its process to reduce

5   its corporate overhead by approximately 37 percent or

6   $100 million annually.

7            The company started out by every department

8   within corporate headquarters and in the field with a

9   blank sheet of paper and relooked at its

10  organizational structure from top to bottom, and then

11  didn't just take the existing employees and put their

12  names in the boxes, but in every department in the

13  company, people reinterviewed for their jobs.  They

14  were not told that they were guaranteed at having a

15  job.  They had to show why they were qualified to have

16  their name be in that box on that new sheet of paper.

17           And so, not only did we end up with cost

18  reductions and less money spent, but we ended up, I

19  think, with the very best team at the company to take

20  the company forward.

21      Q    And where is the company now in the process

22  of that accomplishing and executing on that 37-percent

23  overhead reduction?

24      A    That process is substantially complete.  We

25  have been challenged by Peter, XRoads, and the finance

1    team has been challenged to find additional nonhead-

2    count cost reductions, and those are -- that goal is

3    incorporated in the company's business plan, and we're

4    in the process of going and looking for that

5    additional cost savings.  But that's in a nonhead-

6    count format.  It's in the form of supplies and

7    various kinds of indirect spending that the company

8    makes.

9        Q    In addition to the footprint restructuring,

10   the operational initiatives, the overhead reduction,

11   what has the company done since the petition date

12   regarding claims management?

13       A    Well, a number of things have been done.  I

14   think Your Honor has heard about the reclamation claim

15   process.

16            Originally there were just under 500 claims

17   filed that totalled approximately $125 million.  We

18   have substantially resolved all of those claims.  I

19   think there are going to be a few that we're going to

20   have to ultimately object to, but it's a handful now.

21            The vast majority of those claimants have

22   actually opted into the company's stipulation that was

23   entered into with regard to reclamation, and the

24   actual reconciled claim amount for reclamation claims

25   has been reduced from $125 million to $95 million, a

1   savings from the original filed amounts of over $30

2   million.

3           In addition, the company has resolved and

4   paid approximately $36 million in PACA claims since

5   the beginning of the case, and we have commenced to

6   reconcile the claims, the general claims, that have

7   been filed in the case.

8           The company had an initial claims register

9   that was $21 billion in claims.  There were few

10  duplicates in that process.  And we now estimate that

11  that those claims in that register will be

12  approximately $1.1 to $1.2 billion consistent with

13  that which is reflected in the company's most recently

14  filed MOR.

15          We're about 60 days into the claim

16  reconciliation process.  We actually retained a small

17  group of people that would otherwise have exited the

18  company during the head-count reduction process at

19  corporate, and they are staying on solely to reconcile

20  claims and then they will be departing.  They're

21  working with a team from XRoads with a goal to having

22  all of the claims reconciled prior to when the company

23  exits Chapter 11 in June.

24      Q    That reduction from $20 billion to

25  approximately $1.1 billion, approximately how many

1   claims does that represent?

2       A    I think it's 20-some thousand.  I'm not

3   entirely sure.

4       Q    In addition to claims management, what has

5   the company done since the petition date regarding

6   executory contracts?

7       A    The company has 28 --

8       Q    Non-real estate executory contracts.

9       A    Yes, non-real estate.  The company has

10  approximately 2800 non-real estate executory

11  contracts.  They consist of things like equipment

12  leases and vendor purchase contracts and maintenance

13  agreements for the stores, many different maintenance

14  vendors, supply vendors, cleaning supplies, copier

15  leases, all of those kinds of things.

16          And we're already well into a process of not

17  only the contracts have all been identified, they've

18  all been placed for the very first time into a

19  centralized database for the company.  The company

20  didn't have a central database prior to the beginning

21  of this process.  And approximately 800 of those

22  contracts have actually had a business decision made

23  with them, and approximately just under a hundred of

24  those contracts have actually been filed with the

25  Court for some form of resolution.

1             The savings to date of those that have

2     actually been through the court process is

3     approximately $15 million annually to the company as a

4     result of either the rejection or in many cases the

5     renegotiation or settlement of that contract.

6         Q    $15 million annually, you said?

7         A    That's correct.

8         Q    In addition to what we've talked about so

9     far, what has been, while you've been doing all those

10    things, the impact on the company of the hurricanes

11    this year?

12        A    Yeah, that complicated matters a little

13    bit.  I think as everyone is aware, the company had

14    approximately 125 stores that were in the region

15    affected by Hurricane Katrina.  Approximately 90 of

16    the company's stores had a direct impact from the

17    hurricane.

18             The company has worked diligently, not only

19    to reopen its stores and reopen its stores ahead of

20    its competitors in that area, and currently we're very

21    proud to say that we only have 13 stores that still

22    are not reopened in the New Orleans area, and

23    Winn-Dixie was ahead of most of its competitors

24    reopening in that area.

25             But Winn-Dixie also had to find employees

1    that were displaced all over the country from that

2    area, most of whom had lost their homes completely.

3    And the company was able to restart its operations in

4    its Hammond Distribution Center in Louisiana without

5    any interruption and get those stores up and running.

6              Probably less well known is the impacts of

7    Hurricane Wilma.  The company actually had more

8    stores, but with less severe impact, but more stores

9    actually affected.  Well in excess of a hundred stores

10   of the company were affected by Hurricane Wilma in

11   some form, either through actual damage to the store,

12   water damage, structural damage, broken glass, or with

13   damage or disruption just associated with lack of

14   power.

15             And for a number of weeks, the company had

16   to not only get these stores reopened, and again were

17   reopened in many markets ahead of Publix, but also

18   continue to supply those stores with disrupted issues

19   around transportation, gasoline.  And many of those

20   stores, because of issues with the South Florida

21   utilities company, had to operate to serve the public

22   on generator power for an extended period of time.

23        Q    So give us some idea of what was the impact

24   or cost to the company in terms of the diversion of

25   resources, energy and manpower to address those

1    hurricane issues.

2        A    Well, the company has filed insurance

3    claims.  To date I believe we've filed in excess of

4    $30 million of claims to date, and it may be higher

5    than that at this point, relating to both lost

6    inventory, actual damage not covered by a landlord's

7    policy, as well as, you know, other kinds of issues.

8        Q    In addition to everything else we've talked

9    about so far, has the company focused on the

10   development of the business plan?

11       A    Yes.

12       Q    And what do you mean when we use the term

13   "business plan"?

14       A    Well, business plan just isn't numbers on a

15   page.  It's the company articulating for its creditors

16   and its shareholders its actual strategies, both its

17   business strategies, its competitive strategies, its

18   initiatives, its plans with regard to everything from

19   how it's going to continue the remerchandising of the

20   stores and fixing of the stores to its capital

21   expenditure plans over a multiyear process.

22            And then when those strategies and

23   initiatives and competitive things are put to paper,

24   then also showing why it is the company believes

25   they're achievable and then boiling those down

1    actually to numbers in a multiple-year business plan.

2         Q    And the company has produced a business

3    plan?

4         A    Yes.

5         Q    Approximately how thick is it?

6         A    It's about this thick (indicating).

7         Q    Two and a half inches?

8         A    Inch and a half.

9         Q    Has the company delivered that business plan

10   to its creditor constituencies?

11        A    Yes.  The business plan was delivered to the

12   DIP lender, the creditors committee and the equity

13   committee on approximately Monday, November 7th.

14        Q    What discussions have occurred among the

15   company and the committees regarding the plan?

16        A    Well, we had discussions with the creditors

17   committee professionals the very next day, a short set

18   of discussions while they absorbed the contents of the

19   plan, because again it is an inch and a half thick.

20             And then we actually met in person in

21   Jacksonville with the creditors committee and their

22   advisors on the 9th, that Wednesday of that week.  And

23   then we also met with the equity committee and the

24   equity committee's advisors, partially in person and

25   partially by phone, on the very next day, on Thursday

1   of that same week.

2          In addition, there were due diligence

3   sessions that commenced in connection with the

4   professionals for both of those committees being

5   on site in Jacksonville, and they had in-person

6   meetings with Peter Lynch, and Tom Robbins, who is in

7   charge of merchandising, and Mark Sellers, who is the

8   group VP of operations, and Bennett Nussbaum, the CFO,

9   and Larry Pell, the general counsel, and us on various

10  aspects of the business plan both days, both the

11  equity committee's advisors as well as the creditors

12  committee's advisors.

13         In addition, there have been an ongoing

14  dialogue for the last few weeks then subsequent to

15  that with information requests, follow-up conference

16  calls both with Blackstone, with us, and with

17  individual members of management to answer additional

18  questions on the business plan.

19     Q    And what, in general, to date has been the

20  reaction by the committees and their professionals to

21  the company's proposed business plan?

22     A    The professionals from the committee have

23  indicated --

24     Q    Which committee?

25     A    I'm sorry.  The unsecured creditors

1    committee have indicated to us that, while they do

2    have some additional due diligence questions that

3    they're going to proffer to us over the next few days

4    based upon questions raised during the committees

5    meeting this week, that the committee is generally

6    pleased with the company's business plan and with the

7    efforts of the management team and the turnaround

8    efforts that have occurred to date and that are

9    planned.

10         Q    And what discussion has there been with the

11    creditors committee regarding the transformation of

12    the business plan into a formal plan of

13    reorganization?

14         A    We've been speaking for the last several

15    weeks on an ad hoc basis with the committee's

16    professionals.  We had an official call last week with

17    the committee's professionals to specifically discuss

18    plan of reorganization, sort of process, outline, et

19    cetera.  That was about a two-hour conference call

20    last week.

21              The debtor has committed to deliver a plan

22    of reorganization term sheet to the unsecured

23    creditors committee, it's either the first or second

24    week of January.  I know Mr. Barr will correct me if

25    I'm mistaken.  I think he's indicating it's the first

1    week of January.

2        Q    After delivery of that term sheet the first

3    week of January, what do you anticipate will follow in

4    connection with the development of a consensual plan

5    of reorganization?

6        A    Well, I think there are a variety of issues

7    that we're going to need to discuss.  Obviously, a

8    plan of reorganization of a company this size doesn't

9    get done in a week or two.

10            There need to be a whole series of

11    discussions around a variety of open issues, the

12    treatment of various kinds of specialized claims, tax

13    claims in particular, bar dates associated with those

14    things, substantive consolidation issues which we just

15    really started to have very detailed conversations on,

16    et cetera.

17            So I would anticipate that under a normal

18    process we would engage very heavily in trying to

19    define and resolve all of those issues with all of the

20    official committees in the case during the months of

21    January and February with the idea of basically

22    getting to full conclusion so that a plan can be

23    drafted.

24            Again, typically for a case this size it

25    takes two, three or four weeks to draft a plan,

1    circulate drafts to all the parties, make sure

2    everyone's happy.

3            The goal is obviously to get a plan on file

4    here in March so that the company can exit in June.

5        Q    Can you tell us whether it's preferable for

6    the company to first try to negotiate a consensual

7    plan with its creditors rather than unilaterally

8    filing a plan upon which no agreement has been

9    achieved?

10       A    I think that's a fairly obvious question,

11   but I'll be happy to answer it.

12           Particularly in a case in which the number

13   of professionals that are engaged here, you don't want

14   to create opportunities to create more controversy,

15   more legal fees, et cetera.

16           Filing an unconsensual plan is just an

17   invitation to have a variety of parties hire lawyers

18   and start filing various kinds of objections to the

19   plan.

20           It's a very important process between the

21   debtor and its committees to engage in a process of

22   coming to consensus about what to do with the company

23   going forward, and it's never advisable to file an

24   unconsensual plan.

25       Q    One of the open issues that you identified

1    that needs to be addressed and resolved, you said, was

2    substantive consolidation.  Tell us what you meant by

3    that, please.  What is the issue?

4        A    Certainly.  Again, as I think I testified to

5    before, the debtor consists of approximately 24 legal

6    entities.  Now, much of this structure is set up for a

7    variety of reasons over time, be it the source of

8    various acquisitions, be it tax planning strategies,

9    et cetera.

10            But it becomes very important in the context

11   of a bankruptcy case, particularly one like this,

12   where there may be creditors who may be creditors of

13   one entity but not of another, and really determining

14   whether there really are separate and distinct types

15   of creditors that really are creditors of certain

16   entities but not of others, and then how the value of

17   the debtor and the assets of the debtor break out

18   between those various entities, and then go to the

19   various recoveries that each of those creditor

20   constituencies might be due.

21            And it can become a very complex process.

22   You can choose the easy way, which is to substantively

23   consolidate everything and pay all unsecured creditors

24   the same amount of money or other form of compensation

25   in the case, or you can choose that the issues as

1    between the various types of creditors and the various

2    entities are so divergent that you have to pay

3    different kinds of compensation to them as part of the

4    plan.

5         Q    Depending on which debtor they're a creditor

6    of.

7         A    That's correct.  So it's something not to be

8    taken lightly because you certainly don't want to

9    disadvantage a particular creditor who might be due a

10   differential recovery because of their situation.

11            Then again, it gets more complex when you

12   have to do it that way.

13            So there are arguments on both sides.

14        Q    And what's the status of the discussions

15   between the debtor and the creditors committee on that

16   issue?

17        A    Well, Houlihan, who are the financial

18   advisors to the committee, and Blackstone, who are the

19   debtor's financial advisors, and XRoads have been

20   working through the latter part of the summer and into

21   the fall on sort of high-level issues and areas of

22   inquiry with regard to this issue; in other words,

23   sort of where to start, what kind of information

24   should we have.

25            Some of that did get put aside while the

1    company finished its business plan, and the committee

2    consensually agreed with us to wait while we completed

3    our business plan to then really engage in this

4    process.

5              Now that process has been ongoing.  We were

6    working with Houlihan on their kind of sort of

7    approach to it.

8              We also received from the committee's

9    counsel a set of very detailed questions that they

10   wished to have answered, and I know they have been

11   engaging with Skadden, the debtor's counsel, back and

12   forth on what they really need and clarifying what

13   they need and how they need it and what kind of

14   evidence they need to support the answer, because it's

15   not just good enough to put an answer on a piece of

16   paper, they want support for those answers.  And, by

17   the way, who at the company might be willing to

18   testify to that.

19             I think there's a list of -- I don't know

20   Mr. Barr, what is it, 50-some questions that we're

21   working on?  I think it's 50-some questions.  I'm

22   sorry.

23        Q    I ask the questions, you answer them.

24        A    It's 50-some questions that we're working

25   on, in addition to other financial stuff that Houlihan

1    has requested of us.

2             So we've been going back and forth with them

3    working fairly diligently on trying to get stuff

4    done.  I would say that we're probably not working at

5    the speed at which they would like us to be working on

6    this topic, but we're working as quickly as we can to

7    try to get it done.

8        Q    Given what you've said so far, what do you

9    see unfolding in January and February and March in

10   terms of the plan process in this case?

11       A    Well, we had just delivered to them on the

12   substantive consolidation, we delivered the binder of

13   material, I think, yesterday.  But that's not nearly

14   the full complement of what the unsecured creditors

15   committee has asked for with regard to this issue.

16            So we need to get the rest of those

17   information requests done.  I would suspect that's

18   going to take some period of time.

19            Right now I know people on my team were on

20   the phone last night until about 11:30 trying to hash

21   out what it was going to take to be responsive to

22   those requests.

23            We've obviously got to get through all of

24   the other issues with regard to the negotiations with

25   both sets of committees on the plan and make sure that

1    all the parties in interest are sort of satisfied with

2    where we end up.

3           And then of course the lawyers have to draft

4    the plan and everybody gets to comment on it, which

5    isn't a short process.

6        Q    So what's your time frame for the next three

7    months?

8        A    Well, I think as I specifically said, we're

9    going to negotiate the plan and deal with all of the

10   substantive consolidation issues and hopefully get to

11   a consensual conclusion with the committees on those

12   issues in January and February, draft the plan as

13   quickly as it can be drafted in March, get it filed in

14   March, again with the goal to be exiting in June.

15       Q    Do you believe that a 30-day period

16   extension of exclusivity, as advocated by the

17   unsecured creditors committee, makes sense in light of

18   what you just testified?

19       A    No, I don't.  As a matter of fact, I'm not a

20   lawyer, but as I understand, when pleadings have to be

21   filed, that would mean that we would have to be filing

22   a new pleading two weeks from now.

23       Q    A new pleading to do what?

24       A    To extend exclusivity further.

25       Q    Do you think it's in the debtor's best

1    interest and that of all of its constituencies to

2    grant the debtor's motion to extend the exclusive

3    period for another 90 days?

4        A    Yes, I do.  I think the debtor's taking this

5    process very, very seriously.  It's just it's a very

6    complex case, there are a lot of moving parts.  We're

7    in one of the debtor's busier times of year, and we're

8    just going to need to try to work through these issues

9    consensually and get this done, but it's not going to

10   happen overnight.

11       Q    In your experience, Ms. Etlin, in cases of

12   this magnitude, how is the debtor doing in terms of

13   what it's accomplished to date and the time period

14   within which it's accomplished it?

15       A    I think the debtor's made extraordinary

16   progress to do what you have to do to turn a company

17   around like this.

18            I mean, typically retailers sit in

19   bankruptcy about a year, at least under the old law.

20   They sit in bankruptcy about a year so that they can

21   prove to people they've really turned around, and then

22   they commence some form of plan negotiations.

23            We're commencing those prior to getting to

24   the actual one-year anniversary in this case with the

25   goal to getting this company out as quickly as

```
 1   possible.
 2              MR. BUSEY:  No further questions, Your
 3         Honor.
 4              THE COURT:  Cross-examination.
 5              MR. BARR:  Thank you, Your Honor.  Matthew
 6         Barr with Milbank, Tweed, Hadley & McCloy on
 7         behalf of the official committee of unsecured
 8         creditors.
 9                      CROSS-EXAMINATION
10   BY MR. BARR:
11         Q    Good afternoon, Ms. Etlin.
12         A    Good afternoon.
13         Q    I have a few questions for you.  You were
14   retained or got involved in the case February of this
15   year?
16         A    That is correct.
17         Q    So prepetition you were involved in the case
18   for a short period of time.
19         A    Yes.
20         Q    Do you know the history of the company prior
21   to commencing the Chapter 11 case?
22         A    I'm familiar with the history of the
23   company, yes.
24         Q    Can you tell the Court when Winn-Dixie
25   Stores, Inc., a nondebtor, commenced its
```

1   reorganization efforts outside of Chapter 11?

2       A    Winn-Dixie Stores, Inc., a nondebtor.  I'm

3   sorry, I don't --

4       Q    If I can explain a little, maybe that will

5   help you with the question.

6            When the debtors filed for Chapter 11, they

7   were in the middle of an out-of-court, internal

8   reorganization, were they not?

9       A    No, I don't believe so.

10      Q    Did the debtors prepetition decide to reduce

11  their footprint store plan?

12      A    The debtors had commenced a process to take

13  a very serious look at how they might reduce their

14  store plan and were underway with the planning for

15  that effort prepetition, yes.

16      Q    Do you know when Mr. Lynch joined

17  Winn-Dixie?

18      A    In December of 2004.

19      Q    Do you know why Mr. Lynch was brought in?

20  Was one of the reasons why Mr. Lynch was brought in to

21  reorganize this entity?

22      A    Well, by "reorganize" you mean take the

23  company through a Chapter 11 proceeding, I think Mr.

24  Lynch would vehemently disagree with you.

25            If what you mean by "reorganize" meaning

1    turn the company around and take efforts to turn the

2    company around, the answer would be yes.

3         Q    And when did he start those efforts?

4         A    December, January.  I mean, shortly after he

5    arrived.

6         Q    So is it fair to say that this company has

7    been in a reorganization mode since December 2004 or

8    January of 2005?

9         A    It's fair to say the company was in a

10   restructuring mode, yes.

11        Q    Thank you.

12             With respect to claims management, you've

13   been around restructurings for approximately 30

14   years.  The estimate that the company is now putting

15   out in its monthly operating reports, between $1.1 and

16   $1.2 billion, that's the company's estimate of what it

17   believes its total liability is after a claims-

18   reconciliation process could be?

19        A    That is correct.

20        Q    In your experience, is that the number that

21   you would use to formulate a description in a

22   disclosure statement?

23        A    On a gross basis, yes.  There are obviously

24   issues with regard to the underlying components of

25   some of those claims.  Some of those claims may have

1    administrative or priority status, which obviously

2    have different treatment.

3        Q    Sure.  But typically, in your experience

4    when you formulate a disclosure statement, you need to

5    plug in a number to give creditors an opportunity to

6    decide whether or not they believe the distributions

7    under the plan are appropriate based upon the company

8    with their professionals' estimate of those numbers.

9        A    Yes.  And, as I recall, you also need to

10   take that number and break it down into the various

11   forms of classes of claims with some reasonable degree

12   of accuracy as to their various priorities.

13       Q    Absolutely.  Thank you.

14            With respect to the business plan, do you

15   know if there is a draft plan of reorganization on

16   Skadden Arps's system?  Not system, I apologize.  I

17   mean word-processing system.

18       A    Yes, I understood you.  If by a "draft plan

19   of reorganization," do you mean that they have various

20   forms of plans of reorganization on their system, I'm

21   105-percent sure that they do.

22            If by a "draft plan," you mean one that has

23   been drafted specifically for Winn-Dixie and its

24   reorganization efforts, I don't believe that is the

25   case.

1    Q    The last topic, I guess, of the afternoon

2    will be substantive consolidation, and thank you for

3    going through with Mr. Busey what it is so we don't

4    have to do that.

5         Do you recall when discussions about

6    substantive consolidation commenced with the

7    committee?

8    A    We started discussing, as I think I

9    testified at the substantive consolidation issues with

10    Houlihan, I think it was sometime over the latter part

11    of the summer, after we got through the first sort of

12    big hump of the store dispositions.

13    Q    And do you recall when the committee sent

14    its first diligence requests on substantive

15    consolidation issues?

16    A    Well, I know we received the list from

17    Milbank in October.  I don't know if there was an

18    actual written list before then.

19         I know that we had verbal conversations with

20    Houlihan with regard to their requests for data, and

21    we were in the process of putting those things

22    together.  That initial request was encompassed in

23    that notebook that I hope, I think, was delivered this

24    week to you.  I'm sorry.

25    Q    Would it shock you if told you that an

1   e-mail was sent by XRoads to a team led by somebody at

2   -- I'm sorry -- by Alvarez & Marsal to a team led by

3   XRoads with due diligence questions in July or August

4   of this year?

5        A    No.  As I said, we started discussions with

6   the committee's financial advisors specifically on

7   sort of high-level issues and the kinds of things that

8   we did in the summer.  So that doesn't surprise me at

9   all.

10             MR. BARR:  Thank you.

11             THE COURT:  Ms. Denniston, do you want to

12        ask any questions?

13             MS. DENNISTON:  Just a few, Your Honor.

14                     CROSS-EXAMINATION

15   BY MS. DENNISTON:

16        Q    I believe you testified that you've been

17   speaking with professionals for the creditors

18   committee and you had a two-hour call.  Are you aware

19   of any calls with the equity committee professionals?

20        A    Not that have involved us.  I'm not sure

21   that they have reached out to us on plan issues at

22   this time.

23        Q    You also testified that you believe that the

24   debtor intended to cooperate with both committees, I

25   believe; is that correct?

1        A    That is absolutely true.

2        Q    Is it your understanding that the debtor

3   intends to provide the equity committee with the term

4   sheet that first or second week of January, whenever

5   it's delivered to the creditors committee?

6        A    I would assume that, to the extent the

7   equity committee is in existence, we would provide the

8   same term sheet.

9        Q    What information has been provided in

10  connection with these discussions with the creditors

11  committee by XRoads?

12       A    You mean the plan discussions?  I'm sorry.

13       Q    Yes.

14       A    Other than the business plan, I don't

15  believe we have.  Just the substantive consolidation

16  issues that are going back and forth.

17       Q    And I take it there wouldn't be any problem

18  making that information available to the equity

19  committee?

20       A    I don't think so.  To the extent it's

21  applicable, yes.

22       Q    With regard to the business plan, is the

23  business plan public at this time?

24       A    No, it is not.

25       Q    Is there any summary of the business plan

1   public?

2        A    Not that I'm aware of.

3        Q    And I apologize for bouncing around.  With

4   regard to substantive consolidation, has the debtor

5   made a proposal to the creditors committee as to what

6   it intends to do vis-a-vis substantive consolidation?

7        A    No, we have not.  We're still in a fact

8   gathering mode.

9             MS. DENNISTON:  Thank you.  I have no

10            further questions.

11            THE COURT:  Anybody else have any

12            cross-examination of Ms. Etlin?

13            (No response.)

14            THE COURT:  Redirect, Mr. Busey?

15                      REDIRECT EXAMINATION

16   BY MR. BUSEY:

17        Q    Ms. Etlin, the company's people who are

18   responsible for the preparation of the monthly

19   operating report, the accounting people who are

20   responsible for the operation and the preparation of

21   the monthly operating reports and the 10-Q, are those

22   the same people who prepared or are involved in the

23   preparation of the business plan?

24        A    Yes.  To some degree, yes.  But certainly

25   they're the people who are very involved in the issues

1    around substantive consolidation.

2         Q    That was my next question.

3         A    Sorry.

4         Q    So you've got the MORs, the 10-Q, the

5    business plan and substantive consolidation.  Who are

6    those people that we're talking about?

7         A    It's about a dozen people in the finance

8    team led by one very overworked chief accounting

9    officer.

10        Q    And have they been working pretty diligently

11   on all these issues in the last couple of months?

12        A    Substantive consolidation, we have sort of

13   stepped back from them.  Obviously, the issues that

14   have been raised at the company with regard to getting

15   the 10-K filed and the 10-Q and the MORs filed took

16   absolute precedence.

17             I mean, this is a public company with equity

18   security holders and equity securities that are

19   continuing to trade, the company took it very

20   seriously that it was not able to get its SEC filings

21   prepared timely because of issues associated with

22   satisfying its independent auditors.

23             And it was a very unfortunate environment.

24   People worked extraordinary quantities of time, and

25   the main focus was getting those things on file to

1   protect all of the people who rely on that public data

2   information.

3           So, frankly, we had asked the committees'

4   professionals if they could give us a little latitude

5   until we could get those things filed with regard to

6   some of the more detailed accounting analysis, because

7   we were going to have to work around and outside the

8   finance team in order to get that done.

9           MR. BUSEY:  No further questions, Your

10      Honor.

11          MR. BARR:  Thank you.

12                      RECROSS-EXAMINATION

13  BY MR. BARR:

14      Q    Is substantive consolidation a legal

15  analysis, or a financial business analysis?

16      A    It is ultimately -- as I understand it, Mr.

17  Barr, it's ultimately a legal analysis, but it's based

18  on actual financial business practices of the debtor.

19  It's sort of my layman's explanation of it.

20          So it's some of both.  I know that there is

21  legal structure and legal analysis that goes with it,

22  and then there's also legal conclusions that are

23  supported by actual financial business practices.

24      Q    Sure.  And is it fair to say that a

25  significant amount of the information that would be

1    used could be culled by lawyers looking through

2    information in rooms at Winn-Dixie?

3        A    You know, I honestly can't -- I'm not trying

4    to be evasive.  I really honestly couldn't say that.

5            I am obviously most focused on those things

6    that I'm responsible for trying to go get, and there's

7    quite a stack of that.  I mean, everything from which

8    individual of the company's, I forget, hundred

9    thousand employees works for which legal entity and

10   what their job description is and all of that

11   associated with the things that have been asked for.

12           There's just a lot of accounting and payroll

13   and HR data that's necessary to support some of the

14   questions that I've been asked by the committee.  I've

15   been focused on that.

16           If there's a whole bunch of other stuff that

17   the lawyers can do, I'm just not focused on that.

18       Q    And who's leading the charge for the debtors

19   and Winn-Dixie in the substantive consolidation

20   analysis?

21       A    First of all, we're taking our direction

22   from Skadden, and then it involves both Blackstone and

23   XRoads.  XRoads more for the on-site day-to-day

24   accounting and financially based kinds of things.

25       Q    So you're not sure if there's any legal due

1    diligence or people from a legal perspective there

2    looking for documentation?

3        A    I'm sorry.  The question was:  Do we have

4    legal people on site right now working?

5        Q    Looking for the information necessary to

6    make the legal analysis for substantive

7    consolidation.

8        A    Oh, I think they are.  Everybody's working

9    on the list pretty hard right now to try to get you

10   everything that you have asked for.

11           I don't know whether Skadden's actually put

12   somebody on site, but, as you will remember, the

13   company also has a fairly large in-house lawyer team

14   who are also assisting us with putting that data

15   together.  So I just don't know who's doing what as it

16   pertains to legal aspects of the information

17   requests.

18           I know that the person at the company who is

19   in charge of our process is Jay Castle who sits in the

20   general counsel's office.

21       Q    And when do you think that you will have all

22   the information required that we've asked that we

23   expected yesterday?

24       A    I'm sorry.

25       Q    That's okay.

1     A    Well, there's an initial binder of data that

2     should be to you.  I think, however, based upon the

3     questions that -- the subsequent questions that you

4     and Skadden have been working on, I really need some

5     further clarification about the documentation that's

6     going to be required, because when my guys got

7     finished last night and I met with them before I came

8     to our attorneys' offices this morning, they told me

9     it could take as long as a month to put some of this

10    data together, and I'm sure that was not the intent of

11    the detailed nature of your request.

12         So I'm hoping we can have a further

13    conversation at some point to see whether we can get

14    you stuff much more quickly, or you really don't need

15    it to the extent that maybe it's been outlined to us.

16         So, you know, hopefully sometime in the next

17    30 days.  Hopefully less than that.

18         MR. BARR:  Okay.

19         THE COURT:  Mr. Busey?

20         MR. BUSEY:  Thank you, Your Honor.

21              FURTHER REDIRECT EXAMINATION

22    BY MR. BUSEY:

23    Q    Ms. Etlin, if the company does not do a

24    substantive consolidation in its plan of

25    reorganization, what is the financial analysis that

1    has to be done in order to determine which of the

2    20,000 claimants in the case receive what respective

3    distributions from their various debtors?

4        A    Well, it's going to depend on the nature of

5    what you're deciding to do if you're not substantively

6    consolidating.

7            For example, you could make a distinction

8    that says all vendors.  You know, all vendors is a lot

9    easier than vendors who sold us X, and X being some

10   subset of that.

11           So it will depend, because of course what

12   you're going to have to do is figure out what the

13   differential value is for each of those creditors as

14   to the entity of which they are a creditor, and then

15   make sure you've got the right groups of creditors

16   into which bucket.

17       Q    And you have vendors and you have landlords

18   and you have bondholders and you have people who have

19   guarantees; is that right?

20       A    And I think -- and we have tax claimants and

21   a variety of other people as well.

22       Q    And where is the company in the process of

23   the financial analysis of trying to see what that

24   picture would look like?

25       A    If by that question you mean where are we

1    with regard to the analysis that Mr. Barr has been

2    asking about, we've done some pieces of it.  But the

3    additional information requests that -- the more

4    detailed information requests that we have received,

5    we're just at the beginning of putting that material

6    together.

7          Q     And from your prior testimony, I take it it

8    is your objective that you will gather that material,

9    do the analysis and have that discussion with the

10   creditors committee and come to some resolution of

11   that hopefully by the end of January.

12         A     Oh, absolutely.  I'm hoping it could be

13   sooner than that, but it's going to -- I'm very

14   conscious of -- we take a lot of shots in the press

15   for the professional fees in this case, not only from

16   press but from others associated with this case, and

17   I'm very conscious of not spending the company and, at

18   the end of the day, the creditors' and the equity

19   holders' money unnecessarily.

20               Right now I'm looking at something that my

21   guys tell me is going to take an extraordinary amount

22   of time and I'm going to have to put extra people down

23   here, which of course is going to make Peter Lynch

24   crazy, among others.

25               So I want to see if we can shortcut this

1    process, a, to get the committee what they'd like a

2    little bit sooner, and, b, not to spend the company's

3    money to that degree, because right now it looks like

4    this gigantic prelitigation project.

5        Q    And in the process determine what's in the

6    best interest of the debtor and the creditors.

7        A    Yes, absolutely.

8        MR. BUSEY:  No further questions, Your

9    Honor.

10        THE COURT:  Thank you very much.  You may

11    step down.

12                    (Witness excused.)

13        MR. BUSEY:  Your Honor, that's all of the

14    evidence we have with regard to this motion.

15        THE COURT:  Anybody else wish to present

16    evidence?

17        (No response.)

18        THE COURT:  Anybody objecting to the

19    motion?

20        THE COURT:  Mr. Barr.

21        MR. BARR:  Thank you, Your Honor.

22        As Ms. Etlin just testified and, as I think

23    all of the pleadings in this contested matter

24    prove, the debtors and the professionals have

25    already completed almost all of the significant

1    tasks that need to be completed before we can

2    consensually negotiate and get in front of Your

3    Honor a plan of reorganization to get these

4    entities out of Chapter 11 as soon as possible.

5         We heard about the footprint reduction, we

6    heard about the rejection of leases, we heard

7    about the new management team, we heard about

8    operational initiatives that have been

9    implemented.

10        Luckily, for all the stakeholders in this

11   case, the two hurricanes or the natural disasters

12   have not had a huge impact on the company or

13   these cases, and we commend management for that.

14        The business plan has now been absorbed by

15   the creditors committee.

16        And, Your Honor, this company has been in a

17   restructuring mode for quite a long time, and

18   it's time now to get out of Chapter 11 and

19   preserve the value for all the stakeholders, and

20   obviously our view is for the general unsecured

21   creditors of these estates.

22        Experience shows, Your Honor, that giving

23   people and giving debtors time, they use all the

24   time and then they ask for more time.

25        We're at a critical juncture in this case

1     that we need now to get out.  We need now to

2     focus everything that needed to be focused on

3     before to get to the place where we can get this

4     company reorganized, on its feet and out.  You

5     hear it's starting to operationally turn around.

6     Lets get the company out.

7          Let's, fortunately, stop some of the

8     distractions that we have inside a Chapter 11

9     context.  Let's have the plan formulated, let's

10    have it solicited, let's have whatever fight we

11    potentially are going to have in front of Your

12    Honor so that we don't erode value for the real

13    stakeholders in this case, which we believe is

14    the general unsecured creditors.

15         Your Honor, we don't think it's appropriate

16    for the debtors now to ask for their typical 90

17    days.  We think we're long past that.  We think

18    we are at a stage where 30 days is more than

19    appropriate.

20         I'm not going to go through a litany of

21    everything the debtors have done already.  You've

22    heard it from Ms. Etlin and you've actually seen

23    all of the different pleadings.

24         We also believe that the business plan is

25    pretty clear.  We also believe that we can have a

1          consensual plan very, very quickly.

2              I know you hear that there's all these

3          different things that need to be done, but these

4          are all different things that are done during a

5          plan negotiation process.

6              So 30 days from now, we're going to know the

7          number that goes into a disclosure statement for

8          people to think about.  30 days from now or 60

9          days from now or let's go out 80 days from now,

10         and that's the period of time I'm talking about,

11         Your Honor, where we have a plan on file.  That

12         plan needs to go out to creditors with the

13         disclosure statement.

14             So then you have, let's call it, 25 days'

15         notice of a disclosure statement hearing and

16         another 25 days' notice of a confirmation

17         hearing.  You add that to the 30 days we're

18         requesting, that's 80 days.

19             The banks say there are these what we all

20         call the bubble stores, Your Honor, that there

21         are these stores that everybody's looking at that

22         maybe we do or don't need.

23             Well, there's a period of time in which you

24         negotiate a plan, you send it out on notice, you

25         solicit votes prior to confirmation, and I'm sure

1       the debtors are going to propose a plan that

2       allows them to reject leases up until the time of

3       confirmation when they file that schedule of

4       assumed leases or rejected leases.

5            So they're going to have 75, 80 days from

6       the 30-day extension that we're asking, so even

7       more from today to look at those bubble stores.

8       They don't need 90 days to start this plan

9       process.  They have that process built in, Your

10      Honor.

11           We need to keep people focused on what the

12      goal is, which is to get this company out of

13      Chapter 11 and to preserve the value for the

14      general unsecured creditors, in our view.

15           The committee thought long and hard about

16      the requested extension, and they believe 30 days

17      is more than enough.

18           As I said last time, Your Honor, we are

19      ready.  We have the resources.  We want to

20      negotiate this plan and get it on file.

21           We've heard from the debtors that we'll have

22      a term sheet the first week of January.  Should

23      that term sheet say what everybody expects it to

24      say based upon the business plan, it should be a

25      very, very easy plan to get on file within a

1        couple of weeks, absolutely.

2            You also heard that Skadden has a great

3        database, Your Honor.  Plans are difficult

4        documents, but we're not starting from scratch.

5        There's drafts that can be done now.

6            Substantive consolidation issues you've

7        heard about.  People have views of what those

8        answers should be.  People need to do their

9        diligence, absolutely, to get to the right answer

10       in that process, but, again, that's something

11       that should be done and can be done rather

12       quickly.

13           To say we need all the time to then start

14       the plan negotiations is not the way it should be

15       done, Your Honor.  These are all things that can

16       run concurrently.  And with all due respect, we

17       submit that 30 days is more than enough.

18           Also, to sit by, we are increasingly

19       concerned that being in Chapter 11 longer and

20       longer, we have more of sidetracks which will

21       erode the business potentially or erode the

22       value, which will cause management to have to

23       deal with things that they should not otherwise

24       have to deal with and potentially would not deal

25       with outside of Chapter 11.

1        With respect to some of the issues raised by

2    the banks, the impending holiday season, and

3    unfortunately they're correct that the committee

4    will be working around the clock, but there are a

5    fair amount of professionals retained in this

6    case, there's a fair amount of bodies, there's

7    more than enough for us to get this done over the

8    next 30 days.

9        The holiday season is a busy time for the

10    company, that's fair.  But you heard Blackstone

11    takes a lead role in this, you heard XRoads takes

12    a lead role in this.  Absolutely management will

13    have to take a role in this.

14        The sale process is done.  Blackstone is a

15    financial advisor and absolutely involved day to

16    day with the company, but a lot of their role was

17    to sell and to market stores.  So, Your Honor,

18    there's plenty of professionals on their side of

19    the table that are ready during this holiday

20    season to get a deal done.

21        And, again, based upon what we've heard and

22    what we've seen, in our view it's a very, very

23    easy plan to get done.

24        With respect to other issues raised by the

25    banks or others, we're at a stage in this case,

1       it's time.  90 days is not the right amount of

2       time.  We think 30 is.  Let's get a plan in front

3       of Your Honor, let's get it solicited by the

4       creditors, whoever stakeholders need to vote on

5       it.  Let's get this company out of Chapter 11.

6              The management team has done a great job.

7       They've preserved the value for the creditors.

8       They've put all these initiatives in place.  The

9       company is on an uptick.  But we're poised to

10      craft this plan and let's get out.

11             THE COURT:  Ms. Denniston, do you have

12      anything to say?

13             MS. DENNISTON:  Your Honor, the equity

14      committee filed a limited objection, and we had

15      three concerns.  I think that they've kind of all

16      been articulated through the testimony and

17      comments of counsel.

18             Number one, we support the extension of

19      exclusivity, and we believe the debtor's request

20      for 90 days is reasonable.

21             As the Court heard, the debtor is getting

22      better all the time.  The operations are good,

23      and the debtor needs to have the opportunity to

24      have the time to further expand on that improving

25      trend.  That trend has been a constant trend

1        since the U.S. Trustee made the decision to

2        appoint the committee back in June.

3            But the concern that the equity committee

4        has is this is a very expensive case and there

5        are a lot of professionals, and we don't want to

6        see this drag on any longer than necessary, so we

7        would urge the Court that this be the last

8        extension for exclusivity.

9            And, lastly, it's the equity committee's

10       position, I guess to put it really bluntly, if

11       we're going to have a fight, Your Honor, and I

12       believe we are, then we need to have a fair

13       fight.

14           If the equity committee's got a seat at the

15       table right now, it needs to have access to the

16       same information.  There's a whole constituency

17       out there that's still in the dark.  The business

18       plan is not out there.  There's a number of

19       creditors and shareholders that call that want

20       information.

21           With the release of the monthly operating

22       reports, the positive information that was

23       contained in those, and the debtor finally

24       getting the most recent Q on file, I think it's

25       important that we have this extension, but it

1           should be an extension with a message from the

2           Court that says -- and I believe, for one thing I

3           can agree with the committee on is, we need to do

4           this quickly, we need to be efficient and we need

5           to cap these professional fees.  Another 90 days

6           and, if that's not it, then we move on.

7                But, at the end of the day, the 90 days, I

8           believe, is reasonable based on the information

9           I've been provided, and particularly what I saw

10          that was released to the public toward the end of

11          last week.

12               I think that it is very important and

13          incumbent upon all the professionals in the case

14          to cooperate with and be sure that the equity

15          committee is a part of the discussions.

16          Otherwise, the 90 days is a waste of time,

17          because we cannot get to a consensus if you have

18          a represented constituency that's excluded from

19          the dialogue.

20               And that was the point of the objection that

21          we filed.  We do support the debtor's request.

22               THE COURT:  Anyone else want to be heard?

23               MR. BUSEY:  The debtor would like to be

24          heard, Your Honor.

25               THE COURT:  I know, but I want everybody

1    else to talk first, Mr. Busey, so that you can

2    respond to everybody if you need to.

3         MS. COX:  Good afternoon, Your Honor, Betsy

4    Cox on behalf of Wachovia Bank, which is the

5    agent for itself and the other postpetition

6    lenders.

7         We filed a written response yesterday

8    supporting the debtor's motion, and we reiterate

9    what we said in that response and fully support

10   the debtor's position.  We think it's a

11   reasonable position.

12        We think the debtors have shown, through Ms.

13   Etlin's testimony, that they have established the

14   good cause required by Section 1121(d) for an

15   additional 90 days.

16        They have made a lot of progress so far, and

17   they also have shown the additional work that's

18   necessary to formulate and propose a plan that

19   hopefully will be a confirmable plan.

20        The creditors committee seems to be trying

21   to rush the whole process by saying 30 days,

22   which appears to be an arbitrary number not

23   supported by anything, is a sufficient amount of

24   time, and I think what the debtors are talking

25   about here is not starting plan negotiations in

1    90 days, but having a confirmable plan ready to

2    be filed in 90 days.

3        The bank has been monitoring everything very

4    closely and carefully, believes the debtors are

5    doing what they need to be doing, and additional

6    time is needed and the 90 days is reasonable.

7        Thank you.

8        THE COURT:  U.S. Trustee have any position

9    here?

10        MS. ESCAMILLA:  Your Honor, we have no

11    objection to the request.

12        THE COURT:  Mr. Busey, I'll now hear from

13    you.

14        MR. BUSEY:  Thank you, Your Honor.

15        Your Honor, the 90-day statutory exclusivity

16    period was designed by Congress for a typical

17    bankruptcy case, and this is not a typical

18    bankruptcy case.

19        In cases of this magnitude, that statutory

20    exclusivity period is commonly extended, as Ms.

21    Cox says, for good cause shown.

22        I think we've made an adequate record here

23    for good cause.  We've shown a remarkable, if not

24    unprecedented, effort by this company, a company

25    of this size, a retailer of this size, to at the

1    same time restructure its business by a 35-

2    percent downsizing in the number of stores and

3    corporate overhead, and at the same time in the

4    remaining operating stores institute operational

5    initiatives, design, implement and institute

6    operational initiatives which have already begun

7    to show traction in the monthly operating

8    reports.

9        You heard Ms. Etlin say that after years of

10   declining same store sales, this company now has

11   shown a stop in that decline, and in fact the

12   sales are going up.  All of that in less than a

13   year since the case was filed, in addition to

14   extraordinary claims management and other asset

15   disposition issues that we've done.

16       The debtor is a debtor-in-possession with a

17   fiduciary responsibility for all of its

18   constituencies to reorganize and to produce

19   value.  It has shown that it's doing that.

20       It needs the assistance of this Court for

21   the extension of exclusivity now to take

22   advantage of what is done to date and to propose,

23   negotiate, formulate, draft and file a consensual

24   plan of reorganization.

25       As Ms. Etlin said, if we were put in the

1       position of filing a nonconsensual plan because

2       of a short time period on exclusivity, which is

3       what we'd have to do, if you granted the

4       committee's objection and we only had a 30-day

5       extension of exclusively, we would either have to

6       file another motion and have this exercise in two

7       more weeks, or we'd need to file a plan that

8       could not be, on the record we've made today,

9       consensual.

10          And either of those opportunities would

11      simply drive more professional fees in this case

12      because it would generate contentiousness and

13      litigation in your courtroom, and the whole idea

14      of this proceeding is that it be a consensual

15      proceeding.

16          We have shown why we need 90 days.  We need

17      January to propose to our constituencies a plan

18      that would address all of the issues, including

19      the very sticky issues of how do we address what

20      kind of different distributions to the different

21      creditors or the different debtors in this case,

22      or, alternatively, propose substantive

23      consolidation, which raises a whole other set of

24      issue.

25          And we hope to resolve by consensus by the

1        end of January.  That's pretty ambitious.  And if

2        we do that, negotiate a plan, literally a plan,

3        draft and circulate and comments and negotiate a

4        plan in February, so that that can be filed in

5        March, and then we go through the process of

6        disclosure statement and vote solicitation.

7             That in and of itself, that process that

8        we've shown we need to do, is ambitious.

9             One thing that I would disagree about what

10       the equity committee has told you, I don't think

11       this Court should be sending messages and I don't

12       think you need today to rule on matters that are

13       not before you, and that is whether or not

14       there's going to be another motion to extend

15       exclusivity or not, it simply would depend what

16       happens in the next 90 days, if that motion is

17       filed and what record is made on it, and you

18       don't need to be predicting today.

19            We've told you what we plan to do.  We've

20       shown you that the company has shown a track

21       record of accomplishment of its goals.  We're

22       hopeful that we will achieve, on behalf of all

23       the constituencies of this case, a consensual

24       plan in short order which will capture the

25       maximum value.

1          I think you should honor our track record,

2     we've shown cause, and you should grant our

3     motion.

4          THE COURT:  The Court will grant the motion

5     and extend the exclusivity period for the period

6     requested of 90 days.

7          The evidence presented to this Court is not

8     controverted.  The experts that the debtor is

9     paying lots of money to says that they need the

10    90 days.  Hopefully they won't.  Maybe everybody

11    gets on board, and there's no reason why it could

12    be filed the middle of February or the first of

13    March and move the thing along.  I don't see why

14    not.

15         I think the equity committee is a committee,

16    and they're valid, and they've got financial

17    advisors and legal advisors and, as long they're

18    there, they need to be included in the loop, and

19    we don't need to have any litigation and request

20    for production and discovery situations here.

21    They just sidetrack things.

22         This case has gone well.  There's been no

23    evidence or even allegations that the debtor

24    hasn't been diligent in the operation of this

25    business.

1        It has been complicated.  There's a lot

2    going on.  It's not a little corporation.  They

3    have accomplished quite a bit.  And a lot of

4    these things have to be accomplished before you

5    can even formulate the plan.  You have to go

6    through these claims and you have to deal with

7    the PACA situation and you have to deal with

8    these other matters so you get at least some

9    handle on what you owe, and until you do that

10    you're really just blowing smoke in the air and

11    filing a plan.

12        And the other thing, from my experience

13    before and being on the bench, anybody can file a

14    plan that everybody will vote for.  The question

15    is can the debtor accomplish that.

16        I mean, you can file a plan that says we're

17    going to pay everybody a hundred cents on the

18    dollar, you know, sure they'll vote on that, but

19    feasibility is always a problem.

20        And the only success is if everybody gets

21    together and work together and negotiate.  And

22    this case has so far been operated on a

23    professional level and a lot of matters have been

24    negotiated and worked out, and hopefully that

25    will work and be successful.

```
 1          That being said, the Court will approve the
 2     motion.  I'll look to Mr. Busey to prepare the
 3     order, and this hearing is concluded.
 4          Mr. Busey, now we'll return to the extension
 5     of time to assume or reject unexpired leases.  Is
 6     that --
 7          MR. BUSEY:  Yes, sir, Your Honor.
 8          THE COURT:  -- the next thing?  I'll hear
 9     from you.
10          MR. BUSEY:  Thank you, Your Honor.
11          We ask the Court, for the purpose of this
12     motion, to take notice of the evidence that we
13     just offered on the exclusivity motion, and with
14     that we'll call Ms. Etlin back to the stand and
15     ask her a few more questions.
16          THE COURT:  Very well.  Ms. Etlin, you are
17     still under oath.
18 WHEREUPON,
19                    HOLLY ETLIN
20 was called as a witness herein, and having been
21 previously sworn by the Courtroom Administrator, was
22 examined and testfied further as follows:
23                 DIRECT EXAMINATION
24 BY MR. BUSEY:
25     Q   Ms. Etlin, by the debtors' motion, you're
```

1    aware that debtors are seeking a further extension of

2    their period, under Section 365 of the Bankruptcy

3    Code, within which they may assume or reject unexpired

4    leases of nonresidential real property.

5        A    Yes.

6        Q    And we're seeking that extension for a

7    parallel period of time with exclusivity to March

8    20th, 2006.

9        A    Yes.

10       Q    Why does the debtor need additional time

11   until March 20th in order to determine whether to

12   assume or reject those leases which have not already

13   been the subject of proceedings in this court?

14       A    Well, first of all, it's a matter of common

15   practice in retail cases in which leases are a very

16   significant issue in the case that you have the leases

17   run concurrent with exclusivity.

18            From a business point of view, however, the

19   issue comes down to this:  We've spoken now about the

20   great things that Winn-Dixie has done to turn around

21   its business, and we've spoken about the fact that the

22   store sales are turning and all of that.

23            However, the debtor is a good and conscious

24   business just like any other retailer, and it's always

25   looking very actively at its store base with regard to

1    the relative performance of the stores.

2           And while no further closures are

3    contemplated at this time, there may be some balancing

4    of the remaining chain that the debtor might choose to

5    have occur, and, frankly, the debtor wants to have the

6    additional time to see what the ultimate results are

7    of these continuing merchandising initiatives to make

8    sure that it's not making or cause to make premature

9    decisions on either positive or negative as it

10   pertains to any individual store.

11       Q    Do you believe it's in the debtor's best

12   interest to continue the Section 365 time to assume or

13   reject until March 20th?

14       A    Absolutely.  If you were forced to make a

15   premature decision, a, you might make the wrong

16   decision and that might be bad for value, and also you

17   might create a claim where you might not necessarily

18   have to do so.

19          On the other side, you might choose to

20   assume something that at the end of the day you might

21   not want to assume if you had further time to evaluate

22   it.

23          The debtor had hoped to be through this

24   process by now, but, frankly, this is a process that's

25   not just based upon financial performance.  You have

1    to take a very, very hard look at every remaining

2    store, the prospects for future growth around that

3    store, the prospects for the real estate market around

4    that store, the quality of the real estate, et

5    cetera.  Those are things that happen in the field.

6              And needless to say, over the past few

7    months with the two major hurricanes, the field's been

8    a little distracted, and some of those stores, in

9    particular the stores that the debtor may want to take

10   a much closer look at, are located in South Florida,

11   for example.  And so you had a very significant

12   distraction associated with the hurricanes.

13             MR. BUSEY:  No further questions, Your

14        Honor.

15             THE COURT:  Cross-examination.

16             MR. KUKOFF:  Thank you, Your Honor.  Ian

17        Kukoff here on behalf of --

18             COURT REPORTER:  I didn't hear him.

19             MR. KUKOFF:  I'm sorry.

20             THE COURT:  Stand behind the microphone

21        when you talk.  We can't hear anybody if they're

22        not behind the microphone.

23             MR. KUKOFF:  Ian Kukoff, Blaxberg, Grayson,

24        Kukoff & Siegel on behalf of landlords Anthony

25        and Dorothy Balzebre, store location 370.

```
 1                    CROSS-EXAMINATION
 2   BY MR. KUKOFF:
 3        Q    You had testified earlier that the business
 4   plan was essentially complete at this point and has
 5   been distributed to the creditors committee for
 6   review?
 7        A    Yes.
 8        Q    And is that going to form the foundation for
 9   the term sheet for the plan of reorganization?
10        A    Yes, it is.
11        Q    And in connection with the preparation and
12   completion of that business plan, was there a
13   determination made in regards to which leases would be
14   assumed as part of a reorganization plan?
15        A    The business plan as drafted contemplates
16   substantially all of the existing footprint going
17   forward.  No permanent decision has been made,
18   although we've made both the committees aware that the
19   debtor continues to evaluate certain stores.
20        Q    Has there been any decision made concerning
21   any of the remaining leases, that the debtor intends
22   to assume any of those leases as part of its
23   reorganization plan?
24        A    As I think I previously testified, the
25   debtor has made no specific final decision as it
```

1    pertains to any of the existing 587 stores, either

2    positive or negative, and is continuing to evaluate

3    all of those stores.

4            The debtor believes it has the right

5    footprint today, but there are a variety of operating

6    initiatives underway and they're looking at how every

7    store is responding to those various initiatives.

8        Q    Have you had an opportunity to look at Store

9    370, which is located at Sunset Drive and Galloway

10   Drive in South Miami, Florida?

11       A    Yes, I have.

12       Q    Can you tell the Court what the performance

13   of that store has been?

14       A    Certainly.  The store, from fiscal 2003 to

15   2004, had an excess of a 12-percent sales decline year

16   over year.

17           From 2004 to 2005, the sales actually

18   stablized.  That's fiscal, by the way, so that means

19   2005 ended in June.

20           The sales level actually stablized.

21   However, the net profit before administrative expenses

22   at store level actually declined from fiscal 2004 and

23   2005.

24           This store is one that the debtor is looking

25   very closely at with regard to the effect of its

1  operating initiatives and its need to improve its

2  operations.

3          We're very hopeful that the store will be

4  part of the final go-forward chain, but, frankly,

5  given the historical issues around the operation of

6  this store, the debtor's taking a very, very close

7  look at it and, as I mentioned, it is one of the South

8  Florida stores that have also had impacts from the

9  hurricane.

10      Q    Speaking of the impact of the hurricane,

11  what specifically was that impact?

12      A    There was disruption in a variety of the

13  stores down in the South Florida area as to either

14  loss of power, closure and other kinds of issues

15  associated with the hurricane.

16      Q    Do you know what the impact was with respect

17  to this specific store?

18      A    No, I do not.

19      Q    The debtor had undertaken an analysis of all

20  of the stores in order to determine which of them

21  would be targeted stores for either rejection or

22  assumption and sale; is that right?  From the

23  commencement of the bankruptcy, that's what the debtor

24  had done, and ultimately that resulted in the

25  summertime rejection and sale of several of the

1    stores; is that right?

2        A    Yes.  The debtor's footprint process was

3    specifically focused on entire geographical markets

4    that the debtor was choosing to exit because the

5    debtor did not believe it could be effective.

6            Store 370 is located in the debtor's core

7    go-forward market.

8        Q    So this lease was assumed, was it not?  Not

9    assumed.  This lease was extended.  In other words,

10   there was a renewal option in the Store 370 lease, was

11   there not?

12       A    I'm not sure.  Again, I don't run the real

13   estate department personally.

14       Q    You're not aware that in September of this

15   year that the renewal option was exercised and that

16   this lease was extended than for another five years

17   after the targeted stores were auctioned off in

18   August?

19       A    Well, I believe every -- our operating mode

20   for the debtor has been that, for every lease that's

21   subject to renewal in this process, to the extent that

22   the debtor continues to operate those stores, we're

23   exercising those renewal options to preserve the

24   debtor's option with regard to those stores.

25            So, if there was a renewal option on your

1    store, I'm sure the debtor did exercise it

2    specifically to keep its options open.

3        Q    Isn't it true that, in assuming the lease,

4    the debtor would actually increase the potential

5    rejection damages if this lease was going to expire on

6    December of this year if it in fact ultimately rejects

7    it?

8        A    You're asking me to draw a legal conclusion,

9    and I'm not a lawyer.

10            MR. KUKOFF:  I have nothing further, Your

11        Honor.

12            THE COURT:  Thank you very much.

13            Anyone else have any questions of Ms. Etlin

14        on this issue?

15            MR. HELD:  Thank you, Your Honor.  Eddie

16        Held on behalf of Morrisville Markets.

17                    CROSS-EXAMINATION

18   BY MR. HELD:

19        Q    Ms. Etlin, your testimony earlier has

20   indicated that, as part of the footprint, the debtors

21   have exited the North Carolina area; is that correct?

22        A    Among other areas, that is correct.

23        Q    And with respect to North Carolina, does the

24   debtor have any current operations in North Carolina?

25        A    I don't believe we do.

1        Q    As part of the debtor's business plan, does

2    it intend to have any current operations in the future

3    in North Carolina?

4        A    No, it does not.

5             MR. HELD:  No further questions, Your Honor.

6             THE COURT:  Any other questions of the

7        witness?

8             (No response.)

9             THE COURT:  Mr. Busey, any redirect?

10            MR. BUSEY:  No, Your Honor.

11            THE COURT:  Thank you very much.  You may

12       step down.

13                          (Witness excused.)

14            THE COURT:  Additional evidence, Mr. Busey?

15            MR. BUSEY:  No, Your Honor.

16            THE COURT:  Does anybody else wish to offer

17       evidence on this issue?

18            (No response.)

19            THE COURT:  Mr. Kukoff, I'll hear from you.

20       Do you have an objection?

21            MR. KUKOFF:  Yes, Your Honor, we do.

22            May it please the Court, the purpose of 365

23       (d)(4) is to protect the landlord.

24            As I stated in our objection, this is

25       severely prejudicing this particular landlord at

1    location 370.  Approximately 38 percent of the

2    rentals due and owing for 2005 have not been paid

3    in this case.

4        There's a base rent of approximately $6,000

5    per year that this landlord collects from

6    Winn-Dixie as base rent, and it strongly and

7    heavily relies on percentage rents.

8        Based upon the timing of the filing of the

9    bankruptcy, my client's been denied $61,000 in

10   rent, which totals close to 40 percent of its

11   rentals for that year that creates an incredible

12   strain on the landlord and is burdensome to that

13   landlord.

14       And in this particular instance, the

15   testimony is that this is part of the debtor's

16   core plan going forward and that there is a

17   likelihood that this lease will ultimately be

18   assumed.

19       And if it's not, then we want to know now

20   whether it's going to be assumed or not, because

21   for my client to have to carry that kind of a

22   rental shortfall for a year until this debtor

23   decides it's going to assume or reject the lease

24   is extremely burdensome, not to mention that

25   there is a technical breach of the lease at this

1    point because the debtor didn't pay November rent

2    time.  They didn't pay it at all in November,

3    they paid it in December.

4         There's an obligation under 365 to timely

5    keep the rent current.  They did in fact pay

6    November rent in December, but they unilaterally

7    decided to abate the rent by $600, which may not

8    seem like a lot but it's 10 percent of the

9    monthly base rental.

10        They purport to rely on a provision in the

11   lease which allows for an abatement, but that

12   only applies -- and I've attached a copy of the

13   relevant provisions of the lease -- in the event

14   that there's a catastrophe or a casualty that

15   results in the need to rebuild the facility, or

16   there's a 75-percent cost involved of the

17   existing cost to the store.

18        There's no need for this landlord to have to

19   come before the Court to try to get this debtor

20   to timely comply with its obligations.

21        We've also sought the compliance with the

22   payment of the real estate obligation.  The

23   landlord recently received the real estate bill.

24   There's a $47,000 obligation that's an element of

25   rent that is owed by this tenant.  Although we've

1      spoken with the debtor and they've said the check

2      is in the mail, it has not yet been received.

3          That's an additional strain and burden that

4      this landlord has to deal with and shouldn't have

5      to come to this Court to ask be complied with.

6          Your Honor, based upon the prejudice to this

7      landlord insofar as the shortfall in rent and the

8      amount that he's had to carry and will have to

9      carry going forward until this lease is finally

10     assumed, the fact that there are technical

11     breaches under the lease that still have not yet

12     been cured and need to be cured, and the fact

13     that we believe that this lease ultimately will

14     be assumed and that this really is an effort to

15     try to avoid paying cure amounts, we would

16     respectfully ask that the Court require that the

17     debtor assume this lease.

18         And if, as they say, this lease is not

19     performing, that it reject so at least this

20     landlord has some closure on this and that it

21     knows with some certainty where we're going with

22     regard to this location so the landlord can move

23     on and either release the premises to somebody

24     who is going to pay a much higher rent -- this is

25     an old lease, Your Honor.

1          This lease was entered into in 1970.  In 30

2     years the rentals have approximately doubled,

3     and, as I said, there's only a $6,000 monthly

4     base rent obligation plus the percentage rents.

5     There is a sweet lease deal for Winn-Dixie.

6          And clearly there would be detriment to the

7     landlord if, number one, they're are not required

8     to pay the shortfall in the rent, which is

9     substantial.

10         Like I said, this is a tenant that occupies

11    approximately 40 percent of the entire shopping

12    center and has not paid 40 percent of the rentals

13    that the debtor has attributed to prepetition

14    rent based upon percentage rents.

15         At this juncture, Your Honor, we would ask

16    that the debtor's motion, at least with respect

17    to the Balzebres, be denied and that it be

18    compelled to either assume or reject this lease

19    within the time prescribed by the Court's prior

20    order of December 19th.

21         Thank you.

22         THE COURT:  Thank you.

23         Any other objections?

24         MR. RUSSIN:  Your Honor, we had filed an

25    objection -- Peter Russin on behalf of

1       Pines-Carter -- previously, but that was

2       resolved, but it might be on the docket as an

3       objection.

4              THE COURT:  Is that Pines-Carter?

5              MR. RUSSIN:  Yes, Your Honor.

6              THE COURT:  That's been withdrawn?

7              MR. RUSSIN:  Yes.  It was resolved through

8       our motion where the debtors agreed to assume or

9       reject within 10 days.

10             THE COURT:  Thank you.

11             Any other objections?

12             MR. RUSSIN:  May I be excused, Your Honor?

13             THE COURT:  You certainly may.

14             The issue as to whether or not the debtor

15      should get an extension of time to assume or

16      reject the leases is primarily based -- it's a

17      business decision of the debtor, and the only

18      evidence before the Court was the testimony of

19      Ms. Etlin, a financial reorganization advisor to

20      the debtor, who said that it's in the debtor's

21      interest to have the time to assume or reject

22      extended for the 90 days.

23             I certainly understand the position of Mr.

24      and Mrs. Balzebre, but I've had no evidence

25      presented.  I appreciate what you say, but this

1    is scheduled as an evidentiary hearing and the

2    Court has to make its findings based on the

3    evidence and not on representations of counsel.

4    There was no stipulation to any of those facts.

5        The Court will grant the motion.  Once

6    again, this motion is without prejudice to any

7    landlord filing its own motion to require the

8    debtor to assume or reject, and the Court will

9    deal with those on a case-by-case basis.

10        And, once again, I strongly urge the debtor

11    that if any landlord has a specific problem,

12    sales of a shopping center or something of that

13    nature that's pending, you should try to make a

14    decision on that particular lease as soon as

15    possible or if it's creating some extreme

16    hardship on a particular landlord.

17        That being said, Mr. Busey, do you have an

18    order?

19        MR. BUSEY:  No.  We'll submit an order, Your

20    Honor.

21        THE COURT:  Very well.  I'll look to you for

22    THE order, and the hearing is concluded.

23        Yes, sir.

24        MR. HELD:  Prior to the conclusion, Your

25    Honor, with respect to Morrisville Markets to

1        come full circle as to --

2            THE COURT:  Who is Morrisville Markets?

3            MR. HELD:  That's what I'm about to explain

4        to you.  It's referred to as Store Number 802,

5        and it sort of got under the radar.

6            But in any event, it's in North Carolina, in

7        Wake County, and it was a store that was under

8        construction as part of a shopping center that

9        the construction was never completed as a result

10       of the Chapter 11 filing.

11           The debtors, subject to Your Honor's

12       approval, have agreed, with respect to the

13       extension to assume or reject and the granting of

14       the debtors' motion, to carve Morrisville Market

15       out so that, in essence, the lease will be deemed

16       rejected.

17           In addition to or with respect to that

18       agreement, the Morrisville Market has agreed to

19       release -- the parties will mutually release each

20       other from any and all claims and just go on

21       about their business.

22           And subject to Your Honor's approval, the

23       debtors have agreed to allow that carve-out in

24       the order.

25           THE COURT:  Mr. Busey, is that your

1     agreement, or Ms. Jackson?

2         MR. BUSEY:  Your Honor, we're unable to find

3     any source on the debtor's side for that

4     agreement, so we're going to have to talk to Mr.

5     Held about it.  We received no objection.  He

6     mentioned it to us for the first time today.  You

7     have no evidence before you.

8         THE COURT:  I'm not ruling.  He's just

9     stepping up here.  I don't have that before me.

10        MR. BUSEY:  We'll deal with him.

11        (Laughter.)

12        THE COURT:  Very well.  Thank you very much.

13        MR. HELD:  Thank you, Your Honor.

14        THE COURT:  Motion to implement order on

15    Penman Plaza Associates filed by the debtor.

16        MS. JACKSON:  Your Honor, this is a lease,

17    Store Number 18 located in Neptune Beach, and

18    the debtors have filed a motion to assume this

19    lease.

20        The motion cites proposed cure costs of

21    about $100,000.  After the motion was filed, the

22    landlord filed an objection asking for additional

23    cure amounts.  Those cure amounts were amounts

24    that actually became due after we filed the

25    motion.  The debtors do not need those additional

1      cure amounts.

2            The landlord also asked for a copy of a

3      certificate of insurance.

4            The landlord asked for all of that

5      information, both the cure of the default, the

6      postpetition default, and provision of its

7      insurance certificate, within 30 days of entry of

8      an order approving the motion to assume, and the

9      debtors are in agreement.  We will provide that

10     to the landlord.

11           So we ask the Court to grant our motion to

12     assume.

13           THE COURT:  Mr. Bowlus?

14           MR. BOWLUS:  If I'm understanding this

15     correctly, the additional sums will be paid to

16     cure?

17           MS. JACKSON:  Yes, within 30 days.

18           MR. BOWLUS:  And the proof of insurance will

19     be supplied, and you'll send me an order to that

20     effect and we'll submit it to the Judge.

21           MS. JACKSON:  Yes.

22           MR. BOWLUS:  Just saved a lot of time.

23     Thank you.

24           THE COURT:  Okay, good.  Look to you for the

25       order, Ms. Jackson.  This hearing is concluded.

1         MS. JACKSON:  I will submit one, Your Honor.

2         THE COURT:  The motion to compel debtor to

3    assume or reject filed by By-Pass Partnership.

4         Mr. Post?

5         MR. POST:  May it please the Court, Jim Post

6    on behalf of the debtors.

7         Your Honor, we've been authorized by the

8    attorney for this movant, By-Pass, to request the

9    Court -- both parties request that the Court

10   continue the hearing on this motion, to be

11   scheduled upon a notice by other party or

12   further order of the Court.

13        THE COURT:  Very well, it will be continued

14   until further notice.

15        MR. POST:  Thank you, Your Honor.

16        THE COURT:  Is there anything further before

17   the Court?  Anybody have any further matters that

18   are on the record?

19        MR. BUSEY:  Not on behalf of the debtors,

20   Your Honor.  Thank you.

21        THE COURT:  Very well.  These hearings are

22   concluded.  Thank you very much.  Good to see all

23   of you.

24        (Thereupon, at 3:00 p.m., the hearings were

25   concluded.)

1                         -  -  -

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

128

1                    C E R T I F I C A T E

2    STATE OF FLORIDA )

3    COUNTY OF DUVAL  )

4              I, Cindy Danese, Notary Public, State of

5    Florida at Large, do hereby certify that the attached

6    excerpt represents the proceedings before the United

7    States Bankruptcy Court, Middle District of Florida,

8    Jacksonville Division, before the Honorable Jerry A.

9    Funk, Bankruptcy Judge, in the matter of In Re:

10   Winn-Dixie Stores, Inc.; such transcript is an

11   accurate recordation of the proceedings which took

12   place.  A transcript of this proceeding has been

13   produced on January 13, 2006.

14

15

16

17                              STATEWIDE REPORTING SERVICE

18

19

20

21                              CINDY DANESE

22

23

24

25