Exhibit "A"

# LEASE

between

## BAUMGARDNER-HOGAN REAL ESTATE, LLC.
as Landlord

and

## WINN-DIXIE CHARLOTTE, INC.
as Tenant

June 26, 200 1

## TABLE OF CONTENTS

PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

TITLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

SURVEY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

ENVIRONMENTAL AUDIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

COMPLIANCE WITH LAWS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

CONSTRUCTION OF SHOPPING CENTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

COMPLETION DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

COMMENCEMENT DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

OTHER TENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

PARKING AND COMMON AREAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

SERVICE AREA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

TENANT'S MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

LANDLORD'S MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

FIXTURES AND INTERIOR ALTERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

CASUALTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

QUIET ENJOYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

TAXES AND LIENS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONSTRUCTION RISKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ASSIGNMENT AND SUBLEASING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

SUBORDINATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ESTOPPEL CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

LENDER'S CURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

BENEFIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

TRANSFER BY LANDLORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

SHORT FORM LEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

MARGINAL TITLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

COMPLETE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

DECLARATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ENVIRONMENTAL CONDITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

NO BROKERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

FLORIDA MANDATED PROVISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

EXPANSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TAKE OVER AND RELEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

NO JOINT VENTURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

TIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

NO MERGER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

NET LEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## LEASE

THIS LEASE is made this 26 day of June , 200 1 (the "Effective Date"), between **BAUMGARDNER-HOGAN REAL ESTATE, LLC,** a Kentucky limited liability company ("Landlord"), and **WINN-DIXIE CHARLOTTE, INC.,** successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

## WITNESSETH:

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

**PREMISES**

1. Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein:

(a) A store building known as Winn-Dixie Store #1618, being approximately 222 feet in width by 231 feet in depth, with a front vestibule and rear receiving room(s), together with exterior pads at the rear for freezers and coolers, and a loading dock area (collectively, the "Store"); and

(b) The land on which the Store and certain ancillary improvements (including without limitation parking spaces and roadways) stand (the "Land"). The Land is labeled "Lot 6" on the Site Plan, as hereinafter defined, contains approximately 7.83 acres, and is more particularly described on Exhibit "A"; and

(c) A nonexclusive right and easement (such right and easement Landlord hereby grants to Tenant) to use during the Term, as hereinafter defined, all ramps, sidewalks, streets, entrances, exits, roadways, walkways, trash collection facilities and dumpsters, if any, malls, landscaped areas, parking areas, service areas, driveways, traffic signals, medians, curb cuts, access points, utility lines, water detention and retention facilities and related improvements located in the Shopping Center, as hereinafter defined, as shown on the Site Plan, as hereinafter defined (collectively, the "Common Areas").

The Store, the Land and the Common Areas are collectively referred to herein as the "Premises". The Premises also include the rights of Tenant set forth in that certain Cross Easement and Restrictive Covenants Agreement dated July 28, 1997, and recorded in Book 06916, Page 0110 in the Office of the Clerk of Jefferson County, Kentucky, as modified by that certain Modification of Cross Easement and Restrictive Covenants Agreement of record in Deed Book 7674, Page 127, in the office of the Clerk aforesaid (collectively the "Declaration").

The Premises are located in a shopping center development consisting of "Lot 5", "Lot 6", "Lot 7", and "Outparcel 3" (shown in detail on Exhibit "B," a site plan prepared by Birch, Trautwein & Mims, Inc. on July 7, 1999 the "Site Plan"), known as Blankenbaker Place (as the same may be enlarged from time to time, the "Shopping Center"), located at 201 Blankenbaker Parkway near Blankenbaker Parkway's intersection with Shelbyville Road in the City of Louisville, County of Jefferson, State of Kentucky. The Shopping Center is also more particularly described on Exhibit "B".

**TERM**

2. (a) <u>Initial Term.</u> The term of this Lease shall commence on the Commencement

1

Date, as herein defined, and shall be for an initial term of 20 years (the "Initial Term").

(b)    Extension Term(s). Tenant, at its option, shall be entitled to the privilege of 5 successive extensions of the Initial Term of this Lease, each extension to be for a period of 5 years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (the Initial Term together with the Extension Terms elected by Tenant are hereinafter referred to as the "Term").

Tenant may extend the Term provided that it is not in material or monetary default under this Lease by giving to Landlord a notice in writing at least 180 days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document. If Tenant is, but for the giving of notice and/or the passage of time, in material or monetary default under this Lease at the time it notifies Landlord that it desires to extend the Term and Tenant cures such default within applicable cure periods, then Tenant's extension notice shall become effective upon such cure.

(c)    Return of Premises. Tenant will yield up the Premises and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in broom clean condition, reasonable wear and tear, damage by fire and other casualties and condemnation or appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct. Tenant shall not be required to restore the Premises to their original state. Tenant shall not remove from the Premises, or assert any rights in or to, any conduits, fixtures, ducts or other apparatus not constituting Tenant's Trade Fixtures. Tenant shall surrender to Landlord all keys to or for the Store and shall inform Landlord of all combinations of locks, safes, and vaults, if any, in the Store.

(d)    Holding Over. Any holding over by Tenant of the Premises after the expiration of the Term shall operate and be construed as a tenancy at sufferance from month to month, at 150% of the Basic Rent but otherwise upon the same terms and conditions applicable to the Term.

**RENT**

3.    Tenant shall pay the following without notice, demand, counterclaim, or offset except as expressly provided in this Lease or as provided by law.

(a)    Basic Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord as basic rent for the Premises during the Term the sum of $674,527.00 per annum ("Basic Rent"). Basic Rent shall be paid in twelve (12) equal monthly installments of $56,210.58 per month, together with applicable sales or rent tax due thereon, which installments shall be due and payable in advance on the first day of each and every calendar month of the Term.

(b)    Percentage Rent. In addition, beginning on the Commencement Date, as hereinafter defined, Tenant shall pay Landlord percentage rent equal to the amount, if any, by which one percent (1%) of Gross Sales (as hereinafter defined) exceeds Basic Rent ("Percentage Rent"). Any Percentage Rent which may become due shall be payable within 60 days after the expiration of each Fiscal Year, as hereinafter defined. However, upon final termination of the Term, any Percentage Rent due shall be payable within 60 days after such termination or expiration of the Term. The Percentage Rent for each Fiscal Year shall be calculated separately and without reference to any other Fiscal Year. For purposes of calculation the Percentage Rent due hereunder, Tenant's fiscal year shall be approximately July 1st to June 30th of each year (the "Fiscal Year").

"Gross Sales" shall mean the aggregate sales price of all merchandise (including, without limitation, food and beverages) sold in or from the Store during each fiscal year of the

Term, both for cash and on credit (less bad debt expenses). Gross Sales shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by Tenant from the Premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks, automatic teller machines, public telephones and fuel pumps; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds, savings stamps, or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts, or coupons for exchange of merchandise or other things of value; (9) merchandise or other things of value issued as a premium in connection with any sales promotion program; and (10) any gift certificates or like vouchers until such time as the same have been converted into a sale of merchandise. Tenant makes no representation or warranty as to the amount of Gross Sales it expects to make in or from the Premises. Landlord shall not release and shall keep confidential all information disclosed to or discovered by it concerning Gross Sales, and shall require Landlord's Auditor, as hereinafter defined, to keep the same confidential. Landlord may, however, disclose Gross Sales to its attorneys and accountants and to lenders, prospective lenders, and to prospective purchasers of the Premises (collectively, "Interested Parties") provided that such Interested Parties agree in writing or are otherwise legally obligated to keep Gross Sales information confidential.

Tenant shall keep complete and accurate books and records of its Gross Sales. At the end of each Fiscal Year, or at the end of the Term, if it sooner occurs, Tenant shall submit to Landlord a written statement of Gross Sales for the preceding Fiscal Year. Such statement of Gross Sales shall be treated as confidential by Landlord and shall be conclusive unless Landlord, within 90 days after receipt thereof, shall give written notice to Tenant of its intent to audit Tenant's Gross Sales figures for the prior year. The Landlord may then, at its cost and expense, cause applicable records to be audited at Tenant's place of business in a manner not to unreasonably interfere with Tenant's business by a certified public accountant contracted for and paid by Landlord (the "Landlord's Auditor"). Landlord's Auditor shall provide a copy of its findings and report of audit to Tenant. If Landlord's Auditor finds and it can reasonably demonstrate that Tenant has underpaid Percentage Rent due under this Lease, the Tenant shall pay to Landlord the amount of such underpayment within 30 days of receipt of satisfactory documentation thereof from Landlord's Auditor and if Tenant understated Gross Sales for the preceding year by more than 3%, Tenant shall also pay to Landlord the reasonable out-of-pocket cost of Landlord's Auditor. If Landlord's Auditor finds and it can reasonably demonstrate that Tenant has overpaid Percentage Rent due under this Lease, then Landlord shall promptly pay the amount of any such overpayment to Tenant.

(c)    Additional Rent.  Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay as Additional Rent a portion of (1) Common Area Maintenance Expenses, (2) Real Estate Taxes, (3) Shopping Center Insurance, and (4) Approved Security Expenses (each as hereinafter defined, and collectively, "Additional Rent"). Landlord shall use reasonable efforts to minimize Additional Rent. With respect to all amounts charged to Tenant as Additional Rent under this Lease, Landlord shall maintain for a period of one full calendar year from the last day of the year for which such Additional Rent is due, complete books and records in accordance with generally accepted accounting principles, and all receipts or other evidences of payment by Landlord (the "Payment Evidence"). On or before 90 days after the end of each calendar year of the Term, Landlord shall provide to Tenant an itemized statement showing in reasonable detail the Additional Rent payable for the prior year and copies of the Payment Evidence. Tenant shall not be liable with respect to any amount expended by Landlord and not listed in such itemized statement. Failure of Landlord to timely deliver such itemized statement (unless caused by Force Majeure, as hereinafter defined) shall

relieve Tenant of the obligation to pay any Additional Rent above the estimated amount paid by Tenant during the prior year. Tenant shall have the right, within 180 days of receiving Landlord's statement of Additional Rent, to audit during normal business hours at Landlord's offices Landlord's records regarding Additional Rent. Tenant shall provide a report of such audit to Landlord. If, based upon such audit, it can reasonably be demonstrated that Tenant has underpaid Additional Rent, Tenant shall pay the amount of such underpayment to Landlord within 30 days of completing its audit. If, based upon such audit, Tenant has overpaid Additional Rent, Landlord shall pay the amount of such overpayment to Tenant within 30 days of receiving Tenant's audit report and if it can reasonably be demonstrated that Tenant has overpaid Additional Rent by more than 3%, Landlord shall also pay to Tenant the reasonable, out-of-pocket cost of Tenant's audit.

(1)     Common Area Maintenance Expenses. Tenant shall pay its Pro rata Share of "Common Area Maintenance Expenses". Common Area Maintenance Expenses shall be payable monthly on the first day of each calendar month in the Term, and shall initially be based upon one-twelfth (1/12) of Landlord's estimate of the amount of such Common Area Maintenance Expenses to be due for the upcoming year which, for the first year, is estimated to be $38,461.50. For succeeding years, the basis for a year's Common Area Maintenance Expenses shall be the amount actually paid by Tenant for the prior year.

Common Area Maintenance Expenses include those reasonable and customary expenses actually incurred in good faith by Landlord in maintaining the Common Areas, including those maintenance functions required to be performed in, on, or to the Common Areas under this Lease, including, without limitation, painting, cleaning, traffic control, inspecting, landscaping (only as shown on the Site Plan), maintaining any sprinkler and septic systems and storm water detention facilities required for operation of the Shopping Center, restriping the parking areas, lighting during the Standard Hours, as hereinafter defined (except for the cost of lighting Tenant's Parking Light Area, as hereinafter defined), and otherwise repairing and maintaining the Common Areas.

Common Area Maintenance Expenses do not include upgrading the Shopping Center to a level of service or condition beyond or above that which exists as of the Commencement Date, merchant's association dues or the like, management or administrative fees, the cost of repairs or other work required due to any casualty or other peril (whether insured, uninsured, or uninsurable), the costs of individual tenant improvements or items or services that benefit other tenants to an extent greater than such items of services benefit Tenant, special services or excess utilities provided to or used in the Common Areas as a result of other tenants, any utility or other expense paid for directly by Tenant, advertising or marketing expenses, holiday decorations, penalties for or the cost (including attorneys' fees), of disputes relating to Landlord's failure to timely pay fees or taxes or for Landlord's breach of any other agreement to which Landlord is a party, leasing commissions, Landlord's income taxes, depreciation expense, principal, interest, or late charges on mortgages to which the Shopping Center is subject, the replacement of capital investment items or capital improvements (including repaving of asphalt parking areas or resurfacing concrete parking areas as opposed to repairing potholes or other day-to-day maintenance) unless, in Tenant's reasonable judgment, such items and improvements are likely to and in fact do result in the operating efficiency of the Shopping Center being increased such that the cost of such improvements will be wholly offset by such increased operating efficiency during the Term and the increased efficiency will be reflected accordingly in lower Common Area Maintenance Expenses or unless such capital improvements are mandated by subsequently enacted Legal Requirements, and the cost thereof is amortized over the maximum allowable useful life of such capital improvements the cost of investigating, testing for, removing, abating, or otherwise cleaning up any matter that constitutes a violation of any environmental law, bad debt or real losses or reserves therefor, costs associated with the operation of Landlord as a business entity, such as entity formation costs, entity accounting, etc., costs of selling, syndicating, financing or refinancing Landlord's interest in the Shopping Center, cellular phone charges or pager expenses, travel expenses,

or any single expense over 15% of the estimated Common Area Maintenance Expenses for the current year (i) incurred without the prior written consent of Tenant, which consent shall not unreasonably be withheld or delayed; provided, however, that on or before 10 days after receipt if Tenant fails to consent to or reject any Common Area Maintenance expense submitted by Landlord, such expense shall be deemed approved or (ii) not based upon competitive, arms-length bids obtained no more infrequently than once per year.

(2)    Real Estate Taxes. Tenant shall pay to Landlord, within 30 days of receipt of Landlord's statement and a paid receipt therefor, or directly to the taxing authority if presented with an unpaid bill therefor, its Pro rata Share of "Real Estate Taxes" assessed upon the Shopping Center. Real Estate Taxes includes all ad valorem and general real estate taxes and special assessments for improvements made either on-site or off-site by the taxing authorities as part of a special improvement district (e.g. special assessments for sidewalks or for road widening), less any abatements, early payment discounts, or refunds permitted by law. Real Estate Taxes does not include any special assessment for improvements previously installed or in the process of installation or installed after the Effective Date in connection with the initial development of the Shopping Center, Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Shopping Center. To the extent Tenant is required to pay for any special assessment for improvements, Tenant's obligation shall be determined by treating the special assessment as payable in as many installments as is lawful, and charging Tenant with Tenant's Pro rata Share of each installment. Any annual special assessment deemed payable after the expiration or termination of this Lease shall not be Tenant's obligation. Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense. Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing. If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge shall be at Landlord's sole cost and expense, unless Landlord obtains Tenant's written approval in advance, which may be granted or withheld in Tenant's sole discretion or unless Tenant declines in writing to institute its own challenge and Landlord's challenge results in a net savings to Tenant, in which case, Tenant shall pay its Pro rata Share of the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

(3)    Shopping Center Insurance. Tenant shall pay, within 30 days of receipt of Landlord's statement therefor, its Pro rata Share of "Shopping Center Insurance". Shopping Center Insurance means the reasonable cost of insurance required to be maintained for the Shopping Center under the terms of this Lease. Shopping Center Insurance shall not include the costs of any abnormal or increased premiums for such types of insurance resulting from the acts or omissions of other tenants in the Shopping Center nor business interruption, or rent loss insurance carried by Landlord, nor the excess cost of any insurance policies over that which could be purchased in an arm's length transaction between Landlord and an insurer.

(4)    Approved Security Expenses. Tenant shall pay, within 30 days of receipt of Landlord's statement therefor, its Pro rata Share of "Approved Security Expenses". Approved Security Expenses include the reasonable, out-of-pocket cost of providing necessary safety and security devices and personnel pre-approved by Tenant's designated security officer. If Landlord determines, in its reasonable judgment, that security devices or personnel are necessary to fulfill its obligations under this Lease to keep the Shopping Center and the Common Areas safe and secure, it shall submit a written plan for providing such services to Tenant. Tenant shall submit such plan to its security officer for review. If the plan meets with the approval of Tenant's security officer, Tenant shall advise Landlord of the same. No expense associated with security devices or personnel not approved by Tenant's security officer will be considered for payment. Approved Security Expenses shall not include any expenses not based upon competitive, arms-length bids obtained no more infrequently than

once per year. Payment of Approved Security Expenses or nonpayment of unapproved security expenses by Tenant shall not be interpreted and Landlord shall not claim that such payment or nonpayment should be interpreted as assertion of control over the Common Areas by Tenant.

Tenant's "Pro rata Share" shall be the ratio of the rentable square footage of the Store as it exists from time-to-time to the total rentable square footage of the Shopping Center as it exists from time-to-time.

Basic Rent, Percentage Rent, and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro rated based upon a 365 day year and Tenant shall pay any sales or rent tax due thereon to Landlord or at Tenant's option, directly to the taxing authorities.

**TITLE**          **4.**     Not applicable.

**SURVEY**         **5.**     Not applicable.

**ENVIRONMENTAL**  **6.**     Not applicable.
**AUDIT**

**USE**            **7.**     (a)    Permitted Use. The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business which is not prohibited by paragraph 7(c) below (including discount businesses) (the "Permitted Use").

(b)    Exclusives.    Tenant shall have the exclusive right to:

(i) operate a supermarket, grocery, bakery, and delicatessen;

(ii) sell meat, seafood, and vegetables/fruits/produce, dairy products, and frozen foods; and

(iii) operate a pharmacy or prescription drug concession

in the Shopping Center (each an "Exclusive Use").

Landlord will not directly or indirectly permit any party other than Tenant to use for any Exclusive Use any property located within the Shopping Center (or any property located within 1,000 feet of any exterior boundary of the Shopping Center and currently or hereafter owned or controlled directly or indirectly by Landlord or any entity controlled by, controlling, or under common control with Landlord). The Exclusive Uses set forth above shall supplement and not replace the exclusive rights of Tenant set forth in the Declaration; provided, however, any exceptions to Tenant's Exclusive Uses set forth in the Declaration (including specifically the exceptions and limitations set forth in paragraph 3 of the Declaration) shall be applicable and Landlord shall not be prevented from leasing or renting any portion of the Shopping Center to any person, firm or corporation which is allowed pursuant to paragraph 7(c)(xiv) of this Lease.

In the event the Premises are at any time subject to a first mortgage (provided that such mortgagee has entered into an SNDA, as hereinafter defined, with Tenant and Tenant has first been notified in writing of the name and address of such mortgagee) and so long as said mortgage shall encumber the Premises, and notwithstanding any provision herein to the contrary, Tenant shall have no right to cancel or terminate this Lease or to withhold rental

payments because of a violation of the terms of Tenant's Exclusive Uses hereunder as to property located within 1,000 feet of any exterior boundary of the Shopping Center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its heirs, legal representatives, successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation.

      (c)    Prohibitions.    Without the prior written consent of Landlord and Tenant, which may be withheld or conditioned in Landlord and Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and Landlord shall permit none of the following  (the prohibited uses set forth below shall supplement not replace the prohibited uses set forth in the Declaration):

(i) spa, health, or exercise club; provided, however, this prohibition shall not prohibit, (i) a spa that is primarily designed to provide manicures, facials or other similar services to women, or (ii) a legitimate exercise/fitness club.

(ii) lounge, bar, "teen lounge" or social encounter club;

(iii) bowling alley;

(iv) skating rink;

(v) bingo or electronic or other game parlor;

(vi) theater (either motion or legitimate);

(vii) area or space for the sale or display of pornographic or "adult" material;

(viii) business or professional offices in excess of thirty percent (30%) of the total square feet in the Shopping Center;

(ix) blood bank, abortion or HIV clinic;

(x) automobile dealership;

(xi) church;

(xii) manufacturing or storage business;

(xiii) public auditorium or other public entertainment facility; or

(xiv) restaurants within 100 feet of the nearest wall of the Store (except any delicatessen or restaurant located in the Store); provided, however, this prohibition shall not prohibit Landlord from leasing or renting any portion of the Shopping Center to any person, firm or corporation to be used for or occupied by any business whose principal use is a delicatessen-style restaurant or other restaurant which provides on premises service and sells prepared foods for "on premises consumption" and which may include the sale of sliced meats, fish, fruits, vegetables, dairy products, bakery goods, or frozen foods, as an incidental part of the operation of the delicatessen-style restaurant or other restaurant, including but not limited to such delicatessen-style restaurants as Schlotzsky's or McCallister's; provided, however, in no event shall such a delicatessen-style restaurant or other restaurant (i) exceed 4,000 square feet, or (ii) sell alcoholic beverages other than beer and wine.  For the purposes of this subparagraph, "on premises consumption" may include to-go and drive-thru orders as an incidental part of the restaurant operation.

**COMPLIANCE WITH LAWS**

**8.**    Tenant shall at all times comply with all current and future applicable laws, ordinances, rules, codes, orders, and regulations of every lawful authority (collectively "Legal Requirements") having jurisdiction over the Store, as such shall relate to Tenant's operation of the Store for the Permitted Use.

Landlord shall at all times fully comply with all Legal Requirements applicable to Landlord and to fulfillment of Landlord's obligations under this Lease.

**CONSTRUCTION OF SHOPPING CENTER**

**9.**    Tenant represents and warrants that it has constructed the Shopping Center (other than the small tenant space which was or will be constructed by Landlord) substantially as shown on the Site Plan, has graded and surfaced all paved portions of the Common Areas, and has installed proper and adequate water drainage and lighting for the Shopping Center. Tenant represents and warrants that all design, installation, and construction by or on behalf of Tenant complies in every respect with all applicable Legal Requirements, and was completed in a first-class manner by licensed, bonded and insured contractors, architects, and engineers, as required. The arrangement and location of all buildings and Common Areas shall at all times during the Term be maintained as shown on the Site Plan and shall not be changed and Landlord shall not subdivide, parcel, or otherwise alter the Shopping Center or create any easements in the Common Areas, without the prior written consent of Tenant, which consent shall not unreasonably be withheld, conditioned, or delayed. The exterior facade of the Shopping Center shall not be materially modified without Tenant's prior written consent, which shall not unreasonably be withheld, conditioned, or delayed.

**COMPLETION DATE**

**10.**    Not applicable

**COMMENCEMENT DATE**

**11.**    Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to accrue hereunder on the Effective Date (the "Commencement Date"); provided, however, in the event Landlord does not own fee simple title to the Land on the Effective Date, the Commencement Date shall be the earliest date after which both of the following events have occurred:  (i) this Lease has been fully executed and delivered by both Landlord and Tenant; and (ii) Landlord owns fee simple title to the Land; provided, however, in the event Landlord does not acquire fee simple title to the Land on or before _____N/A_____, 200__, Tenant may elect to terminate this Lease upon written notice to Landlord.

Landlord and Tenant shall execute a supplemental document establishing and confirming the Commencement Date in the form attached hereto as Exhibit "J".

**OTHER TENANTS**

**12.**    Not applicable

**PARKING AND COMMON AREAS**

**13.**    Tenant, its employees, agents, suppliers, licensees, customers, and invitees shall have the nonexclusive right at all times to use, free of charge, during the Term, the Common Areas. Tenant may use the sidewalks adjacent to the Store and the exterior surfaces thereof for the display and sale of merchandise and services so long as such use is permitted by applicable Legal Requirements and does not unreasonably interfere with pedestrian traffic or the rights of other tenants in the Shopping Center to use the Common Areas. No signboards, buildings, or other construction shall be erected in any of the Common Areas or so as to materially obstruct the view of the Store from the adjoining public streets. Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, "park and ride" lots, or sales by merchants utilizing vehicles or booths in the Common Areas shall be allowed in the Shopping Center.

Landlord shall not designate any portion of the Common Areas for the exclusive use of any party and shall at all times during the Term provide and maintain a surfaced parking area substantially as shown on the Site Plan, and of sufficient area to provide:

Prior to construction of the Addition, as hereinafter defined:

(a)    a minimum ratio of at least 5.0 9.5 foot wide automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in the Shopping Center, and

(b)    facilities for convenient parking of at least 500 automobiles (minimum); on the basis of arrangement as provided on the Site Plan and

After construction of the Addition, as hereinafter defined:

(a)    a minimum ratio of at least 5.0 9.5 foot wide automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in the Shopping Center, and

(b)    facilities for convenient parking of at least 500 automobiles (minimum).

Notwithstanding the foregoing, if Legal Requirements mandate that a greater number of parking spaces be provided and maintained, such Legal Requirements shall control. Without Tenant's prior written consent, Landlord will not seek or permit another tenant of the Shopping Center to seek a variance or waiver from the minimum parking requirements applicable to the Shopping Center pursuant to such Legal Requirements.

**SERVICE AREA**    **14.**    Landlord shall provide parking spaces for two large trailer trucks for the exclusive and continuous use of Tenant at the service entrances to the Store. Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the Store and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for the Store into and from trucks and trailers at such service entrances. Tenant shall use reasonable efforts not to impede other traffic in any service drives or lanes in the Shopping Center. Tenant shall not use trailers for permanent merchandise storage.

**UTILITIES**    **15.**    Tenant shall cause to be separately plumbed, wired, installed, as applicable, and separately metered, and shall contract for and pay all charges measured by consumption or use for, telephone, electricity, water, gas, and other utilities and services such as garbage removal and recycling, if any, used by Tenant at the Store. Tenant shall not take or permit any other tenant to take any action that would interfere with access to such utilities sufficient to meet Tenant's needs. Tenant shall be responsible for environmental impact charges, or any "hook up" fees or other charges incident to providing access to any utility to the Store. All of the Common Areas (including parking area) shall be adequately lighted during the hours of ½ hour before dusk until midnight (the "Standard Hours"). Tenant shall cause to be separately metered and shall pay all charges for those parking area lights located in the area designated on the Site Plan as "Tenant's Parking Light Area". No portion of the cost of lighting the Common Areas paid by Tenant shall be included in Common Area Maintenance Expenses billable to Tenant. Tenant shall not tap into any utility lines dedicated for fire alarm or fire sprinkler systems.

**TENANT'S**    **16.**    Tenant shall keep the interior of the Store in a reasonably neat, orderly, and good
**MAINTENANCE**    condition and shall repair or replace as needed the facade of the Store, the exterior walls and structural portions of the Store (including painting of exterior walls as needed), the roof of the

Store (including gutters, downspouts, masonry walls, foundation and structural members of the Store), windows and plate glass, automatic doors, air conditioning and heating systems and floor surfacing of the Store, the automatic sprinkler system (including central alarm system therefor, if required by governmental authority) and interior wiring to the main disconnect or main electrical panel and plumbing, from, but not including, the water meter, excluding repairs which are the responsibility of Landlord, repairs made necessary by reason of fire or the elements or other insured casualty, and reasonable wear and tear. Tenant shall keep the delivery areas of the Store reasonably clean and free from rubbish and dirt. Tenant shall restripe and repair as reasonably necessary the parking areas located on the Land, and no portion of the cost of the same paid by Tenant shall be included in Common Area Maintenance Expenses billable to Tenant. Tenant will not make or suffer any waste of the Premises or do anything in or upon the Premises creating an unreasonable nuisance thereon. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon the Premises for the purpose of making repairs and for examining or showing the same to prospective purchasers or lenders.

Tenant agrees, at its sole cost and expense, (i) to maintain the Store and the Common Areas located on the Land in good and tenantable condition and repair throughout the term of this Lease and any extensions thereof; provided, however, Landlord shall be responsible for cleaning and sweeping the parking areas located on the Land pursuant to paragraph 17 below; (ii) to make all repairs to the Store and the Common Areas located on the Land, structural or otherwise, both interior and exterior, necessary to preserve the same in good order and condition; and (iii) to repair, at or before the end of the term of this Lease or any extensions thereof, all injury to the Store or the Common Areas located on the Land done by Tenant's removal of Tenant's Trade Fixtures, as hereinafter defined. No portion of the cost of (i), (ii) and (iii) above paid by Tenant shall be included in Common Area Maintenance Expenses billable to Tenant.

**LANDLORD'S**
**MAINTENANCE**

17.    Landlord shall comply with or perform the following, the costs of which shall be billable as a portion of Common Area Maintenance Expenses, subject to the limitations provided in this Lease:

Landlord shall maintain, repair, and replace as necessary all structural, exterior portions of the Shopping Center (excluding the Store) and shall maintain the exterior plumbing (including and from the water meter for the Store and including the septic tank, if any), and the exterior wiring including and beyond the main disconnect or electrical panel of the Store. Landlord shall also operate and maintain in good condition and repair during the Term all the Common Areas (excluding the Common Areas located on the Land which shall be the responsibility of Tenant except as otherwise set forth herein), and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding or other security services, cleaning and sweeping as needed but at least three (3) times weekly (including without limitation cleaning and sweeping of the parking areas located on the Land), lighting of the Common Areas (other than Tenant's Parking Light Area) during the Standard Hours and maintenance and cleaning of lighting fixtures as needed, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and maintenance of landscaped areas. Landlord shall keep all exterior surfaces of buildings in the Shopping Center (other than the Store) clean and graffiti free at all times. Landlord will complete such repairs and provide such services as needed but in any event promptly upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to the Store or the Shopping Center rendered necessary by the wilful misconduct of Tenant, or any of its servants, agents, or employees, unless Landlord may be reimbursed for the cost thereof pursuant to insurance policies covering the Shopping Center and/or the Premises.

**SIGNS**

18.    Subject to and in accordance with applicable Legal Requirements, Tenant may place, erect, and maintain any signs, antennae, and satellite dishes on the roof, walls, and any other places on or about the Store, which signs antennae, and satellite dishes shall remain the property of Tenant and may be removed at any time during the Term and shall be removed at the end of the Term and provided Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Premises resulting from the installation or removal of such signs, antennae, and satellite dishes. If installation of any sign, antenna, or satellite dish requires roof penetration or a change in the structure of the Store, Tenant shall obtain Landlord's prior written consent, which shall not unreasonably be withheld, delayed, or conditioned.

Tenant shall have the right to construct, install, and maintain, at its cost, 2 monument sign(s) in the locations marked on the Site Plan. The sign(s) shall be of the maximum height and size permitted by applicable Legal Requirements. Tenant may install, at its cost, sign panel(s) in the uppermost spaces on such monument sign(s) and may connect the sign panel(s) to power outlets installed by Landlord. Tenant shall pay the cost of the electric power for its sign panel(s) if billed as a portion of Additional Rent, and shall pay all other costs of maintaining such monument signs. No portion of the cost of maintaining the monument signs paid by Tenant shall be included in Common Area Maintenance Expenses billable to Tenant.

**FIXTURES AND INTERIOR ALTERATIONS**

19.    Tenant, at its own expense, shall have the right from time to time during the Term to make any interior alterations, additions, and improvements, including additional or alternatively located doors and interior partitions, in and to the Store which do not adversely affect its structural integrity and, provided Tenant has first obtained Landlord's written approval (which shall not unreasonably be withheld, conditioned, or delayed) may make other alterations, additions, or improvements (excluding Tenant's Trade Fixtures, as hereinafter defined "Tenant Modifications"). If Landlord's consent is required in connection with any Tenant Modification, Tenant shall provide to Landlord a reasonably detailed description of the proposed work prior to commencement thereof. Landlord's consent shall be deemed given if Landlord does not send written notice of its disapproval on or before 10 days after the date Tenant requested Landlord's approval. Landlord shall cooperate with Tenant in obtaining any government approvals necessary or desirable in connection with any permitted and/or approved Tenant Modifications, provided that Landlord shall not be required to incur any out-of-pocket expense in connection therewith. Tenant shall make all Tenant Modifications in a good, workmanlike manner and in accordance with all Legal Requirements applicable thereto. All permanent structural Tenant's Modifications shall belong to Landlord and become a part of the Store upon termination or expiration of the Term and all other Tenant Modifications shall, at Landlord's option, either be removed, or shall remain in place at the end of the Term.

Tenant may construct and build or install in the Store any and all racks, counters, shelves, and other fixtures, personal property, and equipment of every kind and nature as may be necessary or desirable in Tenant's business ("Tenant's Trade Fixtures"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant. Tenant shall have the right to and shall at the end of the Term remove all or any part of Tenant's Trade Fixtures at any time, Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of repairing any damage to the Premises resulting from the installation or removal of Tenant's Trade Fixtures or nonstructural nonpermanent Tenant Modifications.

Tenant agrees that it will make full and prompt payment of all sums necessary to pay for the costs of any alterations, additions, and improvements done by Tenant to the Store. Tenant agrees to indemnify and hold harmless Landlord from and against any and all such costs and liabilities incurred by Landlord arising from or growing out of such actions by Tenant, and against any and all construction liens arising from or growing out of such work or the costs thereof which may be asserted, claimed, or charged against the Store. Notwithstanding anything to the contrary in this Lease, the interest of Landlord in the Store shall not be subject to liens for improvements made by or for Tenant, whether or not the same shall be made or

done in accordance with an agreement between Landlord and Tenant, and it is specifically understood and agreed that in no event shall Landlord or the interest of Landlord in the Store be liable for or subject to any construction liens for improvements or work made by or for Tenant. This Lease specifically prohibits the subjecting of Landlord's interest in the Store to any construction liens for improvements made by Tenant or for which Tenant is responsible for payment under the terms of this Lease. All persons dealing with Tenant are hereby placed on notice of the foregoing provisions. If any claim of lien shall be asserted or recorded against the interest of Landlord in the Store arising from or growing out of any improvement or work done by or for Tenant, or any person claiming by, through or under Tenant, or for improvements or work the cost of which is the responsibility of Tenant, Tenant agrees to have such claim of lien canceled and discharged of record as a claim against the interest of Landlord in the Store (either by payment or bond as permitted by law) within twenty-five (25) days after notice to Tenant by Landlord, and if Tenant shall fail to do so, Tenant shall be considered in default under this Lease.

**INDEMNIFICATION**    **20.**    Tenant agrees to indemnify and save harmless Landlord from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage not covered or reimbursable by insurance to any person or property happening in the Store unless caused by the negligence or wilful misconduct of Landlord, its agents, or employees. Likewise, Landlord shall indemnify and save harmless Tenant from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage to any person or property not covered or reimbursable by insurance happening on or about all Common Areas or any portion of the Shopping Center other than the Store, unless caused by the negligence or wilful misconduct of Tenant, its agents or employees.

The foregoing indemnities shall survive the expiration or early termination of the Term of this Lease.

**CASUALTY**    **21.**    If (1) the Store is totally destroyed or damaged by fire or other casualty to the extent of 50% or more of the value thereof based upon replacement costs or to an extent that renders the Store untenantable in Tenant's reasonable judgment, or (2) all or a portion of the Shopping Center (exclusive of the Store) is damaged or destroyed such that, in Tenant's reasonable judgment, the damage or destruction materially affects the value of Tenant's leasehold or its ability to successfully operate the Store for the Permitted Use (a "Major Casualty," anything less being hereinafter referred to as a "Minor Casualty") then:

(a)    if a Major Casualty occurs during the first 17 years of the Initial Term or a Minor Casualty occurs at any time during the Term, then Landlord shall proceed promptly (but in any event within 180 days of destruction or damage) and without expense to Tenant to repair the damage or restore the Store, or the Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall be adjusted in accordance with Tenant's Pro rata share as affected by the Casualty until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored. Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof. Notwithstanding the foregoing, any Mortgagee, as hereinafter defined, shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be

applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents;

(b)    if a Major Casualty occurs during the last 3 years of the Initial Term or during any Extension Term then either Landlord or Tenant shall have the option, exercisable by written notice to the other within 30 days of the date of the Major Casualty to terminate this Lease;

(i) If Landlord so terminates this Lease, Tenant may nevertheless reverse and void Landlord's termination by electing, within 15 days of receipt of Landlord's termination notice, to extend the term of this Lease at the same rent and upon the same terms and conditions as provided herein for the Initial Term so as to expire 10 years from the date of completion of restoration by Landlord, such extension to be in addition to and not in lieu of any Extension Terms then remaining available to Tenant under this Lease. Landlord shall be obligated to extend the Term upon timely receipt of Tenant's election notice;

(ii) If Tenant terminates this Lease, or does not reverse and void Landlord's timely termination, then this Lease shall terminate as of the date of the Major Casualty and all Basic Additional, and Percentage Rent shall be pro rated as of such date;

(iii) If neither Tenant nor Landlord timely terminates this Lease or if Tenant reverses and voids Landlord's timely termination, then Landlord shall to proceed promptly (but in any event within 180 days after Landlord's receipt of insurance proceeds which Landlord agrees to diligently and in good faith seek to obtain) and without expense to Tenant to repair the damage or restore the Store, or the Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall be adjusted in accordance with Tenant's Pro rata share as affected by the Casualty until the earlier of (x) the date Tenant re-opens the Store for business or (y) the date the damage or destruction is completely repaired or restored. Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof. Notwithstanding the foregoing, any Mortgagee, as hereinafter defined, shall be entitled to control disbursement of any such proceeds to ensure proper application of the same toward restoration or repair, unless Tenant terminates this Lease, in which case any insurance proceeds may be applied by such Mortgagee in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents;

(iv) If fire or other casualty destroys or damages any portion of the Common Areas at any time during the term and if, had such destruction or damage occurred to the Store, Landlord would be obligated to repair the Store, then Landlord shall repair the destruction or damage to the Common Areas substantially simultaneously with repair of the Store. Landlord's obligation to repair shall be limited to the amount of insurance proceeds received by it; provided, however, Landlord shall diligently and in good faith seek to obtain the amount of insurance proceeds necessary for full repair.

**INSURANCE**    22.    (a)    *Landlord*.  Landlord shall carry or cause to be carried the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of <u>Best's Insurance Report</u>. Certificates of insurance (Form ACORD-27 or equivalent) shall be furnished to Tenant prior to the Commencement Date, shall show Tenant as an additional insured, shall contain waivers of subrogation, and shall provide 30 days notice to Tenant prior to cancellation, material reduction in policy limits, or any other change adverse to Tenant's interests.

(i)      Liability Insurance.  Landlord shall carry comprehensive general liability insurance coverage on the Shopping Center, stipulating limits of liability of not less than nor more than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate and deductibles of not more than $100,000.00.  Landlord hereby expressly waives any and all claims against Tenant for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(ii)     Casualty Insurance.  Landlord shall carry or cause to be carried all-risk commercial property insurance on the Shopping Center and any permanent or structural additions, alterations, and improvements made thereto by Landlord or Tenant, including flood, windstorm, and earthquake coverage if the Shopping Center is located in a flood or earthquake prone area, in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00, and hereby expressly waives any and all claims against Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

(b)     *Tenant.*  Tenant shall carry or cause to be carried the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report.  Certificates of insurance shall be furnished to Landlord and any Mortgagee, as hereinafter defined, prior to the Commencement Date, shall show Landlord and any such Mortgagee as an additional insured, shall contain waivers of subrogation, and shall provide 30 days notice to Landlord and any such Mortgagee prior to cancellation, material reduction in policy limits, or any other change adverse to Landlord's or such Mortgagee's interests. Notwithstanding the foregoing, so long as Tenant (or Winn-Dixie Stores, Inc. if it is not the Tenant hereunder, but has executed a guaranty of Tenant's obligations hereunder) maintains a net worth in excess of $100 Million, Tenant shall self-insure and shall not be required to provide any insurance certificates to Landlord or any such Mortgagee.  If Tenant elects to self-insure, then Tenant shall provide, at the written request of Landlord, an officer's certificate stating that (i) Tenant has a net worth in excess of $100 Million,  (ii) Tenant has elected to self-insure, and (iii) Tenant will provide the proceeds at the times and in the same amounts as would be required if Tenant had acquired an insurance policy.

(i)      Liability  Insurance.     Tenant shall carry,  at its sole expense, comprehensive general liability insurance coverage on the Store, stipulating limits of liability of not less than $2,000,000.00 and deductibles of not more than $250,000.00.  Tenant hereby expressly waives any and all claims against Landlord  for loss or damage covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

(ii)     Casualty Insurance.  Tenant shall carry or cause to be carried all-risk commercial property insurance on the interior nonstructural portions of the Store that it is responsible for maintaining under this Lease and for its personal property, and Tenant's Trade Fixtures in the amount of the full replacement cost thereof and deductibles of not more than $100,000.00, and hereby expressly waives any and all claims against Landlord  for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, or which would be coverable if such insurance is not obtained or maintained as required by this Lease, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Landlord, its agents, servants or employees.

If Tenant has "self insured" and a claim is made or a loss incurred which would be covered by the insurance described in subparagraphs (i) or (ii) above, then Tenant shall be liable to and

shall indemnify and hold harmless Landlord and/or a Mortgagee, as hereinafter defined, (as their interests may appear) against any such claim or loss and shall pay any settlement or judgment resulting therefrom.    As to casualty losses, Tenant shall pay the replacement cost thereof. Tenant's indemnity obligation under this paragraph in the case of a claim or loss due to "self insurance" shall exist notwithstanding and shall survive any termination of this Lease pursuant to paragraph 21 of this Lease.

**QUIET ENJOYMENT    23.**    Landlord covenants, warrants and represents that:

(a)    The Shopping Center is and shall remain free and clear of all liens and encumbrances superior to the leasehold hereby created, unless the lienor has executed an SNDA, as hereinafter defined, or unless consented to in advance and in writing by Tenant, which consent may be withheld or conditioned in Tenant's sole discretion;

(b)    As of the Effective Date Landlord is a duly organized, validly existing limited liability company, has full right and power to execute, deliver, and perform this Lease and to grant the estate demised herein, and such execution, delivery, performance, and grant have been duly authorized by all necessary action and does not and will not constitute a breach of or default under any contract, Mortgage, order, or judgment by which Landlord or the Shopping Center or any portion thereof is bound, and any future landlord which is a business entity shall be duly organized and maintain its valid existence in its state of organization, and shall have the power and authority to assume and perform this Lease, shall have duly authorized such assumption and performance, and such assumption and performance shall not constitute a breach of or default under any contract, Mortgage, order, or judgment by which such future landlord or the Shopping Center or any portion thereof is bound;

(c)    No consent, approval, or authorization of any other party is necessary to grant to Tenant the rights and privileges intended to be granted under this Lease;

(d)    Tenant, on paying the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anyway appertaining thereto, during the Term; and

(e)    As of the Effective Date, Landlord has not previously, either directly or indirectly, leased any portion of the Shopping Center, sold any portion of the Shopping Center, or otherwise permitted any portion of the Shopping Center or any other property owned or controlled by Landlord within 1,000 feet of any exterior boundary of the Shopping Center to be used in a manner as would be prohibited by or violate this Lease.

**TAXES AND LIENS    24.**    Except for taxes to be paid by Tenant as provided elsewhere in this Lease, all taxes, assessments, and charges on land or improvements and obligations secured by mortgage or other lien upon the Shopping Center (collectively, "Landlord's Obligations") shall be promptly paid by Landlord or transferred to acceptable bond or other adequate security reasonably acceptable to Tenant prior to delinquency and, if Tenant is responsible under this Lease for paying any portion of any of Landlord's Obligations, Landlord shall pay the same in such a manner as to take maximum advantage of any rebate, abatement, or early payment discount available. Tenant shall hold Landlord harmless from and against any failure to pay or any penalty for late payment of any taxes upon any personal property of Tenant or upon Tenant's Trade Fixtures.

**CONDEMNATION    25.**    If any part of the Premises or more than twenty percent (20%) of the Shopping Center, exclusive of the Store, is taken for any public or quasi-public use, under any Legal

Requirement or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to terminate this Lease at its option by written notice to Landlord within 60 days of such taking or purchase, and any unearned Basic Rent, Percentage Rent, Additional Rent or other charges paid in advance shall promptly be refunded to Tenant. If a lesser taking occurs or if Tenant does not elect to terminate this Lease, Landlord shall promptly commence and diligently prosecute to completion any repairs and restoration reasonably necessary and feasible to put the Premises or the Shopping Center in a condition comparable to their condition at the time of taking and this Lease shall continue.

If any portion of the Common Areas or any drive, entrance, median cut, access point, route or mode of access thereto depicted on the Site Plan, is obstructed for longer than 180 days or appropriate governmental authorities notify Tenant that the same will be obstructed for 180 days or longer or taken for any public or quasi-public use, under any Legal Requirement or by right of eminent domain, or private purchase in lieu thereof, so as to unreasonably interfere with the conduct of Tenant's business in the Store or prevent its use of or access to or through the Common Areas, or any drive, entrance, median cut, access point whether or not the same is compensable under applicable Legal Requirements or so as to reduce the required parking area by an amount in excess of 10%, Tenant may, at its option, terminate this Lease within 60 days of the obstruction, taking, or purchase and shall be liable for Basic, Additional, and Percentage Rent only up to the time of such obstruction, taking, or purchase. In the case of a reduction in the required parking area by an amount in excess of ten percent (10%) following which Tenant desires to terminate this Lease, however, Tenant shall notify Landlord and Landlord shall have 15 days after the date of Tenant's notice to propose alternative replacement parking area. If the alternative replacement parking area meets with Tenant's reasonable approval, Landlord will proceed to promptly pave and provide such alternative parking and this Lease shall continue. If the alternative parking area does not meet with Tenant's reasonable approval, Tenant may terminate this Lease as above provided.

If any zoning, comprehensive plan provision, or other Legal Requirement is altered or enacted subsequent to the Effective Date and such alteration or enactment materially limits Tenant's use of the Store for an Exclusive Use or its use of or access to the Common Areas (collectively, a "Zoning Change"), then any such Zoning Change shall be deemed to be a taking or condemnation and shall entitle Tenant to terminate this Lease in accordance with the foregoing provisions of this Section.

Except with respect to the Addition, as hereinafter defined, if constructed and financed by Tenant, any business loss or loss of goodwill or cost of dislocation claimed by Tenant, and the cost of removing nonstructural Tenant Modifications or Tenant's Trade Fixtures from the condemned area, Tenant waives its rights to the proceeds of any condemnation award granted to Landlord.

Notwithstanding any of the foregoing, any Mortgagee, as hereinafter defined, shall be entitled to control disbursement of any condemnation proceeds (other than those, if any, awarded to Tenant for its fixtures, business losses, or other reason) to ensure proper application of the same toward restoration or repair if required by this Lease, unless Tenant terminates this Lease, in which case any such condemnation proceeds may be applied by such Mortgagee, in accordance with applicable mortgage documents, to the payment of any debt secured by such mortgage documents.

**DEFAULT**          **26.**    Tenant:

(A) Tenant shall be in default under this Lease if:

(a)      Tenant fails to pay any Basic Rent, Additional Rent, or Percentage Rent due under this Lease within 10 days after receipt of notice from Landlord stating that such sums are past due and remain unpaid (a "Payment Default"); or

(b)      Tenant fails to perform any other of its material obligations under this Lease within 30 days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure provided that Tenant notifies Landlord in writing that Tenant has in fact undertaken a cure and will prosecute the same to completion in a reasonable manner).

Following an uncured default by Tenant, Landlord may exercise any and all remedies available at law or in equity, provided, however, that Landlord shall use reasonable and diligent efforts to mitigate its damages. Notwithstanding the foregoing, subject to Landlord's obligation to mitigate its damages, Landlord shall have the following specific remedies following an uncured Tenant Default:

(1)      Landlord may expel Tenant from the Premises without terminating this Lease, in which case Landlord shall use reasonable and diligent efforts to re-let the Premises; Tenant shall remain liable for (i) any past due and unpaid Basic, Additional, or Percentage Rent; (ii) the worth at the time of award by a court having jurisdiction thereof of the amount by which the present value of the unpaid rent and other charges due under this Lease from Tenant to Landlord for the balance of the Term exceeds the present value of the market rent for the Premises for the balance of the Term; (iii) the actual out-of-pocket costs to make repairs to the Premises necessitated by removal of Tenant's Trade Fixtures or nonpermanent Tenant Modifications; (iv) reasonable and customary brokerage commissions paid in connection with re-letting the Premises.

(2)      Landlord may terminate this Lease, in which case Tenant shall nevertheless remain liable for any past due and unpaid Basic, Additional, or Percentage Rent and for any out-of-pocket costs incurred due to any default other than a Payment Default accruing prior to the date of termination.

(3)      Amounts due and owing to Landlord and constituting a Payment Default shall bear interest at the higher of the rate of twelve percent (12%) per annum or the highest rate allowed by law (the "Default Rate") on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Tenant.

(B)    Landlord:  Landlord shall be in default under this Lease if:

(a)      Landlord fails to reimburse or pay to Tenant any amount due to Tenant from Landlord within 10 days after receipt of a written statement from Tenant (a "Repayment Default"); or

(b)      Landlord fails to perform any other of its material obligations under this Lease within 30 days after receipt of notice from Tenant (or such longer period as may reasonably be required to effectuate a cure provided that Landlord notifies Tenant in writing that Landlord shall and has in fact undertaken a cure and will prosecute the same to completion in a reasonable manner).

Following an uncured default by Landlord, Tenant may exercise any and all remedies available at law or in equity, provided, however, that Tenant shall use reasonable and diligent efforts to mitigate its damages.

Notwithstanding the foregoing, subject to Tenant's obligation to mitigate its damages, Tenant shall have the following specific remedies in the following specific instances:

(1)      In the case of a Repayment Default, Tenant, Tenant shall be entitled to offset such amount  against  all Basic, Additional, and Percentage Rent due under the Lease,

together with interest thereon at the Default Rate on the unpaid, unrecouped balance until the full amount, with applicable interest, is received from Landlord or recouped by offset.

If Landlord fails, following notice as outlined above, to:

(2)    Timely commence or complete reconstruction of the Store or the Shopping Center (following a casualty or condemnation if obligated to do so under this Lease), Tenant may either (i) extend to Landlord such additional time to complete such construction or reconstruction, as Tenant deems reasonable, in its reasonable discretion, (ii) cause the same to be completed, in which case Tenant shall be entitled to offset the cost of the same against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost of the same until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset or (iii) terminate this Lease by written notice to Landlord without waiving Tenant's rights to damages against Landlord.

(3)    Not applicable.

(4)    Not applicable.

(5)    Not applicable.

(6)    If Tenant is prevented or prohibited from constructing or enjoying the Addition, as hereinafter defined, by any acts or omissions of Landlord (including any prior or successor landlord), or by reason of a breach of any covenant, representation, or warranty made or given by Landlord in this Lease or failure of any condition to be performed by Landlord under this Lease, then Tenant may terminate this Lease.

(7)    If any representation or warranty made by Landlord in paragraph 23(a), 23(d), 23(e) or 41(a) of this Lease is determined during the Term to be false, or if any other representation or warranty made by Landlord in this Lease is determined to have been false when made and such falsity materially affects Tenant's use of the Store for the Permitted Use, its access to or use of the Common Areas, and Landlord has not corrected the falsity or alleviated the material adverse effects to Tenant's reasonable satisfaction within 30 days of written notice from Tenant, Tenant at its option may terminate this Lease by written notice to Landlord. Tenant shall stand released of and from all further liability hereunder from and after the date of such termination and Landlord shall be liable to Tenant for all loss, cost, and expense resulting from or in connection with Landlord's false representation, including, without limitation, the cost of Tenant's relocating its business. Notwithstanding the foregoing, in the event the Premises are at any time subject to a first mortgage (provided that such mortgagee has entered into an SNDA, as hereinafter defined, with Tenant and Tenant has first been notified in writing of the name and address of such mortgagee) and so long as said mortgage shall encumber the Premises, and notwithstanding any provision herein to the contrary, Tenant shall have no right to cancel or terminate this Lease or to withhold rental payments because of a violation of the terms of Tenant's Exclusive Uses hereunder as to property located within 1,000 feet of any exterior boundary of the Shopping Center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its heirs, legal representatives, successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation.

(8)    Tenant shall have the termination rights provided for in the paragraphs of this Lease relating to Casualty and Condemnation.

(9)    If, in order to protect persons or property, it shall be necessary for Tenant to make emergency repairs or if Landlord after receipt of notice as above provided fails or neglects to perform services, maintenance, or repairs, required of it hereunder to the Shopping Center or Common Areas, Tenant shall have the right to do so and failure of Landlord to reimburse

Tenant for the reasonable out-of-pocket cost therefor within 10 days of receipt of a written statement therefore, shall constitute a Repayment Default.

(10) If a release of Hazardous Substances or other environmental condition occurs that is not the result of Tenant's actions or the actions of Tenant's agents, contractors, subcontractors, or employees, which release or environmental condition materially impairs for more than 30 days after written notice of same to Landlord Tenant's ability to use the Premises for the Permitted Use (the "Impairment Period") and, if unremedied, would constitute a violation of applicable Legal Requirements (an "Environmental Violation"), Tenant may (1) abate all rent due under this Lease during the Impairment Period and/or (2) terminate this Lease by written notice to Landlord on or before 30 days after the end of the Impairment Period.

(11) Tenant may, but shall not be obligated to, perform, acquire, or satisfy any lien, encumbrance, agreement, or obligation of Landlord which (if not performed, acquired, or satisfied) would, in Tenant's reasonable judgment, constitute a material threat to its use or enjoyment of the Premises, and if it does so it shall be subrogated to all rights of the obligee against Landlord or the Premises or both and if not promptly reimbursed by Landlord for resulting expenses and disbursements, shall be entitled to offset the cost of the same against all rent due under the Lease, together with interest thereon at the Default Rate on the unpaid, unrecouped cost thereof until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

In the event of an uncured default or a dispute arising out of or in connection with this Lease, the nondefaulting or prevailing party shall be entitled, in addition to whatever other damages or remedies such party is entitled to, to reimbursement for reasonable attorney's fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy.

**CONSTRUCTION RISKS**

27. Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the wilful misconduct, negligence, or carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, materialmen's, employees, agents, or servants by reason of Landlord's constructing the Shopping Center (other than the Store). Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor, or from any negligence or wilful misconduct of Landlord, Landlord's contractors, sub-contractors, materialmen's, or any of their respective employees, agents, or servants during the progress of the work in constructing the Shopping Center (other than the Store), or from any faulty construction thereof. Tenant shall indemnify and hold Landlord harmless from and against mechanics, materialmen's, contractor's or subcontractor's or similar liens and any claims or suits for damage to persons or property from defects in materials or the use of unskilled labor or from negligence or wilful misconduct of Tenant, its agents, employees, or contractors and subcontractors in connection with construction of the Store, Tenant Modifications, installation of Tenant's Trade Fixtures, and construction of the Addition, as hereinafter defined, if the Addition is constructed by Tenant.

**NOTICES**

28. All notices, requests, demands, and other communications required or permitted to be given under this Lease shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All rent payments shall be sent to Landlord at the address below. Each communication shall be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (3) if delivered by U.S. Mail, 3 days after depositing with the United States Postal

Service, postage prepaid by certified mail, return receipt requested, or (4) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

> Landlord :    Baumgardner-Hogan Real Estate, LLC
> c/o Hogan Development Company
> 7400 New LaGrange Road
> Suite 404
> Louisville, KY  40222-4870
> Telecopy: (502) 426-1223
> Attn: Mr. W. Glenn Hogan

or such other address as Landlord may direct from time to time.

> Tenant:    Winn-Dixie Charlotte, Inc.
> Winn-Dixie Store #1618
> 720 Locust Lane
> Louisville, KY  40217
> Telecopy: (502) 636-1834
> Attn:  Real Estate Manager

> With a copy to:  Winn-Dixie Stores, Inc.
> 5050 Edgewood Court
> P.O. Box B
> Jacksonville, FL 32203-0297
> Telecopy: (904) 783-5138
> Attn: General Counsel

or to such other address as Tenant may direct from time to time.

**ASSIGNMENT AND SUBLEASING**

29.    Tenant may without the consent of the Landlord vacate the Premises, or assign this Lease or sublease the Premises in whole or in part; provided, however, Tenant may not without written consent of Landlord, so assign this lease or sublease the Premises for use other than as a supermarket, and if Tenant desires to so assign or sublease for any other use, it shall give written notice to Landlord of its intention and shall reveal the identity of the intended assignee or sublessee, in which case Landlord shall within 30 days of the date of delivery of such notice advise Tenant in writing of its approval or disapproval of such intended assignment or subleasing. If Tenant receives notice of Landlord's approval within such period, Tenant may proceed in due course. If Landlord shall disapprove the intended assignment or subleasing by written notice to Tenant, this Lease shall be deemed terminated and canceled without the execution of any other or further document, and both parties hereto shall be released of and from any further liability thereafter hereunder. If Landlord does not respond within such time period, Landlord shall be deemed to have consented to such subletting or assignment.

In the event Tenant shall voluntarily vacate the entire Premises or cease selling merchandise therein for in excess of a period of six (6) months while the Premises are usable for the operation of a general mercantile business (excluding temporary cessation of business caused by (i) happenings beyond the control of Tenant, (ii) remodeling or enlargement, or (iii) casualty or other Force Majeure), Landlord shall have the continuing option thereafter (unless Tenant shall have reoccupied the Premises and recommenced selling merchandise) to terminate and cancel this Lease upon 30 days written notice to Tenant of its election so to do, unless within such 30 day period Tenant shall advise Landlord that Tenant had prior to receipt of such notice in good faith committed to assign this lease or sublease the Premises to a third party, in which event the provisions of the preceding sub-paragraph shall govern.

In the event of vacating or of any assignment or subleasing as herein permitted, Tenant shall continue to remain liable and responsible for the payment of rentals and the due performance of all other terms, covenants and conditions of this Lease.

In the event of any assignment or sublease or vacating of the entire Premises, the rental thereafter shall be the greater of: (1) a fixed rental only consisting of the average percentage rental, if any, paid by Tenant for the 2 years immediately preceding such assignment, vacating or subletting plus the minimum guaranteed rental provided for herein; or (2) the rentals therein reserved; provided, however, this provision shall not apply in the event such assignment or sublease shall be to any corporation or entity which is the parent of, subsidiary to or affiliated with Tenant or to any corporation or entity with which Tenant merges or consolidates or to which it sells all or substantially all of its business in the state where the Premises are situated.

The provisions of this paragraph shall not be construed to limit or restrict the right of Tenant to sublease a portion or department of the Premises without consent of Landlord to any concessionaire or licensee or otherwise in connection with the operation of Tenant's business in the Premises, provided the sales of such concessionaire or licensee shall be included within the gross sales of Tenant except to the extent limited in paragraph 3(b) above.

**SUBORDINATE**    30.    Provided that, with respect to any mortgage, deed of trust, security deed or other security instrument executed by any landlord in favor of a lender or other financier and securing a construction or permanent loan upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, and any other security documents executed in connection therewith, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement substantially in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage. Landlord hereby irrevocably directs Tenant to comply with any notice received from any Mortgagee requesting, requiring, or directing that Tenant pay any or all Basic, Additional, and/or Percentage Rent to such Mortgagee (a "Rent Payment Notice") notwithstanding any contrary direction, instruction, or request from Landlord. Tenant shall be entitled to rely upon any Rent Payment Notice and shall have no duty to controvert or challenge any Rent Payment Notice. Tenant's compliance with any Rent Payment Notice shall not be deemed to violate, breach, or constitute a default under this Lease. Landlord hereby indemnifies and releases Tenant and shall hold Tenant harmless from and against any and all loss, cost, expense, or damage (including attorneys' fees and costs, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) arising from any claim based upon or in connection with Tenant's compliance with any Rent Payment Notice. Landlord shall look solely to the Mortgagee with respect to any claim Landlord may have on account of an incorrect or wrongful Rent Payment Notice. Tenant shall be entitled to full credit under this Lease for any and all Basic, Additional, and/or Percentage Rent paid to any Mortgagee pursuant to any Rent Payment Notice to the same extent as if such rent were paid to Landlord. No Mortgage shall encumber Tenant's Trade Fixtures or any nonpermanent, nonstructural Tenant Modifications. Tenant assumes no liability or obligation under the Mortgage or with respect to the indebtedness secured thereby.

**ESTOPPEL**    31.    Within a reasonable time, but no less than 10 business days, after Landlord's written
**CERTIFICATE**    request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in substantially

the form attached hereto as Exhibit "E" (an "Estoppel Certificate"). Notwithstanding the foregoing, Landlord shall not request, and Tenant shall not be required to deliver more than 2 Estoppel Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500.00 per additional requested Estoppel Certificate.

**LENDER'S CURE**

32. Simultaneously with any such notice to Landlord, Tenant shall give notice to any holder of a recorded Mortgage encumbering the Premises (provided that such Mortgagee has entered into an SNDA with Tenant and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord. The Mortgagee shall have the right, but not the obligation, to cure such default within the same cure periods provided to Landlord hereunder. Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Lease.

**BENEFIT**

33. This Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises.

**TRANSFER BY LANDLORD**

34. If Landlord transfers Landlord's interest in the Shopping Center or the right to collect rent under this Lease, Landlord agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under this Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under this Lease, (collectively, the "Transfer Requirements") and/or (d) such other information as Tenant may reasonably require. Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in this Lease. The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to temporarily withhold rent in trust pending receipt of Transfer Requirements. In the event of a foreclosure or a transfer in lieu of a foreclosure, the transfer requirements set forth in the SNDA shall supersede the Transfer Requirements set forth herein.

**SHORT FORM LEASE**

35. Landlord shall execute a short form of this Lease in the form attached hereto as Exhibit "G", and cause its recording in the public records of the county or parish in which the Premises are located. Neither Landlord nor Tenant shall record this entire Lease.

**MARGINAL TITLES**

36. The marginal titles appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend, or affect the provisions thereof.

**COMPLETE AGREEMENT**

37. This Lease contains the complete agreement of the parties with reference to the leasing of the Premises and supersedes any prior agreement with respect to the subject matter hereof.

No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**DECLARATION**    38.    Not applicable.

**EXHIBITS**    39.    The following Exhibits attached hereto are hereby incorporated into this Lease by reference:

| Exhibit "A" | - | **Legal Description of the Land** |
| Exhibit "B" | - | **Site Plan of the Shopping Center** |
| Exhibit "C" | - | **SNDA** |
| Exhibit "D" | - | **Not applicable** |
| Exhibit "E" | - | **Estoppel Certificate** |
| Exhibit "F" | - | **Not applicable** |
| Exhibit "G" | - | **Short Form Lease** |
| Exhibit "H" | - | **Not applicable** |
| Exhibit "I" | - | **Not applicable** |
| Exhibit "J" | - | **Supplemental Lease Agreement** |

**FORCE MAJEURE**    40.    If there shall occur, during the Term, (1) strike(s), lockout(s), or labor dispute(s); (2) the inability to obtain labor or materials or reasonable substitutes therefor; (3) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other conditions beyond the control of the party required to perform (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Lease (except for the obligation to pay money), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

**ENVIRONMENTAL CONDITION**    41.    (a)    Landlord. Landlord represents and warrants to Tenant that it has not prior to the commencement of this Lease, and will not during the term of this Lease or any renewal thereof, cause or permit to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. Landlord certifies to Tenant that to its knowledge no other tenant of the Shopping Center has caused or permitted to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center except in accordance with applicable Legal Requirements. "Hazardous Substance" includes, without limitation, any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to Legal Requirements. "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal.

Landlord shall, at its sole cost and expense, take such action as is reasonable, prudent, or required by law as a result of any breach of the foregoing representations and warranties and shall indemnify, protect, and save Tenant, its officers, directors, shareholders, and employees

harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements) of any kind or nature whatsoever (collectively the "Indemnified Matters") which may at any time be imposed upon, incurred by or asserted or awarded against Tenant and arising from or out of any Hazardous Substances on, in, under or affecting all or any portion of the Premises or the Shopping Center, which Hazardous Substances are not the result of Tenant's use or operation of the Premises. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision.

Landlord shall provide to Tenant copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Shopping Center which Landlord receives from any governmental unit or agency overseeing environmental matters and copies received by landlord of any such notices, letters, or requests for information sent to any other tenant of the Shopping Center.

(b)    Tenant. Tenant shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed of on, in or about the Premises except in accordance with applicable Legal Requirements without obtaining Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. If any Hazardous Substance is used, stored, generated, or disposed of on, in, or about the Premises except as permitted above, or if the Premises or the Shopping Center become contaminated in any manner as a result of any breach of the foregoing covenant or any act or omission of Tenant or any of its agents, contractors, subcontractors, or employees and such contamination results in an Environmental Violation, Tenant shall indemnify and hold harmless Landlord, its officers, directors, shareholders, and employees from any and all claims, demands, actions, damages fines, judgments, penalties, costs (including attorneys', consultants', and experts' fees), liabilities, losses (including without limitation, any decrease in value of the Store or Tenant's business operations therein, damages due to loss or restriction of rentable or usable space, or any damages due to adverse impact on marketing of the space in the Shopping Center or the Store), and expenses arising during or after the term of this Lease and arising as a result of such contamination. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes the presence of any Hazardous Substance on, in or about the Premises except in accordance with applicable Legal Requirements or with Landlord's consent and the same results in an Environmental Violation, Tenant, at its sole expense, shall promptly perform such remediation. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld, conditioned, or delayed.

Notwithstanding the foregoing, this indemnification shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Premises or that of its agents or employees. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination on or under the Premises, the Common Areas or any other portion of the Shopping Center resulting from Landlord's ownership, use or operation, or the use of operation by any third party not acting by, through, under or on behalf of Tenant.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Lease and the transfer of Landlord's or Tenant's interests hereunder.

**NO BROKERS**      42.      Neither Landlord nor Tenant has discussed this Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee. Each shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

**FLORIDA**         43.      The following provision is included to satisfy Florida requirements and are applicable
**MANDATED**        only if the Premises are located in Florida and should otherwise be disregarded.
**PROVISION**

Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

**EXPANSION**       44.      As a material inducement to Tenant's entering into this Lease, Landlord grants to Tenant the option and privilege ("Tenant's Enlargement Option") of enlarging the Store to incorporate therein an addition consisting of the area to the north side of the Store measuring approximately 60 feet in width by 231 feet in depth, as shown on the Site Plan (the "Addition" or the "Additional Space"), which area shall be reserved for construction of the Addition except that pending same may be partially paved for parking or Landlord may construct a building thereon and rent space in such building; provided, the rights of tenants in such space shall be expressly subject to Tenant's Enlargement Option.

Provided that Tenant is not in material or monetary default under this Lease, Tenant may exercise Tenant's Enlargement Option by giving to Landlord written notice 180 days prior to the expiration of the 10th year from the Commencement Date or 180 days prior to expiration of each 5-year interval thereafter of its exercise of such option, or at any time if the Additional Space is vacant and Tenant has not received written notice from Landlord that it has leased the Additional Space to another tenant in a manner consistent with this Lease, together with a proposed amendment to this Lease (the "Amendment") to provide for those terms and conditions described below and such additional terms and conditions with respect to the Addition as to which Landlord and Tenant shall subsequently agree.

If Tenant constructs the Addition, Tenant shall obtain and pay all costs, fees, and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition. Tenant's optional construction of the Addition shall be contingent upon Tenant's satisfaction with updates or endorsements to any title policies, surveys, and/or environmental audits, and the provisions of then applicable zoning and land use regulations. Upon completion of the Addition by Tenant, no Basic Rent shall be payable by Tenant in respect of the Addition for the remainder of the Term and no Percentage Rent shall

be payable until Tenant shall have recouped its total cost of the Addition in Percentage Rent that would otherwise be due under this Lease.

Upon completion of the Addition, it shall become a portion of the Store for all purposes and any references in this Lease to the Store shall refer to and include the Addition, and Tenant shall be granted 3 additional Extension Terms of 5 years each, and Tenant's remaining Extension Terms under this Lease, if any, shall be preserved.

**TAKE OVER AND RELEASE**    **45.**    Not applicable.

**GOVERNING LAW**    **46.**  This Lease shall be governed by and construed in accordance with the laws of the State in which the Store is located.

**NO JOINT VENTURE**    **47.**  This is a Lease between a landlord and a Tenant and not an agreement of partnership or joint venture; neither Landlord nor Tenant is the agent of the other.

**TIME**    **48.**    Time is of the essence of this Lease.

**NO MERGER**    **49.**    In the event that Tenant becomes the owner of fee title to the Store or the Shopping Center, the fee title and the leasehold granted hereunder shall not merge but shall remain separate and distinct interests and estates.

**NET LEASE**    **50.**    Except as specifically stated herein otherwise, it is the intent of the Landlord and Tenant that the Basic Rent payable by Tenant to Landlord shall be on an absolute net basis, and that all taxes, insurance and maintenance arising from Tenant's use and occupancy of the Store and the Land are to be paid by Tenant.

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Lease on the dates indicated below, the latter of which shall be filled in the first paragraph of this Lease as the Effective Date.

Witnesses:

Print name: _Michael Poole_

Print name: _David W. Seewer_

LANDLORD:

**BAUMGARDNER-HOGAN REAL ESTATE, LLC,**
a Kentucky limited liability company

By: _____
W. Glenn Hogan
Its Duly Authorized Member
Date: _____6-20-01_____

TENANT:

**WINN-DIXIE CHARLOTTE, INC.,** successor by name change to Winn-Dixie Midwest, Inc.,
a Florida corporation

By: _____
DENNIS M. SHEEHAN
Its: Vice President
Date: _____6/30/01_____

Print name: KAREN NORMAN

Print name: ANITRA D. COLLINS

STATE OF _Kentucky_ )
COUNTY OF _Jefferson_ )

The foregoing instrument was acknowledged before me this _June 20_, 200_1_, by _W. Glenn Hogan_, the Member of **BAUMGARDNER-HOGAN REAL ESTATE, LLC,** a Kentucky limited liability company, on behalf of the company, **[PLEASE CHECK ONE]** [X] who is personally known to me or [ ] who has produced a _____ state driver's license as identification.

Printed Name: _David W. Seewer_
Notary Public, State and County aforesaid.
My Commission Expires: _7-10-01_
Notary ID No.: _____
(NOTARIAL SEAL)

STATE OF FLORIDA )
COUNTY OF DUVAL )

    The foregoing instrument was acknowledged before me this _June 20_, 200_1_, by __DENNIS M. SHEEHAN__, as __Vice__ President of **WINN-DIXIE CHARLOTTE, INC.**, successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.



Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

o:\newforms\lease.sc

JANE E. DeWITTE
Notary Public, State of Florida
Commission No. CC817487
My Commission Exp. 05/18/2004

## EXHIBIT A

### Legal Description

Being Tract 1 as shown on that certain Minor Subdivision Plat which was approved by the Louisville and Jefferson County Planning Commission on February 24, 2001, bearing Docket No. 07-00 and attached to a deed of record in <u>Deed Book 7414, Page 557,</u> in the Office of the Clerk of Jefferson County, Kentucky.

Being a portion of the same property conveyed to Grantor by deed recorded in <u>Deed Book 6916, Page 125,</u> in the Office of the Clerk aforesaid.



Exhibit "B" cont.

Legal Description of the Shopping Center

Tracts 1, 2 and 3 pursuant to Minor Subdivision Plat which was approved by the Louisville and Jefferson County Planning Commission on February 24, 2001, bearing Docket No. 07-00 and attached to a deed of record in <u>Deed Book 7414, Page 557</u>, in the Office of the County Clerk of Jefferson County, Kentucky.

LESS AND EXCEPT that portion of Tract 2 labeled "Outparcel 4" on the attached Site Plan, such outparcel containing approximately 2.004 acres, and being more particularly described as follows:

Beginning at a point, at the northwest corner of a tract conveyed to Stephen S. and Marsha L. Shrock of record in Deed Book 5614, Page 301 as recorded in the Office of the County Court Clerk of Jefferson County, Kentucky; thence with said tract S 14°53'54" E, 350.03 feet to a point; thence S 72°38'51" W, 239.25 feet to the east line of Blankenbaker Parkway; thence with said east line, N 17°21'09" W, 357.59 feet to a point; thence leaving said east line N 74°25'20" E, 254.36 feet to the point of beginning, containing 2.004 acres.

JK 177466.3 80130 00952
6/21/01 9:19 AM

## EXHIBIT "C"

### SUBORDINATION, NONDISTURBANCE,
### AND ATTORNMENT AGREEMENT

**THIS SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT** (this

"Agreement"), made this _____, between _____,

a _____, whose address is _____

_____ (together with its successors, assigns, and transferees "Lender") and **WINN-DIXIE CHARLOTTE,**

**INC.**, successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation, whose address is 720

Locust Lane, Louisville, KY 40217 (together with its successors and assigns, "Winn-Dixie");

### R E C I T A L S:

1.        Lender has made or is about to make a loan to **BAUMGARDNER-HOGAN REAL ESTATE,**

**LLC**, a Kentucky limited liability company ("Landlord"), secured by a mortgage, deed of trust, security deed,

or other financing instrument recorded or to be recorded in the Official Records of Jefferson County,

Kentucky (together with any modifications, consolidations, extensions, replacements, or renewals thereof,

the "Mortgage"), encumbering the real estate known as "Blankenbaker Place" shopping center at 201

Blankenbaker Parkway near Blankenbaker Parkway's intersection with Shelbyville Road, in the City of

Louisville, Jefferson County, Kentucky, and more particularly described in the Mortgage and on Exhibit "A"

attached hereto and incorporated herein (the "Shopping Center"); and

2.        By Lease dated _____ (as amended by _____and as

otherwise to be amended from time to time, the "Lease"), Landlord did lease unto Winn-Dixie, as tenant,

those certain premises which constitute a portion of the Shopping Center and are more particularly described

in the Lease (the "Premises"); and

3.        Lender and Winn-Dixie desire that the Lease shall not terminate but rather shall remain in

full force and effect in accordance with its terms if the Mortgage is foreclosed or any transfer of the Premises

is made in lieu thereof.

**NOW THEREFORE,** for valuable consideration the receipt and sufficiency of which are hereby

acknowledged, Lender and Winn-Dixie agree as follows:

1.        Provided Winn-Dixie is not in material default under the terms of the Lease, then in the

course of or following any exercise of any remedy under the Mortgage, any foreclosure sale of the Shopping

Center or the Premises, or any transfer of the Shopping Center or the Premises thereafter or in lieu of

foreclosure (together with any similar events, a "Foreclosure Event"):

(a)        The right of possession of Winn-Dixie to the Premises and Winn-Dixie's

rights arising out of the Lease shall not be affected or disturbed by Lender.

JK 139171.9 80130 00952
6/19/01 6:39 PM

**Winn-Dixie Store #1618**
**Louisville, Jefferson County, Kentucky**

(b)     Winn-Dixie shall not be named as a party defendant unless required by law.

(c)     The Lease shall not be terminated or affected by any Foreclosure Event.

2.      Following a Foreclosure Event, Winn-Dixie shall attorn to Lender as its new landlord and the Lease shall continue in full force and effect as a direct lease between Winn-Dixie and Lender. Notwithstanding the foregoing, Lender shall not be:

(a)     liable for any act or omission of any prior landlord (including Landlord), unless such action was taken at the direction of or with the approval of Lender; or

(b)     subject to any offsets or defenses which Winn-Dixie might have against any prior landlord (including Landlord) except those which arose out of such landlord's default under the Lease and accrued after Winn-Dixie has notified Lender and given Lender an opportunity to cure as provided in the Lease; or

(c)     bound by any rent Winn-Dixie paid for more than the then current month to any prior landlord (including Landlord); or

(d)     bound by any modification of the Lease made after the date hereof without Lender's consent.

3.      Following a Foreclosure Event, Lender promptly shall give notice thereof to Winn-Dixie, stating its current address and providing evidence of Lender's title to the Premises.

4.      The Lease is subject and subordinate to the lien of the Mortgage and to all advances made or to be made thereunder as though the Mortgage had been executed and recorded prior in point of time to the execution of the Lease.  Notwithstanding the foregoing, subordination of the Lease to the Mortgage should not be construed to constitute Tenant's consent or agreement to any term, condition, or provision of the Mortgage or any related loan document which is inconsistent with or purports to modify, alter, or amend the Lease.

5.      The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto.  However, Winn-Dixie agrees to execute and deliver to Lender such other instrument as Lender shall reasonably request to evidence such provisions.

6.      Winn-Dixie agrees it will not, without the prior written consent of Lender (i) modify the Lease or any extensions or renewals thereof in such a way as to reduce rent, accelerate rent payment, shorten the original term, or change any renewal option; (ii) terminate the Lease, except as provided by its terms; (iii) tender or accept a surrender of the Lease or make a prepayment in excess of one (1) month of any rent thereunder; or (iv) subordinate or knowingly permit subordination of the Lease to any lien subordinate to the Mortgage, except for those liens that are superior to the Mortgage by law, if any.  Any such purported action without such consent shall be void as against Lender.

7.      Winn-Dixie will give notices to Lender in accordance with paragraph 32 of the Lease at the address set forth in the first paragraph of this Agreement or at such other address as Lender may advise from time to time. Lender shall be entitled to the cure periods provided in paragraph 32 under the Lease.

8.    If Lender, or its assignee, obtains Landlord's interest in the Shopping Center or enforces it right to collect rent under this Lease, Lender agrees to promptly provide or cause to be provided to Tenant (a) a copy of a current marked title commitment or title policy showing any new landlord as the owner thereof, (b) a W-9 form or its equivalent setting forth the name and tax identification number of the party collecting rent, signed by an authorized person, (c) a letter of instruction on the letterhead of Landlord (or new landlord in the case of a sale or other transfer) stating (i) the name, address, phone number, and contact person of the entity collecting rent under the Lease, and (ii) the names, addresses, and telecopy numbers of all persons to be provided notices from Tenant under the Lease, (collectively, the "Transfer Requirements") and/or (d) such other information as Tenant may reasonably require. Following receipt of the foregoing, as of the date of any such transfer, the transferring landlord shall be released from any obligations accruing after the date of the transfer except as otherwise expressly provided in the Lease. The Transfer Requirements must be met to ensure that Tenant is paying rent to the proper, entitled party and Tenant shall have the right to temporarily withhold rent in trust pending receipt of Transfer Requirements.

**IN WITNESS WHEREOF,** Lender and Winn-Dixie have executed this Agreement the day and year first above written.

Witnesses:

Print name:_____

Print name:_____

By:_____
    _____
    Its:_____
    Date:_____


**WINN-DIXIE CHARLOTTE, INC.,** successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation

Print name:_____

Print name:_____

By:_____
    _____
    Its:_____ President
    Date:_____

JK 139171.9 80130 00952
6/19/01 6:39 PM

STATE OF _____ )
COUNTY OF _____ )

      The foregoing instrument was acknowledged before me this _____ _____, 200__, by
_____, as _____ of _____,
a _____, on behalf of the _____, **[PLEASE CHECK ONE]**
_____ who is personally known to me or _____ who has produced _____ as
identification.

<br>

_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

<br>

STATE OF FLORIDA )
COUNTY OF DUVAL )

      The foregoing instrument was acknowledged before me this _____ _____, 200__,
by _____, as _____ President of **WINN-DIXIE CHARLOTTE, INC.**,
successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation, on behalf of the corporation,
who is personally known to me.

<br>

_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

**EXHIBIT "D"**

NOT APPLICABLE

**EXHIBIT "E"**

**ESTOPPEL CERTIFICATE**
WINN-DIXIE STORE #1618
Blankenbaker Place
Louisville, Kentucky

The undersigned officer of **WINN-DIXIE CHARLOTTE, INC.,** successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation ("WD"), hereby certifies, on behalf of WD, that as of _____ _____ (the "Certificate Date"), the following is true and correct:

1.     That WD is the tenant ("Tenant") under a currently effective lease (as amended as described below, the "Lease") with BAUMGARDNER-HOGAN REAL ESTATE, LLC, a Kentucky limited liability company, as the current landlord ("Landlord") dated _____, conveying a leasehold estate of the property described therein (the "Premises") located in a shopping center known as Blankenbaker Place (the "Shopping Center"), and the Lease has been amended or is evidenced only by:

    (a)    Short Form Lease dated _____, recorded in Official Records Volume _____, page _____ of the public records of Jefferson County, Kentucky;

    (b)    Letter Agreement(s) dated _____;

    (c)    Supplemental Lease Agreement dated _____;

    (d)    First Amendment to Lease dated _____;

    (e)    Second Amendment to Lease dated _____.

2.     That the term of the Lease commenced _____, and is scheduled to expire on _____ unless renewed or terminated in accordance with the terms of the Lease. Pursuant to the Lease, Tenant is entitled to renew the Lease for five (5) terms of five (5) years each.

3.     That, to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Lease, all rent and other charges due from Tenant to Landlord have been paid through and including _____, _____, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease.

4.     That, to the best of Tenant's knowledge, Landlord is not in default under the Lease, except that Landlord has failed to perform the following maintenance items as required under the Lease:

    (a)    _____

    (b)    _____

    (c)    _____

    (d)    _____

5.     That the Lease contains no provision for purchase of the Premises by Tenant.

6.     Tenant has received no notice of any sale, transfer, assignment, or pledge of Landlord's interest in the Lease or the rent due thereunder to any party except: _____ and _____.

7.     Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law.

8.     Notwithstanding anything to the contrary herein:

(a)     No acceptance or possession of the Premises, opening for or operation of business by Tenant therein, execution of this certificate, or payment of rent under the Lease constitutes or will constitute acceptance by Tenant of work or materials that are defective or not completed in accordance with Tenant's plans and specifications, or a waiver of Tenant's rights against Landlord in connection therewith.

(b)     Tenant makes no representation or warranty that the Premises or the Shopping Center, or any portion thereof is in compliance with the Americans With Disabilities Act or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

9.      The address for notices to Tenant is 720 Locust Lane, Louisville, KY 40217, Attn: Real Estate Manager, with a copy to: General Counsel, Winn-Dixie Stores, Inc., 5050 Edgewood Ct., P.O. Box B, Jacksonville, FL 32203-0297.

10.     This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant.

**IN WITNESS WHEREOF,** the undersigned has executed this certificate on behalf of Tenant.

> **WINN-DIXIE CHARLOTTE, INC.,** successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation
>
> By:_____
>
> Its:_____President

The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge. Further, Landlord certifies that Tenant has fully performed its obligations under the Lease to date and Tenant is not in default thereunder.

**IN WITNESS WHEREOF,** the undersigned has executed this certificate on behalf of Landlord.

> **BAUMGARDNER-HOGAN REAL ESTATE, LLC**
>
> By:_____
>       W. Glenn Hogan
>       Its Duly Authorized Member

JK 139171.9 80130 00952
6/19/01 6:39 PM

**Winn-Dixie Store #1618**
**Louisville, Jefferson County, Kentucky**

## EXHIBIT "F"

NOT APPLICABLE

JK 139171.9 80130 00952
6/19/01 6:39 PM

**Winn-Dixie Store #1618**
**Louisville, Jefferson County, Kentucky**

## EXHIBIT "G"

### SHORT FORM LEASE

**THIS SHORT FORM LEASE** is hereby executed this _____, by and between **BAUMGARDNER-HOGAN REAL ESTATE, LLC,** a Kentucky limited liability company, whose mailing address is 7400 New LaGrange Road, Suite 404, Louisville, KY 40222-4870 ("Landlord") and **WINN-DIXIE CHARLOTTE, INC.,** successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation, whose mailing address is 720 Locust Lane, Louisville, KY 40217 ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### WITNESSETH:

**WHEREAS,** Landlord and Tenant did enter into a Lease, dated _____(the "Lease"); and

**WHEREAS,** Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on Exhibit "A" attached hereto and depicted on the Site Plan attached as Exhibit "B" attached hereto and by these references made a part hereof together with the nonexclusive right to use the Common Areas as described and provided in the Lease (collectively the "Premises").

The term of the Lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, twenty (20) years thereafter. Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each. Tenant has no option to purchase the Premises under the Lease.

Tenant agrees that it will make full and prompt payment of all sums necessary to pay for the costs of any alterations, additions, and improvements done by Tenant to the Store (as defined in the Lease). Tenant agrees to indemnify and hold harmless Landlord from and against any and all such costs and liabilities incurred by Landlord arising from or growing out of such actions by Tenant, and against any and all construction liens arising from or growing out of such work or the costs thereof which may be asserted, claimed, or charged against the Store. Notwithstanding anything to the contrary in the Lease, the interest of Landlord in the Store shall not be subject to liens for improvements made by or for Tenant, whether or not the same shall be made or done in accordance with an agreement between Landlord and Tenant, and it is specifically understood and agreed that in no event shall Landlord or the interest of Landlord in the Store be liable for or subject to any construction liens for improvements or work made by or for Tenant. The Lease specifically prohibits the subjecting of Landlord's interest in the Store to any construction liens for improvements made by Tenant or for which Tenant is responsible for payment under the terms of the Lease. All persons dealing with Tenant are hereby placed on notice of the foregoing provisions. If any claim of lien shall be asserted or recorded against the interest of Landlord in the Store arising from or growing out of any improvement or work done by or for Tenant, or any person claiming by, through or under Tenant, or for improvements or work the cost of which is the responsibility of Tenant, Tenant agrees to have such claim of lien canceled and discharged of record as a claim against the interest of Landlord in the Store (either by payment or bond as permitted by law) within twenty-five (25) days after notice to Tenant by Landlord, and if Tenant shall fail to do so, Tenant shall be considered in default under the Lease.

(a)    Permitted Use.  The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any other mercantile, retail, or service business which is not prohibited by paragraph 7(c) of the Lease (including discount businesses) (the "Permitted Use").

(b)    Exclusives.      Tenant shall have the exclusive right to:

(i) operate a  supermarket, grocery, bakery, and delicatessen;

(ii) sell meat, seafood, and vegetables/fruits/produce, dairy products, and frozen foods; and

(iii) operate a pharmacy or prescription drug concession

in the Shopping Center (each an "Exclusive Use").

Landlord will not directly or indirectly permit any party other than Tenant to use for any Exclusive Use any property located within the Shopping Center (or  any property located within 1,000 feet of any exterior boundary of the Shopping Center and currently or hereafter owned or controlled directly or indirectly by Landlord or any entity controlled by, controlling, or under common control with Landlord).  The Exclusive Uses set forth above shall supplement and not replace the exclusive rights of Tenant set forth in that certain Cross Easement and Restrictive Covenants Agreement dated July 28, 1997, and recorded in Book 06916, Page 0110 in the Office of the Clerk of Jefferson County, Kentucky, as modified by that certain Modification of Cross Easement and Restrictive Covenants Agreement of record in Deed Book _____, Page _____, in the office of the Clerk aforesaid (the "Declaration"); provided, however, any exceptions to Tenant's Exclusive Uses set forth in the Declaration (including specifically the exceptions and limitations set forth in paragraph 3 of the Declaration) shall be applicable and Landlord shall not be prevented from leasing or renting any portion of the Shopping Center to any person, firm or corporation which is allowed pursuant to paragraph 7(c)(xiv) of the Lease.

In the event the Premises are at any time subject to a first mortgage (provided that such mortgagee has entered into an SNDA, as defined in the Lease, with Tenant and Tenant has first been notified in writing of the name and address of such mortgagee) and so long as said mortgage shall encumber the Premises, and notwithstanding any provision herein to the contrary, Tenant shall have no right to cancel or terminate the Lease or to withhold rental payments because of a violation of the terms of Tenant's Exclusive Uses hereunder as to property located within 1,000 feet of any exterior boundary of the Shopping Center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its heirs, legal representatives, successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation.

(c)    Prohibitions.      Without the prior written consent of Landlord and Tenant, which may be withheld or conditioned in Landlord and Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and Landlord shall permit none of the following (the prohibited uses set forth below shall supplement not replace the prohibited uses set forth in the Declaration):

(i) spa, health, or exercise club; provided, however, this prohibition shall not prohibit, (i) a spa that is primarily designed to provide manicures, facials or other similar services to women, or (ii) a legitimate exercise/fitness club.

(ii) lounge, bar, "teen lounge" or social encounter club;

(iii) bowling alley;

(iv) skating rink;

(v) bingo or electronic or other game parlor;

(vi) theater (either motion or legitimate);

(vii) area or space for the sale or display of pornographic or "adult" material;

(viii) business or professional offices in excess of thirty percent (30%) of the total square feet in the Shopping Center;

(ix) blood bank, abortion or HIV clinic;

(x) automobile dealership;

(xi) church;

(xii) manufacturing or storage business;

(xiii) public auditorium or other public entertainment facility; or

(xiv) restaurants within 100 feet of the nearest wall of the Store (except any delicatessen or restaurant located in the Store); provided, however, this prohibition shall not prohibit Landlord from leasing or renting any portion of the Shopping Center to any person, firm or corporation to be used for or occupied by any business whose principal use is a delicatessen-style restaurant or other restaurant which provides on premises service and sells prepared foods for "on premises consumption" and which may include the sale of sliced meats, fish, fruits, vegetables, dairy products, bakery goods, or frozen foods, as an incidental part of the operation of the delicatessen-style restaurant or other restaurant, including but not limited to such delicatessen-style restaurants as Schlotzsky's or McCallister's; provided, however, in no event shall such a delicatessen-style restaurant or other restaurant (i) exceed 4,000 square feet, or (ii) sell alcoholic beverages other than beer and wine. For the purposes of this subparagraph, "on premises consumption" may include to-go and drive-thru orders as an incidental part of the restaurant operation.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Short Form Lease shall be deemed to constitute a single instrument or document. This Short Form Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Short Form Lease, the Lease shall control.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Short Form Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

**LANDLORD:**

**BAUMGARDNER-HOGAN REAL ESTATE, LLC,**
a Kentucky limited liability company

Print name:_____

By:_____

Print name:_____

W. Glenn Hogan
Its Duly Authorized Member

As to Landlord

JK 139171.9 80130 00952
6/19/01 6:39 PM

**Winn-Dixie Store #1618**
**Louisville, Jefferson County, Kentucky**

**TENANT:**

**WINN-DIXIE CHARLOTTE, INC.**, successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation

Print name:_____

By:_____

Print name:_____

Its: _____ President

    As to Tenant

STATE OF _____ )
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____, 200__, by _____, the Member of **BAUMGARDNER-HOGAN REAL ESTATE, LLC**, a Kentucky limited liability company, on behalf of the company, **[PLEASE CHECK ONE]** [ ] who is personally known to me or [ ] who has produced a _____ state driver's license as identification.

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

STATE OF FLORIDA )
COUNTY OF DUVAL )

    The foregoing instrument was acknowledged before me this _____ ___, 200__, by _____, as _____ President of **WINN-DIXIE CHARLOTTE, INC.**, successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

## EXHIBIT "H"

NOT APPLICABLE

JK 139171.9 80130 00952
6/19/01 6:39 PM

## EXHIBIT "I"

NOT APPLICABLE

JK 139171.9 80130 00952
6/19/01 6:39 PM

**Winn-Dixie Store #1618**
**Louisville, Jefferson County, Kentucky**

**EXHIBIT "J"**

**SUPPLEMENTAL LEASE AGREEMENT**

**THIS SUPPLEMENTAL LEASE AGREEMENT** (the "Agreement") is made this _____, 200__, between **WINN-DIXIE CHARLOTTE, INC.**, successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation (the "Tenant"), and **BAUMGARDNER-HOGAN REAL ESTATE, LLC**, a Kentucky limited liability company (the "Landlord").

**WHEREAS,** Tenant and Landlord entered into a Lease dated _____, as amended and/or evidenced by: (a) Short Form Lease dated _____, recorded in Volume ____, page ____ of the public records of Jefferson County, Kentucky; (b) Letter Agreement dated _____; (c) First Amendment to Lease dated _____; (d) Second Amendment to Lease dated_____ (the "Lease") for the use and occupancy of the Premises described therein;

**NOW, THEREFORE,** pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1.    The Commencement Date of the Term is _____.

2.    The Term shall expire at midnight Eastern Time on _____, unless earlier terminated or later extended as provided for in the Lease.

3.    All undefined capitalized terms used herein are as defined in the Lease.

**IN WITNESS WHEREOF,** the parties hereto have signed and sealed this Agreement on the date first set forth above.

Signed, sealed and delivered
in the presence of:

TENANT:

**WINN-DIXIE CHARLOTTE, INC.,** successor by name change to Winn-Dixie Midwest, Inc.,
a Florida corporation

_____
Print name:_____

By:_____
_____
Print name:_____
   Its: _____ President
   Date:_____

LANDLORD:

**BAUMGARDNER-HOGAN REAL ESTATE, LLC**
a Kentucky limited liability company

_____
Print name:_____

By:_____
_____
Print name:_____
   W. Glenn Hogan
   Its Duly Authorized Member
   Date:_____

JK 139171.9 80130 00952
6/19/01 6:39 PM

**Winn-Dixie Store #1618**
**Louisville, Jefferson County, Kentucky**

STATE OF FLORIDA )
COUNTY OF DUVAL )

      The foregoing instrument was acknowledged before me this _____ ___, 200__, by _____, as _____ President of **WINN-DIXIE CHARLOTTE, INC.**, successor by name change to Winn-Dixie Midwest, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.

_____

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

STATE OF _____ )
COUNTY OF _____ )

      The foregoing instrument was acknowledged before me this _____ _____,200__, by _____, the Member of **BAUMGARDNER-HOGAN REAL ESTATE, LLC**, a Kentucky limited liability company, on behalf of the company,  **[PLEASE CHECK ONE]** [ ] who is personally known to me or [ ] who has produced a _____ state driver's license as identification.

_____

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)