IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| In re: | : |
| | :    Case No.: 3-05-bk-03817-JAF |
| WINN-DIXIE STORES, INC., et al., | :    Chapter 11 |
| | :    JOINTLY ADMINISTERED |
| Debtor(s). | : |
| | : |

**OMNIBUS REPLY TO RESPONSES FILED BY THE UNITED STATES TRUSTEE, THE DEBTORS, THE CREDITORS COMMITTEE, AND WACHOVIA BANK NATIONAL ASSOCIATION TO THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS' (I) OBJECTION AND MOTION TO SET ASIDE THE UNITED STATES TRUSTEE'S NOTICE OF DISBANDMENT OF EQUITY SECURITY HOLDERS COMMITTEE AND (II) ALTERNATIVE MOTION FOR APPOINTMENT OF EQUITY SECURITY HOLDERS COMMITTEE NUNC PRO TUNC TO JANUARY 11, 2006**

The Official Committee of Equity Security Holders (the "Equity Committee") initially appointed by the United States Trustee (the "U.S. Trustee") on August 17, 2005, replies[1] to the responses filed by the United States Trustee (the "U.S. Trustee"), Winn-Dixie Stores, Inc., et al. (collectively, the "Debtors"), Wachovia Bank, National Association ("Wachovia") and the official committee of unsecured creditors (the "Creditors Committee," collectively with the U.S. Trustee, Debtors and Wachovia, the "Objecting Parties")[2] to the Objection and Motion to Set Aside the United States Trustee's Notice of Disbandment of Equity Security Holders Committee and Motion for Appointment of Equity Security Holders Committee Nunc Pro Tunc to January 11, 2006 (the "Equity Committee's Motion").

---

[1] The Debtors, the U.S. Trustee, the Creditors Committee and Wachovia Bank for some reason, as a group, ignored the January 25, 2006 deadline set by the Court and each filed their responses late in the day on January 26. As a result, the Equity Committee was not able, as it had intended, to file this reply on Friday, January 27.

[2] The Creditors Committee filed its Objection to Ad Hoc Equity Committee's (i) Motion to Set Aside United States Trustee's Notice of Disbandment of Equity Security Holders Committee and (ii) Motion for Appointment of Equity Security Holders Nunc Pro Tunc to January 11, 2006 on January 27, 2006.

## I. <u>Introduction</u>

1.      The U.S. Trustee's unilateral and extra-judicial disbandment of the Equity Committee is procedurally improper and a clear violation of the Abatement Order.  The Notice of Disbandment circumvented any hearing on the matter, even though a full and open hearing was clearly contemplated by the Abatement Order.  In addition, in contravention of the Abatement Order, the U.S. Trustee held an unknown number of private meetings with those bent on avoiding a truly independent valuation of the Debtors' estates including one of its critical components, a full, fair and independent investigation (the representatives of the Debtors) and those interested simply in obtaining the full value of the estate for themselves (the in-the-money Unsecured Creditors) by prematurely establishing the value of the Debtors and thereby disenfranchising over 36,000 public shareholders.[3]  The Notice of Disbandment thus violates all notions of procedural due process.  Accordingly, the Equity Committee requests that the Court immediately set aside the Notice of Disbandment.

2.      In addition to the U.S. Trustee's violation of the Abatement Order, there is a second independent legal basis for appointing an official equity committee nunc pro tunc to January 11, 2006.  An equity committee is necessary to ensure adequate representation of all equity security holders in these bankruptcy cases.  Other than equity security holders who collectively constitute the Davis Family and the entrenched board of directors, the equity security holders are entirely unrepresented.  Moreover, the Debtors intend to seek waivers of claims against the entrenched board members and former senior management whose interests in obtaining such releases are

---

[3] On January 23, 2006, the Court determined to first resolve whether on the facts currently before it and applicable law, the Equity Committee should be reinstated.  The Court determined further that, only if necessary, would it later consider the facts related to whether, and to what extent, the U.S. Trustee abused its discretion in the manner in which it disbanded the Equity Committee.  Consistent with the Court's instruction, on January 27, 2006 counsel for the Equity Committee submitted to all interested parties a proposed discovery schedule should for some reason the Court reject the arguments addressed by the Equity Committee.

obviously in direct conflict with that of all equity holders.  As a result, the common public

shareholder remains completely unrepresented.  Worse, only parties now openly hostile to the

interests of the public shareholders will remain in these cases absent an order setting aside the

Notice of Disbandment or appointing an official equity committee nunc pro tunc to January 11,

2006.

## II.  Facts Requiring Not Only A Thorough and Independent Investigation But Also the Continued Vigilance of This Equity Committee

3.      Only after the Equity Committee requested an independent investigation of actions

taken under the direction of the entrenched and dominated board of directors of Winn-Dixie Stores,

Inc. ("Winn-Dixie") did the Debtors surreptitiously withdraw their support for the appointment of

the Equity Committee.  Indeed, until the filing of the Notice of Disbandment, the Debtors made no

filings with this Court withdrawing, or indicating their intent to withdraw, their support of the

Equity Committee.  See Debtors' Motion for Summary Judgment, Exh. 16.[4]

4.      The Debtors and the Creditors Committee seek to artificially limit the scope of the

independent investigation demanded by the Equity Committee and now expected by the investing

public.  A truncated investigation lacking input from the Equity Committee which precipitated it

will not uncover claims that will increase the assets of the estate.  See Response to Motion of the

Equity Committee for the Appointment of an Examiner, Exh. 36.  As discussed below in greater

detail, the investigation requested by the Equity Committee is merely illustrative of the benefits to

be brought to the entire estate by the Equity Committee.  The Equity Committee is not arguing that

this Court cannot, without the Equity Committee, ensure independence and completeness.  The fact

---

[4] Exhibit references are to the documents identified in the Official Committee of Equity Security Holders' Request for Judicial Notice of Certain Pleadings and Related Documents Filed with the Court in Connection with the (I) Objection and Motion to Set Aside the United States Trustee's Notice of Disbandment of Equity Security Holders Committee and (II) Motion for Appointment of Equity Security Holders Committee Nunc Pro Tunc to January 11, 2006 filed on January 27, 2006.

that the Debtors reversed course on its support for the Equity Committee only after the need for an investigation was raised, is illustrative of the unique conflict-ridden situation within the estate and that there is a need for the Equity Committee to adequately represent all shareholders.

5.      The Equity Committee's insistence on a full and truly independent investigation emanated from severely troubling events.  Matters requiring full and independent review include:

(a)  The 1999 purchase of illegal insurance from a related party.  In 1999, three (3) directors of Winn-Dixie Stores, Inc. with direct ties to the dominant control shareholder also served as directors of American Heritage Life Investment Corporation, the parent company of American Heritage Life Insurance Company ("American Heritage"), an insurance company from which Winn-Dixie purchased coverage.  Winn-Dixie disclosed payments of tens of millions to American Heritage to support the company owned life insurance policies.  However, none of Winn-Dixie's filings disclosed that the control shareholder owned nearly 40% of American Heritage.  In 2003, the Internal Revenue Service found Winn-Dixie's tax treatment of those policies to be illegal and demanded $52 million in settlement payments.  The Debtors and its entire board have initiated no investigation into whether these illegal acts may lead to an expansion of the estate.  See Winn-Dixie 10-K, Exh. 57.

(b)  Winn-Dixie's Form 10-K and Proxy Statement contain material omissions and fail to provide shareholders with sufficient information regarding Winn-Dixie, particularly, Winn-Dixie's failure to conduct an investigation into any of the litigation identified in the Form 10-K or into the recommendations for re-election of directors and ratification of KPMG's appointment made in the Proxy Statement.  See Winn-Dixie 10- K and Proxy Statement, Exhs. 57 and 58, respectively.

(c)  Winn-Dixie issued approximately $400 million in dividends from 2000 through 2004 and filed for bankruptcy just eight (8) months after payment of the final installment.  See Winn-Dixie 10-K, Exh. 57.

6.      There may be significant claims against Winn-Dixie's directors, officers, senior management and third party professionals for actions, or inactions, causing or contributing to the bankruptcy filings.  These claims have not been investigated.  Absent an equity committee willing to preserve and pursue such claims, it is likely that any proposed plan of reorganization will seek to release these claims to the detriment of the entire bankruptcy estate.  See Motion to Appoint an Examiner, Exh. 31.  This is particularly disturbing in light of the Debtors' extensive D&O insurance coverage.[5]

7.      The Debtors and the Creditors Committee have presumed that there is no return to equity without analyzing whether the value of the estates' assets at exit may provide a return to equity and without allowing the duly appointed Equity Committee to participate in the process.  See December 15 Transcript, Exh. 44.[6]

8.      In sum, the facts already in the record provide strong support for the continued existence of an official committee of equity holders.  In particular, absent the continued participation of an official equity committee, it is clear that no other party is willing or able to represent the interest of equity holders or to seek to fully recover the value of the Debtors' estates for the benefit of all creditors and equity holders by, among other things, preserving and pursuing claims against Winn-Dixie's pre-petition directors, officers, senior management and third party professionals.  In fact, given the Debtors' D&O insurance coverage, there are substantial assets that can be utilized to increase the estates' assets and potentially provide a meaningful return to equity.  Any further delay in determining the appointment of an official equity committee minimizes the

---

[5] See Debtors' Second Amendment to Schedules of Assets and Liabilities and Schedule of Executory Contracts and Unexpired Leases filed on November 3, 2005.  The amended schedules identified approximately twenty-five (25) D&O insurance policies in addition to the Debtors' excess liability and general liability policies.

[6] Moreover, there is no valuation evidence before this Court and to require a full valuation out of the context of the Debtors' proposed plan is highly irregular under applicable case law.

ability of an appointed committee to preserve and enhance the value of the Debtors' estates and meaningfully participate in plan negotiations.  Accordingly, an equity committee should be appointed nunc pro tunc to January 11, 2006.[7]

### III.  Argument

**A.**    **The Notice of Disbandment Violates the Abatement Order**

9.    The issuance of the Notice of Disbandment without further motion to this Court is a violation of the Abatement Order and the due process rights of approximately 36,000 shareholders of Winn-Dixie.  The Motion to Abate, which was filed at the U.S. Trustee's request, expressly stated:

> the Committee seeks an abatement of all proceedings on the Disbandment Motion, including all discovery and motions thereto, and an adjournment of the evidentiary hearing scheduled on the Disbandment Motion for November 16, 2005, without prejudice, **with the Disbandment Motion and all related discovery and pending discovery motions to be placed back upon the Court's calendar upon subsequent motion to and order of the Court.**

Motion to Abate, ¶ 8 (emphasis added).

10.    The Abatement Order, a consent order between the parties, expressly provides:

> All deadlines for discovery and pleadings set forth in the Consent Order Regarding Scheduling and Discovery Issues Related to Motion of Official Committee of Unsecured Creditors Seeking Disbandment of Equity Committee (the "Consent Order") (Docket No. 3509) are suspended **without prejudice to and preserving all rights, both procedural and substantive, of all interested parties.**

---

[7] The Equity Committee is not requesting that the Court usurp the U.S. Trustee's statutory power to appoint members of a committee.  However, the Equity Committee believes that the members currently serving, and the professionals retained, should be reappointed to avoid any further delay or expense.  To appoint entirely new members would be an illogical waste of the estates' assets and would only serve to delay the plan confirmation process further.  Such an illogical course would also confirm the current Equity Committee's concerns that the parties want to kill off this particular equity committee because of its independent posture and vigilance in seeking expansion of the assets of the estates and preventing potentially collusive actions between the entrenched and dominated board of directors and the entirely-in-the-money unsecured creditors.

Abatement Order, ¶ 2 (emphasis added).  As a result, the Equity Committee was unable to conduct any discovery to prepare its objection to the Disbandment Motion much less respond to the sealed review conducted by the U.S. Trustee.

11.      As set forth in the Equity Committee's Motion, the U.S. Trustee admitted that its review was "proceeding in the context of the abated motion."  The U.S. Trustee cannot, after requesting abatement and consenting to the Abatement Order, renege on the agreed upon procedure and issue a unilateral Notice of Disbandment.  The Disbandment Motion and the U.S. Trustee's review in connection that motion is clearly before this Court as a result of the Disbandment Motion and the express terms of the Abatement Order.  To allow the U.S. Trustee to disband the Equity Committee by fiat is a direct violation of the Abatement Order and a violation of all notions of due process.

**B.      Separate and Apart from the Trustee's Violation of the Abatement Order, the Court Should, Under 1102(a)(2), Appoint an Official Equity Committee Nunc Pro Tunc to January 11, 2006**

12.      Under Section 1102(a)(2) of the Bankruptcy Code, bankruptcy courts "may order appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders."[8]  Courts have adopted a three-pronged standard to determine the need for an equity committee.  In re Johns-Manville Corp.,

---

[8] The Objecting Parties assert that the appointment of an equity committee should be the "rare exception," citing In re Williams Communications Group, 281 B.R. 216 (Bankr. S.D.N.Y. 2002).  However, the appointment of equity committees is not rare in large public company bankruptcy cases such as those now before this Court.  See, e.g., In re Trump Hotel and Casino (Case No. 04-46898, D. N.J.); Bush Industries (Case No. 04-12295, W.D. N.Y.); Impath (Case No. 03-16113, S.D. N.Y.); Solutia (Case No. 03-17949, S.D. N.Y.); Peregrine Systems, Inc. (Case No. 02-12740, D. Del.); Stone & Webster, Inc. (Case No. 00-2142, D. Del.); W.R. Grace (Case No. 01-01139, D. Del.); Footstar (Case No. 04-22350, S.D. N.Y.); Cone Mills (Case No. 03-12943, D. Del.); Gadzooks (Case No. 04-31806, N.D. Tex.); Federal Mogul Corporation (Case No. 01-10578, D. Del.); Seitel (Case No. 03-12237, D. Del.); Exide Technologies (Case No. 02-11125, D. Del.); Imperial Distributing (Case No. 01-00141, D. Del.); Adelphia Communications Corporation (Case No. 02-41729, S.D. N.Y.); Finova Corporation (Case No. 01-00697, D. Del.); Heilig-Meyers (Case No. 00-34533, E.D. Va.); Coram Healthcare Corp. (Case No. 00-03299, D. Del.); Pathmark Stores, Inc. (Case No. 02-2963, D. Del.); American Banknote (Case No. 00-11577, S.D. N.Y.); Kmart Corporation (Case No. 02-02474, N.D. Ill.); Comdisco (Case No. 00-24795, N.D. Ill.); LTV Steel (Case No. 00-43866, N.D. Ohio); Amresco, Inc. (Case No. 01-35327, N.D. Texas).

68 B.R. 155, 159 (S.D.N.Y. 1986); In re Edison Bros. Stores, Inc., 1996 U.S. Dist. LEXIS 13768

(D.Del. Sept. 17, 1996).  The Edison Brothers court held:

> courts have considered (1) the number of shareholders, (2) the complexity of the case, and (3) whether the cost of the additional committee outweighs the concern for adequate representation.  In re Wang Laboratories, Inc., 149 B.R. 1 (Bankr. D. Mass. 1992) (citing tripartite test of In re Johns-Manville Corp., 68 B.R. 155 (S.D.N.Y. 1986)).

See id. at 11.  As set forth in the Equity Committee's Motion, each prong of the test is easily

satisfied in these cases.

13.    As to the final factor, courts have held that "there is no statutory test for adequacy of

representation, it must be determined by the facts of the case."  In re Edison Bros. Stores, Inc., 1996

U.S. Dist. LEXIS 13768, *11 (D.Del. Sept. 17, 1996).  In making this determination bankruptcy

courts have considered the following factors: (i) the number of shareholders; (ii) the size and

complexity of the case; (iii) delay and additional cost that would result if the court grants the

motion; (iv) the likelihood of whether the debtors are insolvent; (v) the timing of the motion relative

to the status of the Chapter 11 case; and (vi) other factors relevant to the adequate representation

issue.  See In re Wang Laboratories, Inc., 149 B.R. 1 (Bankr. D. Mass. 1992).  Contrary to the

assertions of the other parties, no single factor is dispositive and the amount of weight given to each

factor should be governed by the circumstances of the case.  In re Kalvar Microfilm, Inc., 195 B.R.

599 (Bankr. D. Del. 1996).

**(i)    The Stock is Widely Held and the Debtors' Cases are Complex**

14.    The Debtors have admitted that the first two factors are satisfied.  In the Debtors'

Motion for Summary Judgment the Debtors' expressly stated:

███████████████████████████████████████████████████████████

Debtors' Motion for Summary Judgment, ¶26.  The Debtors also state:



Debtors' Motion for Summary Judgment, ¶32.

**(ii)    Appointing an Equity Committee Will Not Delay or Add Significant Costs to These Cases**

15.    Appointing an equity committee will not delay or add significant costs to these cases assuming the cooperation of the Debtors and the Creditors Committee which has been largely absent thus far – to the detriment of the Equity Committee and these bankruptcy estates – is forthcoming.  As this Equity Committee was already duly appointed and has been fully and properly functioning since August 2005, including the retention of professionals, there would be no delay in the Court's re-appointing an equity committee.  While the U.S. Trustee is authorized to appoint members to committees, in this case, it would be impractical to conduct a search for all new members at this time.  Any such action would only serve to delay the Debtors' proceedings further and significantly increase the costs to the Debtors' estates at a critical time in the Debtors' proceedings.  Moreover, the current members and retained professionals are familiar with these cases and have actively participated since the appointment of the Equity Committee on August 17, 2005.  If any entity is focused on the best interests of these estates, it is the Equity Committee.  The Equity Committee has no conflicts and under the absolute priority rule must help achieve return to all creditors before achieving a return for its constituency.

16.    The Objecting Parties assert that the estates, where a debtor is hopelessly insolvent, should not bear the burden of an official committee but any such costs should be "shouldered

directly by the equity committee."[9]   However, as set forth below, there is no evidence before this

Court that establishes that the Debtors are hopelessly insolvent.   The evidence does establish that

the Debtors are in significantly better financial and operational condition than when the Debtors

filed the Debtors' Motion for Summary Judgment.   Moreover, in light of the Debtors asserted

progress toward plan negotiation and confirmation and their most recent motion seeking approval of

a $2,000,000 incentive payment for their CEO, the Debtors by their own actions have unequivocally

stated they are far from being hopelessly insolvent.[10]   In fact, these Debtors have repeatedly advised

this Court, and the press, they intend to exit by June 2006.

**(iii)    The Debtors Are Not Hopelessly Insolvent**

17.     The U.S. Trustee rejected the SEC's view that valuation of companies varies wildly

and that the Equity Committee should be left in place.   Indeed, the SEC wrote as follows:



---

[9] The Creditors Committee also argues that the counsel for the Equity Committee had billed the estate in excess of $1.1 million in fees and expenses.  They are wrong.  Through December 31, 2005, counsel for the Equity Committee has submitted $840,626.20 in fees and expenses.  In reviewing the invoices a significant portion of those fees and expenses relate directly to disputing the Creditors Committee's Disbandment Motion.  Moreover, to date, despite being a duly appointed Equity Committee, the Debtors have failed to pay a single dime to the Equity Committee's professionals. This is a clear violation of the Final Order Approving Interim Compensation Procedures for Professionals [Docket No. 434] and has forced counsel for the Equity Committee to file a motion compelling the Debtors to comply with the order.

[10] As recently as Janaury 8, 2006, the Debtors' CEO, Peter Lynch, "touted improvements he has made since arriving in December 2004, ranging from cutting costs to better tailoring each store's goods to match neighborhood tastes.  He believes the turnaround is under way and predicts Winn-Dixie can emerge from bankruptcy in June."  Winn-Dixie Slims Down, Scrubs Up, dated January 8, 2006, http://www.ajc.com/sunday/content/epaper/editions/sunday/business_340caa8cd20c71450012.html.

SEC Letter, Exhibit B, Exh. 40.[11]

18.     The Debtors and the Creditors Committee claim that the Debtors are hopelessly insolvent.  They are wrong.  In a situation closely analogous to the cases now before this Court, the court in Wang Laboratories held "the debtor remains in operation at present, albeit at a loss, and is not *hopelessly* insolvent, which is the *Emons* test."  In re Wang Laboratories, Inc., 149 B.R. 1, 3.  Courts have considered a variety of factors in determining whether a debtor appears to be hopelessly insolvent, including, among other things, the debtor's balance sheet, bond trading, proposed cash distributions under a plan, and due diligence with respect to the debtor's reorganization value.  See In re Williams Communications Group, Inc., 281 B.R. 216, 220-21.  It is premature to assume that the Debtors' are hopelessly insolvent or that there will be no return to equity, particularly in light of the Debtors' own statement that a recovery is well underway which forms the basis of a $2 million bonus to the Debtors' CEO.[12]  As a result of the Abatement Order, there has been no discovery and there is no evidence before this Court that these Debtors are hopelessly insolvent.  The fact that the Debtors' untested book value reflects negative equity is far from dispositive in light of (i) the Debtors' moving forward with a plan of reorganization; (ii) the Debtors' projections and valuation, (iii) the lack of diligence on the nature of all claims against the Debtors and all available assets of the Debtors; and (iv) a full and fair investigation of claims of the Debtors' estates against former directors, officers and professionals is at best unknown and clearly

---

[11] See also In re White Motor Credit Corp., 27 B.R. 554, 558 (N.D. Ohio 1982) ("the issue of White Motor's insolvency was irrelevant in light of the fact that an equity security holders' committee is specifically authorized by § 1102(a)(2) and inasmuch as the interests of the security holders cannot be determined until a reorganization plan is formulated").

[12] Indeed, the Debtors cite to In re Northwestern Corp., 2004 WL 1077913 (Bankr. D. Del. May 13, 2004) and In re Leap Wireless Int'l, Inc., 295 B.R. 135 (Bankr. S.D. Cal. 2003) for the proposition that a proponent bears the burden of establishing that equity will receive a meaningful distribution.  However, in both the cases, negotiated plans and disclosure statements establishing no recovery for equity were already on file.  Moreover, in NorthWestern, the company's public filings consistently stated that there was no value left for equity and significant due diligence had already occurred.  In this case, there is no proposed plan of reorganization and no due diligence has been conducted to determine the value of the Debtors' estates at exit.  As the Debtors are currently negotiating a plan of reorganization, this is precisely the period when an equity committee is most needed to protect the interests of equity holders.

untested by any party to these proceedings.  In any event, the Debtors' enterprise valuation is a

complete unknown at this point.

19.     Moreover, in this case, the Debtors are just now realizing the positive impact of their

restructuring efforts.  In statements before this Court and in the press, the Debtors have reported

significant improvements in their finances and operations.  At the December 15, 2005 hearing,

Holly Etlin, one of the Debtors' financial advisors, testified:

> For the first time in several years the company is positive.  The sales are
> positive.
>
> As I testified, I think the last time I was in court, we were talking about
> our plans with regard to the corporate overhead.  The company has
> completed – it's substantially completed its process to reduce its corporate
> overhead by approximately 37 percent or $100 million annually.

Transcript of December 15, 2005 Hearing Before the Honorable Jerry A. Funk (the "December 15

Transcript"), p. 56.  Ms. Etlin goes on to report that only sixty (60) days into the claim

reconciliation process the Debtors have been able to reduce the initial claims register that was $21

billion in claims to approximately $1.1 to $1.2 billion in claims.  See December 15 Transcript, p.

59.

20.     Moreover, the Debtors recently filed their Motion for Order Authorizing Payment of

CEO Retention Incentive (the "Incentive Motion") seeking this Court's approval of an incentive

payment of $2,000,000 to Peter L. Lynch, the Debtors' President and Chief Executive Officer.  In

the Incentive Motion, the Debtors exalt the progress made in these cases to justify the incentive

payment, stating:

> Among other things, Lynch's leadership has been pivotal to: (a) the
> development and implementation of the Debtors' footprint reduction
> program (the "Footprint Program"), which will provide the Debtors with
> an optimal foundation for the growth of their businesses; (b) the sale or
> closure of more than 300 stores as part of the Footprint Program, including
> the sale of 81 stores yielding gross proceeds exceeding $40 million
> (exclusive of consideration paid for inventory) and the liquidation of 245
> stores producing net proceeds of approximately $136 million (including

inventory); (c) the implementation of various operational initiatives, including (i) a sustainable strategic sourcing program, (ii) a significant reduction of corporate overhead costs, (iii) the reorganization of the Debtors' "field team" by reducing the number of district managers from 96 to 30, (iv) the establishment of several merchandising and marketing programs designed to improve product offerings, (v) the rolling out of customer service initiatives, and (vi) the realignment of the overhead structure to reflect the new footprint; (d) the development of a reclamation and trade vendor lien program; and (e) the development of a business plan that provides the road map by which the Debtors intend to operate their businesses during the next several years and that will eventually serve as the platform for the development and negotiation of a plan of reorganization.

Incentive Motion, ¶ 9.

21.     At this point in the Debtors' proceedings, there is nothing in the record to establish what the enterprise value of the Debtors' assets will be at exit.  Nor have the Debtors been particularly forthcoming.  As a result, a decision not to appoint an equity committee will irreparably and finally harm all 36,000 equity holders in this case with the exception of a handful of insiders poised to certain members of the Davis Family and other insiders who are using the Debtors' negotiation of a plan of reorganization to obtain releases and whose interests are in direct conflict with all other equity holders.  It truly defies logic that the Debtors who (i) are reporting positive sales and significant improvements in finances and operations; (ii) filed a motion for approval of a $2,000,000 incentive payment for their CEO; and (iii) intend to file a plan of reorganization on or before March 20, 2006 are here before this Court claiming that they are hopelessly insolvent.

22.     Lastly and most importantly, until the Equity Committee insisted on an independent investigation subject to bankruptcy court supervision, the Debtors were telling this Court and the investing public that it is premature to determine the value of the Debtors' estates.  In the Debtors' Motion for Summary Judgment, the Debtors assert that a hearing on solvency would be inappropriate

███████████████████████████████████████████████████

Debtors' Motion for Summary Judgment, ¶38.  The Debtors, for whatever reason, have now reversed direction - their apparent goal to prevent the participation of an independent, conflict free equity committee in these cases.  By their own admission, the Debtors' position has significantly improved since the Disbandment Motion was filed.  The only thing that has changed is the Debtors' strong aversion to an independent equity committee likely to continue pressing for maximization of the estates' assets, pursue claims against insiders and reject the proposed plan releases for these individuals.

23.     For purposes of zeroing-out those who seek a forensic investigation, and in private discussions with U.S. Trustee, the Debtors rely on frozen and unpromising financial projections.  However, for purposes of seeking the most recent extension of exclusivity and awarding the Chief Executive Officer a $2 million bonus, the Debtor focuses this Court on Winn-Dixie's recent and substantial improvements in financial performance and on its bright future prospects.  The Equity Committee, too, asks that this Court focus on the future and on the significant prospects that there will be significant value for equity.

### (iv)     **An Equity Committee Is Necessary to Adequately Protect Equity Interests**

24.     The Objecting Parties absurdly argue that DDI and Brandes can adequately represent the interests of shareholders.  Choosing to ignore the clear conflicts of DDI, it is illogical to suggest that a former appointed member of the Equity Committee should take on the financial cost and liability of representing approximately 36,000 shareholders.  This argument is the functional equivalent of claiming that Capital Research & Management Company should assume representation of all creditors because the Creditors Committee's counsel, having spent in excess of $10 million, has become too expensive.  Lastly, courts have refused to impose this kind of

responsibility on any one holder where securities are widely held – such as is the case here.  In re

Beker Industries Corp., 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985) ("the position that some members

of the class may have resources sufficient to protect their interests is of little significance, in our

judgment, at least where the security is widely held.  They do not have the fiduciary duty to

represent their fellow security holders").

   25. As to DDI, as set forth in Paragraph 40 of the Debtors' Response, three (3) of Winn-

Dixie's board members, including the Chairman of the Board, have direct ties to DDI, the Debtors'

largest shareholder.  The Objecting Parties choose to ignore that DDI is controlled by the founders

and that these are the very same board members which are subject to full and truly independent

investigation. This is particularly important where it is clear that the Debtors intend to seek releases

without conducting a full investigation of the facts.  As the U.S. Trustee acknowledged when it did

not appoint DDI to the Equity Committee appointed on August 17, 2005, DDI simply cannot

adequately represent the interests of all equity holders.

   26. The Debtors further argue that with the presence of three (3) DDI directors on the

board of directors "the Debtors can be counted upon to ensure that shareholders receive the value

that they are entitled, if any, under a plan of reorganization."  This same group oversaw Winn-Dixie

on its way into bankruptcy, failed to make adequate public disclosures of the Debtors' financial

conditions, sold to the Debtors illegal insurance contracts, and has resisted any investigation of

themselves.  Moreover, the Debtors' board of directors owe fiduciary duties to parties other than the

shareholders, and as a result cannot represent the shareholders from a fiduciary standpoint.  See

CFTC v. Weintraub, 471 U.S. 343, 355 (1985). [13]  Indeed, in this case, the Debtors have conducted

---

[13] See Debtors' Motion for Summary Judgment, ¶30. ████████████████

████████████████████████████████████████████████████

no analysis of whether there may be value for equity at exit and to not appoint an equity committee would be to prematurely deny equity holders a seat at the table, a seat that equity holders had until just over two (2) weeks ago. [14]

27.    The Objecting Parties also assert that the Creditors Committee could somehow adequately represent equity interests.  This suggestion is patently devoid of credibility or logic, or both.  Hostile to the formation of the Equity Committee from the beginning, this Creditors Committee has laid a clear record that is not working for the interests of shareholders – it wants all the value for its constituency and certainly does not want to establish a value for the Debtors beyond recovery of 100% of the Debtors for themselves.  Aside from the fact that there is no evidence of any effort on the part of the Creditors Committee to take any steps to maximize the return to equity, including fully and fairly determining the enterprise value of the Debtors' estates, the Creditors Committee were unable able to wait even a week before initiating its Disbandment Motion.  Lastly, this Creditors Committee is a house divided, conflicts between representing unsecured creditors and bondholders are looming as the Debtors consider substantive consolidation.  Even if this Creditors Committee were receptive to taking steps to represent the shareholders, it is too entrenched to do so credibly or adequately.

28.    As set forth in the Equity Committee's Motion and this reply, the facts in this case establish that no party currently participating can adequately represent the interests of the equity holders because of conflicts of interest and statements of self-interest already on the record.  To deny equity holders an independent voice at this critical juncture in the Debtors' proceedings is to deny meaningful participation.  Accordingly, the Equity Committee requests that the Court appoint an official equity committee nunc pro tunc to January 11, 2006.

---

[14] In fact in the Leap Wireless case, the Court relied on the analysis of Chanin Capital Partners, the financial advisors to the bondholders, in determining the value of the debtor's estate.  In re Leap Wireless Int'l, Inc., 295 B.R. 135, 138 (Bankr. S.D. Cal. 2003).  There has been no such analysis in these cases.

**C.      The Equity Committee Has Standing to Pursue the Equity Committee's Motion**

29.      Despite allegations to the contrary, the Equity Committee has standing for the limited purpose of contesting its unilateral disbandment where such actions were taken in violation of the Abatement Order and without full notice and opportunity to be heard before this Court.  See In re Parks Jaggers Aero. Co., 129 B.R. 265, 268 (holding that despite provisions in a plan of reorganization dissolving a committee "[a] creditors' committee does not automatically dissolve at the time a chapter 11 reorganization plan is confirmed.  Justifiable reasons may exist for it to continue to monitor the debtor's actions"); In re Wedgestone Financial, 152 B.R. 786 (Bankr. D. Mass. 1993) (the court held that the equity committee was a "party in interest" for purposes of commencing an adversary proceeding despite the dissolution of the committee under the confirmed plan of reorganization).  As a "party in interest" in these cases, the Equity Committee was directly and adversely affected by the U.S. Trustee's unilateral disbandment in contravention of the express provisions of the Abatement Order.  Accordingly, the Equity Committee has standing to pursue an appeal of the U.S. Trustee's decision to disband the Equity Committee as a "person aggrieved."  See In re Westwood Community Two Assoc., Inc., 293 F.3d 1332, 1338 (11th Cir. 2002) ("a person may appeal a bankruptcy court's order as a person aggrieved when that order directly, adversely, and pecuniarily affects the person.  An order will directly, adversely, and pecuniarily affect a person if that order diminishes their property, increases their burdens, or impairs their rights").  This Equity Committee and the constituency represented are "aggrieved."

30.      The Objecting Parties reliance on the Carlucci case is disingenuous in the same way that the Debtors' suggestion that an investigation be undertaken pursuant to the Florida corporate code section on derivative actions was.  Neither the Carlucci case nor the Florida corporate code provision has anything to do with a bankruptcy proceeding.  Indeed, in the Carlucci case the question before the Court was whether the Secretary of Defense had authority to terminate the

employment of a National Security Agency employee.  <u>Carlucci v. Doe</u>, 488 U.S. 93 (1988).  In

<u>Carlucci</u>, the court held that the power to appoint included the power to terminate where an

employee was terminated for cause for engaging in sexual relationships with foreign nationals.

<u>Carlucci v. Doe</u>, 488 U.S. 93 (1988).  No such extreme circumstances exist in these cases.

31.     In this case where a duly appointed Equity Committee has been unilaterally

disbanded without adequate notice or opportunity to be heard before this Court, the denial of

standing serves only to compound the serious injury to more than 36,000 equity holders who have

relied on the Equity Committee since August 17, 2005 to protect their interests in these bankruptcy

cases.  Any argument by the U.S. Trustee, the Debtors or the Creditors Committee to the contrary

only emphasizes the necessity of an equity committee to protect the shareholders' interests.

**D.     An Equity Committee is in the Best Interests of the Estates**

32.     An official equity committee is in the best interests of the bankruptcy estates because

no party to the cases other than the Equity Committee have actively worked since the Debtors'

bankruptcy filings in February 2005 towards maximizing the value for the estates.  Despite the

substantial resources of both the Debtors and the Creditors Committee, neither pursued any

investigation into whether claims may exist against the Debtors' pre-petition directors, officers, and

third party professionals.  While the Debtors acknowledge that an investigation is necessary prior to

confirmation, they continue to delay initiating any independent investigation into the actions of their

pre-petition directors, officers, and third party professionals.  The only result of the Debtors' delay

is an abbreviated investigation and the release of significant claims against the Debtors' pre-petition

directors, officers, and third party professionals without a full and fair investigation.  Absent an

independent equity committee, the foxes will truly control the hen house and its entire production,

reaping all the benefit of the enterprise valuation.

33.    Moreover, despite both the Debtors and Creditors Committee pushing for an exit from bankruptcy by June 2006, neither party has disclosed to this Court or the Equity Committee any due diligence into the enterprise value of the Debtors' estates.[15]  Without subjecting their self-serving conclusions to review, the Debtors and Creditors Committee have prematurely asserted that there is no value for equity and have made no attempts to determine whether the value of the Debtors' assets are being maximized.  As stated by the SEC, this is tantamount to the Creditors Committee presenting a premature cramdown plan effectively eliminating the equity holders.  It is for precisely this reason that an equity committee is necessary and in the best interest of the estates.

34.    The Objecting Parties would have this Court believe that the Equity Committee is no longer necessary in this proceeding because other parties-in-interest can manage the independent investigation and the Equity Committee can add no further value to the proceeding.  None of the Objecting Parties are in a position to oversee on behalf of the equity holders the independent investigation.  The actual appropriate party to oversee the independent investigation is this Court which is exactly the reason why the Equity Committee made a motion for an independent examiner. But most critical to the existence of the Equity Committee is that the rationale for its existence is not based on overseeing the independent investigation but rather what to do with the results of the investigation and additional future due diligence relating to establishing the true value of the estates.

35.    The attempt by the Objecting Parties to tie the existence of the Equity Committee to the oversight of the independent examination is a play to divert this Court's attention away from the true value to the Debtors' estate and fairness to the 36,000 public shareholders in maintaining the Equity Committee.  This proceeding easily satisfies all established tests to appoint and maintain an

---

[15] As noted above, discovery was stayed pursuant to the Abatement Order.

Equity Committee.  There is no evidence to show that the Debtors are hopelessly insolvent and it is premature to make that determination.

36.    Other than the work that current senior management has undertaken to turn the Debtors' business around, the only party to begin to address the fundamental valuation issues is the Equity Committee by moving for an independent investigation.  This case is nearly one year old and no other party has pursued any action to help establish the full and fair value of the Debtors' estates.  By participating in these proceedings, the Equity Committee has proven its value to the Debtors' estates.

37.    As the Debtors' plan of reorganization moves forward, the Equity Committee is critical to further establish the true value of the Debtors' estates by undertaking due diligence with respect to all claims, all available assets and the future expected value of the Debtors as established in the Debtors' plan of reorganization.  This Court can oversee the independent investigation – something the Equity Committee petitioned for and is being resisted by the Objecting Parties; however, this Court cannot on behalf of 36,000 common shareholders determine what actions to take based on the results of the independent investigation, the due diligence into the Debtors' plan of reorganization or any other issues that arise as part of the Debtors' bankruptcy proceeding that could materially affect the recovery of the creditors and the equity.

38.    An example of the critical role that the Equity Committee still has to play in the Debtors' plan of reorganization is to negotiate with the Debtors and the Creditors Committee the return to equity under a plan of reorganization.  This can only be done once all material facts as to the value of the Debtors' estates are known.  The Objecting Parties would have this Court believe that this information is presently known and that there is no possible return to equity.  This Court knows full well there are two components to the established value of equity in any company, the current established value and the expected value.  The current value is the value of a company based

on its then current operating results.  However, companies are not valued solely on their current operating results but also based on their expected performance.  This enterprise value based on the future expectations of performance of a company is a critical component of the value of the Debtors being distributed pursuant to the plan of reorganization.  The stock market can refer to a company's enterprise value as a merger and acquisition premium in trading at a price to earnings multiple relating to next year's earnings.  Once practical aspect of this economic reality is that a company growing earnings at 50% a year is worth more than a company growing earnings at 30% a year where the current earnings are the same.  In fact, this is why so-called price-to-earnings ratios are different for each company because price-to-earnings ratios inherently reflect the future value of the company not the current value.

39.     In this proceeding, the equity must first make sure the creditors can have a full recovery before the equity can receive any distribution.  There are many ways in which the equity can receive a distribution from an initial distribution of equity in the reorganized debtors or assigning that value to the creditors and reserving to equity the enterprise value of the debtors.  The recently announced sale of Albertsons demonstrates that there is enterprise value to the Debtors' equity and that all or some of that value may belong to the current equity holders.  The fact that the common stock trades around $0.70 a share indicates Wall Street does not attribute zero value to the equity but instead understands that there is still enterprise value left in the common stock.  A standard way that enterprise value is captured in a plan of reorganization is through the issuance of warrants.

40.     The Debtors' bankruptcy proceedings are far from over.  The Equity Committee has shown that it can add significant value to the Debtors' estates and there are significantly more critical areas where the Equity Committee has a critical role to play in maximizing, on behalf of 36,000 common shareholders, the value of the Debtors' estates.

## IV.  Conclusion

41.    An official equity committee is necessary and in the best interests of these estates because of the unfortunate record of conflicts of interest internal to the Debtors and Creditors Committee and the fact that the Equity Committee is the only party in these cases who has taken concrete steps to increase the value of the Debtors' estates.  An official equity committee is necessary to ensure meaningful representation of the approximately 36,000 shareholders whose rights are being ignored because of the Debtors' and Creditors Committee's agreed upon, but premature, conclusion that there should be no return to equity.  This Court cannot permit the unilateral action of the U.S. Trustee to deprive the equity holders of representation without a full hearing.  Nor can this Court ignore the Debtors' full reversal of position in connection with its earlier support for an equity committee.  Indeed, by the Debtors' own admission, its performance and financial condition are greatly improved and continuing to improve, a fact that should bode well for equity holders.  Disturbing as it is, the sole explanation for the Debtors' change of tone is the Equity Committee's insistence on an independent investigation by a Court-appointed examiner, pursuant to the Bankruptcy Code.  It is the Debtors' lack of independence and relationships with DDI and the Davis Family that weigh most heavily in favor of the continued representation of the equity by an official committee.

42.    Accordingly, the Equity Committee requests that the Court enter an order (i) setting aside the Notice of Disbandment; (ii) appointing an equity committee nunc pro tunc to January 11, 2006; and (iii) granting such other and further relief as the Court deems just and appropriate.

Respectfully submitted this 29th day of January, 2006.

JENNIS & BOWEN, P.L.

/s/David Jennis
David Jennis
Fla. Bar No. 775940
Chad S. Bowen
Fla. Bar No. 0138290
400 North Ashley Drive, Suite 2540
Tampa, FL 33602
Telephone: (813) 229-1700
djennis@jennisbowen.com
cbowen@jennisbowen.com

And

PAUL, HASTINGS, JANOFSKY & WALKER LLP
Karol K. Denniston
Ga. Bar No. 218333
Carolyn (Keri) Chayavadhanangkur
Ga. Bar No. 122152
600 Peachtree Street, Suite 2400
Atlanta, GA 30308
Telephone: (404) 815-2400
karolkdenniston@paulhastings.com
carolynchayavadhanangkur@paulhastings.com

And

PAUL, HASTINGS, JANOFSKY & WALKER LLP
James D. Wareham
DC Bar No. 411799
875 15th Street
Washington, DC  20005
Telephone: (202) 551-1700
jameswareham@paulhastings.com

*Co-Counsel for the Official Committee of Equity Holders*