**Hearing Date: March 9, 2006**
**Objection Deadline:**
**March 1, 2006 at 4:00 p.m. (E.T.)**

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors.[1] | ) | Jointly Administered |

## MOTION FOR AN ORDER (A) AUTHORIZING THE DEBTORS TO SELL THE JACKSON PROPERTY AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS, AND (B) GRANTING RELATED RELIEF

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), move the Court for entry of an order pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004(g): (a) authorizing Winn-Dixie Montgomery, Inc., a Florida corporation, ("WD Montgomery") to sell its closed fuel center (Number 1382) and underlying tract of land located in Jackson, Mississippi, as more particularly described on Exhibit A attached to this Motion (collectively, the "Jackson Property"), together with related personal property and all related appurtenances, rights, easements, rights-of-way, tenements and hereditaments to Eckstein Properties, LLC (the "Purchaser"), or to a party submitting a higher or better offer, free and clear of

---

[1]  In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc.,

liens, claims and interests and (b) granting related relief.  In support of the Motion, the Debtors respectfully state as follows:

## Background

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered for procedural purposes only.

2.      The Debtors operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No request has been made for the appointment of a trustee or examiner.  On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases pursuant to Bankruptcy Code sections 1102 and 1103.

3.      The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  As of the Petition Date, the Debtors were considered the eighth-largest food retailer in the United States and one of the largest in the Southeast with more than 900 stores.

---

Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

4.      The Debtors have engaged in a footprint reduction resulting in the sale or closure of 326 stores and related facilities.

5.      Prior to the Petition Date, the Debtors operated the Jackson Property as a fuel center adjacent to a Winn-Dixie grocery store (Store No. 1350) (the "Jackson Store"). As part of the Debtors' footprint reduction, the Debtors have rejected the Jackson Store and exited the market. As such, the Debtors no longer need the Jackson Property and its sale will bring cash into the Debtors' estates.

6.      The Debtors have marketed the Jackson Property extensively through DJM Asset Management, Inc. ("DJM"). DJM sent over 10,000 sale notices of sale to potential purchasers. Through DJM's efforts, the Debtors have received two offers for the Jackson Property, including the offer by the Purchaser for $350,000. After reviewing all offers, including all terms of all offers, the Debtors have determined that the Purchaser's offer is the highest or best offer for the Jackson Property.

## Relief Requested

7.      By this Motion, the Debtors request authority to sell WD Montgomery's fee simple title interest in the Jackson Property and the improvements and personal property located on the premises together with all related appurtenances, rights, easements, rights-of-way, tenements and hereditaments (collectively, the "Assets"), free and clear of liens, claims and

3

interests, and subject to higher or better offers.  The Assets are more fully

described in the Real Estate Purchase Agreement (defined below).

## The Real Estate Purchase Agreement

8.      On February 3, 2006, WD Montgomery and the Purchaser entered

into the Real Estate Purchase Agreement attached to this Motion as Exhibit A (the

"Purchase Agreement").

9.      A summary of the material terms of the transaction with the

Purchaser, subject to this Court's approval, are as follows:[2]

> (a)     Assets.  The assets to be sold and transferred to the Purchaser
> include:
>
>> (i)     WD Montgomery's fee simple title interest in the
>> Jackson Property and all of the improvements on the
>> property;
>>
>> (ii)    WD Montgomery's interest in all related
>> appurtenances, rights, easements, rights-of-way,
>> tenements and hereditaments; and
>>
>> (iii)   WD Montgomery's interest in personal property
>> located at the fuel center as described on Exhibit B to
>> the Purchase Agreement.
>
> (b)     Purchase Price.  On the terms and subject to the conditions set
> forth in the Purchase Agreement, the net aggregate purchase
> price for the Assets is $350,000 (the "Purchase Price").  The
> Purchaser has paid $100,000 in escrow as an earnest money
> deposit. At Closing, the total Deposit will be delivered to the
> Closing Agent and the unpaid balance of the Purchase Price
> will be due and payable by wire transfer or cashier's check.
>
> (c)     Sale Free and Clear.  The Purchase Agreement provides that
> the Assets are to be transferred free and clear of any liens,

---

[2] This summary of the Purchase Agreement is provided as a convenience only.  To the extent that this summary differs in any way from the terms of the Purchase Agreement, the terms of the Purchase Agreement control.

claims, interests and encumbrances other than the lien for taxes for the year 2006 and subsequent years (the "Permitted Encumbrances").

10.     The Debtors now move for authority to consummate the sale of the Assets with the Purchaser or, alternatively, to the party submitting a higher or better offer for the Assets.

## Solicitation of Higher and Better Offers

11.     Notwithstanding that the Assets have been sufficiently marketed, the Debtors are soliciting higher and better bids for the Assets.  Any person or entity interested in submitting a higher and better bid for the Assets must submit such bid so that it is received by James Avallone at DJM, 445 Broadhollow Road, Suite 417, Melville, NY 11747 with a copy to undersigned counsel for the Debtors no later than 12:00 p.m. (prevailing Eastern Time) on March 2, 2006.  All bids must comply with the bidding procedures approved by order of the Bankruptcy Court dated June 21, 2005 (Docket No. 1801).  To qualify as a competing bid, the offer must net the Debtors' estates at least $360,000 and be accompanied by a certified check made out to Winn-Dixie Stores, Inc. in an amount equal to 10% of the competing bid.  The required deposit must be sent to undersigned counsel.

12.     If the Debtors receive a higher or better offer for the Assets, they will conduct an auction (the "Auction") for the Assets in accordance with the Bidding Procedures Order.  The Auction will take place at 10:00 a.m. (prevailing Eastern Time) at the offices of Smith Hulsey & Busey, 225 Water Street, Suite

1800, Jacksonville, Florida on March 8, 2006 (the "Auction Date"). The Debtors will conduct the Auction in consultation with the Creditors' Committee and the DIP Lender and on terms the Debtors determine to be in the best interests of their estates and their creditors.

## Applicable Authority

A.    Bankruptcy Code Section 363(b) Authorizes the Sale

13.    Bankruptcy Code section 363(b)(1) provides:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 1107 (a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under section 363(b)(1).  *See* 11 U.S.C. § 1107(a).

14.    A debtor's sale under section 363(b)(1) should be approved when supported by a sound business reason.  *See In re B.D.K. Health Mgmt., Inc.* ("B.D.K. Health Mgmt."), Case Nos. 98-00609-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.),* 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp.*

(*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *Fulton State Bank v. Schipper* (*In re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

15.     Once a court is satisfied that a sound business reason for the sale exists, the Court must also consider whether (a) the sale price is fair and reasonable, (b) the purchaser is proceeding in good faith, and (c) the Debtor has provided interested parties with adequate and reasonable notice. *Delaware & Hudson*, 124 B.R. at 175-176.

16.     The Debtors have a sound business reason for the sale of the Assets. The Jackson Property is located adjacent to a store the Debtors rejected in a market that the Debtors have exited. By selling the Jackson Property, the Debtors will bring at least $350,000 into the Debtors' estates.

17.     WD Montgomery's sale of the Assets to the Purchaser is subject to competing bids, ensuring that the Debtors will receive the highest or best value for the Assets. Thus, the fairness and reasonableness of the consideration to be received for the Assets ultimately will be demonstrated by a "market check" and auction process -- the best means for establishing whether a fair and reasonable price is being paid.

18.     If required, the Debtors are prepared to present further evidence of good faith during the course of the Sale Hearing that the Debtors believe will satisfy this Court and the mandates of Bankruptcy Code section 363(m).

19.     In accordance with Local Rule 2002-1, the Debtors will serve notice of the Motion on the following parties: (a) each taxing authority known to the Debtors to have a potential interest in the Assets, (b) all parties that expressed interest in purchasing the Assets; (c) the Purchaser; (d) counsel for the DIP Lenders; (e) counsel for the Creditors' Committee; (f) counsel for the Equity Committee; (g) all known holders of Interests and Claims (as defined below) in the Assets; (h) all entities having requested notices pursuant to Fed. R. Bankr. P. 2002; and (i) the Office of United States Trustee.

B.     Bankruptcy Code Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims

20.     The Debtors request that this sale of Assets be approved free and clear of any liens, claims or interests.  Pursuant to Bankruptcy Code section 363(f), a debtor may sell property of the estate free and clear of all liens, claims and interests after notice and hearing.  *See In re Parrish*, 171 B.R. 138 (Bankr. M. D. Fla. 1994).

21.     The Debtors believe that with the exception of the Permitted Encumbrances, there are no interests in or claims against the Assets other than the interest of Wachovia Bank, National Association, as Administrative Agent and Collateral Agent (collectively, the "DIP Lender").  The interest of the DIP Lender

8

will be satisfied because the Debtors will cause the proceeds from the sale to be paid in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of All Claims of Debtors' Pre-petition Secured Lenders dated March 23, 2005 (Docket No. 501) (the "Final Financing Order") and the Loan Documents (as defined in the Final Financing Order).

C.      Good Faith Purchaser

22.      The Debtors request that the Court find that the Purchaser, or the party who ultimately submits the highest or best offer for the Assets, acted in good faith within the meaning of Bankruptcy Code section 363(m).

23.      Bankruptcy Code section 363(m) provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m)

9

24.   The Bankruptcy Code does not define the term "good faith." Courts, however, indicate that a party would have to show fraud or collusion between the purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of good faith.

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

> *In re Apex Oil Co.*, 2 B.R. 847, 865
> (Bankr. E.D. Mo. 1988)

*Accord Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).  No such facts exist here.

25.   The Debtors assert that:  (a) the proposed sale is the subject of arm's length negotiations with the Purchaser and is made in good faith; (b) the Purchaser has no affiliation with the Debtors; (c) the Assets were marketed extensively and the purchase price is fair and reasonable; (d) to the best of the Debtors' knowledge, the Purchaser has taken no action to chill or otherwise collude with any other party to restrict bidding on the Assets; and (e) the marketing process that occurred and the notice of the Sale Hearing ensure that the Purchaser has not exerted undue influence over the Debtors.  Accordingly, the Debtors request that the Court find that the Purchaser, or the party submitting a higher or better offer, acted in good

26.    faith within the meaning of Bankruptcy Code section 363(m).  *See*

*B.D.K. Health Mgmt.*, 1998 WL, at *4 (finding that the purchaser is entitled to the

protections of Bankruptcy Code section 363(m) because the sale was negotiated at

arms-length, proposed in good faith and the consideration for the assets was fair

and reasonable).  The Debtors' proposed sale of the Assets is the product of arm's

length negotiations with the Purchaser and was made in good faith.  The Purchaser

has no affiliation with the Debtors, and the ability of third parties to make higher

or better bids ensures that the Purchaser has not exerted any undue influence over

the Debtors.

D.    Elimination of 10-Day Stay Under Rules 6004(g)

27.    Pursuant to Rule 6004(g), F.R. Bankr. P., unless the Court orders

otherwise, all orders authorizing the sale of property outside of the ordinary course

of business pursuant to Bankruptcy Code section 363 are automatically stayed for

ten days after entry of the order.   Given the requirements of the Purchase

Agreement and the need to close the sale as promptly as possible, the Debtors

request that the Court waive the 10-day stay period.

E.    Objection Deadline

27.    Only objections filed and served on Sally McDonald Henry at

shenry@skadden.com, Skadden, Arps, Slate, Meagher, & Flom, LLP, Four Times

Square, New York, New York 10036 and on Cynthia C. Jackson at

cjackson@smithhulsey.com, Smith Hulsey & Busey, 225 Water Street, Suite 1800,

Jacksonville, Florida 32202 so as to be received by March 1, 2006 at 4:00 p.m.

(E.T.) will be considered by the Bankruptcy Court at the Hearing.

## Conclusion

For the foregoing reasons, the Debtors respectfully request that the Court enter an order substantially in the form attached as Exhibit B (a) granting the Motion and authorizing the sale of the Assets to the Purchaser in accordance with the Purchase Agreement, or to the party submitting a higher or otherwise better offer for the Assets; (b) authorizing the Debtors to take all actions reasonably necessary to effectuate the sale of the Assets in accordance with the Purchase Agreement; and (c) granting such other and further relief as the Court deems just and proper.

Dated: February 17, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By ___/s/ D. J. Baker_____
      D. J. Baker
      Sally McDonald Henry
      Rosalie W. Gray

Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Counsel for Debtors

SMITH HULSEY & BUSEY

By ___/s/ Cynthia C. Jackson_____
      Stephen D. Busey
      James H. Post
      Cynthia C. Jackson  (F.B.N. 498882)

225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Debtors

00521170.DOC

# **EXHIBIT A**

## REAL ESTATE PURCHASE AGREEMENT

**SELLER:**                           **WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation
5050 Edgewood Court
Jacksonville, Florida  32254
Attention:  Catherine Ibold

**BUYER:**                            **ECKSTEIN PROPERTIES, LLC** a New York limited liability company
60 Broad Street
Suite 3503
New York, New York  10004
Attention: Shimon Eckstein

**PROPERTY:**                       Real Property, as more particularly described on attached Exhibit A, and related fuel center improvements; together with personal property, as more particularly described on attached Exhibit B (collectively, the "Assets") located at 6240 Old Canton Road, Jackson, Mississippi.

**PURCHASE PRICE:**            $350,000.00

**CONTRACT DATE:**             February _3_, 2006

**CLOSING DATE:**               March 20, 2006

**ESCROW/CLOSING AGENT:**    Smith, Gambrell & Russell, LLP
50 N. Laura Street, Suite 2600
Jacksonville, Florida  32202
Attention: Douglas G. Stanford

**BROKER:**                       DJM Asset Management, LLC

---

**IN CONSIDERATION OF** the mutual covenants and agreements of Buyer and Seller contained in this Agreement, the undersigned Buyer and Seller agree as follows:

1.    **Definitions**.  Unless otherwise defined below, capitalized terms used in this Agreement will have the meanings given to such terms above.

2.    **Buy/Sell Agreement**.  Seller agrees to sell and Buyer agrees to buy the Property for the Purchase Price on the Closing Date subject to and in accordance with this Agreement.  Conveyance of the Property constituting real property will be by special warranty deed free and clear of any interests, liens, mortgages, judgments, taxes or other encumbrances other than the lien for taxes for the year 2006 and subsequent years, and subject only to covenants, easements, restrictions and reservations of record acceptable to Buyer (the "Deed").  Conveyance of the Property constituting personal property as described on attached Exhibit B will be by bill of sale (the "Bill of Sale") substantially in form and substance as set forth in attached Exhibit C, free and clear of all interests, liens, claims or encumbrances.

3.  **Property**.  The Property consists of the Real Property described above, together with all improvements, easements, rights of way, licenses, privileges, hereditaments, and appurtenances, if any, inuring to the benefit of such land, and all Assets located thereon.

4.  **Earnest Money**.  Within 3 business days after the Contract Date, Buyer will deposit $100,000 in escrow with Escrow Agent as Buyer's earnest money deposit (the "Deposit").  Upon receipt of the Deposit, Escrow Agent will place the Deposit in an escrow account, to be disbursed in accordance with the requirements of this Agreement.

5.  **Property Condition**.  Buyer acknowledges and agrees that upon closing, Seller will sell and convey to Buyer and Buyer will accept the Property "as is, where is", with all faults, and there are no oral agreements, express or implied warranties or representations collateral to or affecting the Property by Seller or any third party except for Seller's warranties under the Deed.  Buyer agrees to accept the transfer and conveyance of the Property by Seller without any warranty or representation concerning the quantity, quality, or condition of the Property, the availability of water, sewer, utilities or necessary governmental authorizations, or any other matter not expressed in this Agreement.  However, Seller is obligated to discharge, release or pay off any liens, mortgages, judgments, taxes or other money items (the "Monetary Liens") from the Property so that Seller can convey good title on the Closing Date.

6.  **Investigation Period**.  Buyer has inspected the Property and waives all further investigation of the Property, and has determined that the same is satisfactory to Buyer.

7.  **Title Commitment**.  Buyer has either (a) obtained and evaluated a title insurance commitment and policy and determined that the same is satisfactory to Buyer, or (b) waived delivery and review of a title insurance commitment and policy.

8.  **Boundary Survey**.  Buyer has either (a) obtained and evaluated a boundary map or survey (the "Survey") and determined that the same is satisfactory to Buyer, or (b) waived delivery and review of a Survey.

9.  **Closing Conditions.**

    (a)  Chapter 11 Cases.  Winn-Dixie Stores, Inc. and certain of its affiliated companies, including Seller, filed voluntary petitions for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and have operated its businesses as debtors-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date (the "Bankruptcy Cases"). By order entered on April 13, 2005, the Bankruptcy Cases were transferred to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Bankruptcy Court") where they are being jointly administered under Case No. 05-03817-3F1.

2

(b)    <u>Competitive Bid Process</u>.  By Order dated June 20, 2005, the Bankruptcy Court approved bidding procedures and bid protections for use in the sale of assets in the Bankruptcy Cases (the "<u>Bidding Procedures</u>").  This Agreement is subject to the competitive bid process described in the Bidding Procedures.  Promptly following the Contract Date, Seller will file a motion with the Bankruptcy Court seeking approval of the transactions contemplated by this Agreement, subject to higher or better offers, and the transfer of the Property free and clear of all claims and liens including the Credit Liens, other than Permitted Encumbrances, pursuant, <u>inter alia</u>, to 11 U.S.C. Sections 105, 363 and 1146(c) (the "<u>Sale Motion</u>").  The Bankruptcy Court will set a date for hearing on the Sale Motion and to consider entry of the Sale Order relating to the successful bid (the "<u>Sale Hearing</u>").  Prior to the Sale Hearing, the debtors will conduct an auction pursuant to the Bidding Procedures (the "<u>Auction</u>").  Buyer may participate in the Auction, and may submit purchase terms different from those set forth in this Agreement as Buyer may deem appropriate in seeking to become the successful bidder.  Prior to the Sale Hearing, upon consultation with the Creditors' Committee and DIP Lender, Seller will select the highest or otherwise best offer to purchase the Property, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, as the Successful Bid (as defined in the Bidding Procedures).  Seller will submit the Successful Bid to the Bankruptcy Court at the Sale Hearing, for entry of a Sale Order with respect to the Property by the Bankruptcy Court, either (a) approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, if Buyer is the Successful Bidder under the terms of this Agreement (or as modified during the Auction) or (b) approving the more favorable terms of purchase and sale offered by the Successful Bidder, whether Buyer or otherwise (the "<u>Sale Order</u>").

(c)    <u>Sale Order Approving Agreement</u>.  It will be a condition to the Closing of the transaction contemplated by this Agreement that the Bankruptcy Court will have issued the Sale Order approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, and such Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "<u>Approval Condition</u>").

(d)    <u>Continuing Effectiveness of Agreement</u>.  Notwithstanding that Buyer may not be the successful bidder following the Bidding Procedures, this Agreement, as modified by Buyer's last bid made during the Bidding Procedures, will remain in effect in accordance with, and will remain subject to, the Bidding Procedures.  If the Approval Condition is not otherwise satisfied by April 30, 2006 (the "<u>Outside Date</u>") through no fault of Buyer, or if the sale of the Property closes with another successful bidder, then this Agreement automatically will terminate and Escrow Agent will refund the Deposit to Buyer, and the parties will have no further obligations to the other.

3

10.    **Closing.** Conveyance of the Property from Seller to Buyer and the payment of the Purchase Price from Buyer to Seller (the "Closing") will occur on the Closing Date by mail-away procedures coordinated by Escrow Agent, effective as of a time acceptable to Buyer and Seller. At the Closing, Buyer will deliver the Purchase Price plus Buyer's closing costs to Escrow Agent by wire transfer or cashier's check made payable to Escrow Agent for subsequent delivery to Seller, net of Seller's closing costs, and Seller will sign and deliver the Deed, Bill of Sale and possession of the Property to Buyer. On the Closing Date, Seller also will sign and deliver an affidavit prepared by the title insurance company asking Seller to confirm, among other things, (a) the legal title to the Property, (b) Seller's exclusive possession of the Property, and (c) that Seller is not a foreign person for purposes of the Internal Revenue Service's code and regulations. If Seller is a foreign person, then Buyer will be required to withhold a portion of the Purchase Price to pay taxes. Buyer and Seller will execute and deliver such other documents and instruments as reasonably may be necessary to consummate the transactions described in this Agreement on the Closing Date. Closing Agent is responsible for recording the Deed.

11.    **Closing Costs; Prorations.** At Closing, Seller will be responsible for paying its own attorney's fees and costs, discharge, release or payoff of any Monetary Lien, the cost of recording any release of Monetary Liens, and Seller's Brokerage Commissions, as hereinafter defined ("Seller's Closing Costs"). At Closing, Buyer will be responsible for paying the cost of the Survey, the costs of the title commitment and insurance policy to be issued in the amount of the Purchase Price, transfer tax on the Deed (if required to be paid), the cost of recording the Deed, Buyer's own attorneys' fees and costs, any fees and costs relating to Buyer's financing, if any, and any other fees and costs associated with this transaction ("Buyer's Closing Costs"). If this transaction fails to close for any reason, and without waiving any right or remedy that either party may have against the other in the event of a default hereunder, Seller promptly will pay Seller's Closing Costs, and Buyer promptly will pay Buyer's Closing Costs.

Responsibility for paying property taxes for the year of closing will be prorated between Seller and Buyer, with Seller responsible for taxes accruing prior to the Closing Date, and Buyer responsible for taxes accruing after the Closing Date. Buyer will be responsible for payment of all the taxes for the year of Closing when they become due, and the amount of the taxes that Seller is obligated to pay will be subtracted from the Purchase Price on the Closing Date.

12.    **Loss By Fire or Other Casualty; Condemnation.** If, prior to Seller's legal delivery of the Deed and Buyer's delivery of the Purchase Price, the Property or any material part thereof, is destroyed or materially damaged, or made the subject of a condemnation action, then either party will have the right, exercisable by giving notice of such decision to the other within 5 business days after receiving written notice of such damage, destruction or threatened condemnation, to terminate this Agreement, and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that Buyer will be entitled to the Deposit. If neither party exercises its right of termination, Buyer will purchase the Property pursuant to the terms of this Agreement, and then as Buyer's sole remedy, Seller will assign to Buyer any assignable rights it may have to recover insurance or condemnation proceeds and will promptly pay over and deliver to Buyer any such proceeds Seller receives.

4

13. **Seller's Representations to Buyer**. Seller represents to Buyer that:

   (a) Seller owns fee simple title to the Property and has the power and authority to sign this Agreement with Buyer and to convey the Property to Buyer as required under this Agreement.

   (b) Seller is a corporation duly organized and validly existing under Florida law, and its status is active, and Seller is authorized to transact business in Mississippi as a foreign corporation.

   (c) To Seller's knowledge, and subject to satisfaction of the Approval Condition, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Seller of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority.

   Seller's representations must be true on the Contract Date and remain true on the Closing Date, and Seller will be liable to Buyer for any misstatement of such representations discovered either before or after the Closing.

14. **Seller's Other Obligations**. Between the Contract Date and the Closing Date, Seller will:

   (a) not convey any interest, including a lease or tenancy, in the Property to any person other than Buyer; and

   (b) notify Buyer promptly if Seller becomes aware of any fact that would cause any of Seller's representations made in paragraph 13 above to be untrue or misleading.

15. **Default and Remedies**. If Seller defaults in the performance of its obligations under this Agreement, and such default is not cured on or before the Closing Date, Buyer will be entitled to terminate this Agreement upon written notice to Seller and Escrow Agent and obtain a refund of the Deposit. Buyer waives all other remedies it may have at law or in equity.

   If Buyer fails to perform its obligations under this Agreement, Seller may choose to either (a) terminate this Agreement by written notice to Buyer and Escrow Agent and receive the Deposit as Seller's full measure of damages, or (b) allow Buyer additional time to perform its obligations. Seller waives all other remedies it may have at law or in equity. If Buyer and Seller become involved in a law suit to decide a dispute between them concerning this Agreement or the Property, the losing party will pay the winning party's reasonable attorneys' fees and costs.

16. **General Matters**.

   (a) Time of Performance. Time is of the essence of each party's performance of its obligations under this Agreement.

5

(b)     <u>Notices.</u> If either Buyer or Seller is required or wants to provide any notice to the other, then the notice must be sent to the other by either delivery by hand, by overnight delivery service such as Federal Express or United Parcel Service, or by United States Mail, certified and return receipt requested. Notice will be considered given upon receipt by the addressee if hand delivered or mailed, and on the next business day after placing for delivery with an overnight delivery service. The addresses for sending notices are on the first page of this Agreement, and may be changed by sending a notice of address change following the procedure for notices described in this paragraph.

(c)     <u>Whole Agreement.</u> This Agreement contains the whole and final agreement between Seller and Buyer relating to the purchase and sale of the Property, and all previous discussions or agreements, whether oral or written, are of no effect. This Agreement cannot be changed except by a written amendment signed by both Buyer and Seller.

(d)     <u>Assignment.</u> All terms of this Agreement will be binding upon, and will inure to the benefit of and be enforceable by the parties hereto and their respective legal representatives, heirs, successors and assigns. Except as set forth below, this Agreement may not be assigned by either party without the express written consent of the other. Buyer may assign its rights and obligations under this Agreement to an Affiliate as the "Buyer" hereunder, provided, however, that Buyer shall remain fully liable for performance of the obligations, including indemnifications, of the "Buyer" hereunder. For purposes of the foregoing, "Affiliate" will mean a Person that (either directly or indirectly, through one or more intermediaries) controls, is in common control with or is controlled by, another Person, and any Person that is a director, trustee, officer, employee, agent, partner, shareholder, subsidiary or attorney of any of the foregoing, and will include, without limitation, any limited liability company, partnership or corporation directly or indirectly controlled by, or in common control with, Buyer or Seller.

(e)     <u>Governing Law.</u> The law of the State of Mississippi will control this Agreement.

(f)     <u>Escrow Agent.</u> Escrow Agent signs this Agreement only for the purpose of indicating Escrow Agent's agreement to comply with the terms of this Agreement as they apply to Escrow Agent. Escrow Agent will not be liable to either party except for claims resulting from the gross negligence or willful misconduct of Escrow Agent. Escrow Agent also serves as legal counsel to Seller; the parties agree that if a dispute arises between Seller and Buyer concerning this Agreement or the Property, Escrow Agent may continue to serve in its capacity as legal counsel, even though Escrow Agent will continue to serve in its capacity as Escrow Agent. If Escrow Agent is in doubt as to its duties relating to the Deposit, or receives conflicting claims for the Deposit, then Escrow Agent may continue to hold the Deposit until Buyer and Seller have resolved the matter and have given written instructions to Escrow Agent regarding such resolution, or may interplead the Deposit into a court of appropriate jurisdiction and be relieved of any further responsibility for the Deposit. In any legal action regarding the Deposit brought by Escrow Agent or to which Escrow Agent is made a party, Escrow Agent will be entitled to recover its reasonable costs and attorney's fees. Notices given to escrow agent will be

6

considered properly delivered if given in accordance with the provisions of paragraph (b) above at the address of Escrow Agent that appears on the first page of this Agreement.

(g)   WAIVER OF JURY TRIAL. BUYER AND SELLER EACH AGREE THAT THE NATURE OF THIS AGREEMENT MAKES A JURY DETERMINATION OF ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR THE PROPERTY UNDESIRABLE. ACCORDINGLY, BUYER AND SELLER EACH KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO A TRIAL BY JURY THAT EITHER OF THEM MAY HAVE IN ANY COURT WITH RESPECT TO ANY ACTION RELATING TO THIS AGREEMENT OR THE PROPERTY.

(h)   BROKERAGE. Seller and Buyer warrant each to the other that no broker or agent has been employed with respect to the sale of the Property, other than Seller's brokers, DJM Asset Management, LLC ("Seller's Broker"), which has been retained by Seller pursuant to Order Authorizing Debtors to Retain DJM Asset Management, LLC as Special Real Estate Consultants to the Debtors, issued by the Bankruptcy Court on June 10, 2005 (the "Retention Order"). Seller will be responsible for payment of the brokerage commission to Seller's Broker pursuant to the Retention Order (the "Brokerage Commission"). Each party indemnifies and agrees to hold harmless the other from any claim made by brokers or agents who claim to act for the party sought to be charged for a commission, compensation, brokerage fees, or similar payment in connection with this transaction and against any and all expense or liability arising out of any such claim.

17.   **Consent to Jurisdiction of Bankruptcy Court.** The Bankruptcy Court will have jurisdiction over all matters, including any legal action, suit or proceeding arising out of or relating to this Agreement, any related agreements, or the contemplated transactions and the interpretation, implementation and enforcement of this Agreement, and the parties hereto irrevocably submit and consent to such jurisdiction. Buyer and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in paragraph 13(b) of this Agreement will be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

**[SIGNATURE PAGE FOLLOWS]**

7

**THIS AGREEMENT** is signed by Buyer and Seller, and joined by Escrow Agent as of the Contract Date.

Witnesses:

Print Name: REBECCA L. SAWYER

Print Name: SUSAN MAGADDINO

**SELLER:**

**WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation

By: _____
Name: LAURENCE B. APPEL
Title: Vice President

Reviewed By
XRoads
Date: _____

LEGAL APPROVED
ATTY: _____
DATE: 2/2/06

**BUYER:**

Witnesses:

Print Name: Rebecca Kranz

Print Name: LEAH DEUTSCH

**ECKSTEIN PROPERTIES, LLC** a New York limited liability company

By: _____
Name: Shimo Eckstein
Title: Managing member

**ESCROW AGENT:**

**SMITH, GAMBRELL & RUSSELL, LLP**

By: _____
Name: Douglas G. Stanford
Title: Partner

Dated: February 2, 2006

8

**THIS AGREEMENT** is signed by Buyer and Seller, and joined by Escrow Agent as of the Contract Date.

Witnesses:

**SELLER:**

**WINN-DIXIE MONTGOMERY, INC.,** a Florida corporation

_____
Print Name:_____

By: _____
Name: _____
Title: Vice President

_____
Print Name: _____

Witnesses:

**BUYER:**

**ECKSTEIN PROPERTIES, LLC** a New York limited liability company

Print Name: _____

By: _____
Name: _____
Title: _____

Print Name: _LEAH DEUTSCH_

**ESCROW AGENT:**

**SMITH, GAMBRELL & RUSSELL, LLP**

By:_____
Name: Douglas G. Stanford
Title: Partner

Dated: February __, 2006

8

## EXHIBIT A

A certain parcel of land being Lot 6 and a part
of Lot 2, Northtown Village according to the
plat thereof, on file in the office of the
Chancery Clerk of Hinds County at Jackson,
Mississippi, as now recorded in Plat Book 29 at
Page 33 and a part of the South ½ of Section 5,
T6N, R2E, Hinds County, Mississippi, said parcel
containing 6.59 acres more or less and being
more particularly described by metes and bounds
as follows:

Beginning at an iron pin marking the
intersection of the East right-of-way line of
Old Canton Road with the North right-of-way line
of Northtown Drive (as both are now laid out and
improved, July, 1982) which point is South 30
degrees 04 minutes West 180 feet from the
Southwest corner of Lot 6 of said Northtown
Village, said point also being the Southwest
corner of a parcel of land not a part of
Northtown Village, but numbered as Lot 7; run
thence North 30 degrees 04 minutes East along
the East right-of-way line of Old Canton Road
for a distance of 518.00 feet to a point, which
point is the Northwest corner of a parcel of
land not a part of Northtown Village, but
numbered as Lot 5 on the aforesaid plat of
Northtown Village which point is South 30
degrees 04 minutes West 100 feet from the
Southwest corner of Lot 4 of Northtown Village,
run thence South 59 degrees 56 minutes East
along the North boundary of said parcel marked
Lot 5 on the aforesaid plat of Northtown Village
and said line extended for a distance of 590.00
feet to an iron pin; thence run South 30 degrees
04 minutes West and parallel with the East
boundary of Old Canton Road for a distance of
380.16 feet to an iron pin on the North
right-of-way line of Northtown Drive; run thence
North 89 degrees 44 minutes 44 seconds West
along said North right-of-way line of Northtown
Drive for a distance of 185.25 feet to the Point
of Curvature of a 16.5789 degrees curve to the
right, having a central angle of 28 degrees 49
minutes and a radius of 345.61 feet; run thence

along said North right-of-way line of Northtown
Drive and the arc of said 16.5789 degree curve,
having a chord bearing of North 74 degrees 50
minutes 22 seconds West and a chord distance of
177.83 feet to the Point of Tangency of said
curve; run thence North 59 degrees 56 minutes
West along said North right-of-way line of
Northtown Drive for a distance of 257.42 feet to
the POINT OF BEGINNING, together with all
improvements situated thereon and all rights,
easements and appurtenances pertaining thereto.

Together with a non-exclusive perpetual easement
for ingress and egress over and across a strip
of land forty feet (40') in width north of and
adjacent to the north boundary of the above
described parcel being more particularly
described as follows:

Beginning at an iron pin marking the
intersection of the East right-of-way line of
Old Canton Road with the North right-of-way line
of Northtown Drive (as both are now laid out and
improved, July, 1982) which point is South 30
degrees 04 minutes West 180 feet from the
Southwest corner of Lot 6 of said Northtown
Village, said point also being the Southwest
corner of a parcel of land not a part of
Northtown Village, but numbered as Lot 7; run
thence North 30 degrees 04 minutes East along
the East right-of-way line of Old Canton Road
for a distance of 518.00 feet to a point which
is the Northwest corner of a parcel of land not
a part of Northtown Village, but numbered Lot 5
on the aforesaid plat of Northtown Village which
point is South 30 degrees 04 minutes West 100
feet from the Southwest corner of Lot 4 of
Northtown Village and the point of beginning of
the easement herein described; run thence South
59 degrees 56 minutes East along the north
boundary of the above described parcel for a
distance of 590.0 feet to an iron pin; run
thence North 30 degrees 04 minutes East for a
distance of 40 feet; run thence North 59 degrees
56 minutes West for a distance of 590 feet to a
point on the East right-of-way line of Old
Canton Road; run thence South 30 degrees 04
minutes West for a distance of 40 feet to the
point of beginning.

LESS AND EXCEPT:

A certain parcel of land being a part of Lot 2, Northtown Village, according to the map or plat thereof, on file and of record in the office of the Chancery Clerk of Hinds County at Jackson, Mississippi in Plat Book 29 at Page 33; said parcel further being situated in the South 1/2 of Section 5, T6N-R2E, Hinds County, Mississippi, containing 215,798.83 square feet or 4.9541 acres, more or less and being more particularly described as follows:

Beginning at an iron pin marking the Southeast corner of Lot 7 of the aforesaid Northtown Village, said point also being on the North right-of-way line of Northtown Drive (as now laid out and improved, April, 1984); run thence North 30 degrees 04 minutes East along the East boundary of Lots 7, 6 and 5 of said Northtown Village for a distance of 518.00 feet to the Northeast corner of said Lot 5; run thence South 59 degrees 56 minutes East for a distance of 450.0 feet to an iron pin; run thence South 30 degrees 04 minutes West and parallel to said East boundary of Lots 5, 6 and 7 for a distance of 380.16 feet to an iron pin on the North right-of-way line of said Northtown Drive; run thence North 89 degrees 44 minutes 44 seconds West along said North right-of-way line of Northtown Drive for a distance of 185.25 feet to the Point of Curvature of a 16.5789 degree curve to the right, having a central angle of 29 degrees 49 minutes and a radius of 345.61 feet; run thence along said North right-of-way line of Northtown Drive and the arc of said 16.5789 degree curve having a chord bearing of North 74 degrees 50 minutes 22 seconds West and a chord distance of 177.83 feet to the Point of Tangency of said curve; run thence North 59 degrees 56 minutes West along said North right-of-way line of Northtown Drive for a distance of 117.42 feet to the POINT OF BEGINNING.

Also dedicated herewith is a forty foot (40') wide easement adjacent to the North boundary of the land described above for the purpose of ingress and egress, being more particularly described as follows:

Commence at an iron pin marking the Southwest corner of Lot 7 of the aforesaid Northtown Village, said point also being the intersection of the East right-of-way line of Old Canton Road with the North right-of-way line of Northtown Drive (as both are not laid out and improved, April, 1984); run thence North 30 degrees 04 minutes East along the East right-of-way line of Old Canton Road and the West boundary of Lots 7, 6 and 5 of said Northtown Village for a distance of 518.0 feet to the Northwest corner of said Lot 5; said point further being the POINT OF BEGINNING of the easement herein described; leaving said East right-of-way line of Old Canton Road, run thence South 59 degrees 56 minutes East along the North boundary of said Lot 5 and said line extended for a distance of 590.0 feet to an iron pin; run thence North 30 degrees 04 minutes East for a distance of 40.0 feet; run thence North 59 degrees 56 minutes West for a distance of 590.0 feet to a point on the East right-of-way line of said Old Canton Road; run thence South 30 degrees 04 minutes West for a distance of 40.0 feet to the POINT OF BEGINNING.

<u>LESS AND EXCEPT</u>:

Description of property to be acquired from Jitney Jungle Stores of America, Inc. being situated in Section 5, Township 6 North, Range 2 East, First Judicial District of Hinds County, Mississippi, described to-wit:

Beginning at the westernmost corner of Lot 6, Northtown Village, as recorded in Plat Book 29, Page 33, Hinds County, said point being on the east right-of-way line of Old Canton Road (as now laid out and in use, December 1988); run thence S30°04'W, 180.0 feet along the said east right-of-way line to a point on the north right-of-way line of Northtown Drive, said point being the POINT OF BEGINNING for the property to be acquired; run thence S59°56'E, 15.0 feet along the said north right-of-way line to a point; run thence N14°56'W, 21.21 feet to a point on the east right-of-way line of Old Canton Road; run thence S30°04'W, 15.0 feet along the said east right-of-way line to the point of beginning, said property containing 112 square feet, more or less.

TEMPORARY WORKING EASEMENT

Beginning at the westernmost corner of Lot 6, Northtown Village, as recorded in Plat Book 29, Page 33, Hinds County, said point being on the east right-of-way line of Old Canton Road (as now laid out and in use, December 1988); said point also being the POINT OF BEGINNING for the property to be acquired; run thence S30°04'W, 165.0 feet to a point; run thence S14°56'E, 7.07 feet to a point; run thence N30°04'E, 328.0 feet to a point; run thence S59°56'E, 5.0 feet to a point; run thence N30°04'E, 180.0 feet to a point; run thence N59°56'W, 10.0 feet to a point on the east right-of-way line of Old Canton Road; run thence S30°04'W, 338.0 feet along the said east right-of-way line to the point of beginning, said temporary working easement containing 3427 square feet, more or less.

LESS AND EXCEPT:

A parcel of land situated in the Southeast ¼ of Section 5, Township 6 North, Range 2 East, City of Jackson, Hinds County, Mississippi, and being more particularly described by metes and bounds as follows, to-wit:

Commence at an iron pin marking the intersection of the eastern right of way line of Old Canton Road with the northern right of way line of Northtown Drive (as both are now laid out and improved) which point is South 30° 04' 00" West for a distance of 180.00 feet from the southwest corner of Lot 6 of Northtown Village, a subdivision, the map or plat of which is recorded in Plat Book 29 at Page 33 of the Chancery Records of Hinds County at Jackson, Mississippi, said point also being the southwest corner of a parcel of land not a part of Northtown Village, but numbered as Lot 7; run thence North 30° 04' 00" East along the eastern right of way line of Old Canton Road for a distance of 518.00 feet to a point which is the northwest corner of a parcel of land not a part of Northtown Village, but numbered as Lot 5 on the aforesaid plat of Northtown Village, which is South 30° 04' 00" West for a distance of 100.00 feet from the southwest corner of Lot 4 of the said Northtown Village, said point being the **POINT OF BEGINNING** to the for the parcel herein described; thence leave said eastern right of way line of Old Canton Road and run South 59° 56' 00" East for a distance of 140.00 feet; thence South 30° 04' 00" West for a distance of 227.32 feet; thence North 59° 56' 00" West for a distance of 140.00 feet to the said eastern right of way line of Old Canton Road; thence North 30° 04' 00" East for a distance of 227.32 feet along the said eastern right of line of Old Canton Road to the **POINT OF BEGINNING**, containing 0.7306 acres (31,825 square feet), more or less.

## **EXHIBIT B**

### SCHEDULE OF PERSONAL PROPERTY

The following described personal property, if any, located on the Real Property:

Routers, Air Compressors, Canopy, Kiosk, Fuel Pumps, Fuel Tanks (including underground storage tanks), Pipes, Valves, Fittings, Lines, Shelves, Registers, and Monitoring Devices.

9

**EXHIBIT C**

FORM OF BILL OF SALE

**WINN-DIXIE MONTGOMERY, INC.**, a Florida corporation ("Seller"), in consideration of the mutual covenants set forth in that certain Real Estate Purchase Agreement (the "Agreement") dated effective March __, 2006, between **ECKSTEIN PROPERTIES**, a New York limited liability company ("Buyer") and Seller, does hereby grant, bargain, transfer, sell, assign and convey unto Buyer all of Seller's right, title and interest in the Assets described in the Agreement, including the specific items of personal property described on attached Schedule A.

Seller represents and warrants to Buyer that Seller has good and lawful right, title and interest in the Assets, that the Assets are free and clear of all interests, liens, claims or encumbrances. This conveyance is made pursuant to the order of the Bankruptcy Court in *In re Winn-Dixie Stores, Inc., et al.*, Case No. 05-11063 (RDD)(Jointly Administered), United States Bankruptcy Court, Middle District of Florida, Jacksonville Division.

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed by the undersigned as of this _____ day of March, 2006.

"SELLER"

**WINN-DIXIE MONTGOMERY, INC.**, a Florida corporation

By: _____
Name: _____
Title: _____

10

# **EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

## ORDER (A) AUTHORIZING THE DEBTORS TO SELL THE JACKSON PROPERTY AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS, AND (B) GRANTING RELATED RELIEF

These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 363 and Fed. R. Bankr. P. 6004(g): (a) authorizing Winn-Dixie Montgomery, Inc., a Florida corporation ("WD Montgomery"), to sell its closed fuel center (Number 1382) and underlying tract of land located in Jackson, Mississippi, as more particularly described on Exhibit A attached to the Motion (collectively, the "Jackson Property"), together with all related personal property and all related appurtenances, rights, easements, rights-of-way, tenements and hereditaments to Eckstein Properties, LLC (the "Purchaser"), or to a party submitting a higher or better offer, free and clear of liens, claims, interests and encumbrances and (b) granting related relief (the "Motion").[1]  A hearing on the Motion was held by the Court on March 9, 2006 (the "Sale Hearing").  The Court has read the Motion and considered the representations of counsel.  Upon the representations of

---

[1]     All capitalized terms not otherwise defined by this Order will have the meaning ascribed to them in the Motion or the Purchase Agreement.

counsel and without objection from the United States Trustee or any other interested party, the Court makes the following findings of fact:

        A.      This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

        B.      The Debtors solicited the highest or otherwise best offer for the Assets described in the Purchase Agreement (the "Assets") in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 20, 2005 (the "Bidding Procedures").

        C.      The Debtors have provided interested parties (including all parties asserting claims on interests of the Assets, if any) with proper notice of the Motion, the Auction, the Sale Hearing and the transactions contemplated by the Sale pursuant to 11 U.S.C. §§ 102(1), 105(a), 363 and Fed. R. Bankr. P. 2002 and 6004 and Local Rule 2002-1, the Bidding Procedures Order and the Notice Procedures Order.

        D.      A reasonable opportunity to object or be heard with respect to the Motion and the sale of the Assets has been afforded to all parties in interest (including all third parties asserting Interests or Claims (as such terms are defined below) in, to or against the Assets, if any).

        E.      The Debtors marketed the Assets and conducted the Sale process in compliance with the Bidding Procedures Order. The bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner. Through the Debtors' marketing efforts and Auction process, the Debtors afforded all interested parties a reasonable opportunity to make higher or betters offers to purchase the Assets.

2

00522055.DOC

F.      WD Montgomery (i) has full corporate power and authority to execute and consummate the purchase agreement attached as Exhibit A to this Order (the "Purchase Agreement") and all related documents, and the sale of the Assets has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

G.      WD Montgomery has good business reasons to sell the Assets prior to filing a plan or reorganization pursuant to 11 U.S.C. § 363(b).

H.      Neither Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

I.      The Purchase Agreement was proposed, negotiated and entered into by WD Montgomery and the Purchaser without collusion, in good faith and at arms'-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

J.      The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m).

K.      The consideration being provided by the Purchaser to the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value and fair consideration for the Assets.

3

L.    WD Montgomery's transfer of the Assets to the Purchaser pursuant to the Purchase Agreement will be a legal, valid, and effective transfer of the Assets, and will vest the Purchaser with good and valid title in and to the Assets free and clear of any lien, interest or encumbrance of any kind or nature (collectively, the "Interests") and claim (as such term is defined in 11 U.S.C. § 101(5)) ("Claims") with the exception of the Permitted Encumbrances, as defined in the Motion.

M.    WD Montgomery may sell and transfer the Assets free and clear of all Interests and Claims (other than the Permitted Encumbrances) because any entity with any Interests or Claims, if any, in the Assets to be transferred (i) has consented to the sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. Holders of Interests and Claims, if any, who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2).

N.    The Court's approval of the Purchase Agreement and the sale of the Assets to the Purchaser, or its designee, is in the best interests of the Debtors, their estates, their creditors and other parties in interest. Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.    The Motion is granted.

4

00522055.DOC

2. Any objections to the entry of this Order or to the relief granted and requested in the Motion that have not been withdrawn, waived or settled are denied and overruled on the merits.

3. The terms and conditions of the Purchase Agreement are approved. Pursuant to 11 U.S.C. §§ 105(a), 363(b) and this Order, the Debtors are authorized to consummate the Sale in accordance with the terms and conditions of the Purchase Agreement.

4. WD Montgomery is authorized to consummate and implement fully the Purchase Agreement, together with all additional instruments and documents that may be necessary to implement the Purchase Agreement, and the Debtors are authorized to take all further actions as may reasonably be necessary or appropriate for the purpose of conveying the Assets to the Purchaser, or its designee, or as may be necessary or appropriate to the performance of the Debtors' obligations under the Purchase Agreement.

5. Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties without further order of the Court; provided, however, that, (a) the Debtors will first obtain the prior written consent of (i) the DIP Lender, and (ii) the Creditors' Committee, which consent will not be unreasonably withheld and (b) any such modification, amendment or supplement does not have a materially adverse effect on the Debtors' estates.

5

6.      WD Montgomery will transfer the Assets to the Purchaser, or its designee, upon Closing free and clear of all Interests and Claims (except for the Permitted Encumbrances).    The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender and any other valid and enforceable liens, if any, will attach to the proceeds of the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

7.      WD Montgomery's transfer of the Assets to the Purchaser, or its designee, is a legal, valid, and effective transfer of the Assets and will vest the Purchaser, or its designee, with all right, title and interest of the Debtors in and to the Assets, free and clear of all Interests and Claims (except for the Permitted Encumbrances).

8.      The consideration provided by the Purchaser, or its designee, for the Assets constitutes reasonably equivalent value and fair and reasonable consideration under the Bankruptcy Code and applicable non-bankruptcy law, and may not be avoided under 11 U.S.C. § 363(n).

9.      Upon Closing of the Sale in accordance with the Purchase Agreement and this Order, the Purchaser is deemed to have acted in good faith in purchasing the Assets, as that term is used in 11 U.S.C § 363(m).   Accordingly, the reversal or modification on appeal of the authorization to consummate the sale of the Assets will not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

10.     All entities who are presently in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors.  Each of the

6

Debtors' creditors is authorized and directed to execute any and all documents and take all other actions as may be necessary to release its Interests in and Claims against the Assets (except for the Permitted Encumbrances) (provided that the taking of such actions will not require such creditor to incur any material costs) as such Interests and Claims may have been recorded or may otherwise exist. In the event any creditor fails to release its Interests in or Claims against the Assets, the Debtors are authorized to file or record a copy of this Order. Once filed, registered or otherwise recorded, this Order will constitute conclusive evidence of the release of all Interests in and Claims against the Assets (except for the Permitted encumbrances).

11.    WD Montgomery's transfer of the Assets to the Purchaser, or its designee, will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances or Assumed Liabilities) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

12.    Other than the Permitted Encumbrances, the Assumed Liabilities and other obligations of the Purchaser as set forth in the Purchase Agreement and this Order, the Purchaser and its designee, (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets. The Debtors' transfer of the Assets to the Purchaser, or its designee, does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or

7

the Assets by reason of such transfer under the laws of the United States or any state or territory.

13.     This Order is and will be effective as a determination that any and all Interests or Claims are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

14.     Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to the Purchaser, or its designee.  Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

15.     This Order is binding in all respects upon, and inures to the benefit of, the Debtors, their estates and creditors, the Purchaser and its designee, and its respective affiliates, successors and assigns, and this Order is binding in all respects upon all persons asserting an Interest in or Claim against the Debtors' estates or the Assets. The sale is enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee of the Debtors and their estates.

16.     During the pendency of the Debtors' jointly administered cases, this Court will retain exclusive jurisdiction (a) to enforce and implement the Purchase Agreement and any agreements and instruments executed in connection with the Purchase Agreement, (b) to compel delivery of possession of the Assets to the Purchaser,

8

(c) to resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement and (d) to interpret, implement, and enforce the provisions of this Order.

17.    All persons and entities that hold Interests in or Claims against the Debtors or the Assets are forever barred, estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the sale of the Assets.

18.    Nothing contained in any plan of reorganization or liquidation confirmed in these chapter 11 cases, or any order of this Court confirming such a plan, or any other order entered in these chapter 11 cases or in any subsequent chapter 7 cases will conflict with or derogate from the terms of this Order.

19.    The failure specifically to include any particular provision of the Purchase Agreement in this Order will not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

20.    After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing

9

00522055.DOC

portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Purchase Agreement. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

21.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in the this Order will control.

22.    Notwithstanding Fed. R. Bankr. P. 6004(g), this Order will take effect immediately upon entry.

Dated this ___ day of March, 2006 in Jacksonville, Florida.

_____
Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed
to serve a copy of this Order
on all persons served with
the Motion.

10

00522055.DOC