

# LEASE

## The Marketplace at Port St. Lucie

## Southeasterly Corner of the Intersection of Jennings Road and U.S. 1

# City of Port St. Lucie
# County of St. Lucie
# State of Florida

EXHIBIT ___/___

# TABLE OF CONTENTS

PREMISES ................................................................................. 1

TERM ..................................................................................... 1

RENT ..................................................................................... 2

TITLE .................................................................................... 5

SURVEY ................................................................................... 6

ENVIRONMENTAL AUDIT ..................................................................... 6

USE ...................................................................................... 7

COMPLIANCE WITH LAWS .................................................................... 8

CONSTRUCTION OF SHOPPING CENTER ........................................................ 8

COMPLETION DATE ......................................................................... 8

COMMENCEMENT DATE ....................................................................... 9

OTHER TENANTS .......................................................................... 10

PARKING AND COMMON AREAS ............................................................... 10

SERVICE AREA ........................................................................... 10

UTILITIES .............................................................................. 10

TENANT'S MAINTENANCE ................................................................... 11

LANDLORD'S MAINTENANCE ................................................................. 11

SIGNS .................................................................................. 12

FIXTURES AND INTERIOR ALTERATIONS ...................................................... 12

INDEMNIFICATION ........................................................................ 12

CASUALTY ............................................................................... 12

INSURANCE .............................................................................. 13

QUIET ENJOYMENT ........................................................................ 14

TAXES AND LIENS ........................................................................ 14

CONDEMNATION ........................................................................... 15

DEFAULT ................................................................................. 15

CONSTRUCTION RISKS ................................................................. 15

NOTICES ................................................................................. 16

ASSIGNMENT AND SUBLEASING ...................................................... 17

SUBORDINATE ........................................................................... 17

ESTOPPEL CERTIFICATE ............................................................... 17

LENDER'S CURE ......................................................................... 17

BENEFIT ................................................................................. 18

TRANSFER BY LANDLORD .............................................................. 18

SHORT FORM LEASE .................................................................... 18

MARGINAL TITLES ...................................................................... 18

COMPLETE AGREEMENT ................................................................ 18

DECLARATION ........................................................................... 18

EXHIBITS ................................................................................. 19

FORCE MAJEURE ........................................................................ 19

ENVIRONMENTAL CONDITION .......................................................... 19

NO BROKERS ............................................................................. 21

INDIVIDUAL STATE MANDATED PROVISIONS .......................................... 21

FLORIDA ................................................................................. 21

EXPANSION .............................................................................. 21

TAKE OVER AND RELEASE ............................................................. 23

CONTINGENCIES ........................................................................ 23

EXCULPATION ........................................................................... 23

**LEASE**

**THIS LEASE** is made this _July 3rd_, 1996, between **Marketplace Port St. Lucie Limited Partnership**, a Florida limited partnership ("MPSL") and **Tyringham Ridge, Inc.**, a Nevada corporation ("Ridge" and together with MPSL, "**Landlord**") and **WINN-DIXIE STORES, INC.**, a Florida corporation ("**Tenant**"). "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

**W I T N E S S E T H :**

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

**PREMISES**

**1.** Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, that certain store building, approximately 220 feet in width by 200 feet in depth, together with a front vestibule, rear receiving room(s), exterior pads at the rear for installation of freezers and coolers, and the land on which the same shall stand, which store building and related improvements (collectively, the "Store") are to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided, and the Common Areas, as hereinafter defined (collectively, the "Premises").

The Premises are located in a shopping center development (shown in detail on Exhibit "A," the site plan prepared by Cuhaci & Peterson Architects, Inc. dated February 8, 1994 and last revised January 2, 1996 the "Site Plan"), known as Marketplace at Port St. Lucie (as the same may be enlarged from time to time, and including the Common Areas as defined herein, the "Shopping Center"), located at the southeasterly corner of the intersection of Jennings Road and U.S. 1 in the City of Port St. Lucie , County of St. Lucie, State of Florida. The legal description of the Shopping Center is set forth on Exhibit "B".

**TERM**

**2.** (a) <u>Initial Term.</u> The term of this Lease shall commence on the Commencement Date, as herein defined and shall be for an initial term of twenty (20) years (the "Initial Term").

(b) <u>Extension Term(s).</u> Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of this Lease, each extension to be for a period of five (5) years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term").

Tenant may extend the Term by giving to Landlord a notice in writing at least one hundred eighty (180) days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document.

(c) <u>Return of Premises.</u> Tenant will yield up the Premises and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in broom clean and working condition, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct. Tenant shall not be required to restore the Premises to their original state.

Tenant's Gross Sales figures for the prior year. The Landlord may then cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant contracted for and paid by Landlord (the "Landlord's Auditor"). Landlord's Auditor shall provide a copy of its findings and report of audit to Tenant. If Landlord's Auditor finds that Tenant has underpaid Percentage Rent due under this Lease, the Tenant shall pay to Landlord the amount of such underpayment within thirty (30) days of receipt of satisfactory documentation thereof from Landlord's Auditor and if Tenant has underpaid Percentage Rent by more than three percent (3%), Tenant shall pay the reasonable cost of Landlord's audit. If Landlord's Auditor finds that Tenant has overpaid Percentage Rent due under this Lease, then Landlord shall promptly pay the amount of any such overpayment to Tenant. If Landlord fails to pay promptly the amount of any such overpayment to Tenant, Tenant may deduct the same from the next succeeding payments of Basic Rent, Percentage Rent, or Additional Rent, as hereinafter defined, due under this Lease.

(c)    Additional Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay as Additional Rent a portion of (1) Common Area Maintenance Expenses, (2) Real Property Taxes, and (3) Shopping Center Insurance (collectively, "Additional Rent"). Landlord shall use reasonable efforts to minimize Additional Rent. With respect to all amounts charged to Tenant as Additional Rent under this Lease, Landlord shall maintain for a period of one full calendar year from the last day of the year for which such Additional Rent is due, complete books and records in accordance with generally accepted accounting principles, and all receipts, canceled checks, and other evidences of payment by Landlord (the "Payment Evidence"). On or before ninety (90) days after the end of each calendar year of the Term, Landlord shall provide to Tenant an itemized statement showing in reasonable detail the Additional Rent payable for the prior year. Tenant shall not be liable with respect to any amount expended by Landlord and not listed in such itemized statement. Failure of Landlord to timely deliver such itemized statement (unless caused by Force Majeure, as hereinafter defined) shall relieve Tenant of the obligation to pay Additional Rent. Tenant shall have the right, within one hundred and eighty days of receiving Landlord's statement of Additional Rent, to receive copies of the Payment Evidence and to audit Landlord's records regarding Additional Rent. Tenant shall provide a report of such audit to Landlord. If, based upon such audit, it appears that Tenant has underpaid Additional Rent, Tenant shall pay the amount of such underpayment to Landlord within thirty (30) days of completing its audit. If, based upon such audit, Tenant has overpaid Additional Rent, Landlord shall pay the amount of such overpayment to Tenant within thirty (30) days of receiving Tenant's audit report and, if Landlord over-billed Tenant for Additional Rent by more than three percent (3%), Landlord shall pay to Tenant the reasonable cost of its audit. If Landlord fails to so pay the amount of such overpayment to Tenant, Tenant may offset the amount of such overpayment against all Basic Rent, Additional Rent, and Percentage Rent due under this Lease.

(d)    Common Area Maintenance Expenses. Tenant shall pay its Pro-rata Share of "Common Area Maintenance Expenses" up to a maximum of $3,300.00 per monthly or $39,600.00 per year, subject to an increase in every fifth year of up to 20%. Common Area Maintenance Expenses shall be payable monthly on the first day of each calendar month in the Term, and shall initially be based upon one-twelfth of Landlord's estimate of the amount of such Additional Rent to be due for the upcoming year which, for the first year, is estimated to be $39,600.00. Common Area Maintenance Expenses include those reasonable and customary expenses actually incurred in good faith by Landlord in maintaining the Common Areas, as hereinafter defined, including those maintenance functions required to be performed in, on, or to the Common Areas under this Lease, including, without limitation, lighting, painting, cleaning, traffic control, policing, inspecting, landscaping (only as shown on the Site Plan), repaving the

3

Center Insurance means the reasonable cost of fire, casualty, flood, and vandalism insurance required to be maintained for the Shopping Center under the terms of this Lease. Shopping Center Insurance shall not include the costs of any abnormal or increased premiums for such types of insurance resulting from the acts or omissions of other tenants in the Shopping Center nor business interruption, liability, or rent loss insurance carried by Landlord, nor the excess cost of any insurance policies over that which could be purchased in other than an arm's length transaction between Landlord and an insurer.

Tenant's "Pro-rata Share" shall be the ratio of the gross rentable square footage of the Store, which, as of the Execution Date, is 48,644 to the total gross rentable square footage of the Shopping Center as outlined to be constructed on the Site Plan.

Basic Rent, Percentage Rent, and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated.

**TITLE**    4.    On or before forty-five (45) days after the date on which the last of both Landlord and Tenant shall have executed this Lease (the "Execution Date"), Landlord shall order from a title insurance company reasonably acceptable to Tenant (the "Title Company") and deliver to Tenant's counsel at the address provided hereunder for copies of notices, a title insurance commitment naming Tenant as the proposed insured and committing to insure Tenant's leasehold and any easement rights granted to Tenant in connection therewith and shall provide Tenant with copies of all title exceptions (the "Commitment"). It shall be a condition to Tenant's obligation to pay rent under this Lease that title to Tenant's leasehold and the related easements, if any, be subject only to those exceptions that are acceptable to Tenant or to which Tenant fails to timely object (collectively, the "Permitted Exceptions"). Landlord shall deliver the Commitment to Tenant on or before thirty (30) days after the Execution Date (the "Delivery Deadline"), and Tenant shall have ten (10) days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment. If title is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Title Objection Notice"). If Tenant timely sends to Landlord Tenant's Title Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Closing ("Landlord's Title Objection Response"). If Landlord states in Landlord's Title Objection Response that it is unable or unwilling to cure such objections, then Tenant shall have thirty (30) days to elect by written notice to Landlord whether to (1) waive the unsatisfied objections and occupy the Premises subject to such title defects, or (2) terminate this Lease. If Landlord states in Landlord's Title Objection Response that Landlord is willing to cure the objections stated in Tenant's Title Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Commencement Date. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (1) waive its objections and proceed to occupy the Premises subject to the title defects; or (2) terminate this Lease. On or before the Commencement Date, Landlord, at Landlord's sole expense, shall cause the Title Company to issue to Tenant a leasehold title policy showing Landlord as the owner of the Premises and insuring Tenant's leasehold and the Cross Easement subject only to the Permitted Exceptions in the amount of $500,000.00 (the "Title

**USE**          7.    The Store shall initially be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, but may also be used for the conduct of any mercantile, retail, or service business (including discount businesses, except that, so long as Wal-Mart, or any affiliate of Wal-Mart, is the user of Tract 1, either as owner or lessee, no space in or portion of Tract 2, Outparcel 1, Outparcel 2, or Outparcel 3 and no space in or portion of any other real property adjacent to the Shopping Center shall be leased or occupied by or conveyed to any other party for use as a discount department store or other discount store; provided, however, that the foregoing shall not be deemed to restrict or prohibit the use of the Store as a typical Winn-Dixie "low price leader" grocery store/supermarket) (the "Permitted Use").

Tenant shall have the exclusive right to operate a supermarket, and the nonexclusive right to operate a pharmacy or prescription drug concession, photo lab or film development business, and an automatic teller  machine and banking business in the Shopping Center. Landlord will not directly or indirectly lease or rent any property located within the Shopping Center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish, seafood, or vegetable market, nor will Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm, or corporation engaged in any such business without the prior written permission of Tenant; Landlord will not permit or suffer any property located within the Shopping Center to be used for, or occupied by, any business dealing in or keeping in stock or selling for off-premises consumption any staple or fancy groceries, meats, fish, seafood, vegetables, fruits, bakery goods, dairy products, or frozen foods without the prior written permission of Tenant except (1) by a business or businesses for which the sale of such items does not exceed the lesser of 500 square feet of sales area or ten percent ( 10%) of the square foot area of any storeroom within the Shopping Center, and is incidental only to the conduct of another business, or (2) by a restaurant located no closer than 50 feet from any boundary of the Store, as prepared, ready-to-eat food items, for consumption either on or off site. With the exception of package stores, no other tenant in the Shopping Center may sell beer and wine for off-premises consumption. Except for Schlotzky's deli-style restaurant, which shall be located no closer than 80 feet to any boundary of the Store as it is proposed to be enlarged, only Tenant may operate a bakery, delicatessen, or similar department in the Shopping Center.

Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and no spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theater (either motion or legitimate), business or professional offices, medical offices or clinics, automobile dealership, church, or health, recreational or entertainment-type activities, or "pay" telephones shall be permitted.

Notwithstanding the foregoing, Tenant shall not operate the Store for any use or purpose for which Landlord grants an exclusive to another tenant of the Shopping Center occupying 10,000 s.f. of space or more provided that, with respect to such exclusive use or purpose (a) Landlord gives Tenant ten (10) days' written notice prior to granting same; (b) it does not violate any exclusive use granted to Tenant under this Lease; (c) Tenant is not, on the date of Landlord's notice, using the Store for the proposed exclusive use or purpose, and (d) it does not preclude or unreasonably limit Tenant's operation of the Store as a supermarket.

further that construction shall be completed with all due diligence and, notwithstanding anything to the contrary in this Lease, in any event not later than two (2) months after the Initial Deadline (the "Outside Completion Date"), this option to terminate shall not arise. The Construction Start Date shall be the date as of which (1) Landlord shall have obtained an unrestricted building permit issued by the appropriate governmental authorities, (2) the first concrete footings have been poured and (3) Landlord shall have erected in a manner and location reasonably satisfactory to Tenant, a "Coming Soon" sign in accordance with the specifications listed on Exhibit "H" hereto. If this Lease does not terminate pursuant to paragraph 46 and Landlord has failed to commence or complete construction of the Store and the Shopping Center by the above dates as a result of matters within the control of Landlord, Landlord agrees for a period of three (3) years after such failure or termination not to permit or consent to the use of any portion of the Shopping Center as a supermarket by any party other than Tenant.

**COMMENCEMENT DATE**

11.    Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to accrue hereunder upon the date Tenant opens the Store for business, or upon the expiration of sixty (60) days following the performance of all the requirements listed below (collectively, the "Conditions"), whichever date shall sooner occur (the "Commencement Date").

(a)    The Premises shall have been delivered to Tenant completed in substantial accordance with Tenant's Plans (except for minor "punch list" items which Landlord agrees, in a side letter, to complete with due diligence) and Landlord shall have delivered to Tenant, at Landlord's expense, (1) the Title Policy, (2) the Survey, and (3) the Audit (each as defined in this Lease), and a Certificate of Occupancy or equivalent document for the Store;

(b)    Construction of all of the Common Areas of the Shopping Center shall have been completed substantially as shown on the Site Plan;

(c)    All drives, entrances, median cuts, access points, acceleration and deceleration lanes, and traffic control devices shown on the Site Plan in or connecting the Common Areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(d)    The Declaration as hereinafter defined, shall have been recorded and evidence of recordation provided to Tenant's satisfaction;

(e)    Tenant shall have received a letter, substantially in the form attached hereto as Exhibit "F", from appropriate governmental authorities regarding the zoning and comprehensive plan regulations, if any, applicable to the Premises.

If all the Conditions have not been met on or prior to the Outside Completion Date, Tenant, at its sole option, may terminate this Lease. Tenant shall open the Store for business on or before sixty (60) days after the Conditions have been met.

Landlord and Tenant shall execute a supplemental document establishing and confirming the Commencement Date in the form attached hereto as Exhibit "J" . No acceptance of possession of the Premises, opening for business by Tenant, nor payment of rent under this Lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with the Guideplans or Tenant's Plans, or a waiver of any of the Conditions.

9

any installation charges for the fire alarm system, static or flowing water to supply the fire sprinkler system, environmental impact charges, or any "hook up" fees or other charges incident to providing access to any utility. All of the Common Areas (including parking area) shall be adequately lighted by Landlord, as a portion of Common Area Maintenance Expense during the hours of ½ hour before dusk until 12:00 a.m. (the "Standard Hours"). Landlord shall cause to be separately metered and Tenant shall pay all charges during any time other than the Standard Hours for those parking area lights located in the area outlined in green on the Site Plan.

**TENANT'S MAINTENANCE**

**16.**    Tenant shall keep the interior of the Store in reasonably neat and orderly, and shall maintain the windows and plate glass, automatic doors, interior wiring and plumbing, the floor surfacing, and the air conditioning and heating systems good condition and repair, excepting structural repairs, repairs which are the responsibility of Landlord, repairs made necessary by reason of fire or the elements or other insured casualty, and reasonable wear and tear. Tenant shall keep the delivery areas of the Store reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the Premises or permit anything to be done in or upon the Premises creating an unreasonable nuisance thereon. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon the Premises for the purpose of making repairs and for examining or showing the same to prospective purchasers or lenders.

**LANDLORD'S MAINTENANCE**

**17.**    Landlord shall, at its cost and expense, keep and maintain in good condition and repair the facade of the Shopping Center, the exterior and structural portions of the Store, including the roof, gutter, downspouts, exterior painting, masonry walls, foundation and structural members, the automatic sprinkler system (including central alarm system therefor, if required by governmental authority), the exterior plumbing (including septic tank, if any), and exterior wiring and shall make any and all structural repairs to both the exterior and interior of the Store and the Shopping Center. Landlord shall also operate and maintain in good condition and repair during the Term all the Common Areas, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping as needed but at least three (3) times weekly, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and maintenance of landscaped areas. Landlord shall keep all exterior surfaces of buildings in the Shopping Center clean and graffiti free at all times. Landlord will complete such repairs immediately upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to the Store rendered necessary by the fault, act, or negligence of Tenant, or any of its servants, agents, or employees, unless Landlord may be reimbursed for the cost thereof pursuant to Landlord's insurance policies covering the Shopping Center and/or the Premises.

If, in order to protect persons or property, it shall be necessary for Tenant to make emergency repairs or to perform acts of maintenance or to provide services which are the responsibility of Landlord under this Lease, or if Landlord after receipt of notice as above provided fails or neglects to perform services, maintenance, or repairs, required of it hereunder to the Store or Common Areas, Tenant shall have the right to do so and to deduct from the Basic Rent, Additional Rent, and/or Percentage Rent due or thereafter to become due such sums as may be necessary to reimburse Tenant for the money expended or expense incurred by it in making such repairs.

Tenant's's reasonable judgment, or (2) all or a portion of the Shopping Center (exclusive of the Store) is damaged or destroyed such that, in the reasonable judgment of Cuhaci & Peterson Architects, Inc., or their successors or assigns or such other architect as shall be reasonably acceptable to Landlord and Tenant, the damage or destruction materially affects the value of Tenant's leasehold or its ability to successfully operate the Store for the Permitted Use, and, in Tenant's reasonable judgment, such destruction or damage cannot be repaired or restored within 150 days thereafter, then Tenant may elect within thirty (30) days after such damage, to terminate this Lease by written notice. If the Store shall suffer damage to any extent less than fifty percent (50%) of the value thereof, or if Tenant does not elect to terminate in accordance with the previous sentence, then Landlord shall proceed promptly (but in any event, within 120 days of the commencement of work) and without expense to Tenant to repair the damage or restore the Store, or the Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall abate in proportion to the percentage of the Common Areas damaged or destroyed until the damage or destruction is completely repaired or restored. Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof.

**INSURANCE**      22.      Landlord shall carry the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Certificates of insurance shall be furnished to Tenant prior to the Commencement Date, shall show Tenant as an additional insured, and shall provide thirty (30) days notice to Tenant prior to cancellation, material reduction in policy limits, or any other change adverse to Tenant's interests.

(a)      Liability Insurance. Landlord shall carry, at its sole expense, comprehensive general liability insurance coverage on the Shopping Center, stipulating limits of liability of not less than $2,000,000.00.

(b)      Casualty Insurance. Landlord shall carry all-risk commercial property insurance on the Premises and the Shopping Center and any additions, alterations, and improvements made thereto by Landlord or Tenant, including flood and earthquake coverage if the Shopping Center is located in a flood or earthquake prone area, in the amount of the full replacement cost thereof, and hereby expressly waives any and all claims against Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

Tenant shall carry, at its sole expense, comprehensive general liability insurance coverage on the Store, stipulating limits of liability of not less than $2,000,000.00, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Certificates of insurance shall be furnished to Landlord prior to the Commencement Date, shall show Landlord as an additional insured, and shall provide thirty (30) days notice to Landlord prior to cancellation, material reduction in policy limits, or any other change adverse to Landlord's interests. Notwithstanding the foregoing, so long as Tenant maintains a net worth in

13

**CONDEMNATION**    25.    If any part of the Premises or more than twenty percent (20%) of the Shopping Center, exclusive of the Store, is taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to terminate this Lease at its option, and any unearned Basic Rent, Percentage Rent, Additional Rent or other charges paid in advance shall promptly be refunded to Tenant.  If Tenant does not elect to terminate this Lease, Landlord shall immediately commence and diligently prosecute to completion any repairs and restoration reasonably necessary to put the Premises or the Shopping Center in a condition comparable to their condition at the time of taking and this Lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of Basic Rent, Percentage Rent, Additional Rent, and other adjustments as shall be just and equitable under all circumstances, and if Landlord and Tenant cannot agree as to what is just and equitable, Tenant may terminate this Lease by written notice to Landlord.

If any portion of the Common Areas or route or mode of access thereto, is obstructed or taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to unreasonably interfere with the conduct of Tenant's business in the Store or its use of or access to or through the Common Areas, or so as to reduce the required parking area by an amount in excess of ten percent (10%) or reduce the number of cars which may be conveniently parked to less than 750 in the entire Shopping Center after it is completed, Tenant may, at its option, terminate this Lease and shall be liable for rent only up to the time of such obstruction or taking.

**DEFAULT**    26.    Tenant shall be in default under this Lease if:

(a)    Tenant fails to pay any Basic Rent, Additional Rent, or Percentage Rent due under this Lease within ten (10) days after receipt of notice from Landlord stating that such sums remain unpaid; or

(b)    Tenant fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure).

Following an uncured default by Tenant, Landlord, at its option, may either (1) terminate this Lease or (2) re-enter the Premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the Premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom.  Tenant shall remain liable for the deficiency, if any, between the Basic Rent due hereunder and the total rent obtained by Landlord on reletting.

Notwithstanding the foregoing, a default (except as to payment of rent) shall be deemed cured if Tenant in good faith commences to cure same within thirty (30) days after receipt of notice and thereafter with reasonable diligence proceeds to cure such default.

**CONSTRUCTION RISKS**    27.    Nothing herein contained shall in any sense constitute Landlord as the agent of Tenant in constructing the Store or the Shopping Center, Tenant shall have no control or authority over the construction of the Store or the Shopping Center, beyond the right to reject the tender of the Store for the causes herein stated and to request change orders to be paid by Tenant.  Tenant

15

With a copy to:  Winn-Dixie Stores, Inc.
                 Attn: Mallory Gayle Holm,  Esq.
                 5050 Edgewood Court
                 P.O. Box B
                 Jacksonville, FL 32203-0297

                 Telecopy: (904) 783-5138

or to such other address as Tenant may direct from time to time.

| | |
|---|---|
| **ASSIGNMENT AND SUBLEASING** | 29.    Tenant may assign this Lease, or sublease or vacate the Premises in whole or in part without the consent of Landlord, provided Tenant shall continue to remain liable and responsible for the payment of rent and due performance of all other terms, covenants, and conditions of this Lease. Notwithstanding the foregoing, if Tenant plans to assign or sublet the entire Store for use other than as a supermarket, Tenant shall give written notice of same to Landlord and Landlord shall have twenty (20) days following such notice to elect to terminate this Lease by written notice to Tenant and if Landlord so terminates, Tenant shall be released from all liability accruing under this Lease from and after the date of the termination notice.  Tenant shall not assign or sublet in such a manner as to subdivide the Store into more than 3 parts. |
| **SUBORDINATE** | 30.    Provided that, with respect to any mortgage, deed of trust, security deed or other security instrument securing a lien upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement substantially in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage. |
| **ESTOPPEL CERTIFICATE** | 31.    Within a reasonable time, but no less than ten (10) business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "E" (an "Estoppel Certificate").  Notwithstanding the forgoing, Landlord shall not request, and Tenant shall not be required to deliver more than two (2) Estoppel Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500.00 per additional requested Estoppel Certificate. |
| **LENDER'S CURE** | 32.    Tenant shall give notice to any holder of a recorded Mortgage (a "Mortgagee") encumbering the Premises (provided that such Mortgagee has entered into an SNDA with Tenant and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord.  The Mortgagee shall have the right, but not the obligation, to cure such default and Tenant will not terminate this Lease or abate the rent payable hereunder by reason of such default unless and until it has afforded the Mortgagee thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said thirty |

**EXHIBITS**

**39.**   The following Exhibits attached hereto are hereby incorporated into this Lease by reference:

| | | |
|---|---|---|
| Exhibit "A" | - | Site Plan |
| Exhibit "B" | - | Legal Description of Shopping Center |
| Exhibit "C" | - | SNDA |
| Exhibit "D" | - | Surveyor's Certificate |
| Exhibit "E" | - | Estoppel Certificate |
| Exhibit "F" | - | Zoning Letter |
| Exhibit "G" | - | Short Form Lease |
| Exhibit "H" | - | "Coming Soon" Sign Specifications |
| Exhibit "I" | - | Declaration |
| Exhibit "J" | - | Supplemental Lease Agreement |

**FORCE MAJEURE**

**40.**   If there shall occur, during the Term, (1) strike(s), lockout(s), or labor dispute(s); (2) the inability to obtain labor or materials or reasonable substitutes therefor; (3) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other similar conditions (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Lease (except for the obligation to pay money), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

**ENVIRONMENTAL CONDITION**

**41.**   (a)   Landlord. Landlord represents and warrants to Tenant that it has not prior to the commencement of this Lease, and will not during the term of this Lease or any renewal thereof, cause or permit to be used, stored, generated, or disposed of any Hazardous substance, as hereinafter defined, in, on, or about the Shopping Center. Landlord certifies to Tenant that to its knowledge no other tenant of the Shopping Center has caused or permitted to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center. "Hazardous Substance" includes, without limitation, any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to Legal Requirements. "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal.

Landlord shall, at its sole cost and expense, indemnify, protect, and save Tenant, its officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements) of any kind or nature whatsoever (collectively the "Indemnified Matters") which may at any time be imposed upon, incurred by or asserted or awarded against Tenant and arising from or out of any Hazardous Substances on, in, under or affecting all or any portion of the Premises or the Shopping Center, which Hazardous Substances are not the result of Tenant's use or operation of the Premises. This indemnification includes, without limitation, any and all costs incurred due to any

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Lease.

**NO BROKERS**     42.     Neither Landlord nor Tenant has discussed this Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee. Each shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

**INDIVIDUAL STATE MANDATED PROVISIONS**     43.     Certain states mandate the inclusion of various provisions in all leases of real property located in such states. The following provisions are included to satisfy such individual state requirements and are applicable only if the Premises are located in the state named opposite the provisions appearing below.

**FLORIDA**     Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

**EXPANSION**     44.     As a material inducement to Tenant's entering into this Lease, Landlord grants to Tenant the option and privilege (Tenant's Enlargement Option") of requiring the enlargement of the Store to incorporate therein an addition consisting of the area to the easterly side of the Store measuring approximately 80 feet in width by 200 feet in depth, as shown on the Site Plan (the "Addition" or the "Additional Space"), which area shall be reserved for construction of the Addition except that pending same may be partially paved for parking or Landlord may construct a building thereon and rent space in such building. To facilitate construction of the Addition, Landlord initially shall construct the east wall of the Store with steel column supports equivalently spaced to the nearest row of steel column supports in the open front sales area of the Store and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original Store and the Addition.

Landlord shall give notice to Tenant not less than one hundred eighty (180) days prior to the expiration of the fifth year from the Commencement Date and every five (5) years thereafter throughout the Term reminding Tenant of Tenant's Enlargement Option ("Landlord's Reminder"). Tenant may exercise Tenant's Enlargement Option by giving to Landlord written notice at any time after receipt of Landlord's Reminder until ninety (90) days prior to the expiration of the fifth year from the Commencement Date or ninety (90) days prior to expiration of each five year interval thereafter of its exercise of such option, or at any time if the Additional Space is vacant and Tenant has not received written notice from Landlord that it has leased the Additional Space to another tenant in a manner consistent with this Lease, together with a proposed amendment to this Lease (the "Amendment") to provide for those terms and conditions described below and such additional terms and conditions with respect to the Addition as to which Landlord and Tenant shall subsequently agree. (Tenant's written notice and the Amendment are hereinafter referred to as the "Option Exercise Notice"). Notwithstanding the

21

(c)    Regardless of who constructs the Addition, upon completion of the Addition, it shall become a portion of the Store. If at that time there shall not at such date remain at least ten (10) years of the Initial Term, Tenant shall be granted three (3) additional Extension Terms of five (5) years each, and Tenant's remaining Extension Terms under this Lease, if any, shall be preserved.

(d)    If Tenant is prevented from expanding the Store or constructing the Addition due to the act or omission of Landlord, Tenant may terminate this Lease.

**TAKE OVER AND RELEASE**    45.    If Tenant or its assignee or sublessee fails to operate a business in the Store for sixty (60) days or longer, and such failure to operate is not due to permitted remodeling or enlargement, or a result of casualty or other Force Majeure (a "Store Closing"), then following such Store Closing Landlord may terminate this Lease by written notice to Tenant and from and after the date of such notice neither Landlord nor Tenant shall have any further liability to the other, except as expressly provided otherwise in this Lease.

**CONTINGENCIES**    46.    (a)    On or before ninety (90) days after the Execution Date (the "Plans Deadline"), Landlord and Tenant shall have agreed upon Tenant's Plans.  If they have not so agreed, this Lease shall terminate as of the Plans Deadline.

(b)    On or before six (6) months after the Execution Date (the "Permit Deadline"), Landlord shall have obtained all licenses, permits, and approvals necessary or desirable in connection with this Lease (the "Permits"). Landlord shall notify Tenant within five (5) days of the Permit Deadline as to whether it has obtained the Permits. If Landlord has not obtained the Permits on or before the Permit Deadline, as stated in Landlord's Notice, or if Landlord fails to so notify Tenant, this Lease shall terminate as of the Permit Deadline.

(c)    On or before ninety (90) days after the Execution Date (the "Financing Deadline"), Landlord shall have obtained construction and permanent financing (the "Financing") for the Shopping Center.  Landlord shall notify Tenant within five (5) days of the Financing Deadline as to whether it has obtained the Financing. If Landlord has not obtained the Financing on or before the Financing Deadline, as stated in Landlord's Notice, or if Landlord fails to so notify Tenant, this Lease shall terminate as of the Financing Deadline.

Landlord shall use reasonably diligent efforts to timely review and approve Tenant's Plans, to obtain the Permits prior to the Permit Deadline, and to obtain the Financing prior to the Financing Deadline.

**EXCULPATION**    47.    Tenant shall look solely to the estate and property of Landlord in the Shopping Center, including, without limitation, all rents, profits, and proceeds therefrom, for the collection of any sum due from Landlord to Tenant pursuant to this Lease and not timely paid ("Landlord's Payment Obligations"); provided, however, that it is expressly agreed that if Landlord fails to pay any of Landlord's Payment Obligations, Tenant may offset the unpaid amount, together with

STATE OF _Connecticut_ )

COUNTY OF _Hartford_ )

    The foregoing instrument was acknowledged before me this _23rd July_, 199_6_, by _Thomas E. Cross_, as _President_ of _____, a _____ and the authorized general partner of Marketplace Port St. Lucie Limited Partnership, a Florida limited partnership, on behalf of the limited partnership, **[PLEASE CHECK ONE]** _X_ who is personally known to me or _____ who has produced _____ as identification.

_[signature]_

Printed Name: _Tina R. Smitt_
Notary Public, State and County aforesaid.
My Commission Expires: _8/31/99_
Notary ID No.: _106780_
(NOTARIAL SEAL)

STATE OF _Connecticut_ )

COUNTY OF _Hartford_ )

    The foregoing instrument was acknowledged before me this _23rd July_, 199_6_, by _Thomas E. Cross_, as _____ President of Tyringham Ridge, Inc., a Nevada corporation, on behalf of the corporation, **[PLEASE CHECK ONE]** _X_ who is personally known to me or _____ who has produced _____ as identification.

_[signature]_

Printed Name: _Tina R. Smitt_
Notary Public, State and County aforesaid.
My Commission Expires: _8/31/99_
Notary ID No.: _106780_
(NOTARIAL SEAL)

25



SITE PLAN

THE MARKETPLACE at PORT ST. LUCIE
PORT ST. LUCIE, FL
DEVELOPED BY: DEVCON ENTERPRISES INC.

SP-1

<u>EXHIBIT B</u>

*LEGAL DESCRIPTION*

A parcel of land, being all of Lots 5 through 9 inclusive, all of Tract "C", a portion of water management Tract "A", a portion of Tract "B", and a portion of Tract "D", Port St. Lucie Square, according to the plat thereof, as recorded in Plat Book 28, at Page 22, of the Public Records of St. Lucie County, Florida, being more particularly described as follows:

Begin at the intersection of the easterly right-of-way line of U.S. Highway No. 1, with the South right-of-way line of Jennings Road, as shown on said plat (said point also being the northwest corner of Lot 7); thence, along said South right-of-way line of Jennings Road, North 89 degrees 43 minutes 03 seconds East, 1411.34 feet to the Northeast corner of Tract "B", as shown on said plat; thence, along the East line of said Tract "B", South 00 degrees 00 minutes 55 seconds East, 835.41 feet; thence North 27 degrees 53 minutes 46 seconds West, 192.58 feet; thence South 62 degrees 06 minutes 14 seconds West, 248.10 feet; thence North 27 degrees 53 minutes 46 seconds West, 214.00 feet; thence South 62 degrees 06 minutes 14 seconds West, 350.63 feet to a point on the easterly boundary line of Lot 4, as shown on said plat; thence, along said line, North 29 degrees 54 minutes 30 seconds West, 180.64 feet to a point on the arc of a tangent curve; thence northwesterly, along the arc of said curve being concave to the southwest, having a radius of 40.00 feet, a central angle of 87 degrees 59 minutes 16 seconds, an arc distance of 61.43 feet; thence, tangent to said curve, and along the northerly line of said Lot 4, South 62 degrees 06 minutes 14 seconds West, 214.97 feet to a point on said easterly right-of-way line of U.S. Highway No. 1; thence, along said right-of-way line, North 27 degrees 53 minutes 46 seconds West, 766.90 feet to the Point of Beginning.

LESS AND EXCEPT THE FOLLOWING DESCRIBED PARCEL OF LAND:

Begin at the northwest corner of the Plat of Port St. Lucie Square, as recorded in Plat Book 28, Pages 22 and 22A, Public Records of St. Lucie County, Florida; said point being the intersection of the northeasterly right-of-way line of U.S. Highway No. 1 (a 200.00 foot right-of-way) and the southerly right-of-way line of Jennings Road, a line being 50.00 feet southerly of the north line of Section 12, Township 37 South, Range 40 East; thence N 89 degrees 43 minutes 03 seconds E, along said southerly right-of-way line of Jennings Road, a distance of 232.19 feet; thence S 28 degrees 43 minutes 37 seconds E, a distance of 134.75 feet; thence S 62 degrees 06 minutes 14 seconds W, a distance of 207.70 feet, to a point on said northeasterly right-of-way line of U.S. Highway No. 1; thence N 27 degrees 53 minutes 46 seconds W, along said northeasterly right-of-way line, a distance of 242.36 feet to the Point of Beginning of the herein described parcel of land.

*END OF LEGAL DESCRIPTION*

**EXHIBIT "C"**

**SUBORDINATION, NONDISTURBANCE,**
**AND ATTORNMENT AGREEMENT**

THIS **SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT** (this "Agreement"), made this December 21, 1995, between _____, a _____ _____, whose address is _____ together with its successors, assigns, and transferees "Lender") and **WINN-DIXIE STORES, INC.**, a Florida corporation, whose address is P. O. Box 585200, Orlando, Florida 32858-5200 (together with its successors and assigns, "Winn-Dixie");

**R E C I T A L S:**

1.    Lender has made or is about to make a loan to Marketplace Port St. Lucie Limited Partnership, a Florida limited partnership ("Landlord"), secured by a mortgage, deed of trust, security deed, or other financing instrument to be recorded in the Official Records of St. Lucie County, Florida (together with any modifications, consolidations, extensions, replacements, or renewals thereof, the "Mortgage"), encumbering the real estate known as "Marketplace at Port St. Lucie" shopping center at southeasterly corner of the intersection of Jennings Road and U.S. 1 and more particularly described in the Mortgage and on Exhibit "A" attached hereto and incorporated herein (the "Shopping Center"); and

2.    By lease dated _____ (as amended by _____and as otherwise to be amended from time to time, the "Lease"), Landlord did lease unto Winn-Dixie, as tenant, those certain premises which constitute a portion of the Shopping Center and are more particularly described in the Lease (the "Premises"); and

3.    Lender and Winn-Dixie desire that the Lease shall not terminate but rather shall remain in full force and effect in accordance with its terms if the Mortgage is foreclosed or any transfer of the Premises is made in lieu thereof;

**NOW THEREFORE**, for valuable consideration the receipt and sufficiency of which are hereby acknowledged, Lender and Winn-Dixie agree as follows:

1.    Provided Winn-Dixie is not in material default under the terms of the Lease, then in the course of or following any exercise of any remedy under the Mortgage, any foreclosure sale of the Shopping Center or the Premises, or any transfer of the Shopping Center or the Premises thereafter or in lieu of foreclosure (together with any similar events, a "Foreclosure Event"):

(a)    The right of possession of Winn-Dixie to the Premises and Winn-Dixie's rights arising out of the Lease shall not be affected or disturbed by Lender.

(b)    Winn-Dixie shall not be named as a party defendant.

        (c)      The Lease shall not be terminated or affected by any Foreclosure Event.

2.      Following a Foreclosure Event, Winn-Dixie shall attorn to Lender as its new landlord and the Lease shall continue in full force and effect as a direct lease between Winn-Dixie and Lender. Notwithstanding the foregoing, Lender shall not be:

        (a)      liable for any act or omission of any prior landlord (including Landlord), unless such action was taken at the direction of or with the approval of Lender; or

        (b)      subject to any offsets or defenses which Winn-Dixie might have against any prior landlord (including Landlord) except those which arose out of such landlord's default under the Lease and accrued after Winn-Dixie has notified Lender and given Lender an opportunity to cure as provided in the Lease; or

        (c)      bound by any rent Winn-Dixie paid for more than the then current month to any prior landlord (including Landlord) or

        (d)      bound by any modification of the Lease made after the date hereof without Lender's consent.

3.      Following a Foreclosure Event, Lender promptly shall give notice thereof to Winn-Dixie, stating its current address and providing evidence of Lender's title to the Premises.

4.      The Lease is subject and subordinate to the lien of the Mortgage and to all advances made or to be made thereunder as though the Mortgage had been executed and recorded prior in point of time to the execution of the Lease. Notwithstanding the foregoing, subordination of the Lease to the Mortgage should not be construed to constitute Tenant's consent or agreement to any term, condition, or provision of the Mortgage or any related loan document which purports to modify, alter, or amend the Lease.

5.      The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto. However, Winn-Dixie agrees to execute and deliver to Lender such other instrument as Lender shall reasonably request to evidence such provisions.

**IN WITNESS WHEREOF**, Lender and Winn-Dixie have executed this Agreement the day and year first above written.

Signed, sealed and delivered
in the presence of:

_____

Print name:_____

_____          By:_____

Print name:_____

_____          Its:_____
Date:_____

_____          **WINN-DIXIE STORES, INC.**

Print name:_____

_____          By:_____

Print name:_____          _____

Its:_____
Date:_____

STATE OF _____ )

COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ _____, 199____, by _____, as _____ of _____, a _____, on behalf of the _____, **[PLEASE CHECK ONE]** _____ who is personally known to me or _____ who has produced _____ as identification.

_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

STATE OF FLORIDA )

COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _____ ____, 199____, by _____, as _____ President of Winn-Dixie Stores, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.

_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

## EXHIBIT "D"

## FORM OF SURVEYOR'S CERTIFICATE

TO:    Winn-Dixie Stores, Inc. ("Owner")
       _____ Title Insurance Corporation ("Title Company")

RE:    File No._____ Drawing No. _____ Title: _____

The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that (1) this plat of survey and the property description with respect thereto are true and correct and prepared from an actual on-the-ground survey of the real property (the "Property") shown hereon; (2) such survey was conducted by the Surveyor, or under his supervision; (3) all monuments shown herein actually exist, and the location, size and type of material thereof are correctly shown; (4) except as shown herein, there are no visible encroachments onto the Property or protrusions therefrom, there are no visible easements or rights-of-way on the Property and there are no visible discrepancies, conflicts, shortages in area or boundary line conflicts; (5) the size, location and type of improvements are as shown hereon, and all are located within the boundaries of the Property; (6) the location of all adjoining streets and roads and the distance to and location of the nearest intersecting street or road is as shown; (7) the Point of Beginning of the Property Description is accurate; (8) the Property has access to and from a _____ foot wide public roadway by: (name all streets or other rights-of-way) as shown on the survey; (9) all recorded easements and other exceptions, as noted in _____ Title Insurance Company's Commitment for Title Insurance No. _____, dated _____ have been correctly platted hereon and indicated by official records book and page number; (10) the boundaries, dimensions and other details shown herein are true and correct; (11) the Property is not located in a 100-Year Flood Plain or in an identified "flood prone area", as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Insurance Rate Map Panel #_____ dated _____, which such map panel covers the area in which the Property is situated; (12) the following matters, to the extent such exist on the Property, are shown on the survey: location of all utilities serving the Property, all strips, gores and overlaps with adjacent properties, all interior lot lines, high water marks, if the Property is located on or contains a body of water, elevations of the Property and any natural or constructed objects affecting the Property; (13) the Property is zoned _____; (14) the _____ and _____ boundaries of the Property abut the streets and highways as shown on the survey; and (15) the survey meets or exceeds the minimum technical requirements for surveys pursuant to the statutes of the State of _____ and the most recently promulgated minimum standard detail requirements for ALTA-ACSM surveys.

Executed this the _____ day of _____, 19___.

_____
Registered Land Surveyor No._____
Address:_____

**(SURVEYOR'S SEAL)**

**EXHIBIT "E"**

**ESTOPPEL CERTIFICATE**
WINN-DIXIE STORE #_____

_____

_____

The undersigned officer of **WINN-DIXIE STORES, INC..**, a Florida corporation ("WINN-DIXIE") hereby certifies, on behalf of WINN-DIXIE, that as of December 21, 1995 (the "Certificate Date"), the following is true and correct:

1.     That WINN-DIXIE is the tenant ("Tenant") under a currently effective lease (as amended as described below, the "Lease") with Marketplace Port St. Lucie Limited partnership, as the current landlord ("Landlord") dated _____, 19__, conveying a leasehold estate of the property described therein (the "Premises") located in a shopping center known as Marketplace at Port St. Lucie (the "Shopping Center"), and the Lease has been amended or is evidenced only by:

       (a)     Short Form Lease dated _____;
       (b)     Letter Agreement(s) dated _____;
       (c)     Supplemental Lease Agreement dated _____;
       (d)     First Amendment to Lease dated _____;
       (e)     Second Amendment to Lease dated _____.

2.     That the term of the Lease commenced _____, 19__, and is scheduled to expire on _____, _____ unless renewed or terminated in accordance with the terms of the Lease. Pursuant to the Lease, Tenant is entitled to renew the lease for _____ terms of _____ years each.

3.     That, to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Lease, all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199__, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease.

4.     That, to the best of Tenant's knowledge, Landlord is not in default under the Lease, except that Landlord has failed to perform the following maintenance items as required under the Lease:

       (a)     _____
       (b)     _____
       (c)     _____
       (d)     _____

5.     That the Lease contains no provision for purchase of the Premises by Tenant.

6.     Tenant has received no notice of any sale, transfer, assignment, or pledge of Landlord's interest in the Lease or the rent due thereunder to any party except: _____ and _____

7.     Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law.

8.     Notwithstanding anything to the contrary herein:

(a)     No acceptance or possession of the Premises, the opening for or operation of business by Tenant therein, execution of this certificate, or payment of rent under the Lease constitutes or will constitute acceptance by Tenant of work or materials that are defective or not completed in accordance with Tenant's plans and specifications, or a waiver of Tenant's rights against Landlord in connection therewith.

(b)     Tenant makes no representation or warranty that the Premises or the Shopping Center, or any portion thereof is in compliance with the Americans With Disabilities Act or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

9.      The address for notices to Tenant is P. O. Box 585200, Orlando, Florida 32858-5200, with a copy to: Mallory Gayle Holm, Winn-Dixie Stores, Inc., 5050 Edgewood Ct., P.O. Box B, Jacksonville, FL 32203-0297.

10.     This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant on or before ten (10) days after the Certificate Date.

**IN WITNESS WHEREOF**, the undersigned has executed this certificate on behalf of Tenant.

**WINN-DIXIE STORES, INC.**

By:_____

Its:_____

The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge.  Further, Landlord certifies that Tenant has fully performed its obligations under the Lease to date and Tenant is not in default thereunder.

**IN WITNESS WHEREOF**, the undersigned has executed this certificate on behalf of Landlord.

**Marketplace Port St. Lucie Limited partnership**

By:_____

Its:_____

**EXHIBIT "F"**

**(ZONING/LAND USE AGENCY LETTERHEAD)**

(DATE)

Re:    _____, St. Lucie County, State of  Florida

To Whom It May Concern:

      This is to advise you that the zoning and use of the above-captioned Premises is governed by the laws and regulations of the County of St. Lucie, and the Premises have been zoned to allow an establishment or facility which includes the retail sale of food and drugs, sundries and notions, books and stationery, delicatessen, bakery, beer and wine for off-site consumption, video rental, and similar uses, a bank, and a dry cleaning business under Section _____ of the Zoning Code of the County of St. Lucie, relating to uses permitted in the _____ District.  The aforesaid zoning permits the use of the improvements located or to be located on the Premises as described above.  The aforesaid Zoning District is appropriate for this state's comprehensive plan's future land use designation (if any exists).

      As of the date hereof, we are not aware of any facts with respect to the Premises that constitute a violation of any building or zoning laws, rule or regulations.  Any nonconforming elements of the development are considered valid nonconforming elements under the current building and zoning law.

      Should you have further questions in this regard, please advise.

          Very truly yours,

          (Name)
          (Title)

Attachments
- Zoning Regulations for Permitted Use of Premises
- Zoning Regulations for Non-conforming Uses

## EXHIBIT "G"

### SHORT FORM LEASE

**THIS SHORT FORM LEASE** is hereby executed this December 21, 1995, by and between **Marketplace Port St. Lucie Limited partnership**, a Florida limited partnership, and **Tyringham Ridge, Inc.,** a Nevada corporation whose mailing address is 609 Farmington, Hartford, CT 06105 (together, "Landlord") and **WINN-DIXIE STORES, INC.,** a Florida corporation, whose mailing address is P. O. Box 585200, Orlando, Florida 32858-5200 ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H:

**WHEREAS**, Landlord and Tenant did enter into a Lease (the "Lease"), dated _____; and

**WHEREAS**, Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on Exhibit "A" attached hereto and depicted on the Site Plan attached as Exhibit "B" attached hereto and by these references made a part hereof together with the nonexclusive right to use the Common Areas as described and provided in the Lease (collectively the "Premises").

The term of the Lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, twenty (20) years thereafter. Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each. Tenant has no option to purchase the Premises under the Lease.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Short Form Lease shall be deemed to constitute a single instrument or document. This Short Form Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Short Form Lease, the Lease shall control.

**IN WITNESS WHEREOF,** Landlord and Tenant have executed this Short Form Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

**LANDLORD:**

_____

Print Name:_____

**Marketplace Port St. Lucie Limited Partnership**

By:_____

    its authorized general partner

_____

Print Name:_____

By:_____

    _____

    Its:_____

_____

Print name:_____

**Tyringham Ridge, Inc.,** a Nevada corporation

_____

Print name:_____

By:_____

    _____

    Its:_____

    Date:_____

    As to Landlord

**TENANT:**

_____

Print Name:_____

**WINN-DIXIE STORES, INC.**

_____

Print Name:_____

    As to Tenant

By:_____

    _____

    Its:_____

STATE OF _____ )

COUNTY OF _____ )

      The foregoing instrument was acknowledged before me this _____ _____, 199____, by _____, as _____ of _____, the authorized general partner of Marketplace Port St. Lucie Limited Partnership, a Florida limited partnership, on behalf of the limited partnership, **[PLEASE CHECK ONE]** _____ who is personally known to me or _____ who has produced _____ as identification.


_____

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)


STATE OF _____ )

COUNTY OF _____ )

      The foregoing instrument was acknowledged before me this _____ _____, 199____, by _____, as _____ President of Tyringham Ridge, Inc., a Nevada corporation, on behalf of the corporation, **[PLEASE CHECK ONE]** _____ who is personally known to me or _____ who has produced _____ as identification.


_____

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

STATE OF FLORIDA )

COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _____ ____, 199____, by _____, as _____ President of Winn-Dixie Stores, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.

_____

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

**<u>EXHIBIT "H"</u>**

Coming Soon Sign Specifications

**Text of Sign:**        Coming Soon --
Winn-Dixie
Marketplace

**Size:**                Maximum size permitted by applicable law and
restrictions of record and otherwise reasonably
acceptable to Landlord and Tenant

**EXHIBIT "I"**

DECLARATION OF RESTRICTIVE COVENANTS

**THIS DECLARATION OF EASEMENTS AND RESTRICTIVE COVENANTS** (this "Declaration") is made _____, 199__ by **Marketplace Port St. Lucie Limited Partnership,** a Florida limited partnership and **Tyringham Ridge, Inc.,** a Nevada corporation (together with their respective successors and assigns and any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, "Owner").

## R E C I T A L S

1.      Owner is the owner of that certain real property located in the County of St. Lucie, State of Florida  as described on Exhibit "B" attached hereto (the "Shopping Center") and shown on the Site Plan attached hereto as Exhibit "A" (the "Site Plan"), Outparcel A and Outparcel B and certain other real property hereinafter referred to as  "Owner's Remaining Land".

2.      Owner is the landlord under that certain lease dated _____, 199___ between Owner and Winn-Dixie Stores, Inc., a Florida corporation ("Tenant") pursuant to which Tenant leases a portion of the Shopping Center (the "Store").

3.      Owner intends by this Declaration to grant certain easement and other rights and impose certain use restrictions upon the Shopping Center, Outparcel A and Outparcel B and Owner's Remaining Land for the benefit of Owner, its future tenants, licensees, invitees, and other occupants and for the benefit of Tenant.

**NOW, THEREFORE,** for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby declares that the Shopping Center, Outparcel A and Outparcel B and Owner's Remaining Land, except for the non-restricted area shown on Exhibit "A" or described below (the "Non-Restricted Area"), shall be sold, transferred, leased, conveyed, owned, and occupied subject to the following:

## I.
## RESTRICTIONS

1.1      Restrictions on Use.The Shopping Center, Outparcel A and Outparcel B shall be restricted in accordance with the following: The Store shall initially be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, but may also be used for the conduct of any mercantile, retail, or service business (including discount businesses, except that, so long as Wal-Mart, or any affiliate of Wal-Mart, is the user of Tract 1, either as owner or lessee, no space in or portion of Tract 2, Outparcel 1, Outparcel 2, or Outparcel 3 and no space in or portion of any other real property adjacent to the Shopping Center shall be leased or occupied by or conveyed to any other party for use as a discount department store or other discount store; provided, however, that the foregoing shall not be deemed to restrict or prohibit the use of the Store as a typical Winn-Dixie "low price leader" grocery store/supermarket) (the "Permitted Use").

Tenant shall have the exclusive right to operate a supermarket, and the nonexclusive right to operate a pharmacy or prescription drug concession, photo lab or film development business, and an automatic teller machine and banking business in the Shopping Center.  Landlord will not directly or indirectly lease or rent any property located within the Shopping Center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish, seafood, or vegetable market, nor will Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm, or corporation engaged in any such business without the prior written permission of Tenant; Landlord will not permit or suffer any property located within the Shopping Center to be used for, or occupied by, any business dealing in or keeping in stock or selling for off-premises consumption any staple or fancy groceries, meats, fish, seafood, vegetables, fruits, bakery goods, dairy products, or frozen foods without the prior written permission of Tenant except (1) by a business or businesses for which the sale of

such items does not exceed the lesser of 500 square feet of sales area or ten percent ( 10%) of the square foot area of any storeroom within the Shopping Center, and is incidental only to the conduct of another business, or (2) by a restaurant located no closer than 50 feet from any boundary of the Store, as prepared, ready-to-eat food items, for consumption either on or off site. With the exception of package stores, no other tenant in the Shopping Center may sell beer and wine for off-premises consumption. Except for Schlotzky's deli-style restaurant, which shall be located no closer than 80 feet to any boundary of the Store as it is proposed to be enlarged, only Tenant may operate a bakery, delicatessen, or similar department in the Shopping Center.

Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and no spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theater (either motion or legitimate), business or professional offices, medical offices or clinics, automobile dealership, church, or health, recreational or entertainment-type activities, or "pay" telephones shall be permitted.

Notwithstanding the foregoing, Tenant shall not operate the Store for any use or purpose for which Landlord grants an exclusive to another tenant of the Shopping Center occupying 10,000 s.f. of space or more provided that, with respect to such exclusive use or purpose (a) Landlord gives Tenant ten (10) days' written notice prior to granting same; (b) it does not violate any exclusive use granted to Tenant under this Lease; (c) Tenant is not, on the date of Landlord's notice, using the Store for the proposed exclusive use or purpose, and (d) it does not preclude or unreasonably limit Tenant's operation of the Store as a supermarket.

    1.2    <u>Restrictions on Building Height and Size</u>. Construction of buildings and other improvements in the Shopping Center and on Outparcel A and Outparcel B shall be restricted to a maximum building area of twenty-five percent (25%) of the ground area of each parcel, with the remainder of the parcel to be comprised of Common Areas consisting of parking and landscaped areas. No structure, other than the Store, erected in the Shopping Center or on Outparcel A or Outparcel B shall exceed a maximum vertical building height of twenty-two (22) feet measured from ground level.

The foregoing restrictions shall terminate upon the first to occur of the following (1) seventy-five (75) years after the date hereof, or (2) the date that Tenant permanently ceases to operate a mercantile, retail, or service business in the Store.

## II.
## ATTORNEYS' FEES/ENFORCEMENT

Owner and Tenant shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other owners.

If Owner or Tenant commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

## III.
## MODIFICATION

This Declaration may be modified or amended by owners owning one hundred percent (100%) of the real property comprising the Shopping Center and Owner's Remaining Land, which modification or amendment shall become effective upon (1) the written consent of Tenant, which may be granted or withheld in its sole discretion, and (2) filing same in the real property records of the county of St. Lucie, Florida.

# IV.
# EASEMENTS

4.1     <u>Ingress and Egress</u>.

      (a)     Owner hereby grants to each tenant of the Shopping Center (but only so long as such tenant remains a tenant of the Shopping Center), to Tenant, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through the Common Areas as shown on the Site Plan.

      (b)     Owner shall have the right to temporarily close any part of the Common Areas to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Owner shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Shopping Center.

      (c)     Owner shall have the right to temporarily close any part of the Common Areas as necessary to prevent the public from obtaining prescriptive rights therein, provided that (1) such closure does not exceed the minimum time period required pursuant to applicable law to prevent such prescriptive rights, and (2) Owner uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Shopping Center.

# V.
# GENERAL PROVISIONS

5.1     <u>Covenants Run With the Land</u>. The provisions of this Declaration shall operate as covenants running with the land comprising the Shopping Center, the Store, Outparcel A and Outparcel 2, and Owner's Remaining Land and shall inure to the benefit of Tenant, its successors and assigns.

5.2     <u>Severability</u>. If any term or provision of this Declaration or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Declaration shall be valid and shall be enforced to the extent permitted by law.

5.3     <u>Pronouns</u>. When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.

5.4     <u>Captions</u>. The captions in this Declaration are for convenience only and do not constitute a part of the provisions hereof.

5.5     <u>Governing Law</u>. This Declaration shall be construed and enforced in accordance with, and governed by, the law of the State of Florida.

5.6     <u>No Presumption</u>. This Declaration shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against any owner.

5.7     <u>Exhibits.</u> The following Exhibits attached hereto are hereby incorporated into this Declaration by reference:

Exhibit"A" -    Site Plan

Exhibit "B" -    Legal Description of the Shopping Center, Outparcel A and Outparcel B, Owner's Remaining Land, and the Non-Restricted Area (if any)

**IN WITNESS WHEREOF**, this Declaration has been executed as of the date first above written.

Witnesses:                                          Owner:


_____ ,    **Marketplace Port St. Lucie Limited Partnership**
Print name:_____


_____     By:_____
Print name:_____            _____
                                                              Its:_____
                                                              Date:_____


_____     **Tyringham Ridge, Inc.,** a Nevada corporation
Print name:_____


_____     By:_____
Print name:_____            _____
                                                              Its:_____
                                                              Date:_____


STATE OF _____ )
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____ _____, 199___, by _____, as _____ of Marketplace Port St. Lucie Limited Partnership, a Florida limited partnership, on behalf of the limited partnership, **[PLEASE CHECK ONE]** _____ who is personally known to me or _____ who has produced _____ as identification.


_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

STATE OF _____ )
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ _____, 199___, by
_____, as _____ President of Tyringham Ridge, Inc.,
a Nevada corporation, on behalf of the corporation, **[PLEASE CHECK ONE]** _____ who is personally known
to me or _____ who has produced _____ as identification.


_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

46

**EXHIBIT "A"**

Legal Description of the Shopping Center,  Owner's Remaining Land, and the Non-Restricted Area

**EXHIBIT "B"**

Site Plan

**EXHIBIT "J"**

**SUPPLEMENTAL LEASE AGREEMENT**

**THIS SUPPLEMENTAL LEASE AGREEMENT** (the "Agreement") is made this _____, 199____, between **WINN-DIXIE STORES, INC.**, a Florida corporation, ("Tenant") and **Marketplace Port St. Lucie Limited Partnership**, a Florida limited partnership and **Tyringham Ridge, Inc.**, a Nevada corporation (collectively, "Landlord").

**WHEREAS,** Tenant and Landlord entered into a Lease dated _____, 199_____ (the "Lease") for the use and occupancy of the Premises described therein;

**NOW, THEREFORE,** pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1.    The Commencement Date of the Term is _____, 19_____.

2.    The Term shall expire at midnight Eastern Time on _____, 19_____, unless earlier terminated or later extended as provided for in the Lease.

3.    All undefined capitalized terms used herein are as defined in the Lease.

**IN WITNESS WHEREOF,** the parties hereto have signed and sealed this Agreement on the date first set forth above.

Signed, sealed and delivered
in the presence of:                                     TENANT:

_____     **WINN-DIXIE STORES, INC.**
Print name:_____

_____     By:_____
Print name:_____          _____
                                                                  Its:_____
                                                                  Date:_____

                                                            LANDLORD:

_____     **Marketplace Port St. Lucie Limited Partnership**
Print name:_____

_____     By:_____
Print name:_____          _____
                                                                  Its:_____
                                                                  Date:_____