## SUPPLEMENTAL LEASE AGREEMENT

**THIS SUPPLEMENTAL LEASE AGREEMENT** (the "Agreement") is made effective this 15th day of April 1999, between **WINN-DIXIE STORES, INC.,** a Florida corporation, (hereinafter the "Tenant") **and WESTFORK PLAZA ASSOCIATES L.P.,** a Delaware limited partnership (hereinafter the "Landlord")(**f/k/a WEST FORK C ASSOCIATES I, L.P.**)

**WHEREAS,** Tenant and Landlord entered into a Lease dated March 19, 1998, as amended and/or evidenced by: (a) Short Form Lease dated March 19, 1998, recorded in Official Records book 28038, page 0040 of the public records of Broward County, Florida (the "Lease") for the use and occupancy of the Premises described therein;

**NOW, THEREFORE**, pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1.    The Commencement Date of the Term is April 15, 1999.

2.    The Term shall expire at midnight Eastern Time on April 14, 2019, unless earlier terminated or later extended as provided for in the Lease.

3.    All undefined capitalized terms used herein are as defined in the Lease.

**IN WITNESS WHEREOF**, the parties hereto have signed and sealed this Agreement on the date first set forth above.

Signed, sealed and delivered
in the presence of:

1) _____
Print Name> ...Donna Wolff...

 

 

2) _____
Print Name> ...Brad D. Milke......

*As to Landlord*

1) _____
Print Name> ...Lisa L. Mitchem...

2) _____
Print Name> ...JOAN B. STOOPS...

*As to Tenant*

**WESTFORK PLAZA ASSOCIATES LIMITED PARTNERSHIP**
**(f/k/a WEST FORK C ASSOCIATES I, L.P.)**
a Delaware limited partnership

By: **SREG WESTFORK, INC.,**
    as General Partner

By: _____
Name: _____
     Its    _J.V._    President

*Landlord*

**WINN-DIXIE STORES, INC.,**
a Florida corporation

By: _____
Name> ...James Kufeldt...
     Its    President

*Tenant*

Miami 278 sla
5 17 99 tlm

# Exhibit 1

STATE OF ___FLORIDA___ )
COUNTY OF ___BROWARD___ )

    The foregoing instrument was acknowledged before me this _May_ _24_, 1999, by _Theodore Stoops_, as _Sr Vice President_ of SREG WESTFORK, INC., as general partner of Westfork Plaza Associates Limited Partnership, on behalf of said limited partnership. He is personally known to me or has produced _____ as identification.

_Deborah D. Abbatecola_
Printed Name: _Deborah D. Abbatecola_
Notary Public, State and County aforesaid.
My Commission Expires: _9/21/99_
Notary ID No.: _CC 481259_
(NOTARIAL SEAL)

    DEBORAH D. ABBATECOLA
    COMMISSION # CC 481259
    EXPIRES SEPTEMBER 21, 1999
    BONDED THRU
    ATLANTIC BONDING CO., INC


STATE OF FLORIDA )
COUNTY OF DUVAL )

    The foregoing instrument was acknowledged before me this _June_ _9_, 1999, by _James Kufeld_, as _____ President of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation, who is personally known to me.

_Joan B Stoops_
Printed Name: _JOAN B. STOOPS_
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

    JOAN B STOOPS
    My Commission CC543217
    Expires Mar. 27, 2000

Miami.278 sta
5 17 99 tim

## CONSENT

The undersigned, as owner and holder of a mortgage upon the shopping center or the Premises, hereby consents to the terms and conditions of this Amendment.

Witnesses:

1) _____        _____
Print name> Ellen Vivian

2) _____        By: _____
Print Name> Mira Milenkovic           Holly Schnier, SVP
                                      Its: SVP
                                      Date: 5/25/99

STATE OF ___FL____ )
COUNTY OF __Broward_)

The foregoing instrument was acknowledged before me this __25__ May day of 1999, by __Holly Schnier__, as __Sr. VP__ President of BankAtlantic FL corporation, on behalf of the corporation, who is personally known to me.

Printed Name: Ellen Vivian
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARY SEAL)

ELLEN VIVIAN
COMMISSION # CC 478208
EXPIRES AUG 27, 1999
BONDED THRU
ATLANTIC BONDING CO., INC.

Miami 278.sia
5.17.99 tim

## EXHIBIT "A"

Parcel A of Westfork Commercial Plat, according to the Plat thereof, recorded in Plat Book 160, Page 14, Public Records of Broward County, Florida.

Said lands lying, situate and being in Broward County, Florida.

Tax Folio No.:        1016-15-0010

LESS AND EXCEPT THEREFROM THE FOLLOWING LANDS:

A portion of Parcel "A" of WESTFORK COMMERCIAL PLAT, according to the Plat thereof, as recorded in Plat Book 160, Page 14, of the Public Records of Broward County, Florida, said portion being more particularly described as follows:

Commence at the Southerly most Southwest corner of said Parcel "A"; thence along the south line of said Parcel "A" North 89°39'59" East 349.25 feet; thence continue along the south line of said Parcel "A" North 89°25'02" East 35.73 feet to the Point of Beginning; thence North 54°56'21" West 68.79 feet; thence North 00°20'01" West 230.68 feet; thence North 89°25'02" East 256.73 feet; thence South 00°34'58" East 270.76 feet to the south line of said Parcel "A"; thence along the south line of said Parcel "A" South 89°25'02" West 201.83 feet to the POINT OF BEGINNING.
Bearings are based on a Plat bearing South 89°25'02" West along the south line of Parcel "A".

Said lands situate, lying and being in Broward County, Florida.

Tax Folio No. 1016-15-0010

AND LESS AND EXCEPT:

A portion of Parcel "A" of WESTFORK COMMERCIAL PLAT, according to the Plat thereof, as recorded in Plat Book 160, Page 14, of the Public Records of Broward County, Florida, and being more particularly described as follows:

COMMENCE at the West quarter (W 1/4) corner of Section 16, Township 51 South, Range 40 East, as shown on said Plat; thence along the south line of the North one-half (N 1/2) of said Section 16, North 89° 25' 02" East 1064.15 feet; thence North 00° 34' 58" West 100.00 feet to the POINT OF BEGINNING lying on the South line of said Parcel "A"; thence continue North 00° 34' 58" West 236.00 feet; thence North 89° 25' 02" East 199.67 feet to a point of curvature of a 30.00 foot radius curve concave to the Southwest; thence Southeasterly along said curve through a central angle of 90° 00' 00" an arc distance of 47.12 feet; thence South 00° 34' 58" East 206.00 feet to the South line of said Parcel "A"; thence along said South line South 89° 25' 02" West 229.67 feet to the POINT OF BEGINNING. Basis of bearing is South 89° 25' 02" West along the South line of said Plat.

Said lands situate, lying and being in Broward County, Florida.

AND LESS AND EXCEPT:

A PORTION OF PARCEL "A" OF "WESTFORK COMMERCIAL PLAT", ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 160, PAGE 14 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, SAID PORTION BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHERMOST OF THE SOUTHWEST CORNERS OF SAID PARCEL "A"; THENCE ALONG THE WESTERLY LINE OF SAID PARCEL "A" FOR THE FOLLOWING FOUR (4) COURSES: (1) NORTH 45°20'04" WEST (PLAT BEARING 49.30 FEET; (2) NORTH 00°20'01" WEST 100.78 FEET; (3) NORTH 08°30'35" EAST 100.72 FEET; (4) NORTH 00°20'01" WEST 47.33 FEET; THENCE NORTH 89°40'00" EAST 289.11 FEET TO A POINT ON A 38.00 FOOT RADIUS NON-TANGENT CURVE CONCAVE TO THE SOUTHWEST WHOSE RADIUS POINT BEARS SOUTH 28°12'11" WEST; THENCE SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 67°27'48" AN ARC DISTANCE OF 40.76' TO A POINT OF TANGENT; THENCE SOUTH 00°20'01" EAST 126.60 FEET TO A POINT OF CURVATURE OF A 200.00 FOOT RADIUS CURVE CONCAVE TO THE EAST; THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 17°36'02" AN ARC DISTANCE OF 59.34 FEET TO A POINT OF NON-TANGENCY; THENCE SOUTH 00°20'01" EAST 82.35 FEET TO A POINT ON THE SOUTH LINE OF SAID PARCEL "A"; THENCE ALONG THE SAID SOUTH LINE  SOUTH 89°39'38" WEST 292.96 FEET TO THE POINT OF BEGINNING.

SAID LANDS SITUATE, LYING, AND BEING IN THE CITY OF PEMBROKE PINES, BROWARD COUNTY, FLORIDA

BK 28038 PG 1050

## EXHIBIT "A"
### (continued)

AND LESS AND EXCEPT:

Description:
A portion of Parcel "A" of "Westlark Commercial Plat", according to the plat thereof as recorded in Plat Book 160, Page 14 of the Public Records of Broward County, Florida, said portion being more particularly described as follows:

COMMENCE at the West quarter corner of Section 16, Township 51 South, Range 40 East; thence on a Grid North bearing of North 01°46'13" West (based on said Plat) 100.03 feet to the South boundary of said Parcel "A"; thence along said boundary North 89°39'59" East 2.29 feet to an angle point in said boundary; thence along said boundary North 89°25'02" East 540.66 feet to the POINT OF BEGINNING; thence North 00°34'58" West 72.12 feet to a point of curvature of a 138.50 foot radius curve concave to the East; thence Northerly along said curve through a central angle of 35°48'23" an arc distance of 86.55 feet to a point of tangency; thence North 35°13'25" East 86.80 feet to a point of curvature of a 30.00 foot radius curve concave to the Southeast; thence Northeasterly along said curve through a central angle of 54°11'37" an arc distance of 28.38 feet to a point of tangency; thence North 89°25'02" East 122.20 feet; thence South 00°34'20" East 236.00 feet to the South boundary of said Parcel "A"; thence along said boundary South 89°25'02" West 223.49 feet to the POINT OF BEGINNING.

Basis of bearing is South 89°25'02" West along the South line of said Plat.

Said lands situate, lying, and being in the City of Pembroke Pines, Broward County, Florida.

AND LESS AND EXCEPT:

A PORTION PARCEL A OF "WESTFORK COMMERCIAL PLAT", ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 160, PAGE 14 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, SAID PORTION BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:
COMMENCE AT THE SOUTHERNMOST SOUTHWEST CORNER OF SAID PARCEL A; THENCE ALONG THE SOUTH BOUNDARY OF SAID PARCEL A ON A GRID NORTH BEARING OF NORTH 89°39'59" EAST (BASED ON SAID PLAT) 349.23 FEET TO AN ANGLE POINT IN SAID BOUNDARY; THENCE CONTINUE ALONG SAID BOUNDARY, NORTH 89°25'02" EAST 237.56 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°34'58" WEST 282.28 FEET; THENCE NORTH 89°40'00" EAST 64.74 FEET TO A POINT OF CURVATURE OF A 302.75 FOOT RADIUS CURVE CONCAVE TO THE SOUTH; THENCE EASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 11°5'46" AN ARC DISTANCE OF 59.51 FEET TO A POINT OF TANGENCY; THENCE SOUTH 79°04'14" EAST 149.09 FEET TO A POINT OF CURVATURE OF A 33.00 FOOT RADIUS CURVE CONCAVE TO THE SOUTHWEST; THENCE SOUTHEASTERLY AND EASTERLY AND SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 116°37'05" AN ARC DISTANCE OF 67.17 FEET TO A POINT OF REVERSE CURVATURE OF A 196.50 FOOT RADIUS CURVE CONCAVE TO THE NORTH; THENCE EASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 38°07'49" AN ARC DISTANCE OF 130.77 FEET TO A POINT OF TANGENCY; THENCE SOUTH 00°54'58" EAST 72.12 FEET TO THE SOUTH BOUNDARY FO SAID PARCEL A; THENCE ALONG SAID SOUTH BOUNDARY, SOUTH 89°25'02" WEST 247.37 FEET TO THE POINT OF BEGINNING.

6

RECORDED IN THE OFFICIAL RECORDS BOOK
OF BROWARD COUNTY, FLORIDA
COUNTY ADMINISTRATOR

BK 28038PG0051

## EXHIBIT "A"

Parcel A of Westfork Commercial Plat, according to the Plat thereof, recorded in Plat Book 160, Page 14, Public Records of Broward County, Florida.

Said lands lying, situate and being in Broward County, Florida.

Tax Folio No.:        1016-15-0010

LESS AND EXCEPT THEREFROM THE FOLLOWING LANDS:

A portion of Parcel "A" of WESTFORK COMMERCIAL PLAT, according to the Plat thereof, as recorded in Plat Book 160, Page 14, of the Public Records of Broward County, Florida, said portion being more particularly described as follows:

Commence at the Southerly most Southwest corner of said Parcel "A"; thence along the south line of said Parcel "A" North 89°39'59" East 349.23 feet; thence continue along the south line of said Parcel "A" North 89°25'02" East 35.73 feet to the Point of Beginning; thence North 54°56'21" West 68.79 feet; thence North 00°20'01" West 230.68 feet; thence North 89°25'02" East 256.73 feet; thence South 00°34'58" East 270.76 feet to the south line of said Parcel "A"; thence along the south line of said Parcel "A" South 89°25'02" West 201.83 feet to the POINT OF BEGINNING.
Bearings are based on a Plat bearing South 89°25'02" West along the south line of Parcel "A".

Said lands situate, lying and being in Broward County, Florida.

Tax Folio No. 1016-15-0010

AND LESS AND EXCEPT:

A portion of Parcel "A" of WESTFORK COMMERCIAL PLAT, according to the Plat thereof, as recorded in Plat Book 160, Page 14, of the Public Records of Broward County, Florida, and being more particularly described as follows:

COMMENCE at the West quarter (W 1/4) corner of Section 16, Township 51 South, Range 40 East, as shown on said Plat; thence along the South line of the North one-half (N 1/2) of said Section 16, North 89° 25' 02" East 1064.15 feet; thence North 00° 34' 58" West 100.00 feet to the POINT OF BEGINNING lying on the South line of said Parcel "A"; thence continue North 00° 34' 58" West 236.00 feet; thence North 89° 25' 02" East 199.67 feet to a point of curvature of a 30.00 foot radius curve concave to the Southwest; thence Southeasterly along said curve through a central angle of 90° 00' 00" an arc distance of 47.12 feet; thence South 00° 34' 58" East 206.00 feet to the South line of said Parcel "A"; thence along said South line South 89° 25' 02" West 229.67 feet to the POINT OF BEGINNING. Basis of bearing is South 89° 25' 02" West along the South line of said Plat.

Said lands situate, lying and being in Broward County, Florida.

AND LESS AND EXCEPT:

A PORTION OF PARCEL "A" OF "WESTFORK COMMERCIAL PLAT, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 160, PAGE 14 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, SAID PORTION BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGIN AT THE SOUTHERNMOST OF THE SOUTHWEST CORNERS OF SAID PARCEL "A"; THENCE ALONG THE WESTERLY LINE OF SAID PARCEL "A" FOR THE FOLLOWING FOUR (4) COURSES: (1) NORTH 45°20'01" WEST PLAT BEARING) 49.50 FEET; (2) NORTH 00°20'01" WEST 100.78 FEET; (3) NORTH 06°30'33" EAST 100.72 FEET; (4) NORTH 00°20'01" WEST 47.33 FEET; THENCE NORTH 89°40'00" EAST 289.11 FEET TO A POINT ON A 38.00 FOOT RADIUS NON-TANGENT CURVE CONCAVE TO THE SOUTHWEST WHOSE RADIUS POINT BEARS SOUTH 20°02'1" WEST; THENCE SOUTHEASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 67°27'49" AN ARC DISTANCE OF 40.76' TO A POINT OF TANGENCY; THENCE SOUTH 00°20'01" EAST 128.50 FEET TO A POINT OF CURVATURE OF A 250.00 FOOT RADIUS CURVE CONCAVE TO THE EAST; THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 13°36'02" AN ARC DISTANCE OF 59.34 FEET TO A POINT OF NON-TANGENCY; THENCE SOUTH 00°20'01" EAST 82.35 FEET TO A POINT ON THE SOUTH LINE OF SAID PARCEL "A"; THENCE ALONG THE SAID SOUTH LINE SOUTH 89°39'59" WEST 292.96 FEET TO THE POINT OF BEGINNING

SAID LANDS SITUATE, LYING, AND BEING IN THE CITY OF PEMBROKE PINES, BROWARD COUNTY, FLORIDA.

## EXHIBIT "A"
### (continued)

AND LESS AND EXCEPT:

*Description:*
*A portion of Parcel "A" of "Westfork Commercial Plat", according to the plat thereof as recorded in Plat Book 160, Page 14 of the Public Records of Broward County, Florida, said portion being more particularly described as follows:*

*COMMENCE at the West quarter corner of Section 16, Township 51 South, Range 40 East; thence on a Grid North bearing of North 01°46'13" West (based on said Plat) 100.03 feet to the South boundary of said Parcel "A"; thence along said boundary North 89°39'59" East 2.29 feet to an angle point in said boundary; thence along said boundary North 89°25'02" East 540.66 feet to the POINT OF BEGINNING; thence North 00°34'58" West 72.12 feet to a point of curvature of a 138.50 foot radius curve concave to the East; thence Northerly along said curve through a central angle of 35°48'23" an arc distance of 86.55 feet to a point of tangency; thence North 35°13'25" East 86.80 feet to a point of curvature of a 30.00 foot radius curve concave to the Southeast; thence Northeasterly along said curve through a central angle of 54°11'37" an arc distance of 28.38 feet to a point of tangency; thence North 89°25'02" East 122.20 feet; thence South 00°34'58" East 236.00 feet to the South boundary of said Parcel "A"; thence along said boundary South 89°25'02" West 223.49 feet to the POINT OF BEGINNING.*

*Basis of bearing is South 89°25'02" West along the South line of said Plat.*

*Said lands situate, lying, and being in the City of Pembroke Pines, Broward County, Florida.*

AND LESS AND EXCEPT:

A PORTION PARCEL A OF "WESTFORK COMMERCIAL PLAT", ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 160, PAGE 14 OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, SAID PORTION BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:
COMMENCE AT THE SOUTHERNMOST SOUTHWEST CORNER OF SAID PARCEL A; THENCE ALONG THE SOUTH BOUNDARY OF SAID PARCEL A ON A GRID NORTH BEARING OF NORTH 89°39'59" EAST (BASED ON SAID PLAT) 349.23 FEET TO AN ANGLE POINT IN SAID BOUNDARY; THENCE CONTINUE ALONG SAID BOUNDARY, NORTH 89°25'02" EAST 257.56 FEET TO THE POINT OF BEGINNING; THENCE NORTH 00°34'58" WEST 282.28 FEET; THENCE NORTH 89°40'00" EAST 64.74 FEET TO A POINT OF CURVATURE OF A 302.75 FOOT RADIUS CURVE CONCAVE TO THE SOUTH; THENCE EASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 11°15'46" AN ARC DISTANCE OF 59.51 FEET TO A POINT OF TANGENCY; THENCE SOUTH 79°04'14" EAST 149.09 FEET TO A POINT OF CURVATURE OF A 33.00 FOOT RADIUS CURVE CONCAVE TO THE SOUTHWEST; THENCE SOUTHEASTERLY AND EASTERLY AND SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 116°37'25" AN ARC DISTANCE OF 67.17 FEET TO A POINT OF REVERSE CRUVATURE OF A 156.50 FOOT RADIUS CURVE CONCAVE TO THE NORTH; THENCE EASTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 58°07'49" AN ARC DISTANCE OF 130.77 FEET TO A POINT OF TANGENCY; THENCE SOUTH 00°34'58" EAST 72.12 FEET TO THE SOUTH BOUNDARY FO SAID PARCEL A; THENCE ALONG SAID SOUTH BOUNDARY, SOUTH 89°25'02" WEST 247.37 FEET TO THE POINT OF BEGINNING.

6

RECORDED IN THE OFFICIAL RECORDS BOOK
OF BROWARD COUNTY, FLORIDA
COUNTY ADMINISTRATOR



# LEASE

### The Westfork Plaza
### Northeast Corner of Pines Blvd. and 160 Avenue
### (Dykes Road)

# Pembroke Pines, Broward County, Florida

O:\TRANSFER\MIAMI\PEMBROKE\LEASE.002
July 15, 1996
October 11, 1996
March 9, 1998
March 19, 1998

## TABLE OF CONTENTS

PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TITLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SURVEY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ENVIRONMENTAL AUDIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

COMPLIANCE WITH LAWS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

CONSTRUCTION OF SHOPPING CENTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

COMPLETION DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

COMMENCEMENT DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

OTHER TENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

PARKING AND COMMON AREAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

SERVICE AREA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TENANT'S MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

LANDLORD'S MAINTENANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

FIXTURES AND INTERIOR ALTERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CASUALTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

LANDLORD'S INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

QUIET ENJOYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

TAXES AND LIENS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONSTRUCTION RISKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ASSIGNMENT AND SUBLEASING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

SUBORDINATE .................................................................................. 15

ESTOPPEL CERTIFICATE ...................................................................... 15

LENDER'S CURE .............................................................................. 15

BENEFIT ....................................................................................... 16

TRANSFER BY LANDLORD ...................................................................... 16

SHORT FORM LEASE ............................................................................ 16

MARGINAL TITLES ............................................................................. 16

COMPLETE AGREEMENT ....................................................................... 16

DECLARATION .................................................................................. 16

EXHIBITS ...................................................................................... 16

FORCE MAJEURE .............................................................................. 16

ENVIRONMENTAL CONDITION ................................................................. 17

NO BROKERS ................................................................................... 18

INDIVIDUAL STATE MANDATED PROVISIONS ................................................. 18

FLORIDA ....................................................................................... 18

EXPANSION .................................................................................... 18

TAKE OVER AND RELEASE .................................................................... 19

WAIVER OF TRIAL BY JURY ................................................................... 20

ATTORNEYS FEES .............................................................................. 20

LIMITATION OF LIABILITY .................................................................... 20

SELF-HELP ..................................................................................... 20

## LEASE

**THIS LEASE** is made this March 19, 1998, between **WEST FORK C ASSOCIATES I, L.P.**, a Delaware limited partnership ("Landlord") and **WINN-DIXIE STORES, INC.**, a Florida corporation ("Tenant"). "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### W I T N E S S E T H:

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

**PREMISES**

1.    Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, that certain store building, approximately 222 feet in width by 231 feet in depth, together with a front vestibule, rear receiving room(s), exterior pads at the rear for installation of freezers and coolers, and the land on which the same shall stand, which store building and related improvements (collectively, the "Store") are to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided, and the Common Areas, as hereinafter defined (collectively, the "Premises").

The Premises are located in a shopping center development (shown in detail on Exhibit "A," a site plan prepared by Mark L. Saltz Architects, Inc. on January 26, 1998, (the "Site Plan"), known as Westfork Plaza (as the same may be enlarged from time to time, and including the Common Areas as defined herein, the "Shopping Center"), located at the northeasterly corner of Pines Blvd. and 160 Avenue (Dykes Road) in the City of Pembroke Pines , County of Broward, State of Florida. The legal description of the Shopping Center is set forth on Exhibit "B".

**TERM**

2.    (a)    <u>Initial Term.</u>  The term of this Lease shall commence on the Commencement Date, as herein defined and shall be for an initial term of twenty (20) years (the "Initial Term").

(b)    <u>Extension Term(s).</u>  Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of this Lease, each extension to be for a period of five (5) years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term").

Tenant may extend the Term by giving to Landlord a notice in writing at least six (6) months before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document.

(c)    <u>Return of Premises.</u>  Tenant will yield up the Premises and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in broom clean condition, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct.  Tenant shall not be required to restore the Premises to their original state.

(d)    <u>Holding Over.</u>  Any holding over by Tenant of the Premises after the expiration of the Term shall operate and be construed as a tenancy from month to month, at the same rent and upon the same terms and conditions applicable to the Term.

**RENT**

3.    (a)    <u>Basic Rent.</u>  Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord as basic rent for the Premises during the Term, the sum of $439,330.00 per annum ("Basic Rent"). Basic Rent shall be paid in twelve (12) equal monthly installments of $36,610.83 per month, plus all applicable sales taxes, which installments shall be due and payable in advance on the first day of each and every calendar month of the Term.

(b)    Percentage Rent.  In addition, beginning on the Commencement Date, as hereinafter defined, Tenant shall pay Landlord percentage rent equal to the amount, if any, by which one percent (1%) of Gross Sales (as hereinafter defined) exceeds Basic Rent ("Percentage Rent"). Any Percentage Rent which may become due shall be payable within sixty (60) days after the expiration of each Fiscal Year, as hereinafter defined. However, upon final termination of the Term, any Percentage Rent due shall be payable within sixty (60) days after such termination or expiration of the Term.  The Percentage Rent for each Fiscal Year shall be calculated separately and without reference to any other Fiscal Year.  For purposes of calculation the Percentage Rent due hereunder, Tenant's fiscal year shall be approximately July 1st to June 30th of each year (the "Fiscal Year").  Notwithstanding anything to the contrary in this Lease, Tenant shall be entitled to deduct from the amount of Percentage Rent otherwise due in any Fiscal Year the amount paid or payable by Tenant during the same Fiscal Year for Real Estate Taxes and Shopping Center Insurance, each as hereinafter defined.

"Gross Sales" shall mean the aggregate sales price of all merchandise sold in or from the Store by Tenant during each fiscal year of the Term, both for cash and on credit (less customary reserves for bad debts). Gross Sales shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by Tenant from the Premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks, automatic teller machines and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds, savings stamps, or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts, or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of Gross Sales it expects to make in or from the Premises.  Landlord shall not release and shall keep confidential all information disclosed to or discovered by it concerning Gross Sales, and shall require Landlord's Auditor to keep the same confidential.  Landlord may, however, disclose Gross Sales to lenders, prospective lenders, and to prospective purchasers of the Shopping Center (collectively, "Interested Parties") provided that such Interested Parties agree in writing to keep Gross Sales information confidential.

Tenant shall keep complete and accurate books and records of its Gross Sales. At the end of each Fiscal Year, or at the end of the Term, if it sooner occurs, Tenant shall submit to Landlord a written statement of Gross Sales for the preceding Fiscal Year. Landlord agrees to use all reasonable efforts to treat the Gross Sales report as confidential. Further, the Gross Sales report shall be conclusive unless Landlord, within ninety (90) days after receipt thereof, shall give written notice to Tenant of its intent to audit Tenant's Gross Sales figures for the prior year. The Landlord may then, at its cost and expense, cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant contracted for and paid by Landlord (the "Landlord's Auditor").  If Tenant's understatement in gross sales made from the Demised Premises during the preceding fiscal year exceeds three percent (3%), then, in such event Tenant shall pay the cost of Landlord's audit.  Landlord's Auditor shall provide a copy of its findings and report of audit to Tenant.  If Landlord's Auditor finds that Tenant has underpaid Percentage Rent due under this Lease, the Tenant shall pay to Landlord the amount of such underpayment within thirty (30) days of receipt of satisfactory documentation thereof from Landlord's Auditor.  If Landlord's Auditor finds that Tenant has overpaid Percentage Rent due under this Lease, then Landlord shall promptly pay the amount of any such overpayment to Tenant.  If Landlord fails to pay promptly the amount of any such overpayment to Tenant, Tenant may deduct the same from the next succeeding payments of Basic Rent, Percentage Rent, or Additional Rent, as hereinafter defined, due under this Lease.

(c)    <u>Additional Rent.</u> Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay as Additional Rent a portion of (1) Common Area Maintenance Expenses, (2) Real Estate Taxes, and (3) Shopping Center Insurance (collectively, "Additional Rent"). Landlord shall use reasonable efforts to minimize Additional Rent. With respect to all amounts charged to Tenant as Additional Rent under this Lease, Landlord shall maintain for a period of one full calendar year from the last day of the year for which such Additional Rent is due, complete books and records in accordance with generally accepted accounting principles, and all receipts, canceled checks, and other evidences of payment by Landlord (the "Payment Evidence"). On or before sixty (60) days after the end of each calendar year of the Term, Landlord shall provide to Tenant an itemized statement showing in reasonable detail the Additional Rent payable for the prior year. Tenant shall not be liable with respect to any amount expended by Landlord and not listed in such itemized statement. Failure of Landlord to timely deliver such itemized statement (unless caused by Force Majeure, as hereinafter defined) shall relieve Tenant of the obligation to pay Additional Rent. Tenant shall have the right, within one hundred and eighty days of receiving Landlord's statement of Additional Rent, to request to receive copies of the Payment Evidence and to audit Landlord's records regarding Additional Rent. Tenant shall provide a report of such audit to Landlord. If, based upon such audit, it appears that Tenant has underpaid Additional Rent, Tenant shall pay the amount of such underpayment to Landlord within thirty (30) days of completing its audit. If, based upon such audit, Tenant has overpaid Additional Rent, Landlord shall pay the amount of such overpayment to Tenant within thirty (30) days of receiving Tenant's audit report. If Landlord fails to so pay the amount of such overpayment to Tenant, Tenant may offset the amount of such overpayment against all Basic Rent, Additional Rent, and Percentage Rent due under this Lease.

(d)    <u>Common Area Maintenance Expenses.</u> Tenant shall pay its Pro-rata Share of "Common Area Maintenance Expenses". Common Area Maintenance Expenses shall be payable monthly on the first day of each calendar month in the Term, and shall initially be based upon one-twelfth of Landlord's estimate of the amount of such Additional Rent to be due for the upcoming year which, for the first year, is estimated to be $_$1.50____. Common Area Maintenance Expenses include those reasonable and customary expenses actually incurred in good faith by Landlord in maintaining the Common Areas, as hereinafter defined, including those maintenance functions required to be performed in, on, or to the Common Areas under this Lease, including, without limitation, lighting, painting, cleaning, traffic control, policing, inspecting, landscaping (only as shown on the Site Plan, unless changed with Tenant's consent), repaving the parking areas, and otherwise repairing the Common Areas. With respect to landscaping and plant/grass maintenance, cleaning/sweeping services, and any other service provided and billed as part of Common Area Maintenance Expenses the amount billed for which exceeds $5,000.00 annually, Landlord shall contract for such services based upon competitive, arms-length bids obtained no more infrequently than once every other year. Common Area Maintenance Expenses do not include upgrading the Shopping Center to a level of service or condition beyond or above that which exists as of the Commencement Date, merchant's association dues or the like, management or administrative fees, the cost of repairs or other work to the extent reimbursed by insurance, costs of correcting defects (including latent defects) in the construction of the Store or the Shopping Center, the costs of individual tenant improvements or items or services that benefit other tenants to an extent greater than such items of services benefit Tenant, special services or excess utilities provided to other tenants, any utility or other expense paid for directly by Tenant, advertising or marketing expenses, security guards, holiday decorations, penalties for or the cost (including attorneys' fees, of disputes relating to Landlord's failure to timely pay fees or taxes or for Landlord's breach of any other agreement to which Landlord is a party, leasing commissions, Landlord's income taxes, depreciation expense, principal, interest, or late charges on mortgages to which the Shopping Center is subject, the replacement of capital investment items or new capital improvements unless, in Tenant's reasonable judgment, such items and improvements are likely to and in fact do result in the operating efficiency of the Shopping Center being increased such that the cost of such improvements will be wholly offset by such increased operating efficiency during the Term or unless such improvements are necessary to comply with Legal Requirements (hereinafter defined) applicable to the Common Areas, in which case, the cost thereof shall be amortized over the maximum allowable useful life

of such improvements, the cost of investigating, testing for, removing, abating, or otherwise cleaning up any matter that constitutes a violation of any environmental law, bad debt or real losses or reserves therefor, costs associated with the operation of Landlord as a business entity, as opposed to costs of operating the Shopping Center, such as entity formation costs, entity accounting, etc., costs of selling, syndicating, financing or refinancing Landlord's interest in the Shopping Center, cellular phone charges, or travel expenses.

Notwithstanding anything in the foregoing to the contrary, Tenant's share of Common Area Maintenance Expenses during the first seven (7) years of the term shall not exceed $1.40 per square foot of the demised premises (the "Capped Amount"). The Capped Amount shall increase at the beginning of the eighth (8th) lease year, and every seven (7) years thereafter, by an amount calculated by multiplying the Capped Amount, as in effect immediately prior to each calculation, by a fraction the numerator of which is the Consumer Price Index for the relevant metropolitan area (the "CPI") for the first month of such seven (7) year period, and the denominator of which is the CPI for the 84th month of such period. If the CPI is no longer published, Landlord shall substitute such other reasonably comparable index for computing inflation as Landlord shall select, in its reasonable judgment.

(e)    Real Estate Taxes.    Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Real Estate Taxes." Real Estate Taxes includes all ad valorem real estate taxes, less any abatements, discounts, or refunds permitted by law but excludes special assessments. Real Estate Taxes does not include Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Shopping Center. Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense. Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing but shall incur no liability for failure to do so. If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge shall be at Landlord's sole cost and expense, unless Landlord obtains Tenant's written approval in advance, which may be granted or withheld in Tenant's sole discretion. If Tenant grants its approval, Tenant shall pay its Pro-rata Share of the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

(f)    Shopping Center Insurance.    Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Shopping Center Insurance". Shopping Center Insurance means the reasonable cost of fire, casualty, flood, and vandalism insurance required to be maintained for the Shopping Center under the terms of this Lease. Shopping Center Insurance shall not include the costs of any abnormal or increased premiums for such types of insurance resulting from the acts or omissions of other tenants in the Shopping Center nor business interruption, liability, or rent loss insurance carried by Landlord, nor the excess cost of any insurance policies over that which could be purchased in an arm's length transaction between Landlord and an insurer.

Tenant's "Pro-rata Share" shall be the ratio of the gross rentable square footage of the Store to the total gross rentable square footage of the Shopping Center, as it may change from time to time, as outlined to be constructed on the Site Plan.

Basic Rent, Percentage Rent, and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated based upon a 365 day year.

TITLE    4.    On or before thirty (30) days after the date on which the last of both Landlord and Tenant shall have executed this Lease (the "Execution Date"), Landlord shall order from a title insurance company reasonably acceptable to Tenant (the "Title Company") and deliver to Tenant's counsel at the address provided hereunder for copies of notices, a signed title insurance commitment

dated no earlier than the Execution Date naming Tenant as the proposed insured and committing to insure Tenant's leasehold and any easement rights granted to Tenant in connection therewith and shall provide Tenant with copies of all title exceptions (the "Commitment"). It shall be a condition to Tenant's obligation to pay rent under this Lease that title to Tenant's leasehold and the related easements, if any, be subject only to those exceptions that are acceptable to Tenant or to which Tenant fails to timely object (collectively, the "Permitted Exceptions"). Landlord shall deliver the Commitment to Tenant on or before thirty (30) days after the Execution Date (the "Delivery Deadline"), and Tenant shall have ten (10) days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment. If title is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Title Objection Notice"). If Tenant timely sends to Landlord Tenant's Title Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Closing ("Landlord's Title Objection Response"). If Landlord states in Landlord's Title Objection Response that it is unable or unwilling to cure such objections, then Tenant shall have thirty (30) days to elect by written notice to Landlord whether to (1) waive the unsatisfied objections and occupy the Premises subject to such title defects, or (2) terminate this Lease. If Landlord states in Landlord's Title Objection Response that Landlord is willing to cure the objections stated in Tenant's Title Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Commencement Date. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (1) waive its objections and proceed to occupy the Premises subject to the title defects; or (2) terminate this Lease. (Tenant's right to terminate will not arise unless Tenant in its reasonable judgment, is unable, to use, operate or take possession of the Demised Premises). On or before the Commencement Date, Landlord, at Tenant's expense, shall cause the Title Company to issue to Tenant a leasehold title policy showing Landlord as the owner of the Premises and insuring Tenant's leasehold and the Cross Easement subject only to the Permitted Exceptions in the amount of $500,000.00 (the "Title Policy"). If Landlord fails to timely provide the Commitment or the Title Policy, Tenant may terminate this Lease.

**SURVEY**

5.    On or before thirty (30) days after the Execution Date, Landlord shall order from a surveyor licensed in the state in which the Shopping Center is located and deliver to Tenant's counsel at the address provided hereunder for copies of notices, six (6) sealed copies of an actual survey of the real property comprising the Shopping Center conducted or updated within ninety (90) days of the date of the Commitment, showing all improvements currently located thereon and the projected location of the Store, the Common Areas, and the other buildings to be included in the Shopping Center (the "Survey"). Landlord shall deliver the Survey to Tenant on or before the Delivery Deadline. The Survey shall show the metes and bounds or plat legal description of the Shopping Center as shown on the Commitment, shall locate all exceptions shown in the Commitment that are capable of being so located, and shall bear the certificate attached hereto as Exhibit "D", and shall be otherwise sufficient to permit deletion of the survey exception from the Commitment and the Title Policy. Tenant shall have until the Title/Survey Review Deadline to review the Survey. If the Survey is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Survey Objection Notice"). If Tenant timely sends to Landlord Tenant's Survey Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Survey Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Closing ("Landlord's Survey Objection Response"). If Landlord states in Landlord's Survey Objection Response that it is unable or unwilling to cure such objections, then Tenant shall have thirty (30) days to elect by written notice to Landlord whether to (1) waive the unsatisfied objections and occupy the Premises subject to such Survey defects, or (2) terminate this Lease. If Landlord states in Landlord's Survey Objection Response that Landlord is willing to cure the objections stated in Tenant's Survey Objection Notice, then Landlord shall use reasonable efforts to cure such

objections on or before the Commencement Date. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (1) waive its objections and proceed to occupy the Premises subject to the Survey defects; or (2) terminate this Lease. Within sixty (60) days after the Commencement Date, as defined in this Lease, Landlord shall provide to Tenant six (6) sealed copies of the Survey revised to show the Store "as built".

**ENVIRONMENTAL AUDIT**

6.      On or before thirty (30) days after the Execution Date, Landlord shall order and deliver to Tenant's counsel at the address provided hereunder for copies of notices on or before the Delivery Deadline, from an environmental consultant reasonably satisfactory to Tenant, an environmental audit of the Shopping Center addressed to Tenant, which audit analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental site assessment pursuant to current ASTM standards (an "Audit"). Instead of providing the Audit, Landlord may provide a copy of an Audit issued to Landlord within the three (3) month period immediately prior to the Execution Date together with a letter from the environmental consultant which prepared such Audit stating that Tenant may rely thereon (the "Prior Audit"). Tenant shall have until the Title/Survey Review Deadline to review either the Audit or the Prior Audit. If either reveals any environmental condition not acceptable to Tenant, in its sole judgment, Tenant shall notify Landlord in writing. Landlord shall use reasonable efforts and shall have until sixty (60) days prior to the Commencement Date to cure any environmental condition objected to by Tenant. If Landlord fails to so cure such environmental conditions, to Tenant's satisfaction, Tenant may terminate this Lease.

**USE**

7.      The Store may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, or for the conduct of any mercantile, retail, or service business (including discount businesses), consistent with a first class retail shopping (until the uses within the shopping center deviate from this description) and not in violation of shopping center exclusives for which Tenant has been provided and received prior written notice (the "Permitted Use"). Notwithstanding the foregoing, the store may not be used for a discount department store.

Provided that Tenant is not in default under this Lease beyond any applicable grace period, and is at the time operating the Store as a grocery supermarket, Tenant shall have the exclusive right to operate a supermarket and the non-exclusive right to operate a pharmacy or prescription drug concession, photo lab or film development business and an automatic teller machine and banking business in the Shopping Center. Landlord will not directly or indirectly lease or rent any property located within the Shopping Center for occupancy as a supermarket, grocery store, meat, fish, seafood, or vegetable market, nor will Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm, or corporation engaged in any such business without the prior written permission of Tenant; Landlord will not permit or suffer any property located within the Shopping Center to be used for, or occupied by, any business dealing in or keeping in stock or selling for off-premises consumption any staple or fancy groceries, meats, fish, seafood, vegetables, fruits, bakery goods, dairy products, or frozen foods without the prior written permission of Tenant except (1) by a business or businesses for which the sale of such items does not exceed the lesser of 500 square feet of sales area or ten percent ( 10%) of the square foot area of any storeroom within the Shopping Center, and is incidental only to the conduct of another business, or (2) by a restaurant or other store (such as a bagel store, delicatessen or bakery) not exceeding 3,000 square feet in floor area, located no closer than 400 feet from any boundary of the Store, as prepared, ready-to-eat food items, for consumption either on or off site. With the exception of package stores, no other tenant in the Shopping Center may sell beer and wine for off-premises consumption. Only Tenant may operate a bakery, delicatessen, or similar department in the Shopping Center.

Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and no spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, business or professional offices, medical offices or clinics, automobile dealership, church, or health, recreational or

entertainment-type activities, (except that medical or dental offices may be operated if located at least 75 feet from the perimeter of Tenant's building constructed pursuant to Article 9) shall be permitted, if located within 500 feet of either side of the main entrance to the Store, except that a lounge or bar may be permitted within 400 feet of either side of the main entrance to the Store if part of a restaurant; and "pay" telephones in the common areas of the Shopping Center (i.e., outside tenant's premises) shall not be permitted if located within 400 feet from either side of the main entrances to the Store. No pawn shop may be operated in the Shopping Center.

Notwithstanding anything herein contained to the contrary, none of the restrictions or exclusive rights contained in this Article 7 shall be applicable to the premises leased to K-Mart Corporation. The right of the Tenant to enforce any of the exclusive use rights or restrictions contained herein shall be subject to the condition that at the time enforcement is sought, Tenant shall not be in default under this Lease beyond any applicable grace period, and shall, in the case of any exclusive use, be operating a grocery supermarket in the Store.

**COMPLIANCE WITH LAWS**

8.    Tenant shall at all times comply with all current and future applicable laws, ordinances, and regulations of every lawful authority (collectively "Legal Requirements") having jurisdiction over the Store, as such shall relate to Tenant's operation of the Store for the Permitted Use.

Landlord shall at all times fully comply with all Legal Requirements applicable to fulfillment of its obligations under this Lease.

**CONSTRUCTION OF SHOPPING CENTER**

9.    Landlord, at its sole cost and expense, shall construct the Shopping Center, substantially as shown on the Site Plan, consisting of all the buildings shown thereon, and all ramps, sidewalks, streets, entrances, malls, parking areas, service areas, driveways, traffic signals, utility lines, water detention and retention facilities and related improvements (excluding the buildings, collectively, the "Common Areas"). Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the Common Areas, and shall provide proper and adequate water drainage and lighting therefor, and shall operate and maintain the same in good repair and usable condition during the Term. The arrangement and location of all buildings and Common Areas shall at all times during the Term be maintained as shown on the Site Plan and shall not be changed without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion. The exterior facade of the Shopping Center shall not be materially modified without Tenant's prior written consent, which shall not unreasonably be withheld or delayed. If not shown on the Site Plan, Tenant expressly reserves the right to approve the finish grade elevations of all buildings and the Common Areas within the Shopping Center.

Concurrently with the above construction, Landlord agrees, at its sole cost and expense, to construct the Store in accordance with guidelines submitted by Tenant to Landlord's architect to be used to create Tenant's Plans, as hereinafter defined (the "Guideplans") and with the final plans and specifications to be approved by both Landlord and Tenant which shall include complete civil engineering drawings for the Store and for the Shopping Center showing, among other things, the location of all buildings, finished grade elevations, the location of all utility lines, stormwater drainage facilities, and parking spaces (including handicap spaces) ("Tenant's Plans"). Tenant's Plans shall be approved when initialed by both parties, and when initialed shall constitute a part of this Lease; provided, however, that in the event of a conflict between the Guideplans and Tenant's Plans, the Guideplans shall control. Tenant's Plans shall provide for a completed store building, commonly referred to as a "lock and key job". This Lease shall not be effective or enforceable against Tenant unless and until Landlord and Tenant have so approved Tenant's Plans.

**COMPLETION DATE**

10.    Construction of the Store and the Shopping Center shall begin not later than August 3, 1998 (the "Construction Start Date") and shall be completed not later than August 2, 1999 (the "Initial Deadline"); and if not begun or completed by the Construction Start Date and the Initial Deadline, respectively, then Tenant may terminate this Lease or may extend Landlord additional time for the beginning or completion of construction; provided, however, that if, after the

beginning of construction, Landlord's failure to complete the Store by the Initial Deadline shall be due to Force Majeure, as hereinafter defined, and provided further that construction shall be completed with all due diligence and, notwithstanding anything to the contrary in this Lease, in any event not later than November 2, 1999 (the "Outside Completion Date"), this option to terminate shall not arise. The Construction Start Date shall be the date as of which (1) Landlord shall have obtained an unrestricted building permit issued by the appropriate governmental authorities, (2) the first concrete footings have been poured and (3) Landlord shall have erected in a manner and location reasonably satisfactory to Tenant, a "Coming Soon" sign in accordance with the specifications listed on Exhibit "H" hereto. If, pursuant to this paragraph, Tenant shall terminate this Lease or if Landlord fails to commence or complete construction of the Store and the Shopping Center by the above dates, Landlord agrees for a period of three (3) years after such failure or termination not to permit or consent to the use of any portion of the Shopping Center as a supermarket by any party other than Tenant.

**COMMENCEMENT DATE**

11.     Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to accrue hereunder upon the date Tenant opens the Store for business, or upon the expiration of sixty (60) days following the performance of all the requirements listed below (collectively, the "Conditions"), whichever date shall sooner occur (the "Commencement Date").

(a)     The Premises shall have been delivered to Tenant completed in substantial accordance with Tenant's Plans (except for minor "punch list" items which Landlord agrees, in a side letter, to complete with due diligence) and Landlord shall have delivered to Tenant, at Landlord's expense, (1) the Title Policy, (2) the Survey, and (3) the Audit (each as defined in this Lease), and a Certificate of Occupancy or equivalent document for the Store;

(b)     Construction of all of the Common Areas shall have been completed substantially as shown on the Site Plan;

(c)     All drives, entrances, median cuts, access points, acceleration and deceleration lanes, and traffic control devices shown on the Site Plan in or connecting the Common Areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(d)     Construction of at least 500 lineal feet of store frontage and 100,000 sq. ft. of total building area (excluding the Store ) in the Shopping Center shall have been completed as shown on the Site Plan;

(e)     The stores to be operated in the Shopping Center by each of the following tenants shall have been completed and opened for business before or simultaneously with the Store:              K-Mart Corporation

(f)     Tenant shall have received a letter, substantially in the form attached hereto as Exhibit "F", from appropriate governmental authorities regarding the zoning and comprehensive plan regulations, if any, applicable to the Premises.

If all the Conditions have not been met on or prior to the Outside Completion Date, Tenant, at its sole option, may terminate this Lease. Tenant shall open the Store for business on or before sixty (60) days after the Conditions have been met.

Landlord and Tenant shall execute a supplemental document establishing and confirming the Commencement Date in the form attached hereto as Exhibit "J" . No acceptance of possession of the Premises, opening for business by Tenant, nor payment of rent under this Lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with Tenant's Plans, or a waiver of any of the Conditions.

If, for any reason, the Conditions are met on or after December 1st of any year and on or before January 31st of the succeeding year, rent shall not begin to accrue until the later of

February 1st of the succeeding year, or thirty (30) days after the Conditions are met, unless Tenant actually opens the Store for business sooner.

**OTHER TENANTS**

12.    As a condition and inducement to Tenant's entering into this Lease, Landlord represents and warrants that it has entered into firm commitments for leases with the tenants listed below for the terms and for the amount of floor space indicated (collectively, the "Other Leases"):

| Name | Minimum Term Years | Minimum Floor Area (sq. ft.) |
|------|------|------|
| K-Mart | 20 | 120,000 s.f. |

Landlord further represents and warrants that such tenants shall occupy the space in the Shopping Center in the locations indicated on the Site Plan and for the term and in the minimum square footage of space set opposite their respective names above; and Landlord agrees, on demand, to furnish evidence satisfactory to Tenant, prior to and as a further condition to the establishment of the Commencement Date, that Landlord has entered into non-cancelable leases, except for default, with such tenants.  Landlord shall comply with all of its obligations under the Other Leases.

**PARKING AND COMMON AREAS**

13.    Tenant, its employees, agents, suppliers, customers and invitees, shall have the nonexclusive right at all times to use, free of charge, during the Term, the Common Areas. Tenant may use the sidewalks adjacent to the Store and the exterior surfaces thereof for the display and sale of merchandise and services.

Landlord shall not designate any portion of the Common Areas for the exclusive use of any party and shall at all times during the Term provide and maintain a surfaced parking area substantially as shown on the Site Plan, and of sufficient area to provide:

(a)    a minimum ratio of at least 5.0 automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels)(within Tenant's protected area outlined in blue), and

(b)    facilities for convenient parking of at least 2,160  automobiles (minimum).

Notwithstanding the foregoing, if Legal Requirements mandate that a greater number of parking spaces be provided and maintained, such Legal Requirements shall control.  If the parking area furnished should at any time be materially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is sent to Landlord giving reasonable details, Tenant shall have the right to terminate this Lease.  No signboards or other construction shall be erected in any of the Common Areas or so as to obstruct the view of the Store from the adjoining public streets.  Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, "park and ride" lots, or sales by merchants utilizing vehicles or booths in the Common Areas shall be allowed in the Shopping Center.

**SERVICE AREA**

14.    Landlord shall provide parking spaces for two large trailer trucks for the exclusive and continuous use of Tenant at the service entrances to the Store.  Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the Store and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for the Store into and from trucks and trailers at such service entrances.

**UTILITIES**

15.    Landlord shall cause the Store to be separately metered and Tenant shall pay all charges measured by consumption or use for telephone, electricity, water, gas, and other utilities and services used by Tenant at the Store, and Landlord agrees at all times to provide Tenant

with access to such utilities sufficient to meet Tenant's needs. Tenant shall not be responsible for any installation charges for the fire alarm system, static or flowing water to supply the fire sprinkler system, environmental impact charges, or any "hook up" fees or other charges incident to providing access to any utility. All of the Common Areas (including parking area) shall be adequately lighted by Landlord at its expense during the hours of ½ hour before dusk until 12:00 a.m. (the "Standard Hours"). Landlord shall cause to be separately metered and Tenant shall pay all charges during any time other than the Standard Hours for those parking area lights located in the area outlined in green on the Site Plan.

**TENANT'S MAINTENANCE**

16.    Tenant shall keep the interior of the Store in reasonably neat and orderly, good condition and repair, including the windows and plate glass, automatic doors, air conditioning and heating systems and floor surfacing of the Store, and interior wiring and plumbing, excluding structural repairs, repairs which are the responsibility of Landlord, repairs made necessary by reason of fire or the elements or other insured casualty, and reasonable wear and tear. Tenant shall keep the delivery areas of the Store reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the Premises or permit anything to be done in or upon the Premises creating an unreasonable nuisance thereon. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon the Premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

**LANDLORD'S MAINTENANCE**

17.    Landlord shall, at its cost and expense, keep and maintain in good condition and repair, and replace as necessary the facade of the Store, the exterior and structural portions of the Store (including painting of the exterior walls as needed), roof, gutter, downspouts, exterior painting, masonry walls, foundation and structural members, the automatic sprinkler system (including central alarm system therefor, if required by governmental authority), the exterior plumbing (including septic tank, if any), and the exterior wiring.

Landlord shall maintain, repair, and replace as necessary (the cost of which shall be billable as a portion of Common Area Maintenance Expenses, subject to the limitations provided in this Lease) all structural, exterior portions of the Shopping Center. Landlord shall also operate and maintain in good condition and repair during the Term all the Common Areas, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping as needed but at least three (3) times weekly, lighting in accordance with Tenant's Plans and maintenance and cleaning of lighting fixtures as needed, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and maintenance of landscaped areas. Landlord shall keep all exterior surfaces of buildings in the Shopping Center clean and graffiti free at all times. Landlord will complete such repairs immediately upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to the Store or the Shopping Center rendered necessary by the fault, act, or negligence of Tenant, or any of its servants, agents, or employees, unless Landlord may be reimbursed for the cost thereof pursuant to Landlord's insurance policies covering the Shopping Center and/or the Premises.

If, in order to protect persons or property, it shall be necessary for Tenant to make emergency repairs or to perform acts of maintenance or to provide services which are the responsibility of Landlord under this Lease, or if Landlord after receipt of notice as above provided fails or neglects to perform services, maintenance, or repairs, required of it hereunder to the Store, the Shopping Center, or Common Areas, Tenant shall have the right to do so and to deduct from the Basic Rent, Additional Rent, and/or Percentage Rent due or thereafter to become due such sums as may be necessary to reimburse Tenant for the money expended or expense incurred by it in making such repairs.

**SIGNS**

18.    Tenant may place, erect, and maintain any signs, antennae, and satellite dishes on the roof, walls, and any other places on or about the Store, which signs shall remain the property of Tenant and may be removed at any time during the Term provided Tenant shall repair or

reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Premises resulting from the installation or removal of such signs, antennae, and satellite dishes.

Landlord shall construct, install, and maintain, at its cost, two (2) electrically illuminated pylon signs in the locations marked on the Site Plan. The pylon signs shall be of the maximum height and size permitted by applicable Legal Requirements subject to which Tenant may install, at its cost, sign panels, subject to Legal Requirements, on such pylon signs and may connect the sign panels to power outlets installed by Landlord. Signage rights shall be apportioned on a pro-rata basis relative to store size. Tenant shall pay the cost of the electric power for its sign panels if billed as a portion of Additional Rent.

**FIXTURES AND INTERIOR ALTERATIONS**

19.    Tenant, at its own expense, shall have the right from time to time during the Term to make any interior or exterior alterations, additions, and improvements, including additional or alternatively located doors and interior partitions, in and to the Store which do not adversely affect its structural integrity ("Tenant Modifications"). Tenant shall make all Tenant Modifications in a good, workmanlike manner and in accordance with all Legal Requirements applicable thereto. All permanent structural improvements shall belong to Landlord and become a part of the Store upon termination or expiration of the Term.

Tenant may construct and build or install in the Store any and all racks, counters, shelves, and other fixtures and equipment of every kind and nature as may be necessary or desirable in Tenant's business (Tenant's Trade Fixtures"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant. Tenant shall have the right to remove all or any part of Tenant's Trade Fixtures at any time; provided, Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of repairing any damage to the Premises resulting from the installation or removal of Tenant's Trade Fixtures.

**INDEMNIFICATION**

20.    Tenant agrees to indemnify and save harmless Landlord from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage not covered or reimbursable by insurance to any person or property happening in the Store unless caused by the negligence or wilful misconduct of Landlord, its agents, or employees. Tenant shall maintain comprehensive general liability insurance, naming Landlord as additional insured, insuring Landlord against such events, with the minimum limits of, and otherwise conforming to the requirements for, Landlord's liability insurance set forth below, provided that Tenant may self-insure against such risks so long as Tenant's net worth exceeds $200,000,000.  Likewise, Landlord shall indemnify and save harmless Tenant from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage to any person or property happening on or about all Common Areas or any portion of the Shopping Center other than the Store, unless caused by the negligence or wilful misconduct of Tenant, its agents or employees.

**CASUALTY**

21.    If (1) the Store is totally destroyed or damaged by fire or other casualty to the extent of fifty percent (50%) or more of the value or to an extent that renders the Store untenantable in Tenant's reasonable judgment, or (2) all or a portion of the Shopping Center (exclusive of the Store) is damaged or destroyed such that, in Tenant's reasonable judgment, the damage or destruction materially affects the value of Tenant's leasehold or its ability to successfully operate the Store for the Permitted Use, then Tenant may elect within thirty (30) days after such damage, to terminate this Lease by written notice. If the Store shall suffer damage to any extent less than fifty percent (50%) of the value thereof, or if Tenant does not elect to terminate in accordance with the previous sentence, then Landlord shall to proceed promptly and without expense to Tenant to repair the damage or restore the Store, or the Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall abate in proportion to the percentage of the Common Areas damaged or destroyed until the damage or destruction is completely

repaired or restored. Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof.

**LANDLORD'S INSURANCE**

22.    Landlord shall carry the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Certificates of insurance shall be furnished to Tenant prior to the Commencement Date, shall show Tenant as an additional insured, and shall provide thirty (30) days notice to Tenant prior to cancellation, material reduction in policy limits, or any other change adverse to Tenant's interests.

(a)    Liability Insurance. Landlord shall carry, at its sole expense, comprehensive general liability insurance coverage on the Shopping Center, stipulating limits of liability of not less than $2,000,000.00.

(b)    Casualty Insurance. Landlord shall carry all-risk commercial property insurance on the Premises and the Shopping Center and any additions, alterations, and improvements made thereto by Landlord or Tenant, including flood and earthquake coverage if the Shopping Center is located in a flood or earthquake prone area, in the amount of the full replacement cost thereof, and hereby expressly waives any and all claims against Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

**QUIET ENJOYMENT**    23.    Landlord covenants, warrants and represents that:

(a)    the Shopping Center is and shall remain free and clear of all liens and encumbrances superior to the leasehold hereby created, unless the lienor has executed an SNDA, as hereinafter defined, or unless consented to in advance and in writing by Tenant, which consent may be withheld or conditioned in Tenant's sole discretion;

(b)    Landlord is a duly organized, validly existing limited partnership, has full right and power to execute, deliver, and perform this Lease and to grant the estate demised herein, and such execution, delivery, performance, and grant have been duly authorized by all necessary limited partnership action and does not and will not constitute a breach of or default under any contract, Mortgage, order, or judgment by which Landlord or the Shopping Center or any portion thereof is bound;

(c)    no consent, approval, or authorization of any other party is necessary to grant to Tenant the rights and privilege intended to be granted under this Lease;

(d)    Tenant, on paying the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the Term;

(e)    there is no zoning, comprehensive plan, or other restriction preventing or restricting use of the Premises for the Permitted Use or use of the portion of Common Areas constituting parking areas for parking purposes.

If any representation or warranty made by Landlord in this Lease is determined during the Term to be false, and such falsity materially affects Tenant's use of the Store for the Permitted Use, its access to or use of the Common Areas, or the value of its leasehold estate, Tenant at its option may terminate this Lease by written notice to Landlord. Tenant shall stand released of and from all further liability hereunder from and after the date of such termination and Landlord shall be liable to Tenant for all loss, cost, and expense resulting from or in connection

with Landlord's false representation, including, without limitation, the cost of Tenant's relocating its business.

**TAXES AND LIENS**   24.   All taxes, assessments, and charges on land or improvements and obligations secured by mortgage or other lien upon the Shopping Center shall be promptly paid by Landlord prior to delinquency. Tenant may, but shall not be obligated to, perform, acquire, or satisfy any lien, encumbrance, agreement, or obligation of Landlord which may threaten its use or enjoyment of the Premises, and if it does so it shall be subrogated to all rights of the obligee against Landlord or the Premises or both and shall promptly be reimbursed by Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law. If Tenant is not promptly reimbursed, it may offset the amount due against all Basic Rent, Percentage Rent, and Additional Rent due under this Lease.

**CONDEMNATION**   25.   If any part of the Premises or more than twenty percent (20%) of the Shopping Center, exclusive of the Store, is taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to terminate this Lease at its option, and any unearned Basic Rent, Percentage Rent, Additional Rent or other charges paid in advance shall promptly be refunded to Tenant. If Tenant does not elect to terminate this Lease, Landlord shall immediately commence and diligently prosecute to completion any repairs and restoration reasonably necessary to put the Premises or the Shopping Center in a condition comparable to their condition at the time of taking and this Lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of Basic Rent, Percentage Rent, Additional Rent, and other adjustments as shall be just and equitable under all circumstances, and if Landlord and Tenant cannot agree as to what is just and equitable, Tenant may terminate this Lease by written notice to Landlord.

If any portion of the Common Areas or route or mode of access thereto, is obstructed or taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to unreasonably interfere with the conduct of Tenant's business in the Store or its use of or access to or through the Common Areas, or so as to reduce the required parking area by an amount in excess of ten percent (10%). Tenant may, at its option, terminate this Lease and shall be liable for rent only up to the time of such obstruction or taking.

**DEFAULT**   26.   Tenant shall be in default under this Lease if:

(a)   Tenant fails to pay any Basic Rent, Additional Rent, or Percentage Rent due under this Lease within ten (10) days after receipt of notice from Landlord stating that such sums remain unpaid; or

(b)   Tenant fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure).

Following an uncured default by Tenant, Landlord, at its option, may either (1) terminate this Lease or (2) re-enter the Premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the Premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom. Tenant shall remain liable for the deficiency, if any, between the Basic Rent due hereunder and the total rent obtained by Landlord on reletting.

Notwithstanding the foregoing, a default (except as to payment of rent) shall be deemed cured if Tenant in good faith commences to cure same within thirty (30) days after receipt of notice and thereafter with reasonable diligence proceeds to cure such default.

**CONSTRUCTION RISKS**   27.   Nothing herein contained shall in any sense constitute Landlord as the agent of Tenant in constructing the Store or the Shopping Center, Tenant shall have no control or authority over the construction of the Store or the Shopping Center, beyond the right to reject the tender of the

Store for the causes herein stated and to request change orders to be paid by Tenant. Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the wilful misconduct, negligence, or carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents, or servants by reason of Landlord's constructing the Store or the Shopping Center pursuant to the terms of this Lease or Tenant's Plans. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor, or from any negligence or wilful misconduct of Landlord, Landlord's contractors, sub-contractors, or any of their respective employees, agents, or servants during the progress of the work in constructing the Store or the Shopping Center, or from any faulty construction thereof.

**NOTICES**    28.    All notices, requests, demands, and other communications required or permitted to be given under this Lease shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All rent payments shall be sent to Landlord at the address below. Each communication shall be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (3) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (4) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord :    WEST FORK C ASSOCIATES I, L.P.
200 South Park Road, Suite 200
Hollywood, Florida 33021, Roger LeBlanc

or such other address as Landlord may direct from time to time.

Tenant:    WINN-DIXIE STORES, INC.
1141 S. W. 12th Avenue
Pompano Beach, Florida 33069

With a copy to:  Winn-Dixie Stores, Inc.
Attn: General Counsel, Esquire
5050 Edgewood Court
P.O. Box B
Jacksonville, FL 32203-0297

Telecopy: (904) 783-5138

or to such other address as Tenant may direct from time to time.

**ASSIGNMENT AND SUBLEASING**    29.    Tenant may assign this Lease, or sublease or vacate the Premises in whole or in part without the consent of Landlord, provided Tenant shall continue to remain liable and responsible for the payment of rent and due performance of all other terms, covenants, and conditions of this Lease.

Notwithstanding the foregoing:

a)    In the event Tenant voluntarily vacates the Premises or ceases selling merchandise for in excess of a period of six (6) months while the Premises can be used for the operation of a general mercantile business (excluding temporary cessation of business caused by happenings beyond the control of Tenant or resulting from construction activities), Landlord

12

shall have the continuing option (unless Tenant has reoccupied the Premises) to terminate this Lease commencing on the day after the Premises has been vacant for six (6) months by written notice to Tenant of its election to do so, specifying a date of termination not less than sixty (60) days from the date of Landlord's notice. Within such sixty (60) day period Tenant shall be permitted to prevent such termination by advising Landlord in writing that Tenant had, prior to receipt of Landlord's written termination notice, in good faith committed to assign or sublease the Premises to a third party. Such notice of intended assignment or sublease shall thereafter proceed in accordance with subsection (b) of this Article 29.

　　　　　b)　　　In the event Tenant desires to assign this Lease or to sublease the Premises for the conduct of a business other than a food supermarket, Tenant shall give written notice to Landlord of its intention and reveal the identity of any intended assignee or sublessee. Within thirty (30) days after the delivery of such notice, Landlord may either approve such use or intended assignment or sublease or elect to terminate this Lease by giving written notice to Tenant of such election. In the event Landlord elects to terminate this Lease by giving written notice, Tenant may, at any time from the date of delivery of such notice, surrender possession of the Premises to Landlord, but shall not be required to do so until the expiration of ninety (90) days after delivery of Landlord's notice. Tenant shall be accorded such ninety (90) days in which to cease its business and to remove its stock-in-trade and fixtures and equipment from the Premises. Upon surrender of possession of the Premises by Tenant, this Lease shall be deemed terminated without the execution of any other document, and Landlord and Tenant shall be relieved from all further liability under it. If Tenant gives Landlord written notice of its intention to assign or sublease the Premises and of the identity of Tenant's intended assignee or sublessee, and Landlord fails to give written notice of its election to terminate this Lease within thirty (30) days of the delivery of such written notice by Tenant, then Landlord's option to terminate this Lease shall expire, and Tenant may proceed with its intended assignment or sublease. In the event Landlord shall approve or fail to disapprove the intended assignment of sublease within the period provided, and Tenant subsequently fails to consummate the assignment or sublease, a future intended assignment or sublease shall also be subject to the approval of Landlord in the manner provided by this paragraph. The terms "sublease" and "assignment" shall include subleases and assignments by sublessees and assignees to third parties. Tenant shall remain fully liable under the Lease for the payment of rentals and additional rentals hereunder and for performance of all obligations of Tenant under this Lease notwithstanding Tenant's assignment or sublease pursuant to this Article 29.

**SUBORDINATE**　　　30.　　　Provided that, with respect to any mortgage, deed of trust, security deed or other security instrument securing a lien upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement substantially in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage.

**ESTOPPEL CERTIFICATE**　　　31.　　　Within a reasonable time, but no less than ten (10) business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "E" (an "Estoppel Certificate"). Notwithstanding the forgoing, Landlord shall not request, and Tenant shall not be required to m(..UMortgage (a "Mortgagee")

**CURE**　　　encumbering the Premises (provided that such Mortgagee has entered into an SNDA with Tenant and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord. The Mortgagee shall have the right, but not the obligation, to cure such default and Tenant will not terminate this Lease or abate the

shall have the continuing option (unless Tenant has reoccupied the Premises) to terminate this Lease commencing on the day after the Premises has been vacant for six (6) months by written notice to Tenant of its election to do so, specifying a date of termination not less than sixty (60) days from the date of Landlord's notice. Within such sixty (60) day period Tenant shall be permitted to prevent such termination by advising Landlord in writing that Tenant had, prior to receipt of Landlord's written termination notice, in good faith committed to assign or sublease the Premises to a third party. Such notice of intended assignment or sublease shall thereafter proceed in accordance with subsection (b) of this Article 29.

b)     In the event Tenant desires to assign this Lease or to sublease the Premises for the conduct of a business other than a food supermarket, Tenant shall give written notice to Landlord of its intention and reveal the identity of any intended assignee or sublessee. Within thirty (30) days after the delivery of such notice, Landlord may either approve such use or intended assignment or sublease or elect to terminate this Lease by giving written notice to Tenant of such election. In the event Landlord elects to terminate this Lease by giving written notice, Tenant may, at any time from the date of delivery of such notice, surrender possession of the Premises to Landlord, but shall not be required to do so until the expiration of ninety (90) days after delivery of Landlord's notice. Tenant shall be accorded such ninety (90) days in which to cease its business and to remove its stock-in-trade and fixtures and equipment from the Premises. Upon surrender of possession of the Premises by Tenant, this Lease shall be deemed terminated without the execution of any other document, and Landlord and Tenant shall be relieved from all further liability under it. If Tenant gives Landlord written notice of its intention to assign or sublease the Premises and of the identity of Tenant's intended assignee or sublessee, and Landlord fails to give written notice of its election to terminate this Lease within thirty (30) days of the delivery of such written notice by Tenant, then Landlord's option to terminate this Lease shall expire, and Tenant may proceed with its intended assignment or sublease. In the event Landlord shall approve or fail to disapprove the intended assignment of sublease within the period provided, and Tenant subsequently fails to consummate the assignment or sublease, a future intended assignment or sublease shall also be subject to the approval of Landlord in the manner provided by this paragraph. The terms "sublease" and "assignment" shall include subleases and assignments by sublessees and assignees to third parties. Tenant shall remain fully liable under the Lease for the payment of rentals and additional rentals hereunder and for performance of all obligations of Tenant under this Lease notwithstanding Tenant's assignment or sublease pursuant to this Article 29.

**SUBORDINATE**     30.     Provided that, with respect to any mortgage, deed of trust, security deed or other security instrument securing a lien upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement substantially in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage.

**ESTOPPEL**
**CERTIFICATE**     31.     Within a reasonable time, but no less than ten (10) business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "E" (an "Estoppel Certificate"). Notwithstanding the foregoing, Landlord shall not request, and Tenant shall not be required to deliver more than two (2) Estoppel Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500.00 per additional requested Estoppel Certificate.

**LENDER'S**
**CURE**     32.     Tenant shall give notice to any holder of a recorded Mortgage (a "Mortgagee") encumbering the Premises (provided that such Mortgagee has entered into an SNDA with Tenant and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord. The Mortgagee shall have the right, but not the obligation, to cure such default and Tenant will not terminate this Lease or abate the

rent payable hereunder by reason of such default unless and until it has afforded the Mortgagee thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said thirty (30) day period, provided, however, that the Mortgagee notifies Tenant that it intends to cure such default, in fact undertakes such a cure, and diligently prosecutes such cure to completion. Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Lease.

**BENEFIT**

33.    This Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises.

**TRANSFER BY LANDLORD**

34.    If Landlord transfers Landlord's interest in the Premises, the Shopping Center, or this Lease, Landlord agrees to promptly provide Tenant with satisfactory documentary evidence of such transfer, together with the agreement of Landlord's transferee to assume all of Landlord's obligations under this Lease (except as otherwise agreed to in an SNDA).

**SHORT FORM LEASE**

35.    Landlord agrees that any time on request of Tenant it will execute a short form of this Lease in the form attached hereto as Exhibit "G", and permit its recording in the public records of the county or parish in which the Premises are located.

**MARGINAL TITLES**

36.    The marginal titles appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend, or affect the provisions thereof.

**COMPLETE AGREEMENT**

37.    This Lease contains the complete agreement of the parties with reference to the leasing of the Premises, except for Tenant's Plans to be formally approved by the parties prior to the Commencement Date. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**DECLARATION**

38.    This Article intentionally omitted.

**EXHIBITS**

39.    The following Exhibits attached hereto are hereby incorporated into this Lease by reference:

| | | |
|---|---|---|
| Exhibit "A" | - | Site Plan |
| Exhibit "B" | - | Legal Description of Shopping Center |
| Exhibit "C" | - | SNDA |
| Exhibit "D" | - | Surveyor's Certificate |
| Exhibit "E" | - | Estoppel Certificate |
| Exhibit "F" | - | Zoning Letter |
| Exhibit "G" | - | Short Form Lease |
| Exhibit "H" | - | "Coming Soon" Sign Specifications |
| Exhibit "I" | - | Intentionally Omitted |
| Exhibit "J" | - | Supplemental Lease Agreement |

**FORCE MAJEURE**

40.    If there shall occur, during the Term, (1) strike(s), lockout(s), or labor dispute(s); (2) the inability to obtain labor or materials or reasonable substitutes therefor; (3) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other similar conditions (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Lease (except for the obligation to pay money), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

ENVIRONMENTAL   **41.**    (a)    <u>Landlord</u>. Landlord represents and warrants to Tenant that it has not prior to the
CONDITION    commencement of this Lease, and will not during the term of this Lease or any renewal thereof,
cause or permit to be used, stored, generated, or disposed of any Hazardous substance, as
hereinafter defined, in, on, or about the Shopping Center. Landlord certifies to Tenant that to its
knowledge no other tenant of the Shopping Center has caused or permitted to be used, stored,
generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the
Shopping Center. "Hazardous Substance" includes, without limitation, any and all material or
substances which are defined as "hazardous waste", "extremely hazardous waste" or a
"hazardous substance" pursuant to Legal Requirements. "Hazardous Substance" includes, but
is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and
any substance for which any Legal Requirements require a permit or special handling in its use,
storage, treatment, or disposal.

Landlord shall, at its sole cost and expense, indemnify, protect, and save Tenant, its
officers, directors, shareholders, and employees harmless against and from any and all
damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses,
judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation,
attorneys', consultants' and experts' reasonable fees and disbursements) of any kind or nature
whatsoever (collectively the "Indemnified Matters") which may at any time be imposed upon,
incurred by or asserted or awarded against Tenant and arising from or out of any Hazardous
Substances on, in, under or affecting all or any portion of the Premises or the Shopping Center,
which Hazardous Substances are not the result of Tenant's use or operation of the Premises.
This indemnification includes, without limitation, any and all costs incurred due to any investigation
of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency
or political subdivision.

Landlord shall provide to Tenant copies of any notices, letters, or requests for information
concerning Hazardous Substances in connection with the Shopping Center which Landlord
receives from any governmental unit or agency overseeing environmental matters and copies
received by landlord of any such notices, letters, or requests for information sent to any other
tenant of the Shopping Center. If a release of Hazardous Substances or other environmental
condition occurs that is not the result of Tenant's actions or the actions of Tenant's agents or
employees acting within the scope of their employment, which release or environmental condition
materially impairs for more than seven (7) days Tenant's ability to use the Premises for the
Permitted Use, Tenant may (1) abate all rent due under this Lease during the time Tenant's use
is impaired and/or (2) terminate this Lease by written notice to Landlord.

(b)    <u>Tenant.</u>  Tenant shall not cause or permit any Hazardous Substance to be used,
stored, generated, or disposed of on, in or about the Premises except in accordance with
applicable Legal Requirements without obtaining Landlord's prior written consent, which consent
may be withheld in Landlord's sole discretion. If any Hazardous Substance is used, stored,
generated, or disposed of on, in, or about the Premises except as permitted above, or if the
Premises or the Shopping Center become contaminated in any manner as a result of any breach
of the foregoing covenant or any act or omission of Tenant or any of its agents or employees
acting within the scope of their employment, Tenant shall indemnify and hold harmless Landlord,
its officers, directors, shareholders, and employees from any and all claims, demands, actions,
damages fines, judgments, penalties, costs (including attorneys', consultants', and experts' fees),
liabilities, losses (including without limitation, any decrease in value of the Store or Tenant's
business operations therein, damages due to loss or restriction of rentable or usable space, or
any damages due to adverse impact on marketing of the space in the Shopping Center or the
Store), and expenses arising during or after the term of this Lease and arising as a result of such
contamination. This indemnification includes, without limitation, any and all costs incurred due
to any investigation of the site or any cleanup, removal, or restoration mandated by a federal,
state, or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes
the presence of any Hazardous Substance on, in or about the Premises except in accordance
with applicable Legal Requirements or with Landlord's consent that results in contamination,
Tenant, at its sole expense, shall promptly take any and all necessary actions to return the

Premises or the Common Areas, as the case may be, to the same condition that existed prior to the presence of any such Hazardous Substance on, in, or about the Premises. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld or delayed.

Notwithstanding the foregoing, this indemnification shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Premises. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination resulting from Landlord's ownership, use or operation, or the use of operation by any third party in, or under the Premises, the Common Areas or any other portion of the Shopping Center.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Lease.

**NO BROKERS**  42.  Both Landlord or Tenant has discussed this Lease with Holland and Company Real Estate so as to create any legal right of such broker to a commission or similar fee. Landlord shall be responsible for all brokerage, commissions or other fees associated with this Lease. Furthermore, each party shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

**INDIVIDUAL STATE MANDATED PROVISIONS FLORIDA**  43.  Certain states mandate the inclusion of various provisions in all leases of real property located in such states. The following provisions are included to satisfy such individual state requirements and are applicable only if the Premises are located in the state named opposite the provisions appearing below.

Radon Gas Disclosure. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time. Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

**EXPANSION**  44.  As a material inducement to Tenant's entering into this Lease, Landlord grants to Tenant the option and privilege (Tenant's Enlargement Option") of requiring the enlargement of the Store to incorporate therein an addition consisting of the area to the Northwest side of the Store measuring approximately 60 feet in width by 231 feet in depth, as shown on the Site Plan (the "Addition" or the "Additional Space"), which area shall be reserved for construction of the Addition except that pending same may be partially paved for parking or Landlord may construct a building thereon and rent space in such building. To facilitate construction of the Addition, Landlord initially shall construct the Northwest wall of the Store with steel column supports equivalently spaced to the nearest row of steel column supports in the open front sales area of the Store and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original Store and the Addition.

Tenant may exercise Tenant's Enlargement Option by giving to Landlord written notice ninety (90) days prior to the expiration of the tenth year from the Commencement Date or ninety (90) days prior to expiration of each five year interval thereafter of its exercise of such option, or at any time if the Additional Space is vacant and Tenant has not received written notice from Landlord that it has leased the Additional Space to another tenant in a manner consistent with this Lease, together with a proposed amendment to this Lease (the "Amendment") to provide for those terms and conditions described below and such additional terms and conditions with

respect to the Addition as to which Landlord and Tenant shall subsequently agree. (Tenant's written notice and the Amendment are hereinafter referred to as the "Option Exercise Notice").

On or before ten (10) days after receipt of the Option Exercise Notice, Landlord shall notify Tenant in writing whether it intends, subject to execution and delivery of the Amendment, to construct the Addition, at its sole cost. The Amendment shall include, among other things, the following:

(a)    If Landlord constructs the Addition, Landlord shall obtain and pay all costs, fees and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition. If Landlord does not pay such costs, fees or expenses or obtain such permit(s) and waiver(s), Tenant may obtain and pay for same and deduct the amounts paid or costs incurred from all Basic, Additional, and Percentage Rent payable under this Lease. Upon completion of the Addition and commencement of business therein by Tenant, Basic Rent (and the base for computation of Percentage Rent hereunder) shall be increased by the greater of: an amount equal to ten percent (10%) of the cost of the Addition, or an amount equal to $8.38 per square foot of the Addition, or an amount equal to a computed percentage times the cost of the Addition, such percentage consisting of three percent (3%) plus current prime at the time of the exercise of Tenant's Enlargement Option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant, with the final cost of the Addition upon completion to be certified by the general contractor performing the work. Tenant shall obtain, at its cost and expense, such information or investigations concerning the status of the title, environmental condition, and boundaries of the land upon which the Addition shall be constructed as it shall desire, and it shall be a condition of Tenant's obligation to pay Basic Rent with respect to the Addition that it be satisfied with such information and investigations; or

(b)    If Landlord shall for any reason fail or refuse to construct the Addition after Tenant has properly exercised Tenant's Enlargement Option, Tenant shall have the right but not the obligation to construct the Addition at its sole cost and expense or may terminate this Lease by written notice to Landlord. If Tenant constructs the Addition, Tenant shall obtain and pay all costs, fees, and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition, shall cause any mechanics' lien incurred in connection with such expansion to be promptly discharged, and shall indemnify and hold harmless the Landlord from any expense occasioned thereby. Landlord shall provide, in consideration of Tenant's constructing the Addition, an endorsement to the Title Policy, the Survey, and the Audit. Tenant's optional construction of the Addition shall be contingent upon Tenant's satisfaction with the Title Policy, the Survey, the Audit, and the provisions of then applicable zoning and land use regulations. Upon completion of the Addition by Tenant, no Basic Rent shall be payable by Tenant in respect of the Addition for the remainder of the Term and no Percentage Rent shall be payable until Tenant shall have recouped the cost of the Addition in Percentage Rent that would otherwise be due under this Lease; and

(c)    Regardless of who constructs the Addition, upon completion of the Addition, it shall become a portion of the Store. If at that time there shall not at such date remain at least ten (10) years of the Initial Term, Tenant shall be granted three (3) additional Extension Terms of five (5) years each, and Tenant's remaining Extension Terms under this Lease, if any, shall be preserved.

**TAKE OVER AND RELEASE**    45.    If Tenant or its assignee or sublessee fails to operate a business in the Store for one hundred eighty (180) days or longer, and such failure to operate is not due to permitted remodeling or enlargement, or a result of casualty or other Force Majeure (a "Store Closing"), then following such Store Closing Landlord may terminate this Lease by written notice to Tenant

and from and after the date of such notice neither Landlord nor Tenant shall have any further liability to the other, except as expressly provided otherwise in this Lease.

**WAIVER OF TRIAL BY JURY**

46.    Landlord and Tenant do hereby waive trail by jury in any action, proceeding or counterclaim brought by either against the other, upon any matters whatsoever arising out of or in any way connected with this Lease, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage. It is further mutually agreed that in the event Landlord commences any summary proceeding for non-payment of rent, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding.

**ATTORNEYS FEES**

47.    The prevailing party in any legal action to enforce rights created by this Lease shall be entitled to recover from the non-prevailing party reasonable attorney and paralegal fees and court costs.

**LIMITATION OF LIABILITY**

48.    Notwithstanding anything to the contrary provided in this Lease, if Landlord or any successor-in-interest of Landlord shall be an individual, tenancy-in-common, firm or partnership, general or limited, limited liability company, or corporation, there shall be absolutely no personal liability on the part of such individual, tenancy-in-common, firm, corporation, partnership, limited liability company or the members of any such firm, partnership , joint venture, corporation or limited liability company with respect to any of the terms, covenants and conditions of this Lease, and Tenant shall look solely to the equity of Landlord or such successor-in-interest in the Shopping Center for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Lease to be performed by Landlord, such exculpation of personal liability to be absolute and without any exception whatsoever.

**SELF-HELP**

49.    If Landlord fails to perform any of its material obligations under this Lease, and if Landlord fails to undertake performance of such material obligation within thirty (30) days after notice from Tenant specifying the default (or fails within such period to commence to cure such default and thereafter to prosecute the curing of such default to completion with due diligence), Tenant may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter, cure such default for the account of the Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord. Landlord agrees to reimburse Tenant such amount and indemnify Tenant from and against any and all liability arising from Tenant's cure. Tenant may cure any default prior to the expiration of said thirty (30) days which is reasonably necessary to protect the Premises or Tenant's interest therein or to prevent injury or damage to persons or property. If Landlord fails to reimburse Tenant upon demand for any amount paid for the account of Landlord, pursuant to this Article, such amount may be deducted by Tenant from the next or any succeeding installment of Basic Rent due under this Lease. This Article shall not be construed to abrogate the lender notice requirements imposed by Article 32 of this Lease.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease the day and year indicated below.

Witnesses:

LANDLORD:
**WEST FORK C ASSOCIATES I, L.P.**
a Delaware limited partnership
By:     **Hollywood WFR Associates, L.P.,**
            as  general partner
By:     Hollywood, Inc. (Westfork R)
            as  General  Partner

Print name  Jill Pfenfel

By: _____
Print name: Breen LeBlanc
Its: Senior Vice President
Print name: Dorothy A. Herbert
Date: March 14, 1998

TENANT:

**WINN-DIXIE STORES, INC.**

Print name:    LAURA L. ANDREWS

By: R. P. McCook
Print name: Rebecca L. Sawyer
            R. P. McCook
Its:    Vice President
Date: 3-19-98

21

STATE OF _Florida_ )
COUNTY OF _Brevard_ )

The foregoing instrument was acknowledged before me this _March 16_ 199_8_ by _Roger LeBlanc_ as _Senior Vice President_ of WEST FORK C ASSOCIATES I, L.P., a Delaware limited partnership, on behalf of the limited partnership, **[PLEASE CHECK ONE]** ___√___ who is personally known to me or _____ who has produced _____ as identification.

_Deborah D. Abbatecola_
Printed Name: _DEBORAH D. ABBATECOLA_
Notary Public, State and County aforesaid.
My Commission Expires: _9/01/99_
Notary ID No.: _487259_
(NOTARIAL SEAL)

DEBORAH D. ABBATECOLA
COMMISSION # CC 481259
EXPIRES SEPTEMBER 21, 1999
BONDED THRU
NOTARY CO., INC.

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _March 19_, 199_8_, by _R. P. McCook_ as _Vice_ President of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation, who is personally known to me.

_Jane E. DeWitte_
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires: _____
Notary ID No.: _____
(NOTARIAL SEAL)

JANE E. DeWITTE
My Comm. Exp. May 18, 2000
Comm. No. CC 527798