UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


IN RE:                              CASE NO.: 05-03817-3F1
                                    Jointly Administered
WINN-DIXIE STORES, INC.,

        Debtor.                     CHAPTER 11


_____/



TRANSCRIPT OF PROCEEDINGS




        Hearing re:  Motion for Relief from Stay, before the

Honorable Jerry A. Funk, U. S. Bankruptcy Judge,

commencing at 3:50 p.m., on Monday, February 13, 2006, at

the United States Courthouse, Room 4-D, 300 North Hogan

Street, Jacksonville, Florida, as reported by M. Kim

Simms, RPR, Notary Public in and for the State of Florida

at Large.



                         -  -  -

```
 1  APPEARANCES:

 2  On behalf of the Landlord:

 3       ALAN M. BURGER, ESQUIRE
         Burger, Farmer, Cohen, P.L.
 4       1601 Forum Place
         Suite 404
 5       West Palm Beach, Florida 33401

 6  and

 7       MICHAEL A. KAUFMAN, ESQUIRE

 8       Law Office of Michael A. Kaufman, P.A.
         1601 Forum Place
 9       Suite 404
         West Palm Beach, Florida 33401
10
    On behalf of the Debtors:
11
         JAMES H. POST, ESQUIRE
12       Smith, Hulsey & Busey
         225 Water Street
13       Suite 1800
         Jacksonville, Florida 32201
14

15  On behalf of Official Committee of Unsecured Creditors:

16       PATRICK P. PATANGAN, ESQUIRE

17       Akerman Senterfitt
         50 North Laura Street
18       Suite 2500
         Jacksonville, Florida 32202
19

20

21                              -   -   -
22

23

24

25
```

3

1                          I N D E X

2   WITNESSES                                          PAGE

3   FRANCISCO SARRIA

4   Direct Examination by Mr. Burger                   5

5   Cross Examination by Mr. Post                      27

6   Redirect Examination by Mr. Burger                 30

7   Further Redirect Examination by Mr. Burger         34

8   KATHY JAXON

9   Direct Examination by Mr. Post                     39

10  Cross Examination by Mr. Burger                    45

11  JAY CASTLE

12  Direct Examination by Mr. Post                     47

13  Cross Examination by Mr. Burger                    48

14

15

16                         - - -

17

18                    E X H I B I T S

19  Movant's Exhibit No. 1                             6

20  Movant's Exhibit No. 10                            26

21  Debtor's Exhibits Nos. 1-4                         39

22                         - - -

23

24

25

4

```
 1                  P R O C E E D I N G S
 2   February 13, 2006                        3:50 p.m.
 3                        -  -  -
 4            THE COURT:  Okay.  Your turn.  Back to
 5   Winn-Dixie.  Anybody need a break after all that?  I
 6   guess not.  It came out just about right.
 7            For the record, we'll take appearances.
 8            MR. BURGER:  Alan Burger of Burger, Farmer,
 9   Cohen and Michael Kaufman of Michael J. (sic)
10   Kaufman, P.A., on behalf of Sarria Enterprises, Inc.
11   With us is Francisco Sarria, vice president of Sarria
12   Enterprises, Inc.
13            THE COURT:  Thank you.
14            MR. POST:  May it please the court, Jim Post
15   with the law firm of Smith, Hulsey & Busey on behalf
16   of the debtors.  With me at counsel's table is from
17   Winn-Dixie is Jay Castle and Kathy Jaxon, J-A-X-O-N.
18            MR. PATANGAN:  May it please the court, Patrick
19   Patangan on behalf of the Official Committee of
20   Unsecured Creditors.
21            THE COURT:  Okay.  Mr. Burger?
22            MR. BURGER:  Yes.  Mr. Sarria, call Fransisco
23   Sarria.
24            THE COURT:  Very well.
25            COURTROOM ADMINISTRATOR:  Please take a seat on
```

1      the witness stand.

2    Whereupon,

3                        FRANCISCO SARRIA

4    was called as a witness herein, and having been produced

5    and sworn by the courtroom administrator, was examined and

6    testified as follows:

7                            - - -

8            COURTROOM ADMINISTRATOR:  Please state your name

9         and address including the city and state.

10           THE WITNESS:  Francisco Sarria, 4725 Southwest

11        8th Street, Miami, Florida 33134.

12           MR. BURGER:  Thank you.  If I may approach and

13        give the --

14           THE COURT:  You may.

15                      DIRECT EXAMINATION

16   BY MR. BURGER:

17       Q    Mr. Sarria, can you state your relationship to

18   Sarria Enterprises, Inc.?

19       A    Vice president of Sarria Enterprises, Inc.

20       Q    And as you testify here today, are you the

21   person with the most knowledge of the relationship between

22   Winn-Dixie and Sarria Enterprises, Inc.?

23       A    Yes.

24       Q    Okay.  I put in front of you a document which

25   we've marked as composite -- it's marked as Exhibit 1, do

6

1  you recognize the document?

2      A    Yes.

3      Q    What do you understand that document to be?

4      A    This is the lease for the store in our shopping

5  center, the Winn-Dixie store.

6      Q    Okay.  It's -- just to direct you, is it -- it's

7  a composite exhibit of the lease and all the adenda to the

8  lease; is that correct?

9      A    That is correct.

10          MR. BURGER:  Okay.  And I don't believe that

11      Mr. Post has any objection to this document, is that

12      correct, Mr. Post?

13          THE COURT:  Any objection to the document?

14          MR. POST:  No, Your Honor.  We have our own

15      documents to put into evidence.  And between the

16      movant's exhibits and our exhibits we have a complete

17      set of the lease and amendments.

18          THE COURT:  Very well, it's admitted.

19                                (Whereupon, the document

20                                  previously marked for

21                                  identification as Movant's

22                                  Exhibit No. 1 was received

23                                    into evidence.)

24  BY MR. BURGER:

25      Q    Mr. Sarria, I direct you to Page 2 of the lease.

1  Can you tell me what day of the month rent payments are

2  due under the lease?

3      A    Lease states the rent payment is due on the

4  first of the month.

5      Q    And I direct you to Paragraph 37 of the lease,

6  which is on page 15.  Are you there yet?

7      A    Yes.

8      Q    Okay.  Could you explain to the court if there

9  is any additional rent due on the lease other than the

10  standard normal monthly rent?

11      A    Yes, there is a provision in the lease that

12  calls for a payment of real estate taxes and a formula

13  devising the lease according to the square footage.  And

14  the way that works is as the landlord gets his bill he

15  prorates this amount, and it becomes part of the rent that

16  Winn-Dixie owes the shopping center owner.

17      Q    Okay.  Now, has Winn-Dixie paid -- is it current

18  under its lease?

19      A    No.

20      Q    When did Winn-Dixie fail to pay rent as is

21  defined in the lease?

22      A    From the moment that they stopped paying the

23  real estate tax portion of the rent.

24      Q    When did that occur?

25      A    About five years.

1       Q     Can you tell the court then, have you required

2   Winn-Dixie to pay that tax amount each month?

3       A     Well, when -- according to the lease,

4   Winn-Dixie's supposed to pay that as part of their rent.

5   They have -- they have not done so and so we've made claim

6   to it, and until this day they have not made that payment.

7       Q     And is that defined as additional rent under the

8   lease?

9             MR. POST:  Objection, Your Honor, leading.

10             MR. BURGER:   Okay.

11  BY MR. BURGER:

12      Q     How is the payment of monies that were due for

13  real estate taxes treated under the lease?

14      A     It's treated as a rent payment.

15      Q     Okay.  And rent is due on the first, correct?

16      A     That's correct.

17      Q     As you sit here today, can you advise the court

18  approximately how much money Sarria Enterprises is due for

19  rent under the lease?

20      A     Approximately 125,000.

21      Q     You'll let me show you -- let me go back.

22  Mr. Sarria, was there a point in time when you advised

23  Winn-Dixie that it was -- that it was late in the payment

24  of rent?

25      A     Yes.

1    Q    Do you know approximately when that was?

2    A    Approximately a year ago, there's some

3  correspondence to that I'm sure.  I can't recall right now

4  the exact date.

5    Q    Let me show you what we've marked as --

6  previously marked as No. 9.  Have you seen this document

7  before, Mr. Sarria?

8    A    Yes.

9    Q    What is that document?

10    A    This is a letter sent to one of the Winn-Dixie

11  attorneys where at this point in time in September 2004

12  Winn-Dixie had not paid the rent for two stores in two

13  different locations.

14    Q    Okay.  And from September 14th, 2004, until

15  today has Winn-Dixie paid the rent in this store?

16    A    Not in store Number 237.

17    Q    And with regard to its other rent, aside from

18  the rent that is due as part of the taxes, has Winn-Dixie

19  paid on the first of the month as it's supposed to?

20    A    Well, the rent has been subjected to be coming

21  later every month.  In fact, I would probably speculate

22  the 7th or the 8th of each month.

23    Q    Now, How is it that you've come to have a copy

24  of Exhibit No. 9 in your possession?  Just, is it

25  something you keep in the books and records of Sarria

1  Enterprises?

2      A    We try to keep it in the records, if not, our

3  attorneys usually have it.  There's a lot of

4  correspondence back and forth with a tenant like this.

5      Q    If you could check the last page of Exhibit No.

6  9, do you recognize the fax number on that, the top where

7  it says receiver?

8      A    I can't recall that number right now.

9      Q    441-1175 --

10     A    Oh, I'm sorry, on the top, yes.  That's our --

11     Q    You see that number?

12     A    That is our --

13     Q    That's your fax machine?

14     A    Yes.

15     Q    Okay.  Do you know if Winn-Dixie, to the best of

16  your knowledge, if Winn-Dixie received Exhibit No. 9?

17     A    Well, Alan Grunspan was the attorney for

18  Winn-Dixie at this point in time, I assume he did.

19     Q    After this September 14th, 2004, notification to

20  Winn-Dixie, was there any correspondence or meetings with

21  Winn-Dixie in relation to store Twin Oaks Plaza or Store

22  237?

23     A    With relation to Twin Oaks Plaza there was --

24  Alan Grunspan was handling a matter that we have with

25  Winn-Dixie in reference to the store.

1         MR. BURGER:  We'll move to admit No. 9 into

2    evidence.

3         MR. POST:  I object, Your Honor, on two grounds.

4    One, it's not relevant.  Secondly, it's beyond the

5    scope of the motion to lift the stay which we're here

6    today.  There's no allegation in this motion to lift

7    the stay regarding the subject matter of this

8    exhibit.

9         THE COURT:  You want to respond?

10        MR. BURGER:  Yeah.  That -- it's definitely

11   relevant.  The Notice -- Exhibit No. 9 declares

12   Winn-Dixie to be in default of their lease and

13   specifically says for failure to pay rent, and the

14   issue, as we sit here today, is that Winn-Dixie was

15   in default September 14, 2004, and is in default as

16   we sit here today by failing to pay rent as it came

17   due under the lease and by failing to cure that

18   default such that as we will explain to the court in

19   a little bit that the landlord in this case is

20   seeking leave to terminate the lease.

21        MR. POST:  May I respond, Your Honor?

22        THE COURT:  Sure.

23        MR. POST:  Your Honor, this is -- appears to be

24   a little bit of a trial by ambush.  The Motion for

25   Relief from Stay has one default alleged as to

1      nonpayment of tax liabilities for years 2000- -- from

2      1999 to 2004.  That's the only default alleged in

3      this motion to lift the stay.  I've not been notified

4      that there's going to be any other exhibits or

5      defaults alleged in this case.  We have filed a

6      response in this case based on that assumption, and

7      if -- if we're going to try a different case, I'd

8      like notice of it, and I'd like to come back.

9           MR. BURGER:  If I may, Your Honor.  I served the

10     subpoena, it's not my -- my MO to try anything by

11     ambush, but I served a subpoena on Winn-Dixie to

12     bring documents to this court today, and I asked for

13     all correspondence or documents relating to Store

14     237, this particular -- and this particular landlord.

15     And the response I got was rather than we'll bring

16     the documents or the people that are supposed to

17     come, the response I got was a very nice letter from

18     Mr. Post saying, we'll choose what we want to bring

19     and this is what we're going to bring.  We're going

20     to bring -- we're going to bring the lease dated

21     December 18, 1980, the short form lease dated

22     December 18, 1980, and the first amendment to lease

23     dated May 21, 1993.

24          They brought no other documents nor did they

25     bring the people responsive to the subpoenas, because

1    it was for the persons with the most knowledge of the

2    documents.  The subpoenas were very clear.  They

3    said, please provide the documents, and I'll bring

4    them -- I'll show these subpoenas to the court.  In

5    any event, rather than filing a motion for protective

6    order, now we hear that this is a trial by ambush.

7    It's not a trial by ambush.  In fact, this will lead

8    into the next question, which was, a subsequent

9    letter to Winn-Dixie in January of 2005 saying, you

10   still owe the money, and Winn-Dixie thereafter filed

11   for bankruptcy protection.

12        So I don't see this as being a trial by ambush,

13   it goes right to when was Winn-Dixie declared in

14   default, what do they do in response to default and

15   does this landlord have the right to terminate this

16   lease by seeking leave of court and relief from stay.

17        MR. POST:  May I respond, Your Honor?

18        Your Honor, we received a subpoena from

19   Mr. Burger on July 3- -- January 31st, and we sent

20   him a letter on February 8th pursuant to Rule

21   45(a)(c), excuse me, 45(c)(b), which says that a

22   person who's commanded to produce documents may serve

23   a written objection to such inspection.  If an

24   objection is made, the party serving the subpoena

25   shall not be entitled to inspect or copy the

1    materials except pursuant to an order of the court by

2    which the subpoena was issued.  If an objection has

3    been made the party serving the subpoena may move at

4    any time for an order compelling production.  There's

5    no such order before you, Your Honor.

6         The letter I sent to Mr. Burger said that

7    pursuant to Rule 45, Federal Rules of Civil

8    Procedure, we, as incorporated by the Bankruptcy Rule

9    9016, we object to the subpoena because discovery of

10   the documents or related information are not relevant

11   to the contested matter before the bankruptcy court

12   among other reasons.

13        Instead of Mr. Burger calling me up and saying,

14   well, here's why it's relevant, I'm going to try all

15   these different things, I didn't get that

16   information.  So I'm telling, Your Honor, that this

17   is a case which they're trying that hasn't been

18   noticed, it hasn't been pled.  When we filed our

19   response we haven't -- we didn't address it.

20        And I would also point out to the court one more

21   thing.  If I may approach the bench, Your Honor.

22   This is the case of Bistrian versus East Hampton Sand

23   & Gravel Company.  This is a Eastern District of New

24   York case from 1982.  In this case, there was a

25   motion for relief from stay filed by a landlord

1    before the lease in question had been assumed or

2    rejected, he had a Chapter 11 case.  And in this case

3    the court said that within the context of the chapter

4    proceeding -- Chapter 11 proceeding, the lesser of a

5    nonterminated lease is preempted from seeking to

6    dispossess the debtor or lessee until such time the

7    debtor or lessee is required to assume or reject the

8    lease.  A debtor in the Chapter 11 proceeding is

9    afforded a reasonable time extending no later than

10   date of confirmation to either assume or reject.

11        In this court -- in this case the court held

12   that having established that this lease had not yet

13   been assumed or rejected, procedurally that it's

14   improper for -- it's an improper statutory vehicle

15   for a landlord to try to determine its rights

16   involved in a nonterminated lease in a debt, motion

17   to lift stay hearing.  And for that reason this court

18   said, we're not going to consider your motion to lift

19   the stay.  If you want to file -- if you want to fuss

20   about these things, file a motion to compel or assume

21   or reject the lease, file a motion for administrative

22   expense claim, don't use 362(d) of the Bankruptcy

23   Code.

24        And this case is directly on point to what's

25   happening here.  We have a little, not only it is a

```
 1        trial by ambush, it's -- they're trying to try merits
 2        of this lease -- regarding this lease which should be
 3        something in connection with a motion to assume or
 4        reject the lease or to compel to assume or reject the
 5        lease or a motion for administrative expense claim,
 6        because the only proof of claim that this -- that
 7        this party filed in this case was for this -- for
 8        these post petition tax items, and they claimed
 9        administrative expense claim.
10            So for all these reasons, Your Honor, I object
11        to the introduction of this exhibit, and I would also
12        ask the court to, at this time, dismiss this
13        motion -- deny this motion without prejudice and have
14        them come back with a properly drafted motion in
15        which whatever issues they want to bring on to
16        hearing, we can properly address at the appropriate
17        time.
18            MR. BURGER:  If I may so respond.
19            THE COURT:  Sure.  I figured you'd want to say
20        something.
21            MR. BURGER:  Thank you.  With regard to the
22        subpoena, the language that was cited as to what the
23        proper response should be pursuant to Bankruptcy Rule
24        9016, deals with when someone serves a subpoena for
25        production of things for inspection or copying, in
```

1    which case you have 14 days to review or look at the

2    subpoena and then file an objection, that the

3    objection can be done by letter.  In this case, it

4    was a subpoena to appear at a hearing or a trial, for

5    lack of a better word, it was served in due course.

6        The first of those subpoenas was served on

7    Winn-Dixie November 18th, 2005, it was a

8    subsequent -- that was a notice to produce.  Mr. Post

9    responded to me that there was no procedural avenue

10   to -- allowed in the rules of civil procedure, so I,

11   thereupon, December 2nd, served a subpoena asking for

12   most of the same documents, no response.

13   January 13th, another subpoena.  January 17th,

14   another subpoena, because we were supposed to be here

15   on the 23rd, no response, no objection.  The same

16   basic subpoenas which were served on the 13th and the

17   17th were reserved on January 31st for today and now

18   he objects to the subpoenas claiming that he has 14

19   days to do it by letter.  And, frankly, that's just

20   not the law.

21       Now, I have a case out of Hawaii, United States

22   Bankruptcy Court, In Re: Honda, which says the proper

23   mechanism is for Mr. Post to have filed a motion for

24   protective order and then we would come and address

25   the court on a motion for protective order instead of

1    ignoring the subpoena, ignoring the obligation to
2    bring the documents to the people.
3        With regards to a quote, "trial by ambush", it
4    has been -- the issues have been very clearly frayed
5    and phrased all along.  Here's what happened:  They
6    owed money, they were in default of their lease, we
7    told them they were in default of their lease,
8    therefore, we're entitled to relief from stay.  The
9    issue here becomes, Judge, is that there was a --
10   there was a notice that was sent to Winn-Dixie, and I
11   don't think they'll deny the notice, they -- which
12   was in January.  There was -- the first notice was in
13   September, sent to their counsel, the second notice
14   was sent in January 2005 saying, Please, pay up.
15   Here's the number that's due, $124,000 and change.
16       Winn-Dixie filed for bankruptcy within the time
17   frame of the cure period as allowed in the lease.
18   For instance, the lease says that you give 30 days
19   notice, they have 30 days to cure.  Before that cure
20   period expired, Winn-Dixie filed for bankruptcy,
21   after the notice and before the cure period.
22       So the debtor not -- I mean, the
23   creditor/landlord never got the opportunity to
24   address the issue of what's allowed for in the lease,
25   which is, they're in default, they're in repeated

```
 1    default, the cure period has expired, they're allowed
 2    to leave, to terminate the lease.  That's been the
 3    issue as frayed from day one, from day one.  And if
 4    Winn-Dixie didn't see fit to comply with the subpoena
 5    and dig up the documents, I'm sorry, I can't call
 6    that a trial by ambush.
 7        MR. POST:  May I respond, Your Honor?
 8        THE COURT:  Sure.  I want to hear what everybody
 9    has to say.
10        MR. POST:  I'll represent to you as an officer
11    of the court that this is the first time I've heard
12    this theory from Mr. Burger.  And in the court record
13    is their Motion for Relief from Stay, it's very short
14    and sweet, it's five paragraphs.  It's Paragraph 2
15    says, it's believed the store is known as Winn-Dixie
16    store No. 237.
17        Paragraph 3, the lease on Page 37 requires
18    Winn-Dixie to pay its portion on the real property
19    taxes levied against the premises as additional rent.
20        Paragraph 4, on January 26th, 2005, Sarria
21    notified Winn-Dixie that Winn-Dixie had not paid it's
22    pro rata portion of the tax liability with respect to
23    the premises for the year 1999 through the year 2004.
24    Accordingly, the landlord requested Winn-Dixie to
25    make additional rent payment in the amount of
```

```
1    $124,035.70.  To date of this motion Winn-Dixie has
2    failed or refused to pay the additional rent.
3         Paragraph 5, Sarria wishes the ability to avail
4    itself the remedies under the lease and/or Florida
5    Statute 83 et seq. as a result of Winn-Dixie's
6    default.
7         That's the allegations.
8         THE COURT:  Anything else?
9         MR. BURGER:  Avail itself under all remedies
10   allowed in the lease.  And I'll ask Mr. Sarria if he
11   looks at the lease what his rights are in the event
12   Winn-Dixie was in default.
13        THE COURT:  Objection is sustained.  All you're
14   looking for here is for me to either lift the stay
15   and whatever rights, some state court's gonna deal
16   with that.
17        MR. BURGER:  Lift the stay.
18        THE COURT:  If I lift the stay.
19        MR. BURGER:  Exactly.
20        THE COURT:  Okay.  Objection sustained, the
21   document's not allowed.  The issue is just what was
22   framed in the pleadings, and the only thing I
23   understood plain -- I've read it, I said, well,
24   they're just talking about the taxes.  I didn't read
25   into that, you didn't put me on notice there was
```

1    anything further beyond five years or whatever it was

2    worth of taxes.  It didn't talk about no post, you

3    know, that you're not receiving post petition rent

4    payments or anything like that.

5        MR. BURGER:  The post petition rent came last

6    week, so, I mean, that was something --

7        THE COURT:  For the whole last year?

8        MR. BURGER:  No, no.

9        THE COURT:  Or just for the last month?

10        MR. POST:  For 2005, Your Honor.

11        MR. BURGER:  2005.

12        THE COURT:  The taxes for 2005?

13        MR. BURGER:  Yeah.

14        MR. POST:  That's correct.  And we're current --

15        THE COURT:  Current post petition.

16        MR. POST:  -- petition.

17        THE COURT:  Yes.  We're talking about -- okay, I

18    understand where we are.  Sustained.  Go ahead with

19    your case.

20  BY MR. BURGER:

21    Q    Okay.  Mr. Sarria, let me show you what has

22  already been marked as No. 10 for identification.

23        Mr. Sarria, let me show you what's been marked

24  as No. 10 for identification, have you seen this document?

25    A    Yes.

1       Q       What is this document?

2       A       This is a summary of the amounts owed for the

3  real estate tax amounts of the previous years.

4       Q       Was this document served upon Winn-Dixie?

5       A       Yes, it was sent certified mail and facsimile to

6  their Winn-Dixie property manager.

7       Q       Do you know the date that Winn-Dixie received

8  the document?

9       A       January 31st, 2005, according to the return

10  receipt.

11       Q       Has Winn-Dixie paid the sums that are due --

12  that are requested to be paid in your January 26th, 2005,

13  letter?

14       A       No.

15       Q       When is that sum due that -- in your opinion,

16  when is that sum due under the lease?

17       A       It's due every day.  It's part of the rent.

18  It's due every first of the month, every day.  It's due

19  today.

20       Q       Can you explain to the court, if you look at

21  Exhibit 1 of -- in front of you again, could you look at

22  and explain to the court what remedies you would like to

23  avail yourself of if Winn-Dixie -- if the judge grants

24  relief from the stay and allows you to go forward, what

25  would you like to do with the premises?

1       A       Well, as a landlord I have a lot of obligations

2  and etcetera, I have mortgages, I have insurance, I have

3  to go out there and try to get a tenant to lease this

4  place.  I got a -- probably fix up the store.  I'm not

5  sure what type of maintenance is going on in there.  It's

6  a Pandora's box for me.

7       Q       Do you know if Winn-Dixie's sales under the

8  lease have exceeded $21 million?

9       A       I don't think so.  They provide their numbers

10 once a year, I can't recall.  But, I would have known if

11 it was over 21 million.  I think that's a break point.

12      Q       Can you describe for the court, is it your

13 obligation to bill Winn-Dixie for the taxes or is it

14 Winn-Dixie's obligation to pay the taxes when they're due?

15      A       According to the lease it's Winn-Dixie's

16 obligation to pay.

17      Q       And when -- to the best of your knowledge, from

18 1999 through 2004, Winn-Dixie hasn't paid that rent that's

19 due under the lease; is that correct?

20      A       Correct.

21      Q       Can you explain to the court, if you would, by

22 looking at the lease or maybe you know, does Winn-Dixie --

23 is it entitled to some sort of credit against rent for the

24 sums that are due?  Potentially entitled to credit against

25 rent?

1      A      The only credit that, if they go over that break

2  point, there is a formula where they get a credit on the

3  rent.  Again, it's, excuse me, it's detailed in the lease,

4  where these stores have to perform at a certain level, if

5  they get to that level of sales then there's a percentage

6  part of the rent that gets deducted because they've gone

7  over that break point which then triggers a percentage

8  rent clause.

9      Q      And if Winn-Dixie fails to or withholds a

10 portion of the taxes, does the lease at all deal with a

11 set off or those kinds of issues?

12     A      No.

13     Q      Who drafted the lease to the best of your

14 knowledge?

15     A      Winn-Dixie.

16     Q      Can you tell me sort of -- describe for the

17 court how Winn-Dixie's actions are impacting or

18 handicapping you with respect to the operation of the

19 center?

20     A      Well, obviously, in the operation of a center,

21 the main source of income are your leases, are these

22 tenants who are supposed to pay you.  I can tell you my

23 particular case, we have a mortgage on this property, we

24 have insurance, we have maintenance issues, which are on

25 an ongoing basis.  We have obligations that we have to

1   meet according to the lease.

2            Obviously in a situation like this, and being

3   the market in particular where this center is, we've

4   gotten a 37 percent hike on our real estate taxes, our

5   insurance premiums have gone through the roof, needless to

6   say, we have huge amounts of deductibles, so in a position

7   like this as a landlord, that's why I'm here in this court

8   seeking relief.

9       Q    Could you describe for the court what impact

10  the, if Winn-Dixie's failure to pay these sums may have

11  with respect to your other tenants, your other lease

12  holder obligations?

13      A    I have to pay -- Winn-Dixie not paying is --

14  is -- I still have to pay my mortgage, I have to pay my

15  real estate tax.  If I default in any of the insurance

16  premiums and any of my real estate tax payments, I'm in

17  default with the entire center, that's the obligation that

18  I have under the lease.  Whether it's Winn-Dixie or any

19  other tenant I have to pay these fixed costs rain or

20  shine.

21      Q    I direct you -- well, let me ask you this:  Has

22  Winn-Dixie given you any insurances that it's going to

23  bring its lease current, its rent current?

24      A    Not as of this date.

25      Q    Let me take you to Paragraph 21 of the lease,

1  which is at Page 10.  After Winn-Dixie received the

2  January 31, 2005, letter, the letter dated January 26th,

3  2005, our Exhibit 10, after Winn-Dixie received that

4  document --

5        MR. POST:  Your Honor, for the record, that -- I

6        would object to the admission of that Exhibit 10, I

7        haven't seen a copy of it.

8        MR. BURGER:  Here's a copy of it.

9        MR. POST:  We have no objection to this, Your

10        Honor.

11        THE COURT:  Is that offered?

12        MR. BURGER:  We were going to offer Exhibit 10.

13        THE COURT:  10's admitted.

14                              (Whereupon, the document

15                                  previously marked for

16                                  identification as Movant's

17                                  Exhibit No. 10 was received

18                                      into evidence.)

19        MR. BURGER:  We have a whole stack of --

20        THE COURT:  Has Mr. Post looked at all of those?

21        MR. BURGER:  Most of them.  I don't think he's

22        seen all of them.  But they were all part of the

23        subpoena, Judge.

24        I mean, it's hard for me to understand how

25        someone could say trial by ambush when they were

1    specifically requested in a subpoena.

2         MR. POST:  Your Honor, I would object to the

3    introduction of those stack of documents that

4    Mr. Burger just gave you.

5         THE COURT:  Well, he didn't offer them into

6    evidence.

7         MR. BURGER:  I haven't offered them.  The lease

8    you've already said is good, which is No. 1.

9         THE COURT:  I don't know what the relevance of

10   them will be, but let's just go on.  Mr. Burger, we

11   don't have a lot of time.

12        MR. BURGER:  We're almost --

13   BY MR. BURGER:

14   Q    Exhibit 10.  From the time you received

15   Exhibit 10 until within the 30 days as required in the

16   lease, has Winn-Dixie cured -- did Winn-dixie cure that

17   default?

18   A    No.

19        MR. BURGER:  I have nothing further.

20        THE COURT:  Mr. Post?

21        MR. POST:  Thank you, Your Honor.

22                   CROSS-EXAMINATION

23   BY MR. POST:

24   Q    Sir, your motion to lift the stay which we're

25   here today was filed last June, right?

```
 1      A    If that's what it said, sir.  I don't have the
 2 document in front of me.
 3      Q    So your motion to lift the stay has been
 4 continued several times with either your consent or at
 5 your request, correct?
 6      A    If that's what the document reflects.
 7      Q    And, sir, your -- the motion to lift the stay
 8 that we've read seeks to recover or seeks reimbursement of
 9 1999 taxes, excuse me, Winn-Dixie's portion of the real
10 estate taxes for the years 1999 through 2000, correct --
11 2004, correct?
12      A    Correct.
13      Q    Other than that liability is Winn-Dixie
14 otherwise current on lease 237?
15      A    There's a portion of the 2005 also.
16      Q    Portion for real estate taxes?
17      A    Yes.
18      Q    Have you received Winn-Dixie's check yet for
19 2005 on real estate taxes?
20      A    For a portion of the 2005, yes.
21      Q    So other than these -- this $124,000 item for
22 1999 through 2004 taxes, Winn-Dixie's otherwise current on
23 the lease; is that correct?
24      A    This only reflects until 2004 then there's the
25 addition of the 2005 amount, that's correct.
```

1    Q    Yes, sir.  You have a copy of the lease there in

2  front of you, that's Exhibit 1?

3    A    Yes.

4    Q    Could you turn to Paragraph 37?

5    A    Yes.

6    Q    The second full paragraph talks about, or the

7  whole paragraph 37 talks about these additional rental

8  taxes, right?

9    A    Correct.  It talks about the additional rental

10  amount having to do with the real estate, the ad valorem,

11  real estate taxes and the property.

12    Q    So this lease defines these addition -- this

13  real estate tax liability to be additional rent, correct?

14    A    That's what it says on the lien, that's right.

15    Q    And approximately halfway down through the

16  second paragraph it says:  And such additional rental

17  shall be payable by tenant on demand after payment by

18  landlord, correct?

19    A    Correct.

20    Q    So, Winn-Dixie's obligation to pay this

21  additional rent is after you, the landlord's paid the

22  taxes and the landlord's made a demand on Winn-Dixie,

23  correct?

24    A    Correct.

25    Q    And the first demand that the landlord made on

1  Winn-Dixie to pay the 1999 taxes was your letter of

2  January 26th, 2005, correct?

3      A    Correct.  But the landlord was and did do these

4  payments as stated on the lease.

5      Q    Point is that you didn't ask Winn-Dixie to

6  reimburse you for the 1999 taxes until January 26th, 2005,

7  correct?

8      A    January 26th, 2005, that's correct.

9      Q    And same for the 2000 taxes, correct?

10      A    Yes.

11      Q    And the -- as well as the 2001, 2002, 2003,

12  2004, correct?

13      A    Correct.

14          MR. BURGER:  That's all I have, Your Honor.

15          THE COURT:  Redirect?

16          MR. BURGER:  Yes.

17                      REDIRECT EXAMINATION

18  BY MR. BURGER:

19      Q    Mr. Sarria, I, again, direct you to the

20  provision of the paragraph on Page 15 of the lease,

21  No. 37, where Mr. Post indicated that you were to provide

22  it to the landlord.  Read the first words, it says, Upon

23  request of tenant, landlord agrees to -- is that how the

24  lease reads?

25      A    Yes, sir.

1    Q    Okay.  So do you want to correct your testimony

2    with regard to whose obligation it is to when the

3    obligation arises to pay it?

4    A    Yes, sir, it's Winn-Dixie's obligation when it

5    arises to pay, it says it on the lease.

6         MR. BURGER:  Okay.  I have nothing further for

7         this witness.

8         MR. POST:  Nothing further, Your Honor.

9         THE COURT:  Thank you very much.  You may step

10        down.

11        (Witness excused.)

12        THE COURT:  Additional evidence, Mr. Burger?

13        MR. BURGER:  Yeah, I just have -- I don't know

14        who Winn-Dixie's brought as the person with most

15        knowledge of the taxes that are due, for the monies

16        that are due.

17        MR. POST:  I'm sorry, was that question directed

18        to me?

19        THE COURT:  I assume.

20        MR. BURGER:  That's who I would call, whoever

21        Winn-Dixie brought with most knowledge of the monies

22        that are due.

23        MR. POST:  Your Honor, I would object to that.

24        I do have a witness here who is the property tax

25        manager, but I don't know -- understand the relevance

1    of that, that dispute in this -- in this stay

2    hearing.  As I understand the stay hearing, this is

3    like a preliminary motion to suspend a temporary

4    injunction.  And what's adjudicated by this court

5    today, as I understand, it doesn't constitute

6    adjudication of the merits of any matter, so I would

7    ask -- I would object to what -- to his request

8    because I don't believe that my witness is going to

9    provide anything that's relevant to this hearing.

10        THE COURT:  Just as to relevance, what's the

11   relevance?  What would they testify that's just --

12   that's just supplemental, whether they have to pay

13   the taxes?

14        MR. BURGER:  Supplemental.  And also to

15   introduce the February 2nd letter that was received

16   by my client.  But that's --

17        THE COURT:  Mr. Post, there's no issue, those

18   taxes have not been paid, right, the ones they're

19   complaining were not paid.

20        MR. POST:  That's correct, Your Honor.  We have

21   paid the 2005 taxes, but not the 1999 through 2004.

22        THE COURT:  All right.  Maybe you said some

23   of -- a portion of the 2005 may not be paid.

24        MR. POST:  Apparently the check hasn't gotten

25   through their mail.

1          THE COURT:  Whatever.

2          MR. BURGER:  The issue with the 2005, Your

3     Honor, is that, and in reliance upon your order, this

4     court's order, I think Winn-Dixie's taken the

5     position that the 2005 taxes are a prorated portion

6     between prepetition and a portion post petition.

7          THE COURT:  All right.  So that's only --

8          MR. BURGER:  That's the issue.

9          THE COURT:  But I mean, they've been paid except

10    for that --

11         MR. BURGER:  That's the issue.

12         THE COURT:  That's not before me today to deal

13    with.

14         MR. BURGER:  No.

15         THE COURT:  All right.  So they admit they

16    haven't paid it.  You just need this person to

17    identify some letter?

18         MR. BURGER:  No, that's fine.  The letter -- if

19    they admit they haven't paid it, that's fine.

20         THE COURT:  Okay.  Any additional evidence?

21         MR. BURGER:  Hold on a minute.

22         THE COURT:  I'm not cutting you short.  You do

23    what you have to do.

24         MR. BURGER:  I would call the person from

25    Winn-Dixie with the most knowledge of the lease hold.

1          THE COURT:  Other than relevance --

2          MR. BURGER:  This is to prove the person --

3     about the equity in the property, if there is any

4     equity at all.  Winn-Dixie claims if there's any

5     value or equity in this property.

6          THE COURT:  I think that's appropriate.

7          MR. POST:  Your Honor, we didn't bring anybody

8     today to speak to equity on the property.

9          THE COURT:  Okay.  So they can't prove

10    otherwise.  They can't prove there is equity in the

11    property if they're not here.

12         MR. BURGER:  Okay.  Then hold on a second.  Then

13    I'll recall Mr. Sarria.

14         THE COURT:  Very well.  Mr. Sarria, you're still

15    under oath.

16                   FURTHER REDIRECT EXAMINATION

17   BY MR. BURGER:

18    Q    Mr. Sarria, how many years have you been in the

19   commercial landlord business?

20    A    Since 1985.

21    Q    Can you describe a little bit for the court as

22   to what your general business is?

23    A    This business involves a family, I work along

24   side my brother, my younger brother and my father.  What

25   it basically does is we manage these properties, which we

1    regard throughout the years, we try to keep them in a

2    healthy pace, try to keep them full as far as tenancies,

3    try to meet our obligations and we make a living, these

4    rental properties.

5         Q    Can you describe for the court your experience

6    in renting, or as a landlord in the process of forming a

7    lease with a perspective tenant?

8         A    Well, it all depends on the size of the

9    property, it depends on the size of the space and

10   location.  But, in essence, sometimes it involves the

11   landlord contributions, it involves the tenant asking for

12   the space in a vanilla shell, sometimes it involves build

13   outs, there's just a --

14            THE COURT:  Mr. Sarria, back up just a little

15        bit from that microphone.

16            THE WITNESS:  Sorry.

17            It involves an array of different skills that

18        you have to do to try to get these tenants to come in

19        a shopping center.

20   BY MR. BURGER:

21        Q    With regard to a space the size of the

22   Winn-Dixie space, which I think is about 35,000 square

23   feet; is that correct?

24        A    It's 33,8.

25        Q    And that's the anchor tenant in that center?

1       A    That's our anchor.

2       Q    Can you describe for the court the difficulty

3  that would exist if you said to your perspective anchor,

4  by the way, you have to pay us an additional $100,000 key

5  money to come into the space?

6       A    There is -- there's -- any time you ask anybody

7  for money there is an -- there's always something there to

8  protrude a problem.  If it's free, everything for free is

9  good, but when there's money involved, however amount it

10  is, whether it's a hundred or a million it's always going

11  to be obstacles.

12       Q    So, if someone had to pay that money in order to

13  take over the lease, what would be the prospects of

14  leasing $100,000 -- the $124,000.

15       A    In this particular situation for that type of

16  tenancy, people look at the landlord as someone who's

17  bleeding, and for lack of words, and they're going to step

18  inside and say, look, I'll just take the space, take it or

19  leave it, but I'm not going to pay you the money.  It's

20  not a little space, it's not a 1500 square foot space that

21  you can just delegate to an array of tenants.  This is a

22  big space, not too many people want this space.

23       Q    Do you consider the Winn-Dixie's tenancy to be

24  terminated?

25            MR. POST:  Object, Your Honor.

1          MR. BURGER:  I withdraw that.

2  BY MR. BURGER:

3      Q    How do you consider the Winn-Dixie tenancy?

4      A    I believe Winn-Dixie has -- I believe they're in

5  default against the landlord.  I believe I, as the

6  landlord, in the years we've been together with

7  Winn-Dixie, provided all our obligations until this day.

8  We get letters from that particular location obligating us

9  to do fire sprinkler inspections, to do alarm inspections,

10 until this day we have not defaulted under that lease and

11 til this day I believe they are in default.

12     Q    And if -- if the bankruptcy had not been filed

13 before the 30 days had run, after your letter of

14 January 26th, 2005, what was Sarria Enterprises intending

15 to do with the space as far as Winn-Dixie's concerned?

16     A    I'm sorry, what was that again now?

17     Q    Okay.  If the bankruptcy had not been filed

18 within 30 days of you sending out the demand, what was

19 Sarria Enterprises intending to do with that space, with

20 that tenancy?

21     A    Well, we would have obligated them to pay.  If

22 they don't pay then they have to leave.

23         MR. BURGER:  I have nothing further.

24         THE COURT:  Any further questions of this

25     witness?

1          MR. POST:  No, Your Honor.

2          THE COURT:  Thank you very much, sir, you may

3     step down once again.

4          (Witness excused.)

5          THE COURT:  Any additional evidence?

6          MR. BURGER:  No, Your Honor.

7          THE COURT:  Mr. Post, you wish to offer any

8     evidence?

9          MR. POST:  Yes, Your Honor.  I wish to offer in

10     evidence Winn-Dixie Exhibits 1 through 4.  Exhibit 1

11     is the lease dated December 18th, 1980, between

12     Winn-Dixie and the predecessor landlord.  Exhibit 2

13     is a short form of that lease.  Exhibit 3 is the

14     first amendment to that lease dated May 21st, 1993.

15     Exhibit 4 is the -- it's a letter dated July 25,

16     2005, from Mr. Burger's office to the Winn-Dixie

17     claims register, attaching their proof of claim in

18     the amount of $124,035.70 for taxes for 1999 through

19     2004, and suggesting that the amount is

20     administrative claim for unpaid rent.

21          THE COURT:  Any objection to those exhibits

22     coming into evidence?

23          MR. BURGER:  That's fine, Judge.

24          THE COURT:  They're admitted as previously

25     numbered.

```
 1                              (Whereupon, the documents

 2                                  previously marked for

 3                                  identification as Debtor's

 4                                  Exhibits Nos. 1-4 was

 5                                  received into evidence.)

 6            THE COURT:  Your Honor, I'd like to call

 7       Ms. Kathy Jaxon to the stand.

 8   Whereupon,

 9                         KATHY JAXON

10   was called as a witness herein, and having been produced

11   and sworn by the courtroom administrator, was examined and

12   testified as follows:

13                           - - -

14            COURTROOM ADMINISTRATOR:  Please state your name

15       and address including city and state.

16            THE WITNESS:  My name is Kathryn Jaxon, that's

17       spelled J-A-X-O-N.  Address is 6956 Fruit Cove Road,

18       Jacksonville, Florida 32259.

19            THE COURT:  Thank you.  You may inquire.

20            MR. POST:  Thank you, sir.

21                       DIRECT EXAMINATION

22   BY MR. POST:

23       Q    Ms. Jaxon, where are you employed?

24       A    Winn-Dixie Stores Incorporated.

25       Q    What's your position at Winn-Dixie?
```

1      A    I am an assistant property tax manager.

2      Q    How long have you been with Winn-Dixie?

3      A    March 11th will be four years.

4      Q    As of today, the total number of stores still

5  being operated by the company is approximately 585,

6  correct?

7      A    Yes.

8      Q    Are you aware the bankruptcy code establishes a

9  period within which the debtor must decide whether to

10  assume or reject those 585 leases?

11     A    Yes.

12     Q    Are you aware the court extended the company's

13  statutory period in this case through March 20th, 2006?

14     A    Yes.

15         MR. BURGER:  Judge, I'm going to object just as

16         to the form, he's leading the witness.

17         THE COURT:  Very well.  You can answer the

18         question.  Try not to lead.  I know you're trying to

19         get through some preliminary stuff.

20         MR. POST:  Yes, Your Honor, it's a matter of

21         public record, I was --

22         THE COURT:  Go ahead.

23  BY MR. POST:

24     Q    Ma'am, is the company presently determining

25  which of the approximately 585 remaining stores the

1  reorganized company will continue to operate?

2      A    Yes.

3      Q    The parties to the lease in question, 237, are

4  Winn-Dixie and Sarria, correct?

5      A    Yes.

6      Q    Where is the location of that store?

7      A    I have the address here.  The address is 12254

8  Southwest Eighth Street, Miami, Florida.

9      Q    Is that store that Winn-Dixie continues to

10 operate?

11     A    Yes.

12     Q    Is Winn-Dixie current on all its post petition

13 rent obligations to Sarria on that store?

14          MR. BURGER:  I'm going to object.  She's called,

15     as I understand it, her title is tax --

16          THE WITNESS:  Assistant property tax manager.

17          MR. BURGER:  Tax manager, not, I mean --

18          THE COURT:  I think you need to lay a little bit

19     of a predicate if you want to ask her beyond, are

20     they current on their taxes, I guess you can answer

21     that.  The other rent, I'm not sure, until you

22     establish she's got some knowledge.  Objection

23     sustained.

24 BY MR. POST:

25     Q    Ms. Jaxon, are you part of the working group

1  that has examined the prepetition and post petition

2  obligations owing by Winn-Dixie to Sarria?

3      A    In regard to real estate taxes, yes.

4      Q    And what about with respect to rent payments?

5      A    The rent payments are paid through the real

6  estate department.

7      Q    In the scope of your being part of that working

8  group, have you obtained knowledge as to whether or not

9  those real estate tax -- rent payments have been made or

10 not?

11     A    Yes, I have.  I spoke to the real estate

12 department --

13          THE COURT:  Sustained.  Hearsay.  Is that what

14     you were going to say?

15          MR. BURGER:  Exactly.

16 BY MR. POST:

17     Q    Are you aware whether or not the company has

18 made a final determination as to whether to ultimately

19 accept Store 237 or reject it?

20          MR. BURGER:  Again, object, because it has

21     nothing to do with what she's testified her job is,

22     which is to check the taxes.

23          THE COURT:  Overruled.

24 BY MR. POST:

25     Q    Are you aware whether or not the company's made

1  a final determination as to whether to ultimately accept

2  or reject Store 237?

3      A    I'm not aware whether that determination has

4  been made.

5      Q    Have you had a chance to review Sarria's motion

6  to lift the stay, which is the purpose of this hearing

7  today?

8      A    Yes.

9      Q    Are you aware the motion alleges that the

10  company, as lessee, owes the landlord the amount of

11  $124,035.70 on the terms of the lease as the company's pro

12  rata share of tax liabilities relating to that store?

13      A    Yes.

14      Q    Did Sarria make a prepetition or post petition

15  demand for the payment of this allege tax liability?

16      A    Are you asking if they made a demand or whether

17  it was pre or post?

18      Q    Well, both.

19      A    They did make a demand, yes.

20      Q    And when was that?

21      A    January 26 -- with the letter that was dated

22  January 26th, 2005.

23      Q    Was this the first -- to Winn-Dixie's

24  understanding, was this the first time that you became

25  aware that the debt was being demanded?

1      A      Yes.

2      Q      There was some discussion about Paragraph 37 of

3  this lease agreement, I'd like to show you a copy of it,

4  please.

5      A      Okay.

6      Q      As the property tax manager, what is your

7  understanding as to who is to do what with respect to

8  those tax liabilities?

9      A      Well, the sentence that's been referred to

10  states upon the request of tenant, landlord agrees to

11  exhibit to the tenant to pay taxes -- the paid tax

12  statements as evidence of the basis upon which any

13  increase in taxes are chargeable to the tenant and such

14  additional rent shall be payable by the tenant on demand

15  after payment by the landlord.  My understanding of that

16  is that upon our request, they'll provide us with the

17  evidence to back up their presentation of taxes that

18  they've paid.  And the taxes will be payable by the tenant

19  upon their demand after they pay them to the taxing

20  authority.

21      Q      Thank you.  Would the company be prejudiced if

22  Sarria was granted relief from the stay to presume it's

23  prepetition unsecured claim?

24          MR. BURGER:  Objection.  She's already testified

25      she doesn't know if the lease is going to be accepted

1      or rejected.  She doesn't know the plan.

2           THE COURT:  I'll sustain the objection.  She has

3      very limited, I mean, based on what I've heard, her

4      knowledge of what's going on in the company is very

5      limited to making sure the real estate taxes are

6      dealing with the real taxes on the properties.  So

7      I'll have to sustain the objection, there's no

8      foundation for her to answer that question.

9           MR. POST:  Yes, Your Honor.  Thank you.  That's

10     all the questions I have of this witness.

11          THE COURT:  Cross?

12          MR. BURGER:  Sure.

13                   CROSS-EXAMINATION

14  BY MR. BURGER:

15     Q    Ms. Jaxon, did you look at any books and records

16  before coming over here today?

17     A    Any books and records?

18     Q    Relating to Sarria Enterprises and this

19  particular lease.

20     A    Not other than the documentation.  I did the

21  calculations to recalculate the taxes.

22     Q    Okay.

23     A    And so I reviewed the calculations that I did.

24     Q    You had testified that the first you had heard

25  of any default with regard to the taxes was the January

1    letter, correct?

2         A    That's right.

3         Q    Did you do anything to check the books and

4    records of Winn-Dixie to see if there were earlier demands

5    made by Sarria with regards to a default under the lease?

6         A    No, I did not.

7         Q    Okay.  Were you aware of the September 14, 2004,

8    letter made upon Mr. Grunspan, counsel for Winn-Dixie?

9         A    No, I was not.

10         Q    You don't dispute that that demand was made, do

11    you?

12         A    I wasn't aware of it.

13         Q    Do you happen to know how much a security

14    deposit is that Winn-Dixie has given Sarria?

15         A    No, I'm not aware.

16         Q    Do you --

17              MR. BURGER:  I have nothing further.

18              THE COURT:  Anything else?

19              MR. POST:  No, Your Honor.

20              THE COURT:  Thank you very much, you may step

21         down.

22              (Witness excused.)

23              THE COURT:  Additional evidence?

24              MR. POST:  I'd like to call Mr. Jay Castle to

25         the stand, Your Honor.

1  Whereupon,

2                              JAY CASTLE

3  was called as a witness herein, and having been produced

4  and sworn by the courtroom administrator, was examined and

5  testified as follows:

6                               - - -

7           COURTROOM ADMINISTRATOR:  Please state your name

8      and address including city and state.

9           THE WITNESS:  Jay Castle 329 North Sea Lake

10     Lane, Ponte Vedra, Florida 32082.

11                         DIRECT EXAMINATION

12 BY MR. POST:

13     Q    Sir, would you state your name for the record?

14     A    Jay Frank Castle.

15     Q    Where are you employed?

16     A    Winn-Dixie Stores, Incorporated.

17     Q    What is your position at Winn-Dixie?

18     A    Senior director for litigation within the legal

19 department at Winn-Dixie.

20     Q    How long have you been with Winn-Dixie?

21     A    Roughly three years.

22     Q    Sir, have you had an opportunity to review the

23 Sarria motion lift of stay which is the subject of this

24 hearing today?

25     A    Yes, I have.

1      Q      And, sir, have you had an opportunity to reflect

2 on whether or not the company would be prejudiced if

3 Sarria would grant a relief from the stay to pursue this

4 prepetition unsecured claim?

5      A      Yes, I have reflected on that issue.

6      Q      How would the company be prejudiced?

7      A      In a number of ways.  We would be forced to

8 litigate this issue in a form that would not be convenient

9 for our reorganization process, most likely in South

10 Florida.  We would face the prospect of multiple landlords

11 seeking similar relief.  We would expend additional

12 litigation expenses fending off those efforts.  And we

13 would generally interfere with the intention of management

14 which right now is very closely focused on preparing and

15 filing a plan of reorganization.

16           MR. POST:  Thank you, Your Honor.  That's all I

17      have.

18           THE COURT:  Cross?

19                    CROSS-EXAMINATION

20 BY MR. BURGER:

21      Q      To date has Winn-Dixie proposed a plan of

22 reorganization?

23      A      We have not yet filed a plan, no.

24      Q      And would you agree with me that it has been

25 approximately one year since Winn-Dixie filed its petition

1   for bankruptcy protection?

2        A    Not quite a year, correct.

3        Q    Would you agree with me that -- that Winn-Dixie,

4   almost immediately after filing its plan for

5   reorganization, knew which leases it wanted to reject?

6        A    I don't think I understand your question.

7        Q    Sure.  Winn-Dixie's rejected a large number of

8   leases, has it not?

9        A    We've rejected roughly 300.  No, I'm sorry,

10  that's not correct.  I don't know the exact number of

11  leases we've rejected to date.  We've rejected a number of

12  leases.

13       Q    Is it more than 100?

14       A    I don't know that.

15       Q    As senior litigation counsel for Winn-Dixie you

16  don't have any idea of how many leases you've rejected?

17       A    I have an idea, I don't know if it's more than a

18  hundred.

19       Q    Give me the idea.

20       A    It's roughly 100 to 200.  It's somewhere in that

21  ballpark.

22       Q    You don't know the number that you've rejected

23  but you know for a fact that this lease is potentially

24  problematic to Winn-Dixie?

25       A    I don't think I said that.

1    Q    Has Winn-Dixie formed any opinion that this

2    lease is critical to its reorganization?

3    A    I'm not aware of a determination.  The period by

4    which we have to assume or reject our leases has not yet

5    expired.

6    Q    The original period expired, but you've made

7    multiple motions, correct?

8    A    The court has offered us several extensions of

9    that statutory period.

10   Q    And Sarria has agreed to continue -- initially

11   agreed to continue its motion pending some sort of

12   assumption rejection, correct?

13   A    I'm not aware of negotiations related to the

14   continuances.

15        MR. BURGER:  I have nothing further.

16        THE COURT:  Thank you very much, sir, you may

17        step down.

18        (Witness excused.)

19        THE COURT:  Additional evidence, Mr. Post?

20        MR. POST:  No additional evidence, your Honor.

21        THE COURT:  Rebuttal evidence?

22        MR. BURGER:  Nothing, Your Honor.

23        THE COURT:  I think I would like to have you

24        submit your arguments in writing.  How long do you

25        need?  The sooner the better, but...

1         MR. BURGER:  I understand.  Is 15 days --

2         THE COURT:  That's fine.  I mean, 15, 20 days,

3    whatever.

4         MR. BURGER:  Between 15 and 20 would be great

5    for me.

6         THE COURT:  I usually look for simultaneous

7    submissions.

8         MR. BURGER:  I would appreciate that.

9         THE COURT:  So, just say 15 days.

10        MR. POST:  That will be fine, Your Honor.

11        THE COURT:  With Valentine's day and everything

12   coming up.  All right.  Let's say simultaneous

13   submissions in 15 days, that's somewhere around the

14   28th, I guess right at the end of the month.  Say by

15   the 28th.

16        MR. BURGER:  Great.

17        THE COURT:  And, then I'll get an order out in

18   due course.

19        MR. BURGER:  Thank you very much.

20        THE COURT:  Thank you.

21        MR. BURGER:  Appreciate your time.

22        THE COURT:  Thank you.

23        MR. POST:  Thank you, sir.

24        (Thereupon, the hearing in the above-entitled

25   cause was concluded at 4:50 p.m.)

52

1                     C E R T I F I C A T E

2

3  STATE OF FLORIDA   )

4  COUNTY OF DUVAL    )

5

6       I, M. Kim Simms, Registered Professional Reporter,

7  do hereby certify that the attached represents the

8  proceedings before the United States Bankruptcy Court,

9  Middle District of Florida, Jacksonville Division, before

10  the Honorable Jerry A. Funk, Bankruptcy Judge, in the

11  matter of In Re:  Winn-Dixie Stores, Inc.; such transcript

12  is an accurate recordation of the proceedings which took

13  place.  A transcript of this proceeding has been produced

14  on February 16, 2006.

15

16

17

18                         STATEWIDE REPORTING SERVICE

19

20

21

22                         _____

23                         M. KIM SIMMS, RPR

24

25