IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE:                                                    Case No. 05-03817-3F1

WINN-DIXIE STORES, INC., *et al.*,                        Chapter 11

            DEBTORS.                                      Jointly Administered
_____/

## NOTICE OF FILING A COMPLETE COPY OF EXHIBIT 1 (LEASE) TO THE APPLICATION BY MARKETPLACE PORT ST. LUCIE LIMITED PARTNERSHIP FOR ALLOWANCE AND PAYMENT OF AN ADMINISTRATIVE CLAIM FOR POST-PETITION REAL PROPERTY TAXES

### NOTICE IS HEREBY GIVEN THAT:

Marketplace Port St. Lucie Limited Partnership ("Marketplace"), through the undersigned counsel, files the attached complete copy of *Exhibit 1 (Lease) to Marketplace's Application for Allowance and Payment of an Administrative Claim for Post-Petition Real Property Taxes* ("Application") which Application was filed on February 17, 2006, with the U.S. Bankruptcy Court.

**I HEREBY CERTIFY** that on February 28, 2006, a true and correct copy of the foregoing Notice, with attached Exhibit, has been furnished by the Court's electronic notification system, or by U.S. Mail to:

Winn-Dixie Stores, Inc.                Adam Ravin
5050 Edgewood Court                    Skadden Arps Slate Meagher & Flom, LLP
Jacksonville, FL 32254-3699            Four Times Square
                                       New York, NY  10036


Cynthia C. Jackson                     James H. Post
Smith Hulsey & Busey                   Smith Hulsey & Busey
225 Water St., Suite 1800              225 Water St., Suite 1800
Jacksonville, FL 32201                 Jacksonville, FL 32202

Leanne McKnight Prendergast
Smith Hulsey & Busey
225 Water St., Suite 1800
Jacksonville, FL 32202

United States Trustee – JAX
135 W. Central Blvd., Suite 620
Orlando, FL 32801

Kenneth C. Meeker
U.S. Trustee
135 W. Central Blvd., Suite 620
Orlando, FL 32801

Official Committee of Unsecured Creditors
of Winn-Dixie Stores, Inc.
c/o John B. Macdonald
Akerman Senterfitt
50 N. Laura St., Suite 2500
Jacksonville, FL 32202

Stephen D. Busey
Smith Hulsey & Busey
225 Water St., Suite 1800
Jacksonville, FL 32202

Elena L. Escamilla
135 W. Central Blvd., Suite 620
Orlando, FL 32806

Official Committee of Unsecured Creditors of
Winn-Dixie Stores, Inc.
c/o Dennis F. Dunne
Millbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005

Official Committee of Unsecured Creditors of
Winn-Dixie Stores, Inc.
c/o Patrick P. Patangan
Akerman Senterfitt
50 N. Laura St., Suite 2500
Jacksonville, FL 32202

/s/ Rod Anderson
Alan M. Weiss
Florida Bar No. 340219
Rod Anderson
Florida Bar No. 370762
HOLLAND & KNIGHT LLP
100 North Tampa St., Suite 4100
Tampa, FL 33602
(813) 227-8500
(813) 229-0134 (facsimile)
Attorneys for Marketplace Port St. Lucie
Limited Partnership

# 3600021_v1



# LEASE

### The Marketplace at Port St. Lucie

### Southeasterly Corner of the Intersection of Jennings Road and U.S. 1
# City of Port St. Lucie
# County of St. Lucie
# State of Florida

EXHIBIT ___/___

**TABLE OF CONTENTS**

PREMISES ................................................................................... 1

TERM ....................................................................................... 1

RENT ....................................................................................... 2

TITLE ...................................................................................... 5

SURVEY .................................................................................... 6

ENVIRONMENTAL AUDIT ...................................................................... 6

USE ........................................................................................ 7

COMPLIANCE WITH LAWS ..................................................................... 8

CONSTRUCTION OF SHOPPING CENTER ......................................................... 8

COMPLETION DATE .......................................................................... 8

COMMENCEMENT DATE ........................................................................ 9

OTHER TENANTS ........................................................................... 10

PARKING AND COMMON AREAS ................................................................ 10

SERVICE AREA ............................................................................ 10

UTILITIES ............................................................................... 10

TENANT'S MAINTENANCE .................................................................... 11

LANDLORD'S MAINTENANCE .................................................................. 11

SIGNS ................................................................................... 12

FIXTURES AND INTERIOR ALTERATIONS ....................................................... 12

INDEMNIFICATION ......................................................................... 12

CASUALTY ................................................................................ 12

INSURANCE ............................................................................... 13

QUIET ENJOYMENT ......................................................................... 14

TAXES AND LIENS ......................................................................... 14

CONDEMNATION ............................................................................ 15

DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONSTRUCTION RISKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ASSIGNMENT AND SUBLEASING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

SUBORDINATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ESTOPPEL CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

LENDER'S CURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

BENEFIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

TRANSFER BY LANDLORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

SHORT FORM LEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

MARGINAL TITLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

COMPLETE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

DECLARATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ENVIRONMENTAL CONDITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

NO BROKERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

INDIVIDUAL STATE MANDATED PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

FLORIDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

EXPANSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

TAKE OVER AND RELEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONTINGENCIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

EXCULPATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## LEASE

**THIS LEASE** is made this _July 3rd_, 1996, between **Marketplace Port St. Lucie Limited Partnership**, a Florida limited partnership ("MPSL") and **Tyringham Ridge, Inc.**, a Nevada corporation ("Ridge" and together with MPSL, **"Landlord"**) and **WINN-DIXIE STORES, INC.**, a Florida corporation (**"Tenant"**). "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors, and assigns of the respective parties.

### W I T N E S S E T H :

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged Landlord and Tenant hereby covenant, agree, represent, and warrant, as applicable, as follows:

**PREMISES**

1.    Landlord hereby leases and demises unto Tenant and Tenant hereby leases from Landlord, upon the terms and conditions established herein, that certain store building, approximately 220 feet in width by 200 feet in depth, together with a front vestibule, rear receiving room(s), exterior pads at the rear for installation of freezers and coolers, and the land on which the same shall stand, which store building and related improvements (collectively, the "Store") are to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided, and the Common Areas, as hereinafter defined (collectively, the "Premises").

The Premises are located in a shopping center development (shown in detail on Exhibit "A," the site plan prepared by Cuhaci & Peterson Architects, Inc. dated February 8, 1994 and last revised January 2, 1996 the "Site Plan"), known as Marketplace at Port St. Lucie (as the same may be enlarged from time to time, and including the Common Areas as defined herein, the "Shopping Center"), located at the southeasterly corner of the intersection of Jennings Road and U.S. 1 in the City of Port St. Lucie , County of St. Lucie, State of Florida. The legal description of the Shopping Center is set forth on Exhibit "B".

**TERM**

2.    (a)    <u>Initial Term.</u> The term of this Lease shall commence on the Commencement Date, as herein defined and shall be for an initial term of twenty (20) years (the "Initial Term").

(b)    <u>Extension Term(s).</u> Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of this Lease, each extension to be for a period of five (5) years (each, an "Extension Term") at the same rent and upon the same terms and conditions as provided herein for the Initial Term (together with the Extension Terms elected by Tenant, the "Term").

Tenant may extend the Term by giving to Landlord a notice in writing at least one hundred eighty (180) days before the expiration of the previously established Term, and thereupon the Term shall be extended without the execution of any other document.

(c)    <u>Return of Premises.</u> Tenant will yield up the Premises and all additions thereto (except Tenant's Trade Fixtures, as hereinafter defined) at the end of the Term in broom clean and working condition, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that Landlord is obligated hereunder to repair or correct. Tenant shall not be required to restore the Premises to their original state.

(d)    Holding Over. Any holding over by Tenant of the Premises after the expiration of the Term shall operate and be construed as a tenancy from month to month, at the same rent and upon the same terms and conditions applicable to the Term.

**RENT**

3.    (a)    Basic Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay to Landlord as basic rent for the Premises during the Term, the sum of $352,000.00 per annum ("Basic Rent"). Basic Rent shall be paid in twelve (12) equal monthly installments of $29,333.33 per month, plus all applicable sales taxes, which installments shall be due and payable in advance on the first day of each and every calendar month of the Term.

(b)    Percentage Rent. In addition, beginning on the Commencement Date, as hereinafter defined, Tenant shall pay Landlord percentage rent equal to the amount, if any, by which one percent (1%) of Gross Sales (as hereinafter defined) exceeds Basic Rent ("Percentage Rent"). Any Percentage Rent which may become due shall be payable within sixty (60) days after the expiration of each Fiscal Year, as hereinafter defined. However, upon final termination of the Term, any Percentage Rent due shall be payable within sixty (60) days after such termination or expiration of the Term. The Percentage Rent for each Fiscal Year shall be calculated separately and without reference to any other Fiscal Year. For purposes of calculation the Percentage Rent due hereunder, Tenant's fiscal year shall be approximately July 1st to June 30th of each year (the "Fiscal Year").

"Gross Sales" shall mean the aggregate sales price of all merchandise sold in or from the Store by Tenant during each fiscal year of the Term, both for cash and on credit (less bad debt expenses). Gross Sales shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by Tenant from the Premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines, banks, automatic teller machines and public telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery entries, money orders, government bonds, savings stamps, or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts, or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of Gross Sales it expects to make in or from the Premises. Landlord shall not release and shall keep confidential all information disclosed to or discovered by it concerning Gross Sales, and shall require Landlord's Auditor to keep the same confidential. Landlord may, however, disclose Gross Sales to lenders, prospective lenders, and to prospective purchasers of the Shopping Center (collectively, "Interested Parties") provided that such Interested Parties agree in writing to keep Gross Sales information confidential.

Tenant shall keep complete and accurate books and records of its Gross Sales. At the end of each fiscal year, or at the end of the Term, if it sooner occurs, Tenant shall submit to Landlord a written statement of Gross Sales for the preceding fiscal year. Such statement of Gross Sales shall be treated as confidential by Landlord and shall be conclusive unless Landlord, within ninety (90) days after receipt thereof, shall give written notice to Tenant of its intent to audit

2

Tenant's Gross Sales figures for the prior year. The Landlord may then cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant contracted for and paid by Landlord (the "Landlord's Auditor"). Landlord's Auditor shall provide a copy of its findings and report of audit to Tenant. If Landlord's Auditor finds that Tenant has underpaid Percentage Rent due under this Lease, the Tenant shall pay to Landlord the amount of such underpayment within thirty (30) days of receipt of satisfactory documentation thereof from Landlord's Auditor and if Tenant has underpaid Percentage Rent by more than three percent (3%), Tenant shall pay the reasonable cost of Landlord's audit. If Landlord's Auditor finds that Tenant has overpaid Percentage Rent due under this Lease, then Landlord shall promptly pay the amount of any such overpayment to Tenant. If Landlord fails to pay promptly the amount of any such overpayment to Tenant, Tenant may deduct the same from the next succeeding payments of Basic Rent, Percentage Rent, or Additional Rent, as hereinafter defined, due under this Lease.

(c)    Additional Rent. Beginning on the Commencement Date, as hereinafter defined, Tenant shall pay as Additional Rent a portion of (1) Common Area Maintenance Expenses, (2) Real Property Taxes, and (3) Shopping Center Insurance (collectively, "Additional Rent"). Landlord shall use reasonable efforts to minimize Additional Rent. With respect to all amounts charged to Tenant as Additional Rent under this Lease, Landlord shall maintain for a period of one full calendar year from the last day of the year for which such Additional Rent is due, complete books and records in accordance with generally accepted accounting principles, and all receipts, canceled checks, and other evidences of payment by Landlord (the "Payment Evidence"). On or before ninety (90) days after the end of each calendar year of the Term, Landlord shall provide to Tenant an itemized statement showing in reasonable detail the Additional Rent payable for the prior year. Tenant shall not be liable with respect to any amount expended by Landlord and not listed in such itemized statement. Failure of Landlord to timely deliver such itemized statement (unless caused by Force Majeure, as hereinafter defined) shall relieve Tenant of the obligation to pay Additional Rent. Tenant shall have the right, within one hundred and eighty days of receiving Landlord's statement of Additional Rent, to receive copies of the Payment Evidence and to audit Landlord's records regarding Additional Rent. Tenant shall provide a report of such audit to Landlord. If, based upon such audit, it appears that Tenant has underpaid Additional Rent, Tenant shall pay the amount of such underpayment to Landlord within thirty (30) days of completing its audit. If, based upon such audit, Tenant has overpaid Additional Rent, Landlord shall pay the amount of such overpayment to Tenant within thirty (30) days of receiving Tenant's audit report and, if Landlord over-billed Tenant for Additional Rent by more than three percent (3%), Landlord shall pay to Tenant the reasonable cost of its audit. If Landlord fails to so pay the amount of such overpayment to Tenant, Tenant may offset the amount of such overpayment against all Basic Rent, Additional Rent, and Percentage Rent due under this Lease.

(d)    Common Area Maintenance Expenses. Tenant shall pay its Pro-rata Share of "Common Area Maintenance Expenses" up to a maximum of $3,300.00 per monthly or $39,600.00 per year, subject to an increase in every fifth year of up to 20%. Common Area Maintenance Expenses shall be payable monthly on the first day of each calendar month in the Term, and shall initially be based upon one-twelfth of Landlord's estimate of the amount of such Additional Rent to be due for the upcoming year which, for the first year, is estimated to be $39,600.00. Common Area Maintenance Expenses include those reasonable and customary expenses actually incurred in good faith by Landlord in maintaining the Common Areas, as hereinafter defined, including those maintenance functions required to be performed in, on, or to the Common Areas under this Lease, including, without limitation, lighting, painting, cleaning, traffic control, policing, inspecting, landscaping (only as shown on the Site Plan), repaving the

3

parking areas, and otherwise repairing the Common Areas. With respect to landscaping and plant/grass maintenance, cleaning/sweeping services, and any other service provided and billed as part of Common Area Maintenance Expenses the amount billed for which exceeds $5,000.00 annually, Landlord shall contract for such services based upon competitive, arms-length bids obtained no more infrequently than once per year. Common Area Maintenance Expenses do not include upgrading the Shopping Center to a level of service or condition beyond or above that which exists as of the Commencement Date, merchant's association dues or the like, management or administrative fees, the cost of repairs or other work to the extent reimbursed by insurance, costs of correcting defects (including latent defects) in the construction of the Store or the Shopping Center, the costs of individual tenant improvements or items or services that benefit other tenants to an extent greater than such items of services benefit Tenant, special services or excess utilities provided to other tenants, any utility or other expense paid for directly by Tenant, advertising or marketing expenses, security guards, holiday decorations, penalties for or the cost (including attorneys' fees, of disputes relating to Landlord's failure to timely pay fees or taxes or for Landlord's breach of any other agreement to which Landlord is a party, leasing commissions, Landlord's income taxes, depreciation expense, principal, interest, or later charges on mortgages to which the Shopping Center is subject, the replacement of capital investment items or new capital improvements unless, in Tenant's reasonable judgment, such items and improvements are likely to and in fact do result in the operating efficiency of the Shopping Center being increased such that the cost of such improvements will be wholly offset by such increased operating efficiency during the Term or unless such improvements are necessary to comply with Legal Requirements (hereinafter defined) applicable to the Common Areas, in which case, the cost thereof shall be amortized over the maximum allowable useful life of such improvements, the cost of investigating, testing for, removing, abating, or otherwise cleaning up any matter that constitutes a violation of any environmental law, bad debt or real losses or reserves therefor, costs associated with the operation of Landlord as a business entity, as opposed to costs of operating the Shopping Center, such as entity formation costs, entity accounting, etc., costs of selling, syndicating, financing or refinancing Landlord's interest in the Shopping Center, cellular phone charges, travel expenses, or any expense over $10,000.00 incurred without the prior written consent of Tenant, which consent shall not unreasonably be withheld or delayed.

(e)    Real Property Taxes.  Tenant shall pay, within thirty (30) days of receipt of Landlord's statement and a paid receipt therefor, its Pro-rata Share of "Real Property Taxes". Real Property Taxes includes all ad valorem real estate taxes, less any abatements, discounts, or refunds permitted by law but excludes special assessments. Real Property Taxes does not include Landlord's income taxes or any taxes levied upon the personal property of Landlord or any other tenant of the Shopping Center. Tenant shall have the right to contest or protest any Real Estate Taxes or any assessment used to calculate such Real Estate Taxes by legal action, in Landlord's name if necessary, but at Tenant's sole cost and expense. Within a reasonable time after Landlord receives notice or otherwise learns of any pending increase in Real Estate Taxes or the assessment amount used to calculate the same, Landlord shall notify Tenant in writing. If Landlord institutes any action to challenge any assessment or Real Estate Taxes, such challenge shall be at Landlord's sole cost and expense, unless Landlord obtains Tenant's written approval in advance, which may be granted or withheld in Tenant's sole discretion. If Tenant grants its approval, Tenant shall pay its Pro-rata Share of the cost of Landlord's challenge, including reasonable consultant's fees and reasonable legal costs and fees.

(f)    Shopping Center Insurance.  Tenant shall pay, within thirty (30) days of receipt of Landlord's statement therefor, its Pro-rata Share of "Shopping Center Insurance". Shopping

4

Center Insurance means the reasonable cost of fire, casualty, flood, and vandalism insurance required to be maintained for the Shopping Center under the terms of this Lease. Shopping Center Insurance shall not include the costs of any abnormal or increased premiums for such types of insurance resulting from the acts or omissions of other tenants in the Shopping Center nor business interruption, liability, or rent loss insurance carried by Landlord, nor the excess cost of any insurance policies over that which could be purchased in other than an arm's length transaction between Landlord and an insurer.

Tenant's "Pro-rata Share" shall be the ratio of the gross rentable square footage of the Store, which, as of the Execution Date, is 48,644 to the total gross rentable square footage of the Shopping Center as outlined to be constructed on the Site Plan.

Basic Rent, Percentage Rent, and Additional Rent for fractional years and fractional months occurring at the beginning and end of the Term shall be pro-rated.

**TITLE**

**4.**    On or before forty-five (45) days after the date on which the last of both Landlord and Tenant shall have executed this Lease (the "Execution Date"), Landlord shall order from a title insurance company reasonably acceptable to Tenant (the "Title Company") and deliver to Tenant's counsel at the address provided hereunder for copies of notices, a title insurance commitment naming Tenant as the proposed insured and committing to insure Tenant's leasehold and any easement rights granted to Tenant in connection therewith and shall provide Tenant with copies of all title exceptions (the "Commitment"). It shall be a condition to Tenant's obligation to pay rent under this Lease that title to Tenant's leasehold and the related easements, if any, be subject only to those exceptions that are acceptable to Tenant or to which Tenant fails to timely object (collectively, the "Permitted Exceptions"). Landlord shall deliver the Commitment to Tenant on or before thirty (30) days after the Execution Date (the "Delivery Deadline"), and Tenant shall have ten (10) days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment. If title is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Title Objection Notice"). If Tenant timely sends to Landlord Tenant's Title Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Title Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Closing ("Landlord's Title Objection Response"). If Landlord states in Landlord's Title Objection Response that it is unable or unwilling to cure such objections, then Tenant shall have thirty (30) days to elect by written notice to Landlord whether to (1) waive the unsatisfied objections and occupy the Premises subject to such title defects, or (2) terminate this Lease. If Landlord states in Landlord's Title Objection Response that Landlord is willing to cure the objections stated in Tenant's Title Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Commencement Date. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (1) waive its objections and proceed to occupy the Premises subject to the title defects; or (2) terminate this Lease. On or before the Commencement Date, Landlord, at Landlord's sole expense, shall cause the Title Company to issue to Tenant a leasehold title policy showing Landlord as the owner of the Premises and insuring Tenant's leasehold and the Cross Easement subject only to the Permitted Exceptions in the amount of $500,000.00 (the "Title

5

Policy"). If Landlord fails to timely provide the Commitment or the Title Policy, Tenant may terminate this Lease.

**SURVEY**     5.     On or before forty-five (45) days after the Execution Date, Landlord shall order from a surveyor licensed in the state in which the Shopping Center is located and deliver to Tenant's counsel at the address provided hereunder for copies of notices, six (6) sealed copies of an actual survey of the real property comprising the Shopping Center, showing all improvements currently located thereon and the projected location of the Store, the Common Areas, and the other buildings to be included in the Shopping Center (the "Survey"). Landlord shall deliver the Survey to Tenant on or before the Delivery Deadline. The Survey shall show the metes and bounds or plat legal description of the Shopping Center as shown on the Commitment, shall locate all exceptions shown in the Commitment that are capable of being so located, and shall bear the certificate attached hereto as Exhibit "D". Tenant shall have until the Title/Survey Review Deadline to review the Survey. If the Survey is found to be objectionable to Tenant, Tenant shall notify Landlord in writing on or before the Title/Survey Review Deadline as to those matters to which it objects ("Tenant's Survey Objection Notice"). If Tenant timely sends to Landlord Tenant's Survey Objection Notice, Landlord shall have ten (10) days after the date of receipt of such Tenant's Survey Objection Notice to notify Tenant in writing whether Landlord is willing, in its reasonable judgment, or able to cure the objections before the Closing ("Landlord's Survey Objection Response"). If Landlord states in Landlord's Survey Objection Response that it is unable or unwilling to cure such objections, then Tenant shall have thirty (30) days to elect by written notice to Landlord whether to (1) waive the unsatisfied objections and occupy the Premises subject to such survey defects, or (2) terminate this Lease. If Landlord states in Landlord's Survey Objection Response that Landlord is willing to cure the objections stated in Tenant's Survey Objection Notice, then Landlord shall use reasonable efforts to cure such objections on or before the Commencement Date. If Landlord fails to so cure such objections, then Tenant may, at its sole option, either (1) waive its objections and proceed to occupy the Premises subject to the survey defects; or (2) terminate this Lease. Within sixty (60) days after the Commencement Date, as defined in this Lease, Landlord shall provide to Tenant six (6) sealed copies of the Survey revised to show the Store "as built".

**ENVIRONMENTAL AUDIT**     6.     On or before forty-five (45) days after the Execution Date, Landlord shall order and deliver to Tenant's counsel at the address provided hereunder for copies of notices on or before the Delivery Deadline, from an environmental consultant reasonably satisfactory to Tenant, an environmental audit of the Shopping Center addressed to Tenant, which audit analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental site assessment pursuant to current ASTM standards (an "Audit"). Instead of providing the Audit, Landlord may provide a copy of an Audit issued to Landlord within the three (3) month period immediately prior to the Execution Date together with a letter from the environmental consultant which prepared such Audit stating that Tenant may rely thereon (the "Prior Audit"). Tenant shall have until the Title/Survey Review Deadline to review either the Audit or the Prior Audit. If either reveals any environmental condition not acceptable to Tenant, in its sole judgment, Tenant shall notify Landlord in writing. Landlord shall use reasonable efforts and shall have until sixty (60) days prior to the Commencement Date to cure any environmental condition objected to by Tenant. If Landlord fails to so cure such environmental conditions, to Tenant's satisfaction, Tenant may terminate this Lease.

6

**USE**

7.   The Store shall initially be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, but may also be used for the conduct of any mercantile, retail, or service business (including discount businesses, except that, so long as Wal-Mart, or any affiliate of Wal-Mart, is the user of Tract 1, either as owner or lessee, no space in or portion of Tract 2, Outparcel 1, Outparcel 2, or Outparcel 3 and no space in or portion of any other real property adjacent to the Shopping Center shall be leased or occupied by or conveyed to any other party for use as a discount department store or other discount store; provided, however, that the foregoing shall not be deemed to restrict or prohibit the use of the Store as a typical Winn-Dixie "low price leader" grocery store/supermarket) (the "Permitted Use").

Tenant shall have the exclusive right to operate a supermarket, and the nonexclusive right to operate a pharmacy or prescription drug concession, photo lab or film development business, and an automatic teller  machine and banking business in the Shopping Center. Landlord will not directly or indirectly lease or rent any property located within the Shopping Center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish, seafood, or vegetable market, nor will Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm, or corporation engaged in any such business without the prior written permission of Tenant; Landlord will not permit or suffer any property located within the Shopping Center to be used for, or occupied by, any business dealing in or keeping in stock or selling for off-premises consumption any staple or fancy groceries, meats, fish, seafood, vegetables, fruits, bakery goods, dairy products, or frozen foods without the prior written permission of Tenant except (1) by a business or businesses for which the sale of such items does not exceed the lesser of 500 square feet of sales area or ten percent ( 10%) of the square foot area of any storeroom within the Shopping Center, and is incidental only to the conduct of another business, or (2) by a restaurant located no closer than 50 feet from any boundary of the Store, as prepared, ready-to-eat food items, for consumption either on or off site.  With the exception of package stores, no other tenant in the Shopping Center may sell beer and wine for off-premises consumption.  Except for Schlotzky's deli-style restaurant, which shall be located no closer than 80 feet to any boundary of the Store as it is proposed to be enlarged, only Tenant may operate a bakery, delicatessen, or similar department in the Shopping Center.

Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and no spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theater (either motion or legitimate), business or professional offices, medical offices or clinics, automobile dealership, church, or health, recreational or entertainment-type activities, or "pay" telephones shall be permitted.

Notwithstanding the foregoing, Tenant shall not operate the Store for any use or purpose for which Landlord grants an exclusive to another tenant of the Shopping Center occupying 10,000 s.f. of space or more provided that, with respect to such exclusive use or purpose (a) Landlord gives Tenant ten (10) days' written notice prior to granting same; (b) it does not violate any exclusive use granted to Tenant under this Lease; (c) Tenant is not, on the date of Landlord's notice, using the Store for the proposed exclusive use or purpose, and (d) it does not preclude or unreasonably limit Tenant's operation of the Store as a supermarket.

**COMPLIANCE WITH LAWS**

8.    Tenant shall at all times comply with all current and future applicable laws, ordinances, and regulations of every lawful authority (collectively "Legal Requirements") having jurisdiction over the Store, as such shall relate to Tenant's operation of the Store for the Permitted Use.

Landlord shall at all times fully comply with all Legal Requirements applicable to fulfillment of its obligations under this Lease.

**CONSTRUCTION OF SHOPPING CENTER**

9.    Landlord, at its sole cost and expense, shall construct the Store substantially as shown on the Site Plan, consisting of the building shown thereon, and all ramps, sidewalks, streets, entrances, malls, parking areas, service areas, driveways, traffic signals, utility lines, water detention and retention facilities and related improvements for the Shopping Center (excluding the buildings, collectively, the "Common Areas"). Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the Common Areas, and shall provide proper and adequate water drainage and lighting therefor, and shall operate and maintain the same in good repair and usable condition during the Term. The arrangement and location footprint of all buildings and Common Areas shall at all times during the Term be maintained as shown on the Site Plan and shall not be changed without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, but will not unreasonably be withheld if the change will not affect the parking lot, the visibility of the Store, or the areas immediately adjacent to the Store. The exterior facade of the Shopping Center shall not be materially modified without Tenant's prior written consent, which shall not unreasonably be withheld or delayed. If not shown on the Site Plan, Tenant expressly reserves the right to approve the finish grade elevations of all buildings and the Common Areas within the Shopping Center.

Landlord shall, at its sole cost and expense, construct the Store in accordance with guidelines submitted by Tenant to Landlord's architect to be used to create Tenant's Plans, as hereinafter defined (the "Guideplans") and with the final plans and specifications to be approved by both Landlord and Tenant which shall include complete civil engineering drawings for the Store and for the Shopping Center showing, among other things, the location of all buildings, finished grade elevations, the location of all utility lines, stormwater drainage facilities, and parking spaces (including handicap spaces) ("Tenant's Plans"). Tenant's Plans shall be approved when initialed by both parties, and when initialed shall constitute a part of this Lease; provided, however, that in the event of a conflict between the Guideplans and Tenant's Plans, the Guideplans shall control. Tenant's Plans shall provide for a completed store building, commonly referred to as a "lock and key job". This Lease shall not be effective or enforceable against Landlord or Tenant unless and until Landlord and Tenant have so approved Tenant's Plans.

**COMPLETION DATE**

10.    Construction of the Store and the Shopping Center shall begin not later than thirty (30) days after Landlord obtains an unrestricted building permit issued by the appropriate governmental authorities or eight (8) months after the Execution Date, whichever occurs first (the "Construction Start Date") and shall be completed not later than eight (8) months after the Construction Start Date (the "Initial Deadline"); and if not begun or completed by the Construction Start Date and the Initial Deadline, respectively, then Tenant may terminate this Lease or may extend Landlord additional time for the beginning or completion of construction; provided, however, that if, after the beginning of construction, Landlord's failure to complete the Store by the Initial Deadline shall be due to Force Majeure, as hereinafter defined, and provided

further that construction shall be completed with all due diligence and, notwithstanding anything to the contrary in this Lease, in any event not later than two (2) months after the Initial Deadline (the "Outside Completion Date"), this option to terminate shall not arise. The Construction Start Date shall be the date as of which (1) Landlord shall have obtained an unrestricted building permit issued by the appropriate governmental authorities, (2) the first concrete footings have been poured and (3) Landlord shall have erected in a manner and location reasonably satisfactory to Tenant, a "Coming Soon" sign in accordance with the specifications listed on Exhibit "H" hereto. If this Lease does not terminate pursuant to paragraph 46 and Landlord has failed to commence or complete construction of the Store and the Shopping Center by the above dates as a result of matters within the control of Landlord, Landlord agrees for a period of three (3) years after such failure or termination not to permit or consent to the use of any portion of the Shopping Center as a supermarket by any party other than Tenant.

**COMMENCEMENT DATE**

11.    Basic Rent and, if applicable, Additional Rent and Percentage Rent shall begin to accrue hereunder upon the date Tenant opens the Store for business, or upon the expiration of sixty (60) days following the performance of all the requirements listed below (collectively, the "Conditions"), whichever date shall sooner occur (the "Commencement Date").

(a)    The Premises shall have been delivered to Tenant completed in substantial accordance with Tenant's Plans (except for minor "punch list" items which Landlord agrees, in a side letter, to complete with due diligence) and Landlord shall have delivered to Tenant, at Landlord's expense, (1) the Title Policy, (2) the Survey, and (3) the Audit (each as defined in this Lease), and a Certificate of Occupancy or equivalent document for the Store;

(b)    Construction of all of the Common Areas of the Shopping Center shall have been completed substantially as shown on the Site Plan;

(c)    All drives, entrances, median cuts, access points, acceleration and deceleration lanes, and traffic control devices shown on the Site Plan in or connecting the Common Areas to the adjacent rights-of-way shall have been installed and opened for use by vehicular traffic;

(d)    The Declaration as hereinafter defined, shall have been recorded and evidence of recordation provided to Tenant's satisfaction;

(e)    Tenant shall have received a letter, substantially in the form attached hereto as Exhibit "F", from appropriate governmental authorities regarding the zoning and comprehensive plan regulations, if any, applicable to the Premises.

If all the Conditions have not been met on or prior to the Outside Completion Date, Tenant, at its sole option, may terminate this Lease. Tenant shall open the Store for business on or before sixty (60) days after the Conditions have been met.

Landlord and Tenant shall execute a supplemental document establishing and confirming the Commencement Date in the form attached hereto as Exhibit "J" . No acceptance of possession of the Premises, opening for business by Tenant, nor payment of rent under this Lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with the Guideplans or Tenant's Plans, or a waiver of any of the Conditions.

9

If, for any reason, the Conditions are met on or after December 1st of any year and on or before January 31st of the succeeding year, rent shall not begin to accrue until the later of February 1st of the succeeding year, or thirty (30) days after the Conditions are met, unless Tenant actually opens the Store for business sooner.

**OTHER TENANTS**    12.    [Intentionally Omitted]

**PARKING AND COMMON AREAS**    13.    Tenant, its employees, agents, suppliers, customers and invitees, shall have the nonexclusive right at all times to use, free of charge, during the Term, the Common Areas. Tenant may use the sidewalks adjacent to the Store and the exterior surfaces thereof for the display and sale of merchandise and services.

Landlord shall not designate any portion of the Common Areas for the exclusive use of any party and shall at all times during the Term provide and maintain a surfaced parking area substantially as shown on the Site Plan, and of sufficient area to provide:

(a)    a minimum ratio of at least 5.00 automobile parking spaces for each 1,000 square feet of gross building area (including additional floor levels) in Phase I of the Shopping Center and 5.00 spaces per 1,000 square feet with respect to the entire Shopping Center when completed, and

(b)    facilities for convenient parking of at least 829 automobiles (minimum) in the entire Shopping Center when completed.

Notwithstanding the foregoing, if Legal Requirements mandate that a greater number of parking spaces be provided and maintained, such Legal Requirements shall control. If the parking area furnished should at any time be materially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is sent to Landlord giving reasonable details, Tenant shall have the right to terminate this Lease. No signboards or other construction shall be erected in any of the Common Areas or so as to obstruct the view of the Store from the adjoining public streets. Without the prior written consent of Tenant, which consent may be withheld or conditioned in Tenant's sole discretion, no carnivals, fairs, shows, "park and ride" lots, or sales by merchants utilizing vehicles or booths in the Common Areas shall be allowed in the Shopping Center.

**SERVICE AREA**    14.    Landlord shall provide parking spaces for two large trailer trucks for the exclusive and continuous use of Tenant at the service entrances to the Store. Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the Store and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and for loading and unloading merchandise for the Store into and from trucks and trailers at such service entrances.

**UTILITIES**    15.    Landlord shall cause to be separately metered and Tenant shall pay all charges measured by consumption or use for telephone, electricity, water, gas, and other utilities and services used by Tenant at the Store, and Landlord agrees at all times to provide Tenant with access to such utilities sufficient to meet Tenant's needs. Tenant shall not be responsible for

10

any installation charges for the fire alarm system, static or flowing water to supply the fire sprinkler system, environmental impact charges, or any "hook up" fees or other charges incident to providing access to any utility. All of the Common Areas (including parking area) shall be adequately lighted by Landlord, as a portion of Common Area Maintenance Expense during the hours of ½ hour before dusk until 12:00 a.m. (the "Standard Hours"). Landlord shall cause to be separately metered and Tenant shall pay all charges during any time other than the Standard Hours for those parking area lights located in the area outlined in green on the Site Plan.

**TENANT'S MAINTENANCE**

**16.** Tenant shall keep the interior of the Store in reasonably neat and orderly, and shall maintain the windows and plate glass, automatic doors, interior wiring and plumbing, the floor surfacing, and the air conditioning and heating systems good condition and repair, excepting structural repairs, repairs which are the responsibility of Landlord, repairs made necessary by reason of fire or the elements or other insured casualty, and reasonable wear and tear. Tenant shall keep the delivery areas of the Store reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the Premises or permit anything to be done in or upon the Premises creating an unreasonable nuisance thereon. Tenant shall permit Landlord or its agent at all reasonable times, following notice to and accompanied by a representative of Tenant (except in the case of emergency), to enter upon the Premises for the purpose of making repairs and for examining or showing the same to prospective purchasers or lenders.

**LANDLORD'S MAINTENANCE**

**17.** Landlord shall, at its cost and expense, keep and maintain in good condition and repair the facade of the Shopping Center, the exterior and structural portions of the Store, including the roof, gutter, downspouts, exterior painting, masonry walls, foundation and structural members, the automatic sprinkler system (including central alarm system therefor, if required by governmental authority), the exterior plumbing (including septic tank, if any), and exterior wiring and shall make any and all structural repairs to both the exterior and interior of the Store and the Shopping Center. Landlord shall also operate and maintain in good condition and repair during the Term all the Common Areas, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping as needed but at least three (3) times weekly, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and maintenance of landscaped areas. Landlord shall keep all exterior surfaces of buildings in the Shopping Center clean and graffiti free at all times. Landlord will complete such repairs immediately upon receipt of written notice from Tenant to do so, except that Landlord shall not be obligated to make or pay for any repairs to the Store rendered necessary by the fault, act, or negligence of Tenant, or any of its servants, agents, or employees, unless Landlord may be reimbursed for the cost thereof pursuant to Landlord's insurance policies covering the Shopping Center and/or the Premises.

If, in order to protect persons or property, it shall be necessary for Tenant to make emergency repairs or to perform acts of maintenance or to provide services which are the responsibility of Landlord under this Lease, or if Landlord after receipt of notice as above provided fails or neglects to perform services, maintenance, or repairs, required of it hereunder to the Store or Common Areas, Tenant shall have the right to do so and to deduct from the Basic Rent, Additional Rent, and/or Percentage Rent due or thereafter to become due such sums as may be necessary to reimburse Tenant for the money expended or expense incurred by it in making such repairs.

11

**SIGNS**  **18.**  Subject to obtaining any necessary governmental approvals, Tenant may place, erect, and maintain any signs, antennae, and satellite dishes on the roof, walls, and any other places on or about the Store, which signs shall remain the property of Tenant and may be removed at any time during the Term provided Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of any damage to the Premises resulting from the installation or removal of such signs, antennae, and satellite dishes.

Landlord shall construct, install, and maintain, at its cost, one (1) electrically illuminated pylon sign in the location marked on the Site Plan. The pylon sign shall be of the maximum height and size permitted by applicable Legal Requirements. Tenant may install, at its cost, sign panels in the uppermost spaces on such pylon sign and may connect the sign panels to power outlets installed by Landlord. Tenant shall pay the cost of the electric power for its sign panels if billed as a portion of Additional Rent.

**FIXTURES AND INTERIOR ALTERATIONS**  **19.**  Tenant, at its own expense, shall have the right from time to time during the Term to make any interior or exterior alterations, additions, and improvements, including additional or alternatively located doors and interior partitions, in and to the Store which do not adversely affect its structural integrity, but shall not affect the HVAC, plumbing, electrical or sprinkler systems without Landlord's prior written consent, which shall not unreasonably be withheld ("Tenant Modifications"). Tenant shall make all Tenant Modifications in a good, workmanlike manner and in accordance with all Legal Requirements applicable thereto. All permanent structural improvements shall belong to Landlord and become a part of the Store upon termination or expiration of the Term.

Tenant may construct and build or install in the Store any and all racks, counters, shelves, and other fixtures and equipment of every kind and nature as may be necessary or desirable in Tenant's business (Tenant's Trade Fixtures"), which Tenant's Trade Fixtures shall at all times be and remain the property of Tenant. Tenant shall have the right to remove all or any part of Tenant's Trade Fixtures at any time; provided, Tenant shall repair or reimburse Landlord for the reasonable out-of-pocket cost of repairing any damage to the Premises resulting from the installation or removal of Tenant's Trade Fixtures.

**INDEMNIFICATION**  **20.**  Tenant agrees to indemnify and save harmless Landlord from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage not covered or reimbursable by insurance to any person or property happening in the Store unless caused by the negligence or wilful misconduct of Landlord, its agents, or employees. Likewise, Landlord shall indemnify and save harmless Tenant from any claim or loss (including costs of investigation, court costs, and reasonable attorney's fees, whether incurred in preparation for or at trial, on appeal, or in bankruptcy) by reason of an accident or damage to any person or property happening on or about all Common Areas or any portion of the Shopping Center other than the Store, unless caused by the negligence or wilful misconduct of Tenant, its agents or employees.

**CASUALTY**  **21.**  If (1) the Store is totally destroyed or damaged by fire or other casualty to the extent of fifty percent (50%) or more of the value or to an extent that renders the Store untenantable in

12

Tenant's's reasonable judgment, or (2) all or a portion of the Shopping Center (exclusive of the Store) is damaged or destroyed such that, in the reasonable judgment of Cuhaci & Peterson Architects, Inc., or their successors or assigns or such other architect as shall be reasonably acceptable to Landlord and Tenant, the damage or destruction materially affects the value of Tenant's leasehold or its ability to successfully operate the Store for the Permitted Use, and, in Tenant's reasonable judgment, such destruction or damage cannot be repaired or restored within 150 days thereafter, then Tenant may elect within thirty (30) days after such damage, to terminate this Lease by written notice. If the Store shall suffer damage to any extent less than fifty percent (50%) of the value thereof, or if Tenant does not elect to terminate in accordance with the previous sentence, then Landlord shall proceed promptly (but in any event, within 120 days of the commencement of work) and without expense to Tenant to repair the damage or restore the Store, or the Shopping Center, as the case may be, in accordance with Tenant's Plans or as otherwise agreed to in writing by Tenant. Basic Rent shall abate in proportion to the percentage of the Store damaged, destroyed, or rendered unusable for Tenant's business purposes, and Additional Rent shall abate in proportion to the percentage of the Common Areas damaged or destroyed until the damage or destruction is completely repaired or restored. Landlord's obligation to restore or repair pursuant to this paragraph shall be applicable and enforceable notwithstanding any provision restricting the use of insurance proceeds in any mortgage now or hereafter placed upon the Shopping Center or any portion thereof.

**INSURANCE**      **22.**      Landlord shall carry the types of insurance listed below, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Certificates of insurance shall be furnished to Tenant prior to the Commencement Date, shall show Tenant as an additional insured, and shall provide thirty (30) days notice to Tenant prior to cancellation, material reduction in policy limits, or any other change adverse to Tenant's interests.

(a)      Liability Insurance. Landlord shall carry, at its sole expense, comprehensive general liability insurance coverage on the Shopping Center, stipulating limits of liability of not less than $2,000,000.00.

(b)      Casualty Insurance. Landlord shall carry all-risk commercial property insurance on the Premises, the Shopping Center and any additions, alterations, and improvements made thereto by Landlord or Tenant, including flood and earthquake coverage if the Shopping Center is located in a flood or earthquake prone area, in the amount of the full replacement cost thereof, and hereby expressly waives any and all claims against Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of Tenant, its agents, servants or employees.

Tenant shall carry, at its sole expense, comprehensive general liability insurance coverage on the Store, stipulating limits of liability of not less than $2,000,000.00, placed with a company licensed to transact business in the state where the Shopping Center is located and rated at least "A-" or "excellent" or "superior" in the most recent edition of Best's Insurance Report. Certificates of insurance shall be furnished to Landlord prior to the Commencement Date, shall show Landlord as an additional insured, and shall provide thirty (30) days notice to Landlord prior to cancellation, material reduction in policy limits, or any other change adverse to Landlord's interests. Notwithstanding the foregoing, so long as Tenant maintains a net worth in

13

excess of $100 Million, Tenant may self-insure and shall not be required to provide any insurance certificates to Landlord.

**QUIET ENJOYMENT    23.**    Landlord covenants, warrants and represents that:

(a)    the Shopping Center is and shall remain free and clear of all liens and encumbrances superior to the leasehold hereby created, unless the lienor has executed an SNDA, as hereinafter defined, or unless consented to in advance and in writing by Tenant, which consent may be withheld or conditioned in Tenant's sole discretion;

(b)    MPSL is a duly organized, validly existing limited partnership and Ridge is a duly organized, validly existing corporation, and each has full right and power to execute, deliver, and perform this Lease and to grant the estate demised herein, and such execution, delivery, performance, and grant have been duly authorized by all necessary limited partnership action and does not and will not constitute a breach of or default under any contract, Mortgage, order, or judgment by which Landlord or the Shopping Center or any portion thereof is bound;

(c)    no consent, approval, or authorization of any other party is necessary to grant to Tenant the rights and privilege intended to be granted under this Lease;

(d)    Tenant, on paying the rent herein reserved and performing the covenants and agreements hereof, shall peaceably and quietly have, hold, and enjoy the Premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the Term;

(e)    there is no zoning, comprehensive plan, or other restriction preventing or restricting use of the Premises for the Permitted Use or use of the portion of Common Areas constituting parking areas for parking purposes.

If any representation or warranty made by Landlord in this Lease is determined during the Term to be false, and such falsity materially affects Tenant's use of the Store for the Permitted Use, its access to or use of the Common Areas, or the value of its leasehold estate, Tenant at its option may terminate this Lease by written notice to Landlord. Tenant shall stand released of and from all further liability hereunder from and after the date of such termination and Landlord shall be liable to Tenant for all loss, cost, and expense resulting from or in connection with Landlord's false representation, including, without limitation, the cost of Tenant's relocating its business.

**TAXES AND LIENS    24.**    All taxes, assessments, and charges on land or improvements and obligations secured by mortgage or other lien upon the Shopping Center shall be promptly paid by Landlord prior to delinquency. Tenant may, but shall not be obligated to, perform, acquire, or satisfy any lien, encumbrance, agreement, or obligation of Landlord which may threaten its use or enjoyment of the Premises, and if it does so it shall be subrogated to all rights of the obligee against Landlord or the Premises or both and shall promptly be reimbursed by Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law. If Tenant is not promptly reimbursed, it may offset the amount due against all Basic Rent, Percentage Rent, and Additional Rent due under this Lease. Notwithstanding the foregoing, Tenant shall not have the right to pay any Mortgagee, as hereinafter defined, unless directed to do so in writing by such Mortgagee and by Landlord, and such Mortgagee has executed an SNDA, as hereinafter defined.

14

**CONDEMNATION**    **25.**    If any part of the Premises or more than twenty percent (20%) of the Shopping Center, exclusive of the Store, is taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, Tenant shall be entitled to terminate this Lease at its option, and any unearned Basic Rent, Percentage Rent, Additional Rent or other charges paid in advance shall promptly be refunded to Tenant.  If Tenant does not elect to terminate this Lease, Landlord shall immediately commence and diligently prosecute to completion any repairs and restoration reasonably necessary to put the Premises or the Shopping Center in a condition comparable to their condition at the time of taking and this Lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of Basic Rent, Percentage Rent, Additional Rent, and other adjustments as shall be just and equitable under all circumstances, and if Landlord and Tenant cannot agree as to what is just and equitable, Tenant may terminate this Lease by written notice to Landlord.

If any portion of the Common Areas or route or mode of access thereto, is obstructed or taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to unreasonably interfere with the conduct of Tenant's business in the Store or its use of or access to or through the Common Areas, or so as to reduce the required parking area by an amount in excess of ten percent (10%) or reduce the number of cars which may be conveniently parked to less than 750 in the entire Shopping Center after it is completed, Tenant may, at its option, terminate this Lease and shall be liable for rent only up to the time of such obstruction or taking.

**DEFAULT**    **26.**    Tenant shall be in default under this Lease if:

(a)    Tenant fails to pay any Basic Rent, Additional Rent, or Percentage Rent due under this Lease within ten (10) days after receipt of notice from Landlord stating that such sums remain unpaid; or

(b)    Tenant fails to perform any other of its material obligations under this Lease within thirty (30) days after receipt of notice from Landlord (or such longer period as may reasonably be required to effectuate a cure).

Following an uncured default by Tenant, Landlord, at its option, may either (1) terminate this Lease or (2) re-enter the Premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the Premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom.  Tenant shall remain liable for the deficiency, if any, between the Basic Rent due hereunder and the total rent obtained by Landlord on reletting.

Notwithstanding the foregoing, a default (except as to payment of rent) shall be deemed cured if Tenant in good faith commences to cure same within thirty (30) days after receipt of notice and thereafter with reasonable diligence proceeds to cure such default.

**CONSTRUCTION RISKS**    **27.**    Nothing herein contained shall in any sense constitute Landlord as the agent of Tenant in constructing the Store or the Shopping Center, Tenant shall have no control or authority over the construction of the Store or the Shopping Center, beyond the right to reject the tender of the Store for the causes herein stated and to request change orders to be paid by Tenant.  Tenant

shall not in any manner be answerable or accountable for any loss or damage arising from the wilful misconduct, negligence, or carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents, or servants by reason of Landlord's constructing the Store or the Shopping Center pursuant to the terms of this Lease or Tenant's Plans. Landlord shall indemnify Tenant and save Tenant harmless from and against: all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor, or from any negligence or wilful misconduct of Landlord, Landlord's contractors, sub-contractors, or any of their respective employees, agents, or servants during the progress of the work in constructing the Store or the Shopping Center, or from any faulty construction thereof.

**NOTICES**    **28.**    All notices, requests, demands, and other communications required or permitted to be given under this Lease shall be in writing and sent to the address(es) or telecopy number(s) set forth below. All rent payments shall be sent to Landlord at the address below. Each communication shall be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if given by telecopy, when the telecopy is transmitted to the recipient's telecopy number(s) and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (3) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (4) if given by nationally recognized or reputable overnight delivery service, on the next day after receipted deposit with same.

Landlord :    Marketplace Port St. Lucie Limited Partnership
Attn: Roland G. Labonte
609 Farmington Avenue
Hartford, CT 06105
Telecopy (860) 236-8181

or such other address as Landlord may direct from time to time.

With a copy to:    Jo Marie T. Andrews, Esq.
Levy & Droney
74 Batterson Park Road
Farmington, CT 06032

Telecopy (860) 676-3200

Tenant:    Winn-Dixie Stores, Inc.
P. O. Box 585200
3015 Coastline Rd.
Orlando, Florida 32858-5200

Telecopy (407) 578-4090

With a copy to: Winn-Dixie Stores, Inc.
Attn: Mallory Gayle Holm,  Esq.
5050 Edgewood Court
P.O. Box B
Jacksonville, FL 32203-0297

Telecopy: (904) 783-5138

or to such other address as Tenant may direct from time to time.

**ASSIGNMENT AND SUBLEASING**

29.    Tenant may assign this Lease, or sublease or vacate the Premises in whole or in part without the consent of Landlord, provided Tenant shall continue to remain liable and responsible for the payment of rent and due performance of all other terms, covenants, and conditions of this Lease. Notwithstanding the foregoing, if Tenant plans to assign or sublet the entire Store for use other than as a supermarket, Tenant shall give written notice of same to Landlord and Landlord shall have twenty (20) days following such notice to elect to terminate this Lease by written notice to Tenant and if Landlord so terminates, Tenant shall be released from all liability accruing under this Lease from and after the date of the termination notice.  Tenant shall not assign or sublet in such a manner as to subdivide the Store into more than 3 parts.

**SUBORDINATE**

30.    Provided that, with respect to any mortgage, deed of trust, security deed or other security instrument securing a lien upon the Premises (together with any renewals, modifications, extensions, or replacements thereof, a "Mortgage"), Landlord obtains from the holder of such Mortgage (the "Mortgagee") and delivers to Tenant prior to the Commencement Date or, if the Mortgage is created after the Commencement Date, prior to such Mortgage being recorded, a Subordination, Nondisturbance and Attornment Agreement substantially in the form attached hereto as Exhibit "C" (an "SNDA"), this Lease shall at all times be subject and subordinate to the lien of such Mortgage.

**ESTOPPEL CERTIFICATE**

31.    Within a reasonable time, but no less than ten (10) business days, after Landlord's written request, Tenant agrees to execute and deliver to Landlord an estoppel certificate in the form attached hereto as Exhibit "E" (an "Estoppel Certificate").  Notwithstanding the forgoing, Landlord shall not request, and Tenant shall not be required to deliver more than two (2) Estoppel Certificates per calendar year, unless Landlord pays to Tenant, in advance, $500.00 per additional requested Estoppel Certificate.

**LENDER'S CURE**

32.    Tenant shall give notice to any holder of a recorded Mortgage (a "Mortgagee") encumbering the Premises (provided that such Mortgagee has entered into an SNDA with Tenant and Tenant has first been notified in writing of the name and address of such Mortgagee) of any defaults of Landlord which would entitle Tenant to terminate this Lease or abate the rent payable hereunder, specifying the nature of the default by Landlord.  The Mortgagee shall have the right, but not the obligation, to cure such default and Tenant will not terminate this Lease or abate the rent payable hereunder by reason of such default unless and until it has afforded the Mortgagee thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said thirty

17

(30) day period, provided, however, that the Mortgagee notifies Tenant that it intends to cure such default, in fact undertakes such a cure, and diligently prosecutes such cure to completion. Notwithstanding the foregoing, Tenant shall not be required to deliver such notice to the Mortgagee or to extend to it an opportunity to cure with respect to emergency repairs that Tenant is permitted to make under this Lease.

**BENEFIT**   33.   This Lease and all of the covenants and provisions thereof shall inure to the benefit of and bind the heirs, legal representatives, successors, and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the title to the Premises.

**TRANSFER BY LANDLORD**   34.   If Landlord transfers Landlord's interest in the Premises, the Shopping Center, or this Lease, Landlord agrees to promptly provide Tenant with satisfactory documentary evidence of such transfer, together with the agreement of Landlord's transferee to assume all of Landlord's obligations under this Lease (except as otherwise agreed to in an SNDA).

**SHORT FORM LEASE**   35.   Landlord agrees that any time on request of Tenant it will execute a short form of this Lease in the form attached hereto as Exhibit "G", and permit its recording in the public records of the county or parish in which the Premises are located. Neither Landlord nor Tenant shall record this Lease.

**MARGINAL TITLES**   36.   The marginal titles appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend, or affect the provisions thereof.

**COMPLETE AGREEMENT**   37.   This Lease contains the complete agreement of the parties with reference to the leasing of the Premises, except for Tenant's Plans to be formally approved by the parties prior to the Commencement Date. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**DECLARATION**   38.   Landlord shall have recorded in the public records of St. Lucie County, Florida , declaration(s) of covenants and restrictions substantially in the form attached hereto as Exhibit "I" (collectively, the "Declaration"), as a primary encumbrance(s) and so as not be subject to foreclosure or removal without the express written permission of Tenant, providing that:

   (a)   no portion of the Shopping Center nor any portion of the tracts of land designated on the Site Plan as "Outparcel A or Outparcel B" shall be used for any of the activities or uses prohibited by this Lease;

   (b)   no structure constructed in the Shopping Center (other than the Store) or on the tracts designated on the Site Plan as "Outparcel A or Outparcel B" shall exceed a maximum building area of twenty-five percent (25%) of the ground area thereof or exceed a maximum vertical height of 22 feet as measured from ground level..

**EXHIBITS**

**39.**    The following Exhibits attached hereto are hereby incorporated into this Lease by reference:

| | | |
|---|---|---|
| Exhibit "A" | - | Site Plan |
| Exhibit "B" | - | Legal Description of Shopping Center |
| Exhibit "C" | - | SNDA |
| Exhibit "D" | - | Surveyor's Certificate |
| Exhibit "E" | - | Estoppel Certificate |
| Exhibit "F" | - | Zoning Letter |
| Exhibit "G" | - | Short Form Lease |
| Exhibit "H" | - | "Coming Soon" Sign Specifications |
| Exhibit "I" | - | Declaration |
| Exhibit "J" | - | Supplemental Lease Agreement |

**FORCE MAJEURE**

**40.**    If there shall occur, during the Term, (1) strike(s), lockout(s), or labor dispute(s); (2) the inability to obtain labor or materials or reasonable substitutes therefor; (3) acts of God, weather conditions, enemy or hostile governmental actions, civil commotion, fire, or other casualty, or other similar conditions (each, a "Force Majeure"), and as a result of such Force Majeure, Landlord or Tenant is prevented from punctually performing any of their respective obligations under this Lease (except for the obligation to pay money), then such performance shall be temporarily excused for such period of time as the Force Majeure exists, but no longer.

**ENVIRONMENTAL CONDITION**

**41.**    (a)    Landlord.  Landlord represents and warrants to Tenant that it has not prior to the commencement of this Lease, and will not during the term of this Lease or any renewal thereof, cause or permit to be used, stored, generated, or disposed of any Hazardous substance, as hereinafter defined, in, on, or about the Shopping Center. Landlord certifies to Tenant that to its knowledge no other tenant of the Shopping Center has caused or permitted to be used, stored, generated, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or about the Shopping Center. "Hazardous Substance" includes, without limitation, any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to Legal Requirements. "Hazardous Substance" includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal.

Landlord shall, at its sole cost and expense, indemnify, protect, and save Tenant, its officers, directors, shareholders, and employees harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses (including, without limitation, attorneys', consultants' and experts' reasonable fees and disbursements) of any kind or nature whatsoever (collectively the "Indemnified Matters") which may at any time be imposed upon, incurred by or asserted or awarded against Tenant and arising from or out of any Hazardous Substances on, in, under or affecting all or any portion of the Premises or the Shopping Center, which Hazardous Substances are not the result of Tenant's use or operation of the Premises. This indemnification includes, without limitation, any and all costs incurred due to any

19

investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision.

Landlord shall provide to Tenant copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Shopping Center which Landlord receives from any governmental unit or agency overseeing environmental matters and copies received by landlord of any such notices, letters, or requests for information sent to any other tenant of the Shopping Center. If a release of Hazardous Substances or other environmental condition occurs that is not the result of Tenant's actions or the actions of Tenant's agents or employees acting within the scope of their employment, which release or environmental condition materially impairs for more than seven (7) days Tenant's ability to use the Premises for the Permitted Use, Tenant may (1) abate all rent due under this Lease during the time Tenant's use is impaired and/or (2) terminate this Lease by written notice to Landlord.

(b)     Tenant. Tenant shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed of on, in or about the Premises except in accordance with applicable Legal Requirements without obtaining Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. If any Hazardous Substance is used, stored, generated, or disposed of on, in, or about the Premises except as permitted above, or if the Premises or the Shopping Center become contaminated in any manner as a result of any breach of the foregoing covenant or any act or omission of Tenant or any of its agents or employees acting within the scope of their employment, Tenant shall indemnify and hold harmless Landlord, its officers, directors, shareholders, and employees from any and all claims, demands, actions, damages fines, judgments, penalties, costs (including attorneys', consultants', and experts' fees), liabilities, losses (including without limitation, any decrease in value of the Store or Tenant's business operations therein, damages due to loss or restriction of rentable or usable space, or any damages due to adverse impact on marketing of the space in the Shopping Center or the Store), and expenses arising during or after the term of this Lease and arising as a result of such contamination. This indemnification includes, without limitation, any and all costs incurred due to any investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes the presence of any Hazardous Substance on, in or about the Premises except in accordance with applicable Legal Requirements or with Landlord's consent that results in contamination, Tenant, at its sole expense, shall promptly take any and all necessary actions to return the Premises or the Common Areas, as the case may be, to the same condition that existed prior to the presence of any such Hazardous Substance on, in, or about the Premises. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld or delayed.

Notwithstanding the foregoing, this indemnification shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Premises. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination resulting from Landlord's ownership, use or operation, or the use of operation by any third party in, or under the Premises, the Common Areas or any other portion of the Shopping Center.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

20

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Lease.

**NO BROKERS**   **42.**    Neither Landlord nor Tenant has discussed this Lease with any broker, agent, or finder so as to create any legal right of such broker to any commission or similar fee.  Each shall indemnify and hold the other harmless from and against any claims for any such commission or fee by any person acting by, through, under, or on behalf of the indemnifying party.

**INDIVIDUAL**   **43.**    Certain states mandate the inclusion of various provisions in all leases of real property
**STATE**    located in such states.  The following provisions are included to satisfy such individual state
**MANDATED**    requirements and are applicable only if the Premises are located in the state named opposite the
**PROVISIONS**    provisions appearing below.

**FLORIDA**    Radon Gas Disclosure.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time.  Levels of radon that exceed Federal and State Guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county public health unit.

**EXPANSION**   **44.**    As a material inducement to Tenant's entering into this Lease, Landlord grants to Tenant the option and privilege (Tenant's Enlargement Option") of requiring the enlargement of the Store to incorporate therein an addition consisting of the area to the easterly side of the Store measuring approximately 80 feet in width by 200 feet in depth, as shown on the Site Plan (the "Addition" or the "Additional Space"), which area shall be reserved for construction of the Addition except that pending same may be partially paved for parking or Landlord may construct a building thereon and rent space in such building. To facilitate construction of the Addition, Landlord initially shall construct the east wall of the Store with steel column supports equivalently spaced to the nearest row of steel column supports in the open front sales area of the Store and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original Store and the Addition.

Landlord shall give notice to Tenant not less than one hundred eighty (180) days prior to the expiration of the fifth year from the Commencement Date and every five (5) years thereafter throughout the Term reminding Tenant of Tenant's Enlargement Option ("Landlord's Reminder").  Tenant may exercise Tenant's Enlargement Option by giving to Landlord written notice at any time after receipt of Landlord's Reminder until ninety (90) days prior to the expiration of the fifth year from the Commencement Date or ninety (90) days prior to expiration of each five year interval thereafter of its exercise of such option, or at any time if the Additional Space is vacant and Tenant has not received written notice from Landlord that it has leased the Additional Space to another tenant in a manner consistent with this Lease, together with a proposed amendment to this Lease (the "Amendment") to provide for those terms and conditions described below and such additional terms and conditions with respect to the Addition as to which Landlord and Tenant shall subsequently agree.  (Tenant's written notice and the Amendment are hereinafter referred to as the "Option Exercise Notice").  Notwithstanding the

21

foregoing, in no event shall Tenant's Enlargement Option that recurs every five years expire until ninety (90) days after receipt of Landlord's Reminder or ninety (90) days prior to the expiration of the fifth year from the Commencement Date or ninety (90) days prior to expiration of each five (5) year interval thereafter, whichever is later.

On or before ten (10) days after receipt of the Option Exercise Notice, Landlord shall notify Tenant in writing whether it intends, subject to execution and delivery of the Amendment, to construct the Addition, at its sole cost.  The Amendment shall include, among other things, the following:

(a)    If Landlord constructs the Addition, Landlord shall obtain and pay all costs, fees and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition.  If Landlord does not pay such costs, fees or expenses or obtain such permit(s) and waiver(s), Tenant may obtain and pay for same and deduct the amounts paid or costs incurred from all Basic, Additional, and Percentage Rent payable under this Lease.  Upon completion of the Addition and commencement of business therein, Basic Rent (and the base for computation of Percentage Rent hereunder) shall be increased by the greater of: an amount equal to ten and one-half percent (10.5%) of the cost of the Addition, or an amount equal to $8.00 per square foot of the Addition, or an amount equal to a computed percentage times the cost of the Addition, such percentage consisting of three percent (3%) plus the Prime Rate as quoted in the Wall Street Journal at the time of the exercise of Tenant's Enlargement Option.  At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant, with the final cost of the Addition upon completion to be certified by the general contractor performing the work. Tenant shall obtain, at its cost and expense, such information or investigations concerning the status of the title, environmental condition, and boundaries of the land upon which the Addition shall be constructed as it shall desire, and it shall be a condition of Tenant's obligation to pay Basic Rent with respect to the Addition that it be satisfied with such information and investigations; or

(b)    If Landlord shall for any reason fail or refuse to construct the Addition after Tenant has properly exercised Tenant's Enlargement Option, Tenant shall have the right but not the obligation to construct the Addition at its sole cost and expense.  If Tenant constructs the Addition, Tenant shall obtain and pay all costs, fees, and expenses incident to obtaining all utility permits or allocations of consumption or use of utilities, specifically including, but not limited to, (1) sewerage and water permits, (2) allocations of sewerage and water or (3) waiver(s) of any sewerage or water moratorium(s) required to allow construction of and operation in the Addition, shall cause any mechanics' lien incurred in connection with such expansion to be promptly discharged, and shall indemnify and hold harmless the Landlord from any expense occasioned thereby.  Landlord shall provide, in consideration of Tenant's constructing the Addition, an endorsement to the Title Policy, the Survey, and the Audit.  Tenant's optional construction of the Addition shall be contingent upon Tenant's satisfaction with the Title Policy, the Survey, the Audit, and the provisions of then applicable zoning and land use regulations.  Upon completion of the Addition by Tenant, no Basic Rent shall be payable by Tenant in respect of the Addition for the remainder of the Term and no Percentage Rent shall be payable until Tenant shall have recouped the cost of the Addition in Percentage Rent that would otherwise be due under this Lease; and

(c)    Regardless of who constructs the Addition, upon completion of the Addition, it shall become a portion of the Store. If at that time there shall not at such date remain at least ten (10) years of the Initial Term, Tenant shall be granted three (3) additional Extension Terms of five (5) years each, and Tenant's remaining Extension Terms under this Lease, if any, shall be preserved.

(d)    If Tenant is prevented from expanding the Store or constructing the Addition due to the act or omission of Landlord, Tenant may terminate this Lease.

**TAKE OVER AND RELEASE**    45.    If Tenant or its assignee or sublessee fails to operate a business in the Store for sixty (60) days or longer, and such failure to operate is not due to permitted remodeling or enlargement, or a result of casualty or other Force Majeure (a "Store Closing"), then following such Store Closing Landlord may terminate this Lease by written notice to Tenant and from and after the date of such notice neither Landlord nor Tenant shall have any further liability to the other, except as expressly provided otherwise in this Lease.

**CONTINGENCIES**    46.    (a)    On or before ninety (90) days after the Execution Date (the "Plans Deadline"), Landlord and Tenant shall have agreed upon Tenant's Plans.  If they have not so agreed, this Lease shall terminate as of the Plans Deadline.

(b)    On or before six (6) months after the Execution Date (the "Permit Deadline"), Landlord shall have obtained all licenses, permits, and approvals necessary or desirable in connection with this Lease (the "Permits"). Landlord shall notify Tenant within five (5) days of the Permit Deadline as to whether it has obtained the Permits.  If Landlord has not obtained the Permits on or before the Permit Deadline, as stated in Landlord's Notice, or if Landlord fails to so notify Tenant, this Lease shall terminate as of the Permit Deadline.

(c)    On or before ninety (90) days after the Execution Date (the "Financing Deadline"), Landlord shall have obtained construction and permanent financing (the "Financing") for the Shopping Center.   Landlord shall notify Tenant within five (5) days of the Financing Deadline as to whether it has obtained the Financing.  If Landlord has not obtained the Financing on or before the Financing Deadline, as stated in Landlord's Notice, or if Landlord fails to so notify Tenant, this Lease shall terminate as of the Financing Deadline.

Landlord shall use reasonably diligent efforts to timely review and approve Tenant's Plans, to obtain the Permits prior to the Permit Deadline, and to obtain the Financing prior to the Financing Deadline.

**EXCULPATION**    47.    Tenant shall look solely to the estate and property of Landlord in the Shopping Center, including, without limitation, all rents, profits, and proceeds therefrom, for the collection of any sum due from Landlord to Tenant pursuant to this Lease and not timely paid ("Landlord's Payment Obligations"); provided, however, that it is expressly agreed that if Landlord fails to pay any of Landlord's Payment Obligations, Tenant may offset the unpaid amount, together with

23

interest at the higher of eleven percent (11%) or the Prime Rate on the unpaid balance, against all Basic, Additional, and Percentage Rent due under this Lease.  Further, the foregoing limitation shall not apply if Landlord no longer owns an interest in the Shopping Center and Tenant is prohibited by this Lease or by an SNDA from recovering from or offsetting rent against a subsequent landlord.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease the day and year indicated below.

Witnesses:                                              LANDLORD:

Print name: _Jomarie T. Andrews_        **Marketplace Port St. Lucie Limited Partnership**

                                                        By: _Marketplace Development Comp_ its authorized
                                                        general partner
Print name: _Tam B. Serrott_                 By: _Thomas E Cross_

                                                        Its: _President_
                                                        Date: _7/23/96_

Print name: _Jomarie T. Andrews_         **Tyringham Ridge, Inc.**, a Nevada corporation

Print name: _Tam B. Serrott_                 By: _Thomas E Cross_

                                                        Its: _President_
                                                        Date: _7/23/96_

Print name: **Rebecca L. Sawyer**         TENANT:

                                                        **WINN-DIXIE STORES, INC.**
Print name: **Cynthia N. Crossland**
                                                        By: _James Kufeldt_

                                                        Its: **PRESIDENT**
                                                        Date: _7-15-96_

24

STATE OF _Connecticut_ )

COUNTY OF _Hartford_ )

The foregoing instrument was acknowledged before me this _23rd July_, 199_6_, by _Thomas E. Cross_, as _President_ of _____, a _____ and the authorized general partner of Marketplace Port St. Lucie Limited Partnership, a Florida limited partnership, on behalf of the limited partnership, **[PLEASE CHECK ONE]** _X_ who is personally known to me or _____ who has produced _____ as identification.

Printed Name: _Tina B. Schutt_
Notary Public, State and County aforesaid.
My Commission Expires: _8/31/99_
Notary ID No.: _106780_
(NOTARIAL SEAL)

STATE OF _Connecticut_ )

COUNTY OF _Hartford_ )

The foregoing instrument was acknowledged before me this _23rd July_, 199_6_, by _Thomas E. Cross_, as _____ President of Tyringham Ridge, Inc., a Nevada corporation, on behalf of the corporation, **[PLEASE CHECK ONE]** _X_ who is personally known to me or _____ who has produced _____ as identification.

Printed Name: _Tina B. Schutt_
Notary Public, State and County aforesaid.
My Commission Expires: _8/31/99_
Notary ID No.: _106780_
(NOTARIAL SEAL)

25

STATE OF FLORIDA )

COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this ~~July~~ ~~15~~, 1996, by
~~James Kufeldt~~, as ~~—~~ President of Winn-Dixie Stores, Inc., a Florida corporation,
on behalf of the corporation, who is personally known to me.

Printed Name: ~~BRENDA J. BABCOCK~~
Notary Public, State and County aforesaid.
My Commission Expires: 11-20-99
Notary ID No.: _____
(NOTARIAL SEAL)

Notary Public, State of Florida
BRENDA J. BABCOCK
My Comm. Exp. Nov. 20, 1999
Comm. No. CC 511004

o:\newforms\lease.sc



SITE PLAN

SP-1

SITE PLAN

THE MARKETPLACE at PORT ST. LUCIE
PORT ST. LUCIE, FL
DEVELOPED BY: DEVCON ENTERPRISES INC.

**LEGAL DESCRIPTION**

A parcel of land, being all of Lots 5 through 9 inclusive, all of Tract "C", a portion of water management Tract "A", a portion of Tract "B", and a portion of Tract "D", Port St. Lucie Square, according to the plat thereof, as recorded in Plat Book 28, at Page 22, of the Public Records of St. Lucie County, Florida, being more particularly described as follows:

Begin at the intersection of the easterly right-of-way line of U.S. Highway No. 1, with the South right-of-way line of Jennings Road, as shown on said plat (said point also being the northwest corner of Lot 7); thence, along said South right-of-way line of Jennings Road, North 89 degrees 43 minutes 03 seconds East, 1411.34 feet to the Northeast corner of Tract "B", as shown on said plat; thence, along the East line of said Tract "B", South 00 degrees 00 minutes 55 seconds East, 835.41 feet; thence North 27 degrees 53 minutes 46 seconds West, 192.58 feet; thence South 62 degrees 06 minutes 14 seconds West, 248.10 feet; thence North 27 degrees 53 minutes 46 seconds West, 214.00 feet; thence South 62 degrees 06 minutes 14 seconds West, 350.63 feet to a point on the easterly boundary line of Lot 4, as shown on said plat; thence, along said line, North 29 degrees 54 minutes 30 seconds West, 180.64 feet to a point on the arc of a tangent curve; thence northwesterly, along the arc of said curve being concave to the southwest, having a radius of 40.00 feet, a central angle of 87 degrees 59 minutes 16 seconds, an arc distance of 61.43 feet; thence, tangent to said curve, and along the northerly line of said Lot 4, South 62 degrees 06 minutes 14 seconds West, 214.97 feet to a point on said easterly right-of-way line of U.S. Highway No. 1; thence, along said right-of-way line, North 27 degrees 53 minutes 46 seconds West, 766.90 feet to the Point of Beginning.

LESS AND EXCEPT THE FOLLOWING DESCRIBED PARCEL OF LAND:

Begin at the northwest corner of the Plat of Port St. Lucie Square, as recorded in Plat Book 28, Pages 22 and 22A, Public Records of St. Lucie County, Florida; said point being the intersection of the northeasterly right-of-way line of U.S. Highway No. 1 (a 200.00 foot right-of-way) and the southerly right-of-way line of Jennings Road, a line being 50.00 feet southerly of the north line of Section 12, Township 37 South, Range 40 East; thence N 89 degrees 43 minutes 03 seconds E, along said southerly right-of-way line of Jennings Road, a distance of 232.19 feet; thence S 28 degrees 43 minutes 37 seconds E, a distance of 134.75 feet; thence S 62 degrees 06 minutes 14 seconds W, a distance of 207.70 feet, to a point on said northeasterly right-of-way line of U.S. Highway No. 1; thence N 27 degrees 53 minutes 46 seconds W, along said northeasterly right-of-way line, a distance of 242.36 feet to the Point of Beginning of the herein described parcel of land.

**END OF LEGAL DESCRIPTION**

## EXHIBIT "C"

### SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT

**THIS SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT** (this "Agreement"), made this December 21, 1995, between _____, a _____ _____, whose address is _____ together with its successors, assigns, and transferees "Lender") and **WINN-DIXIE STORES, INC.**, a Florida corporation, whose address is P. O. Box 585200, Orlando, Florida 32858-5200 (together with its successors and assigns, "Winn-Dixie");

### R E C I T A L S :

1.      Lender has made or is about to make a loan to Marketplace Port St. Lucie Limited Partnership, a Florida limited partnership ("Landlord"), secured by a mortgage, deed of trust, security deed, or other financing instrument to be recorded in the Official Records of St. Lucie County, Florida (together with any modifications, consolidations, extensions, replacements, or renewals thereof, the "Mortgage"), encumbering the real estate known as "Marketplace at Port St. Lucie" shopping center at southeasterly corner of the intersection of Jennings Road and U.S. 1 and more particularly described in the Mortgage and on Exhibit "A" attached hereto and incorporated herein (the "Shopping Center"); and

2.      By lease dated _____ (as amended by _____and as otherwise to be amended from time to time, the "Lease"), Landlord did lease unto Winn-Dixie, as tenant, those certain premises which constitute a portion of the Shopping Center and are more particularly described in the Lease (the "Premises"); and

3.      Lender and Winn-Dixie desire that the Lease shall not terminate but rather shall remain in full force and effect in accordance with its terms if the Mortgage is foreclosed or any transfer of the Premises is made in lieu thereof;

**NOW THEREFORE**, for valuable consideration the receipt and sufficiency of which are hereby acknowledged, Lender and Winn-Dixie agree as follows:

1.      Provided Winn-Dixie is not in material default under the terms of the Lease, then in the course of or following any exercise of any remedy under the Mortgage, any foreclosure sale of the Shopping Center or the Premises, or any transfer of the Shopping Center or the Premises thereafter or in lieu of foreclosure (together with any similar events, a "Foreclosure Event"):

(a)      The right of possession of Winn-Dixie to the Premises and Winn-Dixie's rights arising out of the Lease shall not be affected or disturbed by Lender.

(b)      Winn-Dixie shall not be named as a party defendant.

(c)    The Lease shall not be terminated or affected by any Foreclosure Event.

2.    Following a Foreclosure Event, Winn-Dixie shall attorn to Lender as its new landlord and the Lease shall continue in full force and effect as a direct lease between Winn-Dixie and Lender. Notwithstanding the foregoing, Lender shall not be:

(a)    liable for any act or omission of any prior landlord (including Landlord), unless such action was taken at the direction of or with the approval of Lender; or

(b)    subject to any offsets or defenses which Winn-Dixie might have against any prior landlord (including Landlord) except those which arose out of such landlord's default under the Lease and accrued after Winn-Dixie has notified Lender and given Lender an opportunity to cure as provided in the Lease; or

(c)    bound by any rent Winn-Dixie paid for more than the then current month to any prior landlord (including Landlord) or

(d)    bound by any modification of the Lease made after the date hereof without Lender's consent.

3.    Following a Foreclosure Event, Lender promptly shall give notice thereof to Winn-Dixie, stating its current address and providing evidence of Lender's title to the Premises.

4.    The Lease is subject and subordinate to the lien of the Mortgage and to all advances made or to be made thereunder as though the Mortgage had been executed and recorded prior in point of time to the execution of the Lease. Notwithstanding the foregoing, subordination of the Lease to the Mortgage should not be construed to constitute Tenant's consent or agreement to any term, condition, or provision of the Mortgage or any related loan document which purports to modify, alter, or amend the Lease.

5.    The foregoing provisions shall be self-operative and effective without the execution of any further instrument on the part of either party hereto. However, Winn-Dixie agrees to execute and deliver to Lender such other instrument as Lender shall reasonably request to evidence such provisions.

**IN WITNESS WHEREOF**, Lender and Winn-Dixie have executed this Agreement the day and year first above written.

Signed, sealed and delivered
in the presence of:

_____        _____
Print name:_____

_____        By:_____
Print name:_____            _____
                                             Its:_____
                                             Date:_____


_____        **WINN-DIXIE STORES, INC.**
Print name:_____

_____        By:_____
Print name:_____            _____
                                             Its:_____
                                             Date:_____

STATE OF _____ )

COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____ _____, 199____, by _____, as _____ of _____, a _____, on behalf of the _____, **[PLEASE CHECK ONE]** _____ who is personally known to me or _____ who has produced _____ as identification.

 

_____

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

STATE OF FLORIDA )

COUNTY OF DUVAL )

    The foregoing instrument was acknowledged before me this _____ ____, 199____, by _____, as _____ President of Winn-Dixie Stores, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.

 

_____

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

**EXHIBIT "D"**

**FORM OF SURVEYOR'S CERTIFICATE**

TO:    Winn-Dixie Stores, Inc. ("Owner")
_____ Title Insurance Corporation ("Title Company")

RE:    File No._____ Drawing No. _____ Title: _____

  The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that (1) this plat of survey and the property description with respect thereto are true and correct and prepared from an actual on-the-ground survey of the real property (the "Property") shown hereon; (2) such survey was conducted by the Surveyor, or under his supervision; (3) all monuments shown herein actually exist, and the location, size and type of material thereof are correctly shown; (4) except as shown herein, there are no visible encroachments onto the Property or protrusions therefrom, there are no visible easements or rights-of-way on the Property and there are no visible discrepancies, conflicts, shortages in area or boundary line conflicts; (5) the size, location and type of improvements are as shown hereon, and all are located within the boundaries of the Property; (6) the location of all adjoining streets and roads and the distance to and location of the nearest intersecting street or road is as shown; (7) the Point of Beginning of the Property Description is accurate; (8) the Property has access to and from a _____ foot wide public roadway by: (name all streets or other rights-of-way) as shown on the survey; (9) all recorded easements and other exceptions, as noted in _____ Title Insurance Company's Commitment for Title Insurance No. _____, dated _____ have been correctly platted hereon and indicated by official records book and page number; (10) the boundaries, dimensions and other details shown herein are true and correct; (11) the Property is not located in a 100-Year Flood Plain or in an identified "flood prone area", as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Insurance Rate Map Panel #_____, dated _____, which such map panel covers the area in which the Property is situated; (12) the following matters, to the extent such exist on the Property, are shown on the survey: location of all utilities serving the Property, all strips, gores and overlaps with adjacent properties, all interior lot lines, high water marks, if the Property is located on or contains a body of water, elevations of the Property and any natural or constructed objects affecting the Property; (13) the Property is zoned _____; (14) the _____ and _____ boundaries of the Property abut the streets and highways as shown on the survey; and (15) the survey meets or exceeds the minimum technical requirements for surveys pursuant to the statutes of the State of _____ and the most recently promulgated minimum standard detail requirements for ALTA-ACSM surveys.

  Executed this the _____ day of _____, 19___.

_____

Registered Land Surveyor No._____
Address:_____
_____

**(SURVEYOR'S SEAL)**

**EXHIBIT "E"**

**ESTOPPEL CERTIFICATE**
WINN-DIXIE STORE #_____

_____
_____

The undersigned officer of **WINN-DIXIE STORES, INC..**, a Florida corporation ("WINN-DIXIE") hereby certifies, on behalf of WINN-DIXIE, that as of December 21, 1995 (the "Certificate Date"), the following is true and correct:

1.     That WINN-DIXIE is the tenant ("Tenant") under a currently effective lease (as amended as described below, the "Lease") with Marketplace Port St. Lucie Limited partnership, as the current landlord ("Landlord") dated _____, 19__, conveying a leasehold estate of the property described therein (the "Premises") located in a shopping center known as Marketplace at Port St. Lucie (the "Shopping Center"), and the Lease has been amended or is evidenced only by:

    (a)    Short Form Lease dated _____;
    (b)    Letter Agreement(s) dated _____;
    (c)    Supplemental Lease Agreement dated _____;
    (d)    First Amendment to Lease dated _____;
    (e)    Second Amendment to Lease dated _____.

2.     That the term of the Lease commenced _____, 19__, and is scheduled to expire on _____, _____ unless renewed or terminated in accordance with the terms of the Lease. Pursuant to the Lease, Tenant is entitled to renew the lease for _____ terms of _____ years each.

3.     That, to the best of Tenant's knowledge, and subject to Tenant's right of audit and review as provided in the Lease, all rent and other charges due from Tenant to Landlord have been paid through and including _____, 199__, and Tenant currently has no defense, set-offs, or counterclaims to the payment of rent or other charges due Landlord under the Lease.

4.     That, to the best of Tenant's knowledge, Landlord is not in default under the Lease, except that Landlord has failed to perform the following maintenance items as required under the Lease:

    (a)    _____
    (b)    _____
    (c)    _____
    (d)    _____

5.     That the Lease contains no provision for purchase of the Premises by Tenant.

6.     Tenant has received no notice of any sale, transfer, assignment, or pledge of Landlord's interest in the Lease or the rent due thereunder to any party except: _____ and _____.

7.     Tenant is not the subject of any filing for bankruptcy or reorganization under any applicable bankruptcy law.

8.     Notwithstanding anything to the contrary herein:

      (a)      No acceptance or possession of the Premises, the opening for or operation of business by Tenant therein, execution of this certificate, or payment of rent under the Lease constitutes or will constitute acceptance by Tenant of work or materials that are defective or not completed in accordance with Tenant's plans and specifications, or a waiver of Tenant's rights against Landlord in connection therewith.

      (b)      Tenant makes no representation or warranty that the Premises or the Shopping Center, or any portion thereof is in compliance with the Americans With Disabilities Act or other applicable laws or regulations, however, it has not received notification from any government agency of any noncompliance therewith.

      9.      The address for notices to Tenant is P. O. Box 585200, Orlando, Florida 32858-5200, with a copy to: Mallory Gayle Holm, Winn-Dixie Stores, Inc., 5050 Edgewood Ct., P.O. Box B, Jacksonville, FL 32203-0297.

      10.      This certificate is not valid and may not be relied upon unless and until it is executed by the Landlord and a signed counterpart is received by Tenant on or before ten (10) days after the Certificate Date.

      **IN WITNESS WHEREOF**, the undersigned has executed this certificate on behalf of Tenant.

                            **WINN-DIXIE STORES, INC.**

                            By:_____

                                                         
                          Its:_____

      The undersigned, on behalf of Landlord, affirms that the certifications by Tenant in the foregoing certificate are true and correct to the best of Landlord's knowledge. Further, Landlord certifies that Tenant has fully performed its obligations under the Lease to date and Tenant is not in default thereunder.

      **IN WITNESS WHEREOF**, the undersigned has executed this certificate on behalf of Landlord.

                            **Marketplace Port St. Lucie Limited partnership**

                          By:_____

                          Its:_____

<u>**EXHIBIT "F"**</u>

**(ZONING/LAND USE AGENCY LETTERHEAD)**

(DATE)

Re: _____, St. Lucie County, State of Florida

To Whom It May Concern:

      This is to advise you that the zoning and use of the above-captioned Premises is governed by the laws and regulations of the County of St. Lucie, and the Premises have been zoned to allow an establishment or facility which includes the retail sale of food and drugs, sundries and notions, books and stationery, delicatessen, bakery, beer and wine for off-site consumption, video rental, and similar uses, a bank, and a dry cleaning business under Section _____ of the Zoning Code of the County of St. Lucie, relating to uses permitted in the _____ District. The aforesaid zoning permits the use of the improvements located or to be located on the Premises as described above. The aforesaid Zoning District is appropriate for this state's comprehensive plan's future land use designation (if any exists).

      As of the date hereof, we are not aware of any facts with respect to the Premises that constitute a violation of any building or zoning laws, rule or regulations. Any nonconforming elements of the development are considered valid nonconforming elements under the current building and zoning law.

      Should you have further questions in this regard, please advise.

Very truly yours,

(Name)
(Title)

Attachments
- Zoning Regulations for Permitted Use of Premises
- Zoning Regulations for Non-conforming Uses

## EXHIBIT "G"

### SHORT FORM LEASE

**THIS SHORT FORM LEASE** is hereby executed this December 21, 1995, by and between **Marketplace Port St. Lucie Limited partnership**, a Florida limited partnership, and **Tyringham Ridge, Inc.,** a Nevada corporation whose mailing address is 609 Farmington, Hartford, CT 06105 (together, "Landlord") and **WINN-DIXIE STORES, INC.,** a Florida corporation, whose mailing address is P. O. Box 585200, Orlando, Florida 32858-5200 ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H:

**WHEREAS**, Landlord and Tenant did enter into a Lease (the "Lease"), dated _____; and

**WHEREAS**, Landlord and Tenant desire to memorialize the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord the property more particularly described on Exhibit "A" attached hereto and depicted on the Site Plan attached as Exhibit "B" attached hereto and by these references made a part hereof together with the nonexclusive right to use the Common Areas as described and provided in the Lease (collectively the "Premises").

The term of the Lease, unless sooner terminated or extended under provisions thereof, shall commence on the Commencement Date as defined in the Lease and shall terminate, unless sooner terminated or extended as provided in the Lease, twenty (20) years thereafter. Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of the term of the Lease, each extension to be for a period of five (5) years each. Tenant has no option to purchase the Premises under the Lease.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Short Form Lease shall be deemed to constitute a single instrument or document. This Short Form Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Short Form Lease, the Lease shall control.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Short Form Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

**LANDLORD:**

_____

Print Name:_____

**Marketplace Port St. Lucie Limited Partnership**

By:_____
     its authorized general partner

_____

Print Name:_____

By:_____
     _____
     Its:_____

_____

Print name:_____

**Tyringham Ridge, Inc.,** a Nevada corporation

_____

Print name:_____

By:_____
     Its:_____
     Date:_____

     As to Landlord

**TENANT:**

_____

Print Name:_____

**WINN-DIXIE STORES, INC.**

_____

Print Name:_____

By:_____
     Its:_____

     As to Tenant

STATE OF _____ )

COUNTY OF _____ )

      The foregoing instrument was acknowledged before me this _____ _____, 199____, by _____, as _____ of _____, the authorized general partner of Marketplace Port St. Lucie Limited Partnership, a Florida limited partnership, on behalf of the limited partnership, **[PLEASE CHECK ONE]** _____ who is personally known to me or _____ who has produced _____ as identification.


_____

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)


STATE OF _____ )

COUNTY OF _____ )

      The foregoing instrument was acknowledged before me this _____ _____, 199____, by _____, as _____ President of Tyringham Ridge, Inc., a Nevada corporation, on behalf of the corporation, **[PLEASE CHECK ONE]** _____ who is personally known to me or _____ who has produced _____ as identification.


_____

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)


39

STATE OF FLORIDA )

COUNTY OF DUVAL )

  The foregoing instrument was acknowledged before me this _____ ____, 199____, by _____, as _____ President of Winn-Dixie Stores, Inc., a Florida corporation, on behalf of the corporation, who is personally known to me.


_____

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

**EXHIBIT "H"**

Coming Soon Sign Specifications

**Text of Sign:**          Coming Soon --
                          Winn-Dixie
                          Marketplace


**Size:**                 Maximum size permitted by applicable law and
                          restrictions of record and otherwise reasonably
                          acceptable to Landlord and Tenant

**EXHIBIT "I"**

DECLARATION OF RESTRICTIVE COVENANTS

**THIS DECLARATION OF EASEMENTS AND RESTRICTIVE COVENANTS** (this "Declaration") is made _____, 199__ by **Marketplace Port St. Lucie Limited Partnership,** a Florida limited partnership and **Tyringham Ridge, Inc.,** a Nevada corporation (together with their respective successors and assigns and any entity, person, or firm owned or controlled by, owning or controlling, or under common ownership or control therewith, and their respective successors and assigns, "Owner").

**R E C I T A L S**

1.      Owner is the owner of that certain real property located in the County of St. Lucie, State of Florida as described on Exhibit "B" attached hereto (the "Shopping Center") and shown on the Site Plan attached hereto as Exhibit "A" (the "Site Plan"), Outparcel A and Outparcel B and certain other real property hereinafter referred to as "Owner's Remaining Land".

2.      Owner is the landlord under that certain lease dated _____, 199___ between Owner and Winn-Dixie Stores, Inc., a Florida corporation ("Tenant") pursuant to which Tenant leases a portion of the Shopping Center (the "Store").

3.      Owner intends by this Declaration to grant certain easement and other rights and impose certain use restrictions upon the Shopping Center, Outparcel A and Outparcel B and Owner's Remaining Land for the benefit of Owner, its future tenants, licensees, invitees, and other occupants and for the benefit of Tenant.

**NOW, THEREFORE,** for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby declares that the Shopping Center, Outparcel A and Outparcel B and Owner's Remaining Land, except for the non-restricted area shown on Exhibit "A" or described below (the "Non-Restricted Area"), shall be sold, transferred, leased, conveyed, owned, and occupied subject to the following:

**I.**
**RESTRICTIONS**

1.1      Restrictions on Use. The Shopping Center, Outparcel A and Outparcel B shall be restricted in accordance with the following: The Store shall initially be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to foods and food products, but may also be used for the conduct of any mercantile, retail, or service business (including discount businesses, except that, so long as Wal-Mart, or any affiliate of Wal-Mart, is the user of Tract 1, either as owner or lessee, no space in or portion of Tract 2, Outparcel 1, Outparcel 2, or Outparcel 3 and no space in or portion of any other real property adjacent to the Shopping Center shall be leased or occupied by or conveyed to any other party for use as a discount department store or other discount store; provided, however, that the foregoing shall not be deemed to restrict or prohibit the use of the Store as a typical Winn-Dixie "low price leader" grocery store/supermarket) (the "Permitted Use").

Tenant shall have the exclusive right to operate a supermarket, and the nonexclusive right to operate a pharmacy or prescription drug concession, photo lab or film development business, and an automatic teller machine and banking business in the Shopping Center. Landlord will not directly or indirectly lease or rent any property located within the Shopping Center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish, seafood, or vegetable market, nor will Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm, or corporation engaged in any such business without the prior written permission of Tenant; Landlord will not permit or suffer any property located within the Shopping Center to be used for, or occupied by, any business dealing in or keeping in stock or selling for off-premises consumption any staple or fancy groceries, meats, fish, seafood, vegetables, fruits, bakery goods, dairy products, or frozen foods without the prior written permission of Tenant except (1) by a business or businesses for which the sale of

such items does not exceed the lesser of 500 square feet of sales area or ten percent ( 10%) of the square foot area of any storeroom within the Shopping Center, and is incidental only to the conduct of another business, or (2) by a restaurant located no closer than 50 feet from any boundary of the Store, as prepared, ready-to-eat food items, for consumption either on or off site. With the exception of package stores, no other tenant in the Shopping Center may sell beer and wine for off-premises consumption. Except for Schlotzky's deli-style restaurant, which shall be located no closer than 80 feet to any boundary of the Store as it is proposed to be enlarged, only Tenant may operate a bakery, delicatessen, or similar department in the Shopping Center.

Without the prior written consent of Tenant, which may be withheld or conditioned in Tenant's sole discretion, only retail and/or service stores shall be allowed to operate in the Shopping Center, or any enlargement thereof, and no spa, lounge, bar, "teen lounge", bowling alley, pawn shop, skating rink, bingo or electronic or other game parlor, theater (either motion or legitimate), business or professional offices, medical offices or clinics, automobile dealership, church, or health, recreational or entertainment-type activities, or "pay" telephones shall be permitted.

Notwithstanding the foregoing, Tenant shall not operate the Store for any use or purpose for which Landlord grants an exclusive to another tenant of the Shopping Center occupying 10,000 s.f. of space or more provided that, with respect to such exclusive use or purpose (a) Landlord gives Tenant ten (10) days' written notice prior to granting same; (b) it does not violate any exclusive use granted to Tenant under this Lease; (c) Tenant is not, on the date of Landlord's notice, using the Store for the proposed exclusive use or purpose, and (d) it does not preclude or unreasonably limit Tenant's operation of the Store as a supermarket.

1.2    Restrictions on Building Height and Size.  Construction of buildings and other improvements in the Shopping Center and on Outparcel A and Outparcel B shall be restricted to a maximum building area of twenty-five percent (25%) of the ground area of each parcel, with the remainder of the parcel to be comprised of Common Areas consisting of parking and landscaped areas. No structure, other than the Store, erected in the Shopping Center or on Outparcel A or Outparcel B shall exceed a maximum vertical building height of twenty-two (22) feet measured from ground level.

The foregoing restrictions shall terminate upon the first to occur of the following (1) seventy-five (75) years after the date hereof, or (2) the date that Tenant permanently ceases to operate a mercantile, retail, or service business in the Store.

## II.
## ATTORNEYS' FEES/ENFORCEMENT

Owner and Tenant shall be entitled to bring a legal or equitable action to enforce this Declaration without the joinder of all other owners.

If Owner or Tenant commences a legal proceeding to enforce any of the terms of this Declaration, the prevailing party in such action shall have the right to recover reasonable attorneys' fees and costs (whether incurred in preparation for or at trial, on appeal, or in bankruptcy) from the other party.

## III.
## MODIFICATION

This Declaration may be modified or amended by owners owning one hundred percent (100%) of the real property comprising the Shopping Center and Owner's Remaining Land, which modification or amendment shall become effective upon (1) the written consent of Tenant, which may be granted or withheld in its sole discretion, and (2) filing same in the real property records of the county of St. Lucie, Florida.

## IV.
## EASEMENTS

4.1    Ingress and Egress.

(a)    Owner hereby grants to each tenant of the Shopping Center (but only so long as such tenant remains a tenant of the Shopping Center), to Tenant, and their respective employees, contractors, deliverymen, agents, customers, invitees, licensees, and assigns, a nonexclusive, irrevocable easement for the purpose of ingress and egress by vehicular and pedestrian traffic upon, over, across, and through the Common Areas as shown on the Site Plan.

(b)    Owner shall have the right to temporarily close any part of the Common Areas to the extent necessary to conduct routine maintenance, repairs, and alterations thereof; provided, however, that Owner shall use its reasonable efforts to perform such maintenance, repairs, or alterations, at times and in a manner so as to minimize any adverse impact on the operation of any business within the Shopping Center.

(c)    Owner shall have the right to temporarily close any part of the Common Areas as necessary to prevent the public from obtaining prescriptive rights therein, provided that (1) such closure does not exceed the minimum time period required pursuant to applicable law to prevent such prescriptive rights, and (2) Owner uses its reasonable efforts to minimize any adverse impact on the operation of any business within the Shopping Center.

## V.
## GENERAL PROVISIONS

5.1    Covenants Run With the Land.  The provisions of this Declaration shall operate as covenants running with the land comprising the Shopping Center, the Store, Outparcel A and Outparcel 2, and Owner's Remaining Land and shall inure to the benefit of Tenant, its successors and assigns.

5.2    Severability.  If any term or provision of this Declaration or the application of it to any person or circumstance shall to any extent be invalid and unenforceable, the remainder of this Declaration or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Declaration shall be valid and shall be enforced to the extent permitted by law.

5.3    Pronouns.  When required by context, the singular shall include the plural, and the neuter gender shall include a person, corporation, firm, association, or other business arrangement.

5.4    Captions.  The captions in this Declaration are for convenience only and do not constitute a part of the provisions hereof.

5.5    Governing Law.  This Declaration shall be construed and enforced in accordance with, and governed by, the law of the State of Florida.

5.6    No Presumption.  This Declaration shall be interpreted and construed only by the contents hereof and there shall be no presumption or standard of construction in favor of or against any owner.

5.7    Exhibits.  The following Exhibits attached hereto are hereby incorporated into this Declaration by reference:

Exhibit"A" -    Site Plan

Exhibit "B" -    Legal Description of the Shopping Center, Outparcel A and Outparcel B, Owner's Remaining Land, and the Non-Restricted Area (if any)

**IN WITNESS WHEREOF**, this Declaration has been executed as of the date first above written.

Witnesses:                                    Owner:

_____    **Marketplace Port St. Lucie Limited Partnership**
Print name:_____

_____    By:_____
Print name:_____         _____
                                          Its:_____
                                          Date:_____

_____    **Tyringham Ridge, Inc.,** a Nevada corporation
Print name:_____

_____    By:_____
Print name:_____         _____
                                          Its:_____
                                          Date:_____

STATE OF _____ )
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ _____, 199___, by _____, as _____ of Marketplace Port St. Lucie Limited Partnership, a Florida limited partnership, on behalf of the limited partnership, **[PLEASE CHECK ONE]** _____ who is personally known to me or _____ who has produced _____ as identification.


_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

STATE OF _____ )
COUNTY OF _____ )

     The foregoing instrument was acknowledged before me this _____ _____, 199____, by _____, as _____ President of Tyringham Ridge, Inc., a Nevada corporation, on behalf of the corporation, **[PLEASE CHECK ONE]** _____ who is personally known to me or _____ who has produced _____ as identification.

_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____
(NOTARIAL SEAL)

46

**EXHIBIT "A"**

Legal Description of the Shopping Center, Owner's Remaining Land, and the Non-Restricted Area

## EXHIBIT "B"

Site Plan

## EXHIBIT "J"

## SUPPLEMENTAL LEASE AGREEMENT

**THIS SUPPLEMENTAL LEASE AGREEMENT** (the "Agreement") is made this _____ 199___, between **WINN-DIXIE STORES, INC.**, a Florida corporation, ("Tenant") and **Marketplace Port St. Lucie Limited Partnership**, a Florida limited partnership and **Tyringham Ridge, Inc.**, a Nevada corporation (collectively, "Landlord").

**WHEREAS,** Tenant and Landlord entered into a Lease dated _____, 199_____ (the "Lease") for the use and occupancy of the Premises described therein;

**NOW, THEREFORE**, pursuant to the provisions of the Lease, Tenant and Landlord mutually agree as follows:

1.    The Commencement Date of the Term is _____, 19_____.

2.    The Term shall expire at midnight Eastern Time on _____, 19_____, unless earlier terminated or later extended as provided for in the Lease.

3.    All undefined capitalized terms used herein are as defined in the Lease.

**IN WITNESS WHEREOF**, the parties hereto have signed and sealed this Agreement on the date first set forth above.

Signed, sealed and delivered
in the presence of:                                        TENANT:

_____          **WINN-DIXIE STORES, INC.**
Print name:_____


_____          By:_____
Print name:_____               Its:_____
                                                               Date:_____


                                                               LANDLORD:

_____          **Marketplace Port St. Lucie Limited Partnership**
Print name:_____


_____          By:_____
Print name:_____               Its:_____
                                                               Date:_____