# EXHIBIT "A"

THIS LEASE, made this ___23___ day of ___May___, 19 78.

between __JAMERSON CONSTRUCTION CORPORATION, a Florida corporation__

_____ (hereinafter called "Landlord")

and ___WINN-DIXIE STORES, INC., a Florida corporation___

hereinafter called "Tenant"),

which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

**WITNESSETH:**

**PREMISES**   That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and demise unto said Tenant and the Tenant hereby agrees to take and lease from the Landlord, for the term hereinafter specified, the following described premises:

That certain store building, approximately ___160___ feet in width by ___160___   256'

feet in depth

and the land on which the same shall stand (hereinafter collectively called "demised premises"), which store building and related improvements are to be constructed by Landlord according to plans and specifications to be approved by the parties as herein provided, and shall be in the location and of the dimensions as outlined in red on the Plot Plan __entitled "Pine Island Shopping Center, Lee County,__

__Florida" prepared by D. Wilkinson of Huber Construction Co.,__

__dated February 20, 1978, and last revied May 10, 1978___,

attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in detail on Exhibit "A"), known as ___Pine Island Shopping Center___

(hereinafter called "shopping center"), located __one half mile south of__

__intersection of S. R. 78 and S. R. 767, on East side of S. R.__

in the City of __Pine Island__ County of __Lee__,

State of __Florida__, the legal description of the shopping center being

as follows:

> See Exhibit "B" attached hereto and by
> this reference made a part hereof for
> legal description of shopping center.

This instrument was prepared by
Ronald D. Peterson, Attorney at Law
whose address is 1550 Edgewood
Court, Jacksonville, Florida 32205

WD 33-3a—Revised 5/65



**TERM**

    FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens said premises for the transaction of its business as hereinafter provided for an initial term of _____ __twenty (20)__ _____ years from said commencement date. The parties agree to execute a supplemental agreement fixing the commencement date when the same shall have been determined as herein provided.

    This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

**RENTAL**

1. The Tenant agrees to pay to the Landlord as a minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of __Sixty-Seven Thousand Eight Hundred Forty and No/100-------------------__ Dollars (__$67,840.00__ ) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of __Five Thousand Six Hundred Fifty-Three and 34/100--------------------------------------__ Dollars (__$5,653.34__ ) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

    In addition, the Tenant agrees to pay to the Landlord a percentage rental equal to amount if any, by which __one__ _____ per cent ( __1__ %) of Tenant gross sales made from the demised premises in each fiscal year ending June 30th during the term of the lease, and any extensions thereof, exceeds __Sixty-Seven Thousand Eight Hundred Forty and No/100--------------__ Dollars (__$67,840.00__

9,000

Base 6,784,000

2,216,000
1%

$22.160

10,000,000
%
$32.160

11 '' - 42,160.
12 '' - 52,160
13 '' - 62,160

Any excess rent which may be due by reason of each fiscal year. However, be payable by the Tenant within sixty (60) days after the expiration of the last extension upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of said percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the lease-hold. The percentage rent for each fiscal year shall be calculated separately and without ref-erence to the volume of sales of any other year. For purposes of calculating the percentage rental due hereunder, the Tenant's fiscal year shall be from July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINITION OF "GROSS SALES"**

1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all mer-chandise sold, and gross charges for all services rendered in or from the demised premises, both for cash and on credit; provided, however, such term shall not include (1) any sales tax, gross receipts tax, or similar tax by whatever name called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any gov-ernmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) accommodation sales, such as sales of postage stamps, government bonds or savings stamps or similar items; (5) returns of merchan-dise to suppliers or manufacturers; (6) net amount of discounts allowed to any customer, in-cluding discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (7) merchandise or other things of value issued in redemption of trading stamps or as a premium in connection with any sales pro-motion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

**RECORD OF SALES**

1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address hereinafter designated for notices. At the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable by Tenant as hereinabove provided, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

**USE**

2. The demised premises may be used for a retail food store, commonly referred to as a super-market, dealing primarily in, but not limited to foods and food products, or for the conduct of any general mercantile business; provided, however, the demised premises shall not be used, nor assigned or subleased under the terms of Article 26 herein, for any use or business which shall be in direct competition with the primary use or business engaged in by any other then tenant in the shopping center to whom Landlord has granted a right of exclusive use of which Tenant has been given notice, and provided further, the demised premises shall not be used for the sale of prescription drugs or drugs required to be dispensed by a licensed pharmacist so long as the Eckerd Drug Store tenant is in operation in the center.

Tenant at all times shall fully and promptly comply with all laws, ordinances and regula-tions of every lawful authority having jurisdiction of said premises, as such shall relate to the cleanliness and use of said premises and the character and manner of operation of the business conducted in or at said premises



CONSTRUCTION 3. The Case 3:05-cv-03817-JAE ... Doc 6189-1 Filed 03/01/06 Page 5 of 23
OF SHOPPING ·as shown on Exhibit ... , co___ jing of all the buildings in ..., driveways an___lloted improve-
CENTER walks, streets, entranc... ways, ...alls, parking areas, service ...
ments, said improvements (excluding buildings) being sometimes hereinafter referred to as "com-
mon areas." The Landlord, at its sole cost and expense, shall grade and surface with top quality
materials all paved portions of the common areas (including parking area), and shall provide
proper and adequate water drainage and lighting system and operations therefor and shall
operate and maintain the same in good repair and usable condition for use by the patrons
of the shopping center and the tenants and their employees during the term of this lease and
any extensions thereof. The arrangement and location of all store buildings and common areas
(including parking area) within the shopping center shall at all times during the term of this lease,
or any extensions thereof, be maintained as shown on Exhibit "A" and shall not be changed
without the written consent of the Tenant. If not shown on Exhibit "A", Tenant expressly re-
serves the right to approve the finish elevations of all store buildings and common areas (includ-
ing parking and service areas) within the shopping center which are to be constructed concur-
rently with Tenant's store building.

Notwithstanding the foregoing, it is understood that Landlord
intends initially to construct only the store buildings in
Phase I as shown on Exhibit "A", which store buildings shall
be of the size indicated on Exhibit "A" and in the location
thereon shown and Landlord intends to construct the building
for Tenant and the further buildings required under Articles
5 and 6 herein, together with all the common areas in the
shopping center as shown on Exhibit "A", included in Phase
I, the common areas to include all parking areas, sidewalks,
drives, ramps, entrance ways and service areas as shown on
Exhibit "A".  Landlord agrees that throughout the shopping
center at all times, at least a ratio of 5.3 automobile parking
spaces per each 1,000 square feet of gross building area (In-
cluding additional floor levels) shall be maintained during
the term of this lease and any extensions thereof. Landlord
specifically agrees that as to the areas marked "Future Ex-
pansion Area" and "Future Parking" in Phase II as shown in
Exhibit "A" hereto that Landlord may construct buildings only
in the area labeled "Future Expansion Area" and any buildings
constructed shall be of like structural and architectural
design and quality as the building for Tenant and shall be
located only in such locations and of such maximum dimensions
as shall be approved in writing by Tenant herein prior to any
construction of any such buildings.  Landlord specifically
agrees that no buildings shall be constructed on the areas
marked "Future Parking" in Phase II on Exhibit "A" and such
areas shall be paved as parking areas.  As to the area marked
"proposed retail expansion" on Exhibit "A": no buildings shall
be constructed outside the building outlines shown on Exhibit "A",
which outlines shall be the maximum size of any buildings con-
structed.  Landlord agrees that there shall at all times be
maintained a paved 30 foot wide service road around the peri-
meter of the shopping center so as to provide a through circular
traffic pattern around all buildings located in the shopping
center at all times.  Landlord also agrees that any construction
undertaken in the shopping center shall be done in such manner
as to cause the least interference with Tenant's operations
in its demised store premises.  Landlord agrees that until
such time as construction is commenced and diligently completed
in the expansion areas above described said expansion areas
shall be maintained as grassed areas or paved parking and kept
free of weeds and debris.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to
construct the store building for occupancy by Tenant in accordance with the plans and specifi-
cations to be approved by both Landlord and Tenant. Plans and specifications shall be approved
when initialed by both parties, and when initialed shall constitute a part of this lease. Said plans
and specifications shall provide for a completed store building, commonly referred to as a "lock
and key job," and shall include, but without limitation the following:



environmental control panel, heat reclaim oil, emergency generator, automatic sliding doors, interior partitions, all plumbing and plumbing fixtures, drains, electrical wiring, lighting fixtures to Tenant's requirements, connection of Tenant's trade fixtures to plumbing and electrical outlets, automatic sprinkler system (including A. D. T. alarm system therefor if such is required by applicable building codes), air conditioning and heating systems and equipment (including insulated duct work, registers and grilles), music and P. A. systems (except microphones and amplifiers to be furnished by Tenant), manager's office, storm shutters, delicatessen department, vinyl asbestos floor tile (color at Tenant's option), and connections to all utilities.   Tenant, at its own expense, shall furnish its own trade fixtures, compactor or baler and generator for compactor, on concrete pads therefor to be erected by Landlord.   All equipment and fixtures provided by Tenant shall remain the property of Tenant and may be removed by Tenant from the demised premises at any time.

**COMPLETION DATE**

4. Landlord covenants and agrees that the construction of the shopping center shall begin not later than ~~June 15, 1978~~   ~~January 15, 1979~~

by the respective dates, the Tenant, c     *One tent shall supplied*     ancel and termination or completed note this lease or may extend the Lan     *by Jameson Construction*     completion of construction; provided, however, that     Landlord's fail- ure to complete said improvements wi     *date was listed as*     of God, strikes, riots, fire, flood, war, delay of carrier     3/1/00.     ent weather, or other similar happenings which are be     further the im- provements shall be completed with a ~~Febru~~     lelay and in all events not later than _____     ninate shall not arise. If pursuant to this paragraph 1     Landlord agrees for a period of three (3) years after su     it or consent to the use as a supermarket of the den     ping center, or any enlargement thereof.

For the purposes hereof, (                                   ned to have begun until the concrete footings for the store building demised to Tenant under this Lease are poured in the ground at the site.

**COMMENCE-MENT DATE**

5. The Tenant shall open its store for business within thirty (30) days following performance of the following:

(a) Tenant's store building and other improvements constructed on the demised premises shall have been delivered to Tenant completed in accordance with the plans and specifications;

(b) Construction of all of the common areas (including parking area hereinafter specifically required) shall have been completed substantially as shown on Exhibit "A";

(c) Construction of at least ___272___ lineal feet of store frontage and __22,800__ sq. ft. of total building area (excluding Tenant's store building) shall have been completed as shown on Exhibit "A" xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xx readied for opening for business simultaneously with Tenant; and

(d) The stores to be operated by each of the following tenants shall have been completed and opened for business or been readied for opening for business simultaneously with Tenant:

Eckerd Drug Store

(e) Landlord shall have obtained clear title to the shopping center property as described upon Exhibit "B" hereto, and said property shall be free of all restrictions preventing Tenant's conduct of a grocery store or supermarket business in its demised premises hereunder or in any manner preventing or hindering the conduct of any of the permitted uses of Tenant's premises herein set forth in this lease.



(f) Landlord· shall have completed and opened to vehicular traffic the two access drive entrances providing ingress and egress from and to the shopping center from S..R. 767 as shown on Exhibit "A".

(g) Landlord shall have executed in recordable form an. Easement Agreement in acceptable form to Tenant establishing an easement for vehicular ingress and egress between the shopping center property described in Exhibit "D" hereto and State Road 767 providing for a 30 foot minimum width easement from the Easterly right of way of SR 767 along the entire Southerly perimeter boundary of the shopping center property connecting with the most Southeasterly point of the said shopping center property in substantially the configuration shown on Exhibit "A" hereto.  Said Easement Agreement shall have been recorded upon the public records of Lee County, Florida and shall contain a minimum effective term so as not to be cancellable or altered in any way so long as Tenant shall lease space in the shopping center.

(h) Landlord shall have executed and recorded upon the public records of Lee County, Florida a Declaration of Restrictions covering Out Parcels "A" and "B" as shown on Exhibit "A" hereto providing to Tenant the minimum protection required in Article 7 hereof.

(i) Landlord shall have paved, and opened to vehicular traffic, the portion of the service road in the location shown upon Exhibit "A" hereto outlined in red thereon, in addition to the paving of the other areas required to be paved as part of the initial construction required under Article 3 above.

In the event that all the above requirements shall not have been met on or prior to _____February 15, 1979_____ _____ _____, the Tenant at its sole option may cancel and terminate this lease.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of thirty (30) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

**RETAIL AND SERVICE STORES ONLY**

5A.  It is agreed that without the prior written consent of Tenant herein only retail and/or service stores shall be allowed to operate in the shopping center including any enlargement thereof, it being the intent of the parties hereto that no spa, bowling alley, skating rink, bingo parlor, theatre (either motion picture or legitimate), office building, or health, recreational or entertainment-type activities, or non-retail or non-service type activities, shall be permitted except for those presently existing in the shopping center.

**OTHER TENANTS**

6. As a condition and inducement to Tenant's entering into this lease, Landlord represents and warrants that it has entered into firm commitments for leases with the tenants listed below for the terms and for the amount of floor space indicated; . . . .

| Name | Term Years | Floor Area (sq. ft) |
|------|------------|---------------------|
| Local retail and service shops | Variable | 12,000 |
| Eckerd Drug Store | 20 | 10,800 |



Landlord further warrants and represents that such tenants shall occupy the space in the shopping center in the locations indicated on Exhibit "A" and in the minimum amounts set opposite their respective names above; and Landlord agrees, on demand, to furnish evidence satisfactory to Tenant, prior to and as a further condition to the establishment of the commencement date of this lease, that Landlord has entered into non-cancellable leases, except for default, with such tenants.

**PARKING AND COMMON AREAS**

7. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, including parking area, as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a) a minimum ratio of at least 5.3 automobile parking spaces per 1,000 square feet of gross building area (including additional floor levels) in the shopping center initially, and in all phases of the shopping center included in the completed shopping center; and

(b) facilities for convenient parking of at least 250 automobiles in Phase I and the minimum number of automobile parking spaces required by the above parking ratio in the completed shopping center;

and in event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord at its expense during customary food store shopping hours, and Landlord further agrees that no signboards or other construction shall be erected in any of the common areas (including the parking area) shown on Exhibit "A" or so as to obstruct the view of the demised premises from the adjoining public streets.

Landlord further agrees that without the prior written consent of Tenant herein, no traveling carnivals, fairs or shows or sales by transient merchants utilizing vehicles or booths shall be allowed in the shopping center, or any enlargement thereof.

Landlord specifically agrees as to the out parcels labeled "A" and "B" on Exhibit "A" that no buildings shall be constructed thereon in excess of 25% of the ground area square footage of each respective parcels, and no structure on either of said out parcels "A" and "B" shall exceed one story nor 18 feet in vertical height measured from ground level. No use of the structures on either of said out parcels shall be made that will in any manner violate the terms of Articles 28 and 5A hereof. Landlord agrees that construction of buildings in the area marked "Proposed Retail Expansion" shown at the Southeasterly corner of Phase I on Exhibit "A" shall be expressly limited to only the area within the maximum building outlines shown on Exhibit "A". Landlord specifically agrees that all of the foregoing areas shall be maintained as grassed area or paved parking and shall be kept free from weeds and debris.

SERVICE
AREA

8.  Landlord further agrees to provide for the exclusive use
of the Tenant at its grocery service entrances parking spaces
for two large trailer trucks for continuous use and further
agrees that Tenant shall have 24-hour a day facilities for
ingress and egress to the rear of the demised premises and
the exclusive right to such spaces as may be reasonably needed
by Tenant for loading and unloading merchandise for its store
into and from trucks and trailers at such service entrances.

UTILITIES

9. The Tenant agrees to pay all charges for telephone, electricity, water, gas and other utilities
used by Tenant on the demised premises, and Landlord agrees at all times to provide Tenant
with access to such utilities.

TENANT'S
REPAIRS

10. Upon completion of construction by Landlord and acceptance of the demised premises by
Tenant, Tenant agrees to keep the interior of the demised premises in good condition and re-
pair, excepting structural repairs and all repairs which are the responsibility of the Landlord
or which are made necessary by reason of fire and other unavoidable casualties covered by Land-
lord's fire and extended coverage insurance, and excepting reasonable wear and tear.

Within the repair responsibilities of Tenant shall be included
the compactor (or baler or incinerator).

LANDLORD'S
REPAIRS

11.  The Landlord shall, at its cost and expense, keep and
maintain the common areas (including parking area, sidewalks,
ramps and service areas) in good condition and repair, and
shall maintain the exterior of Tenant's store building, in-
cluding the windows and plate glass, roof, gutters, downspouts,
exterior painting, masonry walls, foundation and structural
members, and the plumbing (including septic tank, if any),
wiring, air conditioning and heating systems and floor sur-
facing of the store building in good condition and repair,
and shall make any and all structural repairs to both the
exterior and interior of said premises.  If any portion of
the common areas (including parking area, sidewalks, ramps
and service areas) or any portion of the store building, which
is the responsibility of the Landlord, shall at any time be
in need of repair, Landlord will repair same immediately upon
receipt of written notice from Tenant to do so, except that
the Landlord shall not be obligated to make or pay for any
repairs to Tenant's store building rendered necessary by the
fault, act or negligence of the Tenant, or any of its servants,
agents or employees, except in the case of damage by fire or
the elements, or other casualty covered by Landlord's fire and
extended coverage insurance.

Within the repair responsibilities of Landlord shall be included
the control and extermination of termites and the automatic
sprinkler system (including A. D. T. alarm system therefor if
required by applicable building codes).

If in order to protect the Tenant's property in the store
building it shall be necessary to make emergency repairs to
any portion thereof which is the responsibility of the Land-
lord to repair, or if the Landlord after receipt of notice
as above provided fails or neglects to make with all due dili-
gence such other repairs to the store building or common areas
(including parking area, sidewalks, ramps and service areas)
which are the responsibility of the Landlord, the Tenant shall
have the right to make such repairs and to deduct from the
rental installments then due or thereafter to become due such
sums as may be necessary to reimburse the Tenant for the money
expended or expense incurred by it in making such repairs.

Landlord further covenants that the store building will be so constructed and maintained at all times so as structurally to comply with and conform to the requirements prescribed by any and all ordinances, statutes, rules or regulations of municipal or other governmental authority relating to public health and sanitation or safety, and that Landlord will promptly make any changes or alterations in the premises which may become necessary in order that said premises may conform to such ordinances, statutes, rules or regulations now in force or which may be hereafter passed, adopted or promulgated.

**SIGNS**

12.  Tenant may place, erect and maintain any signs on the roof, walls, and any other place on or about the demised premises, which signs shall remain the property of Tenant and may be removed at any time during the term of this lease, or any extension thereof, provided Tenant shall repair or reimburse Landlord for the cost of any damage to the demised premises resulting from the installation or removal of such signs.

Landlord agrees to construct a shopping center pylon sign in the shopping center in the location adjacent to S. R. 767 as shown on Exhibit "A" and Tenant shall be permitted to affix thereon an electrically illuminated sign panel advertising its business, to be installed by Tenant and connected to power outlets to be installed by Landlord. Also Landlord at its expense will lay and install suitable underground conduit and wiring extending to the pylon site from Tenant's building. Tenant shall maintain its sign panels only and Landlord shall maintain the pylon and pylon base in good state of repair.

**FIXTURES AND INTERIOR ALTERATIONS**

13.  The Tenant, at its own expense, may from time to time during the term of this lease make any interior alterations, additions and improvements in and to the demised premises which it may deem necessary or desirable and which do not adversely affect the structural integrity thereof, but it shall make them in a good workmanlike manner and in accordance with all valid requirements of municipal or other governmental authorities. All permanent structural improvements shall belong to the Landlord and become a part of the premises upon termination or expiration of this lease.

Tenant may construct and build or install in said premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from said premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to said premises resulting from the installation or removal of such items.

**INDEMNIFICATION**

14.  Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises. Likewise, Landlord shall indemnify and save harmless the Tenant from any claim or loss by reason of an accident or damage to any person or property happening on or about all common areas (including without limitation, parking area, sidewalks, ramps and service areas) of the shopping center, and Landlord further agrees to carry, at its expense, public liability insurance coverage on all common areas (including without limitation, parking area, sidewalks, ramps and service areas) of the shopping center, with a contractual liability endorsement on the policy, in a company qualified to transact business in Florida stipulating limits of liability of not less than $200,000.00 for an accident affecting any one person; and not less than $500,000.00 for an accident affecting more than one person; and $50,000.00 property damage. Certificate of such coverage from t insuror providing 30 days' notice to Tenant prior to cancellatic or termination shall be furnished to Tenant.



**CLEANLINESS** 15. Tenant shall at all times keep the interior of the store building in a reasonably, neat and orderly condition and shall keep the entryways and delivery areas adjoining the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for making repairs and for examining or showing the same to prospective purchasers.

**FIRE** 16. In the event that Tenant's building shall be totally destroyed or damaged to the extent of 75% or more of the value thereof by fire or other casualty, then Tenant may elect within thirty (30) days after such damage, to terminate this lease by giving to the Landlord a written notice of termination, and thereupon both parties shall stand released of and from all further liability under this lease. If Tenant's building shall thereby suffer damage to any extent less than 75% of the value thereof, or if Tenant does not elect to terminate as aforesaid, then the Landlord agrees to proceed promptly and without expense to the Tenant to repair the damage or restore the improvements, remitting a fair and just portion of the rent, according to the unusable space, until said premises are completely reinstated or restored. If at any time during the term

Landlord agrees to carry fire and extended coverage insurance on Tenant's building and any additions, alterations and improvements made thereto by Landlord or Tenant and on all other buildings within the shopping center in the amount of full insurable value thereof, above foundation walls, and hereby expressly waives any and all claims against the Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the Tenant, its agents, servants or employees.

**QUIET ENJOYMENT** 17. The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a general mercantile business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a general mercantile business or using the common areas (including parking area) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

**TAXES AND LIENS** 18. All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord when due. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at six per cent (6%) per annum.

(And see Article 34 hereof)



19. If any part of the demised premises or more than twenty per cent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease as aforesaid, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of _____ten_____ per cent (10 %) or

reduce the number of cars which may be conveniently parked to less than 232 in Phase I or the actual number of automobiles required by application of the ratios in Article 7 above less 10% thereof as from time to time required hereunder, the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking.

20. In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.

21. The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

22. It is understood and agreed that nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing said improvements, and that the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated. The Tenant shall not in any manner be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing said improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor or from any negligence caused by Landlord, Landlord's contractors, subcontractors or by any of their employees, agents or servants during the progress of the work in constructing said improvements or from any faulty construction thereof.

...tices required to be given to Landlord hereunder shall be sent by registered or certi-

...to, and all rent payments shall be made to Landlord at _____

...ox 11097, Orlando, Florida 32803

...n other address as Landlord may direct from time to time by written notice forwarded ...
...t by registered or certified mail.

notices required to be given to Tenant shall be sent by registered or certified mail to

at _____ P. O. Box 15200, Orlando, Florida 32808 _____

...uch other address as Tenant may direct from time to time by written notice forwarded to
...rd by registered or certified mail.

The Tenant will yield up the demised premises and all additions thereto (except signs,
...ment and trade fixtures installed by Tenant at its expense) at the termination of the
...cy in as good and tenantable condition as the same are at the beginning of Tenant's oc-
...ncy, reasonable wear and tear, damage by fire and other casualties and condemnation ap-
...riation by eminent domain excepted, and also excepting any damage, disrepair and other
...lition that the Landlord is obligated hereunder to repair or correct.


(Article 25 intentionally deleted.)


5. The Tenant may without the consent of the Landlord assign this lease, or sublease or vacate
...he demised premises in whole or in part, provided the Tenant herein shall continue to remain
...able and responsible for the payment of rentals and due performance of all other terms, cov-
...nants and conditions of this lease.


27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of
_____five_____ ( 5 ) successive extensions of this lease, each extension to be for

a period of _____five_____ ( 5 ) years and on the same terms and conditions

and _at the same rentals as required herein for the initial_

_lease term._


Such option privilege may be exercised by the Tenant giving to the Landlord a notice in
writing at least ____six (6) months____ before the expiration of the initial term,
and if extended, at least ____six (6) months____ before the expiration of such
extended term, stating the intention of the Tenant to exercise such option and the period for
which such option is exercised and thereupon this lease shall be so extended without the execu-
tion of any other or further document.

**XCLUSIVE**
**JPERMARKET**

28. Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, dairy items, vegetables, fruits, bakery goods or frozen foods without written permission of the Tenant,

except the sale of such items in not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental only to the conduct of another business, and except the sale by a restaurant operation of prepared, ready-to-eat food items, either for consumption on or off the premises, shall not be deemed a violation hereof; provided however, as to the store-room to be occupied by the Eckerd Drug Store only, the permitted sale of such food items shall be expanded to 1,500 square feet of sales area.

It is expressly agreed that only Tenant herein may operate a bakery and/or delicatessen or equivalent concession or depart-ment in the shopping center.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any provisions herein to the contrary, the Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of terms of this exclusive provision as to property located within 1,000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its successors and assigns, by way of suit for damages of injunctive relief, or as otherwise provided by law, in the event of any such violation.  If the holder of such first mortgage should succeed to owner-ship of the demsied premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of said first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage.

NATE  29. The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

IT  30. This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

31. The Landlord agrees that at any time on request of the Tenant It will execute a short form of this lease in form permitting its recording.

RINAL  32. The marginal titles appearing in this lease are for reference only and shall not be con-
S  sidered a part of this lease or in any way to modify, amend or affect the provisions thereof,

PLETE  33. This written lease contains the complete agreement of the parties with reference to the
EMENT  leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

34. During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of any increase in ad valorem real estate taxes levied against the demised premises in excess of the amount of such taxes levied thereon for the first (1st)  full calendar year of the lease term in which both the value of the land and the buildings thereon shall be assessed for tax purposes; provided, however, any additional rental payable hereunder by the Tenant may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due hereunder, it being intended that such credit shall be made annually in respect of the tax payments for the previous tax year at the time percentage rentals are payable, but if there shall not be any percentage rentals due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning of the period in which Tenant is responsible for such tax payments, or at the end of the lease term or any extensions thereof, shall be prorated on the basis of the annual credit.  Tenant shall be responsible only for its pro rata share of such taxes for fractional years occurring at the beginning and expiration of the term of this lease, and any extensions thereof.

If such taxes shall not be assessed separately, but shall be included within an assessment of the demised premises and others, said assessments shall be fairly apportioned to determine Tenant's share thereof. Such apportionment shall be made in a ratio which the square footage of Tenant's store building bears to the total square footage of all store buildings (including additional floor levels) from time to time existing in the shopping center.  The amount of taxes attributable to the shopping center, and for which Tenant is to reimburse Landlord in part, shall be less any abatements, discounts or refunds thereon.  Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements as evidence of the basis upon which any increase in taxes is chargeable to Tenant and an "as built" survey of the shopping center, and such additional rental shall be payable by Tenant on demand after payment by Landlord.  All taxes, other than ad valorem real estate taxes including special assessments, improvement liens and the like, shall remain the sole responsibility of the Landlord.  However, Tenant shall remain responsible for sales taxes on rentals levied by law on lessees.

Tenant shall have the right from time to time to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned; and to institute such proceedings in the name of the Landlord as the Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to the Landlord.


It is understood that the shopping center is to be constructed in two phases and that Tenant's demised store building will be located in the initial phase.  The parties hereto agree to amend this article so as to provide a new base year for computing Tenant's contribution to ad valorem tax increases as above set forth at such time as construction of the second phase of the center has been completed, with the result that following completion of the second phase, Tenant's pro-rata share of the increases in ad valorem real estate taxes levied against the entire shopping center shall be based upon the amount of taxes in excess of the taxes levied thereon for the first full calendar year of the lease term in which the value of the land and of the buildings in combined phases 1 and 2 of the shopping center shall be assessed for tax purposes.  Until such time, Tenant shall continue to make contribution toward increases in ad valorem taxes as above set forth.  It is further understood that this paragraph shall not be applicable in the event Tenant's demised store building is assessed separately from the shopping center.

time during the term of this lease, or any extension thereof,
of enlarging its store building by incorporating therein the
area to the northerly side thereof, such addition not to exceed Sixty
(60) feet in width by One Hundred Sixty (160) feet in depth. This
option may be exercised only at such times as the adjoining storerooms
may be vacant, or at five (5) year intervals, it being contemplated that
Landlord shall not lease such area to other tenants for in excess of
five (5) years, and that Tenant shall have the expansion privilege herein
described no later than five (5) years from the commencement date hereof
and at five (5) year intervals thereafter. Landlord shall give notice
to Tenant of any such expiration date and, during the period between
six (6) months and three (3) months prior to such expiration date, afford
to Tenant the opportunity to exercise this option, and upon Tenant giving
to Landlord a notice in writing of its exercise thereof, Landlord agrees
to construct such addition, or prepare such enlargement area for occupancy
by Tenant, at its sole cost and expense, in accordance with plans and
specifications to be approved by the parties hereto, with the construction
to be completed with all due diligence following the vacation of the
necessary area by any other tenant, and the enlarged portion of the build-
ing to be of a like quality of construction as the original building for
Tenant. In order to facilitate the expansion of Tenant's demised store
building as herein contemplated, Landlord agrees that any adjacent build-
ing or buildings within the expansion area shall be of like structural
quality and in architectural harmony with Tenant's store building, shall
front on a line which is the interior sidewalk line of Tenant's demised
store building extended and shall have a finish floor level, roof and ceil-
ing heights which shall be at the same elevations as the finish floor
level, roof and ceiling heights of Tenant's demised store building.
Further, Landlord agrees that the wall of Tenant's demised store building
adjoining the expansion area shall be constructed with steel column sup-
ports therein equivalently spaced to the nearest row of steel column
supports within the open area of Tenant's demised store building and such
wall supports shall be of sufficient load bearing capacity to carry the
roof support system across the full span of the original and of the expan
building width.

Upon completion of such building addition, if there shall not at such dat
remain at least ten (10) years of the then term of this lease, such term
shall be extended for such period of time as shall be necessary to pro-
vide a full ten (10) years from such date. Thereafter, during such exten
term, the annual minimum guaranteed rental (and the base for computation
of percentage rental hereunder) shall be increased by the greater of:
an amount equal to fourteen percent (14%) of the cost of such addition,
or an amount equal to $2.65 per square foot of the enlargement area, or
an amount equal to a computed percentage times the cost of such addition,
such percentage consisting of four percent (4%) plus the current prime
interest rate charged by New York City banks at the time of the exercise
of the option. At Tenant's request, construction cost shall be establish
by bids obtained by Landlord from at least three (3) reputable contracto
acceptable to Tenant, with the final cost of the addition upon completio
to be certified to by the general contractor performing the work. Durin;
such extended term the provisions of this lease shall remain in effect ar
the option periods herein provided (if any shall then remain) shall be
construed to follow upon the end of the extended term and the rentals to
remain as adjusted in consequence of the addition. Upon completion of t
addition, it shall be and become a portion of the demised premises and t
lease thereby be taken and construed as so amended.

Nothing herein contained shall constitute any express or implied obligat
on the part of the holder of a first mortgage encumbering the fee simple
title to the demised premises, or of any purchaser or a sale under fore-
closure of such mortgage, to comply with the terms and provisions of thi
Article, it being the understanding of the parties that the obligation t
cause such expansion is the sole obligation of the Landlord, its heirs,
legal representatives, successors and assigns.

COMMON AREA    36.. Landlord agrees to operate and maintain all the common
MAINTENANCE         areas, as herein defined, and provide therefor all such
                    services as are reasonably required, including, but with-
out limitation, cleaning and sweeping (Landlord agrees that the
common and parking areas of the shopping center shall be swept a
minimum of at least two (2) times each week), lighting, policing, if
necessary, general repair and maintenance of all paved surfaces,
repainting of parking area striping and watering and maintenance of
landscaped areas.  For such services, Tenant shall pay to Landlord,
as additional rental hereunder and as reimbursement for the annual
cost thereof, the sum of $ 2,560.00 per year, payable in twelve (12)
equal monthly installments of $ 213.33  per month in advance on the
first day of each and every calendar month of the lease term, and
any extensions thereof. _Any additional rental payable hereunder
by the Tenant may be credited on a non-cumulative basis against any
and all percentage rental, if any, which may become due hereunder,
it being intended that such credit shall be made annually in respect
of the common area payments for the previous lease year at the time
percentage rentals are payable, but if there shall not be any per-
centage rentals due or the amount thereof shall be insufficient to
allow the full credit, Tenant shall receive no credit, or only a
partial credit, as the case may be; and the credit for fractional
years and fractional months occurring at the beginning and end of
the lease term or any extensions thereof shall be prorated on the
basis of the annual credit.  If the Landlord after receipt of
written notice from Tenant to do so shall fail to make the repairs
or perform the services described in this Article, the Tenant shall
have the right to make such repairs or cause such services to be
performed in its behalf and to deduct from the rental installments
then due or thereafter to become due such sums as may be necessary
to reimburse the Tenant for the money expended or expense incurred
therein.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this agreement the day and year first above written.

Signed, sealed and delivered in the presence of:

JAMERSON CONSTRUCTION CORPORATION, a Florida corporation

By _____ (SEAL)
Its President/Treasurer

By _____ (SEAL)
Its Vice-President/Secretary

As to Landlord

LANDLORD

WINN-DIXIE STORES, INC.

By _____
Its                President

By _____
Its                Secretary

As to Tenant

TENANT

(CORPORATE SEAL)

STATE OF FLORIDA    )

COUNTY OF  Orange  )

       The foregoing instrument was acknowledged before me this

May   23, 19 78 by  Coy W. Jamerson   and

Homer B. Jamerson ,  _____ President and _____

Secretary, respectively, of  Jamerson Construction Corporation,

_____ , a  Florida  _____

corporation, on behalf of the corporation.

Viola Sue Levac

Notary Public, State and County aforesaid

(NOTARIAL SEAL)

My commission expires:

Notary Public, State of Florida at Large.

---

STATE OF  FLORIDA  )

COUNTY OF Duval  )

       The foregoing instrument was acknowledged before me this

May   30, 19 78 by  BL Humes   and

JR Burns ,  _____ President and _____

Secretary, respectively, of  WINN-DIXIE STORES, INC.

_____ , a  Florida  _____

corporation, on behalf of the corporation.

Notary Public, State and County aforesaid

(NOTARIAL SEAL)

My commission expires:

NOTARY PUBLIC, STATE OF FLORIDA AT LARGE

MY COMMISSION EXPIRES APRIL 12, 1980

To: Tom Birch
    813/939 - 7995



Exhibit "A"

March 2, 1978

PINE ISLAND SHOPPING CENTER
PHASE 1, ENCUMBERED PROPERTY

From the Northeast corner of Section 33, Twp. 44S, Rge. 22E, Lee County,
Florida, run S 88° 59' 03" W, 1225.00 ft., along the North line of said
Section 33; thence S 01° 00' 57" E, 203 ft., to the point of beginning. Con-
tinue thence S 01° 00' 57" E, 542.00 ft. to the P. C. of a curve concave to
the Southwest, with a radius of 30.00 ft. and a central angle of 90° 00'; run
thence Northwesterly, 47.12 ft. along the arc of said curve to the P. T.;
thence S 88° 59' 03" W, 571.29 ft., to the P. C. of a curve to the left with a
radius of 30.00 ft. and a central angle of 104° 55' 05"; run thence Southwesterly,
54.93 ft., along the arc of said curve to the Easterly right-of-way line (33 ft.
from the center line) of Pine Island Boulevard (S. R. No. 767); thence
N 15° 56' 02" W, 478.86 ft., along said right-of-way; thence N 88° 59' 03" E,
314.56 ft.; thence N 01° 00' 57" W, 87.00 ft.; thence N 88° 59' 03" E,
439.00 ft. to the Point of Beginning.

Contains 7.689 acres.

X-3336-A

Landlord _____

Tenant _____

TINKLEPAUGH SURVEYING SERVICES,

EXHIBIT "B"

## LEGAL DESCRIPTION OF SHOPPING CENTER

Those certain pieces, parcels or tracts of land lying and being in Lee County, Florida, more particularly described as follows:

From the Northeast corner of Section 33, Twp. 44S, Rge. 22E, Lee County, Florida, run S 88° 59' 03" W, 1225.00 feet, along the North line of said Section 33; thence S 01° 00' 57" E, 260 ft. to the point of beginning. Continue thence S 01° 00' 57" E, 485 feet to the P.C. of a curve concave to the Southwest, with a radius of 30.00 ft. and a central angle of 90° 00'; run thence Northwesterly, 47.12 ft. along the arc of said curve to the P.T.; thence S 88° 59' 03" W, 463.33 ft.; thence N 01° 00' 57" W 120.00 ft; thence S 88° 59' 03" W, 178.97 ft., to the Easterly right-of-way line (33 ft from the center line) of Pine Island Boulevard (S. R. No. 767); thence N 15° 56' 02" W 283.56 ft., along said right-of-way; thence N 88° 59' 03" E; 306.30 ft., thence N 01° 00' 57" W, 96.00 ft.; thence N 88° 59' 03" E, 209 ft., thence S 01 00' 57" E, 35.00 ft., thence N 88 59' 03" E, 230.00 ft. to P.O.B. Contains 6,605 acres

### Phase II

From the Northeast corner of Section 33, Twp. 44 S, Rge 22 E, Lee County, Florida, run S 88° 59' 03" W, 1225 Ft., along the North line of said Section to the point of beginning. Run thence S 1° 00' 57" E, 260 Ft.; thence S 88° 59' 03" W, 230 Ft.; thence N 1° 00' 57" W, 35 F.; thence S 88° 59' 03" W, 209 Ft.; thence S 1° 00' 57" E, 96 Ft; thence S 88 59' 03" W, 306.30 Ft. to the Easterly Right-of-Way line (33 Ft. from the center line) of Pine Island Boulevard (S.R. No. 767); run thence N 15° 56' 02" W, 142.81 Ft., along said Right-of-Way; thence N 88° 59' 03" E, 135.37 Ft.; thence N 1° 00' 57" W, 130.00 Ft.; thence S 88° 59' 03" W, 170. Ft. to the aforesaid Right-of-Way; thence N 15° 56' 02" W, 54.85 Ft. to the North line of the aforesaid Section 33; thence N 88° 59' 03" E, 830.82 Ft. to the point of beginning.

Contains 4.569 Acres