Hearing Date: March 23, 2006, 1:00 p.m.
Objection Deadline: March 16, 2006, 4:00 p.m.

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

## MOTION FOR ORDER APPROVING (I) ASSUMPTION OF MODIFIED EQUIPMENT LEASE WITH CISCO SYSTEMS CAPITAL CORPORATION, (II) FINANCING OF ASSOCIATED SERVICE AGREEMENTS, AND (III) MUTUAL RELEASE OF CLAIMS

Winn-Dixie Stores, Inc. ("Winn-Dixie") and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), move the Court for entry of an order under 11 U.S.C. §§ 105, 363, 364 and 365 and Fed. R. Bankr. P. 4001, 6006 and 9019 approving (i) Winn-Dixie's assumption of a modified router lease and maintenance agreement with Cisco Systems Capital Corporation ("CSCC"), (ii) Winn-Dixie's obtaining of unsecured financing for new router maintenance agreements, and (iii) the mutual release by Winn-Dixie and CSCC of pre-existing claims (the "Motion").  In support of the Motion, the Debtors state as follows:

### Background

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11

---

[1]      In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

U.S.C. §§ 101-1330 as amended (the "Bankruptcy Code").  The Debtors' cases are being jointly administered for procedural purposes only.

2.    The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    On March 1, 2005, pursuant to section 1102 of the Bankruptcy Code, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases.  An official committee of equity security holders appointed by the U.S. Trustee on August 17, 2005 was subsequently disbanded by the U.S. Trustee by notice dated January 11, 2006.

4.    This Court has jurisdiction over the Motion under 28 U.S.C. § 1334. Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.    The statutory predicates for the relief requested by this Motion are sections 105, 363, 364 and 365 of the Bankruptcy Code, supported by Rules 4001, 6006 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Relevant Facts

6.    Winn-Dixie and CSCC are parties to a Master Agreement to Lease Equipment No. 4574 dated as of March 18, 2004 (the "Master Agreement"), pursuant to which Winn-Dixie leased from CSCC the router equipment described in Schedule 001-000 to the Master Agreement dated as of April 6, 2004 ("Schedule 001"), as amended by Amendment No. 1 to

Schedule 001-000 dated as of July 20, 2004 (Schedule 001 as amended, together with the Master Agreement, the "Prepetition Lease").

7.      The Prepetition Lease provides for the leasing of 900 routers for a term of 48 months, as well as for the maintenance of such routers for a term of 44 months.  As of the Petition Date, Winn-Dixie had satisfied its lease payment obligations through November 2005, but was indebted to CSCC for maintenance services in the amount of approximately $160,993.

8.      The terms of the Prepetition Lease are no longer consistent with the needs of the Debtors' store operations.  As a result of the footprint reduction program implemented by the Debtors since the Petition Date, the Prepetition Lease carries an obligation for Winn-Dixie to lease and obtain maintenance services for 318 more routers than it now uses, and this number is likely to increase as a result of with the Debtors' recent decision to sell or close an additional 35 stores.  Moreover, for some time prior to the Petition Date, Winn-Dixie has sought to modify the maintenance portion of the Prepetition Lease to substitute on-site services obtainable from BellSouth for those being provided by CSCC.  As a result of these issues, Winn-Dixie has not made any postpetition maintenance payments to CSCC since the Petition Date, resulting in an outstanding obligation of approximately $386,386, and has not made any lease payments coming due after November 2005, resulting in an outstanding obligation of approximately $194,852.

9.      Subject to modification of the Prepetition Lease to address the issues identified in paragraph 8, Winn-Dixie desires to continue its relationship with CSCC.  Winn-Dixie has therefore engaged in negotiations with CSCC, and has now reached agreement with CSCC, to make the necessary modifications.  The agreement is reflected in the Stipulation Between Winn-Dixie Stores, Inc. and Cisco Systems Capital Corporation for (1) Assumption of Modified

Equipment Lease and (2) Approval of Postpetition Unsecured Financing attached as Exhibit A (the "Stipulation").

10.     As more particularly described in the Stipulation and its attachments, Winn-Dixie and CSCC are entering into a new Schedule No. 002-000 to the Prepetition Lease ("Schedule 002"), which will reduce the number of routers under lease by 318, permit the return of an additional 40 routers, and modify the maintenance provisions for the reduced number of leased routers.  Schedule 002 will be effective with respect to lease obligations beginning in December 2005.  Maintenance payments will be decreased retroactive to March 2005 based upon the reduced number of routers covered by Schedule 002, with the result that the postpetition maintenance obligations will be reduced to $179,299 instead of the original amount of $386,386. The Prepetition Lease as modified by Schedule 002 is proposed to be assumed by order of the Court.

11.     In addition, Winn-Dixie and CSCC are entering into a Software/Services Payment Reimbursement Agreement (No. 5094-SA002-0) substantially in the form attached to the Stipulation ("Loan Agreement 2"), under which CSCC will finance $558,314.28 on an unsecured basis, at an interest rate of 4.25%, to cover postpetition (retroactive at the reduced rate) and future maintenance services for the leased routers in Winn-Dixie's remaining stores, to include new agreements for the services sought to be obtained from BellSouth.  As part of the Stipulation, in the event the financing is not considered to be ordinary course, CSCC is requiring approval of the unsecured financing by the Court.

12.     The parties have also reached agreement with respect to a new maintenance agreement for routers located at Winn-Dixie's headquarters, which have been without a formal maintenance agreement since November 2004.  In connection with the new

4

agreement, the parties are entering into a Software/Services Payment Reimbursement Agreement (No. 5094-SA003-0) substantially in the form attached to the Stipulation ("Loan Agreement 3"), under which CSCC will finance $204,470.14 on an unsecured basis, at an interest rate of 4.25%, to cover maintenance services for the headquarter routers.   CSCC is also requiring approval of this unsecured financing by the Court.

13.     Finally, the Stipulation provides for the mutual release of all claims by Winn-Dixie against CSCC and by CSCC against Winn-Dixie through the date of the Stipulation, with the exception of obligations existing under Schedule 002, Loan Agreement 2 or Loan Agreement 3, and with the exception of property taxes that may be owed by Winn-Dixie under the Prepetition Lease.  The release will operate as a waiver of all prepetition claims held by CSCC against Winn-Dixie, including the $160,993 owed for prepetition maintenance.

## Relief Requested

14.     Pursuant to sections 105, 363, 364 and 365 of the Bankruptcy Code and rules 4001, 6006 and 9019 of the Bankruptcy Rules, and as required by the Stipulation, the Debtors seek entry of an order approving (a) Winn-Dixie's assumption of the Prepetition Lease as modified by Schedule 002 and the Stipulation, (b) Winn-Dixie's obtaining of unsecured financing pursuant to Loan Agreement 2 and Loan Agreement 3, and (c) the mutual release of claims on the terms set forth in the Stipulation.

## Support for Relief Requested

15.     Winn-Dixie and CSCC have reached an agreement with respect to the Prepetition Lease, as set forth in Schedule 002, that will favorably adjust the lease and maintenance terms for the Debtors' store routers to the current and future needs of the Debtors' business.  The agreement is the best possible result for the Debtors' estates and creditors.

Rejection of the Prepetition Lease is not feasible as it will cause significant business disruption, will create rejection damages, and is not likely to result in a replacement arrangement that will deliver material savings.  On the other hand, assumption of the Prepetition Lease without modification is not economic as it will require lease and maintenance payments for more routers that will be utilized, will result in a large cure obligation, and will not address ongoing maintenance issues.

16.     Through the terms of Schedule 002, along with Loan Agreement 2 and the new maintenance agreements financed by this agreement, Winn-Dixie will be allowed to return 318 unneeded routers, obtain a credit for those routers based on their value in the used market, adjust the monthly lease rate based on such credit, and establish an allowance for 40 additional returns.  The new documents will also address the store router maintenance issues by lowering the cost to reflect router returns, waiving unpaid prepetition maintenance, reducing the obligation for unpaid postpetition maintenance, and introducing BellSouth into the servicing arrangement.  As a result, as compared to the cost of the Prepetition Lease without modification, Winn-Dixie estimates that it will realize monthly cash flow savings of approximately $30,000 and overall savings for the full term of approximately $1,020,000.  As an adjunct to the accommodations reached with respect to the store routers, Loan Agreement 3 and the new maintenance agreement to be financed by this agreement will ensure proper servicing of the Debtors' headquarters routers.

17.     The assumption of the Prepetition Lease as modified by Schedule 002 should be approved pursuant to section 365(a) of the Bankruptcy Code.  Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  A debtor's right to assume and reject executory contracts and unexpired leases is a fundamental component of the bankruptcy process, as it provides a debtor with a

mechanism to maximize the value of beneficial contracts in the case of assumption or to eliminate the financial burdens of unfavorable contracts in the case of rejection.  The decision to assume or reject an executory contract or unexpired lease is primarily administrative and should be given great deference by a court, subject only to review under the "business judgment" rule.  The business judgment rule requires the debtor to establish that assumption or rejection of the agreement will likely benefit the estate.  Here, the facts set forth above fully support the Debtors' business judgment in assuming the Prepetition Lease as modified by Schedule 002.

18.    As to the unsecured financing to be obtained under Loan Agreement 1 and Loan Agreement 2, the Debtors believe such financing to be ordinary course and not subject to court approval, in reliance on section 364(a) of the Bankruptcy Code.  Nevertheless, in an abundance of caution in the event parties in interest disagree, the Stipulation requires that such financing be approved by the Court.  Under section 364(b) of the Bankruptcy Code, "[t]he court, after notice and hearing, may authorize the [debtor] to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense."  Accordingly, the Debtors request that the financing to be obtained under Loan Agreement 1 and Loan Agreement 2 be approved under section 364(b).  By financing their obligations under the maintenance agreements covered by the two loan agreements, the Debtors are able to satisfy prepaid maintenance requirements without impact on their cash flows, on fair market terms.  The administrative expense status to be granted to CSCC as a result of the requested approval is appropriate in view of the fact that the maintenance agreements are postpetition transactions creating postpetition obligations that would otherwise have administrative expense status under section 503(b) of the Bankruptcy Code.

19.    To the extent the provisions of the Stipulation, including the release by

Winn-Dixie of any claims against CSCC, constitute a compromise outside the ordinary course of business, approval of the compromise is appropriate under section 363(b) of the Bankruptcy Code and rule 9019 of the Bankruptcy Rules.  Rule 9019 sets forth the standard for bankruptcy court approval of compromises of controversies, providing that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  To approve a settlement under rule 9019, a bankruptcy court must determine that the settlement is supported by adequate consideration and that it is fair, equitable, and in the best interests of the debtor's estate. Here, the facts set forth above amply support the accommodations reached by Winn-Dixie and CSCC under the Stipulation.  As to the release of claims, any potential claims that Winn-Dixie may have against CSCC would relate to prepetition maintenance services provided under the Prepetition Lease, which were not at all times satisfactory.  The waiver by CSCC of $160,993 in prepetition maintenance obligations, coupled with the other concessions contained Schedule 002, provide a fair and equitable resolution of any such claims.  Without the compromises contained in the Stipulation, the Debtors would be left with the unsatisfactory alternatives of rejecting the Prepetition Lease or assuming the Prepetition Lease without modification, either of which would disserve the interests of the Debtors' estates and creditors.

20.     Based upon the foregoing, the Debtors submit that the relief requested in the Motion is in the best interests of the Debtors' estate and creditors and should be approved.

## Notice

21.     Notice of the Motion has been provided to (a) counsel to the United States Trustee, (b) counsel for the Debtors' postpetition secured lenders, (c) counsel for the Creditors Committee, (d) the other parties in interest named on the Master Service List maintained in these cases, and (e) counsel for CSCC.  No other or further notice need be given.

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court (a) enter an order in the form of Exhibit B, approving (i) Winn-Dixie's assumption of the Prepetition Lease as modified by Schedule 002 and the Stipulation, (ii) Winn-Dixie's obtaining of unsecured financing pursuant to Loan Agreement 2 and Loan Agreement 3, and (iii) the mutual release of claims on the terms set forth in the Stipulation, and (b) such other and further relief as the Court deems just and proper.

Dated:  March 3, 2006

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By    *s/ D. J. Baker*
    D. J. Baker
    Sally McDonald Henry
    Rosalie Walker Gray
Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Counsel for the Debtors

SMITH HULSEY & BUSEY

By    *s/ Cynthia C. Jackson*
    Stephen D. Busey
    James H. Post
    Cynthia C. Jackson (Bar # 498882)
225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for the Debtors

**EXHIBIT A**

**STIPULATION BETWEEN WINN-DIXIE STORES, INC. AND CISCO SYSTEMS CAPITAL CORPORATION FOR (1) ASSUMPTION OF MODIFIED EQUIPMENT LEASE AND (2) APPROVAL OF POSTPETITION UNSECURED FINANCING**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| In re: | ) Case No. 05-03817-3F1 |
| | ) |
| WINN-DIXIE STORES, INC., et al., | ) *Chapter 11* |
| | ) |
| Debtors.[1] | ) Jointly Administered |

### STIPULATION BETWEEN WINN-DIXIE STORES, INC.  AND CISCO SYSTEMS CAPITAL CORPORATION FOR (1) ASSUMPTION OF MODIFIED EQUIPMENT LEASE AND (2) APPROVAL OF POSTPETITION UNSECURED FINANCING

Winn-Dixie Stores, Inc., as debtor and debtor-in-possession ("Debtor"), and Cisco

Systems Capital Corporation ("CSCC") stipulate as follows:

### RECITALS

A.    Debtor and CSCC are parties to a Master Agreement to Lease Equipment

No. 4574 dated as of March 18, 2004 (the "Master Agreement"), pursuant to which Debtor

leased from CSCC certain equipment (the "Leased Equipment") described in Schedule 001-000

to the Master Agreement dated as of April 6, 2004 ("Schedule 001"), as amended by

Amendment No. 1 to Schedule 001-000 dated as of July 20, 2004 (Schedule 001 as amended,

together with the Master Agreement, the "Prepetition Lease").

B.    On February 21, 2005 (the "Petition Date"), Debtor and its affiliates filed

voluntary petitions for relief under chapter 11 of title 11, United States Code, 11 U.S.C. §§ 101

*et seq.* (the "Bankruptcy Code").  The chapter 11 cases are pending before the United States

Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court").

---

[1]    In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

C.     Debtor continues to have possession of the Leased Equipment and wishes to (a) assume the Prepetition Lease as modified by Schedule No. 002-000 ("Schedule 002), and (b) return some, but not all, of the Leased Equipment.  Schedule 002 shall be substantially in the form attached as Exhibit A.

D.     Debtor and CSCC wish to enter into Software/Services Payment Reimbursement Agreement No. 5094-SA002-0 ("Loan Agreement 2"), providing for the financing of Debtor's obligations for maintenance services relating to retail locations, and Software/Services Payment Reimbursement Agreement No. 5094-SA003-0 ("Loan Agreement 3"), providing for the financing of Debtor's obligations for maintenance services relating to headquarter locations.  Loan Agreement 2 shall be substantially in the form attached hereto as Exhibit B and Loan Agreement 3 shall be substantially in the form attached hereto as Exhibit C.

## <u>AGREEMENT</u>

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between Debtor and CSCC as follows:

1.     Debtor will seek to assume the Prepetition Lease, as modified by Schedule 002 and this Stipulation (as modified, the "Lease"), pursuant to section 365(a) of the Bankruptcy Code and Rules 6006 and 9019 of the Federal Rules of Bankruptcy Procedure.  CSCC agrees that the requirements of section 365(b) of the Bankruptcy Code are satisfied or waived by the terms of this Stipulation and consents to the assumption.

2.     (a)  Within thirty (30) days after entry of an order by the Bankruptcy Court authorizing the assumption of the Lease, any Leased Equipment that is not included in the Lease will be returned by

Debtor to CSCC at Debtor's expense and in the condition required under the Master Agreement ("Returned Equipment").

(b)   Within thirty (30) days of CSCC's receipt of the Returned Equipment, CSCC will (i) perform a physical audit to confirm the identification of the Returned Equipment and that the Returned Equipment is in good working condition, and (ii) notify Debtor of the audit results and of any Returned Equipment that fails to meet this level of inspection ("Failed Equipment").

(c)   For any item of Failed Equipment or any item of Leased Equipment that has not been returned to CSCC, Debtor shall, within fifteen (15) days of Debtor's receipt of CSCC's audit results, return to CSCC "Replacement Equipment", defined as equipment (i) which is manufactured by the same manufacturer as the Leased Equipment, (ii) with the identical manufacturer type and model as the Leased Equipment, with all engineering changes incorporated as specified by the manufacturer, (iii) with an equal or greater market value as the Leased Equipment replaced by the Replacement Equipment, and (iv) which has been inspected and certified acceptable for maintenance service by the manufacturer.  Debtor shall transfer title to all Replacement Equipment to CSCC free and clear of all liens and encumbrances.

(d)   Within fifteen (15) days of CSCC's receipt of the Replacement Equipment, CSCC will perform a second physical audit ("Second

3

Audit") to confirm the identification and condition of the

Replacement Equipment and notify Debtor of the audit results.

(e)  Within fifteen (15) days of Debtor's receipt of the results of the

Second Audit, Debtor shall pay to CSCC $2,300.00 for each item of

Replacement Equipment that fails to meet the requirements of the

Second Audit, or for any item of Leased Equipment has not been

returned or is damaged.

3.      Debtor will seek authorization from the Bankruptcy Court to obtain the

financing to be provided under Loan Agreement 2 and Loan Agreement 3.

4.      Other than the obligations expressly set forth in this Stipulation, in

Schedule 002, in Loan Agreement 2 and in Loan Agreement 3, or with respect to property taxes

that may be owed by Debtor for the Leased Equipment under the Prepetition Lease, Debtor and

CSCC release and fully discharge each other, and their respective heirs, successors, assigns,

affiliates, agents, or related entities, from any and all claims, demands, damages, debts,

liabilities, accounts, obligations, warranties, costs, expenses, losses, actions, and causes of action

of any kind, based upon, related to, or by reason of, any contract (express, implied-in-fact, or

implied-in-law), defect (latent or patent), lien, order, judgment, liability, matter, cause, fact, act,

or omission occurring or existing now or at any time prior to the date of this Stipulation

("Claims").  Debtor and CSCC hereby acknowledge to the other that each is familiar with

Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A general release does not extend to claims which the
> creditor does not know or suspect to exist in his or her favor at
> the time of executing the release, which if known by him or
> her must have materially affected his or her settlement with
> the debtor."

Debtor and CSCC waive and relinquish to each other any right or benefit which either has or might have under Section 1542 of the Civil Code of the State of California, and all similar provisions of law of other jurisdictions, to the full extent that each might lawfully waive each and all such rights and benefits pertaining to the subject matter of this instrument.  In connection with such waiver and relinquishment, Debtor and CSCC hereby acknowledge to each other that each is aware that they may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the subject matter of this Stipulation, but that it is their intention hereby to fully, finally and forever settle and, release all Claims, known or unknown, suspected or unsuspected, which do now exist, may exist in the future, or heretofore have existed, by each party against the other, and that, in furtherance of such intention, the releases given herein shall be and remain in effect as a full and complete general release with respect to all Claims, notwithstanding the discovery of existence of any such additional or different facts or any additional or different defects or damages (latent or patent).

     5.    In furtherance of, but without limiting, paragraph 4, CSCC specifically agrees that any claims scheduled in the name of CSCC in the schedules of liabilities (as the same may have been and may be amended from time to time) filed by Debtor or any of its affiliates in their chapter 11 cases and any claims asserted in any proofs of claim filed by or on behalf of CSCC against Debtor or any of its affiliates in their chapter 11 cases are waived and relinquished in full, and the Claims Agent serving in the chapter 11 cases of Debtor and its affiliates is hereby authorized to mark and treat such claims as disallowed and expunged for all purposes.

     6.    This Stipulation may be executed in original or by facsimile signature in counterpart copies, and this Stipulation shall be deemed fully executed when each party hereto has executed and possess a counterpart, even if no single counterpart contains all signatures.

7.  Debtor shall file a motion with the Bankruptcy Court seeking an order authorizing (a) the assumption of the Lease and (b) the postpetition financing contemplated by Loan Agreement 2 and Loan Agreement 3 within ten (10) days of execution of this Stipulation by both parties and shall schedule such motion for hearing on the next omnibus hearing date following the requisite notice period.  If Debtor does not obtain court authorization, this Stipulation, Schedule 002, Loan Agreement 2 and Loan Agreement 3 shall be null and void and of no further force or effect.

8.  The Bankruptcy Court shall retain jurisdiction to hear any matters or disputes arising from, or related to, this Stipulation.

STIPULATED AND AGREED THIS 3RD DAY OF MARCH, 2006.

ON BEHALF OF THE DEBTOR:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By _____
D. J. Baker
Rosalie Walker Gray

Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)

Attorneys for Winn-Dixie Stores, Inc.

ON BEHALF OF CSCC:

FRIEDMAN DUMAS & SPRINGWATER LLP

By _____
Cecily A. Dumas
Brandon C. Chaves

150 Spear Street, Suite 1600
San Francisco, California  94105
(415) 834-3800
(415) 834-1044 (facsimile)

Attorneys for Cisco Systems Capital Corporation

**EXHIBIT A**

**SCHEDULE 002**



**SCHEDULE NO. 002-000**

**Master Agreement to Lease Equipment No. 4574**

**THIS SCHEDULE NO.** 002-000 (this "**Schedule**") dated as of March    , 2006, by and between **CISCO SYSTEMS CAPITAL CORPORATION** ("**Lessor**"), having its principal place of business at 170 West Tasman Drive, Mailstop SJC13/3, San Jose, California 95134, and WINN-DIXIE STORES, INC. ("**Lessee**"), having its principal place of business at 5050 Edgewood Court, Jacksonville, Florida, 32254, supplements that certain Master Agreement to Lease Equipment No. 4574 (the "**Agreement**", and together with this Schedule, the "**Lease**") between Lessor and Lessee, incorporated herein by this reference. Capitalized terms not otherwise defined herein have the meanings specified in the Agreement.

**1.  EQUIPMENT DESCRIPTION.**  Quantity, manufacturer, and model of the Equipment subject to this Schedule are as specified in Annex A hereto.

**2.  EQUIPMENT LOCATION.**  The Equipment shall at all times be installed or located at the location specified in Annex A or in the applicable Certificate of Acceptance, or such other location as is permitted under the Agreement.

**3.  EQUIPMENT COST.**  The "**Equipment Cost**" for any item of Equipment is the sum of (a) the equipment purchase price specified in the invoice now or hereafter issued by the Vendor in relation to the Equipment, plus (b) all insurance, installation, cabling, maintenance, software and related expenses to the extent paid or financed by Lessor in its discretion (collectively, "**Soft Costs**") and as may be reflected in Annex A hereto.

**4.  RENTAL PAYMENT AMOUNT.**  The monthly rental payment in respect of the Equipment ("**Rent**") is set forth below:

| Payments | Payment Amount |
|---|---|
| 1 - 4 | $      0.00 |
| 5 | $243,564.95 |
| 6 – 31 | $ 48,712.99 |

**5.  LEASE TERM.**  The "**Lease Term**" of this Lease shall begin on the **Commencement Date**, and shall consist of an "**Original Term**" equal to thirty one (31) months, and the Original Term shall automatically be extended on a month-to-month basis (each, an "**Extended Term**") unless either party notifies the other not later than sixty (60) days prior to the end of the Original Term or, for any Extended Term, thirty (30) days prior to the end of each Extended Term, of its election not to extend such lease term or extended term. The "**Commencement Date**" of this Lease and the "**Acceptance Date**" of the Equipment shall **December 1, 2005.** Notwithstanding any provision to the contrary contained in any Lease Document, Lessee shall be deemed to have irrevocably accepted, for purposes of the Lease, the Equipment on the Commencement Date. Lessee and Lessor acknowledge and agree that Certificates of Acceptance for Equipment identified in Annex A hereto have been delivered by Lessee to Lessor under previous Schedules as identified in Annex A, and each such Certificate of Acceptance shall be valid under this Schedule and shall constitute Lessee's acceptance of Equipment for purposes of this Schedule as of the Commencement Date.

**6.  RENT PAYMENTS.**  Rent for the Original Term shall be payable in thirty one (31) consecutive monthly payments in advance, on the first day of each such period, commencing with the first day of the calendar month immediately following the Commencement Date (unless the Commencement Date is the first day of the month and rent is payable in advance, in which case the first Rent payment shall be due on such date). Lessor agrees that no Rent shall be payable for any period prior to the Commencement Date or for the period from the Commencement Date (provided such date is not the first day of the month)

until, but not including, the first day of the calendar month immediately following the Commencement Date. Unless otherwise agreed in writing by the Lessor at such time, the Rent for any Extended Term shall be payable monthly, in advance, and shall be an amount equivalent to that of the original Rent, adjusted, as applicable, for Soft Costs.

**7.    END OF TERM PURCHASE OPTION PRICE.**  Lessee may or shall, as the case may be, purchase the Equipment in accordance with the terms of Paragraph 8 for the following amount (as checked and completed by Lessor):

☐    (a)        $  1.00

☒    (b)        Fair Market Value (as defined in Paragraph 8).

**8.    END OF TERM PURCHASE OPTION.**

(a)  If option (b) is selected at Paragraph 7, this Lease shall be deemed an "**FMV Lease**" and Lessee shall have an end of term purchase option as follows. (If no option is selected at Paragraph 7, option (b) shall be deemed to apply.) Provided this Lease has not been terminated earlier and there exists no Event of Default or event which with notice, lapse of time or both, would be an Event of Default, not earlier than 90 days and not later than 30 days before the end of the Original Term and at least 30 days before the end of any Extended Term, Lessee may deliver to Lessor an irrevocable notice electing to purchase all (but not less than all) of the Equipment that has not been returned as set forth in section 10 below for an amount equal to the amount specified in the provision selected (or deemed selected) in Paragraph 7, which amount Lessee shall pay to Lessor on the last day of the Lease Term. If no such notice is delivered by Lessee to Lessor within such period, Lessee shall be deemed to have waived any right to purchase such Equipment.

(b)  If option (a) of Paragraph 7 is selected, Lessee shall pay Lessor the amount specified in such option on the last day of the Original Term.

(c)  Upon full payment to it of the amount specified in clause (a) or (b) of this Paragraph 8, Lessor shall transfer its right, title and interest in and to such Equipment to Lessee without recourse or warranty, except that Lessor shall warrant that such Equipment is free and clear of any lien or encumbrance arising by or through Lessor.

(d)  "**Fair Market Value**" shall mean the value which would be obtained in an arm's-length transaction between an informed and willing buyer-user (other than a lessee currently in possession or a used equipment dealer) under no compulsion to buy, and an informed and willing seller under no compulsion to sell and, in such determination, costs of removal from the location of current use shall not be a deduction from such value. Fair Market Value shall be determined by the mutual agreement of Lessor and Lessee in accordance with the preceding sentence or, if Lessee and Lessor cannot agree within 20 days after Lessee's notice of election to purchase under clause (a) of this Paragraph 8, by a qualified independent equipment appraiser selected by Lessor, at Lessee's cost. The parties agree that in no event will the FMV for Equipment under this Schedule, at the expiration of the Original Term, exceed twenty-five percent (25%) of the Equipment Cost set forth in Paragraph 3(a) above.

**9.    CASUALTY VALUE.**  The Casualty Value of the Equipment shall at any time be the greater of (a) Fair Market Value at such time; or (b) as of the date of shipment from the Vendor, 110% of Equipment Cost, such amount to decrease from month to month thereafter by 1.69% of Equipment Cost.

**10.  EARLY RETURN.**  Lessee may, at any time prior to January 1, 2007 and upon forty five (45) days prior written notice to Lessor, return up to forty (40) Items of Equipment ("Early Return") provided (a) no Event of Default exists as of the effective date of the Early Return, and (b) no later than the effective date of the Early Return, Lessor has received in full payment of the remaining Rent payments for each Item of Equipment being returned ("Early Return Payment") plus any associated taxes, less $400 per Item. Lessee may exercise this Early Return option only once, and the Items shall be returned to Lessor together in one shipment and in accordance with the terms of the Lease and Lessor's instructions. The remaining Rent due under this Schedule shall be reduced by the amount of the Early Return Payment, before tax.

**IN WITNESS WHEREOF**, Lessor and Lessee have caused this Schedule to be duly executed by their authorized representatives as of the date first above written.  Each signatory of the Lessee represents that he or she is authorized to execute and deliver this Schedule on behalf of Lessee.

**Cisco System Capital Corporation, Lessor**          **Winn-Dixie Stores, Inc., Lessee**

**By:** _____          **By:**

**Print Name:**                                      **Print Name:**

**Title:** _____          **Title:** _____

**EXHIBIT B**

**LOAN AGREEMENT 2**

No. 5094-SA002-0

## SOFTWARE/SERVICES PAYMENT REIMBURSEMENT AGREEMENT

THIS SOFTWARE/SERVICES PAYMENT REIMBURSEMENT AGREEMENT ("Agreement") is entered into as of March    , 2006, by CISCO SYSTEMS CAPITAL CORPORATION, a Nevada corporation ("CSCC"), having a principal place of business at 170 West Tasman Drive, San Jose, California,  95134, and WINN-DIXIE STORES, INC. a Florida corporation ("Customer"), having a principal place of business at 5050 Edgewood Court, Jacksonville, Florida 32254.

WHEREAS:   (A) Customer has signed and entered into the software, and / or maintenance or service agreement(s) listed on Annex I hereto (together, the "Service Agreement") with Cisco Systems, Inc., a California corporation ("Cisco"), or other third party providers of software or services, or both.   (B) Customer wishes CSCC to finance Customer's payment obligations under the Service Agreement and, to that end, CSCC has or may hereafter advance to Cisco for the account of Customer, the amount(s) set forth in Annex I.   (C) It is a condition precedent to CSCC's willingness to make any such advance that Customer execute and deliver this Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

1.       Customer hereby unconditionally agrees to pay to CSCC pursuant to the terms and conditions of this promissory note, the principal sum of Five Hundred Fifty Eight Thousand, Three Hundred Forteen Dollars and Twenty-Eight Cents ($558,314.28) or so much as may be advanced by CSCC in relation to the Service Agreement and outstanding, including any amount representing any tax charges (other than those measured by CSCC's net income), together with the interest at the per annum rate of Four and Twenty-Five Hundredths percent (4.25%).

2.       Customer shall pay amounts owing hereunder (including principal and interest) in accordance with the following schedule:

| Payment Due Date | Payment Amount (principal & interest) | Number of Payments | Term | Commence Date |
|---|---|---|---|---|
| April 1, 2006 | $209,182.68 | 1 to 14 | 40  months | March 1, 2005 |
| May 1, 2006 | $14,941.62 | 15 to 40 | | |
| (and the first of every month thereafter) | | | | |

Any such payment not made within 15 days from the date due (whether in the ordinary course or by acceleration) shall bear interest from such due date at the lesser of (a) the rate of 14% per annum or (b) the highest lawful rate.  All computations of interest shall be made on the basis of a year of 360 days for the actual number of days (including the first day, but excluding the last day) occurring in the period for which such interest is payable.

3.       Customer acknowledges that this Agreement conveys no explicit or implicit license for the use of Software or other intellectual property, and that such license rights, to the extent they exist, are contained in separate license documentation entered into between Customer and Cisco Systems, Inc. or other licensors.  **CSCC MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER WITH RESPECT TO THE SOFTWARE OR SERVICES, OR INTELLECTUAL PROPERTY RIGHTS, INCLUDING ANY PATENT, COPYRIGHT AND TRADEMARK RIGHTS, OF ANY THIRD PARTY, INCLUDING CISCO SYSTEMS, INC., AND EXPRESSLY DISAVOWS ANY WARRANTY OF TITLE, VALIDITY OR ENFORCEABILITY OF LICENSE, NON-INFRINGEMENT, AVAILABILITY OR QUALITY OR VENDOR OR OTHER SERVICE SUPPORT, OR FITNESS FOR ANY PARTICULAR PURPOSE.**

4.      All outstanding amounts hereunder shall become immediately due and payable on demand if (a) Customer fails to make any payment hereunder when due; (b) Customer or any of its subsidiaries or other affiliates, defaults under any other current or future instrument or agreement with CSCC or Cisco or any of their affiliates, including without limitation any master agreement to lease equipment; (c) Customer breaches any of the provisions of the Service Agreement, or any Service Agreement shall be terminated; or (d) after the Customer's emergence from chapter 11, there occurs any transaction (other than a transaction that is contemplated by the Customer's confirmed plan of reorganization) as a result of which more than 25% of any class of Customer's outstanding common stock is held or controlled, directly or indirectly, by a person, or affiliated group of persons, whose ownership interest in such class of stock in the Customer did not exceed 5% as of the date of this Agreement.

5.      Customer agrees that in addition to all other remedies available to CSCC under this Agreement or applicable law following any event described in Section 4 above, CSCC may (a) upon notice to Customer requiring the same, require Customer to cease all use of any software provided under any Service Agreement, whereupon Customer shall immediately cease all such use; (b) with or without prior notice to Customer, deliver a notice to the licensor (or any sub-licensor) of any such software, requiring that Customer's license rights to such software immediately be terminated or rescinded, whereupon such license rights, including any under the Service Agreements, shall be terminated; (c) with or without prior notice to Customer, deliver a notice to any provider of maintenance or other services under any Service Agreement requiring that such Service Agreement be immediately terminated or rescinded, whereupon all Customer's rights thereunder shall immediately be terminated, and (d) require Customer to assemble and deliver to CSCC all copies of any such software in electronic or other form, together with all documentation.  Customer agrees that monetary damages are not a sufficient remedy and will not adequately compensate CSCC for Customer's breach of this Agreement and that CSCC shall be entitled to seek specific performance or other injunctive relief.

6.      Payment shall be made in lawful tender of the United States.  All payments hereunder shall be made to CSCC at its office located at 170 West Tasman Drive, San Jose, California 95134-1706 (or to such other place as CSCC shall designate in a written notice to Customer), and, unless Customer has obtained CSCC's written consent to another form of payment, such payment shall be made by wire transfer of immediately available funds by no later than 12:00 noon Pacific time on the due date of the payment, in accordance with CSCC's payment instructions.  Whenever any payment hereunder shall be stated to be due on a day other than a Business Day (as defined below), then such payment shall be made on the next succeeding Business Day.   As used herein, "Business Day" means a day (i) other than Saturday or Sunday, and (ii) on which commercial banks are open for business in San Jose, California.  **CUSTOMER'S OBLIGATION TO PAY ALL AMOUNTS HEREUNDER SHALL BE ABSOLUTE AND UNCONDITIONAL, AND SHALL NOT BE SUBJECT TO ANY ABATEMENT, REDUCTION, SETOFF, DEFENSE, COUNTERCLAIM, INTERRUPTION, DEFERMENT OR RECOUPMENT, FOR ANY REASON WHATSOEVER.**

7.      Customer agrees to pay on demand all the losses, costs, and expenses (including, without limitation, attorneys' fees and disbursements) which CSCC incurs in connection with enforcement or attempted enforcement of this Agreement, or the protection or preservation of CSCC's rights under this Agreement, whether by judicial proceedings or otherwise.  Such costs and expenses include, without limitation, those incurred in connection with any workout or refinancing, or any bankruptcy, insolvency, liquidation or similar proceedings.

8.      Customer hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this Agreement.  No single or partial exercise of any power under this Agreement shall preclude any other or further exercise of such power or exercise of any other power. No delay or omission on the part of CSCC in exercising any right under this Agreement shall operate as a waiver of such right or any other right hereunder.

9.      This Agreement shall be binding on Customer and its successors and assigns, and shall be binding upon and inure to the benefit of CSCC, any future holder of this Agreement and their respective successors and assigns.

Customer may not assign or transfer this Agreement or any of its obligations hereunder without CSCC's prior written consent.

10.     This Agreement shall be governed by and construed in accordance with the laws of California.  Customer hereby (i) submits to the non-exclusive jurisdiction of the courts of the State of California and the Federal courts of the United States sitting in the State of California for the purpose of any action or proceeding arising out of or relating to this Agreement, (ii) agrees that all claims in respect of any such action or proceeding may be heard and determined in such courts, (iii) irrevocably waives (to the extent permitted by applicable law) any objection which it now or hereafter may have to the laying of venue of any such action or proceeding brought in any of the foregoing courts in and of the State of California, and any objection on the ground that any such action or proceeding in any such court has been brought in an inconvenient forum, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner permitted by law.

WINN-DIXIE STORES, INC.
By: _____
Print Name: _____
Title:_____


CISCO SYSTEMS CAPITAL CORPORATION

By: _____
Print Name: _____
Title:_____

## AMENDMENT TO LICENSE AND SERVICE AGREEMENTS

In consideration of the financing contemplated hereby and the mutual agreements of the parties hereto, Customer and Cisco Systems, Inc. hereby agree to amend each License Agreement and maintenance or other service agreement financed by CSCC under this Schedule by adding the following as an additional default, event of default or termination event (as the case may be):

> In addition, any license rights provided or maintenance or other service obligations to be undertaken by Cisco Systems, Inc. under this Agreement shall immediately terminate upon receipt by Cisco Systems, Inc. of a written notice from Cisco Systems Capital Corporation ("CSCC") to the effect that CSCC has financed amounts owing under this Agreement pursuant to a lease or other financing document and there has occurred an event of default under such lease or other financing document as a result of which CSCC is entitled to terminate or accelerate amounts owing under such lease or financing document.

**CISCO SYSTEMS, INC.**

**WINN-DIXIE STORES, INC.**

By:  Cisco Systems Capital Corporation,
      its attorney in fact

By: _____

By: _____

Title: _____

Title: _____

ANNEX I
to
Software/Services Payment
Reimbursement Agreement

Software/Services Agreement Information                                    Amount Financed

DataCare Statement of Work to that certain Master Agreement Number BCS34823
 between BellSouth Communications, LLC and Winn-Dixie Stores, Inc. dated March___, 2006
        Schedule For The Purchase of Equipment And/Or Service  - Quote # 321111935          $282,697.58
        Schedule For The Purchase of Equipment And/Or Service  - Quote # 321112089          $111,591.15

Maintenance and support services by Cisco                                          $164,000.00
        February 21, 2005 up to the date this Agreement is executed by the parties

**EXHIBIT C**

**LOAN AGREEMENT 3**

No. 5094-SA003-0

**SOFTWARE/SERVICES PAYMENT REIMBURSEMENT AGREEMENT**

THIS SOFTWARE/SERVICES PAYMENT REIMBURSEMENT AGREEMENT ("Agreement") is entered into as of March    , 2006, by CISCO SYSTEMS CAPITAL CORPORATION, a Nevada corporation ("CSCC"), having a principal place of business at 170 West Tasman Drive, San Jose, California,  95134, and WINN-DIXIE STORES, INC. a Florida corporation ("Customer"), having a principal place of business at 5050 Edgewood Court, Jacksonville, Florida 32254.

WHEREAS:    (A) Customer has signed and entered into the software, and / or maintenance or service agreement(s) listed on Annex I hereto (together, the "Service Agreement") with Cisco Systems, Inc., a California corporation ("Cisco"), or other third party providers of software or services, or both.    (B) Customer wishes CSCC to finance Customer's payment obligations under the Service Agreement and, to that end, CSCC has or may hereafter advance to Cisco for the account of Customer, the amount(s) set forth in Annex I.    (C) It is a condition precedent to CSCC's willingness to make any such advance that Customer execute and deliver this Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

1.    Customer hereby unconditionally agrees to pay to CSCC pursuant to the terms and conditions of this promissory note, the principal sum of Two Hundred Four Thousand, Four Hundred Seventy Dollars and Fourteen Cents ($204,470.14) or so much as may be advanced by CSCC in relation to the Service Agreement and outstanding, including any amount representing any tax charges (other than those measured by CSCC's net income), together with the interest at the per annum rate of Four and Twenty-Five Hundredths percent (4.25%).

2.    Customer shall pay amounts owing hereunder (including principal and interest) in accordance with the following schedule:

| Payment Due Date | Payment Amount (principal & interest) | Number of Payments | Term | Commence Date |
|---|---|---|---|---|
| April 1, 2006 | $76,608.42 | 1 to 14 | 40  months | March 1, 2005 |
| May 1, 2006 | $5,472.03 | 15 to 40 | | |
| (and the first of every month thereafter) | | | | |

Any such payment not made within 15 days from the date due (whether in the ordinary course or by acceleration) shall bear interest from such due date at the lesser of (a) the rate of 14% per annum or (b) the highest lawful rate.  All computations of interest shall be made on the basis of a year of 360 days for the actual number of days (including the first day, but excluding the last day) occurring in the period for which such interest is payable.

3.    Customer acknowledges that this Agreement conveys no explicit or implicit license for the use of Software or other intellectual property, and that such license rights, to the extent they exist, are contained in separate license documentation entered into between Customer and Cisco Systems, Inc. or other licensors.  **CSCC MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER WITH RESPECT TO THE SOFTWARE OR SERVICES, OR INTELLECTUAL PROPERTY RIGHTS, INCLUDING ANY PATENT, COPYRIGHT AND TRADEMARK RIGHTS, OF ANY THIRD PARTY, INCLUDING CISCO SYSTEMS, INC., AND EXPRESSLY DISAVOWS ANY WARRANTY OF TITLE, VALIDITY OR ENFORCEABILITY OF LICENSE, NON-INFRINGEMENT, AVAILABILITY OR QUALITY OR VENDOR OR OTHER SERVICE SUPPORT, OR FITNESS FOR ANY PARTICULAR PURPOSE.**

4.      All outstanding amounts hereunder shall become immediately due and payable on demand if (a) Customer fails to make any payment hereunder when due; (b) Customer or any of its subsidiaries or other affiliates, defaults under any other current or future instrument or agreement with CSCC or Cisco or any of their affiliates, including without limitation any master agreement to lease equipment; (c) Customer breaches any of the provisions of the Service Agreement, or any Service Agreement shall be terminated; or (d) after the Customer's emergence from chapter 11, there occurs any transaction (other than a transaction that is contemplated by the Customer's confirmed plan of reorganization) as a result of which more than 25% of any class of Customer's outstanding common stock is held or controlled, directly or indirectly, by a person, or affiliated group of persons, whose ownership interest in such class of stock in the Customer did not exceed 5% as of the date of this Agreement.

5.      Customer agrees that in addition to all other remedies available to CSCC under this Agreement or applicable law following any event described in Section 4 above, CSCC may (a) upon notice to Customer requiring the same, require Customer to cease all use of any software provided under any Service Agreement, whereupon Customer shall immediately cease all such use; (b) with or without prior notice to Customer, deliver a notice to the licensor (or any sub-licensor) of any such software, requiring that Customer's license rights to such software immediately be terminated or rescinded, whereupon such license rights, including any under the Service Agreements, shall be terminated; (c) with or without prior notice to Customer, deliver a notice to any provider of maintenance or other services under any Service Agreement requiring that such Service Agreement be immediately terminated or rescinded, whereupon all Customer's rights thereunder shall immediately be terminated, and (d) require Customer to assemble and deliver to CSCC all copies of any such software in electronic or other form, together with all documentation.  Customer agrees that monetary damages are not a sufficient remedy and will not adequately compensate CSCC for Customer's breach of this Agreement and that CSCC shall be entitled to seek specific performance or other injunctive relief.

6.      Payment shall be made in lawful tender of the United States.  All payments hereunder shall be made to CSCC at its office located at 170 West Tasman Drive, San Jose, California 95134-1706 (or to such other place as CSCC shall designate in a written notice to Customer), and, unless Customer has obtained CSCC's written consent to another form of payment, such payment shall be made by wire transfer of immediately available funds by no later than 12:00 noon Pacific time on the due date of the payment, in accordance with CSCC's payment instructions.  Whenever any payment hereunder shall be stated to be due on a day other than a Business Day (as defined below), then such payment shall be made on the next succeeding Business Day.   As used herein, "Business Day" means a day (i) other than Saturday or Sunday, and (ii) on which commercial banks are open for business in San Jose, California.  **CUSTOMER'S OBLIGATION TO PAY ALL AMOUNTS HEREUNDER SHALL BE ABSOLUTE AND UNCONDITIONAL, AND SHALL NOT BE SUBJECT TO ANY ABATEMENT, REDUCTION, SETOFF, DEFENSE, COUNTERCLAIM, INTERRUPTION, DEFERMENT OR RECOUPMENT, FOR ANY REASON WHATSOEVER.**

7.      Customer agrees to pay on demand all the losses, costs, and expenses (including, without limitation, attorneys' fees and disbursements) which CSCC incurs in connection with enforcement or attempted enforcement of this Agreement, or the protection or preservation of CSCC's rights under this Agreement, whether by judicial proceedings or otherwise.  Such costs and expenses include, without limitation, those incurred in connection with any workout or refinancing, or any bankruptcy, insolvency, liquidation or similar proceedings.

8.      Customer hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this Agreement.  No single or partial exercise of any power under this Agreement shall preclude any other or further exercise of such power or exercise of any other power. No delay or omission on the part of CSCC in exercising any right under this Agreement shall operate as a waiver of such right or any other right hereunder.

9.      This Agreement shall be binding on Customer and its successors and assigns, and shall be binding upon and inure to the benefit of CSCC, any future holder of this Agreement and their respective successors and assigns.

Customer may not assign or transfer this Agreement or any of its obligations hereunder without CSCC's prior written consent.

      10.     This Agreement shall be governed by and construed in accordance with the laws of California. Customer hereby (i) submits to the non-exclusive jurisdiction of the courts of the State of California and the Federal courts of the United States sitting in the State of California for the purpose of any action or proceeding arising out of or relating to this Agreement, (ii) agrees that all claims in respect of any such action or proceeding may be heard and determined in such courts, (iii) irrevocably waives (to the extent permitted by applicable law) any objection which it now or hereafter may have to the laying of venue of any such action or proceeding brought in any of the foregoing courts in and of the State of California, and any objection on the ground that any such action or proceeding in any such court has been brought in an inconvenient forum, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner permitted by law.

WINN-DIXIE STORES, INC.
By: _____
Print Name: _____
Title:_____

CISCO SYSTEMS CAPITAL CORPORATION

By: _____
Print Name: _____
Title:_____

## AMENDMENT TO LICENSE AND SERVICE AGREEMENTS

In consideration of the financing contemplated hereby and the mutual agreements of the parties hereto, Customer and Cisco Systems, Inc. hereby agree to amend each License Agreement and maintenance or other service agreement financed by CSCC under this Schedule by adding the following as an additional default, event of default or termination event (as the case may be):

> In addition, any license rights provided or maintenance or other service obligations to be undertaken by Cisco Systems, Inc. under this Agreement shall immediately terminate upon receipt by Cisco Systems, Inc. of a written notice from Cisco Systems Capital Corporation ("CSCC") to the effect that CSCC has financed amounts owing under this Agreement pursuant to a lease or other financing document and there has occurred an event of default under such lease or other financing document as a result of which CSCC is entitled to terminate or accelerate amounts owing under such lease or financing document.

**CISCO SYSTEMS, INC.**

By:  Cisco Systems Capital Corporation,
     its attorney in fact

By: _____

Title: _____

**WINN-DIXIE STORES, INC.**

By: _____

Title: _____

ANNEX I
to
Software/Services Payment
Reimbursement Agreement

Software/Services Agreement Information                                    Amount Financed

Master Services Agreement between Cisco Systems, Inc. and Winn-Dixie Stores, Inc.
dated March    , 2006                                                        $204,467.27

**EXHIBIT B**

**ORDER APPROVING (I) ASSUMPTION OF MODIFIED EQUIPMENT LEASE WITH
CISCO SYSTEMS CAPITAL CORPORATION, (II) FINANCING OF ASSOCIATED
SERVICE AGREEMENTS, AND (III) MUTUAL RELEASE OF CLAIMS**

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | |
|---|---|
| In re: | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | *Chapter 11* |
| Debtors. | Jointly Administered |

## ORDER APPROVING (I) ASSUMPTION OF MODIFIED EQUIPMENT LEASE WITH CISCO SYSTEMS CAPITAL CORPORATION, (II) FINANCING OF ASSOCIATED SERVICE AGREEMENTS, AND (III) MUTUAL RELEASE OF CLAIMS

These cases came before the Court for hearing on March 23, 2006, upon the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for entry of an order under 11 U.S.C. §§ 105, 363, 364 and 365 and Fed. R. Bankr. P. 4001, 6006 and 9019 approving (i) the assumption of a modified router lease and maintenance agreement with Cisco Systems Capital Corporation ("CSCC"), (ii) the financing by CSCC of new router maintenance agreements, and (iii) the release by CSCC and the Debtors of pre-existing claims (the "Motion").[1]  The Court has read the Motion and considered the representations of counsel.  Based upon the representations of counsel and without objection by the United States Trustee or any other interested parties, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted.

2.      The Prepetition Lease, as modified by Schedule 002 substantially in the form attached to the Stipulation and by the Stipulation, is assumed under 11 U.S.C. § 365(a).

---

[1]      All capitalized terms not otherwise defined in this order shall have the meaning ascribed to them in the Motion.

3.      Winn-Dixie is authorized under 11 U.S.C. § 364(b) to obtain unsecured financing, allowable as an administrative expense, substantially on the terms set forth in Loan Agreement 1 and Loan Agreement 2 attached to the Stipulation.

4.      Winn-Dixie is authorized under 11 U.S.C. § 363(b) to waive claims against CSCC on the terms of the release contained in the Stipulation.

5.      Any claims scheduled in the name of CSCC in the schedules of liabilities (as amended) filed by Winn-Dixie or any of the other Debtors and any claims asserted in any proofs of claim filed by or on behalf of CSCC against Winn-Dixie or any of the other Debtors are waived and relinquished in full, and the Claims Agent serving in these cases is authorized to mark and treat such claims as disallowed and expunged for all purposes.  All other claims of CSCC against Winn-Dixie that are subject to the release provided in the Stipulation are waived.

6.      Notwithstanding any provisions to the contrary in the Federal Rules of Bankruptcy Procedure, this Order shall take effect immediately upon entry.

Dated _____, 2006 in Jacksonville, Florida.


_____
Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve
a copy of this Order on all parties who
received copies of the Motion.

1082878.02-New York Server 7A - MSW