Hearing Date:  March 23, 2006
Objection Deadline: March 20, 2006
@ 4:00 p.m.

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., <u>et al.</u>, | ) | *Chapter 11* |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |

## MOTION FOR AN ORDER (A) AUTHORIZING THE DEBTORS TO RETAIN LIQUIDATING AGENT AND APPROVING AGENCY AGREEMENT, (B) AUTHORIZING THE DEBTORS TO SELL MERCHANDISE FREE AND CLEAR OF LIENS THROUGH STORE CLOSING SALES IN ACCORDANCE WITH ATTACHED GUIDELINES, (C) AUTHORIZING THE DEBTORS TO SELL PHARMACEUTICAL ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, (D) AUTHORIZING THE DEBTORS <u>TO ABANDON PROPERTY AND (E) GRANTING RELATED RELIEF</u>

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates (collectively, the "Debtors"), move the Court for entry of (i) an order pursuant to 11 U.S.C. §§ 105, 327, 363, 554(a) and Rules 2014 and 6004, of the Federal Rules of Bankruptcy Procedure (a) authorizing the Debtors to employ and retain Hilco Merchant Resources, LLC ("Hilco") and Gordon Brothers Retail Partners, LLC ("Gordon Brothers" and together with Hilco, the "Agent") as

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are Debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

liquidating agent pursuant to the agreement attached as Exhibit A (the "Agency Agreement"), (b) authorizing the Debtors to discontinue operations at each of the stores identified on the attached Exhibit B (the "Closing Stores") and to sell the existing inventory, equipment and supplies located at such stores (collectively, the "Merchandise"), and (c) authorizing the Debtors to sell the Merchandise, and the furniture, fixtures and equipment (the "FF&E") at the Closing Stores free and clear of liens, claims and interests, and pursuant to the guidelines attached as Exhibit 8.1 to the Agency Agreement (the "Guidelines") and (d) in the Debtors' sole discretion, authorizing the Debtors to abandon any Merchandise or FF&E the Debtors' are unable to sell; and (ii) one or more orders authorizing the Debtors to sell the pharmaceutical inventory and prescriptions (the "Pharmaceutical Assets") at the Closing Stores to the Purchaser who submits the highest or best offer free and clear of liens, claims and interests (the "Motion").   In support of the Motion, the Debtors respectfully represent:

## **Background**

1.     On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the Bankruptcy Code.  The Debtors' cases are being jointly administered for procedural purposes only.

2.     The Debtors operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") to serve in these cases pursuant to Bankruptcy Code Sections 1102 and 1103.

3.     The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  At the Petition Date, the Debtors operated more than 900 stores in the United States with nearly 79,000 employees.  Substantially all of the Debtors' store locations are leased rather than owned.

4.     Since the Petition Date, the Debtor's have developed and implemented a new reduced footprint by selling or closing approximately 327 stores which were either located in noncore market areas or which have consistently been unprofitable (the "Targeted Stores").  By order of the Bankruptcy Court dated July 27, 2005 (Docket No. 2537), the Debtors previously retained the Agent to conduct going-out-of-business sales at the Targeted Stores and have been extremely satisfied with the Agent's services.

5.     The Debtors and their financial advisors have identified 35 additional stores that are unprofitable and should be sold or closed to further refine the footprint (collectively, the "Closing Stores").  The Debtors intended to market and sell the Closing Stores as ongoing businesses.  The list of Closing Stores was however published by the media and printed in the Miami Herald on February 27, 2006.  Since the list has been published, sales at the Closing Stores have significantly deteriorated.  For that reason, the Debtors have decided to close the stores, sell the Merchandise, the FF&E and the Pharmaceutical Assets and sell the stores as closed operations (by assuming and assigning the underlying lease).  To the extent the Debtors are unable to sell a Closing Store, the Debtors will ultimately reject the related lease.

6.     The Debtors operate pharmacies at 30 of the Closing Stores.  By state law, the Debtors are unable to close a store without selling or otherwise transferring the Pharmaceutical Assets to another of its locations or to another vendor.  Where economically feasible, the Debtors

will transfer the Pharmaceutical Assets to another of the Debtors' Stores.  Otherwise, the Debtors will sell the Pharmaceutical Assets.  There is a significant market for Pharmaceutical Assets among a fairly small group of purchasers.  The Debtors are providing an information package detailing the Pharmaceutical Assets available for sale to each such potential purchaser that, in the Debtors' business judgment, will purchase the Pharmaceutical Assets for maximum value while minimizing the competitive risk to the Debtors' operation.  The Debtors anticipate receiving a number of offers for the Pharmaceutical Assets.

7.    The Debtors need to promptly close the Closing Stores and liquidate the Merchandise, FF&E and Pharmaceutical Assets to obtain value for these estates.  Any unnecessary delay may cause the Debtors to incur additional administrative obligations in the form of rent and other overhead, without providing any corresponding benefit to the detriment of all creditors.

## **Relief Requested**

8.    By this Motion, the Debtors seek (i) authority pursuant to section 327(e) of the Bankruptcy Code, to employ and retain the Agent again to assist the Debtors in liquidating the Merchandise and FF&E at the Closing Stores, (ii) approval of the Agency Agreement and authority of the Debtors and Agent to take all actions contemplated by the Agreement, (iii) to discontinue operations at the Closing Stores (other than to sell the Merchandise, FF&E and Pharmaceutical Assets), (iv) to sell the Merchandise and FF&E at the Closing Stores free and clear of liens, claims and interests pursuant to section 363 of the Bankruptcy Code and pursuant to the Guidelines, (v) in the Debtors' sole discretion, to abandon any Merchandise or FF&E the

Debtors are unable to sell, and (vi) to sell the Pharmaceutical Assets at an auction free and clear of liens, claims and interests.

9.     The Agency Agreement provides the Debtors with the opportunity to dispose of the Merchandise and FF&E and to maximize the sale proceeds.  The following is a summary of the material terms of the Agency Agreement: [2]

A.     Agent's Fee.  As compensation for the services being provided pursuant to this Agreement, Agent shall be entitled to a fee (the "Agent's Fee") in an amount equal to (a) $4,500 per Store plus (b)(i) 10% of the amount by which the Net Proceeds of the Sale are equal to or grater than 36% of the Retail Value of the Merchandise and less than 37% of the Retail Value of the Merchandise, (ii) 20% of the amount by which the Net Proceeds of the Sale are equal to or greater than 37% of the Retail Value of the Merchandise and less than 38% of the Retail Value of the Merchandise, or (iii) 30% of the amount by which the Net Proceeds of the Sale are equal to or greater than 38% of the Retail Value of the Merchandise.  The Agent's Fee shall be paid by Merchant following the Final Reconciliation described in Section 3.3 below.  All Remaining Merchandise shall remain the property of Merchant but Agent shall be responsible for the disposition of such Remaining Merchandise in accordance with the instructions of Merchant.

B.     FF&E Fee.  The Debtors may elect, on a store-by-store basis, to have the Agent dispose of the FF&E at the Closing Stores.  If the Debtors make such an election for a Closing Store, the fee payable to the Agent with respect to the FF&E will be (i) $2,500 per Closing Store, plus (ii) 15% of the amount by which the net proceeds of sale of the FF&E (gross proceeds less expenses) exceed $50,000 per store.

C.     Control of Proceeds.  All cash proceeds from the sale will be handled in accordance with the Debtors' normal cash management procedures.

D.     Final Reconciliation.  Within sixty days after the end of the sale, the Agent and the Debtors will jointly prepare a final reconciliation including, without limitation, a summary of Proceeds, taxes, expenses, and any other accountings required (the "Final Reconciliation").  Within five days of completion of the Final Reconciliation, (i) any undisputed and unpaid expenses will be paid by the Debtors and (ii) any  portion of the Agent's fee related to a Closing Store for which there is no disputed amount  will be paid by the Debtors to the Agent.

E.     Expenses of the Sale.  All expenses of the sale will be borne by the Debtors consistent with an expense budget to be agreed to between the Agent and the Debtors (the "Expense Budget").  To the extent that the actual expenses exceed the

---

[2] This summary of the Agency Agreement is provided as a convenience only.  To the extent that this summary differs in any way from the terms of the Agency Agreement, the terms of the Agency Agreement and related documents control.

budgeted amount set forth on the Expense Budget, the Agent will pay such excess (unless the expenses exceed the budget because budget information supplied by the Debtors was incorrect or because the Debtors breached the Agency Agreement, in which case the Debtors will be responsible for the excess).

F.   <u>Merchandise Subject to this Agreement</u>.   The Merchandise includes all finished goods inventory that is owned by the Debtors and located in the particular Closing Store on the sale commencement date.   The Merchandise also includes such additional inventory of the Debtors that is not located in the Closing Store on the sale commencement date but which the Debtors and the Agent mutually agree to include in the sale on terms and conditions acceptable to the Debtors and the Agent.   The Merchandise does not include:   (i) goods which belong to sublessees, licensees, or concessionaires of the Debtors; (ii) goods held by the Debtors on memo, on consignment, or as bailee; (iii) pharmaceutical goods in the pharmacy departments; provided, however, that the Debtors have the right (but not the obligation) to continue to operate the pharmacy department at the stores and retain all proceeds relating to such sales; provided further, however, that all direct costs and expenses associated or incurred in connection with the operation of the pharmacy departments at the stores will be at the Debtors' sole expense; (iv) goods or operations relating to ATM machines, "Coin Star" machines, and "bale" salvage at the stores; provided, however, that the Debtors have the right (but not the obligation) to continue such operations at the stores and retain all proceeds relating to such sales; provided further, however, that all direct costs and expenses associated or incurred in connection with such operations relating to ATM machines at the stores will be at the Debtors' sole expense; (v) FF&E improvements to real property which are located in the stores; and (vi) spoiled/unsaleable merchandise.

G.   <u>Vacating the Stores</u>.   The sales under the Agency Agreement will commence immediately after entry of an order of this Court approving the Agreement and continue until April 30, 2006 (subject to extension or acceleration at each Store with the mutual agreement of the Debtors and the Agent); provided that the sale of the FF&E at each store will continue until May 23, 2006 (subject to extension or acceleration at each Store with the mutual agreement of the Debtors and the Agent).   The Agent will provide the Debtors with not less than seven days' advance written notice of its intention to vacate any store.   On the sale termination date, the Agent must vacate and leave the stores in "broom clean" condition (ordinary wear and tear excepted).   All assets of the Debtors used by the Agent in the conduct of the sale must be returned by the Agent to the Debtors unless the Debtors agree otherwise.

10.   By this Motion, the Debtors seek authority to sell the Merchandise and FF&E through the Agent under the Agency Agreement in accordance with the Guidelines.   The Guidelines adequately balance the rights of landlords to maintain the integrity of their properties with the Debtors' obligation to maximize recoveries for their estates and creditors.

11.    The Guidelines permit the Debtors and the Agent to liquidate the Merchandise and FF&E at the Closing Stores without complying with any applicable state and local statutes, rules or ordinances governing liquidation or "going-out-of-business" sales, including laws governing (i) bulk sales, (ii) advertising, (iii) licensing requirements and procedures, (iv) waiting periods or time limits, and (v) inventory increases or the transfer of Merchandise between Targeted Stores (collectively, the "Local Laws").  Notwithstanding the foregoing, however, the Debtors and the Agent will comply with all state and local public health and safety laws (the "Safety Laws"), as well as tax, labor, employment, environmental laws (collectively, the "General Laws"), to the extent applicable.

12.    The Guidelines also permit the Debtors and the Agent to liquidate the Merchandise and FF&E at the Closing Stores without complying with any provisions of a lease, contract or other agreement of the Debtors that would otherwise prevent or impair the Debtors' conduct of the  sales, including any "going dark provisions."

13.    The Debtor's retention of the Agent under the Agency Agreement and prompt closing and sale of the Merchandise pursuant to the Guidelines is in the best interest of the Debtors' respective estates and creditors.

14.    By this Motion, the Debtors also seek authority to sell the Pharmaceutical Assets at an auction to be held on March 23, 2006 at 9:00 a.m. in the offices of Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 (the "Auction").  At the conclusion of the Auction, the Debtors will determine, after consultation with the DIP Lender Agent Representatives and the Committee's Professionals, which, if any, is the highest or best offer for any Pharmaceutical Assets (a "Successful Bid").  The Debtors will file and serve within 24 hours of the conclusion of the Auction, by overnight and hand delivery a notice summarizing the

Successful Bid to (i) the Committee's Professionals, (ii) the U.S. Trustee, (iii) the DIP Lender Agreement Representatives and (iv) the Master Service List.  At the hearing on the Motion, the Debtors will ask the Court to enter one or more orders approving each of the Successful Bidders. The Debtors will conduct the Auction in accordance with the Bid Procedures approved by the Court by order dated June 21, 2005 (Docket No. 1801).

15.     The Debtors sale of the Pharmaceutical Assets is in the best interests of the estates and creditors because the Debtors cannot close the stores without transferring the assets and will obtain maximum value by the immediate sale of the Pharmaceutical Assets.

16.     The Debtors further request authority pursuant to section 554(a) of the Bankruptcy Code, to abandon in their sole discretion any Merchandise and FF&E the Debtors are unable to sell.  In the event the Debtors are unable to sell the Merchandise and FF&E located at the Closing Stores and it is not feasible to transfer these assets to another store, it would cost the Debtors more to remove the Merchandise and FF&E than the Debtors could recover from a sale, and, absent abandonment, the Debtors are at risk of incurring additional administrative obligations in the form of rent or other obligations from the applicable landlord.  For these reasons, it is in the Debtors' best interest to abandon the remaining Merchandise and FF&E to the applicable landlord.

<u>**Applicable Authority**</u>

**A.     The Debtors' Decision to Retain an Agent, Cease Operations and Sell the Merchandise, FF&E and Pharmaceutical Assets at the Closing Stores is Supported by a Sound Business Reason**

17.     The Debtors seek authority, pursuant to section 327(e) of the Bankruptcy Code, to employ and retain the Agent to assist the Debtors in liquidating the Merchandise and FF&E at

the Closing Stores.  The Debtors believe that the results of the store closing sales will be substantially enhanced by the Agent and that it would be more costly for the Debtors to undertake the store closing sales without the Agent.  The Agency Agreement was negotiated at arms-length and in good faith by the Debtors and the Agent.  The terms of the Agency Agreement are fair and reasonable, and are consistent with those charged by liquidators in major liquidation sales of this nature.  The Debtors have confidence in the ability of the Agent to maximize the value of the Merchandise and FF&E.  The Debtors retained the Agent for liquidation of the Targeted Stores previously sold and are pleased with their services.  The Debtors also seek authority to sell the Pharmaceutical Assets by auction.

18.    Bankruptcy Code Section 363(b)(1) provides:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Bankruptcy Code Section 1107 (a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under Section 363(b)(1).

19.    Courts have held that transactions under Section 363(b)(1) should be approved when they are supported by a sound business reason.  *See In re BDK Health Mgmt., Inc*., Case Nos. 98-00609-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a Section 363(b) application must find from the evidence presented before him a good business reason to grant such application); *Fulton State Bank v. Schipper (In re Schipper),* 933 F.2d 513, 515 (7th Cir. 1991) (holding that a debtor in possession can sell assets of his estate outside the ordinary course

of business if he has an articulated business justification); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (holding that the business judgment test is the proper standard to apply when considering a debtor's motion to sell assets outside the ordinary course of business); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that a trustee must show that "there is a sound business purpose for conducting the sale prior to confirmation of a plan"); *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002) ("[T]he Trustee has the burden to establish sound business reasons for the terms of the proposed sale").

20.    If a sound business reason exists, the law vests a debtor's decision to use property outside of the ordinary course of business with a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Official Comm. Of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest, or gross negligence."  Id.

21.    The Debtors have a sound business reason to retain the Agent under the Agency Agreement and to sell the Merchandise, FF&E and Pharmaceutical Assets at these Closing Stores.  The Debtors' sale of the Merchandise, FF&E and Pharmaceutical Assets will bring substantial value to the estate and these assets are not necessary because they are located at stores

the Debtors will no longer operate.  The Debtors' prompt liquidation of the Merchandise, FF&E

and Pharmaceutical Assets and surrender of the Closing Stores to the purchaser or, if applicable,

the landlord, will avoid unnecessary administrative expenses.

22.     Liquidation sales are a routine part of chapter 11 cases involving retail debtors.

*See, e.g., In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that

"going-out-of-business" sales are an important part of "overriding federal policy requiring

Debtor to maximize estate assets").  Bankruptcy courts have granted similar relief in other cases

involving retailers.   *See, e.g., In re Breuners Home Furnishings Corp.,* Case No. 04-12030

(Bankr. D. Del. July 30, 2004); *In re Mansour's, Inc.*, Case No. 04-10979 (Bankr. N.D. Ga. Apr.

20, 2004); *In re Heilig-Meyers Co.*, Case No. 00-34533 (Bankr. E.D. Va. Sept. 13, 2000); In re

London Fog, Inc., Case No. 99-3446 (Bankr. D. Del. Oct 7, 1999); *In re Starter Corp.*, Case No.

99-906 (Bankr. D. Del. July 2, 1999); *In re WSR Corp.,* Case No. 98-1241 (Bankr. D. Del. Oct.

28, 1998); *In re Montgomery Ward Holding Corp.*, Case No 97-1409 (Bankr. D. Del. Nov 7,

1997).

**B.       The Debtors Should Be Permitted to Sell the Merchandise, Pharmaceutical Assets
           and FF&E Free and Clear of All Liens and Encumbrances**

23.     The Debtors request that the sale and transfer of the Merchandise, FF&E and

Pharmaceutical Assets be approved free and clear of liens, interest and encumbrances.  This

relief is consistent with the provisions of 11 U.S.C. § 363(f).

24.     Pursuant to Section 363(f) of the Bankruptcy Code, after notice and a hearing, a

debtor may sell property of the estate free and clear of all liens, interests and encumbrances.  *See

In re Parrish*, 171 B.R. 138, 140 (Bankr. M.D. Fla. 1994) (noting that compliance with the

requirements of Section 363(f) is a prerequisite to a sale free and clear of liens).

25.    The Debtors believe that there are no interests or claims in the Merchandise, Pharmaceutical Assets and FF&E other than the senior liens and superpriority administrative claims of the DIP Lender, which will attach to the net proceeds received from the sale of the Merchandise and FF&E.  The interests of the DIP Lender will be satisfied because the Debtors will cause all net proceeds of the sales to be paid to the DIP Lenders to the extent required in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Lien Bases and Modify the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of All Claims of Debtors' Pre-Petition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).  Notwithstanding the foregoing, the liens and claims of the DIP Lender (and any other liens encumbering the Merchandise or FF&E) will not attach to the proceeds of sale that constitute the Agent's Fee or FF&E Fee under the Agency Agreement.

## C.    Leasehold Provisions Restricting Liquidation Sales are Unenforceable in Chapter 11

26.    A number of the leases governing the Closing Stores contain provisions restricting or prohibiting the Debtors from conducting a going-out-of-business sale, liquidations, or similar sales.  These provisions are unenforceable in chapter 11 because they impermissibly restrain the debtors' ability to maximize the value of its assets under 11 U.S.C. § 363.  *See, e.g., In re Tobago Bay Trading Co.*, 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding that the debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting the debtor from liquidating its inventory were enforced); *In re R.H. Macy*

*& Co., Inc.*, 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (holding that restrictive lease provisions are unenforceable in a chapter 11 case when the debtor sought to conduct going-out-of-business sale); *In re Ames Dep't Stores Inc.*, 136 B.R. at 359 ("[T]o enforce the anti-[going-out-of-business] sale clause of the Lease would contravene overriding federal policy requiring the Debtor to maximize estate assets by imposing additional constraints never envisioned by Congress."); *In re Libson Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding that restrictive lease provisions are unenforceable in chapter 11 cases when the debtor sought to conduct going-out-of-business sale).

27.   Bankruptcy courts have permitted debtors to bypass such restrictive lease provisions in numerous chapter 11 cases.  *See, e.g., In re Breuners Home Furnishings Corp.*, Case No. 04-12030 (Bankr. D. Del. July 30, 2004); *In re WSR Corp.*, Case No. 98-1241 (Bankr. D. Del. Oct. 28, 1998); *In re Montgomery Ward Holding Corp.*, Case No 97-1409 (Bankr. D. Del. Nov 7, 1997); *In re Edison Bros. Stores, Inc.*, Case No. 95-1354 (Bankr. D. Del. June 25, 1997); *In re County Seat Inc.*, Case No. 96-1637 (Bankr. D. Del. Nov. 14, 1996); *In re Pic 'N Pay Stores Inc.*, Case No. 96-182 (Bankr. D. Del March 29, 1996).

## D.     Waiver of any State or Local Laws or Ordinances Restricting the Sales

28.   Each of the states in which the Debtors intend to sell the Merchandise and FF&E have Local Laws restricting the conduct of liquidation sales.  Each of these states also, however, has statutes and regulations which generally except going-out-of-business sales which are authorized by bankruptcy court order from the Local Laws.  *See*, Ala. Code 1975 §8-13-23; Fl. St. §559.25; Ga. St. §10-1-396 and La. R.S. 51.32.  To the extent these sales are not already excepted from the Local Laws, the Debtors seek authority to conduct the sales without complying with the Local Laws; provided, however, that the Debtors, and their agents, will

continue to be bound by and comply with Safety Laws and General Laws, to the extent applicable.

29.    As a general matter, under 28 U.S.C. § 959(b), a debtor-in-possession must "manage and operate the property . . . according to the requirements of the valid laws of the state in which such property is situated."  The Eleventh Circuit and other courts, however, have held that a debtor-in-possession liquidating estate property does not "manage and operate" the property for purposes of Section 959(b).  *See In re N.P. Mining Co., Inc.*, 963 F.2d 1449, 1460-61 (11th Cir. 1992) (holding that Section 959(b) does not apply when a debtor-in-possession is liquidating property as opposed to operating a business); *State of Missouri v. U.S. Bankr. Court for E.D. of Arkansas*, 647 F.2d 768, 778 n.18 (8th Cir. 1981) (same); *Missouri Dep't. of Natural Resources v. Valley Steel Prods. Co., Inc. (In re Valley Steel Prods. Co., Inc.)*, 157 B.R. 442, 447-48 (Bankr. E.D. Mo. 1993) (same); *In re Corona Plastics, Inc.*, 99 B.R. 231, 235-36 (Bankr. D.N.J. 1989) (same).  Because the Debtors seek to sell the Merchandise, FF&E and Pharmaceutical Assets and cease operations at the Closing Stores, Section 959(b) does not require compliance with the Local Laws.

30.    In any event, federal bankruptcy law preempts state and local laws which conflict with the bankruptcy code or its underlying policies.  *See In re Shenango Group, Inc.*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("[T]rustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . [A] state statute cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), aff'd 112 F.3d 633 (3d Cir. 1997).  Preemption is appropriate when, as here, the Local Laws at issue concern economic regulation rather than the health and safety regulations.  *See Baker & Drake, Inc. v. Public Svc. Comm. Of Nev. (In re Baker & Drake, Inc.)*, 35 F.3d 1348,

1353 (9th Cir. 1994) (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety."); *see also Walker v. Maury County ( In re Scott Housing Sys., Inc.)*, 91 B.R. 190, 196-97 (Bankr. S.D. Ga. 1988) (holding that automatic stay under Section 362 is broad and preempts state law except for those laws designed to protect public health and safety).

31.    If applied, the Local Laws will undermine the fundamental purpose of 11 U.S.C. § 363(b) by placing constraints on the Debtors' ability to marshal and maximize estate assets for the benefit of their respective creditors.  The Debtors request that the Court waive any Local Laws requiring creditor notification because creditors and lienholders are protected by the notice provisions of the federal bankruptcy laws.  The Debtors further request that the Court prohibit any federal, state, or local governmental agency or entity from preventing or interfering with the proposed liquidation sales.  *See State of Missouri v. U.S. Bankr. Court for E.D. of Arkansas*, 647 F.2d at 776 (holding that an attempt to enforce state regulation governing liquidation of grain warehouses directly conflicted with bankruptcy court's control over property of the estate and thus violated the automatic stay).

32.    The Debtors' requested waiver of the Local Laws is narrowly tailored to facilitate the successful consummation of the Merchandise, Pharmaceutical Assets and FF&E sales.  The Debtors are not seeking a waiver of all state and local laws, but only those that apply specifically to liquidation or going-out-of-business sales.  The Debtors and their agents will comply with all Safety Laws and General Laws.

33.    Under these circumstances, bankruptcy courts have permitted debtors to bypass such Local Laws in numerous chapter 11 cases.  *See, e.g., In re Breuners Home Furnishings Corp.*, Case No. 04-12030 (Bankr. D. Del. July 30, 2004); *In re WSR Corp.*, Case No. 98-1241 (Bankr.

D. Del. Oct. 28, 1998); *In re Montgomery Ward Holding Corp.*, Case No 97-1409 (Bankr. D. Del. Nov 7, 1997); *In re Edison Bros. Stores, Inc.*, Case No. 95-1354 (Bankr. D. Del. June 25, 1997).

34.    In order to proceed with the sales, the Debtors further request that the Court restrain and enjoin all parties and persons of every nature and description, including but not limited to landlords, utility companies, governmental agencies, sheriffs, marshals or other public officers, creditors, newspapers, other advertising mediums, and all those acting for or on their behalf, from (a) charging advertising rates in excess of the rates charged pursuant to the Debtors' prepetition advertising agreements or, if no such agreements exist, charging advertising rates in excess of rates regularly charged to non-bankrupt customers in the ordinary course, (b) in any way interfering with or otherwise impeding the conduct of the store closing sales, or the Agent's right to use the Closing Stores, and all services, furniture, fixtures, equipment and other assets of the Debtors which the Agent is granted the right to use in the Agency Agreement, or (c) instituting any action or proceeding in any court (other than this Court) or other administrative body having as its objective the obtaining of an order or judgment that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the store closing sales, the operation of the Closing Stores, or the performance by the Debtors of their obligations under the Agency Agreement, including, without limitation, the obligation to pay all amounts the Agent is due pursuant to the terms of the Agency Agreement; provided, however, that notwithstanding the authority granted to the Debtors and the Agent to conduct store closing sales, this Order does not exempt the Debtor or the Agent or their assigns from complying with the Guidelines or Safety Laws.

E.      **Good Faith**

35.     Bankruptcy Code section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

36.     The Bankruptcy Code does not define the term "good faith".  Courts, however, have held that a party would have to show fraud or collusion between the purchaser and other bidders or the Debtors to demonstrate a lack of good faith.

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchasers' good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988).

*Accord Kabro Assoc. of W. Islip, LLC v. Colony Hill Assoc. (In re Colony Hill Assoc.)*, 111 F.3d 269, 276 (2d Cir. 1997).

37. The Debtors submit that:  (a) the Agency Agreement was entered into by the Debtors and the Agent in good faith and the Debtors' sale of goods under the Agency Agreement will be good faith sales within the meaning of Section 363(m) of the Bankruptcy Code, (b) the Pharmaceutical Assets were marketed extensively and the marketing process and notice of the Auction and hearing ensure that any purchaser of Pharmaceutical Assets has not exerted undue influence over the Debtors.  Accordingly, at the hearing on the Motion, the Debtors will request

that the Court find that the (i) Agency Agreement was entered in good faith and the sales of goods under the Agency Agreement will be good faith sales, and (ii) the respective purchaser(s) of the Pharmaceutical Assets acted in good faith within the meaning of Bankruptcy Code section 363(m).  *See BDK Health Mgmt.*, 1998 WL 34188241, at *4 (finding that a purchaser was entitled to the protections of Bankruptcy Code section 363(m) because the sale was negotiated at arms-length, proposed in good faith and the consideration for the assets was fair and reasonable).

**F.    Abandonment**

38.  Pursuant to Section 554(a) of the Bankruptcy Code, the Debtors may abandon property "that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  To the extent the Debtors are unable to sell any Merchandise and FF&E at the Closing Stores and it is not feasible to transfer the assets to another store, it would cost the Debtors more to move the assets than the Debtors could recover in any future sale and, absent abandonment, the Debtors may incur additional administrative obligations from the applicable landlord.  The Debtors submit that it is in the Debtors best interest to have the authority, in their sole discretion, to abandon any such Merchandise and FF&E located at the Closing Stores to the applicable landlord.

**G.    Pharmaceutical Notice**

39.  The states in which the Debtors operate the Closing Stores have regulations governing the transfer of Pharmaceutical Assets.  Although the regulations vary among the states, generally a pharmacy operator is required to transfer any Pharmaceutical Assets to another entity before the pharmacy closes.  These state regulations also require the Debtors to notify their

customers of the transfer so that the customer is able to obtain his prescription without delay. The Debtors will comply with these notices.

## H.    Hilco and Gordon Brothers are Disinterested and Hold No Adverse Interest

40.    To the best of the Debtors' knowledge, information and belief, other than as set forth in the Rule 2014 affidavits which were separately filed by Hilco and Gordon Brothers in these cases on July 5, 2005 (Docket No. 1985) and July 18, 2005 (Docket No. 2266), neither Hilco nor Gordon Brothers represents or holds any interest adverse to the Debtors or the Debtors' estates with respect to the matters for which Hilco and Gordon Brothers are to be retained in these cases.

## I.    Elimination of 10-Day Stay Under Rules 6004(g)

41.    Pursuant to Rule 6004(g), F.R. Bankr. P., unless the Court orders otherwise, all orders authorizing the sale of property outside of the ordinary course of business pursuant to section 363 of the Bankruptcy Code are automatically stayed for ten days after entry of the order. Given the need to close the sales as promptly as possible, the Debtors request that the Court order and direct a waiver of the 10-day stay period.

## Notice

42.    Notice of this Motion has been given to: (a) counsel to the Creditor's Committee; (b) counsel to the DIP Lender; (c) all entities known to assert a lien, claim or interest in or on the Merchandise, Pharmaceutical Assets and FF&E; (d) all non-debtor parties to the leases of the Closing Stores; (e) the Office of the United States Trustee; (f) the Attorneys General for the States of Florida and Georgia and (g) all entities having requested notices pursuant to Rule 2002; and (h) all parties on the Master Service List.

## Conclusion

For the foregoing reasons, the Debtors respectfully request that the Court to enter (i) an order substantially in the form attached as Exhibit C: (a) authorizing the Debtors to retain the Agent under Bankruptcy section 327 pursuant to the Agency Agreement and to take all actions reasonably necessary to sell the Merchandise, FF&E and Pharmaceutical Assets and cease other operations at the Closing Stores; (b) authorizing the Debtors (through the Agent) to liquidate the Merchandise and FF&E and the Debtors to sell the Pharmaceutical Assets all free and clear of liens, claims and interests; (c) authorizing the Debtors to sell the Merchandise and FF&E under the Guidelines and without complying with lease provisions and local regulations which would otherwise impair such sales (d) authorizing the Debtors in their sole discretion to abandon to the applicable landlord any Merchandise and FF&E the Debtors are unable to sell, and (ii) one or more orders substantially in the form attached as Exhibit D authorizing the Debtors to sell any particular Pharmaceutical Assets to the Successful Bidders.

Dated: March 13, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By ___/s/ D. J. Baker_____
      D. J. Baker
      Sally McDonald Henry
      Rosalie Gray
      Eric M. Davis

Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Attorneys for Debtors

SMITH HULSEY & BUSEY

By ___/s/ Cynthia C. Jackson_____
      Stephen D. Busey
      James H. Post
      Cynthia C. Jackson. (F.B.N. 498882)
      Eric N. McKay

225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Attorneys for Debtors

497916.12

**EXHIBIT A**

**3/13/06**

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is made as of this —— day of March, 2006, by and between a joint venture composed of Hilco Merchant Resources, LLC, and Gordon Brothers Retail Partners, LLC (the "Agent"), and Winn-Dixie Stores, Inc. (the "Merchant"), a Florida corporation.

## RECITALS

WHEREAS, Merchant, together with certain of its affiliates and subsidiaries, is a debtor and debtor in possession with a Chapter 11 case pending in the United States Bankruptcy Court for the Middle District of Florida ("Bankruptcy Court").

WHEREAS, Merchant desires that Agent act as Merchant's exclusive agent for the purpose of (i) selling all of the Merchandise (as hereinafter defined) located in 35 of Merchant's retail food stores or such larger or smaller number of Stores from time to time mutually agreed upon by Agent and Merchant, which stores are identified on Exhibit "1" attached hereto and made part hereof (each a "Store" and collectively, the "Stores") during the Sale Term, by conducting a "store closing" or similar theme sale at each of the Stores; and (ii) at Merchant's option, selling or otherwise disposing of the furniture, fixtures, and equipment located at any Stores and any distribution centers designated by Merchant (the "FF&E") and other Excluded Goods designated by Merchant, subject to the terms and conditions set forth herein (the matters described in clauses (i) and (ii) hereof are collectively referred to as the "Sale");

WHEREAS, Agent is willing to serve as Merchant's exclusive agent to conduct the Sale and, to the extent Merchant exercises the option pursuant to Section 14 hereof, the disposition of the FF&E in accordance with the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.

1.1    Defined Terms.  Capitalized terms as used in this Agreement will have the following meanings when used herein.

"Accounting Firm" means a nationally recognized accounting firm mutually acceptable to Merchant and Agent.

"Agency Documents" means this Agreement and each other document and agreement contemplated hereby and executed and delivered in connection herewith.

"Agent" has the meaning set forth in the Preamble.

"<u>Agent Claim</u>" means any such claim, demand, penalty, loss, liability or damage that arises from the acts or omissions of Agent, or its supervisors, agents, independent contractors, employees located at any of the Stores, or the Merchant's Store-level employees being supervised by Agent in connection with or related to the Sales.

"<u>Agent's Fee</u>" has the meaning set forth in Section 3.1.

"<u>Agent Indemnified Parties</u>" means Agent and its officers, directors, employees, agents and independent contractors.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Approval Order</u>" means the order entered by the Bankruptcy Court (i) approving this Agreement, (ii) authorizing the conduct of the Sale pursuant to the terms of this Agreement (A) notwithstanding any state or local law or regulation otherwise governing or purporting to govern the licensing and conduct of the Sale (other than laws related to public health and safety and other similar items), (B) notwithstanding any provision in any lease, mortgage, or other occupancy agreement that purports to limit, govern or restrict the conduct of the Sale, and (C) without the necessity of obtaining any third-party consents, and (iii) which Approval Order shall not have been reversed, vacated or stayed.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>Event of Default</u>" means Merchant's or Agent's failure to perform any of its respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party.

"<u>Excluded Goods</u>" means Spoiled/Unsaleable Merchandise and any other goods not included as "Merchandise" in the Agreement including, but not limited to Merchant Consignment Goods.

"<u>Expenses</u>" means the cost of Replenishment Goods and all "reasonable," out of pocket, documented and customary expenses incurred in connection with the conduct of the Sale and the operation of the Stores during the Sale Term, consistent with and subject to the categories and aggregate amount set forth in the Expense Budget, <u>provided</u>, that Occupancy Expenses shall be limited on a per diem per Store basis during the Sale Term at each Store; provided, further that amount of benefits (including, but not limited to, FICA, unemployment taxes, workers' compensation and health care insurance benefits) payable to employees in the Stores used during the Sale shall be capped for purposes of calculating Expenses hereunder in an amount not to exceed 27.6% of base payroll for each such employee.

"<u>Expense Budget</u>" means an expense budget annexed hereto as <u>Exhibit "A"</u> which sets forth all Expenses related to the Sale and the operation of the Stores during the Sale Term to be agreed to between Agent and Merchant in writing prior to the commencement of the Sale, together with any amended, modification or supplemented Expense Budget in form and substance satisfactory to Merchant and Agent.

"Final Reconciliation" means a final reconciliation of the Sale including, without limitation, a summary of Proceeds, taxes, Expenses, and any other accountings required hereunder, prepared jointly by Agent and Merchant within sixty (60) days after the Sale Termination Date.

"FF&E" has the meaning set forth in the Preamble.

"FF&E Election" means, with respect to FF&E, an option exercisable solely by Merchant in writing on an individual Store-by-Store basis within five (5) days after the Sale Commencement Date, to require Agent to sell the FF&E in any such Store(s).

"FF&E Expense Budget" means an additional expense budget for FF&E-related sale expenses to be mutually agreed upon by Merchant and Agent.

"FF&E Fee" means a commission equal to (a) $2,500 per Store; plus (b) 15% of the amount of the Net FF&E Proceeds in excess of $50,000.

"FF&E Sale Termination Date" means May 23, 2006, subject to extension or acceleration at each Store in accordance with Section 6.1 of this Agreement.

"Interim Reconciliation" has the meaning set forth in Section 8.6.

"Manufacturers Coupons" means manufacturers' coupons and rebates and vendor product allowances.

"Merchandise" has the meaning set forth in Section 5.1.

"Merchant" has the meaning set forth in the Preamble.

"Merchant Consignment Goods" means those goods located in any of the Stores which are not included in Merchandise hereunder.

"Net FF&E Proceeds" means the gross proceeds from the sale of FF&E, including, without limitation, any buyer's premium, less the expenses of the sale of the FF&E (other than Occupancy Expenses).

"Net Proceeds" means the aggregate Proceeds less Expenses.  In no event shall cash on hand at the Stores on the Sale Commencement Date constitute Proceeds for purposes of calculating Net Proceeds.

"Occupancy Expenses" means base rent, percentage rent, HVAC, utilities, CAM, real estate and use taxes, merchant's association dues, and building insurance relating to the Stores on Exhibit B, which shall be mutually agreed to by Merchant and Agent.

"Proceeds" has the meaning set forth in Section 7 of the Agreement.

"Remaining Merchandise" means all unsold Merchandise remaining, if any, in the Stores at the Sale Termination Date.

"Replenishment Goods" means certain inventory (i) replenished in the ordinary course (e.g., perishables) including, without limitation, meat, eggs, milk, yogurt, bread, baked goods, deli, ready-to-serve foods, and produce, and DSD (direct store delivery) goods mutually agreed by Merchant and Agent to be Replenishment Goods; and (ii) other items of inventory (e.g., private label goods, bailment goods) mutually agreed by Merchant and Agent to be Replenishment Goods.

"Retail Value" means for all Merchandise, the retail price in Merchant's POS system at the beginning of the Sale.

"Sale" has the meaning set forth in the Recitals.

"Sale Commencement Date" means immediately after the entry of the Approval Order, but in no event later than March 23, 2006.

"Sale Guidelines" means the Sale guidelines annexed hereto as Exhibit 8.1.

"Sale Term" means the period from the Sale Commencement Date to the Sale Termination Date and with respect to any Store as to which a FF&E Election has been made to the FF&E Sale Termination Date.

"Sale Termination Date" means April 30, 2006, subject to extension or acceleration at each Store in accordance with Section 6.1 of this Agreement.

"Sales Taxes" means all sales, excise, gross receipts, and other taxes attributable to sales of Merchandise as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction.

"Spoiled/Unsaleable Merchandise" means spoiled perishables and produce Inventory that would not be bought by a customer in the ordinary course, such as opened bottles or cans, near-dated or expired or out-of date goods, or near-dated or out-of-date groceries, meat, eggs, milk, yogurt, bread, baked goods, deli, ready-to-serve foods, defrosted frozen goods, and produce.

"Store(s)" has the meaning set forth in the Recitals.

"Supervisors" means qualified supervisors to conduct the Sale and to manage the Sale process and dispose of the Merchandise from the Stores.

1.2    Exhibits.  The following non-exclusive list of Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

4

| Exhibit | Description |
|---|---|
| Exhibit A | Budget |
| Exhibit B | Occupancy Expenses |
| Exhibit 1 | Stores List |
| Exhibit 8.1 | Sale Guidelines |
| Exhibit 8.5 | Form of Daily Report |
| Exhibit 12.4 | Agent Insurance Policies |

1.3    Currency.  Unless otherwise specified, all references to monetary amounts refer to United States dollars.

Section 2.

2.1    Appointment of Agent.  Subject to the issuance of the Approval Order, Merchant hereby appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting and overseeing the Sale in accordance with the terms and conditions of this Agreement.  Agent shall provide Merchant with the following services in accordance with the terms hereof:

(a)    Sell or otherwise dispose of the Merchandise, FF&E and other Excluded Goods from the Stores.

(b)    Provide Supervisors to conduct the Sale and to manage the Sale process and dispose of the Merchandise and other assets located at any of the Stores.

(c)    Recommend and implement Merchant-approved (i) point of purchase, point of sale, and external and internal advertising and signage necessary to effectively sell the Merchandise at the Stores in accordance with a "store closing" or other mutually agreeable theme and to eliminate the use of Merchant's "customer reward cards" and other existing discount arrangements applicable to Merchant's stores not included in the Stores (Agent shall deliver copies of all advertising materials for the Sale to Merchant which shall have the right, within three (3) business days of such delivery, to approve such materials, (which approval shall not be unreasonably withheld or delayed); provided, however, that the failure of the Merchant to reasonably respond to any request for approval within three (3) business days shall be deemed to be approval of the subject materials), (ii) pricing and presentation of Merchandise, (iii) staffing levels for the Stores (including store employees), (iv) merchandise transfer strategies between and among the Stores, and (v) store operation practices (i.e., ongoing services and housekeeping).

(d)    Recommend and implement a Merchant-approved Agent's operating plan for the Sale, including, (i) projections for anticipated discount phasings, revenues and expenses to be incorporated into and made a part of the Expense Budget, (ii) advertising and promotions plan, (iii) supervision plan including, FF&E supervision and central office supervision, (iv) a DSD replenishment plan including, without limitation, any deviations in respect of anticipated phased discounts related to the DSD Merchandise, (v) an FF&E sales plan including, if applicable, anticipated revenues and expenses and occupancy requirements is attached hereto as

5

Schedule 3(a), and (vi) management of Merchandise levels prior to the Sale Commencement Date as mutually agreed by Merchant and Agent.

(e)    Maintain focused and constant communication with Merchant's employees and managers to keep them abreast of strategy and timing, and maintain communication with landlords.

(f)    Maintain integrity and value of Merchant's "brands" and corporate image throughout the Sale.

(g)    Subject to the entry of the Approval Order, advise Merchant with respect to the legal requirements of effecting the "store closing" or other mutually agreeable theme in compliance with all federal, state, and local laws, rules, and regulations, including without limitation state and local permitting laws, to the extent (if at all) applicable following issuance of the Approval Order.

(h)    Establish, monitor and provide oversight of and conduct accounting functions for the Sale, including, without limitation, evaluation of sales of Merchandise by category, sales reporting, mark-downs and discounts, expense monitoring and reporting and updating the Expense Budget by providing weekly comparisons of actual and projected information, sales tax compliance and retail services.

(i)    Supervise each Store throughout the Sale Term such that the operation of each of the Stores is being properly maintained, including ongoing customer service and housekeeping activities.

(j)    Recommend and implement Merchant-approved staffing levels for the Stores and appropriate bonus and/or incentive programs for store employees, which are all subject to approval by Merchant in its sole discretion.

(k)    Develop and recommend to Merchant the use of transitional marketing materials in the Store locations to direct customers to Merchant's on-going stores in that market (if any).

(l)    Provide recommendations and implement Merchant-approved for loss prevention initiatives.

(m)    Perform such other related services deemed by the parties to be necessary or prudent to facilitate the Sale.

(n)    if requested by Merchant, and upon terms and conditions set forth in Section 5.3 hereof, oversee and supervise the disposition of FF&E at the Stores;

(o)    distribute and transfer Merchandise between Stores, including additional Merchandise from Merchant's distribution center(s) for disposition in the Sale, and in that connection providing those additional services described in Section 2.2 below.

Title to all Merchandise shall remain with Merchant at all times during the Sale Term until such Merchandise is sold by or on behalf of Merchant.  All sales of Merchandise in the Stores shall be made on behalf of Merchant.

2.2     In connection with the Services to be provided by Agent pursuant to Section 2.1(-o) hereof with respect to the oversight of the distribution and transfer of Merchandise between and among the Stores and Merchant's distribution centers, Agent shall, to the extent necessary or appropriate in connection with the Sale or as requested by the Merchant, provide Merchant with the following services regarding the movement of Merchandise in and between the Stores and Merchant's distribution centers:

(a)     establish a plan with respect to the identification, timing and routing of Merchandise to be moved and provide projections for the anticipated Expenses related thereto, which Expense projections shall be incorporated into and made a part of the Expense Budget;

(b)     recommend and implement Merchant-approved distribution of Merchandise from Merchant's distribution center(s) and/or the other Store locations to the Stores;

(c)     coordinate the preparation of Merchandise to be moved;

(d)     communicate with Merchant's store managers as to the method of identifying, packing, and shipping such Merchandise among the Stores; and

(e)     recommend appropriate staffing levels to coordinate the movement of Merchandise and the identification, packing and shipping of such Merchandise, and the provision of Supervisors necessary to coordinate such services.

2.3     In connection with the Sale, Agent shall directly retain and engage all Supervisors.  The number and location of Supervisors to be retained and engaged by Agent with respect to the Sale shall be determined by Agent and Merchant.  The Agent and Merchant shall confer periodically concerning the increase/decrease of the number of Supervisors needed during the course of the Sale Term, as the circumstances may dictate and shall agree on any such increases or decreases.  The Supervisors are independent contractors engaged by Agent and are not and shall not be deemed to be employees or agents of Merchant in any manner whatsoever; nor do the Supervisors have any relationship with Merchant by virtue of this Agreement or otherwise which creates any liability or responsibility on behalf of Merchant for such Supervisors.  During the Sale Term, each Supervisor shall perform Services during normal Store operating hours and for the period of time prior to the Store opening and subsequent to the Store closing, as required in connection with the Sale in Agent's discretion.  In consideration of Agent's engagement of said Supervisors, Merchant agrees to pay/reimburse Agent the amount of Agent's fees/expenses for such supervisory services as set forth on Schedule 2.2 hereof, which amounts shall be in addition to the fees specified in Section 3 of this Agreement and shall be set forth in the Expense Budget; provided, however, that Merchant shall have no liability or obligation whatsoever to pay any such fees or expenses that exceed the budgeted amounts for such fees and expenses as set forth in the Expense Budget.

7

Section 3.       Agent's Fee.

3.1     Payments to Agent.  As compensation for the services being provided pursuant to this Agreement, Agent shall be entitled to a fee (the "Agent's Fee") in an amount equal to (a) $4,500 per Store plus (b)(i) those Net Proceeds that result in Net Proceeds equal to or greater than 37.7% of the Retail Value of the Merchandise, but less than or equal to 38.3% of the Retail Value of the Merchandise, and (ii) 30% of Net Proceeds to the extent that such Net Proceeds result in Net Proceeds in excess of 38.3% of the Retail Value of the Merchandise.  The Agent's Fee shall be paid by Merchant following the Final Reconciliation described in Section 3.3 below.  All Remaining Merchandise shall remain the property of Merchant but Agent shall be responsible for the disposition of such Remaining Merchandise in accordance with the instructions of Merchant.

3.2     Control of Proceeds; Calculation of Net Proceeds.  All cash proceeds from the Sale shall be retained by Merchant and handled in accordance with Merchant's normal cash management procedures.  For purposes of calculating Net Proceeds and the aggregate Retail Value of the Merchandise, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store.  Register receipts shall show for each item sold the retail price (as reflected on Merchant's books and records) for such item, and the markdown or other discount permitted to be granted by Agent in connection with such sale in accordance with the terms hereof.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.

3.3     Final Reconciliation.

(a)     Within sixty (60) days after the Sale Termination Date, Agent and Merchant shall jointly prepare a Final Reconciliation of the Sale.  Within five (5) days of completion of the Final Reconciliation, (i) any undisputed and unpaid Expenses shall be paid by Merchant, and (ii) any portion of the Agent's Fee related to a Store for which there is no disputed amount will be paid by Merchant to Agent.  Any (x) disputed amount(s) or (y)  Agent's Fee related to any Store where there are disputed amounts shall not be paid until all disputes related to such Store have been resolved by agreement of the parties or as determined in the manner prescribed in Section 3.3(b) hereof.  During the Sale Term, and until all of the Agent's and Merchant's obligations under this Agreement have been satisfied, Merchant shall have full access to Agent's records with respect to Proceeds, taxes, Expenses, and other records related to the Sale to review and audit such records.

(b)     In the event that there is any dispute with respect to the Final Reconciliation, such dispute shall be promptly (and in no event later than the third business day following the request by either Merchant or Agent) submitted to the Accounting Firm for resolution.  The non-prevailing party shall bear the cost of the Accounting Firm.  The parties shall request that the Accounting Firm render a final and binding decision on the dispute within seven (7) business days following the submission of the dispute.

Section 4.    <u>Expenses</u>.

4.1    <u>Expenses of the Sale</u>.

All Expenses of the Sale shall be borne by Merchant in accordance with the Expense Budget.  To the extent the Expenses of the Sale exceed, in the aggregate, the amount set forth in the Expense Budget as a result of budget information supplied by Merchant being incorrect or Merchant otherwise breaching this Agreement, the amount in excess of the amounts in the Expense Budget shall not be Expenses hereunder and shall be paid by Merchant.  To the extent the Expenses of the Sale, in the aggregate, exceed the amount set forth in the Expense Budget for any other reason, such amounts shall not be Expenses hereunder and shall be paid by Agent.  A copy of the Expense Budget is attached hereto as <u>Exhibit "A"</u> and is incorporated herein by reference.  Agent agrees that the actual Expenses incurred in connection with the Sale (to the extent such items are within the control of Agent) shall not exceed the aggregate amount of the Expense Budget unless Merchant and Agent mutually agree in writing. Without limiting the generality of the foregoing, during the Sale Term, Merchant shall provide Agent with (i) central administrative services necessary to administer the Sale, (ii) employees at the Stores (to the extent deemed necessary by Merchant to effect the Sale), and (iii) peaceful use and occupancy of, and reasonable access (including reasonable before- and after- hours access and normal utilities/phone service) to, the Stores for the purpose of preparing for, conducting, and completing the Sale as contemplated hereby.  It is anticipated that Agent will advance funds for certain categories of reasonable supervision and advertising expenses identified in the Expense Budget, and Merchant shall reimburse Agent therefor (in connection with each Interim Reconciliation) upon presentation of invoices and statements for such expenses, which reimbursement shall be in addition to the Agent's Fee.  In the event that Agent fails to timely vacate any of the Stores on or before May 23, 2006, Agent shall reimburse Merchant for any expenses and/or claims arising from or related to such Store after May 23, 2006.

4.2    <u>Payment of Expenses</u>.

Except for Expenses in excess of the payable Expense Budget, which shall be payable by either Agent or Merchant as set forth in Section 4.1 of this Agreement, on the third business day following each Interim Reconciliation, all undisputed Expenses submitted by Agent for the preceding period based upon invoices and other documentation reasonably satisfactory to Merchant shall be paid by Merchant.  To the extent Merchant disputes that Agent is entitled to payment of any portion of its Expenses, Merchant may withhold payment of the disputed amount and the parties shall work in good faith to resolve the dispute in the manner contemplated by Section 3.3(b).

Section 5.    <u>Merchandise</u>.

5.1    <u>Merchandise Subject to this Agreement</u>.    (a)    For purposes of this Agreement, "<u>Merchandise</u>" shall mean all inventory that is owned by Merchant located in the Stores on the Sale Commencement Date , including, but not limited to, cigarettes and liquor, provided that Merchant has the requisite licenses and employees, and provided further that Agent complies with all applicable law(s), and up to $1.5 million (at cost) of slow-moving, obsolete inventory as set forth on Exhibit 5.1 attached hereto or any additional amount mutually agreed to

by Agent and Merchant.  Notwithstanding the foregoing, "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) pharmaceutical goods in the pharmacy departments; provided, however, that Merchant shall have the right (but not the obligation) to continue to operate the pharmacy department at the Stores and retain all proceeds relating to such sales; provided further, however, that all direct costs and expenses associated or incurred in connection with the operation of the pharmacy departments at the Stores shall be at Merchant's sole expense; (4) goods or operations relating to ATM machines, "Coin Star" machines, and "bale" salvage at the Stores; provided, however, that Merchant shall have the right (but not the obligation) to continue such operations at the Stores and retain all proceeds relating to such sales; provided further, however, that all direct costs and expenses associated or incurred in connection with such operations at the Stores shall be at Merchant's sole expense; (5) FF&E and improvements to real property which are located in the Stores; and (6) Spoiled/Unsaleable Merchandise.  In addition to the foregoing, Merchandise shall also include such additional inventory of Merchant, including direct store delivery goods, that is not located in the Stores on the Sale Commencement Date but which Merchant and Agent mutually agree to include in the Sale no later than the first week after the Sale Term on terms and conditions acceptable to Merchant and Agent in accordance with the terms of this Agreement; it being the intent of the parties to maximize the opportunity incident to the Sale and, thus, to liquidate any obsolete or slow moving goods within the Merchant's chain.

5.2    Excluded Goods.  Merchant shall retain all responsibility for Excluded Goods.  Merchant and Agent shall agree whether to include any Excluded Goods in the Sale and, to the extent appropriate, sell these Excluded Goods at prices established by agreement between Merchant and Agent.  The Agent and Merchant shall agree how to share proceeds of such Sales.

5.3    FF&E.

(a)    Merchant may, in its sole discretion, elect on a Store-by-Store basis to have Agent market and sell the FF&E by making one or more FF&E Elections.  If Merchant makes one or more FF&E Elections, Agent shall market and sell the FF&E in the applicable Stores during the time period commencing on the Sale Commencement Date and concluding on the FF&E Sale Termination Date; provided, however, that Agent shall not sell any fixtures affixed to a wall or the floor unless (i) the proceeds to be received from the sale of such fixtures are substantially greater than the estimated cost of repairs to the relevant wall or floor; or (ii) the purchaser of such fixtures repairs the wall or floor in a commercially reasonable manner at its own expense.  In the event Merchant exercises the FF&E Election with respect to the FF&E in any Store(s), Agent shall be entitled to receive a commission equal to the FF&E Fee, Merchant shall have the right to determine, in the exercise of its reasonable discretion, the sale price of such FF&E.  Unless the applicable lessor agrees that FF&E may be abandoned at the applicable Store, all FF&E shall be removed from the Store(s) on or before the FF&E Sale Termination Date.  Notwithstanding anything to the contrary herein, the Merchant reserves the right to solicit and simultaneously consider offers to dispose of such property separate and apart from the liquidation process contemplated by this Agreement in which case no FF&E Fee shall be earned by or payable to Agent.  The Merchant shall remove any hazardous material, including, without limitation, freon.  Expenses incident to removal of such hazardous materials do not constitute expenses of the sale of FF&E hereunder and shall be paid by Merchant upon demand by Agent.

10

(b)    Merchant shall reimburse reasonable out of pocket expenses attributable to the sale of FF&E pursuant to the FF&E Expense Budget, which FF&E Expense Budget shall be mutually agreed upon in writing by Merchant and Agent.  On or prior to the FF&E Sale Termination Date for each Store, Agent shall leave such Store in "broom clean" condition (ordinary wear and tear excepted); *provided*, *however*, as of the FF&E Sale Termination Date, Agent may abandon in place in a neat and orderly manner any unsold FF&E at the Stores if    a "Vacate and Release" form has been signed by Merchant  and delivered to Agent.  For the avoidance of doubt, Occupancy Expenses shall not be taken into consideration in determining the FF&E Fee.

5.4    Licensed Departments.  Pharmacy and various other departments at the Stores are licensed to third party operators (the "Licensed Departments").  Merchant and Agent shall mutually agree on how to divide amounts payable by the licensees under the agreements pursuant to which they license the Licensed Departments.  In no event shall Agent have any liability to the licensees under the agreements pursuant to which they license the Licensed Departments.

Section 6.    Sale Term.

6.1    Term.  The Sale shall commence at the Stores on the Sale Commencement Date.  Subject to the Approval Order, the Agent shall complete the Sale at each Store, and shall vacate each Store's premises in favor of Merchant or its representative or assignee on or before the Sale Termination Date, provided that Agent may continue its efforts to sell the FF&E on or prior to the FF&E Sale Termination Date.  The Sale Termination Date at any of the Stores may be (a) extended by mutual written agreement of Agent and Merchant or (b) accelerated by Agent, in which case Agent shall provide Merchant with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date.  The FF&E Sale Termination Date at any of the Stores may be (a) extended by mutual written agreement of Agent and Merchant or (b) accelerated by Agent, in which case Agent shall provide Merchant with not less than seven (7) days' advance written notice of any such planned accelerated FF&E Sale Termination Date.

6.2    Vacating the Stores.  Agent shall provide Merchant with not less than seven (7) days' advance written notice of its intention to vacate any Store.  Notwithstanding the foregoing, all Stores shall be vacated on or prior to May 23, 2006 unless Merchant and Agent mutually agree otherwise.  On or prior to the FF&E Sale Termination Date at each Store, Agent shall vacate in favor of Merchant or its representatives or assignee, and leave such Store in "broom clean" condition (ordinary wear and tear excepted). Subject to Section 5.3(b), all assets of Merchant used by Agent in the conduct of the Sale (*e.g.* FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Stores' premises at the end of the Sale Term to the extent the same have not been sold or used as contemplated by this Agreement in the conduct of the Sale or have not been otherwise disposed of through no fault of Agent.  Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent or licensee thereof) to any Store during the Sale Term, ordinary wear and tear excepted.

11

Section 7.    <u>Sale Proceeds</u>.

7.1    <u>Proceeds</u>.  For purposes of this Agreement, "<u>Proceeds</u>" shall mean the total amount (in dollars) of all sales of Merchandise, Replenishment Goods, and Merchant Consignment Goods plus food stamps and other government subsidized credits and related items in connection with such sales made under this Agreement, exclusive of (i) Sales Taxes, (ii) credit card and bank card fees and chargebacks, (iii) returns, allowances, and customer credits, (iv) amounts held in trust for third parties and (v) proceeds generated from the sale of pharmaceutical goods in the pharmacy department.

7.2    <u>Credit Card Proceeds</u>.  Agent may use Merchant's credit card facilities (including Merchant's credit card terminals and processor(s), credit card processor coding, and existing bank accounts) for credit card sales, and Merchant shall process credit card transactions, applying customary practices and procedures.

Section 8.    <u>Conduct of the Sale</u>.

8.1    <u>Rights of Agent</u>.  Agent shall be permitted to conduct the Sale, on behalf of Merchant, as a "store closing" or similar theme sale in the Stores throughout the Sale Term in a manner consistent with the Sale Guidelines and in accordance with this Agreement.  In addition to any other rights granted to Agent hereunder, in performing its duties in connection with the Sale, Agent shall have the right for purposes of the Sale:

(a)    to implement Sale prices and Stores hours in accordance with an agreed upon plan with Merchant as set forth in the Expense Budget and subject to the terms of applicable leases, mortgages, or other occupancy agreements, and local laws or regulations, including, without limitation, Sunday closing laws;

(b)    to request from Merchant the use of, during the Sale Term in accordance with the Expense Budget all FF&E, bank accounts, Store-level customer lists and mailing lists, computer hardware and software, existing supplies located at the Stores, intangible assets (including Merchant's name, logo, and tax identification numbers), Store keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses.  Agent shall exercise due care and return to the Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

(c)    to request from Merchant the use of Merchant's central office facilities, central administrative services, and personnel to process payroll, perform MIS, and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant in-house, at no cost to Agent subject, however, to the Expense Budget; <u>provided</u>, <u>however</u>, that in the event Agent expressly requests

12

Merchant to provide services other than those normally provided to the Stores and relating to the sale of merchandise by Merchant in the ordinary course of business and as expressly contemplated by this Agreement, Agent shall be responsible to reimburse Merchant, as an Expense of the Sale hereunder, for the actual incremental cost of such services incurred by Merchant to a third party (e.g., a party which is not affiliated with or related to Merchant);

(d)     to establish and implement Merchant-approved advertising, signage, and promotion programs consistent with a "store closing," or similar theme sale, and as otherwise provided in the Approval Order and the Sale Guidelines (including, without limitation, by means of media advertising, banners, A-frame, and similar signage);

(e)     to request permission of Merchant to transfer Merchandise between Stores and to facilitate such transfer as directed by Merchant;

(f)     to assist Merchant, at Merchant's sole option, to replenish the Replenishment Goods;

(g)     Recommend and implement Merchant-approved (i) point of purchase, point of sale, and external and internal advertising and signage necessary to effectively sell the Merchandise at the Stores in accordance with a "store closing" or other mutually agreeable theme (Agent shall deliver copies of all advertising materials for the Sale to Merchant which shall have the right, within three (3) business days of such delivery, to approve such materials (which approval shall not be unreasonably withheld or delayed); provided, however, that the failure of the Merchant to reasonably respond to any request for approval within three (3) business days shall be deemed to be approval of the subject materials), (ii) pricing and presentation of Merchandise, (iii) staffing levels for the Stores (including store employees), (iv) merchandise transfer strategies between and among the Stores, and (v) store operation practices (i.e., ongoing services and housekeeping);

(h)     at Agent's election, and as an Expense identified in the Expense Budget, to continue to offer customer services currently offered in the Stores relating to "moneygrams" or money orders, accepting payment of customer utility bills, and check cashing;

(i)     to use the bakery, deli, meat, and other departments, including Licensed Departments, other than pharmacy departments and lottery departments, for periods of time to be agreed between Agent and Merchant;

(j)     to return Merchandise to vendors with the consent of Merchant; and

(k)     to work with Merchant prior to the Sale Commencement Date to manage Merchandise levels at the Stores.

8.2     <u>Terms of Sales to Customers, Compliance With Law</u>.    All sales of Merchandise will be "final sales" and "as is," and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash and nationally recognized bank credit cards, <u>provided</u>, <u>however</u>, that if Agent determines to accept personal checks, Agent shall bear the risk of loss relating thereto.  Unless otherwise directed by Merchant in writing, Agent shall accept Merchant's gift certificates, Merchandise credits, due bills, and rain checks issued by Merchant prior to the Sale Commencement Date.  Except as may otherwise be provided in the Approval Order, Agent shall comply with all applicable laws and regulations in its conduct of the Sale, including laws and regulations governing the advertising of the Sale, Merchandise pricing, and employment.  If Agent fails to perform its responsibilities in accordance with this Section 8.2, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to comply with applicable laws and regulations.    Agent shall honor Manufacturers' Coupons; <u>provided</u>, <u>however</u>, that when Merchant is reimbursed by its coupon clearing house, the net actual amount of such reimbursement shall be included in the calculation of Proceeds at the next Interim Reconciliation of Proceeds during the Sale.  Merchant and Agent shall prepare all appropriate documentation incidental to submission of the Manufacturers' Coupons to the respective manufacturer and/or vendor, and Merchant shall retain all monies received from the manufacturers or vendors on account of such Manufacturers' Coupons.  In addition, and in accordance with applicable law, Agent shall accept food stamps; <u>provided</u>, <u>however</u>, that as part of the weekly Sale reconciliation pursuant to Section 8.6 hereof, the amount of food stamps shall be included in the calculation of Proceeds.

8.3     <u>Sales Taxes</u>.  During the Sale Term, all Sales Taxes shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, and be immediately deposited in Merchant's existing accounts, trust accounts, or other accounts, as designated by Merchant.  With Agent's cooperation, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities.  Provided Agent performs its responsibilities in accordance with this Section 8.3, Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any

and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

8.4　　Supplies.　Agent shall have the right to use for purposes of the Sale all existing supplies (_e.g._, boxes, bags, twine) located at the Stores, at no charge to Agent.　In the event that additional supplies are required in any of the Stores during the Sale, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; provided, however, that Merchant shall assist Agent in obtaining supplies from Merchant's vendors at Merchant's cost to the extent set forth in the Expense Budget.　Supplies have not been, and shall not be, prior to the Sale Commencement Date, transferred by Merchant to or from the Stores so as to alter the mix or quantity of supplies at the Stores from that existing on such date, other than in the ordinary course of business.

8.5　　Daily Reports.

(a)　　Sale Reports.　Agent shall prepare and deliver to Merchant (i) reports of sales (gross and net of discount) on a daily basis, in the form attached hereto as Schedule 8.5, and (ii) from time to time upon request, such other reports as the parties mutually agree are reasonably necessary to properly effect the Sale.

(b)　　FF&E Sale Reports.　If one or more FF&E Elections are made, during the period from the Sale Termination Date until the FF&E Sale Termination Date, Agent shall prepare and deliver to Merchant (i) daily reports, in form and substance satisfactory to Merchant, of sales of FF&E, any FF&E or other property proposed to be abandoned and such other matters as Merchant may reasonably request, (ii) copies of all "Vacate and Release" forms obtained by Agent from a Store lessor or a designated representative of lessor and (iii) from time to time upon request, such other reports as the parties mutually agree are reasonably necessary to properly effect the sale of FF&E.

(c)　　Post Sale.　Each party to this Agreement shall, at all times during the Sale Term and during the one-year period thereafter, provide the other with access to all information, books, and records relating to the Sale and to this Agreement.　All records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.　In addition, Merchant and Agent shall conduct weekly executive conference calls regarding the Sale process and Agent's lead supervisor and financial/accounting supervisor shall be on premises at the Merchant's headquarters and available to answer Merchant's questions during the Sale Term

8.6　　Sale Reconciliation.　On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant shall cooperate to reconcile Expenses, sales of Merchant Consignment Goods and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (each such reconciliation, an "Interim Reconciliation").　Within sixty (60) days after the end of the Sale Term, Agent and Merchant shall complete the Final Reconciliation, the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.

8.7     Force Majeure.  If any casualty or act of God prevents the conduct of business in the ordinary course at any Store for a period in excess of seven (7) consecutive days, such Store and the Merchandise located at such Store shall be eliminated from the Sale and considered to be deleted from this Agreement as of the last date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto.  Agent will use its best efforts to consolidate and transfer all Merchandise which is not the subject of insurance proceeds and include said Merchandise in the Sale in other Stores.

Section 9.     Conditions Precedent.  The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)     All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects (provided that neither party shall be able to terminate this Agreement pursuant to Section 14.10 if any breaches of representations or warranties that would cause this Section 9(a) to be failed to be satisfied have been cured in the time contemplated by Section 13).

(b)     On or before March 23, 2006, the Court shall have entered the Approval Order.

Section 10.     Representations, Warranties, and Covenants.

10.1     Merchant's Representations, Warranties, and Covenants.     Merchant hereby represents, warrants, and covenants in favor of Agent as follows:

(a)     Merchant (i) is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation; (ii) has all requisite corporate power and authority to own, lease, and operate its assets and properties and to carry on its business as presently conducted and, subject to the requirement of Bankruptcy Court approval, has the power and authority to consummate the transactions contemplated by this Agreement; and (iii) is and during the Sale Term will continue to be duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)     Subject to the issuance and entry of the Approval Order, Merchant has the right, power, and authority to execute and deliver the Agency Documents and to perform fully its obligations thereunder.  Subject to the issuance and entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval on the part of Merchant is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Subject to the issuance and entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the

16

legal, valid, and binding obligation of Merchant enforceable in accordance with its terms. Subject to the issuance and entry of the Approval Order, no court order or decree of any federal, state, or local governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for the Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Other than for those contracts or agreements identified by Merchant to Agent on or prior to the Sale Commencement Date, if any, no contract or other agreement to which the Merchant is a party or by which the Merchant is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

          (c)      Agent shall have the right, subject to the right of Merchant to maintain a separate FF&E liquidator, to the unencumbered use and occupancy of, and peaceful and quiet possession of, each of the Stores, in order to perform its obligations described in this Agreement. Other than as identified by Merchant to Agent on or prior to the Sale Commencement Date, to the extent necessary in furtherance of the Sale, Merchant shall throughout the Sale Term maintain in a manner consistent with its customary and historic practices, at its sole expense (except as otherwise provided herein), all cash registers, heating systems, refrigeration, air conditioning systems, elevators, escalators, alarm systems, and all other mechanical devices used in the ordinary course of operation of the Stores or, if applicable, use reasonable efforts to cause any applicable landlord to comply with its obligations under applicable lease and occupancy agreements with respect to any such matter.

          (d)      Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Sale without the prior agreement of Agent.

          (e)      From the date of this Agreement through the Sale Commencement Date, the Merchant has operated and will operate the Stores and all of its stores that are not part of the Sale (the "Remaining Stores") in the ordinary course of business consistent with post-petition historical operations.  Without limiting the foregoing, from the date of this Agreement through the Sale Commencement Date, (i) Merchant has not conducted and will not conduct any promotions or advertised sales at the Stores except promotions and sales in the ordinary course of business consistent with promotions and sales at the Remaining Stores and historic promotions and sales for comparable periods last year, (ii) except as set forth in Section 5.1, Merchant has continued and will continue to replenish the Stores with new Merchandise in a manner consistent with replenishment of the Remaining Stores and historic practices unless otherwise agreed to by the parties, and (iii) all rack jobbers and service vendors have continued and will continue to service the Stores in the ordinary course.

          (f)      Merchant owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise free and clear of all liens, claims and encumbrances of any nature, except for presently existing or future liens, which, in accordance with the Approval Order, shall attach only to the Proceeds to be retained by Merchant hereunder and shall not

attach to the Agent's Fee.  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds except for presently existing or future liens, which, in accordance with the Approval Order, shall attach only to the Proceeds to be retained by Merchant hereunder and shall not attach to the Agent's Fee.

(g)    Merchant covenants to continue to operate the Stores in the post-petition ordinary course of business from the date of this Agreement to the Sale Commencement Date, and to operate the Remaining Stores in the ordinary course of business from the date of this Agreement through the Sale Termination Date, in each case (i) selling inventory during such period at customary prices, (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public (except for Merchant's historic  and customary promotions for all of its locations), (ii) not returning inventory to vendors and not transferring inventory or supplies between or among Stores and Remaining Stores, except as permitted by this Agreement, and (iv) not making any material management personnel moves or changes at the Stores without Agent's prior written consent (which consent will not be unreasonably withheld).  Without limiting the foregoing, Merchant shall not conduct or advertise "going out of business", "store closing", or "liquidation" sales at any of the Remaining Stores located within the market area of any Store at any time during the Sale Term and Merchant shall not offer a discount in such closing Remaining Store or Remaining Stores greater than that being simultaneously offered by Agent in the Stores in such market area.

(h)    Merchant shall provide Agent with its historic policies and practices regarding product recalls.

(i)    Agent shall have peaceful and quiet use and occupancy of the Stores during the term of the Sale, and the expiration date of any lease or effective date of any rejection of any lease, if any, covering a Store shall not be prior to the FF&E Sale Termination Date at such Store.

10.2    Agent's Representations, Warranties, and Covenants.    Agent hereby represents, warrants, and covenants in favor of Merchant as follows:

(a)    Agent is composed of limited liability companies, each of which (i) is duly formed, and validly existing, and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)    Agent hereby acknowledges and warrants that prior to the execution of the Agreement, Agent has had an opportunity to inspect the Stores and the Merchandise.

(c)    Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery, and

performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms. No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor. No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(d)     No action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Agent, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(e)     During the Sale Term, Agent shall maintain (i) a safe working and shopping environment in the Stores; and (ii) Store cleanliness in a manner at least consistent with Merchant's past practices for the Stores.

(f)     Except as may otherwise be provided in the Approval Order, during the Sale Term, Agent shall comply with all federal, state, and local laws, rules, and regulations applicable to Agent in connection with the transactions contemplated by this Agreement.

Section 11.     Insurance.

11.1     Merchant's Liability Insurance.  Merchant shall continue until the Sale Termination Date, in such amounts and on such terms and conditions as are consistent with Merchant's ordinary course operations, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability, and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of, the Stores, and shall cause Agent to be named an additional named insured with respect to all such policies.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions, or self-insured amounts to the extent said claim arises from or relates to the alleged acts or omissions of Merchant or its employees, agents (other than Agent's employees), or independent contractors (other than Agent and independent contractors hired by Agent in conjunction with the Sale or Merchant's employees being supervised by Agent).

11.2     Merchant's Casualty Insurance.  Merchant shall continue until the Sale Termination Date, in such amounts and on such terms and conditions as are consistent with Merchant's ordinary course operations, fire, flood, theft, and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the cost value thereof.

In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise (net of any deductible) shall constitute Proceeds. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent.

11.3    Workers' Compensation Insurance.  Merchant shall continue until the Sale Termination Date, in such amounts and on such terms and conditions as are consistent with Merchant's ordinary course operations, workers' compensation insurance (including employer liability insurance) covering all of Merchant's Store-level employees in compliance with all statutory requirements.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

11.4    Agent's Insurance.  Agent shall maintain at Agent's cost and expense throughout the Sale Term, in such amounts and on such terms and conditions as are acceptable to Merchant in its reasonable discretion, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in, or in connection with Agent's duties at, the Stores, and shall cause Merchant to be named an additional insured with respect to such policies.  Exhibit 11.4 attached hereto contains a description of all such policies.  Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonable satisfactory to Merchant.  In the event of a claim under such policies, Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors.

11.5    Risk of Loss.

Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, except, however, that Agent shall be responsible for supervising the conduct of the Merchant's Store-level employees in connection with the Sale, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing, other than with respect to supervising the conduct of the Merchant's Store-level employees.  Agent shall not be deemed to be a successor employer. Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees, and other persons arising from events occurring at the Stores during and after the Sale Term, except for any Agent Claims.  In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date.  To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant.  In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall

present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party at the address specified in Section 15.1 hereof.

Section 12.    Indemnification.

12.1    Merchant Indemnification.  Merchant shall indemnify and hold the Agent Indemnified Parties harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from or related to:

(a)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations, or warranties contained in any Agency Document;

(b)    any failure of Merchant to pay to its employees any wages, salaries, or benefits due to such employees during the Sale Term;

(c)    any consumer warranty or products liability claims except to the extent such claims arise from representations made by the Agent relating to the Merchandise;

(d)    any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, workers' compensation or under the WARN Act), except for Agent Claims and such other claims for which Agent has indemnified Merchant elsewhere in this Agreement;

(e)    the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent), or representatives.

Notwithstanding anything to the contrary contained in this section 12.1, Merchant's aggregate obligation to indemnify Agent under the terms of the Agreement shall expire three (3) months after the Sale Termination Date and shall not exceed $2,000,000 in the aggregate.

12.2    Agent Indemnification.  To secure Agent's indemnity obligations under this section, Agent shall issue a letter of credit from a bank acceptable to Merchant, in Merchant's sole discretion, in an amount no less than $2,000,000.  The cost of the letter of credit, including fees associated therewith, shall be an Expense of Sale added to the Expense Budget. Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Merchant resulting from or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of the Agent):

(a)    Agent's material breach of or failure to comply with any local, state, or federal laws or regulations, or any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)      any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors, or other officers, directors, or representatives of Agent;

(c)      any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

(d)      any Agent Claims; and

(e)      the negligence or willful misconduct of Agent or any of its officers, directors, employees, agents, or representatives.

Notwithstanding anything to the contrary contained in this section 12.2, Agent's aggregate obligation to indemnify Merchant under the terms of the Agreement shall expire three (3) months after the Sale Termination Date and shall not exceed $2,000,000 in the aggregate.

12.3    <u>Indemnification Procedure</u>.    The party seeking indemnity under this Agreement shall: (a) fully and promptly notify the other party of any claim or proceeding, or threatened claim or proceeding; (b) permit the indemnifying party to take full control of such claim or proceeding; (c) cooperate in the investigation and defense of such claim or proceeding; (d) not compromise or otherwise settle any such claim or proceeding without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned, or delayed; and (e) take all reasonable steps to mitigate any loss or liability in respect of any such claim or proceeding.

Section 13.    <u>Defaults</u>.    In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder.

Section 14.    <u>Miscellaneous</u>.

14.1    <u>Notices</u>.    All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, as follows:

|  |  |
|---|---|
| If to the Agent: | Hilco Merchant Resources |
|  | 5 Revere Drive, Suite 206 |
|  | Northbrook, IL  60062 |
| Attn: | Cory Lipoff |
|  | EVP & Principal |
| Tel: | (847) 849-2915 |
| Fax: | (847) 897-0717 |
|  |  |
|  | Gordon Brothers Group |
|  | 40 Broad Street |
|  | Boston, MA 02109 |

22

|        |                  |          |          |
|--------|------------------|----------|----------|
| Attn:  | Brad Snyder      |          |          |
|        | Managing Director and Principal | | |
| Tel:   | (617) 422-6216   |          |          |
| Fax:   | (617) 422-6288   |          |          |

with a copy to:

|        |                        |
|--------|------------------------|
|        | Latham & Watkins LLP   |
|        | Sears Tower, Suite 5800 |
|        | 233 S. Wacker Drive    |
|        | Chicago, IL  60606     |
| Attn:  | Josef S. Athanas, Esq. |
| Tel:   | (312) 876-7608         |
| Fax:   | (312) 993-9767         |

If to Merchant:

|        |                        |        |       |
|--------|------------------------|--------|-------|
|        | Winn-Dixie Stores, Inc. |       |       |
|        | 5050 Edgewood Ct.      |        |       |
|        | Jacksonville, FL  32254 |       |       |
| Attn:  | Catherine Ibold        |        |       |
| Tel:   | (904) 783-5585         | Fax:   | (904) |
| (Get Fax Please) |              |        |       |

with a copy to:

|        |                          |
|--------|--------------------------|
|        | Smith Hulsey & Busey     |
|        | 225 Water Street, Suite 1800 |
|        | Jacksonville, Florida 32202 |
| Attn:  | John R. Smith, Jr., Esq. |
| Tel:   | (904) 359-7700           |
| Fax:   | (904) 359-7708           |

14.2    Governing Law: Consent to Jurisdiction.    This Agreement shall be governed and construed in accordance with the laws of the State of Florida, without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court shall retain jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the exclusive jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

14.3    Entire Agreement.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

14.4    Amendments.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

14.5    No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

14.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, including, but not limited to, any Chapter 11 or Chapter 7 trustee.  Agent shall not be permitted to assign its obligations under this Agreement.

14.7    Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

14.8    Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

14.9    Reporting.  If requested by Merchant, Agent shall prepare weekly reports including, without limitation, reports that comply with the Merchant's current weekly cash reporting to its central office, reflecting the progress of the Sale, which shall specify the Proceeds received to date.  The Agent will maintain and provide to Merchant sales records to permit calculation of and compliance with any percentage rent obligations under Stores leases.  During the course of the Sale, Merchant shall have the right to have representatives continually act as observers of the Sale in the Stores so long as they do not interfere with the conduct of the Sale.

14.10    Termination.  This Agreement shall remain in full force and effect until the first to occur of: (i) receipt by Merchant of written notice from Agent that any of the conditions specified in Section 9 hereof have not been satisfied; (ii) receipt by Agent of written notice from Merchant that any of the conditions specified in Section 9 hereof have not been satisfied; or (iii) the expiration of the Sale Term and completion and certification by Merchant and Agent of the Final  Reconciliation pursuant to Section 8.6 above.  Notwithstanding the foregoing, the provisions of Sections 3.3, 11 and 12 above shall survive the termination of this Agreement pursuant to this Section 14.10.

Section 15.    Employee Matters.

15.1    Merchant's Employees.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent in its sole discretion deems expedient, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date.  Retained Employees shall at all

times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent. Merchant and Agent agree that except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law (except to the extent such items are amounts for which Merchant is entitled to indemnification hereunder); nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees. Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of its employees prior to the Sale Termination Date.

15.2    Termination of Employees.    Agent may in its discretion stop using any Retained Employee at any time during the Sale. In the event of termination of any Retained Employee, Agent will use all reasonable efforts to notify Merchant at least five (5) days prior thereto, except for termination "for cause" (such as dishonesty, fraud or breach of employee duties), in which event no prior notice to Merchant shall be required, provided Agent shall notify Merchant as soon as practicable after such termination. From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent, which consent shall not be withheld unreasonably.

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

**A JOINT VENTURE COMPOSED OF HILCO MERCHANT RESOURCES, LLC, AND GORDON BROTHERS RETAIL PARTNERS, LLC**
By:    Hilco Merchant Resources, LLC

By:    _____
Name:    _____
Title:    _____


**WINN-DIXIE STORES, INC.**


By:    _____
Name:    _____
Title:    _____

25

**Exhibit 8.1**

## Winn-Dixie Stores, Inc. – Store Closing Guidelines

The following procedures shall apply to Store closing sales ("Sales") to be held at the Stores:[1]

1.    The Sale shall be conducted so that the Stores in which sales are to occur remain open no longer than the normal hours of operation provided for in the respective leases for the Stores.

2.    The Sale shall be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

3.    All display and hanging signs used by the Merchant and the Agent in connection with the Sale shall be professionally produced, and all hanging signs shall be hung in a professional manner.  To the extent authorized by the Bankruptcy Court, the Merchant and the Agent may advertise the Sale as a "store closing" or similar themed sale at the Stores, as provided by the Agency Agreement.  The Merchant and the Agent shall not use neon or day-glo signs.  Nothing contained herein shall be construed to create or impose upon the Merchant and the Agent any additional restrictions not contained in the applicable lease.  In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at the Stores; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store location and shall not be wider than the front of the Store.  In addition, the Merchant and the Agent shall be permitted to utilize sign walkers and customary street signage.

4.    Conspicuous signs shall be posted in the cash register areas of each affected Store to the effect that all sales are "final", that merchandise has been discounted for the Sale and no other discounts will be honored, including Merchant's "customer reward cards" and that customers with any questions or complaints subsequent to the conclusion of the Sale may contact a named representative of the Merchant or the Agent at a specified telephone number.

5.    The Agent shall not distribute handbills, leaflets, or other written materials to customers outside of any of the Stores, unless permitted by the applicable lease or if distribution is customary in the shopping center in which the Store is located.  Otherwise, the Agent may solicit customers in the Stores themselves.  The Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

6.    At the conclusion of the Sale, Agent shall vacate the Stores in "broom-clean"

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agency Agreement.

condition, and shall otherwise leave the Stores in the same condition as at the commencement of the Sale, ordinary wear and tear excepted; provided, however, that the Merchant and/or the Agent shall be authorized to leave any Abandoned Property (as that term is defined herein) in the Stores; provided, further, that the Merchant does not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Merchant may abandon any FF&E or other materials of *de minimis* value (the "Abandoned Property") not sold in the Sale at the Store premises at the conclusion of the Sale. Any Abandoned Property left in a Store after a lease is rejected shall be deemed abandoned, with the landlord having the right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord and without waiver of any damage claims against the Merchant.

7.      The Merchant and/or the Agent, if requested by the Merchant, may sell FF&E owned by the Merchant and located in the Stores during the Sale. The Merchant or the Agent, as the case may be, may advertise the sale of FF&E. Additionally, the purchasers of any FF&E sold during the Sale shall only be permitted to remove the FF&E either through the back shipping areas or through other areas after Store business hours.

8.      Landlords will be provided with the name and telephone number of a representative of the Merchant to notify of any problem arising during the Sale.

9.      The Agent shall not make any alterations to interior or exterior Store lighting. No property of any landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or other signage shall not constitute an alteration to a Store.

10.     At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Store premises as set forth in the applicable leases. The Merchant, the Agent, and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

11.     Post-petition rents shall be paid and other lease obligations shall be performed by the Merchant as required by the Bankruptcy Code, except as modified pursuant to the Approval Order, until the rejection or assumption and assignment of each lease.

12.     The rights of the landlords for any damages to the Stores shall be reserved in accordance with the applicable leases.

13.     Agent shall provide Merchant with not less than seven (7) days' advance written notice of its intention to vacate any Store. The Merchant shall notify a representative of the relevant landlord of the date on which the Sale is scheduled to conclude at a given Store, within three business days of the Merchant's receipt of such notice from the Agent. To the extent reasonably possible, Merchant shall

schedule with each such landlord and Agent a walk-through inspection at which a representative of Merchant will document with photographer or otherwise any issues raised by landlord, Agent or Merchant.

14.   Subject to Bankruptcy Court approval, the Merchant and/or the Agent may conduct one or more auctions of Merchandise and/or FF&E from the Stores.

525100.2

**Winn Dixie**
**Exhibit A - Provisional**

DRAFT - PRIVILEGED AND CONFIDENTIAL
Preliminary and Subject to Change

|  | Winn Dixie |  |
|---|---|---|
| Total # of Stores |  | 35 |
|  |  | 175  Store Weeks |
| **Expenses** |  |  |
| *Payroll* |  |  |
| Salaries | $ | 2,826,970 |
| Incentives |  | 0 |
| Benefits |  | 780,244 |
| **Total Payroll** |  | **3,607,214** |
|  |  |  |
| **Occupancy** |  |  |
| Base Rent |  | 1,106,579 |
| Percentage Rent |  | 0 |
| Utilities |  | 802,864 |
| CAM |  | 102,366 |
| Real Estate and Use Taxes |  | 181,179 |
| Building Insurance |  | 16,620 |
| Other (Misc) |  | 0 |
| **Subtotal Occupancy** |  | **2,209,607** |
|  |  |  |
| Cleaning |  | 24,523 |
| Cleaning Services |  | 185,442 |
| Store Repair |  | 232,078 |
| Equipment Maintenance |  | 97,009 |
| Telephone |  | 41,234 |
| Garbage |  | 51,674 |
| Workers Comp |  | 28,202 |
| Store Ins. Claims |  | 1,052 |
| Regular Insurance |  | 321,769 |
| Laundry |  | 8,382 |
| Exterminating |  | 5,080 |
| Security |  | 53,018 |
| **Other Operating Expenses** |  | **1,049,462** |
|  |  |  |
| **Total Occupancy & Other Operating Expenses** |  | **3,259,070** |
|  |  |  |
| *Advertising* |  |  |
| Media |  | 832,624 |
| Signs |  | 157,500 |
| Sign Walkers |  | 0 |
| **Total Advertising** |  | **990,124** |
|  |  |  |
| *Miscellaneous* |  |  |
| Bank & Credit Card Fee |  | 174,405 |
| Compliance |  | 38,167 |
| Security Labels |  | 4,581 |
| Taxes / Licenses |  | 62,325 |
| Armored Car Services |  | 15,632 |
| Transportation |  |  |
| Other store expenses |  | 88,059 |
| **Total Miscellaneous** |  | **383,168** |
|  |  |  |
| **Supervision** |  | **343,256** |
|  |  |  |
| **Total Expenses** | $ | **8,582,831** |

EXHIBIT B
OCCUPANCY / PER DIEM EXP

DRAFT - PRIVILEGED AND CONFIDENTIAL
Preliminary and Subject to Change

Exhibit B

Per Diem

| Store # | Store Name | Base Rent | CAM | Insurance | Real Estate Taxes | Utilities | Worker's Comp | Regular Insurance | Taxes/Licenses | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 71 | TIFTON | 798 | 37 | 0 | 52 | 404 | 0 | 255 | 38 | 1,585 |
| 149 | CORDELE | 361 | 39 | 37 | 68 | 367 | 41 | 217 | 53 | 1,184 |
| 185 | JACKSONVILLE | 453 | 62 | 41 | 78 | 504 | 59 | 247 | 45 | 1,489 |
| 192 | CAIRO | $ 1,016 | $ 42 | $ 12 | $ 108 | $ 569 | $ 9 | $ 204 | $ 35 | $ 1,996 |
| 205 | MIAMI | 1,092 | 211 | 103 | 255 | 658 | 55 | 327 | 67 | 2,768 |
| 208 | WEST PALM BEACH | 800 | 141 | 0 | 0 | 604 | 0 | 217 | 56 | 1,818 |
| 211 | PLANTATION | 650 | 10 | 0 | 154 | 525 | 0 | 192 | 35 | 1,566 |
| 215 | N MIAMI BEACH | 230 | 42 | 0 | 186 | 516 | 21 | 217 | 29 | 1,241 |
| 217 | POMPANO BEACH | 1,334 | 37 | 0 | 176 | 891 | 21 | 315 | 58 | 2,833 |
| 240 | HIALEAH | 787 | 36 | 0 | 134 | 334 | 0 | 279 | 80 | 1,650 |
| 301 | FT. LAUDERDALE | 1,115 | 1 | 0 | 52 | 763 | 0 | 219 | 48 | 2,197 |
| 310 | DAVIE | 1,072 | 144 | 0 | 419 | 738 | 68 | 205 | 58 | 2,705 |
| 339 | DAVIE | 431 | 9 | 0 | 139 | 599 | 0 | 218 | 33 | 1,430 |
| 372 | SUNRISE | 539 | 10 | 0 | 302 | 481 | 6 | 190 | 49 | 1,575 |
| 409 | OPELIKA | 786 | 36 | 19 | 73 | 403 | 14 | 262 | 64 | 1,657 |
| 516 | BRENT | 464 | 20 | 0 | 36 | 284 | 0 | 162 | 38 | 1,004 |
| 602 | BARTOW | 865 | 58 | 31 | 156 | 789 | 21 | 276 | 38 | 2,232 |
| 613 | BRADENTON | 1,154 | 254 | 19 | 10 | 687 | 0 | 338 | 42 | 2,504 |
| 643 | TAMPA | 1,031 | 58 | 0 | 260 | 695 | 0 | 338 | 68 | 2,451 |
| 659 | SARASOTA | 1,118 | 187 | 0 | 171 | 553 | 0 | 259 | 35 | 2,323 |
| 695 | PALM HARBOR | 1,484 | 53 | 0 | 295 | 751 | 21 | 389 | 51 | 3,044 |
| 719 | CAPE CORAL | 798 | 78 | 0 | 33 | 636 | 172 | 263 | 46 | 2,026 |
| 725 | FT MYERS | 1,198 | 55 | 0 | 140 | 697 | 21 | 294 | 51 | 2,455 |
| 735 | NAPLES | 1,093 | 95 | 40 | 83 | 775 | 0 | 307 | 50 | 2,443 |
| 738 | NAPLES | 1,126 | 166 | 35 | 346 | 725 | 89 | 280 | 50 | 2,818 |
| 1571 | VILLE PLATTE | 1,030 | 29 | 0 | 71 | 771 | 122 | 172 | 117 | 2,312 |
| 1579 | PLAQUEMINE | 1,193 | 35 | 0 | 127 | 929 | 21 | 279 | 106 | 2,689 |
| 2254 | KISSIMMEE | 1,074 | 127 | 85 | 202 | 921 | 21 | 294 | 35 | 2,759 |
| 2257 | ORLANDO | 225 | 12 | 0 | 24 | 310 | 10 | 182 | 35 | 797 |
| 2298 | MELBOURNE | 702 | 210 | 0 | 117 | 745 | 0 | 247 | 36 | 2,057 |
| 2324 | COCOA | 1,195 | 287 | 0 | 270 | 812 | 0 | 293 | 53 | 2,909 |
| 2330 | MERRITT ISLAND | 695 | 13 | 0 | 80 | 651 | 0 | 257 | 37 | 1,732 |
| 2357 | VERO BEACH | 980 | 114 | 32 | 175 | 1,124 | 11 | 242 | 59 | 2,738 |
| 2387 | CASSELBERRY | 1,305 | 118 | 0 | 228 | 902 | 0 | 362 | 40 | 2,954 |
| 2650 | ORLANDO | 1,424 | 100 | 21 | 159 | 822 | 0 | 398 | 45 | 2,969 |
| 35 | Total | $ 31,617 | $ 2,925 | $ 475 | $ 5,177 | $ 22,939 | $ 806 | $ 9,193 | $ 1,781 | $ 74,911 |
| | Per Week | 221,316 | 20,473 | 3,324 | 36,236 | 160,573 | 5,640 | 64,354 | 12,465 | 524,380 |
| | Per Store Week | 6,323 | 585 | 95 | 1,035 | 4,588 | 161 | 1,839 | 356 | 14,982 |

Exhibit 1
GOB Store Listing

DRAFT - PRIVILEGED AND CONFIDENTIAL
Preliminary and Subject to Change

| Store Number | DMA | Store Type | Address | City | State | Zip | County |
|---|---|---|---|---|---|---|---|
| 71 | Albany | Winn-Dixie | 412 N VIRGINIA AVENUE | TIFTON | GA | 31794 | TIFT |
| 149 | Albany | Winn-Dixie | 1101 16TH AVENUE EAST | CORDELE | GA | 31015 | CRISP |
| 185 | Jacksonville | Winn-Dixie | 999 N UNIVERSITY BLVD. | JACKSONVILLE | FL | 32211 | DUVAL |
| 192 | Tallhsee-Thmsvl | Winn-Dixie | 1000 FIRST AVENUE NE | CAIRO | GA | 39828 | GRADY |
| 205 | Miami-Ft. Laude | Winn-Dixie | 18350 NW 7TH AVENUE | MIAMI | FL | 33169 | DADE |
| 208 | West Plm Bch-Fp | Winn-Dixie | 5335 MILITARY TRAIL, BAY 60 | WEST PALM BEACH | FL | 33407 | PALM BEACH |
| 211 | Miami-Ft. Lauderdale | Winn-Dixie | 1885 N PINE ISLAND ROAD | PLANTATION | FL | 33322 | BROWARD |
| 215 | Miami-Ft. Lauderdale | Winn-Dixie | 2145 NE 164TH ST | N MIAMI BEACH | FL | 33162 | DADE |
| 217 | Miami-Ft. Lauderdale | Winn-Dixie | 1199 S FEDERAL HWY | POMPANO BEACH | FL | 33062 | BROWARD |
| 240 | Miami-Ft. Lauderdale | Winn-Dixie | 3890 WEST 18TH AVE | HIALEAH | FL | 33012 | DADE |
| 301 | Miami-Ft. Lauderdale | Winn-Dixie | 1707 E. COMMERCIAL BLVD. | FT. LAUDERDALE | FL | 33334 | BROWARD |
| 310 | Miami-Ft. Lauderdale | Winn-Dixie | 4460 WESTON ROAD | DAVIE | FL | 33331 | BROWARD |
| 339 | Miami-Ft. Lauderdale | Winn-Dixie | 6431 STIRLING RD | DAVIE | FL | 33314 | BROWARD |
| 372 | Miami-Ft. Lauderdale | Winn-Dixie | 15900 WEST STATE RD 84 | SUNRISE | FL | 33325 | BROWARD |
| 409 | Columbus | Winn-Dixie | 2440 PEPPERELL PKY | OPELIKA | AL | 36801 | LEE |
| 516 | Birmingham | Winn-Dixie | 125 HWY 25 | BRENT | AL | 35034 | BIBB |
| 602 | Tampa-St P(Sar) | Winn-Dixie | 1050 N. WILSON AVENUE | BARTOW | FL | 33830 | POLK |
| 613 | Tampa-St P(Sar) | Winn-Dixie | 4502 E SR 64 | BRADENTON | FL | 34208 | MANATEE |
| 643 | Tampa-St P(Sar) | Winn-Dixie | 4479 GANDY BLVD. | TAMPA | FL | 33611 | HILLSBOROUGH |
| 659 | Tampa-St P(Sar) | Winn-Dixie | 5400 CLARK RD. | SARASOTA | FL | 34233 | SARASOTA |
| 695 | Tampa-St P(Sar) | Winn-Dixie | 33650 US HWY 19 NORTH | PALM HARBOR | FL | 34683 | PINELLAS |
| 719 | Ft. Myers-Napls | Winn-Dixie | 2301 DEL PRADO BLVD | CAPE CORAL | FL | 33990 | LEE |
| 725 | Ft. Myers-Napls | Winn-Dixie | 4151 HANCOCK BRIDGE PARKWAY | FT MYERS | FL | 33903 | LEE |
| 735 | Ft. Myers-Napls | Winn-Dixie | 12628 EAST TAMIAMI TRAIL | NAPLES | FL | 34113 | COLLIER |
| 738 | Ft. Myers-Napls | Winn-Dixie | 4015 SANTA BARBARA BLVD. | NAPLES | FL | 34104 | COLLIER |
| 1571 | Lafayette | Winn-Dixie | 811 E LASALLE | VILLE PLATTE | LA | 70586 | EVANGELINE |
| 1579 | Baton Rouge | Winn-Dixie | 58045 BELLEVIEW ROAD | PLAQUEMINE | LA | 70765 | IBERVILLE |
| 2254 | Orl-Dytn B-Mlbn | Winn-Dixie | 2618 BOGGY CREEK ROAD | KISSIMMEE | FL | 34744 | OSCEOLA |
| 2257 | Orl-Dytn B-Mlbn | Winn-Dixie | 695 S SEMORAN BLVD | ORLANDO | FL | 32807 | ORANGE |
| 2298 | Orl-Dytn B-Mlbn | Winn-Dixie | 6300 N. WICKHAM RD, UNIT 132 | MELBOURNE | FL | 32940 | BREVARD |
| 2324 | Orl-Dytn B-Mlbn | Winn-Dixie | 2300 STATE ROAD 524 | COCOA | FL | 32926 | BREVARD |
| 2330 | Orl-Dytn B-Mlbn | Winn-Dixie | 1450 N COURTENAY PKWY | MERRITT ISLAND | FL | 32953 | BREVARD |
| 2357 | West Plm Bch-Fp | Winn-Dixie | 415 21ST. STREET | VERO BEACH | FL | 32960 | INDIAN RIVER |
| 2387 | Orl-Dytn B-Mlbn | Winn-Dixie | 1024 E HIGHWAY 436 | CASSELBERRY | FL | 32707 | SEMINOLE |

GOB Store Listing

DRAFT - PRIVILEGED AND CONFIDENTIAL
Preliminary and Subject to Change

| Store Number | DMA | Store Type | Address | City | State | Zip | County |
|---|---|---|---|---|---|---|---|
| 2650 | Orl-Dytn B-Mlbn | Save Rite | 7149 W. COLONIAL DRIVE | ORLANDO | FL | 32818 | ORANGE |

# EXHIBIT B

DRAFT - PRIVILEGED AND CONFIDENTIAL
Preliminary and Subject to Change

Exhibit 1
GOB Store Listing

| Store Number | DMA | Store Type | Address | City | State | Zip | County |
|---|---|---|---|---|---|---|---|
| 71 | Albany | Winn-Dixie | 412 N VIRGINIA AVENUE | TIFTON | GA | 31794 | TIFT |
| 149 | Albany | Winn-Dixie | 1101 16TH AVENUE EAST | CORDELE | GA | 31015 | CRISP |
| 185 | Jacksonville | Winn-Dixie | 999 N UNIVERSITY BLVD. | JACKSONVILLE | FL | 32211 | DUVAL |
| 192 | Tallhsee-Thmsvl | Winn-Dixie | 1000 FIRST AVENUE NE | CAIRO | GA | 39828 | GRADY |
| 205 | Miami-Ft. Laude | Winn-Dixie | 18350 NW 7TH AVENUE | MIAMI | FL | 33169 | DADE |
| 208 | West Plm Bch-Fp | Winn-Dixie | 5335 MILITARY TRAIL, BAY 60 | WEST PALM BEACH | FL | 33407 | PALM BEACH |
| 211 | Miami-Ft. Lauderdale | Winn-Dixie | 1885 N PINE ISLAND ROAD | PLANTATION | FL | 33322 | BROWARD |
| 215 | Miami-Ft. Lauderdale | Winn-Dixie | 2145 NE 164TH ST | N MIAMI BEACH | FL | 33162 | DADE |
| 217 | Miami-Ft. Lauderdale | Winn-Dixie | 1199 S FEDERAL HWY | POMPANO BEACH | FL | 33062 | BROWARD |
| 240 | Miami-Ft. Lauderdale | Winn-Dixie | 3890 WEST 18TH AVE | HIALEAH | FL | 33012 | DADE |
| 301 | Miami-Ft. Lauderdale | Winn-Dixie | 1707 E. COMMERCIAL BLVD. | FT. LAUDERDALE | FL | 33334 | BROWARD |
| 310 | Miami-Ft. Lauderdale | Winn-Dixie | 4460 WESTON ROAD | DAVIE | FL | 33331 | BROWARD |
| 339 | Miami-Ft. Lauderdale | Winn-Dixie | 6431 STIRLING RD | DAVIE | FL | 33314 | BROWARD |
| 372 | Miami-Ft. Lauderdale | Winn-Dixie | 15900 WEST STATE RD 84 | SUNRISE | FL | 33325 | BROWARD |
| 409 | Columbus | Winn-Dixie | 2440 PEPPERELL PKY | OPELIKA | AL | 36801 | LEE |
| 516 | Birmingham | Winn-Dixie | 125 HWY 25 | BRENT | AL | 35034 | BIBB |
| 602 | Tampa-St P(Sar) | Winn-Dixie | 1050 N. WILSON AVENUE | BARTOW | FL | 33830 | POLK |
| 613 | Tampa-St P(Sar) | Winn-Dixie | 4502 E SR 64 | BRADENTON | FL | 34208 | MANATEE |
| 643 | Tampa-St P(Sar) | Winn-Dixie | 4479 GANDY BLVD. | TAMPA | FL | 33611 | HILLSBOROUGH |
| 659 | Tampa-St P(Sar) | Winn-Dixie | 5400 CLARK RD. | SARASOTA | FL | 34233 | SARASOTA |
| 695 | Tampa-St P(Sar) | Winn-Dixie | 33650 US HWY 19 NORTH | PALM HARBOR | FL | 34683 | PINELLAS |
| 719 | Ft. Myers-Napls | Winn-Dixie | 2301 DEL PRADO BLVD | CAPE CORAL | FL | 33990 | LEE |
| 725 | Ft. Myers-Napls | Winn-Dixie | 4151 HANCOCK BRIDGE PARKWAY | FT MYERS | FL | 33903 | LEE |
| 735 | Ft. Myers-Napls | Winn-Dixie | 12628 EAST TAMIAMI TRAIL | NAPLES | FL | 34113 | COLLIER |
| 738 | Ft. Myers-Napls | Winn-Dixie | 4015 SANTA BARBARA BLVD. | NAPLES | FL | 34104 | COLLIER |
| 1571 | Lafayette | Winn-Dixie | 811 E LASALLE | VILLE PLATTE | LA | 70586 | EVANGELINE |
| 1579 | Baton Rouge | Winn-Dixie | 58045 BELLEVIEW ROAD | PLAQUEMINE | LA | 70765 | IBERVILLE |
| 2254 | Orl-Dytn B-Mlbn | Winn-Dixie | 2618 BOGGY CREEK ROAD | KISSIMMEE | FL | 34744 | OSCEOLA |
| 2257 | Orl-Dytn B-Mlbn | Winn-Dixie | 695 S SEMORAN BLVD | ORLANDO | FL | 32807 | ORANGE |
| 2298 | Orl-Dytn B-Mlbn | Winn-Dixie | 6300 N. WICKHAM RD, UNIT 132 | MELBOURNE | FL | 32940 | BREVARD |
| 2324 | Orl-Dytn B-Mlbn | Winn-Dixie | 2300 STATE ROAD 524 | COCOA | FL | 32926 | BREVARD |
| 2330 | Orl-Dytn B-Mlbn | Winn-Dixie | 1450 N COURTENAY PKWY | MERRITT ISLAND | FL | 32953 | BREVARD |
| 2357 | West Plm Bch-Fp | Winn-Dixie | 415 21ST. STREET | VERO BEACH | FL | 32960 | INDIAN RIVER |
| 2387 | Orl-Dytn B-Mlbn | Winn-Dixie | 1024 E HIGHWAY 436 | CASSELBERRY | FL | 32707 | SEMINOLE |

DRAFT - PRIVILEGED AND CONFIDENTIAL
Preliminary and Subject to Change

| Store Number | DMA | Store Type | Address | City | State | Zip | County |
|---|---|---|---|---|---|---|---|
| 2650 | Orl-Dytn B-Mlbn | Save Rite | 7149 W. COLONIAL DRIVE | ORLANDO | FL | 32818 | ORANGE |

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |


**ORDER (A) AUTHORIZING THE DEBTORS TO RETAIN
LIQUIDATING AGENT AND APPROVING AGENCY AGREEMENT FOR
CLOSING STORE SALES, (B) AUTHORIZING THE DEBTORS TO SELL
MERCHANDISE FREE AND CLEAR OF LIENS AND THROUGH STORE
CLOSING SALES IN ACCORDANCE WITH THE ATTACHED GUIDELINES,
(C) AUTHORIZING THE DEBTORS TO SELL PHARMACY ASSETS
FREE AND CLEAR (D) AUTHORIZING THE DEBTORS TO
ABANDON PROPERTY AND (E) GRANTING RELATED RELIEF**


These cases came before the Court on the motion of Winn-Dixie Stores, Inc. and

twenty-three of its subsidiaries and affiliates (collectively, the "Debtors") for entry of (i)

an order (a) authorizing the Debtors to Retain Liquidating Agent and Approving Agency

Agreement (b) authorizing the Debtors to sell merchandise and furniture, fixtures and

equipment free and clear of liens through store closing sales in accordance with the

attached guidelines and (ii) authorizing the Debtors to sell Pharmaceutical Assets free and

clear, (iii) authorizing the Debtors to Abandon Property and (iv) Granting Related Relief

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are Debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

(the "Motion")[2].  The Court has reviewed the Motion, considered the evidence and heard argument of counsel.   After due deliberation, the Court finds that (i) the Court has jurisdiction over  the Motion pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (iii) notice of the Motion and the hearing on the Motion was adequate under the circumstances, (iv) the store closing and store closing sales set forth in the Motion are based upon the sound business judgment of the Debtors and the Debtors' means of carrying them out as set forth in the Motion are reasonable, necessary and in the best interests of the Debtors' estates, (v) the Debtors and a joint venture composed of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "Agent") entered into the Agency Agreement dated as of March __, 2006 attached to the Motion as Exhibit A and incorporated by reference(the "Agency Agreement"), in good faith within the meaning of section 363(m) of 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") and the Debtors' sales of goods under the Agency Agreement will be good faith sales within the meaning of section 363(m) of the Bankruptcy Code, (vi) the Agency Agreement has been negotiated in good faith and at arm's-length between the Debtors and the Agent, and (vii) neither member of the Agent represents any interest adverse to the Debtors or their estates in the matters for which the Agent is proposed to be retained, and each member of the Agent is disinterested within the meaning of section 101(14) of the Bankruptcy Code; and (viii) just cause exists for the relief granted.  Accordingly, it is

     ORDERED AND ADJUDGED THAT:

     1.     The Motion is granted on the terms and conditions provided by this Order.

---

[2]     Capitalized terms used but not defined in this Order have the meanings ascribed to such terms in the Agency Agreement or, if not defined in the agreement, as defined in the Motion.

2.      In accordance with section 363 of the Bankruptcy Code, the Debtors are authorized and empowered to cease retail operations at the Closing Stores and take such other actions as are reasonable and necessary to cease operations at the stores upon the conclusion of the Store Closing Sales (as defined below).

3.      In accordance with sections 363(b) and 105(a) of the Bankruptcy Code, the Debtors are authorized and empowered to conduct the sales and to sell the Merchandise and FF&E (as defined in the Agency Agreement) through the Agent on the terms and conditions set forth in the Agency Agreement (collectively the "Store Closing Sales") and in accordance with the terms of this Order.

4.      Pursuant to section 327 of the Bankruptcy Code, the Debtors are authorized and empowered to enter into the Agency Agreement and to employ and retain the Agent as their liquidation consultant in accordance with the terms and conditions of the Agency Agreement, including, without limitation, the provisions for compensation of the Agent, without the need for further Court approval or fee application or similar procedure.  The terms of the Agency Agreement are approved and this Order and the Agency Agreement are binding upon the Debtors, all creditors of the Debtors, and any trustees appointed in these proceedings or any trustees appointed in any subsequent proceedings under chapter 7 or chapter 11 of the Bankruptcy Code relating to any of the Debtors.

5.      Pursuant to section 363(f) of the Bankruptcy Code, all Merchandise and FF&E to be sold by the Debtors at the Store Closing Sales are sold free and clear of any and all liens, claims and interests, with any liens, claims and interests to attach to net proceeds after payment of the Agent's Fee and the FF&E Fee in the order of priority

3

provided by the Final Financing Order and the Loan Documents.  The Agent is entitled to the protection of section 363(m) of the Bankruptcy Code in connection with the Store Closing Sales.

6.      The Pharmaceutical Assets to be sold by the Debtors are sold free and clear of liens, claims and encumbrances pursuant to Section 363 of the Bankruptcy Code.

7.      After payment of the Agent Fee and the FF&E fee, the Debtors shall cause the net proceeds from the sales of the Merchandise and FF&E to be paid to the DIP Lender to the extent required in accordance with the terms and conditions of the Final Financing Order and the Loan Documents.  In no event will the Debtors pay the Agent any amount in connection with the sale of the Pharmaceutical Assets.

8.      Subject to the restrictions set forth in this Order, the Debtors and the Agent are authorized to take any and all actions as may be necessary to implement the Agency Agreement in accordance with and subject to the terms of this Order and each of the transactions contemplated by the Agency Agreement, and any actions taken by the Debtors and the Agent necessary to implement the Agency Agreement prior to the date of this Order are approved and ratified in accordance with this Order.

9.      The Debtors and their officers, employees, and agents (subject to the Debtors' internal policies and procedures) are authorized to execute such documents as necessary to carry out the Store Closing Sales and related actions including, without limitation, the Agency Agreement and the sale of the Pharmaceutical Assets.

10.     All parties and persons of every nature and description, including but not limited to landlords, utility companies, governmental agencies, sheriffs, marshals or other public officers, creditors, newspapers, other advertising mediums, and all those acting for

or on their behalf, are jointly and severally restrained and enjoined from (a) charging advertising rates in excess of the rates charged pursuant to the Debtors' prepetition advertising agreements or, if no such agreements exist, charging advertising rates in excess of rates regularly charged to non-bankrupt customers in the ordinary course, (b) in any way interfering with or otherwise impeding the Store Closing Sales conducted in accordance with the Agency Agreement and this Order, or the Agent's right to use the Closing Stores, and all services, furniture, fixtures, equipment and other assets of the Debtors which the Agent is granted the right to use in the Agency Agreement, or (c) instituting any action or proceeding in any court (other than this Court) or other administrative body having as its objective the obtaining of an order or judgment that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Store Closing Sales, the operation of the Closing Stores, or the performance by the Debtors of their obligations under the Agency Agreement, including, without limitation, the obligation to pay all amounts to which the Agent is due pursuant to the terms of the Agency Agreement; provided, however, that notwithstanding the authority granted to the Debtors and the Agent to conduct Store Closing Sales in accordance with the Agency Agreement and this Order, this Order does not exempt the Debtors or the Agent or their assigns from complying with Safety Laws and the Guidelines.

11.     The Agent is authorized and empowered to conduct the Store Closing Sales in accordance with the Agency Agreement and this Order and take all actions necessary to implement the terms and conditions set forth in the Agency Agreement, including, without limitation, refusing to accept returns of goods by customers and

advertising the Store Closing Sales as "store closing sales" in media advertisements and on interior and exterior banners and other signage that the Agent deems appropriate, without complying with federal, state or local laws, rules, statutes, ordinances, licensing requirements, regulations and procedures of any kind or nature, including, without limitation, laws, rules, statutes, ordinances, licensing or consent requirements, regulations and procedures with respect to licenses and permits, state and local waiting periods or time limits, advertising and transferring Merchandise between locations; provided, however, that the Agent shall comply with Safety Laws.

12.    The Agent is authorized and empowered to conduct the Store Closing Sales and take all actions necessary to implement the terms and conditions of the Agency Agreement, including, without limitation, advertising the Store Closing Sales as "store closing sales" in media advertisements, and on interior and exterior banners and other signage that Agent deems appropriate, notwithstanding any consent requirement in, or restrictive provision of, any lease, reciprocal easement agreement or related documents purporting to limit such actions, and Bankruptcy Code section 365(d)(3) does not preclude the relief granted in this paragraph; provided, however, that the Agent complies with the Sale Guidelines attached as Exhibit 1 and the terms of the Agency Agreement and this Order.

13.    The Debtors and their officers, employees, and agents are not required (a) to obtain the approval of any federal, state, or local government agency, department or other authority, and landlord or any other third parties to conduct the closing of the Closing Stores, to conduct the Store Closing Sales and to take the related actions authorized by the Order or (b) to execute, obtain or file releases, termination statements,

assignments, consents, or other instruments to effect, consummate and implement the provisions hereof.

14.    The Debtors and the Agent shall not modify, amend or waive any provision of  this Order, the Agency Agreement, and/or all  schedules and exhibits (including, without limitation, the Expense Budget and any projections related to the Store Closing sales annexed to the Agency Agreement without the prior consent of the DIP Lender); provided, however, that the Agent and the Debtors are not required to obtain the prior consent of the DIP Lender with respect to any modification or variance to any line item in the Expense Budget, as previously approved by the DIP Lender, if, after giving effect to all such modifications and/or variances, the amount of such line item does not in the aggregate increase by an amount equal to or greater than 10% of the line item contained in the Expense Budget previously approved by the DIP Lender.

15.    The Agency Agreement and attached exhibits may be modified, amended or supplemented by the parties without further order of the Court; provided, however, that the parties must obtain the prior written consent of the Creditors' Committee, which consent shall not be unreasonably withheld; and provided further, that any such modification, amendment or supplement will neither be materially adverse nor materially adversely change the economic substance of the transactions contemplated by the Agency Agreement and this Order.  Provided, however, that, notwithstanding anything in this paragraph to the contrary, that the Agent and the Debtors shall not be required to obtain the prior consent of the Creditors' Committee with respect to any modification or variance to any line item in the Expense Budget, as previously approved by the Creditors' Committee, if, after giving effect to all such modifications and/or variances, the amount

7

of such line item does not in the aggregate increase by an amount equal to or greater than 10% of the line item contained in the Expense Budget previously approved by the Creditors' Committee. The Debtors shall provide the U.S. Trustee with a copy of any amendment or modification that requires the consent of the Creditors' Committee hereunder.

16. The Agent is granted a limited license and right to use, during the Sale Term (as defined in the Agency Agreement), the trade names, logos and customer lists relating to and used in connection with the operation of the Closing Stores, solely for the purpose of conducting the Store Closing Sales.

17. Except as expressly set forth in the Agency Agreement, the Agent is not liable for any claims against the Debtors, and the Agent will have no successor liabilities whatsoever.

18. No bulk sales law or any similar law of any state or other jurisdiction will apply in any way to the transactions authorized by this Order.

19. The Debtors shall file with the Court a copy of the Final Reconciliation under the Agency Agreement when it is received by the Debtors.

20. To the extent of any conflict between this Order, the Agency Agreement, the Motion, or any other order entered in these cases, the terms of this Order shall govern.

21. This Court retains exclusive jurisdiction to resolve any dispute arising from or relating to the Store Closing Sales, the Debtors' sale of the Pharmaceutical Assets, the Agency Agreement or this Order.

22. Notwithstanding Rule 6004(g) of the Federal Rules of Bankruptcy Procedure, this Order will take effect immediately upon signature.

23.     This Order is the "Approval Order" described in the Agency Agreement.

24.     If landlords have any issues regarding the Store Closing Sales, they may contact Eric Kaup at Hilco Merchant Resources, LLC, One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, Illinois  60062, phone number (847) 849-2966.

25.     Notwithstanding anything to the contrary set forth in this Order, the Agent agrees that the terms of any written agreements ("Landlord Agreements") between the Agent or its members and any landlords with regard to the conduct of the Store Closing Sales will control with respect to any conflict between the terms of this Order and the terms of the Landlord Agreements.

26.     In the event any landlord alleges the Agent or Merchant has violated this Order or any Landlord Agreement, such landlord may seek a hearing before this Court on three days' notice.

27.     In their sole discretion, the Debtors are authorized pursuant to section 554(a) of the Bankruptcy Code, to abandon any Merchandise and FF&E the Debtors are unable to sell.

28.     Any landlord of the Debtors may within 10 days of the date of this order give notice to the Debtors specifically identifying property in Closing Stores which the landlord contends to be property of the landlord and not property of the Debtors and therefore should not be sold by the Agent.  No such property identified by a landlord shall be sold by the Debtors or the Agent absent agreement of the parties or further order of the Court.

Dated this _____ day of March, 2006, in Jacksonville, Florida.

_____

Jerry A. Funk
United States Bankruptcy Judge

00525560.DOC

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |

### ORDER APPROVING DEBTORS' (A) SALE OF PHARMACEUTICAL ASSETS FREE AND CLEAR OF LIENS AND (B) GRANTING RELATED RELIEF

These cases came before the Court on the motion (Docket No.      ) of Winn Dixie Stores, Inc. and twenty three of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a), 363 and 554(A) and Fed. R. Bankr. P. 6004 (a), authorizing the Debtors to close stores and sell merchandise including pharmaceutical assets located at the Closing Stores[1], including the assets described in the asset purchase agreement attached as Exhibit A (the "Purchase Agreement), free and clear of liens, claims, interests and encumbrances to _____ (the "Purchaser") and (b) granting related relief (the "Motion"), The Court held a hearing on the Motion on March 23, 2006 to approve the sale (the "Sale Hearing"). The Court has reviewed the Motion and heard the representations of counsel. Upon the representations of counsel and without objection by the United States Trustee or any other interested party, the Court makes the following findings of fact:

A.      This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

B.      The Debtors solicited the highest or otherwise best offer for the assets described in the Purchase Agreement (the "Pharmaceutical Assets"), in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 21, 2005 (the "Bidding Procedures").  An Auction for the Pharmaceutical Assets was held on March 23, 2006 at 9:00 a.m. (the Auction).  At the Auction, the Purchaser submitted the final bid of $_____, representing the highest or otherwise best offer received for the Pharmaceutical Assets.

C.      The Debtors have provided interested parties (including all parties asserting claims or interests in the Pharmaceutical Assets, if any) with proper notice of the Motion, the Sale Hearing and the Auction, in accordance with 11 U.S.C. §§ 102(1), 105(a) and 363, Fed. R. Bankr. P. 2002(a) and 6004(a) and Local Rule 2002 1, the Notice Procedures Order and the Bidding Procedures Order.

D.      The Debtors marketed the Pharmaceutical Assets and conducted the sale process in compliance with the Bidding Procedures, the Bankruptcy Code and all other Orders entered in these cases. The bidding on the Pharmaceutical Assets and the Auction was conducted in a non-collusive, fair and good faith manner. The Debtors have given all interested parties a reasonable opportunity to make the highest or otherwise best offer for the Pharmaceutical Assets. In their sound business judgment, the Debtors determined that the

---

[1] All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Motion.

bid submitted by the Purchaser at the Auction represented the highest or otherwise best offer for the Pharmaceutical Assets.

E.      The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A, and all related documents, and the sale of the Pharmaceutical Assets has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

F.      The Debtors have good business reasons to sell the Pharmaceutical Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

G.      Neither the Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

H.      The Debtors and the Purchaser proposed, negotiated and entered into the Purchase Agreement, without collusion, in good faith and at arms' length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

I.      The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

J.      The consideration the Purchaser is providing to the Debtors for the Pharmaceutical Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Pharmaceutical Assets; and (iii) constitutes reasonably equivalent value.

K.      The Debtors' sale of the Pharmaceutical Assets will facilitate the formulation and confirmation of a plan of reorganization. For this reason, the sale of the Pharmaceutical Assets constitute transfers to which 11 U.S.C. § 1146(c) applies.

L.      The Debtors have provided notice of this transfer of the Pharmaceutical Assets, as required by applicable state and federal law.

M.      The Debtors' transfer of the Pharmaceutical Assets to the Purchaser pursuant to the Purchase Agreement will be a legal, valid, and effective transfer of the Pharmaceutical Assets. The Debtors' transfer of the Pharmaceutical Assets to the Purchaser vests the Purchaser with good and valid title in and to the Pharmaceutical Assets, free and clear of any liens, claims, encumbrances, pledges, mortgages, security interests, charges, options or other interests of any kind or nature. The only known claim or interest in the Pharmaceutical Assets (other than the Debtors) is that of Wachovia Bank, National Association, as Administrative Agent and Collateral Agent for itself ("Agent") and the other financial institutions from time to time parties to the Credit Agreement dated as of February 23, 2005, as may be amended or modified (collectively, "Lenders" and together with Agent, collectively, the "DIP Lender"). The DIP Lender consents to sale of the Pharmaceutical Assets on the terms set forth in this Order.

N.      The DIP Lender is adequately protected because the Debtors will cause the proceeds from the Sale to be paid in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre Petition Secured Lenders' Cash

4

Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Pre petition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

      O.      The Purchaser will have no responsibility for any liability, claim or other obligation of or against the Debtors related to the Pharmaceutical Assets by virtue of the transfer of the Pharmaceutical Assets to the Purchaser. The Purchaser will not be deemed, as a result of any action taken in connection with the purchase of the Pharmaceutical Assets, to be a successor to the Debtors or to have, de facto or otherwise, merged with or into the Debtors.

      P.      The Court's approval of the Purchase Agreement is in the best interests of the Debtors, their estates and their creditors. Accordingly, it is

      ORDERED AND ADJUDGED THAT:

      1.      The Motion is granted.

      2.      The Debtors provided adequate notice of the Motion and the Sale Hearing and complied with any applicable state and federal law regarding notice of their transfer of the Pharmaceutical Assets.

      3.      All objections to the entry of this order or to the relief granted and requested in the Motion, that have not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

      4.      The Purchase Agreement is approved in all respects. Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized (subject to applicable closing conditions set forth in the Purchase Agreement), to consummate the sale including transferring and

conveying the Pharmaceutical Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

5.      Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized and empowered to consummate and implement fully the Purchase Agreement, together with all additional instruments and documents that may be necessary to implement the Purchase Agreement. The Debtors are authorized to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Pharmaceutical Assets to Purchaser.

6.      Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties in accordance with the terms of the Purchase Agreement without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of (a) the DIP Lender and (b) the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

7.      The Debtors will transfer the Pharmaceutical Assets to the Purchaser upon closing free and clear of all Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f). The only Claims and/or Interests are those of the senior liens and superpriority administrative claims of the DIP Lender. The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds of the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order),

8.      The Purchaser will  not be liable for any Claims and/or Interests against the Debtors or the Assets, and the Purchaser will have no successor, common control or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors under or by reason of any theory at law or equity.

9.      The Debtors will cause the proceeds from the Sale to be paid in accordance with the terms of the Final Financing Order and the Loan Documents.

10.      The Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the Pharmaceutical Assets under the Bankruptcy Code and applicable non-bankruptcy law, and acted in a non-collusive, fair and good faith manner. For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

11.      Upon closing of the sale of the Pharmaceutical Assets in accordance with the Purchase Agreement and this Order, the Purchaser will be deemed to have acted in good faith in purchasing the Pharmaceutical Assets under the Purchase Agreement as that term is used in 11 U.S.C. § 363(m) and the Purchaser will be entitled to the protections afforded a good faith purchaser pursuant to such section. For that reason, any reversal or modification of this Order on appeal will not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

12.      The Debtors' transfer of the Pharmaceutical Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

13.     Upon closing, this Order will constitute a complete general assignment, conveyance and transfer of the Pharmaceutical Assets and a bill of sale transferring good and marketable title in the Pharmaceutical Assets to Purchaser. Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

14.     This Order is effective as a determination that upon Closing any and all Claims and/or Interests (except for the Permitted Encumbrances and Assumed Liabilities), if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Pharmaceutical Assets.

15.     This Order is binding upon all entities who may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Pharmaceutical Assets.

16.     This Court retains exclusive jurisdiction to (a) enforce and implement the Purchase Agreement and any other agreements and instruments executed in connection with the Purchase Agreement, (b) compel delivery of possession of the Pharmaceutical Assets to the Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement, and (d) interpret, implement and enforce the provisions of this Order.

17.     The terms and provisions of the Purchase Agreement and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser and its respective affiliates, successors and assigns, and any affected

third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

18.     Upon Closing, all persons who hold Claims and/or Interests against the Debtors are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

19.     After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Pharmaceutical Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Claims and/or Interests, or (ii) for any period commencing before and concluding prior to or on Closing or any pre Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Purchase Agreement. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

20.     To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in this Order will control.

21.     Within ten days after closing, the Debtors will file a statement with the Bankruptcy Court as required by and in accordance with Rule 6004(f), Federal Rules of Bankruptcy Procedure.

22.     Notwithstanding Fed. R. Bankr. P. 6004(g)and 6006(d), this Order will take effect immediately upon entry.

Dated this _____ day of March, 2006 in Jacksonville, Florida.

_____
Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to
serve a copy of this Order on all
parties who received copies of
the Motion.

00525416..2DOC