**Hearing Date: May 18, 2006, 1:00 p.m.**
**Objection Deadline: May 4, 2006, 4:00 p.m.**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. [1] | ) | Jointly Administered |
| | ) | |

### DEBTORS' MOTION FOR ORDER AUTHORIZING WINN-DIXIE STORES, INC. TO (I) EXERCISE ITS CONSENT TO SALE OF STOCK BY NON-DEBTOR SUBSIDIARY, SUBJECT TO HIGHER OR OTHERWISE BETTER OFFERS, (II) ENTER INTO A RELATED TRANSITION SERVICES AGREEMENT AND (III) ENTER INTO A RELATED NON-COMPETITION AGREEMENT

Winn-Dixie Stores, Inc. ("Winn-Dixie") and twenty-three of its subsidiaries and

affiliates, as debtors and debtors-in-possession (together with Winn-Dixie, collectively, the

"Debtors"), move for entry of an order under 11 U.S.C. §§ 105 and 363 authorizing Winn-Dixie

to (i) exercise its consent to the sale by W-D (Bahamas) Ltd., a Bahamas company ("W-D

(Bahamas)" or the "Seller"), of shares of common stock of Bahamas Supermarkets Limited

("BSL") pursuant to the terms of a Share Purchase Agreement dated March 29, 2006 (as the

same may be modified, the "Agreement"), substantially in the form attached as Exhibit A, to BK

Foods, Ltd. ("BK Foods") or the party submitting the highest or otherwise best offer for the

shares (BK Foods or the party submitting the highest or otherwise best offer being referred to

hereafter as the "Purchaser"), (ii) enter into a transition services agreement by which the Debtors

will continue to provide the Purchaser under the Agreement with services related to the operation

---

[1]    In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

and management of the businesses which Winn-Dixie currently provides to BSL (the "Transition Services Agreement"), substantially in the form attached as Exhibit B, and (iii) enter into a non-competition agreement by which the Debtors will refrain from competing with the Purchaser for a period of two years (the "Non-Competition Agreement"), substantially in the form attached as Exhibit C (the "Motion").  In support of the Motion, the Debtors respectfully represent as follows:

<u>**Background**</u>

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 as amended (the "Bankruptcy Code").  The Debtors' cases are being jointly administered for procedural purposes only.

2.      The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States.  The Debtors operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On March 1, 2005, pursuant to section 1102 of the Bankruptcy Code, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases.  An official committee of equity security holders appointed by the U.S. Trustee on August 17, 2005 was subsequently disbanded by the U.S. Trustee by notice dated January 11, 2006.

4.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      The statutory predicates for the relief requested in the Motion are sections 105 and 363 of the Bankruptcy Code.

**The Share Purchase Agreement and the Transition Services Agreement**

6.      Winn-Dixie is the parent company of W-D (Bahamas).  W-D (Bahamas) in turn owns 3,546,085 of the issued and outstanding shares (the "Shares") of common stock of BSL. BSL operates 12 supermarkets in the Bahamas under the Winn-Dixie and City Markets banners (the "Bahamas Operations").  Neither W-D (Bahamas) nor BSL is a debtor in these chapter 11 cases.

7.      Beginning in the Fall of 2005, the Debtors considered the possibility of selling the Bahamas Operations.  To this end, the Debtors asked The Blackstone Group, L.P. ("Blackstone"), the Debtors' court-retained financial advisor, to investigate potential purchasers and transaction structures.  In November 2005, Blackstone began a marketing process targeting only selected purchasers who had previously expressed interest in the operations, so as to maintain the confidentiality of the process and minimize operational disruptions at BSL.  After significant analysis, the Debtors, with the assistance of Blackstone, determined that the best structure for the transaction would be a sale of the Shares.  Because W-D (Bahamas) is a holding company, it would dividend all proceeds from the sale of the Shares up to the parent, Winn-Dixie, including amounts necessary to pay Graham, Thompson & Co., legal counsel in the Bahamas to W-D (Bahamas) in connection with the sale of the Shares.  BK Foods presented the Debtors with the most attractive offer for the Shares.[2]

---

[2]      The Debtors, in consultation with the Creditors Committee, have negotiated a transaction fee with Blackstone in the amount of $1.125 million, to compensate Blackstone for the advisory services it performed for the Debtors in connection with this transaction.  Contemporaneous with the filing of this Motion, the Debtors have filed with the Court the Application for Order Approving Supplement to Debtors' Retention of The Blackstone Group, L.P. as Financial Advisors, seeking to include this transaction within the scope of the services that Blackstone is providing and authorizing payment of this transaction fee.

3

8.     On March 29, 2006, W-D (Bahamas) and BK Foods entered into the Agreement.  Pursuant to the terms of the Agreement, upon the satisfaction of several conditions, W-D (Bahamas) is obligated to transfer all of its right, title and interest in and to the Shares to the Purchaser.  Material terms of the Agreement include the following:[3]

(a)     <u>Purchase Price</u>:  On the terms and subject to the conditions set forth in the Agreement, the aggregate purchase price for the Shares is fifty million Bahamian dollars (B$50,000,000) (the "Purchase Price").  Additionally, upon the execution of the Agreement the Purchaser deposited five million Bahamian dollars (B$5,000,000) with the designated escrow agent.  The remainder of the Purchase Price is to be paid at closing.

(b)     <u>Auction Process</u>:  The Agreement contemplates the opportunity for the submission of higher or otherwise better offers.  Specifically, shortly after the filing of the Motion, the Debtors, through Blackstone, intend to solicit competing bids and, to the extent any qualified bids are received (by the deadline of May 11, 2006), hold an auction at 10:00 a.m. on May 15, 2006 at the New York offices of Skadden, Arps, Slate, Meagher & Flom LLP.[4]

(c)     <u>Conditions to Closing</u>:  Conditions to closing include (i) Winn-Dixie obtaining Bankruptcy Court authority to exercise its consent to the execution of the Agreement by W-D (Bahamas), (ii) the Purchaser's and Seller's satisfaction of their respective "Required Statutory Approvals," as set forth in the Agreement, and (iii) the fulfillment of other conditions, including but not limited to executing customary and reasonable documents, as more fully described in the Agreement.

(d)     <u>Transition Services Agreement</u>:  An additional condition to closing is Winn-Dixie's execution, once approved by the Bankruptcy Court, of the Transition Services Agreement.  The Transition Services Agreement is intended to ensure that management and operational know-how regarding the operation of the businesses will be transferred by Winn-Dixie in an orderly fashion to the Purchaser.  Unless the Purchaser exercises its right to terminate for convenience, for breach or for an event of force majeure, the Transition Services Agreement will run for twelve (12) months. Winn-Dixie will receive a fee for the transition services performed, which fee will approximate $1 million (payable in quarterly installments and subject to reduction in the event the Purchaser exercises its termination

---

[3]     This summary of the Agreement is provided as a convenience only.  To the extent that the summary differs in any way from the terms of the Agreement, the terms of the Agreement shall control.

[4]     The bid procedures are attached to the Agreement as Annex C.

rights).[5]  This amount will cover the costs incurred by Winn-Dixie in the performance of the transition services.

(e)     Non-Competition Agreement:  An additional condition to closing is Winn-Dixie's execution, once approved by the Bankruptcy Court, of the Non-Competition Agreement.  The Non-Competition Agreement is intended to ensure that, for a limited period of time (2 years), the Purchaser is able to benefit from its purchase without the threat of competition from Winn-Dixie.  Such an agreement is narrowly tailored and standard in the industry for this type of transaction.

## Relief Requested

9.      By this Motion, the Debtors seek entry of an order authorizing Winn-Dixie to (a) execute a written consent (the "Shareholder Consent") authorizing W-D (Bahamas) to execute the Agreement with the Purchaser, substantially in the form of Exhibit A; (b) execute the Transition Services Agreement with the Purchaser, substantially in the form of Exhibit B, and (c) execute the Non-Competition Agreement with the Purchaser, substantially in the form of Exhibit C (with all such agreements being subject to such additional changes as would make the transaction, taken as a whole, a higher or otherwise better offer in the judgment of the Debtors).

## Basis for Relief

10.     Although the Shares are being sold by a non-debtor, the Debtors recognize that the execution of the Shareholder Consent may, in and of itself, constitute a disposition of property of the estate that is outside of the ordinary course of business.  Accordingly, the Debtors believe they should obtain Court authority for Winn-Dixie's execution of the Shareholder Consent.

11.     The Debtors believe that the marketing efforts that have been conducted to date, together with the conducting of an auction process designed to obtain any higher or otherwise better offers, maximize the value of the Shares.  Thus, the Debtors believe that the Court's

---

[5]   This fee is exclusive of amounts that Winn-Dixie is entitled to receive in connection with procurement services performed for the Purchaser.

approval of the execution of the Shareholder Consent will produce the highest and best value for the Shares and, therefore, the best result for the estates.

12.     Additionally, the Transition Services Agreement and the Non-Competition Agreement constitute transactions that are outside of the ordinary course of business and, thus, require Court approval.  The Debtors believe that the terms of the Transition Services Agreement and the Non-Competition Agreement are fair and reasonable and that the execution of such agreements is a necessary component of the overall transaction structure.

## Applicable Authority

13.     Bankruptcy Code section 363(b)(1) provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Bankruptcy Code section 1107 (a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under section 363(b)(1).  See 11 U.S.C. § 1107(a).

14.     Although Bankruptcy Code section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's property, in applying this section, courts have required that it be based upon the sound business purpose of the debtor.  See In re B.D.K. Health Mgmt., Inc. ("B.D.K. Health Mgmt."), Case Nos. 98-00609-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515

(7th Cir. 1991); <u>Stephens Indus., Inc. v. McClung</u>, 789 F.2d 386, 390 (6th Cir. 1986) (holding

that "a bankruptcy court can authorize a sale of all a chapter 11 debtor's assets under § 363(b)(1)

when a sound business purpose dictates such action"); <u>In re Del. & Hudson Ry. Co.</u>, 124 B.R.

169, 175-76 (D. Del. 1991).  To determine whether a sound business purpose exists, courts look

for four factors: (a) sound business reason; (b) fair and reasonable consideration; (c) good faith

in the transaction; and (d) adequate and reasonable notice.  Here, the Debtors have established

each of these elements.

    15. <u>Sound Business Reason</u>.  Winn-Dixie has a sound business reason for its

execution of the Shareholder Consent, the Transition Services Agreement and the Non-

Competition Agreement.  The Bahamas Operations are not essential to the Debtors' overall

operations.  Since (and even before) the Petition Date, the Debtors have been engaged in a

market reduction process designed to eliminate unprofitable stores and allow the Debtors to

focus on their core markets.  Although the Bahamas Operations are profitable, they are separate

from the Debtors' core operations because BSL is a publicly-traded corporate entity with its own

board, management, employees and support infrastructure.  The Debtors' estates will benefit

from such a sale as substantially all of the proceeds of the sale of the Shares will be dividended

up to Winn-Dixie.

    16. Further, a sound business reason exists for executing the Transition

Services Agreement and the Non-Competition Agreement.  BK Foods has insisted (and the

Debtors believe any alternative purchaser would similarly demand) that Winn-Dixie provides

services to ensure a smooth transition of the Bahamas Operations.  The execution of the

Transition Services Agreement is, thus, a necessary component of the overall transaction -- and

one that will not in any way hurt the Debtors economically.  Indeed, the Transition Services

Agreement provides that the Debtors are to be reimbursed or paid for all of the costs they incur in providing the transition services to the Purchaser.  Similarly, BK Foods has insisted (and the Debtors believe any alternative purchaser would similarly demand) that Winn-Dixie refrain from competing with the Purchaser for a limited period.

17.    <u>Fair and Reasonable Consideration</u>.  The sale of the Shares will provide fair and reasonable consideration to the Debtors' estates.  The Debtors, through their financial advisor, believe that BK Food's offer is the highest or otherwise best offer based upon a standard perspective of value.

18.    As an added measure to ensure that the highest value is obtained, the sale of the Shares will be subject to competing bids and, to the extent qualified bids are received, to a further auction process designed to maximize value for the estates.  Thus, the fairness and reasonableness of the consideration to be received for the Shares ultimately will be demonstrated by a "market check" and auction process – the best means for establishing whether a fair and reasonable price is being obtained.  Further, the bid procedures expressly provide that if the party submitting the highest or otherwise best offer fails to consummate the transaction, the Seller may consummate the transaction with the next highest or otherwise best bidder at the highest price bid by such bidder at the auction.

19.    <u>Good Faith</u>.  The proposed sale is the product of arm's length negotiations between the Seller and the Purchaser and was made in good faith.  The Purchaser has no affiliation with the Seller or the Debtors, and the ability of third parties to make higher or otherwise better offers ensures that the Purchaser has not exerted any undue influence over the Seller or the Debtors.

20.    <u>Adequate and Reasonable Notice</u>.  In view of the previous marketing efforts that were undertaken for the Shares, and in accordance with Local Rule 2002-1, the Debtors will serve notice of this Motion on the following parties: (a) all parties that expressed interest in purchasing the Shares; (b) the Purchaser; (c) counsel to the Office of the United States Trustee; (d) counsel for the Debtors' postpetition secured lenders; (e) counsel for the Creditors' Committee; and (f) all entities having requested notices pursuant to Fed. R. Bankr. P. 2002.

21.    The foregoing notice is good and sufficient under the particular circumstances and reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those persons most interested in these cases and those persons potentially interested in bidding on the Shares.   The Debtors thus submit that the proposed notice is sufficient for entry of an order granting the relief requested in the Motion.

22.    The Debtors have done all that is reasonably possible to secure the highest or otherwise best possible offer for the Shares.  For the reasons noted above, the proposed sale of the Shares to the Purchaser is warranted and appropriate under section 363(b) of the Bankruptcy Code, and the relief requested in this Motion is a product of sound business judgment and is in the best interests of the Debtors, their creditors and their estates.  Additionally, the Debtors submit that the Court's inherent power under section 105 of the Bankruptcy Code provides support for the relief here requested.  Thus, this Court should authorize Winn-Dixie to execute the Shareholder Consent authorizing W-D (Bahamas) to sell the Shares to the Purchaser.

23.    Additionally, if the Court grants the Motion, Winn-Dixie intends to execute the Transition Services Agreement and the Non-Competition Agreement.  The Debtors believe the terms of such agreements are fair and reasonable in the context of the transaction and constitute reasonable exercises of the Debtors' business judgment.

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court (i) enter an order, substantially in the form attached as Exhibit D, authorizing Winn-Dixie to (a) execute the Shareholder Consent, thus enabling W-D (Bahamas) to sell the Shares to the Purchaser pursuant to the Agreement substantially in the form of Exhibit A, (b) execute the Transition Services Agreement substantially in the form of Exhibit B, and (c) execute the Non-Competition Agreement substantially in the form of Exhibit C (with all such agreements being subject to such additional changes as would make the transaction, taken as a whole, a higher or otherwise better offer in the judgment of the Debtors), and (ii) grant such other and further relief as is just and proper.

Dated: March 31, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By ___*s/ D. J. Baker*___
      D. J. Baker
      Sally McDonald Henry
      Rosalie Walker Gray
      Adam S. Ravin
Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Counsel for Debtors

SMITH HULSEY & BUSEY

By ___*s/ Cynthia C. Jackson*___
      Stephen D. Busey
      James H. Post
      Cynthia C. Jackson,
      Florida Bar Number 498882
225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Debtors

**EXHIBIT A**

SHARE PURCHASE AGREEMENT


By and Between


W-D (BAHAMAS) LTD.

and

BK FOODS LTD.


Dated as of March 29, 2006

**TABLE OF CONTENTS**

1.    DEFINITIONS AND INTERPRETATION ........................................................... 2

2.    PURCHASE AND SALE OF SHARES............................................................... 7

3.    CONSIDERATION ......................................................................................... 8

4.    CONDITIONS.................................................................................................. 8

5.    THE CLOSING.............................................................................................. 11

6.    REPRESENTATIONS AND WARRANTIES OF THE SELLER ..................... 13

7.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.............. 15

8.    CONDUCT OF BUSINESS PENDING THE CLOSING ................................. 19

9.    ADDITIONAL AGREEMENTS....................................................................... 24

10.   [RESERVED] ................................................................................................ 29

11.   TERMINATION ............................................................................................. 29

12.   NON-COMPETITION AGREEMENT ............................................................ 32

13.   [RESERVED] ................................................................................................ 33

14.   GENERAL PROVISIONS ............................................................................. 33

## INDEX OF DEFINED TERMS

**Term**                                                                **Page**

Accounting Date                                                             2
Action                                                                     27
Agreed Form                                                                 2
Agreement                                                                   1
Audited Accounts                                                            3
Bahamian Company                                                            3
Bankruptcy Case                                                             2
Bankruptcy Code                                                             1
Bankruptcy Court                                                            2
Break-up Fee                                                               31
Business                                                                    1
Business Day                                                                3
Closing Date                                                                3
Companies Act                                                               3
Company                                                                     1
Company Material Adverse Effect                                             3
Company Subsidiary                                                          7
Confidentiality Agreement                                                  27
Deposit                                                                     8
Filing Date                                                                 2
Governmental Authority                                                      4
Incumbrance                                                                 4
Indemnified Parties                                                        27
Indemnified Party                                                          27
Initial Termination Date                                                   29
Knowledge                                                                   4
Leased Properties                                                           5
Non-Competition Agreement                                                   5
Ordinary Course                                                             5
Owned Properties                                                            5
Parent                                                                      1
Parties                                                                     5
Person                                                                      5
Purchase Price                                                              5
Purchaser                                                                   1
Purchaser Material Adverse Effect                                           6
Purchaser Required Statutory Approval                                       6
Purchaser Subsidiary                                                        7
Purchaser's Attorneys                                                       5
Recitals                                                                    6
Seller                                                                      1
Seller Disclosure Schedule                                                  6

| | |
|---|---|
| Seller Marks | 26 |
| Seller Required Statutory Approvals | 6 |
| Seller's Attorneys | 6 |
| Shareholder Consent | Schedule 4 |
| Shares | 1 |
| Subsidiary | 6 |
| Transition Services Agreement | 7 |
| Warranties | 7 |

**EXECUTION COPY**

### SHARE PURCHASE AGREEMENT

THIS SHARE PURCHASE AGREEMENT, dated as of March 29, 2006 (this "**Agreement**"), is entered into by and between:

1.      W-D (Bahamas) Ltd., a company incorporated and existing under the laws of the Commonwealth of The Bahamas with its registered office at Office of S. O. A. Isaacs, P.O. Box N 4755, Nassau, Bahamas (the "**Seller**") of the first part, and

2.      BK Foods Ltd., a company incorporated and existing under the laws of the Commonwealth of The Bahamas with its registered office at Ocean Centre, Montagu Foreshore, East Bay Street in the Island of New Providence in the said Commonwealth of The Bahamas (the "**Purchaser**," which expression shall where the context so admits include its successors and assigns) of the second part.

### W̲ I̲ T̲ N̲ E̲ S̲ S̲ E̲ T̲ H̲:

**WHEREAS**, Bahamas Supermarkets Limited, a company incorporated and existing under the laws of the Commonwealth of The Bahamas (the "**Company**") is a public company limited by shares and at the date of this Agreement has an authorised share capital of $5,000,000 divided into 5,000,000 ordinary shares of B$1.00 each.  Short details of the Company are set out in Schedule 2;

**WHEREAS**, the Seller is the registered holder of or otherwise beneficially entitled to the shares in the capital of the Company in the numbers set out in the third column of Schedule 1 (the "**Shares**") and has the right to sell or procure the sale of the Shares free from all Incumbrances;

**WHEREAS**, the Company is engaged in the retail sale of groceries, meat, produce and delicatessen products in the Commonwealth of The Bahamas (the "**Business**");

**WHEREAS**, the Seller is a wholly owned subsidiary of Winn-Dixie Stores, Inc., a Florida corporation (the "**Parent**");

**WHEREAS**, the Parent filed a voluntary petition for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "**Filing Date**") and has operated its business as a debtor-in-possession

(as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date.  By order entered on April 13, 2005, the Chapter 11 bankruptcy case of the Parent was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "**Bankruptcy Court**") where it is being administered under case no. 05-03817-3F1 (the "**Bankruptcy Case**");

**WHEREAS**, neither the Seller nor the Company is a debtor in the Bankruptcy Case;

**WHEREAS**, the Seller wishes to sell, or cause to be sold, to the Purchaser, and the Purchaser wishes to purchase from Seller, the Shares on the terms but subject to the conditions of this Agreement;

**WHEREAS**, each of the Boards of Directors of the Purchaser and the Seller has approved the acquisition of the Shares by the Purchaser upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, the authorization of the Parent pursuant to Section 165 of the Companies Act of the Commonwealth of The Bahamas is required for the sale of the Shares and such authorization is subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and the representations, warranties, covenants and agreements contained herein, the Parties hereto, intending to be legally bound hereby, agree as follows:

## 1.      DEFINITIONS AND INTERPRETATION

1.1      In this Agreement and in the Schedules (unless the context otherwise requires) the following words and expressions shall have the following meanings:

| | |
|---|---|
| "Accounting Date" | means June 29, 2005. |
| "Agreed Form" | means in relation to any document the document which is annexed to this Agreement. |
| "Audited Accounts" | means the audited accounts of the Company for the accounting reference period ended on June 29, 2005 comprising, inter alia, a |

2

| | |
|---|---|
| | balance sheet, profit and loss account, notes, auditors' and directors' reports and a statement of the source and application of funds. |
| "Bahamian Company" | means a company incorporated and registered in the Commonwealth of The Bahamas where all its shares or other capital is beneficially owned by one or more citizens of the Commonwealth of The Bahamas directly or through another Bahamian company and it is not in any manner, whether directly or indirectly, controlled by any non-Bahamians. |
| "Business Day" | means any day other than a Saturday or Sunday or any day on which banks in the Commonwealth of The Bahamas or in the State of Florida are required or authorized to be closed. |
| "Closing Date" | means the date of actual completion of the matters provided for in Clause 5 and 'Closing' shall be construed accordingly. |
| "Companies Act" | means the Companies Act, 1992 of the Commonwealth of The Bahamas. |
| "Company Material Adverse Effect" | means any material adverse effect on the business, assets, financial condition or results of operations of the Company and the Company Subsidiaries, taken as a whole; provided, however, that the term "Company Material Adverse Effect" shall not include effects that result from or are consequences of (i) any such effect resulting from any change in law, rule, or regulation of any Governmental Authority that applies generally to Persons conducting a business which is identical or substantially similar to the Business in the Commonwealth of The Bahamas; (ii) changes or developments in the retail markets in the Commonwealth of The Bahamas, including those due to actions by competitors or suppliers of the Company or any Company Subsidiary (as hereinafter defined); (iii) changes or developments in financial or |

3

securities markets or the economy in general or effects of weather or meteorological events; (iv) events or changes that are consequences of terrorist activity, acts of war, acts of public enemies, civil unrest, riots or public disturbances; (v) the Bankruptcy Case, the conversion or dismissal of the Bankruptcy Case, the appointment of a Chapter 11 trustee or examiner in the Bankruptcy Case, or the filing of a motion seeking such conversion, dismissal or appointment; or (vi) the negotiation, announcement, execution, delivery, consummation or anticipation of the transactions contemplated by, or in compliance with, this Agreement.

"Governmental Authority"    means any court, federal, state, local or foreign governmental or regulatory body (including a national securities exchange or other self-regulatory body) or authority.

"Incumbrance"    means any incumbrance or security interest of any kind whatsoever including (without limitation) a mortgage, charge (whether fixed or floating), pledge, lien, hypothecation, right to acquire, right of pre-emption, right of retention, option, conversion right, third party right or interest, right of set-off or counterclaim, trust arrangement, any type of preferential agreement having similar effect or any other form of security interest or any obligation (including any conditional obligation) to create any of the same.

"Knowledge"    of the Seller means the actual knowledge of Kenneth Burns and Mark Sellers, without any requirement of inquiry or investigation.

"Leased Properties"    means the leasehold properties short particulars of which are contained in Schedule 3 and "Leased Property" shall mean any of them.

"Non-Competition

4

Agreement"                      means the agreement between the Parent and the Purchaser
                                attached as Annex A hereto in Agreed Form

"Ordinary Course"               means the ordinary and usual course of business of the Company
                                as currently conducted, taking into account, where applicable, the
                                Bankruptcy Case of Parent.

"Owned Properties"              means the freehold properties short particulars of which are
                                contained in Schedule 3 and 'Owned Property' shall mean any of
                                them.

"Parties"                       means the Seller and the Purchaser and Party shall mean any
                                one of them.

"Person"                        means any natural person, corporation, partnership, limited liability
                                company, joint venture, trust, association or entity of any kind.

"Purchase Price"                has the meaning set forth in Clause 2 hereof.

"Purchaser's Attorneys"         means Higgs & Johnson of Ocean Centre, Montagu Foreshore,
                                East Bay Street, Nassau, The Bahamas.

"Purchaser Material
Adverse Effect"                 means any material adverse effect on the business, assets,
                                financial condition or results of operations of the Purchaser.

"Purchaser Required
Statutory Approval"             means the approval of the Exchange Control Department of The
                                Central Bank of the Bahamas to pay the Purchase Price in
                                Bahamian dollars.

"Recitals"                      means the recitals hereof.

"Seller's Attorneys"            means Graham, Thompson & Co., Sassoon House, Shirley Street
                                & Victoria Avenue, Nassau, New Providence, The Bahamas.

"Seller Disclosure Schedule"    means the schedule and its annexures dated the date of
                                execution of this Agreement delivered immediately before the

5

execution of this Agreement and addressed by the Seller's Attorneys to the Purchaser's Attorneys.

"Seller Required
Statutory Approvals"      means the filings with or approvals from Governmental Authorities required by the Seller in connection with the transactions contemplated by this Agreement set forth on Section 1.1 of the Seller Disclosure Schedule.

"Subsidiary"      of a Person means any corporation or other entity (including partnerships and other business associations and joint ventures) of which at least a majority of the voting power represented by the outstanding capital stock or other voting securities or interests having voting power under ordinary circumstances to elect directors or similar members of the governing body of such corporation or entity (or, if there are no such voting interests, 50% or more of the equity interests in such corporation or entity) shall at the time be held, directly or indirectly, by such Person.  The terms "Company Subsidiary" and "Purchaser Subsidiary" shall be construed accordingly.

"Transition Services
Agreement"      means the Transition Services Agreement between the Parent and the Purchaser attached as Annex B hereto in Agreed Form.

"Warranties"      means the representations, warranties and undertakings given by the Sellers referred to in Clause 6 and Schedule 4.

1.2    Expressions in the singular shall include the plural and in the masculine shall include the feminine.

1.3    References to any statute or statutory provision shall be construed as references to such statute or statutory provision as respectively amended or re-enacted or as their operation is modified by any other statute or statutory provision (whether before or after

6

the date of this agreement) and shall include any provisions of which they are re-enactments (whether with or without modification) and shall include subordinate legislation made under the relevant statute.

1.4 References to recitals, clauses, Schedules and Annexes are references (as the case may be) to recitals and clauses of, and Schedules and Annexes to, this Agreement.

1.5 The headings used in this Agreement are inserted for convenience only and shall not affect its construction or interpretation.

1.6 The Annexes and Schedules attached hereto form part of this Agreement.


**2.    PURCHASE AND SALE OF SHARES**

2.1 Subject to the terms and conditions of this Agreement, at the Closing (as defined below), the Seller agrees as beneficial owner to sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser agrees to purchase and accept from the Seller, all of the Seller's rights, title and interest in and to the Shares free from all claims or Incumbrances (as defined below) for the consideration detailed in Clause 3 hereof.  Subject to the terms and conditions of this Agreement, the Purchaser agrees to deliver to the Seller, and the Seller agrees to accept, the Purchase Price (as defined below), in cash, without deduction, netting, recoupment or setoff of any kind, which delivery will be made by wire transfer in immediately available funds to the bank account or accounts designated by the Seller prior to the Closing.

2.2 The Purchaser shall not be obliged to complete the purchase of any of the Shares unless the purchase of all of the Shares is completed simultaneously.

2.3 The Seller shall be entitled to all dividends on the Shares for which the record date occurs prior to the Closing Date.

**3.    CONSIDERATION**

3.1    Subject to the terms and conditions of this Agreement the total consideration payable to the Seller for the Shares shall be the Purchase Price in the sum of fifty million Bahamian Dollars (B$50,000,000.00) to be paid in cash.

3.2    Concurrently with the execution hereof, the Purchaser shall pay a deposit to the Seller's Attorneys to be held in escrow by the Seller's Attorneys subject to the terms and conditions of this Agreement, including Annex E hereto, by certified cheque or bankers draft in the amount of five million Bahamian Dollars (B$5,000,000.00) (the "**Deposit**") and in part payment of the Purchase Price.  Upon the Closing, the Deposit shall be applied toward the Purchase Price payable by the Purchaser to the Seller, with all interest on the Deposit delivered to the Seller.  Upon termination of this Agreement, the termination provisions hereinafter contained at Clause 11 hereof shall govern the return of the Deposit and the interest accrued thereon to the Purchaser or the retention of the same by the Seller.  Until the earlier of the Closing or the termination of this Agreement, the parties shall, for United States income tax purposes only, treat the Purchaser as owning the Deposit and any accrued interest thereon in accordance with Section 1.468B-8 of the proposed United States Treasury regulations (and any applicable final Treasury Regulations that replace such section or any similar state or local tax section).

**4.    CONDITIONS**

4.1    Conditions to Each Party's Obligation to Effect the Closing.  The respective obligations of each Party to effect the Closing shall be subject to the satisfaction on or prior to the Closing Date of the following conditions, except, to the extent permitted by applicable law, that such conditions may be waived in writing pursuant to Clause 14.3 by the joint action of the Parties hereto:

4.1.1    The absence of any injunction or other judicial or administrative order restraining the Parties or either Party from completing the sale and purchase of the Shares in accordance with the provisions of this Agreement.

8

4.1.2 The Parent shall have executed the Shareholder Consent approving this Agreement and the transactions contemplated hereby, which consent shall have been approved by the Bankruptcy Court following the submission by the Parent of a motion seeking such approval.

4.1.3 The Purchaser Required Statutory Approval shall have been obtained at or prior to the Closing Date.

4.2 <u>Conditions to Obligation of the Purchaser to Effect the Closing</u>.  The obligation of the Purchaser to effect the Closing shall be further subject to the satisfaction, on or prior to the Closing Date, of the following conditions, except as may be waived by the Purchaser in writing pursuant to Clause 14.3:

4.2.1 <u>Performance of Obligations of the Seller</u>.  The Seller shall have performed in all material respects its agreements and covenants contained in or contemplated by this Agreement which are required to be performed by it at or prior to the Closing.

4.2.2 <u>Representations and Warranties</u>.  The representations and warranties of the Seller set forth in this Agreement shall be true and correct (i) on and as of the date hereof and (ii) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specific date or time which need only be true and correct as of such date or time) except in each of cases (i) and (ii) for such failures of representations or warranties to be true and correct (without giving effect to any materiality qualification or standard contained in any such representations or warranties) which would not result in a Company Material Adverse Effect.

4.2.3 <u>Transition Services Agreement and Non-Competition Agreement</u>.  The Transition Services Agreement and the Non-Competition Agreement in substantially the Agreed Forms with such changes as may be required by the Bankruptcy Court shall have been executed and delivered by the Parent following approval by the Bankruptcy Court of such execution and delivery.

9

4.2.4    <u>Closing Certificates</u>.  The Purchaser shall have received a certificate signed by the Seller, dated the Closing Date, to the effect that the conditions set forth in Clauses 4.2.1 and 4.2.2 have been satisfied.

4.3    <u>Conditions to Obligation of the Seller to Effect the Closing</u>.  The obligation of the Seller to effect the Closing shall be further subject to the satisfaction, on or prior to the Closing Date, of the following conditions, except as may be waived by the Seller in writing pursuant to Clause 14.3:

4.3.1    <u>Performance of Obligations of the Purchaser</u>.  The Purchaser shall have performed in all material respects its agreements and covenants contained in or contemplated by this Agreement which are required to be performed by it at or prior to the Closing.

4.3.2    <u>Representations and Warranties</u>.  The representations and warranties of the Purchaser set forth in this Agreement shall be true and correct (i) on and as of the date hereof and (ii) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specific date or time which need only be true and correct as of such date or time) except in each of cases (i) and (ii) for such failures of representations or warranties to be true and correct (without giving effect to any materiality qualification or standard contained in any such representations or warranties) which would not result in a Purchaser Material Adverse Effect.

4.3.3    <u>Transition Services Agreement and Non-Competition Agreement</u>.  The Transition Services Agreement and the Non-Competition Agreement in substantially the Agreed Forms with such changes as may be required by the Bankruptcy Court shall have been executed and delivered by the Purchaser.

4.3.4    <u>Closing Certificates</u>.  The Seller shall have received a certificate signed by the Purchaser, dated the Closing Date, to the effect that the conditions set forth in Clauses 4.3.1 and 4.3.2 have been satisfied.

10

    4.3.5   <u>Exchange Control Department Approval</u>.  The Seller shall have received unconditional written approval from the Exchange Control Department of The Central Bank of the Bahamas to convert the Purchase Price to United States dollars on the Closing Date for remittance abroad.


## 5. THE CLOSING

5.1   <u>Closing</u>.  The consummation of the sale and transfer of the Shares by the Seller to the Purchaser shall take place at the offices of the Seller's Attorneys at 5:00 p.m., local time, on the Wednesday of the week immediately following the date on which the last of the conditions set forth in Clause 4 hereof is fulfilled or waived (except for those conditions which by their nature can only be fulfilled at the Closing), or at such other time, date and place as the Seller and the Purchaser shall mutually agree.  The Purchaser shall be entitled to all rights, privileges and benefits of the Shares from the Closing Date.

5.2   <u>Deliveries by the Seller</u>.  At the Closing, the Seller shall deliver to the Purchaser the documents set forth below:

    5.2.1   In accordance with the practice of the transfer agent of the Company, evidence of the transfer of the Shares duly and validly executed by the Seller in favour of the Purchaser (or as it in writing directs) accompanied by the relevant share certificate or certificates representing the Shares;

    5.2.2   certified resolutions of the Board of Directors of the Seller authorizing the transactions herein contemplated;

    5.2.3   such waivers, consents or other documents as may be required to give good title to the Shares and to enable the Purchaser or its nominees to become registered shareholders;

    5.2.4   the resignations or other evidence of removal of Peter Lynch and Mark Sellers from the Board of Directors of the Company and each Company Subsidiary with a written acknowledgment from each (which shall be executed under seal or as a

11

deed in an agreed form) that he has no claim whatsoever against the Company whether in respect of compensation for loss of office, damages, pensions, loans or otherwise, other than any rights to indemnity to the extent provided in Section 9.8 of this Agreement or to reimbursement of expenses and director fees earned but not theretofore paid;

5.2.5   the Transition Services Agreement as executed and delivered by the Parent following Bankruptcy Court approval of such execution and delivery;

5.2.6   the Seller Disclosure Schedule;

5.2.7   Certificates of Incumbency and good standing of the Seller;

5.2.8   Certificate of good standing of the Company and each Company Subsidiary; and

5.2.9   any other papers, documents, instruments and writing required to be delivered by the Seller to the Purchaser pursuant to this Agreement or as the Purchaser may (by notice from the Purchaser's Attorneys to the Seller's Attorneys given not less than five (5) Business Days prior to the Closing Date) reasonably require.

5.3   Meeting of the Board of Directors.  At the Closing, the Seller and the Purchaser shall cooperate in procuring that a board meeting of the Company shall be held at which:

5.3.1   such persons as the Purchaser may nominate shall be appointed as directors and officers of the Company;

5.3.2   there shall be submitted and accepted the resignations of the directors referred to in Clause 5.2.5 hereof;

5.3.3   the transfers of the Shares shall be approved for registration and the appropriate entry made in the Share Register of the Company;

5.3.4   the existing bank mandates given by the Company shall be amended, if necessary; and

12

5.3.5    the registered office of the Company shall be changed as the Purchaser may direct.

5.4    Purchaser's Closing Obligations.  At the Closing, the Purchaser shall:

5.4.1    pay or procure the payment to and in favour of the Seller the Purchase Price;

5.4.2    certified resolutions of the Board of Directors of the Purchaser authorizing the transactions herein contemplated; and

5.4.3    deliver to the Seller any other documents, instruments and writings reasonably required to be delivered by the Purchaser to the Seller pursuant to this Agreement or as the Seller may (by notice from the Seller's Attorneys to the Purchaser's Attorneys given not less than five (5) Business Days prior to the Closing Date) reasonably require.

5.5    Settlement of Certain Obligations.  At the Closing, (i) the Parent shall reimburse the Company for all claims under insurance coverage maintained by the Parent for the Company that are due and payable as of the Closing Date subject to any applicable adjustment in the Bankruptcy Case and (ii) the Company shall pay to the Seller or to the Parent as the case may be all amounts owing by the Company as of the Closing Date for trade payables and for shared services (including but not limited to information technology services and employee compensation) provided by the Parent or the Seller to the Company through the Closing Date.


6.    **REPRESENTATIONS AND WARRANTIES OF THE SELLER**

6.1    As an inducement to the Purchaser to enter into this Agreement, the Seller warrants and represents to the Purchaser in relation to the Company the terms set out in Schedule 4.

6.2    The Warranties shall be deemed to be qualified by (i) all information that the Company has publicly disclosed; (ii) all information within the actual knowledge of the Purchaser, without any requirement of inquiry or investigation and (iii) any information disclosed in

13

this Agreement or the Schedules or Annexes hereto or the Seller Disclosure Schedule, regardless of where in this Agreement or the Schedules or Annexes hereto or the Seller Disclosure Schedule such information is disclosed.

6.3    Except for Warranties that speak as of a specific date, the Warranties shall be deemed to be given as at the date of this Agreement and to be repeated immediately before Closing and to relate to the facts then existing.

6.4    The Seller undertakes with the Purchaser that, except as may be necessary to give effect to this Agreement, it shall not, and shall use commercially reasonable efforts to cause the Company not to, allow or procure any act or omission before Closing which would constitute a material breach of any of the Warranties if they were given at Closing or which would make any of such Warranties inaccurate or misleading if they were so given.

6.5    The Seller undertakes with the Purchaser that it will within three (3) Business Days disclose in writing to the Purchaser any event or circumstance which may arise or become known to the Seller after the date of this Agreement and prior to Closing which had it been known to the Seller on or before the date of this Agreement would constitute a material breach of a Seller's Warranty.

6.6    None of the information supplied by the Company or their professional advisers prior to the date of this Agreement to the Seller or their officers, employees, agents, representatives or advisers in connection with the Warranties and the contents of the Seller Disclosure Schedule or otherwise in relation to the business or affairs of the Company shall be deemed a representation, warranty or guarantee of its accuracy by the Company to the Seller and the Seller waives any claims against the Company, its officers, employees, agents, representatives or advisers which they might otherwise have in respect of the same.

6.7    Except for the representations and warranties contained in this Clause 6 and Schedule 4 hereto, neither the Seller nor any other Person or entity acting on behalf of the Seller makes any representation or warranty, express or implied, concerning the Shares or the

14

business, finances, operations, assets, liabilities, prospects or any other aspect of the Company or any Company Subsidiary and the Shares are being sold to the Purchaser on an "AS IS, WHERE IS" basis.

**7.      REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

7.1      The Purchaser represents and warrants to the Seller that:

7.1.1    <u>Organization and Qualification</u>.  The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of The Bahamas, has all requisite power and authority to own, lease and operate its assets and properties to the extent owned, leased and operated and to carry on its business as it is now being conducted and is duly qualified and in good standing to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its assets and properties makes such qualification necessary other than in such jurisdictions where the failure to be so qualified or in good standing would not have a Purchaser Material Adverse Effect or prevent, materially delay or materially impair the Purchaser's ability to consummate the transactions contemplated by this Agreement.

7.1.2    <u>Authority</u>.  The Purchaser has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation by the Purchaser of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Purchaser.  No vote of, or consent by, the holders of any class or series of stock issued by the Purchaser is necessary to authorize the execution and delivery by the Purchaser of this Agreement or the consummation by it of the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Purchaser and, assuming the due authorization, execution and delivery hereof by the Seller, constitutes the valid and binding obligation of the Purchaser enforceable against

15

it in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

7.1.3    <u>Statutory Approvals</u>.  Except for the Purchaser Required Statutory Approval, no declaration, filing or registration with, or notice to or authorization, consent or approval of, any Governmental Authority is necessary for the execution and delivery of this Agreement by the Purchaser or the consummation by the Purchaser of the transactions contemplated hereby, except those which the failure to obtain would not have a Purchaser Material Adverse Effect or prevent, materially delay or materially impair the Purchaser's ability to consummate the transactions contemplated by this Agreement.

7.1.4    <u>Litigation</u>.  As of the date hereof, there are no claims, suits, actions or proceedings by any Governmental Authority or any arbitrator pending or, to the knowledge of the Purchaser, threatened against, relating to or affecting the Purchaser or any Purchaser Subsidiary which would have a Purchaser Material Adverse Effect or prevent, materially delay or materially impair the Purchaser's ability to consummate the transactions contemplated by this Agreement.  As of the date hereof, there are no judgments, decrees, injunctions, rules or orders of any court, governmental department, commission, agency, instrumentality or authority or any arbitrator applicable to the Purchaser except for such that would not have a Purchaser Material Adverse Effect or prevent, materially delay or materially impair the Purchaser's ability to consummate the transactions contemplated by this Agreement.

7.1.5    <u>Investigation by the Purchaser; the Seller's Liability</u>.  The Purchaser has conducted its own independent investigation, review and analysis of the Business, operations, assets, liabilities, results of operations, financial condition, software, technology and prospects of the Company, which investigation, review and analysis were done by the Purchaser and its affiliates and, to the extent the Purchaser deemed appropriate, by the Purchaser's representatives.  The

16

Purchaser acknowledges that it and its representatives have been provided adequate access to the personnel, properties, premises and records of the Company for such purpose.  In entering into this Agreement, the Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations of the Seller or its representatives (except the specific representations and warranties of the Seller set forth in this Agreement), and the Purchaser:

7.1.5.1    acknowledges that none of the Seller or any of its directors, officers, shareholders, employees, affiliates, controlling Persons, agents, advisors or representatives (or agents, advisors or representative of any of the foregoing) makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information (including materials furnished in the Company's data room, presentations by the Company's management, financial projections or otherwise) provided or made available to the Purchaser or its directors, officers, employees, affiliates, controlling Persons, agents or representatives;

7.1.5.2    agrees, to the fullest extent permitted by law, that none of the Seller, the Company, or any of their respective directors, officers, employees, shareholders, affiliates, controlling Persons, agents, advisors or representatives (or agents, advisors or representative of any of the foregoing) shall have any liability or responsibility whatsoever to the Purchaser or its directors, officers, employees, affiliates, controlling Persons, agents or representatives on any basis (including in contract or tort, under federal or state securities laws or otherwise) based upon any information provided or made available, or statements made (including materials furnished in the Company's data room, presentations by the Company's management, financial projections or otherwise) to the Purchaser or its directors, officers, employees, affiliates, controlling Persons, advisors, agents or representatives (or any omissions

17

therefrom), including in respect of the specific representations and warranties of the Seller set forth in this Agreement, except that the foregoing limitations shall not apply to the Seller insofar as the Seller makes the specific representations and warranties set forth in this Agreement, but always subject to the limitations and restrictions contained in this Agreement; and

7.1.5.3  acknowledges that, except for the representations and warranties herein contained, neither the Seller nor any other Person or entity acting on behalf of the Seller makes any representation or warranty, express or implied, concerning the Shares or the Business, finances, operations, assets, liabilities, prospects or any other aspect of the Company and that the Shares are being sold to the Purchaser on an "AS IS, WHERE IS" basis.

7.1.6  <u>Financing</u>.  The Purchaser has, and will have throughout the period beginning as of the date hereof and ending on the Closing Date, sufficient cash in immediately available funds to pay the Purchase Price as herein provided and to consummate the transactions contemplated hereby, including, without limitation, payment of fees and expenses in connection with the transactions contemplated hereby. Documents evidencing the foregoing have been provided to the Seller.

7.1.7  <u>Brokers or Finders</u>.  The Purchaser has not entered into any agreement or arrangement entitling any agent, broker, investment banker, financial advisor or other firm or Person to any broker's or finder's fee or any other commission or similar fee in connection with any of the transactions contemplated by this Agreement, except Colina Financial Advisors Limited, whose fees and expenses will be paid by the Purchaser in accordance with the Purchaser's agreement with such firm and the Purchaser shall indemnify and hold the Seller and the Company harmless against any and all costs, claims and demands arising as a result of non payment thereof.

18

7.1.8   Certain Payments.  Neither the Purchaser nor any director, officer, agent, employee or other person acting on behalf of the Purchaser has, directly or indirectly, used any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity, made any unlawful payment to any U.S. or non-U.S. government official or employee or to any U.S. or non-U.S. political parties or campaigns from corporate funds, violated any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any similar law in The Bahamas or elsewhere, or made any bribe, rebate, payoff, influence payment, kickback or similar unlawful payment.

7.1.9   Bahamian Company.  The Purchaser is a Bahamian Company.

7.2   Except for warranties that speak as of a specific date or dates, the warranties contained in this Clause 7 shall be deemed to be given as at the date of this Agreement and to be repeated immediately before Closing and to relate to the facts then existing.

7.3   The Purchaser undertakes with the Seller that it will within three (3) Business Days disclose in writing to the Seller any event or circumstance which may arise or become known to the Purchaser after the date of this Agreement and prior to Closing which had it been known to the Purchaser on or before the date of this Agreement would constitute a material breach of a warranty of Purchaser contained in this Clause 7.

## 8.   CONDUCT OF BUSINESS PENDING THE CLOSING

8.1   Covenants of the Seller.  After the date hereof and prior to the Closing or earlier termination of this Agreement, the Seller agrees that, except as set forth in Section 8.1 of the Seller Disclosure Schedule and except (i) as contemplated in or permitted by this Agreement, (ii) in connection with necessary repairs due to breakdown or casualty, or other actions taken in response to a business emergency or other unforeseen operational matters, (iii) as required by law, rule or regulation, (iv) as would violate any applicable fiduciary duties and/or contractual obligations on the date hereof, or (v) to the extent the Purchaser shall otherwise consent, which decision regarding consent shall be

19

made promptly and which consent shall not be unreasonably withheld, conditioned or delayed:

8.1.1   the Seller shall use commercially reasonable efforts to cause the Company not to:

    8.1.1.1   incur any material expenditure on capital account or enter into any commitments so to do;

    8.1.1.2   dispose of or agree to dispose of or grant any option in respect of any material part of its assets except in the Ordinary Course;

    8.1.1.3   borrow money in any material amount or make any payments out of or drawings on its bank account(s) except in the Ordinary Course;

    8.1.1.4   enter into any contract or commitment that is not Ordinary Course; or

        8.1.1.4.1   grant or agree to grant any lease or third party right in respect of the Leased Properties or assign or agree to assign or otherwise dispose of the same;

        8.1.1.4.2   make any loan;

        8.1.1.4.3   enter into any leasing, hire, purchase, or other agreement or arrangements for payment on deferred terms;

    8.1.1.5   declare, make or pay any dividend on the shares of the Company, including the Shares, other than in the Ordinary Course and consistent with past practice with respect to the payment of dividends by the Company;

    8.1.1.6   grant or issue or agree to grant or issue any mortgages, charges, debentures or other securities for money or redeem or agree to redeem any such securities or give or agree to give any material guarantees or indemnities;

8.1.1.7    permit any of its insurances to lapse or do anything which would make any policy of insurance void or voidable;

8.1.1.8    make any change in the terms and conditions of employment or pension benefits of any of its directors or officers or hire or terminate (other than for good cause) the employment of any director or officer

8.1.1.9    create, issue or grant any option in respect of any class of share or loan capital or agree so to do; or

8.1.1.10   in any other material way depart from the Ordinary Course of its Business either as regards the nature, scope or the manner of conducting the same.

8.1.2    The Seller shall not:

8.1.2.1    dispose of any Shares or any interest in such Shares or grant any Incumbrance over the Shares in whole or in part; or

8.1.2.2    in any way adversely affect in any material respect its current business organization or its existing relations and goodwill with significant customers, suppliers, creditors, lessors and business associates.

8.2    The Seller shall promptly provide the Purchaser with copies of all filings made by the Seller or, to the extent available to the Seller, the Company with, and inform the Purchaser of any communications received by the Seller or, to the extent available to the Seller, the Company from, any Governmental Authority in connection with this Agreement and the transactions contemplated hereby, other than any filings and communications regarding taxes payable by the Seller in the United States of America, including but not limited to tax returns of any kind.

8.3    The Seller shall (a) use commercially reasonable efforts to obtain promptly all of the Seller Required Statutory Approvals, (b) promptly notify the Purchaser of any failure or prospective failure to obtain any such approvals and, if requested by the Purchaser,

21

provide copies of all of the Seller Required Statutory Approvals obtained by the Seller to the Purchaser and (c) cooperate and use commercially reasonable efforts to assist the Purchaser to obtain any consent required as a result of the transactions contemplated by this Agreement under any contract relating to the Company to which the Seller or the Parent is a party; provided, however, that neither the Seller nor the Parent nor any of their affiliates or representatives shall be required by this Section 8.3 to (A) pay any consideration, (B) surrender, modify or amend in any substantive respect any such contract, or (C) agree to either of the foregoing or any other condition or requirement that is adverse or burdensome.

8.4    Pending Closing, the Seller shall use commercially reasonable efforts as a shareholder to procure that the Purchaser, its agents and representatives are given reasonable access, during normal business hours, to the Leased Properties and to the books, records, contracts and commitments of the Company and the Seller shall, upon request, furnish to the Purchaser, its agents and representatives such information as is within the Seller's control regarding the Company and such other matters as the Purchaser may reasonably require, including any filings, applications or approvals required or contemplated by this Agreement or for any other reason related to the transactions contemplated by this Agreement.  Notwithstanding the foregoing, in no event shall the Seller be obligated to provide (i) access or information in violation of law, (ii) bids, letters of intent, expressions of interest or other proposals received from others in connection with the transactions contemplated by this Agreement and information and analysis relating to such communications, or (iii) any information the disclosure of which would jeopardize any privilege available to the Seller, the Company, any Company Subsidiaries or the Parent relating to such information or would cause the Seller, the Company, any Company Subsidiary or the Parent to breach a confidentiality obligation to which it is bound.

8.5     The Seller shall use commercially reasonable best efforts to cause the Company to make the following available to the Purchaser at the Closing:

8.5.1    the certificate of incorporation, statutory books (including minute books), common seal and all books of account and other records of the Company complete and (where appropriate) written up to date;

8.5.2    the Lease Agreements to the Leased Properties and all ancillary documents;

8.5.3    a written acknowledgment under seal in the Agreed Form from each of the existing directors or officers of the Company who is to continue as a director or officer (as the case may be) after the Closing Date that he has no claim whatever against the Company, other than any rights to indemnity to the extent provided under Section 9.8 of this Agreement or to reimbursement of expenses and director fees earned but not theretofore paid;

8.5.4    certificates from the Company's bankers certifying the current and deposit account balances of the Company at the close of business on the last Business Day preceding the Closing Date;

8.5.5    appropriate forms to amend the mandates given by the Company to its bankers; and

8.5.6    written confirmation from the Seller that there are no subsisting guarantees given by the Company in its favour and that the Seller is not indebted to the Company or vice versa, other than for trade payables, claims payable under insurance coverage and amounts payable in connection with shared services that are currently provided by the Parent or the Seller to the Company.

8.6    Covenants of the Purchaser.  After the date hereof and prior to the Closing Date or earlier termination of this Agreement, the Purchaser agrees that, except as expressly contemplated or permitted in this Agreement or to the extent the Seller shall otherwise consent in writing, which decision regarding consent shall be made as soon as reasonably practical, and which consent shall not be unreasonably withheld, conditioned or delayed.

8.6.1    The Purchaser shall promptly provide the Seller with copies of all filings made by the Purchaser with, and inform the Seller of any communications received from (and provide copies of any such communications that are written), any Governmental Authority in connection with this Agreement and the transactions contemplated hereby.

8.6.2    The Purchaser shall use all commercially reasonable efforts to obtain promptly the Purchaser Required Statutory Approval.  The Purchaser shall promptly notify the Seller of any failure or prospective failure to obtain the Purchaser Required Statutory Approval and shall provide to the Seller a copy of the Purchaser Required Statutory Approval obtained by the Purchaser.

8.6.3    The Purchaser shall not, and shall not permit any Purchaser Subsidiary to, (i) acquire or agree to acquire any assets or (ii) acquire or agree to acquire, whether by merger, consolidation, by purchasing any portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, if the entering into of a definitive agreement relating thereto or the consummation of such acquisition, merger or consolidation could reasonably be expected to (A) impose any delay in the expiration of any applicable waiting period or impose any delay in the obtaining of, or increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the transaction contemplated by this Agreement; (B) increase the risk of any Governmental Authority entering an order prohibiting such transaction; or (C) delay or impede the consummation of the transaction contemplated by this Agreement.

9.    **ADDITIONAL AGREEMENTS**

9.1    Regulatory Matters.  Each Party hereto shall cooperate and use best efforts to prepare and file as soon as practicable all necessary documentation, to effect all necessary

24

applications, notices, petitions, filings and other documents, and to use best efforts to obtain all necessary permits, consents, approvals and authorizations of all Governmental Authorities necessary or advisable to obtain the Seller Required Statutory Approvals and the Purchaser Required Statutory Approval.  The Parties further agree to use best efforts to take any act, make any undertaking or receive any clearance or approval required by any Governmental Authority or applicable law.  Each Party shall (i) respond as promptly as practicable to any inquiries or requests received from any Governmental Authority for additional information or documentation and (ii) not enter into any agreement with any Governmental Authority not to consummate the transactions contemplated by this Agreement, except with the prior consent of the other Party hereto (which shall not be unreasonably withheld or delayed).

9.2     Public Announcements.  No announcements of any kind shall be made in respect of the subject matter of this Agreement by any Party except as specifically agreed between the Parties or if required by law or by any Governmental Authority.  Any announcement by any Party so required shall, in any event, be issued after consultation with the other Party as to the content of such announcement except in connection with Parent's Bankruptcy Case.

9.3     Insurance.  The Purchaser acknowledges and agrees that effective upon the Closing, all insurance coverage maintained by the Parent or the Seller applicable to the Company and the Company Subsidiaries shall be terminated or modified to exclude coverage of the Company and the Company Subsidiaries, and, as a result, the Purchaser shall be obligated at or before Closing to obtain at its sole cost and expense replacement insurance policies providing coverage for claims made or arising after the Closing.

9.4     Financial Information.

9.4.1   After the Closing, upon reasonable written notice, the Purchaser and the Seller shall use commercially reasonable efforts to furnish or cause to be furnished to each other and their respective accountants, counsel and other representatives, during normal business hours, such information (including records pertinent to

25

the Company) as is reasonably necessary for financial reporting and accounting matters.

9.4.2   The Purchaser shall cause the Company to retain all of the books and records of the Company and the Company Subsidiaries for a period of eight (8) years after the Closing Date or such longer time as may be required by law.

9.5   <u>Seller's Name and Look and Feel</u>.  The Purchaser shall not acquire, nor shall the Company retain, any rights to the names "Winn-Dixie" or "W-D" (or any derivation thereof) or any trademark, service mark, trade name, company name or symbol related thereto (the "**Seller Marks**").  As soon as reasonably practicable after the Closing but not later than six (6) months after the Closing Date, the Purchaser shall (i) cause the Company to remove the Seller Marks from all stores, markets and other retail operations of the Company, (ii) cause the Company to remove the Seller Marks from all other properties and assets of the Company, (iii) discontinue all use of the Seller Marks or any trademark, service mark, trade name, company name or symbol related or confusingly similar thereto by or on behalf of the Company, and (iv) redesign, refurbish, clean and repaint, as necessary, all stores, markets and other retail operations of the Company and the Company Subsidiaries so as fulfill the Purchaser's obligations in clauses (i) through (iii) above and to remove all evidence of the Seller Marks.  Any use of the Seller Marks during such six- (6) month period shall, and the products or services provided in connection with such use shall, (i) be limited to such uses, products and services as were made of the Seller Marks in connection with the businesses of the Company prior to the Closing Date and (ii) conform to a level of quality at least as high as that practiced by the Company prior to the Closing Date.

9.6   <u>Purchaser Access</u>.  The Purchaser agrees to use reasonable best efforts to minimize any disruption of the businesses of the Seller, the Company, the Company Subsidiaries and the Parent and to indemnify and hold the Seller, the Company, the Company Subsidiaries and the Parent harmless from any and all claims and liabilities, including costs and expenses for loss, injury to or death of any agent or representative of the Purchaser, and any loss, damage to or destruction of any property owned by the Seller,

26

the Company, the Company Subsidiaries, the Parent or others (including claims or liabilities for loss of use of any property) resulting directly or indirectly from the negligence of any of the representatives of the Purchaser during any visit to the Business or property sites, including the Leased Properties of the Company or the Company Subsidiaries prior to the Closing Date.

9.7     Confidentiality.  Except as may be necessary in Parent's Bankruptcy Case, each Party shall, and shall cause its Subsidiaries, agents and representatives to, hold in strict confidence all documents and information concerning the other furnished to it in connection with the transactions contemplated by this Agreement in accordance with the Confidentiality Agreement, dated November 16, 2005, entered into by and between the Parent and the Purchaser (the "**Confidentiality Agreement**") and subject to any subsequent confidentiality agreement.

9.8     Directors' and Officers' Indemnification.

(a)     From and after the Closing Date, the Purchaser shall cause the Company, to the fullest extent permitted under applicable law, to indemnify and hold harmless (and advance funds in respect of each of the foregoing) each present and former employee, agent, director or officer of the Company and the Company Subsidiaries (each, together with such person's heirs, executors or administrators, an "**Indemnified Party**" and, collectively, the "**Indemnified Parties**") against any costs or expenses (including advancing attorneys' fees and expenses in advance of the final disposition of any claim, suit, proceeding or investigation to each Indemnified Party to the fullest extent permitted by law), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative (an "**Action**"), arising out of, relating to or in connection with any action or omission by such Indemnified Party in his or her capacity as an employee, agent, director or officer occurring or alleged to have occurred whether before or after the Closing Date (including acts or omissions in connection with such person's service as an officer, director or other fiduciary in any entity if such service was at the request or for

27

the benefit of the Company or any of the Company Subsidiaries) or this Agreement or the transactions contemplated hereby.   In the event of any such Action, the Purchaser shall cooperate with the Indemnified Party in the defense of any such Action.

(b)      Survival of Indemnification.  To the fullest extent not prohibited by law, from and after the Closing Date, all rights to indemnification against the Company now existing in favor of the Company Indemnified Parties with respect to their activities as such prior to or on the Closing Date, as provided in the Company's and each Company Subsidiary's respective articles of incorporation, by-laws, other organizational documents or indemnification agreements in effect on the date of such activities or otherwise in effect on the date hereof, shall survive the Closing and shall continue in full force and effect for a period of not less than six (6) years from the Closing Date, provided that, in the event any claim or claims are asserted or made within such six (6)-year period, all such rights to indemnification in respect of any claim or claims shall continue until final disposition of such claim or claims.

(c)      For a period of not less than six (6) years after the Closing Date, the Purchaser shall or the Purchaser shall cause the Company to maintain in effect policies of directors' and officers' liability insurance equivalent to those maintained by the Seller on behalf of the Company prior to the Closing Date for the benefit of those persons who are currently covered by such policies on terms no less favorable than the terms of such current insurance coverage.

(d)      In the event that, after the Closing Date, the Company or the Purchaser or any of their respective successors or assigns (i) consolidates with or merges into any other Person or entity and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers all or a substantial portion of its properties and assets to any Person or entity, then and in either such case, proper provisions shall be made so that the successors and assigns of the Company or the Purchaser, as the case may be, shall assume the obligations set forth in this Section 9.8.

(e)      The provisions of this Section 9.8 are intended to be for the benefit of, and shall be enforceable by, each Indemnified Party, his or her heirs, executors or administrators and his or her other representatives.

28

9.9     Purchaser Financing.  The Purchaser shall use its best efforts throughout the period
        beginning as of the date hereof and ending on the Closing Date to maintain sufficient
        cash in immediately available funds to pay the Purchase Price as herein provided and to
        consummate the transactions contemplated hereby, including, without limitation,
        payment of fees and expenses in connection with the transactions contemplated hereby.

9.10    Further Assurances.  Each Party shall, and shall use commercially reasonable efforts to
        execute such further documents or instruments and take such further actions as may
        reasonably be requested by the other party necessary to consummate the transactions
        contemplated hereby in accordance with the terms hereof.

10.     [RESERVED]

11.     TERMINATION

11.1    Termination.  At any time prior to the Closing Date, this Agreement:

        11.1.1  may be terminated by mutual written consent of the Seller and the Purchaser, in
                which event the Deposit shall be immediately returned to the Purchaser together
                with all accrued interest thereon;

        11.1.2  may be terminated by the Purchaser or the Seller, as the case may be, by written
                notice to the other Party, if the Closing Date shall not have occurred on or before
                the date that is thirty (30) days after the date of the Bankruptcy Court approval of
                the Parent's execution and delivery of the Shareholder Consent (the "**Initial
                Termination Date**"); provided, however, that the right to terminate the
                Agreement in this sub-clause shall not be available to any Party whose failure to
                fulfill any obligation under this Agreement shall have caused the failure of the
                Closing Date to occur on or before such date; and provided, further, that if on the
                Initial Termination Date the Purchaser Required Statutory Approvals or the Seller
                Required Statutory Approvals shall not have been obtained but all other

29

conditions to the Closing shall be fulfilled or shall be capable of being fulfilled, then the Seller shall have the sole right to extend the term of this Agreement until September 29, 2006 (time being of the essence with respect to such extended term), unless any act or omission of the Seller in connection with its status with the Exchange Control Department of the Central Bank of the The Bahamas shall be the cause of the failure to obtain either the Purchaser Required Statutory Approval or the Seller Required Statutory Approvals as of the Initial Termination Date, then either Party shall have the right to extend the term until September 29, 2006 (time being of the essence with respect to such extended term).  If on September 29, 2006, the Purchaser Required Statutory Approval or the Seller Required Statutory Approvals remain outstanding, then (unless a further extension is otherwise agreed between the Parties), this Agreement shall be terminated with no liability on the part of any Party.  In the event that the Agreement is terminated pursuant to this Section 11.1.2 the Purchaser shall be entitled to the immediate return of the Deposit, together with all accrued interest thereon;

11.1.3  may be terminated by the Purchaser, by written notice to the Seller, if the Purchaser is not in breach of any of its obligations under this Agreement in any material respect and there shall have been a material breach of any representation or warranty, or a material breach of any covenant or agreement of the Seller hereunder, which breach would result in a Company Material Adverse Effect and such breach shall not have been remedied within ten (10) Business Days after receipt by the Seller of notice in writing from the Purchaser, specifying the nature of such breach and requesting that it be remedied, or the Purchaser shall not have received adequate assurance of a cure of such breach within such ten (10) Business Day period.  In such event, the Deposit, together with all interest accrued thereon, shall be returned immediately to the Purchaser and the Seller, the Company, the Parent and their agents, advisors and other representatives shall be fully released and discharged from any liability or

30

obligation under or resulting from this Agreement and the Purchaser shall not have any other remedy or cause of action under or relating to this Agreement;

11.1.4  may be terminated by the Seller, by written notice to the Purchaser, if there shall have been a material breach of any representation or warranty, or a material breach of any covenant or agreement of the Purchaser hereunder, which breach would result in a Purchaser Material Adverse Effect, and such breach shall not have been remedied within ten (10) Business Days after receipt by the Purchaser of notice in writing from the Seller, specifying the nature of such breach and requesting that it be remedied, or the Seller shall not have received adequate assurance of a cure of such breach within such ten (10) Business Day period.  In such event, the Deposit, together with all interest accrued thereon, shall be remitted immediately to the Seller and the Purchaser and its agents, advisors and other representatives shall be fully released and discharged from any liability or obligation under or resulting from this Agreement and the Seller shall not have any other remedy or cause of action under or relating to this Agreement.  For the avoidance of doubt, the failure of the Purchaser's warranties in sub-Clauses 7.1.6 and 7.1.9 to be true at any time from the date hereof to the Closing Date shall be deemed a material breach of such warranties that would result in a Purchaser Material Adverse Effect for purposes of this Clause 11.1.4; and

11.1.5  shall automatically terminate upon consummation of the sale of the Shares to the Successful Bidder (as defined in the bid procedures set forth in Annex C hereto) if the Purchaser is not the Successful Bidder.  In such event, the Deposit, together with all interest accrued thereon, shall be returned immediately to the Purchaser, and, any other provision of this Agreement notwithstanding, the sole remedy of the Purchaser shall be a break-up fee in the amount of US$1 million (the "**Break-up Fee**") payable by the Seller within five (5) Business Days of the consummation of the sale of the Shares, provided, however, that the Break-up Fee, shall not be due and payable if (i) a Purchaser Material Adverse Effect shall have occurred, or (ii) if the Purchaser shall have breached at any time after the execution hereof any of its respective obligations, representations or warranties

31

contained in this Agreement in any material respect.  Upon the return of the Deposit and the payment of the Break-up Fee, if any, to the Purchaser, the Seller, the Company, the Parent and their agents, advisors and other representatives shall be fully released and discharged from any liability or obligation under or resulting from this Agreement and the Purchaser shall not have any other remedy or cause of action under or relating to this Agreement.

11.2    <u>Frustration of Contract</u>.  Notwithstanding anything contained in this Agreement, the Parties hereto shall be released from their respective obligations hereunder in the event of this Agreement being rendered impossible of performance by either Party due to a decree of a Governmental Authority published in the Official Gazette of the Commonwealth of The Bahamas or an order of a Governmental Authority specifically prohibiting the sale of the Shares by the Seller to the Purchaser, whereupon the Deposit shall be returned to the Purchaser together with all accrued interest thereon.

11.3    <u>Effect of Termination</u>.  In the event of termination of this Agreement pursuant to Clause 11.1, this Agreement shall become void and of no effect with no liability on the part of any party hereto (or any of its directors, officers, employees, agents, legal and financial advisors or other representatives), except that the following clauses shall survive the termination:  Clauses 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 9.7, 11.1 (only insofar as it pertains to the treatment of the Deposit and, if applicable, the Break-up Fee), 11.2 (only insofar as it pertains to the treatment of the Deposit), 11.3, 14.2, 14.4, 14.6, 14.9, 14.10, 14.11, 14.12 and 14.13.

## 12.    NON-COMPETITION AGREEMENT

12.1    In order to induce the Purchaser to enter into this Agreement, the Seller hereby covenants that for a period of two (2) years after Closing the Seller shall not directly or indirectly undertake to carry on or be engaged, concerned or interested either alone or in partnership with or as manager, agent or servant of any other person, firm or company or otherwise in any business in the Commonwealth of The Bahamas which is identical or similar to the Business; <u>provided</u>, <u>however</u>, that nothing herein shall be construed as

32

prohibiting the Seller from continuing its existence as a company incorporated and existing under the laws of the Commonwealth of The Bahamas.

13.    [RESERVED]

14.    GENERAL PROVISIONS

14.1    Survival of Obligations.  The representations, warranties, covenants, obligations and agreements of the parties contained in this Agreement, or in any instrument, certificate, opinion or other writing provided for herein, shall not survive the Closing; provided, however, that the covenants of the Seller and the Purchaser contained in Clauses 9.2, 9.3, 9.4, 9.5, 9.7, 9.8, and 12 shall survive the Closing.

14.2    Amendment and Modification.  This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by each of the Parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement.

14.3    Extension; Waiver.  At any time prior to the Closing Date, a Party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other Party hereto; (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein, to the extent permitted by applicable law.  Any agreement on the part of a Party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.  The failure of any Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.

14.4    Costs and Expenses.  All costs and expenses incurred by or on behalf of the Parties to this Agreement including all fees of representatives, solicitors, counsel and accountants employed by any of the Parties in connection with the negotiation, preparation and

33

execution of this Agreement shall be borne solely by the Party who shall have incurred the same and the other Party shall have no liability in respect of such costs and expenses.  Notwithstanding the foregoing, in any action or proceeding brought to enforce any provisions of this Agreement, or where any provision hereof is validly asserted as a defense, the successful Party in such action or proceeding shall be entitled to recover reasonable attorneys' fees and disbursements.

14.5    <u>Notices</u>.

14.5.1  Any notice or other communication pursuant to, or in connection with, this Agreement shall be in writing and delivered personally, or sent by reputable overnight courier service or by facsimile or other form of electronic transmission to the Parties at the addresses or the numbers set out in Annex D hereto (or to such other address as may from time to time have been notified in writing to the other Parties in accordance with this Clause 14.5).

14.5.2  Subject to Clause 14.5.3, any notice or other communication shall be deemed to have been served:

14.5.2.1 if delivered personally, when left at the address referred to in Clause 14.5.3;

14.5.2.2 when sent by reputable overnight courier service, two (2) clear days after sending it; and

14.5.2.3 if sent by facsimile or other form of electronic transmission (including e-mail), at the time of transmission (<u>provided</u>, that to be effective such transmission must be followed up within one (1) Business Day by reputable overnight courier service).

14.5.3  If a notice is given or deemed given at a time or on a date which is not a Business Day, it shall be deemed to have been given on the next Business Day.

34

14.6     Entire Agreement; No Third Party Beneficiaries.  This Agreement and the Confidentiality
         Agreement (a) constitute the entire agreement and supersede all prior agreements and
         understandings, both written and oral, among the Parties with respect to the subject
         matter hereof and thereof and (b) are not intended to confer, and shall not confer, upon
         any Person other than the Parties hereto and thereto any remedies, claims of liability or
         reimbursement, causes of action or any other rights whatsoever.

14.7     Severability.  Any term or provision of this Agreement that is held by a court of
         competent jurisdiction or other authority to be invalid, void or unenforceable in any
         situation in any jurisdiction shall not affect the validity or enforceability of the remaining
         terms and provisions hereof or the validity or enforceability of the offending term or
         provision in any other situation or in any other jurisdiction.  If the final judgment of a court
         of competent jurisdiction or other authority declares that any term or provision hereof is
         invalid, void or unenforceable, the Parties agree that the court making such
         determination shall have the power to reduce the scope, duration, area or applicability of
         the term or provision, to delete specific words or phrases, or to replace any invalid, void
         or unenforceable term or provision with a term or provision that is valid and enforceable
         and that comes closest to expressing the intention of the invalid or unenforceable term
         or provision.

14.8     Continuation of Agreement.  This Agreement shall (except for any obligation fully
         performed prior to or at Closing) continue in full force and effect after the Closing Date
         notwithstanding Closing.

14.9     Governing Law.  The application and effect of this Agreement shall be governed by and
         construed in accordance with the laws of the Commonwealth of The Bahamas.

14.10    Consent to Jurisdiction.  The Parties hereby submit to the exclusive jurisdiction of the
         Courts of the Commonwealth of The Bahamas The Bahamas in relation to any dispute
         or claim arising out of or in connection with this Agreement.

14.11    Specific Performance.  The Parties hereto agree that irreparable damage would occur in
         the event any of the provisions of this Agreement were not to be performed in

35

accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof in addition to any other remedies at law or in equity.

14.12   <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either party hereto (whether by operation of law or otherwise) without the prior written consent of the other Party.

14.13   <u>Counterparts; Effect</u>.  This Agreement may be executed and delivered (including via facsimile) in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

W-D (BAHAMAS) LTD.


By: _____
Name:
Title:


BK FOODS LTD.


By:_____
Name:
Title:

(667657DC1A)

37

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

W-D (BAHAMAS) LTD.

By: _____
Name:
Title:

BK FOODS LTD.

By: _____
Name: Philip A. Kemp II
Title: DIRECTOR

(667657DC1A)

38

Agreement to be signed by their resp~~~
written above.

W-D (BAHAMAS) LTD.

By:
Name: HARK SELLERS
Title: VICE PRESIDENT

BK FOODS LTD.

By:
Name: Philip A. Kemp II
Title: Director

(667657DC1A)

38 37

**SCHEDULE 1**

| Seller's name | Seller's address | Number of shares sold | Consideration payable for shares |
|---|---|---|---|
| W-D (Bahamas) Ltd. | Office of Roberts, Isaacs & Co.<br>P. O. Box N 4755<br>Nassau, Bahamas | 3,546,085 | B$50,000,000 |

**SCHEDULE 2**

The Company ........................................................................Bahamas Supermarkets Limited

Registered Number.................................. .................…………………………………14275

Registered Office ............................Roberts, Isaacs & Co, P. O. Box N 4755, Nassau, Bahamas

Date of Incorporation ................................................................................ 13 December, 1968

Directors....Peter Lynch, Keva Bethel, L.B. Johnson, Barry Rassin, Hugh G. Sands, Mark Sellers

Secretary....................................................................................…… ..................Laurence Appel

Accounting Reference Date........…………………………… ........................... June 29, 2005

Auditors.................................................................................…..KPMG, Bahamas

Authorised Share Capital ................................................……………. 5,000,000 shares

Issued Share Capital............... ......................................................... 4,560,148 shares

Mortgages/Charges ......................................................................................................0

Mortgagee................................... .................................................................................

Date Created.................................................................................................................

Date Registered ...........................................................................................................

Amount Secured ........................... ..............................................................................

Property Charged.........................................................................................................

Guarantees ............................................................................................................$200,000*

*Bahamas Customs Department  $140,000
  United Natural Foods          $ 60,000
Maximum Liability

The Company Subsidiary.................................................................The City Meat Market Limited

Registered Number....................................... ................…………………………………………359

Registered Office .............................Roberts, Isaacs & Co, P. O. Box N 4755, Nassau, Bahamas

Date of Incorporation ...................................................................................... 11 January, 1936

Directors....Peter Lynch, Keva Bethel, L.B. Johnson, Barry Rassin, Hugh G. Sands, Mark Sellers

Secretary..................................................................................…… ...................Laurence Appel

Accounting Reference Date.........………………………………… ........................... June 29, 2005

Auditors.................................................................................................…KPMG, Bahamas

Authorised Share Capital ..........................................................…………….. 2,000 shares

Issued Share Capital.............................. ............................................................... 5 shares

Mortgages/Charges ...................................... .........................................................................0

Mortgagee................................................ .........................................................................

Date Created..................................................................................................................

Date Registered ..............................................................................................................

Amount Secured ............................................ .........................................................................

Property Charged..........................................................................................................

Guarantees ...............................................................................................................$250,000*

*Bahamas Customs Department

Maximum Liability

## SCHEDULE 3

The Owned Properties

Lot 3, Block 15, Palmdale Sub-division, New Providence Island, The Bahamas

The Leased Properties

| PREMISES | ADDRESS |
| --- | --- |
| SUPERMARKET | SOUTH BEACH PLAZA, EAST STREET SOUTH, NASSAU |
| SUPERMARKET | OAKES FIELD SHOPPING CENTRE THOMPSON BLVD, NASSAU |
| | ROSETTA ST AT PATTON STREET, NASSAU |
| SUPERMARKET | LYFORD CAY SHOPPING CENTRE, NASSAU |
| SUPERMARKET | INDEPENDENCE SHOPPING CENTRE, BAILLOU HILL AND HARROLD ROADS, NASSAU |
| SUPERMARKET | VILLAGE RD AT WULFF RD., NASSAU |
| SUPERMARKET | CABLE BEACH, WEST BAY ST, NASSAU |
| SUPERMARKET | EAST END SHOPPING CENTRE, PRINCE CHARLES DRIVE, NASSAU |
| SUPERMARKET | HARBOUR BAY SHOPPING CENTRE, EAST BAY STREET, NASSAU |
| SUPERMARKET | DOWNTOWN  SHOPPING CENTRE, FREEPORT, GRAND BAHAMA ISLAND |
| SUPERMARKET | SEA HORSE SHOPPING CENTRE, LUCAYA BEACH, GRAND BAHAMA |
| SUPERMARKET | HARBOUR WEST SHOPPING CENTRE, EIGHT-MILE ROCK, GRAND BAHAMA |
| OFFICES AND DISTRIBUTION CENTRE | EAST-WEST HIGHWAY, NASSAU |

**SCHEDULE 4**

**Warranties**

The Warranties and undertakings referred to in Clause 6 are as follows except as provided for in this Agreement or as disclosed in the Seller Disclosure Schedule:

1    **Corporate Matters**

1.1    The Seller is a company duly organized, validly existing and in good standing under the laws of the Commonwealth of The Bahamas.

1.2    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company is a company duly organized, validly existing and in good standing under the laws of the Commonwealth of the Bahamas.

1.3    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the information contained in the Recitals, Clause 2 to this Agreement and Schedules 2 and 3 is true and accurate in all material respects.

1.4    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has complied in all material respects with all applicable laws including the provisions of the Companies Act and the Securities Industry Act, 1999 and the regulations made thereunder.

1.5    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the register of members and all other statutory books and minute books of the Company:

1.5.1    have been properly kept;

1.5.2    are up-to-date; and

1.5.3    contain true full and accurate records of all matters required to be dealt with in them.

1.6    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has not received any notice of any application or intended application under the provisions of the Companies Act for the time being in force for the rectification of the register of members.

1.7    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Purchaser has been supplied with a copy of the memorandum and articles of association of the Company having attached thereto copies of all resolutions as are by law required to be attached together with copies of all resolutions setting out the rights attached to or the conditions of issue of any of the share capital of the Company.  To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, those copies are true complete and up-to-date and set out in full the rights and restrictions attaching to the share capital of the Company.

1.8    To the Knowledge of the Seller, the Company is a public limited company.

1.9    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, no allotment of share capital in the Company has been made in contravention of the provisions of the Companies Act or the Securities Industry Act, 1999.

1.10    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, no unlawful distribution of dividends has been made by the Company.

1.11    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has not entered into any arrangement involving the acquisition from or disposal to its directors or connected persons of non-cash assets.

1.12    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has properly and punctually made and filed all returns, particulars, resolutions and documents and paid all registration fees required by the Companies Act and all such filings were and are correct in all material respects.

1.13    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has maintained and continues to maintain readily available

for inspection by members of the public all documents required to be made so available by the Companies Act or applicable law.

1.14    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has all requisite power and authority to own, lease and operate its assets and properties to the extent owned, leased and operated and to carry on its business as it is now being conducted and is duly qualified and in good standing to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its assets and properties makes such qualification necessary.

1.15    The Seller has all requisite corporate power and authority to enter into this Agreement and, subject to (i) the execution of Parent's written consent to the sale of the Shares after Bankruptcy Court approval thereof (such written consent, the "**Shareholder Consent**") and (ii) the receipt of the applicable Seller Required Statutory Approvals to consummate the transactions contemplated hereby.  Subject to the Shareholder Consent and Bankruptcy Court approval thereof, the execution and delivery of this Agreement and the consummation by the Seller of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Seller. This Agreement has been duly executed and delivered by the Seller (subject to the Shareholder Consent and Bankruptcy Court approval thereof) and, assuming the due authorization, execution and delivery hereof by the Purchaser, constitutes the valid and binding obligation of the Seller enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.  Completion of the transactions contemplated by this Agreement by the Seller will not conflict with, result in the breach of, constitute a default under, or accelerate the performance provided by the terms of any material contract, agreement or deed to which the Seller may be bound or affected or constitute a material default or an event which, with the lapse of time or action by a third party, could result in the creation of any Incumbrance on any of the Shares, except for any such conflict, breach, default, acceleration or creation which would not have a Company Material Adverse Effect or

prevent, materially delay or materially impair the Seller's ability to consummate the transactions contemplated by this Agreement.


**2**      **The Shares and Share Capital**

2.1      There are no agreements or other arrangements in force which:

    2.1.1      provide for the present or future issue allotment or transfer of; or

    2.1.2      accord to any person the right (absolute or conditional) to call for the issue allotment or transfer of any of the Shares (including any option or right of pre-emption or conversion).

2.2      To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, since the Accounting Date:

    2.2.1      no share or loan capital of the Company has been issued or allotted or agreed to be issued or allotted whether conditionally or absolutely;

    2.2.2      the Company has not undergone any capital reorganisation or change in its capital structure;

    2.2.3      no resolutions have been passed by the Company which have not been entered in the minute book of the Company; and

    2.2.4      nothing has been done in the conduct or management of the affairs of the Company which would be likely to prejudice the interests of the Purchaser as prospective purchaser of the Shares.

2.3      To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, no share capital shown in the Audited Accounts or in the statutory books of the Company has been forfeited.

2.4      To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, no shares in the capital of the Company have at any time been issued and no transfers of shares in the capital of the Company have been registered otherwise than in accordance with the articles of association of the Company from time to time in

force and the Companies Act and any necessary governmental consents have been obtained for each issue and transfer of shares in the capital of the Company.

2.5    The Shares are validly issued, fully paid and nonassessable and beneficially owned by the Seller free and clear of any liens, claims, security interests and other Incumbrances of any nature whatsoever and there are no options, warrants, calls, rights, commitments or agreements of any character to which the Seller is a party or by which it is bound obligating the Seller to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock of the Company or obligating the Seller to grant, extend or enter into any such option, warrant, call, right, commitment or agreement.

2.6    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, all dividends or other distributions of profits declared made or paid since the date of incorporation of the Company have been declared made and paid in accordance with law and its articles of association.


**3.    Reserved**


**4    Accounts**

4.1    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the accounting reference date of the Company is (date) and has not at any time been any other such date.

4.2    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Purchaser has been supplied with a true and complete copy of the Audited Accounts.

4.3    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Audited Accounts:

4.3.1    comply with the requirements of applicable law;

4.3.2   have been prepared on a consistent basis in accordance with good accounting practice and comply with all current financial reporting standards applicable to a Bahamian company;

4.3.3   are accurate and show a true, complete and fair view of the state of affairs, financial position, assets and liabilities of the Company and of its results for the financial period ending on the Accounting Date;

4.3.4   as at the Accounting Date are not affected by any unusual or material non-recurring items;

4.3.5   make full provision for depreciation of the fixed assets of the Company having regard to their original cost and estimated life;

4.3.6   make due provision for any bad or doubtful debts; and

4.3.7   fully disclose all assets of the Company as at the Accounting Date.

4.4    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Audited Accounts set out correctly in all material respects all such reserves or provisions for business licence fees as are necessary on the basis of the rates of business licence fees now in force to cover all fees (present and future) liable to be assessed on the Company or for which the Company is accountable up to such date.

**5    Insurances**

5.1    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, there are existing valid policies of insurance for full replacement values against all material liabilities, risks and losses (including but not limited to the losses caused by any unlawful act on the part of any person) against which it is normal or prudent to insure in respect of all property owned by and in the business carried on by the Company.

5.2    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, all premiums due in respect of the Company's insurance policies have been paid in full.

5.3     To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, nothing has been done or has been omitted to be done which could result in any of the Company's insurance policies being or becoming void or voidable.

5.4     The Seller is not aware of any circumstances which would or might entitle the Company to make a claim under any of its insurance policies or which would or might be required under any of its insurance policies to be notified to the insurers, except for such circumstance as would not constitute a Company Material Adverse Effect.

**6      Disputes/Litigation**

6.1     To the Knowledge of the Seller, as of the date hereof, there are no claims, suits, actions or proceedings before any Governmental Authority or arbitrator pending or threatened against, relating to or affecting the Seller which would have a Company Material Adverse Effect or would prevent, materially delay or materially impair the Seller's ability to consummate the transactions contemplated by this Agreement.

6.2     To the Knowledge of the Seller, as of the date hereof, there are no judgments, decrees, injunctions, rules or orders of any court, governmental department, commission, agency, instrumentality or authority or any arbitrator applicable to the Seller except for such that would not have a Company Material Adverse Effect or would prevent, materially delay or materially impair the Seller's ability to consummate the transactions contemplated by this Agreement.

**7      Compliance with Statutes and Licences**

7.1     To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has obtained all licences, consents, approvals, permissions, permits, tests and other certificates and authorities (public or private) necessary for the carrying on of its business in the places and in the manner in which such business is now carried on all of which are valid and subsisting and the Seller knows of no reason or of any facts or circumstances which (with or without the giving of notice or lapse of time) would be likely to give rise to any reason why any of them should be suspended, cancelled, revoked or not renewed.

7.2     To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has conducted and is conducting its business in all respects in accordance with all applicable laws and regulations (whether of the Commonwealth of The Bahamas or elsewhere).

**8      Reserved**

**9      Reserved**

**10     Taxation/Business Licence Fees**

10.1    <u>General</u>.

10.1.1  To the Knowledge of the Seller and except as would not have a Company Material Adverse Effect or as set forth on the Seller Disclosure Schedule:  All returns, computations and payments which should have been made by or on behalf of the Seller and the Company for any tax purpose in the United States of America or elsewhere have been prepared on a proper basis and submitted within the prescribed time limits (taking into account all valid extensions) and no

taxation authority has indicated in writing that it intends to investigate the tax affairs of the Company.

10.1.2 To the Knowledge of the Seller and except as would not have a Company Material Adverse Effect or as set forth on the Seller Disclosure Schedule:  All business licence liabilities of the Company as at the Accounting Date are fully provided for in the Audited Accounts and are up to date.

10.1.3 To the Knowledge of the Seller and except as would not have a Company Material Adverse Effect or as set forth on the Seller Disclosure Schedule:  The books and records of the Company are up-to-date and contain sufficient detail in appropriate form to enable the business licence fees of the Company to be established.

## 11      Miscellaneous

11.1    Neither the Seller nor, to the Knowledge of the Seller, the Company, has entered into any agreement or arrangement entitling any agent, broker, investment banker, financial advisor or other firm or Person to any broker's or finder's fee or any other commission or similar fee in connection with any of the transactions contemplated by this Agreement, except The Blackstone Group, whose fees and expenses will be paid by the Seller upon consummation of the sale of the Shares out of the proceeds of the transaction contemplated hereby.

ANNEX A

NON-COMPETITION AGREEMENT

ANNEX B

TRANSITION SERVICES AGREEMENT

ANNEX C

BIDDING PROCEDURES

### Bid Procedures

Set forth below are the bidding procedures (the "Bid Procedures") to be used by the Seller for the sale of the Shares.  Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Agreement.  The terms and conditions, including the Purchase Price, reflected in the Agreement are referred to herein as the "Initial Bid" and the Purchaser is referred to as the "Initial Bidder."  The Parent intends to file a motion (the "Authorization Motion") with the Bankruptcy Court for an order approving the execution by the Parent of the Shareholder Consent (the "Authorization Order") and intends to notice the Authorization Motion for hearing on May 18, 2006 (the "Authorization Hearing").

## **Requirements for Qualified Competing Bids**

Any person who desires to submit a competing bid for the Shares may do so in writing, provided that such bid:

(a)    must include a binding, executed purchase agreement (each, a "Purchase Agreement"), blacklined to show changes from the Agreement and clearly setting forth any conditions for closing;

(b)    must exceed the Purchase Price by at least U.S. $1.5 million;

(c)    shall not be contingent upon any due diligence investigation, the receipt of financing, or any board of directors, shareholders or other entity approval;

(d)    must include an executed financial declaration evidencing the bidder's financial wherewithal to consummate the purchase of the Shares and satisfy all of the obligations required by the Purchase Agreement;

(e)    must include a cashier's check or be accompanied by a wire transfer, as an earnest money deposit, in an amount equal to U.S. $5 million;

(f)    must disclose the identity of the bidder's organization, including confirmation that the competing bid is made as principal for the bidder's account and, if not, the basis upon which the bidder is acting and the identities of all other participants (if any);

(g)    must disclose any agreements or understandings between the bidder and any third party with respect to the Shares or with respect to any possible transaction involving the Seller.

If the competing bid includes each of the documents and conditions set forth in subparagraph (a) - (g) above, the bid will constitute a "Qualified Competing Bid."  The submission of a competing bid will be deemed to be the bidder's consent for the Seller, the Parent and their advisors to share any information submitted by the competing bidder with (a) the professionals and advisors to the Parent's postpetition secured lenders (the "DIP Lender") and

(b) the professionals and advisors to the official committee of unsecured creditors appointed to serve in the Bankruptcy Case (the "Creditors' Committee").

Any person who desires to submit a competing bid for the Shares will be provided access to certain non-public information in advance of the submission of such bid, provided that such person is deemed by the Parent and the Seller (in their sole discretion) to be a qualified competing bidder and such person executes a confidentiality agreement in a form satisfactory to the Parent and the Seller. Persons interested in receiving such information should contact Michael Kovacs at Blackstone (212) 583-5473.

## Deadline for Competing Bids

Qualified Competing Bids must be served upon and actually received by Blackstone L.P. at the following address on or before 5:00 p.m., Eastern Daylight Time, on May 11, 2006:

The Blackstone Group L.P.
Attention: Ramesh Chakrapani / Michael Kovacs
345 Park Avenue
29th Floor
New York, NY 10154
chakrapani@blackstone.com
kovacs@blackstone.com

The Seller may extend the bid deadlines for the delivery of competing bids once or successively, without further notice and for one or more bidders, but shall not be obligated to do so. Qualified Competing Bids shall be provided to the Creditors Committee's professionals by The Blackstone Group L.P. on the same day each such bid is received by The Blackstone Group L.P.

## Auction

If one or more Qualified Competing Bids are timely received, an auction will be conducted for the Shares at 10:00 a.m. on May 15, 2006 (an "Auction"). The Seller shall provide notice of the Auction at least two (2) days before the Auction to the Initial Bidder and to all parties who have submitted a Qualified Competing Bid.

Based upon the terms of the Initial Bid and the Qualified Competing Bids and such other information as the Seller deems relevant, the Seller may conduct an Auction in any manner (and upon any terms and conditions) the Seller believes will achieve the maximum value for the Shares to be sold.

The Seller may (a) determine, in its sole discretion and in its own business judgment (subject to consultation with the representatives of the Creditors Committee), which Initial Bid or Qualified Competing Bid, if any, is the highest or otherwise best offer with respect to the Shares, and (b) reject any Qualified Competing Bid that, in the Seller's sole discretion (subject to consultation with the representatives of the Creditors Committee), is (i) inadequate or

insufficient, (ii) not in conformity with the requirements of these Bid Procedures or the terms and conditions of sale, or (iii) contrary to the best interests of the Seller.

At the conclusion of the Auction, the Seller shall review each Qualified Competing Bid and the Initial Bid and identify the highest or best offer for the Shares (the "Successful Bid;" such bidder, the "Successful Bidder").  The Seller reserves the right to refuse to consider any bid that fails to comply with the Bid Procedures or any other procedures established by the Seller for the Auction.

If no Qualified Competing Bids are received for the Shares, the Seller shall determine that the Initial Bid is the Successful Bid without conducting an Auction unless the Seller determines at such time that the Purchaser is not in full compliance with the Agreement or reasonably determines that there is a substantial risk that the Purchaser may not be able to complete the acquisition on a timely basis, in which case the Seller may postpone the determination of the Initial Bid as the Successful Bid (or waive the provisions of this clause).

The Auction may be adjourned as the Seller deems appropriate.  Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to all participants.

Only the Seller and the Parent and their respective representatives including their respective advisors, counsel, consultants and agents, counsel for the Creditors' Committee, counsel for the DIP Lender, and the Initial Bidder and the Qualified Bidders and their respective representatives including their advisors, consultants and agents shall be entitled to attend and be heard at the Auction.

## Authorization Hearing

At the Authorization Hearing, the Parent will request that the Bankruptcy Court authorize and approve the execution by the Parent of the Shareholder Consent in connection with the Purchase Agreement of the Successful Bidder.

If the Successful Bidder fails to consummate the Successful Bid in accordance with the terms of its Purchase Agreement, the Seller (i) will retain the earnest money deposit of such bidder, (ii) maintain the right to pursue all available remedies against the bidder, and (iii) with the consent of the Parent, will be free to consummate the proposed transaction with the next highest or best bidder at the Auction and consummate the transaction with such bidder at the highest price bid by such bidder at the Auction without the need for further Bankruptcy Court approval of the Shareholder Consent (or, if that bidder is unable to consummate the transaction at that price, the Seller, with the consent of the Parent, may consummate the transaction with the next highest or best bidder at the highest price bid by such bidder at the Auction, with such bidder and such bid thereafter the Successful Bidder and the Successful Bid, and so forth).

Any bidders submitting bids will bear their own expenses in connection with the sale, regardless of whether the sale is approved, in accordance with the terms of the applicable Purchase Agreement.

**Additional Conditions Applicable to the**
**Initial Bid and All Qualified Competing Bids**

Notwithstanding anything to the contrary in these procedures, the bid of the Successful Bidder will remain irrevocable in accordance with the terms of the Purchase Agreement executed by the Successful Bidder. All other bids will be irrevocable until the earlier to occur of (i) sixty (60) days after entry of an Authorization Order or (ii) closing of the sale of the Shares in accordance with the Successful Bid. Notwithstanding the foregoing, the right of the Initial Bidder will be governed by the terms of the Agreement.

Notwithstanding anything to the contrary in these procedures, the earnest money deposit of the Successful Bidder will be retained by the Seller in accordance with the terms of the Purchase Agreement executed by the Successful Bidder. Deposits of all other bidders will be retained by the Seller until the earlier to occur of (i) sixty (60) days after entry of an Authorization Order or (ii) closing of the sale of the Shares in accordance with the Successful Bid. Notwithstanding the foregoing, the Deposit of the Initial Bidder will be governed by the terms of the Agreement.

Notwithstanding anything to the contrary, the Seller has the right to entertain bids that do not conform to one or more of the requirements set forth in these procedures and to deem such bids Qualified Competing Bids.

Notwithstanding anything to the contrary, any conflict between the terms and conditions of these Bid Procedures and any Purchase Agreement executed by the Seller and any bidder (including the Agreement) will be resolved in favor of these Bid Procedures.

All bids, the Auction and these Bid Procedures are subject to such other terms and conditions as are announced by the Seller, and the Seller reserves the right to amend or waive any provision of these Bid Procedures at any time.

Notwithstanding any other provision set forth in these bid procedures, the Parent and the Seller, as the case may be, shall consult with the representatives of the Creditors' Committee and the DIP Lender when making any determinations or announcements and exercising their discretion as contemplated by or in connection with these Bid Procedures.

4

ANNEX D

NOTICES

ANNEX E

ESCROW TERMS

**<u>EXHIBIT B</u>**

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT, dated as of _____, 2006 (this "**Agreement**"), is made and entered into by and among Winn-Dixie Stores, Inc., a Florida corporation (the "**Service Provider**"), on the one hand, and BK Partners Ltd., a company incorporated and existing under the laws of the Commonwealth of The Bahamas with its registered office at Ocean Centre, Montagu Foreshore, East Bay Street in the Island of New Providence in the said Commonwealth of The Bahamas ("**BK Partners**") and its wholly-owned subsidiary, BK Foods Ltd., a company incorporated and existing under the laws of the Commonwealth of The Bahamas with its registered office at Ocean Centre, Montagu Foreshore, East Bay Street in the Island of New Providence in the said Commonwealth of The Bahamas ("**BK Foods**"), on the other.

W I T N E S S E T H :

WHEREAS, BK Foods and W-D (Bahamas) Ltd., a Bahamas company incorporated and existing under the laws of the Commonwealth of The Bahamas ("**Seller**") have entered into that certain Share Purchase Agreement, dated as of March __, 2006 (the "**Share Purchase Agreement**"), pursuant to which Seller has agreed to sell to BK Foods, and BK Foods has agreed to purchase from the Seller, certain shares in the capital of Bahamas Supermarkets Limited, a company incorporated and existing under the laws of the Commonwealth of The Bahamas (the "**Company**") engaged in the retail sale of groceries, meat, produce and delicatessen products in the Commonwealth of The Bahamas;

WHEREAS, the Seller is a wholly owned subsidiary of the Service Provider;

WHEREAS, the Service Provider currently provides certain services to the Company; and

WHEREAS, in order to assist in the transition of the Company to BK Foods after the Closing, upon the terms and subject to the conditions set forth in this Agreement, BK Partners and the Company (together sometimes, the "**Service Recipient**") desires to receive from the Service Provider and the Service Provider shall provide certain transition services as set forth herein.

NOW THEREFORE, in consideration of the transaction contemplated by the Share Purchase Agreement and the covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1

# ARTICLE I

## DEFINITIONS

Section 1.1    <u>Definitions</u>.  Capitalized terms used but not defined in this Agreement shall have the meanings ascribed to such terms in the Share Purchase Agreement.

# ARTICLE II

## SERVICES

Section 2.1    <u>Scope of Services</u>.

(a)    In accordance with the terms and subject to the conditions set forth in this Agreement, during the Transition Period (as defined herein), the Service Provider shall provide, or cause to be provided, to the Service Recipient the services set forth in Schedule A hereto (the "**Services**").

(b)    In the event that Service Recipient wishes to receive any additional services, Service Recipient shall submit a written request to Service Provider, and Service Provider may elect to provide or not to provide such Services in its sole discretion.  In the event that Service Provider elects to provide such services, the fees therefor shall be mutually agreed by the parties, such services and fees shall be added to Schedule B, and such services shall become "Services" under this Agreement.

Section 2.2    <u>Service Standards; Level of Service</u>.  The Service Provider shall provide or cause to be provided the Services to the Service Recipient in a professional and workmanlike manner, and in a manner and at a quality and level of service at least equal in all material respects to the manner, quality and level of service at which the Services were provided to the Company as of the Closing Date (the "**Service Standards**").

Section 2.3    <u>Means of Providing Services</u>.

(a)    Subject to Section 2.2, the Service Provider shall, in its sole discretion, determine the means and resources used to provide the Services in accordance with its reasonable business judgment.  Without limiting the foregoing, the Service Provider may elect to modify or replace at any time:  (i) its policies and procedures; (ii) any affiliates and/or third parties that provide any Services; (iii) the location from which any Service is provided; or (iv) the intellectual property rights, information technology, products and services used to provide the Services.

(b)    The Service Provider may in its reasonable discretion suspend the provision of the Services (or any part thereof), from time to time, to enable it to perform routine or emergency maintenance to those parts or components of buildings, plant, machinery or other assets of the Service Provider required to provide the Services, provided that: (i) Service Provider shall use commercially reasonable efforts to perform such routine maintenance outside of the normal business hours of the Service Recipient; (ii) the Service Provider provides the Service Recipient with as much prior notice of such suspension and the anticipated duration of

2

the suspension as is reasonably possible; and (iii)  the Service Provider uses its commercially reasonable efforts to carry out the applicable maintenance and resume provision of the relevant Services efficiently as reasonably practicable.

Section 2.4    Certain Limitations.  The Services shall be subject to the following limitations:

(a)    Service Provider shall only be required to provide the Services to or for the benefit of the Company's business.

(b)    The Service Recipient shall not use the Services other than in a manner directly related to the operation of the Company's business.

(c)    Notwithstanding anything herein to the contrary, except as expressly agreed by the Service Provider, the Service Provider shall not be obligated to:  (i) maintain the employment of any specific employee, (ii) hire any additional employees, (iii) modify any existing systems, equipment or software in order to provide the Services, or (iv) acquire additional systems, equipment or software in order to provide the Services.

(d)    The Service Recipient acknowledges and agrees that the Services provided by a third party on the Service Provider's behalf, and the assets licensed or purchased from a third party and used in connection with providing the Services, remain subject to the terms and conditions of any applicable agreements with such third parties and the Service Provider, and the Service Recipient shall adhere to such terms and conditions.  The Service Provider shall use commercially reasonable efforts to obtain any consent from such third parties that it deems necessary in order to provide such Services.  In the event that (i) any such consent is not obtained despite such efforts, (ii) a third party objects to the use of its assets in connection with the provision of the Services or (iii) a third party informs the Service Provider of a change to such terms and conditions that would reasonably be expected to degrade the quality and level of Services below the Service Standards, Service Provider shall so inform Service Recipient, and the parties shall discuss in good faith, as applicable, alternative arrangements or modifications to the Services in order to meet a mutually agreed alternative standard.  All costs associated with such consents, alternative arrangements and modifications shall be borne by BK Partners.

(e)    It shall not be deemed to be a breach of this Agreement if the Service Provider fails to meet the Service Standards because of changes in technology used to provide a Service, which technology is also used by the Service Provider in connection with its provision of a service to itself or to one or more of its affiliates.  In the event that the Service Provider anticipates such a change in technology that would reasonably be expected to degrade the quality and level of Services below the Service Standards, Service Provider shall inform Service Recipient of such change and the parties shall discuss in good faith modifications to the Services in order to meet a mutually agreed alternative standard.

Section 2.5    Cooperation.

(a)    Each party will perform all obligations under this Agreement in good faith and use commercially reasonable efforts to cooperate with the other in all matters

3

relating to the provision and receipt of the Services in order to facilitate the provision and receipt of the Services.

(b)     Without limiting the foregoing, the Service Recipient shall follow the policies, procedures and practices of the Service Provider applicable to the Services, provided that the Service Recipient shall not be obligated to follow any policies, procedures and practices to the extent in doing so the Service Recipient would be in violation of applicable Law.

(c)     A failure of the Service Recipient to act in accordance with Section 2.6(a) that prevents or materially inhibits the Service Provider from providing a Service hereunder shall relieve the Service Provider of its obligation to provide such Service until such time as the failure has ceased.

Section 2.6     <u>Divestiture, Sale or Transfer of Assets</u>.  Nothing in this Agreement shall be deemed to limit the Service Provider's ability to divest, sell or otherwise transfer any of the assets, including contracts and intellectual property licenses, necessary to provide the Services; provided, that the Service Provider's obligation to provide or cause to be provided the Services to the Service Recipient in accordance with this Agreement for the duration of the Transition Period shall not be abrogated or affected thereby.

Section 2.7     <u>Compliance with Law</u>.  Each party shall perform all of its obligations hereunder in accordance with applicable law.

## ARTICLE III
## PRICING

Section 3.1     <u>Pricing</u>.

(a)     In consideration of the Services set forth on Schedule A, BK Partners shall pay to the Service Provider a flat fee of One million United States Dollars ($1,000,000) (the "**Flat Fee**"), payable quarterly in advance in four (4) equal installments (each, an "**Installment**") of Two hundred Fifty thousand United States Dollars ($250,000) each.  The first Installment shall be due and payable on the Closing Date, and each Installment thereafter shall be due and payable on the first Business Day of the each of the following quarters until the Flat Fee has been paid in full.  In addition to the Flat Fee, for goods procured on behalf of the Service Recipient pursuant to the logistics Services set forth on Schedule A, Service Recipient shall pay to Service Provider (i) Service Provider's cost of such goods and (ii) five percent (5%) of such cost (collectively, the "**Procurement Fee**").

(b)     In consideration of the Services set forth on Schedule B (if any), Service Recipient shall pay to Service Provider the fees set forth in Schedule B (together with the Flat Fee, the "**Fees**").  In addition, Service Recipient shall pay all costs and expenses incurred by Service Provider in providing any Services set forth on Schedule B.

(c)     Notwithstanding the foregoing, Service Provider shall have the option to increase the charges for any Services provided to Service Recipient if the Service is provided pursuant to an agreement between Service Provider and a third party, and the third party increases its charges under such Agreement.

(d)    In the event that services have been provided by third parties to Service Provider for the benefit of the Business prior to Closing, and Service Provider receives the invoice(s) for such services following Closing, Service Provider will provide copies of such invoices to the Company, and the Company will promptly reimburse Service Provider for the amounts set forth in such invoices.

Section 3.2    Taxes.  In addition to the other amounts payable under this Agreement, for any Services for which Service Provider charges Fees hereunder, BK Partners shall be obligated to pay, or reimburse the Service Provider for, the amount of any present or future transfer taxes, sales and use tax, value added tax or other equivalent local tax, and any other taxes (except for taxes based on or measured by income) payable by the Service Provider on amounts earned (including the full amount of any interest or penalties levied upon any such amounts, to the extent the interest or penalties result from the failure by BK Partners to pay or reimburse the Service Provider for any amounts pursuant to this Section 3.2 when due) in connection with the provision of any Services to, or the use of such Services by, the Service Recipient.  Invoices issued pursuant to Section 3.3 shall separately state any taxes payable by BK Partners.

Section 3.3    Billing and Cash Settlement.  Except for the Flat Fee, which shall be paid in accordance with Section 3.1, any amounts due under this Agreement shall be billed and paid for in the following manner:  (a) the Service Provider shall invoice BK Partners on a monthly basis for (i) all Services on Schedule B delivered during the preceding month, (ii) the Procurement Fee incurred in the preceding month and (iii) all taxes and expenses incurred in the preceding month; (b) each such invoice shall be payable within thirty (30) days of BK Partners' receipt thereof; and (c) payment of all invoices in respect of the Services provided hereunder shall be made in U.S. Dollars ($) payable by wire transfer of immediately available funds to the Service Provider's nominated account.  Any disputed amounts under this Agreement shall be subject to the dispute resolution procedures in accordance with 9.8 of this Agreement.  In the event that BK Partners fails to pay in full any invoice when due, interest shall accrue daily on the unpaid and undisputed amount, as well as any disputed amounts that subsequently are determined to have been properly invoiced and due to the Service Provider, until such amounts are paid.  The applicable interest rate shall be the lesser of (i) the prime rate as published in The Wall Street Journal on the thirtieth (30th) day after the date of the invoice plus four percent (4%), and (ii) the maximum rate of interest allowed by applicable law.

## ARTICLE IV

## TERM; TERMINATION

Section 4.1    Term.  This Agreement shall become effective as of the date of this Agreement and, subject to Sections 4.2, 4.3 and 4.4, shall remain in force for twelve (12) months thereafter (the "**Transition Period**").

Section 4.2    Termination by Service Recipient.  The Service Recipient may terminate one or more Services, or this Agreement, at any time upon at least sixty (60) days' prior written notice to the Service Provider, provided that any such termination of a Service set forth on Schedule A shall not result in a reduction of Fees.

Section 4.3    <u>Termination by Service Provider</u> In the event that (a) the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code, (b) the Service Provider's chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court or if confirmed does not become effective, or (c) the Bankruptcy Court confirms a chapter 11 plan of liquidation in the Bankruptcy Case, then the Service Provider has the right, in its sole discretion, to terminate this Agreement within 30 days of such event.

Section 4.4    <u>Termination by Either Party</u>.  This Agreement or any Service hereunder may also be terminated by either the Service Provider or the Service Recipient upon written notice to the other party if:

(a)    The other party is in material breach of this Agreement; provided, however, that the breaching party shall have thirty (30) days from receipt of written notice thereof to cure such breach, at which time this Agreement or Service, as applicable, shall terminate if the breach has not been cured to the reasonable satisfaction of the non-breaching party; or

(b)    Performance of this Agreement or any Service has been rendered impossible or impracticable for a period of ten (10) days as a direct result of the occurrence of any Force Majeure Event described in Section 9.1.

Section 4.5    <u>Effect of Termination on Installments</u>.  For the avoidance of doubt, in the event that this Agreement is terminated in accordance with the provisions hereof, BK Partners shall not be obligated to pay the Service Provider any Installments that would otherwise be due and payable following the effective date of such termination.

Section 4.6    <u>Interim Basis</u>.  Service Recipient acknowledges the mutual intent that the Services be provided on an interim basis only and shall use commercially reasonable efforts to terminate the Services as quickly as practicable.

## ARTICLE V

## <u>INDEMNIFICATION</u>

Section 5.1    <u>Indemnification by Service Recipient</u>.  The Service Recipient shall indemnify, defend, release, save and hold harmless the Service Provider and its respective officers, directors, employees, and each of the heirs, executors, successors and assigns of the foregoing (collectively, the "**Service Provider Indemnified Parties**"), from and against any and all claims, demands, suits, actions, causes of action, losses, costs, damages, liabilities, out of pocket expenses incurred or paid including reasonable attorneys' fees (including such fees that are incurred in connection with a Dispute), fines, penalties, costs of investigation or settlement, other professionals' and experts' fees, court or arbitration costs (collectively referred to as "**Damages**"), resulting from, arising out of or related to Service Provider's performance under this Agreement, except Damages arising out of:  (a) the Service Provider's gross negligence, and (b) breach of this Agreement by the Service Provider.

Section 5.2    <u>Indemnification Procedures</u>.

(a)    Each Service Provider Indemnified Party shall provide the Service Recipient with timely notice of any claim or liability subject to indemnification pursuant to Section 5.1; provided, that any failure by any Service Provider Indemnified Party to so notify the Service Recipient shall relieve the Service Recipient of its obligations under Section 5.1 only if and to the extent that the Service Recipient is materially prejudiced thereby.

(b)    The Service Provider Indemnified Party shall (i) give the Service Recipient the opportunity to defend or negotiate a settlement of any indemnifiable claim hereunder at the Service Recipient's expense; provided, that the Service Recipient shall not settle any such claim without the Service Provider's prior written consent, not to be unreasonably withheld or delayed, and (ii) reasonably cooperate with the Service Recipient, at that Service Recipient's expense, in defending or settling such claim.

Section 5.3    <u>No Limitation; No Double Recovery</u>.  Notwithstanding anything else contained in this Agreement or the Share Purchase Agreement, the indemnification rights of any party set forth herein shall exist independent of and in addition to any indemnification rights of any such party contained in the Share Purchase Agreement, and nothing contained in this Article V shall limit or alter the obligation of any party to indemnify any other party pursuant to the Share Purchase Agreement.

## ARTICLE VI

## DISCLAIMER OF WARRANTIES

Section 6.1    <u>DISCLAIMER OF WARRANTIES</u>.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE SERVICE PROVIDER MAKES NO, AND EXPRESSLY DISCLAIMS ANY AND ALL, REPRESENTATIONS OR WARRANTIES WHATSOEVER TO THE EXTENT PERMISSIBLE BY LAW, WHETHER EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO THE SERVICES, SOFTWARE OR HARDWARE PROVIDED HEREUNDER, INCLUDING WARRANTIES WITH RESPECT TO MERCHANTABILITY, OR SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING FROM COURSE OF DEALING, COURSE OF PERFORMANCE OR TRADE USAGE.

Section 6.2    <u>LIMITATION OF LIABILITY</u>.  NOTWITHSTANDING ANYTHING SET FORTH HEREIN TO THE CONTRARY, THE SERVICE PROVIDER SHALL HAVE NO LIABILITY WHATSOEVER TO THE SERVICE RECIPIENT IN CONNECTION WITH THIS AGREEMENT, EXCEPT WITH RESPECT TO CLAIMS ARISING OUT OF THE SERVICE PROVIDER'S GROSS NEGLIGENCE.  IN CONNECTION WITH CLAIMS ARISING OUT OF THE SERVICE PROVIDER'S GROSS NEGLIGENCE, THE AGGREGATE AMOUNT OF DAMAGES FOR WHICH THE SERVICE PROVIDER SHALL BE LIABLE UNDER THIS AGREEMENT SHALL NOT EXCEED THE AGGREGATE AMOUNT OF THE FOLLOWING FEES PAID HEREUNDER:  (A) THE FLAT FEE AND (B) THE FIVE PERCENT (5%) MARKUP SET FORTH IN SECTION 3.1(A)(II).  EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, THE SERVICE PROVIDER IS RESPONSIBLE ONLY FOR THE PERFORMANCE OF THE SERVICES

AND WILL NOT UNDERTAKE RESPONSIBILITY FOR THE PERFORMANCE OF ANY OTHER SERVICE, OBLIGATION OR FUNCTION OF THE SERVICE RECIPIENT.

Section 6.3    CONSEQUENTIAL DAMAGES.  IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY, EXCEPT WITH REGARD TO THE SERVICE RECIPIENT'S INDEMNIFICATION OBLIGATIONS SET FORTH IN ARTICLE V, FOR (A) ANY LOSS OR DAMAGES INCURRED AS A RESULT OF THIRD PARTY CLAIMS, (B) ANY INDIRECT OR CONSEQUENTIAL DAMAGES, OR (C) ANY SPECIAL OR PUNITIVE DAMAGES, INCLUDING LOST OR ANTICIPATED REVENUES, LOSS OF PROFITS, LOST OR ANTICIPATED SAVINGS, LOSS OF BUSINESS OPPORTUNITY OR INJURY TO GOODWILL, IN CONNECTION WITH, OR RELATED TO THE PERFORMANCE OF, THIS AGREEMENT OR ARISING OUT OF THE SERVICES RENDERED HEREUNDER, WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT (INCLUDING THE BREACH OR ANY TERMINATION OF THIS AGREEMENT), TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), MISREPRESENTATION OR OTHERWISE, EVEN IF A PARTY HAS BEEN WARNED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE IN ADVANCE.

## ARTICLE VII

## CONFIDENTIALITY; SECURITY

Section 7.1    Confidentiality.  The parties hereto acknowledge that they will have access to confidential and proprietary information concerning the other party, its customers, affiliates and its business, which information is not readily available to the public.  The Service Provider and the Service Recipient acknowledge that each has taken and will continue to take commercially reasonable actions to ensure such confidential and proprietary information is not made available to the public.  The parties hereto further agree that they will not at any time (during the Transition Period or thereafter) disclose to any person (except to their affiliates and the officers, directors, designees, employees, agents, representatives and permitted subcontractors of such party and their affiliates who require such information in order to perform their duties hereunder or, in the case of the Service Recipient, to receive the full benefit of the Services, but provided that such disclosure is pursuant to reasonable confidentiality obligations that are at least equivalent to those contained herein), directly or indirectly, or make any use of, distribute or make copies of, for any purpose other than those contemplated by the Share Purchase Agreement or this Agreement, any such confidential or proprietary information of the other party.  Notwithstanding the foregoing, information of a party disclosed to the other party shall not be deemed confidential or proprietary if such information (a) becomes known to the public without breach of this Section 7.1 by the other party, (b) was known to the other party prior to disclosure, (c) is disclosed to the other party by a third party not subject to a confidentiality obligation to the disclosing party, or (d) is independently developed by the other party without reference to the disclosing party's information.

Section 7.2    Disclosure.  Notwithstanding Section 7.1, either party may disclose confidential information in the following circumstances (or as otherwise provided by the provisions of this Agreement), provided that such party shall, to the extent reasonably possible and permitted by applicable law, first promptly notify the other party of such intended disclosure

and shall cooperate in seeking any limitations on such disclosure and/or protective measures for disclosed information:

        (a)     in response to a court order or formal discovery request;

        (b)     if a request is made by any governmental entity; and

        (c)     as otherwise required by applicable law.

        Section 7.3    Security.  The Service Recipient shall not tamper with, compromise or circumvent any security or audit measures employed by the Service Provider. The Service Recipient shall not permit users, other than those who are specifically authorized by the Service Recipient to gain access to the Service Provider's computer systems or software for the purpose of receiving Services, to gain such access.  If at any time the Service Provider reasonably determines that (a) any personnel of the Service Recipient have sought to circumvent or have circumvented the Service Provider's security measures, (b) an unauthorized person under the control of the Service Recipient has accessed or has sought to access the Service Provider's computer systems or software, or a Service Recipient employee has engaged in activities that would reasonably be expected to lead to the unauthorized access, destruction or alteration or loss of data, information or (c) software, upon written notice from the Service Provider, the Service Recipient promptly shall terminate any such person's access to the computer systems or software of the Service Provider.

## ARTICLE VIII

## **INTELLECTUAL PROPERTY**

        Section 8.1    Ownership of Data.  The Service Recipient shall own all right, title and interest in and to all data generated solely on its behalf in the performance of the Services. Prior to the termination of the applicable Service, the Service Provider shall provide to the Service Recipient a copy of all such data, but in no event shall the Service Provider be required to change the format or otherwise modify such data.  BK Partners shall bear all costs, including all of the Service Provider's internal and out-of-pocket costs, associated with providing such copy.  The Service Provider shall be the sole and exclusive owner of all other data generated in performance of the Services, including all data of a technical nature, such as maintenance and operations manuals relating to the operation of the Service Provider's services infrastructure.

        Section 8.2    Ownership of Intellectual Property.

        (a)     Except as otherwise provided herein, each of the Service Provider and the Service Recipient shall retain all right, title and interest in and to their respective intellectual property rights, and no other license (other than to the extent necessary for the provision of the Services) or other right, express or implied, is granted hereunder by either party to its intellectual property rights.

        (b)     Except as set forth in Section 8.1, the Service Provider shall exclusively own all right, title and interest throughout the world in and to all intellectual property

rights created in the performance of the Services, and the Service Recipient hereby assigns to the Service Provider all right, title or interest it may have in any such intellectual property rights.

(c)    Both parties shall execute any documents and take any other actions reasonably requested by the other party to effectuate the purposes of this Section 8.2.

Section 8.3    <u>Reservation of Rights</u>.  Except as expressly provided in this Agreement, no party shall have any rights or licenses with respect to any hardware or facility of the other party.  All rights and licenses not expressly granted in this Agreement are expressly reserved by the relevant party.

## ARTICLE IX

## **MISCELLANEOUS**

Section 9.1    <u>Force Majeure</u>.  In the event that the Service Provider is wholly or partially prevented from, or delayed in, providing one or more Services, or one or more Services are interrupted or suspended, by reason of events beyond its reasonable control (including without limitation acts of God, fire, explosion, accident, floods, embargoes, epidemics, war, acts of terrorism, nuclear disaster or riot) (each, a "**Force Majeure Event**"), the Service Provider shall not be obligated to deliver (or timely deliver, as applicable) the affected Services during such period, and the Service Recipient shall not be obligated to pay for any Services not delivered.  Upon the occurrence of a Force Majeure Event, the Service Provider promptly shall give written notice to the Service Recipient of the Force Majeure Event upon which it intends to rely to excuse its performance and of the expected duration of such Force Majeure Event.  The duties and obligations of the Service Provider with regard to the Services hereunder that are directly affected by such Force Majeure Event shall be tolled for the duration of the Force Majeure Event, but only to the extent that the Force Majeure Event prevents the Service Provider from performing its duties and obligations hereunder.  During the duration of the Force Majeure Event, the Service Provider shall use its commercially reasonable efforts to avoid or remove such Force Majeure Event and shall use its commercially reasonable efforts to resume its performance under this Agreement with the least practicable delay.  From and during the occurrence of a Force Majeure Event, the Service Recipient may replace the affected Services by providing such Services for itself or engaging a third party to provide such Services at the Service Recipient's sole cost and expense.

Section 9.2    <u>Interpretation</u>.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)    Words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c)    A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

10

(d)    A reference to any legislation or to any provision of any legislation shall include any modification or re enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)    All references to "$" and dollar shall be deemed to refer to United States currency unless otherwise specifically provided.

Section 9.3    <u>Preparation of this Agreement</u>.  The Service Recipient and the Service Provider hereby acknowledge that (a) the Service Recipient and the Service Provider jointly and equally participated in the drafting of this Agreement, (b) the Service Recipient and the Service Provider have been adequately represented and advised by legal counsel with respect to this Agreement and the transactions contemplated hereby, and (c) no presumption shall be made that any provision of this Agreement shall be construed against either party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

Section 9.4    <u>Relationships of the Parties</u>.  The parties hereto are and shall remain independent contractors and not employees or agents of each other.  Except as expressly granted by the other party in writing, neither the Service Recipient nor the Service Provider shall have any authority, express or implied, to act as an agent of the other parties or their subsidiaries or affiliates under this Agreement.  It is not the intent of the parties hereto to create, nor should this Agreement be construed to create, a partnership, joint venture or employment relationship among or between the parties (including their respective officers, employees, agents or representatives).

Section 9.5    <u>Entire Agreement, No Third Party Beneficiaries</u>.  This Agreement, along with the Share Purchase Agreement and the Non-Competition Agreement (a) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof and thereof and (b) are not intended to confer, and shall not confer, upon any Person other than the parties hereto and thereto any remedies, claims of liability or reimbursement, causes of action or any other rights whatsoever, except those rights conferred on the Service Provider Indemnified Parties pursuant to Section 5.1.

Section 9.6    <u>Governing Law</u>.  The application and effect of this Agreement and all matters arising from it shall be governed by and construed in accordance with the laws of the State of Florida.

Section 9.7    <u>Jurisdiction</u>.  Each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any federal court located in the State of Florida or any Florida state court in the event any dispute arises out of this Agreement; (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any court; and (c) agrees that it shall not bring any action or proceeding relating to this Agreement in any court other than a federal or state court sitting in the State of Florida.  Each party further agrees that service of any process, summons, notice or document by registered or certified mail to such party's address for the giving of notice as set forth in Section 9.9 shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above.  Each party also agrees that a final judgment (after all appeals, if any) against it in any action or proceeding relating to this Agreement brought in federal court

located in the State of Florida or any Florida state court shall be conclusive and binding upon it as to the subject of such final judgment and may be enforced in any other jurisdiction.

    Section 9.8  <u>Dispute Resolution; Escalation Procedure</u>.  The parties shall attempt in good faith to resolve any dispute, controversy or claim arising out of, in connection with, or relating to this Agreement (each, a "**Dispute**") in accordance with the following procedure:  Upon the written request of either party, an employee of each party responsible for the day to day management of the Services under this Agreement shall meet within fifteen (15) days of receipt by the other party of the written request and attempt in good faith to resolve any Dispute.  If such Dispute is not resolved by discussions between such employees within fifteen (15) days after the parties meet in response to a party's written request, then either party may request that the Dispute be further escalated to the chief executive officer or the chief operating officer (or a designee of such person) of each party who shall meet to resolve the Dispute.  Promptly after receipt of such request, the chief executive officer or the chief operating officer (or a designee of such person) of each party shall meet to resolve the Dispute.  In the event that a Dispute is not resolved by the parties, then such dispute shall be submitted to the Bankruptcy Court for resolution.

    Section 9.9  <u>Notices</u>.  Any notice or other communication pursuant to, or in connection with, this Agreement shall be in writing and delivered personally, or sent by reputable overnight courier service or by facsimile or other form of electronic transmission to the parties at the addresses or the numbers set out below (or to such other address as may from time to time have been notified in writing to the other Parties in accordance with this Section 9.9)

    If to the Service Recipient, to:

      BK Partners Ltd.
      Ocean Centre,
      Montagu Foreshore,
      East Bay Street,
      Nassau, Bahamas
      Tel. No. 1-242-502-5200
      Fax No. 1-242-394-8430

      BSL Supermarkets Limited
      [address]
      Tel. No.
      Fax No.

    With concurrent copies, which shall not constitute notice, to:

      Counsel to the Purchaser
      Higgs & Johnson
      Ocean Centre
      Montagu Foreshore
      East Bay Street
      P.O. Box N-3247

Nassau, Bahamas
Tel. No. 1-242-502-5200
Fax No. 1-242-394-8430
Attention: Zarina M. Fitzgerald

If to the Service Provider, to:

Winn Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn:  Office of General Counsel
Telecopy:  (904) 783-5651

With concurrent copies, which shall not constitute notice, to:

Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005
Attn:  Ronald C. Barusch
Telecopy:  (202) 393-5760

Any notice or other communication shall be deemed to have been served:

(a)    if delivered personally, when left at the address referred to in this Section 9.9;

(b)    when sent by reputable overnight courier service;

(c)    if sent by facsimile or other form of electronic transmission, at the time of transmission (provided that to be effective such transmission must be followed up within one (1) Business Day by reputable overnight courier service).

If a notice is given or deemed given at a time or on a date which is not a Business Day, it shall be deemed to have been given on the next Business Day.

Section 9.10    Descriptive Headings.  The headings of the Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

Section 9.11    Extension, Waiver.  A party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other party hereto; (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein, to the extent permitted by applicable law.  Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.  The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.

13

Section 9.12    <u>Amendment and Modification</u>.  This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by each of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement.

Section 9.13    <u>Assignment and Sub-Contracting</u>.

(a)    Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either party hereto (whether by operation of law or otherwise) without the prior written consent of the other party, provided that Service Provider may assign this Agreement or any of the rights, interests or obligations hereunder in connection with a sale of all or substantially all of its business.

(b)    The Service Provider is free to sub-contract the Services to third parties, provided that the Service Provider remains liable for performance of the Services in accordance with this Agreement, including the Service Standards set forth in Section 2.2.  The Service Recipient is prohibited from sub-contracting its obligations under this Agreement without the prior written consent of the Service Provider.

Section 9.14    <u>Severability</u>.  Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

Section 9.15    <u>Counterparts; Effect</u>.  This Agreement may be executed and delivered (including via facsimile) in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

Section 9.16    <u>Costs and Expenses</u>.  Except as expressly set forth in this Agreement, all costs and expenses incurred by or on behalf of the parties to this Agreement including all fees of representatives, solicitors, counsel and accountants employed by any of the Parties in connection with the negotiation, preparation and execution of this Agreement shall be borne solely by the party who shall have incurred the same and the other party shall have no liability in respect of such costs and expenses.  Notwithstanding the foregoing, in any action or proceeding brought to enforce any provisions of this Agreement, or where any provision hereof is validly asserted as a defense, the successful party in such action or proceeding shall be entitled to recover reasonable attorneys' fees and disbursements.

Section 9.17    <u>Survival</u>.  The provisions of Articles V, VI, VIII and IX, and Sections 7.1 and 7.2 and the obligation to pay any Fees accrued prior to termination shall survive the termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers on the day and year first above written.

Winn-Dixie Stores, Inc.

_____

By:_____
Title:

BK Foods Ltd.

_____

By: _____
Title:

BK Partners Ltd.

_____

By: _____
Title:

**SCHEDULE A**

**Services**

The following IT support services will be provided to Service Recipient.

| Business Function | Service | Description of Services |
|---|---|---|
| Systems | Store Ordering | Store ordering for Warehouse product only. Support of Polling application and division RS600, KE3, and Bahamas VSE systems |
| Systems | Merchandising – Tags and Signs | Support of the Shelf Tag system and supporting subsystems referred to as Price Analysis and the Perpetual Inventory (PIF) system which create the Bahamas Store Average file. |
| Systems | Warehouse Replenishment | Support and maintenance of the OMI Biceps system (for GMD) running on MVS. Support and maintenance for buying Activities utilizing the Chainstore application running on the Miami VSE. This includes support of the KE3 System. |
| Systems | Billing | Support and maintenance of the OMI ABS and Legacy Billing systems to cover inventory updates and Store Order Information. **\*Note –** Billing information is passed to Accounts Payable for payment. An interface will need to be built to pass billing information from these systems to Service Recipient's Payables system. Building a new interface would be considered an additional service subject to Section 2.1(b). |
| Systems | Warehousing | Support and Maintenance of the KE3 system for the Nassau DC. |
| Systems | Payroll and Time Reporting | HRp5 will not be supported by Service Provider. The vendor will provide primary support. Service Provider will provide support and maintenance for the Workbrain and CMI software for Time and Attendance. Should a clock need to be serviced, such service will be provided pursuant to a separate maintenance agreement in place with the vendor. |
| Systems | Import Register | Maintenance and support for the online system running on the Bahamas VSE machine. |

17

| Business Function | Service | Description of Services |
|---|---|---|
| Systems | Store Source | Maintenance and support of the application. |
| Systems | Store Transfers | Maintenance and support of the Bahamas Host Store transfer application that allows the manual input of transfer information. **Note** – The ROI application is not utilized in the Bahamas and will not be configured for Service Recipient's use. |
| Systems | Gross Profits | Maintenance and support of the existing A23BY program. **Note –** No change requests will be considered for this program. |
| Systems | Financials | Service Provider will maintain its existing PeopleSoft 7.53 installation and provide the same reporting support that in place as of Closing. **Note** – Changing or building interfaces to Service Provider's financials or other systems would be considered additional services subject to Section 2.1(b). |
| Systems | Network | Network Support, which includes only the following:<br>1) If the Business has a problem with its communications lines, either to the stores or to the office, Service Provider will work with the vendor, Cable Bahamas, to resolve to the problem.<br><br>2) If the Business has a problem with a router, Service Provider will provide it with a spare as follows: If a store or office has a failure, Service Provider will configure the router remotely and work with Service Recipient to swap out the equipment. Service Provider will then send Service Recipient a new spare router.  Service Recipient will send Service Provider the damaged router and Service Provider will have it repaired.<br><br>3) Ethernet switches for the Business will be handled the same way as the routers. If a store or office has a failure, Service Provider will configure the device remotely, work with the Business to swap out the switch and send a replacement spare.  Service Recipient will have the damaged unit sent back to Service Provider for repair. |

18

| Business Function | Service | Description of Services |
|---|---|---|
| | | 4)  Switch firmware upgrades (i.e., loading new firmware and configurations) will be performed by Service Provider on-site at Service Recipient's locations in the Bahamas.<br><br>5)  Router upgrades (i.e., loading new firmware and configurations) will be performed by Service Provider on-site at Service Recipient's locations in the Bahamas.<br><br>6)  Service Provider will provide support for the UPS units that supply power to the network gear. |
| Systems | Backup and Recovery | Mainframe/VSE disaster recovery is part of Service Provider's overall corporate process, and includes backup and recovery of the VSE machines and data. Non Mainframe Networked data is passed through the VPN and backed up at corporate for recovery. Hardware housed in the corporate data center is covered in the corporate recovery plans. |

The following logistic support services will be provided to the Service Recipient.

| Business Function | Service | Description of Services |
|---|---|---|
| | | |
| Warehousing | Process and select store/warehouse orders | Route store/warehouse orders, select product, audit load containers and prepare paperwork for export. |
| Warehousing | Milk/Water crates | Ship product in plastic crates that must be returned to the main land.  Service Recipient will be charged separately for lost crates. |
| Warehousing | GM/HBA product | Receive orders of General Merchandise and Health/Beauty Aides at the Miami DC for loading and documentation completion |

| Business Function | Service | Description of Services |
|---|---|---|
| Warehousing | Ship outside vendors product to Nassau | Receive, sort, verify and obtain invoices for products from the following outside vendors that ship products through Miami to the Bahamas:<br>Shoe Shack<br>GFI gourmet Foods<br>United Natural Foods<br>Hobart Corp.<br>The Stellar Group (Generator Muffler)<br>Tree of Life Foods<br>Spice World<br>EHS Corp.  (Floor Mats)<br>Gourmet Awards<br>McArthur Milk |

**SCHEDULE B**

**Additional Services**

21

**<u>EXHIBIT C</u>**

# NON-COMPETITION AGREEMENT

THIS NON-COMPETITION AGREEMENT, dated as of [•], 2006 (this "**Agreement**"), is entered into by and between Winn-Dixie Stores, Inc. ("**Winn-Dixie**"), a Florida corporation, and BK Foods Ltd. ("**BK Foods**"), a company incorporated and existing under the laws of the Commonwealth of The Bahamas with its registered office at Ocean Centre, Montagu Foreshore, East Bay Street in the Island of New Providence in the said Commonwealth of The Bahamas.

W I T N E S S E T H :

WHEREAS, BK Foods and W-D (Bahamas) Ltd., a company incorporated and existing under the laws of the Commonwealth of The Bahamas, have entered into that certain Share Purchase Agreement, dated as of March 29, 2006 (the "**Share Purchase Agreement**"), pursuant to which Seller has agreed to sell to BK Foods, and BK Foods has agreed to purchase from the Seller, certain shares (the "Shares") in the capital of Bahamas Supermarkets Limited; and

WHEREAS, the Share Purchase Agreement contemplates that, as an inducement to BK Foods to enter into the Share Purchase Agreement, Winn-Dixie will enter into this Agreement.

NOW, THEREFORE, in consideration of the transactions contemplated by the Share Purchase Agreement and the covenants contained herein, the parties hereto, intending to be legally bound hereby, agree as follows:

1.  Definitions

    Capitalized terms used but not defined in this Agreement shall have the meanings ascribed to such terms in the Share Purchase Agreement.

2.  Non-competition

    From the Closing Date until the second anniversary of the Closing Date, Winn-Dixie shall not directly or indirectly undertake to carry on or be engaged, concerned or interested either alone or in partnership with or as manager, agent or servant of any other person, firm or company or otherwise in the retail sale of groceries, meat, produce and delicatessen products in the Commonwealth of The Bahamas; provided, however, that nothing herein shall be construed as prohibiting W-D (Bahamas) Ltd. from continuing its existence as a company incorporated and existing under the laws of the Commonwealth of The Bahamas.

3.  Entire Agreement

> This Agreement, along with the Share Purchase Agreement and Transition Services Agreement, constitutes the entire agreement among the parties hereto with respect to the subject matter addressed herein, and there are no understandings (written or oral) or agreements, conditions or qualifications relative to this Agreement that are not fully reflected in this Agreement.

4.  Governing Law; Jurisdiction

> The application and effect of this Agreement and all matters arising from it shall be governed by and construed in accordance with the laws of the State of Florida.

5.  Jurisdiction

> Each of the parties hereto (a) consents to submit itself to the personal jurisdiction of any federal court located in the State of Florida or any Florida state court in the event any dispute arises out of this Agreement; (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any court; and (c) agrees that it shall not bring any action or proceeding relating to this Agreement in any court other than a federal or state court sitting in the State of Florida.  Each party further agrees that service of any process, summons, notice or document by registered or certified mail to such party's address for the giving of notice as set forth in Section 6 hereof shall be effective service of process for any action, suit or proceeding relating to this Agreement with respect to any matters to which it has submitted to jurisdiction as set forth above.  Each party also agrees that a final judgment (after all appeals, if any) against it in any action or proceeding relating to this Agreement brought in federal court located in the State of Florida or any Florida state court shall be conclusive and binding upon it as to the subject of such final judgment and may be enforced in any other jurisdiction.

6.  Notices

> Any notice or other communication pursuant to, or in connection with, this Agreement shall be in writing and delivered personally, or sent by reputable overnight courier service or by facsimile or other form of electronic transmission to (or to such other address as may from time to time have been notified in writing) such party in accordance with this Section 6.

2

If to BK Foods, to:

        BK Foods Ltd.
        Ocean Centre,
        Montagu Foreshore,
        East Bay Street,
        Nassau, Bahamas
        Tel. No. 1-242-502-5200
        Fax No. 1-242-394-8430
        e-mail:  jfitz@bahamas.net.bs

With concurrent copies, which shall not constitute notice, to:

        Higgs & Johnson
        Ocean Centre
        Montagu Foreshore
        East Bay Street
        P.O. Box N-3247
        Nassau, Bahamas
        Tel. No. 1-242-502-5200
        Fax No. 1-242-394-8430
        Attention: Zarina M. Fitzgerald
        e-mail:  zfitzgerald@higgsjohnson.com

If to Winn-Dixie, to:

        Winn Dixie Stores, Inc.
        5050 Edgewood Court
        Jacksonville, Florida 32254-3699
        Attn:  Office of General Counsel
        Telecopy:  (904) 783-5651
        e-mail:  LarryAppel@winn-dixie.com

With concurrent copies, which shall not constitute notice, to:

        Skadden, Arps, Slate, Meagher & Flom LLP
        1440 New York Avenue, N.W.
        Washington, D.C.  20005
        Attn:  Ronald C. Barusch
        Telecopy:  (202) 393-5760
        e-mail:  RBarusch@skadden.com

Any notice or other communication shall be deemed to have been served:

3

(a)    if delivered personally, when left at the address referred to in this Section 6;

(b)    when sent by reputable overnight courier service, two (2) clear days after sending it;

(c)    if sent by facsimile or other form of electronic transmission (including e-mail), at the time of transmission (provided that to be effective such transmission must be followed up within one (1) Business Day by reputable overnight courier service).

If a notice is given or deemed given at a time or on a date which is not a Business Day, it shall be deemed to have been given on the next Business Day.

7.    Descriptive Headings

The headings of the Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

8.    Amendment and Modification

This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by each of the parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement.

9.    Termination

This Agreement shall terminate and be of no further force and effect upon the second anniversary of the Closing Date.

10.    Severability

Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination

4

shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

11.    Counterparts; Effect

This Agreement may be executed and delivered (including via facsimile) in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

12.    Specific Performance

The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in any federal court located in the State of Florida or any Florida state court, in addition to any other remedy to which they are entitled at law or in equity.

13.    Costs and Expenses.

Except as expressly set forth in this Agreement, all costs and expenses incurred by or on behalf of the parties to this Agreement including all fees of representatives, solicitors, counsel and accountants employed by any of the parties hereto in connection with the negotiation, preparation and execution of this Agreement shall be borne solely by the party who shall have incurred the same and the other party shall have no liability in respect of such costs and expenses.  Notwithstanding the foregoing, in any action or proceeding brought to enforce any provisions of this Agreement, or where any provision hereof is validly asserted as a defense, the successful party in such action or proceeding shall be entitled to recover reasonable attorneys' fees and disbursements.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers on the day and year first above written.

WINN-DIXIE STORES, INC.

By:_____
    Name:
    Title:

BK FOODS LTD.

By:_____
    Name:
    Title:

(675993.5A-DC1A)

6

**EXHIBIT D**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ORDER AUTHORIZING WINN-DIXIE STORES, INC.**
**TO (I) EXERCISE ITS CONSENT TO SALE OF STOCK BY**
**NON-DEBTOR SUBSIDIARY, (II) ENTER INTO A RELATED**
**TRANSITION SERVICES AGREEMENT AND (III) ENTER**
**INTO A RELATED NON-COMPETITION AGREEMENT**

These cases came before the Court for hearing on May 18, 2006 upon the motion

(the "Motion") of Winn-Dixie Stores, Inc. ("Winn-Dixie") and twenty-three of its subsidiaries

and affiliates, as debtors and debtors-in-possession (together with Winn-Dixie, collectively, the

"Debtors")[1], for entry of an order under 11 U.S.C. §§ 105 and 363 authorizing Winn-Dixie to (i)

exercise its consent to the sale by W-D (Bahamas) Ltd., a Bahamas company, of shares of

common stock of Bahamas Supermarkets Limited ("BSL") pursuant to the terms of a Share

Purchase Agreement substantially in the form attached as Exhibit A (the "Agreement"), to the

purchaser under the Agreement (the "Purchaser"), (ii) enter into a transition services agreement

substantially in the form attached as Exhibit B to continue to provide the Purchaser with services

related to the operation and management of the businesses which Winn-Dixie currently provides

to BSL (the "Transition Services Agreement"), and (iii) enter into a non-competition agreement

substantially in the form attached as Exhibit C by which the Debtors will refrain from competing

with the Purchaser for a period of two years (the "Non-Competition Agreement").  The Court has

---

[1]     All capitalized terms not otherwise defined in this order shall have the meaning ascribed to them in the
Motion.

read the Motion and considered the representations of counsel.  Based upon the representations

of counsel and without objection by the United States Trustee or any other interested parties, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted.

2.      Winn-Dixie is authorized to execute the Shareholder Consent.

3.      Winn-Dixie is authorized to execute the Transition Services Agreement,

subject to such additional changes as would make the transaction, taken as a whole, a higher or

otherwise better offer in the judgment of the Debtors; provided, however, that the Transition

Services Agreement executed by Winn-Dixie shall be, in form and substance, reasonably

satisfactory to the Creditors Committee.

4.      Winn-Dixie is authorized to execute the Non-Competition Agreement,

subject to such additional changes as would make the transaction, taken as a whole, a higher or

otherwise better offer in the judgment of the Debtors; provided, however, that the Non-

Competition Agreement executed by Winn-Dixie shall be, in form and substance, reasonably

satisfactory to the Creditors Committee.

Dated _____, 2006 in Jacksonville, Florida.


_____
Jerry A. Funk
United States Bankruptcy Judge


Cynthia C. Jackson is directed to serve
a copy of this Order on all parties who
received copies of the Motion.

2

**<u>EXHIBIT A</u>**

**EXHIBIT B**

**<u>EXHIBIT C</u>**