Hearing Date: May 18, 2006, 1:00 p.m.
Objection Deadline:
May 8, 2006 at 4:00 p.m. (E.T.)

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors.[1] | ) | Jointly Administered |

### MOTION FOR ORDER (A) AUTHORIZING THE DEBTORS TO SELL POMPANO BEACH DISTRIBUTION CENTER AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS AND (B) GRANTING RELATED RELIEF

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), move the Court for entry of an order pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004(g): (a) authorizing the Debtors to sell a distribution center located in Pompano Beach, Florida, more particularly described on Exhibit A attached to this Motion (the "Distribution Center"), together with all attached improvements, to Associated Grocers of Florida, Inc. (the "Purchaser"), or to the party submitting a higher or better offer, free and clear of liens, claims and

---

[1] In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

interests and (b) granting related relief.  In support of the Motion, the Debtors respectfully state as follows:

## Background

1.    On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered for procedural purposes only.

2.    The Debtors operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases pursuant to Bankruptcy Code sections 1102 and 1103.

3.    The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  As of the Petition Date, the Debtors were considered the eighth-largest food retailer in the United States and one of the largest in the Southeast with more than 900 stores.

4.    Prior to the Petition Date, the Debtors operated the Distribution Center located in Pompano Beach, Florida.  Since the Petition Date, the Debtors have determined that their warehouse operations should be consolidated at their

center located in Miami, Florida.   As such, the Debtors no longer need the Distribution Center.

5.      The Debtors have marketed the Distribution Center extensively through DJM Asset Management, Inc. ("DJM").  DJM sent over 2,500 sale notices for the Distribution Center to potential purchasers.  Through DJM's efforts, the Debtors have received 7 offers, including the offer by the Purchaser for $39,300,000.  The Purchaser's offer is the highest or best offer for the Distribution Center.

## Relief Requested

6.      By this Motion, the Debtors request (a) authority to sell their fee simple title interest in the Distribution Center, together with all attached improvements (collectively, the "Assets"), free and clear of liens, claims and interests, subject to higher or better offers, and (b) granting related relief.   The Assets are more fully described in the Facility Purchase Agreement (defined below).

## The Facility Purchase Agreement

7.      On April 6, 2006, the Debtors and the Purchaser entered into the Facility Purchase Agreement attached to this Motion as Exhibit A (the "Facility Agreement").

8.    A summary of the material terms of the transaction with the Purchaser, subject to this Court's approval, are as follows:[2]

(a)    Assets.  The assets to be sold and transferred to the Purchaser include:

(i)    the Debtors' fee simple title in the land and buildings known as the Distribution Center; and

(ii)    all attached improvements.

(b)    Purchase Price.  On the terms and subject to the conditions set forth in the Facility Agreement, the net aggregate purchase price for the Assets is $39,300,000 (the "Purchase Price"). The Purchaser deposited the sum of $1,000,000 at the time the Facility Agreement was executed. The Purchaser will deposit an additional $6,600,000 following the completion of the Investigation Period (as defined below).

(c)    Sale Free and Clear.  The Facility Agreement provides that the Assets are to be transferred free and clear of any liens, claims, interests and encumbrances other than the Permitted Encumbrances, as defined in the Facility Agreement.

(d)    Investigation Period.  The Purchaser has ten days from the execution of the Facility Agreement to investigate and inspect the physical aspects of the Property (the "Investigation Period").

(e)    Overbid Protection.  The initial minimum overbid that may be accepted by the Debtors at any auction must have a value of at least $500,000 more than the Purchaser's initial bid.

(f)    Termination Fee.  In accordance with the Bid Order (defined below), the Debtors have agreed to pay the Purchaser a termination fee in the amount of up to $150,000 for its actual and reasonable costs and expenses incurred in the event Purchaser is not the successful bidder at the Auction (defined below).

---

[2]    This summary of the Facility Agreement is provided as a convenience only.  To the extent that this summary differs in any way from the terms of the Facility Agreement, the terms of the Facility Agreement control.

00527478.DOC.2                                      4

9.     The Debtors now move for authority to consummate the sale of the Assets with the Purchaser or, alternatively, to the party submitting a higher or better offer for the Assets.

## Solicitation of Higher or Better Offers

10.     Notwithstanding that the Assets have been sufficiently marketed, the Debtors are soliciting higher or better bids for the Assets.  Any person or entity interested in submitting a higher and better bid for the Assets must submit such bid so that it is received by James Avallone at DJM, 445 Broadhollow Road, Suite 417, Melville, NY 11747, with a copy to undersigned counsel for the Debtors, no later than 12:00 p.m. (prevailing Eastern Time) on May 15, 2006.  All bids must comply with the bidding procedures approved by order of the Bankruptcy Court dated June 21, 2005 (Docket No. 1801) (the "Bid Order").  To qualify as a competing bid, the offer must net the Debtors' estates at least $500,000 more than the Purchaser's initial bid and be accompanied by a certified check made out to Winn-Dixie Stores, Inc. in an amount equal to 10% of the competing bid.

11.     If the Debtors receive a higher or better offer for the Assets, they will conduct an auction (the "Auction") for the Assets in accordance with the Bid Order.  The Auction will take place at 10:00 a.m. (prevailing Eastern Time) at the offices of Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida, on Wednesday, May 17, 2006.  The Debtors will conduct the Auction in

consultation with the Creditors' Committee and the DIP Lender and on terms the Debtors determine to be in the best interests of their estates and their creditors.

## Applicable Authority

### A.    Bankruptcy Code Section 363(b) Authorizes the Sale.

12.    Bankruptcy Code section 363(b)(1) provides:   "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Bankruptcy Code section 1107 (a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under section 363(b)(1).  *See* 11 U.S.C. § 1107(a).

13.    A Debtors' sale under section 363(b)(1) should be approved when supported by a sound business reason.  *See In re B.D.K. Health Mgmt., Inc.* ("B.D.K. Health Mgmt."), Case Nos. 98-00609-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp.* (In re Chateaugay Corp.), 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp.* (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *Fulton State Bank v. Schipper* (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991); *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a

bankruptcy court can authorize a sale of all a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

14.     Once a court is satisfied that a sound business reason for the sale exists, the Court must also consider whether (a) the sale price is fair and reasonable, (b) the purchaser is proceeding in good faith, and (c) the Debtor has provided interested parties with adequate and reasonable notice.  *Delaware & Hudson*, 124 B.R. at 175-176.

15.     The Debtors have a sound business reason for the sale of the Assets. The Debtors no longer use the Distribution Center and remain liable for the costs associated with the Distribution Center, such as insurance, maintenance and taxes (approximately $858,000 per month).

16.     The Debtors' sale of the Assets to the Purchaser is subject to competing bids, ensuring that the Debtors will receive the highest or best value for the Assets.    Thus, the fairness and reasonableness of the consideration to be received for the Assets ultimately will be demonstrated by an auction process—the best means for establishing whether a fair and reasonable price is being paid.

17.     In accordance with Local Rule 2002-1, the Debtors will serve notice of the Motion on the following parties: (a) each taxing authority known to the Debtors to have a potential interest in the Assets, (b) all parties that expressed interest in purchasing the Assets; (c) the Purchaser; (d) counsel for the DIP

Lenders; (e) counsel for the Creditors' Committee; (f) all known holders of interests and claims in the Assets; (h) all entities having requested notices pursuant to Fed. R. Bankr. P. 2002; and (i) the Office of United States Trustee.

**B.      Bankruptcy Code Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

18.     The Debtors request that their sale of the Assets be approved free and clear of any liens, claims or interests.  Pursuant to Bankruptcy Code section 363(f), a debtor may sell property of the estate free and clear of all liens, claims and interests after notice and hearing.  *See In re Parrish*, 171 B.R. 138 (Bankr.M.D.Fla. 1994).

19.     The Debtors believe that with the exception of the Permitted Encumbrances (as defined in the Facility Agreement), there are no interests in or claims against the Assets other than the interest of Wachovia Bank, National Association, as Administrative Agent and Collateral Agent (collectively, the "DIP Lender").  The interest of the DIP Lender will be satisfied because the Debtors will cause the net proceeds from the sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III)

Authorizing the Repayment in Full of All Claims of Debtors' Pre-petition Secured

Lenders dated March 23, 2005 (Docket No. 501) (the "Final Financing Order")

and the Loan Documents (as defined in the Final Financing Order).

**C.     Good Faith Purchaser**

20.     The Debtors request that the Court find that the Purchaser, or the

party who ultimately submits the highest or best offer for the Assets, acted in good

faith within the meaning of Bankruptcy Code section 363(m).

21.     Bankruptcy Code section 363(m) provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m)

22.     The Bankruptcy Code does not define the term "good faith."  Courts,

however, indicate that a party would have to show fraud or collusion between the

purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of

good faith.

The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Apex Oil Co.*, 2 B.R. 847, 865
(Bankr. E.D. Mo. 1988)

*Accord Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs.* (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997). No such facts exist here.

23.    The Debtors assert that: (a) the proposed sale is the subject of arm's length negotiations with the Purchaser and is made in good faith; (b) the Purchaser has no affiliation with the Debtors; (c) the Assets were marketed extensively and the purchase price is fair and reasonable; (d) to the best of the Debtors' knowledge, the Purchaser has taken no action to chill or otherwise collude with any other party to restrict bidding on the Assets; and (e) the marketing process that occurred and the notice of the Sale Hearing ensure that the Purchaser has not exerted undue influence over the Debtors. Accordingly, the Debtors request that the Court find that the Purchaser, or the party submitting a higher or better offer, acted in good faith within the meaning of Bankruptcy Code section 363(m). *See B.D.K. Health Mgmt.,* 1998 WL, at *4 (finding that the purchaser is entitled to the protections of Bankruptcy Code section 363(m) because the sale was negotiated at arms-length, proposed in good faith and the consideration for the assets was fair and reasonable).

**E.    Elimination of 10-Day Stay Under Rules 6004(g)**

24.    Pursuant to Fed. R. Bankr. P. 6004(g), unless the Court orders otherwise, all orders authorizing the sale of property outside of the ordinary course of business pursuant to Bankruptcy Code section 363 are automatically stayed for ten days after entry of the order.    Given the requirements of the Facility Agreement and the need to close the sale as promptly as possible, the Debtors request that the Court waive the 10-day stay period.

**F.    Objection Deadline**

28.    Only objections filed and served on D. J. Baker at djbaker@skadden.com, Skadden, Arps, Slate, Meagher, & Flom, LLP, Four Times Square, New York, New York 10036 and on Cynthia C. Jackson at cjackson@smithhulsey.com, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 so as to be received by May 8, 2006 at 4:00 p.m. (E.T.) will be considered by the Bankruptcy Court at the Hearing.

**Conclusion**

For the foregoing reasons, the Debtors respectfully request that the Court enter an order substantially in the form attached as Exhibit B (a) granting the Motion and authorizing the sale of the Assets to the Purchaser in accordance with the Facility Agreement, or to the party submitting a higher or otherwise better offer for the Assets; (b) authorizing the Debtors to take all actions reasonably necessary to effectuate the sale of the Assets in accordance with the Facility Agreement; and (d) granting such other and further relief as the Court deems just and proper.

Dated: April 6, 2006

SKADDEN, ARPS, SLATE, MEAGHER          SMITH HULSEY & BUSEY
& FLOM LLP

By   _/s/ D. J. Baker_                          By   _/s/ Cynthia C. Jackson_
    D. J. Baker                              Stephen D. Busey
    Sally McDonald Henry                     James H. Post
    Rosalie W. Gray                          Cynthia C. Jackson  (F.B.N. 498882)

Four Times Square                        225 Water Street, Suite 1800
New York, New York 10036                 Jacksonville, Florida  32202
(212) 735-3000                           (904) 359-7700
(212) 735-2000 (facsimile)               (904) 359-7708 (facsimile)
djbaker@skadden.com                      cjackson@smithhulsey.com

Co-Counsel for Debtors                   Co-Counsel for Debtors

# EXHIBIT A

Draft 4/6/06

## FACILITY PURCHASE AGREEMENT
[Pompano Distribution Center]

**THIS ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>") is made effective as of the Effective Date, by and between:

**WINN-DIXIE STORES, INC.,** a Florida corporation ("<u>Seller</u>"), and

**ASSOCIATED GROCERS OF FLORIDA, INC.**, a Florida corporation, or its permitted assignee pursuant to <u>paragraph 12.2</u> of this Agreement ("<u>Buyer</u>").

### R E C I T A L S :

A.     Seller owns fee simple title to the real property described on attached <u>Exhibit A</u> (the "<u>Land</u>"), together with all easements, appurtenances and hereditaments thereto, located at 1141 SW 12th Avenue, Pompano Beach, Florida, and all improvements located thereon (the "<u>Facility</u>"). The Facility and the Land together are referred to as the "<u>Property</u>."

B.     Seller desires to convey and sell to Buyer, and Buyer desires to acquire (directly or through an Affiliate designated by Buyer) and purchase, the Property, subject to the terms and conditions contained in this Agreement.

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION** and of the mutual undertakings of the parties hereto, Seller and Buyer agree as follows:

1.     **Defined Terms.**  Capitalized terms as used in this Agreement will have the meanings assigned to such terms as they appear in this Agreement, except that the following capitalized terms will have the meanings set forth below:

    1.1     "<u>Affiliate</u>" will mean a Person that (either directly or indirectly, through one or more intermediaries) controls, is in common control with or is controlled by, another Person, and any Person that is a director, trustee, officer, employee, agent, partner, shareholder, subsidiary or attorney of any of the foregoing, and will include, without limitation, any limited liability company, partnership or corporation directly or indirectly controlled by, or in common control with, Buyer or Seller.

    1.2     "<u>Broker</u>" will mean the real estate broker(s) identified in <u>paragraph 10</u> of this Agreement as the broker for the transaction contemplated hereunder.

    1.3     "<u>Business Day</u>" will mean any day, other than Saturday, Sunday, or federal holiday recognized by businesses generally in Jacksonville, Florida.

1

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

1.4 "<u>Claim</u>" will mean any claim (including without limitation as defined by 11 U.S.C. Section 101(5)), demand, action, complaint, suit, lawsuit, litigation, inquiry, hearing, investigation or proceeding, whether formal or informal, commenced, brought or threatened.

1.5 "<u>Closing</u>" will mean the consummation of the assignment, purchase and sale of the Assets pursuant to this Agreement as indicated by delivery of the Deed and other documents contemplated by <u>paragraph 9</u> of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.6 "<u>Closing Agent</u>" will mean Smith, Gambrell & Russell, LLP, Jacksonville, Florida office, acting in its capacity as closing agent for the transactions contemplated hereunder.

1.7 "<u>Closing Statement</u>" will mean a statement to be delivered by Buyer and Seller at Closing, reflecting the net amount due from Buyer to Seller at Closing for the Assets, and the proper allocation of Buyer's Closing Costs and Seller's Closing Costs, after making the adjustments as provided in this Agreement.

1.8 "<u>Closing Date</u>" will have the meaning given in <u>Section 9.1</u> of this Agreement.

1.9 "<u>Consent</u>" will mean any license, permit, order, consent, approval, registration, authorization, inspection, qualification or filing under any Law, with any Governmental Authorities, with any industry or other non-governmental self-regulatory organization, or under any contract or other agreement or instrument with third parties, to which Seller is a party or by which the Assets or Seller's operations at the Property are governed or bound.

1.10 "<u>Delivery Deadline</u>" will mean 5:00 p.m., Eastern Time, on <u>April 14, 2006</u>, constituting the deadline for Seller's delivery of certain documents and materials to Buyer pursuant to <u>paragraphs 4.2.5, 4.4 and 4.5</u> of this Agreement.

1.11 "<u>Effective Date</u>" will mean April 6, 2006.

1.12 "<u>Environmental Laws</u>" will mean any statute, rule, regulation, ordinance, code, order, judgment, writ, injunction or decree that relates to or otherwise imposes liability or standards of conduct concerning environmental protection, discharges, emissions, releases or threatened releases of any noises, odors or Hazardous Materials into ambient air, water or land, or otherwise relating to the manufacture, processing, generation, distribution, use, treatment, storage, disposal, cleanup, transport or handling of Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act, as amended, the Resource Conservation and Recovery Act, as

amended, the Toxic Substances Control Act, as amended, the Federal Water Pollution Control Act, as amended, the Clean Water Act, as amended, any so-called "Superlien" law, and any other similar federal, state or local law.

1.13    "<u>Environmental Permits</u>" will mean all Consents required under any Environmental Law.

1.14    "<u>Escrow Agent</u>" will mean Smith, Gambrell & Russell, LLP, Jacksonville, Florida office, acting in its capacity as escrow agent.

1.15    "<u>Excluded Personal Property</u>" will mean those items of furniture, furnishings and movable equipment, including all computer and related equipment, and all other tangible and intangible personal property listed on <u>Exhibit B</u>.

1.16    "<u>Governmental Authority</u>" will mean any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of the United States, any foreign government, any state of the United States or any political subdivision thereof, and any court or tribunal of competent jurisdiction, and any governmental or non-governmental self-regulatory organization, agency or authority.

1.17    "<u>Hazardous Material</u>" will mean any (i) hazardous substance, toxic substance, hazardous waste or pollutant (as such terms are defined by or within the meaning of any Environmental Law), (ii) material or substance that is regulated or controlled as a hazardous substance, toxic substance, pollutant or other regulated or controlled material, substance or matter pursuant to any Environmental Law, (iii) petroleum, crude oil or fraction thereof, (iv) friable asbestos-containing material, (v) polychlorinated biphenyls, (vi) lead-based paint or (vii) radioactive material.

1.18    "<u>Interest</u>" will mean any and all interests (including any successor, transferee or similar liability), liens (including but not limited to any and all "liens" as defined in 11 U.S.C. § 101(37)), liabilities, mortgages, deeds, trusts, guarantees, security agreements, security interest, rights of setoff or recoupment, pledges, privileges, options, rights of first refusal, preemptive rights, easements, servitudes, encroachments, hypothecations, charges, obligations, rights, restrictions, charges and encumbrances of any kind or nature or other matter causing a defect or imperfection in title.

1.19    "<u>Knowledge</u>" as it relates to Seller will mean and refer to facts and information within the actual knowledge of the executive officers of Winn-Dixie Stores, Inc., and to facts and information that, with reasonable inquiry or investigation, should have been known by such officers.

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

1.20    "Law" will mean any statute, law, ordinance, code, rule, regulation, order, writ, injunction, judgment or decree of any Governmental Authority.

1.21    "Monetary Objections" will mean (i) mortgages or security interests in any of Seller's interest in the Assets; (ii) past due ad valorem taxes and assessments of any kind constituting a lien or Interest against any of the Assets to the extent such assessments can be cured by the payment of money; (iii) construction liens or Interests that have attached to and become a lien or Interest against Seller's interest in the Property; (iv) judgments that have attached to and become a lien or Interest against Seller's interest in the Assets; and (v) any other Interest against Seller's interest in the Assets that can be satisfied by Seller with the payment of money out of the Purchase Price.

1.22    "Outside Date" will mean June 28, 2006.

1.23    "Person" will mean any individual, partnership (limited or general), joint venture, corporation, company, limited liability company, trust, association, unincorporated organization, Governmental Authority or other entity.

1.24    "Seller's Counsel" will mean the law firm or firms engaged by Seller as its legal counsel in connection with the negotiation, due diligence evaluation, documentation and closing of the subject transactions.

1.25    "Title Insurer" will mean First American Title Insurance Company, and its agent, Smith, Gambrell & Russell, LLP, Jacksonville, Florida office.

2.    **Assets.** Seller agrees to grant, bargain, sell and convey to Buyer, and Buyer agrees to purchase from Seller, the following described property (collectively, the "Assets"), free and clear of any and all Claims and Interests (other than Permitted Encumbrances) in accordance with 11 U.S.C. Section 363:

2.1    The Property; and

2.2    All fixtures, furniture and equipment located on the Property, including, but not limited to the Refrigeration System, heating and air conditioning systems, utility systems, elevators, docks, lifts, doors, partitions, lighting fixtures, and flooring located on the Property, but specifically excluding the Excluded Personal Property, which Excluded Personal Property will remain the property of Seller.

3.    **Purchase Price; Payment.**

3.1    Purchase Price. Buyer agrees to pay Seller a purchase price of $39,300,000 for the Assets (the "Purchase Price"), payable to Seller on the Closing Date.  Buyer shall not be liable for any obligations of Seller or have any further obligations beyond the payment of the Purchase Price, except as otherwise expressly set forth in this Agreement.

3.2     <u>Deposit</u>.

  3.2.1   An earnest money deposit of $1,000,000 (the "<u>Initial Deposit</u>") will be due and payable to Escrow Agent within three (3) Business Days after the Effective Date, and will be refundable to Buyer only as expressly provided in this Agreement.

  3.2.2   If Buyer does not timely terminate this Agreement prior to expiration of the Investigation Period, then a second earnest money deposit of $6,600,000 (the "<u>Second Deposit</u>") will be due and payable to Escrow Agent within three (3) Business Days after the expiration of the Investigation Period. The Second Deposit will be refundable to Buyer only as expressly provided in this Agreement.

  3.2.3   Escrow Agent will place the Deposit in an interest-bearing account. Interest accrued on the Deposit will be attributed to Buyer regardless of how the Deposit is paid, and Buyer will be responsible for payment of state and federal income taxes, if any, associated therewith. Buyer's FEI number for federal income tax reporting purposes is 590559107.

  3.2.4   At the Closing, the Deposit will be released to Seller and credited against the Purchase Price, and the unpaid balance of the Purchase Price will be due and payable by Buyer in cash.

3.3     <u>Payment of Purchase Price</u>. On or before the Closing Date, Buyer will deposit the balance of the Purchase Price by wire transfer of immediately available funds (the "<u>Closing Deposit</u>") with Escrow Agent. Escrow Agent will deposit the Closing Deposit into a non-interest bearing escrow account and will disburse or apply the Closing Deposit as provided in this Agreement. At Closing, the Purchase Price will be credited and disbursed to Seller or as Seller directs.

4.     **<u>Condition of Assets; Buyer's Due Diligence; Buyer's Financing</u>.**

4.1     <u>Condition of Assets</u>. Buyer acknowledges and agrees that upon Closing, Seller will sell and assign to Buyer and Buyer will accept the Assets "As Is, Where Is," with all faults, without representations or warranties expressed or implied, and there are no oral agreements, warranties or representations collateral to or affecting the Property by Seller or any third party. The terms and conditions of this paragraph will expressly survive the closing and not merge therein.

4.2     <u>Investigation Period</u>.

  4.2.1   <u>Investigation Period</u>. Buyer will have a period commencing on the Effective Date and expiring at 5:00 p.m., Eastern Time, on <u>April 21, 2006</u>, to investigate and inspect the Assets and all matters relating thereto, to determine whether or not the same is satisfactory to Buyer (the "<u>Investigation Period</u>"). During the

5

Investigation Period, Buyer will be provided access to the Property to inspect the physical condition thereof, determine the structural condition and capacities of the Property, verify zoning, conduct appraisals, engineering and environmental studies, analyze possible lay-outs and uses of the Property, feasibility studies, obtain any financing desired by Buyer, make soil tests, determine allowable uses under zoning or the applicable comprehensive land use plan, verify and evaluate ingress and egress, test for hazardous materials, and to determine the availability of water, sewer and other utilities and services.  All such investigations, tests, verifications, copies and examinations will be made by Buyer at Buyer's sole expense

4.2.2 <u>Access to Property</u>. At all reasonable times during the Investigation Period, Seller will permit Buyer access to the Property as needed to inspect, examine and otherwise undertake those actions that Buyer deems necessary or desirable to determine the feasibility of acquiring the Assets, provided that: (i) Buyer has given Seller at least 24 hours prior notice of Buyer's proposed entry onto the Property; (ii) Buyer's notice includes the names of its agents or contractors who will be performing any evaluation, testing or inspection of the Property and the qualifications of such agents or contractors; (iii) such entry will be conducted during normal business hours; (iv) such entry will be coordinated with Seller, and Buyer will be accompanied by Seller's representative during such entry; and (v) Buyer's entry will not include any invasive testing or measurements except as expressly provided herein to the contrary.

4.2.3 <u>Reporting of Investigations</u>.  If Buyer discovers any condition that affects any of the Assets that is of a nature that requires reporting to applicable governmental agencies, then Buyer or its consultants will promptly notify Seller in writing of such condition and, unless required by applicable law, will not contact or report to such agencies with respect to such condition without Seller's prior written consent.

4.2.4 <u>Indemnification</u>.  Buyer hereby indemnifies and agrees to defend and hold harmless Seller and Seller's partners, shareholders, officers, directors, affiliates, employees and agents from and against any and all loss, damages, liability and expense, including reasonable attorney's fees and litigation expense, arising out of Buyer's investigation of the Property. Buyer further hereby indemnifies and agrees to defend and hold harmless Seller from and against all claims against Seller or the Property filed by contractors, materialmen or laborers performing work and tests for Buyer.  If this sale does not close, or if Buyer otherwise elects to terminate this Agreement as provided herein, Buyer will restore the Property to its original condition prior to such termination.  The foregoing indemnification provisions will survive

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

the expiration or termination of this Agreement and/or the Closing and not be merged therein.

4.2.5    <u>Seller's Deliveries</u>.  By the Delivery Deadline, Seller will deliver to Buyer the following materials to the extent such items are in Seller's active possession and control at the Effective Date:

(a)    copies of as-built plans for the Facility;

(b)    copies of all fixture plans for the Facility;

(c)    copies of all warranties (roof, mechanical, electrical, etc.) in effect for the benefit of Seller with respect to any of the Assets;

(d)    specifications, operating manuals and operating records for the Refrigeration System;

(e)    copies of any licenses or permits issued by Governmental Authority relating to the Property;

(f)    copies of all documents listed as Permitted Encumbrances;

(g)    a copy of Seller's most recent available boundary survey or site plan; and

(h)    copies of any environmental studies of the Property;

it being understood that such materials have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or fitness for a particular purpose, and are not a substitute for Buyer's own investigation and inspection of the property using its own due diligence service providers. Buyer will deliver or return to Seller all materials provided by Seller to Buyer and all materials relating to the Assets obtained by Buyer and all copies of any such materials within five (5) Business Days following termination of this Agreement prior to Closing for any reason.

4.2.6    <u>Election to Proceed</u>.  If Buyer determines that it does not wish to proceed with the acquisition of the Assets for any reason, then Buyer may elect to terminate this Agreement by delivering written notice of such election to Seller at anytime on or before expiration of the Investigation Period. If Buyer timely elects to terminate this Agreement, then, provided Buyer shall have completed any restoration obligations it may have under <u>paragraph 4.2.4</u> of this Agreement, Buyer's Deposit (and all interest accrued thereon) shall be returned promptly to Buyer and thereupon the parties will have no further obligations hereunder except with respect to those provisions of this Agreement that are stated to expressly survive such termination. If Buyer fails to

7

terminate this Agreement prior to expiration of the Investigation Period, then Buyer will be deemed to have elected to proceed with the acquisition of the Assets, and thereupon the Deposit will be nonrefundable to Buyer except as otherwise expressly provided in this Agreement.

4.3   <u>Title</u>. At Closing, Seller will, pursuant to the terms of the Sale Order, convey and assign to Buyer, and Buyer will accept, all of Seller's right, title and interest in the Assets, subject only to those matters listed on <u>Exhibit C</u> and to any other matters approved or waived by Buyer as provided in this Agreement (collectively, the "<u>Permitted Encumbrances</u>"). Seller's interest in the Property will be conveyed by special warranty deed substantially in the form attached as <u>Exhibit D</u> as required by Title Insurer to properly insure Buyer's title to the Property (the "<u>Deed</u>"). Evidence of the delivery of marketable and insurable title to Seller's interest in the Property will be pursuant to Title Insurer's issuance of a policy of title insurance for the Property (in the form of a marked Title Commitment deleting all requirements and the gap and standard exceptions and all other exceptions that are not Permitted Encumbrances, and committing to provide to Buyer's lender an unaltered Form 9 endorsement, and survey and variable rate endorsements, and evidencing the Title Insurer's binding obligation to issue its title policies to Buyer and Buyer's lender), insuring the interest of Buyer in the Property as assigned and conveyed by Seller to Buyer, with the survey exception deleted (and substituted for a survey reading reflecting matters disclosed on the Survey obtained by Buyer) using the promulgated form and typical endorsements or such other or similar form as is available in the state in which the Property is located, in the amount of the Purchase Price (the "<u>Title Policy</u>"). Notwithstanding the foregoing requirements for lender title coverage, Buyer's ability to close on mortgage financing will not constitute a condition to Buyer's obligation to close the transaction contemplated herein.

4.4   <u>Title Commitment</u>. Not later than the Delivery Deadline, Seller will obtain and deliver to Buyer a title insurance commitment (the "<u>Title Commitment</u>") from the Title Insurer committing to insure Buyer's fee simple title to the Property for the amount of the Purchase Price, and stating all exceptions and conditions to such title, including, without limitation, those encumbrances, if any, created pursuant to the Credit Agreement dated as of February 23, 2005, as amended, between Winn-Dixie Stores, Inc. and certain banks and financial institutions, and certain documents executed by Winn-Dixie Stores, Inc. in connection with such Credit Agreement (the "<u>Credit Agreement Liens</u>"), any other liens and encumbrances affecting the Property ("<u>Other Liens</u>"), the Permitted Encumbrances, and all other easements, restrictions, covenants, reservations, and other encumbrances affecting title that are accepted by Buyer (collectively, the "<u>Exceptions</u>"). The Commitment delivered to Buyer will include copies of all Exceptions. Buyer will have until <u>April 19, 2006</u> (the "<u>Review Deadline</u>"), to examine the Commitment. If Buyer reasonably determines that any matter (other than Permitted Encumbrances) renders Seller's title to the Property

8

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

unmarketable, Buyer will notify Seller in writing on or before the Review Deadline of Buyer's objections (the "Objection Notice").

4.5    Survey. Not later than the Delivery Deadline, Seller will obtain and deliver to Buyer and Title Insurer a current boundary survey of the Property (the "Survey"). The Survey will be prepared by a licensed Florida land surveyor, prepared in accordance with the minimum technical standards for surveys under the laws of the State of Florida, certified to Buyer, Seller and Title Insurer, and show a metes and bounds legal description for the Property (the "Legal Description"). Buyer will have until the Review Deadline to review the Survey and to deliver in the Objection Notice its objections to any matter (other than Permitted Encumbrances) that renders Seller's title to the property unmarketable as disclosed by such Survey, including, without limitation, objections as to the accuracy or consistency with the Commitment or the Legal Description.

4.6    Seller's Cure of Objections. If Buyer timely delivers the Objection Notice to Seller, Seller will have until the end of the Investigation Period to attempt to cure such objections, it being understood, however, that the Credit Agreement Liens and Other Liens will not be cured until issuance of the Sale Order and Closing. If Seller is unable or unwilling to cure any objections other than the Credit Agreement Liens and Other Liens prior to the end of the Investigation Period, then Buyer will have until the expiration of the Investigation Period to elect, by written notice to Seller, whether to (i) waive the unsatisfied objections and complete the purchase of the Property subject to the objectionable matters, or (ii) terminate this Agreement and cause the Deposit to be refunded to Buyer.

4.7    Special Covenants and Conditions. Buyer acknowledges the following special covenants and conditions relating to the Property:

4.7.1    Spur Track Agreement. The Facility contains spur tracks served by CSX Transportation, Inc. (the "Railroad"), pursuant to an unrecorded Spur Track Agreement dated January 8, 1974 between the Railroad and Seller (the "Spur Track Agreement"). Seller agrees to exercise diligent and good faith efforts, at no cost to Seller, prior to expiration of the Investigation Period, to obtain the Railroad's undertaking to cooperate with Buyer in terminating the Spur Track Agreement or at Buyer's election, in reaching a replacement agreement between Buyer and the Railroad; provided, however, that if Seller is unable to obtain such undertaking, then Buyer's only remedy will be to terminate this Agreement prior to expiration of the Investigation Period. The railroad spur tracks are considered a Permitted Encumbrance.

4.7.2    Refrigeration System. The Property includes an ammonia-based refrigeration system together with operating manuals and protocols (the "Refrigeration System"). During the Investigation Period, at Buyer's request, Seller will provide Buyer with

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

reasonable technical assistance at Seller's expense, relating to the specifications and operation of the Refrigeration System.  At Closing, Buyer may elect to retain the services of Seller's on-site Refrigeration System technicians as employees of Buyer, and at no cost to Seller, for the purpose of advising Buyer concerning Buyer's shutdown or the proper maintenance of the Refrigeration System.  Seller will have no liability to Buyer in connection with such technical assistance or otherwise in connection with the Refrigeration System, except as provided in Seller's limited representations and warranties in <u>paragraph 5</u> below.

4.7.3   <u>Underground Storage Tanks</u>.

(a)     <u>UST's</u>. The Facility historically has contained underground storage tanks ("<u>UST's</u>"), which have been removed.

(b)     <u>Environmental Law Compliance</u>.  Except as set forth in <u>paragraph 5.1.4</u> below, Seller makes no representations or warranties to Buyer as to the compliance of the UST's with applicable Environmental Laws.

5.      **<u>Representations and Warranties of Seller and Buyer</u>**.

5.1     Seller warrants to Buyer as follows:

5.1.1   <u>Corporate Existence and Authority</u>.  Seller is a Florida corporation, and its status is active. Subject to satisfaction of the Approval Condition pursuant to <u>paragraph 7</u> below, Seller has the corporate power and authority to enter this Agreement and to consummate the transactions contemplated herein.

5.1.2   <u>Title to Property</u>. Seller owns fee simple title to the Property, subject to the Permitted Encumbrances, the Credit Agreement Liens and the Other Liens.

5.1.3   <u>Power to Convey</u>. To Seller's Knowledge, and subject to satisfaction of the Approval Condition pursuant to <u>paragraph 7</u> below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Seller of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Seller's knowledge, other than the Bankruptcy Cases, as defined in <u>paragraph 7</u> below, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which would become a cloud on the title to the Property or any portion thereof or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

5.1.4 <u>Compliance with Environmental Laws</u>. To Seller's Knowledge, Seller has not been notified by any Governmental Authority of any noncompliance of the Property with Environmental Laws, including all Laws relating to (i) releases, discharges, emissions or disposal to air, water, land or ground water; (ii) the use, manufacture, importing, generation, treatment, handling or disposal of Hazardous Material or asbestos-containing materials; (iii) the exposure of persons to toxic, hazardous, harmful or other controlled, prohibited or regulated substances; and (iv) all judicial and administrative orders, injunctions, judgments, declarations, directives, notices or demands with respect to the foregoing matters.

5.2 Buyer warrants to Seller as follows:

5.2.1 <u>Existence and Authority</u>. Buyer, or its permitted assigns, has full power and authority to enter this Agreement and to consummate the transactions contemplated herein, and if Buyer's permitted assign is a business entity, such entity is duly authorized, validly existing and active in the state of its formation.

5.2.2 <u>Power to Acquire</u>. To Buyer's knowledge, and subject to satisfaction of the Approval Condition pursuant to <u>paragraph 7</u> below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Buyer of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Buyer's knowledge, other than the Bankruptcy Cases, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

5.2.3 <u>Financial Condition</u>. Buyer represents, warrants and covenants that as of the Effective Date and continuing through the Closing Date, Buyer has and will have the sufficient funds on hand to perform its obligations under this Agreement, including payment of the Purchase Price at Closing.

6. **<u>Survival of Warranties</u>.** The respective warranties of Buyer and Seller above will not survive the Closing but will merge into the Deed, and will have no further force or effect after the Closing, and the liability of Seller under or with respect to the warranties will be limited to the express remedies of Buyer set forth in this Agreement and the Deed.

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

7.    **Closing Conditions**.

7.1    Approval Condition.

7.1.1    Chapter 11 Cases. Winn-Dixie Stores, Inc. and certain of its affiliated companies, including Seller, filed voluntary petitions for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, U.S.C. §101 et seq., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "Filing Date") and have operated its businesses as debtors-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date (the "Bankruptcy Cases").  By order entered on April 13, 2005, the Bankruptcy Cases were transferred to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Bankruptcy Court") where they are being jointly administered under Case No. 05-03817-3F1.

7.1.2    Competitive Bid Process. By Order dated June 20, 2005, the Bankruptcy Court approved bidding procedures and bid protections for use in the sale of assets in the Bankruptcy Cases (the "Bidding Procedures"). This Agreement is subject to the competitive bid process described in the Bidding Procedures.  Promptly following the expiration of the Investigation Period, provided that this Agreement has not earlier terminated, Seller will file a motion with the Bankruptcy Court seeking approval of the transactions contemplated by this Agreement, subject to higher or better offers, and the transfer of the Property free and clear of all claims and liens including the Credit Agreement Liens and the Other Liens, other than Permitted Encumbrances, pursuant, inter alia, to 11 U.S.C. Sections 105, 363 and 1146(c) (the "Sale Motion").  The Bankruptcy Court will set a date for hearing on the Sale Motion and to consider entry of the Sale Order relating to the successful bid (the "Sale Hearing"). Prior to the Sale Hearing, the debtors will conduct an auction pursuant to the Bidding Procedures (the "Auction"). The Bidding Procedures allow Seller to accept competitive bids on the Property to determine the Successful Bid (as that term is defined in the Bidding Procedures) for the Property.  The party submitting the Successful Bid for the Property as selected by Seller is referred to as the "Successful Bidder".  Buyer may participate in the Auction and may submit purchase terms different from those set forth in this Agreement as Buyer may deem appropriate in seeking to become the Successful Bidder.  Prior to the Sale Hearing, upon consultation with the Creditors' Committee and DIP Lender, Seller will select the highest or otherwise best offer to purchase the Property, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, as the Successful

12

Bid.  Seller will submit the Successful Bid to the Bankruptcy Court at the Sale Hearing for entry of a Sale Order with respect to the Property by the Bankruptcy Court, either (a) approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, if Buyer is the Successful Bidder under the terms of this Agreement (or as modified during the Auction) or (b) approving the more favorable terms of purchase and sale offered by the Successful Bidder, whether Buyer or otherwise (the "Sale Order").

7.1.3   Overbid Protection.  As authorized by the Bidding Procedures, and as an inducement to Buyer to enter into this Agreement to acquire the Property at an effective purchase price of $39,300,000, Seller agrees that it will not accept any initial minimum bid that represents an effective net purchase price of less than $39,800,000.

7.1.4   Sale Order Approving Agreement.  It will be a condition to the Closing of the transaction contemplated by this Agreement that the Bankruptcy Court will have issued the Sale Order approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, and such Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Approval Condition").

7.1.5   Continuing Effectiveness of Agreement.  Notwithstanding that Buyer may not be the successful bidder following the Bidding Procedures, this Agreement, as modified by Buyer's last bid made during the Bidding Procedures, will remain in effect in accordance with, and will remain subject to, the Bidding Procedures.  If the Approval Condition is not otherwise satisfied by the Outside Date through no fault of Buyer, or if the sale of the Property closes with another successful bidder, then this Agreement automatically will terminate and Escrow Agent will refund the Deposit to Buyer, and the parties will have no further obligations to the other.

7.1.6   If Buyer is not the Successful Bidder and Buyer has not breached this Agreement, upon Closing of the sale of the Property to the Successful Bidder, Seller shall pay to Buyer the sum of $150,000 as an agreed-upon fee for Buyer's costs and expenses related to entering into this Agreement (the "Break-up Fee").

7.2   Conditions Precedent to Seller's Obligations.  The obligations of Seller under this Agreement are subject to the Approval Condition and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

7.2.1 Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard. All of Buyer's representations and warranties contained in this Agreement will be true and accurate in all material respects as of the Effective Date and the Closing Date.

7.2.2 No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller will have the right to terminate this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations will be determined in accordance with <u>paragraph 11</u> of this Agreement.

8.      **Casualty; Condemnation**. If, prior to Seller's legal delivery to Buyer of the Deed and Buyer's delivery to Seller of the Purchase Price, the Assets or any portion thereof, are destroyed or materially damaged, or made the subject of a condemnation action, then either party will have the right, exercisable by giving notice of such decision to the other within five (5) business days after receiving written notice of such damage, destruction or threatened condemnation, to terminate this Agreement, and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that Buyer will be entitled to the return from the Escrow Agent of the Deposit. If neither party exercises its right of termination and the Assets are sold to Buyer pursuant to the terms of this Agreement, then as Buyer's sole remedies, Seller will assign to Buyer any assignable rights it may have to recover insurance or condemnation proceeds and will promptly pay over and deliver to Buyer any such proceeds received by it.

9.      **Closing**.

9.1     The consummation of the transactions contemplated herein by Buyer and Seller (the "<u>Closing</u>") will be held on or before that date which is ten (10) days following the satisfaction of the Approval Condition (the "<u>Closing Date</u>"), at a time and place mutually acceptable to the parties, but if none is agreed to, at the offices of Closing Agent in Jacksonville, Florida. Closing may be conducted by use of mail-away procedures including escrow and Closing disbursement and delivery of documents and funds administered by Closing Agent.

9.2     Possession of the Assets will be delivered to Buyer on the Closing Date free and clear of all Claims and Interests and rights of third parties whatsoever, subject only to the Permitted Encumbrances.

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

9.3     At the Closing, Seller will deliver to Buyer or Buyer's designee the following:

(i)     The Deed;

(ii)    The Bill of Sale;

(iii)   The Closing Statement;

(iv)    Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered;

(v)     All keys and codes for the Property; and

(vi)    Any other documentation required of Seller under local law.

Buyer may waive compliance by Seller as to any of the foregoing items by an instrument in writing.

9.4     At the Closing, Buyer will execute and/or deliver to Seller the following:

(i)     The Purchase Price;

(ii)    The Closing Statement;

(iii)   Any other document, instruments or agreements called for hereunder for delivery by Buyer that have not previously been delivered; and

(iv)    Any other documentation required of Buyer under local law.

Seller may waive compliance by Buyer as to any of the foregoing items by an instrument in writing.

9.5     On the Closing Date, Seller and Buyer will each deposit such other instruments with Closing Agent as are reasonably required by the Title Insurer to consummate the conveyance of the Property to Buyer in accordance with the terms hereof.

9.6     All ad valorem taxes for the year in which the Closing occurs will be prorated between Seller and Buyer as of midnight immediately preceding the Closing Date. The proration will be based upon the latest available tax figures with known changes (based on earliest payment discount, if any). The tax proration at Closing may be based on an estimate using the previous year's tax amount.  Buyer agrees to notify the taxing authority promptly after Closing of the transfer and assignment of Seller's interest in the Assets to Buyer for purposes of proper tax assessment notifications.

9.7     Any matter specified in paragraph 9.6 of this Agreement that cannot reasonably be determined and apportioned between Seller and Buyer on

15

the Closing Date will be specified by Buyer and Seller in writing at Closing and will be subject to settlement at such time as such matter is finally determined (but in no event later than ninety (90) days after the Closing Date). Additionally, any apportionments, prorations or adjustments that are miscalculated (through mathematical error) at Closing will be subject to recalculation and final settlement at such time as such miscalculation is discovered (but in no event later than ninety (90) days after the Closing Date). Such apportionments will be effective as of the Closing Date.

9.8     At or prior to Closing, Seller will pay the cost of the documentary stamp taxes on the Deed, the cost of the commission payable to Seller's Broker as disclosed in <u>paragraph 10</u>, and Seller's attorneys' fees and costs ("<u>Seller's Closing Costs</u>"). At or prior to Closing, Buyer will pay the cost of the Title Commitment and insurance policy to be issued pursuant to the Title Commitment in the amount of the Purchase Price, the cost of the Survey, the cost of its due diligence investigations of the Property, the cost of the commission payable to Buyer's Broker, all recording fees, all financing costs of Buyer incurred to purchase the Property including simultaneous issue mortgagee title insurance and related endorsements, Buyer's attorneys' fees and costs and all other fees, costs and expenses incurred by the Buyer in connection herewith ("<u>Buyer's Closing Costs</u>"). If this transaction fails to close for any reason, and without waiving any right or remedy that either party may have against the other in the event of a default hereunder, Seller promptly will pay Seller's Closing Costs, and Buyer promptly will pay Buyer's Closing Costs.

10.     **<u>Brokers; Commissions</u>**. Seller and Buyer acknowledge that Buyer has employed Wayne Schuchts and Ed Lyden of CB Richard Ellis ("<u>Buyer's Broker</u>") with respect to the sale of the Property, and Seller has retained DJM Asset Management, LLC ("<u>Seller's Broker</u>") pursuant to Order Authorizing Debtors to Retain DJM Asset Management, LLC as Special Real Estate Consultants to the Debtors, issued by the Bankruptcy Court on June 10, 2005 (the "<u>Retention Order</u>"). Buyer will be responsible for payment of the brokerage commission to Buyer's Broker, and Seller will be responsible for payment of the brokerage commission to Seller's Broker. Each party indemnifies and agrees to hold harmless the other from any claim made by any other broker or agent who claims to act for the party sought to be charged for a commission, compensation, brokerage fees, or similar payment in connection with this transaction and against any and all expense or liability arising out of any such claim.

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

11.    **Default; Remedies**.

11.1    Seller's Default.  If Seller fails to materially comply with or perform any of the covenants, agreements or obligations to be performed by Seller under this Agreement, then Buyer will be entitled to terminate this Agreement by written notice to Seller and promptly following such termination and Buyer's completion of any restoration obligations it may have under paragraph 4.2.4 of this Agreement, without any other action being necessary, Escrow Agent will return the Deposit (and all interest accrued thereon) to Buyer.  Buyer waives all other remedies it may have at law or in equity.

11.2    Buyer's Default.  If Buyer fails to materially comply with or perform any of the covenants, agreements, or obligations to be performed by Buyer under this Agreement, then Seller may elect to terminate this Agreement by written notice to Buyer and thereupon Escrow Agent will deliver the Deposit to Seller as Seller's agreed liquidated final damages, and not as a penalty, it being understood that Seller's actual damages in the event of such default may be difficult or impossible to ascertain.  Seller waives all other remedies it may have at law or in equity.

11.3    Remedies Cumulative.  The foregoing remedies are in addition to any rights afforded either of the parties pursuant to Seller's indemnity under paragraph 10, and Buyer's indemnities under paragraphs 4.2.4, 4.7.2 and 10 and repair obligations otherwise provided under this Agreement.

11.4    Attorneys' Fees.  If either party commences an action against the other to enforce any of the terms hereof or because of the breach by either party of any of the covenants, terms or conditions hereof, the non-prevailing party will pay to the prevailing party its reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution or defense of such action.

12.    **Miscellaneous**

12.1    Notices. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will be in writing and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by telefax, when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient;  (iii) if delivered by United States Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (iv) if given by nationally recognized or reputable overnight delivery service, on the next business day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

17

If to Seller:

>Winn-Dixie Stores, Inc.
>5050 Edgewood Court
>Jacksonville, Florida 32254-3699
>Attn:  Catherine Ibold
>Telefax No. (904) 783-5138

With a copy to:

>Smith, Gambrell & Russell, LLP
>50 N. Laura Street, Suite 2600
>Jacksonville, Florida 32202
>Attention: Douglas Stanford
>Telefax No.:  (904) 598-6226

If to Buyer:

>Associated Grocers of Florida, Inc.
>7000 NW 32nd Avenue
>Miami, Florida 33147
>Attn: Calvin Miller
>Telefax No. (305) 696-0080

With a copy to:

>Sims Moss Kline and Davis, LLP
>3 Ravinia Drive, Suite 1700
>Atlanta, Georgia 30346-2133
>Attention: Jerry Sims
>Telefax No.:  866-825-3791

If to Escrow Agent or Closing Agent:

>Smith, Gambrell & Russell, LLP
>50 N. Laura Street, Suite 2600
>Jacksonville, Florida  32202
>Attention: Douglas Stanford
>Telefax No.:  (904) 598-6226

or such other address as any of the foregoing parties may from time to time specify by notice to the others.

12.2    <u>Successors And Assigns: Assignment Of Agreement</u>. All terms of this Agreement will be binding upon, and will inure to the benefit of and be enforceable by the parties hereto and their respective legal representatives, heirs, successors and assigns.   Except as set forth below, this Agreement may not be assigned by either party without the express written consent of the other.   Buyer may assign its rights and obligations under this Agreement to an Affiliate as the "Buyer" hereunder, provided, however, that Buyer shall remain fully liable for

performance of the obligations, including indemnifications, of the "Buyer" hereunder.

12.3   <u>Changes And Modifications; Prior Agreements</u>.  This Agreement may not be orally changed, modified or terminated; it supersedes any and all prior understandings and/or letter agreements; other matters of similar nature will be deemed to be of no force or effect in the interpretation of this Agreement, it being intended that this Agreement represents the entire understanding of the parties.  No waiver of any provision hereof will be valid unless in writing and signed by a party against whom it is to be enforced.

12.4   <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of Florida.  Any dispute arising out of or under this Agreement will be litigated in the Bankruptcy Court.

12.5   <u>Time is of the Essence</u>.  Time is of the essence of this Agreement.

12.6   <u>Captions</u>.  The captions of this Agreement are inserted for convenience or reference only and not to define, describe or limit the scope or the intent of this Agreement or any term hereof.

12.7   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same instrument; facsimiles of this Agreement as so executed will be deemed to constitute a counterpart hereof.

12.8   <u>Radon Gas</u>.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county health department.

12.9   <u>Waiver Of Trial By Jury</u>.  Buyer and Seller each agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or the Assets undesirable.  Accordingly, Buyer and Seller each specifically waive any right to a trial by jury that either of them may have in any court with respect to any action relating to this Agreement or the Assets.  The foregoing waiver is made knowingly, voluntarily and intentionally by both Buyer and Seller.

13.   **<u>Consent to Jurisdiction.</u> UNTIL THE BANKRUPTCY CASE IS CLOSED, THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.**

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

Buyer and Seller further agree that, until the Bankruptcy Case is closed or a court finds that the subject-matter jurisdiction is not available in the Bankruptcy Court, service of any process, summons, notice or document by U.S. Registered Mail to any such party's respective address set forth in <u>paragraph 12.1</u> of this Agreement shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above.  Until the Bankruptcy Case is closed or a court finds that the subject-matter jurisdiction is not available in the Bankruptcy Court, each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

14.    **Escrow Agent**.

14.1    <u>Duties</u>.  By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Escrow Agent agrees to promptly deposit the Initial Deposit and the Second Deposit, upon receipt thereof, in an interest bearing account, to hold the same in escrow, and disburse the same in accordance with this Agreement.  Although interest accrued on the Deposit will be payable to the party entitled to the Deposit at such time as the Deposit it paid, interest accrual will be deemed to belong to Buyer for federal and state income tax purposes. Escrow Agent will release the Deposit only as expressly provided in this Agreement.

14.2    <u>Limitations of Liability</u>.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent.

14.3    <u>Role as Counsel</u>.  The parties acknowledge that Escrow Agent also serves as special real estate counsel to Seller.   In the event of a dispute between Seller and Buyer concerning this Agreement to the Property, Escrow Agent may continue to serve both in its capacity as counsel to Seller and in its capacity as Escrow Agent, it being understood that Escrow Agent's duties and obligations as Escrow Agent are purely ministerial in nature.

14.4    <u>Withdrawal</u>.  No party will have the right to withdraw any monies or documents deposited by it with Escrow Agent prior to the closing or termination of this Agreement except in accordance with the terms of this Agreement.

14.5    <u>Dispute</u>.  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest accrued thereon until the matter is resolved either by joint written direction from the parties or by the court having jurisdiction of the dispute or Escrow Agent may interplead the

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

same in such court and be relieved of any and all liability therefore.  In any action or proceeding regarding the escrowed funds or interest accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal).

**[Signatures on following page]**

Facility Purchase Agreement
Winn-Dixie Stores, Inc. S/T Associated Grocers of Florida, Inc.
Pompano Distribution Center – Pompano Beach, FL
April 6, 2006
SGRJAX\83060.3

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

Signed, sealed and delivered in the presence of:

**SELLER:**

**WINN-DIXIE STORES, INC.**, a Florida corporation

By: _____

Name:_____    Name: _____

Title: Senior Vice President

Name:_____    [Corporate Seal]

Signed, sealed and delivered in the presence of:

**BUYER:**

**ASSOCIATED GROCERS OF FLORIDA, INC.**, a Florida corporation

By: _____

Name:_____    Name: _____

Title: _____

Name:_____    [Seal]

SCHEDULE OF EXHIBITS

| Exhibit A | - | Legal Description of Land |
| Exhibit B | - | Schedule of Excluded Personal Property |
| Exhibit C | - | Schedule of Permitted Encumbrances |
| Exhibit D | - | Form of Deed |

The undersigned, Escrow Agent, hereby consents and joins in the execution of this Facility Purchase Agreement for the limited purposes stated herein.

**SMITH, GAMBRELL & RUSSELL, LLP**


By: _____
Name: Douglas G. Stanford
Title: Partner

Dated: April _____, 2006

## EXHIBIT A

LEGAL DESCRIPTION OF PROPERTY

All that certain tract or parcel of land situate, lying and being at Pompano Beach, County of Broward, State of Florida, and described as follows, to wit:

A portion of the Southwest one-quarter (SW 1/4) of Section 2, Township 49 South, Range 42 East, and a portion of the Southeast one-quarter (SE 1/4) of Section 3, Township 49 South, Range 42 East, being all more fully described as follows:

Beginning at the intersection of the South line of the North 500 feet, as measured at right angles, of the said Southeast one-quarter (SE 1/4) of Section 3 and the East right of way line of the Seaboard Coast Line Railroad; thence North 13°16'09" East along said East right of way line a distance of 261.07 feet to a point on a curve; thence Southeasterly along a curve to the left whose chord makes an included angle of 32°50'06" with the last mentioned course, with a radius of 378.40 feet and a central angle of 9°23'16", an arc distance of 62.0 feet to a point of tangency; thence Southeasterly a distance of 64.0 feet to a point of curve; thence Southeasterly along a curve to the left, with a radius of 323.62 feet and a central angle of 38°59'04", an arc distance of 220.19 feet to a point on the said South line of the North 500 feet of the Southeast one-quarter (SE 1/4) of Section 3; thence South 85°50'47" East along the South line of the said North 500 feet of the Southeast one-quarter (SE 1/4) of Section 3, a distance of 598.36 feet; thence South 04°09'13" West a distance of 50.0 feet; thence South 85°50'47" East along the South line of the North 550 feet, as measured at right angles, of the said Southeast one-quarter (SE 1/4) of Section 3, a distance of 1,452.13 feet; thence South 89°19'56" East along the South line of the North 550 feet, as measured at right angles, of the said Southwest one-quarter (SW 1/4) of Section 2 a distance of 301.39 feet to a point; thence South 0°06'45" West 25.0 feet to a point; thence South 85°50'47" East 50.12 feet to a point on the West right of way line of North Andrews Avenue (100 foot right of way); thence South 0°06'45" West along the said West right of way line a distance of 189.84 feet to a point of curve; thence Southerly along a curve to the right with a radius of 1860.08 feet and a central angle of 16°57'05" an arc distance of 550.32; thence North 87°58'24" West along a line 1344.05 feet North of, as measured at right angles and parallel to the South line of, said Section 3 a distance of 2776.74 feet to a point on the said East right of way line of the Seaboard Coast Line Railroad; thence North 13°16'09" East along the said East right of way line a distance of 907.11 feet to the POINT OF BEGINNING.

## **EXHIBIT B**

SCHEDULE OF EXCLUDED PERSONAL PROPERTY

All furniture, furnishings, trade fixtures and movable equipment, including hoist system, and all other tangible and intangible personal property, but not including the racking system (e.g. the racking system is included in Assets to be conveyed to Buyer).

**EXHIBIT C**

SCHEDULE OF PERMITTED ENCUMBRANCES

1.      Taxes and assessments for the year **2006** and subsequent years, which are not yet due and payable.

2.      Underground Storm Drainage Easement recorded in Book 5322, Page 771.

3.      Agreement between Seaboard Coast Line Railroad Company and Winn-Dixie Stores, Inc. recorded in Book 5670, Page 396.

4.      Ordinance No. 87-53 recorded in Book 14747, Page 157.

5.      Easement granted to Broward County by instrument recorded in Book 17108, page 404.

6.      Easement granted to Florida Power & Light Company by instrument recorded in Book 30974, page 264.

7.      Petroleum, Mineral and Road Reservations contained in Deed from the Trustees of the Internal Improvement Fund of the State of Florida, filed in Deed Book 598, page 175, as affected by Quit Claim Deed filed in Book 878, page 640 and by Quit Claim Deed filed in Book 5615, page 109.

All official records book and page references are to public records of Broward County, Florida.

## EXHIBIT D

FORM OF DEED

## SPECIAL WARRANTY DEED

**THIS SPECIAL WARRANTY DEED**, is given this _____ day of _____, 2006, by **WINN-DIXIE STORES, INC.**, a Florida corporation, whose address is 5050 Edgewood Court, Jacksonville, Florida 32254 ("Grantor") to **ASSOCIATED GROCERS OF FLORIDA, INC.**, a Florida corporation, whose mailing address is 7000 NW 32nd Avenue, Miami, Florida 33147 ("Grantee").

W I T N E S S E T H:

That Grantor, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, to it in hand paid by Grantee, the receipt and sufficiency of which is hereby acknowledged, has granted, bargained, sold and conveyed unto Grantee, its successors and assigns, forever, that parcel or parcels of land, situate, lying and being in the County of Broward, State of Florida, as more particularly described on Exhibit A attached hereto ("Property"), together with all tenements, hereditaments and appurtenances belonging thereto.

TO HAVE AND TO HOLD the same unto Grantee in fee simple forever.

AND Grantor does hereby fully warrant the title to the Property and will defend the same against the lawful claims of all persons claiming by, through or under Grantor, but against none other, subject, however, to the permitted encumbrances identified as attached Exhibit B.

IN WITNESS WHEREOF, Grantor has caused these presents to be executed in its name the day and year first above written.

Signed, sealed and delivered
in the presence of:

**GRANTOR:**

**WINN-DIXIE STORES, INC.,** a Florida corporation

_____
Name:_____

By: _____
Print Name: _____
Its: Senior Vice President

_____
Name:_____


STATE OF FLORIDA
COUNTY OF DUVAL

This instrument was acknowledged before me this _____ day of _____, 2006, by _____, the Senior Vice President of Winn-Dixie Stores, Inc., a Florida corporation, on behalf of the corporation.  He either [____] is personally known to me or [____] has produced _____ as identification.

Print Name:_____
Notary Public, State of Florida
Commission No.:_____
My Commission Expires:_____

[NOTARY SEAL]

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

**ORDER (A) AUTHORIZING THE DEBTORS TO SELL**
**POMPANO BEACH DISTRIBUTION CENTER AND RELATED**
**ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS AND**
**(B) GRANTING RELATED RELIEF**

These cases came before the Court upon the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004(g) (a) authorizing the Debtors to sell the Pompano Beach Distribution Center and attached improvements to Associated Grocers of Florida, Inc. (the "Purchaser") or to the party submitting a higher or otherwise better offer, free and clear of liens, claims, interests and encumbrances and (b) granting related relief (the "Motion").[1]  A hearing on the Motion was held by the Court on May 18, 2006 (the "Sale Hearing").   The Court has read the Motion and has considered the representations of counsel.  Upon the representations of counsel and without objection by the United States Trustee or any other interested party, the Court makes the following findings of fact:

---

[1] All capitalized terms not otherwise defined by this Order shall have the meaning ascribed to them in the Motion or the Facility Agreement.

00527623.DOC

A.    This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

B.    The Debtors solicited the highest or otherwise best offer for the assets described in the Facility Agreement (the "Assets") in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 20, 2005 (the "Bidding Procedures").

C.    The Debtors have provided interested parties (including all parties asserting claims on interests of the Assets, if any) with proper notice of the Motion, the Auction, the Sale Hearing and the transactions contemplated by the sale pursuant to 11 U.S.C. §§ 102(1), 105(a), 363 and Fed. R. Bankr. P. 2002 and 6004 and Local Rule 2002-1, the Bid Order.

D.    A reasonable opportunity to object or be heard with respect to the Motion and the sale of the Assets has been afforded to all parties in interest (including all third parties asserting Interests or Claims (as such terms are defined below) in, to or against the Assets, if any).

E.    The Debtors marketed the Assets and conducted the sale process in compliance with the Bidding Procedures Order.  The bidding on the Assets and the Auction (if any) were conducted in a non-collusive, fair and good faith manner.  Through the Debtors' marketing efforts and Auction process, the Debtors afforded all interested parties a reasonable opportunity to make higher or betters offers to purchase the Assets.

F.    The Debtors (i) have full corporate power and authority to execute and consummate the Facility Agreement attached as Exhibit A to this Order and all related documents, and the sale of the Assets has been duly and validly authorized by all

2

necessary corporate action of the applicable Debtors; and (ii) no consents or approvals, other than those expressly provided for in the Facility Agreement, are required to consummate the transactions contemplated by the Facility Agreement.

G.    The Debtors have good business reasons to sell the Assets prior to filing a plan or reorganization pursuant to 11 U.S.C. § 363(b).

H.    Neither Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

I.    The Facility Agreement was proposed, negotiated and entered into by the Debtors and the Purchaser without collusion, in good faith and at arms'-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Facility Agreement to be avoided under 11 U.S.C. § 363(n).

J.    The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m).

K.    The consideration being provided by the Purchaser to the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value and fair consideration for the Assets.

L.    The Debtors' transfer of the Assets to the Purchaser pursuant to the Facility Agreement will be a legal, valid, and effective transfer of the Assets, and will vest the Purchaser with good and valid title in and to the Assets free and clear of any lien, interest or encumbrance of any kind or nature (collectively, the "Interests") and claim (as

such term is defined in 11 U.S.C. § 101(5)) ("Claims") with the exception of the Permitted Encumbrances, as defined in the Facility Agreement.

  M. The Debtors may sell and transfer the Assets free and clear of all Interests and Claims (other than the Permitted Encumbrances) because any entity with any Interests or Claims, if any, in the Assets to be transferred (i) has consented to the sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest; or (iii) otherwise falls within the provisions of 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Interests and Claims, if any, who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2).

  N. The Debtors will cause the net proceeds from the sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order"), and the Loan Documents (as defined in the Final Financing Order).

00527623.DOC

O.     The Court's approval of the Facility Agreement and the sale of the Assets to the Purchaser are in the best interests of the Debtors, their estates, their creditors and other parties in interest.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.     The Motion is granted.

2.     Any objections to the entry of this Order or to the relief granted and requested in the Motion that have not been withdrawn, waived or settled are denied and overruled in their entirety.

3.     The terms and conditions of the Facility Agreement are approved. Pursuant to 11 U.S.C. §§ 105(a), 363(b) and this Order, the Debtors are authorized to consummate the sale in accordance with the terms and conditions of the Facility Agreement.

4.     The Debtors are authorized to consummate and implement fully the Facility Agreement, together with all additional instruments and documents that are reasonably necessary to implement the Facility Agreement, and the Debtors are authorized to take all further actions as reasonably necessary for the purpose of conveying the Assets to the Purchaser, or as may be necessary or appropriate to the performance of the Debtors' obligations under the Facility Agreement.

5.     Any agreements, documents, or other instruments executed in connection with the Facility Agreement may be modified, amended, or supplemented by the parties without further order of the Court; provided, however, that, (a) the Debtors will first obtain the prior written consent of (i) the DIP Lender and (ii) the Creditors' Committee, which consent will not be unreasonably withheld and (b) any such

modification, amendment or supplement does not have a materially adverse effect on the Debtors' estates.

6.      The Debtors will transfer the Assets to the Purchaser upon Closing free and clear of all Interests and Claims (except for the Permitted Encumbrances).   The only Claims and/or Interests in the Assets are those with the DIP Lender.   The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds of the sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

7.      The Debtors' transfer of the Assets to the Purchaser is a legal, valid, and effective transfer of the Assets and will vest the Purchaser with all right, title and interest of the Debtors in and to the Assets, free and clear of all Interests and Claims (except for the Permitted Encumbrances).

8.      The Debtors will cause the net proceeds from the sale to be paid to the DIP Lender to the extent required in accordance with the terms and conditions of the Final Financing Order and the Loan Documents.

9.      The consideration provided by the Purchaser for the Assets constitutes reasonably equivalent value and fair and reasonable consideration under the Bankruptcy Code and applicable non-bankruptcy law, and may not be avoided under 11 U.S.C. § 363(n).

10.     Upon the Closing of the sale in accordance with the Facility Agreement and this Order, the Purchaser is deemed to have acted in good faith in purchasing the Assets, as that term is used in 11 U.S.C § 363(m).   Accordingly, the reversal or modification on appeal of the authorization to consummate the sale of the

00527623.DOC

Assets will not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

11.     All entities who are presently in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors.  Each of the Debtors' creditors is authorized and directed to execute any and all documents and take all other actions as may be necessary to release its Interests in and Claims against the Assets (except for the Permitted Encumbrances) (provided that the taking of such actions shall not require such creditor to incur any material costs) as such Interests and Claims may have been recorded or may otherwise exist.  In the event any creditor fails to release its Interests in or Claims against the Assets, the Debtors are authorized to file or record a copy of this Order.  Once filed, registered or otherwise recorded, this Order will constitute conclusive evidence of the release of all Interests in and Claims against the Assets (except for the Permitted Encumbrances).

12.     The Debtors' transfer of the Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances) against the Debtors or against an insider of the Debtors and (b) the Purchaser having any liability to the Debtors except as expressly stated in the Facility Agreement and this Order.

13.     Other than the Permitted Encumbrances and other obligations of the Purchaser as set forth in the Facility Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets.  The Debtors' transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or

7

assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

14.    This Order is and shall be effective as a determination that any and all Interests or Claims (other than Permitted Encumbrances) are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

15.    Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to the Purchaser.  Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Facility Agreement.

16.    This Order is binding in all respects upon, and inures to the benefit of, the Debtors, their estates and creditors, the Purchaser and its respective affiliates, successors and assigns, and this Order is binding in all respects upon all persons asserting an Interest in or Claim against the Debtors' estates or the Assets.  The sale is enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee of the Debtors and their estates.

17.    During the pendency of the Debtors' jointly administered cases, this Court will retain exclusive jurisdiction (a) to enforce and implement the Facility Agreement and any agreements and instruments executed in connection with the Facility Agreement, (b) to compel delivery of possession of the Assets to the Purchaser, (c) to

8

resolve any disputes, controversies or claims arising out of or relating to the Facility Agreement and (d) to interpret, implement, and enforce the provisions of this Order.

18.     All persons and entities that hold Interests in or Claims against the Debtors or the Assets are forever barred, estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the sale of the Assets.

19.     Nothing contained in any plan of reorganization or liquidation confirmed in these chapter 11 cases, or any order of this Court confirming such a plan, or any other order entered in these chapter 11 cases or in any subsequent chapter 7 cases will conflict with or derogate from the terms of this Order.

20.     The failure specifically to include any particular provision of the Facility Agreement in this Order will not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Facility Agreement be authorized and approved in its entirety.

21.     After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the

9

Facility Agreement.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Facility Agreement.

22.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Facility Agreement and this Order, the provisions contained in the this Order will control.

23.    Notwithstanding Fed. R. Bankr. P. 6004(g), this Order will take effect immediately upon entry.

Dated this ____ day of May, 2006 in Jacksonville, Florida.

_____
Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed
to serve a copy of this Order
on all persons served with
the Motion.

10