Hearing Date: May 4, 2006, 1:00 p.m.
Objection Deadline: May 1, 2006, 4:00 p.m.

# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

| | |
|---|---|
| In re: | ) Case No. 05-03817-3F1 |
| | ) |
| WINN-DIXIE STORES, INC., et al., | ) *Chapter 11* |
| | ) |
| Debtors.[1] | ) Jointly Administered |

## APPLICATION FOR AUTHORITY TO RETAIN DELOITTE FINANCIAL ADVISORY SERVICES LLP AND DELOITTE CONSULTING LLP TO PROVIDE FRESH-START ACCOUNTING SERVICES

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), move the Court for entry of an order under 11 U.S.C. § 327(a) approving the retention of Deloitte Financial Advisory Services LLP ("Deloitte FAS") and Deloitte Consulting LLP ("Deloitte Consulting") nunc pro tunc to March 14, 2006 to provide fresh-start accounting services in connection with implementation of a plan of reorganization and emergence from chapter 11.  In support of the Application, the Debtors state as follows:

### Background

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 as amended (the "Bankruptcy Code").  The Debtors' cases are being jointly administered for procedural purposes only.

---

[1]      In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

2.      The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On March 1, 2005, pursuant to section 1102 of the Bankruptcy Code, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases.  An official committee of equity security holders appointed by the U.S. Trustee on August 17, 2005, was subsequently disbanded by the U.S. Trustee by notice dated January 11, 2006.

4.      This Court has jurisdiction over the Motion under 28 U.S.C. § 1334.  Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      The statutory predicate for the relief requested by this Application is section 327(a) of the Bankruptcy Code, and such relief is subject to Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Relief Requested

6.      By this Application, the Debtors request an order pursuant to section 327(a) of the Bankruptcy Code, approving the retention of Deloitte FAS and Deloitte Consulting to provide fresh-start accounting services in connection with implementation of a plan of reorganization and emergence from chapter 11, in each case nunc pro tunc to March 14, 2006.  The Debtors request that Deloitte FAS and Deloitte Consulting be retained to provide such services on the terms provided in this Application and in the letter agreement between the Debtors and Deloitte FAS dated April 13,

2006 (the "Engagement Letter").  A copy of the Engagement Letter is attached as Exhibit A to this Application.

### Basis for Relief

7.      Throughout the course of these cases, the Debtors have made substantial progress in improving their businesses so as to provide a platform from which to emerge successfully from chapter 11.  As a result of this progress, and notwithstanding significant open issues, the Debtors are, in consultation with the Creditors Committee, in the process of negotiating what they hope will be a consensual plan of reorganization and disclosure statement, and of preparing for their emergence from chapter 11.

8.      Upon emerging from chapter 11, the Debtors must comply with SOP 90-7, *Financial Reporting by Entities in Reorganization Under the Bankruptcy Code* issued by the Accounting Standards Board of the American Institute of Certified Public Accountants ("SOP 90-7"), which requires, among other things, that the Debtors (a) record the effects of their plan of reorganization, (b) revalue their assets and liabilities in their books of entry, and (c) develop an emergence balance sheet (collectively, "Fresh-Start Accounting").  The Debtors propose to engage Deloitte FAS and Deloitte Consulting to provide the services described in the Engagement Letter to ensure that the Debtors are able to comply with the Fresh Start Accounting.  Although Deloitte FAS will provide most of the services related to Fresh-Start Accounting, the Debtors wish to employ Deloitte Consulting to assist Deloitte FAS with such services, as necessary.

9.      The proposed retention of Deloitte FAS and Deloitte Consulting as contemplated by this Application is critical to ensure that the Debtors are able to comply with the Fresh-Start Accounting required upon their emergence from chapter 11.  Deloitte FAS has substantial experience in providing similar services to other companies in chapter 11.  Moreover, as

is contemplated here, in providing services to its clients, Deloitte FAS is routinely assisted by Deloitte Consulting with respect to services for which Deloitte Consulting has specialized knowledge.  Accordingly, the proposed retention of Deloitte FAS and Deloitte Consulting on the terms set forth in this Application and in the Engagement Letter is in the best interest of the Debtors, their estates, creditors, and other parties in interest.

10.     None of the Debtors' other professionals have been retained to provide Fresh-Start Accounting Services.  The Debtors have previously retained Deloitte Consulting and Deloitte & Touche LLP ("Deloitte & Touche") to provide services during these cases pursuant to separate engagements.  Although they are affiliates of Deloitte FAS, the services provided to the Debtors by Deloitte Consulting and Deloitte & Touche as part of their separate engagements do not involve Fresh-Start Accounting.  Deloitte Consulting has provided in-store consulting services to assist the Debtors in developing and initiating in-store operational initiatives.  Deloitte & Touche has provided the Debtors with internal audit risk assessment, quality assessment, and journal entry testing services unrelated to Fresh-Start Accounting.  Accordingly, the Fresh-Start Accounting services proposed to be provided by Deloitte FAS and Deloitte Consulting pursuant to this Application are not duplicative of the services already being provided by Deloitte Consulting, Deloitte & Touche, or any of the Debtors' other professionals.

11.     Subject to the Court's approval of this Application, Deloitte FAS and Deloitte Consulting have indicated their willingness to provide the plan- and emergence-related accounting services required by the Debtors.

12.     To the best of the Debtors' knowledge, except as set forth in (a) this Application, (b) the declaration of Anthony Sasso on behalf of Deloitte FAS dated April 14, 2006, and attached as Exhibit B to this Application (the "Sasso Declaration"), (c) the declaration of Robert

4

W. Pagano on behalf of Deloitte Consulting dated April 14, 2006 and attached as Exhibit C to this Application (the "Pagano Declaration"), and (d) the affidavit of Anthony D. Forcum on behalf of Deloitte Consulting dated May 19, 2005 and attached as Exhibit B to the Debtors' Application for Authority to Retain Deloitte Consulting LLP to Provide In-Store Operational Consulting Services to the Debtors (Docket No. 1486): (a) Deloitte FAS and Deloitte Consulting neither hold nor represent any interest adverse to the Debtors' estates; (b) neither Deloitte FAS nor Deloitte Consulting have had any affiliation with the Debtors, their creditors or any party in interest, or to the Debtors' attorneys that are known to Deloitte FAS and Deloitte Consulting to be assisting the Debtors in these cases, and the personnel expected to provide services to the Debtors on behalf of Deloitte FAS and Deloitte Consulting pursuant to the Engagement Letter are not related to the United States Trustee assigned to these cases, any person employed in the office of such United States Trustee, or the Bankruptcy Judge presiding over these cases; and (c) each of Deloitte FAS and Deloitte Consulting is a "disinterested person" within the meaning of sections 101(14) and 327(a) of the Bankruptcy Code.[2]

13.    The Debtors have agreed to pay the following hourly rates for the projects and services described in the Engagement Letter: (a) $600-$750 for partners/principals/directors, (b) $480-$580 for senior managers, (c) $380-$500 for managers, (d) $275-$375 for senior staff, (e) $190 to $250 for staff, and (f) $75 for paraprofessionals. The Debtors have been advised that these

---

[2]    As previously indicated, the Debtors have previously retained under section 327(a) of the Bankruptcy Code Deloitte Consulting and Deloitte & Touche, affiliates of Deloitte FAS, to provide services that are unrelated to Fresh-Start Accounting and the services proposed to be provided by Deloitte FAS. As of the Petition Date, Deloitte Consulting was owed $209,411 for services provided to the Debtors and expenses incurred. Subsequent to the Petition Date, but prior to May 16, 2005 (the date on which Deloitte Consulting was retained in these cases), Deloitte Consulting provided services to the Debtors totaling $95,842 and incurred $18,003 in expenses, each in support of certain initiatives relating to the Debtors' perishable trading network (such amounts and the $209,411 prepetition claim collectively, the "DC Pre-Engagement Claim"). In the interest of continuing its relationship with the Debtors and to meet the requirements of disinterestedness under the Bankruptcy Code in connection with its separate retention application (which was approved by an order of this Court dated June 16, 2005 and filed at Docket No. 1749), Deloitte Consulting agreed that it would not seek any recovery from the Debtors for the DC Pre-Engagement Claim. No amounts were owing to Deloitte FAS as of the Petition Date.

are typical rates charged by Deloitte FAS and Deloitte Consulting for similar services.  The Debtors have also been advised that, during the normal course of business, these hourly rates are revised to reflect changes in responsibilities, increased experience, geographic differentials, and increased costs of doing business and that such changes will be noted on the invoices for the first time period in which the revised rates become effective.  In addition, the Debtors have agreed to pay for reasonable and necessary expenses incurred by Deloitte FAS and Deloitte Consulting in connection with this engagement, which expenses may include travel, telephone costs, meals, and other necessary costs in providing services to the Debtors and that may be incurred in considering or responding to any legal, regulatory, or other proceedings as a result of this engagement, each in accordance with Deloitte FAS's and Deloitte Consulting's customary reimbursement policies.

14.     Deloitte FAS will file fee applications with the Court in accordance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules, and orders of this Court.  Such fee applications will include and separately designate amounts due on account of work performed by personnel from Deloitte Consulting in connection with this engagement.

15.     Additionally, because the Fresh Start Accounting Services are unrelated to the services provided in connection with this Court's order authorizing the provision of in-store consulting services by Deloitte Consulting and filed at Docket No. 1749 (the "DC Order"), the amounts due for services performed by Deloitte Consulting in connection with this Application will not count toward the $3,375,000 fee cap described in paragraph 5 of the DC Order.

16.     The Engagement Letter also provides for (a) a limitation on any damages that may be recoverable by the Debtors against Deloitte FAS, except to the extent any such damages result from gross negligence, willful misconduct, bad faith, or self-dealing by Deloitte FAS or its

subcontractors, and (b) an indemnification from the Debtors in favor of Deloitte FAS against claims

of third parties, except to the extent any such claims result from gross negligence, willful misconduct,

bad faith, or self-dealing by Deloitte FAS or its subcontractors.

## Notice

17.     Notice of this Motion has been provided to (a) counsel to the United States

Trustee, (b) counsel for the Debtors' postpetition secured lenders, (c) counsel for the Creditors

Committee, (d) the other parties in interest named on the Master Service List maintained in these

cases, (e) Deloitte FAS, and (f) Deloitte Consulting.  No other or further notice need be given.

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the

Court (a) enter an order in the form of Exhibit D to this Application approving the retention of

Deloitte FAS and Deloitte Consulting to provide fresh-start accounting services in connection with

implementation of a plan of reorganization and emergence from chapter 11, in each case _nunc pro_

_tunc_ to March 14, 2006 and (b) grant such other and further relief as the Court deems just and

proper.

Dated:  April 18, 2006.

SKADDEN, ARPS, SLATE, MEAGHER          SMITH HULSEY & BUSEY
& FLOM LLP

By ____*s/ D. J. Baker*_____          By ____*s/ Cynthia C. Jackson*_____
      D. J. Baker                              Stephen D. Busey
      Sally McDonald Henry                     James H. Post
      Rosalie Walker Gray                      Cynthia C. Jackson,
      David M. Turetsky                        Florida Bar Number 498882
Four Times Square                        225 Water Street, Suite 1800
New York, New York 10036                 Jacksonville, Florida  32202
(212) 735-3000                           (904) 359-7700
(212) 735-2000 (facsimile)               (904) 359-7708 (facsimile)
djbaker@skadden.com                      cjackson@smithhulsey.com

Co-Counsel for the Debtors               Co-Counsel for the Debtors

**Exhibit A**

# Deloitte.

Deloitte Financial Advisory
Services LLP
Two World Financial Center
New York, NY 10281-1414
USA

Tel:  1 212 436 2000
Fax:  1 212 436 5000
www.deloitte.com

April 13, 2006

Mr. Bennett Nussbaum
Chief Financial Officer
Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, FL  32254

Dear Bennett:

Pursuant to your request, Deloitte Financial Advisory Services LLP ("Deloitte FAS") is pleased to have the opportunity to assist Winn-Dixie Stores, Inc. and its affiliates (including, but not limited to, its affiliated debtors) ("Winn-Dixie", or, the "Debtor") by providing the services described herein. This letter, including Deloitte FAS's General Business Terms attached as Appendix A, sets forth the agreement (collectively, the "Agreement") between Winn Dixie and Deloitte FAS, effective as of March 14, 2006.

On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Bankruptcy Code. The proceedings have progressed toward the facilitation of a plan of reorganization with the goal to emerge from bankruptcy. As a result, the Debtor will be required to record the effects of its plan of reorganization and revalue it's assets and liabilities under Fresh-Start (if applicable) in its books of original entry as of the reporting date in conformity with all applicable accounting standards. The Debtor desires to hire Deloitte FAS to assist in the planning and implementation of its emergence accounting requirements.

As a result, Winn Dixie agrees that it will promptly seek the Bankruptcy Court's approval of this engagement. The application, proposed order and other supporting documents (collectively, the "Application") submitted to the Bankruptcy Court seeking its approval of this engagement must be satisfactory to Deloitte FAS in all respects.

For purposes of this letter, "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Middle District of Florida (Jacksonville).

Winn-Dixie Stores, Inc.
Mr. Bennett Nussbaum
April 13, 2006
Page 2

## PROJECT OBJECTIVES

### Fresh-Start Accounting and Valuation

It is our understanding that Winn-Dixie requires assistance with the determination of the accounting impact of its Plan of Reorganization, including an emergence balance sheet (the "Fresh-Start Balance Sheet") in accordance with SOP 90-7, *Financial Reporting by Entities in Reorganization under the Bankruptcy Code*, issued by the Accounting Standards Board of the AICPA ("SOP 90-7), and other activities surrounding its implementation (collectively, "Fresh-Start Accounting"). All activities performed by the project team will be governed and approved by Winn-Dixie's management. The following activities constitute the scope of work requested by Winn-Dixie from Deloitte FAS.

## SCOPE OF SERVICES

### Fresh-Start Accounting

We expect that our Fresh-Start Accounting services may include, but not be limited to, the following:

❑ *Assistance with Disclosure Statement and Financial Projections*
  - o Assist management in applying Fresh-Start adjustments to and disclosures for the projected financial information

❑ *Preparation and substantiation of Fresh-Start Balance Sheet under SOP 90-7*
  - o Assist management in the development of an implementation approach for Fresh-Start Accounting, culminating in a strategy and work plan for the project
  - o Assist management in connection with its recording of adjustments to reflect the impact of the discharge of debt and other plan of reorganization requirements, including the related tax implications
  - o Assist management in connection with its recording of adjustments to assets and liabilities in accordance with SFAS 141 as required by SOP 90-7
  - o Assist management with its preparation of analyses supporting adjustments
  - o Assist management with responses to requests from Winn-Dixie's external auditors with respect to Fresh-Start Accounting

❑ *Posting of Fresh-Start entries back to books of entry*
  - o Assist management in connection with its determination of plan of reorganization-related and re-valuation adjustments necessary to record these items to the books of entry of the appropriate legal entities, including, if necessary, preparation of supporting materials

Winn-Dixie Stores, Inc.
Mr. Bennett Nussbaum
April 13, 2006
Page 3

- o   Work with accounting, legal and tax advisors to assist management in determining the allocation of the earnings impact to separate legal entities within the Winn-Dixie structure in accordance with statutory requirements
- o   Assist management in connection with its estimating of recoveries to claimants for accrual accounting purposes, including comparisons with Winn-Dixie's claims database to estimate liabilities related to contingent, unliquidated and disputed claims
- o   Assist management in its allocation of reorganization value to Winn-Dixie's legal entities

❑ *Application Support*

- o   Assist management in its preparation and implementation of the accounting treatments and systems updates required for Fresh-Start Accounting implementation as of the Fresh-Start reporting date. Commonly, the financial systems impacted by the process include the General Ledger, Accounts Payable and Fixed Assets. Other applications may be impacted based upon the impact of the bankruptcy and valuation efforts. Application support includes the following items as required.
    - ▪   Definition of specific processing requirements
    - ▪   Programming specifications
    - ▪   Application configuration and set-up
    - ▪   Interface development
    - ▪   Data cleansing and reconciliation
    - ▪   Project management and administration

**Valuation Services**

❑ *Assistance and valuation work per Fresh-Start under SOP 90-7*

- o   Assist management with the identification of tangible and intangible assets
- o   Assist Management with it's estimate of the fair value of specific assets and liabilities, including performing valuations of certain assets and liabilities, as agreed upon with management
- o   Assist with assignment of values to reporting units, as required
- o   Discuss valuation methodology and results with Winn-Dixie's external auditors
- o   Assist Winn Dixie and its advisors with asset and liability valuation adjustments
- o   Assist management with the coordination of Fresh-Start valuation with tax values and tax attribute planning

Winn-Dixie Stores, Inc.
Mr. Bennett Nussbaum
April 13, 2006
Page 4

## Financial Reporting

We expect that financial reporting services may include, but not be limited to, the following:

❑ *Assistance with Financial Reporting*
   o   Assist management in preparing supporting accounting information for timely record keeping matters and reporting requirements
   o   Assist management in preparing accounting information and disclosures in support of public financial filings such as 10-K or 10-Q's
   o   Assist management with regard to valuation matters that impact financial reporting
   o   Assist management with memoranda supporting accounting positions

## ENGAGEMENT TEAM

The engagement team leaders and their anticipated roles are described below.

Mr. Anthony Sasso, a Director in our Reorganization Services practice, will direct activities associated with accounting treatments. Mr. Sasso has significant experience in advising clients with respect to applicable literature related to bankruptcy accounting and reporting including Fresh-Start Accounting, and has led major Fresh-Start implementation projects.

Mr. Kirk Blair, a Partner in our Reorganization Services practice, will be responsible for evaluating the bankruptcy Plan of Reorganization impacts under SOP 90-7.

Mr. Kevin Moss, a Principal in our Valuation Services practice, will direct valuation-related activities associated with Fresh-Start Accounting and the other valuation services.

Mr. Keith Adams, a Senior Manager in our Valuation Services practice, will be responsible for the day-to-day valuation-related activities associated with Fresh-Start Accounting.

Mr. Robert Pagano, a Principal in Deloitte Consulting LLP, will direct planning and process initiatives as well as activities related to the preparation of accounting systems for recording the effects of the Plan and Fresh-Start Accounting entries.

The engagement team leaders may be assisted by other professionals, including professionals of Deloitte Consulting LLP, which will be providing services hereunder as a subcontractor to Deloitte FAS, to provide technical support and professional support as-needed during the course of this engagement.

Winn-Dixie Stores, Inc.
Mr. Bennett Nussbaum
April 13, 2006
Page 5

## ENGAGEMENT FEES AND EXPENSES

Many of the Accounting and Reporting tasks that will be addressed in this engagement are complex, and the scope for each prospective support task requires in-depth industry and technical knowledge and implementation experience. As such, the cost of this engagement will be based on the scope of the project, the complexity of the issues involved and the experience of our professionals assigned to the engagement. Our fees are based on the actual time incurred multiplied by the applicable hourly rates (the "Applicable Rates"). We endeavor to use staff in a cost-effective manner. The following table provides the Deloitte FAS Applicable Rates by classification of personnel.

| Personnel Classification | Applicable Rates |
| --- | --- |
| Partner/Principal/Director | $600-$750 |
| Senior Manager | $480-$580 |
| Manager | $380-$500 |
| Senior Staff | $275-$375 |
| Staff | $190-$250 |
| Paraprofessional | $75 |

In the normal course of business, Deloitte FAS revises its regular hourly rates to reflect changes in responsibilities, increased experience, geographic differentials and increased costs of doing business. Changes in regular hourly rates will be noted on the invoices for the first time period in which the revised rates become effective.

In addition, we will be entitled to compensation for any time and expenses (including, without limitation, reasonable legal fees and expenses) that we may incur in considering or responding to discovery requests or other requests for documents or information, or in participating as a witness or otherwise in any legal, regulatory, or other proceedings, including, without limitation, those other than the instant matter, as a result of Deloitte FAS's performance of these services.

## MISCELLANEOUS

The services provided by Deloitte FAS to Winn-Dixie will not constitute (1) a fairness or solvency opinion or (2) a compilation, examination, review, or audit of any entity's information, financial or otherwise, historical or prospective, as described in the pronouncements on professional standards issued by the AICPA. In addition, we will not make any predictions or provide any opinions or other assurances concerning the outcomes of future events, including, without limitation, those that pertain to the operating results of any entity, the achievability of any business plan, the success of any investment, the recovery of any asset, or the ability to pay any debt. Additionally, we do not provide legal advice; Winn-Dixie will be responsible for all legal matters.

Winn-Dixie Stores, Inc.
Mr. Bennett Nussbaum
April 13, 2006
Page 6

Winn-Dixie recognizes and acknowledges that by performing the services described herein, Deloitte FAS is not acting in any Winn-Dixie management capacity and that Winn-Dixie has not asked Deloitte FAS to make, nor has Deloitte FAS agreed to make, any business decisions on behalf of Winn-Dixie. All decisions concerning the subject matter of this engagement remain the sole responsibility of Winn-Dixie's management.

The services to be provided by Deloitte FAS will be performed under the Standards for Consulting Services of the American Institute of Certified Public Accountants ("AICPA"). The specific tasks to be performed by Deloitte FAS will be established based on discussions with Winn-Dixie as the engagement progresses and additional information is obtained during the course of the engagement.

Winn-Dixie acknowledges and agrees that management is responsible for supplying complete and accurate information, representations, and books and records upon which we must rely in providing our services. In addition, with respect to these reorganization services, we will not audit or otherwise verify the materials provided to us, nor will we provide any assurances concerning the reliability, accuracy or completeness of any materials provided by management and our services cannot be relied upon to disclose errors or fraud should they exist. We have no responsibility for updating our services.

Winn-Dixie expressly acknowledges that Deloitte FAS does not guarantee, warrant, or otherwise provide any assurances that Winn-Dixie will restructure successfully.

It is understood and agreed that Deloitte FAS may have had and may in the future have discussions, including meetings and telephone conversations, with management representatives regarding the services hereunder with entities within Winn-Dixie where meeting participants did not include representation of management from Winn-Dixie or one or more of its subsidiaries. Each of Winn-Dixie and its subsidiaries agrees that Deloitte FAS shall have no responsibility to such entity within Winn-Dixie relating to matters addressed during any such discussions, whether or not such matters might be considered material by such entity.

In addition to Deloitte FAS's other rights or remedies hereunder, Deloitte FAS may, in its sole discretion and without any liability arising there from, terminate this engagement in the event that (a) a third party objects or threatens to object, or Deloitte FAS reasonably believes that a third party may object, in the form of an objection or otherwise, to Deloitte FAS's retention by Winn-Dixie in the case on the terms and conditions set forth in this letter, (b) a final order authorizing the employment of Deloitte FAS is not issued by the Bankruptcy Court on or before sixty (60) days from the date of this engagement letter on the terms and conditions set forth herein or on such other terms and conditions as are satisfactory to Deloitte FAS, or (c) the Application is denied by the Bankruptcy Court. In such event, Winn-Dixie hereby agrees to withdraw or amend, promptly upon Deloitte FAS's request, any

Winn-Dixie Stores, Inc.
Mr. Bennett Nussbaum
April 13, 2006
Page 7

Application filed or to be filed with the Bankruptcy Court to retain Deloitte FAS's services in the bankruptcy proceeding.

## GENERAL BUSINESS TERMS

This engagement letter, together with the General Business Terms attached hereto, constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the parties, whether written or oral, with respect to the subject matter hereof, and may not be amended except by written agreement signed by the parties. For purposes of the attached General Business Terms, the term "Client" shall mean Winn-Dixie.

## AUTHORIZATION

If the foregoing represents your agreement, please sign both enclosed original letters and return a signed original of this letter to me.

We look forward to assisting you with this project. If you have any questions regarding this engagement letter, please call me at (212-436-4558).

Very truly yours,

Deloitte Financial Advisory Services LLP

By: _____
    Anthony V. Sasso
    Director

Attachments:  General Business Terms

**Accepted and Agreed to by Winn-Dixie Stores, Inc., on behalf of itself and its affiliates:**

**By:** _____

**Title:** Senior VP _____

**Date:** _____

Appendix A

## GENERAL BUSINESS TERMS

**1.     Services.** It is understood and agreed that the Deloitte FAS services (the "Services") under the engagement letter to which these terms are attached (the "Engagement Letter") may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, the Client.

**2.     Payment of Invoices.** Subject to any applicable requirements of the United States Bankruptcy code, the Federal Rules of Bankruptcy Procedures, the Local Rules of the Bankruptcy Court for the Middle District of Florida, or orders of the Bankruptcy Court, Deloitte FAS invoices are due upon presentation. Invoices are due upon presentation. Invoices upon which payment is not received within thirty (30) days of the invoice date shall accrue a late charge of the lesser of (a) 1½% per month or (b) the highest rate allowable by law, in each case compounded monthly to the extent allowable by law. Not withstanding the foregoing, Deloitte FAS will not be entitled to payments of a late charge or interest with respect to payments made by the Debtors within the timeframes contemplated by the Bankruptcy Code, The Federal Rules of Bankruptcy of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court for the Middle District of Florida, or orders of the Bankruptcy Court. Without limiting its rights or remedies, Deloitte FAS shall have the right to halt or terminate the Services entirely if payment is not received within thirty (30) days of the invoice date. The Client shall be responsible for all taxes imposed on the Services or on the transaction, other than income taxes imposed on a net basis or by withholding, and other than taxes imposed on Deloitte FAS's property.

**3.     Term.** Unless terminated sooner in accordance with its terms, this engagement shall terminate on the completion of the Services. This engagement may be terminated by either party at any time by giving written notice to the other party not less than thirty (30) days before the effective date of termination, provided that, in the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period. Deloitte FAS may terminate this engagement upon written notice to the Client if it determines that (a) a governmental, regulatory, or professional entity (including, without limitation, the AICPA, the PCAOB or the Securities and Exchange Commission), or an entity having the force of law has introduced a new, or modified an existing, law, rule, regulation, interpretation, or decision, the result of which would render Deloitte FAS's performance of any part of the engagement illegal or otherwise unlawful or in conflict with independence or professional rules, or (b) circumstances change (including, without limitation, changes in ownership of the Client or any of its affiliates or changes in composition of the identity of the lenders under the Facility (as defined in the Engagement Letter)) such that Deloitte FAS's performance of any part of the engagement would be illegal or otherwise unlawful or in conflict with independence or professional rules. Upon termination of the engagement, the Client will compensate Deloitte FAS under the terms of the Engagement Letter for the Services performed and expenses incurred through the effective date of termination.

**4.     Deliverables.**

a)     Deloitte FAS has created, acquired, or otherwise has rights in, and may, in connection with the performance of the Services, employ, provide, modify, create, acquire, or otherwise obtain rights in, works of authorship, materials, information, and other intellectual property (collectively, the "Deloitte FAS Technology").

b)     Except as provided below, upon full and final payment to Deloitte FAS hereunder, the tangible items specified as deliverables or work product in the Engagement Letter (the "Deliverables") shall become the property of the Client. To the extent that any Deloitte FAS Technology is contained in any of the Deliverables,

Appendix A

Deloitte FAS hereby grants the Client, upon full and final payment to Deloitte FAS hereunder, a royalty-free, fully paid-up, worldwide, nonexclusive license to use such Deloitte FAS Technology in connection with the Deliverables.

c)      To the extent that Deloitte FAS utilizes any of its property (including, without limitation, the Deloitte FAS Technology or any hardware or software of Deloitte FAS) in connection with the performance of the Services, such property shall remain the property of Deloitte FAS and, except for the license expressly granted in the preceding paragraph, the Client shall acquire no right or interest in such property. Notwithstanding anything herein to the contrary, the parties acknowledge and agree that (1) Deloitte FAS shall own all right, title, and interest, including, without limitation, all rights under all copyright, patent, and other intellectual property laws, in and to the Deloitte FAS Technology and (2) Deloitte FAS may employ, modify, disclose, and otherwise exploit the Deloitte FAS Technology (including, without limitation, providing services or creating programming or materials for other clients). Deloitte FAS does not agree to any terms that may be construed as precluding or limiting in any way its right to (1) provide consulting or other services of any kind or nature whatsoever to any person or entity as Deloitte FAS in its sole discretion deems appropriate or (2) develop for itself, or for others, materials that are competitive with or similar to those produced as a result of the Services, irrespective of their similarity to the Deliverables.

d) To the extent any Deloitte FAS Technology provided to the Client hereunder is a product (to the extent it constitutes merchandise within the meaning of section 471 of the Internal Revenue Code), such Deloitte FAS Technology is licensed to the Client by Deloitte FAS as agent for Deloitte FAS Products Company LLC on the terms and conditions herein. The assignment and license grant in this paragraph 4(d) do not apply to any Deloitte FAS Technology (including any modifications or enhancements thereto or derivative works based thereon) that is subject to a separate license agreement between the Client and a third party, including without limitation, Deloitte FAS Products Company LLC.

**5.      Limitation on Warranties. THIS IS A SERVICES ENGAGEMENT. DELOITTE FAS WARRANTS THAT THE SERVICES SHALL BE PERFORMED IN GOOD FAITH AND WITH DUE PROFESSIONAL CARE. DELOITTE FAS DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE CLIENT'S EXCLUSIVE REMEDY FOR ANY BREACH OF THIS WARRANTY SHALL BE FOR DELOITTE FAS, UPON RECEIPT OF WRITTEN NOTICE, TO USE DILIGENT EFFORTS TO CURE SUCH BREACH, OR, FAILING ANY CURE IN A REASONABLE PERIOD OF TIME, THE RETURN OF PROFESSIONAL FEES PAID TO DELOITTE FAS HEREUNDER WITH RESPECT TO THE SERVICES GIVING RISE TO SUCH BREACH.**

**6.      Limitation on Damages and Indemnification.**

a)      The Client agrees that Deloitte FAS, its subcontractors, and their respective personnel shall not be liable to the Client for any claims, liabilities, or expenses relating to this engagement ("Claims") for an aggregate amount in excess of the fees paid by the Client to Deloitte FAS pursuant to this engagement, except to the extent finally judicially determined to have resulted primarily from the gross negligence, bad faith, willful misconduct or self-dealing of Deloitte FAS or its subcontractors. In no event shall Deloitte FAS, its subcontractors, or their respective personnel be liable for any loss of use, data, goodwill, revenues or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement.

Appendix A

b)      The Client shall indemnify and hold harmless Deloitte FAS, its subcontractors and their respective personnel from all Claims relating to this engagement, except to the extent finally judicially determined to have resulted primarily from the gross negligence, bad faith, willful misconduct or self-dealing of Deloitte FAS or its subcontractors.

c)      In circumstances where all or any portion of the provisions of this paragraph are finally judicially determined to be unavailable, the aggregate liability of Deloitte FAS, its subcontractors, and their respective personnel for any Claim shall not exceed an amount that is proportional to the relative fault that Deloitte FAS's conduct bears to all other conduct giving rise to such Claim.

d)      With respect to indemnification Claims arising during the Client's chapter 11 cases, but prior to the effective date of a confirmed plan of reorganization in such cases, all requests for indemnity under the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Bankruptcy Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought; provided, however, that in no event shall Deloitte FAS be indemnified in the case of its known gross negligence, bad faith, willful misconduct or self-dealing.

7.      **Client Responsibilities.** The Client shall cooperate with Deloitte FAS in the performance of the Services, including, without limitation, providing Deloitte FAS with reasonable facilities and timely access to data, information, and personnel of the Client. The Client shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to Deloitte FAS for purposes of the performance of the Services. The Client acknowledges and agrees that the performance of the Services is dependent upon the timely and effective satisfaction of the Client's responsibilities hereunder and timely decisions and approvals of the Client in connection with the Services. Furthermore, the Client shall be solely responsible for, among other things: (i) making all management decisions and performing all management functions itself; (ii) designating a competent employee, preferably within senior management, to oversee the Services; (iii) evaluating the adequacy and results of the Services; (iv) accepting responsibility for results of the Services; and (v) establishing and maintaining its own internal controls, including, without limitation, monitoring of ongoing activities. In connection with the Services, Deloitte FAS shall be entitled to rely on all decisions and approvals of the Client.

8.      **Force Majeure.** Except for the payment of money, neither party shall be liable for any delays or nonperformance resulting from circumstances or causes beyond its reasonable control, including, without limitation, acts or omissions or the failure to cooperate by the other party (including, without limitation, entities or individuals under its control, or any of their respective officers, directors, employees, other personnel and agents), acts or omissions or the failure to cooperate by any third party, fire or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order, or requirement of any governmental agency or authority.

9.      **Limitation on Actions.** No action, regardless of form, relating to this engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for nonpayment may be brought by a party not later than one year following the date of the last payment due to the party bringing such action.

10.     **Independent Contractor.** It is understood and agreed that each party hereto is an independent contractor and that neither party is, nor shall be considered to be, the other's agent, distributor, partner, fiduciary, joint venturer, co-owner, or representative. Neither party shall act or represent itself, directly or by

Appendix A

implication, in any such capacity or in any manner assume or create any obligation on behalf of, or in the name of, the other.

## 11.    Confidentiality and Internal Use.

a)    The Client agrees that all Services and Deliverables shall be solely for the Client's informational purposes and internal use, and are not intended to be, and should not be, used by any person or entity other than the Client. Except as otherwise specifically provided in the Engagement Letter, the Client further agrees that such Services and Deliverables shall not be circulated, quoted, disclosed, or distributed to, nor shall reference to such Services or Deliverables be made to, any person or entity other than the Client.

b)    To the extent that, in connection with this engagement, either party (each, the "receiving party") comes into possession of any trade secrets or other proprietary or confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the disclosing party's consent. The disclosing party hereby consents to the receiving party disclosing such information (1) to subcontractors, whether located within or outside of the United States, that are providing services in connection with this engagement and that have agreed to be bound by confidentiality obligations similar to those in this paragraph 11(b); (2) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards or rules, or in connection with litigation pertaining hereto; or (3) to the extent such information (i) shall have otherwise become publicly available (including, without limitation, any information filed with any governmental agency and available to the public) other than as the result of a disclosure in breach hereof, (ii) becomes available to the receiving party on a nonconfidential basis from a source other than the disclosing party that the receiving party believes is not prohibited from disclosing such information to the receiving party by obligation to the disclosing party, (iii) is known by the receiving party prior to its receipt from the disclosing party without any obligation of confidentiality with respect thereto, or (iv) is developed by the receiving party independently of any disclosures made by the disclosing party to the receiving party of such information. In satisfying its obligations under this paragraph 11(b), each party shall maintain the other's trade secrets and proprietary or confidential information in confidence using at least the same degree of care as it employs in maintaining in confidence its own trade secrets and proprietary or confidential information, but in no event less than a reasonable degree of care. Nothing in this paragraph 11(b) shall alter the Client's obligations under paragraph 11(a) or the Engagement Letter. Notwithstanding anything to the contrary herein, the Client acknowledges that the Deloitte Entities, in connection with performing the Services, may develop or acquire experience, skills, knowledge, and ideas that are retained in the unaided memory of its personnel. The Client acknowledges and agrees that Deloitte FAS may use and disclose such experience, skills, knowledge, and ideas.

## 12.    Survival and Interpretation.    All paragraphs herein relating to payment of invoices, deliverables, limitation on warranties, limitation on damages and indemnification, limitation on actions, confidentiality and internal use, survival and interpretation, assignment, nonexclusivity, waiver of a jury trial, non-solicitation and governing law shall survive the expiration or termination of this engagement. For purposes of these terms and the engagement letter to which these terms are attached, "Deloitte FAS" shall mean Deloitte Financial Advisory Services LLP; to the extent that, as a subcontractor, they agree to provide any of the services under or in connection with the Engagement Letter, the member firms of Deloitte Touche Tohmatsu, and the affiliates of Deloitte Financial Advisory Services LLP, and such member firms; and in all cases any successor or permitted assignee. The Client acknowledges and agrees no related or affiliated entity of Deloitte Financial Advisory Services LLP, whether or not acting as a subcontractor, shall have any liability to the Client or any other person and the Client will not bring any action against such entities in connection with this engagement or the Services. Without limiting the foregoing, the above-referenced entities are intended third party beneficiaries of these terms, including, without limitation, the limitation on liability and indemnification provisions of paragraph 6, and the agreements and undertakings of the Client contained in the Engagement Letter. Any of the affiliated or

Appendix A

related entities of Deloitte FAS may in its own right enforce such terms, agreements and undertakings. **The provisions of Sections 6, 9, 12, 14 and 17 hereof shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise, notwithstanding the failure of the essential purpose of any remedy.**

**13.     Assignment and Subcontracting.** Except as provided below, neither party may assign, transfer, or delegate any of its rights or obligations hereunder (including, without limitation, interests or Claims) without the prior written consent of the other party. The Client hereby consents to Deloitte Financial Advisory Services LLP assigning or subcontracting any of Deloitte Financial Advisory Services LLP's rights and obligations hereunder to (a) any affiliate or related entity, whether located within or outside the United States, or (b) any entity that acquires all or a substantial part of the assets or business of Deloitte FAS. Services performed hereunder by Deloitte Financial Advisory Services LLP's subcontractors shall be invoiced as professional fees on the same basis as the Services performed by Deloitte Financial Advisory Services LLP's personnel, unless otherwise agreed.

**14.     Waiver of Jury Trial. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS ENGAGEMENT.**

**15.     Nonsolicitation.** During the term of this engagement and for a period of one (1) year thereafter, each party agrees that its personnel (in their capacity as such) who had direct and substantive contact in the course of this engagement with personnel of the other party shall not, without the other party's consent, directly or indirectly employ, solicit, engage, or retain the services of such personnel of the other party. In the event a party breaches this provision, the breaching party shall be liable to the aggrieved party for an amount equal to thirty percent (30%) of the annual base compensation of the relevant personnel in his or her new position. Although such payment shall be the aggrieved party's exclusive means of monetary recovery from the breaching party for breach of this provision, the aggrieved party shall be entitled to seek injunctive or other equitable relief. This provision shall not restrict the right of either party to solicit or recruit generally in the media.

**16.     Entire Agreement, Amendment, and Notices.** These terms, and the Engagement Letter, including exhibits, constitute the entire agreement between the parties with respect to this engagement; supersede all other oral and written representations, understandings, or agreements relating to this engagement; and may not be amended except by written agreement signed by the parties. In the event of any conflict, ambiguity, or inconsistency between these terms and the Engagement Letter, these terms shall govern and control. All notices hereunder shall be (a) in writing, (b) delivered to the representatives of the parties at the addresses first set forth above, unless changed by either party by notice to the other party, and (c) effective upon receipt.

**17.     Governing Law, Jurisdiction and Venue, and Severability.** These terms, the Engagement Letter, including exhibits, and all matters relating to this engagement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof). If any provision of these terms or the Engagement Letter is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

**Exhibit B**

UNITED STATES BANKRUPTCY COURT

Middle District of Florida (Jacksonville)

| | |
|---|---|
| In re: | Chapter 11 |
| Winn-Dixie Stores, Inc., | Case No. 05-03840 |
| et al., | Jointly Administered |
| Debtors. | |

**DECLARATION OF ANTHONY SASSO IN SUPPORT OF APPLICATION FOR
AN ORDER AUTHORIZING EMPLOYMENT AND RETENTION OF (I)
DELOITTE FINANCIAL SERVICES LLP TO PERFORM FRESH START
ACCOUNTING SERVICES AND (II) DELOITTE CONSULTING LLP TO
ASSIST IN THE IMPLEMENTATION THEREOF FOR THE
DEBTORS IN POSSESSION NUNC PRO TUNC TO MARCH 14, 2006**

**Anthony Sasso deposes and says:**

1.       I am a director of the firm of Deloitte Financial Advisory Services LLP

("Deloitte FAS"), which has an office located at Two World Financial Center, New York,

New York  10281  I make this declaration based on the affidavit of Anthony Forcum (the

"Forcum Affidavit") filed in connection with the retention of Deloitte Consulting LLP

("Deloitte Consulting"), an affiliate of Deloitte FAS, and upon inquiries made by myself

or on my behalf in support of the application (the "Retention Application") for an order

pursuant to section 327(a) of the Bankruptcy Code (as defined in the Retention

Application) authorizing the approval of (i) Deloitte FAS to provide fresh start

accounting services and (ii) Deloitte Consulting to assist in the implementation thereof,

for the above-captioned debtors and debtors-in-possession (the "Debtors") nunc pro tunc

1

to March 14, 2006.

2.     To my knowledge based on reasonable inquiry, (1) Deloitte FAS, Kirk Blair, a partner of Deloitte FAS,  Kevin Moss, a principal of Deloitte FAS, and Anthony Sasso, a director of Deloitte FAS (the "Deloitte FAS Partners/Principals"), who are anticipated to provide services as part of the engagement team on the engagement for which Deloitte FAS is to be retained in these Chapter 11 cases (the "Winn-Dixie Engagement Team"), and the employees of Deloitte FAS who are anticipated to provide the services as part of the Winn-Dixie Engagement Team, do not hold or represent any interest adverse to any of the Debtors with respect to the matters on which Deloitte FAS is to be retained in these Chapter 11 cases, and (2) as set forth below and, to the best of my knowledge, information and belief, Deloitte FAS and the Deloitte FAS Partners/Principals have no relationship to any of the Debtors, any of the Debtors' significant creditors, other known parties-in-interest in these Chapter 11 cases (as identified by the Debtors), or to the Debtors' attorneys that are known to be assisting the Debtors in these Chapter 11 cases, except as described in the Forcum Affidavit, set forth on Exhibit A attached thereto or herein, (3) the personnel anticipated to provide services to the Debtors in connection herewith are not related to the United States Trustee assigned to these Chapter 11 case, any persons employed in the office of such United States Trustee or the Bankruptcy Judge presiding over such cases and (4) Deloitte FAS and the Deloitte FAS Engagement Partners/Principals are "disinterested persons" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

3.      From time to time, Deloitte FAS or its affiliates have provided, currently provide or may currently provide services and likely will continue to provide services, to certain creditors of the Debtors and various other parties potentially adverse to the Debtors in matters unrelated to these Chapter 11 cases.

4.      As described below (and in the Forcum Affidavit), Deloitte Consulting undertook an internal search to determine whether it or its affiliates, including Deloitte FAS, are or have been employed by or had other relationships with any entities that were listed on a schedule provided to Deloitte Consulting by the Debtors in connection with these chapter 11 cases.  As noted herein, certain of these creditors, other parties-in-interest, attorneys, or accountants have or may have provided goods or services to, currently provide or may currently provide goods or services to, and may in the future provide goods or services to Deloitte FAS and its affiliates and the Deloitte FAS Partners/Principals in matters unrelated to these Chapter 11 cases.

5.      To check upon and disclose possible relationships with parties-in-interest in these chapter 11 cases, Deloitte Consulting researched its client databases and performed reasonable due diligence to determine whether it or its affiliates, including Deloitte FAS, had any relationships with the entities that were listed on a schedule provided to Deloitte Consulting by the Debtors in connection with these Chapter 11 cases, which included the following:

- the Debtors and their affiliates;
- the Debtors' key personnel, including its current and former directors and officers;
- the Debtors' pre-petition senior secured lenders;
- the Debtors' top 50 unsecured trade creditors;

- the Indenture Trustee for the senior unsecured noteholders, the senior unsecured noteholders, and related funds and administrators;

- the publicly identified shareholders of the Debtors;

- parties with filed UCC financing statements;

- the Debtors' mortgage holder;

- the Debtors' material lessors of real property;

- the attorneys and other professionals that the Debtors have sought authority to employ in these Chapter 11 cases;

- the members of the Official Creditors' Committee and its attorneys; and

- other potential parties-in-interest as identified by the Debtors.

6.      Despite the efforts described above to identify and disclose Deloitte FAS's and its affiliates' connections with the parties-in-interest in these Chapter 11 cases, because Deloitte FAS and its affiliates are large firms with many personnel, and because the Debtors are a large enterprise, Deloitte FAS is unable to state with certainty that every client relationship or other connection with it or its affiliates has been disclosed.  In this regard, if Deloitte FAS discovers additional material information that it determines requires disclosure, it will file a supplemental disclosure promptly with the Court.

7.      The results of this internal search are set forth in the Forcum Affidavit which is incorporated herein by reference.

8.      Except as may be disclosed in the Forcum Affidavit, to the best of my knowledge, Deloitte FAS and the Deloitte FAS Partners/Principals do not hold or represent any interest adverse to the Debtors, and I believe that Deloitte FAS and the Deloitte FAS Partners/Principals are "disinterested persons" as that term is defined in Section 101(14) of the Bankruptcy Code, as modified by Section 1107(b) of the

Bankruptcy Code.

9.      As set forth in the Engagement Letter (as defined in the Application), the

nature and extent of the services that Deloitte FAS proposes to render, as may be

requested by the Debtors and as may be agreed to by Deloitte FAS, are:

❑ *Assistance with Disclosure Statement and Financial Projections*
   o   Assist the Debtors' management in applying Fresh-Start adjustments to and disclosures for the projected financial information.

❑ *Preparation and substantiation of Fresh-Start Balance Sheet under SOP 90-7*
   o   Assist the Debtors' management in the development of an implementation approach for Fresh-Start Accounting, culminating in a strategy and work plan for the project;

   o   Assist the Debtors' management in connection with their recording of adjustments to reflect the impact of the discharge of debt and other plan of reorganization requirements, including the related tax implications;

   o   Assist the Debtors' management in connection with their recording of adjustments to assets and liabilities in accordance with SFAS 141 as required by SOP 90-7;

   o   Assist the Debtors' management with their preparation of analyses supporting adjustments; and

   o   Assist the Debtors' management with responses to requests from the Debtors' external auditors with respect to Fresh-Start Accounting.

❑ *Posting of Fresh-Start entries back to books of entry*
   o   Assist the Debtors' management in connection with their determination of plan of reorganization-related and re-valuation adjustments necessary to record these items to the books of entry of the appropriate legal entities, including, if necessary, preparation of supporting materials;

   o   Work with accounting, legal and tax advisors to assist the Debtors' management in determining the allocation of the earnings impact to separate legal entities within the Debtors' structure in accordance with statutory requirements;

   o   Assist the Debtors' management in connection with their estimation of recoveries to claimants for accrual accounting purposes, including comparisons with the Debtors' claims database to estimate liabilities related to contingent, unliquidated and disputed claims; and

o   Assist the Debtors' management in their allocation of reorganization value to the Debtors' legal entities.

❑ *Application Support*

o   Assist the Debtors' management in their preparation and implementation of the accounting treatments and systems updates required for Fresh-Start Accounting implementation as of the Fresh-Start reporting date. Commonly, the financial systems impacted by the process include the General Ledger, Accounts Payable and Fixed Assets. Other applications may be impacted based upon the impact of the bankruptcy and valuation efforts. Application support includes the following items as required.
  ▪ Definition of specific processing requirements
  ▪ Programming specifications
  ▪ Application configuration and set-up
  ▪ Interface development
  ▪ Data cleansing and reconciliation
  ▪ Project management and administration

❑ *Assistance and valuation work per Fresh-Start under SOP 90-7*

o   Assist the Debtors' management with the identification of tangible and intangible assets;

o   Assist the Debtors' management with their estimate of the fair value of specific assets and liabilities, including performing valuations of certain assets and liabilities, as agreed upon with management;

o   Assist with assignment of values to reporting units, as required;
o   Discuss valuation methodology and results with the Debtors' external auditors;

o   Assist the Debtors and their advisors with asset and liability valuation adjustments; and

o   Assist the Debtors' management with the coordination of Fresh-Start valuation with tax values and tax attribute planning.

❑ *Assistance with Financial Reporting*

o   Assist the Debtors' management in preparing supporting accounting information for timely record keeping matters and reporting requirements;

o   Assist the Debtors' management in preparing accounting information and disclosures in support of public financial filings such as 10-K or 10-Q's;

o   Assist the Debtors' management with regard to valuation matters that impact financial reporting; and

o   Assist the Debtors' management with memoranda supporting accounting positions.

6

10.    As described in the declaration of Robert Pagano, filed together herewith, Deloitte Consulting will act as a subcontractor to Deloitte FAS to assist in the implementation aspects of the fresh start accounting services.  In particular, Deloitte Consulting will assist Deloitte FAS in the systems implementation of the results of the fresh start accounting analysis.  These services are primarily defined by the descriptions set forth in the prior paragraph which are identified as "Application Support."

11.    Deloitte FAS (together with Deloitte Consulting) has significant qualifications and experience in performing the scope of work described above that is the subject of Deloitte FAS's retention to provide fresh start accounting services to the Debtors.  Subject to the Court's approval of Deloitte FAS's retention hereunder, the scope of post-petition services Deloitte FAS anticipates providing to the Debtors is limited to those services described above.

12.    Some services incidental to the tasks to be performed by Deloitte FAS in these Chapter 11 cases may be performed by personnel employed by or associated with affiliates of Deloitte FAS.  The fees and expenses with respect to such services, if any, will be included in the fee applications of Deloitte FAS.

13.    Deloitte FAS understands that the Debtors have also employed the services of KPMG LLP, PricewaterhouseCoopers LLP and CFO Services in connection with various professional services.  Deloitte FAS will consult with the Debtors and, as necessary, the Debtors' professionals throughout the pendency of these Chapter 11 cases to ensure that there will be no duplication of services provided to the Debtors.

14.    Deloitte FAS intends to apply to the Court for allowance of compensation

and reimbursement of expenses consistent with the terms of the Engagement Letter, the

Retention Application and this declaration, the applicable provisions of the Bankruptcy

Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy

Court of the Middle District of Florida (Jacksonville), the United States Trustee's

Guidelines and the Orders of this Court.

15.     Deloitte FAS will charge the hourly rates as specified in the Engagement

Letter in performing the aforementioned services.  For all services, the range of rates is as

follows:

| *Staff Classification* | *Hourly Billing Rate* |
|---|---|
| Partner/Principals/Directors | $ 600 – 750 per hour |
| Senior Managers | $ 480 – 580 per hour |
| Managers | $ 380 – 500 per hour |
| Senior Staff | $ 275 – 375 per hour |
| Staff | $ 190 – 250 per hour |
| Paraprofessionals | $  75 per hour |

16.     The professional fees charged for Deloitte FAS's services are calculated

from the actual hours expended in providing the services multiplied by the hourly billing

rates for the specific personnel involved.  In addition, reasonable expenses, including,

without limitation, travel and delivery services will be included in the total amount billed.

17.     Deloitte FAS requests that it be permitted to submit monthly invoices for

fees and expenses. Such invoices will contain reasonable detail consistent with any rules,

guidelines, and/or administrative orders promulgated by the Court that apply to these

Chapter 11 cases.  Deloitte FAS requests that the invoices, after appropriate review, be

paid in a manner consistent with the payment of other retained professionals in this

matter, consistent with any administrative orders, if any, that would apply to interim payments.

18.    As set forth in the Forcum Affidavit, Deloitte Consulting, Deloitte & Touche LLP ("Deloitte & Touche"), also an affiliate of Deloitte FAS, and/or certain of their affiliates did provide services to the Debtors prior to the inception of these Chapter 11 cases and continue to provide certain services to the Debtors during these Chapter 11 cases.

19.    As set forth in the Forcum Affidavit, Deloitte Consulting, an affiliate of Deloitte FAS, received $2,268,100 and D&T Tax Technologies received $18,100 from the Debtors within 90 days prior to the inception of these chapter 11 cases for the services described above.  Deloitte Consulting was owed $209,411 by the Debtors as of the Petition Date.  Deloitte Consulting will not seek any recovery with respect to such amounts.  Subsequent to the Petition Date, but prior to May 16, 2005, Deloitte Consulting provided services to the Debtor totaling $95,842 and incurred $18,003 of expenses in support of the Debtors' initiatives related to implementation of the selected perishable trading network and pricing strategy capability described above.  Deloitte Consulting will also not seek any recovery with respect to such amounts.  [As of the Petition Date, Deloitte FAS was not owed any fees in connection with any services provided to the Debtors.

20.    Deloitte FAS has received no promises regarding compensation in these Chapter 11 cases other than in accordance with the Bankruptcy Code and as set forth in this declaration.  Deloitte FAS has no agreement to share its revenues from the services for which it is seeking to be retained hereunder with any nonaffiliated entity.

9

Declarant: Anthony Sasso
Title: Director

10

**Exhibit C**

UNITED STATES BANKRUPTCY COURT

Middle District of Florida (Jacksonville)

|  |  |
|---|---|
| In re:<br><br>Winn-Dixie Stores, Inc.,<br><br>et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 05-03840<br><br>Jointly Administered |

## DECLARATION OF ROBERT W. PAGANO IN SUPPORT OF APPLICATION FOR AN ORDER AUTHORIZING EMPLOYMENT AND RETENTION OF (I) DELOITTE FINANCIAL SERVICES LLP TO PERFORM FRESH START ACCOUNTING SERVICES AND (II) DELOITTE CONSULTING LLP TO ASSIST IN THE IMPLEMENTATION THEREOF FOR THE DEBTORS IN POSSESSION NUNC PRO TUNC TO MARCH 14, 2006

**Robert W. Pagano deposes and says:**

1.        I am a principal of the firm of Deloitte Consulting LLP ("Deloitte

Consulting"), which has an office located at 2 Hilton Court, Parsippany, New Jersey.  I

make this declaration based on the affidavit of Anthony Forcum (the "Forcum Affidavit")

filed in connection with the prior retention of Deloitte Consulting, an affiliate of Deloitte

Financial Advisory Services LLP ("Deloitte FAS"), and upon inquiries made by myself

or on my behalf in support of the application (the "Retention Application") for an order

pursuant to section 327(a) of the Bankruptcy Code (as defined in the Retention

Application) authorizing the approval of (i) Deloitte FAS to provide fresh start

accounting services and (ii) Deloitte Consulting to assist in the implementation thereof,

for the above-captioned debtors and debtors-in-possession (the "Debtors") nunc pro tunc

to March 14, 2006.

2.      To my knowledge based on reasonable inquiry, (1) Deloitte Consulting, and myself, a principal of Deloitte Consulting, who will provide services as part of the engagement team on the engagement for which Deloitte Consulting is to be retained in pursuant to Retention Application (the "Winn-Dixie Engagement Team"), and the employees of Deloitte Consulting who are anticipated to provide the services as part of the Winn-Dixie Engagement Team, do not hold or represent any interest adverse to any of the Debtors with respect to the matters on which Deloitte Consulting is to be retained in these Chapter 11 cases, and (2) as set forth below and, to the best of my knowledge, information and belief, Deloitte Consulting and myself have no relationship to any of the Debtors, any of the Debtors' significant creditors, other known parties-in-interest in these Chapter 11 cases (as identified by the Debtors), or to the Debtors' attorneys that are known to be assisting the Debtors in these Chapter 11 cases, except as described in the Forcum Affidavit, set forth on Exhibit A attached thereto or herein, (3) the personnel anticipated to provide services to the Debtors in connection herewith are not related to the United States Trustee assigned to these Chapter 11 case, any persons employed in the office of such United States Trustee or the Bankruptcy Judge presiding over such cases and (4) Deloitte Consulting and myself are "disinterested persons" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

3.      From time to time, Deloitte Consulting or its affiliates have provided, currently provide or may currently provide services and likely will continue to provide

services, to certain creditors of the Debtors and various other parties potentially adverse to the Debtors in matters unrelated to these Chapter 11 cases.

4.    As described below (and in the Forcum Affidavit), Deloitte Consulting undertook an internal search to determine whether it or its affiliates are or have been employed by or had other relationships with any entities that were listed on a schedule provided to Deloitte Consulting by the Debtors in connection with these Chapter 11 cases.  As noted herein, certain of these creditors, other parties-in-interest, attorneys, or accountants have or may have provided goods or services to, currently provide or may currently provide goods or services to, and may in the future provide goods or services to Deloitte FAS and its affiliates and myself in matters unrelated to these Chapter 11 cases.

5.    To check upon and disclose possible relationships with parties-in-interest in these Chapter 11 cases, Deloitte Consulting researched its client databases and performed reasonable due diligence to determine whether it or its affiliates had any relationships with the entities that were listed on a schedule provided to Deloitte Consulting by the Debtors in connection with these Chapter 11 cases, which included the following:

- the Debtors and their affiliates;

- the Debtors' key personnel, including its current and former directors and officers;

- the Debtors' pre-petition senior secured lenders;

- the Debtors' top 50 unsecured trade creditors;

- the Indenture Trustee for the senior unsecured noteholders, the senior unsecured noteholders, and related funds and administrators;

- the publicly identified shareholders of the Debtors;

3

- parties with filed UCC financing statements;

- the Debtors' mortgage holder;

- the Debtors' material lessors of real property;

- the attorneys and other professionals that the Debtors have sought authority to employ in these Chapter 11 cases;

- the members of the Official Creditors' Committee and its attorneys; and

- other potential parties-in-interest as identified by the Debtors.

6.      Despite the efforts described above to identify and disclose Deloitte Consulting's and its affiliates' connections with the parties-in-interest in these Chapter 11 cases, because Deloitte Consulting and its affiliates are large firms with many personnel, and because the Debtors are a large enterprise, Deloitte Consulting is unable to state with certainty that every client relationship or other connection with it or its affiliates has been disclosed.  In this regard, if Deloitte Consulting discovers additional material information that it determines requires disclosure, it will file a supplemental disclosure promptly with the Court.

7.      The results of this internal search are set forth in the Forcum Affidavit which is incorporated herein by reference.

8.      Except as may be disclosed in the Forcum Affidavit, to the best of my knowledge, Deloitte Consulting and myself do not hold or represent any interest adverse to the Debtors, and I believe that Deloitte Consulting and myself are "disinterested persons" as that term is defined in Section 101(14) of the Bankruptcy Code, as modified by Section 1107(b) of the Bankruptcy Code.

9.      As set forth in the Engagement Letter (as defined in the Retention

4

Application), the nature and extent of the services that Deloitte FAS proposes to render,

as may be requested by the Debtors and as may be agreed to by Deloitte FAS, are:

❑ *Assistance with Disclosure Statement and Financial Projections*
  o Assist the Debtors' management in applying Fresh-Start adjustments to and disclosures for the projected financial information.

❑ *Preparation and substantiation of Fresh-Start Balance Sheet under SOP 90-7*
  o Assist the Debtors' management in the development of an implementation approach for Fresh-Start Accounting, culminating in a strategy and work plan for the project;

  o Assist the Debtors' management in connection with their recording of adjustments to reflect the impact of the discharge of debt and other plan of reorganization requirements, including the related tax implications;

  o Assist the Debtors' management in connection with their recording of adjustments to assets and liabilities in accordance with SFAS 141 as required by SOP 90-7;

  o Assist the Debtors' management with their preparation of analyses supporting adjustments; and

  o Assist the Debtors' management with responses to requests from the Debtors' external auditors with respect to Fresh-Start Accounting.

❑ *Posting of Fresh-Start entries back to books of entry*
  o Assist the Debtors' management in connection with their determination of plan of reorganization-related and re-valuation adjustments necessary to record these items to the books of entry of the appropriate legal entities, including, if necessary, preparation of supporting materials;

  o Work with accounting, legal and tax advisors to assist the Debtors' management in determining the allocation of the earnings impact to separate legal entities within the Debtors' structure in accordance with statutory requirements;

  o Assist the Debtors' management in connection with their estimation of recoveries to claimants for accrual accounting purposes, including comparisons with the Debtors' claims database to estimate liabilities related to contingent, unliquidated and disputed claims; and

  o Assist the Debtors' management in their allocation of reorganization value to the Debtors' legal entities.

❑ *Application Support*
- o Assist the Debtors' management in their preparation and implementation of the accounting treatments and systems updates required for Fresh-Start Accounting implementation as of the Fresh-Start reporting date. Commonly, the financial systems impacted by the process include the General Ledger, Accounts Payable and Fixed Assets. Other applications may be impacted based upon the impact of the bankruptcy and valuation efforts. Application support includes the following items as required.
  - ▪ Definition of specific processing requirements
  - ▪ Programming specifications
  - ▪ Application configuration and set-up
  - ▪ Interface development
  - ▪ Data cleansing and reconciliation
  - ▪ Project management and administration

❑ *Assistance and valuation work per Fresh-Start under SOP 90-7*
- o Assist the Debtors' management with the identification of tangible and intangible assets;

- o Assist the Debtors' management with their estimate of the fair value of specific assets and liabilities, including performing valuations of certain assets and liabilities, as agreed upon with management;

- o Assist with assignment of values to reporting units, as required;
- o Discuss valuation methodology and results with the Debtors' external auditors;

- o Assist the Debtors and their advisors with asset and liability valuation adjustments; and

- o Assist the Debtors' management with the coordination of Fresh-Start valuation with tax values and tax attribute planning.

❑ *Assistance with Financial Reporting*
- o Assist the Debtors' management in preparing supporting accounting information for timely record keeping matters and reporting requirements;

- o Assist the Debtors' management in preparing accounting information and disclosures in support of public financial filings such as 10-K or 10-Q's;

- o Assist the Debtors' management with regard to valuation matters that impact financial reporting; and

- o Assist the Debtors' management with memoranda supporting accounting positions.

10.    Deloitte Consulting will act as a subcontractor to Deloitte FAS to assist in the implementation aspects of the fresh start accounting services.  In particular, Deloitte

Consulting will assist Deloitte FAS in the systems implementation of the results of the fresh start accounting analysis. These services are primarily defined by the descriptions set forth in the prior paragraph which are identified as "Application Support."

11.    Deloitte FAS, together with Deloitte Consulting, has significant qualifications and experience in performing the scope of work described above that is the subject of Deloitte FAS's retention to provide fresh start accounting services to the Debtors. Subject to the Court's approval of Deloitte FAS's and Deloitte Consulting's retention under the Retention Application, the scope of post-petition services Deloitte Consulting anticipates providing in these Chapter 11 cases is limited to those services described above and in any prior retention application for Deloitte Consulting.

12.    Deloitte Consulting understands that the Debtors have also employed the services of KPMG LLP, PricewaterhouseCoopers LLP and CFO Services in connection with various professional services. Deloitte Consulting and Deloitte FAS will consult with the Debtors and, as necessary, the Debtors' professionals throughout the pendency of these Chapter 11 cases to ensure that there will be no duplication of services provided to the Debtors.

13.    Deloitte FAS intends to apply to the Court for allowance of compensation and reimbursement of expenses consistent with the terms of the Engagement Letter, the Retention Application and this declaration, the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court of the Middle District of Florida (Jacksonville), the United States Trustee's Guidelines and the Orders of this Court. The time and expense of Deloitte Consulting

7

will be included and separately designated in the Deloitte FAS fee application.

14.    Deloitte Consulting will charge the hourly rates as specified in the Engagement Letter in performing the aforementioned services.  For all services, the range of rates is as follows:

| *Staff Classification* | *Hourly Billing Rate* |
|---|---|
| Partner/Principals/Directors | $ 600 – 750 per hour |
| Senior Managers | $ 480 – 580 per hour |
| Managers | $ 380 – 500 per hour |
| Senior Staff | $ 275 – 375 per hour |
| Staff | $ 190 – 250 per hour |
| Paraprofessionals | $  75 per hour |

15.    The professional fees charged for Deloitte Consulting's services are calculated from the actual hours expended in providing the services multiplied by the hourly billing rates for the specific personnel involved.  In addition, reasonable expenses, including, without limitation, travel and delivery services will be included in the total amount billed.

16.    Deloitte Consulting requests that it be permitted to submit its time and expenses in the monthly invoices for fees and expenses submitted by Deloitte FAS. Such invoices will contain reasonable detail consistent with any rules, guidelines, and/or administrative orders promulgated by the Court that apply to these Chapter 11 cases. Deloitte Consulting requests that the invoices, after appropriate review, be paid in a manner consistent with the payment of other retained professionals in this matter, consistent with any administrative orders, if any, that would apply to interim payments.

17.    As set forth in the Forcum Affidavit, Deloitte Consulting, Deloitte &

Touche LLP ("Deloitte & Touche"), also an affiliate of Deloitte FAS, and/or certain of their affiliates did provide services to the Debtors prior to the inception of these Chapter 11 cases and continue to provide certain services to the Debtors during these Chapter 11 cases.

18.     As set forth in the Forcum Affidavit, Deloitte Consulting, received $2,268,100 and D&T Tax Technologies received $18,100 from the Debtors within 90 days prior to the inception of these Chapter 11 cases for the services described above. Deloitte Consulting was owed $209,411 by the Debtors as of the Petition Date. Deloitte Consulting will not seek any recovery with respect to such amounts. Subsequent to the Petition Date, but prior to May 16, 2005, Deloitte Consulting provided services to the Debtor totaling $95,842 and incurred $18,003 of expenses in support of the Debtors' initiatives related to implementation of the selected perishable trading network and pricing strategy capability described above. Deloitte Consulting will also not seek any recovery with respect to such amounts.

19.     Deloitte Consulting has received no promises regarding compensation in these Chapter 11 cases other than in accordance with the Bankruptcy Code and as set forth in this declaration. Deloitte Consulting has no agreement to share its revenues from the services for which it is seeking to be retained hereunder with any nonaffiliated entity.

Declarant: Robert W. Pagano
Title: Principal

9

**<u>Exhibit D</u>**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| In re: | ) Case No. 05-03817-3F1 |
| | ) |
| WINN-DIXIE STORES, INC., et al., | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**ORDER AUTHORIZING DEBTORS TO RETAIN DELOITTE FINANCIAL**
**ADVISORY SERVICES LLP AND DELOITTE CONSULTING LLP**
**TO PROVIDE FRESH-START ACCOUNTING SERVICES**

These cases came before the Court for hearing on May 4, 2006, upon the application of

Winn-Dixie Stores, Inc. and its subsidiaries and affiliates in the above-captioned jointly-

administered cases, as debtors and debtors-in-possession (collectively, the "Debtors"), for entry

of an order authorizing the Debtors to retain Deloitte Financial Advisory Services LLP ("Deloitte

FAS") and Deloitte Consulting LLP ("Deloitte Consulting") to provide fresh-start accounting

services in connection with implementation of a plan of reorganization and emergence from

chapter 11, in each case nunc pro tunc to March 14, 2006 (the "Application").[1]  The Court has

reviewed the Application, the engagement letter attached as Exhibit A to the Application (the

"Engagement Letter"), the supporting declaration of Anthony Sasso on behalf of Deloitte FAS

attached as Exhibit B to the Application (the "Sasso Declaration"), the supporting declaration of

Robert W. Pagano on behalf of Deloitte Consulting attached as Exhibit C to the Application (the

"Pagano Declaration"), and the affidavit of Anthony D. Forcum on behalf of Deloitte Consulting

attached as Exhibit B to the Debtors' Application for Authority to Retain Deloitte Consulting

LLP to Provide In-Store Operational Consulting Services to the Debtors (Docket No. 1486).  The

---

[1]     All capitalized terms not otherwise defined in this Order shall have the meaning ascribed to them
in the Application.

Court has also considered the representations of counsel.  Based upon the representations of counsel, after due deliberation and finding proper notice has been given, the Court determines that good cause exists to grant the relief requested in the Application and that granting such relief is in the best interest of these estates and creditors.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Application is granted.

2.      The Debtors are authorized to retain Deloitte FAS and Deloitte Consulting, nunc pro tunc to March 14, 2006, pursuant to section 327(a) of the Bankruptcy Code, to provide fresh-start accounting services to the Debtors during these cases on the terms set forth in the Application, the Engagement Letter, the Sasso Declaration, and the Pagano Declaration.

3.      If any supplemental declarations or affidavits are filed and served after the entry of this Order, absent any objections filed within twenty (20) days after the filing and service of such supplemental declarations or affidavits, Deloitte FAS's and Deloitte Consulting's employment shall continue as authorized pursuant to this Order.

4.      Deloitte FAS and Deloitte Consulting shall be compensated for services provided pursuant to this Order upon appropriate application by Deloitte FAS in accordance with sections 330 and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules, and orders of this Court.  Any such application for compensation filed by Deloitte FAS shall include and separately designate amounts due on account of work performed by personnel from Deloitte Consulting pursuant to this Order.

5.      The amounts due for services performed by Deloitte Consulting in connection with this Order shall not apply toward the $3,375,000 fee cap described in paragraph 5 of the Court's Order Authorizing Debtors to Retain Deloitte Consulting LLP to Provide In-Store

Operational Consulting Services to the Debtors dated June 16, 2005 and filed at Docket No. 1749.

6.      With respect to indemnification claims based on acts occurring after the Petition Date but prior to the effective date of a confirmed plan of reorganization in the Debtors' chapter 11 cases, all requests for indemnity under the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought; provided, however, that in no event shall Deloitte FAS or Deloitte Consulting be indemnified in the case of its own gross negligence, bad faith, willful misconduct, or self-dealing.

7.      No work performed by Deloitte FAS or Deloitte Consulting shall be duplicative of work performed by any other professional retained by the Debtors in these cases.

8.      The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated May ___, 2006 in Jacksonville, Florida.

_____
Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve
a copy of this Order on all parties included
on the Master Service List.