Hearing Date: May 4, 2006
Objection Deadline: May 1, 2006

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |

## DEBTORS' MOTION FOR AUTHORITY TO ASSUME
## AND ASSIGN NORTH CAROLINA GROUND LEASE TO FOOD LION, LLC

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), move for an order pursuant to Section 365 of the Bankruptcy Code, authorizing the Debtors to assume and assign a nonresidential real property lease to Food Lion, LLC, and in support state:

### Background

1.      On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered for procedural purposes only.

2.      The Debtors operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. On

---

[1]      In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases pursuant to Bankruptcy Code sections 1102 and 1103.

3.      The Debtors are grocery and drug retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners. At the Petition Date, the Debtors operated more than 900 stores in the United States with nearly 79,000 employees. Since the Petition Date, the Debtors have sold or closed over 300 stores.

4.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334. Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      The statutory predicate for the relief requested by this Motion is Bankruptcy Code section 365.

### Relief Requested

6.      Prior to the Petition Date, Winn-Dixie Raleigh, Inc ("WD Raleigh"), Winn-Dixie Stores, Inc. and Food Lion, LLC ("Food Lion") entered into an Asset Purchase Agreement dated October 28, 2004, by which the Debtors agreed to transfer all rights, title and interests held by WD Raleigh in Store 896 to Food Lion. Due to a clerical error, the ground lease for Store 896, dated February 8, 1985, as supplemented and amended, was omitted from the Purchase Agreement (the "Ground Lease"). A copy of the Ground Lease is attached as Exhibit A. No defaults exist under the Ground Lease.

7.    By this Motion, the Debtors request that the Court enter an order authorizing the Debtors to assume and assign the Ground Lease to Food Lion, LLC.

### Applicable Authority

**A.    Authority to Assume and Assign the Leases**

8.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and assign an unexpired lease subject to the Court's approval.

9.    The standard that is applied in determining whether an unexpired lease should be assumed and assigned is the debtors' "business judgment" that the assumption and assignment is in the Debtors' economic best interest. *Sharon Steel Corp. v. National Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984).

10.    To assign a lease, a debtor must provide the landlord with assurance that the new tenant will perform under the lease:

> The trustee may assign an executory contract or unexpired lease of the debtor only if:

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

> 11 U.S.C. § 365(f)(2).

11.    The meaning of "adequate assurance" depends on the facts and circumstances of each case, but should "be given a practical pragmatic construction". *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992) (citation omitted), *aff'd*, 993 F.2d 300 (2d

Cir. 1993). The assurance that rent will be paid is a chief determinant in assessing adequate assurance of future performance. *Id.*

12. Adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance:

(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3).

Thus, adequate assurance includes demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance was present when prospective assignee of lease from debtor had the financial resources, and an expressed willingness, to devote sufficient funding to business in order to give it strong likelihood of succeeding). The Debtors have met the requirements of Section 365(f). Food Lion is a financially sound company in the business of operating grocery stores.

**B.**    **Objection Deadline**

13.    Only objections filed and served on Sally McDonald Henry at shenry@skadden.com, Skadden, Arps, Slate, Meagher, & Flom, LLP, Four Times Square, New York, New York 10036 and on Cynthia C. Jackson at cjackson@smithhulsey.com, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 so as to be received by May 1, 2006 at 4:00 p.m. (E.T.) will be considered by the Bankruptcy Court at the Hearing.

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court: (a) enter an order substantially in the form attached authorizing the Debtors to assume and assign the Ground Lease to Food Lion, and (b) for such other and further relief as the Court deems just and proper.

Dated: April 21, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By   /s/ D. J. Baker
     D. J. Baker
     Sally McDonald Henry
     Rosalie W. Gray

Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Counsel for Debtors

SMITH HULSEY & BUSEY

By   /s/ Cynthia C. Jackson
     Stephen D. Busey
     James H. Post
     Cynthia C. Jackson  (F.B.N. 498882)

225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Debtors

**EXHIBIT A**

## GROUND LEASE

THIS GROUND LEASE, dated as of  February 8, 1985, (this Lease), between DUNN PLAZA ASSOCIATES, a North Carolina general partnership, having an address at 122 E. Stonewall Street, Charlotte, North Carolina 28202, as landlord ("Landlord"), and WINN-DIXIE RALEIGH, INC., a Florida corporation, having an address at P. O. Box 25511, Raleigh, North Carolina 27611, as tenant ("Tenant").

Landlord and Tenant hereby agree as follows:

1.  *Demise of Premises.*  In consideration of the rents to be paid and the agreements to be performed pursuant to this Lease, and upon the terms and conditions herein specified, Landlord hereby leases to Tenant the parcel of land described in Exhibit A, together with all easements, rights and appurtenances thereto (the "Premises").

2.  *Title and Condition.*  The Premises are leased in their present condition, subject to real estate taxes not now due and payable, to all applicable legal requirements and to all restrictions of record.  Landlord covenants and warrants that the Premises are free and clear of all liens and encumbrances except those shown of record at the date of commencement of the term of this Lease and liens for real estate taxes not now due and payable.

3.  *Term.*

(a)  Tenant shall have and hold the Premises, subject to the provisions hereof, for a Basic Term commencing on the date hereof and terminating at midnight on the twentieth (20th) anniversary of the Rental Commencement Date defined in paragraph 4 hereof.

(b)  Tenant shall have the right to extend this Lease beyond the Basic Term for eight (8) successive extensions for five (5) years each (the "Extended Terms").  Tenant shall be



entitled to exercise its right to extend this Lease for each
consecutive Extended Term by giving notice of such extension to
Landlord not less than 180 days prior to the expiration of the
then existing Basic Term or Extended Term, provided Tenant is not
in default hereunder beyond any cure period to which Tenant is
entitled hereunder on the date of such exercise or on the date of
the commencement of each such exercised Extended Term.  Each
Extended Term shall commence on the date next succeeding the
expiration date of the Basic Term or the next preceding Extended
Term, as the case may be.  In the event Tenant fails to exercise
its right to any five (5) year Extended Term within the notice
period provided for such exercise, Tenant's right to exercise any
future extended five (5) year Extended Term shall terminate.

     4.    *Rent.*  Commencing on the first to occur of (i) the
first anniversary of the date hereof, or (ii) the date Tenant
opens for business on the Premises (the "Rental Commencement
Date") Tenant covenants to pay to Landlord, at Landlord's address
set forth above or at such other place as Landlord from time to
time may designate, as Basic Rent for the Premises, the following
amounts:

          (a)  For the period of the Basic Term after the Rental
              Commencement Date, the annual rent of $22,000.00
              per year shall be payable in twelve (12) equal
              monthly installments of $1,833.33 each, in advance
              on or before the first day of each month during
              such period.

          (b)  For each of the first four (4) consecutive five
              (5) year Extended Terms, if exercised, the annual
              rental will be increased by a sum equal to
              $5,000.00 and for each of the last four (4) con-
              secutive five (5) year Extended Terms, if exer-
              cised, the annual rental will be increased by a
              sum equal to $10,000.00.  All such increases shall

-2-

be cumulative.  For example, for the first of the eight five year option periods, if exercised, the annual rental will be $27,000.00; for the second of the eight five year option periods, if exercised, the annual rental will be $32,000.00, etc.  The increased rentals will be paid in twelve (12) equal monthly installments in the same manner as described in subparagraph (a) above.

5.   *Taxes.*

(a)  Tenant covenants to pay during the Basic Term and any exercised Extended Terms, when due and payable without penalty, all costs, expenses and obligations arising from the ownership, possession, maintenance, repair, building upon, rebuilding, use or occupancy of the Premises, including, but not limited to, all ad valorem real estate taxes, taxes and assessments of every kind or nature which are now or may hereafter be imposed or assessed upon the Premises, any improvements thereon, and any personalty placed therein, fees, water and sewer charges, all taxes or excises on rent or any other tax, levy or charge however described levied against the Landlord by the Federal Government, the State of North Carolina or any political subdivision of the State of North Carolina on account of rentals or other charges payable to Landlord hereunder, and other utility and/or governmental charges.

(b)  Tenant shall, at its sole cost and expense, comply with all agreements and legal requirements affecting the Premises or the use thereof.

(c)  So long as Tenant shall pay all Basic Rent and other sums for the payment of which Tenant is obligated hereunder, when and as the same shall become due, and shall perform all of its obligations hereunder, Landlord covenants and agrees that Tenant may peaceably and quietly enjoy the Premises.  Tenant shall be responsible only for its pro rata share of ad valorem

-3-

taxes for fractional years occurring at the commencement and termination of the Basic Term of this Ground Lease, as extended by exercise of Extended Terms pursuant to paragraph 3(b) hereof.

6.  *Mechanics' Liens.*  Tenant covenants and agrees to do all things necessary to prevent the filing of any mechanics' or other liens against the Premises or any part thereof by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant, or anyone holding the Premises or any part thereof, through or under Tenant.  If any such lien shall at any time be filed against Tenant's interest in the Premises, Tenant shall either cause the same to be discharged of record within twenty (20) days after the date of filing of the same, or, if Tenant, in Tenant's discretion and in good faith, determines that such lien should be contested, shall furnish such security as may be necessary or required to prevent any foreclosure proceedings against Landlord's or Tenant's interest in the Premises the pendency of such contest.  If Tenant shall fail to discharge such lien within such period or fail to furnish such security, then, in addition to any other right or remedy of Landlord resulting from Tenant's said default, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by giving security or in such other manner as is, or may be, prescribed by law.  Nothing contained herein shall imply any consent or agreement on the part of Landlord to subject Landlord's estate to liability under any mechanics' or other lien law.  Any amount paid by Landlord hereunder shall be deemed additional rent immediately due and payable after written demand therefor from Landlord to Tenant.

7.  *Condemnation.*

(a) Whenever used in this Lease, the following terms shall have the meanings set forth adjacent thereto:

-4-

(i)    "Condemnation" shall mean any actual or constructive taking by governmental authority by means of eminent domain, condemnation, or deed or agreement in lieu thereof, or otherwise, but shall not include any taking of a strip of land along the frontage of the Premises up to twenty (20) feet in width from the existing right-of-way of U.S. Highway #421, provided access into the shopping center from such highway is maintained.

(ii)    "Building Space" shall mean space in the Winn Dixie building or any replacement thereof ("Building").

(iii)    "Non-Building Space" shall mean space other than Building Space.

(iv)    "Major Condemnation" shall mean (i) any Condemnation of any part of the Building Space, or (ii) a Condemnation of the Non-Building Space which either denies Tenant access to U.S. Highway #421 adjacent to the Premises for more than 90 days or reduces the number of parking spaces in the Premises by fifteen percent (15%) or more.

(v)    "Minor Condemnation" shall mean any Condemnation other than a Major Condemnation.

(b)    If, at any time during the Term of this Lease, a Major Condemnation shall occur, Tenant shall have the option to cancel this Lease upon written notice within sixty (60) days after the occurrence of the Major Condemnation, and upon such notification this Lease shall terminate and expire and the Basic Rental, and other fees, taxes, assessments, utility costs and other charges payable hereunder shall be apportioned and paid to the date of such termination.  In the event of a Major Condemnation or a Minor Condemnation, the proceeds of any award (subject to the provisions of Section (f) hereof) shall be distributed and paid as follows:

(i)    any award for the land making up the Premises shall belong to the Landlord.

-5-

(ii) any award for the Building shall belong to the Tenant.

(c) If the condemning authority does not separately allocate the amount of the award for the land and for the Building, and if Landlord and Tenant are unable to agree on such allocation, the dispute as to the allocation shall be submitted for binding arbitration as provided in the Uniform Arbitration Act as adopted in North Carolina.

(d) In the event of the occurrence of a Minor Condemnation or a Major Condemnation, not resulting in a cancellation of this Lease, the Basic Rent under this Lease shall be reduced to an amount arrived at by multiplying the Basic Rent payable had there been no condemnation by a fraction, the numerator of which is the number of square feet in the land immediately after the Condemnation and the denominator of which is the number of square feet in the land immediately prior to the condemnation.

(e) In the event of a condemnation, Tenant may make a separate claim against the condemning authority for the value of its furniture, equipment and trade fixtures, relocation expenses, and, if allowed, loss of business.

(f) In the event of a Condemnation not resulting in the termination of this Lease, the Tenant shall proceed with reasonable diligence, as and when condemning authority has paid the award to repair and restore the Building, or any part thereof, as nearly as possible to its condition immediately prior to the condemnation.

8. *Assignment and Subletting*.

(a) As used in this Lease, the term "Tenant" shall mean the person or persons, and any of them, having the interest of Tenant in the Premises for the time being pursuant to this Lease and, subject to the provisions of paragraph 8(b), in the event of any transfer of the interest of a Tenant in the Premises, any

-6-

such transferor by making such transfer shall be relieved of all personal liability hereunder arising after such transfer and any such transferee by accepting such transfer shall be deemed to have assumed all covenants and obligations of Tenant hereunder arising from and after the date of such transfer.  If after the improvements referred to in paragraph 16 hereof are completed and Tenant has opened for business therein, a successor Tenant to Winn-Dixie Raleigh, Inc. shall be an individual or partnership, general or limited, it is specifically understood and agreed that there shall be no personal liability on such individual or the members of such partnership with respect to any of the covenants or obligations of this Lease, and Landlord shall look solely to the interest of Tenant in the Premises and, if Tenant shall be a partnership, to the assets of such partnership, for the satisfaction of the remedies of Landlord in the event of a breach by Tenant of any of the covenants or obligations of this Lease, and no other property or assets of such individual or individuals shall be subject to levy, execution or other enforcement procedure for the satisfaction of Landlord's remedies.

Notwithstanding the foregoing provisions of this paragraph 8(a), (i) Winn-Dixie Raleigh, Inc., the original Tenant under this Lease, shall be and remain primarily liable for the performance of all covenants and obligations under this Lease notwithstanding any transfer, mortgage, pledge, arrangement or sublease of the interest of Winn-Dixie Raleigh, Inc. hereunder and any language contained in this paragraph 8(a) pertaining to release of personal liability or release from the obligations to perform obligations and covenants contained herein shall not apply to Winn-Dixie Raleigh, Inc., it being the interest of the parties that Winn-Dixie Raleigh, Inc. shall remain personally liable for the performance of all covenants and agreements of the Tenant under this lease for the full term, including exercised

-7-

renewal terms, hereof and (ii) to the extent any monetary amount
is received by any Tenant hereunder which is payable to the Land-
lord under the terms hereof there shall be no release of personal
liability of such Tenant to make such payment to Landlord.

(b)  Winn-Dixie Raleigh, Inc. may at any time after opening
a fully stocked Winn-Dixie supermarket on the Premises vacate the
Premises and Tenant at any time it is not in default hereunder
may sublet the Premises, or assign, transfer, sell, mortgage or
pledge its interest under this Lease and its interest in and to
any sublease or the rentals payable thereunder.  No mortgage,
pledge or assignment of this Lease absolutely or as security
shall impair or diminish any obligations of Winn-Dixie
Raleigh, Inc. hereunder or impose any obligations on the mort-
gagee, pledgee or assignee thereof.  Any interest so assigned may
be assigned and reassigned in like manner by any assignee
thereof.  In the event the Premises remain less than twenty-five
percent (25%) occupied for a period of in excess of two years,
the Landlord shall be entitled to treat such event as a default
hereunder and may, by written notice to the Tenant prior to the
cure of such default, sublease for the benefit of Tenant all or
part of the unoccupied space in the premises to subtenants upon
terms at least equal to the terms contained herein (with
appropriate adjustments on a prorata basis in rent, fees and
other charges provided herein if the subtenant occupies less than
the entire Premises).  The aforesaid right to sublease for the
benefit of Tenant shall be the only remedy of Landlord in the
event of any such default.

9.  *Performance by Landlord: Contests.*

(a)  If Tenant shall fail to make or perform any payment or
act on its part to be made or performed under this Lease, then,
subject to the provisions of paragraph 9(b), Landlord may (but
need not) upon 10 days' notice to Tenant and without waiving any

-8-

default or releasing Tenant from any obligation, make such pay-
ment or perform such act for the account of Tenant, and the cost
thereof, with interest at the lesser of (i) two percent (2%) in
excess of the prime rate of NCNB National Bank of North Carolina,
as that rate may change from time to time, or (ii) the highest
lawful rate (hereinafter referred to as the "Default Rate"),
shall be payable by Tenant upon demand.

(b)  Tenant shall not be required, nor shall Landlord have
the right, to pay, discharge or remove, any tax, levy, assess-
ment, lien, encumbrance or charge against the Premises, so long
as Tenant shall, at its cost and expense, contest the amount or
validity thereof by appropriate proceedings which shall operate
to prevent the collection of, or other realization upon, such
tax, levy assessment, lien, encumbrance or charge, and the sale
or forfeiture of the Premises or any part thereof, to satisfy the
same, and Tenant delivers to Landlord security satisfactory to
Landlord to insure the payment of any such amount plus interest
and penalties, if such amount is ultimately found to be due.

(c)  In the event of the termination of this Lease as
herein provided, the obligations of Tenant, actual or contingent,
under this Lease which arose prior to such termination shall
survive such termination.

10.  *Defaults and Remedies.*  The following occurrences or acts
shall constitute events of default under this Lease:

(a)  If Tenant shall fail to make payment when due of any
sum payable by it hereunder ("monetary default"), which sums
shall bear interest at the Default Rate from the date due until
paid, and such default is not cured within ten (10) days after
the Landlord has given Tenant written notice of such default; or

(b)  If Tenant shall fail to observe or perform any non-
monetary provisions of this Lease to be observed or performed by
Tenant; and if such default shall continue for 30 days after

-9-

Landlord shall have given Tenant written notice specifying such default and demanding that the same be cured, or, if by reason of the nature thereof such default cannot with due diligence be wholly cured within such 30-day period, if Tenant shall fail to commence such cure within said 30-day period and thereafter prosecute the curing of such default with all due diligence, it being intended in connection with a default not susceptible of being wholly cured with due diligence within such period that the time within which to cure the same shall be extended for such period as may be reasonably necessary to complete the curing of the same with due diligence.

Landlord shall have the right, at its election, subject to paragraph 11, while any event of default shall continue, to give Tenant notice of Landlord's intention to terminate this Lease on a date specified in such notice not earlier than thirty (30) days after the giving of such notice for a non-monetary default or not earlier than ten (10) days after giving of such notice for a monetary default, and if such notice shall be given and such event of default shall not have been cured on or prior to the date so specified this Ground Lease and the estate hereby granted shall terminate on such date; upon such termination, Landlord shall have the immediate right of re-entry and possession of the Premises and the right to remove all persons and property therefrom, and Tenant will quit and surrender the Premises to Landlord, and Landlord may without further notice enter upon, re-enter and repossess the Premises by summary proceedings, ejectment or otherwise.

No remedy herein or otherwise conferred upon or reserved to Landlord shall be considered exclusive of any other remedy, but the same shall be distinct, separate and cumulative and shall be in addition to every other remedy given hereunder, or now or hereafter existing at law or in equity or by statute;

-10-

and every power and remedy given by this Lease to Landlord may be exercised from time to time as often as occasion may arise, or as may be deemed expedient.  No delay or omission of Landlord to exercise any right or power arising from any default on the part of the other shall impair any such right or power, or shall be construed to be a waiver of any such default or any acquiescence thereto.

11.  *Sublease and Mortgage.*

(a)  Tenant intends to sublease the Premises or assign this Ground Lease from time to time hereafter.  During any period of time when such a sublease or assignment (the "Sublease") is in effect, performance by any sublessee or assignee (the "Sub-lessee") of the provisions of this Ground Lease shall be accepted by Landlord as performance hereunder, except that Winn Dixie Raleigh, Inc. shall remain responsible for performance of its obligation to open and operate a super market on the Premises as provided in paragraph 15 hereof; and

(b)  Tenant intends to mortgage, assign or pledge its interest in the Premises as security for indebtedness not to ex-ceed the actual cost of construction of its proposed store build-ing by sale-leaseback or otherwise.  If Tenant shall have made any such mortgage, assignment or pledge to any bank, insurance company, real estate investment trust, pension or trust fund for which a bank is acting as trustee, or other institutional inves-tor ("Institutional Investor") and if Landlord shall have been given notice thereof in accordance with paragraph 12 (each and every such mortgage, assignment or pledge being herein called the "Mortgage" and the mortgagee, assignee or pledgee thereunder together with their respective successors and assigns being herein called the "Mortgagee"):

(i)  upon the occurrence of any event of default under this Lease, Landlord shall give simultaneous notice of such

-11-

event of default to the Mortgagee and the Mortgagee shall have the right to cure such event of default within the cure period granted to Tenant herein, and Landlord in addition grants to Mortgagee an additional twenty (20) days with respect to a default specified in paragraph 10(a) and thirty (30) days (or such longer period as may be required to cure such default with due diligence) with respect to a default specified in paragraph 10(b) to cure such default before taking any action to terminate this Ground Lease;

(ii)  all rights acquired under such mortgage shall be subject to each and all of the covenants, conditions and restrictions set forth in this Lease, and to all rights and interest of Landlord herein, none of which covenants, conditions or restrictions is or shall be waived by Landlord by reason of the rights given so to mortgage such interest in this Lease, except as expressly provided herein, and upon the further condition that the Mortgagee of any such mortgage or assignment shall be an Institutional Investor.

(iii)  There shall be no cancellation, surrender or modification of this Lease by joint action of Landlord and Tenant without the prior consent in writing of the Mortgagee.

(iv)  Landlord agrees that the name of the leasehold mortgagee may be added to the "Loss Payable Endorsement" of any and all insurance policies required to be carried by Tenant hereunder on the condition that the insurance proceeds are to be applied in the manner specified in this Lease and that the Mortgage or collateral document shall so provide.

(v)  Landlord agrees that in the event of termination of this Lease by reason of any default by Tenant, that Landlord will enter into a new lease for the Premises with the Mortgagee or its nominee for the remainder of the Term

-12-

effective as of the date of such termination, at the Basic Rent, and upon the terms, provisions, covenants and agreement as herein contained, subject only to the rights, if any, of the parties then in possession of any part of the Premises provided:

(1) Said Mortgagee or its nominee shall make written request upon the Landlord for such new lease within fifteen (15) days after the date of such termination and such written request is accompanied by any then due payment of Basic Rent, charges, fees, and other monetary amounts payable under this Lease and said Mortgagee or nominee shall execute and deliver such new lease within fifteen (15) days after Landlord shall have delivered same to such Mortgagee or nominee following the aforesaid written request therefore.

(2) Said Mortgagee or its nominee shall pay to Landlord at the time of execution and delivery of said new lease, any and all sums which would, at the time of the execution and delivery thereof, be due pursuant to this Lease but for such termination and, in addition thereto, any reasonable expenses, including reasonable attorney's fees, to which Landlord shall have been subjected by reason of such default, including the costs of negotiation, approval and recording said new lease.

(3) Said Mortgagee or its nominee shall perform and observe all covenants herein contained on Tenant's part to be performed and shall further remedy any other conditions which Tenant under the terminated lease was obligated to perform under the terms of this Lease.

(4) Landlord shall not warrant possession of the Premises to Tenant or Mortgagee under the new lease.

(5) Such new lease shall be expressly made subject to the rights, if any, of Tenant under the terminated lease.

-13-

(6)  The tenant under such new lease shall have the same right, title and interest in and to the Premises as Tenant under the terminated lease.

(vi)  The Mortgagee shall be given notice of any arbitration proceedings by the parties hereto and shall have the right to intervene therein and be made a party to such proceedings and the parties hereto do hereby consent to such intervention.  In the event that the Mortgagee shall not elect to intervene or become a party to such proceedings, the leasehold mortgagee shall receive notice of, and a copy of, any award or decision made in said arbitration proceeding.  Any additional reasonable costs, including reasonable attorneys fees, incurred by the parties as a result of such intervention shall be paid by the Mortgagee.

(vii)  Landlord shall, upon request, execute, knowledge and deliver to each Mortgagee, an agreement prepared at the sole cost and expense of Tenant, in form satisfactory to such Mortgagee and Landlord, between Landlord, Tenant and Mortgagee agreeing to all of the provisions of this paragraph 11.  Any additional reasonable costs incurred by the Landlord in connection with such agreement, including reasonable attorneys fees, shall be paid by the Mortgagee.

The term "Mortgage" whenever used herein, shall include whatever security instruments are used in the locale of the Premises such as, without limitation, deeds of trust, security deeds and conditional deeds as well as financing statements, security agreements and other documentation required pursuant to the Uniform Commercial Code.

12.  *Notices*.  All notices, instruments and communications permitted or required to be delivered pursuant to this Lease shall be in writing and shall be validly given when mailed by prepaid United States registered or certified mail, return

-14-

receipt requested, addressed to the person entitled to receive the same. So long as Landlord shall have been given notice of the name and address of the Mortgagee in the manner provided for notices in this paragraph, a duplicate copy of any notice, instrument or communication given to Tenant shall be sent at the same time to such Mortgagee, and such notice, instrument or communication shall not be deemed to have been properly given or sent unless so sent to such Mortgagee. Landlord, Tenant and the Mortgagee and any other person to whom any such notice, instrument or communication may be given, shall each have the right to specify, from time to time, as its address for purposes of this Lease, any address in the United States upon giving fifteen (15) days' notice thereof to each other person then entitled to receive notices, instrument or communications hereunder. The addresses of Landlord and Tenant for purposes of this Lease, until notice to the contrary has been given as above provided, shall be their respective addresses set forth above.

13. *Estoppel Certificate.* Landlord and Tenant will, from time to time upon ten (10) days' request by the other, or the Mortgagee, execute, acknowledge and deliver a statement, dated currently, certifying that this Lease is unmodified and in full effect (or, if there have been modifications, that this Lease is in full effect as modified, and identifying such modifications) and the dates to which Basic Rent and other amounts payable hereunder have been paid, and that no default exists in the observance of this Lease and no event of default has occurred and is continuing, or specifying each such default or event of default of which the signer may have knowledge, it being intended that any such statement may be relied upon by the Mortgagee or by any prospective purchaser of the interest of Tenant or Landlord in the Premises or any assignee of Tenant, Landlord or the Mortgagee. So long as no default has occurred and is continuing under

-15-

this Lease, Landlord will from time to time, upon ten (10) days' request by the Mortgagee, execute and deliver an instrument in recordable form ratifying and confirming the provisions of this Lease and recognizing a Mortgagee or Sublessee as mortgagee or sublessee of the interest of Tenant in the Property.

14. *No Merger.* There shall be no merger of this Lease or of the leasehold estate hereby created by any other estate or interest in the Premises or any portion thereof by reason of the fact that the same person may acquire or hold, directly or indirectly, (a) this lease or the leasehold estate hereby created or any interest in this Lease or such leasehold estate, and (b) any such other estate or interest in the Premises or any portion thereof, and this Lease shall not be terminated for any cause except as expressly provided herein.

15. *Use.* The Premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited (except as hereinafter provided) to foods and food products, or for the conduct of any general merchantile business; provided, however, except as a supermarket, the Premises shall not be used and shall not be assigned or subleased under the terms hereof, for any use or business engaged in by any other than tenant in the Dunn Plaza Shopping Center as of the date hereof to whom Landlord has granted rights of exclusive use as described on Exhibit X attached hereto, and provided further, the Premises shall not be used for the sale of prescription drugs or drugs required to be dispensed by a licensed pharmacist.

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of said Premises, as such shall relate to the cleanliness and use of said Premises and the character and manner of operation of the business conducted in or at said Premises.

-16-

Tenant agrees to open the store building constructed by it pursuant to paragraph 16 hereof as a fully stocked Winn-Dixie supermarket.

During the terms of this Lease, Tenant agrees:

(i)   To keep the Premises, including all vestibules, entrances and returns located therein, all improvements thereon, all windows, doors and glass or plate glass fixtures and all parking and landscaped areas, in a safe, neat clean condition at all times.

(ii)   To store all trash and garbage in adequate containers within the Premises, maintained in a neat and clean condition and located so as not to be visible to the public and so as not to create or permit any health or fire hazard, and arrange for regular removal thereof at Tenant's expense.

(iii)   Not to burn any papers, trash or garbage or any kind in or about the Premises.

(iv)   Not to distribute any handbills or other advertising matter on or about any part of the shopping center outside the Premises.

(v)   Not to advertise any going-out-of-business, removal, fire, bankruptcy, auction or other distress sale on the Premises, but if any such covenant by Tenant be unlawful, then no such activity may be so conducted, unless and until satisfactory proof has been supplied that the person intending to conduct such sales has complied meticulously with all legal requirements, including without limitation any applicable rules and regulations of the Federal Trade Commission.

(vi)   Not to use any sidewalk, walkways or other common areas within the Premises for the keeping, displaying, advertising and/or sale of any merchandise or other object.

(vii)  Not to install on or about the Premises any exte-
rior lighting, amplifiers or similar devices and/or not to
use in, on or about the Premises any advertising medium
which may be heard or experienced outside the Premises, such
as flashing lights, searchlights, loudspeakers, phonographs,
television or radio broadcasts.

(viii)  Not to install a television antenna outside the
Premises without Landlord's written consent, unless that
antenna is shielded from view from the Common areas on Par-
cel 1 and state maintained roadway adjacent to the Premises.

(ix)  To keep the Premises clean, orderly, sanitary and
free from objectionable odors and from termites, insects,
vermin and other pests, and not to keep any live animals of
any kind in, upon or about the Premises.

(x)  To comply with any and all requirements of any of
the constituted public authorities, and with the terms of
any state of Federal statute or local ordinance or regula-
tion applicable to Tenant or its use of the Premises.

(xi)  To require Tenant's employees to park their vehi-
cles only in parking areas on the Premises and that such
cars will be identified or marked with a standard plate,
sticker or other means of identification provided by Land-
lord.

16.  *Construction of Store Building.*  Tenant agrees to con-
struct or cause to be constructed on the Premises in the location
on the Premises as shown on Exhibit B. attached hereto the Store
Building containing at least 35,000 square feet of floor area,
landscaping, parking and other improvements in accordance with
Plans and Specifications prepared and certified by a licensed
Architect who is a member of the American Institute of Architects
and approved by Landlord.  Tenant agrees to submit such Plans and
Specifications to Landlord for approval within thirty (30) days

-18-

of the date hereof.  In the event that the Landlord and Tenant
cannot agree on those Plans and Specifications within thirty (30)
days of the receipt of same by Landlord, either Landlord or
Tenant may terminate this Lease by written notice to the other.
In the event such Plans and Specifications are approved, a set of
same initialed and dated by Landlord and Tenant will be delivered
to Landlord and Tenant to evidence compliance with the terms
hereof.  Tenant agrees to complete construction of the Improve-
ments indicated on such approved Plans and Specifications and
open for business as a supermarket within one year after such
Plans and Specifications are approved.

      17.  *Exclusive Supermarket.*  Landlord covenants and agrees
that the Tenant shall have the exclusive right to operate a su-
permarket in the Dunn Plaza Shopping Center and any enlargement
thereof.  Landlord further covenants and agrees that it will not
directly or indirectly lease or rent any property located within
the shopping center, for occupancy as a supermarket, grocery
store, meat, fish or vegetable market, nor will the Landlord
permit any tenant or occupant of any such property to sublet in
any manner, directly or indirectly, any part thereof to any per-
son, firm or corporation engaged in any such business without
written permission of the Tenant; and the Landlord further cove-
nants and agrees not to permit or suffer any property located
within the shopping center to be used for or occupied by any
business dealing in or which shall keep in stock or sell for off-
premises consumption any staple or fancy groceries, meats, fish,
vegetables, fruits, bakery goods or frozen foods without written
permission of the Tenant.

      Notwithstanding the foregoing, Tenant agrees that
Rose's Department Store shall be restricted under this Paragraph
17 only to the extent that it shall not be permitted to operate
in its building or elsewhere in the shopping center, a food su-

-19-

permarket or grocery store or any department or concession which would constitute the equivalent thereof.

Despite the restrictions hereinabove contained, Tenant further agrees that the following shall not be deemed to violate the provisions of this paragraph 17:

(a)  one "Hickory Farms" type gourmet food store may be permitted to operate in the shopping center, provided its gross floor area shall not exceed three thousand two hundred fifty (3,250) square feet, and

(b)  one bakery shop may be permitted to operate in the shopping center, provided its gross floor area shall not exceed two thousand five hundred (2,500) square feet, and

(c)  one doughnut shop and/or one candy shop may be permitted to operate in the shopping center, provided the gross floor area of each shall not exceed two thousand (2,000) square feet, and

(d)  other stores in the shopping center (besides those hereinabove described) may sell for off-premises consumption incidental food items customarily sold by similar types of businesses in the area, provided each said other store may not devote to such sales in excess of ten percent (10%) of the gross floor area of its storeroom or two thousand (2,000) square feet, whichever amount of space is smaller.

The foregoing exclusive shall terminate in the event Tenant fails to operate a supermarket in a majority of the store building located on the Premises for a consecutive period of one year, except for failures to so operate caused by damage or destruction of the improvements on the Premises, provided such damage or destruction is repaired or restored within eighteen (18) months after the event causing such damage or destruction and the Tenant commences to again operate a supermarket on the Premises upon completion of such repair or restoration.

-20-

18.  *Overall Shopping Center.*

(a)  It is understood and agreed that Landlord has retained its interest in Parcel 1, as shown on Exhibit "B" hereto, and that such parcel has been developed as a portion of an overall, integrated shopping center in connection with Tenant's development of Parcel 2, as is described in Exhibit "A" hereto.  Tenant agrees to construct the initial improvements on Parcel 2 in accordance with approved plans and specifications and in renovation or replacement thereof in like architectural and structural quality as Landlord's building on Parcel 1.

(b)  Each of said Parcels 1 and 2, Out Parcels 1-7 shown on Exhibit B and Right-of-way Parcels 1 and 2 as shown on Exhibit B shall be provided with reciprocal ingress, egress and parking rights, and the parties shall have the right to service each of the parcels with utilities across the other parcels, installed and maintained within the common areas and not under building areas in each of said parcels, and in such a fashion as to not interfere with the use and appearance of the parcels.

(c)  Each of Parcels 1 and 2 and Out Parcels 1-7 as shown on Exhibit B hereto shall, pending development thereon, be maintained as either paved parking or as landscaped areas, and shall be kept free of weeds, trash, debris and underbrush.  All of the space in Parcels 1 and 2 not used for buildings from time to time shall be reserved for use as common areas, including vehicular parking areas, roadways, service areas, drives, entranceways and exits and sidewalks and other pedestrian and vehicular ways, and as landscaped and planted areas, but permitting those necessary appurtenances for such use including, without limitation, paving, light standards, curbings, directional signs, drainage facilities and underground facilities.  The existing Pylon sign on the Pylon Sign Parcel shown on Exhibit B shall be the only Pylon sign permitted with respect to Parcels 1 and 2.  The Landlord as owner of Parcel 1 and the Tenant as ground lessor of Parcel 2 as shown on Exhibit A hereto shall each indemnify and save harm-

-21-

less the other from any accident or damage to any person or property happening on or about the common areas located or their respective Parcels, and each shall maintain public liability insurance on the common facilities with a contractual liability Rider on the policy and in a company qualified to transact business in the State of North Carolina, stipulating single limits of not less than $1,000,000.00 for damage to property or injury to persons. So long as Winn-Dixie Raleigh, Inc. is the Tenant in possession of the Premises, it shall be allowed to self insure the foregoing coverage in accordance with the emulations and conditions set forth in paragraph 23(f) hereof.

(d)  In the event of casualty loss, complete or partial, to the buildings on Parcel 1 or Parcel 2, the buildings shall be promptly restored to like architectural and structural quality, or the damaged buildings shall be razed and the parcels maintained as paved parking or as landscaped areas, so as not to detract from the appearance of the overall shopping center, unless otherwise provided herein.

(e)  Landlord shall maintain the common areas on Parcel 1 and Tenant shall maintain the common areas on Parcel 2 free of trash and debris, and shall not maintain exposed garbage and trash storage areas or other utility areas which would detract from the appearance of the overall shopping center and the view from Tenant's building toward their parcel.  The exterior of buildings and other improvements on the parcels shall be maintained in good condition and repair to the same end.

(f)  The covenants, restrictions and easements contained in this paragraph 18 and the foregoing paragraph 17 shall be embodied in a Declaration of Restrictions and Grant of Easements document to be recorded affecting Parcel 1 and Parcel 2 as shown on Exhibit "B" hereto, prior to any mortgage or other encumbrance upon the Parcel, or to which such prior encumbrance

-22-

including the underlying ground owner, shall have consented to
the end that such restrictions and easements shall remain in full
force and effect in the event of any foreclosure, termination of
Lease, or similar happening, and providing that the reciprocal
easements shall cease and determine if the restrictions are term-
inated as to any specific parcel. Such covenants and restric-
tions shall remain in full force and effect for and during the
term of this Ground Lease and any extensions or replacements
thereof pursuant to the terms hereof. Landlord shall have the
right to place additional or further restrictions of record
affecting Parcel 1 as shown on Exhibit "B" hereto, but the terms,
covenants, conditions and restrictions required hereunder may be
extended, abrogated, modified, rescinded or amended in whole or
in part only with the written consent of Tenant, Landlord and the
holders of first lien leasehold and/or fee Mortgages on Parcel 1
and Parcel 2.

19. *Non-disturbance and Attornment with Ground Owners.* It is
understood and agreed that Tenant plans to finance construction
of the building for use by Tenant through a sale-leaseback trans-
action, and it is agreed that the purchaser of the building con-
structed for Tenant may in turn mortgage the cost to Tenant of
the Building and related improvements through a financial insti-
tution which shall be an institutional mortgagee such as defined
in Article 11(b) hereof.

20. *Miscellaneous.* Each covenant and agreement contained
in this Lease shall for all purposes be construed to be a sepa-
rate and independent covenant and agreement. If any provision of
this Lease or any application thereof shall to any extent be
invalid and unenforceable, the remainder of this Lease and any
other application of such provision shall be affected thereby.
All provisions of this Lease shall be binding upon and inure to
the benefit of the respective successors and assigns of Landlord

-23-

and Tenant, subject to the provisions of paragraph 8. This Lease may not be amended, modified or discharged except by a writing signed by Landlord and Tenant. This Lease shall be governed by and construed and enforced in accordance with the laws of North Carolina.

21. *Tenant's Covenant to Maintain.* Tenant will, at its own expense, keep and maintain in good order and repair during the full term of this Lease all of the Demised Premises (including the interior and exterior of improvements located thereon).

Tenant shall not make any alterations, additions or improvements to the exterior of the improvements on the Premises architecturally incompatible with improvements on the remainder of the shopping center, without Landlord's prior written consent.

22. *Laws and Insurance Standards.* Tenant shall, during the term of this Lease, at Tenant's sole cost and expense, promptly comply with all laws, ordinances, rules, regulations, directives and standards of all federal, state, county and municipal governments and all departments and agencies thereof having jurisdiction over the Premises now or hereafter in effect. Tenant shall, at Tenant's sole cost and expense, make all changes to the Premises which are or hereafter may be required in order to comply with the foregoing. Tenant expressly covenants and agrees to indemnify and save Landlord harmless from any penalties, damages or charges imposed for any violation of any of the covenants herein expressed, whether occasioned by Tenant or any person upon said Premises by license or invitation of Tenant or holding or occupying the same or any part thereof under or by right of Tenant.

Tenant shall have no claim against Landlord for any damages should Tenant's use and occupancy of the Premises for the purposes set forth in this Lease be prohibited or substantially impaired by reason of any law, ordinance or regulation of fed-

-24-

eral, state, county or municipal governments or by reason of any act of any legal or governmental or other public authority.

23.  *Indemnification of Landlord and Tenant and Liability Insurance.*

(a)  Tenant shall indemnify Landlord and save it harmless from suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage (and each and all of them) arising from or out of any occurrence in, upon, at or from the Premises or the occupancy or use by Tenant of said Premises or any part thereof, or occasioned wholly or in part by any act or omission by Tenant, its agents, contractors, employees, servants, invitees, licensees or concessionaires.  Tenant shall store its property in, and shall occupy, the Premises at its own risk, and releases Landlord, to the full extent permitted by law, from all claims of every kind resulting in loss of life, personal or bodily injury or property damage, no matter when or where same occurs.  Landlord shall not be responsible or liable at anytime for any loss or damage to Tenant's merchandise, equipment, fixtures or other personal property of Tenant or to Tenant's business.  Landlord shall not be responsible or liable to Tenant or to those claiming by, through or under Tenant for any loss or damage to either the person or property of Tenant that may be occasioned by or through the acts or omission of persons occupying adjacent premises.  Landlord shall not be responsible for any injury, loss or damage to any person or to any property of Tenant or other person caused by or resulting from bursting, breakage or from leakage, steam or snow or ice, running, backing up, seepage, or the overflow of water or sewage in any part of said Premises or the Dunn Plaza Shopping Center or for any injury or damage caused by or resulting from Acts of God or the elements.

(b)  Tenant shall at all times during the term of this Lease maintain in full force and effect the following insurance

-25-

in standard form generally in use in the State of North Carolina, with insurance companies authorized to do business in said State, which are satisfactory to Landlord comprehensive public liability insurance in the amount of at least One Million Dollars ($1,000,000.00) single limit coverage for property damage or personal injury.

Such insurance shall name Landlord as additional insured for the full amount of the insurance herein required. With respect to each and every policy of such insurance and each renewal thereof, Tenant, at the beginning of the term of this Lease and thereafter not less than thirty (30) days prior to the expiration of any such policy, shall furnish Landlord with a certificate of insurance executed by the insurer involved, which shall contain, in addition to matters customarily set forth in such a certificate under standard insurance practices, an undertaking by the insurer to give Landlord at least thirty (30) days' prior written notice of any cancellation, nonrenewal or any change in such policy.

(c) Tenant shall, at all times, maintain workmen's compensation insurance to comply with the applicable laws of the State of North Carolina.

(d) The insurance required by this Paragraph may be included in policies of "blanket insurance", provided that, in all other respects, each such policy shall comply with the requirements of this paragraph 23 provided that a separate certificate is issued disclosing the minimum amount of insurance for the Premises, and provided that no other loss which may or may not be also insured thereby, shall in any way affect or limit the coverage and amounts of insurance required hereby.

(e) Provided the Tenant in occupancy under the terms hereof in Winn-Dixie Raleigh, Inc. and it is not in default hereunder beyond any cure period, Winn-Dixie Raleigh, Inc. may, in

-26-

lieu of obtaining the insurance coverage provided in this para-
graph 23, self insure the first $750,000.00 of each such coverage
provided self insurance is allowed by law, a certificate of self
insurance is allowed by law, a certificate of self insurance is
delivered to Landlord by Winn-Dixie Raleigh, Inc. on the dates
that evidence of insurance coverage required hereunder is
required to be delivered, and the self-insurance election does
not deminish Landlord's rights hereunder and is treated as equi-
valent to the insurance coverage otherwise required hereunder.

24.   *Fire Insurance, Rental Interruption Insurance, Damage and
Destruction.*

(a)   At all times during the term of this Lease, Tenant
shall pay all premiums for and maintain in effect, with insurance
companies authorized to do business in North Carolina, policies
of insurance covering the improvements located on the Premises,
providing coverage in the amount of 100% of the replacement cost
of the improvements located on the Premises (less the cost of
foundation footings, excavation and paving), against all casu-
alties included under standard insurance industry practices
within the classification "Fire and Extended Coverage, Vandalism
and Malicious Mischief" and including Rent Insurance for twelve
(12) months and Sprinkler Leakage Insurance.  Nothing in this
Section shall prevent the taking out of policies of blanket
insurance, which may cover real and/or personal property and
improvements in addition to the Building located on the Premises
constitute a part; provided, however, that in all other respects
each such policy shall comply with the other provisions of this
Section (a).  Further, Winn-Dixie Raleigh, Inc. shall be entitled
to self-insure the foregoing hazards subject to the limitations
and conditions set forth in paragraph 23(f) hereof.

Tenant will furnish to Landlord, within thirty (30)
days before Tenant opens for business, and from time to time
thereafter, copies of policies or certificates of insurance evi-

-27-

dencing coverages required by this Lease. All policies required hereunder shall contain an endorsement providing that the insurer will not cancel, nonrenew or change said policy or policies without first giving at least thirty (30) days' prior written notice thereof to the Landlord.

Tenant hereby grants to Landlord on behalf of any insurer providing the insurance described in this Paragraph 24, covering the Demised Premises, improvements therein, or contents thereof, a waiver of any right of subrogation which any such insurer of Tenant may acquire against the Landlord by virtue of payment of any loss under such insurance.

25. *Ownership of Certain Property and Surrender of Premises.* Upon the termination of this Lease, Tenant shall surrender to Landlord the Premises, including, without limitation, all buildings, apparatus and fixtures (except signs, trade fixtures, equipment which has not been permanently attached to the building and furniture installed by Tenant) then upon the Premises, in good condition and repair, and all alterations, improvements, additions, machinery and equipment which may be made or installed from time to time by either party hereto to, in, upon or about the Premises; and, upon such termination, the same shall be surrendered to Landlord by Tenant without injury, damage or disturbance thereto or payment therefor. Said property shall include but not be limited to all components of the heating, air conditioning (including the portion thereof outside the Premises, if any), plumbing and electrical systems, lighting fixtures and fluorescent tubes and bulbs, all dumbwaiters, conveyors and all partitions (whether removable or otherwise). Tenant shall promptly repair any damage to the Premises resulting from the installation or removal of any of the foregoing items.

26. *Holding Over.* If Tenant remains in possession of the Premises or any part thereof after the expiration of the term

-28-

of this Lease with Landlord's acquiescence and without any written agreement of the parties, Tenant shall be only a tenant at will, and there shall be no renewal of this Lease or exercise of an option by operation of law.

27. *Transfer of Landlord's Interest.*  In the event of the sale, assignment or transfer by Landlord of its interest in the Premises or in this Lease (other than a collateral assignment to secure a debt of Landlord) to a successor in interest who expressly assumes the obligations of Landlord hereunder, Landlord shall thereupon be released or discharged from all of its covenants and obligations hereunder, except such obligations as shall have accrued prior to any such sale, assignment or transfer; and Tenant agrees to look solely to such successor in interest of Landlord for performance of such obligations.  Any securities given by Tenant to Landlord to secure performance of Tenant's obligations hereunder may be assigned by Landlord to such successor in interest of Landlord; and, upon acknowledgment by such successor of receipt of such security and its express assumption of the obligation to account to Tenant for such security in accordance with the terms of this Lease, Landlord shall thereby be discharged of any further obligation relating thereto.  Landlord's assignment of the Lease or of any or all of its rights herein shall in no manner affect Tenant's obligations hereunder.  Tenant shall thereafter attorn and look to such assignee, as Landlord, provided Tenant has first received written notice of such assignment of Landlord's interest.

28. *Short Form Lease.*  Upon the Rental Commencement Date, the parties hereto shall execute a memorandum or short form lease agreement, in recordable form, specifying the commencement and termination dates of the Basic Term hereof and including any such other provisions hereof as either party may reasonably desire to incorporate therein.

-29-

29.  *Limitation of Liability*.  Anything contained in this Lease to the contrary notwithstanding, Tenant agrees that it shall look solely to the estate and property of the Landlord in the land comprising the Premises for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord for any default or breach by Landlord of any of its obligations under this Lease, subject, however, to the prior rights of any ground or underlying Landlord or the holder of any mortgage covering the Premises or of Landlord's interest therein.  No other assets of the Landlord shall be subject to levy, execution or other judicial process for the satisfaction of Tenant's claim.  This provision shall not be deemed, construed or interpreted to be or constitute an agreement, express or implied, between the Landlord and Tenant that the Landlord's interest hereunder and in the Premises shall be subject to impressment of an equitable lien or otherwise.  Nothing herein contained shall be construed to limit any right of injunction against the Landlord, where appropriate.

30.  *Termination of Existing Lease*.  Upon the Rental Commencement date hereunder, that Lease dated February 6, 1969 by and between Landlord and Tenant for store space on Parcel 1 of Dunn Plaza Shopping Center, as amended, shall terminate and Tenant shall vacate same.  Tenant understands that Landlord has leased such store space in Parcel 1 to Roses' Stores, Inc. in reliance on this provision and performance by Tenant of the terms of this Lease.  Tenant agrees to execute a Termination Agreement in form for the recording within ten (10) days after termination of the aforesaid Lease.

-30-

IN WITNESS WHEREOF, Tenant has caused this Lease to be duly executed and delivered in its name and on behalf and under its corporate seal, and Landlord has executed and delivered this Lease, all as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

DUNN PLAZA ASSOCIATES, a North Carolina
General Partnership

By: _____ (SEAL)
Its duly authorized partner
LANDLORD

_____
As to Landlord

WINN-DIXIE RALEIGH, INC.

By: _____
Its                    Vice President

Attest _____
Its                    Secretary
TENANT

_____
As to Tenant

(CORPORATE SEAL)

-31-

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

I, _Carol Ann Christian_, a Notary Public for said County and State, do hereby certify that _Van L Weatherspoon_ personally appeared before me this day and, being duly sworn, says that he is a partner of **DUNN PLAZA ASSOCIATES**, a North Carolina limited partnership and acknowledged the due execution of the foregoing instrument on behalf of said partnership.

WITNESS my hand and notarial seal, this _8th_ day of _February_, _1985_.

_Carol Ann Christian_
Notary Public

My Commission Expires:

_8-15-88_

[NOTARIAL SEAL]

STATE OF ___FLORIDA___

COUNTY OF ___DUVAL___

This _1st_ day of _April_, 1984, personally came before me _J. S. Bryan, Jr._ who, being by me duly sworn, says that he is the ___Secretary___ of **WINN-DIXIE RALEIGH, INC.** and that the seal affixed to the foregoing instrument in writing is the corporate seal of the company, and that the said writing was signed and sealed by him, in behalf of said corporation, by its authority duly given. And the said _____ ___Secretary___ acknowledged the said writing to be the act and deed of said corporation.

_Debra W. Wise_
Notary Public

My Commission Expires:

DEBRA W. WISE
Notary Public, State of Florida
My Comm. Exp. Jan. 20, 1968

[NOTARIAL SEAL]

-32-

## EXHIBIT X

*Restrictions affecting Dunn Plaza Shopping Center:*

(1) *Rose's Restriction.*

During the term of this lease or any renewal or extension thereof, no space in Dunn Plaza Shopping Center or any of the land located between State Road 1719, U.S. Highway #421, and State Road 1718, owned by Dunn Plaza Associates or in whole or in part by any of the persons interested in Dunn Plaza Associates, or the Shopping Center or subsequently acquired thereby, as shown on the attached Exhibit "A" or any enlargement thereof, shall be leased or permitted to be used directly or indirectly for the conduct therein of the following:

(a) The business of a 5-10-20¢ or variety store. Stores excluded under this Section 1(a) shall include, but shall not be limited to, stores operated by Woolworth, Kresge, W. T. Grant, Kress, Murphy, Neisner, Newberry, McCrory, McLellan, Fishman, Green, Edwards, Ben Franklin (Butler Brothers) TGY, Super Store, Danner, Kuhn's, Wynn's and V. J. Elmore.

(b) The business of a junior department store or a department store of the type operated by Tenant, except to Tenant. Stores excluded under this Section 1(b) shall include but shall not be limited to stores operated by W. T. Grant, Collins, Clarks, Carolina Cash, Murphy, Newberry, Peebles, Southern Department Store, Kress, Kresge, Woolworth, Edwards, Almart and Ames, provided, however, that Landlord shall have the right to bring a Collins Store into the Center as long as such store is an upgraded quality store similar to those operated by Collins in the Cotswold and Freedom Village Shopping Centers in Charlotte, North Carolina, such store shall not exceed 30,000 square feet of Gross Leaseable Area and any expansion right shall be limited so as to prevent the Collins Store from exceeding a Gross Leaseable Area of 40,000 square feet for as long as Tenant operates a store in the demised premises.

(c) The business of a "Discount House" or "discount business" which for the purpose of this lease, shall mean a retail establishment of more than 3,000 square feet of sales area which regularly sells the major portion of its merchandise off-price or at prices below the normal retail prices, or advertises or holds itself out to the public as a discount house or store, or as regularly selling off-price. Stores excluded under this Section 1(c) shall include but shall not be limited to stores operated by Atlantic, Miracle Mart, Masons, Fields, Korvette, Enterprise, Arlans, G. E. X., Zayres, Bargain City, Kings, Woolco, K-Mart, Clarks, W. T. Grant, John's Bargain Store, Worth Mart, Diskay, Value Village, Big K (Kuhn's), Almart, Ames, Miller's, Gulf-Mart, Gaylord's and Town and Country.

(d) The business of a "Discount Health and Beauty Aid" type of store, whether or not said store operates a prescription drug department. Stores excluded under this Section 1(d) shall include, but shall not be limited to stores operated directly or indirectly by White Cross. Nothing under this Section 1(d) shall exclude from said Shopping Center a conventional type drug store.

(e) Nothing in this Section 1 shall be construed to exclude the Winn-Dixie Supermarket; the Eckerd's Drug Store shown on the attached Exhibit "A", or their successors or assigns.

(f) Landlord guarantees Tenant that for as long as Tenant shall operate a store on the demised premises, the two thirty (30') foot drives connecting State Road 1718 with the Dunn Plaza Shopping Center property, all as shown on the attached Exhibit "A", shall be kept open and free from obstruction in order to provide Tenant and its employees, agents and customers access into and out of the Shopping Center, It is understood that this right of access shall be in the nature of easements and that Landlord will take all necessary action to provide that such right becomes a lien against and runs with that property owned by Landlord and not included in Dunn Plaza Shopping Center as shown on Exhibit "A". It is understood that the easternmost of the aforesaid drives lies on property that Landlord does not own as of the date of this Lease and that Landlord's obligation to provide and maintain access over this drive shall be contingent upon its acquiring (at its sole discretion) an interest in the property.

(g) Landlord agrees that the areas marked "Future Expansion of Shopping Center" will be used only for such purpose and that any such expansion will not result in a violation of the provisions of this Section 1 and the minimum ratio of parking spaces to the Gross Leaseable Area.

(2) *Eckerd's Restriction.*

Landlord covenants, represents and warrants that, within the confines of the area of the Commercial Development described in Exhibit "A" now or in the future controlled directly or indirectly, by Landlord, Landlord's principal owners, stockholders, directors or officers, or their assignees or vendees, no premises (other than Tenant's store unit) shall be leased, rented, used or occupied as a prescription drug department or principally as a "Discount Health and Beauty Aids" type of store without Tenant's prior written consent, which may be withheld or granted at Tenant's sole discretion and further, that in addition no premises so owned or controlled outside the confines of the area of the Commercial Development but within a one (1) mile radius thereof, shall be leased, rented, used or occupied for the operation of a prescription drug department or principally as a "Discount Health and Beauty Aids" type of store. This covenant shall run with the land commencing with the date of execution of this lease and shall continue until such date as shall be the last day of the lease term or extension or renewal thereof.

D095702

-2-

## EXHIBIT A

Located in Dunn, North Carolina and more specifically
described as follows:

BEGINNING at a point in the southerly most margin of the
right-of-way of U.S. Highway #421 (150 foot right-of-way),
which point is located two (2)  courses and distances as
follows from the intersection of the easterly most margin of
the right-of-way of State Road #1719 (60 foot right-of-way)
and the southerly most margin of the right-of-way of U.S.
Highway #421:  (1)  N76-07-49 E 48.76 feet to a point; and  (2)
S 51-01-20 E 975.85 feet to a point or place of Beginning,
and running thence S 00-31 E 200 feet to a point; thence
N 89-29 E 20 feet to a point; thence S 00-31 E 145.13 feet
to a point; thence S 83-18-30 E 47.79 feet to a point;
thence S 00-31 E 65.08 feet to a point; thence S 81-37-30 E
377.05 feet to a point; thence N 00-31 W 408.65 feet to a
point; thence N 89-29 E 231.49 feet to a point; thence
N 38-58-40 E 68.08 feet to a point; thence S 51-01-20 E 20.0
feet to a point; thence N 38-58-40 E 25.0 feet to the point
or place of Beginning, as shown on a survey prepared by Jimmy
F. Cain, R.L.S. dated 2/08/85.

TOGETHER with a nonexclusive roadway easement over the land
hereinafter described appurtenant to the first above described
tract of land for pedestrian and vehicular ingress, egress and
regress between the first above described tract of land and
U.S. Highway #421:

BEGINNING at a point in the southerly most margin of the
right-of-way of U.S. Highway #421 (150 foot right-of-way),
which point is located two (2) courses and distances as
follows from the intersection of the easterly most margin
of the right-of-way of State Road #1719 (60 foot right-of-
way) and the southerly most margin of the right-of-way of
U.S. Highway #421:  (1) N 76-07-49 E 48.76 feet to a point;
and (2) S 51-01-20 E 905.85 feet to the point or place of
Beginning, and running thence with said southerly most margin
of the right-of-way of U.S. Highway #421 S 51-01-20 E 50 feet
to a point; thence S 38-58-40 E 93.08 feet to a point; thence
S 89-29 W 231.49 feet to a point; thence N 00-31 W 30 feet to
a point; thence N 89-29 E 183 feet to a point; thence
N 59-04-30 E 18.93 feet to a point; thence N 38-58-40 E 83
feet to the point or place of Beginning, according to a survey
prepared by Jimmy F. Cain, R.L.S. dated 2/08/85.

SUPPLEMENTAL GROUND LEASE AGREEMENT

THIS SUPPLEMENTAL GROUND LEASE AGREEMENT, made
this __5th__ day of _____May_____, 19 86 , between
DUNN PLAZA ASSOCIATES, a North Carolina general partnership,
hereinafter called "Landlord", and WINN-DIXIE RALEIGH, INC.,
a Florida corporation duly qualified to transact business in
the State of North Carolina, hereinafter called "Tenant",
which terms "Landlord" and "Tenant" shall include, wherever
the context admits or requires, singular or plural, and the
heirs, legal representatives, successors and assigns of the
respective parties;

W I T N E S S E T H:

WHEREAS, by Ground Lease and Memorandum of Ground
Lease each dated February 8, 1985, Landlord did lease and
demise unto Tenant certain premises located in Dunn Plaza
Shopping Center, situated at the intersection of U. S. Hwy.
#421 and Old Erwin Road, in the City of Dunn, County of
Harnett and State of North Carolina, reference being made to
said Ground Lease for a more detailed description of the
demised premises, for a term commencing on February 8, 1985,
and terminating on the twentieth (20th) anniversary of the
Rental Commencement Date; and

WHEREAS, the Memorandum of Ground Lease dated
February 8, 1985 was recorded on June 28, 1985 in Book 785,
Page 424 in the Office of Register of Deeds of Harnett
County, North Carolina, re-recorded on October 30, 1985 in
Book 791, Page 862 in the Office of Register of Deeds of
Harnett County, North Carolina, and again re-recorded on
February 28, 1986 in Book 798, Page 439 in the Office of
Register of Deeds of Harnett County, North Carolina; and

WHEREAS, Tenant has now opened for business in the
demised premises and the parties desire to fix the Rental Com-

APPROVED
AS TO ____
_____
Division M____
_____
Legal Dept.
Winn-Dixie Stores,
Inc.

This instrument was prepared by
Charles P. Linford, Jr., Attorney-
at-Law whose address is P. O.
Box B, Jacksonville, Florida 32203

mencement Date and the termination date of the original term of said Ground Lease in accordance with its terms, as hereinafter set forth;

NOW THEREFORE, in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable considerations paid by Tenant to Landlord, the receipt and sufficiency whereof are hereby acknowledged, it is mutually agreed:

1.  The Rental Commencement Date of the above-described Ground Lease and Memorandum of Ground Lease dated February 8, 1985 is fixed at February 8, 1986 and the expiration of the initial term demised therein shall be at midnight on February 7, 2006.

2.  The word "interest" in the fourth line from the bottom of page 7 of the Ground Lease is deleted and the word "intent" is substituted therefor.

3.  Paragraph 30 of the Ground Lease is amended to add the following sentence:

> "In the event absolute possession of the store space covered by the February 6, 1969 Lease is not delivered on the termination date of such Lease, Tenant shall remain liable for all rent and other charges until and through delivery of such absolute possession."

4.  All covenants, terms and conditions of the above-described Ground Lease not modified or amended by this Supplemental Ground Lease Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Supplemental Ground Lease Agreement the day and year first above written.

Signed, sealed and delivered
in the presence of:

DUNN PLAZA ASSOCIATES, a North
Carolina general partnership

By: _Sam Miriello_ (SEAL)
Sam Miriello, General Partner

By: _____ (SEAL)
Henry J. Faison, General Partner

By: _____ (SEAL)
Van L. Weatherspoon,
General Partner

LANDLORD

WINN-DIXIE RALEIGH, INC.

By: _____
    Its                Vice President

Attest: _____
        Its              Secretary

[CORPORATE SEAL]

TENANT

-3-

STATE OF NORTH CAROLINA

COUNTY OF HARNETT

I, _Francis Rayner_ , a Notary Public for the County
and State aforesaid, certify that Sam Miriello personally
came before me this day and acknowledged that he is a General
Partner of DUNN PLAZA ASSOCIATES, a North Carolina general
partnership and that by authority duly given and as the act
of and on behalf of said DUNN PLAZA ASSOCIATES, the foregoing
instrument was signed in his name.

WITNESS my hand and official seal this _17th_ day of
_June_ , 1986.

_Francis Rayner_
Notary Public

My Commission Expires: My Commission Expires October 2, 1988

[NOTARIAL SEAL]

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

I, _Janice Y. Black_ a Notary Public for the County
and State aforesaid, certify that Henry J. Faison personally
came before me this day and acknowledged that he is a General
Partner of DUNN PLAZA ASSOCIATES, a North Carolina general
partnership and that by authority duly given and as the act
of and on behalf of said DUNN PLAZA ASSOCIATES, the foregoing
instrument was signed in his name.

WITNESS my hand and official seal this _24_ day of
_June_ , 1986.

_Janice Y. Black_
Notary Public

My Commission Expires: _8-13-89_

[NOTARIAL SEAL]

-4-

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

I, Margt Ford , a Notary Public for the County
and State aforesaid, certify that Van L. Weatherspoon
personally came before me this day and acknowledged that he
is a General Partner of DUNN PLAZA ASSOCIATES, a North Carolina
general partnership and that by authority duly given and as
the act of and on behalf of said DUNN PLAZA ASSOCIATES, the
foregoing instrument was signed in his name.

WITNESS my hand and official seal this 19th day of
June , 1986.

Margt Ford
Notary Public

My Commission Expires: 9·28·90

[NOTARIAL SEAL]


STATE OF FLORIDA

COUNTY OF DUVAL

I, DEBRA W. WISE , a Notary Public for the County
and State aforesaid, certify that J.S. Bryan Jr.
personally came before me this day and acknowledged that he is
_____ Secretary of WINN-DIXIE RALEIGH, INC. and that, by
authority duly given and as the act of the corporation, the
foregoing instrument was signed in its name by its Vice
President, sealed with its corporate seal, and attested by
himself as its ____ Secretary.

WITNESS my hand and official seal this 5th day of
May , 1986.


Notary Public

My Commission Expires:

[NOTARIAL SEAL]

DEBRA W. WISE
Notary Public, State of Florida
My Comm. Exp. Jan. 20, 1988

-5-

March 29, 1985

| | |
|---|---|
| FROM: | Charles P. Milford, Jr. |
| TO: | Messrs. A. Dano Davis and J. S. Bryan, Jr. |
| SUBJECT: | New Store Location<br>Dunn Plaza Shopping Center<br>U. S. Hwy. #421 & N. C. Hwy. #1719<br>Dunn, North Carolina<br>(Relocation of store #897) |

The Ground Lease and Short Form Ground Lease described below are submitted herewith for execution.

| | |
|---|---|
| DATE: | February 8, 1985 |
| LOCATION: | Dunn Plaza Shopping Center, intersection of U. S. Hwy. #421 and N. C. Hwy. #1719, Dunn (Harnett County), North Carolina |
| LANDLORD: | DUNN PLAZA ASSOCIATES, a North Carolina general partnership |
| TENANT: | WINN-DIXIE RALEIGH, INC. |
| STORE SIZE: | 200 feet in width by 175 feet in depth, together with a 922 sq. ft. front vestibule, for a total of 35,922 sq. ft. |
| TERM: | 20 years |
| RENEWALS: | Eight (8) 5-year options at the rentals described below. |
| RENT: | This is a "sale/leaseback" deal, whereby we will be leasing a 3 acre parcel of land in an existing shopping center in which our store #897 is now located. We will pay the Landlord $22,000.00 a year for the 3 acres for the initial 20 year term. For each exercised option extension period thereafter, the rental increases $5,000.00 annually for each of the years in the option period exercised.  In other words, for the five years in the first option period, the rental would become $27,000.00 annually and for the second 5-year option period, if exercised, the rental would increase to $32,000.00 annually, etc.  This is a total "Net" deal to the land owner, and we will pay all ad valorem real estate taxes levied against our parcel, have repair responsibility for both the interior and exterior of the building, pay for all maintenance expenses of the parking and service areas of our parcel and self-insure our building and the service areas. |
| OTHER TENANTS: | The main tenants in the existing shopping center are Roses (40,500 sq. ft.) and Eckerd Drugs (12,123 sq. ft.).  The lease on our existing 22,550 sq. ft. store will be automatically terminated by the Landlord upon the rental commencement date of the instant Lease.  Landlord has already arranged to lease our old store to Roses for an expansion of its existing facility next door. |
| MAINTENANCE: | As noted above, we have complete maintenance and repair responsibilities for our store building, both interior and exterior, including roof and structural members. |
| UNUSUAL PROVISIONS: | Although the Ground Lease commences February 8, 1985, we will not begin to pay rent until our building has been completed and occupied by us.  The initial lease term will actually run 20 years from that date.  We will hire our own contractor to build our store building for us and handle all the development expenses ourselves.  Upon comple- |

Messrs. A. Dano Davis and J. S. Bryan, Jr.
March 29, 1985                          Page Two

tion of our building and commencement of the payment of
rentals to the ground lessor, we will sell our building
to an "as yet unidentified investor" to be secured by
Mr. Ripley who will lease back the building to us and
accept an assignment of our Land Lease, subleasing the
land back to us.  That arrangement is, of course, not
treated at all within the Ground Lease document.  Upon
completion of construction of the building, when the
investor is found and the sale/leaseback transaction is
completed, we will essentially have a lease on the build-
ing and a sublease on the 3 acre parcel, necessitating
our paying two rent checks each month:  one to the land
owner and the other to the owner of our building.

Our store will be tied into the remainder of the shopping
center as an integrated unit through a Declaration of
Restrictions/Grant of Easement document (now being ex-
ecuted by Landlord) and our grocery store exclusive is
carried throughout the entire shopping center by that
document.

In the event of a condemnation taking, any award for the
land shall belong to the ground owner and any award for
the building shall belong to us.

We have full rights to vacate, assign and sublease.  If
more than 25% of our premises remain unoccupied for longer
than two years, Landlord has the right to sublease for our
benefit all or part of the unoccupied space to subtenants
upon terms at least equal to the terms contained in this
Ground Lease.

The Ground Lease contemplates that we shall assign our
Ground Lease and that our assignee will, in turn, collaterally
assign the Land Lease as security for the mortgage.  The
document further provides the rights of such mortgagee
shall be subject to the Ground Lease.

We must initially open for business as a supermarket, but
thereafter, our premises may be used for any mercantile
business except as a variety store (to accommodate the
Roses' exclusive) and a drug store or health and beauty
aids store (to accommodate the Eckerd's exclusive).

We are prohibited from displaying and selling merchandise
on the sidewalk or parking areas in our parcel.

Although we have the exclusive supermarket right through-
out the entire shopping center, Roses is restricted only
to the extent that it may not operate a supermarket.  One
"Hickory Farms" type gourmet food store is allowed not
to exceed 3,250 sq. ft., one bakery is allowed, not to
exceed 2,500 sq. ft. and one doughnut and/or candy shop
is allowed, not to exceed 2,000 sq. ft.  Incidental food
sales are allowed in the lesser of 10% of the gross floor
area or 2,000 sq. ft. of sales of all the other stores
in the shopping center.  We lose our supermarket exclusive
right if one is not operated in our premises for more
than one year (except for acts of God).

COMMENTS:        The documents have been executed in proper fashion by the
                 Landlord and Mr. Don James has initialled division ap-
                 proval.  The construction contract has, or shortly will
                 be, signed by Mr. Don James and the plans and specifications
                 have been or shortly will be finalized and approved.

Messrs. A. Dano Davis and J. S. Bryan, Jr.
March 29, 1985        -        Page Three


Please execute on behalf of Tenant.

Charles P. Milford, Jr.

CPM/dw

STATE OF NORTH CAROLINA

COUNTY OF HARNETT                   FIRST AMENDMENT TO GROUND LEASE

    THIS FIRST AMENDMENT TO GROUND LEASE made as of the _29ᵗʰ_
day of _July_ , 1986, by and between Dunn Plaza Associates,
a North Carolina general partnership (hereinafter called
"Landlord") and Winn-Dixie Raleigh, Inc., a Florida corpora-
tion duly qualified to transact business in the State of
North Carolina (hereinafter called "Tenant"),

             W I T N E S S E T H :

    WHEREAS, Landlord and Tenant entered into a Ground
Lease dated February 8, 1985 (the "Lease"), a Memorandum of
which is recorded in Book 785, Page 424-430, re-recorded in
Book 791, Pages 862-868, and re-recorded in Book 798, Pages
439-445, of the Harnett County Registry, and pursuant to which
Landlord leased to Tenant a certain parcel of real property
located in Harnett County, North Carolina (the "Premises");
and

    WHEREAS, pursuant to the Lease, Landlord granted to Tenant
a non-exclusive roadway easement over a tract of land (the
"Easement Tract"), for pedestrian and vehicular traffic for
ingress, egress, and regress between the Premises and U. S.
Highway 421; and

    WHEREAS, Tenant has constructed landscaped islands which
encroach from the Premises onto the Easement Tract by up to
three (3) feet; and

    WHEREAS, the parties desire to amend the Lease in order
to insure that said encroachments are allowed to exist during
the term of the Lease and any extensions thereof;

    NOW, THEREFORE, in consideration of the Premises and other
valuable consideration, the receipt and sufficiency of which
is hereby acknowledged, Landlord and Tenant agree for them-
selves, their successors and assigns that the encroachment
of the landscaped islands hereinafter described which now
extends into the Easement Tract may continue to exist during
the term of this Lease and all extensions thereof, said
encroachment being described as follows:

             BEGINNING at a point located the following three (3)
             courses and distances from the intersection of
             the easterly most margin of the sixty (60) foot
             right-of-way of State Road #1719 and the south-
             erly most margin of the one hundred fifty (150)
             foot right-of-way of U. S. Highway 421: (1) N 76-
             07-49 E 48.76 feet to a point; (2) S 51-01-20 E

955.85 feet to a point; and (3) S 38-58-40 W 93.08
feet to the point and place of BEGINNING; thence S
89-29-00 W 231.49 feet to a point; thence N 00-31-00
W 3.00 feet to a point; thence N 89-29-00 E 231.49
feet to a point; thence S 00-31-00 E 3.00 feet
to the point and place of BEGINNING, containing
694.97 square feet, more or less.

IN WITNESS WHEREOF, the parties hereto have executed
this First Amendment to Ground Lease under seal, all as
of the day and year first above written.

DUNN PLAZA ASSOCIATES, a North
Carolina General Partnership

_____  BY: _____ (SEAL)
As to Landlord                General Partner

BY: _____ (SEAL)
                              General Partner

BY: _____ (SEAL)
                              General Partner

LANDLORD

WINN-DIXIE RALEIGH, INC.

Diana Arcutt
_____  BY: _____
Diana Arcutt                  Its        Vice President
As to Tenant                  ATTEST: _____
                              Its        Secretary

                              TENANT

[CORPORATE SEAL]

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

I, _Maurita Good_, a Notary Public for said
County and State, do hereby certify that _Frank Washington_,
personally appeared before me this day and, being duly sworn,
says that he is a general partner of DUNN PLAZA ASSOCIATES,
a North Carolina limited partnership and acknowledged the due
execution of the foregoing instrument on behalf of said
partnership.

WITNESS my hand and notarial seal, this the _26_ day
of _July_, 1986.

_____
Notary Public

My commission expires:

_1-28-70_

*****

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

I, _Denise Flack_, a Notary Public for said
County and State, do hereby certify that _Henry J. Fann_,
personally appeared before me this day and, being duly sworn,
says that he is a general partner of DUNN PLAZA ASSOCIATES,
a North Carolina limited partnership and acknowledged the due
execution of the foregoing instrument on behalf of said
partnership.

WITNESS my hand and notarial seal, this the _29th_ day
of _July_, 1986.

_Denise J. Flack_
Notary Public

My commission expires:

_3/89_

*****

STATE OF NORTH CAROLINA

COUNTY OF _Harnett_

I, _Jeanette M. Daughtry_, a Notary Public for said
County and State, do hereby certify that _Sam Mirello_,
personally appeared before me this day and, being duly sworn,
says that he is a general partner of DUNN PLAZA ASSOCIATES,
a North Carolina limited partnership and acknowledged the due
execution of the foregoing instrument on behalf of said
partnership.

WITNESS my hand and notarial seal, this the _20th_ day
of _July_, 1986.

_Jeanette M. Daughtry_
Notary Public

My commission expires:

368

-3-

STATE OF *North Carolina*

COUNTY OF *Wake*

This *13* day of *August* 1986, personally came before me *Bill Varnell*, who, being by me duly sworn, says that he is the *Asst* Secretary of WINN-DIXIE RALEIGH, INC. and that the seal affixed to the foregoing instrument in writing is the corporate seal of the company, and that the said writing was signed and sealed by him, in behalf of said corporation, by its authority duly given. And the said *Asst* Secretary acknowledged the said writing to be the act and deed of the corporation.

*L. P. Morgan*
Notary Public

My commission expires:

*7-9-90*

North Carolina-Harnett County

The foregoing certificates of *Mary D Ford, James H. Flack, Jeannette M. Mecklenburg, Harnett Daughtry and L. P. Morgan* Notary Public of *and Wake* County is certified to be correct.

This *15* day of *August* 19 *86*

*Gayle P. Holden - KDH*
Register of Deeds
Harnett County, N. C.

HARNETT COUNTY, N. C.
FILED DATE *8/15/86* TIME *9:46 am*
BOOK *509* PAGE *366-369*
REGISTER OF DEEDS
GAYLE P. HOLDER

369

-4-

## SECOND AMENDMENT TO GROUND LEASE

**THIS SECOND AMENDMENT TO GROUND LEASE**, made this ___3.3.1 9 8___ , 1998, by and between **JAMES W. LOCKAMY** and **DONNA M. LOCKAMY**, his wife ("Landlord") and **WINN-DIXIE RALEIGH, INC.,** a Florida corporation authorized to do business in the State of North Carolina ("Tenant"), recites and provides as follows:

### RECITALS:

1.      By that Ground Lease dated as of February 8, 1985, as amended and/or evidenced by: (a) Memorandum of Ground Lease dated February 8, 1985, recorded in Book 785, page 424 in the Office of the Register of Deeds of Harnett County, North Carolina; (b) Guaranty dated June 16, 1986; (c) Supplemental Ground Lease Agreement dated May 5, 1986; (d) First Amendment to Ground Lease dated July 29, 1986 (the "Lease"), Tenant leased from Landlord the "Premises" (as defined in the Ground Lease) located in Dunn, Harnett County, North Carolina.

2.      Landlord and Tenant desire to amend and modify the Lease as hereinafter set forth.

### WITNESSETH:

For and in consideration of the sum of Ten and No/100 Dollars ($10.00), the mutual promises and agreements contained in the Lease, and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, Tenant and Landlord agree as follows:

1.      The foregoing recitals are true and correct and incorporated here by this reference.

2.      Article 15 of the Ground Lease ("Use") is modified by deleting the following language contained therein:

", and provided further, the Premises shall not be used for the sale of prescription drugs or drugs required to be dispensed by a licensed pharmacist",

and by substituting in its place the following language:

", but notwithstanding anything contained in this Ground Lease or otherwise to the contrary, Tenant shall have the non-exclusive right to operate a pharmacy for the sale of prescription drugs or drugs required to be dispensed by a licensed pharmacist".

3.      Exhibit X attached to the Ground Lease is modified by deleting therefrom the entire paragraph subtitled "Eckerd's Restriction."

4.      The Lease, except as expressly modified and amended by this Second Amendment to Ground Lease shall remain in full force and effect and contains the entire agreement between the parties.

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Second Amendment to Ground Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

_Karen Michael_
Print name: _Karen Michael_

_James W. Lockamy_
James W. Lockamy

_____
Print name:_____

o:\transfer\raleigh\0896\amd.1
January 14, 1998

_Karen Michael_
Print name: _Karen Michael_

_Donna M. Lockamy_
**Donna M. Lockamy**

Print name: _____

_Rebecca L. Sawyer_
Print name: _Rebecca L. Sawyer_

_Brenda J. Babcock_
Print name: **BRENDA J. BABCOCK**

**WINN-DIXIE RALEIGH, INC.**

By: _James Kufeldt_
   James Kufeldt
Its: Vice President
Date: _3/24/98_

Attest: _R. D. Pet_
      Its: Assistant Secretary

STATE OF _N C_ )
COUNTY OF _Harnett_ )

    I, _Linda M Tart_, a Notary Public, State and County aforesaid, do hereby certify that JAMES W. LOCKAMY personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

    Witness my hand and official seal, this the _3_ day of _March_, 1998.

_Linda M Tart_
Printed Name: _Linda M Tart_
Notary Public, State and County aforesaid
My commission expires: _1-20 - 2000_
(NOTARIAL SEAL)

o:\transfer\raleigh\0896\amd.1
January 14, 1998

STATE OF _*N C*_ )
COUNTY OF _*Harnett*_ )

I, _*Linda M Tart*_, a Notary Public, State and County aforesaid, do hereby certify that DONNA M. LOCKAMY personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal, this the _3_ day of _*March*_, 1998.

_*Linda M Tart*_
Printed Name: _*LiNdA M TART*_
Notary Public, State and County aforesaid
My commission expires: _1-20-2000_
(NOTARIAL SEAL)

STATE OF FLORIDA )
COUNTY OF DUVAL )

I, _Rebecca L Sawyer_, a Notary Public, State and County aforesaid, do hereby certify that _*R.D. Peterson*_ personally appeared before me this day and acknowledged that he/she is _____ Secretary of Winn-Dixie Raleigh, Inc., a Florida corporation, and that by authority duly given and as the act of the corporation, the foregoing instrument was signed in its name by its Vice President, sealed with its corporate seal, and attested by her/himself as its Assistant Secretary.

Witness my hand and official seal, this the _24_ day of _*March*_, 1998.

_Rebecca L Sawyer_
Printed Name: _Rebecca L Sawyer_
Notary Public, State and County aforesaid
My commission expires:
(NOTARIAL SEAL)

REBECCA L SAWYER
My Comm. Exp. ___
Comm. No. CC 572310

o:\transfer\raleigh\0896\amd.1
January 14, 1998