## SECOND SUPPLEMENTAL LEASE AGREEMENT

**THIS SUPPLEMENTAL LEASE AGREEMENT** (the "Agreement") is made as of February 16, 2000 (the "Effective Date"), between **WINN-DIXIE STORES, INC.**, a Florida corporation (the "Tenant") and **TA/Western LLC**, a Delaware limited liability company (the "Landlord").

### R E C I T A L S :

1.       Landlord and Tenant are parties to that certain lease dated May 10, 1988, as amended and/or evidenced by: (a) Short Form Lease dated May 10, 1988, recorded in Volume 15916, page 135 of the public records of Broward County, Florida; (b) Letter Agreement dated January 17, 1989; (c) Supplemental Lease Agreement dated November 13, 1989; (d) First Amendment to Lease dated August 1, 1990 and (d) Second Amendment to Lease dated November 30, 1997 (collectively, the "Lease").

2.       The Second Amendment provided for the Premises to be expanded (the "Expanded Premises"), and upon the Remodel and Enlargement Sale Date, for the Lease to be supplemented to establish the Scheduled Expiration Date and the commencement date for payment of Rent for the Expanded Premises.

**NOW THEREFORE**, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.       The foregoing recitals are true and correct in every respect and incorporated herein by reference.

2.       Rent for the Expanded Premises commenced on April 9, 1999.

3.       The Scheduled Expiration Date of the Lease, subject to Tenant's rights of extension as provided in the Second Amendment to Lease, shall be fifteen (15) years from the Remodel and Enlargement Sale Date or April 8, 2014 (the "Extended Term").

4.       Except as expressly modified herein, the Lease remains in full force and effect as written.

**IN WITNESS WHEREOF**, the parties hereto have signed and sealed this Agreement on the date first set forth above.

Signed, sealed and delivered
in the presence of:

Print name: _Lucy W. McCook_

Print name: _Jane E. DeWitte_

**WINN-DIXIE STORES, INC.**

By: _R. P. McCook_

R. P. McCook
Its:   VICE PRESIDENT
Date:  March 14, 2000

Print name: _____

**TA/Western LLC**
a Delaware limited liability company

Print name: _Janene Yannucci_

By: _Janene P. Behler_
JANENE P. BEHLER
Its:   REGIONAL DIRECTOR
Date:  March 8, 2000

EXHIBIT A

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this _March_ _14_, 2000, by _R. P. McCook_, as _Vice_ President of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation, who is personally known to me.

Printed Name: _Lucy W. McCook_
Notary Public, State and County aforesaid.
My Commission Expires: _____ 07/24/00
Notary ID No.: _5 71 884_
(NOTARIAL SEAL)

STATE OF _New_ )
COUNTY OF _Suffolk_ )

The foregoing instrument was acknowledged before me this _March_ _8_, 2000, by _Vincent Bobber_, as _Regional Direct_ of TA/Western LLC, a Delaware limited liability company, on behalf of the limited liability company, who **[PLEASE CHECK ONE]** _✓_ is personally known to me or _____ has produced _____ as identification.

Printed Name: _Anaein Carson_
Notary Public, State and County aforesaid.
My Commission Expires: _7-18-2005_
Notary ID No.: _____
(NOTARIAL SEAL)

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE (" Amendment") is made as of November 30, 1997 by and between SPV REAL ESTATE PARTNERS NO.1, L.P., a Delaware limited partnership ("Landlord") and WINN-DIXIE STORES, INC., Florida corporation ("Tenant").

### RECITALS:

1.     Landlord and Tenant are parties to that certain Lease dated May 10, 1988, as amended and/or evidenced by: (a) Short Form Lease dated May 10, 1988, recorded in Book 15916, page 135 of the public records of Broward County, Florida; (b) Letter Agreement dated January 17, 1989; (c) Supplemental Lease Agreement dated November 13, 1989; (d) First Amendment to Lease dated August 1, 1990 (as amended and evidenced, the "Original Lease"), pursuant to which Tenant has occupied and rented from Landlord the premises consisting of approximately 220 feet wide by 200 feet deep, more particularly described in the Original Lease (the "Premises") and located in a shopping center commonly known as Pompano Marketplace and described in the Original Lease (as the same may be altered or expanded, the "Shopping Center").

2.     The term of the Original Lease expires on October 24, 2009 (the "Scheduled Expiration Date"), subject to Tenant's right to renew five (5) extension periods of five (5) years each (collectively, the "Term").

3.     Tenant intends to expand the Premises to include approximately 60 feet wide by 200 feet deep of additional space located to the right (north) of the Premises in the Shopping Center (the "Additional Space," and together with the Premises, the "Expanded Premises"). The Expanded Premises will consist of a total of approximately 59,233 square feet including vestibule and receiving room. Landlord has agreed to lease to Tenant the Additional Space.

4.     Landlord and Tenant have agreed to amend the Original Lease upon the terms and conditions of this Amendment (as amended by this Amendment, the "Lease").

5.     Capitalized terms not otherwise defined herein shall have the meanings attributed to such terms in the Original Lease.

6.     Landlord is successor-in-interest to original Landlord.

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which hereby are acknowledged, Landlord and Tenant agree, covenant, represent, and warrant, as applicable, as follows:

1.     Recitals. The foregoing recitals are true and correct in every respect and incorporated herein by reference.

2.     Additional Space. Landlord hereby leases the Additional Space to Tenant and Tenant hereby rents the Additional Space from Landlord upon the terms and conditions of the Lease.

3.     Tenant's Improvements. Tenant shall, at its own initial cost and expense (except for Landlord's Contribution, as hereinafter defined), construct or cause to be constructed certain improvements ("Tenant's Improvements") upon the Additional Space, substantially in accordance with plans and specifications previously reviewed and approved by Landlord prepared by Ashlar Architects consisting of 55 pages, commencing with Drawing SP-1 and ending with Drawing E-10 ("Tenant's Plans") and as shown on the Site Plan prepared by Ashlar Architects dated January 20, 1997, last revised October 14, 1997, attached hereto as Exhibit "A-1" and incorporated herein by reference (the "Site Plan") with such changes and deviations as may be reasonably necessary. Landlord agrees to fully cooperate with Tenant in its efforts to obtain any and all necessary permits for Tenant's Improvements (provided at no additional expense to

Q:\FTPDIR\REC\AHDQ\217AMD.EXP
July 29, 1997
October 14, 1997
October 30, 1997
November 12, 1997
November 25, 1997

Landlord). Notwithstanding the foregoing, however, Landlord does specifically agree that it shall diligently and in good faith provide, at its sole cost and expense, subject to prior Tenant's approval, additional parking spaces or make other accommodations (i.e., a City-approved parking variance or otherwise) as may be reasonably necessary to comply with all parking code requirements so as to permit Tenant to pursue construction of Tenant's Improvements. In addition, Tenant may and shall make such other changes and interior modifications as are necessary or desirable to make the entire Expanded Premises suitable for Tenant's use in the conduct of its business. Tenant will perform or cause to be performed all construction of Tenant's Improvements in a good and workmanlike manner and in accordance with all applicable governmental laws, rules, and regulations. Tenant hereby indemnifies and agrees to defend and hold Landlord, the Expanded Premises and the Shopping Center harmless from and against any and all suits, liens, claims, liabilities, actions or causes of action, judgments, damages, losses, costs or expenses (including, without limitation, claims for workers' compensation) of any nature whatsoever, together with reasonable attorneys' fees for counsel of Landlord's choice, arising out of or in connection with Tenant's Improvements (including, but not limited to, construction defects, claims for breach of warranty, personal injury or property damage). The obligations herein shall survive the termination or earlier expiration of the Original Lease as amended hereby.

It is understood that Tenant's undertaking to construct Tenant's Improvements upon a construction cost which has been established by a firm bid in the amount of One Million Four Hundred Seventy-Six Thousand and NO/100 Dollars ($1,476,000). If, however for any reason, the construction cost shall exceed the firm bid of One Million Four Hundred Seventy-Six Thousand and NO/100 Dollars ($1,476,000), Tenant shall have the option of revising Tenant's Plans and in the event the parties are unable, in good faith, based upon the revised Tenant's Plans, to obtain a contract price for the construction costs at or below the firm bid price, Tenant, at its sole option, shall have the election of either: (a) agreeing to pay the excess of such cost over the firm construction bid and Tenant shall thereupon proceed with construction work; or (b) declaring this amendment null and void by giving written notice to Landlord, whereupon both parties shall be relieved of and from all further liabilities hereunder, and the Lease shall continue in full force and effect as if this amendment had not been executed.

For the purposes hereof, the term "construction cost" shall be defined to include the entire cost of construction of the building, to include impact fees, the removal of the existing wall between the present demised store premises and the addition area, conversion of the adjacent store space into Tenant's addition and construction of new building area at the rear of such adjacent vacant store space, and all such renovations and alterations of the existing building as necessary to make the entire enlarged building suitable for use by Tenant in the conduct of its business. There shall be expressly excluded from the term "construction cost" the expense of any and all of Tenant's racks, counters, shelves and other merchandising fixtures and equipment.

Construction of Tenant's Improvements shall not proceed without Tenant first acquiring statutory workers' compensation, commercial general liability insurance and property damage insurance, as well as "All Risks" builders' risk insurance, with minimum coverage of $2,000,000 or such other amount as may be approved by Landlord in writing and issued by an insurance company or companies reasonably satisfactory to Landlord. Not less than thirty (30) days before commencing the construction of Tenant's Improvements, certificates of such insurance shall be furnished to Landlord or, if requested, the original policies thereof shall be submitted for Landlord's approval. All such policies shall provide that thirty (30) days prior notice must be given to Landlord before modification, termination or cancellation. All insurance policies maintained by Tenant pursuant to this Amendment shall name Landlord and any lender with an interest in the Premises as additional insureds and comply with all of the applicable terms and provisions of the Original Lease relating to insurance. Tenant's contractor shall be required to maintain the same insurance policies as Tenant, and such policies shall name Tenant, Landlord and any lender with an interest in the Shopping Center as additional insureds.

Subject to the provisions of this Amendment, Tenant shall promptly apply for building permits and diligently pursue to completion, construction of Tenant's Improvements and thereupon open for business in the Additional Space. In connection with such construction, Tenant shall use best efforts to minimize any interference to businesses within the Shopping Center. During the course of construction of Tenant's Improvements, Tenant shall remain open for business in the Premises. Following the completion of Tenant's

2

Improvements, Tenant shall deliver to Landlord one (1) copy of the as-built plans in connection with Tenant's Improvements. Once Tenant's Plans have been approved by all governmental agencies with jurisdiction, Tenant will not make any material changes to or departures from such plans which affect the exterior or the structural integrity of the Premises without Landlord's prior written approval.

4.      Deadlines.  Landlord shall: (a) relocate any tenants existing from the area Additional Space within fifteen (15) days of the date hereof; (b) remove any existing tenant improvements, fixtures and equipment in such space, (c) remove all asbestos required by law to be removed therefrom (whether ACM or PACM) and remove all debris therefrom, (d) deliver free of leases; (e) deliver free of latent defects; (f) deliver with a watertight roof, subject to satisfactory Tenant review of an acceptable, professional roof report, and (g) deliver to Tenant possession of the Additional Space no later than fifteen (15) days from the date hereof.  Tenant shall have 10 days after delivery of the Additional Space to inspect and accept or reject the same.  If rejected by Tenant, Landlord will promptly complete the deficiencies to Tenant's reasonable satisfaction.  Construction of Tenant's Improvements will commence upon issuance of all applicable permits (the "Construction Period").  Landlord agrees to assist Tenant in obtain necessary permits (provided at no additional expense to Landlord).  If Landlord fails to timely deliver the Additional Space to Tenant, Tenant may, at its option exercisable by written notice to Landlord, either (i) extend to Landlord such additional time to deliver the Additional Space as Tenant deems reasonable, in its sole discretion, or (ii) terminate this Amendment, in which case the Original Lease will continue in effect as written.

5.      Landlord Improvements.        On or before the end of the Construction Period, Landlord shall, at its own cost and expense, modify and renovate the Common Areas ("Landlord's Improvements") as reflected by the Exhibit "A-1" Site Plan attached.  Landlord shall coordinate with Tenant Landlord's Improvements so as to facilitate Tenant's Improvements.

6.      Force Majeure.       Neither Landlord nor Tenant shall be liable or responsible for any delay due to strikes, riots, acts of God, shortages of labor or materials, theft, fire, public enemy, injunction, insurrection, court order, laws, or any other factor or force beyond their respective control for any delay in performing or completing their respective obligations under this Amendment (other than the obligation to pay money, if any).

7.      Completion.      Upon completion of Tenant's Improvements, issuance of a permanent Certificate of Occupancy/Completion or equivalent final document, completion of Landlord's Improvement and commencement of Tenant's doing business in the Additional Space (the "Remodel and Enlargement Sale Date"):

(a)      All references in the Original Lease to "Tenant's store building," "the building," "Tenant's Food Store", "the demised premises" and any other term referring to the Premises shall be deemed and interpreted to apply and refer to the Expanded Premises and the land upon which the Expanded Premises are constructed;

(b)      All references to "Exhibit "A"," the "plot plan," or the "site plan" in the Original Lease shall be deemed and interpreted to apply and refer to the Site Plan;

(c)      Landlord shall pay to Tenant the sum of $1,476,000 ("Landlord's Contribution") by wire transfer or certified check to reimburse Tenant for full cost of Tenant's Improvements within forty-five (45) days of the Remodel and Enlargement Sale Date and upon (but not prior to) delivery to Landlord of copies of the following:

(1)      Copy of permanent Certificate of Occupancy;
(2)      Certificate of Completion by general contractor;
(3)      All unconditional Lien Waivers from general contractor and subcontractors;
(4)      Final application and certificate for payment;
(5)      Any applicable warranties accorded to Landlord, with specific assignable warranties on the roof (ten (10) years) and the HVAC (five (5) years for compressor, excluding labor charges), as they pertain to the Additional Space;

3

(6)    Certification from Architect of Record that Tenant's Improvements were built in accordance with Tenant's Plans; and

(7)    A copy of as-built survey.

Should Landlord fail to make timely payment of Landlord's contribution Tenant shall have the right to deduct from all increased rental payments provided in Article 7 hereof in excess of the current rentals, percentage rent, common area maintenance contributions and real estate tax payments then due or thereafter to become due, such portion of the $1,476,000 sum not reimbursed by Landlord to Tenant, together with interest accruing on the unpaid sum from the expiration of such forty-five (45) day period at the rate of the current median New York publicized prime rate plus two percent (2%);

(d)    The Scheduled Expiration Date shall be extended, contingent upon full reimbursement of Landlord's Contribution, so that fifteen (15) years remain from the Remodel and Enlargement Sale Date (the "Extended Term"), and Tenant shall retain the right to renew and extend the Term beyond such Scheduled Expiration Date for five (5) subsequent extension periods of five (5) years each as provided in the Original Lease.

(e)    The parking ratio described in Article 8(a) and (b) of the Lease, as subsequently modified by the First Amendment to Lease, shall be 3.45 automobile parking spaces to each 1,000 square feet of gross building area, and 827 automobile parking spaces (minimum).

(f)    The repair responsibilities of Landlord and Tenant shall remain as previously provided in the Lease.

(g)    Landlord shall have the right, after ten (10) years from the date hereof (and provided further that "JoAnn's Fabrics" has not exercised a renewal option of their lease term), to construct an additional outparcel building in the location identified on Exhibit A-1 as "Proposed Future Outparcel". Such proposed outparcel building shall meet minimum parking code requirements, and shall not exceed one-story and 24 feet in height, no more than 3,500 square feet of gross building area, and shall be subject to the restrictions set forth in Articles 7 and 28 of the Lease.

8.    Rent.  Following the Remodel and Enlargement Sale Date, and notwithstanding the provisions regarding payment of rent in the Original Lease:

Rent for the Expanded Premises shall be due and payable in accordance with the following:

(a)    Basic Rent:  Tenant shall pay to Landlord as basic rent for the Expanded Premises the sum of $485,632.00 per annum, payable in advance on the first day of each and every calendar month of the remainder of the Term, in equal monthly installments of $40,469.33 per month ("Basic Rent").

(b)    Percentage Rent:  Tenant shall pay Percentage Rent to Landlord equal to the amount by which one percent (1%) of Tenant's Gross Sales exceed the Basic Rent.  Tenant shall continue to have the non-cumulative offset rights against percentage rent as provided under the Lease.  Any Percentage Rent due shall be calculated based upon and payable on or before sixty (60) days after the expiration of each fiscal year of Tenant, which fiscal year currently is from July 1 to June 30 of each year.

Provided, however, Tenant shall continue to have non-cumulative offset rights against Percentage Rent for the Extended Term and any exercised renewal options, for common area maintenance and real estate tax payments.

(c)    Additional Rent:

Common Area Maintenance:    During the Extended Term, Tenant agrees to pay to Landlord as additional rental for common area maintenance reimbursement the amount of $5,923.30 per annum, payable in advance on the first day of each and every calendar month of the remainder of the Term, in equal monthly installments of $493.61 per month ("Additional Rent").

4

11/26/91   14:11 FAX 954 783 2810      WINN DIXIE RE MIA                                      ☒006

9.      Conditions Precedent. Notwithstanding anything to the contrary in this Amendment, Tenant shall have no liability hereunder and no obligation to commence or complete Tenant's Improvements unless and until the following have been satisfied or complied with (the cost to Landlord for items (a), (b) and (c) below shall not exceed $10,000 each or $25,000 total):

(a)      Title. On or before ten (10) days after the date on which both Landlord and Tenant shall have executed this Amendment (the "Execution Date"), Tenant shall order from Lawyers Title Insurance Company (the "Title Company"), at Tenant's expense, a title insurance commitment naming Tenant as the proposed insured and committing to insure Tenant's leasehold and shall provide Tenant with copies of all title exceptions (the "Commitment"). Tenant shall have 30 days after receiving both the Commitment and the Survey, as hereinafter defined (the "Title/Survey Review Deadline") to examine the Commitment. Tenant shall, on or before the Title/Survey Review Deadline, provide written objections, if any, to Landlord as to exceptions listed in the Commitment. It shall be a condition to Tenant's proceeding with Tenant's Improvements that the Expanded Premises and Tenant's entire leasehold interest and any easements benefitting Tenant be subject only to exceptions reasonably satisfactory to Tenant ("Permitted Exceptions"). Prior to commencement of Tenant's Improvements, Landlord agrees to assist Tenant in satisfying all requirements of Schedule B-1 of the Commitment and agrees to execute such affidavits, documents, instruments, or forms as the Title Company may reasonably require to permit the deletion of all but the Permitted Exceptions.

(b)      Survey. On or before ten (10) days after the Execution Date, Tenant shall order, at Tenant's expense, from a surveyor licensed in the state in which the Shopping Center is located, an actual survey of the real property comprising the Shopping Center, showing all improvements currently located thereon (the "Survey"). The Survey shall show the metes and bounds or plat legal description of the Shopping Center as shown on the Commitment, shall locate all exceptions shown in the Commitment that are capable of being so located, and shall bear the certificate attached hereto as Exhibit "B". Tenant shall have until the Title/Survey Review Deadline to review the Survey. If the Survey shows any matters which are objectionable to Tenant, in its reasonable judgment, Tenant shall notify Landlord in writing specifying survey defects. Landlord agrees to assist Tenant to cure defects.

(c)      Environmental Audit. On or before ten (10) days after the Execution Date, Tenant shall order, at Tenant's expense, an environmental audit of the Shopping Center addressed to Tenant, which audit analyzes, addresses, investigates, and/or reports as to those matters recommended to be included in a Phase I environmental audit pursuant to current ASTM standards (an "Audit"). Tenant shall have 30 days after receipt thereof to review the Audit. If either reveals any environmental condition not acceptable to Tenant, in its sole judgment, Tenant shall notify Landlord in writing. Landlord agrees to use reasonable efforts to cure any environmental condition objected to by Tenant.

(d)      Zoning/Comprehensive Plan. Tenant shall have received written evidence from appropriate authorities that the zoning classification for the Premises allows for the operation of Tenant's business as permitted under the Lease and that the zoning classification is appropriate for and consistent with any existing state comprehensive plan future land use designation for the Expanded Premises.

(e)      Amended and Restated Short Form.                Landlord shall have executed and delivered an Amended and Restated Short Form Lease in the form attached hereto as Exhibit C and Landlord's Mortgagee, if any, shall have executed and delivered a Subordination Nondisturbance and Attornment Agreement ("SNDA") in the form attached hereto as Exhibit D and shall have consented to the terms and conditions of this Amendment.

10.      Construction Easement. Landlord grants to Tenant, its agents, employees, contractors, and subcontractors a nonexclusive temporary construction license over and across such areas of the Shopping Center as may be reasonably necessary to enable Tenant to complete or cause to be completed Tenant's Improvements. Such easement shall expire upon such completion.

11.      Remedy for Failure to Perform.

If Tenant fails to fulfill its obligations under this Amendment, then Landlord shall have all remedies available at law or in equity.

Landlord and Tenant and the General Contractor shall meet at the job site as often as is mutually and reasonably advisable, and Landlord shall have the right to have a representative on the construction site on a routine basis to examine and/or inspect the construction of the building addition and related improvements and to otherwise confirm that the construction of the building addition and related improvements is being completed in accordance with the approved plans and specifications, but this inspection right shall not become an unreasonable delay or interference to the timely construction process for the building addition and related improvements. If, at any time during the construction of the building addition and related improvements, landlord discovers that Tenant has failed to construct the building addition and related improvements in accordance with the plans and specifications, then Landlord shall within five (5) calendar days notify Tenant in writing of such defect and Tenant shall have thirty (30) business days within which to correct the defects. If Landlord does not notify Tenant of a particular defect within five (5) calendar days following the date Landlord discovers or should have discovered such defect during the construction of the building addition and related improvements, Landlord waives its rights to object such defect; provided, however, Tenant, not Landlord, shall within the first year following the issuance of a permanent Certificate of Occupancy/Completion, or equivalent final document, have the responsibility for any construction defects specifically with regard to construction of the Tenant's Improvements.

If Landlord fails to comply with or perform its obligations relating to the following, Tenant shall have, without limitation, all remedies available at law or in equity and shall have the following specific remedies in the following specific instances. If Landlord fails to:

(i) timely complete Landlord's Improvements, then Tenant shall notify Landlord in writing and if, on or before 10 days after the date of Tenant's notice, Landlord still has not completed Landlord's Improvements, Tenant may either (ii) extend to Landlord such additional time to complete Landlord's Improvements, as Tenant deems reasonable, in its reasonable discretion; (iii) complete or cause Landlord's Improvements to be completed, in which case Tenant shall be entitled to offset the cost of the same together with interest thereon at the rate of 12% per annum on the unpaid, unrecouped cost of the same against all Basic, Additional, and Percentage Rent due under the Lease, until the full amount expended by Tenant, with applicable interest, is received from Landlord or recouped by offset.

12.    Authority/No Consents.

(a)    Landlord represents and warrants to Tenant that:

(i)    It has the power and lawful authority to execute, deliver, and perform its obligations under this Amendment, such execution, delivery, and performance has been authorized by all necessary action, and no consent, authorization, approval, or notice to any other party is necessary in connection with such execution, delivery, or performance or as a prerequisite to the enforceability against Landlord of this Amendment.

(ii)    It is the fee simple owner of the Shopping Center and the Expanded Premises; its title to the Expanded Premises is free and clear of any lien or encumbrance superior to Tenant's interests under the Lease that would interfere with or prevent Tenant's use of or activities in the Expanded Premises as provided in the Lease. Notwithstanding the foregoing, the parties acknowledge there is currently a lien encumbering the Shopping Center for which a Subordination, Non-Disturbance and Attornment Agreement will be provided to Tenant;

(iii)    It has not, except in accordance with applicable law, used, stored, or disposed of any Hazardous Substance, as hereinafter defined, in, on, or under the Shopping Center. "Hazardous Substance" includes, without limitation, any and all material or substances which are defined as "hazardous waste", "extremely hazardous waste" or a "hazardous substance" pursuant to any applicable legal requirements ("Legal Requirements"). "Hazardous Substance" also includes, but is not limited to, asbestos, polychlorobiphenyls ("PCB's"), chlorofluorocarbons, petroleum, and any substance for which any Legal Requirements require a permit or special handling in its use, storage, treatment, or disposal. To Landlord's

6

actual knowledge without investigation, there are no Hazardous Materials in violation of Legal Requirements in, on or under the Shopping Center.

    (iv)    To its knowledge, the Additional Space is free of latent defects.

    (b)    Tenant represents and warrants to Landlord that:

    (i)    It is incorporated under Florida law and its status is active and current;

    (ii)    It has the corporate power and authority to execute, deliver, and perform its obligations under the Original Lease and this Amendment, which execution, delivery, and performance has been authorized by all necessary corporate action and does not require any consent or approval of, or notice to, any third party; the person(s) signing this Amendment on behalf of Tenant is/are authorized to do so;

    (iii)    It has not, and will not, except in accordance with applicable law, used, stored, or disposed of any Hazardous Substance in, on, or under the Expanded Premises or the sewer system serving the Expanded Premises.

    (iv)    It has the power and lawful authority to execute, deliver, and perform its obligations under this Amendment, such execution, delivery, and performance has been authorized by all necessary action, and no consent, authorization, approval, or notice to any other party is necessary in connection with such execution, delivery, or performance or as a prerequisite to the enforceability against Tenant of this Amendment.

    13.    No Novation.  Except as expressly modified or amended by this Amendment, the Original Lease remains in full force and effect.

    14.    Headings.  The headings appearing in this Amendment are for reference only and do not modify or affect the terms hereof.

    15.    Exhibits.  The following Exhibits are attached hereto and incorporated herein:

| Exhibit "A" | - | Legal Description |
|---|---|---|
| Exhibit "A-1" | - | Site Plan |
| Exhibit "B" | - | Surveyor's Certificate |
| Exhibit "C" | - | Amended and Restated Short Form |
| Exhibit "D" | - | SNDA |

    16.    Use.  Notwithstanding anything to the contrary in the Original Lease, Tenant shall have the right to operate a bank and photo lab in the Shopping Center.

    17.    Hazardous Substances

    (a)    Tenant.    Tenant shall not cause or permit any Hazardous Substance to be used, stored, generated, or disposed of on, in or about the Premises without obtaining Landlord's prior written consent, which consent may be withheld in Landlord's sole discretion. If any Hazardous Substance is used, stored, generated, or disposed of on, in, or about the Premises as permitted above, Tenant shall comply with all legal requirements with respect to same, or if the Premises or the Shopping Center become contaminated in any manner as a result of any breach of the foregoing covenant or any act or omission of Tenant or any of its agents, contractors, subcontractors, or employees and such contamination results in an Environmental Violation, Tenant shall indemnify and hold harmless Landlord, its officers, directors, shareholders, and employees from any and all claims, demands, actions, damages fines, judgments, penalties, costs (including attorneys', consultants', and experts' fees), liabilities, losses (including without limitation, any decrease in value of the Store or Tenant's business operations therein, damages due to loss or restriction of rentable or usable space, or any damages due to adverse impact on marketing of the space in the Shopping Center or the Store), and expenses arising during or after the term of this Lease and arising as a result of such contamination. This indemnification includes, without limitation, any and all costs incurred due to any

7

investigation of the site or any cleanup, removal, or restoration mandated by a federal, state, or local agency or political subdivision. Without limitation of the foregoing, if Tenant causes the presence of any Hazardous Substance on, in or about the Premises except in accordance with applicable Legal Requirements or with Landlord's consent and the same results in an Environmental Violation, Tenant, at its sole expense, shall promptly perform such remediation. Tenant shall first obtain Landlord's approval for any such remedial action, which approval shall not unreasonably be withheld, conditioned, or delayed.

Notwithstanding the foregoing, this indemnification shall only apply to contamination by Hazardous Substances resulting from Tenant's use and operation of the Premises or that of its agents, employees ans subtenants. Nothing herein contained shall be held to indemnify Landlord from liability for Hazardous Substances contamination on or under the Premises, the Common Areas or any other portion of the Shopping Center resulting from Landlord's ownership, use or operation, or the use of operation by any third party not acting by, through, under or on behalf of Tenant.

Tenant shall provide to Landlord copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Premises which Tenant receives from any governmental unit or agency overseeing environmental matters.

Notwithstanding anything to the contrary herein, the provisions of this entire Article shall survive the expiration or the termination of this Lease and the transfer of Landlord's or Tenant's interests hereunder.

(b)     Landlord

Landlord shall provide to Tenant copies of any notices, letters, or requests for information concerning Hazardous Substances in connection with the Shopping Center which Landlord receives from any governmental unit or agency overseeing environmental matters and copies received by landlord of any such notices, letters, or requests for information sent to any other tenant of the Shopping Center.

IN WITNESS WHEREOF, Landlord and Tenant have executed and delivered this Amendment as of the date first above written.

Witnesses:

Print name: Arlene Harrington

Print name: Andy Bryan

SPV REAL ESTATE PARTNERS NO.1, L.P.

By:

Its:

Date:          JAMES A. BROOKS
               VICE PRESIDENT

Print name: Rebecca L. Saviver

Print name: Cynthia N. Crossland

WINN-DIXIE STORES, INC.

By: R. P. McCook

R. P. McCook

Its: Vice President

Date:

8

STATE OF _California_ )
COUNTY OF _Los Angeles_ )

The foregoing instrument was acknowledged before me this ~~November~~ December _3_, 1997, by _James R. Brooks_ as authorized general partner of **SPV REAL ESTATE PARTNERS NO.1, L.P.**, a Delaware limited partnership, who is **[Please check]** (personally known to me) or ~~who has produced_____ as identification.~~

Printed Name: _Cindy Byun_
Notary Public, State and County
aforesaid.
My Commission Expires: _Aug. 23, 2001_
Notary ID No.: _1152653_

(NOTARIAL SEAL)

CINDY BYUN
Commission # 1152653
Notary Public - California
Los Angeles County
My Comm. Expires Aug 23, 2001

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this ~~November~~ December _4_, 1997, by _R. P. McCook_, as _Vice_ President of **WINN-DIXIE STORES, INC.**, a Florida corporation, on behalf of the corporation, who is personally known to me.

_Jane E. DeWitte_
Printed Name:
Notary Public, State and County aforesaid.
My Commission Expires:
Notary ID No.:

(NOTARIAL SEAL)

JANE E. DeWITTE
My Comm. Exp. May 18, 2000
Comm. No. CC 527798

9

## CONSENT

The undersigned, as the owner and holder of a mortgage upon the Shopping Center or the Premises, hereby consents to the terms and conditions of this Amendment.

Witnesses:

_____     _____
Print name:_____

_____     By:_____
Print name:_____      Its:_____
                                     Date:_____

STATE OF _____ )
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this November ___, 1997, by _____, as _____ President of _____, a _____ corporation, on behalf of the corporation, who is personally known to me.


_____
Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.: _____           (NOTARIAL SEAL)

10

LEGAL DESCRIPTION:            EXHIBIT "A"

A portion of the SE 1/4 of Section 1, Township 49 South, Range 42 East
and a portion of the SW 1/4 of Section 6, Township 49 South, Range 43 East
lying West of the West right-of-way line of U.S. Highway No. 1, also being
State Road (4) 5 as per State Road right-of-way map Section 86020-2102, all
of the above lying and being in the City of Pompano Beach, Broward County,
Florida, more particularly described as follows:

Commence at the Southeast corner of said Section 1; thence North 0°-04'-25"
East along the East line of said Section 1, also being the West line of said
Section 6 for a distance of 1237.99 feet to the Point of Beginning of the
hereinafter described tract of land; thence North 13°-57'-09" East along the
said West right-of-way line of U.S. Highway No. 1, also being State Road (4) 5
for a distance of 500.26 feet to a point of intersection with a line being
944.50 feet South of and parallel with the North line of the SW 1/4 of said
Section 6; thence North 89°-07'-45" West along the said South line of the
North 944.50 feet of the SW 1/4 of Section 6 for 120.12 feet to a Point of
Intersection with the East line of said Section 1; thence North 0°-04'-25"
East along said East line of Section 1 for a distance of 217.14 feet to a
point being 60.00 feet South of the North line of the South 1/2 of the NE 1/4
of the SE 1/4 of said Section 1; thence North 90°-00'-00" West along a line,
(also as described in Deed Book 3427-382, Public Records of Broward County,
Florida) being 60.00 feet South of the North line of the South 1/2 of the
NE 1/4 of the SE 1/4 of said Section 1 for a distance of 939.43 feet; thence
South 0°-03'-30" East along a line (also as described in Deed Book 3427-382
Public Records of Broward County, Florida) being 60.00 feet East of the West
line of the East 3/4 of the East 1/2 of the SE 1/4 of said Section 1 for a
distance of 605.08 feet; thence South 89°-51'-38" East along the North line
of the SE 1/4 of the SE 1/4 of said Section 1 for a distance of 272.68 feet
to the Northeast corner of the NW 1/4 of the SE 1/4 of the SE 1/4 of said
Section 1; thence South 0°-00'-52" East along the West line of the East 1/2
of the East 1/2 of the SE 1/4 of Section 1 for a distance of 419.02 feet to
a point being 86.15 feet South of and parallel with the South line of the
NW 1/4 of the NE 1/4 of the SE 1/4 of the SE 1/4 of said Section 1; thence
South 89°-47'-27" East along a line 86.15 feet South of the said South line
of the NW 1/4 of the NE 1/4 of the SE 1/4 of the SE 1/4 of Section 1 for a
distance of 332.36 feet; thence North 0°-01'-45" East along the West line of
the SE 1/4 of the NE 1/4 of the SE 1/4 of the SE 1/4 of said Section 1 for a
distance of 86.15 feet to the Northwest corner of the SE 1/4 of the NE 1/4
of the SE 1/4 of the SE 1/4 of said Section 1; thence South 89°-47'-27" East
along the North line of the South 3/4 of the SE 1/4 of the SE 1/4 of said
Section 1 for a distance of 274.10 feet to a Point of Intersection with the
West right-of-way line of said U.S. Highway No. 1, also being State Road (4) 5;
thence North 13°-57'-09" East along said West right-of-way line of U.S. Highway
No. 1, also being State Road (4) 5, for a distance of 243.54 feet to the POINT
OF BEGINNING.

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

**EXHIBIT "B"**
**SURVEYOR'S CERTIFICATE**

Certified to: _____

RE:    File #_____ Drawing No. _____ Title:_____

The undersigned Registered Land Surveyor (the "Surveyor") hereby certifies that:

1.    This survey was prepared from an actual on-the-ground survey of the real property shown hereon (the "Property") and was conducted by the Surveyor or under the Surveyor's supervision;

2.    Monuments have been duly located or placed and actually exist at all major corners of the boundaries of the Property and such monuments are located, are of the size, and consist of the materials, as shown on this Survey;

3.    The survey and the legal description of the Property, including the point of beginning and all calls, is true, correct, and accurate, is identical to the legal description contained in _____ Title Insurance Company's commitment for title insurance No. _____, dated _____ (the "Commitment") and there are no visible discrepancies, conflicts, shortages in area, boundary line conflicts, visible encroachments onto or protruding from the Property, or visible easements or rights-of-way (other than those which exist pursuant to recorded instruments) except as noted hereon;

4.    All recorded easements or other instruments or exceptions noted in the Commitment ("Exceptions") and capable of being located have been correctly located hereon and are indicated by official recording information [book and page], and those Exceptions which cannot be located or do not affect the Property are noted hereon either as "blanket" Exceptions that affect the entire Property or as not affecting the Property;

5.    The following, if they exist on the Property, have been located on this Survey:
    (a)    buildings (labeled as to type, dimensions and gross square footage, and distance from each boundary line);
    (b)    significant other improvements other than buildings, such as signs, parking areas, or other structures such as fences or walls (labeled as to dimensions and nature of use);
    (c)    water/gas/sewer mains and telephone/electric/utility lines (as determined by on site surface observation only);
    (d)    water retention or detention ponds;
    (e)    high water marks, if the Property is located on or contains a body of water;
    (f)    interior lot lines; and
    (g)    any natural or constructed objects affecting the Property.

6.    Lines indicating all setback restrictions of record or disclosed by applicable building or zoning codes are drawn hereon and any height or bulk restrictions of record or disclosed by applicable building or zoning codes, if any, are noted hereon and the source for either type of restriction is indicated on this Survey. If no such restrictions affect or apply to the Property, a note has been placed hereon to so indicate;

7.    If a street address has been assigned for the Property, it is noted on this Survey;

8.    A vicinity map is contained on this Survey and such vicinity may shows the Property in reference to nearby public rights-of-way and major street intersections. This Survey shows the names and widths of all rights-of-way bounding the Property and indicates (a) whether such rights-of-way are public or private; (b) by use of arrows drawn to the Property boundary line that there are no gaps between the Property boundaries and the borders of such rights-of-way; (c) existing curb cut access points to any such rights-of-way which are public; and (d) that the Property has access to and from a public roadway as shown on the Survey. This Survey shows the distance to and location of the nearest intersecting public street or road (if access is by easement or private right of way);

9.    Based upon a review of Federal Flood Insurance Rate Maps (or the state or local equivalent if no federal map exists), the Surveyor has determined by scaled map location and graphic plotting only that the Property is not located in a 100 year Flood Plain or in an identified "flood prone area" as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Insurance Rate Map Panel #_____, dated _____, which such map panel covers the area in which the Property is situated;

10.    The Property contains approximately _____ acres and currently is zoned _____.

11.    The name of the owners of the properties adjoining the Property are indicated on this Survey;

12.    This Survey meets or exceeds the minimum technical standards established pursuant to the laws of the state in which the Property is located and meets the requirements set forth in the Winn-Dixie Survey Protocol (Form SP-1).

13.    This is to certify that this map or plat and the survey on which it is based were made (i) in accordance with "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by ALTA and ACSM in 1992, and includes items 1, 2, 3, 4, 6, 7, 8, and 10 of the Table A thereof, and (ii) pursuant to the Accuracy Standards (as adopted by ALTA and ACSM and in effect on the date of this certification) of a(n) _____ [insert "Urban", "Suburban", "Rural", or "Mountain/Marshland" here] Survey.

Signature:_____    Registered Land Surveyor No._____

Address:_____

Phone:_____    Fax:_____

**EXHIBIT "C"**

This Instrument was prepared by
Kim Rice Bongiovanni, Attorney-at-Law
whose address is P. O. Box B
Jacksonville, Florida 32203

(Reserved for Clerk)

### AMENDED AND RESTATED SHORT FORM LEASE

THIS AMENDED AND RESTATED SHORT FORM LEASE is executed as of this November 13, 1997, by and between SPV REAL ESTATE PARTNERS NO. 1, L.P., a Delaware limited partnership, whose mailing address is 1999 Avenue of the Starts, Suite 2000, Los Angeles, CA 90068 ("Landlord") and WINN-DIXIE STORES, INC., a Florida corporation, whose mailing address is 1141 S. W. 12th Ave., Pompano Beach, Florida 33069-4671 ("Tenant"), which terms "Landlord" and "Tenant" shall include, wherever the context permits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

### W I T N E S S E T H :

WHEREAS, Landlord and Tenant are parties to that certain Lease dated May 10, 1988, as amended and/or evidenced by: (a) Short Form Lease dated May 10, 1988, recorded in Book 15916, page 135 of the public records of Broward County, Florida; (b) Letter Agreement dated January 17, 1989; (c) Supplemental Lease Agreement dated November 13, 1989; (d) First Amendment to Lease dated August 1, 1990 (as amended and evidenced, the "Original Lease"), pursuant to which Tenant has occupied and rented from Landlord the premises consisting of approximately 220 feet wide by 200 feet deep, more particularly described in the Original Lease (the "Premises") and located in a shopping center commonly known as Pompano Marketplace and described in the Original Lease (as the same may be altered or expanded, the "Shopping Center").

WHEREAS, the term of the Original Lease expires on October 24, 2009 (the "Scheduled Expiration Date"), subject to Tenant's right to renew for five (5) subsequent extension periods of five (5) years each (each, an "Extension Term" and together with the initial term, the "Term").

WHEREAS, Tenant has requested of Landlord that it be permitted to expand the Premises to include approximately 12,000 square feet of additional space located to the north of the Premises in the Shopping Center (the "Additional Space," and together with the Premises, the "Expanded Premises"). The Expanded Premises will consist of a total of approximately 59,233 square feet. Landlord has agreed to lease to Tenant the Additional Space.

WHEREAS, Landlord and Tenant desire to memorialize and confirm the terms and conditions of the Lease of record.

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does hereby demise and lease unto Tenant and Tenant does hereby lease from Landlord a portion of the property more particularly described on Exhibit "A" attached hereto and depicted on the Site Plan attached as

Exhibit "B" attached hereto and by these references made a part hereof together with the nonexclusive right and easement to use the Common Areas as described and provided in the Lease.

The Scheduled Expiration Date shall be extended, contingent upon full reimbursement of Landlord's Contribution, so that fifteen (15) years remain from the Remodel and Enlargement Sale Date (the "Extended Term"), and Tenant shall retain the right to renew and extend the Term beyond such Scheduled Expiration Date for five (5) subsequent extension periods of five (5) years each as provided in the Original Lease. Annual rent, payable in monthly installments on the 1st day of each month during the term thereof, and provisions regulating the use and purposes to which the Expanded Premises shall be limited, are set forth in detail in the Lease and Landlord and Tenant agree to abide by the terms of the Lease. Tenant has no option to purchase the Expanded Premises under the Lease.

The parking ratio described in Article 8(a) and (b) of the Lease, as subsequently modified by the First Amendment to Lease, shall be 3.45 automobile parking spaces to each 1,000 square feet of gross building area, and 827 automobile parking spaces (minimum).

Landlord shall have the right, after ten (10) years from the date hereof (and provided further that "JoAnn's Fabrics" has not exercised a renewal option of their lease term), to construct an additional outparcel building in the location identified on Exhibit A-1 as "Proposed Future Outparcel". Such proposed outparcel building shall meet minimum parking code requirements, and shall not exceed one-story and 24 feet in height, no more than 3,500 square feet of gross building area, and shall be subject to the restrictions set forth in Articles 7 and 28 of the Lease.

All the terms, conditions, provisions and covenants of the Lease are incorporated herein by this reference for all purposes as though written out at length herein, and both the Lease and this Short Form Lease shall be deemed to constitute a single instrument or document. This Short Form Lease is not intended to amend, modify, supplement, or supersede any of the provisions of the Lease and, to the extent there may be any conflict or inconsistency between the Lease or this Short Form Lease, the Lease shall control.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Short Form Lease to be executed as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

Print Name: _Arlene J Harrington_

Print Name: _Cindy Byun_

SPV Real Estate Partners No. 1, L.P.

By: _____
Its: _____
     JAMES R. BROOKS
     VICE PRESIDENT

Print Name:_____

WINN-DIXIE STORES, INC.

By: _____
Print Name:_____
Its: _____

2

STATE OF _California_ )
COUNTY OF _Los Angeles_ )

The foregoing instrument was acknowledged before me this ~~November~~ December 3 , 1997, by
_James R. Brooks_ , the _Vice_ President of SPV Real Estate Partners No. 1, L.P., a
Delaware limited partnership, on behalf of the limited partnership, who **[PLEASE CHECK ONE]** ✓ is
personally known to me ~~or          has produced                                as identification.~~

Printed Name: _Cindy Byon_
Notary Public, State and County aforesaid.
My Commission Expires: _Aug. 23, 2001_
Notary ID No.: _1152653_
(NOTARIAL SEAL)

CINDY BYON
Commission # 1152653
Notary Public - California
Los Angeles County
My Comm. Expires Aug 23, 2001

STATE OF FLORIDA )
COUNTY OF DUVAL )

The foregoing instrument was acknowledged before me this November _____ , 1997, by
_____, as _____ President of WINN-DIXIE STORES, INC., a Florida
corporation, on behalf of the corporation, who are personally known to me.

Printed Name: _____
Notary Public, State and County aforesaid.
My Commission Expires:_____
Notary ID No.:_____
(NOTARIAL SEAL)

SUPPLEMENTAL LEASE AGREEMENT

THIS SUPPLEMENTAL LEASE AGREEMENT, made this _13th_ day of _November_, 1989, between POMP COMMERCIAL CORP., a Florida corporation, hereinafter called "Landlord", WINN-DIXIE STORES, INC., a Florida corporation, hereinafter called "Tenant", which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singular or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

W I T N E S S E T H :

WHEREAS, by Lease dated May 10, 1988, Pomp Commercial Corp., as Landlord, did lease and demise unto Tenant that certain premises located at Pompano Marketplace Shopping Center, westerly side of U.S. Hwy. #1 and its intersection with S.E. 12th Street in the City of Pompano Beach, County of Broward, State of Florida, reference being made to said Lease for a more detailed description of the demised premises, for an initial term of twenty (20) years commencing upon a date dependent upon the completion of certain construction, and upon such other terms and conditions as are set forth therein, and;

WHEREAS, a Short Form of said Lease is recorded in Official Records Book 15916, page 135 of the Public Records of Broward County, Florida.

WHEREAS, said Lease has been amended in certain particulars by Letter Agreement dated January 17, 1989; and

WHEREAS, Tenant has now opened for business in the demised premises and the parties desire to fix the commencement date of said Lease as hereinafter set forth;



This Instrument was prepared by Charles P. Milford, Jr., Attorney-at-Law whose address is P. O. Box B, Jacksonville, Florida 32203

NOW THEREFORE, in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable considerations paid by Tenant to Landlord, the receipt and sufficiency whereof are hereby acknowledged, it is mutually agreed:

1.   The commencement date of the above-described Lease is fixed at October 25, 1989 and the expiration of the initial term of twenty (20) years demised therein shall be at midnight on October 24, 2009.

2.   All covenants, terms and conditions of the above-described Lease not modified or amended by this Supplemental Lease Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Supplemental Lease Agreement the day and year first above written.

Signed, sealed and delivered in the presence of:

POMP COMMERCIAL CORP.

By _____
   Its HAROLD S. WENAL, President

Attest _____
      Its _____ Secretary
          SUSAN K. CHAPMAN, AS
          (CORPORATE SEAL)

_____
Witness

_____
As to Landlord

                                        LANDLORD

WINN-DIXIE STORES, INC.

By _____
   Its _____ President

Attest _____
      Its _____ Secretary
          (CORPORATE SEAL)

_____
Witness

_____
As to Tenant

                                        TENANT

STATE OF FLORIDA

COUNTY OF *Brevard*

The foregoing instrument was acknowledged before me this *13th*
day of *November* , 1989, by
HAROLD S. WENAL, PRESIDENT   and   SUSAN K. CHAPMAN, SECRETARY   ,
_____ President and _____ Secretary, respectively, of
POMP COMMERCIAL CORP, a Florida corporation, on behalf of the
corporation.

(NOTARIAL SEAL)

Notary Public
State and County aforesaid
My commission expires:

NOTARY PUBLIC STATE OF FLORIDA
MY COMMISSION EXP. OCT. 31, 1992
BONDED THRU GENERAL INS. UND.

STATE OF FLORIDA

COUNTY OF DUVAL

The foregoing instrument was acknowledged before me this *22*
day of *November* , 1989, by
James Kufeldt   and   J. S. Bryan, Jr.   ,
_____ President and _____ Secretary, respectively, of
WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the
corporation.

(NOTARIAL SEAL)

Notary Public
State and County aforesaid
My commission expires:

JOAN JOHNS
Notary Public, State of Florida
My Commission Expires 1-11-93

- 3 -

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE, made this ___1st___ day of
___August___, 1990, between POMPANO MARKETPLACE PARTNERS, a
Florida General Partnership, (hereinafter called "Landlord"), and
WINN-DIXIE STORES, INC., a Florida corporation, (hereinafter
called "Tenant"), which terms "Landlord" and "Tenant" shall
include, wherever the context admits or requires, singular or
plural, and the heirs, legal representatives, successors and
assigns of the respective parties;

### W I T N E S S E T H :

WHEREAS, by Lease dated May 10, 1988, a Short Form of which
is recorded in Official Records Book 15916, page 135 of the
public records of Broward County, Florida, Landlord did lease and
demise unto Tenant those certain premises, in said lease more
particularly described located in a shopping center development
known as "Pompano Marketplace", situated adjacent to the westerly
side of U.S. Highway #1 at its intersection with S.E. 12th Street
in the City of Pompano Beach, County of Broward and State of
Florida, upon the terms and conditions as set forth in said
lease; and

WHEREAS, said lease was amended by Letter Agreement dated
January 17, 1989; and

WHEREAS, the parties have agreed to further amend said
lease, as hereinafter set forth;

NOW THEREFORE, in consideration of the premises and the sum
of Ten and No/100 Dollars ($10.00) and other good and valuable
considerations in hand paid by Tenant to Landlord, the receipt
and sufficiency of which are hereby acknowledged, it is mutually
agreed as follows:

1. By virtue of substituting a new plot plan attachment to
the lease, for the purpose of graphically showing certain changes
in the layout of the shopping center, the said lease, as
previously amended, is hereby further amended by deleting from



APPROVED
S [illegible]

[illegible] Mgr.

Legal Dept,
n-Dixie Stores,
Inc.

This Instrument was prepared by
Charles P. Milford, Jr., Attorney-
at-Law whose address is P. O.
Box 8, Jacksonville, Florida 32203

(1)

the first page thereof the date "April 6, 1988", appearing in the ninth from last line on page one and substituting in lieu thereof the date "June 12, 1990". The plot plan attached to the lease as Exhibit "A" is hereby deleted from the lease and plot plan last revised June 12, 1990 attached hereto as Exhibit "A" and by this reference made a part hereof is substituted in lieu thereof. Henceforth, whereinsoever in said lease, as amended, reference is made to Exhibit "A" or to the plot plan of the shopping center, the same shall be construed to apply to the plot plan last revised June 12, 1990 and attached hereto as Exhibit "A".

2. The last paragraph of Article 8 appearing on page 7 of said lease is hereby deleted in its entirety and the following language substituted in lieu thereof:

> As to the building sites labeled 1 through 3 respectively on Exhibit "A", the following restrictions shall apply: No building which may be allowed on any such property shall exceed one (1) story nor twenty-five (25) feet in height; any buildings constructed on site 1 shall not exceed a total of 6,550 square feet of floor space; any building constructed on site 2 shall not exceed 6,585 square feet of floor space; any building on site 3 shall not exceed 2,700 square feet of floor space. Such building sites may be used only for businesses or activities which do not violate the restrictions on use set forth in Article 7 and 28 of this lease. Pending such use or construction thereon, the building sites shall be maintained as grassed or landscaped areas and kept free of weeds and debris or may be used as paved parking area.

3. Paragraph (a) of Article 8 appearing on page 7 of said lease is hereby deleted in its entirety and the following language substituted in lieu thereof:

> (a) a minimum ratio of at least one automobile parking space for each 260 square feet of gross building area (including additional floor levels) in the shopping center, and".

4. The figure "740" appearing in the first line of Article 8(b) on page 7 of said lease is hereby deleted and the figure "834" substituted in lieu thereof.

In similar fashion, the figure "600" appearing in the third from last line of Article 20 on page 12 of the lease is deleted and the figure "751" substituted in lieu thereof.

It is mutually understood and agreed that the said lease shall be and remain in full force and effect and unmodified except as the same is specifically modified and amended hereby. All covenants, terms, obligations and conditions of the said Lease, as previously amended, which are not modified or amended by this First Amendment to Lease, are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed the day and year first above written.

Signed, sealed and delivered
in the presence of:

POMPANO MARKETPLACE PARTNERSHIP,
a Florida General Partnership

BY: POMP COMMERCIAL CORP., a
Florida corporation, as
general partner

_Vicki P Columbo_
Witness

By _____
Its _____ Vice _____ President

_Judy Mellman_
As to Landlord

Attest _____
Its _____ Ass't Secretary

(CORPORATE SEAL)

LANDLORD

BY: CAL FED ENTERPRISES, a
California corporation, as
general partner

_Barbara Page_
Witness

By _____
Its _____ V/ce _____ President

_Carol Zimmerman_
As to Landlord

Attest _____
Its Assistant Secretary

(CORPORATE SEAL)

LANDLORD

WINN-DIXIE STORES, INC.

_Brenda J. Kinlaw_
Witness

By _____
Its _____ President

_Susan G. Clarkson_
As to Tenant

Attest _____
Its _____ Secretary

(CORPORATE SEAL)

TENANT

STATE OF FLORIDA               }

COUNTY OF                   }

The foregoing instrument was acknowledged before me this _1o1_

day of ~~Mar~~ August _____, 1990, by

_Monroe H Ridenhour_ and _Earl C Kurtz_,

_Vice_ President and _Asst_ Secretary, respectively, of POMP

COMMERCIAL CORP., a Florida corporation, as general partner of

POMPANO MARKETPLACE PARTNERS, a Florida General Partnership.

_Vickie P Columbo_
Notary Public
State and County aforesaid
My commission expires:    NOTARY PUBLIC STATE OF FLORIDA    (NOTARIAL SEAL)
                         MY COMMISSION EXP. DEC.21,1993
                         BONDED THRU GENERAL INS. UND.

STATE OF ~~FLORIDA~~ California     }

COUNTY OF Los Angeles     }

The foregoing instrument was acknowledged before me this _8th_

day of _August_ _____, 1990, by

_Rex L White_ and _Jean D Stuckz_,

_Asst Vice_ President and _Asst_ Secretary, respectively, of CAL

FED ENTERPRISES, a California corporation, as general partner of

POMPANO MARKETPLACE PARTNERS, a Florida General Partnership.

_Gina E Kerr_
Notary Public
State and County aforesaid
My commission expires: 4-23-91

OFFICIAL SEAL
GINA E. KERR
NOTARY PUBLIC -CALIFORNIA
PRINCIPAL OFFICE IN
LOS ANGELES COUNTY
My Commission Exp. April 23, 1991

(NOTARIAL SEAL)

STATE OF FLORIDA              }

COUNTY OF DUVAL          }

The foregoing instrument was acknowledged before me this _25th_

day of _September_ _____, 1990, by

_James Kufeldt_ and _Wayne E. Ripley, Jr._,

__ President and _Asst_ Secretary, respectively, of

WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the

corporation.

_Susan G Clarkson_
Notary Public
State and County aforesaid
My commission expires: Notary Public, State of Florida
                        My Commission Expires Apr. 11, 1991

(NOTARIAL SEAL)

(4)

CONSENT

SECURITY PACIFIC NATIONAL BANK, a *National Banking Association* ~~corporation~~, as the holder of a mortgage encumbering the premises described in the foregoing FIRST AMENDMENT TO LEASE, and as holder of a certain collateral assignment of the Landlord's interest in the Lease therein described and the rents due thereunder, dated *5-10-88*, hereby consents to the foregoing FIRST AMENDMENT TO LEASE and agrees that it shall not be construed as a violation of any of the terms and conditions contained in its said mortgage or said collateral assignment of rents and leases dated *11-23-88*

IN WITNESS WHEREOF, SECURITY PACIFIC NATIONAL BANK, a *National Banking Association* ~~corporation~~ has caused this consent to be executed in its corporate name and its corporate seal to be hereunto affixed and attested by its officers thereunto duly authorized this *15* day of *August*, ~~1989~~.

Signed, sealed and delivered
in the presence of:

SECURITY PACIFIC NATIONAL BANK

_____        By *Mary Bowman*
Witness                                     Its ~~Vice~~ President

_____        Attest *Kim Obaya*
Witness *Mary E. Deane*                      Its        Secretary

(CORPORATE SEAL)

STATE OF ~~FLORIDA~~ *CALIFORNIA*

COUNTY OF *LOS ANGELES*

The foregoing instrument was acknowledged before me this *15th* day of *August, 1990*, ~~1989~~, by *Mary Bowman* ~~and~~ _____, *Vice* President ~~and~~ _____ Secretary, respectively, of SECURITY PACIFIC NATIONAL BANK, a *National Banking Assoc.* ~~corporation~~, on behalf of the corporation.

_____
Notary Public
State and County aforesaid
My commission expires:

(NOTARIAL SEAL)

OFFICIAL SEAL
EMOGENE OBA
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
My Commission Expires Dec. 13, 1991





WINN-DIXIE STORES, INC.   5050 EDGEWOOD COURT   P.O. BOX B   JACKSONVILLE, FLORIDA 32203-0297   (904) 783-5000

Pomp Commercial Corp.                    January 17, 1989
Post Office Box 6007
Ft. Lauderdale, FL 33310

Re:  New Winn-Dixie Store Location
     Pompano Market Place
     U.S. Highway #1 & S.E. 12th Street
     Pompano Beach, Florida

Gentlemen:

     Reference is made to that certain Lease dated May 10, 1988
covering the captioned location wherein you are Landlord and this
company is Tenant.  This letter, when executed by you in the
spaces below, will serve to amend the said Lease in the following
particulars:

     The following language is hereby added at the end of the
first paragraph of Article 14 on page 9 of this Lease:

     "In connection with any construction work to be performed by
Tenant on the demised premises, Tenant agrees to indemnify and
hold Landlord harmless from any mechanics', materialmen's or
laborers' liens or encumbrances arising out of such construction
work and to cause any such liens to be promptly discharged."

     Except as the said Lease is herein amended, the same shall
remain in full force and effect and unmodified, in accordance
with its terms.

     Please indicate your acceptance of the understandings
contained herein by signing below and returning two copies to:
C. P. Milford, Attorney, P.O. Box B, Jacksonville, Florida 32203.

                         Sincerely,

                         WINN-DIXIE STORES, INC.

                         By _____
                            Its            Vice President
                                                 TENANT

Acceptance of the above        POMP COMMERCIAL CORP.
understanding is hereby
acknowledged this 20th         By _____
day of January , 1989.            Its Harold S. Wenal, President
                                                 LANDLORD


OPERATORS OF SUPERMARKETS ACROSS THE SUNBELT

The City of Pompano Beach
100 W ATLANTIC BLVD
POMPANO BEACH FL 33060



## CERTIFICATE OF OCCUPANCY

TEMPORARY ☒
PARTIAL ☒

Issue date . . . . . . . .   11/9/98
Expiration date . . . . . . .

Folio Number . . . . . . .   9201500010
Property Address . . . . .   1199 South Federal Hwy
                           Pompano Beach     FL    33062
Subdivision Name . . . . .   U S 1 SUBDIVISION
Legal Description . . . . .   PARCEL "A"

Property Zoning . . . . .   B3

Owner . . . . . . . . . .   SPV REAL ESTATE PRTNERS #1 LP

Contractor . . . . . . . .   Konover Construction Corp South

Application number . . . .   #97-5049
Description of Work . . . .   Expansion (Winn-Dixie Store)
Construction type . . . . .   3P
Occupancy Type . . . . .   G1
Flood Zone . . . . . . . .   *X
Special conditions
    ***TEMPORARY/PARTIAL FOR DELI AND PRODUCE AREAS ONLY***

Approved . . . . . . . .   _____
                                  Building Official

VOID UNLESS SIGNED BY BUILDING OFFICIAL

FILE: PM — W/D   T-BLDOUT

# LEASE

THIS LEASE, made this ____10th____ day of _____May_____, 19 __88__

between ____POMP COMMERCIAL CORP., a Florida corporation,_____

_____

_____ (hereinafter called "Landlord")

and ____WINN-DIXIE STORES, INC., a Florida corporation,_____

_____

_____(hereinafter called "Tenant");

which terms "Landlord" and "Tenant" shall include, wherever the context admits or requires, singu-

lar or plural, and the heirs, legal representatives, successors and assigns of the respective parties;

## WITNESSETH:

**PREMISES**    That the Landlord, in consideration of the covenants of the Tenant, does hereby lease and

demise unto said Tenant and the Tenant hereby agrees to take and lease from the Landlord, for

the term hereinafter specified, the following described premises:

That certain store building, approximately____220____ feet in width by ____200____

feet in depth, __together with concrete pads at rear of building for instal-__

__lation of Tenant's exterior freezers and/or coolers, a front vestibule__

__measuring approximately 82 feet by 12 feet, a rear receiving room,__

and the land on which the same shall stand (hereinafter collectively called "demised pre-

mises"), which store building and related improvements are to be constructed by Land-

lord according to plans and specifications to be approved by the parties as herein pro-

vided, and shall be in the location and of the dimensions as outlined in red on the

Plot Plan __entitled "U.S. 1 & S.E. 12th Street, Pompano Beach, Florida",__

__prepared by Najdink Associates, Architects/Planners, Ft. Lauderdale,__

__Florida, dated February 8, 1988, last revised April 6, 1988_____,

attached hereto marked Exhibit "A" and by this reference made a part hereof.

The demised premises are located in a shopping center development (shown in de-

tail on Exhibit "A"), known as ____Pompano Marketplace_____

(hereinafter called "shopping center"), located __adjacent to the westerly side of__

__U. S. Hwy. #1 at its intersection with S. E. 12th Street_____

in the City of____Pompano Beach____, County of ____Broward_____,

State of____Florida_____, the legal description of the shopping center being

set forth on Exhibit "B" attached hereto and by this reference made a part hereof.



APPROVED
AS TO FORM

Division Manager

Legal Dept.
Winn-Dixie Stores,
Inc.

This instrument was prepared by
Charles P. Milford, Jr., Attorney
at Law whose address is P. O.
Box 8, Jacksonville, Florida 32203

**TERM**       FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens said premises for the transaction of its business as hereinafter provided for an initial term of _____ _____twenty (20)_____years from said commencement date. The parties agree to execute a supplemental agreement fixing the commencement date when the same shall have been determined as herein provided.

       This lease is granted and accepted upon the foregoing and upon the following terms, covenants, conditions and stipulations:

**RENTAL**       1. The Tenant agrees to pay to the Landlord as a minimum guaranteed rental for the demised premises during the term of this lease, and any extensions thereof, the sum of _Three Hundred_ _____ One Thousand One Hundred Thirty-Two and No/100———————————————————————— _____ Dollars ($_301,132.00_____) per annum. The minimum guaranteed rental shall be paid in twelve (12) equal monthly installments of__Twenty-Five Thousand Ninety-Four and 33/100————— ——————————————————————————————————————————— Dollars ($_25,094.33____) per month, which installments shall be due and payable in advance on the first day of each and every calendar month of the lease term, and any extensions thereof.

       In addition, the Tenant agrees to pay to the Landlord a percentage rental equal to the amount, if any, by which one percent (1%) of Tenant's gross sales made from the demised premises in each fiscal year of Tenant during the term of this lease, and any extensions thereof, exceeds the minimum guaranteed annual rental.

       Any excess rent which may become due by reason of the percentage of sales provision shall be payable by the Tenant within sixty (60) days after the expiration of each fiscal year. However, upon final termination of the lease, if not extended, or upon termination of the last extension thereof, any excess rent which may be due by reason of said percentage of sales provision shall be payable by Tenant within sixty (60) days after such termination or expiration of the leasehold. The percentage rent for each fiscal year shall be calculated separately and without reference to the volume of sales of any other year. For purposes of calculating the percentage rental due hereunder, the Tenant's fiscal year shall be from approximately July 1st to June 30th of each year. The first monthly installment of rental shall be due on the first day of the next succeeding complete calendar month after the date the lease commences as hereinafter provided, and shall include any rent due for the preceding fractional month. Both guaranteed rental and percentage rental for fractional years and fractional months occurring at the beginning and end of the term, or any extension thereof, shall be pro-rated on the basis of the annual rental.

**DEFINI-**
**TION OF**
**"GROSS**
**SALES"**       1a. The term "gross sales" as used herein shall mean the aggregate gross sales price of all merchandise sold, in or from the demised premises, both for cash and on credit; provided, however, such term shall not include (1) any rental tax, or any sales tax, gross receipts tax, or similar tax by whatever named called, the amount of which is determined by the amount of sales made, and which Tenant may be required to collect and account for to any governmental agency; (2) transfers of merchandise made by the Tenant from the demised premises to any other stores or warehouses of Tenant or its affiliated companies; (3) credits or refunds made to customers for merchandise returned or exchanged; (4) all sales of cigarettes and tobacco; (5) all receipts from vending machines and public pay telephones; (6) accommodation check cashing fees and accommodation sales, such as sales of postage stamps, lottery tickets, money orders, government bonds

or savings stamps or similar items; (7) returns of merchandise to suppliers or manufacturers; (8) net amount of discounts allowed to any customers, including discounts resulting from the issuance to customers of trading stamps, receipts or coupons for exchange of merchandise or other things of value; and (9) merchandise or other things of value issued as a premium in connection with any sales promotion program. Tenant makes no representation or warranty as to the amount of sales it expects to make in the demised premises.

**RECORD OF SALES**   1b. The Tenant shall keep complete and accurate books and records of its gross sales made from the demised premises, which books and records shall be kept by the Tenant at the office address hereinafter designated for notices. Within ninety (90) days from the end of each fiscal year, or at the end of the leasehold, if it sooner occurs, and at such time as the percentage rental shall be payable by Tenant as hereinabove provided, the Tenant shall submit to the Landlord a written statement of the gross sales made by Tenant from the demised premises during the preceding fiscal year. Such statement of sales shall be treated as confidential by the Landlord and shall be conclusive unless the Landlord, within ninety (90) days after receipt thereof, shall cause applicable records to be audited in a manner not to unreasonably interfere with Tenant's business by a certified public accountant employed and paid by the Landlord.

**USE**   2. The demised premises may be used for a retail food store, commonly referred to as a supermarket, dealing primarily in, but not limited to, foods and food products, or for the conduct of any general mercantile (including discount operations), retail or service business. Tenant shall have the right to have a banking facility in the demised premises as well as the right to install and operate automatic teller machines or automatic fund transfer machines in the demised premises. Tenant also expressly reserves the right at any time to operate a pharmacy department and to sell prescription drugs and drugs required to be dispensed by a licensed pharmacist from the demised premises.

Tenant at all times shall fully and promptly comply with all laws, ordinances and regulations of every lawful authority having jurisdiction of said premises, as such shall relate to the cleanliness and use of said premises and the character and manner of operation of the business conducted in or at said premises.

**CONSTRUCTION OF SHOPPING CENTER** 3. The Landlord, at its sole cost and expense, shall construct the shopping center, substantially as shown on Exhibit "A", consisting of all the buildings shown thereon, together with all ramps, sidewalks, streets, entranceways, malls, parking areas, service areas, driveways and related improvements (excluding buildings) being sometimes hereinafter referred to as "common areas". The Landlord, at its sole cost and expense, shall grade and surface with top quality materials all paved portions of the common areas (including parking area), and shall provide proper and adequate water drainage and lighting system and operations therefor and shall operate and maintain the same in good repair and usable condition for use by the patrons of the shopping center and the tenants and their employees during the term of this lease and any extensions thereof. The arrangement and location of all store buildings and common areas (including parking area) within the shopping center shall at all times during the term of this lease, or any extensions thereof, be maintained substantially as shown on Exhibit "A" and shall not be changed without the written consent of the Tenant. The exterior of the shopping center (including store buildings and Tenant's demised premises) shall not be modified without Tenant's prior written consent. If not shown on Exhibit "A", Tenant expressly reserves the right to approve the finish grade elevations of all store buildings and common areas (including parking and service areas) within the shopping center which are to be constructed concurrently with Tenant's store building.

Notwithstanding the foregoing, it is understood that Landlord intends initially to construct only Tenant's store building and the store buildings required under Articles 5 and 6 herein, together with all the common areas of the shopping center. Landlord reserves the right, but shall not be required, to construct additional buildings within the shopping center but only in the areas and in the locations reserved therefor as shown on Exhibit "A". All such additional buildings must be of like structural and architectural quality as the building for Tenant. In conjunction with the construction of any additional buildings, at least the ratio of automobile parking area to gross building area as hereinafter required shall be maintained at all times. Pending such construction, the future building sites shall be maintained as paved parking areas or as grassed and landscaped areas and kept free of weeds and debris. Landlord agrees that Tenant shall have uninterrupted use and enjoyment of the demised premises and the common areas during any such additional construction without unreasonable interference therewith by reason of such construction work.

Concurrently with the above construction, Landlord agrees at its sole cost and expense, to construct the store building for occupancy by Tenant in accordance with the plans and specifications to be approved by both Landlord and Tenant. Plans and specifications shall be approved when initialed by both parties, and when initialed shall constitute a part of this lease. Said plans and specifications shall provide for a completed store building, commonly referred to as a "lock and key job".

-4-

COMPLETION
DATE

4. Landlord covenants and agrees that the construction of the shopping center shall begin not later than ____4-30-89____ and shall be completed not later than ____ March 31, 1990 __, and if the same shall not be begun or completed by the respective dates, the Tenant, at its option, may, in either of such events, cancel and terminate this lease or may extend the Landlord additional time for the beginning or completion of construction; provided, however, that if after the beginning of construction the Landlord's failure to complete said improvements within the stipulated time shall be due to acts of God, strikes, riots, fire, flood, war, delay of carriers, material shortages, embargoes or inclement weather, or other similar happenings which are beyond the control of Landlord, and provided further the improvements shall be completed with all due diligence commensurate with such delay and in all events not later than ____July 31, 1990____ (outside completion date), said option to terminate shall not arise. "Construction of the shopping center" shall be deemed to have begun when the first concrete footings have been poured. If pursuant to this paragraph Tenant shall cancel or terminate this lease or if Landlord fails to commence or complete construction of the shopping center by the above dates, Landlord agrees for a period of three (3) years after such failure or cancellation or termination not to permit or consent to the use as a supermarket of the demised premises or any portion of the shopping center, or any enlargement thereof, except by Tenant.

COMMENCE-
MENT DATE

5. The Tenant shall open its store for business within sixty (60) days following performance of the following:

(a) Tenant's store building and other improvements constructed on the demised premises shall have been delivered to Tenant completed in accordance with the plans and specifications and Landlord shall have delivered to Tenant, at Landlord's expense, a Certificate of Occupancy or equivalent document for the demised store building;

(b) Construction of all of the common areas shall have been completed substantially as shown on Exhibit "A";

(c) Construction of all the highway median cuts, driveways and entranceways into the shopping center shall have been completed as shown on Exhibit "A";

(d) Construction of at least 13,380 square feet of total building area (excluding Tenant's store building) shall have been completed as shown on Exhibit "A";

(e) The stores to be operated by each of the following tenants shall have been completed and opened for business simultaneously with Tenant:

13,380 sq. ft. of other tenant space

(f) A traffic light signal device shall have been installed and be in operation at the entranceway into the shopping center from the intersection of U. S. Hwy. #1 and S. E. 12th Street. Landlord shall be deemed in compliance with this condition if Landlord has obtained the necessary approvals to install the traffic light signal device and is in the process of causing said device to be installed.

In the event that all the above requirements shall not have been met on or prior to the outside completion date, the Tenant at its sole option may cancel and terminate this lease.

Rent shall begin to accrue hereunder upon the date the Tenant opens its store for business, or upon the expiration of sixty (60) days following the performance of all the above requirements, whichever date shall sooner occur. No acceptance of possession of the demised premises, opening for business by Tenant nor payment of rent under this lease shall constitute acceptance by Tenant of defective work or materials or of work not completed in accordance with plans and specifications.

**OTHER TENANTS**

6. As a condition and inducement to Tenant's entering into this lease, Landlord represents and warrants that it has entered into firm commitments for leases with the tenants listed below for the terms and for the amount of floor space indicated:

| Name | Minimum Term Years | Minimum Floor Area (sq. ft.) |
|------|--------------------|------------------------------|
| Local tenants | Variable | 13,380 |

Landlord further warrants and represents that such tenants shall occupy the space in the shopping center in the locations indicated on Exhibit "A" and in the minimum amounts set opposite their respective names above; and Landlord agrees, on demand, to furnish evidence satisfactory to Tenant, prior to and as a further condition to the establishment of the commencement date of this lease, that Landlord has entered into non-cancellable leases, except for default, with such tenants.

**RETAIL AND SERVICE STORES ONLY**

7. Without the prior written consent of Tenant herein only retail and/or service stores shall be allowed to operate in the shopping center, or any enlargement thereof, it being the intent of the parties hereto that no bowling alley, skating rink, bingo or electronic game parlor, sales of automobiles, or non-retail or non-service type activities, shall be permitted in the shopping center. However, it is agreed that the operation of a total of 20,000 sq. ft. of business and professional office space located not closer than 165 feet from the demised premises shall not be deemed a violation hereof.

**PARKING AND COMMON AREAS**

8. Landlord hereby dedicates and grants to Tenant, its employees, agents, suppliers, customers and invitees, a non-exclusive right at all times to use, free of charge, during the term of this lease, or any extensions thereof, all the common areas, as defined in Article 3 hereof, and as shown on Exhibit "A", which areas are acknowledged to be for use by such persons, along with others similarly entitled, for parking and for ingress and egress between the demised premises and all other portions of the shopping center and the adjoining streets, alleys and sidewalks. Tenant may use the sidewalks adjacent to the demised premises for the display and sale of merchandise and services from time to time with Landlord's prior written approval, which shall not be unreasonably withheld, provided Tenant does not make such a request more than six (6) times in any calendar year and provided such is allowed by all applicable governmental agencies.

Landlord shall at all times during the term of this lease, and any extensions thereof, provide and maintain a surfaced parking area substantially as shown on Exhibit "A", and of sufficient area to provide:

(a) a minimum ratio of at least ~~three (3) square feet of~~ 3.5 automobile parking spaces ~~area~~ to each ~~square foot~~ of gross building area (including additional floor levels) in the shopping center, and

(b) facilities for convenient parking of at least ~~800~~ 740 automobiles (minimum);

and in the event the parking area furnished should at any time be substantially less, and such deficiency of parking facilities shall continue for thirty (30) days after written notice thereof is received by Landlord giving reasonable details, the Tenant at its option shall have the right to terminate this lease, provided, that the termination of the lease for such a default may be prevented and the lease reinstated by Landlord curing the default within thirty (30) days after receipt of such notice of termination. All of the common areas (including parking area) shall be adequately lighted by Landlord at its expense during Tenant's food store shopping hours, and Landlord further agrees that no signboards or other construction shall be erected in any of the said common areas shown on Exhibit "A" or so as to obstruct the view of the demised premises from the adjoining public streets. Without the prior written consent of Tenant herein, no carnivals, fairs or shows nor sales by merchants utilizing vehicles or booths in the common areas shall be allowed in the shopping center, or any enlargement thereof.

As to the building sites labeled 1 through 4 respectively on Exhibit "A", the following restrictions shall apply: No building which may be allowed on any such parcel shall exceed one (1) story nor twenty-five (25) feet in height; any building constructed on site 1 shall not exceed 3,200 sq. ft. of floor space; any building to be constructed on site 2 shall not exceed 4,250 sq. ft. of floor space; any building constructed on site 3 shall not exceed 3,200 sq. ft. of floor space; any building constructed on site 4 shall not exceed 3,600 sq. ft. of floor space. Such building sites may be used only for businesses or activities which do not violate the restrictions on use set forth in Articles 7 and 28 hereof. Pending such use or construction thereon, the building sites shall be maintained as grassed or landscaped areas and kept free of weeds and debris, or may be used as paved parking area.

**SERVICE AREA**

9. Landlord further agrees to provide for the exclusive use of the Tenant at its grocery service entrances parking spaces for two large trailer trucks for continuous use and further agrees that Tenant shall have 24-hour a day facilities for ingress and egress to the rear of the demised premises and the exclusive right to such spaces as may be reasonably needed by Tenant for refuse disposal and loading and unloading merchandise for its store into and from trucks and trailers at such service entrances.

**UTILITIES**    10.  The Tenant agrees to pay all charges measured by consumption or use for telephone, electricity, water, gas and other utilities used by Tenant on the demised premises, and Landlord agrees at all times to provide Tenant with access to such utilities.  Tenant shall not be required to pay charges for fire alarm system, static or flowing water to supply the fire sprinkler system, or any "hook up" fees, environmental impact charges, system impact charges or similar charges incident to providing access to any utility system.

**TENANT'S**    11.  Upon completion of  construction by  Landlord and acceptance
**REPAIRS**     of  the  demised  premises  by  Tenant,  Tenant  agrees  to  keep  the interior  of  the  demised  premises  in  good  condition  and  repair, excepting  structural  repairs  and  all  repairs  which  are  the responsibility  of  the  Landlord  or  which  are  made  necessary  by reason  of  fire  and  other  casualties  covered  by  Landlord's  fire and  extended  coverage  insurance,  and  excepting  reasonable  wear and  tear.   Within  such  repair  responsibility  of  Tenant  shall  be included:   the  air  conditioning  and  heating  equipment  (but  not duct  work,  which  shall  be  the  responsibility  of  Landlord), provided  Landlord  shall  accord  to  Tenant  the  benefit  of  any warranties  extended  by  the  manufacturers  or  the  installers  of such  equipment;  the  floor  surfacing;  and  the  replacement  of  any plate  glass  damaged  or  broken,  except  that  covered  by  Landlord's fire  and  extended  coverage  insurance.

                                                                        and       window frames

**LANDLORD'S**  12.  The Landlord shall, at its cost and expense, keep and maintain, in good condition and repair,
**REPAIRS**     the common areas, the exterior of Tenant's store building, including the ▮▮▮▮▮▮▮
automatic doors, roof, gutter, downspouts, exterior painting, masonry walls, foundation and struc-
tural members, the automatic sprinkler system (including central alarm system therefor, if required
by governmental authority), the plumbing (including septic tank, if any), wiring, ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of the store building in good condition and repair, and
shall make any and all structural repairs to both the exterior and interior of said premises. If any
portion of the common areas (as defined in Article 3 hereof) or any portion of the store building,
which is the responsibility of the Landlord, shall at any time be in need of repair, Landlord will
repair same immediately upon receipt of written notice from Tenant to do so, except that the Land-
lord shall not be obligated to make or pay for any repairs to Tenant's store building rendered
necessary by the fault, act or negligence of the Tenant, or any of its servants, agents or
employees, except in the case of damage by fire or the elements, or other casualty covered by
Landlord's fire and extended coverage insurance.

Tenant may construct and build or install in said premises any and all racks, counters, shelves and other fixtures and equipment of every kind and nature as may be necessary or desirable in the Tenant's business, which racks, counters, shelves and other fixtures and equipment shall at all times be and remain the property of the Tenant, and Tenant shall have the right to remove all or any part of the same from said premises at any time; provided, Tenant shall repair or reimburse Landlord for the cost of repairing any damage to said premises resulting from the installation or removal of such items.

**INDEMNI-**
**FICATION**
15. Tenant agrees to indemnify and save harmless the Landlord from any claim or loss (to include costs of investigation, court costs and reasonable attorney's fees) by reason of an accident or damage to any person or property happening in the demised premises. Likewise, Landlord shall indemnify and save harmless the Tenant from any claim or loss (to include costs of investigation, court costs and reasonable attorney's fees) by reason of an accident or damage to any person or property happening on or about all common areas (as defined in Article 3 hereof) of the shopping center, and Landlord further agrees to carry, at its expense, public liability insurance coverage on all common areas (as defined in Article 3 hereof) of the shopping center, with a contractual liability endorsement on the policy, in a company qualified to transact business in the state where the premises are located, stipulating limits of liability of not less than $1,000,000.00. Certificate of such coverage from the insurer providing 30 days' notice to Tenant prior to cancellation or termination shall be furnished to Tenant.

Tenant agrees to indemnify and save harmless the Landlord from any claim or loss by reason of an accident or damage to any person or property happening in the demised premises caused by the negligence of Tenant, its servants, agents or employees or of its contractors.

**CLEANLINESS**
16. Tenant shall at all times keep the interior of the store building in a reasonably neat and orderly condition and shall keep the entryways and delivery areas adjoining the building reasonably clean and free from rubbish and dirt. Tenant will not make or suffer any waste of the premises or permit anything to be done in or upon the demised premises creating a nuisance thereon, and Tenant further agrees to permit the Landlord or its agent at all reasonable times to enter upon the premises for the purpose of making repairs and for examining or showing the same to prospective purchasers.

**FIRE**
17. In the event that Tenant's building shall be totally destroyed or damaged to any extent by fire or other casualty, Landlord agrees to proceed, without expense to Tenant, to repair the damage and to restore the premises to the same condition as existed prior to such damage. In the event that Landlord shall fail within a reasonable time, not to exceed forty-five (45) days following such damage, to proceed with and within a reasonable time commensurate with the amount of damage, not to exceed nine (9) months following such damage, to complete the repairs and restore the premises, Tenant may, at its option, in either of such events, terminate this lease by giving to Landlord written notice thereof. If Landlord's failure to commence or complete

said repairs within the stipulated time shall be due to strikes, war, material shortages, weather conditions or similar happenings beyond its control, and provided further, the repairs are completed with all due diligence commensurate with such delay, such option to terminate shall not arise. If at any time during the term of this lease, or any extensions thereof, any of the buildings in the shopping center, exclusive of Tenant's store building, are damaged by fire or by the elements or otherwise, Landlord shall immediately commence and diligently prosecute to completion repair of all such damage and shall restore said improvements to their condition prior to such damage.

If damage to Tenant's building in excess of fifty percent (50%) of the value thereof shall occur within the last two (2) years of the initial term or any of the option extension periods provided for herein, the obligation of Landlord to restore the premises shall not arise unless Tenant shall give notice to Landlord within thirty (30) days after such damage of its desire to extend the term of this lease for an additional period so as to expire five (5) years from the date of such damage, and on the same conditions and for the same rentals. Upon such notice, Landlord agrees with all due diligence to repair and restore Tenant's building and the lease shall continue and the remaining option periods, if any, shall be construed to follow upon the end of such extended term. Failing such notice to extend, Landlord at its option shall have the right to terminate this lease or to restore the premises and the lease shall continue for the remainder of the then unexpired term.

Tenant shall be entitled to an abatement of a fair and just portion of the rent, according to the unusable space, from the date of such damage until said premises are completely reinstated or restored.

Landlord shall carry fire and extended coverage insurance on Tenant's building and any additions, alterations and improvements made thereto by Landlord or Tenant and on all other buildings within the shopping center in the amount of full insurable value thereof, above foundation walls, and hereby expressly waives any and all claims against the Tenant for loss or damage due to fire, explosion, windstorm or other casualty covered by such insurance, regardless of the cause of such damage, including without limitation, damage resulting from the negligence of the Tenant, its agents, servants or employees.

**QUIET**
**ENJOYMENT**    18. The Landlord covenants, warrants and represents that upon commencement of the lease term, the shopping center, including the demised premises, will be free and clear of all liens and encumbrances superior to the leasehold hereby created; that the Landlord has full right and power to execute and perform this lease and to grant the estate demised herein; and that the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease and any extensions thereof.

The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a general mercantile business or use of common areas for parking purposes, and that should such zoning or other restriction be in effect or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a general mercantile business or using the common areas (as defined in Article 3 hereof) in conjunction therewith, the Tenant at its option may terminate this lease and shall stand released of and from all further liability hereunder.

**TAXES AND LIENS**

19. All taxes, assessments and charges on land or improvements and obligations secured by mortgage or other lien upon the demised premises or the shopping center shall be promptly paid by the Landlord prior to delinquency. The Tenant may perform, acquire or satisfy any lien, encumbrance, agreement or obligation of the Landlord which may threaten its enjoyment of the premises, and if it does so it shall be subrogated to all rights of the obligee against the Landlord or the premises or both and shall be reimbursed by the Landlord for resulting expenses and disbursements, together with interest thereon at the maximum rate allowed by law.

(And see Article 37 hereof.)

**CONDEM- NATION**

20. If any part of the demised premises or more than twenty per cent (20%) of the buildings, exclusive of Tenant's building, within the shopping center, be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, the Tenant shall be entitled to termination of this lease at its option, and any unearned rent or other charges paid in advance shall be refunded to the Tenant. In the event the Tenant does not elect to terminate this lease as aforesaid, the Landlord shall immediately commence and diligently prosecute to completion the repair and restoration of the improvements, including Tenant's store building, within the shopping center to a condition comparable to their condition at the time of taking and the lease shall continue, but Tenant shall be entitled to such division of proceeds and abatement of rent and other adjustments as shall be just and equitable under all circumstances.

In the event that any portion of the common areas (including parking area and access thereto) designated as such on Exhibit "A", be taken for any public or quasi-public use, under any statute or by right of eminent domain, or private purchase in lieu thereof, so as to materially or substantially interfere with the conduct of Tenant's business in the demised premises, or so as to reduce the required parking area by an amount in excess of ___ ten_____ per cent ( -10- %) or reduce the number of cars which may be conveniently parked to less than ___600_____, the Tenant may, at its option, terminate this lease and shall be liable for rent only up to the time of such taking.

**DEFAULT**   21. In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office address hereinafter designated, from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom; but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting. However, a default (except as to payment of rentals) shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.

**BANKRUPTCY**   22. The Tenant further covenants and agrees that if, at any time, Tenant is adjudged bankrupt or insolvent under the laws of the United States or of any state, or makes a general assignment for the benefit of creditors, or if a receiver is appointed of all the property of the Tenant is appointed and shall not be discharged within ninety (90) days after such appointment, then the Landlord may, at its option, declare the term of this lease agreement at an end and shall forthwith be entitled to immediate possession of the said premises.

**CONSTRUCTION RISKS**   23. It is understood and agreed that nothing herein contained shall constitute the Landlord as the agent in any sense of the Tenant in constructing said improvements, and that the Tenant shall have no control or authority over the construction of said improvements, beyond the right to reject the tender of the Tenant's store building for the causes herein stated. The Tenant shall not in any manner, be answerable or accountable for any loss or damage arising from the negligence or the carelessness of Landlord or Landlord's contractor or of any of their sub-contractors, employees, agents or servants by reason of Landlord's constructing said improvements pursuant to the terms of this lease. Landlord shall indemnify Tenant and save Tenant harmless from and against all mechanics', materialmen's, sub-contractors' and similar liens; all claims and suits for damage to persons or property from defects in material or from the use of unskilled labor; or from any negligence caused by Landlord, Landlord's contractors, sub-contractors or by any of their employees, agents or servants during the progress of the work in constructing said improvements or from any faulty construction thereof.

**NOTICES**   24. All notices required to be given to Landlord hereunder shall be sent by registered or certified mail to, and all rent payments shall be made to Landlord at _____

   P. O. Box 6007

   Ft. Lauderdale, Florida 33310

or to such other address as Landlord may direct from time to time by written notice forwarded to Tenant by registered or certified mail.

   All notices required to be given to Tenant shall be sent by registered or certified mail to Tenant at   P. O. Box 408300

   Ft. Lauderdale, Florida 33340-8300

or to such other address as Tenant may direct from time to time by written notice forwarded to Landlord by registered or certified mail.

**END OF TENANCY**   25. The Tenant will yield up the demised premises and all additions thereto (except signs, equipment and trade fixtures installed by Tenant at its expense) at the termination of the tenancy in as good and tenantable condition as the same are at the beginning of Tenant's occupancy, reasonable wear and tear, damage by fire and other casualties and condemnation appropriation by eminent domain excepted, and also excepting any damage, disrepair and other condition that the Landlord is obligated hereunder to repair or correct. It is understood, however, that Tenant shall not be required to restore the demised premises to their original state. Any holding over by Tenant of the demised premises after the expiration of the term of this lease, or any extensions thereof, shall operate and be construed as a tenancy from month to month only at the same rentals reserved herein and upon the same terms and conditions as contained in this lease.

**ASSIGNMENT AND SUBLEASING**   26. The Tenant may without the consent of the Landlord assign this lease, or sublease or vacate the demised premises in whole or in part, provided the Tenant herein shall continue to remain liable and responsible for the payment of rentals and due performance of all other terms, covenants and conditions of this lease.

   In the event of any assignment or sublease or vacating of the entire premises, the annual rental thereafter shall be the sum of: (a) the average percentage rental, if any, paid by Tenant for the two full fiscal years of Tenant immediately preceding such assignment, vacating or subletting, and (b) the minimum guaranteed rental provided for herein; provided, however, this provision shall not apply in the event such assignment or sublease shall be to any corporation or entity which is the parent of, subsidiary to or affiliated with Tenant or to any corporation or entity with which Tenant merges or consolidates or to which it sells all or substantially all of its business in the state where the demised premises are situated. The provisions of this paragraph shall not be construed to limit or restrict the right of Tenant to sublease a portion or department of the demised premises without consent of Landlord to any concessionaire or licensee or otherwise in connection with the operation of Tenant's business in the demised premises, provided the sales of such concessionaire or licensee shall be included within the gross sales of Tenant, as defined hereinabove in Article 1a.

-14-

**EXTENSIONS**        27. It is further agreed that Tenant, at its option, shall be entitled to the privilege of _____
_____five_____( 5   ) successive extensions of this lease, each extension to be for a period
of _____five_____( 5   ) years and at the same rentals and upon the same terms
and conditions as required herein for the initial term.

Such option privilege may be exercised by the Tenant giving to the Landlord a notice in writing at
least_____three (3) months_____ before the expiration of the initial term, and if ex-
tended, at least_____three (3) months_____ before the expiration of such extended
term, stating the intention of the Tenant to exercise such option and the period for which such option is
exercised and thereupon this lease shall be so extended without the execution of any other or further
document.

**EXCLUSIVE**        28. Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a
**SUPERMARKET**   supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees
that it will not directly or indirectly lease or rent any property located within the shopping center, or
within 1000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat,
fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to
sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged
in any such business without written permission of the Tenant; and Landlord further covenants and agrees
not to permit or suffer any property located within the shopping center to be used for or occupied by any
business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy
groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written
permission of the Tenant; except the sale of such items in not to exceed the lesser of 500 square feet of
sales area or 10% of the square foot area of any storeroom within the shopping center, as an incidental
only to the conduct of another business, and except the sale by a restaurant operation of prepared,
ready-to-eat food items, either for consumption on or off the premises, shall not be deemed a violation
hereof.  With the exception of package stores, only Tenant herein
may sell beer and wine in the shopping center for off-premises
consumption.  Further, it is expressly agreed that only Tenant
may operate a bakery and/or delicatessen department in the shop-
ping center.

Tenant reserves the right to operate a pharmacy department within
its store premises at any time, but Landlord reserves the right
to lease up to 13,000 sq. ft. of gross building area in the
shopping center to a chain drug store provided that the same is
located no closer than 100 feet from the nearest point of Ten-
ant's demised store building.

Further notwithstanding the foregoing, Landlord shall be per-
mitted to lease one (1) storeroom for each of the following uses:
(a) wine and cheese shop not to exceed 2,125 sq. ft.; (b) health
food store of not to exceed 2,125 sq. ft.; (c) ice cream and
yogurt store not to exceed 1,700 sq. ft.; (d) soft drink/fruit
beverage-type store, each not to exceed 1,700 sq. ft.; and (e) a
deli-restaurant not to exceed 5,000 sq. ft.  All such facilities
may be located no closer than 250 feet from the nearest point of
Tenant's demised store building.  Landlord shall also be per-
mitted to lease one (1) storeroom for package liquor sales for
off-premises consumption on the conditions that the same not
exceed 3,200 sq. ft. in floor space and not be located nearer
than 175 feet from the nearest point of Tenant's demised store
building.

In the event the demised premises are at any time subject to a first mortgage (provided Tenant has been notified in writing of the name and address of the holder thereof) and so long as said mortgage shall encumber the demised premises, and notwithstanding any provisions herein to the contrary, the Tenant shall have no right to cancel or terminate this lease or to withhold rental payments because of a violation of the terms of this exclusive provision as to property located within 1000 feet of any exterior boundary of the shopping center, but nothing herein shall deprive Tenant of any rights of recourse against Landlord, its successors and assigns, by way of suit for damages or injunctive relief, or as otherwise provided by law, in the event of any such violation. If the holder of such first mortgage should succeed to ownership of the demised premises by virtue of foreclosure or transfer of title thereto in lieu of such foreclosure or otherwise, in such event the terms of this exclusive provision shall apply to the holder of such first mortgage as owner-landlord only with respect to the land which was formerly encumbered by the lien of said first mortgage. For the purposes hereof, the term "first mortgage" shall include any first security instrument.

SUBORDINATE    29. The Tenant agrees that this lease shall at all times be subject and subordinate to the lien of any mortgage (which term shall include all security instruments) that may be placed on the demised premises by the Landlord; and Tenant agrees, upon demand, without cost, to execute any instrument (in a form acceptable to Tenant) as may be required to effectuate such subordination; provided, however, as a condition to this subordination provision, the Landlord shall obtain from any such mortgagee an agreement in writing, which shall be delivered to Tenant, providing in substance that, so long as Tenant shall faithfully discharge the obligations on its part to be kept and performed under the terms of this lease, its tenancy shall not be disturbed, nor shall this lease be affected by any default under such mortgage, and in the event of foreclosure or any enforcement of any such mortgage, the purchaser at such foreclosure sale shall be bound to Tenant for the term of this lease, the rights of Tenant hereunder shall expressly survive, and this lease shall in all respects continue in full force and effect, provided, however, that Tenant fully performs all of its obligations hereunder.

NOTICE TO    30. Tenant agrees that it will give notice to any holder of a first mortgage (which term shall in-
LENDER    clude all security instruments) encumbering the demised premises (provided Tenant has first been notified in writing of the name and address of such mortgage holder) of any defaults of the Landlord which would entitle Tenant to terminate this lease or abate the rental payable hereunder, specifying the nature of the default by the Landlord, and thereupon the holder of the mortgage shall have the right, but not the obligation, to cure such default and Tenant will not terminate this lease or abate the rental payable hereunder by reason of such default unless and until it has afforded the mortgage holder thirty (30) days, after such notice, to cure such default and a reasonable period of time in addition thereto if circumstances are such that said default cannot reasonably be cured within said 30-day period, provided, however, the Tenant shall not be required to deliver such notice to the mortgage holder or to extend to it an opportunity to perform in respect of emergency repairs which Tenant is permitted to make under the provisions of Article 12 of this lease.

**COMMON AREA MAINTENANCE**

31. Landlord agrees to operate and maintain in good condition and repair all the common areas, as herein defined, and provide therefor all such services as are reasonably required, including, but without limitation, safe-guarding, cleaning and sweeping, lighting, snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting of parking area striping, and watering and maintenance of landscaped areas. If the Landlord, after fifteen (15) days following receipt of written notice from Tenant to do so, shall fail to make the repairs or perform the services described in this Article, the Tenant shall have the right to make such repairs or cause such services to be performed in its behalf and to deduct from the rental installments then due or thereafter to become due such sums as may be necessary to reimburse the Tenant for the money expended or expense incurred therein. Tenant shall not reimburse Landlord for any expense not reasonably connected with the necessary maintenance and repair of the shopping center common areas. Examples of expenses for which Tenant shall not make reimbursement are rental insurance premiums and shopping center management fees and administrative costs.

For such services, Tenant shall pay to Landlord, as additional rental hereunder and as reimbursement for the annual cost thereof, the sum of $4,632.80 per year, payable in twelve (12) equal monthly installments of $386.07 per month in advance on the first day of each and every calendar month of the lease term, and any extensions thereof. Any additional rental payable hereunder by the Tenant may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due hereunder, it being intended that such credit shall be made annually in respect of the common area payments for the previous lease year at the time percentage rentals are payable, but if there shall not be any percentage rentals due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning and end of the lease term or any extensions thereof shall be pro-rated on the basis of the annual credit.

**BENEFIT**

32. This lease and all of the covenants and provisions thereof shall inure to the benefit of and be binding upon the heirs, legal representatives, successors and assigns of the parties hereto. Each provision hereof shall be deemed both a covenant and a condition and shall run with the land.

**TRANSFER BY LANDLORD**

33. In the event Landlord transfers Landlord's interest in this lease, Landlord agrees to promptly provide Tenant with documentary evidence, satisfactory to Tenant, of such transfer of Landlord's interest in this lease.

**SHORT FORM LEASE**

34. The Landlord agrees that at any time on request of the Tenant it will execute a short form of this lease in form permitting its recording.

-17-

**MARGINAL TITLES**    35. The marginal titles appearing in this lease are for reference only and shall not be considered a part of this lease or in any way to modify, amend or affect the provisions thereof.

**COMPLETE AGREEMENT**    36. This written lease contains the complete agreement of the parties with reference to the leasing of the demised premises, except plans and specifications for Tenant's store and related improvements to be formally approved by the parties prior to the effective date of this lease. No waiver of any breach of covenant herein shall be construed as a waiver of the covenant itself or any subsequent breach thereof.

**TAXES**    37.  During the term of this lease and any extensions thereof, Tenant agrees to pay to Landlord as additional rental the amount of Landlord's ad valorem real estate taxes levied against the demised premises (and a proportionate part of the common areas within the shopping center allocable thereto apportioned as provided below).  Tenant shall be responsible for its pro-rata share of such taxes for fractional years occurring at the beginning and expiration of the term of this lease, and any extensions thereof. ~~However, in no event shall Tenant's payment in respect of Landlord's ad valorem real estate taxes levied against the demised premises exceed the sum of Eighteen Thousand Twenty-Two and 40/100 Dollars ($18,022.40) per year.~~

If such taxes shall not be assessed separately but shall be included within an assessment of the demised premises and others, said assessment shall be fairly apportioned to determine Tenant's share thereof.  Such apportionment shall be made in the ratio which the square footage of the ground floor of Tenant's store building bears to the total square footage of the ground floor of all store buildings (including additional floor levels) from time to time existing in the shopping center.  The amount of taxes attributable to the shopping center, and for which Tenant is to reimburse Landlord in part, shall be less any abatements, discounts or refunds thereon.  Upon request of Tenant, Landlord agrees to exhibit to Tenant the paid tax statements as evidence of the basis upon which any taxes are chargeable to Tenant and an "as built" survey of the shopping center, and such additional rental shall be payable by Tenant on demand after payment by Landlord.  All taxes, other than ad valorem real estate taxes, including special assessments, improvement liens, and the like, shall remain the sole responsibility of the Landlord.  However, Tenant shall remain responsible for sales taxes on rentals levied by law on lessees.

Tenant shall have the right from time to time to contest or protest or review by legal proceedings or in such other manner as may be provided, any such taxes, assessments or other governmental impositions aforementioned, and to institute such proceedings in the name of the Landlord as the Tenant may deem necessary; provided, however, any expense incurred by reason thereof shall be borne by the Tenant and such proceedings conducted free of all expense to the Landlord; and provided still further, that Tenant shall take no contest or protest action which results in the institution of any foreclosure proceedings or similar action by the holder of a security deed against the demised premises.

tax

Any additional rental payable hereunder by Tenant for real estate taxes and assessments may be credited on a non-cumulative basis against any and all percentage rental, if any, which may become due hereunder, it being intended that such credit shall be made annually in respect of the tax payments for the previous year at the time percentage rentals are payable, but if there shall not be any percentage rental due or the amount thereof shall be insufficient to allow the full credit, Tenant shall receive no credit, or only a partial credit, as the case may be; and the credit for fractional years and fractional months occurring at the beginning of the period in which Tenant is responsible for such tax payments, or at the end of the lease term, or any extensions thereof, shall be prorated on the basis of the annual credit.

Notwithstanding the above, it is agreed that Tenant's obligation to make the payments herein described is expressly conditioned upon receipt from Landlord of a written statement for such ad valorem real estate tax contributions (as well as the other documents described herein if requested by Tenant) no later than December 31 of the calendar year following the year in which the taxes were due.

OPTION FOR
EXPANSION

30. Tenant is hereby granted the option and privilege at any time during the term of this lease, or any extensions thereof, of enlarging its store building by incorporating therein the area to the    northerly    side thereof 60 feet in width, 200 feet in depth, containing approximately 10,500 sq. ft., as shown on Exhibit "A".

It is intended that the expansion is to be accomplished during the first ten (10) years of the initial term of this lease only (a) at such times as the expansion area shall remain undeveloped, or if any adjoining storerooms have been constructed thereon, at such time as the same may be vacant and not under lease, or (b) at the expiration of the tenth (10th) year of the initial term of this lease, it being contemplated that Landlord shall lease such area to other tenants only for such periods as will expire concurrently with the expiration of the tenth (10th) year of the initial term of this lease. Thereafter, the option may be exercised only at such times as the adjoining storerooms may be vacant and not under lease, or at 5-year intervals, it being contemplated that Landlord shall lease such area to other tenants only for such periods as will expire at 5-year intervals dating from the expiration of the tenth (10th) year of the initial term of this lease. Landlord shall give notice to Tenant of any such expiration dates and, during the period between nine (9) months and six (6) months prior to such expiration dates, afford to Tenant the opportunity to exercise this option, and upon Tenant giving to Landlord a notice in writing of its exercise thereof, Landlord agrees to construct such addition, or prepare such enlargement area for occupancy by Tenant, at its sole cost and expense, in accordance with plans and specifications to be approved by the parties hereto, with the construction to be completed with all due diligence following the vacation of the necessary area by any other tenant, and the enlarged portion of the building to be of a like quality of construction as the original building for Tenant. In order to facilitate the expansion of Tenant's demised store building as herein contemplated, Landlord agrees that any adjacent building or buildings within the expansion area shall be of like structural quality and in architectural harmony with Tenant's store building, shall front on a line which is the interior sidewalk line of Tenant's demised store building extended and shall have a finish floor level, roof and ceiling heights which shall be at the same elevations as the finish floor level, roof and ceiling heights of Tenant's demised store building. Further, Landlord agrees that the wall of Tenant's demised store building adjoining the expansion area shall be constructed with steel column supports therein equivalently spaced to the nearest row of steel column supports within the open area of Tenant's demised store building and such wall supports shall be of sufficient load bearing capacity to carry the roof support system across the full span of the original and of the expanded building width.

Upon completion of such building addition, if there shall not at such date remain at least ten (10) years of the then term of this lease, such term shall be extended for such period of time as shall be necessary to provide a full ten (10) years from such date. Thereafter, during such extended term, the annual minimum guaranteed rental (and the base for

-19-

computation of percentage rental hereunder) shall be increased by the greater of: an amount equal to twelve percent (12%) of the cost of such addition, or an amount equal to $6.50 per square foot of the enlargement area, or an amount equal to a computed percentage times the cost of such addition, such percentage consisting of four percent (4%) plus the current prime interest rate charged by New York City banks at the time of the exercise of the option. At Tenant's request, construction cost shall be established by bids obtained by Landlord from at least three (3) reputable contractors acceptable to Tenant, with the final cost of the addition upon completion to be certified to by the general contractor performing the work. During such extended term the provisions of this lease shall remain in effect and the option periods herein provided (if any shall then remain) shall be construed to follow upon the end of the extended term and the rentals to remain as adjusted in consequence of the addition. Upon completion of the addition, it shall be and become a portion of the demised premises and this lease thereby be taken and construed as so amended.

It is agreed that Landlord's obligation to perform the store enlargement as herein contemplated is conditioned upon Landlord's being able to obtain financing satisfactory to it for such purpose, but upon the exercise by Tenant of the option contemplated herein, Landlord will exert diligent efforts to obtain the necessary financing. If financing is unobtainable and Landlord is unable to construct the contemplated enlargement, the Landlord shall not be responsible in damages by reason thereof, nor shall Tenant have the right to cancel or terminate this lease or to withhold rental payments on account of such breach. However, Tenant shall have the right, but shall not be obligated, to construct the contemplated building addition at its own expense, with the then term of the lease to be extended for a 10-year period and the remaining option extensions to be deferred as above contemplated; and Tenant shall be entitled to occupy the enlarged building during construction and for the 10-year extended term hereunder without obligation to pay any minimum guaranteed rental in respect of such enlargement area.

Also, with respect to Tenant's constructing the addition at its expense, for the duration of the construction period, for the duration of the 10-year extended term hereunder, for the duration of the remainder of the initial term hereunder, if any, and for the duration of any subsequent option extension periods, there shall be an adjustment in the percentage rentals which would otherwise be payable under the provisions of Article 1 hereof whereby the Tenant shall pay to the Landlord a percentage rental equal to the amount, if any, by which one percent (1%) of Tenant's gross sales made from the demised premises in each fiscal year ending June 30th exceeds the annual minimum guaranteed rental payable hereunder as increased by the greater of: an amount equal to twelve percent (12%) of the cost of such addition, or an amount equal to $6.50 per square foot of the enlargement area, or an amount equal to a computed percentage times the cost of such addition, such percentage consisting of four percent (4%) plus the current prime interest rate charged by New York City banks at the time of exercise of the option.

Further, with respect to Tenant's constructing the addition at its expense, upon the expiration of the extended 10-year term hereunder and for the remainder of the initial term hereunder, if any, and any exercised option extensions thereafter, the original annual minimum guaranteed rental for the original premises shall be increased to cover the enlarged premises by the greater of: an amount equal to twelve percent (12%) of the cost of such addition, or an amount equal to $6.50 per square foot of the enlargement area, or an amount equal to a computed percentage times the cost of such addition, such percentage consisting of four percent (4%) plus the current prime interest rate charged by New York City banks at the time of the exercise of the

option. Such adjusted amount shall also become the base for computation of percentage rental hereunder. Both guaranteed rentals and percentage rentals for fractional years and fractional months occurring at the beginning and expiration of such extended 10-year term shall be prorated between the rentals payable before and those payable after the rental adjustments provided herein.

Upon completion of the enlargement as contemplated hereunder, whether at Landlord's or at Tenant's expense, the parties hereto agree to execute a supplement to this lease fixing the duration of the extension of the lease term, the effective annual minimum guaranteed rental as adjusted and the base amount for computation of percentage rentals as adjusted, all in accordance with the provisions of this Article.

Nothing herein contained shall constitute any express or implied obligation on the part of the holder of a first mortgage encumbering the fee simple title to the demised premises, or of any purchaser at a sale under foreclosure of such mortgage, to comply with the terms and provisions of this Article, it being the understanding of the parties that the obligation to cause such expansion is the sole obligation of the Landlord, its heirs, legal representatives, successors and assigns, or of the Tenant, its successors and assigns, if it elects to construct the contemplated building addition at its own expense.

LAND-
LORD'S
LIABILITY
AND
SELF-HELP

39. Notwithstanding anything to the contrary provided in this lease, if Landlord or any successor in interest of Landlord shall be an individual, joint venture, tenancy in common, firm or partnership, general or limited, it is specifically understood and agreed that there shall be absolutely no personal liability on the part of such individual or on the part of the members of such firm, partnership or joint venture with respect to any of the terms, covenants and conditions of this lease, and that Tenant shall look solely to the equity of Landlord or such successor in interest in the shopping center for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this lease to be performed by Landlord, such exculpation of personal liability to be absolute and without any exception whatsoever.

If Landlord shall default in the performance or observance of any agreement or condition in this lease contained on its part to be performed or observed, and if Landlord shall not cure such default within thirty (30) days after notice from Tenant specifying the default (or shall not within said period commence to cure such default and thereafter prosecute the curing of such default to completion with due diligence), Tenant may, at its option, without waiving any claim for damages for breach of agreement, at any time thereafter cure such default for the account of the Landlord, and any amount paid or any contractual liability incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord and the Landlord agrees to reimburse Tenant therefor or save Tenant harmless therefrom; provided that Tenant may cure any such default as aforesaid prior to the expiration of said waiting period, but after said notice to Landlord, if the curing of such default prior to the expiration of said waiting period is reasonably necessary to protect the real estate or Tenant's interest therein or to prevent injury or damage to persons or property. If Landlord shall fail to reimburse Tenant upon demand for any amount paid for the account of Landlord hereunder, said amount may be deducted by Tenant from the next or any succeeding payments of rent due hereunder.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this agreement the

day and year first above written.

Signed, sealed and delivered
in the presence of:

_____

_____
As to Landlord

POMP COMMERCIAL CORP.

By _____ President
Harold S. Wenal,

Attest _____
Its _____ ASST _____ Secretary

(CORPORATE SEAL)

LANDLORD

_____

_____
As to Tenant

WINN-DIXIE STORES, INC.

By _____
Its _____ President

Attest _____
Its _____ Secretary

(CORPORATE SEAL)

TENANT

-22-

STATE OF _Florida_ )
COUNTY OF _Broward_ )


        The foregoing instrument was acknowledged before me
this _March_ , 19 __ , by _Frank S. Weiner_ and
_Frances H. McCrary_ _____ President and _ass't_ Secretary,
respectively, of POMP COMMERCIAL CORP., a Florida corporation, on
behalf of the corporation.

                            _Jacquelin A. Dort_
                            Notary Public, State and
(NOTARIAL SEAL)             County aforesaid.  My com-
                            mission expires:

                            NOTARY PUBLIC STATE OF FLORIDA
                            MY COMMISSION EXP. MAY 24, 1945
                            BONDED THRU GENERAL INS. UND.


STATE OF  FLORIDA)
COUNTY OF DUVAL  )


        The foregoing instrument was acknowledged before me
this _May 24_ , 19 _88_ , by _James Kufeldt_ and
_J. S. Bryan, Jr._ , _____ President and ____ Secretary,
respectively, of WINN-DIXIE STORES, INC., a Florida corporation,
on behalf of the corporation.

                            _Debra W. Wise_
                            Notary Public, State and
(NOTARIAL SEAL)             County aforesaid.  My com-
                            mission expires:



EXHIBIT "B"
LEGAL DESCRIPTION

All that certain piece, parcel or tract of land lying and being situate in the City of Pompano Beach, County of Broward and State of Florida, more particularly described as follows:

THE EAST ONE-HALF (E 1/2) OF THE SOUTHWEST ONE-QUARTER (SW 1/4) OF THE NORTHEAST ONE-QUARTER (NE 1/4) OF THE SOUTHEAST ONE-QUARTER (SE 1/4), LESS THE WEST 60 FEET AND THE NORTH 60 FEET THEREOF;

AND
THE SOUTHEAST ONE-QUARTER (SE 1/4) OF THE NORTHEAST ONE-QUARTER (NE 1/4) OF THE SOUTHEAST ONE-QUARTER (SE 1/4), LESS THE SOUTH 68.96 FEET OF THE EAST 365.05 FEET AND LESS THE NORTH 60 FEET THEREOF;

AND
THE NORTHWEST ONE-QUARTER (NW 1/4) OF THE NORTHEAST ONE-QUARTER (NE 1/4) OF THE SOUTHEAST ONE-QUARTER (SE 1/4) OF THE SOUTHEAST ONE-QUARTER (SE 1/4), LESS THE NORTH 96.73 FEET OF THE EAST 32.34 FEET THEREOF.
ALL IN SECTION 1, TOWNSHIP 49 SOUTH, RANGE 42 EAST;

TOGETHER WITH

A PORTION OF THE NORTHWEST ONE-QUARTER (NW 1/4) OF THE SOUTHWEST ONE-QUARTER (SW 1/4) OF SECTION 6, TOWNSHIP 49 SOUTH, RANGE 43 EAST, MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF SAID NORTHWEST ONE-QUARTER (NW 1/4) OF THE SOUTHWEST ONE-QUARTER (SW 1/4) OF SAID SECTION 6; THENCE NORTH ALONG THE WEST LINE THEREOF, A DISTANCE OF 68.96 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH ALONG SAID WEST LINE A DISTANCE OF 321.48 FEET; THENCE EAST MAKING AN INCLUDED ANGLE OF 89°12'70" A DISTANCE OF 119.97 FEET TO A POINT ON THE WEST RIGHT-OF-WAY LINE OF U.S. HIGHWAY NO.1; THENCE SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY LINE A DISTANCE OF 329.37 FEET; THENCE WEST MAKING AN INCLUDED ANGLE OF 103°47'30", A DISTANCE OF 40.95 FEET TO THE POINT OF BEGINNING; SAID LANDS SITUATE, LYING AND BEING IN BROWARD COUNTY, FLORIDA.

TOGETHER WITH

THE NORTH 86.5 FEET OF THE SOUTH THREE-QUARTER (S 3/4) OF THE WEST ONE-HALF (W 1/2) OF THE EAST ONE-HALF (E 1/2) OF THE SOUTHEAST ONE-QUARTER (SE 1/4) OF THE SOUTHEAST ONE-QUARTER (SE 1/4) OF SECTION 1, TOWNSHIP 49 SOUTH, RANGE 42 EAST, BROWARD COUNTY, FLORIDA.

TOGETHER WITH

A TRACT OF LAND LYING IN SECTION 1, TOWNSHIP 49 SOUTH, RANGE 42 EAST, AND SECTION 6, TOWNSHIP 49 SOUTH, RANGE 43 EAST, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY LINE OF U.S. HIGHWAY NO.1 AND THE WEST LINE OF SAID SECTION 6; THENCE NORTHEASTERLY ALONG SAID WESTERLY RIGHT-OF-WAY LINE FOR A DISTANCE OF 110.69 FEET TO A POINT; THENCE WESTERLY WITH A AN INCLUDED ANGLE OF 76°13'00" A DISTANCE OF 406.00 FEET TO A POINT; THENCE SOUTHERLY WITH AN INCLUDED ANGLE OF 89°33'00" A DISTANCE OF 83.69 FEET TO A POINT; THENCE EASTERLY WITH AN INCLUDED ANGLE OF 90°07'00" A DISTANCE OF 365.00 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH

ALL THAT PART OF THE SOUTH 236.57 FEET OF THE NORTHEAST ONE-QUARTER (NE 1/4) OF THE NORTHEAST ONE-QUARTER (NE 1/4) OF THE SOUTHEAST ONE-QUARTER (SE 1/4) OF THE SOUTHEAST ONE-QUARTER (SE 1/4) LYING WEST OF STATE ROAD NO.5, FORMERLY STATE ROAD NO.4 (U.S. HIGHWAY NO.8, IN SECTION 1, TOWNSHIP 49 SOUTH, RANGE 42 EAST.

SAID LANDS LYING IN THE CITY OF POMPANO BEACH, BROWARD COUNTY, FLORIDA AND CONTAINING 19.52 ACRES MORE OR LESS.

SHORT FORM LEASE

THIS SHORT FORM LEASE, made this _10th_ day of
_May_, 19_88_, between POMP COMMERCIAL CORP., a
Florida corporation, (hereinafter called "Landlord") and
WINN-DIXIE STORES, INC., a Florida corporation, (hereinafter
called "Tenant"); which terms "Landlord" and "Tenant" shall
include, wherever the context admits or requires, singular
or plural, and the heirs, legal representatives, successors
and assigns of the respective parties;

W I T N E S S E T H :

That the Landlord, in consideration of the
covenants of the Tenant, does hereby lease and demise unto
said Tenant and the Tenant hereby agrees to take and lease
from the Landlord, for the term hereinafter specified, the
following described premises:

> That certain store building, approxi-
> mately 220 feet in width by 200 feet in
> depth, together with concrete pads at
> rear of building for installation of
> Tenant's exterior freezers and/or
> coolers, a front vestibule measuring
> approximately 82 feet by 12 feet, a rear
> receiving room, and the land on which
> the same shall stand (hereinafter
> collectively called "demised premises"),
> which store building and related
> improvements are to be constructed by
> Landlord according to plans and
> specifications to be approved by the
> parties hereto and shall be in the
> location and of the dimensions as out-
> lined in red on the Plot Plan attached
> as Exhibit "A" to a certain collateral
> lease agreement executed by the parties
> hereto and of even date herewith.

> The demised premises are located in a
> shopping center development known as
> Pompano Marketplace
> (hereinafter called "shopping center"),
> located adjacent to the westerly side of
> U. S. Hwy. #1 at its intersection with
> S. E. 12th Street in the City of Pompano
> Beach, County of Broward, State of
> Florida, the legal description of the
> shopping center being attached hereto as
> Exhibit "B" and by this reference made a
> part hereof.

APPROVED
AS TO FORM
Division/Manager
Winn-Dixie Stores,
Inc.

This Instrument was prepared by
Charles P. Milford, Jr., Attorney
at Law whose address is P. O.
Box B, Jacksonville, Florida 32203

FOR THE TENANT TO HAVE AND TO HOLD from the date when Tenant opens said premises for the transaction of its business for an initial term of twenty (20) years.

It is further agreed that Tenant, at its option, shall be entitled to the privilege of five (5) successive extensions of this lease, each extension to be for a period of five (5) years.

Landlord covenants and agrees that the Tenant shall have the exclusive right to operate a supermarket in the shopping center and any enlargement thereof. Landlord further covenants and agrees that it will not directly or indirectly lease or rent any property located within the shopping center, or within 1,000 feet of any exterior boundary thereof, for occupancy as a supermarket, grocery store, meat, fish or vegetable market, nor will the Landlord permit any tenant or occupant of any such property to sublet in any manner, directly or indirectly, any part thereof to any person, firm or corporation engaged in any such business without written permission of the Tenant; and Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant. With the exception of package stores, only Tenant herein may sell beer and wine in the shopping center for off-premises consumption; provided, however, that the provisions of this paragraph are expressly subject to and conditioned upon certain modifications thereof as particularly set forth in the collateral lease agreement of even date herewith below mentioned.

IT IS UNDERSTOOD AND AGREED that this is a Short Form Lease which is for the rents and upon the terms, covenants and conditions contained in the aforesaid collateral lease agreement executed by the parties hereto

and bearing even date herewith, which collateral lease agreement is and shall be a part of this instrument as fully and completely as if the same were set forth herein.

IN WITNESS WHEREOF, the Landlord and Tenant have executed this instrument the day and year first above written.

Signed, sealed and delivered
in the presence of:

POMP COMMERCIAL CORP.

By _____
Harold S. Wenal,   President

_____
As to Landlord

Attest _____
Its   ASST   Secretary

(CORPORATE SEAL)

LANDLORD

_____
As to Tenant

WINN-DIXIE STORES, INC.

By _____
Its   President

Attest _____
Its   Secretary

(CORPORATE SEAL)

TENANT

Address of Landlord:   P. O. Box 6007
                       Ft. Lauderdale, Florida 33310

Address of Tenant:     P. O. Box 408300
                       Ft. Lauderdale, Florida 33340-8300

STATE OF _Florida_                    )
COUNTY OF _Broward_                   )


        The foregoing instrument was acknowledged before me
this _May 10_ , 19 _91_ , by _Harold S. Liberts_ and
_Monroe H. Pickenhour_ ,  — President and _Asst._ Secretary,
respectively, of POMP COMMERCIAL CORP., a Florida corporation, on
behalf of the corporation.

                              _Jacqueline L. Doot_
                              Notary Public, State and
(NOTARIAL SEAL)               County aforesaid. My com-
                              mission expires:

                                 NOTARY PUBLIC STATE OF FLORIDA
                                 MY COMMISSION EXP. MAY 26, 1995
                                 BONDED THRU GENERAL INS. UND.


STATE OF  FLORIDA)
COUNTY OF DUVAL  )


        The foregoing instrument was acknowledged before me
this _May 24_ , 19 _88_ , by _James Kufeldt_ and
_J. S. Bryan, Jr._ ,  — President and ___ Secretary,
respectively, of WINN-DIXIE STORES, INC., a Florida corporation,
on behalf of the corporation.

                              _Debra W. Wise_
                              Notary Public, State and
(NOTARIAL SEAL)               County aforesaid.  My com-
                              mission expires:



EXHIBIT "A"



ISSUE / REVISION

3-9-88 P + Z SUBMITTAL

4-6-88 REVISED PER P+C
COMMENTS; MAX 10 SPACES +
MEDIAN ADDED AT NORTH ACCESS +
REVISED TO "POMPANO MARKET
PLACE" PER OWNER

T ONE-HALF IE 1/21 OF THE SOUTHEAST ONE-QUARTER
NORTHEAST ONE-QUARTER INE 1/41 OF THE SOUTHEAST
1/41; LESS THE WEST 60 FEET AND THE NORTH 60 FEET THEREOF;
AND
ONE-QUARTER ISE 1/41 OF THE NORTHEAST
1/41 OF THE SOUTHEAST ONE-QUARTER ISE 1/41,
68.96 FEET OF THE EAST 365.05 FEET AND LESS THE
HEREOF;
AND
NE-QUARTER INW 1/41 OF THE NORTHEAST ONE-QUARTER
SOUTHEAST ONE-QUARTER ISE 1/41 OF THE SOUTHEAST ONE
LESS THE NORTH 36.73 FEET OF THE EAST 32.34 FEET

TOWNSHIP 49 SOUTH, RANGE 42 EAST;
TOGETHER WITH:

OF THE NORTHWEST ONE-QUARTER INW 1/41 OF
NE-QUARTER ISW 1/41 OF SECTION 6, TOWNSHIP 49
EAST, MORE FULLY DESCRIBED AS FOLLOWS:

AT THE SOUTHWEST CORNER OF SAID NORTHWEST
1/41 OF THE SOUTHWEST ONE-QUARTER ISW 1/41 OF SAID
NORTH ALONG THE WEST LINE THEREOF, A DISTANCE
POINT OF BEGINNING; THENCE CONTINUE NORTH ALONG
DISTANCE OF 32.48 FEET; THENCE EAST MAKING AN
F 89 °2'00" A DISTANCE OF 119.53 FEET TO A POINT
IT-OF-WAY LINE OF U.S. HIGHWAY NO.1; THENCE
LONG SAID RIGHT-OF-WAY LINE A DISTANCE OF 329.57
E MAKING AN INCLUDED ANGLE OF 03°47'30", A
I FEET TO THE POINT OF BEGINNING; SAID LANDS
BEING IN BROWARD COUNTY, FLORIDA.
TOGETHER WITH:

86.15 FEET OF THE SOUTH THREE-QUARTER IS 3/41 OF
F IW 1/21 OF THE EAST ONE-HALF IE 1/21 OF THE
QUARTER ISE 1/41 OF THE SOUTHEAST ONE-QUARTER
N 6, TOWNSHIP 49 SOUTH, RANGE 42 EAST, BROWARD

25'

TYP 209,025/300 = 697 SPACES

= 784 SPACES

POMPAN

U.S. 1 & S.E

POMPAN

DATE 5-10-88

APPROVED
AS TO FORM

Division Mgr.

Legal Dept.
Winn-Dixie Stores,
Inc.

LANDLORD

Majdiak associates
architects/planners
2800 e. commercial blvd.
t. lauderdale, florida
305/772-1510
florida cert. no. 6207

DRAWING NO:

SP·1

SHEET 1 OF 5

EXHIBIT "B"
LEGAL DESCRIPTION

All that certain piece, parcel or tract of land lying and being situate
in the City of Pompano Beach, County of Broward and State of Florida,
more particularly described as follows:

THE EAST ONE-HALF (E 1/2) OF THE SOUTHWEST ONE-QUARTER
(SW 1/4) OF THE NORTHEAST ONE-QUARTER (NE 1/4) OF THE SOUTHEAST
ONE-QUARTER (SE 1/4), LESS THE WEST 60 FEET AND THE NORTH 60 FEET THEREOF;

AND

THE SOUTHEAST ONE-QUARTER (SE 1/4) OF THE NORTHEAST
ONE-QUARTER (NE 1/4) OF THE SOUTHEAST ONE-QUARTER (SE 1/4),
LESS THE SOUTH 68.96 FEET OF THE EAST 365.05 FEET AND LESS THE
NORTH 60 FEET THEREOF;

AND

THE NORTHWEST ONE-QUARTER (NW 1/4) OF THE NORTHEAST ONE-QUARTER
(NE 1/4) OF THE SOUTHEAST ONE-QUARTER (SE 1/4) OF THE SOUTHEAST ONE-
QUARTER (SE 1/4), LESS THE NORTH 96.13 FEET OF THE EAST 32.34 FEET
THEREOF.
ALL IN SECTION 1, TOWNSHIP 49 SOUTH, RANGE 42 EAST;

TOGETHER WITH

A PORTION OF THE NORTHWEST ONE-QUARTER (NW 1/4) OF
THE SOUTHWEST ONE-QUARTER (SW 1/4) OF SECTION 6, TOWNSHIP 49
SOUTH, RANGE 43 EAST, MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF SAID NORTHWEST
ONE-QUARTER (NW 1/4) OF THE SOUTHWEST ONE-QUARTER (SW 1/4) OF SAID
SECTION 6; THENCE NORTH ALONG THE WEST LINE THEREOF, A DISTANCE OF
68.96 FEET TO THE POINT OF BEGINNING; THENCE CONTINUE NORTH ALONG
SAID WEST LINE A DISTANCE OF 321.48 FEET; THENCE EAST MAKING AN
INCLUDED ANGLE OF 89°12'10" A DISTANCE OF 1199.93 FEET TO A POINT
ON THE WEST RIGHT-OF-WAY LINE OF U.S. HIGHWAY NO.1; THENCE
SOUTHWESTERLY ALONG SAID RIGHT-OF-WAY LINE A DISTANCE OF 329.37
FEET; THENCE WEST MAKING AN INCLUDED ANGLE OF 103°47'30", A
DISTANCE OF 40.95 FEET TO THE POINT OF BEGINNING; SAID LANDS
SITUATE, LYING AND BEING IN BROWARD COUNTY, FLORIDA.

TOGETHER WITH

THE NORTH 86.15 FEET OF THE SOUTH THREE-QUARTER (S 3/4) OF
THE WEST ONE-HALF (W 1/2) OF THE EAST ONE-HALF (E 1/2) OF THE
SOUTHEAST ONE-QUARTER (SE 1/4) OF THE SOUTHEAST ONE-QUARTER
(SE 1/4) OF SECTION 1, TOWNSHIP 49 SOUTH, RANGE 42 EAST, BROWARD
COUNTY, FLORIDA.

TOGETHER WITH

A TRACT OF LAND LYING IN SECTION 1, TOWNSHIP 49 SOUTH, RANGE
42 EAST, AND SECTION 6, TOWNSHIP 49 SOUTH, RANGE 43 EAST, MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE WESTERLY RIGHT-OF-WAY
LINE OF U.S. HIGHWAY NO.1 AND THE WEST LINE OF SAID SECTION 6;
THENCE NORTHEASTERLY ALONG SAID WESTERLY RIGHT-OF-WAY LINE FOR A
DISTANCE OF 110.67 FEET TO A POINT; THENCE WESTERLY WITH A AN
INCLUDED ANGLE OF 76°13'00" A DISTANCE OF 406.00 FEET TO A POINT;
THENCE SOUTHERLY WITH AN INCLUDED ANGLE OF 89°53'00" A DISTANCE OF
43.69 FEET TO A POINT; THENCE EASTERLY WITH AN INCLUDED ANGLE OF
90°07'00" A DISTANCE OF 365.00 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH

ALL THAT PART OF THE SOUTH 236.57 FEET OF THE NORTHEAST
ONE-QUARTER (NE 1/4) OF THE NORTHEAST ONE-QUARTER (NE 1/4) OF THE
SOUTHEAST ONE-QUARTER (SE 1/4) OF THE SOUTHEAST ONE-QUARTER
(SE 1/4) LYING WEST OF STATE ROAD NO.5, FORMERLY STATE ROAD NO.4
(U.S. HIGHWAY NO.8, IN SECTION 1, TOWNSHIP 49 SOUTH, RANGE 42
EAST.

SAID LANDS LYING IN THE CITY OF POMPANO BEACH, BROWARD
COUNTY, FLORIDA AND CONTAINING 19.52 ACRES MORE OR LESS.