**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| WINN-DIXIE STORES, INC., et al., | : | Case No. 05-03817-3F1 |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | |

## NOTICE OF FIRST AND FINAL FEE APPLICATION

**PLEASE TAKE NOTICE** that Paul, Hastings, Janofsky & Walker LLP has filed the
*First and Final Interim Fee Application of Paul, Hastings, Janofsky & Walker LLP as Counsel to
the Official Committee of Equity Security Holders for Compensation and Reimbursement of
Expenses* with the United States Bankruptcy Court for the Middle District of Florida.

Dated: May 9, 2006

PAUL, HASTINGS, JANOFSKY &
WALKER LLP

  _/s/ Karol K. Denniston_____
Karol K. Denniston
Ga. Bar No. 218333
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Telephone: (404) 815-2400
karolkdenniston@paulhastings.com

***Co-Counsel for the Official Committee of
Equity Security Holders***
JENNIS BOWEN & BRUNDAGE, P.L.
 /s/ *David S. Jennis*
David S. Jennis
Florida Bar No. 775940
Chad S. Bowen
Florida Bar No. 0138290
400 N. Ashley Dr. , Ste. 2540
Tampa, FL 33602
Telephone: (813) 229-1700
Facsimile: (813) 229-1707
djennis@jennisbowen.com

PAUL, HASTINGS, JANOFSKY &
WALKER LLP
James D. Wareham
DC Bar No. 411799
875 15th Street
Washington, DC 20005
Telephone: (202) 551-1700
jameswareham@paulhastings.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| WINN-DIXIE STORES, INC., et al., | : | Case No. 05-03817-3F1 |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | |

**SUMMARY OF FIRST AND FINAL APPLICATION OF PAUL, HASTINGS,
JANOFSKY & WALKER LLP AS COUNSEL TO THE OFFICIAL
COMMITTEE OF EQUITY SECURITY HOLDERS FOR COMPENSATION
AND REIMBURSEMENT OF EXPENSES FOR THE COMPENSATION PERIOD OF
AUGUST 17, 2005 THROUGH JANUARY 31, 2006**

Name of Applicant:___Paul, Hastings, Janofsky & Walker LLP_____

Authorized to Provide
Professional Services to: ___Official Committee of Equity Security Holders_____

Date of Retention:___*nunc pro tunc* to August 17, 2005_____

Compensation Period for Which Compensation
and Reimbursement is Sought: _August 17, 2005 through and including January 31, 2006_

Amount of Compensation Requested
as Actual, Reasonable, and Necessary: $1,059,317.25

Amount of Expense Reimbursement Requested
as Actual, Reasonable, and Necessary: _$82,563.31_

This is a(n)        ____ Monthly        ____ Interim        XX Final Application

Total Amount of Compensation
and Reimbursement Sought:        $1,141,880.56

**SUMMARY OF MONTHLY STATEMENTS OF PAUL, HASTINGS, JANOFSKY
& WALKER LLP AS COUNSEL TO THE OFFICIAL COMMITTEE OF
EQUITY SECURITY HOLDERS FOR COMPENSATION AND REIMBURSEMENT
OF EXPENSES FOR THE COMPENSATION PERIOD
FROM AUGUST 17, 2005 THROUGH JANUARY 31, 2006**

| Monthly Period; Submittal Date | Total Fees Requested | Total Expenses Requested | Amount of Fees Paid (80%) | Amount of Expenses Paid (100%) | Total Amount of Fees and Expenses Sought |
|---|---|---|---|---|---|
| First Monthly 8/17/05 through 9/30/05; Submitted: 12/16/05 | $273,290.50 | $12,923.26 | $0.00 | $0.00 | $286,213.76 |
| Second Monthly 10/1/05 through 10/31/05; Submitted: 12/16/05 | $127,258.00 | $9,383.27 | $0.00 | $0.00 | $136,641.27 |
| Third Monthly 11/1/05 through 11/30/05; Submitted: 1/3/06 | $230,093.50 | $25,836.67 | $0.00 | $0.00 | $255,930.17 |
| Fourth Monthly 12/1/05 through 12/31/05 | $153,931.25 | $7,813.50 | $0.00 | $0.00 | $161,841.00 |
| Fifth Monthly 1/1/06 through 1/31/06 | $274,744.00 | $26,606.61 | $0.00 | $0.00 | $301,350.61 |
| **Grand Totals[1]** | **$1,059,317.25** | **$82,563.31** | **$0.00** | **$0.00** | **$1,141,880.56** |

---

[1] For the period of August 17, 2005 through January 11, 2006, Paul Hastings incurred fees in the amount of $857,132.25 and expenses in the amount of $59,779.04.

## CUMULATIVE TIME SUMMARY
### (AUGUST 17, 2005 THROUGH JANUARY 31, 2006)

| Name of Professional | Year Admitted to Bar (State) | Position with the Applicant (Area of Expertise) | Billing Rate[2] | Total Hours Billed for Compensation Period | Total Compensation for Compensation Period |
|---|---|---|---|---|---|
| Thomas R. Pollock | 1985 (MA) 1986 (NY) | Partner, Corporate | $750.00 | 70.90 | $ 53,175.00 |
| Thomas R. Pollock | 1985 (MA) 1986 (NY) | Partner, Corporate | $ 675.00 | 238.00 | $ 160,650.00 |
| James D. Wareham | 1986 (IL) 1987 (DC) | Partner, Litigation | $725.00 | 102.20 | $ 74,095.00 |
| James D. Wareham | 1986 (IL) 1987 (DC) | Partner, Litigation | $ 675.00 | 201.20 | $ 135,810.00 |
| Andrew M. Short | 1986 (NY) | Partner, Tax | $ 685.00 | .50 | $ 342.50 |
| John A. Reding | 1970 (CA) | Partner, Litigation | $ 670.00 | 1.70 | $ 1,139.00 |
| Michael L. Zuppone | 1989 (NY) | Corporate, Partner | $ 660.00 | 1.30 | $ 858.00 |
| Jesse Austin | 1980 (GA) 1980 (NC) | Corporate, Partner | $660.00 | 3.30 | $ 2,178.00 |
| Jesse Austin | 1980 (GA) 1980 (NC) | Corporate, Partner | $ 630.00 | 2.80 | $ 1,764.00 |
| Eve M. Coddon | 1986 (CA) | Partner, Litigation | $ 570.00 | 18.60 | $ 10,602.00 |
| Elizabeth H. Noe | 1989 (LA) 1996 (GA) | Partner, Corporate | $ 465.00 | 1.80 | $ 837.00 |
| Karol K. Denniston | 1985 (WV, TX), 1988 (CA), 1996 (UK), 2003 (GA) | Partner, Corporate | $525.00 | 105.70 | $ 55,492.50 |
| Karol K. Denniston | 1985 (WV, TX), 1988 (CA), 1996 (UK), 2003 (GA) | Partner, Corporate | $ 460.00 | 385.20 | $ 177,192.00 |
| Katherine A. Traxler | 1990 (CA) | Of Counsel, Corporate | $ 550.00 | 4.50 | $ 2,475.00 |
| James E. Anklam | 1987 (VA) 1988 (DC) | Of Counsel, Litigation | $ 500.00 | 4.70 | $ 2,350.00 |
| Kathleen O. Currey | 1993 (GA, SC) | Of Counsel, Corporate | $ 450.00 | 4.30 | $ 1,935.00 |

---

[2]  Consistent with firm practice, Paul Hastings changed certain of its guideline hourly rates effective as of January 1, 2006.

| Name of Professional | Year Admitted to Bar (State) | Position with the Applicant (Area of Expertise) | Billing Rate[2] | Total Hours Billed for Compensation Period | Total Compensation for Compensation Period |
|---|---|---|---|---|---|
| Stephen Z. Starr | 1992 (CA) 1994 (DC) 1995 (NY) 1995 (NJ) | Associate, Corporate | $550.00 | 3.10 | $ 1,705.00 |
| Stephen Z. Starr | 1992 (CA) 1994 (DC) 1995 (NY) 1995 (NJ) | Associate, Corporate | $ 510.00 | 32.70 | $ 16,677.00 |
| Jonathan C. Tyras | 1999 (NY) | Associate, Corporate | $ 480.00 | 1.50 | $ 720.00 |
| Nicole Gerrard | 2000 (CA) | Associate, Corporate | $ 450.00 | .60 | $ 270.00 |
| Edward Han | 1998 (CA) | Associate, Litigation | $ 420.00 | 4.10 | $ 1,722.00 |
| Ann M. Miller | 1999 (NY) 2000 (DC) | Associate, Corporate | $ 400.00 | 62.20 | $ 24,880.00 |
| Justo (Jay) Rodriguez III | 1998 (FL) 2002 (GA) | Associate, Corporate | $365.00 | 5.20 | $ 1,898.00 |
| Justo (Jay) Rodriguez III | 1998 (FL) 2002 (GA) | Associate, Corporate | $325.00 | 29.50 | $ 9,587.50 |
| R. Samuel Snider | 2000 (GA) | Associate, Corporate | $350.00 | 15.90 | $ 5,565.00 |
| R. Samuel Snider | 2000 (GA) | Associate, Corporate | $315.00 | 19.40 | $ 6,111.00 |
| Dominic J. Maffei | 2003 (CA) | Associate, Corporate | $ 340.00 | 21.80 | $ 7,412.00 |
| Gregory M. Shamo | 2001 (CA) | Associate, Corporate | $ 335.00 | 17.00 | $ 5,695.00 |
| Christine D. Tognoli | 2004 (CA) | Associate, Corporate | $325.00 | 3.20 | $ 1,040.00 |
| Nicole C. Farrar | 2003 (VA) 2004 (DC) | Associate, Corporate | $ 305.00 | 1.20 | $366.00 |
| Darcy R. White | 2002 (MA) 2004 (GA) | Associate, Corporate | $ 295.00 | 5.00 | $ 1,475.00 |
| Jacob M. Mikow | 2005 (CA) | Associate, Corporate | $ 270.00 | 22.40 | $ 6,048.00 |
| Carolyn C. Chayavadhanangkur | 2002 (GA) | Associate, Corporate | $310.00 | 365.20 | $ 96,778.00 |
| Carolyn C. Chayavadhanangkur | 2002 (GA) | Associate, Corporate | $ 265.00 | 160.00 | $ 49,600.00 |
| Toronda M. Silas | 2004 (TX) 2005 (GA) | Associate, Corporate | $230.00 | 49.20 | $ 11,316.00 |
| Toronda M. Silas | 2004 (TX) 2005 (GA) | Associate, Corporate | $ 220.00 | 231.40 | $ 50,908.00 |
| Emily N. Pittman | 2005 (GA) | Associate, Corporate | $ 220.00 | 14.50 | $ 3,190.00 |
| Wayne L. Clark | Not Applicable | Litigation Support Senior Analyst | $195.00 | 10.10 | $ 1,969.50 |
| Devora L. Nealy | Not Applicable | Paralegal | $160.00 | 61.00 | $ 9,760.00 |
| Devora L. Nealy | Not Applicable | Paralegal | $ 150.00 | 150.60 | $ 22,590.00 |
| Stephanie F. Baird | Not Applicable | Paralegal | $145.00 | .50 | $ 72.50 |

| Name of Professional | Year Admitted to Bar (State) | Position with the Applicant (Area of Expertise) | Billing Rate[2] | Total Hours Billed for Compensation Period | Total Compensation for Compensation Period |
|---|---|---|---|---|---|
| Scott B. Snipes | Not Applicable | Librarian | $130.00 | 7.40 | $ 962.00 |
| Scott B. Snipes | Not Applicable | Librarian | $ 125.00 | 25.80 | $ 3,225.00 |
| Kate A. Ruby | Not Applicable | Librarian | $ 125.00 | .20 | $ 25.00 |
| Maureen M. Moomaw | Not Applicable | Docket/Calendar Coordinator | $115.00 | 1.30 | $ 149.50 |
| Maureen M. Moomaw | Not Applicable | Docket/Calendar Coordinator | $ 110.00 | 11.40 | $ 1,254.00 |
| J. Ryan Hall | Not Applicable | Case Assistant | $70.00 | 220.5 | $ 14,332.50 |
| J. Ryan Hall | Not Applicable | Case Assistant | $ 65.00 | 40.40 | $ 2,828.00 |
| Lindsay A. Wells | Not Applicable | Case Assistant | $70.00 | 40.40 | $ 2,828.00 |
| Lindsay A. Wells | Not Applicable | Case Assistant | $ 65.00 | 235.35 | $ 15,297.75 |
| Audrey DeVoe | Not Applicable | Librarian | $ 60.00 | 1.50 | $ 90.00 |
| Benjamin Gillespie | Not Applicable | Case Assistant | $ 50.00 | 1.50 | $ 75.00 |
| | | **Totals** | | **3,019.75** | **$1,059,317.25** |
| | | **Blended Average Billing Rate** | **$350.80**[3] | | |

---

[3] The blended rate <u>excluding</u> paraprofessionals is $478.94 per hour.

LEGAL_US_E # 70347888.17

## CUMULATIVE COMPENSATION SUMMARY BY PROJECT CATEGORY
## (AUGUST 17, 2005 THROUGH JANUARY 31, 2006)

| Client Number | Matter Description | Total Hours for Compensation Period | Total Fees for Compensation Period |
|---|---|---|---|
| 59559-00003 | Business Operations | 8.30 | $ 3,437.50 |
| 59559-00004 | Case Administration | 515.75 | $ 62,479.25 |
| 59559-00005 | Claims Administration and Objections | 86.10 | $ 10,009.50 |
| 59559-00006 | Meetings/Committees | 91.60 | $ 40,464.50 |
| 59559-00007 | Equity Committee Matters | 422.00 | $ 193,261.50 |
| 59559-00008 | Financing | 24.70 | $ 6,074.00 |
| 59559-00009 | General Committee Governance | 59.10 | $ 22,744.50 |
| 59559-00010 | Insurance | 43.50 | $ 16,793.50 |
| 59559-00011 | Litigation (General) | 516.50 | $ 241,250.50 |
| 59559-00012 | Non-Working Travel Time | 0.00 | |
| 59559-00013 | Objections to Committee Formation | 858.80 | $ 344,852.50 |
| 59559-00014 | Plan/Disclosure Statement/Voting Issues | 46.80 | $ 14,242.00 |
| 59559-00015 | Confirmation of Plan of Reorganization | 18.50 | $ 4,070.00 |
| 59559-00016 | Retention/Fee Matters/Disclosures (Paul Hastings) | 203.50 | $ 61,846.50 |
| 59559-00017 | Retention/Fee Matters/Objections (Others) | 124.60 | $ 37,791.50 |
| **Total** | | **3,019.75** | **$1,059,317.25** |

**CUMULATIVE EXPENSE SUMMARY**
**(AUGUST 17, 2005 THROUGH JANUARY 31, 2006)**

| Expense Category | Total Expenses for Compensation Period |
|---|---|
| Airfare | $  9,340.29 |
| Courier Service | $  2,134.22 |
| Facsimile | $     726.25 |
| Lexis/Online Search | $44,588.83 |
| Lodging | $  2,289.76 |
| Long Distance Telephone | $  1,033.73 |
| Meals | $  1,119.99 |
| Outside Professional Services | $  1,554.22 |
| Parking | $     416.50 |
| Photocopy Charges | $16,625.35 |
| Postage/Express Mail | |
| Secretarial Overtime | |
| Taxi/Ground Transportation | $  1,858.10 |
| Miscellaneous | $     876.07 |
| **Total** | **$82,563.31** |

**IN THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| WINN-DIXIE STORES, INC., et al., | : | Case No. 05-03817-3F1 |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | |

**FIRST AND FINAL APPLICATION OF PAUL, HASTINGS,**
**JANOFSKY & WALKER LLP AS COUNSEL TO THE OFFICIAL**
**COMMITTEE OF EQUITY SECURITY HOLDERS FOR**
**COMPENSATION AND REIMBURSEMENT OF EXPENSES**

Paul, Hastings, Janofsky & Walker LLP (the "Applicant" or "Paul Hastings"), counsel to the Official Committee of Equity Security Holders (the "Equity Committee") appointed in the above-captioned cases, hereby files the First and Final Fee Application of Paul, Hastings, Janofsky & Walker LLP as Counsel to the Official Committee of Equity Security Holders for Compensation and Reimbursement of Expenses (the "Application") for the period from August 17, 2005 through January 31, 2006 (the "Compensation Period").

As this Application contains information subject to the Seal Order (as defined below) and/or the confidentiality agreement between Paul Hastings and the Debtors, Paul Hastings is filing the complete Application under seal consistent with the terms of the Seal Order and the confidentiality agreement.

## INTRODUCTION

1.      Following the commencement of these Chapter 11 cases, the Debtors (as defined below) expressed their desire to have a committee of equity security holders appointed and requested that the U.S. Trustee (as defined below) make such an appointment. The U.S. Trustee

appointed the Equity Committee and this Court approved the retention of Paul Hastings as counsel for the Equity Committee.

2.      Since its appointment on August 17, 2005, the Equity Committee has been forced to defend its existence on behalf of all equity holders against the Creditors Committee's, and subsequently the Debtors' and U.S. Trustee's, actions to disband the Equity Committee.  The fees and expenses incurred by Applicant were the result of the extensive motions practice, discovery and delays caused by the actions of the Creditors Committee (as defined below) and the U.S. Trustee.  As discussed more fully below, in light of the contentious proceeding and the dispute over the Equity Committee's appointment, the Equity Committee incurred significant fees and expenses in protecting the interests of equity holders and fulfilling its fiduciary duties to its constituency.  The fees and expenses are reasonable and fully justified in light of the need of the Equity Committee to respond strongly to the Creditors Committee's Disbandment Motion and the U.S. Trustee's Notice of Disbandment.  To do otherwise would have been a breach of the Equity Committee's fiduciary duties.

## <u>SUMMARY OF RELIEF REQUESTED</u>

3.      Applicant submits this Application pursuant to (i) Sections 330 and 331 of Title 11, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), (ii) Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (iii) the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under Section 330 of the Bankruptcy Code effective January 30, 1996 (the "U.S. Trustee Guidelines") and (iv) the Final Interim Procedures Order (as defined below), seeking entry of an Order allowing final compensation for legal services rendered in the above-captioned cases during the Compensation Period.  The Application consists of (i) an allowance of compensation for services rendered during the Compensation Period in the amount of $1,059,317.25 as itemized by professional and

by project category (matter number) on <u>Exhibit</u> <u>A</u> annexed hereto, and (ii) reimbursement of out-of-pocket expenses in the amount of $82,563.31 necessarily incurred in connection therewith, as itemized by expense category and project category (matter number) on <u>Exhibit</u> <u>B-1</u> annexed hereto.  An additional itemization of airfare, lodging, meals and miscellaneous expenses by individual and project category (matter number) is set forth on <u>Exhibit</u> <u>B-2</u> annexed hereto.

4.    During the Compensation Period, Applicant expended an aggregate of 3,019.75 hours in connection with its representation of the Equity Committee in this case.  A detailed description of the services rendered by Applicant during the Compensation Period is set forth below.  In addition, annexed hereto as <u>Exhibit</u> <u>C,</u> <u>Exhibit</u> <u>D,</u> <u>Exhibit</u> <u>E,</u> <u>Exhibit</u> <u>F</u> and <u>Exhibit</u> <u>G</u> are billing statements setting forth a break down of Applicant's actual time charges during the Compensation Period, itemizing the dates upon which services were rendered, the time spent on each date (identifying separate hours worked by professionals and paraprofessionals on each matter), the services rendered and the dollar value of such services.  Finally, at the beginning of the Application are (i) a cumulative summary of compensation by project category and (ii) a cumulative summary of expenses maintained throughout these Chapter 11 cases.

## **BACKGROUND**

### A.    **Commencement of Chapter 11 Cases**

5.    On February 21, 2005 (the "Petition Date"), Winn-Dixie Stores, Inc., et al.  (the "Debtors") filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court").  The Debtors' cases are being jointly administered for procedural purposes only.

6.    The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Despite

- 4 -

the Equity Committee's request, and the Debtors' agreement thereto, no trustee or examiner has been appointed in these Chapter 11 cases.

**B.      The U.S. Trustee's Decision to Appoint an Equity Committee**

7.      On or about March 11, 2005, DDI, Inc. ("DDI"), through its counsel, Kaye Scholer LLP, sent a letter (the "First DDI Letter") to the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee for New York") requesting the appointment of a committee of equity holders in these Chapter 11 cases.  A copy of the letter is attached hereto as <u>Exhibit H</u>.

8.      On or about March 21, 2005, Brandes Investment Partners, L.P. ("Brandes") sent a letter to the U.S. Trustee for New York, supporting DDI's request for the appointment of an equity committee.  A copy of the letter is attached hereto as <u>Exhibit I</u>.

9.      On or about May 4, 2005, after the Bankruptcy Cases were transferred from the New York Bankruptcy Court to this Court, DDI sent a letter (the "Second DDI Letter") to the Office of the United States Trustee for the Middle District of Florida (the "U.S. Trustee") again, requesting the appointment of an equity committee.  A copy of the letter is attached hereto as <u>Exhibit J</u>.

10.      On or about May 10, 2005, Brandes sent a letter (the "Second Brandes Letter") to the U.S. Trustee supporting DDI's renewed request for the appointment of an equity committee. A copy of the letter is attached hereto as <u>Exhibit K</u>.

11.      On or about May 11, 2005, the Official Committee of Unsecured Creditors (the "Creditors Committee") sent the U.S. Trustee a letter (the "Creditors Committee's First Letter") in response to DDI's and Brandes' requests for appointment of an equity committee setting forth the reasons why the Creditors Committee believed an equity committee should not be appointed. A copy of the letter is attached hereto as <u>Exhibit L</u>.

12.    On or about June 3, 2005, the Debtors sent the U.S. Trustee a response (the "Debtors' June 3 Letter") supporting the appointment of an equity committee, stating:

> While mindful that the appointment of an Equity Committee is not appropriate in every chapter 11 case, the Debtors believe that, given the facts as they are currently known, the appointment of an Equity Committee in these cases and at this time is appropriate and in the best interests of their estates.

Debtors' June 3 Letter, p.1.    A copy of the Debtors' June 3 Letter is attached hereto as Exhibit M.

13.    On or about June 10, 2005, the Creditors Committee sent to the U.S. Trustee a letter setting forth additional reasons why an equity committee should not be appointed in these cases.    A copy of the letter is attached hereto as Exhibit N.

14.    On or about June 16, 2005, DDI sent a third letter ("DDI's Third Letter") providing further reasons for the appointment of an equity committee, stating:

> Simply put, is the concern for adequate representation for 36,000 largely unsophisticated equity security holders significantly outweighed by the cost of another committee in these mega-cases? The answer is clearly no . . . .
>
> Stated alternatively, and asked rhetorically, can the Creditors' Committee (comprised of two landlords, two large vendors and three distressed investors) adequately represent thousands of equity security holders when its comes to advocating, among other things, which restructuring alternatives should be implemented that are beneficial for the long term interests of the companies, and how the reorganization value of the companies should be valued and ultimately allocated among the parties in interest? The Creditors' Committee's motivations and goals clearly are often not aligned with the equity security holders on these fundamental issues.

DDI's Third Letter, p. 3.  A copy of DDI's Third Letter is attached hereto as Exhibit O.

15.    Upon consideration of the letters described above as well as the Debtors' Schedules and Statement of Financial Affairs, Monthly Operating Reports, trading activity and public filings and considering whether there is a substantial likelihood of a meaningful

distribution to shareholders and whether such shareholders are adequately represented, **the U.S. Trustee determined to form an Equity Committee on June 28, 2005.** <u>See</u> United States Trustee's Second Objection to Motion of Official Committee of Unsecured Creditors For Entry of Order, Under 11 U.S.C. §§ 105 and 1102, Disbanding Official Committee of Equity Security Holders [filed under seal at Docket No. 4000] (the "U.S. Trustee's Second Objection"), ¶¶ 7-12.

16.    On August 17, 2005, **the U.S. Trustee, pursuant to Section 1102(a) of the Bankruptcy Code, appointed the Equity Committee** to serve in these Chapter 11 cases and designated the following five (5) equity security holders to serve as members of the Equity Committee in these cases: (i) Mr. Houston Maddox; (ii) Mr. Greg Rippel on behalf of the Brandes Investment Partners, L.P. Profit Sharing Plan; (iii) Mr. Paul Madsen;[1] (iv) Mr. Michael Nakonechny; and (v) Mr. Kenneth Thomas.

17.    Following the Equity Committee's appointment on August 17, 2005, the members of the Equity Committee and Paul Hastings entered into confidentiality agreements with the Debtors.  The confidentiality agreements were necessary in order for the Equity Committee to receive and review confidential information related to the Debtors' business operations, finances, proposed business plan and plan of reorganization.

## C.    Creditors Committee's Immediate Challenge to the Appointment of an Equity Committee and the Disbandment Motion

<u>Creditors Committee's Seal Motion</u>

18.    Immediately following the U.S. Trustee's appointment of the Equity Committee on August 17, 2005, the Creditors Committee filed its Motion for Permission to File Motion Seeking Disbandment of the Equity Committee Under Seal [Docket No. 3297] (the "Seal Motion").  The Debtors also filed a Motion Regarding Filing Under Seal of Pleadings Related to

---

[1] On or about September 23, 2005, Mr. Madsen resigned from the Equity Committee.

Appointment of Equity Committee [Docket No. 3309]. The Ad Hoc Committee of Winn-Dixie Retirees and the U.S. Trustee filed objections to the motions to file pleadings under seal. See Limited Objection to Debtors' Motion Regarding Filing Under Seal of Pleadings Related To Appointment of Equity Committee [Docket No. 3352], Objection to Motion of Official Committee of Unsecured Creditors for Permission to File Motion Seeking Disbandment of Equity Committee Under Seal [Docket No. 3365], and Objection to Debtors' Motion Regarding Filing Under Seal of Pleadings Related to Appointment of Equity Committee [Docket No. 3366].

19.     On September 2, 2005, the Creditors Committee filed its Motion for Entry of Order, Under 11 U.S.C. §§ 105 and 1102, Disbanding Official Committee of Equity Security Holders [filed under seal at Docket No. 3363] (the "Disbandment Motion"). The Creditors Committee sought disbandment of the Equity Committee on the grounds that the equity security holders are "hopelessly 'out of the money' . . . and because the Shareholders are already adequately represented." Disbandment Motion, ¶1.

20.     On September 8, 2005, the Court held a hearing on the Seal Motion during which the parties presented extensive oral argument regarding the propriety of filing all pleadings related to the appointment of the Equity Committee under seal. During the hearing, the Debtors acknowledged that requesting that pleadings be filed under seal was "an extraordinary request for relief." Following the hearing, on September 12, 2005, the Court issued its Order Requiring Filing Under Seal of Pleadings Related to Appointment of Equity Committee [Docket No. 3436] (the "Seal Order"). Pursuant to the Seal Order, the Court required the pleadings related to the Disbandment Motion to be filed under seal in accordance with Local Rule 5005-4. The Court held that the pleadings shall remain under seal and confidential and shall not be made available

to anyone other than (a) the Court and (b) on the condition that they maintain the confidentiality of the confidential information, the Limited Recipients (as defined in the Seal Order).[2]

21.      After lengthy discussions among the parties, the parties reached an agreement regarding scheduling and discovery related to the Disbandment Motion and on September 19, 2005, the Court entered its Consent Order Regarding Scheduling and Discovery Issues Related to Motion of Official Committee of Unsecured Creditors Seeking Disbandment of Equity Committee [Docket No. 3509] (the "Consent Order").  Pursuant to the Consent Order, the Court requested that all dispositive pleadings to dismiss the Disbandment Motion be filed no later than September 26, 2005 at 5:00 p.m.  Pursuant to agreement between and among the parties to the Consent Order the September 26, 2005 deadline was extended to September 29, 2005 at 5:00 p.m.

Dispositive Motions

22.      Initially, the Debtors, the U.S. Trustee, and the Equity Committee members unanimously supported the existence and appointment of the Equity Committee in this case.  On or about September 29, 2005, Applicant, on behalf of the Equity Committee, filed a Motion for Summary Judgment [filed under seal at Docket No. 3343] and Memorandum of Law of the Official Committee of Equity Security Holders in Support of Summary Judgment [filed under seal at Docket No. 3708] (collectively, the "Motion for Summary Judgment").

23.      On or about September 29, 2005, the Debtors filed their Motion for Summary Judgment Denying Creditors Committee's Motion to Disband Equity Committee [filed under seal at Docket No. 3711] ("Debtors' Motion for Summary Judgment") stating as follows:

> the record reflects that the Debtors have made filings in these cases indicating that they are solvent and that there is shareholder equity

---

[2] As certain information contained in this Application is subject to the Seal Order, Paul Hastings is filing the complete Application under seal consistent with the Seal Order.

> on a book value basis.  Based on these facts (and all the other considerations outlined in this Motion), a rational decision maker could conclude that the appointment of the Equity Committee was appropriate.

Debtors' Motion for Summary Judgment, ¶ 42.

24.    On or about September 29, 2005, the U.S. Trustee filed its objection to Motion of Official Committee of Unsecured Creditors For Entry of Order, Under 11 U.S.C. §§ 105 and 1102, Disbanding Official Committee of Equity Security Holders [filed under seal at Docket No. 3710] in support of its appointment of the Equity Committee.

25.    On October 14, 2005, the Court issued a letter ruling announcing its ruling on the dispositive motions (the "Letter Ruling").  On October 18, 2005, the Court entered its Order Denying Motion for Summary Judgment Denying Creditors' Committee's Motion to Disband Equity Committee [filed under seal at Docket No. 3895] (the "Summary Judgment Order").  The Court found that it had the authority to review the U.S. Trustee's decision to appoint an equity committee and that "the proper standard of review is whether appointment of the Equity Committee was arbitrary, capricious, or otherwise an abuse of discretion based on the information that the United States Trustee had before her at the time she made the decision to appoint the Equity Committee."  Summary Judgment Order, p. 6.

Clarification Motion

26.    Despite the clear language of the Summary Judgment Order, on October 19, 2005, the Creditors Committee filed its Motion of Official Committee of Unsecured Creditors for Clarification of Letter Ruling Dated October 14, 2005 [filed under seal at Docket No. 3893] (the "Clarification Motion") requesting clarification which would allow the Creditors Committee to seek "discovery related to all factual data and analyses that could have or should have been considered by the U.S. Trustee."

27.     The U.S. Trustee continued to support appointment of the Equity Committee.  On or about October 20, 2005, the U.S. Trustee filed its Response and Objection to Motion of Official Committee of Unsecured Creditors for Clarification of Letter Ruling Dated October 14, 2005 [filed under seal at Docket No. 3903], objecting to the Clarification Motion and seeking to limit the scope of discovery to only the information and materials actually considered by the U.S. Trustee in making the decision to appoint the Equity Committee.

28.     On or about October 20, 2005, the Debtors filed their Response and Objection to Creditors Committee's Motion for Clarification of Letter Ruling Dated October 14, 2005 [filed under seal at Docket No. 3902] objecting to the Clarification Motion and seeking to limit the scope of discovery to only the information and materials actually considered by the U.S. Trustee in making the decision to appoint the Equity Committee.

29.     On or about October 21, 2005, the Equity Committee filed its Joinder of the Official Committee of Equity Security Holders to (I) the Debtors' Response and Objection to Creditors Committee's Motion for Clarification of Letter Ruling Dated October 14, 2005 and (II) United States Trustee's Response and Objection to Motion of Official Committee of Unsecured Creditors for Clarification of Letter Ruling Dated October 14, 2005 [filed under seal at Docket No. 3916].

30.     The Court held a hearing on October 24, 2005 under seal, during which there was lengthy oral argument regarding the Creditors Committee's request for clarification and the scope of discovery.  After hearing argument from counsel, including Applicant on behalf of the Equity Committee, the Court stated:

> …  I see no reason to back off from my previous ruling.
>
> The issue as framed is whether or not the U.S. Trustee acted arbitrarily or capriciously in appointing an equity committee or abused its discretion, and that will be the issue and it will be based

- 11 -

on the facts presented, if there are any, at the trial hopefully in November.

If there are any discovery disputes that you cannot resolve, then I'll deal with those in due course, but I would hope that they'll be resolved.

Transcript of October 24, 2005 Hearing Before the Honorable Jerry A. Funk [filed under seal].

31.    Following the hearing, the Court issued its Order Denying Motion of Official Committee of Unsecured Creditors for Clarification Ruling Dated October 14, 2005 [filed under seal at Docket No. 3925] (the "Clarification Order").

Motions for Protective Order

32.    On September 8, 2005, the Creditors Committee served the Equity Committee with its First Request for Production of Documents by Official Committee of Unsecured Creditors Pursuant to Bankruptcy Rules 2020, 7034 and 9014, Directed to the Equity Committee (the "First Request for Production"). The First Request for Production went well beyond the scope of the Court's Summary Judgment Order and requested, among other things, the following:

- all documents concerning any communications between or among (i) the Equity Committee; (ii) any Equity Committee Member; (iii) any Equity Holder; (iv) the Office of the United States Trustee, (v) the United States Securities and Exchange Commission, or (vi) any other person, in each case relating to the investigation and appointment of an official committee of Equity Holders;

- all documents concerning any communications between and among (i) any Equity Committee Member, and (ii) any of the Debtors, D.D.I., Inc., any member of the Davis Family and each of their respective affiliates, agents, advisors, representatives, officers, directors, employees, attorneys, or experts, including, but not limited to, Skadden, Arps, Slate, Meagher & Flom LLP, the Blackstone Group, XRoads Solutions Group, and Kaye Scholer LLP;

- all documents, including meeting minutes and board resolutions, concerning the decision of any Equity Committee Member to advocate for, pursue the appointment of, or participate as a member of an official committee of Equity Holders; and

- all documents concerning investigations, communications or analyses that the Equity Committee or any Equity Committee Member performed or relied upon

- 12 -

since the Petition Date in connection with evaluating the financial condition of the Debtors, including any determination of whether any Debtor is insolvent within the meaning of section 101(32) of the Bankruptcy Code.

33.     In addition, on or about October 24, 2005, the Creditors Committee served the Equity Committee with a Notice of Deposition Pursuant to Fed. R. Civ. P. 30 regarding the depositions of Brandes Investment Partners, L.P. ("Brandes") and Jefferies & Company, Inc. ("Jefferies"). The Creditors Committee sought to depose Brandes and Jefferies on the following items:

- any investigation performed or relied upon by Brandes or Jefferies to determine if individual persons, firms, associations, partnerships, corporations or other entities holding any right in an equity security of the debtors were adequately represented within the meaning of section 1102 of the Bankruptcy Code;

- any and all communications between and among the debtors, the Equity Committee, any Equity Committee member, any equity holders or their counsel, the U.S. Trustee, the United States Securities and Exchange Commission, Skadden, Arps, Slate, Meagher & Flom LLP, Blackstone, XRoads, Kaye Scholer LLP, Jefferies, counsel for the Equity Committee or any other person relating to whether the equity holders were adequately represented;

- any and all investigations, communications or analyses that Brandes or Jefferies performed or relied upon since the Petition Date in connection with evaluating the financial condition of the Debtors, including any determination of whether any Debtor is insolvent within the meaning of section 101(32) of the Bankruptcy Code; and

- any and all investigations, communications or analyses that the Equity Committee, Brandes or Jefferies performed, caused to be performed or relied upon in connection with evaluating the financial performance and projections of future financial performance of the Debtors since the Petition Date.

34.     On October 31, 2005, Applicant prepared and served on behalf of the Equity Committee its Objections and Responses to the First Request for Production of Documents by Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Rules 2020, 7034 and 9014, Directed to the Equity Committee. Consistent with the Summary Judgment Order, the Equity Committee objected to providing any documents that go beyond information provided to the

U.S. Trustee prior to the U.S. Trustee's decision to form the Equity Committee on or about June 28, 2005.

35.    Despite entry of the Clarification Order and numerous discussions with the interested parties, the parties were unable to reach agreement on the scope of discovery.  On or about November 1, 2005, the Debtors' filed their Motion for Protective Order in Connection with Discovery Related to Creditors Committee's Motion to Disband Equity Committee [filed under seal at Docket No. 3991].  The Equity Committee also filed a Motion for (I) Order Enlarging Time Within Which to Comply with Discovery Deadlines; and (II) Protective Order in Connection with Discovery Requests [filed under seal at Docket No. 3999].  Both motions asserted that the extensive discovery sought by the Creditors Committee was not relevant to the issue before the Court, namely whether the U.S. Trustee abused her discretion in appointing an equity committee based on the information that she had before at the time the decision to appoint an equity committee was made.

36.    The hearing on the motions for protective order was originally scheduled for November 4, 2005 and the Equity Committee was prepared to go forward with its motion for protective order at that time.  However, the motions were adjourned in light of the abatement of the proceedings related to the Disbandment Motion as described below.  As a result of the bilateral agreement to abate the Disbandment Motion between the U.S. Trustee and the Creditors Committee, the Equity Committee was denied the opportunity to be heard by this Court and to seek discovery related to the Disbandment Motion.

Agreement Between the U.S. Trustee and Creditors Committee to Abate Proceedings Related to the Disbandment Motion

37.    On or about November 1, 2005, the U.S. Trustee via email advised the Equity Committee that it had reached an agreement with the Creditors Committee to abate the Disbandment Motion.  Prior to making the abatement agreement, there was no notice or

discussion with the Equity Committee or its counsel.  The email circulated by the U.S. Trustee also attached the U.S. Trustee's Second Objection supporting its decision to appoint the Equity Committee:

> The United States Trustee, who has extensive experience in these matters, utilized all the resources available to her, carefully deliberated on the matter before reaching her conclusion almost two months after the initial requests for the appointment of an equity committee.  A review of the United States Trustee's exercise of her discretionary authority in the instant case reveals a conscientious review of facts in reaching a conclusion, far from a whimsical or an impulsive decision.

U.S. Trustee's Second Objection, ¶ 18.

38.    Despite the filing of the U.S. Trustee's Second Objection, and a mere two weeks before the scheduled trial on the Disbandment Motion, on November 2, 2005, at the U.S. Trustee's request, the Creditors Committee filed a Motion to Abate Proceedings on Disbandment Motion and to Adjourn Evidentiary Hearing Scheduled for November 16, 2005 [Docket No. 4013] (the "Motion to Abate") seeking to abate all proceedings regarding the Disbandment Motion, including all pending discovery and related motions and to adjourn the hearing on the Disbandment Motion for three weeks to allow the U.S. Trustee to review her decision to appoint the Equity Committee.

39.    The Court held a hearing on the Motion to Abate on November 4, 2005 and, following the hearing, entered its Order Granting Motion of Official Committee of Unsecured Creditors to Abate Proceedings on Disbandment Motion and to Adjourn Evidentiary Hearing Scheduled for November 16, 2005 [Docket No. 4049] (the "Abatement Order").  As a result of the Abatement Order, despite the ongoing discovery and discovery dispute, the Equity Committee was unable to conduct any discovery in connection with the Disbandment Motion, and no hearing was ever held on the Disbandment Motion.

<u>The U.S. Trustee's Information Request in Connection with the Pending Disbandment Motion</u>

- 15 -

40.     Following the hearing on the Abatement Motion, on or about November 3, 2005, the U.S. Trustee sent an information request (the "U.S. Trustee's Information Request") to all of the parties to the Disbandment Motion requesting detailed information regarding the Debtors' historical and current operations and financial condition and requested the parties respond within five (5) business days.  In its letter, the U.S. Trustee states, without any advance notice to the Equity Committee or any of the notice parties to the Disbandment Motion,that:

> This matter is proceeding in the context of the abated motion, therefore the confidentiality protections of the prior order to seal documents remains in place.

U.S. Trustee's Information Request, p. 2 (emphasis added).   A copy of the U.S. Trustee's Information Request is attached hereto as Exhibit P.

41.     In response to the U.S. Trustee's request, Jefferies and Paul Hastings participated in a conference call with the U.S. Trustee to discuss the Debtors' financial projections, business plan and value of claims which may be asserted against the Debtors' pre-petition directors, officers, senior management and third party professionals.  In addition, the Equity Committee sent the following letters to the U.S. Trustee in support of the Equity Committee's appointment:

- November 11, 2005 letter regarding the meeting with the Debtors' representatives and professionals;[3]

- December 5, 2005 letter regarding the need for adequate representation of equity holders as well as the possible benefit of the Debtors' significant director and officer insurance policies to the bankruptcy estates;[4]

- December 9, 2005 letter regarding the Debtors' financial information as disclosed in the Form 10-Q for the period ended September 26, 2005 and the monthly operating reports for September, October and November 2005 as well as analysis of the recent trading activity;[5] and

---

[3]  A copy of the November 11, 2005 letter is attached hereto as Exhibit Q.
[4]  A copy of the December 5, 2005 letter is attached hereto as Exhibit R.
[5]  A copy of the December 9, 2005 letter is attached hereto as Exhibit S.

- December 13, 2005 letter regarding the market trading activity and further analysis of the Debtors' recently reported financials including market reaction to such financials.[6]

42.     At the December 1, 2005 hearing, the U.S. Trustee requested additional time to review the Debtors' monthly operating reports and Form 10-K filed with the SEC, further delaying any evidentiary hearing on the Disbandment Motion.

43.     On or about December 8, 2005, Winn-Dixie filed its Form 10-Q for the period ended September 26, 2005, as well as its Form 8-K, which included the monthly operating reports for September, October and November 2005.  The financial information included in the Form 10-Q and Form 8-K was the most current information publicly available and showed significant improvement in Winn-Dixie's financial condition.[7]  Despite notice of the improved financial condition being provided to the market, the U.S. Trustee continued its confidential review of the Equity Committee's appointment.

**D.     The Debtors' 2005 Form 10-K and Financial Performance Prior to the Bankruptcy**

Release of the Debtors' Business Plan and Due Diligence Requests

44.     Upon their selection as professionals for the Equity Committee in August 2005, the Equity Committee's professionals began reviewing and analyzing publicly available materials for possible strategies for maximizing value to the Debtors' estates, including, but not

---

[6] A copy of the December 13, 2005 letter is attached hereto as Exhibit T.
[7] In addition to the monthly operating reports, the Debtors stated on the record that there had been significant improvements in their finances and operations:

> Q:  Can you discern from those monthly operating reports any progress or traction these merchandising initiatives have realized to date?
> A:  Yes.  The most significant of those is, as I previously testified the company has had several years of consecutive sales declines in its stores.  For the first time in several years the company is positive.  The sales are positive. . . . we've talked about the fact that we expected sales to bottom out and start to come back, and that shows it.

Transcript of December 15, 2005 Hearing Before the Honorable Jerry A. Funk, pp.  The market reacted positively to the reports of the Debtors' improved financial condition with increased trading on both the bonds and equity.

limited to reviewing the Debtors' finances, business plans and claims.  On October 6, 2005, the

Equity Committee's professionals met with the Debtors for an initial due diligence meeting.

45.    Following the October 6, 2005 meeting, the Equity Committee's professionals

requested additional information from the Debtors numerous times, including the following

letters:

- November 1, 2005 letter requesting a copy of the proposed business plan prior to the November 10, 2005 meeting; [8]and

- November 1, 2005 letter requesting insurance policies, including the Debtors' directors and officers insurance policies which were not identified on the Debtors' schedules and statements.[9]

46.    On or about November 10, 2005, the Equity Committee's professionals met with

the Debtors for an initial presentation of the Debtors' business plan.  Following the meeting,

Jefferies again provided the Debtors' professionals with information requests regarding the

Debtors' business plan, finances, accounting procedures and taxes.  While the Debtors responded

to certain due diligence requests, the Debtors failed to respond completely to the requests or to

provide reasons for not responding.  Accordingly, Paul Hastings sent the following letters to

counsel for the Debtors requesting the information:

- November 14, 2005 letter requesting additional information on the Debtors' directors and officers insurance policies;[10]

- November 21, 2005 letter following up on requests already provided by Jefferies including a copy of the Debtors' accounting manual, information regarding the Internal Revenue Service Audits and an organizational chart by reporting/operational entity;[11] and

- December 22, 2005 letter again requesting the information identified in the November 21, 2005 letter along with additional items provided by Jefferies.[12]

---

[8]  A copy of the November 1, 2005 letter is attached hereto as Exhibit U.
[9]  A copy of the November 1, 2005 letter is attached hereto as Exhibit V.
[10]  A copy of the November 14, 2005 letter is attached hereto as Exhibit W.
[11]  A copy of the November 21, 2005 letter is attached hereto as Exhibit X.
[12]  A copy of the December 22, 2005 letter is attached hereto as Exhibit Y.

47.    Despite counsel for the Debtors' assurances, the Equity Committee's professionals never received much of the information requested.  Indeed, at the December 15, 2005 hearing, Applicant became aware that the Debtors' professionals testified on the record that they were actively discussing with the Creditors Committee the structure of a plan of reorganization, including substantive consolidation.  At the hearing the Court stated:

> **I think the equity committee is a committee and they're valid, and they've got financial advisors and legal advisors and, as long [as] they're there, they need to be included in the loop, and we don't need to have any litigation and request for production and discovery situations here.  They just sidetrack things.**

Transcript of December 15, 2005 Hearing Before the Honorable Jerry A. Funk, p. 105.

48.    Consistent with the Court's statements, in a letter dated December 22, 2005, counsel for the Equity Committee reiterated its request made at the December 15, 2005 hearing to be provided with information regarding substantive consolidation and any proposed plan of reorganization on the same terms and timing as the Creditors Committee.  The Debtors never provided the Equity Committee with any information regarding substantive consolidation or a proposed plan of reorganization.

Winn-Dixie's 2005 Form 10-K and Proxy Statement

49.    On October 26, 2005, Winn-Dixie Stores, Inc. ("Winn-Dixie") filed its proxy statement (the "Proxy") on Form 14A and its annual report on Form 10-K (the "2005 Form 10-K") for the fiscal year ended June 29, 2005 with the United States Securities and Exchange Commission (the "SEC").[13]  The Equity Committee reviewed the Proxy and the 2005 Form 10-K

---

[13] On or about December 8, 2005, Winn-Dixie filed its Form 10-Q for the period ended September 26, 2005 and its Form 8-K which included monthly operating reports for September, October and November 2005 which contained more up-to-date information regarding the Debtors' finances.  The 2005 Form 10-K is not representative and did not indicate the consistently improving trends in the Debtors' operations and finances evident in the Form 10-Q and monthly operating reports.

in connection with the Debtors' financial performance as a part of its efforts to develop strategies designed to maximize value to the Debtors' estates and improve the return to equity holders.

50.    In its Proxy, Winn-Dixie requested that shareholders take action on three proposals at the 2005 annual meeting scheduled for December 8, 2005 (the "Annual Meeting"):

- the election of three Class III directors for terms expiring in 2008;

- the ratification of the appointment of KPMG LLP ("KPMG") as Winn-Dixie's independent registered public accounting firm for fiscal year 2006; and

- any other business that may properly come before the meeting.

51.    The Annual Meeting was to be held on December 8, 2005, but Winn-Dixie, through a press release issued on December 1, 2005, announced that the annual meeting was postponed at the request of the Equity Committee.[14]    No new date for the Annual Meeting has been established by Winn-Dixie.

52.    By filing the Proxy and nominating the incumbent directors, Winn-Dixie and its Board of Directors essentially represented that: (A) the nominees were fit and qualified to serve in the face of the bankruptcy, notwithstanding that Winn-Dixie had not undertaken any investigation into the demise of the Debtors, including any investigation into what role, if any, that any of these directors played in Winn-Dixie's downfall, or reconciled why or how these directors remained qualified to serve despite the fact that these same directors were in place during the time Winn-Dixie experienced a complete operations breakdown and record losses resulting in the bankruptcy filing; and (B) KPMG had fulfilled its duties to Winn-Dixie and was not implicated by or involved in any wrongdoing in connection with the bankruptcy of the Debtors.    As more fully set forth below, without an investigation to support Winn-Dixie's recommendations, the Proxy was materially misleading because it omitted material information

---

[14] As set forth in greater detail in Paragraphs 64 to 75 below, Paul Hastings participated in numerous conference calls with Debtors' counsel regarding the need for an independent investigation and the postponement of the Annual Meeting.

LEGAL_US_E # 70347888.17

for an equity holder to be fully informed in connection with its decision to vote in favor of the election of the Board of Director's nominees for director and to ratify the Board of Director's selection of KPMG as Winn-Dixie's independent auditor.

53.    In addition to the Proxy, Winn-Dixie filed its 2005 Form 10-K which disclosed the presence of a number of lawsuits that have been asserted against Winn-Dixie, however, the 2005 Form 10-K failed to disclose important, material information regarding the impact of these lawsuits on the nominee directors, KPMG, the other directors and other interested parties.

54.    Winn-Dixie did disclose, for the first time, the conclusion reached by Winn-Dixie that there was a material weakness in its internal controls and procedures.

55.    As more fully set forth below, without disclosing additional information, the 2005 Form 10-K was materially misleading because it omitted material information necessary for an equity holder to be fully informed in connection with its investment decision with respect to the equity of Winn-Dixie and made material misstatements about the merits of outstanding securities class action claims.

56.    During the Compensation Period, Paul Hastings reviewed and analyzed Winn-Dixie's SEC filings in connection with exploring ways to maximize certain assets of the bankruptcy estates apparently ignored by the Debtors.  These assets included potential claims against directors, officers and senior management potentially covered by an excessive amount of director and officers' insurance.  This review and analysis established, among other things, the following: in the six-year period preceding the bankruptcy filings, Winn-Dixie experienced significant fluctuation in its financial performance.  In its annual report for the fiscal year ended June 2000, Winn-Dixie reported losses in excess of $228 million.  Winn-Dixie had more than recovered by 2003, reporting record earnings of approximately $239 million in its annual report for the fiscal year ended 2003.  This represented an aggregate increase in reported annual

earnings of approximately $465 million in a three-year period. The apparent trend of increased earnings, however, was short-lived as Winn-Dixie reported alternating earnings and losses over the next four quarters. The total losses reported by Winn-Dixie in its annual report for the fiscal year ended June 2004 was approximately $100 million. In its Form 10-Q for the quarter ending in September 2004, Winn-Dixie reported losses of over $150 million, and, in its subsequent quarterly filing in January 2005, Winn-Dixie reported losses of just under $400 million.

57.    Pursuant to SEC regulations, Winn-Dixie should have been disclosing in its periodic reports, among other things, any known material trends that favorably or unfavorably affected Winn-Dixie, its capital resources or results of operations. However, Winn-Dixie identified only competitive store openings as the trend that it expected to continue to negatively impact the company. The disclosure was generic in nature and provided no sense of scope or materiality relating to how this negative trend would impact the company.

58.    Winn-Dixie also disclosed in its 2005 Form 10-K the existence of several lawsuits that have been brought against Winn-Dixie. Winn-Dixie states in its 2005 Form 10-K:

> In February 2004, several putative class action lawsuits were filed in the United States District Court for the Middle District of Florida against us and certain present and former executive officers alleging claims under federal securities laws.

59.    Winn-Dixie failed to disclose any additional information regarding the class action, specifically whether the allegations extended to actions taken by either the directors currently up for re-election, KPMG, or other current directors, former senior management and professionals.

60.    The 2005 Form 10-K also disclosed the IRS' disallowance of certain deductions taken by Winn-Dixie with respect to certain life insurance policies:

> The Company held company-owned life insurance ("COLI") policies and deducted interest on outstanding loans from March 1993 to December 1997. In the fall of 1996, Congress passed

- 22 -

legislation phasing out such deduction over a three-year period.  In 2000, the Company established a reserve for taxes and interest related to this issue since the IRS issued both and unfavorable opinion and a computational decision.  During 2003, the Company paid $52.0 million in taxes and interest to the IRS to settle this issue and reversed the remaining COLI tax reserve of $28.0 million.

61.    Winn-Dixie's limited disclosure failed to provide material facts related to the COLI that bear on the qualifications and past performance of two of the directors up for re-election, Mr. Rider and Ms. North, who were on the Board of Directors at the time Winn-Dixie purchased the insurance policies.  Upon review of Winn-Dixie's proxy filed in 1999, it was determined that Dano Davis, Robert Davis and Radford Lovett, then directors of Winn-Dixie with direct ties to the Davis family and DDI, Winn-Dixie's controlling shareholder, were also directors of American Heritage Life Investment Corporation, the parent company of American Heritage Life Insurance Company ("American Heritage"), an insurance company from which Winn-Dixie purchased certain life insurance products. Each of Winn-Dixie's proxies from 1994 through 2000 disclosed millions to tens of millions of dollars of premiums and interest payments made to American Heritage to support the COLI policy.

62.    However, none of Winn-Dixie's public filings disclosed that the Davis family owned nearly 40% of American Heritage, nor did they disclose whether Mr. Davis was a participant in the COLI policy.  Moreover, nowhere prior to the IRS determination that the interest deductions pertaining to the COLI were unlawful did Winn-Dixie disclose the possibility that, or include a risk factor relating to, the potential that the IRS would disallow past deductions. Nor did Winn-Dixie disclose that the policies subject to the IRS determination, and a $52 million settlement, were the same COLI policies that Winn-Dixie purchased from American Heritage in the 1990s.  Finally, Winn-Dixie did not disclose in any public filings that in 1999 American Heritage was sold to The Allstate Corporation for roughly $1.1 billion of which the Davis family

- 23 -

received nearly $400 million.  There is no mention in any filing by Winn-Dixie with the SEC that described D. Davis', R. Davis' and R. Lovett's financial interest in American Heritage and their apparent direct financial interest in the payment of substantial premiums by Winn-Dixie.

63.     Additionally, Winn-Dixie disclosed in the 2005 Form 10-K that it received a written demand from various individuals contending that the current directors of the Board violated their fiduciary duties to Winn-Dixie by, among other things, filing and issuing false and misleading statements.  Winn-Dixie has acknowledged that it had not engaged in any independent investigation in order to assess and determine whether the Board of Directors, KPMG, senior management or other professionals played any role in the demise of Winn-Dixie. Notwithstanding this acknowledgement, Winn-Dixie stated in the 2005 Form 10-K that it believed the foregoing claim was without merit.

64.     Despite the bankruptcy filing and the assertion of these claims against Winn-Dixie and its directors and officers, and the repeated demands from Paul Hastings as counsel to the Equity Committee, Winn-Dixie (i) failed to conduct any investigation, evaluation or other performance review in connection with claims that have been asserted or that could be asserted against members of the Board of Directors, senior management and KPMG for actions or inactions that caused or contributed to the bankruptcy filings and (ii) failed to provide any basis for its statement that the claims asserted in the various lawsuits were "without merit."

**E.     The Equity Committee's Motion to Appoint an Examiner**

65.     Following receipt and review of Winn-Dixie's Proxy and 2005 Form 10-K, on November 2, 2005, Paul Hastings, on behalf of the Equity Committee, sent counsel for the Debtors a letter requesting that Winn-Dixie's Board of Directors form an independent committee with independent counsel to investigate potential pre-petition claims the estate may have against pre-petition officers, directors, senior management and professionals whose actions, or inactions,

led to Winn-Dixie's deteriorated financial condition and the chapter 11 bankruptcy filings.  A copy of the November 2, 2005 letter is attached hereto as <u>Exhibit Z</u>.

66.     Counsel for the Debtors responded on November 9, 2005 stating Winn-Dixie's Board of Directors would consider the Equity Committee's November 2, 2005 letter at the next board meeting scheduled for December 8, 2005.  A copy of the November 9, 2005 letter is attached hereto as <u>Exhibit AA</u>.

67.     Following receipt of the November 9, 2005 letter, counsel for the Equity Committee requested in a letter dated November 15, 2005 that Winn-Dixie delay the proposed re-election of directors and ratification of KPMG's appointment until the requested independent investigation into the actions or inactions of the directors, officers, senior management and professionals could be conducted and completed.  A copy of the November 15, 2005 letter is attached hereto as <u>Exhibit BB</u>.

68.     Paul Hastings continued to pursue discussions with the Debtors' counsel regarding the postponement of the Annual Meeting because of the need for an independent investigation.  During these lengthy discussions, the Debtors' counsel acknowledged that the Debtors had not conducted any investigation, independent or otherwise, regarding the actions or inactions of Winn-Dixie's pre-petition board of directors, senior management and professional advisors.

69.     As discussed above, as a result of the Equity Committee's discussions with the Debtors, Winn-Dixie postponed its Annual Meeting scheduled for December 8, 2005 issuing a press release to this effect on December 1, 2005.

70.     Paul Hastings, on behalf of the Equity Committee, and counsel for the Debtors continued discussions regarding the need for an independent investigation, the scope of the investigation and how such investigation should be conducted and by whom.  On December 7,

2005, Debtors' counsel proposed proceeding with an investigation under FLA. STAT. ANN. §607-07401. The Debtors acknowledged that the Board of Directors was not independent and proposed an independent entity be retained to conduct the investigation. The Debtors were unwilling to stipulate to the appointment of an examiner under Section 1104 of the Bankruptcy Code and expressed their desire to retain additional professionals to conduct the investigation under FLA. STAT. ANN. §607-07401.

71.     The Debtors' proposal failed to provide the creditors and interest holders the same protections that are provided by appointment of an examiner under the Bankruptcy Code, namely clear bankruptcy court jurisdiction and supervision of the examiner and the examination process, including established procedures for dealing with the disclosure and filing of the examiner's report and implementation of the findings. During these discussions, Paul Hastings on behalf of the Equity Committee focused on providing all interested parties with notice of the facts as reported by the Debtors that gave rise to the need for an independent investigation, and the need for the appointment of an examiner along with the transparency provided by conducting an investigation under Section 1104 of the Bankruptcy Code.

72.     As a result of Winn-Dixie's failure to conduct any sort of investigation into whether, and what, claims may be asserted against Winn-Dixie's directors, officers, senior management and third party professionals and the inability to reach an agreement with the Debtors regarding an independent investigation, the Equity Committee filed its Motion for Order Appointing an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code [Docket No. 4536] (the "Motion to Appoint an Examiner") on December 8, 2005.

73.     On or about December 21, 2005, the Equity Committee filed its Request for Scheduling Conference with Respect to the Motion of the Official Committee of Equity Security Holders for Order Appointing an Examiner Pursuant to Section 1104 of the Bankruptcy Code

[Docket No. 4735], requesting an order setting a scheduling conference on January 12, 2006 with respect to the Motion to Appoint an Examiner.  Notwithstanding numerous requests from the Applicant, it was not until January 10, 2006 that counsel for the Debtors confirmed that the request for a scheduling conference would be included on the agenda for the January 12, 2006 hearing.

74.    On or about January 5, 2006, the Debtors filed their Response to Motion of the Equity Committee for the Appointment of an Examiner [Docket No. 5003] (the "Debtors' Response to the Motion to Appoint an Examiner").  As set forth therein, the Debtors did not object to the appointment of an examiner, but requested that the Court enter an order limiting the scope and time of the investigation as well as the compensation to be paid to the independent examiner.

75.    On or about January 10, 2006, the Creditors Committee filed its Response to Request for Scheduling Conference with Respect to Motion of Official Committee of Equity Security Holders for Order Appointing an Examiner Pursuant to Section 1104 of the Bankruptcy Code [Docket No. 5071] and Wachovia Bank, National Association filed its Response to Motion of the Equity Committee for the Appointment of an Examiner [Docket No. 5090].  Both parties conceded that upon a request of a party-in-interest appointment of an examiner pursuant to Section 1104 of the Bankruptcy Code was mandatory.

76.    However, at the January 12, 2006 hearing, the Court continued the Motion to Appoint an Examiner pending the determination of the status of the Equity Committee.  The Motion to Appoint an Examiner was never heard by the Court because of the U.S. Trustee's issuance of the Notice of Disbandment described below.

**F.    The U.S. Trustee's Notice of Disbandment**

77.    One day prior to the scheduling conference on the Motion to Appoint an Examiner, January 11, 2006, the U.S. Trustee filed its Notice of Disbandment.  The U.S. Trustee contacted counsel for the Equity Committee on January 11, 2006 to indicate the U.S. Trustee's intent to file the Notice of Disbandment that afternoon.  The U.S. Trustee provided no other notice of its intent to disband the Equity Committee.

**G.    The Equity Committee's Response to the Notice of Disbandment and Motion for Appointment of an Equity Committee**

78.    In response to the Notice of Disbandment, on January 17, 2006, the Equity Committee filed the Official Committee of Equity Security Holders' (I) Objection and Motion to Set Aside the United States Trustee's Notice of Disbandment of Equity Security Holders Committee and (II) Motion for Appointment of Equity Security Holders Committee Nunc Pro Tunc to January 11, 2006 [Docket No. 5170] (the "Equity Committee's Response").

79.    The Equity Committee asserted that the issuance of the unilateral Notice of Disbandment by the U.S. Trustee constituted an abuse of discretion which deprived the Court of jurisdiction over the pending, but abated, Disbandment Motion.  As a result of the abatement of the Disbandment Motion, the Court continued to have jurisdiction over the disbandment of the Equity Committee and the U.S. Trustee should have complied with the rules of bankruptcy procedures, including providing all interested parties with notice and an opportunity to be heard at a hearing before the Court.

80.    In addition, the Equity Committee sought reappointment of an equity committee so it could continue to represent its constituency in the Debtors' bankruptcy proceedings.  The Equity Committee believed that absent the Equity Committee's involvement Winn-Dixie's over 36,000 shareholders would not be adequately represented in these proceedings.  Moreover, at that time, no other party was willing or able to represent the interests of equity holders.

- 28 -

81.     The Debtors, the U.S. Trustee and Wachovia Bank filed objections to the Equity Committee's Response on January 26, 2006 and on or about January 27, 2006, the Creditors Committee filed its objection.  Each of the parties without seeking relief from the Court filed their objections under seal.

82.     At the request of the Debtors and the Creditors Committee, the Court held a status conference on January 23, 2006 to determine the scope of the hearing on the Equity Committee's Response.

83.     On or about January 29, 2006, the Equity Committee filed its Omnibus Reply to Responses Filed by the United States Trustee, the Debtors, the Creditors Committee and Wachovia Bank National Association to the Official Committee of Equity Security Holders' (I) Objection and Motion to Set Aside the United States Trustee's Notice of Disbandment of Equity Security Holders Committee and (II) Motion for Appointment of Equity Security Holders Committee Nunc Pro Tunc to January 11, 2006 [Docket No. 5440].

84.     On January 30, 2006, the Court held a hearing on the Equity Committee's Response.  The hearing included extensive oral argument during which the Debtors disclosed that counsel for the Creditors Committee intended to conduct an investigation of the Debtors. Paul Hastings, on behalf of the Equity Committee, argued that the Equity Committee was necessary to adequately protect the interests of all equity holders and any determination regarding the return to equity was premature in light of the Abatement Order staying discovery and the lack of any proposed plan of reorganization.  The Court took the matter under advisement and on February 6, 2006 issued its Order Denying Motion for Appointment of Equity Security Holders Committee [filed under seal at Docket No. 5627] (the "Order Denying Appointment").

## RETENTION OF APPLICANT AS COUNSEL FOR THE EQUITY COMMITTEE

**A.      Selection of Paul Hastings As Counsel and Paul Hastings' Experience**

85.      Following the Equity Committee's appointment on August 17, 2005, the Equity Committee selected Paul Hastings as counsel and Jennis & Bowen PC as co-counsel.  Paul Hastings is a full service law firm with approximately 1,000 attorneys.  Applicant's primary office is located in Los Angeles, California.  The offices from which services were primarily rendered in these Chapter 11 cases are located in Atlanta, Georgia; San Francisco, California and Washington, D.C.  Applicant also maintains offices in Orange County, California; San Diego, California; Stamford, Connecticut; New York, New York; Beijing, China; Shanghai, China; Hong Kong, China; London, England; Milan, Italy; Paris, France; and Tokyo, Japan.

86.      Applicant was founded in 1951 and represents a broad spectrum of clientele including major public companies, large and small privately-held corporations, partnerships, private foundations, trusts, estates and individuals.  Included in the list are a large variety of enterprises of varied size, form and function, including financial and investment institutions, manufacturing companies, retail stores, real estate development companies and professional firms.

87.      The Paul Hastings attorneys in charge of this engagement are James D. Wareham, Thomas R. Pollock, and Karol K. Denniston.

88.      James D. Wareham is Global Chairman of Paul Hastings' Litigation Department. Mr. Wareham has served as lead counsel in the defense of numerous securities class action suits, government investigations and complex civil cases, such as those initiated by the Securities and Exchange Commission.  While at his prior law firm, Mr. Wareham served as lead counsel for Laidlaw, Inc. during its two (2) year Chapter 11 reorganization.  Laidlaw, Inc. filed in Buffalo,

New York and emerged from bankruptcy in July 2003.  As lead counsel, Mr. Wareham had an integral role in negotiating the plan of reorganization.

89.    Thomas R. Pollock is a Partner in Paul Hastings' National Corporate Finance Practice Group and is co-chair of the Capital Markets Practice Group.  He has extensive experience in public and private securities offerings, merger and acquisition transactions, the formation of venture and leveraged buyout interests, leveraged and non-leveraged acquisitions, spin-offs and dispositions, and workout situations.

90.    Karol K. Denniston is a Partner in Paul Hastings' Finance and Restructuring Group.  Ms. Denniston's practice focuses on Chapter 11 cases from a debtor, creditor and committee perspective and on international distressed debt, insolvencies and restructuring.  Ms. Denniston routinely provides bankruptcy analysis and advice in connection with international and domestic restructurings both in and out of court.  Ms. Denniston was one of the lead bankruptcy attorneys in the bankruptcy case of NorthWestern Corporation and is experienced in representing committees and in dealing with contested valuations in chapter 11 reorganizations.  Ms. Denniston has over 20 years of experience as a bankruptcy attorney.  In addition, solely to the extent circumstances required, certain other attorneys of Applicant's finance and restructuring group, tax department, corporate department and litigation department, also performed discrete services with Applicant's representation of the Equity Committee in these Chapter 11 cases.

91.    On or about September 7, 2005, the Equity Committee filed its Application for an Order Pursuant to Section 1103(a) of the Bankruptcy Code and Bankruptcy Rule 2014 Authorizing the Nunc Pro Tunc Retention of Paul, Hastings, Janofsky & Walker LLP as Legal Counsel for the Official Committee of Equity Security Holders (the "Retention Application") [Docket No. 3386] and the Affidavit of Karol K. Denniston in support thereof [Docket No.

3387]. Subsequently, an additional Affidavit of Karol K. Denniston was filed on September 14, 2005 [Docket No. 3455] to correct a scrivener's error in the Affidavit of Karol K. Denniston filed on September 7, 2005.

92.    On or about September 14, 2005, the Creditors Committee filed its Limited Objection to Application for Order Pursuant to Section 1103(a) of the Bankruptcy Code and Bankruptcy Rule 2014 Authorizing Nunc Pro Tunc Employment and Retention of Paul, Hastings, Janofsky & Walker, LLP as Legal Counsel for the Equity Security Holders Committee [Docket No. 3443], requesting this Court to postpone consideration of the Retention Application until a ruling on the Disbandment Motion.

93.    On or about October 17, 2005, the Ad Hoc Committee of Winn-Dixie Retirees' filed their Objection to Application for Order Pursuant to Section 1103(a) of Bankruptcy Code and Bankruptcy Rule 2014 Authorizing Nunc Pro Tunc Employment and Retention of Paul, Hastings, Janofsky & Walker, LLP as Legal Counsel for the Equity Security Holders Committee [Docket No. 3885].

94.    On or about October 21, 2005, Richard S. Ehster, a creditor in these Chapter 11 cases, filed his Objection to Application for Order Pursuant to Section 1103(a) of Bankruptcy Code and Bankruptcy Rule 2014 Authorizing Nunc Pro Tunc Employment and Retention of Paul, Hastings, Janofsky & Walker, LLP as Legal Counsel for the Equity Security Holders Committee [Docket No. 3909].

95.    In addition to the objections filed with the Court, Paul Hastings participated in numerous discussions with the U.S. Trustee and the Debtors regarding the Retention Application and proposed form of order. Prior to the hearing, the Equity Committee, the Debtors and the U.S. Trustee were able to resolve the concerns related to Paul Hastings' retention. At the hearing to consider the Retention Application held on December 1, 2005, the U.S. Trustee stated:

> Your honor, an equity committee does exist.  I see no harm at this point to authorize the employment of Paul, Hastings.

Transcript of December 1, 2005 Hearing Before the Honorable Jerry A. Funk, p. 16.  **The Court agreed with the U.S. Trustee, stating:**

> **I think the committee does exist. And I don't think it makes a difference one way or the other, but I think they're more comfortable having an appointment.**

See id. at pp. 17-18.

96.     **On December 2, 2005, this Court entered its Order Pursuant to Section 1103(a) of the Bankruptcy Code and Bankruptcy Rule 2014 Authorizing the Nunc Pro Tunc Employment and Retention of Paul, Hastings, Janofsky & Walker LLP as Legal Counsel for the Equity Security Holders Committee [Docket No. 4417], authorizing the retention of the Applicant as counsel to the Equity Committee effective as of August 17, 2005.**

**B.     Entry of the Final Interim Procedures Order And Debtors' Failure to Comply with the Final Interim Procedures Order**

97.     On or about March 4, 2005, the New York Bankruptcy Court entered its Order Approving Interim Compensation Procedures for Professionals [Docket No. 265].  On or about March 15, 2005, the New York Bankruptcy Court entered its Final Order Approving Interim Compensation Procedures for Professionals, dated March 15,2 005 (the "Final Interim Procedures Order") [Docket No. 434].

98.     Pursuant to the Final Interim Procedures Order, each professional seeking monthly compensation must serve a monthly statement ("Monthly Statement") on or before the 20th day of the month for services rendered during the previous month upon (i) the U.S. Trustee for the Middle District of Florida, 135 W. Central Blvd., Suite 620, Orlando, Florida 32801; (ii) D.J. Baker, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New

- 33 -

York 10036; (iii) Laurence B. Appel, Senior Vice President and General Counsel, Winn-Dixie Stores, Inc., 5050 Edgewood Court, Jacksonville, Florida 32254; (iv) counsel for any official committee appointed in these Chapter 11 cases; and (v) counsel for the agent for the Debtors' post-petition secured lenders. If no objection to the compensation or reimbursement sought in a Monthly Statement is interposed within twenty (20) days after service thereof, the Debtors shall pay eighty percent (80%) of the fees and one-hundred percent (100%) of the expenses.

99.    The Final Interim Procedures Order further provides (i) that, at a minimum, every 120 days, but not more than every 180 days, each Professional (as defined in the Final Interim Procedures Order) must submit an application for interim or final approval of compensation and reimbursement of expenses on the basis of Monthly Statements submitted for the prior four (4) to six (6) months and (ii) upon failure to submit such application for interim or final approval of compensation and reimbursement of expenses, the Professional shall be ineligible to receive further monthly payments for compensation or reimbursement of expenses absent further order of the Court.

100.    On or about August 10, 2005, the Court entered its Order Granting Motion to Appoint Fee Examiner [Docket No. 2933] directing the Debtors to consult with the U.S. Trustee and the Creditors Committee in selecting an examiner. On or about December 14, 2005, the Court entered its Order Authorizing Debtors to Employ and Retain Stuart, Maue, Mitchell & James Ltd as Fee Examiner [Docket No. 4599], authorizing the employment and retention of Stuart, Maue, Mitchell & James Ltd. as a fee examiner in these Chapter 11 cases.

101.    On or about December 16, 2005, pursuant to the Final Interim Procedures Order, Applicant submitted to the Debtors and other parties-in-interest its invoices for the period from August 17, 2005 through September 30, 2005 (the "First Monthly Fee Statement"). The First Monthly Fee Statement included fees for services rendered in the amount of $273,290.50 and

expenses in the amount of $12,923.26.  To date, no objection has been made by the Debtors or any other party-in-interest to the First Monthly Fee Statement.  The Debtors have failed to pay eighty percent (80%) of the fees and one hundred percent (100%) of the expenses owing with respect to the First Monthly Fee Statement in violation of the Final Interim Procedures Order.

102.    On or about December 16, 2005, pursuant to the Final Interim Procedures Order, Applicant submitted to the Debtors and other parties-in-interest its invoices for the period from October 1, 2005 through October 31, 2005 (the "Second Monthly Fee Statement").  The Second Monthly Fee Statement included fees for services rendered in the amount of $127,258.00 and expenses in the amount of $9,383.27.  To date, no objection has been made by the Debtors or any other party-in-interest to the Second Monthly Fee Statement.  The Debtors have failed to pay eighty percent (80%) of the fees and one hundred percent (100%) of the expenses owing with respect to the Second Monthly Fee Statement in violation of the Final Interim Procedures Order.

103.    On or about January 3, 2006, pursuant to the Final Interim Procedures Order, Applicant submitted to the Debtors and other parties-in-interest its invoices for the period from November 1, 2005 through November 30, 2005 (the "Third Monthly Fee Statement").  The Third Monthly Fee Statement included fees for services rendered in the amount of $230,093.50 and expenses in the amount of $25,836.67.  To date, no objection has been made by the Debtors or any other party-in-interest to the Third Monthly Fee Statement.  The Debtors have failed to pay eighty percent (80%) of the fees and one hundred percent (100%) of the expenses owing with respect to the Third Monthly Fee Statement in violation of the Final Interim Procedures Order.

104.    On or about January 6, 2006, Applicant sent a letter to the Debtors' counsel requesting that the Debtors, in accordance with the Final Interim Procedures Order, remit payment in satisfaction of eighty percent (80%) of the fees owing with respect to the First Monthly Fee Statement and the Second Monthly Fee Statement in the aggregate amount of

$320,438.80 and one hundred percent (100%) of the expenses owing with respect to the First Monthly Fee Statement and the Second Monthly Fee Statement in the aggregate amount of $22,306.53.

105.    On or about January 18, 2006, pursuant to the Final Interim Procedures Order, Applicant submitted to the Debtors and other parties-in-interest its invoices for the period from December 1, 2005 through December 31, 2005 (the "Fourth Monthly Fee Statement"). The Fourth Monthly Fee Statement included fees for services rendered in the amount of $153,931.25 and expenses in the amount of $7,813.15. To date, no objection has been made by the Debtors or any other party-in-interest to the Fourth Monthly Fee Statement. The Debtors have failed to pay eighty percent (80%) of the fees and one hundred percent (100%) of the expenses owing with respect to the Fourth Monthly Fee Statement in violation of the Final Interim Procedures Order.

106.    Following the hearing on January 31, 2006, Applicant finalized its invoices for the period from January 1, 2006 through January 31, 2006 (the "Fifth Monthly Fee Statement," collectively with the First, Second, Third and Fourth Monthly Fee Statements, the "Compensation Period Fee Statements"). The Fifth Monthly Fee Statements include fees for services rendered in the amount of $274,744.00 and expenses in the amount of $26,606.61. Consistent with firm practice, Paul Hastings changed certain of its guideline hourly rates effective as January 1, 2006. The new hourly rates for the attorneys, paralegals and cases assistants affected by the rate change are included in the summary charts included herewith.

107.    As of the filing of this Application, no objections have been made by the Debtors or any other party-in-interest to the First, Second, Third and Fourth Monthly Fee Statements. Pursuant to the Final Interim Procedures Order, the deadline for the Debtors and other parties-in-interest to object to the First and Second Monthly Fee Statements was January 5, 2006. The deadline for parties to object to the Third Monthly Fee Statements was January 23, 2006. The

- 36 -

deadline for parties to object to the Fourth Monthly Fee Statements was February 7, 2006.

Despite the passing of the objection deadlines, Applicant has not received payment with respect

to any of the Compensation Period Fee Statements as required by the Final Interim Procedures

Order.

## JURISDICTION, VENUE AND BASIS FOR RELIEF

108.    This Court has jurisdiction over the Application pursuant to 11 U.S.C. § 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of the

Debtors' chapter 11 cases and this Application is proper under 28 U.S.C. §§ 1408 and 1409.  The

statutory predicates for the relief sought herein are 11 U.S.C. §§ 330 and 331 and Rule 2016 of

the Bankruptcy Rules.

## DESCRIPTION OF SERVICES RENDERED DURING
## THE COMPENSATION PERIOD

109.    The time records attached as Exhibit C, Exhibit D, Exhibit E, Exhibit F, and

Exhibit G provide a detailed description of the services rendered by Applicant during the

Compensation Period.

110.    Despite the contentious nature of this proceeding since the Equity Committee's

appointment, Applicant attempted to efficiently provide services to the Equity Committee

focusing on maximizing a return to equity holders upon the Debtors' emergence from

bankruptcy.  That this Court subsequently determined, based on information provided by the

Debtors, that there was no prospect of a return to equity holders does not change the Equity

Committee's need for representation or the value of the services delivered to the Equity

Committee.  See Order Denying Appointment, pp. 3-4.  Despite the Court's ultimate ruling, the

Court recognized the Equity Committee's right to vigorous representation and participation

during the process:

> I think the equity committee is a committee, and they're valid, and they've got financial advisors and legal advisors and, as long [as] they're there, they need to be included in the loop, and we don't need to have any litigation and request for production and discovery situations here.

Transcript of December 15, 2005 Hearing Before the Honorable Jerry A. Funk, p. 105.

### A.   *Case Administration (See Matters 00003, 00004 and 00005)*

111.   During the Compensation Period, Applicant spent numerous hours gathering and disseminating information to the Equity Committee, and assisting the Equity Committee in its review of various pleadings and proposed orders related to these Chapter 11 cases and other documents regarding the Debtors' business operations and financial condition, including claims transfers, proposed orders with respect to litigation settlements, rejection and/or assumption of real property leases and financing and operational information provided by the Debtors.   A significant amount of time was spent reviewing and seeking information regarding the Debtors' financial performance.   This included meeting with the Debtors and their financial advisors and attempting, albeit at times unsuccessfully, to obtain current, pertinent and detailed information necessary to review and analyze the Debtors' financial projections and assumptions.

112.   Applicant assisted the Equity Committee in reviewing and analyzing publicly available information regarding the status of the Debtors' operations and Chapter 11 cases, including the Debtors' monthly operating reports, public documents filed with the Securities Exchange Commission (the "SEC") and this Court, press releases, and information provided by the Debtors on what led to the Debtors' bankruptcy filings including the performance and decisions made by the Debtors' senior management and financial advisors regarding payment of dividends and other questionable transactions outlined in the Motion to Appoint an Examiner.

113.   During the Compensation Period, Applicant prepared for and participated in numerous meetings, discussions and conference calls with the Equity Committee, the Debtors

and their retained professionals regarding various issues including, among other things, the Debtors' operations, finances, and projected valuation upon emergence.

**B.**    ***Equity Committee Matters (See Matters 00006, 00007, and 00009)***

114.    During the Compensation Period, following the appointment of the Equity Committee, Applicant prepared for and participated in numerous meetings regarding formation of the Equity Committee and its organization.   Specifically, Applicant assisted the Equity Committee in drafting by-laws, coordinating Equity Committee meetings and preparing minutes of Equity Committee meetings.

115.    Applicant also prepared memoranda advising the Equity Committee with respect to issues regarding general governance and fiduciary duties.   Applicant participated in conference calls with the Equity Committee with regard to the selection of a financial advisor to represent the Equity Committee in these Chapter 11 cases.   Applicant assisted the Equity Committee in its review of materials submitted by prospective financial advisors and advised the Equity Committee with respect to its selection, and the role, of the financial advisor.   On or about August 31, 2005, the Equity Committee selected Jefferies to serve as its financial advisor in these Chapter 11 cases.

116.    Following the Equity Committee's selection of Jefferies, Applicant and Jefferies reviewed the publicly available materials and those provided by the Debtors in connection with the Equity Committee's goal of maximizing the return to the bankruptcy estate and increasing the distribution to equity holders.   During the Compensation Period, based on information provided by the Debtors and publicly available information regarding the Debtors' historical financial information, Applicant coordinated with Jefferies to assist the Equity Committee's review of the Debtors' operations, footprint reduction plan, proposed business plan, financial

projections, SEC filings and as reported by the Debtors, the Debtors' consistently improving operational performance.

117.    As set forth in Paragraphs 44 through 48 above, Applicant participated in numerous meetings and conference calls with the Debtors' professionals regarding the Debtors' business operations and the request for additional due diligence.   As a result of the Debtors' failure to respond to multiple due diligence requests from Jefferies, Applicant was forced to prepare numerous letters to counsel for the Debtors requesting various information including, among other things, the Debtors' proposed business plan, insurance policies, accounting manual, and IRS audits. (Exhs. U through Y).

118.    Following Applicant's review of the Winn-Dixie 10-K and the Proxy Statement and its subsequent identification of the deficiencies contained therein, Applicant advised the Equity Committee of such deficiencies and on seeking postponement of the Annual Meeting. Services provided included participating in multiple conferences with counsel for the Debtors and preparing the following letters to the Debtors regarding an independent investigation:

- November 2, 2005 letter requesting an independent investigation (Exh. Z); and

- November 15, 2005 letter requesting that Winn-Dixie delay the Annual Meeting pending an independent investigation (Exh. BB).

119.    As set forth in Paragraphs 65 through 76, Applicant participated in lengthy negotiations with counsel for the Debtors regarding the postponement of the Annual Meeting and procedures for an independent investigation.   As a result of these discussions, the Debtors agreed to postpone the Annual Meeting and acknowledged the need for an independent investigation.[15]

---

[15] The services provided to the Equity Committee in connection with the postponement of the Annual Meeting and protection of their rights as shareholders was necessary to ensure that equity holders were not irreparably harmed. See Allen v. Prime Computer, Inc., 540 A.2d 417, 421 (Del. 1988); see also, Frenz v. Gencor Indus., Civil Action No. 1204-N, 2005 Del. Ch. LEXIS 141, at *2 (Del. Ch. Sept. 9, 2005) ("Plaintiffs could allege . . . that interference with a shareholder's right to nominate an independent director constitutes irreparable harm."); R.D. Hubbard v.

120.    Applicant continued discussions with the Debtors but the parties were unable to reach a consensual agreement regarding an independent investigation.  As a result, Applicant further advised the Equity Committee with respect to seeking an examiner and the need for a special investigation into the pre-petition conduct of Winn-Dixie's board of directors, officers, senior management and third party professionals.  Applicant prepared and filed on behalf of the Equity Committee the Motion to Appoint an Examiner.

**C.    *Litigation General (See Matter 00011)***

121.    As set forth in Paragraphs 49 to 64 above, Applicant reviewed and analyzed the Debtors' public filings, including the Proxy and 2005 Form 10-K.  Applicant provided extensive analysis to the Equity Committee regarding the material deficiencies in Winn-Dixie's Proxy and 2005 Form 10-K including, among other things, disclosures regarding:

- the re-election of the three Class III directors for terms expiring in 2008;

- the ratification of the appointment of KPMG as Winn-Dixie's independent registered public accounting firm for fiscal year 2006;

- the securities class action lawsuits asserted against Winn-Dixie;

- the material weaknesses in Winn-Dixie's internal controls and procedures identified in the 2005 Form 10-K;

- the company owned life insurance policies and Winn-Dixie's relationship with American Heritage; and

- the financial deterioration of Winn-Dixie's finances in the years prior to the bankruptcy filings.

122.    As set forth in Paragraphs 49 through 64 above, Applicant research, analyzed and advised the Equity Committee on whether any claims could be brought against the Debtors' pre-petition directors, officers, senior management and third party professionals arising out of any action or inaction contributing to the Debtors' bankruptcy filings.  Applicant also researched

_____
Hollywood Park Realty Enters., Civil Action No. 11779, 1991 Del. Ch. LEXIS 9, at *16-18 (Del. Ch. Jan. 14, 1991) (finding that "thwarting shareholders' voting rights" would result in irreparable harm).

whether any claims could be asserted in connection with Winn-Dixie's failure to fully disclose material information in the Proxy and 2005 Form 10-K as described in Paragraphs 48 through 63 above. As a result of Applicant's review, Applicant prepared and sent a letter to the SEC regarding the deficiencies in the 2005 Form 10-K and Proxy on January 3, 2006. A copy of the January 3, 2006 letter is attached as <u>Exhibit CC</u>.

123.    In addition to the public filings, Applicant reviewed Winn-Dixie's extensive director and officer insurance policies. In particular, Applicant advised the Equity Committee regarding the coverage provided, including comparisons to other companies, and whether and how such policies might be utilized to provide a direct benefit to the Debtors' estates. Applicant, on behalf of the Equity Committee, prepared a letter advising the U.S. Trustee that the extensive director and officer insurance policies may provide for a significant benefit to the Debtors' estates and that further investigation was necessary to determine whether any claims could be asserted against the Debtors' pre-petition directors and officers. (Exh. R). Applicant and the Equity Committee were focused on maximizing value for the Debtors' estates.

**D.    *Objections to Committee Formation (See Matter 00013)***

124.    As set forth in Paragraphs 18 through 21 above, following the appointment of the Equity Committee on August 17, 2005, the Creditors Committee immediately sought disbandment of the Equity Committee. In addition, the Creditors Committee sought to have the proceedings sealed which prevented equity holders not on the committee from participating and monitoring the process.

125.    During the period from the Creditors Committee's filing of the Disbandment Motion on September 2, 2005 to the U.S. Trustee's Notice of Disbandment on January 11, 2006, the Equity Committee was forced to file the following pleadings in order to protect the rights of all equity holders:

- 42 -

- Motion for Summary Judgment [filed under seal at Docket No. 3343];

- Memorandum of Law of the Official Committee of Equity Security Holders in Support of Summary Judgment [filed under seal at Docket No. 3708];

- Joinder of the Official Committee of Equity Security Holders to (I) the Debtors' Response and Objection to Creditors Committee's Motion for Clarification of Letter Ruling Dated October 14, 2005 and (II) United States Trustee's Response and Objection to Motion of Official Committee of Unsecured Creditors for Clarification of Letter Ruling Dated October 14, 2005 [filed under seal at Docket No. 3916];

- Objections and Responses to the First Request for Production of Documents by Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Rules 2020, 7034, and 9014, Directed to the Equity Committee; and

- Motion for (I) Order Enlarging Time Within Which to Comply with Discovery Deadlines; and (II) Protective Order in Connection with Discovery Requests [filed under seal at Docket No. 3999].

126. The dispute regarding the appointment of the Equity Committee was long, drawn out and contentious. Indeed, two months after the filing of the Disbandment Motion and following the filing of dispositive motions, discovery requests and motions for protective order, the U.S. Trustee and the Creditors Committee bilaterally agreed (without notice to, or input from the Equity Committee or its counsel) to abate the Disbandment Motion, prolonging any final determination regarding the status of the Equity Committee. During the two month period, Applicant spent significant amounts of time advising the Equity Committee regarding strategy in connection with the Disbandment Motion, preparing the motion for summary judgment and preparing for an evidentiary hearing which was scheduled for November 16, 2005. Applicant was prepared to go forward with the Disbandment Motion on November 16, 2005 – it was only the bilateral agreement between the U.S. Trustee and the Creditors Committee which prevented resolution of the issue in November.

127. As a result of the contentious nature of the proceedings and the ongoing challenge to the Equity Committee's existence, Applicant was forced to attend the following hearings to ensure that the interests of all equity holders were adequately protected:

- September 1, 2005;

- September 8, 2005;

- October 24, 2005;

- November 4, 2005;

- December 1, 2005;

- December 15, 2005;

- January 12, 2006; and

- January 30, 2006.

128.    Following the bilateral agreement between the U.S. Trustee and the Creditors Committee to abate the Disbandment Motion and the Equity Committee's participation in eight hearings regarding the disbandment, the U.S. Trustee issued the Notice of Disbandment on January 11, 2006.  Following the filing of the Notice of Disbandment, Applicant advised the Equity Committee on the procedural issues with the Disbandment Motion and the Notice of Disbandment as well as the law regarding the court's authority to appoint an equity committee, including analysis regarding adequate representation and a likelihood of return to equity.  As a result of the U.S. Trustee's unilateral Notice of Disbandment, the Equity Committee was forced to file the Equity Committee's Response objecting to the Notice of Disbandment and seeking an order appointing an equity committee nunc pro tunc to January 11, 2006.  To fail to object to the Notice of Disbandment in light of the procedural defects and the need for adequate representation in these cases would have been a breach of the Equity Committee's fiduciary duties to its constituency.  Accordingly, Applicant, on behalf of the Equity Committee prepared and filed the Equity Committee's Response and participated in the January 23, 2006 status conference as well as the January 30, 2006 contested hearing.

E.    *Plan of Reorganization Matters (See Matters 00014 and 00015)*

129.    During the Compensation Period, Applicant engaged in discussions and meetings with the Debtors and their professionals with respect to the Debtors' business plan.  Applicant also consulted with Jefferies with respect to the business plan and financial projections provided by the Debtors.

130.    During the Compensation Period, the Debtors filed their Motion for Order Further Extending Exclusive Periods for Filing Chapter 11 Plans and Obtaining Acceptances of Such Plans [Docket No. 2981] and Motion for Order Granting Third Extension of Exclusive Periods for Filing Chapter 11 Plans and Obtaining Acceptances of Such Plans [Docket No. 4312] (collectively, the "Exclusivity Period Extension Motions").

131.    Applicant, in response to the Exclusivity Period Extension Motions, prepared and filed, on behalf of the Equity Committee, the Limited Objection to Debtor's Motion to Extend Exclusive Periods for Filing and Soliciting Acceptances to Chapter 11 Plan [Docket No. 3389] and Limited Objection to the Debtors' Motion for Order Granting Third Extension of Exclusive Periods for Filing Chapter 11 Plans and Obtaining Acceptances of Such Plans [Docket No. 4524].

132.    On December 19, 2005, this Court entered its Order Granting Third Extension of Exclusive Periods for Filing Chapter 11 Plans and Obtaining Acceptances of Such Plans, extending the exclusive period within which the Debtors may filed a plan of reorganization until March 20, 2006.

**F.**    *Retention Matters (See Matters 00016 and 00017)*

133.    Following its selection by the Equity Committee, Applicant prepared and filed the following pleadings with respect to obtaining this Court's approval of the retention of professionals, including Applicant, to represent the Equity Committee in these Chapter 11 cases:

- Application for Order Pursuant to Section 1103(a) of the Bankruptcy Code and Bankruptcy Rule 2014 Authorizing the Nunc Pro Tunc Employment and Retention of Paul, Hastings, Janofsky & Walker LLP as Legal Counsel for the Official Committee of Equity Security Holders [Docket No. 3386];

- Affidavit of Karol Denniston [Docket No. 3387];

- Supplemental Affidavit of Karol K. Denniston [Docket No. 3455];

- Application for an Order Pursuant to Section 328 and 1103(a) of the Bankruptcy Code and Bankruptcy Rule 2014 Authorizing the Nunc Pro Tunc Employment and Retention of Jefferies & Company as Financial Advisor to the Official Committee of Equity Security Holders [Docket No. 3719]; and

- Affidavit of William Q. Derrough [Docket No. 3721].

134.    During the Compensation Period, Applicant advised the Equity Committee with respect to the retention of financial advisors and expert witnesses in connection with the Debtors' Chapter 11 cases, including the retention of expert witnesses in connection with the Motion to Disband, valuation and the Florida corporations code.  With regard to the retention of other professionals, Applicant assisted in the review and/or preparation of engagement letters, retention application and confidentiality agreements.

135.    Applicant also assisted the Equity Committee in its review of retention and fee applications filed by the Debtors and the Creditors Committee's professionals in these Chapter 11 cases.[16]

---

[16]  Despite being a duly appointed official committee, the Creditors' Committee never served counsel for the Equity Committee with monthly statements in violation of the Final Interim Procedures Order.

**G.**    ***Other Matters (See Matters 00008 and 00010)***

136.    During the Compensation Period, Applicant reviewed the Debtors' debtor-in-possession financing and other debt documents.  Applicant monitored the Debtors' use of the Debtors' debtor-in-possession financing and financial performance through review of monthly operating reports, information supplied by the Debtors' and due diligence conducted by Jefferies.

137.    During the Compensation Period, the Debtors filed their Motion for Order Approving Settlement Agreement and Release of Claims with Debtors' Property Insurers [Docket No. 3959] (the "Property Insurer Settlement Motion") and the Motion for Order (I) Authorizing and Approving Post-Petition Premium Finance Agreement Between Debtors and AFCO Premium Credit LLC and (II) Granting Related Relief [Docket No. 3961] (the "AFCO Premium Motion"), seeking court approval of settlements with property insurers with regard to damages to the Debtors' property sustained during the 2004 hurricane season and seeking approval of that certain post-Petition Date financing agreement between the Debtors and AFCO Premium Credit, LLC, respectively.

138.    Applicant, in response to the Property Insurer Settlement Motion and the AFCO Premium Motion, on behalf of the Equity Committee, prepared and filed, respectively, the Objection of Official Committee of Equity Security Holders to Debtors' Motion for Order Approving Settlement Agreement and Release of Claims with Debtors' Property Insurers [Docket No. 4128] and Objection of the Official Committee of Equity Security Holders to Debtors' Motion for Order Authorizing Post-Petition Financing Agreement between Debtors and AFCO Premium Credit and (II) Granting Related Relief [Docket No. 4127].

139.    On November 17, 2005, this Court entered its Order Approving Settlement Agreement and Release of Claims with Debtors' Property Insurers, authorizing the Debtors to enter into those certain settlement agreements identified in the Property Insurer Settlement

Motion.   On November 17, 2005, this Court also entered its Order (I) Authorizing and Approving Post-Petition Premium Finance Agreement between Debtors and AFCO Premium Credit LLC and (II) Granting Related Relief, authorizing the Debtors to enter into the financing agreement identified in the AFCO Premium Motion.

**H.**   *Paralegal Time*

140.   The compensation for legal services rendered in these cases by Applicant includes, paralegal, case assistant and library staff time.   Such time is charged at the same rate billed by Applicant to all of its clients and averaged approximately $93.39 per hour during the Compensation Period.   Applicant's paralegal and library staff performed an essential function in organizing a large flow of information and documents.   Without the assistance of Applicant's paralegal and library staff, substantial additional attorney time would have been expended.

**DISBURSEMENTS**

141.   During the Compensation Period, Applicant incurred certain necessary expenses in rendering legal services to the Equity Committee.   As such, Applicant seeks reimbursement for its reasonable, necessary and actual expenses incurred during the Compensation Period, as detailed on Exhibit B, aggregating $82,563.31.   All disbursements set forth in this Application are charged to all of Applicant's clients on the same basis as charged to the Equity Committee in these Chapter 11 cases except that, as required by the U.S. Trustee Guidelines, Applicant has billed the Debtors' estates for photocopies at a rate of $0.10 per page (rather than the rate of $0.20 per page it charges to other clients) and facsimiles at a rate of $1.00 per page (rather than the rate of $1.25 per page it charges to other clients).

## LEGAL STANDARD

**A.      Payment of Fees and Expenses Under Section 330(a)(1) of the Bankruptcy Code**

142.    The Bankruptcy Code provides that a committee of equity security holders

appointed by the United States Trustee is authorized to employ attorneys:

> At a scheduled meeting of a committee appointed under section 1102 of this title, at which a majority of the members of such committee are present, and with the court's approval, such committee may select and authorize the employment by such committee of one or more attorneys, accountants, or other agents to represent or perform services for such committee.

11 U.S.C. § 1103(a) (2000).

143.    During the December 1, 2005 hearing, this Court affirmed the existence of the

official Equity Committee and appointed Paul Hastings as co-counsel, stating:

> The Court:  All Right.
> The Court will approve the employment of Paul, Hastings, et al.,
> and I'll do it nunc pro tunc.
>
> I think the committee does exist.  And I don't think it makes a difference one way or the other, but I think they're more comfortable having an appointment.

See Transcript of December 1, 2005 Hearing Before the Honorable Jerry A. Funk.

144.    Section 330(a)(1) of the Bankruptcy Code allows payment to a professional

person employed under Section 1103 of the Bankruptcy Code of:

> (A)      reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and
> (B)      reimbursement for actual, necessary expenses.

11 U.S.C. §330(a)(1) (2000).

145.    Congress rejected the "spirit of economy" when it enacted the Bankruptcy

Reform Act of 1978 because it concluded that taking economy too much into account interfered

with the policy of encouraging skilled professionals to participate in bankruptcy cases.  In re

Hillsborough Holdings Corp. (Stroock, Stroock & Lavan v. Hillsborough Holdings Corp.), 127 F.3d 1398, 1403 (11th Cir. 1997). Reasonableness of compensation is determined by the "market-driven approach" which considers the nature, extent and value of the services provided by the professional, and the cost of comparable services in non-bankruptcy contexts. See In re Busy Beaver Building Ctr., Inc., 19 F.3d 833, 849 (3d Cir. 1994), cited with approval in In re Hillsborough Holdings Corp., 127 F.3d at 1404 ("The Third Circuit has held, and we agree, that the best approach to achieving the goal of full -- but not excessive -- compensation 'is to rely on the market . . .'").

146.    In accordance with its practice in non-bankruptcy matters, Applicant has calculated the compensation requested in the Application by applying its standard hourly rates. Consistent with firm practice, Applicant changed certain of its guideline hourly rates effective as of January 1, 2006. The revised hourly rates are set forth in the summary charts included with this Application. During the Compensation Period, including the period following the Applicant's increase in hourly rates, Applicant's hourly rates were well within the range of rates that are charged by comparable firms in other large bankruptcy cases. Applicant's blended average hourly rate for the Compensation Period is approximately $350.80, well within the ranges of rates for professionals in these bankruptcy cases. Indeed, the rates for counsel for the Debtors and Creditors Committee are $520.74 and $469.04, respectively for the same period. Accordingly, Applicant's rates should be determined to be reasonable under Section 330 of the Bankruptcy Code.

147.    Section 330(a)(1)(B) of the Bankruptcy Code permits reimbursement for actual, necessary expenses. Applicant's expenses incurred during the Compensation Period constitute only those necessary expenses that were incurred in connection with Applicant's representation

of the Equity Committee.    Applicant has properly requested reimbursement of only actual, necessary and appropriate legal expenses.

148.    In light of the Creditors Committee's opposition to the existence of the Equity Committee, it was necessary and reasonable for Applicant to incur fees and expenses in defending the appointment of the Equity Committee and at the same time deliver professional services to the Equity Committee consistent with the obligations of the Equity Committee to maximize the return to these bankruptcy estates and for the benefit of the equity holders represented by the Equity Committee.    As described in detail in Paragraphs 22 to 39 above, there was extensive motions practice in connection with the Disbandment Motion, including motions for summary judgment and protective orders.    Failure to respond to the Creditors Committee's Disbandment Motion and other actions would have significantly injured the interests of all equity holders and would have been a breach of the Equity Committee's fiduciary duty to represent such members.    See In re Microboard Processing, Inc., 95 B.R. 283, 285 (Bankr. D. Conn. 1989) ("A creditors' committee and its members owe no duty to the debtor or to the estate . . . . A committee and the holders of claims who serve on it only have a fiduciary duty to the parties or class represented").    See also In re Dow Corning, Corp., 255 B.R. 445, 485 (Bankr. E.D. Mich. 2000) (a member's fiduciary duty "extends to the class as a whole, not to its individual members).    Accordingly, the actions and services provided by the Applicant were necessary and reasonable in light of the prolonged dispute over the appointment of the Equity Committee and the need for the Equity Committee to have representation in connection with the discharge of the Equity Committee's fiduciary duties to the equity holders it represented.

149.    Throughout the Compensation Period, Applicant was forced to respond to the Disbandment Motion and related pleadings, including extensive discovery requests served by the Creditors Committee and the U.S. Trustee's Information Request.    The fees and expenses

incurred in connection with advising the Equity Committee on the production to the Creditors Committee and the U.S. Trustee were in direct response to the requests and actions of such parties. The services provided were necessary to protect the interests of the Equity Committee and their constituency. <u>See</u> <u>In re of Concrete Prods., Inc.</u>, 208 B.R. 1015, 1024 (Bankr. S.D. Ga. 1996) ("Debtors' counsel in Chapter 11 cases are not insurers of a successful reorganization and may be entitled to reasonable compensation even in a failed case") (citing <u>Matters of Coastal Nursing Center, Inc.</u>, and <u>Tybee Island Nursing Center, Inc.</u>, Ch. 11 Cases No. 93-40898 & 93-40899, slip op. at 5-9 (Bankr. S.D. Ga. Oct. 10, 1993)).

150.    Moreover, it was the Creditors Committee's and the U.S. Trustee's bilateral agreement to abate the Disbandment Motion and adjourn the November 16, 2005 hearing on the Disbandment Motion that delayed the Court's consideration of the appointment of the Equity Committee. <u>See</u> <u>In re Dragone</u>, 324 B.R. 445 (Bankr. D. Conn. 2005) (granting counsel for the creditors committee's fee application over the objection of the debtors where the debtors caused much of the delay in the case resulting in the incurrence of additional fees). During the abatement period, Applicant continued to advise the Equity Committee in connection with the U.S. Trustee's Information Request, the Motion to Appoint an Examiner, the Debtors' business plan and financial projections and the status of the bankruptcy proceedings, including the preparation of the following letters to counsel for the Debtors regarding the need for an independent investigation:

- November 2, 2005 letter regarding that the Board of Directors form an independent committee to investigate claims (Exh. Z);

- November 15, 2005 letter requesting that Winn-Dixie delay the Annual Meeting until an independent investigation can be conducted (Exh. BB);

To do otherwise would have been a breach of the Equity Committee's fiduciary duties and would have jeopardized the interests of all equity holders.

- 52 -

151.    It is the same fiduciary duty owed by the Equity Committee to all equity holders that necessitated a strong response to the Notice of Disbandment filed on January 11, 2006.  The significant procedural deficiencies in the U.S. Trustee's unilateral decision to disband the Equity Committee while the Disbandment Motion remained pending and without notice and opportunity for all equity holders to be heard before the Court required the prosecution of the Equity Committee's Response.  It was the duty of the Equity Committee to ensure that this Court determine the issue of the appointment of an Equity Committee after full briefing and oral argument on the issue based on the best information and evidence available to the Equity Committee and its professionals at the time.   Accordingly, the fees and expenses incurred in defending the Equity Committee's existence were necessary in light of the committee's fiduciary duties and the need to adequately represent the interests of the over 36,000 equity holders.

152.    In accordance with Rule 2016 of the Federal Rules of Bankruptcy Procedure, Applicant hereby states that (i) all services for which compensation is sought herein were rendered to the Equity Committee solely in connection with these Chapter 11 cases and not on behalf of an individual creditor or other persons, (ii) Applicant has received no payment or promise of payment for services rendered in these Chapter 11 cases, (iii) no agreement or understanding exists between Applicant and any other person for the sharing of compensation to be received for services rendered in or in connection with these Chapter 11 cases, and (iv) no division of compensation will be made by Applicant, except as between members of Applicant, and no agreement prohibited by 18 U.S.C. § 155 or Section 504 of the Bankruptcy Code has been made.

**Applicant Was Retained By Order Of This Court And The Services Provided Were Necessary To Protect The Interests Of All Equity Holders**

153.    The Equity Committee was duly appointed under Section 1102 of the Bankruptcy Code on August 17, 2005 and following such appointment selected Paul, Hastings, Janofsky &

Walker LLP as counsel.   As set forth above, an official equity committee, with the court's approval, may select and authorize the employment of counsel.   <u>See</u> 11 U.S.C. §1103(a).   In this case, the Equity Committee selected Applicant and, on December 1, 2005, this Court approved of such selection finding at the December 1, 2005 hearing:

> **I think the committee does exist. And I don't think it makes a difference one way or the other, but I think they're more comfortable having an appointment.**

Transcript of December 1, 2005 Hearing Before the Honorable Jerry A. Funk, pp. 17-18 (emphasis added).

154.   In complex cases, counsel for committees are necessary to ensure the effective functioning of the committee:

> Counsel usually participates in every aspect of a committee's activities. . . . Often, committee members are inexperienced in reorganization cases and must rely on counsel's advice regarding the performance of the committee's duties as well as for guidance in strategic matters in the case.

Norton Bankruptcy Law and Practice 2d, §78:11.   This case is evidence of the importance of counsel for a committee.   In this case, three of the four Equity Committee members were individuals with little recent significant experience in reorganizations.   In addition to providing extensive advice regarding the formation of a committee and the responsibilities of committee members, including advising on their fiduciary duties to all equity holders, throughout the Compensation Period, Applicant held frequent conference calls with Equity Committee members to advise members regarding the Debtors' proceedings and activities in connection with the Disbandment Motion.   Because the Equity Committee was forced to actively and aggressively address the Disbandment Motion and discharge its fiduciary duties to its constituency regarding the Debtors' progress toward a plan of reorganization and operating performance these calls were frequent and lengthy.

- 54 -

155.     Applicant has established that under the highly contentious circumstances of these bankruptcy proceedings and the appointment of the Equity Committee that the fees and expenses incurred were necessary to protect the interests of the constituency represented by the Equity Committee.   Indeed, courts have allowed compensation and reimbursement to professionals "who represent or hold an interest adverse to the interests of the estate."  See In re Keller Fin. Servs., Inc., 243 B.R. 806, 812 (Bankr. M.D. Fla. 1999).  In the Keller Financial case, the court granted the request for reimbursement of counsel for the debtors where the debtors took a position adverse to the estates by contesting the appointment of a Chapter 11 trustee.  Despite the court's appointment of the Chapter 11 trustee, the Keller Financial court still granted the award of fees and expenses during the period services were provided as counsel to the debtors-in-possession.  See id.

156.     Courts also have held:

> once the prima facia showing is made by an applicant, any objection raised must be substantiated by evidence showing that the applicant has requested an unreasonable amount, whether it be excessive hourly rates/hours or duplicative/unnecessary work.  *See id.*  **General dissatisfaction or a disagreement over business judgment will not suffice.**

In re SGE Mortgage Funding Corp., 301 B.R. 915, 917 (Bankr. M.D. Ga. 2003) (emphasis added).  The court goes on to find that the movants' actions were not unreasonable holding:

> While the fees have been high in this case, it is an extremely complex case with multiple allegations of fraud and wrong-doing by SGE's former principals . . . . there is no indication that Movants could have done anything specific which would have resulted in a better outcome than has already occurred.

See id.

157.     While the Court's entry of the Order Denying Appointment was not a desirable outcome for equity holders, Applicant's actions, on behalf of the Equity Committee, provided the Equity Committee and the 36,000 equity holders represented thereby with an opportunity to be

heard and an opportunity to provide this Court with the best evidence available to the Equity Committee establishing the reasons why an Equity Committee was important and necessary to this bankruptcy estate and this reorganization. That the Court was not persuaded thereby does not in any way eradicate the need for the services Applicant delivered to the Equity Committee. See In re Keller Fin. Servs., Inc., 243 B.R. at 818 (the court held in approving fees and expenses incurred in contesting the appointment of a Chapter 11 trustee "[i]n this case, Williams Reed performed substantial legal services under difficult circumstances. The Debtors' cases involved complex, sophisticated issues, significant debt, numerous creditors, and considerable publicity") and In re Dragone, 324 B.R. at 447 ("[sections 1102(a)(1) and 1103(a)] buttress the conclusion that the protection of unsecured creditors' interests by competent and experienced attorneys is necessary for the administration of chapter 11 cases").

158.    Finally, prior to the appointment of the Equity Committee, the Debtors in their June 3, 2005 letter to the U.S. Trustee supporting appointment acknowledged the need for adequate representation outweighed the costs to the estates:

> In determining that the appointment of an Equity Committee at the present time is appropriate, the Debtors have also considered the costs of such an appointment to the Debtors' estates. If appointed, **an Equity Committee will be entitled to retain professionals pursuant to section 1103 of the Bankruptcy Code. The resulting costs to the Debtors' estates will not be trivial.** However, the Debtors believe that given the facts as they are currently known, the benefits of having a committee representing the interests of equity holders are likely to outweigh the resulting costs.

Debtor's June 3 Letter, p. 2 (emphasis added) (Exh. M).

159.    In this case, the parties recognized that significant fees may be incurred in connection with the appointment of an Equity Committee. The resulting dispute regarding the appointment of the Equity Committee and the proceedings related to the Disbandment Motion were the result of not the Equity Committee's actions, but the actions of the Debtors, the U.S.

Trustee and the Creditors Committee.  The Equity Committee was prepared to proceed to an evidentiary hearing on the Disbandment Motion on November 16, 2005, a mere month and a half after the Creditors Committee filed its Disbandment Motion.  However, the Creditors Committee and the U.S. Trustee bilaterally agreed to abate the Disbandment Motion and, as a result, the Court's consideration of the appointment of an equity committee did not occur until January 30, 2006.  The parties should not now be allowed to object to the fees and expenses incurred in defending the Disbandment Motion or during the interim period during which Applicant represented the Equity Committee in connection with the progress of the Debtors' bankruptcy proceedings, including the due diligence of the Debtors described above, and activities related to the Debtors' proposed business plan, improving financial and operating performance and in connection with the Motion to Appoint an Examiner.

160.    During this time period, the Court acknowledged that the Equity Committee existed and should be allowed to participate fully in the bankruptcy proceedings.  Applicant, on behalf of the Equity Committee, took reasonable, efficient, and appropriate actions in order to protect the interests of all equity holders.  Applicant's fees and expenses incurred are reasonable under the circumstances.

161.    Applicant requests that this Application and the attached exhibits be admitted into evidence at any hearing on this Application.

## **CONCLUSION**

162.    Accordingly, Paul Hastings respectfully requests entry of a final order approving fees in the amount of $1,059,317.25 and expenses in the amount of $82,563.31 for the period of August 17, 2005 through January 31, 2006.

## NOTICE

163.    Pursuant to the Final Interim Procedures Order, notice of the Application has been given to (i) bankruptcy counsel for the Debtors, (ii) corporate counsel for the Debtors, (iii) counsel to the agent for the Debtors' post-petition secured lenders, (iv) the United States Trustee, (v) counsel for the Creditors' Committee, (vi) the fee examiner[17], (vii) Mr. Houston Maddox, (viii) Mr. Greg Rippel, (ix) Mr. Ian Rose, (x) Mr. Michael Nakonechny, and (xi) Mr. Kenneth Thomas.

Respectfully submitted this 9th day of May, 2006.


PAUL, HASTINGS, JANOFSKY & WALKER LLP

/s/ Karol K. Denniston
Karol K. Denniston
Ga. Bar No. 218333
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Telephone: (404) 815-2400
karolkdenniston@paulhastings.com

- and -

PAUL, HASTINGS, JANOFSKY & WALKER LLP
James D. Wareham
DC Bar No. 411799
875 15th Street
Washington, DC  20005
Telephone: (202) 551-1700
jameswareham@paulhastings.com

*Co-Counsel for the Official Committee of Equity Security Holders*
JENNIS BOWEN & BRUNDAGE, P.L.

/s/ David S. Jennis
David S. Jennis
Florida Bar No. 775940
Chad S. Bowen
Florida Bar No. 0138290
400 N. Ashley Dr., Ste. 2540
Tampa, FL 33602
Telephone: (813) 229-1700
Facsimile: (813) 229-1707
djennis@jennisbowen.com

---

[17] Because certain information contained herein is confidential and thus, subject to the Seal Order and the fee examiner is not among the Limited Recipients identified in the Seal Order, who pursuant thereto, may receive such confidential information and/or pleadings, the fee examiner is being served with a copy of the redacted version of the Application.  Upon motion to the Court and the subsequent approval thereof, Applicant will serve upon the fee examiner an unredacted version of the Application.