### UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 05-3817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

### NOTICE OF HEARING AND FILING

1.    Pursuant to the Amended Motion for Order (a) Authorizing the Sale of Additional Stores and Related Equipment Free and Clear of Liens, Claims and Interests, (b) Authorizing the Assumption and Assignment or Alternatively, the Rejection of Leases and Establishing a Claim Bar Date, and (c) Granting Related Relief filed with the Court on April 26, 2006 (the "Motion") (Docket No. 7517), Winn-Dixie, Inc. and its subsidiaries and affiliates as debtors and debtors-in-possession (collectively, the "Debtors"), provide notice of their intent to enter an agreement with 99 Cent Supercenter LLC in substantially the form attached, for the Debtors' lease of store number 215 located in North Miami Beach, Florida for $80,000 (the "Sale").

### Notice of Hearing

2.    A hearing to approve the Sale is scheduled for **May 18 at 1:00 p.m. E.T.** before the Honorable Jerry A. Funk, United States Bankruptcy Judge for the Middle District of Florida, 300 North Hogan Street, Courtroom 4D, Jacksonville, Florida 32202.

Dated: May 10, 2006.

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By ____s/ D. J. Baker_____
     D. J. Baker
     Sally McDonald Henry
     Rosalie Gray

Four Times Square
New York, New York 10036
(212) 735-3000
(917) 777-2150 (facsimile)
djbaker@skadden.com

Co-Counsel for Debtors
00531518

SMITH HULSEY & BUSEY

By ____s/ Cynthia C. Jackson_____
     Stephen D. Busey
     James H. Post
     Cynthia C. Jackson (FBN 498882)

225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Debtors

<u>Store No.</u>:
   215

## <u>ASSET PURCHASE AGREEMENT</u>
[99 Cent Supercenter LLC]

**THIS ASSET PURCHASE AGREEMENT** (this "<u>Agreement</u>") is made effective as of May 9, 2006 (the "<u>Effective Date</u>"), by and between

**WINN-DIXIE STORES, INC.**, a Florida corporation ("<u>Seller</u>"), and

**99 CENT SUPERCENTER LLC**, a Florida corporation, or its permitted assignee pursuant to <u>paragraph 17.5</u> of this Agreement ("<u>Buyer</u>").

### R E C I T A L S :

A.   Seller is the tenant of the supermarket store located at 2145 N.E 164th St. North Miami Beach, FL 33162 (the "<u>Store</u>"), under the respective lease, including any amendments thereto, as described in <u>Exhibit A</u> to this Agreement (the "<u>Lease</u>"). The Store occupies the respective leased premises as described in the Lease (the "<u>Leased Premises</u>"), within the respective parcel of real property described in <u>Exhibit A</u> to this Agreement associated with the Lease.   Seller's leasehold interest in the Leased Premises pursuant to the Lease, together with those additional items described in <u>paragraph 2.0</u> of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "<u>Assets</u>".

B.   Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.   Seller (Winn-Dixie Stores, Inc. and its affiliated debtors) filed voluntary petitions for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 <u>et seq.</u>, as amended (the "<u>Bankruptcy Code</u>") on February 21, 2005 (the "<u>Petition Date</u>") and has operated its business as debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Petition Date (the "<u>Bankruptcy Cases</u>").   The Bankruptcy Cases are being jointly administered in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "<u>Bankruptcy Court</u>"), under Case No. 05-03817-3F1.

**IN CONSIDERATION OF $10.00** and other good and valuable consideration and of the mutual undertakings of the parties hereto, Buyer and Seller agree as follows:

1.0   **<u>Defined Terms</u>.**   Capitalized terms not otherwise defined in this Agreement will have the meanings assigned to such terms below.

   1.1   "<u>Adequate Assurance Information</u>" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that the Landlord and any Subtenants are adequately assured of Buyer's future performance under the Lease, as required by Section 365(f) of the Bankruptcy Code, including, if appropriate, a Replacement Guaranty of Buyer's obligations under the Lease and (where applicable) the Subleases by

an Affiliate of Buyer with sufficient assets to provide adequate assurance of future performance.

1.2    "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3    "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4    "Allocation Schedule" will mean the allocation of the Purchase Price and the Deposit among the Assets as provided in Exhibit B to this Agreement.

1.5    "Approval Condition" will have the meaning assigned in paragraph 5.2 of this Agreement.

1.6    "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.7    "Auction" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.8    "Bankruptcy Cases" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.9    "Bankruptcy Code" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.10    "Bankruptcy Court" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.11    "Bidding Procedures" will mean the bidding procedures and bid protections for use in the sale of assets in the Bankruptcy Cases as approved by the Bankruptcy Court by Order dated June 20, 2005.

1.12    "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit C to this Agreement, pursuant to which Seller will sell and convey to Buyer at each Closing the Equipment and other tangible and intangible personal property constituting a portion of the Assets.

1.13    "Building" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.14    "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.15    "Buyer" will have the meaning assigned in the introductory paragraph of this Agreement.

1.16    "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigation of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policy (and the cost of any simultaneously issued mortgagee title

insurance policy and any loan-related title insurance endorsements thereon); (d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instrument(s); (e) recording fees payable in connection with recording the Conveyance Instrument(s) in the appropriate public records; (f) cost of the Environmental Reports, including any supplements or updates; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on any note or mortgage; and (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment.

1.17  "Buyer's Closing Direction" will have the meaning assigned in paragraph 14.6 of this Agreement.

1.18  "Buyer's Escrowed Items" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.19  "Closing" will mean the consummation of the assignment, assumption, sale, and purchase of the Assets pursuant to this Agreement, as provided in paragraph 14.0 of this Agreement.

1.20  "Closing Date" will have the meaning assigned in paragraph 14.1 of this Agreement.

1.21  "Closing Escrow Date" will mean the date that is 2 Business Days prior to the Closing Date or such earlier date after satisfaction of the Approval Condition as Buyer and Seller may designate.

1.22  "Closing Statement" will mean a statement in the form of Exhibit D to this Agreement (or in such other form as is prepared by Seller and reasonably acceptable to Buyer) reflecting the net amount due to Seller at Closing, after making the adjustments described in paragraph 3.4.2 and 3.4.3 of this Agreement and in other provisions of this Agreement.

1.23  [Intentionally deleted]

1.24  "Confidentiality Agreement" will mean the Confidentiality Letter Agreement dated effective _____, 2006, between Winn-Dixie and Buyer, a complete and correct copy of which is attached as Exhibit E to this Agreement, regarding, among other things, confidentiality relating to the subject matter of this Agreement.

1.25  "Conveyance Instrument" will mean the Assignment and Assumption of Lease substantially in the form of Exhibit F to this Agreement, pursuant to which Seller will assign and convey, and Buyer will assume, Seller's leasehold interest, as tenant, under the Lease, together with Seller's interest in any Improvements.

1.26  "Credit Agreement Liens" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and the DIP Lender, as the same has been

or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.27    "Cure Costs" will mean amounts (if any) payable by Seller pursuant to Section 365(b) of the Bankruptcy Code upon Seller's assumption of the Lease and any Subleases.

1.28    "Damages" will have the meaning assigned in paragraph 16.5 of this Agreement.

1.29    "Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.30    "DIP Lender" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.31    "Due Diligence Materials" will mean, collectively, (i) the Lease and any Subleases, (ii) the Title Report, (iii) the Environmental Report, (iv) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, at the Store, on the Merrill Website, or otherwise, and (v) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.32    "Effective Date" will have the meaning assigned in the introductory paragraph of this Agreement.

1.33    "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.34    "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.35    "Escrow Agent" will mean Smith, Gambrell & Russell, LLC, Jacksonville office, acting as escrow and closing agent.

1.36    "Excluded Personal Property" will mean the items or categories of items identified on Exhibit G to this Agreement, which are expressly excluded from the Assets to be sold to Buyer under this Agreement.

1.37    "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.38    "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.39    "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.40    "Initial Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.41  "<u>Inventory</u>" will mean all inventories of goods and merchandise within the Store and owned by Seller and held for resale in the ordinary course of business of Seller conducted at the Store to retail customers.

1.42  "<u>Knowledge</u>" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of all senior officers of Buyer and its Affiliates having responsibility for legal affairs, without any requirement of investigation or inquiry.

1.43  "<u>Landlord</u>" will mean the lessor under the Lease.

1.44  "<u>Leased Premises</u>" will have the meaning assigned in <u>paragraph A</u> of the Recitals to this Agreement, and will include the elements thereof as described in <u>paragraph 2.0</u> of this Agreement.

1.45  "<u>Lease</u>" will have the meaning assigned in <u>paragraph A</u> of the Recitals to this Agreement.

1.46  "<u>Liquidated Deposit</u>" will have the meaning assigned in <u>paragraph 16.1</u> of this Agreement.

1.47  "<u>Material Adverse Effect</u>" will mean, with respect to any fact, circumstance, change, or event, that such fact, circumstance, change, or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transaction contemplated herein, or on the continued operation of the Store for its current use, except to the extent that fact, circumstance, change, or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery, or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transaction contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transaction contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Cases; (f) the conversion or dismissal of any or all of the Bankruptcy Cases; (g) the appointment of a Chapter 11 trustee or examiner in the Bankruptcy Cases; or (h) the Wind-up Procedures.

1.48  "<u>Merrill Website</u>" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Panther 06" with respect to the disposition of the Store and other properties.

1.49  "<u>Monetary Liens</u>" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through, or under Seller: (A) mortgages on any of Seller's leasehold interests and/or on the Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have

attached to and become a lien against Seller's interest under the Lease and/or on the Assets; and (D) judgments that have attached to and become a lien against Seller's interest under the Lease and/or the Assets.

1.50    "Ordinary course of business" means the ordinary course of business of Seller after the Filing Date, subject to the Wind-up Procedures.

1.51    "Outside Date" means May 31, 2006, as such date may be extended by the written agreement of Seller and Buyer.

1.52    "Permit" will have the meaning assigned in paragraph 7.2 of this Agreement.

1.53    "Permitted Encumbrances" will mean (i) all matters listed on Exhibit H to this Agreement, (ii) all other matters set forth as exceptions in the Title History, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in the Title Commitment, other than Monetary Liens.

1.54    "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, or non-incorporated organization or government or any agency or political subdivision thereof.

1.55    "Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.56    "Real Property" will mean the Leased Premises and the Improvements together.

1.57    "Replacement Guaranty" will mean any guaranty of Buyer's payment and performance obligations under the Lease or any Sublease, given by a parent Affiliate of Buyer as may be required either to obtain Landlord's approval of the Adequate Assurance Information or to obtain Landlord's consent to the release of Winn-Dixie as a guarantor under the Lease or Sublease, as the case may be.

1.58    "Sale Hearing" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.59    "Sale Motion" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.60    "Sale Order" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.61    "Second Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.62    "Seller" will have the meaning assigned in the introductory paragraph of this Agreement.

1.63   "Seller's Closing Direction" will have the meaning assigned in paragraph 14.6 of this Agreement.

1.64   "Seller's Brokers" will mean one or more of DJM Asset Management, LLC, The Food Partners, LLC, and The Blackstone Group, L.P.

1.65   "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; and (c) the Cure Costs.

1.66   "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.67   "Store" will have the meaning assigned in paragraph A of the Recitals to this Agreement, including, if applicable, any associated fuel center operated by Seller at the Leased Premises.

1.68   "Sublease" will mean, with respect to the Store, each sublease of a portion of the Leased Premises listed on Exhibit A to this Agreement (if any), including amendments.  If no sublease is listed on Exhibit A to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Sublease will be disregarded.

1.69   "Subtenant" will mean any subtenant or sublessee under the Sublease.  If no sublease is listed on Exhibit A to this Agreement, then the Conveyance Instrument to any Subtenant at such the Store will be disregarded.

1.70   "Successful Bid" will have the meaning assigned to such term in the Bidding Procedures, and as otherwise contemplated in paragraph 5.1 of this Agreement, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.71   "Successful Bidder" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.72   "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, located within the Store and owned by Seller on the Closing Date, excluding, however, all packaging materials and supplies relating to the preparation or merchandising of Inventory, or any other supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of its Affiliates.

1.73   [Intentionally deleted]

1.74   "Title Commitment" will mean that current leasehold title insurance commitment obtained by Seller from Title Insurer, committing to insure Buyer's leasehold interest in the Real Property upon Closing, as made available to Buyer for review on the Merrill Website within 10 days following the Effective Date.

1.75    "Title History" will mean those materials evidencing the state of title to the Real Property, including any existing title report, title abstract, title insurance policy, and/or title insurance commitment with respect to the Store that Seller has made available to Buyer for review on the Merrill Website prior to the Effective Date.   Buyer understands that the Title History may include previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.76    "Title Insurer" will mean First American Title Insurance Company, either itself or by and through its authorized agents, or any other nationally recognized title insurance company as designated by Seller.

1.77    "Title Policy" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.78    "Title Reports" will mean, collectively, (i) the Title History and (ii) the Title Commitment.

1.79    "Wind-up Procedures" will mean any pre-Closing actions and procedures as Seller or Winn-Dixie may consider necessary or appropriate to prepare for the anticipated assignment and transfer of the Assets to Buyer at Closing, including sell-down, liquidation or removal of Inventory, removal of Excluded Personal Property, and related marketing, promotions and advertising at the Store, and closing of the Store.

1.80    "Winn-Dixie" will mean Winn-Dixie Stores, Inc., a Florida corporation.

2.0   **Property Included in Sale.**  Seller agrees to assign, transfer, sell, and convey the Assets to Buyer, and Buyer agrees to assume and purchase the Assets from Seller. The Assets are comprised of the following:

2.1    Seller's leasehold interest, as tenant, under the Lease, and Seller's interest in any leasehold improvements, including the release of Winn-Dixie from any guaranty of Seller's payment and performance obligations under the Lease, which Buyer acknowledges may require delivery of a Replacement Guaranty by a parent Affiliate of Buyer;

2.2    Seller's interest in all fixtures and all equipment located in the store building now existing on the Leased Premises (the "Building"), including but not limited to Seller's interest in (i) any heating and air conditioning system or any facility used to provide a utility service or any other similar service to the Building, elevators, docks, lifts, doors, storefront, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "Improvements"), (ii) Seller's trade fixtures and equipment located in the Building (the "Equipment"), and (iii) the Supplies; and

2.3    Seller's interest, as sublessor, in any Sublease.

Excluded Personal Property is expressly excluded from the Assets to be assigned and

transferred by Seller to Buyer under this Agreement.

3.0 **Purchase Price.**

3.1     Amount.  The purchase price to be paid by Buyer to Seller for the Assets will be the fixed sum of $80,000.00 (the "Purchase Price").  The Purchase Price will be allocated to the Store as set forth in the Allocation Schedule.

3.2     Contract Consideration and Deposit.  As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer will deliver to Escrow Agent, no later than 2 Business Days after the Effective Date, an initial earnest money deposit with respect to the Store in the amount set forth in the Allocation Schedule (the "Initial Deposit"). Furthermore, within 1 Business Day after satisfaction of the Approval Condition, Buyer will deliver to Escrow Agent an additional earnest money deposit in the amount set forth in the Allocation Schedule (the "Second Deposit").   The Initial Deposit, by itself, and together with the Second Deposit, if required to be delivered pursuant to this paragraph, will be referred to herein as the "Deposit".  Buyer will make the Initial Deposit and the Second Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Initial Deposit will be subject to refund to Buyer to the extent and in the circumstances described in paragraphs 4.4, 13.0, 15.0, 16.0 and 22.0.  Upon delivery of the Second Deposit, the Deposit will be non-refundable to Buyer except pursuant to paragraph 16.2.   The applicable portion of the Deposit will be credited against the Purchase Price at Closing and will be held in a non-interest bearing escrow account maintained by Escrow Agent prior to Closing.

3.3     Competitive Bidding Procedures.  Buyer acknowledges that Seller's obligations under this Agreement are subject to the Bidding Procedures and the Bankruptcy Approval Procedures as described in paragraph 5.0 below. Accordingly, the purchase and sale of the Assets may become involved in a competitive bidding process which will entitle Seller, in its sole discretion, to select a higher or otherwise better offer for the Assets than the Purchase Price and other terms and conditions set forth in this Agreement.

3.4     Payment.  The Purchase Price will be paid in the following manner:

3.4.1     *Purchase Price*.   On the Closing Escrow Date, Buyer will deliver to Escrow Agent the Purchase Price, net of the Deposit, and as adjusted as provided under the Closing Statement.   Such funds will be transferred by wire transfer to an account designated in writing by Escrow Agent.  Subject to the conditions set forth in paragraph 10 of this Agreement, on the Closing Date, Seller and Buyer will instruct Escrow Agent to deliver the escrowed funds in payment of the Purchase Price and disbursement of same in accordance with the Closing Statement.

3.4.2     *Certain Transaction Costs*.  All relevant rent, taxes (including real and personal property taxes), utilities, and other payments regarding the Assets will be prorated (based on actual days within the relevant

annual, quarterly, or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Purchase Price payable at the Closing to the extent thereof. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as and when due, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be stipulated at the Closing based on good faith estimates reasonably acceptable to Buyer and Seller. There will be no post-Closing reproration or adjustment of prorated items. Following Closing, Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.4.2 that apply to the period after the Closing will survive the Closing.

3.4.3 *Sales Tax*. Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom.

3.5 Allocation of Purchase Price Among Assets. Buyer will have the right to allocate the Purchase Price, for tax purposes and all other purposes, among the Assets at the Store; provided, however, that such allocation will not be binding upon Seller or determinative with respect to any allocation made by Seller of the Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Cases. The allocation contemplated in the immediately preceding sentence will be set forth with respect to the Assets on the Closing Statement.

## 4.0 **Buyer's Due Diligence.**

4.1 Acknowledgment; Access to Premises.

4.1.1 In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence regarding the Store and the Assets and that Buyer has had the opportunity to consult with Buyer's legal, financial, and tax advisors with respect to the transaction contemplated by this Agreement. Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Store and the Assets and to acquire such additional information about the Store and the Assets as Buyer has reasonably requested. Physical access to the Store will be permitted for Buyer's site visits and inspections, provided that Buyer arranges such access in advance with Seller.

4.1.2 Direct contact with any members of management, employees, or stakeholders of Seller or visits to the Store are not permitted, except upon prior arrangement with Seller's agent, The Food Partners. To

arrange for access to the Store for inspection or to interview Seller's employees, Buyer must contact Seller's representative at The Food Partners: Doug Herman by telephone at 202-589-0438 or by e-mail at dherman@thefoodpartners.com. Such pre-arranged site access will be subject to the following conditions: (a) Buyer will have given Seller at last 24-hours notice of Buyer's proposed entry into a Store or interview of Employees, (b) such entry or interviews will be conducted during normal business hours, (c) Buyer will be accompanied by Seller's representative during such entry and interviews, (d) Buyer's entry will not include any invasive testing or measurements, and (e) Buyer will conduct such investigations and interviews in such a manner so as to avoid disruption of the Seller's business operations in the Store. Furthermore, any such access will comply in all respects with Confidentiality Agreement, except as otherwise may be provided in this paragraph 4.1.

4.2   Title.   Buyer confirms and acknowledges that Seller has made the Title History available to Buyer through the Merrill Website prior to the Effective Date. Seller will deliver the Title Commitment to Buyer within 10 days after the Effective Date. Buyer may request Title Insurer to provide title insurance covering Buyer's leasehold interest in the Lease (the "Title Policy") at Closing, based on the Title Commitment.

4.2.1   If any matter set forth in the Title Commitment for the Store would have a Material Adverse Effect upon the present use or occupancy of such Store, then Buyer may object to such matter by delivery of written notice of objection to Seller given not later than 3 Business Days after the Title Commitment either is delivered to Buyer or is posted on the Merrill Website. To be effective, any such notice of objection must be directed to Seller using e-mail address catherineibold@winn-dixie.com, with a copy using e-mail address dstanford@sgrlaw.com, and must include a subject matter line in capital letters: "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #215".

4.2.2   If Buyer timely notifies Seller of any valid objection to any matter set forth in the Title Commitment, then Seller will have a period of 3 Business Days after such notice in which to notify Buyer in writing either that: (i) Seller declines or is unable to cure such objection (other than Monetary Liens, which Seller will be obligated to cure at or prior to Closing), or (ii) Seller intends to cure or resolve such objection at or prior to Closing. If written notice is given by Seller pursuant to clause (i) above, then Buyer may elect, within 3 Business Days after Seller's notice, either to terminate this Agreement, with no liability to Buyer or Seller, or to waive such objection and proceed with the transaction hereunder, and in the latter event, then Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter and such matter will constitute a Permitted Encumbrance.

4.3   Environmental Reports.   Seller has, to the extent of available information,

posted historical environmental reports on the Merrill Website covering the Real Property. Within 10 days after the Effective Date, Seller will deliver to Buyer and post on the Merrill Website current phase I environmental site assessment reports for the Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where the Store is located (the "<u>Environmental Report</u>").

4.3.1   If Buyer determines that any matter set forth in the Environmental Report would have a Material Adverse Effect upon the present use or occupancy thereof, then Buyer may object to such matter by delivery of written notice of objection to Seller given not later than 3 Business Days after the Environmental Report either is delivered to Buyer or is posted on the Merrill Website.  To be effective, any such notice of objection must be directed to Seller using e-mail address <u>catherineibold@winn-dixie.com</u>, with a copy to e-mail address <u>dstanford@sgrlaw.com</u>, and must include a subject matter line in capital letters: "ENVIRONMENTAL REPORT OBJECTION NOTICE - WINN-DIXIE STORE #215".

4.3.2   If Buyer timely notifies Seller of any valid objection to any matter set forth in the Environmental Report, then Seller will have a period of 3 Business Days after such notice in which to notify in writing Buyer either that: (i) Seller declines or is unable to cure such objection, or (ii) Seller intends to cure or resolve such objection at or prior to Closing.  If written notice is given by Seller pursuant to <u>clause (i)</u> above, then this Agreement will be deemed terminated automatically, with no liability to Buyer or Seller.  If the Environmental Report discloses any condition that affects the Real Property or other Assets that is of a nature that requires reporting to applicable governmental agencies, then Buyer or its consultants will promptly notify Seller in writing of such condition and, unless required by applicable law, Buyer will not contact or report to such agencies with respect to such condition without Seller's prior written consent; <u>provided, however,</u> that in no event will Buyer or its representatives contact such agencies without providing Seller with prior notice of Buyer's intention to make such contact or report, and providing Seller the opportunity to make such contact or report itself in lieu of Buyer.

4.4   <u>Termination Rights</u>.  In the event that Buyer provides timely written notice of its election to terminate this Agreement pursuant to <u>paragraphs 4.2.2 or 4.3.2</u> above, then this Agreement will be deemed terminated as to the Store, and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that if Buyer is not in breach of this Agreement, then Buyer will be entitled to the return from the Escrow Agent of the Deposit.

4.5   <u>Return of Reports and Documents</u>.  If this Agreement is terminated for any reason, then all materials provided by Seller to Buyer and all materials relating to the Assets obtained by Buyer and all copies of any such materials will be delivered to Seller within 5 Business Days following termination.  This paragraph will not in any way limit Buyer's duties to Seller or Winn-Dixie

under the Confidentiality Agreement.

## 5.0 **Bankruptcy Approval Procedures.**

5.1     Competitive Bid Process.  This Agreement is subject to the competitive bid process described in the Bidding Procedures.  Promptly following the expiration of the Review Period, if this Agreement has not otherwise terminated in accordance with its terms as to all of the Assets, then Seller will file a motion with the Bankruptcy Court seeking approval of the transaction contemplated by this Agreement, subject to higher or better offers, and the transfer of the Assets free and clear of all claims and liens including the Credit Liens, other than Permitted Encumbrances, pursuant, inter alia, to 11 U.S.C. Sections 105 and 363 (the "Sale Motion").  The Bankruptcy Court will set a date for hearing on the Sale Motion (the "Sale Hearing") and to consider entry of the Sale Order relating to the Successful Bid, as defined in the Bidding Procedures.  The Bidding Procedures allow Seller to accept competitive bids on the Assets.  If an acceptable competitive bid is received, Seller may conduct an auction prior to the Sale Hearing pursuant to the Bidding Procedures (the "Auction").  The party submitting the Successful Bid for the Assets as selected by Seller is referred to as the "Successful Bidder".  Buyer may participate in the Auction, and may submit purchase terms different from those set forth in this Agreement as Buyer may deem appropriate in seeking to become the Successful Bidder.  Prior to the Sale Hearing, upon consultation with the Creditors' Committee and the lender holding the Credit Agreement Liens (the "DIP Lender"), Seller will select the highest or otherwise best offer to purchase the Assets, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, as the Successful Bid.  Seller will submit the Successful Bid to the Bankruptcy Court at the Sale Hearing, for entry of a Sale Order with respect to the Assets by the Bankruptcy Court, either (a) approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transaction contemplated herein, if Buyer is the Successful Bidder under the terms of this Agreement (or as modified during the Auction) or (b) approving the more favorable terms of purchase and sale offered by the Successful Bidder, whether Buyer or otherwise (the "Sale Order").

5.2     Sale Order Approving Agreement.  It will be a condition to the Closing of the transaction contemplated by this Agreement that the Bankruptcy Court will have issued the Sale Order approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transaction contemplated herein, and such Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Approval Condition").

5.3     Continuing Effectiveness of Agreement.  Notwithstanding that Buyer may not be the Successful Bidder following the Bidding Procedures, this Agreement, as modified by Buyer's last bid made during the Bidding Procedures, will remain in effect in accordance with, and will remain subject to, the Bidding Procedures. If the Approval Condition is not otherwise satisfied by the Outside Date through no fault of Buyer or if the sale of the Assets closes with

another Successful Bidder, then this Agreement automatically will terminate and Escrow Agent will refund the Deposit to Buyer, and the parties will have no further obligations to the other.

**6.0   Representations and Warranties of Seller Relating to the Assets.**  To induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

6.1   On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format, or on the Merrill Website: (i) copies of the Lease (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a)   copies of the Title History;

(b)   copies of environmental history for the Store;

(c)   copies of the site plans or boundary surveys for the Store;

(d)   copies of the fixture plans for the Store; and

(e)   a list of the Equipment (other than Excluded Personal Property) as reflected in Seller's current records;

it being understood that the materials described in this paragraph 6.1 have been provided for informational purposes only with no representations or warranties by Seller as to accuracy, completeness, or otherwise.

6.2   At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Monetary Liens and other encumbrances, other than the Permitted Encumbrances, to the extent provided under Section 363 of the Bankruptcy Code.

**7.0   General Representations and Warranties of Seller.**  In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

7.1   Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Florida and, subject to satisfaction of the Approval Condition, has the power and authority to consummate the transaction contemplated herein.  This Agreement and any closing document to which Seller is or is to become a party, which includes the transaction contemplated by this Agreement and any closing documents thereto, have, subject to satisfaction of the Approval Condition, been duly authorized by all required corporate action on behalf of Seller.

7.2   No consent, license, approval, or authorization of, or filing, registration, or

declaration with, or exemption or other action by any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery, or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party to the transaction herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, and (iii) Bankruptcy Court approvals issued in satisfaction of the Approval Condition.

7.3    Subject to satisfaction of the Approval Condition, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4    To Seller's Knowledge, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a Material Adverse Effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

7.5    None of the employees employed by Seller in the Store is covered by a union contract, collective bargaining agreement, or other labor agreement.

7.6    Seller has not engaged any brokers in connection with the transaction contemplated by this Agreement, except Seller's Brokers.

8.0    **Buyer's Representations and Warranties.**  In order to induce Seller to enter into this Agreement and to sell, assign, and convey the Assets to Buyer as provided herein, Buyer represents and warrants to Seller as follows:

8.1    Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Florida, and is licensed to transact business in the State in which the Assets are located, and has the power and authority to consummate the transaction contemplated herein. This Agreement and each of the closing documents to which Buyer is or is to become a party, which includes the transaction contemplated by this Agreement and any closing documents thereto, have been duly authorized by all required limited liability company action on behalf of Buyer.

8.2    No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transaction herein or therein contemplated, other than (i) those that have been obtained and are in full

force and effect, (ii) approvals, if any, required under the HSR Act, and (iii) Bankruptcy Court approvals issued in satisfaction of the Approval Condition.

8.3    This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

8.4    There is no action, suit, or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

8.5    Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

8.6    As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit, or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it herein.

9.0    **Covenants of Seller.**  Seller hereby covenants for the benefit of Buyer as follows:

9.1    Subject to the Wind-up Procedures, Seller will maintain the Store in its present condition, reasonable wear and tear, casualty loss, and condemnation impacts excepted.

9.2    Subject to the Wind-up Procedures, Seller will not sell, dispose of, abandon, or remove the Assets from the Store or agree to do so except in the ordinary course of business.

9.3    During implementation of the Wind-up Procedures, Seller will use commercially reasonable efforts to remove all Excluded Personal Property from the Store on or before the Closing Date, except that Buyer will remove and dispose of Seller's signs and panels that are part of the Excluded Personal Property as more fully provided in paragraph 10.2 of this Agreement.

9.4    Following satisfaction of the Approval Condition, Seller will release to Buyer a schedule of Seller's current employees at the Store, and will permit Buyer, at reasonable times during normal business hours and with minimum impact on Seller's business, to arrange for personal interviews with Store managers and other Store employees, at times and places mutually agreeable to both Seller and Buyer, and to arrange for those relevant employees of Seller, who are interested in potential employment with Buyer, to interview with Buyer.

9.5    Seller will transfer or terminate all of its employees working at each Store on or before the Closing Date, except to the extent otherwise required by the Family Medical Leave Act.

9.6    Seller will cooperate reasonably with Buyer, upon written request, with respect to Buyer's performance of its covenants under paragraph 10.0 of this Agreement.

The covenants set forth in this paragraph 9.0 that relate to any period after Closing for the Store will survive the Closing.

10.0    **Covenants of Buyer.**  Buyer hereby covenants for the benefit of Seller as follows:

10.1    Buyer will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11.0 of this Agreement.

10.2    Within 48 hours after the Closing Date, Buyer will, at Buyer's sole cost and expense, remove from the Store, destroy, and lawfully dispose of all signs and panels that are part of the Excluded Personal Property.    Without limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 16.5 of this Agreement will encompass any breach by Buyer of this paragraph 10.2.

10.3    Buyer will use commercially reasonable efforts to take or cause to be taken all actions to assist and cooperate with Seller in doing all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transaction contemplated by this Agreement.

10.4    Buyer will provide the Adequate Assurance Information to Seller, the Bankruptcy Court, Landlord, and any Subtenants as reasonably may be requested.

The covenants set forth in this paragraph 10.0 that relate to any period after Closing for the Store will survive the Closing.

11.0    **Conditions Precedent to Buyer's Obligations.**  The obligations of Buyer under this Agreement are subject to satisfaction of the Approval Condition, and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t 99 Cent Supercenter LLC
Store No. 215
May 9, 2006
SGRJAX\85341.2

herein):

11.1   Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of paragraph 6.1 of this Agreement), all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Seller's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2   No order, injunction, or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transaction contemplated by this Agreement will be in effect, and, if the transaction contemplated herein is determined to be subject to regulatory review and approval under the HSR Act, then such approval or clearance will have been obtained.

11.3   The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) will have been waived by the Bankruptcy Court or will have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer will have the right to terminate this Agreement pursuant to paragraph 15.1.4 of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies, and obligations, including any right of termination, will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to paragraph 15.1.4.

12.0   **Conditions Precedent to Seller's Obligations.**  The obligations of Seller under this Agreement are subject to satisfaction of the Approval Condition and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

12.1   Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are

qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. All of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

12.2   No order, injunction, or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transaction contemplated by this Agreement will be in effect, and, if the transaction contemplated herein is determined to be subject to regulatory review and approval under the HSR Act, then such approval or clearance will have been obtained.

12.3   The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) will have been waived by the Bankruptcy Court or will have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller will have the right to terminate this Agreement pursuant to paragraph 15.1.5 of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies, and obligations, including any right of termination, will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to paragraph 15.1.5.

13.0   **Loss by Fire or Other Casualty; Condemnation**.  Prior to the Closing, if the Store, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with the Store, then either Buyer or Seller will have the right, exercisable by giving notice of such decision to the other within 5 Business Days after receiving written notice of such damage, destruction, or condemnation proceedings, to terminate this Agreement, and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that if Buyer is not in breach of this Agreement, then Buyer will be entitled to the return from Escrow Agent of the Deposit.  If neither party exercises such right of termination as affected by such casualty or proceeding and the Store is sold to Buyer pursuant to the terms of this Agreement, then, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

14.0   **Closing Date and Closing**.

14.1   Closing Date; Procedures.  Promptly following satisfaction of the Approval Condition, Seller will designate a Business Day reasonably acceptable to Buyer that falls on or before the Outside Date as the closing date for the

Store. Such designated closing date is referred to herein as the "Closing Date." The Closing will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

14.2    Seller's Closing Deliveries. Subject to the conditions contained in paragraph 12.0 of this Agreement, on or before the Closing Escrow Date as determined based on the designated Closing Date, Seller will deliver the following ("Seller's Escrowed Items") into escrow with Escrow Agent:

    (i)    Two counterparts of the Conveyance Instrument, executed by Seller;

    (ii)    The Bill of Sale, executed by Seller;

    (iii)    Two counterparts of the Closing Statement, executed by Seller;

    (iv)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; provided, however, that in no event will Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion; and

    (v)    Any other documents, instruments, or agreements called for herein for delivery by Seller that have not previously been delivered.

Buyer may waive Seller's compliance as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement. Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent, will not be deemed to be an acknowledgement by Seller that the conditions of paragraph 12.0 of this Agreement have been fulfilled or waived until Seller's Closing Direction is delivered.

14.3    Buyer's Closing Deliveries. Subject to the conditions contained in paragraph 11.0 of this Agreement, on or before the Closing Escrow Date as determined based on the designated Closing Date, Buyer will deliver the following ("Buyer's Escrowed Items") into escrow with Escrow Agent:

    (i)    Two counterparts of the Conveyance Instrument, executed by Buyer;

    (ii)    Two counterparts of the Replacement Guaranty, if required, executed by the requisite parent Affiliate of Buyer;

    (iii)    Two counterparts of the Closing Statement, executed by Buyer;

    (iv)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; and

    (v)    Any other document, instrument, or agreement called for herein for

delivery by Buyer that has not previously been delivered.

(vi)     All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to paragraph 3.0 of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by paragraph 17.6 of this Agreement.  Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will not be deemed to be an acknowledgement by Buyer that the conditions of paragraph 11.0 of this Agreement have been fulfilled or waived until Buyer's Closing Direction is delivered.

14.4    Title Insurer Requirements.  On the Closing Date, Seller and Buyer will each deposit with Escrow Agent such other instruments as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the Assets in accordance with the terms hereof; provided, however, that in no event will Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion.

14.5    Payment of Closing Costs.  Except as provided in paragraph 16.0 of this Agreement, at or before Closing for the Store, or if Closing does not occur due to earlier termination of this Agreement in accordance with its terms, (i) Seller will pay Seller's Closing Costs; and (ii) Buyer will pay Buyer's Closing Costs.

14.6    Closing Direction.  On the Closing Date, Escrow Agent will notify Buyer and Seller, if this be the case, that Escrow Agent is in possession of all of Seller's Escrowed Items and all of Buyer's Escrowed Items and is prepared to release such items for legal delivery subject only to receipt of (i) written notice from Seller or Seller's counsel to Escrow Agent and Buyer confirming that Seller is prepared to proceed to closing and that all of the conditions of paragraph 12.0 of this Agreement have been fulfilled or otherwise waived ("Seller's Closing Direction"), and (ii) written notice from Buyer or Buyer's counsel to Escrow Agent and Seller confirming that Buyer is prepared to proceed to closing and that all of the conditions of paragraph 11.0 of this Agreement have been fulfilled or otherwise waived ("Buyer's Closing Direction").  Upon receipt of Buyer's Closing Direction and Seller's Closing Direction, Escrow Agent will be deemed authorized and directed to release and disburse, as appropriate, the Seller's Escrowed Items and the Buyer's Escrowed Items, without further condition, on the Closing Date.

14.7    Closing Turnover.  Contemporaneously with delivery of the latter of Seller's Closing Direction and Buyer's Closing Direction to Escrow Agent, all right, title, and interest of Seller in and to the Assets will pass to Buyer, and Seller thereafter will have no further right, title, interest, or obligation with respect to the Store or the Assets, except as may be expressly provided in this Agreement.   Promptly following Closing, Seller will turn over to Buyer exclusive physical possession of the Store and the Assets associated therewith, including, to the extent in Seller's possession, control or custody,

all keys, combinations to safes, security codes, and passwords, and Buyer may commence preparation for opening of the Store as a Buyer's store, including, without limitation, disconnecting items of equipment that are included in Excluded Personal Property and moving such items aside, and commencing electrical and wiring work required in order to install Buyer's point of sale and other equipment, signage, and similar items.

14.8 <u>Closing Deliveries and Disbursements</u>.   Subject to satisfaction of the requirements set forth in <u>paragraph 14.6</u> above, at the commencement of business on the Closing Date, Escrow Agent will release and disburse, as appropriate, the Buyer's Escrowed Items and the Seller's Escrowed Items, with disbursements of Buyer's Closing Costs, Seller's Closing Costs, and the Purchase Price, as provided in the Closing Statement.

## 15.0 **Termination**.

15.1 <u>Termination</u>. This Agreement may be terminated, and the transaction contemplated herein abandoned, only as follows:

15.1.1 by written consent of Seller and Buyer, in which case the applicable Deposit will be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the Deposit, then Escrow Agent will pay over the Deposit to Seller as consideration for Seller's agreement to terminate this Agreement);

15.1.2 at the election of Seller if and to the extent permitted under <u>paragraph 16.1</u> of this Agreement, in which case the Deposit will be disbursed as provided in such <u>paragraph 16.1</u>;

15.1.3 at the election of Buyer if and to the extent permitted under <u>paragraph 16.2</u> of this Agreement, in which case the Deposit will be disbursed as provided in such <u>paragraph 16.2</u>;

15.1.4 at the election of Buyer if any of the conditions set forth in <u>paragraph 11.0</u> of this Agreement has not been satisfied or waived by Buyer on or before the Outside Date, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies, and obligations, including any right of termination, will be determined in accordance with <u>paragraph 16.0</u> of this Agreement rather than pursuant to this <u>paragraph 15.1.4</u>;

15.1.5 at the election of Seller if any of the conditions set forth in <u>paragraph 12.0</u> of this Agreement has not been satisfied or waived by Seller on or before the Outside Date, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies, and obligations, including any

right of termination, will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to this paragraph 15.1.5;

15.1.6   at the election of Buyer or Seller as provided in paragraph 4.4, 13.0, or 22.0 of this Agreement, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach of this Agreement, then Buyer's and Seller's respective rights, remedies, and obligations (including any right of termination) will be determined in accordance with paragraph 15.2 of this Agreement rather than pursuant to this paragraph 15.1.6;

15.1.7   at the election of Seller, if this Agreement is terminated by Buyer for any reason, including, without limitation, because of Seller's breach of this Agreement, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time such election is made, Buyer is in breach of this Agreement, then Buyer's and Seller's respective rights, remedies, and obligations (including any right of termination) will be determined in accordance with paragraph 15.2 of this Agreement rather than pursuant to this paragraph 15.1.7;

15.1.8   at the election of Seller (A) if this Agreement is not the Successful Bid with respect to the Store or (B) if the Approval Condition is not satisfied or (C) if this Agreement is terminated by Seller for any reason other than as provided in paragraph 15.1.9 below, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach of this Agreement, then Buyer's and Seller's respective rights, remedies, and obligations (including any right of termination) will be determined in accordance with paragraph 15.2 of this Agreement rather than pursuant to this paragraph 15.1.8;

15.1.9   at the election of Seller, if the Cure Costs with respect to the Lease exceed 15% of the Purchase Price, provided that in such case Seller may terminate this Agreement under this paragraph 15.1.9, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time such election is made Buyer is in breach with respect to this Agreement, then Buyer's and Seller's respective rights, remedies, and obligations (including any right of termination) will be determined in accordance with paragraph 15.2 of this Agreement rather than pursuant to this paragraph 15.1.9; or

15.1.10  at the election of Buyer or Seller, if the Closing has not occurred on or before the Outside Date for any reason other than as contemplated in paragraphs 15.1.1 through 15.1.9 of this Agreement, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided that neither Buyer nor Seller, as the case may be, will be entitled to terminate this Agreement pursuant

to this paragraph 15.1.10 if such party's breach of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies, and obligations (including any right of termination) will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to this paragraph 15.1.10.

15.2    Reservation of Remedies.  Upon any termination of this Agreement pursuant to paragraphs 15.1.3 through 15.1.10 of this Agreement, each party will retain those rights (if any) it may have under paragraph 16.0 of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

16.0    **Default and Remedies**.

16.1    Buyer's Default.  If the Closing as contemplated under this Agreement is not consummated due to Buyer's breach of this Agreement, or if this Agreement is terminated due to Buyer's breach of this Agreement, then Seller will be entitled, as its sole and exclusive remedy for such breach, (A) to terminate this Agreement or (B) to receive the Deposit (the "Liquidated Deposit") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof.  Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity. Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages.  The right to receive the Liquidated Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by Buyer, and Seller hereby waives and releases any right to (and Seller hereby covenants that it will not) sue Buyer: (a) for specific performance of this Agreement or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit.  Buyer hereby waives and releases any right to (and hereby covenants that it will not) sue Seller or seek or claim a refund of the Liquidated Deposit (or any part thereof) on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages.  This paragraph 16.1 is subject to paragraph 16.3 and 16.4 of this Agreement.

16.2    Default by Seller.   In the event of Seller's breach of its covenants, representations, or warranties as provided in this Agreement, or if, following satisfaction of the Approval Condition, the sale of the Store as contemplated under this Agreement is not consummated due to Seller's refusal or inability to Close the transaction contemplated herein, then Buyer will be entitled, as its sole and exclusive remedy for such breach, to receive the return of the Deposit, which return will operate to terminate this Agreement and release Seller from any and all liability under this Agreement. Buyer expressly waives and releases (i) any right to seek specific performance of Seller's obligations

under this Agreement and (ii) any right to seek or collect any damages, including any actual, consequential, speculative, remote, or punitive damages. This paragraph 16.2 is subject to paragraphs 16.3 and 16.4 of this Agreement.

16.3   Notice of Default; Opportunity to Cure.   Neither Seller nor Buyer will be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within 5 Business Days after receipt of such notice; provided, however, that this paragraph 16.3: (i) will not be applicable to Buyer's failure to deliver any Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Real Property Escrow Date or the Closing Date and, accordingly, (ii) will not have the effect of extending the Closing Date or the due date of the Deposit.

16.4   Recoverable Damages.   In no event will the provisions of paragraphs 16.1 and 16.2 of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreement and paragraphs 16.5 and 17.3 of this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees, or expenses under the Confidentiality Agreement and paragraphs 3.4.2 and 3.4.3 of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs. In addition, if this Agreement is terminated for any reason, and Buyer or any Affiliate of Buyer asserts any claim or right to the Assets that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to the Assets, then Seller will have all rights and remedies available at law or in equity with respect to such assertion by Buyer and any loss, damage, or other consequence suffered by Seller as a result of such assertion.

16.5   Buyer Indemnification of Seller.   Buyer will indemnify and save and hold harmless Seller and its Affiliates and representatives from and against any and all costs, losses liabilities, damages, lawsuits, deficiencies, claims, and expenses (whether or not arising out of third-party claims), including, without limitation, interest, penalties, reasonable attorneys' fees, and all amounts paid in investigation, defense, or settlement for any of the foregoing (herein, the "Damages") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by Buyer (including any payment obligation), or the inaccuracy of any representation made by Buyer in or pursuant to this Agreement or other transaction documents, (b) any liability, obligation, or commitment of any nature (absolute, accrued, contingent, or otherwise) of Buyer that is due to or arises in connection with Buyer's acts or omissions prior to, on, or after the Closing Date, including any claim, liability, or obligation that is assumed by Buyer pursuant to this Agreement or in any transaction documents signed by Buyer.   Notwithstanding the foregoing, Buyer will not be liable for any matter (i) with respect to which Seller has not given Buyer written notice within a reasonable period of time following Seller's receiving written notice of such matter, specifying the claim and the

basis for the claim in reasonable detail (unless the failure to provide such information did not have a Material Adverse Effect on Buyer), or (ii) that is due to Seller's acts or omissions. The provisions of this paragraph 16.5 will cover all obligations and liabilities of whatsoever kind, nature, or description relating, directly or indirectly, to product liability, third party litigation, or third party claims against Buyer or Seller in connection with, arising out of, or relating to the Assets. This paragraph 16.5 will survive the Closing or earlier termination of this Agreement.

16.6    Mutuality of Remedies.  Buyer and Seller each hereby knowingly, voluntarily, and intentionally waive and relinquish the right to assert mutuality of remedies as a defense to enforceability of this Agreement by either party.

## 17.0    Miscellaneous.

17.1    Notices. All notices, requests, demands, offers, and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this paragraph 17.1 and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, 3 days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested; or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn: Michael Chlebovec, Director – Asset Management
Telefax No.: 904 783-5646
e-mail: *michaelchlebovec@winn-dixie.com*

With a copy to:

Winn-Dixie Stores, Inc. – Legal Department
5050 Edgewood Court
Jacksonville, Florida 32254-3699
Attn: Catherine B. Ibold, Esquire, Group Leader - Real Estate
Telefax No.: 904-783-5138

e-mail: *catherineibold@winn-dixie.com*

and

Smith, Gambrell & Russell, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Attn: Douglas G. Stanford, Esquire
Telefax No.: 904-598-6300
e-mail: *dstanford@sgrlaw.com*

If to Buyer:

99 Cent Supercenter LLC
PO BOX 630099
Miami, Florida 33163
Attn: Cobie Elharar
Telefax No.: 305-653-2060
e-mail: *cobie@99supercenters.com*

With a copy to:

Horizon properties
7785 NW 146th St.
Miami Lakes, Florida 33016
Attn: Michael Behar
Telefax No.: 305-364-9980
e-mail: *mbehar@horizonpropertiesfl.com*

If to Escrow Agent:

Smith, Gambrell & Russell, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Attn: Douglas G. Stanford, Esquire
Telefax No.: 904-598-6300
e-mail: *dstanford@sgrlaw.com*

or such other address as any party may from time to time specify by notice to the other.

17.2    <u>Notice of Certain Inquiries</u>.  If any party is contacted, whether before or after the Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to the transaction contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

17.3    <u>Brokers and Finders</u>.    The parties agree that there is no brokerage commission due in connection with the transaction contemplated by this Agreement other than that due by Seller to Seller's Brokers.  Seller agrees to

pay all fees and commissions claimed by Seller's Brokers as a result of the transaction contemplated by this Agreement, which fees and commissions will be considered payable with respect to the Store only if, as and when the Closing contemplated by this Agreement occurs.  Except for Seller's Brokers, neither Seller nor Buyer has dealt with any investment adviser, real estate broker, real estate consultant, or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement.  Seller and Buyer hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions, or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts, said indemnifications by Seller and Buyer to survive the Closing or earlier termination of this Agreement.

17.4    Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

17.5    Assignment.  Neither Seller nor Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole discretion of the party whose consent is so required.  No assignment by Buyer will release or relieve Buyer of its liabilities and obligations hereunder, which will remain in full force and effect notwithstanding any such assignment.

17.6    Amendments.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller and Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to approval of the Bankruptcy Court, if applicable.

17.7    Governing Law.   The application and effect of this Agreement as to any particular Store or Stores will be governed by and construed in accordance with the laws of the State in which the Store is located; the application and effect of this Agreement as to any matter of the rights and obligations of the parties generally will be governed by and construed in accordance with the laws of the State of Florida.

17.8    Merger of Prior Agreements.   This Agreement, together with the Confidentiality Agreement which is hereby incorporated into this Agreement by reference, supersedes all prior agreements and understandings between the parties hereto and constitutes the entire agreement of the parties with respect to the matters contained herein.  **BUYER ACKNOWLEDGES ITS OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT CONTINUE AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THIS AGREEMENT.**

17.9    Survival.  Acceptance by Buyer of the Conveyance Instrument will constitute an acknowledgement by Buyer that all of Seller's representations, covenants, and obligations under this Agreement and all conditions to Buyer's obligations

to close under this Agreement have been performed, satisfied, and/or waived. Seller's representations, warranties, covenants, and obligations under this Agreement will not survive the Closing but will merge into the Conveyance Instrument, and will have no further force or effect after the Closing, except that those covenants of Seller under paragraph 18.3 of this Agreement that are expressly provided to be performed after the Closing will survive.  All representations, warranties, and covenants of obligations of Buyer under this Agreement will survive the Closing.    In addition, all representations, covenants, and obligations of Buyer under the Confidentiality Agreement will survive the termination or consummation of this Agreement.

17.10  Time is of the Essence.  Time is of the essence for this Agreement.

17.11  No Recordation.  This Agreement will not be recorded in any public office or court other than as part of the process of satisfying the Approval Condition or in connection with any HSR Act requirement, except that upon default it may be presented to a court of competent jurisdiction.

17.12  State Specific Provisions:

17.12.1    **With respect to Florida**: Radon Gas.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county health department.

17.12.2    [Intentionally deleted]

## 18.0  **Escrow Agent**.

18.1  Duties.  By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent.  Upon its receipt of funds from Buyer, Escrow Agent will receive and hold such funds and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.

18.2  Indemnity.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent.  If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all loss, cost, damage, liability, or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct.  If the indemnity amounts payable herein result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts.  Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.

18.3 <u>Dispute</u>.  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor.  In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Buyer is not the prevailing party in such action or proceeding.  If there is no prevailing party, Seller and Buyer each will be responsible for one-half of such costs and fees.

18.4 <u>Execution by Escrow Agent</u>.  Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this <u>paragraph 18.0</u>.  Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this <u>paragraph 18.0</u> will not be required.

19.0 **Waiver of Jury Trial**.  Buyer and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transaction contemplated herein undesirable.  Accordingly, Buyer and Seller each knowingly, voluntarily, and intentionally waive any right to a trial by jury that either of them may have in any court with respect to any action relating to this Agreement or the transaction contemplated herein.

20.0 **Confidentiality**.  Buyer acknowledges and agrees that Seller is a beneficiary of the Confidentiality Agreement and is entitled to enforce all obligations of Buyer and exercise all rights and remedies of Winn-Dixie under such agreement, acting alone or acting jointly with Winn-Dixie.  The Confidentiality Agreement will be a continuing agreement of Buyer and Winn-Dixie, and will be applicable to the transaction that are the subject matter herein to the same extent as if the Confidentiality Agreement was fully incorporated into this Agreement.

21.0 **<u>Consent to Jurisdiction.</u> THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTION AND THE INTERPRETATION, IMPLEMENTATION, AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.**

Buyer and Seller further agree that service of any process, summons, notice, or document by U.S. registered mail to any such party's respective address set forth in <u>paragraph 17.1</u> of this Agreement will be effective service of process for any action, suit, or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above.   Each of Buyer and Seller irrevocably and unconditionally waive any objection to the laying of venue of any action, suit, or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waive and agree not to plead or claim in such court that any

such action, suit, or proceeding brought in such court has been brought in an inconvenient forum. If a court finds that subject-matter jurisdiction is not available in the Bankruptcy Court, Buyer and Seller hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of the U.S. District Court for the Middle District of Florida, Jacksonville Division, or if such court will not have jurisdiction, then to the appropriate courts of the State of Florida sitting in Duval County, Florida.

22.0 **HSR Filings.** The parties anticipate that the transaction contemplated herein is exempt from review and filing under the HSR Act. However, if for any reason the transaction contemplated herein is determined to be subject to regulatory review and clearance or approval under the HSR Act, then either Buyer or Seller will have the right, exercisable prior to satisfaction of the Approval Condition by giving notice of such decision to the other within 5 Business Days after receiving written notice of such HSR Act requirements, to terminate this Agreement and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that if Buyer is not then in breach of this Agreement, then Buyer will be entitled to the return from the Escrow Agent of the Deposit. This termination right is not exercisable after satisfaction of the Approval Condition. If neither party exercises its right of termination as provided above, or if such right of termination is no longer exercisable, then Seller and Buyer will seek regulatory approval or HSR clearance and prepare and submit, in a timely manner, all necessary filings for Seller and Buyer in connection with this Agreement under the HSR Act and the rules and regulations thereunder, and it will be a condition precedent to the obligations of both Buyer and Seller that all such required HSR Act approvals or clearance are obtained, as provided in paragraph 11.2 and paragraph 12.2 above. In such latter event, Seller and Buyer will request expedited treatment of such HSR Filing by the Federal Trade Commission, will make promptly any appropriate or necessary subsequent or supplemental filings, and will furnish to each other copies of all HSR Filings at the same time as they are filed with the appropriate governmental authority, except to the extent such party is legally restricted from providing or believes, based where appropriate on the advice of counsel, that it should not provide such copies, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds, or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

23.0 **Disclaimers and Waivers.**

23.1 **NO RELIANCE ON DOCUMENTS. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN PARAGRAPHS 6.0 AND 7.0 HEREOF (THE "CONTRACT WARRANTIES"), SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY, OR COMPLETENESS OF ANY MATERIALS, DATA, OR INFORMATION DELIVERED BY OR ON BEHALF OF SELLER TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY. BUYER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA, AND INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING, IN ELECTRONIC FORMAT, OR ON THE MERRILL**

WEBSITE) ARE PROVIDED TO BUYER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA, OR INFORMATION BY BUYER WILL BE AT THE SOLE RISK OF BUYER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER ACKNOWLEDGES AND AGREES THAT (A) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL, OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER WILL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (B) BUYER WILL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED BY SELLER OR ANY AFFILIATE TO BUYER, BUT RATHER WILL RELY ON ITS OWN INVESTIGATIONS AND ANY REPORTS COMMISSIONED BY BUYER WITH RESPECT THERETO, AND (C) NEITHER SELLER, ANY AFFILIATE OF SELLER, NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE BY SELLER, OR ANY AFFILIATE TO BUYER, WILL HAVE ANY LIABILITY TO BUYER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

23.2    **Disclaimers**.  EXCEPT FOR THE CONTRACT WARRANTIES,  BUYER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY, OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS, OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS. BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER WILL SELL AND CONVEY TO BUYER AND BUYER WILL ACCEPT THE ASSETS "AS IS, WHERE IS, WITH ALL FAULTS".  BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND NEITHER SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER OR ANY AFFILIATE, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT, OR ON THE MERRILL WEBSITE, OTHER THAN THE CONTRACT WARRANTIES.

BUYER ACKNOWLEDGES THAT BUYER'S ACCESS AND INSPECTION

RIGHTS HAVE BEEN LIMITED AS SET FORTH IN THIS AGREEMENT AND THAT BUYER UNDERSTANDS THE RISKS ASSOCIATED WITH PURCHASING THE ASSETS ON THE BASIS OF SUCH LIMITED INVESTIGATIONS.   BUYER  REPRESENTS  TO  SELLER  THAT NOTWITHSTANDING SUCH LIMITATIONS BUYER HAS CONDUCTED SUCH INVESTIGATIONS AS BUYER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE ASSETS AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE ASSETS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION), AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AFFILIATES, AGENTS, OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN THE CONTRACT WARRANTIES. UPON CLOSING, BUYER WILL ASSUME THE RISK THAT ADVERSE  MATTERS,  INCLUDING,  BUT  NOT  LIMITED  TO, CONSTRUCTION  DEFECTS  AND  ADVERSE  PHYSICAL  AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS, AND BUYER, UPON CLOSING, WILL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER AND SELLER'S AFFILIATES (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AND AGENTS) FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT OR UNDER ANY ENVIRONMENTAL LAW), LOSSES, DAMAGES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE), LOSSES, DAMAGES, LIABILITIES, COSTS, AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AND SELLER'S AFFILIATE'S (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AND AGENTS) AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT  OR  PATENT  CONSTRUCTION  DEFECTS  OR  PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS), AND ANY AND ALL  OTHER  ACTS,  OMISSIONS,  EVENTS,  CIRCUMSTANCES,  OR MATTERS REGARDING THE ASSETS.

BUYER AGREES THAT SHOULD ANY INVESTIGATION, CLEANUP, REMEDIATION, OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION) ON OR RELATED TO THE ASSETS BE REQUIRED AFTER THE DATE OF CLOSING, NEITHER SELLER NOR ANY AFFILIATE WILL HAVE ANY LIABILITY TO BUYER TO PERFORM OR PAY  FOR  SUCH  INVESTIGATION,  CLEAN-UP,  REMOVAL,  OR REMEDIATION, AND BUYER EXPRESSLY WAIVES AND RELEASES ANY CLAIM TO THE CONTRARY.

BUYER  FURTHER  ACKNOWLEDGES  THAT  (1)  THE  CONTRACT WARRANTIES WILL NOT SURVIVE THE CLOSING BUT WILL MERGE INTO THE CONVEYANCE INSTRUMENT, AND WILL HAVE NO FURTHER

**FORCE OR EFFECT AFTER THE CLOSING FOR SUCH STORE AND (2) THE LIABILITY OF SELLER UNDER OR WITH RESPECT TO THE CONTRACT WARRANTIES WILL BE LIMITED TO THE EXPRESS REMEDIES OF BUYER SET FORTH IN THIS AGREEMENT.**

**BUYER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS, AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY BUYER, AND BUYER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OF BUYER'S CHOICE WITH REGARD TO THE TERMS OF SUCH DISCLAIMERS, WAIVERS, AND RELEASES.  BUYER ACKNOWLEDGES AND WARRANTS THAT BUYER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS, AND RELEASES IS FREE AND VOLUNTARY.**

23.3    <u>Effect and Survival of Disclaimers</u>.  Seller and Buyer acknowledge that the provisions of this <u>paragraph 23.0</u> are an integral part of the transaction contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller would not enter into this Agreement but for the provisions of this <u>paragraph 23.0</u>.  Seller and Buyer agree that the provisions of this <u>paragraph 23.0</u> will survive Closing or any earlier termination of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, Buyer and Seller have executed this Agreement as of the Effective Date.

Signed, sealed and delivered  
in the presence of the following  
subscribing witnesses:

**SELLER:**

**WINN-DIXIE STORES, INC.,**  
a Florida corporation

_____  
Name: _____

By: _____  
Name: _____  
Title: _____

_____  
Name: _____


Signed, sealed and delivered  
in the presence of the following  
subscribing witnesses:

**BUYER:**

**99 CENT SUPERCENTER LLC,**  
a Florida Corporation

_____  
Name: _____

By: _____  
Name: Cobie ELharar  
Title:   COO

_____  
Name: _____


[NOTE: WITNESSES AND OTHER FORMALITIES OF EXECUTION  
TO BE CONFORMED TO APPLICABLE STATE REQUIREMENTS, IF ANY]

Acknowledged and agreed this _____ day of _____, 2006 for the limited purposes set forth in paragraph 18.0 of this Agreement:

**ESCROW AGENT:**

**SMITH, GAMBRELL & RUSSELL, LLP**

By: _____
Name: Douglas G. Stanford
Title:   Partner

Schedule of Exhibits

Exhibit A  –   Lease and Property Descriptions
Exhibit B  –   Allocation Schedule
Exhibit C  –   Form of Bill of Sale
Exhibit D  –   Form of Closing Statement
Exhibit E  –   Confidentiality Agreement
Exhibit F  –   Form of Conveyance Instrument
Exhibit G  –   Schedule of Excluded Personal Property
Exhibit H  –   Schedule of Permitted Encumbrances