## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 05-3817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | Chapter 11 |
| Debtors. | ) | Jointly Administered |

## NOTICE OF HEARING AND FILING

1.        Pursuant to the Amended Motion for Order (a) Authorizing the Sale of Additional Stores and Related Equipment Free and Clear of Liens, Claims and Interests, (b) Authorizing the Assumption and Assignment or Alternatively, the Rejection of Leases and Establishing a Claim Bar Date, and (c) Granting Related Relief filed with the Court on April 26, 2006 (the "Motion") (Docket No. 7517), Winn-Dixie, Inc. and its subsidiaries and affiliates as debtors and debtors-in-possession (collectively, the "Debtors"), provide notice of their intent to enter into an agreement with Wal-Mart Stores, Inc. in substantially the form attached, for the Debtors' lease of store number 217 located in Pompano Beach, Florida for $625,000 pursuant to an order of the Court in substantially the form attached as Exhibit E to the agreement (the "Sale").

### Notice of Hearing

2.        A hearing to approve the Sale is scheduled for **May 18 at 1:00 p.m. E.T.** before the Honorable Jerry A. Funk, United States Bankruptcy Judge for the Middle District of Florida, 300 North Hogan Street, Courtroom 4D, Jacksonville, Florida 32202.  The deadline for filing objections is May 17, 2006.

Dated:  May 10, 2006.

| | |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | SMITH HULSEY & BUSEY |
| By    _s/ D. J. Baker_ | By    _s/ Cynthia C. Jackson_ |
| D. J. Baker | Stephen D. Busey |
| Sally McDonald Henry | James H. Post |
| Rosalie Gray | Cynthia C. Jackson (FBN 498882) |
| Four Times Square | 225 Water Street, Suite 1800 |
| New York, New York 10036 | Jacksonville, Florida  32202 |
| (212) 735-3000 | (904) 359-7700 |
| (917) 777-2150 (facsimile) | (904) 359-7708 (facsimile) |
| djbaker@skadden.com | cjackson@smithhulsey.com |
| Co-Counsel for Debtors | Co-Counsel for Debtors |

00531555

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made effective as of May __, 2006 (the "<u>Effective Date</u>"), by and among

**WINN-DIXIE STORES, INC.,** a Florida corporation ("Seller"), and

**WAL-MART STORES, INC.**, a Delaware corporation, or its permitted assignee pursuant to <u>paragraph 18.5</u> of this Agreement ("<u>Buyer</u>").

### R E C I T A L S :

A.  Seller is the tenant of the supermarket store (the "<u>Store</u>"), which is listed on <u>Exhibit A-1</u> to this Agreement by Seller's designated Store number, under the lease, including amendments thereto and all related documents listed on <u>Exhibit A-2</u> to this Agreement (the "<u>Lease</u>"). The Store occupies the leased premises as described in the Lease (the "<u>Leased Premises</u>"), within the parcel of real property described on <u>Exhibit A-2</u> to this Agreement. Seller's leasehold interest in the Leased Premises pursuant to the Lease, together with those additional items described in <u>paragraph 2.1</u> of this Agreement relating to the Leased Premises, hereinafter collectively are referred to as the "<u>Assets</u>."

B.  Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.  Buyer intends to use the Store as a prototypical "<u>Neighborhood Markets</u>" store operated by Buyer, which may include the sale of groceries, general merchandise and related items as well as the operation of a pharmacy (the "<u>Use</u>").

D.  Seller filed a voluntary petition (the "<u>Petition</u>") for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 <u>et seq.</u>, as amended (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "<u>Filing Date</u>") and has operated its business as a debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of Seller was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "<u>Bankruptcy Court</u>") where it is being administered under case no. 05-03817-3F1 (the "<u>Bankruptcy Case</u>").

**IN CONSIDERATION OF $10.00 AND OTHER GOOD AND VALUABLE CONSIDERATION AND OF THE MUTUAL UNDERTAKINGS** of the parties hereto, it is agreed as follows:

1.0 **Defined Terms**.  Capitalized terms as used in this Agreement will have the following meanings when used herein.

    1.1.    "<u>Adequate Assurance Information</u>" will mean financial and other information provided by Buyer in connection with this Agreement, and any other information as may be reasonably requested by Seller to demonstrate to the Bankruptcy Court that the Landlord is adequately assured of Buyer's future performance under the Lease, as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Buyer's obligations under the Lease by an Affiliate of Buyer with sufficient assets to provide adequate assurance of future performance.

    1.2.    "<u>Affiliate</u>" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

    1.3.    "<u>Agreement</u>" will mean this Asset Purchase Agreement, dated as of the Effective Date, including all Exhibits hereto.

    1.4.    "<u>Approval Condition</u>" will have the meaning assigned in <u>paragraph 5.2</u> of this Agreement.

    1.5.    "<u>Approval Hearing</u>" will mean a hearing to occur on May 18, 2006 and to be held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

    1.6.    "<u>Assets</u>" will have the meaning assigned in <u>paragraph A</u> of the Recitals to this Agreement.

    1.7.    "<u>Auction</u>" will have the meaning assigned in <u>paragraph 5.1</u> of this Agreement.

    1.8.    "<u>Bankruptcy Case</u>" will have the meaning assigned in <u>paragraph D</u> of the Recitals to this Agreement.

    1.9.    "<u>Bankruptcy Code</u>" will have the meaning assigned in <u>paragraph D</u> of the Recitals to this Agreement.

    1.10.    "<u>Bankruptcy Court</u>" will have the meaning assigned in <u>paragraph D</u> of the Recitals to this Agreement.

    1.11.    "<u>Bankruptcy Court Approval</u>" will mean the entry of one or more Sale Orders with respect to the Store by the Bankruptcy Court.

    1.12.    "<u>Bidding Procedures</u>" will mean the procedures approved by the Bankruptcy Court by Order dated June 20, 2005, which will govern the selection by Seller of the Successful Bid relating to a particular Store.

1.13.   "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit B to this Agreement, pursuant to which Seller will sell and convey to Buyer at Closing the Improvements relating to the Store.

1.14.   "Building" will have the meaning assigned in paragraph 2.1.2 of this Agreement.

1.15.   "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.16.   "Buyer" will have the meaning assigned in the initial paragraph of this Agreement.

1.17.   "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigations of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policy (and the cost of any simultaneous issue mortgagee title insurance policy and any loan-related title insurance endorsements thereon); (d) recording fees payable in connection with recording the Conveyance Instrument in the appropriate public records; (e) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instrument(s); (f) cost of the Environmental Reports, including any supplements or updates, not to exceed $1,500.00 in total, provided that Buyer receives a "reliance letter" from the issuer of the respective Environmental Report on or before each Closing; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages, and (h) the fees and costs of the Closing Escrow Agent.

1.18.   "Buyer's Escrowed Items" will have the meaning assigned in paragraph 15.3 of this Agreement.

1.19.   "Closing" will mean the consummation of the assignment, assumption, sale and purchase of the Assets pursuant to this Agreement as indicated by delivery of the Conveyance Instrument and other documents contemplated by paragraph 15 of this Agreement and the Purchase Price as contemplated in this Agreement, which will be deemed to occur at 12:01 a.m. on the Closing Date.

1.20.   "Closing Date" will have the meaning assigned in paragraph 15.1 of this Agreement.

1.21.   "Closing Statement" will mean a statement in the form of Exhibit C to this Agreement (or in such other form as is prepared by Seller and reasonably acceptable to Buyer) reflecting the net amount due Seller

at Closing, after making the adjustments described in <u>paragraph 3.3.2</u> of this Agreement and in other provisions of this Agreement.

1.22. "<u>Confidentiality Agreement</u>" will mean the existing letter agreement between Seller and Buyer, as modified, regarding, among other things, confidentiality relating to the subject matter of this Agreement.

1.23. "<u>Conveyance Instrument</u>" will mean the Assignment and Assumption of Lease substantially in the form of <u>Exhibit F</u> to this Agreement, pursuant to which Seller will assign and convey, and Buyer will assume, Seller's leasehold interest, as tenant, under the Lease, including any SNDA, together with Seller's interest in any Improvements.

1.24. "<u>Credit Agreement Liens</u>" will mean liens and encumbrances created by Seller pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Seller and certain banks and financial institutions, as the same has been or may hereafter be amended, and (ii) documents executed by Seller in connection with such Credit Agreement.

1.25. "<u>Cure Costs</u>" will mean amounts (if any) payable pursuant to Section 365(b) of the Bankruptcy Code upon the assumption of the Lease.

1.26. "<u>Damages</u>" will have the meaning assigned in <u>paragraph 17.5</u> of this Agreement.

1.27. "<u>Deposit</u>" will have the meaning assigned in <u>paragraph 3.2</u> of this Agreement.

1.28. "<u>Due Diligence Materials</u>" will mean, collectively, (i) the Lease, the Title History and the Environmental Reports, (ii) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, on the Merrill Website, or otherwise prior to the date hereof and (iii) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.29. "<u>Effective Date</u>" will have the meaning assigned in the initial paragraph of this Agreement.

1.30. "<u>Environmental Reports</u>" will have the meaning assigned in <u>paragraph 4.3</u> of this Agreement.

1.31. "<u>Equipment</u>" will mean Seller's trade fixtures and equipment located in the Building.

1.32.  "Escrow Agent" will mean Title Insurer, acting as escrow and closing agent.

1.33.  "Excluded Personal Property" will mean all of items of personal property used by Seller in the operation of the Store at or in the Building, including without limitation, the Equipment, the Inventory and the Supplies, whether owned or leased by Seller, but excluding the Improvements and any item of personal property necessary to the use of the Improvements.

1.34.  "Filing Date" will have the meaning assigned in paragraph D of the Recitals to this Agreement.

1.35.  "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.36.  "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.37.  "Improvements" will have the meaning assigned in paragraph 2.1.2 of this Agreement.

1.38.  "Initial Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.39.  "Inventory" will mean all inventories of goods and merchandise within the Store and owned by Seller and held for resale in the ordinary course of business of Seller conducted at the Store to retail customers.

1.40.  "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel of Winn-Dixie, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of Robert Bray, Senior Vice President, Real Estate, without any requirement of investigation or inquiry.

1.41.  "Landlord" will mean the lessor under the Lease.

1.42.  "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.1 of this Agreement.

1.43.  "Lease" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.44.   "Liquidated Deposit" will have the meaning assigned in paragraph 17.1 of this Agreement.

1.45.  "<u>Material Adverse Effect</u>" will mean, with respect to any fact, circumstance, change or event, that such fact, circumstance, change or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transactions contemplated herein, or on the continued operation of the Store for its current use or for Buyer's contemplated Use, taken as a whole, except to the extent that fact, circumstance, change or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transactions contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transactions contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Case; (f) the conversion or dismissal of the Seller's Bankruptcy Case or the bankruptcy case of any of Sellers' Affiliates; (g) the appointment of a Chapter 11 trustee or examiner in the bankruptcy case of the Seller or of any of its Affiliates; or (h) the effect of the Wind-up Procedures on the operations of the Store (as opposed to any effect of the Wind-up Procedures on the Assets).

1.46.  "<u>Merrill Website</u>" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Panther" with respect to the disposition of the Store and other properties.

1.47.  "<u>Monetary Liens</u>" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through or under Seller: (A) mortgages on the Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against any of the Assets to the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under the Lease or on any other Assets; (D) judgments that have attached to and become a lien against Seller's interest under the Lease or on any other Assets; and (E) any other liens against the Real Property that can be cured by the payment of money.

1.48.  "<u>Ordinary Course of Business</u>" means the ordinary course of business of Seller after the Filing Date.

1.49.  "<u>Outside Date</u>" as to the Store that is the subject of this Agreement means the date that is the later of ten (10) Business Days after the Approval Hearing for the Store or three (3) Business Days after Seller satisfies its pre-Closing obligations under this Agreement, including

paragraph 9.2 of this Agreement, and all conditions to Closing under paragraph 11 are satisfied, with respect to the Store.

1.50. "Permits" will have the meaning assigned in paragraph 7.2 of this Agreement.

1.51. "Permitted Encumbrances" will mean all matters listed on Exhibit D to this Agreement.

1.52. "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

1.53. "Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.54. "Real Property" will mean the Leased Premises and the Improvements together.

1.55. "Sale Order" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.56. "Second Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.57. "Seller" will have the meaning assigned in the initial paragraph of this Agreement.

1.58. "Seller's Brokers" will mean one or more of DJM Asset Management, LLC, The Food Partners, LLC, and the Blackstone Group, L.P.

1.59. "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 18.3 of this Agreement; and (c) the Cure Costs.

1.60. "Seller's Escrowed Items" will have the meaning assigned in paragraph 15.2 of this Agreement.

1.61. "SNDA" will have the meaning assigned in paragraph 2.1.1 of this Agreement.

1.62. "Store" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.63. "Successful Bid" will have the meaning assigned to such term in the Bidding Procedures, and as otherwise contemplated in paragraph 5.1 of this Agreement, as determined by Seller in its sole discretion in

accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.64.   "<u>Successful Bidder</u>" will have the meaning assigned in <u>paragraph 5.1</u> of this Agreement.

1.65.   "<u>Supplies</u>" will mean all supplies relating to the operation and maintenance of the Equipment, and all packaging materials and supplies relating to the preparation or merchandising of Inventory, located within the Store and owned by Seller.

1.66.   "<u>Title Commitments</u>" will mean any updated leasehold title insurance commitments obtained by Seller from Title Insurer, committing to insure Buyer's leasehold interest in the Real Property upon Closing, together with all documents referenced therein and any documents excepted from the definition of the term Title History, to the extent any of the foregoing are either delivered to Buyer or posted on the Merrill Website (with written notice thereof delivered to Buyer) within ten (10) days after Buyer is declared the Successful Bidder.

1.67.   "<u>Title History</u>" will mean all documents listed on Schedule B-II to the Title Commitment issued by First American Title Insurance Company, dated February 17, 2006, with respect to the Store, except for the document listed as exception #8, which was not available on the Merrill Website or otherwise provided to Buyer prior to the Effective Date.

1.68.   "<u>Title Insurer</u>" will mean First American Title Insurance Company, either itself or by and through its authorized agents, or any other nationally recognized title insurance company, as designated by Seller.

1.69.   "<u>Title Policy</u>" will have the meaning assigned in <u>paragraph 4.2</u> of this Agreement.

1.70.   "<u>Title Reports</u>" will mean, collectively, (i) the Title History and (ii) the Title Commitments.

1.71.   "<u>Use</u>" will have the meaning assigned in <u>paragraph C</u> of the Recitals to this Agreement.

1.72.   "<u>Wind-up Procedures</u>" will mean any pre-Closing actions and procedures as Seller or Winn-Dixie may consider necessary or appropriate to prepare for the anticipated assignment and transfer of the Assets to Buyer at Closing, including sell-down or liquidation of Inventory, removal of Excluded Personal Property, and related marketing, promotions and advertising at the Store and closing of the Store.

2.0    **Property Included in Sale**.

2.1.    Seller agrees to assign, transfer, sell and convey to Buyer, and Buyer agrees to assume and purchase from Seller, the Assets, which are comprised of the following:

2.1.1    Seller's leasehold interest, as tenant, under the Lease, any Subordination, Non-Disturbance and Attornment Agreement or other similar agreement (each, an "<u>SNDA</u>") related thereto, and Seller's interest in any leasehold improvements;

2.1.2    Seller's interest in all fixtures (other than the Equipment) located in the Store building now existing on the Leased Premises (the "<u>Building</u>"), including but not limited to Seller's interest in heating and air conditioning systems, facilities used to provide any utility services, or other similar services to the Building, elevators, docks, lifts, doors, storefronts, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "<u>Improvements</u>"); and

Excluded Personal Property is expressly excluded from the Assets to be sold, assigned or transferred by Seller to Buyer under this Agreement.

2.2.    Buyer hereby agrees and acknowledges that Seller's obligations under this Agreement are conditioned upon the entry of a Sale Order approving the sale of the Assets to Buyer pursuant to the terms and conditions of this Agreement.

3.0    **Purchase Price**.

3.1.    <u>Amount</u>.   The purchase price to be paid by Buyer to Seller for the Assets is Six Hundred Twenty-Five Thousand and No/100 Dollars ($625,000) (the "<u>Purchase Price</u>").

3.2.    <u>Contract Consideration and Deposit</u>.   As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement and in accordance with the Bidding Procedures, Buyer has delivered, to Escrow Agent an initial earnest money deposit in the aggregate amount of Twenty Thousand and No/100 Dollars ($20,000) (the "<u>Initial Deposit</u>"). Furthermore, within 3 Business Days after satisfaction of the Approval Condition, Buyer will deliver to Escrow Agent an additional earnest money deposit such that the total deposit, including the Initial Deposit, shall be equal to thirty percent (30%) of the Purchase Price (the "<u>Second Deposit</u>"). The Initial Deposit by itself, and together with the Second Deposit if required to be delivered pursuant to this paragraph, will be referred to herein as the "<u>Deposit</u>."   Buyer will make the Initial Deposit and the Second Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Initial Deposit will be subject to refund to Buyer to

the extent and in the circumstances described herein, including paragraphs 4.0, 13.0, 16.0. and 17.0. Upon delivery of the Second Deposit, the Deposit will be non-refundable to Buyer except to the extent and in the circumstances described herein, including paragraphs 4.0, 13.0, 16.1.1, 16.1.3, 16.1.4, 16.1.6 and 17.2. The applicable portion of the Deposit will be credited against the Purchase Price at the relevant Closing and will be held in a non-interest bearing escrow account maintained by Escrow Agent prior to the relevant Closing.

3.3.    *Payment*.  The Purchase Price will be paid in the following manner:

3.3.1    *Purchase Price*.  On the Closing Date, Buyer will transfer and deliver to Escrow Agent (by wire transfer to an account designated in writing by Escrow Agent) the Purchase Price (less the Deposit and with any adjustments with respect to the Purchase Price contemplated by the Closing Statement), and will, subject to the conditions set forth in paragraph 11 of this Agreement, instruct Escrow Agent to transfer and deliver the escrowed Purchase Price (as so adjusted), by wire transfer to an account designated in writing by Seller.

3.3.2    *Certain Transaction Costs*.  All relevant rent, taxes (including real and personal property taxes and assessments), common area maintenance expenses and all other items of additional rent, utilities and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Purchase Price payable at the Closing to the extent thereof.  Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as appropriate.  Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be stipulated at the Closing based on good faith estimates reasonably acceptable to Buyer and Seller.  There will be no post Closing reproration or adjustment of prorated items. Following Closing, Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes.  The provisions of this paragraph 3.3.2 which apply to the period after the Closing shall survive the Closing.

3.3.3    *Sales Tax*.  Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is

subject to an available exemption therefrom.  This <u>paragraph 3.3.3</u> shall survive the Closing.

3.4.  <u>Allocation of Purchase Price Among Assets</u>.  Seller shall have the right to allocate the Purchase Price, for tax purposes and all other purposes, among the Assets related to the Store.

## 4.0  **Buyer's Due Diligence**.

4.1.  <u>Acknowledgment</u>.  In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence, through the Merrill Website, regarding the Store and the Assets and it has had the opportunity to consult with Buyer's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement.  Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives of Seller with respect to the Store and the Assets and to acquire such additional information about the Store and the Assets as Buyer has reasonably requested.  Buyer agrees that any physical access to or investigation of the Store by Buyer or its representatives shall be reasonably limited by and shall comply in all respects with the reasonable written instructions and requirements of Seller.

4.2.  <u>Title</u>.  Buyer confirms and acknowledges that Seller has made the Title History and other documents evidencing the state of title of the Store available to Buyer through the Merrill Website prior to the Effective Date.  Seller will deliver the Title Commitments to Buyer within ten (10) days after Buyer is declared the Successful Bidder.  Buyer may negotiate with the Title Insurer, or another title insurer of its choosing, to obtain a title insurance policy with respect to the Store (the "<u>Title Policy</u>") at Closing.  If any matter set forth in the Title Commitments that was not included in the Title History, individually or in the aggregate with other matters, interferes in a material and adverse way with the Buyer's proposed Use or occupancy of the Store, Buyer may object to such matter by delivery of written notice of objection to Seller within three (3) business days of the date the Title Commitment is either delivered to Buyer or posted on the Merrill Website (with written notice thereof delivered to Buyer).  To be effective, any such notice of objection must be directed to Seller using email address catherineibold@winn-dixie.com, with a copy using email address dstanford@sgrlaw.com, and must include a subject matter line in capital letters: "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #_____" (with the appropriate Store number set forth).  If Buyer timely notifies Seller of any valid objection to any such matter set forth in the Title Commitment with respect to the Store, and if Seller declines or is unable to cure any such objection prior to the

-11-

Closing Date, then Buyer will have the right to terminate this Agreement on or prior to the Closing Date and receive the Deposit, with no liability to Buyer.  If Buyer closes the purchase of the Assets, then Buyer will be deemed to have waived any objection made under this paragraph 4.2 to any matter, other than a Monetary Lien, set forth as an exception in the Title Commitment for which notice has been provided in accordance with this paragraph 4.2, and such matter shall constitute a Permitted Encumbrance.

4.3.    Environmental Reports.  Buyer confirms and acknowledges that Seller has made available to Buyer for review on the Merrill Website, that certain Phase I Environmental Site Assessment, dated March 17, 2006, issued by Golder Associates Inc. and that certain Phase I Environmental Site Assessment, dated January 27, 1998, issued by ICF Kaiser Engineers, Inc. (each, an "Environmental Report"), covering the Real Property relating to the Store.

5.0    **Bankruptcy Approval Procedures**.

5.1.    Competitive Bid Process.  Seller has filed a motion with the Bankruptcy Court seeking approval of the transactions contemplated by this Agreement, subject to higher or better offers, and the transfer of the Assets free and clear of all claims and liens including the Credit Liens, other than Permitted Encumbrances, pursuant, inter alia, to 11 U.S.C. Sections 105 and 363 (the "Sale Motion").  The Bankruptcy Court has set May 18, 2006 as the date for hearing on the Sale Motion (the "Sale Hearing") and to consider entry of the Sale Order relating to the Successful Bid, as defined in the Bidding Procedures.  Buyer has been determined, following an auction conducted in accordance with the Bidding Procedures, to be the "Successful Bidder" with respect to the Store.  Seller will submit the Successful Bid (i.e., this Agreement) to the Bankruptcy Court at the Sale Hearing, for entry of a Sale Order with respect to the Assets by the Bankruptcy Court, approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby (the "Sale Order").

5.2.    Sale Order Approving Agreement.  It will be a condition to the Closing of the transaction contemplated by this Agreement that the Bankruptcy Court will have issued the Sale Order approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, and such Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Approval Condition").

6.0    **Representations and Warranties of Seller Relating to the Assets**.  To induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

6.1.    On or prior to the Effective Date, Seller has made available to Buyer for review on the Merrill Website and otherwise: (i) copies of the Lease (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

a)  copies of the site plan for the Store; and

b)  copies of the fixture plan for the Store;

it being understood that the materials described in this paragraph 6.1 have been provided for information purposes only with no representations or warranties by Seller as to accuracy, completeness or otherwise.

6.2.    To Seller's Knowledge, the Assets are in material compliance with applicable zoning laws as well as any applicable deed restrictions, covenants, conditions, restrictions, easement agreements and any other applicable private land use restrictions, and Seller has not received any written notice of material violation of any of the foregoing that has not been remedied or cured.

6.3.    To Seller's Knowledge, except for any Permitted Encumbrances, there are no condemnation, environmental, zoning or other land use regulation proceedings, either instituted or threatened, in writing, that would have a Material Adverse Effect on the Buyer's intended Use of the Store.

6.4.    At Closing, Seller will own and convey the Assets free and clear of all Liens and Claims as defined in section 10.5, including all Monetary Liens, other than the Permitted Encumbrances, as provided in the Sale Order.

7.0    **General Representations and Warranties of Seller**.  In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed  to the contrary in this Agreement or in the Due Diligence Materials:

7.1.    Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida and, subject to the requirement of Bankruptcy Court Approval, has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Seller is or is to become a party, and the transactions contemplated by this

Agreement and such closing documents, have, subject to the requirement of Bankruptcy Court Approval, been duly authorized by all required corporate action on behalf of Seller.

7.2.    No consent, license, approval or authorization of, or filing, registration or declaration with, or exemption or other action by, any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party or the transactions herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, and (iii) Bankruptcy Court approvals issued in satisfaction of the Approval Condition.

7.3.    Subject to the satisfaction of the Approval Condition, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4.    Other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending or, to the Knowledge of Seller, threatened against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a Material Adverse Effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

7.5.    None of the employees employed by Seller in the Store is covered by a union contract, collective bargaining agreement or other labor agreement.

7.6.    Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except Seller's Brokers.

7.7.    There are no subleases or other occupancies, including any licensee pursuant to a license, of the Leased Premises, for which Buyer will be responsible or which will survive Closing.

8.0    **Buyer's Representations and Warranties.**    Buyer represents and warrants to Seller as follows:

8.1.    Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the power and authority to consummate the transaction contemplated hereunder. This Agreement and each of the closing documents to which Buyer is or is to become a party, and the transactions contemplated by this Agreement and such closing documents, have been duly authorized by all required action on behalf of Buyer.

8.2.    No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transactions herein or therein contemplated, other than Bankruptcy Court approvals issued in satisfaction of the Approval Condition.

8.3.    This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

8.4.    There is no action, suit or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

8.5.    Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

8.6.    As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of

-15-

credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

9.0    **Covenants of Seller**.  Seller hereby covenants for the benefit of Buyer as follows:

9.1.    Subject to the Wind-up Procedures, Seller will (i) use commercially reasonable efforts to maintain the Assets until the relevant Closing, in the same condition as on the date hereof, excepting the effects of ordinary wear and tear, condemnation and casualty, and (ii) will not sell, dispose of, abandon or remove from the Store any of the Assets or agree to do so.  During implementation of the Wind-up Procedures, Seller will remove all Excluded Personal Property from the Store on or before the Closing Date

9.2.    Seller shall deliver possession of the Leased Premises to Buyer at the Closing in a broom clean condition and free of any other tenancies and encumbrances (except Permitted Encumbrances) with all Excluded Personal Property not a part of the Assets removed therefrom.  To the extent that any Excluded Personal Property remains at the Real Property at Closing, and after written notice to Seller and expiration of a thirty-day period in which Seller might remove such Excluded Personal Property, Buyer shall have the right to remove same from the Real Property at Seller's sole cost and expense.

9.3.    Seller will transfer or terminate all its employees working at each Store, effective on or prior to the Closing Date.

9.4.    Seller will use commercially reasonable efforts to obtain the prompt entry of a Sale Order.

9.5.    From the Effective Date through and including the Closing Date, Seller will comply at all times in all material respects with its post-petition obligations under the Lease.

9.6.    Seller will not place, or cause to be placed, Liens on the Assets that would survive Closing or take any action that would cause Seller to be unable to perform its obligations under this Agreement (other than in connection with the discharge of its fiduciary duties, including considering higher or better bids for the Assets).

9.7.    Seller will maintain insurance coverage (including fire and general liability insurance) for the Assets on substantially the same terms and conditions as all other similarly situated supermarkets maintained by Seller.

9.8.    Seller will pay all postpetition real estate and ad valorem property taxes when due and owing with respect to the ownership and operation of the Store.

9.9.    Seller will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Buyer in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

9.10.    Seller shall not permit the Lease to be deemed rejected, pursuant to section 365(d)(4) of the Bankruptcy Code, prior to the Closing.

9.11.    Seller shall not take any action that results in an increase of the Cure Costs with respect to the Lease.

The covenants set forth in this paragraph 9.0 that relate to any period after Closing will survive Closing.

10.0    **Covenants of Buyer**.    Buyer for itself hereby covenants for the benefit of Seller as follows:

10.1.    Buyer will execute and deliver such documents as may be reasonably required by the Title Insurer in connection with Closing and the issuance of the Title Policy, if any.

10.2.    Buyer will use commercially reasonable efforts to obtain all Permits, if any, required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11 of this Agreement.

10.3.    Buyer will use all commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, and to assist and cooperate with Seller in doing, all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

10.4.    Buyer will use commercially reasonable efforts to obtain the entry of a Sale Order, including by providing Adequate Assurance Information to Seller, the Bankruptcy Court and the Landlord as may be reasonably requested.

The covenants set forth in this paragraph 10.0 that relate to any period after Closing will survive Closing.

11.0    **Conditions Precedent to Buyer's Obligations**.    The obligations of Buyer under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in

this Agreement, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

11.1.   Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.   Subject to any limitations set forth in this Agreement, all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the relevant Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Seller's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the relevant Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

11.2.   No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

11.3.   The Approval Condition shall have occurred and the Sale Order shall have been entered by the Bankruptcy Court in substantially the form of Exhibit E to this Agreement and shall not have been (A) effectively stayed by a court of competent jurisdiction or (B) materially modified or amended without the prior written consent of Buyer.   The Sale Order shall provide that Buyer shall assume obligations under and be bound only by those pre-Closing documents with respect to the Assets (other than this Agreement) as are listed on Exhibit A-4 attached hereto, and that the failure of any party to object to the terms of the Sale Order shall forever bar and estop said party, its heirs, successors and assigns, and any predecessor in interest, of itself and anyone claiming by, through or under it or them, from asserting any claims against Buyer (or parties claiming through Buyer) or attempting to enforce any rights against Buyer (or parties claiming through Buyer) based on pre-Closing documents with respect to the Assets (other than this Agreement) not listed on Exhibit A-4.   The Sale Order shall also provide that notwithstanding any provision in any lease, contract, reciprocal easement agreement ("REA") or applicable law, the Buyer is authorized to allow the Leased Premises to remain dark for up to

-18-

eighteen (18) months after Closing, and Buyer shall not be deemed to have lost any exclusive or other rights under the Lease as a result of remaining dark for such eighteen (18) month period.  The Sale Order shall also provide that in connection with the opening and operating of a retail store at the Property, the Purchaser is authorized to perform alterations and remodeling to the extent necessary to conduct its typical retail operations, including alterations necessary to provide two prototypical truck loading dock/wells at the Leased Premises, and to replace and modify existing signage, notwithstanding any provision to the contrary in the Lease or any related document, including any provision requiring consent of any non-Debtor party for such work. Appropriate notice of this Agreement and the proposed terms of the Sale Order shall have been provided prior to the hearing on the Sale Order to all parties to the Lease, all relevant taxing authorities, the U.S. Trustee and all other interested parties.

11.4.    The Sale Order shall approve the sale, assumption and assignment of the Lease as described on <u>Exhibit A-2</u>.  If any additional lease agreement or amendment (other than as stated on <u>Exhibit A-2</u>) or exclusive use clause (other than as stated on <u>Exhibit A-3</u>) which individually or in the aggregate with other matters, interferes in a material and adverse way with Buyer's proposed use or occupancy of the Store for the Use, including but not limited to the rent, the term, the extensions of the Lease, and the operation of a pharmacy, Buyer will have the right to terminate this Agreement, by delivery of written notice of termination to Seller within three (3) Business Days of the date of entry of the Sale Order and shall include in the reference or subject matter line the following, in capital letters "BUYER TERMINATION NOTICE - WINN-DIXIE STORE # _____ (with the appropriate Store number or numbers set forth).  Buyer shall be entitled, as its sole and exclusive remedy, to a return of the Deposit, which return shall operate to terminate this Agreement and release Seller from any and all liability under this Agreement (except for those obligations that survive the termination of this Agreement pursuant to the terms hereof).  If Buyer fails to terminate this Agreement within the applicable three-day period described above, then Buyer will have no further right to terminate under this <u>paragraph 11.4</u>.

11.5.    The Sale Order shall provide that the transfer of the Assets to the Buyer pursuant to the Agreement shall be free and clear of all interests, mortgages, security interests, pledges, liens, inchoate liens, judgments, encumbrances or charges of any kind or nature, including all Monetary Liens, other than the Permitted Encumbrances (collectively, the "<u>Liens</u>"), and all claims (as defined in Section 101(5) of the Bankruptcy Code), whether arising prior to or subsequent to the Filing Date, and whether imposed by agreement, understanding, law, equity or otherwise (collectively, the "<u>Claims</u>") to the extent permitted under Section 363(f) of the Bankruptcy Code, and all such Liens and

Claims shall attach to the Purchase Price in the order of their priority, and with the same validity, force and effect which they now have as against the Assets.

11.6.   Seller shall confirm that (i) to the best of Seller's knowledge, the intended Use of the Store by the Buyer under its trade name complies with the use provisions of the Lease and (ii) to the best of Seller's knowledge, there are no applicable exclusive use clauses to which the Lease is subject.

11.7.   The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been effectively waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer shall have the right to terminate this Agreement pursuant to <u>paragraph 16.1.4</u> of this Agreement; <u>provided</u>, <u>however</u>, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>paragraph 17</u> of this Agreement rather than pursuant to <u>paragraph 16.1.4</u>.

12.0   **Conditions Precedent to Seller's Obligations**.   The obligations of Seller under this Agreement are subject to the satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

12.1.   Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.   All of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

12.2. No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement will be in effect.

12.3. The Sale Order shall have been entered by the Bankruptcy Court in substantially the form of Exhibit E to this Agreement and shall not have been (A) effectively stayed by a court of competent jurisdiction or (B) materially modified or amended without the prior written consent of Seller, which shall not be unreasonably withheld.

12.4. The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall have been waived by the Bankruptcy Court or shall have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller shall have the right to terminate this Agreement pursuant to paragraph 16.1.5 of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with paragraph 17 of this Agreement rather than pursuant to paragraph 16.1.5.

13.0 **Loss by Fire or Other Casualty; Condemnation**.  In the event that, prior to a Closing, the Store, or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property associated with the Store, Buyer will have the right, exercisable by giving notice of such decision to the Seller within five (5) Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement, and thereafter none of the parties will have any further rights or obligations hereunder and Buyer shall have no obligation to pay the Purchase Price; provided, however, that, in such event, if Buyer is not in breach of this Agreement, Buyer will be entitled to the return from the Escrow Agent of the Deposit.  If Buyer does not exercise its right of termination notwithstanding such casualty or proceeding and the Store is sold to Buyer pursuant to the terms of this Agreement, as Buyer's sole remedies, Seller will assign to Buyer any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Buyer any such proceeds or compensation received by it.

14.0  **Possession**.  Seller will turn over to Buyer exclusive physical possession of the Store and the Assets, including all keys, combinations to safes, security codes and passwords, on the Closing Date free and clear of all occupancies, including any subtenant with respect to the Store, and in the condition required by paragraph 9 of this Agreement upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been

authorized by Seller and Buyer to transfer to Seller, the Purchase Price.  The provisions of this <u>paragraph 14.0</u> shall survive each Closing.

**15.0** **<u>Closing</u>.**

15.1.   <u>Closing Date; Procedures</u>.   Promptly following satisfaction of the Approval Condition, Seller will designate either the fourth Business Day after the Approval Hearing or such other date as reasonably approved by Buyer as the closing date for the Store.  Such designated closing date is referred to herein as a "<u>Closing Date</u>."  The Closing will be conducted by use of escrows administered by Escrow Agent, including delivery of documents and funding into escrow and subsequent release and legal delivery of the same from escrow following authorization given by Buyer and Seller based on satisfaction of the terms and conditions of this Agreement.

15.2.   On or before the Closing Date, Seller will, subject to the conditions contained in <u>paragraph 12</u> of this Agreement, deliver the following ("<u>Seller's Escrowed Items</u>") to Escrow Agent:

(i)     Two counterparts of the Conveyance Instrument, executed by Seller;

(ii)    The relevant Bill of Sale, executed by Seller;

(iii)   Two counterparts of the Closing Statement, executed by Seller;

(iv)    Such other instruments as are reasonably required by the Title Insurer in accordance with the terms hereof; <u>provided</u>, <u>however</u>, that in no event shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller  elects to do so in its sole discretion; and

(v)     Any other documents, instruments or agreements called for hereunder for delivery by Seller that have not previously been delivered.

Buyer may waive compliance by Seller as to any of the foregoing items in a manner permitted by <u>paragraph 18.6</u> of this Agreement.  Seller's delivery of all of Seller's Escrowed Items (other than those waived by Buyer) to Escrow Agent, will be deemed to be an acknowledgement by Seller that the conditions of <u>paragraph 12</u> of this Agreement have been fulfilled or waived as of the Closing Date.

15.3.   On or before the Closing Date for the Store, Buyer will, subject to the conditions contained in <u>paragraph 11</u> of this Agreement, deliver the following ("<u>Buyer's Escrowed Items</u>") to Escrow Agent:

(i)    Two counterparts of the Conveyance Instrument, executed by Buyer;

(ii)    Two counterparts of the Closing Statement, executed by Buyer;

(iii)    Any other document, instrument or agreement called for hereunder for delivery by Buyer that has not previously been delivered; and

(iv)    All funds required to be transferred and delivered by Buyer to Escrow Agent pursuant to paragraph 3 of this Agreement.

Seller may waive compliance by Buyer as to any of the foregoing items in a manner permitted by paragraph 18.6 of this Agreement.  Buyer's delivery of all of Buyer's Escrowed Items (other than those waived by Seller) to Escrow Agent will be deemed to be an acknowledgement by Buyer that the conditions of paragraph 11 of this Agreement have been fulfilled or waived as of the Closing Date.

15.4.    At the Closing, Seller will, subject to the conditions contained in paragraph 12 of this Agreement, direct Escrow Agent to deliver Seller's Escrowed Items to Buyer and Buyer will, subject to the conditions contained in paragraph 11 of this Agreement, direct Escrow Agent to deliver Buyer's Escrowed Items and the Purchase Price to Seller.

15.5.    On the Closing Date, Seller and Buyer will each deposit such other instruments with the Title Insurer as are reasonably required by the Title Insurer or otherwise required to consummate the purchase of the relevant Assets in accordance with the terms hereof; provided, however, that in no event shall Seller be required to indemnify the Title Insurer, Buyer, or any other party pursuant to any such instrument, or undertake any other material liability not expressly contemplated in this Agreement, unless Seller elects to do so in its sole discretion.

15.6.    Except as provided in paragraph 17 of this Agreement, (i) Seller will be responsible for Seller's Closing Costs and shall pay same when due and payable; and (ii) Buyer will be responsible for Buyer's Closing Costs and shall pay same when due and payable.  The provisions of this paragraph 15.6 shall survive Closing or earlier termination of this Agreement.

15.7.    Closing Direction.  On the Closing Date, Escrow Agent will notify Buyer and Seller, if this be the case, that Escrow Agent is in possession of all of Seller's Escrowed Items and all of Buyer's Escrowed Items, and is prepared to release such items for legal delivery subject only to receipt of (i) written notice from Seller or Seller's counsel to Escrow Agent and Buyer confirming that Seller is prepared to proceed to closing and that all of the conditions of paragraph 12.0 of this Agreement have been

fulfilled or otherwise waived ("<u>Seller's Closing Direction</u>"), and (ii) written notice from Buyer or Buyer's counsel to Escrow Agent and Seller confirming that Buyer is prepared to proceed to closing and that all of the conditions of <u>paragraph 11.0</u> of this Agreement have been fulfilled or otherwise waived ("<u>Buyer's Closing Direction</u>").   Upon receipt of Buyer's Closing Direction and Seller's Closing Direction, Escrow Agent will be deemed authorized and directed to release and disburse, as appropriate, the Seller's Escrowed Items and the Buyer's Escrowed Items without further condition, on the Closing Date.

15.8.   <u>Closing Turnover</u>.   Contemporaneously with delivery of the latter of Seller's Closing Direction and Buyer's Closing Direction to Escrow Agent, all right, title and interest of Seller in and to the Assets will pass to Buyer, and Seller thereafter will have no further right, title, interest or obligation with respect to the Store or the Assets, except as may be expressly provided in this Agreement.   As part of the Closing, Seller will turn over to Buyer exclusive physical possession of the Store and the Assets including all keys, combinations to safes, security codes and passwords.

15.9.   <u>Closing Deliveries and Disbursements</u>.   Subject to satisfaction of the requirements set forth in <u>paragraph 15.7</u> above, at the commencement of business on the Closing Date, Escrow Agent will release and disburse, as appropriate, the Buyer's Escrowed Items and the Seller's Escrowed Items, with disbursements of the Purchase Price, as provided in the Closing Statement.

16.0   **Termination.**

16.1.   This Agreement may be terminated, and the transactions contemplated hereby abandoned, only as follows, and as provided for otherwise in this Agreement:

16.1.1   by written consent of Seller and Buyer, in which case the Deposit shall be disbursed as provided in such written consent (but if such written consent does not provide for the disbursement of the Deposit, then Escrow Agent shall pay over the Deposit to Seller as consideration for Seller's agreement to terminate this Agreement);

16.1.2   at the election of Seller if and to the extent permitted under <u>paragraph 17.1</u> of this Agreement, in which case the Deposit shall be disbursed as provided in such <u>paragraph 17.1</u>;

16.1.3   at the election of Buyer if and to the extent permitted under <u>paragraph 17.2</u> of this Agreement, in which case the Deposit shall be disbursed as provided in such <u>paragraph 17.2</u>;

16.1.4    at the election of Buyer if any of the conditions set forth in <u>paragraph 11</u> of this Agreement has not been satisfied or waived by Buyer on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; <u>provided</u>, <u>however</u>, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>paragraph 17</u> of this Agreement rather than pursuant to this <u>paragraph 16.1.4</u>;

16.1.5    at the election of Seller if any of the conditions set forth in <u>paragraph 12</u> of this Agreement has not been satisfied or waived by Seller on or before the Outside Date, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; <u>provided</u>, <u>however</u>, that if any of such conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations, including any right of termination, shall be determined in accordance with <u>paragraph 17</u> of this Agreement rather than pursuant to this <u>paragraph 16.1.5</u>;

16.1.6    at the election of Buyer or Seller as provided in <u>paragraph 13</u> of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; <u>provided</u>, <u>however</u>, that if at the time any such election is made, Buyer is in breach in respect of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with <u>paragraph 17</u> of this Agreement rather than pursuant to this <u>paragraph 16.1.6</u>;

16.1.7    at the election of Seller or Buyer (A) if the Approval Condition is not satisfied or (B) the Bankruptcy Court denies approval of the Sale Order, in which case Seller will direct Escrow Agent to return the Deposit to Buyer; provided, however, that if at the time any such election is made, Buyer is in breach of this Agreement, then Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) will be determined in accordance with <u>paragraph 17</u> of this Agreement rather than pursuant to this <u>paragraph 16.1.7</u>; or

16.1.8    at the election of Buyer or Seller if the Closing will not have occurred on or before the Outside Date for any reason other than as contemplated in <u>paragraphs 16.1.1 through 16.1.6</u> of this Agreement, in which case Seller shall direct Escrow Agent to return the Deposit to Buyer; provided that neither

Buyer nor Seller, as the case may be, will be entitled to terminate this Agreement pursuant to this <u>paragraph 16.1.8</u> if such party's breach of this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date and in the case of any such breach Buyer's and Seller's respective rights, remedies and obligations (including any right of termination) shall be determined in accordance with <u>paragraph 17</u> of this Agreement rather than pursuant to this <u>paragraph 16.1.8</u>.

16.2. If this Agreement is terminated for any reason, then all materials provided by Seller to Buyer and all materials relating to the Assets obtained by Buyer and all copies of any such materials will be destroyed or delivered to Seller within five (5) Business Days following termination.  This paragraph shall not in any way limit Buyer's duties to Seller under the Confidentiality Agreement.

16.3. Upon any termination of this Agreement pursuant to <u>paragraphs 16.1.2 through 16.1.8</u> of this Agreement, each party will retain those rights (if any) it may have under <u>paragraph 17</u> of this Agreement against any other party for breach by such other party prior to such termination of any of its covenants or other obligations under or relative to this Agreement.

17.0  **Default and Remedies.**

17.1. <u>Buyer's Default</u>.  If the Closing does not occur due to Buyer's breach of this Agreement, or if this Agreement is properly terminated due to Buyer's breach of this Agreement, then Seller shall be entitled, as its sole and exclusive remedy for such breach, (A) to terminate this Agreement and (B) to receive the Deposit (the "<u>Liquidated Deposit</u>") as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such a breach are impractical to ascertain and the amount of the Liquidated Deposit is a reasonable estimate thereof.  Seller hereby expressly waives and relinquishes any and all other remedies at law or in equity.  Seller's right to receive the Liquidated Deposit is intended not as a penalty, but as full-liquidated damages.  Except for those obligations of Buyer that survive Closing as provided in <u>paragraph 18.9</u>, the right to receive the Liquidated Deposit as full liquidated damages is Seller's sole and exclusive remedy in the event of breach of this Agreement by Buyer, and Seller hereby waives and releases any right to (and Seller hereby covenants that it shall not) sue Buyer with respect to the Store: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Liquidated Deposit.  Buyer hereby waives and releases any right to (and hereby covenants that it shall not) sue Seller or seek or claim a refund of the Liquidated

Deposit (or any part thereof) on the grounds that the Liquidated Deposit is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages. This <u>paragraph 17.1</u> is subject to <u>paragraph 17.4</u> of this Agreement.

17.2.   <u>Default by Seller</u>.  If the Closing does not occur due to Seller's breach of this Agreement or Seller's refusal or inability to close the transactions contemplated herein, or if this Agreement is properly terminated due to Seller's breach of this Agreement, then Buyer will be entitled to, as its sole and exclusive remedy for such breach, the return of the Deposit, which return shall operate to terminate this Agreement and release Seller from any and all liability under this Agreement (except for obligations of Seller hereunder that survive termination of this Agreement); <u>provided</u>, <u>however</u>, that in the event of a breach of this Agreement by Seller, Buyer may elect not to terminate this Agreement, but instead to seek specific performance of Seller's obligations under this Agreement.  In such event, except for those obligations of Seller that survive each Closing as provided in <u>paragraph 18.9</u>, Buyer expressly waives and releases any right to seek or collect any damages, including any actual, consequential, speculative, remote or punitive damages, as a result of such default. This <u>paragraph 17.2</u> is subject to <u>paragraph 17.4</u> of this Agreement. The provisions of this <u>paragraph 17.2</u> shall survive termination of this Agreement.

17.3.   <u>Notice of Default; Opportunity to Cure</u>.  Neither Seller nor Buyer shall be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within five (5) Business Days after receipt of such notice; <u>provided, however</u>, that this <u>paragraph 17.3</u> (i) shall not be applicable to Buyer's failure to deliver any Deposit or any portion thereof on the date required under this Agreement or to a party's failure to make any deliveries required of such party on the Closing Date and, accordingly, (ii) shall not have the effect of extending the Closing Date or the due date of any Deposit.

17.4.   <u>Recoverable Damages</u>.  In no event shall the provisions of <u>paragraphs 17.1 and 17.2</u> of this Agreement limit (i) either Buyer's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to, a party's express obligation to indemnify the other party in accordance with the Confidentiality Agreement and this Agreement, or (ii) either Buyer's or Seller's obligation to pay costs, fees or expenses under the Confidentiality Agreement and <u>paragraph 3.3.2</u> of this Agreement, or the damages recoverable by any party against any other party due to a party's failure to pay such costs.  In addition, if this Agreement is terminated for any reason, and Buyer or any Affiliate of Buyer

wrongfully asserts any claim or right to any Asset that would otherwise delay or prevent Seller from having clear, indefeasible, and marketable title to any Asset, then Seller shall have all rights and remedies available at law or in equity with respect to such assertion by Buyer and any loss, damage or other consequence suffered by Seller as a result of such assertion. Notwithstanding anything to the contrary contained herein, in no event shall Buyer be obligated to indemnify Seller hereunder, including pursuant to paragraph 17.5, for any amounts which, in the aggregate, exceed the amount of the Deposit, except (i) as expressly provided in the Confidentiality Agreement and (ii) with respect to any act or omission on or after each Closing Date, including any claim, liability or obligation that is assumed by Buyer pursuant to this Agreement or in any transaction documents signed by Buyer.

17.5.    Buyer Indemnification of Seller. Buyer shall indemnify and save and hold harmless Seller and its Affiliates and representatives, from and against any and all costs, losses, liabilities, damages, lawsuits, deficiencies, claims and expenses (whether or not arising out of third-party claims) including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement for any of the foregoing (herein, the "Damages") incurred in connection with or arising out of or resulting from (a) any breach of any covenant or warranty by Buyer (including any payment obligation), or the inaccuracy of any representation made by Buyer in or pursuant to this Agreement or other transaction documents, (b) any liability, obligation or commitment of any nature (absolute, accrued, contingent or otherwise) of Buyer that is due to or arises in connection with Buyer's acts or omissions prior to, on or after the Closing Date, including any claim, liability, or obligation that is assumed by Buyer pursuant to this Agreement or in any transaction documents signed by Buyer. Notwithstanding the foregoing, Buyer shall not be liable for any matter (i) with respect to which Seller has not given Buyer written notice within a reasonable period of time following Seller's receiving written notice of such matter, specifying the claim and the basis for the claim in reasonable detail (unless the failure to provide such information did not have a Material Adverse Effect on Buyer), or (ii) that is due to Seller's acts or omissions. The provisions of this paragraph 17.5 shall cover all obligations and liabilities of whatever kind, nature or description relating, directly or indirectly, to product liability, third party litigation or third party claims against Buyer or Seller in connection with, arising out of, or relating to the Assets. This paragraph 17.5 shall survive the Closing or earlier termination of this Agreement. Except as otherwise expressly provided in this Agreement, including, without limitation, the provisions of this paragraph 17 and paragraph 23 of this Agreement, or other transaction documents, the Buyer does not, pursuant to this Agreement or other transaction documents or otherwise, assume,

agree to perform, pay, discharge or indemnify the Seller or its Affiliates and representatives against or otherwise have any responsibility for, any liabilities or obligations of the Seller, fixed, contingent or otherwise, known or unknown, relating to or arising out of the Assets arising prior to the Closing Date.

18.0    **Miscellaneous**.

18.1.    <u>Notices</u>. All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this <u>paragraph 18.1</u> and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission, when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three (3) Business Days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Buyer at their respective addresses stated below:

If to Seller:

Winn-Dixie Stores, Inc.
5050 Edgewood Court
Jacksonville, Florida  32254-3699
Attn:  Michael Chlebovec, Director - Asset Management
Telefax No.:  (904) 783-5646
e-mail:  *michaelchlebovec@winn-dixie.com*

With a copy to:

Winn-Dixie Stores, Inc. -- Legal Department
5050 Edgewood Court
Jacksonville, Florida  32254-3699
Attn:  Catherine Ibold, Group Leader - Real Estate
Telefax No.:  (904) 783-5138
e-mail:  *catherineibold@winn-dixie.com*

and

Smith, Gambrell & Russell, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Attn:  Douglas Stanford
Telefax No.:  (904) 598-6300
e-mail:  *dstanford@sgrlaw.com*

If to Buyer:

Wal-Mart Stores, Inc.
2001 S.E. Tenth Street
Bentonville, Arkansas  72712
Attn:  Karen Roberts
Telefax No.: 479-277-5991
e-mail: *karen.roberts@walmartlegal.com*

With a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York  10019
Attn:  John C. Longmire, Esq.
Telefax No.:  212-728-8111
e-mail:  *jlongmire@willkie.com*

If to Escrow Agent:

First American Title Insurance Company
3563 Philips Highway
Building E, Suite 504
Jacksonville, Florida 32207
Attn:  William Gallogly
Telefax No.:  (904) 858-9299
e-mail:  *wgallogly@firstam.com*

or such other address as any party may from time to time specify by notice to the other.

18.2.   <u>Notice of Certain Inquiries</u>.  If any party is contacted, whether before or after any Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to any transactions contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

18.3.  <u>Brokers and Finders</u>.  The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Agreement other than that due by Seller to Seller's Brokers. Seller agrees to pay all fees and commissions claimed by Seller's Brokers as a result of the transaction contemplated by this Agreement. Except for Seller's Brokers, neither Seller nor Buyer has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with the sale of the Assets or this Agreement.  Seller and Buyer hereby indemnify and agree to hold harmless each other from and against any claims by any other Person for brokerage fees, commissions or other similar costs related to the purchase of the Assets and this Agreement by reason of Seller's or Buyer's own acts. The terms of this <u>paragraph 18.3</u> shall survive all Closings or earlier termination of this Agreement.

18.4.  <u>Successors and Assigns</u>.  This Agreement will be binding upon, and inure to the benefit of, the parties hereto and their respective successors, and permitted assigns.

18.5.  <u>Assignment</u>.  Neither Seller nor Buyer may assign or delegate any duties or obligations under this Agreement without the prior written consent of the other, which consent may be granted or withheld in the sole discretion of the party whose consent is so required; <u>provided</u>, <u>however</u>, that Buyer shall be permitted, without the consent of Seller, to assign its interests and obligations under this Agreement to one or more Affiliates of Buyer.  In the event of such an assignment to an Affiliate of Buyer, (a) such Affiliate will promptly provide satisfactory Adequate Assurance Information to Seller or (b) Buyer will guarantee the obligations of such Affiliate hereunder.  No assignment by Buyer shall release or relieve Buyer of its liabilities and obligations hereunder, which shall remain in full force and effect notwithstanding any such assignment.

18.6.  <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may be amended or modified by, and only by, a written instrument executed by Seller and Buyer (and delivered physically or by facsimile transmission from any party or its counsel to the other party or its counsel) and subject to Bankruptcy Court Approval, if applicable.

18.7.  <u>Governing Law</u>.  The application and effect of this Agreement will be governed by and construed in accordance with the laws of the State in which the Store is located; the application and effect of this Agreement as to any matter of the rights and obligations of the parties generally will be governed by and construed in accordance with the laws of the State of Florida.

18.8. <u>Merger of Prior Agreements</u>.   This Agreement supersedes all prior agreements and understandings between the parties hereto, other than the Confidentiality Agreement, and (except for the Confidentiality Agreement) constitutes the entire agreement of the parties with respect to the matters contained herein.  **BUYER ACKNOWLEDGES ITS OBLIGATIONS UNDER THE CONFIDENTIALITY AGREEMENT CONTINUE AFTER THE EXECUTION AND DELIVERY OF THIS AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN THE CONFIDENTIALITY AGREEMENT OR THIS AGREEMENT**.

18.9. <u>Survival</u>.   Except as otherwise expressly provided herein, acceptance by Buyer of the Conveyance Instrument shall constitute an acknowledgement by Buyer that all of Seller's representations, covenants and obligations under this Agreement with respect to such Store and all conditions to Buyer's obligations to close under this Agreement have been performed, satisfied and/or waived.   Seller's and Buyer's representations, warranties, covenants and obligations under this Agreement shall not survive the Closing but shall merge into the Conveyance Instrument and shall have no further force or effect after the Closing, except that those representations, warranties, covenants and obligations of Seller and Buyer that are expressly stated herein to survive the Closing.

18.10. <u>Time is of the Essence</u>.   Time is of the essence to this Agreement.

18.11. <u>No Recordation</u>.   This Agreement will not be recorded in any public office or court other than as part of the Bankruptcy Court Approval process except that upon default it may be presented to a court of competent jurisdiction.

18.12. <u>State Specific Provisions</u>:

18.12.1 <u>Radon Gas</u>. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

19.0 **Escrow Agent.**

19.1. <u>Duties</u>.  By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon its receipt of funds from Buyer, Escrow Agent will receive and hold such funds in an interest-bearing account and in trust to be disposed of in accordance with the provisions of this Agreement.

19.2.  <u>Indemnity</u>.  Escrow Agent will not be liable to any party except for claims resulting from the negligence or willful misconduct of Escrow Agent.  If the escrowed funds or interest accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all loss, cost, damage, liability or expense, including costs of reasonable attorneys' fees to which Escrow Agent may be put or which may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's negligence or willful misconduct.  If the indemnity amounts payable hereunder result from the fault of Buyer or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts.  Otherwise, Buyer and Seller each will be responsible for one-half of such amounts.

19.3.  <u>Dispute</u>.  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor.  In any action or proceeding regarding the escrowed funds or interest accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Buyer is not the prevailing party in such action or proceeding.  If there is no prevailing party, Seller and Buyer each shall be responsible for one-half of such costs and fees.

19.4.  <u>Execution by Escrow Agent</u>.  Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this <u>paragraph 19.</u>  Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this <u>paragraph 19</u> shall not be required.

20.0  **Waiver of Jury Trial**.  Buyer and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transactions contemplated herein undesirable.  Accordingly, Buyer and Seller each knowingly, voluntarily and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Agreement or the transactions contemplated herein.

21.0  **Consent to Jurisdiction.**  THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE

INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Buyer and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in paragraph 18.1 of this Agreement shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court, and irrevocably and unconditionally waives and agrees not to plead or claim in such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum. If a court finds that subject-matter jurisdiction is not available in the Bankruptcy Court, Buyer and Seller hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of the U.S. District Court for the Middle District of Florida, Jacksonville Division, or if such court shall not have jurisdiction, then to the appropriate courts of the State of Florida sitting in Duval County, Florida.

22.0 **HSR Filings.**   The parties anticipate that the transactions contemplated hereby are exempt from review and filing under the HSR Act.   However, if such is not the case, Seller and Buyer shall each seek regulatory approval or HSR clearance and prepare and submit, in a timely manner, all necessary filings for Seller and Buyer in connection with this Agreement under the HSR Act and the rules and regulations thereunder.   Seller and Buyer shall request expedited treatment of such HSR Filing by the Federal Trade Commission, shall make promptly any appropriate or necessary subsequent or supplemental filings, and shall furnish to each other copies of all HSR Filings at the same time as they are filed with the appropriate governmental authority except to the extent such party is legally restricted from providing or believes, based where appropriate on the advice of counsel, that it should not provide such copies.

23.0 **Disclaimers and Waivers.**

23.1. <u>NO RELIANCE ON DOCUMENTS</u>.   EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN (THE "<u>CONTRACT WARRANTIES</u>"), SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED BY OR ON BEHALF OF SELLER TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY.   BUYER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING, IN

ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE) ARE PROVIDED TO BUYER AS A CONVENIENCE ONLY AND THAT, EXCEPT AS PROVIDED HEREIN, ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY BUYER SHALL BE AT THE SOLE RISK OF BUYER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS PROVIDED HEREIN (A) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER SHALL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (B) EXCEPT WITH RESPECT TO THE "RELIANCE LETTER" REFERRED TO IN SECTION 1.16, BUYER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED BY SELLER OR ANY AFFILIATE TO BUYER, BUT RATHER WILL RELY ON ITS OWN INVESTIGATIONS AND ANY REPORTS COMMISSIONED BY BUYER WITH RESPECT THERETO, AND (C) EXCEPT WITH RESPECT TO THE "RELIANCE LETTER" REFERRED TO IN SECTION 1.16, NEITHER SELLER, ANY AFFILIATE OF SELLER NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE BY SELLER OR ANY AFFILIATE TO BUYER WILL HAVE ANY LIABILITY TO BUYER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

23.2.    **DISCLAIMERS.    EXCEPT FOR THE CONTRACT WARRANTIES, BUYER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE TO BUYER, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "<u>AS IS, WHERE IS, WITH ALL FAULTS</u>".    BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND NEITHER**

SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER OR ANY AFFILIATE, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR ON THE MERRILL WEBSITE, OTHER THAN THE CONTRACT WARRANTIES.

BUYER ACKNOWLEDGES THAT BUYER'S ACCESS AND INSPECTION RIGHTS HAVE BEEN LIMITED AS SET FORTH IN THIS AGREEMENT AND THAT BUYER UNDERSTANDS THE RISKS ASSOCIATED WITH PURCHASING THE ASSETS ON THE BASIS OF SUCH LIMITED INVESTIGATIONS.  BUYER REPRESENTS TO SELLER THAT NOTWITHSTANDING SUCH LIMITATIONS BUYER HAS CONDUCTED SUCH INVESTIGATIONS AS BUYER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE ASSETS AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE ASSETS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION), AND, EXCEPT AS PROVIDED HEREIN, WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AFFILIATES, AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN THE CONTRACT WARRANTIES.   EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, UPON CLOSING, BUYER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY BUYER'S INVESTIGATIONS, AND BUYER, UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER AND SELLER'S AFFILIATES (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS AND EMPLOYEES) FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT OR UNDER ANY ENVIRONMENTAL LAW), LOSSES, DAMAGES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH BUYER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER AND SELLER'S AFFILIATES (AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS AND EMPLOYEES) AT ANY TIME BY REASON OF

OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE ASSETS.

BUYER AGREES THAT SHOULD ANY INVESTIGATION, CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION) ON OR RELATED TO THE ASSETS BE REQUIRED AFTER THE DATE OF CLOSING, NEITHER SELLER NOR ANY AFFILIATE WILL HAVE NO LIABILITY TO BUYER TO PERFORM OR PAY FOR SUCH INVESTIGATION, CLEAN-UP, REMOVAL OR REMEDIATION, AND BUYER EXPRESSLY WAIVES AND RELEASES ANY CLAIM TO THE CONTRARY.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, BUYER FURTHER ACKNOWLEDGES THAT (1) THE CONTRACT WARRANTIES SHALL NOT SURVIVE THE CLOSING BUT SHALL MERGE INTO THE CONVEYANCE INSTRUMENT FOR SUCH STORE, AND SHALL HAVE NO FURTHER FORCE OR EFFECT AFTER THE CLOSING AND (2) THE LIABILITY OF SELLER UNDER OR WITH RESPECT TO THE CONTRACT WARRANTIES SHALL BE LIMITED TO THE EXPRESS REMEDIES OF BUYER SET FORTH IN THIS AGREEMENT.

BUYER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY BUYER, AND BUYER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OF BUYER'S CHOICE WITH REGARD TO THE TERMS OF SUCH DISCLAIMERS, WAIVERS AND RELEASES. BUYER ACKNOWLEDGES AND WARRANTS THAT BUYER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS AND RELEASES IS FREE AND VOLUNTARY.

23.3.    <u>Effect and Survival of Disclaimers</u>.  Seller and Buyer acknowledge that the provisions of this <u>paragraph 23</u> are an integral part of the transactions contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller would not enter into this Agreement but for the provisions of this <u>paragraph 23</u>.  Seller and Buyer agree that the provisions of this <u>paragraph 23</u> shall survive all Closings or any termination of this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

**SELLER:**

**WINN-DIXIE STORES, INC.**,
a Florida corporation

By:  _____
Name: _____

STATE OF FLORIDA
COUNTY OF DUVAL

The foregoing instrument was acknowledged before me under oath on this _____ day of _____, 2006 by _____, the _____ of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation, who is personally known to me.

_____
Notary Public, State of Florida
Seal:

**BUYER:**

**WAL-MART STORES, INC.**,
a Delaware corporation

By:  _____
Name:        Robert Bray
Title:  Vice President, Real Estate

STATE OF ARKANSAS
COUNTY OF BENTON

The foregoing instrument was acknowledged before me by _____, _____ of WAL-MART STORES, INC., a Delaware corporation, on behalf of the corporation, who is personally known to me and who did not take an oath.

Given under my hand and official seal this _____ day of _____, 2006.

_____
Notary Public, State of Arkansas
My commission expires: _____
Seal:

Acknowledged and agreed this _____ day of _____, 2006 for the limited purposes set forth in <u>paragraph 19</u> of this Agreement:

**ESCROW AGENT:**

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By:    _____
Name:
Title:

<u>LIST OF EXHIBITS</u>

Exhibit A-1    -    List of Stores
Exhibit A-2    -    Description of Lease and Leased Premises
Exhibit A-3    -    Exclusive Use Clauses
Exhibit A-4    -    List of Documents Binding on Buyer
Exhibit B     -    Form of Bill of Sale
Exhibit C     -    Form of Closing Statement
Exhibit D     -    Permitted Encumbrances
Exhibit E     -    Form of Sale Order
Exhibit F     -    Form of Conveyance Instrument

EXHIBIT A-1
To Asset Purchase Agreement

<u>List of Stores</u>

| Store No. | Street Address | City | County | State |
|-----------|----------------|------|--------|-------|
| 217 | 1199 South Federal Highway | Pompano Beach | Broward | FL |

EXHIBIT A-2
TO ASSET PURCHASE AGREEMENT


DESCRIPTION OF LEASE AND RELATED LAND

WINN-DIXIE STORE # **217 -** Pompano Beach, Florida

Lease:          Lease, dated May 10, 1988, between Pomp Commercial Corp., Landlord, and Winn-Dixie Stores, Inc., Tenant.

Short Form Lease, dated May 10, 1988, between Pomp Commercial Corp., Landlord, and Winn-Dixie Stores, Inc., Tenant.

Amendments     First Amendment to Lease, dated August 1, 1990, between Pompano Marketplace Partners, Landlord, and Winn-Dixie Stores, Inc., Tenant.

Supplemental Lease Agreement, dated November 13, 1989, between Pomp Commercial Corp., Landlord, and Winn-Dixie Stores, Inc., Tenant.

Second Amendment to Lease, dated November 30, 1997, between SPV Real Estate Partners No.1 L.P., Landlord, and Winn-Dixie Stores, Inc., Tenant.

Second Supplemental Lease Agreement, made February 16, 2000, between TA/Western LLC, Landlord, and Winn-Dixie Stores, Inc., Tenant.

Subordination, Nondisturbance, and Attornment Agreement, made January 20, 1998, between Wells Fargo Bank, National Association, Lender, and Winn-Dixie Stores, Inc.

Letter Agreement, dated January 17, 1989, between Pomp Commercial Corp., Landlord, and Winn-Dixie Stores, Inc., Tenant.


Premises:       That certain store building and related improvements located at 1199 South Federal Highway, Pompano Beach, Broward County, Florida.

Legal Description:     The real property as more particularly described as follows:
SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "A"

LEGAL DESCRIPTION:

A portion of the SE 1/4 of Section 1, Township 49 South, Range 42 East and a portion of the SW 1/4 of Section 6, Township 49 South, Range 43 East lying West of the West right-of-way line of U.S. Highway No. 1, also being State Road (4) 5 as per State Road right-of-way map Section 86020-2102, all of the above lying and being in the City of Pompano Beach, Broward County, Florida, more particularly described as follows:

Commence at the Southeast corner of said Section 1; thence North 0°-04'-25" East along the East line of said Section 1, also being the West line of said Section 6 for a distance of 1237.99 feet to the Point of Beginning of the hereinafter described tract of land; thence North 13°-57'-09" East along the said West right-of-way line of U.S. Highway No. 1, also being State Road (4) 5 for a distance of 500.26 feet to a point of intersection with a line being 944.50 feet South of and parallel with the North line of the SW 1/4 of said Section 6; thence North 89°-07'-45" West along the said South line of the North 944.50 feet of the SW 1/4 of Section 6 for 120.12 feet to a Point of Intersection with the East line of said Section 1; thence North 0°-04'-25" East along said East line of Section 1 for a distance of 217.14 feet to a point being 60.00 feet South of the North line of the South 1/2 of the NE 1/4 of the SE 1/4 of said Section 1; thence North 90°-00'-00" West along a line, (also as described in Deed Book 3427-382, Public Records of Broward County, Florida) being 60.00 feet South of the North line of the South 1/2 of the NE 1/4 of the SE 1/4 of said Section 1 for a distance of 939.43 feet; thence South 0°-03'-30" East along a line (also as described in Deed Book 3427-382 Public Records of Broward County, Florida) being 60.00 feet East of the West line of the East 3/4 of the East 1/2 of the SE 1/4 of said Section 1 for a distance of 605.08 feet; thence South 89°-51'-38" East along the North line of the SE 1/4 of the SE 1/4 of said Section 1 for a distance of 272.68 feet to the Northeast corner of the NW 1/4 of the SE 1/4 of the SE 1/4 of said Section 1; thence South 0°-00'-52" East along the West line of the East 1/2 of the East 1/2 of the SE 1/4 of Section 1 for a distance of 419.02 feet to a point being 86.15 feet South of and parallel with the South line of the NW 1/4 of the NE 1/4 of the SE 1/4 of the SE 1/4 of said Section 1; thence South 89°-47'-27" East along a line 86.15 feet South of the said South line of the NW 1/4 of the NE 1/4 of the SE 1/4 of the SE 1/4 of Section 1 for a distance of 332.36 feet; thence North 0°-01'-45" East along the West line of the SE 1/4 of the NE 1/4 of the SE 1/4 of the SE 1/4 of said Section 1 for a distance of 86.15 feet to the Northwest corner of the SE 1/4 of the NE 1/4 of the SE 1/4 of the SE 1/4 of said Section 1; thence South 89°-47'-27" East along the North line of the South 3/4 of the SE 1/4 of the SE 1/4 of said Section 1 for a distance of 274.10 feet to a Point of Intersection with the West right-of-way line of said U.S. Highway No. 1, also being State Road (4) 5; thence North 13°-57'-09" East along said West right-of-way line of U.S. Highway No. 1, also being State Road (4) 5, for a distance of 243.54 feet to the POINT OF BEGINNING.

EXHIBIT A-3
TO ASSET PURCHASE AGREEMENT

<u>EXCLUSIVE USE CLAUSES</u>

None.

EXHIBIT A-4
TO ASSET PURCHASE AGREEMENT

<u>LIST OF DOCUMENTS BINDING ON BUYER</u>

WINN-DIXIE STORE # **217**
Pompano Beach, Florida

Lease:        Lease, dated May 10, 1988, between Pomp Commercial Corp., Landlord, and Winn-Dixie Stores, Inc., Tenant.

Short Form Lease, dated May 10, 1988, between Pomp Commercial Corp., Landlord, and Winn-Dixie Stores, Inc., Tenant.

Amendments:    First Amendment to Lease, dated August 1, 1990, between Pompano Marketplace Partners, Landlord, and Winn-Dixie Stores, Inc., Tenant.

Supplemental Lease Agreement, dated November 13, 1989, between Pomp Commercial Corp., Landlord, and Winn-Dixie Stores, Inc., Tenant.

Second Amendment to Lease, dated November 30, 1997, between SPV Real Estate Partners No.1 L.P., Landlord, and Winn-Dixie Stores, Inc., Tenant.

Second Supplemental Lease Agreement, made February 16, 2000, between TA/Western LLC, Landlord, and Winn-Dixie Stores, Inc., Tenant.

Subordination, Nondisturbance, and Attornment Agreement, made January 20, 1998, between Wells Fargo Bank, National Association, Lender, and Winn-Dixie Stores, Inc.

Letter Agreement, dated January 17, 1989, between Pomp Commercial Corp., Landlord, and Winn-Dixie Stores, Inc., Tenant.

EXHIBIT B
To Asset Purchase Agreement


Form of Bill of Sale

## BILL OF SALE

**WINN-DIXIE STORES, INC.**, a Florida corporation ("Seller"), in consideration of the mutual covenants set forth in that certain Asset Purchase Agreement dated effective _____, 2006, among **WAL-MART STORES, INC.** a Delaware corporation, or its permitted assignee pursuant to paragraph 17.5 of the Agreement (hereinafter defined) ("Buyer") and Seller (the "Agreement"), does hereby grant, bargain, transfer, sell, assign and convey unto Buyer all of Seller's right, title and interest in the Assets described in the Agreement (other than the Lease or permit(s), which are subject to separate instruments of conveyance and assignment), relating to Seller's store location as more particularly described on attached Schedule A.

This Bill of Sale is delivered by Seller to Buyer as required under the Agreement, and is made subject to the terms and conditions of the Agreement. All capitalized terms not expressly defined herein shall have the meanings ascribed to them in the Agreement.

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed by the undersigned as of this _____ day of _____, 2006.

**SELLER:**

**WINN-DIXIE STORES, INC.**,
a Florida corporation

By: _____
Name:
      _____
Title: Vice President

<u>EXHIBIT C</u>
To Asset Purchase Agreement

**FORM OF CLOSING STATEMENT**

**CLOSING STATEMENT SUMMARY**

| | |
|---|---|
| **BUYER:** | Wal-Mart Stores, Inc., a Delaware corporation, or its permitted assignee pursuant to paragraph 18.5 of the Agreement |
| **SELLER:** | Winn-Dixie Stores, Inc., a Florida corporation |
| **ESCROW AGENT and SETTLEMENT AGENT:** | _____ |
| **PROPERTY** | Store No. 2__ |
| **CLOSING DATE:** | _____, 2006 |

_____

**SELLER'S STATEMENT**

**I.    PURCHASE PRICE:**

      Leasehold:                                                      $_____

      FF&E:                                                            $_____

      TOTAL PURCHASE PRICE:                              $_____

**II.**                                                                        $_____

**III.**                                                                       $_____

**A.    NET CREDIT/DEBIT TO SELLER:**    ($_____)    or $_____

**B.    TOTAL CLOSING COSTS PAYABLE**    ($_____)
      **BY SELLER:**

**AMOUNT DUE SELLER**                                      $_____

## BUYER'S STATEMENT

I.      **TOTAL PURCHASE PRICE:**                                      $_____

A.      **NET CREDIT/DEBIT TO BUYER:**     ($_____)    or
                                                                     $_____
B.      **TOTAL CLOSING COSTS PAYABLE**   ($_____)
        **BY BUYER:**
C       **DEPOSIT**                                ($_____)

**AMOUNT DUE FROM BUYER**                             $_____

## TOTAL DISBURSEMENTS[1]

1.      Deposit from Escrow Agent                      $_____
2.      Amount Due From Buyer                          $_____

**TOTAL RECEIPTS:**                                    $_____

1.      Seller's Brokers Fees                          ($_____)
2.      Title Premiums, Title Examination Fees and related
          Costs, Recording and Escrow Fees             ($_____)
3.      Seller's Cure Costs                            ($_____)
4.      Seller's Proceeds                              _____
[5.]    [Other]                                        ($_____)
**TOTAL DISBURSEMENTS:**

## STIPULATIONS

<u>Purchase Agreement</u>.  This transaction has been closed pursuant to the provisions set forth in that certain Asset Purchase Agreement between Seller and Buyer, dated effective as of _____, 2006 (the "Purchase Agreement"). Attached hereto is an individual itemized closing statement for the Assets covered by the Purchase Agreement.

<u>Authorization to Disburse</u>.  By their signatures below, Seller and Buyer hereby (a) authorize and direct the closing agent to (i) make the disbursements included in this Closing Statement and (ii) to wire the AMOUNT DUE SELLER to the following account:

                            _____
                            _____

_____

[1] Refer to Individual Property Closing Statement for Itemization.

_____

_____

Counterparts.  This Closing Statement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement and the signatures of any party to any counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart.  To facilitate execution and delivery of this Closing Statement, the parties may execute and exchange counterparts of the signature pages hereof by telecopier or electronic mail, immediately followed by delivery of originals by overnight delivery services.

Adjustments.  Seller and Buyer acknowledge and agree that any amounts not determinable as of the Closing Date or reflected on this Closing Statement (including on the individual closing statements attached hereto) will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination.  Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination.

The undersigned parties acknowledge and agree to the this Closing Statement as of this _____ day of _____, 2006, and hereby authorize _____ Title Insurance Company, as closing agent, to disburse the sums set forth herein in accordance herewith.

**SELLER:**                                    **BUYER:**

**WINN-DIXIE STORES, INC.**,          **WAL-MART STORES, INC.**,
a Florida corporation                     a Delaware corporation

By:                                            By:
_____       _____
Name:                                         Name:
_____       _____
Title: Vice President                      Title: _____

## INDIVIDUAL PROPERTY CLOSING STATEMENT

**BUYER:**      Wal-Mart Stores, Inc., a Delaware corporation, or its permitted assignee pursuant to paragraph 18.5 of the Agreement

**SELLER:**      Winn-Dixie Stores, Inc., a Florida corporation

**ESCROW AGENT and SETTLEMENT AGENT:** _____

**Property:**      Store No. 2__

**CLOSING DATE:**      _____, 2006

### SELLER'S STATEMENT

**ALLOCATED BASE PURCHASE PRICE:**

$_____

Leasehold and Improvements:

$_____

TOTAL PURCHASE PRICE:

**Less Adjustments (Debit):**

$_____

Seller's Prorated Share of Taxes and Other Charges Payable Under Lease (1)

$_____

Buyer's Prorated Share of Rents Paid in Advance

$_____

**Total Debit Adjustments:**

$_____

**Plus Adjustments (Credit):**

$_____

Seller's Prorated Share of Rents and Other Charges Paid in Advance Under Lease (3)

$_____

Environmental Assessment Costs Paid by Seller

$_____

[Other]

$_____

**Total Credit Adjustments:**

**NET DEBIT/CREDIT TO SELLER**

**Less Closing Costs Payable by Seller:**

Seller's Attorneys' Fees & Costs                    $_____

Seller's Brokerage Fees                             $_____

Cure Costs                                          $_____

**Total Seller's Closing Costs:**

**AMOUNT DUE TO SELLER**                            $_____

<u>**BUYER'S STATEMENT**</u>

**ALLOCATED PURCHASE PRICE:**       $_____

**<u>Less Adjustments (Credit)</u>:**

Allocated Amount of Deposit                         $_____

Seller's Prorated Share of Rents and Other Charges Paid in Advance Under Lease (1)                         $_____

[Other]                                             $_____

**Total Debit Adjustments:**

**<u>Plus Adjustments (Debit)</u>:**                $_____

Seller's Prorated Share of Rents and    $_____
Other Charges Paid in Advance
Under Lease (3)

Environmental Assessment Costs          $_____
Paid by Seller

[Other]                                 $_____

**Total Credit Adjustments:**                       $_____

**NET DEBIT/CREDIT TO BUYER**

**Less Closing Costs Payable by Buyer:**

Buyer's Attorneys' Fees & Costs      $_____

Title Insurance Premiums(4)          $_____

Title Examination Fees              $_____

Transfer/Documentary Taxes          $_____

Buyer's Brokerage Fees              $_____

Closing Escrow Fees                 $_____

**Total Buyer's Closing Costs:**     $_____

**AMOUNT DUE FROM BUYER**                        $_____

**ALLOCATED AMOUNT OF BASE DEPOSIT**             $_____

**TOTAL AMOUNT DUE AT CLOSING**                  $_____

## SCHEDULE OF DISBURSEMENTS

1.    Allocated Amount of Deposit from Escrow Agent       $_____
2.    Amount Due From Buyer                               $_____

**TOTAL RECEIPTS:**                                       $_____

1.    The Food Partners, LLC                              ($_____)
      (Seller's Brokers Fees)
2.    Title Insurance Company                             ($_____)
      Title Premiums, Title Examination Fees and related
       Costs, Recording and Escrow Fees
3.    _____                                ($_____)
      Transfer/Documentary Taxes
4.    **[Name of Inventory Service]**                     ($_____)
      (Inventory Service Fees)
5.    _____
      (Lease Cure Costs, if any)
6.    Seller                                              ($_____)
      (Seller's Proceeds)

                                            _____

_____

**TOTAL DISBURSEMENTS:**
**Notes**:

(1)      <u>2006 Prorations - Amounts Not Yet Paid and Payable</u>.  Prorations are based on (i) estimate of 2006 real estate taxes derived from actual 2005 amounts paid by Seller in arrears in accordance with Lease; and (ii) estimate of 2005 insurance charges derived from actual 2005 amounts paid by Seller in arrears in accordance with Lease. Buyer will be responsible for the payment of such charges for 2006 and subsequent years.

**Real          Estate Taxes**

Store #2___

- 2006 Real Estate Taxes                    $
- Per Diem Tax Amount                       $
- Seller's Share of 2006 Taxes
   (1/1/06  -  __/__/06)  (_____
days)                                       $_____        _____

**Total Real Estate Taxes:**


**Personal Property Taxes**

Store #2___

- 2006 Personal Property Taxes      $
- Per Diem Tax Amount               $
- Seller's Share of 2005 Taxes
   (1/1/06  -  __/__/06)  (_____
days)                               $_____        _____

**Total Personal Property Taxes:**


**CAM Charges**

Store #2___

-      2006      CAM
Charges                             $
-        Per    Diem
Amount                              $
-    Seller's  Share  of  2006  CAM
Charges
   (__/__/__  -  __/__/06)  (_____
days)                               $_____        _____

**Total CAM Charges:**


**Insurance**

Store #2___

- 2006 Insurance                                  $
-       Per    Diem
Amount                                            $
- Seller's Share of 2006 Insurance
   (__/__/__ - __/__/06) (_____
days)                                             $ _____
**Total Insurance:**
**Total   Amount   of   Seller's**
**Prorated   Share   of   2006**
**Prorations:**                                                        _____


Store #2__
- Total _____, 2006 rent paid:       $
- Per diem rent:                             $
- Buyer's prorated share
   (__/__/__ - __/__/06) (_____ days)   $ _____
**Total Amount of Seller's Prorated Share of _____**
**Prorations:**


(2)          _____, 2006 Prorations - Amounts Previously Paid by Seller.
Prorations are based on _____, 2006 rents, common area
maintenance assessments and other charges previously paid by
Seller in accordance with Lease.  Buyer will be responsible for the
payment of such charges that become due and payable for
_____, 2006 and thereafter.  Prorations are as follows:

**Rent**

Store #2__
- Total _____, 2006 rent paid:       $
- Per diem rent:                             $
- Buyer's prorated share
   (__/__/__ - __/__/06) (_____ days)   $ _____
- Per diem rent:                             $
- Buyer's prorated share
   (__/__/__ - __/__/06) (_____ days)   $ _____  _____
**Total Amount of Buyer's Prorated Share of _____**
**Prorations:**


(4)          Title Premiums and Expenses.   Title insurance fees and costs,
including title examination fees and title insurance premiums, are as
follows:

Store #2__
                                             $
- Title Search Fees and Costs               -

$
   - Title Premium   - _____
   **Total Amount of Title Fees and Expenses:**

(5)      <u>Utility Deposits and Charges</u>. All utility deposits will be returned to Seller directly by the respective utility companies. Seller will be responsible for payment of any portion of any utility charges attributable to utility service (including telephone service) provided through and including the date hereof. Buyer will be responsible for payment of any new utility deposits which may be assessed by the respective utility companies and for payment of any portion of such utility charges attributable to utility service provided subsequent to the date hereof. The party responsible for each share of such utility charges will pay such charges promptly and without demand therefor. Each party agrees to indemnify and hold harmless the other party from and against liability for payment of the first party's share of such utility charges.

(6)      <u>Adjustments</u>. Seller and Buyer acknowledge and agree that any amounts not determinable as of the Closing Date or reflected on this Closing Statement will be taken into account at the Closing based on good faith estimates with the actual amount to be calculated by Seller and Buyer as soon as practicable after the actual amounts are determinable with an appropriate adjustment to be paid by the appropriate party promptly after determination. Seller and Buyer also acknowledge and agree to execute any documents necessary to correct any errors or omissions in the Closing Statement with an appropriate adjustment to be paid by the appropriate party promptly after determination. Buyer agrees that it will timely make all required notifications to appropriate taxing authorities to effect the change in party responsible for taxes.

(7)      <u>Capitalized Terms</u>.  Capitalized terms used herein will have the meanings ascribed to them in the Purchase Agreement.

EXHIBIT D
To Asset Purchase Agreement

**<u>Permitted Encumbrances</u>**

The following items, to the extent the same are applicable to the tenant's interest under the terms of the Lease:

1.  Taxes and assessments of any taxing authority that are attributable to any period following Closing.

2.  All applicable laws, ordinances, and regulations imposed by any applicable governmental authority, including, but not limited to, all applicable building, zoning, land use and environmental ordinances and regulations.

3.  Rights of Landlord under the Lease, including the rights of the Landlord's mortgagee.

4.  All other matters set forth as exceptions in the Title History, other than Monetary Liens.

5.  Subject to paragraph 4.2, all other matters set forth as exceptions in any Title Commitment, other than Monetary Liens.

EXHIBIT E

FORM OF SALE ORDER

# UNITED STATES BANKRUPTCY COURT

# MIDDLE DISTRICT OF FLORIDA

# JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., <u>et al.</u>, | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

## ORDER APPROVING DEBTORS' (A) SALE OF LEASEHOLD INTEREST IN STORE NO. 217 FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS (B) <u>ASSUMPTION AND ASSIGNMENT OF LEASE AND (C) RELATED RELIEF</u>

This matter came before the Court on May 18, 2006 on the motion, dated April 11, 2006, of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order (Docket No. 7092) under 11 U.S.C. §§ 105(a), 363 and 365 and Fed. R. Bankr. P. 3002, 6004 and 6006 (a) authorizing the Debtors to sell certain leasehold

interests, including the assets described in the asset purchase agreement attached as Exhibit A (the "Purchase Agreement") between Winn-Dixie Stores, Inc. and Wal-Mart Stores, Inc. (the "Purchaser"), free and clear of liens, claims, interests and encumbrances, (b) authorizing the Debtors to assume and assign the unexpired lease identified in the Purchase Agreement (the "Lease") in connection with such sale, (c) fixing a cure amount for the applicable lease and (d) granting related relief (the "Motion").   By the Motion, the Debtors asserted that the only cure required under the Lease for Store No. 217 was payment of $757.37 (the "Cure Amount").   By the Motion, landlords were given until April 25, 2006 to object to the Cure Amounts.   The landlord for Store No. 217 filed a timely objection and unless resolved by the parties, the matter will be set for hearing before the Court at a future date. The Court held a hearing on the Motion on May 18, 2006 to approve the sale of the Assets[2] (the "Sale Hearing"). **Alternatives, depending on the circumstance:** [The Court has reviewed the Motion and heard the representations of counsel.   Upon the representations of counsel and without objection by the United States Trustee or any other interested party, the Court makes the following findings of fact:] **or** [The Court has reviewed the Motion, [considered the evidence] and heard arguments of counsel.   After due deliberation and good and sufficient cause existing, the Court makes the following findings of fact:]

---

[2]  All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Purchase Agreement.

A.    This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

B.    The Debtors solicited the highest or otherwise best offer for the assets described in the Purchase Agreement (the "Assets"), in accordance with bidding procedures (the "Bidding Procedures") approved by the Court by order (Docket No. 1801) dated June 20, 2005 (the "Bidding Procedures Order"). Competing bids were received for the Assets, and the Debtors conducted an auction for the Assets on May 9, 2006 (the "Auction").  At the Auction, the Purchaser submitted the final aggregate bid of $625,000 representing the highest or otherwise best offer received for the Assets.

C.    The Debtors have provided interested parties (including all parties asserting claims or interests in the Assets, if any) with proper notice of the Motion, the Sale Hearing, the Auction, the assumption and assignment of the Lease, and the fixing of any cure amount, in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365, Fed. R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order entered by the Court in these cases and the Bidding Procedures Order.  Such notice was good and sufficient, appropriate under the circumstances and no other or further notice of the Motion, the Sale Hearing, the Auction, the assumption and assignment of the Lease, or the fixing of any cure amount is or shall be required.  A reasonable opportunity to object or be heard on the relief requested was afforded to all parties in interest.

D.    The Debtors marketed the Assets and conducted the sale process in  compliance with the Bidding Procedures Order, the Bidding Procedures, the Bankruptcy Code and all other applicable Orders entered in these cases.  The bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner.  The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets.  In their sound business judgment, the Debtors determined that the purchase price provided in the Purchase Agreement was the highest or otherwise best offer for the Assets.

E.    Following the Auction, in accordance with the Bidding Procedures, the Debtors provided notice of the Successful Bid (as defined in the Bidding Procedures), the Purchase Agreement, and the proposed terms of this Order to (i) the Committee's Professionals, (ii) the DIP Lender Agent Representatives, (iii) the U.S. Trustee, (iv) all applicable taxing authorities and other governmental agencies, (v) all non-debtor parties to the Lease and (vi) all other relevant parties.  Such notice was good and sufficient, appropriate under the circumstances and no other or further notice of the Successful Bid, the Purchase Agreement, or this Order is or shall be required.  A reasonable opportunity to object or be heard on the relief requested was afforded to all parties in interest.

F.    The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A, the assumption and assignment agreement attached as Exhibit F to the Purchase Agreement (the "Assumption and Assignment Agreement"), and all related documents, and the sale of the Assets (the "Sale") and the assumption and

assignment of the Lease, as described in the Purchase Agreement, has been duly and validly authorized by all necessary corporate action of the applicable Debtors; and (ii)  no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

G.    The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

H.    Neither the Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

I.    The Debtors and the Purchaser proposed, negotiated and entered into the Purchase Agreement, without collusion, in good faith and at arms'-length bargaining positions.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

J.    The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the benefits and protections afforded by that section.

K.    The consideration the Purchaser is providing to the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

L.      The Debtors' transfer of the Assets to the Purchaser pursuant to the Purchase Agreement, any related bills of sale or other applicable transfer agreements, including the Assumption and Assignment Agreement, will be a legal, valid, and effective transfer of the Assets.   The Debtors' transfer of the Assets to the Purchaser vests the Purchaser with good and valid title in and to the Assets free and clear of any and all liens, claims, encumbrances, pledges, mortgages, security interests, charges, options, judgments or other interests of any kind or nature (collectively, the "Claims and/or Interests"), with the exception of the Permitted Encumbrances, if any, as defined in the Purchase Agreement.   Any non-assumed Claims and/or Interests will attach to the proceeds of the sale of the Assets with the same validity, enforceability and priority they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors, Wachovia Bank National Association, as Administrative Agent and Collateral Agent for itself ("Agent") and the other financial institutions from time to time parties to the Credit Agreement dated as of February 23, 2005, as may be amended or modified (collectively, "Lenders" and together with Agent, collectively, the "DIP Lender") and all other interested parties with respect to such Claims and/or Interests.

M.      The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the Purchase Agreement free and clear of all Claims and/or Interests (except the Permitted Encumbrances) because any entity with any Claims and/or Interests in the Assets to be transferred (i) has consented to the Sale (including the assumption and assignment of the Lease) or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to

accept money satisfaction of such Claims and/or Interests; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied.  Holders of Claims and/or Interests, if any, who did not object, or who withdrew their objections to the Motion are deemed to have consented to the Sale pursuant to 11 U.S.C. § 363(f)(2).

N.    The Debtors will cause the net proceeds from the Sale to be paid in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

O.    The Debtors' assumption and assignment of the Lease in connection with the Sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

P.    The Debtors have provided the landlord under the Lease with adequate assurance that they will promptly cure any defaults under the Lease pursuant to 11 U.S.C. § 365(b)(1).

Q.     The Court will determine whether any amounts are due by the Debtors under the Lease (if any, the "Cure Amount").  The Debtors will pay the Cure Amount, if any, upon entry of a final order of the Court establishing any such Cure Amount.  Upon payment of any such Cure Amount, all defaults, if any, under the Lease will be deemed cured.

R.     The Debtors and Purchaser have provided the landlord under the Lease with adequate assurance of its future performance under the Lease, and the assumption, assignment and sale of the Lease satisfies the requirements of 11 U.S.C. §§ 363, 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B), as applicable.

S.     No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under the Lease.

T.     Except as expressly set forth in the Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser will have no responsibility for any liability, claim or other obligation of or against the Debtors related to the Assets or the Lease by virtue of the transfer of the Assets and the assumption and assignment of the Lease to the Purchaser.  The Purchaser will not be deemed, as a result of any action taken in connection with the purchase of the Assets or the assumption and assignment of the Lease, to (i) be a successor to the Debtors (other than with respect to any obligations arising under the Lease from and after the Closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors. The Purchaser is not acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the Purchase Agreement.

U.    The Court's approval of the Purchase Agreement and the Assumption and Assignment Agreement is in the best interests of the Debtors, their estates and their creditors.  Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.    The Motion is granted to the extent set forth in this Order.

2.    All objections to the entry of this order or to the relief granted and requested in the Motion with respect to the Purchase Agreement, the Lease, the sale of the Assets to the Purchaser or any related matter addressed in this Order that have not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

3.    The Purchase Agreement and the Assignment and Assumption Agreement are each approved in all respects.  Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized (subject to applicable Closing conditions set forth in the Purchase Agreement), to consummate the Sale, including transferring and conveying the Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

4.    The Debtors are authorized, in accordance with 11 U.S.C. §§ 105(a), 363 and 365, to assume and assign the Lease to the Purchaser.

5.    The Debtors and the Purchaser have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2), including the provision of adequate assurance of future performance.  In particular, while

the Court does not expressly decide the issue of whether the real property that is the subject of the Lease (the "Property") is part of a "shopping center" within the meaning of 11 U.S.C. § 365, all of the so-called "shopping center provisions" of the Bankruptcy Code with respect to the assumption of a shopping center lease have been satisfied in connection with the assumption and assignment of the Lease and the Purchaser's use of the premises in a manner consistent with its typical retail operations (including the operation of a pharmacy), as described in the Purchase Agreement.

6.      The Lease will be assumed and assigned to the Purchaser, in accordance with its terms.  The assigned Lease will remain in full force and effect notwithstanding any provision therein to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1)) which prohibit, restrict or condition such assignment or transfer). The DIP Lender and all non-debtor parties to the Lease are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the Purchase Agreement.

7.      Any rights contained in the Lease which purport to be personal only to the Debtors or to be exercisable only by the Debtors constitute unenforceable restrictions on assignment and may be freely exercised by the Purchaser, following Closing, to their full extent.

8.      Notwithstanding any provision in any lease, contract, reciprocal easement agreement ("REA") or applicable law, the Purchaser is authorized to allow the Leased Premises to remain dark for up to eighteen

(18) months after Closing, notwithstanding any subsequent assignment or disposition of the Leased Premises in accordance with the terms of the Lease (unless the Lease or such contract, REA or local law would allow the Leased Premises to remain dark for a period in excess of eighteen (18) months following Closing, in which case such longer period shall apply). The fact that the Leased Premises remains dark for up to eighteen (18) months after Closing shall not result in the termination or forfeiture of any restrictions encumbering other parcels which benefit the Leased Premises.

9.     In connection with the opening and operating of a retail store at the Leased Premises, the Purchaser is authorized to perform alterations and remodeling to the extent necessary to conduct its typical retail operations, including alterations necessary to provide two prototypical truck loading dock/wells at the Leased Premises, and to replace and modify existing signage, notwithstanding any provision to the contrary in the Lease or any related document, including any provision requiring the consent of any non-Debtor party for such work.

10.     Provisions contained in the Lease which are or could have the effect of being provisions which restrict "going dark," alteration and recapture provisions contained in the Lease, provisions requiring consent or otherwise restricting the rights provided for in this Order (including "go-dark," alteration and remodeling rights), or clauses which impose a fee or a penalty or a profit sharing upon assignment or limit or condition extension or renewal options, clauses which seek to increase the rent (including

percentage rent clauses) or impose a penalty or to modify or terminate the Lease or terminate or otherwise impair any exclusive rights of the tenant under the Lease as a result of going dark or upon assignment, provisions which directly or indirectly limit or condition or prohibit assignment, continuous operating covenants, covenants that any user of the Debtors' premises operate under the name of "Winn-Dixie," and/or operate with a use similar to a "Winn-Dixie," and similar provisions contained in any other documents with respect to the Assets shall not restrict, limit, or prohibit the sale or assumption and assignment of the Assets to the Purchaser and such clauses are hereby deemed and found to be unenforceable anti-assignment clauses within the meaning of 11 U.S.C. § 365(f).

11.    Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized and empowered to consummate and implement fully the Purchase Agreement and the Assignment and Assumption Agreement, together with all additional instruments and documents that may be necessary to implement the Purchase Agreement.  The Debtors are authorized to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Assets, including the Lease, to the Purchaser.

12.    Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties in accordance with the terms of the Purchase Agreement without further order of the Court, provided that (i) if necessary, the Debtors first obtain the prior written consent of (a) the DIP

Lender and (b) the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

13.     The Debtors will transfer the Assets to the Purchaser upon closing free and clear of all Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances). The only known Claims and/or Interests in the Assets are those of the landlord with respect to the Lease, the senior liens and superpriority administrative claims of the DIP Lender and any liens of the Broward County Tax Collector for unpaid taxes.  The Claims and/or Interests of the landlord will be satisfied upon Closing by the Debtors' payment of the Cure Amount, if any, and the Debtors' and the Purchasers' demonstration of adequate assurance of future performance under 11 U.S.C. § 365.  The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender, and any other liens, claims or interests with respect to the Assets, will attach to the proceeds of the Sale, in the case of the DIP Lender in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).  The liens, if any, of the Broward County Tax Collector on the Debtors' interest in the Leased Premises shall attach to the proceeds of the sale of the Lease to the Purchaser, and the claims, if any, related to such liens shall be treated and resolved in these cases.

14.     The Debtors will cause the net proceeds from the Sale to be paid, to the extent required, in accordance with the terms of the Final

Financing Order and the Loan Documents (as defined in the Final Financing Order).

15.     The Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia, without collusion.  For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

16.     All defaults, claims or other obligations of the Debtors arising or accruing under the Lease, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be cured by the Debtors by paying the Cure Amount, if any.   No other or further monetary amounts or obligations are due or existing under the Lease or any other Assigned Agreement by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise.

17.     An objection regarding a "cure issue" to the assumption and assignment of the Lease shall not affect the assumption and assignment of the Lease.  The Debtors will hold the Purchaser harmless from any failure by the Debtors to pay any applicable Cure Amount.

18.     The failure of any party to: (a) allege in these proceedings any pre-assumption and assignment default under the Lease, other than the Cure Amount; (b) identify any amendment, modification, sublease or other agreement relating to or affecting the Assets, other than

those listed on Exhibit A-4 to the Purchase Agreement, (c) assert any material waiver, failure to act, or act or statement contrary to that presented in the Motion by the Debtors or (d) assert any objection or defense to the entry of this Order, shall forever bar and estop said party, its heirs, successors and assigns, and any predecessor in interest, of itself and anyone claiming by, through or under it or them, from asserting any claims or attempting to enforce any rights based thereon in any subsequent cases, proceedings, or actions against the Debtors or the Purchaser (or parties claiming through the Purchaser), in law or in equity in this or before any other court or tribunal, and any such claim(s) shall be and are terminated, exonerated, barred and adjudicated against such person.  No party shall be entitled to enforce against the Purchaser any pre-closing document, instrument or agreement with respect to the Assets other than a document, instrument or agreement listed on Exhibit A-4 to the Purchase Agreement, and all parties shall be enjoined from attempting to enforce any such document, instrument or agreement against Purchaser or any of its affiliates, related parties, successors or assigns.

19.      Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Lease to the Purchaser, (a) the Debtors and their estates are relieved from any and all liability for any breach of the Lease occurring after assignment to the Purchaser, and (b) subject to the terms of this Order, the Purchaser is responsible for any and all claims and obligations under the Lease occurring or arising after the assignment.

20. Subject to the terms of this Order, the Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser assumes all rights and obligations of the Debtors under the Lease on and after the Closing Date.

21. All non-Debtor parties to the Lease are forever enjoined and estopped from contesting the Cure Amount (except as may be permitted by the Court) and from asserting any default against the Purchaser which existed prior to the Closing Date.

22. Upon the Debtors' assignment of the Lease to the Purchaser, no default will exist under the Lease. Upon entry of this Order and the assumption and assignment of the Lease, the Purchaser is deemed to be in compliance with all terms and provisions of the Lease.

23. Subject to the terms and conditions of this Order, all entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors. Prior to or upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims and/or Interests in the Assets (except for the Permitted Encumbrances), if any. In the event any creditor fails to release its Claims and/or Interests in the Assets upon Closing, the Debtors are authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other documents on such creditor's behalf. The Purchaser is also authorized to file, register or

otherwise record a certified copy of this Order upon Closing.  Once this Order is so filed, registered or otherwise recorded, the Order constitutes conclusive evidence of the release of all Claims and/or Interests against the Assets as of the Closing (except for the Permitted Encumbrances).

24.     The Purchaser acted in good faith, as that term is used in 11 U.S.C. § 363(m), in purchasing the Assets, including the Lease, under the Purchase Agreement.  For that reason, any reversal or modification of this Order on appeal will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

25.     The Debtors' transfer of the Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

26.     Other than the Permitted Encumbrances and other obligations of the Purchaser as set forth in the Purchase Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets, including the Lease.  The Debtors' transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by

reason of such transfer under the laws of the United States or any state or territory.

27.     Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets, including the Lease, and a bill of sale transferring good and marketable title in the Assets to Purchaser.  Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

28.     This Order is effective as a determination that upon Closing any and all Claims and/or Interests (except for the Permitted Encumbrances), if any, will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

29.     This Order is binding upon all entities who may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Assets.

30.     The landlord under the Lease is directed to sign any instruments, applications, consents or other documents which may be required by any public or quasi-public authority or other party or entity, for purposes of obtaining any permits, approvals or other necessary

documentation and/or action required for the alterations and remodeling permitted under this Order.

31.     This Court retains exclusive jurisdiction to (a) enforce and implement the Purchase Agreement, the Assumption and Assignment Agreement, and any other agreements and instruments executed in connection with the Purchase Agreement, (b) compel delivery of possession of the Assets to Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement or the Assumption and Assignment Agreement, and (d) interpret, implement and enforce the provisions of this Order.

32.     The terms and provisions of the Purchase Agreement, the Assumption and Assignment Agreement and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

33.     Except with respect to Permitted Encumbrances, all persons who hold Claims and/or Interests against the Debtors are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

34.      After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Claims and/or Interests or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Purchase Agreement.  No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

35.      To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in the Purchase Agreement will control.

36.      Within ten days after Closing, the Debtors will file a statement with the Bankruptcy Court as required by and in accordance with Rule 6004(f) of the Federal Rules of Bankruptcy Procedure.

37.      Notwithstanding Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d), this Order will take effect immediately upon entry.

Dated this _____ day of May, 2006 in Jacksonville, Florida.


_____
Jerry A. Funk
United States Bankruptcy Judge


Cynthia C. Jackson is directed to serve
a copy of this Order on counsel for the
Purchaser and all parties who received
copies of the Motion.

EXHIBIT F
To Asset Purchase Agreement

<u>Form of Assignment</u>

**ASSIGNMENT AND ASSUMPTION OF LEASE**
Store #217

**THIS ASSIGNMENT AND ASSUMPTION OF LEASE** (this "Assignment") is made as of _____, 2006 (the "Effective Date"), by and between **WINN-DIXIE STORES, INC.** a Florida corporation (hereinafter referred to as "Assignor"), and **WAL-MART STORES, INC.,** a Delaware corporation, or its permitted assignee pursuant to paragraph 17.5 of the Agreement (hereinafter defined) (hereinafter referred to as "Assignee");

**R E C I T A L S:**

A.    Assignor has agreed to convey to Assignee certain assets in connection with Assignor's retail supermarket store location described on attached <u>Exhibit A</u> (the "Premises") as more particularly described in the Asset Purchase Agreement dated effective _____, 2006 by and among Assignor, as seller, Assignee, as buyer, as amended from time to time (the "Agreement").

B.    As part of the purchase and sale of Assignor's assets referenced above, Assignor has agreed to assign to Assignee all of Assignor's right, title and interest, as tenant or lessee, in and to the lease, together with any and all amendments thereto, as described on the attached Exhibit A (the "Lease"), and Assignee has agreed to assume and perform Assignor's liabilities and obligations arising under the Lease after the Effective Date, all subject to and in accordance with the terms of the Lease, the Agreement and this Assignment;

**NOW**, **THEREFORE**, in consideration of the premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.    **<u>EFFECTIVE DATE</u>**. This Assignment shall be effective as of the Effective Date.

2.    **<u>ASSIGNMENT</u>**.

(a)    Assignor hereby assigns, transfers, and conveys unto Assignee all of Assignor's right, title, interest and obligation as tenant or lessee in and to the Lease and all of the rights, benefits and privileges of the tenant or lessee thereunder.

3.    **<u>ASSUMPTION; ACCEPTANCE OF PREMISES</u>**.

(a)     Assignee hereby accepts the aforesaid assignment of the Lease and assumes and agrees to pay and perform all liabilities and obligations of the tenant or lessee that accrue under the Lease from and after the Effective Date, and Assignee hereby indemnifies, and agrees to save, insure, defend and hold harmless Assignor from and against all liabilities and obligations of the tenant or lessee that accrue under the Lease on or after the Effective Date.

4.     **NOTICES**. All notices, requests, demands, and other communications required or permitted to be given under this Assignment will be in writing and sent to the address(es) set forth below. Each communication will be deemed duly given and received: (1) as of the date and time the same is personally delivered with a receipted copy; (2) if delivered by U.S. Mail, three (3) days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested; (3) if given by nationally recognized or reputable overnight delivery service, on the next business day after receipted deposit with same; or (4) if given by telefax, when the telefax is transmitted to the recipient's telefax number and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient.

If to Assignor:     Winn-Dixie Stores, Inc.; Re: Store #217
                    5050 Edgewood Court
                    Jacksonville, FL 32254-3699
                    Attn: Chief Financial Officer
                    Telefax No.: 904/783-5646

With a copy to:     Winn-Dixie Stores, Inc.
                    5050 Edgewood Court
                    Jacksonville, FL 32254-3699
                    Attn: Office of General Counsel
                    Telefax No.: 904/783-5641

or to such other address or telefax number as Assignor may direct from time to time.

If to Assignee:     Wal-Mart Stores, Inc.
                    2001 S.E. Tenth Street
                    Bentonville, Arkansas  72712
                    Attn: Karen Roberts
                    Telefax No.: 479-277-5991
                    e-mail: *karen.roberts@walmartlegal.com*

With a copy to:     Willkie Farr & Gallagher LLP787 Seventh Avenue
                    New York, New York  10019
                    Attn: John C. Longmire, Esq.

Telefax No.: 212-728-8111
e-mail: *jlongmire@willkie.com*

or to such other address or Telefax number as Assignee may direct from time to time.

5.  **NOTICE OF ASSIGNMENT.** On the Effective Date, Assignor and Assignee shall execute and deliver a Notice of Assignment of Lease and record the same in the recording office of the county in which the Premises is located, for the purpose of placing third parties on notice of Assignor's assignment to Assignee of Assignor's right, title and interest as tenant or lessee in and to the Lease.

6.  **BINDING EFFECT.** This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns.

7.  **FURTHER ASSURANCES.** Assignor and Assignee each covenant and agree to execute or procure any additional documents as may be reasonably necessary to establish the rights of the other hereunder.

8.  **NO BROKERS.** The parties agree that there is no brokerage commission due in connection with the transactions contemplated by this Assignment other than that due by Assignor to Assignor's Brokers, if any, as defined on the attached Exhibit B, and that due by Assignee to Assignee's Brokers, if any, as described on the attached Exhibit B. Assignor agrees to pay all fees and commissions claimed by Assignor's Brokers arising out of this Assignment, and Assignee agrees to pay all fees and commissions, if any, claimed by Assignee's Brokers arising out of this Assignment. Except for Assignor's Brokers and Assignee's Brokers, respectively, neither Assignor nor Assignee has dealt with any investment adviser, real estate broker, real estate consultant or finder, or incurred any liability for any commission or fee to any investment adviser, real estate broker, real estate consultant, or finder in connection with this Assignment, the Lease or the Premises. Assignor and Assignee hereby indemnify and agree to hold harmless each other from and against any claims by any other person or entity for brokerage fees, commissions or other similar costs related to this Assignment, the Lease or the Premises by reason of Assignor's or Assignee's own acts, said indemnifications by Assignor and Assignee to survive expiration or earlier termination of this Assignment.

9.  **WAIVER OF JURY TRIAL.** Assignor and Assignee each acknowledge and agree that the nature of this Assignment, the Premises and the Lease makes a jury determination of any dispute arising out of this Assignment, the Premises or the Lease undesirable. Accordingly, Assignor and Assignee each knowingly, voluntarily and intentionally waive any right to a trial by jury that any of them may have in any court with respect to any action relating to this Assignment, the Premises or the Lease.

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment as of the Effective Date.

Signed, sealed and delivered                **ASSIGNOR:**
in the presence of:

                                             **WINN-DIXIE STORES, INC.**,
a Florida corporation

_____        By: _____
Name: _____        Name: _____
                                       Title: Vice President
_____        [CORPORATE SEAL]
Name: _____

STATE                     OF                     FLORIDA
COUNTY OF DUVAL

The foregoing instrument was acknowledged before me under oath on this _____ day of _____, 2006 by _____, the _____ of WINN-DIXIE STORES, INC., a Florida corporation, on behalf of the corporation, who is personally known to me.

                        _____
                        Notary Public, State of Florida
                        Seal:

[SIGNATURES CONTINUED ON FOLLOWING PAGE]

Signed, sealed and delivered
in the presence of:

**ASSIGNEE:**

**WAL-MART STORES, INC.**,
a Delaware corporation

_____
Name: _____

By: _____
Name: _____
Title: _____
[CORPORATE SEAL]

_____
Name: _____


STATE                                    OF                                    ARKANSAS
COUNTY OF BENTON

The foregoing instrument was acknowledged before me by _____, the _____ of WAL-MART STORES, INC., a Delaware corporation, on behalf of the corporation, who is personally known to me and who did not take an oath.

Given under my hand and official seal this _____ day of _____, 2006.

_____
Notary Public, State of Arkansas
My commission expires: _____

WINN-DIXIE STORE # **217 -** Pompano Beach, Florida

Lease:         Lease, dated May 10, 1988, between Pomp Commercial Corp., Landlord, and Winn-Dixie Stores, Inc., Tenant.

               Short Form Lease, dated May 10, 1988, between Pomp Commercial Corp., Landlord, and Winn-Dixie Stores, Inc., Tenant.

Amendments     First Amendment to Lease, dated August 1, 1990, between Pompano Marketplace Partners, Landlord, and Winn-Dixie Stores, Inc., Tenant.

               Supplemental Lease Agreement, dated November 13, 1989, between Pomp Commercial Corp., Landlord, and Winn-Dixie Stores, Inc., Tenant.

               Second Amendment to Lease, dated November 30, 1997, between SPV Real Estate Partners No.1 L.P., Landlord, and Winn-Dixie Stores, Inc., Tenant.

               Second Supplemental Lease Agreement, made February 16, 2000, between TA/Western LLC, Landlord, and Winn-Dixie Stores, Inc., Tenant.

               Subordination, Nondisturbance, and Attornment Agreement, made January 20, 1998, between Wells Fargo Bank, National Association, Lender, and Winn-Dixie Stores, Inc.

               Letter Agreement, dated January 17, 1989, between Pomp Commercial Corp., Landlord, and Winn-Dixie Stores, Inc., Tenant.

Premises:      That certain store building and related improvements located at 1199 South Federal Highway, Pompano Beach, Broward County, Florida.

Legal Description:     The real property as more particularly described as follows:
                       SEE ATTACHED LEGAL DESCRIPTION

EXHIBIT "A"

LEGAL DESCRIPTION:

A portion of the SE 1/4 of Section 1, Township 49 South, Range 42 East and a portion of the SW 1/4 of Section 6, Township 49 South, Range 43 East lying West of the West right-of-way line of U.S. Highway No. 1, also being State Road (4) 5 as per State Road right-of-way map Section 86020-2102, all of the above lying and being in the City of Pompano Beach, Broward County, Florida, more particularly described as follows:

Commence at the Southeast corner of said Section 1; thence North 0°-04'-25" East along the East line of said Section 1, also being the West line of said Section 6 for a distance of 1237.99 feet to the Point of Beginning of the hereinafter described tract of land; thence North 13°-57'-09" East along the said West right-of-way line of U.S. Highway No. 1, also being State Road (4) 5 for a distance of 500.26 feet to a point of intersection with a line being 944.50 feet South of and parallel with the North line of the SW 1/4 of said Section 6; thence North 89°-07'-45" West along the said South line of the North 944.50 feet of the SW 1/4 of Section 6 for 120.12 feet to a Point of Intersection with the East line of said Section 1; thence North 0°-04'-25" East along said East line of Section 1 for a distance of 217.14 feet to a point being 60.00 feet South of the North line of the South 1/2 of the NE 1/4 of the SE 1/4 of said Section 1; thence North 90°-00'-00" West along a line, (also as described in Deed Book 3427-382, Public Records of Broward County, Florida) being 60.00 feet South of the North line of the South 1/2 of the NE 1/4 of the SE 1/4 of said Section 1 for a distance of 939.43 feet; thence South 0°-03'-30" East along a line (also as described in Deed Book 3427-382 Public Records of Broward County, Florida) being 60.00 feet East of the West line of the East 3/4 of the East 1/2 of the SE 1/4 of said Section 1 for a distance of 605.08 feet; thence South 89°-51'-38" East along the North line of the SE 1/4 of the SE 1/4 of said Section 1 for a distance of 272.68 feet to the Northeast corner of the NW 1/4 of the SE 1/4 of the SE 1/4 of said Section 1; thence South 0°-00'-52" East along the West line of the East 1/2 of the East 1/2 of the SE 1/4 of Section 1 for a distance of 419.02 feet to a point being 86.15 feet South of and parallel with the South line of the NW 1/4 of the SE 1/4 of the SE 1/4 of said Section 1; thence South 89°-47'-27" East along a line 86.15 feet South of the said South line of the NW 1/4 of the NE 1/4 of the SE 1/4 of the SE 1/4 of Section 1 for a distance of 332.36 feet; thence North 0°-01'-45" East along the West line of the SE 1/4 of the NE 1/4 of the SE 1/4 of the SE 1/4 of said Section 1 for a distance of 86.15 feet to the Northwest corner of the SE 1/4 of the NE 1/4 of the SE 1/4 of the SE 1/4 of said Section 1; thence South 89°-47'-27" East along the North line of the South 3/4 of the SE 1/4 of the SE 1/4 of said Section 1 for a distance of 274.10 feet to a Point of Intersection with the West right-of-way line of said U.S. Highway No. 1, also being State Road (4) 5; thence North 13°-57'-09" East along said West right-of-way line of U.S. Highway No. 1, also being State Road (4) 5, for a distance of 243.54 feet to the POINT OF BEGINNING.

Exhibit B

Schedule of Brokers

EXHIBIT B-1

ASSIGNOR'S BROKERS

       The Blackstone Group L.P.
       345 Park Avenue
       New York, New York 10154

       The Food Partners, LLC
       1250 Eye Street, NW
       Suite 850
       Washington, DC 20005

       DJM Asset Management, LLC
       445 Broad Hollow Road
       Suite 417
       Melville, New York 11747

EXHIBIT B-2

ASSIGNEE'S BROKERS

       None.