**Schedule A**
**To Assignment and Assumption of Leases**

**Description of Premises and Lease**

STORE #:

STREET ADDRESS:

SHOPPING CENTER:

LEASE:

AMENDMENTS TO LEASE:

SUBLEASES:

AMENDMENTS TO SUBLEASES:

EXHIBIT E
Page 6 of 6

Exhibits to Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84193.1

EXHIBIT F
To Second Asset Purchase Agreement


Confidentiality Agreement


(attached below)

EXHIBIT F
Page 1 of 1

EXHIBIT F                    @002/007



March 2, 2006

Mach Markets Inc. (the "Prospective Purchaser")
31 East Prospect Avenue
Mount Vernon, NY 10550

Attention: Esmail Mobarak

RE:    Winn-Dixie Stores, Inc./Project Panther 06 – Possible Transaction with Prospective Purchaser –
       Confidentiality Letter Agreement

Ladies and Gentlemen:

This letter sets forth specific terms with respect to information provided to the Prospective Purchaser, or
to be provided to the Prospective Purchaser, by Winn-Dixie Stores, Inc. or one or more of its direct or
indirect wholly-owned subsidiaries (collectively, the "Company"). The Prospective Purchaser is
considering a possible acquisition of certain assets of the Company as described on the Internet website
maintained by Merrill Corporation (the "Merrill Web Site") on behalf of the Company under the name
"Project Panther 06" (the "Assets"), by a sale of assets or otherwise (a "Transaction"). The Prospective
Purchaser has requested certain information concerning the Company and the Assets.

As a condition to the Company furnishing the Prospective Purchaser with such information, including
any Confidential Information Memorandum prepared by the Company, the Prospective Purchaser
agrees, in its entity capacity, and on behalf of its officers, directors, shareholders, partners, members,
managers and employees (collectively, the "Purchaser Parties") to consider and treat all Evaluation
Material as strictly confidential, in accordance with the provisions of this letter. The term "Evaluation
Material" shall mean:

(a)    any information concerning the Assets or the Company that is furnished to the Prospective
       Purchaser by or on behalf of the Company, whether furnished before or after the date of this
       letter and whether furnished on the Merrill Web Site, or otherwise in writing, orally,
       electronically, or by other means; and

(b)    any analyses, compilations, studies or other documents prepared by the Purchaser Parties or any
       of the Prospective Purchaser's contractors, agents or advisers (including, without limitation,
       attorneys, accountants, consultants, bankers, financial advisers and any representatives of your
       advisers) (collectively, the "Representatives") that contain or otherwise reflect such information;

(c)    but excluding, information that (a) was or becomes generally available to the public other than as
       a result of a disclosure by the Purchaser Parties or the Representatives or (b) was or becomes
       available to the Prospective Purchaser on a non-confidential basis from a source other than the
       Company or its advisers, provided that such source was not known by the Prospective Purchaser
       to be bound by any letter with the Company to keep such information confidential or to
       otherwise be prohibited from transmitting the information to the Prospective Purchaser by a
       contractual, legal or fiduciary obligation.

Mach Markets Inc.
Confidentiality Letter Agreement
March 2, 2006
Page 2

The Prospective Purchaser hereby agrees that the Evaluation Material shall be used solely for the purpose of evaluating a possible Transaction between the Company and the Prospective Purchaser, and that such information shall be kept confidential by the Purchaser Parties and the Representatives, except to the extent that disclosure of such information (a) has been consented to in writing by the Company, (b) is required by law, regulation, supervisory authority or other applicable judicial or governmental order or (c) is made to the Representatives who need to know such information for the purpose of evaluating any such possible Transaction between the Company and the Prospective Purchaser (it being understood that the Representatives shall have been advised of this letter and shall have agreed to be bound by the provisions hereof). In any event, the Prospective Purchaser shall be responsible for any breach of this letter by any of the Purchaser Parties or the Representatives and the Prospective Purchaser agrees, at the Prospective Purchaser's sole expense, to take all reasonable measures (including but not limited to court proceedings) to restrain the Purchaser Parties and the Representatives from prohibited or unauthorized disclosure or use of the Evaluation Material.

In addition, without the prior written consent of the Company, the Prospective Purchaser shall not disclose, and shall direct the Purchaser Parties and the Representatives not to disclose, to any person:

(a)    that the Evaluation Material has been made available to the Purchaser Parties or the Representatives;

(b)    that discussions or negotiations are taking place concerning a possible Transaction between the Company and the Prospective Purchaser, or

(c)    any terms, conditions or other facts with respect to any such possible Transaction, including the status thereof or any announcement of the existence of a Transaction.

In the event that any of the Purchaser Parties or the Representatives are requested or required by law, regulation, supervisory authority or other applicable judicial or governmental order to disclose any Evaluation Material, the Prospective Purchaser shall provide the Company with prompt written notice of such request or requirement so that the Company may seek an appropriate protective order. If, failing the entry of a protective order, the Purchaser Parties or the Representatives are, in the written opinion of the Prospective Purchaser's counsel, compelled to disclose Evaluation Material, then the Prospective Purchaser may disclose that portion of the Evaluation Material that the Prospective Purchaser's legal counsel advises that the Purchaser Parties or the Representatives are compelled to disclose; provided, however, that in making such disclosure, the Prospective Purchaser shall exercise reasonable efforts to obtain assurance that confidential treatment shall be accorded to that portion of the Evaluation Material that is being disclosed. In any event, the Prospective Purchaser shall not oppose action by the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment shall be accorded the Evaluation Material.

If any Purchaser Party or Representative is contacted, whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to a Transaction that is the subject matter of this letter, then such party shall promptly notify the Company of such contact and describe the facts and circumstances thereof.

The Prospective Purchaser agrees that neither the Purchaser Parties nor any Representatives shall initiate or maintain contact with any third party in interest in the Assets or real and personal property related thereto, including any landlord, lender, subtenant, contractor or licensee, or (except for those contacts made in the ordinary course of business) with any officer, director or employee of the Company

Mach Markets Inc.
Confidentiality Letter Agreement
March 2, 2006
Page 3

regarding the business, operation, prospects or finances of the Company or the Assets, except with the express permission of the Company or its legal counsel.

For one (1) year from the date hereof, the Purchaser Parties shall not directly or indirectly solicit for employment or employ any employee of the Company to whom the Purchaser Parties or the Representatives had been directly or indirectly introduced or otherwise became aware of as a result of the Prospective Purchaser's consideration of a Transaction, as long as such employees continue to be employed by the Company. Notwithstanding the foregoing, nothing herein shall restrict or preclude the Prospective Purchaser's ability to make generalized searches for employees by use of advertisements in any medium or to hire any individual responding to such advertisements.

The Prospective Purchaser hereby acknowledges that the Prospective Purchaser is aware and that the Prospective Purchaser shall advise the Purchaser Parties and the Representatives that federal and state securities laws prohibit any person who has material, non-public information about a company from purchasing or selling securities of such a company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

All Evaluation Material disclosed by the Company shall be and shall remain the property of the Company. Within five (5) business days after being so requested by the Company, the Purchaser Parties and the Representatives shall return all tangible Evaluation Material furnished to the Prospective Purchaser by the Company. Except to the extent a party is advised in writing by counsel that such destruction is prohibited by law, following the Company's request, the Purchaser Parties and the Representatives shall destroy all other Evaluation Material, including written material, memoranda, notes, copies, excerpts and other writings or recordings whatsoever prepared by the Purchaser Parties or the Representatives. Any destruction of materials shall be confirmed by the Prospective Purchaser in writing to the Company, including an itemization of the specific materials destroyed, the medium in which such materials were recorded, and the method of such destruction. Any Evaluation Material that is not returned or destroyed, including without limitation any oral Evaluation Material, shall remain subject to the confidentiality obligations set forth in this letter.

You understand and acknowledge that any and all information contained in the Evaluation Material is being provided without any representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material, on the part of the Company. You agree that none of the Company or any of its directors, officers, stockholders, owners, affiliates, agents, or representatives shall have any liability to you or any of your Representatives. It is understood that the scope of any representations and warranties to be given by the Company shall be negotiated along with other terms and conditions in arriving at a mutually acceptable form of definitive agreement should discussions between you and the Company progress to such a point.

The Prospective Purchaser agrees that unless and until a definitive agreement regarding a Transaction between the Company and the Prospective Purchaser has been executed, neither the Company nor the Prospective Purchaser shall be under any legal obligation of any kind whatsoever with respect to such a Transaction by virtue of this letter except for the matters specifically agreed to herein. The Prospective Purchaser further acknowledges and agrees that the Company reserves the right, in its sole discretion, to reject any and all proposals made by the Purchaser Parties or the Representatives with regard to a Transaction between the Company and the Prospective Purchaser, and to terminate discussions and negotiations with the Prospective Purchaser at any time prior to entry into a definitive agreement regarding a Transaction between the Company and the Prospective Purchaser.

Mach Markets Inc.
Confidentiality Letter Agreement
March 2, 2006
Page 4

The Prospective Purchaser acknowledges and agrees that, at any time prior to entry into a definitive agreement regarding a Transaction between the Company and the Prospective Purchaser:

(a)    the Company shall be free to conduct any process with respect to a possible Transaction as the Company in its sole discretion shall determine (including, without limitation, by negotiating with any prospective party and entering into a definitive written agreement without prior notice to the Prospective Purchaser or any other person, and by making the Merrill Web Site and other Evaluation Materials available for review by others);

(b)    any procedures relating to such Transaction may be changed at any time without notice to the Prospective Purchaser or any other person; and

(c)    the Prospective Purchaser shall not have any claim whatsoever against the Company or any of its directors, officers, stockholders, owners, affiliates, agents or representatives, arising out of or relating to any possible or actual Transaction (other than those pursuant to this letter or as against parties to a definitive written agreement between the Company and the Prospective Purchaser in accordance with the terms thereof).

If the Company and the Prospective Purchaser enter into a definitive agreement regarding a Transaction between the Company and the Prospective Purchaser, then the terms of this letter nonetheless shall be deemed continuing, and shall be incorporated into such definitive agreement by reference; provided, however, that to the extent the terms of this letter and the terms of the definitive agreement are in conflict or are inconsistent, the terms of the definitive agreement shall be controlling.

It is understood and agreed that money damages would not be a sufficient remedy for any breach of this letter and that, in the event of a breach of this letter by any of the Purchaser Parties or the Representatives, the Company shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach. The Prospective Purchaser further agrees to waive any requirement for the security or posting of any bond in connection with any such remedy available to the Company. Such remedy shall not be deemed to be the exclusive remedy for breach of this letter but shall be in addition to all other remedies available at law or equity to the Company.

In the event of litigation relating to this letter, if a court of competent jurisdiction determines in a final, non-appealable order that any Purchaser Party or Representative has breached this letter, then the Prospective Purchaser shall be jointly and severally liable with such breaching party and shall pay to the Company the reasonable legal fees and actual costs that the Company incurred in connection with such litigation, including any appeal therefrom.
All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this letter shall conform to the requirements below and shall be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's telefax number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next business day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next business day after receipted deposit with same, and addressed to the Company

Mach Markets Inc.
Confidentiality Letter Agreement
March 2, 2006
Page 5

or the Prospective Purchaser at their respective addresses stated below:

If to the Company:

    Winn-Dixie Stores, Inc.
    c/o The Food Partners, LLC
    1250 Eye Street, NW, Suite 850
    Washington, DC 20005
    Attention: Matthew Morris, Principal
    Telefax No. 202 589 0433
    e-mail: mmmorris@thefoodpartners.com

With a copy to:

    Winn-Dixie Stores, Inc.
    5050 Edgewood Court
    Jacksonville, Florida 32254-3699
    Attn: Office of General Counsel
    Telefax No. 904 783 5651
    e-mail: larryappel@winn-dixie.com

If to the Prospective Purchaser:

    Mach Markets Inc
    31 East Prospect Ave
    Mount Vernon, NY 10550
    Telefax No. 914-667-5015
    e-mail: emobarak@nyfoodtown.com

With a copy to:

    Telefax No.
    e-mail:

or such other address as any party may from time to time specify by notice to the other.

This letter is for the benefit of the Company and is governed by the laws of the State of Florida without regard to conflict of laws principles. Any action brought in connection with this letter shall be brought in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, and the parties hereto hereby irrevocably consent to the jurisdiction of such court.

This letter may not be amended except in writing signed by both parties hereto. No failure or delay by the Company in exercising any right hereunder or any partial exercise thereof shall operate as a waiver thereof or preclude any other or further exercise of any right hereunder. The invalidity or unenforceability of any provision of this letter shall not affect the validity or enforceability of any other provisions of this letter, which shall remain in full force and effect.

Mach Markets Inc.
Confidentiality Letter Agreement
March 2, 2006
Page 5

This letter may be executed in counterparts (including by means of telecopied signature pages). Please confirm that the foregoing is in accordance with your understanding of our letter by signing and returning a copy of this letter to The Food Partners, LLC. Your correspondence with The Food Partners, LLC, should be directed as follows:

Winn-Dixie Stores, Inc. – Project Panther 06
c/o The Food Partners, LLC
1250 Eye Street, NW, Suite 850
Washington, DC 20005
Attention: Matthew Morris, Principal
Telefax No. 202 589 0433
e-mail: msmorris@thefoodpartners.com

Upon your delivery of an acknowledged copy of this letter as provided above, this letter shall constitute the valid and binding agreement of the Company and the Prospective Purchaser, and referred to as the "Confidentiality Letter Agreement."

Sincerely,

THE COMPANY:

WINN-DIXIE STORES, INC.


By: _____
Name: Larry B. Appel
Title: Senior Vice President and General Counsel


                    ACKNOWLEDGED AND AGREED as of the date first
                    set forth above

                    THE PROSPECTIVE PURCHASER:

                    Mach Markets Inc.
                    [Prospective Purchaser Name]
                    a New York
                    [state of formation, business entity type]

                    By: _____
                    Name: Esmail Mobarak
                    Title:    President




                                 Confidentiality Letter Agreement
                                 Winn-Dixie Stores, Inc. – Project Panther 06

**EXHIBIT G**
**To Second Asset Purchase Agreement**

**Schedule of Excluded Personal Property**

(a)     Inventory;

(b)     packaging materials, and supplies not included in the term "Supplies";

(c)     store shelf tags and pricing cards;

(d)     leased or owned point-of-sale equipment, photo lab equipment and security equipment;

(e)     other leased equipment (including all other leased equipment described on attached Schedule G-1 to this Agreement with respect to each Store – See Excel Spreadsheet Schedule G-1.XLS);

(f)     sound intercom and music service equipment and contracts;

(g)     owned computers and routers, including Cisco 2651 routers, IBM 4029 (Pharmacy) servers, ACM BOSS (back office system servers), and 64k Frame circuits;

(h)     computer equipment that contains software subject to a license that restricts its transfer or imbedded data files that in either case is/are not easily and effectively deleted or removed;

(i)     equipment and other personal property that is neither owned nor leased by Seller, including by way of example but not as a limitation, third-party owned or supplied equipment such as payphones, vending machines, kiosks, blood pressure machines, sanitation chemical mixing equipment, copiers, Western Union equipment, money order equipment, coin rolling, sorting or counting equipment, ATM's, rug cleaners and equipment owned by product vendors;

(j)     shopping carts;

(k)     over-the-road motor vehicles;

(l)     computer software subject to a license that restricts its transfer or that resides on equipment comprising Excluded Personal Property;

(m)     data files, including pharmacy prescription records and files;

(n)     lottery equipment and tickets;

(o)     accounts receivable, bank accounts, cash and cash equivalents;

(p)     trademarks, trade names, private labels, logos and designs of Seller, Winn-Dixie or their Affiliates;

Exhibits to Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84193.1

(q)    building signs and panels in all pole and pylon signs that advertise Seller's business in the Stores;

(r)    intellectual property and rights relating to any of the foregoing;

(s)    service agreements;

(t)    leases of personal property;

(u)    contracts and warranties relating to Seller's possession and operation of the Stores;

NOTES:

1.    Any equipment transferred from a Store to another Seller location must be accounted for using the proper equipment transfer forms. Seller's "Store Maintenance" department will undertake this task for Seller. No equipment is to be removed from the Store unless it has been determined to constitute "Excluded Personal Property" and has been approved and the proper equipment transfer forms have been completed by Store Maintenance.

2.    For any and all computers to remain in a Store, the following procedures will be performed:

(a)    All computers left behind in a Store will have data and software removed to a point at which the computers can no longer "boot" off an internal drive. Buyer is responsible for reloading any and all computer systems with Buyer's own software so that it will work in a new environment.

(b)    Generic POS files will be provided upon request. Buyer will get the same file. It will consist of UPC, item description, pack size, and department code. Seller will not provide any electronic price information.

(c)    Seller's 64k Frame circuits will not be transferred. Buyer will be responsible for installing its own frame, DSL, or VSAT data solution before the Store is transferred.

(d)    Any Verifone "Everest Plus" Pinpads left behind in the Store will have their encryption keys destroyed by the act of opening up the pinpad. Seller will not provide additional pinpads. Buyer is responsible for its own EPS solution.

(e)    Category 5 cabling will be left in place.

(f)    Seller will not train, assist, or otherwise help in the setup of Buyer's POS or back office environment.

EXHIBIT G
Page 2 of 3

Exhibits to Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84193.1

SCHEDULE G-1
To Exhibit G

Excluded Leased Equipment

(Excel Spreadsheet Schedule G-1.XLS)

(attached below)

Exhibits to Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84193.2

EXHIBIT G-1

| Unit | Asset ID | Acq Date | DeptID | Descr | Location | Class | Serial ID |
|------|----------|----------|--------|-------|----------|-------|-----------|
| WDPOM | 03070960 | 2003-05-28 | 0208 | ENTERASYS ETHERNET SWITCH | 0208 | SWITCH | 030700296310B |
| WDPOM | 03070961 | 2003-05-28 | 0208 | ENTERASYS ETHERNET SWITCH | 0208 | SWITCH | 030701546108 |
| WDPOM | 03074261 | 2003-08-26 | 0208 | LEXMARK T630N | 0208 | PRINTER | 9915B77 |
| WDPOM | 03074262 | 2003-08-26 | 0208 | LEXMARK T630N RX W/DIMM CHIP | 0208 | PRINTER | 9915BH7 |
| WDPOM | 03074263 | 2003-08-26 | 0208 | LEXMARK T630N RX W/DIMM CHIP | 0208 | PRINTER | 9915B6Z |
| WDPOM | 03074316 | 2003-09-05 | 0208 | OPTIPLEX SX260 | 0208 | PC | 9CP7B31 |
| WDPOM | 03074317 | 2003-09-05 | 0208 | OPTIPLEX SX260 | 0208 | PC | GCP7B31 |
| WDPOM | 03074318 | 2003-09-05 | 0208 | OPTIPLEX SX260 | 0208 | PC | GDP7B31 |
| WDPOM | 03074319 | 2003-09-05 | 0208 | OPTIPLEX SX260 | 0208 | PC | CP78B31 |
| WDPOM | 03074320 | 2003-09-05 | 0208 | OPTIPLEX SX260 | 0208 | PC | HPT8B31 |
| WDPOM | 03074321 | 2003-09-05 | 0208 | OPTIPLEX SX260 | 0208 | PC | JPT8B31 |
| WDPOM | 03074322 | 2003-09-05 | 0208 | OPTIPLEX SX260 | 0208 | PC | 3QT8B31 |
| WDPOM | 03074338 | 2003-09-16 | 0208 | LEXMARK T630N | 0208 | PRINTER | 9915B77 |
| WDPOM | 03074339 | 2003-09-16 | 0208 | LEXMARK T630N RX | 0208 | PRINTER | 9915BH7 |
| WDPOM | 03074340 | 2003-09-16 | 0208 | LEXMARK T630N RX | 0208 | PRINTER | 9915B6Z |
| WDPOM | 03086613 | 2005-01-17 | 0208 | PHARMACY OPTIPLEX GX270 | 0208 | PC | 4FPFY51 |
| WDPOM | 03087790 | 2005-06-15 | 0208 | IVR PHARMACY | 0208 | PHARMACY | 4FPFY51 |
| WDPOM | 03087807 | 2005-05-16 | 0208 | DDA SYSTEM | 0208 | PHARMACY | |
| WDPOM | 03088268 | 2005-06-29 | 0208 | Pharmacy Risc 6000 Server (IBM P615) | 0208 | SERVER | 003973E |
| WDPOM | 03083319 | 2004-07-01 | 0208 | CISCO STORE ROUTERS $ MAINT. | 0208 | ROUTER | JMX819L01L |
| WDPOM | 03086609 | 2005-05-16 | 0208 | DDA PROJECT SOFTWARE PHARMACY | 0208 | SOFTWARE | |

EXHIBIT G-1

| Unit | Asset ID | Acq Date | DeptID | Descr | Location | Class | Serial ID |
|---|---|---|---|---|---|---|---|
| WDPOM | 03070981 | 2003-05-28 | 0211 | ENTERASYS ETHERNET SWITCH | 0211 | SWITCH | 03130564610B |
| WDPOM | 03070982 | 2003-05-28 | 0211 | ENTERASYS ETHERNET SWITCH | 0211 | SWITCH | 03131765610B |
| WDPOM | 03075664 | 2003-11-18 | 0211 | OPTIPLEX SX260 | 0211 | PC | 6GDGH31 |
| WDPOM | 03075665 | 2003-11-18 | 0211 | OPTIPLEX SX260 | 0211 | PC | 9GDGH31 |
| WDPOM | 03075666 | 2003-11-18 | 0211 | OPTIPLEX SX260 | 0211 | PC | DGDGH31 |
| WDPOM | 03075683 | 2003-11-18 | 0211 | OPTIPLEX SX260 | 0211 | PC | J8C2H31 |
| WDPOM | 03075684 | 2003-11-18 | 0211 | OPTIPLEX SX260 | 0211 | PC | 19C2H31 |
| WDPOM | 03075707 | 2003-09-11 | 0211 | LEXMARK T630N | 0211 | PRINTER | 9915B3X |
| WDPOM | 03080225 | 2004-08-10 | 0211 | ACM 502 SELF CHECKOUT LANE | 0211 | CKOUT LANE | |
| WDPOM | 03080226 | 2004-08-10 | 0211 | ACM 503 SELF CHECKOUT LANE | 0211 | CKOUT LANE | |
| WDPOM | 03088322 | 2004-07-01 | 0211 | CISCO STORE ROUTERS $ MAINT. | 0211 | ROUTER | JMX0819L0UZ |

EXHIBIT G-1

| Unit | Asset ID | Acq Date | DeptID | Descr | Location | Class | Serial ID |
|---|---|---|---|---|---|---|---|
| WDPOM | 03070878 | 2003-05-28 | 0339 | ENTERASYS ETHERNET SWITCH | 0339 | SWITCH | 030510086610B |
| WDPOM | 03070879 | 2003-05-28 | 0339 | ENTERASYS ETHERNET SWITCH | 0339 | SWITCH | 03043821610B |
| WDPOM | 03075522 | 2003-10-29 | 0339 | LEXMARK T630N | 0339 | PRINTER | 9915NC9 |
| WDPOM | 03075523 | 2003-10-29 | 0339 | LEXMARK T630N RX | 0339 | PRINTER | 9915NCP |
| WDPOM | 03075524 | 2003-10-29 | 0339 | LEXMARK T630N RX | 0339 | PRINTER | 9915NCM |
| WDPOM | 03075611 | 2003-11-18 | 0339 | OPTIPLEX SX260 | 0339 | PC | 9VDGH31 |
| WDPOM | 03075612 | 2003-11-18 | 0339 | OPTIPLEX SX260 | 0339 | PC | HVDGH31 |
| WDPOM | 03075613 | 2003-11-18 | 0339 | OPTIPLEX SX260 | 0339 | PC | 3WDGH31 |
| WDPOM | 03075614 | 2003-11-18 | 0339 | OPTIPLEX SX260 | 0339 | PC | 9L92H31 |
| WDPOM | 03075615 | 2003-11-18 | 0339 | OPTIPLEX SX260 | 0339 | PC | CL92H31 |
| WDPOM | 03075616 | 2003-11-18 | 0339 | OPTIPLEX SX260 | 0339 | PC | FL92H31 |
| WDPOM | 03084038 | 2004-12-16 | 0339 | ACM 502 RIGHT HAND LANE | 0339 | CKOUT LANE | |
| WDPOM | 03084039 | 2004-12-16 | 0339 | ACM 503 RIGHT HAND LANE | 0339 | CKOUT LANE | |
| WDPOM | 03084040 | 2004-12-16 | 0339 | ACM 502 LEFT HAND LANE | 0339 | CKOUT LANE | |
| WDPOM | 03084041 | 2004-12-16 | 0339 | ACM 503 LEFT HAND LANE | 0339 | CKOUT LANE | |
| WDPOM | 03086236 | 2004-07-01 | 0339 | PHARMACY - OPTIPLEX GX270 | 0339 | PC | 4707051 |
| WDPOM | 03087868 | 2005-05-16 | 0339 | DDA SYSTEM | 0339 | PHARMACY | |
| WDPOM | 03088265 | 2005-06-29 | 0339 | Pharmcy Risc 6000 Server (IBM P615) | 0339 | SERVER | 003976E |
| WDPOM | 03088409 | 2004-07-01 | 0339 | CISCO STORE ROUTERS $ MAINT. | 0339 | ROUTER | JMX0819L029 |

EXHIBIT G-1

| Unit | Asset ID | Acq Date | DeptID | Descr | Location | Class | Serial ID |
|------|----------|----------|--------|-------|----------|-------|-----------|
| WDPOM | 03070918 | 2003-05-28 | 0372 | ENTERASYS ETHERNET SWITCH | 0372 | SWITCH | 03050351610B |
| WDPOM | 03070919 | 2003-05-28 | 0372 | ENTERASYS ETHERNET SWITCH | 0372 | SWITCH | 03043686610B |
| WDPOM | 03075583 | 2003-11-18 | 0372 | OPTIPLEX SX260 | 0372 | PC | HJDGH31 |
| WDPOM | 03075584 | 2003-11-18 | 0372 | OPTIPLEX SX260 | 0372 | PC | 3KDGH31 |
| WDPOM | 03075585 | 2003-11-18 | 0372 | OPTIPLEX SX260 | 0372 | PC | 7KDGH31 |
| WDPOM | 03075607 | 2003-11-18 | 0372 | OPTIPLEX SX260 | 0372 | PC | 89C2H31 |
| WDPOM | 03075608 | 2003-11-18 | 0372 | OPTIPLEX SX260 | 0372 | PC | 99C2H31 |
| WDPOM | 03076155 | 2003-09-14 | 0372 | LEXMARK T630N | 0372 | PRINTER | 9915NCH |
| WDPOM | 03080741 | 2004-09-09 | 0372 | ACM 502 RIGHT CHECKOUT LANE | 0372 | CKOUT LANE | |
| WDPOM | 03080742 | 2004-09-09 | 0372 | ACM 503 RIGHT CHECKOUT LANE | 0372 | CKOUT LANE | |
| WDPOM | 03088429 | 2004-07-01 | 0372 | CISCO STORE ROUTERS $ MAINT. | 0372 | ROUTER | JMX0819L0U4 |

EXHIBIT H
To Second Asset Purchase Agreement

Schedule of Permitted Encumbrances

1.   Taxes and assessments of any taxing authority that levies taxes or assessments on real property for the year 2006 and subsequent years.

2.   All applicable laws, ordinances, and regulations imposed by any applicable governmental authority, including, but not limited to, all applicable building, zoning, land use and environmental ordinances and regulations.

3.   Rights or claims of parties in possession, boundary line disputes, overlaps, encroachments, and any other matters which would be disclosed by an accurate survey and inspection of the Leased Premises, including but not limited to all matters shown or set forth on any survey, site plan or Environmental Report.

4.   Rights of Landlords under the Leases, including the rights of any Landlord's mortgagee.

5.   Rights of Subtenants under the Subleases.

6.   All matters set forth as exceptions in the Title History or the site plans, other than Monetary Liens.

7.   All other matters not set forth in the Title History that are set forth as exceptions in the Title Commitments, other than Monetary Liens.

     **Note to Buyer:  Buyer has limited rights to object to certain matters set forth in the Title Commitments pursuant to paragraphs 4.2 and 4.4 of the Asset Purchase Agreement**

8.   All other restrictions, reservations, covenants, agreements, easements, limitations and other matters appearing of record as of the date of this Agreement, other than Monetary Liens, and which do not, individually or in the aggregate, interfere in a material and adverse way with the present use of or occupancy of the affected Store.

EXHIBIT H
Page 1 of 1

Exhibits to Second Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Sunrise Properties, LLC
Store Nos. 208, 211, 339 & 372
April 10, 2006
SGRJAX\84183.1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re                                          )

WINN-DIXIE STORES, INC., et al.,               )        Case No. 05-03817-3F1
                                                        *Chapter 11*
                  Debtors.                     )        Jointly Administered

---

## DECLARATION OF ESMAIL MOBARAK

I, Esmail Mobarak, state and declare as follows:

1.      I am a Member of Summit Holdings, LLC (the "Purchaser"). I am duly authorized to make this Declaration on behalf of the Purchaser. I make this Declaration based on my own personal knowledge and based on my knowledge and review of the business records of the Purchaser. If called as a witness, I could truthfully and competently testify to the matters stated in this Declaration.

2.      I submit this Declaration in connection with the Purchaser's offer to purchase assets (the "Bid") from Winn-Dixie Stores, Inc. and its debtor affiliates (collectively, the "Debtors"). The assets subject to the Bid consist of leasehold interests at certain locations at which the Debtors historically have operated grocery stores and equipment and other assets (the "Assets").

3.      The Purchaser is not an affiliate of the Debtors. The Purchaser has at all times dealt at arm's length and in good faith with the Debtors, has no connection with any insider of the Debtors, and has not received any material non-public information regarding the Assets from the Debtors or their advisors except through the due diligence process established by the Debtors and their advisors in these Chapter 11 cases.

4.    The Purchaser is not a party to any agreement among potential bidders for the Debtors' assets and does not intend to enter into any such agreement or otherwise to conspire to chill bidding for such assets.

5.    The Bid identifies one or more unexpired leases to be assumed by the Debtors and assigned to the Purchaser (collectively, the "Assigned Leases").  With respect to each of the Assigned Leases, the Purchaser intends to perform and has the financial capability to perform its obligations under such Assigned Lease arising from and after the date on which such Assigned Leases are is assigned to the Purchaser.

6.    Attached as Exhibit A are true and correct copies of the following:   (a) the balance sheet as of the end of the most recent fiscal quarter for which financial results are available of the affiliate of Purchaser that will guarantee the Purchaser's obligations under the Assigned Leases; (b) such affiliate's income statement for the four quarters ending on the date of such balance sheet.  The financial statements in Exhibit A have been prepared in accordance with generally accepted accounting principles and fairly and accurately represent the financial condition and operating results of the Purchaser for the time periods specified.

7.    The Bid includes a provision that permits the Purchaser, in certain circumstances, to assign its rights to acquire the Assets to one or more affiliates of the Purchaser.  Should the Purchaser exercise that option, (a) the obligations of the Purchaser's assignee acquiring each Store will be guaranteed by the Purchaser, and (b) all of the foregoing statements will be deemed to refer, with respect to each Store, collectively to the Purchaser and its assignee acquiring such Store, and such statements will be accurate if interpreted in that manner.

8.    All of the business records of the Purchaser to which I have referred in this Declaration or in the preparation of this Declaration were made at or near the time of the event

recorded, by or from information transmitted by a person with knowledge of the matters recorded in such records, and were made and kept in the course of the Purchaser's regularly conducted business activities. It is the regular practice of the Purchaser to make such records.

9.    The Purchaser consents to the Debtors' providing a copy of this Declaration, including exhibits, to any non-Debtor party to an Assigned Lease.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on May 1, 2006, at Mount Vernon, New York.

_____
Esmail Mobarak

**Exhibit A**

Financial Statements

Peter R. Lavoy
President & Chief Operating Officer
732-596-6011 (Direct Dial)
732-596-6020 (Fax)



## Foodtown, Inc.

May 2, 2006

To Whom It May Concern:

Please be advised that Foodtown Supermarkets is a Cooperative of independent owners who operate Foodtown Stores throughout the tri-state area in New Jersey, New York and Pennsylvania. Foodtown was established in 1955, and currently has seventeen Members with sixty stores. Mr. Esmail Mobarak is a Member of Foodtown in good standing and he owns three stores which are located at:

- 5555 Broadway, Riverdale, NY 10463
- 31 East Prospect Avenue, Mount Vernon, NY 10550
- 3155 Amboy Road, Staten Island, NY 10306

Foodtown's sales for 2005 were $721 million.

If I can be of any further assistance, please feel free to contact me.

Very truly yours,

FOODTOWN, INC.

Peter Lavoy
President & COO

PL:jm

# Interactive Business Services



May 1, 2006

Esmail Mobarak
1809 East Broadway Street, Suite 328
Oviedo, FL 32765

Dear Mr. Mobarak:

We submit herewith, your Balance Sheet as of December 31, 2005.

This Financial Statement is prepared primarily for your financial guidance, and as such, our
examination did not include confirmation of Assets and Liabilities. Accordingly we do not
express an opinion on the accompanying statement.

Yours very truly,

INTERACTIVE BUSINESS SERVICES

Matthew Cundari
Certified Public Accountant

MC/yb
Encs.

229 Jericho Tpke, New Hyde Park, NY 11040  (718) 279-8777 • Fax (718) 631-8220

## ESMAIL MOBARAK
### BALANCE SHEET
### AS OF DECEMBER 31, 2005

### ASSETS

| | | |
|---|---|---|
| Personal Residence | $ | 1,900,000 |
| Checking & Savings Accounts | $ | 2,750,000 |
| Cars | $ | 120,000 |
| IRA Accounts: | $ | 52,000 |
| Brokerage Account: | $ | 1,300,000 |
| Real Estate | $ | 275,000 |
| Other Personal Assets: | $ | 540,000 |

### Business Assets:

| | | |
|---|---|---|
| Vernon Market Place, Inc. (Mt. Vernon, NY ) | $ | 2,929,000 |
| Quran Corp. (Bronx, NY ) | $ | 2,818,000 |
| Amboy Market Place, Inc. (Staten Island, NY ) | $ | 1,743,000 |
| Cooperative Holdings (NSA Risk Retention Group Inc. & Foodtown Cooperative) | $ | 11,356,000 |
| **TOTAL ASSETS** | $ | **25,783,000** |

### LIABILITIES AND NET WORTH

### Liabilities

| | | |
|---|---|---|
| Mortgage Payable - Personal Residence | $ | 584,000 |
| Secured Loans | $ | 987,000 |
| **Total Liabilities** | $ | 1,571,000 |

### Net Worth

| | | |
|---|---|---|
| Net Worth | $ | 24,212,000 |
| **TOTAL LIABILITIES AND NET WORTH** | $ | **25,783,000** |

PREPARED WITHOUT AUDIT

# Interactive Business Services



May 1, 2006

**Esmail Mobarak**
1809 East Broadway Street, Suite 328
Oviedo, FL 32765

Dear Mr. Mobarak:

We submit herewith, your Income & Expense Statement for the period January 1, 2005 through December 31, 2005.

This Financial Statement is prepared primarily for your financial guidance, and as such, our examination did not include confirmation of Assets and Liabilities. Accordingly we do not express an opinion on the accompanying statement.

Yours very truly,

INTERACTIVE BUSINESS SERVICES

Matthew Cundari
Certified Public Accountant

MC/yb
Encs.

# ESMAIL MOBARAK
## INCOME & EXPENSE STATEMENT
### JANUARY 1, 2005 THROUGH DECEMBER 31, 2005

**INCOME**

| | | |
|---|---|---:|
| 2005 Wages | $ | 176,000 |
| Interest & Dividends | $ | 5,039 |
| S-Corp Distributions | $ | 383,740 |
| **TOTAL INCOME** | $ | 564,779 |

**EXPENSES**

| | | |
|---|---|---:|
| Mortgage | $ | 43,776 |
| Debt Service | $ | 16,800 |
| Taxes | $ | 141,540 |
| Insurance | $ | 15,348 |
| **TOTAL EXPENSES** | $ | 217,464 |

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | Case No. 05-03817-3F1 |
| | | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

## DECLARATION OF ESMAIL MOBARAK

I, Esmail Mobarak, state and declare as follows:

1.    I am a Member of Legacy Group, LLC (the "Purchaser"). I am duly authorized to make this Declaration on behalf of the Purchaser. I make this Declaration based on my own personal knowledge and based on my knowledge and review of the business records of the Purchaser. If called as a witness, I could truthfully and competently testify to the matters stated in this Declaration.

2.    I submit this Declaration in connection with the Purchaser's offer to purchase assets (the "Bid") from Winn-Dixie Stores, Inc. and its debtor affiliates (collectively, the "Debtors"). The assets subject to the Bid consist of leasehold interests at certain locations at which the Debtors historically have operated grocery stores and equipment and other assets (the "Assets").

3.    The Purchaser is not an affiliate of the Debtors. The Purchaser has at all times dealt at arm's length and in good faith with the Debtors, has no connection with any insider of the Debtors, and has not received any material non-public information regarding the Assets from the Debtors or their advisors except through the due diligence process established by the Debtors and their advisors in these Chapter 11 cases.

4.   The Purchaser is not a party to any agreement among potential bidders for the Debtors' assets and does not intend to enter into any such agreement or otherwise to conspire to chill bidding for such assets.

5.   The Bid identifies one or more unexpired leases to be assumed by the Debtors and assigned to the Purchaser (collectively, the "Assigned Leases"). With respect to each of the Assigned Leases, the Purchaser intends to perform and has the financial capability to perform its obligations under such Assigned Lease arising from and after the date on which such Assigned Leases are is assigned to the Purchaser.

6.   Attached as Exhibit A are true and correct copies of the following:   (a) the balance sheet as of the end of the most recent fiscal quarter for which financial results are available of the affiliate of Purchaser that will guarantee the Purchaser's obligations under the Assigned Leases; (b) such affiliate's income statement for the four quarters ending on the date of such balance sheet. The financial statements in Exhibit A have been prepared in accordance with generally accepted accounting principles and fairly and accurately represent the financial condition and operating results of the Purchaser for the time periods specified.

7.   The Bid includes a provision that permits the Purchaser, in certain circumstances, to assign its rights to acquire the Assets to one or more affiliates of the Purchaser. Should the Purchaser exercise that option, (a) the obligations of the Purchaser's assignee acquiring each Store will be guaranteed by the Purchaser, and (b) all of the foregoing statements will be deemed to refer, with respect to each Store, collectively to the Purchaser and its assignee acquiring such Store, and such statements will be accurate if interpreted in that manner.

8.   All of the business records of the Purchaser to which I have referred in this Declaration or in the preparation of this Declaration were made at or near the time of the event

recorded, by or from information transmitted by a person with knowledge of the matters recorded in such records, and were made and kept in the course of the Purchaser's regularly conducted business activities. It is the regular practice of the Purchaser to make such records.

9.     The Purchaser consents to the Debtors' providing a copy of this Declaration, including exhibits, to any non-Debtor party to an Assigned Lease.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on May 1, 2006, at Mount Vernon, New York.

_____
Esmail Mobarak

**Exhibit A**

Financial Statements

05-02-06  10:30   From-EXECUTIVE OFFICE                    +7325986020        T-225  P.02/02  F-302

Peter R. Lavoy
President & Chief Operating Officer
732-596-6011 (Direct Dial)
732-596-6020 (Fax)



# Foodtown, Inc.

May 2, 2006

To Whom It May Concern:

Please be advised that Foodtown Supermarkets is a Cooperative of independent owners who operate Foodtown Stores throughout the tri-state area in New Jersey, New York and Pennsylvania.  Foodtown was established in 1955, and currently has seventeen Members with sixty stores.  Mr. Esmail Mobarak is a Member of Foodtown in good standing and he owns three stores which are located at:

- 5555 Broadway, Riverdale, NY 10463
- 31 East Prospect Avenue, Mount Vernon, NY 10550
- 3155 Amboy Road, Staten Island, NY 10306

Foodtown's sales for 2005 were $721 million.

If I can be of any further assistance, please feel free to contact me.

Very truly yours,

FOODTOWN, INC.

Peter Lavoy
President & COO

PL:jm

# Interactive Business Services



May 1, 2006

Esmail Mobarak
1809 East Broadway Street, Suite 328
Oviedo, FL 32765

Dear Mr. Mobarak:

We submit herewith, your Balance Sheet as of December 31, 2005.

This Financial Statement is prepared primarily for your financial guidance, and as such, our examination did not include confirmation of Assets and Liabilities. Accordingly we do not express an opinion on the accompanying statement.

Yours very truly,

INTERACTIVE BUSINESS SERVICES

Matthew Cundari
Certified Public Accountant

MC/yb
Encs.

229 Jericho Tpke, New Hyde Park, NY 11040  (718) 279-8777 • Fax (718) 631-8220

## ESMAIL MOBARAK
### BALANCE SHEET
#### AS OF DECEMBER 31, 2005

**ASSETS**

| | | |
|---|---|---|
| Personal Residence | $ | 1,900,000 |
| Checking & Savings Accounts | $ | 2,750,000 |
| Cars | $ | 120,000 |
| IRA Accounts: | $ | 52,000 |
| Brokerage Account: | $ | 1,300,000 |
| Real Estate | $ | 275,000 |
| Other Personal Assets: | $ | 540,000 |

**Business Assets:**

| | | |
|---|---|---|
| Vernon Market Place, Inc. (Mt. Vernon, NY ) | $ | 2,929,000 |
| Quran Corp. (Bronx, NY ) | $ | 2,818,000 |
| Amboy Market Place, Inc. (Staten Island, NY ) | $ | 1,743,000 |
| Cooperative Holdings (NSA Risk Retention Group Inc. & Foodtown Cooperative) | $ | 11,356,000 |
| **TOTAL ASSETS** | **$** | **25,783,000** |

**LIABILITIES AND NET WORTH**

**Liabilities**

| | | |
|---|---|---|
| Mortgage Payable - Personal Residence | $ | 584,000 |
| Secured Loans | $ | 987,000 |
| **Total Liabilities** | $ | 1,571,000 |

**Net Worth**

| | | |
|---|---|---|
| Net Worth | $ | 24,212,000 |
| **TOTAL LIABILITIES AND NET WORTH** | **$** | **25,783,000** |

**PREPARED WITHOUT AUDIT**

# Interactive Business Services



May 1, 2006

**Esmail Mobarak**
1809 East Broadway Street, Suite 328
Oviedo, FL 32765

Dear Mr. Mobarak:

We submit herewith, your Income & Expense Statement for the period January 1, 2005
through December 31, 2005.

This Financial Statement is prepared primarily for your financial guidance, and as such, our
examination did not include confirmation of Assets and Liabilities. Accordingly we do not
express an opinion on the accompanying statement.

Yours very truly,

INTERACTIVE BUSINESS SERVICES

Matthew Cundari
Certified Public Accountant

MC/yb
Encs.

229 Jericho Toke. New Hvde Park. NY 11040  (718) 279-8777 • Fax (718) 631-8220

## ESMAIL MOBARAK
### INCOME & EXPENSE STATEMENT
### JANUARY 1, 2005 THROUGH DECEMBER 31, 2005

**INCOME**

| | | |
|---|---|---|
| 2005 Wages | $ | 176,000 |
| Interest & Dividends | $ | 5,039 |
| S-Corp Distributions | $ | 383,740 |
| **TOTAL INCOME** | **$** | **564,779** |

**EXPENSES**

| | | |
|---|---|---|
| Mortgage | $ | 43,776 |
| Debt Service | $ | 16,800 |
| Taxes | $ | 141,540 |
| Insurance | $ | 15,348 |
| **TOTAL EXPENSES** | **$** | **217,464** |

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| | ) | |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| | ) | |
| Debtors. | ) | Jointly Administered |

ORDER APPROVING DEBTORS' (A) SALE OF LEASEHOLD
INTEREST IN STORE NO. ____ AND RELATED EQUIPMENT FREE
AND CLEAR OF LIENS, CLAIMS AND INTERESTS (B) ASSUMPTION
AND ASSIGNMENT OF LEASES AND (C) RELATED RELIEF

These cases came before the Court on the motion of Winn-Dixie Stores,

Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-

possession (collectively, the "Debtors"), for an order (Docket No. __) under 11 U.S.C.

§§ 363 and 365 and Fed. R. Bankr. P. 3002, 6004 and 6006, (a) authorizing the Debtors

to sell leasehold interests and equipment, including the assets described in the asset

purchase agreement attached as Exhibit A for Store No. _____ (the "Purchase

Agreement), free and clear of liens, claims and interests to the entity submitting the

highest and or otherwise best offer (the "Purchaser"), (b) authorizing the Debtors to

assume and assign all unexpired leases identified in the Purchase Agreement in

connection with the sale, (c) fixing cure amounts for the applicable lease, and (d) granting

related relief (the "Motion"). By the Motion, the Debtors asserted that the only cure

required under the lease for Store No. _____ (the "Lease") was payment of $_____

(the "Cure Amount"). By the Motion, the landlord was given until April 25, 2006 to

object to the Cure Amount. **Alternatives:** [No objection was filed.] **or** [The landlord for Store No. _____ (the "Landlord") filed a timely objection and unless resolved by the parties, the matter will be set for hearing before the Court at a future date.] The Court held a hearing on the Motion on May 18, 2006 to approve the sale (the "Sale Hearing"). **Alternatives:** [The Court has reviewed the Motion and heard the representations of counsel. Upon the representations of counsel and without objection by the United States Trustee or any other interested party, the Court makes the following findings of fact.] **or** [The Court has reviewed the Motion, considered the evidence and heard arguments of Counsel. After due deliberation and good and sufficient cause exists, the Court makes the following findings of fact.]

      A.    This Court has jurisdiction over the Motion and the transactions contemplated by the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).

      B.    The Debtors solicited the highest or otherwise best offer for the assets described in the Purchase Agreement (the "Assets"), in accordance with bidding procedures approved by the Court by order (Docket No. 1801) dated June 16, 2005 (the "Bidding Procedures"). A competing bid was received for the Assets and the Debtors conducted an auction on May 9, 2006 (the "Auction"). At the Auction, the Purchaser submitted the final aggregate bid of $_____, representing the highest or otherwise best offer received for the Assets.

      C.    The Debtors have provided interested parties (including all parties asserting claims or interests in the Assets, if any) with proper notice of the Motion, the

2

Sale Hearing,[1] the Auction, the assumption and assignment of the Lease, and the fixing of any cure amounts, in accordance with 11 U.S.C. §§ 102(1), 105(a), 363 and 365, Fed. R. Bankr. P. 2002(a), 6004(a) and 6006(c), Local Rule 2002-1, the Notice Procedures Order and the Bidding Procedures Order.

D.    The Debtors marketed the Assets and conducted the sale process in compliance with the Bidding Procedures. The bidding on the Assets and the Auction were conducted in a non-collusive, fair and good faith manner. The Debtors have given all interested parties a reasonable opportunity to make a highest or otherwise best offer for the Assets. In their sound business judgment, the Debtors determined that the bid submitted by the Purchaser at the Auction represented the highest or otherwise best offer for the Assets.

E.    The Debtors (i) have full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A, the Assumption and Assignment Agreement attached as Exhibit B, and all related documents, and the sale of the Assets and the assumption and assignment of the Lease has been duly and validly authorized by all necessary corporate action of the applicable Debtors and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

F.    The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

---

[1]    All capitalized terms not otherwise defined in this Order have the same meaning provided to them in the Motion.

00528223.3

G.    Neither the Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

H.    The Debtors and the Purchaser proposed, negotiated and entered into the Purchase Agreement, without collusion, in good faith and at arms'-length bargaining positions. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

I.    The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded by that section.

J.    The consideration the Purchaser is providing to the Debtors for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; and (iii) constitutes reasonably equivalent value.

K.    The Debtors' transfer of the Assets to the Purchaser pursuant to the Purchase Agreement and the Assumption and Assignment Agreement will be a legal, valid, and effective transfer of the Assets. The Debtors' transfer of the Assets to the Purchaser vests the Purchaser with good and valid title in and to the Assets free and clear of any liens, claims, encumbrances, pledges, mortgages, security interests, charges, options or other interests of any kind or nature (collectively, the "Claims and/or Interests"), with the exception of the Permitted Encumbrances , if any, as defined in the Purchase Agreement. Any non-assumed Claim and/or Interest will attach to the proceeds of the sale with the same validity, enforceability and priority they now have as against the Assets, subject to any rights, claims, defenses and objections of the Debtors, Wachovia Bank National Association, as Administrative Agent and Collateral Agent for itself

4

("Agent") and the other financial institutions from time to time parties to the Credit Agreement dated as of February 23, 2005, as may be amended or modified (collectively, "Lenders" and together with Agent, collectively, the "DIP Lender") and all other interested parties with respect to such Claims and/or Interests.

L.    The Debtors may sell and transfer the Assets in accordance with the terms and conditions of the Purchase Agreement free and clear of all Claims and/or Interests (except the Permitted Encumbrances, if any) because any entity with any Claims and/or Interests in the Assets to be transferred (i) has consented to these sale (including the assumption and assignment of the Lease) or is deemed to have consented to the sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claims and/or Interests; or (iii) otherwise falls within the provisions 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. Holders of Claims and/or Interests, if any, who did not object, or who withdrew their objections to the Motion are deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2).

M.    The Debtors will cause the net proceeds from the Sale to be paid in accordance with the terms of the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in full of all Claims of Debtors' Prepetition Secured Lenders, dated March 23, 2005 (the "Final Financing

5

00528223.3

Order") (Docket No. 501), and the Loan Documents (as defined in the Final Financing Order).

N.      The Debtors' assumption and assignment of the Lease in connection with the Sale is (i) an exercise of their sound business judgment, and (ii) in the best interests of the Debtors' estates and creditors.

O.      The Debtors have provided the landlord of the Lease with adequate assurance that they will promptly cure any defaults under the Lease pursuant to 11 U.S.C. §§ 365(b)(1).

P.      Pursuant to 11 U.S.C. § 365 and Fed. R. Bankr. P. 6006, the Cure Amount set forth on Exhibit E to the Motion, if any, constitute all amounts due and owing under the Lease and will be fixed and allowed for the Lease.  No other amounts are due and owing by the Debtors under the Lease.  The Debtors will pay the Cure Amount, if any, in accordance with the terms and provisions of the Purchase Agreement. Upon payment of the Cure Amount, all defaults, if any, under the Lease will be deemed cured.

Q.      The Debtors and the Purchaser have provided the Landlord with adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C), 365(b)(3) and 365(f)(2)(B).

R.      No default of the type described in 11 U.S.C. § 365(b)(2)(D) exists under the Lease.

S.      Except as expressly set forth in the Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser will have no responsibility for any liability, claim or other obligation of or against the Debtors related to the Assets or

6

the Lease by virtue of the transfer of the Assets and the assumption and assignment of the Lease to the Purchaser. The Purchaser will not be deemed, as a result of any action taken in connection with the purchase of the Assets or the assumption and assignment of the Lease to (i) be a successor to the Debtors (other than with respect to the Assumed Liabilities and any obligations arising under the assigned Lease from and after the closing); or (ii) have, *de facto* or otherwise, merged with or into the Debtors. The Purchaser is not acquiring or assuming any liability, warranty, or other obligation of the Debtors, except as expressly set forth in the Purchase Agreement or in any assigned Lease.

   T. The Court's approval of the Purchase Agreement and the Assumption and Assignment Agreement is in the best interests of the Debtors, their estates and their creditors. Accordingly, it is

   ORDERED AND ADJUDGED THAT:

   1. The Motion is granted.

   2. All objections to the entry of this order or to the relief granted and requested in the Motion, including, to the extent the Landlord failed to file and serve a timely objection, any objection to the proposed Cure Amount, that has not been withdrawn, waived or settled at or before the Sale Hearing, are denied and overruled on the merits.

   3. The Purchase Agreement and the Assignment and Assumption Agreement are each approved in all respects. Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized (subject to applicable Closing conditions set forth in the Purchase Agreement), to consummate the Sale including transferring

and conveying the Assets to the Purchaser, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

4.        Upon Closing, the Debtors are authorized, in accordance with 11 U.S.C. §§ 105(a), 363 and 365, to assume and assign the Lease to Purchaser.

5.        The Debtors have satisfied the requirements of 11 U.S.C. §§ 365(b)(1), (3) and 365(f)(2).

6.        The Lease will be assumed and assigned to the Purchaser, in accordance with their respective terms.  The assigned Lease will remain in full force and effect notwithstanding any provision in the Lease to the contrary (including provisions of the type described in 11 U.S.C. §§ 365(b)(2), (e)(1) and (f)(1)) which prohibit, restrict or condition such assignment or transfer). All non-debtor parties to the Lease are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the Purchase Agreement.

7.        Pursuant to 11 U.S.C. § 363(b), the Debtors are authorized and empowered to consummate and implement fully the Purchase Agreement and the Assignment and Assumption Agreement, together with all additional instruments and documents that may be necessary to implement the Purchase Agreement. The Debtors are authorized to take all actions necessary for the purpose of assigning, transferring, granting, conveying, and conferring the Assets and the Lease to Purchaser.

8

00528223.3

8.      Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties in accordance with the terms of the Purchase Agreement without further order of the Court, provided that (i) the Debtors first obtain the prior written consent of (a) the DIP Lender and (b) the Creditors' Committee, which consent will not be unreasonably withheld and (ii) any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.      The Debtors will transfer the Assets to the Purchaser upon closing free and clear of all Claims and/or Interests pursuant to 11 U.S.C. §§ 105(a) and 363(f) (except for the Permitted Encumbrances, if any).  The only Claims and/or Interests in the Assets are those of the landlord with respect to the applicable Lease being sold and assigned pursuant to the Purchase Agreement and the senior liens and superpriority administrative claims of the DIP Lender.  The Claims and/or Interests of such landlord will be satisfied upon Closing by the Debtors' cure of any defaults under the respective Lease and the Debtors' and the Purchasers' demonstration of adequate assurance of future performance under 11 U.S.C. §365.  The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender attach to the proceeds of the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

00528223.3

10.     The Debtors will cause the net proceeds from the Sale to be paid in accordance with the terms of the Final Financing Order and the Loan Documents.

11.     The Purchaser provided the Debtors with reasonably equivalent value and fair consideration for the Assets under the Bankruptcy Code and applicable non-bankruptcy law.  For that reason, the transfer may not be avoided under 11 U.S.C. § 363(n).

12.     **Alternatives:** [The Cure Amount for the Lease is fixed in the respective amounts set forth on Exhibit E.] **or** [Unless resolved by the parties, the Court will schedule a hearing on the Landlord's objection to the proposed Cure Amount upon notice by the Debtors.  Once the cure objection is resolved by the parties or adjudicated by the Court, the Debtors will pay any such Cure Amount.]  All defaults, claims or other obligations of the Debtors arising or accruing under the Lease, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in 11 U.S.C. § 365(b)(2)) will be cured by the Debtors in accordance with the Purchase Agreement, by paying the Cure Amount.  No other or further monetary amounts or obligations are due or existing under the Lease by the Debtors, whether pursuant to 11 U.S.C. § 365(b)(1) or otherwise.  The Debtors will pay any Cure Amount in accordance with the terms and provisions set forth in the Purchase Agreement.

13.     Pursuant to 11 U.S.C. § 365(k), upon the assignment of the Lease to the Purchaser, (a) the Debtors and their estates are relieved from any

10

and all liability for any breach of the Lease occurring after assignment to the Purchaser, and (b) the Purchaser is responsible for any and all claims and obligations under the Lease occurring or arising after the assignment.

14.    Subject to the terms of this Order, the Purchase Agreement and the Assumption and Assignment Agreement, the Purchaser assumes all rights and obligations of the Debtors under the Lease.

15.    All non-Debtor parties to the Lease are forever enjoined and estopped from contesting the Cure Amount and from asserting any default against the Purchaser which existed as of the date of the Sale Hearing.

16.    Upon the Debtors assignment of the Lease to the Purchaser, no default will exist under the Lease. Upon entry of this Order and the assumption and assignment of the Lease, the Purchaser is deemed to be in compliance with all terms and provisions of the Lease.

17.    Subject to the terms and conditions of this Order, all entities that are presently, or upon Closing may be, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors. Prior to or upon the Closing, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims and/or Interests in the Assets (except for any Permitted Encumbrances). In the event any creditor fails to release its Claims and/or Interests in the Assets upon Closing, the Debtors are authorized to take any action necessary to do so including, to execute and file any statements, instruments, releases and other documents on such creditor's behalf. The Purchaser is also authorized to file,

11

register or otherwise record a certified copy of this Order upon Closing in accordance with the terms of the Purchase Agreement and this Order. Once this Order is so filed, registered or otherwise recorded in accordance with the provisions of this Order, the Order constitutes conclusive evidence of the release of all Claims and/or Interests against the Assets as of the Closing (except for any Permitted Encumbrances).

18.     Upon Closing of the sale of Assets in accordance with the Purchase Agreement and this Order, the Purchaser will be deemed to have acted in good faith in purchasing the Assets and Lease under the Purchase Agreement as that term is used in 11 U.S.C § 363(m). For that reason, any reversal or modification of the Order on appeal will not affect the validity of the sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

19.     The Debtors' transfer of the Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for any Permitted Encumbrances) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

20.     Other than the Permitted Encumbrances and other obligations of the Purchaser as set forth in the Purchase Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets, including, the Lease. The Debtors' transfer of the Assets to the Purchaser

12

00528223.3

does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

21.      Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets and the Lease and a bill of sale transferring good and marketable title in the Assets to Purchaser.  Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

22.      This Order is effective as a determination that upon Closing any and all Claims and/or Interests (except for any Permitted Encumbrances), will be, and are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

23.      This Order is binding upon all entities who may be required to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to any of the Assets.

24.      This Court retains exclusive jurisdiction to (a) enforce and implement the Purchase Agreement, the Assumption and Assignment Agreement, and any other agreements and instruments executed in connection with the Purchase Agreement, (b) compel delivery of possession of the Assets to Purchaser, (c) resolve any disputes, controversies or claims arising out of or

00528223.3

relating to the Purchase Agreement or Assignment Agreement, and (d) interpret, implement and enforce the provisions of this Order.

25.      The terms and provisions of the Purchase Agreement, the Assignment Agreement and this Order will be binding in all respects upon, and will inure to the benefit of, the Debtors, their estates, the Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise will be binding.

26.      Except as may otherwise be provided for in the Purchase Agreement and/or all related documents, including, without limitation, claims arising from the Purchaser's performance and obligations under the Purchase Agreement, all related documents and this Order, upon Closing, all persons who hold Claims and/or Interests against the Debtors are forever estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

27.      After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or

14

relating to any Interests or Claims or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Purchase Agreement. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

28. To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in this Order will control.

29. Within ten days after Closing, the Debtors will file a statement with the Bankruptcy Court as required by and in accordance with Rule 6004(f), Federal Rules of Bankruptcy Procedure.

30. Notwithstanding Fed. R. Bankr. P. 6004(g) and 6006(d), this Order will take effect immediately upon entry.

Dated this _____ day of May, 2006 in Jacksonville, Florida.

_____
Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to
serve a copy of this Order on all
parties who received copies of the
Motion.

15

00528223.3