**EXHIBIT A**

Store No.:
205

## ASSET PURCHASE AGREEMENT
Tropical Supermarket No. 15, Inc.

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is made effective as of May 17, 2006 (the "Effective Date"), by and between

**WINN-DIXIE STORES, INC.,** a Florida corporation ("Seller"), and

**TROPICAL SUPERMARKET NO. 15, INC.**, a Florida corporation, or its permitted assignee pursuant to paragraph 17.5 of this Agreement ("Buyer").

**RECITALS:**

A.  Seller is the tenant of the supermarket store located at 1 NW 183rd Street and NW 7th Avenue, Miami, Florida (the "Store"), under the respective lease, including any amendments thereto, as described in Exhibit A to this Agreement (the "Lease"). The Store occupies the respective leased premises as described in the Lease (the "Leased Premises"), within the respective parcel of real property described in Exhibit A to this Agreement associated with the Lease. Seller's leasehold interest in the Leased Premises pursuant to the Lease, together with those additional items described in paragraph 2.0 of this Agreement relating to such Leased Premises, hereinafter collectively are referred to as the "Assets".

B.  Seller desires to transfer and sell and Buyer has agreed to acquire and purchase the Assets, subject to the terms and conditions contained in this Agreement.

C.  Seller (Winn-Dixie Stores, Inc. and its affiliated debtors) filed voluntary petitions for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the "Bankruptcy Code") on February 21, 2005 (the "Petition Date") and has operated its business as debtor-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Petition Date (the "Bankruptcy Cases"). The Bankruptcy Cases are being jointly administered in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Bankruptcy Court"), under Case No. 05-03817-3F1.

**IN CONSIDERATION OF $10.00** and other good and valuable consideration and of the mutual undertakings of the parties hereto, Buyer and Seller agree as follows:

1.0 **Defined Terms.** Capitalized terms not otherwise defined in this Agreement will have the meanings assigned to such terms below.

    1.1 "Adequate Assurance Information" will mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that the Landlord and any Subtenants are adequately assured of Buyer's future performance under the Lease, as required by Section 365(f) of the Bankruptcy Code, including, if appropriate, a Replacement Guaranty of Buyer's obligations under the Lease and (where applicable) the Subleases by an Affiliate of Buyer with sufficient assets to provide adequate assurance of future performance.

1.2 "Affiliate" will have the meaning set forth in Section 101(2) of the Bankruptcy Code.

1.3 "Agreement" will mean this Asset Purchase Agreement dated as of the Effective Date including all Exhibits hereto.

1.4 "Allocation Schedule" will mean the allocation of the Purchase Price and the Deposit among the Assets as provided in Exhibit B to this Agreement.

1.5 "Approval Condition" will have the meaning assigned in paragraph 5.2 of this Agreement.

1.6 "Assets" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.7 "Auction" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.8 "Bankruptcy Cases" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.9 "Bankruptcy Code" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.10 "Bankruptcy Court" will have the meaning assigned in paragraph C of the Recitals to this Agreement.

1.11 "Bidding Procedures" will mean the bidding procedures and bid protections for use in the sale of assets in the Bankruptcy Cases as approved by the Bankruptcy Court by Order dated June 20, 2005.

1.12 "Bill of Sale" will mean a bill of sale substantially in the form of Exhibit C to this Agreement, pursuant to which Seller will sell and convey to Buyer at each Closing the Equipment and other tangible and intangible personal property constituting a portion of the Assets.

1.13 "Building" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.14 "Business Day" will mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Jacksonville, Florida.

1.15 "Buyer" will have the meaning assigned in the introductory paragraph of this Agreement.

1.16 "Buyer's Closing Costs" will mean: (a) fees and costs of Buyer's counsel relating to the subject transaction; (b) fees and costs incurred by Buyer to conduct Buyer's due diligence investigation of the Assets; (c) title insurance fees and costs, including title examination fees and title insurance premiums for the Title Policy (and the cost of any simultaneously issued mortgagee title insurance policy and any loan-related title insurance endorsements thereon);

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

2

(d) documentary stamp tax or transfer tax, if any, payable in connection with the execution and delivery of the Conveyance Instrument(s); (e) recording fees payable in connection with recording the Conveyance Instrument(s) in the appropriate public records; (f) cost of the Environmental Reports, including any supplements or updates; (g) any loan closing costs incurred by Buyer, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on any note or mortgage; and (h) sales taxes, if any, payable in connection with the purchase and sale of the Equipment.

1.17 "Buyer's Closing Direction" will have the meaning assigned in paragraph 14.6 of this Agreement.

1.18 "Buyer's Escrowed Items" will have the meaning assigned in paragraph 14.3 of this Agreement.

1.19 "Closing" will mean the consummation of the assignment, assumption, sale, and purchase of the Assets pursuant to this Agreement, as provided in paragraph 14.0 of this Agreement.

1.20 "Closing Date" will have the meaning assigned in paragraph 14.1 of this Agreement.

1.21 "Closing Escrow Date" will mean the date that is 2 Business Days prior to the Closing Date or such earlier date after satisfaction of the Approval Condition as Buyer and Seller may designate.

1.22 "Closing Statement" will mean a statement in the form of Exhibit D to this Agreement (or in such other form as is prepared by Seller and reasonably acceptable to Buyer) reflecting the net amount due to Seller at Closing, after making the adjustments described in paragraph 3.4.2 and 3.4.3 of this Agreement and in other provisions of this Agreement.

1.23 [Intentionally deleted]

1.24 "Confidentiality Agreement" will mean the Confidentiality Letter Agreement dated effective March 3, 2006, between Winn-Dixie and Buyer, a complete and correct copy of which is attached as Exhibit E to this Agreement, regarding, among other things, confidentiality relating to the subject matter of this Agreement.

1.25 "Conveyance Instrument" will mean the Assignment and Assumption of Lease substantially in the form of Exhibit F to this Agreement, pursuant to which Seller will assign and convey, and Buyer will assume, Seller's leasehold interest, as tenant, under the Lease, together with Seller's interest in any Improvements.

1.26 "Credit Agreement Liens" will mean liens and encumbrances created by Seller or Winn-Dixie pursuant to (i) the Credit Agreement, dated February 23, 2005, as amended, between Winn-Dixie and the DIP Lender, as the same has been

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

3

or may hereafter be amended, and (ii) documents executed by Winn-Dixie or Seller in connection with such Credit Agreement.

1.27 "Cure Costs" will mean amounts (if any) payable by Seller pursuant to Section 365(b) of the Bankruptcy Code upon Seller's assumption of the Lease and any Subleases.

1.28 "Damages" will have the meaning assigned in paragraph 16.5 of this Agreement.

1.29 "Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

1.30 "DIP Lender" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.31 "Due Diligence Materials" will mean, collectively, (i) the Lease and any Subleases, (ii) the Title Report, (iii) the Environmental Report, (iv) all other documents and materials provided or made available to Buyer for review (pursuant to the Confidentiality Agreement or otherwise) in hard copy, in electronic format, at the Store, on the Merrill Website, or otherwise, and (v) all documents and materials prepared by or for Buyer in connection with Buyer's investigations with respect to the Assets.

1.32 "Effective Date" will have the meaning assigned in the introductory paragraph of this Agreement.

1.33 "Environmental Report" will have the meaning assigned in paragraph 4.3 of this Agreement.

1.34 "Equipment" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.35 "Escrow Agent" will mean Smith, Gambrell & Russell, LLC, Jacksonville office, acting as escrow and closing agent.

1.36 "Excluded Personal Property" will mean the items or categories of items identified on Exhibit G to this Agreement, which are expressly excluded from the Assets to be sold to Buyer under this Agreement.

1.37 "HSR Act" will mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

1.38 "HSR Filing" will mean the filings, if any, required under the HSR Act related to this transaction.

1.39 "Improvements" will have the meaning assigned in paragraph 2.2 of this Agreement.

1.40 "Initial Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

4

1.41  "Inventory" will mean all inventories of goods and merchandise within the Store and owned by Seller and held for resale in the ordinary course of business of Seller conducted at the Store to retail customers.

1.42  "Knowledge" will mean (i) in the case of Seller, the actual knowledge of Larry Appel, Senior Vice President and General Counsel, without any requirement of investigation or inquiry, and (ii) in the case of Buyer, the actual knowledge of all senior officers of Buyer and its Affiliates having responsibility for legal affairs, without any requirement of investigation or inquiry.

1.43  "Landlord" will mean the lessor under the Lease.

1.44  "Leased Premises" will have the meaning assigned in paragraph A of the Recitals to this Agreement, and will include the elements thereof as described in paragraph 2.0 of this Agreement.

1.45  "Lease" will have the meaning assigned in paragraph A of the Recitals to this Agreement.

1.46  "Liquidated Deposit" will have the meaning assigned in paragraph 16.1 of this Agreement.

1.47  "Material Adverse Effect" will mean, with respect to any fact, circumstance, change, or event, that such fact, circumstance, change, or event would individually or in the aggregate have a material adverse effect on Seller's or Buyer's ability to consummate the transaction contemplated herein, or on the continued operation of the Store for its current use, except to the extent that fact, circumstance, change, or event results from or relates to: (a) general economic or market conditions or conditions generally affecting the retail, grocery, or pharmacy industries that, in either case, do not disproportionately adversely affect the Assets; (b) the announcement of the transaction contemplated hereby; (c) the execution of, compliance with the terms of, or the taking of any action required by this Agreement or the consummation of the transaction contemplated hereby; (d) any change in accounting requirements or principles or any change in applicable laws or the interpretation thereof; (e) the filing of the Bankruptcy Cases; (f) the conversion or dismissal of any or all of the Bankruptcy Cases; (g) the appointment of a Chapter 11 trustee or examiner in the Bankruptcy Cases; or (h) the Wind-up Procedures.

1.48  "Merrill Website" will mean the internet website maintained by Merrill Corporation on behalf of Seller and certain Affiliates of Seller under the name "Project Panther 06" with respect to the disposition of the Store and other properties.

1.49  "Monetary Liens" will mean (i) any Credit Agreement Liens; and (ii) any of the following which arise by, through, or under Seller: (A) mortgages on any of Seller's leasehold interests and/or on the Assets; (B) past due ad valorem taxes and assessments of any kind constituting a lien against the Assets to

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

5

the extent such taxes and assessments are the responsibility of Seller and can be cured by the payment of money; (C) construction liens that have attached to and become a lien against Seller's interest under the Lease and/or on the Assets; and (D) judgments that have attached to and become a lien against Seller's interest under the Lease and/or the Assets.

1.50    "Ordinary course of business" means the ordinary course of business of Seller after the Filing Date, subject to the Wind-up Procedures.

1.51    "Outside Date" means May 31, 2006, as such date may be extended by the written agreement of Seller and Buyer.

1.52    "Permit" will have the meaning assigned in paragraph 7.2 of this Agreement.

1.53    "Permitted Encumbrances" will mean (i) all matters listed on Exhibit H to this Agreement, (ii) all other matters set forth as exceptions in the Title History, other than Monetary Liens, and (iii) subject to the provisions of paragraph 4.2 of this Agreement, all other matters set forth as exceptions in the Title Commitment, other than Monetary Liens.

1.54    "Person" will mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, or non-incorporated organization or government or any agency or political subdivision thereof.

1.55    "Purchase Price" will mean the amount set forth in paragraph 3.1 of this Agreement.

1.56    "Real Property" will mean the Leased Premises and the Improvements together.

1.57    "Replacement Guaranty" will mean any guaranty of Buyer's payment and performance obligations under the Lease or any Sublease, given by a parent Affiliate of Buyer as may be required either to obtain Landlord's approval of the Adequate Assurance Information or to obtain Landlord's consent to the release of Winn-Dixie as a guarantor under the Lease or Sublease, as the case may be.

1.58    "Sale Hearing" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.59    "Sale Motion" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.60    "Sale Order" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.61    "Second Deposit" will have the meaning assigned in paragraph 3.2 of this Agreement.

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

6

1.62 "Seller" will have the meaning assigned in the introductory paragraph of this Agreement.

1.63 "Seller's Closing Direction" will have the meaning assigned in paragraph 14.6 of this Agreement.

1.64 "Seller's Brokers" will mean one or more of DJM Asset Management, LLC, The Food Partners, LLC, and The Blackstone Group, L.P.

1.65 "Seller's Closing Costs" will mean: (a) fees and costs of Seller's counsel relating to the subject transaction; (b) commissions payable to Seller's Brokers as provided in paragraph 17.3 of this Agreement; and (c) the Cure Costs.

1.66 "Seller's Escrowed Items" will have the meaning assigned in paragraph 14.2 of this Agreement.

1.67 "Store" will have the meaning assigned in paragraph A of the Recitals to this Agreement, including, if applicable, any associated fuel center operated by Seller at the Leased Premises.

1.68 "Sublease" will mean, with respect to the Store, each sublease of a portion of the Leased Premises listed on Exhibit A to this Agreement (if any), including amendments. If no sublease is listed on Exhibit A to this Agreement, then each reference in this Agreement and the Conveyance Instrument to any Sublease will be disregarded.

1.69 "Subtenant" will mean any subtenant or sublessee under the Sublease. If no sublease is listed on Exhibit A to this Agreement, then the Conveyance Instrument to any Subtenant at such the Store will be disregarded.

1.70 "Successful Bid" will have the meaning assigned to such term in the Bidding Procedures, and as otherwise contemplated in paragraph 5.1 of this Agreement, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

1.71 "Successful Bidder" will have the meaning assigned in paragraph 5.1 of this Agreement.

1.72 "Supplies" will mean all supplies relating to the operation and maintenance of the Equipment, located within the Store and owned by Seller on the Closing Date, excluding, however, all packaging materials and supplies relating to the preparation or merchandising of Inventory, or any other supplies that contain trademarks, trade names, private labels, logos or designs of Seller, Winn-Dixie or any of its Affiliates.

1.73 [Intentionally deleted]

1.74 "Title Commitment" will mean that current leasehold title insurance commitment obtained by Seller from Title Insurer, committing to insure

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

7

Buyer's leasehold interest in the Real Property upon Closing, as made available to Buyer for review on the Merrill Website within 10 days following the Effective Date.

1.75 "Title History" will mean those materials evidencing the state of title to the Real Property, including any existing title report, title abstract, title insurance policy, and/or title insurance commitment with respect to the Store that Seller has made available to Buyer for review on the Merrill Website prior to the Effective Date. Buyer understands that the Title History may include previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

1.76 "Title Insurer" will mean First American Title Insurance Company, either itself or by and through its authorized agents, or any other nationally recognized title insurance company as designated by Seller.

1.77 "Title Policy" will have the meaning assigned in paragraph 4.2 of this Agreement.

1.78 "Title Reports" will mean, collectively, (i) the Title History and (ii) the Title Commitment.

1.79 "Wind-up Procedures" will mean any pre-Closing actions and procedures as Seller or Winn-Dixie may consider necessary or appropriate to prepare for the anticipated assignment and transfer of the Assets to Buyer at Closing, including sell-down, liquidation or removal of Inventory, removal of Excluded Personal Property, and related marketing, promotions and advertising at the Store, and closing of the Store.

1.80 "Winn-Dixie" will mean Winn-Dixie Stores, Inc., a Florida corporation.

2.0 **Property Included in Sale.** Seller agrees to assign, transfer, sell, and convey the Assets to Buyer, and Buyer agrees to assume and purchase the Assets from Seller. The Assets are comprised of the following:

2.1 Seller's leasehold interest, as tenant, under the Lease, and Seller's interest in any leasehold improvements, including the release of Winn-Dixie from any guaranty of Seller's payment and performance obligations under the Lease, which Buyer acknowledges may require delivery of a Replacement Guaranty by a parent Affiliate of Buyer;

2.2 Seller's interest in all fixtures and all equipment located in the store building now existing on the Leased Premises (the "Building"), including but not limited to Seller's interest in (i) any heating and air conditioning system or any facility used to provide a utility service or any other similar service to the Building, elevators, docks, lifts, doors, storefront, ceilings, walls, partitions, lighting fixtures, and flooring (collectively, the "Improvements"), (ii) Seller's

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

8

trade fixtures and equipment located in the Building (the "<u>Equipment</u>"), and (iii) the Supplies; and

2.3   Seller's interest, as sublessor, in any Sublease.

Excluded Personal Property is expressly excluded from the Assets to be assigned and transferred by Seller to Buyer under this Agreement.

3.0   **Purchase Price.**

3.1   <u>Amount</u>.  The purchase price to be paid by Buyer to Seller for the Assets will be the fixed sum of One Hundred Thousand Dollars, ($100,000.00) (the "<u>Purchase Price</u>").  The Purchase Price will be allocated to the Store as set forth in the Allocation Schedule.

3.2   <u>Contract Consideration and Deposit</u>.  As specific consideration for Seller's agreement to sell the Assets to Buyer in accordance with the terms and conditions of this Agreement, Buyer will deliver to Escrow Agent, no later than 2 Business Days after the Effective Date, an initial earnest money deposit with respect to the Store in the amount set forth in the Allocation Schedule (the "<u>Initial Deposit</u>").  Furthermore, within 1 Business Day after satisfaction of the Approval Condition, Buyer will deliver to Escrow Agent an additional earnest money deposit in the amount set forth in the Allocation Schedule (the "<u>Second Deposit</u>").  The Initial Deposit, by itself, and together with the Second Deposit, if required to be delivered pursuant to this paragraph, will be referred to herein as the "<u>Deposit</u>".  Buyer will make the Initial Deposit and the Second Deposit by wire transfer to an account designated in writing by Escrow Agent.  The Initial Deposit will be subject to refund to Buyer to the extent and in the circumstances described in <u>paragraphs 4.4, 13.0, 15.0. 16.0 and 22.0</u>.  Upon delivery of the Second Deposit, the Deposit will be non-refundable to Buyer except pursuant to <u>paragraph 16.2</u>.  The applicable portion of the Deposit will be credited against the Purchase Price at Closing and will be held in a non-interest bearing escrow account maintained by Escrow Agent prior to Closing.

3.3   <u>Competitive Bidding Procedures</u>.  Buyer acknowledges that Seller's obligations under this Agreement are subject to the Bidding Procedures and the Bankruptcy Approval Procedures as described in <u>paragraph 5.0</u> below. Accordingly, the purchase and sale of the Assets may become involved in a competitive bidding process which will entitle Seller, in its sole discretion, to select a higher or otherwise better offer for the Assets than the Purchase Price and other terms and conditions set forth in this Agreement.

3.4   <u>Payment</u>.  The Purchase Price will be paid in the following manner:

3.4.1   *Purchase Price*.  On the Closing Escrow Date, Buyer will deliver to Escrow Agent the Purchase Price, net of the Deposit, and as adjusted as provided under the Closing Statement.  Such funds will be transferred by wire transfer to an account designated in writing by Escrow Agent.  Subject to the conditions set forth in <u>paragraph 10</u> of

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

9

this Agreement, on the Closing Date, Seller and Buyer will instruct Escrow Agent to deliver the escrowed funds in payment of the Purchase Price and disbursement of same in accordance with the Closing Statement.

3.4.2 *Certain Transaction Costs*. All relevant rent, taxes (including real and personal property taxes), utilities, and other payments regarding the Assets will be prorated (based on actual days within the relevant annual, quarterly, or monthly period, as appropriate) between the parties as of midnight of the date preceding the Closing Date and will be a credit or debit, as the case may be, against the Purchase Price payable at the Closing to the extent thereof. Following any proration of annual real and personal property taxes resulting in a credit to Buyer, Buyer will be responsible for payment of such taxes to the appropriate taxing authorities or Landlord, as and when due, as appropriate. Any amounts not determinable as of the Closing Date or reflected on the Closing Statement will be stipulated at the Closing based on good faith estimates reasonably acceptable to Buyer and Seller. There will be no post-Closing reproration or adjustment of prorated items. Following Closing, Buyer will timely make all required notifications to taxing authorities to effect the change in party responsible for taxes. The provisions of this paragraph 3.4.2 that apply to the period after the Closing will survive the Closing.

3.4.3 *Sales Tax*. Sales taxes, if any, resulting from the transfer of the Assets, or any particular category thereof, to the extent permitted by law, will be paid by Buyer, unless such transfer is subject to an available exemption therefrom.

3.5 Allocation of Purchase Price Among Assets. Buyer will have the right to allocate the Purchase Price, for tax purposes and all other purposes, among the Assets at the Store; provided, however, that such allocation will not be binding upon Seller or determinative with respect to any allocation made by Seller of the Purchase Price in accordance with the Bankruptcy Code or in any motion or pleading filed by Seller in the Bankruptcy Cases. The allocation contemplated in the immediately preceding sentence will be set forth with respect to the Assets on the Closing Statement.

4.0 **Buyer's Due Diligence.**

4.1 Acknowledgment; Access to Premises.

4.1.1 In deciding to acquire the Assets pursuant to this Agreement, Buyer acknowledges that it has had the opportunity to conduct due diligence regarding the Store and the Assets and that Buyer has had the opportunity to consult with Buyer's legal, financial, and tax advisors with respect to the transaction contemplated by this Agreement. Buyer confirms and acknowledges that Seller has given Buyer and its representatives the opportunity for access to the Merrill Website and the opportunity to ask and have answered questions of representatives

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

10

of Seller with respect to the Store and the Assets and to acquire such additional information about the Store and the Assets as Buyer has reasonably requested. Physical access to the Store will be permitted for Buyer's site visits and inspections, provided that Buyer arranges such access in advance with Seller.

    4.1.2  Direct contact with any members of management, employees, or stakeholders of Seller or visits to the Store are not permitted, except upon prior arrangement with Seller's agent, The Food Partners. To arrange for access to the Store for inspection or to interview Seller's employees, Buyer must contact Seller's representative at The Food Partners: Doug Herman by telephone at 202-589-0438 or by e-mail at dherman@thefoodpartners.com. Such pre-arranged site access will be subject to the following conditions: (a) Buyer will have given Seller at last 24-hours notice of Buyer's proposed entry into a Store or interview of Employees, (b) such entry or interviews will be conducted during normal business hours, (c) Buyer will be accompanied by Seller's representative during such entry and interviews, (d) Buyer's entry will not include any invasive testing or measurements, and (e) Buyer will conduct such investigations and interviews in such a manner so as to avoid disruption of the Seller's business operations in the Store. Furthermore, any such access will comply in all respects with Confidentiality Agreement, except as otherwise may be provided in this paragraph 4.1.

4.2  Title.  Buyer confirms and acknowledges that Seller has made the Title History available to Buyer through the Merrill Website prior to the Effective Date. Seller will deliver the Title Commitment to Buyer within 10 days after the Effective Date. Buyer may request Title Insurer to provide title insurance covering Buyer's leasehold interest in the Lease (the "Title Policy") at Closing, based on the Title Commitment.

    4.2.1  If any matter set forth in the Title Commitment for the Store would have a Material Adverse Effect upon the present use or occupancy of such Store, then Buyer may object to such matter by delivery of written notice of objection to Seller given not later than 3 Business Days after the Title Commitment either is delivered to Buyer or is posted on the Merrill Website. To be effective, any such notice of objection must be directed to Seller using e-mail address catherineibold@winn-dixie.com, with a copy using e-mail address dstanford@sgrlaw.com, and must include a subject matter line in capital letters: "BUYER TITLE OBJECTION NOTICE - WINN-DIXIE STORE #205".

    4.2.2  If Buyer timely notifies Seller of any valid objection to any matter set forth in the Title Commitment, then Seller will have a period of 3 Business Days after such notice in which to notify Buyer in writing either that: (i) Seller declines or is unable to cure such objection (other than Monetary Liens, which Seller will be obligated to cure at or prior to Closing), or (ii) Seller intends to cure or resolve such objection

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

11

at or prior to Closing. If written notice is given by Seller pursuant to <u>clause (i)</u> above, then Buyer may elect, within 3 Business Days after Seller's notice, either to terminate this Agreement, with no liability to Buyer or Seller, or to waive such objection and proceed with the transaction hereunder, and in the latter event, then Buyer will be deemed to have waived any objection made under this <u>paragraph 4.2</u> to any matter and such matter will constitute a Permitted Encumbrance.

4.3    <u>Environmental Reports</u>. Seller has, to the extent of available information, posted historical environmental reports on the Merrill Website covering the Real Property. Within 10 days after the Effective Date, Seller will deliver to Buyer and post on the Merrill Website current phase I environmental site assessment reports for the Store, prepared by an environmental consultant or engineer selected by Seller and, if applicable, licensed in the state where the Store is located (the "<u>Environmental Report</u>").

  4.3.1    If Buyer determines that any matter set forth in the Environmental Report would have a Material Adverse Effect upon the present use or occupancy thereof, then Buyer may object to such matter by delivery of written notice of objection to Seller given not later than 3 Business Days after the Environmental Report either is delivered to Buyer or is posted on the Merrill Website. To be effective, any such notice of objection must be directed to Seller using e-mail address <u>catherineibold@winn-dixie.com</u>, with a copy to e-mail address <u>dstanford@sgrlaw.com</u>, and must include a subject matter line in capital letters: "ENVIRONMENTAL REPORT OBJECTION NOTICE - WINN-DIXIE STORE #205".

  4.3.2    If Buyer timely notifies Seller of any valid objection to any matter set forth in the Environmental Report, then Seller will have a period of 3 Business Days after such notice in which to notify in writing Buyer either that: (i) Seller declines or is unable to cure such objection, or (ii) Seller intends to cure or resolve such objection at or prior to Closing. If written notice is given by Seller pursuant to <u>clause (i)</u> above, then this Agreement will be deemed terminated automatically, with no liability to Buyer or Seller. If the Environmental Report discloses any condition that affects the Real Property or other Assets that is of a nature that requires reporting to applicable governmental agencies, then Buyer or its consultants will promptly notify Seller in writing of such condition and, unless required by applicable law, Buyer will not contact or report to such agencies with respect to such condition without Seller's prior written consent; <u>provided</u>, <u>however</u>, that in no event will Buyer or its representatives contact such agencies without providing Seller with prior notice of Buyer's intention to make such contact or report, and providing Seller the opportunity to make such contact or report itself in lieu of Buyer.

4.4    <u>Termination Rights</u>. In the event that Buyer provides timely written notice of its election to terminate this Agreement pursuant to <u>paragraphs 4.2.2 or</u>

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

12

        4.3.2 above, then this Agreement will be deemed terminated as to the Store, and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that if Buyer is not in breach of this Agreement, then Buyer will be entitled to the return from the Escrow Agent of the Deposit.

  4.5    Return of Reports and Documents. If this Agreement is terminated for any reason, then all materials provided by Seller to Buyer and all materials relating to the Assets obtained by Buyer and all copies of any such materials will be delivered to Seller within 5 Business Days following termination. This paragraph will not in any way limit Buyer's duties to Seller or Winn-Dixie under the Confidentiality Agreement.

5.0  **Bankruptcy Approval Procedures**.

  5.1    Competitive Bid Process. This Agreement is subject to the competitive bid process described in the Bidding Procedures. Promptly following the expiration of the Review Period, if this Agreement has not otherwise terminated in accordance with its terms as to all of the Assets, then Seller will file a motion with the Bankruptcy Court seeking approval of the transaction contemplated by this Agreement, subject to higher or better offers, and the transfer of the Assets free and clear of all claims and liens including the Credit Liens, other than Permitted Encumbrances, pursuant, inter alia, to 11 U.S.C. Sections 105 and 363 (the "Sale Motion"). The Bankruptcy Court will set a date for hearing on the Sale Motion (the "Sale Hearing") and to consider entry of the Sale Order relating to the Successful Bid, as defined in the Bidding Procedures. The Bidding Procedures allow Seller to accept competitive bids on the Assets. If an acceptable competitive bid is received, Seller may conduct an auction prior to the Sale Hearing pursuant to the Bidding Procedures (the "Auction"). The party submitting the Successful Bid for the Assets as selected by Seller is referred to as the "Successful Bidder". Buyer may participate in the Auction, and may submit purchase terms different from those set forth in this Agreement as Buyer may deem appropriate in seeking to become the Successful Bidder. Prior to the Sale Hearing, upon consultation with the Creditors' Committee and the lender holding the Credit Agreement Liens (the "DIP Lender"), Seller will select the highest or otherwise best offer to purchase the Assets, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, as the Successful Bid. Seller will submit the Successful Bid to the Bankruptcy Court at the Sale Hearing, for entry of a Sale Order with respect to the Assets by the Bankruptcy Court, either (a) approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transaction contemplated herein, if Buyer is the Successful Bidder under the terms of this Agreement (or as modified during the Auction) or (b) approving the more favorable terms of purchase and sale offered by the Successful Bidder, whether Buyer or otherwise (the "Sale Order").

  5.2    Sale Order Approving Agreement. It will be a condition to the Closing of the transaction contemplated by this Agreement that the Bankruptcy Court will have issued the Sale Order approving this Agreement and all of the terms and

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

13

conditions hereof and authorizing Seller to consummate the transaction contemplated herein, and such Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Approval Condition").

5.3 <u>Continuing Effectiveness of Agreement</u>. Notwithstanding that Buyer may not be the Successful Bidder following the Bidding Procedures, this Agreement, as modified by Buyer's last bid made during the Bidding Procedures, will remain in effect in accordance with, and will remain subject to, the Bidding Procedures. If the Approval Condition is not otherwise satisfied by the Outside Date through no fault of Buyer or if the sale of the Assets closes with another Successful Bidder, then this Agreement automatically will terminate and Escrow Agent will refund the Deposit to Buyer, and the parties will have no further obligations to the other.

6.0 **<u>Representations and Warranties of Seller Relating to the Assets</u>.** To induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

6.1 On or prior to the Effective Date, Seller has delivered to Buyer or made available to Buyer for review, in hard copy, in electronic format, or on the Merrill Website: (i) copies of the Lease (including amendments with respect thereto) as in effect on the Effective Date, and (ii) the following materials, to the extent such items currently exist and are in the possession or control of Seller:

(a) copies of the Title History;

(b) copies of environmental history for the Store;

(c) copies of the site plans or boundary surveys for the Store;

(d) copies of the fixture plans for the Store; and

(e) a list of the Equipment (other than Excluded Personal Property) as reflected in Seller's current records;

it being understood that the materials described in this <u>paragraph 6.1</u> have been provided for informational purposes only with no representations or warranties by Seller as to accuracy, completeness, or otherwise.

6.2 At Closing, subject to Bankruptcy Court Approval, Seller will own and convey the Assets free and clear of all Monetary Liens and other encumbrances, other than the Permitted Encumbrances, to the extent provided under Section 363 of the Bankruptcy Code.

7.0 **<u>General Representations and Warranties of Seller</u>.** In order to induce Buyer to purchase the Assets as provided above, Seller represents and warrants to Buyer

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

14

that, except as disclosed to the contrary in this Agreement or in the Due Diligence Materials:

7.1    Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of Florida and, subject to satisfaction of the Approval Condition, has the power and authority to consummate the transaction contemplated herein. This Agreement and any closing document to which Seller is or is to become a party, which includes the transaction contemplated by this Agreement and any closing documents thereto, have, subject to satisfaction of the Approval Condition, been duly authorized by all required corporate action on behalf of Seller.

7.2    No consent, license, approval, or authorization of, or filing, registration, or declaration with, or exemption or other action by any governmental authority or third party ("Permit") is or will be required in connection with the execution, delivery, or performance by Seller of this Agreement or any closing document to which Seller is or is to become a party to the transaction herein or therein contemplated other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, and (iii) Bankruptcy Court approvals issued in satisfaction of the Approval Condition.

7.3    Subject to satisfaction of the Approval Condition, this Agreement and each of the closing documents to which Seller is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with the respective terms thereof, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

7.4    To Seller's Knowledge, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a Material Adverse Effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

7.5    None of the employees employed by Seller in the Store is covered by a union contract, collective bargaining agreement, or other labor agreement.

7.6    Seller has not engaged any brokers in connection with the transaction contemplated by this Agreement, except Seller's Brokers.

8.0    **Buyer's Representations and Warranties.** In order to induce Seller to enter into this Agreement and to sell, assign, and convey the Assets to Buyer as provided herein, Buyer represents and warrants to Seller as follows:

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

15

8.1 Buyer is a Florida corporation duly organized, validly existing, and in good standing under the laws of the State of Florida, and is licensed to transact business in the State in which the Assets are located, and has the power and authority to consummate the transaction contemplated herein. This Agreement and each of the closing documents to which Buyer is or is to become a party, which includes the transaction contemplated by this Agreement and any closing documents thereto, have been duly authorized by all required corporate action on behalf of Buyer.

8.2 No Permit is or will be required in connection with the execution, delivery or performance by Buyer of this Agreement or any closing document to which Buyer is or is to become a party or the transaction herein or therein contemplated, other than (i) those that have been obtained and are in full force and effect, (ii) approvals, if any, required under the HSR Act, and (iii) Bankruptcy Court approvals issued in satisfaction of the Approval Condition.

8.3 This Agreement and each of the closing documents to which Buyer is or is to become a party constitute, or will upon the execution and delivery thereof constitute, the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with the respective terms thereof, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

8.4 There is no action, suit, or proceeding pending or, to the Knowledge of Buyer, threatened against or affecting Buyer before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Buyer is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Buyer) have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or the closing documents to which Buyer is or is to become a party.

8.5 Entry into this Agreement or any of the closing documents to which Buyer is or is to become a party by Buyer will neither constitute, nor with the giving of notice or lapse of time or both constitute, an event of default or a default by Buyer under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaws, or other material agreement to which Buyer is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a Material Adverse Effect on the ability of Buyer to perform its obligations under this Agreement or any of the closing documents to which Buyer is or is to become a party.

8.6 As of the Effective Date and at all times through and including the Closing Date, Buyer has and will have sufficient cash, available lines of credit, or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it herein.

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

16

9.0 **Covenants of Seller.** Seller hereby covenants for the benefit of Buyer as follows:

9.1 Subject to the Wind-up Procedures, Seller will maintain the Store in its present condition, reasonable wear and tear, casualty loss, and condemnation impacts excepted.

9.2 Subject to the Wind-up Procedures, Seller will not sell, dispose of, abandon, or remove the Assets from the Store or agree to do so except in the ordinary course of business.

9.3 During implementation of the Wind-up Procedures, Seller will use commercially reasonable efforts to remove all Excluded Personal Property from the Store on or before the Closing Date, except that Buyer will remove and dispose of Seller's signs and panels that are part of the Excluded Personal Property as more fully provided in paragraph 10.2 of this Agreement.

9.4 Following satisfaction of the Approval Condition, Seller will release to Buyer a schedule of Seller's current employees at the Store, and will permit Buyer, at reasonable times during normal business hours and with minimum impact on Seller's business, to arrange for personal interviews with Store managers and other Store employees, at times and places mutually agreeable to both Seller and Buyer, and to arrange for those relevant employees of Seller, who are interested in potential employment with Buyer, to interview with Buyer.

9.5 Seller will transfer or terminate all of its employees working at each Store on or before the Closing Date, except to the extent otherwise required by the Family Medical Leave Act.

9.6 Seller will cooperate reasonably with Buyer, upon written request, with respect to Buyer's performance of its covenants under paragraph 10.0 of this Agreement.

The covenants set forth in this paragraph 9.0 that relate to any period after Closing for the Store will survive the Closing.

10.0 **Covenants of Buyer.** Buyer hereby covenants for the benefit of Seller as follows:

10.1 Buyer will use commercially reasonable efforts to obtain all Permits required to perform the obligations of Buyer under this Agreement and each of the closing documents to which Buyer is or is to become a party and to attain the fulfillment of the conditions set forth in paragraph 11.0 of this Agreement.

10.2 Within 48 hours after the Closing Date, Buyer will, at Buyer's sole cost and expense, remove from the Store, destroy, and lawfully dispose of all signs and panels that are part of the Excluded Personal Property. Without limitation, Buyer acknowledges that Buyer's indemnification of Seller under paragraph 16.5 of this Agreement will encompass any breach by Buyer of this paragraph 10.2.

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

17

    10.3    Buyer will use commercially reasonable efforts to take or cause to be taken all actions to assist and cooperate with Seller in doing all things necessary or appropriate to consummate and make effective, in the most expeditious manner practicable, the transaction contemplated by this Agreement.

    10.4    Buyer will provide the Adequate Assurance Information to Seller, the Bankruptcy Court, Landlord, and any Subtenants as reasonably may be requested.

The covenants set forth in this paragraph 10.0 that relate to any period after Closing for the Store will survive the Closing.

11.0    **Conditions Precedent to Buyer's Obligations.** The obligations of Buyer under this Agreement are subject to satisfaction of the Approval Condition, and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Buyer in Buyer's sole discretion, unless otherwise stated herein):

    11.1    Seller will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Seller will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. Subject to any limitations set forth in this Agreement (including, without limitation, the last sentence of paragraph 6.1 of this Agreement), all of Seller's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Seller's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects on the Effective Date and as of the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

    11.2    No order, injunction, or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transaction contemplated by this Agreement will be in effect, and, if the transaction contemplated herein is determined to be subject to regulatory review and approval under the HSR Act, then such approval or clearance will have been obtained.

    11.3    The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) will have been waived by the Bankruptcy Court or will have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Buyer will have the right to terminate this Agreement pursuant to

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

18

paragraph 15.1.4 of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies, and obligations, including any right of termination, will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to paragraph 15.1.4.

12.0 **Conditions Precedent to Seller's Obligations.** The obligations of Seller under this Agreement are subject to satisfaction of the Approval Condition and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including, without limitation, each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

12.1 Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. All of Buyer's representations and warranties contained in this Agreement which are not qualified by reference to a materiality standard will be true and accurate in all material respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect; and all of Buyer's representations and warranties contained in this Agreement which are qualified by reference to a materiality standard will be true and accurate in all respects as of the Effective Date and the Closing Date, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect.

12.2 No order, injunction, or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transaction contemplated by this Agreement will be in effect, and, if the transaction contemplated herein is determined to be subject to regulatory review and approval under the HSR Act, then such approval or clearance will have been obtained.

12.3 The stays imposed by Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) will have been waived by the Bankruptcy Court or will have expired.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller will have the right to terminate this Agreement pursuant to paragraph 15.1.5 of this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies, and obligations, including any right of termination, will be determined in accordance with paragraph 16.0 of this Agreement rather than pursuant to paragraph 15.1.5.

13.0 **Loss by Fire or Other Casualty; Condemnation.** Prior to the Closing, if the Store, or any material part thereof, is destroyed or materially damaged, or if

Asset Purchase Agreement
Winn-Dixie Stores, Inc. s/t Tropical Supermarkets
Winn-Dixie Store #205
May 17, 2006
SGRJAX\86041.1

19