## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| In re: ) | Case No. 05-03817-3F1 |
| ) | |
| WINN-DIXIE STORES, INC., et al., ) | *Chapter 11* |
| ) | |
| Debtors. ) | Jointly Administered |

## ORDER AUTHORIZING WINN-DIXIE STORES, INC.
## TO (I) EXERCISE ITS CONSENT TO SALE OF STOCK BY
## NON-DEBTOR SUBSIDIARY, (II) ENTER INTO A RELATED
## TRANSITION SERVICES AGREEMENT AND (III) ENTER
## INTO A RELATED NON-COMPETITION AGREEMENT

These cases came before the Court for hearing on May 18, 2006 upon the motion

(the "Motion") of Winn-Dixie Stores, Inc. ("Winn-Dixie") and twenty-three of its subsidiaries

and affiliates, as debtors and debtors-in-possession (together with Winn-Dixie, collectively, the

"Debtors")[1], for entry of an order under 11 U.S.C. §§ 105 and 363 authorizing Winn-Dixie to (i)

exercise its consent to the sale by W-D (Bahamas) Ltd., a Bahamas company, of shares of

common stock (the "Shares") of Bahamas Supermarkets Limited ("BSL") pursuant to the terms

of a Share Purchase Agreement (the "Purchase Agreement") to the party who, in accordance with

the bid procedures that were annexed to the Motion (the "Bid Procedures"), submitted the

highest or otherwise best offer for the Shares (such party, the "Purchaser"), (ii) enter into a

transition services agreement to continue to provide the Purchaser with services related to the

operation and management of the businesses which Winn-Dixie currently provides to BSL (the

"Transition Services Agreement"), and (iii) enter into a non-competition agreement by which the

Debtors will refrain from competing with the Purchaser for a period of two years (the "Non-

Competition Agreement").  Following an auction held on May 16, 2006, the Seller, in

---

[1]    All capitalized terms not otherwise defined in this order shall have the meaning ascribed to them in the
Motion.

consultation with the Debtors, determined that BSL Holdings, Ltd. ("BSL Holdings") had

submitted the highest or otherwise best offer for the Shares and, thus, BSL Holdings was

designated as the Successful Bidder, as such term is defined in the Bid Procedures. The Court

has read the Motion and considered the representations of counsel. Based upon the

representations of counsel and without objection by the United States Trustee or any other

interested parties, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted as modified by this Order.

2.      Any objections to the entry of this Order or to the relief granted and

requested in the Motion that have not been withdrawn, waived or settled are denied and

overruled in their entirety.

3.      Winn-Dixie is authorized to execute the Shareholder Consent to enable W-

D (Bahamas) Ltd. to enter into the Purchase Agreement, substantially in the form attached as

Exhibit A, with the Purchaser, or if the Purchaser fails to consummate the transaction, then with

another bidder to the extent permitted by the Bid Procedures.

4.      Winn-Dixie is authorized to execute the Transition Services Agreement,

substantially in the form attached as Exhibit B, subject to such additional changes as would make

the transaction, taken as a whole, a higher or otherwise better offer in the judgment of the

Debtors; provided, however, that the Transition Services Agreement executed by Winn-Dixie

shall be, in form and substance, reasonably satisfactory to the Creditors Committee.

5.    Winn-Dixie is authorized to execute the Non-Competition Agreement, substantially in the form attached as Exhibit C, subject to such additional changes as would make the transaction, taken as a whole, a higher or otherwise better offer in the judgment of the Debtors; provided, however, that the Non-Competition Agreement executed by Winn-Dixie shall be, in form and substance, reasonably satisfactory to the Creditors Committee.

Dated ___18___, 2006 in Jacksonville, Florida.

Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed to serve
a copy of this Order on all parties who
received copies of the Motion.

# EXHIBIT A

SHARE PURCHASE AGREEMENT


By and Between


W-D (BAHAMAS) LTD.


And


BSL HOLDINGS LIMITED


Dated as of May 17, 2006

## TABLE OF CONTENTS

1. DEFINITIONS AND INTERPRETATION ..................................................................2

2. PURCHASE AND SALE OF SHARES........................................................................7

3. CONSIDERATION.........................................................................................................7

4. CONDITIONS.................................................................................................................8

5. THE CLOSING.............................................................................................................10

6. REPRESENTATIONS AND WARRANTIES OF THE SELLER ................................12

7. REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.........................14

8. CONDUCT OF BUSINESS PENDING THE CLOSING.............................................18

9. ADDITIONAL AGREEMENTS....................................................................................23

10. [RESERVED]..............................................................................................................27

11. TERMINATION .........................................................................................................27

12. NON-COMPETITION AGREEMENT .......................................................................30

13. [RESERVED]..............................................................................................................30

14. GENERAL PROVISIONS ..........................................................................................30

## INDEX OF DEFINED TERMS

| Term | Page |
|---|---|
| Accounting Date | 2 |
| Action | 26 |
| Agreed Form | 2 |
| Agreement | 1 |
| Audited Accounts | 2 |
| Bahamian Company | 3 |
| Bankruptcy Case | 2 |
| Bankruptcy Code | 1 |
| Bankruptcy Court | 2 |
| Business | 1 |
| Business Day | 3 |
| Closing Date | 3 |
| Companies Act | 3 |
| Company | 1 |
| Company Material Adverse Effect | 3 |
| Company Subsidiary | 6 |
| Confidentiality Agreement | 25 |
| Deposit | 7 |
| Filing Date | 1 |
| Governmental Authority | 4 |
| Incumbrance | 4 |
| Indemnified Parties | 25 |
| Indemnified Party | 25 |
| Initial Termination Date | 28 |
| Knowledge | 4 |
| Leased Properties | 4 |
| Non-Competition Agreement | 4 |
| Ordinary Course | 4 |
| Owned Properties | 4 |
| Parent | 1 |
| Parties | 5 |
| Person | 5 |
| Purchase Price | 5 |
| Purchaser | 1 |
| Purchaser Material Adverse Effect | 5 |
| Purchaser Required Statutory Approval | 5 |
| Purchaser Subsidiary | 6 |
| Purchaser's Attorneys | 5 |
| Recitals | 5 |
| Restricted Person | 5 |
| Seller | 1 |
| Seller Disclosure Schedule | 5 |

| Term | Page |
|------|------|
| Seller Marks | 24 |
| Seller Required Statutory Approvals | 5 |
| Seller's Attorneys | 5 |
| Shareholder Consent | Schedule 4 |
| Shares | 1 |
| Subsidiary | 6 |
| Transition Services Agreement | 6 |
| Warranties | 6 |

EXECUTION COPY

## SHARE PURCHASE AGREEMENT

THIS SHARE PURCHASE AGREEMENT, dated as of May 17, 2006 (this **"Agreement"**), is entered into by and between:

1.      W-D (Bahamas) Ltd., a company incorporated and existing under the laws of the Commonwealth of The Bahamas with its registered office at Office of S. O. A. Isaacs, P.O. Box N 4755, Nassau, Bahamas (the **"Seller"**) of the first part, and

2.      BSL Holdings Ltd., a company incorporated and existing under the laws of the Commonwealth of The Bahamas with its registered office in the City of Nassau, in the Island of New Providence in the said Commonwealth of The Bahamas (the **"Purchaser,"** which expression shall where the context so admits include its successors and assigns) of the second part.

### W I T N E S S E T H :

**WHEREAS**, Bahamas Supermarkets Limited, a company incorporated and existing under the laws of the Commonwealth of The Bahamas (the **"Company"**) is a public company limited by shares and at the date of this Agreement has an authorised share capital of $5,000,000 divided into 5,000,000 ordinary shares of B$1.00 each. Short details of the Company are set out in Schedule 2;

**WHEREAS**, the Seller is the registered holder of or otherwise beneficially entitled to the shares in the capital of the Company in the numbers set out in the third column of Schedule 1 (the **"Shares"**) and has the right to sell or procure the sale of the Shares free from all Incumbrances;

**WHEREAS**, the Company is engaged in the retail sale of groceries, meat, produce and delicatessen products in the Commonwealth of The Bahamas (the **"Business"**);

**WHEREAS**, the Seller is a wholly owned subsidiary of Winn-Dixie Stores, Inc., a Florida corporation (the **"Parent"**);

**WHEREAS**, the Parent filed a voluntary petition for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq., as amended (the **"Bankruptcy Code"**), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the **"Filing Date"**) and has operated its business as a debtor-in-possession

(as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date. By order entered on April 13, 2005, the Chapter 11 bankruptcy case of the Parent was transferred to the United States Bankruptcy Court for the Middle District of Florida (the "**Bankruptcy Court**") where it is being administered under case no. 05-03817-3F1 (the "**Bankruptcy Case**");

**WHEREAS**, neither the Seller nor the Company is a debtor in the Bankruptcy Case;

**WHEREAS**, the Seller wishes to sell, or cause to be sold, to the Purchaser, and the Purchaser wishes to purchase from Seller, the Shares on the terms and subject to the conditions of this Agreement;

**WHEREAS**, each of the Boards of Directors of the Purchaser and the Seller has approved the acquisition of the Shares by the Purchaser upon the terms and subject to the conditions set forth herein; and

**WHEREAS**, the authorization of the Parent pursuant to Section 165 of the Companies Act of the Commonwealth of The Bahamas is required for the sale of the Shares and such authorization is subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and the representations, warranties, covenants and agreements contained herein, the Parties hereto, intending to be legally bound hereby, agree as follows:

## 1. DEFINITIONS AND INTERPRETATION

1.1 In this Agreement and in the Schedules (unless the context otherwise requires) the

following words and expressions shall have the following meanings:

| | |
|---|---|
| "Accounting Date" | means June 29, 2005. |
| "Agreed Form" | means in relation to any document the document which is annexed to this Agreement. |
| "Audited Accounts" | means the audited accounts of the Company for the accounting reference period ended on June 29, 2005 comprising, inter alia, a |

balance sheet, profit and loss account, notes, auditors' and directors' reports and a statement of the source and application of funds.

"Bahamian Company"    means a company incorporated and registered in the Commonwealth of The Bahamas, the shares and other equity interests of which are beneficially owned only by persons who are not Restricted Persons.

"Business Day"    means any day other than a Saturday or Sunday or any day on which banks in the Commonwealth of The Bahamas or in the State of Florida are required or authorized to be closed.

"Closing Date"    means the date of actual completion of the matters provided for in Clause 5 and 'Closing' shall be construed accordingly.

"Companies Act"    means the Companies Act, 1992 of the Commonwealth of The Bahamas.

"Company Material Adverse Effect"    means any material adverse effect on the business, assets, financial condition or results of operations of the Company and the Company Subsidiaries, taken as a whole; provided, however, that the term "Company Material Adverse Effect" shall not include effects that result from or are consequences of (i) any such effect resulting from any change in law, rule, or regulation of any Governmental Authority that applies generally to Persons conducting a business which is identical or substantially similar to the Business in the Commonwealth of The Bahamas; (ii) changes or developments in the retail markets in the Commonwealth of The Bahamas, including those due to actions by competitors or suppliers of the Company or any Company Subsidiary (as hereinafter defined); (iii) changes or developments in financial or securities markets or the economy in general or effects of weather or meteorological events; (iv) events or changes that are consequences of terrorist activity, acts of war, acts of public enemies, civil unrest, riots or public disturbances; (v) the

3

Bankruptcy Case, the conversion or dismissal of the Bankruptcy Case, the appointment of a Chapter 11 trustee or examiner in the Bankruptcy Case, or the filing of a motion seeking such conversion, dismissal or appointment; or (vi) the negotiation, announcement, execution, delivery, consummation or anticipation of the transactions contemplated by, or in compliance with, this Agreement.

"Governmental Authority"    means any court, federal, state, local or foreign governmental or regulatory body (including a national securities exchange or other self-regulatory body) or authority.

"Incumbrance"    means any incumbrance or security interest of any kind whatsoever including (without limitation) a mortgage, charge (whether fixed or floating), pledge, lien, hypothecation, right to acquire, right of pre-emption, right of retention, option, conversion right, third party right or interest, right of set-off or counterclaim, trust arrangement, any type of preferential agreement having similar effect or any other form of security interest or any obligation (including any conditional obligation) to create any of the same.

"Knowledge"    of the Seller means the actual knowledge of Kenneth Burns and Mark Sellers, without any requirement of inquiry or investigation.

"Leased Properties"    means the leasehold properties short particulars of which are contained in Schedule 3 and "Leased Property" shall mean any of them.

"Non-Competition Agreement"    means the agreement between the Parent and the Purchaser attached as Annex A hereto in Agreed Form "Ordinary Course" means the ordinary and usual course of business of the Company as currently conducted, taking into account, where applicable, the Bankruptcy Case of Parent.

"Owned Properties"    means the freehold properties short particulars of which are contained in Schedule 3 and 'Owned Property' shall mean any of them.

4

"Parties"                          means the Seller and the Purchaser and Party shall mean any one of them.

"Person"                           means any natural person, corporation, partnership, limited liability company, joint venture, trust, association or entity of any kind.

"Purchase Price"                   has the meaning set forth in Clause 2 hereof.

"Purchaser's Attorneys"            means Davis & Co, 11 Victoria Ave., Nassau, The Bahamas.

"Purchaser Material Adverse Effect"   means any material adverse effect on the business, assets, financial condition or results of operations of the Purchaser.

"Purchaser Required Statutory Approvals"   means the approval of the Exchange Control Department of The Central Bank of the Bahamas to pay the Purchase Price in Bahamian dollars.

"Recitals"                         means the recitals hereof.

"Restricted Person"                means a person that is not a Bahamian citizen or permanent resident with the right to work in The Bahamas.

"Seller's Attorneys"               means Graham, Thompson & Co., Sassoon House, Shirley Street & Victoria Avenue, Nassau, New Providence, The Bahamas.

"Seller Disclosure Schedule"       means the schedule and its annexures dated the date of execution of this Agreement delivered immediately before the execution of this Agreement and addressed by the Seller's Attorneys to the Purchaser's Attorneys.

"Seller Required Statutory Approvals"   means the filings with or approvals from Governmental Authorities required by the Seller in connection with the transactions contemplated by this Agreement set forth on Section 1.1 of the Seller Disclosure Schedule.

| | |
|---|---|
| "Subsidiary" | of a Person means any corporation or other entity (including partnerships and other business associations and joint ventures) of which at least a majority of the voting power represented by the outstanding capital stock or other voting securities or interests having voting power under ordinary circumstances to elect directors or similar members of the governing body of such corporation or entity (or, if there are no such voting interests, 50% or more of the equity interests in such corporation or entity) shall at the time be held, directly or indirectly, by such Person. The terms "Company Subsidiary" and "Purchaser Subsidiary" shall be construed accordingly. |
| "Transition Services Agreement" | means the Transition Services Agreement between the Parent and the Purchaser attached as Annex B hereto in Agreed Form. |
| "Warranties" | means the representations, warranties and undertakings given by the Sellers referred to in Clause 6 and Schedule 4. |

1.2     Expressions in the singular shall include the plural and in the masculine shall include the feminine.

1.3     References to any statute or statutory provision shall be construed as references to such statute or statutory provision as respectively amended or re-enacted or as their operation is modified by any other statute or statutory provision (whether before or after the date of this agreement) and shall include any provisions of which they are re-enactments (whether with or without modification) and shall include subordinate legislation made under the relevant statute.

1.4     References to recitals, clauses, Schedules and Annexes are references (as the case may be) to recitals and clauses of, and Schedules and Annexes to, this Agreement.

1.5     The headings used in this Agreement are inserted for convenience only and shall not affect its construction or interpretation.

1.6     The Annexes and Schedules attached hereto form part of this Agreement.

## 2. PURCHASE AND SALE OF SHARES

2.1     Subject to the terms and conditions of this Agreement, at the Closing (as defined below), the Seller agrees as beneficial owner to sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser agrees to purchase and accept from the Seller, all of the Seller's rights, title and interest in and to the Shares free from all claims or Incumbrances (as defined below) for the consideration detailed in Clause 3 hereof. Subject to the terms and conditions of this Agreement, the Purchaser agrees to deliver to the Seller, and the Seller agrees to accept, the Purchase Price (as defined below), in cash, without deduction, netting, recoupment or setoff of any kind, which delivery will be made by wire transfer in immediately available funds to the bank account or accounts designated by the Seller prior to the Closing.

2.2     The Purchaser shall not be obliged to complete the purchase of any of the Shares unless the purchase of all of the Shares is completed simultaneously.

2.3     The Seller shall be entitled to all dividends on the Shares for which the record date occurs prior to the Closing Date.

## 3. CONSIDERATION

3.1     Subject to the terms and conditions of this Agreement the total consideration payable to the Seller for the Shares shall be the Purchase Price in the sum of fifty four million Bahamian Dollars (B$54,000,000.00) to be paid in cash.

3.2     Prior to the execution hereof, the Purchaser has paid a deposit to the Seller's Attorneys to be held in escrow by the Seller's Attorneys subject to the terms and conditions of this Agreement, including Annex E hereto, by certified cheque or bankers draft in the amounts of five million Bahamian Dollars (B$5,000,000.00) (collectively the **"Deposit"**) and in part payment of the Purchase Price. Upon the Closing, the Deposit shall be applied toward the Purchase Price payable by the Purchaser to the Seller, with all interest on the Deposit delivered to the Seller. Upon termination of this Agreement, the termination provisions hereinafter contained at Clause 11 hereof shall govern the return of the Deposit and the interest accrued thereon to the Purchaser or the retention of the same by the Seller. Until the earlier of the Closing or the termination of this Agreement,

7

the parties shall, for United States income tax purposes only, treat the Purchaser as owning the Deposit and any accrued interest thereon in accordance with Section 1.468B-8 of the proposed United States Treasury regulations (and any applicable final Treasury Regulations that replace such section or any similar state or local tax section).

## 4. CONDITIONS

4.1     Conditions to Each Party's Obligation to Effect the Closing. The respective obligations of each Party to effect the Closing shall be subject to the satisfaction on or prior to the Closing Date of the following conditions, except, to the extent permitted by applicable law, that such conditions may be waived in writing pursuant to Clause 14.3 by the joint action of the Parties hereto:

  4.1.1   The absence of any injunction or other judicial or administrative order restraining the Parties or either Party from completing the sale and purchase of the Shares in accordance with the provisions of this Agreement.

  4.1.2   The Parent shall have executed the Shareholder Consent approving this Agreement and the transactions contemplated hereby, which consent shall have been approved by the Bankruptcy Court following the submission by the Parent of a motion seeking such approval.

  4.1.3   The Purchaser Required Statutory Approvals shall have been obtained at or prior to the Closing Date.

4.2     Conditions to Obligation of the Purchaser to Effect the Closing. The obligation of the Purchaser to effect the Closing shall be further subject to the satisfaction, on or prior to the Closing Date, of the following conditions, except as may be waived by the Purchaser in writing pursuant to Clause 14.3:

  4.2.1   Performance of Obligations of the Seller. The Seller shall have performed in all material respects its agreements and covenants contained in or contemplated by this Agreement which are required to be performed by it at or prior to the Closing.

  4.2.2   Representations and Warranties. The representations and warranties of the Seller set forth in this Agreement shall be true and correct (i) on and as of the

date hereof and (ii) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specific date or time which need only be true and correct as of such date or time) except in each of cases (i) and (ii) for such failures of representations or warranties to be true and correct (without giving effect to any materiality qualification or standard contained in any such representations or warranties) which would not result in a Company Material Adverse Effect.

4.2.3    <u>Transition Services Agreement and Non-Competition Agreement</u>. The Transition Services Agreement and the Non-Competition Agreement in substantially the Agreed Forms with such changes as may be required by the Bankruptcy Court shall have been executed and delivered by the Parent following approval by the Bankruptcy Court of such execution and delivery.

4.2.4    <u>Closing Certificates</u>. The Purchaser shall have received a certificate signed by the Seller, dated the Closing Date, to the effect that the conditions set forth in Clauses 4.2.1 and 4.2.2 have been satisfied.

4.3    <u>Conditions to Obligation of the Seller to Effect the Closing</u>. The obligation of the Seller to effect the Closing shall be further subject to the satisfaction, on or prior to the Closing Date, of the following conditions, except as may be waived by the Seller in writing pursuant to Clause 14.3:

4.3.1    <u>Performance of Obligations of the Purchaser</u>. The Purchaser shall have performed in all material respects its agreements and covenants contained in or contemplated by this Agreement which are required to be performed by it at or prior to the Closing.

4.3.2    <u>Representations and Warranties</u>. The representations and warranties of the Purchaser set forth in this Agreement shall be true and correct (i) on and as of the date hereof and (ii) on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specific date or time which need only be true and correct as of such date or time) except in each of cases (i) and (ii) for such failures of representations or warranties to be true and correct (without giving effect to any

9

materiality qualification or standard contained in any such representations or warranties) which would not result in a Purchaser Material Adverse Effect.

4.3.3    <u>Transition Services Agreement and Non-Competition Agreement</u>. The Transition Services Agreement and the Non-Competition Agreement in substantially the Agreed Forms with such changes as may be required by the Bankruptcy Court shall have been executed and delivered by the Purchaser.

4.3.4    <u>Closing Certificates</u>. The Seller shall have received a certificate signed by the Purchaser, dated the Closing Date, to the effect that the conditions set forth in Clauses 4.3.1 and 4.3.2 have been satisfied.

4.3.5    <u>Exchange Control Department Approval</u>. The Seller shall have received unconditional written approval from the Exchange Control Department of The Central Bank of the Bahamas to convert the Purchase Price to United States dollars on the Closing Date for remittance abroad.

## 5. THE CLOSING

5.1    <u>Closing</u>. The consummation of the sale and transfer of the Shares by the Seller to the Purchaser shall take place at the offices of the Seller's Attorneys at 5:00 p.m., local time, on the Wednesday of the week immediately following the date on which the last of the conditions set forth in Clause 4 hereof is fulfilled or waived (except for those conditions which by their nature can only be fulfilled at the Closing), or at such other time, date and place as the Seller and the Purchaser shall mutually agree. The Purchaser shall be entitled to all rights, privileges and benefits of the Shares from the Closing Date.

5.2    <u>Deliveries by the Seller</u>. At the Closing, the Seller shall deliver to the Purchaser the documents set forth below:

5.2.1    In accordance with the practice of the transfer agent of the Company, evidence of the transfer of the Shares duly and validly executed by the Seller in favour of the Purchaser (or as it in writing directs) accompanied by the relevant share certificate or certificates representing the Shares;

5.2.2    certified resolutions of the Board of Directors of the Seller authorizing the transactions herein contemplated;

5.2.3    such waivers, consents or other documents as may be required to give good title to the Shares and to enable the Purchaser or its nominees to become registered shareholders;

5.2.4    the resignations or other evidence of removal of Peter Lynch and Mark Sellers from the Board of Directors of the Company and each Company Subsidiary with a written acknowledgment from each (which shall be executed under seal or as a deed in an agreed form) that he has no claim whatsoever against the Company whether in respect of compensation for loss of office, damages, pensions, loans or otherwise, other than any rights to indemnity to the extent provided in Section 9.8 of this Agreement or to reimbursement of expenses and director fees earned but not theretofore paid;

5.2.5    the Transition Services Agreement as executed and delivered by the Parent following Bankruptcy Court approval of such execution and delivery;

5.2.6    the Seller Disclosure Schedule;

5.2.7    Certificates of Incumbency and good standing of the Seller;

5.2.8    Certificate of good standing of the Company and each Company Subsidiary; and

5.2.9    any other papers, documents, instruments and writing required to be delivered by the Seller to the Purchaser pursuant to this Agreement or as the Purchaser may (by notice from the Purchaser's Attorneys to the Seller's Attorneys given not less than five (5) Business Days prior to the Closing Date) reasonably require.

5.3    Meeting of the Board of Directors. At the Closing, the Seller and the Purchaser shall cooperate in procuring that a board meeting of the Company shall be held at which:

5.3.1    such persons as the Purchaser may nominate shall be appointed as directors and officers of the Company;

5.3.2    there shall be submitted and accepted the resignations of the directors referred to in Clause 5.2.4 hereof;

11

5.3.3    the transfers of the Shares shall be approved for registration and the appropriate entry made in the Share Register of the Company;

5.3.4    the existing bank mandates given by the Company shall be amended, if necessary; and

5.3.5    the registered office of the Company shall be changed as the Purchaser may direct.

5.4    Purchaser's Closing Obligations. At the Closing, the Purchaser shall:

5.4.1    pay or procure the payment to and in favour of the Seller the Purchase Price;

5.4.2    deliver to the Seller certified resolutions of the Board of Directors of the Purchaser authorizing the transactions herein contemplated; and

5.4.3    deliver to the Seller any other documents, instruments and writings reasonably required to be delivered by the Purchaser to the Seller pursuant to this Agreement or as the Seller may (by notice from the Seller's Attorneys to the Purchaser's Attorneys given not less than five (5) Business Days prior to the Closing Date) reasonably require.

5.5    Settlement of Certain Obligations. At the Closing, (i) the Parent shall reimburse the Company for all claims under insurance coverage maintained by the Parent for the Company that are due and payable as of the Closing Date subject to any applicable adjustment in the Bankruptcy Case and (ii) the Company shall pay to the Seller or to the Parent as the case may be all amounts owing by the Company as of the Closing Date for trade payables and for shared services (including but not limited to information technology services and employee compensation) provided by the Parent or the Seller to the Company through the Closing Date.

## 6. REPRESENTATIONS AND WARRANTIES OF THE SELLER

6.1    As an inducement to the Purchaser to enter into this Agreement, the Seller warrants and represents to the Purchaser in relation to the Company the terms set out in Schedule 4.

12

6.2     The Warranties shall be deemed to be qualified by (i) all information that the Company has publicly disclosed; (ii) all information within the actual knowledge of the Purchaser, without any requirement of inquiry or investigation and (iii) any information disclosed in this Agreement or the Schedules or Annexes hereto or the Seller Disclosure Schedule, regardless of where in this Agreement or the Schedules or Annexes hereto or the Seller Disclosure Schedule such information is disclosed.

6.3     Except for Warranties that speak as of a specific date, the Warranties shall be deemed to be given as at the date of this Agreement and to be repeated immediately before Closing and to relate to the facts then existing.

6.4     The Seller undertakes with the Purchaser that, except as may be necessary to give effect to this Agreement, it shall not, and shall use commercially reasonable efforts to cause the Company not to, allow or procure any act or omission before Closing which would constitute a material breach of any of the Warranties if they were given at Closing or which would make any of such Warranties inaccurate or misleading if they were so given.

6.5     The Seller undertakes with the Purchaser that it will within three (3) Business Days disclose in writing to the Purchaser any event or circumstance which may arise or become known to the Seller after the date of this Agreement and prior to Closing which had it been known to the Seller on or before the date of this Agreement would constitute a material breach of a Seller's Warranty.

6.6     None of the information supplied by the Company or their professional advisers prior to the date of this Agreement to the Seller or their officers, employees, agents, representatives or advisers in connection with the Warranties and the contents of the Seller Disclosure Schedule or otherwise in relation to the business or affairs of the Company shall be deemed a representation, warranty or guarantee of its accuracy by the Company to the Seller and the Seller waives any claims against the Company, its officers, employees, agents, representatives or advisers which they might otherwise have in respect of the same.

6.7     Except for the representations and warranties contained in this Clause 6 and Schedule 4 hereto, neither the Seller nor any other Person or entity acting on behalf of the Seller makes any representation or warranty, express or implied, concerning the Shares or the business, finances, operations, assets, liabilities, prospects or any other aspect of the

Company or any Company Subsidiary and the Shares are being sold to the Purchaser on an "AS IS, WHERE IS" basis.

## 7. REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

7.1 The Purchaser represents and warrants to the Seller that:

    7.1.1   <u>Organization and Qualification</u>. The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of The Bahamas, has all requisite power and authority to own, lease and operate its assets and properties to the extent owned, leased and operated and to carry on its business as it is now being conducted and is duly qualified and in good standing to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its assets and properties makes such qualification necessary other than in such jurisdictions where the failure to be so qualified or in good standing would not have a Purchaser Material Adverse Effect or prevent, materially delay or materially impair the Purchaser's ability to consummate the transactions contemplated by this Agreement.

    7.1.2   <u>Authority</u>. The Purchaser has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation by the Purchaser of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Purchaser. No vote of, or consent by, the holders of any class or series of stock issued by the Purchaser is necessary to authorize the execution and delivery by the Purchaser of this Agreement or the consummation by it of the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Purchaser and, assuming the due authorization, execution and delivery hereof by the Seller, constitutes the valid and binding obligation of the Purchaser enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

7.1.3   <u>Statutory Approvals</u>. Except for the Purchaser Required Statutory Approvals, no declaration, filing or registration with, or notice to or authorization, consent or approval of, any Governmental Authority is necessary for the execution and delivery of this Agreement by the Purchaser or the consummation by the Purchaser of the transactions contemplated hereby, except those which the failure to obtain would not have a Purchaser Material Adverse Effect or prevent, materially delay or materially impair the Purchaser's ability to consummate the transactions contemplated by this Agreement.

7.1.4   <u>Litigation</u>. As of the date hereof, there are no claims, suits, actions or proceedings by any Governmental Authority or any arbitrator pending or, to the knowledge of the Purchaser, threatened against, relating to or affecting the Purchaser or any Purchaser Subsidiary which would have a Purchaser Material Adverse Effect or prevent, materially delay or materially impair the Purchaser's ability to consummate the transactions contemplated by this Agreement. As of the date hereof, there are no judgments, decrees, injunctions, rules or orders of any court, governmental department, commission, agency, instrumentality or authority or any arbitrator applicable to the Purchaser except for such that would not have a Purchaser Material Adverse Effect or prevent, materially delay or materially impair the Purchaser's ability to consummate the transactions contemplated by this Agreement.

7.1.5   <u>Investigation by the Purchaser; the Seller's Liability</u>. The Purchaser has conducted its own independent investigation, review and analysis of the Business, operations, assets, liabilities, results of operations, financial condition, software, technology and prospects of the Company, which investigation, review and analysis were done by the Purchaser and its affiliates and, to the extent the Purchaser deemed appropriate, by the Purchaser's representatives. The Purchaser acknowledges that it and its representatives have been provided adequate access to the personnel, properties, premises and records of the Company for such purpose. In entering into this Agreement, the Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review and analysis and not on any factual representations of the Seller or its representatives (except the specific representations and warranties of the Seller set forth in this Agreement), and the Purchaser:

7.1.5.1    acknowledges that none of the Seller or any of its directors, officers, shareholders, employees, affiliates, controlling Persons, agents, advisors or representatives (or agents, advisors or representative of any of the foregoing) makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information (including materials furnished in the Company's data room, presentations by the Company's management, financial projections or otherwise) provided or made available to the Purchaser or its directors, officers, employees, affiliates, controlling Persons, agents or representatives;

7.1.5.2    agrees, to the fullest extent permitted by law, that none of the Seller, the Company, or any of their respective directors, officers, employees, shareholders, affiliates, controlling Persons, agents, advisors or representatives (or agents, advisors or representative of any of the foregoing) shall have any liability or responsibility whatsoever to the Purchaser or its directors, officers, employees, affiliates, controlling Persons, agents or representatives on any basis (including in contract or tort, under federal or state securities laws or otherwise) based upon any information provided or made available, or statements made (including materials furnished in the Company's data room, presentations by the Company's management, financial projections or otherwise) to the Purchaser or its directors, officers, employees, affiliates, controlling Persons, advisors, agents or representatives (or any omissions therefrom), including in respect of the specific representations and warranties of the Seller set forth in this Agreement, except that the foregoing limitations shall not apply to the Seller insofar as the Seller makes the specific representations and warranties set forth in this Agreement, but always subject to the limitations and restrictions contained in this Agreement; and

7.1.5.3    acknowledges that, except for the representations and warranties herein contained, neither the Seller nor any other Person or entity acting on behalf of the Seller makes any representation or warranty, express or implied, concerning the Shares or the Business, finances, operations, assets, liabilities, prospects or any other aspect of the Company and

that the Shares are being sold to the Purchaser on an "AS IS, WHERE IS" basis.

7.1.6   <u>Financing</u>. The Purchaser has, and will have throughout the period beginning as of the date hereof and ending on the Closing Date, sufficient cash in immediately available funds to pay the Purchase Price as herein provided and to consummate the transactions contemplated hereby, including, without limitation, payment of fees and expenses in connection with the transactions contemplated hereby. Documents evidencing the foregoing have been provided to the Seller.

7.1.7   <u>Brokers or Finders</u>. The Purchaser has not entered into any agreement or arrangement entitling any agent, broker, investment banker, financial advisor or other firm or Person to any broker's or finder's fee or any other commission or similar fee in connection with any of the transactions contemplated by this Agreement, except Fidelity Merchant Bank & Trust Limited, whose fees and expenses will be paid by the Purchaser in accordance with the Purchaser's agreement with such firm and the Purchaser shall indemnify and hold the Seller and the Company harmless against any and all costs, claims and demands arising as a result of non payment thereof.

7.1.8   <u>Certain Payments</u>. Neither the Purchaser nor any director, officer, agent, employee or other person acting on behalf of the Purchaser has, directly or indirectly, used any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity, made any unlawful payment to any U.S. or non-U.S. government official or employee or to any U.S. or non-U.S. political parties or campaigns from corporate funds, violated any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any similar law in The Bahamas or elsewhere, or made any bribe, rebate, payoff, influence payment, kickback or similar unlawful payment.

7.1.9   <u>Bahamian Company</u>. The Purchaser is, and will be throughout the period beginning as of the date hereof and ending on the Closing Date, a Bahamian Company.

7.1.10  <u>Restricted Person</u>.

(a) No Restricted Person has, or will have at any time throughout the period beginning as of the date hereof and ending on the Closing Date, any direct or indirect interest in the Purchaser.

(b) No Restricted Person has, or will have at any time throughout the period beginning as of the date hereof and ending on the Closing Date, a right of any kind (by conversion or otherwise) to acquire any shares or any other equity interest in the Purchaser or the Company.

(c) There are no agreements, side letters or other arrangements of any kind to issue shares or any other equity interest (or any interest of any kind inconsistent with the terms of this Sub-Clause 7.1.10) in the Purchaser or the Company, nor will there be any such agreements, side letters or other arrangements of any kind at any time throughout the period beginning as of the date hereof and ending on the Closing Date.

(d) All of the Purchaser's loan transactions and other financial arrangements related to or in connection with this Agreement are, and shall be at all times throughout the period beginning as of the date hereof and ending on the Closing Date, on a standard arm's-length lending basis (without any equity-like features).

7.2    Except for warranties that speak as of a specific date or dates, the warranties contained in this Clause 7 shall be deemed to be given as at the date of this Agreement and to be repeated immediately before Closing and to relate to the facts then existing.

7.3    The Purchaser undertakes with the Seller that it will within three (3) Business Days disclose in writing to the Seller any event or circumstance which may arise or become known to the Purchaser after the date of this Agreement and prior to Closing which had it been known to the Purchaser on or before the date of this Agreement would constitute a material breach of a warranty of Purchaser contained in this Clause 7.

## 8. CONDUCT OF BUSINESS PENDING THE CLOSING

8.1    Covenants of the Seller. After the date hereof and prior to the Closing or earlier termination of this Agreement, the Seller agrees that, except as set forth in Section 8.1 of the Seller Disclosure Schedule and except (i) as contemplated in or permitted by this Agreement, (ii) in connection with necessary repairs due to breakdown or casualty, or other actions taken in response to a business emergency or other unforeseen operational matters, (iii) as required by law, rule or regulation, (iv) as would violate any applicable fiduciary duties and/or contractual obligations on the date hereof, or (v) to the extent the

Purchaser shall otherwise consent, which decision regarding consent shall be made promptly and which consent shall not be unreasonably withheld, conditioned or delayed:

8.1.1 the Seller shall use commercially reasonable efforts to cause the Company not to:

8.1.1.1   incur any material expenditure on capital account or enter into any commitments so to do;

8.1.1.2   dispose of or agree to dispose of or grant any option in respect of any material part of its assets except in the Ordinary Course;

8.1.1.3   borrow money in any material amount or make any payments out of or drawings on its bank account(s) except in the Ordinary Course;

8.1.1.4   enter into any contract or commitment that is not Ordinary Course; or

8.1.1.4.1   grant or agree to grant any lease or third party right in respect of the Leased Properties or assign or agree to assign or otherwise dispose of the same;

8.1.1.4.2   make any loan;

8.1.1.4.3   enter into any leasing, hire, purchase, or other agreement or arrangements for payment on deferred terms;

8.1.1.5   declare, make or pay any dividend on the shares of the Company, including the Shares, other than in the Ordinary Course and consistent with past practice with respect to the payment of dividends by the Company;

8.1.1.6   grant or issue or agree to grant or issue any mortgages, charges, debentures or other securities for money or redeem or agree to redeem any such securities or give or agree to give any material guarantees or indemnities;

8.1.1.7   permit any of its insurances to lapse or do anything which would make any policy of insurance void or voidable;

8.1.1.8   make any change in the terms and conditions of employment or pension benefits of any of its directors or officers or hire or terminate (other than for good cause) the employment of any director or officer;

8.1.1.9   create, issue or grant any option in respect of any class of share or loan capital or agree so to do; or

8.1.1.10 in any other material way depart from the Ordinary Course of its Business either as regards the nature, scope or the manner of conducting the same.

8.1.2 The Seller shall not:

8.1.2.1   dispose of any Shares or any interest in such Shares or grant any Incumbrance over the Shares in whole or in part; or

8.1.2.2   in any way adversely affect in any material respect its current business organization or its existing relations and goodwill with significant customers, suppliers, creditors, lessors and business associates.

8.2   The Seller shall promptly provide the Purchaser with copies of all filings made by the Seller or, to the extent available to the Seller, the Company with, and inform the Purchaser of any communications received by the Seller or, to the extent available to the Seller, the Company from, any Governmental Authority in connection with this Agreement and the transactions contemplated hereby, other than any filings and communications regarding taxes payable by the Seller in the United States of America, including but not limited to tax returns of any kind.

8.3   The Seller shall (a) use commercially reasonable efforts to obtain promptly all of the Seller Required Statutory Approvals, (b) promptly notify the Purchaser of any failure or prospective failure to obtain any such approvals and, if requested by the Purchaser, provide copies of all of the Seller Required Statutory Approvals obtained by the Seller to the Purchaser and (c) cooperate and use commercially reasonable efforts to assist the Purchaser to obtain any consent required as a result of the transactions contemplated by this Agreement under any contract relating to the Company to which the Seller or the Parent is a party; provided, however, that neither the Seller nor the Parent nor any of their affiliates or representatives shall be required by this Section 8.3 to (A) pay any

consideration, (B) surrender, modify or amend in any substantive respect any such contract, or (C) agree to either of the foregoing or any other condition or requirement that is adverse or burdensome.

8.4    Pending Closing, the Seller shall use commercially reasonable efforts as a shareholder to procure that the Purchaser, its agents and representatives are given reasonable access, during normal business hours, to the Leased Properties and to the books, records, contracts and commitments of the Company and the Seller shall, upon request, furnish to the Purchaser, its agents and representatives such information as is within the Seller's control regarding the Company and such other matters as the Purchaser may reasonably require, including any filings, applications or approvals required or contemplated by this Agreement or for any other reason related to the transactions contemplated by this Agreement. Notwithstanding the foregoing, in no event shall the Seller be obligated to provide (i) access or information in violation of law, (ii) bids, letters of intent, expressions of interest or other proposals received from others in connection with the transactions contemplated by this Agreement and information and analysis relating to such communications, or (iii) any information the disclosure of which would jeopardize any privilege available to the Seller, the Company, any Company Subsidiaries or the Parent relating to such information or would cause the Seller, the Company, any Company Subsidiary or the Parent to breach a confidentiality obligation to which it is bound.

8.5    The Seller shall use commercially reasonable best efforts to cause the Company to make the following available to the Purchaser at the Closing:

8.5.1    the certificate of incorporation, statutory books (including minute books), common seal and all books of account and other records of the Company complete and (where appropriate) written up to date;

8.5.2    the Lease Agreements to the Leased Properties and all ancillary documents;

8.5.3    a written acknowledgment under seal in the Agreed Form from each of the existing directors or officers of the Company who is to continue as a director or officer (as the case may be) after the Closing Date that he has no claim whatever against the Company, other than any rights to indemnity to the extent provided under Section 9.8 of this Agreement or to reimbursement of expenses and director fees earned but not theretofore paid;

21

8.5.4    certificates from the Company's bankers certifying the current and deposit account balances of the Company at the close of business on the last Business Day preceding the Closing Date;

8.5.5    appropriate forms to amend the mandates given by the Company to its bankers; and

8.5.6    written confirmation from the Seller that there are no subsisting guarantees given by the Company in its favour and that the Seller is not indebted to the Company or vice versa, other than for trade payables, claims payable under insurance coverage and amounts payable in connection with shared services that are currently provided by the Parent or the Seller to the Company.

8.6    Covenants of the Purchaser. After the date hereof and prior to the Closing Date or earlier termination of this Agreement, the Purchaser agrees that, except as expressly contemplated or permitted in this Agreement or to the extent the Seller shall otherwise consent in writing, which decision regarding consent shall be made as soon as reasonably practical, and which consent shall not be unreasonably withheld, conditioned or delayed:

8.6.1    The Purchaser shall promptly provide the Seller with copies of all filings made by the Purchaser with, and inform the Seller of any communications received from (and provide copies of any such communications that are written), any Governmental Authority in connection with this Agreement and the transactions contemplated hereby.

8.6.2    The Purchaser shall use all commercially reasonable efforts to obtain promptly the Purchaser Required Statutory Approvals. The Purchaser shall promptly notify the Seller of any failure or prospective failure to obtain the Purchaser Required Statutory Approvals and shall provide to the Seller a copy of the Purchaser Required Statutory Approvals obtained by the Purchaser.

8.6.3    The Purchaser shall not, and shall not permit any Purchaser Subsidiary to, (i) acquire or agree to acquire any assets or (ii) acquire or agree to acquire, whether by merger, consolidation, by purchasing any portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership,

association or other business organization or division thereof, if the entering into of a definitive agreement relating thereto or the consummation of such acquisition, merger or consolidation could reasonably be expected to (A) impose any delay in the expiration of any applicable waiting period or impose any delay in the obtaining of, or increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the transaction contemplated by this Agreement; (B) increase the risk of any Governmental Authority entering an order prohibiting such transaction; or (C) delay or impede the consummation of the transaction contemplated by this Agreement.

8.6.4 Neither the Purchaser nor any of its Subsidiaries, agents, representatives or affiliates shall take any action that would be reasonably likely to cause any of the Purchaser's warranties, including but not limited to those in Sub-Clauses 7.1.6, 7.1.9 and 7.1.10, to be untrue at any time.

## 9. ADDITIONAL AGREEMENTS

9.1 <u>Regulatory Matters</u>. Each Party hereto shall cooperate and use best efforts to prepare and file as soon as practicable all necessary documentation, to effect all necessary applications, notices, petitions, filings and other documents, and to use best efforts to obtain all necessary permits, consents, approvals and authorizations of all Governmental Authorities necessary or advisable to obtain the Seller Required Statutory Approvals and the Purchaser Required Statutory Approvals. All such documentation of the Seller and the Purchaser shall be subject to the approval of the other party hereto, which approval shall not be unreasonably withheld or delayed. The Parties further agree to use best efforts to take any act, make any undertaking or receive any clearance or approval required by any Governmental Authority or applicable law. Each Party shall (i) respond as promptly as practicable to any inquiries or requests received from any Governmental Authority for additional information or documentation and (ii) not enter into any agreement with any Governmental Authority not to consummate the transactions contemplated by this Agreement, except with the prior consent of the other Party hereto (which shall not be unreasonably withheld or delayed).

9.2    Public Announcements. No announcements of any kind shall be made in respect of the subject matter of this Agreement by any Party except as specifically agreed between the Parties or if required by law or by any Governmental Authority. Any announcement by any Party so required shall, in any event, be issued after consultation with the other Party as to the content of such announcement except in connection with Parent's Bankruptcy Case.

9.3    Insurance. The Purchaser acknowledges and agrees that effective upon the Closing, all insurance coverage maintained by the Parent or the Seller applicable to the Company and the Company Subsidiaries shall be terminated or modified to exclude coverage of the Company and the Company Subsidiaries, and, as a result, the Purchaser shall be obligated at or before Closing to obtain at its sole cost and expense replacement insurance policies providing coverage for claims made or arising after the Closing.

9.4    Financial Information.

9.4.1    After the Closing, upon reasonable written notice, the Purchaser and the Seller shall use commercially reasonable efforts to furnish or cause to be furnished to each other and their respective accountants, counsel and other representatives, during normal business hours, such information (including records pertinent to the Company) as is reasonably necessary for financial reporting and accounting matters.

9.4.2    The Purchaser shall cause the Company to retain all of the books and records of the Company and the Company Subsidiaries for a period of eight (8) years after the Closing Date or such longer time as may be required by law.

9.5    Seller's Name and Look and Feel. The Purchaser shall not acquire, nor shall the Company retain, any rights to the names "Winn-Dixie" or "W-D" (or any derivation thereof) or any trademark, service mark, trade name, company name or symbol related thereto (the **"Seller Marks"**). As soon as reasonably practicable after the Closing but not later than six (6) months after the Closing Date, the Purchaser shall (i) cause the Company to remove the Seller Marks from all stores, markets and other retail operations of the Company, (ii) cause the Company to remove the Seller Marks from all other properties and assets of the Company, (iii) discontinue all use of the Seller Marks or any trademark, service mark, trade name, company name or symbol related or confusingly similar thereto by or on behalf of the Company, and (iv) redesign, refurbish, clean and

24

repaint, as necessary, all stores, markets and other retail operations of the Company and the Company Subsidiaries so as fulfill the Purchaser's obligations in clauses (i) through (iii) above and to remove all evidence of the Seller Marks. Any use of the Seller Marks during such six- (6) month period shall, and the products or services provided in connection with such use shall, (i) be limited to such uses, products and services as were made of the Seller Marks in connection with the businesses of the Company prior to the Closing Date and (ii) conform to a level of quality at least as high as that practiced by the Company prior to the Closing Date.

9.6     Purchaser Access.  The Purchaser agrees to use reasonable best efforts to minimize any disruption of the businesses of the Seller, the Company, the Company Subsidiaries and the Parent and to indemnify and hold the Seller, the Company, the Company Subsidiaries and the Parent harmless from any and all claims and liabilities, including costs and expenses for loss, injury to or death of any agent or representative of the Purchaser, and any loss, damage to or destruction of any property owned by the Seller, the Company, the Company Subsidiaries, the Parent or others (including claims or liabilities for loss of use of any property) resulting directly or indirectly from the negligence of any of the representatives of the Purchaser during any visit to the Business or property sites, including the Leased Properties of the Company or the Company Subsidiaries prior to the Closing Date.

9.7     Confidentiality. Except as may be necessary in Parent's Bankruptcy Case, each Party shall, and shall cause its Subsidiaries, agents and representatives to, hold in strict confidence all documents and information concerning the other furnished to it in connection with the transactions contemplated by this Agreement in accordance with the Confidentiality Agreement, dated April 5, 2006, entered into by and between the Parent and the Purchaser (the "**Confidentiality Agreement**") and subject to any subsequent confidentiality agreement.

9.8     Directors' and Officers' Indemnification.

        (a)     From and after the Closing Date, the Purchaser shall cause the Company, to the fullest extent permitted under applicable law, to indemnify and hold harmless (and advance funds in respect of each of the foregoing) each present and former employee, agent, director or officer of the Company and the Company Subsidiaries (each, together with such person's heirs, executors or administrators, an "**Indemnified Party**" and, collectively, the "**Indemnified Parties**") against any costs or

expenses (including advancing attorneys' fees and expenses in advance of the final disposition of any claim, suit, proceeding or investigation to each Indemnified Party to the fullest extent permitted by law), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative (an **"Action"**), arising out of, relating to or in connection with any action or omission by such Indemnified Party in his or her capacity as an employee, agent, director or officer occurring or alleged to have occurred whether before or after the Closing Date (including acts or omissions in connection with such person's service as an officer, director or other fiduciary in any entity if such service was at the request or for the benefit of the Company or any of the Company Subsidiaries) or this Agreement or the transactions contemplated hereby. In the event of any such Action, the Purchaser shall cooperate with the Indemnified Party in the defense of any such Action.

(b) <u>Survival of Indemnification</u>. To the fullest extent not prohibited by law, from and after the Closing Date, all rights to indemnification against the Company now existing in favor of the Company Indemnified Parties with respect to their activities as such prior to or on the Closing Date, as provided in the Company's and each Company Subsidiary's respective articles of incorporation, by-laws, other organizational documents or indemnification agreements in effect on the date of such activities or otherwise in effect on the date hereof, shall survive the Closing and shall continue in full force and effect for a period of not less than six (6) years from the Closing Date, <u>provided</u> that, in the event any claim or claims are asserted or made within such six (6)-year period, all such rights to indemnification in respect of any claim or claims shall continue until final disposition of such claim or claims.

(c) For a period of not less than six (6) years after the Closing Date, the Purchaser shall or the Purchaser shall cause the Company to maintain in effect policies of directors' and officers' liability insurance equivalent to those maintained by the Seller on behalf of the Company prior to the Closing Date for the benefit of those persons who are currently covered by such policies on terms no less favorable than the terms of such current insurance coverage.

(d) In the event that, after the Closing Date, the Company or the Purchaser or any of their respective successors or assigns (i) consolidates with or merges into any other Person or entity and shall not be the continuing or surviving corporation or entity of

such consolidation or merger or (ii) transfers all or a substantial portion of its properties and assets to any Person or entity, then and in either such case, proper provisions shall be made so that the successors and assigns of the Company or the Purchaser, as the case may be, shall assume the obligations set forth in this Section 9.8.

(e)     The provisions of this Section 9.8 are intended to be for the benefit of, and shall be enforceable by, each Indemnified Party, his or her heirs, executors or administrators and his or her other representatives.

9.9     <u>Purchaser Financing</u>. The Purchaser shall use its best efforts throughout the period beginning as of the date hereof and ending on the Closing Date to maintain sufficient cash in immediately available funds to pay the Purchase Price as herein provided and to consummate the transactions contemplated hereby, including, without limitation, payment of fees and expenses in connection with the transactions contemplated hereby.

9.10    <u>Further Assurances</u>. Each Party shall, and shall use commercially reasonable efforts to execute such further documents or instruments and take such further actions as may reasonably be requested by the other party necessary to consummate the transactions contemplated hereby in accordance with the terms hereof.

## 10. [RESERVED]

## 11. TERMINATION

11.1    <u>Termination</u>. At any time prior to the Closing Date, this Agreement:

11.1.1   may be terminated by mutual written consent of the Seller and the Purchaser, in which event the Deposit shall be immediately returned to the Purchaser together with all accrued interest thereon;

11.1.2   may be terminated by the Purchaser or the Seller, as the case may be, by written notice to the other Party, which shall take immediate effect upon service thereof, if the Closing Date shall not have occurred on or before the date that is ninety (90) days after the date of the Bankruptcy Court approval of the Parent's

execution and delivery of the Shareholder Consent (the **"Initial Termination Date"**); provided, however, that the right to terminate the Agreement in this Sub-Clause shall not be available to any Party whose failure to fulfill any obligation under this Agreement shall have caused the failure of the Closing Date to occur on or before such date; and provided, further, that if on the Initial Termination Date the Purchaser Required Statutory Approvals or the Seller Required Statutory Approvals shall not have been obtained but all other conditions to the Closing shall be fulfilled or shall be capable of being fulfilled, then the Seller shall have the sole right to extend the term of this Agreement until September 29, 2006 (time being of the essence with respect to such extended term), unless any act or omission of the Seller in connection with its status with the Exchange Control Department of the Central Bank of the The Bahamas shall be the cause of the failure to obtain either the Purchaser Required Statutory Approvals or the Seller Required Statutory Approvals as of the Initial Termination Date, then either Party shall have the right to extend the term until September 29, 2006 (time being of the essence with respect to such extended term). If on September 29, 2006, the Purchaser Required Statutory Approvals or the Seller Required Statutory Approvals remain outstanding, then (unless a further extension is otherwise agreed between the Parties), this Agreement shall be terminated with no liability on the part of any Party. In the event that the Agreement is terminated pursuant to this Section 11.1.2 the Purchaser shall be entitled to the immediate return of the Deposit, together with all accrued interest thereon;

11.1.3    may be terminated by the Purchaser, by written notice to the Seller, if the Purchaser is not in breach of any of its obligations under this Agreement in any material respect and there shall have been a material breach of any representation or warranty, or a material breach of any covenant or agreement of the Seller hereunder, which breach would result in a Company Material Adverse Effect and such breach shall not have been remedied within ten (10) Business Days after receipt by the Seller of notice in writing from the Purchaser, specifying the nature of such breach and requesting that it be remedied, or the Purchaser shall not have received adequate assurance of a cure of such breach within such ten (10) Business Day period. In such event, the Deposit, together with all interest accrued thereon, shall be returned immediately to the Purchaser and the Seller, the Company, the Parent and their agents, advisors and other representatives shall be fully released and discharged from any liability or

obligation under or resulting from this Agreement and the Purchaser shall not have any other remedy or cause of action under or relating to this Agreement; and

11.1.4   may be terminated by the Seller, by written notice to the Purchaser, if there shall have been a material breach of any representation or warranty, or a material breach of any covenant or agreement of the Purchaser hereunder, which breach would result in a Purchaser Material Adverse Effect, and such breach shall not have been remedied within ten (10) Business Days after receipt by the Purchaser of notice in writing from the Seller, specifying the nature of such breach and requesting that it be remedied, or the Seller shall not have received adequate assurance of a cure of such breach within such ten (10) Business Day period. In such event, the Deposit, together with all interest accrued thereon, shall be remitted immediately to the Seller and the Purchaser and its agents, advisors and other representatives shall be fully released and discharged from any liability or obligation under or resulting from this Agreement and the Seller shall not have any other remedy or cause of action under or relating to this Agreement. For the avoidance of doubt, the failure of a Purchaser warranty in Sub-Clause 7.1.6, 7.1.9 or 7.1.10 to be true at any time from the date hereof to the Closing Date shall be deemed a material breach of such warranties that would result in a Purchaser Material Adverse Effect for purposes of this Clause 11.1.4.

11.2   Frustration of Contract. Notwithstanding anything contained in this Agreement, the Parties hereto shall be released from their respective obligations hereunder in the event of this Agreement being rendered impossible of performance by either Party due to a decree of a Governmental Authority published in the Official Gazette of the Commonwealth of The Bahamas or an order of a Governmental Authority specifically prohibiting the sale of the Shares by the Seller to the Purchaser, whereupon the Deposit shall be returned to the Purchaser together with all accrued interest thereon.

11.3   Effect of Termination. In the event of termination of this Agreement pursuant to Clause 11.1, this Agreement shall become void and of no effect with no liability on the part of any party hereto (or any of its directors, officers, employees, agents, legal and financial advisors or other representatives), except that the following clauses shall survive the termination: Clauses 1.1, 1.2, 1.3, 1.4, 1.5, 1.6, 9.7, 11.1 (only insofar as it

pertains to the treatment of the Deposit), 11.2 (only insofar as it pertains to the treatment of the Deposit), 11.3, 14.2, 14.4, 14.6, 14.9, 14.10, 14.11, 14.12 and 14.13.

## 12.    NON-COMPETITION AGREEMENT

12.1    In order to induce the Purchaser to enter into this Agreement, the Seller hereby covenants that for a period of two (2) years after Closing the Seller shall not directly or indirectly undertake to carry on or be engaged, concerned or interested either alone or in partnership with or as manager, agent or servant of any other person, firm or company or otherwise in any business in the Commonwealth of The Bahamas which is identical or similar to the Business; provided, however, that nothing herein shall be construed as prohibiting the Seller from continuing its existence as a company incorporated and existing under the laws of the Commonwealth of The Bahamas.

## 13. [RESERVED]

## 14. GENERAL PROVISIONS

14.1    Survival of Obligations. The representations, warranties, covenants, obligations and agreements of the parties contained in this Agreement, or in any instrument, certificate, opinion or other writing provided for herein, shall not survive the Closing; provided, however, that the covenants of the Seller and the Purchaser contained in Clauses 9.2, 9.3, 9.4, 9.5, 9.7, 9.8, and 12 shall survive the Closing.

14.2    Amendment and Modification. This Agreement may be amended, modified and supplemented in any and all respects, but only by a written instrument signed by each of the Parties hereto expressly stating that such instrument is intended to amend, modify or supplement this Agreement.

14.3    Extension; Waiver. At any time prior to the Closing Date, a Party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other Party hereto; (b) waive any inaccuracies in the representations and warranties contained

herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein, to the extent permitted by applicable law. Any agreement on the part of a Party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party. The failure of any Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.

14.4    Costs and Expenses. All costs and expenses incurred by or on behalf of the Parties to this Agreement including all fees of representatives, solicitors, counsel and accountants employed by any of the Parties in connection with the negotiation, preparation and execution of this Agreement shall be borne solely by the Party who shall have incurred the same and the other Party shall have no liability in respect of such costs and expenses. Notwithstanding the foregoing, in any action or proceeding brought to enforce any provisions of this Agreement, or where any provision hereof is validly asserted as a defense, the successful Party in such action or proceeding shall be entitled to recover reasonable attorneys' fees and disbursements.

14.5    Notices.

14.5.1    Any notice or other communication pursuant to, or in connection with, this Agreement shall be in writing and delivered personally, or sent by reputable overnight courier service or by facsimile or other form of electronic transmission to the Parties at the addresses or the numbers set out in Annex D hereto (or to such other address as may from time to time have been notified in writing to the other Parties in accordance with this Clause 14.5).

14.5.2    Subject to Clause 14.5.3, any notice or other communication shall be deemed to have been served:

14.5.2.1 if delivered personally, when left at the address referred to in Clause 14.5.1;

14.5.2.2 when sent by reputable overnight courier service, two (2) clear days after sending it; and

14.5.2.3 if sent by facsimile or other form of electronic transmission (including e-mail), at the time of transmission (provided, that to be effective such

transmission must be followed up within one (1) Business Day by reputable overnight courier service).

14.5.3   If a notice is given or deemed given at a time or on a date which is not a Business Day, it shall be deemed to have been given on the next Business Day.

14.6    Entire Agreement; No Third Party Beneficiaries. This Agreement and the Confidentiality Agreement (a) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof and thereof and (b) are not intended to confer, and shall not confer, upon any Person other than the Parties hereto and thereto any remedies, claims of liability or reimbursement, causes of action or any other rights whatsoever.

14.7    Severability.  Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the Parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision.

14.8    Continuation of Agreement. This Agreement shall (except for any obligation fully performed prior to or at Closing) continue in full force and effect after the Closing Date notwithstanding Closing.

14.9    Governing Law. The application and effect of this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of The Bahamas.

14.10   Consent to Jurisdiction.  The Parties hereby submit to the exclusive jurisdiction of the Courts of the Commonwealth of The Bahamas The Bahamas in relation to any dispute or claim arising out of or in connection with this Agreement.

14.11   <u>Specific Performance</u>. The Parties hereto agree that irreparable damage would occur in the event any of the provisions of this Agreement were not to be performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof in addition to any other remedies at law or in equity.

14.12   <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either party hereto (whether by operation of law or otherwise) without the prior written consent of the other Party.

14.13   <u>Counterparts; Effect</u>.  This Agreement may be executed and delivered (including via facsimile) in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

W-D (BAHAMAS) LTD.

By: _____

Name:

Title:

BSL HOLDINGS LTD.

By:_____

Name:

Title:

**SCHEDULE 1**

| Seller's name | Seller's address | Number of shares sold | Consideration payable for shares |
|---|---|---|---|
| W-D (Bahamas) Ltd. | Office of Roberts, Isaacs & Co. P. O. Box N 4755 Nassau, Bahamas | 3,546,085 | B$54,000,000 |

**SCHEDULE 2**

The Company ...........................................................................Bahamas Supermarkets Limited

Registered Number................................... ................……………………………………………14275

Registered Office ............................Roberts, Isaacs & Co, P. O. Box N 4755, Nassau, Bahamas

Date of Incorporation ................................................................................ 13 December, 1968

Directors....Peter Lynch, Keva Bethel, L.B. Johnson, Barry Rassin, Hugh G. Sands, Mark Sellers

Secretary.....................................................................…… ...................Laurence Appel

Accounting Reference Date.......……………………………… ............................ June 29, 2005

Auditors...................................................................................KPMG, Bahamas

Authorised Share Capital ...................................................……………… 5,000,000 shares

Issued Share Capital............... ......................................................... 4,560,148 shares

Mortgages/Charges ............................................ ...............................................................0

Mortgagee............................................... ...........................................................................

Date Created........................................... ...........................................................................

Date Registered ................................................ ...............................................................

Amount Secured ........................................ ......................................................................

Property Charged....................................................................................................

Guarantees ..............................................................................................$200,000*

*Bahamas Customs Department $140,000

United Natural Foods $ 60,000

Maximum Liability

The Company Subsidiary................................................................. The City Meat Market Limited

Registered Number........................................ ...............…………………………………………….359

Registered Office ............................Roberts, Isaacs & Co, P. O. Box N 4755, Nassau, Bahamas

Date of Incorporation ........................................................................................ 11 January, 1936

Directors....Peter Lynch, Keva Bethel, L.B. Johnson, Barry Rassin, Hugh G. Sands, Mark Sellers

Secretary.................................................................................…… ..................Laurence Appel

Accounting Reference Date...........……………………………… ............................ June 29, 2005

Auditors......................................................................................................KPMG, Bahamas

Authorised Share Capital ......................................................…………….. 2,000 shares

Issued Share Capital............................... ............................................................ 5 shares

Mortgages/Charges ...................................... ..............................................................0

Mortgagee................................................ .................................................................

Date Created.......................................... ..............................................................

Date Registered ...................................... ..............................................................

Amount Secured ...................................... ..............................................................

Property Charged................................................................................................

Guarantees ..................................................................................................$250,000*

*Bahamas Customs Department

Maximum Liability

**SCHEDULE 3**

The Owned Properties

Lot 3, Block 15, Palmdale Sub-division, New Providence Island, The Bahamas

The Leased Properties

| PREMISES | ADDRESS |
|---|---|
| SUPERMARKET | SOUTH BEACH PLAZA, EAST STREET SOUTH, NASSAU |
| SUPERMARKET | OAKES FIELD SHOPPING CENTRE THOMPSON BLVD, NASSAU |
| SUPERMARKET | ROSETTA ST AT PATTON STREET, NASSAU |
| SUPERMARKET | LYFORD CAY SHOPPING CENTRE, NASSAU |
| SUPERMARKET SUPERMARKET | INDEPENDENCE SHOPPING CENTRE, BAILLOU HILL AND HARROLD ROADS, NASSAU |
| SUPERMARKET | VILLAGE RD AT WULFF RD., NASSAU |
| SUPERMARKET | CABLE BEACH, WEST BAY ST, NASSAU |
| SUPERMARKET | EAST END SHOPPING CENTRE, PRINCE CHARLES DRIVE, NASSAU |
| SUPERMARKET | HARBOUR BAY SHOPPING CENTRE, EAST BAY STREET, NASSAU |
| SUPERMARKET | DOWNTOWN SHOPPING CENTRE, FREEPORT, GRAND BAHAMA ISLAND |
| SUPERMARKET | SEA HORSE SHOPPING CENTRE, LUCAYA BEACH, GRAND BAHAMA |
| SUPERMARKET | HARBOUR WEST SHOPPING CENTRE, EIGHT-MILE ROCK, GRAND BAHAMA |
| OFFICES AND DISTRIBUTION CENTRE | EAST-WEST HIGHWAY, NASSAU |