**SCHEDULE 4**

**Warranties**

The Warranties and undertakings referred to in Clause 6 are as follows except as provided for in this Agreement or as disclosed in the Seller Disclosure Schedule:

1       **Corporate Matters**

1.1     The Seller is a company duly organized, validly existing and in good standing under the laws of the Commonwealth of The Bahamas.

1.2     To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company is a company duly organized, validly existing and in good standing under the laws of the Commonwealth of the Bahamas.

1.3     To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the information contained in the Recitals, Clause 2 to this Agreement and Schedules 2 and 3 is true and accurate in all material respects.

1.4     To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has complied in all material respects with all applicable laws including the provisions of the Companies Act and the Securities Industry Act, 1999 and the regulations made thereunder.

1.5     To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the register of members and all other statutory books and minute books of the Company:

        1.5.1    have been properly kept;

        1.5.2    are up-to-date; and

        1.5.3    contain true full and accurate records of all matters required to be dealt with in them.

1.6     To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has not received any notice of any application or intended

application under the provisions of the Companies Act for the time being in force for the rectification of the register of members.

1.7     To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Purchaser has been supplied with a copy of the memorandum and articles of association of the Company having attached thereto copies of all resolutions as are by law required to be attached together with copies of all resolutions setting out the rights attached to or the conditions of issue of any of the share capital of the Company. To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, those copies are true complete and up-to-date and set out in full the rights and restrictions attaching to the share capital of the Company.

1.8     To the Knowledge of the Seller, the Company is a public limited company.

1.9     To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, no allotment of share capital in the Company has been made in contravention of the provisions of the Companies Act or the Securities Industry Act, 1999.

1.10    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, no unlawful distribution of dividends has been made by the Company.

1.11    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has not entered into any arrangement involving the acquisition from or disposal to its directors or connected persons of non-cash assets.

1.12    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has properly and punctually made and filed all returns, particulars, resolutions and documents and paid all registration fees required by the Companies Act and all such filings were and are correct in all material respects.

1.13    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has maintained and continues to maintain readily available for inspection by members of the public all documents required to be made so available by the Companies Act or applicable law.

1.14    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has all requisite power and authority to own, lease and operate its assets and properties to the extent owned, leased and operated and to carry

on its business as it is now being conducted and is duly qualified and in good standing to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its assets and properties makes such qualification necessary.

1.15   The Seller has all requisite corporate power and authority to enter into this Agreement and, subject to (i) the execution of Parent's written consent to the sale of the Shares after Bankruptcy Court approval thereof (such written consent, the **"Shareholder Consent"**) and (ii) the receipt of the applicable Seller Required Statutory Approvals to consummate the transactions contemplated hereby. Subject to the Shareholder Consent and Bankruptcy Court approval thereof, the execution and delivery of this Agreement and the consummation by the Seller of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Seller. This Agreement has been duly executed and delivered by the Seller (subject to the Shareholder Consent and Bankruptcy Court approval thereof) and, assuming the due authorization, execution and delivery hereof by the Purchaser, constitutes the valid and binding obligation of the Seller enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. Completion of the transactions contemplated by this Agreement by the Seller will not conflict with, result in the breach of, constitute a default under, or accelerate the performance provided by the terms of any material contract, agreement or deed to which the Seller may be bound or affected or constitute a material default or an event which, with the lapse of time or action by a third party, could result in the creation of any Incumbrance on any of the Shares, except for any such conflict, breach, default, acceleration or creation which would not have a Company Material Adverse Effect or prevent, materially delay or materially impair the Seller's ability to consummate the transactions contemplated by this Agreement.

**2      The Shares and Share Capital**

2.1    There are no agreements or other arrangements in force which:

2.1.1    provide for the present or future issue allotment or transfer of; or

2.1.2   accord to any person the right (absolute or conditional) to call for the issue allotment or transfer of any of the Shares (including any option or right of preemption or conversion).

2.2   To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, since the Accounting Date:

2.2.1   no share or loan capital of the Company has been issued or allotted or agreed to be issued or allotted whether conditionally or absolutely;

2.2.2   the Company has not undergone any capital reorganisation or change in its capital structure;

2.2.3   no resolutions have been passed by the Company which have not been entered in the minute book of the Company; and

2.2.4   nothing has been done in the conduct or management of the affairs of the Company which would be likely to prejudice the interests of the Purchaser as prospective purchaser of the Shares.

2.3   To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, no share capital shown in the Audited Accounts or in the statutory books of the Company has been forfeited.

2.4   To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, no shares in the capital of the Company have at any time been issued and no transfers of shares in the capital of the Company have been registered otherwise than in accordance with the articles of association of the Company from time to time in force and the Companies Act and any necessary governmental consents have been obtained for each issue and transfer of shares in the capital of the Company.

2.5   The Shares are validly issued, fully paid and nonassessable and beneficially owned by the Seller free and clear of any liens, claims, security interests and other Incumbrances of any nature whatsoever and there are no options, warrants, calls, rights, commitments or agreements of any character to which the Seller is a party or by which it is bound obligating the Seller to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock of the Company or obligating the Seller to grant, extend or enter into any such option, warrant, call, right, commitment or agreement.

2.6    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, all dividends or other distributions of profits declared made or paid since the date of incorporation of the Company have been declared made and paid in accordance with law and its articles of association.

**3. Reserved**

**4 Accounts**

4.1    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the accounting reference date of the Company is (date) and has not at any time been any other such date.

4.2    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Purchaser has been supplied with a true and complete copy of the Audited Accounts.

4.3    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Audited Accounts:

4.3.1    comply with the requirements of applicable law;

4.3.2    have been prepared on a consistent basis in accordance with good accounting practice and comply with all current financial reporting standards applicable to a Bahamian company;

4.3.3    are accurate and show a true, complete and fair view of the state of affairs, financial position, assets and liabilities of the Company and of its results for the financial period ending on the Accounting Date;

4.3.4    as at the Accounting Date are not affected by any unusual or material nonrecurring items;

4.3.5    make full provision for depreciation of the fixed assets of the Company having regard to their original cost and estimated life;

4.3.6    make due provision for any bad or doubtful debts; and

4.3.7    fully disclose all assets of the Company as at the Accounting Date.

4.4    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Audited Accounts set out correctly in all material respects all such reserves or provisions for business licence fees as are necessary on the basis of the rates of business licence fees now in force to cover all fees (present and future) liable to be assessed on the Company or for which the Company is accountable up to such date.

## 5 Insurances

5.1    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, there are existing valid policies of insurance for full replacement values against all material liabilities, risks and losses (including but not limited to the losses caused by any unlawful act on the part of any person) against which it is normal or prudent to insure in respect of all property owned by and in the business carried on by the Company.

5.2    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, all premiums due in respect of the Company's insurance policies have been paid in full.

5.3    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, nothing has been done or has been omitted to be done which could result in any of the Company's insurance policies being or becoming void or voidable.

5.4    The Seller is not aware of any circumstances which would or might entitle the Company to make a claim under any of its insurance policies or which would or might be required under any of its insurance policies to be notified to the insurers, except for such circumstance as would not constitute a Company Material Adverse Effect.

## 6 Disputes/Litigation

6.1    To the Knowledge of the Seller, as of the date hereof, there are no claims, suits, actions or proceedings before any Governmental Authority or arbitrator pending or threatened against, relating to or affecting the Seller which would have a Company Material Adverse Effect or would prevent, materially delay or materially impair the Seller's ability to consummate the transactions contemplated by this Agreement.

6.2    To the Knowledge of the Seller, as of the date hereof, there are no judgments, decrees, injunctions, rules or orders of any court, governmental department, commission, agency, instrumentality or authority or any arbitrator applicable to the Seller except for such that would not have a Company Material Adverse Effect or would prevent, materially delay or materially impair the Seller's ability to consummate the transactions contemplated by this Agreement.

## 7 Compliance with Statutes and Licences

7.1    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has obtained all licences, consents, approvals, permissions, permits, tests and other certificates and authorities (public or private) necessary for the carrying on of its business in the places and in the manner in which such business is now carried on all of which are valid and subsisting and the Seller knows of no reason or of any facts or circumstances which (with or without the giving of notice or lapse of time) would be likely to give rise to any reason why any of them should be suspended, cancelled, revoked or not renewed.

7.2    To the Knowledge of the Seller, and except as would not have a Company Material Adverse Effect, the Company has conducted and is conducting its business in all respects in accordance with all applicable laws and regulations (whether of the Commonwealth of The Bahamas or elsewhere).

## 8 Reserved

## 9 Reserved

**10 Taxation/Business Licence Fees**

10.1 <u>General</u>.

    10.1.1  To the Knowledge of the Seller and except as would not have a Company Material Adverse Effect or as set forth on the Seller Disclosure Schedule: All returns, computations and payments which should have been made by or on behalf of the Seller and the Company for any tax purpose in the United States of America or elsewhere have been prepared on a proper basis and submitted within the prescribed time limits (taking into account all valid extensions) and no taxation authority has indicated in writing that it intends to investigate the tax affairs of the Company.

    10.1.2  To the Knowledge of the Seller and except as would not have a Company Material Adverse Effect or as set forth on the Seller Disclosure Schedule: All business licence liabilities of the Company as at the Accounting Date are fully provided for in the Audited Accounts and are up to date.

    10.1.3  To the Knowledge of the Seller and except as would not have a Company Material Adverse Effect or as set forth on the Seller Disclosure Schedule: The books and records of the Company are up-to-date and contain sufficient detail in appropriate form to enable the business licence fees of the Company to be established.

**11 Miscellaneous**

11.1    Neither the Seller nor, to the Knowledge of the Seller, the Company, has entered into any agreement or arrangement entitling any agent, broker, investment banker, financial advisor or other firm or Person to any broker's or finder's fee or any other commission or similar fee in connection with any of the transactions contemplated by this Agreement, except The Blackstone Group, whose fees and expenses will be paid by the Seller upon consummation of the sale of the Shares out of the proceeds of the transaction contemplated hereby.

ANNEX A

NON-COMPETITION AGREEMENT

ANNEX B

TRANSITION SERVICES AGREEMENT

ANNEX C

NOTICES

ANNEX D

ESCROW TERMS

**EXHIBIT B**

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT, dated as of _____, 2006 (this "**Agreement**"), is made and entered into by and among Winn-Dixie Stores, Inc., a Florida corporation (the "**Service Provider**"), on the one hand, and BSL Holdings Limited., a company incorporated and existing under the laws of the Commonwealth of The Bahamas with its registered office at Fidelity House, 51 Frederick Street, in the Island of New Providence in the said Commonwealth of The Bahamas (the "**Buyer**") on the other.

### W I T N E S S E T H:

WHEREAS, the Buyer and W-D (Bahamas) Ltd., a Bahamas company incorporated and existing under the laws of the Commonwealth of The Bahamas ("**Seller**") have entered into that certain Share Purchase Agreement, dated as of March __, 2006 (the "**Share Purchase Agreement**"), pursuant to which Seller has agreed to sell to the Buyer, and the Buyer has agreed to purchase from the Seller, certain shares in the capital of Bahamas Supermarkets Limited, a company incorporated and existing under the laws of the Commonwealth of The Bahamas (the "**Company**") engaged in the retail sale of groceries, meat, produce and delicatessen products in the Commonwealth of The Bahamas;

WHEREAS, the Seller is a wholly owned subsidiary of the Service Provider;

WHEREAS, the Service Provider currently provides certain services to the Company; and

WHEREAS, in order to assist in the transition of the Company to the Buyer after the Closing, upon the terms and subject to the conditions set forth in this Agreement, the Buyer and the Company (together sometimes, the "**Service Recipient**") desires to receive from the Service Provider and the Service Provider shall provide certain transition services as set forth herein.

NOW THEREFORE, in consideration of the transaction contemplated by the Share Purchase Agreement and the covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

### ARTICLE I

### DEFINITIONS

Section 1.1      Definitions. Capitalized terms used but not defined in this Agreement shall have the meanings ascribed to such terms in the Share Purchase Agreement.

## ARTICLE II

## SERVICES

Section 2.1          Scope of Services.

(a)          In accordance with the terms and subject to the conditions set forth in this Agreement, during the Transition Period (as defined herein), the Service Provider shall provide, or cause to be provided, to the Service Recipient the services set forth in Schedule A hereto (the "**Services**").

(b)          In the event that Service Recipient wishes to receive any additional services, Service Recipient shall submit a written request to Service Provider, and Service Provider may elect to provide or not to provide such Services in its sole discretion. In the event that Service Provider elects to provide such services, the fees therefor shall be mutually agreed by the parties, such services and fees shall be added to Schedule B, and such services shall become "Services" under this Agreement.

Section 2.2          Service Standards; Level of Service. The Service Provider shall provide or cause to be provided the Services to the Service Recipient in a professional and workmanlike manner, and in a manner and at a quality and level of service at least equal in all material respects to the manner, quality and level of service at which the Services were provided to the Company as of the Closing Date (the "**Service Standards**").

Section 2.3          Means of Providing Services.

(a) Subject to Section 2.2, the Service Provider shall, in its sole discretion, determine the means and resources used to provide the Services in accordance with its reasonable business judgment. Without limiting the foregoing, the Service Provider may elect to modify or replace at any time: (i) its policies and procedures; (ii) any affiliates and/or third parties that provide any Services; (iii) the location from which any Service is provided; or (iv) the intellectual property rights, information technology, products and services used to provide the Services.

(b) The Service Provider may in its reasonable discretion suspend the provision of the Services (or any part thereof), from time to time, to enable it to perform routine or emergency maintenance to those parts or components of buildings, plant, machinery or other assets of the Service Provider required to provide the Services, provided that: (i) Service Provider shall use commercially reasonable efforts to perform such routine maintenance outside of the normal business hours of the Service Recipient; (ii) the Service Provider provides the Service Recipient with as much prior notice of such suspension and the anticipated duration of the suspension as is reasonably possible; and (iii) the Service Provider uses its commercially reasonable efforts to carry out the applicable maintenance and resume provision of the relevant Services efficiently as reasonably practicable.

Section 2.4          Certain Limitations. The Services shall be subject to the following limitations:

(a) Service Provider shall only be required to provide the Services to or for the benefit of the Company's business.

(b) The Service Recipient shall not use the Services other than in a manner directly related to the operation of the Company's business.

2

(c) Notwithstanding anything herein to the contrary, except as expressly agreed by the Service Provider, the Service Provider shall not be obligated to: (i) maintain the employment of any specific employee, (ii) hire any additional employees, (iii) modify any existing systems, equipment or software in order to provide the Services, or (iv) acquire additional systems, equipment or software in order to provide the Services.

(d) The Service Recipient acknowledges and agrees that the Services provided by a third party on the Service Provider's behalf, and the assets licensed or purchased from a third party and used in connection with providing the Services, remain subject to the terms and conditions of any applicable agreements with such third parties and the Service Provider, and the Service Recipient shall adhere to such terms and conditions. The Service Provider shall use commercially reasonable efforts to obtain any consent from such third parties that it deems necessary in order to provide such Services. In the event that (i) any such consent is not obtained despite such efforts, (ii) a third party objects to the use of its assets in connection with the provision of the Services or (iii) a third party informs the Service Provider of a change to such terms and conditions that would reasonably be expected to degrade the quality and level of Services below the Service Standards, Service Provider shall so inform Service Recipient, and the parties shall discuss in good faith, as applicable, alternative arrangements or modifications to the Services in order to meet a mutually agreed alternative standard. All costs associated with such consents, alternative arrangements and modifications shall be borne by the Service Recipient.

(e) It shall not be deemed to be a breach of this Agreement if the Service Provider fails to meet the Service Standards because of changes in technology used to provide a Service, which technology is also used by the Service Provider in connection with its provision of a service to itself or to one or more of its affiliates. In the event that the Service Provider anticipates such a change in technology that would reasonably be expected to degrade the quality and level of Services below the Service Standards, Service Provider shall inform Service Recipient of such change and the parties shall discuss in good faith modifications to the Services in order to meet a mutually agreed alternative standard.

Section 2.5        Cooperation.

(a)        Each party will perform all obligations under this Agreement in good faith and use commercially reasonable efforts to cooperate with the other in all matters relating to the provision and receipt of the Services in order to facilitate the provision and receipt of the Services.

(b) Without limiting the foregoing, the Service Recipient shall follow the policies, procedures and practices of the Service Provider applicable to the Services, provided that the Service Recipient shall not be obligated to follow any policies, procedures and practices to the extent in doing so the Service Recipient would be in violation of applicable Law.

(c) A failure of the Service Recipient to act in accordance with Section 2.6(a) that prevents or materially inhibits the Service Provider from providing a Service hereunder shall relieve the Service Provider of its obligation to provide such Service until such time as the failure has ceased.

Section 2.6      Divestiture, Sale or Transfer of Assets. Nothing in this Agreement shall be deemed to limit the Service Provider's ability to divest, sell or otherwise transfer any of the assets, including contracts and intellectual property licenses, necessary to provide the Services; provided, that the Service Provider's obligation to provide or cause to be provided the Services to the Service Recipient in accordance with this Agreement for the duration of the Transition Period shall not be abrogated or affected thereby.

Section 2.7      Compliance with Law. Each party shall perform all of its obligations hereunder in accordance with applicable law.

3

## ARTICLE III
## PRICING

Section 3.1    Pricing.

(a) In consideration of the Services set forth on Schedule A, the Company shall pay to the Service Provider a flat fee of One million United States Dollars ($1,000,000) (the **"Flat Fee"**), payable quarterly in advance in four (4) equal installments (each, an **"Installment"**) of Two hundred Fifty thousand United States Dollars ($250,000) each. The first Installment shall be due and payable on the Closing Date, and each Installment thereafter shall be due and payable on the first Business Day of the each of the following quarters until the Flat Fee has been paid in full. In addition to the Flat Fee, for goods procured on behalf of the Company pursuant to the logistics Services set forth on Schedule A, the Company shall pay to Service Provider (i) Service Provider's cost of such goods and (ii) five percent (5%) of such cost (collectively, the **"Procurement Fee"**).

(b) In consideration of the Services set forth on Schedule B (if any), the Company shall pay to Service Provider the fees set forth in Schedule B (together with the Flat Fee, the **"Fees"**). In addition, the Company shall pay all costs and expenses incurred by Service Provider in providing any Services set forth on Schedule B.

(c) Notwithstanding the foregoing, Service Provider shall have the option to increase the charges for any Services provided to Service Recipient if the Service is provided pursuant to an agreement between Service Provider and a third party, and the third party increases its charges under such Agreement.

(d) In the event that services have been provided by third parties to Service Provider for the benefit of the Business prior to Closing, and Service Provider receives the invoice(s) for such services following Closing, Service Provider will provide copies of such invoices to the Company, and the Company will promptly reimburse Service Provider for the amounts set forth in such invoices.

Section 3.2    Taxes. In addition to the other amounts payable under this Agreement, for any Services for which Service Provider charges Fees hereunder, the Service Recipient shall be obligated to pay, or reimburse the Service Provider for, the amount of any present or future transfer taxes, sales and use tax, value added tax or other equivalent local tax, and any other taxes (except for taxes based on or measured by income) payable by the Service Provider on amounts earned (including the full amount of any interest or penalties levied upon any such amounts, to the extent the interest or penalties result from the failure by the Service Recipient to pay or reimburse the Service Provider for any amounts pursuant to this Section 3.2 when due) in connection with the provision of any Services to, or the use of such Services by, the Service Recipient. Invoices issued pursuant to Section 3.3 shall separately state any taxes payable by the Service Recipient.

Section 3.3    Billing and Cash Settlement. Except for the Flat Fee, which shall be paid in accordance with Section 3.1, any amounts due under this Agreement shall be billed and paid for in the following manner: (a) the Service Provider shall invoice the Company on a monthly basis for (i) all Services on Schedule B delivered during the preceding month, (ii) the Procurement Fee incurred in the preceding month and (iii) all taxes and expenses incurred in the preceding month; (b) each such invoice shall be payable within thirty (30) days of the Company's receipt thereof; and (c) payment of all invoices in respect of the Services provided hereunder shall be made in U.S. Dollars ($) payable by wire transfer of immediately available funds to the Service Provider's nominated account. Any disputed amounts under this Agreement shall be subject to the dispute resolution procedures in accordance with 9.8 of this Agreement. In the event that the Company fails to pay in full any invoice when due, interest shall accrue daily on the unpaid and undisputed amount, as well as any disputed amounts that subsequently are determined to have

4

been properly invoiced and due to the Service Provider, until such amounts are paid. The applicable interest rate shall be the lesser of (i) the prime rate as published in The Wall Street Journal on the thirtieth (30th) day after the date of the invoice plus four percent (4%), and (ii) the maximum rate of interest allowed by applicable law.

## ARTICLE IV

### TERM; TERMINATION

Section 4.1    Term. This Agreement shall become effective as of the date of this Agreement and, subject to Sections 4.2, 4.3 and 4.4, shall remain in force for twelve (12) months thereafter (the "**Transition Period**").

Section 4.2    Termination by Service Recipient. The Service Recipient may terminate one or more Services, or this Agreement, at any time upon at least sixty (60) days' prior written notice to the Service Provider, provided that any such termination of a Service set forth on Schedule A shall not result in a reduction of Fees.

Section 4.3    Termination by Service Provider In the event that (a) the Bankruptcy Case is converted to a case under chapter 7 of the Bankruptcy Code, (b) the Service Provider's chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court or if confirmed does not become effective, or (c) the Bankruptcy Court confirms a chapter 11 plan of liquidation in the Bankruptcy Case, then the Service Provider has the right, in its sole discretion, to terminate this Agreement within 30 days of such event.

Section 4.4    Termination by Either Party. This Agreement or any Service hereunder may also be terminated by either the Service Provider or the Service Recipient upon written notice to the other party if:

(a)    The other party is in material breach of this Agreement; provided, however, that the breaching party shall have thirty (30) days from receipt of written notice thereof to cure such breach, at which time this Agreement or Service, as applicable, shall terminate if the breach has not been cured to the reasonable satisfaction of the non-breaching party; or

(b)    Performance of this Agreement or any Service has been rendered impossible or impracticable for a period of ten (10) days as a direct result of the occurrence of any Force Majeure Event described in Section 9.1.

Section 4.5    Effect of Termination on Installments. For the avoidance of doubt, in the event that this Agreement is terminated in accordance with the provisions hereof, the Company shall not be obligated to pay the Service Provider any Installments that would otherwise be due and payable following the effective date of such termination.

Section 4.6    Interim Basis. Service Recipient acknowledges the mutual intent that the Services be provided on an interim basis only and shall use commercially reasonable efforts to terminate the Services as quickly as practicable.

## ARTICLE V

### INDEMNIFICATION

Section 5.1    Indemnification by Service Recipient. The Service Recipient shall indemnify, defend, release, save and hold harmless the Service Provider and its respective officers, directors, employees, and each of the heirs, executors, successors and assigns of the foregoing

(collectively, the "**Service Provider Indemnified Parties**"), from and against any and all claims, demands, suits, actions, causes of action, losses, costs, damages, liabilities, out of pocket expenses incurred or paid including reasonable attorneys' fees (including such fees that are incurred in connection with a Dispute), fines, penalties, costs of investigation or settlement, other professionals' and experts' fees, court or arbitration costs (collectively referred to as "**Damages**"), resulting from, arising out of or related to Service Provider's performance under this Agreement, except Damages arising out of: (a) the Service Provider's gross negligence, and (b) breach of this Agreement by the Service Provider.

Section 5.2    <u>Indemnification Procedures</u>.

(a)    Each Service Provider Indemnified Party shall provide the Service Recipient with timely notice of any claim or liability subject to indemnification pursuant to Section 5.1; provided, that any failure by any Service Provider Indemnified Party to so notify the Service Recipient shall relieve the Service Recipient of its obligations under Section 5.1 only if and to the extent that the Service Recipient is materially prejudiced thereby.

(b)    The Service Provider Indemnified Party shall (i) give the Service Recipient the opportunity to defend or negotiate a settlement of any indemnifiable claim hereunder at the Service Recipient's expense; provided, that the Service Recipient shall not settle any such claim without the Service Provider's prior written consent, not to be unreasonably withheld or delayed, and (ii) reasonably cooperate with the Service Recipient, at that Service Recipient's expense, in defending or settling such claim.

Section 5.3    <u>No Limitation; No Double Recovery</u>. Notwithstanding anything else contained in this Agreement or the Share Purchase Agreement, the indemnification rights of any party set forth herein shall exist independent of and in addition to any indemnification rights of any such party contained in the Share Purchase Agreement, and nothing contained in this Article V shall limit or alter the obligation of any party to indemnify any other party pursuant to the Share Purchase Agreement.

**ARTICLE VI**

**DISCLAIMER OF WARRANTIES**

Section 6.1    <u>DISCLAIMER OF WARRANTIES</u>. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE SERVICE PROVIDER MAKES NO, AND EXPRESSLY DISCLAIMS ANY AND ALL, REPRESENTATIONS OR WARRANTIES WHATSOEVER TO THE EXTENT PERMISSIBLE BY LAW, WHETHER EXPRESS, IMPLIED OR STATUTORY, WITH RESPECT TO THE SERVICES, SOFTWARE OR HARDWARE PROVIDED HEREUNDER, INCLUDING WARRANTIES WITH RESPECT TO MERCHANTABILITY, OR SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT, AND ANY WARRANTIES ARISING FROM COURSE OF DEALING, COURSE OF PERFORMANCE OR TRADE USAGE.

Section 6.2    <u>LIMITATION OF LIABILITY</u>. NOTWITHSTANDING ANYTHING SET FORTH HEREIN TO THE CONTRARY, THE SERVICE PROVIDER SHALL HAVE NO LIABILITY WHATSOEVER TO THE SERVICE RECIPIENT IN CONNECTION WITH THIS AGREEMENT, EXCEPT WITH RESPECT TO CLAIMS ARISING OUT OF THE SERVICE PROVIDER'S GROSS NEGLIGENCE. IN CONNECTION WITH CLAIMS ARISING OUT OF THE SERVICE PROVIDER'S GROSS NEGLIGENCE, THE AGGREGATE AMOUNT OF DAMAGES FOR WHICH THE SERVICE PROVIDER SHALL BE LIABLE UNDER THIS AGREEMENT SHALL NOT EXCEED THE AGGREGATE AMOUNT OF THE FOLLOWING FEES PAID HEREUNDER: (A) THE  FLAT FEE AND (B) THE FIVE PERCENT (5%) MARKUP SET FORTH IN SECTION 3.1(A)(II).

EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, THE SERVICE PROVIDER IS RESPONSIBLE ONLY FOR THE PERFORMANCE OF THE SERVICES AND WILL NOT UNDERTAKE RESPONSIBILITY FOR THE PERFORMANCE OF ANY OTHER SERVICE, OBLIGATION OR FUNCTION OF THE SERVICE RECIPIENT.

Section 6.3     CONSEQUENTIAL DAMAGES. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY, EXCEPT WITH REGARD TO THE SERVICE RECIPIENT'S INDEMNIFICATION OBLIGATIONS SET FORTH IN ARTICLE V, FOR (A) ANY LOSS OR DAMAGES INCURRED AS A RESULT OF THIRD PARTY CLAIMS, (B) ANY INDIRECT OR CONSEQUENTIAL DAMAGES, OR (C) ANY SPECIAL OR PUNITIVE DAMAGES, INCLUDING LOST OR ANTICIPATED REVENUES, LOSS OF PROFITS, LOST OR ANTICIPATED SAVINGS, LOSS OF BUSINESS OPPORTUNITY OR INJURY TO GOODWILL, IN CONNECTION WITH, OR RELATED TO THE PERFORMANCE OF, THIS AGREEMENT OR ARISING OUT OF THE SERVICES RENDERED HEREUNDER, WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT (INCLUDING THE BREACH OR ANY TERMINATION OF THIS AGREEMENT), TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), MISREPRESENTATION OR OTHERWISE, EVEN IF A PARTY HAS BEEN WARNED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE IN ADVANCE.

## ARTICLE VII

## CONFIDENTIALITY; SECURITY

Section 7.1     Confidentiality. The parties hereto acknowledge that they will have access to confidential and proprietary information concerning the other party, its customers, affiliates and its business, which information is not readily available to the public. The Service Provider and the Service Recipient acknowledge that each has taken and will continue to take commercially reasonable actions to ensure such confidential and proprietary information is not made available to the public. The parties hereto further agree that they will not at any time (during the Transition Period or thereafter) disclose to any person (except to their affiliates and the officers, directors, designees, employees, agents, representatives and permitted subcontractors of such party and their affiliates who require such information in order to perform their duties hereunder or, in the case of the Service Recipient, to receive the full benefit of the Services, but provided that such disclosure is pursuant to reasonable confidentiality obligations that are at least equivalent to those contained herein), directly or indirectly, or make any use of, distribute or make copies of, for any purpose other than those contemplated by the Share Purchase Agreement or this Agreement, any such confidential or proprietary information of the other party. Notwithstanding the foregoing, information of a party disclosed to the other party shall not be deemed confidential or proprietary if such information (a) becomes known to the public without breach of this Section 7.1 by the other party, (b) was known to the other party prior to disclosure, (c) is disclosed to the other party by a third party not subject to a confidentiality obligation to the disclosing party, or (d) is independently developed by the other party without reference to the disclosing party's information.

Section 7.2     Disclosure. Notwithstanding Section 7.1, either party may disclose confidential information in the following circumstances (or as otherwise provided by the provisions of this Agreement), provided that such party shall, to the extent reasonably possible and permitted by applicable law, first promptly notify the other party of such intended disclosure and shall cooperate in seeking any limitations on such disclosure and/or protective measures for disclosed information:

(a) in response to a court order or formal discovery request;

(b) if a request is made by any governmental entity; and

7

(c) as otherwise required by applicable law.

Section 7.3        Security. The Service Recipient shall not tamper with, compromise or circumvent any security or audit measures employed by the Service Provider. The Service Recipient shall not permit users, other than those who are specifically authorized by the Service Recipient to gain access to the Service Provider's computer systems or software for the purpose of receiving Services, to gain such access. If at any time the Service Provider reasonably determines that (a) any personnel of the Service Recipient have sought to circumvent or have circumvented the Service Provider's security measures, (b) an unauthorized person under the control of the Service Recipient has accessed or has sought to access the Service Provider's computer systems or software, or a Service Recipient employee has engaged in activities that would reasonably be expected to lead to the unauthorized access, destruction or alteration or loss of data, information or (c) software, upon written notice from the Service Provider, the Service Recipient promptly shall terminate any such person's access to the computer systems or software of the Service Provider.

## ARTICLE VIII

## INTELLECTUAL PROPERTY

Section 8.1        Ownership of Data. The Service Recipient shall own all right, title and interest in and to all data generated solely on its behalf in the performance of the Services. Prior to the termination of the applicable Service, the Service Provider shall provide to the Service Recipient a copy of all such data, but in no event shall the Service Provider be required to change the format or otherwise modify such data. The Company shall bear all costs, including all of the Service Provider's internal and out-of-pocket costs, associated with providing such copy. The Service Provider shall be the sole and exclusive owner of all other data generated in performance of the Services, including all data of a technical nature, such as maintenance and operations manuals relating to the operation of the Service Provider's services infrastructure.

Section 8.2        Ownership of Intellectual Property.

(a) Except as otherwise provided herein, each of the Service Provider and the Service Recipient shall retain all right, title and interest in and to their respective intellectual property rights, and no other license (other than to the extent necessary for the provision of the Services) or other right, express or implied, is granted hereunder by either party to its intellectual property rights.

(b) Except as set forth in Section 8.1, the Service Provider shall exclusively own all right, title and interest throughout the world in and to all intellectual property rights created in the performance of the Services, and the Service Recipient hereby assigns to the Service Provider all right, title or interest it may have in any such intellectual property rights.

(c) Both parties shall execute any documents and take any other actions reasonably requested by the other party to effectuate the purposes of this Section 8.2.

Section 8.3        Reservation of Rights. Except as expressly provided in this Agreement, no party shall have any rights or licenses with respect to any hardware or facility of the other party. All rights and licenses not expressly granted in this Agreement are expressly reserved by the relevant party.

8