Hearing Date:  June 15, 2006, 1:00 p.m.
Objection Deadline:  June 5, 2006, 4:00 p.m. (E.T.)

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors.[1] | ) | Jointly Administered |

## MOTION FOR ORDER (A) AUTHORIZING WINN-DIXIE RALEIGH, INC. TO SELL STOCKBRIDGE STORE AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS AND (B) GRANTING RELATED RELIEF

Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), move the Court for entry of an order pursuant to 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004(g): (a) authorizing Winn-Dixie Raleigh, Inc. ("WD Raleigh") to sell a closed store (Store No. 2701) and the underlying tract of land, located in Stockbridge, Georgia, more particularly described in Exhibit A attached to this Motion, together with all related appurtenances, rights, easements, rights-of-way, tenements and hereditaments (the "Stockbridge Property"), to BH Properties, LLC, its permitted successors and/or assigns (collectively, the "Purchaser"), or to a party submitting a higher or better offer, free and clear of liens, claims and

---

[1]      In addition to Winn-Dixie Stores, Inc., the following entities are debtors in these related cases: Astor Products, Inc., Crackin' Good, Inc., Deep South Distributors, Inc., Deep South Products, Inc., Dixie Darling Bakers, Inc., Dixie-Home Stores, Inc., Dixie Packers, Inc., Dixie Spirits, Inc., Dixie Stores, Inc., Economy Wholesale Distributors, Inc., Foodway Stores, Inc., Kwik Chek Supermarkets, Inc., Sunbelt Products, Inc., Sundown Sales, Inc., Superior Food Company, Table Supply Food Stores Co., Inc., WD Brand Prestige Steaks, Inc., Winn-Dixie Handyman, Inc., Winn-Dixie Logistics, Inc., Winn-Dixie Montgomery, Inc., Winn-Dixie Procurement, Inc., Winn-Dixie Raleigh, Inc., and Winn-Dixie Supermarkets, Inc.

interests and (b) granting related relief.  In support of the Motion, the Debtors respectfully state as follows:

**Background**

1.    On February 21, 2005 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization relief under chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered for procedural purposes only.

2.    The Debtors are grocery and pharmaceutical retailers operating in the southeastern United States, primarily under the "Winn-Dixie" and "Winn-Dixie Marketplace" banners.  The Debtors operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request has been made for the appointment of a trustee or examiner.

3.    On March 1, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") to serve in these cases pursuant to Bankruptcy Code sections 1102 and 1103.  An official committee of equity security holders appointed by the U.S. Trustee on August 17, 2005, was subsequently disbanded by notice dated January 11, 2006.

4.    Prior to the Petition Date, the Debtors developed a store on owned property located in Stockbridge, Georgia (the "Stockbridge Store").  The Debtors

closed the Stockbridge Store on August 28, 2005 and have exited this market area. The sale of the Stockbridge Property will also save the estates a minimum of $56,435 per year in administrative expenses (in the form of taxes and insurance).

5.      The Debtors have marketed the Stockbridge Property extensively through DJM Asset Management, Inc. ("DJM").  DJM sent over 2,500 notices of sale to potential purchasers.  Through DJM's efforts, the Debtors have received 3 offers for the Stockbridge Property, including the offer by the Purchaser for $2,000,000.  After reviewing all offers, including all terms of all offers, the Debtors have determined that the Purchaser's offer is the highest and best offer for the Stockbridge Property.

## Relief Requested

6.      By this Motion, the Debtors request authority to sell WD Raleigh's fee simple title interest in the Stockbridge Property and all related appurtenances, rights, easements, rights-of-way, tenements and hereditaments (collectively, the "Assets"), free and clear of liens, claims and interests, and subject to higher or better offers.  The Assets are more fully described in the Real Estate Purchase Agreement (defined below).

## The Real Estate Purchase Agreement

7.      On April 18, 2006, WD Raleigh and the Purchaser entered into the Real Estate Purchase Agreement attached to this Motion as Exhibit A (the "Purchase Agreement").

8.     A summary of the material terms of the transaction with the

Purchaser, subject to this Court's approval, are as follows:[2]

> (a)    <u>Assets</u>.  The assets to be sold and transferred to the Purchaser, are sold AS IS, WHERE IS, and include:
>
>> (i)    WD Raleigh's fee simple title interest in the Stockbridge Property; and
>>
>> (ii)    WD Raleigh's interest in all related improvements, appurtenances, rights, easements, rights-of-way, tenements and hereditaments.
>
> (b)    <u>Purchase Price</u>.  On the terms and subject to the conditions set forth in the Purchase Agreement, the net aggregate purchase price for the Assets is $2,000,000 (the "Purchase Price"). Buyer has deposited an initial earnest money deposit of $50,000 and a second deposit of $160,000 with the escrow agent.  At Closing, the combined deposits will be credited against the Purchase Price and the unpaid balance of the Purchase Price will be due and payable in cash.
>
> (c)    <u>Overbid Protection</u>. Pursuant to the Order Establishing Bidding Procedures for the Sale of Assets, dated June 20, 2005 (Docket No. 1801) (the "Bidding Procedures Order"), the initial minimum overbid that may be accepted by the Debtors at any auction must have a value of at least $2,060,000.
>
> (d)    <u>Break-up Fee</u>.  If Purchaser is not the Successful Bidder and the Purchaser has not breached the Purchase Agreement, upon Closing of the sale of the Property to the Successful Bidder, WD Raleigh will pay to the Purchaser, the sum of $40,000 as a Break-up Fee.
>
> (e)    <u>Sale Free and Clear</u>.  The Purchase Agreement provides that the Assets are to be transferred free and clear of any liens,

---

[2]    This summary of the Purchase Agreement is provided as a convenience only.  To the extent that this summary differs in any way from the terms of the Purchase Agreement, the terms of the Purchase Agreement control.

claims, interests and encumbrances other than the Permitted Encumbrances, as defined in the Purchase Agreement.

9.      The Debtors move for authority to consummate the sale of the Assets with the Purchaser or, alternatively, to the party submitting a higher or better offer for the Assets.

## Solicitation of Higher and Better Offers

10.     Notwithstanding that the Assets have been sufficiently marketed, the Debtors are soliciting higher and better bids for the Assets. Any person or entity interested in submitting a higher and better bid for the Assets must submit such bid so that it is received by James Avallone at DJM, 445 Broadhollow Road, Suite 417, Melville, NY 11747, with a copy to undersigned counsel for the Debtors, no later than 12:00 p.m. (prevailing Eastern Time) on June 12, 2006. All bids must comply with the bidding procedures approved by the Bidding Procedures Order. To qualify as a competing bid, the offer must net the Debtors' estates at least $2,060,000 and be accompanied by a certified check made out to Smith, Gambrell & Russell, LLP, as Escrow Agent, in an amount equal to 10% of the competing bid. The required deposit must be sent to undersigned counsel.

11.     If the Debtors receive a higher or better offer for the Assets, they will conduct an auction (the "Auction") for the Assets in accordance with the Bidding Procedures Order. The Auction will take place at 10:00 a.m. (prevailing Eastern Time) at the offices of Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida on Wednesday, June 14, 2006 (the "Auction Date").

The Debtors will conduct the Auction in consultation with the Creditors Committee and the DIP Lender and on terms the Debtors determine to be in the best interests of their estates and their creditors.

## Applicable Authority

**A.    Bankruptcy Code Section 363(b) Authorizes the Sale.**

12.    Bankruptcy Code section 363(b)(1) provides:  "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   Bankruptcy Code section 1107 (a) gives the Debtors, as debtors-in-possession, the same authority as a trustee to use, sell or lease property under section 363(b)(1).  See 11 U.S.C. § 1107(a).

13.    A debtors' sale under section 363(b)(1) should be approved when supported by a sound business reason.  *See In re B.D.K. Health Mgmt., Inc.* ("B.D.K. Health Mgmt."), Case Nos. 98-00609-6B1, 1998 WL 34188241, at *5 (Bankr. M.D. Fla. November 16, 1998) (approving sale on expedited basis where sale serves a sound business purpose); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *Stephens*

*Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "a bankruptcy court can authorize a sale of all a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

14.     Once a court is satisfied that a sound business reason for the sale exists, the Court must also consider whether (a) the sale price is fair and reasonable, (b) the purchaser is proceeding in good faith, and (c) the debtor has provided interested parties with adequate and reasonable notice.  *Del. & Hudson*, 124 B.R. at 175-176.

15.     The Debtors have a sound business reason for the sale of the Assets. The Debtors have exited the market in Stockbridge, Georgia and the sale of the Stockbridge Property will generate cash for the Debtors.

16.     The sale of the Assets to the Purchaser is subject to competing bids, ensuring that the Debtors will receive the highest or best value for the Assets. Thus, the fairness and reasonableness of the consideration to be received for the Assets ultimately will be demonstrated by a "market check" and auction process -- the best means for establishing whether a fair and reasonable price is being paid.

17.     If required, the Debtors are prepared to present further evidence of good faith during the course of the Sale Hearing that the Debtors believe will satisfy this Court and the mandates of Bankruptcy Code section 363(m).

18.    In accordance with Local Rule 2002-1, the Debtors will serve notice of the Motion on the following parties: (a) each taxing authority known to the Debtors to have a potential interest in the Assets; (b) all parties that expressed interest in purchasing the Assets; (c) the Purchaser; (d) counsel for the DIP Lenders; (e) counsel for the Creditors Committee; (f) all known holders of Interests and Claims (as defined below) in the Assets; (g) all entities having requested notices pursuant to Fed. R. Bankr. P. 2002; and (h) the Office of United States Trustee.

**B.    Bankruptcy Code Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

19.    The Debtors request that WD Raleigh's sale of the Assets be approved free and clear of any liens, claims or interests.  Pursuant to Bankruptcy Code section 363(f), a debtor may sell property of the estate free and clear of all liens, claims and interests after notice and hearing.  *See In re Parrish*, 171 B.R. 138 (Bankr. M.D. Fla. 1994).

20.    The Debtors believe that with the exception of the Permitted Encumbrances (as defined in the Purchase Agreement), there are no interests in or claims against the Assets other than the interest of Wachovia Bank, National Association, as Administrative Agent and Collateral Agent (collectively, the "DIP Lender").  The interest of the DIP Lender will be satisfied because the Debtors will cause the proceeds from the sale to be paid, to the extent required,  in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362,

363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of All Claims of Debtors' Pre-Petition Secured Lenders dated March 23, 2005 (Docket No. 501) (the "Final Financing Order") and the Loan Documents (as defined in the Final Financing Order).

**C.    Good Faith Purchaser.**

21.    The Debtors request that the Court find that the Purchaser, or the party who ultimately submits the highest or best offer for the Assets, acted in good faith within the meaning of Bankruptcy Code section 363(m).

22.    Bankruptcy Code section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m)

23.    The Bankruptcy Code does not define the term "good faith." Courts, however, indicate that a party would have to show fraud or collusion between the

purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of good faith.

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

> *In re Apex Oil Co.*, 2 B.R. 847, 865 (Bankr. E.D. Mo. 1988)

*Accord Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs.* (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997).  No such facts exist here.

24.    The Debtors assert that:  (a) the proposed sale is the subject of arm's length negotiations with the Purchaser and is made in good faith; (b) the Purchaser has no affiliation with the Debtors; (c) the Assets were marketed extensively and the purchase price is fair and reasonable; (d) to the best of the Debtors' knowledge, the Purchaser has taken no action to chill or otherwise collude with any other party to restrict bidding on the Assets; and (e) the marketing process that occurred and the notice of the Sale Hearing ensure that the Purchaser has not exerted undue influence over the Debtors.  Accordingly, the Debtors request that the Court find that the Purchaser, or the party submitting a higher or better offer, acted in good faith within the meaning of Bankruptcy Code section 363(m).  *See B.D.K. Health Mgmt.*, 1998 WL, at *4 (finding that the purchaser is entitled to the

protections of Bankruptcy Code section 363(m) because the sale was negotiated at arms-length, proposed in good faith and the consideration for the assets was fair and reasonable).

**D.     Elimination of 10-Day Stay Under Rule 6004(g)**

25.     Pursuant to Rule 6004(g), Fed. R. Bankr. P., unless the Court orders otherwise, all orders authorizing the sale of property outside of the ordinary course of business pursuant to Bankruptcy Code section 363 are automatically stayed for ten days after entry of the order.   Given the requirements of the Purchase Agreement and the need to close the sale as promptly as possible, the Debtors request that the Court waive the 10-day stay period.

**E.     Objection Deadline**

26.     Only objections filed and served on D. J. Baker at djbaker@skadden.com, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 and on Cynthia C. Jackson at cjackson@smithhulsey.com, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202 so as to be received by June 8, 2006 at 4:00 p.m. (E.T.) will be considered by the Bankruptcy Court at the Hearing.

<u>**Conclusion**</u>

For the foregoing reasons, the Debtors respectfully request that the Court enter an order substantially in the form attached as Exhibit B, (a) granting the Motion and authorizing WD Raleigh's sale of the Assets to the Purchaser in accordance with the Purchase Agreement, or to the party submitting a higher or

otherwise better offer for the Assets, (b) authorizing the Debtors to take all actions reasonably necessary to effectuate the sale of the Assets in accordance with the Purchase Agreement, and (c) granting such other and further relief as the Court deems just and proper.

Dated: May 26, 2006

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By    /s/ D. J. Baker
     D. J. Baker
     Sally McDonald Henry
     Rosalie Walker Gray

Four Times Square
New York, New York 10036
(212) 735-3000
(212) 735-2000 (facsimile)
djbaker@skadden.com

Co-Counsel for Debtors

00532704

SMITH HULSEY & BUSEY

By    /s/ Cynthia C. Jackson
     Stephen D. Busey
     James H. Post
     Cynthia C. Jackson  (F.B.N. 498882)

225 Water Street, Suite 1800
Jacksonville, Florida  32202
(904) 359-7700
(904) 359-7708 (facsimile)
cjackson@smithhulsey.com

Co-Counsel for Debtors

**EXHIBIT A**

## REAL ESTATE PURCHASE AGREEMENT
[Stockbridge – Store #2701]

**THIS REAL ESTATE PURCHASE AGREEMENT** (this "Agreement") is made as of April _18_, 2006 (the "Effective Date"), between

**BH PROPERTIES, LLC,** a California limited liability company ("Buyer"), its permitted successors and/or assigns, and

**WINN-DIXIE RALEIGH, INC.,** a Florida corporation ("Seller").

1.    SALE AND PURCHASE. Seller agrees to sell, assign, transfer and convey to Buyer, and Buyer agrees to purchase from Seller, that certain tract of land situated in Henry County, Georgia, as more particularly described on attached Exhibit A, together with all appurtenances, rights, easements, rights-of-way, tenements and hereditaments incident thereto (collectively, the "Property"). The Property comprises a retail shopping center including a primary parcel improved with a store building and one unimproved outparcel (the "Shopping Center"), and is intended to constitute an integrated commercial community. Accordingly, the Property is subject to a Declaration of Reciprocal Easements and Restrictive Covenants (the "Declaration") as more fully described on the Schedule of Permitted Encumbrances attached as Exhibit B (the "Permitted Encumbrances"). The Property to be conveyed does not include furniture, fixtures and equipment except as set forth below ("FF&E").

2.    PURCHASE PRICE AND PAYMENT. In consideration of the conveyance of the Property to Buyer, Buyer will pay to Seller the sum of $2,100,000 (the "Purchase Price"), payable as follows:

   (a)    An initial earnest money deposit of $50,000 (the "Initial Deposit") will be due and payable to Smith, Gambrell & Russell, LLP, through its Jacksonville, Florida office, as escrow agent ("Escrow Agent") under the provisions of paragraph 14 within 3 days after the Effective Date, and will be refundable to Buyer only as expressly provided in this Agreement.

   (b)    If Buyer does not timely terminate this Agreement prior to expiration of the Investigation Period, then a second earnest money deposit of $160,000 (the "Second Deposit") will be due and payable to Escrow Agent within 3 days after the expiration of the Investigation Period, as hereinafter defined. The Second Deposit will be refundable to Buyer only as expressly provided in this Agreement. The Initial Deposit by itself, and together with the Second Deposit if required to be delivered pursuant to this paragraph, will be referred to herein as the "Deposit."

   (c)    At Closing, the Deposit will be credited against the Purchase Price, and the unpaid balance of the Purchase Price will be due and payable in cash (as adjusted by prorations and payment of expenses as herein provided).

3.    PROPERTY CONDITION AND INVESTIGATION.

(a)    Property Conveyed AS IS. BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING, SELLER WILL SELL AND CONVEY TO BUYER AND BUYER WILL ACCEPT THE PROPERTY **"AS IS, WHERE IS,"** WITH ALL FAULTS, AND THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER OR ANY THIRD PARTY. THE TERMS AND CONDITIONS OF THIS PARAGRAPH WILL EXPRESSLY SURVIVE THE CLOSING AND NOT MERGE THEREIN.

(b)    Property Improvements.   Buyer acknowledges that Buyer is acquiring property and improvements without any specialized equipment for grocery store operation.   Improvements will include standard HVAC, but will not include Seller's prefabricated refrigeration rooms, freezers or mechanical rooms which will be removed prior to Closing.

(c)    Investigation Period.

(i)    Buyer will have a period commencing on the Effective Date and expiring at 5:00 p.m. on that date which is 15 days after the receipt of all Property Reports referenced below, Title Commitment and Survey, in which to investigate and inspect the Property to determine whether or not the same is satisfactory to Buyer (the "Investigation Period"). During the Investigation Period, Buyer will be provided access to the Property to inspect the physical condition thereof, verify zoning, conduct appraisals, engineering and environmental studies, feasibility studies, obtain any financing desired by Buyer, make soil tests, determine allowable uses under zoning or the applicable comprehensive land use plan, test for hazardous materials, and to determine the availability of water, sewer and other utilities. All such investigations, tests, verifications, copies and examinations will be made by Buyer at Buyer's sole expense.

(ii)    Buyer indemnifies and agrees to defend and hold harmless Seller from and against any loss, damages or liability arising out of Buyer's investigation of the Property, including reasonable attorney's fees. Buyer further indemnifies and agrees to defend and hold harmless Seller from and against all claims or liens against Seller or the Property filed by contractors, materialmen or laborers performing work and tests for Buyer. If this sale does not close, or if Buyer otherwise elects to terminate this Agreement as provided herein, Buyer will restore the Property to its original condition prior to such termination.

(iii)    Within 5 business days after the Effective Date, Seller will deliver to Buyer, to the extent in the possession of Seller or its legal counsel, copies of all documents listed as Permitted Encumbrances, a copy of Seller's most recent available boundary survey or site plan, environmental site assessment report, and engineering reports, if any, relating to the Property (collectively, the "Property Reports"). Buyer acknowledges that the Property Reports are provided for informational purposes only, are not warranted by Seller for accuracy, completeness, or fitness for a particular purpose, and are not a

2

substitute for Buyer's own investigation and inspection of the Property using its own due diligence service providers. If Buyer fails to close for any reason, all materials provided by Seller to Buyer (including without limitation, the Property Reports), all materials relating to the Property obtained by Buyer, and all copies of any such materials, will be delivered to Seller promptly, and in any event not later than 10 business days following such termination.

(iv)   Buyer agrees to accept the transfer and conveyance of the Property by Seller without any warranty or representation concerning the quantity, quality, or condition of the Property, the availability of water, sewer, utilities or necessary governmental authorizations, or any other matter not expressed in this Agreement. Buyer is accepting the Property "AS IS" with all faults. Seller has no obligation to make any independent investigation or verification of the condition of the Property. THERE ARE NO EXPRESS OR IMPLIED WARRANTIES GIVEN TO BUYER IN CONNECTION WITH THE SALE OF THE SUBJECT PROPERTY (other than the warranties set forth in the Special Warranty Deed to be delivered by Seller to Buyer at Closing).

(v)    If Buyer determines, in accordance with the terms specified herein, that Buyer does not wish to proceed with the acquisition of the Property, then Buyer may, by written notice to Seller and Escrow Agent given not later than the expiration of the Investigation Period, terminate this Agreement and thereupon Buyer will have no further obligations hereunder except with respect to the indemnifications and restoration obligations given by Buyer to Seller as provided in this paragraph 3.   Upon such termination notice timely given, Escrow Agent will refund the Deposit to Buyer. In the event Buyer fails to terminate this Agreement prior to expiration of the Investigation Period, then Buyer will be deemed to have elected to proceed with the acquisition of the Property, and thereupon, the Second Deposit will be due and payable to Escrow Agent, and the Deposit will be nonrefundable to Buyer except in the event of: (A) a material default by Seller under this Agreement that is not cured by Seller on or before the Closing Date; (B) Seller's inability to deliver title pursuant to paragraph 4; (C) failure of the Approval Condition pursuant to paragraph 6 if such failure is not a result of a default by Buyer hereunder; or (D) a loss or condemnation event pursuant to paragraph 7 as a result of which Buyer timely elects not to acquire the Property.   In the event that Buyer timely elects to terminate this Agreement, Seller agrees to promptly execute and deliver to Escrow Agent all releases and documentation required to refund the Deposit to Buyer.

4.   **TITLE AND SURVEY MATTERS.**

(a)   Title Commitment. Not later than 5 business days after the Effective Date, Seller will obtain and deliver to Buyer a title insurance commitment (the "Commitment") from Fidelity National Title Insurance Company (the "Title Insurer") committing to insure Buyer's fee simple title to the Property for the amount of the Purchase Price, and stating all exceptions and conditions to

3

such title, including, without limitation, those encumbrances created pursuant to the Credit Agreement dated as of February 23, 2005, as amended, between Winn-Dixie Stores, Inc. and certain banks and financial institutions, and certain documents executed by Winn-Dixie Stores, Inc. or Seller in connection with such Credit Agreement (the "Credit Agreement Liens"), any other liens and encumbrances affecting the Property ("Other Liens"), the Permitted Encumbrances, and all other easements, restrictions, covenants, reservations, and other encumbrances affecting title that are accepted by Buyer (collectively, the "Exceptions"). The Commitment delivered to Buyer will include copies of all Exceptions. Buyer will have 10 days after receiving both the Commitment and the Survey, as hereinafter defined (the "Review Deadline"), to examine the Commitment. It is a condition of Buyer's obligation to close and pay to Seller the Purchase Price that title to the Property is marketable or insurable subject only to the Permitted Encumbrances and those other Exceptions that are reasonably acceptable to Buyer. If Buyer reasonably determines that any matter (other than Permitted Encumbrances) renders Seller's title to the Property unmarketable, Buyer will notify Seller in writing on or before the Review Deadline of Buyer's objections (the "Objection Notice").

(b)     Boundary Survey. Not later than 5 business days after the Effective Date, Seller will obtain and deliver to Buyer and Title Insurer a current boundary survey of the Property (the "Survey"). The Survey will be prepared by a licensed surveyor, prepared in accordance with the minimum technical standards for surveys under the laws of the state in which the Property is located, certified to Buyer, Seller and Title Insurer, and show a metes and bounds legal description for the Property (the "Legal Description"). Buyer will have until the Review Deadline to review the Survey and to deliver in the Objection Notice its objections to any matters that render Seller's title to the Property unmarketable (other than Permitted Encumbrances) disclosed by such Survey, including, without limitation, objections as to the accuracy or consistency with the Commitment or the Legal Descriptions.

(c)     Seller's Cure of Objections. If Buyer timely delivers the Objection Notice to Seller, Seller will have until the end of the Investigation Period to attempt to cure such objections, it being understood, however, that the Credit Agreement Liens and Other Liens will not be cured until issuance of the Sale Order and Closing. If Seller is unable or unwilling to cure any objections other than the Credit Agreement Liens and Other Liens prior to the end of the Investigation Period, then Buyer will have until the expiration of the Investigation Period to elect, by written notice to Seller, whether to (i) waive the unsatisfied objections and complete the purchase of the Property subject to the objectionable matters, or (ii) terminate this Agreement and cause the Deposit to be refunded to Buyer.

4

5.    WARRANTIES OF SELLER AND BUYER.

(a)    Seller's Warranties.  Seller warrants to Buyer as follows:

(i)    Corporate Existence and Authority.  Seller is a Florida corporation and its status is active. Subject to the satisfaction of the Approval Condition pursuant to paragraph 6 below, Seller has the corporate power and authority to enter this Agreement and to consummate the transactions contemplated herein.

(ii)    Title to Property.  Seller owns fee simple title to the Property, subject to the Permitted Encumbrances and the Credit Agreement Liens.

(iii)    Power to Convey.  To Seller's knowledge, and subject to satisfaction of the Approval Condition pursuant to paragraph 6 below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Seller of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Seller's knowledge, other than the Bankruptcy Cases, as defined in paragraph 6 below, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which would become a cloud on the title to the Property or any portion thereof or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

(b)    Buyer's Warranties.  Buyer warrants to Seller as follows:

(i)    Existence and Authority.  Buyer, or its permitted assigns, has full power and authority to enter this Agreement and to consummate the transactions contemplated herein, and if Buyer's assign is a business entity, such entity is duly authorized, validly existing and active in the state of its formation.

(ii)    Power to Acquire.  To Buyer's knowledge, and subject to satisfaction of the Approval Condition pursuant to paragraph 6 below, the execution of this Agreement and the performance of its terms will not constitute or result in a violation or breach by Buyer of any agreement, judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, order, rule or regulation of any governmental authority. To Buyer's knowledge, other than the Bankruptcy Cases, there is no action, suit, proceeding or investigation pending which would prevent the transactions contemplated by this Agreement or which questions the validity or enforceability of the transactions contemplated by this Agreement or any action taken pursuant hereto.

5

(iii)  <u>Financial Condition</u>.  Buyer has and will have the sufficient funds on hand as of the Effective Date and continuing through the Closing Date to perform its obligations under this Agreement, including payment of the Purchase Price at Closing.

(c)  <u>Survival of Warranties</u>. The respective warranties of Buyer and Seller above will not survive the Closing but will merge into the Deed, and will have no further force or effect after the Closing, and the liability of Seller under or with respect to the warranties will be limited to the express remedies of Buyer set forth in this Agreement.

6.  <u>CLOSING CONDITIONS</u>.

(a)  <u>Approval Condition</u>.

(i)  <u>Chapter 11 Cases</u>.  Winn-Dixie Stores, Inc. and certain of its affiliated companies, including Seller, filed voluntary petitions for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, U.S.C. §101 <u>et seq.</u>, as amended (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York on February 21, 2005 (the "<u>Filing Date</u>") and have operated its businesses as debtors-in-possession (as defined in Section 1101 of the Bankruptcy Code), as authorized by Sections 1107 and 1108 of the Bankruptcy Code, since the Filing Date (the "<u>Bankruptcy Cases</u>"). By order entered on April 13, 2005, the Bankruptcy Cases were transferred to the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "<u>Bankruptcy Court</u>") where they are being jointly administered under Case No. 05-03817-3F1.

(ii)  <u>Competitive Bid Process</u>.  By Order dated June 20, 2005, the Bankruptcy Court approved bidding procedures and bid protections for use in the sale of assets in the Bankruptcy Cases (the "<u>Bidding Procedures</u>").  This Agreement is subject to the competitive bid process described in the Bidding Procedures.  Promptly following the expiration of the Investigation Period, Seller will file a motion with the Bankruptcy Court seeking approval of the transactions contemplated by this Agreement, subject to higher or better offers, and the transfer of the Property free and clear of all claims and liens including the Credit Liens, other than Permitted Encumbrances, pursuant, <u>inter alia</u>, to 11 U.S.C. Sections 105, 363 and 1146(c) (the "<u>Sale Motion</u>").  The Bankruptcy Court will set a date for hearing on the Sale Motion and to consider entry of the Sale Order relating to the successful bid (the "<u>Sale Hearing</u>").  Prior to the Sale Hearing, the debtors will conduct an Auction pursuant to the Bidding Procedures.  Buyer may participate in the Auction, and may submit purchase terms different from those set forth in this Agreement as Buyer may deem appropriate in seeking to become the successful bidder.  Prior to the Sale Hearing, upon consultation with the Creditors' Committee and DIP Lender, Seller will select the highest or otherwise best offer to purchase the Property, as determined by Seller in its sole discretion in accordance with the Bidding Procedures, as the Successful Bid (as defined in the Bidding Procedures).  Seller will submit the Successful Bid to the Bankruptcy

6

Court at the Sale Hearing, for entry of a Sale Order with respect to the Property by the Bankruptcy Court, either (a) approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, if Buyer is the Successful Bidder under the terms of this Agreement (or as modified during the Auction) or (b) approving the more favorable terms of purchase and sale offered by the Successful Bidder, whether Buyer or otherwise (the "Sale Order").

(iii)   Overbid Protection. Seller agrees, subject to Bankruptcy Court approval, that the initial minimum overbid that may be accepted by Seller in the competitive bid process will have a value of at least $2,163,000 (three percent (3%) higher than the Purchase Price)

(iv)   Sale Order Approving Agreement. It will be a condition to the Closing of the transaction contemplated by this Agreement that the Bankruptcy Court will have issued the Sale Order approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby, and such Sale Order either will have become final and non-appealable, or the Sale Order will contain a waiver of the stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Approval Condition").

(v)   Continuing Effectiveness of Agreement. Notwithstanding that Buyer may not be the successful bidder following the Bidding Procedures, this Agreement, as modified by Buyer's last bid made during the Bidding Procedures, will remain in effect in accordance with, and will remain subject to, the Bidding Procedures. If the Approval Condition is not otherwise satisfied by June 15, 2006 (the "Outside Date") through no fault of Buyer, or if the sale of the Property closes with another successful bidder, then this Agreement automatically will terminate and Escrow Agent will refund the Deposit to Buyer, and the parties will have no further obligations to the other.

(b)   Conditions Precedent to Seller's Obligations. The obligations of Seller under this Agreement are subject to the Approval Condition and satisfaction on or before the Closing Date, or such other date as herein provided, of all conditions contained in this Agreement, including each of the following (any of which may be waived by Seller in its sole discretion, unless otherwise stated herein):

(i)   Buyer will have performed in all material respects all of its covenants contained in this Agreement which are not qualified by reference to a materiality standard; and Buyer will have performed in all respects all of its covenants contained in this Agreement which are qualified by reference to a materiality standard. All of Buyer's representations and warranties contained in this Agreement will be true and accurate in all material respects as of the Effective Date and the Closing Date.

7

(ii)    No order, injunction or decree issued by any applicable governmental authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement with respect to such Store will be in effect.

If any of the foregoing conditions has not been satisfied on or before the Outside Date, then Seller will have the right to terminate this Agreement; provided, however, that if any of the foregoing conditions has not been satisfied due to a breach of this Agreement by Buyer or Seller, then Buyer's and Seller's respective rights, remedies and obligations will be determined in accordance with paragraph 13 of this Agreement.

(c)    Break-up Fee.    If Buyer is not the Successful Bidder and Buyer has not breached this Agreement, upon Closing of the sale of the Property to the Successful Bidder, Seller shall pay to Buyer the sum of $42,000 (three percent (3%) of the Purchase Price) as an agreed-upon fee for Buyer's costs and expenses related to entering into this Agreement (the "Break-up Fee")

7.    LOSS BY FIRE OR OTHER CASUALTY; CONDEMNATION.    If, prior to Seller's legal delivery of the Deed and Buyer's delivery of the Purchase Price, the Property or any material part thereof, are destroyed or materially damaged, or made the subject of a condemnation action, then either party will have the right, exercisable by giving notice of such decision to the other within 5 business days after receiving written notice of such damage, destruction or threatened condemnation, to terminate this Agreement, and thereafter neither of the parties will have any further rights or obligations hereunder; provided, however, that Buyer will be entitled to the return from the Escrow Agent of the Deposit.    If neither party exercises its right of termination and the Property is sold to Buyer pursuant to the terms of this Agreement, then as Buyer's sole remedies, Seller will assign to Buyer any assignable rights it may have to recover insurance or condemnation proceeds and will promptly pay over and deliver to Buyer any such proceeds received by it.

8.    CLOSING AND CLOSING DATE.    The consummation of the transactions contemplated herein by Buyer and Seller (the "Closing") will be held on or before that date which is 10 days following the satisfaction of the Approval Condition (the "Closing Date"), at a time and place mutually acceptable to the parties, but if none is agreed to, at the offices of Escrow Agent in Jacksonville, Florida. Closing may be conducted by use of mail-away procedures including escrow and Closing disbursement and delivery of documents and funds administered by Escrow Agent, as closing agent.

9.    CLOSING DELIVERIES.    On the Closing Date, Seller will execute and deliver a limited warranty deed (the "Deed") to Buyer as will be required to convey title to the Property to Buyer subject to the Permitted Encumbrances and in accordance with this Agreement. The Deed will be in form and substance reasonably satisfactory to Seller and Buyer and in proper form for recording. Additionally, on the Closing Date, Seller will execute and deliver the title affidavit as required by the Title Insurer to allow the issuance of the title insurance policy without the standard exceptions other than for taxes for the year of Closing, those standard exceptions required under the laws of the state in which the Property is located, and for specific matters disclosed by the Survey, and a non-foreign affidavit as required under the Internal Revenue Code. At Closing, Buyer and Seller will execute and deliver a closing statement setting forth the disbursement of the Purchase Price and closing costs associated

8

with the transactions contemplated herein.  On the Closing Date, Seller will turn over exclusive physical possession of the Property to Buyer upon confirmation to Seller by the Escrow Agent that Escrow Agent has received and holds the entire Purchase Price for disbursement without further condition.

10.     CLOSING COSTS.  At or prior to Closing, Seller will pay the cost of the commission payable to Seller's Brokers as disclosed in paragraph 12, and Seller's attorneys' fees and costs ("Seller's Closing Costs").  At or prior to Closing, Buyer will pay the cost of transfer taxes on the Deed, the cost of the title commitment and insurance policy to be issued pursuant to the Commitment in the amount of the Purchase price, the cost of the Survey, the cost of its due diligence investigations of the Property, recording fees, all financing costs of Buyer incurred to purchase or develop the Property including simultaneous issue mortgagee title insurance and related endorsements, Buyer's attorneys' fees and costs and all other fees, costs and expenses incurred by the Buyer in connection herewith ("Buyer's Closing Costs").  If this transaction fails to close for any reason, and without waiving any right or remedy that either party may have against the other in the event of a default hereunder, Seller promptly will pay Seller's Closing Costs, and Buyer promptly will pay Buyer's Closing Costs.

11.     PRORATIONS.  All ad valorem taxes for the year in which the Closing occurs will be prorated between Seller and Buyer as of midnight immediately preceding the Closing Date, and will be paid at Closing.  The proration will be based upon the latest available tax figures with known changes (based on earliest payment discount, if any).  The tax proration at Closing may be based on an estimate using the previous year's tax amount.

12.     BROKERAGE.  Seller and Buyer warrant each to the other (and it is agreed that this warranty will survive delivery of the Deed) that no broker or agent has been employed with respect to the sale of the Property, other than Seller's brokers, DJM Asset Management, LLC ("Seller's Broker"), which has been retained by Seller pursuant to Order Authorizing Debtors to Retain DJM Asset Management, LLC as Special Real Estate Consultants to the Debtors, issued by the Bankruptcy Court on June 10, 2005 (the "Retention Order").  Seller will be responsible for payment of the brokerage commission to Seller's Broker pursuant to the Retention Order. Each party indemnifies and agrees to hold harmless the other from any claim made by brokers or agents who claim to act for the party sought to be charged for a commission, compensation, brokerage fees, or similar payment in connection with this transaction and against any and all expense or liability arising out of any such claim.

13.     REMEDIES.

        (a)     Seller's Default.  In the event that Seller defaults in the performance of its obligations under this Agreement, and such default is not cured on or before the Closing Date, Buyer will be entitled to terminate this Agreement upon written notice to Seller and Escrow Agent and obtain a refund of the Deposit. Buyer waives all other remedies it may have at law or in equity, except with respect to the indemnifications provided in paragraph 12 above, which indemnification will survive separately from the termination of this Agreement.

9

(b)  **Buyer's Default.** If Buyer fails to make the Deposit when due or to comply with or perform any of the covenants, agreements, or obligations to be performed by Buyer under the terms and provisions of this Agreement, then Seller will  be entitled to terminate this Agreement upon written notice to Buyer and Escrow Agent, and the Deposit will be paid to Seller as reasonable liquidated damages.  Seller waives all other remedies it may have at law or in equity, except with respect to the indemnifications provided under **paragraph 3(c)(ii)** and **paragraph 12** above,  which indemnifications will survive separately from the termination of this Agreement.

14.  **ESCROW AGENT.**

(a)  **Duties.** By joining in the execution of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent.  Upon receipt, Escrow Agent will hold the Deposit in trust, and deposit the same into an interest bearing escrow account (money market rates), to be disposed of in accordance with the provisions of this Agreement.

(b)  **Indemnity.** Escrow Agent will not be liable to either party except for claims resulting from the negligence or willful misconduct of Escrow Agent.

(c)  **Role as Counsel.** The parties acknowledge that Escrow Agent also serves as special real estate counsel to Seller.  In the event of a dispute between Seller and Buyer concerning this Agreement to the Property, Escrow Agent may continue to serve both in its capacity as counsel to Seller and in its capacity as Escrow Agent, it being understood that Escrow Agent's duties and obligations as Escrow Agent are purely ministerial in nature.

(d)  **Withdrawal.** No party will have the right to withdraw any monies or documents deposited by it with Escrow Agent prior to the Closing or termination of this Agreement except in accordance with the terms of this Agreement.

(e)  **Written Objection.** If a written objection is filed with Escrow Agent, or Escrow Agent otherwise is in doubt as to its duties, Escrow Agent may continue to hold the funds in escrow until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court having jurisdiction of the dispute or the Escrow Agent may interplead the same in the Circuit Court and be relieved of any and all liability therefor.  In any action or proceeding regarding the Deposit brought by Escrow Agent or to which Escrow Agent is made a party Escrow Agent will be entitled to recover its reasonable costs and attorney's fees (through appeal).

Real Estate Purchase Agreement
Winn-Dixie Montgomery Inc. S/T BH Properties, LLC
Store #2701 – Stockbridge, Georgia
April 5, 2006
SGRJAX\82357.2

15.  <u>NOTICES</u>.  All notices, demands, requests and other communications hereunder will be in writing and will be deemed to have been given (i) on the same business day if delivered personally, (ii) 3 business days following mailing by registered or certified mail, return receipt requested, postage prepaid, or (iii) on the same business day if sent by telefax, to Buyer, Seller or Escrow Agent at its respective address set forth below:

|  |  |
|---|---|
| If to Seller: | Winn-Dixie Raleigh, Inc.<br>5050 Edgewood Court<br>Jacksonville, Florida  32254<br>Attention: Catherine Ibold<br>Telefax No.: 904 783 5138 |
| with a copy to: | Smith, Gambrell & Russell, LLP<br>50 N. Laura Street, Suite 2600<br>Jacksonville, Florida  32202<br>Attention: Douglas G. Stanford<br>Telefax No.: 904 598 6226 |
| If to Buyer: | BH Properies, LLC<br>11111 Santa Monica Boulevard<br>Suite 1800<br>Los Angeles, CA  90025<br>Attention: Steve Jaff<br>Telefax No.: 310 820 8070 |
| with a copy to: | The Taratoot Company<br>1562 Lenox Road<br>Atlanta, Georgia 30306<br>Attention: Timothy C. Moore<br>Telefax No.: 404 869 3171 |
| If to Escrow Agent: | Smith, Gambrell & Russell, LLP<br>50 N. Laura Street, Suite 2600<br>Jacksonville, Florida  32202<br>Attention: Douglas G. Stanford<br>Telefax No.: 904 598 6226 |

or at such other address as the party may specify from time to time by written notice to the other party.

16.  <u>MISCELLANEOUS PROVISIONS</u>.

   (a)  <u>Successors And Assigns; Assignment Of Agreement</u>.  All terms of this Agreement will be binding upon, and will inure to the benefit of and be enforceable by the parties hereto and their respective legal representatives, heirs, successors and assigns.  Except as set forth below, this Agreement may not be assigned by either party without the express written consent of the other.

11

(b)     <u>Governing Law</u>. This Agreement will be governed and construed in accordance with the laws of the State of Florida. Any dispute arising out of or under this Agreement will be litigated in the Bankruptcy Court.

(c)     <u>Captions</u>. The captions of this Agreement are inserted for convenience or reference only and not to define, describe or limit the scope or the intent of this Agreement or any term hereof.

(d)     <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same instrument.

(e)     <u>Changes And Modifications; Prior Agreements</u>. This Agreement may not be orally changed, modified or terminated; it supersedes any and all prior understandings and/or letter agreements; other matters of similar nature will be deemed to be of no force or effect in the interpretation of this Agreement, it being intended that this Agreement represents the entire understanding of the parties. No waiver of any provision hereof will be valid unless in writing and signed by a party against whom it is to be enforced.

(f)     <u>Waiver</u>. No failure of either party to exercise any power given hereunder or to insist upon strict compliance with any obligations specified herein, and no custom or practice at variance with the terms hereof, will constitute a waiver of any party's right to demand exact compliance with the terms hereof; provided, however, that any party may, at its sole option, waive any requirement, covenant or condition herein established for the benefit of such party without affecting any of the other provisions of this Agreement.

(g)     <u>Further Assurances</u>. Seller and Buyer each agree to execute and deliver to the other such further documents and instruments as may be reasonable and necessary in furtherance of and to effectuate the intent of the parties as expressed by the terms and conditions hereof.

(h)     <u>Attorneys' Fees</u>. If either party commences an action against the other to enforce any of the terms hereof or because of the breach by either party of any of the covenants, terms or conditions hereof, the losing or defaulting party will pay to the prevailing party reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution and defense of such action.

(i)     <u>Time Of Essence</u>. Time is of the essence of each party's performance of this Agreement.

(j)     <u>Business Day</u>. Whenever a date specified herein shall fall on a Saturday, Sunday or legal holiday, the date shall be extended to the next succeeding Business Day. For purposes of the foregoing, "Business Day" will mean any day, other than a Saturday, Sunday or legal holiday.

(k)     WAIVER OF TRIAL BY JURY. BUYER AND SELLER EACH AGREE THAT THE NATURE OF THIS AGREEMENT MAKES A JURY DETERMINATION OF ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR THE PROPERTY UNDESIRABLE. ACCORDINGLY, BUYER AND SELLER EACH SPECIFICALLY

12

WAIVE ANY RIGHT TO A TRIAL BY JURY THAT EITHER OF THEM MAY HAVE IN ANY COURT WITH RESPECT TO ANY ACTION RELATING TO THIS AGREEMENT OR THE PROPERTY. THE FOREGOING WAIVER IS MADE KNOWINGLY, VOLUNTARILY AND INTENTIONALLY BY BOTH BUYER AND SELLER.

(l)     CONSENT TO JURISDICTION OF BANKRUPTCY COURT. THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Buyer and Seller further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in paragraph 15 of this Agreement will be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Buyer and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court.

**[SIGNATURE PAGES FOLLOW]**

13

**IN WITNESS WHEREOF,** Buyer and Seller have executed this Agreement as of the Effective Date.

**SELLER:**

Signed, sealed and delivered
in the presence of:

Name: REBECCA L. SAWYER

Name: SUSAN MAGADDINO

**WINN-DIXIE RALEIGH, INC.,** a Florida corporation

By:
Name: Bennett L. Nussbaum
Title: Senior Vice President

[Corporate Seal]

LEGAL APPROVED
ATTY: CBC
DATE: 7/13/06

**BUYER:**

Signed, sealed and delivered
in the presence of:

Name: Steve Jaffe

Name: Mary di Lu

**BH PROPERTIES, LLC,** a California limited liability company

By:
Name: Arshan Gruin
Title: Member

[Seal]

Reviewed By

XRoads
Date: 7/13/06

SCHEDULE OF EXHIBITS:

Exhibit A - Legal Description of Property
Exhibit B - Schedule of Permitted Encumbrances

Real Estate Purchase Agreement
Winn-Dixie Montgomery Inc. S/T BH Properties, LLC
Store #2701 – Stockbridge, Georgia
April 5, 2006
SGRJAX\82357.2

The undersigned, Escrow Agent, hereby consents and joins in the execution of this Real Estate Purchase Agreement for the limited purposes stated herein.

**SMITH, GAMBRELL & RUSSELL, LLP**

By: _____
Name: Douglas G. Stanford
Title: Partner

Dated: April __12__ 2006

## EXHIBIT A

### LEGAL DESCRIPTION OF PROPERTY

TRACT A

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 24 & 25 OF THE 12TH DISTRICT, HENRY COUNTY, GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF THE MITERED CORNER OF THE INTERSECTION OF THE NORTHERLY SIDE OF THE RIGHT-OF-WAY ALONG WALT STEPHENS ROAD (130 FOOT RIGHT-OF-WAY ) AND THE EASTERLY SIDE OF THE RIGHT OF WAY ALONG SPEER ROAD (80 FOOT RIGHT-OF-WAY) THENCE CONTINUE ALONG THE MITER BETWEEN THE NORTHERLY SIDE OF THE RIGHT-OF-WAY ALONG WALT STEPHENS ROAD (130 FOOT   RIGHT-OF-WAY) AND THE EASTERLY SIDE OF THE RIGHT-OF-WAY ALONG SPEER ROAD (80 FOOT RIGHT-OF-WAY) NORTH 45 DEGREES 21 MINUTES 45 SECONDS WEST A DISTANCE OF 67.54 FEET TO A POINT ON THE NORTHERLY SIDE OF THE MITERED CORNER OF THE INTERSECTION OF THE NORTHERLY SIDE OF THE RIGHT-OF-WAY ALONG WALT STEPHENS ROAD (130 FOOT RIGHT-OF-WAY) AND THE EASTERLY SIDE OF THE RIGHT-OF-WAY ALONG SPEER ROAD (80 FOOT RIGHT-OF-WAY);

THENCE LEAVE SAID MITERED CORNER BETWEEN THE NORTHERLY SIDE OF THE RIGHT-OF-WAY ALONG WALT STEPHENS ROAD (130 FOOT RIGHT-OF-WAY) AND THE EASTERLY SIDE OF THE RIGHT-OF-WAY ALONG SPEER ROAD (80 FOOT RIGHT-OF-WAY) AND CONTINUE ALONG THE EASTERLY SIDE OF THE RIGHT-OF-WAY ALONG SPEER ROAD (80 FOOT RIGHT-OF-WAY) NORTH 12 DEGREES 57 MINUTES 24 SECONDS WEST A DISTANCE OF 207.98 FEET TO A #4 REBAR FOUND;

THENCE CONTINUE ALONG THE EASTERLY SIDE OF THE RIGHT-OF-WAY ALONG SPEER ROAD (80 FOOT RIGHT-OF-WAY) NORTH 13 DEGREES 21 MINUTES 18 SECONDS WEST A DISTANCE OF 190.43 FEET TO A POINT;

THENCE CONTINUE ALONG THE EASTERLY SIDE OF THE RIGHT-OF-WAY ALONG SPEER ROAD (80 FOOT RIGHT-OF-WAY) ALONG THE ARC OF A CURVE TO THE RIGHT (SAID CURVE HAVING A RADIUS OF 26,887.81 FEET AND BEING SUBTENDED BY A CHORD BEARING NORTH 11 DEGREES 31 MINUTES 32 SECONDS WEST AND HAVING A CHORD DISTANCE OF 276.18 FEET) AN ARC DISTANCE OF 276.18 FEET TO A ½ INCH OPEN TOP PIPE SET;

THENCE LEAVE THE EASTERLY SIDE OF THE RIGHT-OF-WAY ALONG SPEER ROAD (80 FOOT RIGHT-OF-WAY) AND CONTINUE NORTH 74 DEGREES 25 MINUTES 40 SECONDS EAST A DISTANCE OF 391.80 FEET TO A ½ INCH OPEN TOP PIPE SET;

THENCE CONTINUE SOUTH 70 DEGREES 59 MINUTES 16 SECONDS EAST A DISTANCE OF 355.65 FEET TO A ½ INCH OPEN TOP PIPE SET;

THENCE CONTINUE SOUTH 11 DEGREES 28 MINUTES 08 SECONDS EAST A DISTANCE OF 336.09 FEET TO A ½ INCH OPEN TOP PIPE SET;

THENCE CONTINUE SOUTH 19 DEGREES 10 MINUTES 24 SECONDS WEST A DISTANCE OF 507.27 FEET TO A ½ INCH OPEN TOP PIPE SET, SAID ½ INCH OPEN TOP PIPE SET BEING LOCATED ALONG THE NORTHERLY SIDE OF THE RIGHT-OF-WAY ALONG WALT STEPHENS ROAD (130 FOOT RIGHT-OF-WAY);

THENCE CONTINUE ALONG THE NORTHERLY SIDE OF THE RIGHT-OF-WAY ALONG WALT STEPHENS ROAD (130 FOOT RIGHT-OF-WAY) NORTH 73 DEGREES 11 MINUTES 51 SECONDS WEST A DISTANCE OF 271.07 FEET TO A CONCRETE MONUMENT FOUND;

THENCE CONTINUE ALONG THE NORTHERLY SIDE OF THE RIGHT-OF-WAY ALONG WALT STEPHENS ROAD (130 FOOT RIGHT-OF-WAY) NORTH 77 DEGREES 46 MINUTES 05 SECONDS WEST A DISTANCE OF 164.27 FEET TO A POINT LOCATED AT THE SOUTHERLY

SIDE OF THE MITERED CORNER OF THE INTERSECTION OF THE NORTHERLY SIDE OF THE RIGHT-OF-WAY ALONG WALT STEPHENS ROAD (130 FOOT RIGHT-OF-WAY) AND THE EASTERLY SIDE OF THE RIGHT-OF-WAY ALONG SPEER ROAD (80 FOOT RIGHT-OF-WAY) AND SAID POINT ALSO MARKING THE POINT OF BEGINNING.

**TOGETHER WITH:**

TRACT B

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 24 & 25 OF THE 12TH DISTRICT, CITY OF STOCKBRIDGE, HENRY COUNTY, GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF THE MITERED CORNER AT THE INTERSECTION OF THE NORTHERLY RIGHT-OF-WAY OF WALT STEPHENS ROAD (130 FOOT RIGHT-OF-WAY) AND THE EASTERLY RIGHT-OF-WAY OF SPEER ROAD (80 FOOT RIGHT-OF-WAY),
THENCE NORTH 45 DEGREES 21 MINUTES 45 SECONDS WEST A DISTANCE OF 67.54 FEET TO A POINT ON THE NORTHERLY SIDE OF SAID MITERED CORNER AND THE EASTERLY RIGHT-OF-WAY OF SPEER ROAD;
THENCE CONTINUE ALONG THE EASTERLY RIGHT-OF-WAY OF SPEER ROAD NORTH 12 DEGREES 57 MINUTES 24 SECONDS WEST A DISTANCE OF 207.98 FEET TO A #4 REBAR FOUND;
THENCE CONTINUE ALONG THE EASTERLY RIGHT-OF-WAY OF SPEER ROAD NORTH 13 DEGREES 21 MINUTES 18 SECONDS WEST A DISTANCE OF 190.43 FEET TO A POINT OF CURVATURE;
THENCE CONTINUE ALONG THE ARC OF CURVATURE TO THE RIGHT AN ARC DISTANCE OF 33.10 FEET, (SAID CURVE HAVING A RADIUS OF 26,887.81 FEET AND BEING SUBTENDED BY A CHORD BEARING NORTH 11 DEGREES 47 MINUTES 04 SECONDS WEST AND HAVING A CHORD DISTANCE OF 33.10 FEET) TO THE TRUE POINT OF BEGINNING.
THENCE CONTINUE ALONG SAID CURVE TO THE RIGHT AN ARC DISTANCE OF 178.90 FEET (SAID CURVE BEING SUBTENDED BY A CHORD BEARING NORTH 13 DEGREES 33 MINUTES 31 SECONDS WEST AND HAVING A CHORD DISTANCE OF 178.90 FEET) TO A POINT;
THENCE LEAVING SAID RIGHT-OF-WAY NORTH 74 DEGREES 25 MINUTES 40 SECONDS EAST A DISTANCE OF 304.86 FEET TO A POINT;
THENCE SOUTH 43 DEGREES 16 MINUTES 48 SECONDS EAST A DISTANCE OF 44.27 FEET TO A POINT; THENCE SOUTH 19 DEGREES 00 MINUTES 44 SECONDS WEST A DISTANCE OF 217.51 FEET TO A POINT; THENCE SOUTH 52 DEGREES 51 MINUTES 59 SECONDS WEST A DISTANCE OF 50.14 FEET TO A POINT; THENCE SOUTH 85 DEGREES 42 MINUTES 09 SECONDS WEST A DISTANCE OF 51.54 FEET TO A POINT; THENCE NORTH 70 DEGREES 59 MINUTES 16 SECONDS WEST A DISTANCE OF 81.40 FEET TO A POINT; THENCE SOUTH 76 DEGREES 38 MINUTES 43 SECONDS WEST A DISTANCE OF 50.34 FEET TO THE TRUE POINT OF BEGINNING.
SAID TRACT OF LAND CONTAINING 10.607 ACRES AND BEING MORE FULLY SHOWN AS TRACT "A" ON AN ALTA/ACSM LAND TITLE SURVEY FOR SUNBELT-DIX, INC., WINN-DIXIE ATLANTA, INC., WINN-DIXIE STORES, INC., FIRST UNION NATIONAL BANK, AS AGENT, FIRST SECURITY BANK, NATIONAL ASSOCIATION, AS OWNER TRUSTEE UNDER THE DIXON REALTY TRUST 1999-1, LEBOEUF, LAMB, GREENE & MACRAE, L.L.P. & FIRST AMERICAN TITLE INSURANCE COMPANY, BY BARTON SURVEYING, INC. , BEARING THE CERTIFICATION AND SEAL OF DAVID BARTON, GEORGIA REGISTERED LAND SURVEYOR NO. 2533, DATED JUNE 22, 1999, LAST REVISED JUNE 29, 1999.
TOGETHER WITH EASEMENTS CONTAINED IN THAT CERTAIN DECLARATION OF RECIPROCAL EASEMENTS AND RESTRICTIVE COVENANTS DATED OF EVEN DATE HEREWITH

BETWEEN SUNBELT-DIX, INC. AND WINN-DIXIE ATLANTA, INC., RECORDED OR TO BE RECORDED IN THE PUBLIC RECORDS OF HENRY COUNTY, GEORGIA.

TOGETHER WILL ALL RIGHTS AND EASEMENTS CONTAINED IN THAT CERTAIN RECIPROCAL EASEMENT AND RESTRICTIVE COVENANT AGREEMENT BY AND BETWEEN SUNBELT-DIX, INC. AND WALT STEPHENS ASSOCIATES, LLC, DATED SEPTEMBER 30, 1998, RECORDED WITH THE OFFICE OF THE CLERK OF THE SUPERIOR COURT OF HENRY COUNTY, GEORGIA IN DEED BOOK 3190, PAGE 167.

## **EXHIBIT B**

### SCHEDULE OF PERMITTED ENCUMBRANCES

1. All taxes for the year 2006 and subsequent years which are liens not yet due and payable

2. Easement from Mrs. R. L. Smith to Georgia Power Company, dated March 8, 1939, filed April 7, 1939, and recorded in <u>Deed Book 31, Page 88</u>, records of the Superior Court of Henry County, Georgia.

3. Right-of-Way Easement from Mrs. Cornelia Thogmartin to American Telephone and Telegraph Company of Georgia, dated May 12, 1941, filed April 22, 1942, and recorded in <u>Deed Book 33, Page 423</u>, aforesaid records; as transferred by Indenture from American Telephone and Telegraph Company of Georgia to Southern Bell Telephone and Telegraph Company, dated October 14, 1976, filed January 24, 1977, and recorded in <u>Deed Book 289, Page 187</u>, aforesaid records.

4. Easement from Rosa Lee Smith to Georgia Power Company, dated July 28, 1947, filed November 21, 1947, and recorded in <u>Deed Book 39, Page 27</u>, aforesaid records.

5. Easement for Right-of-Way from Jonesboro Dev. Co., to Georgia Power Company, dated November 7, 1950, filed December 2, 1950, and recorded in <u>Deed Book 43, Page 363</u>, aforesaid records.

6. Right-of-Way Deed from Alan Kemper to Henry County, Georgia, dated May 1, 1984, filed January 4, 1985, and recorded in <u>Deed Book 608, Page 319</u>, aforesaid records.

7. Reciprocal Easement and Restrictive Covenant Agreement by and between Walt Stephens Associates, LLC, a Georgia limited liability company, Bill Mabros and Milly Mabros and Sunbelt-Dix, Inc., as Delaware corporation, dated September 30, 1998, filed February 9, 1999, and recorded in <u>Deed Book 3190, Page 167</u>, aforesaid records.

8. Declaration of Reciprocal Easements and Restrictive Covenants by Sunbelt-Dix, Inc., a Delaware corporation , and Winn-Dixie Atlanta, Inc., a Florida corporation, dated July 29, 1999, filed August 11, 1999, and recorded in <u>Deed Book 3406, Page 65</u>, aforesaid records.

**AMENDMENT TO**
**REAL ESTATE PURCHASE AGREEMENT**

**THIS AMENDMENT TO REAL ESTATE PURCHASE AGREEMENT** (this "Amendment") is made effective as of May 1, 2006, by and between **WINN-DIXIE RALEIGH, INC.**, a Florida corporation ("Seller") and **BH PROPERTIES, LLC,** a California limited liability company ("Buyer").

**RECITALS:**

A.      Seller and Buyer are parties to that certain Real Estate Purchase Agreement (the "Agreement") dated effective April 18, 2006 ("Effective Date"), pursuant to which Seller has agreed to sell to Buyer the Property described therein located in Henry County, Georgia.

B.      The Agreement provided Buyer with a period commencing on the Effective Date and expiring at 5:00 p.m. on that date which is 15 days after the receipt of all Property Reports, Title Commitment and Survey (the "Investigation Period"), in which to investigate and inspect the Property to determine whether or not the same is satisfactory to Buyer.

C.      Buyer has requested to change the Effective Date to a later date to correspond to the date of Buyer's receipt of the updated Title Commitment on May 1, 2006.

D.      Seller and Buyer desire to amend the Agreement and enter into this Amendment for the purpose of evidencing such extension.

**IN CONSIDERATION OF** $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Investigation Period.   The first sentence of Paragraph 3(c)(i) of the Agreement is amended as follows:

> "Buyer will have a period commencing on May 1, 2006 and expiring at 5:00 p.m. on May 15, 2006, in which to investigate and inspect the Property to determine whether or not the same is satisfactory to Buyer (the "Investigation Period")".

2.      Miscellaneous.   Except as expressly provided in this Amendment, the Agreement shall continue in full force and effect as written; provided, however, that in the event of any inconsistencies between this Amendment and the Agreement, the provisions of this Amendment shall be controlling.  Capitalized terms used in this Amendment without definition have the meanings assigned to such terms in the Agreement.

**IN WITNESS WHEREOF,** Seller and Buyer have executed this Amendment as of the date first above written.

Witnesses:

**SELLER:**

**WINN-DIXIE RALEIGH, INC.,** a
Florida corporation

Name: ~~REBECCA L. SAWYER~~

By: _____
Name: ~~Bennett L. Nussbaum~~
Title: Vice President

Name: LAURA L. ANDREWS

[CORPORATE SEAL]

LEGAL APPROVED
ATTY: _CBₑ_
DATE: 5-3-06

**BUYER:**

**BH PROPERTIES, LLC,** a California
limited liability company

By: _____
Name: _____
Title: _____

Name: _____

Name: _____

[SEAL]

Reviewed By
_____
XRoads
Date: _____

2

**IN WITNESS WHEREOF,** Seller and Buyer have executed this Amendment as of the date first above written.

Witnesses:

**SELLER:**

**WINN-DIXIE RALEIGH, INC.,** a Florida corporation

Name:_____

By:_____
Name:_____
Title: Vice President

Name:_____

[CORPORATE SEAL]

**BUYER:**

**BH PROPERTIES, LLC,** a California limited liability company

Name: _____STEVEN JAFFE_____

By:_____
Name:____ARShAN BOZINI____
Title:____member____

Name: _Steven Heller_____

[SEAL]

2

The undersigned, Escrow Agent, hereby acknowledges the foregoing Amendment to Real Estate Purchase Agreement as to the particular provisions affecting Escrow Agent's duties and responsibilities under the Real Estate Purchase Agreement.

**Smith, Gambrell & Russell, LLP**

By: _____
Name: _____ DOUGLAS G. STANFORD
Title: _____

Dated: May ___, 2006

3

## SECOND AMENDMENT TO
## REAL ESTATE PURCHASE AGREEMENT

**THIS SECOND AMENDMENT TO REAL ESTATE PURCHASE AGREEMENT** (this "Second Amendment") is made effective as of May 12, 2006, by and between **WINN-DIXIE RALEIGH, INC.**, a Florida corporation ("Seller") and **BH PROPERTIES, LLC**, a California limited liability company ("Buyer").

### RECITALS:

A.    Seller and Buyer are parties to that certain Real Estate Purchase Agreement (the "Agreement") dated effective April 18, 2006, as amended May 1, 2006 ("Effective Date"), pursuant to which Seller has agreed to sell to Buyer the Property described therein located in Henry County, Georgia.

B.    The Agreement provided that Buyer will have a period commencing on May 1, 2006 and expiring at 5:00 p.m. on May 15, 2006, in which to investigate and inspect the Property to determine whether or not the same is satisfactory to Buyer (the "Investigation Period").

C.    Buyer has requested an extension of the Investigation Period to May 19, 2006, and Seller has agreed to grant that extension.

D.    Seller and Buyer desire to amend the Agreement and enter into this Second Amendment for the purpose of evidencing such extension.

**IN CONSIDERATION OF** $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Investigation Period.   The first sentence of Paragraph 3(c)(i) of the Agreement is amended as follows:

"Buyer will have a period commencing on May 1, 2006 and expiring at 5:00 p.m. EDST on May 19, 2006, in which to investigate and inspect the Property to determine whether or not the same is satisfactory to Buyer (the "Investigation Period")".

2.    Miscellaneous.   Except as expressly provided in this Second Amendment, the Agreement shall continue in full force and effect as written; provided, however, that in the event of any inconsistencies between this Second Amendment and the Agreement, the provisions of this Second Amendment shall be controlling. Capitalized terms used in this Second Amendment without definition have the meanings assigned to such terms in the Agreement.

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Second Amendment as of the date first above written.

Witnesses:

**SELLER:**

**WINN-DIXIE RALEIGH, INC.,** a Florida corporation

_Susan Magaddino_
Name: __SUSAN MAGADDINO__

By: _____
Name: __Bennett L. Nussbaum__
Title: Vice President

_Rebecca L. Sawyer_
Name: __REBECCA L. SAWYER__

[CORPORATE SEAL]

Reviewed By

LEGAL APPROVED
ATTY: _____
DATE: _5/10/06_

XRoads
Date: _____

**BUYER:**

**BH PROPERTIES, LLC,** a California limited liability company

Name: _____

By: _____
Name: _____
Title: _____

Name: _____

[SEAL]

2

**IN WITNESS WHEREOF,** Seller and Buyer have executed this Second Amendment as of the date first above written.

Witnesses:

**SELLER:**

**WINN-DIXIE RALEIGH, INC.,** a
Florida corporation

Name:_____

By:_____
Name:_____
Title: Vice President

Name:_____

[CORPORATE SEAL]

**BUYER:**

**BH PROPERTIES, LLC,** a California
limited liability company

Name:_____ STEVEN JAFFE _____

By:_____
Name:_____ _____
Title:_____ MEMBER _____

Name:_____ STEVEN HELLER _____

[SEAL]

2

The undersigned, Escrow Agent, hereby acknowledges the foregoing Second Amendment to Real Estate Purchase Agreement as to the particular provisions affecting Escrow Agent's duties and responsibilities under the Real Estate Purchase Agreement.

**Smith, Gambrell & Russell, LLP**

By: _____

Name: Douglas G. Stanford
Title: Partner
Dated: May 12, 2006

3

### THIRD AMENDMENT TO
### REAL ESTATE PURCHASE AGREEMENT

**THIS THIRD AMENDMENT TO REAL ESTATE PURCHASE AGREEMENT** (this "Third Amendment") is made effective as of May 23, 2006, by and between **WINN-DIXIE RALEIGH, INC.,** a Florida corporation ("Seller") and **BH PROPERTIES, LLC,** a California limited liability company ("Buyer").

### RECITALS:

A.    Seller and Buyer are parties to that certain Real Estate Purchase Agreement (the "Agreement") dated effective April 18, 2006, as amended from time to time ("Effective Date"), pursuant to which Seller has agreed to sell to Buyer the Property described therein located in Henry County, Georgia.

B.    Seller and Buyer desire to amend the Agreement and enter into this Third Amendment for the purpose of evidencing such extension.

**IN CONSIDERATION OF** $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Purchase Price.  The first sentence of Paragraph 2 of the Agreement is amended as follows:

"In consideration of the conveyance of the Property to Buyer, Buyer will pay to Seller the sum of $2,000,000 (the "Purchase Price"), payable as follows:".

2.    Overbid Protection.  Paragraph 6(a)(ii) of the Agreement is amended as follows:

"Seller agrees, subject to Bankruptcy Court approval, that the initial minimum overbid that may be accepted by Seller in the competitive bid process will have a value of at least $2,060,000 (three percent (3%) higher than the Purchase Price)."

3.    Break-up Fee.  Paragraph 6(c) of the Agreement is amended as follows:

"If Buyer is not the Successful Bidder and Buyer has not breached this Agreement, upon Closing of the sale of the Property to the Successful Bidder, Seller shall pay to Buyer the sum of $40,000 (three percent (2%) of the Purchase Price) as an agreed-upon fee for Buyer's costs and expenses related to entering into this Agreement (the "Break-up Fee")."

4.    Miscellaneous.    Except as expressly provided in this Third Amendment, the Agreement shall continue in full force and effect as written; provided, however, that in the event of any inconsistencies between this Third Amendment and the Agreement, the provisions of this Third Amendment shall be controlling. Capitalized terms used in this Third Amendment without definition have the meanings assigned to such terms in the Agreement.

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Third Amendment as of the date first above written.

Witnesses:

SELLER:

**WINN-DIXIE RALEIGH, INC.,** a Florida corporation

By: _____

Name: _____

Name: __Bennett L. Nussbaum__

Name: _____

Title: Vice President

Name: __Pamela Brown__

[CORPORATE SEAL]

BUYER:

**BH PROPERTIES, LLC,** a California limited liability company

By: _____

Name: __STEVEN JAFFE__

Name: __ALSHAN GOZINI__

Name: __HEIDI KROUTZ__

Title: __MEMBER__

[SEAL]

2

Reviewed By

XRoads Date:

LEGAL APPROVED
ATTY: CBI
DATE: 5/24/06

Real Estate Purchase Agreement – Third Amendment
Stockbridge/Store #2701
Winn-Dixie Raleigh, Inc. S/T BH Properties, LLC
May 23, 2006
SGRJAX/84842.1

The undersigned, Escrow Agent, hereby acknowledges the foregoing Third Amendment to Real Estate Purchase Agreement as to the particular provisions affecting Escrow Agent's duties and responsibilities under the Real Estate Purchase Agreement.

**Smith, Gambrell & Russell, LLP**

By: _____

Name: Douglas G. Stanford
Title: Partner
Dated: May 24, 2006

3

**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No.  05-03817-3F1 |
| WINN-DIXIE STORES, INC., et al., | ) | *Chapter 11* |
| Debtors. | ) | Jointly Administered |

### ORDER (A) AUTHORIZING WINN-DIXIE RALEIGH, INC. TO SELL STOCKBRIDGE CLOSED STORE AND RELATED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS AND (B) GRANTING RELATED RELIEF

These cases came before the Court upon the motion of Winn-Dixie Stores, Inc. and twenty-three of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors"), for an order under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 6004 (a) authorizing Winn-Dixie Raleigh, Inc. ("WD Raleigh") to sell the Stockbridge Property, together with all related appurtenances, rights, easements, rights-of-way, tenements and hereditaments, to BH Properties, LLC, a California limited liability company, its permitted successors and/or assigns (the "Purchaser") or to the party submitting a higher or otherwise better offer, free and clear of liens, claims, interests and encumbrances, and (b) granting related relief (the "Motion").[1]  A hearing on the Motion was held by the Court on June 15, 2006 (the "Sale Hearing").   The Court has read the

---

[1]     All capitalized terms not otherwise defined by this Order shall have the meaning ascribed to them in the Motion or the Purchase Agreement.

Motion and has considered the representations of counsel. Upon the representations of counsel and without objection by the United States Trustee or any other interested party, the Court makes the following findings of fact:

A.   This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

B.   The Debtors solicited the highest or otherwise best offer for the Assets described in the Purchase Agreement (the "Assets") in accordance with bidding procedures approved by order of the Court (Docket No. 1801) dated June 20, 2005 (the "Bidding Procedures Order").

C.   The Debtors have provided interested parties (including all parties asserting claims or interests in, to or against the Assets, if any) with proper notice of the Motion, the Auction, the Sale Hearing and the transactions contemplated by the Sale pursuant to 11 U.S.C. §§ 102(1), 105(a), 363 and Fed. R. Bankr. P. 2002 and 6004 and Local Rule 2002-1, the Bidding Procedures Order and the notice procedures order, approved by order of the Court (Docket No. 254) dated March 4, 2005 (the "Notice Procedures Order").

D.   A reasonable opportunity to object or be heard with respect to the Motion and the sale of the Assets has been afforded to all parties in interest (including all third parties asserting Interests or Claims, as such terms are defined below, in, to or against the Assets, if any).

2

E.    The Debtors marketed the Assets and conducted the Auction process in compliance with the Bidding Procedures Order. The bidding on the Assets and the Auction (if any) were conducted in a non-collusive, fair and good faith manner. Through the Debtors' marketing efforts and Auction process, the Debtors afforded all interested parties a reasonable opportunity to make higher or betters offers to purchase the Assets.

F.    WD Raleigh (i) has full corporate power and authority to execute and consummate the Purchase Agreement attached as Exhibit A to this Order and all related documents, and the sale of the Assets has been duly and validly authorized by all necessary corporate action of the applicable Debtors and (ii) no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required to consummate the transactions contemplated by the Purchase Agreement.

G.    The Debtors have good business reasons to sell the Assets prior to filing a plan of reorganization pursuant to 11 U.S.C. § 363(b).

H.    Neither Purchaser nor any of its affiliates is an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101.

I.    The Purchase Agreement was proposed, negotiated and entered into by WD Raleigh and the Purchaser without collusion, in good faith and at arms'-length bargaining positions. Neither the Debtors nor the Purchaser have

engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under 11 U.S.C. § 363(n).

J.     The Purchaser is a good faith purchaser within the meaning of 11 U.S.C. § 363(m).

K.     The consideration being provided by the Purchaser to the Debtors for the Assets (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Assets, and (iii) constitutes reasonably equivalent value and fair consideration for the Assets.

L.     WD Raleigh's transfer of the Assets to the Purchaser pursuant to the Purchase Agreement will be a legal, valid, and effective transfer of the Assets, and will vest the Purchaser with good and valid title in and to the Assets free and clear of any lien, interest or encumbrance of any kind or nature (collectively, the "Interests") and claim (as such term is defined in 11 U.S.C. § 101(5)) ("Claims") with the exception of the Permitted Encumbrances, as defined in the Purchase Agreement.

M.     WD Raleigh may sell and transfer the Assets free and clear of all Interests and Claims (other than the Permitted Encumbrances) because any entity with any Interests or Claims, if any, in the Assets to be transferred (i) has consented to the sale, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest, or (iii) otherwise falls within the provisions of 11 U.S.C. § 363(f) and, therefore, in each case, one or more of the

4

standards set forth in 11 U.S.C. § 363(f)(1)-(5) has been satisfied. Holders of Interests and Claims, if any, who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2).

N.      The Debtors will cause the proceeds from the Sale to be paid in accordance with the terms of the Final Order Pursuant to Sections 105, 361, 362, 363, 364(c) and 364(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing Debtors to Obtain Secured Post-Petition Financing on a Superpriority Priming Lien Basis and Modifying the Automatic Stay, (II) Authorizing Debtors to Use Pre-Petition Secured Lenders' Cash Collateral and Granting Adequate Protection, and (III) Authorizing the Repayment in Full of all Claims of Debtors' Pre-Petition Secured Lenders, dated March 23, 2005 (the "Final Financing Order"), and the Loan Documents (as defined in the Final Financing Order).

O.      The Court's approval of the Purchase Agreement and the sale of the Assets to the Purchaser are in the best interests of the Debtors, their estates, their creditors and other parties in interest. Accordingly, it is

ORDERED AND ADJUDGED THAT:

1.      The Motion is granted.

2.      Any objections to the entry of this Order or to the relief granted and requested in the Motion that have not been withdrawn, waived or settled are denied and overruled on the merits.

3.      The terms and conditions of the Purchase Agreement are approved. Pursuant to 11 U.S.C. §§ 105(a), 363(b) and this Order, the Debtors are authorized to consummate the Sale in accordance with the terms and conditions of the Purchase Agreement.

4.      WD Raleigh is authorized to consummate and implement fully the Purchase Agreement, together with all additional instruments and documents that may be necessary to implement the Purchase Agreement, and the Debtors are authorized to take all further actions as may reasonably be necessary or appropriate for the purpose of conveying the Assets to the Purchaser, or as may be necessary or appropriate to the performance of the Debtors' obligations under the Purchase Agreement.

5.      Any agreements, documents, or other instruments executed in connection with the Purchase Agreement may be modified, amended, or supplemented by the parties without further order of the Court; provided, however, that (a) the Debtors will first obtain the prior written consent of (i) the DIP Lender and (ii) the Creditors' Committee, which consent will not be unreasonably withheld, and (b) any such modification, amendment or supplement does not have a materially adverse effect on the Debtors' estates.

6.      WD Raleigh will transfer the Assets to the Purchaser upon Closing free and clear of all Interests and Claims (except for the Permitted Encumbrances). The only Claims and/or Interests in the Assets are those with the

DIP Lender. The senior liens and superpriority administrative Claims and/or Interests of the DIP Lender will attach to the proceeds from the Sale in accordance with the Final Financing Order and the Loan Documents (as defined in the Final Financing Order).

7.     WD Raleigh's transfer of the Assets to the Purchaser is a legal, valid, and effective transfer of the Assets and will vest the Purchaser with all right, title and interest of WD Raleigh in and to the Assets, free and clear of all Interests and Claims (except for the Permitted Encumbrances).

8.     The Debtors will cause the net proceeds from the Sale to be paid to the DIP Lender to the extent required in accordance with the terms of the Final Financing Order and the Loan Documents.

9.     The consideration provided by the Purchaser for the Assets constitutes reasonably equivalent value and fair and reasonable consideration under the Bankruptcy Code and applicable non-bankruptcy law, and may not be avoided under 11 U.S.C. § 363(n).

10.     Upon Closing of the Sale in accordance with the Purchase Agreement and this Order, the Purchaser is deemed to have acted in good faith in purchasing the Assets, as that term is used in 11 U.S.C § 363(m). Accordingly, the reversal or modification on appeal of the authorization to consummate the Sale of the Assets will not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.

11.    All entities that are presently in possession of some or all of the Assets are directed to surrender possession of the Assets to the Debtors. Each of the Debtors' creditors is authorized and directed to execute any and all documents and take all other actions as may be necessary to release its Interests in and Claims against the Assets (except for the Permitted Encumbrances) (provided that the taking of such actions do not require such creditor to incur any material costs) as such Interests and Claims may have been recorded or may otherwise exist. In the event any creditor fails to release its Interests in or Claims against the Assets, the Debtors are authorized to file or record a copy of this Order. Once filed, registered or otherwise recorded, this Order will constitute conclusive evidence of the release of all Interests in and Claims against the Assets (except for the Permitted Encumbrances).

12.    WD Raleigh's transfer of the Assets to the Purchaser will not result in (a) the Purchaser having any liability for any Claim and/or Interest (except for the Permitted Encumbrances) against the Debtors or against an insider of the Debtors or (b) the Purchaser having any liability to the Debtors except as expressly stated in the Purchase Agreement and this Order.

13.    Other than the Permitted Encumbrances and other obligations of the Purchaser as set forth in the Purchase Agreement and this Order, the Purchaser (and its affiliates, successors or assigns) will have no responsibility for any liability of the Debtors arising under or related to the Assets. WD Raleigh's

8

transfer of the Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Assets), to any liability for Claims and/or Interests against the Debtors or the Assets by reason of such transfer under the laws of the United States or any state or territory.

14.     This Order is effective as a determination that any and all Interests or Claims are, without further action by any person or entity, unconditionally released, discharged and terminated with respect to the Assets.

15.     Upon Closing, this Order will constitute a complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to the Purchaser. Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

16.     This Order is binding in all respects upon, and inures to the benefit of, the Debtors, their estates and creditors, the Purchaser and its respective affiliates, successors and assigns, and this Order is binding in all respects upon all persons asserting an Interest in or Claim against the Debtors' estates or the Assets. The Sale is enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any chapter 7 or chapter 11 trustee of the Debtors and their estates.

17.    During the pendency of the Debtors' jointly administered cases, this Court will retain exclusive jurisdiction to (a) enforce and implement the Purchase Agreement and any agreements and instruments executed in connection with the Purchase Agreement, (b) compel delivery of possession of the Assets to the Purchaser, (c) resolve any disputes, controversies or claims arising out of or relating to the Purchase Agreement and (d) interpret, implement, and enforce the provisions of this Order.

18.    All persons and entities that hold Interests in or Claims against the Debtors or the Assets are forever barred, estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, successors or assigns or any of their respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale of the Assets.

19.    Nothing contained in any plan of reorganization or liquidation confirmed in these chapter 11 cases, or any order of this Court confirming such a plan, or any other order entered in these chapter 11 cases or in any subsequent chapter 7 cases will conflict with or derogate from the terms of this Order.

20.    The failure specifically to include any particular provision of the Purchase Agreement in this Order will not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

21.    After the Closing, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Assets, or (b) collect or attempt to collect from the Purchaser or any of its affiliates any tax (or other amount alleged to be owing by one or more of the Debtors) (i) on account of or relating to any Interests or Claims or (ii) for any period commencing before and concluding prior to or on Closing or any pre-Closing portion of any period commencing before the Closing and concluding after the Closing, or (iii) assessed prior to and payable after Closing, except as otherwise provided in the Purchase Agreement.  No bulk sales law or any similar law of any state or other jurisdiction applies in any way to any of the transactions under the Purchase Agreement.

22.    To the extent of any inconsistency between the provisions of any agreements, documents, or other instruments executed in connection with the Purchase Agreement and this Order, the provisions contained in this Order will control.

23.   Notwithstanding Fed. R. Bankr. P. 6004(g), this Order will take effect immediately upon entry.

Dated this ___ day of June 2006 in Jacksonville, Florida.

_____
Jerry A. Funk
United States Bankruptcy Judge

Cynthia C. Jackson is directed
to serve a copy of this Order
on all persons served with
the Motion.

00532827